# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**ELOUISE PEPION COBELL, et al.,**    )
                                        )

               **Plaintiffs,**    )
                                          )

          **v.**           )      **Civil Action Number 96-1285 (RCL)**
                                          )

**GALE A. NORTON, Secretary of the**    )
**Interior, et al.,**                    )
                                          )

            **Defendants.**    )
_____)

**FILED**

SEP 17 2002

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

## MEMORANDUM OPINION

    This matter comes before the Court after a twenty-nine day bench trial to determine whether defendants Gale Norton, Secretary of the Interior, and Neal McCaleb, Assistant Secretary of Interior for Indian Affairs, should be held in civil contempt of court. After carefully reviewing of all the evidence presented and representations made at trial, the record in this case, and the applicable law, the Court finds that these defendants are in civil contempt of court. The Court's findings of fact and conclusions of law are detailed below.

## I.   INTRODUCTION

    The Department of Interior's administration of the Individual Indian Money ("IIM") trust has served as the gold standard for mismanagement by the federal government for more than a century. As the trustee-delegate of the United States, the Secretary of Interior does not know the precise number of IIM trust accounts that she is to administer and protect, how much money is or should be in the trust, or even the proper balance for each individual account. Because of the Secretary's systemic failure as a trustee-delegate, the federal government regularly issues

1476

payments to beneficiaries–of their <u>own</u> money–in erroneous amounts.  In fact, the Interior

Department cannot provide an accurate accounting to the majority of the estimated 300,000 trust

beneficiaries, despite a clear statutory mandate and the century-old obligation to do so.  As the

Court observed more than two years ago, "[i]t is fiscal and governmental irresponsibility in its

purest form."  <u>Cobell v. Babbitt ("Cobell V")</u>, 91 F.Supp.2d 1, 6 (D.D.C. 1999).

Equally troubling is the manner in which the Department of Interior has conducted itself

during the course of this litigation.  In February of 1999, the Court held Bruce Babbitt, then-

Secretary of the Interior, and Kevin Gover, then-Assistant Secretary of Interior for Indian Affairs,

in civil contempt for violating two of this Court's discovery orders.  Among other things, the

Court found that almost immediately after proposing a clear and unambiguous order which the

Court signed, "the defendants disobeyed that order and successfully covered up their

disobedience through semantics and strained, unilateral, self-serving interpretations of their own

duties."  <u>Cobell v. Babbitt ("Cobell IV")</u>, 188 F.R.D. 122, 140 (D.D.C. 1999).  The defendants'

misconduct did not end there.  Since holding then-Secretary Babbitt and then-Assistant Secretary

Gover in contempt, the Court has had to sanction the Department of Interior for filing frivolous

motions, enter several temporary restraining orders to prevent the Department from taking

potentially adverse actions, and appoint both a Special Master (to oversee discovery) and a Court

Monitor (to review the defendants' trust related activities).  Moreover, there are several motions

currently pending before the Court regarding alleged misconduct by the Interior Department.  In

short, the Department of Interior has handled this litigation the same way that it has managed the

IIM trust–disgracefully.

The issue now before the Court is whether the Secretary of the Interior and the Assistant

Secretary of Interior for Indian Affairs should again be held in civil contempt of court.

Specifically, the Court ordered these two government officials to show cause why they should

not be held in civil contempt for: (1) failing to comply with the Court's Order of December 21,

1999, to initiate a Historical Accounting Project; (2) committing a fraud on the Court by

concealing the Department's true actions regarding the Historical Accounting Project during the

period from March 2000, until January 2001; (3) committing a fraud on the Court by failing to

disclose the true status of the TAAMS project between September 1999 and December 21, 1999;

(4) committing a fraud on the Court by filing false and misleading quarterly status reports starting

in March 2000, regarding TAAMS and BIA Data Cleanup; and (5) committing a fraud on the

Court by making false and misleading representations starting in March 2000, regarding

computer security of IIM trust data.  The Court will address each of these specifications below in

turn.

## II.   BACKGROUND

### A.   FACTUAL BACKGROUND[1]

1.   <u>History</u>

During the early 1800s, the United States' policy towards Native Americans–which

included entering into (and frequently violating) treaties as well as the use of force–led to the

removal and relocation of many tribes from the East and Midwest to unsettled lands in the West.

---

[1]The underlying facts of this case have already been detailed by both this Court, see, e.g., Cobell v. Babbitt ("Cobell I"), 30 F.Supp.2d 24, 27-29 (D.D.C. 1998), and the U.S. Court of Appeals for the D.C. Circuit ("D.C. Circuit"), see Cobell v. Norton ("Cobell VI"), 240 F.3d 1081, 1086-1092 (D.C. Cir. 2001).  In light of these decisions, the Court will only give a brief summary of the facts pertinent to the instant matter.

In the late 19th century, the United States' policy of relocation was replaced with a policy of assimilation. Under this new policy, the federal government allotted land that had been set aside for tribes to individual tribe members instead. The policy of assimilation was designed "to extinguish tribal sovereignty, erase reservation boundaries, and force assimilation of Indians into society at large." Yakima v. Yakima Indian Nation, 502 U.S. 251, 254 (1992).

The assimilationist policy, which began with individually negotiated treaties, became federal law when Congress passed the General Allotment Act of 1887, also known as the "Dawes Act." Under the Dawes Act,

> beneficial title of the allotted lands vested in the United States as trustee for individual Indians. The trust was to last for 25 years or more, at which point a fee patent would issue to the individual Indian allottee. During the trust period, individual accounts were to be set up for each Indian with a stake in the allotted lands, and the lands would be managed for the benefit of the individual allottees. Indians could not sell, lease, or otherwise burden their allotted lands without government approval. Where tribes resisted allotment, it could be imposed.

Cobell VI, 240 F.3d at 1087.

The United States' policy of assimilation and its allotment of tribal lands ended with the enactment of the Indian Reorganization Act of 1934 ("IRA"). Although the IRA provided that unallotted surplus Indian lands would be returned to tribal ownership, the statute did not disturb lands already allotted to individual Indians, and actually extended the trust period for allotted lands indefinitely. Thus, under the IRA the federal government maintained control of lands already allotted but not yet fee-patented, and accordingly retained its fiduciary obligations to administer the trust lands and funds arising therefrom for the benefit of individual Indian beneficiaries. These lands form the basis of the IIM trust accounts that are at the core of this

lawsuit.[2]

2.    Federal IIM Trust Responsibilities

There is no question that as a result of the allotments made from 1887-1934 and the

IRA's indefinite extension of the trust period, the United States has assumed the fiduciary

obligations of a trustee.  United States v. Mitchell ("Mitchell II"), 463 U.S. 206, 225 (1983)

(noting that "a fiduciary relationship necessarily arises when the Government assumes . . .

elaborate control over forests and property belonging to Indians.").  Although the United States

itself is the trustee of the IIM trust, under current law the Secretary of the Interior and the

Secretary of the Treasury are the designated trustee-delegates.  The failure of either Secretary to

perform his or her particular fiduciary responsibilities results in the United States breaching its

fiduciary obligations to the IIM trust beneficiaries.  Cobell VI, 240 F.3d at 1088.

Within the Department of Interior, several agencies have specific trust obligations.  These

agencies include, among others, Bureau of Indian Affairs ("BIA"), Office of Trust Fund

Management ("OTFM"), and Office of the Special Trustee ("OST").[3]  BIA is primarily

responsible for trust land management, including the approval of leases and land transfers, and

---

[2]Two later developments in the United States-Indian relationship are worth mentioning. In the early 1950s, the federal government switched course yet again by adopting the "termination policy." Under this policy, the federal government sought to terminate its relationship with the Indian tribes, and, specifically, sever the trust relationship. The termination policy was short lived, however, and was soon replaced with the current policy of "self-determination and self governance." The highlight of the current policy came in 1975 when Congress enacted the Indian Self-Determination and Education Assistance Act. That statute authorizes tribes to assume some of the management functions currently imposed on the Bureau of Indian Affairs ("BIA") and Office of Trust Fund Management ("OTFM").

[3]For a more extensive discussion of their responsibilities, see Cobell V, 91 F.Supp.2d at 9-12.

income collection.  The vast majority of transactions involving IIM trust lands must be approved

by BIA.  OTFM, in conjunction with the Treasury Department, deposits IIM land revenues,

maintains the individual IIM accounts, and ensures that money is distributed to IIM account

holders.  OST, which was created in 1994, oversees the IIM trust reform efforts.[4]

The Department of Interior and its subagencies have utterly failed to manage the IIM trust

in a manner consistent with the fiduciary obligations of a trustee-delegate.  The D.C. Circuit

succinctly noted this failure in February of last year when it wrote that:

> The federal government does not know the precise number of IIM trust accounts
> this it is to administer and protect.  At present, the Interior Department's system
> contains over 300,000 accounts covering an estimated 11 million acres, but the
> Department is unsure whether this is the proper number of accounts. . .[In fact,]
> [n]ot only does the Interior Department not know the proper number of accounts,
> it does not know the proper balances for each IIM account, nor does Interior have
> sufficient records to determine the value of IIM accounts . . . Current account
> reconciliation procedures are insufficient to ensure that existing account records,
> reported account balances, or payments to IIM beneficiaries are accurate. . . As a
> result, the government regularly issues payments to trust beneficiaries in
> erroneous amounts–from unreconciled accounts–some of which are known to
> have incorrect balances.

Cobell VI, 240 F.3d at 1089.

3.    The Indian Trust Fund Management Reform Act

Concern over the Department of Interior's management of the IIM trust is not a recent

development.  Since at least the mid-1980s there has been widespread disapproval of the manner

in which the Department of Interior has administered the IIM trust.  Time and again, however,

Department officials pledged to address these concerns.  Finally, in 1988, Congress began

---

[4]While most of the United States' fiduciary duties are performed by the Department of
Interior, the Treasury Department has significant trust responsibilities as well.  Specifically, the
Treasury Department maintains and invests IIM funds at the Interior Department's direction and
provides accounting and financial management services.

holding oversight hearings on the Interior Department's management of the IIM trust.  These

hearings resulted in the issuance of a report in 1992, entitled <u>Misplaced Trust: The Bureau of</u>

<u>Indian Affairs' Mismanagement of the Indian Trust Fund ("Misplaced Trust")</u>, which harshly

criticized the Department of Interior's handling of the IIM trust accounts.  Among other things,

the report found "significant, habitual problems in BIA's ability to fully and accurately account

for trust fund moneys, to properly discharge its fiduciary responsibilities, and to prudently

manage the trust funds."  Pls.' Ex. 55 at 3.

As a result of the findings made in <u>Misplaced Trust</u>, Congress passed the Indian Trust

Fund Management Reform Act in 1994 ("1994 Act").  The 1994 Act codified certain preexisting

trust duties that the United States owes to the IIM beneficiaries.[5]  In addition, the 1994 Act

identified some of the Secretary of Interior's duties to ensure "proper discharge of the trust

responsibilities of the United States." 25 U.S.C. § 162a(d).  Moreover, because Congress

recognized that the Interior Department's pattern of historic failures could not be allowed to

continue, the 1994 Act also created OST "to provide for more effective management of, and

accountability for the proper discharge of, the Secretary's trust responsibilities to Indian tribes

and individual Indians[.]" 25 U.S.C. § 4041(1).  OST is headed by the Special Trustee, a sub-

cabinet level officer who reports directly to the Secretary of the Interior.  Despite the "general

oversight" duties of the Special Trustee, ultimate decision-making power over the IIM trust

accounts remains with the Secretary of Interior.  25 U.S.C. § 4043(b)(1).

---

[5]It is worth noting that the 1994 Act did not create the government's IIM trust duties, but
rather explicitly acknowledged some of them.

4.    The High Level Implementation Plan

The 1994 Act requires the Special Trustee to develop a "comprehensive strategic plan"

for trust management reform and an appropriate reform timetable to ensure "proper and efficient

discharge of the Secretary's trust responsibilities." 25 U.S.C. § 4043(a)(1).  In accordance with

these obligations, the Special Trustee submitted a "strategic plan" to the Secretary of Interior and

Congress in April of 1997.  After reviewing the Special Trustee's strategic plan, the Secretary of

Interior issued his own plan in July of 1998, known as the High Level Implementation Plan

("HLIP").  The HLIP consisted of twelve "subprojects" which focused on ensuring the accuracy

of information regarding the IIM trust accounts and developing uniform policies and procedures

to guide trust management in the future.  The two subprojects that are particularly important to

the instant proceeding are Data Cleanup and Computer Systems.  Under the BIA portion of the

Data Cleanup subproject, the Interior Department sought to "have a level of data in the

[computer] system that allows for proper land title records and every allottee and every tribe to

receive the correct dollars that they're supposed to get." Phase I Trial Tr. at 2504.  As for the

Computer Systems subproject, the Department of Interior committed itself to the acquisition and

implementation of two new computer systems to help it better manage the IIM trust accounts.

The principal new computer system is known as the Trust Asset and Accounting Management

System ("TAAMS").  TAAMS, when implemented, is supposed to allow BIA to administer trust

assets, generate timely bills, identify delinquent payments, track income from trust assets, and

distribute proceeds to the appropriate account holders.

On March 1, 2000, the Department of Interior filed its Revised and Updated High Level

Implementation Plan with the Court.  Although the Revised HLIP was different than the original

in many respects, for purposes of the instant matter it is sufficient to note that it maintained subprojects regarding BIA Data Cleanup and TAAMS.  Since the Revised HLIP supplanted the original, it will be considered the HLIP for the remainder of this opinion.

## B.    PROCEDURAL HISTORY

The plaintiffs filed the instant action against the Secretary of the Interior and other federal officials on June 10, 1996, "to compel performance of trust obligations."  They alleged that the federal government's trustee-delegates, including the Secretary of Interior, breached (and continue to be in breach of) their fiduciary duty to plaintiffs by mismanaging IIM trust accounts. On February 4, 1997, this Court certified the named plaintiffs under Federal Rule of Civil Procedure 23(b)(1)(A) and (b)(2) as class representatives for all present and former IIM account beneficiaries.  Cobell I, 30 F. Supp.2d at 28.  The Court bifurcated proceedings in the case on May 5, 1998 [Docket Entry # 94].  Phase I would address "fixing the system," or reforming the management and accounting of the IIM trust to bring the defendants into compliance with its fiduciary obligations. Phase II, on the other hand, would address "correcting the accounts," or performing a historical accounting of the IIM trust accounts.

The Court denied the defendants' motion to dismiss and their first motion for summary judgment on November 5, 1998.  Specifically, the Court found that it had jurisdiction to adjudicate the plaintiffs' claims since, pursuant to Section 702 of the Administrative Procedure Act, the government had waived its sovereign immunity.  Id. at 30-42 (finding that "[t]he case law and legislative history with respect to § 702 clearly evince the federal government's consent

to suit in the present case.").[6]  At the same time, however, the Court granted the government's

motion to dismiss the plaintiffs' claim for mandamus "because the duties alleged by the plaintiffs

in this case cannot be construed as ministerial[.]" Id. at 36.

On February 22, 1999, after a two-week bench trial, the Court found Bruce Babbitt, then-

Secretary of the Interior, Robert Rubin, then-Secretary of the Treasury, and Kevin Gover, then-

Assistant Secretary of Interior for Indian Affairs, in civil contempt for violating two of this

Court's discovery orders.  Cobell v. Babbitt ("Cobell II"), 37 F.Supp.2d 6, 9 (D.D.C. 1999).  In

particular, the Court found by clear and convincing evidence that these defendants were in

violation of its November 27, 1996 production order,[7] and its May 4, 1998 scheduling order.[8]  Id.

In concluding that these defendants were in civil contempt, the Court explicitly rejected their

contention that they had made a good faith effort to produce the applicable documents to the

plaintiffs.  Id. at 38 (opining that "[t]he defendants have fallen far short of proving their defense

of good faith substantial compliance.").  Instead, the Court found that almost immediately after

proposing a clear and unambiguous order which the Court signed, "the defendants disobeyed that

order and successfully covered up their disobedience through semantics and strained, unilateral,

---

[6]The Court also rejected the government's arguments that the administration of its trust duties is not subject to judicial review because the duties are committed solely to agency discretion.  Cobell I, 30 F.Supp.2d at 33.  Finally, the Court rejected the government's argument that there was no final agency action, as required by 5 U.S.C. § 704 for actions brought under the APA.  Id.

[7]Paragraph 19 of the Court's First Order of Production of Information required the defendants to produce "[a]ll documents, records, and tangible things which embody, refer to, or relate to IIM accounts of the five named plaintiffs or their predecessors in interest."

[8]The Court's May 4, 1998 order set June 30, 1998 as the final deadline for production of the pertinent documents.

-10-

self-serving interpretations of their own duties." <u>Cobell IV</u>, 188 F.R.D. at 140. Notwithstanding

"defendants' reckless disregard for this court's orders and their attorneys' mismanagement of this

case," the Court limited "compensatory relief to monetary sanctions[9] and coercive relief to the

appointment of a special master."[10] <u>Cobell II</u>, 37 F.Supp.2d at 38. The Court noted, however,

that "[s]hould it appear at any point that the defendants are not taking all reasonable steps to

comply with the orders of this court, then harsher relief will be duly administered." <u>Id.</u> at 38.

On June 7, 1999, the Court denied another motion for summary judgment filed by the

government. <u>Cobell v. Babbitt ("Cobell III")</u>, 52 F.Supp.2d 11, 34 (D.D.C. 1999). As an initial

matter, the Court observed that "the controlling Supreme Court case law on point clearly

provides [that] the establishment of this trust creates certain substantive rights in favor of its

beneficiaries, the plaintiffs, and violations of these rights by actions taken or not taken by federal

officials may be remedied by prospective relief."[11] <u>Id.</u> at 20. In accordance with this elementary

---

[9]On August 10, 1999, the Court awarded $624,643.50 in expenses and attorneys' fees to the plaintiffs. <u>Cobell IV</u>, 188 F.R.D. at 123 (D.D.C. 1999). In so ruling, the Court noted that:
> [it] is aware of the unfortunate consequences of today's ruling on American taxpayers. Ultimately these taxpayers will be forced to pay for the misconduct of their government's officials and their government's attorneys. This is a troublesome concept for the court.

<u>Id.</u> at 140.

[10]The Court appointed a special master pursuant to Rule 53 of the Federal Rules of Civil Procedure. The order accompanying the Court's memorandum opinion provided that:
> The Special Master shall oversee the discovery process and administer document production, compliance with court orders, and related matters. Further duties of the special master shall be set out in a forthcoming order.

<u>Cobell II</u>, 37 F.Supp.2d at 40.

[11]The Court also recognized, however, that "the fiduciary relationship that serves as the basis of plaintiffs' breach of trust claims is grounded in and defined by statute and has arisen from the pervasive, complete federal governmental control of plaintiffs' IIM funds." <u>Cobell III</u>,

yet fundamental finding, the Court concluded that, "[c]ontrary to defendants' position, Congress

has subjected defendants to the full range of relief that plaintiffs seek, in terms of sovereign

immunity." Id. The Court accordingly found that "plaintiffs may seek prospective redress for

breaches of these duties through common law remedies such as an injunction and declaratory

relief, with the ultimate goal being the rendering of an accounting."[12] Id. at 24.  The Court also

recognized, however, that "these remedies, as well as the [plaintiffs'] underlying substantive

rights, must be construed in light of the common law of trusts." Id. at 28-29.

Having denied the government's motion to dismiss and its motions for summary

judgment, the Court held a six-week bench trial during the summer of 1999 to address the

plaintiffs' Phase I claims.  The Court issued its Memorandum Opinion, which included extensive

findings of fact and conclusions of law, on December 21, 1999.  After determining that it had

jurisdiction, the Court found that the federal government was in breach of certain fiduciary duties

that it owed to plaintiffs.  Specifically, the Court accepted a written stipulation filed by the

defendants on the eve of trial in which they admitted that they were not in compliance with

several obligations prescribed in the 1994 Act.  In addition, the Court ruled, pursuant to the

Declaratory Judgment Act, 28 U.S.C. § 2201, and the Administrative Procedure Act, 5 U.S.C. §§

702 & 706, that:

 1. [The 1994 Act requires defendants to] provide plaintiffs an accurate accounting of all

---

52 F.Supp.2d at 24.

 [12]It is worth noting that the Court also "recognize[d] that one available remedy, putting
the trustee into receivership, more clearly implicates separation of powers concerns." Cobell III,
52 F. Supp.2d at 28 n.18.  Notwithstanding this recognition, however, the Court concluded that
"[i]t is simply too early to exclude the possibility of receivership at some point in the future, even
if it would be currently inappropriate." Id.

-12-

money in the IIM trust held in trust for the benefit of plaintiffs, without regard to when the funds were deposited.

2. [The 1994 Act requires defendants to] retrieve and retain all information concerning the IIM trust that is necessary to render an accurate accounting of all money in the IIM trust held in trust for the benefit of plaintiffs.

3. [D]efendants owe plaintiffs, pursuant to the statutes and regulations governing the management of the IIM trust, the statutory trust duty to:

(a) establish written policies and procedures for collecting from outside sources missing information necessary to render an accurate accounting of the IIM trust;

(b) establish written policies and procedures for the retention of IIM-related trust documents necessary to render an accurate accounting of the IIM trust;

(c) establish written policies and procedures for computer and business systems architecture necessary to render an accurate accounting of the IIM trust; and

(d) establish written policies and procedures for the staffing of trust management functions necessary to render an accurate accounting of the IIM trust.

4. [D]efendant Lawrence Summers, Secretary of the Treasury, owes plaintiffs, pursuant to the statutes and regulations governing the management of the IIM trust, the statutory trust duty to retain IIM trust documents that are necessary to render an accurate accounting of all money in the IIM trust held in trust for the benefit of plaintiffs.

5. Defendants are currently in breach of the statutory trust duties declared in subparagraphs II(2)-(4).

6. Defendants have no written plans to bring themselves into compliance with the duties declared in subparagraphs II(2)-(4).

7. Defendants must promptly come into compliance by establishing written policies and procedures not inconsistent with the court's Memorandum Opinion that rectify the breaches of trust declared in subparagraphs II(2)-(4).

Cobell V, 91 F.Supp.2d at 58.[13]  In order to allow the defendants the opportunity to come into

compliance with its fiduciary obligations, the court remanded "the required actions to defendants

for further proceedings not inconsistent with the court's Memorandum Opinion." Id. at 58.  In

addition, the Court retained jurisdiction over the case for five years and ordered the defendants to

submit "quarterly status reports setting forth and explaining the steps that [they] have taken to

rectify the breaches of trust declared" by the Court and "to bring themselves into compliance

---

[13]It is worth noting that the Court dismissed with prejudice plaintiffs' pure common law claims as well as their claims regarding obstruction of the Special Trustee. Cobell V, 91 F.Supp.2d at 58.

with their statutory trust duties embodied in the" 1994 Act. Id. at 59.

The defendants appealed this Court's decision, alleging that it improperly construed the nature and extent of the government's fiduciary duties to the IIM trust beneficiaries.[14]  After considering all of the arguments raised by the government, the D.C. Circuit affirmed this Court's decision on February 23, 2001.  Specifically, the D.C. Circuit found that:

> The government's broad duty to provide a complete historical accounting to IIM beneficiaries necessarily imposes substantial subsidiary duties on those government officials with responsibility for ensuring that an accounting can and will take place.  In particular, it imposes obligations on those who administer the IIM trust lands and funds to, among other things, maintain and complete existing records, recover missing records where possible, and develop plans and procedures sufficient to ensure that all aspects of the accounting process are carried out.

Cobell VI, 240 F.3d at 1105.  The D.C. Circuit further affirmed this Court's conclusion that the defendants were in breach of these fiduciary duties.  Id. at 1105-08, 1110 (finding that "the Department [of Interior] is still unable to execute the most fundamental of trust duties–an accurate accounting.").  In addition, the D.C. Circuit found that the plaintiffs could seek judicial relief to rectify these breaches by the defendants.  Id. at 1105-10 (noting that "[f]ederal courts have repeatedly recognized the right of Native Americans to seek relief for breaches of fiduciary obligations . . . .").  At the same time, however, the D.C. Circuit observed that "[t]he actual legal breach is the failure to provide an accounting, not [the government's] failure to take the discrete individual steps that would facilitate an accounting."  Id. at 1106.  In accordance with these findings and conclusions, the D.C. Circuit remanded the case back to this Court for further proceedings.  Id. at 1110 (stating that "[w]hile the district court may have mischaracterized some

_____

[14]This Court certified its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Cobell V, 91 F.Supp.2d at 59.

-14-

of the government's specific obligations, its broader conclusion that government officials breached their obligations to IIM beneficiaries is in accordance with the law and well supported by the evidentiary record. Therefore, we affirm the order of the district court and remand to that court for further proceedings.").

On the same day that the D.C. Circuit issued its Opinion affirming this Court's order regarding the Phase I trial, Dominic Nessi ("Nessi"), then-Chief Information Officer for BIA and one of the principal witnesses for the Interior Department during the Phase I trial, sent a memorandum to the Special Trustee which stated, inter alia, "that trust reform is slowly, but surely imploding at this point in time." See Pls.' Ex. 2, Tab A at 1. In light of this memorandum, on April 16, 2001, the Court appointed—with the consent of the plaintiffs and the Interior defendants[15]—a Court Monitor to "monitor and review all of the Interior defendants' trust reform activities and file written reports of his findings with the Court."[16]

The Court Monitor filed his First Report on July 11, 2001. The First Report addressed the DOI's efforts towards conducting a historical accounting for the IIM trust beneficiaries. The Court Monitor found that "the status of the actual accounting, with few exceptions, was, for lack of a better term, at ground zero." Pls.' Ex. 1 at 2. The Court Monitor's Second Report, filed on August 9, 2001, reviewed the DOI's actions regarding TAAMS. The Court Monitor concluded that the Quarterly Reports submitted by the DOI (beginning in March of 2000) did not accurately reflect the status of TAAMS. The Court Monitor's Third Report, filed on September 17, 2001,

---

[15]At the hearing on April 16, 2001, counsel for the government stated, "the government wants to put on the record that it consents to this order and appreciates the court's time and attention to this[.]" Tr. of Hearing on April 16, 2001 at 5.

[16]The Court appointed the Court Monitor pursuant to its inherent powers.

addressed the HLIP's BIA Data Cleanup subproject.  The Court Monitor found that the DOI's

Quarterly Reports consistently failed to provide the Court with an accurate picture of BIA Data

Cleanup.  On October 16, 2001, the Court Monitor filed his Fourth Report.  In the Fourth Report,

the Court Monitor reviewed, among other things, the portion of the Interior Department's

Seventh Quarterly Report that addressed BIA Data Cleanup and TAAMS.  The Court Monitor

found that the Seventh Quarterly Report, like the first six, failed to describe accurately the status

of the BIA Data Cleanup subproject or the TAAMS subproject.

On November 14, 2001, the Special Master submitted his Report and Recommendation

Regarding the Security of Trust Data at the Department of Interior ("Report on IT Security").  In

the Report on IT Security, the Special Master examined the trust data security systems of the

Department of Interior.  The security of these systems is critically important because they contain

sensitive individual Indian trust information.  After making extensive findings, the Special

Master concluded that the Department of Interior "has demonstrated a pattern of neglect that has

threatened, and continues to threaten, the integrity of trust data upon which Indian beneficiaries

depend."  Pls.' Ex. 15 at 153.  In short, the Special Master found that the Department of Interior

knew that its computer systems were insecure and did little to nothing about it.  Id. at 141-53.


C.      **THE ORDER & SUPPLEMENTAL ORDER TO SHOW CAUSE**

On November 28, 2001, the Court ordered Gale Norton, Secretary of the Interior, and

Neal McCaleb, Assistant Secretary of the Interior for Indian Affairs, to show cause why they

should not be held in civil contempt of court in their official capacities for the following:

1.      Failing to comply with the Court's Order of December 21, 1999, to initiate a

Historical Accounting Project.

2.      Committing a fraud on the Court by concealing the Department's true actions
        regarding the Historical Accounting Project during the period from March 2000,
        until January 2001.

3.      Committing a fraud on the Court by failing to disclose the true status of the
        TAAMS project between September 1999 and December 21, 1999.

4.      Committing a fraud on the Court by filing false and misleading quarterly status
        reports starting in March 2000, regarding TAAMS and BIA Data Clean-up.

Cobell v. Norton, 175 F.Supp.2d 24, 27 (D.D.C. 2001). On December 6, 2001, the Court issued

a supplemental order that required these defendants to show cause why they should not be held in

civil contempt for:

5.      Committing a fraud on the Court by making false and misleading representations
        starting in March, 2000, regarding computer security of IIM trust data.

Id. These five specifications formed the basis of the instant contempt trial. The Court will make

findings of fact and conclusions of law relevant to each of these specifications below.

Specifically, the Court will address the Department of Interior's efforts to carry out a historical

accounting project for the IIM trust accounts, which is relevant to the first two specifications; the

Interior Department's TAAMS and BIA Data Cleanup subprojects, which are relevant to the

third and fourth specifications; and, finally, the defendants' actions regarding IT security, which

is relevant to the fifth specification.

Before turning to those issues, however, the Court must delineate the legal standards

governing this proceeding. In this regard, the Court will provide the applicable law concerning

civil contempt of court, fraud on the court, and courts' inherent power to sanction litigation

misconduct.

## III.   APPLICABLE LEGAL STANDARDS

### A.   CIVIL CONTEMPT

It is beyond peradventure that courts have the inherent authority to enforce their orders through the exercise of their contempt powers. Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991) (observing that "it is firmly established that 'the power to punish for contempt is inherent in all courts.'"); Shillitani v. United States, 384 U.S. 364, 370 (1966) (stating that "[t]here can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt."). Specifically, courts may utilize civil contempt proceedings to obtain compliance with an order or to compensate for damage sustained as a result of noncompliance with an order.[17] Food Lion, Inc. v. United Food and Commercial Workers Int'l Union, 103 F.3d 1007, 1016 (D.C. Cir. 1997); NLRB v. Blevins Popcorn Co., 659 F.2d 1173, 1184 (D.C. Cir. 1981). At the same time, however, because "[t]he judicial contempt power is a potent weapon," see Common Cause v. Nuclear Regulatory Comm'n, 674 F.2d 921, 927 (D.C. Cir. 1982), courts should be prudent in exercising that power. Joshi v. Professional Health Services, Inc., 817 F.2d 877, 879 n.2 (D.C. Cir. 1987) (noting that "in light of the remedy's extraordinary nature, courts rightly impose it with caution."). Cf. Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980) (admonishing courts to exercise their inherent powers with "restraint and discretion.").

---

[17]It is important to distinguish between civil contempt proceedings–like the instant matter–and criminal contempt proceedings. The D.C. Circuit has explained that:

> Traditionally, whether a contempt is civil or criminal has depended on the 'character and purpose' of the sanction. A sanction is considered civil if it is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court."

Evans v. Williams, 206 F.3d 1292, 1294-95 (D.C. Cir. 2000) (internal quotations omitted).

-18-

Two elements must be established before a party may be held in civil contempt for violating an order. Armstrong v. Executive Office of the President, 1 F.3d 1274, 1289 (D.C. Cir. 1993). First, the Court must have issued an order that is clear and reasonably specific. Id. at 1289; Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 16-17 (1st Cir. 1991) (noting that in order for a party to be held in civil contempt, the court must have issued "a clear and unambiguous order that left no reasonable doubt as to what behavior was expected and who was expected to behave in the intended fashion."). In determining whether an order is clear and reasonably specific, courts apply "an objective standard that takes into account both the language of the order and the circumstances surrounding the issuance of the order." United States v. Young, 107 F.3d 903, 907 (D.C. Cir. 1997). See also Project B.A.S.I.C., 947 F.2d at 16-17 (finding that "the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden" or what acts are required."). Second, the putative contemnor must have violated the court's order. Armstrong, 1 F.3d at 1289 (recognizing that "civil contempt will lie only if the putative contemnor has violated an order that is clear and unambiguous.").

It is not necessary in civil contempt proceedings for the violation of the court order to be intentional or for the putative contemnor to have acted in bad faith.[18] McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949) (opining that since the purpose of civil contempt is remedial, "it matters not with what intent the defendant did the prohibited act."); Food Lion, 103

---

[18] In criminal contempt proceedings, on the other hand, the putative contemnor must have willfully violated the court's order. United States v. Young, 107 F.3d 903, 907 (D.C. Cir. 1997); Blevins, 659 F.2d at 1183-84. For purposes of criminal contempt, "willfulness" has been defined as a "deliberate or intended violation, as distinguished from an accidental, inadvertent or negligent violation." TWM Manufacturing Co. v. Dura Corp., 722 F.2d 1261, 1272 (6th Cir. 1983).

F.3d at 1016 (observing that "the law is clear in this circuit that 'the [contemnor's] failure to

comply with the court decree need not be intentional" and that a "finding of bad faith on the part

of the contemnor is *not* required.") (emphasis in original).  In fact, for purposes of civil contempt,

"the intent of the recalcitrant party is irrelevant."  Blevins, 659 F.2d at 1184.

A declaratory judgment, by itself, cannot serve as the foundation for a finding of civil

contempt.  Armstrong, 1 F.3d at 1290 (noting that a finding of civil contempt may not be based

on a declaratory judgment alone); Burgess v. Ryan, 996 F.2d 180, 184 (7th Cir. 1993)

(recognizing that "declaratory judgments . . . are not enforced by contempt[.]").  The reason why

noncompliance with a declaratory judgment cannot result in a contempt citation is that:

> even though a declaratory judgment has 'the force and effect of a final judgment,'
> 28 U.S.C. § 2201, it is a much milder form of relief than an injunction.  Though it
> may be persuasive, it is not ultimately coercive; noncompliance with it may be
> inappropriate, but is not contempt.

Steffel v. Thompson, 415 U.S. 452, 471 (1974) (quoting Perez v. Ledesma, 401 U.S. 82, 125-126

(Brennan, J., concurring)).  See also Armstrong, 1 F.3d at 1289.  For example, in Perez v.

Ledesma, the plaintiffs sought declaratory and injunctive relief from a criminal obscenity law

that they believed was unconstitutional.  Perez, 401 U.S. at 83-84.  In his concurring opinion (in

which he also dissented in part), Justice Brennan observed that declaratory relief would have a

significantly different impact on the administration of the state's criminal law than an injunction.

Id. at 124.  Specifically, he recognized that while an injunction against enforcement of the statute

"paralyzes the [s]tate's enforcement machinery," a declaratory judgment, in contrast, merely

delineates the parties' "legal status and rights; it neither mandates nor prohibits state action."  Id.

Thus, in the context of state criminal laws, a prosecutor can not be held in civil contempt for

charging an individual under a statute declared unconstitutional by a court, while she presumptively could be found in civil contempt if the court had enjoined enforcement of the statute altogether. Id. at 124-25; see also Steffel, 415 U.S. at 469-71.[19]  Applying this principle in a slightly different context, in Armstrong v. Executive Office of the President, several private parties challenged certain federal agencies' guidelines regarding the retention of records stored on their computer systems. Armstrong, 810 F.Supp. 335 (D.D.C. 1993). Ruling in favor of the plaintiffs, the Court "ORDERED, that the Plaintiff[s] shall have a Declaratory Judgment that the guidelines issued by and at the direction of the Defendant Agencies are inadequate and not reasonable and are arbitrary and capricious and contrary to law in that they permit the destruction of records contrary to the Federal Records Act[.]" Id.at 350.  The Court did not, however, rule that the agencies had to promulgate new guidelines. Id.  Nevertheless, the Court subsequently found those agencies in civil contempt for failing to take such action. Armstrong, 821 F.Supp. 761 (D.D.C 1993).  On appeal, the D.C. Circuit vacated the contempt citation on the ground that the agencies "were never directly ordered to promulgate new regulations." Armstrong, 1 F.3d at 1289.  In so doing, the D.C. Circuit explicitly relied upon the reasoning provided by the Supreme Court in Ledesma and Steffel.  It is worth noting that a party can, consistent with these cases, be held in civil contempt for violating an order issued in a case, notwithstanding the fact that the ultimate relief sought in the action is a declaratory judgment. See, e.g., Doe v. General Hospital of the District of Columbia, 434 F.2d 427, 429-32 (D.C. Cir. 1970).

The burden of proof in civil contempt proceedings rests on the moving party. Food Lion,

---

[19]In this regard, the Supreme Court observed in both Perez and Steffel that not only do different standards govern the imposition of the two forms of relief, but that there are important reasons for the distinctions as well.

103 F.3d at 1016. In particular, the party seeking a finding of contempt must "demonstrate by clear and convincing evidence that the alleged contemnor violated the court's prior order."[20] Id. See also Blevins, 659 F.2d at 1183 (noting that "[i]n civil contempt proceedings the clear and convincing evidence standard applies[.]"). The "clear and convincing evidence" standard requires the Court to "reach a firm conviction of the truth of the evidence about which he or she is certain." United States v. Montague, 40 F.3d 1251, 1255 (D.C. Cir. 1994).

After the moving party makes a prima facie showing of civil contempt–that is, demonstrates by clear and convincing evidence that the putative contemnor violated an unambiguous order–the party charged with contempt can still defend itself on the ground of "good faith substantial compliance" with the court order. Food Lion, 103 F.3d at 1017.[21] The burden of proving good faith substantial compliance "is on the party asserting the defense[.]" Id. In order to raise this defense successfully, the putative contemnor must demonstrate "that it took all reasonable steps within [its] power to comply with the court's order." Id. Good faith alone, however, is not sufficient to relieve a party from a finding of civil contempt. Id. at 1017-18 (noting that "[a]lthough a party's good faith may be a factor in determining whether substantial

---

[20]The burden of proof in criminal contempt proceedings is "beyond a reasonable doubt." Young, 107 F.3d at 907; Blevins, 659 F.2d at 1183-84. The reason for this distinction is that courts provide alleged criminal contemnors the same procedural safeguards as ordinary criminal defendants. Blevins, 659 F.2d at 1183-84 (noting that "the procedural safeguards that attend any criminal proceeding, including the reasonable doubt standard of proof, come into play" in criminal contempt proceedings.).

[21]As the Court noted in its Memorandum Opinion after the first contempt trial, "[a]lthough the viability of this defense has not been squarely resolved in this circuit, . . . the plaintiffs have not made such a challenge in this case." Cobell, 37 F.Supp.2d at 10 n.3. Accordingly, the Court will assume–as it did in the first contempt trial–that the "good faith substantial compliance" defense is extant and may therefore be asserted by the defendants.

compliance occurred, and may be considered in mitigation of damages, good faith alone is not sufficient to excuse contempt").

Courts have the power to impose both coercive and compensatory sanctions upon parties found in civil contempt. United States v. United Mine Workers, 330 U.S. 258, 303-04 (1947). Specifically, courts may impose coercive sanctions "to compel the contemnor into compliance with an existing court order" and compensatory sanctions to "compensate the complainant for losses suffered as a result of the contumacy." United States v. Dowell, 257 F.3d 694, 699 (7th Cir. 2001). See also Consolidated Rail Corp. v. Yashinsky, 170 F.3d 591, 595 (6th Cir. 1999) (noting that "[c]ompensatory contempt orders compensate the party harmed by the other party's contemptuous actions; coercive orders seek to cajole the party in contempt to act in the manner desired by the court."). Moreover, courts have considerable discretion in imposing coercive and compensatory sanctions. United States v. Berg, 20 F.3d 304, 311 (7th Cir. 1994) (recognizing that "the district court has broad discretion in imposing those sanctions."); Rodriguez v. IBP, Inc., 243 F.3d 1221, 1231 (10th Cir. 2001) (noting that "[a] district court may exercise broad discretion in using its contempt power to assure compliance with its orders."). In fact, "[t]he measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief." McComb, 336 U.S. at 193. Thus, for example, "[w]hen fashioning a sanction to secure compliance, a district court should 'consider the character and magnitude of the harm threatened by the continued contumacy and the probable effectiveness of any suggested sanction in bringing about the result desired.'" Citronelle-Mobile Gathering, Inc. v. Watkins, 943 F.2d 1297, 1304 (11th Cir. 1991) (quoting United Mine Workers, 330 U.S. at 304).

## B.    FRAUD ON THE COURT

The authority to respond to and punish fraud on the court is, like the contempt power, among a court's inherent powers.  See, e.g., Universal Oil Products v. Root Refining Co., 328 U.S. 575, 580 (1946) (noting that the "inherent power of a federal court to investigate whether a judgment was obtained by fraud, is beyond question."); Aude v. Mobil Oil Corp., 892 F.2d 1115, 1119 (1st Cir. 1989) (recognizing that "[t]here is an irrefragable linkage between courts' inherent powers and the rarely-encountered problem of fraud on the court.").  Most cases addressing the concept have arisen where a party seeks to set aside a judgment already entered, invoking the court's inherent power, Federal Rule of Civil Procedure 60(b), or both.  See, e.g., Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 244 (1944), rev'd on other grounds; Standard Oil Co. v. United States, 429 U.S. 17 (1976); Baltia Air Lines, Inc. v. Transaction Management, Inc., 98 F.3d 640, 642-43 (D.C. Cir. 1996).  Courts have also utilized their power to punish fraud on the court, however, during the pendency of a case.  See, e.g., Aude, 892 F.2d at 1118; Synanon Church v. United States, 579 F.Supp. 967, 972 (D.D.C. 1984) (noting that "[a]llegations of fraud upon the court arise in two contexts: first, as in this case, before there has been an adjudication, and second, in cases where a party seeks to overturn a final judgment, usually under Fed. R. Civ. P. 60(b)."), aff'd, 820 F.2d 421 (D.C. Cir. 1987).

Courts appear to apply the same standard for determining if a party has committed a fraud on the court regardless of whether the misconduct is discovered before or after a final judgment has been entered.  In both instances, the concept of fraud on the court "embraces that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of

adjudging cases presented for adjudication." Transaero v. La Fuerza Area Boliviana, 24 F.3d

457, 460 (2d Cir. 1994) (internal quotation marks omitted).  See also Aude, 892 F.2d at 1118

(stating that a fraud on the court occurs when "a party . . . sentiently set[s] in motion some

unconscionable scheme calculated to interfere with the judicial system's ability impartially to

adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of

the opposing party's claim or defense.").  For example, in Hazel-Glass Company v. Hartford-

Empire Company, the court found out--several years after the entry of final judgment--that

Hartford (with the assistance of counsel) had procured the publication of an article, ostensibly

written by a disinterested expert, supporting its legal position.  Hazel-Glass, 322 U.S. at 239-43.

The court learned that the article, which Hartford relied upon greatly, was actually written by

Hartford's officials and attorneys.  Id.  In concluding that this misconduct constituted a fraud on

the court, the Supreme Court found that:

> tampering with the administration of justice in the manner indisputably shown
> here involves far more than an injury to a single litigant.  It is a wrong against the
> institutions set up to protect and safeguard the public, institutions in which fraud
> cannot complacently be tolerated consistently with the good order of society.

Id. at 246.  Similarly, in Synanon Church v. United States, the court found, before judgment had

been entered in the case, that Synanon executives and counsel had engaged in an extensive effort

to destroy pertinent documents, and then tried to conceal their actions from the court and the

opposing party.  Synanon Church, 579 F.Supp. at 972-76 (noting that "[t]his destruction and

cover-up were conducted under the direction of . . . Synanon's 'Archivist,' with the 'knowledge

and approval of Synanon's legal department.'") (quoting Synanon Foundation, Inc. v. Bernstein,

et. al., Civil Action No. 7189-78 (D.C. Super. Ct. Oct. 12, 1983)).  Based upon this evidence, the

court had no trouble finding that Synanon (with the assistance of counsel) had committed a fraud on the court. Id. at 974-77.

The relief ordered based upon a finding of fraud on the court has consistently been both swift and severe. In cases where the fraud is unearthed prior to the entry of final judgment, courts almost always dismiss the case (if the plaintiff was the party that perpetrated the fraud) or enter a default judgment (if the defendant committed the fraud). See, e.g., Aude, 892 F.2d at 1119 (noting that "the caselaw [is] fully consonant with the view that a federal district judge can order dismissal or default where a litigant has stooped to the level of fraud on the court."). Likewise, in cases where the fraud is discovered after judgment has already been entered, courts typically vacate or set aside the fraudulently begotten judgment no matter how long it has been in effect. See, .e.g., Hazel-Atlas Co., 322 U.S. at 244 (observing that "[f]rom the beginning there has existed . . . a rule of equity to the effect that under certain circumstances, one of which is after discovered fraud, relief will be granted against judgments regardless of the term of their entry."). For example, in Hazel-Atlas, the Supreme Court held that "[t]he total effect of all this fraud . . . calls for nothing less than a complete denial of relief to Hartford[.]" Id. at 250. Similarly, in Synanon Church, the court found that its inherent powers were "properly invoked to dismiss Synanon's case to regain its tax-exempt status because Synanon engaged in a 'deliberately planned and carefully executed scheme to defraud.'" Id. at 974.

Because the sanctions imposed on the defrauding party are so severe, courts require the fraud to be proven–like civil contempt–by clear and convincing evidence. Aude, 892 F.2d at 1118 (noting that the fraud must be demonstrated "clearly and convincingly[.]"). In this regard, courts have recognized the strong policy interests in favor of both finality of judgments and

adjudications on the merits.  With respect to the former, "[f]ederal courts, both trial and

appellate, long ago established the general rule that they would not alter or set aside their

judgments after the expiration of the term at which the judgments were finally entered."  Hazel-

Atlas Glass Co., 322 U.S. at 244.  The reason for this rule is that courts have usually found that

society is best served by putting an end to litigation after a case has been tried and judgment

entered.  Id. (recognizing further the "deep rooted policy in favor of the repose of judgments

entered during past terms[.]").  At the same time, however, courts have also acknowledged "the

fundamental importance of trying cases on the merits . . . ."  Shepherd v. American Broadcasting

Companies, Inc., 62 F.3d 1469, 1476 (D.C. Cir. 1995).  See also Shea v. Donohoe Construction

Co., 795 F.2d 1071, 1076 (D.C. Cir. 1986) (noting that "our system favors the disposition of

cases on the merits[.]").  The reason for this rule is that parties should normally be allowed to

present their case or defense to a court for adjudication.  Aude, 892 F.2d at 1118 (stating that

courts "should carefully balance the policy favoring adjudication on the merits with competing

policies such as the need to maintain institutional integrity and the desirability of deterring future

misconduct.").

    In light of the severe sanctions and policy interests involved in determining that a party

has committed a "fraud on the court," courts also require "a showing that one has acted with an

intent to deceive or defraud the court."  United States v. Buck, 281 F.3d 1336, 1342 (10th Cir.

2002).  The reason for this requirement, at least in the context of granting relief from a final

judgment, is that "[a] proper balance between the interests underlying finality on the one hand

and allowing relief due to inequitable conduct on the other makes it essential that there be a

showing of conscious wrongdoing–what can properly be characterized as a deliberate scheme to

defraud–before relief from a final judgment is appropriate[.]" Id. (quoting Robinson v. Audi Aktiengesellschaft, 56 F.3d 1259, 1267 (10th Cir. 1995)).  The same principle (and requirement) applies in the context of dismissing actions and entering default judgments based on fraudulent conduct by a party.  Wyle v. R.J. Reynolds Industries, Inc., 709 F.2d 585, 589 (9th Cir. 1983) (noting that "courts have inherent power to dismiss an action when a party has wilfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.").

To the extent the Court has framed four of the five specifications in terms of fraud on the court, it is important to note that the commission of a fraud on the court can form the basis for a finding of contempt.  Cf. Pendergast v. United States, 317 U.S. 412 (1943) ("To use bribery and fraud on the Court to obtain its order for disbursement of nearly $10,000,000 in trust in its custody is not only contempt but contempt of a kind far more damaging to the Court's good name and more subtly obstructive of justice than throwing an inkwell at a Judge or disturbing the peace of a courtroom.") (Jackson, J., dissenting).  See also United States v. Williams, 622 F.2d 830, 838 (5th Cir. 1980) (noting that "[t]he defendants in Pendergast perpetrated a fraud on the court, punishable as criminal contempt[.]"); South Beach Suncare, Inc. v. Sea and Ski Corp., 1999 WL 350458 (S.D. Fla. May 17, 1999) (observing that "a district court may hold a party in contempt for fraudulently presenting evidence."); Kelly v. SEG Sports Corp., 1997 WL 374745 (Mich. June 4, 1997) (finding that "while the representations were not incorporated in an injunction or order, the court refrained from considering and possibly issuing an injunction on the strength of these representations.  If they were made with the knowledge that the promises could not or would not be kept, the making of the representations might constitute fraud on the court, leading to contempt penalties.").

## C.    POWER TO SANCTION LITIGATION MISCONDUCT

In addition to the powers discussed above, this Court undoubtedly has the inherent authority to address all types of party (and attorney) misconduct.[22] Shepherd, 62 F.3d at 1472 (D.C. Cir. 1995) (recognizing that "[t]he inherent power encompasses the power to sanction attorney or party misconduct, and includes the power to enter a default judgment."); F.J. Hanshaw Enterprises, Inc. v. Emerald River Development, Inc., 244 F.3d 1128, 1136-37 (9th Cir. 2001) (noting that "[c]ourts have the ability to address the full range of litigation abuses through their inherent powers."); Penthouse Int'l, Ltd. v. Playboy Enterprises, Inc., 663 F.2d 371, 386 (2d Cir. 1981) (observing that "[a] federal district court possesses broad inherent power to protect the administration of justice by levying sanctions in response to abusive litigation practices."). Indeed, there is no question that courts have "broad authority through means other than contempt–such as by striking pleadings, assessing costs, excluding evidence, and entering default judgment–to penalize a party's failure to comply with the rules of conduct governing the litigation process." International Union v. Bagwell, 512 U.S. 821, 833 (1994). See also Shepherd, 62 F.3d at 1475 (observing that "inherent power sanctions available to courts include fines, awards of attorney's fees and expenses, contempt citations, disqualifications or suspensions of counsel, and drawing adverse evidentiary inferences or precluding the admission of evidence.").

District courts have "considerable discretion" in sanctioning party misconduct. Perkinson v. Gilbert/Robinson, Inc., 821 F.2d 686, 689 (D.C. Cir. 1987).  As the Supreme Court noted in

---

[22]It is important to note that "[s]uch judicial sanctions never have been considered criminal, and the imposition of civil, coercive fines to police the litigation process appears consistent with this authority." International Union v. Bagwell, 512 U.S. 821, 833 (1994).

Chambers v. NASCO, 501 U.S. at 44-45, "[a] primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." In this regard, the entry of a default judgment or outright dismissal of a complaint, though severe, is within the court's discretion. Chambers, 501 U.S. at 45. In deciding the appropriate sanction to impose on the wrongdoing party, courts "must properly 'calibrate the scales' to ensure that the gravity of [the] inherent power sanction corresponds to the misconduct." Shepherd, 62 F.3d at 1479 (noting further that "[t]he graver the sanction under consideration, the more precision this calibration requires."). See also Republic of the Philippines v. Westinghouse Electric Corp., 43 F.3d 65, 73 (3d Cir. 1995) (finding that "a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified."). "This does not mean that courts must first *impose* a lesser sanction, for . . . a district court need not exhaust other options before dismissing a suit or imposing a default judgment." Shepherd, 62 F.3d at 1479 (emphasis in original). See also Webb v. District of Columbia, 146 F.3d 964, 971 (D.C. Cir. 1998). Rather, it means that before imposing a litigation-ending sanction, such as default or dismissal, the court must explain why lesser sanctions were likely to be ineffective. Id. See also Bonds v. District of Columbia, 93 F.3d 801, 808 (D.C. Cir. 1996) (stating that "[p]articularly in the context of litigation-ending sanctions," courts have found that "dismissal is a sanction of last resort to be applied only after less dire alternatives have been explored without success or would obviously prove futile."). In addition, before a court can impose a litigation-ending sanction, the misconduct must be proven by clear and convincing evidence. Shepherd, 62 F.3d at 1476-78. On the other hand, the imposition of lesser sanctions, such as adverse evidentiary rulings, "do not

require a heightened standard of proof." Id. In order to impose those sanctions, the misconduct

need only be proven by a preponderance of the evidence. Id. (noting that "[b]ecause issue related

sanctions are fundamentally remedial, rather than punitive and do not preclude a trial on the

merits, we conclude that they do not require a heightened standard of proof.").

## IV.   FINDINGS OF FACT

Upon consideration of all the evidence presented and representations made at trial, and in

accordance with Federal Rule of Civil Procedure 52(a), the Court finds the following facts

established by clear and convincing evidence. See, e.g., Cifra v. General Electric, Co., 252 F.3d

205, 215 (2d Cir. 2001) (noting that the "obligations of the court as the trier of fact are to

determine which of the witnesses it finds credible, which of the permissible competing inferences

it will draw, and whether the party having the burden of proof has persuaded it as factfinder that

the requisite facts are proven.").[23]

As noted above, first the Court will address the Department of Interior's effort to carry

out a historical accounting project, which is relevant to Specifications 1 and 2. Next, the Court

will address the Interior Department's TAAMS and BIA Data Cleanup subprojects, which are

relevant to Specifications 3 and 4. Finally, the Court will address IT security, which is relevant

---

[23]Although the Court Monitor addressed many of these issues in his reports, see Pls.' Exs. 1-5, the Court has not based any of its findings of fact on his findings and conclusions. Rather, the Court has conducted its own independent review of the evidence presented and representations made at this contempt trial. The Court's findings of fact are based exclusively on that review. It is worth noting, however, that the Court has conducted this review notwithstanding the fact that the defendants failed to file timely responses to many factual allegations raised in the first three reports of the Court Monitor, as required by the Court's order entered April 15, 2001. Order of April 15, 2001 at 2 (stating that "[t]he parties shall . . . have 10 days from the date of notice to submit any objections or comments to the report.").

to Specification 5.

## A.   HISTORICAL ACCOUNTING PROJECT–SPECIFICATIONS 1 & 2

The Court has organized its findings of fact pertinent to Specifications 1 and 2

chronologically.  To put the findings of fact relevant to these specifications in context, however,

the Court will briefly discuss its earlier rulings regarding the historical accounting project and

describe the circumstances surrounding the Department's decision to publish a notice in the

Federal Register.

### 1.   Prior Decisions by this Court Regarding the Historical Accounting (1998-1999)

The Court bifurcated this case on May 5, 1998.  Specifically, the Court ordered that "to

the greatest extent feasible, this case shall be divided between that aspect which seeks to institute

new trust management practices, often referred to as 'fixing the system,' and that aspect which

seeks to obtain an accounting or approximation thereof and to correct the accounts of the

members of the plaintiff class, often referred to as 'correcting the accounts.'" Order of May 5,

1998 at 2.  See also Cobell III, 52 F.Supp.2d at 19 (noting that "[t]he second phase of this suit

concerns plaintiffs' claim for an accounting, which is their ultimate goal in this case and

unambiguously provided for by statute.").  Notwithstanding this bifurcation, the Court observed

in its Memorandum Opinion regarding the Phase I trial that "[t]he interplay between the two

components . . . is an important issue." Cobell V, 91 F.Supp.2d at 31.  In particular, the Court

found that:

> Everyone understands that the second phase of this case will involve a trial
> regarding defendants' rendition of an accounting.  In general terms, that process
> will involve the government bringing forward its proof on IIM trust balances and

then plaintiffs making exceptions to that proof. The government mistakenly assumes, however, that because 'trial two' involves the actual accounting then the scope of the required accounting–even at its most basic level–is a matter that need not be addressed today. On this point, the government is incorrect. The government alludes to the argument that the Trust Fund Management Reform Act does not require a 'historical' accounting. This argument necessarily brings the issue of whether the Act requires an accounting of all IIM trust money within the scope of today's decision. Simply put, the Court cannot declare defendants' duties and assess whether defendants are in compliance with these duties without establishing the funds to which the duties apply. The disposition of this narrow (but threshold) issue leaves all other accounting issues as matters for the second component of this litigation.

Id. at 31-32 (internal citations omitted).

In deciding whether "the Trust Fund Management Reform Act imposes on the United States, and, *a fortiori*, its trustee delegates, the duty to render a 'historical' accounting," see Cobell V, 91 F.Supp.2d at 40, the Court had to determine if the statutory provision that requires the Secretary of Interior to account for the daily and annual balance of "all funds" held in trust by the United States for the benefit of an individual Indian really means all funds. 25 U.S.C. § 4011. As the Court found this statutory interpretation question rather straightforward, its analysis was necessarily brief. The Court concluded that "all funds" does mean all funds–as opposed to only some subset of the individual Indian trust funds managed by the Department of Interior. Cobell V, 91 F.Supp.2d at 41 (emphasis added). The Court could not then and it can not now "put a finer point on it than that." Id. Accordingly, the Court ruled that the 1994 Act "requires defendants to provide plaintiffs an accurate accounting of all money in the IIM trust held in trust for the benefit of plaintiffs, without regard to when the funds were deposited." Id. at 58. As a corollary to that finding, the Court further ruled that the 1994 Act "requires defendants to retrieve and retain all information concerning the IIM trust that is necessary to render an accurate

accounting of all money in the IIM trust held in trust for the benefit of plaintiffs." Id. at 58. The

Court did not, however, prescribe the precise manner in which the accounting should be

performed. Id. at 40 n.32. Rather, the Court "explicitly left open the choice of how the

accounting would be conducted, and whether certain accounting methods, such as statistical

sampling or something else, would be appropriate." Cobell VI, 240 F.3d at 1104.

The Court issued its decision regarding the Phase I trial on December 21, 1999. Cobell

V, 91 F.Supp.2d at 1. On the same date, the Court certified its order for interlocutory appeal

pursuant to 28 U.S.C. § 1292(b). Cobell V, 91 F.Supp.2d at 57. In so doing, the Court expressly

noted that "[o]ther proceedings in this matter shall not be stayed during the pendency of any

interlocutory appeal that is taken." Id. at 57.

2.     The Interior Department's Actions From December 1999 Until January 2001[24]

Despite the fact that this Court certified its order regarding the Phase I trial for

interlocutory appeal, the Justice Department–which manages this litigation on behalf of the

federal government–informed the Department of Interior that it would not appeal the order unless

Interior began "an administrative process towards a historical accounting." Contempt II Tr. at

697. Specifically, the Solicitor General's Office[25] told the Department of Interior that it had to

initiate a historical accounting project consistent with this Court's order before the Justice

---

[24]Although the time period covered in Specification 2 is March 2000 until January 2001,
this section of the Court's findings of fact will begin in December 1999. The reason is that while
the Department did not begin making the representations that form the basis for Specification 2
regarding the historical accounting until March 2000, events that occurred during the preceding
months are pertinent to those filings.

[25]It is important to note that the Solicitor General's Office, which is part of the
Department of Justice, is different than the Solicitor's Office, which is part of the Department of
Interior.

Department would agree to appeal the ruling to the D.C. Circuit. Contempt II Tr. at 45-46 ("this had to be done in order to file an appeal of the Court's decision of December 1999."). The reason for this condition was that the Department of Justice felt "there needed to be some action, some motion indicating that [the Interior Department was] moving forward with complying with the order to do a historical accounting." Contempt II Tr. at 698. See also Contempt II Tr. at 46-47 ("in order to argue the appeal, [Interior] had to be somewhat responsive to the Court order and explain why–what we were doing to follow through on the Court's order."). Consequently, in early January 2000, the Department of Interior decided to publish a notice in the Federal Register regarding the performance of a historical accounting project. Contempt II Tr. at 44. As Thomas Thompson, Principal Deputy Special Trustee, explained during the contempt trial:

> A.   I wanted to point out that there had been conversation and it was my sense that a large measure of the Federal Register process was in order to respond to the solicitor general's requirement for an administrative process towards a historical accounting.
>      It was my sense that a good portion of what we were doing was to deal with that request, demand if you will, from the Solicitor General's Office.
>
> Q.   Now, why is it your understanding that the solicitor general made a request that this action had to be taken to support the appeal?
>
> A.   In conversations, it was stated specifically that the appeal -- that the Federal Register notice was the, quote/unquote, price of the appeal, that without some specific action in hand, the appeal would not go forward, would not be argued.

Contempt II Tr. at 697-98. See also Contempt II Tr. at 46 ("I [Thompson] sensed that the primary purpose of the Federal Register notice was more likely to be in order to meet the price of

the appeal by the Solicitor General who had to argue the case or present the case to the Appeals Court."). Thus, the Department of Interior decided to publish a notice in the Federal Register so that it could appeal this Court's Phase I trial ruling.

Having agreed to comply with the Justice Department's condition for appeal, the Department of Interior petitioned the D.C. Circuit for permission to appeal this Court's order regarding the Phase I trial in January of 2000.[26] The Interior Department (in its corrected petition) argued that this Court did not have jurisdiction to "initially define the scope of the agency's action, or to hold a trial to resolve the accounting issue itself." Corrected Petition For Permission to Appeal at 12. Rather, the Department contended that "[t]he complex question of how best to achieve an accounting or reconciliation of IIM accounts has been left by Congress to Interior to determine in the first instance." Id. In support of this argument, the Interior Department stated that it will "implement a process under the APA to meet its remaining obligations regarding reconciliation and accounting," and that "[t]hat process will include consultation with Indian Tribes, an opportunity for comment by account beneficiaries and the public, and will commence with a notice published in the Federal Register on or before March 1, 2000." Id. at 13. On February 17, 2000, the D.C. Circuit granted the Interior Department's request for permission to appeal this Court's decision regarding the Phase I trial. The D.C. Circuit did not, however, stay the order entered by this Court. Oral Argument was subsequently scheduled for September 5, 2000.

On March 1, 2000, the defendants filed a motion with this Court for an order finding that

---

[26]The Department of Interior filed a petition for permission to appeal on January 3, 2000, and a corrected petition for permission to appeal on January 5, 2000.

counsel for the Department of Interior would not violate any rules of professional conduct (including the rules concerning attorney contact with represented parties) by providing advice and assistance to the Department regarding the notice in the Federal Register.  Motion For Entry of an Order at 1.  In the motion, the Interior Department told the Court that it "has prepared a proposed notice for publication in the Federal Register . . . [which] outlines an administrative process for fulfilling DOI's statutory obligations and seeks comment, through a public process, from IIM account holders and the general public."  Id. at 2.  The Interior Department stated that it was initiating this administrative process "to determine the most reasonable methods for providing account holders with information to evaluate their accounts and to determine whether there are discrepancies due to past management practices."  Id. at 6-7.  The Department of Interior further noted that it drafted the proposed notice with the advice and assistance of counsel in the Solicitor's Office.  Id. at 4.  In support of its motion, the Department of Interior attached the corrected petition for permission to appeal referenced above (as Exhibit 1) and a copy of the proposed notice (as Exhibit 2).

The plaintiffs filed their response to the Department of Interior's motion on March 20, 2000.  In their opposition, the plaintiffs argued that the notice in the Federal Register was "nothing more than a desperate attempt to end-run this Court, and should not be countenanced."  Pls.' Opp'n at 4.  Specifically, the plaintiffs argued that the notice in the Federal Register was devised to delay the historical accounting "for five years or more[,]" and to support the defendants' recently filed appeal.  Id. at 1-4.

The Department of Interior filed a reply brief in support of the motion on March 24, 2000.  In its reply brief, the Interior Department argued that contrary to the insinuations of the plaintiffs,

the meetings regarding the notice in the Federal Register were not meant to circumvent ethical rules against attorney contact with represented parties, and, in fact, were being held "in accordance with this Court's findings that Defendants have a duty to account to IIM beneficiaries." Defs.' Reply at 7.

On March 28, 2000, the Court–relying upon the representations made by the Department of Interior–granted the defendants' motion for the entry of an order regarding a public administrative process.[27]  In particular, the Court found that the communications contained in and contemplated by the proposed notice would not contravene applicable ethical rules concerning attorney contact with represented parties.  At the same time, however, the Court stated that it "makes no ruling at this time on any other legal question presented by the Proposed Notice." Order of March 28, 2000 [Docket Entry 479].

Having received approval from the Court, the Department of Interior published its notice in the Federal Register on April 3, 2000. Pls.' Ex. 1, Tab 14.  Consistent with the representations made to this Court and the D.C. Circuit, the Interior Department stated in the summary section that "[t]his notice initiates an information gathering process with IIM account beneficiaries, and the public, to comply with Congressional directives to determine the most reasonable methods

---

[27]On March 27, 2000, the day before the Court ruled on the defendants' motion concerning the notice in the Federal Register, the Department of Interior filed the first of three motions for partial summary judgment regarding the historical accounting of IIM trust accounts. In the motion, the Interior Department argued that the plaintiffs are not entitled to a common law-style historical accounting that reconciles each credit or debit that was or should have been made to each IIM account from the beginning of the trust, and that the plaintiffs' claim for a court-ordered restatement or correction of IIM accounts is a claim for money damages, which is beyond this Court's jurisdiction. See Defs.' Memo. in Supp. of Mot. at 23-45.  In addition to these arguments, the Department of Interior once again stated that: (1) it should have the opportunity in the first instance to define the parameter of any historical accounting project, and (2) the notice in the Federal Register was the initial step in that process. Id. at 2.

for providing accountholders with information to evaluate their accounts and to determine whether there are discrepancies due to past management practices." Pls.' Ex. 1, Tab 14 at 17521. The notice presented respondents several accounting options to consider, including transaction-by-transaction, limited reconciliation, statistical sampling, analysis of current account data, and payment formula.[28] The Interior Department told the respondents that although it "intends to consider the widest possible range of options for meeting the goals stated above, [it] will be guided by a number of factors in evaluating the reasonableness of each option[,]" including cost, time, feasibility, and finality. Pls.' Ex. 1, Tab 14 at 17525-26. Notwithstanding the fact that publication of the notice in the Federal Register was delayed by over a month, the public meetings (which were scheduled between April 24 and May 9, 2000) were not postponed. Pls.' Ex. 1, Tab 14 at 17521-22. The Office of American Indian Trust ("OAIT") was the agency responsible for conducting the meetings, and Jim Pace was the primary project officer from OAIT in charge of oversight. The notice also provided that written comments would be collected until June 30, 2000. Pls.' Ex. 1, Tab 14 at 17521.

The Department of Interior filed its opening brief with the D.C. Circuit on May 24,

---

[28]For a detailed explanation of what each of these methods entails, see Pls.' Ex. 1, Tab 14 at 17526-27. Since the parties have focused on the transaction-by-transaction and statistical sampling approaches, the Court will briefly describe these two methods of performing the historical accounting. A transaction-by-transaction reconciliation "would involve attempting to research all transactions that have occurred in each account in order to try and locate documents which could demonstrate each transaction was correct and then applying appropriate verification procedures to the reconstruction." Id. at 17526. A statistical sampling approach, in contrast, would involve using "a statistically relevant sample of accounts, transactions, or tracts of land to support a reasonable inference about the accuracy of past account transaction activity." Id. at 17527. With respect to the statistical sampling method, it is worth noting that the Department of Interior did not provide any details in the Federal Register notice on how the statistical sampling approach would be performed.

2000.[29] In the brief, the Interior Department once again argued that it–rather than the

Court–should have the opportunity in the first instance to define the parameter of any historical

accounting project, and that the notice in the Federal Register was the first step in that process.

Opening Brief for Appellants at 24 (arguing that this Court's decision was "premature because

the [1994 Act] contemplates that Interior will determine questions regarding the scope of any

historical reconciliation in the first instance."). Specifically, the Interior Department stated that

"after ensuring that implementation of the prospective reforms was well underway, [it] recently

has begun a process of examining how and to what extent to reconcile transactions within the

IIM trust which occurred prior to 1994, and has begun seeking appropriations for this

undertaking." Id. at 17; 60 (noting that "[t]he historical effort has recently been initiated by a

Federal Register announcement.").

Despite the fact that it was still receiving written comments in response to the Federal

Register notice and compiling observations from the public meetings, the Department of Interior

began seeking funding for a statistical sampling project in the summer of 2000.[30] On June 16,

---

[29]On May 12, 2000, the Department of Interior filed its second motion for partial summary judgment with this Court. In the motion, the Department argued that the 1994 Act did not require it to perform an accounting for funds not actually held in trust and deposited or invested pursuant to the Act of June 24, 1938. Defs.' Second Phase II Motion at 1.

[30]Although the documentary evidence states that the funding was for a "statistical sampling" proposal, certain Interior Department officials testified at trial that the terms "statistical sampling" and "historical accounting" were ill-defined and used very loosely, often interchangeably, during this period. See, e.g., Contempt II Tr. at 270 (Thompson); Contempt II Tr. at 2738-40 (Lamb). Indeed, Robert Lamb, Deputy Assistant Secretary for Budget and Finance, testified that "[a] person could be speaking and they would use both terms in the same sentence and kind of mean the same thing." Contempt II Tr. at 2739-40. Some Interior officials also testified that the Department had not yet made a decision regarding which accounting method it would use to perform a historical accounting at the time of these funding requests. See, e.g., Contempt II Tr. at 247-48. They contend that the Department decided to use the

statistical sampling approach on August 2, 2000. Consistent with these representations, the Department of Interior contends that the decision regarding how to perform the historical accounting had not yet been made, and that these funding requests were only a placeholder; that is, funding for whatever method of accounting the Department ultimately selected. See Defs.' Proposed Findings at 10-11. Plaintiffs, in contrast, argue (and the Court Monitor found) that these documents demonstrate that the Department of Interior had already decided to conduct the historical accounting project by using a statistical sampling approach. See Pls.' Proposed Findings at 12.

The Court rejects the Department's interpretation of these documents. Specifically, the Court finds by clear and convincing evidence that these funding requests were for exactly what they said, a "statistical sampling proposal." Although the Department did not know the precise manner in which the statistical sampling would occur (which is why the proposal is at times referred as a pilot project), the evidence adduced at trial shows that statistical sampling was the chosen methodology for performing the historical accounting of the IIM trust accounts. Thus, the Court finds that the Department had decided–albeit not officially–to use statistical sampling as the method of performing the historical accounting no later than June of 2000. This finding is important because it supports the plaintiffs' contention that the publication of the notice in the Federal Register was a sham. That is, if the Department selected a specific method to perform the historical accounting before the comments to the notice in the Federal Register were collected and evaluated, then the plaintiffs would be well on their way to proving that the Federal Register process was a farce and that the Department committed a fraud on this Court (as well as the D.C. Circuit).

The Court makes these findings for several reasons. First, the Department of Interior had considered using statistical sampling to perform the historical accounting for several years. See generally Tr. of October 21, 1997 Hearing; Defendants' June 30, 1998 Motion to Adopt Defendants' Sampling Approach. There is no evidence, however, that the Department ever actually contemplated utilizing the transaction-by-transaction method. In fact, the evidence suggests that the Department had rejected the latter approach out of hand based on unsubstantiated cost and time projections as well as the Department's view that Congress would never fund such an accounting. Thus, it is highly improbable that when the Interior Department requested funding to perform the historical accounting it intended the money to be used for anything other than a statistical sampling project. Second, the requests themselves do not indicate that the funding is only meant to be a placeholder. Rather, the requests plainly state that the money will be used to fund a statistical sampling proposal--an approach that the Department had been considering for years. Third, in April of 2000, the Department of Interior detailed specific methods of performing a historical accounting in the Federal Register. The Court finds it highly unlikely that shortly thereafter the Department prepared budget requests that used the term "statistical sampling" to refer broadly to any of the methods listed in the notice. Finally, during this contempt trial, the Principal Deputy Special Trustee agreed that there had been a "continuing dialogue between DOI officials and Congressional appropriations staffers" concerning the need to fund a statistical sampling proposal. Contempt II Tr. at 342-43.

Even if the Court were to assume that these funding requests were just a place holder and

-41-

2000, Assistant Secretary John Berry, from the Office of Policy, Management and Budget, sent an "urgently needed FY 2001 budget amendment request for the Department of Interior" to Jacob Lew, Director of the Office of Management and Budget. Pls.' Ex. 1, Tab 9. In his letter, Assistant Secretary Berry wrote that "[i]n addition to the costs to mitigate the Court-identified breaches in FY 2001, the Department estimates a cumulative shortfall of $16.7 million for trial two litigation activities and costs for a statistical accounting stemming from the Federal Register Notice process." Id. at (unnumbered page) 3. Assistant Secretary Berry went on to write that while "[t]he costs associated with carrying out the statistical sampling proposal are difficult to estimate[,] . . . [c]onsultants will likely need to be hired at a cost of $9 million to develop and carry out the proposal." Id. at (unnumbered page) 4. Moreover, by July of 2000, the Department's effort to fund the statistical sampling project was moving from the Office of Management and Budget to Congress. Pls.' Ex. 1, Tab 12.[31]

By late July of 2000, the Solicitor's Office became concerned that the Department was taking too long to decide officially how it was going to perform the historical accounting of the IIM trust accounts. Several months had passed since the Department published its notice in the Federal Register, and oral argument before the D.C. Circuit was scheduled for September 5, 2000. Contempt II Tr. at 388 ("because there had not been a decision, there hadn't been much

_____

that the Department did not decide to use the statistical sampling method until August 2, 2000, it would not change the Court's ultimate conclusions regarding either Specification 1 or Specification 2.

[31]It is worth noting that at this time the Department of Interior along with the Department of Justice appear to have been discussing a limited statistical sampling pilot project known as the Wecker proposal. See Pls.' Ex. 1, Tab 10; Tab 11. Ultimately, however, the Department of Interior decided not to fund or participate in the Wecker proposal. Pls.' Ex. 1, Tab 13.

movement in recent months on the Federal Register notice, it was necessary in the minds of some to show some movement that could be offered to the appeals court with regard to the Federal Register notice."). Accordingly, on August 2, 2000, Anne Shields, Chief of Staff for then-Secretary Babbitt, chaired a meeting with certain senior Interior officials–including attorneys from the Solicitor's Office–to discuss the historical accounting project. Contempt II Tr. at 2742-43; Contempt II Tr. at 388; Contempt II Tr. at 688.

The participants did not know prior to the meeting that they were going to discuss how the historical accounting should actually be performed. Rather, some officials, such as the Assistant Secretary for Budget and Finance, thought that the Chief of Staff called the meeting to discuss who would carry out the historical accounting project. Contempt II Tr. at 2742-43 ("I had gone-- kind of lobbied to talk about the who, . . . [w]ho is going to be in charge of historical accounting."). Other officials, in contrast, such as the Principal Deputy Special Trustee, thought that the meeting had been called to discuss how the Department would go about deciding which method to use to perform the historical accounting. Contempt II Tr. at 75 ("we actually went there for a different agenda purpose, which was to discuss what the options were and how to decide how to do [the] historical accounting[.]"). In accordance with the Principal Deputy Special Trustee's understanding of the meeting, the Office of the Special Trustee prepared a presentation on how the Interior Department should go about deciding which method to use to perform the historical accounting. Contempt II Tr. at 140.

Notwithstanding this uncertainty, the participants began discussing statistical sampling as the preferred method for performing the historical accounting soon after the meeting started. Contempt II Tr. at 419-20. In fact, the Office of the Special Trustee did not even have the

opportunity to make its presentation regarding how the Department should go about deciding which approach to employ before the attendees began discussing using the statistical sampling method to perform the historical accounting. Contempt II Tr. at 75-76 ("We never got to that agenda item in the meeting . . . as it turned pretty quickly to a discussion about statistical sampling and who would do it."); Contempt II Tr. at 580 (same). Although there was some discussion of the other approaches identified in the Federal Register (including transaction-by-transaction), these methods were in effect summarily rejected. Contempt II Tr. at 453-54 (Principal Special Deputy Trustee agreeing that "[t]here was no sentiment for th[e] [transaction-by-transaction] method of accounting and the participants rejected it out of hand at the meeting."). See also Contempt II Tr. at 432-33 ("[t]here was discussion in the meeting about other concerns and other issues on historical accounting, but the majority of the discussion and obviously the result of the discussion was selection of statistical sampling.").

The Chief of Staff decided, with the approval of those attending the meeting (including the attorneys from the Solicitor's Office), that the Department would utilize the statistical sampling method to perform the historical accounting of the IIM trust accounts. Contempt II Tr. at 432 ("There was clearly a decision in that meeting that statistical sampling would be the approach taken."); Contempt II Tr. at 433 ("Anne Shields was the senior person there and she [made the decision] based on a consensus or unanimous views of the people at the meeting."). The Chief of Staff also decided that the Office of the Special Trustee would be in charge of the statistical sampling project. Contempt II Tr. at 434; Contempt II Tr. at 2753-54. In choosing a specific method to perform the historical accounting at the August 2, 2000 meeting, the participants explicitly discussed what they could do to support the appeal pending with the D.C.

-44-

Circuit. Contempt II Tr. at 388.[32] Several officials thought that selecting a particular method to perform the historical accounting would help the Department's pending appeal because it would show that the agency was making progress towards fulfilling its fiduciary obligations. Contempt II Tr. at 388.

The Department of Interior did not research the merits of the statistical sampling approach before selecting it on August 2, 2000, see Contempt II Tr at 577-78, or the costs and benefits of the transaction-by-transaction method before summarily rejecting it at the August 2, 2000 meeting, see Contempt II Tr. at 281. Contempt II Tr. at 581. As the Special Trustee, Thomas Slonaker, testified during the contempt trial:

> Q.   The next conclusion of the Court Monitor is as follows: "The Interior Secretary's decision was not supported by any legitimate decisionmaking process or research effort to determine the method to conduct an historical accounting."
>          Do you agree with that?
>
> A.   Yes.
>
> Q.   Why do you agree with that?
>
> A.   On its face, there is no particular logical step to what was done.
>
> Q.   There was no logical step at the time the Federal Register Notice process occurred; is that a fair statement?
>
> A.   Yes.
>
> Q.   And is there any now?

---

[32]It is important to note that "[i]n the backdrop of these decisions and these considerations about whether [this] Court['s] order was being complied with was a heavy reliance that, on appeal, the Interior Department would be sustained." Contempt II Tr. at 463-64. That is, the Interior Department and its attorneys from the Department of Justice thought that the appeal was a "slam dunk." Contempt II Tr. at 1018.

A.    To go to a statistical sampling?

Q.    Correct.

A.    I don't believe so.

Q.    You've never seen any research to support it, have you?

A.    No.

Contempt II Tr. at 2190-91.  In fact, the only action taken by the Department to determine how to

perform the historical accounting was placing a notice in the Federal Register.[33]  Contempt II Tr.

at 289.  Indeed, as explained above in footnote 31, during the summer of 2000 the Department of

Interior considered (but ultimately decided against) joining a pilot study by the Justice

Department which would have evaluated the potential use of the statistical sampling method to

perform the historical accounting.  Pls.' Ex. 1, Tab 10; Tab 11.  In a memorandum to Justice

Department attorneys dated July 24, 2000, Robert Lamb, Deputy Assistant Secretary of Interior

for Budget and Finance, wrote that the Department "obviously will learn about the strengths and

weaknesses of the sampling methodology through the pilot process."  Pls.' Ex. 1, Tab 11 (stating

further that "[t]hat after all is the purpose of a pilot.").[34]  The pilot project became moot nine days

_____

[33]As noted above, the Department actually published the notice in the Federal Register so that it could appeal this Court's Phase I trial ruling.

[34]In fact, in Deputy Assistant Secretary Lamb's memorandum dated July 24, 2000, the Department of Interior offered to participate in and help fund the Justice Department's statistical sampling pilot project. Pls.' Ex. 1, Tab 11 (Deputy Assistant Secretary Lamb writing that "the Department is willing to fund the cost of the pilot."). This offer was subsequently withdrawn, however, since the Interior Department decided (nine days later) to use the statistical sampling approach to perform the historical accounting. Contempt II Tr. at 280-81 ("this was no longer necessary and not probably a good use of Interior's resources, since we already made a decision to do statistical sampling on the 2nd of August."). See also Pls.' Ex. 1, Tab 13.

later, however, when the Interior Department selected the statistical sampling method to perform

the historical accounting.  Contempt II Tr. at 280-81.

The Department of Interior also had not compiled or evaluated the results of the Federal

Register process before deciding to use the statistical sampling approach to perform the historical

accounting.  Pls.' Ex. 1, Tab 15.  Indeed, as Deputy Assistant Secretary Lamb noted in the July

24, 2000 memorandum mentioned above, "the analysis of comments is just beginning[.]"  Pls.'

Ex. 1, Tab 11.  Assistant Secretary Lamb explained in more detail during the contempt trial what

he meant when he wrote this particular part of the memorandum:

> the comments from the Federal Register process was just beginning and
> what I was trying to say there is that I am not deciding -- I don't know how
> ultimately we are going to do an historical accounting.  We've got a Federal
> Register process, the one you and I have been talking about, that was
> wrapping up.  We would have those results in, you know, in due
> course, we're keeping an open mind, we're not prejudging -- I
> wasn't prejudging the results.

Contempt II Tr. at 2740.

At the same time, however, the Department of Interior knew even before publishing the

notice in the Federal Register that the Indian beneficiaries would want a full transaction-by-

transaction accounting of their assets held in trust by the federal government.  See, e.g.,

Contempt II Tr.at 72 ("For 15 years, we had heard from the Indians about their preference for a

transaction by transaction accounting of their monies . . . .");  Contempt II Tr. at 246 (The Federal

Register process "was preordained in the sense that I [Thompson] knew the answer from the

beneficiaries, that they would ask for a transaction by transaction analysis.").  Many senior

officials at the Interior Department (including some attending the meeting) also knew, as of

August 2, 2000, that the vast majority of the comments to the notice in the Federal Register

favored the transaction-by-transaction approach. Contempt II Tr. at 290-91 ("it was generally known that the results across the board from the senior managers was that the -- that the beneficiaries were asking for a transaction-by-transaction accounting.").

Consequently, the Interior officials at the August 2, 2000 meeting recognized that the Department would have to explain why it selected the statistical sampling method to perform the historical accounting of the IIM trust accounts instead of the transaction-by-transaction approach. Contempt II Tr. at 284 (Principal Deputy Special Trustee, testifying that "[i]n the session I cautioned that you've got the Federal Register notice which didn't lead you into this path. You're going to have to reconcile that issue[.]"); Contempt II Tr. at 436 (recognizing that it was not going "to be acceptable to abandon the [Federal Register] process and leap strictly into statistical sampling without some explanation of why that decision was taken."). The participants at the meeting discussed who would be in charge of writing a memorandum explaining the basis for the Department's decision. Contempt II Tr. at 435. The Interior officials present at the meeting selected Kevin Gover, then-Assistant Secretary of Interior for Indian Affairs, to draft a memorandum that provided the reasons why the Department rejected the transaction-by-transaction approach in favor of the statistical sampling method. Contempt II Tr. at 435-36. In addition, the Special Trustee agreed to write a separate memorandum outlining the statistical sampling approach that the Department planned to use to perform the historical accounting. Contempt II Tr. at 435. Both of these memoranda were to be submitted to Secretary Babbitt since he had final decision making authority over the method that the Department of Interior would use to perform the historical accounting of the IIM trust accounts. Thomas Thompson, the Principal Deputy Special Trustee, agreed to draft a memorandum for Secretary Babbitt's

signature officially adopting statistical sampling as the approach that the Department would use to perform the historical accounting. Contempt II Tr. at 435.

On August 11, 2000, Jim Pace, the primary project officer from OAIT, drafted a memorandum on behalf of then-Assistant Secretary Gover summarizing the results of the Federal Register process. Pls.' Ex. 1, Tab 15.[35] Pace began the memorandum by reiterating that Interior published the notice in the Federal Register "to initiate an information gathering process with IIM account holders" to determine how the Department should perform the historical accounting of the IIM trust accounts. Pls.' Ex. 1, Tab 15 at 2. Pace then noted that more than one thousand individuals attended the public meetings (sixty percent of whom identified themselves as IIM account holders), and that most of the participants provided their comments orally. Pls.' Ex. 1, Tab 15 at 3. He also observed that in addition to the seven written comments submitted at the public meetings, the Department received one-hundred-and-forty-six written comments by mail. Pls.' Ex. 1, Tab 15 at 3. In summarizing the comments to the notice, Pace found that:

> eighty-one of the respondents who wrote in, and an overwhelming majority of those who voiced their preferences at the public meetings wanted to see a transaction-by-transaction reconciliation, in spite of the discouraging language contained in the Federal Register Notice stating that such a solution was not very likely since Congress had already dismissed such a solution.

Pls.' Ex. 1, Tab 15 at 3. The memorandum did not address the Department's decision to use the statistical sampling method to perform the historical accounting. That is, Pace did not attempt to explain why the Department selected the statistical sampling method instead of the transaction-by-transaction approach.

---

[35]It is important to note that this was the first (and only) memorandum by the Department addressing the comments to the notice in the Federal Register.

On August 23, 2000, an attorney in the Solicitor's Office named Edith Blackwell

redrafted the memorandum that Pace had prepared summarizing the results of the Federal

Register process.[36]  Pls.' Ex. 1, Tab 16.  Blackwell redrafted the memorandum so that it would

support the decision (made on August 2, 2000) to use the statistical sampling method.  Contempt

II Tr. at 290; Contempt II Tr. at 452-53.  In revising the memorandum, Blackwell stated that she

"tried to create a decisional document which provides the rational[e] for the decision" to employ

the statistical sampling method instead of the transaction-by-transaction approach.  Pls.' Ex. 1,

Tab 16 at 1.  In rejecting the latter approach, Blackwell wrote that:

> the question of a historical accounting has been reviewed by Department staff,
> Congress, and outside third parties.  A transaction-by-transaction accounting
> would cost hundreds of millions of dollars and take many years to complete.  To
> accomplish this task would require the Department to significantly increase BIA
> staff and Congress to double BIA's current appropriation.  Based on informal
> discussions we do not believe that Congress is willing to fund a transaction-by-
> transaction reconciliation.  Given the critical unmet educational, infrastructure and
> economic needs of Indian people, we believe that funding a transaction-by-
> transaction analysis is not appropriate.

Pls.' Ex. 1, Tab 16 at 3.  With respect to the Department's decision to employ the statistical

sampling method to perform the historical accounting, Blackwell wrote that:

> We believe that [by] using statistical sampling we can perform a transaction-by-
> transaction analysis on a statistically significant portion of the total number of
> accounts.  With a high degree of confidence we believe we can extrapolate to all
> account holders an error rate.  We believe that this approach is best given the
> massive number of records, the complexity, and the condition of the records.  We
> also note that GAO and Congress have suggested sampling.

Pls.' Ex. 1, Tab 16 at 4.  Blackwell went on to describe the manner in which the Department

---

[36]It is worth noting that Edith Blackwell attended the meeting held on August 2, 2000, in
which the Department decided to use the statistical sampling approach to perform the historical
accounting.  Contempt II Tr. at 388.

planned on carrying out the statistical sampling project. Pls.' Ex. 1, Tab 16 at 4. Upon

completion of her revised draft, Blackwell distributed the memorandum (via e-mail) to other

attorneys in the Solicitor's Office and to certain senior Interior officials to review. Pls.' Ex. 1,

Tab 16. Despite these substantial revisions, it is important to note that then-Assistant Secretary

Gover did not finalize his memorandum for then-Secretary Babbitt until December 21, 2000.

Pls.' Ex. 1, Tab 3.

     In the interim, on September 5, 2000, the D.C. Circuit heard oral argument regarding the

Department's interlocutory appeal. At the hearing, the Interior Department claimed–as it had in

its corrected petition for permission to appeal and in its appellate briefs–that it was in the process

of discharging properly its fiduciary obligations towards the Indian trust beneficiaries. Pls.' Ex.

1, Tab 19. Specifically, with respect to the historical accounting (or reconciliation), the

Department noted that it commenced an administrative process in April of 2000 by publishing a

notice in the Federal Register. Pls.' Ex. 1, Tab 19. In accordance with this representation, the

Department argued that "Congress expected th[e] reconciliation process to be done

administratively," and that "it's not something which can be done initially in court." Pls.' Ex. 1,

Tab 19.[37] Thus, the Department argued, as it had previously, that this Court did not have

jurisdiction to determine the scope of the historical accounting of the IIM trust accounts before

---

[37]It is worth noting that the D.C. Circuit did not find the Department's argument
persuasive. In particular, one judge on the panel stated that:
> we spend our lives reviewing judicially those things which are to be done first
> administratively. I am not sure why you think it advances the ball any to say
> Congress meant for it to be done administratively[.]

the agency itself had decided how and to what extent it was going to do so.[38]

In December of 2000, then-Assistant Secretary Gover, Special Trustee Slonaker, and Principal Deputy Special Trustee Thompson completed their memoranda regarding the decision to utilize the statistical sampling method. Pls.' Ex. 1, Tab 18. In an e-mail dated December 18, 2000, the Special Trustee indicated that he was satisfied with the latest draft of the Assistant Secretary's memorandum. Pls.' Ex. 1, Tab 18. The Special Trustee then asked Edith Blackwell and Tim Elliot,[39] two attorneys in the Solicitor's Office, whether they agreed with his assessment. Pls.' Ex. 1, Tab 18. While it is unclear whether these two attorneys had additional comments to make to the Assistant Secretary's memorandum (Blackwell had, as noted above, already redrafted it back in August of 2000), they did express dissatisfaction with both the Special Trustee's and the Principal Deputy Special Trustee's memoranda. Specifically, Blackwell wrote in response to the Special Trustee's e-mail message that:

> Tim and I are not O.K. with the memo [written by the Principal Deputy Special Trustee] for the Secretary's signature. In addition, Tom [Slonaker] your memo discusses the lack of funding but Congress gave us money for this project this year. Among other things, the letter for the Secretary's signature states that the

---

[38]There were two other developments at this time worth mentioning. First, on September 19, 2000, the Department of Interior filed its third motion for partial summary judgment with this Court. In the motion, the Department argued that neither the 1994 Act nor any other law required it to account for transactions that occurred in IIM accounts before 1951. Defs.' Third Phase II Mot. at 1-2. The Department asserted that prior to 1951 the IIM accounts were "settled" by the Department of Treasury (until 1921) and the General Accounting Office (between 1921 and 1951). Id. Second, on September 29, 2000, Congress approved the Department's funding request for a statistical sampling project. Pls.' Ex. 1, Tab 2. In so doing, it noted that "while approving the request to begin an IIM sampling approach, the managers direct the Department to develop a detailed plan for the sampling methodology it adopts, its costs and benefits, and the degree of confidence that can be placed on the likely results." Pls.' Ex. 1, Tab 2.

[39]It is important to note that Tim Elliot also attended the August 2, 2000 meeting. Contempt II Tr. at 388.

Secretary accepts the Special Trustee's conditions, one of them being funding. I believe that this and other problems with the Secretary's memo must be fixed and would advise the Special Trustee to update his letter to note that funding has been received.

Pls.' Ex. 1, Tab 18. Shortly after Blackwell sent her response, Elliot showed his displeasure by writing that:

I agree with Edith's comments. My earlier comments went only to the question asked (Kevin's Memo). Edith, have you taken a stab at re-drafting the memorandum for the Secretary. If not, we probably should. I am particularly concerned that it does not mention the memorandum from Kevin, whose memo is the only one to explain why we are not following the majority of the comments received.

Pls.' Ex. 1, Tab 18.

On December 21, 2000, after these revisions were made, the Assistant Secretary for Indian Affairs, the Special Trustee, and the Principal Deputy Special Trustee submitted their respective memoranda to then-Secretary Babbitt. Pls.' Ex. 1, Tab 3. Then-Assistant Secretary Gover included in his final draft the paragraph written by Blackwell which stated that:

Department staff, Congress, and outside third-parties have all reviewed the question of how to perform a historical accounting. Each agrees that a complete transaction-by-transaction accounting for every account would cost hundreds of millions of dollars and take many years to complete. Moreover, to accomplish this task would require the Department to significantly increase its BIA staff and would require Congress to double BIA's current appropriation.

Pls.' Ex. 1, Tab 3. He went on to note that Congress observed in the Conference Report accompanying the Department's FY 2001 Appropriation that using the transaction-by-transaction approach to perform the historical accounting could cost hundreds of millions of dollars, and that "the managers have been concerned for years about the potential cost and effectiveness of any approach that might be used." Pls.' Ex. 1, Tab 3. Additionally, then-Assistant Secretary Gover

justified using the decision to employ the statistical sampling method by writing that:

> With the administrative process complete and with the above direction from
> Congress, it is now up to the Department to decide on a course of action.
> Although the majority of comments received from the Federal Register notice
> preferred a complete transaction-by-transaction reconciliation, Congress has made
> it clear in the above language that they are unlikely to fund such a process.
> Furthermore, I must take into consideration the critical unmet educational,
> infrastructure and economic needs of Indian people in allocating the limited
> appropriations available to the BIA.  I believe that through statistical sampling, we
> can perform a transaction-by-transaction analysis on a statistically significant
> portion of the total number of accounts.  This approach is best, given the massive
> number of records, the complexity, and the condition of the records.  Therefore,
> taking into consideration the entire Federal Register process, Congress' directive
> and the other critical needs of the Department, I believe that a sampling approach
> represents the best alternative to meeting our goals under the 1994 American
> Indian Trust Fund Management Reform Act.

Pls.' Ex. 1, Tab 3.  In his memorandum, on the other hand, the Special Trustee outlined the

process the Department would follow in carrying out the statistical sampling project.  Pls.' Ex. 1,

Tab 3.  It is worth noting that the scope of the statistical sampling project was limited to 1952-

1993.  Pls.' Ex. 1, Tab 3.

On December 29, 2000, then-Secretary Babbitt officially selected the statistical sampling

method to perform the historical accounting of the IIM trust accounts.  Pls.' Ex. 1, Tab 4.  In a

one-page memorandum, then-Secretary Babbitt wrote that:

> I have reviewed the attached memoranda from the Special Trustee for American Indians
> and the Assistant Secretary–Indian Affairs.  I concur with the recommendation of each
> that the Department should use statistical sampling instead of attempting a transaction-by-
> transaction historical reconciliation of all IIM accounts.

Pls.' Ex. 1, Tab 4.  Then-Secretary Babbitt went on to note that Congress had already

appropriated approximately ten million dollars for a statistical sampling project–money that had

been requested months earlier.  Pls.' Ex. 1, Tab 4.  He also wrote in the memorandum that:

> the Department . . . believe[s] that [it] must examine past account activity to discover information that will enable beneficiaries and the Department to evaluate whether income from individual trust assets was properly credited, maintained, and distributed to and from IIM accounts before October 25, 1994. <u>As part of this process, the Department is exploring approaches to gather such information so as to fairly compensate beneficiaries and finally resolve any discrepancies.</u>

Pls.' Ex. 1, Tab 4 (emphasis added).  Then-Secretary Babbitt concluded the memorandum by writing that "I have asked the Special Trustee to plan, organize, direct, and carry-out th[e statistical sampling project] including developing the detailed plan required by Congress in the Conference Report." Pls.' Ex. 1, Tab 4.

On January 8, 2001, the Department of Interior filed then-Secretary Babbitt's decisional memorandum as well as the Assistant Secretary for Indian Affairs' and the Special Trustee's memoranda with the D.C. Circuit. Pls.' Ex. 24.  In the transmittal letter, the Department told the D.C. Circuit that, "[a]s indicated in these supporting memoranda, the Secretary's decision flows out of the Federal Register process discussed in the Opening Brief for Appellants at 17, 60, and in the Appellees' Response Brief at 33-34." Pls.' Ex. 24.  The next day, the Department of Interior filed all three memoranda with this Court.  Pls.' Ex. 23.  Specifically, the Department told this Court that "[n]otice is hereby given of the filing of the attached Memorandum from Secretary Bruce Babbitt regarding the statistical sampling of Individual Indian Money accounts, with supporting memoranda from Tom Slonaker, Special Trustee for American Indians, and Kevin Gover, Assistant Secretary for Indian Affairs." Pls.' Ex. 23.

In late January of 2001, Gale Norton replaced Bruce Babbitt as Secretary of the Interior. Contempt II Tr. at 4279.

3.     The Department of Interior's Actions From February 2001-February 2002

On February 27, 2001, Secretary Norton "opted to follow" former-Secretary Babbitt's decision to use the statistical sampling method to perform a historical accounting. Pls.' Ex. 1, Tab 21; Tab 23.[40]  Specifically, Secretary Norton issued a one-page memorandum entitled "Statistical Sampling of Individual Indian Money Accounts."  Pls.' Ex. 1, Tab 21.  After referencing the memoranda from Secretary Babbitt dated December 29, 2000, the Special Trustee for American Indians dated December 21, 2000, and the Assistant Secretary for Indian Affairs dated December 21, 2000, Secretary Norton wrote that:

> I concur in the directive that the Department proceed with a form of statistical sampling using a methodology which will provide the basis for an historical accounting of the IIM accounts.  The purpose for this process should be to fulfill the court's directive to provide the IIM trust beneficiaries an accounting for their funds held in trust by the United States since the Act of June 24, 1938.

Pls.' Ex. 1, Tab 21.  Like former-Secretary Babbitt, Secretary Norton also assigned the task of planning, organizing, and performing the statistical sampling project to the Special Trustee.  Pls.' Ex. 1, Tab 21.

The Department of Interior did not perform any additional research regarding the different accounting methods prior to Secretary Norton's decision on February 27, 2001.  Contempt II Tr. at 507-508; Contempt II Tr. at 4387.  In fact, Secretary Norton did not even consider the other approaches listed in the Federal Register before affirming former-Secretary Babbitt's decision to use the statistical sampling method.  Contempt II Tr. at 4387-88.  As Secretary Norton testified during the contempt trial:

---

[40]It is worth noting that Secretary Norton made her decision four days after the D.C. Circuit issued its opinion affirming this Court's Phase I trial ruling.  Cobell VI, 240 F.3d at 1110.

> I didn't really understand that memo as making a
> choice on the various models of accounting. I -- the model
> that I knew of was statistical sampling. I look[ed] at the Court
> of Appeals decision. It said statistical sampling was
> something that the Department of Interior could choose, and so
> without realizing that that might be viewed as contrary to
> anything that this Court had said, we -- I basically signed it
> and said get busy, go ahead and start moving on this activity
> and assigned to the Special Trustee the responsibility to move
> forward with that.

Contempt II Tr. at 4338.

As of March 2001, the Department of Interior had not yet begun collecting missing

information from outside sources that would help it render a historical accounting of the IIM trust

accounts.[41]  Contempt II Tr. at 760.  See also Contempt II Tr. at 473-76.  In particular, the

Department made no attempt to obtain missing documents produced prior to 1994.[42]  Contempt II

Tr. at 803-04 ("there was no effort proposed or attempted of a concerted effort to locate missing

documents from the period 1994 and [backward].").  Attorneys in the Solicitor's Office played a

significant role in the Department's decision not to begin collecting pertinent documents made

prior to 1994.  Contempt II Tr. at 765; 779; 788-89; 792-93.  Specifically, the attorneys in the

Solicitor's Office did not think that the Department had any obligation to collect such documents

and believed that doing so would be inconsistent with its legal position before the D.C. Circuit.

Contempt II Tr. at 766-67.  As the Principal Deputy Special Trustee testified at trial:

---

[41]As of February 2002, it was still unclear to the Court what efforts, if any, have been made by the Department of Interior to locate missing documents.  Contempt II Tr. at 804 (The Department is "working on the planning and replanning [of] this information collection effort in light of the Secretary's decision to do a full accounting.").

[42]The Department assumed that it had "in its possession the bulk of documents, information and data generated since 1994[.]"  Pls.' Ex. 7 (Report on Collecting Information From Outside Sources) at 2.

> The overarching consideration was the appeal and
> the expectation that [this Court's] order would be overturned. That
> figured into a lot of this discussion and a lot of this work.
> In preparing this report we first tried to focus the effort
> toward an accounting, what it took to do an accounting, but we
> were not allowed to really use the term accounting as we
>
> understood it in conjunction with this effort.
> The earlier drafts of this report look radically
> different than what you see in the published report. The
> attorneys in this case were arguing that we did not have a
> statutory duty to do an accounting before 1994, and were
> arguing that through the litigation process.

Contempt II Tr. at 766-67. See also Contempt II Tr. at 794 ("The basic argument was that there

was not an obligation to perform an accounting before 1994. That was going to be

appealed and it was going to be won.").

Moreover, the Department failed to inform the Court that it was not going to attempt to

locate pertinent documents produced prior to 1994. For example, in its Report on Collecting

Information From Outside Sources, Interior stated that:

> Although th[is] [Court's Phase I trial] Order did not define the period to be
> covered by the directed accounting, the question of the scope and nature of
> Department's responsibility to render an accounting prior to October 25, 1994, the
> effective date of the Indian Trust Fund Management Reform Act, is under appeal.
> Therefore, this document details the proposed strategies for collecting missing
> information to meet Interior's statutory obligation.

Pls.' Ex. 7 (Report on Collecting Information From Outside Sources) at 2. In addition, the

Quarterly Reports submitted by the Department beginning in March of 2000 included similarly

vague statements regarding the scope of the document collection project. See, e.g., Pls.' Ex. 9 at

37.[43] Attorneys in the Solicitor's Office also played a significant role in determining the

---

[43]It is worth noting that even the Department describes its reports as containing oblique
and fleeting references to the fact that the collection project did not include documents produced

language used in these reports. See, e.g., Contempt II Tr. at 766-67.

The Court appointed a Court Monitor in this case on April 16, 2001. The Court Monitor was directed to "monitor and review all of the Interior defendants' trust reform activities and file written reports of his findings with the Court." Order of April 16, 2001 at 2. In accordance with this order, the Court Monitor began reviewing the Department of Interior's efforts to perform a historical accounting in late April of 2001. As part of his review, the Court Monitor requested certain information from Michael Rosetti, who had recently joined the Department as Counselor to Secretary Norton. Pls.' Ex. 1 at 37; Contempt II Tr. at 4388. Specifically, the Court Monitor asked Rosetti "to determine what research the Secretary had directed or her subordinates had done in preparation of her memorandum concurring in the statistical sampling project first directed by Secretary Babbitt." Pls.' Ex. 1 at 37. In addition to this request, the Court Monitor asked Rosetti questions regarding what the Department had (and had not) done to facilitate ultimately performing a historical accounting since the Court issued its Phase I trial ruling. Pls.' Ex. 1 at 38. See also Contempt II Tr. at 4388. In response to these inquiries, Rosetti indicated that the Department would reexamine its decision to use the statistical sampling method to perform the historical accounting. Pls.' Ex. 1 at 38. See also Contempt II Tr. at 4388.

By memorandum dated July 10, 2001, Secretary Norton announced that the Department of Interior was going to reconsider which accounting method it should use to perform the historical accounting of the IIM trust accounts. Pls.' Ex. 1, Tab 25. See also Contempt II Tr. at 336-342; Contempt II Tr. at 496 ("It would seem to me that the first memorandum, to coin a phrase, was no longer operative."). That is, as of July 10, 2001, the Department of Interior did

_____

prior to 1994. See Defs.' Proposed Findings at 14.

not know which method or methods it was going to use to perform a historical accounting of the

IIM trust accounts. Rather, as Secretary Norton indicated in her memorandum, the Department

was going to begin the process of selecting an accounting method anew. Pls.' Ex. 1, Tab 25.

Specifically, after recognizing that "an accounting to the IIM beneficiaries is long overdue[,]"

Secretary Norton wrote that:

> The next step in this process is to develop a comprehensive plan for the historical accounting. Although myriad accounting approaches may be employed in some form and to some degree in this endeavor, it is imperative that the Department's approach satisfies our obligation to account and that the methods used to meet that goal meet appropriate fiduciary standards.

Pls.' Ex. 1, Tab 25. To facilitate the decision-making process and the development of a

comprehensive plan, Secretary Norton established (by issuing a Secretarial Order on the same

date) the Office of Historical Trust Accounting ("OHTA"). Pls.' Ex. 1, Tab 25. Secretary

Norton explained in her memorandum that she was creating OHTA "to insure that [the

Department] begin[s] this comprehensive planning process promptly but at the same time ha[s]

the necessary information for due deliberation[.]" Pls.' Ex. 1, Tab 25. In particular, Secretarial

Order 3231 instructed OHTA "to plan, organize direct, and execute the historical accounting of

Individual Indian Money Trust (IIM) accounts." Pls.' Ex. 1, Tab 25. Moreover, Secretarial

Order 3231 directed OHTA to, within 60 days, "prepare a comprehensive description and

timetable for completion of all steps that are needed to staff and develop a comprehensive plan

for a historical accounting that meets the Department's fiduciary obligations to IIM

beneficiaries." Pls.' Ex. 1, Tab 25. Secretarial Order 3231 also directed OHTA to, within 120

days, "identify the preliminary work that can be done immediately." Pls.' Ex. 1, Tab 25.

On September 10, 2001, OHTA issued its Blueprint for Preparing the Comprehensive

Plan for the Historical Accounting of IIM Accounts ("Blueprint"). Pls.' Ex. 28.[44] OHTA

designed the Blueprint to serve as "the initial plan for the development of the 'comprehensive

plan for a historical accounting' or simply the Comprehensive Plan." Pls.' Ex. 28 at 8. Thus, as

Bert Edwards, Executive Director of OHTA, stated in his transmittal letter to Secretary Norton,

"[t]he Blueprint will be used as a starting point for the work that will transform it into the

Comprehensive Plan." Pls.' Ex. 28. See also Contempt II Tr. at 114 (referring to the Blueprint

as a plan to develop a plan to perform the historical accounting). OHTA estimated that it would

"complete the Comprehensive Plan by mid-year 2002." Pls. Ex. 28. In other words, the actual

plan (as opposed to the plan to develop a plan) would not be ready until more than thirty months

after this Court issued its Phase I trial ruling.

On November 7, 2001, OHTA issued its Report Identifying Preliminary Work for the

Historical Accounting. Pls.' Ex. 31.[45] In the Report, OHTA identified certain work that had

begun already or would begin shortly to support the Department's effort to perform a historical

accounting of the IIM trust accounts. Pls.' Ex. 31. In particular, OHTA stated that "[t]he

projects described in the Report will assist development of the Comprehensive Plan in a number

of ways while actually accomplishing part of the historical accounting for certain IIM accounts."

Pls.' Ex. 31 (transmittal letter). Thus, for example, in describing its activities regarding

Judgment and Per Capita Accounts, OHTA stated that a contractor to OST began (and

completed) a pilot test in June of 2001 to reconcile ten Judgment accounts and five Per Capita

---

[44]The Department of Interior filed a copy of the report with the Court on September 12, 2001.

[45]The Department of Interior filed a copy of the report with the Court on November 9, 2001.

transactions.[46]  Pls.' Ex. 31 at 14.  At the same time, however, OHTA reiterated that it did not

anticipate completing the Comprehensive Plan until the middle of 2002.  Pls.' Ex. 31 (transmittal

letter).

On November 14, 2001, the Department of Interior filed with the Court its notice of

proposed reorganization to improve Indian Trust Assets Management.  Pls.' Ex. 104.  In the

notice, the Department stated that "[t]he proposed reorganization results from concerted efforts

by Interior to create a management structure that can effectively implement trust reform and

eliminate problems identified by the Court, the Court Monitor, Interior, and Interior's consultant,

Electronic Data Systems Corporation ("EDS")."  Pls.' Ex. 104 at (unnumbered) 1.  In particular,

the Department indicated that:

> [t]he proposed reorganization consolidates Indian trust asset management
> functions in a new agency: the Bureau of Indian Trust Assets Management
> ["BITAM"].  The proposed Bureau will report to an Assistant Secretary for Indian
> Trust Assets Management. . .[Because] [t]he proposed reorganization impacts
> many interested parties[,] Interior has begun consultation with Indian tribes and
> with Congress. . . Trust reform activities will continue during this transition
> process.  The final organization structure will depend upon the results of the
> consultation process.

Pls.' Ex. 104 at (unnumbered) 2.  While it would be both premature and unnecessary at this time

for the Court to make any factual findings regarding the merits of the BITAM proposal,[47] it is

worth noting an exchange between plaintiffs' counsel and Tex Hall, a Tribal Chairman and an

_____

[46]Of course, in the same report OHTA recognized that: [t]hese IIM accounts are often
based on a single transaction and the accounts rarely include income based on allotted land
revenues or from other sources."  Pls.' Ex. 31 at 11.  See also Contempt II Tr. at 1085-87
(Principal Deputy Special Trustee testifying that this was a "fairly discrete" pilot project.).

[47]This is particularly true in light of the fact that Secretary Norton has subsequently
informed the Court that the proposal has been abandoned by the Department.

IIM account holder, at the contempt trial:

> Q.    I want turn you now to a discussion of what's been
> referred to as the BITAM proposal. Do you know what the BITAM
> proposal is? Or I should say the Bureau of Trust Asset
> Management Proposal from the Department of Interior?
>
> A.    Yeah. I -- we call it "bite 'em," but you know --
>
> Q.    And could you tell us in your understanding -- well,
> first of all, do you support that proposal? Do you believe
> that that's the answer to trust reform?
>
> A.    No, sir.
>
> Q.    And do you believe that the tribal leadership that you
> have been involved with in this -- in the task force believes
> that that is an appropriate proposal for trust reform?
>
> A.    The tribal leaders task force that I co-chair is 100
> percent opposed to BITAM.

Contempt II Tr. at 4472. For purposes of this contempt trial, it is sufficient for the Court to find

that no reorganization has occurred, and, in fact, the Department did not even have a final plan

that it was ready to implement at the time the record closed.

Moreover, as of February 2002 (when the record in this trial closed), the Department of

Interior did not know how it was going to perform a historical accounting of the IIM trust

accounts. It still only had, as the Principal Deputy Special Trustee testified at trial, a plan for

developing a plan.[48] Cf. Contempt II Tr. at 342; Contempt II Tr. at 1083-86.

---

[48]In addition, Secretary Norton testified about work that Ernst & Young has performed on
the accounts belonging to the five named plaintiffs. See, e.g., Contempt II Tr. at 4298-4330. The
Court finds that while the work performed on these accounts may assist the agency in performing
an accounting for those individuals, it was not done as part of a general effort to provide the IIM
trust beneficiaries with an accounting and there is no indication that the work can be or will be
used towards that end. It is absurd for the Secretary to now argue that the work performed by
Ernst & Young brings her into compliance with the Court's Phase I trial ruling.

**B.**     **TAAMS & BIA DATA CLEANUP–SPECIFICATIONS 3 & 4**

In this section the Court will present its findings of fact regarding Specifications 3 and 4.

Specifically, the Court will address in turn the TAAMS subproject, which relates to both of these

specifications, and the BIA Data Cleanup subproject, which is relevant to Specification 4.  The

Court will make its factual findings regarding TAAMS and BIA Data Cleanup chronologically.

　　　1.     <u>TAAMS</u>

　　　　　a)     <u>Background information on TAAMS</u>

"TAAMS is a general trust land management system that is intended to efficiently

manage" IIM and tribal trust accounts by "ensuring accurate distribution of funds to individuals

and tribes through a proper management framework." Pls.' Ex.60 at 31.  Although TAAMS will

perform (if fully implemented) numerous functions for the Department of Interior, <u>see</u> Pls.' Ex.

2, Tab 2 at 25-35, the system itself can be divided into three primary areas.  Pls.' Ex. 60 at 31.

First, the "Title" portion will enable TAAMS to identify all tracts of land held in trust for IIM

beneficiaries, maintain basic ownership data (current and history), and generate summary reports

with all ownership and encumbrance information (including active leases, contracts, and

agreements).  Pls.' Ex. 2, Tab 2 at 25-27.  <u>See also</u> Phase I trial Tr. at 2316-18 (testifying that "in

order to have a proper land title records system, you have to establish a chain of title.  And in the

case of Indian records, it's typical to go back to the original patent, you know, which is 1887, or

in that -- in that -- and that's our goal, is to have TAAMS have a full chain of title.").  Second, the

"Realty" or "Lease" part of TAAMS will report all activity on the individual tracts of land,

establish and maintain payor information, and incorporate modifications to specific leases.  Pls.'

Ex. 2, Tab 2 at 28-30.  <u>See also</u> Phase I trial Tr. at 2321-24 (noting that the Realty portion will,

-64-

among other things, keep information on payors). Third, the "Accounting" portion will allow

TAAMS to maintain a history of all account transactions, generate a payment schedule for and

record payments received from payors, and interface with the Trust Fund Accounting System

("TFAS").[49]  Pls.' Ex. 2, Tab 2 at 31-33.  See also Phase I trial Tr. at 2326-30 (noting that it will

generate "a payment schedule to the lessee and the lessor, the payor, and provide[] a bill so that

they have . . .all the correct information on it[.]").  Because of its ancillary nature, the Accounting

portion of TAAMS is designed to be implemented in conjunction with the Realty portion.  Pls.'

Ex. 60 at 31 (noting that "[t]he Accounting module tracks billings and accounts receivable of the

trust and is to be implemented in conjunction with Realty.").

 The Department of Interior acquired TAAMS (and TFAS) to replace two older or

"legacy" computer systems used by BIA.  Phase I trial Tr. at 2786 (noting that "the TAAMS

system really is intended to replace two legacy applications.").  The first system, which is known

as the Land Records Information System ("LRIS"), "supports the land title function by providing

land-title related information e.g. ownership and encumbrances."  Pls.' Ex. 6 at 68.  See also

Cobell V, 91 F.Supp.2d at 19.  The second system, which is known as the Integrated Records

Management System ("IRMS"), "supports the land resource management function and is

primarily used at the Agency level for generating lease bills and for income/revenue distribution

---

[49]TFAS is the other computer system that the Department of Interior acquired to assist it
in managing the IIM trust accounts.  See supra part II(A)(4).  Unlike TAAMS, which is a trust
asset management system, TFAS is a trust fund financial system.  Cobell V, 91 F.Supp.2d at 18.
As the Court noted in its Phase I trial opinion, "[a]ssuming that complete and correct information
is retrieved and loaded onto TFAS, and further assuming that TFAS can properly integrate with
the other necessary computer and business systems [like TAAMS], then it should allow Interior
to bring OTFM's financial management practices up to commercial standards."  Id.

to Indian owners." Pls.' Ex. 6 at 68.[50]  See also Cobell V, 91 F.Supp.2d at 19.

      b)     Phase I trial testimony regarding TAAMS (June 10, 1999-July 23, 1999)[51]

The Department of Interior presented extensive testimonial and documentary evidence

regarding TAAMS during the Phase I trial.  The primary witnesses for Interior on this subproject

were Dominic Nessi, then-Senior Advisor to the Assistant Secretary for Indian Affairs and

Project Manager for TAAMS, and David R. Orr, Senior Vice President of Applied TerraVision

Systems, Inc. ("ATS") (the vendor hired by Interior to provide the software system).  Several

other witnesses for Interior, including then-Secretary Babbitt and then-Assistant Secretary for

Indian Affairs Gover, also testified about TAAMS on a more limited basis during the Phase I

trial.  In addition, the Department introduced into evidence numerous exhibits related to this

particular subproject.  See, e.g., Defs.' Phase I trial Ex. 82.

During the Phase I trial the Interior Department acknowledged that the two primary

electronic database systems used by BIA to administer the IIM trust accounts–LRIS and

IRMS–were inadequate in several critical aspects.  See, e.g., Phase I trial Tr. at 412-21; 1153-54.

The Department admitted and the Court found that LRIS and IRMS do not enable the

Department to administer properly the IIM trust accounts.  Phase I trial Tr. at 148-53, 412-21,

441-42, and 1153-54; Cobell V, 91 F.Supp.2d at 19.  Based upon the representations made by the

Department's witnesses, the Court found the inadequacies of LRIS and IRMS to include (among

---

[50]It is worth noting that "[s]ome BIA offices use these systems, some use modified versions of these systems, some use their own 'in house' electronic databases, and others continue to use manual paper systems."  Cobell V, 91 F.Supp.2d at 19.

[51]Although the Phase I trial ended on July 23, 1999, the Department of Interior did not submit its proposed findings of fact and conclusions of law until August 4, 1999, and its response to the plaintiffs' proposed findings until August 9, 1999.

other things): "(1) inconsistent data, making it difficult to identify the appropriate owners of allotments or beneficiaries' appropriate land interests therein; (2) inconsistent use of the legacy systems; (3) significant backlogs in the certification of title; (4) the absence of important information, such as the schedules for payments due on leases; (5) the absence of an adequate general ledger system; (6) the nonexistence of a master list of leases and assets; and (7) insufficient internal controls and audits of the systems." Id.

The Department of Interior argued that the deficiencies of LRIS and IRMS should not affect the outcome of the Phase I trial, however, since none of them are "applicable to the new system being developed and implemented by BIA at the time of trial, the Trust Asset and Accounting Management System[.]" Defs.' Phase I trial proposed findings at ¶ 204. Interior stated that as a result of the legacy systems' limitations, the Strategic Plan recommended and the (original) HLIP required the development and implementation of a new trust management system, which the Department referred to as TAAMS. Phase I trial Tr. at 989-90. Thus, the Department contended that the legacy systems' admitted inadequacies were irrelevant at the time of trial because "TAAMS is, at heart, a data management system that contains all the essential functions to enable BIA to meet the requirements of the 1994 Reform Act." Defs.' Phase I trial proposed findings at ¶ 213. See also Defs.' Phase I trial proposed findings at ¶ 443. Moreover, the Department argued, in large part based on the testimony regarding TAAMS, that injunctive relief was not appropriate. The Department specifically stated that:

> [t]he testimony at trial showed that Interior is making good faith efforts to come into compliance with all legal obligations through promulgation and implementation of the HLIP. Plaintiffs have not shown that an injunction is necessary to prevent violations from persisting. There is no reason to conclude that an injunction is required to bring about compliance with these duties.

-67-

Defs.' Phase I trial proposed findings at ¶ 549 (citing ¶ 389, which quoted then-Assistant Secretary Gover as testifying that: "I believe the TAAMS project itself shows [w]hat this agency is capable of when it has the resources and when it's properly led. And I hope that my presentation will give the Court the confidence that our agency is capable of carrying out the remainder of this program."). See also Phase I trial Tr. at 5011 and 5063.

To support its position, the Department of Interior presented a large volume of testimonial and documentary evidence regarding the capabilities of TAAMS.[52] Specifically, witnesses for the Department stated that TAAMS will allow BIA to administer trust assets, generate timely bills, identify delinquent payments, track income from trust assets, and distribute proceeds to the appropriate account holders. Phase I trial Tr. at 1108, 2319, 2389-91, 2788, and 2810. The Department noted that the key features of TAAMS that will support these functions are an asset management system (with a master lease subsystem), a billing and accounts receivable subsystem, and a collection subsystem.[53] Defs.' Phase I trial Ex. 82; Phase I trial Tr.

---

[52]Before explaining the capabilities of TAAMS, the Department initially noted that the system was a commercial-off-the shelf system ("COTS"). Phase I trial Tr. at 2760. Interior contended that it prudently elected to use a COTS rather than build new software from the ground up since there was software commercially available that did many of the things that BIA needed to accomplish, and because it would result in significant time savings. Phase I trial Tr. at 992, 2359-60. See also Defs.' Phase I trial Ex. 82 ("DOI decided that a COTS effort would be the most efficient, effective and expedient process to replace the existing legacy systems."). At the same time, the Department recognized that some modifications were (and would be) made to the system to address the particular needs of BIA. The Department explicitly stated, however, that "these modifications were not unusual in terms of changes the [vendor] ha[s] made for other customers." Defs.' Phase I trial proposed findings at ¶ 209 n.40. Interior further noted that, prospectively, TAAMS has the capacity for expansion as the needs of BIA change. Phase I trial Tr. at 2361, 2391, 2375, and 2778.

[53]It is worth noting, in light of the recent cases filed by certain tribal beneficiaries, that the Department stated that "TAAMS includes both tribal lands and individual allotments and will be used as the primary tool in asset and resource management by BIA." Defs.' Phase I trial

at 2297-98. Witnesses for Interior also testified that TAAMS will have a major module for administering land title records, a sub-module for probate tracking, and a tickler system that will notify BIA employees of upcoming important events, such as when leases are about to expire, when it is time to advertise leases, and when collections are due. Phase I trial Tr. at 1150 and 2390. These witnesses further testified that TAAMS will also generate a report for each beneficiary covering all transactions related to leases on that beneficiary's property. Phase I trial Tr. at 2389-91.[54] In sum, the Department argued during the Phase I trial that TAAMS was a first-rate land management system, and that it was significantly better than the legacy systems used by BIA. See, e.g., BIA Press Release of June 25, 1999, TAAMS WORKS!!!, at 1 (quoting then-Assistant Secretary Gover as stating that "[t]his system is state of the art, and it has been designed by those who know exactly what the Trust Management System needs to do for Tribes and individuals."). Dominic Nessi, one of the primary Phase I trial witnesses for the Department, provided a noteworthy example of such testimony:

> Q.   As project manager, Mr. Nessi, can you describe for the Court in your view how good a system TAAMS is going to be?
>
> A.   It has the potential probably to be the best land management system in the United States. It has -- it's been built with the best technology that is available. It meets the needs of a user population because they've been intimately involved with its design. It's easily expandable. We have an excellent vendor who is -- stays on

proposed findings at ¶ 214 (citing Phase I trial Tr. at 994 and 180).

[54]The Interior Department also explicitly noted that TAAMS will be able to interface with TFAS. Phase I trial Tr. at 1154, 2273, and 2618. The Department further noted that "TFAS is integrally related to TAAMS through electronic interfaces for a seamless trust management system." Defs.' Phase I trial Ex. 82.

> the leading edge of technology. It's integratable into the
> Internet. I honestly can't think of a flaw in the system
> right now. It's that good.
>
> Q.   As project manager, is it your intention to work as
> hard as you can to see that it's the best land management
> toll in the country?
>
> A.   Yes, absolutely.

Phase I trial Tr. at 2391. See also Phase I trial Tr. at 2668 (Nessi, testifying that "the work that

we're doing in the next month or two gives you a system that's 20 times better than the Legacy

systems.").

The Department of Interior also presented a significant amount of evidence regarding the

manner in which it would implement TAAMS. In particular, witnesses for Interior testified that

despite initial delays the TAAMS project was on schedule at the time of trial. Phase I trial Tr. at

992, 2286-87, and 2753. The Department informed the Court that it began a 100-day pilot

project in Billings, Montana in June1999, during which both TAAMS and the legacy computer

systems (LRIS and IRMS) would run in parallel.[55]  Phase I trial Tr. at 2280; Defs.' Phase I trial

Ex. 82 (noting that by "[u]sing live data in a parallel processing environment, [the Department]

will be able to perform a detailed transactional review of each document as it flows through

TAAMS to insure that it is properly recorded on the data base and that all calculations are in

conformance with expected results."). Dominic Nessi, Project Manager for TAAMS, explained

that the pilot included unveiling the system, performing pre-deployment data cleanup, converting

---

[55]The Department also noted the steps that it had taken and the work that it had done prior
to conducting the pilot project. Defs.' Phase I trial Ex. 82. See also Phase I trial Tr. at 2348-51.

the data,[56] training the staff, testing the system,[57] conducting independent verification and

validation ("IV & V"),[58] and completing post-deployment data cleanup. Phase I trial Tr. at 2280-

81. The Department indicated that the Billings Pilot period provided it an opportunity "to fully

and thoroughly test TAAMS, data conversion techniques, the capacity of the communications

infrastructure, and the data cleanup approach before moving on to other AO jurisdictions."

Defs.' Phase I trial Ex. 82 (also noting that "Billings will provide a robust system test" that "tests

all of the functionality of TAAMS.").

The Department of Interior further informed the Court during the Phase I trial that it

planned to begin implementing TAAMS on a geographic basis in late 1999. Phase I trial Tr. at

---

[56]Data conversion refers to the process by which the Department planned on getting the data stored in the legacy systems into TAAMS.

[57]The Department indicated that it planned on conducting thorough user acceptance tests (UAT) of TAAMS in July 1999. Defs.' Phase I trial Ex. 82 ("Detailed User Acceptance Testing" from July 6, 1999 until July 10, 1999.). Dominic Nessi explained at trial that UATs are internal project management team tests conducted to evaluate the status or functionality of the system. Phase I trial Tr. at 2358 and 2366-67. Moreover, David Orr testified that UATs are "the first phase of testing where we take actual TAAMS users, allow them to go into the programs, [and] run them." Phase I trial Tr. at 2783-84. He went on to state that the Department (and ATS) will use the UATs "as a confirmation process to confirm that the design and the functionality in the systems actually meets the needs of the individual users out in the area and agency offices." Phase I trial Tr. at 2845. In addition to these UATs, the Department also informed the Court that it would conduct systems tests in July of 1999. Defs.' Phase I trial Ex. 82.

[58]Dominic Nessi explained the IV & V process during the Phase I trial. He testified that:
> Verification is verifying that we built the system -- we built the
> system correctly. Validation is . . . ensuring that we built the correct
> system. So the first one means that the system just runs properly, all the
> gears move and the programs work, but, as I had said earlier, you could
> have a system that works, but the users don't like it or it doesn't meet all
> of the functions. That's what validation does. So, as we do our verification
> and validation testing next week and then again in August, we will have an
> independent contractor view our testing methods.

Phase I trial Tr. at 2384-85.

2280-81. See also Defs.' Phase I trial Ex. 82. Dominic Nessi explained that:

> [Interior] hope[s] to have the overwhelming majority of Billings completed
> by around October 1st. At that point in time we have plans to go
> on to Juneau, Aberdeen, Minneapolis. We've already started
> working towards those. But, you know, they're tentative
> until we know that we have a good system that's well tested
> and ready to move forward.
>
> Q.   Is there some point at which a decision is going to be
> made about whether to continue on to these other areas?
>
> A.   Well, we'll have an official decision in approximately
> the last week of September, but we'll have a pretty firm
> idea well in advance of that.
>
> Q.   At the end, how many sites will TAAMS be available at?
>
> A.   At the end of this initial deployment period, it will
> be the 12 area offices, the central office, OTFM, 86 agency
> offices, and approximately 120 tribes.
>
> Q.   Is there a grand total you can give us?
>
> A.   It's about 230, I believe, 240.

Phase I trial Tr. at 2280-81. Moreover, the Department indicated that the "TAAMS

implementation schedule by Area Office" was as follows: Billings (June 1999); Juneau (October

1999); Aberdeen (October 1999); Minneapolis (November 1999); Eastern (January 2000);

Anadarko (February 2000); Muskogee (March 2000); Albuquerque (March 2000); Navajo

(March 2000); Phoenix (April 2000); Portland (June 2000); Sacramento (July 2000). Defs.'

Phase I trial Ex. 82. See also Phase I trial Tr. at 2354 ("Yes. This is the current roll-out that we

have in mind."). Thus, the Department planned on having TAAMS in all the area offices by the

end of 2000. Defs.' Phase I trial Ex. 82. As David Orr testified:

> Q.   But the system will be fully implemented when?  What [is]

the target date?

A.   The target date is for all the area offices to be
complete within the Year 2000.  The infrastructure project
needs to be complete prior to the Year 2000.  So it makes
sense to me that they'll have to continue their procurement
roll-out for infrastructure which they've already started
now and are going from area to area prior to the end of this
year in order to be Y2K-compliant everywhere.

Phase I trial Tr. at 2857-58.[59]

Although the Department of Interior recognized that it had an aggressive deployment

schedule for TAAMS, it explicitly told the Court that the schedule was realistic and that it

expected to meet the dates listed in the schedule.  Phase I trial Tr. at 2281, 2286-87, 2574-76,

2849, and 2857-58.[60]  In particular, the Department stated that it "has already tested the software

and established that it works and, therefore, 'there is not really much chance of a catastrophic

failure.'"  Defs.' Phase I trial proposed findings at ¶ 229.[61]  The Department went on to note that

"[t]o deal with the problems that do arise, Interior has contracted for independent validation and

verification . . .with an outside contractor," which will "help tell Interior whether TAAMS is

ready for full-scale deployment."  Defs.' Phase I trial proposed findings at ¶ 229.  Moreover, in

terms of the functionality of TAAMS, Dominic Nessi testified during cross-examination that:

I'm absolutely certain it will work, but prudent project

---

[59]The Department also indicated during the Phase I trial that it would continue to improve
and modify TAAMS after this implementation period elapsed.  See, e.g., Phase I trial Tr. at 1156.

[60]It is worth noting that while the Department argued during the Phase I trial that its
implementation schedule was realistic and that it expected to meet the schedule, it now relies on
the contrary testimony elicited during that trial to argue that the schedule was still only tentative
at that point.

[61]As the Court finds below, this factual representation was patently untrue.

management, prudent IT development knows that you
have bugs in software, and that's how you get them out, you
test through them.  TAAMS is -- TAAMS is not an ALMRS.  I
mean, ALMRS had some other issues, from what I understand,
just in terms of development time and some other things.
That's not TAAMS.

Q.   If TAAMS -- let me go back to my question.  If TAAMS
does not work, what is the impact on the trust beneficiary?

A.   That's a hypothetical question that I can't answer
because there's -- that's not a possibility.

Phase I trial Tr. at 2579-80.[62]

   c)  The TAAMS project during July and August 1999

   The Court is deeply troubled that many of the findings detailed in this section occurred

either during the Phase I trial or before the Department submitted its proposed findings of fact

and conclusions of law on August 4, 1999.  Although Specification 3 deals exclusively with the

Department's failure to disclose the true status of the TAAMS project between September 1999

and December 21, 1999, the evidence presented at this contempt trial clearly shows that the

Department knew well before September that the testimony it had provided in June and July was

no longer accurate.  In fact, it is insulting to the plaintiffs and an affront to the Court for the

Department to argue now that the problems with TAAMS only became apparent after the Phase I

trial ended.  That being said, the Court will proceed to make specific findings relevant to this

time period.

_____

  [62]ALMRS refers to the Bureau of Land Management's ("BLM") automated land and
mineral records system, which was intended to be BLM's computerized land management
system.  ALMRS had been under development for several years at enormous expense to BLM
(around $450,000,000) before it was finally abandoned.  Phase I trial Tr. at 125-26 and 1129-30.

The Department of Interior was not able to test fully TAAMS in July or August of 1999.[63]

Contempt II Tr. at 2610-11 ("I know in July we did a formalized test and things didn't work out.

There were -- you know, they needed to do additional changes and things weren't ready and we

needed to get that all squared away."); Contempt II Tr. at 1147 (noting that the Department

"knew that it was having difficulties in doing systems test and user tests in the June, July, August

time frame."). A significant reason for the incomplete testing was that Interior could not

accurately convert data from the two legacy systems into TAAMS. Contempt II Tr. at 3292-93.

That is, the Department found that it could not convert the data from both legacy systems into a

single land management system (TAAMS) at the same time. Contempt II Tr. at 3294-96.

Dominic Nessi explained the data-conversion problems the Department experienced in July of

1999 during this contempt trial:

> Q.    Can you give me a sense about what
> happened with the system in say July, August of '99?
>
> A.    Beginning in July, we were supposed to begin a combined
> system user test. That didn't happen.
>
> Q.    Why?
>
> A.    The data conversion proved to be a far greater
> challenge than anyone could have imagined, and during the
> month of July, we actually had the test teams actually showed
> up, but the test wasn't really conducted because there was
> just -- every day the conversion team would say tomorrow we'll
> have it done; tomorrow we'll have it done. And that happened
> throughout July and it never was completed in July.

---

[63]Despite the fact that the Department indicated during the Phase I trial that there would
be both systems tests and user acceptance tests, see generally Defs.' Phase I trial Ex. 82, it
appears that in July of 1999 Interior decided to combine these two tests. Contempt II Tr. at 1139-
40 and 3291.

Q.   The data conversion was not completed?

A.   The data conversion, right.

Contempt II Tr. at 3292-93. See also Pls.' Ex. 2, Tab 7F (noting that during an IV & V test that

took place from July 6-July 9, 1999, "[m]ajor problems with data conversion were found.").[64]

The Department of Interior was not able to resolve the data conversion problems that it

had encountered in July before it attempted another test of TAAMS in August of 1999. See, e.g.,

Pls.' Ex. 2, Tab 4B (noting that, as of August 5, 1999, "[a] data conversion from the legacy

systems has yet to be successfully completed. This is absolutely critical."). A later issued IV &

V Report detailed the magnitude of the data conversion problems experienced by Interior during

the August test:

> The first critical problem discovered involved data conversion errors. That
> process had resulted in some of the data being shifted by 20 characters resulting in
> multiple data errors and causing difficulty in the test evaluation process.
> ...
> The team was briefed on the developer-test DB [database] differences. The
> development DB had old Billings test data. The test team had been using a newer
> DB. Due to this, the programmers could not duplicate several problems found by
> the testers. This indicated that the data conversion was still causing problems, and
> the testers couldn't tell when they had an application problem or a DB problem.
> ...
> It was decided that the project schedule would be extended for several weeks to
> allow for data conversion and application fixes to be incorporated and tested prior
> to the next test event.

Pls.' Ex. 2, Tab 7F at 18. See also Contempt II Tr. at 2974 (noting that there was "a terrible

struggle with data conversions" at the August test.).

Another important reason why the Department was not able to test fully TAAMS was that

---

[64]Earlier drafts of the IV & V report that were provided to the Department made the same
findings regarding these tests. See, e.g., Pls.' Ex. 2, Tab 6E, 7C.

the test plan and the test scripts[65] themselves were incomplete at this time. Pls.' Ex. 2, Tab 4F.

As of June 1999, "both the test plan and test script documents were at the outline level of detail."

Pls.' Ex. 2, Tab 7F at 11. See also Pls.' Ex. 2, Tab 3H (stating, on June 17, 1999, that "[t]he

User Acceptance test plan needs significant work."). While the test plan and test scripts became

more fully developed during the next two months, the IV & V contractor, SRA, Inc., observed

that as of August 1999 "[a] great deal of work" still needed to be done. Pls.' Ex. 2, Tab 7F at 12.

At the end of August, SRA told Interior that "[t]he TAAMS team needs to validate the testing

process is correct and complete before trying to perform the IV & V." Pls.' Ex. 2, Tab 4F

(emphasis in original). See also Contempt II Tr. at 2610-12. John Snyder, a computer specialist

for the Department, confirmed during this contempt trial that the problems with the test plan and

scripts identified in June of 1999 had not been resolved by August of 1999. Contempt II Tr. at

2610-12.

 The limited testing of TAAMS that the Department was able to perform during July and

August of 1999 revealed numerous problems with the land management system. Contempt II Tr.

at 1125 (Principal Deputy Special Trustee, agreeing that "TAAMS failed its July and August

1999 user acceptance tests and could not be deployed in September 1999 as an integrated

---

[65]Daryl White explained at the contempt trial that "[a] test script is -- it's almost like a script perhaps in a play.  It tells you exactly who the actors are, in this case, who is the operator, what kind of equipment are you using, what is it that you're exactly going to accomplish.  Is this a transaction, and how do you accomplish that step by
step.  And it's important for the observer so the observer can see, as the operator steps through the script, if there is a problem, you can identify it exactly, where the problem occurs.  For example, you might hit return, the transaction should be taken by the system, but the system is in a constant loop. It's processing, but not giving us any screen output. That would be noted by the observer at this script level, at this point, and then if you saw that as recurring, then you could report back later these areas need to be fixed." Contempt II Tr. at 2473-74.

system on the schedule presented to this Court during trial."); Pls.' Ex. 2, Tab 6E (Draft IV & V

Report noting that "[i]t was quickly apparent that the system was not yet ready for formal

testing."). That is, the portions of the system that the Department actually tested did not perform

correctly during the summer of 1999. See, e.g., Contempt II Tr. at 1141-42 (noting that

"generally in the August time frame, at this point, we were aware that there were difficulties,

unexpected difficulties being encountered."). For example, SRA noted, in commenting on the

August test, that "15 critical application problems were identified out of 26 total problems

identified in the two days of test," and that as a result "[t]he system was not [even] ready for

formal testing, at this time." Pls.' Ex. 2, Tab 7F at 18.[66] Moreover, it became apparent that from

a software development standpoint the title portion of TAAMS was much further along than the

realty part of the system. Contempt II Tr. at 2621-22 (Snyder, testifying that "title was, in terms

of the actual software development, where they were with it and the production, it was further

along. Realty still had some issues in terms of the interface, some other things related to that.").[67]

In addition to the problems discussed above, it also became clear during the summer of

1999 that there would need to be additional changes to the TAAMS software in order for it to

meet the needs of the Department of Interior (and BIA). See, e.g., Pls.' Ex. 2, Tab 3A (noting, on

July 6, 1999, that "TAAMS is evolving every day and that all of the systems are in flux[.]");

_____

[66] It is important to note that SRA considered this testing to be "successful" because "the problems were found in test, not after release." Pls.' Ex. 2, Tab 7F at 18. While this description may (although it is unlikely) be appropriate in an IV & V report, it clearly is not an appropriate way to describe the results of these tests to a Court or to an opposing party.

[67] It is important to note that significant problems were identified at this time concerning the interface between TAAMS and TFAS. Contempt II Tr. at 2693-95. Moreover, the Department recognized that these problems had to be resolved in order for TAAMS to perform the functions identified during the Phase I trial. Contempt II Tr. at 2693-95.

Contempt II Tr. at 2983-84 (testifying that significant modifications needed to be made to TAAMS). In other words, during July and August of 1999 Interior determined that numerous changes needed to be made in order for TAAMS to perform the functions that had been discussed during the Phase I trial.[68] Pls.' Ex. 6 at 69; Contempt II Tr. at 3294-95. The reason for the modifications was that Interior and ATS had not taken into account the unique business practices of BIA or its needed functionality when they designed TAAMS. Contempt II Tr. at 3297-98. See also Pls.' Ex. 6 at 69. Consequently, "it became apparent during the system test conducted with BIA users during July and August 1999 that a significant level of analysis and system modification remained in order to ensure that all of the BIA's unique business functions were addressed." Pls.' Ex. 6 at 69.[69]

As a result of all of the problems the Department of Interior encountered in the summer

---

[68]These changes converted TAAMS from a commercial off the shelf system (COTS) to what Interior now refers to as a modified off the shelf system (MOTS). Contempt II Tr. at 2689-90 (Q.    So in the June 1999 time frame, was TAAMS at that point a COTS or a MOTS? A.    June of '99.  I mean, I would say that it was a MOTS because we were going to have to make changes from something off the shelf.). The development and implementation of a MOTS is much more complex and time consuming than a COTS. Contempt II Tr. at 2689-91. In fact, as the Court explains below, the realty portion of TAAMS still is not ready for implementation more than three years after the Phase I trial, and a moratorium has been placed on that portion of TAAMS until the Department has a better understanding of what it needs to do.

[69]It is worth noting that the Department of Interior relies on this language, which was quoted from the Revised HLIP that was filed in March 2000, as demonstrating that it reported accurately to the Court on the status of TAAMS. The trouble with this argument, of course, is that the Department knew that it had not taken into account the unique business practices of BIA and that it was going to have to perform substantial modifications to the system back in the summer of 1999, but waited until March of 2000–after the Court had already issued its Phase I trial ruling–to inform the Court. See, e.g., Contempt II Tr. at 2998-99. It is like a defendant admitting liability the day after summary judgment is granted in his favor. Moreover, as the Court discusses below, this description did not inform the Court in March of 2000 that these problems persisted and would greatly delay the implementation of the realty portion of TAAMS.

of 1999, the agency tentatively decided to alter the manner in which it was going to implement

TAAMS. Contempt II Tr. at 3292-96. See also Pls.' Ex. 2, Tab 4G. Specifically, in August of

1999 the Department contemplated changing the implementation plan from a geographic based

approach (whereby it would implement both the title and realty portions of TAAMS together) to

a function based approach (whereby it would implement the title portion of TAAMS prior to the

realty portion). See, e.g., Pls.' Ex. 2, Tab 3D (noting, on the same day that the August test ended,

that "the Configuration Management Board[70] has made a conditional decision to accelerate the

deployment of TAAMS to the title plants this calendar year.").[71]  On August 31, 1999, Dominic

Nessi sent a memorandum[72] to Edith Blackwell (an attorney in the Solicitor's Office) in which he

described this particular change to the implementation schedule. Pls.' Ex. 2, Tab 4G. In the

memorandum, Nessi wrote that:

> the earlier deployment schedule was completely geographic-based with Area
> Offices being deployed in their entirety for all functions. The schedule has been
> tentatively revised (final decision to be made September 13, 1999) to implement
> the Title Plants in all geographic areas during the period of November and
> December. This change was considered for the following reasons:
> •        Implementing a single major functions across the BIA will allow a more

---

[70]"The configuration board would review all software changes [to TAAMS] and they would make the decision of what release it would go into and if it was ready for production or if it was ready for user acceptance test. They reviewed all test scripts and the software requirement itself." Contempt II Tr. at 3133-34.

[71]It is interesting to note that the Department characterized this choice, which was based on the fact that it could not implement both the title and realty portions of TAAMS together as an integrated system, as a decision to accelerate the Title portion. Use of the word accelerate is particularly misleading in light of the schedule presented to the Court during the Phase I trial.

[72]It is worth noting that Nessi prepared the memorandum at the request of an attorney in the Solicitor's Office named Michael Carr, see Contempt II Tr. at 3310-11, and that another attorney in the Solicitor's Office named Edward Cohen received (and had knowledge of) this memorandum. Pls.' Ex. 2, Tab 5B.

focused integration of the new system into existing business processes. . . .
- Simplify the data conversion process by transferring data from one system (LRIS then IRMS) to TAAMS rather than two at one time.

Pls.' Ex. 2, Tab 4G. John Snyder, a computer specialist for the Department, further explained during this contempt trial that another reason the Department was considering implementing the title portion of TAAMS first was that the realty portion was not close to being ready at that time. Contempt II Tr. at 2622 ("the title approach made sense simply because title was, in terms of the actual software development, where they were with it and the production, it was further along. Realty still had some issues in terms of the interface, some other things related to that."). That is, there was no reason to maintain the geographic based implementation schedule since the realty portion of TAAMS was not even close to being ready to do all of the things Interior had stated that it could during the Phase I trial. Contempt II Tr. at 2621-23.[73]

    d)    <u>The TAAMS project from September 1, 1999 until September 26, 1999</u>

The Department of Interior knew in early September 1999 that its Phase I trial testimony was not accurate and that it needed to inform the Court of the problems it was experiencing with

---

[73]The Department repeatedly stated during this contempt trial that the decision to implement the title portion first was "based purely on a desire to move forward with implementing TAAMS in an efficient and effective manner." <u>See</u> Defs.' Proposed Findings at 28. Interior further noted that "the decision to deploy title first was at that time viewed as a change to the rollout <u>process</u>, rather than a change to the end <u>product</u> that would be delivered. Defs.' Proposed Findings at 28 (emphasis in original). These arguments miss the mark and are irrelevant. It may very well be true that as of August 1999 it became more efficient and effective to implement first the title portion of TAAMS. It may also have been true that when fully implemented TAAMS would be the same system that was described at the Phase I trial. The weakness with Interior's position is that the reason why it would be more efficient to implement the title portion first was that there were so many problems with the realty portion of the system and with trying to implement both title and realty together as an integrated system. Moreover, while the final system may have been consistent with what the Department presented during the Phase I trial, it was clear in the summer that it was going to take much longer to implement such an integrated system.

the TAAMS project. Contempt II Tr. at 1126-27 ("We certainly felt we needed to let you know that the tests had not been successful."). On September 8, 1999, Chief of Staff Ann Shields chaired a meeting that was attended by several senior Interior officials (including then-Assistant Secretary for Indian Affairs Gover) to "[d]iscuss [the] current TAAMS status and agree on Departmental Policy Positions." Pls.' Ex. 2, Tab 4E. The participants at the meeting acknowledged that as a result of the difficulties identified above, "[i]n effect, the TAAMS pilot [wa]s just beginning." Pls.' Ex. 2, Tab 4E. The attendees further recognized that "[t]he Department need[ed] to quickly inform" this Court about the lack of progress that had been made in implementing TAAMS. Pls.' Ex. 2, Tab 4E. See also Contempt II Tr. at 1127 & 2550. Specifically, attorneys in the Solicitor's Office indicated that the Department needed to file a memorandum with the Court by September 21, 1999, since Secretary Babbitt was scheduled to testify before Congress on September 22, 1999. See, e.g., Pls.' Ex. 2, Tab 5B ("the notice should go to the court before the hearing."); Pls.' Ex. 2, Tab 5C ("we also need to file something with the Court on Tuesday so that the Judge does not read this in the newspaper."); Contempt II Tr. at 2618 ("Mr. Babbitt had testimony on the 22nd, and so the thought was if any of this was going to come up in his testimony, then it should also go to the Court prior to that, because the last thing we thought -- it didn't make a lot of sense to have the Court find out about it after it had gone to Congress.").

Department officials began drafting a memorandum to file with the Court shortly after the September 8, 1999 meeting ended. Pls.' Ex. 2, Tab 5B. These officials, at the direction of an attorney in the Solicitor's Office, used the memorandum written by Dominic Nessi back on August 31, 1999, see Pls.' Ex. 2, Tab 4G, as a preliminary draft. Pls.' Ex. 2, Tab 5B; Contempt

II Tr. at 2615.[74]  The first draft of the memorandum was circulated to several individuals within

Interior (including attorneys in the Solicitor's Office) on September 16, 1999.  Pls.' Ex. 2, Tab

5D.  After circulating a revised draft on September 17, 1999, see Pls.' Ex. 2, Tab 5E, John

Snyder prepared a final version of the memorandum on September 20, 1999.  Pls.' Ex. 2, Tab 5F.

See also Contempt II Tr. at 2617-18.  The memorandum provided in pertinent part that:

> Staff of the Bureau of Indian Affairs (BIA) and Applied Terravision Systems
> (ATS) of Dallas, Texas have recently completed a number of activities leading up
> to the September 7 installation of the Trust Asset and Accounting Management
> System (TAAMS) in the Billings Area.  Work is now proceeding to complete the
> system pilot by conducting TAAMS system testing in Dallas and user acceptance
> testing in the Billings Area and Agency Offices.  A final decision on TAAMS
> deployment based on the pilot tests is expected near the middle or end of
> November. . . .
> The TAAMS Conversion team [experience] a number of problems in transferring
> the electronic data stored in the existing legacy systems into the new and
> completely different structure and format of TAAMS. . . . By August 30, 1999,
> conversion processing had reached a satisfactory level and a final data conversion
> was begun on September 1.  The final data conversion was completed on
> September 6th in order to begin training in Billings using live Billings data. . . .
> In parallel with the data conversion activities, system testing continued with a
> team of BIA system users and ATS staff.  System functions were tested repeatedly
> throughout August.  Increasingly broader tests were conducted as new functions
> of the system were populated with converted data.
> The culmination of system testing, conversion and data cleanup activities, allowed
> for an installation of TAAMS in the entire Billings Area beginning September 7,
> 1999.
> Deployment activities were initiated with the installation of TAAMS software in
> the Billings Title Plan and the training of approximately 30 Billings Title Plant
> staff.

Pls.' Ex. 2, Tab 5F.  The Department of Interior never filed this (or any other) memorandum with

the Court to correct or update its Phase I trial testimony.  Contempt II Tr. at 1127, 1350, and

---

[74]It is important to note that Nessi's memorandum specifically stated that the "schedule
has been tentatively revised" to implement the title portion of TAAMS first, as opposed of
implementing both the title and realty parts of TAAMS together.  Pls.' Ex. 2, Tab 5B.

2528.

On September 22, 1999, then-Secretary Babbitt testified before the Senate Committee on

Indian Affairs about several topics related to the IIM trust, including TAAMS. Pls.' Ex. 2, Tab

5J.[75] Secretary Babbitt did not inform the committee that Interior had experienced numerous

problems in implementing TAAMS since June of 1999. Instead, at the hearing then-Secretary

Babbitt stated that:

> [t]he development of the basic data processing system, the TAAMS system, is
> going exceedingly well. I was in Billings in June for the startup of that process
> with our partners from Applied Terra Vision and the other contractors. The
> system is moving along nicely. We now have it running in parallel with the
> existing systems. That's a very important milestone. . . . I anticipate making a
> final deployment decision by late November . . . I believe we'll be back here in
> early November with a comprehensive report which says the TAAMS system is
> meeting expectations, that the original decision to go with off-the-shelf
> technology was entirely correct and that the validation and testing that is taking
> place demonstrates that.

Pls.' Ex. 2, Tab 5J. Moreover, the prepared statement for then-Secretary Babbitt indicated that

Interior "anticipate[s] minor system adjustments as a result of this testing process." Pls.' Ex. 2,

Tab 5J (further stating that since June 25, 1999, the Department "developed data conversion

programs to transfer the electronic information from the existing BIA systems to TAAMS.").

The Court finds based on the overwhelming circumstantial evidence adduced at trial that

the Department of Interior intentionally failed to submit the memorandum which described the

---

[75]It is worth noting that on September 21, 1999, the Configuration Management Board
decided (by a vote of 5-0) to recommend that the Department proceed with the function based
approach to implementing TAAMS. Pls.' Ex. 2, Tab 5G. Among the reasons given for the
decision was that the title first approach would simplify "the conversion process by focusing on
LRIS data only." Pls.' Ex. 2, Tab 5G.

status of TAAMS.[76] The Court makes this finding for several reasons. First, the Department had

an incentive not to file the memorandum in September of 1999. The foundation of Interior's

defense during the Phase I trial was that it was in the process of implementing a new land

management system that would enable it to manage the IIM trust properly. Informing the Court

that the copious testimony it provided was no longer accurate and that TAAMS was not able to

perform the plethora of functions discussed at trial would reduce substantially the likelihood that

the Department would obtain a favorable ruling. Second, the Court finds it highly unlikely given

the number of officials and attorneys in the Solicitor's Office that were aware of the

memorandum, the time spent preparing it, and the admitted need to provide a copy to the Court

that the memorandum was mistakenly not filed. As the Principal Deputy Special Trustee

testified during this contempt trial, "it would have to be extraordinary considering the attention to

this[.]"[77] Contempt II Tr. at 1127. Finally, in light of then-Secretary Babbitt's testimony before

---

[76]There is no question that the Court can infer intent based on circumstantial evidence. The Department itself recognized during this contempt trial that "fraud does not require the proof of the proverbial smoking gun. It does not require a specific statement: I intend to defraud this Court by withholding material information." Contempt II Tr. at 4623. Moreover, when a court sits as the trier of fact it is able to make reasonable inferences that are supported by the evidence. Cifra, 252 F.3d at 215. Indeed, courts, when sitting as the trier of fact, regularly make inferences in a wide variety of cases such as those brought under Title VII.

[77]It is worth noting that Edith Blackwell indicated in a memorandum drafted in June of 2000 that the Court was not given an update on the status of TAAMS "[s]ince the record for the Phase 1 trial had closed, and this Court, in response to Plaintiffs' oral request to open the record, told the parties that it would not reopen the record[.]" Pls.' Ex. 63 at DEF0040882 (June 1, 2000 draft). While it is not clear that this was in fact the reason why the memorandum was not filed, it suggests that there was a conscious decision made by attorneys for the Department not to file the memorandum. Of course, to the extent that this is not the reason why Interior failed to file the memorandum, it demonstrates Edith Blackwell's propensity for not being candid with this Court. This memorandum, like the one discussed above, was never filed with the Court because a Justice Department attorney decided that it is "better to say nothing at all than give [a] weak reason for not informing [the] Court. Pls.' Ex. 63 at DEF004078. In this regard, it is also very

the Senate Committee on Indian Affairs, there is no basis upon which this Court can conclude

that the Department wanted to provide it with an accurate status report on the TAAMS project.

Then-Secretary Babbitt told Congress on September 22, 1999 that the TAAMS project was going

"exceedingly well." The reason why the Department was supposed to give the Court a copy of

the memorandum on September 21, 1999 was because then-Secretary Babbitt was going to

inform Congress of the problems the Department was experiencing. Contempt II Tr. at 2618

("Mr. Babbitt had testimony on the 22nd, and so the thought was if any of this was going to

come up in his testimony, then it should also go to the Court prior to that, because the last thing

we thought -- it didn't make a lot of sense to have the Court find out about it after it had gone to

Congress."). In light of then-Secretary Babbitt's failure to inform Congress of the difficulties

with the TAAMS project, it is unreasonable to think that the Department wanted to provide the

Court with a memorandum that explained certain problems with the land management system.[78]

Even if the Department had filed the memorandum on September 21, 1999, it still would

not have provided the Court with an accurate status of the TAAMS project. That is, the

---

important to note that while the Court would not and did not reopen the record based on
plaintiffs' request, it certainly would have reopened the record if the Department had indicated
that TAAMS, the backbone of its trust reform effort and the centerpiece of its Phase I trial
defense, was not functioning properly and was not nearly as developed as witnesses such as
Dominic Nessi had stated at trial.

[78]It is important to note that the Court's finding in this regard is not inconsistent with the
testimony by Interior officials at the contempt trial that they thought the Court would be provided
a copy of the memorandum. See, e.g., Contempt II Tr. at 2528 and 2618. None of these officials
indicated that they personally had any responsibility for or intention of filing the memorandum.
Rather, John Snyder testified that once he sent a copy of the memorandum to certain officials,
including one in the Solicitor's Office named Michael Carr, it was no longer his responsibility.
Contempt II Tr. at 2617-18 ("At this point in time I had a whole pile of things on my plate, that
this was not -- once it went to senior managers, it was gone as far as I was concerned.").

memorandum itself demonstrates that the Department had no intention of telling the Court about the problems that it had experienced during the summer of 1999. Specifically, the memorandum failed to inform the Court that: (1) the Department was not able to test fully TAAMS in July and August of 1999 because the test plan and scripts were incomplete; (2) the Department was not able to test fully TAAMS during the summer of 1999 because it could not convert the data from both legacy systems at the same time; (3) the portions of TAAMS that were tested did not perform correctly; (4) the Department was going to have to make significant changes to the system in order for it to perform the functions mentioned by the Department during the Phase I trial and for it to capture the unique business practices of BIA; (5) as a result of all of these problems the Department had decided to change the manner in which it would implement TAAMS from a geographic based approach to a function based approach;[79] and (6) the Department could not properly interface TAAMS with TFAS. The Court finds each of these omissions material to the status of TAAMS in light of the testimony elicited during the Phase I trial. Moreover, with respect to data conversion, the memorandum stated that "[b]y August 30, 1999 conversion processing had reached a satisfactory level and a final conversion was begun on September 1." Pls.' Ex. 2, Tab 5F. The problem is that even as of November 1999, the Department of Interior had only been able to convert data from the LRIS system into the title portion of TAAMS. Contempt II Tr. at 3316-17. In other words, there was no conversion from the IRMS system into (the realty portion of) TAAMS at the time the Department was supposed to

---

[79] Although certain documents referred to this as a tentative decision, Dominic Nessi, the TAAMS project manager, testified that by the fall of 1999 the Department had decided to implement the title portion first. Contempt II Tr. at 3314-15. Moreover, John Snyder testified during this contempt trial that even he could not have figured out from the memorandum that it was referring exclusively to the title portion of TAAMS. Contempt II Tr. at 2705-06.

file the memorandum with the Court.  Contempt II Tr. at 3316-17.  These material omissions

from the memorandum provide yet another basis upon which the Court can infer the requisite

intent on the part of the Department of Interior.

        e)      <u>The TAAMS project from September 27, 1999 until December 20, 1999</u>

      The Department of Interior (and ATS) continued to experience difficulties testing

TAAMS in the fall of 1999.  The initial test during this period occurred from September 27-

September 30, 1999.  Pls.' Ex. 2, Tab 5I.  There were several problems with this particular test.

First, it was clear from the outset that the Department was still not prepared to test TAAMS at

this time.  Pls.' Ex. 2, Tab 5I.  As John Snyder testified during this contempt trial:

> Q.    What was your overall impression [] of how the
> testing [process] itself went [] in that September '99
> system test?
>
> A.    The process didn't go as well as -- didn't go like it
> was supposed to be planned to at all.  The individual
> reviewers didn't get, like the IV&V and the GAO people did not
> get copies of the script so they could mark up as they were
> going.  They only got them because I xeroxed them, so I spent
> a fair amount of time doing that, which took me from being
> able to observe the test, because I was trying to get the
> information to the players.
>       We didn't get the daily follow-up that I had
> expected to get because the intent was you get a tremendous
> amount of -- you know, 600 plus pages of scripts to go
> through.  At the end of the day we should all sit down and go
> through what failed, what worked, what are the errors and how
> are they going to be taken care of.
>
> Q.    Sort of a recap at the end of the day?
>
> A.    Sort of -- and then the same thing should occur the
> following morning, because what they were going to do, what
> Artesia was going to do was to give those errors and those
> problems to their programming staff and they would work the

> evening and the night to make changes, corrections, whatever
> else, and then come back to tell us what the intent was.
>
> Then when we started off with our morning kick-off
> of saying here's what we've completed over the night, this is
> what we fixed, this is what is still a problem, you know,
> there are some other issues; those kind of things. And then
> lay the ground work for the coming day.
>
> Q.    And those things weren't happening?
>
> A.    And that was not happening.

Contempt II Tr. at 2628-2629. See also Pls.' Ex. 2, Tab 5I ("ATS was not prepared for

conducting the test. . . ATS didn't have all the test scripts completed nor were they sure which

requirements they needed to test.").

Second, the majority of the portions of TAAMS that Interior was able to examine still

were not demonstrated successfully during this test. As the IV & V contractor detailed in its

draft report:

> The TAAMS system testing through September 27 tested about two thirds of the
> mandatory requirements SRA was to look at. While only about 10 percent of
> those requirements tested failed, nearly 50% of the requirements were only
> partially demonstrated successfully and the demonstrated success was often highly
> variable. . .
> A numerical summary of the requirements reviewed by SRA for this report looks
> like this. Of the 66 requirements reviewed by the IV & V team:
> -24 still need testing because they were not demonstrated during the Sept. test
> -1 needs additional analysis
> Of the 41 that were demonstrated:
> -7 failed
> -32 were partially demonstrated and;
> -2 were fully demonstrated.
> This means we are at risk if we accept the results other than the two requirements
> that were demonstrated successfully.

Pls.' Ex. 2, Tab 6E. The Principal Deputy Special Trustee explained the importance of these

findings during the contempt trial:

[Q.]   Do you understand what this means, Mr. Thompson?

A.   Yes, I do.

Q.   And what does it mean as you understand it?

A.   That the systems test failed.

Q.   Now, there has been some history on the meaning of that term, "the system test failed." Do you mean the system failed the test or test failed, Mr. Thompson?

A.   I think I am safe to say both of those are affirmative answers.

Contempt II Tr. at 1231-32.

Third, it became increasingly clear during this test that the RFP (or contract) itself was inhibiting the Department's ability to test adequately the functionality of TAAMS.  The IV & V Report made repeated reference to the fact that the lack of specificity in the RFP made it difficult to conduct a thorough and complete evaluation of the testing process.  Two of the identified "Constraints" on the IV & V process, for example, addressed this issue:

> **Constraint**: Since the original contract envisioned a COTS procurement, the more rigorous development activities associated with Testing, Configuration Management or Quality Assurance standards were not initially levied on the products or processes.

> **Actual Impact**: While there was testing, CM and QA throughout the duration of the project there were no development standards identified in the contract for these areas, project documentation sometimes not up to par with typical government deliverables for a system of this complexity.  This resulted in reviews and comments on documents being subject to individual preferences. The IV & V team applied selected best practices, used in SRA's government business area for systems similar to TAAMS.

> **Constraint**: The requirements lacked sufficient clarity was a major constraint on TAAMS development and test.

> **Actual Impact**: Because many requirements were inadequate and/or too complex,
> software development and test script development schedules were difficult to
> maintain, and many test scripts had an extremely large number of steps or did not
> completely test all nuances of the requirement.

Pls.' Ex. 2, Tab 7F at 5.  See also Contempt II Tr. at 3318-21 (Nessi, stating that "my concern

here was that SRA really didn't have the opportunity to do a good IV & V because we didn't set

the stage properly at the very beginning.").[80]

Due to the difficulties encountered during the September test, the Department decided to

schedule another test in November of 1999. Pls.' Ex. 2, Tab 5I (recommending that "ATS

conduct another full systems test using several BIA users as testers."); Pls.' Ex. 2, Tab 6D

(noting that "TAAMS will need another monitored 'test.'"); Pls.' Ex. 2, Tab 6E (suggesting that

"a second testing be conducted in Billings at a later date using actual users."). See also Pls.' Ex.

2, Tab 7F ("A number of critical requirements had not been tested. Some of these were planned

for the future, so a judgment on the quality of that testing and the requirement validation process

could not be made. Since the scripts for testing were delivered just before testing began, a

review was not possible until after the testing was completed. The results of this first analysis

indicated that most of the requirements were only partially validated. A second test was planned

for the week of November 22nd.").

The Department tested TAAMS again from November 22-November 24, 1999. Pls.' Ex.

2, Tab 7F at 20. While this test went better than the one in September, the Department still

encountered several problems and was not able to determine whether TAAMS would perform the

---

[80]It is worth noting that while these problems improved during the fall of 1999, even as of
November there were still significant issues that had not been resolved. See, e.g., Contempt II
Tr. at 2647-50 (Snyder, testifying that "[t]here still wasn't a quality assurance documented
process, but they were at least going through the configuration management side.").

functions discussed during the Phase I trial. Pls.' Ex. 2, Tab 7F at 21-22. First, there were

significant aspects of TAAMS that the Department was unable to test. Pls.' Ex. 2, Tab 7F at 21-

24. In particular, the Department did not test the requirement that "[t]he system shall calculate

the distribution allocation of a leased/contract payment for each owner . . . based on monetary

ownership interest in the tract[,]" the requirement that the system "shall record the appropriate

direct, in-kind, or crop sharing lease payment made to the owner[,]" the "TAAMS interface with

Trust Funds Accounting System (TFAS) and Minerals Management Service (MMS) . . . although

these interfaces are critical to successful system operation[,]" or the "requirements that had

history dependence" because "the history data had not been loaded into the Billings DB prior to

the test[.]" Pls.' Ex. 2, Tab 7F. See also Contempt II Tr. at 2658; 2662-63. SRA noted that each

of these things needed to be tested to ensure proper functionality prior to implementing TAAMS.

Pls.' Ex. 2, Tab 7F.

     Second, SRA identified numerous things that the Department needed to do before it

would be in a position to implement TAAMS. Pls. Ex. 2, Tab 7F at iv-vi. For instance, SRA

noted, among other things, in its report that :

> Any failures (Prs) that occurred during the System test, the Billings pilot or User
> Tests that are judged as critical or major should be fixed and retested prior to any
> deployment.
>
> The critical requirements that were not validated, failed validation, or were
> partially validated during the functional testing should be tested and totally
> validated; any important or non-critical requirements should be analyzed for
> further testing. . .
>
> One critical area that has not been tested yet is the TFAS and MMS interfaces. A
> functional test of the TAAMS interface with TFAS and MMS should be
> conducted as soon as possible; certainly prior to any full TAAMS capability
> deployment, otherwise any measure of total system effectiveness or suitability

won't be possible. . .

TAAMS business rules should be incorporated, a detailed network load analysis conducted and any remaining instability resolved prior to deployment beyond Billings.

Pls.' Ex. 2, Tab 7F at iv-vi.  SRA ended this part of its report by stating that "[a]ssuming the forgoing recommendations and risk mitigation strategies are implemented the IV & V team feels that deployment beyond Billings could proceed with minimized risk and a reasonable assurance of success."  Pls.' Ex. 2, Tab 7F at vi.  While some Interior officials apparently viewed the results of the tests and this statement in the report as "favorable," see, e.g., Pls.' Ex. 2, Tab 8B, SRA did not.  Pls.' Ex. 2, Tab 8C.  Specifically, Jerry Manesis, the SRA representative in charge of the IV & V testing, stated that "my opinion of the overall report is that it was not favorable.  I think it was favorable in spots but generally it pointed out a significant number of problem areas that I believe offset the positive things we found.  I'm not certain what words [the Department] might want to use to describe the overall report but my choice would not be favorable."  Pls.' Ex. 2, Tab 8C.[81]

Third, the November test failed to demonstrate that TAAMS would actually be able to perform the numerous functions described by the Department during the Phase I trial.  That is, the Department had not yet solved the problems identified in July and August, particularly with respect to the realty portion of TAAMS, regarding the unique business practices of BIA and the

---

[81]It is also worth noting that the Department had not satisfactorily conducted a user acceptance test at this time.  Pls.' Ex. 2, Tab 7C.  For example, in a memorandum dated December 16, 1999, Daryl White, the Chief Information Officer for Interior, wrote that "[t]hough I agree the participation of the user community throughout the process significantly increases the probability of user acceptance of this system, I do not believe it obviates the need for a formal uses (i.e. usability) test.  Pls.' Ex. 2, Tab 7C (further noting that "[t]he bottom line is I need to see . . . User survey results, preferably two sets of results.").

agency's needed functionality.  See generally Pls.' Ex. 66 (noting that, as of December 17, 2001,

the Department still had not adequately addressed these problems).  An exchange at this

contempt trial between plaintiffs' counsel and Deborah McLeod, a Senior Project Manager for

ATS, demonstrates this point:

> Q.    And just for purposes -- I just want to run through and
> see if these are the same functionality as was described at
> the trial in 1999.  And if you turn your attention to
> paragraph 213 [of the Defendants' Phase I trial proposed findings],
> do you see that on that page?
>
> A.    Yes.
>
> Q.    Page 71.  And it reads:
> "TAAMS is the heart of data management system that
> contains all the essential functions to enable BIA to meet the
> requirements of the 1994 Reform Act.  TAAMS allows BIA to
> administer trust assets, generate timely bills, identify
> delinquent payments, track income from trust assets, and
> distribute proceeds to the appropriate accountholders."
> Now at this point in time, does TAAMS actually
> operate anywhere in the country to do any of that function?
>
> A.    No.  It's still in testing.
>
> Q.    The next sentence reads:
> "The key feature of TAAMS that supports these
> functions are an asset management system with a master lease
> subsystem, a billing and accounts receivable subsystem and
> collections subsystem."
> Now let me ask you first, does the asset management
> system with a master lease subsystem, does that operate
> anywhere in this country today, within BIA?
>
> A.    I'm not sure what they mean exactly about asset, but
> no, that would still be in the realty, so it is not in
> production, no.
>
> ...

Q.   If the TAAMS realty was successfully tested in the November '99 time frame, what was the importance of the decision to just proceed only with the title portion?  Why was that a sound business decision?

A.   Title is more uniform.  They already have their business process across BIA.  Realty didn't have that luxury.  They never pulled together before TAAMS.  Title had one system; realty has multiple systems.  Title had a team of people that worked together way before TAAMS ever came involved that set the standard across BIA.  Realty had never done that; they run as individual companies, if you may, in their own areas.

     So the decision was made that realty needed more time to come up with our business rules and they needed to set a standard across BIA and make a decision what are really regulations they need to follow or was it just because that's the way they did their business.  That's why we made that decision.

Contempt II Tr. at 3128-29, 3132-33.[82]  Thus, it was clear that after the November test TAAMS

still was not capable of performing the numerous functions that the Department had told the

Court it could do during the Phase I trial.[83]

_____

     [82]It is important to note that attorneys in the Solicitor's Office knew about the problems the Department was experiencing with TAAMS.  See, e.g., Contempt II Tr. at 1282 (Principal Deputy Special Trustee testifying that "I think I'm fair in saying that representatives of the Solicitor's office would have participated in meetings on TAAMS development, TAAMS status, and would have had some knowledge.").

     [83]Ms. McLeod testified at great length during the contempt trial that the September and November tests were "successful," and that they proved TAAMS worked.  See, e.g., Contempt II Tr. at 3127-28.  The Court finds Ms. McLeod's testimony not to be credible in this respect.  First, the other documentary and testimonial evidence presented at trial demonstrates the multitude of problems Interior experienced (and continues to experience) with the TAAMS project.  It is inconceivable, given the current status of the project, that the testing of TAAMS nearly three years ago showed that the land management system worked.  Second, Ms. McLeod's contention that the system functioned well during this time period is belied by the fact that the Department had to change the manner in which it planned to implement TAAMS.  It is clear that the Department was not even close to being able to implement the realty portion (or the history part of the title portion) of TAAMS during the fall of 1999.  In fact, the Department years later is still

-95-

f)      This Court's Memorandum Opinion of December 21, 1999

The Court issued its Memorandum Opinion regarding the Phase I trial on December 21,

1999. Cobell V, 91 F. Supp.2d at 1. In the opinion the Court made numerous findings of fact

regarding the manner in which the Department had administered and was administering the IIM

trust accounts. Id. at 7-24. Specifically, the Court found that the Department had mismanaged

the trust accounts of several hundred thousand Indian trust beneficiaries for more than a century.

Id. The Court also found that the Department could not provide the majority of the trust

beneficiaries with an accounting of their assets held in trust by the federal government, and did

not have the infrastructure in place to enable it prospectively to perform properly its fiduciary

obligations to the trust beneficiaries. Id. With respect to the Department's computer systems,

the Court initially noted that the Department of Interior conceded at trial that LRIS and IRMS do

not enable it to administer properly the IIM trust, and that as a result the agency decided to

acquire two new computer systems (TFAS and TAAMS). Id. at 18. Relying upon the

representations made by the Department during the Phase I trial, the Court found, among other

things, that:

> [TAAMS] is currently in the pilot stages of implementation, specifically in the
> Billings Area BIA office. . .TAAMS, when implemented, will allow BIA to
> administer trust assets, generate timely bills, identify delinquent payments, track
> income from trust assets, and distribute proceeds to the appropriate account
> holders. The key features of TAAMS that will support these functions are a
> billing and accounts receivable subsytsem and a collection subsystem. TAAMS
> also will have a major module for administering land title records, a sub-module

not even close to being able to implement those portions of TAAMS. Third, Dominic Nessi, the
TAAMS Project Manager for Interior, threatened to quit after learning about the IV & V report
and its assessment of TAAMS. Pls.' Ex. 2, Tab 7E (stating that he was "really disappointed"
with the IV & V report.). In short, Ms. McLeod was not a credible witness regarding TAAMS at
this contempt trial.

> for probate tracking, and a tickler system that will notify BIA employees of
> upcoming important events, such as when leases are about to expire, when it is
> time to advertise leases, and when collections are due.

Id. at 19.

The Court also made several conclusions of law in its Phase I trial ruling. The Court

began, as all courts must, by considering whether it had jurisdiction to adjudicate plaintiffs'

claims against the Secretary of Interior. Id. at 24-30. The Court concluded that it had

jurisdiction and that the plaintiffs could bring suit against the Secretary of Interior pursuant the

1994 Act. Id. The Court ultimately concluded, as noted above, see Section II. B, that the

Secretary of Interior was in breach of certain fiduciary duties owed to plaintiffs. Id. at 58. In

particular, the Court accepted a written stipulation filed by the Department on the eve of trial in

which it admitted that it was not in compliance with several obligations prescribed in the 1994

Act. Id. at 32-34. The Court further found that defendants owed an accounting to plaintiffs of all

money held in trust for their benefit, and that, in addition to the breaches admitted to in its

stipulation, defendants were in breach of four other statutory duties owed to plaintiffs. Id. at 58.

Having found the defendants in breach of their fiduciary obligations, the Court was left with the

difficult task of determining what relief to grant plaintiffs.

The Secretary of Interior (and the other defendants) argued that the Court should not issue

injunctive relief because they were in the process of bringing themselves into compliance with

the 1994 Act and discharging properly their fiduciary obligations. They contended that it was up

to the administrative agency to rectify the breaches and to determine the manner in which it

would so do. Plaintiffs, on the other hand, argued that the Court should appoint a receiver over

the trust or at least a special master to oversee the corrective actions taken by the Department.

As the Court noted in the opinion:

> One of plaintiffs' primary goals in the prospective component of this litigation is to have the IIM trust put under court supervision. Plaintiffs' requests range from receivership to a Special Monitor with investigatory powers. The government, on the other hand, takes the position that it is not in breach of any trust duties and, even if it is, there is already sufficient supervision of the IIM trust to warrant the court's denial of all continuing supervision requests.

Cobell V, 91 F.Supp.2d at 52. The Court ultimately concluded, based on the representations of

defendants, that while their "cry of 'trust us' is offensive to the court and insulting to

plaintiffs[,]" it would not issue an injunction or appoint a receiver (or special master). Id. at 53.

Specifically, the Court found that:

> defendants have the type of historical record of recalcitrance that troubles the court. The court is aware that defendants, especially Interior, ha[ve] made promises similar to those relied upon today each time that it has come up for review on the IIM trust. Indeed, these broken promises are what necessitated the passage of the Trust Fund Management Reform Act. Promises made in court, however, are different than the puffing to Congress that Interior has done over the past few decades. The court can ensure that these promises are kept, and it has the contempt power that will allow it to do so when appropriate.
> Despite defendants' history, the court has decided to give defendants one last opportunity to carry through on their promises. The HLIP, defendants' most comprehensive plan to eventually bring themselves into compliance with their duty to render an accurate accounting, is a substantial step in the right direction, as even plaintiffs admit. This time, there is substance to support defendants' promises. The court feels that it is therefore its constitutional duty to allow defendants the opportunity to cure the breaches of trust declared in this Memorandum Opinion. Given separation of powers concerns, the court will deny for the time being plaintiffs' request to appoint a receiver or Special Master over the IIM trust. Should the court find in the future upon proper motion by plaintiffs that defendants have been less than truthful in their representations or that defendants' adherence to prompt remedial action turns out to have been feigned, then the court may well decide to exercise its authority to ensure that its orders are carried out.
> For the time being, the court will give the government, perhaps for the last time in this case, the benefit of the doubt. The court will declare the statutorily based trust rights of plaintiffs under the IIM trust as described above, declare that defendants have breached their trust duties in certain specific respects that warrant

-98-

prospective relief, and remand the administrative record to the Department of the Interior and the Department of the Treasury for further proceedings not inconsistent with this Memorandum Opinion.

Id.

In addition to the relief noted above, the Court also ordered defendants to file with the Court quarterly status reports detailing the steps that they have taken to rectify the breaches of trust declared by the Court and to bring themselves into compliance with the duties enumerated in the 1994 Act. Id. at 58-59. Specifically, the Court ordered that:

1. Beginning March 1, 2000, defendants shall file with the court and serve upon plaintiffs quarterly status reports setting forth and explaining the steps that defendants have taken to rectify the breaches of trust declared today and to bring themselves into compliance with their statutory trust duties embodied in the Indian Trust Fund Management Reform Act of 1994 and other applicable statutes and regulations governing the IIM trust.
2. Each quarterly report shall be limited, to the extent practical, to actions taken since the issuance of the preceding quarterly report. Defendants' first quarterly report, due March 1, 2000, shall encompass actions taken since June 10, 1999.
3. Defendants Secretary of the Interior and Assistant Secretary of the Interior--Indian Affairs shall file with the court and serve upon plaintiffs the revised or amended High Level Implementation Plan. The revised or amended HLIP shall be filed and served upon completion but no later than March 1, 2000.
4. Defendants shall provide any additional information requested by the court to explain or supplement defendants' submissions. Plaintiffs may petition the court to order defendants to provide further information as needed if such information cannot be obtained through informal requests directly to defendants.
5. The court DENIES plaintiffs' requests for prospective relief that have not already been granted by this order. The court has based much of its decision today--especially the denial of more extensive prospective relief--on defendants' plans (in both substance and timing) to bring themselves into compliance with their trust duties declared today and provided for explicitly by statute. These plans have been represented to the court primarily through the High Level Implementation Plan, but also through the representations made by government witnesses and government counsel. Given the court's reliance on these representations, the court ORDERS defendants, as part of their quarterly status reports, to explain any changes made to the HLIP. Should plaintiffs believe that they are entitled to further prospective relief based upon information contained in these reports or otherwise learned, they may so move at the appropriate juncture.

Such a motion will then trigger this court's power of judicial review.

Id.

g)      The Department of Interior's Quarterly Status Reports (March 1, 2000-January 16, 2002)

The Department began filing quarterly status reports with the Court in March of 2000. Pls.' Ex. 7.  Interior recognized in these reports, as it had during the Phase I trial, that TAAMS was an integral part of the trust reform effort.  See, e.g., Pls.' Ex. 7 at 1.  The Department also noted (particularly in the First Quarterly Status Report) that while it had experienced problems in the summer and early fall of 1999, see e.g., Pls.' Ex. 7 (Revised HLIP) at 69-71, "significant headway" had been made towards implementing TAAMS and the subproject would be completed in due course.  See, e.g., Pls.' Ex. 7 (Revised HLIP) at 77 (stating that "[t]he Title portion of TAAMS is scheduled for completion May 2000.  The mandatory realty functions, including the necessary interfaces with MMS and TFAS to process distribution transactions, are scheduled for completion in August 2000.").  The Department continued reporting progress on the TAAMS project through the fall of 2000.  See generally Pls.' Ex. 8, 9.  In each of these status reports, the Department provided the Court with little to no indication that there were still considerable obstacles to implementing TAAMS.  Id.  Beginning with the quarterly report filed in the winter of 2000, the Department finally started to report, in a superficial, incomplete, and misleading manner, that it was continuing to experience problems that might hinder its ability to implement TAAMS.  See, e.g., Pls.' Ex. 12.  In these reports, the Department still managed, however, to provide the Court with a positive assessment of TAAMS because it limited its

reporting, for the most part, to the milestones set forth in the Revised HLIP.[84] See, e.g., Pls.' Ex. 12. Thus, Interior failed to inform the Court, until the eve of this contempt trial, that it would not be able to implement the realty portion of the land management system or the historical part of the title portion in the foreseeable future. Pls.' Ex. 13. The failure by the Department of Interior to apprise the Court of how far TAAMS really was from being implemented (or even deployed) can only be described as a fraud on the court. See, e.g., Pls.' Ex. 38-41. The Court will address each of the Department's Quarterly Status Reports below.

> 1.   The First Quarterly Status Report and the Revised High Level
>       Implementation Plan (June 10, 1999-January 31, 2000)[85]

The Department of Interior filed its First Quarterly Status Report ("First Report") along with the Revised High Level Implementation Plan ("HLIP") on March 1, 2000. Pls.' Ex. 7.[86] In the First Report the Department stated that "[s]ince the revised and amended [HLIP] contains detailed information on all project milestones, this report primarily contains summary information." Pls.' Ex. 7 at 1. In light of the fact that the First Report was based on and meant to be read in conjunction with the HLIP, the Court will analyze these two documents together.[87]

_____

[84]The Court rejects Interior's effort to blame the misleading nature of the reports on the fact that it simply followed the Revised HLIP. The Department itself selected the manner in which it would submit the quarterly reports, and there is no reason why it could not (and should not) have changed its reporting method to better inform the Court.

[85]It is important to note that no significant changes occurred with respect to the TAAMS project between December 21, 1999 and January 31, 2000. That is, all of the problems discussed above were still present when the reporting period ended for the First Quarterly Status Report. See, e.g., Pls.' Ex. 2, Tab 7D, 7E, 7F, 8B, 8C.

[86]The HLIP was actually included as an attachment to the First Report. Pls.' Ex. 7.

[87]The Court will consider the Revised HLIP as part of the First Report for purposes of this opinion.

Before assessing the veracity of the representations made by the Department in the First Report,

however, the Court will make two preliminary findings.  First, in order to comply with this

Court's Order of December 21, 1999, the defendants should have set forth and explained the

steps that they have taken since June 10, 1999 to rectify the breaches of trust declared by the

Court and to bring themselves into compliance with the statutory trust duties prescribed in the

1994 Act.  Cobell V, 91 F. Supp.2d at 59.  While the First Report discussed the four statutory

breaches that the Court identified in its Memorandum Opinion, it did not address (or even

mention) the seven statutory breaches that Interior had stipulated to immediately preceding the

Phase I trial.  Contempt II Tr. at 2083-84, 2087, 2234; Pls.' Ex. 7.  Thus, the Department--in

clear derogation of this Court's order--did not set forth and explain the steps that it had taken to

bring itself into compliance with requirements of the 1994 Act.  Second, attorneys in the

Solicitor's Office were intimately involved in the drafting and preparation of the First Report

(including the HLIP).  See, e.g., Pls.' Ex. 26, 27; Contempt II Tr. at 1365-70 (noting that "[t]he

Solicitor's Office was involved with review and publication of all these reports.").  This finding,

as the Court notes below, is germane to the plaintiffs' allegation that the Department committed a

fraud on the Court by filing these documents.

The Department of Interior acknowledged, as it had during the Phase I trial, the

importance of the TAAMS project to its overall trust reform effort in the First Report.  As a

general matter, Interior noted in the Executive Summary that the "keystone to effective trust asset

management in the Department is a comprehensive trust asset management system that includes

accurate information on land ownership, leases, billing and accounts receivable, and collections."

Pls.' Ex. 7 at 1.  Moreover, with respect to its specific statutory obligations, the Department

recognized in the First Report that "TAAMS will help to address the following provisions of the

[1994 Act]: [1] [p]roviding adequate systems for accounting for and reporting trust fund

balances[;] [2] [p]roviding adequate controls over receipts and disbursements[;] [3] [p]roviding

periodic timely reconciliations to assure the accuracy of accounts[;] [4] [d]etermining accurate

cash balances[;] [5] [p]reparing and supplying account holders with periodic statements of their

account performance and with balances of their account which shall be available on a daily

basis[;] [6] [a]ppropriately managing the natural resources located within the boundaries of

Indian reservations and trust lands[;] [7] [p]reparing accurate and timely reports to account

holders on a periodic basis regarding all collections, disbursements, investments, and return on

investments related to their trust accounts[;] [8] [m]aintaining complete, accurate and timely data

regarding the ownership and lease of Indian lands." Pls.' Ex. 7 (HLIP) at 73.  Thus, the

Department clearly knew the significance of the TAAMS project and intended to use the land

management system as the mechanism by which it would properly manage the IIM trust accounts

and discharge its fiduciary responsibilities.  Id.  See also Contempt II Tr. at 4175-76 (Deputy

Secretary of Interior Griles recognizing that "from everything I've gathered that TAAMS became

trust reform . . . it became an end-all, and it cannot be the end-all.").

 The Department of Interior admitted in the First Report (HLIP) that it had experienced

several problems testing and implementing TAAMS during the summer and early fall of 1999.

In particular, the agency observed that:

> the initial design meetings did not fully capture the entire scope of the BIA's
> needed functionality . . . [and] it became apparent that the lack of consistent
> business rules and processes across the BIA . . . placed the software vendor in a
> very difficult position as it attempted to modify the software to meet the BIA's
> needs.  Although it was always assumed that additional adjustments would be

necessary after the first prototype, it was initially believed that a large part of the basic functionality was present in the late-June 1999 release of TAAMS. This was not the case and it became apparent during the systems tests conducted with BIA users during July and August 1999 that a significant level of analysis and system modification remained in order to ensure that all of the BIA's unique business functions were addressed. . .The net result of these events during the late summer and early fall was that the deployment schedule outlined in the TAAMS contract could not be achieved as originally planned. In retrospect, the Department concedes that the plan was overly optimistic given the complexity of the task at hand.

Pls.' Ex. 7 (HLIP) at 69-71.[88] Interior failed to inform the Court, however, that these problems

persisted through the latter part of 1999 and that they continued to affect significantly the

TAAMS project in January of 2000. Id. In fact, the Department actually ended this section of

the HLIP on a positive note by stating that "the progress achieved could not have been

accomplished without this direct attack on the problem and, of course, the initiative and

cooperation of hundreds of BIA staff and contractor employees across the country." Pls.' Ex. 7

(HLIP) at 71.[89]

Despite the fact that the problems identified during the summer and fall of 1999 still

plagued the TAAMS project in January of 2000, see supra Section IV. B(1)(e), the Department of

───────────────────

[88]Later in the HLIP, however, the Department stated that "[i]mmediately following the unveiling [of TAAMS in Billings on June 25, 1999,] an extensive set of testing procedures and user reviews was conducted to insure that TAAMS met the contract requirements and user needs." Pls.' Ex. 7 (HLIP) at 80. It is difficult to reconcile this statement with the one discussed above.

[89]It is worth noting that the Court rejects Interior's contention that this section of the First Report demonstrates how candid the agency was concerning the status of TAAMS. The fallacy with the Department's argument lies in the fact that this information was not conveyed to the Court until more than six months after the agency identified the problems and two months after the Court issued its Phase I trial ruling. Moreover, as the Court finds below, while the Department did report on the difficulties that it encountered during the summer and early fall of 1999, it represented to the Court that it would nonetheless be able to implement TAAMS in due course.

Interior informed the Court that "[t]he title portion of TAAMS [wa]s scheduled for completion [in] May 2000[,] [and] [t]he mandatory realty functions, including the necessary interfaces with MMS and TFAS to process distribution transactions, [we]re scheduled for completion in August 2000." Pls.' Ex. 7 (HLIP) at 77.  See also Pls.' Ex. 7(HLIP) at 23 ("Now, with TAAMS nearing completion, it is apparent that a significant level of new information will also be necessary to enter."). Moreover, the Department stated that "[t]he BIA will recommend that the Secretary certify that the land title portion of the system be deployed to all title plants[,]" and "[a] Secretarial determination will be made within the next 45 days." Pls.' Ex. 7 at 2.  These representations are important because they show that while Interior conceded that it had experienced several setbacks in summer and fall of 1999, it indicated to the Court that the title portion and the mandatory functions of the realty portion would be completed within a matter of months.

In addition to providing the Court with a positive assessment of the status of TAAMS, the Department also made several false and misleading representations to the Court in the First Report to support its deployment schedule. See, e.g., Pls.' Ex. 7 at 14.[90]  First, in his cover letter to the HLIP, which is dated February 29, 2000, then-Secretary Babbitt made the patently false statement that TAAMS was operational at the pilot site in Billings, Montana.  Specifically, then-Secretary Babbitt told the Court that:

> [s]ignificant headway has been made in establishing new trust management and financial systems that will handle the millions of records that are the foundation of a reliable trust management program.  The Trust Funds Accounting System

---

[90]  It is important to note that the false and misleading representations made by Interior in the First Report led the Court to believe that the agency could meet the schedule presented in the First Report.

(TFAS) is operational in all but three offices and those sites will be converted to the new system shortly. The Trust Asset and Accounting Management System (TAAMS) is operational at the pilot site in Billings, Montana, and we are currently working towards nationwide deployment in other BIA locations.

Pls.' Ex. 7. The Court's findings above make clear that TAAMS–as described during the Phase I trial–was not even close to being operational in Billings, Montana in February of 2000, and, in fact, still is not fully operational at that or and other site. See e.g., Section IV. B(1)(e). See also Contempt II Tr. at 2095-2098 (Principal Deputy Special Trustee, testifying that "I do not consider this to be a very clear statement of what was going on at Billings. A test part of TAAMS was being tested at the pilot site in Billings. I would not call it operational."). As Dominic Nessi explained during this contempt trial:

> [Q.]   Was it operational at that point in time, since you were the project manager for TAAMS?  You probably would know, wouldn't you?
>
> A.   No, it wasn't operational.  We had -- they hadn't had the second user test by that point.
>
> Q.   I'd like to turn your attention to Plaintiffs' Exhibit 6, which is the HLIP, which is HLIP 2000, that I believe you were questioned by [defense counsel] about.  Do you have that in front of you?
>
> A.   Yes, sir.
>
> Q.   I'd like you to turn in this exhibit to what is the fourth page of the exhibit.  It's not numbered, but it's the fourth page of the exhibit, and it -- it's a letterhead with the Secretary of the Interior at the top, Washington.  Do you see that?
>
> A.   Yes.
>
> Q.   I'd like to turn your attention to the third paragraph.  I'd like you to turn your attention to the third line from the

bottom of that paragraph.  It states as follows:
"The trust asset and accounting management system
(TAAMS) is operational at the pilot site in Billings, Montana,
and we are currently working towards nationwide deployment in
all -- in other BIA locations."
Is that a correct statement?

A.    No, it's not.

Q.    I'd like to turn your attention to the second page.
I'd like to turn your attention to the signature page.  Do you
notice this appears to be the signature of Bruce Babbitt?

A.    Yes, sir.

Contempt II Tr. at 3396-97.[91]

Second, consistent with former Secretary Babbitt's statement, the Department of Interior

falsely represented to the Court that "[t]he land ownership module of [TAAMS] was designed,

implemented, piloted, tested, and subjected to independent verification and validation (IV & V)

at the pilot test site in Billings, Montana."  Pls.' Ex. 7 at 1 (emphasis added).  During the Phase I

trial, Interior used the terms "deploy" and "implement" interchangeably because it thought that

TAAMS would, in due course, be fully functional.  See e.g., Phase I trial Tr. at 2280-81; Defs.'

Phase I trial Ex. 82.  See also Contempt II Tr. at 1777 (Principal Deputy Special Trustee

_____

[91]In this regard, the Court rejects the utterly implausible and unconvincing interpretation
of former-Secretary Babbitt's statement by Daryl White, Chief Information Officer for Interior.
Contempt II Tr.at 2499-2500 (stating that "I would get from that, that they are actively engaged
in a pilot test of the system without having any other knowledge of what they might actually be
doing.  But the key word there is 'pilot site,' and to me, that's a test situation.").  Additionally,
the Court rejects the preposterous interpretation that Dominic Nessi offered later in his
testimony.  Contempt II Tr. at 3672-74 (testifying that "[t]o me, the term operational means that
the software -- I'm speaking of just the software -- is working.  The reverse side being it's not
inoperable.").  There simply was not and is not any ambiguity in what then-Secretary Babbitt told
this Court.  These two officials should be ashamed for offering such farcical interpretations of the
statement made by then-Secretary Babbitt.

testifying that "[t]he original definition for deployment, in my mind, included full

implementation of the system."); 1923-24 (noting that "there was no distinction between those

terms through the fall of 1999[.]"). In the First Report, however, the Department decided to

distinguish these two terms.[92] Pls.' Ex. 7 at 81; Contempt II Tr. at 1150-51. Specifically, Interior

stated that "[d]eployment begins with the loading of TAAMS software on the desktops of the

individual workstations at the office site[,]" and then involves the performance of a series of

tasks to ensure that it works properly. Pls.' Ex. 7 at 81. Interior went on to state that "[o]nce the

tasks are satisfactorily completed and the office is using the TAAMS software full-time, the site

will be considered 'implemented.' Pls.' Ex. 7 at 81. There is no question that the title portion of

TAAMS was not "implemented," as that term was defined in the First Report (HLIP), at the pilot

site (or any other location) on March 1, 2000. See, e.g., Contempt II Tr. at 1417-19.

Third, the Department of Interior falsely represented in the First Report that "[s]ystem

testing for the pilot site was successfully conducted during September and November 1999."

Pls.' Ex. 7 at 14. The evidence presented at trial and the Court's findings above make clear that

the September and November 1999 tests were not successful.[93] See supra IV. B(1)(e). During

---

[92]Several Interior officials recognized that changing the meaning of the terms at this late of date would leave the Department vulnerable to allegations that it was being deceptive about the true status of TAAMS. Pls.' Ex. 2, Tab 7I (stating that "[w]e believe that attempting to "deploy" out of Billings at this time, while the system is not "implementable," may open us to accusations by the Cobell Court and the Congress that we are being deceptive about the status of TAAMS."). In a memorandum dated February 23, 2000, the chairman of the Field User Group wrote that the group "discussed the idea of defining "deploying" TAAMS as being something that is separate and apart from "implementing" TAAMS. In other words, it was suggested that the Bureau should certify that the software is "deployable" but not "implementable" at this time. Pls.' Ex. 2, Tab 7I.

[93]In a draft report, the word successful had actually been crossed out. Pls.' Ex. 2, Tab 8D.

the course of this contempt trial there were several exchanges between the parties over whether the term "successful" simply meant that the tests were completed or whether it meant that TAAMS itself functioned properly. The Court does not need to enter this fray because the statement was patently false under either interpretation. First, with respect to the tests being completed, the Court's findings above make clear that the Department was not able to test several important aspects of the land management system and that many portions that Interior did test in September and November actually failed or were only partially validated. Id. Second, as the Court detailed extensively above, the tests conducted in both September and November 1999 revealed considerable problems with TAAMS and showed that the land management system was not capable of performing the numerous functions described by the Department during the Phase I trial. See supra IV. B(1)(e).[94] Thus, it is disingenuous for Interior to assert now that even though TAAMS was not (and is not) capable of performing many of the functions described during the Phase I trial, the systems tests were nonetheless "successful" because the software itself was working.[95] A fundamental assumption with any systems test is that if the system works properly, it will be able to carry out the functions that it was designed to perform. In this case, the evidence clearly demonstrates that TAAMS could not then and it cannot now perform the functions represented to the Court during the summer of 1999. Id.

Fourth, the Department misled the Court when it stated in the First Report that "[s]ince the time of trial, it has been determined that deploying TAAMS on first a functional rather than a

---

[94]This statement by the Department is particularly egregious with respect to the September test.

[95]As noted above, see supra IV.B(1)(e), this latter contention by Interior was simply not true.

geographic basis is a better approach." Pls.' Ex. 7 at 13.  This representation was deceptive

because it implied that the Department had reevaluated the different methods by which it could

implement TAAMS and determined that a function based approach was superior to a geographic

based approach.  As noted above, however, the real reason why the Department selected the

functional method over the geographic approach was that it had experienced considerable

problems with the realty portion of TAAMS in 1999, making it impossible to implement that part

of the system along with the title portion.  Thus, the function based approach was not really a

better method for deploying TAAMS, rather it was the only option available to the Department.

The alternative would have been literally to do nothing since Interior could not then and it cannot

now deploy the realty portion of TAAMS.  Contempt II Tr. at 1226 (Principal Deputy Special

Trustee testifying that "[r]ight now, there is a large black hole with regard to the land title and

realty systems that we designated as TAAMS.").

Finally, the Department misled the Court when it stated in the First Report that

"[a]ssuming the foregoing recommendations and risk mitigation strategies are implemented, the

IV & V team [SRA] feels that deployment beyond the Rocky Mountain Region could proceed

with minimized risk and a reasonable assurance of success." Pls.'Ex. 7 (HLIP) at 79.  As the

Court recognized above, see IV.B(1)(e), SRA noted significant problems with TAAMS that

needed to be addressed prior to deploying the system beyond the pilot site at Billings, Montana.

Id.  Even a representative for the IV & V contractor stated in February of 2000 that there were

considerable problems with TAAMS and that he did not view the results of the IV & V tests as

"favorable." Pls.' Ex. 2, Tab 8C.  In summarizing the results of the IV & V tests, the Department

focused on the positive aspects of the system and minimized or completely disregarded the

negative comments provided by SRA. Pls.' Ex. 7 at 79. Furthermore, the Department did not disclose the fact that work still needed to be done on the title portion and the realty portion was not even close to being completed. In addition, the Principal Deputy Special Trustee explained during this contempt trial that the recommendation by SRA only applied to the title portion of TAAMS. Contempt II Tr. at 1874-75.

    2.    <u>Quarterly Status Reports 2-7 (February 1, 2000-July 31, 2001)</u>

Before addressing each of these reports separately, the Court will make two preliminary findings that are pertinent to all of them. First, the defendants failed to explain the steps that they had taken to bring themselves into compliance with the obligations prescribed in the 1994 Act in these reports. Contempt II Tr. at 2083-86. That is, the Department–in clear derogation of this Court's December 21, 1999 order–failed to report the steps that it had taken (assuming that there are some) to bring itself into compliance with the 1994 Act. Thus, in the 18 month period after the Court issued its Phase I trial ruling, Interior did not provide the Court with any substantive description of its efforts to correct the statutory breaches of trust that it had stipulated to in the summer of 1999. Second, like the initial status report, attorneys in the Solicitor's Office also participated in (and had considerable control over) these reports as well. <u>See, e.g.</u>, Contempt II Tr. at 1649-50.

    a)    <u>Quarterly Status Report 2 (February 1, 2000-April 30, 2000)</u>

Interior filed its Second Quarterly Status Report ("Second Report") on June 1, 2000. Pls.' Ex. 8.[96] In the Second Report, the Department represented to the Court that it had completed

---

    [96]The Department of Interior indicated in the First Report that "[f]uture quarterly reports will track each of the milestones through completion." Pls.' Ex. 7 at 1. Thus, each of the subsequent status reports were based on, and perpetuated the representations made in, the First

both milestones (in the TAAMS project) scheduled to be finished during this time period. Pls.' Ex. 8 at 13. In fact, the Department indicated that both of these milestones were actually completed ahead of schedule. Pls.' Ex. 8 at 13. Specifically, the Department told the Court that "[a] User Test conducted April 21-24, 2000 concluded that the land title functionality of TAAMS was sufficient to initiate deployment to all BIA and tribal land records offices." Pls.' Ex. 8 at 13. Interior reported that "[u]pon completion of the April User Test the DOI decided to deploy the land title and records function of TAAMS." Pls.' Ex. 8 at 13. Moreover, with respect to the realty portion of the system, the Department stated that "[f]inal design requirements to the TAAMS leasing module were developed by the TAAMS design team and delivered to [ATS] on April 28, 2000. ATS will now begin incorporating these final requirements into the TAAMS release 1.0 for leasing due August 28, 2000." Pls.' Ex. 8 at 13. Thus, the Department clearly portrayed TAAMS in a positive light in its Second Report, and, in fact, did not give the Court any indication that significant problems still existed with the system.[97] Moreover, there were several important facts that the Department failed to disclose to the Court in this report. First, on April 3, 2000, Dominic Nessi, Project Manager for TAAMS, wrote a blistering memorandum, which he sent to the Assistant Secretary of Interior for Indian Affairs, entitled "Trust Reform

---

Report (including the HLIP). Indeed, the later reports simply tracked the milestones provided to the Court by the Department in the First Report (and HLIP). As Secretary Norton recognized in the Eighth Report, see Pls.' Ex. 66 at 6, this method of reporting insulated the Department of Interior from providing the Court with an objective and complete assessment of trust reform in general and TAAMS in particlar. The Office of Policy Management and Budget was in charge of preparing the First and Second Reports. Contempt II Tr. at 2260.

[97]Specifically, the Department did not present any evidence during this contempt trial that suggested that Interior had addressed the problems with TAAMS that it had identified months earlier. Of course, given the current state of TAAMS, no such evidence exists.

May be Hazardous to One's Health." Pls.' Ex.2, Tab 9F.  In the memorandum, Nessi indicated

that "career employees (and contractors) tasked with working on this important initiative are

increasingly finding themselves or their work efforts the target of attacks by the many detractors

of the Department's trust reform efforts." Pls.' Ex.2, Tab 9F at 1.  He cautioned that "[t]he

difficulties created by these individuals are a very real threat to the successful completion of

TAAMS[.]" Pls.' Ex.2, Tab 9F at 2.  Equally alarming, Nessi wrote that:

> [w]e frequently find when making day-to-day decisions that none of the
> alternatives are really preferable and we oftentimes have to chose the least
> disadvantageous.  We also find that no matter how many hours worked, the task
> continues to grow as we uncover additional items that need correction.  As I have
> worked on TAAMS for the past year, it has become obviously apparent that this
> initiative is far different from what was originally conceived two years ago.  The
> problems are far greater than originally projected and the resources needed must
> be continually reevaluated to ensure adequacy.

Pls.' Ex.2, Tab 9F at 2.  The Court was told nothing about the Project Manager's concerns about

TAAMS.  Second, the Department failed to inform the Court that only current data was ready to

be placed in the title portion of TAAMS; that is, the title portion did not then (and it does not

now) have historical information in the system.  Contempt II Tr. at 2024-25.  Thus, in effect, the

Department was only capable of deploying, after years of development and several rounds of

testing, a system that could provide present ownership information for a limited number of trust

beneficiaries.  Third, the Department did not inform the Court that the February 2000 tests of the

title portion of TAAMS revealed significant problems with that portion of the system.  Pls. Ex. 2,

Tab 9B.

      b)     Quarterly Status Report 3 (May 1, 2000-July 31, 2000)

The Department filed its Third Quarterly Status Report ("Third Report") on September 1,

2000.[98]  Like the prior two status reports, the Third Report provided the Court with a positive

assessment of TAAMS. Pls.' Ex. 9 at 18-20.  Specifically, the Department told the Court that:

> [t]he Land Title and Records Functionality of TAAMS has been completed and is
> now fully loaded on the desktops in the Rocky Mountain Region, Southern Plains
> Region and Alaska Region Land Title and Records Offices (LTRO), as well as
> some limited deployment to all other BIA and tribal LTROs. Plans are proceeding
> for deployment to the Pacific Region in September. The TAAMS title
> functionality has been well received by the user community and appears to meet
> their needs for properly managing Indian land ownership records.
> ...
> A thorough and in-depth reanalysis and review of the original leasing, distribution
> and accounts receivable modules was conducted from May through August. The
> leasing functions underwent extensive testing from August 14-25. Initial results
> from the contractor and the users participating in the system test were positive,
> and the limited errors discovered during the system test have been fixed and
> retested satisfactorily. Feedback from the users participating in the system test
> was encouraging and their eagerness to have TAAMS deployed at their work is
> evident.
> ...
> Re-deployment to the Rocky Mountain (Billings) Region (RMRO) of the leasing
> distribution and accounts receivable functionality of TAAMS is expected to begin
> early in September. An eight-week deployment is planned[.]
> ...
> TAAMS is scheduled to be implemented (system of record) in the Rocky
> Mountain region in mid-November, replacing the legacy system.

Pls.' Ex. 9 at 18-19.  The Department also provided the Court with a chart detailing the

milestones for the TAAMS System Subproject and whether the scheduled completion dates were

---

[98]The Office of Special Trustee assumed responsibility for compiling the quarterly reports
in August of 2000. Pls.' Ex.9 (transmittal letter). The Special Trustee and the Principal Deputy
Special Trustee testified at great length during this contempt trial that each of the reports they
compiled became a "negotiated" process in which the Department (including attorneys in the
Solicitor's Office) would temper the language drafted by the Office of Special Trustee. See, e.g.,
Contempt II Tr. at 160-63; 782-83. As a result of this process, the Special Trustee and Principal
Special Trustee testified that they became increasingly worried about the accuracy of the
representations made in the quarterly status reports. See, e.g., Contempt II Tr. at 2280-87. Of
particular concern was their view that the Department accentuated the positive aspects of
TAAMS while minimizing (or simply not mentioning at all) the problems that the agency was
experiencing with the land management system. See, e.g., Contempt II Tr. at 160-63; 2218-20.

met. Pls.' Ex. 9 at 21. Out of the twenty-two milestones identified, the Department reported that

sixteen were completed, and another two (complete system modification effort and deployment

to BIA and tribal sites) were completed with respect to the title portion of TAAMS. Pls.' Ex. 9 at

21. Thus, this chart deceptively indicated that the Department was making considerable progress

towards finishing the TAAMS project.

At the same time, however, it is important to note that the Department observed, for the

first time in a quarterly status report, that "[t]here are areas that remain a significant challenge

and must be overcome for the TAAMS initiative to be a full success[,]" including data cleanup,

business processes and procedures, and user acceptance. Pls.' Ex. 9 at 19-20. Moreover, in the

"Special Trustee Observations" section of the report, the Department recognized that "[t]he

TAAMS project schedule is heavily influenced by two activities–data conversion and cleanup,

and training and acceptance of the system by the user community."[99] Pls.' Ex. 9 at 3.

Although it appears on the surface that the Department was more forthright in this report,

a close examination reveals that the Third Report was still, like the initial two status reports,

misleading. First, the Department again failed to inform the Court that the title portion of

TAAMS was only functional with respect to current title. That is, the Department touted the

"Land Title and Records functionality of TAAMS" as being "completed and . . .fully loaded on

the desktops in the Rocky Mountain Region, Southern Plains Region and Alaska Region Land

Title and Records Offices[,]" knowing that it had absolutely no historical data to support it.

---

[99]It is important to note that the Special Trustee added this section to the quarterly reports because he was not satisfied with the totality of the representations made by the Department in the First and Second Reports. Contempt II Tr. at 1553.

Contempt II Tr. at 3121-22.[100]  Second, the Department actually changed portions of the Special

Trustee's observations section prior to filing the Third Report with the Court.  Specifically, in a

draft, the Special Trustee wrote that:

> [s]ignificant management intervention will be required to ensure that all BIA users
> accept TAAMS.  It is expected that the DOI decision on the deployment of
> TAAMS, and the commencing of deployment beyond Billings will not occur by
> August 31, 2000 as planned.

Pls.' Ex. 2, Tab 9H.  Thus, the Special Trustee was going to tell the Court explicitly that the

Department was not going to meet the August 31, 2000 milestone.  This language was

subsequently changed, however, in the version filed with the Court.  In the final draft, the

Department told the Court that:

> [a]n 8 week re-deployment of the TAAMS realty functionality is underway in Billings.  It
> is expected that the DOI decision on the deployment of the realty portion of TAAMS

---

[100]The Court recognizes that Special Trustee stated in the portion of his observations
section devoted to BIA Data Cleanup that "in the Rocky Mountain Regional Office (Billings),
the historical records for land title and records are not complete and cannot immediately be
placed into TAAMS until the missing electronic records are researched and entered into the
legacy database."  Pls.' Ex. 9 at 3.  This representation fails, however, to purge the misleading
statements regarding the title part of TAAMS detailed above for several reasons.  First, the
representation itself does not indicate that the title portion of TAAMS was incapable of
supporting historical data at this time.  It only indicated that some of the historical information
had not been put into TAAMS because of lingering issues concerning BIA Data Cleanup.
Second, there was no connection between this statement in the BIA Data Cleanup section of the
Special Trustee's observations and the section in the Third Report devoted to TAAMS.  That is,
the fact that the Special Trustee placed this comment in his observations section does not absolve
the Department of the misleading representations it made in the TAAMS section of the actual
report.  Indeed, the Department itself did not point to this statement during the contempt trial.
Rather, the Court, after reviewing the quarterly status reports again in their entirety, recently
found this particular comment.  Third, as the Court notes below in its findings regarding BIA
Data Cleanup, this particular observation was not even in the original draft of the Third Report.
Initially, the Special Trustee wrote, in commenting on the bleak state of BIA Data Cleanup, that
"more than 15 months after data cleanup commenced in Billings, the data is still not completely
converted, nor cleaned up enough sufficiently to implement TAAMS in Billings."  Pls.' Ex. 2,
Tab 9H.  This statement was ultimately replaced with the one discussed above.

beyond Billings will occur later in the fall of this year.

Pls.' Ex. 9 at 3. Interior had completely sidestepped the completion date of August 31, 2000, and instead simply stated that it would decide sometime in the fall of 2000 whether to deploy the realty portion of TAAMS. Third, the Department of Interior reported that the realty portion of TAAMS underwent "thorough and in-depth" reanalysis in August of 2000, and that the "[i]nitial results . . .[of] the system test were positive, and the limited errors discovered during the system test have been fixed and retested satisfactorily." Pls.' Ex. 9 at 18. This representation was misleading because they suggested that the realty portion was functioning well. It completely disregarded the fact, like the comment in the Special Trustee's section, that the milestone set in the Revised HLIP was not going to be met. That is, the Department knew that the realty portion of TAAMS would not be ready to "deploy" by the milestone date, yet it still only informed the Court that the results of the systems test were "positive."

   c) Quarterly Status Report 4 (August 1, 2000-October 31, 2000)

The Department of Interior filed its Fourth Quarterly Status Report ("Fourth Report") with the Court on December 1, 2000. In the Fourth Report, the Department had no choice but to inform the Court that it had not been able to meet the August 31, 2000 milestones for the realty portion of TAAMS. Notwithstanding the fact that it had failed to complete these milestones, Interior reassured the Court that the modifications it needed to make to the system work were minor, and that deployment would take place in the early to middle part of 2001. Pls.' Ex. 10 at 31. Specifically, with respect to the two milestones scheduled to be completed during this period, Interior told the Court that:

    Complete System Modification Effort–Realty Functions and Interfaces. This

-117-

milestone was scheduled to be completed by August 31, 2000.  This milestone was not met. . . .

Preliminary results from the transactional verification analysis of the leasing module in the Rocky Mountain Regional Office and subordinate agency offices indicate that the vendor may need to make additional modifications to TAAMS before it can be used as the system of record in this region.  The additional modifications are not major design changes, however, they are integral to the leasing process and must be completed prior to its full-time use.

...

Realty Functions and Interfaces Start.  This milestone was scheduled to be completed by August 31, 2000.  This milestone was missed, as it is dependent upon the completion of Milestone K2, Complete System Modification Effort–Realty Functions and Interfaces, discussed above.  Upon the completion of system testing, transactional verification and analysis, TAAMS will be released for use as the system of record.  It is expected that this will occur shortly after the completion of the 'follow–up' system and user test scheduled to begin February 12, 2001.  Deployment will occur 30-60 days after the modifications are complete and the Department has notified Congress.

Pls.' Ex. 10 at 31.  While providing this rough time estimate, the Department recognized that it needed new dates for these two milestones.  Pls.' Ex. 10 at 33.  In addition to these representations, the Department also told the Court that it had conducted a meeting in September of 2000 to review the status of the TAAMS project.  Pls.' Ex. 10 at 32.  Interior indicated that it had decided, based on "activities associated with the deployment of TAAMS, such as conversion, data cleanup, data analysis, etc.," that a "more focused deployment approach" would help ensure the ultimate success of the project.  Pls.' Ex. 10 at 32.  Thus, Interior decided to develop a schedule for deployment based on dividing the 12 BIA regions into three groups (A,B, and C).  Pls.' Ex. 10 at 32.  Finally, the Department reported that during the September meeting it reviewed the ongoing eight-week leasing, accounts receivable, distribution and interface test.  Pls.' Ex. 10 at 32.  Surprisingly, Interior stated that "[t]he test was very successful in that it presented a clear picture of what has been accomplished and what tasks remain to be performed

before TAAMS can be considered fully ready for use. A Transactional Verification Analysis (TVA) report developed by BIA fully outlines the remaining issues in detail." Pls.' Ex. 10 at 32. In his observations section, the Special Trustee reiterated the bulk of these statements. Pls.' Ex. 10 at 5-6.

While the Department was more forthright in this report than the previous three, it still accentuated the positive aspects of TAAMS and presented the Court with a favorable view of the land management system despite the numerous problems with it. That is, even though the milestone deadlines for the realty portion of the system had been missed, the Department still told the Court that only minor adjustments were necessary and the testing of the system was "successful" in that it showed Interior what needed to be done. Pls.' Ex. 10 at 32. Moreover, the Department again failed to provide the Court with information regarding the title portion's ability to support historical data, see Pls.' Ex. 10 at 31-34, despite the fact that the issue was specifically raised at the September meeting. Pls.' Ex. 2, Tab 9J (writing, in reference to the September 2000 meeting, that "[a] definite division between 'current' and 'history' was noted. Only the 'current' portion was demonstrated. It was mentioned that there were still some issues with the 'current' portion and some data clean up still needed to be done. . . History is not in the system, i.e. a chain of title could not be accomplished from the data currently present."). In addition, the Department failed to inform the Court the present status of the conversion of data from IRMS into the realty portion of TAAMS–namely that "they are going to scrap the existing IRMS conversion programs and an Artesia person and a BIA person are going to remap the data bases and start over on the

IRMS data conversion."[101]  Pls.' Ex. 2, Tab 9J.

        d)      Quarterly Status Report 5 (November 1, 2000-January 1, 2001)

      The Department of Interior submitted its Fifth Quarterly Status Report (Fifth Report) on

March 1, 2001.[102]  In the Report, the Department once again provided the Court with a positive

assessment of TAAMS.  In particular, with respect to the title portion of the system, Interior

wrote that:

> Effective December 29, 2000, TAAMS was made the system of record for current
> title for the Rocky Mountain, Southern Plains, Eastern Oklahoma and Alaska
> Regions.  These four title plants represent all offices designated in Group A for
> deployment . . . The title history data is not complete.  As necessary, field staff
> will continue to supplement historical title information in TAAMS with data and
> information from legacy systems and hard copy data.

Pls.' Ex. 11 at 27.  Moreover, with respect to the realty portion of TAAMS, Interior reported that

the complete system modification effort would be completed by May 31, 2001.  Pls.' Ex. 11 at

27.  In support of this date, the Department indicated that BIA finished its transactional

verification analysis of the leasing module, and that a review was being conducted to determine

"the remaining functions that must be included for the realty portion to be completely

operational."  Pls.' Ex. 11 at 27.  Additionally, the Department indicated, with respect to the

"Realty Functions and Interfaces Start" milestone, that "[b]ased on the schedule discussed above,

TAAMS title and realty modules are scheduled to be fully implemented by June 1, 2001 in the

---

      [101]In addition to the Department's failures regarding TAAMS, the agency also did not
disclose to the Court that it had selected a method (statistical sampling) for performing the
historical accounting project.  This was a rather important omission.

      [102]This is the first quarterly status report filed during Gale Norton's tenure as Secretary of
Interior.  Contempt II Tr. at 4279.  The Court recognizes that Assistant Secretary McCaleb did
not take office until July of 2001.

Rocky Mountain Region." Pls.' Ex. 11 at 28.

Like the previous reports, the Department of Interior continued to report progress on the

TAAMS system notwithstanding the fact that the originally scheduled milestones had long since

passed. Thus, despite the fact that Interior was incapable of even deploying (as opposed to

implementing) the realty portion of the land management system at the pilot site at Billings, it

nonetheless provided the Court with a positive assessment of the system's status and indicated

that it would be fully operational within a matter of months. These completion dates represented

to the Court can only be described, in light of the later filed quarterly status reports, see generally

Pls.' Ex. 66, as being based on nothing more than speculation and wishful thinking. That is,

there does not appear to have been any support for these arbitrarily set completion dates.

See generally Pls.' Ex. 66. Worse yet, the Department deceptively informed the Court in the

Fifth Report that "[e]ffective December 29, 2000, TAAMS was made the system of record for

current title for the Rocky Mountain, Southern Plains, Eastern Oklahoma and Alaska Regions."

Pls.' Ex. 11 at 27. A December 6, 2000 memorandum from Sharon Blackwell, Deputy

Commissioner of Indian Affairs, clearly indicated that TAAMS was only considered the system

of record for these locations in part. The memorandum provided that :

> Effective December 29, 2000 [TAAMS] shall be considered the system of record
> for all current activities in the Land Title and Records Offices in the[se] [four
> regions], with the following considerations:
> > Alaska Region–All transactions in regional areas for which data had been
> > loaded into TAAMS.
> > Eastern Oklahoma–All transactions for which data has been loaded into
> > TAAMS.
> > Rocky Mountain Region–In response to your letter of November 29, 2000,
> > [several] actions will be taken. . . We expect a quick resolution and we do
> > not believe it is necessary to delay this decision pending its completion.
> > Southern Plains Region–TAAMS as the system of record shall be effective

December 26, 2000, at the conclusion of the Southern Plains Land Title
and Records Office initial review and parallel test of the system.

Pls.' Ex. 2, Tab 10G. The qualification that it would be considered the system of record for

transactions for which data had been loaded into TAAMS was critically important because, as the

Court later learned, there was relatively little data input into TAAMS at that time in the Alaska

and Eastern Oklahoma regions. Therefore, the Department considered TAAMS to be the system

of record notwithstanding the fact that a relatively small amount of data had been put into the

system. Later quarterly status reports filed by the Department confirmed the limitations of the

current title portion of TAAMS at these regions even to this date. See, e.g., Pls.' Ex. 66 at 123-

24. Thus, the first quarterly status report submitted after Secretary Norton's arrival at the

Department contained just as much false and misleading information as the previous four reports

filed under Secretary Babbitt.

   e)  Quarterly Status Report 6 (February 1, 2001-April 30, 2001)

The Department filed its Sixth Quarterly Status Report ("Sixth Report") on June 1,

2001.[103] As an initial matter, Interior noted that no milestone due dates fell within this reporting

period. Pls.' Ex. 12 at 25. The Department went on to report that it completed a system test on

April 12, 2001, in which "the functions tested appeared to be sound and functions as defined for

the test were met by the application." Pls.' Ex. 12 at 26. Interior also noted that it conducted a

Test Readiness Review on April 18, 2001, to identify and resolve any issues that could cause a

---

[103] As noted above, Gale Norton was sworn in as Secretary of Interior in late January 2001.
Contempt II Tr. at 4279. Thus, this is the first quarterly status report that covered dates for which
she is entirely responsible. Secretary Norton did not get off to a good start, as the Department of
Interior submitted the Sixth Report notwithstanding the fact that the Special Trustee failed to
verify its accuracy and completeness. Pls.' Ex. 12 (May 31, 2001 letter from Special Trustee to
Cruden, DOJ); Pls.' Ex. 5, Tab A at 5.

delay in the test schedule. Pls.' Ex. 12 at 26. Based in part on the results of that test, the

Department decided to include a new milestone, "User Review," that was completed on May 4,

2001. Pls.' Ex. 12 at 27. As a result of the new milestone, Interior indicated that it had extended

the "Realty Functions" milestone from May 31, 2001 until June 25, 2001. Pls.' Ex. 12 at 25. In

the Sixth Report, the Department of Interior also told the Court that after the Executive

Management Decision on June 25, 2001, "the deployment schedule will be finalized with major

milestones identified for the following groups: Group A[;] Group B[;] and Group C[.]" Pls.' Ex.

12 at 27-28. Interior further presented the Court with a tentative deployment schedule for the

title and realty portions of TAAMS for these regions. Pls.' Ex. 12 at 28. In particular, the

Department indicated that the tentative deployment schedule was "[b]ased on a successful UAT

of TAAMS and successfully running [the system in] parallel with the legacy systems[.] Pls.' Ex.

12 at 28. For purposes of this opinion, it is sufficient to note that Group A (Rocky Mountain,

Southern Plains, Eastern Oklahoma, and Alaska) were set to be completed by December of 2001.

Pls.' Ex. 12 at 28. The Department recognized, however, that "[d]ata cleanup and training could

have a major impact on the deployment schedule for TAAMS." Pls.' Ex. 12 at 28.[104]

---

[104]The Special Trustee's observations were particularly circumspect in this report. Pls.'
Ex. 12 at 3-5. Specifically, the Special Trustee wrote that:
>As indicated in the last three Quarterly Reports, the Special Trustee has expressed
>heightened concern about the project management capabilities assigned to several
>major HLIP subprojects. Those concerns center on such matters as a lack of clear
>strategy, adequate financial and staff planning, communications, and the
>appropriate direction of contractors. . . .Given the complexity of several projects,
>we may not know the full depth of the problems in those projects until the
>management issues are resolved satisfactorily. The Department has several
>options under active consideration to strengthen the management of those
>subprojects. . .The Special Trustee continues to have concerns regarding the
>capability of the BIA project management to implement TAAMS across all twelve
>regions. As noted above, these concerns are being addressed.

The second report filed during Secretary Norton's tenure with the Department contained just as much misleading (if not outright false) information as the previous quarterly status reports filed with this Court. True to form, the Department of Interior again represented to the Court that it was moving ever closer to being able to implement fully the title and realty portions of TAAMS. This time, however, the Department stated that it had conducted specific tests that indicated that it was almost ready to deploy TAAMS to the Group A Regions. The Court finds this report particularly misleading (and troubling) in light of the Department's Eighth Report and the current status of TAAMS. See infra IVB(1)(g)(3). Based on these later filed reports (and the EDS report, see, Pls.' Ex. 60), it is inconceivable that the Department would make these statements to the Court. I simply do not understand how Secretary Norton could have filed this report (or the Seventh Report) with the Court. Indeed, the Special Trustee himself noted in his observations section that he believed that the "TAAMS leasing portion still required considerable programming to provide conformity with sound trust principles and practice, and to meet BIA users needs." Pls.' Ex. 12 at 4. In short, the Sixth Report was little more than an extension of the prior five reports to the extent that the Department indicated that it was getting closer to being able to deploy TAAMS, while it had little to no substantive evidence to support those representations. See infra IVB(1)(g)(3). See also Pls.' Ex. 60 at 123-24 (noting that, "[i]n the past, milestones were arbitrarily set for TAAMS and were unrealistic.").

        f)      Quarterly Status Report 7 (May 1, 2001-July 31, 2001)

The Department of Interior submitted its Seventh Quarterly Status Report ("Seventh

---

Pls.' Ex. 12 at 3-5.

Report") on October 3, 2001.[105]  Before considering the Seventh Report proper, the Court will

briefly address the process that led up to the filing of the report.  The Seventh Report was

originally due on September 1, 2001.  On August 27, 2001, however, William Myers, the

Solicitor for Interior, informed Secretary Norton that he wanted to discuss the Special Trustee's

observations section of the report, in which Thomas Slonaker wrote that he "was not satisfied

with the completeness or the quality of the information provided in this quarterly report."  Pls.'

Ex. 36.  Solicitor Myers informed Secretary Norton that the draft report had to be finalized by

August 31, 2001, and that he wanted to meet with her on August 28, 2001 to discuss the matter.

Pls.' Ex. 36.  On August 29, 2001, Secretary Norton wrote the Special Trustee a memorandum in

which she stated, referring to the above quoted portion of the Special Trustee's draft observations

section, that "[s]ince I have not heard from you on this subject prior to my review of the draft,

and since your office compiled the report, I assume that your concerns were of insufficient

severity or immediacy for you to recommend a delay in filing the report."  Pls. Ex. 4, Tab 1.  The

Court finds Secretary Norton's memorandum to the Special Trustee very peculiar in light of the

Special Trustee's earlier observations, see, e.g. Pls.' Ex. 12 at 3, in which he indicated his

growing concern about the accuracy of the quarterly status reports, as well as the Court Monitor

Reports, which discussed some of the Special Trustee's concerns.  See, e.g., Pls' Ex. 2 at 104-05.

On August 31, 2001, the Special Trustee indicated to the Solicitor's Office that he would not

verify the quarterly report. Defs.' Ex. P, Tab 36.  Consequently, Interior filed a motion for an

extension of time because the Special Trustee was "not satisfied with the completeness or the

quality of the information provided in the" report.  Pls.' Ex. 4, Tab 4 at 1.  The Department

---

[105]Assistant Secretary McCaleb took office prior to the filing of this report.

requested a thirty day extension so that it could verify the accuracy of the representations made in the report. Pls.' Ex. 4, Tab 4 at 1. The verification process that followed can only be described as a debacle. See generally Pls.' Ex. 4, 5. It is worth noting that the Special Trustee never verified the Seventh Report, and the Department was only able to get it verified after making several changes.

Turning now to the Seventh Report, Interior reported as an initial matter that it had recently entered into a contract with Electronic Data Systems ("EDS") to provide an independent assessment of the TAAMS project. Pls.' Ex. 13 at 29. The Department then stated that, although the Integrated User Acceptance Test (IUAT) conducted at the Rocky Mountain Region "showed that significant progress continues and the IUAT methodology proved effective, this test confirmed [that] the software was not ready for deployment." Pls.' Ex. 13 at 29. The Department went on to provide the Court with a summary of the test results, which confirmed that the system was indeed not ready for deployment. Pls.' Ex. 13 at 29. Thus, Interior had no choice but to concede that the "Realty Functions and Interfaces" milestone of May 31, 2001, was not met. Pls.' Ex. 13 at 31.[106] As a result, the Department informed the Court that it was in the process of developing new milestone dates. Pls.' Ex. 13 at 34. With respect to the title portion of TAAMS, the Department reported that the "[t]itle module is operational only in Group A . . . Regions, and the exact status of each of the four regional offices will be provided in the next quarterly report." Pls.' Ex. 13 at 33.

The Seventh Report, like the previous six, failed to portray accurately the status of

---

[106]It is worth pointing out that, despite recognizing that it was unable to deploy the system as planned, the Department nonetheless told the Court that several "major activities for the TAAMS Completion Schedule" were completed during this reporting period. Pls.' Ex. 13 at 30.

TAAMS. Specifically, Interior presented a positive picture of TAAMS despite the fact that the

agency was not ready to deploy or implement the land management system as scheduled, and,

after the Integrated User Acceptance Test, clearly was not going to be able to deploy or

implement it anytime soon. Importantly, the Department made no mention of the "Data

Analysis" section of the IUAT report, which explicitly noted that "[f]ailures were spread across

all applications and disciplines, and none of the applications appear mature enough for

implementation." Pls.' Ex. 2, Tab1C at 2. Thus, while conceding that the milestone had been

missed and that the system was not ready for deployment, Interior did not provide the Court with

anything close to what can be construed as a complete picture of the system's status. Indeed, the

Special Trustee himself indicated in his observations section that he was "not satisfied with the

completeness or the quality of the information provided in this quarterly report." Pls.' Ex. 13 at

6. Even before the Seventh Report was filed with the Court, the Special Trustee advised the

Secretary that he did not believe the Department (and the project managers) had sufficient

evidence to corroborate the representations made in the report. Pls.' Ex. 4, Tab 3. As the Special

Trustee testified during this contempt trial:

> I had lost confidence by that time in the reporting of
> the completeness of some of the subprojects, partly because I
> believed, as I mentioned a few minutes ago, that they perhaps
> were not properly conceived, and there might even be areas of
> the subproject that were not being properly monitored by the
> subproject manager who had never even dreamed that a
> particular aspect of the subproject really had to be part of
> his plan.

Contempt II Tr. at 2224-25. Moreover, even after telling the Court that the current title portion

of TAAMS was the system of record for the Group A Regions and that it was operational, the

Department failed to provide the Court with the actual status at the Group A Regions. Pls.' Ex. 13 at 33. Instead, the agency simply stated that it would provide that information to the Court in the next quarterly status report. Pls.' Ex. 13 at 33. The problem with this representation is that the Department did know at the time it filed the report with the Court, at least in part, the status of TAAMS at these locations, and the status was not as positive as Interior had led the Court to believe in the Fifth Report. Pls.' Ex. 3 at 22-25 (this was filed with the Court on September 17, 2001, well before Interior submitted the Seventh Report). In sum, the Seventh Report was no closer to providing the Court with a complete and accurate assessment of TAAMS than the previous six reports. Indeed, Secretary Norton herself testified during the contempt trial that "it was an insufficient picture" and "it's not a particularly good document." Contempt II Tr. at 4381.

3.    Quarterly Status Report 8 (August 1, 2001-December 31, 2001) & The Status of
       TAAMS at the Time of the Contempt Trial

The Department of Interior filed its Eighth Quarterly Status Report ("Eighth Report") on January 16, 2002.[107] In the Eighth Report, before addressing the status of specific trust reform efforts, Secretary Norton made three important concessions that are worth mentioning. First, Secretary Norton recognized that the previous seven reports did not provide the Court with a sufficiently detailed or objective assessment of trust reform.[108] Pls.' Ex. 66 at 6. Specifically,

———————————————

[107]On November 26, 2001, the Department requested that the Court accept the reports generated by EDS in lieu of a traditional quarterly status report. The Court denied the defendants' request on December 17, 2001, but provided the Department an additional 30 days to submit the Eighth Report pursuant to the December 21, 1999 order.

[108]While Secretary Norton's admission in this respect is a step in the right direction, there are nevertheless three significant problems with it. First, it became apparent during the contempt trial that the Department knew before even the Seventh Report had been submitted that by

-128-

Secretary Norton wrote in her observations section that:

> [a]s indicated in the introduction, the style, methodology and content of this report differ from previous reports. We are introducing a new format that is designed to be more readable, and the information is based upon a methodology to document more objectively both accomplishments and lack of progress. The previous format focused on the steps we have taken and the completion of milestones. In retrospect, this format exacerbated the ordinary human inclination to report accomplishments and to ignore obstacles, difficulties and problems that were not directly related to the milestones. With this report, we have demanded that managers report both progress and problems. Our report also includes the key recommendations of outside management consultants who have criticized the current approach to some trust reform goals. The overarching goal is to provide the Court with a more comprehensive and candid reflection of trust reform.

Pls.' Ex. 66 at 6. Second, Secretary Norton acknowledged that the Department now considers the HLIP, the plan by which trust management reform progress was measured and reported to the Court in the past, to be obsolete. Pls.' Ex. 66 at 7. In particular, she wrote that "HLIP milestones have become increasingly disconnected from the overall objectives of trust reform[,]" and, "[m]ore fundamentally, the HLIP does not reflect an adequately coordinated and comprehensive view of the trust reform process." Pls.' Ex. 66 at 7 (writing further that "[m]any of its identified activities have been designated as being completed; however, little material progress is evident."). Third, Secretary Norton noted that the Eighth Report "marks the beginning of the

---

limiting the information to the HLIP, Interior would be providing the Court with an inaccurate assessment of the TAAMS subproject. Contempt II Tr. at 4381-82. Thus, there is no excuse for the Department not changing the manner in which it organized the reports at an earlier date. Second, the Department itself initially tried simply to file the EDS report as the Eighth Report. See Defs.' Mot. to Permit Filing Modified Form of Trust Reform Status Report. The Department only made these concessions after the Court denied Interior's motion. Order of December 17, 2001. Third, these admissions came only after the Court initiated contempt proceedings against Secretary Norton and Assistant Secretary McCaleb. The Court finds that it is highly unlikely that the Department would have made these concessions or created a new format for the quarterly reports if the Court had not ordered the Secretary and Assistant Secretary to show cause why they should not be held in civil contempt for filing false and misleading quarterly status reports.

transition from a narrow, non-integrated, task oriented set of activities related to trust reform, to

an integrated, goal focused approach to managing and accounting for trust assets." Pls.' Ex. 66 at

8. Specifically, she informed the Court that:

> The senior management team will coordinate a new management strategic plan to
> replace the HLIP. This will incorporate a broad variety of perspectives, including
> those offered by tribes, individual Indians, outside consultants, and other agencies.
> This plan will incorporate ways to overcome challenges and obstacles identified in
> this report by the subproject managers, EDS, Inc., the Special Trustee and the
> Director of Indian Trust Transition. Our objectives are (1) to plan and conduct a
> valid, cost-effective and timely accounting of the IIM trust in a manner that
> satisfies the Department's fiduciary duty to account to IIM beneficiaries, (2) to
> develop a beneficia[l] approach to trust management and service delivery, (3) to
> record and maintain comprehensive, up-to-date and accurate land and natural
> resource ownership records, and (4) to develop a workforce plan and associated
> activities to attract and maintain a qualified, effective workforce.

Pls.' Ex. 66 at 8.

Ross Swimmer, the Director of the Office of Indian Trust Transition (OITT), also

provided the Court with a detailed observations section in the Eighth Report. Pls.' Ex. 66 at 15.

Secretary Norton created OITT in November of 2001 to establish a temporary office within the

Office of the Secretary that would be responsible for planning and implementing the transition of

the Department's Indian trust functions, which were (and are) currently dispersed throughout the

Department. Pls.' Ex. 66 at 15. As part of his effort to assist the Department in compiling the

Eighth Report (and to ensure that the report was both complete and accurate), Swimmer

participated in interviews with all subproject managers regarding their individual reports. Pls.'

Ex. 66 at 15. Swimmer reported to the Court that during the course of these interviews it became

readily apparent that there had not been sufficient documentation to support representations made

in the prior quarterly reports. Specifically, he stated that:

> During the interview process, questions were asked such as: You state you did this task or training or report, etc., where is the documentation? Often the response was similar to: I really believe it was done, but I will have to do more checking to confirm. In other words, subproject managers were willing to state certain progress was made but when challenged could not always defend their position. In other instances, I would hear that subproject managers had completed a task, but when asked what happened with their work to insure that the beneficiary received his/her income, the answer often was: That is not my area. . . .
> It is very alarming to read and hear reports of progress being made and, in some instances, projects completed without having this work fit into an overall context of trust management.

Pls.' Ex. 66 at 15-16.

EDS, the independent contractor that had been hired by the Department in June of 2001 to evaluate the status of TAAMS, submitted an interim report on November 12, 2001. In its interim report, which was summarized in the Department's Eighth Report, EDS observed that:

> progress has been made in implementing the current Title application with the name & address module. The current title application is being used in four regions. Title history is dependent upon BIA Data Cleanup tasks and is not yet available in production. The business functions in the Realty area are much more complex than Title. During development, critical requirements for defining the Realty application were not appropriately captured, partially due to its accelerated development schedule. This resulted in extensive re-coding, so that the COTS product is at this point a custom design. The original COTS product was focused on the leasing and did not have a title component that reflected BIA land management practices. In addition to being time consuming and expensive, the extensive set of changes exposes the system to an increased risk of operating problems when placed in production.

Pls.' Ex. 66 at 124. In addition to this general description, EDS flagged several issues for Interior that needed to be addressed, including the fact that different business models and processes throughout the regions and field offices make TAAMS development complex and costly, the TAAMS requirements determination and gathering process is inadequate, and testing teams do not have detailed requirements to test against, making it difficult to measure success.

Pls.' Ex. 66 at 125.  As the Principal Deputy Special Trustee testified at trial:

> EDS' assessment was that the project needed a thorough
> replanning; that probably before we were ready to embark on a
> reinvestigation, a reinvestment in TAAMS, it would be upwards
> of a year's time.  In the interim we need to do things like
> requirements analysis, planning, outreach, et cetera, and then
> in something short of two years time that they would present,
> as I recall, options for what to do with TAAMS, either to
> abandon it, to re-do it, to look at other off-the-shelf
> options, so forth.

Contempt II Tr. at 146.  Based on its findings, EDS recommended that the Department should

appoint a single individual accountable for TAAMS and BIA Data Cleanup, accelerate[109]

TAAMS title and defer realty and accounting functionality, and improve stakeholder

involvement in TAAMS and BIA Data Cleanup.  Pls.' Ex. 66 at 125.

The Department of Interior radically changed its assessment of TAAMS, in part based on

the observations and recommendations of EDS, in the Eighth Report.  Interior informed the

Court that, in accordance with EDS' recommendations, the agency "is deferring realty and

accounting functionality until the business processes are documented and defined."  Pls.' Ex. 66

at 121.  Moreover, the Department indicated that several significant steps remain and that there

are numerous additional issues and concerns that must be addressed.  Pls.' Ex. 66 at 122-23.

Thus,  Interior finally–after over two years–recognized that there were significant impediments to

implementing (or even deploying) the realty portion of TAAMS.  That is, without resolving these

underlying issues the land management system described in great detail to the Court in the

summer of 1999 would remain no more a reality than the Department's non-existent historical

---

[109]EDS subsequently defined "accelerate" to mean "focusing existing resources on the
data cleanup activities required to support the nation-wide deployment of core title
functionality."  Pls.' Ex. 98, Tab 6.

accounting project.[110]

There is no question that, based on the representations made by the Department in the

Eighth Report as well as the substantial testimony during this contempt trial, TAAMS will not

perform the functions described to the Court during the summer of 1999 for several years, if ever.

See, e.g., Contempt II Tr. at 1124 (Principal Deputy Special Trustee agreeing that "TAAMS . . .

presently c[an] not support the Court-directed trust reform effort and will not be capable of

supporting for years, if ever[.]"); 2210 (Special Trustee, agreeing that TAAMS cannot now and

may not ever be implemented); 3456 (Nessi, testifying that "there were three findings:  lack of

executive leadership, which I would completely concur with; they told me that title was

salvageable, which I would probably agree with because I thought it was a pretty good piece of

software; and they told me that leasing needed to be scrapped, which, based on the last time I saw

TAAMS in March, I would agree with that.").  The problems associated with interfacing

TAAMS with TFAS, which are critically important to the successful implementation and

functioning of the land management system, still have not been resolved.  Contempt II Tr. at

1255-57; 1296-98.  Indeed, TFAS itself continues to rely on unverifiable data.  Contempt II Tr. at

1227-28, 1427-29.  Moreover, not only has the Department failed to implement (or deploy) the

Accounting module of TAAMS, which tracks the billing and accounts receivable of the trust, it

has made little to no progress since the Phase I trial in doing so.  Contempt II Tr. at 1221-25.  As

---

[110]The Department also mentioned in the Eighth Report the status of the Land Title and
Records Offices.  Pls.' Ex. 66 at 123-24.  As discussed above, the Department confirmed that the
current title portion of TAAMS was being used with limitations, and LRIS, courthouses, and/or
manual processes are still being used at the Group A locations.  Pls.' Ex. 66 at 123-24.  For an
almost amusing illustration of how little progress has been made in implementing the title
portion of TAAMS, see Contempt II Tr. at 3120-22.

the Principal Deputy Special Trustee testified during this contempt trial:

> Q.   Now, sir, was the accounts receivables system deferred, then?
>
> A.   In a sense, that would be correct because the accounts receivable piece is going to be in the realty side of TAAMS, the portion that they have not been able to successfully test.
>
> Q.   Is the accounts receivable system implemented today?
>
> A.   No.
>
> Q.   What is the consequence of not having an accounts receivable system, Mr. Thompson?
>
> A.   Well, as we discussed yesterday or the day before, absent an accounts receivable system, you have no way to project, for want of a better term, the due ends off of leases.  An accounts receivable gives you an extra check and balance that once a lease is established, there is a pattern for payment and you can use that information, then, as a cross-check against whether you're receiving your payments on time and fully for each lease itself there.
>
> Q.   So if, in fact, accounts receivable is -- the deployment of an accounts receivable system is deferred, there would be no need to have all the leases recorded, would there?
>
> A.   I guess I would argue, you need to have your lease universe captured somewhere.  In order to manage that lease universe and the production of income from it, it's necessary to have an accounts receivable system as well as a collection system to complement the work that's done in the trust fund accounting system.
>
> Q.   Is it correct that yesterday, you testified that you felt among the current leases, at least 50 percent of those leases are -- short-term leases are not recorded?
>
> A.   My information is that more than 50 percent of the leases managed in BIA are not presently recorded in an automated system.

Q.   And it's also your testimony there is no accounts
receivable system today, correct?

A.   There is some accounts receivable systems on the trust
fund side.  There may be some independent, but there is not a
national or uniform accounts receivable system in existence.

Q.   So is it fair to say as of today, you do not know
whether you are receiving for the individual Indian trust all
the monies that are being paid for the use of the Indian trust
lands?

A.   I could say that it makes it much more difficult to
ascertain whether you're receiving all of those funds or not.
It means that there is not an independent or an automated way
to assure yourself that, in fact, that's going on.

Q.   Are there manual audits to confirm it on an annual
basis, Mr. Thompson?

A.   Not uniformly.

THE COURT:  There is nothing different about that,
then, than from the trial in '99, is there?

THE WITNESS:  No, Your Honor, there is not.

Contempt II Tr. at 1221-25.  It is equally clear that the legacy systems do not enable the

Department to discharge properly its fiduciary responsibilities.  See, e.g., Contempt II Tr. at

1623-25; Phase I trial Tr. at 148-53, 412-21, 441-42, and 1153-54.  Thus, while the Department

has already spent 33 million dollars on TAAMS, see Contempt II Tr. at 650-51, for all practical

purposes the project is in a state of disrepair.  Pls.' Ex. 66 at 121.

2.      BIA Data Cleanup

       a)      Background information on BIA Data Cleanup

Because there are many sources of errors in electronic data, Interior recognized the need

for a subproject--in both the Original and Revised HLIP--devoted to data cleanup.  The

Department, in describing this problem, observed that:

> [t]he data maintained electronically in support of land title and resource
> management requires cleanup and reconciliation across systems.  Incorrect or
> inconsistent data is the result of, among other things, a) multiple manual entries of
> the same information into the automated system, b) the tendency to use the same
> information inconsistently or unsystematically across automated systems and
> functions, and c) the use of different automated systems for the land resource
> management function.

Pls.' Ex. 6 at 21.  See also Pls.' Ex. 7 at 7 (noting that "data that is stored in the legacy systems

can be inconsistent, inaccurate, or incomplete.").  The ultimate goal of the data cleanup

subproject "is to ensure correct and updated data such that Indian trust records are accurate, meet

management and operational standards, and establish permanent data integrity at all BIA levels."

Pls.' Ex. 6 at 24.  See also Pls.' Ex. 6 at 5 (noting that "[t]he Data Cleanup subprojects within

OST and BIA are aimed at ensuring that data housed in existing or new systems are accurate and

complete, and aimed at eliminating transaction processing backlogs to ensure records are up-to-

date–particularly land ownership information and records.").

　　　　The BIA Data Cleanup effort focuses primarily on preparing data for conversion from the

existing legacy systems (LRIS and IRMS) to TAAMS and then bringing that data up to a

sufficient level of reliability and quality.  Contempt II Tr. at 3759.  The first step in this process is

"pre-deployment" cleanup, which brings the data to a quality level that can support the initial

TAAMS deployment.  Pls.' Ex. 6 at 30.  Interior explained this process in the revised HLIP:

> Based on the results of the analysis task and the developed Data Cleanup Strategy,
> data/records needing cleanup prior to deployment of TAAMS will be addressed
> during this task at each geographic location.  This includes necessary Data
> Cleanup to support the TAAMS Pilot and deployment, as well as all subsequent
> locations.

> Pre-deployment Data Cleanup focuses on ensuring that 'key' data fields such as tract number and owner ID are unique and correct, inconsistencies between the legacy systems are researched and amended as necessary. Eliminating these errors ensures that TAAMS data conversion can be processed effectively.

Pls.' Ex. 6 at 30. Even after TAAMS is deployed in a particular region, the Department

recognized that additional cleanup activities, known as "post-deployment" cleanup, would be

required. Pls.' Ex. 6 at 30. Interior also explained what this entails in the revised HLIP:

> Examples of post-deployment Data Cleanup include reviewing standard BIA reports, such as the Title Status Report, from the legacy system against TAAMS reports, addressing inconsistencies, researching and making corrections to data errors and entering document processing backlogs, such as completed probates.

Pls.' Ex. 6 at 33. The Department selected DataCom Sciences, Inc. ("DataCom") as the

contractor for this subproject in January of 1999. Pls.' Ex. 3, Tab 1D. In the Original HLIP, the

Department indicated that it planned on completing the pre-deployment data cleanup by May 31,

1999, and the post-deployment data cleanup by June 30, 2000. Pls.' Ex. 6 at 7.

      The Department of Interior has acknowledged the importance of data cleanup for several

years. See, e.g., Pls.' Ex. 3, Tab 1A; Phase I trial Tr. at 3110-11, 3121-22. Specifically, Interior

recognized during the summer of 1999 that the BIA Data Cleanup subproject was vitally

important to the TAAMS initiative because without complete and accurate electronic data, it

would not matter how well the new land management system functioned. Phase I trial Tr. at

3121-22 ("I don't think there is any doubt, even on the plaintiffs' side, that this data cleanup and

the installation of the new system is critical to have even the basics of a trust management

system."); Pls.' Ex. 3, Tab 1C ("The cleanup of trust data is the foundation upon which the new

system will be laid. Without timely and accurate information, TAAMS cannot achieve the

improvements in trust management that are expected."). Thus, the Department understood, even

before the Phase I trial ended, the interrelationship between the TAAMS subproject and the BIA

Data Cleanup subproject.  Phase I trial Tr. at 3110-11.

b)    The First Quarterly Status Report and The Revised HLIP

In the First Report (which, as noted above, included the Revised HLIP), the Department

of Interior informed the Court that it was not going to be able to meet the schedule presented in

the Original HLIP.[111]  Pls.' Ex. 7 at 7.  Specifically, Interior reported to the Court that it had

encountered (and continued to face) problems in performing the data cleanup subproject, as well

as in measuring the overall progress that it had made towards completing the subproject.  The

agency wrote that:

> One of the difficult aspects of the BIA Data Cleanup task is that the data needed
> to properly plan the effort from beginning to end, including precise milestones, are
> essentially unavailable.  When the Data Cleanup process began in January 1999,
> the extent to which this factor would impact planning had not yet been
> determined.  While the BIA has learned a great deal about the character of its data,
> it is difficult to quantify the extent of the data problem in any comprehensive
> manner.  We have found that: 1) each BIA and tribal site's Data Cleanup issues
> are very different; 2) the nature of processing backlogs is difficult to assess; 3) the
> lack of uniform nation-wide legacy systems makes gathering information difficult;
> 4) data definitions differ from region to region and, in some cases, agency to
> agency within the same region; and 5) the BIA's business process has permitted
> regional variation in its data rules to the extent that key information such as the
> format of Indian owner identification numbers differs considerably from one
> region to another.

Pls.' Ex. 6 at 22; id. at 24 ("it is difficult to estimate a total cost and duration for the entire

cleanup effort at this time.").  Nonetheless, Interior informed the Court that it anticipated

completing the post-deployment cleanup by sometime in 2003.  Pls.' Ex. 7 at 7.

As a result of these difficulties as well as its initial efforts, Interior told the Court that it

---

[111]As indicated above, the Court will consider the Revised HLIP as part of the First
Quarterly Status Report for purposes of this opinion.

was going to take a decentralized approach to performing data cleanup.  The Department

explained in the HLIP that:

> Some BIA sites present such great Data Cleanup challenges that it could be years
> before the data is sufficiently ready for system deployment using our initial
> standard.  As a result, it was determined that a separate strategy would be
> determined for each Data Cleanup site, concentrating on ensuring that the most
> basic requirements of data integrity were met, such as elimination of duplicate
> records in the legacy systems.

Pls.' Ex. 6 at 23.  Each region, and offices within the regions, had been operating independently

and had developed their own processes for land title and resource management functions,

including different uses of automated systems.  Pls.' Ex. 6 at 20.  See also Contempt II Tr. at

3434.  Each region thus had its own data problems to fix in order for it to work in TAAMS.  As

Dominic Nessi testified during this contempt trial:

> ...the local office sets a priority with the data cleanup contractor.
> It was originally and initially determined that in terms of the BIA, only
> the local offices would have the best knowledge on what their data
> cleanup issues are.  There is absolutely no way somebody
> sitting in Washington is going to be able to tell a local
> office what their data cleanup priorities are.

Contempt II Tr. at 3432.

Even though Interior chose to take a decentralized approach to BIA Data Cleanup, the

agency identified in general terms what the subproject would entail at each site.  In particular, the

Department reported in the HLIP that:

> The BIA Data Cleanup subproject will:
>
> • Identify missing documents/data and enter the pertinent data in to the
>   appropriate systems;
> • Insure that data in existing legacy systems are consistent prior to migration
>   to the new system;
> • perform manual research and data entry at sites;

-139-

- Verify/reconcile current and historical data; Prepare data for conversion to new TAAMS which includes LRIS capabilities;
- Establish effective data administration policies and procedures; . . .
- Provide clean land records and title data in time for the initial implementation of the TAAMS system pilot and full deployment to BIA regions[.]

Pls.' Ex. 6 at 25.  Thus, while Interior did not have a uniform approach to fulfilling these requirements, the end goal for data cleanup at each location was to have accurate and complete data in TAAMS.  Contempt II Tr. at 3432 ("It's to ensure that accurate and complete data is in TAAMS.").

In the First Report, the Department also recognized–as it had during the summer of 1999–the importance of BIA Data Cleanup as well as its relationship to the other subprojects (especially TAAMS).  Pls.' Ex. 6 at 25-26.  Specifically, in terms of the data cleanup itself, Interior observed that "[v]erification and validation of data is essential to providing accurate and reliable information to account holders."  Pls.' Ex. 6 at 24.  Thus, the Department understood that this subproject had to be completed in order for the Department to discharge its fiduciary obligations properly.  Pls.' Ex. 6 at 25-26.  That is, the information contained in the Department's computer systems–whether it be LRIS, IRMS or TAAMS–must be both accurate and complete.  Moreover, with respect to the interrelationship between the BIA Data Cleanup subproject and the TAAMS subproject, Interior wrote that "[t]he BIA Data Cleanup effort has a direct impact and bearing on the TAAMS deployment.  The TAAMS potential for cost savings and operational efficiencies will be negated if the underlying data quality is poor."  Pls.' Ex. 6 at 26.  Thus, Interior knew that its efforts to deploy TAAMS would be limited based on the progress (or lack thereof) in completing the BIA Data Cleanup subproject.

Notwithstanding the fact that Interior had failed to establish meaningful metrics to describe the overall progress of the BIA Data Cleanup subproject and that it had to postpone its anticipated completion date by three years, the agency reported several accomplishments to the Court in the First Report. Pls.' Ex. 7 at 7. Specifically, the Department stated that:

- Pre-migration clean-up was completed in August 1999 at all locations within the Rocky Mountain Region where TAAMS is being pilot-tested. More than 2,000 records were analyzed, researched and corrected prior to conversion.
- A detailed Data Management Plan in support of TAAMS was completed in August 1999. . . .
- Data for 18,000 tracts in the Alaska Region, where no legacy systems exist, was entered into the new TAAMS database by the contractor. . . .
- A Configuration Management Plan was prepared in August and revised in October 1999 to guide development and deployment of software modifications in order to ensure the continuing integrity of the data.

Pls.' Ex. 7 at 7-8. The Department did not, however, explain to the Court how much closer these accomplishments actually got the agency to completing this particular subproject. The Department also did not tell the Court how much closer it was to completing the subproject at the particular regional offices.

        c)     Quarterly Status Reports 2-7 (February 1, 2000-July 31, 2001)

Before turning to each of these quarterly status reports individually, it is important to note that Ross Ridgeway, of DataCom, explained at this contempt trial how the cleanup process was actually carried out during this time period. He testified that at the local offices where DataCom conducted cleanup activities, BIA would first generate anomaly reports, which are basically a list of records that might have a certain type of error. Contempt II Tr. at 3733-34, 3772-73, 3795. DataCom, in turn, would prepare a task plan for addressing the anomaly. Contempt II Tr. at 3734, 3773-74. DataCom personnel would address each instance of the anomaly, conducting

-141-

research using hard copy, legacy system data and reports, and other data. Contempt II Tr. at

3735. DataCom would then make a recommendation to BIA regarding whether and how to

correct the particular instance of the anomaly. If BIA concurred with the recommendation,

DataCom would make the change. Contempt II Tr. at 3735-36. DataCom kept track of its

progress on a task by task basis. Contempt II Tr. at 3804, 3813, 3815.

1.      Quarterly Status Report 2 (February 1, 2000-April 30, 2000)

In the Second Report, the Department of Interior summarized the progress that DataCom

had made in performing specific tasks in several regional offices. Pls.' Ex. 8 at 6-7. For

example, Interior noted that in the Rocky Mountain Region (Billings), "to date more than 2,000

LRIS cases, involving over 16,000 tracts, have been researched by DataCom employees. Totals

for IRMS include just over 2,500 cases completed encompassing more than 2,300 tracts." Pls.'

Ex. 8 at 6. Moreover, with respect to the Alaska Region, the Department wrote that "[d]uring the

month of March, the contractor continued to examine, review and encode tracts into TAAMS."

Pls.' Ex. 8 at 6. The Department informed the Court that in the Alaska Region it had decided to

focus on one particular area at a time, starting with Cook Inlet. Pls.' Ex.8 at 6. Interior did not,

however, provide the Court with any indication or explanation as to how much progress had been

made towards completing the BIA Data Cleanup subproject as a whole, or even at the individual

regional offices. That is, while Interior provided the Court with a summary of what tasks had

been completed (or at least initiated) during this time period, it failed to indicate, even at the

regional level, how much work remained or how those tasks fit into an overall plan to complete

the subproject.

2.      Quarterly Status Report 3 (May 1, 2000-June 31, 2000)

The Department of Interior again reported on the progress that DataCom had made during this time period. Pls.' Ex. 9 at 7-10. In summarizing the milestone due this quarter ("Perform Pre-Deployment Data Cleanup in Current Systems"), the agency indicated that "[t]he BIA's data cleanup contractor has an active data cleanup program effort occurring[,]" and "[d]ata cleanup continued at ten BIA regional offices and ten agencies for the month of July." Pls.' Ex. 9 at 7. Thus, Interior reported that this milestone, which was to be initiated by June 30, 2000, was met. Pls.' Ex. 9 at 7. The Department also provided the Court with an overview of the cleanup process at the different regional offices. Pls.' Ex. 9 at 7. In this overview section, Interior reported, as it had in the Second Report, on the progress that DataCom had made in performing specific tasks. Pls.' Ex. 9 at 8. For example, the Department stated that, in the Alaska Region, "Cook Inlet was 84% complete with a total of 592 allotment documents entered, Koniag was 69% complete, with 403 allotment documents entered, and Chugach was 13% complete with 44 allotment documents entered into TAAMS." Pls.' Ex. 9 at 8. In addition, with respect to the Great Plains Region, Interior reported that "[t]hrough July, data cleanup personnel have completed the research process for 9,217 cases (89%)[,] . . . completed 5,638 cases (52%) for the Multiple Owner ID Task (Aberdeen and Minneapolis)[,]" and have "completed 1,342 (10%) of 13,000 cases by the end of July for the Document Processing task." Pls.' Ex. 9 at 8. Like the prior two status reports, the Department failed to put these endeavors in context for the Court even at each regional office. Based on the statistics provided by the Department, it appeared that much progress was being made.

Moreover, as noted above, the Special Trustee took over responsibility for compiling the status reports during this time period and began including his own observations section in the

reports.  In the Third Report, the Special Trustee wrote that "[i]ndications are that the BIA Data

Cleanup effort continues to present serious challenges and may delay implementation of TAAMS

at some locations. . . The Special Trustee will work with the BIA subproject manager to obtain

meaningful metrics on the progress of the BIA data cleanup effort." Pls.' Ex. 9 at 3.  While these

statements are a step in the right direction, there are four significant problems with them.  First,

the Special Trustee's recognition that there were not "meaningful metrics" for the BIA Data

Cleanup subproject demonstrates that Interior was aware of the fact that the progress it was

reporting to the Court on specific tasks were not put into context for the Court.  That is, the

Department knew that it had failed to provide the Court with "meaningful metrics" in the past

two quarterly status reports and that the Court had only been told that a high percentage of

specific tasks were completed or initiated.  Second, this observation by the Special Trustee meant

that Interior was aware of the fact that it had failed to provide the Court with such information in

the Third Report as well.  Third, there is no indication that the representations made by the

Special Trustee were meant to be read by the Court as the Department's official assessment of

the subproject.  Indeed, the portion of the status report devoted exclusively to the BIA Data

Cleanup subproject itself made no mention of this concern.  Finally, an earlier draft of this

section, which was later changed by the Department, reveals that it deliberately tempered the

language used in the only portion of the report that indicated there may be problems with the BIA

Data Cleanup subproject.  Specifically, the earlier draft provided that:

> Recent indications are that the BIA Data Cleanup and data conversion effort
> continues to present serious obstacles to the successful implementation of
> TAAMS. The BIA data cleanup effort continues to uncover significantly greater
> data cleanup challenges than were previously anticipated. For instance, more than
> 15 months after data cleanup commenced in Billings, the data is still not

> completely converted, nor cleaned up sufficiently to implement TAAMS in
> Billings.

Pls.' Ex. 2, Tab 9H. It is ironic that the Department now argues that the Special Trustee's

observations demonstrate how forthright it was with the Court.

### 3.    Quarterly Status Report 4 (August 1, 2000-October 31, 2000)

The Department of Interior continued its practice of summarizing the progress that

DataCom had made in performing specific tasks in the Fourth Report. For example, Interior

noted that in the Alaska Region, "Cook Inlet is 84% complete (592 allotment documents

entered)[;] Koniag is 78% complete (455 allotment documents entered)[;] Chugach is 32%

complete (105 allotment documents entered)[;] [and] Ahtna is 29% complete (287 allotment

documents entered)." Pls.' Ex. 10 at 15. Moreover, with respect to the Great Plains Region,

Interior wrote that the multiple owner ID task is 71% complete (8,535 cases), the document

processing task is 20% complete (2,622 of 13,000 Joint Tribal Advisory Committee deeds); and

that 94% of the current agency global processing requests have been processed. Pls. Ex. 10 at

15. Interior never informed the Court of the overall status of the subproject or how much (or

little) progress had been made at the different regional offices. The only indication that there

may be problems with the subproject was provided by the Special Trustee, who stated in his

observations section that BIA Data Cleanup "will remain a difficult challenge[,]" and that BIA

management was working with DataCom to establish more precise indicators of progress. Pls.'

Ex. 10 at 6.[112] For the reasons stated above, the Court finds that the Special Trustee's

---

[112]The Department also included in this report an appendix that described the pre-and
post-deployment tasks. Pls.' Ex. 10 at 67. While this appendix helped the Court understand
what the specific tasks entailed, it failed to give the Court a sense of the overall status of the
subproject. In other words, it may have helped the Court understand what DataCom was actually

observations section does not purge the report itself from being grossly misleading.

4.     Quarterly Report 5 (November 1, 2000-January 31, 2001)

The Department sealed its fate with respect to Specification 4 by filing the Fifth Report.[113]

In this quarterly status report, the Special Trustee began his observation section, which preceded

the BIA Data Cleanup subproject portion of the report, by writing that "Data cleanup progress

has been provided in chart form in Appendix B of this report to provide a more user-friendly

representation of the project." Pls.' Ex. 11 at 5.  In light of the Eighth Report, see Pls.' Ex. 66,

and the EDS Report, see Pls.' Ex. 60, it is clear that Appendix B to the Fifth Report did just the

opposite; that is, it gave the Court the false impression that significant progress was being made

towards completing the data cleanup subproject (even at the regional level) when in reality it was

not.  Specifically, these charts indicated that a relatively high percentage of the tasks assigned to

DataCom were either completed or were nearing completion at the regional offices.  See, e.g.,

Pls.' Ex. 11 at 65-67.  Even assuming that the representations themselves were accurate, the

appendix left the Court with the impression that the subproject was moving forward towards

completion (even if only at the regional level) when in fact it was (and is) still years away from

being finished.  As the Principal Deputy Special Trustee testified at trial:

> Q    Can you give us an example of some of the issues that
> gave you the greatest concern?
>
> A    Well, as I mentioned earlier, one of my concerns was
> the BIA data cleanup project, because it didn't seem to have

doing, but it did not provide the Court with an overall assessment of the progress made (or not
made) towards completing the subproject.

[113]As noted above, this was the first quarterly status report filed during Secretary Norton's
tenure.

the attention focused on it that I thought necessary in that
the data was needed to be able to run TAAMS, and because of
the consuming nature of the TAAMS project, most attention was
focused there.
As we tried to figure out where they were in terms
of data cleanup, the data that was needed to run TAAMS, we
weren't getting very good metrics information about what was
actually being done, what was actually being corrected, what
was being fixed.  So we called for a series of reports and
requested information from the BIA project managers about
what's going on, give us some numbers, show us where you are
in this effort.
They were using a contractor at our insistence and
there were some 200 people -- at some point, up to 200 people
working in the field on BIA data cleanup and there didn't seem
to be much central direction or central management.
They submitted a series of charts and information
and numbers that basically reflected what the contractor was
doing, and it was the contractor's status report and, you
know, we had a thousand of these to fix and we have done 900
of them; we had ten of these to fix and we've done nine of
them.  The way the charts were portrayed -- you would get the
impression that great progress was being made, the data was
almost fixed, but I didn't believe that was very
representative of the actual status of the data.
As we probed further and further, we learned later
that there wasn't -- there wasn't really much of a dedicated
staff on BIA on this project in the field.  They were doing it
in the course of their business.  It was just not a well
managed project.

Contempt II Tr. at 92-94 (emphasis added).  Interior made matters worse by also providing the

Court with a summary of the status of the specific tasks assigned to DataCom in the BIA Data

Cleanup section of the report.  Pls.' Ex. 11 at 14-15.

    5.  Sixth Quarterly Report (February 1, 2001-April 30, 2001)

  The Sixth Report was just as misleading as the prior five quarterly status reports with

respect to the BIA Data Cleanup subproject.[114]  The Department of Interior presented, as it had in

the Fifth Report, a chart detailing the progress that DataCom had made in completing certain

enumerated tasks.  Pls.' Ex. 12 at B-1-B-9.  The chart indicated that DataCom had made

considerable progress towards completing the tasks Interior had assigned to it.  Id.  As the Court

noted above in its discussion of the Fifth Report, these charts clearly created a misconception

about the status of the BIA Data Cleanup subproject, particularly in light of the Eighth Report,

see Pls.' Ex. 66, and the EDS Report, see Pls.' Ex. 60.  There was simply no way for the Court to

know, based on the Sixth Report (and Appendix B), how bad of shape the BIA Data Cleanup

subproject really was in at that time.  Moreover, in terms of the section of the report devoted to

data cleanup, the Department of Interior provided the Court with very little information regarding

the actual status of the subproject.  Pls.' Ex. 12 at 11-14.  Indeed, even the summary of the status

in each region was considerably less descriptive that in earlier quarterly reports.  Pls.' Ex. 12 at

11-14.

In addition, the representations made by the Special Trustee in his observations section do

not relieve the Department of responsibility for filing this misleading quarterly status report.  In

his observations section, the Special Trustee wrote that he "continue[d] to be concerned about the

progress in the BIA Data Cleanup project."  Pls.' Ex. 12 at 4.  There are two reasons why this

statement (and his other observations) do not absolve Interior.  First, while the Special Trustee's

concerns certainly appear (in light of the Eighth Report) to have been warranted, it does not

change the fact that the Sixth Report itself failed to provide the Court with an accurate

---

[114]In light of the Court's findings in this section, it is clear that the replacement of
Secretary Babbitt with Secretary Norton made absolutely no difference in terms of these reports.

assessment of the subproject's status. That is, the Department cannot escape responsibility for filing a misleading quarterly status report based on the scant representations of the Special Trustee alone. In this regard, it is important to note that there was no indication in the report that the views expressed by the Special Trustee represented the position of the Department itself. Second, it became clear during this contempt trial that attorneys in the Solicitor's office and other senior Interior officials tempered the language used by the Special Trustee in both this and earlier filed reports. Contempt II Tr. at 1649-51 ("It was a negotiation process. Each paragraph, each line, each word debated over."). Consistent with this finding, the Special Trustee himself did not provide a meaningful assessment of the project's status. Rather, he simply indicated to the Court that he was concerned about the Department's ability to complete the cleanup effort. Pls.' Ex. 12 at 3-4.

6)   <u>Seventh Quarterly Report (May 1, 2001-July 31, 2001)</u>

The Department of Interior once again failed to provide the Court with an accurate assessment of the BIA Data Cleanup subproject when it filed its Seventh Quarterly Status Report. In particular, the Department indicated to the Court that "[t]he exact status of the BIA Data Cleanup and Management, including work performed by BIA personnel, will be in the next quarterly report." Pls.' Ex. 13 at 13; <u>see</u> <u>id.</u> at 16 (describing several milestones simply as "ongoing."). This statement effectively summarizes the problem with the prior six reports in that the agency reported on the progress that DataCom had made in performing specific tasks but failed to put these tasks into context for the Court. That is, the Court was consistently told that DataCom had completed or was in the process of completing certain assigned tasks, but it was never informed about how close or far the Department was from finishing the BIA Data Cleanup

subproject as a whole (or even at each regional office). The fact that the Department still could not provide the Court with such information two years after the Phase I trial ended is both inexcusable and pathetic. As noted above, even the Special Trustee refused to verify the Seventh Report because he was "not satisfied with the completeness or the quality of the information provided" in the report. Pls.' Ex. 13 at 6. It is worth noting that in the Seventh Report Interior went on to summarize the activities at the different regional offices in general terms. Pls.' Ex. 13 at 13. These summaries, however, utterly failed to assist the Court in understanding the status of the BIA Data Cleanup subproject. It is also important to mention that Interior decided against attaching charts, as it had with the Fifth and Sixth Reports, detailing the progress DataCom had made in completing specified tasks. Pls.' Ex. 13.

> d)      The Current Status of BIA Data Cleanup and the Eighth Quarterly Status Report[115]

In its November 12, 2001 report, EDS documented extensive problems with the BIA Data Cleanup subproject. Pls.' Ex. 60. Of particular importance to this contempt trial was the company's findings regarding "measurement systems," which it defined as "[q]uantitative status and forecasts that provides a shared understanding of the current program performance among all stakeholders." Pls.' Ex. 60 at 141. In this regard, EDS specifically found that:

> BIA never defined the size of the BIA Data Cleanup Project, therefore making it impossible to forecast the cost, effort, and schedule to complete the cleanup activities. There is not an agreed upon position on the status of TAAMS and BIA Data Cleanup.
> Program-level planning has been ineffective; an effort to produce a manageable, integrated schedule that encompasses the tasks for all affected parties, including

---

[115]It is important to note that the Department made, as noted above in the section of the opinion addressing TAAMS, numerous concessions regarding its earlier reports in the Eighth Report.

the Department's tasks, is not underway.  Managing the schedule has been neither robust nor proactive.  The failure to plan effectively has in turn resulted in deficient program tracking and forecasting. . . .

The HLIP and Quarterly Report are the main measurement tools used to evaluate Reform related efforts.  They are not granular enough, however, to truly measure progress. . . .

Pls.' Ex. 60 at 141-43.  See also id. at 34 ("The roles and expectations of the contractor and BIA field staff have not been well defined, in terms of the impact on the overall effort.").  Thus, the Department never had a cohesive strategy or plan to complete the BIA Data Cleanup subproject.[116]

Moreover, in the Eighth Report, the Department of Interior confirmed that it had experienced and was experiencing considerable problems with the BIA Data Cleanup project. Pls.' Ex. 66 at 89.  In particular, the Deputy Special Trustee for American Indians for Trust Systems and Projects wrote that, in assessing the subproject, the definition of the project was not well defined, the universe of work was not established prior to its inception, there was inadequate project management, there was inadequate direction and performance metrics for contractor tasks, and the BIA had the unrealistic expectation that its staff performing daily operations could also develop cleanup plans, oversee the contractor, and verify and substantiate work.  Pls.' Ex. 66 at 89-90.  Interior further reported that much work remained in this subproject in each regional office.  Pls.' Ex. 66 at 94-97.  For example, in the Alaska region, the Department indicated that "[t]here are approximately 17,753 tracts that need to be encoded into TAAMS[,]" and "927 tracts have been completed to date."  Pls.' Ex. 66 at 94.  Even assuming the Department increases its

---

[116]It is worth mentioning that EDS also found that the Department "has not applied an adequate number of resources to the effort[,]" and "[t]he shortages of resources can cause synchronization problems given that the underlying data can change and the delayed approval can be based on inaccurate data."  Pls.' Ex. 60 at 34.

production rate, it will still be at least another five years before the entry of title data is complete

in that region.[117]  Contempt II Tr. at 3754-56.  Upon consideration of the EDS report (and the

later filed Eighth Report), the Principal Deputy Special Trustee succinctly noted the overall state

of the subproject when he said that: "[t]he bottom line is that I think in any sense, we're years

away from having clean information in a TAAMS system."  Contempt II Tr. at 1798.  See also

Contempt II Tr. at 59 ("I [Principal Deputy Special Trustee] think the BIA data cleanup effort

needs a thorough and total replanning, such as what I think is being described by EDS and

analyzed by the Department now."); Contempt II Tr. at 2221 (Special Trustee agreeing that "[t]he

BIA data clean-up subproject is at risk of delaying trust reform and TAAMS implementation far

beyond any date the Interior defendants have announced.").[118]

    In the Eighth Report, Interior went on to state that in the latter part of 2001 it recognized

the need to reevaluate the manner in which it was approaching the BIA Data Cleanup subproject.

Pls.' Ex. 66 at 80.  The agency indicated that "[d]uring this reporting period [August 1, 2001-

December 31, 2001] emphasis was placed on re-structuring the data cleanup subproject."  Pls.'

Ex. 66 at 80.  Specifically, the Department reported that it did a number of things which, it now

believes, will ultimately enable it to complete this particular subproject.  Pls.' Ex. 66 at 80-81,

91-102.  For instance, Interior indicated that during this reporting period it conducted site

assessments at four regional offices.  Pls.' Ex. 66 at 82.  While these efforts may ultimately prove

_____

    [117]At the current rate it would take DataCom more than a decade to complete this portion
of the project in the Alaska Region.  Contempt II Tr. at 3754-56.

    [118]Indeed, the TAAMS Information Migration Evaluation tests, which were meant to
measure the accuracy of the data placed into TAAMS, see Contempt II Tr. at 3742-43,
demonstrated that the data in the land management system was not reliable.  Contempt II Tr. at
3365-67.

to be beneficial, the Department recognized that at this point it still does not have "a clear picture of the entire magnitude of the cleanup project." Defs.' Proposed Findings at 96. Indeed, in the Eighth Report Interior noted that it is "still gathering information on the types and volume of data cleanup by region. Each region is unique in how they enter data into the legacy systems. As we do the site assessments and load data into an automated system, we will undoubtedly uncover errors we have not encountered in other regions." Pls.' Ex. 66 at 86.

     e)  Conclusions in light of the Eighth Report and the EDS Report

   The EDS Report and the Department's Eighth Report do not affect the Court's findings above regarding the misleading nature of the other quarterly status reports. Specifically, the Court detailed above how the Department provided it with no meaningful way of measuring either the overall progress of the subproject or even the progress of the subproject at each regional office. Rather, Interior simply provided the Court with essentially a list of tasks assigned to its contractor, DataCom, and then reported on the progress DataCom had made in completing those tasks. This method of reporting gave the Court the impression that a significant amount of progress was being made when in reality the Department was (and is) still many years away from completing this subproject even at the regional level.

   The Department argues, in its proposed findings, that since there were no meaningful metrics for the BIA Data Cleanup subproject, it was not fraudulent or misleading to report on the progress that DataCom had made in completing its assigned tasks. Defs.' Proposed Findings at 95. There are two reasons why the Court rejects this contention. First, the fact that Interior did not have meaningful metrics–that is, the fact that it did not know precisely how close or far away the subproject was from completion–does not change the fact that its reports created the

impression that it was making considerable progress towards completing the subproject. In other words, the fact that Interior did not know how much progress had been made does not excuse (or even affect) the misleading nature of the quarterly status reports that it filed with the Court, particularly in light of the fact that the agency knew the limitations of its planning efforts. Pls.' Ex. 66. Second, as noted above, the Department misled the Court at even the regional level by filing reports that suggested DataCom was close to completing its assigned tasks. This method of reporting created the false notion that, even at the regional office level, Interior was making considerable progress towards completing the data cleanup project. The EDS Report and the Eighth Report now confirm that Interior is years away from completing data cleanup at these regional offices.

Interior also argues that, in light of the EDS Report and the Eighth Report, the Court must distinguish between "failures of project management, on the one hand, and reporting, on the other[.]" Defs.' Proposed Findings at 147. The Department concedes that the subproject was incompetently managed, but nonetheless argues that the reports themselves were not misleading. Id. at 144. The Court rejects the Department's position in this regard. As an initial matter, the Court agrees (and finds) that the BIA Data Cleanup subproject has been grossly mismanaged from its inception. Contempt II Tr. at 2413-15. The EDS report explains in great detail how the Department failed to manage adequately this particular subproject. The Court also agrees that there is a difference between poor management and filing misleading quarterly status reports. The problem for the government, however, is that these two concepts are not mutually exclusive. It is clear that in this particular case the subproject was not only horribly mismanaged, but that at the same time the Department misled the Court into believing that significant progress was being

made. That is, the fact that the Court now knows that the Department never had a specific plan

to finish the data cleanup subproject (even at the regional level), does not change the fact that the

status reports filed with the Court were very misleading. Contempt II Tr. at 1353 (Principal

Deputy Special Trustee testifying that "I have great discomfort with the data cleanup effort in

BIA, both how it was being executed and how it was being reported. That comment is reflected

in the Special Trustee's observations, third quarterly report and beyond. I think it's fair to say that

the reporting was certainly not accurate and particularly not clear on the status of BIA data

cleanup."); 2221 (Special Trustee, agreeing that "Interior defendants' quarterly reports have

consistently failed to provide this Court with a truthful, accurate and clear picture of the status of

BIA data clean-up."). If anything, the incompetent manner in which the subproject was managed

reinforces the Court's finding that it reported misleading information to the Court because it is

now clear that the agency never understood the scope of the subproject and all of the work that

was necessary to complete it. Thus, for example, the Court now knows that the agency had no

basis for making certain representations, such as "[t]he revised schedule extends the post-

deployment date to 2003[,]" see Pls.' Ex. 7 at 7. The Court does not understand how the

Department of Interior could have made such a statement when it knew that it had not developed

a plan to ensure completion of the subproject.[119] See, e.g., Contempt II Tr. at 58 (Principal

Deputy Special Trustee, testifying that "I was never convinced that BIA had their arms around

the seriousness or the scope of the BIA data cleanup effort. Even the publication of the first

plans, I had questions about whether they could pull off what they had presented. As time went

---

[119]As an aside, it is incredible for the Secretary, particularly considering that she is a
trustee-delegate, to concede that the Department incompetently managed this critically important
subproject.

on, it was pretty clear to me they weren't paying enough attention to this issue, and as we closed up in the middle of -- or as we got into the 2000, 2001 time frame, it was pretty clear there wasn't anybody managing the project on a day-to-day basis.  That gives me pause.").

## C.   INFORMATION TECHNOLOGY ("IT") SECURITY–SPECIFICATION 5[120]

The Court will now address the Fifth Specification levied against Secretary Norton and Assistant Secretary McCaleb.  This specification concerns the representations made to the Court by defendants regarding computer security of IIM trust data.  The Court has to the greatest extent possible organized its findings of fact pertinent to this specification chronologically.

### 1.   Interior's March 2000 Representations–TRO Hearing

Beginning in March of 2000, the plaintiffs started questioning the manner in which Interior secured the vast quantities of confidential trust information stored in its computer systems.  Specifically, on March 7, 2000, the plaintiffs filed a motion for a temporary restraining order ("TRO") (Docket Entry # 450), claiming that the private contractors negotiating the Office of Information Resources Management[121] ("OIRM") move from Albuquerque, New Mexico to Reston, Virginia were being provided access to confidential trust data in violation of, inter alia,

---

[120]For purposes of this opinion, IT security will be defined as it is in the Clinger-Cohen Act, 40 U.S.C. § 1401(3)(A), i.e. "any equipment or interconnected system or subsystem of equipment, that is used in the automatic acquisition, storage, manipulation, management, movement, control, display, switching, interchange, transmission, or reception of data or information by [an] executive agency."  This is consistent with the manner in which the term "IT security" was defined in the Report and Recommendation of the Special Master.  Pls.' Ex. 15 at 3 n.6.

[121]The plaintiffs noted in their motion that "OIRM maintains the legacy trust software applications and other software applications used by the BIA on a nationwide basis."  Pls.' Motion for a TRO at 2.

the Privacy Act.[122]   Pls.' Motion for a TRO at 3 (contending that "on February 29, 2000, . . . BIA

contractors were granted official access to all OIRM IIM hardcopy and electronic trust records.").

The plaintiffs asserted that, in contravention of several federal statutes, these contractors "have

unfettered access to all IIM trust information in the OIRM BIA systems."   Pls.' Motion for TRO

at 4.

In opposing the TRO request, the Department acknowledged that there were substantial

problems with the security of the computer systems at the OIRM facility in Albuquerque.   See,

e.g., Tr. of March 7, 2000 Hrng. at 31-32.   In this regard, the Department filed the declaration of

Executive Vice-President Daniel Marshall, III, of Interior Systems, Inc., the private contractor

performing the move to Reston.   Mr. Marshall outlined many of these deficiencies in his

declaration, stating that:

> I have observed that systems applications fail on a daily basis; ISSDA reports to
> the Treasury Department have not worked since at least January; there currently
> exists no published standards or procedures; metrics are lacking for measuring
> application code changes, requirement documentation, data center run times or
> recovery help calls received; there exists no run books for the data center; and to
> my knowledge, Unisys software has not been updated since installation two years
> ago.   Most importantly, there exists no written operating procedures or security
> manuals in the current work environment.   ISI has been tasked to remedy these
> deficiencies during and after the relocation of OIRM from Albuquerque to Reston.

Defs.' Opp'n to PI, Tab 9 at ¶ 7.[123]   In addition, Assistant Secretary Gover noted in his

---

[122]In support of their motion, the plaintiffs attached the declaration of Mona Infield, an
OIRM employee with extensive training and experience in computer systems.   In her declaration,
Infield stated that "[c]orruption of IIM trust data caused by the dismantling and relocation of the
OIRM operations and data center may be irreparable; IIM trust data lost may not be recoverable."
Pls.' Motion for a TRO.

[123]Prior to the TRO hearing on March 7, 2000, Interior provided the Court with several
declarations, like the one given by Marshall, but did not file them on the public record.   Tr. of
March 7, 2000 Hrng. at 21.   The Department subsequently attached these declarations to its

declaration that "[o]ver the past four years, Interior's Office of the Inspector General (OIG) has

issued audit reports that found 22 separate findings regarding data security in BIA's Office or

Information and Resource Management of which 18 were determined to be high-risk." Defs.'

Opp'n to PI, Tab 3 at ¶ 5.

The Department of Interior emphasized in opposing the TRO motion that moving the

OIRM facility from Albuquerque to Reston was a critical first step toward getting a handle on

and correcting the prevailing IT security problems. Defs.' Opp'n to PI, Tab 3 at ¶¶ 6-7

(Declaration of Assistant Secretary Gover: "I determined that relocation and consolidation of all

BIA administrative operations to the Washington metropolitan area was a critical first step.  I

believed that information resources management is a critical part of the administrative operations

and that the management of the transition to TAAMS would be improved if the OIRM office

were located here.  I am confident that face-to-face, direct supervision of the accounting and

information resources management staff will result in improved financial and information

technology services.").  That is, Interior argued that the motion for a temporary restraining order

should be denied because one of the reasons why it was moving OIRM to Reston was to make

the trust information stored in the computer systems more secure.  Id.; see also Tr. of March 7,

2000 Hrng. at 26-27 (counsel for defendants: "The delay would, of course -- if an injunction were

entered, it would delay the improvements that Secretary Gover is trying to accomplish by moving

this office to Washington so that it can be under closer supervision, and reorganized as

necessary.").  During the TRO hearing on March 7, 2000, counsel for the Department explicitly

---

opposition to the plaintiffs' motion for a preliminary injunction.  For ease of reference, the Court
will cite to these declarations as they were attached to defendants' preliminary injunction
opposition.

told the Court that Interior was "on the verge" of correcting these problems and that moving

OIRM to Reston was a necessary initial step:

> THE COURT: . . . I must say, looking at this picture in
> the long range, which I look at it at, I was dumbfounded to
> read paragraph seven of this Marshall affidavit to say this
> whole critical system has no existing published standards or
> procedures, has no application codes, no existing runs
> books, never been updated, no existing written operating
> procedures, no security manuals in the current work
> environment. I mean, to be this far down the road in trust
> reform, and I know you're trying to save yourself from this
> TRO, but this is the most shocking information I've seen
> yet, I think, since my whole trial here.
>
> MR. FINDLAY: This -- this needs correcting.
>
> THE COURT: It's very disappointing to read this
> kind of stuff. We have nothing now. You know, we have no
> safeguards now so we can't be any worse off, is what you're
> telling me. I mean, it's shocking what he has in that last
> paragraph, isn't it?
>
> MR. FINDLAY: It is discouraging, Your Honor, I
> agree.
>
> THE COURT: Discouraging, to say the least.
>
> MR. FINDLAY: I agree, and it is all the more
> reason to get on with this. Make the move, get it under the
> thumb of management here in Washington, improve these
> systems.
>
> THE COURT: We have no written operating
> procedures, no security manuals in the current environment.
> We have nothing. Boy, I just don't know how that squares
> with the trial we had, all the great plans Interior had.
> And you find the most critical system, the heart of
> everything we're operating now, and this is what you come in
> and tell me: We have nothing to protect any of this?
>
> MR. FINDLAY: Your Honor, we're on the verge of

> correcting this, Your Honor.  This is -- this is one reason
> that this step in trust reform is coming early in the
> process.  Congress has directed the department to move with
> it quickly.

Tr. of March 7, 2000 Hrng. at 31-33; see also id. at 23-24 ("The move, importantly, is part of

trust reform.  Specifically, in this case the movement of this office is being conducted in order to

bring it under closer supervision by management in Washington, and also to address particular

deficiencies in the office, and improving those by consolidating them with other functions and

giving them much more attention.").  While the Court initially granted the plaintiffs' request for a

TRO, it kept the defendants' arguments (and representations) in mind when considering whether

to issue a preliminary injunction.

2.      March 2000 Representations–The Preliminary Injunction Pleadings and Hearing

In seeking a preliminary injunction ("PI"), the plaintiffs reiterated their position that IIM

beneficiaries would be irreparably injured if BIA contractors, as part of the planned OIRM move

from Albuquerque to Reston, were given access to certain electronic data systems that housed

information relating to IIM trust accounts.

Similarly, in its opposition to the plaintiffs' motion for a preliminary injunction, the

Department of Interior once again argued that moving OIRM to Reston was necessary in order to

improve the security of its computer systems.  In the opposition itself, Interior represented that

moving the facility to Reston is "expected to solve the fundamental problem of management at

OIRM by ensuring closer supervision of the security and operation of several trust and non-trust

computer systems essential to the operation of BIA."  Defs.' PI Opp'n at 2 (noting further that the

move "[is] expected to permit modifications to these systems that would improve their stability

-160-

and security."); see also id. at 4 (stating that the move is necessary "to remedy longstanding, material weaknesses in the functions of the office."). The Department attached several declarations to its opposition to support its contention that IT security would be improved if the Court permitted the move to Reston to proceed. For example, Edward D. Williams, Executive Vice-President for Outsourcing, PRT Group, Inc., stated that "it is critical that this data relocation project be implemented as soon as possible so that additional security improvements can be put in place (e.g. computer firewalls, etc.)." Defs.' PI Opp'n, Tab 8 at ¶ 18 (noting further that "[e]very day of delay perpetuates a situation in which the data is less secure than it could be."); see also id. at Tab 10 at ¶ 11 (Bohdan Maksymiuk, Senior Project Manager for PRT Group, Inc., stating that "[i]n addition to ensuring the security of electronic and hard copy data during the move, the Plan also sets forth . . . several improvements the move will make to operations and data security on an ongoing basis."). The Department made these arguments yet again at the preliminary injunction hearing on March 29, 2000. Tr. of March 29, 2000 Hrng. at 24-26, 31-32.

Upon consideration of the defendants' representations that IT security (and computer system management overall) would be improved by moving OIRM from Albuquerque to Reston, the Court denied the plaintiffs' motion for a preliminary injunction on April 4, 2000. Specifically, the Court stated on the record that:

> I do this because I have concluded, albeit
> reluctantly, that as of today plaintiffs are unable to
> establish a sufficient likelihood of success on the merits to
> warrant granting the extraordinary remedy of granting a
> preliminary injunction.
>     It's clear that the defendants were, in fact,
> acting in violation of the law on March 7th, when this Court

granted the temporary restraining order.  But as of today,
the government appears to have brought itself into compliance
by assuring that both the contractor for the move, Interior
Systems, Incorporated, and its contractual partner, PRT
Group, Incorporated, are legally obligated to keep all trust
data confidential.  The contract and subcontract now have
 specific privacy act confidentiality clauses, and the
 contractual relationships appear to be authorized by law for
purposes of the Trade Secrets Act.  Although the question
is not free from doubt, for purposes of today's ruling, the
Court finds as a preliminary matter that the confidentiality
provisions imposed on the contractors are sufficient to
insure against violation of the Indian Minerals Development
Act, assuming that the Interior Department is entitled to
some deference under Chevron in its interpretation of that
particular statute.

  The Court continues to be alarmed and disturbed by
the revelation that BIA had no security plan for the
preservation of this data before this TRO was brought, and
that BIA has now placed itself in the incredible position
that it cannot now create such a plan with its own employees,
but that it can do so only if this Court allows BIA to go
forward with these government contractors creating the plan,
and then insuring that this critical data is preserved and
protected.

  This entire fiasco is vivid proof to this Court
that Secretary Babbitt and Assistant Secretary Gover have
still failed to make the kind of efforts that are going to be
required to ever make trust reform a reality.  Coming so soon
after their trial testimony last summer, and all of the
personal assurances they gave this Court about the priority
they were now placing on trust reform, the facts brought to
light in this proceeding provide overwhelming proof to the
Court that the defendants simply continue to provide more
empty promises.

  Nevertheless, the Court cannot enjoin this
operation at this time without inflicting substantial harm on
third parties and, indeed, without harming the very
beneficiaries of these trust records who will have critical
 payments delayed by the disruption of operations that would
 occur if the preliminary injunction issued.

  The defendants argued to this Court that the risk
of data loss increases with every day that the Court denies

> access to these government contractors, and I find this is,
> in fact, true. The sheer incompetence of BIA and the way
> they undertook these moves can now only be saved by their own
> contractors. The defendants admit that they will still not
> be in compliance with OMB circular A-130, requiring a
> security plan, but they say that only the contractors can now
> prepare such a plan so that they can come into compliance.

Tr. of April 4, 2000 Hrng. at 10-13.

3.     November 2000 Representations–The Progress Report

On November 30, 2000, the Department of Interior provided the Court with an eight-page

"Progress Report" on "significant developments since April 2000, including the successful

relocation of trust data in Reston, Virginia, and the formal commencement of 'live operations' in

the Reston data center."[124]  Progress Report of November 30, 2000 at 1 [Docket Entry # 585].  As

an initial matter, Interior explained to the Court how it performed the data move from

Albuquerque to Reston, as well as some of the changes that were made to the agency's original

plan.  Progress Report of November 30, 2000 at 1-3.

The Department of Interior went on to discuss the physical security measures that it had

taken at the Reston facility.  Progress Report of November 30, 2000 at 3-4.  Specifically, Interior

indicated that after a theft occurred at OIRM in October of 2000, BIA "put 24-hour guards on

duty in the building and have begun strict procedures to handle traffic and visitors to the offices."

Progress Report of November 30, 2000 at 4 (further noting that "BIA plans to install security

cameras with a closed-circuit television monitoring system.").  These representations led the

Court to believe that at least in terms of physical security at the facility the Department had taken

---

[124]Although not directly applicable to the Fifth Specification, it is worth noting that the move to Reston took considerably longer than Interior (and the Court) expected.  Progress Report of November 30, 2000 at 2.

-163-

and was taking both necessary and appropriate steps to ensure the security of trust data.

Interior also explicitly discussed IT security and the development of security plans in its Progress Report of November 30, 2000. With respect to IT security, the Department informed the Court that:

> There is still significant work to be done in this regard, but now that the new data center has been safely relocated, more effort can focus on long-term IT security matters. Recently, the BIA Chief Information Officer hired a National Information Technology Security Officer, John Curran, to oversee development of information technology security policy and plans. Furthermore, the security function at the Bureau of Indian Affairs' Office of Information Resources Management (OIRM) has been elevated to report directly to the Director of OIRM.

Progress Report of November 30, 2000 at 6. Based on these representations, the Court believed that while the computer systems were not yet secure, the Department now finally had the facility in place that would enable it to better protect the trust data stored on these computer systems and that doing so was a top priority of the agency. Moreover, with respect to the development of security plans at BIA, Interior indicated in the Progress Report that it had hired SeNet International Corporation "to evaluate information technology security at the BIA, make recommendations for improvement, and develop security plans." Progress Report of November 30, 2000 at 7 (further noting that eventually SeNet will develop security plans for specific information technology systems (including the information technology systems utilized by OIRM), develop updated policies and procedures, and develop systems architecture."). These representations reinforced the Department's earlier statements that it was in the process of addressing the significant deficiencies with IT security.

    4.    <u>Site Visit of the Special Master to OIRM (February 8, 2001)</u>

On February 8, 2001, the Special Master (accompanied by an attorney from the Department of Justice, an attorney from the Solicitor's Office, and a representative from plaintiffs' class) visited OIRM's facility in Reston Virginia.  Special Master Report (March 12, 2001) at 1 [Docket Entry # 678].  Upon arrival, the Special Master and the DOJ attorney "entered the facility via a construction entrance and, with the assistance of an employee who did not request that [they] produce any identification, passed by the front security desk twice without being detected, questioned or detained."  Id. (further noting that "[t]here were no security cameras in sight.").  The Special Master and the DOJ attorney proceeded to the OIRM office area, where the Special Master was able to remove from a shredder a "computer-generated printout labeled 'Individual Indian Monies Interest Calculations.'"[125]  Id.  The Special Master subsequently introduced himself to several employees, including Deputy Director Ken Russell.  Id. at 2.  Deputy Director Russell "expressed no surprise when [the Special Master] described the ease with which [he] gained entry into the facility and with which [he] was able to enter [OIRM's] work area."  Id. at 2.  The Special Master recounted that Deputy Director Russell "characterized the security at the facility as 'terrible[,]'" and that Deputy Director Russell actually produced a memorandum dated February 6, 2001 from the Chief Information Officer that explicitly stated that "[t]he Data Center in Reston is currently less secure than the data center in Albuquerque that we transitioned from in November 2000[.]" Id.[126]

---

[125] The Special Master was informed that this "printout constituted an IIM daily report and that the calculations it contained were located on a computer backup tape."  Special Master Report (March 12, 2001) at 2.

[126]It is important to note that in a memorandum dated February 13, 2001, Director Deborah Maddux attempted to address the concerns raised by the CIO.  Special Master Report (March 12, 2001) at 3.

5.    April 2001 Opposition to Plaintiffs' Motion For Special Master Investigation[127]

Prompted by the Special Master's Site Visit Report, which was filed with the Court on March 12, 2001, the plaintiffs requested that the special master investigate the Department's "failure to implement adequate security measures to protect IIM-related trust data at" the OIRM facility in Reston.  Pls.' Motion For Special Master Investigation [Docket Entry # 699] at 1.  In particular, plaintiffs moved to have the "Special Master investigate the veracity of representations made by the Interior Secretary and her employees, agents and counsel related thereto[.]" Id.  Plaintiffs went on to argue in their motion that "former Secretary Bruce Babbitt, former Assistant Secretary Kevin Gover, and their employees, agents and counsel have materially misled this Court and plaintiffs through their representations during the March 2000 hearings and related briefs in opposition to plaintiff's motion for a preliminary injunction to protect trust documents from loss or destruction." Id. at 1-2.

The Department of Interior filed its opposition to the plaintiffs' motion for a special master investigation into computer security on April 25, 2001.  Although the Department acknowledged (as it had back in March of 2000) that its computer systems were not entirely secure, it "vehemently" argued that it "has made security a top priority and has taken numerous steps to improve the security of the Reston facility since the Special Master's visit." Id. at 2. Defs.' Opp'n at 2-3 [Docket Entry # 716] (further stating that Interior has significantly improved both physical and computer security at OIRM).  The Department went on to outline the security measures–both computer and physical–that had been completed since the November, 2000 move to Reston, and the security measures that it planned on taking in the future.

---

[127]As noted above, Secretary Norton took office in late January of 2001.

In particular, with respect to completed computer security improvements, the Department stated that "[i]n the past year, Interior has embarked on several analyses of computer security at IRM" and has hired John Curran to "oversee development of IT security policy and plans." Id. at 6-7. Interior further noted that it "has developed security awareness training" and that Mr. Curran was "in the process of implementing three levels of training for IRM personnel: security briefing for managers, computer users, and IT staff." Id. at 8. Finally, the Department pointed out that Mr. Curran has developed an "Information Technology Security Program" (ITSP) that "provides a bureau-wide plan for meeting the statutory and practical requirements that accompany the use of IT processing, storage and transmission capabilities" and "prescribes the standards for IT security programs, in accordance with existing laws, regulations and Executive branch orders." Id. at 6-7.

As to future computer security improvements, the defendants stated that "plans are underway for the protection of applications and support systems." Id. at 7. Interior noted that "SeNet has developed draft security plans for a number of major applications and general support systems." Id. The Court was told that these security plans would provide "instructions and guidance to all system owners on steps needed to protect systems and data." Id.

With respect to physical security, the Department noted that, in the wake of the Special Master's February 2001 on-site visit, several changes had been made, including (i) the implementation of 24-hour guard service; (ii) the addition of perimeter foot patrols; (iii) the adjustment of the data center doors to ensure automatic closure; (iv) the issuance of memoranda by both Deputy Commissioner Blackwell and the Deputy Director of OIRM (Ken Russell) to all OIRM employees reiterating the physical security rules and regulations; and (5) the connection of

a computer monitor in the IT security room to cameras, thus permitting the monitoring (and

recording) of activity in the data center, Unisys room, and corridors leading to the data center."

Id. at 4-6.  Work that still needed to be done with respect to physical security included the

installation of card key readers and the provision of color-coded cards to those employees

allowed access to the data center.  Id.

In sum, the Department of Interior reiterated the same arguments concerning computer

security in its April 25, 2001 filing that it made back in March of 2000.  Specifically, Interior

argued that while the computer systems were not yet entirely secure, the agency had made the

systems considerably more secure than they were before the move to Reston through its

extensive efforts, and that it would continue to make the systems more secure in the future.

Thus, Interior boldly argued in its April 25, 2001 filing that:

> there is no basis for a Special Master investigation of security at IRM.  While the
> new facility in Reston needed immediate physical security improvements, IRM
> has identified the problems and taken corrective action.  Moreover, IRM has taken
> significant steps to improve IT security and is developing plans and programs for
> both physical and computer security to provide guidance on maintaining the
> proper level of effective security.

Defs.' Opp'n at 8; see also id. at 13 (asserting that "the move of IRM to Reston has been

accomplished successfully and security has undergone numerous improvements."), 14 (arguing

that "the requested Special Master investigations and assessments related to IRM are without

merit.  In the five months since IRM successfully completed its move, BIA has made a concerted

effort to provide IRM with reliable physical and computer security.").

Upon consideration of the plaintiffs' motion and the representations by the defendants in

their opposition, the Court directed the Special Master to examine the trust data security systems

-168-

in the custody or control of the Department of Interior.  Report on IT Security at 2.

6. <u>May 2001 Opposition to Plaintiffs' Motion for a TRO and PI</u>

On May 17, 2001, plaintiffs moved for a temporary restraining order and a preliminary

injunction after Dominic Nessi was quoted in Government Executive, a monthly business

magazine, as stating that:

> [f]or all practical purposes, we have no security, we have no infrastructure, . . .
> Our entire network has no firewalls on it.  I don't like running a network that can
> be breached by a high school kid.  I don't like running a program that is out of
> compliance with federal statutes, especially when I have no ability to put it into
> compliance.

Report on IT Security at 1-2.  In its opposition, which was filed on May 29, 2001, the defendants

argued yet again that the plaintiffs' "position is wholly without merit."  Defs.' Response at 8.  In

light of the Department's representations in its response to this motion as well as in its April 25,

2001 filing, the Court declined to enter injunctive relief at that point in time.  That is,

notwithstanding the fact that the Court had directed the Special Master to examine the state of IT

security at the Interior Department, it specifically declined to order further injunctive relief based

on the Department's representations that the plaintiffs' position was "without merit."  Defs.'

Response at 13 (April 25, 2001); Defs.' Response at 8 (May 29, 2001).

7. <u>Report and Recommendation of the Special Master Regarding the Security of
Trust Data at the Department of Interior ("Report on IT Security")</u>

In accordance with the Court's request that he examine the trust data security systems in

the custody or control of Interior, the Special Master "interviewed government employees and

private contractors, reviewed relevant statutes and regulations, evaluated reports generated by

public agencies and private organizations, and pored over thousands of pages of internal

memoranda, correspondence and e-mail transmissions." Report on IT Security at 2.  The Special

Master also retained the services of Predictive Systems--an independent firm with expertise in

security systems--to conduct penetration tests and assist in the ultimate evaluation of the current

state of the Department's IT security.  Report on IT Security at 3, 133.  The Special Master filed

his 154-page Report on IT Security on November 14, 2001.  In light of the Department's failure

to dispute any of the underlying facts set out in the Special Master's report as well as the

agency's ultimate concession that the report complied with the requirements of Federal Rule of

Civil Procedure 53, the Court adopted the findings of the Report on IT Security on January 15,

2002.  Thus, all of the findings made by the Special Master in his Report on IT Security shall be

considered established for purposes of this civil contempt trial (and part of the record of this

case) and incorporated into this opinion.  Although it is therefore unnecessary for the Court to

restate the findings made by the Special Master in his report, the Court will nonetheless briefly

recount three of the more significant ones.

First, the Special Master found that the Department of Interior has known about pervasive

IT security deficiencies for more than a decade.  See, e.g., Report on IT Security at 17 (finding

that "[t]o date, there have been at least 30 reports generated by both governmental and private

organizations including the Office of the Inspector General ("OIG"), the General Administration

Office ("GAO"), a House of Representatives Subcommittee, Arthur Anderson & Co.

("Anderson"), SeNet International ("SeNet"), the Special Master and Predictive Systems,

Incorporated ("Predictive") which have addressed the state of IT Security at the DOI."), 141

(finding that "[a]fter ten years of blistering reviews generated by federal agencies and private

contractors, this deplorable condition is inexcusable.  It can not be argued that Interior was

-170-

unaware of the hundreds of deficiencies and suggested remedies chronicled in this Report."). In

his Report, the Special Master chronicled in great detail the findings of several private and public

organizations that had examined IT security at the Department of Interior. Report on IT Security

at 17-133. Every one of these organizations found considerable problems with the security of the

Department's computer systems. See, e.g., id. at 18-19 (noting that Arthur Anderson found in

1989 that "[t]he ability of the computer specialists to access and alter the master data files and the

application files permits the programmers the ability to compromise the integrity of the data and

the data processing. A computer specialist has the ability to create a new account, transfer funds

to the account and process a check."), 34 (observing that a May 2000 report by the Inspector

General's Office found that "[u]ser codes are not routinely removed for terminated employees or

transferred employees; passwords are not changed on a regular basis; [and] complete

documentation does not exist to readily identify the owner of each user code."),[128] 40 (noting that

a House of Representatives subcommittee ranked Interior lowest out of the entire executive

branch on its Computer Security Report Card), 50 (noting that SeNet found that "[w]eak

perimeter protection is by far the most common cause of security breaches (intrusions) by

outsiders. Our findings indicate that the current situation presents a serious security risk[.]").

These organizations also made numerous recommendations to the Department of Interior on how

it could make its computer systems, several of which housed IIM trust data, more secure. Id. at

17-133. Moreover, internal memoranda from the Department confirmed that its own officials

recognized the massive IT security problem facing the agency. See, e.g., id. at 141-42 (citing a

---

[128]It is worth noting that a January 2001 report by the Inspector General's Office found
that these problems still existed. Report on IT Security at 35.

July 2, 1999 E-Mail from David Shearer (Chief, IRM Program Planning Review & Standard

Division) to numerous Interior personnel (including the Chief Information Officer), which

provided that "[a]s you know, hackers continue to target Federal IRM Community at an alarming

rate."); (citing a February 2, 2001 E-Mail from BIA Chief of Telecommunications Curtis

Hohenstein to OIRM Deputy Director Ken Russell, which provided that "[c]urrently 'Trust Data'

is transversing [sic] the Bureau's Wide Area Network and is open to data theft from outside

sources.  Our entire Network is now 'open to the public' domain and is under constant threat of

attack and includes ALL major BIA Applications and Operating Systems.  The threat of crippling

the entire BIANET is real.").

Second, the Special Master found that the Department of Interior has not taken necessary

actions to correct its numerous and longstanding IT security deficiencies.  Id. at 143-54.

Specifically, the Special Master found that "[i]n truth, the system is in its current state of

disrepair because protecting trust funds is not now, and has never been, a 'priority' deserving

adequate resources."  Id. at 148.  The Special Master detailed how, "[f]or example, the lack of

firewalls and adequate perimeter security have been repeatedly identified by the [Inspector

General] Reports and the SeNet Reports as among the most grievous risks threatening trust data.

. . Notwithstanding, the BIA removed the firewalls from one of the only two locations where they

were in use and the Office of the Solicitor now questions the prudence of allocating funds for

their purchase."  Id. at 144-45.  The Special Master further noted that as late as June of 2001,

"after the publication of tens of thousands of pages detailing every conceivable problem

challenging the agency's security systems," the Chief Information Officer for Interior sought[,

rather than to take corrective action,] to "conduct [instead] yet another 'review of the current

state of Trust Management IT security across the Department[,] [b]ased on the results of [which],

Interior will be prepared to make decisions on how to proceed with implementing IT security as

part of the Trust Management program . . . ." Id. at 148.  This finding is particularly troubling to

the Court in light of the fact that the Department does not appear to even have read many of the

earlier commissioned reports.  Id. at 146-54.  The Special Master's findings in this regard are

critically important because they eviscerate the position put forth by the Department beginning in

March of 2000–namely that while significant IT security problems exist, Interior has taken and is

taking necessary steps to secure its computer systems that house IIM trust data.  That is, these

findings demonstrate that despite the Department's representations to the contrary, it has not

taken and is not taking necessary actions to ensure the security of trust information stored on its

computer systems.  In light of the Special Masters findings, all of the agency's representations

regarding the improvements to IT security now ring conspicuously hollow.[129]

    Third, the Special Master found (with the assistance of Predictive Systems) that the

current state of IT security at the Department of Interior is deplorable.  Id at 141-154.

Specifically, the Special Master found that:

        [t]he critical data of concern to the Court remains housed on systems that have:

---

    [129]In its November 29, 2001 response to the Special Master's report, the Department of
Interior argued that it was, as of late September 2001 taking actions to correct the longstanding
IT security issues.  Defs.' Response at 5-8.  As the Court noted in its January 15, 2002 order,
however, while it now appears that Interior has at least taken one positive step by contracting
with Predictive Systems, it was "too little, too late[.]"  Even assuming that the Department is now
finally taking corrective actions, it would not affect any of the Court's factual findings or legal
conclusions.  The reason is that the Department of Interior cannot mislead the Court for nearly
two years and then, after the Special Master begins examining the veracity of their
representations, try and begin to take the appropriate actions it was supposed to take (and had
represented to the Court that it was taking) years earlier.

> no firewalls, no staff currently trained/capable of building and maintaining firewall devices, no hardware/software solution for monitoring network activity including but not limited to hacking, virus and worm notification . . .[and] a serious lack of wide area networking and security personnel in general. The BIA is also far behind the other bureaus in Interior regarding staffing of messaging systems and infrastructure support . . . There is currently no capacity for the systems and infrastructure support . . .There is currently no capacity for the OIRM to analyze daily system logs generated by the IRMS system to look for unusual or possibly nefarious activities or to track changes made to each data file. . . . Likewise, there are insufficient current staff to handle t[he] day to day configuration issues of the data communication wide area network (WAN) let alone monitor, log and report the increasing "hacking" type activity.

Id. at 141. The Special Master recounted how Predictive Systems was able, as part of its initial penetration test, "to gain access to both critical systems (IRMS and TAAMS) identified by BIA." Id. at 134 (noting further that "Predictive achieved access to these systems that allowed creating shared directories, accessing data, and making changes to these systems (including adding user accounts."). The Special Master further detailed how, after the Director of OIRM intimated that Predictive was only able to penetrate the systems since OIRM had "in essence, 'turned over the keys to the store[,]'" Predictive Systems once again penetrated the BIA systems (this time using only free tools and utilities, which are widely available on the internet), and actually was able to create a false account in the name of the Special Master by altering the name of an existing account belonging to a beneficiary located in Oregon. Id. at 137-38. The penetration tests performed by Predictive Systems demonstrated that Interior's computer systems housing IIM trust data remain completely insecure.

Based on these findings, the Special Master concluded (and recommended) that:

> Interior–in derogation of court order, common-law, and statutory and regulatory directives–has demonstrated a pattern of neglect that has threatened, and continues to threaten, the integrity of trust data upon which Indian beneficiaries depend.

Rather than take any remedial action, its senior management has resorted to the condescending refrain that has consistently insinuated itself into the federal government's relationship with Native Americans, in general, and with IIM holders, in particular. And that is one that requests forbearance and trust on the grounds that reform continues to be the 'highest priority.' It is the view of the Special Master that, in this instance, such trust is not warranted, requests for forbearance should be denied and promises of future compliance should not be credited. The stakes are simply too high. An agency that ignores its own commissioned reports and those generated by other federal agencies; ignores pleas from its own staff for adequate funding; and spends tens of millions of dollars funding computer systems when the integrity of the very data to be loaded on those systems has been open to compromise for so many years, inspires little confidence.

The security of systems housing trust data is no better today than it was ten years ago. The circumstances leading to the Court's alarm 'that BIA had no security plan for the preservation of [trust] data,' . . .speak with compelling application today. The continued lack of trust data security is 'vivid proof' that Interior has 'still failed to make the kind of effort that they are going to be required to ever make trust reform a reality.' It is the recommendation of the Special Master that the Court intervene and assume direct oversight of those systems housing Indian trust data. Without such direct oversight, the threat to records crucial to the welfare of hundreds of thousands of IIM beneficiaries will continue unchecked.

Id. at 153-54 (internal citations omitted).

8.    Subsequent Injunctive Relief Granted by the Court

In light of the findings made by the Special Master in his Report on IT Security, the plaintiffs filed an additional emergency alternative motion for a temporary restraining order on December 4, 2001. After the Department of Interior failed to present any reason for not granting the plaintiffs' request at the additional hearings held on the matter, the Court had no choice but to order, on December 5, 2001, that the Interior defendants "immediately disconnect from the Internet all information technology systems that house or provide access to individual Indian trust data;" and that the Department "immediately disconnect from the Internet all computers within the custody and control of the Department of Interior, its employees and contractors, that have

access to individual Indian trust data." Order of December 5, 2001 [Docket Entry # 1036].[130]

This injunctive relief was both necessary and warranted in light of the Department's wholesale

failure to protect the vast quantities of commercially sensitive trust information stored on its

computer systems.

On December 17, 2001, after another round of hearings and discussions between the

parties on the issue of IT security (or the lack thereof) at the Department of Interior, the Court

entered a "consent"[131] order regarding information technology. The order superseded the

temporary restraining order entered by the Court on December 5, 2001, and provided a

mechanism by which the Department of Interior would be able to bring its computer systems

back online. Order of December 17, 2001 at 5-8 [Docket Entry # 1063]. The order further

provided that it "may be vacated by this Court once the Court has determined that the Interior

Defendants are in full compliance with this Consent Order and Interior's relevant information

technology systems are in compliance with the applicable standards outlined in OMB Circular A-

130." Id. at 8.


D.    **REORGANIZATION OF TRUST FUNCTIONS AT THE DEPARTMENT OF
      INTERIOR**

There was a considerable amount of testimony adduced at this contempt trial regarding

the organization of the Department's trust management functions as well as the individuals

---

[130]This order was amended on December 6, 2001 to reflect that it only applied to the
Interior defendants. Order of December 6, 2001 [Docket Entry # 1038].

[131]This order was labeled as a "consent" order because the defendants consented to it, not
because both parties consented to it.

currently in charge of certain aspects of the trust reform effort.  See, e.g., Contempt II Tr. at

3937-38.  In particular, every witness during this contempt trial that was asked about and

commented on Interior's organizational framework agreed that it was and is a significant

impediment to the agency's ability to discharge properly its fiduciary obligations.  See, e.g.,

Contempt II Tr. at 4332-33.  For example, Deputy Secretary Griles testified that:

> . . .over time it became evident that there was some
> inherent conflicts with the current organization.  In talking
> with Mr. Slonaker specifically, he indicated that he believed
> that in having the oversight responsibility of Special Trustee
> to oversee the trust responsibilities and obligations and
> trying to be -- and I will use the term the IG, if you will,
> of the Department to oversee the implementation and how it was
> being done, he believed he had inherent conflict with the
> implementation of trust reform specifically with the
> management of the funds and the collection of the funds and
> disbursement of the funds, that that resulted in him having an
> inherent conflict in how he should go forward.
>    At the same time it was clear that within the Bureau
> of Indian Affairs, in my opinion, there were inherent problems
> of lack of leadership and lack of direction, and that we
> needed to bring all this together into some format that would
> allow for the Department to have a much better organization to
> respond to the demands of the Department.

Contempt II Tr. at 3935-37.  Moreover, Secretary Norton herself recognized that Interior needed

to make changes both at the personnel and organizational levels.  Specifically, she testified

during this contempt trial that:

> A.    I think we still have a long way to go in looking at
> the people who are performing various tasks and making sure
> that those people are the appropriate people for those various
> tasks.  We're still in the process of identifying the
> deficiencies in our organization and putting in place the
> procedures to be able to correct those deficiencies.
>
> Q.    So you're engaged in -- is the restructuring critical

to trust reform, as you understand it?

A.    I believe it is important that we do some type of
improvement in our structure, and to me, it seems that we
certainly need to be able to have a clear structure that is
going to have accountability, responsibility.  It is going to
have a consistent way of identifying what needs to be done for
the various elements of trust reform and getting those things
done.

Q.    And today, those elements aren't in place, correct?

A.    Unfortunately, we have found ourselves with a system
that is not sufficient.  We're working to put those changes in
place, but we still have a long way to go.  We still have
reorganization to do, we still have improvements that need to
be done in a great many ways.

Contempt II Tr. at 4331-32.  See also Contempt II Tr. at 2413-15 (Special Trustee testifying that

he considered there to be significant management problems with the TAAMS and BIA Data

Cleanup subproject).  In addition, there was also both documentary and testimonial evidence

concerning intra-agency disputes that affected the administration of the IIM trust accounts.  See,

e.g., Contempt II Tr. at 121.  The Court considers these disputes and problems to be part of the

greater issue of trust management that the Department must address.  Thus, while it is not

appropriate at this point for the Court to make findings on precisely how the Department of

Interior should address all of these management issues, it is important for the Court to flag this

issue as one that must be resolved in an expeditious manner.[132]

---

[132]It is also worth noting that, perhaps as a result of his testimony during this contempt
trial or other public statements that were critical of the Department, Thomas Slonaker resigned as
Special Trustee.  While the Court makes no findings at this time regarding the reason for his
resignation, the timing is certainly curious to say the least.

## V. CONCLUSIONS OF LAW

In this section of the opinion the Court will make conclusions of law based on the

findings of fact presented above. Specifically, the Court will address in turn each of the five

specifications enumerated in the show cause orders of November 28, 2001, and December 6,

2001.

### A.   SPECIFICATION 1: FAILURE TO INITIATE A HISTORICAL ACCOUNTING PROJECT

The Court concludes based on the findings of fact detailed above that the defendants

failed to initiate a historical accounting project as required by the Order of December 21, 1999.

The findings of fact presented above clearly establish that the Department of Interior did not take

any substantive measures (except publishing a sham notice in the Federal Register) during the

eighteen month period following the Court's Phase I trial decision to provide the plaintiffs with

the accounting that they are legally entitled to receive. The Court is both saddened and disgusted

by the Department's intransigence in the face of the Phase I trial ruling.

In an order dated May 5, 1998, the Court bifurcated this case into that aspect which seeks

to institute new trust management practices, known as the "fixing the system" portion, and that

aspect which seeks to obtain an accounting of the funds held in the IIM trust by the defendants,

known as the "correcting the accounts" portion. In the summer of 1999, the Court held the Phase

I trial in this action, which encompassed both the fixing the system portion of the case as well as

the threshold issue of determining the scope of the accounting that would be required for the

correcting the accounts portion of the action (Phase II trial).

In the Phase I trial ruling of December 21, 1999, the Court explicitly found that the 1994

Act requires the Interior defendants to provide plaintiffs with an accurate accounting of <u>all</u> money in the IIM trust held in trust for the benefit of plaintiffs, without regard to when the funds were deposited.  As a corollary to that finding, the Court further ruled that the 1994 Act requires defendants to retrieve and retain all information concerning the IIM trust that is (or will be) necessary to render an accurate accounting of the above mentioned funds.  While the Court thus ruled that the defendants had to perform a historical accounting of the IIM trust accounts–indeed, there would be no Phase II trial without the accounting–the Court refrained from prescribing a specific method by which the accounting had to be performed.  That is, the Court remanded the matter back to the Department of Interior to perform the historical accounting that would form the basis of the Phase II trial without ordering the Department to utilize a specific accounting method.

Between December 21, 1999 and July 10, 2001, the Department of Interior failed to take any substantive steps towards completing the required historical accounting of the IIM trust accounts.  Instead, as the Court discussed at great length above, for more than a year after the Court's Phase I trial ruling the Department engaged in a sham Federal Register process that greatly misled this Court.  In particular, that process caused this Court to believe that the agency was utilizing a valid administrative approach to determine which accounting method it would use to perform the required historical accounting.  In reality, the Department of Interior was using the Federal Register process to support its appeal of this Court's Phase I trial ruling.  Irrespective of that deceitful process, for purposes of Specification 1 it is both sufficient and clear that as of July 10, 2001–more than a year and a half after the Court issued its Phase I trial ruling–the Department of Interior still had not started researching or analyzing the different accounting

-180-

methods, or retrieving the missing documents that would be necessary to perform an accounting. Thus, leaving aside for the moment the actual rendition of an accounting, as of July 2001 the Department had not even taken the preliminary steps that would enable it to select a particular method to perform the historical accounting. In fact, the Department did not know at that time when it would even be able to make an informed decision about how to perform the historical accounting of the IIM trust accounts. Moreover, the agency was not then and is not today in a position to estimate when it will ultimately complete the accounting so that the Phase II trial, as described in the Memorandum Opinion of December 21, 1999, can be held.

The evidence presented at this contempt trial confirmed that Interior only began taking the initial steps to develop a plan to perform the historical accounting after more than eighteen months had passed since the Court issued its Phase I trial ruling, and after the Court Monitor had examined the agency's efforts (or lack thereof) to date. It still remains to be seen whether the actions taken by the Department since July of 2001 were taken in good faith and whether they will prove to be fruitful.

The defendants argue that, notwithstanding the Department's wholesale failure to initiate a historical accounting project during the eighteen-month period following the Court's Phase I trial ruling, there are three reasons why they should not be held in civil contempt of court. In particular, the defendants contend that: (1) they complied with the Court's December 21, 1999 ruling; (2) the Court's Phase I trial ruling is not clear and reasonably specific regarding initiating a historical accounting project; and (3) the Court's Phase I trial ruling is a declaratory judgment, and a declaratory judgment alone cannot form the basis for a contempt citation. Defs.' Proposed Findings at 139. The Court will address each of these contentions in turn.

The Court rejects the defendants' argument that they should not be held in civil contempt because they complied with the Court's Phase I trial ruling. The Court's findings of fact presented above amply demonstrate that the agency failed to take any substantive actions to facilitate the rendition of an accounting in the eighteen month period following the Phase I trial ruling. The defendants argue, however, that they initiated a historical accounting project by creating the Office of Historical Trust Accounting, conducting a pilot accounting of certain judgment fund and per capita accounts, and performing work on the accounts of the five named plaintiffs. The Court will address each of these contentions separately.

There are two problems with the defendants' argument regarding the creation of OHTA. First, the elementary act of establishing a separate office to determine how the Department should perform the historical accounting of the IIM trust accounts hardly constitutes initiating a historical accounting project. That is, such a preliminary step is not sufficient to qualify as initiating a historical accounting project because by itself it is nothing more than a bureaucratic shuffle. Indeed, there is no reason why the Department could not have simply tasked existing offices or subagencies within Interior to carry out the same functions that OHTA now performs. Thus, the creation of a separate office to perform these functions at best brings the Department marginally closer to performing the required historical accounting. It does not, however, constitute initiating a historical accounting project. The second, and more significant, problem with the defendants' argument regarding the creation of OHTA is that the office was not established until eighteen months after the Court issued its Phase I trial ruling. The Court explicitly found during the initial contempt trial in this case that a "spurt of activity on the heals of plaintiffs' motion for a finding of contempt" is not sufficient to avoid a contempt citation.

-182-

Cobell II, 37 F.Supp.2d at 21-22 (citing Aspira v. Board of Educ., 423 F.Supp. 647, 654 (S.D.N.Y. 1976)).  In this case, the defendants waited more than a year and a half before establishing OHTA, and did so only after the Court Monitor reported the negative results of his examination into the agency's efforts to date to Michael Rosetti, Counselor to Secretary Norton. In light of these facts, the defendants cannot shield themselves from exposure to a contempt citation by referring to the creation of OHTA.  Thus, while the creation of that office appears to be a positive first step in terms of planning to perform a historical accounting, it is too little, too late to constitute initiating a historical accounting project for purposes of Specification 1.

The Court similarly finds that there are two reasons why it must reject the defendants' argument concerning the pilot accounting of certain judgment fund and per capita accounts. First, the Department did not begin this pilot until June of 2001, more than seventeen months after the Court issued its Phase I trial ruling.  For the reasons provided above, Interior cannot rely on efforts undertaken at such a late date to avoid a contempt citation.  Second, OHTA's own report observed that this pilot project involved "IIM accounts that are often based on a single transaction and the accounts rarely include income based on allotted land revenues or from other sources." Pls.' Ex. 31 at 11.  Thus, even assuming the pilot was timely, it is not sufficient to constitute initiating a historical accounting project within the context of the Court's December 21, 1999 Order.  That is, conducting a pilot accounting project for a subset of funds is not enough to warrant discharging Specification 1.

Finally, the Court rejects the defendants' contention that they initiated a historical accounting project because of the work Ernst & Young performed on the accounts of the five named plaintiffs.  This argument is particularly weak even for the Department of Interior.

-183-

Notwithstanding the fact that the work performed by Ernst & Young may prove to be valuable in terms of providing those plaintiffs with an accounting, the work was not meant to be part of a larger historical accounting project.[133]  In other words, the work Ernst & Young performed on the accounts of the five named plaintiffs does not represent an effort on the part of the defendants to perform a historical accounting for the thousands of IIM trust beneficiaries.  Thus, it can not and does not constitute, for purposes of Specification 1, initiating a historical accounting project.

The defendants also argue that they should not be held in civil contempt of court because the Court's Order of December 21, 1999 is not clear and reasonably specific regarding initiating a historical accounting project.  In fact, the defendants go so far as to state that the order does not even "direct that such a project be initiated."  Defs.' Proposed Findings at 139.  The Court rejects this argument by the defendants.  In May of 1998, the Court bifurcated the proceedings in this case so that it would address the fixing the system portion of the case first (Phase I), and then, after an accounting was performed, the correcting the accounts portion of the action (Phase II).  Order of May 5, 1998 [Docket Entry # 94].[134]  In June of 1999, before the Phase I trial was held, the Court specifically noted that "the second phase of this suit concerns plaintiffs' claim for an accounting, which is their ultimate goal in this case."  Cobell III, 52 F.Supp.2d at 19.  Moreover, in the Phase I trial ruling itself, the Court explicitly ruled that the defendants had to perform an

_____

[133]In fact, the record of this case indicates that the Department of Interior planned (and perhaps still plans) on using the Ernst & Young Report to demonstrate that no historical accounting is required because the accounts of the five named plaintiffs were managed properly. While it is not appropriate for the Court to make findings on the validity of the defendants' position, it is important to note that the work performed by Ernst & Young was not done as part of a generally applicable historical accounting project.

[134]At that point in time it was still up to the plaintiffs to prove that they were legally entitled to an accounting.

accounting of all funds held in the IIM trust for the benefit of plaintiffs.[135]  Given this procedural

history, it is inconceivable that the defendants would now argue that they do not even have to

initiate a historical accounting project.  That being said, the Court agrees with the defendants that

in the Phase I trial ruling it did not prescribe a specific accounting method for the agency to

employ.  This fact does not, however, vindicate the defendants' contention in this regard.  As an

initial matter, it is important to note that the Court correctly refrained at that time from ordering

Interior to use a specific accounting method.  Cobell VI, 240 F.3d at 1109.  More importantly, for

purposes of the instant contempt trial, Specification 1 does not purport to hold defendants in civil

contempt for selecting a particular accounting method.  Rather, Specification 1 is predicated on

the defendants' wholesale failure to take any substantive steps towards rendering an accounting

for eighteen months after the Court issued its Phase I trial ruling.  In this respect, the Court's

December 21, 1999 decision could not have been more clear–the defendants must provide

plaintiffs an accurate accounting of all money in the IIM trust held in trust for the benefit of

plaintiffs, without regard to when the funds were deposited.[136]  Based on the defendants'

complete failure to act, they cannot now claim that they were unaware of what was required of

them.

---

[135]It is important to note that there is no difference between a "historical accounting" and
an "accounting."  Indeed, these terms have often been used interchangeably by both the parties
and the Court.  Any accounting of funds necessarily involves examining past transactions and
events that could effect the current balance.  In this opinion, the Court has predominantly used
the term historical accounting to emphasize that the Interior Department must take past
transactions into consideration to ensure that the current balances in the IIM trust accounts are
accurate.

[136]The D.C. Circuit further noted that the accounting must be for all funds (or at least so
long as they were deposited after the Act of June 24, 1938).

The final argument raised by the defendants with respect to Specification 1 is that they should not be held in civil contempt because the "Court's order addressing the historical accounting is a declaratory judgment[,] and a "declaratory judgment is not an order punishable by contempt when it is not obeyed." Defs.' Proposed Findings at 139. There are two reasons why the Court rejects this argument by the defendants. First, the Court finds that the procedural history of this action distinguishes it from the cases cited by the defendants in which a contempt citation could not be issued. The defendants are correct that by itself a declaratory judgment cannot serve as the foundation for a finding of civil contempt. Steffel, 415 U.S. at 471; Armstrong, 1 F.3d at 1290. The reason is that a declaratory judgment ordinarily does not require action or forbearance by the parties; rather, a declaratory judgment merely delineates the parties' legal status and rights. Id. The problem for the defendants, however, is that in this case the Court's Phase I trial ruling did more than simply declare the rights of the plaintiffs and the corresponding obligations of the defendants. The Court's order of December 21, 1999 dealt with the first of two phases that had been identified in a scheduling order entered back in May of 1998. In issuing the Phase I trial ruling, the Court explicitly found that the defendants owed the plaintiffs an accounting for all funds held in the IIM trust for their benefit. The Court further noted that it would hold a Phase II trial to address the "correcting the accounts" portion of the case once the mandated accounting was finished, and even went so far as to explain what the Phase II trial would entail. The Court accordingly remanded the matter back to the agency to perform the necessary accounting. In light of this procedural history, the Court finds that this case is distinguishable from cases in which the court simply declared the rights of the parties, and that a contempt citation can be levied against the defendants. Id. The defendants were clearly

-186-

directed to perform an accounting of the IIM trust accounts so that the Phase II trial could proceed. In this regard, it is worth noting that even the D.C. Circuit, in describing this Court's order of December 21, 1999, wrote that "[t]he court further found that the defendants were in violation of the above-mentioned fiduciary duties, ordered them to come into compliance with their duties and remanded the required action to the defendants for further proceedings 'not inconsistent' with the court's opinion." Cobell VI, 240 F.3d at 1094, 1107 (noting also that "the district court issued an order to compel those actions which had been unlawfully withheld or unreasonably delayed. Specifically, the district court remanded the required actions to [the defendants] so that they may begin to discharge the duties found by the court."). Second, the Court rejects the defendants' argument because one of the reasons the Court refrained from issuing a structural injunction at the end of the Phase I trial was the defendants' representations that it was unnecessary since they would comply with any order issued by the Court. In light of those statements by the Interior defendants, the Court finds that the agency (and the defendants in this contempt trial) cannot now come forward and argue that a contempt citation will not stand because the Court declined to issue a structural injunction. This is particularly true in light of the Court's admonition in the Phase I trial ruling that "the court can ensure that the [Interior defendants'] promises are kept, and it has the contempt power that will allow it to do so when appropriate." Cobell V, 91 F.Supp.2d at 54. Moreover, the defendants did not request and the Court did not grant a stay of its December 21, 1999 order. Thus, there is no excuse for the agency's inaction.

Notwithstanding the above analysis and the extensive findings of fact regarding this specification, the Court will not issue a contempt citation at this time with respect to

-187-

Specification 1. Instead, the Court finds that it is sufficient simply to hold that the defendants unreasonably delayed initiating the historical accounting project that they were required to perform in accordance with this Court's Order of December 21, 1999, and that such delay falls within the broad category of litigation misconduct that courts have the inherent power to redress. Shepherd, 62 F.3d at 1472; Penthouse Int'l Ltd., 663 F.2d at 386. In other words, the Court finds that the defendants' failure to initiate a historical accounting project for eighteen months after the Phase I trial ruling constitutes sanctionable misconduct in that it unnecessarily and significantly delayed the Court's and plaintiffs' ability to proceed with the Phase II trial. Webb, 146 F.3d at 971; Shepherd, 62 F.3d at 1475. The defendants' failure to initiate a historical accounting project has prejudiced plaintiffs' ability to present their case,[137] and created an intolerable burden on this Court's ability to adjudicate this matter in an orderly and expeditious manner. Furthermore, there is no question that the plaintiffs suffered irreparable injury as a result of the year and a half delay, and that they continue to be injured by the defendants' failure to provide them with an accurate accounting of their funds held in the IIM trust. As the Court noted in its Phase I trial ruling, "[t]he longer defendants delay in creating the plans necessary to render an accounting, the greater the chance that plaintiffs will never receive an actual accounting of their own trust money." Cobell V, 91 F.Supp.2d at 47. The D.C. Circuit itself recognized that "[g]iven that many plaintiffs rely upon their IIM trust accounts for their financial well-being, the injury from delay could cause irreparable harm to plaintiffs' interests as IIM trust beneficiaries." Cobell VI, 240 F.3d at 1097. Moreover, the Court finds that the Department's failure to initiate a historical

---

[137]This is particularly true in light of the fact that Interior made no attempt to retrieve documents produced prior to 1994.

accounting project after the Court issued its Phase I trial ruling demonstrates the agency's continuing breach of its fiduciary duty to plaintiffs and its persistent refusal to comply with the orders of this Court.

**B.      SPECIFICATION 2:  CONCEALING THE DEPARTMENT'S TRUE ACTIONS REGARDING THE HISTORICAL ACCOUNTING PROJECT FROM MARCH 2000 UNTIL JANUARY 2001**

The Court concludes based on the findings of fact detailed above that the defendants committed a fraud on the Court by concealing the Department's true actions regarding the Historical Accounting Project during the period from March 2000, until January 2001.  The evidence presented and representations made at this contempt trial with respect to this specification prove just how deceitful and disingenuous the defendants can be towards both the individual Indian trust beneficiaries and this Court.  The Court's factual findings further demonstrate the lengths the Department will go to avoid having to provide the 300,000 plaintiffs in this action with an accounting of their money held in trust by the United States.

The Department of Interior represented to this Court (and the plaintiffs) that it was placing a notice in the Federal Register to determine the most reasonable method for providing account holders with information to evaluate their accounts and to determine whether there are discrepancies due to past management practices.  These representations led the Court to believe that the agency was embarking on a legitimate administrative process to determine which accounting method it should utilize to perform the required historical accounting.  In reality, the only accounting method the Department of Interior ever considered using was statistical sampling.  Thus, the notice published in the Federal Register was actually part of a scheme on the

-189-

part of the Interior defendants to get the D.C. Circuit to overturn this Court's Phase I trial ruling,

delay initiating a historical accounting project, and prevent more invasive relief from this Court.

The Department of Justice would not permit the Interior defendants to appeal this Court's

Phase I trial ruling unless the agency began an administrative process towards a historical

accounting. Notwithstanding the fact that Interior never intended to use any accounting method

other than statistical sampling,[138] the agency paid the "price of the appeal" and published a notice

in the Federal Register anyway. In the notice, the Department outlined four potential accounting

methods that it could use to perform the historical accounting of the IIM trust accounts, including

statistical sampling and transaction-by-transaction. Believing that this was a good faith effort on

Interior's part to gather information, numerous IIM beneficiaries, at their own expense, traveled

to and provided comments at numerous meetings across the country. These beneficiaries

overwhelmingly favored the transaction-by-transaction approach.

On appeal, the Department of Interior contended both in its written briefs and during oral

argument that it, rather than this Court, should have the opportunity in the first instance to define

the parameter of any historical accounting project. To support this contention, the Department

represented to the D.C. Circuit (again, both in its written submissions and during oral argument)

that it had recently undertaken an administrative process to ascertain the most reasonable

approach to performing the historical accounting.[139] The Department of Justice felt that it was

---

[138]This, of course, assumes that the Department intended to actually perform some type of an accounting of the IIM trust accounts. In light of the agency's history of recalcitrance towards such an endeavor, the assumption is dubious at best.

[139]As the Court explains in more detail below, it does not rely on any of the defendants' representations to the D.C. Circuit to support the conclusion that the agency committed a fraud on this Court. Rather, the representations to the D.C. Circuit demonstrate the reasoning behind

imperative to show action by the historically recalcitrant agency, and that publishing a notice in the Federal Register provided the avenue by which it could do so. These representations formed the factual foundation of the agency's appellate argument that it, rather than this Court, should determine as an initial matter the scope of the historical accounting project. The Department also used the notice in the Federal Register to show that it was taking steps to provide plaintiffs with an accounting of their money held in trust by the agency. Thus, Interior argued before the D.C. Circuit that this Court's Phase I trial ruling was premature and should be reversed because the agency was in the process of determining for itself the scope of the historical accounting.

Despite Interior's representations to this Court (and the D.C. Circuit), the agency never considered the beneficiaries' comments to the notice in the Federal Register before deciding which accounting method to use. In fact, the agency had not even compiled the results of the Federal Register process before it chose statistical sampling as the approach to conduct the accounting. Worse yet, the Department actually began seeking funding for the statistical sampling project before the time for filing written comments to the notice had even expired. The Interior Department, of course, did all of this without ever researching the costs or benefits of the different accounting methods or ascertaining what the different approaches would even entail. It is thus clear that the only accounting method ever considered by the Department was statistical sampling. Consistent with these deplorable actions, the Department also failed to inform the Court that it was not going to make any effort to retrieve missing documents produced before 1994.

---

the scheme perpetrated by the defendants. This Court recognizes that it is the responsibility of the D.C. Circuit to address fraudulent representations made before it.

One of the more disheartening aspects of this unconscionable scheme was the pervasive involvement of attorneys in the Solicitor's Office. Attorneys in the Solicitor's Office assisted in preparing the notice published in the Federal Register, participated in the meeting where Interior officially selected statistical sampling as the method it would use to perform the historical accounting, and drafted the memoranda used by the agency to support its predetermined choice to employ the statistical sampling approach. These attorneys took such actions knowing that the agency had never considered any of the other options enumerated in the notice published in the Federal Register, or even the comments to the notice provided by the trust beneficiaries. The Court is very disappointed that attorneys, particularly those that work for the government, would engage in such subterfuge.

The Court concludes that the gross misbehavior described above by the Interior defendants and their counsel rises to the level of fraud on the court, see Aoude, 892 F.2d at 1118-19 ("Because corrupt intent knows no stylistic boundaries, fraud on the court can take many forms."); Synanon, 579 F.Supp. at 974-77 (fraud on the Court includes "fraud perpetrated by officers of the court[.]"), and warrants a finding of civil contempt. Cf. Pendergast, 317 U.S. 412; Williams, 622 F.2d at 838. See also Bagwell, 512 U.S. at 833 (finding that "[c]ontempts such as failure to comply with document discovery, for example, while occurring outside the court's presence, impede the court's ability to adjudicate the proceedings before it and thus touch upon the core justification for the contempt power."). With the willful assistance of attorneys in the Solicitor's Office, the Department of Interior falsely represented to this Court that it was publishing a notice in the Federal Register to determine which accounting method to use in performing a historical accounting of the IIM trust accounts. Kupferman, 459 F.2d at 1078. As

the Court (and plaintiffs) now know, the Department never planned on using the comments to the notice as part of its decision-making process. Rather, the agency published the notice in the Federal Register to support the appeal it had filed with the D.C. Circuit. In this regard, this case is readily distinguishable from the cases cited by defendants where the courts concluded that no fraud on the court had been committed. For example, in In re Antibiotic Antitrust, the Eighth Circuit found that no fraud on the court had been perpetrated where one party made a single misrepresentation that it later corrected. 538 F.2d at 195. In this case, there was a scheme directed towards both plaintiffs and the Court about the central matter in the case–a historical accounting. The cases are not even in the same ballpark. Moreover, the Second Circuit found that no fraud on the court had been committed in Transaero because the alleged wrongdoer had a good-faith basis for believing certain facts to be true. 24 F.3d at 460-61. Again, the alleged misdeeds of the party in that case are markedly different than the deplorable actions taken by the defendants in this case. In the instant matter, the Department of Interior intentionally misled this Court and plaintiffs into believing that it was undertaking a legitimate administrative process to determine how to perform a historical accounting. In reality it was trying to manipulate the D.C. Circuit into reversing this Court's Phase I trial ruling so that it would not have to conduct any accounting.[140] As a result of committing this fraud on the Court the defendants are in civil

_____

[140]Even if the Court were to agree with the defendants that the egregious actions taken by the defendants did not constitute a "fraud on the court" as that term has been defined in other instances, like when a party is trying to obtain relief from judgment, it would not vindicate the defendants in this matter. It is clear that at the very least the defendants' actions fall within the category of general litigation misconduct that this Court has the inherent power to redress. To the extent the Court has the inherent power to redress such behavior, regardless of how the parties choose to label it, the Court clearly has the authority to redress the actions by the Interior defendants in this specification.

contempt.

The Court finds that there are two additional substantive arguments raised by the defendants that are worth addressing. First, in their consolidated opposition to plaintiffs' show cause motions, the defendants argue that this Court cannot sanction the defendants for conduct engaged in during its appeal to the D.C. Circuit. Consolidated Opp'n at 28 n.20 (citing, for example, Conner v. Travis County, 209 F.3d 794 (5th Cir. 2000). This contention by the defendants misunderstands the charge levied in Specification 2, and is accordingly rejected. The Court's decision today is based solely on representations that were made by the defendants to this Court, as opposed to those made to the D.C. Circuit. In particular, the defendants informed this Court in March of 2000 that the Interior Department was undertaking an administrative process to determine which accounting method to use in performing the historical accounting. In fact, the defendants actually requested an order from this Court, which they received, finding that attorneys in the Solicitor's Office would not violate ethical rules by participating in the notice process. Further, in January of 2001, the Department informed this Court that it had decided to use the statistical sampling method. In this filing, the agency attached the memoranda of Secretary Babbitt which indicated that the decision to use statistical sampling was based on the Federal Register process. The Court finds that such representations made directly to this Court give it the power to address the issues raised in Specification 2. Now, of course, the fact remains that the defendants also in all likelihood committed a fraud upon the Court of Appeals as well. That matter, however, should be left to the D.C. Circuit to resolve. The important thing to recognize is that the commission of a fraud on this Court is not mutually exclusive with the commission of a fraud on the Court of Appeals. Indeed, it is quite clear that the Interior

Department is fully capable of simultaneously defrauding more than one court in this action.

The second issue worth addressing is defendants' contention that to the extent plaintiffs are not satisfied with the manner in which the Federal Register process was carried out, they should file an action under the APA against the defendants, rather than a motion for a contempt finding in the instant matter.  Contempt II Tr. at 2562-64.  There are two problems with the defendants' position.  First, the plaintiffs already have filed an action under the APA against the defendants to obtain an accounting.  At this point, in light of the Court's Phase I trial ruling, instituting contempt proceedings to ensure compliance with this Court's orders is a proper avenue by which plaintiffs may proceed.  Second, and more importantly, the defendants' argument fails to appreciate the crux of Specification 2.  This specification is not just about the defendants' decision to use a particular accounting method; rather, it is about the defendants representing to this Court (and plaintiffs) that they were embarking on an administrative process to determine which method they would employ to perform the accounting when in reality the decision had already been made.  There is no question that addressing such fraudulent representations should be handled in this action, rather than in a new suit under the APA.

## C.  SPECIFICATION 3: FAILING TO DISCLOSE THE TRUE STATUS OF THE TAAMS PROJECT BETWEEN SEPTEMBER 1999 and DECEMBER 21, 1999

The Court concludes based on the findings of fact above that the defendants committed a fraud on the Court by failing to disclose the true status of the TAAMS project between September 1999 and December 21, 1999.  The Department of Interior (and its attorneys) knew, even before the Phase I trial ended, that many of the representations it had made during that trial

with respect to TAAMS were inaccurate. Notwithstanding the fact that Interior was aware of these false statements and the need to correct them, the agency intentionally failed to inform the Court about the massive problems it was experiencing with the new land management system. Thus, the record upon which this Court based its Phase I trial decision was infected with numerous false statements and inaccurate documents put forth by the Interior defendants.

In the Phase I trial, which was held during the summer of 1999, the Department of Interior presented extensive testimonial and documentary evidence regarding TAAMS. Interior argued that while its legacy computer systems had many shortcomings, TAAMS did not. In particular, the Department represented to the Court that TAAMS would allow BIA to administer trust assets, generate timely bills, identify delinquent payments, track income from trust assets, and distribute proceeds to the appropriate account holders. Dominic Nessi, the project manager for TAAMS, even went so far as to state that TAAMS "has the potential probably to be the best land management system in the United States." Phase I trial Tr. at 2391. The Department also described the manner in which the agency was going to implement the land management system and the general time frame for doing so. Specifically, the agency indicated that it would first conduct a 100 day pilot project in Billings, Montana. After completing the pilot project, the Department planned on implementing TAAMS on a geographical basis to the different Area Offices in the coming year (2000).

In the late summer and early fall of 1999 it became obvious to the Department that it would not be able to implement TAAMS either in the manner that it had described or during the time period that it had provided to the Court in the Phase I trial. The reason was that the agency experienced significant problems with the land management system in July and August that

precluded it from even beginning the pilot project in Billings, Montana.  Moreover, at this time

the Department identified considerable data conversion problems, recognized the fact that it had

not properly taken into account the unique business processes or needed functionality of BIA

when developing the land management system, and learned that there would be significant

obstacles to implementing the realty portion of TAAMS.  The realty portion of the land

management system, of course, performs most of the functions identified by the Department

during the Phase I trial.  Interior thus knew that all of these monumental problems would have to

be resolved before TAAMS would ever be able to perform the functions that the Department had

touted to the Court.

       As a result of these developments, the Department of Interior, including several attorneys

in the Solicitor's Office, knew that they needed to inform the Court about the significant

problems the agency was experiencing with its new land management system.  Despite this

knowledge and the fact that these officials and attorneys had actually drafted a memorandum to

provide to the Court, the Department of Interior chose to say and do nothing.  That is, the agency

made a conscious and deliberate decision not to correct the patently false statements that its

officials had made during the Phase I trial.  Moreover, even assuming arguendo that the

Department intended to file the memorandum that it had prepared, the agency still would not

have provided the Court with anything approaching an accurate status of the TAAMS project.

Indeed, as the Court noted above, the memorandum itself demonstrates that the Department

never intended to inform the Court of all the problems it was experiencing with TAAMS.

       The Court concludes that the defendants committed a fraud on the Court by failing to

disclose the true status of the TAAMS project between September 1999 and December 21, 1999,

see Aoude, 892 F.2d at 1118-19; Baltia Air Lines, 98 F.3d at 642-43 (noting that examples of

fraud on the court include "the knowing participation of an attorney in the presentation of

perjured testimony."), and that they are therefore in civil contempt of court. Cf. Pendergast, 317

U.S. 412; Williams, 622 F.2d at 838.  It is now abundantly clear that the six week Phase I trial

was nothing more than a dog and pony show put on by the Interior defendants.  These defendants

discussed all of the benefits of TAAMS and then intentionally failed to inform the Court that the

land management system, which was the centerpiece of their trust reform effort and defense

during the Phase I trial, was experiencing enormous problems and would not be able to be

implemented anytime in the near future.  In so doing, the defendants deliberately allowed this

Court to rule on a record that was replete with factual errors.  Thus, there is no doubt that the

defendants' actions, with the full knowledge of attorneys in the Solicitor's Office, see

Kupferman, 459 F.2d at 1078, interfered with this Court's ability to adjudicate fairly this case

and with the plaintiffs' ability to present their case.  In this regard, the Court finds that this case is

readily distinguishable from those in which a party or attorney simply mischaracterized the

evidence presented at trial or failed to correct a minor representation.  See, e.g., Weldon v.

United States, 225 F.3d 647 (2d Cir. 2000).  The heart of the defendants' case during the Phase I

trial was that it would soon be able to discharge its fiduciary duties properly because TAAMS, its

new land management system, was going enable the agency to perform a wide range of functions.

Upon learning that the land management system was not even close to being ready for

implementation (even at the pilot site), the Department of Interior covered up that fact rather than

informing the Court.  Under even the most restrictive view of the term, this unquestionably

constitutes a fraud on the court.

As a corollary to this conclusion, it is important to note that parties in general and attorneys in particular have a continuing duty to apprise a court of developments which may affect the outcome of a case. See, e.g., Board of License Commissioners v. Pastore, 469 U.S. 238, 240 (recognizing that counsel "have a continuing duty to inform the Court of any developments which may conceivably affect the outcome of the litigation."). See also United States v. Shaffer Equipment Company, 11 F.3d 450, 458-59 (4th Cir. 1993). Even the Department itself concedes that "the delays in the TAAMS project during the summer and fall of 1999 should have been disclosed to the Court." Defs.' Motion for Judgment on Partial Findings (January 18, 2002) at 13. The reason for this rule is that:

> Our adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice. However, because no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent, and custom, and argument to reasoned conclusions–all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition. Even the slightest accommodation of deceit or lack of candor in any material respect quickly erodes the validity of the process. As soon as the process falters in that respect, the people are then justified in abandoning support for the system in favor of one where honesty is preeminent. . . The system can provide no harbor for clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end.

Shaffer Equipment Company, 11 F.3d at 457-58. By intentionally failing to apprise the Court of the true status of TAAMS, the defendants plainly committed a fraud on this Court and are accordingly adjudged to be in civil contempt of court.[141]

---

[141]Even if the Court were to assume for the sake of argument that the actions by the defendants did not rise to the level of fraud on the court, there is no question that the failure to inform the Court of the true status of the land management system after the agency became aware of its deplorable condition is sanctionable litigation misconduct that this Court can redress. Furthermore, even if the Court were to ignore completely the record developed at this contempt trial and focus exclusively on the current condition of TAAMS, it is clear that one of the

**D.    SPECIFICATION 4: FILING FALSE AND MISLEADING QUARTERLY STATUS REPORTS STARTING IN MARCH 2000, REGARDING TAAMS AND BIA DATA CLEANUP**

The Court concludes based on the findings of fact detailed above that the defendants committed a fraud on the Court by filing false and misleading quarterly status reports starting in March 2000, regarding TAAMS and BIA Data Cleanup.  The evidence presented and representations made during this contempt trial clearly demonstrate that the Interior defendants intentionally filed the false and misleading quarterly status reports to make this Court (and the plaintiffs) believe that significant headway had been made on these two critical subprojects.  In reality, only minimal progress–if any at all–had been made during this time period, and presently neither the TAAMS nor the BIA Data Cleanup subproject are even remotely close to being completed.[142]  By filing false and misleading quarterly status reports the Department of Interior prevented both the Court and the plaintiffs from learning the true status of these two vital subprojects for more than eighteen months.  In my fifteen years on the bench I have never seen a litigant make such a concerted effort to subvert the truth seeking function of the judicial process.  I am immensely disappointed that I see such a litigant today and that the litigant is a Department of the United States government.  The Department of Interior is truly an embarrassment to the federal government in general and the executive branch in particular.  The 300,000 individual Indian beneficiaries deserve a better trustee-delegate than the Secretary of Interior.

------

principal bases for this Court's December 21, 1999 decision–that TAAMS will enable the agency to administer properly the IIM trust accounts–is no longer valid.  Both of these findings would warrant the relief that the Court has decided to grant below.

[142]The lack of progress the Department of Interior has made in completing these two subprojects during the three years since the Phase I trial is remarkable.

This sorry saga began when the Department of Interior filed its First Report along with the Revised HLIP in March of 2000.  In the First Report Interior failed to inform the Court that the difficulties the agency had experienced with TAAMS during the late summer and early fall of 1999 persisted through the winter months, and that the problems were still impeding the implementation of the land management system.  Instead, the Department left the Court with the distinct impression that while there were difficulties in the summer and fall of 1999, progress was now being made towards deploying the land management system.  In addition to mischaracterizing the overall status of TAAMS, the Department also included several patently false and misleading statements in the report about the land management system, including that: (1) TAAMS was operational at the pilot site in Billings, Montana; (2) the land ownership module was implemented at the pilot site in Billings, Montana; (3) the system testing was successful in September and November 1999; (4) the functional approach to implementing TAAMS  was better than the geographical method; and (5) the IV & V contractor felt that there was a reasonable assurance of successfully implementing the land management system.

The First Report and the Revised HLIP also failed to portray accurately the status of the BIA Data Cleanup subproject.  Although the agency was more forthright about the difficulties it was experiencing with this subproject than the TAAMS subproject, Interior still intentionally misled the Court by making it seem that significant progress had been made towards ensuring accurate data in the agency's computer systems.[143]

---

[143]The Court concludes that the false and misleading information contained in this report alone would be sufficient to sustain a finding of fraud on the court and civil contempt.  In fact, the Court finds that each of the first seven quarterly status reports submitted by the Department of Interior constitute a fraud on the court and warrants a finding of civil contempt.  To the extent that all of the reports fall within the ambit of Specification 4, however, the Court will group them

The next six quarterly status reports filed by the Department both perpetuated and in many respects supplemented the false and misleading representations made in the First Report and the Revised HLIP. Because it would be a needless exercise to recount all of the false and misleading representations made in these six reports (particularly since the Court already did so above), the Court will simply note that there is no question that the Department of Interior intentionally failed to provide the Court with a complete and accurate picture of the TAAMS subproject and the BIA Data Cleanup subproject during this time period (February 1, 2000-July 31, 2001). That is, for more than a year after filing the First Report and Revised HLIP the Department of Interior continued to make the Court believe that significant headway was being made towards deploying and implementing TAAMS and completing the BIA Data Cleanup subproject. In reality, the land management system has been and still is at best years away from being fully implemented and the BIA Data Cleanup subproject is still only in the initial stages. Indeed, it is now quite clear that the Department may never be able to implement TAAMS as a fully integrated land management system and that it may be another decade before the agency can state with any amount of certainty that the data maintained in its computer systems is accurate.

The egregious nature of the Department's conduct in this regard is exacerbated by the fact that attorneys in the Solicitor's Office actively participated in the drafting of these false and misleading quarterly status reports. It is abundantly clear that these lawyers played a significant role in the reporting process and that they specifically and consistently tempered the language used in the reports. Although there is no excuse for anyone to engage in this type of misconduct, it is particularly troubling when attorneys, particularly those that work for the federal

together for purposes of this opinion.

-202-

government, do so.  As the Court noted in its ruling after the first contempt trial:

> The federal government here did not just stub its toe.  It abused the rights of the plaintiffs to obtain these trust documents, and it engaged in a shocking pattern of deception of the court.  I have never seen more egregious misconduct by the federal government.  In my own experience, government lawyers always strived to set the example by following the highest ethical standards that were then a model for the rest of the legal profession, and the Justice Department always took the position that its job was not to win an individual case at all costs, but to see that justice was done.  Justice has not been done to these Indian beneficiaries.

Cobell II, 37 F.Supp.2d at 38.  Nothing has changed in the three and a half years since the Court issued that opinion.

In the Eighth Report, which was filed during this contempt trial, the Department of Interior essentially conceded that the prior seven quarterly status reports did not accurately portray the status of either the TAAMS or BIA Data Cleanup subprojects, and that the reporting format the agency selected "exacerbated the ordinary human inclination to report accomplishments and to ignore obstacles, difficulties and problems[.]" Pls.' Ex. 66 at 6.  While the Court appreciates these admissions by Secretary Norton and views the Eighth Report as much more candid than the previous seven reports, it in no way absolves the defendants for intentionally filling seven false and misleading quarterly status reports over a period of a year and a half.

Thus, in accordance with the foregoing analysis, the Court has no trouble finding that the Department of Interior committed a fraud on the Court by filing false and misleading quarterly status reports (beginning in Mach 2000) regarding the TAAMS and BIA Data Cleanup subprojects, Aoude, 892 F.2d at 1118-19; Baltia Air Lines, 98 F.3d at 642-43, and that these defendants are in civil contempt of court for doing so.  Cf. Pendergast, 317 U.S. 412; Williams,

622 F.2d at 838.[144]  There is no question that the false and misleading information contained in these reports affected the Court's ability to adjudicate this matter fairly and that it all but destroyed the plaintiffs' ability to present their case.[145]  Aoude, 892 F.2d at 1118-19.  Moreover, the implication of attorneys in the Solicitor's Office clearly make this misconduct constitute fraud on the court.  Kupferman, 459 F.2d at 1078.  It is almost unfathomable that a federal agency would engage in such a pervasive scheme aimed at defrauding the Court and preventing the plaintiffs from learning the truth about the administration of their trust accounts.  As the Court found above with respect to Specification 3, the pervasiveness and the centrality of the representations made (or not made) by the defendants in this case distinguish it from those cases in which courts found that de mimimus misrepresentations or omissions did not rise to the level of fraud on the court.  The false and misleading nature of these quarterly status reports was intentional and went to the heart of the Department's trust reform efforts.  In light of these

--------

[144]It is also worth noting that the quarterly status reports were filed pursuant to the Court's Order of December 21, 1999.  The Court has no difficulty finding that that order was both clear and that it was reasonably specific.  In particular, the order required defendants to file "quarterly status reports setting forth and explaining the steps that [they] have taken to rectify the breaches of trust declared [by the Court] and to bring themselves into compliance with their statutory trust duties embodied in the" 1994 Act.  Cobell V, 91 F.Supp.2d at 59.  Even the Department of Interior concedes that "an order requiring them to submit periodic reports requires that the reports be truthful."  Defs.' Consolidated Opp'n (November 15, 2001) at 29.  The defendants plainly violated this order by filing reports that were replete with false and misleading representations.  Moreover, the Department did not even address the seven breaches that the agency stipulated to on the eve of the Phase I trial.

[145]Again, even if the Court were to conclude that the actions by the defendants did not formally represent a fraud on the court, it undeniably would still constitute sanctionable litigation misconduct that this Court can redress.  Shepherd, 62 F.3d at 1472.  Moreover, leaving aside for the moment the charged specification, in light of the Department's concessions in the Eighth Report it is abundantly clear that the agency cannot be trusted to provide the Court with timely and complete information regarding the status of its trust reform efforts.  Even this latter finding alone would support most of the relief granted by the Court today.

findings the contempt citation levied by the Court today is clearly appropriate.

**E.   SPECIFICATION 5: MAKING FALSE AND MISLEADING REPRESENTATIONS STARTING IN MARCH 2000, REGARDING COMPUTER SECURITY OF IIM TRUST DATA**

In light of the findings of fact detailed above, the Court has no difficulty concluding that the defendants committed a fraud on the Court by making false and misleading representations starting in March 2000, regarding computer security of IIM trust data.

Beginning in March 2000, the plaintiffs started questioning the manner in which Interior secured the vast quantities of confidential trust information stored in its computer systems. Specifically, the plaintiffs filed several motions between March 2000 and May 2001 in which they argued that the Department of Interior was not taking proper measures to ensure the security of the trust information maintained in the agency's computer systems.  In response to these motions, the Interior Department and its attorneys consistently represented to this Court that while there was a problem with data security, the agency was in the process of making the pertinent computer systems more physically and electronically secure.  One Justice Department lawyer even went so far as to state that the Department was "on the verge" of correcting these problems.  Tr. of March 7, 2000 Hrng. at 31-33.  These representations were patently false, and the Department and its attorneys knew it.  As the Special Master found in his Report on IT Security:

> Interior–in derogation of court order, common-law, and statutory and regulatory directives–has demonstrated a pattern of neglect that has threatened, and continues to threaten, the integrity of trust data upon which Indian beneficiaries depend. Rather than take any remedial action, its senior management has resorted to the condescending refrain that has consistently insinuated itself into the federal

government's relationship with Native Americans, in general, and with IIM holders, in particular. And that is one that requests forbearance and trust on the grounds that reform continues to be the 'highest priority.' It is the view of the Special Master that, in this instance, such trust is not warranted, requests for forbearance should be denied and promises of future compliance should not be credited. The stakes are simply too high. An agency that ignores its own commissioned reports and those generated by other federal agencies; ignores pleas from its own staff for adequate funding; and spends tens of millions of dollars funding computer systems when the integrity of the very data to be loaded on those systems has been open to compromise for so many years, inspires little confidence.

The security of systems housing trust data is no better today than it was ten years ago. The circumstances leading to the Court's alarm 'that BIA had no security plan for the preservation of [trust] data,' . . .speak with compelling application today. The continued lack of trust data security is 'vivid proof' that Interior has 'still failed to make the kind of effort that they are going to be required to ever make trust reform a reality.'

Report on IT Security at 153-54 (internal citations omitted).

There is no question that the defendants, by representing to the Court (and plaintiffs) for more than a year that they were in the process of making their computer systems more secure when in reality they were doing virtually nothing, committed a fraud on this Court, see Aoude, 892 F.2d at 1118-19, and are in civil contempt. Cf. Pendergast, 317 U.S. 412; Williams, 622 F.2d at 838.[146] This is particularly true because of the involvement of several attorneys for the defendants in the fraudulent scheme. Kupferman, 459 F.2d at 1078. By deliberately making these false and misleading representations, the defendants necessarily precluded this Court from fairly and promptly adjudicating this matter and undeniably hindered the plaintiffs' ability to present its case on this critical point. As Judge Robb of the D.C. Circuit wrote (in dissent) in United States v. Brown, 428 F.2d 1100, 1104 (D.C. Cir. 1970), "[d]aily a United States District

---

[146]Even assuming arguendo that the defendants' actions did not constitute a fraud on the court, they clearly amounted to sanctionable litigation misconduct that this Court has the inherent power to redress.

Court proceeds on the assumption, proven reliable by long experience, that representations made in open court by trial counsel as officers of the Court are candid, truthful and may be accepted at face value." The Department of Interior has demonstrated that neither its officials nor its attorneys can be trusted to provide the Court with accurate information regarding the agency's efforts to ensure the security of its computer systems.

In addition to making conclusions of law with respect to Specification 5 proper, at this time the Court will also address the Special Master's contention that a fiduciary duty of the defendants–of which they are currently in breach–is to ensure that the computer systems that house confidential IIM trust data are adequately secured. Report on IT Security at 3-4 ("It is the thesis of this Report that a fundamental component of Interior's duty to monitor and verify trust information 'contained in and processed by the computer systems' necessarily includes an obligation to ensure its integrity."). Although the Court believes that the Special Master construed the defendants' fiduciary obligations in this regard too narrowly, it nonetheless agrees with the fundamental proposition articulated by the Special Master in his Report on IT Security.[147] Specifically, the Court finds that the Department of Interior has the fiduciary obligation to ensure the security of trust information regardless of whether that information is stored on a computer or in a warehouse. Thus, the Court will declare today, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Administrative Procedure Act, 5 U.S.C. §§ 702 & 706, that the Department of Interior is under the duty to ensure that all information

---

[147]It is important to note that the reason why the duty was narrowly construed in the Report on IT Security was because that report only dealt with electronic information. In the Special Master's previously filed reports he made clear that the Department has a similar obligation with respect to paper trust records.

regarding the IIM trust (regardless of whether it is in paper or electronic form) that is necessary to

perform an accurate accounting of all IIM trust funds held in trust by the United States is

properly secured and maintained.  The Court reaches this conclusion for two reasons.  First, the

Court finds that the text of the 1994 Act itself requires the Department to take such action.  The

1994 Act enumerates certain things that the Secretary of Interior must do in order to discharge

properly her fiduciary duties.  These responsibilities include, for example, "determining accurate

account balances[,] providing periodic, timely reconciliations to assure the accuracy of

accounts[,] and accounting for the daily and annual balance of all funds held in trust by the

United States for the benefit of an Indian tribe or individual Indian . . . ."  25 U.S.C. § 162a(d);

25 U.S.C. § 4011.  The Court finds that in order to perform these duties properly the Secretary of

Interior must ensure that the IIM trust information is secure.  To be sure, there is simply no

possible way for the Secretary to provide plaintiffs with, for instance, an accurate accounting if

the data upon which she relies to do so is subject to unauthorized manipulation.  The Court's

finding today is entirely consistent with and is actually a corollary to this Court's ruling in

December 1999.  In that opinion, the Court noted, among other things, that "a fundamental

requirement of defendants' responsibilities in rendering an accurate accounting is retaining the

documents necessary to reach that end[.]"  The Court similarly finds and declares today that the

defendants' accounting responsibilities also includes the duty to ensure the security of the

information upon which that accounting will be based.  The second reason why the Court reaches

this conclusion is that even if the duty to secure IIM trust information does not fall within the

ambit of one of the enumerated obligations in the 1994 Act, in light of the trust law principles

that govern this action it is clearly one of the agency's subsidiary duties.  See generally

Restatement (Second) of Trust §§ 169-185. The 1994 Act explicitly provides that "Secretary's

proper discharge of the trust responsibilities of the United States shall include (but are not limited

to) the following[.]" 25 U.S.C. §162a(d). Thus, it is clear that the statute itself was not meant to

and does not in fact provide an exhaustive list of the Secretary's responsibilities. While it would

not be proper at this time to determine the full extent of her duties, the Court finds that it is

necessary to declare that one of the non-enumerated duties of the Secretary is to ensure the

security of all IIM trust data (whether it be in paper or electronic form) necessary to perform an

accurate accounting.


**F.    DEFENDANTS' ARGUMENTS THAT THE COURT SHOULD EXERCISE ITS
       DISCRETION AND NOT HOLD THEM IN CIVIL CONTEMPT**

Despite the foregoing legal conclusions, the Department of Interior makes several

arguments why this Court should refrain from holding Secretary Norton and Assistant Secretary

McCaleb in civil contempt of court. The Court will address each of these arguments below.

The defendants first argue that "even if the Court views the evidence as sufficient to find

contempt, it should nonetheless decline to do so." Defs.' Proposed Findings at 152. To support

this contention, the defendants cite numerous cases in which the court ultimately declined to hold

a party in contempt. Id. at 152-53. There are two reasons why the Court rejects this argument.

First, while I agree that Courts must be mindful of the impact a contempt citation will have on a

party, it does not stand to reason that once the necessary facts establishing contumacious conduct

are proven the Court should simply decline to hold the wrongdoing party in contempt. To do so

would make the contempt proceedings themselves a complete waste of time, which in this case

would be quite substantial. Second, the extent of defendants' transgressions recounted above are so egregious that the Court has no difficulty concluding that the contempt citations levied today are warranted.

The second argument raised by Interior is that the Court must consider the good faith efforts of the agency to comply with the orders of this Court. Defs.' Proposed Findings at 154. In particular, the defendants argue that the Court should consider the actions taken by Secretary Norton during her tenure in office before finding her in contempt of court. As an initial matter, the Court finds that to the extent the defendants are asserting the defense of good-faith substantial compliance, that particular defense does not help them defend against the five specifications at issue in this contempt trial. The Court's extensive findings of fact provided above demonstrate in great detail numerous actions taken by the Interior defendants that were taken in bad faith. Indeed, four of the five specifications enumerated in the orders to show cause are expressed in terms of fraud on the court. The commission of a fraud on the court almost by definition involves actions that were taken in bad faith. In addition, the Court's findings regarding the other specification, which involved the agency's failure to initiate a historical accounting project, amply demonstrate that the Department failed to take any substantive action for eighteen months after this Court issued its Phase I trial ruling. Such indifference by the defendants hardly constitutes either good faith conduct or substantial compliance with the Court's Order of December 21, 1999. In light of the Court's findings above, the defendants' contention that the Court should consider their "good-faith" efforts would be laughable if it were not so sad and cynical. Moreover, with respect to the specific actions of Secretary Norton, the Court's findings of fact demonstrate that for a significant period of time she was at best

-210-

marginally more responsive than her predecessor to the orders of this Court and her fiduciary

obligations as a trustee-delegate of the United States.  In fact, it is quite clear that she began to

modify her conduct only after the Court Monitor and Special Master began examining the issues

pertinent to the instant opinion, and when her contempt trial became visible on the horizon.

Consistent with the preceding contention, the defendants argue that this Court should not

hold the current Secretary of Interior in contempt of court based on the contumacious conduct of

her predecessor or actions taken during her predecessor's term in office.  Defs.' Proposed

Findings at 157-58.  In other words, Secretary Norton argues that she should not be held in

contempt of court for the misconduct that occurred during Bruce Babbitt's tenure as Secretary of

the Interior.  The Court rejects this contention in its entirety.  As an initial matter, it is important

to remember that both this lawsuit in general and this contempt trial in particular are against the

Secretary of Interior in her official capacity.  That is, this action is not maintained against Gale

Norton as an individual, just as the previous contempt trial was not against Bruce Babbitt in his

individual capacity.  Rather, both trials were against the Secretary of Interior–it did not matter

who actually occupied the office at the time.  In light of this fact, to the extent these contempt

specifications are against the Secretary of Interior in her official capacity only, the caselaw is

clear that "a substituted party steps into the same position of the original party."  See, e.g.,

Alberti v. Klevenhagen, 610 F.Supp. 138, 141-42 (S.D. Tex. 1985) (finding county sheriff in

office for five months in contempt of court based almost exclusively on his predecessor's failure

to comply with an injunction.).  See also Ranson v. Brennan, 437 F.2d 513, 516 (5th Cir. 1971);

Corbin v. Blankenburg, 39 F.3d 650, 654 (6th Cir. 1994).  In this regard, Federal Rule of Civil

Procedure 25(d)(1) explicitly provides that "[w]hen a public officer is a party to an action in an

official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party." While the defendants characterize these propositions of law as "unremarkable," the Court finds them to be dispositive of this issue. Moreover, the Court finds that a contrary rule would not only be inconsistent with the very notion of official capacity, but it would also be incredibly disruptive to litigation against governmental agencies. The cornerstone of suits against government officials in their official capacities is that the action runs against the office, not the individual. As a corollary to that basic premise, one office holder binds his or her successors by the actions taken during the course of the litigation. A contrary rule would make it virtually impossible to conduct litigation against the government because each new office holder could potentially repudiate the actions or representations of their predecessor. Cf. Morales Feliciano v. Rullan, 2002 WL 1477851 at *6 (1st Cir. 2002) (noting that "a government official, sued in his representative capacity, cannot freely repudiate stipulations entered into by his predecessor in office during an earlier stage of the same litigation.").

The defendants further argue that "[a]ny time a request is made by a party in civil litigation to have a Cabinet officer held in contempt, considerations of interbranch comity arise." Defs.' Proposed Findings at 157. To support their position, the defendants cite In Re Attorney General, 956 F.2d 58, 64 (2d Cir. 1979), in which the Second Circuit noted that:

> Although we unequivocally affirm the principle that no person is above the law, . . .we cannot ignore the fact that a contempt sanction imposed on the Attorney General in his official capacity has greater public importance, with separation of powers overtones, and warrants more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant.

In Re Attorney General, 596 F.2d at 64. Thus, defendants contend that holding a Cabinet officer

in contempt "should be a last resort." Id. at 65. As an initial matter, the Court finds that federal

courts have the power to hold executive branch officials, even Cabinet officers, in civil contempt

of court. Cobell II, 37 F.Supp.2d at 37-38 (holding former-Secretary Babbitt in civil contempt of

court); In Re Kessler, 100 F.3d 1015, 1016-18 (D.C. Cir. 1997) (noting that "[c]ontempt orders

have been levied against executive branch officials without even so much as a hint that such

orders offend separation of powers."). The Court further finds that, as a result of the

overwhelming evidence regarding the contumacious conduct by the defendants in this matter, the

Court need not decide whether Secretary Norton, as a Cabinet officer, enjoys greater protection

against a contempt citation than other litigants. But see Int'l Union of Operating Engineers v.

Arthurs, 355 F.Supp. 7, 13 (W.D. Okla. 1973) (finding that "[i]t is far more important for a

government agency to . . . show obedience to the judicial process than it would be in the case of a

private individual."). Even under the most deferential standard, the Court has no difficulty

concluding that the contempt citations levied today are appropriate.[148]

Finally, the defendants argue that "[t]he Court is obliged to consider the prospective

impact of a contempt finding upon the Secretary's ability to carry out the very reforms that all

parties agree are essential to effective trust administration." Defs.' Proposed Findings at 160-61.

During this contempt trial, Deputy Secretary Griles was not quite as diplomatic in the way he

---

[148]The defendants further argue, in this regard, that the Secretary is entitled more
deference than other litigants because this action is brought under the APA. The Court rejects
this contention. First, the D.C. Circuit made clear in February of last year that in this case the
Secretary cannot simply don the mantle of administrator. Rather, the Secretary's actions are
subject to the more stringent standards of a fiduciary. Cobell VI, 240 F.3d at 1099. Second, and
more importantly for purposes of this opinion, the fraud committed by the Interior defendants in
this action, as well as the failure to initiate a historical accounting project, are so egregious that
no amount of deference would support the conclusion that the Secretary and Assistant Secretary
should not be held in civil contempt of court.

articulated this argument.  Specifically, he testified that:

> I also know that from people around the Department who I would
> never -- the inference around the Department is once that [contempt finding]
> was determined, people's efforts kind of -- they went, well, he
> has already done the worst he can do to us; we are going to go
> on and do the other things.
> So I guess if we can find a way to move forward
> together, that is a lot better than the adversarial role, and
> that allows us to do it in a meaningful fashion without -- I
> mean, this Secretary and us, if -- the IIM accountholders and
> the tribal leaders and the people who we have to work with
> have to believe that we are going to do this if you give us a
> chance.  If contempt is issued, I think that is going to put a
> big stigma on us, that, well, this Judge has already said
> they've already been in contempt.

Contempt II Tr. at 4184-85.  The Court rejects this contention put forth by the defendants and

Deputy Secretary Griles.  The Department of Interior cannot engage in the type of despicable

conduct detailed in this opinion and then argue that the Court should nevertheless not hold the

Secretary and Assistant Secretary in civil contempt because it may affect their prospective ability

to discharge their fiduciary obligations.  The plaintiffs' lawsuit in general and this contempt trial

in particular are predicated on the fact that these defendants have not in the past and are not

currently carrying out their fiduciary obligations properly.  The defendants' argument that a

contempt citation would somehow further undermine their ability to discharge their fiduciary

duties correctly is farcical.  The Court has yet to see the Department take any action that would

support its contention in this regard.  Moreover, by finding the defendants in civil contempt today

the Court has not "done the worst" that it can do.  Upon a proper motion and for good cause

shown, the Court has the power to institute additional (civil or criminal) contempt proceedings in

this matter, and, if it appears that the defendants are not performing their fiduciary duties to the

-214-

best of their ability, the Court can always entertain another motion by plaintiffs to appoint a receiver over the IIM trust. Thus, if individuals at the Department of Interior, including Secretary Norton, feel that as a result of this Court's ruling they are unable or unwilling to perform their duties to the best of their ability, then they should leave the Department forthwith or at least be reassigned so that they do not work on matters relating to the IIM trust.

## VI. RELIEF

The most taxing aspect of this case has been and continues to be fashioning appropriate relief for the plaintiffs. Each time it has been confronted with this difficult issue the Court has stuck to its constitutional roots by awarding only that relief which it finds to be absolutely necessary. For example, following the first contempt trial in this action, in which the Court held former-Secretary Babbitt and former-Assistant Secretary Gover in civil contempt of court after the plaintiffs proved by clear and convincing evidence that these defendants disobeyed two discovery orders and successfully covered up their disobedience through semantics and strained, unilateral, self-serving interpretations of their own duties, the Court took the moderate steps of appointing a special master to oversee the discovery process and awarding plaintiffs reasonable expenses and attorneys' fees incurred as a result of defendants' failure to obey the orders. Cobell II, 37 F.Supp.2d at 39. Moreover, in its Order of December 21, 1999, after the plaintiffs proved that the defendants were in breach of the fiduciary obligations that they owe to the class of 300,000 IIM trust beneficiaries, the Court granted the most mild form of relief that it could fashion. Specifically, the Court declared that the defendants were in breach of certain fiduciary duties that they owe to the plaintiffs, and then remanded the matter back to the administrative

agency to bring itself into compliance with those duties as well as the obligations found in the

1994 Act. Cobell V, 91 F.Supp.2d at 58-59. So as not to interfere unduly in the inner workings

of the Interior Department, the Court further ordered the defendants to file quarterly status reports

setting forth and explaining the steps that they have taken to rectify the breaches of trust declared

by the Court and to bring themselves into compliance with their statutory trust duties embodied

in the 1994 Act. Id. at 59. The Court thus explicitly declined at that time to issue a structural

injunction or even to appoint a special master to monitor the defendants' progress towards

bringing themselves into compliance with their trust duties. Id. at 54-55. The Court also rejected

at that time the plaintiffs' request for the appointment of a receiver to manage the IIM trust

accounts. Id. at 52.[149]

---

[149]The manner in which the Court has handled IT security is yet another example of how this Court has not only used great care in fashioning relief for the plaintiffs, but also how the Court has recognized its role in the tripartite framework established in the Constitution. When it became clear in the spring of 2000 that the Department could not move OIRM from Albuquerque to Reston without using third-party contractors, this Court nonetheless denied the plaintiffs' motion for a preliminary injunction. Specifically, the Court stated that:

> [It] cannot enjoin this operation at this time without inflicting
> substantial harm on third parties and, indeed, without harming
> the very beneficiaries of these trust records who will have critical
> payments delayed by the disruption of operations that would
> occur if the preliminary injunction issued.

Tr. of April 4, 2000 Hrng. at 10-13. While the Court eventually ordered the defendants to disconnect their computers from the internet, it did so only after it became abundantly clear in December of 2001 that the Interior Department still, more than a year and a half later, had not secured the confidential trust data stored on its computer systems. Even at that late date, the Court still tried to give the agency every opportunity to avoid injunctive relief. Alas, through its own incompetence and recalcitrance the Department forced the Court into the position of having to harm the very beneficiaries who have brought this lawsuit because the agency left their confidential trust information virtually unprotected from manipulation through the internet. Thus, there is no question that, with respect to IT security, this Court has exhibited both a tremendous amount of patience with the Department of Interior and a great amount of respect for the separation of powers doctrine. In this regard, the Court ultimately denied the plaintiffs' request for further injunctive relief in the form of a preliminary injunction because the defendants

-216-

In light of the Court's extensive findings of fact and conclusions of law provided above, there is no question that the plaintiffs are entitled to relief as a result of the defendants' disgraceful actions. The difficulty in this case, however, lies in fashioning specific relief to award plaintiffs based on the contumacious and sanctionable conduct of the defendants. In making this determination, the Court notes that it is well settled that courts have considerable discretion in imposing coercive and compensatory sanctions to redress contumacious conduct, see, e.g., McComb, 336 U.S. at 193 (noting that "[t]he measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief."), and that judges similarly enjoy such discretion in fashioning relief to redress the commission of a fraud on the court or actions that constitute general litigation misconduct, see Aude, 892 F.2d at 1119; Perkinson, 821 F.2d at 689. See also Chambers, 501 U.S. at 45. The plaintiffs argue that the only appropriate relief is to appoint a receiver over the IIM trust. They contend that the defendants' actions are so inimical to trust reform that the Secretary of Interior should not be permitted to continue to administer the IIM trust. The defendants, on the other hand, contend that the Court should stay the course with respect to the Order of December 21, 1999. In response to plaintiffs' request for the appointment of a receiver, the defendants' arrogantly argue only that such an appointment would be unconstitutional, and this Court therefore lacks the power to grant such relief. That is, the Department of Interior does not argue that the appointment of a receiver is unwarranted; rather, the agency only contends that this Court does not have the authority to issue such an order. As the Court discusses in detail below,

---

offered their own order concerning information technology on December 17, 2001. That order still remains in effect today.

notwithstanding the fact that plaintiffs' request for the appointment of a receiver passes

constitutional muster, the Court will not take such action at this time.  Instead, as it has done

throughout this litigation, the Court will grant only that relief which it views as being necessary

at the moment.  Specifically, the Court will schedule further proceedings to ensure that the

defendants properly discharge their fiduciary obligations, appoint another special master to

monitor the status of trust reform, and award plaintiffs attorneys' fees and expenses.  The Court

notes that much of the relief granted is not dependent on the Court's conclusion that the

defendants committed several frauds on the Court.  Rather, the Court has fashioned much of the

relief granted today (such as future proceedings and the appointment of a special master) simply

because of the current status of trust reform.[150]  That is, irrespective of whether the defendants

perpetrated a fraud on the plaintiffs and this Court, there is no doubt that they have failed to bring

themselves promptly into compliance with the fiduciary duties declared by the Court in

December of 1999 and listed in the 1994 Act.  As such, the Court has no choice but to modify the

future proceedings in this case and to appoint another special master to monitor the status of trust

reform and the defendants' efforts to bring themselves into compliance with the trust obligations

declared by the Court and enumerated in the 1994 Act.  The Court will describe all of this relief

below.


A.      THE APPOINTMENT OF A RECEIVER OVER THE IIM TRUST

        The plaintiffs vigorously argue that the only adequate remedy to redress the defendants'

---

[150]Of course, the Court's legal conclusions detailed above certainly provide further
support for this relief.

egregious misconduct in this case is the appointment of a receiver over the IIM trust.

Specifically, the plaintiffs contend that this Court should "be dissuaded no longer by any further

misrepresentation or pettifoggery and promptly appoint a receiver so that trust reform may finally

commence." Pls.' Consolidated Motion of October 19, 2001 at 64. In response, the defendants

(arrogantly) fail to argue that the appointment of a receiver is not warranted in this case. Rather

the defendants contend only that "[t]he relief Plaintiffs seek is beyond this Court's authority to

provide because the United States Constitution prohibits appointment of a receiver to assume the

trust management and reform duties Congress has conferred on the Secretary [of Interior]."

Defs.' Opposition to Pls.' October 19, 2001 Motion at 1. As the Court explains below, while it

finds that the appointment of a receiver in this case would be consistent with both the 1994 Act

and the United States Constitution, the Court will refrain from granting such relief at this time.

Instead, the Court has determined that the more sound approach is to schedule and conduct

further proceedings to determine what additional relief (other than a receiver) is warranted with

respect to the fixing the system portion of the case, and approve an approach to conducting a

historical accounting of the IIM trust accounts. The Court will discuss these future proceedings

and what they will entail in the next section of this opinion.

> a)    Courts' Equitable Power to Appoint a Receiver

It is well settled that courts can take broad remedial action pursuant to their equitable

powers to compel compliance with an order. Dixon v. Barry, 967 F.Supp 535, 550 (D.D.C.

1997) (Robinson, J.). One option available to courts in this regard is the appointment of a

receiver. Morgan v. McDonough, 540 F.2d 527, 533 (1st Cir. 1976) (noting, in a school

desegregation case, that when "[t]he more usual remedies, contempt proceedings and further

injunctions were plainly not very promising, as they invited further confrontation and delay; and when the usual remedies are inadequate, a court of equity is justified, particularly in aid of an outstanding injunction, in turning to less common ones, such as a receiver, to get the job done."). As the First Circuit observed long ago, "receiverships are and have for years been a familiar equitable mechanism." Id.

Specifically, in the context of trusts, "there is a long history of equitable supervision of trusts and trustees by courts, which, at the behest of beneficiaries, routinely compel trustees to perform duties, enjoin breaches of trust, compel redress of breaches of trust, remove faithless trustees, and appoint receivers to administer trust property." First Fiduciary Corp. v. Commissioner of Banks, 43 Mass. App. Ct. 457, 459 n.2 (Mass. Ct. App. 1997). See also Morrison v. Doyle, 582 N.W. 2d 237, 243 (Minn. 1998) (noting that "[t]he beneficiary of a trust may maintain a suit . . . to appoint a receiver to take possession of the trust property and administer the trust[.]"); Carstens v. Nat'l Bank & Trust Co., 461 N.W.2d 331, 333 (Iowa 1990) (same); Boyce v. Wendt, 9 N.W.2d 531, 533-35 (Mich. 1943) (same). Indeed, the Restatement of Trusts (Second) explicitly provides that one equitable remedy available to a beneficiary is the appointment "of a receiver to take possession of the trust property and administer the trust." Restatement (Second) Trusts § 199. See also Beckett v. Air Line Pilots Association, 995 F.2d 280, 286 (D.C. Cir. 1993) (citing approvingly Restatement § 199 for the proposition that "it is equally fundamental that the beneficiary of a trust may maintain a suit to compel the trustee to perform his duties as trustee or to redress a breach of trust."). Numerous commentators have also recognized that the appointment of a receiver over a trust is one option available to a court if it appears necessary to protect the trust property. See, e.g., Scott on Trusts (Volume III) at § 199.4

(1967); Bogert, Trusts & Trustees at § 861 (1995). It is worth noting that these same

commentators (and courts) have found that "[o]rdinarily, of course, if the trustee is not properly

administering the trust he will be removed as trustee." Scott on Trusts (Volume III) at § 199.4.

Moreover, federal courts have repeatedly held that separation of powers concerns do not

inhibit their ability to appoint a receiver over a state agency or official. Morgan, 540 F.2d at 533-

34. Stated differently, the case law is clear that federal courts "are empowered to appoint

receivers to take over state or local institutions . . . if necessary to enforce a court order." Emma

C. v. Eastin, 2001 WL 1180636 at *16 (N.D. Cal. 2001). To be sure, federal courts have used

receivers to make state and local public officials comply with legal mandates in a number of

factual settings, including public schools, see Morgan, 540 F.2d at 533-34; prisons, see Shaw v.

Allen, 771 F. Supp. 760, 763-64 (S.D. W.Va. 1990); mental health facilities, see Dixon, 967

F.Supp at 550;[151] water treatment plants, see United States v. Detroit, 476 F.Supp. 512 (E.D.

Mich. 1979); and child welfare centers, see LaShawn v. Kelly, 887 F.Supp.297, 315 (D.D.C.

1995) (Hogan, J.).

Similarly, state courts have appointed receivers over their executive counterparts to

compel compliance with court orders. See, e.g., Judge Rotenberg Educ. Center, 424 Mass. 430,

465-66 (Mass. 1997) (noting that "[w]hen necessary, the role of the judicial branch in civil cases

is to provide remedies for violations of the law, including violations committed by the executive

branch."). Like federal courts, state courts have appointed receivers in a wide variety of settings,

including prisons, see Crain v. Bordenkircher, 376 S.E.2d 140, 143 (W. Va. 1988); housing

---

[151]It appears that Judge Hogan and Judge Robinson considered their cases like the state
cases cited above, as opposed to involving the appointment of a receiver over a federal agency or
official.

developments, see Perez v. Boston Housing Authority, 400 N.E.2d 1231, 1250-52 (Mass. 1980);

juvenile treatment centers, see District of Columbia v. Jerry M., 738 A.2d 1206, 1213-14 (D.C.

Ct. of App. 1999); and mental health facilities, see Judge Rotenberg, 677 N.E.2d at 149-50.

> b)   The 1994 Act Does Not Prevent the Court from Appointing a Receiver

Before addressing the constitutional arguments raised by the defendants the Court must

determine whether the 1994 Act itself precludes the appointment of a receiver over the IIM trust.

To the extent that the 1994 Act provides the primary basis for plaintiffs' claims in this action, the

Court has to consider if that statute prohibits the remedy of receivership. After carefully

reviewing the 1994 Act, the Court finds that the statute does not prevent it from appointing a

receiver over the IIM trust so long as the appointment is otherwise justified. The Court reaches

this conclusion for several reasons.

First, the text of the 1994 Act itself does not limit this Court's ability to grant relief to the

plaintiffs. The Court's inquiry begins, as it must, with the text of the applicable statute. Cf.

Duncan v. Walker, 121 S.Ct. 2120, 2124 (2001); Southern California Edison Co. v. FERC, 116

F.3d 507, 511 (D.C. Cir. 1997); Natural Resources Defense Counsel v. Browner, 57 F.3d 1122,

1125 (D.C. Cir. 1995). In this case, the 1994 Act provides that the "Secretary [of the Interior]

shall account for the daily and annual balance of all funds held in trust by the United States for

the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to

the Act of June 24, 1938[.]" 25 U.S.C. § 4011. The statute further states that "[t]he Secretary's

proper discharge of the trust responsibilities of the United States shall include" among other

things "[p]roviding adequate systems for accounting" and "[d]etermining accurate cash balances.

25 U.S.C. § 162a(d). Thus, as the Court observed in its Phase I trial ruling, the 1994 Act

"recognized and codified the trust duties of the Secretary of the Interior, as the primary trustee-delegate of the United States, toward the IIM trust." Cobell V, 91 F.Supp.2d at 13. The text of the statute does not, however, indicate whether a court may appoint a receiver as a result of the Secretary's failure to discharge properly her fiduciary obligations enumerated in the statute. In fact, while the statute plainly names the Secretary of Interior as the primary trustee-delegate for the United States, it clearly does not limit in any way the relief that a court may grant as a result of violations of the statute by the Secretary. It would be a perverse reading of the 1994 Act to say the least for the Court to find that the Secretary is insulated from having a receiver appointed by the same statutory provisions that she is charged with violating.

Second, the legislative history of the 1994 Act supports the Court granting relief that will ensure that the fiduciary obligations of the United States are properly discharged. As this Court noted in its Phase I trial ruling:

> By the mid-1980s there was uniform disapproval of the manner in which Interior was administering the IIM trust. In 1988, Congress began to hold oversight hearings related to the handling of government trust accounts. On April 22, 1992, the House Committee on Government Operations issued a report entitled Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund, H.R. No. 102-499 (1992) (Pls.' Ex. 1). This thoroughly documented report concluded that Interior had made no credible effort to address the problems in trust administration in a "wide range of areas" and that Interior had disobeyed many congressional directives aimed at forcing Interior to correct trust management practices and reconcile the Indian trust accounts. Pls.' Ex. 1. . . .Based largely on the findings made in Misplaced Trust, Congress passed the Indian Trust Fund Management Reform Act. See Pub.L. No. 103-412 (1994) (Pls.' Ex. 1).

Cobell V, 91 F.Supp.2d at 12. Thus, Congress enacted the 1994 Act in large part because the Secretary of Interior was not properly discharging her fiduciary duties to the IIM beneficiaries. Indeed, the D.C. Circuit explicitly found that the 1994 Act was "a remedial statute designed to

ensure more diligent fulfillment of the government's obligations." Cobell VI, 240 F.3d at 1098.

See also Cobell V, 91 F.Supp.2d at 47 ("Again, the entire purpose of the Act, passed five years

ago, was to force Interior to take these types of basic trust-fund management actions. The [1994

Act] was Congress's judgment that Interior's actions had been unreasonably delayed."). In light

of this purpose, the Court finds that–to the extent any ambiguity exists–it is unreasonable to read

the 1994 Act as a limitation of the Court's ability to appoint a receiver over the IIM trust.

Third, the Court finds that the 1994 Act does not limit this Court's power to appoint a

receiver over the IIM trust because it is well settled that "if a right of action exists to enforce a

federal right and Congress is silent on the question of remedies, a federal court may order any

appropriate relief." Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 69 (1992). See

also Cobell VI, 240 F.3d at 1108. The plaintiffs in this case undeniably have a right of action to

enforce a federal right as both this Court and the Court of Appeals have held. Cobell V, 91

F.Supp.2d at 59-60; Cobell VI, 240 F.3d at 1110. Moreover, the D.C. Circuit has explicitly

found (in this case) that "courts are presumed to possess the full range of remedial powers–legal

as well as equitable–unless Congress has expressly restricted their exercise. Cobell VI, 240 F.3d

at 1108 (citing Crocker v. Piedmont Aviation, Inc., 49 F.3d 735, 749 (D.C. Cir. 1995).

Therefore, while the plaintiffs still must show that the appointment of a receiver does not violate

the Constitution, as a threshold matter the 1994 Act does not inhibit their ability to obtain such

relief.

Fourth, and finally, even assuming that the 1994 Act is ambiguous on this point, the

Court should interpret the act to permit such relief that is otherwise available because the statute

must be "construed liberally in favor of the Indians, with ambiguous provisions interpreted to

-224-

their benefit." Cobell VI, 240 F.3d at 1101. The fact that this governing canon of construction arises "from principles of equitable obligations and normative rules of behavior, applicable to the trust relationship between the United States and Native American people[,]" further supports this interpretation of the 1994 Act. Albuquerque Indian Rights v. Lujan, 930 F.2d 49, 59 (D.C. Cir. 1991). See also County of Oneida v. Oneida Indian Nation of New York State, 470 U.S. 226, 247-48 (1985) (finding that ambiguities that should be resolved in favor of Indian claims.").

    c)    <u>The Constitution Does Not Bar the Appointment of a Receiver in this Case</u>

The cases cited above in Section VI.A(1) amply demonstrate that this Court, as a general matter, possesses broad equitable power to ensure compliance with its orders. The extent to which the Court can exercise this power in the instant case has specifically been examined by both this Court and the Court of Appeals. In June of 1999, this Court observed that, "[c]ontrary to defendants' position, Congress has subjected defendants to the full range of relief that plaintiffs seek, in terms of sovereign immunity." Cobell III, 52 F.Supp.2d at 20. The defendants maintained that plaintiffs were not entitled to common law remedies such as injunctive and declaratory relief because such an allowance would essentially be creating a new body of federal common law. Id. at 24. The Court explicitly rejected the defendants' contention in this regard, finding that:

> Neither logic nor the case law supports defendants' position; to the contrary, both point toward the availability of these remedies. . . .With the exception of the removal of the government as trustee, plaintiffs are entitled to seek standard common law remedies for breach of their IIM trust rights.

Id. On appeal, the D.C. Circuit explained in more detail the scope of this Court's equitable power in this case. In particular, the D.C. Circuit found that:

-225-

the district court has substantial ability to order that relief which is necessary to cure [defendants'] legal transgressions:

> The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. . .

Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies. Because the agencies involved delayed performance of their legal obligations, the court was justified in fashioning equitable relief that would ensure the vindication of plaintiffs' rights. <u>That this case involves decades-old Indian trust funds rather than segregated schools does not change the nature of the court's remedial powers.</u>

<u>Cobell VI</u>, 240 F.3d at 1108 (emphasis added) (citations omitted).

Despite the clear import of this Court's and the Court of Appeals' findings, the defendants nonetheless maintain that the appointment of a receiver over the IIM trust is unconstitutional. Specifically, the defendants maintain that such relief would "contravene the Appointments Clause, general principles of separation of powers, and Articles I, II, and III of the Constitution, and would be limited by the Appropriations Clause." Defs.' Opposition at 2. The Court will address each of these contentions in turn.

1.    <u>Appointments Clause</u>

The defendants contend that appointing a receiver over the IIM trust would violate the Appointments Clause of the Constitution. The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" all principal officers of the United States. U.S. Const. art. II § 2, cl.2. The defendants make several different contentions in this regard, each of which will be addressed by the Court.

First, the defendants maintain that by appointing a receiver over the IIM trust the Court would be usurping the power of the President to appoint all principal officers of the United States. Defs.' Opposition at 3. The defendants assert that the receiver would be a principal officer because the duties he would perform (exercising authority over the IIM trust) "are those of a principal officer–the secretary of Interior–appointed by the President with the advice and consent of the Senate." Id. The Court finds that while the defendants are correct that the Secretary of Interior is a principal officer, see Edmond v. United States, 520 U.S. 651, 663-64 (1997), they are wrong to assume that by discharging some of the responsibilities currently assigned to the Secretary the court-appointed receiver would be transformed into a principal officer. To the contrary, it is well established that court-appointed receivers are inferior officers of the United States. See, e.g., Atlantic Trust Company v. Chapman, 208 U.S. 360, 370-72 (1908). The reason is that "[g]enerally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers[;] that is, "inferior officers are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination." Edmond, 520 U.S. at 662-63. In the instant case, the receiver would be under the direction of a United States District Judge, who was appointed by Presidential nomination and is a principal officer of the United States.[152] Edmond, 520 U.S. at 667 (Souter, J., concurring) (finding that "United States district judges cannot be inferior officers"); In re Sealed Case, 838 F.2d 476, 483 (D.C. Cir. 1988) (stating that "lower federal judges" are

---

[152]It is also well recognized that the tenure of court-appointed receivers last no longer than necessary, and that their powers are sharply delimited and circumscribed by the appointment order itself. These facts further support the "inferior officer" status of court-appointed receivers. Edmond, 520 U.S. at 661.

"according to our reading of the clause" principal officers.), rev'd sub nom. Morrison v. Olson,
487 U.S. 654 (1988). Even the defendants state in a different section of their opposition that "[a]
court-appointed receiver is 'an officer of the court' and has no powers except such as are
conferred upon him by the order of his appointment." Defs.' Opposition at 11 (citing Booth v.
Clark, 58 U.S. (17 How.) 322, 331 (1854). Thus, to the extent defendants argue that the court-
appointed receiver would be a principal officer, they are wrong.

Second, defendants maintain that if the court-appointed receiver is an inferior officer,
then the Court lacks the power to make such an appointment because Congress has not vested the
Court with such authority. Defs.' Opposition at 5 (referring to the portion of the Appointments
Clause that provides that "Congress may by Law vest the Appointment of such inferior Officers,
as they think proper, in the President alone, in the Courts of Law, or in the Heads of
Departments."). The defendants' argument in this regard is misplaced. The numerous cases
cited above demonstrate that federal district courts are vested with the power to appoint a
receiver to ensure compliance with its orders. See, e.g., Morgan, 540 F.2d at 533 (noting that
"receiverships are and have been for years a familiar equitable mechanism."). The Supreme
Court itself has recognized that "courts have long participated in the appointment of court
officials such as United States commissioners or magistrates." Morrison, 487 U.S. at 679 n16.
Furthermore, in addition to its inherent equitable powers (which the act creating the Court in the
first instance conferred upon it), the All Writs Act provides this Court with the power to "issue
all writs necessary or appropriate in aid of [its] respective jurisdiction[] and agreeable to the
usages and principles of law." 28 U.S.C. § 1651(a). As such, this Court has the equitable power
to ensure that its orders are complied with by appointing a receiver over the IIM trust. Dixon v.

Barry, 967 F.Supp. at 550 (noting that "it is abundantly clear that a court may appoint a receiver to force public officials to comply with court orders."); Cobell VI, 240 F.3d at 1108 (stating that "courts are presumed to possess the full range of remedial powers–legal and equitable–unless Congress has expressly restricted their exercise.").

The final argument raised by the defendants is that "Congress could not authorize appointment of a receiver in this case" because it would be "incongruous with the judicial power." Defs.' Opposition at 6. That is, even if Congress wanted to permit this Court to appoint a receiver, it did not have the power to do so since administering trusts are not within the purview of judicial duties. Because this contention closely fits into the defendants' general separation of powers argument which the Court addresses in the next section, it is sufficient for the Court simply to note at this point that all of the cases cited above involving prisons, schools, mental hospitals, water treatment plants, and child welfare centers belie defendants' position in this regard. Defendants fail to appreciate that courts appoint receivers over public (and private) institutions to remedy illegal conduct. Morgan, 540 F.2d at 533. Such action clearly falls within the ambit of courts' everyday duty to decide cases and controversies.

2.      General Separation of Powers Principles

The heart of the defendants' constitutional claim is that the "appointment of a receiver would contravene the separation of powers doctrine by permitting the court to intrude on functions entrusted to the other branches of the federal government." Defs.' Opposition at 7. The Court will address and reject in turn each of the arguments the defendants present to support this contention.

First, the defendants argue that the separation of powers doctrine seeks to prevent the

aggrandizement of power in any one of the three branches of government. Defs.' Opposition at

7. They make the fallacious contention that the Court would be placing itself over the executive

branch in contravention of the separation of powers doctrine if it chooses to appoint a receiver

over the IIM trust.  In making this argument, the defendants completely fail to comprehend the

reason why courts appoint receivers over public institutions.  Courts do not appoint receivers

over executive agencies or officials to usurp the power of the executive branch.  To the contrary,

receiverships are only imposed as equitable relief after a particular executive official has

demonstrated that she will not comply with the less intrusive remedies already granted by the

court.  Morgan, 540 F.2d at 533 (stating that the appointment of a receiver is permissible when

more usual remedies, such as contempt proceedings or further injunctions are likely to cause

further delay and confrontation.); Shaw v. Allen, 771 F.Supp. at 763 (finding that "where the

actions or omissions of elected public officials, whether representatives of federal, state, or local

government impermissibly impinge on the constitutionally protected rights of individuals,

including prisoners, federal courts as interpreters of the Constitution must act to stop such

infringement."); Newman, 466 F.Supp. at 635 (finding that "[w]hen the usual remedies are

inadequate, a court is justified in resorting to a receivership[.]").  Thus, courts' power to appoint

a receiver over public institutions is an important structural safeguard in our tripartite

constitutional system of government because it prevents the executive branch from placing itself

over the judiciary and the legislature.  Id.  This case is a perfect example of such a scenario.

After more than a century of mismanagement, Congress enacted the 1994 Act "to ensure more

diligent fulfillment of the government's obligations."  Cobell VI, 240 F.3d at 1098.  Five years

later, after the Interior defendants continued to breach their fiduciary obligations, this Court

declared that the agency was not properly discharging its duties towards the 300,000 IIM

beneficiaries, and remanded the matter back to the agency so that it could promptly correct the

breaches and bring itself into compliance with the 1994 Act. Cobell V, 91 F.Supp.2d at 59. The

Secretary and Assistant Secretary of Interior did virtually nothing worthwhile. The intransigence

exhibited by the defendants in the face of a clear legislative mandate and court order amply

demonstrate that the Secretary of Interior and Assistant Secretary have placed themselves, as

executive branch officials, above both Congress and this Court. Under such circumstances, "[i]t

would seriously erode our system of separation of powers if the executive branch was effectively

immune from the judicial power. The federal courts must have the inherent authority to enforce

executive branch compliance with judicial orders[.]" McBride v. Coleman, 955 F.2d 571, 582-83

(8th Cir. 1992) (Lay, C.J., dissenting). Thus, courts have recognized in numerous factual settings

that they possess the power to appoint a receiver if necessary to curb illegal conduct by executive

branch officials that continues after the court has ordered it to cease. Cf. Cobell VI, 240 F.3d at

1108 (noting that "[o]nce a right and a violation have been shown, the scope of a district court's

equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent

equitable remedies.").[153]

        The second argument raised by the defendants is that the appointment of a receiver would

be inconsistent with the Court's Article III power, which is limited to deciding cases and

controversies. Defs.' Opposition at 9. As a corollary to this argument, the defendants argue that

---

[153]The defendants also make the unremarkable contention that this Court cannot exercise
equitable power in contravention of the Constitution. The better formulation of this argument is
that this Court's equitable power is limited by the Constitution. The problem for the defendants
is that the appointment of a receiver in this case would not contravene any provision of the
Constitution.

it is the Executive branch's constitutionally prescribed responsibility to ensure that the laws are faithfully executed, and the Court cannot interfere with the exercise of that responsibility.  Id. Once again, the defendants have misconstrued and misunderstood what courts do when they appoint a receiver in a particular case.  A necessary component of this Court's jurisdiction is the ability to determine what relief to grant if the plaintiff prevails in the action.  The Court undertakes this responsibility on a daily basis without even the slightest hint that it does so in contravention to Article III.  In this case, after the plaintiffs proved that the defendants were in breach of the fiduciary duties that they owe to the IIM beneficiaries, the Court found that the appropriate relief was a declaratory judgment.  A later determination by this Court that more intrusive relief is necessary, whether it be in the form of an injunction or the appointment of a receiver, would not change the basic action taken by the Court.  That is, the Court would still only be deciding, as it does in numerous other cases pending before it, what relief is necessary to remedy illegal conduct by the defendant.  Thus, the decision by a court to appoint a receiver, though more intrusive than a declaratory judgment, is still only a matter of what relief to grant in a particular case.  To be sure, all of the cases cited above in which federal district courts appointed a receiver over a state agency demonstrate that courts can, consistent with Article III, grant such relief.  In terms of the Court's power to take such action in this case, the D.C. Circuit has already concluded that the fact that "this case involves decades-old Indian trust funds rather than segregated schools does not change the nature of the court's remedial power."  Cobell, 240 F.3d at 1108.

Having placed into context what courts do when they appoint a receiver, it is clear that the defendants' Article II argument similarly must fail.  By appointing a receiver, the Court

would not be usurping the executive branch's authority and responsibility to ensure that the laws are faithfully executed. Rather, the Court would simply be granting the relief necessary to cure the defendants' continuing breach of its fiduciary obligations towards the IIM beneficiaries. As the Seventh Circuit observed in a similar context: "the fact that it is a federal agency or officer charged with an act of racial discrimination does not alter the pertinent standards, since it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government. Gautreaux v. Romney, 448 F.2d 731, 738 (7th Cir. 1971). See also Bolling v. Sharpe, 347 U.S. 497, 498-99 (1954). Thus, if the Court were to accept the defendants' self-serving interpretation of Article II, it would mean that federal courts could not appoint a receiver over, for example, a federal prison that was operated in violation of the Eighth Amendment, or the schools in the District of Columbia since the Supreme Court has held that the Fifth Amendment (as opposed to the Fourteenth Amendment) applies to those institutions. I do not believe that either the Constitution or the applicable case law supports such an interpretation of Article II.

The third separation of powers argument raised by the defendants is that, in accordance with the Supreme Court's decisions in cases such as Morrison v. Olson, 487 U.S. 654 (1988) and Mistretta v. United States, 488 U.S. 361 (1989), the Court cannot consistent with Article III manage the IIM trust itself. Defs. Opposition at 9-12. As the Court noted above, this argument by the defendants misconstrues what courts do in general when they appoint receivers and what this Court would be doing in particular if it decides to appoint a receiver over the IIM trust. Determining what relief to grant in a particular case falls squarely within the purview of this Court's Article III duties. Whether the decision entails granting monetary or injunctive relief, or

the appointment of a receiver, for purposes of Article III the basis of the Court's power and

exercise of that power is the same. Cobell VI, 240 F.3d at 1108 ("Once a right and a violation

have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad,

for breadth and flexibility are inherent in equitable remedies."). As the First Circuit held in

Morgan, "[t]o be sure, direct judicial intervention in the operation of a school system is not to be

welcomed, and it should not be continued longer than necessary. But if in extraordinary

circumstances it is the only reasonable alternative to noncompliance with a court's plan of

desegregation, it may, with appropriate restraint, be ordered." Morgan, 540 F.2d at 533. See also

Newman, 486 F.Supp. at 635 ("When the usual remedies are inadequate, a court is justified in

resorting to a receivership[.]"). Indeed, to accept defendants' contention in this regard would

require this Court to disregard all of the cases previously cited where federal courts appointed a

receiver. The Court declines to do so because the defendants' contention is plainly erroneous.

 The fourth argument put forth by defendants is that "a receiver would be controlled by the

Court and accountable only to the Court, stripping the President of the power to remove an

executive official[.]" Defs.' Opposition at 13. Yet again, the defendants' strained interpretations

of the Constitution and the corresponding case law can not be accepted by this Court. A court-

appointed receiver is an officer of the Court, not the executive branch. As such, all of the cases

cited by defendants in this section of their brief are wholly inapplicable to the appointment of a

receiver in the instant matter. Even if the Court appointed a receiver over the IIM trust, the

President would still maintain the power to remove any official within the Department of

Interior, including Secretary Norton herself, that he so desired.

 Moreover, the Court finds that the cases cited by defendants where certain duties were

placed outside the President's immediate control, such as <u>Printz v. United States</u>, 521 U.S. 898 (1997), are distinguishable from the situation presented in this case, where a court would appoint a receiver as relief for the Secretary's continuing failure to discharge properly her fiduciary obligations. In the cases cited by defendants, courts have held that "the insistence of the Framers upon unity in the Federal Executive . . would be shattered, and the power of the President would be subject to reduction, if Congress could act as effectively without the President as with him, by simply requiring state officers to execute its laws. <u>Printz</u>, 521 U.S. at 922-23. Unlike those cases, courts only appoint a receiver after the relevant executive official refuses to comply with the orders of the court and correct the illegal condition that required relief in the first instance. That is, courts do not appoint receivers because they wish to take control of the functions normally performed by the executive branch; rather, courts take such action because the executive official has in effect declined to do so herself.

Consistent with their fourth argument, the defendants' fifth contention is that the appointment of a receiver over the IIM trust would be unconstitutional because Congress has already made the Secretary of Interior the trustee-delegate for the United States. Initially, the Court notes that this argument is really a statutory rather than constitutional question. As the Court found above, the 1994 Act (and the other applicable statutes) do not inhibit this Court's authority to appoint a receiver over the IIM trust. Indeed, the statutory sections that the defendants cite are the very provisions that the Secretary was found to be in breach of during the Phase I trial, and are the same provisions of which she is still not in compliance. The fact that Congress codified the Secretary of Interior's status as trustee-delegate for the United States is by itself irrelevant. That is, by appointing a receiver, the Court would in no way be acting in

-235-

contravention to the 1994 Act or the views expressed by Congress in that statute. Indeed, in

virtually every case in which a receiver is appointed an executive branch official was originally

tasked with carrying out the duties performed by the receiver. The appointment of a receiver

only becomes necessary when that executive official fails to act in accordance with that statute

and the governing law. Thus, for these reasons and those provided in the preceding section, the

Court rejects this argument by the defendants.

      The sixth argument raised by defendants is that there is no difference between removing

the United States as trustee and appointing a receiver to administer the IIM trust, and as such the

Court cannot do either. The Court rejects this position by the defendants because there is a

significant difference between these two remedies. Initially, it is worth noting that the difference

between appointing a receiver and removing the trustee is well recognized in the case law, and by

commentators. See, e.g., Restatement (Second) Trusts at § 199. More importantly, this Court

recognized back in June of 1999 that while it probably could not remove the United States as the

trustee, the other remedies ordinarily available to beneficiaries–including the appointment of a

receiver–are available to the plaintiffs in this case. Cobell III, 52 F.Supp.2d at 24-25, 28 n.17.

While the Court will not describe all of the differences between the two remedies, it will note

that the primary difference between removing a trustee (or trustee-delegate) and appointing a

receiver is that a receivership lasts only so long as is necessary to ensure that the trust is being

administered properly, while the removal of the trustee or trustee-delegate is permanent.

Restatement (Second) Trusts at § 199, Comment d ("The receivership will be terminated by the

court when it is determined by the court that the trustee [or trustee-delegate] may properly

continue as trustee[.]"); Comment e ("[I]f the trustee who is removed is one of several trustees,

the remaining trustees may be permitted to administer the trust or the court may appoint a new trustee."). Thus, appointing a receiver in this case would not entail removing the Secretary of Interior as the trustee-delegate for the United States.

The final argument raised by the defendants is that the cases where a federal (or state) court appointed a receiver over a state agency are not applicable to the instant matter. The Court disagrees. These cases provide an important starting point for assessing this Court's power under Article III, and its equitable power to remedy illegal conduct by defendants. To the extent that the Court's power must be evaluated in light of the fact that the defendants in this action are federal rather than state officials, the Court has done so. There is nothing in either the Constitution or the corresponding case law that prevents the Court from granting such relief.

### 3.   Appropriations Clause

The final constitutional argument presented by the defendants is that the "appointment of a receiver would violate the Appropriations Clause to the extent that the receivership would require expenditures from the Treasury." Defs.' Opposition at 18. The defendants' argument on this point is sorely misplaced. Initially, the Court notes that it has already determined that "claims of lack of funding cannot be allowed to legally impair the United States' trustee-delegates' exacting fiduciary duties toward management of this trust." Cobell V, 91 F. Supp.2d at 48. Thus, the United States must allocate sufficient funds to enable it to administer the IIM trust properly. Loudner v. United States, 108 F.3d 896, 903 n. 7 (8th Cir. 1997) (finding that "the government may not avoid its trust duties on the grounds that the budget and staff of the Department of Interior are inadequate."). In terms of the defendants' actual claim that the appointment of a receiver itself would violate the Appropriations Clause, they are incorrect.

-237-

Nothing in such an order would contravene that provision of the Constitution. An order appointing a receiver would not be "order[ing] the obligation of funds for which there is no appropriation." Rochester Pure Waters Dist. v. EPA, 960 F.2d 180, 184 (D.C. Cir. 1992). Furthermore, Congress has in the past and continues to fund the government's efforts to administer the IIM trust. Thus, an order from this Court appointing a receiver would not encroach in any way on Congress' power regarding how much money to allocate to the administration of the IIM trust. Moreover, even if the Court were to assume that the appointment order itself would require the expenditure of funds, the Court finds that this relief is analogous to the relief discussed in cases like Edelman v. Jordan, 415 U.S. 651 (1974), where prospective remedies in the form of an injunction are awarded notwithstanding the fact that compliance with the injunction requires a state to expend funds. In this case, the appointment of a receiver would be prospective equitable relief granted by the Court to ensure that the United States discharges its fiduciary obligations properly.

      d)     The Court Declines to Appoint a Receiver at his Time

Having found that the appointment of a receiver is constitutionally permissible, the Court must now undertake the difficult task of deciding whether to grant such relief at this time. Courts have generally recognized that the appointment of a receiver should be the remedy of last resort. See, e.g., Bracco, 462 F.Supp. at 456 (finding that "a receiver should not be appointed if a less drastic remedy exists."). As a result, the most important factor for a court to consider when deciding whether to appoint a receiver is if an alternative remedy appears likely to be successful. Dixon v. Barry, 967 F.Supp. at 550. Thus, for example, in affirming a district court's decision to appoint a receiver over a public high school, the First Circuit observed in Morgan that:

> The more usual remedies contempt proceedings and further injunctions were plainly not very promising, as they invited further confrontation and delay; and when the usual remedies are inadequate, a court of equity is justified, particularly in aid of an outstanding injunction, in turning to less common ones, such as a receivership, to get the job done.

Morgan, 540 F.2d at 533.  See also Newman, 466 F.Supp. at 634 (appointing a receiver after determining that "[f]urther injunctions or contempt proceedings will not accomplish the task of compliance; such remedies promise only confrontation and delay.  When the usual remedies are inadequate, a court is justified in resorting to a receivership, particularly when it acts in aid of an outstanding injunction.").

After carefully examining the extensive record in this case (which is replete with instances of misconduct by the defendants), the Court has decided not to appoint a receiver at this juncture.  Instead, the Court has determined that it will grant further injunctive relief[154] to make

---

[154]Specifically, the Court plans on entering a structural injunction in this case.  Structural injunctions are somewhat different than ordinary injunctions, "in that their goal is not merely to halt a single wrongful practice, but to halt a group of wrongful practices by restructuring a social institution such as a mental hospital, school, or prison."  See Dobbs, Law of Remedies (2nd Edition) at § 7.4(4).  While most of the cases in which structural injunctions have been entered involve constitutional claims, see, e.g., Hutto v. Finney, 437 U.S. 678 (1978) (8th & 14th Amendments), the Court finds that such an injunction is nevertheless both permissible and warranted in this case.  This is not an ordinary case of government delay or the failure of the government to abide by its legal obligations.  Rather, in this case, the United States government is charged with the most exacting fiduciary duties towards the 300,000 individual Indian beneficiaries that comprise the plaintiffs' class.  The Department of Interior, as the trustee-delegate for the United States, has utterly failed to manage this trust properly.  The Court must enter injunctive relief that will fully redress these pervasive and longstanding problems so that the agency can finally, after more than a century, discharge its fiduciary obligations properly.  Moreover, the D.C. Circuit has explicitly found that this court's equitable power is as extensive in this case as in cases challenging unconstitutional conduct.  In particular, the D.C. Circuit stated in February of last year "[t]hat this case involves decades-old Indian trust funds, rather than segregated schools does not change the nature of the court's remedial powers."  Cobell VI, 240 F.3d at 1108.  Accordingly, even though the Court has decided not to use the full extent of those powers by appointing a receiver, it will enter further injunctive relief.

the defendants correct the breaches of trust declared by the Court and stipulated to by the

defendants back in 1999. The Court has thus chosen to stay its hand for the last time so that it

can see whether the defendants, after six years and two contempt citations, can finally comply

with the orders of this Court and begin to discharge their fiduciary obligations properly.


**B.      FUTURE PROCEEDINGS–PHASE 1.5 TRIAL**

It is now abundantly clear that the Phase II trial envisioned and described by the Court in

the Memorandum Opinion issued on December 21, 1999, will not occur anytime in the

foreseeable future. Cobell V, 91 F.Supp.2d at 31-32 (stating that in general terms the Phase II

trial "will involve the government bringing forward its proof on IIM trust balances and then

plaintiffs making exceptions to that proof."). It is equally apparent to the Court that the

defendants are no closer today to discharging their fiduciary responsibilities properly than they

were during the Phase I trial back in the summer of 1999. At the conclusion of that trial, after the

plaintiffs proved that the defendants were in breach of the fiduciary duties that they owe to the

300,000 individual Indian trust beneficiaries, the plaintiffs requested that this Court put the IIM

trust under court supervision. The Court declined to grant such relief at that time because it felt

that it was its constitutional duty to allow the defendants to correct the breaches declared by the

Court and those found in the 1994 Act. Thus, by declaring the trust duties of the defendants and

remanding the matter back to the agency, the Court granted the least intrusive form of relief that

it could fashion.

In light of the current posture of this case, it is now obvious that this relief was and is

insufficient. The recalcitrance exhibited by the Department of Interior in complying with the

orders of this Court is only surpassed by the incompetence that the agency has shown in

administering the IIM trust. Accordingly, the Court concludes that while its factual findings and

legal conclusions in the Phase I trial ruling were correct (and will therefore not be disturbed), the

relief granted by the Court at that time is no longer adequate.[155]  Consistent with this conclusion,

the Court has determined that it must now consider granting further injunctive relief with respect

to the fixing the system portion of the case and the historical accounting project.[156]  The Court's

conclusion in this regard is in full accord with the principle that courts should "exercise the least

possible power adequate to the end proposed." Spallone, 493 U.S. at 280.  The reason is that

there is an equally established axiom that "when the least intrusive measures fail to rectify the

problems, more intrusive measures are justifiable." Stone v. City of San Francisco, 968 F.2d

850, 861 (9th Cir. 1992). See also Ruiz v. Estelle, 679 F.2d 1115, 1161 (5th Cir. 1982), vacated

in part on other grounds, 688 F.2d 266 (5th Cir. 1982) (noting that "the remedy should begin

with what is absolutely necessary.  If those measures later prove ineffective, more stringent ones

should be considered.").  Moreover, the D.C. Circuit even explicitly stated that "while th[is]

---

[155]The Court will not disturb the relief that it granted in its order of December 21, 1999 at this time.  Thus, for example, the defendants still must submit quarterly status reports and must bring themselves into compliance with the requirements of the 1994 Act.  The relief granted by the Court in this opinion thus supplements rather than supplants the relief provided by the Court in its Phase I trial ruling.  The Court also plans, at the appropriate time, to hold the Phase II trial as described in the Court's Memorandum Opinion of December 21, 1999.  Thus, even after the Court issues further relief in this matter, the defendants will still ultimately have to put forth their proof that an accounting has been performed for the 300,000 IIM beneficiaries and that they are discharging their fiduciary obligations properly.

[156]As noted above, although the Court finds that appointing a receiver over the IIM trust is both constitutionally permissible and justified on the record in this case, the Court concludes that the better approach is to, as an initial matter, grant injunctive relief.  This, of course, assumes that in the interim the Department does not take further action that is so inimical to the proper administration of the IIM trust that the immediate appointment of a receiver is warranted.

court should (and did) remand to the agency for the proper discharge of its obligations, the court should not abdicate its responsibility to ensure that its instructions are followed. This would seem particularly appropriate where, as here, there is a record of agency recalcitrance and resistance to the fulfillment of its legal duties." Cobell, 240 F.3d at 1109. At this juncture, it is crystal clear that more than a declaratory judgment is necessary to ensure that the defendants discharge their fiduciary obligations properly. Thus, as the Supreme Court stated in Powell v. McCormack, "[a] court may grant declaratory relief even though it chooses not to issue an injunction or mandamus. A declaratory judgment can then be used as a predicate to further relief, including an injunction." Powell, 395 U.S. 486, 499 (1969) (internal citations omitted). See also Gautreaux v. Romney, 448 F.2d 731, 736 (7th Cir. 1971). To the extent plaintiffs believe that they are entitled to relief in addition to any injunction that may be entered by the Court, they may request such relief at the appropriate time.

In accordance with the foregoing analysis, the Court will schedule and conduct further proceedings (which shall hereinafter be referred to as the Phase 1.5 trial) to determine what additional relief is warranted in this matter.[157] Specifically, the Phase 1.5 trial will encompass additional remedies with respect to the fixing the system portion of the case, and approving an approach to conducting a historical accounting of the IIM trust accounts. In this regard, the Court will order the Interior defendants to file with the Court and serve upon the plaintiffs a plan for conducting a historical accounting of the IIM trust accounts. This plan shall be filed and served upon completion but no later than January 6, 2003. In addition, the Court will order the

---

[157]The relief granted by the Court at the conclusion of these proceedings will thus, as noted above, supplement rather than supplant the relief granted by the Court at the conclusion of the Phase I trial.

defendants to file with the Court and serve upon the plaintiffs a plan for bringing themselves into compliance with the fiduciary obligations that they owe to the IIM trust beneficiaries. As part of this plan, the defendants shall describe, in detail, the standards by which they intend to administer the IIM trust accounts, and how their proposed actions would bring them into compliance with those standards. This plan should also be filed and served when completed but no later than January 6, 2003. The Court will grant leave to the plaintiffs to file any plan or plans of their own regarding the aforementioned matters. If the plaintiffs wish to make such a filing, they should do so no later than January 6, 2003, and should provide the defendants with a copy.[158] The parties shall file any summary judgment motions with respect to the Phase 1.5 trial no later than January 31, 2002. The parties shall also be afforded the opportunity to file a response to the plan or plans of the other party. These responses shall be filed no later than January 31, 2003. The Phase 1.5 trial shall begin on May 1, 2003, at 10:00 a.m. Dates for pretrial and motions hearings will be set in subsequent orders.

There are two additional issues worth addressing before moving on to the next section. First, since the Phase I trial ended, the Department of Interior has annoyingly persisted in arguing that this Court lacks jurisdiction to review its efforts to conduct a historical accounting of the IIM trust accounts because it has not taken final agency action, as required by the APA.[159]  See, e.g., Defs.' Response to the Fifth Report of the Court Monitor at 12-15. The Court finds the Department's contention in this regard to be misplaced. Numerous courts have recognized, and

---

[158]The Court will also grant leave to the Treasury defendant to make a pertinent submission in this regard, but such a filing should be made no later than January 6, 2003.

[159]This is a rather peculiar legal position to take in light of Specification 1.

in fact the APA specifically provides, that where a federal court has jurisdiction to hear challenges to an agency action it also has jurisdiction over claims of unreasonable delay. Telecommunications Research and Action Center v. FCC, 750 F.2d 70, 75 (D.C. Cir. 1984). See also Sierra Club v. Thomas, 828 F.2d 783, 793 (D.C. Cir. 1987) (noting that where "an agency is under an unequivocal statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers 'final agency action' review."); Public Citizen Health Research Group v. Commissioner, FDA, 740 F.2d 21, 32 (recognizing that "[w]hen agency recalcitrance is in the face of a clear statutory duty or is of such a magnitude that it amounts to an abdication of statutory responsibility, the court has the power to order the agency to act to carry out its substantive mandates."). In the instant matter, both this Court and the D.C. Circuit have already concluded that the Department of Interior has unreasonably delayed providing plaintiffs with an accurate accounting of their funds held in trust by the United States, and in discharging their fiduciary duties properly. Cobell V, 91 F.Supp.2d at 37; Cobell VI, 240 F.3d at 1096-97. In light of these findings, it is disingenuous for the defendants to continue to argue–one-hundred years after the IIM trust was established, eight years after Congress enacted the 1994 Act, and nearly three years after this Court issued its Phase I trial decision–that the Court lacks jurisdiction to compel the agency to act when it has unreasonably delayed in doing so.

Moreover, the Court finds that even assuming arguendo that its Phase I trial decision "reset the clock for a finding of unreasonable delay, [defendants'] reasonable time to discharge its fiduciary obligations has expired." Cobell VI, 240 F.3d at 1095 (internal quotation marks omitted). The D.C. Circuit noted in February of last year that in determining whether an agency has unreasonably delayed taking certain action, courts should consider four factors: (1) the length

of time that has elapsed since the agency came under a duty to act; (2) the reasonableness of the delay in light of the statute which authorizes the agency's action; (3) the consequences of the agency's delay; and (4) the pleas of the administrative agency to practical difficulty in carrying out a legislative mandate.  Id. at 1096 (citing In re International Chemical Workers Union, 958 F.2d 1144, 1149 (D.C. Cir. 1992)).

Upon consideration of the first two factors–length of time that has elapsed and the reasonableness in light of the statutory scheme–the evidence presented and representations made during this contempt trial undeniably show that since this Court issued its Phase I trial ruling the defendants have unnecessarily delayed performing an accounting of the IIM trust accounts, and discharging properly their fiduciary obligations.  In the thirty two months since this Court issued its Phase I trial ruling, the defendants have not only failed to develop a final plan for performing a historical accounting of the IIM trust accounts, but they have abandoned as obsolete the Revised HLIP, which was their plan to ultimately enable them to discharge their fiduciary obligations properly.  Moreover, although the 1994 Act did not provide a specific timetable as to when these reforms were to take place, the fact that this Court found nearly three years ago (and the Court of Appeals one and a half years ago) that the agency had already waited too long to take appropriate action means that the agency cannot now come forward and present the same argument.

With respect to the third factor–the consequences of the agency's delay–the Court has no trouble finding that the delay in this case is particularly harmful to the plaintiffs.  As the D.C. Circuit noted in February of last year:

> [T]he consequences of further agency delay are potentially quite severe.

> Documents necessary for a proper accounting and reconciliation have been lost or destroyed, and the district court found little reason to believe that this would change in the near future.  The longer defendants delay in creating the plans necessary to render an accounting, the greater the chance that plaintiffs will never receive an actual accounting of their own trust money.  Given that many plaintiffs rely upon their IIM trust accounts for their financial well-being, the injury from delay could cause irreparable harm to plaintiffs' interests as IIM trust beneficiaries.  Thus, it seems that the interests at stake are not merely economic interests in an administrative scheme, but personal interests in life and health.

Cobell, 240 F.3d at 1097.  By their continuing failure to provide plaintiffs with an accounting, the defendants compound the already substantial harm that the plaintiffs have endured.

With respect to the fourth factor–administrative convenience–the Court finds that although the tasks charged to the Department are certainly complex, that is not an excuse for the failure by the defendants to develop a plan to perform a historical accounting within the last three years or to discharge their fiduciary duties properly.  Indeed, the D.C. Circuit specifically noted that "[w]hat little progress the government has made appears more due to the litigation than diligence in discharging fiduciary obligations."  Cobell, 240 F.3d at 1097.  This contempt trial and the reports of the Court Monitor and Special Master prove just that.[160]

In sum, the Court finds that even assuming the clock was reset after the Phase I trial ruling was issued in December of 1999, the reasonable time for the defendants to develop a plan to perform a historical accounting project and to develop a plan to enable them to discharge their fiduciary obligations properly has expired.  Accordingly, the defendants must submit such plans as the Court details above to the Court by the scheduled date.

---

[160]Although the defendants do not appear to take this position, it is important for the Court to note that the same analysis would apply to the fixing the system portion of the case. That is, the Court find that the defendants have unreasonably delayed discharging their fiduciary obligations properly, even if the clock only started to run on December 21, 1999.

The second issue that the Court will briefly address is its decision to permit the plaintiffs

to file their own plan for the Phase 1.5 trial.  Although the defendants did not raise this issue in

the instant contempt proceeding, in other filings they have argued that "[t]he task of the

reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the

agency decision based on the record the agency presents to the reviewing court."  Defs.'

Response to the Fifth Report of the Court Monitor at 18 (quoting Florida Power & Light Co. v.

Lorion, 470 U.S. 729, 743-44 (1985)).  There are two reasons why the Court has decided to

permit plaintiffs to submit their own plan or plans.  First, the Court finds that while the

defendants' waiver of sovereign immunity was made pursuant to the APA, the appropriate

standard for the Court to apply when reviewing the defendants' actions comes from trust law.[161]

In this regard, the D.C. Circuit unequivocally held, in affirming this Court's Order of December

21, 1999, that:

> The Secretary cannot escape h[er] role as trustee by donning the mantle of
> administrator to claim that courts must defer to h[er] expertise and delegated
> authority. . .The Secretary has an overriding duty . . . to deal fairly with Indians.
> This duty necessarily constrains the Secretary's discretion.  When faced with
> several choices, an administrator is generally allowed to select any reasonable
> option.  Yet this is not the case when acting as a fiduciary for Indian beneficiaries
> as stricter standards apply to federal agencies when administering Indian
> programs.

Cobell VI, 240 F.3d at 1099 (internal quotations omitted).  That court went on to note that "the

Secretary is obligated to act as a fiduciary . . . h[er] actions must not merely meet the minimal

requirements of administrative law, but must also pass scrutiny under the more stringent

---

[161]In reaching this conclusion, the Court recognizes (as it has in the past) that the
plaintiffs' claims in this case are statutorily-based, and that the federal government's fiduciary
obligations may not be coextensive with those of an ordinary trustee.

standards demanded of a fiduciary. Id. (stating further that the federal government's conduct "should be judged by the most exacting fiduciary standards."). In accordance with this conclusion, the Court has decided to permit plaintiffs to file their own plan for the Court to consider during the Phase 1.5 trial. A primary reason why courts typically limit their examination of agency action to the administrative record is the arbitrary and capricious standard of review found in the APA. This standard of review is highly deferential to the administrative agency, and prevents a reviewing Court from disturbing the agency's decision so long as there is a rational basis for it. National Black Media Coalition v. FCC, 706 F.2d 1224, 1228 (D.C. Cir. 1983); Ethyl Corp. v. EPA, 541 F.2d 1, 34 (D.C. Cir. 1976). In the present case, this highly deferential standard of review does not apply. As such, the Court finds that the plaintiffs should be able to at least file with the Court their own plan for resolving the Phase 1.5 trial issues. The Court's decision is consistent with the approach other courts have taken in redressing longstanding violations such as those present in this case. Thus, for example, in the context of housing desegregation, the Second Circuit found that:

> the defendant does not shoulder its burden at the remedy stage merely by coming forward with a plan. The defendant must come forward with a plan that promises realistically to work, and promises to work now. The district court has not only the power but the duty to ensure that the defendant's proposal represents the most effective means of achieving desegregation. Thus, when the City proposed its alternative plan to desegregate Yonkers, the district court was under a duty to weigh that claim in light of the facts at hand and in light of any alternative which may be shown as feasible and more promising in their effectiveness.

United States v. Yonkers Board of Education, 29 F.3d 40, 43 (1994).

The second reason why the Court will permit the plaintiffs to file a plan is the unconscionable delay by the defendants in performing a historical accounting and discharging

their fiduciary duties properly.  As noted above, both this Court and the D.C. Circuit found that:

> [i]n the case at bar, it is clear that the federal government has been under an obligation to discharge the fiduciary duties owed to IIM trust beneficiaries for decades. It is also clear that refusing to hear plaintiffs' claims could unduly prejudice their rights as trust beneficiaries. [It is] clear that insofar as the federal government owes trust beneficiaries a duty to maintain records and provide an accounting, delaying review is tantamount to denying review altogether.

Cobell VI, 240 F.3d at 1095.  In light of this finding, as well as the Court's findings regarding

unreasonable delay, the Court believes that the most efficient and equitable means of addressing

these issues is to permit the plaintiffs to file their plan with the Court directly.  Furthermore, the

Court anticipates issuing injunctive relief with respect to the historical accounting component of

this action at the conclusion of the Phase 1.5 trial.  The Court will take such action as a result of

the defendants' persistent failure to undertake such an accounting even after the Court's Phase I

trial ruling.  Because the Court will not simply remand the matter back to the agency again as it

did in December of 1999, it is not only appropriate but necessary for the plaintiffs to be heard on

these matters at this time.

The Court will leave all other matters regarding any such plan submitted by the plaintiffs

until such time as the parties submit their motions for summary judgment.  Thus, for example,

the Court does not decide today how it will evaluate the plan submitted by plaintiffs with the

plans filed by the Department of Interior.  The Court only decides, as an initial matter, that the

plaintiffs shall be permitted to make such a filing.

## C.     PLAINTIFFS' REASONABLE EXPENSES & ATTORNEYS' FEES

There is no question that the defendants must be ordered to pay the reasonable expenses,

including attorneys' fees, incurred by plaintiffs as a result of having to litigate this contempt trial.

Courts have long recognized that such relief is appropriate to redress both contumacious and

sanctionable conduct by a litigant. Food Lion, 103 F.3d 1007, 1017 n.14 (finding that "despite

the general American rule against fee shifting, we see no reason why a district court should not

be authorized to include legal fees specifically associated with the contempt as part of the

compensation that may be ordered to make the plaintiff whole[.]"); Shepherd, 62 F.3d at 1475

(acknowledging that "inherent power sanctions available to courts include" among other things

the "award[] of attorney's fees and expenses[.]"). Awarding such relief is particularly

appropriate in this case considering the severity of the defendants' transgressions and the fact that

the conduct has undeniably exacerbated the already considerable harm that the plaintiffs have

suffered as a result of the defendants' failure to discharge their fiduciary obligations properly.

In deciding to award the plaintiffs reasonable expenses, including attorneys' fees, the

Court notes that at least some courts have held that sovereign immunity prevents courts from

imposing monetary sanctions against the federal government for litigation misconduct. See, e.g.,

United States v. Horn, 29 F.3d 754, 770 (1st Cir. 1994). According to these courts, "[t]he

principle of sovereign immunity operates on the broadest possible level: it stands as an obstacle

to virtually all direct assaults against the public fisc, save only those incursions from time to time

authorized by Congress." Id. at 761. These courts thus hold that absent an express waiver of

sovereign immunity, no matter how egregious the government's conduct, a private party may not

recover expenses. Id. at 770.

While I agree with these courts that sovereign immunity is a vitally important doctrine, I

do not believe that it precludes this Court from ordering the defendants to pay the plaintiffs'

-250-

reasonable expenses, including attorneys' fees, that they incurred as a result of having to prosecute this contempt trial. There are three reasons why I have reached this conclusion.

First, under the law-of-the-case doctrine, this Court can order the defendants to pay such costs based on their contumacious behavior and litigation misconduct. In February of 1999, this Court held then-Secretary Babbitt and then-Assistant Secretary Gover in civil contempt for violating two of this Court's discovery orders. Cobell II, 37 F. Supp.2d at 37. For relief, the Court ordered the defendants to "pay plaintiffs' reasonable expenses, including attorneys' fees, caused by the defendants' failure to obey this court's First Order of Production of Information, issued November 27, 1996 and subsequent Scheduling Order of May 4, 1998." Id. at 39. Thereafter, on August 10, 1999, the Court ordered the defendants to pay plaintiffs $624,643.50 to cover their reasonable expenses and attorneys' fees. Cobell IV, 188 F.R.D. at 123 (D.D.C. 1999). On March 29, 2002, after the defendants filed two frivolous motions, this Court awarded attorneys' fees to the plaintiffs yet again. "The law-of-the-case doctrine rests on a simple premise: the same issue presented a second time in the same case in the same court should lead to the same result." Kimberlin v. Quinlan, 199 F.3d 496, 500 (D.C. Cir 1999). See also LaShawn v. Barry, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (noting that "[i]nconsistency is the antithesis of the rule of law."). Applying the law-of-the-case doctrine to the instant matter requires the Court to find that it has the power to award reasonable expenses, including attorney's fees, to the plaintiffs as a result of the defendants' contumacious conduct.

Second, even if the law-of-the-case doctrine did not apply, this Court would still find that it has the authority to order the government to pay such expenses. The reason is that I believe there has been a waiver of sovereign immunity in this case. The APA expressly waives

sovereign immunity in actions other than those seeking money damages.[162]  5 U.S.C. § 702.

Thus, for example, both this Court and the D.C. Circuit held that the plaintiffs can, consistent

with the sovereign immunity doctrine, maintain the instant suit against the defendants.  See, e.g.,

Cobell V, 91 F.Supp.2d at 36-38.  This Court finds that a corollary to this waiver is that the

government must comply with the rules governing the litigation process.  That is, to the extent

the government has consented to be sued by the plaintiffs, it has also consented to abide by the

rules governing the litigation process.  Therefore, when the government fails to comply with

those rules, as they have done in this case repeatedly, the Court can sanction the government.

Some courts have found that while courts can sanction the government for litigation misconduct,

they cannot award expenses.  Horn, 29 F.3d at 770.  I do not believe that this mechanistic

application of the sovereign immunity doctrine is appropriate.  The better approach, in this

judge's opinion, is to find that once sovereign immunity has been waived by the government for

a particular cause of action, it has been waived for all issues related to that cause of action.[163]

Third, even if the sovereign immunity doctrine applies to the instant matter, the Court

---

[162]The Court recognizes that another statutory waiver of sovereign immunity can be found in the Equal Access to Justice Act, 28 U.S.C. § 2412 (1994).  The problem with the waiver in that statute, however, is that in this particular case, it would adversely affect the amount and timing of plaintiffs' recovery of attorneys' fees.

[163]This view of the sovereign immunity doctrine does not mean, however, that courts can order the government to compensate a party for losses sustained as a result of the government's contumacious violation of an injunction.  See Coleman v. Espy, 986 F.2d 1184, 1191-92 (8th Cir. 1993).  The D.C. Circuit has explicitly noted that whether courts can order such a payment is an open question in this circuit.  United States v. Waksberg, 112 F.3d 1225, 1227-28 (D.C. Cir. 1997).  Although the Court expresses no opinion on that issue, it will note that even assuming that sovereign immunity precludes such an award, it does not follow that courts would similarly be precluded from ordering the government to pay for the expense incurred as a result of litigating the contempt issue itself.

finds that its inherent power to award expenses, including attorneys' fees, to a prevailing party in a civil contempt proceeding trumps that doctrine. Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240 (1975) (finding that a court "may assess attorneys' fees for the willful disobedience of a court order ... as part of the fine to be levied ") (internal quotation marks omitted). The reason is that a contrary ruling would make not only the plaintiffs in this case mere supplicants of the federal government, it would make this Court a mere supplicant of the executive branch. Virtually all of the cases cited by the defendants in opposing plaintiffs' request for a receiver support the Court's conclusion in this regard. In this case, the defendants committed four frauds on this Court. In addition, they refused to comply with this Court's order to initiate a historical accounting project. As the Court noted above, unfortunately for plaintiffs, there is no real "compensatory" relief that the Court can grant as a result of the defendants' conduct. Rather, in this case the Court found that the only real option was to conduct further proceedings to determine how to finally bring the defendants into compliance with their fiduciary obligations. In accordance with this conclusion, the Court has determined that at least it can award the plaintiffs the cost of litigating this contempt trial. Under these circumstances, to find that this Court lacks the inherent authority to award expenses to plaintiffs means that this Court lacks the power to enforce its orders against the executive branch of the United States government. This Court does not believe that such a result is consistent with the tripartite framework established by the Constitution, or the applicable case law. As the Court stated during the first contempt trial in this matter:

> courts have a duty to hold government officials responsible for their conduct when they infringe on the legitimate rights of others. These officials are responsible for seeing that the laws of the United States are faithfully executed. In this case, the

laws--the orders of this court--were either ignored or thwarted at every turn by these officials and their subordinates. The court must hold such government officials accountable; otherwise, our citizens--as litigants--are reduced to mere suppliants of the government, taking whatever is dished out to them. That is not our system of government, as established by the Constitution. We have a government of law, and government officials must be held accountable under the law.

Cobell, 37 F.Supp.2d at 14.

## D.   THE PLAINTIFFS' MOTION FOR NON-PARTY EMPLOYEES AND COUNSEL TO SHOW CAUSE WHY THEY SHOULD NOT BE HELD IN CONTEMPT OF COURT

In the order to show cause issued against Secretary Norton and Assistant Secretary McCaleb, the Court deferred ruling on the plaintiffs' motion filed on October 19, 2001, as it related to 37 non-party employees and counsel.  Upon consideration of the memoranda filed in support of and in opposition to the plaintiffs' motion, the record in this case, and the applicable law, the Court finds that it is not appropriate to order these individuals to show cause at this time why they should not be held in contempt of court.  The Court does conclude, however, that the record in this case warrants referring the matter to Special Master Balaran so that he may examine the culpability of these 37 individuals.  Cf. Universal Oil Products, 328 U.S. at 580. The Court reaches this conclusion in part because of rather than in spite of the investigation conducted by the Inspector General's Office into these matters.  In conducting its investigation, the Inspector General failed to interview several "key" individuals that it believes to have knowledge of pertinent information.  See Department of Interior Office of Inspector General Report: Allegations Concerning Conduct of Department of the Interior Employees Involved in Various Aspects of the Cobell Litigation (June 2002) at 1, n.1 (noting that "all but one former

key employee refused to be interviewed[,]" and one "employee agreed, initially, to speak to OIG

investigators, but refused requests for a follow-up interview.  He subsequently left his position

with DOI."). The Inspector General's Office thus recognized that "in some instances [it is]

unable to provide a complete picture of what happened."[164] Id.  The Court will accordingly refer

this matter to Special Master Balaran so that he may develop a complete record with respect to

these 37 non-party individuals.  Special Master Balaran shall, upon completing his review of

these matters, issue a report and recommendation regarding whether each individual should be

ordered to show cause why he or she should not be held in (civil or criminal) contempt of court,

or whether other sanctions are appropriate against such individuals.  The Court will also refer the

plaintiffs' motion for order to show cause regarding e-mail destruction to Special Master Balaran

so that he may issue a report and recommendation regarding the issues raised in that motion as

well.


E.       **THE APPOINTMENT OF A SPECIAL MASTER-MONITOR**

        Although the Court declines at this juncture to place the IIM trust into receivership, the

Court concludes that the appointment of a special master to monitor the status of trust reform is

clearly warranted.  The Court has decided to appoint another special master rather than expand

the powers of Special Master Balaran in this regard because the scope of this lawsuit is such that

it is not practical to have only one individual perform all of the required duties.

---

[164]It is disappointing, to say the least, that the Inspector General would conclude that there
was no intentional misconduct when such a large number of key participants were never even
interviewed.  Nevertheless, the Inspector General's Report is a virtual compendium of
information that shows an agency in total disarray.

This Court has the authority to appoint a special master to monitor the manner in which the defendants discharge their statutory trust duties. United States v. Microsoft Corp., 147 F.3d 935, 954 (D.C. Cir. 1998) (noting the "well-established tradition allowing use of special masters to oversee compliance."). See also Defs.' Response to the Fifth Report of the Court Monitor at 15 ("The Court plainly has jurisdiction to monitor Interior's actions in coming into compliance with its duty to account."). In addition to its inherent equitable powers, the Court is explicitly granted this authority by Rule 53 of the Federal Rules of Civil Procedure and ostensibly by the All Writs Act, 28 U.S.C. § 1651(a), which authorizes a court to "issue all writs necessary or appropriate in aid of [its] respective jurisdiction[] and agreeable to the usages and principles of law." Under Rule 53(b), a court may appoint a special master "upon a showing that some exceptional condition requires it." Fed. R. Civ. P. 53(b). See also Organization for Reform of Marijuana Laws v. Mullen, 828 F.2d 536, 542 (9th Cir. 1987). Thus, the Court recognizes that "[t]he appointment of a special master is the exception and not the rule and [that] there must be a showing that some exceptional condition requires such an appointment." Williams v. Lane, 851 F.2d 867, 884 (7th Cir. 1988) (citing 5A Moore's Federal Practice ¶ 53.05[3] n.42 (1987)). Upon consideration of the extensive record in this action, the Court finds that such exceptional circumstances plainly exist and that the appointment of a special master-monitor is not only appropriate at this time but essential to the effective management of this case.

First, there is no doubt that the appointment of a special master-monitor is justified as a result of the recalcitrance exhibited by the Department of Interior in complying with the orders of this Court, reporting on the current status of trust reform, and discharging its fiduciary obligations. Id. (concluding that the appointment of a special master was appropriate because

"[t]he record here is replete with instances of administrative recalcitrance."). See also Hook v.

Arizona, 120 F.3d 921, 926 (9th Cir. 1997) (finding that the appointment of a special master was

appropriate because of the defendant's "history of noncompliance[.]"). Even in the Phase I trial

ruling of December 21,1999, the Court found that "it would not be an abuse of discretion to

appoint a Special Master or Monitor to closely check defendants' progress toward bringing

themselves into compliance with their trust duties. After all, defendants have shown their

historic inability to keep their promises with regard trust management reform and their

unwillingness to comply with court orders." Cobell V, 91 F.Supp.2d at 55 (stating further that

defendants "are but one step away from earning more involved court oversight over the IIM trust,

such as another Special Master or Monitor, should they fail to live up to their own

representations or fail to abide by the court's order issued this date."). Nevertheless, the Court

declined at that time to appoint a special master because, even after years of empty promises by

the agency and a finding of civil contempt, the Court felt that it was "its constitutional duty to

allow defendants the opportunity to cure the breaches of trust declared" by the Court and "to

carry through on their promises." Id. at 54. In light of what the Court now knows about the

defendants' actions after the Phase I trial ruling as well as the current status of the agency's trust

reform activities, it would be nothing less than an abdication of this Court's constitutionally

prescribed duty for it not to take further action and appoint a special master-monitor. Indeed, the

Court specifically told the defendants in December of 1999 that "[s]hould the court find in the

future upon proper motion by plaintiffs that defendants have been less than truthful in their

representations or that defendants' adherence to prompt remedial action turns out to have been

feigned, then the court may well decide to exercise its authority to ensure that its orders are

carried out." Id. at 54.  Moreover, the D.C. Circuit stated that "[i]t remains to be seen whether in preparing to do an accounting the Department takes steps so defective that they would necessarily delay rather than accelerate the ultimate provision of an adequate accounting, and the detection of such steps would fit within the court's jurisdiction to monitor the Department's remedying of the delay[.]" Cobell VI, 240 F.3d at 1110.  Even now the Court has decided only to grant this minimal relief rather than take more intrusive action like appointing a receiver.

It is important to note that despite the above analysis, the Court's decision to appoint a special master-monitor is not dependent on its legal conclusions regarding the perpetration of a fraud on the Court.  Even assuming arguendo that the defendants did not commit a fraud on the Court, the appointment of a special master-monitor is still clearly necessary to ensure that this Court and the plaintiffs receive timely, accurate information regarding the status of trust reform and the defendants' efforts to discharge properly their fiduciary duties.  The defendants have conceded, both during this contempt trial proper and in their Eighth Report, that the first seven quarterly status reports did not provide the Court with complete and accurate information regarding the TAAMS and BIA Data Cleanup subprojects, IT security, the Department's efforts to perform a historical accounting of the IIM trust accounts, or the seven statutory breaches that the agency stipulated to on the eve of the Phase I trial.  In light of these failures on the part of the Interior defendants (irregardless of whether they amount to a fraud on the court), the Court finds it both appropriate and necessary to appoint a special master-monitor.  Of course, the Court's ultimate conclusion that the Department did commit such a fraud provides further support for the appointment of a special master-monitor.

Second, the appointment of a special master-monitor in this matter is also appropriate

because of the extensive daily involvement required in monitoring the defendants' efforts to bring themselves into compliance with their trust duties declared by the Court and prescribed in the 1994 Act. Hook, 120 F.3d at 926; Gary W. v. Louisiana, 601 F.2d 240, 244-45 (5th Cir. 1979). See also Local 28 of Sheet Metal Workers' Int'l Assoc. v. EEOC, 478 U.S. 421, 482 (1986) (finding that "in light of the difficulties inherent in monitoring compliance with the court's orders, and especially petitioners' established record of resistance to prior state and federal court orders designed to end their discriminatory membership practices, appointment of an administrator was well within the District Court's discretion."). There is no practical means by which this Court alone can monitor the status of trust reform or the defendants' purportedly vast efforts to bring themselves into compliance with their trust responsibilities. Courts have consistently found that under such circumstances it is proper for them to appoint a special master or monitor. See, e.g., Hook, 120 F.3d at 926; Hoptowit v. Ray, 682 F.2d 1237, 1263 (9th Cir.1982); Campbell v. McGruder, 580 F.2d 521, 543-44 (D.C. Cir. 1978); Newman v. Alabama, 559 F.2d 283, 290 (5th Cir. 1977), rev'd in part on other grounds; Alabama v. Pugh, 483 U.S. 781; Salazar v. District of Columbia, 1997 WL 306876 at 2-4 (D.D.C. 1997).

The Court recognizes that most of the cases cited above involve situations where a structural injunction has already been entered by the Court and, as a result, the special master-monitor actually oversees in many respects the defendants' efforts to bring themselves into compliance with that order. See, e.g., Apex Fountain Sales v. Kleinfeld, 818 F.2d 1089, 1097 (3d Cir. 1987). See also Williams v. Lane, 851 F.2d 867, 884 (7th Cir. 1988) (affirming the district court's decision "appointing a master directed to supervise and coordinate the actions of prison officials to effectuate full compliance[.]"). In this case the Court has not yet entered a

structural injunction.  In light of this fact, the Court finds that the newly appointed special master-monitor should not oversee or manage the Department's efforts to bring themselves into compliance with the obligations declared by the Court and enumerated in the 1994 Act.  Rather, at this time the special master-monitor should only monitor the current status of trust reform and the Department's trust reform efforts as they relate to the duties declared by the Court and found in the 1994 Act.  The special master-monitor shall advise the Court and the parties of his findings by periodically filing reports with the Court.[165]  To the extent the special master-monitor has recommendations on particular matters, he may include them in his reports as well.  Moreover, the Court finds that, consistent with the above described duties, the newly appointed special master-monitor shall oversee the discovery process and administer document production, except on matters related to IT security, document retention and preservation, and the Department of the Treasury.  Those matters shall still be handled by Special Master Balaran.

In accordance with the foregoing analysis, the Court will appoint a special master-monitor in this action pursuant to Rule 53(b) to monitor the status of trust reform and the defendants' progress towards bringing themselves into compliance with their fiduciary duties as declared by the Court and prescribed in the 1994 Act.  The special master-monitor shall ensure that the Court (and the plaintiffs) receive complete and accurate information regarding these matters by periodically filing status reports.[166]  In these reports, the special master-monitor may apprise the Court of any other matters that he deems pertinent to this litigation, but take no

---

[165]The special master-monitor shall provide copies of his reports to the parties.

[166]The appointment of the special master-monitor in no way affects the defendants' obligation to continue to file quarterly status reports as provided in the Court's Order of December 21, 1999.

further action without prior approval of the Court, as well as provide the Court with any

recommendations he may have regarding issues identified in the reports. The special master-

monitor shall also oversee the discovery process and administer document production, except

insofar as the issues raised by the parties relate to IT security, records preservation and retention,

the Department of the Treasury, or Paragraph 19 documents.

Nothing in this section of the Memorandum Opinion shall affect the appointment of

Special Master Balaran, except that he shall only oversee the discovery process to the extent that

it involves issues related to IT security, records preservation and retention, the Department of

Treasury, and Paragraph 19 documents.[167] All other future discovery matters shall be within the

purview of the newly appointed special master-monitor unless the Court specifically directs that

they be handled by Special Master Balaran.[168]


F.     **FURTHER RELIEF–DISCOVERY**

The defendants have amply demonstrated during the two and a half years since this

Court's Phase I trial ruling that they cannot be trusted to report in a timely manner complete and

accurate information regarding the status of trust reform and their efforts to discharge their

fiduciary responsibilities properly. At the time the Court issued its Phase I trial decision, the

---

[167]To the extent that Special Master Balaran has already started working on pending discovery motions, he shall be tasked with addressing those motions or referring them to the Special Master-Monitor for disposition. The newly appointed special master-monitor will be empowered to address discovery motions filed after this date or referred to him by Special Master Balaran.

[168]In light of the Court's decision to appoint a Special Master-Monitor at this time, the Court will terminate the consent order of April 15, 2002, in which it extended the appointment of the Court Monitor for another year.

Court found that it was sufficient for the defendants to file quarterly status reports and for plaintiffs to then "petition the court to order defendants to provide further information as needed if such information cannot be obtained through informal requests directly to defendants." Cobell V, 91 F.Supp.2d at 59. See also Contempt II Tr. at 1474-75. The Court finds that this approach is no longer appropriate in light of the false and misleading quarterly status reports filed by the defendants since March 2000. Accordingly, the Court will permit plaintiffs full discovery on matters that they otherwise would not have been able to explore prior to this decision. While the Court will thus expand the scope of discovery for the plaintiffs, the Special Master-Monitor shall ensure that such discovery does not unreasonably interfere with the defendants' ability to develop their plans for submission to the Court. As noted above, the Court will also continue to require the defendants to file quarterly status reports pursuant to the December 21, 1999 Order.

## G.    IT SECURITY

Although the Court continues to be deeply concerned about the deplorable status of IT security and the fact that the defendants committed a fraud by making false and misleading representations regarding this matter, the Court has decided that further injunctive relief is not warranted at this time. Thus, the Court will not vacate or modify the consent order regarding information technology entered on December 17, 2001. The Court reaches this conclusion in large part based on the representations made by the Special Master that Associate Deputy Secretary James Cason is working closely and cooperatively with him on these issues. If it appears in the future that further relief is warranted, however, the Court can and will take appropriate measures at that time.

-262-

**H.      ISSUE PRECLUSION**

The Court has decided that in addition to the Phase II trial, which will address the

correcting the accounts portion of the case, the Court will conduct a Phase 1.5 trial to determine

what further relief to grant in this action at this time.  In light of these future proceedings, the

Court finds that the plaintiffs shall be permitted, based on the Court's decision today, to file an

appropriate motion regarding issue preclusion prior to either the Phase 1.5 trial or the Phase II

trial.  Shepherd, 62 F.3d at 1475 (noting that "inherent power sanctions available to courts

include . . . drawing adverse evidentiary inferences or precluding the admission of evidence.").


**I.      CERTIFICATION OF ORDER FOR INTERLOCUTORY APPEAL**

The Court certified its Order of December 21, 1999 for interlocutory appeal pursuant to

28 U.S.C. § 1292(b) because it found that "an immediate appeal of the court's order may

materially advance the ultimate termination of the litigation." Cobell V, 91 F.Supp.2d at 59.  In

light of the extraordinary delay since that time caused by the defendants' unconscionable actions,

the Court will not certify the order accompanying this Memorandum Opinion for interlocutory

appeal.  Such an appeal by the defendants would undeniably delay even further this already

protracted litigation, and compound the harm that plaintiffs suffer each day as a result of the

defendants' inability to discharge properly their fiduciary duties.  Moreover, the Court will not

grant a motion for a stay pending appeal, should defendants seek to appeal today's decision.  This

Court will not authorize further delay by defendants.[169]

---

[169]The Court acknowledges that defendants have sought to delay even today's ruling in
order to try to obtain additional evidence from an on-going proceeding before Special Master
Balaran.  The Court has in fact read the Special Master's depositions of the Special Trustee and

## VII. CONCLUSION

In February of 1999, at the end of the first contempt trial in this matter, I stated that "I have never seen more egregious misconduct by the federal government." Cobell II, 37 F.Supp.2d at 38. Now, at the conclusion of the second contempt trial in this action, I stand corrected. The Department of Interior has truly outdone itself this time. The agency has indisputably proven to the Court, Congress, and the individual Indian beneficiaries that it is either unwilling or unable to administer competently the IIM trust. Worse yet, the Department has now undeniably shown that it can no longer be trusted to state accurately the status of its trust reform efforts. In short, there is no longer any doubt that the Secretary of Interior has been and continues to be an unfit trustee-delegate for the United States.

Over a two year period, the defendants successfully led this Court and the plaintiffs to believe that they were bringing themselves into compliance with the 1994 Act, and that they were taking steps that would one day provide the foundation for a historical accounting of the IIM trust accounts. In reality, as the Court chronicled in painstaking detail above, the Interior Department was experiencing so many difficulties in so many different aspects of its trust reform effort that the agency is still only at best marginally closer to discharging its fiduciary obligations properly than it was three years ago when the Court held the Phase I trial. Moreover, in terms of the historical accounting project, the Court's findings make clear that the Department did virtually

---

his Principal Deputy, since portions were filed under seal in connection with the defendants' motion to revoke the appointment of the Court Monitor, and the Court obtained the full unredacted depositions. Nothing therein would affect this Court's view of the credibility of Mr. Slonaker or Mr. Thompson even if it were considered, so the Court agrees with plaintiffs (in their opposition to defendants' motion to defer resolution of this contempt proceeding) that this is much ado about nothing.

nothing during the eighteen month period following this Court's Order of December 21, 1999. As a result of this fraudulent conduct, the defendants are in civil contempt of this Court.

Congress has mandated, the Court has ordered, and the beneficiaries have pleaded for meaningful reform of the IIM trust.  This Court need not sit supinely by waiting, hoping that the Department of Interior complies with the orders of this Court and the fiduciary obligations mandated by Congress in the 1994 Act.  To do so would be futile.  I may have life tenure, but at the rate the Department of Interior is progressing that is not a long enough appointment. Accordingly, the Court has ordered relief today that it views as being absolutely necessary to getting both this case and trust reform back on track.  In the meantime, Secretary Norton and Assistant Secretary McCaleb can now rightfully take their place alongside former-Secretary Babbitt and former-Assistant Secretary Gover in the pantheon of unfit trustee-delegates.

A separate order shall issue this date detailing the legal conclusions and relief granted by the Court.

Date:  _9-17-02_

Royce C. Lamberth
United States District Judge