**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **ELOUISE PEPION COBELL, et al.,**<br>**on their own behalf and on behalf of**<br>**all persons similarly situated,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No.96CV1285 (RCL)** |
| **GALE NORTON, Secretary of**<br>**the Interior, et al.,** | ) ) ) | |
| **Defendants.** | ) ) ) | |
| _____ | ) | |

**PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE WHY THE DEPARTMENT
OF THE INTERIOR, INTERIOR SECRETARY GALE NORTON, AND HER SENIOR
MANAGERS AND COUNSEL, SHOULD NOT BE HELD IN CIVIL AND CRIMINAL
CONTEMPT FOR VIOLATING COURT ORDERS, INCLUDING THE TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION <u>ENTERED TO PROTECT
TRUST DATA AND ASSETS</u>**

# I.  INTRODUCTION

Norton and her senior managers and counsel again have filed false and materially

misleading quarterly reports and have submitted false and materially misleading declarations

regarding the security of Individual Indian Trust data ("Trust Data") housed in, or accessed by,

Information Technology Systems managed or administered by the Department of the Interior, its

agents, and contractors ("IT Systems").  At the same time that Norton and her senior managers and

counsel represented to this Court and plaintiffs that IT Systems' security was improving and that

Trust Data were secure,[1] they knew that such data and Individual Indian Trust assets ("Trust

Assets") remained in imminent risk of further loss, destruction, corruption and unlawful

manipulation.

These misrepresentations are material and they were procured, directed, and coordinated

by and between Norton, Griles, Cason, Chief Information Officer – Hord Tipton, and Hart

Rossman[2] and, at the very least, they were aided and abetted by the current Department of Justice

*Cobell* litigation team, including without limitation Robert McCallum, Jr., Peter Kiesler, Stuart

Schiffer, Christopher Kohn, Sandra Spooner, John Stemplewicz, Glenn Gillett and John

Warshawsky.[3]

The case for contempt could not be more clear.  Four recently disclosed government

---

[1]This Court entered a preliminary injunction on July 28, 2003 that directed Norton to disconnect immediately from the Internet all IT Systems that house or access Trust Data unless Norton and former Acting Assistant Secretary–Indian Affairs Aureen Martin each certified that such systems are essential to protect life or property or were secure from unauthorized access. *Cobell v. Norton*, 274 F. Supp.2d 111 (D.D.C. 2003).

[2]Hart Rossman is the Technical Director of SAIC; he is responsible for various aspects of IT security.  Rossman filed a declaration on August 11, 2003 wherein he represented deceptively to this Court and plaintiffs that IT Systems were secure and in compliance with various statutes when, in fact, they were not then and are not now.

[3]Hereinafter referred to as "Certifying Defense Counsel" who are identified by name on relevant quarterly reports and other filings with this Court, including filings that transmitted false and materially misleading "certifications" and other misrepresentations concerning IT security.

reports[4] confirm what plaintiffs have said to this Court repeatedly: that pervasive, uncorrected, material weaknesses in IT security expose Trust Data to further loss, destruction, corruption and unlawful manipulation.  Critically, these government reports were prepared **contemporaneously** with Norton's and her senior managers' and counsel's preparation and filing of the aforementioned quarterly reports and declarations which made representations in direct conflict with findings stated in such government reports.

This is not an academic or theoretical charge against the trustee-delegates.  The material weaknesses in IT security have harmed and continue to harm plaintiffs irreparably, as this Court confirmed following a careful review of the nature and scope of the IT security mess.  This Court's findings of irreparable harm were true and correct at the time they were made and they are equally true today:

> [T]he continued operation of computer systems connected to the Internet that either house or provide access to individual Indian trust data, **which have not been demonstrated to be secure** from Internet access by unauthorized persons, **constitutes further and continuing irreparable injury to plaintiffs**.[5]

Indeed, this Court explicitly recognized the serious consequences of insecure IT Systems and explained that it would be foolish to permit IT Systems to remain connected to the Internet, reminding the trustee-delegates and their counsel that "[w]ithout any evidence that the systems are secure, it would be an act of folly for this Court simply to permit them to remain connected."[6]

Yet, as of the date of this motion, insecure IT Systems remain connected to the Internet

---

[4](1) September 22, 2003 annual evaluation of IT security by the Inspector General ("IG Annual Evaluation"); (2) September 12, 2003 General Accounting Office report entitled *Information Technology: Department Leadership Crucial to Success of Investment Reforms at Interior* ("GAO Report"); (3) September 8, 2003 Office of Management and Budget report entitled *Financial Management Status Report and Strategic Plan (FY2004-FY2008)* ("OMB Report"); and (4) December 9, 2003 Report by the *Subcommittee on Technology, Information, Policy, Intergovernmental Relations and the Census - United States House of Representatives*. Attached hereto as Plaintiffs' Exhibits 6, 7, 8, and 9, respectively.

[5]*Cobell*, 274 F. Supp.2d at 130 (emphasis added).

[6]*Id.* at 133.  With no explanation, as noted in footnote 5 above, this Court abruptly changed its position and shifted the burden of proof to plaintiffs when it entered the modest IT Injunction.

although Norton has proffered **no** competent evidence[7] that Trust Data housed in, or accessed by, IT Systems, in fact, are secure.  To be sure, no competent evidence exists to justify reconnection.  Rather, **all** competent evidence and independent reports and assessments demonstrate conclusively that Interior's IT Systems continue to be plagued by material weaknesses in security.  As a result, precisely that which this Court had expressed grave concern about has now occurred.

In that regard, contrary to the representations of Norton and her senior managers and counsel, powerful evidence shows that Trust Data and Trust Assets are at greater risk today than they were prior to the entry of the July 28 preliminary injunction (and, indeed, even prior to the December 17, 2001 consent order).  According to recently disclosed **government** reports, IT Systems

> [have] **not established access controls that limit or detect inappropriate access to information technology systems** and related resources, thereby **increasing the risk of unauthorized modification, loss, or disclosure of sensitive or confidential data**.[8]

Simply put, Norton and her senior managers and counsel knowingly and willfully have violated this Court's orders and knowingly and willfully have covered-up debilitating weaknesses in IT Systems that they reconnected – or left connected – to the Internet.  Thereby, they have openly repudiated their fiduciary duties, violated both statute and common law, and made a mockery of the modest relief fashioned by this Court.

Perhaps what best illustrates Norton's bad faith and open disdain for this Court, as well as the fiduciary duties conferred on her by Congress, is found in her recent *Report on the Implementation of the Federal Information Security Management Act (FISMA): FY2003*

---

[7]**Both** statute (28 U.S.C. § 1746) and local rules (LCvR 5.1(h)(2)) mandate that unsworn declarations be attested to unequivocally as true and correct and that the declarants be prosecuted for perjury when representations contained therein are false.  Here, the relevant declarations are false and materially misleading, unsworn, and omit the requisite **unconditional** jurat.  Yet, IT Systems remain connected to the Internet based on these incompetent declarations.

[8]*See* Plaintiffs' Exhibit 8 (September 8, 2003 OMB Report) (emphasis added).

("Norton's Report to Congress"), dated September 17, 2003.[9]  Therein, Norton does not accept responsibility for **her** failure to secure IT Systems; instead, **she** audaciously blames **this Court** for material weaknesses in IT security and identifies **this Court** as the reason IT Systems remain insecure today.  Conspicuously, Norton ignores findings contained in every single report that has assessed the lack of security in Interior's IT Systems – including the GAO, NIST, the Inspector General, and other government entities, as well as Interior's own contractors and, of course, the Special Master – and complains bitterly to Congress that it is **this Court** that "**continues to cause** tremendous hardship ... and **unnecessary risk to maintaining sound security**."[10]

When one weighs whether or not to commence civil and criminal contempt proceedings against a government official – particularly one who occupies the unique position of a trustee-delegate of the United States – it is important to determine whether such proceedings can and will accomplish important objectives of this Court, including without limitation the critical need to ensure the integrity of the litigation process.   Here, plaintiffs have endured more than seven and one-half years of unprecedented litigation misconduct undertaken by Norton, her predecessor, and their senior managers and counsel.  Such litigation misconduct is established and there is no need at this time to once again discuss in detail established findings of fraud, deception, spoliation of evidence, witness intimidation, violations of law and court orders, breaches of trust, obstruction of judicial officers and other contemptible and unethical behavior.

What is important to recognize is that despite this pattern and practice of misconduct, to date, this Court has not imposed meaningful accountability on a single individual, even those who

---

[9]*See* Plaintiffs' Exhibit 10.  Norton's Report to Congress is required by the Federal Information Security Management Act of 2002 for the purpose of keeping Congress informed about the adequacy of IT security and the steps taken to ensure the security of data housed in IT Systems. This is one of two reports that were prepared contemporaneously with "certifications" by Cason *et al.* concerning the status of IT security that were concealed from this Court and plaintiffs until December 30, 2003, the date they were produced to plaintiffs pursuant to this Court's order.  The other report is the September 22, 2003 annual evaluation of IT security by the Inspector General. *See* Plaintiffs' Exhibit 6.  Both reports are discussed more fully below.

[10]Norton's Report to Congress at 7.

have knowingly, willfully, and repeatedly violated this Court's orders.  The Interior Department as well as the Justice Department act through their officials; it is these officials who have engaged, and continue to engage, in well-documented litigation misconduct and it is these officials who must be stopped through meaningful sanctions – coercive, compensatory and punitive.

It is clear that the modest civil sanctions that this Court has imposed have not been interpreted by Norton *et al.* as they should; as a unique display of forbearance by a compassionate judge who generously provided extraordinary leeway to an admittedly unprepared trustee-delegate in the hope that she would learn-on-the-job how to discharge comprehensive fiduciary duties that Congress, in its infinite wisdom, had conferred upon the Interior Secretary.

Unfortunately, it is clear that Norton and her senior managers and counsel have viewed such forbearance as a sign of weakness.  It is also clear that this Court's leniency does nothing but encourage them to ratchet-up their contemptible behavior, growing progressively more confident in their immunity each time that the judiciary did not hold them personally accountable, no matter how repugnant, disrespectful, or unethical their conduct.  Nominal financial sanctions that are reimbursed by the government mean nothing to them.  Referrals of defense counsel to the Disciplinary Panel of the U.S. District Court are a mere annoyance, particularly when the referrals sit on a clerk's desk gathering dust for more than a year.  Moreover, the financial sanctions awarded to date have not compensated plaintiffs for the fees and expenses they have incurred in connection with the pervasive underlying misconduct that plagues this litigation as well as the consequences thereof.[11]  Indeed, nominal financial sanctions are acceptable to Norton *et al.* because, in reality, a nominal remedy is viewed by them **and** the court of appeals as no civil remedy at all.

In short, the modest relief fashioned by this Court has encouraged continued stonewalling

---

[11]Notably, the court of appeals underscored the absence of compensatory sanctions for the underlying contemptuous conduct as a reason why it decided to vacate adjudged civil contempt citations against Norton and to recast the civil contempt proceeding as a criminal proceeding.  *See Cobell v. Norton,* 334 F.3d 1128, 1145 (D.C. Cir. 2003).

and deception while years have been, and continue to be, wasted, Trust Data is lost, destroyed and corrupted, and Trust assets are lost and misappropriated.[12]  And, as an unintended consequence, it has allowed Norton *et al.* to benefit greatly from their repugnant conduct since they have done so at **no** personal risk.

Therefore, civil contempt proceedings– as well as meaningful compensatory **and** coercive sanctions, including confinement[13] – are needed now to ensure that the Preliminary Injunction and other relevant orders are obeyed immediately and to ensure that the Court of Appeals does not again recast a civil contempt trial as a criminal proceeding.

Punitive sanctions are also appropriate here.  Therefore, criminal contempt proceedings should commence since the repeated violations of the TRO, the Preliminary Injunction, and other relevant orders are knowing and willful.  Perhaps, if Norton, McCallum, *et al.* are convinced that they **can and will** be held accountable for **their** misconduct and that **their** fitness to practice law **can and will** be subject to close scrutiny, the integrity of this battered judicial process will be restored.

