**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ELOUISE PEPION COBELL, et al.,**<br>**on their own behalf and on behalf of**<br>**all persons similarly situated,** ) ) ) ) | |
| **Plaintiffs,** ) ) | |
| **vs.** ) ) | **Case No. 96CV1285 (RCL)** |
| **GALE NORTON, Secretary of**<br>**the Interior, et al.,** ) ) ) | |
| **Defendants.** ) ) ) | |

**PLAINTIFFS' EQUAL ACCESS TO JUSTICE ACT PETITION FOR INTERIM FEES
THROUGH THE PHASE 1.0 PROCEEDING**

Plaintiffs submit this petition seeking fees and expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d) (2004) and 28 U.S.C. § 2412(b) (2004) ("EAJA") and this Court's May 27, 2004 Order directing plaintiffs to "submit an EAJA application for interim fees through the Phase 1.0 proceeding ...." *Cobell v. Norton*, 319 F. Supp.2d 36, 41 (D.D.C. 2004).

This petition conforms with the substantial and valuable guidance provided by the Court in its May 27th decision. Accordingly, plaintiffs do not seek an award for fees, at this time, related to Trial 1.5 or expended in establishing the facts in the second contempt trial relied upon in Trial 1.5,[1] since this Court has made clear that consideration of such an award is premature because the September 25, 2003 Order is presently under appeal. *Id.* at 43. The award plaintiffs seek is solely for an interim EAJA award for the Trial 1.0 proceeding that this Court held was appropriate since

> [i]n the Phase 1.0 trial plaintiffs achieved many significant results on issues central to the case. The Court certified the opinion for interlocutory appeal and was affirmed." See

---

[1] *Cobell v. Norton*, 283 F. Supp. 2d 66, 85 (D.D.C.2003) ("Because the D.C. Circuit did not set aside the findings of fact made in this Court's September 17, 2002 memorandum opinion, the Court will treat those factual findings as having been established.").

> *Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir.2001). The Phase 1.0 opinion meets the criteria in the [EAJA] legislative history: it resolved issues central to the case, set the stage for future relief for plaintiffs, and as an interlocutory appeal was both significant and discrete. The Court finds it appropriate to consider an interim award of fees for the Phase 1.0 trial.

319 F. Supp.2d at 43.   As this Court further explained, "Phase 1.0 should by necessity include all appropriate time expended by plaintiffs since the inception of the suit." *Id.*   In the first section of this brief, plaintiffs discuss in greater detail their view as to the scope of the Trial 1.0 proceeding to aid the Court in understanding what we have included and what we have not.   We explain, for example, why time expended defending the Phase 1.0 appeal and time spent ensuring that defendants complied with the Court's December 21, 1999 order is included in the scope of this EAJA petition. *See Select Milk Producers, Inc. v. Veneman*, 304 F. Supp. 2d 45, 57 (D.D.C. 2004) (permitting award for time expended post-decision since "the attorney could reasonably be expected to follow up to make sure the changes operated as intended").

In the following section, plaintiffs show why we are eligible for the more common EAJA award under  28 U.S.C. § 2412(d)(1)(A) since we are a prevailing party,  the government's position was not "substantially justified," and no "special circumstances" exist that would make an award unjust.  *See, e.g., Pierce v. Underwood*, 487 U.S. 552 (1988).

 In addition, plaintiffs also demonstrate in this section why we are also eligible for a market rate fee award under § 2412(b) of EAJA because of defendants' incontestible record of bad faith, both pre-litigation and during litigation.[2]  We are mindful of this Court's admonishment in its May 27th Order that for

---

[2]Plaintiffs sought an enlargement in filing this Petition in part because they were attempting to obtain expert testimony with respect to market rates for attorneys.  During the time of the enlargement, plaintiffs contacted several experts on this subject matter but was unable to secure an expert for less than $40,000.  Because of plaintiffs' limited resources, we were unable to hire an expert under that compensation arrangement.

In lieu of obtaining expert testimony specifically on the subject matter of the appropriate market rate for the attorneys representing plaintiffs in this litigation, plaintiffs instead have utilized a survey of market rates of attorneys as compiled by PriceWaterhouseCoopers.  Such survey is attached to the Gingold Affidavit as Exhibit ____.

As this survey is proprietary to PriceWaterhouseCoopers, plaintiffs respectfully request that it

plaintiffs to attain an award under §2412(b), we must not merely rely on general statements that defendants have engaged in bad faith, but rather plaintiffs must "support such an application with detailed factual support." *Cobell,* 319 F. Supp.2d at 44. Plaintiffs do so herein.

As this Court has explained, "[a]n award of attorney's fees under § 2412(b) can take place where 'the bad faith (1) occurred in connection with the litigation, or (2) was an aspect of the conduct giving rise to the lawsuit.'" *Id.* (quoting *Am. Hosp. Ass'n v. Sullivan,* 938 F.2d 216, 219 (D.C. Cir.1991)). This Court further explained on May 27th that "a court can find bad faith in a party's pre-litigation conduct where 'a party, confronted with a clear statutory or judicially-imposed duty towards another, is so recalcitrant in performing that duty that the injured party is forced to undertake otherwise unnecessary litigation to vindicate plain legal rights.'" *Id.* (quoting *Am. Hosp. Ass'n,* 938 F.2d at 220 (additional citations omitted)).

Plaintiffs demonstrate below that in this case defendants' conduct satisfies both: (a) pre-litigation bad faith that required the filing of this lawsuit; and, (b) bad faith in connection with the litigation itself. As this Court and the Court of Appeals have repeatedly made clear, it is beyond question that the United States owed (and continues to owe) substantial clear statutory and judicially-imposed duties to individual Indian trust beneficiaries – duties that were "recognized and reaffirmed" by the 1994 Trust Reform Act, 25 U.S.C. §§ 4001 *et seq.* Indeed, the Court of Appeals in *Cobell VI* held that it is "beyond dispute that the government has longstanding and substantial trust obligations to Indians, particularly to IIM trust beneficiaries, not the least of which is a duty to account." Nevertheless, defendants have utterly failed and "unconscionable delay[ed]"[3] carrying out these plain duties for centuries and still refused to comply with the law after enactment of the 1994 Act – a "remedial statute designed to ensure more diligent fulfillment of the government's obligations." It was this extraordinary "malfeasance"[4] that forced plaintiffs to bring

---

not be reprinted, posted on an internet site, or otherwise disseminated in a public manner in order to protect its confidentiality.

[3]*Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir.2001) (holding that defendants have "unconscionabl[y] delay[ed]" fulfilling the "most basic" fiduciary duties).

[4]*See, e.g., Cobell v. Norton*, 240 F.3d 1081, 1109 (D.C. Cir.2001) (describing the "magnitude of government malfeasance" in failing to fulfill the fundamental fiduciary duties owed to the plaintiff class).

this action to vindicate the plain legal rights of the plaintiff class.  As we will show, such actions squarely meet the definition of pre-litigation bad faith.

Of course, the government's bad faith did not end with the filing of the Complaint, but expanded exponentially thereafter.  At every turn, defendants malfeasance is simply unprecedented, and in section 3 plaintiffs discuss the numerous steps that government counsel and officials have taken to undermine the integrity of this litigation.  Although this section is long, we believe it is necessarily so in light of this Court's admonishment that we include "detailed factual support" for our assertion that defendants have acted in bad faith.

The final section of this Petition discusses the nature of this case and why the hours plaintiffs have expended in representing the plaintiff class were necessary, justified and reasonable given the extraordinary and unique nature (as well as expansive scope) of this litigation.

## I.  SCOPE OF THIS EAJA PETITION – THE TRIAL 1.0 PROCEEDINGS

By its Order of May 27th, this Court permitted plaintiffs to file an EAJA Petition to include time expended "through the Phase 1.0 proceeding ...."  *Cobell*, 319 F. Supp.2d at 41. Moreover, as this Court further clarified: "Phase 1.0 should by necessity include all appropriate time expended by plaintiffs since the inception of the suit." *Id.*  Therefore, this petition includes time expended from the development of Complaint in 1996 through the affirmance of this Court's Phase 1.0 decision by the Court of Appeals on February 23, 2001.  *Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir.2001). For this post-decisional period, plaintiffs seek EAJA fees for time expended  in a variety of task that are plainly part of the "Phase 1.0 proceeding," including defending against the government's appeal.

In deciding which additional tasks subsequent to Trial 1.0[5] to include in this petition, plaintiffs have looked to the recent opinion in *Select Milk Producers, Inc. v. Veneman*, 304 F. Supp. 2d 45 (D.D.C. 2004) for guidance. In *Select Milk*, the government challenged certain time incurred subsequent to the

_____

[5]Plaintiffs have included <u>no</u> time relating to Trial 1.5 or the preparation therefor, nor have they included any time subsequent to Trial 1.5 apart from the preparation of this Petition.

injection that served as the basis of the EAJA fee award.  This Court allowed such subsequent time on two bases: (1) "the attorneys could reasonably be expected to follow up to make sure the changes operated as intended"; and (2) "the remaining hours until the dismissal of the case were spent partly as a result of defendant's own litigation conduct."  *Id.* at 57.

*Select Milk* supports recovery for fees incurred after the Trial 1.0 decision was rendered on December 21, 1999.  After this Court handed down the *Cobell V* decision, plaintiffs counsel made substantial effort to follow up and make sure the decision was carried out.  This included, without limitation, monitoring defendants' trust reform efforts and reviewing quarterly reports.  Moreover, plaintiffs expended considerable time uncovering, documenting and presenting the various manifold misrepresentations that defendants repeatedly had made before, during and after Trial 1.0.  This work was not only instrumental to ensure that defendants were following the Court's December 21, 1999 Order, but also was necessitated by " defendant[s'] own litigation [mis]conduct" as in *Select Milk.*        In Trial 1.0, this Court confirmed not only that plaintiffs had won a great victory, but understood that success would require plaintiffs' "continued, close involvement in [the] reform efforts."  *Cobell V*, 91 F. Supp. 2d at 57.

EAJA cases, as well as cases from similar contexts,[6] have long recognized and made allowance for follow-on efforts that are related to or that further the initial trial or proceeding.  For example, in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546 (1986), the Supreme Court interpreted § 304(d) of the Clean Air Act to allow an award of attorney's fees to citizen groups who monitored compliance with a consent decree subsequent to entry of such decree.  Much like in *Cobell*, the district court in *Delaware Valley* was faced with defiance, resulting in the need to institute contempt proceedings.  *Id.* at 549-50.  The government was later held in contempt in a subsequent phase of the litigation.  *See id.* at 551.  The Supreme Court approved the district court's authorization of fees for the

---

[6]Caselaw involving similar  fee shifting statutes and related governing principles apply to EAJA with equal force.  *See McDonald v. Secretary of Health and Human Services*, 884 F.2d 1468, 1479 (1st Cir. 1989).  ("Likewise the section 1988 case law concerning the scope of recovery of attorneys' fees should also be applicable to EAJA cases.")  *See also Hensley  v.  Eckerhart*, 461 U.S. 424, 433 n. 7 (1983) The rule announced "are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party'").

follow-on monitoring by counsel of the initial consent decree, reasoning that "the work done by counsel in these two phases was as necessary to the attainment of adequate relief for their client as was all of their earlier work in the courtroom which secured Delaware Valley's initial success in obtaining the consent decree." *Id.* at 558.[7]  Of course, many of the efforts of plaintiffs' counsel after *Cobell V* were equally necessary to ensure compliance with orders and that actual trust reform would finally commence (it did not). Frequently, this involved exposing and appropriately challenging defendants' misrepresentations to this Court.[8]

*Jenkins v. State of Missouri*, 127 F.3d 709 (8th Cir. 1997) offers additional guidance as to what post-judgment time is properly included in a fee award, particularly for institutional reform cases like *Cobell*. The following discussion is illuminating:

> [I]t is more complicated to assess the relations of each part of the litigation to the whole in cases that proceed over an indefinite time than in a simple action that comes to judgment and ends.  Reimbursement for post-judgment litigation fees can be as important as reimbursement for pre-judgment fees in accomplishing the purpose of section 1988.  In suits

---

[7] The *Delaware Valley* Court buttressed its conclusion that § 304(d) of the Clean Air Act authorized an award of attorney's fees for monitoring subsequent compliance with a consent decree by noting that such subsequent monitoring efforts had been found compensable under similar statutes such as § 1988:

> Several courts have held that, in the context of the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, post-judgment monitoring of a consent decree is a compensable activity for which counsel is entitled to a reasonable fee.  See, *e.g., Garrity v. Sununu* 752 F.2d 727, 738-739 (CA1 1984); *Bond v. Stanton* 630 F.2d 1231, 1233 (CA7 1980); *Miller v. Carson* 628 F.2d 346, 348 (CA5 1980); *Northcross v. Board of Ed. of Memphis City Schools* 611 F.2d 624, 637 (CA6 1979), cert. denied, 447 U.S. 911 (1980).

*Id.* at 559 (parallel citations omitted).

[8] Noting the similarities between § 304(d) of the Clean Air Act and § 1988, the *Delaware Valley* Court confirmed that many federal attorney's fees statutes are to be interpreted and applied in similar fashion:  "Given the common purpose of both § 304(d) and § 1988 to promote citizen enforcement of important federal policies, we find no reason not to interpret both provisions governing attorney's fees in the same manner." *Id.* at 560.  Just as the *Delaware Valley* Court equated § 304(d) of the Clean Air Act operationally with § 1988, the Court in *Hensley v. Eckerhart*, *supra*, 461 U.S. 424 (1983) had earlier equated § 1988 with EAJA.  *See* note 5, *supra*.  Thus, the principles and logistics relating to the application of § 304(d) and EAJA are parallel and provide cross-support for each other.  *See also Sullivan v. Hudson*, 490 U.S. 877 (1989) (applying holding in *Delaware Valley*, in the EAJA context.

for long-term injunctive relief, such as institutional reform cases and school desegregation cases, the remedy can unfold in phases over many years.

A plaintiff's attorney may engage in several kinds of post-judgment activity. Some types of post-judgment activities are readily seen to be necessary adjuncts to the initial litigation, whereas other types of activities are more like a new, separate lawsuit and require a fee determination independent of the underlying case. Thus, monitoring the defendant's compliance with court orders and enforcing the remedy are generally compensable as part of the underlying case. *See Pennsylvania v. Delaware Valley Citizens' Council*, 478 U.S. 546, 559 (1986) (various monitoring and enforcement activities, including work before administrative agencies that could have adversely affected rights under consent decree); *Schafer*,[9] 83 F.3d at 1010-11; *Duran v. Carruthers*, 885 F.2d 1492 (10th Cir.1989) (monitoring).

*Id.* at 716-17 (emphasis added; parallel citations omitted).

Since plaintiffs' post-Trial 1.0 efforts were necessary adjuncts to the Trial 1.0 victory – and particularly in light of this Court's having envisioned and authorized plaintiffs' "continued close involvement" in post-Trial 1.0 matters and trust reform efforts – the *Jenkins* framework strongly supports the conclusion that the post-Trial 1.0 fees sought by plaintiffs herein are properly awarded.[10]

Plaintiffs have claimed certain time after this Court's December 21, 1999 decision was rendered. This includes time defending against the appeal, which resulted in the full affirmance by the Court of Appeals on February 23, 2001. Plaintiffs believe that such time along with time expended in ensuring defendants compliance with *Cobell V* is compensable in this Application for the reasons stated above.

Plaintiffs have also included time expended in preparing this petition and the considerable hours throughout this litigation, but particularly in calendar year 2000, expended in establishing the innumerable instances of defendants' bad faith litigation efforts discussed in further detail in the following section of this Petition. But for plaintiffs' counsel's efforts during this period and expenditure of time in uncovering misconduct, malfeasance and attempts to undermine the judicial process, plaintiffs would not be able to

---

[9]*Association for Retarded Citizens v. Schafer*, 83 F.3d 1008 (8th Cir. 1996), *cert. denied,* 519 U.S. 993.

[10]*See also Plyler v. Evatt*, 902 F.2d 273, (4th Cir. 1990) (post-decree efforts of plaintiff class to preserve fruits of decree were compensable under § 1988 even though modification plaintiff class opposed was granted); *Vibra-Tech Engineers, Inc. v. United States*, 787 F.2d 1416 (1986) (preliminary injunction entered pursuant to which prevailing party became entitled to attorney's fees under EAJA; fees incurred with respect to post-order motions that were filed for purposes of delay also recoverable under EAJA).

demonstrate defendants' bad faith with the requisite detail that this Court has made clear is necessary. *Cobell*, 319 F. Supp.2d at 44 (warning that plaintiffs "should support such an application with detailed factual support"). The factual support plaintiffs rely on herein to establish bad faith is the product of considerable hours of painstaking review and research throughout this litigation up to and including 2001 and including without limitation the research and analysis which served as the basis for Plaintiffs Motion to Reopen Trial 1.0 filed in November 2000.

The time plaintiffs' counsel has expended as set forth in the attached affidavits of counsel and accompanying schedules was necessary, reasonable and within the scope of the Trial 1.0 proceedings.[11]

## II. PLAINTIFFS ARE ELIGIBLE FOR AN AWARD OF ATTORNEYS FEES AND EXPENSES NOT ONLY UNDER SECTION 12(d)(1)(A) OF EAJA, BUT ALSO FOR AN AWARD AT MARKET RATES FEES UNDER SECTION 2412(b) SINCE THE GOVERNMENT HAS ENGAGED IN BAD FAITH

The Equal Access to Justice Act waives the sovereign immunity of the United States against an award of attorneys' fees in two distinct manners. First, 28 U.S.C. § 2412(d)(1)(A) provides for the award of fees against the United States in most types of civil litigation "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." *See, e.g., Pierce v. Underwood*, 487 U.S. 552 (1988). Although more common, § 2412(d) imposes certain requirements and restrictions including a statutory cap (with some exceptions) on the hourly rate for attorney's fees. *See, e.g.,* § 2412(d)(2)(B). The second waiver of the United States' governmental immunity is set forth in 28 U.S.C. § 2412(b). Unlike § 2412(d), there is no statutory cap to the hourly rate for attorney fees under § 2412(b); rather, counsel is permitted to claim a "reasonable rate." *Kerin v. U.S. Postal Service*, 218 F.3d 185, 190 (2nd Cir. 2000) ("In contrast to § 2412(d), the statutory language of

---

[11]Among other time that plaintiffs have sought through this petition is time spent in trying to resolve this case through settlement and mediation, including Court ordered mediation. Such time is compensable. *See, e.g., Ellis v. University of Kansas Medical Center*, 163 F.3d 1186, 1202-03 (10th Cir.1998) (compensating for attorney time spent in furtherance of settlement); *E.M. v. Milville Bd. Of Education*, 849 F. Supp. 312, 317 (D.N.J. 1994) (compensating for attorney time spent in furtherance of mediation).

§ 2412(b) imposes no ceiling on the hourly rate used to calculate bad faith fees, requiring only that such fees be "reasonable.'").[12]  Section 2412(b),  the "lesser used "provision, provides that "[t]he United States ... liable for [attorneys'] fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award."

Plaintiffs are eligible for an EAJA award based on both § 2412(d)(2)(B) and §2412(d).

### A.  Plaintiffs Satisfy All Prerequisites of An Award Under § 2412(d)(2)(B)

By this petition, plaintiffs make a claim for an EAJA award for all attorneys fees and expenses related to the Trial 1.0 proceeding under 2412(d) – the common EAJA provision permitting fees capped by statute.  Plaintiffs meet all the conditions for a § 2412(d)(2)(B) award.  First, as this Court has repeatedly held, "[i]t is clear plaintiffs have prevailed on those issues related to the Phase 1.0 trial both in this Court and on appeal." *Cobell,*319 F. Supp. 2d at 40 (*citing Cobell v. Babbitt*, 91 F. Supp.2d 1 (D.D.C.1999), *affirmed*, 240 F.3d 1081 (D.C. Cir.2001)).

Second, the United States' position in this litigation is clearly not "substantially justified."  To be substantially justified, the government's position must have a "a reasonable basis in law and fact." *Pierce,* 487 U.S. at 566, n.2.  Importantly, "[t]he burden to prove substantial justification is on the government." *National Ass'n of Mfrs. v. U.S. Dept. of Labor*, 962 F. Supp. 191, 196 (D.D.C. 1997) .  Moreover, "whenever the Government contests an application for fees under EAJA, it must address two issues: first, whether the agency's underlying action that gave rise to the civil litigation is substantially justified; second, whether its position in the civil litigation is substantially justified." *Jones v. Lujan*, 887 F.2d 1096, (D.C. Cir. 1989), *overruled on other grounds Kay v. Ehrler*, 499 U.S. 432 (1991). *Accord Role Models America, Inc. v. Brownlee*, 353 F.3d 962, 967 (D.C. Cir. 2004) ("The government, however, must demonstrate the reasonableness not only of its litigation

---

[12]That reasonable rate is calculated based on "prevailing market rates for comparable attorneys of comparable skill and standing in the pertinent legal community." *Id. See also Blum v. Stenson*, 465 U.S. 886, 895, (1984) (Reasonable attorneys fees should be "calculated according to the prevailing market rates in the relevant community").

position, but also of the agency's actions."); *Taylor v. Heckler*, 835 F.2d 1037, 1040 (3d Cir.1987)

("'the government is thus deemed to have two positions for EAJA purposes, both [of which] must be

'substantially justified'.... [I]f either government position does not bear scrutiny, the prevailing private

party should be awarded attorneys' fees [and other reasonable fees and expenses].'").  Here, neither

defendants' "underlying conduct" nor their "position in civil litigation" is, in any respects, justified –

substantially or otherwise.

