UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELOUISE PEPION COBELL, et al., )<br>)<br>             Plaintiffs, )<br>)<br>  v.  )<br>)<br>GALE A. NORTON, Secretary of the )<br>Interior, et al., )<br>)<br>             Defendants. )<br>_____ ) | Civil Action Number 96-1285 (RCL) |

**MEMORANDUM AND ORDER**

    Before the Court is defendants' May 12, 2004 Motion to Strike Plaintiffs' Emergency Notice of Individual Indian Trust Records in Imminent Risk of Destruction and Loss ][2569] ("Motion to Strike"), plaintiffs' opposition, and defendants' reply thereto. The Emergency Notice filed by Plaintiffs on April 28, 2004 reports the destruction and damage to individual Indian trust records – the details of which are set out in two letters: one authored by unidentified employees of the Office of Trust Records ("OTR"), division of the Office of the Special Trustee ("OST"), see Emergency Notice, Ex. 1 ("OTR Letter"), and a second penned by OTR union representative Susan Sandoval. Id. at Exhibit 2 ("Sandoval Letter").

    Defendants move to strike Plaintiffs' Emergency Notice pursuant to Fed. R. Civ. P. 12(f) arguing that the filing is "incompetent;" contains unsupported "extremely disturbing information concerning the current status of records retention" at the Department of the Interior, Motion to Strike at 1, 2; consists of "facially incompetent letters" whose contents "have no legal pertinence," id. at 3; and "includes derogatory slurs (including race-based remarks) against certain Interior officials." Id. at 3 n. 5. Defendants, in support of their Motion to Strike, file a

1

letter from Michael M. Billings, Labor Relations Officer, U.S. Department of the Interior responding to the Sandoval Letter, attached to which is a letter from OTR Director Ethel Abeita ("Abeita Letter").  Motion to Strike at Exhibit 1.

For the reasons set forth more fully below, the Court finds defendants' contentions to be without merit and denies the Motion to Strike.

Standard of Review

Rule 12(f) provides, in pertinent part, that "upon motion made by a party within 20 days of service of the pleading upon the party . . . , the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  It is settled in this jurisdiction that the term "pleading" for the purposes of Rule 12(f) includes affidavits and declarations filed in support of technical pleadings because Rule 12(f) is the only viable method for attacking materiality and pertinence defects in such documents.  See Larouche v. Department of the Treasury, 2000 WL 805214, at *13-14 (D.D.C. 2000) (citing Humane Society of the United States v. Babbitt, 46 F.3d 93, 97 n.5 (D.C. Cir. 1995) (internal citation omitted).  The Court, possessing considerable discretion in disposing of motions to strike, is mindful that motions to strike are not favored, are often being considered "time wasters," 2A Moore's Federal Practice, §12.21 at 2419, and should usually be denied "unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation," Ulla-Maija, Inc. v. Kivimaki, 2003 WL 169777, at *4 (S.D.N.Y. 2003), or "unless it can be shown that no evidence in support of the allegation would be admissible." Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d.Cir. 1976) (emphasis added).

Applying these standards to the facts presented here, the Court finds plaintiff's Emergency Notice beyond the reach of defendants' Motion to Strike.

2

Rule 12(f) Does Not Apply to the Allegations Set Out in the Emergency Notice as a Matter of Law

Defendants contend that the Emergency Motion is repetitive; without legal pertinence; immaterial to the underlying proceedings; and contains defamatory statements that must be stricken under Rule 12(f). Defendants are mistaken; their argument betrays a misreading of Rule 12(f), a misreading of the allegations set out in the Emergency Notice, and an unreasonably narrow construction of their fiduciary responsibilities.

In the first instance, "redundant" matter, as contemplated by Rule 12(f), refers to allegations that constitute a needless repetition of other averments in a pleading. One such example confronted the court in Stewart v. Thomas, 538 F.Supp. 891, 894 (D.D.C. 1982), where plaintiff's cause of action for "outrage" was stricken as redundant under Rule 12(f), since the plaintiff also asserted a separate claim for intentional infliction of emotional distress. The allegations set out in the Emergency Notice present no such repetition. They do not regurgitate past instances of misfeasance but alert the Court to new incidents of document destruction.

