# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELOUISE PEPION COBELL, <u>et al.</u>, | ) | |
| on her own behalf and on behalf of | ) | |
| all those similarly situated, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 96-1285 (RCL)** |
| | ) | |
| GALE NORTON, | ) | |
| Secretary of the Interior, <u>et al.</u>, | ) | |
| | ) | |
| **Defendants.** | ) | |

_____)

## MEMORANDUM AND ORDER

This matter comes before the Court on the defendants' Motion [2792] to Reconsider the October 22, 2004 Memorandum Opinion (the "motion for reconsideration"). Two related filings are: (1) the defendants' Motion [2765] to File the Declaration of Michael Hackett Under Seal; and (2) the defendants' Motion [2781] to File the Declaration of Nina Sisquieros Under Seal. These filings once again place before the Court the matter of Interior's misinterpretation of this Court's Order issued September 29, 2004, as clarified by the Court's Orders of October 1, 2004, October 22, 2004, and November 17, 2004, and the ensuing controversy involving Interior's alleged bad-faith withholding of trust checks. The Court will take this opportunity to address this matter in some detail in the discussion below.

Upon consideration of the defendants' Motions [2765], [2781] to File the Declarations of Michael Hackett and Nina Sisquieros Under Seal, the oppositions thereto, the replies, the applicable law, and the entire record in this case, the Court concludes that the defendants'

Motions [2765], [2781] will be granted.

The defendants made certain redactions on both the Hackett and Sisquieros declarations and requested an order allowing them to file the unredacted versions of these declarations under seal to protect sensitive information.  But the defendants have filed with the Court and served upon the plaintiffs only the redacted copies of the declarations of Michael Hackett and Nina Sisquieros,[1] which, as the plaintiffs correctly argue, is inconsistent with LCvR 5.1(j)(1).  A party must file an appropriate motion and obtain an order from the Court in order to file documents under seal.  Further, Local Civil Rule 5.1(j)(1) requires that the party seeking such a sealing order must attach to his or her motion to seal a copy of the document for which the sealing order is sought so that the Court can, upon review of the document, determine whether it warrants filing under seal.  "The document will be treated as sealed, pending the outcome of the ruling on the motion."  LCvR 5.1(j)(1).  Here, however, the defendants' failure to file with the Court unredacted copies of the Hackett and Sisquieros affidavits, while technically improper under the Local Rule, is harmless enough and easily remedied by requiring that they do so now and that they forward copies of the unredacted Hackett and Sisquieros affidavits herein placed under seal to the plaintiffs.  The redactions do not impede the Court's ability to consider the Hackett and Sisquieros declarations in the course of analyzing the issues in relation to which those declarations were filed.  None of the information relevant to those issues has been redacted.

Having thus disposed of the relatively simple matter of the defendants' motions to seal,

---

[1]The defendants filed the redacted declaration of Michael Hackett as Exhibit 1 attached to *Defendants' Notice* [2764] *Regarding Plaintiffs' Emergency Notice Regarding the Failure to Distribute Trust Checks*; and the defendants filed the redacted declaration of Nina Sisquieros as Exhibit 1 attached to *Defendants' Notice* [2782] *Regarding Plaintiffs' Emergency Notice Regarding Ongoing Retaliation in Violation of This Court's Orders*.

the Court now turns to the defendants' motion for reconsideration.  Upon consideration of the

defendants' motion, the opposition thereto, the reply, the applicable law, and the entire record in

this case, the Court concludes that disposition of the defendants' motion to reconsider this

Court's October 22, 2004 Memorandum Opinion shall be temporarily deferred.  The defendants

will be afforded the opportunity to request an evidentiary hearing on the matters set forth in their

motion.  Should the defendants elect not to call for such a hearing, their motion for

reconsideration will be denied.  The Court's reasoning is set forth below.

## BACKGROUND

On September 29, 2004, this Court ordered that Interior discontinue communications with

members of the plaintiff class regarding the sale, exchange, transfer, or conversion of Indian trust

land until a proper notice appraising the class members of their rights in this litigation could be

fashioned by the parties and approved by the Court.  Almost immediately following the issuance

of this order, on September 30, 2004, Interior disseminated a notice throughout its Bureau of

Indian Affairs ("BIA") purporting to interpret the scope of this Court's Order and to explain how

the Order should be implemented.  See *Def.'s Request* [2712] *for an Emergency Status

Conference*, Ex. 1 (Notice), Sept. 30, 2004.  Importantly, this Notice made no mention of any

action to be taken regarding the distribution of trust-related payments to Indian beneficiaries.

