# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELOUISE PEPION COBELL, et al., | ) | |
| on her own behalf and on behalf of | ) | |
| all those similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 96-1285 (RCL) |
| | ) | |
| GALE NORTON, | ) | |
| Secretary of the Interior, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on the plaintiffs' *Motion* [2562] *to Compel
Deposition Testimony of Anson Baker and Request for Sanctions* ("motion to compel"); as well
as on the defendants' *Motion* [2811] *for a Protective Order Regarding Plaintiffs' Notices of
Deposition of Howard Tipton, Brian Burns, Pat Moloney [sic], Thao Le, and John Messano*; the
defendants' *Motion* [2816] *for a Protective Order Regarding Plaintiffs' Notices of Deposition of
James Cason, Mark Limbaugh, Jeffrey Jarrett, Timothy Vigotsky, Kathryn Clement, Steven
Williams, Donald Murphy, Mary Kendall Adler, William Ragsdale, Francis Cherry, Jr., Robert
Doyle, Norma Campbell, Regina Lawrence, Ethel Abeita, Thomas Kerstetter, and Wendall
Galvan*; and the defendants' *Motion* [2818] *for a Protective Order Regarding Plaintiffs' Notice
of Deposition of Donnie McClure*.[1]

---

[1]Because these three motions for protective orders are identical in substance, differing only as to the
deposition notices to which they apply, they will be referred to collectively as the "motions for protective orders." If
any individual deposition notice requires individualized discussion, that notice will be referenced by the name of the
proposed deponent. Additionally, although these motions for protective orders have not been fully briefed by the
parties, the Court finds that the legal issues governing their resolution are sufficiently clear and applicable to all three

Related to this matter are the plaintiffs' *Motion [2653] for Expedited Consideration of Plaintiffs' Motion to Compel Deposition Testimony of Anson Baker and Request for Sanctions* ("motion to expedite"), and the defendants' *Motion [2573] for Leave to File a Surreply in Opposition to Plaintiffs' Motion to Compel Deposition Testimony of Anson Baker and Request for Sanctions* ("motion for leave to file surreply").  Upon consideration of these motions, the oppositions thereto, any replies, the applicable law, and the entire record herein, the Court concludes that the plaintiffs' motion to compel shall be GRANTED IN PART AND DENIED IN PART; that the defendants' motions for protective orders shall be DENIED; that the plaintiffs' motion to expedite shall be DENIED AS MOOT; and that the defendants' motion for leave to file surreply shall be DENIED.  The Court's reasoning is set forth below.

## I.  BACKGROUND

The Court broadened the scope of permissible discovery in this case in its Opinion issued September 17, 2002, explaining that "the Court will permit plaintiffs full discovery on matters that they otherwise would not have been able to explore prior to this decision."  Cobell v. Norton, 226 F. Supp. 2d 1, 159 (D.D.C. 2002).  Pursuant to the Court's restoration of discovery rights, on August 21, 2003 the plaintiffs noticed the deposition of Anson Baker, former Chief Appraiser in the Bureau of Indian Affairs' Navajo Regional Appraisal Office.  Mr. Baker had previously admitted to former Special Master Alan Balaran "that he erased all appraisal information related to Navajo rights-of-way from his computer before transferring duty stations." Id.  See also Site Visit Report of the Special Master to the Office of Appraisal Services in Gallup, New Mexico and the Bureau of Indian Affairs, Navajo Realty Office in Window Rock, Arizona at 2 (Aug. 20,

---

motions, which are identical in substance.  Accordingly, no further briefing related to the motions for protective orders is necessary to the Court's disposition thereof.

2003) ("Special Master Report").  In that report, the Special Master found that "Baker deliberately erased all appraisal information from his computer and inadvertently misplaced at least two appraisal-related documents—all without any awareness that he had violated a Court order or breached any regulations."  Special Master Report at 10.  The defendants subsequently moved this Court for a protective order to block the plaintiffs' deposition of Baker and the accompanying document-production requests.  On March 15, 2004, in response to the parties' motions, the Court ordered that "plaintiffs may take the deposition of Anson Baker."  Cobell v. Norton, 220 F.R.D. 106, 108 (D.D.C. Mar. 15, 2004)

In its Memorandum and Order issued March 15, 2004, the Court explained that the former Special Master's findings regarding Baker's conduct give rise to "two independent concerns: first, the impact of Baker's actions on the administration of the trust, and second, the professed ignorance of at least one senior Interior official of the Court's long-standing directives to properly retain, safeguard and protect individual Indian trust information."  Cobell, 220 F.R.D. at 108.  The Court found that these two areas, as well as "issues related to individual Indian trust record creation, retention, or preservation" are fairly subject to discovery during the plaintiffs' deposition of Baker.  Id. at 108–09.  In that same Memorandum and Order, the Court denied the plaintiffs' requests for the production of documents, which either sought "appraisal records for purposes of evaluating management of trust assets—matters that stray beyond the scope of the underlying litigation," id. at 109 (citing Cobell v. Babbitt, 91 F. Supp. 2d 1, 18 (D.D.C. 1999) ("[A]sset management is not part of this lawsuit ...."));  or were "overly broad, vague, and impose[d] an undue burden."  Id.

On March 31, 2004, the plaintiffs began to take Baker's deposition, but were unable to

3

secure answers to certain questions to which the defendants objected.  Those objections are the subject of the present motion to compel.

On December 30, 2004, the plaintiffs noticed the depositions of Hord Tipton, Chief Information Officer, Department of the Interior; Brian Burns, Chief Information Officer, Bureau of Indian Affairs; Pat Moloney, Chief, Systems Division, Office of the Chief Information Officer, Department of the Interior; Thao Le, Chief Technology Officer, Office of the Chief Information Officer, Department of the Interior; and John Messano, Director, Office of Information Operations.  Then, on January 11, 2005, the plaintiffs noticed the depositions of James Cason, Associate Deputy Secretary of the Interior; Mark Limbaugh, Deputy Commissioner, Bureau of Reclamation, Department of the Interior; Jeffrey Jarrett, Director, Office of Surface Mining, Department of the Interior; Timothy Vigotsky, Director, National Business Center, Department of the Interior; Kathryn Clement, Deputy Director, United States Geological Survey; Steven Williams, United States Fish and Wildlife Service, Department of the Interior; Donald Murphy, Deputy Director, National Park Service; and Mary Kendall Adler, Deputy Inspector General, Department of the Interior.

On January 12, 2005, the plaintiffs noticed the depositions of William Pat Ragsdale, Director, Office of Trust Review and Audit; Francis Cherry Jr., Deputy Director for Operations, Bureau of Land Management, Department of the Interior; Robert Doyle, Deputy Director, United States Geological Survey; and Norma Campbell, Director, Office of Planning and Performance Management.  On January 13, 2005, the plaintiffs noticed the depositions of Regina Lawrence, Office of the Chief Information Officer, Department of the Interior; Ethel Abeita, Director, Office of the Special Trustee; Thomas Kerstetter, Service Center Specialist, Office of the Special

Trustee; and Wendall Galvan, Records Management Specialist.  Finally, on January 21, 2005, the

plaintiffs noticed the deposition of Donnie McClure, Records Management Officer, Office of

Historical Trust Accounting, Department of the Interior.

The defendants' three motions for protective orders seek to bar all of these depositions.

The Court will address the defendants' arguments in these motions after discussing the

objections lodged against certain of the plaintiffs' Baker-deposition questions.

## II.  ANALYSIS

The defendants raise two categories of objections to the questions posed by the plaintiffs

during the Baker deposition.  With respect to the majority of the deposition questions at issue, the

defendants argue that the subjects of the plaintiffs' queries stray beyond the permissible scope of

discovery as specified in the Court's March 15, 2004 Memorandum and Order.  Additionally, the

defendants claim that one of the plaintiffs' questions requires the disclosure of information that is

shielded from discovery by the attorney-client privilege.

In seeking to bar the plaintiffs' most recent series of proposed depositions, the defendants

argue centrally that this is a case governed by the procedural restrictions of the Administrative

Procedures Act, and that discovery is thus limited in a manner that renders the proposed

depositions inappropriate.  In addition, the defendants contend that the plaintiffs have not

proffered a sufficient account of the relevance of the testimony of the proposed deponents,

rendering their deposition requests inadequate under Federal Rule of Civil Procedure 26.  Finally,

the defendants argue that the plaintiffs' discovery rights have been suspended by previous order

of this Court.

Beyond the debate over the propriety of the contested Baker-deposition questions and the

5

most recent round of deposition notices, however, looms the larger issue of the nature of this

litigation and the corresponding scope of discovery in this case.  In an attempt to lay this

perpetual dispute to rest, the Court will first address the background issue of the nature and scope

of discovery in this case generally, before discussing specific limitations on the scope of

discovery that are relevant to the deposition of Anson Baker and the plaintiffs' deposition

notices.  Finally, the Court will address the two categories of contested Baker-deposition

questions in the order they are introduced here and discuss the merits of the defendants' motions

for protective orders.

**A.     The Scope of Discovery Generally**

The plaintiffs contend in their motion that the restrictions on the Baker deposition set

forth in the Court's March 15, 2004 Memorandum and Order "should be construed in conformity

with both this Court's September 17, 2002 findings and instructions ... and the Court of Appeals'

February 23, 2001 declaratory judgment ...."  Pl.'s Mot. to Compel at 6 (referring to Cobell v.

Norton ("Cobell VI"), 240 F.3d 1081 (D.C. Cir. 2001)).  They continue, arguing:

> [S]ince the Court of Appeals' February 23, 2001 decision declared that the
> Trial 2 accounting is to include (1) an accounting of all items of the Trust
> (including without limitation real estate and mineral interests—not just
> reported transactions), and (2) the provision of sufficient information for the
> beneficiaries to meaningfully ascertain whether the trustee-delegates have
> faithfully discharged their trust duties ..., Trial 2 discovery is necessarily broad.
> It encompasses all information pertinent to the conduct (or misconduct) of the
> trustee-delegates.  Given the breadth of the subject matter and applicability of
> the ordinary, liberal discovery provisions of the Federal Rules of Civil
> Procedure, any restriction or limitation on the nature and scope of discovery
> must be precise and narrowly drawn.
> ...
> Furthermore, the unconditional obligation of the trustee delegates to account
> for their conduct and that of their managers necessarily includes actions they
> have taken ... that have damaged the trust beneficiaries, including without
> limitation the undervaluation of allottee lands for rights-of-way, easements,

6

> and sales; the failure to collect all trust revenue as obligations become due and
> owing; the failure to collect all rents, bonuses, and penalties; the failure to
> obtain market rates for all oil, gas, timber, coal and other natural resources
> beneficially owned by the Cobell plaintiffs; ... and any other misappropriation,
> waste, and loss of Trust assets.

Pl.'s Mot. to Compel at 5 n.16, 6 n.17.  These arguments about what subject-matter may fairly be

taken up in the Baker deposition, and indeed about what further discovery the plaintiffs may

legitimately conduct in general, implicate the broader issue of the nature of this case and the

matters that lie properly within the scope of discovery.

Under Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery

regarding any matter, not privileged, that is relevant to the claim or defense of any party."  FED.

R. CIV. P. 26(b)(1).  As the plaintiffs rightly note, the Court restored their "full discovery rights"

in its Opinion and Order issued September 17, 2002.[2]  Those rights, however, remain limited by

the scope-of-discovery provision of the Federal Rules of Civil Procedure.  Accordingly, the

ongoing debate over the nature of the plaintiffs' claims in this case is also a contest over the

scope of discovery.  Here, the plaintiffs and defendants have taken the fight over the content of

the Baker deposition and the plaintiffs' recent deposition notices as an opportunity to renew their

contest over what issues are, in fact, being litigated here.

