## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**ELOUISE PEPION COBELL, <u>et al.</u>,**    )
**on her own behalf and on behalf of**    )
**all those similarly situated,**    )
    )
    **Plaintiffs,**    )
    )
    **v.**    )    **Civil Action No. 96-1285 (RCL)**
    )
**GALE NORTON,**    )
**Secretary of the Interior, <u>et al.</u>,**    )
    )
    **Defendants.**    )
_____)

## <u>MEMORANDUM AND ORDER</u>

This matter comes before the Court on the defendants' *Motion* [2832] *to Strike Plaintiffs'*

*Notice of Supplemental Information in Support of Plaintiffs' Renewed Request for Emergency*

*Status Conference*.  Upon consideration of the defendants' motion, the opposition thereto, the

reply, the applicable law, and the entire record herein, the Court concludes that the defendants'

motion will be denied.  The Court's reasoning is set forth below.

## <u>BACKGROUND</u>

On December 5, 2001, having been presented with extensive evidence of the lack of

security for Individual Indian Trust data housed on or accessed by information technology

systems at Interior, the Court entered a temporary restraining order requiring "that defendants

shall immediately disconnect from the Internet all information technology systems that house or

provide access to individual Indian trust data [and] that defendants shall immediately disconnect

from the Internet all computers within the custody and control of the Department of the Interior,

its employees and contractors, that have access to individual Indian trust data." Temporary

Restraining Order [1036], issued Dec. 5, 2001, at 2.[1]  At Interior's urging, the Court entered a

consent order on December 17, 2001, outlining a procedure by which Interior could reconnect its

IT systems to the Internet only after satisfying the Special Master that those systems were secure.

See Consent Order [1063], issued Dec. 17, 2001.  The December 17, 2001 Consent Order, not

having been modified by any subsequent Order, remains in effect today.

   The Special Master's process for reviewing Interior's IT security broke down in late

spring, 2003, see Cobell v. Norton, 274 F. Supp. 2d 111, 114–24 (recounting the events

surrounding the disintegration of this process), and as a result the Court issued a preliminary

injunction on June 28, 2003, requiring that Interior "immediately disconnect from the Internet all

Information Technology Systems within [its] custody or control ... until such time as the Court

approves their reconnection to the Internet." Id. at 135.  The Court allowed Interior IT systems

connected to the Internet as of the date the preliminary injunction was issued to remain connected

if they "impact[ed] life or property," or if Interior certified to Court that the connected systems

either did not house or access Individual Indian Trust data or were secure from unauthorized

access from the Internet.  See id. at 135–36.

   Upon reviewing Interior's certifications for Internet-connected IT systems submitted in

accordance with the June 28, 2003 preliminary injunction and finding them to be both

procedurally and substantively defective, the Court, on March 15, 2004, entered a preliminary

---

[1]Subsequently, on the defendants' motion, the Court modified the December 5 TRO to allow Interior to "reconnect to the Internet, within 24 hours of notice to the Special Master and plaintiffs' counsel with appropriate documentation, any information technology system that does not house individual Indian trust data and that does not provide access to individual Indian trust data."  Order, issued Dec. 8, 2001, at 1.

injunction that required Interior to disconnect (or to keep disconnected) from the Internet

Interior's IT systems at certain bureaus and offices, including the BIA, regardless of whether or

not they housed or accessed Individual Indian Trust Data.  See Cobell v. Norton ("Cobell XII"),

310 F. Supp. 2d 77 (D.D.C. 2004).  The March 15, 2004 preliminary injunction superseded and

replaced the Court's June 28, 2003 preliminary injunction.  See Preliminary Injunction Order

[2531], issued Mar. 15, 2004, at 1.

　　　　The D.C. Circuit vacated the Court's March 2004 preliminary injunction by opinion

issued December 3, 2004.  See Cobell v. Norton, 391 F.3d 251 (D.C. Cir. Dec. 3, 2004).  In the

wake of the decision of the Court of Appeals, the plaintiffs requested that the Court hold an

emergency status conference to determine how to proceed in addressing Interior's Indian trust-

related IT security issues going forward.  See Pls.' Request [2776] for Emergency Status

Conference Regarding the Security of Electronic Trust Records, filed Dec. 3, 2004; Pl's

Renewed Request [2804] for Emergency Status Conference Regarding the Security of Electronic

Trust Records, filed Jan. 4, 2005.

　　　　The plaintiffs subsequently filed, as an attachment to their Notice of Supplemental

Information in Support of Plaintiffs' Renewed Request for Emergency Status Conference ("Pls.'

