**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ELOUISE PEPION COBELL, et al.,** ) | |
| **on their own behalf and on behalf of** ) | |
| **all those similarly situated,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 96-1285 (RCL)** |
| ) | |
| **GALE NORTON,** ) | |
| **Secretary of the Interior, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

The plaintiffs' *Motion* [2746] *to Require Defendants to Give their Beneficiaries Notice of their Continuing Inability or Refusal to Discharge their Fiduciary Duties* presents one of the few questions in this case that remain unaddressed—whether the Court should order the distribution of a notice containing information about this litigation to the entire 500,000-member plaintiff class. Federal Rule of Civil Procedure 23(d), the extensive factual record, and the prior law of the case govern the answer. After considering the plaintiffs' motion, Interior's memorandum in opposition, the plaintiffs' reply brief, the applicable law, and the entire record herein, the Court concludes that the plaintiffs' motion will be granted.

## BACKGROUND

At times, it seems that the parties, particularly Interior, lose sight of what this case is really about. The case is nearly a decade old, the docket sheet contains over 3000 entries, and the issues are such that the parties are engaged in perpetual, heated litigation on several fronts

1

simultaneously.  But when one strips away the convoluted statutes, the technical legal complexities, the elaborate collateral proceedings, and the layers upon layers of interrelated orders and opinions from this Court and the Court of Appeals, what remains is the raw, shocking, humiliating truth at the bottom: After all these years, our government still treats Native American Indians as if they were somehow less than deserving of the respect that should be afforded to everyone in a society where all people are supposed to be equal.

For those harboring hope that the stories of murder, dispossession, forced marches, assimilationist policy programs, and other incidents of cultural genocide against the Indians are merely the echoes of a horrible, bigoted government-past that has been sanitized by the good deeds of more recent history, this case serves as an appalling reminder of the evils that result when large numbers of the politically powerless are placed at the mercy of institutions engendered and controlled by a politically powerful few.  It reminds us that even today our great democratic enterprise remains unfinished.  And it reminds us, finally, that the terrible power of government, and the frailty of the restraints on the exercise of that power, are never fully revealed until government turns against the people.

The Indians who brought this case are beneficiaries of a land trust created and maintained by the government.  The Departments of the Interior and Treasury, as the government's Trustee-Delegates, were entrusted more than a century ago with both stewardship of the lands placed in trust and management and distribution of the revenue generated from those lands for the benefit of the Indians.  Of course, it is unlikely that those who concocted the idea of this trust had the Indians' best interests at heart—after all, the original General Allotment Act that created the trust was passed in 1887, at a time when the government was engaged in an "effort to eradicate Indian

culture" that was fueled, in part, "by a greed for the land holdings of the tribes[.]"  Cobell v. Babbitt ("Cobell V"), 91 F. Supp. 2d 1, 7–8 (D.D.C. 1999).  But regardless of the motivations of the originators of the trust, one would expect, or at least hope, that the modern Interior department and its modern administrators would manage it in a way that reflects our modern understandings of how the government should treat people.  Alas, our "modern" Interior department has time and again demonstrated that it is a dinosaur—the morally and culturally oblivious hand-me-down of a disgracefully racist and imperialist government that should have been buried a century ago, the last pathetic outpost of the indifference and anglocentrism we thought we had left behind.

The present motion asks the Court to revisit what has become one in a list of lamentable circumstances revealed by this litigation: Despite Interior's near wholesale abdication of its trust duties, the vast majority of the Indian beneficiaries remain unaware that anything is out of order. Interior distributes various kinds of information to Indian beneficiaries, and the beneficiaries, uninformed of the wretched state of things at Interior, make decisions that affect their trust assets on the basis of that information.  The plaintiffs now ask the Court to consider the possibility that Interior's ghastly past performance calls into question the reliability of any information it distributes to the Indians.  If Interior cannot truthfully guarantee that it is providing the beneficiaries with accurate information on which to base decisions that materially affect their interests in the trust, then the beneficiaries deserve, at the very least, a warning to that effect. Any ordinary, reasonable trustee under similar circumstances would have given each and every beneficiary such a warning years ago.  Unhappily, Interior is no ordinary trustee.

A.      **Factual History**

Interior's management of the Indian trust has been a nightmare from the beginning.  A

1992 congressional report noted:

> Scores of reports over the years by the Interior Department's inspector
> general, the U.S. General Accounting Office, the Office of Management and
> Budget, and others have documented significant, habitual problems in the
> [Bureau of Indian Affairs's] ability to fully and accurately account for trust
> fund moneys, to properly discharge its fiduciary responsibilities, and to
> prudently manage the trust funds.

Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund, H.R.

No. 102-449 (1992).  Despite this show of concern, the record in this case establishes that

Congress's efforts to address the problem have failed.  Not surprisingly, Interior's internal efforts

to reform trust management, lately undertaken at this Court's direction, have also universally

crashed and burned.  What remains is the same situation that obtained at the outset of this case:

Interior's unremitting neglect and mismanagement of the Indian trust has left it in such a

shambles that recovery may prove impossible.

The ignominious record speaks for itself.  Interior "does not know the precise number of

[Individual Indian Money trust ("IIM")] accounts that it is to administer and protect." Cobell v.

Norton ("Cobell VI"), 240 F.3d 1081, 1089 (D.C. Cir. 2001).  Interior "does not know the proper

balances for each IIM account, nor does Interior have sufficient records to determine the value of

IIM accounts." Cobell VI, 240 F.3d at 1089.  This Court has noted that "the United States freely

gives out 'balances' to plaintiffs, [but] it admits that currently these balances cannot be supported

by adequate transactional documentation." Cobell V, 91 F. Supp. 2d at 10.  And, "[c]urrent

account reconciliation procedures are insufficient to ensure that existing account records,

reported account balances, or payments to IIM beneficiaries are accurate." Cobell VI, 240 F.3d

at 1089.  One result is that Interior issues payments to Indian beneficiaries "in erroneous

amounts—from unreconciled accounts—some of which are known to have incorrect balances."

Cobell V, 91 F. Supp. 2d at 6.  Interior cannot even determine which IIM account holders are

members of the plaintiff class.  See Mem. & Order [2587], May 28, 2004, at 2–3.  Thus, every

communication Interior issues to IIM account holders is likely to end up in the hands of at least

some class members.

The Court has concluded that the 1994 Indian Trust Fund Management Reform Act

"requires [Interior] to retrieve and retain all information concerning the IIM trust that is necessary

to render an accurate accounting of all money in the IIM trust."  Cobell V, 91 F. Supp. 2d at 58.

While the Court has consistently emphasized Interior's duty to preserve trust records against loss,

damage, and destruction, it has become clear that Interior's complete and continuing default in

this obligation remains a primary cause of its inability to properly administer the IIM trust.  On

February 22, 1999, the Court found that unchecked rodent infestations were damaging trust

documents at storage facilities in Nebraska and New Mexico; and that trust documents and

microfiche held by the Department of the Treasury had been recently destroyed.  See Cobell v.

Babbitt, 37 F. Supp. 2d 6, 15, 22 n.8, 28 (D.D.C. 1999).  These findings—and the realization that

former Secretaries of the Interior and Treasury, along with an Assistant Secretary of the Interior

for Indian Affairs, had mislead the Court with respect thereto—prompted the Court to cite those

individuals for civil contempt.  Cobell, 37 F. Supp. 2d at 39–40.  As an additional response, the

Court appointed a Special Master who was charged with, among other things, ensuring that trust

records were properly safeguarded during the pendency of this case.  See Order [213], Feb. 22,

1999.  While the Special Master's efforts were informative, they proved to be an insufficient

motivation for Interior to reform its records-management practices

    Examples abound.  The Special Master informed the Court that numerous Interior offices

lacked the basic facilities and procedures to ensure the safety of trust documents retained in paper

form.  See, e.g., Report of the Special Master Regarding Site Visits to Area and Agency Offices

(Apr. 25, 1999); Report of the Special Master Regarding Site Visits to Area and Agency Offices

(Oct. 29, 1999).  He discovered trust records stored in puddles of water, near bags of fertilizer,

and alongside containers of combustible fuels, tires, and debris of various kinds.  See Third

Report of the Special Master Regarding Site Visits to Area and Agency Offices (Nov. 12, 1999).

