**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
**ELOUISE PEPION COBELL, et al.,**          )
                                                        )
        **Plaintiffs,**                                )
                                                        )
        **v.**                                            )     **Civil Action Number 96-1285 (RCL)**
                                                        )
**GALE A. NORTON, Secretary of the**       )
**Interior, et al.,**                                  )
                                                        )
        **Defendants.**                             )
_____)

## MEMORANDUM OPINION

Before the Court is plaintiffs' Equal Access to Justice Act Petition for Interim Fees

Through the Phase 1.0 Proceeding ("Interim Fee Petition").  Plaintiffs seek fees and expenses in

the amount of $14,528,467.21 for their efforts "resolv[ing] issues" central to Phase 1.0 of the

case and "set[ting] the stage for future relief."  Cobell v. Norton, 319 F.Supp.2d 36, 41 (D.D.C.

2004).  Defendants oppose the Interim Fee Petition, citing both plaintiffs' failure to demonstrate

a legal entitlement to an award under the Equal Access to Justice Act as well as plaintiffs'

submission of poorly documented, excessive, redundant, and otherwise defective time records.

Defendants maintain that, to the extent an award is warranted, it should not exceed $4,313,047.

Opposition to plaintiffs' Equal Access to Justice Act Petition for Interim Fees Through the Phase

1.0 Proceeding ("Defendants' Opposition"), at 78.  Plaintiffs, in response, press the Court to

immediately grant an award for all "uncontested" hours at "market rates" and postpone deciding

the "contested" hours until a later date.  Plaintiffs' Reply, at 67.

After examining the record and considering the briefs presented, the Court, for the reasons set out more fully below, awards plaintiffs fees in the amount of $4,534,275.97 and expenses in the amount of $2,532,195.08, for a total Interim Fee Award of $7,066,471.05.

**BACKGROUND**

Plaintiffs initiated this class action in 1996 on behalf of more than 350,000 Native Americans against the Secretaries of the Interior and the Treasury as trustee-delegates, seeking equitable relief to redress mismanagement of the trust fund accounts. Cobell v. Babbitt, 30 F.Supp.2d 24 (D.D.C. 1998). The class was initially represented by five-named plaintiffs, Elouise Pepion Cobell, Thomas Maulson, James Louis Larose, Penny Cleghorn, and Earl Old Person, until the Court, on March 5, 2003, removed Old Person as a class representative.

Plaintiffs sought both a "retrospective" accounting of the government's Individual Indian Money (IIM) trust account system as well as a "prospective" order demanding that the Departments of the Interior and the Treasury manage Indian accounts in accordance with their statutory and common-law duties. Plaintiffs grounded their claims on a long line of Congressional Acts including the General Allotment Act of 1887, ch. 119, 24 Stat. 388 (vesting beneficial title of certain lands in the United States as trustee for individual Native Americans); the Indian Reorganization Act of 1934, 48 Stat. 984 (halting allotment of Native American lands and returning surplus land to tribal ownership); the Indian Self-Determination and Education Assistance Act, 88 Stat. 2203 (1975) (granting tribal management over certain functions previously administered by the Bureau of Indian Affairs and the Office of Trust Fund Management); and the more recently promulgated Indian Trust Fund Management Reform Act ("Trust Reform Act"), 108 Stat. 423q (codified as amended at 25 U.S.C. §162a(d) (1994)).

On November 5, 1998, this Court bifurcated the proceedings into two "phases."   Phase 1.0 was "a trial to determine the extent to which the defendants have violated their trust duties"; while Phase 2.0 is projected to be "a trial on the extent to which the defendants have remedied those breaches." Cobell v. Norton, 226 F.R.D. 67, 73 (D.D.C. 2005).

On December 21, 1999, after conducting a six-week bench trial addressing plaintiffs' Phase 1.0 claims, the Court issued a Memorandum Opinion containing detailed factual findings and conclusions of law.  Cobell v. Babbitt, 91 F.Supp.2d 1 (D.D.C. 1999) (hereinafter referred to as "Cobell V" (see Cobell, 226 F.R.D. at 73 n.4)).  In Cobell V, the Court found defendants in breach of their statutory trust duties and issued a declaratory judgment requiring defendants: (1) to provide plaintiffs an accurate accounting; (2) to retrieve and retain all information necessary to render an accurate accounting of all money in the IIM trust; and (3) to establish written policies and procedures for complying with their statutory obligations and for rectifying those breaches identified by the Court.  Cobell, 91 F.Supp.2d at 57.  The Court also retained jurisdiction for a period of five years and ordered defendants to file quarterly status reports "setting forth and explaining the steps that defendants have taken to rectify the breaches of trust declared today and to bring themselves into compliance with their statutory trust duties." Id.

The Court denied, however, plaintiffs' requests for the appointment of a monitor with investigatory powers, id. at 52, and for prospective relief.  Id. at 56.  The Court also dismissed with prejudice plaintiffs' common-law claims as well as their allegations that defendants obstructed the operation of the Special Trustee. Id. at 57.

On February 23, 2001, the United States Court of Appeals for the District of Columbia affirmed this Court's rulings and held that: (1) the District Court could consider plaintiffs'

claims absent final administrative action; (2) the Secretary of the Treasury breached his fiduciary obligations toward beneficiaries by failing to maintain documents necessary to perform accounting; (3) there was ample evidence supporting the Court's finding that defendants failed to take reasonable steps to discharge their trust obligations; (4) management of a trust and rendering of an adequate accounting required locating and retaining records, operational computer systems, and adequate staffing; and (5) the Court's continued oversight was mandatory. Cobell v. Norton, 240 F.3d 1081, 1098 (D.C. Cir. 2001) (hereinafter referred to as "Cobell VI" (see Cobell, 226 F.R.D. 73 n.4)).

Plaintiffs request reimbursement for fees and costs incurred by attorneys Dennis Gingold, Thaddeus Holt, and Mark Brown; the Native American Rights Fund ("NARF"); the law firm of Kilpatrick Stockton ("KS"); accountant and litigation consultant Geoffrey Rempel; and the accounting firm, PricewaterhouseCoopers ("PwC"), for bringing about these rulings.

Defendants challenge plaintiffs' Interim Fee Petition on every conceivable front, alleging: (1) that plaintiffs' petition runs afoul of the notice requirements of Fed. R. Civ. P. 23(h)(1); (2) that plaintiffs failed to demonstrate "eligibility" under section 2412(d)(2)(B); (3) that plaintiffs are not "prevailing parties" entitled to recover under section 2412(d); (4) that defendants' position was, at all relevant times, "substantially justified;" (5) that plaintiffs failed to submit "contemporaneous" time records; (6) that plaintiffs' time entries are inadequately documented, excessive, and non-compensable under EAJA; and (7) that plaintiffs are not entitled to a fee enhancement under Section 2412(b).

Defendants' objections are considered below.

**ANALYSIS**

The Equal Access to Justice Act ("EAJA") provides, in pertinent part, that:

[A] court shall award to a prevailing party other than the United States fees and other expenses . . . incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States . . . , unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. §2412(d)(1)(A).

In enacting EAJA, Congress sought to "ensure that individuals . . . [would] not be deterred from seeking review of, or defending against, unjustified governmental action because of the expense involved in securing the vindication of their rights." Sullivan v. Hudson, 490 U.S. 877, 883 (1989) (quoting H.R. Rep. No.120, 99th Cong., 1st Sess. 4 (1985)). The Act effectuates this legislative purpose by requiring the federal government to pay attorneys' fees and expenses incurred by the victims of its unreasonable action. The Court is satisfied the Indian beneficiaries were just such victims.

I.     NOTICE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(h)

Defendants argue that plaintiffs are not entitled to a recovery under EAJA, having failed to comply with the notice requirement of Fed. R. Civ. P. 23(h)(1). Opposition, at 8. Rule 23(h)(1) requires that claims for attorneys' fees be made by motion with notice served on all parties and class members "in a reasonable manner." ((23(h)(1)). The rule was promulgated to "ensure that the amount and mode of payment of attorney fees are fair and proper whether the fees come from a common fund or are otherwise paid." Rule 23 Advisory Committee's Note (2003 Amend.).

The record reveals that plaintiffs originally provided copies of the Interim Fee Petition only to the four-named class representatives. Interim Fee Petition, at 16,  n.4. Defendants take

issue with this limited notice on the grounds that plaintiffs not only bypassed the remaining class members but deviated from their usual practice of posting their court filings on their web site. Opposition, at 8, n. 3.

Plaintiffs respond that notice requirements of Rule 23(h)(1) do not apply to the Interim Fee Petition because the rule only became effective on December 1, 2003 – long after the initiation of this litigation.  Plaintiffs' Reply, at 19.

Plaintiffs' argument is unpersuasive as it overlooks the fact that Rule 23(h), as a procedural rule, may be "applied in suits arising before their enactment without raising concerns about retroactivity."  Landgraf v. USI Film Products, 511 U.S. 244, 275 (1994).  Keeping faith with this principle, courts have consistently applied Rule 23(h) to litigation initiated before its enactment.  See, e.g., In re Livent, Inc. Noteholders Securities Litigation, 355 F.Supp.2d 722 (S.D.N.Y. 2005) (Securities Class Action Complaint filed on Oct. 09, 1998); In re WorldCom, Inc., Erisa Litigation, 2004 WL 2338151 (S.D.N.Y. Oct. 18, 2004) (ERISA class action filed on June 21, 2002); Latino Officers Assen City of New York, Inc. v. City of New York, 2004 WL 2066605 (S.D.N.Y. Sept. 15, 2004) (Title VII action filed in September 1999).

What constitutes "reasonable notice" under Rule 23(h)(1), however, remains an open question.  Even defendants concede, "it is not clear what will constitute adequate 'notice' of the Interim Petition that must be provided to the class members under Rule 23(h)."  Opposition, at 8, n.3.  This Court, however, on July 12, 2005, recognized it has considerable latitude to determine whether plaintiffs' notice "provides the class with sufficient information to question objectionable fee requests and to scrutinize any potential conflicts of interest that arise from certain payment scenarios." Cobell v. Norton, 229 F.R.D. 5, 21 (D.D.C. 2005).

The class in this case is comprised of approximately 500,000 current and former IIM Trust beneficiaries.  Even Interior has, to date, been unable to identify all of the current beneficiaries of the trust.  Notice to every class member, an ideal objective, is far from practicable much less reasonable.   Throughout the course of this litigation, class counsel has surmounted this obstacle by utilizing their website as the primary vehicle to communicate with the beneficiaries.  Accordingly, on November 8, 2005, the Court held that "it is reasonable to conclude" that notification on plaintiffs' website "is adequate for purposes of Rule 23(h)(1)." See Mem. Op. (November 8, 2005).  The Court also ordered plaintiffs to publish the Interim Fee Petition  in the *Native American Times*, *Indian Country Today* and *News From Indian Country* – generally considered among the most widely read periodicals in Indian Country.  The Native American Times, alone, boasts "a proven readership of over 36,000" and a website that "is now averaging over a million hits monthly."  See http://nativetimes.com/.

In accordance with the November 8, 2005 Order, plaintiffs posted and published the Interim Fee Petition allowing the class 30 days to file any comments and objections with the Court.  The Court finds plaintiffs' compliance with its November 8 Order sufficient to satisfy the demands of Rule 23(h)(1), and defendants' objections are now moot.

**OBJECTIONS**

Pursuant to the Court's November 8, 2005 Order, plaintiffs received one objection, from Mr. Eddie Jacobs, to "Plaintiffs' Petition for an [Interim] Award of Attorneys' Fees Pursuant to the Equal Access to Justice Act."  It is to be noted that other than Mr. Jacobs, no trust beneficiary among the 500,000 or more in the plaintiff class has objected or commented to the interim fee petition by telephone or e-mail.  See Plaintiffs' Exhibit 1 (Declaration of Mari Keenan) at ¶¶ 3-4.

Mr. Jacobs objects that the petition is "totally offensive and disrespectful to American Indian beneficiaries" because plaintiffs' attorneys are getting compensation when the beneficiaries "have not received one cent from this class action lawsuit."  See Eddie Jacobs Obj. Mr. Jacob's objection has no substantive comment on plaintiffs' interim fee petition.  Mr. Jacob's frustration is the same as plaintiffs in that all would like the IIM beneficiaries to receive just compensation in a timely manner and before their attorneys.  But this has been, and continues to be, an extremely arduous and complex process.  The Court sympathizes with Mr. Jacobs but finds that his lone objection does not take issue with the merits of plaintiffs' application.

## II.    ELIGIBILITY TO RECEIVE AN EAJA AWARD PURSUANT TO 28 U.S.C.A. §2412(D)(2)(B)(I)

To receive an award under EAJA, a party must demonstrate "net worth [that] did not exceed $2,000,000 at the time the civil action was filed." 28 U.S.C.A. §2412(d)(2)(B)(I). Defendants maintain that plaintiffs failed to comply with the statute, having merely "alleged" and not "shown" eligibility.  Opposition, at 12.  Defendants' contention is without merit.

On September 13, 2004, plaintiffs filed their Notice of Filing Named Plaintiff' Affidavits in Support of Plaintiffs' Equal Access to Justice Act Petition for Interim Fees Through the Phase 1.0 Proceeding.  Attached to the Notice were affidavits signed by the class representatives, attesting to the fact that their net worth fell within EAJA statutory guidelines at the time the litigation was initiated.   The Court finds these submissions amply satisfy the requirements of the statute for the entire class.  See Olenhouse v. Commodity Credit Corp., 922 F.Supp. 489, 493 (D. Kan. 1996) (as "[t]he agency has not shown that the named farmers were unrepresentative of the class or that unnamed members of the class were willing and able to bear the cost of the

litigation," the farmers need only demonstrate "that the named plaintiffs, i.e., those who prosecuted the claim and seek the EAJA award – each met the net worth").

    III.    <u>PREVAILING PARTIES</u>

    EAJA allows a "prevailing party" to collect fees and expenses unless a court determines that such an award would be unjust or that "the position of the United States was substantially justified." 28 U.S.C. §2412(d)(1)(A).  Defendants concede that, "[u]nder EAJA standards, plaintiffs are probably prevailing parties for Phase 1 trial," Opposition, at 16, and that <u>Cobell V</u> was "largely affirmed on appeal."  Defendants qualify their characterization of plaintiffs' success, however, in an attempt to reduce that award with the time plaintiffs spent litigating those claims which may not have succeeded.  For the reasons demonstrated below, no reduction is warranted.

    In federal fee-shifting statutes, a "prevailing party" must demonstrate: (1) that it is "a party in whose favor a judgment is rendered, regardless of the amount of damages awarded"; (2) the existence of "a court-ordered change in the legal relationship between the plaintiff and the defendant"; and (3) that it has done more than "having acquired a judicial pronouncement unaccompanied by judicial relief."  <u>Select Milk Producers, Inc. v. Johanns</u>, 400 F.3d 939, 946-47 (D.C. Cir. 2005).  Plaintiffs have successfully carried that burden.

    There can be no dispute that the Court's December 21, 1999 declaratory judgment was just that, a "judgment" or "decree and any order from which an appeal lies." BLACK'S LAW DICTIONARY 846 (7th ed. 1999) (citing Fed.R.Civ.P. 54).  <u>Cobell V</u> provided "judicial relief" that required defendants to take "some action (or cessation of action)," <u>Thomas v. Nat'l Sci. Found.</u>, 330 F.3d 486 at 493 (quoting <u>Hewitt v. Helms</u>, 482 U.S. 755, 761 (1987)), and significantly altered the legal relationship between plaintiffs and the trustee-delegates.  <u>See</u>

Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources, 532 U.S. 598, 604 (2001).  See also, Tex. State Teachers Assen v. Garland Indep. Sch. Dist., 489 U.S. 782, 792 (1989).

Cobell V also required defendants to provide plaintiffs an accurate accounting; to retrieve and retain all information necessary to render an accurate accounting of all money in the IIM trust; to establish written policies and procedures for collecting from outside sources missing information necessary to render an accurate accounting; and to retain IIM-related trust documents necessary to render an accurate accounting of the IIM trust.  Cobell V, 91 F.Supp.2d 1, 58 (D.D.C. 1999).  This was not "a case in which the Government voluntarily changed its ways before judicial action was taken," rendering moot the need for litigation "through voluntary cessation before there was a judicially sanctioned change in the legal relationship of the parties." Johanns, 400 F.3d at 949.  As the Court of Appeals observed, what "little progress" was made was "more due to the litigation than diligence in discharging its fiduciary obligations."  Cobell VI, 240 F.3d at 1097.

Defendants' representations notwithstanding, plaintiffs' status as a "prevailing party" and their entitlement to a fee award is not tempered by the fact that they may not have technically prevailed on all aspects of their claims.  Defendants suggest that any fee recovery must be reduced pro rata to reflect those claims for which plaintiffs were unsuccessful.  While there is support for the proposition that, where "some but not all of the government's defenses are substantially justified the prevailing party should be compensated for combating those that are not," Cinciarelli v. Reagan, 729 F.2d 801, 805 (D.C. Cir. 1984), the Court finds this principle trumped by one of greater compelling application:

> [w]here a plaintiff has obtained excellent results his attorney should recover a fully compensatory fee.  Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified.  In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee.  The result is what matters.

Hensley v. Eckerhart, 461 U.S. 424, 435 (1983).

Here, plaintiffs achieved more than "excellent results," they achieved a "stunning victory."  Cobell V, 91 F.Supp.2d at 51.  And this victory was in no way diluted by plaintiffs' inability to convince the Court: (1) that the trustee-delegates breached their common-law duties; (2) to appoint a Court monitor or special master to oversee compliance with the Court's orders; (3) to grant prospective relief about "unclaimed moneys" or "miscellaneous receipts" accounts at Treasury; or (4) that defendants impeded the ability of the Special Trustee to perform his functions.

In the first instance, plaintiffs' "common-law claims for breach of trust against these federal officials in the context of financial mismanagement of the IIM trust," Cobell V, 91F.Supp.2d at 28, did not vitiate plaintiffs' claim that the trustee-delegates violated their statutory duties under the Trust Reform Act.  Plaintiffs' "common law" arguments represented an "alternative legal ground" to their contention that defendants violated the Trust Reform Act and thus breached their fiduciary duties toward Indian beneficiaries.  Hensley, 461 U.S. at 435. Plaintiffs successfully persuaded the Court of Appeals that the Trust Reform Act constituted both a reaffirmation as well as a codification of the United States' common-law trust responsibilities, and that defendants violated these statutory duties.  See Cobell VI, 240 F.3d at 1100 ("The Indian Trust Fund Management Reform Act reaffirmed and clarified preexisting

duties; it did not create them. It further sought to remedy the government's long-standing failure to discharge its trust [i.e., common law] obligations").  In short, plaintiffs may have been unable to impress this Court that defendants violated their "common law duties," but they achieved the identical goal by demonstrating, in the alternative, that the government violated the Trust Reform Act.  And "[g]iven [petitioner's] success in the case, [] the time its attorneys spent on alternative grounds should not be used to reduce its award."  Davis County Solid Waste Management and Energy Recovery Special, 169 F.3d 755, 760 n.8 (D.C. Cir. 1999) (citations omitted).  See also, Copeland, 641 F.2d 880, 891-92 (D.C. Cir. 1980) (en banc). ("it sometimes will be the case that a lawsuit will seek recovery under a variety of legal theories complaining of essentially the same injury.  A district judge must take care not to reduce a fee award arbitrarily simply because a plaintiff did not prevail under one or more of these legal theories").

