**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ELOUISE PEPION COBELL, *et al.*,    :
                                    :
        Plaintiffs,                 :
                                    :
    v.                              :  Civil Action No. 96-1285 (JR)
                                    :
DIRK KEMPTHORNE, Secretary of       :
the Interior, *et al.*,             :
                                    :
        Defendants.                 :

<u>MEMORANDUM</u>

In January 2008, I found that the government had not
succeeded in providing the accounting mandated by the Indian
Trust Fund Management Reform Act, and that the record
demonstrated the impossibility of rendering such an accounting.
<u>Cobell v. Kempthorne</u>, 532 F. Supp. 2d 37 (D.D.C. 2008) (<u>Cobell
XX</u>).  On the basis of that ruling, plaintiffs ask for equitable
relief in the nature of restitution, seeking the return of funds
that have been received into the IIM trust in the years since
1887 but cannot now be proven to have been disbursed or credited
to IIM account holders, plus an amount representing the benefit
the government has assertedly enjoyed from having the use of
those funds. <u>See</u> [Dkt. 3515].  An evidentiary proceeding was
convened on June 9, 2008, for the purpose of considering whether
such relief was warranted, and, if so, determining its dollar
amount.

Plaintiffs' claims for withheld funds and for an amount
representing "benefit to the government" raise significant

jurisdictional and other legal issues.  Those issues were briefed
by the parties before the June trial, see Plaintiffs' Memorandum
in Support of Equitable Restitution and Disgorgement, [Dkt.
3515]; Defendants' Response to Plaintiffs' Memorandum in Support
of Equitable Restitution and Disgorgement, [Dkt. 3519], but I
deferred ruling on them in the belief that they would be
illuminated by evidence adduced at the trial.  [Dkt. 3526].  At
the trial, the government sought to explain the difference
between IIM trust receipts and IIM trust postings noted in my
January 2008 opinion, see 532 F. Supp. 2d at 85-86, and both
sides presented models for estimating the amount of money
withheld from, or not disbursed to, IIM account holders over the
years.  Evaluation of those models, and of the plaintiffs' legal
theories for recovery, is the principal focus of this memorandum.

Although the case no longer directly concerns the
accounting question that dominated the first twelve years of its
existence, the evaluation of the plaintiffs' legal theories for
recovery is necessarily influenced by what we have learned from
the government's failed effort to produce an accounting and from
the many round trips the case has taken to the Court of Appeals.
It is clear now that this Court has broad equitable authority to
deal with a century or more of trustee nonfeasance and to fashion
appropriate remedies, see Cobell v. Norton, 240 F.3d 1081, 1108-
10 (D.C. Cir. 2001) (Cobell VI), but it is also clear that that

authority is constrained by traditional doctrinal limits on
federal courts that apply in suits against the government,
including sovereign immunity and separation of powers.  See
Cobell v. Norton, 392 F.3d 461, 473 (D.C. Cir. 2004) (Cobell
XIII).  It is clear that the duties of the trustee and the
principles of equity that govern failures to account are derived
from statutes as informed by common law principles of trust, see
Cobell VI, 240 F.3d at 1098-1102, but it is also clear that those
statutory and common law principles are tempered by the unique
nature of the trust and of the trustee.  See Cobell v. Norton,
428 F.3d 1070, 1075-76 (D.C. Cir. 2005) (Cobell XVII).
Accordingly, methods that might be unacceptable in a typical
trust case, such as statistical sampling, are available here,
where I am instructed to strike a more forgiving "balance between
exactitude and cost."  Id. at 1076; see also id. at 1077-79
(discussing statistical sampling).  In these uncharted waters,
where the trust is of enormous scope, the trustee of unusual
character, and the data affected with such great uncertainty, the
law of trusts is a sort of magnetic compass; it cannot be
expected to point to due north, or to "map directly" onto this
context.  Id. at 1078.

One useful if not very precise pointer provided by case
law is that a trustee may not hide behind obscurity that he
himself has created.  See, e.g., Rainbolt v. Johnson, 669 F.2d

- 3 -

767, 769 (D.C. Cir. 1981) ("Under established principles of trust law, if the former trustee has not kept adequate accounts, the benefit of the doubt is to be given to the beneficiary."); George Gleason Bogert, et al., The Law of Trusts and Trustees § 962 (2007) ("As to a trustee who fails to keep proper records of his trust it is usually stated that, 'all presumptions are against him' on his accounting, or that 'all doubts on the accounting are resolved against him.'"). Thus, a consequence of the government's failure to account is that evidentiary presumptions run in favor of the plaintiffs.

But even this principle, like the trust duties themselves, requires compass correction in the context of this suit. The rules that identify and govern a breach of the accounting duty for a simple, 25-year trust with a single beneficiary cannot be applied, unaltered, to a 121-year old perpetual trust, managed by civil servants, with rapidly multiplying beneficiaries and a variety of ever-changing assets. Equity seeks "to do justice to <u>all</u> parties," <u>Bollinger & Boyd Barge Serv., Inc. v. The Motor Vessel, Captain Claude Bass</u>, 576 F.2d 595, 598 (5th Cir. 1978) (emphasis added) -- "its orders are adapted to the exigencies of the case," <u>Taylor v. Sterrett</u>, 499 F.2d 367, 368 (5th Cir. 1974), and it seeks to make accurate evaluations of difficult evidence, not to provide "windfalls" for victims or punishment for wrongdoers. See <u>Bollinger & Boyd</u>, 576

- 4 -

F.2d at 598.  The application of familiar equitable principles will have to be made fairly to fit the special character of this case and this trust.

My conclusions, after attempting to apply a suitably adjusted set of equitable principles to the facts of this case, are that plaintiffs have properly asserted a claim for restitution; that this Court has both the jurisdiction and the power to adjudicate that claim; and that the evidence supports an award in the amount of $455,600,000, a number that is within the range of the government's own admitted "uncertainty" about the amount necessary to restore the proper balance to the IIM trust. I have rejected the plaintiffs' claim of entitlement to an additional sum representing "benefit to the government."

This opinion -- indeed, this litigation -- neither deals with nor resolves any claims that IIM account holders may have for <u>damages</u> against the government.[1]  And it leaves for another day the question of how and to whom the award should be distributed.

---

[1]    <u>E.g.</u>, claims for income never collected, assets sold/leased below market, assets mismanaged, lost or stolen funds, failure to enforce lease terms, money not paid on direct pay contracts.  <u>See</u> Tr. 45:1-18 (Laycock); PX-4.

## I.  Starting Point

Two important exhibits received at the October 2007 trial, AR-171 and DX-365, appeared to show that only 77 percent of the dollars collected on behalf of individual Indians over the years had actually been posted to IIM accounts, and that, over those years, the difference amounted to a shortfall of some $3 billion.  See Cobell XX, 532 F. Supp. 2d at 85-86.  I did not believe this to be the intended import of these exhibits, and I said so, noting the government's mention of the role of lease deposits and other non-individual monies in the system, id. at 86, but also noting that the parties had paid only "desultory" attention to the "throughput" question I had posed at the beginning of the trial.  Id. at 82.  The government made it clear at the outset of the June 2008 trial that indeed it had not intended to communicate the existence of a $3 billion shortfall.

The government's task of estimating and explaining the actual shortfall was complicated, however, by the fact that it could not produce an individualized accounting and by the paucity of existing aggregate data about the IIM trust.  Tr. 500:19-501:16 (Herman) (acknowledging the Court's request for an explanation of the shortfall between receipts and postings, and attributing the difficulty to the lack of aggregate data).  The government's explanation at the June 2008 trial was, essentially, that receipts recorded in the IIM system include monies not

- 6 -

intended for IIM accounts, but the government also conceded that, without transaction-by-transaction accounting, there is essentially no way to distinguish IIM transactions from non-individual transactions.  Id.  There is some historical data regarding total receipts and disbursements in the early years of the trust, but "for the most part aggregate receipt and disbursement records on IIM weren't kept."  Tr. 784:3-5 (Angel). For many years during the early period of the trust, there is no receipt and disbursement data at all.  See DX-461.

Moreover, considerable evidence has been collected over the long life of this litigation, and more was adduced at the June 2008 trial, detailing the various ways in which trust systems purporting to contain receipt and disbursement data have been and still are unreliable, from qualified audits, Tr. 392:10 et seq. (Pallais), to a 73-page compendium of critiques and negative comments by politicians and auditors, each one hyperlinked to an historical document.  PX-65.[2]  There was also the out-of-balance condition between Interior and Treasury records, see Cobell XX, 532 F. Supp. 2d at 74-75, which lent

---

[2]      This information was hardly new: this Court has repeatedly acknowledged material weaknesses in the IIM accounting systems, and those findings have been affirmed by the Court of Appeals.  See, e.g., Cobell VI, 240 F.3d at 1104-06; Cobell XX, 532 F. Supp. 2d at 86 ("heaps of records suggest[] that the numbers informing these calculations are unreliable.").

credence to the possibility that substantial funds had gone missing over the life of the trust.

## II.   The "IIM system"

The framework for the government's presentation was its description of how funds move into, out of, around, and through what was described as the "IIM system."  DX-370; Tr. 463:1-492:11 (Herman).  Michelle Herman was the government's principal witness on the flow of IIM funds, at least for the more recent era beginning in approximately 1972.  The notion of an "IIM system" was her own construct: a kind of botanical description of the information systems and accounts she has observed and studied over a career of working with the Indian trust.  Tr. 571:8-22 (Herman).  In fact, many of the labels she used in describing the system are not actually used in the system, nor is the very notion of a system itself.  Tr. 647:17-648:7 (Herman).

Both parties nevertheless resorted to the term "IIM system" throughout the trial, using it to refer to the interlocking series of accounts, bookkeeping entries, and other data sets, used by the Department of Treasury and the Department of Interior to collect, hold, invest, track, and disburse IIM trust funds.  It is a subset of a larger Indian trust "system," which also includes the tribal trust accounts.  Modern information systems, including the Integrated Records Management

System (IRMS) and the more recent Trust Funds Accounting System (TFAS), are described at length in Cobell XX.  See 532 F. Supp. 2d at 43-44.  Other components of the system, such as the general and detailed ledgers that were maintained by the Bureau of Indian Affairs and its various agencies and area-level offices before IRMS, have received less attention -- except for the repeated finding that the general ledger does not reconcile with either the subsidiary BIA ledgers or the Treasury ledger.  See Cobell XX, 532 F. Supp. 2d at 74-75.

Today, receipts that the government collects in its capacity as trustee for individual Indians are posted to the 14X-6039 account at Treasury.  See PX-65, hyperlink at ¶ 84, Dep't of Interior, Audit Report to the Congress of the United States, D084-0005 to 0006 (November 1955) ("Collections made by the Bureau on behalf of these Indians are deposited into the Treasury of the United States in deposit account 14X6039, Individual Indian Money.").  When disbursements are made from the 14X-6039 account in the form of Treasury checks -- as opposed to bookkeeping transfers or electronic funds transfers -- they are tagged with Agency Location Code (ALC) 4844.  Tr. 569:7-11 (Herman) (ALC 4844 relates to the IIM system).  The 14X-6039 account exists within the Treasury General Count (TGA), so that, in the modern world, at least, cash posted to 14X-6039 becomes an asset of the government.  But the balance of that account

represents an offsetting liability of the government, much like a checking account at a bank.  Tr. 213:20-214:18 (Miller) (distinguishing cash and funds in the 14X-6039 account).

