IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELOUISE PEPION COBELL<br>　　Highway 89, HC 73<br>　　Box 761<br>　　Valier, Montana 59486,<br><br>EARL OLD PERSON<br>　　P.O. Box 486<br>　　Browning, Montana 59486,<br><br>MILDRED CLEGHORN<br>　　Route 1, Box 600<br>　　Apache, Oklahoma 73006,<br><br>THOMAS MAULSON<br>　　P.O. Box 277<br>　　Long's Pond Road<br>　　Lac du Flambeau, Wisconsin 54538,<br><br>JAMES LOUIS LAROSE<br>　　Route 1, Box 15<br>　　Winnebago, Nebraska 68071,<br><br>all on their own behalf and on<br>　　behalf of all persons similarly<br>　　situated,<br>　　　　　　　　Plaintiffs,<br><br>　　　　　v.<br><br>BRUCE BABBITT, Secretary of the<br>　　Interior<br>　　1849 C Street N.W.<br>　　Washington, D.C. 20240,<br><br>ADA E. DEER, Assistant Secretary of<br>　　the Interior - Indian Affairs<br>　　1849 C Street N.W.<br>　　Washington, D.C. 20240, and<br><br>ROBERT E. RUBIN, Secretary of the<br>　　Treasury<br>　　1500 Pennsylvania Avenue N.W.<br>　　Washington, D.C. 20220,<br><br>　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br><br>CASE NUMBER  1:96CV01285<br><br>JUDGE: Royce C. Lamberth<br><br>DECK TYPE: Civil General<br><br>DATE STAMP: 06/10/96<br><br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>　Civil Action No. ____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT TO COMPEL PERFORMANCE OF TRUST OBLIGATIONS

### I.  GENERAL NATURE OF THE ACTION

1.   This action is brought to redress gross breaches of
trust by the United States, acting by and through the defendants,
with respect to the money of more than 300,000 individual
Indians.

2.   Involved in this action are accounts commonly referred
to as Individual Indian Money ("IIM") accounts.  As is more fully
set forth hereinbelow, IIM accounts include money which is the
property of individual Indians, held by the United States as
trustee on their behalf.  Such accounts currently reflect a
balance of more than Four Hundred and Fifty Million Dollars
($450,000,000.00), and more than Two Hundred and Fifty Million
Dollars ($250,000,000.00) passes through them each year; the true
totals would be far greater than those amounts, but for the
breaches of trust herein complained of.

3.   Defendants, the officers charged with carrying out the
trust obligations of the United States, have grossly mismanaged,
and continue grossly to mismanage, such trusts in at least the
following respects, among others:

(a)   They have failed to keep adequate records and to
install an adequate accounting system, including but not limited
to their failure to install an adequate accounts receivable
system;

(b)   They have destroyed records bearing upon their breaches
of trust;

-2-

(c)   They have failed to account to the trust beneficiaries
with respect to their money;

(d)   They have lost, dissipated, or converted to the United
States' own use the money of the trust beneficiaries; and

(e)   Defendants Babbitt and Deer have prevented, and
combined and conspired with others to prevent, the Special
Trustee for American Indians, appointed pursuant to the American
Indian Trust Fund Management Reform Act of 1994 ("the 1994 Act"),
P.L. 103-412, 108 Stat. 4239, codified to 25 U.S.C. §§ 162a(d)
and 4001-4061, from carrying out duties and responsibilities
conferred upon him by law to correct their unlawful practices and
procedures with respect to IIM accounts.

4.   By this action the more than 300,000 individual Indian
trust beneficiaries seek, inter alia, the aid of this Court to
compel defendants to take action wrongfully withheld and
otherwise comply with the law, to review their acts with respect
to the IIM accounts, to direct them to institute appropriate
trust practices, and to direct them to restore trust funds
wrongfully lost, dissipated, or converted.

5.   This action deals only with Individual Indian Money
accounts.  The United States also holds money and property in
trust for Indian tribes and has committed breaches of those
trusts as well; however, plaintiffs do not in this action claim
standing to seek redress of those breaches and such breaches are
not covered by this action.

