## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| **ELOUISE PEPION COBELL, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **No. 1:96CV01285(TFH)** |
| ) | |
| **KEN SALAZAR, Secretary of** ) | |
| **the Interior, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

## JOINT MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT

**December 10, 2010**

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL SUMMARY .........................................................................................6

        A.      THE SETTLEMENT AGREEMENT ........................................................6

                1.      Classes Settled by this Agreement .................................................6

                2.      Monetary Terms ..............................................................................8

                3.      The Accounting/Trust Administration Fund....................................9

                        a.      Stage 1 payments. ................................................................9

                        b.      Stage 2 payments ...............................................................10

                4.      Trust Administration Adjustment Fund. .......................................12

                5.      The Trust Land Consolidation Fund. ............................................12

                6.      Indian Education Scholarships......................................................13

                7.      Taxes and Eligibility for Benefits ...............................................14

                8.      Releases.........................................................................................14

                9.      Attorneys' Fees .............................................................................15

                10.     Secretarial Commission on Trust Reform....................................17

        B.      The Notice Program.................................................................................17

                1.      Characteristics of the Classes Settled by this Agreement............17

                2.      The Parties Have Agreed on a Comprehensive Notice Program...............18

III.    ARGUMENT ........................................................................................................24

        A.      Preliminary Approval of the Settlement Agreement is Proper ................24

                1.      The Settlement Agreement Fairly Resolves this Litigation.......................24

                2.      The Settlement is the Result of Arms-Length Negotiations. ....................26

                3.      The Terms of Settlement Reflect the Strength of Plaintiffs' Case
                        and the Reality that No End is in Sight....................................27

US2000 11964147.1

**4.**      Settlement is Timely ...................................................................29

**5.**      Counsel Believes the Settlement is Fair and Reasonable .........................29

**6.**      The Parties Have Agreed to an Award of Attorneys' Fees and Costs to Plaintiffs Within a Range Subject to the Court's Discretion. ............................................................................30

**7.**      Class Representatives Are Treated Reasonably........................................31

B.      The Trust Administration Class Should Be Certified And the February 4, 1997, Certification Order Modified. .....................................................................32

**1.**      This Court's Certification Order Describing the Historical Accounting Class Should be Modified in Accordance with the Settlement Agreement...............................................................32

**2.**      The Court Should Certify the Trust Administration Class for Purpose of Settlement. ...............................................................32

C.      The Notice Program Should Be Approved ...........................................................33

**1.**      The Notice Program Provides the Best Possible Notice to Class Members .................................................................................33

**2.**      The Long-Form Notice Satisfies the Requirements of Rule 23.................34

**3.**      No Other Notice is Required for the Settlement to Be Effective...............36

## I.      INTRODUCTION

On December 7, 2009, the parties executed an agreement to settle this litigation contingent upon authorizing legislation and this Court's approval ("Settlement Agreement" or "Agreement").[1]   On the same date, the Parties executed an Agreement on Attorneys' Fees, Expenses, and Costs ("Attorneys' Fee Agreement") to address compensation to Class Counsel. On February 26, 2010, the Parties modified the Settlement Agreement to revise, among other things, the first sentence of paragraph C2b of the Agreement to read:  "The deadline for those Class Members in the Trust Administration Class to opt out will be ninety (90) days from the first day Notice is sent."[2]  On November 17, 2010, the Parties modified the Agreement in light of discussions with Congress.[3]

On November 30, 2010, following twelve months of debate, Congress approved the Agreement with the modifications agreed to by the Parties.  On December 8, 2010, the President signed the Claims Resolution Act of 2010 (the "Claims Resolution Act") into law and formalized approval of the settlement by Congress and the Executive Branch.[4]   Now, the settlement is before this Court for preliminary approval in accordance with governing law.

This action was filed by Elouise Pepion Cobell ("Ms. Cobell"), Mildred Cleghorn, Thomas Maulson and James Louis LaRose (collectively, "Named Plaintiffs")[5] on June 10, 1996,

---

[1] The Settlement Agreement and its exhibits are attached as Exhibit 2.

[2] The February 26, 2010, Modification is attached as Exhibit 6.

[3] The November 17, 2010 Modification is attached as Exhibit 12.

[4] Claims Resolution Act of 2010, Public Law 111-291 (Dec. 8, 2010; 124 Stat. 3064). The Claims Resolution Act of 2010 is attached as Exhibit 3.

[5] Earl Old Person, a named plaintiff in the original complaint, was removed by order on March 5, 2003 [Dkt. No. 1864]. On February 4, 1997, this Court certified a "plaintiff class consisting of present and former beneficiaries of Individual Indian Money accounts (exclusive of those who prior to the filing of the Complaint herein had filed actions on their own behalf alleging claims included in the Complaint)"; approved the Named Plaintiffs as representatives of the class; and approved class counsel. *See* Order Certifying Class Action [Dkt. No. 27].  Mildred Cleghorn passed away in 1998 and is now represented by her daughter Penny.

in their own behalf and on behalf of over 500,000 similarly situated individual Indian trust beneficiaries to enforce trust duties the United States owes to the those beneficiaries, including without limitation the fiduciary duty to  provide an historical accounting of Individual Indian Money ("IIM")  accounts and the subsidiary duty to reform broken trust management systems. Named defendants to the lawsuit in their official capacity as trustee-delegates of the United States are Secretary of the Interior, Ken Salazar; Secretary of the Treasury, H. Timothy Geithner; and Assistant Secretary for Indian Affairs, Larry Echohawk.

When this action was filed, the United States had failed to discharge its trust duty to provide an accounting of trust fund assets held in trust for individual Indians.  *See, e.g*., *Cobell v. Norton,* ("*Cobell VI*"), 240 F.3d 1081, 11102 (D.C. Cir. 2001).  Chief Judge Royce C. Lamberth, upon learning of the parties' agreement to settle the case, described it as "one of the most complicated and difficult cases ever to be litigated in this court."[6]  Over the course of more than fourteen years, the litigation encompassed approximately 250 days of hearings and trials, 10 interlocutory appeals, one *en banc* petition to the D.C. Circuit, and two petitions for writs of certiorari to the Supreme Court. With that history in mind, the parties now jointly move the Court to approve the settlement to which the parties have agreed and that Congress and the President have approved.

On December 21, 1999, this Court declared the United States in breach of trust duties that it owes to the plaintiff class.  *See Cobell v. Babbitt*("*Cobell V*"), 91 F. Supp. 2d 1, 6 (D.D.C. 1999), *aff'd*, 240 F. 3d 1081 (D.C. Cir. 2001).   At that time, this Court ordered Interior defendants to conduct an historical accounting of individual Indian beneficiaries' trust fund

---

[6] Remarks of the Honorable Royce C. Lamberth, Chief Judge, United States District Court for the District of Columbia at the December 8, 2009, ceremony honoring the Honorable James Robertson at 5. Transcript attached as Exhibit 4.

US2000 11964147.1

assets. *Id*. at 41-42.  To date, however, the historical accounting has not been completed nor statements of account rendered and, absent settlement, this case will not conclude "in the foreseeable future"[7] no matter how much more money is appropriated.

In July 2009, the parties initiated settlement discussions.[8]  For five months, the parties engaged in good faith, intense, and, from time to time, contentious negotiations, culminating in the settlement that is the subject of this motion.[9]  Secretary Salazar confirmed the significance of this settlement and explained that the litigation has brought a "national injustice" to the attention of the country and moved the United States to "right a past wrong."[10]  This Court is fully in accord, finding that, here, "[h]uman welfare and livelihood are at stake." *Cobell V,* 91 F. Supp. 2d at 6.

In an effort to resolve this long-standing dispute, the parties have come to a settlement. What is before this Court is the product of difficult, arms-length negotiations that is in the best interest of the class members and the United States.  Ms. Cobell, class counsel, and government officials have traveled  throughout Indian Country holding – and attending – public meetings to explain the terms of the settlement, provide advance information on beneficiaries' rights and obligations under the Settlement Agreement, correct misinformation, and listen to concerns of class members about fairness as well as the need for a prompt resolution of this case.

Congressional review of the settlement began immediately after it was announced by the President on December 8, 2009, and extended into the next year as both Houses considered and debated the terms.  In addition, the parties and their counsel engaged in numerous briefings and

---

[7]   *See* Settlement Agreement at 4.

[8]   This marked the eighth time that the parties participated in mediations and settlement negotiations in this case.

[9]   *See* Exhibit 2.

[10]   *See* December 8, 2009 comments of Secretary Salazar at http://www.cobellsettlement.com/press/video.php.

US2000 11964147.1

discussions with Members of Congress and their staff. Hearings were held before the committees

of jurisdiction in both Houses. After initial passage in the House, amendments were proposed in

the Senate.  Following several weeks of discussion, the proposed legislation was amended, and

the parties agreed to conform the Settlement Agreement to the amended legislation. [11]  The

modifications are intended to ensure fairness of the settlement, nothing more.[12]  With the

necessary legislation enacted, the Agreement as modified is now before this Court. The parties

respectfully request that the Court grant preliminary approval of the settlement as approved by

Congress.