Accordingly, for the reasons stated above and for those described more fully below, **to the fullest extent** that an Article III court has inherent authority to ensure the integrity of its proceedings and to enforce the Constitution and other laws of this land, including the trust obligations of the United States government, plaintiffs respectfully request that each the

---

[12]It is ironic that counsel for Norton and other contemnors are paid timely and in full their fees and expenses – millions of dollars in appropriated funds – for defending their clients' indefensible behavior in these proceedings at the same time plaintiffs' counsel are awarded little or no compensation for the extraordinary time spent in connection with, and as a natural and probable consequence of, repeated violations of court orders and other litigation misconduct that plague this litigation.

[13]Six and one half years ago, this Court warned defendants and their counsel that confinement is the preferred coercive remedy for obdurate government officials who violate court orders:

> If I order it, and they don't do it that way, it is on pain of contempt.  I have a general philosophy that I don't fine **government officials** that are **in contempt**. **I put them in jail.**  I think fines do no good.  They just penalize the taxpayer.

August 21, 1997 Status Call Transcript at 11.  The time for confinement is now.

aforementioned individuals be ordered to show cause why he or she should not be held in civil and criminal contempt and, further, that the Department of the Interior[14] too be ordered to show cause why it should not be held in civil contempt.

## II.  RELEVANT COURT ORDERS

Throughout this litigation, various court orders, including temporary restraining orders ("TRO") and the preliminary injunction ("IT Injunction") have required both certification and full disclosure of matters relevant to the adequacy of Information Technology Systems' security.  Each of these orders is clear and unambiguous and Norton and her senior managers and counsel were well aware of the terms as well as the nature and scope of these orders (and their unconditional compliance obligations).  Moreover, the orders are, and have been, central to the preservation of Trust Data, both to render the accounting of all items of the Trust declared several years ago by this Court on December 21, 1999 and the Court of Appeals on February 23, 2001 and, equally importantly, to collect, allocate and distribute, accurately and fully, current revenue derived from Trust lands and the interest earned on the investment and reinvestment of such revenue.[15]

### A.  Quarterly Reporting

Beginning December 21, 1999 (at the same time this Court first restricted plaintiffs' formal discovery rights), this Court ordered defendants to file with this Court and serve on plaintiffs "quarterly status reports setting forth and explaining the steps they have taken to rectify declared breaches of trust and to bring themselves into compliance with trust duties embodied in the Indian Trust Fund Management Reform Act of 1994 ("Trust Reform Act") and other applicable statutes

---

[14]*See generally, Landmark Legal Foundation v. Environmental Protective Agency,* 272 F.Supp.2d 70 (D.D.C. 2003) (holding the EPA in civil contempt for actions taken by its officials).

[15] Notably, Norton and her senior managers and counsel **never** asked for clarification of these orders.

and regulations governing the IIM trust."[16] Three years later, this Court found that the quarterly reporting had been uniformly false, materially misleading, and otherwise wholly inadequate and it ordered that Norton "**personally** sign all forthcoming quarterly reports."[17]

### B.   Temporary Restraining Order and Preliminary Injunction Violations

Norton *et al.* repudiated and defied the December 17, 2001 Consent Order ("Consent Order") and otherwise engaged willfully in unlawful action – which knowingly exposed, and continues to expose, Trust Data to further destruction, loss, corruption and unlawful manipulation – including their obstruction of the Master's oversight and monitoring duties that this Court conferred on the Master to ensure the accurate reporting of Norton's compliance with Court orders.  Because such obstruction was material, this Court, on June 27, 2003, entered a temporary restraining order, again compelling Norton to disconnect from the Internet all insecure IT Systems and again

---

[16]*Cobell v. Babbitt*, 91 F. Supp.2d 1, 60 (D.D.C. 1999).  Notably, the Court of Appeals affirmed, expanded, and finalized this Court's judgment, holding that the Trust Reform Act codifies and reconfirms fiduciary duties, is inclusive, and must be read in the context of the common law of trusts.  *See Cobell v. Norton,* 240 F.3d 1081 (D.C. Cir. 2001).

[17]*See* December 17, 2001 Order at 2 (emphasis added).  In retrospect, this Court lamented its decision to restrict plaintiffs' formal discovery rights in light of the persistent filing of materially misleading reports and other papers by Norton, her senior managers, and counsel and acknowledged that the constraints on discovery had harmed plaintiffs.  Furthermore, because such deceptive self-reporting proved to be a dismal failure, as this Court expressly confirmed on September 17, 2003, the Court re-established plaintiffs "full discovery" rights:

> At the time the Court issued its Phase I trial decision, the Court found that it was sufficient for the defendants to file quarterly status reports and for plaintiffs to then "petition the court to order defendants to provide further information as needed if such information cannot be obtained through informal requests directly to defendants." *Cobell V*, 91 F. Supp.2d at 59. *See also* Contempt II Tr. at 1474-75. **The Court finds that this approach is no longer appropriate** in light of the false and misleading quarterly status reports filed by the defendants since March 2000. Accordingly, the Court will permit plaintiffs **full discovery** on matters that they otherwise would not have been able to explore prior to this decision. While the Court will thus expand the scope of discovery for the plaintiffs, the Special Master-Monitor shall ensure that such discovery does not unreasonably interfere with the defendants' ability to develop their plans for submission to the Court. As noted above, the Court will also continue to require the defendants to file quarterly status reports pursuant to the December 21, 1999 Order.

*Cobell v. Norton*, 226 F. Supp.2d 1, 159 (D.D.C. 2002). (emphasis added)

demanding compliance with the terms of the Consent Order:

> [T]hat Interior defendants immediately shall disconnect from the Internet all information technology systems which house or provide access to individual Indian trust data until such time as the Special Master has determined that all individual Indian trust data is properly secured; and it is
>
> FURTHER ORDERED that Interior defendants shall immediately disconnect from the Internet all computers within the custody and control of the Department of the Interior, its employees and contractors, that house or provide access to individual Indian trust data until such time as the Special Master has determined that individual Indian trust data is properly secured.[18]

Finding that violations of court orders and breaches of trust continued, on July 28, 2003, this Court entered a preliminary injunction to mitigate continuing, unreasonable risks to Trust Data; however, it again rejected plaintiffs' request for all necessary relief and entered an injunction that is wholly dependent for its effectiveness on candid and forthright representations of Norton, and her senior managers and counsel.  Specifically, the Court ordered that:

> 1. The Interior defendants shall immediately disconnect from the Internet all Information Technology Systems within the custody or control of the U.S. Department of the Interior, and its employees, agents, and contractors, that House or Access Individual Indian Trust Data, until such time as the Court approves their reconnection to the Internet, *with the following two exceptions:*
>
> > (a) Immediate disconnection shall *not* be required for each specifically identified Information Technology System and computer that the Interior defendants certify, within ten (10) days of the date of entry of this Order, to be **essential for protection against fires or other threats to life or property**, and provide a specific justification in support thereof, in accordance with Rule 11 of the Federal Rules of Civil Procedure.
> >
> > (b) Immediate disconnection shall *not* be required for each specifically identified Reconnected System that the Interior defendants certify, within fifteen (15) days of the date of entry of this Order, and in accordance with Rule 11 of the Federal Rules of Civil Procedure, that the Interior Department currently believes either (1) **does not House or Access to Individual Indian Trust Data**, and provide a specific justification thereof, *or* (2) **is secure from Internet access by unauthorized users**, and provide a specific justification in support thereof, stating in specific terms the security measures that are presently in place to protect unauthorized Internet access to the Individual Indian Trust Data that the

---

[18]Temporary Restraining Order at 1-2.

Information Technology System Houses or provides Access to.[19]

The obligations set forth in the TRO, the IT Injunction, and other relevant orders are clear and unambiguous.   However, this Court's trust was misplaced.  As plaintiffs demonstrate below, instead of candor, Norton and her senior managers and counsel knowingly and willfully violated such orders and acted in concert to coverup their violations, further harming plaintiffs irreparably and further undermining the integrity of this litigation.  Accordingly, the prompt commencement of civil and criminal contempt proceedings is warranted.

### III.  VIOLATIONS OF QUARTERLY REPORTING REQUIREMENTS

**A.   *Material Misrepresentations – Affirmatively and by Omission – Regarding IT Security Have Further Exposed Trust Data and Assets to Loss, Destruction, Corruption and Unlawful Manipulation*.**

Following this Court's September 17, 2002 opinion and order, Norton and her senior managers and counsel began a new campaign of deceit and subterfuge to conceal from this Court and plaintiffs essential information regarding the adequacy of IT security.  Beginning (at least) with the eleventh quarterly report filed on November 1, 2002, and contrary to the actual status of IT security, Norton *et al.* made the following misrepresentation to this Court and plaintiffs:[20]

> The relative security and integrity of DOI's computer systems is **gradually improving**.[21]

And, then again on February 3, 2003:

> Although system security weaknesses are still present, the relative security and integrity of Interior's computer systems is **slowly improving**.[22]

---

[19]*Cobell v. Norton*, 274 F. Supp.2d at 136-37 (bold emphasis added, italics original).

[20]Notably, the eighth, ninth and tenth quarterly status reports were equally deceptive, indicating that meaningful and effective reforms were occurring when, in fact, they were not.

[21]Plaintiffs' Exhibit 1 (excerpts of the 11th quarterly report) at 8 (emphasis added).  This quarterly report has the same disclosure problems associated with the 8th-10th quarterly reports, as identified in n. 20 above.

[22]Plaintiffs Exhibit 2 (excerpts of the 12th quarterly report) at 10 (emphasis added).  This report has the same disclosure problems identified in n. 21 above.

Among the more egregious deceptions found in the 13th quarterly report, Norton and her senior

managers and counsel state to this Court:

> [External penetration] [s]cans were conducted in January, February and March
> 2003.  The results were distributed to the Chief Information Officer of each bureau,
> and the **data shows that bureaus decreased the number of potential**
> **vulnerabilities by more than eighty percent during this quarter**.  The results
> were also provided to the Special Master.[23]

And, by August 1, 2003:

> Interior's computer **security efforts are showing significant progress.**

---

[23]Plaintiffs' Exhibit 3 (excerpts of the 13th quarterly report) at 10 (emphasis added). In addition
to the materially inadequate disclosures that plague all quarterly reports, the results of external
scans, while mentioned in passing, have never been provided to this Court or plaintiffs.  This is
significant in light of this Court's finding that plaintiffs did not prove that the IT Systems were
insecure when it again fashioned modest relief and entered the IT Injunction:

> [P]laintiffs have not demonstrated to the satisfaction of the Court that the
> reconnected systems are not presently secure from unauthorized Internet access.

*Cobell v. Norton*, 274 F. Supp.2d at 133.  As noted above, in finding that plaintiffs did not prove
that IT Systems were insecure, this Court inexplicably "adopt[ed] some middle ground [short of
the] extreme step[] of disconnecting all of the reconnected systems. . . ." *Id*.  This "middle
ground" was adopted notwithstanding the fact that plaintiffs have been, and continue to be,
unlawfully obstructed in their efforts to obtain the production of evidence that would demonstrate
conclusively that Trust Data is "not presently secure."  Moreover, plaintiffs were rarely provided
prior notice of, or invited to accompany the Master, DOJ and DOI on IT security site visits.
Tellingly, plaintiffs were provided notice prior to one such meeting between the Master, Interior
and Justice regarding the status of IT security. (This Court may recall that Norton dubbed
defendants' representatives who were tasked with the duty to meet *ex parte* with the Master on IT
security matters as her "trusted points of contact.").  However, Norton and her counsel abruptly
terminated further meetings with the Master after plaintiffs' counsel insisted that they be present.
Notwithstanding the righteous indignation that Norton and her counsel feigned convincingly before
the Court of Appeals, it is clear that Norton and her counsel found such *ex parte* meetings – as
well as *ex parte* submissions – to be useful to their litigation strategy, so much so that they refused
to meet with the Master on IT security matters unless he barred plaintiffs' attendance, which he
properly refused to do in response to plaintiffs' protests.