Defendants' pre-litigation actions were monumentally unreasonable in both law and fact.  As

trustee-delegates, defendants have managed a trust for nearly a century, but they have consistently and

continuously failed to fulfill the most basic and rudimentary fiduciary duties to the trust beneficiary plaintiff

class.  Report after report from the turn of the century to present has demonstrated the mind-numbing

problem with defendants' mal-administration and mismanagement.  The following passage from this

Court's *Cobell V* decision tells of only a small slice of the problem, but gives significant indication of the

breadth of government malfeasance involved:

> It would be difficult to find a more historically mismanaged federal program than the
> Individual Indian Money (IIM) trust. The United States, the trustee of the IIM trust,
> cannot say how much money is or should be in the trust. As the trustee admitted on the
> eve of trial, it cannot render an accurate accounting to the beneficiaries, contrary to a
> specific statutory mandate and the century-old obligation to do so. More specifically, as
> Secretary Babbitt testified, an accounting cannot be rendered for most of the
> 300,000-plus beneficiaries, who are now plaintiffs in this lawsuit. Generations of IIM
> trust beneficiaries have been born and raised with the assurance that their trustee, the
> United States, was acting properly with their money. Just as many generations have been
> denied any such proof, however. "If courts were permitted to indulge their sympathies, a
> case better calculated to excite them could scarcely be imagined." *Cherokee Nation v.
> Georgia*, 30 U.S. (5 Pet.) 1, 15, 8 L.Ed. 25 (1831) (Marshall, *C.J.*).

> Notwithstanding all of this, defendants, the trustee-delegates of the United States,
> continue to write checks on an account that they cannot balance or reconcile. The court
> knows of no other program in American government in which federal officials are
> allowed to write checks--some of which are known to be written in erroneous
> amounts--from unreconciled accounts--some of which are known to have incorrect
> balances. Such behavior certainly would not be tolerated from private sector trustees. It
> is fiscal and governmental irresponsibility in its purest form.

*Cobell V*, 91 F. Supp. 2d at 4.  This is a trust with no management system, operated without appropriate IT security and with incomplete and corrupt data, with no accounts receivable system, with no internal controls, with no systematic set of policies and procedures, and with trustee-delegates who are incompetent and have destroyed virtually all of the records of this trust. Billions of dollars of assets belonging to the plaintiff class have been mismanaged.  Despite piles of reports identifying with specificity the myriad problems, and notwithstanding Congress' enactment of a remedial statute – the 1994 Act – "designed to ensure more diligent fulfillment of the government's obligations," *Cobell VI,* 240 F.3d at 1098, defendants have failed to take any of the steps necessary to reform the trust and provide an accounting. *Id.* at 1089 ("Time and again Interior Department officials pledged to address these concerns. Yet, as Interior officials readily acknowledge, there has been little progress at reforming the management of IIM trust accounts.").  Instead, they argued they had no enforceable trust duties and certainly no duty to account to the Indian beneficiaries of the trust.  Simply put, in no respect – in whole or in part – was the government's position substantially justified.

Defendants' litigation position – as documented in greater detail *infra* – was also patently unreasonable.  Among other things, the government took the position during the entire Phase 1.0 proceeding that the United States does not owe a duty to account to individual Indian trust beneficiaries. *See Cobell VI*, 240 F. 3d at 1094 ("Specifically, [trustee-delegates] take issue with the district court's finding of specific trust obligations, including a judicially enforceable duty to account.").  This is a plainly untenable position as the Court of Appeals made clear: "[T]he 1994 Act reaffirms the government's preexisting fiduciary duty to perform a complete historical accounting of trust fund assets." *Id.* at 1102.  Moreover, the Court noted that defendants "never explain how one can give a fair and accurate accounting of all accounts without first reconciling the accounts, taking into account past deposits, withdrawals, and accruals. Indeed, the government's own expert acknowledged that one could not determine an accurate account balance without confirming historical account balances."  *Id.*

In short, neither the government's pre-litigation conduct nor their positions in this litigation were remotely reasonable or justified.  Since, plaintiffs have prevailed, as held by this Court, the government's

position was not substantially justified and there are no factors making an award unjust, plaintiffs are entitled to an award of reasonable expenses including fees pursuant to § 2412(d).  Accordingly, to the extent that this Court does not find plaintiffs' eligibility to a fee award at market rates based on the government's bad faith conduct as allowed pursuant to  28 U.S.C. § 2412(b) (*see infra*), the Court should award plaintiffs, at minimum, an award based on hours expended in the Phase 1.0 proceeding calculated according to the EAJA statutorily hourly capped rate of $125.00 plus a cost of living adjustment based on the Consumer Price Index.  *Cooper v. United States R.R. Ret. Bd.*, 24 F.3d 1414, 1417 (D.C. Cir.1994) (per curiam) (determining that a "a cost-of-living increase is warranted," the Court calculated it "as measured by the Consumer Price Index").  The following table is the rates for each year relevant to this Petition calculated as this Court did in *Chen v. Slattery,* 842 F. Supp. 597 (D.D.C. 1994):[13]

| YEAR | CPI-U | EAJA RATE |
|------|-------|-----------|
| 1996 | 100 | $125.00 |
| 1997 | 100.8 | $126.00 |
| 1998 | 102.1 | $127.62 |
| 1999 | 104.2 | $130.25 |
| 2000 | 107.6 | $134.50 |
| 2001 | 110.4 | $138.00 |
| 2002 | 113.0 | $141.25 |
| 2003 | 116.2 | $145.25 |
| 2004 | 118.9 (May) | $148.62 |

---

[13] *Chen* sets forth the formula for calculating the statutory rates for EAJA, adjusting for the cost of living as calculated by the Consumer Price Index for the Washington, D.C. / Maryland / Virginia area for each year as follows:



$$\frac{rate}{\$125.00} = \frac{CPI\text{-}Ub}{CPI\text{-}Ua}$$

CPI-Ub is the average CPI for the year in which the hours were expended.  CPI-Ua is the CPI at the time that EAJA was amended to increase the statutory cap to $125.00 (1996).

|  |  |  |
|--|--|--|

In each attorney's affidavit accompanying this Application, counsel sets forth the reasonable hours expended in each year.  Plaintiffs derive the "EAJA capped" fees based on multiplying these claimed hours by the above capped COLA adjusted rates.  We have calculated rates for law clerks and paralegals at "the lower of either the prevailing market rate or the statutory rate of $125 per hour ...."  *See, e.g., Wilson v. Principi*, 16 Vet. App. 509, 511 (2002).

### B.  Because Defendants' Underlying Conduct in This Litigation Constitutes Bad Faith, Plaintiffs Are Eligible for a Fee Award Based on Prevailing Market Rates

The second waiver of the United States' governmental immunity is set forth in 28 U.S.C. § 2412(b). Unlike § 2412(d), there is no statutory cap to the hourly rate for attorney fees under § 2412(b); rather, counsel is permitted to claim a "reasonable rate."  *Kerin v. U.S. Postal Service*, 218 F.3d 185, 190 (2nd Cir. 2000) ("In contrast to § 2412(d), the statutory language of § 2412(b) imposes no ceiling on the hourly rate used to calculate bad faith fees, requiring only that such fees be "reasonable.'").[14]  Section 2412(b),  the "lesser used "provision, provides that "[t]he United States ... liable for [attorneys'] fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." It is axiomatic that under the common law  "American Rule," the losing party ordinarily does not pay the attorney fees of the prevailing party.  *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975) ("In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser.").

---

[14]That reasonable rate is calculated based on "prevailing market rates for comparable attorneys of comparable skill and standing in the pertinent legal community." *Id. See also Blum v. Stenson*, 465 U.S. 886, 895, (1984) (Reasonable attorneys fees should be "calculated according to the prevailing market rates in the relevant community").

13

There are, however, exceptions to this general rule.  One such well recognized exception is where the losing party has engaged in "bad faith."  *See F.D. Rich Co. v. United States*, 417 U.S. 116, 129 (1974) ("[A]ttorneys' fees may be awarded to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980).  "Bad faith can support an award of attorneys' fees in circumstances where the bad faith (1) occurred in connection with the litigation, or (2) was an aspect of the conduct giving rise to the lawsuit." *Am. Hosp. Ass'n v. Sullivan*, 938 F.2d 216, 219 (D.C. Cir.1991) (Sentelle, *J.*). *Accord Hall v. Cole*, 412 U.S. 1, 15 (1973) ("It is clear ... that 'bad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation."); *Nepera Chem., Inc. v. Sea-Land Serv., Inc.,* 794 F.2d 688, 701 (D.C. Cir.1986).

Prior to a more thorough discussion of these two distinct types of "bad faith" as a basis for attorney's fees under EAJA § 2412(d), it is critical to understand the appropriate standard of review of the district court's determinations of bad faith.

EAJA fee awards are reviewed for abuse of discretion and therefore the district court's determination will not be reversed unless "its decision rests on clearly erroneous factual findings or if it leaves us with a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *F.J. Vollmer Co. v. Magaw*, 102 F.3d 591, 595-96 (D.C. Cir.1996).[15] Such a limited standard of review is "appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983).

---

[15]*See also Blum v. Stenson,* 465 U.S. 886, 902 n. 19 ("A district court is expressly empowered to exercise discretion in determining whether an award is to be made and if so its reasonableness."); *Kattan by Thomas v. District of Columbia,* 995 F.2d 274, 278 (D.C. Cir.1993) ("A district court's discretion as to the proper hourly rate to award counsel should not be upset absent clear misapplication of legal principles, arbitrary fact finding, or unprincipled disregard for the record evidence."); *Copeland v. Marshall,* 641 F.2d 880, 901 (D.C. Cir.1980) (*en banc* ) ("It is common learning that an attorney's fee award by the District Court will be upset on appeal only if it represents an abuse of discretion.").

This highly deferential review standard governs not only review of EAJA generally but also of the determination of bad faith under 2412(b) specifically.  In *American Hosp. Ass'n v. Sullivan*, 938 F.2d at 222, the D.C. Circuit held that "the question of bad faith in the context of the common law exception to the American rule on counsel fees . . . is one of fact requiring a clearly erroneous standard of review." *See also U.S. v. Wallace*, 964 F.2d 1214, 1217 (D.C. Cir. 1992) ("We review the trial court's finding of bad faith under the clearly erroneous standard.").

Defendants have engaged in conduct that constitutes "bad faith" both in their conduct "giving rise to the lawsuit" and in their behavior "in connection with the litigation."  *See Am. Hosp. Ass'n*, 938 F.2d at 219.  Because these two types of bad faith raise different concerns, we will address each separately below.

### 1.  The Government Engaged in Bad Faith That Gave Rise to the Litigation

Market rates are recoverable where "conduct giving rise to the lawsuit" constitutes bad faith. *Gray Panthers Project Fund v. Thompson*, 304 F. Supp. 2d 36, 39 (D.D.C. 2004).  The test for when pre-litigation conduct constitutes bad faith for EAJA purposes is well-settled:  "[A] party, confronted with a clear statutory or judicially-imposed duty towards another, is so recalcitrant in performing that duty that the injured party is forced to undertake otherwise unnecessary litigation to vindicate plain legal rights." *Fitzgerald v. Hampton*, 545 F. Supp. 53, 57 (D.D.C.1982). *See also American Employers Ins. Co. v. American Sec. Bank*, 747 F.2d 1493, 1502 (D.C. Cir.1984) ("[E]xception to the American rule ... allows an award of attorneys' fees when the party has been the victim of unwarranted, oppressive, or vexatious conduct on the part of his opponent and has been forced to sue to enforce a plain legal right."); *Gray Panthers*, *supra*, 304 F. Supp.2d 36.  (D.D.C. 2004).

In this case, that standard is clearly met. The United States has clear and substantial legal obligations to the plaintiffs, including fiduciary duties that they have failed for over a century to fulfill.  On this point the Court of Appeals in *Cobell VI* could not have been more clear – holding that it is "beyond dispute – that the government has longstanding and substantial trust obligations to Indians, particularly to IIM trust beneficiaries, not the least of which is a duty to account." *Cobell VI*, 240 F.3d at 1097

(emphasis added).  Despite congressional reports like Misplaced Trust,[16] along with scores of reports

by  "The General Accounting Office, Interior Department Inspector General, and Office of Management

and Budget, among others, [which have all condemned the mismanagement of the IIM trust accounts"

and congressional enactment of a "remedial" statute to force reform, the government "Interior officials

readily acknowledge, there has been little progress at reforming the management of IIM trust accounts."

*Id.* at 1089.  The Court of Appeals held that this "recalcitrance," this extraordinary delay in fulfilling the

most fundamental fiduciary duties was not only undue, but was "unconscionable."  *Id.* at 1096. The

Court of Appeals concluded that "it is beyond question that the government has delayed fulfilling its trust

obligations for many years."  *Id.* (emphasis added).

It is beyond peradventure that defendants as trustee-delegates constitute a "party, confronted

with [] clear statutory [and] judicially-imposed dut[ies] towards [IIM beneficiaries]" and furthermore that

they have been "so recalcitrant in performing th[ose] dut[ies]" that the plaintiff beneficiary class – "the

injured party" – was "forced to undertake otherwise unnecessary litigation to vindicate plain legal rights."

In other words, the government's actions fit the classic definition of pre-litigation bad faith conduct. *See*

*American Employers Ins.*, *supra*, 747 F.2d at 1502; *Fitzgerald*, *supra*, 545 F. Supp. at 57; *Gray*

*Panthers*, *supra*, 304 F. Supp.2d at 39.

What is more, we are not talking about a situation where there can be any legitimate dispute that

these fiduciary duties are owed to individual Indian trust beneficiaries.  Not only is there a statute, the

---

[16]In *Cobell V,* this Court described the state of affairs that led to the Misplaced Trust report and it unmistakable conclusions:

> By the mid-1980s there was uniform disapproval of the manner in which Interior was administering the IIM trust. In 1988, Congress began to hold oversight hearings related to the handling of government trust accounts. On April 22, 1992, the House Committee on Government Operations issued a report entitled Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund, H.R. No. 102-499 (1992) .... This thoroughly documented report concluded that Interior had made no credible effort to address the problems in trust administration in a 'wide range of areas' and that Interior had disobeyed many congressional directives aimed at forcing Interior to correct trust management practices and reconcile the Indian trust accounts.

91 F. Supp. 2d at 12.

1994 Act, which "recognized and reaffirmed" that such fiduciary duties exist, but these "longstanding"

duties are fundamental and form the core of the legal relationship between trustee – here the United

States – and the beneficiaries of this trust – plaintiffs.  On this point *Cobell VI* is illuminating:

> The fundamental problem with appellants' claims is the premise that their duties are
> solely defined by the 1994 Act. The Indian Trust Fund Management Reform Act
> reaffirmed and clarified preexisting duties; it did not create them. It further sought to
> remedy the government's long-standing failure to discharge its trust obligations; it did not
> define and limit the extent of appellants' obligations.... Enactment of the Indian Trust
> Fund Management Reform Act in 1994 did not alter the nature or scope of the fiduciary
> duties owed by the government to IIM trust beneficiaries. Rather, by its very terms the
> 1994 Act identified a portion of the government's specific obligations and created
> additional means to ensure that the obligations would be carried out.

> * * *

> Not only does the 1994 Act <u>plainly</u> reaffirm the government's preexisting duty to provide
> an accounting to IIM trust beneficiaries, <u>but it is **plain** that such an obligation inheres in
> the trust relationship itself. The obligation of a trustee to provide an accounting is a
> fundamental principle governing the subject of trust administration</u>.

Id. at 1100, 1103 (emphasis added).

In point of fact, the duty to account – which defendants in bad faith claimed they do not owe – is

so fundamental that black letter trust law makes clear that no trust can properly exist without a duty to

account, and indeed a provision in a trust instrument that purports to eliminate the duty is void *ab initio*.

This is explained with clarity in Bogert, THE LAW OF TRUSTS & TRUSTEES (rev 2d ed), § 973, pp

462-64, 467:

> <u>If the settlor attempts to eliminate any accounting duty of the trustee, by providing that it
> shall not be necessary for his trustee to account to anyone at any time, it would seem that
> the clause should be invalid and the duty of the trustee unaffected</u>. ... Provisions of this
> sort in deeds and wills would seem against public policy and void .... There is a small
> amount of authority on the subject. The better reasoned decisions hold that the trustee
> still must account to the proper court.

> * * *

> A settlor who attempts to create a trust without any accountability in the trustee is
> contradicting himself. <u>A trust necessarily grants rights to the beneficiary that are
> enforceable in equity</u>. If the trustee cannot be called to account, the beneficiary cannot
> force the trustee to any particular line of conduct with regard to the trust property or sue
> for breach of trust. The trustee may do as he likes with the property, and the beneficiary
> is without remedy. <u>If the court finds that the settlor really intended a trust, it would seem</u>

that accountability in chancery or other court must inevitably follow as an incident.
Without an account the beneficiary must be in the dark as to whether there has been a
breach of trust and so is prevented as a practical matter from holding the trustee liable
for a breach.

§ 973, pp 462-64, 467 (emphasis added).  *Accord Wood v. Honeyman*, 178 Or. 484, 566, 169 P.2d
131, 166 (1946) ("We are completely satisfied that no trust instrument can relieve a trustee from his
duty to account in a court of equity. ... [E]ven when [a no accounting duty] provision is made a part of
the trust instrument, the trustee will, nevertheless, be required in a suit for an accounting to show that he
faithfully performed his duty and will be liable to whatever remedies may be appropriate if he was
unfaithful to his trust.); *Ferguson v. Mueller*, 115 Colo. 139, 169 P.2d 610 (1946) (every trust
beneficiary is entitled to a court accounting from his trustee, and this right cannot be barred by a term of
the trust instrument); *Salter v. Salter*, 209 Ga. 90, 70 S.E.2d 453 (1952) (a provision in a trust
instrument that the trustee need not account or file an inventory does not relieve the trustee from
accounting in a court of equity); *In re Porter's Estate*, 164 Kan. 92, 187 P.2d 520 (1947) (clause
stating that trustees for charity are not to give bond or be under obligation to account to any person or
court does not deprive the court of jurisdiction to hold the trustees to account).

Moreover, the government can hardly claim that they were unaware of their clear legal duties.
*See Cobell VI,* 240 F.3d 1104 ("This position should not come as a surprise to appellants, as it has
been the official position of the federal government. In 1996 (prior to the filing of the initial complaint in
this case) the Interior Department's Solicitor issued an opinion that government trustees have an
'affirmative duty ... to make a full and proper accounting.'" ).  Nevertheless, they unconscionably
delayed fulfillment of these plain obligations.  *Id.* at 1109 (noting the extraordinary "record of agency
recalcitrance and resistance to the fulfillment of its legal duties"; noting the extraordinary nature of the
"magnitude of government malfeasance"; remarking on the "longstanding inability or unwillingness of
government officials to discharge their fiduciary obligations").

In no uncertain terms, it took this case to prompt any action at all:

18

> Federal officials were aware of their fiduciary obligations long before the passage of the
> 1994 Act-let alone the initiation of this action-and yet little progress has been made in
> discharging those duties. What little progress the government has made appears more
> due to the litigation than diligence in discharging its fiduciary obligations. See
> MISPLACED TRUST H.R.REP. NO. 102- 499,,, at 5 (noting that "the only thing that
> seems to stimulate a flurry of activity at the Bureau [of Indian Affairs] is an impending
> appearance ... before a congressional committee"). *See also Cobell V*, 91 F. Supp.2d
> at 20 n.15 (noting that the "positive steps taken by defendants toward bringing
> themselves into compliance with the law" have "not come easily").

*Id.* at 1096.

In short, despite awareness and clarity of their duties, defendants forced plaintiffs to bring this action to vindicate their rights.  This is precisely the type of conduct – flouting clear statutory and fiduciary duties for decades (and thereby forcing a plaintiff class to bring an action to vindicate their rights) – that constitutes bad faith.  *See, e.g., Am. Hosp. Ass'n*, 938 F.2d  at 220 (A court can find pre-litigation bad faith "where a party, confronted with a clear statutory or judicially-imposed duty towards another, is so recalcitrant in performing that duty that the injured party is forced to undertake otherwise unnecessary litigation to vindicate plain legal rights." (Internal quotation marks and citation omitted)).

Since bad faith conduct of the government necessitated the very legal action itself, it is settled law in this Circuit that "all of the hours expended on this litigation were attributable to his bad faith" and accordingly all the hours are compensable at market rates.  *Gray Panthers*, *supra*, 304 F. Supp.2d at 39 (emphasis added).