The Emergency Notice similarly can not be construed as being "without legal pertinence," or "immaterial." Under Rule 12(f) "immaterial" matter consists of statements and averments bearing no essential or important relationship to the claim for relief or the defenses being pled. See, e.g., Mitchell v. Bendix Corp., 603 F.Supp. 920 (N.D. Ind. 1985) (agency findings with no preclusive effects on district court were stricken from employment discrimination complaint as immaterial). As stated, both the OTR and the Sandoval Letters detail incidents whereby trust records vital to individual Indian beneficiaries were placed in jeopardy and/or destroyed. To find these averments "immaterial" or "legally impertinent" would be tantamount to ruling that the destruction of trust information bears no essential or important relationship to the plaintiffs' claim for relief. Nothing could be further from the truth. Retention

and preservation of document and trust information is at the core of this litigation and has preoccupied this Court since it first held that "[t]he Indian Trust Fund Management Reform Act, 25 U.S.C. §§ 162a et seq. and 4011 et seq., requires defendants to retrieve and retain all information concerning the IIM trust that is necessary to render an accurate accounting of all money in the IIM trust held in trust for the benefit of plaintiffs." Cobell v. Babbitt, 91 F.Supp.2d 1, 58 (D.D.C.1999). This view was resoundingly affirmed by the Court of Appeals:

> The government's broad duty to provide a complete historical accounting to IIM beneficiaries necessarily imposes substantial subsidiary duties on those government officials with responsibility for ensuring that an accounting can and will take place. In particular, it imposes obligations on those who administer the IIM trust lands and funds to, among other things, maintain and complete existing records, recover missing records where possible, and develop plans and procedures sufficient to ensure that all aspects of the accounting process are carried out.

Cobell v. Norton, 240 F.3d 1081, 1105 (D.C. Cir. 2001).

Beyond the legal significance attaching to the preservation of trust information, the allegations set out in the Emergency Notice must be assessed in the context of a string of similar incidents which have checkered this litigation dating back to December 22, 1999 when the Court found by clear and convincing evidence "that Bruce Babbitt, Secretary of the Interior; Robert Rubin, Secretary of the Treasury; and Kevin Gover, Assistant Secretary, Department of the Interior are in civil contempt of this court's First Order of Production of Information, issued November 27, 1996 and subsequent Scheduling Order of May 4, 1998." Cobell v. Babbitt, 37 F. Supp.2d 6, 15 (D.D.C. 1999). The Court found these cabinet officials not only failed to produce documents responsive to plaintiffs' discovery requests, but lied about their failure to clean up a rodent infestation that infected trust records at a Nebraska document storage facility, id.; a rodent infestation in an Albuquerque document facility that housed "thousands of uninventoried boxes

4

of IIM documents" id. at 22 n.8; and the destruction of documents and microfiche by the Department of the Treasury. Id. at 28.

It was these abuses that compelled this Court to appoint a Special Master to, among other things, monitor the orderly flow of discovery and to ensure that trust information was safeguarded in accordance with fiduciary principles and Court order. See Order (Feb. 24, 1999).

Since his appointment, the Master has filed dozens of reports documenting a myriad of disturbing (and undisputed) findings with respect to the lack of care with which trust information was being safeguarded. See, e.g., Report of the Special Master Regarding Site Visits to Area and Agency Offices (Oct. 29, 1999) (concluding that agency and area offices are unable to ensure the safe storage of trust records); Report of the Special Master Regarding Site Visits to Area and Agency Offices (Apr. 25, 1999) (concluding that, in several agency offices, active trust documents are not stored and maintained properly); Third Report of the Special Master Regarding Site Visits to Area and Agency Offices (Nov. 12, 1999) (reporting instances of trust records stored in puddles water near sacks of fertilizer, as well as in wooden and corrugated metal shed amidst gasoline canisters, tires, machinery and other debris); Recommendation and Report of the Special Master Regarding the Delayed Disclosure of the Destruction of Uncurrent Check Records Maintained by the Department of the Treasury (Dec. 3, 1999) (discussing Treasury's failure to disclose the fact that it had destroyed 162 boxes of historical documents); Report of the Special Master Regarding the Destruction of Eleven Boxes of Treasury Securities by the Fort Worth Federal Record Center (Jan. 9, 2001); Site Visit Report of the Special Master to the Office of Information Resources Management (Mar. 12, 2001) (documenting the lack of security at the Office of Information Resources Management in Reston, Virginia and the discovery of information relating to individual Indian money accounts in a shredder); Report and