At a Status Conference held by the Court on October 1, 2004, however, the plaintiffs

advised the Court that employees of Interior's Bureau of Indian Affairs ("BIA") were

withholding checks from Indian trust beneficiaries and citing this Court's Order of September 29,

2004 as the reason for doing so.  The Court stated unequivocally in open court that its Order

concerning land-sale-related communications could not possibly be construed to require the

withholding of trust checks.  See Stat. Conf. Tr., Oct. 1, 2004, at 9, 12 ("THE COURT: [...] Why

did anybody even talk about withholding checks?  That's preposterous.  I had no discussion

whatsoever in either the 2002 opinion or the opinion this week about holding up checks.  The

very thought that the Secretary and her delegates would do that is just beyond my

comprehension. ... So to stop [trust checks] and [say] that it's because of my order is a flat-out

lie.").  In response, Sandra Spooner, counsel for Interior, assured the Court that "[t]he checks are

not being withheld ... the Secretary and her delegates are not doing that."  See id. at 9.  Interior

distributed its Second Notice explaining this Court's Orders to the BIA on October 4, 2004.  Like

the First Notice, the Second Notice made no mention of trust checks, a fact which this Court

finds disturbing in light of the proceedings at the October 1, 2004 Status Conference.  See Def.'s

Notice of Filing [2723], Ex. 1 at 1–3, filed Oct. 12, 2004.

    Furthermore, despite the representations of counsel at the October 1, 2004 Status

Conference, the plaintiffs thereafter filed with the Court several notices detailing Interior's

ongoing withholding of checks in violation of the Court's explicit instructions.[2]  The Court held

yet another Status Conference on October 6, 2004, to address further confusion at Interior as well

as the check-withholding issues raised by the plaintiffs, at which the Court again made clear that

its orders in no way required that trust checks be withheld.  Interior subsequently distributed a

---

[2] See, e.g., *Plaintiffs' Request* [2717] *for Second Emergency Status Conference to Address Ongoing Retaliation Taken by Interior Secretary Gale Norton Against Individual Indian Trust Beneficiaries*, filed Oct. 5, 2004; *Plaintiffs' First Notice* [2718] *of Supplemental Information Regarding Plaintiffs' Request for Second Emergency Status Conference to Address Ongoing Retaliation Taken by Interior Secretary Gale Norton Against Individual Indian Trust Beneficiaries*, filed Oct. 6, 2004; *Plaintiffs' Second Notice* [2719] *of Supplemental Information Regarding Plaintiffs' Request for Second Emergency Status Conference to Address Ongoing Retaliation Taken by Interior Secretary Gale Norton Against Individual Indian Trust Beneficiaries*, filed Oct. 6, 2004; *Plaintiffs' First Notice* [2721] *of Supplemental Information Regarding Ongoing Retaliation Taken by Interior Secretary Gale Norton Against Individual Indian Trust Beneficiaries*, filed Oct. 8, 2004.

Third Notice to the BIA on October 8, 2004, which expressly superseded the First and Second

Notices in their entirety.  See Def.'s Notice of Filing [2723], Ex. 1 (Notice #3), at 4–6, filed Oct.

12, 2004.  In this Third Notice, Interior finally addressed the issue of trust check withholding in

the following paragraph:

> It has also been brought to our attention that some individuals appear to be
> confused about any effect that the court's most recent Orders may have
> upon the payment of checks to individual Indians.  Please be advised that
> the court has made it clear that the Order does not affect our normal
> processes of receiving payment checks on behalf of individual Indians, the
> processing of those checks or the subsequent payment of funds to individual
> Indian recipients.  Please utilize your currently established business
> practices to process Indian funds in an effective and expeditious manner.  In
> addition, please communicate with and reassure individual Indians that there
> are no court-related delays in processing funds.

Def.'s Notice of Filing [2723], Ex. 1 at 5, filed Oct. 12, 2004.

This rare bit of candor from Interior would be more reassuring were it not for the strange

timing of its release.  Again, on October 1 the Court explicitly instructed Interior that trust

payments to individual Indians were not to be withheld.  But Interior's Second Notice, released

October 4, made no mention of trust checks at all.  Interior waited an additional four days to

distribute the Third Notice to the BIA, so that the Court's instruction against the withholding of

trust checks was not relayed to BIA's offices in Indian country for eight full days after it was

announced.  And the plaintiffs have adduced evidence that, during this eight-day lag, BIA

employees continued to withhold trust checks from individual Indian beneficiaries.

One example to be found among the plaintiffs' various filings is the First Affidavit of

Francelia Phillips, filed with the Court on October 8, 2004.  Therein, Ms. Phillips averred that on

several occasions between October 6, 2004 and October 8, 2004, at least two employees in the

5

rental office of the Bureau of Indian Affairs' Winnegabo agency represented that her Indian trust check would be or was then being withheld as a result of this Court's Order of September 29, 2004.   At least one of those employees referred to this Court's Order as a "gag order."  Ms. Phillips did not receive her trust check until the week of October 18, 2004.