---

[2]For this reason, the defendants' claim in their motions for protective orders that the Court barred the plaintiffs from conducting further discovery in this case is unavailing.  The Court restored full discovery rights to the plaintiffs in September, 2002.  If the converse were true, it would have been fairly self-defeating for the Court to spend the time and energy necessary to prepare the Memorandum and Order authorizing the deposition of Anson Baker that was issued March 15, 2004.  To be sure, in an Order issued September 2, 2004, the Court temporarily suspended the plaintiffs' full discovery rights pending the resolution of two appeals in this case.  See Order [2662] issued September 2, 2004.  "[A] party's filing of a notice of appeal divests the district court of jurisdiction over the matters being appealed."  Id. at 2 (citing Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982))  However, the mandates have been handed down for the D.C. Circuit's two December 2004 decisions in this case on the appeals with which the Court's September 2, 2004 Order was concerned.  The mandate for the Court of Appeals' decision issued December 3, 2004, was entered on the docket in this Court on January 6, 2005; and the mandate for the Court of Appeals' decision issued December 10, 2004 was issued by the Court of Appeals January 25, 2005.  Accordingly, there is no longer any reason for suspending the plaintiffs' discovery efforts, the Court's September 2, 2004 Order will be vacated in an Order accompanying this Opinion.

In the first sentence of their motion to compel, the plaintiffs contend that "[i]t is unlawful and a breach of trust for trustee-delegates to waste or ruin, or to permit the waste or ruin of, Individual Indian Trust ... assets."  Pl.'s Mot. to Compel at 1 (citing United States v. White Mountain Apache Tribe, 537 U.S. 465, 476 (2002) ("[E]lementary trust law, after all, confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch.")).  The plaintiffs characterize the nature of the lawsuit with the claim that "plaintiffs brought this action in equity to compel the United States government (1) to render a complete and accurate accounting of all items in the trust and correct and restate account balances in accordance therewith and (2) to rehabilitate and reform the long-troubled Trust which has been plagued by malfeasance (e.g. pervasive fraud and corruption) and neglect."  Pl.'s Mot. to Compel at 2.[3]

Clearly, then, the plaintiffs' position is that issues related to the administration of trust assets, in addition to issues related to the manner in which such administration is recorded and accounted for, are within the scope of this litigation, relevant to the plaintiffs' claims, and thus proper subjects of discovery.  If there was ever any doubt on this count, the plaintiffs contend, then asset-administration issues are certainly placed squarely within the ambit of the case by the decision of the Court of Appeals in Cobell VI, in which that Court affirmed this Court's finding that the government does, indeed, owe fiduciary duties to the Indian trust beneficiaries; and that the government has breached some or all of the owed fiduciary duties.  In their briefs in

_____

[3]Indeed, the plaintiffs press the issue, contending that "anyone familiar with this case knows ... [that] these proceedings are not limited to the accounting duty declared by this Court on December 21, 1999, and expanded by the Court of Appeals on February 23, 2001.  The complaint filed by plaintiffs on June 10, 1996 expressly includes plaintiffs' request for equitable relief to rehabilitate and reform the Trust that has been victimized by neglect and the malfeasance of the United States government and its trustee-delegates and their counsel for 117 years."  Pl.'s Mot. to Compel at 10.

opposition to Interior's motions for protective orders, the plaintiffs argue that the Court of

Appeals' two most recent decisions in this case[4] affirm that this litigation concerns a variety of

fiduciary duties owed by Interior to the Indians beyond the duty to render an adequate accounting

of the trust. Whether the plaintiffs' argument has any merit, then, will be determined by an

examination of the decision of this Court that was reviewed in Cobell VI and the resulting effects

of the Court of Appeals' decisions, both in Cobell VI and in the two most recent opinions, upon

proceedings in this Court.

On November 5, 1998, this Court bifurcated the proceedings in this case into two

"phases": (1) a trial to determine the extent to which the defendants have violated their trust

duties; and (2) a trial on the extent to which the defendants have remedied those breaches.  The

results of the "Phase 1" trial are embodied in the Cobell V opinion, wherein this Court set forth

and explained at length its conclusions with respect to the defendants' breaches of trust duties.

Now in Cobell V, the opinion that generated the Court of Appeals' decision in Cobell VI, this

Court held that any fiduciary duties the government owes to the Indian trust beneficiaries, and

any corresponding rights that the plaintiffs may enforce through litigation, flow from federal

---

[4]For the sake of convenience, the Court will refer to the D.C. Circuit's December 3, 2004 opinion, Cobell v. Norton, No. 03-5262, slip op. (D.C. Cir. Dec. 3, 2004), as Cobell XII, and its December 10, 2004 opinion, Cobell v. Norton, No. 03-5314, slip op. (D.C. Cir. Dec. 10, 2004), as Cobell XIII. It has become conventional for the parties to this case, this Court, and the Court of Appeals to refer to numerous published opinions in this case by Roman numeral.  Thus, this Court's opinion detailing its finding that Interior breached its duty to account for the IIM trust, reported at 91 F. Supp. 2d 1 (D.D.C. 1999), is referred to as "Cobell V," and the D.C. Circuit's opinion affirming that finding, published at 240 F.3d 1081 (D.C. Cir. 2001), is called "Cobell VI."  This Court's Opinion authorizing discovery by the plaintiffs, declaring some of the defendants' fiduciary duties as trustee-delegates of the IIM trust, and holding several individuals in contempt, reported at 226 F. Supp. 2d 1 (D.D.C. 2002), is called Cobell VII; and the D.C. Circuit's opinion vacating the Cobell VII contempt findings, published at 334 F.3d 1128 (D.C. Cir. 2003), is called Cobell VIII.   Other examples include this Court's initial injunction related to Interior's information technology security, reported at 274 F. Supp. 2d 111 (D.D.C. 2003), called Cobell IX; this Court's structural injunction governing Interior's performance of an adequate accounting of the IIM trust, reported at 283 F. Supp. 2d 66 (D.D.C 2003), called Cobell X; and this Court's second injunction concerning Interior's information technology security, reported at 310 F. Supp. 2d 77 (D.D.C. 2004), called Cobell XI.  Thus, XII and XIII are the next numerals in sequence.

statutes and not from the common law.  Specifically,

> the Court is compelled to follow the more current holdings of the Supreme
> Court, especially Mitchell II's instruction that 'statutes and regulations
> establish a fiduciary relationship and define the contours of the United
> States' fiduciary responsibilities.' ... Consequently, to the extent that
> plaintiffs seek relief solely alleged to be afforded to them by rights arising
> under the common law of trusts, plaintiffs have failed to state a claim.

Cobell v. Babbitt ("Cobell V", 91 F. Supp. 2d 1, 31 (D.D.C. 1999) (quoting United States v.

Mitchell ("Mitchell II"), 463 U.S. 206, 224 (1983)).

In detailing the statutes at issue in this case, this Court explained that "[a]ll of the

plaintiffs' soundly grounded claims arise from the statutory scheme giving defendants pervasive

control of plaintiffs' [Indian] trust money." Id. at 24.  One other relevant statute is the Indian

Trust Fund Management Reform Act of 1994 (the "1994 Act"), Pub. L. No. 103-412 (1994),

which was passed in response to overwhelming evidence that the Departments of the Interior and

the Treasury, the government's trustee-delegates for the Indian trust, had mismanaged the trust

for decades.[5]  In that enactment, Congress codified the preexisting fiduciary duties owed by the

government to the trust beneficiaries.  See Cobell VI, 240 F.3d at 1090, 190 n.2.

The 1994 Act requires that the Secretary of the Interior, as trustee-delegate of the Indian

trust, take actions that "include (but are not limited to) ... [(1)] Providing adequate systems for

accounting for and reporting trust fund balances[;] ... [(2)] Providing adequate controls over

receipts and disbursements[;] ... [(3)] Providing periodic, timely reconciliations to assure the

accuracy of accounts[;] ... [(4)] Preparing and supplying ... periodic statements of ... account

---

[5]See, e.g., Cobell V, 91 F. Supp. 2d at 12–13; Cobell VI, 240 F.3d at 1089–90; *Misplaced Trust: The
Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund*, H.R. No. 102-499 (1992); U.S. GENERAL
ACCOUNTING OFFICE, FINANCIAL MANAGEMENT: BIA'S MANAGEMENT OF THE INDIAN TRUST FUNDS, GAO/T-
AIMD-93-4 (1993); U.S. GENERAL ACCOUNTING OFFICE, FINANCIAL MANAGEMENT: STATUS OF BIA'S EFFORTS TO
RECONCILE INDIAN TRUST FUND ACCOUNTS AND IMPLEMENT MANAGEMENT IMPROVEMENTS, GAO/T-AIMD-94-99
(1994) (all detailing deficits in the government's management of the Indian trust).

performance[;] ... [and (5)] Establishing consistent, written policies and procedures for trust fund management and accounting." 25 U.S.C. § 162a(d).  In its Opinion finding the defendants in breach of the accounting duties codified in the 1994 Act, this Court clarified that the statutory nature of the duties and rights at issue here limits both the proper subject-matter of the litigation and the Court's subject-matter jurisdiction.

Generally, federal-court subject matter jurisdiction may extend only to actionable cases or controversies, as prescribed by Article III of the Constitution and by 28 U.S.C. § 1331.  An actual case or controversy exists only where the rights asserted by the plaintiffs are judicially actionable—that is, one of the constitutional requirements that must be met to demonstrate standing, and thus to meet a necessary prerequisite to stating an actual case or controversy, is that the injury complained of is remediable by judicial action.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992).;Valley Forge, 454 U.S. at 472; Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979); Watt v. Energy Action Educational Foundation, 454 U.S. 151, 161 (1981); Branton v. FCC, 993 F.2d 906, 908 (D.C. Cir. 1993); Fulani v. Brady, 935 F.2d 1324, 1326 (D.C. Cir. 1991).  Logically then, any cause of action must at least be judicially cognizable in order for it to constitute a justiciable case or controversy.

As this Court has previously made clear, "plaintiffs' substantive rights are created by—and therefore governed by—statute.  Thus, to the extent plaintiffs seek relief beyond that provided by statute, their claims must be denied."  Cobell V, 91 F. Supp. 2d at 29.  The Court went on to conclude that the plaintiffs' statutorily-based claims may be enforced either under § 702 of the Administrative Procedures Act ("APA"), Id., or through non-statutory review pursuant to the Supreme Court's decision in American School of Magnetic Healing v. McAnnulty.  Id. at

29–30.  Despite the potentially misleading name, "non-statutory review" means review of agency action that is not provided for by the APA, but nevertheless requires "that the governmental action violate either a specific statutory provision or deprive an individual of a right granted by statute."  Id. at 30. (citing Chamber of Commerce v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996)).  Thus, both the plaintiffs' actionable rights and the fiduciary duties that the defendants have been found to have breached are created and fully governed by statute.  See Cobell XIII, No. 03-5314, slip op. at 19–20 (D.C. Cir. 2004) (explaining that the Supreme Court's approach to defining the government's fiduciary duties with respect to the Indians is to "look to trust law to find that a particular common law duty … [is] implied in a … statute").  Of course, as both this Court and the Court of Appeals have recognized, the 1994 Act "may not explicitly recite every trust duty owed by the government to plaintiffs[.]"  Cobell V, 91 F. Supp. 2d at 30.  However, "this does not mean that every common law duty applies either."  Id.

The D.C. Circuit made clear that the common law of trusts has but one application in this litigation—to aid in the elaboration of the government's fiduciary duties—explaining that "the general 'contours' of the government's obligations may be defined by statute, but the interstices must be filled in through general trust law."  Cobell VI, 240 F.3d at 1101.  To be distinguished from the application of common law to elaborate the nature of the defendants' duties as trustee-delegates, however, is the potential for enforcement of those duties through a common-law cause of action for breach of trust.  As explained above, the plaintiffs' rights must be based in statute in order for this Court to have the requisite jurisdiction to enforce them.  Put differently, just as there is not necessarily a private right of action to enforce every right created by statute; the common law may create an array of rights yet fail to provide a mechanism by which a private

12

individual whose common-law rights are violated may seek redress.