Notice"), a copy of a May 7, 2004 memorandum from Kaniah Konkoly-Thege, an attorney in

Interior's Office of the Solicitor, to BIA Chief Information Officer Brian Burns ("the

memorandum").  See Pls.' Notice [2810], filed Jan. 11, 2005, at Ex. 1 (Mem. from Konkoly-

Thege to Burns, May 7, 2004).  That memorandum recounts the advice of both the Department of

Justice ("DOJ") and the Solicitor's Office regarding the Secretary of the Interior's conclusion

that the proposal of the Assistant Secretary of the Interior for Indian Affairs and the BIA to

"implement Lotus Notes remote dial-up" on BIA IT systems would not violate "any of the Cobell court orders."[2]

The defendants make two arguments in support of their motion to strike the plaintiffs' Notice and the memorandum.  First, the defendants contend that the allegation in the plaintiffs' Notice—that the Lotus Notes remote dial-up system at BIA would constitute an illicit Internet connection—has no basis in fact and that the Notice should be stricken for that reason.  The Court finds, however, that the truth of the plaintiffs' contention in this regard is a question of fact that may only be resolved after the current evidentiary hearing is completed.  It follows that the Court cannot summarily strike the plaintiffs' Notice for lack of evidentiary support on the basis of the unsupported assertions in the defendants' motion alone.

The defendants' second argument is that the memorandum is shielded by the attorney-client privilege and thus should not be discoverable or subject to public release by the plaintiffs.  Thus, the defendants claim, the memorandum, the plaintiffs' Notice (which recounts the content of the memorandum in some detail), and any other of the plaintiffs' filings referencing the content of the memorandum, should be stricken from the record in this case.  The plaintiffs respond that the memorandum falls within the "fiduciary exception" to the attorney-client privilege.  There is no need to address the applicability of the fiduciary exception, however, as the Court concludes that the defendants have failed, as a threshold matter, to demonstrate that any part of the memorandum is protected by the attorney-client privilege.

_____

[2]All BIA's IT systems housing or accessing Individual Indian Trust Data were initially disconnected from the Internet pursuant to the December 5, 2001 TRO and remain disconnected today, pursuant to the December 17, 2001 Consent Order, because Interior has never obtained approval from the Special Master or the Court (after the end of the Special Master's involvement in this litigation) to reconnect those systems.

**DISCUSSION**

Federal Rule of Civil Procedure 12(f) provides, in relevant part, that "upon motion made by a party within 20 days of service of the pleading upon the party ..., the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f).  An allegation may be stricken as "scandalous" under this standard if it is found to be wholly lacking in evidentiary support.  See, e.g., Alexander v. FBI, 186 F.R.D. 21, 53 (D.D.C. 1998) (striking as scandalous charges that an attorney "threatened Plaintiffs' counsel and family" for lack of evidentiary support); Pigford v. Veneman, 215 F.R.D. 2, 4–5 (D.D.C. 2003) (striking as scandalous accusations that attorney displayed a "racist attitude" as devoid of evidentiary foundation); In re Johnson, 236 B.R. 510, 523 (D.D.C. 1999) (striking as scandalous allegations that bankruptcy trustee was a "liar" because they were "so devoid of necessary evidence ... that they amount to little more than name-calling). Resolution of motions to strike lies firmly within the discretion of the Court, Cobell v. Norton, 2004 WL 2008937 at *1 (D.D.C.); and such motions are generally disfavored, being regarded as "time wasters."  2A MOORE'S FEDERAL PRACTICE § 12.21, at 2419.  As such, motions to strike should be denied unless the movant can show either that there exists no evidence to support the allegations in question, or that "no evidence in support of the allegations would be admissible." Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976).

The plaintiffs' Notice alleges that the BIA Lotus Notes remote dial-up system "clandestinely enable[s] thousands of employees and contractors to reconnect to the Internet in direct violation of this Court's orders"; Pls.' Notice at 3; and that various Interior and DOJ

personnel and officials participated or were complicit in the alleged violation.  See, e.g., id. at 1–2.  The defendants deny that the Court's Orders would be violated, insisting that the BIA Lotus Notes remote dial-up system neither constitutes an Internet connection nor requires any Internet connectivity in order to function.  In support of this argument, the defendants cite only the memorandum itself, in which various offices conclude that the BIA Lotus Notes remote dial-up system would not violate this Court's Orders.  See Defs.' Reply [2861] to Pls.' Opp. to Defs.' Mot. to Strike ("Defs.' Reply"), filed Mar. 3, 2005, at 2 (concluding that plaintiffs' failure to cite evidence for allegations in plaintiffs' Notice renders those allegations rebuttable by citation to the memorandum alone).