He found remnants of trust documents that had been shredded.  See Site Visit Report of the

Special Master to the Office of Information Resources Management (Mar. 12, 2001).  He

reported that Interior's Office of the Special Trustee/Office of Trust Records, which is most

directly responsible for ensuring the preservation of trust documents, had no effective trust

records training program.  See Second Investigative Report of the Special Master Regarding the

Office of Trust Records (Apr. 11, 2002).  The Special Master also alerted the Court that Interior

had decided to relocate 32,000 boxes of active trust documents to the Lee's Summit Federal

Records Center "without regard to the consequences" and with "utter indifference to the safety of

these records or to the ability of IIM beneficiaries to have meaningful access to vital

information[.]"  See Emergency Report of the Special Master Regarding Defendants' Proposed

Relocation of Records to the Lee's Summit Federal Records Center (Apr. 17, 2002), at 22–23.

    Interior's management of electronic trust records has proven even more abysmal, if that is

possible.  See, e.g., Report and Recommendation of the Special Master Regarding the Security of

Trust Data at the Department of the Interior (Dec. 4, 2001) (describing a department-wide lack of electronic data security).  The Court has disconnected various bureaus and offices within Interior from the Internet on more than one occasion on the basis of evidence that security for electronic trust data was inadequate.  See Temporary Restraining Order [1036], issued Dec. 5, 2001, at 2; Cobell v. Norton, 274 F. Supp. 2d 111, 135 (D.D.C. 2003); Cobell v. Norton, 310 F. Supp. 2d 98, 99–100 (D.D.C. 2004).  In fact, the Court is currently conducting a lengthy evidentiary hearing on this very issue, which has been revived by the plaintiffs' newest allegations that electronically-stored Indian trust data is at risk of corruption.

The problems that result from Interior's inability to maintain complete and accurate records of the IIM trust are compounded and made more intractable by the penchant of Interior's employees, officials, and litigation counsel to be less than forthcoming with the Court.  Aside from the 1999 contempt citations mentioned above, the Court also held Secretary of the Interior Gale Norton and former Assistant Secretary of Indian Affairs Neal McCaleb in civil contempt for, among other things, misleading the Court about the status of Interior's trust reform efforts and computer security.  See Cobell v. Norton, 226 F. Supp. 2d 1, 29–46, 88–130 (D.D.C. 2002).[1] In December 2002, the Court referred a number of Interior's litigation counsel from the Department of Justice to the Court's Committee on Grievances after reviewing evidence indicating that they had participated in Interior's efforts to communicate with plaintiff-class members without authorization from plaintiffs' counsel in violation of D.C. Rule of Professional

---

[1]While the contempt citations themselves were vacated on appeal, see Cobell v. Norton, 334 F.3d 1128, 1145–50 (D.C. Cir. 2003), the Court of Appeals did not call this Court's findings of fact into question.  As such, the factual findings that supported the 2002 contempt citations will be treated as having been established.  Cobell v. Norton, 283 F. Supp. 2d 66, 85 (D.D.C. 2003).

Conduct 4.2(a).[2]  See Cobell v. Norton, 212 F.R.D. 14, 23–24 (D.D.C. 2002).  Though the

Committee on Grievances determined that no further action was warranted, it is nevertheless

telling that evidence supporting such a disciplinary referral was produced at all.

Add vindictiveness to dishonesty and managerial ineptitude.  Interior has demonstrated a

tendency to retaliate against both the Indian beneficiaries and its own employees when it feels

slighted.  On May 21, 1999, the Court entered an Order providing that:

> The Department of the Interior, together with all of its supervisory officials,
> are hereby enjoined from taking any retaliatory action, or making any threats
> of such action, for providing testimony or information in this action, against
> (1) any person who has identified as a potential witness in this case ..., (2)
> any person who is called upon through legal process ... to give testimony or
> provide other information in this litigation, or (3) any person individually
> identified by Plaintiffs, in writing, to Defendants as a potential witness in
> this action.

Order [277], May 21, 1999.  On March 7, 2000, the plaintiffs submitted to the Court affidavits

from Mona Infield, a Bureau of Indian Affairs employee, in support of their motion for a

temporary restraining order to preserve trust records that appeared to be in imminent danger of

destruction.  The Court granted the plaintiffs' motion, see Order [451], Mar. 7, 2000, and it

subsequently came to the Court's attention, after an investigation by the Special Master, that

Interior had taken severe adverse employment actions against Ms. Infield after her affidavits were

made public.  See Recommendation and Report of the Special Master Concerning Plaintiffs'

Motion for Order to Show Cause [670], Feb. 21, 2001, at 16 (concluding that "sufficient

evidence [did exist] to support a finding of probable cause that the actions complained of by

---

[2]Rule 4.2(a), also called the "anti-contact rule," requires that:
> [d]uring the course of representing a client, a lawyer shall not communicate or cause
> another to communicate about the subject matter of the representation with a party known
> to be represented by another lawyer in the matter, unless the lawyer has the prior consent of
> the lawyer representing such other party or is authorized by law to do so.

Infield were retaliatory and initiated in violation of the Court's [May 21, 1999] Order"); Mem &

Order [1218], Mar. 29, 2002 (accepting the Special Master's findings).

The Court ordered Interior Secretary Gale Norton and Assistant Secretary Neal McCaleb

to show cause why they should not be held in contempt for violating the Court's anti-retaliation

order, see Mem. & Order [1480], Sept. 17, 2002, and the matter was later settled to the Court's

satisfaction.  See Stip. of Dismissal With Prejudice & Consent Order [1788], Feb. 6, 2003

(vacating Sept. 17, 2002 show cause order on stipulation of settlement by parties).[3]  In the course

of resolving the Infield matter, the Court cautioned Interior to "consider the prospect of future

contempt proceedings before engaging in" further retaliatory behavior.  Mem. & Order [1480],

Mar. 29, 2002, at 5.  It is illustrative enough of the depths to which Interior has sunk that the

Court found it necessary to issue a general anti-retaliation order in the first place; but Interior's

subsequent willful retaliation against its own employee in the face of such an order betrays a truly

Machiavellian guile.

As if the Infield business was not enough, Interior's wrath was turned on the Indian

beneficiaries themselves in the wake of the Court's September 29, 2004 order restricting

communications between Interior and class members concerning sales of Indian trust land (the

"land-sales order").  See Cobell v. Norton, 225 F.R.D. 41, 53–54 (D.D.C. 2004) (explaining the

basis for the land-sales order); Order [2708], Sept. 29, 2004 (specifying restrictions on land-sale-

---

[3]Initially, the Court declined to issue a show cause order in the Infield retaliation matter after Interior
represented to the Court that it had compensated Ms. Infield by offering her a permanent position and paying her
attorneys fees.  See Mem. & Order [1480], Mar. 29, 2002 (denying motion for order to show cause).  But the Court
later learned that Interior's offers to compensate Infield were "illusory," and thus issued the order to show cause on
renewed motion by the plaintiffs.  See Mem. & Order, Sept. 17, 2002 (noting Interior's refusal to guarantee that the
position offered to Ms. Infield would not be eliminated shortly after the show-cause motion was dismissed and that
Interior's settlement offer included no provision for paying the plaintiffs' attorneys' fees in the matter; issuing order
to show cause).

related communications).  Evidence collected by the plaintiffs demonstrated that "[d]uring the period between October 1, 2004 and October 8, 2004, a number of individual Indian trust beneficiaries were denied either their trust checks or information regarding their trust checks by BIA employees who cited this Court's [land-sales] Order as justification."  Cobell v. Norton, 335 F. Supp. 2d 531, 542 (D.D.C. 2005).  Of course, the Court had previously made clear at a hearing held on October 1, 2004, that the land-sales order had no effect whatsoever on Interior's ability to distribute trust checks.  See Cobell, 335 F. Supp. 2d at 533–34 (quoting Tr. (Stat Conf., Oct. 1, 2004): "to stop [trust checks] and [say] that it's because of [the land-sales] order is a flat-out lie.").