Similarly, the Court's refusal to appoint a court monitor or special master did not diminish plaintiffs' success.  Cobell V makes clear that the very duties plaintiffs asked the Court to delegate to a third-party monitor were, in fact, retained by the Court.  For example, "to ensure that trust reform is successfully completed," the Court ordered defendants to "file with the court and serve upon plaintiffs quarterly status reports setting forth and explaining the steps that defendants have taken to rectify the breaches of trust declared today and to bring themselves into compliance with their statutory trust duties embodied in the Indian Trust Fund Management Reform Act of 1994 and other applicable statutes and regulations governing the IIM trust").  Cobell V, 91 F.Supp 2d at 56.  By reserving these duties for itself, the Court did not deny plaintiffs' request that defendants' activities be monitored.  No reduction in fees is warranted.

With respect to plaintiffs' claim for prospective relief, defendants correctly observe that the Court rejected plaintiffs' request as little more than "vague accusations about certain money

purportedly kept in the 'unclaimed moneys' or 'miscellaneous receipts' accounts at Treasury."

Cobell V, 91 F.Supp.2d at 23.  Counsel's individual time entries, however, reveal a de minimis

effort on the part of plaintiffs that in no measurable way detracted from their overall success.

Finally, the Court's denial of plaintiffs' claims of obstruction against the Office of the

Special Trustee does not warrant a proportional reduction in fees.  By the time the Phase 1.0 trial

was underway, plaintiffs had "all but withdrawn their claims for 'obstruction' of the discharge of

the Special Trustee's duties by defendant Babbitt's meager funding requests and reorganization

of OST."  Cobell V, at 51.  The Court's review of plaintiffs' time entries confirms that plaintiffs

expended an imperceptibly small fraction of time on these claims with no discernible impact on

the ultimate results.

In sum, the Court's position on these claims neither detracts from plaintiffs' victory nor

warrants a reduction in fees based on "a mathematical approach comparing the total number of

issues in the case with those actually prevailed upon."  Hensley, 461 U.S. at 435-36, n.11.

IV.   SUBSTANTIAL JUSTIFICATION

Eligibility for a fee award under the EAJA requires, among other things, that the

Government's position was not "substantially justified," 28 U.S.C. §2412(d) (1) (A), i.e., one

that "a reasonable person could think it correct, that is, if it has a reasonable basis in law and

fact."  Pierce v. Underwood, 487 U.S. 552, 566, n.2 (1988).  Defendants, at all times, "bear[] the

burden of establishing that its position meets the substantial justification threshold," Lundin v.

Mecham, 980 F.2d 1450, 1459 (D.C. Cir. 1992)), and demonstrating "the reasonableness not

only of its litigation position, but also of the agency's actions." American Wrecking Corp. v.

Secretary of Labor, 364 F.3d 321 (D.C. Cir.  2004) (emphasis added and in original).  See 28

U.S.C. §2412(d)(2)(D) (providing that "'position of the United States' means, in addition to the

position taken by the United States in the civil action, the action or failure to act by the agency upon which the civil action is based") (emphasis added).  See also, Halverson v. Slater, 206 F.3d 1205, 1208 (government must show "that its position, including both the underlying agency action and the arguments defending that action in court, was 'substantially justified' within the meaning of the Act." (D.C. Cir. 2000)).

Defendants contend the government's position was, at all times, "reasonable" and thus "substantially justified." Opposition, at 18, 19.   They urge this Court not to conflate their loss both at trial and on appeal with the "reasonableness" of their position.  Opposition, at 18 (citing Cooper v. United States R.R. Ret. Bd., 24 F.3d 1414, 1416 (D.C. Cir. 1994)).  The Court finds defendants' position not well taken.  At all relevant times, defendants acted in a manner flatly at odds with controlling authority that could not be "justified to a degree that could satisfy a reasonable person." Underwood, 487 U.S. at 565.

The record on this point is clear.  Recognizing "the magnitude of government malfeasance and potential prejudice to the plaintiffs' class,"  the Court of Appeals stripped defendants of the deference normally conferred upon agencies as a matter of course and entrusted this Court with an unparalleled level of  oversight.  Cobell VI, 240 F.3d at 1109. ("[w]hile ordinarily we defer to an agency's interpretations of ambiguous statutes entrusted to it for administration, deference is not applicable in this case") (citing Chevron U.S.A., Inc. v. Nat. Resources Def. Council, Inc., 467 U.S. 837 (1984)).

Beyond this, the Circuit repeatedly underscored that defendants' conduct, both at the agency level and during litigation, at all relevant times, was "fundamentally unreasonable." F.J. Vollmer Co., Inc. v. Magaw, 102 F.3d 591, 596 (D.C. Cir. 1996).  See Cobell VI, 240 F.3d at 1093 ("The "egregious" failure of defendants to produce documents, in violation of a Court

order "was only compounded by the Treasury Department's contemporaneous destruction of documents potentially responsive to the court's production order, and the failure of government officials to apprise the court or the plaintiffs of the defendants' unwillingness and self-inflicted inability to comply with the production orders"); Cobell VI, 240 F.3d at 1097 ("For these reasons, we find no basis for disturbing the district court's conclusion that appellants unreasonably delayed the discharge of their fiduciary obligations"); Cobell VI, 240 F.3d at 1096 ("That Congress enacted its own remedial statute to address this unconscionable delay does not mitigate the egregious amount of time plaintiffs have waited for, as discussed below, the 1994 Act is not the source of plaintiffs' rights").

Finally, it is undisputed that, "[f]ederal officials [,] [] aware of their fiduciary obligations long before the passage of the 1994 Act," Cobell VI, 240 F.3d at 1097, "unlawfully withheld" or "unreasonably delayed" faithful execution of their trust obligations.  Id. at 1094.  By any yardstick, defendants' conduct can not reasonably be characterized was as "substantially justified."

Defendants parenthetically argue that "the greatest indicator that its position was nonetheless justified is that the Court certified its December 21, 1999 order for interlocutory appeal."  Opposition, at 19.  Defendants' argument is without merit as it misconstrues the rationale behind the Court's grant of interlocutory certification.  28 U.S.C. §1292(b) vests the Court with the authority to certify any order that "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  This Court found both trustee-delegates unreasonably breached their clearly delineated fiduciary responsibilities toward plaintiff class.  Not only was there no "substantial ground for difference of opinion" as to

defendants' culpability, see Cobell VI, 240 F.3d at 1096, but defendants are incorrect if they interpret the Court's efforts to "materially advance" the termination of the litigation as an implicit validation of their position.

**THE INTERIM FEE PETITION**

In its May 27, 2004 Opinion, this Court instructed plaintiffs that "any fee petition submitted as to Phase 1.0 should, by necessity, include all appropriate time expended by plaintiffs since the inception of the suit with the exception of the Court's award of fees for the first contempt trial." See Cobell v. Norton, 319 F.Supp.2d 36, 42 (D.D.C. 2004) (citing Cobell v. Babbitt, 188 F.R.D. 122 (D.D.C.1999)). In determining what constitutes "appropriate time," the Court starts with the proposition that plaintiffs, at all times, maintain the burden of establishing the reasonableness of both their entitlement to the hours expended and the hourly rates. Hensley, 461 U.S. at 436. Defendants, for their part, carry the burden of rebuttal, requiring "submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged." Blum v. Stenson, 465 U.S. 886, 892 n.5 (1984) (citation omitted).

Plaintiffs, in support of the Interim Fee Petition, submitted 1,129 pages of time records, 11 affidavits, 7 supplemental affidavits, and a Law Firm Statistical Survey performed by PricewaterhouseCoopers attesting to the range of hourly rates normally charged by attorneys in the Washington, D.C.; Atlanta, Georgia; and Winston Salem, North Carolina areas ("PwC Survey"). In total, plaintiffs' petition seeks fees and costs on behalf of 34 attorneys, 3 paralegals, 3 law librarians, 9 law clerks, and 44 experts.

Defendants maintain that the Interim Fee Petition, as a whole, represents an unreasonable request for fees. They object to plaintiffs's claim as unsupported by contemporaneous time

records; beyond the scope of the Phase I proceedings; being duplicative of awards rendered in other proceedings; related to unsuccessful settlement and mediation efforts; unsupported by adequate documentation; excessive; and not recoverable, as a matter of law.

After reviewing the parties' submissions and time entries, the Court undertook a three-step process. It first excluded from the fee calculation those hours that strayed beyond the scope of Phase 1.0, violated EAJA's statutory guidelines, or sought compensation already awarded. The Court next analyzed the remaining hours to determine whether they were "reasonable," and deducted those it found excessive, unnecessary, redundant, or improperly documented. Finally, the Court multiplied the remaining hours by an appropriate hourly rate.

I.      ERRORS IN CALCULATION

Examining plaintiffs' time entries and affidavits, the Court uncovered several arithmetic errors. For example, Gingold requests compensation for 9,114.4 hours spent on Phase 1.0 proceedings. The Court calculated, however, that Gingold expended 10,092.4 hours on these activities. (Defendants represent Gingold's time to be 10,101.8 hours, see Opposition, at Exhibit 9.) The Court finds this discrepancy stems from the fact that Gingold inadvertently omitted from his total request, the 978 hours he spent during 1996 and 1997. Unlike those entries where Gingold consciously discounted his time, see, e.g., Gingold Affidavit at 3 ("Where the issue is unclear, I discounted the recorded time by 50% to reflect a fair and appropriate allocation"); Gingold [Reply] Affidavit at 11 ("As I stated in my original affidavit, I have discounted my time materially to ensure a fair allocation of time and that no double recovery would occur"), this discrepancy is obviously a mathematical miscalculation and not a conscious attempt by Gingold to reduce his invoice. Accordingly, the Court relied on and awarded an amount based on its own calculation. See American Petroleum Institute v. United States E.P.A., 72 F.3d 907, 912 (D.C.

-17-

Cir. 1996). ("We first note that the petition reflects an apparent arithmetic error of $1,000.  The

fee request seeks fees of $287,370 for representation from June, 1994, to February, 1995.

Monthly billing statements for that time period document only $286,370.  We therefore first

deduct $1,000 to correct the apparent error in calculation").

II.     CONTEMPORANEOUS TIME ENTRIES

Defendants urge the Court to reject the Interim Fee Petition on the grounds that plaintiffs

failed to submit "contemporaneous records of exact time spent on the case, by whom, their status

and usual billing rates, as well as a breakdown of expenses such as the amounts spent copying

documents, telephone bills, mail costs and other expenditures related to the case."  Opposition, at

8 (quoting Cmty. Hearing & Plumbing Co. v. Garrett, 2 F.2d 1143, 1146 (Fed. Cir. 1993)).

Defendants take issue, for example, with plaintiffs' stated practice of transferring time

entries from hard copy to computer.  The record reveals that Gingold recorded his time in a diary

and then input the information into his computer, Gingold Aff., at &¶ 1 and 2; Keith Harper,

John Echohawk, and Lorna Babby maintained daily records that were subsequently entered on a

weekly or monthly basis on a computer database, Harper Aff., at & 2, Echohawk Aff., at ¶ 2,

Babby Aff., at ¶ 2; and Stacy Gingold Bear "maintained [her] time records in an annual hard

copy diary . . . . [f]rom this diary, . . entered [her] time electronically into a Quattro Pro software

application." Gingold Bear Aff., at ¶ 2.

Defendants next accuse plaintiffs of improperly "modifying," Opposition, at 10,

"editing," id., and "altering" id. n.4, their time records.  Defendants cite to those entries where

plaintiffs "added clarity where contemporaneous entries had been made in abbreviated, coded,

short-hand, or summary form," Gingold Aff., at ¶ 2 (August 16, 2004); or, "slightly modified

some of the descriptions to clarify the task completed," Babby Aff., at ¶ 3; or "edited some of

-18-

the original description to fix obvious recording errors . . . . because of the need for increased clarity . . . [and] slightly modified some of the descriptions so as to clarify the task that I was completing," Echohawk Aff., at ¶ 3; or "edited some of the original descriptions to fix obvious recording errors . . . . because of the need for increased clarity . . . slightly modified some of the descriptions so as to clarify the task that [he] was completing," Rempel Aff., at ¶ 4; or "added clarity where contemporaneous entries had been made in abbreviated, coded, short-hand, or summary form."  Gingold Bear Aff., at ¶ 2.

The Court finds defendants' objections to plaintiffs' practice of transferring records from one medium to another and clarifying records to facilitate judicial review, meritless.

 In the first instance, defendants put forth no evidence supporting their challenge.  "[A] respondent to a fee application must file affidavits in opposition [] where the respondent challenges the factual accuracy of the fee petition.  Joy Mfg. Corp. v. Pullman-Peabody Co., 742 F.Supp. 911, 915 (W.D. Pa. 1990).   Defendants, having been present at all proceedings and having reviewed all filings could easily have "submit[ted] to the District Court any evidence challenging the . . . the facts asserted in the affidavits submitted by respondents' counsel," Blum v. Stenson, 465 U.S. 886, 892 n.5 (1984) (citing City of Detroit v. Grinnell Corporation, 495 F.2d 448, 472-473 (2d Cir. 1974)).  Instead, defendants offer only innuendo and speculation.

Beyond this, defendants' interpretation of the "contemporaneous time records" requirement is draconian.  A time record is "contemporaneous" if its descriptions are both "accurate and current," In re Hudson & Manhattan R. R. Co., 339 F.2d 114, 115 (2d Cir. 1964), and includes "for each attorney, the date, the hours expended, and the nature of the work done." New York Assen for Retarded Children v. Carey, 711 F.2d 1136, 1148 (2d Cir.1983).   While the

need to "maintain contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney" is "particularly apt" in EAJA petitions since "the fee requirements will be satisfied from the United States Treasury," In re Donovan, 877 F.2d 982, 994 (D.C. Cir. 1989), this Court does not share defendants' obsession with the medium in which plaintiffs' time records were entered or with the fact that abbreviated notations were clarified and mistakes corrected to assist the Court's review.

What is significant is that plaintiffs' time entries do not constitute "casual after-the-fact estimates." Action on Smoking and Health v. C.A.B., 724 F.2d 211, 220 (D.C. Cir. 1984).  The Court has no reason to question the veracity of plaintiffs' sworn affirmations that they clarified abbreviated notations and shorthand to allow "this Court to make an informed decision about the relevance and appropriateness of the entry," (Gingold Bear Aff., at ¶ 2), or that they were "diligent to check the time claimed with contemporaneous records, briefs or memoranda to ensure against recording errors."  Echohawk Aff., at ¶ 3.  In short, the Court finds defendants' exceptions to plaintiffs' entries on the grounds that they do not constitute contemporaneous records to be without foundation.

III.   SCOPE OF RECOVERABLE FEES

1.   NON COMPENSABLE TIME

a.   Claims for Which Plaintiffs Already Received Compensation

Plaintiffs seek compensation for "time expended from the development of Complaint in 1996 through the affirmance of this Court Phase 1.0 decision by the Court of Appeals on February 23, 2001."  Interim Fee Petition, at 4.   Defendants argue that this request is overbroad and asks the Court to purge the Interim Fee Petition of those hours for which fees have already been awarded. Opposition, at 49.  In support, defendants provide the Court with a chart

segregating the time Gingold spent litigating claims related to Phase 1.0 and the time he

expended related to Contempt I and Mona Infield's retaliation complaint – claims for which fees

have already been granted.  Gingold responds that he discounted his time materially "to ensure a

fair allocation of time and that no double recovery would occur."  Gingold [Supplemental] Aff.,

at ¶ 11.

To prevent duplication of awards, the Court independently reviewed Gingold's time

entries, segregated those hours for which he was already awarded fees, and deducted those hours

from the Interim Fee Petition.  See Appendix I.

### b.      Phase 1.5 and Contempt II

The Court similarly deducted those entries reflecting time spent litigating Phase 1.5, and

Contempt II-related claims.   Plaintiffs have not yet demonstrated their status as "prevailing

parties" with respect to these claims and are thus entitled to no compensation at this time.  See

Thomas v. Nat'l Sci. Found., 330 F.3d 486, 491 (D.C. Cir. 2003).  See Appendix I.

### c.      Settlement and Mediation

Plaintiffs seek fees and expenses for time engaged in court-ordered mediation and

settlement efforts.  Interim Petition, at 8.   Defendants oppose this request on the grounds that the

parties' settlement efforts were unsuccessful and did not result in a "material alteration of the

legal relationship of the parties."  Opposition, at 51 (citing Buckhannon, 532 U.S. at 604

(quoting Texas State Teachers Assn. v. Garland Independent School Dist., 489 U.S. 782, 792-93

(1989))).  Plaintiffs insist they are entitled to fees for time spent engaged in settlement

discussions, regardless of the outcome, because they were mediating at the direction of the

Court, .  Reply, at 38.   Plaintiffs' position is unpersuasive.

Plaintiffs engaged in mediation and settlement efforts to avoid protracted litigation.  Had these efforts culminated in a favorable settlement, plaintiffs would not have taken the case to trial.  Instead, they would have sought a judgment affirming the settlement agreement and, to the extent the terms of that agreement "materially altered" the legal relationship between the parties, would have been entitled to a fee award as a "prevailing party."  See Buckhannon 532 U.S. at 604 (Settlement agreements, "[i]n addition to judgments on the merits," can serve as the basis for an award of attorney's fees if "enforced through a consent decree") (citing Maher v. Gagne, 448 U.S. 122 (1980)).  Plaintiffs' settlement efforts did not bear fruit; they cannot be compensated for that time.  See Appendix I.

The Court is unconvinced, however, by defendants' attempt to deny "the accounting fees submitted by PwC incurred in the statistical sampling project" by bootstrapping them to the failed settlement negotiations.  Opposition, at 51.   Defendants proffer that each party undertook and assumed financial responsibility for this project because, "it was believed that the parties could then engage in informed settlement talks and perhaps work out an appropriate settlement amount."  Opposition, at 50.  This argument is unconvincing.  The statistical sampling project commenced in 1996 – three years before the parties engaged in formal settlement discussions.  Defendants offer no evidence by way of affidavits or other documentation supporting their position that the statistical sampling project was undertaken for settlement purposes only.  The Court instead credits PwC partner Pollner's sworn statement that, "[a]t no time during our engagement did we understand that the statistical sampling effort was intended for settlement discussions," Pollner Aff., at ¶ 6, and finds PwC's expenses for these services to be compensable.

d.     Clerical, Librarian, and Secretarial Tasks

-22-

In this jurisdiction, "paralegals and law clerks are to be compensated at their market rates." In re Olson, 884 F.2d 1415, 1426 (D.C. Cir. 1989) (per curiam) (quoting Donovan, 877 F.2d at 993 n.20)).  To recover these fees, however, the services rendered by the paralegal must be legal in nature, i.e., "factual investigation, locating and interviewing witnesses, assistance with depositions, interrogatories and document production, compilation of statistical and financial data, checking legal citations and drafting correspondence." Missouri v. Jenkins, 491 U.S. 274, 288 n.10 (1989).