Interior is responsible for the subsidiary accounts (and sometimes just bookkeeping entries) that are recognized as part of the IIM system -- from which and to which the funds in the 14X-6039 account flow.  These include the IIM accounts themselves; Special Deposit Accounts (SDAs), which are used to temporarily store unallocated funds; so-called Tribal IIM accounts (IIM accounts that actually belong to tribes but are used by those tribes as a convenient checking system); and administrative accounts or account numbers used to record the collection of fees and the like.  These SDA, Tribal IIM and administrative accounts and entries might be referred to as non-individual components of the IIM system.  They hold or record funds which are collected in the government's capacity as trustee but may not be owed to or intended for IIM beneficiaries.  For example, an SDA might contain a deposit made by a leaseholder or a bidder that will eventually be returned, or money that is destined for a tribal trust account rather than an IIM account.  In short, the "IIM system" that the government has been trying to explain and account for _includes_ the IIM accounts.  _See generally infra_, Section IV.A.  It receives, holds, transfers, disburses and records money that is associated with the government's role

as trustee for IIM account holders, but which, by design, may never arrive in an Individual Indian Money account.

## III.  Plaintiffs' Model[3]

Plaintiffs support their claim for an award of about $47 billion (restitution plus benefit to the government) with a model that rests upon the legal premise that any government data regarding IIM receipts should be treated as an admission, while only negotiated checks or other irrefutable evidence can be probative of disbursements.  The plaintiffs' model thus accepts the government's estimates of receipts from the October 2007 trial, together with other government receipt data, see PX-41 at n.1; PX-189-A at n.1, but uses its own method to calculate year-by-year disbursements from the trust.

### III.A.  Description of plaintiffs' model

Plaintiffs' model begins with a calculated "disbursement rate" which is arrived at by simple division: the numerator is the value of electronic fund transfers and checks that were sent to (and cashed by) beneficiaries during the years 1988-2002, and the denominator is the total receipts for those years.  See Tr. 1481:1-1493:22 (Palmer); PX-189-C (disbursement rate calculation).  That disbursement rate is then applied to whatever government receipts data and estimates that can be found

---

[3]     This analysis focuses on PX-189, a spreadsheet that amended and supplemented plaintiffs' original exhibit, PX-41, in light of data and criticism presented by the government.

for all of the years of the trust dating back to 1887.  <u>See</u> PX-41; PX-189-A.[4]  The process yields a spreadsheet which contains, for each year, a dollar amount for receipts, a calculated dollar amount for disbursements (receipts x disbursement rate), and a number that represents the difference between receipts and disbursements.  Plaintiffs call these columns "corrected revenues," PX-189-A at Column E, "disbursements," <u>id.</u> at Column F, and "nominal benefit to government," <u>id.</u> at Column G.  Column G sums to approximately $4 billion in plaintiffs' rebuttal model and is asserted to be the total dollar amount of funds withheld by the government over a period of 120 years -- a number, which, after subtracting the current stated balance of the trust, leaves approximately $3.6 billion that, in plaintiffs' submission, must be restored to plaintiffs' accounts.

Plaintiffs use the same model to calculate the benefit that they assert the government has enjoyed from not having to borrow and pay the 10-year bond rate on the annual, and accruing, "nominal benefit" amounts.  The method is best described by example.  In 1887, the first year of the trust, the government had not yet withheld any money from IIM accounts.  Thus, the

_____

[4]    In their rebuttal model, plaintiffs began to use some government disbursement data rather than always relying on their calculated disbursement rate.  However, either this disbursement data or the receipt data tends to be "adjusted" according to rates that are either driven by or extremely similar to the calculated disbursement rate.  <u>See</u> <u>infra</u>, Section III.B.iii.

entire benefit to the government in that year is the nominal benefit in Column G.  Compare PX-189-A, at Column G, FY 1887, with id. at Column J, FY 1887.  The next year, 1888, the government accrues additional nominal benefit based on the difference between receipts and disbursements in that year. See PX-189-A at Column G, FY 1888.  But plaintiffs then add to the 1888 nominal benefit an amount representing the value to the government of holding the 1887 benefit -- not having to borrow that amount at the 10-year bond rate, see PX-189-A at Column I, FY 1888.  This sum, plus the nominal benefit for 1888, plus the balance carried forward from 1887, is called the "accumulated benefit, end of year."  See PX-189-A at Column J, FY 1888.  The same operation is carried forward from year to year until 2007, by which time, in plaintiffs' rebuttal model, the accumulated benefit has grown to approximately $47 billion.  The existing balance of the IIM trust accounts is deducted at the end.  See generally, Tr. 268:2-272:11 (Cornell) (describing operation of the model). The plaintiffs' model is excerpted below:

| Fiscal Year | Corrected Revenues E | Disbursements F | Nominal Benefit to the Government (E - F) G | 10 yr. Treasury Bond Rate H | Accrued Benefit (J * H) I | Accum. Benefit (J + G + I) J |
|---|---|---|---|---|---|---|
| 1887 | $560,000 | $440,000 | $130,000 | 3.52% | 0 | $130,000 |
| 1888 | $1,070,000 | $830,000 | $240,000 | 3.67% | 0 | $380,000 |
| | | | | | | |
| 2007 | $316,000,000 | $238,180,000 | $77,810,000 | 4.76% | $2.1445 Billion | $47. 2749 Billion |

As noted, the annual "nominal benefit" number in this model is driven by plaintiffs' "disbursement rate," which is not and does not pretend to be actual disbursements, but is rather a calculated factor that is itself driven by the plaintiffs' legal theory about proper evidence of receipts and disbursements.  <u>See</u> PX-189-A at n.4 (describing disbursement calculations).[5]  The only disbursement data whose accuracy plaintiffs were willing to acknowledge were 1988-2002 Electronic Fund Transfers and Automated Clearinghouse payments (EFT/ACH) and numbers from the Check Payment Reconciliation System (CP&R).  <u>See</u> Tr. 1481:5-12 (Palmer).

Even the CP&R check data were discounted, according to plaintiffs' own estimate of the value of checks that were never negotiated (because the value of checks that were never cashed was presumed to have remained in the Treasury).  <u>See</u> PX-189-C at Column C & n.5; Tr. 1482:5-22 (Palmer). Plaintiffs first compared the <u>number</u> of checks cashed to the <u>number</u> of checks that had been cut, <u>see</u> PX-56 at Column E -- the percentage was calculated to be 93.75 percent -- and simply assumed that this ratio could be used to calculate the <u>dollar value</u> of negotiated CP&R disbursements, despite the obvious likelihood that it would be the lower value checks that tended not to be deposited.  Tr. 310:22-311:11

---

[5]    Any ratios or rates that are identified in this footnote as relating to "Attachment C" are manifestly driven by plaintiffs' calculated disbursement rate.  <u>See</u> PX-189-C.

(Cornell).  In their rebuttal model, plaintiffs purported to correct this obvious mistake, now comparing the dollar value of checks negotiated with the dollar value of checks cut.  But the resulting ratio of 93.68 percent -- remarkably similar to the first one -- is derived from only a single year of data,[6] and it disregards government data from the same document that shows that cancelled check values are only about two percent of total check values, see DX-236 at 2 (compare "checks" and "stppay" for 2003).  It appears, indeed, that the dollar value of checks returned to Treasury or cancelled because they are not cashed in a timely fashion is less than one percent of the total value of checks cut.  See, e.g., DX-236 at 1 (value of cancelled checks was 0.02 percent of total check value for FY 1999); DX-242 at 17 (in a representative study, value of uncashed checks was 0.17 percent of total check values); DX-275 (value of checks cancelled for limited payability were less than 0.2 percent of total check value for same period).

III.B.   Evaluation of plaintiffs' model

        Plaintiffs' model suffers from numerous methodological flaws that were illuminated by the government's presentation and,

---

        [6]    Partly from calendar years data and partly from fiscal year data, see PX-189-C at n.5.  Plaintiffs used a standard calculation to transform between fiscal and calendar years.

in many instances, are obvious to anyone having basic familiarity
with the case.

The most obvious flaw, perhaps, is that the size of
plaintiff's calculated shortfall -- $4 billion, out of total
receipts of about $14 billion, <u>see</u> PX-189-A at Column B -- is
uncorroborated by any other event or data.  Yes, the United
States Government spills billions of dollars a year, loses money
to fraud, waste, and abuse, and generally mismanages its affairs.
But the Indian trust has been repeatedly audited, and while each
of those audits has been qualified, <u>see</u> <u>Cobell XX</u>, 532 F. Supp.
2d at 54 (discussing meaning of the many qualified audits), no
audit report states or hints at the disappearance of anything
close to 30 percent of trust receipts.  Plaintiffs even purport
to find $315 million in "nominal withholding" for the period from
2003 to 2007, <u>see</u> PX-189-A, despite BIA's major improvements in
accounting and record-keeping practices during that period.
Whatever problems have existed in the history of this trust, and
however serious the misfeasances and malfeasances of the trustees
over 120 years, there has never been any evidence of such
prodigious pilfering of assets from within the trust system
itself.[7]

---

[7] This observation, as noted at the outset, has nothing to
say about IIM trust management, or about funds that may not have
been received or collected.

Methodologically, the two most important flaws in plaintiffs' model are: (1) that the model includes as collections certain sums that, by definition, will not be reflected as disbursements in the CP&R data, including Osage headright payments; and (2) that the model accepts historical receipt data and disregards historical disbursement data from the same documents and systems, or makes self-serving adjustments to one side of the ledger and not the other. These flaws will be discussed in turn.

III.B.i  *CP&R data*

Even if plaintiffs had treated 100 percent of the checks in the CP&R data as having been negotiated, those data would necessarily under-report disbursements from the IIM system. Transfers of funds from Tribal IIM accounts or SDAs directly to tribal trust funds are effected by intra-bureau bookkeeping transfers, not by checks that would show up in CP&R data. Tr. 569:6-22 (Herman). Michelle Herman provided two examples of such "BB transfers," see DX-480 at 9; DX-481 at 2, both of which involved millions of dollars. In a government document detailing disbursements for fiscal year 1999, DX-238 at 1, such BB transfers amount to $73.5 million of disbursements from the trust, compared to about $202 million in checks and EFTs. Plaintiffs' experts agreed that, unless such transfers had been made by check (which they were not), they would necessarily be

absent from the CP&R data.  Tr. 353:20-25 (Cornell); Tr. 1566:12-
1567:10 (Palmer).  This basic mistake in plaintiffs' theory --
ignoring or overlooking fund transfers -- had the effect of
driving up the amount allegedly "withheld" and driving down the
disbursement rate upon which plaintiffs relied for their
calculations of "withholding" for all the years before 1988.