6.   Plaintiffs have no adequate administrative remedies.
Plaintiffs have requested defendants repeatedly to comply with
their obligations and redress the breaches of trust herein
complained of, without success.  Moreover, as is more fully set
forth hereinbelow, plaintiffs have supported the passage of
legislation directed at redressing some of the wrongs herein
complained of, and such legislation has been enacted by Congress;
yet defendants have refused to obey the mandate of Congress and
have undermined efforts of the Special Trustee hereinafter
described to bring their activities into compliance with law.
Defendants have exhausted all avenues of redress other than this
action.   Only this Court can provide to plaintiffs the relief to
which they are entitled.

## II.    THE PARTIES

### A.    The Plaintiffs

7.   Plaintiff Cobell is an enrolled member of the Blackfeet
Indian Tribe and is the beneficiary of an IIM account.

8.   Plaintiff Old Person is an enrolled member of the
Blackfeet Indian Tribe and is the beneficiary of an IIM account.

9.   Plaintiff Cleghorn is an enrolled member of the Fort
Sill Apache Tribe (Oklahoma) and was in the past the beneficiary
of an IIM account.

10.   Plaintiff Maulson is an enrolled member of the Lac du
Flambeau Chippewa Tribe (Wisconsin) and was in the past the
beneficiary of an IIM account.

-4-

11.  Plaintiff LaRose is an enrolled member of the Winnebago Tribe of Nebraska and is the beneficiary of an IIM account.

12.  All plaintiffs bring this action on their own behalf and on behalf of all persons similarly situated, as is more fully set forth under "Class Action Allegations" hereinbelow.

### B.  The Defendants

13.  Defendant Babbitt is Secretary of the Interior and chief officer of the Department of the Interior, and as such is charged by law with carrying out the duties and responsibilities of the United States as trustee for the named plaintiffs and all other owners of IIM accounts.

14.  Defendant Deer is Assistant Secretary of the Interior - Indian Affairs and head of the Bureau of Indian Affairs within the Department of the Interior (hereinafter sometimes called "BIA" or "the Bureau"), and as such is the delegate of defendant Babbitt for the carrying out certain of his responsibilities with respect to IIM accounts.

15.  Defendant Rubin is Secretary of the Treasury, and as such is custodian of the moneys in IIM accounts, is responsible for maintaining certain records in connection therewith, and has certain investment responsibilities with respect thereto.

### III.  JURISDICTION

16.  This Court has jurisdiction over this action under 28 U.S.C. § 1331, in that it is an action arising under the constitution and laws of the United States, and under 28 U.S.C. § 1361, in that it is an action in the nature of an action of

mandamus to compel an officer or employee of the United States to perform a duty owed to plaintiffs.

## IV. THE TRUST OBLIGATIONS OF THE UNITED STATES AND OF DEFENDANTS WITH RESPECT TO INDIVIDUAL INDIAN ACCOUNTS.

17. The bulk of the funds held by the United States in trust for IIM account holders is derived ultimately from income from individual land allotments. Such allotments date from the era, lasting until 1934, when it was the policy of the United States to break up Indian tribes and tribal lands. In implementation of such policy, on many reservations the bulk of tribal land was divided into tracts normally of 80 or 160 acres (called "allotments") and the tracts were patented to individual Indians, with legal title thereto held by the United States as trustee for the allottee. In many instances, such tracts produce income from, e.g., the lease of tracts for grazing or farming purposes, the sale of timber from tracts, and the grant of oil, gas, or mineral mining rights. The income so derived forms the core of the IIM accounts here involved.

18. To a limited extent, moneys from one or more of the following additional sources may be contained in, or have passed through, IIM accounts:

(a) Funds originally held in trust for a tribe which were distributed per capita to tribe members;

(b) Per capita distributions of funds appropriated to meet judgments of the Indian Claims Commission and courts and in settlement of claims;

-6-

(c)  Income from investment of funds;

(d)  Money paid from tribal funds to equalize allotments;

(e)  Proceeds of sales of allotments;

(f)  Compensation for rights of way;

(g)  Rent for allotments of aged or incompetent allottees;

(h)  Proceeds of sales of allotments of incompetent Indians;

(i)  Money due to incompetent or orphan Indians;

(j)  Money accruing from the Department of Veterans Affairs or other government agencies to minors or incompetent adults;

(k)  Apportionment or allotment of pro rata shares of tribal or trust funds; and

(l)  Per capita annual payments to members of certain specified tribes.