Further, as a principal component of settlement, the parties respectfully request that this

Court certify the Trust Administration Class[13] in accordance with Rule 23(b)(3) of the Federal

---

[11] The Senate unanimously passed the settlement legislation, as amended.  The September discussions with Senators and their staff resulted in five principal changes to the settlement legislation and the Agreement, as set forth in the November 17, 2010 Modification (Exhibit 12): (1) the Secretary of the Interior will consult with Indian Country about the Land Consolidation program, (2) the Secretary will also consult with Indian Country about his appointments to a special Board of Trustees that will govern the Scholarship Fund; (3) an additional $100 million will be re-allocated from the Trust Land Consolidation Fund to a Trust Administration Adjustment Fund to be paid to low-payment Trust Administration Class members; (4) the district court will determine the amount to which the plaintiffs may be entitled for incentive awards and for attorneys' fees, expenses, and costs, in accordance with controlling law, including with respect to attorneys' fees, expenses, and costs, any applicable rule of law requiring counsel to produce contemporaneous time, expense, and cost records, and giving due consideration to the special status of class members as beneficiaries of a federally created and administered trust; and, (5) the notice shall contain a description of all material provisions of the Attorneys' Fee Agreement.

[12] Over the course of the year, the Settlement Agreement has been modified on several occasions to extend its term, to provide an additional 30 days during the notice period, and to provide for modification of the legislation pursuant to the September discussions. The modifications are set forth in Exhibits 5 - 12.  Note that the third modification of the settlement agreement was an oral extension agreed-to by the parties. Exhibit 7 (April 8, 2010 Hearing Transcript) at 5:2-4 ("I have consulted with the parties before coming here today, and I am hereby approving their agreement to extend the deadline again . . . .").

[13] *See* Settlement Agreement at A(35).

US2000 11964147.1

Rules of Civil Procedure and modify the February 4, 1997 Class Certification Order [Dkt. No. 27] accordingly. An amended complaint and corresponding motion to amend are submitted contemporaneously with this motion to ensure final resolution of this action in accordance with the special jurisdiction conferred upon this Court pursuant to the Claims Resolution Act of 2010.[14]   The settlement, therefore, comprises two separate but overlapping classes: a Trust Accounting Class and the Trust Administration Class.

Given the numerosity and geographical diversity, potential language barriers, and limited access to news media of the class members, as well as the number of mailing addresses that are unknown, the parties have committed to a comprehensive outreach program to assure to adequate class notice. The parties have selected Kinsella Media, LLC ("Kinsella Media") as Notice Contractor. At the parties' request, Kinsella has developed a comprehensive, detailed Notice Program (the "Notice Program") that will satisfy the requirements of Rule 23.[15]

Plaintiffs and defendants respectfully request, therefore, that this Court grant preliminary approval of the Settlement Agreement, and also approve the proposed Notice Program, the form of Notice, Kinsella Media as Notice Contractor, and the Garden City Group, Inc. ("GCG") as Claims Administrator[16]   To facilitate the settlement, plaintiffs have also submitted separate unopposed motions today to request that the Court: (1) grant leave to amend the Complaint; (2) modify the Class Certification Order of February 4, 1997; and (3)  approve JPMorgan Chase, N.A. as the Qualifying Bank for the deposit of settlement funds.

---

[14] *See* Claims Resolution Act § 101 (d) (2).

[15] The Notice Plan is attached as Exhibit 13.

[16] The parties selected GCG as Claims Administrator pursuant to A(5) of the Settlement Agreement.

US2000 11964147.1

## II.     FACTUAL SUMMARY

## A.     THE SETTLEMENT AGREEMENT

### 1.     Classes Settled by this Agreement

On February 4, 1997, this Court granted Plaintiffs' Motion for Class Certification pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (b)(2) "on behalf of a plaintiff class consisting of present and former beneficiaries of Individual Indian Money accounts (exclusive of those who prior to the filing of the Complaint herein had filed actions on their own behalf alleging claims included in the Complaint)."[17] This Court reserved the right to modify the certification order as the interests of justice required.

In different decisions, this Court and the court of appeals have  clarified the nature and scope of this class to exclude: (a) income derived from individual Indian trust land received by a beneficiary on a direct pay basis, *Cobell v. Kempthorne* ("*Cobell XX*"), 532 F. Supp. 2d 37, 95-96 (D.D.C. 2008), *rev'd on other grounds*, *Cobell v. Salazar* ("*Cobell XXII*"), 573 F. 3d 808 (D.C. Cir. 2009); (b) income derived from individual Indian trust land under the management of tribes, *id.*; (c) IIM accounts closed prior to October 25, 1994,[18] *Cobell XXII,* 573 F. 3d at 815; and (d) heirs to money from closed accounts that were subject to final probate determinations, *id.*

The current definition of the Historical Accounting Class as provided in the Settlement Agreement,[19] incorporates these judicial modifications.  Members of the Historical Accounting Class consist of:

a.     Individual Indian beneficiaries alive on September 30, 2009 (and deceased beneficiaries who had an open IIM Account as of that date), who:

---

[17] *See* Order Certifying Class Action at 2-3 (Feb. 4, 1997) [Docket No. 27].

[18] October 25, 1994 is the effective date of the American Indian Trust Reform Act of 1994, Pub. L. No. 103-412, 108 Stat. 4239, codified (as amended) as 25 U.S.C. § 162a *et seq.* (the "Trust Reform Act").

[19] *See* Settlement Agreement at A(16).

US2000 11964147.1

1.      had not filed an action for an historical accounting on their own behalf prior to June 10, 1996; and

2.      had an IIM account open during any period between October 25, 1994, and September 30, 2009; and

3.      had at least one cash transaction credited to that IIM account as long as such credit was not later reversed.

b.      The estate of any Historical Class Member who dies after September 30, 2009, but before distribution.

The Amended Complaint incorporates the current definition of the Historical Accounting Class as set forth in the Settlement Agreement.[20]

The Settlement Agreement and Amended Complaint identify a new "Trust Administration Class" consisting of:

1.      Individual Indian beneficiaries alive as of September 30, 2009 (and the estate of any such beneficiary whose IIM trust accounts or IIM estate interest had been open in probate as of that date), who –

a.      had not filed an action on their own behalf or were not part of a group of individuals certified as a class in a class action, stating a Funds Administration or Land Administration Claim prior to the filing of the Amended Complaint; and either

b.      had an IIM account in the Electronic Ledger Era (currently available electronic data in systems of the Department of Interior dating from approximately 1985 to the present); or

---

[20] *See* Amended Complaint at ¶ XI (36)(a).

US2000 11964147.1

        c.      had a recorded or other demonstrable beneficial ownership interest in land held in trust or restricted status as of September 30, 2009, regardless of the existence of an IIM account and regardless of whether proceeds generated from that trust land;

      2.     The estate of any Trust Administration Class Member who dies after September 30, 2009 but before distribution.[21]

It is believed that a majority of the Trust Administration Class are also members of the Historical Accounting Class. All members of the Historical Accounting Class are members of the Trust Administration Class.

## 2.   Monetary Terms

The total amount of the settlement is $3.412 billion,[22] and will be allocated among three funds: (1) a $1.412 billion Accounting/Trust Administration Fund held by the Qualifying Bank[23] in a Settlement Account and paid directly to class members, of which an estimated  $337 million is proposed to be paid to settle Historical Accounting Claims,[24] after deduction of court-approved fees, incentive payments, and expenses of administration, with the balance to be distributed to settle Fund and Land Administration Claims;[25] (2) a $100 million Trust Administration Adjustment Fund will be deposited in the Settlement Account held by the Qualifying Bank to be used to increase the minimum payment made to  members of the Trust Administration Class;[26]

---

[21] *See id.* at ¶ XI (36)(b); *see* Settlement Agreement at A(35).

[22] *Id.* at A(1), A(36) and E(2).

[23] "Qualifying Bank" is defined as "a federally insured depository institution that is well capitalized, as that term is defined in 12 CFR 325.103, and that is subject to regulation by the Board of Governors of the Federal Reserve System or the U.S. Comptroller of the Currency pursuant to 12 CFR 9.18.  Settlement Agreement at A.(29).  The settlement legislation  vests approval authority in this Court, which shall consider the rights and interests of class members in that review.  *See* Claims Resolution Act § 101(h).

[24] "Historical Accounting Claims" are defined at A(15) of the Settlement Agreement.

[25] Settlement Agreement at A(14) and (21), respectively.

[26] *See* Claims Resolution Act § 101 (j)(1)(A).   *See also infra* at 12-13 (discussing the Trust Administration Adjustment Fund).