Indeed, but for defendants' systemic spoliation of evidence and their unlawful withholding
of relevant information from plaintiffs, there is no doubt that conclusive evidence of the
inadequacy of IT security would have been proffered by plaintiffs a year ago (at least) – and
certainly **much sooner** than the more candid but narrow Inspector General and General Accounting
Office reports attached hereto.  *See* Plaintiffs' Exhibits 6 & 7.  Critically, such evidence would
have been helpful to this Court in fashioning an effective IT Injunction rather than another modest
remedy – admittedly a "middle ground" – that, just like all other such modest relief fashioned in
this litigation, has proved ineffective because of continuing deception and disobedience of Norton
and her counsel.  Plaintiffs suggest that no more "middle ground" remedies should be fashioned
here; an order is either effective or it is not.

> **Substantial efforts** have been made during the past 18 months to install firewalls and intrusion detection systems, reconfigure systems, update security patches, scan networks for vulnerabilities, update password procedures and provide computer security training.

> **Systems vulnerability scanning efforts conducted by Interior demonstrate that perimeter security has improved**. Interior is taking steps to eliminate "false positive" scanning results and to ensure the few remaining real vulnerabilities are consistently addressed.  Interior has also examined the communications nexus, called the Virtual Private Exchange (VPX), to ensure it is adequately secured. Interior is also preparing for additional security evaluations of its internal IT systems.[24]

Equally deceptive, Norton and her senior managers and counsel represented to this Court and plaintiffs  that the "number of hosts with potential high risk vulnerabilities was reduced by about **fifty percent from the previous quarter**. . . ."[25]

> To understand just how poor Interior's IT security is, one need only consider Interior's self-appraised "scorecard." Approximately one month before the *Subcommittee on Technology,*

---

[24]Plaintiffs' Exhibit 4 (excerpts of the 14th quarterly report) at 10 (emphasis added).  These material misrepresentations were made three days after this Court entered the IT Injunction that provides that "[i]f certifications . . . are submitted within fifteen (15) days of the entry of the preliminary injunction, the Court will not . . . order the systems thus certified to be immediately disconnected from the Internet."  *Cobell v. Norton,* 274 F.Supp.2d at 133.  Simply put, this Court previously found Norton, and her senior managers and counsel to be mendacious and contemptible. Yet, it decided to rely **solely** on their incompetent, false, and otherwise materially misleading certifications and permitted insecure IT Systems to be reconnected – or remain connected – to the Internet.  Parenthetically, step one in Norton's and her counsel's ruse consisted of the standard false and materially misleading quarterly report, representing that "significant progress" and "perimeter security has improved" when, in fact, no such progress or correction of material weakness in IT security has occurred.  Step two consisted of the preparation and filing of false and misleading certifications to the same effect.  Their *modus operandi* hasn't changed.

[25]*Id.* at 16 (emphasis added).  This statement must be viewed in context.  If one assumes that only 1000 high risk vulnerabilities existed at the beginning of the 13th quarterly report's reporting period, then a reduction in the number of vulnerabilities by 80% (as represented in the 13th quarterly report) would mean that a mere 200 vulnerabilities remained at the end of the reporting period.  Consequently, a reduction of the remaining 200 vulnerabilities by another 50% in the following quarter (as represented by Norton in the 14th quarterly report) would leave 100 vulnerabilities at the end of the quarter.

> While such information might have some topical value, quantitatively – to the extent it is truthful (which would be shocking) – such disclosure is utterly meaningless and misleading qualitatively, viz-a-viz the materiality of each remaining vulnerability and each remaining weakness, the corresponding risk to Trust Data, and the affect (*e.g.,* loss, destruction, and corruption) that each such vulnerability and weakness has had, and continues to have, on Trust Data.

*Information, Policy, Intergovernmental Relations and the Census - United States House of Representatives* reported on the continuing failure of the IT security, Norton self-graded Interior's IT security a dismal 43%.[26] What is more extraordinary still, the calculation of this grade included the self-assessment that "BIA received a score of 81.9% on Interior's security scorecard"[27] and "OST received a score of 80% on Interior's scorecard"[28] – systems which the government has been forced to concede **continue to be insecure** and, therefore, remain disconnected from the Internet.  A review of these numbers suggests that but for the "passing" scores of BIA and OST, **Interior's overall grade of 43 would have been much lower**.  Put another way, Norton and her senior managers and counsel would have this Court believe that the BIA and OST (IT Systems that today remain disconnected from the Internet because of pervasive IT security problems) are, in fact, more secure than the IT Systems that remain connected to the Internet.[29]  If the self-assessment regarding the security of off-line BIA and OST IT Systems is true, then the IT Systems that are connected to Internet are plainly in violation of the IT Injunction.  If the assessment is false, Norton and her senior managers and counsel have been caught in yet another lie to this Court.  In either

---

[26]*See* Plaintiffs' Exhibit 9, Attachment at 1.  This Court may note that the Department of the Interior, the Department of Justice and the Department of the Agriculture are the only agencies to receive an "F" for four consecutive years – in 2000, 2001, 2002 and 2003.  *Id.*, Attachment at 3.  Moreover, this Court may also note that nearly every other government entity evaluated (except for the Interior trustee-delegate) posted **progressive** improvement from 2002.  *Id.*  Contrary to the representations of Norton and her senior managers and counsel, Interior posted **no marked year to year improvement** according to the Committee's assessment. *Id.*  Incredibly, these reports are based on "**self-evaluations**," meaning that the reported "F" is surely the rosiest assessment of the adequacy of Interior's IT security.

[27]*See* Plaintiffs' Exhibit 5 (excerpts of the 15th quarterly report) at 7.

[28]*Id.* at 8.

[29]Reconnection of insecure IT Systems to the Internet has occurred over the vigorous objections of plaintiffs, based on unsworn, statutorily and evidentiarily incompetent certifications of Interior senior managers and counsel.  *See e.g. Interior Defendants' Office of the Inspector General's Submissions in Compliance with Preliminary Injunction*, filed August 11, 2003, declaring that the National Business Center, Minerals Management Service, Office of Surface Mining, Bureau of Land Management and other agencies engaged in the management and administration of Trust assets are secure when they are not.  And, because of the obstruction of the Master, there is **no** effective monitoring of IT security to ensure the protection of critical Trust Data.

case, this Court, the Master, and plaintiffs continue to be victims of a con game.

What is indisputable is that Norton and senior managers and counsel knowingly and willfully have filed false and misleading quarterly reports.  This is demonstrated by two recent government party reports submitted to this Court **by plaintiffs**: (1) the September 8, 2003 Office of Management and Budget report entitled *Financial Management Status Report and Strategic Plan (FY2004-FY2008)* ("OMB Report"); and (2) the September 12, 2003 General Accounting Office report entitled *Information Technology: Department Leadership Crucial to Success of Investment Reforms at Interior* ("GAO Report").[30]  It is telling that Norton withheld these reports from this Court and plaintiffs.[31]

**B.   The OMB Report Discloses Pervasive Weaknesses in IT Systems which Expose Trust Data to Further Loss, Destruction, Corruption, and Unlawful Manipulation.**

On September 8, 2003, Norton transmitted he OMB Report to OMB in accordance with various statutory and executive order reporting requirements, including FISMA.[32]

Notable admissions contained in the OMB Report include:

- "**Key** departmental financial management systems that are **critical to the sound management** of Interior's diverse, geographically diffuse operations and programs **are in urgent need of replacement**. . . .  **The systems do not have the necessary security**

---

[30]Attached hereto as Plaintiffs' Exhibits 8 & 7, respectively.

[31]Norton and her counsel concealed from this Court and plaintiffs the existence of the OMB Report because it contains material information that conflicts directly with contemporaneous declarations that they filed with this Court.  Parenthetically, while it may be safe to deceive this Court, it is clear that Norton and her counsel are not so sanguine that they are comfortable to lie to the President.  Not until plaintiffs filed their September 17, 2003 notice did Norton and her counsel even acknowledge the existence of the OMB Report.  Notably, they did not disclose that the report contains material admissions concerning deficiencies in IT security, limiting their disclosure to an acknowledgment that the report had been prepared and that Hord Tipton "supported this effort by issuing reporting guidance, collecting the required data, and preparing a coordinated draft of the FISMA report."  Plaintiffs' Exhibit 5 at 7.  Similarly, no disclosure of the GAO Report or its similarly adverse assessment of IT security was made by Norton and her counsel in any quarterly report or by separate notice to the Court.  Nothing has changed.

[32]Financial Information Security Management Act of 2002.

**capabilities to facilitate more open access via the Internet**."[33]

• "Interior continues to focus efforts on correcting material weaknesses and noncompliance issues reported by its financial statement auditors; however, **the Department continues to be challenged by the remaining FMFIA material weaknesses, including challenges in managing Indian Trust Funds and inadequate computer security**. While these and other issues are being addressed with extensive resource commitments, the issues are complex and will require several years to resolve."[34]

• The FY 2002 Audited Financial Statement disclosed **multiple Department-wide material weaknesses including "Inadequate Control Over Trust Funds**."[35]

• "*Access Controls*. In some instances, **the Department has not established access controls that limit or detect inappropriate access to information technology systems** and related resources, thereby **increasing the risk of unauthorized modification, loss, or disclosure of sensitive or confidential data**. The Department will take action to secure network vulnerabilities and improve access control deficiencies in each of the following areas: network configuration management; password management; monitoring of security violation logs; access to program and sensitive files that control computer hardware and sensitive applications; and, other physical security controls."[36]

• "The increasing growth in electronic commerce and the **growing vulnerabilities of information systems to unauthorized access** have resulted in the need for a comprehensive improvement to IT security."[37]

To be sure, Norton, Griles[38] and Tipton[39] (and, obviously Cason too) cannot say they did

not have direct knowledge of the aforementioned weaknesses.  That is because Norton established

and chairs a committee, dubbed – in classic Orwellian terms  – the "Management Excellence

---

[33]*Id.* at 5 (emphasis added).

[34]*Id.* (emphasis added).

[35]*Id.* at 24 Exhibit 3-2.  Importantly, the report disclosed that this material weakness would remain uncorrected until at least FY 2005.

[36]*Id.* at 31.

[37]*Id.* at 33 Exhibit 3-4 (emphasis added).  Norton and her senior managers have known about this material weakness since at least September 30, 2002.  However, it is not even scheduled for correction until FY 2004.

[38]Griles represents to this Court that he is in charge of trust reform. *See* Plaintiffs' Exhibit 11 (Griles Declaration) at ¶¶ 3, 15 ("[I am] the official currently in charge of trust reform in the Department").

[39]*Id.* at 5-6.  Tipton reports **directly** to Norton. *Id.* at 6 ("Chief Information Officer - **Reports to the Secretary** and receives administrative guidance from the Assistant Secretary - Policy, Management and Budget") (emphasis added).

Council" ("Management Council"), to provide "**leadership, direction, and accountability** to implement the Administration's goals and provide[] overall direction and oversight of the Department's management reform activities."[40]  The Management Council includes Norton, Griles, co-defendant Dave Anderson, and Hord Tipton.  As part of its express duties, the Management Council, individually and collectively, supervised the preparation and vetting of the OMB Report as well as the quarterly reports. The aforementioned four also claim significant responsibility for management of this litigation and reform of the Trust.  Each knew that the information contained in the OMB Report could not be reconciled with representations made in various quarterly reports that they prepared and filed with this Court – much less their **declarations** and representations made to this Court that purport to justify reconnection of insecure IT Systems.  Nonetheless, they suppressed this information at the same time they filed false and misleading quarterly reports, knowing that the Master had been put on ice and plaintiffs remain hamstrung in their discovery efforts.

C.      *The GAO Confirms Pervasive Material Weaknesses in IT Security which Expose Trust Data to Further Loss, Destruction, Corruption, and Unlawful Manipulation.*

The GAO Report was transmitted to Congress contemporaneously with Norton's transmittal of her report to OMB.  This is powerful evidence that Norton and her senior managers

---

[40]Plaintiffs' Exhibit 8 at 5 (emphasis added). Notwithstanding the obvious public relations purpose of Norton's "Management Excellence Council," the General Accounting Office oxymoronically found that there is **no** management, **no** excellence, **no** accountability, and **no** compliance with Secretarial Orders:

> However, Interior's CIO has taken **limited action to ensure that the secretarial order was implemented** and that other required improvements to the process were made. The department had envisioned a certification process through which it would hold bureaus accountable for improving their investment management capabilities, but **it has yet to implement this concept**. Until sound management structures and a certification process are in place, **the department's ability to oversee the bureaus' practices for investment management will be limited**.