For these reasons, plaintiffs believe that pursuant to § 2412(b) and because defendants' bad faith "conduct g[ave] rise to th[is] lawsuit," plaintiffs are entitled to receive a "reasonable amount of fees" for representing plaintiffs in this action calculated at market rates.  Plaintiffs' counsel are of differing levels of skill and experience and accordingly we discuss the market rates available to each counsel in the attached affidavits. *Gray Panthers*, *supra*, 304 F. Supp.2d at 39 ("Because cases should be treated as a whole in determining EAJA fees, this court will make one determination of bad faith concerning the Secretary's pre-litigation conduct. His failure to abide by congressional mandates necessitated this

action; therefore, all of the hours expended on this litigation were attributable to his bad faith, even after the issuance of the preliminary injunction.").

### 2.  The Government's Conduct During the Litigation Also Constitutes Bad Faith, Making Plaintiffs Eligible for a Fee Award at Market Rates.

As alluded to earlier, independent of actions pre-litigation giving rise to the action that constitute bad faith, a party can take action "in connection with the litigation" itself that constitutes bad faith. Defendants actions in litigating *Cobell* during the times relevant to this Petition plainly meet the definition of bad faith as well.

There are numerous actions that can constitute litigation related "bad faith."  Court have recognized, *inter alia*, that filing of frivolous motions, advancement of a baseless contention, misleading the court, discovery abuse, violation of court orders, intimidation of witnesses, suborning perjury and taking actions that delay or disrupt the litigation. *See, e.g., Hutto v. Finney*, 437 U.S. 678, 689, n. 14 (1979) ("An equity court has the unquestioned power to award attorney's fees against a party who shows bad faith by delaying or disrupting the litigation ...."); *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, n. 4 (1968) (*per curiam*) (Evidence of "groundless contentions for purposes of delay" is sufficient for finding of bad faith); *Lipsig v. National Student Marketing Corp.*, 663 F.2d 178, 182 (D.C. Cir. 1980) (advancement of frivolous claims or defenses constitutes bad faith); *Fritz v. Honda Motor Co.*, 818 F.2d 924 (D.C. Cir.1987) (discovery abuse as bad faith);  *Ford v. Temple Hosp.*, 790 F.2d 342, 347 (3d Cir.1986) ("the intentional advancement of a baseless contention that is made for an ulterior purpose, *e.g.*, harassment or delay."); *Hicks v. Arthur*, 891 F. Supp. 213, 215 (E.D. Pa.1995) (Examples of bad faith include taking litigation positions for "an ulterior motive, or misconduct such as knowingly using perjured testimony, citing as binding authority overruled or non-binding cases, or otherwise misrepresenting facts or law to the court."); *Loftus v. Southeastern Pennsylvania Tranp. Auth.*, 8 F. Supp.2d 458, 461 (E.D. Pa.1998), aff'd, 187 F.3d 626 (3rd Cir.1999) ("When a claim is advocated despite the fact that it is patently frivolous or where a litigant continues to pursue a claim in the face of an irrefutable defense, bad faith can be implied."); *Reich v.*

*Hall Holding Co.*, 990 F. Supp. 955, 967 (N.D. Ohio 1998) (bad faith includes actions taken to delay or prolong litigation).

Clearly, there is ample evidence that defendants have throughout the Phase 1.0 proceedings engaged in a pattern and practice of behavior that constitutes bad faith litigation conduct in every conceivable respect.  Examples include: spoliation of evidence and failing to timely report such spoliation to the Court; intimidating witnesses and attempting to suborn perjury; discovery abuse including failing to provide requested information and destroying requested information; attempting to prevent depositions; and advancing an endless stream of baseless contentions and unsupportable legal positions.  In the next subsection, plaintiffs discuss these specific instances of bad faith throughout the litigation.

Although courts have generally agreed that the fees are "limited to those expenses necessary to counter the losing party's bad faith,"[17] or "for work and expense attributable to bad-faith endeavors,"[18] there are certain types of conduct that permit a finding that all fees are recoverable as bad faith fees.  This is the circumstance, for example, in where the government's "failure to abide by congressional mandates necessitated this action" and "therefore, <u>all of the hours expended on this litigation were attributable to his bad faith</u>."  *See, e.g., Gray Panthers*, *supra*, *v. Thompson*, 304 F. Supp.2d 36 (discussed in greater detail in the next section *infra*).  As we have shown, this overarching conduct can occur pre-litigation or in foundational positions that a party takes during litigation.

Along with the pre-litigation bad faith discussed *supra*, the trustee-delegates during litigation continued to advance baseless legal positions in bad faith, which required plaintiffs, for example, to conduct discovery and perform in depth research to prove that the trust management system had always been broken, and was presently still broken.  Plaintiffs had to litigate the issue of whether the Individual Indian Trust was an actual trust, and that defendants had a pre-existing duty to perform an accounting –

---

[17] *Sierra Club v. United States Army Corps of Eng'rs*, 776 F.2d 383, 390 (2d Cir.1985).

[18]*Lipsig.*, 663 F.2d at 181, n.21.

despite admissions from the Special Trustee, and opinions of the Interior Solicitor, that of course a

trustee has a duty to account.

One example will illustrates this point.  From the inception of this litigation, defendants took the

absurd position that the management of the individual Indian Trust was adequate, despite mountains of

evidence to the contrary from, among others, the GAO, Interior's Inspector General, the Special

Trustee, Arthur Andersen, Price Waterhouse, and numerous reports from Congress committees.  On

this score, the government's assertions were worse than groundless, they were patently false.

Accordingly, the government's baseless contentions regarding the adequacy of their trust management,

standing alone, would be sufficient for a finding of bad faith.  *See, e.g., Newman*, *supra*, 390 U.S. at

402, n. 4 (advancement of  "groundless contentions" constitute bad faith).

It gets worse, however.  This Court on May 5, 1998 issued a scheduling order that, at plaintiffs

urging, included the following provision:

> On or before June 10, 1998, defendants shall serve and file a statement of the <u>specific</u>
> <u>respects</u>, if any, in which they concede that the **present** management of the trust here
> involved is inadequate.

May 5, 1998 Order at 2, ¶ 1 (emphasis added).  Importantly, the Court asked the government to in

good faith concede the manner in which "present management" as opposed to "future" or "planned"

management was inadequate.  The government responded by boldly stating in total disregard of the facts

as they knew it: "Defendants hold the view that **the present management of the trust**, taking into

account the changes that are in progress, **is adequate**."  *Defendants' Statement Pursuant to May 5,*

*1998 Order* at 2. Because defendants in bad faith would not admit the ways in which present

management was inadequate, plaintiffs had to continue their efforts to prove that point through

conducting discovery, reviewing material and drafting legal arguments.  We did so.

It is now quite clear that defendants' statements that systems were "adequate" was plainly and

demonstrably false.  They conceded as much on the eve of trial, as this Court acknowledged in its

December 21, 1999 decision:

In addition to these more legally based admissions, Interior has made significant concessions on some factual matters, as well. In a written stipulation filed on the eve of trial, Interior admitted that, as of the commencement of trial:

> 1. [T]he Department of the Interior cannot provide all account holders with a quarterly report which provides the source of funds, and the gains and losses. [See 25 U.S.C. § 4011.]
>
> 2. [T]he Department of the Interior does not adequately control the receipts and disbursements of all IIM account holders. [See id. § 162a(d)(2).]
>
> 3. [T]he Department of the Interior's periodic reconciliations are insufficient to assure the accuracy of all accounts. [See id. § 162a(d)(3).]
>
> 4. [A]lthough the Department of the Interior makes available to all IIM account holders the daily balance of their account and can provide periodic statements of the account balances, the Department does not provide all account holders periodic statements of their account performance. [See id. § 162a(d)(5).]
>
> 5. [The] Department of the Interior does not have written policies and procedures for all trust fund management and accounting functions. [See id. § 162a(d)(6).]
>
> 6. [T]he Department of the Interior does not provide adequate staffing, supervision and training for all aspects of trust fund management and accounting. [See id. § 162a(d)(7).]
>
> 7. [The Department of the Interior's] record keeping system [is inadequate]. [See id. § 162a(d)(1), (3), (4), (6).]

Def. DOI's Factual Stipulations, filed June 11, 1999, at 5-6, 2 n.2

*Cobell v. Babbitt*, 91 F. Supp.2d 1, 33 (D.D.C. 1999).  The government conceded, without trial, that as of June 10, 1999, they could not comply with the most fundamental aspects of their statutory fiduciary obligation. Secretary of the Interior admitted further, during trial, that "[a]s of trial, 'the entitlements of Individual Indians that are dictated by the trust responsibilities of the United States are not being fulfilled.' Trial Tr. at 3765. ... 'The fiduciary obligation of the United States government is not being fulfilled.' Trial Tr. at 3768. " *Cobell,* 91 F. Supp. 2d at 33-34.

These admissions further evidence the absurdity of their pre-trial position that trust management systems were "adequate."  While such admissions **may** aid the government in showing that from that

23

point, their position changed – although as we show below they continued their bad faith in other respects through and after trial – it cannot erase the bad faith throughout the first three years of litigation that caused serious delays and exponentially increased the work of plaintiffs' counsel because of the government's steadfast refusal to admit their failure to have complied with clear legal duties.

Since the most fundamental aspects of the Trial 1.0 proceedings were impacted dramatically by the government's refusal to come clean with the obvious failures in their management of the IIM trust – in bad faith – virtually all pre-trial fees are attributable to the government's bad faith refusal to admit at the inception the well- documented and on-going failures in their management of the beneficiary class's trust assets. Accordingly, all pre-trial 1.0 fees should be "bad faith" fees and compensated at market rates.

In addition, it is clear as plaintiffs painstaking review has demonstrated, defendants actions and positioning during the 1.0 trial in the summer of 1999 and afterwards also plainly constituted bad faith.

## III. "DETAILED FACTUAL SUPPORT" FOR A FINDING OF BAD FAITH SINCE THE INCEPTION OF THIS LITIGATION – UNCONTESTED FINDINGS OF FACT[19]

At all times relevant to the issues central to the Trial 1.0 proceedings, the trustee-delegates have engaged in malfeasance, misfeasance and nonfeasance in the administration and management of the Individual Indian Trust ("Trust"); have permitted fraud and corruption to pervade the management and administration of the Trust; and otherwise have knowingly and willfully breached the trust duties that the United States government owes to all past and present Trust beneficiaries, including 500,000 current individual Indian trust beneficiaries.

---

[19]Set forth in Appendix I attached hereto, plaintiffs set forth a complete compendium of facts that support a finding that defendants have litigated this case in bad faith since its inception. This section primarily deals with admissions, findings of fact made by this Court and the unchallenged reports of the Special Master. The exhibits identified in this section and Appendix I correspond to and have the same numbers as the exhibits attached to *Plaintiffs Motion to Reopen Trial One in this Action and Memorandum of Points and Authorities in Support Thereof,* dated November 30, 2000. Inasmuch as these exhibits have already been filed with this Court and the instant Petition filing is weighty (to say the least), plaintiffs will only file them again if requested by this Court.

Nonetheless, defendants and their counsel defend the indefensible; they have argued, and continue to argue, notwithstanding the law of this case and relevant decisions of the U.S. Supreme Court and in disregard of the findings of this Court that: (1) the Individual Indian Trust ("Trust") is a hollow trust; (2) the trustee delegates do not owe trust duties to the *Cobell* class; (3) the Trust systems are adequate and secure and enable the trustee-delegates to discharge the fiduciary duties that the government owes; (4) even if the systems are inadequate and insecure, this Court is powerless to ensure that the trust duties owed are discharged prudently and enforced; and, as a result, (5) this Court is powerless to protect  individual Indian trust beneficiaries from further waste and destruction of Trust assets – including electronic and hard copy Trust records.

The consequences of the bad faith defense mounted by defendants and their counsel are devastating to the class; they – including tens of thousands of children, the elderly, and the infirm – are deprived of their property, their funds, their assets and thus are unable to obtain adequate shelter, food, clothing, health care, and education.  Members of the class have died, and continue to die, while the government continues its bad faith defense.  That the harm caused by this shameful conduct is irreparable is incontestable.

Finally, to the extent that there is any doubt that the untenable positions taken by defendants and their counsel constitute bad faith and any doubt that defendants and their counsel have done so for the purpose of undermining the integrity of this litigation since the date the plaintiffs filed their complaint, the unprecedented scandalous attacks against this Court and its officers dispose of this question conclusively.

Accordingly, below plaintiffs restate in summary form facts that demonstrate that the Trial 1.0 proceedings were knowingly and willfully defended in bad faith.

***A.  Adverse Findings of the Special Master Which Uncovered Systemic Flouting of Defendants' Obligation to Preserve Trust Documents – Despite Defendants' Repeated Representations to the Contrary and Their Having Been Held in Contempt for Failure to Produce Documents***

Federal Rules of Civil Procedure Rule 53 governs the powers of special masters and the effect of their orders.  Rule 53(e)(2) provides that in non-jury proceedings "the court shall accept the master's findings of fact unless clearly erroneous."  Such report becomes final unless objected to within 10 days.  Fed R. Civ. P. Rule 53(e)(2).  The orders and findings of fact issued by the Special Master and discussed below are therefore binding and indisputable by defendants as they have not filed objections to any of these Reports and Recommendations of the Special Master.  Among the more salient of these binding rulings and findings are the following.

**1.  Adverse Findings of the Special Master Relating to the Destruction of Trust Documents at  Hyattsville Facility and Cover-up Related Thereto by Agents and Employees of Secretary Summers**

On November 23, 1998[20] – the day an evidentiary hearing commenced to assess defendants' compliance with the First Order for the Production of Information, dated November 27, 1996 ("First Order") and to determine a date certain for Trial 2.0 – Treasury ordered the destruction of non-summary level IIM documents.[21]  This destruction continued through the first contempt trial and ended on the last day of the contempt trial – some two months later and after the destruction of 162 boxes of relevant documents at Treasury's Hyattsville facility; the destruction and its subsequent cover-up was the subject of an in-depth report of the Special Master.  *See Recommendation and Report of the Special Master Regarding the Delayed Disclosure of the Destruction Of Uncurrent Check Records Maintained by the Department of the Treasury (December 3, 1999)* (the "*December 1999 Hyattsville Findings*").  Such destruction stopped only because a Treasury employee noticed records

---

[20]This was the same day that Interior "coincidentally" began destruction of all of its electronic trust documents – primarily in the form of e-mail.

[21]Treasury had for years been attempting to extricate itself from this litigation by asserting that it had only "summary level" documents.  *See, e.g.,* Trial 1.0 Tr. at 4994.

designated for destruction with Indian-sounding names (therefore belying the "no summary level documents" argument) on a chair in her office and questioned whether they should be destroyed because of their relevance to this litigation.  *See December 1999 Hyattsville Findings* at 24.  Thereafter, in the months that followed Treasury attorneys passed up numerous opportunities to inform this Court and plaintiffs of the Hyattsville destruction – including, ironically, as part of their opposition to plaintiffs' motion for greater document protection mechanisms,  various status conferences and the Secretary of the Treasury's critical motion for summary judgment that he had hoped would extricate himself from this litigation.  *See December 1999 Hyattsville Findings* at 56-77.          The massive Hyattsville destruction and cover-up caused the Department of Justice to generate an internal report, known as the Tyler Report after its principal author, ostensibly in an attempt to ensure that such destruction not be repeated.  The Tyler Report was criticized by the Special Master as being specific on the details of the actual destruction but largely useless as to the events encompassing the cover-up.  The Special Master stated:

> In glaring contrast to its commendable level of specificity on the document destruction, however, the Tyler Report was inexplicably ambiguous in its narrative of the events which took place between January 28, 1999 – the date when FMS attorneys first became aware that documents potentially relevant to the <u>Cobell</u> litigation may have been destroyed – and May 11, 1999 – when the Court was <u>finally</u> notified of the destruction.

December 1999 Hyattsville Findings at 2 (emphasis original).

The Special Master also entered a finding that this destruction was part of a pattern and practice of document destruction and obfuscation since the inception of this litigation:

> **What make these violations particularly egregious is that they were by no means isolated incidents in this litigation.  Rather, they constituted part of a greater pattern of obfuscation that has permeated the <u>Cobell</u> litigation and has manifested itself on other occasions** including: (1) the delayed disclosure of the destruction of the microfilm checks and the loss of the Bureau of Public Debt "missing box"; (2) the repeated misrepresentations that Treasury was in full compliance with Paragraph 19 of the November 1996 Order; (3) the ongoing objections to plaintiffs' requests for document preservation orders on the false premise that such steps were unnecessary; and (4) the silence during status conferences and pleadings when critical facts concerning Treasury's discovery responses and obligations were either omitted or misstated.

*Id.* at 120-21 (emphasis added).[22]  Equally significant, the Special Master found, that in addition to the pattern and practice of knowing and willful obstruction of this Court's enforcement of the trust duties that the government owes to the *Cobell* class, there was powerful evidence that the defendants and their counsel were "out of control:"

> **This is a system clearly out of control.**
> Had FMS counsel expended the same energy ensuring that DOJ, the Court, the Plaintiffs, and/or the Inspector General were notified of the document destruction as they spent shifting the blame to other agencies and to one another, the problems described above would not have reached the crescendo that they did and this investigation would not have been necessary.  Had Main Treasury acted in accordance with its supervisory function and managed this litigation in a manner commensurate with its significance, again, this investigation would be superfluous.  Unfortunately, those charged with supervising this litigation fell woefully short of their responsibilities.  It can only be assumed that Treasury's indifference stemmed from the vain hope that it would be summarily dismissed from the case or that the Court would not find its Secretary in contempt.  These assumptions were incorrect.

*Id.* at 118 (emphasis added).  The Special Master concluded by recommending that the Department of the Treasury and the Department of Justice be required to report to the Court all steps they had taken to ensure that these incidents do not reoccur, and further that the Court take no action until it could review what corrective and/or disciplinary measures have been taken to hold accountable those responsible for the document destruction and cover-up.  *Id.* at 121.[23]  Parenthetically, this Court took no action to discipline the responsible attorneys, including the former Treasury General Counsel, for their roles in the destruction and cover-up.

_____

[22]This list was not complete as a summary of document destruction is never current; never complete.  For example, on November 14, 2000, Brian Ferrell wrote a letter to the Special Master (Exhibit 75) in which he described yet another intentional destruction of relevant documents located at the Fort Worth Federal Records Center.  And one week later, on November 21, 2000, Mr. Ferrell again wrote to the Special Master  (Exhibit 76) informing him of yet another of 7 additional boxes of Treasury documents.  Other additional document destruction admissions of Treasury are set forth in the accompanying Appendix at ¶¶ 49-50.

[23]This resulted in an internal report (the "Treasury Report") by Treasury that it also attempted to cover up.  Secretary Summers moved to seal the Treasury Report – which assessed the conduct of the Treasury trustee-delegate and his employees and agents – and related documents from plaintiffs, their counsel, and the public.  The motion was opposed by plaintiffs. In addition, Dow Jones & Company, Inc. moved to intervene and pressed for public access to the documents Treasury hoped to secrete due to the gravity of the issues to which they pertained and the significant public interest therein.  This Court denied defendants' motion.

In response, the Treasury attorneys involved filed various comments and objections to the December 1999 Hyattsville Findings, resulting in the Special Master's reiteration of his findings in a Report issued February 7, 2000 (the "Supplement Hyattsville Findings").   In his Supplement Hyattsville Findings the Special Master concluded among other things that

1)    "[R]epresentations were made to the Court which, at worst, were patently untrue, at best, were misleading insofar as they reported a false state of compliance with the Court's November 1996 Order"; (*Id.* at 2)

2)    The duty of candor that attorneys owe to courts and other tribunals was "flagrantly violated" when the Treasury attorneys delayed disclosure of the document destruction, notwithstanding their early recognition of their potential responsiveness to the Court's November 27, 1996 discovery order, as well as their potential relevance to a meaningful accounting;   (*Id.* at 24)

3)    The Treasury attorneys' actions constituted spoilation of evidence – evidence that due to the nature of the destruction of the Hyattsville documents rendered it difficult, if not impossible, for plaintiffs to reconstruct the full contents of the destroyed boxes from other sources; and (*Id.* at 31)

4)    The cover-ups and failures to disclose to the Court "could be construed as the perpetuation of a potential fraud upon the Court." (*Id.* at 25)

Plaintiffs submit that these various findings of fact emanating from the Special Master's thorough and detailed analyses of defendants' willful breaches of their fiduciary duties – and in particular their habitual destruction of trust documents (many of which should have been produced <u>prior</u> to the commencement of Trial 1.0 pursuant to the First Order) – had undermined materially the integrity of Trial 1.0 and alone constitute sufficient grounds for this Court to find that the Trial I proceedings were knowingly and willfully undermined and defended in bad faith.


**2.  Adverse Findings of the Special Master Relating to Site Visits**

Because of defendants' repeated refusals to produce documents, it became necessary that a "strong" Special Master be appointed on February 24, 1999.   On August 12, 1999, the Court authorized Special Master Balaran  "to oversee the Interior Department's retention and protection from

destruction of IIM Records through, among other things, on-site visits to any location where IIM Records are maintained" and to "recommend to the Department that it take reasonable steps to protect IIM records found to be in jeopardy of destruction." Despite the Special Master's repeated on-site visits – and <u>four</u> scathing Reports to the Court later – the Interior defendants refused to reign the out-of-control agency and the destruction of trust documents continued unabated.