Recommendation of the Special Master Regarding the Security of Trust Data at the Department of the Interior (Dec. 4, 2001) (discussing the wholesale abdication by Interior of its responsibilities to safeguard individual Indian trust data residing on its computer systems); Second Investigative Report of the Special Master Regarding the Office of Trust Records (Apr. 11, 2002) (discussing OST/OTR's failure to implement a meaningful trust records training program); and Emergency Report of the Special Master Regarding defendant's Proposed Relocation of Records to the Lee's Summit Federal Records Center at 22-23 (Apr. 17, 2002) (exposing the decision of senior Interior/OST officials to transport 32,000 boxes containing active individual Indian trust information to the Lee's Summit Federal Records Center "without regard to the consequences" and with "an utter indifference to the safety of these records or to the ability of IIM beneficiaries to have meaningful access to vital information").  Two additional reports of the Special Master have been disputed and are still pending action. See Corrected Report of the Special Master Regarding the Deletion of Individual Indian Trust Information by Former Assistant Secretary-Indian Affairs Neal McCaleb (Jan. 24, 2003) (reporting that the former Assistant Secretary, Indian Affairs routinely deleted individual Indian trust information from his computer); and Site Visit Report of the Special Master to the Office of Appraisal Services in Gallup, New Mexico and the Bureau of Indian Affairs Navajo Realty Office in Window Rock, Arizona (Aug. 20, 2003) (reporting the destruction of computer information relating to the appraisals of allottee lands by the former BIA Navajo Regional Supervisory Appraiser Anson Baker).

      The allegations set out in the OTR Letter and Sandoval Letter are yet another chapter in this sad litany of indifference demonstrated by defendants.  They are not "immaterial."

These allegations are similarly not "impertinent."  Under Rule 12(f), if material pleaded "fairly presents a question of law or fact which the court ought to hear, it may not be stricken as impertinent."  Gateway Bottling, Inc. v. Dad's Rootbeer Co., 53 F.R.D. 585, 588 (W.D. Pa. 1971).  The validity of the allegations attached to plaintiffs' Emergency Notice presents exactly the type of questions that demands the Court's attention.

Finally, the allegations set out in Plaintiff's Emergency Notice can not be considered scandalous in context of Rule 12(f).  Statements are to be stricken as "scandalous" only when they contain allegations "that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." 2 MOORE'S FEDERAL PRACTICE § 12.37[3] at 12-97; see also In re 2TheMart.com Inc. Securities Litigation,114 F.Supp.2d 955, 965 (C.D. Cal. 2000) ("scandalous" includes allegations that cast "a cruelly derogatory light on a party or other person").

The offensive provision targeted by defendants consists of a statement found in the OTR Letter that questions the need for a senior Interior official to persistently remind OTR employees of his religious affiliation when, in their mind, he is viewed as an unsympathetic non-Indian (or "white man").  These remarks, while technically unrelated to the underlying litigation, do not rise to the level of being "scandalous," as defined in this jurisdiction.  See, e.g., Alexander v. FBI, 186 F.R.D. 21, 53 (D.D.C. 1998) (Court struck charges that attorney Paul Gaffney "threatened Plaintiffs' counsel and family" as void of any evidentiary support); Pigford v. Veneman, 215 F.R.D. 2, 4-5 (D.D.C. 2003) (Court struck filings that accused opposing counsel of exhibiting "racist attitude" without support in facts or evidence, and thus "scandalous" per se under 12(f)); In re Johnson, 236 B.R. 510, 523  (D.D.C. 1999) (Court struck a bankruptcy debtor's ad hominem allegations that the Trustee was a "liar" on the grounds that they were "so

devoid of the necessary evidence to sustain them that they amount to little more than name-calling."). In other words, there is nothing in the OTR Letter to "that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." 2 MOORE'S FEDERAL PRACTICE § 12.37[1] at 12-93 -12-94 (3d ed. 2002).

The Allegations Set out in the Emergency Notice are Independently Admissible.