On November 19, 2004, the defendants filed with the Court the Affidavit of Michael Hackett, supposedly in response to the allegations set forth in the Phillips Affidavit.  Mr. Hackett's affidavit, however, does not address the incidents that reportedly occurred between October 6, 2004, and October 8, 2004; but rather only discusses events occurring after October 12, 2004.  The incidents described in the Phillips affidavit, if true, constitute blatant and reprehensible violations of this Court's clear directions.  These occurrences are made more disturbing by the necessary conclusion that Interior's upper management must have been somehow involved.

A second example is found in the affidavit of Carmen Patricio, filed on November 15, 2004 as an exhibit to the plaintiffs' *Emergency Notice* [2761] *Regarding Ongoing Retaliation in Violation of this Court's Orders*.  Ms. Patricio explains that around October 5, 2004, she attempted to contact her local BIA field office, the Papago Agency in Arizona, regarding the status of her IIM trust check; and that one Liz Siow told her that the BIA was prohibited from discussing trust checks by this Court's Order.  See Patricio Aff. at ¶ 3.  Patricio, like Phillips, was advised that this Court had imposed a "gag order" on the BIA.  See *Pl.'s Emergency Notice* [2761] *Regarding Ongoing Retaliation in Violation of this Court's Orders*, Attch. 2 (Rempel Aff.), at ¶ 2; *Pl.'s Second Notice* [2719] *of Supplemental Information Regarding Pl.'s Request for Second Emergency Status Conference to Address Ongoing Retaliation Taken by Interior*

*Secretary Gale Norton Against Individual Indian Trust Beneficiaries* ("Pl.'s Second Notice"),

Attch. 2 (Evans Aff.), at ¶ 6 (Ms. Patricio 'was told that there is a gag order and to contact

plaintiffs['] counsel.").

      The defendants filed the affidavit of Nina Sisquieros, superintendent of the Papago

Agency, in response to Ms. Patricio's affidavit.  <u>See</u> *Def.'s Notice* [2781] *Regarding Plaintiffs'*

*Emergency Notice Regarding Ongoing Retaliation in Violation of this Court's Orders*, Ex. 1

(Sisquieros Decl.).  However, like the Hackett affidavit discussed above, the Sisquieros affidavit

alleges no facts to rebut the plaintiffs' specific evidence that trust checks and information

regarding trust checks was being withheld from IIM trust beneficiaries by the BIA during the

period between October 1 and October 8, 2004.  In fact, Sisquieros does not allege any facts

regarding the exchange between Patricio and Liz Siow on October 5, 2004.  Rather, Sisquieros

makes only the broad statements that "[a]t no time did BIA or the Papago Agency attempt to

delay or withhold any royalty payments," and that "Ms. Patricio's trust payments were processed

in the ordinary course of business."  <u>See</u> Sisquieros Decl. at ¶¶ 9–10.  Neither of these statements

address Ms. Patricio's allegation that BIA employees refused to give her information about her

trust check on October 5, and cited this Court's Order as the reason.  Mr. Rempel's affidavit

corroborates Ms. Patricio's claims, as he attests that he had to explain the scope and effect of this

Court's Order to Ms. Siow before she would "reluctantly" answer Ms. Patricio's questions.  <u>See</u>

Rempel Aff. at ¶ 6.  As neither the Hackett nor the Sisquieros affidavit rebut the plaintiffs'

allegations, the plaintiffs' claims concerning the withholding of trust checks stand uncontested by

the defendants.

      Even more distressingly, these two examples seem to be merely representative of a much

larger number of similar occurrences during the period between October 1 and October 8.  Ms. Evans, for example, filed an affidavit in which she details conversations with "LT" and "IK," both individual Indian trust beneficiaries who had contacted the BIA around October 5, 2004 regarding their trust checks and were rebuffed.  See Pl.'s Second Notice, Attch. 2 (Evans Aff.), at ¶¶ 4–5.  "LT," like Phillips and Patricio, was told that the BIA could not communicate with him because of this Court's "gag order."  See id., at ¶ 4.

Other evidence corroborates the pattern described by the above-discussed affidavits. Attached to the defendants' motion for reconsideration is a copy of a notice that was previously submitted to the Court during a status conference related to these matters.  The notice, which was affixed to the door of the BIA's Anadarko Agency office, notified Indians that the office was closed to all but "non-trust matters."  See Def.'s Mot. to Reconsider the Court's October 22, 2004 Memorandum Opinion ("Def.'s Mot."), Ex. 4 (Anadarko Notice).  Elouise Cobell submitted an affidavit detailing her October 1 conversation with Ross Denny, superintendent of BIA's Blackfeet Agency office during which Denny advised Cobell that "he had orders from the higher ups that no information can be provided to individual Indian [trust] account holders as a result of a Court Order this week."  *Pl.'s Request for Second Emergency Status Conference—to Address Ongoing Retaliation Taken by Interior Secretary Gale Norton Against Individual Indian Trust Beneficiaries*, Attch. 2 (Cobell Aff.) (emphasis added).