Accordingly, this Court dismissed the plaintiffs' common-law breach of trust claims as non-actionable.  See Cobell V, 91 F. Supp. 2d at 31 (explaining the distinction between use of the common law in the elaboration of the defendants' statutorily created trust duties on the one hand and to enforce those duties through litigation on the other, finding that the latter application of common law does not give rise to judicially cognizable rights); Id. at 32 ("Although many of these same [common law] duties may arise ... as concomitants to the government's statutorily enumerated trust duties, the common-law nature of those actions cannot be considered actionable in [itself.]").  Specifically, the Court denied "the importation of various trust duties not relevant to obtaining an accounting of existing trust money," and disposed of "plaintiffs' common-law claim that the government has breached its duty of care" in managing trust assets.  Id. at 32 n.23. In this way, the Court confined the scope of this litigation solely to issues related to the defendants' duty to provide to the Indian beneficiaries an accounting of the trust, which is the subject matter of the only claim the plaintiffs assert that is statutorily-based.  As such, the claim for an accounting is the only "live" claim in this litigation.[6]

The plaintiffs claim that in Cobell VI "the Court of Appeals declared that the historical accounting must include (1) all items of the trust and (2) the conduct of the trustee,"  Pl.'s Mot. to Compel at 6 (citing Cobell VI, 240 F.3d at 1103); and that this declaration indicates that all

---

[6]The Court of Appeals in Cobell VI, while not squarely addressing this portion of the Cobell V ruling, both left intact and tacitly agreed with this Court's conclusion that the plaintiffs' common-law breach of trust claims are not actionable.  See Cobell VI, 240 F.3d at 1104 ("No common law claim for an accounting is cognizable ...."). Now this Court had held, in an Opinion issued after Cobell V, that the plaintiffs might be able to invoke all the common law duties of trustees once a fiduciary relationship between Interior and the IIM trust beneficiaries had been established in the record.  See Cobell X, 283 F. Supp. 2d at 260 n.12.  However, the Court of Appeals in Cobell XIII has finally silenced debate on this matter, holding that  "[i]nsofar as plaintiffs may have said that [they could invoke all common law trust duties against the government in this case], they were wrong," and explicitly reversing any statement of this Court to the contrary.  See Cobell XIII, No. 03-5314, slip op. at 20.

13

asset-management issues are relevant to resolution of the question whether the defendants have rendered an adequate accounting consistent with their fiduciary obligations. The Court is unable to find the language wherein the Court of Appeals held that the required accounting must include "the conduct of the trustee," but even assuming that such a statement is implicit in the Court of Appeals' holding, it does not follow that the adequacy of the defendants' management of trust assets is thereby made a part of this case. The Court of Appeals in <u>Cobell VI</u> did not impose any additional requirements upon the defendants beyond those set forth by this Court in <u>Cobell V</u>. To the contrary, <u>Cobell VI</u> reversed this Court's <u>Cobell V</u> ruling that the defendants had breached not one, but several, fiduciary duties related to the duty to render an accounting.

In <u>Cobell V</u>, this Court concluded that the defendants had breached separate fiduciary duties by failing to "retrieve and retain all information concerning the IIM trust that is necessary to render an adequate accounting[;]" by failing to "establish written policies and procedures" for collecting and retaining documents and records necessary to the rendition of an accounting; by failing to implement "computer and business systems architecture necessary" to facilitate the required accounting; and by failing to provide for adequate "staffing of trust management functions" to fulfill accounting obligations. <u>See</u> <u>Cobell V</u>, 91 F. Supp. 2d at 58. The Court of Appeals, however, concluded that "[w]hile there is a specific duty to provide a complete accounting, there is no specific duty to, for example, implement particular policies or retrieve information either in the 1994 Act or elsewhere." <u>Cobell VI</u>, 240 F.3d at 1105. Far from expanding the scope of the accounting duties imposed by this Court in <u>Cobell V</u>, then, <u>Cobell VI</u> actually narrowed the range of actions that defendants would be required to undertake as a matter of legal duty. It follows that this Court's decision in <u>Cobell V</u> continues, after the <u>Cobell VI</u>

14

decision, to define the subject-matter of this litigation.

To be sure, the Court of Appeals defined the nature and scope of the defendants' accounting duty expansively, explaining, for example, that "[i]t is black-letter trust law that '[a]n accounting necessarily requires a full disclosure and description of each item of property constituting the corpus of the trust at its inception." Cobell VI, 240 F.3d at 1103 (quoting Engelsmann v. Holenkamp, 402 S.W.2d 382, 391 (Mo. 1966)).  However, in the subsequent section of that opinion the Court of Appeals clarified the limited scope of this litigation, holding that "[t]he actual legal breach is the failure to provide an accounting, not [the] failure to take the discrete individual steps that would facilitate an accounting."  Id. at 1106; see also Cobell XIII, No. 03-5314, slip op. at 16 (restating this holding).  The plaintiffs' single "live" cause of action seeks a remedy for this legal breach, and the remedy that this Court has fashioned is limited to ensuring that the defendants produce the requisite accounting of the Indian trust.  Nothing in the Cobell VI Opinion can be construed to broaden the scope of this case to include issues unrelated to the defendants' obligation to provide an accounting of the trust, such as matters related to asset management or other aspects of trust administration unrelated to the processes by which records and other documentation of transactions involving trust assets and the actions of the trustee-delegates are created, stored, preserved, and so forth.  The plaintiffs themselves seem to have come to this realization—they concede in their reply brief that the Court of Appeals found "'... no need to alter the district court's order [in Cobell V].'"  Pl.'s Reply at 7 (quoting Cobell VI, 240 F.3d at 1106).

The foregoing discussion makes clear that this case is only about the rendition of an accounting of the Indian trust.  It has been the consistent position of both this Court and the

Court of Appeals that, currently, the plaintiffs' only justiciable claim in this litigation is for the defendants' breach of their legal duty to provide that accounting. Every remedy and form of relief that has been afforded the plaintiffs by this Court has related directly to the reform and supervision of the defendants' records-management infrastructure. This is because the only aspects of the defendants' activities as trustee-delegates that are properly within the Court's jurisdiction are those that relate directly to the capacity of the defendants to render the accounting required by law.

This limitation on the subject-matter of this litigation similarly functions to limit the subjects that the plaintiffs may explore through discovery. "Full discovery rights," as granted by this Court in its September 17, 2002 Opinion and Order, are rights to take full discovery within the scope established by Rule 26, which provides that discovery may only be taken where it is relevant to some claim or defense of one of the parties. As the plaintiffs' only "live" claim here is that the defendants have breached their duty to render an accounting of the Indian trust, the scope of discovery includes only those matters directly related to the defendants' accounting infrastructure—that is, those systems and processes, either in place or deficient and in need of reform, that constitute the defendants' capacity to render a complete accounting of the trust assets and the transactions involving those assets during the existence of the trust.

The plaintiffs' reply brief in support of their motion to compel advances two principal arguments for the proposition that the scope of this litigation, and thus of discovery, is not in fact limited in the manner set forth above. First, the plaintiffs contend that the Cobell V Order "provided for continuing oversight of trust management—not merely the discharge of the historical accounting duty—for at least five years." Pl.'s Reply at 5 (emphasis in original). As

16

evidence of this Court's commitment to enforcing broad trust reform duties against the

defendants, the plaintiffs cite the Court's requirements set forth in the Order accompanying the

Cobell V Opinion that "the trustee-delegates ... file quarterly 'status reports' that explain their

progress ... in their trust reform effort and 'bring themselves into compliance' with the trust

obligations codified in the 1994 Act and elsewhere."  Pl.'s Reply at 5 (citing Cobell V, 91 F.

Supp. 2d at 59–60).  However, this a misstatement of the Court's Order.

Paragraph II of the Cobell V Order issues a declaratory judgment that "The Indian Trust

Fund Management Reform Act ... requires defendants to provide plaintiffs an accurate

accounting of all money in the IIM trust held in trust for the benefit of plaintiffs, without regard

to when the funds were deposited."  Cobell V, 91 F. Supp. 2d at 59.  The Court went on, in

subparagraphs II(2)–(4) of the Cobell V Order, to declare that "the statutes and regulations

governing the management of the IIM trust" impose upon the defendants the various duties

related to record and document management and retention infrastructure discussed above.[7]  See

id.  Each of these other duties declared in Cobell V were explicitly limited to the established

scope of this case, as evidenced by the fact that each paragraph declaring a trust duty expressly

limits the actions demanded of the defendants to those "necessary to render an accurate

accounting of the IIM trust."  Id.  Subparagraph II(5) of the Cobell V Order declares that

"defendants are currently in breach of the statutory trust duties declared in subparagraphs

---

[7]Specifically, the Court declared that the defendants have the statutory trust duties to "retrieve and retain all information concerning the IIM trust that is necessary to render an accurate accounting of all money in the IIM trust held in trust for the benefit of the plaintiffs[;]" to "establish written policies and procedures for collecting from outside sources missing information necessary to render an accurate accounting of the IIM trust;" to "establish written policies and procedures for the retention of IIM-related trust documents necessary to render an accurate accounting of the IIM trust;" to "establish written policies and procedures for computer and business systems architecture necessary to render an accurate accounting of the IIM trust; and" to "establish written policies and procedures for the staffing of trust management functions necessary to render an accurate accounting of the IIM trust." Cobell V, 91 F. Supp. 2d at 58.

II(2)–(4)."  Id.  The subparagraphs of the Cobell V Order establishing the Court's continuing

jurisdiction over this case and mandating that the defendants submit quarterly status reports, in

turn, are all expressly limited to the established scope of this litigation by the inclusion of the

qualification that defendants need only report on matters related to "the breaches of trust declared

today."  Id. at 59.

  In Cobell VI, the Court of Appeals reduced all but one of this Court's Cobell V

declarations to statements of "subsidiary duties on those government officials with responsibility

for ensuring that an accounting can and will take place."  Cobell VI, 240 F.3d at 1105.  However,

the only legal duty to be enforced against the defendants in this case, after the Cobell VI decision,

is the defendants' "broad duty to provide a complete historical accounting to IIM

beneficiaries[.]"  Id.  With respect to the relief the Court afforded the plaintiffs in the Cobell V

Order, the Court of Appeals explained that:

> The actual legal breach is the failure to provide an accounting, not [the]
> failure to take the discrete individual steps that would facilitate an
> accounting.  Thus, while the district court must amend its opinion on
> remand to account for this distinction, there is no need to alter the district
> court's order, as the bottom line is the same: By failing to take reasonable
> steps toward the discharge of the federal government's fiduciary obligations
> to the IIM trust beneficiaries, [the defendants] breached their duties.

Cobell VI, 240 F.3d at 1106.  The only fiduciary duty that the Court's Cobell V Order enforces,

then, is the duty to render an accounting.  It can do no more, of course, because no other of the

defendants' fiduciary duties are at issue in this case.

  It follows that the quarterly status reports Ordered by the Court, limited as they are to

information concerning "the breaches of trust declared today," are limited to information

concerning the government's breach of its "broad duty to provide a complete historical

18

accounting" of the IIM trust after <u>Cobell VI</u>.  The specific matters upon which the Court ordered the defendants to report—all related to deficiencies discovered in the defendants' records-management infrastructure—are not themselves breaches of legal duties.  A necessary precondition to the defendants' achieving the necessary capability to render the required accounting, however, requires remedying these infrastructure problems.  Accordingly, these matters continue to be mandatory subjects of the quarterly reports because the Court has determined that they are directly relevant to the defendants' accounting duties—a determination that the Court of Appeals affirmed in <u>Cobell VI</u>.