Unfortunately, the statements in the memorandum, which are unsworn and unverified, are not proper evidence to support the necessary factual predicate for the defendants' argument—that the BIA Lotus Notes remote dial-up system does not constitute a connection to the Internet within the meaning of this Court's Orders.  No facts are recited in the memorandum in support of this conclusion, the memorandum merely asserts the conclusion and details various agencies' positions regarding the conclusion's validity.

Indeed, the only fact in the record related to this issue is the fact that the BIA either has implemented or plans to implement a Lotus Notes remote dial-up system.  Because this fact, without more, is insufficient to establish either the defendants' conclusion that the system does not constitute an Internet connection or the plaintiffs' conclusion that it does; and because the implementation of Lotus Notes remote dial-up does not, on its face, tend to make either conclusion more likely to be true than the other; it follows that both conclusions are equally likely to be true on the present record.  Put differently, the single relevant fact in the record lends

6

equal support to both parties' assertions.  Thus, the Court cannot conclude that the allegations in

the plaintiffs' Notice should be stricken as wholly devoid of factual support.

The defendants' second argument in favor of striking the plaintiffs' Notice and the

memorandum is that the content of the memorandum is protected by the attorney-client privilege.

This Court has previously removed from the public record in this case documents shown to

contain privileged material.  See, e.g., Cobell v. Norton, 213 F.R.D. 69, 77–79 (D.D.C. 2003)

(striking various filings from the record where contents were shown to be protected by

deliberative process privilege and work-product doctrine).

According to Federal Rule of Evidence 501, "the privilege of a witness ... shall be

governed by the principles of the common law as they may be interpreted by the courts of the

United States in light of reason and experience."  FED. R. EVID. 501.  The attorney-client

privilege—the most venerable of these common law evidentiary privileges, see Upjohn Co. v.

United States, 449 U.S. 383, 389 (1981) (citing 8 J. WIGMORE, EVIDENCE § 2290 (1961))—is

intended to "encourage full and frank communication between attorneys and their clients ...

[because] sound legal advice or advocacy serves public ends and ... such advice or advocacy

depends upon the lawyer's being fully informed by the client."  Id.; see also Trammel v. United

States, 445 U.S. 40, 51 (1980) ("The lawyer-client privilege rests on the need for the advocate

and counselor to know all that relates to the client's reasons for seeking representation if the

professional mission is to be carried out.").

Generally, the attorney-client privilege will apply where:

> (1) the asserted holder of the privilege is or sought to become a client; (2)
> the person to whom the communication was made (a) is a member of the
> bar of a court or his subordinate and (b) in connection with this

> communication is acting as a lawyer; (3) the communication relates to a fact
> of which the attorney was informed (a) by his client (b) without the presence
> of strangers (c) for the purpose of securing primarily either (i) an opinion of
> law or (ii) legal services or (iii) assistance in some legal proceeding, and (d)
> not for the purpose of committing a crime or tort; and (4) the privilege has
> been (a) claimed and (b) not waived by the client.

Cobell v. Norton, 226 F.R.D. 67, 87 (D.D.C. 2005) (quoting Alexander v. FBI, 193 F.R.D. 1, 4

(D.D.C. 2000); Alexander v. FBI, 192 F.R.D. 42, 45 n.2 (D.D.C. 2000); Alexander v. FBI, 186

F.R.D. 154, 161 (D.D.C. 1999) (citing In re Sealed Case, 737 F.2d 94, 98–99 (D.C. Cir. 1984))).

It is well established that "the party claiming the privilege bears the burden of proving that the

communications are protected." In re Lindsey, 148 F.3d 1100, 1106 (D.C. Cir. 1998).  Each and

every element of the privilege must be proved by "competent evidence," and the proponent's

burden "cannot be 'discharged by mere conclusory or ipse dixit assertions.'"  Cobell, 213 F.R.D.

at 71 (quoting Martin v. Valley Nat'l Bank of Ariz., 140 F.R.D. 291, 302 (S.D.N.Y. 1991)).

Both the DOJ and the Solicitor's Office are in attorney-client relationships with

Interior—DOJ is Interior's trial counsel in this litigation and the Solicitor's Office is Interior's

general counsel.  This observation entails the conclusion that both DOJ and the Solicitor's Office

are in attorney-client relationships with each of Interior's bureaus, divisions, offices, officials,

and employees.  See Mead Data Central, Inc. V. United States Dep't of the Air Force, 566 F.2d

242, 253 n.24 (D.C. Cir. 1977).  Thus the Bureau of Indian Affairs, the Office of the Secretary,

and the Office of the Assistant Secretary of the Interior for Indian Affairs, all of which are

defendants in this litigation insofar as the Department of Interior is a defendant in this litigation,

are all effectively clients of both the DOJ (Ms. Spooner) and Interior's Office of the Solicitor

(Ms. Konkoly-Thege).  See Tax Analysts v. IRS, 117 F.3d 607, 618–620 (D.C. Cir. 1997).