Apparently, Interior's withholding of trust checks or information about trust checks from the Indians was one outward manifestation of a period of Byzantine maneuvering within the department in an attempt to either evade or, failing that, mischaracterize and vilify this Court and the land-sales order.  See Cobell v. Norton, 224 F.R.D. 266, 269–71 (D.D.C. 2004) (discussing these activities in detail).  As the Court explained, the evidence strongly supports the inference that:

> Either (1) the Secretary [of the Interior] was grossly negligent when she failed to add a proscription against the withholding of trust checks to the set of instructions distributed by Interior to the BIA on October 4, 2004, when the risk that checks would be withheld in the absence of such a proscription was reasonably foreseeable; or (2) the Secretary intentionally omitted a proscription against the withholding of trust checks from the October 4 instructions despite her knowledge that checks would likely be withheld in the absence of such a proscription.

Cobell, 335 F. Supp. 2d at 542.  In light of the record in this case, the Court found it more likely that the Secretary's actions constituted willful misconduct, and invited the Secretary to give testimony to the contrary if the Court's conclusion was in error.  See id. at 542–43.  The

10

Secretary declined the Court's invitation.

But these are only examples. The entire record in this case tells the dreary story of Interior's degenerate tenure as Trustee-Delegate for the Indian trust—a story shot through with bureaucratic blunders, flubs, goofs and foul-ups, and peppered with scandals, deception, dirty tricks and outright villainy—the end of which is nowhere in sight. Despite the breadth and clarity of this record, Interior continues to litigate and relitigate, in excruciating fashion, every minor, technical legal issue. See Cobell v. Norton, 357 F. Supp. 2d 298, 306–07 (D.D.C. 2005). This is yet another factor forestalling the final resolution of the issues in this case and delaying the relief the Indians so desperately need. See id. It is against this background of mismanagement, falsification, spite, and obstinate litigiousness that this Court is to evaluate the general reliability of the information Interior distributes to IIM account holders.

## B.  Procedural History

This is not the first time the Court has considered authorizing some form of notice to plaintiff-class members, though the propriety of class-wide notice is a matter of first impression. On December 23, 2002, pursuant to Federal Rule of Civil Procedure 23(d), the Court ordered that Interior could no longer conduct communications with Indian trust beneficiaries that threatened their rights as class members (the "class communication order"). See Cobell, 212 F.R.D. at 24. The broad relief granted in the class communication order was predicated on the Court's finding that the cover letter Interior included with certain account statements distributed to a number of IIM account holders—which gave the recipient a fairly narrow window of time in which to appeal the content of the statement before it became final—had the effect of extinguishing Indian beneficiaries' rights to a full and accurate accounting of their trust assets. See Cobell, 212 F.R.D.

11

at 17.  The class communication order suspended Interior's mailing of any future account

statements until the Court's approval was obtained.  See id. at 20.  On May 28, 2004, the Court

approved Interior's proposal to mail a number of account statements along with a notice

informing recipients that they might be class members and that the account statement would not

adversely effect their rights in this litigation.  See Mem. & Order [2587], May 28, 2004, at 5–6.

The Court found that this notice was sufficient to protect class members against the particular

kind of harm threatened by the account statements.  See id. at 4–5.

Later in 2004, the Court considered whether Interior's communications with Indian trust

beneficiaries concerning sales of Indian trust land threatened to extinguish the class rights by

facilitating the permanent alienation of trust corpus on the basis of inadequate or incorrect

information from Interior.  Concluding on the weight of the evidence that the communications

did pose such a threat, and that they therefore violated the class communication order, the Court

invoked Rule 23(d) to suspend land-sales-related communications between Interior and the

plaintiff class.  See Cobell, 225 F.R.D. at 53–54.  The Court later approved, as it did for the

account statements mentioned above, a form of notice designed to protect class members' rights

to be included with all land-sales-related communications going forward.  See Cobell, 224

F.R.D. at 288–89.  Approval of this notice followed a series of hearings conducted by the Court

to address Interior's befuddlement concerning the effect of the Court's land-sales order.

Interior was particularly confused about what types of communications were covered by

the Court's order.  Specifically, the Court found it necessary to expressly exclude from the notice

requirement communications between Interior and Indian beneficiaries concerning: "1.

Encumbrances, leasing, lease sales, permitting, rights of way, and timber sales of or on

individually-owned Indian trust land; 2.  The investment of trust funds in [individual Indian money trust] accounts; 3.  Estate planning, will drafting and the probate of or relating to Indian trust assets; 4.  The surveying or appraisal of trust assets; 5.  Title to trust lands; 6.  Ownership of trust fund lands; [and] 7.  Physical improvement or alteration of trust assets."  See Cobell, 224 F.R.D. at 288.

It is obvious that none of these kinds of communications are subject to an order that specifies communications regarding the sale of Indian trust land, as the Court verbally confirmed when Interior raised the question.  See Tr. (Hrng., Oct. 1, 2004), at 11–12; 18–19.  Nevertheless, Interior halted all these sorts of communications with Indians on the basis of a stubbornly formalist and acontextual reading of the Court's order.  Interior's "reasoning" in this regard was exposed when Sandra Spooner, trial counsel for Interior at the time, informed the Court that one paragraph of the Court's land-sales  order "is not limited ... to land sales.  We believe that that is what the Court intended, but we did not feel at liberty ... to assume that that's what the Court meant when that is not what the order said specifically."  Tr. (Hrng., Oct. 1, 2004), at 14.  Spooner advised the Court that Interior's management took this paragraph to preclude "all communications" with IIM beneficiaries, see id. at 18, despite the lack of reference to any type of communication other than communications related to sales of trust land in either the land-sales order or the accompanying Memorandum Opinion.

The Court explained that the categories of communications determined to be outside the scope of the land-sales order had not been considered because the were not properly before the

Court at the time,[4] and that the Court "would like to be educated similarly if there are any of these other items that [the Court] ought to be doing something about." Tr. (Hrng., Oct. 1, 2004), at 19. Later, the Court invited additional briefing concerning whether communications between Interior and Indian beneficiaries beyond those related to land sales should be subject to a broader Rule 23(d) order. See Tr. (Hrng., Oct. 19, 2004), at 21. The plaintiffs submitted the present motion in response to the Court's invitation.

## DISCUSSION

The plaintiffs' motion once again asks this Court to grant relief under Federal Rule of Civil Procedure 23(d). The plaintiffs argue that all communications from Interior to Indian beneficiaries containing IIM trust-related information threaten to extinguish the recipients' rights as members of the plaintiff class. As such, they conclude, all such communications should be accompanied by a notice similar to notices the Court has required Interior to distribute in the past. Additionally, the plaintiffs want Interior to bear the burden and cost of distributing the notice. The Court agrees with the plaintiffs, and will order that Interior include a modified version of the plaintiffs' proposed notice with all written communications from Interior to current and former IIM account holders at Interior's expense.[5]

---

[4]Interior characterizes this decision as the Court's "explicit[] recogni[tion]" that these other types of communications are "ones for which prior notice is not needed." Defs.' Opp., at 9. To the contrary, however, the Court expressly reserved the "question of notice to everyone under all circumstances[,]" to be taken up "separately in another month, or whenever it's ripe." Tr. (Hrng., Oct. 19, 2004), at 21. Interior's contention that the Court exempted other types of communications from any future notice requirement at the time of the land-sales order is a flagrant misrepresentation of the record.