The Court has examined plaintiffs' time entries with this standard in view and discovered that many of the tasks undertaken by staff assistants, paralegals, and counsel were purely clerical in nature.  Tasks such as "Serve email brief at federal courthouse;" (Rempel –  September 8, 2000); "locate exhibits; "file management" (Sarah Perez/Levitas bill –  January 24, 2000 and March 7, 2000); "searched for & faxed Cora Jones letter to Bob" (Babby –  June 4, 1998), as well as "work done by librarians, clerical personnel and other support staff . . . [are] generally considered within the overhead component of a lawyer's fee," and thus non-compensable. Olson, 884 F.2d at 1426-27.  The Olson Court reasoned that "such billing practice is not common," id., at 1427 n.18, and that most fee petitions failed to "demonstrate[e] that charging market rates for a firm's non-legal support personnel is community practice." Id.

Here, plaintiffs have not only failed to demonstrate "that law firms in Washington customarily bill clients for [clerical] services, or even that its own attorneys customarily bill for them," Role Models of America, Inc. v. Brownlee, 353 F.3d 962, 974 (2004), but for all of its detail, the "PwC Survey", attached as Exhibit D-1 to the Levitas Affidavit, places no numerical value on these services.  The Court will accordingly disallow these activities. See Appendix I.

e.    Media-Related Activity

-23-

Plaintiffs seek compensation for time spent engaged in media related activity.  Harper, for example, seeks an award for time spent in "Telephone call from two Indian country papers & Times" (February 6, 1007).  Peregoy looks to the Court for compensation for time spent "Meet[ing] with media consultants and IIM team" (June 3, 1996), as does Rempel for "Discussion and meeting w/Policy Impact, potential PR firm for Plaintiffs. DG, EC" (June 5, 2000).

In this Circuit,"the government cannot be charged for time spent in discussions with the press."  Role Models, 353 F.3d at 973.  The Court will deduct these activities from plaintiffs' time sheets.  That said, time spent by plaintiffs reviewing press clippings concerning the litigation will be compensable as "provid[ing] useful and important information that assisted counsel in their representation of the subject."  In re Meese, 907 F.2d 1192, 1203 n.19 (D.C. Cir. 1990). See Appendix I.

## 2.    COMPENSABLE TIME

### a.    Monitoring

Plaintiffs request compensation for time "expended in a variety of tasks that are plainly part of the 'Phase 1.0 proceeding,' including defending against the government's appeal." Interim Fee Petition, at 5.  (citing Select Milk Producers, Inc. v. Veneman, 304 F.Supp.2d 45 (D.D.C. 2004), aff'd in part, and rev'd in part, 400 F.3d 939 (D.C. Cir. 2005)).  These "additional tasks" include "monitoring defendants' trust reform efforts and reviewing quarterly reports," ensuring "the decision was carried out," and "uncovering, documenting and presenting the various manifold misrepresentations that defendants repeatedly had made before, during and after Trial 1.0."  Id. at 5. Defendants oppose plaintiffs' request for compensation on the grounds

that plaintiffs' "monitoring" efforts took place beyond what "the Court has already circumscribed" as "the time period for which fees could be awarded."  Opposition, at 46.

The Court disagrees. "Services devoted to reasonable monitoring of the court's decrees, both to insure full compliance and to ensure that the plan is indeed working to desegregate the school system, are compensable services." Northcross v. Bd. of Education, 611 F.2d 624, 637 (6th Cir. 1978).  Plaintiffs performed services essential, in many respects, to the long-term success of the plaintiffs' suit and "crucial to the obtaining of adequate relief for the class as plaintiffs' success at the liability stage." Bond v. Stanton, 630 F.2d 1231, 1233-34 (7th Cir. 1980).  The Court will award plaintiffs for these efforts.

IV.     REASONABLENESS OF FEE REQUEST

1.     Inadequate Documentation

Defendants contend that many of plaintiffs' time entries lack sufficient detail to permit the Court both to "access accurately the work that should be compensated and that which is duplicative or excessive of attorney's time records," Sierra Club v. Mullen, 619 F. Supp. 1244, 1251 (D.D.C. 1985), and to "determine with a high degree of certainty" that the hours billed were reasonable. In re Donovan, 877 F.2d 982, 995 (D.C. Cir. 1989). See also, United Slate Tile & Composition v. G & M Roofing, 732 F.2d 495, 502 n.2 (6th Cir.1984).

While "[i]t is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney," Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 167 (3d Cir. 1973), the Court agrees with defendants that many of plaintiffs' time entries lack "some fairly definite information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, e.g., senior partners,

junior partners, associates, the court cannot know the nature of the services for which compensation is sought."  Id.

For example, many of plaintiffs' time records "provide little or no reference to the substance of the work claimed," Sierra Club, 619 F. Supp. at 1251 (D.D.C. 1985).  Entries such as: "research read cases; searched Westlaw" (Robert Peregoy – May 15, 1996); "meet with attys" (Richard Dauphinais – June 17, 1996)"; "prepare for trial" (Dennis Gingold  – June 9, 1999"); "further trial preparation and document review" and "trial preparation"(Elliot Levitas – June 2 and June 29, 1999"); and "preparation for trial" (Lorna Babby – June 8, 1999), are so vaguely generic that the Court can not determine with certainty whether the activities they purport to describe were necessary and reasonable.  See Kennecott Corp. v. EPA, 804 F.2d 763, 767 (D.C. Cir. 1986) (per curiam) (generic entries are inadequate to meet a fee applicant's "heavy obligation to present well-documented claims").

Some entries provide no description of services, whatsoever.  Attorney Guest and law clerk Kelly, for example, ask to be compensated for 116 hours without supplying any information indicating the tasks they performed.  The Court will deduct those hours from the Interim Fee Petition in their entirety.  See Jordan v. United States Dep't. of Justice, 691 F.2d 514, 518 (D.C. Cir. 1982) ("Outright denial may be justified when the party seeking fees declines to proffer any substantiation in the form of affidavits, timesheets or the like").  See Appendix I.

Other time records make, "no mention . . . of the subject matter of a meeting, telephone conference or the work performed during hours billed." In re Meese, 907 F.2d at 1204.  Entries illustrative of this particular problem include: "conference call with Dennis & E. Worliss" (Babby – February 18, 1999); "telephone call to KH re: general update" (Babby – November 22,

1999); "call for Plaintiffs" (Harper – June 6, 1996); "background research for RD" (Harper –

March 6, 1996); "confce call and follow-ups" (Holt – July 15 and 23, 1996).

Similarly infirm are those time entries containing "vague and cryptic designations" such

as: "rvw & respond to email inquiry from A. Jarett" (Babby – September 18, 2000); "confer

w/RD" (Harper – April 16, 1996); "Discussed strategy w/Dennis, Thad, Bob & Keith" (Babby –

February 25, 1998); "Met w/Keith & Bob re: strategy" (Babby – March 24, 1998); "conference

with Elliott Levitas regarding strategy and legal issues" (Miles Alexander/Levitas – April 23,

1999); "confer w/RD & RP re: legal strategy" (Keith M. Harper – June 1, 1996).  The Court will

reduce these and similarly inadequate entries in accordance with the formula set out in Appendix

V.  See Cabrera v. Fischler, 814 F. Supp. 269, 289-90 (E.D.N.Y. 1993), aff'd in part, remanded

in part on other grounds, 24 F.3d 372 (2d Cir. 1994) (for entries such as "staff meeting," "talk

w/," and "processed documents the court "should not award the full amount requested");

Weinberger v. Great Northern Nekoosa Corp., 801 F. Supp. 804, 829 (D. Me. 1992) ("The Court

will disallow hours for such activities as 'research,' 'attention to matter,' 'draft letter,' and

'strategize' in the absence of more detailed  time entries").

Plaintiffs, in some instances, successfully rehabilitate sparsely detailed entries through

supplemental documentation.  For example, Levitas, in his Supplemental Affidavit, provides the

full names and positions of those KS employees listed in his time entries only by their initials.

Levitas [Supplemental] Aff., at 2-4.  Other attempts by plaintiffs to salvage inadequately

documented entries are less persuasive.  Holt, for example, argues that his May 1, 2, and 3, 1996

request for time  spent doing "basic research," should be granted because that time "obviously

dealt with the multifarious items that must be reviewed for a complaint, such as substantive law,

relief available, defenses that may be raised, mode and manner of service, etc. etc," Holt

[Supplemental] Aff., at ¶ 7.  The Court disagrees; it is not inclined to cross-reference each of plaintiffs' voluminous time entries to compensate for Mr. Holt's failure to more fully describe his activities in the first instance.  That responsibility rests squarely with plaintiffs, who, at all times, "bear[] the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley, 461 U.S. at 436.  Holt's request will be reduced accordingly.  See Appendix IV.

One category of poorly documented records worthy of separate discussion is plaintiffs' widespread use of "block billing."  Unlike vague or generic task entries, block billing entries do not always suffer from inadequate description.  Their infirmity stems from the fact that they represent activities lumped together in a single entry with no indication how much time was spent on each task.  See Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1554 n. 15 (10th Cir.1996) ("Block billing" entries such as these represent a method of "time-keeping" by which "each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks").   In its review of these entries, the Court "[wa]s left to approximate the amount of time which should be allocated to each task . . . . [and] cannot determine with a high degree of certainty, as it must, that the billings are reasonable." In re Olson, 884 F.2d at 1428 (citing United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Assen, Local 307 v. G & M Roofing and Sheet Metal Co., Inc., 732 F.2d 495, 502 n.2 (6th  Cir.1984)).

Examples of this problem include: "Review recent decisions including Pueblo of San Ildefonso v. U.S.; continue revisions of interim relief; telcoms with Dauphianis, Holt and Peregoy re. same." (10.0 hours) (Gingold – July 31, 1996); "Meet Keith and Rick to prepare for IIM attorney meeting; meet IIM attorneys at NARF; meet Dan Press, Sandy Harris at office;

meet Keith for follow-up at NARF calls to Dennis and Dan; Calls to Mildred Cleghorn; draft

Cleghorn bio for complaint; review old." (11.9 hours) (Peregoy – June 6, 1996); "Draft briefs;

finalize research and redo laches section; provide comments for statutes of limitations; confer

generally re: same w/ BP, DG etc." (11 hours) (Harper – August 19, 1998); "Preparation of joint

pre-trial statement incl. Meeting with defendants on process to complete it; review of documents

to determine if exhibits, discussions of witness list and being determining testimony of

witnesses; draft stipulations and review other stipulations." (16 hours) (Harper – May 26, 1999);

"Continued preparation of response to dispositive motions: talked to Bob abt. standard for

granting motion for summary judgment, PW work, briefing responsibilities.  Talked to Keith abt.

jurisdiction section; reviewed Thad's response on sampling plan; met." (9 hours) (Babby August

5, 1998); "Research re class cert papers, meet with Cobell, Echohawk, Browning Van Ness, then

at NARF w/ prep and followup." (9 hours) (Holt – September 4, 1996).

     Courts confronted with petitions containing block time entries have responded in a

variety of ways.  Some, after concluding they are unable to "determine the appropriate amount

attributable to the conversations or conferences lacking identifying subject matter," have simply

voided "the entire time entries billed as block time."  Reyes v. Nations Title Agency of Ill., Inc.,

2001 WL 687451, at *1 (N.D. Ill. June 19, 2001).  Others have undertaken "some attempt to

adjust the fee award in an effort to reflect an apportionment.'"  Traditional Cat Assen, Inc. v.

Gilbreath, 340 F.3d 829, 834 (9th Cir.2003) (emphasis in original) (quoting Gracie v. Gracie,

217 F.3d 1060, 1070 (9th Cir.2000)).  At least one court developed the novel approach of

disallowing entries of three or more hours that contain four or more tasks or entries of three or

more hours that contain two or more tasks – if one of those tasks of them could have taken

anywhere from a small to a substantial amount of time.  Oberdorfer v. Glickman, 2001 WL 34045732, at *5 (D. Or. Sep 14, 2001).

This Court will not undertake the futile task of separating plaintiffs' block entries into their constituent tasks and apportioning a random amount of time to each.  Rather, it will exercise the discretion accorded it by the Hensley Court and reduce the time requested.  461 U.S. at 437 n.12.  (See Appendix  V.)  See also, Gilbreath, 340 F.3d at 834-35 (where it is impossible to distinguish between compensable and non-compensable claims, the Court held "[t]here is no precise rule or formula for making these determinations.  The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.  The court necessarily has discretion in making this equitable judgment"); McDannel v. Apfel, 78 F.Supp.2d 944, 948 (S.D. Iowa 1999) (where faced with "[Petitioner's] block billing" that "does not permit the Court to determine a reasonable fee on the basis of the work performed," the Court may "reduce the applicant's hours to reflect a percentage reduction").

## 2.    Excessive Fees

As stated, defendants contest the validity of the Interim Fee Petition, as a whole, arguing that it is "excessive on its face." Opposition, at 59.  That said, they take particular exception to plaintiffs' request for compensation for time purportedly spent on 12 particular tasks set out in Exhibit 8 of their Opposition ("12 Tasks"); with plaintiffs' petition for time spent preparing and editing the fee petition; and with the fee application of PricewaterhouseCoopers.  Opposition, at 63.

Preliminarily, it must be noted that, nowhere in their Opposition and attachments have defendants provided the Court with counter-affidavits contradicting any factual allegation

relative to hours expended or fee rates charged made by the plaintiffs.  On similar facts, the

Supreme Court expressly "decline[d] to consider petitioner's further argument that the hours

charged by respondents' counsel were unreasonable" insofar as "petitioner failed to submit to

the District Court any evidence challenging the accuracy and reasonableness of the hours

charged, or the facts asserted in the affidavits submitted by respondents' counsel." Blum, 465

U.S. at 892 n.5.  The Court finds, however, that defendants' Opposition and attachments suffice

to put plaintiffs on notice of those entries it deems excessive and to trigger the Court's

examination into the merit of those allegations.

In reviewing defendants' allegations, the Court is guided by the following principles:

First, fee requests must be scrutinized for "excessive, redundant or otherwise

unnecessary" hours "which firms would have excluded from bills to their own clients." Hensley,

461 U.S. at 434.

Second, Courts assume that attorneys routinely exercise billing judgment on behalf of

their client and expect that same treatment with respect to the legal bills presented to one's

adversary. LeRoy v. City of Houston, 906 F.2d 1068 (5th Cir. 1990).  Accordingly, certain fees

that may not be "unreasonable between a first class law firm and a solvent client, are not

[always] supported by indicia of reasonableness sufficient to allow us justly to tax the same

against the United States." In re North (Shultz Fee Application), 8 F.3d 847, 852 (D.C. Cir.

1993) (per curiam); see also, Copeland, 641 F.2d at 891 ("[h]ours that are not properly billed to

one's client also are not properly billed to one's adversary pursuant to statutory authority").

Third, "[s]worn testimony that, in fact, it took the time claimed is evidence of

considerable weight on the issue of the time required in the usual case and therefore, it must

appear that the time claimed is obviously and convincingly excessive under the circumstances."
Perkins v. Mobile Housing Bd., 847 F.2d 735, 738 (11th Cir.1988).

> a.      12 Tasks

Defendants point to the 12 Tasks as "the more egregious examples" of plaintiffs'
excessive billing practices. Defendants' Opposition at 63.  The Court will briefly analyze three
of these tasks.

1.      Plaintiffs request compensation for drafting a two-page filing entitled Plaintiffs'
Request for Trial Date to Begin on August 3, 1998.  By the Court's calculation, plaintiffs
expended 20.7 hours (15.4 hours by Gingold; 2.4 hours by Holt; and 2.9 hours by Harper)  –
drafting a two-page filing containing no legal analysis or discussion.  Applying the statutory
EAJA rate of $125 per hour, plaintiffs' request amounts to $2,587, or $1,293.75 per page.

2.      Plaintiffs request fees for 122.33 hours expended drafting a nine-page filing
entitled Plaintiffs' Reply to Defendants' Opposition to Setting a Trial Date Filed 11-13-97.  At
current EAJA rates, plaintiffs' request amounts to $15,291.25, or $1,699.02 per page.

3.      Finally, plaintiffs request compensation for 852.47 hours or more than 30
business days spent drafting Appellee's 66-page Response Brief.  At EAJA rates, plaintiffs'
request amount to $1,615 per page.

Plaintiffs argue that their efforts should be scrutinized not "on the basis of number of
hours expended per page but rather, on the complexity of the particular issue.  Holt
[Supplemental] Aff., at ¶ 11.  This argument, while theoretically sound, see Mitchell v. National
R.R. Passenger Corp., 217 F.R.D. 53, 58 (D.D.C. 2003) (Facciola, M.) ("[t]he more complicated
the legal issues and the factual analysis the greater the number of hours that must be spent on the

document"), is unpersuasive.  The Court, having presided over all hearings and conferences and reviewed all pleadings and motions possesses a "superior understanding of the litigation."  Daly v. Hill, 790 F.2d 1071, 1078-79 (4th Cir. 1986) (quoting Hensley, 461 U.S. at 437).  Based on this intimate understanding, the Court agrees with defendants that the three aforementioned examples are egregiously excessive.

In the first example, plaintiffs seek compensation for more than 20 hours for time expended by three attorneys with more than 50 years combined legal experience drafting a two-page document.  In the second example, plaintiffs request compensation for more than 120 hours expended on a document that, while clear, straightforward, and well written, consists primarily of a recitation of historical events which, except for a reference to the Restatement of Trusts, contains no legal analysis.  Even the Response Brief, which was well reasoned and represented a significant level of legal scholarship, contained arguments that were repeatedly iterated in briefs before this Court.  This, plus the fact that plaintiffs spent more than 35.5 full days to draft a response to an appeal for a trial that lasted less than 30 business days, renders plaintiffs' request excessive.

In sum, the 12 Tasks represent "egregious examples" of plaintiffs' tendency toward excessiveness and to charge more than any private firm could legitimately invoice its client.  It would be well within the discretion of the Court to deny these requests in their entirety. Environmental Defense Fund, Inc. v. Reilly, 1 F.3d 1254, 1258 (D.C. Cir. 1993) ("We may deny in its entirety a request for an 'outrageously unreasonable' amount, lest claimants feel free to make 'unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place'").  See also, Brown v. Stackler, 612 F.2d 1057, 1059 (7th Cir.1980) ("the District Court

was warranted in departing from the usual practice and reacting vigorously to prevent such abuse of the court's authority to award reasonable compensation to counsel").

The Court declines to take such drastic action, however, mindful that Phase 1.0 was "protracted, unique and was very ably handled." In re Olson, 884 F.2d at 1429. Instead, the Court will reduce the fees sought by plaintiffs for time expended drafting the Request for Trial Date by 95% and the remaining 11 tasks items identified in Exhibit 8 to Defendants' Opposition, by 50%. See Appendix II.

b.   Preparation of Fee Petition

Plaintiffs' fee application for 1,708.94 hours for time spent drafting and editing the Interim Fee Petition is similarly excessive – particularly Gingold's request for 455.9 for "review[ing], segregate[ing], prepar[ing] relevant time re Trial 1 EAJA petition fee application."