         Transfers from the IIM system are not the only
transactions overlooked by plaintiffs' single-minded reliance on
CP&R data.  The accounting systems relied on by Interior were
designed to track money, not to aggregate throughput data.
Accordingly, they register every intrafund transfer as a debit to
one account and a credit to another.  This (standard bookkeeping)
process creates double-counting of receipts if only CP&R data is
used to measure disbursements, because, while both the initial
collection and the transfer will show up as "receipts," only
checks cut when the money leaves the system will show up as
"disbursements."  Government contractors have been working to
"map" such transfer transactions and eliminate them from the
data, and their receipt and disbursement data has accordingly
changed since the October trial.  Tr. 481:11-482:15; 626:25-
629:21; 648:19-649:15 (Herman).  Reliance on CP&R data also
results in overstated receipts because beginning IRMS balances
registered as new receipts; government contractors have been

working to eliminate those transactions as well.  Tr. 624:1-626:15 (Herman).

        Plaintiffs continue to draw their receipts data from government figures produced during the October trial, see PX-189-A n.1; AR-171, ignoring or refusing to accept the replacement of those figures with updated numbers, see DX-371, that have eliminated phantom receipts.  They refuse to accept Ms. Herman's reductions in receipt data because she did not "show her work." Plaintiffs are skeptical about a reduction in revenue for the years 1986-1997 of "roughly $243 million" between the AR-171 exhibit in the October trial and the revised DX-371 exhibit produced at these proceedings, see Tr. 628:8-17 (Herman); PX-119, but they have in no way refuted Ms. Herman's testimony, and I find it to be credible.  In any case, Ms. Herman's treatment of the data is demonstrably even-handed: disbursements have been reduced by roughly as much, if not more, over the same period. Tr. 649:7 (Herman); compare AR-171 at Column G with DX-371 at Column H for FY1986-FY1997.[8]  Again, relying on the older numbers has a two-fold skewing effect -- driving up the nominal amount withheld in these years and driving down the calculated disbursement rate that controls the other years.

---

        [8]    Plaintiffs' complaint about Ms. Herman showing her work illuminates a central problem with this litigation.  Ms. Herman's work, on just this problem, and only for the years since 1986, encompasses some 115 million transactions, Tr. 627:4-7 (Herman), many of which are extremely complex.

III.B.ii  *Osage headrights*

The error of plaintiffs' total reliance on CP&R data as representative of disbursements is especially palpable when one considers the inclusion in their model of Osage headright monies as trust receipts.  Osage headrights are the product of the Osage Allotment Act of 1906, Pub. L. No. 59-321, 34 Stat. 539, which allotted Osage tribal lands to individual members, see id. at § 2, 34 Stat. 540, but preserved the mineral estate of those lands for common management under the direction of the tribe.  See id. at § 3, 34 Stat. 543.  The proceeds of the mineral estate were to be held in trust for, and distributed per capita to, individual Osage Indians.  Id. at § 4, 34 Stat. 544.

There is a legal dispute between the parties as to whether Osage headright funds are IIM funds that fall within the class certification order in this case.  See Order, [Dkt. 27] at 2-3 (class to consist of "beneficiaries of Individual Indian Money accounts").  What is beyond dispute, however, is that mineral estate proceeds destined for Osage headright holders are collected into a tribal trust fund and disbursed from that fund directly to individual headright owners, without ever passing through the IIM system.  Tr. 473:22-474:1 (Herman).  Osage headright disbursements are not to be found in CP&R disbursement data, and both of plaintiffs' experts agreed that Osage mineral estate revenues did not belong in IIM system receipt data.  Tr.

1577:8-16 (Palmer); 334:7-23 (Cornell), see, e.g., DX-372 at 2025 et seq. Nevertheless, plaintiffs' model "corrects" government receipt data by adding in the value of Osage headright payments for every year. See PX-189-A at Column E.[9] The effect of this mistake, once again, is both to add over $800 million in erroneous receipts and to drive down plaintiffs' calculated disbursement rate, see Tr. 1596:6-17 (Palmer), causing the inaccuracy to metastasize.

III.B.iii  *Data "adjustments"*

Plaintiffs' demonstrated willingness to accept data they liked and reject data they disliked did not enhance the credibility of their model. Their initial model would accept government receipt data from a historical document, but reject disbursement data from the same document in favor of their calculated disbursement rate. See Tr. 291:18-292:23 (Cornell). Their rebuttal model continued to make self-serving modifications to the historical data, some driven by their calculated

_____

[9]  Some Osage headright payments do flow through the IIM system, because some headright holders both have IIM accounts and are either minor, incompetent, or otherwise unable to receive their headright payment directly. See Tr. 659:12-16 (Herman). Because headrights are alienable, many current headright holders are not Osage, and those who are Indians may not have IIM accounts. See http://www.osagetribe.com/mineral/info_sub_page. aspx?subpage_id=6. The government has endeavored to calculate what portion of Osage monies enter the trust, but this is simply to avoid double-counting in the event that the Court accepts the plaintiffs' model. Whatever Osage monies do enter the IIM system are already reflected in the general receipt and disbursement data.

disbursement rate, <u>see</u> PX-189-A at n.1, and some even more
baseless.  <u>See generally</u>, Tr. 1578:24-1584:19 (Palmer).  Two
examples follow.

        First, plaintiffs' adjustment of CD&L data: Aggregate
government data for the years 1972-1987 were developed by the
firm of Chevarria, Dunn, & Lamey (CD&L) from general and detailed
ledgers for the various BIA agencies and area offices.  <u>See</u> Tr.
604:7-623:12 (Herman).  Plaintiffs accept the receipt data, but,
asserting (with some basis) that the disbursement data may be
flawed, incomplete, or estimated, <u>see id.</u>, they <u>modify</u> the
disbursement data.  <u>See</u> PX-189-A at n.4.  The modification is
calculated by dividing the government's reported disbursement
rates from the years in which there is CP&R data (approximately
101 percent)[10] by the plaintiffs' calculated disbursement rate
(74.45 percent).  This yields, for those years, a so-called
"disbursement adjustment ratio" of 134.1 percent, which appears
to represent nothing more than the factor by which the plaintiffs
do not trust government disbursement data, but which is applied
to make a wholesale downward adjustment of CD&L disbursements
data for the years 1972-1987, as well as for the years 2003-2007,
when receipt and disbursement data come from qualified audits,
and for 1955, where receipt and disbursements come from a

_____

        [10]    <u>See</u> PX-189-C at Column H.  It is typical for
disbursements to exceed 100 percent of collections in some years.

historical audit report.  See PX-189-A at n.4; see also PX-53
(1955 Report).

        Second, plaintiffs' adjustment of receipts data located
by Morgan Angel: Historical evidence regarding receipts and
disbursements from the period 1923-1949 was developed by the
government's historian, Edward Angel of the firm Morgan, Angel
and Associates.  Tr. 787:23-792:22 (Angel).  These reports were
produced in response to a 1906 appropriations act which required
the heads of departments to prepare reports regarding any
receipts and disbursements that were not paid into the Treasury.
See Pub. L. No. 59-383, § 5, 34 Stat. 746, 763 (1906).  These
reports generally bore the title: "Statement of Moneys Received
and Expended by Disbursing Agents of the Indian Service During
the Fiscal Year [   ] Without Being Paid into the General
Treasury of the United States."  See, e.g., DX-426 at 3; DX-27 at
14.  Each has an entry for IIM receipts and disbursements.
Dr. Angel suspected that these reports would exclude both
receipts and disbursements that did not flow into or out of the
Treasury.  Tr. 790:6-791:10 (Angel).  This would make sense, as
the statute requires "a detailed account of all payments, made
from such funds," where such funds refers to funds "not paid into
the General Treasury."  Thus, if there is any understatement on
these reports, it likely encompasses both receipts and
disbursements.  Nonetheless, the plaintiffs' model increases the

receipts -- and only the receipts -- by dividing them by 77 percent, the figure that represented the gap between receipts and postings in DX-365.  Tr. 1581:7-13 (Palmer).  This exhibit from the October 2007 trial was prepared to discuss what percentage of dollars would be covered by the government's accounting procedures, and had nothing to do with the percentage of funds that might have been collected and not paid into the Treasury, a detail about which the plaintiffs' witness (a last-minute surrogate) was evidently unprepared to testify.  Tr. 1578:24-1584:19 (Palmer).  Dr. Palmer's ultimate defense of the "adjustment" he had made was that it was similar to the calculated disbursement rate, Tr. 1586:16-32 (Palmer), which -- as has already been discussed -- plaintiffs' model has artificially deflated.

My overall conclusion about plaintiffs' model is that it cannot be used as a representation or even an estimate of the amount of trust funds that the government has failed to disburse or post to IIM accounts.  Instead of providing unbiased opinions, plaintiffs' expert witnesses essentially provided plaintiffs with a way to put a dollar value on their argument that all data that favors the plaintiffs may be treated as admitted, and all data that disfavors them must be proven by the government with discrete, transactional evidence.

**IV.   The Government's Case**

        The government's presentation had two parts.  First,
the government endeavored to explain how DX-365, the chart it
introduced in the October 2007 trial, could state that postings
to IIM accounts were 77 percent of collections without admitting
that the other 23 percent of the funds were unaccounted for.
Second, the government developed its own model for evaluating the
amount of funds that might reasonably be considered missing from
IIM accounts.


IV.A  <u>Collections and postings to IIM accounts</u>

        Ms. Herman's "IIM system" testimony has been discussed
in previous sections of this memorandum.  Two of her explanations
for the difference between collections and postings -- the
double-counting of opening balances and intrafund transfers --
have already been covered.

        The rest of the explanation is provided by Ms. Herman's
testimony that a significant amount of the funds that are
considered "receipts" of the IIM system are never intended for an
IIM account.  Tr. 487:23-488:10 (Herman).  As described above,
the IIM system includes many non-individual accounts, including
SDAs and administrative accounts.  <u>See</u> <u>supra</u>, Part II.  Using
record examples, Ms. Herman described three types of
disbursements that might be made from these non-individual

- 25 -

accounts without money passing through any IIM trust.  See generally, DX-370 (graphically displaying the flow of funds).

First, funds might be transferred directly from an SDA or an administrative account to third parties.  Tr. 517:25-518:14 (Herman).  Such funds might include bid deposits associated with contracts, earnest money associated with land sales, deposits on leases, and administrative fee payments including fees to the government, among other things.  Id.  One example, from the modern, electronic era, was a $5.2 million disbursement from an SDA to an insurance agency on behalf of a tribe.  See DX-474; Tr. 505:18-506:23 (Herman).  Another example, one that straddled the paper and electronic eras, was a $3000 performance bond, deposited in 1978 and disbursed in 2006, with interest, as $16,767.16.  DX-491; Tr. 534:20-536:15 (Herman).  A 1941 audit report showed special accounts for a cemetery fund and for school activities.  See DX-486 at 2.  And a Commissioner's report from 1910 showed that $2.7 million out of $7.6 million in disbursements represented returns of funds to unsuccessful bidders.  DX-33 at 2; see also DX-32 at 7 (1909 Report).  The government's conclusion that significant funds moved from special accounts or administrative accounts direct to third parties without posting to IIM accounts appears well-founded.