19.  As trustee of the funds in such accounts, the United States owes, and continuously since the inception of the IIM account program has owed, certain duties and responsibilities to the account holders as trust beneficiaries, including but not limited to the duty:

(a)  To maintain adequate books and records with respect to such accounts; including, without limitation, records as to the leases and other contractual arrangements giving rise to income from allotments, and as to investments of moneys held in trust;

(b)  To maintain adequate records as to the ownership of such accounts; including, without limitation, records as to the devolution of rights in and to such accounts, by assignment, bequest, devise, intestate succession, or otherwise;

-7-

    (c)  To maintain adequate systems and controls to guard
against error and dishonesty, by, without limitation, maintaining
an accurate accounts receivable system and separating the billing
and collection functions;

    (d)  To invest such funds as permitted by law, and to
deposit them in such depositary institutions as are permitted by
law; to exercise prudence in the selection of such investments
and depositary institution as are authorized by law; and, within
the constraints of law and prudence, to maximize the return on
such investments and deposits;

    (e)  To account regularly and accurately to the
beneficiaries, to give them upon request accurate information as
to the state of their accounts, and to pay to them on demand such
amounts as they may be entitled to; and

    (f)  To refrain from self-dealing and benefiting from the
management of the trust funds.

    20.  The proper discharge by defendants of the trust
responsibilities of the United States with respect to IIM
accounts was reconfirmed and restated, in part, by § 101 of the
1994 Act, 25 U.S.C. § 162a(d), as including, without limitation:

    (a)  Providing adequate systems for accounting for and
reporting trust fund balances;

    (b)  Providing adequate controls over receipts and
disbursements;

    (c) · Providing periodic, timely reconciliations to assure
the accuracy of accounts;

(d) Determining adequate cash balances;

(e) Preparing and supplying account holders with periodic statements of their account performance and with balances of their account which shall be available on a daily basis;

(f) Establishing consistent, written policies and procedures for trust fund management and accounting; and

(g) Providing adequate staffing, supervision, and training for trust fund management and accounting.

V. BREACHES OF TRUST BY DEFENDANTS

21. The United States, acting through the defendants, has consistently and egregiously failed to comply with these and other responsibilities of a trustee and continues to do so. Such breaches of trust include, without limitation:

(a) Failure ever to reconcile or audit the accounts, so that defendants are unable to provide accurate account balances or to determine how much money that should have been collected and credited to IIM accounts was not collected or was diverted to improper ends;

(b) Deliberate destruction of records from which the amounts that should have been credited to IIM accounts could be determined;

(c) Failure to establish an accounts receivable system, so that defendants have no way of confirming that the income due from the trust assets, and other funds that should have been credited to IIM accounts, has in fact been collected;

(d)  Failure to separate billing and collection functions or to install other systems necessary to guard against diversion of beneficiaries' funds;

(e)  Failure to maintain accurate ownership records, so that defendants have no way of determining to whom the income that has been collected belongs;

(f)  Failure to provide regular, accurate reports to beneficiaries to tell them the correct amounts and sources of their income;

(g)  Failure to exercise prudence and observe the requirements of law with respect to investment and deposit of IIM funds, and to maximize the return on investments within the constraints of law and prudence; and

(h)  Engaging in self-dealing and benefiting from the management of the trust funds.

22.  The consequences of these and other acts of mismanagement in breach of trust include, but are not limited to, the following:

(a)  As of the close of fiscal 1995, there was a total of more than 387,000 IIM accounts, among which there were at least 15,599 duplicate accounts with the same number;

(b)  There were many duplicate accounts with the same name;

(c)  Twelve separate databases of accounts were maintained and there was no common database;

-10-

(d)   There were more than 54,000 accounts, containing over $46,000,000, for individuals with no address or no correct address;

(e)   Out of more than 48,000 accounts containing more than $159,000,000 supposedly held in trust for minors until they reach the age of 18, over 15,000 accounts, containing more than $24,000,000, were held for persons who in fact were over 18;

(f)   More than $122,000,000 was held in nearly 22,000 accounts which were supposedly temporary repositories pending determination of ownership of the funds; more than 4000 of these accounts, containing over $3,000,000, had no activity for 18 months;

(g)   There were more than 21,000 accounts with more than $36,000,000 for persons who had died; at least 2400 of these were for closed estates, yet more than $600,000 due to heirs under such estates had still not been distributed; and

(h)   There were more than 280 overdraft accounts totaling over $325,000.