US2000 11964147.1

and, (3) a $1.9 billion Trust Land Consolidation Fund[27] held and administered by the Department of the Interior to purchase fractionated interests in trust or restricted lands from individual Indians.[28]

All fees and expenses of the Claims Administrator, Notice Contractor, and Qualifying Bank as well as the fees, expenses, and incentive awards of Class Representatives and Class Counsel, as approved by this Court, will be paid out of the Settlement Account, not the Trust Land Consolidation Fund.  Up to $300 million of expenses and costs incurred by the Interior defendants in their administration of the Trust Land Consolidation Fund may be charged against the Trust Land Consolidation Fund.

**3.      The Accounting/Trust Administration Fund**

A total of $1.412 billion will be paid into the Accounting/Trust Administration Fund and held in the Settlement Account.[29] Disbursements to class members from this fund will be made in two stages.

a.      Stage 1 payments.

Stage 1 payments settle Historical Accounting Claims.[30]  The Historical Accounting Class is defined as follows:

> [T]hose individual Indian beneficiaries (exclusive of those who prior to the filing of the Complaint on June 10, 1996 had filed actions on their own behalf stating a claim for a historical accounting) alive on the Record Date[31] and who had an IIM Account open during any period between October 25, 1994 and the Record Date,

---

[27] *See* Settlement Agreement at A(36), F(2).  The December 7, 2009 Settlement Agreement established a $2 billion Trust Land Consolidation Fund.  As modified, that has been reduced to $1.9 billion and $100 million is allocated to the Trust Administration Adjustment Fund.  *See* Claims Resolution Act §101(e)(1)(c)(i).

[28] *See* Settlement Agreement at F(2).  The sale of interests in trust land pursuant to the settlement is voluntary.  No class member may be compelled to sell his or her interest in trust land.

[29] *Id.* at E(2)(a).  "Settlement Account" is defined as a trust account(s) established by Class Counsel in a Qualified Bank.  *Id.* at A(31).

[30] *Id.* at E(3).

[31] The "Record Date" is September 30, 2009, 11:59 p.m. Eastern time.  *See id.* at A(30).

US2000 11964147.1

which IIM Account had at least one cash transaction credited to it at any time as long as such credits were not later reversed.  Beneficiaries deceased as of the Record Date are included in the Historical Accounting Class only if they had an IIM Account that was open as of the Record Date.  The estate of any Historical Accounting Class Member who dies after the Record Date but before distribution is in the Historical Accounting Class.[32]

Each member of the Historical Accounting Class will receive a per capita payment of $1,000.[33]  No opt-out election is available to this class.[34]  If a distribution to any member of this class is returned, it will be deposited in that class member's IIM account or held for his or her benefit in a separate, commingled, interest-bearing account at the Qualifying Bank (the "Remainder Account").  The Claims Administrator must take reasonable steps to locate each class member and distribute the funds held in the Remainder Account.[35]

### b.    Stage 2 payments

Stage 2 payments will be made to settle the Funds and Land Administration Claims of Trust Administration Class members.[36]  Members of the Trust Administration Class are defined as:

> [T]hose individual Indian beneficiaries (exclusive of persons who filed actions on their own behalf, or a group of individuals who were certified as a class in a class action, stating a Funds Mismanagement Claim or a Land Mismanagement Claim prior to the filing of the Amended Complaint) alive as of the Record Date and who have or had IIM Accounts in the "Electronic Ledger Era" (currently available electronic data in systems of the Department of the Interior dating from approximately 1985 to the present), as well as individual Indians who, as of the Record Date, had a recorded or other demonstrable ownership interest in land held in trust or restricted status, regardless of the existence of an IIM Account and regardless of the proceeds, if any, generated from the Land.   The Trust Administration Class does not include beneficiaries deceased as of the Record Date, but does include the estate of any deceased beneficiary whose IIM Accounts or other trust assets had been open in probate as of the Record Date.  The estate of

---

[32] *Id.* at A(16).

[33] *Id.* at E(3)(a).

[34] *Id.* at C(2)(a).

[35] *Id.* at E(3)(c).

[36] *Id.* at E(4).

10

US2000 11964147.1

any Trust Administration Class Member who dies after the Record Date but before distribution is included in the Trust Administration Class.[37]

Members of the Trust Administration Class may opt out of the settlement by providing a written request for exclusion to the Claims Administrator within 90 days of Notice.[38]

Each member of the Trust Administration Class who does not opt out will receive a baseline payment of $500.[39]   In addition, each member of that class who has, or had, an IIM account that generated income credited to his or her account is paid an additional pro rata share of the funds remaining in the Accounting/Trust Administration Fund.[40]   That payment is based on a formula set forth in E(4)(b)(3) of the Settlement Agreement, which is calculated using the ten highest revenue years reflected in each class member's IIM account from October 1, 1985, to the Record Date.

Returned funds will be deposited in the identified class member's IIM account or, if none exists, the Remainder Account. Here, too, the Claims Administrator must take reasonable steps to locate and distribute such funds to the correct class member.[41]

The Settlement Agreement recognizes that individual Indians who are not identified as class members may claim membership in the Trust Administration Class.   A procedure is established to address the validity of their claims.[42]

Distribution of Stage 2 payments are made after the Trust Administration Class has been "substantially identified."[43]   A "Reserve Fund" will be established for beneficiaries who do not

---

[37] *Id.* at A(35).

[38] *Id.* at C(2)(b), as amended by the February 26, 2010, Second Modification of December 7, 2009 Class Action Settlement Agreement.

[39] *Id.* at E(4)(b)(1).

[40] Amounts remaining for distribution from the Accounting/Trust Administration Fund are calculated after deducting those items set forth in E(4)(b)(2) of the Settlement Agreement.

[41] Settlement Agreement at E(4)(d).

[42] *Id.* at E(4)(e) 2-5.

[43] *Id.* at E(4)(e)(7).

US2000 11964147.1

receive notice of Stage 2 distributions and come forward after distribution of Stage 2 funds.[44] Excess funds after distribution, if any, are deposited in an Indian Education Scholarship Fund.[45]

### 4. Trust Administration Adjustment Fund.

The Trust Administration Adjustment Fund[46] will comprise a deposit of an additional $100 million into the Settlement Account to be used to increase the minimum payment made to members of the Trust Administration Class. After calculation of the pro rata share in E(4)(b) of the Settlement Agreement, the Trust Administration Adjustment Fund will be used to increase the minimum payment to each Trust Administration Class Member whose pro rate share is (i) zero; or (ii) greater than zero, but who would, after adjustment, receive a smaller Stage 2 payment than those Class Members in clause (i). It is intended to ensure "to the extent practicable (as determined by the court)" that each member of the Class who is eligible to be paid from the Trust Administration Adjustment Fund receives the same total payment under Stage 2 as adjusted.[47] Initial estimates prepared by Interior defendants indicate that the minimum payment to Trust Administration Class Members will be in the range of $800.00.[48]

### 5. The Trust Land Consolidation Fund.

An impediment to effective trust administration and trust reform is the continuing fractionation of allotments, which results in allotments with hundreds or thousands of undivided, beneficial ownership interests. *See generally Cobell XX*, 532 F. Supp. 2d at 40 (noting "enormous administrative difficulties" caused by fractionation). Accordingly, $1.9 billion will

---

[44] *Id.* at E(4)(e)(6).

[45] *Id.* at E(4)(e)(8).

[46] *See* Claims Resolution Act § 101(j)(1).

[47] *Id.* at (j)(2)(B).

[48] This assumption is subject to revision based upon, among other things, the costs of administration, including notice and distribution, payments to attorneys and named plaintiffs, and the total number of class members identified as a result of the notice process.

US2000 11964147.1

be set aside to purchase fractionated interests in trust and restricted lands.[49]   The Settlement Agreement incorporates by reference certain terms and provisions set forth in 25 U.S.C. §§ 2201, *et seq.*[50] The Agreement provides that Interior defendants will have no more than ten (10) years from the date of Final Approval of the Settlement Agreement to expend the $1.9 billion, up to 15% of which may be used for administrative costs for implementing the Land Consolidation Program.   The Agreement also establishes procedures for the sale of fractionated interests in Trust or restricted land pursuant to the Land Consolidation Program for individual Indians whose whereabouts are unknown.[51]

### 6.    Indian Education Scholarships

The Settlement Agreement provides that funds for Indian Education Scholarships will be available to Native American students "to defray the cost of attendance at both post-secondary vocational schools and institutions of higher education."[52]   Scholarship monies will come from three principal sources: (a) balances remaining in the Accounting/Trust Administration Fund;[53] (b) payments for Class Members designated as "whereabouts unknown," whose funds are not claimed within five years of Final Approval;[54] and (c) up to $60 million from the Trust Land Consolidation Fund, an incentive intended to encourage individual Indians to participate in the Land Consolidation Program.[55]

---

[49] *See* Settlement Agreement at F(2). Note that the Settlement Agreement originally provided for the creation of a $2 billion Land Consolidation Fund, but this was modified to $1.9 billion pursuant to legislation and adopted by the parties. *See* Claims Resolution Act §101(C)(i).