Plaintiffs' Exhibit 7 at 30 (emphasis added). *See also id.* at 33 ("**[N]one** of the bureaus had fully implemented the [Secretarial] order.").  In reality, there has been **no meaningful** improvement in the deeply troubled IT Systems notwithstanding initial positive reports of the Master that permitted reconnection of insecure IT Systems.

16

and counsel knew that their quarterly reports and declarations were false at the time they were made and that they continue to engage in a scheme to defraud this Court and plaintiffs with respect to IT security.

The GAO and OMB reports are consistent and, in fact, both complement and supplement each other; the GAO Report focuses on Norton's inability to manage IT assets and investments and the OMB Report focuses on long-standing, uncorrected weaknesses in IT Systems.  And, their conclusions are identical: Norton is not competent to secure IT Systems that house or access Trust Data; nor can she manage effectively funds appropriated for such purposes.  As a consequence, the trustee-delegate has exposed Trust Data to further loss, destruction, corruption and unlawful manipulation.

The GAO Report is illuminating and tells a disturbing story far different from that which Norton *et al.* has told this Court:

> The Department of the **Interior has limited capability**.... [and] **is carrying out few of the activities that support critical foundational processes** (see table below). As an initial step to improve its investment management capability, the department has issued a *Capital Planning and Investment Control Guide*, which describes its approach to IT investment management. However, **it has thus far implemented few of the processes described in its own guide**. In addition, **it has yet to develop an adequate approach to identify existing** projects and **systems**. In order to ensure strong investment management at all levels, the department has also specified a requirement for certifying bureau-level investment processes, but **certification has not yet begun**. Finally, in order to strengthen the CIO's ability to manage IT investments at all levels, the Secretary of the Interior has issued an order establishing the authority of the bureau-level CIOs; however, **the order has not been fully implemented**.[41]

Notwithstanding repeated representations to the contrary, nothing has changed in more than seven and one-half years of this litigation: new standards – incorporated in regulations and guides – continue to be promulgated and disseminated but compliance is **not, and cannot be,** enforced. Secretarial orders continue to be issued but are **not** implemented.  A process for "certifying bureau-level investment processes [has been developed and established], but certification has **not**

---

[41]Plaintiffs' Exhibit 7 at "Highlights" page (emphasis added).

yet begun."[42]

It should be no surprise to this Court that it is not possible to reconcile conflicting, contemporaneous findings of the GAO with representations contained in "certifications" filed with this Court by Norton and her senior managers and counsel on August 11, 2003 and, again, on August 27, 2003.  Because, in reality, nothing has changed in seven and one-half years; hundreds of millions of dollars of appropriated funds continue to be spent on contractors; personnel continue to be shuffled and reshuffled, offices and positions continue to be renamed, responsibilities continue to be restated,  committees and boards continue to be created, misrepresentations continue to be made, material weaknesses in IT security continues to exist, Trust Data continues to be at risk, and posturing for this Court is preferred over candor.

Notwithstanding Norton's concerted efforts to coverup this scandal, all competent evidence demonstrates that IT security – which has always been poor – has eroded and that conditions today are worse than they were prior to December 5, 2001, the date this Court first ordered Norton to **immediately** disconnect from the Internet all IT Systems that house or access Trust Data.  And, make no mistake, Norton and her senior managers and counsel have employed, and will continue to employ, every means at their disposal to deceive this Court and suppress material information adverse to their position in this litigation. Their actions upon receipt of the draft GAO Report are indicative of their persistent unethical and unlawful conduct.

Norton **concurred unequivocally** in the concealed draft findings of the General Accounting Office, but **insisted** that the GAO "remove[] **all** descriptions of ... [the] Trust"[43] to continue to conceal the import of such findings with respect to Trust Data.  Had this information been reported candidly to this Court and plaintiffs under seal, the declarations and reports would have been exposed immediately for the fraud they are.  Given the history in this case, it should be no a

---

[42]*See also id.* at 33-34 (emphasis added) ("[T]he department has yet to fully implement a certification process through which it can hold bureaus accountable for their IT investment management processes.").

[43]See Plaintiffs' Exhibit 7 at 39 (emphasis added).

surprise that this information was **never disclosed**. If defense counsel truly knew nothing – an assumption that defies logic – it means that they conducted **no** due diligence, for even the most basic due diligence would have revealed the deception practiced on this Court and plaintiffs. In reality, Secretary Norton and her senior managers and counsel would have this Court rule blind and in ignorance rather than provide accurate information to the Court and to 500,000 individual Indian trust beneficiaries.

The relentless litigation misconduct of Norton *et al.* again proves the correctness of this Court's findings one year ago: "The Department of Interior has demonstrated that **neither its officials nor its attorneys can be trusted** to provide the Court with accurate information regarding the agency's efforts to ensure the security of its computer systems."[44]  Additional findings of the General Accounting Office with respect to the trustee-delegate are as follows:

- **Interior's capacity** to effectively manage IT investments **is limited.**[45]

- Interior demonstrates **few capabilities** for IT investment management.[46]

- Interior IT Boards are operating but have **limited skill and experience**.[47]

- **No** project and system **inventory exists** to support informed investment decision making.[48]

- **Interior lacks fundamental capabilities** for adequate IT project **oversight**.[49]

- Interior **cannot** link IT investments to business needs.[50]

- A selection process is established, but **IT boards lack** necessary **experience** for effective

---

[44]*Cobell v. Norton*, 226 F.Supp.2d 1, 129-130 (emphasis added).

[45]*See* Plaintiffs' Exhibit 7 at 12-13.

[46]*Id*. at 13-15.

[47]*Id*. at 15-18.

[48]*Id*. at 19-21.

[49]*Id*. at 21-24.

[50]*Id*. at 24-26.

implementation.[51]

- Interior is **not** managing IT investments as a portfolio as it must.[52]

- Interior **cannot** effectively **oversee IT investments** in the bureaus.[53]

- Department and bureau CIO's **cannot provide leadership** for IT investment processes.[54]

- Interior does **not** follow through with the requisite certification of each bureau's IT investment management process.[55]

- **Interior's efforts** to improve investment management processes and oversight **are** fragmented and **inadequate**.[56]

The GAO concluded that Norton and her senior managers **cannot** ensure the security of

Trust Data:

> **The Department of the Interior lacks most of the fundamental IT investment management practices necessary to effectively and efficiently manage its IT resources**. Only by effectively and efficiently managing these resources can the department gain opportunities to further leverage its IT investments and make better allocation decisions among many investment alternatives. Recent moves by senior executives to define an IT investment management approach—and to align the IT investment decision review process with the CIOs at both the department and bureau levels – demonstrate Interior's realization that reform is necessary. Nonetheless, **the department still finds itself without many of the capabilities it needs to ensure that Interior's mix of IT investments best meets the agency's mission and business priorities**. Interior's ability to guide and oversee investment practices throughout the agency is limited by its lack of mature investment management processes. The department has recognized that it needs to oversee bureau activities, and it has begun to establish the authority of bureau CIOs to manage IT investments and to implement certification of standard investment processes in the bureaus. However, until the department is able to ensure mature investment management capabilities at all levels, its ability to wisely select and effectively manage IT investments will be limited. Interior's success in resolving the weaknesses described in this report will depend on the department's ability to plan and execute the implementation of robust investment management and related practices throughout the agency. However, **the department's efforts have**

---

[51]*Id*. at 26-28.

[52]*Id*. at 28-30.

[53]*Id*. at 30-31.

[54]*Id*. at 31-33.

[55]*Id*. at 33-34.

[56]*Id*. at 34-36.

**suffered from a lack of unified planning, clear implementation guidance, supporting resources, and follow-up on requirements that have been established by the CIO. Until the department develops a comprehensive plan, supported by top management, that delineates performance expectations for process improvements, <u>Interior's prospects will remain limited for successfully developing the management capabilities that are necessary to make prudent decisions that maximize the benefits and minimize the risks of its IT investments</u>.**[57]

**D.      *A Comparison of Quarterly Report Misrepresentations to Findings and Conclusions of the GAO***

Norton concealed from this Court and plaintiffs the GAO report that disclosed IT security failures at the same time she and her senior managers and counsel filed false quarterly reports and declarations that touted their "successes" at managing IT security investments and assets.  A review of the GAO Report confirms that Interior has squandered more than one billion taxpayer dollars[58] with no material improvement in IT security and without ensuring the protection and preservation of Trust Data. The comparison below between what Norton *et al.* has reported and findings made by GAO, evidences conclusively the nature and scope of the pervasive deceit.

*Misrepresentation*

Beginning with the November 1, 2002 (11th) quarterly report, Norton and her senior managers and counsel falsely assured this Court and plaintiffs that they had addressed "proper controls and funding" for "[a]ll aspects of system functionality and requirements:"

IT Security and Capital Asset Planning:

• The budget justifications (Exhibit 300's) for IT systems were reviewed from an IT security perspective for the first time this quarter in connection with the FY 2004 budget. The review focused on IT security components relevant to the stage of the system lifecycle (planning, design, development, testing, implementation, steady state, or expiration). This year, for the first time, **DOI's new capital planning executive review boards met to assess major investments for IT systems. All aspects of system functionality and requirements analysis along with IT security were reviewed to <u>assure proper controls and funding were being</u>**

---

[57]*Id.* at 36 (emphasis added).

[58]*See id. at* 7 ("about $1 billion in Interior IT investment projects were not subject to department-level review and approval during [the preceding two years].").

**addressed**.[59]

*GAO Findings*

  To the contrary, far from being able to "assure proper controls and funding were

addressed," the GAO found **nothing** had been accomplished:

> [T]he department's ability to oversee the successful implementation and execution
> of the required [investment management] practices is limited, although a number of
> initiatives have been undertaken to address this issue. However, **efforts to
> implement the reform initiatives have not moved forward as specified in
> implementing memoranda**, [consequently, Interior] lack[s] essential management
> controls over its IT investments, and it will be unable to ensure that the mix of
> investments it is pursuing is the best to meet the department's strategic goals,
> objectives, and mission.[60]

In fact, in July 2003 the GAO found that Norton's "capital planning review boards"[61] were

ineffective[62] and lacked "core competencies in using the IT investment approach."[63] Specifically,

the Norton's Management Council was criticized for its ineffectiveness:

> Until the department implements an effective IT investment board process that is
> well established and understood throughout the agency, **executives cannot be
> adequately assured that decisions made by the boards are being well supported
> and carried out** by its executives and line managers or that each board is operating
> according to established policies and procedures.[64]

Importantly, at the same time Norton and her senior managers and counsel represented that

"Exhibit 300's" are employed to they review and ensure the efficacy of IT security investments and

assets, the GAO concluded that this not possible because (a) there are **no** formal policies and

procedures in place to support the completion and review of the Exhibit 300's; (b) Exhibit 300's

---

[59]Plaintiffs' Exhibit 1 at 10 (emphasis added)

[60]Plaintiffs' Exhibit 7 at 12-13 (emphasis added).

[61]Although it is not entirely clear, the capital planning review board appears to be a
subcommittee of the Management Council chaired by Norton and includes, Griles, Cason, Tipton
and Lamb. *See* Plaintiffs' Exhibit 8 (OMB Report) at 5-8.

[62]*Id.* at 17.

[63]*Id.* at 25.

[64]*Id.* (emphasis added).

are **not** required for non-major IT investments (67% of the IT Systems); and ©) the Management

Council **cannot** "demonstrate that identified users participated in project management."[65]  Simply

put, the GAO concluded that Norton's Management Council is ineffective and can provide **no**

assurance that proper controls are in place.