During the week of April 14 through April 21, 1999, the Special Master toured a number of Interior field offices in response to plaintiffs' Motion in Support of Document Protection Order. He noted that "storage conditions at several of the locations to be patently substandard with documents piled in a haphazard manner. See 6/7/99 Recommendation and Report of Special Master at 8-9. As a result thereof, the Special Master recommended safeguards to ensure that all relevant Indian trust documents are properly protected and retained. *Id.* at 19.

It is at this time that concerted, active resistance to this Court, resistance that heretofore had been material but for the most part passive, began in earnest. Between October 12 and 19, 1999, the Special Master conducted site visits at 13 BIA Area and Agency Offices and found that Interior continued to place irreplaceable individual Indian trust documents in jeopardy. Further, he predicted what would eventually occur in this litigation through the bad faith of defendants and their counsel: that the "disruption of the IIM collection and disbursement process due to either the inadvertent or purposeful destruction of these documents would be devastating." *See* Report (Second) of the Special Master Regarding Site Visits to Area and Agency Offices Dated October 29, 2000 at 7.

Interior's recalcitrance stiffened in the face of the Master's warnings. Thereafter, on November 1, 1999, the Special Master visited two Bureau of Indian Affairs agency offices in North Dakota. This was the third of his site visits. He again observed that boxes of trust documents were in deplorable conditions and BIA's "callous disregard for these records reveals a problem beyond that of insufficient resources." *See* Third Report of the Special Master Regarding Site Visits to Area and Agency Offices dated November 12, 1999 at 4. In the course of his investigation at the Fort Totten agency, he reported to this Court that he was misled, lied to and obstructed:

> I must evaluate the Fort Totten Agency as among the worst sites I have visited concerning the care and maintenance of IIM documents. Its callous disregard for these records reveals a problem beyond that of insufficient resources. Together with what I perceived to be a duplicitous denial of the existence [of] any off-site storage facility and a transparent attempt to prevent me from photographing the area, the Agency's deliberate indifference to the proper maintenance of IIM documents presents a disturbing profile.

*Id.* at 4.

From November 13 through November 17, 2000, the Special Master made additional site visits to 6 reservations in Montana and the Northwest. He confirmed what plaintiffs had been stating since June 10, 1996 in the face of repeated denials by defendants and their counsel; that the Interior defendants utterly failed to protect the trust records against the elements, particularly against fire. In virtually all instances, he found that the trust documents being housed unsafely were irreplaceable or of critical importance. *See* Fourth Site Visit Report of the Special Master to Area and Agency Offices dated November 29, 2000 at 2-4. The Special Master concluded:

> [E[fforts [of dedicated employees], however, do not offset the lack of secure, environmentally controlled and fire-resistant storage facilities and cabinets in which trust records are housed. Local officials uniformly attribute this problem to a shortage of resources and a failure on the part of the agency to prioritize the safeguarding of trust information. In my view, until adequate funds are earmarked for, and allocated to, purchasing new equipment and upgrading existing facilities, IIM documents will remain in jeopardy.

*Id.* at 6. Thus, notwithstanding repeated representations defendants and their counsel have made to this Court and plaintiffs <u>since June 14, 1996 –</u> that all electronic and hard copy trust records would be retained – almost a year after defendants were found to be in breach of their fiduciary duties in Trial 1.0, and almost two years after they were first held in contempt – defendants and their counsel defied this Court by refusing to preserve and protect irreplaceable trust documents and by covering up their misconduct. Clearly, this misconduct constitutes bad faith and has undermined materially the integrity of the Trial 1.0 proceedings. Moreover, it has delayed unconscionably a resolution of this case on the merits.

**3.  Sanctions Imposed for Defendants' Transparent Misuse of the Privacy Act and Related Authorities to Avoid Producing Documents.**

Defendants had obfuscated and delayed producing documents whose production had been ordered over three years before.  Defendants had submitted to a contempt trial and disgorged over $600,000 in attorney's fees as a result – all to avoid producing documents responsive to Paragraph 19 of the Court's November 27, 1996 First Order.  Parenthetically, as demonstrated by plaintiffs in numerous filings, Paragraph 19 is only one of the various paragraphs of the First Order that defendants and their counsel violated willfully and repeatedly.  In fact, defendants never complied with the First Order as a whole and never have updated the production as required by the First Order.  Further, defendants made no effort to comply with the February 24, 1999 order that required them to prepare a joint plan that if executed properly would bring them into compliance with the First Order.  Never.  And, at all times relevant to this fee application defendants have stonewalled and delayed production – so that the spoliation could continue without interruption – despite knowingly false representations that they had produced all documents called for.  Finally, when all other delaying tactics were exhausted, on January 21, 2000, defendants filed their "Motion for Protective Order for Defendants' Production of Confidential Information and Memorandum of Points and Authorities in Support Thereof" ("Motion for Protective Order") seeking to shield from public disclosure vast quantities of documents responsive to Paragraph 19.  In making such motion, defendants stretched to find any facially plausible authority they could find, and settled on the excuse that the documents were confidential and protected from disclosure to plaintiffs' own attorneys by plaintiffs' own privacy-type rights pursuant to the Indian Minerals Development Act and the Trade Secrets Act.[24]

The Special Master found the positions taken by defendants were "not substantially justified," were "groundless in light of the overwhelming case law to the contrary" and "patently frivolous."  *See*

---

[24]Defendants had early on argued that disclosure was prohibited by the Privacy Act and had negotiated and insisted on entrance of a protective order to preserve the confidentiality of such documents.  Defendants had at the time made no suggestion that any other rights similar to Privacy Act rights might be applicable.  *See Report and Recommendation of the Special Master Concerning Plaintiffs' Request for Sanctions Pursuant to Federal Rule of Civil Procedure 37(a)(4) at* 4-5.

*Report and Recommendation of the Special Master Concerning Plaintiffs' Request for Sanctions Pursuant to Federal Rule of Civil Procedure 37(a)(4)* at 16-17.

Most telling was the fact that defendants had failed to give even a passing thought to protecting or exercising these confidentiality rights when Interior moved the OIRM offices from Albuquerque to Reston, Virginia – and when caught in this conspicuous inconsistency once again made evasive misrepresentations to the Court. The Special Master found that: "When this matter was further explored during the March 29, 2000 hearing, it became apparent that, **contrary to defendants' March 7 representations**, OIRM contractors had been given access to confidential IIM information prior to entering into a contract binding them to secrecy." *Id.* at 11 (bolded emphasis added; underscored emphasis original). The Special Master characterized such duplicity as "selective targeting."[25]

This episode is but an example of the bad faith practiced by defendants and their counsel since this case was filed and it demonstrates not only the lengths defendants had gone to evade complying with basic discovery obligations essential to the integrity of the Trial 1.0 proceedings but also their utter disregard for the orders, directives and instructions of the Court and Special Master.

### 4.  The April 4, 2000 Preliminary Injunction Hearing at Which the Breadth of Defendants' Fraud on the Court Became Undeniable and Resulted in Findings Adverse to the Government

On April 4, 2000, this Court "reluctantly" denied plaintiffs' motion for a preliminary injunction to ensure protection of trust-related data and documents impacted by the move of the Office of Information Resource Management (OIRM) to Reston, Virginia. Hearing Transcript 4/4/00 at 11-12.[26]   In the

---

[25]The Special Master lists as the ultimate justification for his finding that defendants' actions were not substantially justified that "defendants' stated goal of limiting the unfettered disclosure of confidential information appears to have been selectively targeted at plaintiffs as evidenced by the unrestricted access to IIM data given the PRT/ISI contractors prior to March 21, 2000." *Id.* at 17.

[26]The Court dissolved its initial TRO and "reluctantly" denied plaintiffs' motion for a preliminary injunction, noting that, as a practical matter, it could not enter the injunction because to do so would hurt plaintiffs:

> Nevertheless, the Court cannot enjoin this operation at this time without inflicting substantial harm on third parties and, indeed, without harming the very beneficiaries of these trust records who will have critical payments delayed by the

process, however, the Court made certain findings of fact about what the Court had discovered since

issuing its ruling on Trial 1.0 in December 1999.  *Id.* at 4.  These findings of fact address six specific

areas in which the Court found grave discrepancies between what was testified to at Trial 1.0 on the one

hand and what was later discovered to be the truth.

>    1.  **"First, the summary of the defense, that trust reform is underway"** – this Court

pointed to the following representations that defendants had made at trial:

>    "What I think our proof has shown you, however, is that trust reform is
>    springing up.  Not overnight, Your Honor, but steadily and with growing
>    momentum.  There seems to be little or no disagreement that what the
>    Interior Department is doing today  is implementing a set of necessary
>    and appropriate measures to bring the trust reform system forward, and
>    to help bring it into compliance with the standards laid out in the Trust
>    Reform Act of 1994." (Clark Closing Argument at Tr. 5011).

>    "The rest of it has been presented, but perhaps not as clearly as it should
>    have been.  Policies and procedures exist in this BIAM, the BIA manual.
>    They exist in the Department manual.  They exist by force of law as
>    regulations.  There's an awful [lot] there." (Clark Closing Argument at
>    Tr. 5033).

The Court juxtaposed these representations with the subsequent admissions made by defendants

regarding their inability to implement trust reform.  The Court noted that such admissions were

>    exemplified by paragraph 7 of the March 7th, 2000, declaration of Daniel
>    Marshall, III, Executive Vice President of the government contractor involved
>    [in the OIRM move], ISI, he says...
>>    "I have observed that systems applications fail on a daily basis.  ISSDA
>>    reports to the Treasury Department have not worked since at least
>>    January.  There currently exists no published standards or procedures.
>>    Metrics are lacking for measuring application code changes,
>>    requirements documentation, data center run times or recovery help calls
>>    received.  There exists no run books for the data center, and to my
>>    knowledge, Unisys software has not been updated since installation two
>>    years ago.  Most importantly, there exist no written operating
>>    procedures or security manuals in the current work environment.  ISI
>>    has been tasked to remedy these deficiencies during and after the

---

disruption of operations that would occur if the preliminary injunction issued.
      The defendants argued to this Court that the risk of data loss increases with every
day that the Court denies access to these government contractors, and I find this is, in
fact, true.  The sheer incompetence of BIA and the way they undertook these moves
can now only be saved by their own contractors
Hearing Transcript 4/4/00 at 12.

relocation of OIRM from Albuquerque, New Mexico to Reston, Virginia.

Hearing Transcript 4/4/00 at 5 (quoting Declaration of Daniel Marshall III).[27]

**2. Architecture** – The second area in which the Court found a material difference between what was heard at Trial 1.0 and what was discovered later is systems architecture. Specifically, the Court noted:

> At trial, Mr. Nessi testified at page 2572 that defendants have considered and are working on an architectures [sic]. They have conducted in depth discussions with OTFM and MMS to ensure that they understand the relationships between the systems, and he also said at page 2582 they will start documenting that in a more formalized way. He also testified that commercial off-the-shelf systems, COTS, like TAAMS, are frequently designed this way. In the closing arguments at page 5030, the government argued the testimony was pretty clear from Mr. Thompson and Mr. Nessi, that with the COTS commercial off-the-shelf software, architecture isn't such a big issue. The Court now learns that the reality is that in the HLIP 2000, at page 69, the original plan for TAAMS deployment has undergone considerable change since trial, and TAAMS is now described at page 76 of that plan as a modified off-the-shelf system. At page 69 of that plan, defendants have now recognized that a significant level of analysis and system modification remains before TAAMS will meet BIA's core business needs.
>
> Also at page 69 [of the HLIP] . . . "As a result of a limited amount of preplanning and development," defendants are now employing a new system development methodology that allows for numerous system releases. Although frequent releases have made system testing difficult, features included in new releases must be constantly reviewed 'to ensure that they [do][28] not conflict with some aspect of TAAMS previously decided upon." That's also at page 69.

---

[27]The Court had expressed similar sentiments on March 7, 2000 in the initial TRO hearing in which it admonished defendants for misleading the Court during Trial 1.0:

> [L]ooking at this picture in the long range, which I look at it at, I was dumbfounded to read paragraph seven of this Marshall affidavit ... and I know you're trying to save yourself from this TRO, but **this is the most shocking information I've seen yet, I think, since my whole trial here** .... It's very disappointing to read this kind of stuff. **We have nothing now**. You know, we have no safeguards now so we can't be any worse off ... . We have nothing. Boy, I just don't know how that squares with the trial we had, all the great plans Interior had. And you find the most critical system, the heart of everything we're operating now, and this is what you come in and tell me: We have nothing to protect any of this?

*See* Plaintiffs' Exhibit 54 at 32 (emphasis added).

[28]Brackets original.

> At page 70, it's noted that, "Through training exercises, it's been
> repeatedly revealed that the latest system release [does][29] not meet the
> user's needs, and also "that business rules continue to need refinement."

Hearing Transcript 4/4/00 at 6-7.

**3. Implementation Schedule** – The Court also found troubling the discrepancies  between trial

testimony and later revelations regarding the trust reform implementation schedule.  The Court

noted:

> [T]he testimony at trial by Mr. Nessi, at page 2576, was that "TAAMS has a
> realistic project management schedule." The testimony of Assistant Secretary
> Gover, at page 1138, was "There is an excellent project management schedule
> for TAAMS."  The Court now learns in HLIP-2000, at page 71, that, "In
> retrospect, the Department concedes that the plan was overly optimistic given
> the complexity of the task."  At a [sic] the same page the Department says, "The
> deployment schedule originally outlined in the TAAMS contract [cannot][30] be
> achieved as originally planned."
> At pages 81 to 82 in the HLIP-2000, it notes that because the accounting,
> distribution and interface capabilities of TAAMS are not yet in place and cannot
> yet be tested, "it is not even possible to project a complete deployment schedule
> at this time."

Hearing Transcript 4/4/00 at 7-8.

**4. Independent Verification and Validation** – In regards to independent verification and

validation, the Court made the following findings:

> Mr. Nessi's testimony at trial, at page 2385, was making sure that a
> system operates properly, i.e., independent verification and validation,
> "is the heart of a system development effort."  The Court now learns that
> the reality, as set forth in HLIP-2000 at page 70 is, the modified system
> development effort "does not lend itself to system testing in the
> traditional sense," and "Conversion issues...oftentimes interfere[][31] with a
> full test."
> And then in HLIP-2000 at page 79, testing "of one critical area, the TFAS and
> the MMS interfaces, remains incomplete, and the independent verification and
> validation contractor [has] recommended against full deployment of TAAMS
> until that functional area is fully tested."

Hearing Transcript 4/4/00 at 8.

---

[29]Brackets original.

[30]Brackets original.

[31]Brackets and ellipsis original.

**5. Interface** – The Court also issued findings of fact regarding the interface between TAAMS

and TFAS (or more precisely the lack thereof); the Court again noted material differences

between Trial 1.0 testimony and post-December 21, 1999 admissions:

> Turning then to the interface issues, at trial the TAAMS/TFAS interface was
> described by Mr. Thompson's testimony as, "Not a very complicated technical
> thing to have to do at this time.  It's kind of like merging two software packages
> on your personal computer."  That's at trial transcript at 3096.
> Mr. Nessi's testimony at trial was, the programming of the TAAMS and TFAS
> interface was complete as of July 1999.   Mr. Orr's testimony at trial was that as
> of July 1999 interfaces between TAAMS and TFAS were "already built."
> That's at page 74.
> Mr. Nessi's testimony at page 2586 is, "If the interface didn't work tomorrow, it
> would probably take 12 hours to get the interface working." The Court now
> learns the reality, according to the HLIP-2000 at page 71, quote, "In retrospect,
> the plan to purchase two off-the-shelf systems independently, TAAMS and
> TFAS, and interface them with an existing system, MMS, had inherent
> difficulties from its inception."
> And then in the Quarterly Report Number 1 at page 13, quote, "Interfaces
> between TAAMS, TFAS and MMS, are not yet complete."

Hearing Transcript 4/4/00 at 8-9.

**6. Functionality** – On the last of the six enumerated areas, the Court made express findings

regarding certain critical distinctions between Trial 1.0 testimony and post-decision

representations of defendants on issues of TAAMS functionality.  Specifically, the Court found

that:

> At trial the Court was told by Nessi's testimony, at page 2391, that on
> June 28th, 1999, the TAAMS project manager "honestly [could not]
> think of a flaw in the system...It's that good."
> Mr. Nessi said at page 2578 to 2579, TAAMS is operational.  "The system is
> already working," and at page 2668, "TAAMS will be 20 times better than the
> legacy systems by the fall of 1999."
> The testimony the Court has now learned is, in the Thompson deposition
> transcript, at page 102, "TAAMS is not up.  They're still working a pilot in the
> Billings area.  It  is not operational."
> And in the Rossman deposition, most surprising of all to the Court, at page 173,
> TAAMS contains test data only, "not the actual file data."
> The Rossman deposition, at pages 124 and 174, also indicates that because
> TAAMS is not yet operational, the designation of IRMS and LIRS as legacy
> systems is premature.  "They are not legacy yet."

Hearing Transcript 4/4/00 at 9-10.  These six areas provide vivid and concrete proof that

defendants' trust reform efforts – like their testimony at trial – are riddled with material

misrepresentations, broken promises and a pattern and practice of saying anything to delay the

day of reckoning and accountability.  There is rarely better evidence of bad faith.  But, here it

gets worse.

The Court concluded its analysis with the following summation of defendants' bad faith conduct:

> This entire fiasco is vivid proof to this Court that Secretary Babbitt and Assistant
> Secretary Gover have still failed to make the kind of efforts that are going to be required
> to ever make trust reform a reality.  Coming so soon after their trial testimony last
> summer, and all of the personal assurances they gave this Court about the priority they
> were now placing on trust reform, the facts brought to light in this proceeding provide
> overwhelming proof to the Court that the defendants simply continue to provide more
> empty promises.

Hearing Transcript 4/4/99 at 12.  These established findings of fact constitute one of several evidentiary

keystones that warrant a finding that defendants at all times relevant to these proceedings have engaged

in bad faith – because, in fact, since the date this case was filed, they have lied to this Court and

plaintiffs, have defied this Court's orders, and have refused to discharge the fiduciary duties owed by the

United States to individual Indian trust beneficiaries.


### 5.  The Trial 1.0 Defense Was Compromised by Substantial Withholding and Spoliation of Evidence by Defendants

From the contempt trial of early 1999, the Court became acutely aware of many problems of

document withholding by defendants and their counsel and their refusal to comply with the Court's

orders, accompanied by misrepresentations to the Court and to plaintiffs.  Facts that were concealed

and finally came to light subsequent to the Trial 1.0 decision are powerful evidence of bad faith since the

date this action in equity was filed; that the behavior of defendants and their counsel was knowing,

willful,  pervasive and extended to various categories of potential evidence, including in particular, e-

mails that were not before the Court in 1999.  For clarity we will review the sordid record of defendants

and their counsel.

Only two days after the suit was filed, counsel for plaintiffs requested, and received in writing,

assurance from James Simon, Deputy Assistant Attorney General, that "no documents or records of any

kind which refer or relate to IIM accounts or to any matter alleged in the complaint [would be] altered, erased, or destroyed ... including, without limitation, E-mail and all other electronic data as well as hard copy documents and all documents or tangible things within the scope of FRCP Rule 34(a)(1)." Plaintiffs' Exhibit 39.  Consistent with Mr. Simon's undertaking, within a few days or weeks a series of directives went out from high-level officials at Interior –  including Ed Cohen, the Deputy Solicitor; Hilda Manuel, Deputy Commissioner - Bureau of Indian Affairs; Gayle Gordon, Acting Director - Office of Information Resources Management; and the Special Trustee and the acting head of the BIA – directing that documents, specifically including e-mails, be maintained intact.  (*See* Plaintiffs' Exhibits 41 and 42.)

There can thus be no question that by mid-1996, soon after the commencement of this action, and thenceforth, **every responsible person in the Interior Department** knew that documents, specifically including e-mails, that had any relevance to the Individual Indian Trust was required to have been securely preserved intact, without destruction, alteration, or erasure.  Mr. Simon of the Justice Department was the first of many who had given plaintiffs and their counsel assurances that this was the case. Salient examples of this purported goal of protecting trust documents include the strongly-worded and categorical instructions disseminated by top Interior officials.  In their July 28, 1997, "Response" [Surreply] to Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion for Interim Relief, defendants, through their counsel, represented to the Court that "Plaintiffs' requested policies **have already been implemented (e.g., electronic backup; document preservation** ...." and that "pertinent orders have been disseminated to the field [and] ... they are also being followed <u>and</u> implemented ."  Plaintiffs' Exhibit 44 at 5-6 (bolded emphasis added; underscored emphasis original). This Court would rely on defendants representations.  And, for some time, plaintiffs too would mistakenly rely on such baseless representations when framing document requests and evaluating defendants' compliance.  But, as will be seen, the reality lurking behind these comforting assurances was far different.