Defendants take issue with the allegations set out in the anonymously authored OTR Letter as being incompetent and containing hearsay. Although the Court would normally be disinclined to accept anonymous letters such as the OTR letter, it is within its purview to do so as a trial court is accorded wide latitude to receive evidence as it sees fit. See General Elec. Co. v. Joiner, 522 U.S. 136, 141-42 (1997). This is particularly true in those situations when the trial court is conducting a bench trial. Harris v. Rivera, 454 U.S. 339, 346 (1981). In civil bench trials, for example, many experienced judges admit hearsay they deem reasonably reliable and probative, either "for what it is worth" or on some more explicit rejection of the hearsay rule and its some 30 exceptions. McCormick on Evidence, 137 (2d ed. 1972); Weinstein, ALTERNATIVES TO THE PRESENT HEARSAY RULES, SUPRA; DAVIS, HEARSAY IN NONJURY CASES, 83 Harv L Rev. 1362 (1970). The Fifth Circuit, in a much-cited decision, held a 50-year-old newspaper story admissible to show the occurrence of a fire at that time "because it is necessary and trustworthy, relevant and material, and its admission is within the trial judge's exercise of discretion in holding the hearing within reasonable bounds." Dallas County v. Commercial Union Assur. Co., 286 F.2d 388, 398 (5th Cir.1961). This is true both in the administrative context, see Johnson v. United States, 628 F.2d 187, 190-91(D.C. Cir. 1980) (hearsay may be substantial evidence depending on its truthfulness, reasonableness and credibility; hearsay statements are highly

8

probative where declarants are disinterested witnesses, statements are essentially consistent, and counsel had access to the statements prior to agency hearing), and in the criminal context where Federal Rule of Evidence 104(a) provides that judges are "not bound by the rules of evidence except those with respect to privileges."

Beyond this, and perhaps most crucially, defendants indirectly concede the veracity of most of the critical contentions set out in the Emergency Notice. The Abeita Letter confirms those allegations set out in the Sandoval Letter, that "350 boxes [were identified] as being moldy," and that "[t]he initial cleaning process undertaken by Iron Mountain was not successful." Abeita Letter at ¶6. The Abeita Letter also confirms the OTR Letter's report that, on or about February 23 or 24, 2004, there was a leak in the roof of the Yale Street warehouse in Albuquerque, New Mexico – where an estimated 100 pallets (each containing 50 boxes) of trust records were housed. According to the OTR Letter, "[o]ne of these pallets is right under a leak from the roof. The whole pallet gets wet from the top down. . . . One of the inside walls, which is concrete, looks like a mini water fall." OTR Letter at 3-4; Abeita Letter at ¶13. Abeita further notes that the wet boxes in the leaking warehouse were moved to a warehouse that stores agricultural products, id. at ¶14, that boxes of documents brought in from the field (during an unidentified time period) contain mold and will remain so while OTR "search[es] for a suitable contractor" to clean them; id. at ¶6; and that boxes containing mouse droppings remain uncleaned because OTR is still trying to "locat[e] a suitable contractor" to rectify what it now claims are "newly found boxes." Id. at ¶ 7.

The Court is thus confronted with two independent sources confirming that boxes containing individual Indian trust records sustained water damage from a leaking roof, and several hundred boxes of records are contaminated with mold. To the extent further details are

9

needed, Plaintiffs may depose Abeita and other OTR employees and verify the allegations set forth in the Emergency Notice.

Finally, and most disturbingly, the Court again observes that defendants have yet again failed to notify the Court when trust records are in jeopardy or actually damaged. Defendants' obligation to report on the safety of trust records is undisputed. In December 1999, the Court found: "The Indian Trust Fund Management Reform Act, 25 U.S.C. §§ 162a et seq. and 4011 et seq., requires defendants to retrieve and retain all information concerning the IIM trust that is necessary to render an accurate accounting of all money in the IIM trust held in trust for the benefit of plaintiffs." Cobell v. Babbitt, 91 F. Supp.2d 1, 58 (D.D.C. 1999). The Court then directed defendants to "file with the court and serve upon plaintiffs quarterly status reports setting forth and explaining the steps that defendants have taken to rectify the breaches of trust declared today and to bring themselves into compliance with their statutory trust duties" and that such reports "shall be limited, to the extent practical, to actions taken since the issuance of the preceding quarterly report." Id. at 58-59. In so doing, the Court assumed defendants would not omit pertinent facts or file reports containing half-truths. The Court's trust was clearly misplaced.