Cobell called the Blackfeet Agency again on October 4, after the Court issued its check-withholding admonition and instructions regarding the implementation of its land-sales Order at the October 1 Status Conference, and was again advised, this time by acting-superintendent Cliff Hall, that "no information could be provided ... as a result of a Court Order."  Id.  Margaret

8

Coburn, another individual Indian trust beneficiary, also contacted Mr. Hall at the Blackfeet

agency on October 4;  and she too was told that this Court's Order prevented him from giving her

any information at all.  See id., Attch. 3 (Coburn Aff.).  There is also evidence in the record that

the BIA's Turtle Mountain Agency in Belcourt, North Dakota, was effectively shut down to

individual Indian trust beneficiaries even after the October 1, 2004 Status Conference.  See Pl.'s

Second Notice, Attch. 1 (Cain Aff.).  Shirley Cain, a tribal judge for the Turtle Mountain Band of

Chippewa Indians, filed an affidavit describing an October 5, 2004 conversation with Valentino

Cartwright, a realty specialist at the Turtle Mountain Agency.  See id. at ¶¶ 7–8.  When Cain

inquired about certain pieces of IIM trust property for the purposes of deciding a case pending

before the Tribal Court, Cartwright informed her that "due to the recent ruling in the *Cobell v.

Norton* case, he was unable to give [Cain] any type of information about ... trust land."  Id. ¶ 9.

This evidence, taken together, demonstrates that even after the Court's statements at the October

1, 2004 Status Conference, BIA employees continued to withhold trust checks, information

concerning trust checks, and other information unrelated to the subject-matter of this Court's

September 29, 2004 Order.  What remains unclear is the reason that these employees would

taken these actions after the Court vigorously instructed Interior on the proper implementation of

its Order on October 1.

Interior's First and Second Notices, distributed to BIA field offices on September 30 and

October 4, respectively, while not explicitly instructing BIA employees to withhold trust checks

from Indian trust beneficiaries, certainly do not forbid such practices.  In fact, the silence of the

Second Notice on the check-withholding issue is quite distressing considering that it was

distributed after a fairly intense discussion of the matter at the October 1, 2004 Status

Conference.  What remains undisputed, however, is the plaintiffs' claim, evidenced by the documents discussed above, that Indian beneficiaries were told that trust checks and information regarding trust checks were in fact being withheld during the period between the October 1, 2004 Status Conference, and October 8, 2004, when Interior's third notice was forwarded to the BIA. Interior was apparently unable to move as swiftly in implementing the clarifications to this Court's Orders as it was in demanding them.

Tellingly, Interior was able to quite quickly draft and disseminate a lengthy set of instructions regarding the implementation of the Court's five-page long September 29, 2004 Order—in fact, it took no more than one day.  But for some reason, the same agency was bogged down for a full week attempting to come up with instructions for the implementation of (1) the Court's single paragraph Order issued October 1, 2004 and (2) the Court's single-sentence admonition, made in open court on October 1, 2004, that BIA could not withhold checks based on any court order.  The week-long time lag in the later instance is inexcusable.  No doubt, this time lag is to blame for whatever damage the Indians sustained as a result of BIA withholding their trust checks.  One might even go so far as to draw the inference that this delay was intentional retaliation by the Secretary and her agents against the members of the plaintiff class.

Subsequently, following additional status conferences and redundant clarifications at the behest of Interior, this Court approved a form of notice and a waiver of the right to consult with class counsel to be distributed with such communications going forward.  See Cobell v. Norton, 224 F.R.D. 266 (D.D.C. Oct. 22, 2004) (approving notice); see also Memorandum Opinion and Accompanying Order, issued Sept. 29, 2004; Order, issued Oct. 1, 2004,; Cobell v. Norton, ___ F.R.D. ___, 2004 WL 2603555 (D.D.C. Nov. 17, 2004).  The details of this pained process of

clarification and elaboration need not be repeated here, if for no other reason than to avoid

further confusing Interior.  In the process of discussing and approving this notice, however, the

Court, in its October 22, 2004 Memorandum Opinion, made certain statements that are the

subject of the defendants' motion for reconsideration.  Specifically, the Court included the

following paragraphs in its discussion of the factual background of the issues addressed in the

October 22, 2004 Memorandum opinion.