In light of the explicitly limited scope of (1) the Court's declarations of duties and breaches in <u>Cobell V</u>, as clarified by <u>Cobell VI</u>; (2) the purpose for which this Court has retained continuing jurisdiction in this case; and (3) the clear limitations on the mandatory subject-matter of the quarterly status reports; there can be no doubt that both the Court's declarations and the relief afforded in <u>Cobell V</u> relate directly, and <u>solely</u>, to the defendants' duty to render an accounting and not to any matters of asset management.  For these reasons, the plaintiffs' first argument for the inclusion of asset management in the scope of this litigation, and thus in the scope of discovery, turns out to be ultimately unavailing.

The second argument advanced in the plaintiffs' reply brief is more easily disposed of.  At great length, the plaintiffs present examples of instances where the defendants have conceded that "the scope of this case and the reporting requirement ... include "progress of trust reform" and 'improving the underlying trust management and accounting systems.'"  Pl.'s Rep. at 6.  Put more simply, the plaintiffs contend that the defendants themselves concede, quite regularly, that this case includes matters of asset management and trust reform generally; and that those

admissions by the defendants should either control the scope of the litigation and therefore of

discovery or somehow guide the Court's understanding of its own prior Orders.  Obviously,

however, the only relevant consideration for the purposes of Rule 26 is the nature of the claims

that the parties have asserted.

As discussed above, the only claim at issue in this litigation, within the meaning of Rule

26, is the plaintiffs' statutory claim for breach of the defendants' duty to render an accounting of

the IIM trust.  The parties control the scope of a case only insofar as they are at liberty to decide

what claims, defenses, counterclaims, and so forth, to place in their initial pleadings.  Once those

pleadings are before the Court, however, the Court determines the nature of the claims asserted

therein.  Here, the Court has elaborated at great length, both here and previously, its

determination of the nature of the claims at issue in this case.  As such, the opinions of the parties

can have no further bearing on the subject until they become arguments sufficient to persuade

this Court to reexamine its prior determinations.  Certainly, the semantic flubs of the Secretary of

the Interior bring no such persuasive force to bear.  As this Court has previously made clear, "it is

not the proper role of [the parties or their counsel] to expound upon the basis on which the

judge" allows discovery to proceed.  Cobell v. Norton, 213 F.R.D. 16, 26 (D.D.C. 2003)

(addressing the scope of the plaintiffs' deposition of Donna Erwin).

In accordance with the foregoing, the Court again specifies that the current scope of this

case, and thus of general discovery under Rule 26, is limited to matters relevant to the plaintiffs'

statutory claim that the defendants have breached their statutory duty to provide an accurate

accounting of all money in the IIM trust held in trust for the benefit of the plaintiffs, without

regard to when the funds were deposited.[8]  This narrow scope dictates that Phase II of this

litigation, according to the bifurcated scheme the Court has devised, will involve determining the

extent to which the defendants have succeeded in remedying their breach—that is, the extent to

which the defendants have rendered the requisite accounting.  Although the plaintiffs assert that

---

[8]It should be noted that nothing in the opinion of the Court of Appeals issued December 3, 2004 alters the scope of this litigation.  Although the D.C. Circuit states that "the underlying lawsuit is both an Indian case and a trust case," that statement is made in the context of explaining the distinction between the Secretary of the Interior's role as both head of an administrative agency and trustee of the Indian trust.  See Cobell v. Norton, No. 03-5262 (D.C. Cir. Dec. 3, 2004), slip op. at 9.  In rejecting the government's arguments that this Court should defer to Interior's determinations with respect to the security of its information technology infrastructure, the Court of Appeals concluded that the nature of this case, as "an Indian case and a trust case," does away with the usual presumption that administrative agency decision-making is owed a great degree of deference in the courts.  Never does the Court of Appeals waver from the established characterization of the case.  To the contrary, the Court of Appeals described the underlying litigation by quoting Cobell VI for the proposition that the only "'actual legal breach ... is the failure to provide an accounting.'" Id., slip. op. at 4 (quoting Cobell VI, 240 F.3d at 1106).

    The Court of Appeals held that this Court "retains substantial latitude, much more so than in the typical agency case, to fashion an equitable remedy because the underlying lawsuit is both an Indian case and a trust case," but such latitude can only extend to equitable enforcement of the single trust duty of the defendants that has thus far been declared by this Court.  See id., slip op. at 9.  Cobell XIII makes this point absolutely clear, holding that while the duty to account is "not … the only fiduciary duty in this case," Cobell XIII, No. 03-5314, slip op. at 17, the Court cannot exercise its equitable powers to enforce any duty other than the duty to account until that other duty has been declared to exist by the Court.  See id. at 19–20.  In order to declare other enforceable fiduciary duties, the Court must find that such duties arise out of one of the statutes governing the IIM trust.  See id.  To be sure, the Court's authority to require Interior to take steps to shore up its information technology infrastructure was affirmed in Cobell XII.  That authority only exists, however, as an incident to the Court's authority to enforce the defendants' accounting duty.  The Court of Appeals explained that the Court's continuing jurisdiction in these proceedings exists so that the Court can complete the "difficult task of extracting an accounting" from Interior; and that "maintaining adequate computer systems, along with staff and document retention policies, is critical to the completion of an adequate accounting." See id., slip op. at 8.  The Court's broad remedial powers, then, remain circumscribed by the fundamental basis of its jurisdiction—namely, the nature of the plaintiffs' live claims in this litigation.

    One way to conceptualize this distinction is by generalizing it in terms of categories and particulars.  Abstractly, a category is a set of things that share one or more cognizable qualities, while a particular is any given instance of a single thing bearing the quality or qualities that places it in the relevant category.  Here, the defendants' declared duty to render an accounting is a particular instance of the category of statutorily codified common-law trust duties.  One quality that the particulars in this category share is that when such duties are breached, courts will have greater latitude to design remedies for the breach compared to a case in which a plaintiff seeks APA-enforcement of a particular of some other category of statutorily created rights.  The salient difference is the common-law source of the particular right being enforced in this case.  Importantly, however, the Court is only adjudicating the breach of one particular right in this category.  While each right in the category would, arguably, grant the Court broader-than-usual equitable remedial powers, the Court can only use those broadened powers to enforce the rights that are before it.  The specification that a Court may only act on live cases or controversies, and thus only upon the rights properly placed before it by the plaintiffs' "live" claims, is analytically prior to the broadening of the Court's equitable powers that results from determining that the right belongs to the category of statutorily codified common law trust rights.  It follows that there is no inconsistency in holding that the Court's equitable powers are quite broad with respect to the right that it may properly enforce, but nonexistent with respect to other rights of the same category that are not properly before the Court.

discovery related to Phase II "is necessarily broad," Pl.'s Mot. to Compel at 5 n.16, that discovery will nevertheless continue to be limited by the scope of this case and thus cannot stray beyond the subject matter set forth above.

As an important aside, the Court does not take for granted the special relationship between the parties to this litigation. The defendants are fiduciaries entrusted with management of the assets of the beneficiaries, who constitute the plaintiff class. As trustee-delegates, the defendants may well have duties under the relevant statutes similar to those of the trustee of a common-law trust, including the obligation to disclose to the beneficiaries all information material to the trust. See, e.g., Eddy v. Colonial Life Ins. Co. of Am., 919 F.2d 747, 750 (D.C. Cir. 1990) ("The duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts ...."); RESTATEMENT (SECOND) OF TRUSTS § 173 (common law trustee "is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know ..."). If the defendants in fact owe such a duty of disclosure, then the plaintiffs are arguably entitled to have the defendants disclose just about any piece of trust-related information they can think to demand.

Indeed, the Court of Appeals in Cobell VI indicated that the statutory duties of governmental trustees may be drafted broadly, to be supplemented where necessary by the common law of trusts. However, the Court of Appeals also made clear that while the defendants in this case may owe a variety of statutorily-based fiduciary duties to the plaintiff-beneficiaries, many of them drawn from the common law of trusts, only one such duty is currently before this Court in this case—the duty of the defendants to render a complete and accurate historical

22

accounting of the trust.  As such, while the full panoply of the defendants' fiduciary duties may

entitle the plaintiffs to unlimited disclosure of all trust-related information, including information

related to asset management, it remains the case that only the defendants' accounting duty is

subject to enforcement by this Court at this time.

The Court is not empowered, by the Constitution or otherwise, to act as an ombudsman to

ensure that the defendants comply with all of the plaintiffs' requests for information, whether or

not the defendants' fiduciary duties require that they do so.  Again, the Court's power to act in

this case is circumscribed by the limits of its jurisdiction; and the Court's jurisdiction is in turn

limited to the claims being litigated herein.  The only effective mechanism for forcing

compliance with the general fiduciary duty to disclose would be an order granting a motion to

compel.  However, the Court can only issue such orders where the information to be disclosed is

within the scope of discovery defined by Rule 26.  Thus, while the plaintiffs may indeed have the

right to access any and all trust-related information, that right may not be properly enforced by

this court in this case because the defendants' fiduciary duty to disclose material information to

trust beneficiaries is not currently at issue in these proceedings.  Only the defendants' duty to

account is properly before this Court.

However, the current limits on the Court's equitable enforcement powers may be

expanded.  If the plaintiffs were to move for leave to file an amended complaint alleging that the

defendants have a statutory duty to use due care in administering trust assets, and stating a

statutory claim for breach of that duty, the Court would likely have subject-matter jurisdiction

over such a claim on the jurisdictional theory discussed above.[9]  Indeed, the Court of Appeals in

_____

[9]Given the record in this case and the volume of factual showings related to asset mismanagement and so
forth that the plaintiffs have already made, such a motion would likely be granted.

Cobell XIII pointed to statutes from which such a duty of care might be derived.  See Cobell XIII,

No. 03-5314, slip op. at 18–19 (discussing the statutes that regulate Interior's management and

investment of IIM trust funds).  Cobell XIII makes clear that the defendants, as trustees of the

IIM trust, have fiduciary duties beyond the above-discussed duty to account.  See id., slip op. at

16.  However, "the district court may [not] simply copy a list of common law duties from the

Restatement and then order Interior to explain how it will satisfy them. … The Court's authority

is limited to considering specific claims that Interior breached particular statutory trust duties,

understood in light of the common law of trusts, and ordering specific relief for those breaches."

Id., slip op. at 19, 32.  The Court concludes that the plaintiffs should plead whatever breaches of

fiduciary duty they wish this Court to enforce with particularity, specifying the statutory basis of

each such duty in accordance with the standard announced by the Court of Appeals.

Adding claims to the complaint is, of course, the accepted method for expanding the

scope of discovery in a case consistent with the dictates of Rule 26.  Furthermore, the addition of

a statutory claim for the breach of a statutorily codified common-law trust duty to use reasonable

care in asset management would almost certainly do away with the defendants' argument that

issues related to asset management may not properly be addressed in this litigation.  Until such a

claim is added, however, the Court's power to act is limited to the single claim over which it

retains continuing jurisdiction after Cobell VI, Cobell XII, and Cobell XIII—the plaintiffs' claim

concerning the defendants' breach of their accounting duty.