Given the nature of these attorney-client relationships, the attorney-client privilege hypothetically extends to: (1) communications between Interior's attorneys in the Solicitor's Office and DOJ and Brian Burns, an Interior employee, because ""[w]here the client is an organization, the [attorney-client] privilege extends to those communications between attorneys and all agents or employees of the organization who are authorized to act or speak for the organization in relation to the subject matter of the communication[;]" Mead Data Cent., 566 F.2d at 253 n.24; and (2) communications between DOJ and the Solicitor's Office, as communications between multiple attorneys representing the same client may also be privileged. See id. at 253 n.21.  Thus, if Interior demonstrates that all the requirements for the application of the privilege are satisfied, the privilege will not be destroyed by the specific nature of, or parties to, the communications embodied in the memorandum.

Having found that these attorney-client relationships exist, it is also clear from the face of the memorandum that Interior, the client, sought and received legal advice from the DOJ and the Solicitor's Office relating to the activation of a Lotus Notes remote dial-up system at the BIA, a fact about which DOJ and the Solicitor's Office were undoubtably informed by Interior for the purpose of obtaining the legal advice transmitted in the memorandum.  The Court is willing to assume that Interior did not seek the advice given in the memorandum in furtherance of any crime, fraud, or tort; and Interior has clearly asserted the privilege in its motion to strike.  Thus, the memorandum facially satisfies the test for privileged attorney-client communications set forth in Alexander.

The Alexander test is incomplete, however, when applied to communications made by attorneys to clients, like the communications relayed in the memorandum at issue here, as

opposed to communications made by clients to attorneys.  In the case of attorney-to-client communications, attorney-client privilege may only properly be invoked if the communications "rest on <u>confidential</u> information obtained from a client."  <u>In re Sealed Case</u>, 737 F.2d at 99 (quoting <u>Mead Data Central</u>, 566 F.2d at 254) (emphasis added).  The attorney-client privilege does not protect an attorney's opinion or advice, but only "the secrecy of the underlying facts" obtained from the client.  <u>Mead Data Central</u>, 566 F.2d at 254 n.28.  To establish the existence of the privilege for any attorney-to-client communication, as opposed to a client-to-attorney communication, "the claimant must demonstrate with reasonable certainty ... that the lawyer's communication rested in significant and inseparable part on the client's confidential disclosure." <u>In re Sealed Case</u>, 737 F.2d at 99 (citing <u>Brinton v. Department of State</u>, 636 F.2d 600, 603–04 (D.C. Cir. 1980); <u>Mead Data Central</u>, 566 F.2d at 254).

Thus the proponent must make two additional showings when asserting the privilege for an attorney-to-client communication.  First, the claimant must establish that the communication was predicated on information obtained from the client; and second, the claimant must demonstrate that this information obtained from the client was confidential.  The prototypical case would involve a client confessing some act to his attorney and asking for advice on his possible criminal liability for having committed that act.  Because "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant[,]" <u>Upjohn</u>, 449 U.S. at 390–91, the attorney's responsive advice will usually satisfy the first requirement as a matter of course.[3]  If the attorney can also

---

[3]Indeed, the American Bar Association's Code of Professional Responsibility indicates that:
A lawyer should be fully informed of all the facts of the matter he is handling in order for his client to obtain the full advantage of our legal system.  It is for the lawyer in the exercise

show that the information about the subject act communicated to the attorney by the client was confidential, then attorney-client privilege will permit nondisclosure of the attorney's communication of advice to the client.

As in the prototypical case, the memorandum at issue here contains legal advice concerning the client's possible liability for committing an act—the implementation of Lotus Notes remote dial-up at BIA.  Any <u>competent</u> legal advice on this question must be based on the knowledge of DOJ and the Solicitor's Office concerning BIA's plan to implement Lotus Notes remote dial-up the detailed workings of such a system in the BIA's IT environment.  Assuming the attorneys whose opinions are relayed in the memorandum exercised the appropriate level of diligence in formulating their opinions, the memorandum facially satisfies the first requirement of the expanded <u>Alexander</u> privilege test for attorney-to-client communications.