[5]Interior's tongue-in-cheek summary of its responses to the plaintiffs' motion—"The Proposed Notice is the wrong notice at the wrong time to the wrong group of recipients paid for, and sent out by, the wrong party[,]" Defs.' Opp. at 2—typifies the level of respect that Interior generally accords both the Indian beneficiaries and this Court. The puerile reference is not lost on the Court, but Interior's misguided attempt at levity in the context of litigating an issue of immense importance to 500,000 members of a historically oppressed people is disgraceful. Unfortunately, it is also unsurprising from a defendant that this Court has charged with "setting the gold standard for arrogance in litigation strategy and tactics." Cobell, 357 F. Supp. 2d at 307. This Court has played host to countless pleadings

14

i.      Rule 23(d) Legal Standard

Interior has previously conceded and does not now dispute this Court's authority to

restrict Interior's communications with Indian beneficiaries pursuant to Rule 23(d).  See Cobell,

212 F.R.D. at 19 (citing Defs.' Supp. Opp. Br. at 3; Defs.' Surreply at 5–6).  Rule 23(d), allows a

Court presiding over a class action to "impose conditions on the representative parties[,]"

Cobell, 212 F.R.D. at 19 (citing In re School Asbestos Litig., 842 F.2d 671, 683 (3d Cir. 1988)),

including restrictions on communications with class members if those communications are found

to "interfere with the proper administration of a class action ... [or] abuse[] the rights of members

of the class."[6]  Id. (quoting Jack Faucett Assocs., Inc. v. Am. Tel. & Tel. Co., 1985 WL 25746 at

*5 (D.D.C. 1985).

Importantly, restrictive orders issued under Rule 23(d) need not be predicated on "a

finding of actual harm; [Rule 23(d)] authorizes the imposition of a restricting order to guard

against the 'likelihood of serious abuses.'"  In re School Asbestos Litig., 842 F.2d at 683

(quoting Gulf Oil Co. v. Bernard, 452 U.S. 89, 104 (1981)).  The Supreme Court directs that

Rule 23(d) orders "should be based on a clear record and specific findings that reflect a weighing

of the need for a limitation and the potential interference with the rights of the parties."  Gulf Oil,

---

from clinically insane litigants and prison inmates but has rarely seen such a disrespectful tenor in a court filing.

[6]Contrary to the first argument in Interior's opposition, Rule 23(d) places no time-related condition on the Court's authority to issue restrictive orders.  See Defs.' Opp., at 2–4 (pointing out at length that "Plaintiffs' do not explain in their Motion why, after nearly eight years of silence on all of the significant events in this case, a 'mid-litigation, informational notice,' ... is urgently needed now").  Rule 23(d) does not require that a restrictive order be predicated on some "recent event" in a case, see Defs.' Opp., at 4, but rather imbues the Court with "ample discretion" to fulfill its duty to restrict communications that threaten class members' rights.  See Kleiner, 751 F.2d at 1203; Jack Faucett Assocs., 1985 WL 25746 at *5.  Additionally, if the Court finds that Interior's communications with the Indian beneficiaries threaten class rights, those communications violate the class communications order.  Surely Interior does not mean to argue that the Court's inherent authority to enforce its own orders is subject to some sort of timing requirement.  But if that is the argument, there is no warrant for the claim that such a requirement exists.  The only temporal limitation on the Court's consideration of action under Rule 23(d) is the requirement that such issues be raised on an appropriately briefed, ripe motion from one of the parties.

452 U.S. at 101 (as quoted in Cobell, 212 F.R.D. at 19).

The only right to be weighed against the need for a limiting order is Interior's First Amendment right to free speech.  See Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193, 1205–06 (11th Cir. 1985) (cautioning that free speech rights must bear on the decision to issue a Rule 23(d) order restricting communications).  The Kleiner Court indicated that a finding of "good cause" is sufficient to support restricting communications, provided that the issuing court shows a "heightened sensitivity" for the First Amendment implications of the restriction.  See Kleiner, 751 F.2d at 1205–06.  The existence of good cause is determined by evaluating "the severity and the likelihood of the perceived harm; the precision with which the order is drawn; the availability of a less onerous alternative; and the duration of the order."  Id.  The Court has already decided that threats to class rights are of adequate severity to support the issuance of a Rule 23(d) order where the proponent of the order establishes that the threatened harm is likely to occur.  See Cobell, 212 F.R.D. at 20.  The Court also previously determined that including a curative notice with harmful communications for the duration of the litigation is sufficiently precise in contour and limited in duration to avoid impinging on free-speech rights.  See id. Finally, requiring notice is less onerous than the alternative of prohibiting the harmful communications altogether.

ii.      Law of the Case: The Class Communications Order and the Land-Sales Order

Pursuant to its authority under Rule 23(d), the Court entered the class communications order to prohibit Interior from conducting with the Indian beneficiaries "any communications that affect the rights of class members to a full and accurate accounting of their Individual Indian Money trust accounts."  Cobell, 212 F.R.D. at 24.  The Court excluded from the effect of this

16

Order "regular sorts of business communications with class members that occur in the ordinary course of business," as such communications "do not purport to extinguish the rights of the class members in this litigation."  Id. at 20–21.

Interior contends that this exception amounts to a per-se rule that communications occurring in Interior's ordinary course of business do not threaten class rights, see Defs.' Opp. at 8–9 (arguing that "ordinary course of business communications by definition are communications where the rights of absent class members are not at risk"), and thus that it precludes the relief requested here because most or all of the communications with which the plaintiffs are concerned take place in the ordinary course of Interior's business.  See id.  This argument betrays a misunderstanding of both the class communication order and its ordinary-course-of-business exception.

In determining whether to issue the class communication order, the Court focused its Rule 23(d) inquiry on the effects of the challenged communications, explaining with respect to the account statements that "what this Court considers improper is sending notices to individual class members that have the effect of extinguishing [their] rights ...."  Cobell, 212 F.R.D. at 19 (emphasis added).  The Court's attention to the actual effects rather than the "types" of the challenged communications debunks the defendants' characterization of the ordinary-course-of-business exception as a per-se rule.  At least one respected treatise endorses the Court's reasoning, explaining that ordinary-course-of-business communications may be exempted from a Rule 23(d) restrictive order "as long as the communications do not relate to the claims involved in the litigation ...."  3 NEWBERG ON CLASS ACTIONS § 15.18 (3d ed. 1992) (as quoted in Cobell, 212 F.R.D. at 17).

17

Indeed, though Interior argued that the communications restricted by the Court's land-sales order occurred in the ordinary course of Interior's business, see <u>Cobell</u>, 225 F.R.D. at 52, the Court nevertheless found it necessary to restrict those communications.  The Court again based its exercise of Rule 23(d) authority not on the "type" of communication at issue, but rather on the land-sales-related communications' actual effects on class rights.  <u>See Cobell</u>, 225 F.R.D. at 52–53.  The land-sales order stands for the proposition that even Interior's ordinary-course-of-business communications may threaten class rights and thereby violate the class communication order.

In analyzing the land-sales issue, the Court noted that "the underlying rationale for enforcing the right to an accounting is to facilitate informed decision-making with respect to the disposition of trust assets."  <u>Cobell</u>, 225 F.R.D. at 52.  "That means, at the very least, that the trust beneficiaries should retain all or most of their trust assets in as unaltered a state as is practicable, until Interior completes the required accounting," so that the completed accounting "can support the kind of informed disposition of trust assets that ought to be facilitated by conscientious management by a principled fiduciary."  <u>Id.</u>  The Court elaborated:

> [w]hile it is difficult to envision the ways in which information about this litigation and the historical accounting that Interior has been ordered to produce would affect the decision of any given trust beneficiary on whether or not to sell trust land, it is impossible to imagine that such information would have no effect at all.  If the underlying rationale for enforcing the right to an accounting is to facilitate informed decision-making with respect to the disposition of trust assets, then to allow beneficiaries to continue to make decisions that substantially alter their trust interests without information about this litigation and Interior's obligations is to effectively rob those beneficiaries of the cash value of their rights.