The Court acknowledges the necessity to review time records and segregate those related to the Phase 1.0 proceedings. Hours reasonably expended on preparing fee petitions are always compensable, Environmental Defense Fund v. EPA, 672 F.2d 42, 62 (D.C. Cir. 1982), and courts in this Circuit have routinely awarded reasonable fees incurred in requesting fees under fee-shifting statutes, including successful EAJA actions. Hirschey v. F.E.R.C., 777 F.2d 1, 2 (D.C. Cir. 1985). The Court, however, is hard pressed to understand why Gingold spent the equivalent of nearly 19 full days reviewing and preparing his time entries. If, as his affidavit attests, Gingold maintained his time records on a computer, it should have been a simple manner to either: (1) print out time records, highlight the time entries related to Phase 1.0, and turn the time records over to a paralegal or secretary to prepare a statement containing only that time, or (2) make an electronic copy of the time records file(s), delete the time entries not related to Phase 1.0, and print out a statement with only the relevant time.

-34-

The Court finds Gingold's time allowance for "review[ing], segregate[ing], prepar[ing] relevant time re Trial 1 EAJA petition fee application" grossly excessive and will reduce this amount by 75%.   It similarly finds the 1,137.04 of the remaining 1,253.04 hours plaintiffs request for drafting the Interim Fee Petition "excessive, redundant, or otherwise unnecessary," Hensley, 461 U.S. at 434, and will reduce these hours by 50%.  See Appendix III.

c.      PricewaterhouseCoopers

(I)      Expert Fees

Under EAJA, "fees and expenses" include: "the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees." 28 U.S.C. §2412(d)(2)(A).  See Outlaw v. Chater, 921 F.Supp.13, 15-16 (D.D.C. 1996).

This jurisdiction has also made plain that "attorney fees" and expert witness expenses are separate and distinct items of expense.  See Kooritzky v. Herman, 178 F.3d 1315, 1322 (D.C. Cir. 1999) ("[e]xpert fees were regarded not as a subset of attorney's fees, but as a distinct category of litigation expense") (quoting West Virginia Univ. Hosps., 499 U.S. 83, 92 (1991)).

Plaintiffs seek reimbursement for PwC's services in the amount of $4,528,684 to which defendants mount several objections.  First, defendants ask the Court to reduce this amount by $1,723,377 to reflect the fact that, between June 1996 through March 1998, "[s]ufficient details were not maintained to allow a description of the specific tasks performed by person by day." Opposition, at 57 (quoting Pollner Aff., at ¶ 30).

The Court's review of the record revealed that many of PwC's time entries prior to March 1998 were, in fact, inadequately documented, rendering it impossible for the Court "to determine with a high degree of certainty that such hours were actually and reasonably

-35-

expended." <u>United Slate Tile & Composition</u>, 732 F.2d at 502 n.2.  For the period ending June 15, 1996, for instance, PwC asks for $5,220 as compensation for 29 hours spent on a task described only as "[R]esearch/Compilation of findings."  The Court finds this description wanting and will discount the requested expense accordingly.  <u>See</u> Appendix IV.

Other PwC's time entries during this same time frame are not as deficient as defendants allege.  In its April 1997 invoice, for example, PwC requests fees for time described generically as "meetings with opposing counsel/experts" and "meetings/discussion with counsel."   Without more, this description of services prevents meaningful examination.  In this instance, however, PwC attached a chart describing these efforts in greater detail: "meetings and discussions with counsel regarding project status, the meeting with BIA, interim relief and other issues."  The Court finds this additional information sufficient to enable the Court to meaningfully assess the validity of PwC's request.

Defendants express additional concern that PwC's complement of 44 consultants working in tandem with plaintiffs' counsel and support staff was excessive.  Opposition, at 61.  Specifically, defendants object to paying for PwC's simultaneous use of three consultants during trial; to PwC's 539 hour bill for assisting with post-trial briefs; and to PwC's $541.93 per page charge for reviewing the High Level Implementation Plan.  <u>Id.</u> at 61-62.  Defendants also fault PwC for billing its consultants at a rate $200 to $225 per hour for "tasks ordinarily performed by a paralegal at a lower rate," such as bates numbering, labeling, preparing inventories of documents; organizing exhibits; and pulling documents for trial.  <u>Id.</u> at 76.

The Court's review of PwC's time entries verify that, at times, as many as three experts were present simultaneously during Trial 1.0.   In June 1999, Forhecz attended trial on 20 days; Fitzsimmons on 11 days; Rempel on 14 days; and Schweizer on two days.  Pollner Exhibit AG.

On nine of those days, Forhecz, Fitzsimmons, and Rempel were present in the courtroom at the same time. PwC responds that three consultants were needed during trial: one as a "testifying expert"; another as a "potential testifying expert;" and a third to "provide[] direct support to Plaintiffs' counsel." Pollner Reply Aff., at ¶ 8. While the Court does not dispute the need for a testifying expert's presence at trial, it finds the need for a "backup" expert, redundant, and the simultaneous presence of a third and fourth expert to "provide support," excessive.

With respect to PwC's post-trial review of briefs, Pollner defends PwC's invoice on the grounds that "these documents were massive filings." Pollner Aff., at ¶ 9. She further attributes PwC's time spent on the High Level Implementation Plan to the fact that PwC engaged "not only [in] the review of the document itself, but analysis of the plan." Id. The Court disagrees and based on its familiarity with the volume of the post-trial filings, finds PwC's fee application to be excessive and will reduce its requested compensable hours by 35%. See Appendix IV.

Finally, Pollner insists that it was necessary to utilize PwC consultants to number and organize documents "due solely to defendants haphazard production of these documents that PwC had to undertake this exercise." Pollner Aff., at ¶ 10. Pollner's response, however, does not address defendants' concern that the hourly rate which PwC charged for those services was unjustified. The Court finds that even "haphazard" production does not justify a $200 per hour paralegal fee, especially when PwC provided no evidence that any of its employees had paralegal training. See Walter Jones Jr. v. Armstrong Cork Co., 630 F.2d 324 (5th Cir. 1980) (upholding district court holding that law firm employee was entitled to no compensation "in light of the district court's conclusion that it had not been established that [employee] was a 'paralegal.'"). Beyond this, neither Pollner nor defendants address the more crucial issue – whether the services characterized as "paralegal" activities were "legal in nature" and deserving

-37-

of compensation at any rate.

The Court's review of PwC's time entries also reveals that the firm billed 149 hours in February 1999 for bates numbering documents and 117 hours in the same month for labeling, stamping and making an inventory of documents and preparing binders.  Not only does this Court finds this time to be excessive, but it is independently troubled by PwC's failure to "distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers but which a lawyer may do because he has no other help available."  Missouri v. Jenkins, 491 U.S. 274, 288 n.10 (1989).  Duties such as "courthouse run," photocopying, stamping, and labeling documents are not legal.  They are administrative functions requiring no particular legal skills or training.

Clerical work, whether performed in-house or outsourced, constitutes a non-compensable "overhead component of a lawyer's fee."   Olson, 884 F.2d at 1426-27.  Rather than reduce hours spent on these tasks to "paralegal rates," the Court will purge PwC's request for time spent on administrative functions and award actual paralegal functions in accordance with the formula set out in Section III (1)(d), above.  The Court, for the reasons stated above, will also deduct from PwC's request those hours spent on settlement and mediation (excluding that time spent on the statistical sampling project, see Section III(1)(c), above), and those that stray beyond the scope of Phase 1.0.  See Appendix IV.

(ii)    Expert Expenses

PwC requests reimbursement for expenses associated with "travel to site visits, travel to meetings with AA, photocopying, and other engagement-related expenses" from June 1996 through January 2000.  Pollner Aff., at ¶ 32.  PwC did not supply the Court with any description

of these expenses, nor did it provide the Court with affidavits, invoices, or receipts specifying how much money was spent on any particular task in any given month.

This omission is fatal. Under EAJA, no costs are awardable for taxi fares, postage, Action on Smoking & Health, 724 F.2d at 223-24, telephone bills, or travel expenses, NAACP v. Donovan, 554 F.Supp. 715, 719-20 (D.D.C. 1982). Only duplication expenses are reimbursable. Mass. Fair Share v. Law Enforcement Assistance Admin., 776 F.2d 1066, 1069-70 (D.C. Cir. 1985) (per curiam). PwC's failure to distinguish between expenses spent on duplication as opposed to travel expenses, makes it impossible for the Court to distinguish between reimbursable and non-reimbursable costs. The Court will therefore disallow PwC's request for expenses in its entirety. See Appendix IV.

> d.    Holt Expenses

Holt requests reimbursement for $3,626.59 for taxi, telephone, and research expenses. Only $356.68 for his research on Lexis is compensable under EAJA. Hirschey v. FERC, 777 F.2d at 6 (finding that "a charge . . . for computer research is appropriate"). The remaining requested expenses are non-compensable and will be deducted. See Appendix IV.

> V.    FIXED PERCENTAGE REDUCTION

The Court has undertaken a "painstaking review of each time entry" in plaintiffs' 1,129 pages of time records. Jones v. Clinton, 57 F. Supp. 2d 719 n.8 (E.D. Ark. 1999)). Even so, it cannot reasonably be expected to engage in "[a] pleading-by-pleading examination of the copious files in this case," Copeland, 641 F.2d 880 at 903, lest it abdicate the remainder of its judicial responsibilities for an indefinite period. At some point, "[i]t is neither practical nor desirable to expect the trial court judge to have reviewed each paper in this massive case file to decide, for example, whether a particular motion could have been done in 9.6 hours instead of

14.3 hours." Id. at 903.  The Third Circuit Court correctly observed that,

> an appellate court does not intend that a district court, in setting an attorneys' fee, become enmeshed in a meticulous analysis of every detailed facet of the professional representation.  It . . . is not our intention that the inquiry into the adequacy of the fee assume massive proportions, perhaps even dwarfing the case in chief.  Once the district court determines the reasonable hourly rates to be applied, for example, it need not conduct a minute evaluation of each phase or category of counsel's work.

Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 540 F.2d 102, 116 (3d Cir. 1976) (en banc).

That said, the Court need not review every document to confirm its suspicion that plaintiffs' time entries suffer in the main from insufficient detail and excessiveness.  Therefore, with the exception of the more egregious examples noted above, the Court will reduce plaintiffs' requested hours by 20% – an amount it considers reasonable, "without performing an item-by-item accounting."  Role Models of America, Inc., 353 F.3d at 973 (quoting Copeland, 641 F.2d at 903).  See Appendix V.

The Court is guided in large part by the well settled proposition that, "[a] fixed reduction is appropriate given the large number of entries that suffer from one or more of the deficiencies we have described."  Role Models America, Inc., 353 F.3d at 973-974.  See, e.g., Pete v. UMW Welf. & Retirement Fund, 517 F.2d 1275, 1289, 1290 & n.74 (D.C. Cir. 1975) (en banc) (30% reduction); Davis v. Board of School Comm'rs, 526 F.2d 865, 868- 69 (5th Cir. 1976); Kane v. Martin Paint Stores, Inc., 439 F.Supp. 1054, 1057-58 (S.D.N.Y. 1977) (20% reduction), aff'd, 578 F.2d 1368 (2d Cir. 1978);  Terrell v. Shalala, 1995 WL 307157, at *4 (N.D. Ill., May 15, 1995) (60% reduction); Sierra Club v. Mullen, 619 F. Supp. at 1252, (80% reduction); Cheng v. McCredit, 1995 WL 430953, at *4 (N.D. Ill. July 11, 1995) (75% reduction).

The Court is also guided by decisions it rendered in response to previous fee applications

filed in this litigation. After the first contempt trial, plaintiffs submitted a fee application

requesting $2,366,684.00 for fees and expenses which the Court reduced by 73.6%.  In April

2002, the Court reduced plaintiffs' $409,038.82 fee request by 69.3% – after expressly

admonishing plaintiffs to "be more circumspect when submitting fee statements." Cobell, 231

F.Supp.2d at 305.  In January 2003, the Special Master reduced plaintiffs' request for fees

related to their successful representation of Mona Infield's retaliation claims by 56%.

In this instance, the Court finds plaintiffs have taken some of the Court's prior

admonitions to heart.  Plaintiffs' fee application may be less detailed than some received by the

courts, but is not so impoverished as to warrant a drastic reduction in fees.  Overall, the

submissions satisfy the standards enunciated in Copeland.  And while a 20% reduction might not

be precise, "the Court believes it represents a fair and expeditious solution to determining the

sum total of reasonable fees and expenses that plaintiff incurred." Jones v. Clinton, 57

F.Supp.2d 719, 728 n.16 (E.D. Ark. 1999).

VI.    HOURLY RATE

Finally, the Court must determine what hourly rate to apply.

The amount of attorney fees an eligible "prevailing party" may recover under EAJA must

be "reasonable" and calculated using "prevailing market rates for the kind and quality of the

services furnished."  The hourly rate for EAJA fees set forth in 28 U.S.C. §2412(d)(2)(A),

provides that attorney fees shall not be awarded in excess of $125 per hour unless the court

determines that an increase is justified due to an increase in the cost of living or a "special

factor," i.e., where counsel possesses "some distinctive knowledge or specialized skill needful

for the litigation in question – as opposed to an extraordinary level of the general lawyerly

knowledge and ability useful in all litigation."  Pierce v. Underwood, 487 U.S. 552, 572 (1988).

Petitioners may also be entitled to a fee enhancement pursuant to 28 U.S.C. §2412(b), when defendants have acted in "bad faith." Action on Smoking and Health, 724 F.2d at 217. See Runyon v. McCrary, 427 U.S. 160, 183 (1976) (recognizing "the 'inherent power' of the federal courts to assess attorneys' fees when the losing party has 'acted in bad faith'") (citations omitted).

Since plaintiffs do not claim entitlement under 28 U.S.C. §2412(d)(2)(A), the Court will not address the propriety of its application here. Plaintiffs do, however, seek an enhancement of EAJA's statutory fee ceiling pursuant to §2412(b), which, if successful, would render the United States "liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." This "narrow exception" to the American Rule, Am. Hosp. Assen v. Sullivan, 938 F.2d 216, 219 (D.C. Cir. 1991), is triggered "where the losing party has acted "vexatiously, wantonly, or for oppressive reasons." Id. (quoting F.D. Rich Co. v. United States, 417 U.S. 116, 129, (1974)). It is a "punitive" award, that must be construed "stringently," Bergman v. United States, 844 F.2d 353, 357 (6th Cir. 1988), and "imposed only in exceptional cases and for dominating reasons of justice." Baldr Motor Co. v. Abo Properties, Inc., 780 F.2d 751, 756 (9th Cir.) (quotations omitted). As demonstrated below, plaintiffs are entitled to a bad faith enhancement.

Defendants advance the argument that the Court can only impose an enhancement under §2412(b) if it finds both pre-trial and trial misconduct. The government cites to Karin v. United States Postal Serv., 218 F.3d 185, 190 (2d Cir. 2000) in support of the proposition that, "pre-litigation conduct alone may not be the sole basis for a fee award resulting from a finding of bad faith"). It cites further to Lamb Engr. & Constr. Co. v. Nebraska Pub. Power Dist., 103 F.3d

14522, 1435 (8th Cir. 1997), where the Eighth Circuit held that a court may not impose a bad

faith fee award "solely on the conduct that led to the substantive claim and to similar rulings in

the Second, Eighth, Tenth, Fifth, Ninth and Sixth Circuits.  Opposition, at 24.  Defendants are

mistaken.

    However persuasive the holdings cited by defendants overlook two key principles.  First,

the unique relationship between the trustee-delegates and the Indian beneficiaries, permits the

Court considerable latitude to relax stringent application of the "bad faith" standard.  See, e.g.,

McEnteggart v. Cataldo,  (1st Cir. 1971) (attorney's fees assessed against college board of

trustees for forcing professor to vindicate constitutionally secured right); Rolax v. Atlantic

Coastline R. R., 186 F.2d 473 (4th Cir. 1951) (attorneys' fees awarded where "plaintiffs of small

means have been subjected to discriminatory and oppressive conduct by a powerful labor

organization which was required, as bargaining agent, to protect their interests."); Niday v.

Graef,  279 F. 941(9th Cir. 1922) (attorney's fees awarded against family lawyer from his

elderly client due to breach of fiduciary relationship).

    Second, the holdings cited by defendants are not the law in this jurisdiction.  In this

Circuit, a "bad faith" enhancement is appropriate where the Government's misconduct "(1)

occurred in connection with the litigation, or (2) was an aspect of the conduct giving rise to the

litigation."  Am. Hosp. Assen v. Sullivan, 938 F.2d 216, 219 (D.C. Cir. 1991) (emphasis added).

See also, Nepera Chemical, Inc. v. Sea-Land Service, Inc., 794 F.2d 688, 701-01 (D.C. Cir.

1986) ("Federal courts have applied this exception both when bad faith occurred in connection

with the litigation and when it was an aspect of the conduct that gave rise to the lawsuit")

(footnotes omitted); Hutto v. Finney, 437 U.S. 678, 689 n.14 (1978) ("(a)n equity court has the

unquestioned power to award attorney's fees against a party who shows bad faith by delaying or

disrupting the litigation or by hampering the enforcement of a court order" (citing Alyeska

Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 258-259, (1975)); Aero Corp. v.

Department of Navy, 558 F.Supp. 404, 418 (D.D.C. 1983) (Under the "bad faith exception," fee

awards "are not restricted to instances of frivolous litigation or implausible legal theories;

attorney's fees may also be awarded upon a finding of bad faith 'in the conduct of the

litigation.'" (quoting Hall v. Cole, 412 U.S. 1, 15 (1973)).

Finally, even were the Court to adopt defendants' argument that §2412(b) requires both

litigation and pre-litigation misconduct, a bad faith enhancement would be justified.

It is a matter of record that defendants abrogated their trust responsibilities toward the

Indian beneficiaries in a manner not "substantially justified."  Defendants' pretrial conduct

consistently contravened controlling authority and required plaintiffs "to undertake otherwise

unnecessary litigation to vindicate plain legal rights."  Sullivan, 938 F.2d at 220 (quoting

Fitzgerald v. Hampton, 545 F.Supp. 53, 57 (D.D.C. 1982)).  Defendants not only engaged in

conduct characterized by the Court of Appeals as "unreasonable" and "egregious," but their

explanation for such wanton conduct offered no counterweight to the evidence that supports the

Circuit's conclusion that what "little progress" that was undertaken by defendants to comply

with their statutory obligations, was "more due to the litigation than diligence in discharging its

fiduciary obligations."  Cobell VI, 240 F.3d at 1097.

Defendants' abuse of the judicial process independently merits a fee sanction.  See In

Roadway Express, Inc. v. Piper, 447 U.S. 752, 766 (1980) (monetary sanctions against counsel

are within a court's powers in the presence of a "willful abuse [of the] judicial processes" or

otherwise conducted litigation in bad faith).  See also, Lipsig v. National Student Marketing

Corp., 663 F.2d 178, 182 (D.C. Cir. 1980) (per curiam); (finding "bad faith" for the purpose of a

fee award, where party "engaged in dilatory tactics during discovery and courtroom hearings,

consistently failed to meet scheduled filing deadlines, misused the discovery privilege and on at

least two occasions seriously misled the Court by misquoting or omitting material portions of

documentary evidence") (footnotes and internal quotation marks omitted); Baldr Motor Co., 780

F.2d at 756 (the bringing of a case barred by the statute of limitations).

Since the inception of Phase 1.0, defendants demonstrated an unprecedented level of

defiance, both of the Rules of Civil Procedure and of this Court's orders. One need look no

further than defendants' refusal to comply with paragraph 19 of the Court's November 27, 1996

First Order of Production, requiring defendants to produce "[a]ll documents, records, and

tangible things which embody, refer to, or relate to IIM accounts of the five-named plaintiffs or

their predecessors in interest," and to defendant Interior's destruction of e-mail backup tapes, to

crystallize this point.