A second instance in which money received into the IIM system would not be posted to IIM accounts would be transfers

from SDAs and administrative accounts into tribal trust accounts. Tr. 485:25-486:6 (Herman) (transfers to tribal trust accounts were a "significant amount of money").  One example was a timber transaction that moved through an SDA, with $4.46 million of the total transferred to tribal trust accounts (a non-check, "BB" transfer), $563,000 used for a reforestation payment (a third party disbursement), and only $609,000 posted to IIM accounts. See DX-480; Tr. 521:21-525:19 (Herman).  (Significant amounts of so-called "Tribal IIM" have passed through the system, although these amounts were not included in DX-365.)  The government's conclusion that there was money moving through the system that was intended for the tribes and not for IIM accounts is supported by the evidence.

Finally, there are payments to what Ms. Herman described as "stakeholders."  Tr. 486:7-487:4 (Herman). Stakeholder payments are payments made to individual Indians, often -- but not always -- IIM account holders, that do not move through IIM accounts.  For example, a tribe may have a judgment account or an account for per capita distribution, which amount is deposited in the IIM system is the form of a non-individual account.  A large portion of that money then goes directly to stakeholders by check, without touching IIM accounts, while some of the funds -- typically, for minors and the like -- do go to IIM accounts.  The government presented just such an example -- a

Per Capita account[11] of $43.5 million where $7.8 million was transferred into "land-based" IIM accounts while $27.5 million was paid direct without touching an individual account.  See DX-475; Tr. 507:8-510:3 (Herman).  Judgment and Per Capita funds go to tribe members as such, not to "land-based" IIM account holders.  Judgment and Per Capita accounts themselves only exist inside the IIM system for bookkeeping and check-writing convenience.  Amounts that are transferred into IIM accounts are typically for beneficiaries who are minor, incompetent, or impossible to locate.  Again, the explanation that stakeholder payments were reflected in IIM system receipts, but not in individual account postings, appears to be well supported.

Ms. Herman's flowchart, and her testimony and documentary examples of non-IIM payments from non-individual accounts, together with the evidence that receipts can be double-counted, went a long way towards explaining the nature of the discrepancy between receipts and postings in DX-365.  Her explanation did not quantify the discrepancy, however: Ms. Herman admitted that there was no ready way to determine what percentage of receipts were for stakeholders, for tribal trusts, and for

---

[11]   See Cobell XX, 532 F. Supp. 2d at 40 ("A small percentage of the funds flowing through the IIM trust are in "Judgment" and "Per Capita" accounts, which were created to hold funds derived from litigation settlements (Judgment accounts) and tribal revenues allocable to individual Native Americans (Per Capita accounts).").

third parties.  Such a determination is not impossible, but would
be very time consuming, would require finding and reviewing
financial documents, and has not been done.  <u>See</u> Tr. 641:23-
642:16 (Herman); Tr. 636:15-24 (Herman) (same regarding intrafund
transfers).

IV.B.  <u>The government's model</u>

    After the government's admission in the October 2007
trial that perhaps $3 billion of IIM system receipts had not been
posted to IIM accounts, my finding that the government had not
and could not provide an adequate accounting of its IIM
trusteeship, and plaintiff's presentation of at least a theory
that some $4 billion of IIM funds had never been disbursed to IIM
account holders, the burden of quantifying and explaining the
shortfall shifted to the government.  Because Ms. Herman's
explanations of the various ways that IIM system receipts might
be transferred or disbursed without passing through IIM accounts
was neither quantified nor reasonably quantifiable, and because
there is no aggregate IIM receipt and disbursement data for
considerable portions of the history of the Indian trust, the
government resorted to a statistical modeling approach.

    IV.B.i  *Explanation of the government's model*

    The government's model was developed and presented by
an expert statistician, Frederick Scheuren.  It uses available

receipt and disbursement information and then employs a
statistical technique known as "multiple imputation" to fill in
the blanks, which are many.  Tr. 929:12-25 (Scheuren).  Multiple
imputation is an established technique that uses available data
to impute missing data, but instead of yielding a single value
that best fits the data as modeled, it uses modern computing
power to impute multiple values for each missing data point.  Tr.
932:9-23 (Scheuren).  Its chief value in this regard is that it
allows the statistician to "see the uncertainty" that exists
because of the missing data.  Id.  In the words of the
Dr. Scheuren, "missing data is not free," Tr. 934:1-3, meaning
that, the more data that is missing, the lower the confidence
that can be placed in the values the model generates.

        Dr. Scheuren used the following procedure to create his
multiple imputation model.  See generally DX-460 (outlining steps
in government's approach).  First, his firm (NORC) assessed the
available data.  This involved four kinds of data: historic
reports that Dr. Angel had uncovered for 1909-1911, 1922-1949,
and 1955; data from the general and detailed agency ledgers
identified by CD&L for 1972-1985; IRMS data from 1986-1995; and
audit report data from 1996 to the present.  See DX-372; Tr.
939:14-940:7 (Scheuren).  This left a significant number of years

for which there was no data.  <u>See</u> DX-471 (NORC's data set).[12]
NORC also assessed the data set for data points that did not
appear to make sense, and treated "outliers" as missing values.
<u>See</u> DX-461; Tr. 942:22-943:17 (Scheuren).  The resulting data set
represented the information that NORC would use to try to assess
the likely values of -- and resulting uncertainty from -- the
missing receipt and disbursement data.

The next step involved using scatter plots and
statistical techniques to assess the relationship between
available variables.  This is an exploratory step where different
variables are compared using familiar statistical techniques,
such as regression analysis, to assess their correlation with
each other and the explanatory force they might have in a
statistical model.  Tr. 947:6-948:16 (Scheuren).  NORC's model
employed five variables: (1) fiscal year; (2) receipts;
(3) disbursements; (4) reported trust balance; and (5) the value
of one Osage headright.  Receipts and disbursements were chosen
because (obviously) they were the values that NORC was attempting
to study; balance and headright value were chosen because

---

[12]     As will be discussed below, the model is principally
focused on receipts and disbursements, but includes other
information as well.  The statistical modeling is multivariate.
<u>See</u> Tr. 941:11-15 (Scheuren).  The model employs historical data
regarding trust balances and the size of the Osage headright to
assist in the modeling.  These variables provide some information
in years where there is no receipt or disbursement data.  <u>See,</u>
<u>e.g.</u>, DX-461 at FY1912-FY1921.

exploratory statistical testing showed them to be correlated to the other variables.  Neither correlation is surprising: balance information is quite likely to be related to the amount that enters and leaves the trust each year, and the value of an Osage headright, while not strictly related to IIM, is something of a surrogate for the overall condition of the economy, especially useful as a metric for the value of certain oil and gas assets that might powerfully affect Indian trust data.  Tr. 998:24-999:7 (Scheuren).  Osage headright value was also used because its value was known back to the first year of the trust.  Tr. 948:23-949:9 (Scheuren).  It was thus an important variable in the model.  Tr. 948:15-16 (Scheuren) ("[T]he Osage variable was really the main variable we had.")

        Once the modeled relationships between the variables were established, NORC performed its multiple imputation step using a statistical application called SAS.  Tr. 949:22-950:9 (Scheuren).  Ten thousand values were imputed for each missing data point.  Tr. 952:14-24 (Scheuren).  NORC produced a data set reflecting the average or "point estimate" for each data point, see DX-492, but hiding behind each of these values are all 10,000 imputations, which are carried forward and affect the uncertainty in the data that is calculated by the computer program.  Tr. 937:18-22 (Scheuren) (data set is completed "in a way that would allow us to measure its uncertainty.").

Next, NORC used a second model, a "time series model," to assess the fit between all the imputed and fixed values in the newly completed data set. See generally, DX-460; Tr. 953:17-961:24. This "remodeling" was done in large part because NORC recognized that even much of the data treated as fixed "had its own problems," and that "that uncertainty needs to be incorporated into this calculation." Tr. 954:4-7 (Scheuren). The time series model assessed the strength of the relationship between data in a given year and data for the previous seven years -- a kind of rolling average. Tr. 957:9-959:10 (Scheuren). This was done all the way up until 1996, when IIM data began to be regularly audited, and so it helped to assess the uncertainty underlying the CD&L data from the general and detailed ledger, and the data from the IRMS system. See DX-462 at 3 (model adjustments end in 1996). This time series modeling did not affect point estimates very much, Tr. 961:23-24 (Scheuren); it was essentially a search for irregularity over time, which was scored as uncertainty and which caused the uncertainty in the model to increase by about one-third. Tr. 961:9-22 (Scheuren).

This uncertainty manifested itself in the final step of the model, which involved calculating an average difference between overall receipts and disbursements, and then creating a distribution of values around that mean based on the amount of variance and uncertainty that was detected through the previous

steps.  Tr. 964:11-971:19 (Scheuren) (describing final step).
The resulting histogram, DX-463, shows that the calculated mean
would be $583.6 million, which is $159.9 million more than the
current stated balance of the trust.  See DX-464; Tr. 967:22-
970:13 (Scheuren).  Because there is so much uncertainty in the
data, however, the histogram displays a wide variance.  Tr.
970:21-24 (Scheuren).  The 95 percent confidence interval is wide
enough that it encompasses a zero difference between the
calculated and stated balance of the trust, meaning that the
current, stated balance could very well be exactly correct.  Id.
("[T]he values are spread so widely that you cannot reject [the]
hypothesis that the data could be . . . consistent with the $423
million [stated balance].").  But that variance cuts both ways:
At the 95 percent confidence interval, the histogram encompasses
a shortfall between IIM receipts and IIM disbursements of up to
$365.7 million.  Tr. 970:25-971:6 (Scheuren); DX-464.  The 99
percent confidence interval would accommodate a finding of a
shortfall of up to $455.6 million.  Tr. 972:21-973:9 (Scheuren).

IV.B.ii  *Evaluation of the government's model*

The greatest strength of the government's model is that
its outcome comports with what is actually known about the IIM
trust.  First, the $159.9 million gap between the calculated mean
and current stated balance of the IIM trust may be taken as a
sort of admission that the correct balance of the IIM trust is

greater than its stated balance.  Second, the wide variance of
possible outcomes around the mean is consistent with the one
thing that 12 years of this litigation has truly settled, which
is that there is still much that is unknown about the trust.
Third, the fact that the exact current stated value of the trust
lies within the confidence interval reflects the reality that, in
the absence of some kind of equitable evidentiary presumption in
favor of the plaintiffs, one permissible conclusion from the
record would be that the government has not withheld any funds
from plaintiffs' accounts.  Indeed, despite a profusion of
evidence and opinion about the unreliability of IIM records,
there has been essentially no direct evidence of funds in the
government's coffers that belonged in plaintiffs' accounts.  And
finally, the very large value that represents the high end of the
99 percent confidence interval reflects the government's frank
acknowledgment that uncertainty is not free.  That number is best
understood as an <u>admission</u> that the range of uncertainty about
aggregate IIM trust date includes the possibility that the return
of $455.6 million is necessary to correct the trust's balance.
Crediting all the uncertainty to the plaintiffs -- as I do --
results in the conclusion that the balance of the trust should be
roughly double its current stated amount.