23.   Plaintiffs have no reason to believe that the present situation is significantly different. Moreover, the foregoing list includes only examples already admitted by defendants. On information and belief, there are many other consequences of defendants' mismanagement in breach of trust which are presently unknown to plaintiffs and which can only be brought to light and corrected with the aid of this Court.

24.  The representative plaintiffs, and all other members of
the class, thus do not know, and have no way of ascertaining, and
unless this Court grants the relief here sought will in the
future have no way of knowing or ascertaining, the true state of
their accounts; what amounts should have been credited to their
accounts and should be so credited in the future; what amounts
should have been paid to them and should be paid in the future;
or how much of their money has been or will be diverted or
converted to other uses.

VI.  DEFENDANTS' UNDERMINING OF CONGRESSIONALLY MANDATED ACTION
     TO CORRECT CERTAIN ELEMENTS OF THEIR BREACH OF TRUST

     A.   The American Indian Trust Fund Management
          Reform Act of 1994

25.  Congress has recognized the gross breaches of trust
here complained of, as have the General Accounting Office and the
Office of Management and Budget.  The OMB has consistently placed
the financial management of Indian trust funds as a "high risk
liability" to the United States.  In 1992 the House Committee on
Government Operations, after several years of investigation and
Congressional hearings, issued a report entitled "Misplaced
Trust:  The Bureau of Indian Affairs' Mismanagement of the Indian
Trust Fund."  Ultimately, in 1994 Congress enacted the 1994 Act,
for the benefit of plaintiffs and all other beneficiaries of IIM
accounts (as well as the beneficiaries of tribal trust funds).

26.  The 1994 Act created the office of Special Trustee for
American Indians as a sub-cabinet level officer (Executive Level
II or higher pay scale) appointed by the President by and with

the advice and consent of the Senate, reporting directly to the
Secretary of the Interior. 25 U.S.C. § 4042. Congress's stated
purposes in creating that office were, inter alia, "to provide
for more effective management of, and accountability for the
proper discharge of, the Secretary's trust responsibilities
to . . . individual Indians," "to ensure that reform of such
practices in the [Interior] Department is carried out in a
unified manner," and "to ensure the implementation of all reforms
necessary for the proper discharge of the Secretary's trust
responsibilities to . . . individual Indians." 25 U.S.C. § 4041.
The statutory responsibilities of the Special Trustee include,
inter alia:

(a)  To prepare "a comprehensive strategic plan for all
phases of the trust management business cycle that will ensure
proper and efficient discharge of the Secretary's trust
responsibilities to . . . individual Indians," including
"identification of all reforms to the policies, procedures,
practices and systems . . . of the Bureau" and other relevant
Interior Department elements "necessary to ensure the proper and
efficient discharge of the Secretary's trust responsibilities . .
. ," 25 U.S.C. §§ 4043(a)(1) and (2)(A);

(b)  To "oversee all reform efforts within the Bureau" and
other relevant Interior Department elements "to ensure the
establishment of policies, procedures, systems and practices to
allow the Secretary to discharge his trust responsibilities . . .
," 25 U.S.C. § 4043(b)(1);

(c)   To "monitor the reconciliation of . . . Individual
Indian Money trust accounts to ensure that the Bureau provides
the account holders with a fair and accurate accounting of all
trust accounts," 25 U.S.C. § 4043(b)(2)(A);

(d)   To "ensure that the Bureau establishes appropriate
policies and procedures, and develops necessary systems, that
will allow it . . . properly to account for and invest, as well
as maximize," subject to requirements of law, "the return on the
investment of all trust fund monies," and "to prepare accurate
and timely reports to account holders . . . on a periodic basis
regarding all collections, disbursements, investments, and return
on investments related to their accounts," 25 U.S.C.
§ 4043(b)(2)(B); and

(e)   To ensure that "the policies, procedures, practices,
and systems of the Bureau" and other relevant elements "related
to the discharge of the Secretary's trust responsibilities are
coordinated, consistent, and integrated, and . . . that the
[Interior] Department prepares comprehensive and coordinated
written policies and procedures . . . ," 25 U.S.C. § 4043(c)(1);
"that the Bureau imposes standardized trust fund accounting
procedures throughout the Bureau . . . ," 25 U.S.C. § 4043(c)(2);
"that the trust fund investment, general ledger, and subsidiary
accounting systems of the Bureau are integrated and that they are
adequate to support the trust fund investment needs of the
Bureau," 25 U.S.C. § 4043(c)(3); that records, asset management,
and accounting systems of the Bureau and other relevant elements

-14-

of the Interior Department interface appropriately, and that "the Bureau of Land management and the Bureau provide Indian landholders with accurate and timely reports on a periodic basis that cover all transactions related to leases of Indian resources," 25 U.S.C. § 4043(c)(4).