[50] *See* Settlement Agreement at F(1).

[51] *Id.* at F(6).   Congress approved the procedures.  *See* Claims Resolution Act § 101 (e)(5).

[52] *See* Settlement Agreement at G(1).

[53] *Id.* at G(2)(a).

[54] *Id.* at G(2)(b).

[55] *Id.* at G(2)(c).   The Settlement Agreement provides a formula for contributions to the Scholarship Fund based on the dollar value of the fractionated interest purchased.  *Id.* at (c) (1)-(3).   Transfers from the Trust Land Consolidation Fund to the Indian Education Scholarship Holding Fund have been ratified by Congress.  *See* Claims Resolution Act § 101(e)(1)(D).

13

### 7.     Taxes and Eligibility for Benefits

As set forth in the Agreement[56] and the Claims Resolution Act of 2010, amounts received by individual Indians pursuant to the Agreement are not included in their taxable income and shall not affect their eligibility for social benefits programs, including without limitation food stamps during a one-year period, which begins on the date settlement funds are received by the class member.[57]

### 8.     Releases

The Settlement Agreement provides that members of the Historical Accounting and Trust Administration Classes are deemed to have released the Department of the Interior from  the obligation to perform an historical accounting of IIM Accounts or any individual Indian trust asset, including any right to an accounting in aid of the jurisdiction of a court to render a money judgment, unless a member of the Trust Administration Class properly and timely opts out in accordance with directions contained in the Settlement Agreement.[58]  In addition, unless they opt out, all members of the Trust Administration Class will release all claims and causes of action related to fund administration and land administration, as those claims and causes of action are described in the amended complaint filed with this joint motion. There are twelve explicit exceptions to these releases.[59]  Plaintiffs are neither waiving nor releasing any claims or causes of action for future trust reform.[60]  The rights of Trust Administration Class members who elect to opt out of the settlement are preserved.[61]

---

[56] *See* Settlement Agreement at H(1).
[57] *See*  Claims Resolution Act § 101(f).
[58] *See* Settlement Agreement at I(1), I(7).
[59] *Id.* at I(3).
[60] *Id.* at I(4).
[61] *Id.* at I(7).

14

9.    **Attorneys' Fees**

The Settlement Agreement provides that the amount to which Plaintiffs are entitled for attorneys' fees, expenses and costs "are within the discretion of the Court in accordance with controlling law."[62]   The separate Agreement on Attorneys' Fees, Expenses and Costs ("Agreement on Attorneys' Fees") likewise confirms that "[t]he amount of attorneys' fees, expenses and costs shall be decided by the Court in accordance with controlling law and awarded from the Accounting/Trust Administration Fund."[63]   Similarly, the Claims Resolution Act of 2010 provides the amounts to which Plaintiffs are entitled for attorneys' fees, expenses and costs shall be determined "in accordance with controlling law including, with respect to attorneys' fees, expenses, and costs, any applicable rule of law requiring counsel to produce contemporaneous time, expense, and cost records in support of a motion for such fees, expenses, and costs; and . . . giving due consideration to the special status of Class Members . . . as beneficiaries of a federally created and administered trust."[64]

The Settlement Agreement also sets forth a process for the presentation of the attorneys' fees to the Court for decision.  For fees, expenses and costs through the date of the Settlement Agreement (*i.e.*, December 7, 2009) and within times set by the Court:  (a) Plaintiffs will submit a petition for the fees and post it on their Internet website; (b) Defendants may then respond and Class Members may object to the requested fees; and (c) Plaintiffs will then have a chance to reply.[65]   For work, expenses and costs of the attorneys after December 7, 2009, the Settlement Agreement provides that they are to be paid at reasonable intervals following Final Approval at

---

[62]  *Id.* at J(5).
[63]  Exhibit 14 (Fee Agreement) at ¶ 3.
[64]  *See* § 101 (g).
[65]  Settlement Agreement (Exhibit 2) at J(2) and J(3).

15

the actual billing rates for the attorneys.[66]   The post-Settlement fees must be approved by the Court with due consideration of any objections by Class Members, responses by Defendants, and replies by Plaintiffs.[67]

The Fee Agreement also provides that Plaintiffs' motion for counsel fees, expenses and costs incurred through December 7, 2009 "shall not assert that Class Counsel be paid more than $99,900,000.00 above amounts previously paid by Defendants."[68]   Likewise, in their response, Defendants have agreed that they "shall not assert that Class Counsel be paid less than $50,000,000.00 above the amounts previously paid by Defendants."[69]   The parties have agreed that they will not appeal an award "[i]n the event that the Court awards attorneys' fees, expenses, and costs  . . . in an amount equal to or greater than $50,000,000.00 and equal to or less than $99,900,000.00."[70]   This range for Class Counsel's fees, expenses and costs through December 7, 2009 is not stated as a limitation on the Court's discretion to decide the amount "in accordance with controlling law . . . . [and] giving due consideration to the special status of Class Members as beneficiaries of a federally created and administered trust.[71]

On the other hand, however, the Agreement on Attorneys' Fees sets forth an agreed limit on the amount of post-Settlement fees Class Counsel can receive.  The parties initially agreed to a limit of $10 million on post-Settlement attorneys' fees, expenses and costs,[72] but subsequently

---

[66] *Id.* at J(4).
[67] *Id.*
[68] Fee Agreement at ¶4(a).
[69] *Id.* at ¶ 4.b.
[70] *Id.* at ¶ 4.e.
[71] Exhibit 3 (Claims Resolution Act) at (g)(1)(A), and at (g)(1)(B).
[72] Exhibit 14 (Fee Agreement) at ¶5.

US2000 11964147.1

increased the limit to $12 million in recognition of the possible additional unanticipated work resulting from a delay in the enactment of the authorizing legislation.[73]

Finally, the Settlement Agreement requires Plaintiffs to file concurrently with this Motion a Notice setting forth the amount they will request for Class Counsel's fees, expenses and costs through December 7, 2009[74] so that this Notice to the plaintiff classes can include the amount being sought by Class Counsel.[75]

### 10.    Secretarial Commission on Trust Reform

The parties recognize that the Department of the Interior's trust reform efforts must continue.  Accordingly, on December 8, 2009, Secretary Salazar announced the creation of a 5-member Secretarial Commission to make recommendations regarding Interior's future responsibility for management and administration of trust assets maintained for individual Indian trust beneficiaries.[76]  The work of this Commission is funded by this settlement.[77]

### B.    THE NOTICE PROGRAM

### 1.    Characteristics of the Classes Settled by this Agreement

The identification of beneficiaries presents unique challenges due to, among other things, class size, geographical diversity of class members, and the long time periods involved, as well as the number of individuals whose whereabouts are presently unknown.  Currently, "[t]he exact number [of beneficiaries] is not known due to the lack of accurate or comprehensive records,"[78]

---

[73] Exhibit 15 (Modification of December 7, 2009 Agreement on Attorneys' Fees, Expenses and Costs) at ¶6.

[74] Exhibit 2 (Settlement Agreement) at J(1).

[75] *Id.*

[76] Secretarial Order 2392 ("Individual Indian Trust Management") is attached as Exhibit 16.

[77] *See* Settlement Agreement at F(2).

[78] *See* Notice Program at p. 4.

17

although it is believed there are over 500,000 individual class members.[79] Tens of thousands of addresses are unknown because beneficiaries have moved or died.[80]

The settlement affects members of most federally-recognized tribes west of the Mississippi River, particularly those individual Indians with beneficial interests in trust land in Arizona, Washington, California, New Mexico, North Dakota, South Dakota, Oklahoma and Montana.[81]  But class members are located throughout the country.[82]  They have varying degrees of education, exposure to national and local media, and basic information about their assets held in trust.  Many class members do not identify themselves as beneficiaries or know that they have assets held in trust by the government, which may entitle them to relief in this settlement.

## 2.      The Parties Have Agreed on a Comprehensive Notice Program

The parties believe that the notice program must be comprehensive and thorough to ensure adequate coverage of a disparate plaintiff population that exceeds 500,000.  Accordingly, the parties retained Kinsella Media, the preeminent notice expert in the country.  Kinsella Media has designed a notice program that is believed to be one of the most comprehensive and thorough class action notice programs ever proposed.[83]

In that regard, Kinsella Media has designed and implemented over 600 class action programs for some of the largest lawsuits covering a wide variety of claims including antitrust, bankruptcy, consumer fraud, and product liability. Kinsella Media has relevant expertise in designing and implementing notice programs for classes, which do not have widespread

---

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.*  In approximately 1950, the federal government initiated an Indian Relocation Program designed to move Native Americans from reservations to metropolitan areas across the country. This program continued until the 1970s.