*Misrepresentation*

Norton and her senior managers and counsel knowingly and willfully deceived this Court

when they falsely provided "assurances" in the 12th quarterly report that IT investments are linked

effectively to identified security needs:

> Capital Asset Planning Security Review
> The OCIO IT Security office continued reviewing Exhibit 300s for IT systems filed
> in conjunction with FY 2004 budget requests. **The Exhibit 300** Capital Asset Plan
> and Business Case, which is submitted yearly to OMB as justification for funding
> Interior's individual construction and major information technology capital assets,
> **demonstrates** Interior's planning, budgeting, acquisition and management
> **process for those assets, and** provides assurance **that these investments are**
> **linked to mission needs in an effective and efficient manner**. The review
> focused on IT security requirements dependent upon the stage of the system
> lifecycle. Exhibits 300's lacking the content necessary to make an informed IT
> security determination were identified to the OCIO Capital Planning Office and
> returned for revisions. The Exhibit 300 process also provides a **focused**
> **opportunity to** ensure adherence **to Interior's IT Security architecture**
> **throughout the lifecycle of IT systems**.[66]

*GAO Findings*

There is **no** "assurance that [IT] investments are linked to mission needs." In fact, Norton

and her senior management and counsel cannot "ensure adherence to Interior's IT Security

architecture" because Norton has established **no** system – **none** – to ensure that informed and

intelligent decisions are made by the Management Council on IT security matters.  The GAO

confirmed the nature and scope of this deception as follows:

> [The Management Council] does not have any written standards or existing
> repositories of information on Interior's IT investments that meet ITIM standards,

---

[65]*See also id.* at 27 (Management Counsel's use of the Exhibit 300's also disregards more
appropriate and complete selection criteria that are set forth in the *Capital Planning and
Investment Control.*).

[66]Plaintiff's Exhibit 2 at 12 (emphasis added).

and **it has not assigned responsibility or allocated resources for this purpose**. **In April 2003**, departmental officials indicated that they are planning to use the Exhibit 53 report they prepared for OMB as their IT project and system inventory. However, according to the same officials, the current Exhibit 53 report for Interior does not constitute a comprehensive list of its IT investments. Moreover, this report does not include information on actual project cost and schedule or other information needed to support IT investment decisions. . . . **Interior's IT investment boards do not currently have the information they need to make well-informed decisions regarding selecting, controlling, and evaluating investment decisions**. Without information from such an inventory, the department- and bureau-level boards **cannot ensure** that duplication among existing and proposed IT investments is eliminated. In addition, the boards cannot compare actual project performance with expectations and determine whether corrective actions should be taken.[67]

Simply put, Norton and her senior managers and counsel are **not** capable of providing meaningful "assurance" to this Court – much less an honest "demonstrat[ion]" – that IT Systems are properly managed and that investments in IT security are effective.

*Misrepresentation*

In the 13th quarterly report, Tipton claims to have completed the "IT Security Asset Valuation Guide, Version 2.0," which he deceptively represents "provides a means for allocating capital resources, establishing work priorities, and establishing and **validating IT security requirements based upon an IT system's overall importance**."[68]

*GAO Findings*

There is **no** compliance system in place to ensure the adequacy of IT security requirements:

[The Management Council] currently has no consistent way of knowing the extent to which project management plans are being developed, approved, maintained, and reviewed. As a result, the department has no mechanisms for ensuring that up-to-date information on actual costs and schedule are being provided to the IT investment boards. Finally, Interior lacks an IT projects and systems inventory to capture performance information that can be used by its boards in the investment decision process. **According to Interior officials**, the department is not executing many of the key practices for Stage 2 IT project oversight because it currently

---

[67]Plaintiffs' Exhibit 7 at 20 (emphasis added).

[68]Plaintiffs' Exhibit 3 at 10 (emphasis added).  Similar representations are made in the 14th quarterly report. *See* Plaintiffs Exhibit 4 at 14.  Conspicuously, despite the fact that the GAO Report was released during the 15th quarterly report's reporting period, Norton made no mention of the GAO report or its findings; findings that expressly refute the representations made by Norton *et al.* in the 11th, 12th, 13th and 14th quarterly reports.

relies on the bureaus to perform these management functions. However, since the department has not developed policies and procedures for the bureaus to follow in conducting IT project oversight, **Interior is running the risk that under performing projects will not be reported to the appropriate IT investment board. In the absence of effective board oversight, Interior executives do not have adequate assurance that projects are being developed on schedule and within budget**.[69]

In accordance with the all too familiar practice of defendants and their counsel, Interior officials confessed privately to the GAO that they are **not** "executing many of the key practices for ... IT project oversight" at the same time Norton *et al.* were making representations to the contrary to this Court and plaintiffs.

Each of the five quarterly reports filed by Norton that purport to address IT security issues – Reports 11-15 – is progressively more dishonest and misleading than the previous report.  Each quarterly report represents that appropriate plans have been developed, measures have been implemented, and steps have been taken to ensure that funds appropriated by Congress were allocated and invested properly and effectively.  These representations are false, as the GAO and OMB Reports make clear.

In fact, the GAO confirmed what this Court has found repeatedly – that Norton cannot, and will not, discharge her fiduciary duties and has redelegated fiduciary responsibilities to similarly unfit and unskilled officials whom she appointed to her Management Council and IT boards. Given the incompetence of Interior management, the failure to protect Trust Data was inevitable: guidance is ignored, Secretarial orders cannot be enforced, IT investments cannot meet critical Trust needs, and there is no assurance that this can, or will, change.  And, worse, instead of candor, Norton contemporaneously suppressed this information, choosing to continue to dupe this Court, representing, among other things, that "[t]he Exhibit 300 . . . **demonstrates** Interior's planning, budgeting, acquisition and management process for those assets, and **provides assurance** that these investments are linked to mission needs in an effective and efficient manner."[70]

---

[69]Plaintiffs' Exhibit 7 at 22 (emphasis added).

[70]*Id.* at 12.

**E.** ***Two Recently Produced its Reports Disclose That Norton and Her Senior Manager and Counsel Suppress Information Confirming That Trust Data are in Imminent Risk***

*FISMA Report*

In accordance with the Federal Information Security Management Act of 2002 ("FISMA"), Norton must report to Congress on the progress she has made in ensuring IT security.  The report is dated September 17, 2003 and is entitled "*Report on the Implementation of the Federal Information Security Management Act (FISMA): FY2003.*"[71]

The FISMA Report postures before Congress and focuses on the trustee-delegate's prospective efforts only; actions that Norton **intends** to take.  It conspicuously omits mention of all materially adverse information, including explicit concerns raised by both the GAO and the Inspector General regarding her demonstrated inability to manage and secure Interior's IT Systems.  The FISMA Report deceptively suggests that the security weaknesses that have plagued IT Systems historically have been resolved and the IT Systems – while not **technically** in compliance with FISMA and OMB Circular A-130 – are now generally secure.  The preface is illustrative:

> DOI made **major progress** in developing the infrastructure for the DOI IT security program including new IT security policies, plans, and guidelines. DOI places a **high priority** on assuring that its people, programs, and technology protect and **secure DOI's missions and operations**.  The DOI Office of the Chief Information Officer (OCIO) made **significant improvements** to the DOI IT security program during FY 2003.  The DOI continues to make progress in the area of addressing IT security weaknesses [that] remain.[72]

Indeed, in conclusory fashion Norton mentions only that the Inspector General believes that "DOI does not have an adequate segregation of duties which is often a primary indicator of inappropriate IT security staffing."[73] And, she deceptively proclaims that the "Inspector General (OIG)

---

[71]*See generally* Plaintiffs' Exhibit 10 ("FISMA Report").

[72]Plaintiffs' Exhibit 10 (FISMA Report) at 1 (emphasis added).

[73]*Id.* at 5.

acknowledges that the OCIO made progress in FY 2003."[74]

Norton grudgingly acknowledges that there is some "room to improve;" however, she blames this Court for the unresolved IT security problems, describing this Court's efforts to protect Trust Data as a nuisance and unjustifiable interference that "continues to cause tremendous hardship on these offices [disconnected from the Internet] as it greatly inhibits their ability to efficiently serve their customers and **adds costs and unnecessary risk** to maintaining sound security."[75].

That Norton and her senior managers and counsel are comfortable lying to this Court is well established.  The false and materially misleading FISMA Report simply proves  that she views Congress with the same contempt that she views this Court and 500,000 individual Indian trust beneficiaries.

*IG Annual Evaluation*

---

[74]*Id.* at 7.

[75]*Id.* (emphasis added); *see also id.* at 6.   Moreover, other than a casual, passing reference to unexplained concerns about segregation of duties, she identifies the IT Injunction and its mandate that insecure IT Systems be disconnected from the Internet as the only significant obstacle to a complete resolution of  remaining – but unidentified – IT security weaknesses.  Notably, while KPMG had identified a material weakness in 2001, Norton represents that it only made "recommendations for improvement" in FY 2003.  *Id.* at 15.  The veracity of this representation cannot be tested inasmuch as Norton has refused to produce KPMG audits (FY2001-2003) to plaintiffs and they continue to be withheld from this Court despite their obvious relevance to the IT Injunction and plaintiffs outstanding discovery requests:

> DOI identified a material weakness during FY 2001 in "Security and General Controls over Financial Management Systems" as a result of the audited financial statements.  Findings from the internal and external audits of DOI's financial IT systems along with the Indian Trust Management systems formed the basis for reporting the IT security program as a material weakness.  DOI has placed a high priority on the Departmental IT security function and has organized an effort for continuous monitoring of program achievement level as an expanded corrective action plan (POA&M).  This material weakness was assigned a targeted correction completion date of FY 2004.  Follow-on audits by KPMG (Bearing Point) found that even though DOI was working toward improving the security and controls over IT systems, controls still need additional improvement.

*Id.* No doubt, the KPMG FY2003 audit identifies the same material weaknesses in 2003 that it reported on in 2001.

FISMA also requires that the Interior Inspector General prepare an annual evaluation of the department's IT security program.  The most recent evaluation was transmitted to Norton on September 22, 2003 (the "IG Report"), five days after Norton submitted her FISMA Report to Congress.  Contrary to the representations contained in the aforementioned quarterly reports that were reviewed and approved by Norton and her senior managers and counsel and contrary to contemporaneous declarations of Norton's senior managers (*e.g.,* Cason) that Norton and her counsel approved and filed with this Court to justify their ill-conceived reconnection of IT Systems to the Internet, as well as the false and misleading FISMA Report reviewed, approved, and submitted by Norton to Congress five days earlier, the inspector general concluded that Interior's IT Systems are insecure: "[Interior's] overall security program does not yet adequately protect all information systems supporting the operations and assets of the Department and therefore **remains a material weakness**."[76]

Principal findings of the IG, concerning continuing material weaknesses in IT security, are as follows:

- "[Interior's] overall security program still does not demonstrate that all information systems supporting DOI operations and assets are adequately protected . . . . until bureaus and offices fully implement security policies and procedures, effectively assess risks, and fully integrate corrective action plans with the capital planning and investment control process, **DOI should continue to report to the Congress the lack of an adequate information security program as a material weakness**."[77]

- "Bureaus and offices senior-level management were **not always held accountable** for ensuring that federal and DOI policies, procedures, practices, and control techniques were implemented."[78]

- "[T]here was little evidence that [DOI] contractors were required to perform background investigations and provide resultant security clearances for their employees [redacted]."[79]

---

[76]Plaintiffs' Exhibit 6 (IG Evaluation), Transmittal Letter to Norton (emphasis added).

[77]*Id.* at 2-3 (emphasis added).

[78]*Id.* at 5 (emphasis added).

[79]*Id.* at 6.

- "All DOI information systems have **not** been included in its system inventory and have **not** had the **risk** of harm from unauthorized access and use adequately addressed."[80]

- "**DOI's network perimeters were expanded without assurance that adequate controls were implemented**."[81]

- "**Many of DOI's information systems, including major applications, have operated and continue to operate without certifications and accreditations**.  Thus, management is **not** assured that risks have been minimized to an acceptable level for systems under their control."[82]

- "[Interior's information technology self] assessments and evaluations **did not always test technical and operations controls to determine if they were operating as designed or intended**."[83]

- "There is **little assurance** that the 83 completed system security plans provide controls needed to effectively safeguard information and information systems.  We found that plans:
  **"**Were **not** always based on risk assessments
  **"**Did **not** include adequate determinations of the levels of confidentiality, integrity, and availability of the information being processed, transmitted, or stored.
  **"**Did **not** include adequate descriptions of the systems, such as describing general support systems that operated major applications and applications supported by general support systems. [Redacted]
  **"**Did **not** include system security plans or interconnectivity descriptions and agreements for other internal and external connected systems. [Redacted]
  **"**Assigned system security management responsibility to the wrong person. . . .
  **"**Did **not** include milestone dates for implementing needed controls."[84]

- "[T]here is little assurance that security plans were updated based on periodic reviews of security controls or practiced throughout the lifecycle of each system as required by Office of Management and Budget Circular A-130, Appendix III and FISMA.  This occurred because **DOI had not adequately managed the development of information system security plans** or required bureaus to report the dates the plans were developed and updated."[85]

- "Overall, continuity of operations plans have **not** been adequately

---

[80]*Id.* at 7 (emphasis added).