It was in this context that  this Court entered its First Order.  Negotiated and consented to by defendants, this Order directed production, <u>inter alia</u>, of "[a]ll documents, records, and tangible things

which embody, refer to, or relate to IIM accounts of the five named plaintiffs or their predecessors in interest." See Plaintiffs' Exhibit 77 at ¶ 19. As the Court will well recall, defense counsel gave repeated, sometimes indignant, assurances — at a hearing on December 6, 1996 (see Plaintiffs' Exhibit 78), by written report of December 27, 1996, (See Plaintiffs' Exhibit 57 at 12), at a January 21, 1997 status conference, (see Plaintiffs' Exhibit 79 at 8)**,** that all the information requested in Paragraph 19 of the Order was being furnished, as did Willa Perlmutter, counsel for defendants, in a February 11, 1997 status report to the Court. (See Plaintiffs' Exhibit 57 at 13.) None of these protestations gave any intimation that less than all the documents and records "which embody, refer to, or relate to IIM accounts of the five named plaintiffs or their predecessors in interest" would be produced – whether by reason of their destruction, failure to maintain them, or otherwise – or that the search for such documents, in fact, had been terminated. Yet, as the Court will recall, at his deposition on May 12 and 13, 1998, Joe Christie, Special Assistant to the Special Trustee, testified that Willa Perlmutter had instructed him to do nothing in response to the Court's November 1996 Order. (See Plaintiffs' Exhibit 80 at 43-48.**)** Matters went downhill from there; and, ultimately, defendants were held in contempt for failing to comply with the Court's Order.

Moreover, nothing in the Court's Order of November 1996 excluded e-mails from the documents to be produced; indeed, each of plaintiffs' subsequent requests for production of documents explicitly included e-mail within the scope of the documents to be produced. Defendants and their counsel admitted as much in their *Motion for Protective Order Clarifying Duty to Produce E-mail Records* at 3, n. 4 (filed August 2, 2000).

Defendants' knowledge and complicity in this cover-up is long-standing and far-reaching. Defendants filed on July 22, 1998, a "Consolidated" memorandum in support of motions for enlargement of time and for protective order with respect to plaintiffs' Third Request for Production of Documents. Such memorandum recognized that plaintiffs' requests were "without temporal limitation" and covered documents "in no less than 19 locations through the United States." (See Plaintiffs' Exhibit 88 at 7.) In support of these motions, Edith Blackwell, of the Interior Solicitor's office, represented by declaration

that she was gathering the documents responsive to plaintiffs' Third Request.  (*See*  Plaintiffs' Exhibit 89 at ¶ 2.)  And defendants' reply supporting their motion for protective order with respect to the Third Request, filed August 11, 1998, represented that the search for all responsive documents — including electronic data and e-mail "throughout the United States" — had commenced.  Nothing in this reply or any subsequent filing modified in any way defendants' or Ms. Blackwell's July 22, 1998 representations that all responsive documents would be sought, collected and produced.  (*See, e.g.,* Plaintiffs' Exhibit 90 at 4-5 n. 5.)  After further motions practice and hearings, the Court by order of November 9, 1998, denied defendants' motion for protective order with respect to the Third Request and set a December 7 deadline for responses and a privilege log.  Deputy Solicitor Cohen expressed on November 10 his clear understanding of the Court's order:  "We have been ordered to collect certain Solicitor documents for production ... these requests are very broad and include all documents, memos, drafts, and e-mails, and some are not limited in time." *See* Plaintiffs' Exhibit 94 at 1. (Emphasis added.)

On November 20, defendants filed a motion for reconsideration of the November 9 order, asking relief from "obligations to produce the Solicitor's Offices' e-mail records that may be on electronic back-up tapes."  (*See* Plaintiffs' Exhibit 96.)  Supporting declarations by Glenn Schumaker, MIS Team Leader for the Solicitor's Office,  and Connie Lundgren, also of the Solicitor's office, spoke of a number of sets of backup tapes to be restored and searched, and asserted that responsive documents were being collected and shipped.  See Plaintiffs' Exhibits 98 and 99.

But the motion and supporting declarations did not disclose – and indeed concealed – a mere three days after the Court's order, Cohen had expressly authorized the Solicitor's Office to resume routine destruction of backup tapes.  (*See* Plaintiffs' Exhibit 95.)  This concealment continued  when on February 12, 1999, defendants opposed plaintiffs' motion to compel production of documents responsive to their second through fifth requests for production.  (*See* Plaintiffs Exhibit 100.)  And again, on March 16, 1999, when defendants moved to strike plaintiffs' proposed orders regarding document retention their concealment continued unabated, as they represented to the Court:  "Nor do defendants deny their obligations to take all reasonable steps to retain relevant documents or other information,

**which they have done**."  (*See* Plaintiffs Exhibit 46 at 7-8; emphasis original.)  Nor was there even a

feeble attempt at long-overdue disclosure when Babbitt and Gover's March 26, 1999, "Document

Production Plan," which recognized that "electronic files" and "electronic backups" were within their

document production obligation, was promulgated.  (*See* Plaintiffs' Exhibit 102 at 6.)  Defendants'

concealment continued when Babbitt and Gover's April 12, 1999 opposition to plaintiffs' proposed

order regarding document retention and protection assured the Court and the plaintiffs that they had

taken all "reasonable steps to ensure that documents relevant to this litigation are preserved."  (*See*

Plaintiffs' Exhibit 51 at 1 & 7.)

  Not until May 20, 1999 – nearly three years after defense counsel assured plaintiffs that all such

documents would be preserved and two and one-half years after the First Order was entered was it

disclosed that the Solicitor's Office in fact had be systemically destroying all backup e-mail tapes until

eight days before.  (*See* Plaintiffs' Exhibit 35 at ¶ 12.)   Not until the final pretrial hearing on June 7,

1999, did Mr. Brooks admit to the Court that valuable evidence contained in the Solicitor's Office e-

mails had been destroyed.  (*See* Plaintiffs' Exhibit 2 at 54.)  The Court segregated this issue from the

upcoming trial and referred the matter to the Special Master in order not to delay the Trial 1.0.

  Through the reports of the Special Master, the Court is fully aware of the sorry tale of document

destruction and coverup on the part of Treasury Department lawyers — a story that evolved and

worsen since the Master's reports were filed in that regard.[32].

  In addition, the oft-repeated representations by Treasury Secretaries to this Court that Treasury

keeps only "summary-level" information was refuted by Treasury's having been forced to identify

belatedly its cache of detailed records — not to mention defendants' Third Motion for Summary

Judgment, which damningly admitted for the first time that Treasury, contrary to its repeated

misrepresentations to this Court and plaintiffs, in fact, had created and destroyed systematically detailed

---

[32]Treasury finally confessed to the Special Master in 2000 that each day since the inception of this litigation, Federal Reserve Banks – Treasury's fiscal agent – systematically had destroyed records relevant to these proceedings.

accounting records with respect to the Individual Indian Trust since at least the administration of James Madison in 1817.  (*See* Plaintiffs' Exhibit 31 at 9.)

Thus, because of defendants' inexcusable withholding and spoilation of evidence, it is clear that at all times relevant to this interim fee application defendants have litigated this case in bad faith.

**6.  Defendants in Trial 1.0 in Bad Faith Had Been "Posturing for the Court" and "Putting On a Show" of a Sham Trust Reform at the Same Time Trust Reform was Imploding**

It is incontestable that the glowing descriptions of trust reform – included in defendants' filings prior to Trial 1.0 and through the trial itself – had been orchestrated by defendants and their counsel and were gravely misleading.  "We've got a show to put on," counsel for defendants told the Court on the second day of trial, (Transcript at 496) and it is now clear that indeed it was just that — a show. Indeed, after more than eight years of this litigation, no meaningful trust reform has been, or is being, accomplished.  The misrepresentations are far reaching and, as discussed below, cover the major elements that defendants promised throughout the Trial 1.0 and on appeal.   This is particularly true with respect to TAAMS –  the centerpiece of the sham trust reform, described by defendants at the trial as the "necessary component for maintaining [BIA's] trust role for the foreseeable future."  Defs' Exh. 82 (TAAMS Slide Show).

Shamefully, on February 23, 2001 – a year and one-half after the conclusion of Trial 1.0 and the same day the Court of Appeals affirmed this Court's Trial 1.0 decision – Dom Nessi, the government's key witness in Trial 1.0, confessed notwithstanding his obviously coached Trial 1.0 testimony to the contrary that, in reality, "trust reform is slowly, but surely imploding...."[33]  Mr. Nessi confessed further that "posturing for the Court" was the principal intent of defendants and their counsel notwithstanding the facts to the contrary.[34]  He also characterized the HLIP – defendants' highly touted blue print for trust reform – as little more than "wishful thinking" and that defendants and their counsel, in fact, had no idea

_____

[33]Plaintiffs' Exhibit A (Memorandum from Dom Nessi, CIO-IA, to Tom Slonaker, Special Trustee, dated February 23, 2001) at 1.

[34]*Id.*

what they were doing with respect to the rehabilitation of a Trust that "has been neglected for decades in DoI."[35]

What follows is a compilation of selected critical problems and misrepresentations with respect to trust reform that justify a finding that this litigation since its inception – and at all times relevant to the Trial 1.0 proceedings – has been defended in unprecedented bad faith.  To include each item of misconduct that evidences the bad faith of defendants and their counsel would require a filing of encyclopedic proportions.

**"TAAMS Works."**  This, it will be recalled, was the caption of a glowing press release issued during the trial.  And this was the shibboleth that defendants repeatedly represented to the Court and the plaintiffs.  TAAMS Project Manager Dominic Nessi categorically swore at trial: "[T]he system is already working.  ...  It's already operational."  Tr. at 2578.  "TAAMS is on schedule," defendant Gover testified, reinforcing Nessi's lie.  Tr. at 1082.   Nessi testified further  that TAAMS would be deployed and fully implemented nationwide no later than July 2000.  Tr. at 2345.  But nine months after this testimony, Tommy Thompson, the Principal Deputy Special Trustee, testified candidly in a deposition: "TAAMS is not up, they're still working on a pilot in the Billings area.  It is not operational yet." (Thompson Dep. 3/13/00 at 101.)

In fact, defendants knew TAAMS was loaded with "dummy data" during Trial 1.0, and, in particular the government's star witness knew even before that trial started and during the trial that there were grave problems with TAAMS.[36]  In HLIP-2000, the revised trust reform plan issued on February 29, 2000 – seven months after defense counsel procured false testimony to the contrary during Trial 1.0 – the Department of the Interior was forced to admit:  "One of the most important observations made

---

[35]*Id.*  This memorandum was one of two drafted by Nessi on February 23, 2001 that ultimately was provided to this Court.  The other Nessi memorandum is to the Deputy Commissioner – Bureau of Indian Affairs and to the Director, Office of Trust Responsibility.  Therein, Nessi belatedly admits what plaintiffs had claimed but defendants repeatedly denied; the complete failure of BIA data cleanup critical to both an adequate accounting and to meaningful trust reform *See* Plaintiffs' Exhibit B.

[36]*See* Plaintiffs' Exhibit 16 at 348-49 ("I don't believe that Mr. Nessi made a true statement in court.").

after the first prototype was released in mid-summer 1999 was that the initial design meetings did not

fully capture the entire scope of the BIA's needed functionality."  (HLIP-2000 at 69.)  The Department

further stated:

> "[I]t became apparent during the system tests conducted with BIA users **during July and August 1999** that a significant level of analysis and system modification remained in order to ensure that all of the BIA's unique business functions were addressed [by TAAMS].
>
> * * *
>
> "[T]he net result of these events **during the late summer and early fall** was that the deployment schedule outlined in the TAAMS contract could not be achieved as originally planned.  **In retrospect, the Department concedes that the plan was overly optimistic given the complexity of the task at hand.**"

*Id.* at 69-71 (emphasis added).  In other words, <u>during the last weeks of the trial itself and the period of</u>

<u>filing and consideration of proposed findings and conclusions, defendants knew already that TAAMS</u>

<u>was in serious trouble and that the representations made to the Court during the trial were false and</u>

<u>materially misleading and made in bad faith</u>.  Yet their proposed findings of fact asked that this Court

find that TAAMS was "on schedule" and had been rolled out successfully in Billings.  (Defs' Proposed

Findings of Fact at 230).

In sum, it is clear that defendants and their counsel knew that TAAMS could never "work" as

attested to by defendants and their counsel during Trial 1.0 and at all times relevant to this fee application.

Furthermore, by defendants' own admissions, it is also clear that defendants had made repeated

representations about TAAMS being operational that were simply untrue and defendants knew such

representations were untrue each time they were made.  Indeed, TAAMS failure could not be reversed

and abandonment was the final solution.[37]

**TAAMS Was Not a "COTS" System as Represented to this Court.**  A key component

of TAAMS as it was represented in Trial 1.0 to induce the Court to continue to stay its hand, was that it

was a commercial off-the-shelf system (a "COTS") that  could be put promptly into service with few

modifications — thus avoiding a repeat of Interior's fiasco with the "ALMRS" computer system, a nearly

---

[37]After spending several years and several million dollars, Interior quietly abandoned their cornerstone of trust reform.  *See* Trial 1.5 Tr., Day 1 PM session (May 1, 2003) at 97:6-8) (testimony of Paul Homan).

half-billion dollar system specially designed for the Bureau of Land Management which could never be made to work.  At Trial 1.0, Nessi assured this Court that TAAMS, as a ready-made COTS, would avoid the "requirements creep" or constant tinkering and readjustment, introducing new problems and complications each time, that bedeviled ALMRS.   (Tr. At 2282.)  However, defendants finally admitted months after Trial 1.0 had closed – content that they had dodged the receivership bullet in Trial 1.0 – that TAAMS is not a COTS after all, but a "MOTS," or modified off-the-shelf system.  (HLIP-2000 at 76.)   And, contrary to Nessi's testimony, defendants confessed that TAAMS indeed been overtaken by "requirements creep" — which defendants recast with a more euphonious name "evolutionary prototyping."   (HLIP-2000 at 69.)

**Independent Verification and Validation ("IV&V").**  "IV&V" was described at Trial 1.0 by Nessi as "the heart of a system development effort is [sic]  making sure that it operates properly." (Tr. At 2385.)  Both Nessi and defendant Babbitt testified that IV&V would be completed in 60 to 90 days from the date of the testimony.  *Id.*  Yet HLIP-2000 disclosed – months <u>after</u> the Trial 1.0 decision was rendered – that final system testing, in fact, had been delayed until late November 1999, and not in the Rocky Mountain regional office until February 2000.  And, contrary to defendants' repeated filings – before, during and after the close of Trial 1.0 –  no testing had ever been done with respect to leasing, accounting, and interface functions.  (HLIP-2000 at 79.)

More significantly, testing became pointless because TAAMS "development" had degenerated into "evolutionary prototyping," which "does not lend itself to system testing in the traditional sense." (HLIP-2000 at 70).  Indeed, the third quarterly report makes no mention of IV&V at all.  It became clear from a GAO report released two weeks after the third quarterly report that IV&V – the importance of which had been underscored repeatedly by defendants under oath – was abandoned. And, this decision had been concealed from this Court and plaintiffs.

**Systems Architecture and Interfaces.**  Nessi testified under oath at Trial 1.0 that he was "working on" a systems architecture for TAAMS, that "in depth discussions with OTFM and MMS" were being conducted "to ensure that [they] understand the relationships between the systems," and that

Interior would "start documenting that in a more formalized way." Tr. 2572, 2582.  As for the specific component of systems architecture involving the interface between TAAMS and TFAS, Nessi swore that this programming was complete, testing was imminent, and testified falsely that "If the interface didn't work tomorrow, it would probably take 12 hours to get the interface working."  Tr. 2586, 2618.  And the witness Orr, an executive with an outside computer contractor, testified that TAAMS/TFAS interfaces were already built and the data communications link between them worked.  (Tr. 2774-75.) In their response to plaintiffs' proposed findings and conclusions filed August 9, 1999, defendants asked the Court to find that the interfaces "have been built and are functional."  (Defs' Resp. to Pltfs' Prop. Findings of Fact and Conclusions of Law at ¶ 72).

This testimony was belied as early as the HLIP-2000 and the very first quarterly report dated March 1, 2000.  "In retrospect," said HLIP-2000, "the plan to purchase two off-the-shelf systems independently (TAAMS and TFAS) and interface them with an existing system (MMS) had inherent difficulties from its inception."  HLIP-2000 at 71 (emphasis added).  The first quarterly report contradicted defendants' proffered trial testimony and conceded that interfaces between TAAMS, TFAS and MMS were not yet complete.  (Quarterly Report No. 1 at 13.)  (This was not "12 hours" but eight months after the relevant Trial 1.0 testimony.)  Rossman further underscored the Trial 1.0 misrepresentations by testifying that there was **no** interface between TFAS and BIA's legacy systems (LRIS & IRMS).  (Rossman Dep. at 175.)

**Data Cleanup.**  Trial 1.0 saw extensive testimony about the poor condition of much of the BIA data to be loaded into TAAMS – with respect to its uncontrolled loss, corruption, and destruction – and the absolute critical need to clean it up.  Nessi testified that data cleanup was "part of the TAAMS initiative."  (Tr. at 2458.)   He further testified that the cleanup could take place after the deployment of TAAMS: "I'm not sure data cleanup is easier on either end, but there are many advantages to doing it -- to doing a large portion of it after deployment."  (Tr. at 2263-64).  Indeed, Mr. Nessi claimed that "[i]t is possible for us to load the data into the systems and use TAAMS to perform the correction activity on it if we need to.  In fact, it will in many cases probably speed up that correction activity." (Tr. at 2936).

47

And it was represented that data cleanup would be completed promptly.  "By September, October,

Billings will not have dirty data," Nessi testified (though later hedging that data cleanup might "go a little

longer in Billings")  "It will have considerably better data than it has today, and it will be, we believe,

accurate information."  (Tr. At 2598.)

      But, in fact, nothing was accomplished. Under the "revised" schedule attached to the HLIP-

2000, there were no proposed deadlines for data cleanup ever at any point in the future; HLIP-2000

says only that "it is difficult to estimate a total cost and duration for the entire cleanup effort at this time"

— while admitting that "the data is not getting any better and immediate action is necessary," and that

"[t]he TAAMS potential for cost savings and operational efficiencies will be negated if the underlying

data quality is poor.  Consequently, pre-deployment Data Cleanup is critical."  (HLIP-2000 at 26.)

Moreover, defendants ultimately were forced to admit that:

> [I]t has become very clear that it would not be possible to conduct a long pre-
> implementation Data Cleanup using the existing legacy systems.  The legacy systems lack
> any data integrity features such as filters and edits, they operate slowly and are
> frequently unavailable due to system and network issues.

(HLIP-2000 at 23.)

      The General Accounting Office reported in September 2000, nine months after Trial 1.0

concluded, that no progress had been made on the cleanup of the relevant  records.  "Interior needs to

clean up thousands of inaccurate, incomplete, and/or outdated trust fund records before converting the

data for TAAMS.  Yet it has only a few months left to do so before the planned implementation of phase

I of TAAMS." *Indian Trust Funds, Improvements Made in Acquisition of New Asset and

Accounting System But Significant Risks Remain* (GAO/AIMD-00-259, Sept. 2000) at 12.  Clearly

the failure to implement data cleanup is illustrative of defendants' modus operandi: lie, deny, delay,

obfuscate, and in bad faith say anything to escape the Court's initial stage of scrutiny. And then, upon

their fraud being exposed, unabashed repeat the cycle of lying, denial, delay and obfuscation to persuade

this Court to exercise forbearance and delay further a resolution of this case on the merits in willful

disregard of the irreparable harm such bad faith inflicts on the *Cobell* class.[38]  Indeed, whether or not

TAAMS had been a realistic solution to the bankrupt trust management systems, data cleanup was

essential to prudent trust management; without accurate and complete data no adequate accounting can

be rendered and no trust reform can occur.

**Probate Backlog.**  The extensive probate backlog – together with the *Youpee* interest

resolution – was supposed to be "worked off" many years ago, according to the testimony of Tommy

Thompson, the Principal Deputy Special Trustee at trial.  (Tr. at 3008)  The third quarterly report's

section on Probate Backlog purports to be extensive, but when boiled down to its essence, the only

achievement that was touted was the hiring of ten lawyers.  In fact, nothing was accomplished; the

backlogged actually increased since the date this action was filed.  Even this modest achievement was

diminished by the Report's noting of missed milestones and the incomplete and unverified Contractor's

report.  Report at 12.  Again, another goal represented to this Court and plaintiffs as achievable was

never met, and the pattern and practice of lying, stalling, and stonewalling this Court and plaintiffs

continued with impunity.

**User Acceptance.**  User acceptance of TAAMS always was a myth perpetuated by

defendants and their counsel until reality finally set in.  While the third quarterly report states at one point

that the TAAMS title functionality has been well received (Report at p.18), elsewhere the Report tells us

it is expected that "TAAMS will encounter more [resistance from the user community] than most [new

systems]."  (Report at p.20)  The Special Trustee's "Observations" suggest that "the change in the way of

doing business that TAAMS represents is not readily accepted by all users."  (Report at p.3).  In fact,

the field employees of Interior were correct in rejecting TAAMS as a system of record, a fatally flawed

system that had been grossly misrepresented to this Court and plaintiffs as the solution to generations of

inept trust management.  Indeed, even if TAAMS could have been salvaged (and it could not) TAAMS

---

[38]On advice of defense counsel, defendants set up a process where they virtually assured the most
optimistic picture of trust reform would be painted and defendants could attempt to shield themselves
from accountability by delegating sign-off authority to project managers.  In this way, the concerted
deception and effort to undermine the integrity of these proceedings could continue unabated without
exposing the defendants to a serious risk of punishment.

could not resolve the hopeless problems caused by the manifestly unfit trustee-delegates continues to plague Interior today.