For example, in their 11th Status Report to the Court, dated November 1, 2002, Interior informed the Court that "OTR developed strategic goals . . . [and] [t]his report will use the strategic goals as the format for reporting OTR activities." 11th Status Report at 70. "Strategic Goal 3: Safeguard Records" was a place setting for Interior to summarize actions taken to preserve trust documents. Interior continued to provide updates to Strategic Goal 3 in their 12th and 13th quarterly submissions status reports to the Court. In its 14th Status Report, the agency stated that "[t]his Status Report modifies the format of reporting on each strategic goal identified

in Status Report to the Court Number Eleven. This report will include information on strategic goals when activity has occurred on those goals." 14th Status Report at 64 (Aug. 1, 2003). And in the 14th, 15th, 16th, 17th, and 18th Status Reports, Strategic Goal 3 disappeared without explanation. None of these reports mentions the possibility of water damage to untold number of records from a leaking roof, 350 boxes with mold, and the "recently uncovered" boxes with mouse droppings all detailed in the Abeita Letter.

Interior's failure to report these happenings appears deliberate. Plaintiffs' Emergency Notice was filed on April 28, 2004. Yet, Interior Defendants' 17th Status Report, filed on May 3, 2004, made no mention of the damage to the trust records. The 17th Status Report simply states: "During this reporting period, OTR received a letter from a union representing certain OTR employees. The union questioned a proposed records move to Kansas and accused OTR of improper record keeping procedures. Through a reply letter to the union, OTR's Director responded to the union's allegation." 17th Status Report at 32 (May 3, 2004).

The Court is not endowed with powers of divination that would allow it to interpret phrases such as "improper record keeping procedures," to mean actual damage and possible destruction of hundreds of boxes of trust records. And, of course, Interior's 18th Status Report to the Court, filed on August 2, 2004, contains no mention whatsoever of the safety and present condition of these trust records. Instead, Interior focuses its attention and resources on discrediting those who report incidents of document destruction by filing frivolous motions such as the instant Motion to Strike. Interior has once again proven that it can not be trusted and is in need of judicial oversight

This incident vividly demonstrates the marked contrast between how the Secretary of the Interior responds to the destruction and/or damage to hundreds of boxes with thousands of

11

Indian trust records and how the Secretary of the Treasury responded after the Court's initial contempt trial in 1999. When Secretary Rubin learned of the destruction of 162 boxes of Indian Trust Records, he immediately ordered an aggressive investigation and his General Counsel, Neal Wolin, ordered a full inquiry into the conduct of Treasury's lawyers in failing to tell the Court the true facts. See Cobell v. Norton, 157 F. Supp. 2d 82 (D.D.C. 2001) (describing the Treasury Department's comprehensive internal review process after the initial contempt). Ultimately, Treasury demonstrated to the Court the corrective actions that it took, including a mandatory training session for all 1,000 lawyers in the Treasury Department about the lessons learned. That is how responsible government officials and agencies act, and the Court has previously recognized the great strides that Treasury has made in this litigation. In 2001 the Court stated

> the corrective action taken by Treasury–including this report–stands in marked contrast to the dearth of corrective action taken by the Interior Department and the Justice Department. Neither of those agencies has provided any report whatsoever–under seal or otherwise–demonstrating that they have held *any* attorney accountable in *any* way whatsoever for *any* misconduct in this litigation."

Id. at 92 (emphasis in original).

The actions of Interior and Secretary Norton in this instance again demonstrate why the Court continues to believe that Interior sets the gold standard for mismanagement of a government agency.

It is therefore ORDERED that:

1) Defendants' Motion to Strike is hereby DENIED.

2) The monthly report of activities that OTR previously provided to the Special Master via the Department of Justice shall henceforth be filed with the Court, under penalty of

perjury, beginning with a report of activities for August 2004. These reports shall accurately reflect the state of trust records and report any problems that may negatively impact the safety of individual Indian trust records in a timely and comprehensive manner.[1]

       3) A complete report of the current status of the damaged records discussed herein shall be provided within ten days of this date.

    SO ORDERED.

    Signed by Royce C. Lamberth, United States District Judge, on September 9, 2004.

---

[1] On May 29, 2003, the Special Master relieved the Department of Justice of its obligation to file status reports on the grounds that he could "no longer rely on the accuracy of representations made in these reports." Letter from Special Master Alan L. Balaran to Department of Justice Attorney Amalia Kessler at 2.