> It came to the Court's attention that, initially, Interior felt that
> compliance with the September 29, 2004 Order required Interior to shut
> down the Bureau of Indian Affairs entirely.  Field offices were closed and
> notices were affixed to their doors explaining that no business could be
> conducted due to this Court's Order of September 29, 2004; and apparently
> all live telephone operators were replaced with a recorded message of the
> same stripe.  Most appallingly, the entire process by which payments are
> made to IIM account holders from lease revenues, royalties, and so forth
> was similarly shut down.  These actions, of course, were taken pursuant to a
> deliberate, infantile, and frankly ridiculous misinterpretation of this Court's
> straightforward Order.
>
> Although the Secretary claims that she orally ordered that no payments
> to Indians be withheld, her initial written instructions to Interior employees
> were silent on the issue.  Further, the tenor of the Secretary's instructions
> apparently led many employees to hold payments and, in numerous cases, to
> tell the Indian beneficiaries that their checks were being withheld as a direct
> result of this Court's Order.  As the Court forcefully explained to the
> Secretary's counsel at a hearing held by the Court on October 1, 2004, such
> statements were lies.  The Secretary's addition, in her instructions
> promulgated to Interior on September 30, 2004, of items 2 through 8 on the
> list of subjects of communication between Interior and Indians restricted by
> this Court's Order, before seeking any clarification from the Court, is yet
> another example of how the Secretary treats these Indian beneficiaries—one
> so far beyond the pale that it led the Court to inquire of defense counsel
> whether the Secretary had "decided to declare war on the Indians that
> brought this case[.]"
>
> The Secretary's claim that she was unsure what the Court intended in
> its September 29, 2004 Order is now, as it was then, totally bogus.  What is
> clear is that the Secretary, in a fit of pique and perhaps anger at both the
> Court and the plaintiffs for the issuance of the September 29 Order, simply
> retaliated against the Indian beneficiaries under the thin disguise of a

> preposterous and facially false "interpretation" of the Court's Order.  That
> this "interpretation" was not crafted in good faith is clear, but the
> Secretary's motive for her bad faith interpretation and retaliation passes
> understanding.

Cobell, 224 F.R.D. at 270–71.  The defendants argue that the Court's statements in the above-

quoted paragraphs are "unsupported by facts presented to the Court by the parties," Def.'s Mot.

to Reconsider ("Def.'s Mot.") at 1, and that, as such, "[j]ustice requires that the Court reconsider

its statements."  Id. at 18.  The defendants argue that justice requires such reconsideration

because, although they concede that the Court's statements at issue here are dicta, "the Court's

conclusions regarding retaliation will become the 'lore' of the case, and Plaintiffs will now

routinely cite the Court's language ... as if it were conclusively established."  Def.'s Mot. at 1–2.

## DISCUSSION

Of course, the statements made in the October 22, 2004 Memorandum Opinion with

which the defendants' motion for reconsideration is concerned do not constitute any sort of final,

appealable judgment on the merits in this case.  In fact, the Court's statements are no judgment at

all, and thus have no legal effect.  Rather, as the defendants concede, the Court's statements

challenged in this motion "were not used to support the October 22, Order which accompanied

the Memorandum Opinion and are thus dicta."  Def.'s Mot. at 1.  Nevertheless, the Court will

begin the discussion of this motion by setting forth the legal standards governing motions for

reconsideration of non-final judgments.  Rule 54(b) governs reconsideration of orders that do not

constitute final judgments in a case.  See Campbell v. United States Dep't of Justice, 231 F.

Supp. 2d 1, 6 n.8 (D.D.C. 2002) (Rule 54(b) "addresses interlocutory judgments"); Moore v.

Hartman, 2004 WL 1921964 at *3 (D.D.C. 2004) (explaining that Rule 54(b) governs the

disposition of requests for reconsideration of interlocutory orders); <u>APCC Servs.</u>, 281 F. Supp.

2d at 44 (same).  Rule 54(b) provides, in relevant part, that:

> any order or other form of decision, however designated, which adjudicates
> fewer than all the claims or the rights and liabilities of fewer than all the parties
> ... is subject to revision at any time before the entry of judgment adjudicating
> all the claims and the rights and liabilities of all the parties.

FED. R. CIV. P. 54(b).

Importantly, the standard for reconsideration of interlocutory orders under Rule 54(b) is

distinct from the standard applicable to motions for reconsideration of final judgments.

"[C]ourts have more flexibility in applying Rule 54(b)" than in determining whether

reconsideration is appropriate under Rules 59(e) and 60(b).  <u>Moore</u>, 2004 WL 1921964 at *3.