**B.**     **Specific Limitations on Discovery for the Baker Deposition**

The plaintiffs' motion to compel does not challenge the restrictions the Court placed on

the deposition of Anson Baker in its March 15, 2004 Memorandum and Order; nor does it seek

an enlargement or clarification of the general scope and nature of discovery in this case as defined by the scope of the litigation discussed above.  Rather, the plaintiffs' present motion merely propounds one interpretation of the scope of discovery in this case, and then argues that all of the plaintiffs' questions to which the defendants object actually fall squarely within that scope.  Even if the plaintiffs made such a challenge or request for clarification,[10] the Court would be disinclined to alter its consistent position—reiterated in its March 15, 2004 Memorandum and Order with a full understanding of the nature and effect of the Court of Appeals' Cobell VI decision—that discovery in this case may not wander into areas of trust administration beyond accounting, as "asset management is not part of this lawsuit."  See Cobell, 91 F. Supp. 2d at 18 (as discussed and reiterated in Cobell, 220 F.R.D. at 109, where the Court disallowed document production requests that strayed into areas of asset management beyond the defendants' established accounting duties).[11]  This restriction on discovery relating to asset management has been, and remains, the law of this case.

In accordance with this position, in its March 15, 2004 Memorandum and Order the Court set forth three, *and only three*, subject-matter areas as proper subjects of the plaintiffs' questions to Anson Baker.  Those areas are: (1) "the impact of Baker's actions on the administration of the

---

[10]The only contention in the plaintiffs' motion that could be construed as an argument that the scope of discovery should be altered is the argument that the Court's instructions set forth in its March 15, 2004 Memorandum and Order should be interpreted in conformity with the decision of the Court of Appeals in February, 2001.  However, the plaintiffs take no further analytical steps to indicate how the Court's express limitations on the Baker deposition are out of sync with the D.C. Circuit's decision on their face, and thus there is no cognizable argument made that the Court's explicit instructions with respect to the proper subject-matter of the Baker deposition would need alteration in order to interpret the Court's March 15, 2004 Order consistently with the decision of the Court of Appeals.  To the contrary, the Court was fully cognizant of the Court of Appeals' decision when it determined the restrictions set forth in the March 15, 2004 Memorandum and Order, and there is no persuasive reason for the Court to believe that it has erred in its interpretation of the effect of that decision on this litigation.

[11]This disinclination is motivated, for the most part, by 8-year pedigree of this litigation and the possibility that any alteration in the scope of discovery may ensure that the case continues into perpetuity.

trust[;]" (2) Baker's "professed ignorance ... of the Court's long-standing directives to properly

retain, safeguard and protect individual Indian trust information[;]" and (3) "issues related to

individual Indian trust record creation, retention, or preservation." Cobell, 220 F.R.D. at 108.

The Court, almost in the same breath, explicitly disallowed the plaintiffs' attempts to take

discovery on "management of trust assets," as such discovery "stray[s] beyond the scope of the

underlying litigation." Id. at 109. District courts are unquestionably empowered to impose these

kinds of discovery limitations in addition to those imposed by Rule 26(A). As the Supreme

Court explained:

> [T]he discovery provisions, like all of the Federal Rules of Civil Procedure,
> are subject to the injunction of Rule 1 that they "be construed to secure the
> just, speedy and inexpensive determination of every action." To this end,
> the requirement of Rule 26(b)(1) that the material sought in discovery be
> "relevant" should be firmly applied, and the district courts should not
> neglect their power to restrict discovery where "justice requires [protection
> for] a party or person from annoyance, embarrassment, oppression, or undue
> burden or expense ..." Rule 26(c). With this authority at hand, judges
> should not hesitate to exercise appropriate control over the discovery
> process.

Herbert v. Lando, 441 U.S. 153, 177 (1979). Thus this Court may, in its discretion, limit the

scope of individual depositions in order to provide that information produced is likely to be

relevant and in order to ensure the efficiency of the litigation process. The specific subject-

matter limitations placed on the Baker deposition are an exercise of this authority, and thus are

dispositive of what questions the plaintiffs may permissibly ask during that deposition regardless

of the general scope of discovery discussed above.

Importantly, the only conduct of Mr. Baker at issue in the Court's March 15, 2004

Memorandum and Order was his admitted destruction of trust-related documents and records.

Thus, plaintiffs are allowed to explore the "impact of Baker's actions on the administration of the

trust" only with respect to his actions in destroying trust-related documents and records.  It is also important to note that permitting the plaintiffs to explore the impact of Baker's destruction of trust documents requires that the plaintiffs be allowed to inquire into the specific contents of the documents that were destroyed.  After all, one cannot determine the impact of losing something if one is unsure what that thing is.

Aside from the fairly self-explanatory subject-matter areas directly related to Baker's individual conduct, it is useful to think of the third permissible subject-area of discovery discussed in the March 15, 2004 Memorandum and Order—the "creation, retention, or preservation" of Indian trust records— in abstract terms.  Information related to "individual Indian trust record creation, retention, or preservation," may best be understood as information related to the processes that constitute Interior's information-management infrastructure.  That is, in accordance with the scope of discovery in this case generally, discovery in the Baker deposition must be limited to information directly related to the capacity of the defendants to render the requisite accounting.

Subjects that are not included within this permissible subject-matter area, but that might be construed to be included by one unfamiliar with the scope of the underlying litigation, include aspects of "individual Indian trust record creation" that have to do with the processes and procedures for selecting and analyzing the data that is recorded incident to trust transactions.  Put more simply, discovery in this case does not extend to the manner in which the defendants determine what kinds of information are placed in trust records—rather, it is the content-neutral processes by which trust records are created, stored, secured, and preserved that are properly subject to discovery in this case.  For example, while the types of software programs employed to

27

generate appraisal records for Indian trust land may properly be explored, as the adequacy of the systems by which records are generated is at issue here insofar as it relates to the condition of the defendants' data-management infrastructure; the standards for what kinds of land valuations are employed in the process of actually appraising Indian trust land are beyond the scope of discovery.  Such information is related to the management of trust assets, and not to the defendants' capacity to render an accurate and complete historical accounting of the Indian trust.

To generalize the operative distinction, discovery is permissible as to the content-independent processes by which individual Indian trust documents and records are created, handled, stored, moved from place to place, and so forth; and discovery is not permissible as to the processes by which document content itself is selected and created.  It follows that questions related to the adequacy and security of physical and electronic document storage facilities, computer data backup systems, and the like will be permissible.  In contrast, questions concerning the standards that govern decisions about what kinds of information to provide to trust beneficiaries related to leasing mineral rights, for example, are beyond the scope of permissible discovery in this matter.  This distinction will become even more clear in the following discussion of the plaintiffs' questions that the defendants contend are beyond the permissible scope of discovery.

**C.   Baker Deposition Questions Allegedly Beyond the Scope of the Court's March 15, 2004 Order**

First, the plaintiffs asked Baker the following questions about the use of market data in the preparation of appraisal reports concerning Indian trust land: (1) "[B]ased on your understanding, is market data an important element of completing an appraisal report?" Pl.'s Mot. to Compel at 8 (quoting Baker Dep. Tr. at 14:8–15:10); (2) "Do you have any

28

understanding as to the relevance of market data to the accounting?" Id. at 11 (quoting Baker

Dep. Tr. at 21:14–22); (3) "Are there different types of market value?" Id. at 12 (quoting Baker

Dep. Tr. at 36:16–38:14); (4) "What different types of market value are included in the appraisal

request?" Id.; (5) "Do you know what different types of market appraisal exist?" Id.; and (6) "Do

any of the governing standards, that you understand apply to your job, discuss market value?" Id.

at 15 (quoting Baker Dep. Tr. at 38:18–41:6).

        In each case, the defendants instructed Baker not to answer and objected that these

questions relate to asset management or other non-accounting related aspects of trust

management, and as such are beyond the scope of the deposition as specified in the Court's

March 15, 2004 Memorandum and Order.  The plaintiffs argue that these questions are allowed

because they are relevant to "the impact of Baker's conduct on the administration of the trust," in

that "appraisals play an integral part in an honest valuation of easements and rights-of-way and

such valuation is material to and affects the amount a third-party pays for encumbering an

allotee's land."  Pl.'s Mot. to Compel at 9.  This argument, however,  misunderstands the scope

of the Court's March 15, 2004 Memorandum and Order.

        By including "the impact of Baker's conduct on the administration of the trust" within the

scope of the deposition, the Court designated for exploration the specific impact of Baker's

admitted destruction of trust records and documents upon the defendants' ability to render the

requisite historical accounting, as this would be the only information within the general scope of

discovery as set forth above.  As the methodology the defendants employ in generating appraisals

of allottee land for the purpose of valuing third-party encumbrances is relevant to asset

management generally and not to either the three permissible Baker-deposition subjects

enumerated above or the defendants' ability to render an accounting of the trust, the plaintiffs'

questions on this subject will be disallowed with one exception.   Question (4) merely asks Baker

to discuss the contents of specific documents that he admittedly erased.   Because the contents of

the destroyed documents are directly relevant to assessing the impact of Baker's conduct on the

administration of the trust, the Court will grant the plaintiffs' motion to compel Baker to answer

question (4).

Second, the plaintiffs asked Baker the following series of questions, among others, related

to the way in which Interior uses "appraisal value" during the processing of applications for

rights-of-way across Indian trust land: (1) "When you receive the appraisal, provided by the

Applicant for the Right of Way, do you share that appraisal with the allottees?" Pl.'s Mot. to

Compel at 17 (quoting Baker Dep. Tr. At 64:6–66:13); (2) "Have you ever shared [appraisal]

information with the allottees?" Id.; (3) "Do you have any understanding why you wouldn't share

[appraisal] information with allottees?" Id.; and (4) "Do you ever share that type of [appraisal]

information with the company who is an Applicant ... asking for a Right of Way?" Id. at 19

(quoting Baker Dep. Tr. at 66:19–69:12).   The plaintiffs asked other questions on the same

subject that need not be repeated because of their similarity the above.   See Pl.'s Mot. to Compel

at 19–21.

The plaintiffs explain that these questions were designed to elicit information "that would

enable this Court and plaintiffs to determine whether any 'consents' [to the granting of rights-of-

way] obtained by El Paso Natural Gas and other companies were knowing and wilfull."   See id.

at 22.   In other words, because appraisal values are important to the computation of the actual

value of a right of way, failure to present an individual Indian trust beneficiary with appraisal

information prior to his or her consenting to a right of way at a certain price runs the risk that the

beneficiary may not be aware that the price offered does not reflect the actual value of the right-

of-way being conferred.  Of course, the possibility that the defendants' right-of-way negotiation

process could be deficient to the financial detriment of trust beneficiaries is grave cause for

concern.  Nevertheless, this case is about the defendants' duty to render a full and accurate

historical accounting of the Indian trust, not about the way in which the defendants manage trust

assets.  Therefore, questions about nature of the defendants' conduct during the negotiation and

conveyancing of rights-of-way, having nothing to do with the defendants' capacity to render the

requisite accounting, are beyond the scope of discovery in this case.  Furthermore, there is no

apparent relationship between the answers to these questions and either Anson Baker's conduct,

his awareness or ignorance of governing regulations and Orders of this Court, or the creation,

retention, and preservation of trust records.  These questions will therefore be disallowed as

outside the scope of the Court's March 15, 2004 Order.

Third, the plaintiffs questioned Baker about the way in which the amounts of payments to

allottees are determined, as follows: "if the appraisals are destroyed and if the market data is

destroyed, and the market value is unavailable, how, based on the records that you know exist in

your files, how would you determine how much is paid to the Trust Beneficiary for the

incumbrance [sic] on his property?"  Pl.'s Mot. to Compel at 22–23 (quoting Baker Dep. Tr. at

87:16–88:7).  The plaintiffs contend that this question is within the scope of permissible

discovery because it may "lead to the discovery of information concerning monies actually

collected and paid into the trust as well as monies that should have been paid, but for the

misconduct of the trustee-delegates and their managers."  Id. at 23.  Now there is a version of this

question that is within the scope of discovery set forth in the Court's March 15, 2004

Memorandum and Order.  The plaintiffs may legitimately ask, for example, whether the

defendants have the capacity to reproduce the information destroyed by Baker.  This question

would be relevant to the impact of Baker's actions on the administration of the trust.  However,

that is not the form of the question before the Court.  Here, the plaintiffs clearly seek information

concerning the kinds of data brought to bear and the methods used in the calculation of the

amount of payments owing to allottees with encumbrances on their trust land.[12]  The Court

cannot discern the relevance of this question as phrased to the three permissible Baker-deposition

subject-areas set forth in the March 15, 2004 Order.  Furthermore, the information sought by way

of this question relates to the way in which trust assets are managed, not to the defendants'

capacity to account for such management transactions, and is thus outside the general scope of

discovery in this case.  This question, then, will also be disallowed.