What remains is to determine whether the information communicated to DOJ and the Solicitor's Office by Interior–the fact that BIA was planning to implement Lotus Notes remote dial up and the details concerning how that system would work–was confidential at the time it was communicated.  In order for client information to be confidential, the client must communicate the information to the attorney "with the expectation of secrecy," and the information must not have been "known or disclosed to any third party" at the time it was communicated.  <u>Mead Data Central</u>, 566 F.2d at 254.  Furthermore, any expectation of secrecy must be reasonable in order to support a claim of privilege.  The Fifth Circuit adheres to this

---

of his independent professional judgment to separate the relevant and important from the irrelevant and unimportant.  The observance of the ethical obligation of a lawyer to hold inviolate the confidences and secrets of his client not only facilitates the full development of facts essential to proper representation of the client but also encourages laymen to seek early legal assistance.

AMER. BAR. ASSOC., MODEL CODE OF PROFESSIONAL RESPONSIBILITY, Canon 4, Ethical Consideration 4.1 (1969).

view.  In <u>United States v. Robinson</u>, that court explained that "[t]he assertor of the [attorney-client] privilege must have a <u>reasonable</u> expectation of confidentiality [for the client information], either because the information disclosed is intrinsically confidential, or by showing that [the assertor] had a subjective intent of confidentiality."  121 F.3d 971, 976 (5th Cir. 1997) (emphasis added).  After finding on the facts of <u>Robinson</u> that the allegedly privileged information was not "intrinsically" confidential, the Fifth Circuit rejected the proponent's assertion of a subjective expectation of confidentiality as "manifestly unreasonable," endorsing the corollary idea that any subjective expectation of confidentiality, in order to support a claim of privilege, must be reasonable.  <u>See</u> <u>Robinson</u>, 121 F.3d at 976.

Bearing in mind that "'[t]he proponent must conclusively prove each element of the [attorney-client] privilege[,]'" <u>In re Lindsey</u>, 148 F.3d at 1106 (quoting <u>SEC v. Gulf & Western Indus.</u>, 518 F. Supp. 675, 682 (D.D.C. 1981)), the Court notes that Interior has offered no evidence that the client information on which the legal opinions communicated in the memorandum were based was confidential.  <u>See</u> <u>Mead Data Cent.</u>, 566 F.2d at 254 (similarly rejecting attorney-client privilege claims in the FOIA context for lack of evidence that the underlying client information was confidential).  Therefore, the Court concludes that the memorandum is not protected by the attorney-client privilege under the expanded <u>Alexander</u> privilege test applicable to attorney-to-client communications.

Moreover, it is unlikely that Interior could produce evidence to support the proposition that the information regarding BIA's Lotus Notes remote dial-up system was confidential within the meaning of our privilege law.  The Court of Appeals recently reaffirmed prior holdings that Interior, as trustee-delegate of the Individual Indian Money Trust, is subject to all the common

law fiduciary duties that govern trusteeships generally, so long as the fiduciary duties have some

statutory basis.  See Cobell v. Norton ("Cobell XIII"), 392 F.3d 461, 470–73 (D.C. Cir. 2004).

Once the Court determines that Interior owes certain fiduciary duties because those duties are

"rooted in and outlined by the relevant statutes and treaties," Cobell v. Norton (Cobell VI), 240

F.3d 1081, 1099 (D.C. Cir. 2003), those obligations are then to be "defined in traditional

equitable terms," by reference to the common law of trusts.  See Cobell XIII, 392 F.3d at 472.

Interior's statutory duty under the 1994 Indian Trust Fund Management Reform Act,

codified in relevant part at 25 U.S.C. §162a(d), to provide a full and accurate accounting of the

Trust to the Indian beneficiaries, recognized by this Court and affirmed by the Court of Appeals,

see Cobell v. Babbit, 91 F. Supp. 2d 1, 32–33 (D.D.C. 1999), aff'd Cobell v. Norton, 240 F.3d

1081, 1190–91 (D.C. Cir. 2001), seems necessarily to establish Interior's more general fiduciary

duty to disclose to the trust beneficiaries all information relevant to trust administration.  In the

common law of trusts, a trustee's duty to keep and render accounts to trust beneficiaries is simply

one of the obligations imposed by the trustee's broader duty to furnish to trust beneficiaries all

material information concerning trust administration.  See BOGERT'S TRUSTS & TRUSTEES § 961

(2d ed. 1983) (explaining the general duty to provide information to trust beneficiaries and how

that duty requires, among other things, the provision of full and accurate accountings of the

trust)[4]; Restatement (Second) of Trusts §§ 173, 173 cmt. d (referencing RESTATEMENT (SECOND)

---

[4]Bogert's explanation bears repeating here:

> The beneficiary is the equitable owner of the trust property, in whole or in part. The
> trustee is a mere representative whose function is to attend to the safety of the trust property
> and to obtain its avails for the beneficiary in the manner provided by the trust instrument.
> That the settlor has created a trust and thus required that the beneficiary enjoy his property
> interest indirectly does not imply that the beneficiary is to be kept in ignorance of the trust,
> the nature of the trust property and the details of its administration. If the beneficiary is to
> be able to hold the trustee to proper standards of care and honesty and to obtain the benefits
> to which the trust instrument and doctrines of equity entitle him, he must know of what the

OF TRUSTS § 172, which explains the trustee's specific duty to keep and render accounts).