<u>Id.</u>  The plaintiffs now argue that all communications between Interior and IIM beneficiaries similarly rob class members of the "cash value" of their right to an accounting.

18

iii.    Interior's Communications with Indian Beneficiaries

The plaintiffs advance a single argument in support of class-wide notice:  In light of Interior's record, no information disseminated by Interior to class members can be presumed reliable.  As such, any decisions that Indian beneficiaries make on the basis of information from Interior likely will be less-than-fully informed, although the Indians have no way to know that. One of the rights the plaintiffs seek to vindicate in this litigation is the right of the Indian beneficiaries to a full and accurate accounting of the Indian trust, which is essentially the right to have complete and reliable information on which to base decisions affecting their interests in the trust.  Thus, the plaintiffs insist, inducing the beneficiaries to make trust-related decisions before completion of the court-ordered accounting is tantamount to extinguishing their rights to that accounting.  See Plaintiffs' Motion [2746] to Require Defendants to Give Their Beneficiaries Notice of Defendants' Continuing Inability or Refusal to Discharge Their Fiduciary Duties ("Pls.' Mot."), at 1–2.

One response in Interior's opposition is quite general.  Perhaps attempting to capitalize on the plaintiffs' odd choice of title, Interior contends that "Plaintiffs do not really seek to communicate with the class and give them a ... mid-litigation update on the status of the case and the right to consult with class counsel.  Rather, ... Plaintiffs now seek to have the Court recognize a novel new trust duty—the duty to notify beneficiaries that a trustee has breached its trust duties ...."  Defendants' Opposition [2755] to Pls.' Mot. ("Defs.' Opp."), at 4.  The Court of Appeals has held, Interior posits, that this Court may only enforce a particular common-law fiduciary duty against Interior if that duty has a statutory basis, see Cobell v. Norton, 392 F.3d 461, 471–72 (D.C. Cir. 2004), and neither this Court nor the Court of Appeals has yet declared that Interior

has a statutorily-based obligation to disclose its breaches of fiduciary duty to trust beneficiaries. As the plaintiffs cite no statute that expressly or impliedly creates such a duty, Interior has persuasively refuted the title of the plaintiffs' motion.  But the motion itself, which only requests that class members be notified of the potential unreliability of Interior's trust-related communications, survives this argument quite well.[7]

This Court has noted that "[i]t is not the accounting in and of itself that is the desired product of this Court's enforcement of Interior's fiduciary obligations.  Rather ... the Court intends that trust beneficiaries remain, after this litigation is completed, in a position in which the accounting that Interior must generate will be in some meaningful sense beneficial." Cobell, 225 F.R.D. at 52.  The court-ordered accounting is designed to promote class members' rights to make fully informed choices about their trust assets.  If there are no more informed decisions to be made, or if all the trust assets are gone, then the court-ordered accounting will be useless to the Indians.[8]  This is the core of the plaintiffs' right to an accounting that supported the land-sales order, and that similarly supports additional Rule 23(d) relief when the Court identifies other

---

[7]Interior further asserts that "[t]he parties are vigorously disputing the nature of this Court's jurisdiction and authority to use the type of inherent equitable powers available to a 'chancellor' in equity in the current appeals of the Phase 1.5 structural injunction and the IT preliminary injunction." Defs.' Opp. at 6.  It is unclear what Interior means to dispute with this argument.  It is possible that this represents an additional argument against the strawman characterization of the plaintiffs' requested relief just mentioned.  If so, it is irrelevant.

The argument is also irrelevant as an attack on this Court's authority under Rule 23(d) to impose today's new notice requirement, which authority flows from the fact that this case is a class action rather than from the Court's equitable powers.  Indeed, the majority of the questions about the scope of this Court's equitable powers in this case have been resolved by the Court of Appeals in favor of expansive remedial authority.  See generally Cobell v. Norton, 391 F.3d 251, 257–58 (D.C. Cir. 2004); Cobell v. Norton, 392 F.3d 461, 468–75 (D.C. Cir. 2004). Finally the notice set forth in today's order makes no mention of the few matters that remain disputed on appeal.

[8]Of course, the only way to fully safeguard this right would be to suspend all trust-related decision-making until this case concludes and Interior actually provides the required accounting, so that the maximum number of decisions affecting trust assets could be as fully informed as possible.  Unfortunately, such a course of action is impracticable.  The inclusion of class-wide notice containing information about this litigation and contact information for plaintiffs' counsel with each threatening communication from Interior will have to suffice as an interim measure.

communications that violate the class communication order by threatening to interfere with the Indians' right to fully informed trust-related decision-making.

Interior does not dispute the factual predicates of the plaintiffs' argument.  Interior concedes that all trust-related information Interior communicates to Indian beneficiaries is inherently unreliable.  Of course, anything other than a concession of this point would be laughable in light of the record in this case.  The factual record, composed of the accumulated detritus of nine years spent examining Interior's odious performance as Trustee-Delegate for the Indian trust, is certainly clear enough and smattered with a sufficient number of specific abuses to satisfy the Gulf Oil standard for relief under Rule 23(d).  If Interior cannot even ascertain the number of existing IIM account holders, how can any of its more complicated calculations, such as land appraisals, be trusted?  If Interior is willing to deceive this Court, why would anyone think that Interior would hesitate to lie to the Indians?

Interior also concedes that Indian beneficiaries make decisions that affect their trust assets in reliance on information from Interior.  Together, these concessions entail the conclusion that communications from Interior threaten class members' right to make fully informed decisions about their trust assets.  Thus, all communications from Interior to class members containing information on which a class member might base a trust-related decision violate the class communication order for the same reason that land-sales-related communications were found to violate the class communication order.  For this reason, the Court will again supplement the class communication order to require that henceforth every written communication from Interior to current and former IIM account holders must contain a notice designed to protect the rights of the class.  The functional effect of the relief granted today is to eliminate the "ordinary course of

business" exception from the class communications order.

The Court will require that notice accompany all written communications from Interior to current or former IIM account-holders because Interior cannot determine which IIM account-holders are class members.[9]  The Court will not, however, require that notice accompany oral communications.  Interior has previously used supposed restrictions on oral communications to the disadvantage of the Indian beneficiaries.  See Cobell, 224 F.R.D. at 270 (noting that Interior closed down BIA offices and routed telephone calls to prerecorded messages in an effort to "adhere" to what Interior perceived to be the Court's restriction on land-sales-related oral communications); id. at 288 (clarifying that the land-sales order had never been "applicable to oral communications, either in person or by telephone ..." to prevent any further "misinterpretations").

Notice must accompany all written communications from Interior to current or former IIM account-holders without regard to subject matter.  This requirement ensures maximum protection, as it is difficult to determine, ex ante, the kinds of information that might influence an Indian beneficiary's trust-related decisions.  With so much at stake, the Court greatly prefers over-inclusion to under-inclusion.  Furthermore, this requirement should make today's Order clear enough to forestall the kind of confusion and misadventure that held sway at Interior in the wake of the Court's land-sales order.  And, relieving Interior of the undoubtedly complicated and time-consuming task of differentiating between kinds of communications also seems to

---

[9]Again, the Court takes no position on the disputed issue of the scope of the plaintiff class.  See Cobell, 224 F.R.D. at 269 n.1; Mem. & Order, May 28, 2004, at 5.  While Interior disputes the plaintiffs' claim that many former IIM account holders are class members, it is nevertheless prudent, in the interest of full coverage, to send notice to anyone who might wind up in the plaintiff class after resolution of the legal disputes.

significantly decrease the resource-burden imposed by today's notice requirement.[10]

iv.     Burden and Cost of Providing Class-Wide Notice

The plaintiffs argue that Interior, rather than the plaintiffs, should bear the costs—both financial and logistical—of providing the required notice.  See Pls.' Mot. at 12–20.  Nefariously, this is the only argument in the plaintiffs' motion that Interior genuinely attempts to take issue with.  See Defs.' Opp. at 11.  Nevertheless, Interior's arguments are ultimately unconvincing, and the Court will require that Interior expend both the effort and the funds required to ensure that the notice approved in today's order goes out with all future communications from Interior to current or former IIM account holders.