In the first of these instances, defendants made numerous illegitimate representations,

failed to correct known misrepresentations, and neglected to inform the court about self-inflicted

obstacles to comply with its discovery obligations. As a result, the Court held both trustee-

delegates in contempt of court – a decision that was never appealed. Cobell v. Babbitt, 37

F.Supp.2d 6 (D.D.C. 1999). Independently, the Special Master found that defendant Interior

violated Court orders by overwriting e-mail backup tapes and destroying potentially responsive

evidence – again, a decision the government never appealed. Opinion of the Special Master

(July 27, 2001). In both instances, there was no "substantial uncertainty as to whether the

documents were lost through inadvertence or because of actions taken in bad faith." Perkinson v.

Gilbert/Robinson, Inc., 821 F.2d 686, 691 (D.C. Cir. 1987).

In short, defendants' disregard of the judicial process during Phase 1.0 was not confined

to a discrete instance of misconduct that might allow the Court to tailor an enhanced fee "to those expenses necessary to counter the losing party's bad faith."  Sierra Club, 776 F.2d at 389. Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 21 (2d Cir. 1996) (the Court should include factual findings on "what proportion of the plaintiffs' attorney fees resulted from the offensive conduct") (citation omitted).  Defendants did not simply file an "allegedly meritless counterclaim," Karin v. United States Postal Serv., 218 F.3d at 193, or fail to comply with local rules regarding exchange of exhibits.  Toombs v. Leone, 777 F.2d 465, 471-72 (9th Cir. 1985).  In those situations, a fee award could readily be tailored "to the legal work conducted in defense of that claim."

Indeed, defendants' misconduct permeated the entire Phase 1.0 litigation and adversely impacted plaintiffs' ability to adequately present their case.  The Court finds that plaintiffs are entitled to a §2412(b) enhancement.

### 2.   Market v. Laffey Rate

Having held that plaintiffs' award is not restricted by any statutory ceiling on the hourly rate used to calculate fees under §2412(b), Karin v. U.S. Postal Serv., 218 F.3d 185, 190-91 (2d Cir. 2000), the Court must determine what constitutes an appropriate fee.  To assist in that determination, the Court will rely on EAJA precedent as well as on case law arising under other fee-shifting statutes. See, e.g., Indep. Fed'n of Flight Attendants v. Zipes, 491 U.S. 754, 759 n.2 (1989) (noting that the similar language in "fee-shifting statutes suggests they are to be interpreted alike).

It is a settled proposition that, "a fee applicant's burden in establishing a reasonable hourly rate entails a showing of at least three elements: the attorneys' billing practices; the attorneys' skill, experience, and reputation; and the prevailing market rates in the relevant

community." Covington v. District of Columbia, 57 F.3d 1101, 1107 (D.C. Cir. 1995), cert. denied, 516 U.S. 1115 (1996) (citations omitted). See also, Jenkins, 491 U.S. at 286 (reasonable hourly rate usually "calculated on the basis of rates and practices prevailing in the relevant market").

Plaintiffs ask the Court to award "market rates" in accordance with those set out in the PwC Survey. Defendants request that, to the extent the Court finds the government to have proceeded in bad faith, it should award rates pursuant to the Laffey Matrix. Opposition, at 74.

The Laffey Matrix is a schedule of hourly rates based on years of experience originally developed by the D.C. Circuit. See Laffey v. Northwest Airlines, Inc., 572 F. Supp. 354 (D.D.C. 1983), rev'd on other grounds, 746 F.2d 4 (D.C. Cir. 1984)). The United States Attorney's Office for the District of Columbia subsequently developed a version of the Laffey Matrix which it updates annually. It serves as a useful starting point for determining prevailing market rates in the District of Columbia, that can be supplemented with additional information. Covington, 857 F.2d at 1107. The Laffey Matrix proposes a hierarchy of rates ranging from "junior associates" with 1 to 3 years experience after law school graduation; "senior associates" with 4 to 7 years experience after graduation from law school; "experienced federal court litigators" in their 8th through 10th years after graduation from law school; "experienced federal court litigators" in their 11th through 19th years after law school graduation; and "very experienced federal court litigators" in their 20th year or more after graduation from law school Laffey, 572 F. Supp. at 371.

The Court will apply Laffey rates to the Interim Fee Petition. Laffey rates in existence when Phase 1.0 was being litigated were almost indistinguishable from the "market rates" charged by individual counsel at the time. See Levitas Aff., Exhibit D-1. Moreover, to the

extent The PwC Survey suggests plaintiffs be compensated a rate greater than permitted by Laffey, it does so without any supporting affidavit by an attorney or law firm knowledgeable in the activities litigated by plaintiffs.  See Jordan v. United States Dep't. of Justice, 691 F.2d 514, 517 (D.C. Cir. 1982) (acknowledging importance of petitioner's submission of  "the affidavit of a partner in a local law firm attesting, on the basis of personal knowledge, to the reasonableness of the hourly rates claimed") (footnote omitted).

By applying the Laffey Matrix to the Interim Fee Petition, the Court offers no opinion whether these rates should apply to subsequent successful petitions.

LAFFEY MATRIX

| Years (Rate for June 1 - May 31, based on prior year's CPI-U) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Experience | 95-96 | 96-97 | 97-98 | 98-99 | 99-00 | 00-01 | 01-02 | 02-03 | 03-04 | 04-05 |
| 20+ years | 315 | 325 | 330 | 335 | 340 | 350 | 360 | 370 | 380 | 390 |
| 11-19 years | 275 | 280 | 285 | 290 | 295 | 305 | 315 | 335 | 335 | 345 |
| 8-10 years | 225 | 230 | 235 | 240 | 245 | 250 | 260 | 265 | 270 | 280 |
| 4-7 years | 185 | 190 | 195 | 195 | 200 | 205 | 210 | 215 | 220 | 225 |
| 1-3 years | 145 | 150 | 155 | 155 | 160 | 165 | 170 | 175 | 180 | 185 |
| Paralegals/ Law Clerk | 80 | 80 | 85 | 85 | 90 | 90 | 95 | 100 | 105 | 110 |

DENNIS GINGOLD

Dennis Gingold is lead counsel for plaintiffs and has been engaged full time in this matter since 1996.  Gingold Aff., at ¶ 22.  Gingold was admitted to the bar in 1974 and thus seeks compensation at the rate of an attorney with 20-plus years of experience.  Gingold Aff., at ¶24.  His rates for litigating Phase 1.0 under Laffey, are as follows:

| Year (June 1- May31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years |
| Rate | $315 | $325 | $330 | $335 | $340 | $350 | $360 | $370 | $380 | $390 |

THADDEUS HOLT

Thaddeus Holt is a retired equity partner of the firm Bred, Abbott & Morgan.  Holt Aff.,

at ¶ 20.  He has been a member of the bar and engaged in litigation and administrative practice

since 1956.  Holt Aff., at ¶ 27.  His rates for litigating Phase 1.0 under Laffey, are as follows:

| Year (June 1- May31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years |
| Rate | $315 | $325 | $330 | $335 | $340 | $350 | $360 | $370 | $380 | $390 |

## MARK BROWN

Mark Brown has specialized in litigation for the last 24 years, Brown Aff., at ¶ 1, and

joined plaintiffs' litigation team after Trial 1.  His rates for litigating Phase 1.0 under Laffey, are

as follows:

| Year (June 1- May31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years |
| Rate | $315 | $325 | $330 | $335 | $340 | $350 | $360 | $370 | $380 | $390 |

## KILPATRICK STOCKTON

Elliott Levitas is counsel to Kilpatrick Stockton and was retained by plaintiffs in

February 1999 to participate in this litigation.  Levitas Aff., at ¶¶ 2, 3.  Levitas, a former

Congressman from Georgia, graduated from law school in 1955.  His rates for litigating Phase

1.0 under Laffey, are as follows:

| Year (June 1- May31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years |
| Rate | $315 | $325 | $330 | $335 | $340 | $350 | $360 | $370 | $380 | $390 |

Miles Alexander, Steve Clay, and David Zacks are KS attorneys who assisted with class

action issues.  Levitas Aff., at ¶ 27.  "In 1999, they collectively possessed more than 120 years of

litigation experience."  Id.  "Beginning in April 1999, Roderick Dennehy, a partner then with approximately 25 years of litigation experience began serving as "second chair" with Levitas during his role in the Trial 1.0 proceedings."  Levitas Aff., at ¶ 30.   Their rates for litigating Phase 1.0 under Laffey, are as follows:

| Year (June 1- May31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years |
| Rate | $315 | $325 | $330 | $335 | $340 | $350 | $360 | $370 | $380 | $390 |

Jill Warner is a KS attorney who assisted with separation of powers issues.  Levitas Aff., at ¶ 28.  She graduated from law school in 1995.  Id.  Her rates for litigating Phase 1.0 under Laffey, are as follows:

| Year (June 1- May31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | 1-3 years | 1-3 years | 1-3 years | 1-3 years | 4-7 years | 4-7 years | 4-7 years | 8-10 years | 8-10 years | 8-10 years |
| Rate | $145 | $150 | $155 | $155 | $200 | $205 | $210 | $265 | $270 | $280 |

Robert Marcovitch is a KS attorney who assisted during Trial 1.0.  Levitas Aff., at ¶ 37. He graduated from law school in 1987.  Id.  His rates for litigating Phase 1.0 under Laffey, are as follows:

| Year (June 1 - May 31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | 8-10 years | 8-10 years | 8-10 years | 11-19 years | 11-19 years | 11-19 years | 11-19 years | 11-19 years | 11-19 years | 11-19 years |
| Rate | $225 | $230 | $235 | $290 | $295 | $305 | $315 | $325 | $335 | $345 |

Ronald Raider, a KS attorney with "18 years of experience" who assisted in the preparation of the fee application.  Levitas Aff., at ¶ 39.  His rates for litigating Phase 1.0 under Laffey, are as follows:

| Year (June 1 – May 31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | 8-10 years | 8-10 years | 11-19 Years | 11-19 years | 11-19 years | 11-19 years | 11-19 years | 11-19 years | 11-19 years | 11-19 years |
| Rate | $225 | $230 | $285 | $290 | $295 | $305 | $315 | $325 | $335 | $345 |

Levitas did not provide the Court with any information concerning the experience of the following KS attorneys: Jordana Sternberg (described as a "junior associate" Levitas Aff., at ¶ 29); Robert Vaughan, Kim Stogener, J.F. Matthews ("a former junior associate," Levitas Reply Aff., at ¶ 3); Vance Hughes; J. Michael Wiggins; Wilmer Parker; Matthew Yungwirth ("a former junior KS associate," Levitas Reply Aff., ¶ 3); Burleigh Singleton (a "senior associate at KS in its litigation group," Levitas Reply Aff., at ¶ 3); David Barger; Thomas Bick; Christopher Brady; Audra Dial ("Ms. Dial is a senior associate in the KS litigation group.  Ms. Dial was a junior associate at the time of the Trial 1.0 proceedings," Levitas Reply Aff., at ¶3); Timothy Carssow ("a senior KS partner," Levitas Reply Aff., at ¶3); and Tad Carithers ("a former KS associate in the litigation group," Levitas Reply Aff., at ¶3).  Accordingly, the Court will award them at the "junior associate" rate as set out below.

| Year (June 1 - May 31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | 1-3 years | 1-3 years | 1-3 Years | 1-3 years | 1-3 years | 1-3 years | 1-3 years | 1-3 years | 1-3 years | 1-3 years |
| Rate | $145 | $150 | $155 | $155 | $160 | $165 | $170 | $175 | $180 | $185 |

Sarah Perez is a former KS paralegal, Levitas Aff., ¶ 38, and Alexis Applegate is currently a paralegal at KS.  Levitas Aff., at ¶ 39.  Their rates under Laffey, are as follows:

| Year (June 1 - May 31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk |
| Rate | $80 | $80 | $85 | $85 | $90 | $90 | $95 | $100 | $105 | $110 |

Stacey Gingold Bear served as a paralegal in support of plaintiffs' Trial 1 litigation team. Gingold Bear Aff., at ¶ 1. She erroneously indicated in her affidavit that paralegals in June 1999 were compensable at $105 under the Laffey rate. During that year, paralegals and law clerks were compensated at $90 per hour under the Laffey rate. Her rates under Laffey, are as follows:

| Year (June 1 - May 31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk |
| Rate | $80 | $80 | $85 | $85 | $90 | $90 | $95 | $100 | $105 | $110 |

Angie Foley, Alfred Lurey, Constance Boken, Caroline Spangenberg, Kathy Crosslin, Patricia Flynn, and Susan Cahoon are included in the Interim Fee Petition as having supported the Phase 1.0 effort. There is no information, however, indicating whether these individuals are clerical staff, librarians, paralegals, or attorneys. The record is similarly barren of any information indicating how many years these individuals have performed their respective functions. For the purpose of the Interim Fee Petition, the Court will compensate those individuals for whom KS seeks compensation at the paralegal rate as set out below.

| Year (June 1 - May 31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk |
| Rate | $80 | $80 | $85 | $85 | $90 | $90 | $95 | $100 | $105 | $110 |

NATIVE AMERICAN RIGHTS FUND ("NARF")

The NARF attorneys are not in private practice with an established billing rate confirmed by the legal market. Supreme Court precedent teaches that prevailing market rates are to be used

when awarding attorney's fees to lawyers working for nonprofit legal services organizations.

See Blum, 485 U.S. at 893-895 ("'reasonable fees' under 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or non-profit counsel").  The Court finds no basis to deviate from the Laffey Matrix.

> Moreover, since
>
> Lawyers working in private legal aid organizations, for example, often do not receive fees for their legal work and thus necessarily lack any billing history that could serve as their presumptively reasonable rate; for them, a district court must determine the 'prevailing market rates in the relevant community,' and award counsel that as the reasonable hourly rate.

Covington, 839 F. Supp 894, 896; aff'd., 57 F.3d 1101 (citing Blum, 465 U.S. at 895).  The fact that Harper previously requested and received fee awards based on $170 per hour in this case neither negates nor modifies the clear holding of Blum as applied to lawyers who work for nonprofit legal organizations.  Defendants have cited no authority urging a departure from Blum and from the utilization of prevailing market rates as the basis for a reasonable hourly rate for Harper for this fee application.

Echohawk received his J.D. in 1970.  Echohawk Aff., at ¶ 14.  He is currently the Executive Director of NARF.  Echohawk Aff., at ¶ 1.  His rates for litigating Phase 1.0 under Laffey, are as follows:

| Year (June 1- May31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years |
| Rate | $315 | $325 | $330 | $335 | $340 | $350 | $360 | $370 | $380 | $390 |

Keith Harper graduated from law school in January 1994.  Harper Aff., at ¶ 20.  The Laffey Matrix is based on a June 1-May 31 annual time frame. Since Harper graduated from law

school in January 1994, he was, for Laffey Matrix purposes, a "senior associate" (4-7 years) during the period January 1998-December 2001 and an "experienced federal litigator" (8-10 years) during the period January 2002 to present.  Id.  To accommodate Harper's January graduation date, the Court has divided Laffey year 2001-2002 (June 2001-May 2002) to demarcate the point (January 2002) at which Harper moved from the experience range of 4-7 years to the experience range of 8-10 years.  The Court finds that the reasonable hourly rates for Harper's time on the Infield reprisal allegations are those in the Laffey Matrix, as set forth below with the adjustment for the split year:

| Year (June 1 - May 31) (Except for Split Year) | 1995-1996 | 1996-1997 | 06//97-12//97 | 01//98-05/98 | 06/98-05/99 | 1999-2000 |
|---|---|---|---|---|---|---|
| Experience Range | 1-3 years | 1-3 years | 1-3 years | 4 -7 yrs | 4 -7 yrs | 4 -7 yrs |
| Rate | $145 | $150 | $155 | $195 | $195 | $200 |

| Year (June 1 - May 31) (Except for Split Year) | 2000-2001 | 06/01-12/01 | 01/02-05/02 | 06/02-12/02 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|
| Experience Range | 4 -7 yrs | 4-7 yrs | 8-10 yrs | 8-10 yrs | 8-10 yrs | 11-19 yrs |
| Rate | $205 | $210 | $260 | $265 | $270 | $345 |

Lorna Babby is a 1991 law school graduate and currently is a senior staff attorney with the Native American Rights Fund (NARF).  Babby Aff., at ¶¶ 1 and 14.   Her rates for litigating Phase 1.0 under Laffey, are as follows:

| Year (June 1- May 31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | 4-7 yrs | 4-7 yrs | 4-7 yrs | 4-7 yrs | 8-10 yrs | 8-10 yrs | 8-10 yrs | 11-19 yrs | 11-19 yrs | 11-19 yrs |
| Rate | $185 | $190 | $195 | $195 | $245 | $250 | $260 | $325 | $335 | $345 |

Richard Guest received his J. D. in 1994 and is currently a staff attorney with NARF.  Guest Aff., at ¶¶ 1 and 8(c). Guest seeks compensation for 75.6 hours of time in preparing his

affidavit for himself and compensation for 41 hours for time expended by his law clerk Matthew Kelly, at the Laffey rate of $270 per hour.  Id. at ¶¶13 and 14.   Neither Guest nor Kelly will be awarded any fee, having failed to produced any time sheets in support of their petition.

Richard Dauphinais received his J. D. in 1975 and joined NARF as a staff attorney in 1979.  Guest Aff., at ¶ 8(c).  His rates for litigating Phase 1.0 under Laffey, are as follows:

| Year (June 1 - May 31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years | 20+ years |
| Rate | $315 | $325 | $330 | $335 | $340 | $350 | $360 | $370 | $380 | $390 |

James Kawahara received his J.D. in 1991.  Guest Aff., at ¶ 8(b).  NARF erroneously seeks reimbursement for Kawahara's time at the rate of $195 for June to May of 1996; $190 for June to May of 1997; and $195 from June to May of 1998.  Guest Aff., at ¶ 9(b).  His rates for litigating Phase 1.0 under Laffey, are as follows:

| Year (June 1 - May 31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | 4-7 years | 4-7 years | 4-7 years | 4-7 years | 8-10 years | 8-10 years | 8-10 years | 11-19 years | 11-19 years | 11-19 years |
| Rate | $185 | $190 | $195 | $195 | $245 | $250 | $260 | $325 | $335 | $345 |

Robert Peregoy received his J.D. in 1984 and joined NARF the same year.  Guest Aff., at ¶ 8(c).  His rates for litigating Phase 1.0 under Laffey, are as follows:

| Year (June 1 - May 31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Experience Range | 11-19 years | 11-19 Years | 11-19 Years | 11-19 years | 11-19 years | 11-19 years | 11-19 years | 11-19 years | 11-19 years | 20+ years |
| Rate | $275 | $280 | $285 | $290 | $295 | $305 | $315 | $325 | $335 | $390 |

NARF's law clerks' rates for litigating Phase 1.0 under Laffey, are as follows:

| Year (June 1 - May 31) | 1995-1996 | 1996-1997 | 1997-1998 | 1998-1999 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|---|---|---|---|---|---|

| Experience Range | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk | Para-legal/ Law Clerk |
|---|---|---|---|---|---|---|---|---|---|---|
| Rate | $80 | $80 | $85 | $85 | $90 | $90 | $95 | $100 | $105 | $110 |

## GEOFFREY REMPEL

Geoffrey Rempel, a certified public accountant, is "a full time member of plaintiffs' litigation team" and has been involved with this case from its inception, seeks compensation for services rendered of $225.  Rempel Aff., at ¶ 1.   He began working on Phase 1.0 issues while employed as a Staff Consultant at PwC until March 2000 when he joined plaintiffs' litigation team as a Litigation Consultant.  Id.