      Not only do I find the government's model plausible,
but I find that it is based on the sound and principled use of

available data.  Dr. Scheuren was the only statistician to
testify about these matters.[13]  I found his testimony to be
extremely knowledgeable and credible -- he was forthcoming and
cooperative, and willing to acknowledge any mistakes and
weaknesses in the model or underlying data.  I was also impressed
by the extent to which Dr. Scheuren was responsive to concerns
expressed by the plaintiffs.  He appears to have exercised his
expertise free from direction by defense counsel, and -- in
contrast to plaintiffs' recently retained experts -- he brought a
considerable amount of experience within the case to bear on his
modeling.  I credit his testimony that multiple imputation was a
sound method of evaluating the impact of missing data on the
uncertainty regarding trust balances.

I also found that the model was methodologically fair
and carefully employed.  Many of the outliers that NORC excluded
seemed to favor the government.  See DX-461 (low throughput in FY
1922 excluded as outlier; low trust balance in 1926 excluded as
outlier).  And any data treated as missing favored the
plaintiffs, because it increased the uncertainty in the model.
The model used essentially all the available historical data

---

[13]    There can be no complaint that plaintiffs lacked time
or opportunity to review Scheuren's methodology or data. The
parties were given a standing offer to adjourn the trial in the
event that they were confronted with information that they were
not immediately able to address.  See Hrg. Tr. 83:1-7 (Apr. 28,
2008) (the Court); Tr. Pretrial Conference 13:8-17 (June 2, 2008)
(the Court).  The offer was not taken up.

without regard to whether it favored either side, and did not make self-serving adjustments. Unlike plaintiffs' model, it incorporated the latest data mapping, which reduced both receipts and disbursements in the modern period. Although the government could have argued that the data include monies not intended for individual Indians and attempted to exclude those values, see supra, Section III.B., it recognized that it was difficult to disentangle those transactions, and instead relied on overall receipt and disbursement data. Tr. 641:23-642:16 (Herman). Above all, I thought the model's use of available data was evenhanded -- designed to illuminate what little is known about the trust, not to argue a legal theory about certain monies that should or should not be counted.

This is not to say that the government's model was perfect. Although it was designed to evaluate uncertainty even in the existing data, it may not have adequately accounted for just how unreliable the underlying data was. NORC treated Dr. Angel's data from 1923-1949 as complete, even though Dr. Angel himself believed that both receipts and disbursements might be understated. See supra, Section III.B.iii. The ledger data from CD&L that was treated as fixed may have been incomplete, and it certainly reflected estimation techniques, because some data fields for some agencies in some years were filled in using data from previous years. See Tr. 609:4-623:9

- 37 -

(Herman).  Dr. Scheuren was impressed by the weaknesses demonstrated in the CD&L data by plaintiffs' counsel, and although his model already attempted to evaluate the uncertainty in that data, he suggested that it might be appropriate to increase the confidence interval from 95 percent to 97.5 percent in response to these revelations.  Tr. 974:15-976:3 (Scheuren). The record in this case is replete with indictments of the reliability of IRMS data, which NORC's model employed from 1986-1995.  Also, the model does not produce point estimates that "foot" -- if you take the balance in year T and add estimated receipts and subtract estimated disbursements for year T+1, you typically do not get the imputed balance for year T+1.  The fact that the balance data is used to model the imputed values, but does not fit perfectly, indicates that the model itself has considerable built-in uncertainty.  Finally, the audit data from 1996 forward was not even subjected to the time series remodeling step that added uncertainty to the model, even though these numbers reflected only qualified audits that continued to express concerns about system reliability.

        But whatever criticisms plaintiffs had about the government's model, they were not able to prove any bias that would render it fundamentally unsound.  Thus, for example, plaintiffs showed that about $580 million of the disbursements in the CD&L ledger data reflected substitutions, where the agency

data for that year were filled in using the data from the previous year, see Tr. 621:9-12 (Herman), but review of the ledgers shows that in years where disbursement data was substituted, receipt data was also substituted at those same agencies.  See DX-372 at tabs GLDL-R and GLDL-D.  And if Dr. Angel's data for 1923-1949 under-reported receipts, they likely under-reported disbursements as well.  Plaintiffs argue that the fit between the Osage variable and the other variables is suspect because Osage revenues are oil and gas driven and have nothing to do with timber and other revenue streams.  But Osage headright values reflect a variable that is internal to the Indian trust system and that incorporates information about economic well-being.  Moreover, the existence of a fit between two variables is simply a matter of statistical correlation, and if the fit is not very strong, the result is to benefit the plaintiffs by adding uncertainty to the model.  None of these arguments identifies systematic bias in the data, and whatever omissions the plaintiffs were able to identify are minor when compared with plaintiffs' model, which is systematically designed to misrepresent the data in the plaintiffs' favor.

In sum, the government's model is imperfect, but it presents a plausible estimate of funds withheld, and it is particularly useful in evaluating the uncertainty in existing trust data.  Dr. Scheuren credibly testified that the strength of

his model lies, not in establishing point estimates for certain
values in certain years, but in evaluating "overall uncertainty
at the balance level."  Tr. 1027:11-12 (Scheuren).

## V.   "Benefit to the Government"

In plaintiffs' submission, every dollar of Treasury
receipts that was intended for an IIM trust beneficiary but
neither disbursed nor posted to an IIM account was a dollar the
government did not need to borrow.  Plaintiffs' calculated
"benefit to the government" thus grows their calculated "nominal
benefit" number by adding interest at the 10-year bond rate,
compounded annually.  In their rebuttal model, the effects of
compound interest transform their $3.5 billion nominal
withholding number into some $46.8 billion of benefit conferred.
That submission is rejected, for the reasons set forth below.

First, as explained earlier in this memorandum,
plaintiffs' model contains plain inaccuracies, and the compound
interest factor only compounds them.  For example, plaintiffs'
incorrect inclusion of about $660,000 in Osage funds for the
years 1887-1889 results in more than $44 million of (erroneous)
calculated benefit to the government (to say nothing about the

way that plaintiffs' misuse of Osage data also hypes the model by
driving down its calculated disbursement rate.)[14]

Second, plaintiffs presented no evidence that their
theoretical benefit to the government was anything other than a
theory.  Plaintiffs' only witness with knowledge of the borrowing
practices of Treasury was Dr. James C. Miller, former director of
the Office of Management and Budget.  All he could say of
plaintiffs' theory regarding saved borrowing costs was that it
was sound as a matter of economics and common sense; he said so
on the basis of no personal knowledge of the day-to-day mechanics
of borrowing decisions at Treasury.  Tr. 253:21-254:2 (Miller).
Plaintiffs' theory assumes that any cash in the government's
hands benefits the government regardless of where it is held, but
a government witness with knowledge of Treasury borrowing
practices testified that cash and investments held outside the
Treasury General Account are not considered in Treasury borrowing
decisions, Tr. 1245:21-1246:13 (Grippo); plaintiffs believed
otherwise, but they did not produce a witness with personal
knowledge who could dispute this testimony.  Historian Terence
Kehoe testified for the government that, especially in early

---

[14]     This is a back of the envelope calculation: Plaintiffs
mistakenly include $660,000 in Osage headright funds; their
calculated disbursement rate is 74 percent, meaning they believe
26% of that money is withheld; the average 10-year bond rate over
the life of the trust is about 4.74 percent; it would compound
about 120 times for these first three years.
$660,000*(.26)*((1.0474)^{120}) = \$44,465,751$.

periods, significant amounts of IIM were held outside the
Treasury.  See generally Tr. 1077:4-8, DX-497.  (How much weight
to accord that testimony is unclear, because it was evident that
Dr. Kehoe could not testify confidently about precisely how and
where IIM monies were historically held.)  Suffice it to say that
the evidence produced at trial did not illuminate whether and how
any benefit would have accrued to the government from the
withholding of IIM monies, especially during the early periods of
the trust.

        Plaintiffs adduced no evidence that the Treasury ever
decided to make an actual investment of IIM funds to the
government's own benefit and produced no evidence of any decision
not to borrow money on account of IIM funds.  All that has been
put forward is a general theory that, by inexorable operation of
the government's cash management system and status as a perpetual
debtor, every undisbursed IIM trust dollar that the government
holds is a dollar the government does not have to borrow.  One
need not have the mind-set of a Creationist to reject that theory
as unproven.


**VI.  Jurisdiction**

        The accounting that Congress mandated and that
plaintiffs demanded in this suit would have documented the
management and disposition of allotted assets over the life of

the trust.  Such an accounting would have allowed individual
plaintiffs to determine whether they had viable claims for
damages -- for failure to collect income, enforce lease terms, or
make payments on direct pay contracts; for misfeasance in
negotiating sales or leases at below-market prices; or for
negligence in allowing funds to be lost or stolen.  I found,
however, that Interior's 2007 accounting plan did not provide
such an accounting and, that providing plaintiffs with the
"instrumental right" contemplated by Congress, see Cobell XIII,
392 F.3d at 468, would be prohibitively expensive and, as a
practical matter, impossible.  The trustee's irremediable breach
of its accounting duty has unquestionably harmed individual
plaintiffs (if not necessarily the plaintiff class): their
putative damages claims have been prejudiced by the impossibility
of assembling accurate data about the disposition of their
assets.  That harm cannot be remedied by a monetary award in this
Court, however, because any such relief would be a substitute for
the accounting itself and beyond this Court's jurisdiction to
award.

       Alternative remedies that involve monetary awards
against the government are difficult to come by in the district
courts.  Our jurisdiction over non-tort claims for damages
against the government is conferred by 28 U.S.C. § 1346(a)(2).
It is concurrent with the jurisdiction of Court of Federal Claims

for disputes up to $10,000, but, for claims exceeding that
amount, the Court of Federal Claims has exclusive jurisdiction.
See 28 U.S.C. § 1491(a)(1) (providing same jurisdiction as
§ 1346(a)(2) without $10,000 limit).   The only other applicable
statute that can provide the necessary waiver of sovereign
immunity is 5 U.S.C. § 702, within the Administrative Procedure
Act, which allows for an "action in a court of the United States
seeking relief other than money damages."   Id. (emphasis added).
If they are to recover a monetary award in this case, the
plaintiffs must fit their claim within that provision.

        An award of money is not always "money damages," see
Bowen v. Massachusetts, 487 U.S. 879 (1988), but the Supreme
Court has recently recognized, and with increasing emphasis, that
"[a]lmost invariably . . . suits seeking (whether by judgment,
injunction, or declaration) to compel the defendant to pay a sum
of money to the plaintiff are suits for 'money damages,' as that
phrase has traditionally been applied."   Great-West Life &
Annuity Ins. Co. v. Knudson, 534 U.S. 204, 210 (2002) (citing
Justice Scalia's dissent in Bowen, 487 U.S. at 918-919).   Even
under Bowen and its progeny, § 702 allows for a monetary award
against the government only insofar as money may be "the very
thing to which [the plaintiff] was entitled" -- that is to say,
the non-payment of money must be the very unlawful act of which
the agency is accused.   See, e.g., Dep't of the Army v. Blue Fox,

<u>Inc.</u>, 525 U.S. 255, 262 (1999).  If the money is sought as compensation for another harm, and not as "specific relief," then it is money damages, and it is not within the waiver.  <u>Id</u>.