27. The powers conferred on the Special Trustee by the 1994 Act to enable him to carry out his responsibilities include development of an annual consolidated trust management program budget proposal "that would enable the Secretary to efficiently and effectively discharge his trust responsibilities and to implement the comprehensive strategic plan." 25 U.S.C. § 4043(c)(5)(A). The Special Trustee has broad powers with respect to such budget, and funds appropriated for trust management which are included in the Trust Management Program Budget may not be reprogrammed without his consent. 25 U.S.C. § 4043(c)(5).

28. Moreover, the 1994 Act confers on the Special Trustee "access to all records, reports, audits, reviews, documents, papers, recommendations, files and other material, as well as to any officer and employee, of the [Interior] Department and any office or bureau thereof," as he "deems necessary for the performance of his duties." 25 U.S.C. § 4043(e).

29. The 1994 Act also provides for a nine-member Advisory Board to the Special Trustee, including five trust fund account holders (including IIM account holders); two members with practical experience in trust fund and financial management; one member with practical experience in fiduciary investment

-15-

management; and one member from academia with knowledge of
general management of large organizations. 25 U.S.C. § 4046.

30.   The 1994 Act requires that the Special Trustee be
appointed by the President, with Senate confirmation, "from among
individuals who possess demonstrated ability in general
management of large governmental or business entities and
particular knowledge of trust fund management, management of
financial institutions, and the investment of large sums of
money."  25 U.S.C. § 4042(b)(1).  Such a person was in fact found
and appointed, in the person of Paul Homan, a major figure in
banking and trust and fiduciary management, with extensive
experience in large-scale turnarounds of troubled banking
operations, who has served in such posts as chief executive
officer of Riggs National Bank, executive vice-president of
Continental Illinois Trust Company, Senior Deputy Controller of
the Currency for Bank Supervision, and Senior Adviser to the
Controller of the Currency.  He in turn appointed a qualified
Advisory Board, of which plaintiff Cobell has been elected Chair.

   B.   Defendants' Undermining of the Special Trustee's
        Implementation of the American Indian Trust Fund
        Management Reform Act of 1994

31.  Defendants Babbitt and Deer vigorously opposed the
adoption of the 1994 Act and particularly opposed Title III of
that Act, which created the office of Special Trustee and
established his authority and responsibilities.  Since its
adoption and since the Special Trustee took office, such
defendants, individually and in combination and conspiracy with

-16-

employees of the Department of the Interior, have willfully and purposefully obstructed and harassed efforts of the Special Trustee to carry out his mandate under the 1994 Act. Plaintiffs are not presently aware of all the forms, subtle as well as overt, which such obstruction and harassment has taken, but are aware of at least the following forms:

(a)  At the close of Fiscal Year 1995, they had $24,000,000 in uncommitted appropriated funds which could have been reprogrammed with the approval of congressional committees and applied to the work of the Special Trustee; rather than apply such funds, they returned them to the Treasury;

(b)  They refused to request adequate funds for Fiscal Year 1996 for the work of the Special Trustee mandated by the 1994 Act;

(c)  They prevented the Special Trustee from preparing the strategic plan mandated by the 1994 Act;

(d)  They refused to permit the Special Trustee to conduct the technology and use survey necessary to carry out his duties mandated by the 1994 Act;

(e)  They prevented the Advisory Board from meeting to conduct its functions mandated by the 1994 Act; and

(f)  They refused to permit the Special Trustee to employ adequate staff and expert consultants necessary to carry out his duties mandated by the 1994 Act.

## VII. CLASS ACTION ALLEGATIONS

32. This action is brought as a class action (on behalf of a class consisting of all present and former beneficiaries of IIM accounts) under Rule 23(b)(1)(A) of the Federal Rules of Civil Procedure, in that the class is so numerous that joinder of all members is impracticable; there are questions of law and fact common to the class; the claims of the representative plaintiffs are typical of the claims of the class; the representative plaintiffs will fairly and adequately protect the interests of the class; and the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the defendants; all as is more fully set forth hereinbelow.