[83] The Notice Plan is attached as Exhibit 13.

18

exposure to "traditional" media, and other insular populations, such as *In re Holocaust Victim Assets Litigation*[84] and *In re W.R. Grace & Co.*[85]

Kinsella Media has designed a class action notice program with four principal components: Direct Notice, Paid Media Advertising, Outreach to Third-Parties, and Earned Media. In addition, Ms. Cobell and plaintiffs' counsel have undertaken, and will continue to undertake, a series of On-Site Meetings with Beneficiaries during the notice period.

***Direct Notice***.   The centerpiece of the notice program will be direct notice to class members.  Direct notice consists of the transmission of the court-approved long-form notice[86] via U.S. Mail to class members whose names and addresses are available,[87] or to any other individual who requests a copy.[88]   Directly-mailed notice is generally considered the "gold standard" for class action notice. The court-approved short and long-form notices will also be available for download on the website.[89]

---

[84] Kinsella Media was responsible for providing notice in *In re Holocaust Victim Assets Litigation,* Nos. CV-96-4849, CV-96-5161, and CV-97-461 (E.D.N.Y.), to reach Romani Holocaust victims (Gypsies).  Using in-country organizers and human rights organizations, the firm designed and implemented a "grassroots" campaign to reach the isolated and educationally disadvantaged Roma in 15 countries in Europe and the former Soviet Union.

[85] *In re W.R. Grace & Co* No. 01-01139, (Bankr. D.Del.), Kinsella Media included notice to indigenous peoples in Canada in an aboriginal language (Inuktitut) for the Zonolite Attic Insulation notice program in Canada using media targeted specifically to these Native Peoples.

[86] The long form notice is attached hereto as Exhibit 17.

[87] Interior maintains a database of beneficiary trust information, including names and addresses. Interior staff estimates that Interior has address information for approximately 337,000 class members. Notice Program at p. 11.

[88] Any visitors to the website have the ability to put their contact information into a database and register to receive the long-form notice: https://cert.tgcginc.com/iim/register.php.   Alternatively, individuals may call a toll-free number to register to receive the long form notice – 800-961-6109. This toll-free number is prominently displayed on the website, included in every Ask Elouise Letter, *see infra* at 19, and was distributed during counsel's On-Site Meetings with Beneficiaries.  To date, 22,493 prospective beneficiaries have registered via phone or the Internet to receive the court-approved long form notice.

[89] The short form notice is attached hereto as Exhibit 18.

US2000 11964147.1

Plaintiffs have retained GCG, one of the most respected settlement administration firms in the country.  GCG has over 25 years experience working with parties to extract necessary data from the most complex data systems for use in mailed notice programs.  GCG will manage all aspects of the formatting, printing, and first-class mailing of the notice documents to all potential beneficiaries for whom Interior has a last-known address or an address that can be obtained by GCG through advance level address searches.  Notice packets returned to GCG with forward address information will be updated in the database GCG has designed for the *Cobell* settlement and promptly re-mailed.  To attempt to reach those class members whose notice packets are returned without forward address information, extensive advance level searches will be employed.

In   addition,   since   the   filing   of   the   litigation,   plaintiffs   have   utilized http://www.indiantrust.com to communicate with members of the class.[90]  Class members and others have the ability to put their e-mail address into the website and receive periodic updates on the case.  To date, 9,324 prospective beneficiaries have done so.[91]  Since December 7, 2009, plaintiffs have transmitted sixteen public communications (Ask Elouise Letters) to answer questions and provide the most current and accurate information about the settlement.  These transmissions are preserved and available on the website for any class member with a question[92] along with a consolidated Frequently Asked Questions section.[93]

Because information possessed by Interior about the identity and location of trust beneficiaries is incomplete and at times out-of-date, the direct notice program is supplemented

---

[90] Following the signing of the Settlement Agreement on December 7, 2009, all web traffic was redirected to http://www.cobellsettlement.com/index.php.
[91] Since the inception of this case, approximately 16,359 individuals have put in their email addresses to receive updates, but only 9,324 have valid addresses at this point in time.
[92] http://www.cobellsettlement.com/class/ask_elouise.php.
[93] http://www.cobellsettlement.com/press/faq.php.

US2000 11964147.1

through Paid Media, Outreach to Third-Parties, Earned Media and On-Site Meetings with Beneficiaries.

Potential Class Members who are not currently receiving IIM account statements, but receive notice of the Settlement Agreement and believe they might be a member of one of the classes settled by the Agreement can download the Claim Form on http://www.indiantrust.com or request that a notice packet be sent to their address.[94] The Claim Form enables potential individuals to self-identify as a member of one of the Classes by providing GCG with relevant information about their account or trust land.[95]

***Paid Media Advertising***. Paid media advertising consists of the purchase of advertisements in newspapers, consumer magazines, television, radio, the Internet, and Native American media.[96]  Paid media advertising is guaranteed to appear with precise content and timing allowing for targeted, cost-effective overlapping message delivery in discrete populations.

In this case, media consumption habits of individual Indian class members are largely identical to Native Americans at-large.  Demographic and geographic information for Native Americans is widely available through a variety of sources including, but not limited to, census data, syndicated data available from GfK MRI's[97] *2009 Doublebase* Survey, other government data, and *Tiller's Guide to Indian Country*. Research indicates that Native Americans are heavy

---

[94] A Claim Form is attached to each Long Form Notice. The Claim Form is attached as Exhibit 19.

[95] Heirs to a deceased Class Member may also use the Claim Form to self-identify.

[96] *See* Notice Program at pp. 19-32.

[97] GfK MRI is a nationally accredited media and marketing research firm that provides syndicated data on audience size, composition, and other relevant factors pertaining to major media including broadcast, magazines, newspapers, and outdoor advertising.  GfK MRI provides a single source measurement of major media, products, services, and in-depth consumer demographic and lifestyle/psychographic characteristics.

21

users of television and magazines and above average users of newspapers and radio.[98] Accordingly, media will be purchased in: (1) local television and radio markets and other key markets with significant concentrations of Native American populations; (2) local and national Native American print media; (3) newspaper supplements that have broad geographic distribution in the United States to reach class members nationally; (4) military newspapers to reach Native Americans who are or were serving in the armed services;[99] and (5) Native American-focused websites.

**_Outreach to Third-Parties_**. Kinsella Media has identified and directly contacted hundreds of entities affiliated with Native Americans in order to solicit their input and arrange for their participation in the notice program, including nursing homes, non-profits, religious organizations, tribal colleges, and other organizations that serve Native Americans.[100] Notice packets, including posters, flyers, DVDs and other pre-produced materials for use in organizational newsletters and bulletins, will be provided.[101]

Interior will also be posting information and flyers in BIA agencies, schools, and tribal courts and has facilitated a similar arrangement with Indian Health Service facilities.[102] Kinsella Media has contacted over 70 of the 106 largest tribes, and the majority agreed to receive, post, and distribute prepared materials in government offices and related tribal institutions.[103] Where

---

[98] *See* Notice Program at p.18.

[99] Native Americans are 2.5 times more likely to be in the military than the typical adult. *Id.* at p. 21.

[100] *Id.* at 35.

[101] *Id.*

[102] *Id.*

[103] *Id.* at 36.

US2000 11964147.1

appropriate, Kinsella Media has also contacted individual chapters, districts, and organizations within the tribes' structures to request assistance with the notice program.[104]

Finally, Kinsella Media has contacted and cataloged hundreds of businesses including restaurants, gas stations, casinos, convenience stores, smoke shops, clothing stores, beauty parlors and many others to support the notice program.[105]   GCG will support the notice program by sending personnel to selected third-party organizations that have agreed to post information to verify that the program is implemented effectively.[106]

***Earned Media***.   Significant earned media resulted from the announcement of the settlement in early December 2009.  Since that point in time, additional media coverage of the settlement was generated through: extensions of the Settlement Agreement; public statements of government officials (including the President and the Secretary of the Interior), Elouise Cobell, and plaintiffs' counsel; and, Congressional consideration and ultimate approval. A Google search reveals over 425 separate news reports or published stories since the signing of the Settlement Agreement including, without limitation, an extensive Associated Press profile of Ms. Cobell, multiple National Public Radio news items, and two editorials in each of the following publications: New York Times, Seattle Times, and Washington Post.

***On-Site Meetings with Beneficiaries***.   To date, plaintiffs' counsel and Elouise Cobell have advertised and conducted 27 separate on-site meetings around Indian Country.[107] These meetings have ranged from a few to over five hours and were presented as a discussion of the case, its history, and the Settlement Agreement, including class members' rights and responsibilities under that agreement. These discussions typically were followed by an extensive

---

[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] The itinerary is attached as Exhibit 20.

US2000 11964147.1

question and answer period.  Most meetings were well attended by hundreds of class members. Plaintiffs' counsel will undertake to schedule additional meetings during the notice period.