[81]*Id.* at 8 (emphasis added).

[82]*Id.* at 9 (emphasis added).

[83]*Id.* (emphasis added).

[84]*Id.* at 9-10 (emphasis added).

[85]*Id.* at 10 (emphasis added).

developed, tested, or fully integrated with physical operations plans or business resumption plans.  Specifically, plans were **not** always updated to reflect the current information system environment, did **not** include critical resources needed to recover systems in a prioritized manner, or did **not** identify the location for alternative processing.  Also, plans were **not** always tested and personnel were not always trained in their responsibilities for expeditiously

- "Bureaus and offices [redacted] did **not** always backup system information and application program and operating system software.  Because information systems were **not** managed as an enterprise, back-up and off-site storage of information and information systems was **not** performed at centralized storage facilities, but at hundreds of small and remote DOI locations.  Consequently smaller and remote locations [redacted] either did **not** back-up at all or performed it sporadically.  **When back-up was performed in these remote or small offices, we noted that it was generally stored at employees' homes**."[87]

- "Overall, Plans of Actions and Milestones (POA&M) developed by bureaus and offices were **not** complete or used effectively.  Specifically, the Plans did **not**:
  ▪ Include all information systems owned and operated by DOI that had weaknesses.
  ▪ Include all weaknesses whether identified through organization's internal reviews or by organizations such as the Office of Inspector General.
  ▪ Include incremental steps for correcting weaknesses especially when milestone dates are in excess of 6 months.
  ▪ Always include costs for correcting weaknesses.
  ▪ Prioritize weaknesses in order of significance."[88]

Chief Information Officer Tipton had full knowledge of  material weaknesses in IT security and that he reported his findings to Norton, Cason, *et al*.  Accordingly, it is certain that he knew and understood the nature and scope of these security problems before the IG did – and certainly long before the IG had finalized his findings and conclusions – yet Norton and her senior managers and counsel decided to provide contrary information to this Court.

Simply put, at no time did Norton and her counsel honestly report the true status of IT security to this Court and plaintiffs.   Instead, Norton and her senior managers and counsel chose to lie and coverup serious risks which imperil all electronic Trust Data and billions of dollars of Trust assets.  Today, the IT Systems are no more secure than they had been two-and-one-half years

---

[86]*Id.* (emphasis added).

[87]*Id.* at 10-11 (emphasis added).

[88] *Id.* at 11 (emphasis added).

ago when plaintiffs first uncovered evidence of material weaknesses in security and reported them to this Court.  At that time, Norton and her counsel falsely represented to this Court that plaintiffs' claims were wholly without merit.  Obdurately, they insist today there is no merit in plaintiffs' claims notwithstanding the fact **that all** competent evidence is to the contrary.

## IV.  VIOLATIONS OF THIS COURT'S TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**A.**     ***Norton et al. Knowingly and Willfully Violated the Preliminary Injunction When They Reconnected Insecure IT Systems to the Internet***

Norton and Martin provided **no** certifications notwithstanding this Court's explicit requirement that they themselves do so **prior** to reconnecting IT Systems to the Internet.  This **knowing and willful** violation alone justifies commencement of both civil and criminal contempt proceedings.

Because of the lack of reliability of unsworn "certifications," both federal statute and local rules require that declarants attest unconditionally that representations made are true and correct and acknowledge that the failure to make truthful representations subjects the declarant to prosecution for perjury.  Both 28 U.S.C. § 1746 and LCvR 5.1(h) require explicitly  that all *jurats* for unsworn declarations contain the following language: "I declare under penalty of perjury that the foregoing is true and correct."  Yet, not one "certification" prepared and filed by Norton's senior managers and counsel is sworn under oath; nor does any "certification" contain the requisite unconditional language for full accountability.   Not one.  Therefore, the absence of certifications renders each representation evidentiarily incompetent, wholly unreliable, and in clear violation of the IT Injunction.

Moreover, it is patently unreasonable for the Certifying Defense Counsel[89] to have filed such unsworn certifications without first conducting due diligence.  Rule 11 provides in pertinent part: "The signature of an attorney or party constitutes a certificate by him that he has read ... the paper; that to the best of his knowledge, information, and belief formed **after reasonable inquiry it is well grounded in fact** and is warranted by existing law."  Generally,  "[w]hat constitutes

---

[89]Robert McCallum, Jr., Peter Kiesler, Stuart Schiffer, Christopher Kohn, Sandra Spooner, John Stemplewicz, Glenn Gillett and John Warshawsky, each of whom was identified by name on papers transmitting the false and misleading "certifications," similarly dishonest quarterly reports, and other materially misleading information to this Court.

'reasonable inquiry' depends on the circumstances of the case." *Duncan v. WJLA-TV, Inc.*, 106 F.R.D. 4, 5-6 (D.D.C. 1984); *Foster v. Michelin Tire Corp.*, 108 F.R.D. 412, 415 (C.D.Ill.1985); *SFM Corp. v. Sunstrand Corp.*, 102 F.R.D. 555 (N.D.Ill.1984).

Here, whether defense counsel acted reasonably or unreasonably must be examined with consideration of the following facts: (1) Material information central to the credibility of the representations made by Norton and her senior managers had been **readily available** to the Certifying Defense Counsel in contemporaneous GAO, IG, and OMB reports and from the officials who prepared and vetted such reports. (2) Established findings of this Court meticulously document pervasive litigation misconduct of Norton, her senior managers and counsel, including their practice of filing false and materially misleading declarations with this Court. (3) The matters here involved pertain to the protection of critical Trust Data and the continuing vulnerability of IT Systems, matters that have been the center of controversy in this litigation for several years. (4) Trust Data has been found to be lost, destroyed, corrupted, and unlawfully manipulated. (5) Defense counsel themselves have expressly acknowledged and confirmed the critical need to secure Trust Data more than two years ago when Mr. Kohn stood before this Court and persuaded it to enter the December 17, 2001 "consent" order over the objections of plaintiffs' counsel. (6) The declarants – including Cason – refuse to execute sworn declarations or certifications and otherwise will not attest to the representations contained therein in violation of requirements imposed by statute and local rules.[90]   (7) Sandra Spooner contemptuously and unlawfully barred the Master from effective monitoring of the adequacy of IT security. (8) The consequences of defense counsel's failure to conduct **due** diligence are severe in that this Court previously found that the failure to demonstrate that Trust Data is secure itself constitutes

---

[90]Indeed, it is Cason's declaration that was principally relied on in support of reconnection to the Internet of various IT Systems. Yet, by his own admission **under oath** he has **no** trust experience, **no** professional IT experience, **no** professional IT security experience, and **no** professional records management experience. *See* Trial 1.5 Transcript, June 24, 2003, Day 21 at Tr.42:8-21. Relying on representations made by one who is admittedly incompetent is unreasonable *per se*.

33

irreparable harm to the plaintiff class.

These facts make clear that it would be wholly unreasonable for Certifying Defense Counsel not to conduct careful and comprehensive due diligence independent of the declarants themselves before they filed any one of the unverified, unsworn, and evidentiarily incompetent "certifications."  Accordingly, only two rational conclusions can be made: either the Certifying Defense Counsel intentionally failed to make reasonable inquires and decided not to conduct the requisite due diligence or, worse, they knowingly and willfully aided and abetted Norton and her senior managers in the deception practiced on this Court and the various corresponding violations of the IT Injunction.  In either case, it is clear that the Certifying Defense Counsel, as well as Norton and her senior managers, knowingly and willfully violated the injunction.[91]

In that regard, it is important to note Norton's Project Management Office ("PMO") is responsible for ensuring that Certifying Defense Counsel are properly and timely informed of the status of IT security.  As explained by Norton, herself:

> The PMO coordinates compliance activities within Interior and **acts as the liaison between Interior, Department of Justice (DOJ) and the Court for trust system IT security issues**. **The following processes ensure** that Interior achieves and maintains compliance with the Consent Order for Internet reconnection and with the standards of OMB Circular A-130, Appendix III.[92]

The 13th quarterly report describes multiple processes, proposals, tracking mechanisms, reports and meetings between the Certifying Defense Counsel and Interior officials to ensure that the

---

[91]In reality, the Certifying Defense Counsel was well aware of the misleading nature of their filing filings which has been corroborated by IT reports filed with this Court.  **Multiple** third-parties were conducting their own reviews of IT Systems at the same time the "certifications" were prepared and filed with this Court.  It is no coincidence that each of the third-parities reached **identical** conclusions that conflict irreconcilably with the papers Norton, and her senior managers and counsel filed with this Court.  Moreover, Interior officials, in fact, **concurred** with the findings and conclusions of the General Accounting Office.  Simply put, **all** competent evidence demonstrates that IT Systems continue to be insecure and should not be reconnected, or remain connected, to the Internet.  Yet, defense counsel chose to bury this evidence and file false and materially misleading "certifications" with this Court on August 11, 2003.  Such conduct by officers of this Court is indefensible and should no longer be countenanced.

[92]See Plaintiffs' Exhibit 3 (13th quarterly report) at 12 (emphasis added).  The PMO reports to Hord Tipton who in turn reports directly to Norton.  *Id.* at 11.

Department of Justice "and the Court" are informed of the true status of the IT security.[93]

Four years ago, in response to the failure of defense counsel to inform this Court about on-going document destruction, the Special Master commented directly on Justice Department disclosure obligations in this litigation: "[G]overnment attorneys are bound by the 'higher standards' contemplated by the Rules of Professional Conduct, the Federal Rules of Civil Procedure, and the Local Rules of this Court."[94]  Of course, it cannot be disputed that the Certifying Defense Counsel have a fundamental, unconditional duty of candor to this Court:

> The courts have consistently held that the duty of candor is the fundamental obligation of all lawyers involved in litigation.  On that score, the declarants' repeated litany that they were simply waiting for the proper vehicle to disclose the document destruction runs counter to the well established principle that an attorney's litigation strategy on behalf of her client does not override her duty of candor to the court.  See Mitchell v. United States, 259 F.2d 787, 792 (D.C. Cir. 1958) ("A lawyer, employed or appointed, is under obligation to defend with all his skill and energy, but he also has moral and ethical obligations to the court, embodied in the canons of ethics of the profession."); Thornton v. United States, 357 A.2d 429, 437 (D.C. 1976) (duty to the client "must be met in conjunction with, rather than in opposition to, other professional obligations").[95]

Here, the Certifying Defense Counsel knew that Trust Data continued to be insecure and they knew that reconnecting IT Systems to the Internet would harm plaintiffs irreparably and violate the preliminary injunction.  Yet, they filed with this Court false "certifications" to coverup material

---

[93]Id. at 12-13.

[94]See Supplemental Recommendation and Report of the Special Master Regarding the Delayed Disclosure of the Destruction of Uncurrent Check Records Maintained by the Department of the Treasury, filed February 7, 2000 at 16.

[95]Id. at 17.  See also id. at 18 (citing Geoffrey C. Hazard, Jr. & W. William Hodes, THE LAW OF LAWYERING: A HANDBOOK ON THE MODEL RULES OF PROFESSIONAL CONDUCT, § 3.3.101, at 575-76 (2d ed. 1990)).

> Rule 3.3 requires lawyers to play fair with the court.  It is designed to protect the integrity of the decision-making process, and hence the ability of courts to function as courts. . . .