**Slippery Definitions.**  Finally, we note that defendants' quarterly reports and various filings at all times relevant to this fee application are (and continue to be) replete with terms whose definitions shift to obscure concealed failures and habitual false and materially misleading representations to this Court and plaintiffs.

Typical is a quiet shift in the meaning of "deployment."  Much attention was paid prior to, during, and post Trial 1.0 to the "deployment" schedule for TAAMS.  "Deployment" normally connotes getting the system into action at the planned locations, and Nessi so defined TAAMS "deployment" in his Trial 1.0 testimony:  "Well, deployment is the general term that you use that would relate to all of the transition activities from the Legacy system to TAAMS, everything that is involved with that." Tr. 2354.[39]

In the second quarterly report, dated June 1, 2000, desperate to claim that some meaningful "deployment" of TAAMS had taken place, defendants subtly altered the meaning of the word. "Deployment" now denoted, not "all of the transition activities," but nothing more than the physical installation of TAAMS software on the desktop.  Report, Appendix B, at 2.

"Milestone" is another slippery concept.  The quarterly reports refer to milestones being "met" or "completed."  For most people, such terms mean that the task or mission has been accomplished; the job done.  But in this Alice-in-Wonderland language of the unfit trustee-delegates and their unethical counsel, the terms "milestone met" or "completed" was redefined – at the same time this new definition was concealed from this Court and plaintiffs – to mean merely that the task has just commenced, even when implementation may have been encountering serious difficulties or had failed completely.  And, notwithstanding such routine impairments or failures, defendants and their counsel willfully would misrepresent such failures as milestones that had been met or completed.

---

[39]Parenthetically, the term "Legacy System" is another slippery term.  Obviously, the "Legacy Systems" are the only systems operating today – and were the only systems operating at all times relevant to this fee application.  Thus, they are hardly a "legacy."  And, the repeated efforts of defendants and their unethical counsel to recast some TAAMS derivative or remnant as a "system of record" is nothing more than more clever word games and utter bad faith.

The third quarterly report also uses words like "challenges" when meaning serious, fundamental, crippling problems that could not be resolved. (*See* Report at p.3).

In general, it is no coincidence that the quarterly reports differed materially from one another in format and in organization, making it difficult – if not impossible – for this Court and plaintiffs to track changes from one to another and further conceal the nature and scope of the deception practiced by defendants and their counsel on this Court and plaintiffs.

### 7.  Defendants' Trial 1.0 Related Misrepresentations

- Prior to Trial 1.0, on May 2, 1999, the government's lead trial counsel Tom Clark raised concerns and expressed serious reservations to Interior Department attorneys Edith Blackwell, Michael Carr and Stephen Swanson and fellow Justice Department attorneys James Eichner and Phillip Brooks regarding overstatements and misleading representations made on behalf of defendants Babbitt and Gover with respect to the progress of trust reform.  *See* Plaintiffs' Exhibit 1.

- On June 7, 1999, Mr. Clark  represented falsely to this Court  that defendants are not in breach of their trust duties owed by the United States to individual Indian trust beneficiaries.   *See* Plaintiffs' Exhibit 2 at 86.

- On June 8, 1999, cognizant of this Court's warning, Mr. Clark, on behalf of defendants, made admissions in the form of stipulations that were limited in scope to defendants' failure to comply with certain of their statutory trust duties that were stated literally in the 1994 Trust Reform Act.  Mr. Clark falsely assured the Court that "DOI has already implemented, and is currently implementing, significant reforms of the IIM system ...."  *See* Plaintiffs' Exhibit 3 at 5.

- Also on June 7, 1999, this Court, in response to Mr. Clark's false and materially misleading representation that defendants have in fact discharged their trust duties, questioned openly his candor and reminded Mr. Clark about the importance of conducting defendants' Trial One defense in good faith.  The Court explicitly warned Mr. Clark and defendants that they would suffer severe

consequences if the Court finds their defense is asserted in bad faith as it was.  *See id.* at 104-105; *see generally id.* at 86.

• For nine weeks, commencing June 10, 1999 and concluding on July 23, 1999, this Court presided over the trial of whether as of June 10, 1999, the Secretary of the Treasury, the Secretary of the Interior, and the Assistant Secretary of Interior – Indian Affairs were in breach of trust responsibilities owed by the United States to individual Indian trust beneficiaries, and whether the Court should rely on the representations made by defendants that trust reform would be completed in accordance with law without direct oversight by a special master or receiver.  *See* Plaintiffs' Exhibit 4 at 5062-63.

• On June 10, 1999, Mr. Clark summarized how defendants would proceed in presenting their evidence by stating: "We have got a show to put on ...."  *See* Plaintiffs' Exhibit 5 at 196.

### Is TAAMS Operational

• At Trial 1.0, defendants and their counsel presented the Trust Asset Management System ("TAAMS") as the centerpiece of their trust reform effort.  The TAAMS system was designed by an outside contractor, Artesia Systems, Inc.  Through a Power Point presentation, defendants and their counsel described TAAMS as the "necessary component for maintaining the Bureau's trust role for the foreseeable future."  Defendants presented TAAMS as critical to ensuring BIA would have a continuing role in the management of the Individual Indian Trust, as defendants' last  "chance to demonstrate BIA's management expertise and commitment to the trust process."  *See* Plaintiffs' Exhibit 6.[40]

---

[40]Defendant Gover, in his testimony of June 17, 1999, acknowledged defendants' desperate need to convince this Court that TAAMS works and that trust reform is on schedule – whether or not either representation was true – to avoid the risk that this Court or Congress otherwise might assume control over trust reform and ultimately the Individual Indian Trust itself.  Mr. Gover stated:

> [W]hat distinguishes us from a social services agency, or an education agency in the United States Government is this trust responsibility, without the trust responsibility, the other functions of the Bureau of Indian Affairs could be done by somebody else, by HUD, by the Education Department, or the Department of Health and Human Services.

Plaintiffs' Exhibit 7 at 923.  Of course, the importance of this conspicuous bad faith strategy – to do and say anything at any time to persuade this Court to continue its policy of forbearance where forbearance is otherwise unwarranted and, in fact, harmful – is underscored by the unique honor

- At Trial 1.0, Mr. Nessi, Interior's central "reformer," testified that TAAMS was the "essential and integral part of the trust reform program." *See* Plaintiffs' Exhibit 8 at 2518. More than that, defendants readily admitted that their strategy from the date this litigation was filed was to do anything to keep the Court out of direct trust reform oversight. In furtherance of this objective, they would represent to this Court in their testimony and through repeated filings that they would roll-out TAAMS successfully. Assistant Secretary Gover, a named defendant and the government's first witness, testified on this very point:

> I believe the TAAMS project itself shows [what] this agency is capable of when it has the resources and when it's properly led. And I hope my presentation will give the Court the confidence that our agency is capable of carrying out the remainder of this program.

*See* Plaintiffs' Exhibit 9 at 1052.

- At Trial 1.0, defendants and their counsel represented falsely that TAAMS had tested successfully in the BIA Billings Area Office during Trial 1.0. *See* Plaintiffs' Exhibit 10 at 2286. Mr. Nessi, the TAAMS project manager, proclaimed falsely that the unveiling of TAAMS "went very, very well," and that TAAMS was "probably the best data processing system I have ever seen unveiled." *See id.* at 2286-87.

- Defendants issued a press release during Trial 1.0 that proclaimed "TAAMS Works: Indian Trust Fund system passes test." The text of the release states falsely: "The program designed by the Trust management employees of the BIA and implemented by Applied Terra Vision, Artesia Systems Group, **worked perfectly**. " *See* Plaintiffs' Exhibit 11 at 1 (emphasis added). Mr. Nessi further represented falsely that TAAMS was "already working." *See* Plaintiffs' Exhibit 12 at 2578.

- When examined under oath about the consequences of a failure of TAAMS, Nessi dismissed failure as a possibility and instead testified falsely that the system is operational:

---

bestowed on each member of the Justice Department's Trial 1.0 litigation team – the prestigious John Marshall Award for their successful deception for the first five years of this litigation ("Their work ... has enabled the United States Departments of Interior and the Treasury to continue their efforts ... without judicial intervention.").

> Q. So what will happen if TAAMS, as I hypothesized before, fails? What
> will be the impact of that failure on the trust beneficiaries?
>
> A. Are you talking about the TAAMS program, the system itself?
>
> Q. I'm talking about the program and the—yes, the program.
>
> A. Well, it's a hypothetical question because the system is **already
> working**. So it's difficult for me to say what would happen if it failed. It
> hasn't failed. **It's already operational.**

*See id.* at 2578-79 (emphasis added).

- Nine months after the "successful Billings pilot rollout, Deputy Special Trustee Tommy Thompson confirmed that Nessi's testimony was false and materially misleading; that "TAAMS is not up, they're still working on a pilot in the Billings area. **It is not operational yet.**" *See* Plaintiffs' Exhibit 13 at 101 (emphasis added). On March 1, 2000, defendants filed their new High Level Implementation Plan (HLIP-2000) and their First Quarterly Report, both of which confirmed that TAAMS was not yet operational and not up and running. *See* Plaintiffs' Exhibit 14 at 69-70.

- TAAMS failed and never could be deployed and implemented as represented by defendants and their counsel for years in this litigation for several reasons: (A) The commercial off-the-shelf software was not – as represented by defendants and their counsel – a comprehensive trust asset and accounting management system; in fact, it was only a limited oil and gas inventory program. (B) TAAMS could not be redesigned and modified sufficiently to constitute an effective comprehensive trust management system. (C) Defendants failed to develop an information architecture in accordance with representations they and their counsel had made expressly and repeatedly to this Court, a material and fatal omission in clear violation of the Court's December 21, 1999 Order. *See* Plaintiffs' Exhibits 12 at 2572.

- Defendants did not inform the Court that TAAMS was loaded with "test data" during Trial One, as was later conceded by Mr. Rossman. *See* Plaintiffs' Exhibit 15 at 140.

- On June 30, 1999, Dom Nessi testified falsely under oath that Ms. Mona Infield had expressed no concerns about the roll-out of TAAMS:

> Q.     And did she [Ms. Infield] express any concerns about the roll-out of the [TAAMS] system to you?
>
> A.     No.

*See* Plaintiffs' Exhibit 12 at 2656.

• On October 3, 2000, Ms. Infield testified under oath that Mr. Nessi had testified falsely in Court on June 30, 1999 regarding her "objections to TAAMS." Specifically, Ms. Infield testified that prior to June 10, 1999, TAAMS did not work and that Mr. Nessi knew that TAAMS did not work at the time of his testimony:

> Q.     So to your knowledge, the concerns [about TAAMS] were raised prior to the trial last summer on June which commenced on June 10th, 1999; is that correct?
>
> A.     That's correct.

*See* Plaintiffs' Exhibit 16 at 347.

> Q.     To the best of your knowledge, do you recall whether or not Dominic Nessi testified in court that you, Mona Infield, raised no concerns with regard to TAAMS?
>
> A.     I do recall reading that in Mr. Nessi's testimony from the trial last summer.
>
> Q.     [I]s that a true statement Mr. Nessi made in court?
>
> A.     I don't believe that Mr. Nessi made a true statement in court.
>
> Q.     That's –
>
> A.     Regarding my objections to TAAMS.
>
> Q.     Prior to the trial last summer, which commenced on June 10th, 1999, did TAAMS work?
>
> A.     No, it did not.

Id. at 348 - 349.

> Q.     Did Mr. – to your knowledge, did Dominic Nessi know that it didn't work?
>
> A.     I believe that he did know that.
>
> ....
>
> Q.     Was information provided to Mr. Nessi by you and individuals with whom you worked to the effect that it [TAAMS] wasn't working at that time?
>
> A.     Yes, there was.

*Id.* at 350.

> Q.    (By Mr. Gingold) Are you aware of the representations that defendants made in court in the trial that commenced June 10th, 1999?
>
> A.    With respect to TAAMS?
>
> Q.    Correct.
>
> A.    Yes.
>
> Q.    To your knowledge, were those statements true.
>
> A.    No, they were not.
>
> Q.    Were they materially false?
>
> A.    Yes, they were.
>
> ...
>
> Q.    Were their statements made knowing they were false, to your knowledge?
>
> A.    I believe some of them were made knowingly.

*Id.* at 351 - 352.

## TAAMS Implementation Schedule

•    At Trial 1.0, defendants represented that TAAMS would replace BIA's "legacy" systems in accordance with a schedule they had represented was realistic, and would enable the BIA and all other Interior bureaus and offices to discharge their trust responsibilities prudently and without further delay.  *See* Plaintiffs' Exhibit 12 at 2576 .

•    Plaintiffs, before and during Trial 1.0, not only concealed the fact that TAAMS was not operational currently, but would not be implemented anytime soon, if ever.  Defendants represented to this Court that plaintiffs' concerns about the viability of TAAMS were untenable and convinced this Court to rely on their material misrepresentations – that TAAMS was not only already operational, but would be fully implemented no later than July 2000.[41] Specifically, Mr. Nessi was asked

---

[41]Defendants' TAAMS rollout schedule as described in Trial 1.0 was documented in Plaintiffs' Exhibit 6, which provided:

The TAAMS Implementation Schedule by Area Office:

| | | |
|---|---|---|
| • | Billings | June, 1999 |
| • | Juneau | Oct, 1999 |
| • | Aberdeen | Oct, 1999 |

whether the "TAAMS Implementation Schedule by Area Office" – which showed July 2000 as the completion for TAAMS roll-out – reflected the up-to-date schedule and he insisted that it was: "Yes. This is the current roll-out that we have in mind." He was asked if this is "current today still?" and he responded again: "Yes, it is." Plaintiffs' Exhibit 10 at 2354. Mr. Nessi knowingly and willfully concealed from this Court that that the roll-out had been delayed and that TAAMS had failed its tests.

- Assistant Secretary Gover testified falsely at trial with the same certainty: "TAAMS is on schedule." Plaintiffs' Exhibit 9 at 1082. He later added: "There is an excellent project management schedule for TAAMS." *Id.* at 1138.

- Mr. Nessi agreed, restating falsely and with certainty that "TAAMS has a realistic project management schedule." Plaintiffs' Exhibit 12 at 2576.

- Defendants' Proposed Findings and Conclusions filed in early August, 1999, asked that this Court to adopt a false finding of fact that TAAMS was "on schedule" and had been successfully rolled out in Billings:

> Despite initial delays, as a result of the efforts of Dom Nessi, The TAAMS project is **on schedule** and the **successful roll-out** of the TAAMS pilot in the Billings Office **occurred during this trial** in conformance with the schedule set forth in the HLIP.

Plaintiffs' Exhibit 17 at ¶ 230 (internal citations omitted) (emphasis added).

---

| | | |
|---|---|---|
| • | Minneapolis | Nov, 1999 |
| • | Eastern | Jan, 2000 |
| • | Anadarko | Feb, 2000 |
| • | Muskogee | Mar, 2000 |
| • | Albuquerque | Mar, 2000 |
| • | Navajo | Mar, 2000 |
| • | Phoenix | Apr, 2000 |
| • | Portland | Jun, 2000 |
| • | Sacramento | Jul, 2000 |

• Waiting until after this Court had decided Trial 1.0 on December 21, 1999, defendants and their counsel in HLIP-2000, defendants confessed that: "One of the most important observations made after the first prototype was released **in mid-summer 1999** was that the initial design meetings did not fully capture the entire scope of the BIA's needed functionality." *See* Plaintiffs' Exhibit 14 at 69; *see also* ¶ 17, *supra*.

• Defendants and their counsel also conceded after the Trial 1.0 decision that: "[I]t became apparent during the system tests conducted with BIA users **during July and August 1999** that a significant level of analysis and system modification remained in order to ensure that all of the BIA's unique business functions were addressed [by TAAMS]." *See* Plaintiffs' Exhibit 14 at 69 (emphasis added).

• Defendants also admitted that, "[t]he net result of these events during **the late summer and early fall** was that the deployment schedule outlined in the TAAMS contract could not be achieved as originally planned.  In retrospect, the Department concedes that the plan was overly optimistic given the complexity of the task at hand." *See* Plaintiffs' Exhibit 14 at 70-71[42] (emphasis added).

---

[42]Interior officials have touted the TAAMS program outside of court to Indian trust beneficiaries as well.  In the October 1999 Annual Meeting of the National Congress of American Indians, former Assistant Secretary Gover made the following absolutely false statement during a plenary session:

> TAAMS has been launched in the Billings Regional office, **and implemented in all agencies in Montana**.  The Trust Assets and Accounting Management System pilot is a success. . . .The implementation of TAAMS is a true success story.  This extremely complicated project is moving forward **on schedule**.  Many obstacles have been thrown in its path by those who have bet their reputations that the BIA could not fix the trust system.  We even have heard that people within the department say that TAAMS doesn't work, doesn't even exist.  Well, it exists, and it works.  And if you have any doubts, walk next door to the exhibition hall and see it for yourself.

Plaintiffs' Exhibit 18 (Statement From Mr. Kevin Gover, *From Fear To Hope*, October 5, 1999) at 3 (emphasis added).  What the government ultimately admitted after years of lying to this Court and plaintiffs is that by "late summer" in 1999 (certainly prior to October 1999), they had known that TAAMS was failing and drastically off schedule.  Plaintiffs' Exhibit 14 at 70-71.  Moreover, it was later revealed through the deposition of Tommy Thompson and Kenneth Rossman that throughout the testing through 1999, there was only dummy or "test data" in TAAMS – not real data.  *See* ¶¶ 13, 15, *supra*.

- On November 9, 2000 – nearly a year and one-half after the close of Trial 1.0 – Deputy Special Trustee Tommy Thompson admitted to the Advisory Board for the Special Trustee what plaintiffs had been stating for years; that Artesia TAAMS does not work and cannot work.  *See* Plaintiffs' Exhibits 19 & 20, (Affidavits from Cobell and Whitefeather).

**The Meaning of Deployment**

- At Trial 1.0, Mr. Nessi testified as to what is meant by the TAAMS "deployment" as follows:

> Well, **deployment** is the general term that you use that would **relate to all of the transition activities from the Legacy system to TAAMS, everything that is involved with that.**

*See* Plaintiffs' Exhibit 10 at 2354 (emphasis added).

- On June 1, 2000, defendants and their counsel filed a false and materially misleading 2nd Quarterly Report with the Court, but Interior attempted to evade accountability by expressly disclaiming responsibility for the accuracy of any representations stated therein.  *See* Plaintiffs' Exhibit 21 at 1.

- In the 2nd Quarterly Report, defendants and their counsel further misrepresented that:

> The Department of Interior completed a deployment decision review in March as scheduled.  At that time, the DOI decided not to deploy until after a second user test was conducted in April.  Upon completion of the April User Test the DOI decided to **<u>deploy</u>** the land title and records function of TAAMS.

Plaintiffs' Exhibit 21 at 13 (emphasis added).

- In the 2nd Quarterly Report to the Court, defendants and their counsel materially redefined and limited the meaning of the term "deployment" to the simple act of downloading of software into an agency's desktop computer:

> Deployment consists of the physical installation of TAAMS software on the desktop.  Implementation occurs after deployment once the site personnel have

59

> thoroughly inspected its data and is comfortable with using TAAMS as the "system of record.

*See* Plaintiffs' Exhibit 22 at 2 (emphasis omitted).[43]

## "Requirement Creep" & "Evolutionary Prototyping"

- In April 1999, the GAO issued a report evaluating Artesia TAAMS. The report was highly critical of *inter alia*, the Artesia TAAMS implementation schedule. *See, e.g., Indian Trust Funds: Interior Lacks Assurance That Trust Improvement Plan Will Be Effective* (GAO/AIMD-99-53, April 28, 1999) Plaintiffs' Exhibit 23 at 13-14.

- At Trial 1.0, Mr. Nessi responded to such criticism by testifying falsely that a deliberate pace for implementation was unsatisfactory because of what he termed "requirement creep"; specifically, he testified:

> Every computer system has an optimum time for its design and development period. Going into TAAMS—in general, you can take way too long. You could have a situation **where you allow the users to constantly change the system, add new requirements, add their own personal desires in what the system should be.**

---

[43] At all times relevant to this fee application, deception and obfuscation were practiced by defendants and their counsel. *See* Appendix I (discussing defendants' pattern and practice of deception in this case). This particular episode involves defendants' manipulation of the meaning of "deployment" – a term crucial to evaluating the effectiveness of defendants' sham trust reform activities. It is similar to the pattern and practice of obfuscation, deceit and cover-up found by this Court when it held defendants in contempt for violating the November 27, 1996 document production order. Moreover, it is akin to the sleight-of-hand practiced by defendants when they sought to evade the document production and records preservation obligations imposed on them by this Court and through Federal Rules. For example, as part of their scheme to escape personal accountability for their unabated destruction of e-mail, defendants and their counsel first provided "Attachment A: Potentially Responsive Documents" to the Court and plaintiffs on March 26, 1999 to help rehabilitate themselves before this Court by setting forth the breadth of their acknowledged discovery obligations, including without limitation all forms of electronic records. This attachment identified an inventory of documents that would be searched – this time presumably in earnest – and it included an explanatory footnote that defined documents to be protected, searched and produced as "electronic files" and all their "electronic backups," among others. On June 2, 1999, this same "Attachment A" – unaltered – was distributed to all senior officials of the Department of Interior by the Chief of Staff as part of her directive to "retain" key documents related to trust management. However, on August 12, 1999, "Attachment A" was altered, the explanatory footnote was deleted without notice, and defendants and their counsel unethically substituted the corrupted attachment for the original version and in bad faith buried it into a package of documents provided to the Special Master to limit the scope and undermine the integrity of the document protection order entered by this Court. *See* Appendix I, ¶¶ 90, 97, 99.