For example, our Court has held that Rule 54(b) reconsideration may be granted "as justice

requires."  <u>APCC Servs.</u>, 281 F. Supp. 2d at 44; <u>Campbell</u>, 231 F. Supp. 2d at 7 (quoting

<u>Childers v. Slater</u>, 197 F.R.D. 185, 190 (D.D.C. 2000)); <u>M.K. v. Tenet</u>, 196 F. Supp. 2d 8, 12

(D.D.C. 2001).

Other courts apply a variety of different standards when confronted with a motion for

reconsideration under Rule 54(b).  <u>See generally</u> <u>Moore</u>, 2004 WL 1921964 at *3 n.7 (surveying

various standards); <u>Motorola, Inc. v. J.B. Rodgers Mechanical Contractors, Inc.</u>, 215 F.R.D. 581

(D. Ariz. 2003) (same); <u>see, e.g.</u>, <u>Gallant v. Telebrands Corp.</u>, 35 F. Supp. 2d 378, 394 (D.N.J.

1998) (predicating Rule 54(b) reconsideration on whether "the parties proffer 'supplemental

evidence or new legal theories'") (quoting <u>United States ex rel. Haskins v. Omega Institute, Inc.</u>,

25 F. Supp. 2d 510, 512 (D.N.J. 1998)); <u>Neal v. Honeywell</u>, 1996 WL 627616, at *2 (N.D. Ill.

1996) (noting that Rule 54(b) motions for reconsideration are "best characterized as a common

law motion for reconsideration" to be granted where the court "has patently misunderstood a

party," "has made a decision outside the adversarial issues presented to the Court by the parties,"

"has made an error not of reasoning but of apprehension," or where "a controlling or significant

change in the law or facts [has occurred] since the submission of the issue to the Court") (quoting

Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1191 (7th Cir. 1990)).

"[R]econsideration will generally be denied unless the moving party can point to controlling

decisions or data that the court overlooked—matters, in other words, that might *reasonably be*

*expected to alter the conclusion reached by the court*."  Shrader v. CSX Transp., Inc., 70 F.3d

255, 257 (2d Cir. 1995).

    This Court has previously announced that it will adhere to the "as justice requires"

standard for determining whether to grant reconsideration of an interlocutory order under Rule

54(b).  See Cobell, 224 F.R.D. at 272.  And again, asking "what justice requires" amounts to

determining, within the Court's discretion, whether reconsideration is necessary under the

relevant circumstances.  This Court has also previously noted that district courts retain "broad

discretion to grant or deny a motion for reconsideration."  Cobell v. Norton, 226 F. Supp. 2d 175,

177 (D.D.C. 2002) (citing Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 233–34 (1995)).  This

Court will only grant the defendants' motion, then, if it finds in its discretion, that "justice [so]

requires."

    Here, the defendants argue, essentially, that "justice requires" that the Court redact one of

its Opinions in order to prevent the plaintiffs from citing language that they find objectionable.

The challenged statements formed no part of the basis of the Court's decision detailed in the

October 22, 2004 Memorandum Opinion, nor does the content of the Order issued along with

that Opinion depend in any way on the statements at issue here.  Indeed, the only harm that the defendants claim is perpetrated by the statements is the possibility that the defendants may have to read those statements again and again as the plaintiffs incorporate portions of the above-quoted language into future pleadings.  In order for justice to require reconsideration, logically, it must be the case that, some sort of "injustice" will result if reconsideration is refused.  That is, the movant must demonstrate that some harm, legal or at least tangible, would flow from a denial of reconsideration.  For example, if a court issued an injunction that prevented a party from taking certain kinds of actions in the future, and the court's conclusion that such an injunction was warranted under the circumstances was based on application of an incorrect legal standard; the proponent of a motion for reconsideration would be able to demonstrate that actual harm would result if reconsideration were refused in the form of a continuing legal restraint on conduct that would not exist but for the Court's refusal to reconsider its actions.

Here, however, the only potential "harm" alleged by the defendants is that the Court's statements will become the "lore of the case," and, as such, will be routinely repeated in future filings by the plaintiffs.  But the defendants make no argument to support the notion that this result, the only result that would flow from this Court's denying the defendants' motion for reconsideration, would somehow harm the defendants or be otherwise unjust.  Thus, there is no showing that failure to reconsider the challenged language from the October 22, 2004 Memorandum Opinion would result in any "injustice" at all.  It follows that, under the circumstances, "justice" cannot require reconsideration.  On this application of the relevant legal standard, then, this Court would deny the defendants' motion.

However, the decision whether to reconsider its interlocutory rulings is within the Court's

15

discretion.  So, even if the appropriate legal standard does not indicate that reconsideration is

warranted, the Court may nevertheless elect to grant a motion for reconsideration if there are

other good reasons for doing so.  One such reason might be that the Court, in dicta, drew

incorrect inferences from evidence in the record.  If the Court were persuaded that its inferences

were in error, then the Court might wish to alter the incorrect dicta so that its Opinion would

present as accurate a representation of the factual background as possible.  The Court will, for

this reason, briefly discuss the defendants' arguments to determine whether they persuade the

Court to reconsider its statements.