      Fourth, the plaintiffs asked a series of questions related to other issues involved in the

---

[12]The plaintiffs' follow-up questions demonstrate that gaining information about the defendants' asset-management practices is the thrust of this inquiry:

> Q: **And the rates are usually determined by [] appraisals, correct?**  Or the amount paid is determined by the appraisal, correct?  Or the appraisal review, either one, correct?
> A: **Or the negotiations.**
> Q: Between the allottee and the company, correct?  Well, we're talking about the allottees only, correct?
> A. **After the appraisal is given to Realty, or the appraisal review is given to Realty, then Realty, the Managers, BIA Managers meet with the company and they agree on the final amount.**
>    If the tribe is involved, that's a different scenario.
> Q: No, no, no.
> A. Okay, **just on the allottees, then the Managers agree on a final amount, with the company.**
> Q: **The Managers or the allottees?**

Pl.'s Mot. to Compel at 23 (quoting Baker Dep. Tr. at 89:14–90:12) (emphasis added by plaintiffs).  Clearly, the plaintiffs sought information concerning the degree to which the Indian trust beneficiary whose land is the subject of a negotiation for an encumbrance is involved in the negotiation process, which bears on whether full and fair value is being given for encumbrances under the defendants' asset-management processes.  Again, such information is clearly beyond the scope of discovery as set forth herein.

defendants' methods for placing a value on encumbrances upon Indian trust beneficiaries' trust lands.  For example, they asked Baker: (1) "[W]hen you're dealing with the length and width of the easement, is there information provided in these same files [] concerning how that length and width of [the] easement affects a particular allottee['s (sic) property[?] ... [D]oes it make a difference if it goes through the middle of the property versus the boundary line of the property?" Pl.'s Mot. to Compel at 25 (quoting Baker Dep. Tr. at 123:6–125:12); (2) "[E]ach pipeline crossing the [Eastern Navajo] region invariably runs across private, tribal, and allottee parcels of land ... Does that make your job more complicated, for the purposes of evaluating all the allottees['] land[?] ... [Do you] use the valuations of private and tribal lands to determine the valuations of the allottees land that are being crossed ... ?" Id. at 31 (quoting Baker Dep. Tr. at 198:21–199:18); (3) "You had an understanding that you aren't going to verify whether or not the easements across private lands on the same pipeline that ran across allotee lands [] were purchased in fee.  Are you instructed not to verify that [representation of the pipeline company]? ... Did you independently determine that you aren't going to look them up?" Id. (quoting Baker Dep. Tr. at 208:22–209:7, 209:9–209:12); and (4) "Do you know whether or not the appraisals for the allotments were undervalued versus tribal or private lands?" Id. at 32 (quoting Baker Dep. Tr. at 220:7–220:12).

Again, the plaintiffs argue that these questions are designed to lay bare the misconduct of the trustee-delegates in administering trust lands.  Specifically, they seek to elicit information regarding the defendants' policies and practices related to the valuation of allottee land for the purpose of conveying easements and other rights of way across such land to third parties.  The plaintiffs contend that such information is relevant to the defendants' capacity to render the

required accounting because the manner in which these rights of way are valued directly impacts whether or not the allottees receive a fair price when conveying those rights of way.  If it is proven that Indians do not receive fair value in exchange for conveying rights in their trust lands, the plaintiffs conclude, then the defendants cannot render an accurate accounting of the trust because each entry reflecting a right-of-way payment to a trust beneficiary will understate the amount that the trust beneficiary should have been paid had the value of that right of way been fairly determined.

Assuming that the plaintiffs are justified in their suspicions about the manner in which the defendants conduct these kinds of transactions involving trust assets, it clearly follows that any historical accounting cannot but present undervaluations of allottee rights-of-way relative to the fair market value of such encumbrances.  It does not follow, however, that information regarding the defendants' practices in ascertaining the value of rights of way across allottee lands are within the scope of discovery in this case.  The requirement that the defendants render a complete and accurate historical accounting of the trust is the requirement that the defendants present a complete and accurate record of all transactions involving trust property since the inception of the trust.  The Indian beneficiaries are entitled to know what monies are owed to them under the various contracts, leases, etc., that involve their trust land, and whether those monies have been disbursed properly.

However, the actual terms of the agreements that give rise to the monies due and owing to the Indian beneficiaries, whether or not the defendants negotiated or otherwise participated in the formation of those agreements, are not at issue in this litigation.  The defendants' accounting requires that they "match up" the various agreements to the persons entitled to benefit from them,

and ensure that the correct amounts under the terms of the various agreements have been paid to the correct beneficiaries, or that those beneficiaries are at least correctly appraised of the amounts that they are owed.  Again, the asset management policies and practices that result in the creation of agreements involving trust land, even where the terms of those agreements are (1) disagreeable for some reason and (2) only present in the agreement due to some malfeasance or negligence of the defendants, are not at issue in this case.  They are separate subjects for separate pieces of litigation, and are certainly outside the scope of the Baker deposition as set forth in this Court's March 15, 2004 Memorandum and Order.  The plaintiffs' questions related to the way that the value of a right-of-way across an Indian allottee's land is determined are thus disallowed with the exception of the series of questions numbered (1) above, which ask only for information concerning the contents of specific documents erased by Baker.  For the reasons set forth above, the Court finds that these questions are relevant to the impact of Baker's conduct on the administration of the trust and are thus within the scope of permissible discovery established in the Court's March 15, 2004 Order.  Accordingly, the Court will grant the plaintiffs' motion to compel Baker to answer the plaintiffs' questions reproduced above at number (1).

Fifth, and finally for the purposes of dealing with the plaintiffs' questions that the defendants contend are beyond the proper scope of discovery, the plaintiffs asked Baker about allegations in the former Special Master's Site-Visit Report other than the conceded allegation that Baker destroyed trust records and documents.  Specifically, the plaintiffs explained to Baker that the report "states the record reveals that Baker devalued allottee lands based on unsubstantiated and undocumented assumptions."  Pl.'s Mot. to Compel at 29 (quoting Baker Dep. Tr. at 166:9–170:12).  They proceeded to ask Baker:

> Q: Is that true, what's in his report?
> A: I don't think so.
> Q: [W]hat's false about [it], generally, what's false about what Mr. Balaran said?

Pl.'s Mot. to Compel at 30 (quoting Baker Dep. Tr. at 186:3–188:2).  The plaintiffs argue that the answers to these questions are relevant in that they would reveal Baker's motives for destroying the trust records and documents that he admittedly destroyed.  Clearly, however, these questions seek to elicit Baker's comments on whether or not he undervalued Indian trust lands.

The plaintiffs could quite easily explore Baker's motives for destroying trust-related documents by asking the following question: "Why did you delete the trust records?"  Such a question would get at whether Baker was either negligent or instructed to destroy records by upper-level officials in the Department of the Interior, information clearly relevant both to Baker's professed ignorance of governing regulations and Court orders, as well as to the defendants' ability and willingness to take steps this Court has determined necessary to discharge their accounting duty.  If Baker was instructed to erase the records, for example, then his reason for failing to comply with this Court's restrictions on such conduct would be clear.  However, whether Baker destroyed the documents specifically because they demonstrate his complicity in negligent or intentional mismanagement of trust assets goes beyond the scope of permissible discovery in this case, as such information relates almost exclusively to the asset management practices of one agent of the trustee-delegates.  Given that there is a way that the plaintiffs could elicit the relevant information regarding Baker's motives without straying beyond the scope of discovery, the Court will disallow the above-quoted form of the plaintiffs' question.

**D.      The Defendants' Assertion of Attorney-Client Privilege**

Generally, "[t]he attorney-client privilege protects confidential communications made

between clients and their attorneys when the communications are for the purpose of securing

legal advice or services." In re Lindsey, 148 F.3d 1100, 1103 (D.C. Cir. 1998). More

specifically, this Court has held that attorney-client privilege will apply where:

> (1) the asserted holder of the privilege is or sought to become a client; (2)
> the person to whom the communication was made (a) is a member of the
> bar of a court or his subordinate and (b) in connection with this
> communication is acting as a lawyer; (3) the communication relates to a fact
> of which the attorney was informed (a) by his client (b) without the presence
> of strangers (c) for the purpose of securing primarily either (i) an opinion of
> law or (ii) legal services or (iii) assistance in some legal proceeding, and (d)
> not for the purpose of committing a crime or tort; and (4) the privilege has
> been (a) claimed and (b) not waived by the client.

Alexander v. FBI, 193 F.R.D. 1, 4 (D.D.C. 2000); Alexander v. FBI, 192 F.R.D. 42, 45 n.2

(D.D.C. 2000); Alexander v. FBI, 186 F.R.D. 154, 161 (D.D.C. 1999) (citing In re Sealed Case,

737 F.2d 94, 98–99 (D.C. Cir. 1984)). Where the communications at issue were made by

attorneys, rather than by clients, those communications are privileged only if they "rest on

information obtained from a client." In re Sealed Case, 737 F.2d at 99 (quoting Mead Data

Central, Inc. V. United States Dep't of the Air Force, 566 F.2d 242, 254 (D.C. Cir. 1977)). The

privilege does not protect an attorney's opinion or advice, but only "the secrecy of the underlying

facts" obtained from the client. Mead, 566 F.2d at 254 n.28. Although it is often difficult to

distinguish between an attorney's advice communicated to a client from the client's confidential

disclosures to the attorney, the proponent of the privilege must nevertheless show with

"reasonable certainty ... that the lawyer's communication rested in significant and inseparable

part on the client's confidential disclosure." In re Sealed Case, 737 F.2d at 99 (citation omitted).

Additionally, "communications between a trustee and its attorneys concerning the

administration of the trust fall within the 'fiduciary exception' to the [attorney-client] privilege."

Cobell v. Norton, 212 F.R.D. 25, 27 (D.D.C. 2002).  The fiduciary exception to the doctrine of

attorney-client privilege excludes from the protection of the privilege communications between

trustees and their attorneys that relate to fiduciary matters.  See id. at 27–29 (explaining the

history, evolution, and current application of the fiduciary exception).  This Court has held that

communications between a trustee and her attorney will not be shielded by privilege unless such

communications "solely concern non-fiduciary matters."  Id. at 29.  That is, the privilege may

apply only "where a trustee seeks legal advice solely in his own personal interest or where the

discovery material has been shown to relate exclusively to non-fiduciary matters." Id. (emphasis

in original).  It is the proponent of the privilege who bears the burden of demonstrating that all

elements necessary for application of the attorney-client privilege are present and that the

fiduciary exception does not apply to the communications at issue.  See id. at 28–29.

    Here, the plaintiffs asked Baker to discuss a conversation he had with Larry Jensen,

Counselor to the Solicitor at Interior.  The Office of the Solicitor is the Department of the

Interior's general counsel and therefore Baker, as an Interior employee, is effectively Jensen's

client.  See Tax Analysts v. IRS, 117 F.3d 607, 618–620 (D.C. Cir. 1997) (explaining "[i]n the

governmental context, the 'client' may be the agency and the attorney may be an agency lawyer"

for the purposes of applying the attorney-client privilege; taking for granted that "the agency" as

client includes agency employees, not simply the agency as a separate entity).  The plaintiffs'

unsupported assertion that Baker was not Jensen's client at the time of the relevant

communications does not persuade this Court to depart from the logical conclusion that agency

employees are clients of agency counsel.