Thus, the Court has no doubt that Interior, as trustee-delegate of the Individual Indian Trust, has a common law fiduciary duty to fully and accurately inform the Indian Trust beneficiaries about Interior's management of the trust.  See Eddy v. Colonial Life Ins. Co. of Am., 919 F.2d 747, 750 (D.C. Cir. 1990) ("The duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts ...."); RESTATEMENT (SECOND) OF TRUSTS § 173 (common law trustee "is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know ...").[5]  Put differently, "[i]n a trustee relationship, ... there exists no legitimate need for a trustee to shield his actions from those he is obligated to serve."  Washington-Baltimore Newspaper Guild, Local 35 v. Washington Star Co., 543 F. Supp. 906, 909 n.5 (D.D.C. 1982).

It has become abundantly clear in the course of this litigation that the security of Interior's IT systems and the data housed on those systems is of vital interest to the Individual Indian Trust

---

trust property consists and how it is being managed.
    From these considerations it follows that the trustee has the duty to inform the beneficiary of important matters concerning the trust and that the beneficiary is entitled to demand of the trustee all information about the trust and its execution for which he has any reasonable use. ...
    If the beneficiary asks for relevant information about the terms of the trust, its present status, past acts of management, the intent of the trustee as to future administration, or other incidents of the administration of the trust, and these requests are made at a reasonable time and place and not merely vexatiously, it is the duty of the trustee to give the beneficiary the information which he has asked.  Furthermore, the trustee must permit the beneficiary to examine the account books of the trust, trust documents and papers, and trust property, when a demand is made at a reasonable time and place and such inspection would be of benefit to the beneficiary.
BOGERT'S TRUSTS & TRUSTEES § 961 (2d ed. 1983).

    [5]Of course, the Court does not today announce a final disposition of this issue, as it is not properly presented on the present motion.

beneficiaries.  Indeed, this Court disconnected Interior's IT systems from the Internet in 2001

precisely because the security weaknesses found to exist in those systems threatened the integrity

of Individual Indian Trust data, which data is of immeasurable importance to the beneficiaries for

a variety of reasons.  Records of transactions involving trust assets, appraisals of trust land, and

the progression of ownership of the trust corpus are stored on Interior's IT systems.  If this data is

corrupted or lost, the beneficiaries will have no way of knowing the value of their trust assets or

what the government is doing with those assets.

Furthermore, loss or corruption of trust data guarantees that Interior will be forever

unable to render the full and accurate accounting of the Trust mandated by this Court, by the

Court of Appeals, by federal statute, and by Interior's common-law fiduciary duties as trustee-

delegate.  Indeed, the Court of Appeals has affirmed these propositions more than once, recently

reiterating its previous conclusion that "maintaining adequate computer systems, along with staff

and document retention policies, is critical to the completion of an adequate accounting."  Cobell

XII, 391 F.2d at 257 (citing Cobell v. Norton ("Cobell VI"), 334 F.3d 1081, 1110 (D.C. Cir.

2003)).  It is beyond dispute that any modification to Interior IT systems that potentially impacts

the security of Individual Indian Trust data is both directly related to Interior's administration of

the trust and of immense importance to the plaintiff-beneficiaries.[6]

Accordingly, at the time the information about BIA's implementation of Lotus Notes

remote dial-up was communicated to DOJ and the Solicitor's Office, Interior, as trustee-delegate

---

[6]While the defendants adamantly oppose the plaintiffs' implication that Lotus Notes remote dial-up poses a threat to the security of Indian Trust data, that issue is neither properly before the Court nor material to the privilege question addressed here.  For the purposes of this disposition, the information Interior gave its attorneys concerning BIA's implementation of Lotus Notes remote dial-up might just as well be information concerning any other material change in Interior's IT systems—the disposition of the privilege question would likely remain the same.

of the Indian trust, was under a common-law, statutory, and case-law imposed duty to disclose

that same information to the Indian Trust beneficiaries.  Of course, the existence of a duty to

disclose does not guarantee disclosure; and this Court cannot guarantee proper disclosure by

coercive Order, as Interior's duty to disclose is not at issue in this case.  See Cobell v. Norton,

226 F.R.D. 67, 80–81 (D.D.C. 2005) (discussing the general fiduciary duty to disclose but

explaining that "while the defendants in this case may owe a variety of statutorily-based fiduciary

duties to the plaintiff-beneficiaries, many of them drawn from the common law of trusts, only

one such duty is currently before this Court in this case--the duty of the defendants to render a

complete and accurate historical accounting of the trust").  Whether the duty to disclose is

fulfilled by this particular trustee-delegate, however, is irrelevant for these purposes.