Generally, the "plaintiff must bear the cost of notice to the class[.]"  Eisen v. Carlisle Jacquelin, 417 U.S. 156, 178 (1974).  However, the Supreme Court has provided that "where a defendant can perform one of the tasks necessary to send notice [to a plaintiff class], such as identification [of the class members], more efficiently than the representative plaintiff, the district court has discretion to order him to perform the task under rule 23(d)."  Oppenheimer

---

[10]Interior contends that this requirement entails "the absurd result in which the ... [n]otice would be attached to communications regarding health care, education, and other topics that are unrelated to the subject matter of this case."  Defs.' Opp. at 8 n.6.  But this is not an argument at all.  Interior does not claim, for example, that including the required notice in communications related to health care and education will make the notice requirement somehow unduly burdensome.  Unless Interior feels that this Court should be in the business of avoiding absurdity as an evil in itself (in which case Interior should have long ago moved to strike the majority of its own pleadings from the record in this case), it is difficult to understand how any possible overbreadth in the notice requirement is not justified by the need to maximize protection of class rights.

Additionally, it is not obvious that Interior is correct to characterize this result as "absurd."  Many class members depend on the IIM trust as their primary (or sole) source of income.  Whenever these Indians spend money on prescription medications or school supplies, they do so because they think their IIM trust income is sufficient to allow for these expenditures.  Or, if Indians decide to forego purchasing prescription drugs, notebook paper, and the like, it may be because their Interior-drafted account statement tells them they cannot afford these things.  In either case, inaccuracies in Interior's trust-related information may relate directly to health care and education decisions.  It is certainly inappropriate for Interior to declare, as a general matter, that "health care" and "education ... are unrelated to the subject matter of this case."  Indeed, for some Indians there may be no aspect of everyday life that is unrelated to the subject matter of this case.  This observation throws into sharp relief not only the gravity of Interior's responsibilities as Trustee-Delegate, but also the inestimable cost of Interior's failure in that role.

Fund, Inc. v. Sanders, 437 U.S. 340, 350 (1978).  Where a district court orders a class-action

defendant to perform a task necessary to distribute notice to the class, the court "must exercise its

discretion in deciding whether to leave the cost of complying with its order where it falls, on the

defendant, or place it on the party who benefits, the representative plaintiff."  Oppenheimer Fund,

437 U.S. at 358.

Interior claims that shifting the notice-related costs and burdens to a class-action

defendant is warranted only if the notice is "needed to protect class member rights."  Defs.' Opp.

at 10–11 (discussing the kinds of notices involved in cases cited in the plaintiffs' motion: a

notice designed to prevent erroneous deportation of class members; a mandatory opt-out notice;

and a mandatory notice of dismissal).  This is a throwaway argument—Interior's postulated rule

is nowhere to be found in the Oppenheimer Fund case, which controls this issue and requires

only that the district court adjudge it more efficient to shift the burden and expense of notice to

the defendant.  Indeed, had Interior bothered to address Oppenheimer Fund at all, it would have

been clear that there is a distinction between the test for whether a court should require notice to

the class under Rule 23(d) on the one hand and the standard governing the allocation of the

burdens and costs of distributing that notice on the other.  Only the former inquiry involves an

evaluation of potential harm to class members' rights.[11]  And, even under the defendants' make-

---

[11]Interior makes much the Ninth Circuit's emphasis in the Barahona-Gomez case on the risk that class
members might be erroneously deported in the absence of notice.  See Defs.' Op. at 10–11 (citing Barahona-Gomez
v. Reno, 167 F.3d 1228, 1236 (9th Cir. 1999)).  But the Ninth Circuit made clear that the risk to class members
justified the district court's imposition of a notice requirement.  See Barahona-Gomez, 167 F.3d at 1236 ("the
district court did not err in requiring notice to the class [under Rule 23(d)]. ...The Court found that notice ... would
prevent the irreparable harm of an erroneous deportation.").  Distinctly, when reviewing the district court's decision
to allocate to the defendant the cost and work associated with providing notice, the Barahona-Gomez Court focused
on the burden to the government, noting that the required notice "can easily be attached to an order denying a class
member's suspension application," and that "the government made no presentation as to any additional costs
associated with providing this notice."  Id. at 1237.  Thus, the Ninth Circuit distinguished the standards for requiring
notice and allocating the costs of notice in the same manner suggested here.

believe legal standard, shifting the burdens and costs of notice to Interior would be justified because the Court has concluded above that the notice approved today is, in fact, necessary to protect class member rights.[12]

The Supreme Court provides guidance for allocating the work involved in sending notice, advising district courts to consider whether the defendant can perform some notice-related task "with less difficulty or expense than could the representative plaintiff." Oppenheimer Fund, 437 U.S. at 356. Here, including the required notice in mailings that Interior already planned to distribute to IIM account holders will be substantially more efficient than requiring the plaintiffs to send out the notices in a separate mass mailing. Interior has ready access to contact information for IIM account holders, so that for Interior, all that today's order really requires is the insertion of one additional piece of paper into regular mailings. Moreover, the principal purpose of the notice approved today is to warn the Indians about the potential unreliability of Interior's communications. Including the notices with the communications they reference reduces the potential for confusion and misinterpretation of the notice. The Court will, therefore, allocate to Interior the tasks of (1) preparing enough copies of the notice for one copy to be included in every written communication sent to a current or former IIM account-holder; and (2) attaching a copy of the notice to each such communication prior to distribution.

---

[12]Because this section of Interior's opposition is ambiguous on its face, the Court allows that this may be a different argument—namely, the argument that burden- and fee- shifting related to sending class notice is per-se inappropriate in class actions where, as here, the class is certified under Federal Rule of Civil Procedure 23(b)(2). The only plausible predicate for this argument is the observation that Rule 23(b)(2), unlike Rule 23(b)(3), does not mandate distribution of notice to the class. But this distinction does not affect the Court's discretion under Rule 23(d). There is no salient difference between a case in which notice is required by the Federal Rules and one where notice is mandated by court order. Further, there is precedent for the applicability of Oppenheimer Fund's explanation of a district court's Rule 23(d) authority to class actions certified under Rule 23(b)(2). See Barahona-Gomez, 167 F.3d at 1236–37 (applying Oppenheimer Fund to shift notice-related tasks to defendant in class action certified under Fed. R. Civ. P. 23(b)(2)).

This allocation is consistent with Oppenheimer Fund.  Discussing the considerations that should bear on a district court's distribution of the work involved in sending class notice, the Supreme Court noted that "district courts ... have found it appropriate to order a defendant ... to perform tasks other than identification [of class members] that are necessary to the sending of notice."  Oppenheimer Fund, 437 U.S. at 355.  Implicitly endorsing this Court's approach, the Oppenheimer Fund Court cites with approval instances where defendants have been ordered to "enclose class notices in their own periodic mailings to class members in order to reduce the expense of sending the notice."  Id. at 355 n.22 (citing as examples Ste. Marie v. Eastern R. Assn., 72 F.R.D. 443, 450 n.2 (S.D.N.Y. 1976); Gates v. Dalton, 67 F.R.D. 621, 633 (E.D.N.Y. 1975); Popkin v. Wheelabrator-Frye, Inc., 20 Fed. R. Serv. 2d 125, 130 (E.D.N.Y. 1975)).