The Court, in its November 12, 2002 Memorandum Opinion, "deem[ed] $225 to be a reasonable hourly rate of compensation for services rendered by Rempel," Cobell v. Norton, 231 F.Supp.2d at 303, and held:

> Defendants object to this rate as unreasonable, claiming that the better part of the services rendered by Rempel 'appears to have been' more akin to paralegal work than accounting services, and should therefore be valued at a diminished rate. Defs.' Opp. at 33. Having reviewed Rempel's billing statements at length, as well as his supporting affidavits, the Court finds defendants' characterization of the nature of Rempel's services to be without merit. See Pls.' Statement, Rempel Aff. ¶¶ 5-6. The Court also finds credible Rempel's assertion that 'to the extent I incurred time that may be considered clerical or administrative in nature, that time is de minimus [sic] and immaterial to this fee application.' Id. at p 7.

Id.

Defendants continue to object to Rempel's rate arguing that, since leaving, he was no longer functioning in his capacity as an accountant but as a paralegal and should be compensated accordingly.  Opposition, at 77.

The Court has reviewed and compared Rempel's time entries here and in the April 2002 fee application and finds no "material" difference between the type of work for which the Court

previously awarded Rempel an hourly rate of $225 and the type of work for which Rempel now seeks compensation.  Consequently, the Court deems $225 to be a reasonable hourly rate of compensation for Rempel's services.

**CONCLUSION – FEE AWARD**

After multiplying the reasonable hours expended by the reasonable hourly rate, the Court has calculated a "lodestar" figure per member of the litigation team,  Hensley, 461 U.S. at 433; Blum v. Stenson, 465 U.S. 886, 888 (1984) – an amount presumed to "represent[] the 'reasonable' fee."  City of Burlington v. Dague, 505 U.S. 557, 562 (1992).  These amounts are as follows:

Fees:

| | |
|---|---|
| Dennis Gingold | $ 2,007,032.16 |
| Thaddeus Holt | $   490,678.40 |
| Mark Brown | $     79,947.77 |
| Kilpatrick Stockton | $   406,097.60 |
| Native American Rights Fund | $ 1,502,311.84 |
| Geoffrey Rempel | $     40,278.60 |
| Stacy Gingold Bear | $       7,929.60 |
| | |
| TOTAL FEES | $ 4,534,275.97 |

Expenses:

| | |
|---|---|
| PricewaterhouseCoopers | $ 2,531,838.40 |
| Thaddeus Holt | $         356.68 |
| | |
| TOTAL EXPENSES | $ 2,532,195.08 |
| | |
| TOTAL FEES AND EXPENSES | $ 7,066,471.05 |

See Appendices IV and V.

The Court emphasizes that this interim fee award does not purport to determine "the total amount of fees due ... nor [the] absolute entitlement to attorney's fees."  Pigford v. Veneman, 369 F.3d 545, 547 (D.C. Cir. 2004.) (quoting Rosenfeld v. United States, 859 F.2d 717, 720

(1988)).  It does not presume to "dispositively determine fees due up to this stage of the litigation," id. (quoting Trout v. Garrett, 891 F.2d 332, 335 (1989)), nor does it preclude the Court from revising the award at a later time should additional facts come to light.  Rosenfeld, 859 F.2d at 722.

A separate Order shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, December 19, 2005.

Appendix I:  Non-compensable Hours

| Name | Year | Total Hrs Requested | Settlement/ Mediation Deducted | Beyond the Scope of Phase 1.0 and Fees Previously Awarded Deducted | Clerical and Administrative Services Deducted | Media/Public Relations Deducted | Travel Time for Media/Public Relations (divided in half to reflect travel was billed at half rate) | Failure to Provide Time Sheets to Support Fees Requested | Total Hours Deducted | Total Compensable Hours Remaining |
|---|---|---|---|---|---|---|---|---|---|---|
| Babby | 1997-1998 | 293.80 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 293.800 |
| | 1998-1999 | 1,187.15 | 9.8 | 0 | 2.3 | 0 | 0 | 0 | 12.100 | 1,175.047 |
| | 1999-2000 | 1,518.40 | 7.5 | 338.5 | 0 | 11.4 | 4.65 | 0 | 362.050 | 1,156.350 |
| | 2000-2001 | 586.80 | 0 | 426.7 | 3.5 | 0 | 0 | 0 | 430.200 | 156.600 |
| Bear | 1999-2000 | 94.40 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 94.400 |
| Brown | 1999-2000 | 44.41 | 0 | 26.25 | 0 | 0 | 0 | 0 | 26.250 | 18.163 |
| | 2000-2001 | 436.31 | 4.999 | 310.95 | 0 | 0 | 0 | 0 | 315.949 | 120.356 |
| | 2001-2002 | 402.49 | 0.5 | 347.672 | 0 | 0 | 0 | 0 | 348.172 | 54.319 |
| | 2002-2003 | 0.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 0.000 |
| | 2003-2004 | 139.27 | 0 | 139.269 | 0 | 0 | 0 | 0 | 139.269 | 0.000 |
| | 2004-2005 | 219.14 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 219.139 |
| Dauphinais | 1995-1996 | 145.70 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 145.700 |
| | 1996-1997 | 219.85 | 1.75 | 0 | 1 | 0 | 0 | 0 | 2.750 | 217.100 |
| Echohawk | 1996-1997 | 32.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 32.000 |
| | 1997-1998 | 12.20 | 0 | 3.9 | 0 | 0 | 0 | 0 | 3.900 | 8.300 |
| | 1998-1999 | 15.40 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 15.400 |
| | 1999-2000 | 60.70 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 60.700 |
| | 2000-2001 | 1.20 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 1.200 |
| Gingold | 1995-1996 | 122.70 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 122.700 |
| Gingold (cont'd.) | 1996-1997 | 1,682.20 | 0 | 0 | 9.5 | 0 | 0 | 0 | 9.500 | 1,672.700 |
| | 1997-1998 | 1,484.20 | 0.5 | 0 | 0 | 0 | 0 | 0 | 0.500 | 1,483.700 |

Appendix I:  Non-compensable Hours

| Name | Year | Total Hrs Requested | Settlement/ Mediation Deducted | Beyond the Scope of Phase 1.0 and Fees Previously Awarded Deducted | Clerical and Administrative Services Deducted | Media/Public Relations Deducted | Travel Time for Media/Public Relations (divided in half to reflect travel was billed at half rate) | Failure to Provide Time Sheets to Support Fees Requested | Total Hours Deducted | Total Compensable Hours Remaining |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1998-1999 | 1,999.10 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 1,999.100 |
| | 1999-2000 | 2,461.40 | 163.3 | 723.6 | 0 | 0 | 0 | 0 | 886.900 | 1,574.500 |
| | 2000-2001 | 1,677.70 | 315.3 | 431.6 | 0 | 0 | 0 | 0 | 746.900 | 930.800 |
| | 2001-2002 | 0.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 0.000 |
| | 2002-2003 | 0.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 0.000 |
| | 2003-2004 | 25.60 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 25.600 |
| | 2004-2005 | 639.50 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 639.500 |
| Guest | 2004-2005 | 75.60 | 0 | 0 | 0 | 0 | 0 | 75.60 | 75.600 | 0.000 |
| Harper | 01/96-12/96 | 400.10 | 0 | 0 | 0 | 1.7 | 0 | 0 | 1.700 | 398.400 |
| | 01/97-05/97 | 182.79 | 2.72 | 0 | 0 | 4.7 | 0 | 0 | 7.420 | 175.370 |
| | 1997-1998 | 735.43 | 6.95 | 0 | 0.75 | 8.4 | 0 | 0 | 16.100 | 719.330 |
| | 1998-1999 | 1,280.28 | 3.9 | 0 | 1.6 | 0.3 | 0 | 0 | 5.800 | 1,274.480 |
| | 1999-2000 | 1,637.70 | 157.2 | 461.73 | 0 | 25.7 | 0 | 0 | 644.630 | 993.070 |
| | 06/00-12/00 | 637.65 | 93.3 | 388.85 | 0 | 7.5 | 0 | 0 | 489.650 | 148.000 |
| | 01/01-05/01 | 79.40 | 0 | 0 | 0 | 0 | 8.9 | 0 | 8.900 | 70.500 |
| Harper (cont'd.) | 01/04-05/04 | 0.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 0.000 |
| | 06/04-12/04 | 263.20 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 263.200 |

Appendix I:  Non-compensable Hours

| Name | Year | Total Hrs Requested | Settlement/ Mediation Deducted | Beyond the Scope of Phase 1.0 and Fees Previously Awarded Deducted | Clerical and Administrative Services Deducted | Media/Public Relations Deducted | Travel Time for Media/Public Relations (divided in half to reflect travel was billed at half rate) | Failure to Provide Time Sheets to Support Fees Requested | Total Hours Deducted | Total Compensable Hours Remaining |
|---|---|---|---|---|---|---|---|---|---|---|
| Holt | 1995-1996 | 42.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 42.000 |
| | 1996-1997 | 393.25 | 5.9 | 0 | 0 | 0 | 0 | 0 | 5.900 | 387.350 |
| | 1997-1998 | 446.59 | 0.5 | 4.9 | 0 | 0 | 0 | 0 | 5.400 | 441.190 |
| | 1998-1999 | 581.40 | 35.1 | 22.5 | 0 | 0 | 0 | 0 | 57.600 | 523.800 |
| | 1999-2000 | 671.30 | 56.8 | 52.2 | 0 | 0 | 0 | 0 | 109.000 | 562.300 |
| | 2000-2001 | 168.05 | 0 | 30.9 | 0 | 0 | 0 | 0 | 30.900 | 137.150 |
| | 2001-2002 | 56.90 | 0 | 56.9 | 0 | 0 | 0 | 0 | 56.900 | 0.000 |
| | 2002-2003 | 0.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 0.000 |
| | 2003-2004 | 0.50 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 0.500 |
| | 2004-2005 | 17.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 17.000 |
| Kawahara | 1995-1996 | 27.10 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 27.100 |
| | 1996-1997 | 152.14 | 12.8 | 0 | 0 | 0 | 0 | 0 | 12.800 | 139.340 |
| | 1997-1998 | 34.30 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 34.300 |
| Kelly | 2004-2005 | 41.00 | 0 | 0 | 0 | 0 | 0 | 41.00 | 41.000 | 0.000 |
| NARF Clerks | 1997-1998 | 309.25 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 309.250 |
| | 1998-1999 | 171.75 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 171.750 |
| NARF Clerks (cont'd.) | 1999-2000 | 333.50 | 0 | 0 | 1.4 | 0 | 0 | 0 | 1.400 | 332.100 |
| | 2000-2001 | 205.45 | 0 | 205.45 | 0 | 0 | 0 | 0 | 205.450 | 0.000 |
| | 2001-2002 | 132.50 | 0 | 132.5 | 0 | 0 | 0 | 0 | 132.500 | 0.000 |
| Peregoy | 1995-1996 | 15.40 | 0 | 0 | 8 | 4 | 0 | 0 | 12.000 | 3.400 |
| | 1996-1997 | 440.75 | 2.7 | 0 | 0 | 25.2 | 0 | 0 | 27.900 | 412.850 |

Appendix I:  Non-compensable Hours

| Name | Year | Total Hrs Requested | Settlement/ Mediation Deducted | Beyond the Scope of Phase 1.0 and Fees Previously Awarded Deducted | Clerical and Administrative Services Deducted | Media/Public Relations Deducted | Travel Time for Media/Public Relations (divided in half to reflect travel was billed at half rate) | Failure to Provide Time Sheets to Support Fees Requested | Total Hours Deducted | Total Compensable Hours Remaining |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1997-1998 | 298.15 | 4.6 | 0 | 0 | 4 | 0 | 0 | 8.600 | 289.550 |
| | 1998-1999 | 586.33 | 5.163 | 5 | 0.2 | 0 | 0 | 0 | 10.363 | 575.969 |
| Rempel | 1999-2000 | 193.80 | 0 | 155.48 | 1 | 1.5 | 0 | 0 | 157.980 | 35.820 |
| | 2000-2001 | 969.30 | 83.7 | 795.5 | 0 | 36.7 | 0 | 0 | 915.900 | 53.400 |
| | 2001-2002 | 0.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 0.000 |
| | 2002-2003 | 0.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 0.000 |
| | 2003-2004 | 1.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 1.000 |
| | 2004-2005 | 267.10 | 0 | 0 | 0 | | 0 | 0 | 0.000 | 267.100 |
| Levitas | 1998-1999 | 296.90 | 43.3 | 0 | 0 | 0 | 0 | 0 | 43.300 | 253.600 |
| | 1999-2000 | 1,255.70 | 282.6 | 337.2 | 0 | 0 | 0 | 0 | 619.800 | 635.900 |
| | 2000-2001 | 504.90 | 38.4 | 237.6 | 0 | 0 | 0 | 0 | 276.000 | 228.900 |
| | 2001-2002 | 0.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 0.000 |
| | 2002-2003 | 0.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 0.000 |
| | 2003-2004 | 2.30 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 2.300 |
| Levitas (cont'd.) | 2004-2005 | 16.60 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 16.600 |
| Alexander (MJA) | 1998-1999 | 1.10 | 0.6 | 0 | 0 | 0 | 0 | 0 | 0.600 | 0.500 |
| | 1999-2000 | 0.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 0.000 |
| | 2000-2001 | 1.10 | 0.3 | 0.8 | 0 | 0 | 0 | 0 | 1.100 | 0.000 |
| Barger (DGB) | 1999-2000 | 0.80 | 0 | 0.8 | 0 | 0 | 0 | 0 | 0.800 | 0.000 |
| Bick (TKB) | 1998-1999 | 1.40 | 1 | 0 | 0 | 0 | 0 | 0 | 1.000 | 0.400 |

Appendix I:  Non-compensable Hours

| Name | Year | Total Hrs Requested | Settlement/ Mediation Deducted | Beyond the Scope of Phase 1.0 and Fees Previously Awarded Deducted | Clerical and Administrative Services Deducted | Media/Public Relations Deducted | Travel Time for Media/Public Relations (divided in half to reflect travel was billed at half rate) | Failure to Provide Time Sheets to Support Fees Requested | Total Hours Deducted | Total Compensable Hours Remaining |
|---|---|---|---|---|---|---|---|---|---|---|
| Brady (JCB) | 1998-1999 | 3.10 | 0.6 | 0 | 0 | 0 | 0 | 0 | 0.600 | 2.500 |
| Carssow (JTC) | 1998-1999 | 0.40 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 0.400 |
|  | 1999-2000 | 2.50 | 0.9 | 1.6 | 0 | 0 | 0 | 0 | 2.500 | 0.000 |
|  | 2000-2001 | 0.50 | 0.5 | 0 | 0 | 0 | 0 | 0 | 0.500 | 0.000 |
| Carithers (TC) | 2000-2001 | 33.70 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 33.700 |
| Clay (ASC) | 1998-1999 | 18.40 | 2.7 | 0 | 0 | 0 | 0 | 0 | 2.700 | 15.700 |
|  | 1999-2000 | 17.20 | 9.9 | 3.6 | 0 | 0 | 0 | 0 | 13.500 | 3.700 |
|  | 2001-2002 | 0.80 | 0.8 | 0 | 0 | 0 | 0 | 0 | 0.800 | 0.000 |
|  | 2004-2005 | 0.20 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 0.200 |
| Dennehy (RCD) | 1998-1999 | 52.50 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 52.500 |
|  | 1999-2000 | 133.90 | 1.8 | 45 | 0 | 0 | 0 | 0 | 46.800 | 87.100 |
| Dennehy (RCD) (cont'd.) | 2000-2001 | 3.50 | 3.5 | 0 | 0 | 0 | 0 | 0 | 3.500 | 0.000 |
| Dial (AD) | 1998-1999 | 17.70 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 17.700 |
|  | 1999-2000 | 5.80 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 5.800 |
| Hughes (JVH) | 1998-1999 | 3.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 3.000 |
| Marcovitch (RPM) | 1999-2000 | 8.00 | 0 | 5.8 | 0 | 0 | 0 | 0 | 5.800 | 2.200 |
|  | 2000-2001 | 70.80 | 0 | 43.7 | 0 | 0 | 0 | 0 | 43.700 | 27.100 |

Appendix I:  Non-compensable Hours

| Name | Year | Total Hrs Requested | Settlement/ Mediation Deducted | Beyond the Scope of Phase 1.0 and Fees Previously Awarded Deducted | Clerical and Administrative Services Deducted | Media/Public Relations Deducted | Travel Time for Media/Public Relations (divided in half to reflect travel was billed at half rate) | Failure to Provide Time Sheets to Support Fees Requested | Total Hours Deducted | Total Compensable Hours Remaining |
|---|---|---|---|---|---|---|---|---|---|---|
| Matthews (JFM) | 1999-2000 | 12.50 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 12.500 |
| Parker (WP) | 1999-2000 | 3.40 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 3.400 |
| | 2000-2001 | 0.30 | 0 | 0.3 | 0 | 0 | 0 | 0 | 0.300 | 0.000 |
| Raider (RLR) | 1998-1999 | 0.50 | 0.5 | 0 | 0 | 0 | 0 | 0 | 0.500 | 0.000 |
| | 1999-2000 | 3.20 | 0 | 3.2 | 0 | 0 | 0 | 0 | 3.200 | 0.000 |
| | 2004-2005 | 46.60 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 46.600 |
| Singleton (BLS) | 2000-2001 | 20.90 | 0 | 6 | 0 | 0 | 0 | 0 | 6.000 | 14.900 |
| Sternberg (JRS) | 1998-1999 | 5.20 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 5.200 |
| Stogner (KHS) | 1999-2000 | 6.30 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 6.300 |
| Vaughan (RCV) | 1999-2000 | 4.40 | 0.6 | 1.5 | 0 | 0 | 0 | 0 | 2.100 | 2.300 |
| Warner (JWX) | 1998-1999 | 33.30 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 33.300 |
| Wiggins (JMW) | 1999-2000 | 280.80 | 51.8 | 132 | 0 | 0 | 0 | 0 | 183.800 | 97.000 |
| | 2000-2001 | 224.00 | 7.5 | 164.6 | 0 | 0 | 0 | 0 | 172.100 | 51.900 |
| Yungwirth (MSY) | 2000-2001 | 6.80 | 0 | 3 | 0 | 0 | 0 | 0 | 3.000 | 3.800 |
| Zacks (DMZ) | 1998-1999 | 0.40 | 0.4 | 0 | 0 | 0 | 0 | 0 | 0.400 | 0.000 |
| | 1999-2000 | 32.50 | 16.4 | 10.6 | 0 | 0 | 0 | 0 | 27.000 | 5.500 |