Plaintiffs are aware of the jurisdictional wire they walk,[15] and they carefully do not seek compensation for the <u>accounting</u> they have not received.  Instead, they demand the restitution of monies collected for their benefit that the trustee has failed to distribute to them or to post to their IIM accounts.  They also demand disgorgement of an amount of money that represents the "benefit to the government" of the government's having the use of their undisbursed money.[16]  The jurisdictional question is whether the claim for money withheld, or the claim for "benefits to the government," or both, are claims for "specific relief," within the waiver of § 702 and within the jurisdiction of this Court.

## VI.A  <u>Money withheld</u>

The duty of a trustee to collect trust revenues and allocate them to the beneficiary and not to himself is as plain as any trust duty, <u>see</u> RESTATEMENT (THIRD) OF TRUSTS § 84 ("The

---

[15]    For a daring display of their tightrope act, see Tr. of Appellate Oral Argument(Sept. 16, 2005), [Dkt. 3519, Exhibit 1].

[16]    Both of these claims are fairly subsumed within the fourth prayer for relief in the plaintiffs' original complaint [Dkt. # 1] filed on 6/10/96: "For a decree . . . directing the defendants to make whole the IIM accounts of the class members."

trustee has a duty to see that trust property is designated or identifiable as property of the trust."); BOGERT, § 541 ("The trustee has the duty to collect and preserve the property made subject to the trust.").  The failure faithfully to perform that duty is a breach of trust, the remedy for which is the restitution of withheld or misplaced money to the beneficiary's account.  That money is not a substitute remedy for a failed accounting: it is the trust property itself.  It is "the very thing to which [the beneficiaries were] entitled."

        The government has breached its fiduciary duty to the plaintiffs in two ways that are separate from one another. (1) The failure properly to allocate and pay trust funds to beneficiaries -- the subject of the present memorandum -- is remediable by restitution or disgorgement of the very money that has been withheld.  (2) The failure to account is remediable by a successful accounting -- the very thing that has not been provided -- but, in this case, that accounting is impossible. Money damages might be an alternative remedy for failure to account, but this Court has no jurisdiction to award money damages.  The two types of breach are related, to be sure: the government seeks to disprove plaintiffs' claim of missing money using accounting techniques.  That effort, however, does not transform the missing money claim into an alternative remedy for a failed accounting.  Restitution and disgorgement are not

remedies for the failure to <u>account</u>, but for the failure to <u>pay</u>.
The only relevance to plaintiffs' restitution claim of my
impossibility finding is that it raises an evidentiary
presumption in favor of the beneficiaries and against the
trustee.

The foregoing analysis answers the sovereign immunity
problem, but the government also argues that this Court lacks
subject-matter jurisdiction to order a monetary award because no
statute authorizes anything more than an accounting.  That
argument fails in the face of repeated holdings, in this case,
that this Court may exercise jurisdiction over claims for breach
of trust under the auspices of the APA, and that the trust duties
that plaintiffs may seek to enforce in this Court are imposed,
not only by statute, but by established principles of equity and
federal common law.  The very holding of <u>Cobell VI</u> was an
affirmation of Judge Lamberth's findings of <u>duty</u> and <u>breach</u>, and
not solely on the basis of obligations created by in the 1994
Act.  <u>See</u> 240 F.3d at 1100 ("The Indian Trust Fund Management
Reform Act reaffirmed and clarified preexisting duties; it did
not create them.  It further sought to remedy the government's
long-standing failure to discharge its trust obligations; it did
not define and limit the extent of appellants' obligations.").
Plaintiffs' claim of the withholding or failure properly to
allocate IIM money is a claim that "the federal government has

unreasonably delayed or <u>unlawfully withheld</u> performance of its trust duties" within the meaning of the APA.  <u>Cobell VI</u>, 240 F.3d at 1104 (emphasis added); <u>see also</u> 5 U.S.C. § 706.  There is no doubt that this raises a federal question.  28 U.S.C. § 1331.

To the extent that plaintiffs still assert it, I do not accept the theory that the government's failure to provide an accounting triggers a broad panoply of inherent equitable powers, allowing this Court to order any remedy necessary to do justice to plaintiffs and prevent unjust enrichment by the government. That theory may or may not be applicable to a garden-variety trust, but it has no application here, where the government is immune from suit unless the remedy sought is specific relief. The distinction between general equitable relief and specific relief is rarely explored because it matters only when the government is the defendant -- in district court -- and only when the relief sought is not injunctive.  But even plaintiffs' expert agreed that it is only the specific nature of the relief sought here that secures the jurisdiction of this Court to order monetary relief against the government.  <u>See</u> Tr. 77:4-21 (Laycock); <u>Blue Fox</u>, 525 U.S. at 262.

Which is not to say that equity's role in this case is limited to defining the precise kind of relief that is available. As will be discussed in greater detail below, equity allocates benefits of doubt and burdens of proof so as to hold the trustee

accountable if he cannot produce a reliable statement of account. It permits the beneficiary-plaintiff to "prove" amounts withheld by forcing the defendant-trustee to disprove them, thus preventing the trustee from taking an advantage of his own breach of trust.  In short, my authority "to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery," Atlas Life Ins. v. W. I. Southern, Inc., 306 U.S. 563, 568 (1939), will provide substantial leeway in my assessment of the evidence in the case, and the evidence that is missing.

Explaining the distinction between my broad equitable authority to assess the evidence and my limited authority to order monetary relief against the government reconciles what might appear to be ambiguities in the Court of Appeals' several statements about the scope of my equity jurisdiction.  In Cobell VI, the Court seemed to emphasize the district court's power to "order any appropriate relief," citing Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 69 (1992): "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."  In Cobell XII, 391 F.3d 251, 257 (D.C. Cir. 2004), the Court returned to the theme, stating that "[t]he district court . . . retains substantial latitude, much more so than a typical agency case, to

fashion an equitable remedy because the underlying lawsuit is both an Indian case and a trust case in which the trustees have egregiously breached their fiduciary duties."  But the Court of Appeals has also made clear, repeatedly, that the APA <u>does</u> limit the equitable powers available to this Court.  <u>See, e.g.</u>, <u>Cobell XVII</u>, 428 F.3d 1070, 1075 (D.C. Cir. 2005) (Congress did not appear "to grant courts the same discretion that an equity court would enjoy in dealing with a negligent trustee."); <u>Cobell XIII</u>, 392 F.3d 461, 473 (D.C. Cir. 2004) ("The availability of the common law of trusts cannot fully neutralize the limits placed [on the court's remedial authority] by the APA."); <u>Cobell VIII</u>, 334 F.3d 1128, 1141 (D.C. Cir. 2003) (court did not have "inherent power" to appoint a special master with extrajudicial powers).

Here is the Rosetta stone that deciphers these pronouncements: Equity walks abroad in trust cases, and it allows a district court to reach farther and react more flexibly than a court ordinarily could in a traditional case at law, but the court is nonetheless constrained by the doctrines that traditionally limit the powers of the federal courts in cases against the federal government.  In a breach of trust case, I may have "the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case," <u>Cobell VI</u>, 240 F.3d at 1108 (citing <u>Hecht Co. v. Bowles</u>, 321 U.S. 321, 329-30

(1944)), but that does not mean that I may transgress the
boundaries posed by doctrines such as subject-matter
jurisdiction, sovereign immunity, and, most palpably the in
history of this case, the separation of powers between federal
agencies and federal courts.  Thus, while equity will influence
questions of proof and calculations regarding funds withheld, it
does not allow me to award any relief -- whether legal or
equitable -- other than the specific return of funds withheld in
breach of trust, because, in this Court, the government has not
waived its immunity to anything other than specific relief.


VI.B.  "Benefit to the government"

        The foregoing discussion telegraphs the answer to the
next question, which is whether I have jurisdiction in equity to
order disgorgement of the "benefit to the government" plaintiffs
think was derived from the withholding of trust funds.  The
answer is simply "No" -- but the plaintiffs have devoted such a
significant amount of attention to the claim that a full
explanation for its rejection will be attempted here.  I have
concluded after hearing the evidence that the claim must be
denied (1) because there is no proof that the government was
actually relieved from the need to borrow money because of IIM
funds it had not posted to accounts; (2) because a claim for
theoretical savings of borrowing costs is in substance a claim

for damages; and (3) because, in general, an accounting for profits is not specific relief within the meaning of <u>Bowen</u> and <u>Blue Fox</u>.

 VI.B.i. *The calculated "benefit" is unproven*

  Plaintiffs did not produce a single witness who could testify in detail about modern borrowing practices at Treasury. The financial practices of the Treasury Department in the early years of the trust -- a very important era because, in plaintiffs' submission, early differences compound over the life of the trust -- remain a complete mystery.  Even if the record contained information about Treasury's use of identified trust funds now or in the past, such information would not prove anything about the use or management of misidentified or mislaid funds.  Plaintiffs' assumption that all funds went into the Treasury General Account and were all taken into account when the government made borrowing decisions is thus only an assumption, entirely unproven as to any specific funds, and specifically refuted as to the modern borrowing practices at Treasury.

  "If profits from the use of the property are sought, the plaintiff has the burden of proof to establish the gross amount of such profits."  <u>See</u> Joel Eichengrun, <u>Remedying the Remedy of Accounting</u>, 60 Ind. L.J. 463, 469-70 (1985) (citing <u>Pallma v. Fox</u>, 182 F.2d 895 (2d Cir. 1950) (Hand, C.J.)). Plaintiffs essentially concede as much, <u>see</u> Plaintiffs' Proposed

Findings of Fact and Conclusions of Law, [Dkt. 3549] at 140

(plaintiffs have burden of proving a reasonable approximation);

id. at 141 (citing above article), but they did not sustain their

burden.

    VI.B.ii  *The calculated "benefit" is a claim for interest*

        The lack of any identifiable benefit to the government

also means that the remedy sought cannot be specific relief.  The

application of an averaged interest rate, on an annual

compounding basis, to a calculated approximate principal amount,

to represent an amount by which the government would have been

enriched by withholding funds in the Treasury, yields only a

speculative and theoretical "benefit."  There is no question but

that beneficiaries are entitled to interest or imputed yields on

trust assets, Cobell XIII, 392 F.3d at 468, but a claim for

interest is certainly a claim for damages, and not within the

APA's waiver of sovereign immunity.  See Library of Congress v.

Shaw, 478 U.S. 310, 311 (1986) ("The no-interest rule is to the

effect that interest cannot be recovered in a suit against the

Government in the absence of an express waiver of sovereign

immunity from an award of interest.").

        The government is always borrowing -- servicing debt on

a daily basis.  If any dollar that it is able to avoid paying on

any day for any reason were a "benefit" to the government in the

form of saved borrowing costs, any claimant could ride the § 702

waiver into district court, seeking compound interest on his underlying claim, thus swallowing not only the non-interest rule, but also the exclusive jurisdiction of the Court of Federal Claims.