33. Numerosity. The class is composed of substantially more than 300,000 individual Indians.

34. Common questions. Questions of law and fact common to the class include, but are not limited to, the legal standards governing the trust obligations of the United States with respect to the funds in IIM accounts; what accounting, recordkeeping, reporting, and other practices are, have been, and will for the future be, necessary to achieve compliance with such standards; the extent to which, if at all, the defendants have complied with such standards and have implemented or failed to implement such practices; the measures necessary to be taken in order to correct past breaches of trust and bring the activities of defendants

into compliance with the law for the future, and the nature, extent, and lawfulness of the defendants' interference with the exercise of the statutory responsibilities of the Special Trustee. The commonality of these questions to all members of the class is reinforced by the fact that IIM moneys are pooled for investment purposes.

35. <u>Typicality</u>. The claims of the representative plaintiffs and all other members of the class arise from the same practices and course of conduct of the defendants and are based on the same legal theory.

36. <u>Fair and adequate representation</u>. (a) All named plaintiffs are or have been beneficiaries of the trust obligations herein involved, are or have been owners of IIM accounts, and like all owners of IIM accounts are unable to know whether their account balances are what they should have been in the absence of the breaches of trust herein complained of.

(b) Plaintiff Elouise Cobell, the lead representative plaintiff, is a recognized leader in Indian affairs with substantial experience both in financial management and in Indian matters generally, and is project director of the Individual Indian Moneys Trust Correction, Recovery, and Capacity-Building Project of Blackfeet Reservation Development Fund, Inc., a project that is directly supportive of the present effort and is further devoted to development and improvement of Indian capacity to manage funds and achieve self-sufficiency. She is a graduate of Great Falls Business College and attended Montana State

-19-

University.  Her professional background is in accounting.  She was one of the lead organizers of Blackfeet National Bank, the only national bank located on a reservation that is owned by an Indian tribe.  She is a director and secretary of the bank and is active in its management, and with her husband she manages a ranch producing cattle, wheat, and barley.  She served for 13 years as Treasurer of the Blackfeet Indian Tribe, and has served as Controller of the tribe.  She has held various positions with the Native American Finance Officer Association.  She has served as Chair of the Intertribal Monitoring Association on Indian Trust Funds.  She is a member of the board of the Montana Community Foundation; is a member of the executive board of Women and Foundation/Corporate Philanthropy; and is Chair of the National Rural Development and Finance Corporation.  She is Chair of the Special Trustee Advisory Board, appointed under the 1994 Act, 25 U.S.C. § 4046.

(c)  Plaintiff Earl Old Person, an enrolled member of the Blackfeet Tribe, was born April 15, 1929 to Juniper and Molly Old Person, a prominent family of the Blackfeet Indian Reservation.  He was raised on the reservation in the community of Starr School, where he attended grade school, and graduated from Browning High School, Browning, Montana.  He was elected to the Blackfeet Tribal Business Council in 1954 as one of the youngest Blackfeet to serve in this capacity.  He has been the Chairman of the Blackfeet Indian Nation for 40 years and continues in this capacity as of today, giving a total of 42 years of service to

the Indian people. He is a lifetime Chief of the Blackfeet Indian Nation and was inducted into the Kainai Chieftainship in Canada. He is a recognized leader in Indian affairs locally and nationally. He has served as President of the Affiliated Tribes of the Northwest and President of the National Congress of American Indians.

(d)  Plaintiff Mildred Cleghorn is an enrolled member of the Fort Sill Apache Tribe of Oklahoma, of which she served as tribal chairperson for twenty years, from 1976 through 1995. She is a recognized leader in Indian affairs. In 1886 her father was taken as a prisoner of war with Geronimo by the United States cavalry, and she was born a prisoner of war in 1910 in Fort Sill, Oklahoma. She is a former member of the National Tribal Chairmen's Association, the United Tribes of Western Oklahoma, and the United Indian Nations of Oklahoma. She was awarded a B.S. degree in 1941 by Oklahoma State University and for many years taught home economics at the Fort Sill Indian School and at the Riverside Indian School in Anadarko, Oklahoma. During 1972-74 she served as the national director of education for the North American Indian Women's Association. She is a member of the National Association of Retired Teachers, the National Association of Retired Federal Employees, and a past member of the American Association of University Women. In 1986 Ms. Cleghorn was the Guest of Honor in Bowie, Arizona at the Centennial Commemoration of Cessation of Hostilities between the Chiricahua Apache and the United States government.