Plaintiffs' counsel and government officials also attended meetings together around Indian Country, including conferences held by the National Congress of American Indians, since signing the Settlement Agreement to discuss the case and its settlement.  Information was disseminated at each meeting and case status was discussed.  Interior Defendants also hosted conference calls with tribal leaders on two occasions to discuss the general parameters of the Settlement Agreement.

## III.   ARGUMENT

## A.   PRELIMINARY APPROVAL OF THE SETTLEMENT AGREEMENT IS PROPER

### 1.   The Settlement Agreement Fairly Resolves this Litigation

A class action may be "settled … or compromised only with the court's approval."  Fed. R. Civ. P. 23(e).  In granting approval, a court must find that the settlement is "fair, adequate, and reasonable and is not the product of collusion between the parties."  *Thomas v. Albright,* 139 F.3d 227, 231 (D.C. Cir. 1998) (quoting *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir. 1977). Approval of a class action settlement is a two-step process.  *See* MANUAL FOR COMPLEX LITIGATION (Fourth) §§ 13.14 and 21.632 (2004).  First, a court reviews the settlement agreement and makes a "preliminary fairness evaluation."  *Id.* § 21.632. The purpose of the evaluation is to determine whether the settlement proposal is sufficient to justify public notice and a hearing.  *Id.* §13.14.  Second, if this Court is satisfied following its preliminary review of the settlement, notice to class members is ordered and a fairness hearing is scheduled pursuant to Rule 23(e).  MANUAL FOR COMPLEX LITIGATION § 21.633.  At the fairness hearing, proponents of the settlement must demonstrate that its terms are "fair, reasonable and adequate."  *Id.* § 21.634.

US2000 11964147.1

The same criteria that justify approval of a class action settlement at a final hearing – fairness, adequacy and reasonableness – guide a court's preliminary approval. *See* MANUAL FOR COMPLEX LITIGATION § 21.632; *Freeport Partners, L.L.C. v. Allbritton*, No. Civ. A. 04-2030 (D.D.C. Oct. 18, 2005) (Memorandum Order).   Review at this stage, however, is more attenuated. As this Court has explained, preliminary approval of a settlement should be granted "if the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys, and appears to fall within the range of possible approval . . . ." *In re Vitamins Antitrust Litig.* ("*In re Vitamins*"), 2001 WL 856292, *4 (D.D.C. July 25, 2001) (*quoting* MANUAL FOR COMPLEX LITIGATION (Third) § 30.41 (1999))*; see also Jack Faucett Associates, Inc. v. American Telephone and Telegraph Co.,* No. 81-1804, 1985 WL 5199, *2 (D.D.C. Dec. 16, 1985) (granting motion for preliminary approval of a class action settlement where it was "prima facie within the range of reasonableness"); *In re Traffic Executive Ass'n-E. R.R.,* 627 F.2d 631, 634 (2d Cir. 1980) (preliminary approval "is at most a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness.") Factors considered in this Circuit in determining the reasonableness of a settlement include "(a) whether the settlement is the result of arms-lengths negotiations; (b) the terms of the settlement in relation to the strength of plaintiffs' case; (c) the stage of the litigation proceedings at the time of settlement;  . . . and [(d)] the opinion of experienced counsel."[108] *In re Lorazepam & Chloride Antitrust Litig. v. Mylan Laboratories, Inc., ("In re Lorazepam"),* No.

---

[108] In a hearing on final approval, the court would also consider the "reaction of the class" to the settlement.

US2000 11964147.1

MDL 1290(TFH), 2003 WL 22037741, *2 (D.D.C. June 16, 2003); *Thomas*, 139 F.3d at 231-33;

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd,* 565 F. Supp. 2d 49, 54-55 (D.D.C. 2008).

Preliminary approval of a class action settlement is within the discretion of the court. *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 50 (D.D.C. 2010); *In re Vitamins*, 2001 WL 856292 at *4. Any such determination is based on its "familiarity with the issues and evidence of the case as well as the arms-length nature of the negotiations prior to the settlement." *Id.* (*quoting In re Southern Ohio Correctional Facility*, 173 F.R.D. 205, 211 (S.D.Ohio 1977)). However, such discretion is influenced by public policy that favors settlement of class actions "given the litigation expenses and judicial resources required." *In re Baan Co. Securities Litig.*, 284 F. Supp. 2d 62, 64 (D.D.C. 2003); *see also Radosti*, 717 F. Supp. 2d at 50; *In re Vitamins Antitrust Litig.,* 305 F. Supp. 2d 100, 103 (D.D.C. 2004).

For nearly fifteen years, this Court has addressed "a serious injustice . . . that has persisted for over a century and that crie[d] out for redress." *Cobell v. Kempthorne* ("*Cobell XIX*"), 455 F.3d 317, 335 (D.C. Cir. 2006). After lengthy and sometime difficult settlement discussions and extensive Congressional review, a fair and reasonable settlement has been achieved. Preliminary approval is appropriate.

**2.     The Settlement is the Result of Arms-Length Negotiations.**

"[A] presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arms' length negotiations between experienced, capable counsel after meaningful discovery." *In re Vitamins*, 305 F. Supp. 2d at 104. *See also In re Lorazepam*, 2003 WL 22037741 at *2; *Freeport Partners, LLC v. Allbritton*, No. 04-2030(GK), 2006 WL 627140, *8 (D.D.C. Mar. 13, 2006). The Settlement Agreement was executed after five months of extensive and sometimes contentious negotiations among experienced counsel on both sides who

US2000 11964147.1

have devoted considerable time and effort to this litigation.[109]   After execution of the Settlement

Agreement, Congress vetted its terms for twelve months.   The vetting process resulted in

modifications that provide additional benefits to the classes, including the allocation of $100

million from the Land Consolidation Fund to the Trust Administration Adjustment Fund.

Plainly, this settlement is the result of arms-length negotiations and, properly, may be presumed

to be fair, reasonable, and adequate.  *See Equal Rights Center v. Washington Metropolitan Area*

*Transit Authority,* 573 F. Supp. 2d 205, 212 (D.D.C. 2008) (class action settlement presumed

reasonable where the parties engaged in six months of vigorous negotiations and the litigation

was unusually contentious).

> **3.      The Terms of Settlement Reflect the Strength of Plaintiffs' Case and the
> Reality that No End is in Sight.**

On December 21, 1999, this Court declared, among other things, that defendants are in

breach of trust duties that the United States owes to the *Cobell* plaintiffs, primarily the duty to

account for IIM trust funds.  *Cobell V*, 91 F. Supp. 2d at 58.  That decision was affirmed on

appeal.  *See Cobell v. Norton* ("*Cobell VI*"), 240 F.3d 1081 (D.C. Cir. 2001).  Accordingly, the

government owes plaintiffs fiduciary duties that arise from their exercise of control over

individual Indian trust assets, duties that include the duty to account. *Id.* at 1098, 1101, 1109.

The D.C. Circuit has described the trustee-delegates' conduct in harsh terms.  *See, e.g., Cobell*

*XIX,* 455 F.3d at 333 (explaining defendants have "flagrantly and repeatedly breached [their]

fiduciary obligations").   Interior defendants' duty to render the best historical accounting that

they can render is now established. *See, e.g., Cobell XXII,* 573 F.3d at 813 (holding that "[e]quity

---

[109]  Plaintiffs' counsel represent further that, consistent with controlling law and the ethical
standards promulgated by the District of Columbia Bar, no plaintiffs' attorney has requested or
been offered any compensation, appointment, or benefit by defendants during negotiations
related to the settlement or this case, other than as set forth expressly in the Settlement and Fee
Agreements.

US2000 11964147.1

requires the courts to assure that Interior provides the best accounting it can").  On appeal, the
D.C. Circuit vacated a $455.6 million award and instructed the Department of the Interior to
"provide the trust beneficiaries the best accounting possible, in a reasonable time, with the
money that Congress is willing to appropriate." *Id.*

But for this settlement and independent of trust reform issues, the decision in *Cobell XXII*
portends further litigation on the nature and scope of the "best accounting" that can be rendered,
as well as the monetary remedies and other relief that may be available to plaintiffs.  Because the
parties continue to disagree regarding the nature and scope of a required accounting, among
other issues, continued litigation "entails substantial risks" and "monetary recovery certainly
cannot be assumed."  *In re Lorazepam*, 2003 WL 22037741 at *4; *see also In re Ampicilllin
Antitrust Litig.*, 82 F.R.D. 652, 654 (D.D.C. 1979). Accordingly, settlement "'provide[s] a
significant benefit to the class' and should therefore be . . . approve[ed]."  *In re Lorazepam*, 2003
WL 22037741 at *4 (*quoting In re Vitamins Antitrust Litig.*, 2001 WL 1772352, at *3 (D.D.C.
2001)); *see also Radosti,* 717 F. Supp. 2d at 64 (finding class action settlement to be fair and
reasonable given the significant recovery obtained for class members, difficulties faced by
plaintiffs in pursuing their claims, and risks and costs inherent in continued litigation).The
parties recognize that but for this settlement "there is no end [to this litigation] anticipated in the
foreseeable future" and are "mindful of the admonition of the Court of Appeals that they work
together "'to resolve his case expeditiously and fairly,'" *Cobell XIX*, 455 F.3d at 336.[110] This is a
reasonable and fair settlement to all parties considering the strength of plaintiffs' case and the
reality that any litigated resolution on the merits might not come for many more years.