> According to this rule, where there is danger that the tribunal will be misled, a litigating lawyer must forsake his client's immediate and narrow interests in favor of the interests of the administration of justice itself.  In these situations, the conception of lawyer as 'officer of the court' achieves its maximum force.

information detrimental to their untenable litigation position, here and in the court of appeals.[96]

**B.      The Failure to Disconnect Interior Contractors' IT Systems from the Internet
         Violated the June 27 Temporary Restraining Order and the July 28 Preliminary
         Injunction**

Both the temporary restraining order and preliminary injunction required Norton to

immediately disconnect from the Internet, all IT Systems in the custody and control of Interior

contractors that house or access Trust Data.  The language is identical:

> The Interior defendants shall immediately disconnect from the Internet all
> Information Technology Systems within the custody or control of the U.S.
> Department of the Interior, and its employees, agents, and contractors, that House or
> Access Individual Indian Trust Data.[97]

However, Norton has presented **no** evidence that the connected contractor IT Systems are secure,

whether such systems contemptuously continue to be connected to the Internet without interruption

or were reconnected.  Indeed, all available evidence demonstrates that IT Systems and Trust Data

under the control of DOI contractors, including Tribes, is at least as insecure as Interior's IT

Systems.  For example, an OMB questionnaire (Memorandum 03-19) was submitted to the IG (or

other appropriate official) for response by each executive agency pursuant to FISMA.  Questions B

and C and Interior's answers are as follows:

**Question B**

---

[96]Parenthetically, having destroyed documents, having refused to comply with formal discovery
requests of plaintiffs – *e.g.,* improperly blocking the deposition of relevant government officials –
and having ousted the Master from his oversight of IT security, it is obvious that the Certifying
Defense Counsel became emboldened and increasingly more confident that their various lies and
misrepresentations regarding the security of Trust Data now would be difficult – if not impossible
– to prove.  Obviously, there is no way for this Court or plaintiffs to assess fully the nature and
scope of IT security inadequacies absent independent, third party reports.  And, while plaintiffs
did not consent to the December 17, 2001 order, it, at least, provided a mechanism for this Court
and plaintiffs to obtain certain candid information.  No such means exists today as the unfit trustee-
delegate and her senior managers and counsel are free to file false and materially misleading
"certifications" and, to the detriment of 500,000 individual Indian trust beneficiaries, maintain the
connection of insecure IT Systems to the Internet.

This Court and plaintiffs will never know how much Trust Data has been lost, destroyed,
corrupted and unlawfully manipulated and how many Trust assets have been lost or
misappropriated in the intervening five months.

[97]*See, e.g.,* temporary restraining order at 1-2; *Cobell v. Norton*, 274 F. Supp.2d at 136-37.

*For operations and assets under their control, have agency program officials and the agency CIO used appropriate methods (e.g., audits or inspections, agreed upon IT security requirements for contractor provided services or services provided by other agencies) to ensure that contractor provided services or services provided by another agency for their program and systems are adequate, secure and meet the requirements of FISMA, OMB policy and NIST guidelines, national security policy, and agency Policy?*

**Interior Answer B**
No.

**Question C**
*If no, please explain why.*

**Interior Answer C**
DOI has been focusing on security DOI-operated systems **not those operated or maintained by contractors [including Tribes]** and other agencies.  In that regard, our review identified contracts awarded by bureaus to service providers by bureaus which did **not** have adequate clauses for identifying sensitive positions for information technology services and requiring background clearances and related **other security requirements.**[98]

First, Norton and her senior managers admit that they do not know the status of IT Systems operated by contractors, including Tribes.  Second, Norton and her senior managers admit that the contracts let to such contractors are inadequate to ensure the security of Trust Data and Trust Assets.  Third, Norton did not instruct such contractors to disconnect from the Internet insecure IT Systems despite clear and ambiguous orders of this Court and despite their admitted ignorance in that regard.

This violation of the TRO and the IT Injunction is as egregious as any of Norton's violations to date.  Norton and her senior managers and counsel knew that she did not know the adequacy of IT security of contractor controlled systems although she was required by order and injunction to immediately disconnect from the Internet all such systems that were not secure.  Further, Norton and her senior managers and counsel knew that reconnection was prohibited unless competent evidence was provided to this Court that such systems were secure.  Yet, Norton and her senior managers and counsel knowingly and willfully disobeyed this Court's orders and did **nothing.**  The malfeasance and bad faith of Norton and her senior managers and counsel here are

---

[98]Plaintiffs' Exhibit 6 (Appendix 2) at 18 (italics in original, bold emphasis added).

palpable.

**C.      *Hart Rossman Knowingly Filed a False and Materially Misleading Declaration.***

On August 11, 2003, Hart Rossman – Technical Director responsible for security testing of

IT Systems – prepared and filed a declaration wherein he represented falsely to this Court that

"Interior, **consistent with existing Federal guidance**, has directed the Bureau heads and CIOs . . .

to use risk management methodologies that conform with NIST guidance to determine the threat to

Interior information technology systems, the vulnerability of those systems to identified threats, and

the subsequent impact of harm to those systems."[99]  Rossman falsely represented further that

"Interior, **consistent with the guidance laid forth by the OMB —02-09 and IT industry best**

**practices** as set forth by the SANS (SysAdmin, Audit, Network, Security) Institute have [sic]

instituted a Department-wide program to assess the technical vulnerability of IT systems facing the

Internet."[100]  Finally, he falsely represented that Interior was in compliance with "existing Federal

guidance" and suggested that security was adequate, asserting that Interior had "**reduced**

**significantly the number of vulnerable hosts**."[101]

To be sure, Rossman – more so than Norton, Cason and the other Interior officials who are

by their own admission way over their heads and simple laymen with respect to IT security – has

been held out to this Court as an expert who fully understands all aspects of IT security and

Interior's inability to comply with "existing Federal guidelines" or "IT industry best practices."

Therefore, he knew that his declaration was false and misleading at the time he prepared it,

executed it, and filed it with this Court and, unconscionably, he understood fully the risks to Trust

Data and the harm to trust beneficiaries when insecure IT Systems remain connected to the Internet.

Yet, he chose to ignore such risks.

In 2002 Rossman completed a department-wide review of Interior, concluding that Interior

---

[99]Plaintiffs' Exhibit 12 at ¶ 8 (emphasis added).

[100]*Id.* at ¶ 9 (emphasis added).

[101]*Id.* at ¶ 10 (emphasis added).

could **not** "carry[] out its responsibilities under the [Clinger-Cohen] act.[102]  The GAO Report

carefully recorded Rossman's incriminating findings as follows:

> In 2002, **Interior contracted with Science Applications International Corporation (SAIC) to study the department and bureau CIO organizations and determine whether it was in compliance with the requirements of the Clinger-Cohen Act**. SAIC concluded that, in the current environment, Interior's **CIO did not have adequate power**—or the leverage of a formal structure with clear lines of authority and control of resources—**to carry out its responsibilities under the act**. The study pointed to a general lack of authority and resource control at the bureau level as well, which further inhibited the CIO's ability to function. **According to SAIC, in most of the bureaus, the CIOs lacked the authority to effect change among their subordinate IT staff and decision areas because they cannot allocate or withdraw funds and do not control hiring, training, or performance appraisals**. On the basis of these findings, SAIC recommended that Interior establish formal lines of authority from the department's CIO to the bureau CIOs and to IT staff at lower levels.[103]

Rossman's prior report removes any doubt that he personally knew and fully understood how far

Interior was out of compliance with "Federal statutes" and "IT industry best practices" because

**he, himself, prepared the report that found Interior to be out of compliance**. Yet, Rossman

chose to lie and materially mislead this Court and plaintiffs, rather than inform this Court candidly

that Interior **cannot** "carry out its responsibilities under the act."  No doubt, the candid,

confidential findings contained in Rossman's full report – a report that Norton, and her senior

managers and counsel, **continue to conceal** from this Court and refuse to produce to plaintiffs –

---

[102]*See* Plaintiffs' Exhibit 7 (GAO Report) at 31.

[103]*Id*. (emphasis added).  This Court should note that the SAIC study was never submitted to the Court; indeed, this report was also concealed from this Court and plaintiffs.  Of further note, two additional reports were completed according to the GAO report:

> The META Group performed the first study [first report], after which the SAIC study, described earlier, was completed to assess the earlier results. G&B Solutions was then contracted to further elaborate and validate the earlier work [second report], focusing on technical solutions and CIO authorities.

*Id*. at 35. Neither of these reports has been submitted to this Court, nor were the Court and plaintiffs even apprised of the existence of such reports, or their findings and conclusions, by quarterly report or otherwise.

are even more damaging.[104]

Importantly, the issue is not whether Rossman knowingly misled this Court and plaintiffs by representing that external security risks had been "reduced significantly" – for he most certainly has deceived this Court (in light of the material omissions in his deliberately ambiguous declaration) – it is that he **more than anyone else** knew that essential directions and guidance were not being followed, but represented otherwise in his declaration.

Indeed, Rossman knew that Interior was materially out of compliance and that Norton's actions were not "consistent with existing Federal guidance" nor were they "consistent with . . . IT industry best practices." Moreover, Rossman knew that Norton, Griles, Cason, and her other Interior senior managers lack the competence and skill to ensure the security of Trust Data. Yet, he withheld material information, postured shamelessly for the Court, and with malice misled this Court and plaintiffs. He, too, has undermined the integrity of this litigation and he too should be held accountable.

Accordingly, for the foregoing reasons, plaintiffs respectfully request that Hart Rossman be sanctioned for knowingly and willfully filing a false and materially misleading declaration and that both civil and criminal contempt proceedings commence against him for aiding and abetting Norton, Griles, Cason and the Certifying Defense Counsel in their concerted violation of this Court's orders to conceal and coverup the inadequacy of IT security.

---

[104]Norton has retained Rossman as Interior's "third party" contractor who shall be responsible for testing and assessing the security of IT Systems to-be-connected to the Internet. *See Interior Defendants' Submission Pursuant to the July 28, 2003 Preliminary Inunction Regarding Reconnection of Computer Systems*, filed August 27, 2003. Inasmuch as Rossman has been bought and paid for, there is **no** reason to believe that his prospective reports to the Court on the adequacy of IT security will be accurate and candid. Clearly, Norton is getting what she paid for.

## V.  THE GOVERNMENT'S CONDUCT MEETS THE STANDARDS FOR BOTH CIVIL AND CRIMINAL CONTEMPT

It is settled law that courts have the inherent authority to enforce their orders through the exercise of their contempt powers. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991) (observing that "it is firmly established that the power to punish for contempt is inherent in all courts." (Internal quotations omitted);  *Shillitani v. United States,* 384 U.S. 364, 370 (1966) (stating that "[t]here can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt.").  Specifically, courts may utilize civil contempt proceedings to obtain compliance with an order **or to compensate for damage sustained as a result of noncompliance with an order**. *Food Lion, Inc. v. United Food and Commercial Workers Int'l Union,* 103 F.3d 1007, 1016 (D.C. Cir.1997) (emphasis added). *See also NLRB v. Blevins Popcorn Co.,* 659 F.2d 1173, 1184  (D.C. Cir.1981); *Cobell*, 226 F. Supp.2d at 21-24.

Two elements must be established before a party may be held in civil contempt for violating an order.  *Armstrong v. Executive Office of the President,* 1 F.3d 1274, 1289 (D.C.Cir.1993).  First, the Court must have issued an order that is clear and reasonably specific. *Id.* at 1289.  *See also  Project B.A.S.I.C. v. Kemp,* 947 F.2d 11, 16-17 (1st Cir.1991).  In determining whether an order is clear and reasonably specific, courts apply "an objective standard that takes into account both the language of the order and the circumstances surrounding the issuance of the order." *United States v. Young,* 107 F.3d 903, 907 (D.C. Cir.1997).  Second, the contemnor must have violated the court's order.  *Armstrong,* 1 F.3d at 1289 (recognizing that "civil contempt will lie only if the putative contemnor has violated an order that is clear and unambiguous.").

Both elements are met here.  As discussed above, several orders have been violated knowingly and willfully by Norton and her senior managers and counsel.  Violations relate to false and deceptive reporting as well as the refusal to disconnect from the Internet insecure IT Systems. For example, two principal orders have been violated:  First, this Court ordered on December 21, 1999 that Norton submit reports on a quarterly basis  "explaining the steps that defendants have

41

taken to rectify the breaches of trust declared today and to bring themselves into compliance with their statutory trust duties embodied in the Indian Trust Fund Management Reform Act of 1994 and other applicable statutes and regulations governing the IIM trust." *Cobell v. Norton*, 91 F. Supp 2d 1, 56 (D.D.C. 1999). Second, on July 28, 2003, the Court ordered Interior to disconnect IT Systems immediately from the Internet, allowing for two narrow exceptions both of which required certification of certain specific factual predicates:

> (a) Immediate disconnection shall not be required for each specifically identified Information Technology System and computer that the Interior **defendants certify**, within ten (10) days of the date of entry of this Order, to be essential for protection against fires or other threats to life or property, and provide a specific justification in support thereof, in accordance with Rule 11 of the Federal Rules of Civil Procedure.