> In the business, they call that requirements creep.  It just becomes out of control, and that happens quite frequently.  The system becomes bulky and hard to manage.

Exhibit at 10 at 2281-82 (emphasis added).

• Defendants' expressed abhorrence to user-friendly modifications did not last long after trial.  In the HLIP-2000, defendants informed this Court that they changed the position they asserted before and during Trial 1.0 and adopted a new system design methodology known as "evolutionary prototyping" to guide further TAAMS modifications.  Specifically, HLIP-2000, defendants now assert:

> As a result of a limited amount of pre-planning and development of a precise design specification and requirement, the BIA chose to modify TAAMS using an "evolutionary prototyping" method for rapid development.  This method is a **user-centric design effort** that allows for the development of numerous system releases, each one closer to the final target than the last.  This is an accepted process for rapid system development and helps to ensure that the user community has a significant opportunity for input on the design.

> One of the most important observations made after the first prototype was released in mid-summer 1999 was that the initial design meetings did not fully capture the entire scope of the BIA's needed functionality.

Plaintiffs' Exhibit 14 at 69.

## Architecture, Interfacing and ALMRS

• The April 1999 GAO Report, completed on the eve of Trial 1.0, directly supported plaintiffs' claim that failure of Interior to properly evaluate and honestly assess the user needs and the refusal to develop an appropriate architecture necessarily would materially reduce the likelihood that any new systems could work as an integrated system and enable the government to discharge its trust duties.  Specifically, the GAO Report confirmed the validity of plaintiffs' concerns about Interior's failure to "properly analyze its information technology needs . . .."  Plaintiffs' Exhibit 23 at 1. The GAO Report concluded that "[u]ntil Interior develops an information system architecture addressing all of its trust management functions, it cannot ensure that its information systems will not be duplicative or incompatible or will optimally support the needs across all business areas." *Id.*

- At Trial 1.0, defendants and their counsel procured testimony from a series of witnesses who testified falsely that the development of information systems architecture prior to implementation was unnecessary for TAAMS to be effective.  Indeed, as Tom Clark averred falsely in his closing argument, TAAMS is a "COTS, commercial off-the-shelf software" and thus architecture "isn't such a big issue." Plaintiffs' Exhibit 4 at 5030; *see also* Plaintiffs' Exhibit 24 at 3704, 3725-26 (Babbitt testimony stating that system architecture was not necessary).

- Defendants waited until long after the close of Trial 1.0 to admit that the lack of systems architecture had been a devastating problem.  *See* Plaintiffs' Exhibit 14 at 71.

- On September 15, 2000, GAO confirmed that defendants did not develop an adequate system architecture.  While GAO opined that the absence of adequate system architecture would not guarantee failure, in fact, failure was likely and had occurred.  *See* Plaintiffs' Exhibit 25 at 16-17. Practically speaking,

  > Interior has not reengineered the business processes that TAAMS is to support even though these processes were designed in a very different system environment. Without taking time now to examine and revise its business processes, Interior will not be able to maximize the benefits that can be gained from TAAMS and it may perpetuate outmoded ways of doing business.

  *Id.* at 2; *see generally id.* at 3.  Defendants did not dispute this finding. *Id.*

- Defendants' witnesses at Trial 1.0 averred falsely that problems associated with lack of architecture such as difficulties associated with implementing critical interfaces were not present for TAAMS implementation. Defendants asserted falsely  that interfacing was not difficult. Tommy Thompson, for example, stated that the TAAMS to TFAS interface "is not a very complicated technical thing to have to do at this time.  Its kind of like merging two software packages on your personal computer."  Plaintiffs' Exhibit 26 at 3096.  Nessi testified that "[i]f the interface didn't work tomorrow, it would probably take 12 hours to get the interface working." Plaintiffs' Exhibit 12 at 2586.  In addition, defendants' witnesses asserted falsely that they had already sufficiently addressed

architecture issues in their current planning scheme.  Mr. Nessi in bad faith was unequivocal in this regard:

> Your Honor, we already had mitigated the architecture issue.  We have sat down with OTFM and with MMS, and within our three organizations we have a very good understanding of the architecture between the three systems right now.

Plaintiffs' Exhibit 12 at 2582.

- In its Response to Plaintiffs' Proposed Findings of Fact and Conclusions of Law and Proposed Orders, defendants asked this Court to adopt an incontestably false finding that: "[T]he evidence establishes that the interfaces between the trust computer systems **have been built and are functional**."  Plaintiffs' Exhibit 27 at 72.

- Months after the conclusion of Trial 1.0, defendants and their counsel were forced to admit that interfacing TAAMS with both TFAS and the MMS system had proved to be near impossible and that the lack of architecture was a severe obstacle to reform as plaintiffs had stated repeatedly.  The HLIP-2000 states that "the plan to purchase two off-the-shelf systems independently (TAAMS and TFAS) and interface them with an existing system (MMS) **had inherent difficulties from its inception**," Plaintiffs' Exhibit 14 at 71 (emphasis added), although neither the Court nor plaintiffs were made aware of these inherent difficulties during trial.  Furthermore, these inherent difficulties have resulted in Interior's inability to interface TAAMS with TFAS and MMS.  In turn, since "the TFAS and the MMS interfaces[] remain[] incomplete, . . . the independent verification and validation contractor [has] recommended against full deployment of TAAMS until the functional area is fully tested."  *Id.* at 79.  Not only did defendants' failure to diagram an architecture create "difficulties" but those difficulties contributed materially to the failure of TAAMS.

- The timing of defendants' Trial 1.0 testimony reveals that prior to the filing of their proposed post-trial submissions in August 1999, they had known that their representations prior to, during, and subsequent to Trial 1.0 were false and that interface was a serious, unresolvable problem.

However, in early July when asked during direct examination "Is the TFAS interface with TAAMS operational?," Mr. Nessi testified that "[t]he programming is . . . complete now I believe, and we're **going to be testing that most of next week and the following week**." Plaintiffs' Exhibit 12 at 2618 (emphasis added). Mr. Orr supported this posturing when the Court asked – "what is the status of the interface with TAAMS?", he testified falsely that "Both of the interfaces to MMS and TFAS are written. As far as the computer program, they are in test mode." Plaintiffs' Exhibit 28 at 2776. Defendants would later admit through the HLIP-2000 that interface had always been a serious problem, that it "had inherent difficulties from its inception," Plaintiffs' Exhibit 14 at 71, and no interface in fact was functional. Yet, defendants asked the Court to adopt a false finding of fact on August 9th. Plaintiffs' Exhibit 27 at 72; *see also* Plaintiffs' Exhibit 29 at 13 (Quarterly Report Number 1 noting that even by March 1, 2000, TAAMS-TFAS-MMS interface was not completed).

• The GAO warned defendants and their counsel that the TAAMS implementation plan was defective and unreasonably risky, in part, because defendants had refused to design and adopt a systems architecture <u>prior</u> to systems implementation. *See, e.g., Indian Trust Funds: Interior Lacks Assurance That Trust Improvement Plan Will Be Effective* (Plaintiffs' Exhibit 23) at 1. GAO expressed particular concern here because the GAO believed defendant was perilously close to repeating the same disastrous mistake that had been made when Interior wasted more than $411 million on the BLAM ALMRS project, a project that resulted in the creation of a system that could perform certain critical functions in two hours that a normal human being can perform in fifteen minutes! *See e.g.* GAO/T-AIMD-99-102, March 4, 1999. Defendants described ALMRS in their Trial 1.0 proposed findings and conclusions as follows:

> ALMRS was intended to be the Bureau of Land Management's computerized land management system and was under development for several years at enormous expense to the Bureau of Land management. After spending $450 million on the system, the acting director of BLM suspended the development of the system.

Plaintiffs' Exhibit 17 at 70.

- At Trial 1.0, defendants's witnesses testified falsely that, contrary to GAO's criticism, TAAMS was distinguishable from ALMRS because it was a commercial off-the-shelf system, *see* Plaintiffs' Exhibit 28 at 2760,; that it therefore did not require an architecture. In their Proposed Findings of Fact and Conclusion of Law, defendants and their counsel asserted falsely that "ArtesiaLand is a commercial off the shelf system," Plaintiffs' Exhibit 17 at 70, ¶ 209, and, thus, "TAAMS differs from the Bureau and Land Management's automated land and mineral record system (ALMRS)." *Id.* at 70, n. 41.

- Months after Trial 1.0 had closed and the decision was rendered, defendants recanted and conceded that TAAMS, in fact, was not the COTS they had represented to this Court since the inception of this litigation, because of the significant user-based modifications (so-called "evolutionary prototyping") made as a matter of practice to the Artesia system since "deployment" had commenced. In the HLIP-2000, defendants admited that "TAAMS is . . . best described as a modified off-the-shelf system (MOTS)." Plaintiffs' Exhibit 14 at 76.

### Independent Verification and Validation

- At Trial 1.0, defendants and their counsel acknowledged that periodic testing, specifically IV&V, is necessary to ensure that TAAMS meets its functional requirements. Specifically, Mr. Nessi testified falsely that IV&V is the "heart of a system development effort." *See* Plaintiffs Exhibit 10 at 2384-85.

- Mr. Nessi also testified on June 28, 1999 on the purported schedule for IV & V testing, stating falsely:

> So, **as we do our verification and validation testing next week and then again in August**, we will have an independent contractor view our testing methods. We'll engage in all of those over the **next 60 to 90 days**.

*Id.* at 2384 (emphasis added). *See also id.* at 2280-81.

- Two weeks after Nessi testified, Secretary Babbitt took the stand, presumably, if Nessi is to be believed, after IV&V testing had begun.  The Secretary said little different than what Nessi reported regarding the IV&V schedule:

  > [E]verybody agrees that for a couple of two, three months, we've got these outside critics in watching, and we're not going to make a final decision until September because we did, I think, very appropriately, sort of get some outside, you know, kind of a blue team or a red team, whichever, to kind of look at this thing and critique it.

  Plaintiffs' Exhibit 24 at 3711.

- Notwithstanding defendants' testimony in Trial 1.0, months after the trial and decision rendered by this Court – through the HLIP-2000 – defendants conceded that IV&V testing too was not on schedule. The HLIP-2000 revealed for the first time that the IV&V testing did not permit "final system test [until] November 22-24." Plaintiffs' Exhibit 14 at 79.  In addition, the user testing in the Rocky Mountain Regional Office did not occur until February 1-4, 2000.  Moreover, the testing revealed, according to defendants, that because of interfacing difficulties, "the IV&V contractor recommended against full deployment of TAAMS until that functional area was fully tested."  *Id.* And the majority of testing did not examine the effectiveness of  the "leasing, accounting and distribution and interface functions" of TAAMS. *Id.* at 80.  All of this material information was known but was concealed from this Court and plaintiffs until after this Court relied on the knowing and willful material misrepresentations of defendants and their counsel and decided Trial 1.0.

- Through the Quarterly Reports and independent GAO reports, it was revealed that defendants had abandoned independent validation and verification because "evolutionary prototyping" precluded this Court and plaintiffs from conducting an independent check of the functionality or effectiveness of the system.  *See* paragraph 34, *supra*, and Plaintiffs Exhibit 14 at 70, 79 and Plaintiffs Exhibit 25 at 7-8, 10, 19-20,

- The GAO found that defendants' "test plans were flawed because they were designed with the assumption that no errors would be found." *See* Plaintiffs Exhibit 25 at 7.  The GAO found further that negative and poor test results routinely "were ignored," dismissed, and concealed by defendants as "eccentricities or malfunctions of the computing platform rather than defects in the system being tested." *Id.* at 7.

- In the HLIP-2000, defendants represented falsely to the Court that:

  > From June through November 1999, the IV&V [independent validation and verification] team observed various system and functional tests of TAAMS, culminating in the **final** system test on November 22-24...the IV&V contractor provided suggestions the TAAMS team was able to incorporate, **improving the test results** and ensuring the tests were **repeatable**.

  Plaintiffs' Exhibit 14 at 79 (emphasis added).

- Defendants willfully concealed from the Court in the 2nd and 3rd quarterly status reports that IV&V was abandoned and tests were conducted with dummy data.  On September 15, 2000, the General Accounting Office reported the abandonment of independent validation and verification and exposed defendants' sham tests of TAAMS, confirming the March 7, 2000, deposition testimony of OTLSR Director Ken Rossman that there was no need to protect the data in TAAMS because it was loaded with dummy data and did not work.  *See* ¶¶ 50 and 15, respectively, *supra*.

### Department of Treasury

- On July 23, 1999, defense counsel closed his defense of the Treasury Secretary by representing falsely to the Court that Treasury did not maintain detail level accounting or transaction information; that "Treasury maintains [only] summary level accounting information.  The various agencies retain the detailed information that plaintiffs are so concerned about." *See* Plaintiffs Exhibit 4 at 4999, *see generally id.* at 5000-04,.  This misrepresentation was confirmed by Commissioner Gregg of the Financial Management Service. *See id.* at 3299-3300, 3309-11.  However, on February 28, 2000

– six months after Trial 1.0 had closed and two months after the Trial 1.0 decision had been rendered – defendant Treasury produced an inventory of documents and certain exemplars (but, conspicuously, continued to refuse to produce the documents themselves; documents that had been required to be produced in accordance with this Court's orders and plaintiffs' repeated discovery requests) that were, in fact, detailed accounting records – as well as Treasury's materially false and misleading Motion for Summary Judgement III with respect to the GAO settlement of accounts ("MSJ III") that admitted for the first time and notwithstanding representations to the contrary for several years that Treasury, in fact, had maintained these detailed accounting records – including Indian trust records since at least 1817.[44]    More importantly, notwithstanding repeated representations to this Court and plaintiffs since June 1996, Treasury's trust duties as reflected in those records have been, and continued to be, significant, "Treasury's Auditor for the Interior Department was directed to 'receive and examine...all accounts relating to...Indians...and to all other businesses within the jurisdiction of the department of the Interior, and certify the balances arising thereon. . . .'" Plaintiffs' Exhibit 31 at 9 (MSJ III).    Yet, plaintiffs' counsel and PricewaterhouseCoopers were forced to spend years in an effort to obtain such documents or substitutes only to be met with the same refrain that no such records had ever existed.

•    On February 28, 2000, Treasury produced to plaintiffs a binder of erroneously captioned "Summary-Level Inventory of Accounting Information;" however, this binder, in fact, contained exemplars of detailed documents.  Contrary to representations made to this Court prior to and during Trial 1.0, and contrary to defendants' repeatedly false responses to plaintiffs' numerous discovery requests, the Treasury inventory included the following detailed documents: SF 1166 – A paper voucher representing a manual payment certification and contains payee name and check serial number; CRCFR043 – a daily notice of non-Treasury Disbursing Offer check issues that were

---

[44]"**[B]etween 1817 and 1951**, governing law required each disbursing agent to submit his accounts, including those relating to IIM account, for settlement.  Settlement consisted of a double audit – one by the Indian Office in Washington, D.C. and then by a second agency (the Department of the Treasury) [ ] until 1921. . . ." Plaintiffs' Exhibit 31 at 1-2 (footnote omitted; emphasis added).

canceled in the CP&R system and includes a detailed listing of agency location code, check symbol/serial number, payee name, an check amount; <u>SF 1081</u> – a form indicating an investment or redemption transaction showing account number, face value, rate, cost, etc. by account numbers; and <u>FMS 6655</u> – an FMS report that presents the detailed receipt transactions reported by Agencies (including IIM trust accounts) during the month and cumulative fiscal year, including the balances forwarded at the beginning of the fiscal year, appropriation warrants, non-expenditure transfers, net disbursements to date, and closing balances at month end.

- On June 16, 2000 – more than four years after this action was filed – Treasury finally admitted to the Special Master and to plaintiffs that – notwithstanding repeated representations to the contrary that all individual Indian trust funds were held exclusively in the 14X6039 IIM Trust Deposit Account – plaintiffs, in fact, had been correct and that unquantified amounts of individual Indian trust funds had been commingled and held by Treasury in other accounts, including the Custodial Tribal Account. *See* Plaintiffs' Exhibit 32.

## **Data Cleanup**

- HLIP-2000 eliminated deadlines for this critical task. *See* Plaintiffs' Exhibit 14 at 22, and 132. But, despite the deplorable nature of remaining Trust records, the General Accounting Office reported that no progress had been made on the cleanup of those records, and that "Interior needs to clean up thousands of inaccurate, incomplete, and/or outdated trust fund records ...." Plaintiffs' Exhibit 25 at 12.

- Defendants, in fact, did not effect data cleanup and as a result, knowingly and willfully set-up TAAMS to fail: "[I]t has become very clear that **it would not be possible to conduct a long pre-implementation Data Cleanup** using the existing legacy systems. The legacy systems lack any data integrity features such as filters and edits, they operate slowly and are frequently unavailable due to system and network issues," *see* Plaintiffs' Exhibit 14 at 23 (emphasis added). The consequences of not cleaning up BIA data prior to conversion are fatal to both an adequate

accounting and the operation of an effective trust management system – garbage in – garbage out, "[t]he TAAMS potential for cost savings and operational efficiencies will be negated if the underlying data quality is poor.  Consequently, **pre-deployment Data Cleanup is critical**." *Id.* at 26 (emphasis added).

• Nonetheless, Mr. Nessi, the designated sub-project leader for BIA Data Cleanup, falsely represented to this Court that no data cleanup was required in Billings or any other area. *See* Plaintiffs' Exhibit 12 at 2599.  Moreover, Mr. Nessi refused to accept responsibility for ensuring accurate information is processed by TAAMS:

> Q.  The other part, of making sure that that information, paper or electronic, is correct, accurately reflecting the reality, is not your responsibility, as I understand your testimony?
>
> A.   That's correct.

*Id.* at 2608.

## Court Findings and Conclusions

• On December 21, 1999, the Court held Treasury Secretary Summers, Interior Secretary Babbitt and Assistant Secretary Gover in breach of trust and retained jurisdiction over this matter for at least five years, but – notwithstanding serious concerns expressed by plaintiffs – the Court accepted and relied on the representations of defendants and their counsel and, at that time, withheld appointment of a special master and receiver to oversee trust reform and the accounting that had been unduly delayed.  *See* December 3, 1999 Memorandum Opinion: Findings of Fact and Conclusions of Law ("12/3/99 Opinion") at 117-18.

• On December 21, 1999, this Court found defendants in breach of the trust duties owed by the United States to plaintiffs and set the standard by which defendants' conduct would be reviewed going forward:

> [D]efendants have the type of historical record of recalcitrance that troubles the court.  The court is aware that defendants, especially Interior, has made promises similar to those relied upon today each time that it has come up for review on the IIM trust.  Indeed, these broken promises are what necessitated the passage of the

70

Trust Fund Management Reform Act. Promises made in court, however, are different than the puffing to Congress that Interior has done over the past few decades. The court can ensure that these promises are kept, and it has the contempt power that will allow it to do so when appropriate. ...**Should the court find in the future upon proper motion by plaintiffs that defendants have been less than truthful in their representations or that defendants' adherence to prompt remedial action turns out to have been feigned, then the court may well decide to exercise its authority to ensure that its orders are carried out.**

12/3/99 Opinion at 117-18 (emphasis added).

• Defendants knowingly and willfully and in bad faith have deceived this Court and plaintiffs from the date this action in equity was filed, and at all times relevant to this fee application. *See*. ¶¶ 1 *et seq.*, *supra*. Throughout this litigation, defendants and their counsel unlawfully, in breach of trust, and in bad faith, have destroyed and withheld documents and other information that would have aided the Court and plaintiffs in exposing the mendacity of defendants' Trial 1.0 representations. *See* Appendix I at ¶¶ 24, 50, 51, 71, 115-19. Defendants and their counsel repeatedly made material misrepresentations prior to, during, and subsequent to Trial 1.0 that were relied upon by this Court and plaintiffs and, thereby, have forced plaintiffs to endure unrelenting irreparable harm. *See Id.* at ¶¶ 1, 13, 29-31, 42, 50, and 53. These material misrepresentations forced plaintiffs to spend scarce resources in years of futile efforts and concealed ongoing breaches of trust and willful violations of this Court's orders at all times relevant to this fee application.[45]

## Actions Taken By Defendants to Undermine the Integrity of Trial 1.0

• On May 5, 1998, this Court entered a Scheduling Order, among other things, denying defendants' request to stay discovery pending a decision on their dispositive motions, setting November 17, 1998 as the completion date for discovery, and setting March 15, 1999 as the trial date for Phase I, "fixing the system." *See* Plaintiffs' Exhibit 33.

• On November 6, 1998, this Court denied defendants' Motion to Dismiss, thus ensuring this case would proceed to Trial 1.0. *See* Plaintiffs' Exhibit 34 at 5.