A court can only draw its inferences and craft its descriptions of the factual background

of a case from evidence placed in the record by the parties.  With respect to the statements about

the closing of BIA offices and the refusal by BIA employees to discuss trust matters or trust

checks with Indian beneficiaries, the Court finds that the only factual allegations in the record

that address the period between October 1 and October 8, 2004, are those put there by the

plaintiffs.  Upon review of this evidence, discussed above, the Court finds that a truly disturbing

trend is indicated.  Indians were turned away from BIA offices, without regard to the nature of

their inquiries, and this Court's narrowly tailored Order was cited as the reason.  Indian trust

beneficiaries calling to inquire about the status of their regular trust income payments were told

that BIA could not speak to them because this Court had imposed a "gag order."  All the factual

evidence before the Court indicates that beneficiaries were told that payments would be delayed

because of this Court's Order, and Indians were harmed by those false statements.  These facts

are unrebutted by the defendants.

Many Indians depend on their IIM trust payments as an important part of their

16

income—an income that, on average, is meager to begin with.  These Indians are the poorest

minority group in the country.  The idea that Interior would either instruct or allow BIA to

withhold trust payments, and then to stonewall the Indians who dared to ask why, is an obscenity

that harkens back to the darkest days of United States-Indian relations.  But this idea, no matter

how profane and repugnant to the foundational principles of our government, is amply supported

in the record by evidence that remains uncontested by any factual proffer from Interior.  The

Court is offended that the individuals responsible for these acts would cite the Court's Orders as

justification; but the perniciousness and irresponsibility demonstrated by blaming the Court pales

in comparison to the utter depravity and moral turpitude displayed by these individuals'

willingness to withhold needed finances from people struggling to survive and support families

on subsistence incomes.  These actions, whether Interior ordered them taken or merely turned a

blind eye and allowed them to occur, are a testament to the startling inhumanity of government

bureaucracy.  In light of this evidence, the Court declines to revisit its October 22, 2004

statements on these matters.

Now the defendants also contend that the Court inappropriately inferred that the BIA's

withholding of trust checks from IIM beneficiaries was an intentional act of retaliation by the

Secretary of the Interior.  To be sure, defense counsel Sandra Spooner represented on the record

that the Secretary had not issued an order to BIA mandating that trust checks should be withheld.

This, however, is the only factual assertion in the record directly addressing the Secretary's

actions following the issuance of the Court's September 29, 2004 Order.

It is an established general principle of law that "[i]t is reasonable to infer that a person

ordinarily intends the natural and probable consequences of acts knowingly done or knowingly

omitted. So unless the contrary appears from the evidence, [one] may draw the inference that [a person] intended all the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any act knowingly done or knowingly omitted ...." 2A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 497.1; see Whitfield v United States, 92 U.S. (2 Otto.) 165 (1875); Wilson v City Bank, 84 U.S. (17 Wall.) 473 (1873); Duke v United States , 90 F.2d 840, (4th Cir. 1937); Cleo-Syrup Corp. v Coca-Cola Co., 139 F.2d 416 (8th Cir. 1943). Another relevant concept is found in tort law, where the doctrine of *res ipsa loquitor* allows an inference of negligence where, although direct evidence of negligence is lacking, an event giving rise to a negligence claim is of a type that does not normally occur in the absence of negligence. See Jesionowski v. Boston & M. R. R., 329 U.S. 452, 456 (1947). These legal principles exist and are routinely applied because direct evidence of a person's intent is often very difficult to acquire. Here the Court, adhering to general legal principles, and in the absence of direct evidence of the Secretary's intent, made an inference based on the evidence at its disposal.

The following facts are clearly established in the record. As of the status conference held by the Court on October 1, 2004, the plaintiffs had alleged that BIA employees were withholding trust checks from Indian trust beneficiaries and citing this Court's Order as the justification for doing so. Further, an email that Special Trustee Ross Swimmer forwarded to various Interior employees in which Swimmer explained that the Court's September 29, 2004 Order might prohibit the distribution of trust checks demonstrates that at least some of the higher management at Interior: (1) thought trust checks ought to be withheld; or at least (2) knew that some Interior employees might think that trust checks ought to be withheld. At the October 1 status

18

conference, the Court explained, in no uncertain terms, that trust checks were not to be withheld and that its September 29, 2004 Order had nothing to do with trust payments. Between October 1, 2004 and October 4, 2004, a set of instructions for implementing this Court's September 29, 2004 Order was drafted and, presumably, approved (or at least reviewed) by the Secretary of the Interior. That set of instructions, disseminated throughout the BIA on October 4, made no mention of whether or not trust checks should be withheld pursuant to the Court's Order. During the period between October 1, 2004 and October 8, 2004, a number of individual Indian trust beneficiaries were denied either their trust checks or information regarding their trust checks by BIA employees who cited this Court's Order as justification.