    Even with the attorney-client relationship established, however, the defendants, as

proponents of the privilege, continue to bear the burden of showing both that the privilege should apply and that the fiduciary exception is not applicable to the communications at issue. Now the plaintiffs' questioning of Baker revealed that Baker had received an unsolicited call from Jensen after Baker admitted to the Special Master that he had destroyed trust documents. Pl.'s Mot. to Compel at 25–26. Baker testified at deposition that Jensen did not ask him whether he had destroyed any documents, but only advised Baker to retain personal counsel. See Pl.'s Mot. to Compel at 27–28 (quoting Baker Dep. Tr. at 165:5–166:7). Baker also stated that he had never heard of, much less met with, Jensen prior to the conversation at issue. See id. at 28 (quoting Baker Dep. Tr. at 166:9–167:15). The plaintiffs then asked Baker whether Jensen had stated a reason or reasons why Baker should acquire private counsel. See id. at 29 (quoting Baker Dep. Tr. at 166:9–170:12). Baker answered in the affirmative, at which point the defendants objected, contending that the subject-matter of the conversation is protected from discovery by the attorney-client privilege. See id. In response, the plaintiffs' principal argument is that the information sought falls within the fiduciary exception set forth above and is thus discoverable.

Aside from arguing that Baker was not Jensen's client, which the Court rejected above, the plaintiffs insist that the other elements required for the privilege to apply are simply not present here. The Court is inclined to agree. While it may be difficult in some cases to distinguish between an attorney's opinions and confidential communications from the client, as "advice prompted by the client's disclosures may be further and inseparably informed by other knowledge and encounters," In re Ampicillin Antitrust Litig., 81 F.R.D. 377, 388 n.20, here the task is relatively easy. In situations where it is difficult to make this distinction, determining the applicability of the privilege to a given communication requires that a Court consider whether the

rationale for the privilege—the desire to protect client secrets—is implicated by the potential that the relevant communication may be disclosed.

Here, Baker testified under oath that (1) he had never spoken to Jensen prior to the conversation at issue and (2) he did not give Jensen any information regarding Baker's destruction of documents during the conversation at issue.  Now the subject-matter of the conversation surrounding the point at which Jensen advised Baker to retain private counsel and then explained why Baker should do so remains unknown; however, it is unlikely that confidential information was discussed as the defendants allowed the plaintiffs to ask Baker about the rest of the discussion.  The defendants only objected when the plaintiffs asked Baker to repeat the specific advice Jensen gave him regarding Baker's retention of private counsel.  See Pl.'s Mot. to Compel at 27–29.  Furthermore, even if Jensen's advice to Baker was in some way based on confidential information about Baker's conduct, because Baker and Jensen had never communicated prior to the relevant conversation, Jensen simply cannot have been informed of those confidential facts "by his client, without the presence of strangers, for the purpose of securing primarily either an opinion of law ..., legal services or assistance in some legal proceeding" as is required by the test set forth above.  Alexander, 186 F.R.D. at 161.  Again, the proponent of the privilege bears the burden of demonstrating that the conditions necessary for application of the privilege are satisfied.  Here, the defendants produce no evidence that Jensen's statement to Baker regarding Baker's retention of private counsel was based on confidential information that Baker revealed to Jensen.  The Court therefore finds that the privilege does not apply.

The plaintiffs next argue that even if the privilege is found to apply, "the information

discussed by Baker and Jensen ... is within the fiduciary exception to attorney-client privilege because it involves, and directly relates to, the management and administration of the trust." Pl.'s Mot. to Compel at 26.  The defendants counter that if the test for the application of the fiduciary exception was merely whether the relevant communication relates to trust administration, "no attorney-client communications in this case would be privileged.  Instead, the issue is the reason for the communication."  Def.'s Opp. to Pl.'s Mot. to Compel at 10 n.11. Again, the relevant test for the applicability of the fiduciary exception is whether the relevant communication relates solely to non-fiduciary matters; and the proponent of the privilege bears the burden of demonstrating that this test has been satisfied.  Here, the defendants have manifestly failed to carry that burden.

The only argument the defendants make regarding the reasons for the Baker-Jensen communication, which, importantly, was initiated by Jensen, is that the discussion was "solely related to the issue of procuring legal services for Mr. Baker after allegations were made against him ....  This legal advice related solely to Mr. Baker personally or to the government's exposure to civil or criminal liability ...."  Def.'s Opp. to Pl.'s Mot. to Compel at 11.  To be sure, this Court has concluded that attorney-client communications may be shielded by privilege, even where the client is a fiduciary, if the "trustee obtained the legal advice solely to protect himself personally or the government from civil or criminal liability."  Cobell, 212 F.R.D. at 30. Facially, then, the defendants have asserted the proper basis for finding that the Baker-Jensen communication is outside the fiduciary exception and thus protected from disclosure by the attorney-client privilege.

In order to enjoy the benefits of the attorney-client privilege, however, the proponent

must establish all essential elements of the privilege by competent evidence. This showing

cannot be successfully made by "mere conclusory or ipse dixit assertions." See Cobell, 212

F.R.D. at 27 (citing Martin v. Valley National Bank of Arizona, 140 F.R.D. 291, 302 (S.D.N.Y.

1991). This evidentiary burden remains upon the proponent of the privilege where the

applicability of the fiduciary exception is at issue. See id. Here, the defendants present no

evidence at all, but rather merely assert that the reasons for Jensen's discussion with Baker make

the fiduciary exception inapplicable to that discussion. Such an assertion hardly qualifies as

"competent evidence" of the applicability of the privilege. For the foregoing reasons, the Court

finds insufficient evidentiary grounds to sustain the defendants' privilege objection to the

questions posed by the plaintiffs and quoted in the plaintiffs' Motion to Compel under the

heading "Eighth Contested Objection." These questions will be allowed.[13]

### E.    The Plaintiffs' Motion for Sanctions

The final matter before the Court is the plaintiffs' request that the Court sanction the

defendants for noncompliance with discovery requests under Federal Rule of Civil Procedure

37(a)(4)(A). See *Pl.'s Mot.* [2653] *for Expedited Consideration of Motion to Compel Discovery*

*and Request for Sanctions*. Rule 37(a)(4)(A) provides, in relevant part, that if a motion to

compel discovery is granted:

> the court shall, after affording an opportunity to be heard, require the party
> or deponent whose conduct necessitated the motion or the party or attorney
> advising such conduct or both of them to pay to the moving party the

---

[13]The Court is particularly inclined to vigorously enforce the burden of production and persuasion with respect to the applicability of the attorney-client privilege where the fiduciary exception is at issue, due to the compelling rationale supporting the existence of the fiduciary exception. As our Court explained, "[a]s a representative for the beneficiaries of the trust which he is administering, the trustee is not the real client in the sense that he is personally being served [by the attorney]. ... The trustee ... cannot subordinate the fiduciary obligations owed to the beneficiaries to [his or her] own private interests under the guise of attorney-client privilege." Washington-Baltimore Newspaper Guild, Local 35 v. Washington Star Co., 543 F. Supp. 906 (D.D.C. 1982).

> reasonable expenses incurred in making the motion, including attorney's
> fees, unless the court finds that the motion was filed without the movant's
> first making a good faith effort to obtain the disclosure or discovery without
> court action, or that the opposing party's nondisclosure, response, or
> objection was substantially justified, or that other circumstances make an
> award of expenses unjust.

FED. R. CIV. P. 37(a)(4)(A).  District courts are afforded broad discretion to determine when Rule

37 sanctions are warranted.  See Bonds v. District of Columbia, 93 F.3d 801, 808 (D.C. Cir.

1996); Sturgis v. Am. Ass'n of Retired Persons, 1993 WL 518447, at *1 (D.C. Cir. 1993) (per

curiam); Steffan v. Cheney, 920 F.2d 74, 75 (D.C. Cir. 1990); Cobell, 213 F.R.D. at 28.

However, the language of the Rule itself is mandatory, dictating that the Court must award

expenses upon granting a motion to compel disclosure unless one of the specified bases for

refusing to make such an award is found to exist.  The Court has afforded the parties the

opportunity to be heard through their written submissions, which is sufficient to satisfy the

requirement of Rule 37.  See Alexander v. FBI, 186 F.R.D. 144, 147 n.1 (citing Advisory

Committee Note on Rule 37, 146 F.R.D.  401, 690 (1993); 8A CHARLES ALAN WRIGHT, ARTHUR

R. MILLER, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2288, at 663–64, 664 n.25 (2d ed.

1994)).  The defendants argue that their objections during the Baker deposition were

"substantially justified," such that an award of Rule 37 sanctions would not be justified here.

Def.'s Opp. to Pl.'s Mot. to Compel at 11.  The Court agrees, and will deny the plaintiffs' motion

for sanctions.

"The Supreme Court has stated that a party meets the 'substantially justified' standard

when there is a 'genuine dispute' or if 'reasonable people could differ' as to the appropriateness

of the motion."  Alexander, 186 F.R.D. at 147 (quoting Pierce v. Underwood, 487 U.S. 552, 565

(1988)); see also 8A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, ET AL., FEDERAL PRACTICE

AND PROCEDURE § 2288 (2d ed. 1994) ("Making a motion, or opposing a motion, is

'substantially justified' if the motion raised an issue about which reasonable people could

genuinely differ on whether a party was bound to comply with a discovery rule.").  For example,

"[w]hen there is no controlling precedent on the issue, and counsel marshals what authority there

is in support of her position, the position she articulates will be found to be substantially justified

even if she does not prevail."  Boca Investerings P'ship v. United States, 1998 WL 647214, at *2

(D.D.C. 1998) (explaining that the "substantially justified" standard is "a forgiving one").

However, "a party's position is not substantially justified if there is no legal support for it, if the

party concedes the validity of his opponent's position after [costing] everyone time and money,

or, worse, defies an unequivocally clear obligation."  Id.

Here, the Court denies the majority of the plaintiffs' requests for compelled disclosure,

and thus the defendants' objections to those requests are by definition substantially justified.  The

Court grants the plaintiffs' motion to compel as to those requests that demand only information

concerning the actual contents of the specific documents that Baker admittedly destroyed, as well

as to the request for disclosure of the conversation between Baker and Jensen.  The Court finds

that the defendants' objections to the former category of requests are substantially justified, due

to their similarity to the objections that the Court concludes are meritorious herein and due to the

complicated distinctions that must be made by the parties between permissible and impermissible

subject-matter areas for the purposes of compelling disclosure and discovery in this case.

Reasonable people could certainly differ on the issue of whether a given question relates more

substantially to asset management than to accounting.  Thus, the Court finds that these

objections, too, are substantially justified.  What remains, then, is whether the defendants'

assertion of attorney-client privilege was substantially justified.

This matter is to be distinguished from the circumstances involved when the Court last addressed this issue.  See Cobell, 213 F.R.D. at 28–32.  There, the Court found the defendants' contention that "[c]ourts have refused to compel discovery in analogous circumstances" to be unsupported in the caselaw.  See id. at 31.  Here, by contrast, the defendants more squarely address the law of this case regarding the attorney-client privilege, correctly recognize the required elements and that the fiduciary exception may apply, yet fail to produce evidence sufficient to carry their burden to establish the applicability of the privilege to the Baker-Jensen communication.  The defendants lose this argument not because it is incorrect, but rather because they fail to support their position with sufficient facts.  It does not follow from this that the objection was not substantially justified, nor does the failure to produce evidence show that the evidence does not exist at all.  The Court need not, however, determine whether a failure of evidentiary support renders an argument not "substantially justified."  Even if the Court made such a finding, which would support the imposition of Rule 37 sanctions if the only objection to discovery contested in the plaintiffs' motion to compel were the assertion of attorney-client privilege.  However, the plaintiffs' motion contains other requests for disclosure, most of which are denied herein.