What is dispositive of the present motion, leaving aside the defendants' failure to

conclusively prove that each requirement for applicability of the privilege is satisfied here, is the

observation that the existence of Interior's duty to disclose this information to the beneficiaries,

who are also the plaintiffs in this case, entails that Interior could not have had any reasonable

expectation of secrecy at the time the information about BIA's plans to implement a Lotus Notes

remote dial-up system was communicated to the Solicitor's Office and DOJ.  Cf. Cobell, 213

F.R.D. at 73–74 (emphasizing the importance of the client's expectation that the information

communicated to the attorney will remain confidential in determining whether information is

protected by attorney-client privilege).  Recalling the two possible bases for claiming that client

information is confidential set forth in Robinson, 121 F.3d at 976, it is clear that the client

information at issue here cannot be "intrinsically" confidential in light of Interior's fiduciary duty

to disclose.  To the contrary, information falling within such a disclosure obligation would seem

to be intrinsically "public," at least as regards those to whom disclosure is owed.

If Interior nevertheless subjectively expected to keep this information secret and thereby breach its fiduciary duty to disclose, the Court can only conclude that such an expectation was "manifestly unreasonable" and cannot support a finding that the information was "confidential" within the meaning of the governing law. After all, the attorney-client privilege is designed to protect the privacy interests of clients in general and thereby promote "the best possible" representation by attorneys. See Mead Data Cent., 566 F.2d at 252; see also Upjohn Co. v. United States, 449 U.S. 383, 389 (1981) (purpose of attorney-client privilege is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice"). To avoid overprotecting client interests at the expense of the competing interests of adverse parties, legal fact-finders, and the general public in having unfettered access to material information, see Jafee v. Redmond, 518 U.S. 1, 9 (1996) (quoting United States v. Bryan, 339 U.S. 323, 331 (1950) for the established principle, standing in opposition to assertions of evidentiary privilege, "'that the public ... has a right to every man's evidence'"), the law of attorney-client privilege must be narrowly tailored to effectuate its purposes.

For example, where a client's expectation of confidentiality is unreasonable because the information communicated to the attorney is likely to be made public through another channel, such as the discovery process, denying that information the protection of the attorney-client privilege "is in accordance with the purposes of the privilege; a client will not be less likely to show his lawyer important documents, because those documents do not become more easily discoverable by their revelation to the lawyer." Robinson, 121 F.3d at 976. While it is certainly

true that the balance of the interests supporting application of the privilege on the one hand and

those supporting disclosure of information on the other will vary from case to case,[7] it is at least

clear from the premises presented here that in cases where a client's expectation of

confidentiality is unreasonable because the information communicated is subject to disclosure

independent of its transmission to an attorney, application of the attorney client privilege does no

service to the interests supporting non-disclosure.  In such cases, the interests supporting public

access to "every man's evidence," weighed against nothing at all, cannot help but dictate that the

privilege should not apply.

     Here, Interior's fiduciary duties mandate that the information concerning BIA's Lotus

Notes remote dial-up system should be disclosed to the plaintiff-beneficiaries, and revealing that

information to an attorney does not make it any more "discoverable"—the beneficiaries already

have a right to the information.  Placing this information outside the attorney-client privilege

does not provide any disincentive for clients in general to disclose information to their attorneys,

meaning that the underlying purposes of the attorney-client privilege do not support application

---

[7]In a FOIA case, the D.C. Circuit noted the case-sensitivity of test for applicability of the attorney-client privilege, explaining that "courts must objectively weigh the merits and requirements of each contention [of the parties], evaluate the contentions in light of all applicable law, and rule in accord with the dominant interest of either confidentiality or public access," when determining whether the privilege will exempt information from disclosure. See Mead Data Cent., 566 F.2d 254 n.28.  To take into account "all applicable law," the Mead court found that claims of attorney-client privilege made to protect information from disclosure under FOIA's exemption five must be evaluated not only "in relation to the law governing such privileges," but also in light of "the general precept that the FOIA's exemptions are to be narrowly construed."  Id.  In close cases arising under FOIA, then, it would seem that FOIA's general purpose of granting public access to information controlled by the government should swing the balance in favor of disclosure.