To determine which party should bear the monetary cost of sending notice to the class, "the test should be whether the expense is substantial."  Oppenheimer Fund, 437 U.S. at 359.  If found to be substantial, the court "should be considerably more ready to place the cost of the defendant's performing an ordered task on the representative plaintiff, who derives the benefit[.]"  Id. at 358.  The cost of performing a notice-related task allocated to the defendant may remain with the defendant, for example, where the "expense involved [is] so insubstantial as not to warrant the effort required to calculate it and shift it to the representative plaintiff," or where "the task ordered is one that the defendant must perform in any event in the ordinary course of its business."  Id. at 359.

Including the approved notice in its mailings to current or former IIM account holders falls squarely within the ordinary course of Interior's business.  See Oppenheimer Fund, 437 U.S. at 359 n.28 (citing orders requiring defendants to include notice in periodic mailings as

appropriate instances of shifting cost of task to defendants as part of "ordinary course of business"). But even the cost of an ordinary-course-of business task should be borne by the plaintiff if the expenses involved would be "substantial." <u>See id.</u> Interior makes no argument that the cost of including notice in mailings to IIM account holders would be substantial, and the insertion of one additional sheet of paper into each mailing does not seem likely to generate appreciable expense.[13] The Court thus concludes that Interior should expend the cost as well as the effort required to distribute the approved notice as provided in today's Order.

> v.     Content of the Required Notice

Interior objects to much of the content of the plaintiffs' proposed notice, which reads as follows:

> You are receiving this notice because as an individual Indian trust beneficiary, you may be a member of the plaintiff class in the <u>Cobell v. Norton</u> litigation.
>
> The <u>Cobell v. Norton</u> litigation was filed by Elouise Cobell and other named plaintiffs on June 10, 1996 in the U.S. District Court for the District of Columbia on behalf of all current and past beneficiaries of the Individual Indian Money ("IIM") Trust ("<u>Cobell</u> Class"). This lawsuit is an action in equity to enforce the trust duties that the United States government owes to the <u>Cobell</u> Class. Named as defendants are the Interior Secretary, the Assistant Interior Secretary-Indian Affairs, and the Secretary of the Treasury who, in their official capacities, are trustee-delegates for the government in the management and administration of the IIM Trust ("Trustee-Delegates"). The Trustee-Delegates have admitted that they do not know whether the information that they are providing to you about your Trust assets is accurate and complete. In addition, they have been held in breach of fiduciary duties that the United States government owes the <u>Cobell</u> Class. As a result, the Trustee-Delegates have been ordered to provide the Cobell Class an accounting of their conduct and an accounting of all items of the IIM Trust since its inception. They also have been ordered to discharge their trust duties in

---

[13]For example, adding one extra page to Interior's regular mailings is unlikely to increase the weight of those mailings enough to require additional postage. Indeed, by eschewing any requirement that Interior attempt to differentiate either among IIM account holders or types of communications when including the notice, the Court seems to have imposed the least costly procedure possible.

accordance with all applicable statutory, treaty, and common law.

A future trial is necessary, but is not yet scheduled, for the Court to assess the adequacy of the Trustee-Delegates' accounting. Until such time as the Court has judged an accounting to be adequate and it has found that the Trustee-Delegates are discharging their fiduciary duties prudently and in accordance with law, the Court in Cobell v. Norton has determined that it is essential to ensure that communications by and between the government and the Cobell Class do not interfere with the class members' right to an accurate and complete accounting or otherwise adversely affect their rights in this litigation.

In that regard, the United States Court of Appeals has held that each individual Indian trust beneficiary has a right to an accurate and complete accounting and other relevant information regarding his or her trust assets. However, the government is currently unable to provide all individual Indian trust beneficiaries an accurate and complete accounting of their trust assets and is unable to provide a timetable for when that accounting will be rendered. A beneficiary's right to request and receive relevant information regarding their trust assets is not on hold pending the resolution of this litigation on the merits or the rendition of an adequate accounting. Any beneficiary may request that the government provide relevant information regarding their trust assets at reasonable intervals.

Each class member also has a right to consult with class counsel regarding this notice or their rights as individual Indian trust beneficiaries. For further information you may access the Cobell Class website, www.indiantrust.com or contact the following counsel for the Cobell Class: Dennis M. Gingold, Esq., 607 14th Street, N.W., 9th Floor, Washington, DC 20005, phone: (202) 824-1448, fax: (202) 318-2372, email: dennismgingold@aol.com, or Keith Harper, Esq., Native American Rights Fund, 1712 N Street, N.W., Washington, DC 20036-2976, phone: (202) 785-4166, fax: (202) 822-0068, email: harper@narf.org.

Pls.' Mot., Ex. 1 (Proposed Order), at 2–3 (footnote omitted).

Interior correctly observes that the Court rejected similar language in the plaintiffs'

proposed land-sales notice, Defs.' Opp. at 6, because "several of the assertions in the plaintiffs'

proposed notice are disputed matters currently pending before the Court of Appeals." Cobell,

224 F.R.D. at 280. While many of Interior's appellate issues have been resolved, see generally

Cobell v. Norton, 391 F.3d 251 (D.C. Cir. 2004) (resolving appeal of preliminary injunction

related to security of electronic trust data at Interior); Cobell v. Norton, 392 F.3d 461 (D.C. Cir.

2004) (resolving the majority of Interior's issues related to the structural injunction issued after

Trial 1.5), some matters related to the now-reissued structural injunction remain pending.  See,

e.g., Cobell, 357 F. Supp. 2d 298 (reissuing portion of structural injunction vacated but not

addressed on the merits); Defendants' Notice of Appeal [2869], filed Mar. 4, 2005 (informing the

Court that Interior would appeal the reissuance of the structural injunction).  As some of the

statements in the plaintiffs' proposed class-wide notice may be disputed on Interior's remaining

appeals, the Court will edit the notice accordingly.[14]

Interior next contends that Federal Rule of Civil Procedure 23(h)(1) requires that today's

notice also contain information about the plaintiffs' August 17, 2004 Petition for Interim Fees

under the Equal Access to Justice Act (the "interim fee petition").  See Defs.' Opp. at 12.  Rule

23(h)(1) requires that claims "for an award of attorney fees and nontaxable costs must be made

by motion under Rule 54(d)(2)" and that "[n]otice of [such] motion must be served on all parties

and, for motions by class counsel, directed to class members in a reasonable manner."  FED. R.

CIV. P. 23(h)(1).  Though the plaintiffs' interim fee request was filed as a petition under the

Equal Access to Justice Act rather than as a Rule 54(d)(2) motion, the Advisory Committee notes

emphasize that Rule 23(h)(1) was intended to "provide[] a format for all awards of attorney fees

and nontaxable costs in connection with a class action[.]"  Notice to the class of all fee motions is

required, the Advisory Committee explains, because "[f]ee awards are a powerful influence on

---

[14]Interior also "vigorously dispute[s] ... any description which inaccurately states that the duties of the various Defendants are co-extensive."  Defs.' Opp. at 7 n.4.  The Court need not attempt to determine whether the Defendants' duties are in fact identical, as only Interior's duties are relevant to the central purpose of this notice. Indeed, there need be no specific enumeration of the defendants' various fiduciary duties in the notice.  It is enough for informational purposes that the notice name the defendants.

the way attorneys initiate, develop, and conclude class actions," such that "members of the class have an interest in the arrangements for payment of class counsel whether that payment comes from the class fund or is made directly by another party[.]"