Appendix I:  Non-compensable Hours

| Name | Year | Total Hrs Requested | Settlement/ Mediation Deducted | Beyond the Scope of Phase 1.0 and Fees Previously Awarded Deducted | Clerical and Administrative Services Deducted | Media/Public Relations Deducted | Travel Time for Media/Public Relations (divided in half to reflect travel was billed at half rate) | Failure to Provide Time Sheets to Support Fees Requested | Total Hours Deducted | Total Compensable Hours Remaining |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2000-2001 | 20.90 | 7.2 | 8.7 | 0 | 0 | 0 | 0 | 15.900 | 5.000 |
| | 2003-2004 | 0.60 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 0.600 |
| | 2004-2005 | 0.20 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 0.200 |
| **Levitas (Non-Atty)** | | | | | | | | 0 | 0.000 | |
| Fisher (RSF) | 1999-2000 | 0.80 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 0.800 |
| | 2000-2001 | 1.00 | 0.8 | 0 | 0 | 0 | 0 | 0 | 0.800 | 0.200 |
| Cavallini (DFC) | 1998-1999 | 0.60 | 0.6 | 0 | 0 | 0 | 0 | 0 | 0.600 | 0.000 |
| Bond (WWB) | 2000-2001 | 0.80 | 0.8 | 0 | 0 | 0 | 0 | 0 | 0.800 | 0.000 |
| Perez (SP) | 1998-1999 | 71.40 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 71.400 |
| Perez (SP) (cont'd.) | 1999-2000 | 156.70 | 7.9 | 25.3 | 0 | 0 | 0 | 0 | 33.200 | 123.500 |
| | 2000-2001 | 125.60 | 2.7 | 45.9 | 0 | 0 | 0 | 0 | 48.600 | 77.000 |
| Applegate (AEA) | 2004-2005 | 15.80 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 15.800 |
| **Levitas Unidentified)** | | | | | | | | 0 | 0.000 | |
| Boken (CRB) | 1999-2000 | 1.40 | 0 | 1.4 | 0 | 0 | 0 | 0 | 1.400 | 0.000 |
| | 2004-2005 | 78.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0.000 | 78.000 |

Appendix I:  Non-compensable Hours

| Name | Year | Total Hrs Requested | Settlement/ Mediation Deducted | Beyond the Scope of Phase 1.0 and Fees Previously Awarded Deducted | Clerical and Administrative Services Deducted | Media/Public Relations Deducted | Travel Time for Media/Public Relations (divided in half to reflect travel was billed at half rate) | Failure to Provide Time Sheets to Support Fees Requested | Total Hours Deducted | Total Compensable Hours Remaining |
|------|------|------|------|------|------|------|------|------|------|------|
| Cahoon (SAC) | 1999-2000 | 0.60 | 0 | 0.6 | 0 | 0 | 0 | 0 | 0.600 | 0.000 |
| | TOTAL | 30,957.876 | 1,459.082 | 6,139.551 | 29.250 | 131.100 | 13.550 | 116.600 | 7,889.133 | 23,068.743 |

Appendix II:  Twelve Tasks, Defendants' Exhibit 8

| Activity | Attorney | Hours Billed | Percent Reduced | Hours Reduced | Hours Remaining | Laffey Rate | Amount Reduced |
|---|---|---|---|---|---|---|---|
| Plaintiffs' Motion to Certify Class Action, 06/06/96 | Dauphinais | 33.55 | 50 | 16.775 | 16.775 | $325.00 | $5,451.88 |
| | Gingold | 75.8 | 50 | 37.9 | 37.9 | $325.00 | $12,317.50 |
| | Harper | 76 | 50 | 38 | 38 | $150.00 | $5,700.00 |
| | Holt | 63.5 | 50 | 31.75 | 31.75 | $325.00 | $10,318.75 |
| | Kawahara | 18.5 | 50 | 9.25 | 9.25 | $190.00 | $1,757.50 |
| | Peregoy | 18.4 | 50 | 9.2 | 9.2 | $280.00 | $2,576.00 |
| Plaintiffs' Motion for Interim Relief, 4/16/97 | Echohawk | 1.8 | 50 | 0.9 | 0.9 | $325.00 | $292.50 |
| | Gingold | 444.3 | 50 | 222.15 | 222.15 | $325.00 | $72,198.75 |
| | Harper | 16 | 50 | 8 | 8 | $150.00 | $1,200.00 |
| | Holt | 87.8 | 50 | 43.9 | 43.9 | $325.00 | $14,267.50 |
| | Kawahara | 20.1 | 50 | 10.05 | 10.05 | $190.00 | $1,909.50 |
| | Peregoy | 11.9 | 50 | 5.95 | 5.95 | $280.00 | $1,666.00 |
| Plaintiffs' Opposition to Defendants Motion for Protective Order and to Quash Subpoena Directed to Paul Homan, 06/13/97 | Gingold | 24.3 | 50 | 12.15 | 12.15 | $330.00 | $4,009.50 |
| | Harper | 17.15 | 50 | 8.575 | 8.575 | $155.00 | $1,329.13 |
| | Holt | 20.3 | 50 | 10.15 | 10.15 | $330.00 | $3,349.50 |
| | Kawahara | 3.3 | 50 | 1.65 | 1.65 | $195.00 | $321.75 |
| Reply Memorandum | Gingold | 120 | 50 | 60 | 60 | $330.00 | $19,800.00 |

Appendix II:  Twelve Tasks, Defendants' Exhibit 8

| Activity | Attorney | Hours Billed | Percent Reduced | Hours Reduced | Hours Remaining | Laffey Rate | Amount Reduced |
|---|---|---|---|---|---|---|---|
| in Support of Plaintiffs' Motion for Interim Relief, 07/21/97 | | | | | | | |
| | Harper | 96.9 | 50 | 48.45 | 48.45 | $155.00 | $7,509.75 |
| | Holt | 36.8 | 50 | 18.4 | 18.4 | $330.00 | $6,072.00 |
| | Kawahara | 9.8 | 50 | 4.9 | 4.9 | $195.00 | $955.50 |
| Plaintiffs' Request for Trial Date to Begin on August 3, 1998, 10/28/97 | Gingold | 16.5 | 95 | 15.675 | 0.825 | $330.00 | $5,172.75 |
| | Harper | 4.1 | 95 | 3.895 | 0.205 | $155.00 | $603.73 |
| | Holt | 4.2 | 95 | 3.99 | 0.21 | $330.00 | $1,316.70 |
| Plaintiffs' Reply to Defendants' Opposition to Setting a Trial Date, 11/13/97 | Gingold | 59.6 | 50 | 29.8 | 29.8 | $330.00 | $9,834.00 |
| | Harper | 40.83 | 50 | 20.415 | 20.415 | $155.00 | $3,164.33 |
| | Holt | 3.4 | 50 | 1.7 | 1.7 | $330.00 | $561.00 |
| | NARF Clerks | 18.5 | 50 | 9.25 | 9.25 | $85.00 | $786.25 |
| Plaintiffs' Memorandum in Opposition to Defendants' Motions for Protective Order and Expedited Hearing Regarding | Babby | 13.9 | 50 | 6.95 | 6.95 | $195.00 | $1,355.25 |

Appendix II:  Twelve Tasks, Defendants' Exhibit 8

| Activity | Attorney | Hours Billed | Percent Reduced | Hours Reduced | Hours Remaining | Laffey Rate | Amount Reduced |
|---|---|---|---|---|---|---|---|
| Deposition of Joe Christie and Donna Erwin, 04/02/98 | | | | | | | |
| | Gingold | 15.8 | 50 | 7.9 | 7.9 | $330.00 | $2,607.00 |
| | Harper | 8.9 | 50 | 4.45 | 4.45 | $195.00 | $867.75 |
| | Holt | 9.3 | 50 | 4.65 | 4.65 | $330.00 | $1,534.50 |
| | Peregoy | 20.05 | 50 | 10.025 | 10.025 | $285.00 | $2,857.13 |
| Plaintiffs' Memorandum in Support of Their Proposed First Case Management Order, 04/22/98 | Babby | 5.3 | 50 | 2.65 | 2.65 | $195.00 | $516.75 |
| | Gingold | 21.8 | 50 | 10.9 | 10.9 | $330.00 | $3,597.00 |
| | Holt | 24.8 | 50 | 12.4 | 12.4 | $330.00 | $4,092.00 |
| Plaintiffs' Response to Defendants' Memorandum in Support of Defendants' Motion for Protective Order Regarding Third Formal Request for Production, 07/13/98 | Babby | 24.7 | 50 | 12.35 | 12.35 | $195.00 | $2,408.25 |
| | Gingold | 64.46 | 50 | 32.23 | 32.23 | $335.00 | $10,797.05 |
| | Harper | 6.9 | 50 | 3.45 | 3.45 | $195.00 | $672.75 |
| | Holt | 32 | 50 | 16 | 16 | $335.00 | $5,360.00 |
| | Peregoy | 8 | 50 | 4 | 4 | $290.00 | $1,160.00 |

Appendix II:  Twelve Tasks, Defendants' Exhibit 8

| Activity | Attorney | Hours Billed | Percent Reduced | Hours Reduced | Hours Remaining | Laffey Rate | Amount Reduced |
|---|---|---|---|---|---|---|---|
| Plaintiffs' Proposed Findings of Fact and Conclusions of Law, 09/04/99 | Babby | 131.7 | 50 | 65.85 | 65.85 | $245.00 | $16,133.25 |
| | Gingold | 195.1 | 50 | 97.55 | 97.55 | $340.00 | $33,167.00 |
| | Harper | 105.1 | 50 | 52.55 | 52.55 | $200.00 | $10,510.00 |
| | Holt | 37.3 | 50 | 18.65 | 18.65 | $340.00 | $6,341.00 |
| | Levitas | 48.8 | 50 | 24.4 | 24.4 | $340.00 | $8,296.00 |
| | PwC | | | | | | See Chart IV |
| | NARF Clerks | 4 | 50 | 2 | 2 | $90.00 | $180.00 |
| Plaintiffs' Opposition to Defendants' Motion for Leave to File Reply to Plaintiffs' Answers to "Corrected" Petition for Petition for Permission to Appeal, 01/24/00 | Babby | 18.4 | 50 | 9.2 | 9.2 | $245.00 | $2,254.00 |
| | Echohawk | 2.8 | 50 | 1.4 | 1.4 | $340.00 | $476.00 |
| | Gingold | 16.9 | 50 | 8.45 | 8.45 | $340.00 | $2,873.00 |
| | Harper | 7.3 | 50 | 3.65 | 3.65 | $200.00 | $730.00 |
| | Holt | 1.9 | 50 | 0.95 | 0.95 | $340.00 | $323.00 |
| | Levitas | 13.4 | 50 | 6.7 | 6.7 | $340.00 | $2,278.00 |
| Appellees' Response | Babby | 211.6 | 50 | 105.8 | 105.8 | $250.00 | $26,450.00 |

Appendix II:  Twelve Tasks, Defendants' Exhibit 8

| Activity | Attorney | Hours Billed | Percent Reduced | Hours Reduced | Hours Remaining | Laffey Rate | Amount Reduced |
|---|---|---|---|---|---|---|---|
| Brief, 06/23/00 | | | | | | | |
| | Brown | 60.87 | 50 | 30.435 | 30.435 | $350.00 | $10,652.25 |
| | Echohawk | 1.7 | 50 | 0.85 | 0.85 | $360.00 | $306.00 |
| | Gingold | 15.2 | 50 | 7.6 | 7.6 | $360.00 | $2,736.00 |
| | Harper | 212 | 50 | 106 | 106 | $205.00 | $21,730.00 |
| | Holt | 205.1 | 50 | 102.55 | 102.55 | $360.00 | $36,918.00 |
| | Levitas | 146 | 50 | 73 | 73 | $360.00 | $26,280.00 |
| | TOTAL | 3034.41 | | 1528.365 | 1506.045 | | $440,900.68 |

Appendix III:  Excessive Time Spent on Fee Petition

| Activity | Attorney | Hours Requested | Percent Reduced | Hours Reduced | Hours Remaining | Laffey Rate | Amount Reduced |
|---|---|---|---|---|---|---|---|
| Gingold's Preparation of Fee Petition and Supporting Affidavits, 08/16/04 and 09/28/04 (June 2003 - May 2004) | Gingold | 25.60 | 50 | 12.8 | 12.8 | $380.00 | $4,864.00 |
| Gingold's Preparation of Fee Petition and Supporting Affidavits, 08/16/04 and 09/28/04, for "review[ing], segregate[ing], prepar[ing] relevant time re Trial 1 EAJA petition fee application" (June 2004 - May 2005) | Gingold | 455.90 | 75 | 341.925 | 113.975 | $390.00 | $133,350.75 |
| Gingold's Preparation of Fee Petition and Supporting Affidavits, 08/16/04 and 09/28/04 (June 2004 - May 2005) | Gingold | 183.60 | 50 | 91.8 | 91.8 | $390.00 | $35,802.00 |
| Harper's Preparation of Fee Petition and Supporting Affidavits, 8/16/04 and 9/28/04 | Harper | 263.20 | 50 | 131.6 | 131.6 | $335.00 | $44,086.00 |
| Holt's Preparation of Fee Petition and Supporting Affidavits, 8/16/04 and 9/28/04 | Holt | 17.50 | 50 | 8.75 | 8.75 | $390.00 | $3,412.50 |
| Brown's Preparation of Fee Petition and Supporting Affidavits, 8/16/04 and 9/28/04 | Brown | 219.14 | 50 | 109.5695 | 109.5695 | $390.00 | $42,732.11 |
| Rempel's Preparation of Fee Petition and Supporting Affidavits, 8/16/04 and 9/28/04 (June 2003 - May 2004; June 2004 - May 2005) | Rempel | 267.10 | 50 | 133.55 | 133.55 | $250.00 | $33,387.50 |
| Levitas' Preparation of Fee Petition and Supporting Affidavits, 8/16/04 and 9/28/04 (June 2003 - May 2004) | Levitas | 2.30 | 50 | 1.15 | 1.15 | $380.00 | $437.00 |
| Levitas' Preparation of Fee Petition and Supporting Affidavits, 8/16/04 and 9/28/04 (June 2004 - May 2005) | Levitas | 16.60 | 50 | 8.3 | 8.3 | $390.00 | $3,237.00 |
| Zacks' Preparation of Fee Petition and Supporting Affidavits, 8/16/04 and 9/28/04 (June 2003 - May 2004) | Zacks | 0.60 | 50 | 0.3 | 0.3 | $380.00 | $114.00 |
| Zacks' Preparation of Fee Petition and Supporting Affidavits, 8/16/04 and 9/28/04 (June 2004 - May 2005) | Zacks | 0.20 | 50 | 0.1 | 0.1 | $390.00 | $39.00 |
| Applegate's Preparation of Fee Petition and Supporting Affidavits, 8/16/04 and 9/28/04 | Applegate | 15.80 | 50 | 7.9 | 7.9 | $110.00 | $869.00 |

Appendix III:  Excessive Time Spent on Fee Petition

| Activity | Attorney | Hours Requested | Percent Reduced | Hours Reduced | Hours Remaining | Laffey Rate | Amount Reduced |
|---|---|---|---|---|---|---|---|
| (June 2004 - May 2005) | | | | | | | |
| Boken's Preparation of Fee Petition and Supporting Affidavits, 8/16/04 and 9/28/04 (June 2004 - May 2005) | Boken | 78.00 | 50 | 39 | 39 | $110.00 | $4,290.00 |
| Clay's Preparation of Fee Petition and Supporting Affidavits, 8/16/04 and 9/28/04 (June 2004 - May 2005) | Clay | 0.20 | 50 | 0.1 | 0.1 | $390.00 | $39.00 |
| Raider's Preparation of Fee Petition and Supporting Affidavits, 8/16/04 and 9/28/04 (June 2004 - May 2005) | Raider | 46.60 | 50 | 23.3 | 23.3 | $345.00 | $8,038.50 |
| | TOTAL | 1,592.34 | | 910.14 | 682.19 | | $309,834.36 |

Appendix IV:  Compensable Expenses

**PricewaterhouseCoopers**

| | Total Requested | Expenses Deducted | Clerical and Administrative Services Deducted | Settlement/ Mediation Deducted | Beyond the Scope of Phase 1.0 Deducted | Total Compensable Time Remaining | 35% Reduction for Excessive, Unnecessary, or Redundant Time and Lack of Adequate Description | Total Compensation |
|---|---|---|---|---|---|---|---|---|
| TOTAL | $4,528,684.00 | $240,894.00 | $219,945.00 | $23,000.00 | $149,709.00 | $3,895,136.00 | $1,363,297.60 | $2,531,838.40 |

**Holt**

| | Expenses Requested | Expenses Deducted | Total Expenses Compensated |
|---|---|---|---|
| TOTAL | $3,626.59 | $3,269.91 | $356.68 |

| TOTAL COMPENSABLE EXPENSES | $2,532,195.08 |
|---|---|

Appendix V:  Total Compensable Time

| Name | Year | Total Hours Requested | Total Compensable Hours Remaining | Reduction for Excessive, Unnecessary, or Redundant Time (Appendices II and III) | Total Hours Remaining | 20% Reduction for Inadequate Documentation and Block Billing | Total Hours Remaining | Hourly Rate | Total Compensable Per Year | Total Compensable per Individual |
|---|---|---|---|---|---|---|---|---|---|---|
| Babby | 1997-1998 | 293.80 | 293.80 | 9.6000 | 284.2000 | 56.84 | 227.36 | $195.00 | $44,335.20 | |
| | 1998-1999 | 1,187.15 | 1,175.05 | 12.3500 | 1162.6970 | 232.5394 | 930.16 | $195.00 | $181,380.73 | |
| | 1999-2000 | 1,518.40 | 1,156.35 | 75.0500 | 1081.3000 | 216.26 | 865.04 | $245.00 | $211,934.80 | |
| | 2000-2001 | 586.80 | 156.60 | 105.8000 | 50.8000 | 10.16 | 40.64 | $250.00 | $10,160.00 | $447,810.73 |
| Bear | 1999-2000 | 94.40 | 94.40 | 0.0000 | 94.4000 | 18.88 | 75.52 | $105.00 | $7,929.60 | $7,929.60 |
| Brown | 1999-2000 | 44.41 | 18.16 | 0.0000 | 18.1630 | 3.6326 | 14.53 | $340.00 | $4,940.34 | |
| | 2000-2001 | 436.31 | 120.36 | 30.4350 | 89.9210 | 17.9842 | 71.94 | $350.00 | $25,177.88 | |
| | 2001-2002 | 402.49 | 54.32 | 0.0000 | 54.3190 | 10.8638 | 43.46 | $360.00 | $15,643.87 | |
| | 2002-2003 | 0.00 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $370.00 | $0.00 | |
| | 2003-2004 | 139.27 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $380.00 | $0.00 | |
| | 2004-2005 | 219.14 | 219.14 | 109.5695 | 109.5695 | 21.9139 | 87.66 | $390.00 | $34,185.68 | $79,947.77 |
| Dauphinais | 1995-1996 | 145.70 | 145.70 | 0.0000 | 145.7000 | 29.14 | 116.56 | $315.00 | $36,716.40 | |
| | 1996-1997 | 219.85 | 217.10 | 16.7750 | 200.3250 | 40.065 | 160.26 | $325.00 | $52,084.50 | $88,800.90 |
| Echohawk | 1996-1997 | 32.00 | 32.00 | 0.9000 | 31.1000 | 6.22 | 24.88 | $325.00 | $8,086.00 | |
| | 1997-1998 | 12.20 | 8.30 | 0.0000 | 8.3000 | 1.66 | 6.64 | $330.00 | $2,191.20 | |
| | 1998-1999 | 15.40 | 15.40 | 0.0000 | 15.4000 | 3.08 | 12.32 | $335.00 | $4,127.20 | |
| | 1999-2000 | 60.70 | 60.70 | 1.4000 | 59.3000 | 11.86 | 47.44 | $340.00 | $16,129.60 | |
| | 2000-2001 | 1.20 | 1.20 | 0.8500 | 0.3500 | 0.07 | 0.28 | $350.00 | $98.00 | $30,632.00 |
| Gingold | 1995-1996 | 122.70 | 122.70 | 0.0000 | 122.7000 | 24.54 | 98.16 | $315.00 | $30,920.40 | |
| | 1996-1997 | 1,682.20 | 1,672.70 | 260.0500 | 1412.6500 | 282.53 | 1130.12 | $325.00 | $367,289.00 | |
| | 1997-1998 | 1,484.20 | 1,483.70 | 136.4250 | 1347.2750 | 269.455 | 1077.82 | $330.00 | $355,680.60 | |
| | 1998-1999 | 1,999.10 | 1,999.10 | 32.2300 | 1966.8700 | 393.374 | 1573.50 | $335.00 | $527,121.16 | |
| | 1999-2000 | 2,461.40 | 1,574.50 | 106.0000 | 1468.5000 | 293.7 | 1174.80 | $340.00 | $399,432.00 | |
| | 2000-2001 | 1,677.70 | 930.80 | 7.6000 | 923.2000 | 184.64 | 738.56 | $350.00 | $258,496.00 | |
| | 2001-2002 | 0.00 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $360.00 | $0.00 | |
| | 2002-2003 | 0.00 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $370.00 | $0.00 | |
| Gingold | 2003-2004 | 25.60 | 25.60 | 12.8000 | 12.8000 | 2.56 | 10.24 | $380.00 | $3,891.20 | |