Plaintiffs place their principal reliance on a single case, Henkels v. Sutherland, 271 U.S. 298 (1928). That case involved shares of stock that had been seized and sold under the Trading with the Enemy Act, the proceeds of the sale having been invested in government securities. The government argued that the interest earned on the investment need not be paid out because of the no-interest rule. The Court disagreed, noting that the rule could not "enable the government unjustly to enrich itself at the expense of its citizens, by appropriating income actually earned and received, which morally and equitably belongs to them as plainly as though they had themselves made the investment." Id. at 301. The Court identified a constitutional concern over taking the actual proceeds of a citizen's property. Id.

Henkels does not support plaintiffs' proposition that borrowing costs saved by the government must be disgorged to prevent unjust enrichment or an unconstitutional taking. In fact, the Court in Henkels specifically directed that the interest should be paid only on the portion of the proceeds that were actually invested, after "taking into account" and deducting

"the average amount of such proceeds which remained uninvested in the Treasury." Id. at 302.  Profits actually earned from investments are not the same as the imputed profits plaintiffs' seek to recover here.

   VI.B.iii  *In general, accounting for profits is outside the waiver of immunity in § 702*

   Even if plaintiffs had provided satisfactory proof of an actual "benefit to the government," and even if their "benefit to the government" claim were not in substance a claim for interest, it would not come within the § 702 waiver of sovereign immunity.  A general award of profits earned by the trustee, as distinct from a claim for specific income or proceeds actually generated by trust property, cannot be the sort of specific relief identified by Bowen and Blue Fox.

   Plaintiffs read § 702 and Bowen far too broadly in arguing that any remedy classifiable as restitution or disgorgement is relief "other than money damages."  The Supreme Court has already made clear that, where money is at stake, it must be "the very thing to which [the plaintiff] was entitled" to come within the waiver, see Bowen, 487 U.S. at 895 -- or the suit must be brought "to enforce the statutory mandate itself, which happens to be one for the payment of money." Blue Fox, 525 U.S. at 262 (citing Bowen, 487 U.S. at 900).

   The facts of Bowen are instructive: The Secretary of Health and Human Services had disallowed certain Medicaid

reimbursements to the State of Massachusetts.  The suit asked the district court to review the Secretary's order under the APA, set it aside as unlawful, and require payment.  <u>Bowen</u>, 487 U.S. at 887-88 & n.10.  The payment of money, which the Court ultimately did require, was what the statute required the Secretary to do -- "the very thing to which [the plaintiff] was entitled."  A helpful mnemonic for the rule of <u>Bowen</u> is to consider whether payment of money was to remedy a wrong, or whether non-payment <u>was</u> the wrong.  It is the latter case -- of continuing non-payment in violation of the law -- that can properly be reviewed under the APA's waiver of immunity.

General disgorgement of profits to prevent unjust enrichment would be a remedy, not a trust duty.  A trustee owes a beneficiary a duty of loyalty, <u>see</u> RESTATEMENT (THIRD) OF TRUSTS § 78; BOGERT, ET AL. § 543, and "the trustee must not personally profit from his administration of the trust."  BOGERT, ET AL. § 541.  When the trustee breaches this duty, a variety of remedies are available to the beneficiary, including compensation for loss and recovery of profits to prevent unjust enrichment.  BOGERT, ET AL. § 861.  But the "very thing" to which the beneficiary was entitled was the trustee's undivided loyalty and abstention from personal profit -- whatever he recovers is a substitute for what the trustee failed to provide.  It is true that disgorgement is aimed at discouraging breach, not at compensating for loss, <u>see</u>

- 56 -

id., but where it is a tool to <u>encourage</u> performance of the duty, it is not the duty itself.

This discussion disposes of plaintiffs' alternative theory -- asserted very late in the proceedings -- that the Act of September 11, 1841, 5 Stat. 465 makes an award of interest "specific relief."  That statute requires that all trust funds held by the United States be invested in "stock of the United States bearing a rate of interest not less than five per centum per annum."  Id.  Whether this statute applies to Indian funds is doubtful, see Mescalero Apache Tribe v. United States, 518 F.2d 1309, 1324-26 (Ct. Cl. 1975), but, even if it does apply to IIM funds, a demand made under its rubric would be a demand for substitutionary relief.  The very thing to which plaintiffs would be entitled under this statutory scheme would be the investment of their funds; an action "to enforce the statutory mandate itself," Bowen, 487 U.S. at 900, would request an injunction requiring future investment, not compensation for prior failure to invest.  That failure would have to be remedied by compensation for the lost investment -- that is, money damages.

Finally, plaintiffs cite a statute which, in their submission, provides them with a separate waiver of sovereign immunity for interest on trust funds.  25 U.S.C. § 4012 provides that the Secretary "shall make payments to an individual Indian in full satisfaction of any claim of such individual for interest

on amounts deposited or invested on behalf of such individual
before October 25, 1994, retroactive to the date that the
Secretary began investing individual Indian monies."  This
statute certainly waives the no-interest rule with respect to
interest earned on funds actually "deposited or invested," but it
does not waive immunity to a claim for interest that might have
been earned on funds that were not invested,[17] and it does not
grant jurisdiction to district courts to recover it, at least not
in increments of more than $10,000.[18]

## VII.  Application of Equitable Trust Principles

The core legal question in this case is how to apply
equitable principles for the administration of trust cases to the
unique situation posed by the IIM trust system.  Resolution of

---

[17]     A bill that would have required payment of "an amount
equal to the interest which would have been earned if funds of
such Indian tribe or individual Indians . . . had been deposited
or invested in accordance with such Act," was introduced and was
not enacted.  See H.R. 1846, 103d Cong. § 102(2).

[18]     The government has also raised the argument that what
plaintiffs seek is prejudgment interest, which would be beyond
the power of any court to award.  See Library of Congress v.
Shaw, 478 U.S. 310, 311 (1986).  I have determined that, for the
three separate reasons stated above, what is sought is not
specific relief within the waiver of immunity in § 702.  That is
the limit of my holding.  Whether it is prejudgment interest or a
separate claim for damages to beneficiaries from the government's
failure to invest trust funds as required by its duties as
trustee, see RESTATEMENT (THIRD) OF TRUSTS §§ 90-92, is more properly
a question for a court that has jurisdiction over claims for
money damages.

the question requires examining both cases in equity and whatever substantive federal trust law exists.  The body of modern case law is not substantial, and, because most trust law is state law, federal courts including the Supreme Court routinely resort to the restatements and to the treatises to find applicable principles.  See, e.g., United States v. Mitchell (Mitchell II), 463 U.S. 206, 225 (1983).  Even with these general sources in hand, however, hard rules suitable for application to new cases are hard to pin down.[19]

This is in the nature of equity.  The equity system evolved in England as an alternative to law courts precisely because the rigidity of the writ system did not allow law courts

_____

[19]    The opening paragraphs of WILLIAM Q. DEFUNIAK, HANDBOOK OF MODERN EQUITY 1 (2d ed. 1956), indicate the difficulty:

All writers on the subject of equity seem to start their discussions in agreement that the term is difficult to define.  They then point out that equity in its popular sense signifies natural justice or whatever is right and just as between man and man, adding the cautionary statement that this, of course, is not the legal sense of the term.  They usually unite in offering as the technical or scientific legal meaning the definition that equity is that system of jurisprudence or justice originally administered by the High Court of Chancery of England and administered in courts of this country which have such chancery jurisdiction, or equity jurisdiction as it is now generally called.
    To the reader approaching the subject for the first time, such a definition tells him exactly nothing.

the flexibility adequately to address the distinctions among
individual cases.  See WILLIAM Q. DEFUNIAK, HANDBOOK OF MODERN EQUITY 3-
4 (2d ed. 1956).  The Supreme Court has recognized that equity
"has always preserved the elements of flexibility and
expansiveness . . . in order to meet the requirements of every
case."  Union Pac. Ry. Co. v. Chicago, R.I. & P. Ry. Co., 163
U.S. 564, 601 (1896) (quoting J.N. POMEROY, A TREATISE ON EQUITY
JURISPRUDENCE § 111).  It is a fundamental maxim of equity that it
looks to substance rather than form, JOHN MCGHEE, SNELL'S EQUITY
§ 3-24 (30th ed. 2000). "In equity, as nowhere else, courts
eschew rigid absolutes and look to the practical realities and
necessities inescapably involved in reconciling competing
interests."  Lemon v. Kurtzman, 411 U.S. 192, 201 (1973); see
also Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944) ("The essence
of equity jurisdiction has been the power of the Chancellor to do
equity and to mould each decree to the necessities of the
particular case.  Flexibility rather than rigidity has
distinguished it.  The qualities of mercy and practicality have
made equity the instrument for nice adjustment and reconciliation
between the public interest and private needs."); Taylor v.
Sterrett, 499 F.2d 367, 368 (5th Cir. 1974) ("[Equity's] orders
are adapted to the exigencies of the case.").  In other words,
sitting in equity, I have significant freedom to fit existing
principles of trust law to the exigencies of this case.  See

<u>Meredith v. City of Winter Haven</u>, 320 U.S. 228, 235 (1943) ("An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity.").

At the same time, I must be mindful that equity is not measured by the length of the chancellor's foot. <u>See</u> <u>Grupo</u> <u>Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.</u>, 527 U.S. 308, 332-33 (1999) (citing 1 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE § 19). Nor, in this case, will I even exercise all the discretion of a private-law chancellor in equity. <u>Cobell</u> <u>XVII</u>, 428 F.3d at 1077. Courts of equity are no less constrained than any others by doctrines such as sovereign immunity and separation of powers. These constraints, however, are constraints upon the <u>remedies</u> that are available to district courts sitting in equity. <u>See Grupo Mexicano</u>, 527 U.S. at 333. A district court has much broader discretion when considering whether and how much to modify (for example) the evidentiary presumptions that run against a trustee who fails in his duty to account. <u>See, e.g.</u>, <u>White v. Rankin</u>, 18 A.D. 228, 229 (N.Y. App. Div. 1897) (applying presumption against the trustee only after finding "no equitable considerations present in this case which call, in any respect, for a mitigation of this rule."); RESTATEMENT (THIRD) OF TRUSTS § 83 ("A trustee's failure to maintain necessary books and records <u>may</u> also cause a court in reviewing a judicial

accounting to resolve doubts against the trustee.") (emphasis added).

Thus informed by general principles of trust law, we turn to the particular realities of the IIM system.  No chancellor, whatever his shoe size, has ever encountered a trust as complex or problematic as the IIM trust.  The IIM trust is perpetual, and so violates the rule against perpetuities.  Its beneficiaries number in the hundreds of thousands and are dispersed, as are its assets, over a vast geographic area. Beneficial interests in particular assets are constantly fractionating into smaller and smaller pieces, and the government is dependent upon Indian probate proceedings to determine the proper holders of minute entitlements.  The trust is already over 120 years old, and so predates not only the electronic age, but many forms of interstate communication and rationalized, bureaucratic record keeping on a national scale.  And, unlike the average trust, where administrative costs are taxed against trust income, the IIM trust is "funded entirely at the taxpayers' expense."  Cobell XVII, 428 F.3d at 1074-75.