(e)   Plaintiff Thomas Maulson is an enrolled member of the Lac du Flambeau Chippewa Tribe (Wisconsin), of which he has served as tribal chairman since October 1992. He is a recognized leader in Indian affairs. He also currently is the president of the Great Lakes Inter-Tribal Council, an association of the Indian tribal governments in Wisconsin. He has been the national spokesman for the Great Lakes Indian Fish and Wildlife Commission, and was elected by nine Indian tribes to serve as chairman of the Voight Task Force, organized to protect Indian hunting, fishing and gathering rights in a three-state area. From 1960 to 1963 he served in the United States armed forces. After receiving an honorable discharge, he returned to the Lac du Flambeau Reservation and worked as a tribal police officer and later as a tribal fish and game warden. Since then he has been self-employed, operating several successful businesses. From 1983 to 1989 he served two terms as his Tribe's first tribal judge, having attended the National Judicial College at the University of Nevada, Reno. In addition to his extensive tribal government experience, he has served in several state government positions, including his 1992 election as Vilas County supervisor, State Tourism Committee, and Vilas County Mining and Solid Waste Committee.

(f)   Plaintiff James Louis LaRose is an enrolled member of the Winnebago Tribe of Nebraska, of which he has served as tribal councilman and tribal chairman during various periods beginning in 1971. He is a recognized leader in Indian affairs. He is a

-22-

past board member and chairman of the Nebraska Indian Inter-
Tribal Development Corporation, a statewide consortium of
Nebraska Indian tribes dedicated to facilitating individual and
tribal economic self-sufficiency.  He is also the former chairman
of the Nebraska Indian Commission, and since 1971 has served as a
board member of Americans for Indian Opportunity.  In the 1970s
he led the organizational effort which culminated in the
establishment of Nebraska Indian Community College, of which he
served as chief administrator in the formative years.  He is a
past vice-chairman of the American Indian Higher Education
Consortium, the national association of the twenty-eight tribal
colleges in the United States.  Since 1992, he has served as the
intergovernmental liaison specialist of the Winnebago Tribe of
Nebraska, and concurrently is the director of the Winnebago Bison
Project, a tribal program to foster and restore a sustainable
buffalo herd on the Winnebago Reservation.  He holds A.A. and
B.S. degrees in education.

    (g)  Counsel for plaintiffs are experienced in the
substantive and procedural law involved in the case.  They
include Dennis M. Gingold, an experienced banking lawyer;
Thaddeus Holt, an experienced big-case and class-action
litigator; Henry Paul Monaghan, Professor of Law at a leading
national law school, whose specialties include class action
litigation, constitutional law, federal courts, jurisdiction, and
procedure; Daniel S. Press, who has more than 25 years'
experience in Indian law and served as counsel to the Intertribal

Monitoring Association on Indian Trust Funds for six years, in
which capacity he participated in the drafting of the 1994 Act;
and the Native American Rights Fund, an organization experienced
in Indian law and litigation and Indian affairs generally,
including the law and management of Indian trust funds, through
John Echohawk, Executive Director, member of the Pawnee Tribe,
and recognized leader in the field of Indian law; Richard
Dauphinais, member of the Turtle Mountain Band of Chippewa
Indians with fifteen years of experience in Indian law
litigation; Robert M. Peregoy, a Flathead Indian who currently
serves as Chief Justice of the Court of Appeals of the
Confederated Salish and Kootenai Tribes; James Kawahara, a member
of the Winnebago Tribe of Nebraska; and Keith Harper, a member of
the Cherokee Tribe of Oklahoma, a Skadden Fellow, and, formerly,
a law clerk for the Honorable Lawrence W. Pierce of the United
States Court of Appeals for the Second Circuit.