---

[110] *See* Settlement Agreement at p. 4.

US2000 11964147.1

### 4.      Settlement is Timely

Settlement should come at a time when "counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-a-vis the probability of success and range of recovery." *In re Lorazepam*, 2003 WL 22037741 at \*4; *Meijer,* 565 F. Supp. 2d at 57.   Settlement was reached after nearly fifteen years of vigorously contested litigation, during which the parties participated in significant discovery, reviewed tens of millions of pages of documents, deposed and examined scores of expert and fact witnesses, briefed and argued hundreds of motions and multiple appeals, and appeared in lengthy evidentiary hearings and trials, one of which lasted fifty-nine trial days.   Plaintiffs and plaintiffs' counsel had, and continue to have, sufficient information to assess adequately the risks of litigation at the time of settlement.   *See In re Lorazepam*, 2003 WL 22037741 at \*5 (preliminary approval appropriate where the parties had engaged in "substantial and vigorous litigation," including "voluminous document discovery [and] depositions" and an appeal of class certification issues); *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 117 (D.D.C. 2007) (settlement appropriate where plaintiffs' counsel had reviewed one million pages of documents and conducted twenty depositions).

### 5.      Counsel Believes the Settlement is Fair and Reasonable

As this Court has noted, the opinion of experienced counsel "should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement." *In re Lorazepam,* 2003 WL 22037741 at \*6;  *Radosti,* 717 F. Supp. 2d at 57.  The undersigned class counsel have unique experience litigating complex financial matters, including the nearly fifteen years they have litigated this landmark case.   Each is of the opinion that this proposed settlement, given the current status of this litigation, the risks going forward, and the likelihood of lengthy litigation in the future should it not be resolved, is fair and reasonable and in the best interest of the plaintiffs. *See Equal Rights Center*, 673 F. Supp. 2d at 213 (crediting opinion of

counsel as to the fairness of the settlement given their over three years of experience litigating the matter before the court).

With respect to new claims added to the Trust Administration Class,[111] plaintiffs' counsel are uniquely experienced and qualified to evaluate and estimate the value of those claims. The Amended Complaint states that evidence was adduced during the course of this litigation showing, among other things, a failure to collect and credit trust funds, a failure to prudently invest collected funds, charging improper administrative fees, a failure to investigate allegations of theft and fraud, and the incorrect disbursement of trust funds.[112] As the Circuit has held, "the accounting is a purely instrumental right -- a way of finding out the size of [beneficiaries'] claims." *Cobell v. Norton* ("*Cobell XIII*"), 392 F.3d 461, 467 (D.D.C. 2004). Accordingly, no attorney or group has more practical information and knowledge about the nature and scope of the claims impacting the *Cobell* plaintiffs.

### 6.     The Parties Have Agreed to an Award of Attorneys' Fees and Costs to Plaintiffs Within a Range Subject to the Court's Discretion.

Class Counsel have undertaken fifteen years of highly contentious and difficult litigation against defendants, including an extraordinary twelve month legislative approval process. In framing and prosecuting this case, they undertook substantial risk, litigated novel procedural, jurisdictional, and substantive legal issues, and navigated through a series of unique appellate decisions, which the Circuit acknowledged as a "complicated legal morass" from which no "exit" is readily apparent. *Cobell XXII*, 573 F.3d at 812.

---

[111] Importantly, claims made in the original complaint are included in both the Historical Accounting Class (*e.g.*, trustee-delegates' failure to render an adequate accounting) and the Trust Administration Class (*e.g.*, misappropriation of collected trust funds). However, new claims included in the Amended Complaint and resolved by this Settlement Agreement are entirely within the Trust Administration Class.

[112] *See* Amended Complaint at ¶¶ 27-28

US2000 11964147.1

The award of fees and expenses is in the discretion of this Court.  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  Taken together, the Settlement Agreement, Agreement on Fees, and Claims Resolution Act of 2010 provide that the amount for attorneys' fees, expenses, and costs shall be determined in accordance with controlling law, giving due consideration to the special status of Class Members as beneficiaries of a federally created and administered trust.[113]

The Settlement Agreement and Agreement on Fees also contain procedures and provisions for the submission of these issues to the Court, including a requirement for notice to the plaintiff classes and an opportunity for Class Members to object.[114]   The only action the Court now needs to take regarding Class Counsel's compensation is to set times for the filing of the necessary submissions.  The parties have jointly proposed times for those submissions in the proposed Order on this Motion, which is being filed concurrently.

### 7.    Class Representatives Are Treated Reasonably.

Class representatives are not treated more favorably than other class members.  Apart from any incentive fees to which they may be entitled and awarded by this Court, class representatives will be treated precisely the same way and are subject to the same distribution formula as fellow members of the Historical Accounting and Trust Administration Classes. "[C]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *In re Lorazepam*, 2003 WL 22037741 at *10.  Incentive awards requested by class representatives will be set forth in a separate filing with this Court.[115]  Plaintiffs will disclose the amount(s) requested

---

[113] *Supra* at II.A.9.

[114] *Id.*

[115]   Under the terms of the Settlement Agreement, prior to a hearing on the Motion for Preliminary Approval, plaintiffs must file a notice with this Court "stating the amount of incentive awards which will be requested for each Class Representative, including expenses and

in the Notice to the classes, and the defendants, as well as any class member, may respond to the request.    Any incentive awards are within the discretion of this Court and must be consistent with "controlling law."[116]

**B.**    **THE TRUST ADMINISTRATION CLASS SHOULD BE CERTIFIED AND THE FEBRUARY 4, 1997, CERTIFICATION ORDER MODIFIED.**

**1.**    **This Court's Certification Order Describing the Historical Accounting Class Should be Modified in Accordance with the Settlement Agreement.**

In entering the February 4, 1997 class certification order, this Court reserved its right to modify the order as the interests of justice may require. *See supra* at 6; *see also* Fed .R. Civ. P. 23(c)(1)(C) (An order certifying a class "may be altered or amended before judgment"); *Lightfoot v. District of Columbia*, 246 F.R.D. 326, 334 n.6 (D.D.C. 2007) (discussing amendment of class certification order in light of developments in the case).    Decisions of this Court and the court of appeals have had the effect of limiting those beneficiaries entitled to relief under allegations set forth in the complaint. *See supra* at 6. The parties, in their Settlement Agreement, have adopted a definition of the Historical Accounting Class, which is in conformity with governing law.[117]    Accordingly, the parties respectfully request that this Court modify the class certification order in accordance with the terms of the Settlement Agreement and implementing legislation.

**2.**    **The Court Should Certify the Trust Administration Class for Purpose of Settlement.**

The Settlement Agreement establishes a second class, the Trust Administration Class, consisting of beneficiaries with claims for trust land and funds mismanagement.    *See supra* at

---

costs that were not paid for by attorneys, which expenses and costs are expected to be in the range of $15 million above those paid by Defendants to date."  Settlement Agreement at K(1).
[116]  *Id*. K(2); Claims Resolution Act § 101(g)(1).
[117]    *See also* Settlement Agreement at A(15).

US2000 11964147.1

[TBA].[118]  Congress has expressly approved this class.[119]  Typically, when presented with a class established by settlement agreement, a court must "consider whether the proposed class meets the requirements of Federal Rule of Civil Procedure 23."  *Vista Healthplan, Inc. v. Warner Holdings Co. III, LLC*, 246 F.R.D. 349, 356 (D.D.C. 2007).  However, such an analysis is unnecessary where, as here, Congress has specifically approved certification of the Trust Administration Class under Rule 23.  Section 101 (d)(2)(A) of the Act expressly provides that "[n]otwithstanding the requirements of the Federal Rules of Civil Procedure, the court in [this case] may certify the Trust Administration Class."  Additionally, on certification, "the Trust Administration Class shall be treated as a class certified under rule 23(b)(3) … for purposes of Settlement."  *Id.* at § 101(d)(2)(B); *see generally Shady Grove Orthopedic Assoc's, P.A. v. Allstate Ins. Co.*, ___ U.S.___, 130 S. Ct. 1431, 1438 (2010) ("Congress … has ultimate authority over the Federal Rules of Civil Procedure; it can create exceptions to an individual rule as it sees fit – either by directly amending the rule or by enacting a separate statute overriding it in certain circumstances").  In accordance with the Settlement Agreement and the authorizing legislation approved by Congress and signed by the President, the parties respectfully request certification of the Trust Administration Class under Rule 23(b)(3).