> (b) Immediate disconnection shall not be required for each specifically identified Reconnected System that the Interior **defendants certify**, within fifteen (15) days of the date of entry of this Order, and in accordance with Rule 11 of the Federal Rules of Civil Procedure, that the Interior Department currently believes either (1) does not House or Access to Individual Indian Trust Data, and provide a specific justification thereof, or (2) is secure from Internet access by unauthorized users, and provide a specific justification in support thereof, stating in specific terms the security measures that are presently in place to protect unauthorized Internet access to the Individual Indian Trust Data that the Information Technology System Houses or provides Access to.[105]

Despite the clear and unambiguous terms of these orders, Norton *et al.* filed declarations and quarterly reports that were false and materially misleading, as documented *supra*, thereby violating both orders willfully. They were mandated by this Court to report and submit certifications that are candid and honest, yet they knowingly violated these mandates by dishonestly reporting and declaring matters central covered by the orders.

Although the conduct of Norton *et al.* is demonstrably willful, it is important to bear in mind that, as distinguished from criminal contempt, civil contempt occurs when a court order is violated whether or not the contemnor intended to violate the order and whether or not the contemnor acted in bad faith. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191 (1949) (since the purpose of civil contempt is remedial, "it matters not with what intent the defendant did

---

[105]*Cobell v. Norton,* 274 F. Supp.2d 111, 135-36 (D.D.C. 2003) (emphasis added).

the prohibited act."); *Food Lion,* 103 F.3d at 1016 (observing that "the law is clear in this circuit that 'the [contemnor's] failure to comply with the court decree need not be intentional'" and that a "finding of bad faith on the part of the contemnor is *not* required.") (emphasis in original).  In fact, for purposes of civil contempt, "the intent of the recalcitrant party is irrelevant." *Blevins,* 659 F.2d at 1184.[106]

Courts have the power to impose both coercive and compensatory sanctions upon parties found in civil contempt.  *United States v. United Mine Workers,* 330 U.S. 258, 303-04 (1947). Specifically, courts may impose coercive sanctions "to compel the contemnor into compliance with an existing court order" and compensatory sanctions to "compensate the complainant for losses suffered as a result of the contumacy." *United States v. Dowell,* 257 F.3d 694, 699 (7th Cir.2001).  *See also Consolidated Rail Corp. v. Yashinsky,* 170 F.3d 591, 595 (6th Cir.1999) (noting that "[c]ompensatory contempt orders compensate the party harmed by the other party's contemptuous actions;  coercive orders seek to cajole the party in contempt to act in the manner desired by the court.").  Moreover, courts have considerable discretion in imposing coercive and compensatory sanctions.  *United States v. Berg,* 20 F.3d 304, 311 (7th Cir.1994) (recognizing that "the district court has broad discretion in imposing those sanctions.");  *Rodriguez v. IBP, Inc.,* 243 F.3d 1221, 1231 (10th Cir.2001) (noting that "[a] district court may exercise broad discretion in using its contempt power to assure compliance with its orders.").  In fact, "[t]he measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief." *McComb,* 336 U.S. at 193.  Thus, for example, "[w]hen fashioning a sanction to secure compliance, a district court should 'consider the character and magnitude of the harm threatened by the continued contumacy and the probable effectiveness of any suggested sanction in bringing about

---

[106]It should be noted as well that civil contempt may be established by "clear and convincing evidence that the alleged contemnor violated the court's prior order." *Food Lion,* 103 F.3d at 1016. *See also Blevins,* 659 F.2d at 1183 ("In civil contempt proceedings the clear and convincing evidence standard applies . . ..").  The "clear and convincing evidence" standard requires the Court to "reach a firm conviction of the truth of the evidence about which he or she is certain." *United States v. Montague,* 40 F.3d 1251, 1255 (D.C. Cir.1994).

the result desired.' " *Citronelle-Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297, 1304 (11th

Cir.1991) (quoting *United Mine Workers,* 330 U.S. at 304).

Traditionally, whether a contempt is civil or criminal depends on the "character and

purpose" of the sanction.  A sanction is civil if it is remedial, compensatory, or otherwise for the

benefit of the complainant.  For criminal contempt, the sanction is punitive; punishment fashioned

to vindicate the authority of the court itself. *Evans v. Williams,* 206 F.3d 1292, 1294-95 (D.C.

Cir.2000).

There are a number of fundamental distinctions that characterize civil and criminal

contempt. Unlike with civil contempt, the contemnor must have willfully violated the Court's order

for a criminal contempt citation. *United States v. Young,* 107 F.3d 903, 907 (D.C. Cir.1997);

*Blevins,* 659 F.2d at 1183-84.  For purposes of criminal contempt, "willfulness" has been defined

as a "deliberate or intended violation, as distinguished from an accidental, inadvertent or negligent

violation." *TWM Manufacturing Co. v. Dura Corp.,* 722 F.2d 1261, 1272 (6th Cir.1983).

Additionally, the United States Court of Appeals has held in this case that "a sanction for one's

past failure to comply with an order is criminal in nature."  *See Cobell v. Norton,* 334 F.3d 1128,

1146-47 (D.C. Cir. 2003).  The distinction is important here; for while Norton and her senior

managers and counsel can now disconnect insecure IT Systems and begin to comply with the

preliminary injunction, they did not do so "immediately" and, therefore, cannot place the

proverbial genie back in the bottle.  Norton and her senior managers and counsel deliberately

deceived this Court and reconnected IT Systems in clear violation of this Court's orders.

Disconnecting relevant IT Systems now does not, and cannot, rectify willful violations of the IT

Injunction or cure the further irreparable harm they have inflicted upon individual Indian trust

beneficiaries in the interim.  For this reason, plaintiffs have asked that both civil and criminal

contempt sanctions be imposed on Norton, Griles, Cason, Tipton, Hart Rossman, McCallum,

Kiesler, Schiffer, Kohn, Spooner, Stemplewicz, Gillett and Warshawsky.[107]

Here, the aforementioned individuals knew that their representations were false and materially misleading at the time they made them to this Court and plaintiffs. Each knew that Interior's IT Systems did not meet the standard set forth by the Court in the July 28 preliminary injunction. Therefore, they knowingly and willfully prepared and filed false "certifications" and quarterly reports to continue to con this Court, and they covered-up their malfeasance by obstructing the Master's oversight efforts and refusing to comply with plaintiffs' discovery requests. Thus, the actions of the aforementioned individuals are knowing, willful, concerted and calculated to deceive this Court and plaintiffs.[108]

## VI. CONCLUSION

For the reasons state above, plaintiffs respectfully request that this Court grant plaintiffs' motion and enter orders to show cause why Norton, Griles, Cason, Tipton, Rossman, McCallum, Kiesler, Schiffer, Kohn, Spooner, Stemplewicz, Gillett and Warshawsky should not be held in civil and criminal contempt.[109]

---

[107]The burden of proof in criminal contempt proceedings is "beyond a reasonable doubt." *Young,* 107 F.3d at 907; *Blevins,* 659 F.2d at 1183-84. The reason for this distinction is that courts provide alleged criminal contemnors the same procedural safeguards as ordinary criminal defendants. *Blevins,* 659 F.2d at 1183-84 (noting that "the procedural safeguards that attend any criminal proceeding, including the reasonable doubt standard of proof, come into play" in criminal contempt proceedings.).

[108]Issues of *respondeat superior* are not implicated here inasmuch as each of the aforementioned individuals (except for Griles and Tipton) personally filed false "certifications." Norton is a named defendant and a trustee-delegate in this litigation and has testified regarding the aforementioned matters. Moreover, she is required to sign and **attest** to the accuracy of each quarterly report filed with this Court. Cason personally attests to the accuracy and completeness of the sections of the quarterly report relating to the IT security. Hart Rossman knowingly has filed a false and materially misleading declaration and each of the Certifying Defense Counsel has filed these papers with the Court – knowing that the information contained therein was false, materially misleading, and calculated to deceive this Court and plaintiffs as to the true status of the IT security.

[109]In accordance with Local Rule 7.1(m), plaintiffs' counsel hereby certifies that we met and conferred with defendants counsel on January 13, 2004. Defendants counsel stated that they will oppose this motion.

Respectfully submitted,

/s/ Dennis Gingold

Of Counsel:

JOHN ECHOHAWK
Native American Rights Fund
1506 Broadway
Boulder, Colorado 80302
303-447-8760

DENNIS M. GINGOLD
D.C. Bar No. 417748
P.O. Box 14464
Washington, D.C. 20044-4464
202 824-1448

/s/ Keith Harper

KEITH HARPER
D.C. Bar No. 451956
Native American Rights Fund
1712 N Street, N.W.
Washington, D.C. 20036-2976
202 785-4166

Attorneys for Plaintiffs

January 13, 2004

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE WHY THE DEPARTMENT OF THE INTERIOR, INTERIOR SECRETARY GALE NORTON, AND HER SENIOR MANAGERS AND COUNSEL, SHOULD NOT BE HELD IN CIVIL AND CRIMINAL CONTEMPT  FOR VIOLATING THE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ENTERED TO PROTECT TRUST DATA AND TRUST ASSETS was served on the following via US Mail on this day, January 13, 2004.


Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
406.338.7530 (fax)

/s/ Angie Paige
_____
Angie Paige


Pursuant to agreement with defense counsel, the Named Individuals also will be served personally by plaintiffs at their residences or places of business, by service of their attorneys, or by acceptance of such service by the Department of Justice at such time as defense counsel inform plaintiffs' counsel of their preference on such service. However, if plaintiffs are not so informed of the service preference by the close of business on January 15, 2004, plaintiffs will serve each such official at his residence or place of business, whichever is more convenient.  Once service is effected, a revised certificate of service will be filed with this Court.

/s/ Dennis Gingold
_____
Dennis Gingold

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA


ELOUISE PEPION COBELL, *et al.*,  )
                      )
          **Plaintiffs,**  )
                      )     **Civil Action**
                      )     **No. 1:96 CV O1285 (RCL)**
        **v.**  )
                      )
GALE NORTON, *et al.*,  )
                      )
          **Defendants.**  )
                      )
_____)


### ORDER


This matter comes before the Court on *Plaintiffs' Motion for an Order to Show Cause Why the Department of the Interior, Interior Secretary Gale Norton, and Her Senior Managers and Counsel, Should Not Be Held in Civil and Criminal Contempt for Violating Court Orders, Including the Temporary Restraining Order and Preliminary Injunction Entered to Protect Trust Data and Assets* ("*Show Cause Motion*")  Upon consideration of plaintiffs' motion, the opposition of thereto, plaintiffs' reply, as well as the entire record of this case, it is HEREBY

ORDERED that the *Show Cause Motion* is GRANTED; it is further

ORDERED that the Interior Department as well as Interior Secretary Norton, Deputy Secretary Griles, Associate Deputy Secretary Cason, Chief Information Officer Tipton, and Hart Rossman, and Associate Attorney General Robert McCallum, Jr., Assistant Attorney General Peter Kiesler, Deputy Assistant Attorney General Stuart Schiffer, and Justice Department attorneys Christopher Kohn, Sandra Spooner, John Stemplewicz, Glenn Gillett, and John Warshawsky (collectively "Named Individuals") shall show cause why they should not be held in civil contempt in a trial that shall commence March 15, 2004.  It is further

ORDERED that each of the Named Individuals is hereby referred to the U.S. Attorney for the District of Columbia for prosecution for knowing and willful violations of the June 27, 2003 Temporary Restraining Order and the July 28, 2003 Preliminary Injunction that were entered by this Court to ensure the protection of trust data housed in Information Technology Systems.   It is further

ORDERED that Named Individuals who are attorneys with the Department of Justice are hereby referred to the Disciplinary Panel of the United States District Court for the District of Columbia for further investigation and a determination on their fitness to continue to practice law in this Court.

SO ORDERED


_____th day of January 2004


_____
Hon. Royce Lamberth
United States District Judge