---

[45]**See established findings in Norton contempt decision.**

- On November 23-24, 1998, this Court held a hearing to review issues related to defendants' failure to produce documents held by Interior in the BIA Winnebago, Nebraska agency office and to set a trial date for Phase II – the restatement and correction of the Individual Indian Trust balances. *See* Plaintiffs' Exhibit 36.

- Beginning November 23, 1998 – six days after the Court-ordered date for completion and closure of discovery – and continuing through the contempt trial, Treasury Department employees secretly destroyed 162 boxes of relevant trust documents held at the Hyattsville federal records center, documents that referenced individual Indian trust beneficiaries by name and were clearly not summary level documents. On the same day, despite representations to the contrary to both this Court and plaintiffs, and despite court orders and internal directives compelling the preservation of all relevant e-mail, Interior Department lawyers secretly began destroying relevant Solicitor's Office e-mail. *See* Plaintiffs' Exhibit 35 at ¶ 12.

- On November 24, 1998, this Court requested that plaintiffs' file a motion for an order to show cause why defendants should not be held in contempt for their failure to produce documents in accordance with the requirements of paragraph 19 of the First Order of Production. *See* Plaintiffs' Exhibit 36 at 214.

- On January 14, 1999, Joe Christie testified during the contempt trial that Treasury had informed the Solicitor's Office that "about 20,000 cubic feet" of relevant records were held in storage that were earmarked for disposal. Mr. Christie further testified that Treasury reported in a follow-up communication sometime thereafter that 8,000 cubic feet of records remained, but would not transfer the remaining records to Interior. *See* Plaintiffs' Exhibit 37 at 777-78. References to the 20,000 cubic feet of documents, the 8,000 cubic feet of remaining documents – and, most importantly, the disappearing 12,000 cubic feet of documents – would likely have been contained

in the Solicitor's Office e-mail that Interior attorneys began systematically destroying on that fateful November 23rd date.[46]

## IV.  THIS LITIGATION IS HISTORIC IN SCOPE AND COMPLEXITY AND TIME SPENT BY PLAINTIFFS' COUNSEL IN VINDICATING THE RIGHTS OF THE BENEFICIARY CLASS ARE EMINENTLY REASONABLE

This case involves more than 500,000 individual Indian trust beneficiaries, an accounting of nearly 50 million acres of individual Indian trust assets and over $13 billion dollars in revenue plus investment accruals over a century that the government estimates may cost upwards of $14 billion to account for.  Over sixty government lawyers have made appearances in this case – not to mention the myriad of others working behind the scenes on this case.  Exhibits and document pages filed in this case exceed 1 million pages, not included the millions of pages more electronically stored.  The case has required plaintiffs small litigation team to devote seven days a week every week for virtually the entire length of this case. These hours have been spent drafting pleadings, briefs and correspondence, strategizing and discussing issues with co-counsel, reviewing documents produced and those found through diligence of counsel, analyzing data and information related to defendants' failures to reform, protecting witnesses from government retaliation, and innumerable other task that has led to plaintiffs' "stunning victory ... achieved ... on behalf of the 300,000-plus Indian beneficiaries of the IIM trust."   *Cobell v. Babbitt*, 91 F. Supp.2d 1 (D.D.C.1999).

---

[46]Mr. Christie, Mr. Homan, Ms. Infield, Mr. Slonaker, Mr. Thompson, and Mr. Miller were targets of vicious retaliation for their truthful testimony before this Court on the very matters that are covered by this interim fee application.  Two anti-retaliation orders were entered to protect witnesses from intimidation and retaliation; none have worked.  And, the Master frequently had noted the palpable fear of reprisal that pervades Interior if employees come forward and tell this Court the truth.  Only Ms. Infield remains with the Interior Department – after three years of administrative leave while she was stripped of her duties.  Indeed, Interior and Justice did not limit themselves to attacks on Interior officials, they also scandalously attacked this Court and its judicial officers.  What is clear is that the bad faith conduct of defendants and their counsel from the date this litigation was filed was designed for one purpose: to undermine the integrity of these proceedings and deny plaintiffs justice.  As this Court has lamented, this is not our system of government.

It is fair to say that this case is *sui generis* in numerous respects.  It has required extreme diligence and creativity from plaintiffs' counsel. The hours plaintiffs counsel has expended in representing the plaintiff class is necessary, justified and reasonable given the extraordinary and unique nature, as well as expansive scope of this litigation.   This case involves more than 500,000 individual Indian trust beneficiaries, an accounting of nearly 10 million acres of individual Indian trust assets and over $13 billion dollars in revenue plus investment accruals over a century that the government estimates may cost upwards of $14 billion to account for.   Plaintiffs' claimed fees are reasonable given the breadth of the suit as demonstrated below, the success in vindicating rights achieved and the extraordinary obstructionist tactics of the government that have led to the expansion of this litigation exponentially.[47]

This Court found that plaintiffs had achieved a "stunning victory" in Trial 1.0, and indeed has given other indications of the quality of plaintiffs' work product.[48]  But it is the complexity and scope of this case that makes it unique.  Consider the following:

•       This litigation is one of the largest class actions in history.  It is massive and highly complex, as defendants admitted early on.[49]  The number of plaintiffs are so vast – upwards of 500,000 – that defendants can not even provide a list of the names of even the present IIM accountholders, let

---

[47]*Cf. Mitchell v. National Railroad Passenger Corp.*, 217 F.R.D. 53, 58 (D.D.C. 2003) ("The bottom line comparison should be between the gross hours worked and the gross fees sought in relation to the document[s] produced.").

[48]*See, e.g.,* Transcript of April 4, 2000 hearing re preliminary injunction, in which the Court stated:

Even though the plaintiffs are not going to receive the preliminary injunction they seek today, they have again achieved another important victory in their effort to establish the defendants are either unable or unwilling to take the steps necessary to make trust reform a reality.

*Id.* at 14.

[49]In an early status conference, defendants' counsel, Lewis Wiener, stated:  "In that regard this is a massive piece of litigation...this is a very complex piece of litigation ...."  January 21, 1997 Status Conference, transcript at 16.  In a subsequent status conference he reiterated:  "[T]his is a massively complex case.  There are millions upon millions of documents that must be reviewed."  April 23, 1998 Status Conference at 14.  He later noted that the issues in this litigation were "myriad and complex."  *Id.* at 18.

alone the deceased ones and any "off the system" members of the Beneficiary class.  Plaintiffs, of

course, have an obligation to ensure to the extent practicable that beneficiaries, as members of the

class, are informed about their rights.  This requires constant effort on behalf of the plaintiff team to

communicate in various ways with class members including through local tribal media, community

meetings, accepting routine phone calls, preparation of updating material and making presentations

at allottee group meetings.

•   The government admits they have mismanaged this Trust for over 100 years.[50] Documentation of

this mismanagement is critical to counter defendants' oft-repeated contention that their records are

substantially accurate.  Plaintiffs have reviewed significant data and other information, including

private and government reports back to the inception of the trust to show the complete lack of a

trust management system during all times.

•   This litigation presents probably the greatest single exposure of the federal government.  Over

$170,000,000 has passed through and/or accrued in the Trust for which the government must

account but appears incapable of doing so.[51]  Defendant Neal McCaleb could not dispute that as

much as $100 billion was owed.[52]  And the defendants' own expert estimated the government's

---

[50]*See, e.g.*, The House Committee on Government Operations 1992 report entitled "Misplaced
Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund" (the "Synar Report"),
Exhibit 55 to the Second Contempt Trial; *see also* testimony of Robert Lamb,  Second Contempt Trial,
Day 17 at 2883-84.

[51]*See* Trial 1.5, Day 11, testimony of Richard Fasold, at 21.  Such estimate included interest
compounded at 4.5%.

[52]*See* defendant Neal McCaleb's interview with Sam Donaldson on February 15, 2002:
      MR. DONALDSON: It sounds to me like, Secretary McCaleb, at some
point down the line, Native Americans are going to get money because of
this problem in the past in accounting.
      SECRETARY McCALEB:  Well, I think – I think that's a probability
because, in my judgment, there will probably have to be some kind of an
agreed settlement on the issue because of the problematic – the problem
of finding all the source documents.
      MR. DONALDSON: Well Elouise Cobell says she thinks it's 100 billion
dollars.
      SECRETARY McCALEB:  ....I don't – I don't – because we can't do
an accounting, I can't refute that.  That's the problem.

exposure at between $10-40 billion.[53]   Defendants, themselves, admit that over $13 billion in

nominal dollars (i.e., before any interest is added) has passed through the Trust.[54]

- The complexity of this litigation is manifested by the fact that over 2500 pleadings, orders and court

  papers have been filed herein.[55]   Moreover, in Trial 1.0 alone, there were 1000 pages of exhibit,

  and, in addition, the government supplied an "Administrative Record" that contained approximately

  40 binders 5 inches thick of documents.[56]

- The issues in this case which have been raised by the parties are extremely demanding and involved

  – ranging from constitutional law, including separation of powers and sovereign immunity principles;

  trust law dating back to the 1500's; Indian law; complex jurisdictional issues; class action issues;

  governmental and administrative law defenses raised by defendants; federal question issues; the

  effect of bad faith conduct on the part of a litigant, including the effect of intentional destruction of

  trust documents and other litigation misconduct; civil and criminal contempt; federal civil procedure

  issues, including those revolving around the use of special masters, protective orders and privilege

  issues; the powers of a court sitting in equity; and various appellate issues.  Indeed, the complexity

---

Id. at 8-9.  Such interview was plaintiffs' Exhibit 51 in Trial 1.5;  see also Trial 1.5, Day 11, at 43-44.

[53]See SRA International, Inc., *DOI Initial Risk Assessment for Indian Trust Management (ITM) Systems*, at 5-1 ("The overall potential impact of the aforementioned threats to ITM [Indian Trust Management] remains significant.  The litigation against DOI by existing plaintiffs could potentially cost the Federal government **somewhere between $10B and $40B**."  (Emphasis added.)).  The SRA study was filed as Exhibit 2 to *Plaintiffs' Reply to Government's Opposition to Plaintiffs' Consolidated Motion for Leave to Amend and Motion to Amend Plaintiffs' February 15, 2002 Summary Judgment Contempt Motion and a Contempt Finding Pursuant to F.R.C.P. 56(g) in Accordance with Newly Discovered Evidence:  The April 19, 2002 Letter of GAO General Counsel Anthony Gamboa to OHTA Director Bert Edwards*, filed June 28, 2002.

[54]See Trial 1.5, Day 11, transcript at 20-23.

[55]The docket sheet shows that as of August 9, 2004 2624 documents had been filed.

[56]See Trial 1.0 Pre-trial Conference (June 7, 1999) at 70 (administrative record consists of 17 linear feet of documents); Trial 1.0, Day 18, at 3261 (Court's interchange with witness Thomas Thompson regarding the administrative record:  "THE COURT:  That's pretty daunting-looking, isn't it?  THE WITNESS:  Guilty.  THE COURT:  He just looked at the administrative record and looked overwhelmed.  So I told him it was pretty daunting-looking."); *see also* Trial 1.0, Day 25, at 4196 (entire administrative record before Court).

of this litigation is underscored by the testimony of defendants' own expert, David Lasater, who found the case so complex that it considerably lengthened the amount of time it took him to put into writing his thoughts.[57]

• The action is sufficiently complex and demanding – apparently from both a legal and ethical perspective – that defendants have gone through at least four trial teams – which has compounded the difficulties and delays of this litigation and warranted further effort and diligence on the part of plaintiffs' counsel.[58]

---

[57]Mr. Lasater testified:

> [It is] my personal view that that 60 days would not include the preparation of a textural report, it would include only the completion of the analysis that would be part of that textural report and that **it had been my experience that writing words in a case as complex as this and with as much detail as this one will have will take many days beyond the completion of the analysis.**

May 21, 1998 Deposition of David Lasater at 56 (emphasis added). Mr. Lasater continued with a similar observation in his testimony before the Court during the November 24, 1998 Status Conference:

> Q.   You said six to eight weeks to produce your analysis and write your report. How does – as you now anticipate, it how does it divide between producing the analysis and writing the report?
> A.   Well, given the size and complexity of this case, I suspect that the final writing of the report might require as much as a week to 10 days, because I'm taking very complex – **I'm going to be taking very complex matters and reducing those to English words, and that is a difficult process, as you lawyers know.**

Transcript at 207-08 (emphasis added).

[58]As this Court noted when defendants started with yet a new trial team on the eve of the Second Contempt Trial:

> THE COURT: Now I will take the government's motion for an enlargement of time. And explain to me why, when the enlargement is caused by the government's own misconduct of **having again replaced their attorneys for the third time**, I should even consider it.
> MR. NAGLE: Well, Your Honor, **the enlargement of time is a product of the scope of the issues and the nature of the issues necessary to be tried**.
> THE COURT: .... The second one is August 9th. I just gave you those dates. So you've had months. **Now, because the other counsel are thrown out and you come in, you think that gets you to start all over? That's what happened last time.**
> MR. NAGLE: No, Your Honor.
> THE COURT: **How many times does the government get to start all over with a new team?**
> ....
> THE COURT: **How is that fair to the plaintiffs?**
> MR. NAGLE: Well, it wouldn't be, but that's not the basis of our motion, Your Honor.

November 30, 2001 Hearing Transcript at 20-21 (emphasis added).

- All material delay is attributable to defendants.  Indeed, during Trial 1.0 – when this action was a little more than three years old – defendants admitted that they had improperly delayed.[59]   The action has been delayed and extended beyond all reason by defendants.[60]

- Defendants' patent delay was so great that this Court had to warn defendants as early as Trial 1.0 that he would not countenance further delay.[61]   This Court recognized that defendants' representations in Trial 1.0 were "empty promises," shortly thereafter.[62]

- This litigation, including Trial 1.0, was made materially more difficult by reason of defendants' having destroyed and/or refused to produce documents.[63]

- Defendants have at all times, regardless of which trial team they elected to deploy, have utilized dozens of attorneys against plaintiffs' small litigation team.  It is fair to say that the government has employed approximately 100 attorneys on this litigation over its history – not including Solicitor's Office attorneys, White House counsel and the 54 law firms retained to represent various

---

[59]Phillip Brooks, defendants' lead counsel stated to this Court:
> **There's blame right over here at this table about how the case didn't progress so that we could settle these issues out**, and now we've had to come in here and bring this out....**[I]t is an extremely complex case, and it's a complex problem**...

Trial 1.0, Day 5 transcript at 797-98 (emphasis added).

[60]*See also* note 58.

[61]"THE COURT:   [T]his Court is not going to sit here and allow this mismanagement] to continue....So if they don't clean it up, it's going to be cleaned up in my lifetime."  Trial 1.0, Day 29, at 4721.

[62]This Court noted in the April 4, 2000 preliminary injunction hearing:
> This entire fiasco is vivid proof to this Court that Secretary Babbitt and Assistant Secretary Gover have still failed to make the kind of efforts that are going to be required to ever make trust reform a reality.  Coming so soon after their trial testimony last summer, and all of the personal assurances they gave this Court about the priority they were now placing on trust reform, the facts brought to light in this proceeding provide overwhelming proof to the Court that the defendants simply continue to provide more empty promises.

*Id.* at 12.

[63]*See, e.g.*, Trial 1.0 transcript, Day 5, at 780 ("THE COURT:  I understand, but I'm talking about people that are destroying things.  Nothing ever happens to them....And people who are covering it up, nothing every happens to them.  That's what the Tyler report said. ");

contemnors.  Indeed, a review of a recent docket[64] lists 40 attorneys on just the Electronic Case Filing (ECF) system who have represented defendants in this litigation at various times – not counting the numerous attorneys listed who are representing contemnors.

• This litigation has an added layer of complexity resulting from its more than 8 year duration.  It takes particular talent and dedication to amass, catalogue and call up the history, facts and law that has been developed over almost a decade – and to ensure that present filings are made in a manner consistent with such history.[65]

• Defendants are employing so many attorneys on this case that they routinely file unnecessary and make-work motions in an apparent attempt to bury plaintiffs in paper.  Defendants' continual motions for reconsideration are a prime example of this questionable conduct.[66]

_____

[64]as of August 15, 2004.

[65]Defendants have on numerous occasions filed papers that were inconsistent with prior filings or representations to the Court which defendants had made, or with obvious fiduciary duties.  For example,

(1) Defendants' having crafted and filed the March 7, 2000 Declaration of Daniel Marshall, III, Executive Vice President of Interior Systems, Inc., in which he stated that system applications were failing "on a daily basis," there were "no published standards or procedures," metrics were lacking in key areas, and "there exist no written operating procedures or security manuals."  *See* transcript of April 4, 2000 hearing at 5.  This, of course, was contradictory to the assertions defendants made in Trial 1.

(2) Defendants' improperly communicating with plaintiff class members by sending them purported statements of account without seeking leave of Court, when prior teams of defendants had clearly understood their ethical obligations sufficiently to have filed a motion seeking such leave of Court.  *See Cobell v. Norton*, 213 F.R.D. 33, 35 (D.D.C. 2003) ("The proper course of action would have been for defendants to file a motion requesting an order from this Court finding that their proposed communications with class members would not violate the ethical rules prohibiting contact with represented parties, **precisely as they did in March 2000 and December 2001, when administrative processes they were contemplating involved contacts with class members**."  (Emphasis added.)).

[66]*See Cobell v. Norton*, *supra*, 213 F.R.D. 33, 41 (D.D.C. 2003), in which this Court chastised defendants as follows:

In short, defendants' motion to reconsider fails to set forth any persuasive arguments why this Court should reconsider the opinion it issued on December 23, 2002.  Instead, defendants misinterpret the language contained in the notices they mailed to class members,

Accordingly, plaintiffs respectfully submit that the time they have spent in obtaining the "stunning victory" recognized by this Court in Trial 1.0, as well as the complexity of the issues and the quality of the work performed amply warrant the fees they are requesting.


## V.  SUMMARY OF ATTORNEY'S FEES AND EXPENSES REQUESTED

Set forth below is the summary of fees and expenses requested by plaintiffs with respect to the Trial 1 proceeding.

---

misrepresent statements made by their defense counsel to this Court, and mischaracterize the holdings of the cases that they claim lend support to their arguments, all in an attempt to re-open issues that have already been the subject of two rounds of briefing and oral arguments.  There is no better way to waste the limited resources of a court than for a party to ask it to return to issues that the party has already litigated and lost.  In their surreply to plaintiffs' motion for a preliminary injunction and a Rule 23 order, defendants announced that "[b]riefing on this issue is now complete." Defs.' Surreply at 1. Briefing on these issues is now more than complete.

*Id.* at 41 (brackets original).

| ATTORNEY/PROFESSIONAL | Fees Requested at Market Rates | Expenses Requested | EXPENSES ALLOWED | FEES ALLOWED |
|---|---|---|---|---|
| DENNIS GINGOLD | $4,817,641.70 | $0.00 | $0.00 | |
| NATIVE AMERICAN RIGHTS FUND | [See below – broken out by attorney] | | | |
| John Echohawk | $18,814.21 | | | |
| Keith Harper | $1,064,466.71 | | | |
| Richard Guest | $20,412.00 | | | |
| Rick Dauphinais | $117,346.75 | | | |
| Jim Kawahara | $43,064.80 | | | |
| Robert Peregoy | $407,060.14 | | | |
| Lorna Babby | $474,195.98 | | | |
| NARF Law Clerks | $101,978.00 | | | |
| THADDEUS HOLT | $1,116,562.12 | $3,626.59 | | |
| ELLIOTT LEVITAS | $1,095,909.50 | | | |
| MARK KESTER BROWN | $420,022.83 | $0.00 | $0.00 | |
| GEOFFREY REMPEL | $298,681.88 | $0.00 | $0.00 | |
| PRICEWATERHOUSECOOPERS | | $4,528,684.00 | | |
| STACY BEAR | $9,912.00 | | | |
| **TOTAL** | $9,996,156.62 | $4,532,310.59 | | |

August 17, 2004

Of Counsel
JOHN ECHOHAWK
Native American Rights Fund
1506 Broadway
Boulder, Colorado 80302
(303) 447-8760

Respectfully submitted,

_____/s/ Dennis M. Gingold_____
DENNIS M. GINGOLD
D.C. Bar No. 417748
607 14th Street, N.W.
Box #6
Washington, D.C.  20005
(202) 824-1448


_____/s/ Keith Harper_____
KEITH HARPER
  D.C. Bar No. 451956
Native American Rights Fund
1712 N Street, N.W.
Washington, D.C.  20036-2976
(202) 785-4166


_____/s/ Mark Kester Brown_____
MARK KESTER BROWN
  D.C. Bar No. 470952
607 14th Street, NW,
Box #6
Washington, DC 20005
(202) 824-1447

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing *Plaintiffs' Equal Access to Justice Act Petition for Interim Fees Through the Phase 1.0 Proceeding* with all attachments and exhibits was served via courier on the following:

Sandra R. Spooner

Deputy Director

Commercial Litigation Branch

Civil Division

1100 L Street, NW

Room 10052

Washington, DC 200044-0875

and on the following who are not registered for Electronic Case Filing, by first class mail, on this day, August 17, 2004:

Earl Old Person (*Pro se*)

Blackfeet Tribe

P.O. Box 850

Browning, MT 59417

406.338.7530 (fax)

_____/s/ Ruth Hargrow_____
RUTH HARGROW