These facts clearly demonstrate that it was foreseeable to the Secretary that trust checks might be withheld by BIA employees in misplaced reliance on this Court's Order. Applying the above-stated legal principles to these facts, the Court finds that the occurrences during the period between October 1 and October 8, 2004, documented in the plaintiffs' evidence and discussed above, are unlikely to have happened in the absence of either negligence or intentional action by the upper-management at Interior, over whom the Secretary has direct control and oversight. This finding is consistent with the logical structure of the tort-law doctrine of res ipsa loquitur. With respect to the Secretary's intent, one of two conclusions follows by inference. Either (1) the Secretary was grossly negligent when she failed to add a proscription against the withholding of trust checks to the set of instructions distributed by Interior to the BIA on October 4, 2004 when the risk that checks would be withheld in the absence of such a proscription was reasonably foreseeable; or (2) the Secretary intentionally omitted a proscription against the withholding of trust checks from the October 4 instructions despite her knowledge that checks would likely be

withheld in the absence of such a proscription.  Taking into consideration the lengthy record in

this case, see, e.g., Cobell, 224 F.R.D. at 283–85 (detailing various incidents of questionable

conduct by the defendants and their attorneys in this litigation), the Court is persuaded that

conclusion (2) is more likely to be true than conclusion (1).  There is absolutely nothing in the

record, other than Sandra Spooner's unsubstantiated assertion, to rebut the Court's inference; and

thus the Court has before it no persuasive reason to reexamine its statements in the October 22,

2004 Memorandum Opinion.

 However, it is not outside the realm of possibility that a persuasive argument for

reconsideration might be made on the basis of additional, heretofore unrevealed, evidence.  The

only evidence that might persuade the Court to reassess its determination about the Secretary's

actions following the October 1 status conference would be direct evidence of the Secretary's

intent.  Such evidence, of course, can only be provided by the Secretary herself.  If the Secretary

wishes to testify at an evidentiary hearing on these matters, she is hereby invited to do so.  Until

such time as the Court has a shred of evidence to rebut the evidence currently in the record upon

which the Court bases its inference regarding the Secretary's actions, however, the Court finds no

basis upon which to grant the defendants' motion for reconsideration.

 In light of the defendants' current failure to rebut or even address the plaintiffs'

allegations regarding BIA's withholding of trust checks between October 1 and October 8, the

Court will treat those allegations as conceded.  However, should the defendants so desire, the

Court is willing to conduct an evidentiary hearing concerning the plaintiffs' allegations of BIA's

misconduct.  Given the pendency of other matters in this litigation, however, the Court will

require that such a request be made sooner rather than later.  If the defendants elect not to call for

an evidentiary hearing at which to present the Secretary's testimony regarding her actions following the October 1, 2004 status conference, then the defendants' motion for reconsideration will be denied for the foregoing reasons.

In accordance with the foregoing, it is hereby

ORDERED that the defendants must, within ten (10) days of this date, notify the Court of the defendants' decision to either (1) concede the plaintiffs' allegations discussed in this Memorandum or (2) request an evidentiary hearing concerning the plaintiffs' allegations discussed in this Memorandum.

Upon consideration of the defendants' Motion [2765] to File the Declaration of Michael Hackett Under Seal, opposition thereto, the reply, the applicable law, and the record herein, it is hereby

ORDERED that the defendants' Motion [2765] to File the Declaration of Michael Hackett Under Seal is GRANTED.

Upon consideration of the defendants' Motion [2781] to File the Declaration of Nina Sisquieros Under Seal, the opposition thereto, the reply, the applicable law, and the entire record herein, it is hereby

ORDERED that the defendants' Motion [2781] to File the Declaration of Nina Sisquieros Under Seal is GRANTED.

The defendants having filed only the redacted copies of the declarations of Michael Hackett and Nina Sisquieros on the record in this case, and the defendants having only served the redacted copies of the declarations of Michael Hackett and Nina Sisquieros on the plaintiffs, it is hereby

21

ORDERED that the defendants' must, within five (5) days of this date, file unredacted copies of the declarations of Michael Hackett and Nina Sisquieros under seal with the Court and provide copies of the unredacted declarations of Michael Hackett and Nina Sisquieros to the plaintiffs.

SO ORDERED.

Signed by Royce C. Lamberth, United States District Judge, February 7, 2005.