When a motion to compel is granted in part and denied in part, Federal Rule of Civil Procedure 37(4)(c) requires that "reasonable expenses incurred in relation to the motion" be apportioned in a just manner.  FED. R. CIV. P. 37(4)(c); see also Boca, 1998 WL 647214, at *2. Here, the Court finds that the great majority of the defendants' objections complained of in the plaintiffs' motion to compel were "substantially justified," with only one objection of

questionable justification.  Although the Court does not today resolve whether the defendants'

privilege objection was substantially justified, the Court nevertheless finds that it would be unjust

to impose the expenses of this motion upon the defendants.  This would be true even if the Court

found the privilege argument lacking in substantial justification.  The expenses associated with

filing this motion were primarily incurred in connection with the objections based on the scope of

permissible discovery during the Baker deposition.  The privilege issue is tangential, at best, to

the thrust of the plaintiffs' motion, and certainly makes up a tiny fraction of the briefing in this

matter.  To impose, say, one-twelfth of the cost of bringing a motion to compel upon the

defendants, whose arguments were eleven-twelfths "substantially justified," does not seem to

serve any of the purposes of Rule 37.  The Court therefore concludes that an award of Rule 37

Sanctions is inappropriate under the circumstances.

F.      **The Defendants' Motions for Protective Orders**

The defendants' motions for protective order are identical in substance, with the

exception of the defendants' objection to the plaintiffs' notice of deposition of Mr. Cason, which

will be addressed below.  Generally, the party moving for a protective order under Federal Rule

of Civil Procedure 26(c) bears the burden of establishing good cause for the entry of the

protective order.  See Ellsworth Assoc., Inc. v. United States, 917 F. Supp. 841, 845 (D.D.C.

1996).  Aside from a specific argument concerning the Cason deposition, the defendants advance

the same three good-cause arguments in favor of a protective order barring the other depositions

that the plaintiffs have requested.

First, the defendants argue that the plaintiffs' discovery rights have been suspended by an

order of this Court.  However, as was discussed above, see supra, note 2,that suspension is no

longer necessary in light of the completion of the two appeals that were then pending. The Court's rulings concerning discovery have never been disturbed by the Court of Appeals, and, in fact, the Court's authority to grant the plaintiffs additional discovery as an equitable remedy was implicitly affirmed in Cobell XIII, when the D.C. Circuit recognized this Court's ongoing and "broad case management authority." Cobell XIII, No. 03-5314, slip op. at 24. The Court of Appeals' issuance of the Cobell XII and XIII opinions has disposed of the rationale for this Court's prior suspension of the plaintiffs' discovery efforts. As such, the Court's Order [2662] of September 2, 2004, in which discovery was drastically limited, shall be vacated in the Order accompanying this Opinion. Therefore, the only limitations on the plaintiffs' discovery rights going forward will be those imposed by the scope of this lawsuit and the requirements of Rule 26.

Second, and at greater length, the defendants argue that this Court is precluded from allowing discovery concerning Interior's efforts at trust reform by virtue of the nature of this litigation. The defendants claim that this is a case involving no more than judicial review of prototypical administrative agency action under the APA and, in the typical APA case, "judicial review is limited to the administrative record." The defendants contend that the compilation and Court review of the administrative record must be completed prior to allowing any discovery. The conclusion that discovery must be restricted depends, however, on the legitimacy of the logically prior proposition that this is, in fact, a typical APA case involving judicial review of final agency action and no more. This premise, however, is ill-founded and the defendants' argument is therefore ultimately unsound.

To be sure, certain provisions of the APA are relevant to this litigation. APA provisions

provide the necessary waiver of sovereign immunity and the statutory cause of action that make

this lawsuit justiciable in the first place.  However, the defendants have never been successful in

portraying this litigation as a typical case of judicial review of agency action.  In Cobell XII, the

Court of Appeals specifically rejected the defendants' argument that this Court's power to order

equitable relief in this case is constrained by the APA, and made clear that "the narrower judicial

powers appropriate under the APA do not apply [here] … because the underlying lawsuit is both

an Indian case and a trust case in which the trustees have egregiously breached their fiduciary

duties."  Cobell XII, No. 03-5262, slip op. at 9.  For this reason, the Court of Appeals in Cobell

VI "did not limit the district court's authority to exercise its discretion as a court of equity in

fashioning a remedy to right a century old wrong[.]"  Id.

 Cobell XIII's discussion of the applicability of the APA to this litigation is consistent

with that of Cobell XII.  The Cobell XIII Court notes that the APA, coupled with the Supreme

Court's decisions in Lujan v. National Wildlife Federation, 497 U.S. 871 (1990), and Norton v.

Southern Utah Wilderness Alliance, 124 S. Ct. 2372 (2004), place some limits on this Court's

power to act in this case.  See Cobell XIII, No. 03-5314, slip op. at 20–22.  These limitations,

however, apply only to the Court's ability to fashion "enforcement remedies," id., slip op. at 25,

and do not interfere with the Court's "broad case management authority."  Id., slip op. at 24.

More specifically, the Cobell XIII Court's discussion of the APA is intended to make clear that

this Court cannot issue "broad programmatic remedies"−that is, orders that simply require

Interior to comply with general statutory requirements−but rather must first find that

"government actions (or inactions) breach[] a legal duty and that the steps ordered by the court

constitute[e] an essential remedy" before fashioning equitable relief that compels specific agency

48

action.  See Cobell XIII, No. 03-5314, slip op. at 27–28.  Thus, while the Court of Appeals may

have recognized some APA-based limitations on this Court's remedial authority, the rationale for

respecting those limitations is not germane to the question of discovery.

Indeed, the Cobell XIII  Court seems to have anticipated further discovery in this case,

perhaps even beyond the scope set forth in the foregoing discussion.  The D.C. Circuit's

conclusion that "judicial monitoring of Interior [must be] anchored in … specific stipulations [of

breaches of the fiduciary duty to account] or in some future adjudicated findings," Cobell XIII,

No. 03-5314, slip op. at 25, and that this Court "may declare the government's legal obligations

… pursuant to the Declaratory Judgment Act," id., slip op. at 28, indicate that the Court of

Appeals left open the possibility that breaches of other fiduciary duties, beyond the duty to

account, might be brought into this litigation.  The Court of Appeals' statements defining the

contours of this Court's ongoing and potentially expanded remedial authority in this case would

be rendered meaningless if that Court had simultaneously endorsed the position that the very

nature of this case prevents the plaintiffs from conducting further discovery.  As this Court

adheres to the canon of judicial interpretation requiring that judicial opinions be read, wherever

possible, in an internally consistent manner, the Court concludes that the defendants'

interpretation of the two recent appellate opinions as reinstating APA-based prohibitions on

discovery simply cannot be correct.

The defendants' contention that the Cobell XII decision reintroduced APA limitations on

discovery in this case rests on a single patch of text in which the Court of Appeals reaffirmed the

reasonableness of this Court's decision that "the post-liability phase of [this] litigation would, in

part, 'involve the government bringing forth proof of IIM trust balances and then plaintiffs

making exceptions to that proof.'"  Cobell XIII, No. 03-5262, slip op. at 12 (quoting Cobell V, 91

F. Supp. 2d at 31).  The defendants contend that this affirmation amounts to a holding that this

litigation should proceed according to a process "identical to that followed in APA cases."

However, this conclusion ignores the bulk of the Cobell XII Court's opinion, as well as the

companion opinion issued in Cobell XIII.  The foregoing discussion shows that these opinions

intended not to impose rigid APA limits on future proceedings in this case.  Rather, Cobell XII

and Cobell XIII define and expand this Court's equitable powers to enforce Interior's fiduciary

duties as trustee of the IIM trust.  At the very least, neither of these opinions has anything to say

that would limit this Court's "broad case management authority," including the authority to allow

discovery as it sees fit consistent with Rule 26.  Finally, it should be intuitively obvious that this

Court is free to model some aspect of future proceedings in this case on a typical APA-review

action without somehow unwittingly binding itself to all the limitations the APA imposes upon

courts reviewing agency action in normal cases.  This is not, by any stretch of the imagination, a

normal case.

 The defendants' third general argument against allowing the plaintiffs to conduct the

proposed depositions is that the plaintiffs have failed to sufficiently establish the relevance of the

testimony they seek to the subject-matter of this litigation.  This argument is unpersuasive.

Federal Rule of Civil Procedure 26(b)(1) provides that discovery is permissible so long as it is

"reasonably calculated to lead to the discovery of admissible evidence."  FED. R. CIV. P. 26(b)(1).

Although the defendants argue that the plaintiffs, by their recent deposition notices, seek the

Court's permission to conduct an "untethered fishing expedition," the Court concludes that the

limitations on the scope of permissible discovery set forth in this opinion provide sufficient

safeguards against any potential abuse of the discovery process.  Further, upon examination of the plaintiffs' discovery notices and briefs in opposition to the defendants' motions for protective orders, the Court finds that the plaintiffs have made an offer of proof sufficient to satisfy the minimal relevancy requirement of Rule 26(b)(1).   Accordingly, the defendants' motions for protective orders will be denied, and the plaintiffs will be authorized to take the depositions proposed in their deposition notices.

The final matter requiring the Court's consideration is the defendants' argument that the deposition of James Cason, Associate Deputy Secretary of the Interior, must be barred in accordance with the Supreme Court's decision in United States v. Morgan, 313 U.S. 409 (1941). The Court concludes, upon consideration of this argument, that Morgan is inapplicable to Mr. Cason and that his deposition will be allowed to proceed.  First, Mr. Cason is an Associate Deputy Secretary, a position that simply does not rise to the level of "top executive department official" within the meaning of the Morgan rule.  Mr. Cason's position ranks at Level IV of the federal government's Senior Executive Service ("SES").  As such, Mr. Cason's position is not subject to Senate confirmation and is lower in ranking than all Executive Schedule positions. Indeed, Mr. Cason may most appropriately be called a "mid-level" executive, rather than a "top executive official."  "Top executive" officials are confirmed by the Senate and are in the Executive Schedule, not the SES.  Mr. Cason is not the type of executive official in need of protection from the discovery process.

Furthermore, and perhaps more importantly, Mr. Cason has submitted several sworn statements in this case.  The Court concludes that it would offend the fundamental principles of equity that animate the federal discovery rules to allow an individual to submit affidavits that

support the defendants' position yet immunize that same individual from examination by the plaintiffs concerning the matters sworn to in his affidavits.  Of course, the plaintiffs' deposition of Mr. Cason will likely cover subjects far beyond the contents of Mr. Cason's statements of record in this matter.  However, as discussed above, the plaintiffs have satisfied the Court that their proposed depositions are reasonably calculated to lead to the discovery of admissible evidence, so that additional questioning of Mr. Cason will remain faithful to the Federal Rules.  Accordingly, the defendants' motion for a protective order to prevent the plaintiffs from deposing James Cason will be denied.

### III.  CONCLUSION

The Court today resolves the plaintiffs' motion to compel, rendering moot the plaintiffs' motion to expedite consideration of their motion to compel.  Furthermore, the Court finds no reason to address the statement in the plaintiffs' reply brief that is the subject of the defendants' proposed surreply, eliminating any need to consider the defendants' arguments in response.  There being no other persuasive reason before the Court for allowing the defendants to file an additional brief on this matter, the defendants' motion for leave to file a surreply will be denied.

A corresponding Order will issue this date.


Signed by Royce C. Lamberth, United States District Judge, February 8, 2005.