     This, of course, is a trust case rather than a FOIA case, but the Mead court's principled approach to evaluating claims of attorney-client privilege is not restricted to the FOIA context.  If courts are to take into account "all applicable law" and "rule in accord with the dominant interest of either confidentiality or public access," it would be inappropriate to ignore the important fiduciary considerations that are central to this litigation.  "All applicable law" in this case includes the law of trusts and fiduciary duties, and the fiduciary duty to disclose information relating to trust administration surely must be added to the number of interests weighing in favor of public access here.

of the privilege in this instance.  Because the client-information underpinning the substance of

the attorney-to-client communications in the memorandum at issue here is not itself confidential,

the attorney-client privilege does not apply to those communications,[8] and no basis exists for this

Court to strike it from the public record in this case.

---

[8]The relationship between today's holding and the fiduciary exception to the attorney client privilege is not difficult to grasp.  This Court has held that communications between attorneys and clients that are fiduciaries, such as the trustee-delegates in this case, will not be protected by the attorney-client privilege except "where [the client-fiduciary] seeks legal advice solely in his own personal interest or where the discovery material has been shown to relate exclusively to non-fiduciary matters."  Cobell v. Norton, 212 F.R.D. 24, 30 (D.D.C. 2002).  Thus, attorney-client communications that relate either exclusively or partially to trust administration are within this exception and outside the privilege.

With respect to attorney-to-client communications, it turns out that the expanded Alexander test applied herein and the fiduciary exception are likely to yield the same results in most cases.  That is, a finding that an attorney-to-client communication relates to trust administration for the purpose of the fiduciary exception will likely be predicated on observations about the trust-related nature of the underlying client information on which the attorney communication is predicated.  As has been made clear, where the underlying client information is related to trust administration, that information cannot be confidential in light of the client-fiduciary's duty to disclose, and thus the attorney communication predicated on that information does not satisfy the expanded Alexander test for privilege.  It would be incorrect, however, to find that the fiduciary exception is the rule that permits disclosure of such communications, because the application of an "exception" to the privilege requires at least the assumption that but for the existence of the fiduciary exception, the attorney-to-client communication would be privileged.  The correct conclusion is that these attorney-to-client communications predicated on trust-related client information were never privileged at all for the reasons set out in this Memorandum.

With respect to client-to-attorney communications, the analysis is different.  The expanded Alexander test's inquiry into the confidentiality of client-information is relevant only to the privilege status of attorney-to-client communications, while the privilege status of client-to-attorney communications is tested on the basic Alexander test alone.  This means that the trust-related nature of the information communicated by the client to the attorney does not bear on the initial finding of privilege for client-to-attorney communications, but rather is relevant only in determining whether the fiduciary exception permits disclosure of an otherwise privileged communication because that communication relates exclusively or partially to trust administration.

The following example further clarifies this distinction.  Imagine that the Court is here considering not one, but three memoranda related to BIA's implementation of Lotus Notes remote dial-up.  Aside from (1) the memorandum relaying the opinion of DOJ and the Solicitor's Office concerning the legality of the system in light of this Court's Orders; imagine that the Court is also considering the privilege status of (2) a memorandum from the BIA to the Solicitor's Office containing nothing more than a "for your information" notification of BIA's plan to implement the system; and (3) a subsequent memorandum from BIA to DOJ requesting advice on how to respond to the plaintiffs' discovery requests concerning the system.

Memorandum (1) does not satisfy the expanded Alexander test for attorney-to-client communications for the reasons discussed herein.  Memorandum (2) likely would satisfy the basic Alexander test for a privileged client-to-attorney communication, but nevertheless likely would be subject to disclosure under the fiduciary exception as it relates to the security of trust data, a matter central to trust administration.  Memorandum (3) likely would satisfy the basic Alexander test for a privileged client-to-attorney communication, and likely would not fall within the fiduciary exception as it seems wholly related to litigation matters rather than trust administration.

## <u>CONCLUSION</u>

The defendants have failed to satisfy the Court that the plaintiffs' Notice makes allegations lacking any basis in fact; and the attorney-to-client communications contained in the memorandum are not protected by the attorney-client privilege.  Thus, the Court will not strike from the public record in this case the plaintiffs' Notice, the memorandum, or any subsequently filed document that quotes or references the plaintiffs' Notice or the memorandum.

Accordingly, it is hereby

ORDERED that the defendants' *Motion* [2832] *to Strike Plaintiffs' Notice of Supplemental Information in Support of Plaintiffs' Renewed Request for Emergency Status Conference* is DENIED.

SO ORDERED.


Signed by Royce C. Lamberth, United States District Judge, June 17, 2005.