The Rule 23(h)(1) notice requirement provides the class with sufficient information to question objectionable fee requests and to scrutinize any potential conflicts of interest that arise from certain payment scenarios, and these benefits do not vary with the procedural mechanism by which fees are sought. Rule 23(h)(1)'s purpose thus dictates that class members must be notified of any fee request made by class counsel regardless of the provision of law authorizing the request, including the plaintiffs' interim fee petition. However, Rule 23(h)(1) does <u>not</u> require the Court to include information about the interim fee petition in today's class-wide notice. To the contrary, the Rule requires only that the class be notified "in a reasonable manner," leaving the Court with some latitude to determine the proper form and timing of notice. Information about the interim fee petition is beyond the scope of the limited informational aims of the notice ordered today, and not at all germane to its central purpose of advising class members of the unreliability of Interior's trust information. The Court thus concludes that including fee information in today's notice would be an unreasonable manner of notifying the class of the plaintiffs' petition. The Court will, however, order that plaintiffs' counsel submit to the Court a proposed notice to the class regarding the interim fee petition, as well as a proposal for distributing that notice to class members.

Having resolved Interior's content-related objections, the Court also finds that the plaintiffs' proposed notice is too long, contains overwrought language and sentence structure, and communicates unnecessary details. When paring down the plaintiffs' proposed land-sales

notice, the Court expressed its faith in "the ability of plaintiffs' counsel to provide all who

inquire with additional information related to the details of this litigation; as well as with a full

description of the rights of class members." Cobell, 224 F.R.D. at 208. The Court retains this

faith today, and concludes that providing contact information for plaintiffs' counsel in today's

notice allows for omission of some detail.

The Court will require that the following modified notice be included in all future written

communications from Interior, its agents, representatives, employees, officials, or counsel to past

or present IIM account holders:

> Please be aware that past and present Individual Indian Money ("IIM") Trust
> account holders may be members of a class action lawsuit, Cobell v. Norton,
> No. 1:96CV01285 (D.D.C.) (Judge Lamberth). The defendants in this lawsuit,
> the Secretary of the United States Department of the Interior and the Secretary
> of the United States Department of the Treasury, are the federal government's
> Trustee-Delegates for the IIM Trust. The Court in the Cobell case has ruled
> that the Department of the Interior must provide each IIM Trust beneficiary
> with a complete and accurate accounting of his or her IIM Trust account.
> Because other related matters are not yet resolved, the Cobell case is still
> pending and the accounting has not yet been completed.
>
> While the Cobell case is ongoing, the Court has determined that it is essential
> to ensure that communications from the Department of the Interior do not
> adversely affect the rights of IIM Trust account holders who are also members
> of the Cobell lawsuit. For that reason, this notice is included with this
> communication for the information of current and former IIM Trust account
> holders.
>
> Evidence introduced in the Cobell case shows that any information related to
> the IIM Trust, IIM Trust lands, or other IIM Trust assets that current and
> former IIM Trust account holders receive from the Department of the Interior
> may be unreliable. Current and former IIM Trust account holders should keep
> in mind the questionable reliability of IIM Trust information received from the
> Department of the Interior if and when they use such information to make
> decisions affecting their IIM Trust assets.
>
> Current and former IIM account holders have the right to consult with the
> attorneys for the class in Cobell v. Norton regarding this notice or any other

matter related to the IIM Trust.  For further information you may access the Cobell class website, www.indiantrust.com or contact the following attorneys representing the Cobell class: Dennis M. Gingold, Esq., 607 14th Street, N.W., 9th Floor, Washington, DC 20005, phone: (202) 824-1448, fax: (202) 318-2372, email: dennismgingold@aol.com, or Keith Harper, Esq., Native American Rights Fund, 1712 N Street, N.W., Washington, DC 20036-2976, phone: (202) 785-4166, fax: (202) 822-0068, email: harper@narf.org.

## CONCLUSION

While it is undeniable that Interior has failed as a Trustee-Delegate, it is nevertheless difficult to conjure plausible hypotheses to explain Interior's default.  Perhaps Interior's past and present leaders have been evil people, deriving their pleasure from inflicting harm on society's most vulnerable.  Interior may be consistently populated with apathetic people who just cannot muster the necessary energy or emotion to avoid complicity in the Department's grossly negligent administration of the Indian trust.  Or maybe Interior's officials are cowardly people who dodge their responsibilities out of a childish fear of the magnitude of effort involved in reforming a degenerate system.  Perhaps Interior as an institution is so badly broken that even the most well-intentioned initiatives are polluted and warped by the processes of implementation.[15]

---

[15]This hypothesis may be the most plausible, as there is some evidence to substantiate it.  In June, 2002, Interior filed with the Court a report generated by Interior's Office of Inspector General ("OIG") following an investigation of "seven specific issues relating to allegations that senior managers and attorneys of the Department of the Interior ... engaged in misconduct."  See Notice [1355] of Filing the Office of Inspector General's Report: Allegations Concerning Conduct of Department of the Interior Employees Involved in Various Aspects of the Cobell Litigation ("OIG Rep."), June 25, 2002, exec. summ. at 1.  This investigation was conducted during the pendency of the 2002 contempt trial mentioned above.  In the course of investigating Interior, the OIG "uncovered bad judgment, unfocused management, a myriad of definitional issues, and extreme hostility among the players and entities[,]" and "found factions with extremely myopic views of and approaches to the very complex issues at hand."  OIG Rep., exec. summ. at 2.  The OIG noted that in its decades of oversight of Interior, "we have often observed ... a Department whose components are blinded by clouded judgment and crippled by distrust[,]" id. at 6, characterized by a "bunker mentality" in which Interior employees generally "begin by protecting [their] own Bureau or office, to the detriment of other Bureaus or offices if necessary; then protect the Department, and/or the institution or position it has advanced; [and] finally, protect the public interests ...."  Id.  The OIG found that while Interior's various entities and employees are "fueled by a multitude of motivations, many of which were well-intentioned[,]" id. at 2, one of the least prevalent motivations "was to protect and advance the interests of Individual Indian Trust account holders."  Id.

The government as a whole may be inherently incapable of serving as an adequate fiduciary because of some structural flaw.  Perhaps the Indians were doomed the moment the first European set foot on American soil.  Who can say?  It may be that the opacity of the cause renders the Indian trust problem insoluble.

On numerous occasions over the last nine years, the Court has wanted to simply wash its hands of Interior and its iniquities once and for all.  The plaintiffs have invited the Court to declare that Interior has repudiated the Indian trust, appoint a receiver to liquidate the trust assets, and finally relieve the Indians of the heavy yoke of government stewardship.  The Court may eventually do all these things—but not yet.  Giving up on rehabilitating Interior would signal more than the downfall of a single administrative agency.  It would constitute an announcement that negligence and incompetence in government are beyond judicial remedy, that bureaucratic recalcitrance has outpaced and rendered obsolete our vaunted system of checks and balances, and that people are simply at the mercy of governmental whim with no chance for salvation.  The Court clings to a slim and quickly receding hope that future progress may vitiate the need for such a grim declaration.

This hope is sustained in part by the fact that the Indians who brought this case found it in themselves to stand up, draw a line in the sand, and tell the government: Enough is enough—this far and no further.  Perhaps they regret having done so now, nine years later, beset on all sides by the costs of protracted litigation and the possibility that their efforts may ultimately prove futile; but still they continue.  The notice requirement established by the Court today represents a significant victory for the plaintiffs.  For the first time in the history of this case, the majority of Indian beneficiaries will be aware of the lawsuit, the plaintiffs' efforts, and the danger involved

33

in placing any further confidence in the Department of the Interior.  Perhaps more importantly, the Indians will be advised that they may contact class counsel for guidance on their trust-related concerns.  This likely will bring to light a wealth of new evidence concerning Interior's mismanagement of the trust; it will also open an avenue to relief for individuals throughout Indian country whose suffering might otherwise be buried forever in a bureaucratic tomb.

Real justice for these Indians may still lie in the distant future; it may never come at all. This reality makes a statement about our society and our form of government that we should be unwilling to let stand.  But perhaps the best that can be hoped for is that people never forget what the plaintiffs have done here, and that other marginalized people will learn about this case and follow the Indians' example.

A corresponding Order will issue today.


Signed by Royce C. Lamberth, United States District Judge, July 12, 2005.