Appendix V:  Total Compensable Time

| Name | Year | Total Hours Requested | Total Compensable Hours Remaining | Reduction for Excessive, Unnecessary, or Redundant Time (Appendices II and III) | Total Hours Remaining | 20% Reduction for Inadequate Documentation and Block Billing | Total Hours Remaining | Hourly Rate | Total Compensable Per Year | Total Compensable per Individual |
|---|---|---|---|---|---|---|---|---|---|---|
| (cont'd.) | | | | | | | | | | |
| | 2004-2005 | 639.50 | 639.50 | 433.7250 | 205.7750 | 41.155 | 164.62 | $390.00 | $64,201.80 | **$2,007,032.16** |
| Guest | 2004-2005 | 75.60 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $270.00 | $0.00 | **$0.00** |
| Harper | 01/96-12/96 | 400.10 | 398.40 | 38.0000 | 360.4000 | 72.08 | 288.32 | $150.00 | $43,248.00 | |
| | 01/97-05/97 | 182.79 | 175.37 | 8.0000 | 167.3700 | 33.474 | 133.90 | $155.00 | $20,753.88 | |
| | 1997-1998 | 735.43 | 719.33 | 85.7850 | 633.5450 | 126.709 | 506.84 | $195.00 | $98,833.02 | |
| | 1998-1999 | 1,280.28 | 1,274.48 | 3.4500 | 1271.0300 | 254.206 | 1016.82 | $195.00 | $198,280.68 | |
| | 1999-2000 | 1,637.70 | 993.07 | 56.2000 | 936.8700 | 187.374 | 749.50 | $200.00 | $149,899.20 | |
| | 06/00-12/00 | 637.65 | 148.00 | 106.0000 | 42.0000 | 8.4 | 33.60 | $205.00 | $6,888.00 | |
| | 01/01-05/01 | 79.40 | 70.50 | 0.0000 | 70.5000 | 14.1 | 56.40 | $205.00 | $11,562.00 | |
| | 01/04-05/04 | 0.00 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $270.00 | $0.00 | |
| | 06/04-12/04 | 263.20 | 263.20 | 131.6000 | 131.6000 | 26.32 | 105.28 | $345.00 | $36,321.60 | **$565,786.38** |
| Holt | 1995-1996 | 42.00 | 42.00 | 0.0000 | 42.0000 | 8.4 | 33.60 | $315.00 | $10,584.00 | |
| | 1996-1997 | 393.25 | 387.35 | 75.6500 | 311.7000 | 62.34 | 249.36 | $325.00 | $81,042.00 | |
| | 1997-1998 | 446.59 | 441.19 | 51.2900 | 389.9000 | 77.98 | 311.92 | $330.00 | $102,933.60 | |
| | 1998-1999 | 581.40 | 523.80 | 16.0000 | 507.8000 | 101.56 | 406.24 | $335.00 | $136,090.40 | |
| | 1999-2000 | 671.30 | 562.30 | 19.6000 | 542.7000 | 108.54 | 434.16 | $340.00 | $147,614.40 | |
| | 2000-2001 | 168.05 | 137.15 | 102.5500 | 34.6000 | 6.92 | 27.68 | $350.00 | $9,688.00 | |
| | 2001-2002 | 56.90 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $360.00 | $0.00 | |
| | 2002-2003 | 0.00 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $370.00 | $0.00 | |
| | 2003-2004 | 0.50 | 0.50 | 0.0000 | 0.5000 | 0.1 | 0.40 | $380.00 | $152.00 | |
| | 2004-2005 | 17.00 | 17.00 | 8.7500 | 8.2500 | 1.65 | 6.60 | $390.00 | $2,574.00 | **$490,678.40** |
| Kawahara | 1995-1996 | 27.10 | 27.10 | 0.0000 | 27.1000 | 5.42 | 21.68 | $190.00 | $4,119.20 | |
| | 1996-1997 | 152.14 | 139.34 | 19.3000 | 120.0400 | 24.008 | 96.03 | $195.00 | $18,726.24 | |
| Kawahara (cont'd.) | 1997-1998 | 34.30 | 34.30 | 6.5500 | 27.7500 | 5.55 | 22.20 | $195.00 | $4,329.00 | **$27,174.44** |

Appendix V:  Total Compensable Time

| Name | Year | Total Hours Requested | Total Compensable Hours Remaining | Reduction for Excessive, Unnecessary, or Redundant Time (Appendices II and III) | Total Hours Remaining | 20% Reduction for Inadequate Documentation and Block Billing | Total Hours Remaining | Hourly Rate | Total Compensable Per Year | **Total Compensable per Individual** |
|---|---|---|---|---|---|---|---|---|---|---|
| Kelly | 2004-2005 | 41.00 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $105.00 | $0.00 | **$0.00** |
| NARF Clerks | 1997-1998 | 309.25 | 309.25 | 9.2500 | 300.0000 | 60 | 240.00 | $85.00 | $20,400.00 | |
| | 1998-1999 | 171.75 | 171.75 | 0.0000 | 171.7500 | 34.35 | 137.40 | $85.00 | $11,679.00 | |
| | 1999-2000 | 333.50 | 332.10 | 2.0000 | 330.1000 | 66.02 | 264.08 | $90.00 | $23,767.20 | |
| | 2000-2001 | 205.45 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $90.00 | $0.00 | |
| | 2001-2002 | 132.50 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $95.00 | $0.00 | **$55,846.20** |
| Peregoy | 1995-1996 | 15.40 | 3.40 | 0.0000 | 3.4000 | 0.68 | 2.72 | $275.00 | $748.00 | |
| | 1996-1997 | 440.75 | 412.85 | 15.1500 | 397.7000 | 79.54 | 318.16 | $280.00 | $89,084.80 | |
| | 1997-1998 | 298.15 | 289.55 | 10.0250 | 279.5250 | 55.905 | 223.62 | $285.00 | $63,731.70 | |
| | 1998-1999 | 586.33 | 575.97 | 4.0000 | 571.9685 | 114.3937 | 457.57 | $290.00 | $132,696.69 | **$286,261.19** |
| Rempel | 1999-2000 | 193.80 | 35.82 | 0.0000 | 35.8200 | 7.164 | 28.66 | $225.00 | $6,447.60 | |
| | 2000-2001 | 969.30 | 53.40 | 0.0000 | 53.4000 | 10.68 | 42.72 | $225.00 | $9,612.00 | |
| | 2001-2002 | 0.00 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $225.00 | $0.00 | |
| | 2002-2003 | 0.00 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $225.00 | $0.00 | |
| | 2003-2004 | 1.00 | 1.00 | 0.0000 | 1.0000 | 0.2 | 0.80 | $225.00 | $180.00 | |
| | 2004-2005 | 267.10 | 267.10 | 133.5500 | 133.5500 | 26.71 | 106.84 | $225.00 | $24,039.00 | **$40,278.60** |
| Levitas | 1998-1999 | 296.90 | 253.60 | 0.0000 | 253.6000 | 50.72 | 202.88 | $335.00 | $67,964.80 | |
| | 1999-2000 | 1,255.70 | 635.90 | 31.1000 | 604.8000 | 120.96 | 483.84 | $340.00 | $164,505.60 | |
| | 2000-2001 | 504.90 | 228.90 | 73.0000 | 155.9000 | 31.18 | 124.72 | $350.00 | $43,652.00 | |
| | 2001-2002 | 0.00 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $360.00 | $0.00 | |
| | 2002-2003 | 0.00 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $370.00 | $0.00 | |
| | 2003-2004 | 2.30 | 2.30 | 1.1500 | 1.1500 | 0.23 | 0.92 | $380.00 | $349.60 | |
| | 2004-2005 | 16.60 | 16.60 | 8.3000 | 8.3000 | 1.66 | 6.64 | $390.00 | $2,589.60 | **$279,061.60** |
| Alexander (MJA) | 1998-1999 | 1.10 | 0.50 | 0.0000 | 0.5000 | 0.1 | 0.40 | $335.00 | $134.00 | |
| Alexander (MJA) (cont'd.) | 1999-2000 | 0.00 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $340.00 | $0.00 | |

Appendix V:  Total Compensable Time

| Name | Year | Total Hours Requested | Total Compensable Hours Remaining | Reduction for Excessive, Unnecessary, or Redundant Time (Appendices II and III) | Total Hours Remaining | 20% Reduction for Inadequate Documentation and Block Billing | Total Hours Remaining | Hourly Rate | Total Compensable Per Year | Total Compensable per Individual |
|---|---|---|---|---|---|---|---|---|---|---|
|  | 2000-2001 | 1.10 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $350.00 | $0.00 | **$134.00** |
| Barger (DGB) | 1999-2000 | 0.80 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $295.00 | $0.00 | **$0.00** |
| Bick (TKB) | 1998-1999 | 1.40 | 0.40 | 0.0000 | 0.4000 | 0.08 | 0.32 | $335.00 | $107.20 | **$107.20** |
| Brady (JCB) | 1998-1999 | 3.10 | 2.50 | 0.0000 | 2.5000 | 0.5 | 2.00 | $85.00 | $170.00 | **$170.00** |
| Carssow (JTC) | 1998-1999 | 0.40 | 0.40 | 0.0000 | 0.4000 | 0.08 | 0.32 | $335.00 | $107.20 |  |
|  | 1999-2000 | 2.50 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $340.00 | $0.00 |  |
|  | 2000-2001 | 0.50 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $350.00 | $0.00 | **$107.20** |
| Carithers (TC) | 2000-2001 | 33.70 | 33.70 | 0.0000 | 33.7000 | 6.74 | 26.96 | $160.00 | $4,313.60 | **$4,313.60** |
| Clay (ASC) | 1998-1999 | 18.40 | 15.70 | 0.0000 | 15.7000 | 3.14 | 12.56 | $335.00 | $4,207.60 |  |
|  | 1999-2000 | 17.20 | 3.70 | 0.0000 | 3.7000 | 0.74 | 2.96 | $340.00 | $1,006.40 |  |
|  | 2001-2002 | 0.80 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $350.00 | $0.00 |  |
|  | 2004-2005 | 0.20 | 0.20 | 0.1000 | 0.1000 | 0.02 | 0.08 | $390.00 | $31.20 | **$5,245.20** |
| Dennehy (RCD) | 1998-1999 | 52.50 | 52.50 | 0.0000 | 52.5000 | 10.5 | 42.00 | $335.00 | $14,070.00 |  |
|  | 1999-2000 | 133.90 | 87.10 | 0.0000 | 87.1000 | 17.42 | 69.68 | $340.00 | $23,691.20 |  |
|  | 2000-2001 | 3.50 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $350.00 | $0.00 | **$37,761.20** |
| Dial (AD) | 1998-1999 | 17.70 | 17.70 | 0.0000 | 17.7000 | 3.54 | 14.16 | $155.00 | $2,194.80 |  |
|  | 1999-2000 | 5.80 | 5.80 | 0.0000 | 5.8000 | 1.16 | 4.64 | $160.00 | $742.40 | **$2,937.20** |
| Hughes (JVH) | 1998-1999 | 3.00 | 3.00 | 0.0000 | 3.0000 | 0.6 | 2.40 | $335.00 | $804.00 | **$804.00** |
| Marcovitch (RPM) | 1999-2000 | 8.00 | 2.20 | 0.0000 | 2.2000 | 0.44 | 1.76 | $395.00 | $695.20 |  |
|  | 2000-2001 | 70.80 | 27.10 | 0.0000 | 27.1000 | 5.42 | 21.68 | $305.00 | $6,612.40 | **$7,307.60** |
| Matthews (JFM) | 1999-2000 | 12.50 | 12.50 | 0.0000 | 12.5000 | 2.5 | 10.00 | $90.00 | $900.00 | **$900.00** |
| Parker (WP) | 1999-2000 | 3.40 | 3.40 | 0.0000 | 3.4000 | 0.68 | 2.72 | $340.00 | $924.80 |  |
|  | 2000-2001 | 0.30 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $350.00 | $0.00 | **$924.80** |
| Raider (RLR) | 1998-1999 | 0.50 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $290.00 | $0.00 |  |
| Raider (RLR) (cont'd.) | 1999-2000 | 3.20 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $295.00 | $0.00 |  |

Appendix V:  Total Compensable Time

| Name | Year | Total Hours Requested | Total Compensable Hours Remaining | Reduction for Excessive, Unnecessary, or Redundant Time (Appendices II and III) | Total Hours Remaining | 20% Reduction for Inadequate Documentation and Block Billing | Total Hours Remaining | Hourly Rate | Total Compensable Per Year | Total Compensable per Individual |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2004-2005 | 46.60 | 46.60 | 23.3000 | 23.3000 | 4.66 | 18.64 | $345.00 | $6,430.80 | **$6,430.80** |
| Singleton (BLS) | 2000-2001 | 20.90 | 14.90 | 0.0000 | 14.9000 | 2.98 | 11.92 | $205.00 | $2,443.60 | **$2,443.60** |
| Sternberg (JRS) | 1998-1999 | 5.20 | 5.20 | 0.0000 | 5.2000 | 1.04 | 4.16 | $155.00 | $644.80 | **$644.80** |
| Stogner (KHS) | 1999-2000 | 6.30 | 6.30 | 0.0000 | 6.3000 | 1.26 | 5.04 | $200.00 | $1,008.00 | **$1,008.00** |
| Vaughan (RCV) | 1999-2000 | 4.40 | 2.30 | 0.0000 | 2.3000 | 0.46 | 1.84 | $340.00 | $625.60 | **$625.60** |
| Warner (JWX) | 1998-1999 | 33.30 | 33.30 | 0.0000 | 33.3000 | 6.66 | 26.64 | $155.00 | $4,129.20 | **$4,129.20** |
| Wiggins (JMW) | 1999-2000 | 280.80 | 97.00 | 0.0000 | 97.0000 | 19.4 | 77.60 | $200.00 | $15,520.00 | |
| | 2000-2001 | 224.00 | 51.90 | 0.0000 | 51.9000 | 10.38 | 41.52 | $205.00 | $8,511.60 | **$24,031.60** |
| Yungwirth (MSY) | 2000-2001 | 6.80 | 3.80 | 0.0000 | 3.8000 | 0.76 | 3.04 | $165.00 | $501.60 | **$501.60** |
| Zacks (DMZ) | 1998-1999 | 0.40 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $335.00 | $0.00 | |
| | 1999-2000 | 32.50 | 5.50 | 0.0000 | 5.5000 | 1.1 | 4.40 | $340.00 | $1,496.00 | |
| | 2000-2001 | 20.90 | 5.00 | 0.0000 | 5.0000 | 1 | 4.00 | $350.00 | $1,400.00 | |
| | 2003-2004 | 0.60 | 0.60 | 0.3000 | 0.3000 | 0.06 | 0.24 | $380.00 | $91.20 | |
| | 2004-2005 | 0.20 | 0.20 | 0.1000 | 0.1000 | 0.02 | 0.08 | $390.00 | $31.20 | **$3,018.40** |
| **Levitas (Non-Atty)** | | | | | 0.0000 | 0 | 0.00 | | $0.00 | |
| Fisher (RSF) | 1999-2000 | 0.80 | 0.80 | 0.0000 | 0.8000 | 0.16 | 0.64 | $90.00 | $57.60 | |
| | 2000-2001 | 1.00 | 0.20 | 0.0000 | 0.2000 | 0.04 | 0.16 | $90.00 | $14.40 | **$72.00** |
| Cavallini (DFC) | 1998-1999 | 0.60 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $85.00 | $0.00 | **$0.00** |
| Bond (WWB) | 2000-2001 | 0.80 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $90.00 | $0.00 | **$0.00** |
| Perez (SP) | 1998-1999 | 71.40 | 71.40 | 0.0000 | 71.4000 | 14.28 | 57.12 | $85.00 | $4,855.20 | |
| | 1999-2000 | 156.70 | 123.50 | 0.0000 | 123.5000 | 24.7 | 98.80 | $90.00 | $8,892.00 | |
| | 2000-2001 | 125.60 | 77.00 | 0.0000 | 77.0000 | 15.4 | 61.60 | $90.00 | $5,544.00 | **$19,291.20** |
| Applegate (AEA) | 2004-2005 | 15.80 | 15.80 | 7.9000 | 7.9000 | 1.58 | 6.32 | $110.00 | $695.20 | **$695.20** |
| **Levitas (Unidentified)** | | | | | 0.0000 | 0 | 0.00 | | | |

Appendix V:  Total Compensable Time

| Name | Year | Total Hours Requested | Total Compensable Hours Remaining | Reduction for Excessive, Unnecessary, or Redundant Time (Appendices II and III) | Total Hours Remaining | 20% Reduction for Inadequate Documentation and Block Billing | Total Hours Remaining | Hourly Rate | Total Compensable Per Year | **Total Compensable per Individual** |
|---|---|---|---|---|---|---|---|---|---|---|
| Boken (CRB) | 1999-2000 | 1.40 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $90.00 | $0.00 | |
| | 2004-2005 | 78.00 | 78.00 | 39.0000 | 39.0000 | 7.8 | 31.20 | $110.00 | $3,432.00 | **$3,432.00** |
| Cahoon (SAC) | 1999-2000 | 0.60 | 0.00 | 0.0000 | 0.0000 | 0 | 0.00 | $90.00 | $0.00 | **$0.00** |
| | | 30957.876 | 23,068.743 | 2,438.510 | 20,630.233 | 4,126.047 | 16,504.186 | | $4,534,275.97 | $4,534,275.97 |