These realities temper the application of ordinary trust law.  Consider the position plaintiffs have taken here, that government revenue data may be treated as sufficient evidence of receipts, but that every disbursement must be proven by a check or similar documentation of disbursement to a

beneficiary.  See Plaintiffs' Proposed Findings of Fact and
Conclusions of Law, [Dkt. 3549] at 136-148.  That assertion
invokes the equitable principle that all inferences will be drawn
against the trustee who cannot produce satisfactory statements of
account.  See, e.g., BOGERT, ET AL. § 962 ("As to a trustee who
fails to keep proper records of his trust it is usually stated
that, 'all presumptions are against him' on his accounting, or
that 'all doubts on the accounting are resolved against him.')";
id. at n.11 (collecting cases).  The Court of Appeals has
acknowledged the same principle.  See Rainbolt v. Johnson, 669
F.2d 767, 769 (D.C. Cir. 1981) ("Under established principles of
trust law, if the former trustee has not kept adequate accounts,
the benefit of the doubt is to be given to the beneficiary.").
And this rule is no doubt required to prevent the trustee from
benefitting from his own breach; a claim that the trustee has
held trust funds as his own cannot be defended on the ground that
the trustee's own records are unclear.  See Cafritz v. Corp.
Audit Co., 60 F. Supp. 627, 632 (D.D.C. 1945) ("All evidence is
to be weighed according to the proof which it was in the power of
one side to have produced, and in the power of the other side to
have contradicted.").

        Yet there are at least three reasons not to accept
plaintiffs' super-strong assertion of the presumption in this
case.  First, and foremost, to do so would breathe new life into

a "gold-plated" form of accounting that the Court of Appeals has already rejected as unduly burdensome, and that plaintiffs themselves have disclaimed.  See Tr. of Appellate Oral Argument 40:1-45:25 (Sept. 16, 2005), [Dkt. 3519, Exhibit 1].  The Court of Appeals has made clear that statistical sampling is an acceptable method of accounting for IIM trust transactions.  See Cobell XVII, 428 F.3d at 1077-79.  And my holding of legal impossibility was not based on a finding that the accounting was literally and permanently impossible, but rather on the fact that a meaningful accounting was irrationally expensive.  See Cobell XX, 532 F. Supp. 2d at 102.  It would be bizarre if, following these precedents, the government -- really, the taxpayers -- were held liable for every transaction not proven by a method that is not legally required and would be irrational to pursue.  In assessing the government's accounting plan it was necessary to consider whether there was a reasonable balance "between exactitude and cost."  Cobell XVII, 428 F.3d at 1076.  I will not now apply a presumption that eliminates any semblance of that balance.

The second reason to reject the presumption plaintiffs advance is that it would be unfair given the nature of the IIM trusts.  One cannot fail to be impressed by the sheer volume of the transactions involved.  The difficulties of administering a trust of such geographic scope are not lightly ignored.  That the

government lacks reliable records back to 1887 is hardly surprising, as even the plaintiffs' own witness conceded.  Tr. 331:19-332:8 (Cornell).  But for the 1994 Act, indeed, an accounting claim raised 121 years into the trust would ordinarily be prejudicially late.  See, e.g., Bogert et al. § 962 ("Beneficiaries who know of the method employed by a trustee in keeping accounts and do not object over a period of years will not be heard to object later.").  The passage of the 1994 Act renewed plaintiffs' entitlement to an accounting, but it did not necessarily create an entitlement to the super-strong adverse inference asserted here.  In importing certain doctrines from background trust law and excluding others, the Court must seek fairness to both parties.  See, e.g., Providence Rubber Co. v. Goodyear, 76 U.S. 788, 807 (1870) (a court should "exercise its flexible jurisdiction in equity as to protect all rights and do justice to all concerned.").

Finally, it would be inequitable to apply plaintiffs' proposed presumption, because its outcome would be manifestly inaccurate.  Comparing aggregate government receipt data only to CP&R or EFT disbursement data is not a comparison of apples to apples.  Applying the presumption in this way goes well beyond counting obscurity against the government, and instead provides the plaintiffs with a windfall, which is not acceptable in equity.  See Bollinger & Boyd, 576 F.2d at 598.  As always,

equity prefers substance over form and will not apply

presumptions in a formalistic way that generate manifestly

counterfactual outcomes.

At the same time, I cannot ignore the settled trust

principle that the trustee has a responsibility to keep and

produce accurate records, and that presumptions will run against

him when he cannot comply.  The government surely came to these

proceedings with something to prove: it had produced a document

stating -- admitting -- that only 77 percent of system receipts

had been posted to IIM accounts, <u>see</u> DX-365, and it could not

produce a precise accounting for the funds so received and

posted.  Statistical modeling provides a way that the government

might begin to satisfy its burden, and because by its very nature

it provides a measure of the uncertainty in government data, it

suggests a way that the presumption against the trustee who

cannot account might be given effect.  The government's

statistical model allows for the use of the best available data

while preserving measures of uncertainty that can be scored to

the plaintiffs' benefit in the final analysis.  This preserves

fidelity to trust principles while also providing fairness in

their application.

For the sake of clarity, the principles to be applied

should be succinctly stated.  The following principles, distilled

from prior <u>Cobell</u> opinions and from background trust law, seem

most applicable to a proper analysis of the evidence in this
case:

     1)  Statistical modeling is an acceptable means by
which to analyze existing trust data and the
uncertainty in those data.  See Cobell XVII, 428 F.3d
at 1077-79.

     2)  The best available data regarding receipts and
disbursements should be used, even if there are
questions regarding its reliability, so long as account
is taken of its weaknesses and there is no evidence of
bias.  Cf. Bollinger & Boyd, 576 F.2d at 598; Kelly v.
Intermountain Planned Parenthood Inc., 828 F. Supp.
788, 794 (D. Mont. 1992) ("It is axiomatic that no rule
of equity should be applied in blind disregard of
fact.").

     3) Because the trustee should not benefit from his
breach, the benefit of doubt runs to the beneficiary,
see Rainbolt, 669 F.2d 769, and whatever uncertainty is
revealed in the data will be credited to the
beneficiary.

These three principles, founded in basic trust law but modified
as necessary to fit the exigencies of this case, inform and
produce the resolution of plaintiffs' claim for restitution.

**VIII.  Application of Law to Fact**

From the beginning of the June 2008 trial, the
government had the burden of explaining the gap between receipts
and postings revealed by its exhibits from the October 2007
trial.  Plaintiffs added nothing to that burden by their trial
presentation.  Their model did not make use of the best available
evidence and did not make fair or reasonable comparisons of data.
Plaintiffs injected bias in their model through use of unfounded
adjustments.  By deeming all receipts admitted and seeking to put
the government to the strictest of proof on all disbursements,
plaintiffs' model not only attempted via the "back door" to
impose a "gold plated" accounting standard the Court of Appeals
had already rejected, but it employed a super-strong
interpretation of the presumption against the breaching trustee
that cannot be equitably applied to the trusts at issue here.
The plaintiffs' model stands or falls with their legal theory,
and it falls.

The government's model, on the other hand, fits
comfortably within the equitable principles that should be
applied with respect to the IIM trust, because it offers a useful
way of pricing the considerable uncertainty in the data.
Plaintiffs presented no statistical testimony challenging the
government's model, which I found to be sound.  The model did
rely on data whose reliability has been questioned, but it

attempted to price out the uncertainty in both the imputed values and the existing data, and no evidence was introduced showing the data to be biased in either direction.  Finally, the government's model essentially <u>admits</u> that the existing balance of the trust may be understated, and its proponent, Dr. Scheuren, admitted that uncertainty should be scored in the plaintiffs' favor.  Tr. 945:9-18 (Scheuren).  The numbers produced by the application of the uncertainty model are high, but they are plausible in relation to the total throughput of the IIM system, the current stated balance, and the many, many examples of system deficiencies that have been introduced over the course of this suit.  I accordingly accept the government's model as a reasonable approximation of the amount by which the total balance of the IIM trust is understated.

All that remains, then, is to select the appropriate confidence interval to apply in assessing the uncertainty to be credited to the plaintiffs.  Dr. Scheuren testified that in most business settings, a 95 percent confidence interval is understood as appropriate.  Tr. 971:13-972:18 (Scheuren).  He also testified, however, that it was reasonable to move to an even wider confidence interval -- from 95 percent to 97.5 percent -- to address problems that the plaintiffs demonstrated with the reliability and precision of the CD&L data.  Tr. 974:16-975:4 (Scheuren).  Based on this testimony, I see two reasons to move

beyond Dr. Scheuren's 97.5 percent interval to the maximally conservative estimate provided by the 99 percent confidence interval.

First, there is more uncertainty in the data than even Dr. Scheuren was willing to acknowledge.  Dr. Angel's historical reports are not biased but may be understated, IRMS data has important reliability problems, and the qualified audit data is, after all, only <u>qualified</u>, and was not even subjected to the time-series remodeling step.  Using a 99 percent confidence interval is an appropriate way of addressing this remaining and unaddressed uncertainty.  Second, a 99 percent confidence interval is a legally sound way of crediting obscurities and doubts to the plaintiffs.  Although it creates a highly conservative estimate -- the most conservative possible --  it is far less draconian than the presumption that ordinary trust law might apply in an ordinary trust case.

But, as the size of the final figure demonstrates, this is hardly the ordinary case.  After 12 years of contentious litigation, the government can say only that, with 99 percent confidence, it believes that no more than $455,600,000 is missing from the stated balance of the IIM trust.  This statement has the character of an admission -- by responsible civil servants -- that there are limits to what can be confidently stated with respect to the IIM system, and that a history of accounting

nonfeasance makes such a substantial error plausible.  It also represents the product of zealous and determined advocacy on the part of plaintiffs' counsel, who have fought to vindicate their clients' belief that the government's inattention to its trust duties has had not only historical significance, but real economic significance in the day-to-day lives of individual Indians.

The costs of this litigation have been great: government manpower and funds, careers of financial consultants, judicial resources, and forests of paper have been dedicated to its prosecution and defense.  The <u>Cobell</u> case will no doubt stand, in some respects, as a cautionary tale about the limited ability of a court to right historical wrongs that could have been –- and should have been –- settled by the same political branches in recognition of their own failure to preserve the trust.  But the benefits of the litigation are manifest: not only has the present and future reliability of the Indian trust system greatly increased, but the repository at Lenexa and the technological tools that have been developed to examine historical transactions have created a wellspring of information from which scholars will continue to learn about the history of the Indian trusts, Indian lands, and Federal-Indian relations.

The entry of final judgment must await a third proceeding here regarding the appropriate allocation to the

plaintiff class of the monies to be restored.  The Clerk will be
directed to set a status conference in late August.  Perhaps it
is not too much to hope that the announcement in this memorandum
of a hard number will give rise to some off-line conversation
between the parties in the meantime.


                              JAMES ROBERTSON
                         United States District Judge