(h)  In addition, the services of the accounting firm of
Price Waterhouse LLP have been retained for this litigation.  One
of the "Big Six" accounting firms, with more than 100 offices and
14,000 professionals in the United States (including more than 50
government controls specialists and more than 400 litigation
specialists), Price Waterhouse has extensive experience in
evidence analysis and expert testimony in banking and fiduciary
matters, with in-house expertise in such fields as banking and
fiduciary activities; data gathering and evaluation; internal
controls, accounting practices, systems, and standards in

government and private business; information systems
(particularly government), financial systems, and distributed
systems; business process reengineering; systems requirement
definition; and modeling and statistical analysis. Price
Waterhouse commands abundant personnel and other resources to
manage the discovery product in this case and present expert
testimony for the assistance of the Court.

37. <u>Risk of inconsistent or varying adjudication</u>.
Substantially all IIM accounts are held for the beneficiaries by
the defendants on essentially the same basis and subject to the
same obligations and responsibilities of the United States and
the defendants. Moreover, the funds in such accounts are held by
defendants, and invested, in a common pool. Defendants'
inadequate recordkeeping and other incompetent systems management
affects all IIM account holders alike. The duties and
obligations of the defendants need to be ascertained, and
adequate systems and controls need to be installed, with respect
to all beneficiaries alike, and inconsistent determinations by
different courts at the suit of different plaintiffs with respect
to such systems and controls would establish incompatible
standards of conduct for the defendants.

<u>COUNT ONE</u>

38. Plaintiffs reallege the allegations of paragraphs 1
through 37 hereof.

39. Defendants owe to plaintiffs and to all members of the
class the duty to ensure that the obligations of the United

States as trustee for their benefit are complied with. Further, under the 1994 Act, defendants owe to plaintiffs and to all members of the class the duty not to interfere with the work of the Special Trustee, but to give his work all the cooperation and assistance in their power.

40.  Plaintiffs are entitled to an order in the nature of a writ of mandamus to compel defendants to perform such duties.

## COUNT TWO

41.  Plaintiffs reallege the allegations of paragraphs 1 through 37 hereof.

42.  The acts of defendants herein alleged constitute final agency action and the unlawful withholding of action.  Plaintiffs and each of them have suffered legal wrong and are aggrieved and adversely affected thereby.  Plaintiffs are entitled to review thereof under 5 U.S.C. § 702.

WHEREFORE, THE PREMISES CONSIDERED, PLAINTIFFS PRAY:

1.  For an order certifying the named plaintiffs under Rule 23(b)(1)(A) of the Federal Rules of Civil Procedure as representatives of a class consisting of all present and former beneficiaries of IIM accounts.

2.  For a decree construing the trust obligations of defendants to the members of the class, declaring that defendants have breached, and are in continuing breach of, their trust obligations to such class members, and directing the institution of accounting and other practices in conformity with such obligations.

3.  For a decree restraining and enjoining defendants and·
all those acting in concert or conspiracy with them from further
hindrance or interference with the Special Trustee in the
carrying out of his statutory duties, and directing them to
cooperate with the Special Trustee and facilitate his performance
of his statutory duty.

4.  For a decree ordering an accounting and directing the
defendants to make whole the IIM accounts of the class members.

5.  For award of plaintiffs' costs of suit, including,
without limitation, attorneys' fees under the Equal Access to
Justice Act and under general principles of law and equity, and
the fees and costs of expert assistance.

6.  And for such other, further, or different relief as
plaintiffs may be entitled to in the premises.

Of Counsel:

JOHN ECHOHAWK
RICHARD DAUPHINAIS
ROBERT M. PEREGOY
JAMES K. KAWAHARA
KEITH HARPER
  Native American Rights Fund
  1712 N Street N.W.
  Washington, D.C. 20036-2976
  (202) 785-4166

HENRY PAUL MONAGHAN
  435 West 116th Street
  New York, New York 10027
  (212) 854-2644

DANIEL S. PRESS
  Van Ness Feldman
  1050 Thomas Jefferson St., N.W.
  Washington, D.C. 20007-3877
  (202) 298-1800

June 10, 1996

DENNIS M. GINGOLD
D.C. Bar No. 417748
  Aukamp & Gingold
  1201 Pennsylvania Ave., N.W.
  Suite 821
  Washington, D.C. 20004
  (202) 662-6775

THADDEUS HOLT
D.C. Bar No. 101998
  1201 Pennsylvania Ave., N.W.
  Suite 821
  Washington, D.C. 20004
  (334) 990-8750

Attorneys for Plaintiffs