## C.   THE NOTICE PROGRAM SHOULD BE APPROVED

### 1.   The Notice Program Provides the Best Possible Notice to Class Members

This Court is obligated to see that class members receive sufficient notice of the proposed settlement.  *Equal Rights Center*, 573 F. Supp. 2d at 211.  Rule 23(e)(1)(B) requires this Court to "direct notice in a reasonable manner to all class members who would be bound by a proposed settlement."  *See generally Vista Healthplan, Inc.,* 246 F.R.D. at 355-56; MANUAL FOR COMPLEX

---

[118]  *Id.* at A(35).
[119]  *See* Claims Resolution Act § 101 (a)(10), (d)(2).

LITIGATION, § 21.312.  Settlement notices should be provided in the same manner as certification notices.  *Id.* at 294.  Accordingly, in cases of a Rule 23(b)(3) certification, this Court must review a proposed notice program to ensure that the parties provide class members with the "best notice practicable under the circumstances."  Fed. R. Civ. P.  23(c)(2)(B).[120]  "[I]ndividual notice" must be provided "to all members who can be identified through reasonable effort."  *Id.*   Those individual members who can be so identified must receive notice via mail or other direct means. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 174-75 (1974).  However, "[n]either Rule 23 nor the requirements of due process require actual notice to each and every possible class member."  *In re Prudential Insurance Co. of America Sales Practices Litig.*, 177 F.R.D. 216, 233 (D.N.J. 1997); *see also Pigford v. Veneman,* 208 F.R.D. 21, 23 (D.D.C. 2002).

When all class members cannot be identified, other methods such as publication in newspapers and periodicals, are deemed sufficient.  *See, e.g., Baan Securities Litig.,* 284 F. Supp. 2d at 67 (approving mailings of notice to 17,500 customers and brokers and publication of notice in newspapers); *In re Lorazepam,*  2003 WL 22037741 at *5 (notice was nationally disseminated through newspapers, magazines, the Internet, and direct mailings to over 55,000 potential class members); *Collins v. Pension Benefit Guar. Corp.*, 1996 WL 335346, *2 (D.D.C. June 7, 1996) (notice provided to 113,000 class members whose addresses could be ascertained and through publications in newspapers and other print media).  *See also* MANUAL FOR COMPLEX LITIGATION § 21.312; 3 NEWBERG ON CLASS ACTIONS § 22:85 (4th ed.).

## 2.      The Long-Form Notice Satisfies the Requirements of Rule 23.

A notice of settlement in a class action must be "reasonable." Fed. R. Civ. P. 23(e)(1)(B). "There are no rigid rules to determine whether a settlement notice to the class satisfies

---

[120] For classes certified under Rule 23(b)(1) or (b)(2), "the court may direct appropriate notice to the class."  Fed. R. Civ. P. 23(c)(2)(A).

constitutional or Rule 23(e) requirements." *WalMart Stores, Inc. v. VISA U.S.A., Inc.,* 396 F.3d 96, 114 (2nd Cir. 2005). The notice must "fairly apprise the prospective members of the class of the terms of the proposed notice and of the options that are open to them in connection with the proceedings." *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2nd Cir. 1982). "Notice is 'adequate if it may be understood by the average class member.'" *Wal Mart Stores*, 396 F.3d at 114 (quoting 4 NEWBERG ON CLASS ACTIONS § 11:53; *see also* MANUAL FOR COMPLEX LITIGATION § 21.312. (detailing requirements of notice).

The proposed long form notice provides all of the information recommended by the Manual on Complex Litigation since it (1) defines the classes; (2) describes the options open to the class members and the deadlines for taking action; (3) describes the essential terms of the settlement and informs the class members where they can obtain a copy of the entire settlement agreement; (4) discloses the incentive awards proposed for the class representatives; (5) provides information regarding Class Counsel's request for attorney fees and expenses; (6) indicates the time and place of the hearing to consider approval of the settlement; (7) describes the method for objecting to the settlement and for opting out of the Trust Administration Class; (8) explains the procedures for allocating and distributing settlement funds, and the different kinds of relief for the different classes; (9) explains the benefits available under the Trust Land Consolidation Program; (10) to the extent practicable, provides information on potential individual recoveries; and (11) prominently displays the address and phone number of class counsel and how to make inquiries. *See* MANUAL ON COMPLEX LITIGATION § 21.312 at 295. Additionally, the long form notice explains the binding effect of the Agreement on class members, including the binding effect on a class member's IIM account balance as of September 30, 2009, unless the class

member opts out of the Trust Administration Class.  The long form notice also provides the opt-out forms, and clearly explains the difference between opting out and claiming benefits.

### 3.      No Other Notice is Required for the Settlement to Be Effective.

The notice to class members is the only notice required for purpose of settlement.  The Class Action Fairness Act (CAFA) § 3(a), 28 U.S.C. § 1715 (2006), adds a new notice requirement for certain settling defendants in class action cases commenced after February 18, 2005,[121] but the new notice requirement does not apply to this case.  This case was initiated in 1996, well before the CAFA became effective.  On that basis alone, the CAFA notice provision would not apply here.  Even if the CAFA were assumed to be effective for the new claims added by the Amended Complaint filed pursuant to the settlement terms now before the Court, the plain language of the CAFA notice requirement makes clear that it does not apply to the federal government.  The CAFA provision requires settling defendants to give notice of a class action settlement to the "appropriate Federal official" and to an "appropriate State official" in every state where a class member resides.  Id.  The notice provision states that "[n]ot later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official . . . and the appropriate Federal official, a notice of the proposed settlement consisting of" an enumerated list of information.  Id. § 1715(b).  If this section were to apply, this court would be prohibited from "giving final approval of a proposed settlement . . . earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under subsection (b)."  Id. § 1715(d).  Moreover, if a defendant is subject to this

---

[121] 28 U.S.C. § 1332 note ("The amendments made by this Act shall apply to any civil action commenced on or after the date of enactment of this Act.").

notice provision but fails to give the required notice, a class member "may refuse to comply with and may choose not to be bound by" the settlement.

This section, however, does not apply to the federal government as a settling defendant. Subsection (f) contains a rule of construction that clearly and unequivocally exempts the federal government from this notice provision.  It states: "Nothing in this section shall be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials."  Id. § 1715(f).  When this rule of construction is applied to this case, section 1715 is not to be interpreted as "imposing any obligations, duties, or responsibilities upon" the Attorney General or the Secretaries of the Department of the Interior or the Department of the Treasury.  When, as here, the settling defendants are themselves components or officials of the federal government, the rule of construction for the CAFA notice provision renders it inapplicable to the settlement.122   Therefore, no notice other than that specified for class members under Rule 23 is required for the settlement to proceed to final approval.

---

122 The logic of this conclusion is confirmed by the irrational result that would obtain if a notice were required – the Attorney General would be obligated to send himself a CAFA notice.  See 28 U.S.C. § 1715(a)(1)(A) (identifying the Attorney General as an "appropriate Federal official" to receive notice under the CAFA provision).

37

Respectfully submitted, this 10th day of December, 2010.

/s/ Dennis M. Gingold
DENNIS M. GINGOLD
D.C. Bar No. 417748
607 14th Street, N.W.
9th Floor
Washington, D.C. 20005
(202) 824-1448


/s/ Keith M. Harper
KEITH M. HARPER
D.C. Bar No. 451956
JUSTIN GUILDER
D.C. Bar No. 979208
KILPATRICK STOCKTON, LLP
607 14th Street, N.W
Washington, D.C.  20005
(202) 508-5844

DAVID COVENTRY SMITH
N.C. Bar No. 12558
Admitted *Pro Hac Vice*
KILPATRICK STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
(336) 607-7392

WILLIAM E. DORRIS
Georgia Bar No. 225987
Admitted *Pro Hac Vice*
ELLIOTT LEVITAS
D.C. Bar No. 384758
KILPATRICK STOCKTON LLP
1100 Peachtree Street
Suite 2800
Atlanta, Georgia  30309
404-815-6500


Attorneys for Plaintiffs

TONY WEST
Assistant Attorney General
MICHAEL F. HERTZ
Deputy Assistant Attorney General
J. CHRISTOPHER KOHN
Director


/s/Robert E. Kirschman, Jr.
ROBERT E. KIRSCHMAN, JR.
Deputy Director
D.C. Bar No. 406635
MICHAEL J. QUINN
Trial Attorney
D.C. Bar No. 401376
Commercial Litigation Branch
Civil Division
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875
(202) 616-0328


Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing JOINT MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT was served on the following via facsimile, pursuant to agreement, on this day, December 10, 2010.

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
406.338.7530 (fax)


/s/ Shawn Chick