H. R. 4783

# One Hundred Eleventh Congress
## of the
## United States of America

**AT THE SECOND SESSION**

*Begun and held at the City of Washington on Tuesday,*
*the fifth day of January, two thousand and ten*

## An Act

This Act may be cited as "The Claims Resettlement Act of 2010.".

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Claims Resolution Act of 2010".

(b) TABLE OF CONTENTS.—The table of contents of this Act is as follows:

Sec. 1. Short title; table of contents.

TITLE I—INDIVIDUAL INDIAN MONEY ACCOUNT LITIGATION SETTLEMENT
Sec. 101. Individual Indian Money Account Litigation Settlement.

TITLE II—FINAL SETTLEMENT OF CLAIMS FROM IN RE BLACK FARMERS DISCRIMINATION LITIGATION
Sec. 201. Appropriation of funds for final settlement of claims from In re Black Farmers Discrimination Litigation.

TITLE III—WHITE MOUNTAIN APACHE TRIBE WATER RIGHTS QUANTIFICATION
Sec. 301. Short title.
Sec. 302. Purposes.
Sec. 303. Definitions.
Sec. 304. Approval of Agreement.
Sec. 305. Water rights.
Sec. 306. Contract.
Sec. 307. Authorization of WMAT rural water system.
Sec. 308. Satisfaction of claims.
Sec. 309. Waivers and releases of claims.
Sec. 310. White Mountain Apache Tribe Water Rights Settlement Subaccount.
Sec. 311. Miscellaneous provisions.
Sec. 312. Funding.
Sec. 313. Antideficiency.
Sec. 314. Compliance with environmental laws.

TITLE IV—CROW TRIBE WATER RIGHTS SETTLEMENT
Sec. 401. Short title.
Sec. 402. Purposes.
Sec. 403. Definitions.
Sec. 404. Ratification of Compact.
Sec. 405. Rehabilitation and improvement of Crow Irrigation Project.
Sec. 406. Design and construction of MR&I System.
Sec. 407. Tribal water rights.
Sec. 408. Storage allocation from Bighorn Lake.
Sec. 409. Satisfaction of claims.
Sec. 410. Waivers and releases of claims.
Sec. 411. Crow Settlement Fund.
Sec. 412. Yellowtail Dam, Montana.
Sec. 413. Miscellaneous provisions.

H. R. 4783—2

Sec. 414. Funding.
Sec. 415. Repeal on failure to meet enforceability date.
Sec. 416. Antideficiency.

TITLE V—TAOS PUEBLO INDIAN WATER RIGHTS

Sec. 501. Short title.
Sec. 502. Purposes.
Sec. 503. Definitions.
Sec. 504. Pueblo rights.
Sec. 505. Taos Pueblo Water Development Fund.
Sec. 506. Marketing.
Sec. 507. Mutual-Benefit Projects.
Sec. 508. San Juan-Chama Project contracts.
Sec. 509. Authorizations, ratifications, confirmations, and conditions precedent.
Sec. 510. Waivers and releases of claims.
Sec. 511. Interpretation and enforcement.
Sec. 512. Disclaimer.
Sec. 513. Antideficiency.

TITLE VI—AAMODT LITIGATION SETTLEMENT

Sec. 601. Short title.
Sec. 602. Definitions.

Subtitle A—Pojoaque Basin Regional Water System

Sec. 611. Authorization of Regional Water System.
Sec. 612. Operating Agreement.
Sec. 613. Acquisition of Pueblo water supply for Regional Water System.
Sec. 614. Delivery and allocation of Regional Water System capacity and water.
Sec. 615. Aamodt Settlement Pueblos' Fund.
Sec. 616. Environmental compliance.
Sec. 617. Funding.

Subtitle B—Pojoaque Basin Indian Water Rights Settlement

Sec. 621. Settlement Agreement and contract approval.
Sec. 622. Environmental compliance.
Sec. 623. Conditions precedent and enforcement date.
Sec. 624. Waivers and releases of claims.
Sec. 625. Effect.
Sec. 626. Antideficiency.

TITLE VII—RECLAMATION WATER SETTLEMENTS FUND

Sec. 701. Mandatory appropriation.

TITLE VIII—GENERAL PROVISIONS

Subtitle A—Unemployment Compensation Program Integrity

Sec. 801. Collection of past-due, legally enforceable State debts.
Sec. 802. Reporting of first day of earnings to directory of new hires.

Subtitle B—TANF

Sec. 811. Extension of the Temporary Assistance for Needy Families program.
Sec. 812. Modifications to TANF data reporting.

Subtitle C—Customs User Fees; Continued Dumping and Subsidy Offset

Sec. 821. Customs user fees.
Sec. 822. Limitation on distributions relating to repeal of continued dumping and
          subsidy offset.

Subtitle D—Emergency Fund for Indian Safety and Health

Sec. 831. Emergency Fund for Indian Safety and Health.

Subtitle E—Rescission of Funds From WIC Program

Sec. 841. Rescission of funds from WIC program.

Subtitle F—Budgetary Effects

Sec. 851. Budgetary effects.

H. R. 4783—3

# TITLE I—INDIVIDUAL INDIAN MONEY ACCOUNT LITIGATION SETTLEMENT

### SEC. 101. INDIVIDUAL INDIAN MONEY ACCOUNT LITIGATION SETTLEMENT.

(a) DEFINITIONS.—In this section:

(1) AGREEMENT ON ATTORNEYS' FEES, EXPENSES, AND COSTS.—The term "Agreement on Attorneys' Fees, Expenses, and Costs" means the agreement dated December 7, 2009, between Class Counsel (as defined in the Settlement) and the Defendants (as defined in the Settlement) relating to attorneys' fees, expenses, and costs incurred by Class Counsel in connection with the Litigation and implementation of the Settlement, as modified by the parties to the Litigation.

(2) AMENDED COMPLAINT.—The term "Amended Complaint" means the Amended Complaint attached to the Settlement.

(3) FINAL APPROVAL.—The term "final approval" has the meaning given the term in the Settlement.

(4) LAND CONSOLIDATION PROGRAM.—The term "Land Consolidation Program" means a program conducted in accordance with the Settlement, the Indian Land Consolidation Act (25 U.S.C. 2201 et seq.), and subsection (e)(2) under which the Secretary may purchase fractional interests in trust or restricted land.

(5) LITIGATION.—The term "Litigation" means the case entitled Elouise Cobell et al. v. Ken Salazar et al., United States District Court, District of Columbia, Civil Action No. 96–1285 (TFH).

(6) PLAINTIFF.—The term "Plaintiff" means a member of any class certified in the Litigation.

(7) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(8) SETTLEMENT.—The term "Settlement" means the Class Action Settlement Agreement dated December 7, 2009, in the Litigation, as modified by the parties to the Litigation.

(9) TRUST ADMINISTRATION ADJUSTMENT FUND.—The term "Trust Administration Adjustment Fund" means the $100,000,000 deposited in the Settlement Account (as defined in the Settlement) pursuant to subsection (j)(1) for use in making the adjustments authorized by that subsection.

(10) TRUST ADMINISTRATION CLASS.—The term "Trust Administration Class" means the Trust Administration Class as defined in the Settlement.

(b) PURPOSE.—The purpose of this section is to authorize the Settlement.

(c) AUTHORIZATION.—

(1) IN GENERAL.—The Settlement is authorized, ratified, and confirmed.

(2) AMENDMENTS.—Any amendment to the Settlement is authorized, ratified, and confirmed, to the extent that such amendment is executed to make the Settlement consistent with this section.

(d) JURISDICTIONAL PROVISIONS.—

(1) IN GENERAL.—Notwithstanding the limitation on the jurisdiction of the district courts of the United States in section 1346(a)(2) of title 28, United States Code, the United States

H. R. 4783—4

District Court for the District of Columbia shall have jurisdiction of the claims asserted in the Amended Complaint for purposes of the Settlement.

(2) CERTIFICATION OF TRUST ADMINISTRATION CLASS.—

(A) IN GENERAL.—Notwithstanding the requirements of the Federal Rules of Civil Procedure, the court in the Litigation may certify the Trust Administration Class.

(B) TREATMENT.—On certification under subparagraph (A), the Trust Administration Class shall be treated as a class certified under rule 23(b)(3) of the Federal Rules of Civil Procedure for purposes of the Settlement.

(e) TRUST LAND CONSOLIDATION.—

(1) TRUST LAND CONSOLIDATION FUND.—

(A) ESTABLISHMENT.—On final approval of the Settlement, there shall be established in the Treasury of the United States a fund, to be known as the "Trust Land Consolidation Fund".

(B) AVAILABILITY OF AMOUNTS.—Amounts in the Trust Land Consolidation Fund shall be made available to the Secretary during the 10-year period beginning on the date of final approval of the Settlement—

(i) to conduct the Land Consolidation Program; and

(ii) for other costs specified in the Settlement.

(C) DEPOSITS.—

(i) IN GENERAL.—On final approval of the Settlement, the Secretary of the Treasury shall deposit in the Trust Land Consolidation Fund $1,900,000,000 out of the amounts appropriated to pay final judgments, awards, and compromise settlements under section 1304 of title 31, United States Code.

(ii) CONDITIONS MET.—The conditions described in section 1304 of title 31, United States Code, shall be deemed to be met for purposes of clause (i).

(D) TRANSFERS.—In a manner designed to encourage participation in the Land Consolidation Program, the Secretary may transfer, at the discretion of the Secretary, not more than $60,000,000 of amounts in the Trust Land Consolidation Fund to the Indian Education Scholarship Holding Fund established under paragraph (3).

(2) OPERATION.—The Secretary shall consult with Indian tribes to identify fractional interests within the respective jurisdictions of the Indian tribes for purchase in a manner that is consistent with the priorities of the Secretary.

(3) INDIAN EDUCATION SCHOLARSHIP HOLDING FUND.—

(A) ESTABLISHMENT.—On final approval of the Settlement, there shall be established in the Treasury of the United States a fund, to be known as the "Indian Education Scholarship Holding Fund".

(B) AVAILABILITY.—Notwithstanding any other provision of law governing competition, public notification, or Federal procurement or assistance, amounts in the Indian Education Scholarship Holding Fund shall be made available, without further appropriation, to the Secretary to contribute to an Indian Education Scholarship Fund, as described in the Settlement, to provide scholarships for Native Americans.

H. R. 4783—5

(4) ACQUISITION OF TRUST OR RESTRICTED LAND.—The Secretary may acquire, at the discretion of the Secretary and in accordance with the Land Consolidation Program, any fractional interest in trust or restricted land.

(5) TREATMENT OF UNLOCATABLE PLAINTIFFS.—A Plaintiff, the whereabouts of whom are unknown and who, after reasonable efforts by the Secretary, cannot be located during the 5-year period beginning on the date of final approval of the Settlement, shall be considered to have accepted an offer made pursuant to the Land Consolidation Program.

(f) TAXATION AND OTHER BENEFITS.—

(1) INTERNAL REVENUE CODE.—For purposes of the Internal Revenue Code of 1986, amounts received by an individual Indian as a lump sum or a periodic payment pursuant to the Settlement shall not be—

(A) included in gross income; or

(B) taken into consideration for purposes of applying any provision of the Internal Revenue Code that takes into account excludable income in computing adjusted gross income or modified adjusted gross income, including section 86 of that Code (relating to Social Security and tier 1 railroad retirement benefits).

(2) OTHER BENEFITS.—Notwithstanding any other provision of law, for purposes of determining initial eligibility, ongoing eligibility, or level of benefits under any Federal or federally assisted program, amounts received by an individual Indian as a lump sum or a periodic payment pursuant to the Settlement shall not be treated for any household member, during the 1-year period beginning on the date of receipt—

(A) as income for the month during which the amounts were received; or

(B) as a resource.

(g) INCENTIVE AWARDS AND AWARD OF ATTORNEYS' FEES, EXPENSES, AND COSTS UNDER SETTLEMENT AGREEMENT.—

(1) IN GENERAL.—Subject to paragraph (3), the court in the Litigation shall determine the amount to which the Plaintiffs in the Litigation may be entitled for incentive awards and for attorneys' fees, expenses, and costs—

(A) in accordance with controlling law, including, with respect to attorneys' fees, expenses, and costs, any applicable rule of law requiring counsel to produce contemporaneous time, expense, and cost records in support of a motion for such fees, expenses, and costs; and

(B) giving due consideration to the special status of Class Members (as defined in the Settlement) as beneficiaries of a federally created and administered trust.

(2) NOTICE OF AGREEMENT ON ATTORNEYS' FEES, EXPENSES, AND COSTS.—The description of the request of Class Counsel for an amount of attorneys' fees, expenses, and costs required under paragraph C.1.d. of the Settlement shall include a description of all material provisions of the Agreement on Attorneys' Fees, Expenses, and Costs.

(3) EFFECT ON AGREEMENT.—Nothing in this subsection limits or otherwise affects the enforceability of the Agreement on Attorneys' Fees, Expenses, and Costs.

(h) SELECTION OF QUALIFYING BANK.—The United States District Court for the District of Columbia, in exercising the discretion

H. R. 4783—6

of the Court to approve the selection of any proposed Qualifying Bank (as defined in the Settlement) under paragraph A.1. of the Settlement, may consider any factors or circumstances regarding the proposed Qualifying Bank that the Court determines to be appropriate to protect the rights and interests of Class Members (as defined in the Settlement) in the amounts to be deposited in the Settlement Account (as defined in the Settlement).

(i) APPOINTEES TO SPECIAL BOARD OF TRUSTEES.—The 2 members of the special board of trustees to be selected by the Secretary under paragraph G.3. of the Settlement shall be selected only after consultation with, and after considering the names of possible candidates timely offered by, federally recognized Indian tribes.

(j) TRUST ADMINISTRATION CLASS ADJUSTMENTS.—

(1) FUNDS.—

(A) IN GENERAL.—In addition to the amounts deposited pursuant to paragraph E.2. of the Settlement, on final approval, the Secretary of the Treasury shall deposit in the Trust Administration Adjustment Fund of the Settlement Account (as defined in the Settlement) $100,000,000 out of the amounts appropriated to pay final judgments, awards, and compromise settlements under section 1304 of title 31, United States Code, to be allocated and paid by the Claims Administrator (as defined in the Settlement and pursuant to paragraph E.1.e of the Settlement) in accordance with this subsection.

(B) CONDITIONS MET.—The conditions described in section 1304 of title 31, United States Code, shall be deemed to be met for purposes of subparagraph (A).

(2) ADJUSTMENT.—

(A) IN GENERAL.—After the calculation of the pro rata share in Section E.4.b of the Settlement, the Trust Administration Adjustment Fund shall be used to increase the minimum payment to each Trust Administration Class Member whose pro rata share is—

(i) zero; or

(ii) greater than zero, but who would, after adjustment under this subparagraph, otherwise receive a smaller Stage 2 payment than those Trust Administration Class Members described in clause (i).

(B) RESULT.—The amounts in the Trust Administration Adjustment Fund shall be applied in such a manner as to ensure, to the extent practicable (as determined by the court in the Litigation), that each Trust Administration Class Member receiving amounts from the Trust Administration Adjustment Fund receives the same total payment under Stage 2 of the Settlement after making the adjustments required by this subsection.

(3) TIMING OF PAYMENTS.—The payments authorized by this subsection shall be included with the Stage 2 payments under paragraph E.4. of the Settlement.

(k) EFFECT OF ADJUSTMENT PROVISIONS.—Notwithstanding any provision of this section, in the event that a court determines that the application of subsection (j) is unfair to the Trust Administration Class—

(1) subsection (j) shall not go into effect; and

(2) on final approval of the Settlement, in addition to the amounts deposited into the Trust Land Consolidation Fund

H. R. 4783—7

pursuant to subsection (e), the Secretary of the Treasury shall deposit in that Fund $100,000,000 out of amounts appropriated to pay final judgments, awards, and compromise settlements under section 1304 of title 31, United States Code (the conditions of which section shall be deemed to be met for purposes of this paragraph) to be used by the Secretary in accordance with subsection (e).

# TITLE II—FINAL SETTLEMENT OF CLAIMS FROM IN RE BLACK FARMERS DISCRIMINATION LITIGATION

## SEC. 201. APPROPRIATION OF FUNDS FOR FINAL SETTLEMENT OF CLAIMS FROM IN RE BLACK FARMERS DISCRIMINATION LITIGATION.

(a) DEFINITIONS.—In this section:

(1) SETTLEMENT AGREEMENT.—The term "Settlement Agreement" means the settlement agreement dated February 18, 2010 (including any modifications agreed to by the parties and approved by the court under that agreement) between certain plaintiffs, by and through their counsel, and the Secretary of Agriculture to resolve, fully and forever, the claims raised or that could have been raised in the cases consolidated in *In re Black Farmers Discrimination Litigation,* Misc. No. 08–mc–0511 (PLF), including Pigford claims asserted under section 14012 of the Food, Conservation, and Energy Act of 2008 (Public Law 110–246; 122 Stat. 2209).

(2) PIGFORD CLAIM.—The term "Pigford claim" has the meaning given that term in section 14012(a)(3) of the Food, Conservation, and Energy Act of 2008 (Public Law 110–246; 122 Stat. 2210).

(b) APPROPRIATION OF FUNDS.—There is appropriated to the Secretary of Agriculture $1,150,000,000, to remain available until expended, to carry out the terms of the Settlement Agreement if the Settlement Agreement is approved by a court order that is or becomes final and nonappealable, and the court finds that the Settlement Agreement is modified to incorporate the additional terms contained in subsection (g). The funds appropriated by this subsection are in addition to the $100,000,000 of funds of the Commodity Credit Corporation made available by section 14012(i) of the Food, Conservation, and Energy Act of 2008 (Public Law 110–246; 122 Stat. 2212) and shall be available for obligation only after those Commodity Credit Corporation funds are fully obligated. If the Settlement Agreement is not approved as provided in this subsection, the $100,000,000 of funds of the Commodity Credit Corporation made available by section 14012(i) of the Food, Conservation, and Energy Act of 2008 shall be the sole funding available for Pigford claims.

(c) USE OF FUNDS.—The use of the funds appropriated by subsection (b) shall be subject to the express terms of the Settlement Agreement.

(d) TREATMENT OF REMAINING FUNDS.—If any of the funds appropriated by subsection (b) are not obligated and expended to carry out the Settlement Agreement, the Secretary of Agriculture shall return the unused funds to the Treasury and may not make

H. R. 4783—8

the unused funds available for any purpose related to section 14012 of the Food, Conservation, and Energy Act of 2008, for any other settlement agreement executed in *In re Black Farmers Discrimination Litigation*, No. 08–511 (D.D.C.), or for any other purpose.

(e) RULES OF CONSTRUCTION.—Nothing in this section shall be construed as requiring the United States, any of its officers or agencies, or any other party to enter into the Settlement Agreement or any other settlement agreement. Nothing in this section shall be construed as creating the basis for a Pigford claim.

(f) CONFORMING AMENDMENTS.—Section 14012 of the Food, Conservation, and Energy Act of 2008 (Public Law 110–246; 122 Stat. 2209) is amended—

(1) in subsection (c)(1)—

(A) by striking "subsection (h)" and inserting "subsection (g)"; and

(B) by striking "subsection (i)" and inserting "subsection (h)";

(2) by striking subsection (e);

(3) in subsection (g), by striking "subsection (f)" and inserting "subsection (e)";

(4) in subsection (i)—

(A) by striking "(1) IN GENERAL.—Of the funds" and inserting "Of the funds";

(B) by striking paragraph (2); and

(C) by striking "subsection (g)" and inserting "subsection (f)";

(5) by striking subsection (j); and

(6) by redesignating subsections (f), (g), (h), (i), and (k) as subsections (e), (f), (g), (h), and (i), respectively.

(g) ADDITIONAL SETTLEMENT TERMS.—For the purposes of this section and funding for the Settlement Agreement, the following are additional terms:

(1) DEFINITIONS.—In this subsection:

(A) SETTLEMENT AGREEMENT.—The term "Settlement Agreement" means the settlement, including any modifications agreed to by the parties and approved by the court, between the Secretary of Agriculture and certain plaintiffs, by and through their counsel in litigation titled Black Farmers Discrimination Litigation, Misc. No. 08–mc–0511 (PLF).

(B) NEUTRAL ADJUDICATOR.—

(i) IN GENERAL.—The term "Neutral Adjudicator" means a Track A Neutral or a Track B Neutral as those terms are defined in the Settlement Agreement, who have been hired by Lead Class Counsel as that term is defined in the Settlement Agreement.

(ii) REQUIREMENT.—The Track A and B Neutrals called for in the Settlement Agreement shall be approved by the Secretary of the United States Department of Agriculture, the Attorney General, and the court.

(2) OATH.—Every Neutral Adjudicator shall take an oath administered by the court prior to hearing claims.

(3) ADDITIONAL DOCUMENTATION OR EVIDENCE.—Any Neutral Adjudicator may, during the course of hearing claims, require claimants to provide additional documentation and evidence if, in the Neutral Adjudicator's judgment, the additional

H. R. 4783—9

documentation and evidence would be necessary or helpful in
deciding the merits of the claim, or if the adjudicator suspects
fraud regarding the claim.

(4) ATTORNEYS FEES, EXPENSES, AND COSTS.—

(A) IN GENERAL.—Subject to subparagraph (B) and the
provisions of the Settlement Agreement regarding attor-
neys' fee caps and maximum and minimum percentages
for awards of attorneys fees, the court shall make any
determination as to the amount of attorneys' fees, expenses,
and costs in accordance with controlling law, including,
with respect to attorneys' fees, expenses, and costs, any
applicable rule of law requiring counsel to produce contem-
poraneous time, expenses, and cost records in support of
a motion for such fees, expenses, and costs.

(B) EFFECT ON AGREEMENT.—Nothing in this para-
graph limits or otherwise affects the enforceability of provi-
sions regarding attorneys' fees, expenses, and costs that
may be contained in the Settlement Agreement.

(5) CERTIFICATION.—An attorney filing a claim on behalf
of a claimant shall swear, under penalty of perjury, that: "to
the best of the attorney's knowledge, information, and belief
formed after an inquiry reasonable under the circumstances,
the claim is supported by existing law and the factual conten-
tions have evidentiary support".

(6) DISTRIBUTION OF CLAIMS DETERMINATIONS AND SETTLE-
MENT FUNDS.—In order to ensure full transparency of the
administration of claims under the Settlement Agreement, the
Claims Administrator as that term is defined in the Settlement
Agreement, shall provide to the Secretary of Agriculture, the
Inspector General of the Department of Agriculture, the
Attorney General, and Lead Class Counsel as that term is
defined in the Settlement Agreement, all information regarding
Distribution of Claims Determinations and Settlement Funds
described in the Settlement Agreement.

(h) REPORTS.—

(1) GOVERNMENT ACCOUNTABILITY OFFICE.—

(A) IN GENERAL.—The Comptroller General of the
United States shall evaluate the internal controls
(including internal controls concerning fraud and abuse)
created to carry out the terms of the Settlement Agreement,
and report to the Congress at least 2 times throughout
the duration of the claims adjudication process on the
results of this evaluation.

(B) ACCESS TO INFORMATION.—Solely for purposes of
conducting the evaluation under subparagraph (A), the
Comptroller General shall have access, upon request, to
the claims administrator, the claims adjudicators, and
related officials, appointed in connection with the aforemen-
tioned settlement, and to any information and records gen-
erated, used, or received by them, including names and
addresses.

(2) USDA INSPECTOR GENERAL.—

(A) PERFORMANCE AUDIT.—The Inspector General of
the Department of Agriculture, within 180 days of
the initial adjudication of claims, and subsequently as
appropriate, perform a performance audit based on a statis-
tical sampling of adjudicated claims.

H. R. 4783—10

(B) AUDIT RECIPIENTS.—The audits described in clause (i) shall be provided to Secretary of Agriculture and the Attorney General.

# TITLE III—WHITE MOUNTAIN APACHE TRIBE WATER RIGHTS QUANTIFICATION

## SEC. 301. SHORT TITLE.

This title may be cited as the "White Mountain Apache Tribe Water Rights Quantification Act of 2010".

## SEC. 302. PURPOSES.

The purposes of this title are—
(1) to authorize, ratify, and confirm the Agreement;
(2) to authorize and direct the Secretary to execute the Agreement and take any other action necessary to carry out all obligations of the Secretary under the Agreement in accordance with this title;
(3) to authorize the amounts necessary for the United States to meet the obligations of the United States under the Agreement and this title; and
(4) to permanently resolve certain damage claims and all water rights claims among—
(A) the Tribe and its members;
(B) the United States, acting as trustee for the Tribe and its members;
(C) the parties to the Agreement; and
(D) all other claimants seeking to determine the nature and extent of the water rights of the Tribe, its members, the United States, acting as trustee for the Tribe and its members, and other claimants in—
(i) the consolidated civil action in the Superior Court of the State of Arizona for the County of Maricopa styled In re the General Adjudication of All Rights To Use Water In The Gila River System and Source, W–1 (Salt), W–2 (Verde), W–3 (Upper Gila), W–4 (San Pedro); and
(ii) the civil action pending in the Superior Court of the State of Arizona for the County of Apache styled In re the General Adjudication of All Rights to Use Water in the Little Colorado River System and Source and numbered CIV–6417.

## SEC. 303. DEFINITIONS.

In this title:
(1) AGREEMENT.—The term "Agreement" means—
(A) the WMAT Water Rights Quantification Agreement dated January 13, 2009; and
(B) any amendment or exhibit (including exhibit amendments) to that Agreement that are—
(i) made in accordance with this title; or
(ii) otherwise approved by the Secretary.
(2) BUREAU.—The term "Bureau" means the Bureau of Reclamation.

H. R. 4783—11

(3) CAP.—The term "CAP" means the reclamation project authorized and constructed by the United States in accordance with title III of the Colorado River Basin Project Act (43 U.S.C. 1521 et seq.).

(4) CAP CONTRACTOR.—The term "CAP contractor" means an individual or entity that has entered into a long-term contract (as that term is used in the repayment stipulation) with the United States for delivery of water through the CAP system.

(5) CAP FIXED OM&R CHARGE.—The term "CAP fixed OM&R charge" has the meaning given the term in the repayment stipulation.

(6) CAP M&I PRIORITY WATER.—The term "CAP M&I priority water" means the CAP water having a municipal and industrial delivery priority under the repayment contract.

(7) CAP SUBCONTRACTOR.—The term "CAP subcontractor" means an individual or entity that has entered into a long-term subcontract (as that term is used in the repayment stipulation) with the United States and the District for the delivery of water through the CAP system.

(8) CAP SYSTEM.—The term "CAP system" means—
    (A) the Mark Wilmer Pumping Plant;
    (B) the Hayden-Rhodes Aqueduct;
    (C) the Fannin-McFarland Aqueduct;
    (D) the Tucson Aqueduct;
    (E) any pumping plant or appurtenant works of a feature described in any of subparagraphs (A) through (D); and
    (F) any extension of, addition to, or replacement for a feature described in any of subparagraphs (A) through (E).

(9) CAP WATER.—The term "CAP water" means "Project Water" (as that term is defined in the repayment stipulation).

(10) CONTRACT.—The term "Contract" means—
    (A) the proposed contract between the Tribe and the United States attached as exhibit 7.1 to the Agreement and numbered 08–XX–30–W0529; and
    (B) any amendments to that contract.

(11) DISTRICT.—The term "District" means the Central Arizona Water Conservation District, a political subdivision of the State that is the contractor under the repayment contract.

(12) ENFORCEABILITY DATE.—The term "enforceability date" means the date described in section 309(d)(1).

(13) INDIAN TRIBE.—The term "Indian tribe" has the meaning given the term in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450b).

(14) INJURY TO WATER RIGHTS.—
    (A) IN GENERAL.—The term "injury to water rights" means an interference with, diminution of, or deprivation of, a water right under Federal, State, or other law.
    (B) INCLUSIONS.—The term "injury to water rights" includes—
        (i) a change in the groundwater table; and
        (ii) any effect of such a change.
    (C) EXCLUSION.—The term "injury to water rights" does not include any injury to water quality.

(15) LOWER COLORADO RIVER BASIN DEVELOPMENT FUND.— The term "Lower Colorado River Basin Development Fund"

H. R. 4783—12

means the fund established by section 403 of the Colorado River Basin Project Act (43 U.S.C. 1543).

(16) OFF-RESERVATION TRUST LAND.—The term "off-reservation trust land" means land—

(A) located outside the exterior boundaries of the reservation that is held in trust by the United States for the benefit of the Tribe as of the enforceability date; and

(B) depicted on the map attached to the Agreement as exhibit 2.57.

(17) OPERATING AGENCY.—The term "Operating Agency" means the 1 or more entities authorized to assume responsibility for the care, operation, maintenance, and replacement of the CAP system.

(18) REPAYMENT CONTRACT.—The term "repayment contract" means—

(A) the contract between the United States and the District for delivery of water and repayment of the costs of the CAP, numbered 14–06–W–245 (Amendment No. 1), and dated December 1, 1988; and

(B) any amendment to, or revision of, that contract.

(19) REPAYMENT STIPULATION.—The term "repayment stipulation" means the stipulated judgment and the stipulation for judgment (including any exhibits to those documents) entered on November 21, 2007, in the United States District Court for the District of Arizona in the consolidated civil action styled Central Arizona Water Conservation District v. United States, et al., and numbered CIV 95–625–TUC–WDB (EHC) and CIV 95–1720–PHX–EHC.

(20) RESERVATION.—

(A) IN GENERAL.—The term "reservation" means the land within the exterior boundary of the White Mountain Indian Reservation established by the Executive order dated November 9, 1871, as modified by subsequent Executive orders and Acts of Congress—

(i) known on the date of enactment of this Act as the "Fort Apache Reservation" pursuant to chapter 3 of the Act of June 7, 1897 (30 Stat. 62); and

(ii) generally depicted on the map attached to the Agreement as exhibit 2.81.

(B) NO EFFECT ON DISPUTE OR AS ADMISSION.—The depiction of the reservation described in subparagraph (A)(ii) shall not—

(i) be used to affect any dispute between the Tribe and the United States concerning the legal boundary of the reservation; or

(ii) constitute an admission by the Tribe with regard to any dispute between the Tribe and the United States concerning the legal boundary of the reservation.

(21) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(22) STATE.—The term "State" means the State of Arizona.

(23) TRIBAL CAP WATER.—The term "tribal CAP water" means the CAP water to which the Tribe is entitled pursuant to the Contract.

H. R. 4783—13

(24) TRIBAL WATER RIGHTS.—The term "tribal water rights" means the water rights of the Tribe described in paragraph 4.0 of the Agreement.

(25) TRIBE.—The term "Tribe" means the White Mountain Apache Tribe organized under section 16 of the Act of June 18, 1934 (commonly known as the "Indian Reorganization Act") (25 U.S.C. 476).

(26) WATER RIGHT.—The term "water right" means any right in or to groundwater, surface water, or effluent under Federal, State, or other law.

(27) WMAT RURAL WATER SYSTEM.—The term "WMAT rural water system" means the municipal, rural, and industrial water diversion, storage, and delivery system described in section 307.

(28) YEAR.—The term "year" means a calendar year.

## SEC. 304. APPROVAL OF AGREEMENT.

(a) APPROVAL.—

(1) IN GENERAL.—Except to the extent that any provision of the Agreement conflicts with a provision of this title, the Agreement is authorized, ratified, and confirmed.

(2) AMENDMENTS.—Any amendment to the Agreement is authorized, ratified, and confirmed, to the extent that such amendment is executed to make the Agreement consistent with this title.

(b) EXECUTION OF AGREEMENT.—

(1) IN GENERAL.—To the extent that the Agreement does not conflict with this title, the Secretary shall promptly—

(A) execute the Agreement, including all exhibits to the Agreement requiring the signature of the Secretary; and

(B) in accordance with the Agreement, execute any amendment to the Agreement, including any amendment to any exhibit to the Agreement requiring the signature of the Secretary, that is not inconsistent with this title; and

(2) DISCRETION OF THE SECRETARY.—The Secretary may execute any other amendment to the Agreement, including any amendment to any exhibit to the Agreement requiring the signature of the Secretary, that is not inconsistent with this title if the amendment does not require congressional approval pursuant to the Trade and Intercourse Act (25 U.S.C. 177) or other applicable Federal law (including regulations).

(c) NATIONAL ENVIRONMENTAL POLICY ACT.—

(1) ENVIRONMENTAL COMPLIANCE.—In implementing the Agreement and carrying out this title, the Secretary shall promptly comply with all applicable requirements of—

(A) the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.);

(B) the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.);

(C) all other applicable Federal environmental laws; and

(D) all regulations promulgated under the laws described in subparagraphs (A) through (C).

(2) EXECUTION OF AGREEMENT.—

H. R. 4783—14

(A) IN GENERAL.—Execution of the Agreement by the Secretary under this section shall not constitute a major Federal action under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(B) ENVIRONMENTAL COMPLIANCE.—The Secretary shall carry out all necessary environmental compliance activities required by Federal law in implementing the Agreement.

(3) LEAD AGENCY.—The Bureau shall serve as the lead agency with respect to ensuring environmental compliance associated with the WMAT rural water system.

**SEC. 305. WATER RIGHTS.**

(a) TREATMENT OF TRIBAL WATER RIGHTS.—The tribal water rights—

(1) shall be held in trust by the United States on behalf of the Tribe; and

(2) shall not be subject to forfeiture or abandonment.

(b) REALLOCATION.—

(1) IN GENERAL.—In accordance with this title and the Agreement, the Secretary shall reallocate to the Tribe, and offer to enter into a contract with the Tribe for the delivery in accordance with this section of—

(A) an entitlement to 23,782 acre-feet per year of CAP water that has a non-Indian agricultural delivery priority (as defined in the Contract) in accordance with section 104(a)(1)(A)(iii) of the Arizona Water Settlements Act (Public Law 108–451; 118 Stat. 3488), of which—

(i) 3,750 acre-feet per year shall be firmed by the United States for the benefit of the Tribe for the 100-year period beginning on January 1, 2008, with priority equivalent to CAP M&I priority water, in accordance with section 105(b)(1)(B) of that Act (118 Stat. 3492); and

(ii) 3,750 acre-feet per year shall be firmed by the State for the benefit of the Tribe for the 100-year period beginning on January 1, 2008, with priority equivalent to CAP M&I priority water, in accordance with section 105(b)(2)(B) of that Act (118 Stat. 3492); and

(B) an entitlement to 1,218 acre-feet per year of the water—

(i) acquired by the Secretary through the permanent relinquishment of the Harquahala Valley Irrigation District CAP subcontract entitlement in accordance with the contract numbered 3–07–30–W0290 among the District, Harquahala Valley Irrigation District, and the United States; and

(ii) converted to CAP Indian Priority water (as defined in the Contract) pursuant to the Fort McDowell Indian Community Water Rights Settlement Act of 1990 (Public Law 101–628; 104 Stat. 4480).

(2) AUTHORITY OF TRIBE.—Subject to approval by the Secretary under section 306(a)(1), the Tribe shall have the sole authority to lease, distribute, exchange, or allocate the tribal CAP water described in paragraph (1).

H. R. 4783—15

(c) WATER SERVICE CAPITAL CHARGES.—The Tribe shall not be responsible for any water service capital charge for tribal CAP water.

(d) ALLOCATION AND REPAYMENT.—For the purpose of determining the allocation and repayment of costs of any stage of the CAP constructed after November 21, 2007, the costs associated with the delivery of water described in subsection (b), regardless of whether the water is delivered for use by the Tribe or in accordance with any assignment, exchange, lease, option to lease, or other agreement for the temporary disposition of water entered into by the Tribe, shall be—

(1) nonreimbursable; and

(2) excluded from the repayment obligation of the District.

(e) WATER CODE.—Not later than 18 months after the enforceability date, the Tribe shall enact a water code that—

(1) governs the tribal water rights; and

(2) includes, at a minimum—

(A) provisions requiring the measurement, calculation, and recording of all diversions and depletions of water on the reservation and on off-reservation trust land;

(B) terms of a water conservation plan, including objectives, conservation measures, and an implementation timeline;

(C) provisions requiring the approval of the Tribe for the severance and transfer of rights to the use of water from historically irrigated land identified in paragraph 11.3.2.1 of the Agreement to diversions and depletions on other non-historically irrigated land not located on the watershed of the same water source; and

(D) provisions requiring the authorization of the Tribe for all diversions of water on the reservation and on off-reservation trust land by any individual or entity other than the Tribe.

## SEC. 306. CONTRACT.

(a) IN GENERAL.—The Secretary shall enter into the Contract, in accordance with the Agreement, to provide, among other things, that—

(1) the Tribe, on approval of the Secretary, may—

(A) enter into contracts or options to lease, contracts to exchange, or options to exchange tribal CAP water in Maricopa, Pinal, Pima, and Yavapai Counties in the State providing for the temporary delivery to any individual or entity of any portion of the tribal CAP water, subject to the condition that—

(i) the term of the contract or option to lease shall not be longer than 100 years;

(ii) the contracts or options to exchange shall be for the term provided in the contract or option; and

(iii) a lease or option to lease providing for the temporary delivery of tribal CAP water shall require the lessee to pay to the Operating Agency all CAP fixed OM&R charges and all CAP pumping energy charges (as defined in the repayment stipulation) associated with the leased water; and

H. R. 4783—16

(B) renegotiate any lease at any time during the term of the lease, subject to the condition that the term of the renegotiated lease shall not exceed 100 years;

(2) no portion of the tribal CAP water may be permanently alienated;

(3)(A) the Tribe (and not the United States in any capacity) shall be entitled to all consideration due to the Tribe under any contract or option to lease or exchange tribal CAP water entered into by the Tribe; and

(B) the United States (in any capacity) has no trust or other obligation to monitor, administer, or account for, in any manner—

(i) any funds received by the Tribe as consideration under a contract or option to lease or exchange tribal CAP water; or

(ii) the expenditure of those funds;

(4)(A) all tribal CAP water shall be delivered through the CAP system; and

(B) if the delivery capacity of the CAP system is significantly reduced or anticipated to be significantly reduced for an extended period of time, the Tribe shall have the same CAP delivery rights as a CAP contractor or CAP subcontractor that is allowed to take delivery of water other than through the CAP system;

(5) the Tribe may use tribal CAP water on or off the reservation for any purpose;

(6) as authorized by subsection (f)(2)(A) of section 403 of the Colorado River Basin Project Act (43 U.S.C. 1543) and to the extent that funds are available in the Lower Colorado River Basin Development Fund established by subsection (a) of that section, the United States shall pay to the Operating Agency the CAP fixed OM&R charges associated with the delivery of tribal CAP water (except in the case of tribal CAP water leased by any individual or entity);

(7) the Secretary shall waive the right of the Secretary to capture all return flow from project exchange water flowing from the exterior boundary of the reservation; and

(8) no CAP water service capital charge shall be due or payable for the tribal CAP water, regardless of whether the water is delivered for use by the Tribe or pursuant to a contract or option to lease or exchange tribal CAP water entered into by the Tribe.

(b) REQUIREMENTS.—The Contract shall be—

(1) for permanent service (within the meaning of section 5 of the Boulder Canyon Project Act (43 U.S.C. 617d)); and

(2) without limit as to term.

(c) RATIFICATION.—

(1) IN GENERAL.—Except to the extent that any provision of the Contract conflicts with a provision of this title, the Contract is authorized, ratified, and confirmed.

(2) AMENDMENTS.—Any amendment to the Contract is authorized, ratified, and confirmed, to the extent that such amendment is executed to make the Contract consistent with this title.

(d) EXECUTION OF CONTRACT.—To the extent that the Contract does not conflict with this title, the Secretary shall execute the Contract.

H. R. 4783—17

(e) PAYMENT OF CHARGES.—The Tribe, and any recipient of tribal CAP water through a contract or option to lease or exchange, shall not be obligated to pay a water service capital charge or any other charge, payment, or fee for CAP water, except as provided in an applicable lease or exchange agreement.

(f) PROHIBITIONS.—

(1) USE OUTSIDE STATE.—No tribal CAP water may be leased, exchanged, forborne, or otherwise transferred by the Tribe in any way for use directly or indirectly outside the State.

(2) USE OFF RESERVATION.—Except as authorized by this section and paragraph 4.7 of the Agreement, no tribal water rights under this title may be sold, leased, transferred, or used outside the boundaries of the reservation or off-reservation trust land other than pursuant to an exchange.

(3) AGREEMENTS WITH ARIZONA WATER BANKING AUTHORITY.—Nothing in this title or the Agreement limits the right of the Tribe to enter into an agreement with the Arizona Water Banking Authority (or any successor entity) established by section 45–2421 of the Arizona Revised Statutes in accordance with State law.

(g) LEASES.—

(1) IN GENERAL.—To the extent that the leases of tribal CAP Water by the Tribe to the District and to any of the cities in the State, attached as exhibits to the Agreement, are not in conflict with the provisions of this title—

(A) those leases are authorized, ratified, and confirmed; and

(B) the Secretary shall execute the leases.

(2) AMENDMENTS.—To the extent that amendments are executed to make the leases described in paragraph (1) consistent with this title, those amendments are authorized, ratified, and confirmed.

**SEC. 307. AUTHORIZATION OF WMAT RURAL WATER SYSTEM.**

(a) IN GENERAL.—Consistent with subsections (a) and (e) of section 312 and subsection (h) of this section, the Secretary, acting through the Bureau, shall plan, design, and construct the WMAT rural water system to divert, store, and distribute water from the North Fork of the White River to the Tribe that shall consist of—

(1) a dam and storage reservoir, pumping plant, and treatment facilities located along the North Fork of the White River near the community of Whiteriver;

(2) a distribution system consisting of pipelines extending from the treatment facilities to existing water distribution systems serving the communities of Whiteriver, Fort Apache, Canyon Day, Cedar Creek, Carrizo, and Cibecue;

(3) connections to existing distribution facilities for the communities described in paragraph (2), but not including any upgrades of, or improvements to, existing or future public water systems for the communities described in paragraph (2) that may be necessary to accommodate increased demand and flow rates (and any associated changes in water quality);

(4) connections to additional communities along the pipeline, provided that the additional connections may be added

H. R. 4783—18

to the distribution system described in paragraph (2) at the expense of the Tribe;

(5) appurtenant buildings and access roads;

(6) electrical power transmission and distribution facilities necessary for operation of the project; and

(7) any other project components that the Secretary, in consultation with the Tribe, determines to be necessary.

(b) MODIFICATIONS.—The Secretary and the Tribe—

(1) may modify the components of the WMAT rural water system described in subsection (a) by mutual agreement; and

(2) shall make all modifications required under subsection (c)(2).

(c) FINAL PROJECT DESIGN.—

(1) IN GENERAL.—The Secretary shall issue a final project design of the WMAT rural water system, including the dam, pumping plants, pipeline, and treatment plant, that is generally consistent with the project extension report dated February 2007 after the completion of—

(A) any appropriate environmental compliance activity; and

(B) the review process described in paragraph (2).

(2) REVIEW.—

(A) IN GENERAL.—The Secretary shall review the proposed design of the WMAT rural water system and perform value engineering analyses.

(B) RESULTS.—Taking into consideration the review under subparagraph (A), the Secretary, in consultation with the Tribe, shall require appropriate changes to the design, so that the final design—

(i) meets Bureau of Reclamation design standards;

(ii) to the maximum extent practicable, incorporates any changes that would improve the cost-effectiveness of the delivery of water through the WMAT rural water system; and

(iii) may be constructed for the amounts made available under section 312.

(d) CONVEYANCE OF TITLE.—

(1) IN GENERAL.—Title to the WMAT rural water system shall be held by the United States until title to the WMAT rural water system is conveyed by the Secretary to the Tribe pursuant to paragraph (2).

(2) CONVEYANCE TO TRIBE.—The Secretary shall convey to the Tribe title to the WMAT rural water system not later than 30 days after the date on which the Secretary publishes in the Federal Register a statement of findings that—

(A) the operating criteria, standing operating procedures, emergency action plan, and first filling and monitoring criteria of the designers have been established and are in place;

(B) the WMAT rural water system has operated under the standing operating procedures of the designers, with the participation of the Tribe, for a period of 3 years;

(C) the Secretary has provided the Tribe with technical assistance on the manner by which to operate and maintain the WMAT rural water system;

H. R. 4783—19

(D) the funds made available under section 312(b)(3)(B) have been deposited in the WMAT Maintenance Fund; and

(E) the WMAT rural water system—

(i) is substantially complete, as determined by the Secretary; and

(ii) satisfies the requirement that—

(I) the infrastructure constructed is capable of storing, diverting, treating, transmitting, and distributing a supply of water as set forth in the final project design described in subsection (c); and

(II) the Secretary has consulted with the Tribe regarding the proposed finding that the WMAT rural water system is substantially complete.

(e) ALIENATION AND TAXATION.—

(1) IN GENERAL.—Conveyance of title to the Tribe pursuant to subsection (d) does not waive or alter any applicable Federal law (including regulations) prohibiting alienation or taxation of the WMAT rural water system or the underlying reservation land.

(2) ALIENATION OF WMAT RURAL WATER SYSTEM.—The WMAT rural water system, including the components of the WMAT rural water system, shall not be alienated, encumbered, or conveyed in any manner by the Tribe, unless a reconveyance is authorized by an Act of Congress enacted after the date of enactment of this Act.

(f) OPERATION AND MAINTENANCE.—

(1) IN GENERAL.—Consistent with subsections (d) and (e) of section 312, the Secretary, acting through the Bureau and in cooperation with the Tribe, shall operate, maintain, and replace the WMAT rural water system until the date on which title to the WMAT rural water system is transferred to the Tribe pursuant to subsection (d)(2).

(2) LIMITATION.—

(A) IN GENERAL.—Beginning on the date on which title to the WMAT rural water system is transferred to the Tribe pursuant to subsection (d)(2), the United States shall have no obligation to pay for the operation, maintenance, or replacement costs of the WMAT rural water system.

(B) LIMITATION ON LIABILITY.—Effective on the date on which the Secretary publishes a statement of findings in the Federal Register pursuant to subsection (d)(2), the United States shall not be held liable by any court for damages arising out of any act, omission, or occurrence relating to the land or facilities conveyed, other than damages caused by any intentional act or act of negligence committed by the United States, or by employees or agents of the United States, prior to the date on which the Secretary publishes a statement of findings in the Federal Register pursuant to subsection (d)(2).

(g) RIGHT TO REVIEW.—

(1) IN GENERAL.—The statement of findings published by the Secretary pursuant to subsection (d)(2) shall be considered to be a final agency action subject to judicial review under sections 701 through 706 of title 5, United States Code.

H. R. 4783—20

(2) EFFECT OF TITLE.—Nothing in this title gives the Tribe or any other party the right to judicial review of the determination by the Secretary under subsection (d) except under subchapter II of chapter 5, and chapter 7, of title 5, United States Code (commonly known as the "Administrative Procedure Act").

(h) APPLICABILITY OF ISDEAA.—

(1) AGREEMENT FOR SPECIFIC ACTIVITIES.—On receipt of a request of the Tribe, and in accordance with the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450 et seq.), the Secretary shall enter into 1 or more agreements with the Tribe to carry out the activities authorized by this section.

(2) CONTRACTS.—Any contract entered into pursuant to the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450 et seq.) for the purpose of carrying out any provision of this title shall incorporate such provisions regarding periodic payment of funds, timing for use of funds, transparency, oversight, reporting, and accountability as the Secretary determines to be necessary (at the sole discretion of the Secretary) to ensure appropriate stewardship of Federal funds.

(i) FINAL DESIGNS; PROJECT CONSTRUCTION.—

(1) FINAL DESIGNS.—All designs for the WMAT rural water system shall—

(A) conform to Bureau design standards; and

(B) be subject to review and approval by the Secretary.

(2) PROJECT CONSTRUCTION.—Each project component of the WMAT rural water system shall be constructed pursuant to designs and specifications approved by the Secretary, and all construction work shall be subject to inspection and approval by the Secretary.

(j) CONDITION.—As a condition of construction of the facilities authorized by this section, the Tribe shall provide, at no cost to the Secretary, all land or interests in land that the Secretary identifies as necessary for the construction, operation, and maintenance of those facilities.

**SEC. 308. SATISFACTION OF CLAIMS.**

(a) IN GENERAL.—Except as set forth in the Agreement, the benefits realized by the Tribe and its members under this title shall be in full satisfaction of all claims of the Tribe, its members, and the United States, acting as trustee for the benefit of the Tribe and its members, for water rights and injury to water rights under Federal, State, or other law with respect to the reservation and off-reservation trust land.

(b) USES OF WATER.—All uses of water on land outside of the reservation, if and when that land is subsequently and finally determined to be part of the reservation through resolution of any dispute between the Tribe and the United States over the location of the reservation boundary, and any fee land within the reservation placed into trust and made part of the reservation, shall be subject to the maximum annual diversion amounts and the maximum annual depletion amounts specified in the Agreement.

(c) NO RECOGNITION OF WATER RIGHTS.—Notwithstanding subsection (a), nothing in this title recognizes or establishes any right of a member of the Tribe to water on the reservation.

H. R. 4783—21

**SEC. 309. WAIVERS AND RELEASES OF CLAIMS.**

(a) IN GENERAL.—

(1) CLAIMS AGAINST THE STATE AND OTHERS.—Except for the specifically retained claims described in subsection (b)(1), the Tribe, on behalf of itself and its members, and the United States, acting in its capacity as trustee for the Tribe and its members, as part of the performance of the respective obligations of the United States and the Tribe under the Agreement, are authorized to execute a waiver and release of any claims against the State (or any agency or political subdivision of the State), or any other person, entity, corporation, or municipal corporation under Federal, State, or other law for all—

(A)(i) past, present, and future claims for water rights for the reservation and off-reservation trust land arising from time immemorial and, thereafter, forever; and

(ii) past, present, and future claims for water rights arising from time immemorial and, thereafter, forever, that are based on aboriginal occupancy of land by the Tribe, its members, or their predecessors;

(B)(i) past and present claims for injury to water rights for the reservation and off-reservation trust land arising from time immemorial through the enforceability date;

(ii) past, present, and future claims for injury to water rights arising from time immemorial and, thereafter, forever, that are based on aboriginal occupancy of land by the Tribe, its members, or their predecessors; and

(iii) claims for injury to water rights arising after the enforceability date for the reservation and off-reservation trust land resulting from off-reservation diversion or use of water in a manner that is not in violation of the Agreement or State law; and

(C) past, present, and future claims arising out of, or relating in any manner to, the negotiation, execution, or adoption of the Agreement, an applicable settlement judgement or decree, or this title.

(2) CLAIMS AGAINST TRIBE.—Except for the specifically retained claims described in subsection (b)(3), the United States, in all capacities (except as trustee for an Indian tribe other than the Tribe), as part of the performance of its obligations under the Agreement, is authorized to execute a waiver and release of any and all claims against the Tribe, its members, or any agency, official, or employee of the Tribe, under Federal, State, or any other law for all—

(A) past and present claims for injury to water rights resulting from the diversion or use of water on the reservation and on off-reservation trust land arising from time immemorial through the enforceability date;

(B) claims for injury to water rights arising after the enforceability date resulting from the diversion or use of water on the reservation and on off-reservation trust land in a manner that is not in violation of the Agreement; and

(C) past, present, and future claims arising out of or related in any manner to the negotiation, execution, or adoption of the Agreement, an applicable settlement judgement or decree, or this title.

H. R. 4783—22

(3) CLAIMS AGAINST UNITED STATES.—Except for the specifically retained claims described in subsection (b)(2), the Tribe, on behalf of itself and its members, as part of the performance of the obligations of the Tribe under the Agreement, is authorized to execute a waiver and release of any claim against the United States, including agencies, officials, or employees of the United States (except in the capacity of the United States as trustee for other Indian tribes), under Federal, State, or other law for any and all—

(A)(i) past, present, and future claims for water rights for the reservation and off-reservation trust land arising from time immemorial and, thereafter, forever; and

(ii) past, present, and future claims for water rights arising from time immemorial and, thereafter, forever that are based on aboriginal occupancy of land by the Tribe, its members, or their predecessors;

(B)(i) past and present claims relating in any manner to damages, losses, or injuries to water, water rights, land, or other resources due to loss of water or water rights (including damages, losses, or injuries to hunting, fishing, gathering, or cultural rights due to loss of water or water rights, claims relating to interference with, diversion, or taking of water, or claims relating to failure to protect, acquire, or develop water, water rights, or water infrastructure) within the reservation and off-reservation trust land that first accrued at any time prior to the enforceability date;

(ii) past, present, and future claims for injury to water rights arising from time immemorial and, thereafter, forever that are based on aboriginal occupancy of land by the Tribe, its members, or their predecessors; and

(iii) claims for injury to water rights arising after the enforceability date for the reservation and off-reservation trust land resulting from the off-reservation diversion or use of water in a manner that is not in violation of the Agreement or applicable law;

(C) past, present, and future claims arising out of, or relating in any manner to, the negotiation, execution, or adoption of the Agreement, an applicable settlement judgment or decree, or this title;

(D) past and present claims relating in any manner to pending litigation of claims relating to the water rights of the Tribe for the reservation and off-reservation trust land;

(E) past and present claims relating to the operation, maintenance, and replacement of existing irrigation systems on the reservation constructed prior to the enforceability date that first accrued at any time prior to the enforceability date, which waiver shall only become effective on the full appropriation and payment to the Tribe of $4,950,000 of the amounts made available under section 312(b)(2)(B);

(F) any claims relating to operation, maintenance, and replacement of the WMAT rural water system, which waiver shall only become effective on the date on which funds are made available under section 312(b)(3)(B) and deposited in the WMAT Maintenance Fund;

(G) past and present breach of trust and negligence claims for damage to the land and natural resources of the Tribe caused by riparian and other vegetative manipulation by the United States for the purpose of increasing water runoff from the reservation that first accrued at any time prior to the enforceability date; and

(H) past and present claims for trespass, use, and occupancy of the reservation in, on, and along the Black River that first accrued at any time prior to the enforceability date.

(4) EFFECT ON BOUNDARY CLAIMS.—Nothing in this title expands, diminishes, or impacts any claims the Tribe may assert, or any defense the United States may assert, concerning title to land outside the most current survey, as of the date of enactment of this Act, of the northern boundary of the reservation.

(b) RESERVATION OF RIGHTS AND RETENTION OF CLAIMS.—

(1) RESERVATION OF RIGHTS AND RETENTION OF CLAIMS BY TRIBE AND UNITED STATES.—

(A) IN GENERAL.—Notwithstanding the waiver and release of claims authorized under subsection (a)(1), the Tribe, on behalf of itself and its members, and the United States, acting as trustee for the Tribe and its members, shall retain any right—

(i) subject to subparagraph 16.9 of the Agreement, to assert claims for injuries to, and seek enforcement of, the rights of the Tribe and its members under the Agreement or this title in any Federal or State court of competent jurisdiction;

(ii) to assert claims for injuries to, and seek enforcement of, the rights of the Tribe under the judgment and decree entered by the court in the Gila River adjudication proceedings;

(iii) to assert claims for injuries to, and seek enforcement of, the rights of the Tribe under the judgment and decree entered by the court in the Little Colorado River adjudication proceedings;

(iv) to object to any claims by or for any other Indian tribe, Indian community or nation, or dependent Indian community, or the United States on behalf of such a tribe, community, or nation;

(v) to participate in the Gila River adjudication proceedings and the Little Colorado River adjudication proceedings to the extent provided in subparagraph 14.1 of the Agreement;

(vi) to assert any claims arising after the enforceability date for injury to water rights not specifically waived under this section;

(vii) to assert any past, present, or future claim for injury to water rights against any other Indian tribe, Indian community or nation, dependent Indian community, allottee, or the United States on behalf of such a tribe, community, nation, or allottee;

(viii) to assert any past, present, or future claim for trespass, use, and occupancy of the reservation in, on, or along the Black River against Freeport-

H. R. 4783—24

McMoRan Copper & Gold, Inc., Phelps Dodge Corporation, or Phelps Dodge Morenci, Inc. (or a predecessor or successor of those entities), including all subsidiaries and affiliates of those entities; and

(ix) to assert claims arising after the enforceability date for injury to water rights resulting from the pumping of water from land located within national forest land as of the date of the Agreement in the south ½ of T. 9 N., R. 24 E., the south ½ of T. 9 N., R. 25 E., the north ½ of T. 8 N., R. 24 E., or the north ½ of T. 8 N., R. 25 E., if water from the land is used on the land or is transported off the land for municipal, commercial, or industrial use.

(B) AGREEMENT.—On terms acceptable to the Tribe and the United States, the Tribe and the United States are authorized to enter into an agreement with Freeport-McMoRan Copper & Gold, Inc., Phelps Dodge Corporation, or Phelps Dodge Morenci, Inc. (or a predecessor or successor of those entities), including all subsidiaries and affiliates of those entities, to resolve the claims of the Tribe relating to the trespass, use, and occupancy of the reservation in, on, and along the Black River.

(2) RESERVATION OF RIGHTS AND RETENTION OF CLAIMS BY TRIBE AGAINST UNITED STATES.—Notwithstanding the waiver and release of claims authorized under subsection (a)(3), the Tribe, on behalf of itself and its members, shall retain any right—

(A) subject to subparagraph 16.9 of the Agreement, to assert claims for injuries to, and seek enforcement of, the rights of the Tribe and its members under the Agreement or this title, in any Federal or State court of competent jurisdiction;

(B) to assert claims for injuries to, and seek enforcement of, the rights of the Tribe and members under the judgment and decree entered by the court in the Gila River adjudication proceedings;

(C) to assert claims for injuries to, and seek enforcement of, the rights of the Tribe and members under the judgment and decree entered by the court in the Little Colorado River adjudication proceedings;

(D) to object to any claims by or for any other Indian tribe, Indian community or nation, or dependent Indian community, or the United States on behalf of such a tribe, community, or nation;

(E) to assert past, present, or future claims for injury to water rights or any other claims other than a claim to water rights, against any other Indian tribe, Indian community or nation, or dependent Indian community, or the United States on behalf of such a tribe, community, or nation;

(F) to assert claims arising after the enforceability date for injury to water rights resulting from the pumping of water from land located within national forest land as of the date of the Agreement in the south ½ of T. 9 N., R. 24 E., the south ½ of T. 9 N., R. 25 E., the north ½ of T. 8 N., R. 24 E., or the north ½ of T. 8 N., R. 25 E., if water from that land is used on the land

H. R. 4783—25

or is transported off the land for municipal, commercial, or industrial use;

(G) to assert any claims arising after the enforceability date for injury to water rights not specifically waived under this section;

(H) to seek remedies and to assert any other claims not specifically waived under this section; and

(I) to assert any claim arising after the enforceability date for a future taking by the United States of reservation land, off-reservation trust land, or any property rights appurtenant to that land, including any water rights set forth in paragraph 4.0 of the Agreement.

(3) RESERVATION OF RIGHTS AND RETENTION OF CLAIMS BY UNITED STATES.—Notwithstanding the waiver and release of claims authorized under subsection (a)(2), the United States shall retain any right to assert any claim not specifically waived in that subsection.

(c) EFFECTIVENESS OF WAIVER AND RELEASES.—Except as otherwise specifically provided in subparagraphs (E) and (F) of subsection (a)(3), the waivers and releases under subsection (a) shall become effective on the enforceability date.

(d) ENFORCEABILITY DATE.—

(1) IN GENERAL.—This section takes effect on the date on which the Secretary publishes in the Federal Register a statement of findings that—

(A)(i) to the extent that the Agreement conflicts with this title, the Agreement has been revised through an amendment to eliminate the conflict; and

(ii) the Agreement, as so revised, has been executed by the Secretary, the Tribe, and the Governor of the State;

(B) the Secretary has fulfilled the requirements of sections 305 and 306;

(C) the amount made available under section 312(a) has been deposited in the White Mountain Apache Tribe Water Rights Settlement Subaccount;

(D) the State funds described in subparagraph 13.3 of the Agreement have been deposited in the White Mountain Apache Tribe Water Rights Settlement Subaccount;

(E) the Secretary has issued a record of decision approving the construction of the WMAT rural water system in a configuration substantially similar to that described in section 307;

(F) the judgments and decrees substantially in the form of those attached to the Agreement as exhibits 12.9.6.1 and 12.9.6.2 have been approved by the respective trial courts; and

(G) the waivers and releases authorized and set forth in subsection (a) have been executed by the Tribe and the Secretary.

(2) FAILURE OF ENFORCEABILITY DATE TO OCCUR.—If the Secretary does not publish a statement of findings under paragraph (1) by April 30, 2021—

(A) this title is repealed effective May 1, 2021, and any activity by the Secretary to carry out this title shall cease;

H. R. 4783—26

(B) any amounts made available under section 312 shall immediately revert to the general fund of the Treasury;

(C) any other amounts deposited in the White Mountain Apache Tribe Water Rights Settlement Subaccount (including any amounts paid by the State in accordance with the Agreement), together with any interest accrued on those amounts, shall immediately be returned to the respective sources of those funds; and

(D) the Tribe and its members, and the United States, acting as trustee for the Tribe and its members, shall retain the right to assert past, present, and future water rights claims and claims for injury to water rights for the reservation and off-reservation trust land.

(3) NO ADDITIONAL RIGHTS TO WATER.—Beginning on the enforceability date, all land held by the United States in trust for the Tribe and its members shall have no rights to water other than those specifically quantified for the Tribe and the United States, acting as trustee for the Tribe and its members, for the reservation and off-reservation trust land pursuant to paragraph 4.0 of the Agreement.

(e) UNITED STATES ENFORCEMENT AUTHORITY.—Nothing in this title or the Agreement affects any right of the United States to take any action, including environmental actions, under any laws (including regulations and the common law) relating to human health, safety, or the environment.

(f) NO EFFECT ON WATER RIGHTS.—Except as provided in paragraphs (1)(A)(ii), (1)(B)(ii), (3)(A)(ii), and (3)(B)(ii) of subsection (a), nothing in this title affects any rights to water of the Tribe, its members, or the United States, acting as trustee for the Tribe and its members, for land outside the boundaries of the reservation or the off-reservation trust land.

(g) ENTITLEMENTS.—Any entitlement to water of the Tribe, its members, or the United States, acting as trustee for the Tribe and its members, relating to the reservation or off-reservation trust land shall be satisfied from the water resources granted, quantified, confirmed, or recognized with respect to the Tribe, its members, and the United States by the Agreement and this title.

(h) OBJECTION PROHIBITED.—Except as provided in paragraphs (1)(A)(ix) and (2)(F) of subsection (b), the Tribe and the United States, acting as trustee for the Tribe shall not—

(1) object to the use of any well located outside the boundaries of the reservation or the off-reservation trust land in existence on the enforceability date; or

(2) object to, dispute, or challenge after the enforceability date the drilling of any well or the withdrawal and use of water from any well in the Little Colorado River adjudication proceedings, the Gila River adjudication proceedings, or any other judicial or administrative proceeding.

## SEC. 310. WHITE MOUNTAIN APACHE TRIBE WATER RIGHTS SETTLE-MENT SUBACCOUNT.

(a) ESTABLISHMENT.—There is established in the Lower Colorado River Basin Development Fund a subaccount to be known as the "White Mountain Apache Tribe Water Rights Settlement Subaccount", consisting of—

H. R. 4783—27

(1) the amounts deposited in the subaccount pursuant to section 312(a); and

(2) such other amounts as are available, including the amounts provided in subparagraph 13.3 of the Agreement.

(b) USE OF FUNDS.—

(1) IN GENERAL.—Subject to paragraph (2), the Secretary shall use amounts from the White Mountain Apache Tribe Water Rights Settlement Subaccount for the planning, design, and construction of the WMAT rural water system, in accordance with section 307(a).

(2) REQUIREMENTS.—In carrying out the activities described in paragraph (1), the Secretary shall use such sums as are necessary from the White Mountain Apache Tribe Water Rights Settlement Subaccount—

(A) to provide the Bureau with amounts sufficient to carry out oversight of the planning, design, and construction of the WMAT rural water system;

(B) to repay to the Treasury (or the United States) any outstanding balance on the loan authorized by the White Mountain Apache Tribe Rural Water System Loan Authorization Act (Public Law 110–390; 122 Stat. 4191), after which repayment, the Tribe shall have no further liability for the balance on that loan; and

(C) to carry out all required environmental compliance activities associated with the planning, design, and construction of the WMAT rural water system.

(c) ISDEAA CONTRACT.—

(1) IN GENERAL.—If the Tribe so requests, the planning, design, and construction of the WMAT rural water system shall be carried out pursuant to the terms of an agreement or agreements entered into under section 307(h).

(2) ENFORCEMENT.—The Secretary may pursue any judicial remedies and carry out any administrative actions that are necessary to enforce an agreement described in paragraph (1) to ensure that amounts in the White Mountain Apache Tribe Water Rights Settlement Subaccount are used in accordance with this section.

(d) PROHIBITION ON PER CAPITA DISTRIBUTIONS.—No amount of the principal, or the interest or income accruing on the principal, of the White Mountain Apache Tribe Water Rights Settlement Subaccount shall be distributed to any member of the Tribe on a per capita basis.

(e) AVAILABILITY OF FUNDS.—

(1) IN GENERAL.—Amounts in the White Mountain Apache Tribe Water Rights Settlement Subaccount shall not be available for expenditure by the Secretary until the enforceability date.

(2) INVESTMENT.—The Secretary shall invest the amounts in the White Mountain Apache Tribe Water Rights Settlement Subaccount in accordance with section 403(f)(4) of the Colorado River Basin Project Act (43 U.S.C. 1543(f)(4)).

(3) USE OF INTEREST.—The interest accrued on amounts invested under paragraph (2) shall not be available for expenditure or withdrawal until the enforceability date.

**SEC. 311. MISCELLANEOUS PROVISIONS.**

(a) LIMITED WAIVER OF SOVEREIGN IMMUNITY.—

H. R. 4783—28

(1) IN GENERAL.—In the case of a civil action described in paragraph (2)—

(A) the United States or the Tribe, or both, may be joined in the civil action; and

(B) any claim by the United States or the Tribe to sovereign immunity from the civil action is waived for the sole purpose of resolving any issue regarding the interpretation or enforcement of this title or the Agreement.

(2) DESCRIPTION OF CIVIL ACTION.—A civil action referred to in paragraph (1) is a civil action filed—

(A) by any party to the Agreement or signatory to an exhibit to the Agreement in a United States or State court that—

(i) relates solely and directly to the interpretation or enforcement of this title or the Agreement; and

(ii) names as a party the United States or the Tribe; or

(B) by a landowner or water user in the Gila River basin or Little Colorado River basin in the State that—

(i) relates solely and directly to the interpretation or enforcement of section 309 of this title and paragraph 12.0 of the Agreement; and

(ii) names as a party the United States or the Tribe.

(b) EFFECT OF TITLE.—Nothing in this title quantifies or otherwise affects any water right or claim or entitlement to water of any Indian tribe, band, or community other than the Tribe.

(c) LIMITATION ON LIABILITY OF UNITED STATES.—

(1) IN GENERAL.—The United States shall have no trust or other obligation—

(A) to monitor, administer, or account for, in any manner, any amount paid to the Tribe by any party to the Agreement other than the United States; or

(B) to review or approve the expenditure of those funds.

(2) INDEMNIFICATION.—The Tribe shall indemnify the United States, and hold the United States harmless, with respect to any claim (including claims for takings or breach of trust) arising out of the receipt or expenditure of funds described in paragraph (1)(A).

(d) APPLICABILITY OF RECLAMATION REFORM ACT.—The Reclamation Reform Act of 1982 (43 U.S.C. 390aa et seq.) and any other acreage limitation or full-cost pricing provision under Federal law shall not apply to any individual, entity, or land solely on the basis of—

(1) receipt of any benefit under this title;

(2) the execution or performance of the Agreement; or

(3) the use, storage, delivery, lease, or exchange of CAP water.

(e) SECRETARIAL POWER SITES.—The portions of the following named secretarial power site reserves that are located on the Fort Apache Indian Reservation or the San Carlos Apache Reservation, as applicable, shall be transferred and restored into the name of the Tribe or the San Carlos Apache Tribe, respectively:

(1) Lower Black River (T. 3 N., R. 26 E.; T. 3 N., R. 27 E.).

(2) Black River Pumps (T. 2 N., R. 25 E.; T. 2 N., R. 26 E.; T. 3 N., R. 26 E.).

H. R. 4783—29

(3) Carrizo (T. 4 N., R. 20 E.; T. 4 N., R. 21 E.; T. 4½ N., R. 19 E.; T. 4½ N., R. 20 E.; T. 4½ N., R. 21 E.; T. 5 N., R. 19 E.).

(4) Knob (T. 5 N., R. 18 E.; T. 5 N., R. 19 E.).

(5) Walnut Canyon (T. 5 N., R. 17 E.; T. 5 N., R. 18 E.).

(6) Gleason Flat (T. 4½ N., R. 16 E.; T. 5 N., R. 16 E.).

(f) NO EFFECT ON FUTURE ALLOCATIONS.—Water received under a lease or exchange of tribal CAP water under this title shall not affect any future allocation or reallocation of CAP water by the Secretary.

(g) AFTER-ACQUIRED TRUST LAND.—

(1) REQUIREMENT OF ACT OF CONGRESS.—

(A) LEGAL TITLE.—Subject to subparagraph (B), after the enforceability date, if the Tribe seeks to have legal title to additional land in the State located outside the exterior boundaries of the reservation taken into trust by the United States for the benefit of the Tribe, the Tribe may do so only pursuant to an Act of Congress specifically authorizing the transfer for the benefit of the Tribe.

(B) EXCEPTIONS.—Subparagraph (A) shall not apply to—

(i) the restoration of land to the reservation subsequently and finally determined to be part of the reservation through resolution of any dispute between the Tribe and the United States over the location of the reservation boundary, unless required by Federal law; or

(ii) off-reservation trust land acquired prior to January 1, 2008.

(2) WATER RIGHTS.—

(A) IN GENERAL.—After-acquired trust land that is located outside the reservation shall not include federally reserved rights to surface water or groundwater.

(B) RESTORED LAND.—Land that is restored to the reservation as the result of the resolution of any reservation boundary dispute between the Tribe and the United States, or any fee simple land within the reservation that is placed into trust, shall have water rights pursuant to section 308(b).

(3) ACCEPTANCE OF LAND IN TRUST STATUS.—

(A) IN GENERAL.—If the Tribe acquires legal fee title to land that is located within the exterior boundaries of the reservation, the Secretary shall accept the land in trust status for the benefit of the Tribe in accordance with applicable Federal law (including regulations) for such real estate acquisitions.

(B) RESERVATION STATUS.—Land held in trust by the Secretary under subparagraph (A), or restored to the reservation as a result of resolution of a boundary dispute between the Tribe and the United States, shall be deemed to be part of the reservation.

(h) CONFORMING AMENDMENT.—Section 3(b)(2) of the White Mountain Apache Tribe Rural Water System Loan Authorization Act (Public Law 110–390; 122 Stat. 4191) is amended by striking "January 1, 2013" and inserting "May 1, 2021".

H. R. 4783—30

**SEC. 312. FUNDING.**

(a) RURAL WATER SYSTEM.—

(1) MANDATORY APPROPRIATIONS.—Subject to paragraph (2), out of any funds in the Treasury not otherwise appropriated, the Secretary of the Treasury shall transfer to the Secretary to carry out the planning, engineering, design, environmental compliance, and construction of the WMAT rural water system $126,193,000.

(2) INCLUSIONS.—The amount made available under paragraph (1) shall include such sums as are necessary, but not to exceed 4 percent of the construction contract costs, for the Bureau to carry out oversight of activities for planning, design, environmental compliance, and construction of the rural water system.

(b) WMAT SETTLEMENT AND MAINTENANCE FUNDS.—

(1) DEFINITION OF FUNDS.—In this subsection, the term "Funds" means—

(A) the WMAT Settlement Fund established by paragraph (2)(A); and

(B) the WMAT Maintenance Fund established by paragraph (3)(A).

(2) WMAT SETTLEMENT FUND.—

(A) ESTABLISHMENT.—There is established in the Treasury of the United States a fund to be known as the "WMAT Settlement Fund", to be administered by the Secretary, consisting of the amounts deposited in the fund under subparagraph (B), together with any interest accrued on those amounts, for use by the Tribe in accordance with subparagraph (C).

(B) TRANSFERS TO FUND.—

(i) IN GENERAL.—There are authorized to be appropriated to the Secretary for deposit in the WMAT Settlement Fund—

(I) $78,500,000; and

(II) any additional amounts described in clause (ii), if applicable.

(ii) AUTHORIZATION OF ADDITIONAL AMOUNTS.—In accordance with subsection (e)(4)(B), if the WMAT rural water system is conveyed to the Tribe before the date on which the $35,000,000 described in subsection (e)(2) is completely made available, there is authorized to be appropriated to the Secretary, for deposit in the WMAT Settlement Fund, any remaining amounts that would otherwise have been made available for expenditure from the Cost Overrun Subaccount.

(C) USE OF FUNDS.—

(i) IN GENERAL.—The Tribe shall use amounts in the WMAT Settlement Fund for any of the following purposes:

(I) Fish production, including hatcheries.

(II) Rehabilitation of recreational lakes and existing irrigation systems.

(III) Water-related economic development projects.

(IV) Protection, restoration, and economic development of forest and watershed health.

H. R. 4783—31

(ii) EXISTING IRRIGATION SYSTEMS.—Of the amounts deposited in the Fund under subparagraph (B), not less than $4,950,000 shall be used for the rehabilitation of existing irrigation systems.

(3) WMAT MAINTENANCE FUND.—

(A) ESTABLISHMENT.—There is established in the Treasury of the United States a fund to be known as the "WMAT Maintenance Fund", to be administered by the Secretary, consisting of the amounts deposited in the fund under subparagraph (B), together with any interest accrued on those amounts, for use by the Tribe in accordance with subparagraph (C).

(B) MANDATORY APPROPRIATIONS.—Out of any funds in the Treasury not otherwise appropriated, the Secretary of the Treasury shall transfer to the Secretary $50,000,000 for deposit in the WMAT Maintenance Fund.

(C) USE OF FUNDS.—The Tribe shall use amounts in the WMAT Maintenance Fund only for the operation, maintenance, and replacement costs associated with the delivery of water through the WMAT rural water system.

(4) ADMINISTRATION.—The Secretary shall manage the Funds in accordance with the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.), including by investing amounts in the Funds in accordance with—

(A) the Act of April 1, 1880 (25 U.S.C. 161); and

(B) the first section of the Act of June 24, 1938 (25 U.S.C. 162a).

(5) AVAILABILITY OF AMOUNTS FROM FUNDS.—Amounts in the Funds shall be available for expenditure or withdrawal only after the enforceability date and in accordance with subsection (f).

(6) EXPENDITURE AND WITHDRAWAL.—

(A) TRIBAL MANAGEMENT PLAN.—

(i) IN GENERAL.—The Tribe may withdraw all or part of the amounts in the Funds on approval by the Secretary of a tribal management plan, as described in the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.).

(ii) REQUIREMENTS.—In addition to the requirements under the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.), a tribal management plan under this subparagraph shall require the Tribe to use any amounts withdrawn from the Funds in accordance with paragraph (2)(C) or (3)(C), as applicable.

(iii) ENFORCEMENT.—The Secretary may take judicial or administrative action to enforce the provisions of a tribal management plan described in clause (i) to ensure that any amounts withdrawn from the Funds under the tribal management plan are used in accordance with this title and the Agreement.

(iv) LIABILITY.—If the Tribe exercises the right to withdraw amounts from the Funds, neither the Secretary nor the Secretary of the Treasury shall retain any liability for the expenditure or investment of the amounts.

H. R. 4783—32

(B) EXPENDITURE PLAN.—

(i) IN GENERAL.—The Tribe shall submit to the Secretary for approval an expenditure plan for any portion of the amounts in the Funds that the Tribe does not withdraw under the tribal management plan.

(ii) DESCRIPTION.—The expenditure plan shall describe the manner in which, and the purposes for which, amounts remaining in the Funds will be used.

(iii) APPROVAL.—On receipt of an expenditure plan under clause (i), the Secretary shall approve the plan, if the Secretary determines that the plan is reasonable and consistent with this title and the Agreement.

(iv) ANNUAL REPORT.—For each of the Funds, the Tribe shall submit to the Secretary an annual report that describes all expenditures from the Fund during the year covered by the report.

(C) CERTAIN PER CAPITA DISTRIBUTIONS PROHIBITED.— No amount in the Funds shall be distributed to any member of the Tribe on a per capita basis.

(c) COST INDEXING.—All amounts made available under subsections (a), (b), and (e) shall be adjusted as necessary to reflect the changes since October 1, 2007, in the construction cost indices applicable to the types of construction involved in the construction of the WMAT rural water supply system, the maintenance of the rural water supply system, and the construction or rehabilitation of the other development projects described in subsection (b)(2)(C).

(d) OPERATION, MAINTENANCE, AND REPLACEMENT.—Out of any funds in the Treasury not otherwise appropriated, the Secretary of the Treasury shall transfer to the Secretary $2,500,000 for the operation, maintenance, and replacement costs of the WMAT rural water system, to remain available until the conditions described in section 307(f) have been met.

(e) COST OVERRUN SUBACCOUNT.—

(1) ESTABLISHMENT.—There is established in the Lower Colorado River Basin Development Fund a subaccount to be known as the "WMAT Cost Overrun Subaccount", to be administered by the Secretary, consisting of the amounts deposited in the subaccount under paragraph (2), together with any interest accrued on those amounts, for use by the Secretary in accordance with paragraph (4).

(2) MANDATORY APPROPRIATIONS; AUTHORIZATION OF APPROPRIATIONS.—

(A) MANDATORY APPROPRIATIONS.—Out of any funds in the Treasury not otherwise appropriated, the Secretary of the Treasury shall transfer to the Secretary $24,000,000 for deposit in the WMAT Cost Overrun Subaccount.

(B) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated for deposit in the WMAT Cost Overrun Subaccount $11,000,000.

(3) AVAILABILITY OF FUNDS.—

(A) IN GENERAL.—Amounts in the WMAT Cost Overrun Subaccount shall not be available for expenditure by the Secretary until the enforceability date.

(B) INVESTMENT.—The Secretary shall invest the amounts in the WMAT Cost Overrun Subaccount in accordance with section 403(f)(4) of the Colorado River Basin Project Act (43 U.S.C. 1543(f)(4)).

H. R. 4783—33

(C) USE OF INTEREST.—The interest accrued on the amounts invested under subparagraph (B) shall not be available for expenditure or withdrawal until the enforceability date.

(4) USE OF COST OVERRUN SUBACCOUNT.—

(A) INITIAL USE.—The Secretary shall use the amounts in the WMAT Cost Overrun Subaccount to complete the WMAT rural water system or to carry out activities relating to the operation, maintenance, or replacement of facilities of the WMAT rural water system, as applicable, if the Secretary determines that the amounts made available under subsections (a) and (d) will be insufficient in the period before title to the WMAT rural water system is conveyed to the Tribe—

(i) to complete the WMAT rural water system; or

(ii) to operate and maintain the WMAT rural water system.

(B) TRANSFER OF FUNDS.—All unobligated amounts remaining in the Cost Overrun Subaccount on the date on which title to the WMAT rural water system is conveyed to the Tribe shall be—

(i) returned to the general fund of the Treasury; and

(ii) on an appropriation pursuant to subsection (b)(2)(B)(ii), deposited in the WMAT Settlement Fund and made available to the Tribe for use in accordance with subsection (b)(2)(C).

(f) CONDITIONS.—The amounts made available to the Secretary for deposit in the WMAT Maintenance Fund, together with any interest accrued on those amounts under subsection (b)(3) and any interest accruing on the WMAT Settlement Fund under subsection (b)(2), shall not be available for expenditure or withdrawal until the WMAT rural water system is transferred to the Tribe under section 307(d)(2).

(g) RECEIPT AND ACCEPTANCE.—The Secretary shall be entitled to receive, shall accept, and shall use to carry out this title the funds transferred under subsections (a), (b), (d), and (e), without further appropriation, to remain available until expended.

### SEC. 313. ANTIDEFICIENCY.

The United States shall not be liable for failure to carry out any obligation or activity authorized to be carried out under this title (including any such obligation or activity under the Agreement) if adequate appropriations are not provided by Congress expressly to carry out the purposes of this title.

### SEC. 314. COMPLIANCE WITH ENVIRONMENTAL LAWS.

In implementing the Agreement and carrying out this title, the Secretary shall promptly comply with all applicable requirements of—

(1) the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.);

(2) the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.);

(3) all other applicable Federal environmental laws; and

(4) all regulations promulgated under the laws described in paragraphs (1) through (3).

# TITLE IV—CROW TRIBE WATER RIGHTS SETTLEMENT

### SEC. 401. SHORT TITLE.

This title may be cited as the "Crow Tribe Water Rights Settlement Act of 2010".

### SEC. 402. PURPOSES.

The purposes of this title are—

(1) to achieve a fair, equitable, and final settlement of claims to water rights in the State of Montana for—

(A) the Crow Tribe; and

(B) the United States for the benefit of the Tribe and allottees;

(2) to authorize, ratify, and confirm the Crow Tribe-Montana Water Rights Compact entered into by the Tribe and the State of Montana on June 22, 1999;

(3) to authorize and direct the Secretary of the Interior—

(A) to execute the Crow Tribe-Montana Water Rights Compact; and

(B) to take any other action necessary to carry out the Compact in accordance with this title; and

(4) to ensure the availability of funds necessary for the implementation of the Compact and this title.

### SEC. 403. DEFINITIONS.

In this title:

(1) ALLOTTEE.—The term "allottee" means any individual who holds a beneficial real property interest in an allotment of Indian land that is—

(A) located within the Reservation or the ceded strip; and

(B) held in trust by the United States.

(2) CEDED STRIP.—The term "ceded strip" means the area identified as the ceded strip on the map included in appendix 5 of the Compact.

(3) CIP OM&R.—The term "CIP OM&R" means—

(A) any recurring or ongoing activity associated with the day-to-day operation of the Crow Irrigation Project;

(B) any activity relating to scheduled or unscheduled maintenance of the Crow Irrigation Project; and

(C) any activity relating to replacement of a feature of the Crow Irrigation Project.

(4) COMPACT.—The term "Compact" means the water rights compact between the Tribe and the State of Montana contained in section 85–20–901 of the Montana Code Annotated (2009) (including any exhibit, part, or amendment to the Compact).

(5) CROW IRRIGATION PROJECT.—

(A) IN GENERAL.—The term "Crow Irrigation Project" means the irrigation project—

(i) authorized by section 31 of the Act of March 3, 1891 (26 Stat. 1040);

(ii) managed by the Secretary (acting through the Bureau of Indian Affairs); and

(iii) consisting of the project units of—

(I) Agency;

(II) Bighorn;
(III) Forty Mile;
(IV) Lodge Grass #1;
(V) Lodge Grass #2;
(VI) Pryor;
(VII) Reno;
(VIII) Soap Creek; and
(IX) Upper Little Horn.

(B) INCLUSION.—The term "Crow Irrigation Project" includes land held in trust by the United States for the Tribe and the allottees in the Bozeman Trail and Two Leggins irrigation districts.

(6) ENFORCEABILITY DATE.—The term "enforceability date" means the date on which the Secretary publishes in the Federal Register the statement of findings described in section 410(e).

(7) FINAL.—The term "final" with reference to approval of the decree described in section 410(e)(1)(A), means—

(A) completion of any direct appeal to the Montana Supreme Court of a decree by the Montana Water Court pursuant to section 85–2–235 of the Montana Code Annotated (2009), including the expiration of time for filing of any such appeal; or

(B) completion of any appeal to the appropriate United States Court of Appeals, including the expiration of time in which a petition for certiorari may be filed in the United States Supreme Court, denial of such petition, or issuance of a final judgment of the United States Supreme Court, whichever occurs last.

(8) FUND.—The term "Fund" means the Crow Settlement Fund established by section 411.

(9) INDIAN TRIBE.—The term "Indian tribe" has the meaning given the term in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450b).

(10) JOINT STIPULATION OF SETTLEMENT.—The term "joint stipulation of settlement" means the joint stipulation of settlement relating to the civil action styled Crow Tribe of Indians v. Norton, No. 02–284 (D.D.C. 2006).

(11) MR&I SYSTEM.—

(A) IN GENERAL.—The term "MR&I System" means the municipal, rural, and industrial water system of the Reservation, generally described in the document entitled "Crow Indian Reservation Municipal, Rural and Industrial Water System Engineering Report" prepared by DOWL HKM, and dated July 2008 and updated in a status report prepared by DOWL HKM dated December 2009.

(B) INCLUSIONS.—The term "MR&I System" includes—

(i) the raw water intake, water treatment plant, pipelines, storage tanks, pumping stations, pressure-reducing valves, electrical transmission facilities, and other items (including real property and easements necessary to deliver potable water to the Reservation) appurtenant to the system described in subparagraph (A); and

(ii) in descending order of construction priority—

(I) the Bighorn River Valley Subsystem;

(II) the Little Bighorn River Valley Subsystem; and

H. R. 4783—36

(III) Pryor Extension.

(12) MR&I SYSTEM OM&R.—The term "MR&I System OM&R" means—

(A) any recurring or ongoing activity associated with the day-to-day operation of the MR&I System;

(B) any activity relating to scheduled or unscheduled maintenance of the MR&I System; and

(C) any activity relating to replacement of project features of the MR&I System.

(13) RESERVATION.—The term "Reservation" means the area identified as the Reservation on the map in appendix 4 of the Compact.

(14) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(15) TRIBAL COMPACT ADMINISTRATION.—The term "Tribal Compact Administration" means any activity relating to—

(A) the development or enactment by the Tribe of the tribal water code;

(B) establishment by the Tribe of a water resources department; and

(C) the operation by the Tribe of that water resources department (or a successor agency) during the 10-year period beginning on the date of establishment of the department.

(16) TRIBAL WATER CODE.—The term "tribal water code" means a water code adopted by the Tribe in accordance with section 407(f).

(17) TRIBAL WATER RIGHTS.—The term "tribal water rights" means—

(A) the water rights of the Tribe described in article III of the Compact; and

(B) the water rights provided to the Tribe under section 408.

(18) TRIBE.—The term "Tribe" means the Crow Tribe of Indians of the State of Montana on behalf of itself and its members (but not its members in their capacities as allottees).

## SEC. 404. RATIFICATION OF COMPACT.

(a) RATIFICATION OF COMPACT.—

(1) IN GENERAL.—Except as modified by this title, and to the extent the Compact does not conflict with this title, the Compact is authorized, ratified, and confirmed.

(2) AMENDMENTS TO COMPACT.—If amendments are executed to make the Compact consistent with this title, those amendments are also authorized, ratified, and confirmed to the extent such amendments are consistent with this title.

(b) EXECUTION OF COMPACT.—

(1) IN GENERAL.—To the extent that the Compact does not conflict with this title, the Secretary is directed to and shall promptly execute the Compact, including all exhibits to or parts of the Compact requiring the signature of the Secretary.

(2) MODIFICATIONS.—Nothing in this title precludes the Secretary from approving modifications to appendices or exhibits to the Compact not inconsistent with this title, to

H. R. 4783—37

the extent such modifications do not otherwise require Congressional approval pursuant to section 2116 of the Revised Statutes (25 U.S.C. 177) or other applicable Federal law.

(c) ENVIRONMENTAL COMPLIANCE.—

(1) IN GENERAL.—In implementing the Compact, the Secretary shall promptly comply with all applicable aspects of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.), and all other applicable environmental Acts and regulations.

(2) EXECUTION OF THE COMPACT.—

(A) IN GENERAL.—Execution of the Compact by the Secretary under this section shall not constitute a major Federal action under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(B) COMPLIANCE.—The Secretary shall carry out all Federal compliance activities necessary to implement the Compact.

## SEC. 405. REHABILITATION AND IMPROVEMENT OF CROW IRRIGATION PROJECT.

(a) IN GENERAL.—Notwithstanding any other provision of law, and without altering applicable law (including regulations) under which the Bureau of Indian Affairs collects assessments and carries out CIP OM&R, other than the rehabilitation and improvement carried out under this section, the Secretary, acting through the Commissioner of Reclamation, shall carry out such activities as are necessary to rehabilitate and improve the water diversion and delivery features of the Crow Irrigation Project, in accordance with an agreement to be negotiated between the Secretary and the Tribe.

(b) LEAD AGENCY.—The Bureau of Reclamation shall serve as the lead agency with respect to any activity to rehabilitate or improve the water diversion or delivery features of the Crow Irrigation Project.

(c) SCOPE.—

(1) IN GENERAL.—The scope of the rehabilitation and improvement under this section shall be as generally described in the document entitled "Engineering Evaluation of Existing Conditions, Crow Agency Rehabilitation Study" prepared by DOWL HKM, and dated August 2007 and updated in a status report dated December 2009 by DOWL HKM, on the condition that prior to beginning construction activities, the Secretary shall review the design of the proposed rehabilitation or improvement and perform value engineering analyses.

(2) NEGOTIATION WITH TRIBE.—On the basis of the review described in paragraph (1), the Secretary shall negotiate with the Tribe appropriate changes to the final design so that the final design meets applicable industry standards, as well as changes, if any, that would improve the cost-effectiveness of the delivery of irrigation water and take into consideration the equitable distribution of water to allottees.

(d) NONREIMBURSABILITY OF COSTS.—All costs incurred by the Secretary in carrying out this section shall be nonreimbursable.

(e) FUNDING.—The total amount of obligations incurred by the Secretary in carrying out this section shall not exceed $131,843,000, except that the total amount of $131,843,000 shall be increased

H. R. 4783—38

or decreased, as appropriate, based on ordinary fluctuations from May 1, 2008, in construction cost indices applicable to the types of construction involved in the rehabilitation and improvement.

(f) TRIBAL IMPLEMENTATION AGREEMENT.—

(1) IN GENERAL.—At the request of the Tribe, in accordance with applicable Federal law, the Secretary shall enter into 1 or more agreements with the Tribe to implement the provisions of this section by which the Tribe shall plan, design, and construct any or all of the rehabilitation and improvement required by this section.

(2) OVERSIGHT COSTS.—The Bureau of Reclamation and the Tribe shall negotiate the cost of any oversight activities carried out by the Bureau of Reclamation for each agreement under this section, provided that the total cost for that oversight shall not exceed 4 percent of the total project costs.

(g) ACQUISITION OF LAND.—

(1) TRIBAL EASEMENTS AND RIGHTS-OF-WAY.—

(A) IN GENERAL.—Upon request, and in partial consideration for the funding provided under section 414(a), the Tribe shall consent to the grant of such easements and rights-of-way over tribal land as may be necessary for the rehabilitation and improvement of the Crow Irrigation Project authorized by this section at no cost to the United States.

(B) JURISDICTION.—The Tribe shall retain criminal and civil jurisdiction over any lands that were subject to tribal jurisdiction prior to the granting of an easement or right-of-way in connection with the rehabilitation and improvement of the Crow Irrigation Project.

(2) USER EASEMENTS AND RIGHTS-OF-WAY.—In partial consideration of the rehabilitation and improvement of the Crow Irrigation Project authorized by this section and as a condition of continued service from the Crow Irrigation Project after the enforceability date, any water user of the Crow Irrigation Project shall consent to the grant of such easements and rights-of-way as may be necessary for the rehabilitation and improvements authorized under this section at no cost to the Secretary.

(3) LAND ACQUIRED BY THE UNITED STATES.—Land acquired by the United States in connection with rehabilitation and improvement of the Crow Irrigation Project authorized by this section shall be held in trust by the United States on behalf of the Tribe as part of the Reservation of the Tribe.

(h) PROJECT MANAGEMENT COMMITTEE.—The Secretary shall facilitate the formation of a project management committee composed of representatives from the Bureau of Reclamation, the Bureau of Indian Affairs, and the Tribe—

(1) to review cost factors and budgets for construction, operation, and maintenance activities relating to the Crow Irrigation Project;

(2) to improve management of inherently governmental activities through enhanced communication; and

(3) to seek additional ways to reduce overall costs for the rehabilitation and improvement of the Crow Irrigation Project.

H. R. 4783—39

### SEC. 406. DESIGN AND CONSTRUCTION OF MR&I SYSTEM.

(a) IN GENERAL.—The Secretary, acting through the Commissioner of Reclamation, shall plan, design, and construct the water diversion and delivery features of the MR&I System, in accordance with 1 or more agreements between the Secretary and the Tribe.

(b) LEAD AGENCY.—The Bureau of Reclamation shall serve as the lead agency with respect to any activity to design and construct the water diversion and delivery features of the MR&I System.

(c) SCOPE.—

(1) IN GENERAL.—The scope of the design and construction under this section shall be as generally described in the document entitled "Crow Indian Reservation Municipal, Rural and Industrial Water System Engineering Report" prepared by DOWL HKM, and dated July 2008 and updated in a status report dated December 2009 by DOWL HKM, on the condition that prior to beginning construction activities, the Secretary shall review the design of the proposed MR&I System and perform value engineering analyses.

(2) NEGOTIATION WITH TRIBE.—On the basis of the review described in paragraph (1), the Secretary shall negotiate with the Tribe appropriate changes to the final design so that the final design meets applicable industry standards, as well as changes, if any, that would improve the cost-effectiveness of the delivery of MR&I System water and take into consideration the equitable distribution of water to allottees.

(d) NONREIMBURSABILITY OF COSTS.—All costs incurred by the Secretary in carrying out this section shall be nonreimbursable.

(e) FUNDING.—The total amount of obligations incurred by the Secretary in carrying out this section shall not exceed $246,381,000, except that the total amount of $246,381,000 shall be increased or decreased, as appropriate, based on ordinary fluctuations from May 1, 2008, in construction cost indices applicable to the types of construction involved in the design and construction of the MR&I System.

(f) TRIBAL IMPLEMENTATION AGREEMENT.—

(1) IN GENERAL.—At the request of the Tribe, in accordance with applicable Federal law, the Secretary shall enter into 1 or more agreements with the Tribe to implement the provisions of this section by which the Tribe shall plan, design, and construct any or all of the rehabilitation and improvement required by this section.

(2) OVERSIGHT COSTS.—The Bureau of Reclamation and the Tribe shall negotiate the cost of any oversight activities carried out by the Bureau of Reclamation for each agreement under this section, provided that the total cost for that oversight shall not exceed 4 percent of the total project costs.

(g) ACQUISITION OF LAND.—

(1) TRIBAL EASEMENTS AND RIGHTS-OF-WAY.—

(A) IN GENERAL.—Upon request, and in partial consideration for the funding provided under section 414(b), the Tribe shall consent to the grant of such easements and rights-of-way over tribal land as may be necessary for the construction of the MR&I System authorized by this section at no cost to the United States.

(B) JURISDICTION.—The Tribe shall retain criminal and civil jurisdiction over any lands that were subject to tribal

H. R. 4783—40

jurisdiction prior to the granting of an easement or right-of-way in connection with the construction of the MR&I System.

(2) LAND ACQUIRED BY THE UNITED STATES.—Land acquired by the United States in connection with the construction of the MR&I System authorized by this section shall be held in trust by the United States on behalf of the Tribe as part of the Reservation of the Tribe.

(h) CONVEYANCE OF TITLE TO MR&I SYSTEM FACILITIES.—

(1) IN GENERAL.—The Secretary shall convey title to each MR&I System facility or section of a MR&I System facility authorized under subsection (a) to the Tribe after completion of construction of a MR&I System facility or a section of a MR&I System facility that is operating and delivering water.

(2) LIABILITY.—

(A) IN GENERAL.—Effective on the date of the conveyance authorized by this subsection, the United States shall not be held liable by any court for damages of any kind arising out of any act, omission, or occurrence relating to the land, buildings, or facilities conveyed under this subsection, other than damages caused by acts of negligence committed by the United States, or by employees or agents of the United States, prior to the date of conveyance.

(B) TORT CLAIMS.—Nothing in this section increases the liability of the United States beyond the liability provided in chapter 171 of title 28, United States Code (commonly known as the "Federal Tort Claims Act").

(3) NOTICE OF PROPOSED CONVEYANCE.—Not later than 45 days before the date of a proposed conveyance of title to any MR&I System facility, the Secretary shall submit to the Committee on Natural Resources of the House of Representatives and to the Committee on Energy and Natural Resources of the Senate notice of the conveyance of each such MR&I System facility or section of a MR&I System facility.

(4) MR&I SYSTEM OM&R OBLIGATION OF THE FEDERAL GOVERNMENT AFTER CONVEYANCE.—The Federal Government shall have no obligation to pay for the operation, maintenance, or replacement costs of the MR&I System beginning on the date on which—

(A) title to any MR&I System facility or section of a MR&I System facility under this subsection is conveyed to the Tribe; and

(B) the amounts required to be deposited in the MR&I System OM&R Account pursuant to section 411 have been deposited in that account.

(i) AUTHORITY OF TRIBE.—Upon transfer of title to the MR&I System or any section of a MR&I System facility to the Tribe in accordance with subsection (h), the Tribe is authorized to collect water use charges from customers of the MR&I System to cover—

(1) MR&I System OM&R costs; and

(2) any other costs relating to the construction and operation of the MR&I System.

(j) ALIENATION AND TAXATION.—Conveyance of title to the Tribe pursuant to subsection (h) does not waive or alter any applicable Federal law prohibiting alienation or taxation of the MR&I System or the underlying Reservation land.

H. R. 4783—41

(k) TECHNICAL ASSISTANCE.—The Secretary shall provide technical assistance to prepare the Tribe for operation of the MR&I System, including operation and management training.

(l) PROJECT MANAGEMENT COMMITTEE.—The Secretary shall facilitate the formation of a project management committee composed of representatives from the Bureau of Reclamation, the Bureau of Indian Affairs, and the Tribe—

(1) to review cost factors and budgets for construction, operation and maintenance activities for the MR&I System;

(2) to improve management of inherently governmental activities through enhanced communication; and

(3) to seek additional ways to reduce overall costs for the MR&I System.

(m) NON-FEDERAL CONTRIBUTION.—

(1) IN GENERAL.—Prior to completion of the final design of the MR&I System required by subsection (c), the Secretary shall consult with the Tribe, the State of Montana, and other affected non-Federal parties to discuss the possibility of receiving non-Federal contributions to the cost of the MR&I System.

(2) NEGOTIATIONS.—If, based on the extent to which non-Federal parties are expected to use the MR&I System, a non-Federal contribution to the MR&I System is determined by the parties described in paragraph (1) to be appropriate, the Secretary shall initiate negotiations for an agreement on the means by which such contributions may be provided.

**SEC. 407. TRIBAL WATER RIGHTS.**

(a) INTENT OF CONGRESS.—It is the intent of Congress to provide to each allottee benefits that are equivalent to or exceed the benefits allottees possess as of the date of enactment of this Act, taking into consideration—

(1) the potential risks, cost, and time delay associated with litigation that would be resolved by the Compact and this title;

(2) the availability of funding under this title and from other sources;

(3) the availability of water from the tribal water rights; and

(4) the applicability of section 7 of the Act of February 8, 1887 (25 U.S.C. 381) and this title to protect the interests of allottees.

(b) CONFIRMATION OF TRIBAL WATER RIGHTS.—

(1) IN GENERAL.—The tribal water rights are ratified, confirmed, and declared to be valid.

(2) USE.—Use of the tribal water rights shall be subject to the terms and conditions established by the Compact.

(c) HOLDING IN TRUST.—The tribal water rights—

(1) shall be held in trust by the United States for the use and benefit of the Tribe and the allottees in accordance with this section; and

(2) shall not be subject to forfeiture or abandonment.

(d) ALLOTTEES.—

(1) APPLICABILITY OF ACT OF FEBRUARY 8, 1887.—The provisions of section 7 of the Act of February 8, 1887 (25 U.S.C. 381), relating to the use of water for irrigation purposes shall apply to the tribal water rights.

(2) ENTITLEMENT TO WATER.—Any entitlement to water of an allottee under Federal law shall be satisfied from the tribal water rights.

(3) ALLOCATIONS.—Allottees shall be entitled to a just and equitable allocation of water for irrigation purposes.

(4) EXHAUSTION OF REMEDIES.—Before asserting any claim against the United States under section 7 of the Act of February 8, 1887 (25 U.S.C. 381), or any other applicable law, an allottee shall exhaust remedies available under the tribal water code or other applicable tribal law.

(5) CLAIMS.—Following exhaustion of remedies available under the tribal water code or other applicable tribal law, an allottee may seek relief under section 7 of the Act of February 8, 1887 (25 U.S.C. 381), or other applicable law.

(6) AUTHORITY.—The Secretary shall have the authority to protect the rights of allottees as specified in this section.

(e) AUTHORITY OF TRIBE.—

(1) IN GENERAL.—Except as provided in paragraph (2), the Tribe shall have authority to allocate, distribute, and lease the tribal water rights—

(A) in accordance with the Compact; and

(B) subject to approval of the Secretary of the tribal water code under subsection (f)(3)(B).

(2) LEASES BY ALLOTTEES.—Notwithstanding paragraph (1), an allottee may lease any interest in land held by the allottee, together with any water right determined to be appurtenant to the interest in land.

(f) TRIBAL WATER CODE.—

(1) IN GENERAL.—Notwithstanding the time period set forth in article IV(A)(2)(b) of the Compact, not later than 3 years after the date on which the Tribe ratifies the Compact as set forth in section 410(e)(1)(E), the Tribe shall enact a tribal water code, that provides for—

(A) the management, regulation, and governance of all uses of the tribal water rights in accordance with the Compact; and

(B) establishment by the Tribe of conditions, permit requirements, and other limitations relating to the storage, recovery, and use of the tribal water rights in accordance with the Compact.

(2) INCLUSIONS.—Subject to the approval of the Secretary, the tribal water code shall provide that—

(A) tribal allocations of water to allottees shall be satisfied with water from the tribal water rights;

(B) charges for delivery of water for irrigation purposes for allottees shall be assessed on a just and equitable basis;

(C) there is a process by which an allottee may request that the Tribe provide water for irrigation use in accordance with this title;

(D) there is a due process system for the consideration and determination by the Tribe of any request by an allottee, or any successor in interest to an allottee, for an allocation of such water for irrigation purposes on allotted land, including a process for—

(i) appeal and adjudication of any denied or disputed distribution of water; and

H. R. 4783—43

(ii) resolution of any contested administrative decision; and

(E) there is a requirement that any allottee with a claim relating to the enforcement of rights of the allottee under the tribal water code or relating to the amount of water allocated to land of the allottee must first exhaust remedies available to the allottee under tribal law and the tribal water code before initiating an action against the United States or petitioning the Secretary pursuant to subsection (d)(6).

(3) ACTION BY SECRETARY.—

(A) IN GENERAL.—The Secretary shall administer the tribal water rights until the tribal water code is enacted in accordance with paragraph (1) and those provisions requiring approval pursuant to paragraph (2).

(B) APPROVAL.—The tribal water code shall not be valid unless—

(i) the provisions of the tribal water code required by paragraph (2) are approved by the Secretary; and

(ii) each amendment to the tribal water code that affects a right of an allottee is approved by the Secretary.

(C) APPROVAL PERIOD.—The Secretary shall approve or disapprove the tribal water code within a reasonable period of time after the date on which the Tribe submits it to the Secretary.

(g) EFFECT.—Except as otherwise specifically provided in this section, nothing in this title—

(1) authorizes any action by an allottee against any individual or entity, or against the Tribe, under Federal, State, tribal, or local law; or

(2) alters or affects the status of any action pursuant to section 1491(a) of title 28, United States Code.

## SEC. 408. STORAGE ALLOCATION FROM BIGHORN LAKE.

(a) STORAGE ALLOCATION TO TRIBE.—

(1) IN GENERAL.—As described in and subject to article III(A)(1)(b) of the Compact, the Secretary shall allocate to the Tribe 300,000 acre-feet per year of water stored in Bighorn Lake, Yellowtail Unit, Lower Bighorn Division, Pick Sloan Missouri Basin Program, Montana, under a water right held by the United States and managed by the Bureau of Reclamation, as measured at the outlet works of Yellowtail Dam, including—

(A) not more than 150,000 acre-feet per year of the allocation, which may be used in addition to the natural flow right described in article III(A)(1)(a) of the Compact; and

(B) 150,000 acre-feet per year of the allocation, which may be used only as supplemental water for the natural flow right described in article III(A)(1)(a) of the Compact for use in times of natural flow shortage.

(2) TREATMENT.—

(A) IN GENERAL.—The allocation under paragraph (1) shall be considered to be part of the tribal water rights.

(B) PRIORITY DATE.—The priority date of the allocation under paragraph (1) shall be the priority date of the water right held by the Bureau of Reclamation.

H. R. 4783—44

(C) ADMINISTRATION.—
(i) IN GENERAL.—The Tribe shall administer the water allocated under paragraph (1) in accordance with the Compact.
(ii) TEMPORARY TRANSFER.—In accordance with subsection (c), the Tribe may temporarily transfer by service contract, lease, exchange, or other agreement, not more than 50,000 acre-feet of water allocated under paragraph (1)(A) off the Reservation, subject to the approval of the Secretary and the requirements of the Compact.

(b) ALLOCATION AGREEMENT.—
(1) IN GENERAL.—As a condition of receiving an allocation under this section, the Tribe shall enter into an allocation agreement with the Secretary to establish the terms and conditions of the allocation, in accordance with the terms and conditions of the Compact and this title.
(2) INCLUSIONS.—The allocation agreement under paragraph (1) shall include, among other things, a provision that—
(A) the agreement is without limit as to term;
(B) the Tribe, and not the United States, shall be entitled to all consideration due to the Tribe under any lease, contract, or agreement the Tribe may enter into pursuant to the authority in subsection (c);
(C) the United States shall have no trust obligation or other obligation to monitor, administer, or account for—
(i) any funds received by the Tribe as consideration under any lease, contract, or agreement the Tribe may enter into pursuant to the authority in subsection (c); or
(ii) the expenditure of such funds;
(D) if the facilities at Yellowtail Dam are significantly reduced or are anticipated to be significantly reduced for an extended period of time, the Tribe shall have the same storage rights as other storage contractors with respect to the allocation under this section;
(E) the costs associated with the construction of the storage facilities at Yellowtail Dam allocable to the Tribe—
(i) shall be nonreimbursable; and
(ii) shall be excluded from any repayment obligation of the Tribe;
(F) no water service capital charges shall be due or payable for any water allocated to the Tribe pursuant to this title and the allocation agreement, regardless of whether that water is delivered for use by the Tribe or is delivered under any leases, contracts, or agreements the Tribe may enter into pursuant to the authority in subsection (c);
(G) the Tribe shall not be required to make payments to the United States for any water allocated to the Tribe pursuant to this title and the allocation agreement except for each acre-foot of stored water leased or sold for industrial purposes; and
(H) for each acre-foot of stored water leased or sold by the Tribe for industrial purposes—
(i) the Tribe shall pay annually to the United States an amount to cover the proportionate share

H. R. 4783—45

of the annual operation, maintenance, and replacement costs for the Yellowtail Unit allocable to the amount of water for industrial purposes leased or sold by the Tribe; and

(ii) the annual payments of the Tribe shall be reviewed and adjusted, as appropriate, to reflect the actual operation, maintenance, and replacement costs for the Yellowtail Unit.

(c) TEMPORARY TRANSFER FOR USE OFF RESERVATION.—

(1) IN GENERAL.—Notwithstanding any other provision of statutory or common law and subject to paragraph (2), on approval of the Secretary and subject to the terms and conditions of the Compact, the Tribe may enter into a service contract, lease, exchange, or other agreement providing for the temporary delivery, use, or transfer of not more than 50,000 acre-feet per year of water allocated under subsection (a)(1)(A) for use off the Reservation.

(2) REQUIREMENT.—An agreement under paragraph (1) shall not permanently alienate any portion of the water allocated under subsection (a)(1)(A).

(d) REMAINING STORAGE.—

(1) IN GENERAL.—As of the date of enactment of this Act, water in Bighorn Lake shall be considered to be fully allocated and no further storage allocations shall be made by the Secretary.

(2) EFFECT OF SUBSECTION.—Nothing in this subsection prevents the Secretary from—

(A) renewing the storage contract with Pennsylvania Power and Light Company consistent with the allocation to Pennsylvania Power and Light Company in existence on the date of enactment of this Act; or

(B) entering into future agreements with either the Northern Cheyenne Tribe or the Crow Tribe facilitating either tribe's use of its respective allocation of water from Bighorn Lake.

## SEC. 409. SATISFACTION OF CLAIMS.

(a) IN GENERAL.—

(1) SATISFACTION OF TRIBAL CLAIMS.—The benefits realized by the Tribe under this title shall be in complete replacement of and substitution for, and full satisfaction of, all claims of the Tribe against the United States under paragraphs (1) and (3) of section 410(a).

(2) SATISFACTION OF ALLOTTEE CLAIMS.—The benefits realized by the allottees under this title shall be in complete replacement of and substitution for, and full satisfaction of—

(A) all claims waived and released under section 410(a)(2); and

(B) any claims of the allottees against the United States that the allottees have or could have asserted that are similar in nature to those described in section 410(a)(3).

(b) SATISFACTION OF CLAIMS RELATING TO CROW IRRIGATION PROJECT.—

(1) IN GENERAL.—Subject to paragraph (3), the funds made available under subsections (a) and (f) of section 414 shall be used to satisfy any claim of the Tribe or the allottees with respect to the appropriation of funds for the rehabilitation,

H. R. 4783—46

expansion, improvement, repair, operation, or maintenance of the Crow Irrigation Project.

(2) SATISFACTION OF CLAIMS.—Upon complete transfer of the funds described in subsections (a) and (f) of section 414 any claim of the Tribe or the allottees with respect to the transfer of funds for the rehabilitation, expansion, improvement, repair, operation, or maintenance of the Crow Irrigation Project shall be deemed to have been satisfied.

(3) EFFECT.—Except as provided in section 405, nothing in this title affects any applicable law (including regulations) under which the United States collects irrigation assessments from—

(A) non-Indian users of the Crow Irrigation Project; and

(B) the Tribe, tribal entities and instrumentalities, tribal members, allottees, and entities owned by the Tribe, tribal members, or allottees, to the extent that annual irrigation assessments on such tribal water users exceed the amount of funds available under section 411(e)(3)(D) for costs relating to CIP OM&R.

(c) NO RECOGNITION OF WATER RIGHTS.—Notwithstanding subsection (a) and except as provided in section 407, nothing in this title recognizes or establishes any right of a member of the Tribe or an allottee to water within the Reservation or the ceded strip.

## SEC. 410. WAIVERS AND RELEASES OF CLAIMS.

(a) IN GENERAL.—

(1) WAIVER AND RELEASE OF CLAIMS BY THE TRIBE AND THE UNITED STATES ACTING IN ITS CAPACITY AS TRUSTEE FOR THE TRIBE.—Subject to the retention of rights set forth in subsection (c), in return for recognition of the tribal water rights and other benefits as set forth in the Compact and this title, the Tribe, on behalf of itself and the members of the Tribe (but not tribal members in their capacities as allottees), and the United States, acting as trustee for the Tribe and the members of the Tribe (but not tribal members in their capacities as allottees), are authorized and directed to execute a waiver and release of all claims for water rights within the State of Montana that the Tribe, or the United States acting as trustee for the Tribe, asserted, or could have asserted, in any proceeding, including the State of Montana stream adjudication, prior to and including the enforceability date, except to the extent that such rights are recognized in the Compact or this title.

(2) WAIVER AND RELEASE OF CLAIMS BY THE UNITED STATES ACTING IN ITS CAPACITY AS TRUSTEE FOR ALLOTTEES.—Subject to the retention of rights set forth in subsection (c), in return for recognition of the water rights of the Tribe and other benefits as set forth in the Compact and this title, the United States, acting as trustee for allottees, is authorized and directed to execute a waiver and release of all claims for water rights within the Reservation and the ceded strip that the United States, acting as trustee for the allottees, asserted, or could have asserted, in any proceeding, including the State of Montana stream adjudication, prior to and including the enforceability date, except to the extent that such rights are recognized in the Compact or this title.

H. R. 4783—47

(3) WAIVER AND RELEASE OF CLAIMS BY THE TRIBE AGAINST THE UNITED STATES.—Subject to the retention of rights set forth in subsection (c), the Tribe, on behalf of itself and the members of the Tribe (but not Tribal members in their capacities as allottees), is authorized to execute a waiver and release of—

(A) all claims against the United States, including the agencies and employees of the United States, relating to claims for water rights within the State of Montana that the United States, acting as trustee for the Tribe, asserted, or could have asserted, in any proceeding, including the State of Montana stream adjudication, except to the extent that such rights are recognized as tribal water rights in this title, including all claims relating in any manner to the claims reserved against the United States or agencies or employees of the United States in section 4(e) of the joint stipulation of settlement;

(B) all claims against the United States, including the agencies and employees of the United States, relating to damages, losses, or injuries to water, water rights, land, or natural resources due to loss of water or water rights (including damages, losses, or injuries to hunting, fishing, gathering, or cultural rights due to loss of water or water rights, claims relating to interference with, diversion or taking of water, or claims relating to failure to protect, acquire, replace, or develop water, water rights, or water infrastructure) within the State of Montana that first accrued at any time prior to and including the enforceability date, including all claims relating to the failure to establish or provide a municipal rural or industrial water delivery system on the Reservation and all claims relating to the failure to provide for, operate, or maintain the Crow Irrigation Project, or any other irrigation system or irrigation project on the Reservation;

(C) all claims against the United States, including the agencies and employees of the United States, relating to the pending litigation of claims relating to the water rights of the Tribe in the State of Montana;

(D) all claims against the United States, including the agencies and employees of the United States, relating to the negotiation, execution, or the adoption of the Compact (including exhibits) or this title;

(E) subject to the retention of rights set forth in subsection (c), all claims for monetary damages against the United States that first accrued at any time prior to and including the enforceability date with respect to—

(i) the failure to recognize or enforce the claim of the Tribe of title to land created by the movement of the Bighorn River; and

(ii) the failure to make productive use of that land created by the movement of the Bighorn River to which the Tribe has claimed title;

(F) all claims against the United States that first accrued at any time prior to and including the enforceability date arising from the taking or acquisition of the land of the Tribe or resources for the construction of the Yellowtail Dam;

H. R. 4783—48

(G) all claims against the United States that first accrued at any time prior to and including the enforceability date relating to the construction and operation of Yellowtail Dam and the management of Bighorn Lake; and

(H) all claims that first accrued at any time prior to and including the enforceability date relating to the generation, or the lack thereof, of power from Yellowtail Dam.

(b) EFFECTIVENESS OF WAIVERS AND RELEASES.—The waivers under subsection (a) shall take effect on the enforceability date.

(c) RESERVATION OF RIGHTS AND RETENTION OF CLAIMS.—Notwithstanding the waivers and releases authorized in this title, the Tribe on behalf of itself and the members of the Tribe and the United States, acting as trustee for the Tribe and allottees, retain—

(1) all claims for enforcement of the Compact, any final decree, or this title;

(2) all rights to use and protect water rights acquired after the date of enactment of this Act;

(3) all claims relating to activities affecting the quality of water, including any claims the Tribe may have under—

(A) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.), including for damages to natural resources;

(B) the Safe Drinking Water Act (42 U.S.C. 300f et seq.);

(C) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.); and

(D) any regulations implementing the Acts described in subparagraphs (A) through (C);

(4) all claims relating to damages, losses, or injuries to land or natural resources not due to loss of water or water rights (including hunting, fishing, gathering, or cultural rights);

(5) all rights, remedies, privileges, immunities, and powers not specifically waived and released pursuant to this title or article VII(E) of the Compact;

(6) all claims against any person or entity other than the United States, including claims for monetary damages, with respect to—

(A) the claim of the Tribe of title to land created by the movement of the Bighorn River; and

(B) the productive use of that land created by the movement of the Bighorn River to which the Tribe has claimed title; and

(7) all claims that first accrued after the enforceability date with respect to claims otherwise waived in accordance with subparagraphs (B) and (E) through (H) of subsection (a)(3).

(d) EFFECT OF COMPACT AND TITLE.—Nothing in the Compact or this title—

(1) affects the ability of the United States, acting as sovereign, to take actions authorized by law, including any laws relating to health, safety, or the environment, including—

(A) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.);

H. R. 4783—49

(B) the Safe Drinking Water Act (42 U.S.C. 300f et seq.);

(C) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.); and

(D) any regulations implementing the Acts described in subparagraphs (A) through (C);

(2) affects the ability of the United States to take actions acting as trustee for any other Indian tribe or allottee of any other Indian tribe;

(3) confers jurisdiction on any State court—

(A) to interpret Federal law regarding health, safety, or the environment;

(B) to determine the duties of the United States or other parties pursuant to Federal law regarding health, safety, or the environment; or

(C) to conduct judicial review of Federal agency action;

(4) waives any claim of a member of the Tribe in an individual capacity that does not derive from a right of the Tribe; or

(5) revives any claims waived by the Tribe in the joint stipulation of settlement.

(e) ENFORCEABILITY DATE.—

(1) IN GENERAL.—The enforceability date shall be the date on which the Secretary publishes in the Federal Register a statement of findings that—

(A)(i) the Montana Water Court has issued a final judgment and decree approving the Compact; or

(ii) if the Montana Water Court is found to lack jurisdiction, the district court of jurisdiction has approved the Compact as a consent decree and such approval is final;

(B) all of the funds made available under subsections (c) through (f) of section 414 have been deposited in the Fund;

(C) the Secretary has executed the agreements with the Tribe required by sections 405(a) and 406(a);

(D) the State of Montana has appropriated and paid into an interest-bearing escrow account any payments due as of the date of enactment of this Act to the Tribe under the Compact;

(E)(i) the Tribe has ratified the Compact by submitting this title and the Compact to a vote by the tribal membership for approval or disapproval; and

(ii) the tribal membership has voted to approve this title and the Compact by a majority of votes cast on the day of the vote, as certified by the Secretary and the Tribe;

(F) the Secretary has fulfilled the requirements of section 408(a); and

(G) the waivers and releases authorized and set forth in subsection (a) have been executed by the Tribe and the Secretary.

(f) TOLLING OF CLAIMS.—

(1) IN GENERAL.—Each applicable period of limitation and time-based equitable defense relating to a claim described in this section shall be tolled for the period beginning on the date of enactment of this Act and ending on the date on which

H. R. 4783—50

the amounts made available to carry out this title are transferred to the Secretary.

(2) EFFECT OF SUBSECTION.—Nothing in this subsection revives any claim or tolls any period of limitation or time-based equitable defense that expired before the date of enactment of this Act.

(g) EXPIRATION AND TOLLING.—In the event that all appropriations authorized by this Act have not been made available to the Secretary by June 30, 2030—

(1) the waivers authorized in this section shall expire and be of no further force or effect; and

(2) all statutes of limitations applicable to any claim otherwise waived shall be tolled until June 30, 2030.

(h) VOIDING OF WAIVERS.—If the waivers pursuant to this section are void under subsection (g)—

(1) the United States' approval of the Compact under section 404 shall no longer be effective;

(2) any unexpended Federal funds appropriated or made available to carry out the activities authorized in this Act, together with any interest earned on those funds, and any water rights or contracts to use water and title to other property acquired or constructed with Federal funds appropriated or made available to carry out the activities authorized in this Act shall be returned to the Federal Government, unless otherwise agreed to by the Tribe and the United States and approved by Congress; and

(3) except for Federal funds used to acquire or develop property that is returned to the Federal Government under paragraph (2), the United States shall be entitled to set off any Federal funds appropriated or made available to carry out the activities authorized in this Act that were expended or withdrawn, together with any interest accrued, against any claims against the United States relating to water rights in the State of Montana asserted by the Tribe or in any future settlement of the water rights of the Crow Tribe.

## SEC. 411. CROW SETTLEMENT FUND.

(a) ESTABLISHMENT.—There is established in the Treasury of the United States a fund to be known as "the Crow Settlement Fund", to be administered by the Secretary for the purpose of carrying out this title.

(b) TRANSFERS TO FUND.—The Fund shall consist of such amounts as are deposited in the Fund under subsections (c) through (h) of section 414.

(c) ACCOUNTS OF CROW SETTLEMENT FUND.—The Secretary shall establish in the Fund the following accounts:

(1) The Tribal Compact Administration account, consisting of amounts made available pursuant to section 414(c).

(2) The Energy Development Projects account, consisting of amounts made available pursuant to section 414(d).

(3) The MR&I System OM&R Account, consisting of amounts made available pursuant to section 414(e).

(4) The CIP OM&R Account, consisting of amounts made available pursuant to section 414(f).

(d) DEPOSITS TO CROW SETTLEMENT FUND.—

H. R. 4783—51

(1) IN GENERAL.—The Secretary of the Treasury shall promptly deposit in the Fund any amounts appropriated for that purpose.

(2) PRIORITY OF DEPOSITS TO ACCOUNTS.—Of the amounts appropriated for deposit in the Fund, the Secretary of the Treasury shall deposit amounts in the accounts listed in subsection (c)—

(A) in full; and

(B) in the order listed in subsection (c).

(e) MANAGEMENT.—

(1) IN GENERAL.—The Secretary shall manage the Fund, make investments from the Fund, and make amounts available from the Fund for distribution to the Tribe consistent with the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.).

(2) INVESTMENT OF CROW SETTLEMENT FUND.—Beginning on the enforceability date, the Secretary shall invest amounts in the Fund in accordance with—

(A) the Act of April 1, 1880 (25 U.S.C. 161);

(B) the first section of the Act of June 24, 1938 (25 U.S.C. 162a); and

(C) the obligations of Federal corporations and Federal Government-sponsored entities, the charter documents of which provide that the obligations of the entities are lawful investments for federally managed funds, including—

(i) the obligations of the United States Postal Service described in section 2005 of title 39, United States Code;

(ii) bonds and other obligations of the Tennessee Valley Authority described in section 15d of the Tennessee Valley Authority Act of 1933 (16 U.S.C. 831n–4);

(iii) mortgages, obligations, and other securities of the Federal Home Loan Mortgage Corporation described in section 303 of the Federal Home Loan Mortgage Corporation Act (12 U.S.C. 1452); and

(iv) bonds, notes, and debentures of the Commodity Credit Corporation described in section 4 of the Act of March 8, 1938 (15 U.S.C. 713a–4).

(3) DISTRIBUTIONS FROM CROW SETTLEMENT FUND.—

(A) IN GENERAL.—Amounts from the Fund shall be used for each purpose described in subparagraphs (B) through (E).

(B) TRIBAL COMPACT ADMINISTRATION ACCOUNT.—The Tribal Compact Administration account shall be used for expenditures by the Tribe for Tribal Compact Administration.

(C) ENERGY DEVELOPMENT PROJECTS ACCOUNT.—The Energy Development Projects account shall be used for expenditures by the Tribe for the following types of energy development on the Reservation, the ceded strip, and land owned by the Tribe:

(i) Development and marketing of power generation on the Yellowtail Afterbay Dam authorized in section 412(b).

(ii) Development of clean coal conversion projects.

H. R. 4783—52

(iii) Renewable energy projects other than the project described in clause (i).

(D) CIP OM&R ACCOUNT.—

(i) IN GENERAL.—Amounts in the CIP OM&R Account shall be used for CIP OM&R costs.

(ii) REDUCTION OF COSTS TO TRIBAL WATER USERS.—

(I) IN GENERAL.—Subject to subclause (II), the funds described in clause (i) shall be used to reduce the CIP OM&R costs to all tribal water users on a proportional basis for a given year.

(II) LIMITATION ON USE OF FUNDS.—Funds in the CIP OM&R Account shall be used to pay irrigation assessments only for the Tribe, tribal entities and instrumentalities, tribal members, allottees, and entities owned by the Tribe, tribal members, or allottees.

(E) MR&I SYSTEM OM&R ACCOUNT.—Funds from the MR&I System OM&R Account shall be used to assist the Tribe in paying MR&I System OM&R costs.

(4) WITHDRAWALS BY TRIBE.—

(A) IN GENERAL.—The Tribe may withdraw any portion of amounts in the Fund on approval by the Secretary of a tribal management plan in accordance with the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.).

(B) REQUIREMENTS.—

(i) IN GENERAL.—In addition to the requirements under the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.), the tribal management plan of the Tribe under subparagraph (A) shall require that the Tribe spend any amounts withdrawn from the Fund in accordance with this title.

(ii) ENFORCEMENT.—The Secretary may carry out such judicial or administrative actions as the Secretary determines to be necessary to enforce a tribal management plan to ensure that amounts withdrawn by the Tribe from the Fund under this paragraph are used in accordance with this title.

(C) LIABILITY.—The Secretary and the Secretary of the Treasury shall not be liable for the expenditure or investment of amounts withdrawn from the Fund by the Tribe under this paragraph.

(D) EXPENDITURE PLAN.—

(i) IN GENERAL.—For each fiscal year, the Tribe shall submit to the Secretary for approval an expenditure plan for any portion of the amounts described in subparagraph (A) that the Tribe elects not to withdraw under this paragraph during the fiscal year.

(ii) INCLUSION.—An expenditure plan under clause (i) shall include a description of the manner in which, and the purposes for which, amounts of the Tribe remaining in the Fund will be used during subsequent fiscal years.

(iii) APPROVAL.—On receipt of an expenditure plan under clause (i), the Secretary shall approve the plan if the Secretary determines that the plan is—

(I) reasonable; and

(II) consistent with this title.

(5) ANNUAL REPORTS.—The Tribe shall submit to the Secretary annual reports describing each expenditure by the Tribe of amounts in the Fund during the preceding calendar year.

(6) CERTAIN PER CAPITA DISTRIBUTIONS PROHIBITED.—No amount in the Fund shall be distributed to any member of the Tribe on a per capita basis.

(f) AVAILABILITY.—

(1) IN GENERAL.—Except as provided in paragraph (2), the amounts in the Fund shall be available for use by the Secretary and withdrawal by the Tribe beginning on the enforceability date.

(2) EXCEPTION.—The amounts made available under section 414(c) shall be available for use by the Secretary and withdrawal by the Tribe beginning on the date on which the Tribe ratifies the Compact as provided in section 410(e)(1)(E).

(g) STATE CONTRIBUTION.—The State of Montana contribution to the Fund shall be provided in accordance with article VI(A) of the Compact.

(h) SEPARATE APPROPRIATIONS ACCOUNT.—Section 1105(a) of title 31, United States Code, is amended—

(1) by redesignating paragraphs (35) and (36) as paragraphs (36) and (37), respectively;

(2) by redesignating the second paragraph (33) (relating to obligational authority and outlays requested for homeland security) as paragraph (35); and

(3) by adding at the end the following:

"(38) a separate statement for the Crow Settlement Fund established under section 411 of the Crow Tribe Water Rights Settlement Act of 2010, which shall include the estimated amount of deposits into the Fund, obligations, and outlays from the Fund.".

## SEC. 412. YELLOWTAIL DAM, MONTANA.

(a) STREAMFLOW AND LAKE LEVEL MANAGEMENT PLAN.—

(1) IN GENERAL.—Nothing in this title, the Compact, or the Streamflow and Lake Level Management Plan referred to in article III(A)(7) of the Compact—

(A) limits the discretion of the Secretary under the section 4F of that plan; or

(B) requires the Secretary to give priority to any factor described in section 4F of that plan over any other factor described in that section.

(2) BIGHORN LAKE MANAGEMENT.—Bighorn Lake water management, including the Streamflow and Lake Level Management Plan, is a Federal activity, and the review and enforcement of any water management decisions relating to Bighorn Lake shall be as provided by Federal law.

(3) APPLICABILITY OF PARAGRAPHS (1) AND (2).—The Streamflow and Lake Level Management Plan referred to in and part of the Compact shall be interpreted to clearly reflect paragraphs (1) and (2).

(4) APPLICABILITY OF INSTREAM FLOW REQUIREMENTS IN PLAN.—Notwithstanding any term (including any defined term) or provision in the Streamflow and Lake Level Management Plan, for purposes of this title, the Compact, and the Streamflow

H. R. 4783—54

and Lake Level Management Plan, any requirement in the
Streamflow and Lake Level Management Plan that the Tribe
dedicate a specified percentage, portion, or number of acre-
feet of water per year of the tribal water rights to instream
flow means (and is limited in meaning and effect to) an obliga-
tion on the part of the Tribe to withhold from development
or otherwise refrain from diverting or removing from the Big-
horn River the specified quantity of water for the duration,
at the locations, and under the conditions set forth in the
applicable requirement.

(b) POWER GENERATION.—

(1) IN GENERAL.—Notwithstanding any other provision of
law, the Tribe shall have the exclusive right to develop and
market power generation on the Yellowtail Afterbay Dam, pro-
vided that this exclusive right shall expire 15 years after the
date of enactment of this Act if construction has not been
substantially completed on the power generation project of the
Tribe.

(2) BUREAU OF RECLAMATION COOPERATION.—The Bureau
of Reclamation shall cooperate with the Tribe on the develop-
ment of any power generation project under this subsection.

(3) AGREEMENT.—Before construction of a power generation
project under this subsection, the Tribe shall enter into an
agreement with the Bureau of Reclamation that contains provi-
sions that—

(A) allocate the responsibilities for the design, construc-
tion, and operations of the project;

(B) assure the compatibility of the power generation
project with the operations of the Yellowtail Unit and the
Yellowtail Afterbay Dam, which shall include entering into
agreements—

(i) regarding operating criteria and emergency
procedures, as they relate to dam safety; and

(ii) under which, should the Tribe propose any
modifications to facilities owned by the Bureau of Rec-
lamation, the proposed modifications shall be subject
to review and approval by the Secretary, acting
through the Bureau of Reclamation;

(C) beginning 10 years after the date on which the
Tribe begins marketing power generated from the
Yellowtail Afterbay Dam, the Tribe shall make annual
payments for operation, maintenance, and replacement
costs in amounts determined in accordance with the guide-
lines and methods of the Bureau of Reclamation for
assessing operation, maintenance, and replacement
charges, provided that such annual payments shall not
exceed 3 percent of gross annual revenue produced by
the sale of electricity generated by such project; and

(D) the Secretary—

(i) shall review the charges established in the
agreement on the date that is 5 years after the date
on which the Tribe makes the first payment described
in subparagraph (C) to the Secretary under the agree-
ment and at 5 year intervals thereafter; and

(ii) may increase or decrease the charges in propor-
tion to the amount of any increase or decrease in
the costs of operation, maintenance, and replacement

H. R. 4783—55

for the Yellowtail Afterbay Dam, provided that any increase in operation, maintenance, and replacement costs assessed to the Tribe may not exceed—

(I) 5 percent in any 5 year period; and

(II) 3 percent of the gross annual revenue produced by the sale of electricity generated by such project.

(4) USE OF POWER BY TRIBE.—Any hydroelectric power generated in accordance with this subsection shall be used or marketed by the Tribe.

(5) REVENUES.—The Tribe shall retain any revenues from the sale of hydroelectric power generated by a project under this subsection.

(6) LIABILITY OF UNITED STATES.—The United States shall have no trust obligation to monitor, administer, or account for—

(A) the revenues received by the Tribe under this subsection; or

(B) the expenditure of the revenues received by the Tribe under this subsection.

(c) CONSULTATION WITH TRIBE.—The Bureau of Reclamation shall consult with the Tribe on at least a quarterly basis on all issues relating to the management of Yellowtail Dam by the Bureau of Reclamation.

(d) AMENDMENTS TO COMPACT AND PLAN.—The provisions of subsection (a) apply to any amendment to—

(1) the Compact; or

(2) the Streamflow and Lake Level Management Plan.

## SEC. 413. MISCELLANEOUS PROVISIONS.

(a) WAIVER OF SOVEREIGN IMMUNITY BY THE UNITED STATES.— Except as provided in subsections (a) through (c) of section 208 of the Department of Justice Appropriation Act, 1953 (43 U.S.C. 666), nothing in this title waives the sovereign immunity of the United States.

(b) OTHER TRIBES NOT ADVERSELY AFFECTED.—Nothing in this title quantifies or diminishes any land or water right, or any claim or entitlement to land or water, of an Indian tribe, band, or community other than the Tribe.

(c) LIMITATION ON CLAIMS FOR REIMBURSEMENT.—With respect to Indian land within the Reservation or the ceded strip—

(1) the United States shall not submit against any Indian-owned land located within the Reservation or the ceded strip any claim for reimbursement of the cost to the United States of carrying out this title and the Compact; and

(2) no assessment of any Indian-owned land located within the Reservation or the ceded strip shall be made regarding that cost.

(d) LIMITATION ON LIABILITY OF UNITED STATES.—

(1) IN GENERAL.—The United States has no trust or other obligation—

(A) to monitor, administer, or account for, in any manner, any funds provided to the Tribe by any party to the Compact other than the United States; or

(B) to review or approve any expenditure of those funds.

H. R. 4783—56

(2) INDEMNIFICATION.—The Tribe shall indemnify the United States, and hold the United States harmless, with respect to all claims (including claims for takings or breach of trust) arising from the receipt or expenditure of amounts described in paragraph (1)(A).

(e) EFFECT ON CURRENT LAW.—Nothing in this section affects any provision of law (including regulations) in effect on the day before the date of enactment of this Act with respect to preenforcement review of any Federal environmental enforcement action.

(f) LIMITATIONS ON EFFECT.—

(1) IN GENERAL.—Nothing in this title, the Compact, or the Streamflow and Lake Level Management Plan referred to in article III(A)(7) of the Compact—

(A) limits, expands, alters, or otherwise affects—

(i) the meaning, interpretation, implementation, application, or effect of any article, provision, or term of the Yellowstone River Compact;

(ii) any right, requirement, or obligation under the Yellowstone River Compact;

(iii) any allocation (or manner of determining any allocation) of water under the Yellowstone River Compact; or

(iv) any present or future claim, defense, or other position asserted in any legal, administrative, or other proceeding arising under or relating to the Yellowstone River Compact (including the original proceeding between the State of Montana and the State of Wyoming pending as of the date of enactment of this Act before the United States Supreme Court);

(B) makes an allocation or apportionment of water between or among States;

(C) addresses or implies whether, how, or to what extent (if any)—

(i) the tribal water rights, or any portion of the tribal water rights, should be accounted for as part of or otherwise charged against any allocation of water made to a State under the provisions of the Yellowstone River Compact; or

(ii) the Yellowstone River Compact includes the tribal water rights or the water right of any Indian tribe as part of any allocation or other disposition of water under that compact; or

(D) waives the sovereign immunity from suit of any State under the Eleventh Amendment to the Constitution of the United States, except as expressly authorized in Article IV(F)(8) of the Compact.

(2) EFFECT OF CERTAIN PROVISIONS IN COMPACT.—The provisions in paragraphs (1) and (2) of article III (A)(6)(a), paragraphs (1) and (2) of article III(B)(6)(a), paragraphs (1) and (2) of article III(E)(6)(a), and paragraphs (1) and (2) of article III (F)(6)(a) of the Compact that provide protections to certain water rights recognized under the laws of the State of Montana do not affect in any way, either directly or indirectly, existing or future water rights (including the exercise of any such rights) outside of the State of Montana.

(g) EFFECT ON RECLAMATION LAW.—The activities carried out by the Bureau of Reclamation under this title shall not establish a precedent or impact the authority provided under any other provision of Federal reclamation law, including—

(1) the Rural Supply Act of 2006 (Public Law 109–451; 120 Stat. 3345); and

(2) the Omnibus Public Land Management Act of 2009 (Public Law 111–11; 123 Stat. 991).

**SEC. 414. FUNDING.**

(a) REHABILITATION AND IMPROVEMENT OF CROW IRRIGATION PROJECT.—

(1) MANDATORY APPROPRIATION.—Out of any funds in the Treasury not otherwise appropriated, the Secretary of the Treasury shall transfer to the Secretary $73,843,000, adjusted to reflect changes since May 1, 2008, in construction cost indices applicable to the types of construction involved in the rehabilitation and improvement of the Crow Irrigation Project, for the rehabilitation and improvement of the Crow Irrigation Project.

(2) AUTHORIZATION OF APPROPRIATIONS.—In addition to the amount made available under paragraph (1), there is authorized to be appropriated to the Secretary for the rehabilitation and improvement of the Crow Irrigation Project $58,000,000, adjusted to reflect changes since May 1, 2008, in construction cost indices applicable to the types of construction involved in the rehabilitation and improvement of the Crow Irrigation Project.

(b) DESIGN AND CONSTRUCTION OF MR&I SYSTEM.—

(1) MANDATORY APPROPRIATION.—Out of any funds in the Treasury not otherwise appropriated, the Secretary of the Treasury shall transfer to the Secretary $146,000,000, adjusted to reflect changes since May 1, 2008, in construction cost indices applicable to the types of construction involved in the design and construction of the MR&I System, for the design and construction of the MR&I System.

(2) AUTHORIZATION OF APPROPRIATIONS.—In addition to the amount made available under paragraph (1), there is authorized to be appropriated to the Secretary for the design and construction of the MR&I System $100,381,000, adjusted to reflect changes since May 1, 2008, in construction cost indices applicable to the types of construction involved in the design and construction of the MR&I System.

(c) TRIBAL COMPACT ADMINISTRATION.—Out of any funds in the Treasury not otherwise appropriated, the Secretary of the Treasury shall transfer to the Secretary $4,776,000, adjusted to reflect changes in appropriate cost indices during the period beginning on the date of enactment of this Act and ending on the date of the transfer, for Tribal Compact Administration.

(d) ENERGY DEVELOPMENT PROJECTS.—Out of any funds in the Treasury not otherwise appropriated, the Secretary of the Treasury shall transfer to the Secretary $20,000,000, adjusted to reflect changes in appropriate cost indices during the period beginning on the date of enactment of this Act and ending on the date of the transfer, for Energy Development Projects as set forth in section 411(e)(3)(C).

(e) MR&I SYSTEM OM&R.—Out of any funds in the Treasury not otherwise appropriated, the Secretary of the Treasury shall

H. R. 4783—58

transfer to the Secretary $47,000,000, adjusted to reflect changes in appropriate cost indices during the period beginning on the date of enactment of this Act and ending on the date of the transfer, for MR&I System OM&R.

(f) CIP OM&R.—Out of any funds in the Treasury not otherwise appropriated, the Secretary of the Treasury shall transfer to the Secretary $10,000,000, adjusted to reflect changes in appropriate cost indices during the period beginning on the date of enactment of this Act and ending on the date of the transfer, for CIP OM&R.

(g) USE.—In addition to the uses authorized under subsections (a) and (b), such amounts as may be necessary of the amounts made available under those subsections may be used to carry out related activities necessary to comply with Federal environmental and cultural resource laws.

(h) ACCOUNT TRANSFERS.—

(1) IN GENERAL.—The Secretary may transfer from the amounts made available under subsection (a) such amounts as the Secretary, with the concurrence of the Tribe, determines to be necessary to supplement the amounts made available under subsection (b), on a determination of the Secretary, in consultation with the Tribe, that such a transfer is in the best interest of the Tribe.

(2) OTHER APPROVED TRANSFERS.—The Secretary may transfer from the amounts made available under subsection (b) such amounts as the Secretary, with the concurrence of the Tribe, determines to be necessary to supplement the amounts made available under subsection (a), on a determination of the Secretary, in consultation with the Tribe, that such a transfer is in the best interest of the Tribe.

(i) RECEIPT AND ACCEPTANCE.—The Secretary shall be entitled to receive, shall accept, and shall use to carry out this section the funds transferred under subsections (a) through (f), without further appropriation.

## SEC. 415. REPEAL ON FAILURE TO MEET ENFORCEABILITY DATE.

If the Secretary does not publish a statement of findings under section 410(e) not later than March 31, 2016, or the extended date agreed to by the Tribe and the Secretary, after reasonable notice to the State of Montana, as applicable—

(1) this title is repealed effective April 1, 2016, or the day after the extended date agreed to by the Tribe and the Secretary after reasonable notice to the State of Montana, whichever is later;

(2) any action taken by the Secretary and any contract or agreement pursuant to the authority provided under any provision of this title shall be void;

(3) any amounts made available under section 414, together with any interest on those amounts, shall immediately revert to the general fund of the Treasury;

(4) any amounts made available under section 414 that remain unexpended shall immediately revert to the general fund of the Treasury; and

(5) the United States shall be entitled to set off against any claims asserted by the Tribe against the United States relating to water rights—

(A) any funds expended or withdrawn from the amounts made available pursuant to this title; and

H. R. 4783—59

(B) any funds made available to carry out the activities authorized in this title from other authorized sources.

**SEC. 416. ANTIDEFICIENCY.**

The United States shall not be liable for any failure to carry out any obligation or activity authorized by this title (including any such obligation or activity under the Settlement Agreement) if adequate appropriations are not provided expressly by Congress to carry out the purposes of this title in the Reclamation Water Settlements Fund established under section 10501 of Public Law 111–11 or the "Emergency Fund for Indian Safety and Health" established by section 601(a) of the Tom Lantos and Henry J. Hyde United States Global Leadership Against HIV/AIDS, Tuberculosis, and Malaria Reauthorization Act of 2008 (25 U.S.C. 443c(a)).

# TITLE V—TAOS PUEBLO INDIAN WATER RIGHTS

**SEC. 501. SHORT TITLE.**

This title may be cited as the "Taos Pueblo Indian Water Rights Settlement Act".

**SEC. 502. PURPOSES.**

The purposes of this title are—

(1) to approve, ratify, and confirm the Taos Pueblo Indian Water Rights Settlement Agreement;

(2) to authorize and direct the Secretary to execute the Settlement Agreement and to perform all obligations of the Secretary under the Settlement Agreement and this title; and

(3) to authorize all actions and appropriations necessary for the United States to meet its obligations under the Settlement Agreement and this title.

**SEC. 503. DEFINITIONS.**

In this title:

(1) ELIGIBLE NON-PUEBLO ENTITIES.—The term "Eligible Non-Pueblo Entities" means the Town of Taos, the El Prado Water and Sanitation District, and the New Mexico Department of Finance and Administration Local Government Division on behalf of the Acequia Madre del Rio Lucero y del Arroyo Seco, the Acequia Madre del Prado, the Acequia del Monte, the Acequia Madre del Rio Chiquito, the Upper Ranchitos Mutual Domestic Water Consumers Association, the Upper Arroyo Hondo Mutual Domestic Water Consumers Association, and the Llano Quemado Mutual Domestic Water Consumers Association.

(2) ENFORCEMENT DATE.—The term "Enforcement Date" means the date upon which the Secretary publishes the notice required by section 509(f)(1).

(3) MUTUAL-BENEFIT PROJECTS.—The term "Mutual-Benefit Projects" means the projects described and identified in articles 6 and 10.1 of the Settlement Agreement.

(4) PARTIAL FINAL DECREE.—The term "Partial Final Decree" means the Decree entered in New Mexico v. Abeyta and New Mexico v. Arellano, Civil Nos. 7896–BB (U.S.6 D.N.M.) and 7939–BB (U.S. D.N.M.) (consolidated), for the resolution

H. R. 4783—60

of the Pueblo's water right claims and which is substantially in the form agreed to by the Parties and attached to the Settlement Agreement as Attachment 5.

(5) PARTIES.—The term "Parties" means the Parties to the Settlement Agreement, as identified in article 1 of the Settlement Agreement.

(6) PUEBLO.—The term "Pueblo" means the Taos Pueblo, a sovereign Indian tribe duly recognized by the United States of America.

(7) PUEBLO LANDS.—The term "Pueblo lands" means those lands located within the Taos Valley to which the Pueblo, or the United States in its capacity as trustee for the Pueblo, holds title subject to Federal law limitations on alienation. Such lands include Tracts A, B, and C, the Pueblo's land grant, the Blue Lake Wilderness Area, and the Tenorio and Karavas Tracts and are generally depicted in Attachment 2 to the Settlement Agreement.

(8) SAN JUAN-CHAMA PROJECT.—The term "San Juan-Chama Project" means the Project authorized by section 8 of the Act of June 13, 1962 (76 Stat. 96 and 97), and the Act of April 11, 1956 (70 Stat. 105).

(9) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(10) SETTLEMENT AGREEMENT.—The term "Settlement Agreement" means the contract dated March 31, 2006, between and among—

(A) the United States, acting solely in its capacity as trustee for Taos Pueblo;

(B) the Taos Pueblo, on its own behalf;

(C) the State of New Mexico;

(D) the Taos Valley Acequia Association and its 55 member ditches;

(E) the Town of Taos;

(F) the El Prado Water and Sanitation District; and

(G) the 12 Taos area Mutual Domestic Water Consumers Associations, as amended to conform with this title.

(11) STATE ENGINEER.—The term "State Engineer" means the New Mexico State Engineer.

(12) TAOS VALLEY.—The term "Taos Valley" means the geographic area depicted in Attachment 4 of the Settlement Agreement.

## SEC. 504. PUEBLO RIGHTS.

(a) IN GENERAL.—Those rights to which the Pueblo is entitled under the Partial Final Decree shall be held in trust by the United States on behalf of the Pueblo and shall not be subject to forfeiture, abandonment, or permanent alienation.

(b) SUBSEQUENT ACT OF CONGRESS.—The Pueblo shall not be denied all or any part of its rights held in trust absent its consent unless such rights are explicitly abrogated by an Act of Congress hereafter enacted.

## SEC. 505. TAOS PUEBLO WATER DEVELOPMENT FUND.

(a) ESTABLISHMENT.—There is established in the Treasury of the United States a fund to be known as the "Taos Pueblo Water Development Fund" (referred to in this section as the "Fund") to be used to pay or reimburse costs incurred by the Pueblo for—

(1) acquiring water rights;

H. R. 4783—61

(2) planning, permitting, designing, engineering, constructing, reconstructing, replacing, rehabilitating, operating, or repairing water production, treatment or delivery infrastructure, on-farm improvements, or wastewater infrastructure;

(3) restoring, preserving and protecting the Buffalo Pasture, including planning, permitting, designing, engineering, constructing, operating, managing and replacing the Buffalo Pasture Recharge Project;

(4) administering the Pueblo's water rights acquisition program and water management and administration system; and

(5) watershed protection and enhancement, support of agriculture, water-related Pueblo community welfare and economic development, and costs related to the negotiation, authorization, and implementation of the Settlement Agreement.

(b) MANAGEMENT OF FUND.—The Secretary shall manage the Fund, invest amounts in the Fund, and make monies available from the Fund for distribution to the Pueblo consistent with the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.) (hereinafter, "Trust Fund Reform Act"), this title, and the Settlement Agreement.

(c) INVESTMENT OF FUND.—Upon the Enforcement Date, the Secretary shall invest amounts in the Fund in accordance with—

(1) the Act of April 1, 1880 (21 Stat. 70, ch. 41, 25 U.S.C. 161);

(2) the first section of the Act of June 24, 1938 (52 Stat. 1037, ch. 648, 25 U.S.C. 162a); and

(3) the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.).

(d) AVAILABILITY OF AMOUNTS FROM FUND.—Upon the Enforcement Date, all monies deposited in the Fund pursuant to section 509(c)(1) or made available from other authorized sources shall be available to the Pueblo for expenditure or withdrawal after the requirements of subsection (e) have been met.

(e) EXPENDITURES AND WITHDRAWAL.—

(1) TRIBAL MANAGEMENT PLAN.—

(A) IN GENERAL.—The Pueblo may withdraw all or part of the Fund on approval by the Secretary of a tribal management plan as described in the Trust Fund Reform Act.

(B) REQUIREMENTS.—In addition to the requirements under the Trust Fund Reform Act, the tribal management plan shall require that the Pueblo spend any funds in accordance with the purposes described in subsection (a).

(2) ENFORCEMENT.—The Secretary may take judicial or administrative action to enforce the requirement that monies withdrawn from the Fund are used for the purposes specified in subsection (a).

(3) LIABILITY.—If the Pueblo exercises the right to withdraw monies from the Fund, neither the Secretary nor the Secretary of the Treasury shall retain any liability for the expenditure or investment of the monies withdrawn.

(4) EXPENDITURE PLAN.—

(A) IN GENERAL.—The Pueblo shall submit to the Secretary for approval an expenditure plan for any portions of the funds made available under this title that the Pueblo does not withdraw under paragraph (1)(A).

H. R. 4783—62

(B) DESCRIPTION.—The expenditure plan shall describe the manner in which, and the purposes for which, amounts remaining in the Fund will be used.

(C) APPROVAL.—On receipt of an expenditure plan under subparagraph (A), the Secretary shall approve the plan if the Secretary determines that the plan is reasonable and consistent with this title.

(5) ANNUAL REPORT.—The Pueblo shall submit to the Secretary an annual report that describes all expenditures from the Fund during the year covered by the report.

(f) AMOUNTS AVAILABLE ON APPROPRIATION.—Notwithstanding subsection (d), $15,000,000 of the monies deposited in the Fund—

(1) shall be available upon appropriation or availability of the funds from other authorized sources for the Pueblo's acquisition of water rights pursuant to Article 5.1.1.2.3 of the Settlement Agreement, the Buffalo Pasture Recharge Project, implementation of the Pueblo's water rights acquisition program and water management and administration system, the design, planning, engineering, permitting or construction of water or wastewater infrastructure eligible for funding under subsection (a), or costs related to the negotiation, authorization, and implementation of the Settlement Agreement, provided that such funds may be expended prior to the Enforcement Date only for activities which are determined by the Secretary to be more cost effective when implemented as early as possible; and

(2) shall be distributed by the Secretary to the Pueblo on receipt by the Secretary from the Pueblo of a written notice and a Tribal Council resolution that describes the purposes under paragraph (1) for which the monies will be used after a cost-effectiveness determination by the Secretary has been made as described in paragraph (1). The Secretary shall make the determination described in paragraph (1) within a reasonable period of time after receipt of the notice and resolution.

(g) NO PER CAPITA DISTRIBUTIONS.—No portion of the Fund shall be distributed on a per capita basis to members of the Pueblo.

## SEC. 506. MARKETING.

(a) PUEBLO WATER RIGHTS.—Subject to the approval of the Secretary in accordance with subsection (e), the Pueblo may market water rights secured to it under the Settlement Agreement and Partial Final Decree, provided that such marketing is in accordance with this section.

(b) PUEBLO CONTRACT RIGHTS TO SAN JUAN-CHAMA PROJECT WATER.—Subject to the approval of the Secretary in accordance with subsection (e), the Pueblo may subcontract water made available to the Pueblo under the contract authorized under section 508(b)(1)(A) to third parties to supply water for use within or without the Taos Valley, provided that the delivery obligations under such subcontract are not inconsistent with the Secretary's existing San Juan-Chama Project obligations and such subcontract is in accordance with this section.

(c) LIMITATION.—

(1) IN GENERAL.—Diversion or use of water off Pueblo lands pursuant to Pueblo water rights or Pueblo contract rights to San Juan-Chama Project water shall be subject to and not inconsistent with the same requirements and conditions of State

H. R. 4783—63

law, any applicable Federal law, and any applicable interstate compact as apply to the exercise of water rights or contract rights to San Juan-Chama Project water held by non-Federal, non-Indian entities, including all applicable State Engineer permitting and reporting requirements.

(2) EFFECT ON WATER RIGHTS.—Such diversion or use off Pueblo lands under paragraph (1) shall not impair water rights or increase surface water depletions within the Taos Valley.

(d) MAXIMUM TERM.—

(1) IN GENERAL.—The maximum term of any water use lease or subcontract, including all renewals, shall not exceed 99 years in duration.

(2) ALIENATION OF RIGHTS.—The Pueblo shall not permanently alienate any rights it has under the Settlement Agreement, the Partial Final Decree, and this title.

(e) APPROVAL OF SECRETARY.—The Secretary shall approve or disapprove any lease or subcontract submitted by the Pueblo for approval within a reasonable period of time after submission, provided that no Secretarial approval shall be required for any water use lease for less than 10 acre-feet per year with a term of less than 7 years, including all renewals.

(f) NO FORFEITURE OR ABANDONMENT.—The nonuse by a lessee or subcontractor of the Pueblo of any right to which the Pueblo is entitled under the Partial Final Decree shall in no event result in a forfeiture, abandonment, relinquishment, or other loss of all or any part of those rights.

(g) NO PREEMPTION.—

(1) IN GENERAL.—The approval authority of the Secretary provided under subsection (e) shall not amend, construe, supersede, or preempt any State or Federal law, interstate compact, or international treaty that pertains to the Colorado River, the Rio Grande, or any of their tributaries, including the appropriation, use, development, storage, regulation, allocation, conservation, exportation, or quantity of those waters.

(2) APPLICABLE LAW.—The provisions of section 2116 of the Revised Statutes (25 U.S.C. 177) shall not apply to any water made available under the Settlement Agreement.

(h) NO PREJUDICE.—Nothing in this title shall be construed to establish, address, prejudice, or prevent any party from litigating whether or to what extent any applicable State law, Federal law, or interstate compact does or does not permit, govern, or apply to the use of the Pueblo's water outside of New Mexico.

## SEC. 507. MUTUAL-BENEFIT PROJECTS.

(a) IN GENERAL.—Upon the Enforcement Date, the Secretary, acting through the Commissioner of Reclamation, shall provide financial assistance in the form of grants on a nonreimbursable basis to Eligible Non-Pueblo Entities to plan, permit, design, engineer, and construct the Mutual-Benefit Projects in accordance with the Settlement Agreement—

(1) to minimize adverse impacts on the Pueblo's water resources by moving future non-Indian ground water pumping away from the Pueblo's Buffalo Pasture; and

(2) to implement the resolution of a dispute over the allocation of certain surface water flows between the Pueblo and non-Indian irrigation water right owners in the community of Arroyo Seco Arriba.

H. R. 4783—64

(b) COST-SHARING.—

(1) FEDERAL SHARE.—The Federal share of the total cost of planning, designing, and constructing the Mutual-Benefit Projects authorized in subsection (a) shall be 75 percent and shall be nonreimbursable.

(2) NON-FEDERAL SHARE.—The non-Federal share of the total cost of planning, designing, and constructing the Mutual-Benefit Projects shall be 25 percent and may be in the form of in-kind contributions, including the contribution of any valuable asset or service that the Secretary determines would substantially contribute to completing the Mutual-Benefit Projects.

(3) ADDITIONAL STATE CONTRIBUTION.—As a condition of expenditure by the Secretary of the funds made available under section 509(c)(2), the State shall—

(A) appropriate and make available the non-Federal share described in paragraph (2); and

(B) agree to provide additional funding associated with the Mutual-Benefit Projects as described in paragraph 10 of the Settlement Agreement.

## SEC. 508. SAN JUAN-CHAMA PROJECT CONTRACTS.

(a) IN GENERAL.—Contracts issued under this section shall be in accordance with this title and the Settlement Agreement.

(b) CONTRACTS FOR SAN JUAN-CHAMA PROJECT WATER.—

(1) IN GENERAL.—The Secretary shall enter into 3 repayment contracts within a reasonable period after the date of enactment of this Act, for the delivery of San Juan-Chama Project water in the following amounts:

(A) 2,215 acre-feet/annum to the Pueblo.

(B) 366 acre-feet/annum to the Town of Taos.

(C) 40 acre-feet/annum to the El Prado Water and Sanitation District.

(2) REQUIREMENTS.—Each such contract shall provide that if the conditions precedent set forth in section 509(f)(2) have not been fulfilled by March 31, 2017, the contract shall expire on that date.

(3) APPLICABLE LAW.—Public Law 87–483 (76 Stat. 97) applies to the contracts entered into under paragraph (1) and no preference shall be applied as a result of section 504(a) with regard to the delivery or distribution of San Juan-Chama Project water or the management or operation of the San Juan-Chama Project.

(c) WAIVER.—With respect to the contract authorized and required by subsection (b)(1)(A) and notwithstanding the provisions of Public Law 87–483 (76 Stat. 96) or any other provision of law—

(1) the Secretary shall waive the entirety of the Pueblo's share of the construction costs, both principal and the interest, for the San Juan-Chama Project and pursuant to that waiver, the Pueblo's share of all construction costs for the San Juan-Chama Project, inclusive of both principal and interest shall be nonreimbursable; and

(2) the Secretary's waiver of the Pueblo's share of the construction costs for the San Juan-Chama Project will not result in an increase in the pro rata shares of other San Juan-Chama Project water contractors, but such costs shall

be absorbed by the United States Treasury or otherwise appro-
priated to the Department of the Interior.

**SEC. 509. AUTHORIZATIONS, RATIFICATIONS, CONFIRMATIONS, AND
CONDITIONS PRECEDENT.**

(a) RATIFICATION.—

(1) IN GENERAL.—Except to the extent that any provision
of the Settlement Agreement conflicts with any provision of
this title, the Settlement Agreement is authorized, ratified,
and confirmed.

(2) AMENDMENTS.—To the extent amendments are executed
to make the Settlement Agreement consistent with this title,
such amendments are also authorized, ratified, and confirmed.

(b) EXECUTION OF SETTLEMENT AGREEMENT.—To the extent
that the Settlement Agreement does not conflict with this title,
the Secretary shall execute the Settlement Agreement, including
all exhibits to the Settlement Agreement requiring the signature
of the Secretary and any amendments necessary to make the Settle-
ment Agreement consistent with this title, after the Pueblo has
executed the Settlement Agreement and any such amendments.

(c) FUNDING.—

(1) TAOS PUEBLO WATER DEVELOPMENT FUND.—

(A) MANDATORY APPROPRIATION.—Out of any funds in
the Treasury not otherwise appropriated, the Secretary
of the Treasury shall transfer to the Secretary for deposit
in the Taos Pueblo Water Development Fund established
by section 505(a), for the period of fiscal years 2011 through
2016, $50,000,000, as adjusted by such amounts as may
be required due to increases since April 1, 2007, in
construction costs, as indicated by engineering cost indices
applicable to the types of construction or rehabilitation
involved.

(B) AUTHORIZATION OF APPROPRIATIONS.—In addition
to the amount made available under subparagraph (A),
there is authorized to be appropriated to the Secretary
for deposit in the Taos Pueblo Water Development Fund
established by section 505(a) $38,000,000, as adjusted by
such amounts as may be required due to increases since
April 1, 2007, in construction costs, as indicated by
engineering cost indices applicable to the types of construc-
tion or rehabilitation involved, for the period of fiscal years
2011 through 2016.

(2) MUTUAL-BENEFIT PROJECTS FUNDING.—

(A) FUNDING.—

(i) MANDATORY APPROPRIATION.—Out of any funds
in the Treasury not otherwise appropriated, the Sec-
retary of the Treasury shall transfer to the Secretary
to provide grants pursuant to section 507 $16,000,000
for the period of fiscal years 2011 through 2016.

(ii) AUTHORIZATION OF APPROPRIATIONS.—In addi-
tion to the amount made available under clause (i),
there is authorized to be appropriated to the Secretary
to provide grants pursuant to section 507 $20,000,000
for the period of fiscal years 2011 through 2016.

(B) DEPOSIT IN FUND.—The Secretary shall deposit the
funds made available pursuant to subparagraph (A) into
a noninterest-bearing fund, to be known as the "Taos

H. R. 4783—66

Settlement Fund", to be established in the Treasury of the United States so that such funds may be made available on the Enforcement Date as set forth in section 507(a).

(3) RECEIPT AND ACCEPTANCE.—The Secretary shall be entitled to receive, shall accept, and shall use to carry out this title the funds transferred under paragraphs (1)(A) and (2)(A)(i), without further appropriation, to remain available until expended.

(d) AUTHORITY OF SECRETARY.—The Secretary is authorized to enter into such agreements and to take such measures as the Secretary may deem necessary or appropriate to fulfill the intent of the Settlement Agreement and this title.

(e) ENVIRONMENTAL COMPLIANCE.—

(1) EFFECT OF EXECUTION OF SETTLEMENT AGREEMENT.—The Secretary's execution of the Settlement Agreement shall not constitute a major Federal action under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(2) COMPLIANCE WITH ENVIRONMENTAL LAWS.—In carrying out this title, the Secretary shall comply with each law of the Federal Government relating to the protection of the environment, including—

(A) the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.); and

(B) the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.).

(f) CONDITIONS PRECEDENT AND SECRETARIAL FINDING.—

(1) IN GENERAL.—Upon the fulfillment of the conditions precedent described in paragraph (2), the Secretary shall publish in the Federal Register a statement of finding that the conditions have been fulfilled.

(2) CONDITIONS.—The conditions precedent referred to in paragraph (1) are the following:

(A) The President has signed into law the Taos Pueblo Indian Water Rights Settlement Act.

(B) To the extent that the Settlement Agreement conflicts with this title, the Settlement Agreement has been revised to conform with this title.

(C) The Settlement Agreement, so revised, including waivers and releases pursuant to section 510, has been executed by the Parties and the Secretary prior to the Parties' motion for entry of the Partial Final Decree.

(D) Congress has fully appropriated or the Secretary has provided from other authorized sources all funds made available under paragraphs (1) and (2) of subsection (c).

(E) The Legislature of the State of New Mexico has fully appropriated the funds for the State contributions as specified in the Settlement Agreement, and those funds have been deposited in appropriate accounts.

(F) The State of New Mexico has enacted legislation that amends NMSA 1978, section 72–6–3 to state that a water use due under a water right secured to the Pueblo under the Settlement Agreement or the Partial Final Decree may be leased for a term, including all renewals, not to exceed 99 years, provided that this condition shall not be construed to require that said amendment state that any State law based water rights acquired by the

H. R. 4783—67

Pueblo or by the United States on behalf of the Pueblo may be leased for said term.

(G) A Partial Final Decree that sets forth the water rights and contract rights to water to which the Pueblo is entitled under the Settlement Agreement and this title and that substantially conforms to the Settlement Agreement and Attachment 5 thereto has been approved by the Court and has become final and nonappealable.

(g) ENFORCEMENT DATE.—The Settlement Agreement shall become enforceable, and the waivers and releases executed pursuant to section 510 and the limited waiver of sovereign immunity set forth in section 511(a) shall become effective, as of the date that the Secretary publishes the notice required by subsection (f)(1).

(h) EXPIRATION DATE.—

(1) IN GENERAL.—If all of the conditions precedent described in section (f)(2) have not been fulfilled by March 31, 2017, the Settlement Agreement shall be null and void, the waivers and releases executed pursuant to section 510 and the sovereign immunity waivers in section 511(a) shall not become effective, and any unexpended Federal funds, together with any income earned thereon, and title to any property acquired or constructed with expended Federal funds, shall be returned to the Federal Government, unless otherwise agreed to by the Parties in writing and approved by Congress.

(2) EXCEPTION.—Notwithstanding subsection (h)(1) or any other provision of law, except as provided in subsection (i), title to any property acquired or constructed with expended Federal funds made available under section 505(f) shall be retained by the Pueblo.

(i) RIGHT TO SET-OFF.—If the conditions precedent described in subsection (f)(2) have not been fulfilled by March 31, 2017, and the Settlement Agreement is null and void under subsection (h)(1)—

(1) the United States shall be entitled to set off any Federal funds made available under section 505(f) that were used for purposes other than the purchase of water rights against any claim of the Pueblo against the United States described in section 510(b) (but excluding any claim retained under section 510(c)); and

(2) the Pueblo shall have the option either—

(A) to accept an equitable credit for any water rights acquired with funds made available under section 505(f) against any water rights secured for the Pueblo by the Pueblo, or by the United States on behalf of the Pueblo, in any litigation or future settlement of the case styled New Mexico v. Abeyta and New Mexico v. Arellano, Civil Nos. 7896–BB (U.S.6 D.N.M.) and 7939–BB (U.S. D.N.M.) (consolidated); or

(B) to convey to the United States any water rights acquired with funds made available under section 505(f).

(j) EXTENSION.—The dates in subsections (h) and (i) and section 510(e) may be extended if the Parties agree that an extension is reasonably necessary.

### SEC. 510. WAIVERS AND RELEASES OF CLAIMS.

(a) CLAIMS BY THE PUEBLO AND THE UNITED STATES.—In return for recognition of the Pueblo's water rights and other benefits,

H. R. 4783—68

including but not limited to the commitments by non-Pueblo parties, as set forth in the Settlement Agreement and this title, the Pueblo, on behalf of itself and its members, and the United States acting in its capacity as trustee for the Pueblo are authorized to execute a waiver and release of claims against the parties to New Mexico v. Abeyta and New Mexico v. Arellano, Civil Nos. 7896–BB (U.S.6 D.N.M.) and 7939–BB (U.S. D.N.M.) (consolidated) from—

(1) all claims for water rights in the Taos Valley that the Pueblo, or the United States acting in its capacity as trustee for the Pueblo, asserted, or could have asserted, in any proceeding, including but not limited to in New Mexico v. Abeyta and New Mexico v. Arellano, Civil Nos. 7896–BB (U.S.6 D.N.M.) and 7939–BB (U.S. D.N.M.) (consolidated), up to and including the Enforcement Date, except to the extent that such rights are recognized in the Settlement Agreement or this title;

(2) all claims for water rights, whether for consumptive or nonconsumptive use, in the Rio Grande mainstream or its tributaries that the Pueblo, or the United States acting in its capacity as trustee for the Pueblo, asserted or could assert in any water rights adjudication proceedings except those claims based on Pueblo or United States ownership of lands or water rights acquired after the Enforcement Date, provided that nothing in this paragraph shall prevent the Pueblo or the United States from fully participating in the inter se phase of any such water rights adjudication proceedings;

(3) all claims for damages, losses or injuries to water rights or claims of interference with, diversion or taking of water (including but not limited to claims for injury to lands resulting from such damages, losses, injuries, interference with, diversion, or taking) in the Rio Grande mainstream or its tributaries or for lands within the Taos Valley that accrued at any time up to and including the Enforcement Date; and

(4) all claims against the State of New Mexico, its agencies, or employees relating to the negotiation or the adoption of the Settlement Agreement.

(b) CLAIMS BY THE PUEBLO AGAINST THE UNITED STATES.— The Pueblo, on behalf of itself and its members, is authorized to execute a waiver and release of—

(1) all claims against the United States, its agencies, or employees relating to claims for water rights in or water of the Taos Valley that the United States acting in its capacity as trustee for the Pueblo asserted, or could have asserted, in any proceeding, including but not limited to in New Mexico v. Abeyta and New Mexico v. Arellano, Civil Nos. 7896–BB (U.S.6 D.N.M.) and 7939–BB (U.S. D.N.M.) (consolidated);

(2) all claims against the United States, its agencies, or employees relating to damages, losses, or injuries to water, water rights, land, or natural resources due to loss of water or water rights (including but not limited to damages, losses or injuries to hunting, fishing, gathering, or cultural rights due to loss of water or water rights, claims relating to interference with, diversion or taking of water or water rights, or claims relating to failure to protect, acquire, replace, or develop water, water rights or water infrastructure) in the Rio Grande mainstream or its tributaries or within the Taos

H. R. 4783—69

Valley that first accrued at any time up to and including
the Enforcement Date;

(3) all claims against the United States, its agencies, or
employees for an accounting of funds appropriated by the Act
of March 4, 1929 (45 Stat. 1562), the Act of March 4, 1931
(46 Stat. 1552), the Act of June 22, 1936 (49 Stat. 1757),
the Act of August 9, 1937 (50 Stat. 564), and the Act of May
9, 1938 (52 Stat. 291), as authorized by the Pueblo Lands
Act of June 7, 1924 (43 Stat. 636), and the Pueblo Lands
Act of May 31, 1933 (48 Stat. 108), and for breach of trust
relating to funds for water replacement appropriated by said
Acts that first accrued before the date of enactment of this
Act;

(4) all claims against the United States, its agencies, or
employees relating to the pending litigation of claims relating
to the Pueblo's water rights in New Mexico v. Abeyta and
New Mexico v. Arellano, Civil Nos. 7896–BB (U.S.6 D.N.M.)
and 7939–BB (U.S. D.N.M.) (consolidated); and

(5) all claims against the United States, its agencies, or
employees relating to the negotiation, Execution or the adoption
of the Settlement Agreement, exhibits thereto, the Final Decree,
or this title.

(c) RESERVATION OF RIGHTS AND RETENTION OF CLAIMS.—Not-
withstanding the waivers and releases authorized in this title,
the Pueblo on behalf of itself and its members and the United
States acting in its capacity as trustee for the Pueblo retain—

(1) all claims for enforcement of the Settlement Agreement,
the Final Decree, including the Partial Final Decree, the San
Juan-Chama Project contract between the Pueblo and the
United States, or this title;

(2) all claims against persons other than the Parties to
the Settlement Agreement for damages, losses or injuries to
water rights or claims of interference with, diversion or taking
of water rights (including but not limited to claims for injury
to lands resulting from such damages, losses, injuries, inter-
ference with, diversion, or taking of water rights) within the
Taos Valley arising out of activities occurring outside the Taos
Valley or the Taos Valley Stream System;

(3) all rights to use and protect water rights acquired
after the date of enactment of this Act;

(4) all rights to use and protect water rights acquired
pursuant to State law, to the extent not inconsistent with
the Partial Final Decree and the Settlement Agreement
(including water rights for the land the Pueblo owns in Questa,
New Mexico);

(5) all claims relating to activities affecting the quality
of water including but not limited to any claims the Pueblo
might have under the Comprehensive Environmental Response,
Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et
seq.) (including but not limited to claims for damages to natural
resources), the Safe Drinking Water Act (42 U.S.C. 300f et
seq.), the Federal Water Pollution Control Act (33 U.S.C. 1251
et seq.), and the regulations implementing those Acts;

(6) all claims relating to damages, losses, or injuries to
land or natural resources not due to loss of water or water
rights (including but not limited to hunting, fishing, gathering,
or cultural rights); and

H. R. 4783—70

(7) all rights, remedies, privileges, immunities, powers, and claims not specifically waived and released pursuant to this title and the Settlement Agreement.

(d) EFFECT.—Nothing in the Settlement Agreement or this title—

(1) affects the ability of the United States acting in its sovereign capacity to take actions authorized by law, including but not limited to any laws relating to health, safety, or the environment, including but not limited to the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.), the Safe Drinking Water Act (42 U.S.C. 300f et seq.), the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.), the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.), and the regulations implementing such Acts;

(2) affects the ability of the United States to take actions acting in its capacity as trustee for any other Indian tribe or allottee;

(3) confers jurisdiction on any State court to—

(A) interpret Federal law regarding health, safety, or the environment or determine the duties of the United States or other parties pursuant to such Federal law; or

(B) conduct judicial review of Federal agency action; or

(4) waives any claim of a member of the Pueblo in an individual capacity that does not derive from a right of the Pueblo.

(e) TOLLING OF CLAIMS.—

(1) IN GENERAL.—Each applicable period of limitation and time-based equitable defense relating to a claim described in this section shall be tolled for the period beginning on the date of enactment of this Act and ending on the earlier of—

(A) March 31, 2017; or

(B) the Enforcement Date.

(2) EFFECT OF SUBSECTION.—Nothing in this subsection revives any claim or tolls any period of limitation or time-based equitable defense that expired before the date of enactment of this Act.

(3) LIMITATION.—Nothing in this subsection precludes the tolling of any period of limitations or any time-based equitable defense under any other applicable law.

## SEC. 511. INTERPRETATION AND ENFORCEMENT.

(a) LIMITED WAIVER OF SOVEREIGN IMMUNITY.—Upon and after the Enforcement Date, if any Party to the Settlement Agreement brings an action in any court of competent jurisdiction over the subject matter relating only and directly to the interpretation or enforcement of the Settlement Agreement or this title, and names the United States or the Pueblo as a party, then the United States, the Pueblo, or both may be added as a party to any such action, and any claim by the United States or the Pueblo to sovereign immunity from the action is waived, but only for the limited and sole purpose of such interpretation or enforcement, and no waiver of sovereign immunity is made for any action against the United States or the Pueblo that seeks money damages.

(b) SUBJECT MATTER JURISDICTION NOT AFFECTED.—Nothing in this title shall be deemed as conferring, restricting, enlarging, or determining the subject matter jurisdiction of any court,

including the jurisdiction of the court that enters the Partial Final Decree adjudicating the Pueblo's water rights.

(c) REGULATORY AUTHORITY NOT AFFECTED.—Nothing in this title shall be deemed to determine or limit any authority of the State or the Pueblo to regulate or administer waters or water rights now or in the future.

**SEC. 512. DISCLAIMER.**

Nothing in the Settlement Agreement or this title shall be construed in any way to quantify or otherwise adversely affect the land and water rights, claims, or entitlements to water of any other Indian tribe.

**SEC. 513. ANTIDEFICIENCY.**

The United States shall not be liable for failure to carry out any obligation or activity authorized to be carried out under this title (including any such obligation or activity under the Agreement) if adequate appropriations are not provided expressly to carry out the purposes of this title by Congress or there are not enough monies available to carry out the purposes of this title in the Reclamation Water Settlements Fund established under section 10501 of Public Law 111–11 or the "Emergency Fund for Indian Safety and Health" established by section 601(a) of the Tom Lantos and Henry J. Hyde United States Global Leadership Against HIV/AIDS, Tuberculosis, and Malaria Reauthorization Act of 2008 (25 U.S.C. 443c(a)).

# TITLE VI—AAMODT LITIGATION SETTLEMENT

**SEC. 601. SHORT TITLE.**

This title may be cited as the "Aamodt Litigation Settlement Act".

**SEC. 602. DEFINITIONS.**

In this title:

(1) AAMODT CASE.—The term "Aamodt Case" means the civil action entitled State of New Mexico, ex rel. State Engineer and United States of America, Pueblo de Nambe, Pueblo de Pojoaque, Pueblo de San Ildefonso, and Pueblo de Tesuque v. R. Lee Aamodt, et al., No. 66 CV 6639 MV/LCS (D.N.M.).

(2) ACRE-FEET.—The term "acre-feet" means acre-feet of water per year.

(3) AUTHORITY.—The term "Authority" means the Pojoaque Basin Regional Water Authority described in section 9.5 of the Settlement Agreement or an alternate entity acceptable to the Pueblos and the County to operate and maintain the diversion and treatment facilities, certain transmission pipelines, and other facilities of the Regional Water System.

(4) CITY.—The term "City" means the city of Santa Fe, New Mexico.

(5) COST-SHARING AND SYSTEM INTEGRATION AGREEMENT.— The term "Cost-Sharing and System Integration Agreement" means the agreement, dated August 27, 2009, to be executed by the United States, the State, the Pueblos, the County, and the City that—

H. R. 4783—72

(A) describes the location, capacity, and management (including the distribution of water to customers) of the Regional Water System; and

(B) allocates the costs of the Regional Water System with respect to—

(i) the construction, operation, maintenance, and repair of the Regional Water System;

(ii) rights-of-way for the Regional Water System; and

(iii) the acquisition of water rights.

(6) COUNTY.—The term "County" means Santa Fe County, New Mexico.

(7) COUNTY DISTRIBUTION SYSTEM.—The term "County Distribution System" means the portion of the Regional Water System that serves water customers on non-Pueblo land in the Pojoaque Basin.

(8) COUNTY WATER UTILITY.—The term "County Water Utility" means the water utility organized by the County to—

(A) receive water distributed by the Authority; and

(B) provide the water received under subparagraph (A) to customers on non-Pueblo land in the Pojoaque Basin.

(9) ENGINEERING REPORT.—The term "Engineering Report" means the report entitled "Pojoaque Regional Water System Engineering Report" dated September 2008 and any amendments thereto, including any modifications which may be required by section 611(d)(2).

(10) FUND.—The term "Fund" means the Aamodt Settlement Pueblos' Fund established by section 615(a).

(11) OPERATING AGREEMENT.—The term "Operating Agreement" means the agreement between the Pueblos and the County executed under section 612(a).

(12) OPERATIONS, MAINTENANCE, AND REPLACEMENT COSTS.—

(A) IN GENERAL.—The term "operations, maintenance, and replacement costs" means all costs for the operation of the Regional Water System that are necessary for the safe, efficient, and continued functioning of the Regional Water System to produce the benefits described in the Settlement Agreement.

(B) EXCLUSION.—The term "operations, maintenance, and replacement costs" does not include construction costs or costs related to construction design and planning.

(13) POJOAQUE BASIN.—

(A) IN GENERAL.—The term "Pojoaque Basin" means the geographic area limited by a surface water divide (which can be drawn on a topographic map), within which area rainfall and runoff flow into arroyos, drainages, and named tributaries that eventually drain to—

(i) the Rio Pojoaque; or

(ii) the 2 unnamed arroyos immediately south; and

(iii) 2 arroyos (including the Arroyo Alamo) that are north of the confluence of the Rio Pojoaque and the Rio Grande.

(B) INCLUSION.—The term "Pojoaque Basin" includes the San Ildefonso Eastern Reservation recognized by section 8 of Public Law 87–231 (75 Stat. 505).

H. R. 4783—73

(14) PUEBLO.—The term "Pueblo" means each of the pueblos of Nambe, Pojoaque, San Ildefonso, or Tesuque.

(15) PUEBLOS.—The term "Pueblos" means collectively the Pueblos of Nambe, Pojoaque, San Ildefonso, and Tesuque.

(16) PUEBLO LAND.—The term "Pueblo land" means any real property that is—

(A) held by the United States in trust for a Pueblo within the Pojoaque Basin;

(B)(i) owned by a Pueblo within the Pojoaque Basin before the date on which a court approves the Settlement Agreement; or

(ii) acquired by a Pueblo on or after the date on which a court approves the Settlement Agreement, if the real property is located—

(I) within the exterior boundaries of the Pueblo, as recognized and conformed by a patent issued under the Act of December 22, 1858 (11 Stat. 374, chapter V); or

(II) within the exterior boundaries of any territory set aside for the Pueblo by law, executive order, or court decree;

(C) owned by a Pueblo or held by the United States in trust for the benefit of a Pueblo outside the Pojoaque Basin that is located within the exterior boundaries of the Pueblo as recognized and confirmed by a patent issued under the Act of December 22, 1858 (11 Stat. 374, chapter V); or

(D) within the exterior boundaries of any real property located outside the Pojoaque Basin set aside for a Pueblo by law, executive order, or court decree, if the land is within or contiguous to land held by the United States in trust for the Pueblo as of January 1, 2005.

(17) PUEBLO WATER FACILITY.—

(A) IN GENERAL.—The term "Pueblo Water Facility" means—

(i) a portion of the Regional Water System that serves only water customers on Pueblo land; and

(ii) portions of a Pueblo water system in existence on the date of enactment of this Act that serve water customers on non-Pueblo land, also in existence on the date of enactment of this Act, or their successors, that are—

(I) depicted in the final project design, as modified by the drawings reflecting the completed Regional Water System; and

(II) described in the Operating Agreement.

(B) INCLUSIONS.—The term "Pueblo Water Facility" includes—

(i) the barrier dam and infiltration project on the Rio Pojoaque described in the Engineering Report; and

(ii) the Tesuque Pueblo infiltration pond described in the Engineering Report.

(18) REGIONAL WATER SYSTEM.—

(A) IN GENERAL.—The term "Regional Water System" means the Regional Water System described in section 611(a).

(B) EXCLUSIONS.—The term "Regional Water System" does not include the County or Pueblo water supply delivered through the Regional Water System.

(19) SAN JUAN-CHAMA PROJECT.—The term "San Juan-Chama Project" means the Project authorized by section 8 of the Act of June 13, 1962 (76 Stat. 96, 97), and the Act of April 11, 1956 (70 Stat. 105).

(20) SAN JUAN-CHAMA PROJECT ACT.—The term "San Juan-Chama Project Act" means sections 8 through 18 of the Act of June 13, 1962 (76 Stat. 96, 97).

(21) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(22) SETTLEMENT AGREEMENT.—The term "Settlement Agreement" means the agreement among the State, the Pueblos, the United States, the County, and the City dated January 19, 2006, and signed by all of the government parties to the Settlement Agreement (other than the United States) on May 3, 2006, as amended in conformity with this title.

(23) STATE.—The term "State" means the State of New Mexico.

# Subtitle A—Pojoaque Basin Regional Water System

## SEC. 611. AUTHORIZATION OF REGIONAL WATER SYSTEM.

(a) IN GENERAL.—The Secretary, acting through the Commissioner of Reclamation, shall plan, design, and construct a regional water system in accordance with the Settlement Agreement, to be known as the "Regional Water System"—

(1) to divert and distribute water to the Pueblos and to the County Water Utility, in accordance with the Engineering Report; and

(2) that consists of—

(A) surface water diversion facilities at San Ildefonso Pueblo on the Rio Grande; and

(B) any treatment, transmission, storage and distribution facilities and wellfields for the County Distribution System and Pueblo Water Facilities that are necessary to supply 4,000 acre-feet of water within the Pojoaque Basin, unless modified in accordance with subsection (d)(2).

(b) FINAL PROJECT DESIGN.—The Secretary shall issue a final project design within 90 days of completion of the environmental compliance described in section 616 for the Regional Water System that—

(1) is consistent with the Engineering Report; and

(2) includes a description of any Pueblo Water Facilities.

(c) ACQUISITION OF LAND; WATER RIGHTS.—

(1) ACQUISITION OF LAND.—Upon request, and in exchange for the funding which shall be provided in section 617(c), the Pueblos shall consent to the grant of such easements and rights-of-way as may be necessary for the construction of the Regional Water System at no cost to the Secretary. To the extent that the State or County own easements or rights-of-way that may be used for construction of the Regional Water System, the State or County shall provide that land or interest in land as necessary for construction at no cost to the Secretary.

H. R. 4783—75

The Secretary shall acquire any other land or interest in land that is necessary for the construction of the Regional Water System.

(2) WATER RIGHTS.—The Secretary shall not condemn water rights for purposes of the Regional Water System.

(d) CONDITIONS FOR CONSTRUCTION.—

(1) IN GENERAL.—The Secretary shall not begin construction of the Regional Water System facilities until the date on which—

(A) the Secretary executes—

(i) the Settlement Agreement; and

(ii) the Cost-Sharing and System Integration Agreement; and

(B) the State and the County have entered into an agreement with the Secretary to contribute the non-Federal share of the costs of the construction in accordance with the Cost-Sharing and System Integration Agreement.

(2) MODIFICATIONS TO REGIONAL WATER SYSTEM.—

(A) IN GENERAL.—The State and the County, in agreement with the Pueblos, the City, and other signatories to the Cost-Sharing and System Integration Agreement, may modify the extent, size, and capacity of the County Distribution System as set forth in the Cost-Sharing and System Integration Agreement.

(B) EFFECT.—A modification under subparagraph (A)—

(i) shall not affect implementation of the Settlement Agreement so long as the provisions in section 623 are satisfied; and

(ii) may result in an adjustment of the State and County cost-share allocation as set forth in the Cost-Sharing and System Integration Agreement.

(e) APPLICABLE LAW.—The Indian Self-Determination and Education Assistance Act (25 U.S.C. 450 et seq.) shall not apply to the design and construction of the Regional Water System.

(f) CONSTRUCTION COSTS.—

(1) PUEBLO WATER FACILITIES.—

(A) IN GENERAL.—Except as provided in subparagraph (B), the expenditures of the Secretary to construct the Pueblo Water Facilities under this section shall not exceed $106,400,000.

(B) EXCEPTION.—The amount described in subparagraph (A) shall be increased or decreased, as appropriate, based on ordinary fluctuations in construction costs since October 1, 2006, as determined using applicable engineering cost indices.

(2) COSTS TO PUEBLO.—The costs incurred by the Secretary in carrying out activities to construct the Pueblo Water Facilities under this section shall not be reimbursable to the United States.

(3) COUNTY DISTRIBUTION SYSTEM.—As a condition of the Secretary using the funds made available pursuant to section 617(a)(1), the costs of constructing the County Distribution System shall be a State and local expense pursuant to the Cost-Sharing and System Integration Agreement.

(g) INITIATION OF DISCUSSIONS.—

(1) IN GENERAL.—If the Secretary determines that the cost of constructing the Regional Water System exceed the amounts

H. R. 4783—76

described in the Cost-Sharing and System Integration Agreement for construction of the Regional Water System and would necessitate funds in excess of the amount made available pursuant to section 617(a)(1), the Secretary shall initiate negotiations with the parties to the Cost-Sharing and System Integration Agreement for an agreement regarding non-Federal contributions to ensure that the Regional Water System can be completed as required by section 623(e).

(2) JOINT RESPONSIBILITIES.—The United States shall not bear the entire amount of any cost overrun, nor shall the State be responsible to pay any amounts in addition to the amounts specified in the Cost-Sharing and System Integration Agreement.

(h) CONVEYANCE OF REGIONAL WATER SYSTEM FACILITIES.—

(1) IN GENERAL.—Subject to paragraph (2), on completion of the construction of the Regional Water System as defined in section 623(e), the Secretary, in accordance with the Operating Agreement, shall convey to—

(A) each Pueblo the portion of any Pueblo Water Facility that is located within the boundaries of the Pueblo, including any land or interest in land located within the boundaries of the Pueblo that is acquired by the United States for the construction of the Pueblo Water Facility;

(B) the County the County Distribution System, including any land or interest in land acquired by the United States for the construction of the County Distribution System; and

(C) the Authority any portions of the Regional Water System that remain after making the conveyances under subparagraphs (A) and (B), including any land or interest in land acquired by the United States for the construction of the portions of the Regional Water System.

(2) CONDITIONS FOR CONVEYANCE.—The Secretary shall not convey any portion of the Regional Water System facilities under paragraph (1) until the date on which—

(A) construction of the Regional Water System is substantially complete, as defined in section 623(e); and

(B) the Operating Agreement is executed in accordance with section 612.

(3) SUBSEQUENT CONVEYANCE.—On conveyance by the Secretary under paragraph (1), the Pueblos, the County, and the Authority shall not reconvey any portion of the Regional Water System conveyed to the Pueblos, the County, and the Authority, respectively, unless the reconveyance is authorized by an Act of Congress enacted after the date of enactment of this Act.

(4) INTEREST OF THE UNITED STATES.—On conveyance of a portion of the Regional Water System under paragraph (1), the United States shall have no further right, title, or interest in and to the portion of the Regional Water System conveyed.

(5) ADDITIONAL CONSTRUCTION.—On conveyance of a portion of the Regional Water System under paragraph (1), the Pueblos, County, or the Authority, as applicable, may, at the expense of the Pueblos, County, or the Authority, construct any additional infrastructure that is necessary to fully use the water delivered by the Regional Water System.

(6) TAXATION.—Conveyance of title to any portion of the Regional Water System, the Pueblo Water Facilities, or the

H. R. 4783—77

County Distribution System under paragraph (1) does not waive or alter any applicable Federal law prohibiting taxation of such facilities or the underlying land.

(7) LIABILITY.—

(A) IN GENERAL.—Effective on the date of conveyance of any land or facility under this section, the United States shall not be held liable by any court for damages of any kind arising out of any act, omission, or occurrence relating to the land and facilities conveyed, other than damages caused by acts of negligence by the United States, or by employees or agents of the United States, prior to the date of conveyance.

(B) TORT CLAIMS.—Nothing in this section increases the liability of the United States beyond the liability provided in chapter 171 of title 28, United States Code (commonly known as the "Federal Tort Claims Act").

(8) EFFECT.—Nothing in any transfer of ownership provided or any conveyance thereto as provided in this section shall extinguish the right of any Pueblo, the County, or the Regional Water Authority to the continuous use and benefit of each easement or right of way for the use, operation, maintenance, repair, and replacement of Pueblo Water Facilities, the County Distribution System or the Regional Water System or for wastewater purposes as provided in the Cost-Sharing and System Integration Agreement.

## SEC. 612. OPERATING AGREEMENT.

(a) IN GENERAL.—The Pueblos and the County shall submit to the Secretary an executed Operating Agreement for the Regional Water System that is consistent with this title, the Settlement Agreement, and the Cost-Sharing and System Integration Agreement not later than 180 days after the later of—

(1) the date of completion of environmental compliance and permitting; or

(2) the date of issuance of a final project design for the Regional Water System under section 611(b).

(b) APPROVAL.—The Secretary shall approve or disapprove the Operating Agreement within a reasonable period of time after the Pueblos and the County submit the Operating Agreement described in subsection (a) and upon making a determination that the Operating Agreement is consistent with this title, the Settlement Agreement, and the Cost-Sharing and System Integration Agreement.

(c) CONTENTS.—The Operating Agreement shall include—

(1) provisions consistent with the Settlement Agreement and the Cost-Sharing and System Integration Agreement and necessary to implement the intended benefits of the Regional Water System described in those documents;

(2) provisions for—

(A) the distribution of water conveyed through the Regional Water System, including a delineation of—

(i) distribution lines for the County Distribution System;

(ii) distribution lines for the Pueblo Water Facilities; and

(iii) distribution lines that serve both—

(I) the County Distribution System; and

(II) the Pueblo Water Facilities;

H. R. 4783—78

(B) the allocation of the Regional Water System capacity;

(C) the terms of use of unused water capacity in the Regional Water System;

(D) terms of interim use of County unused capacity, in accordance with section 614(d);

(E) the construction of additional infrastructure and the acquisition of associated rights-of-way or easements necessary to enable any of the Pueblos or the County to fully use water allocated to the Pueblos or the County from the Regional Water System, including provisions addressing when the construction of such additional infrastructure requires approval by the Authority;

(F) the allocation and payment of annual operation, maintenance, and replacement costs for the Regional Water System, including the portions of the Regional Water System that are used to treat, transmit, and distribute water to both the Pueblo Water Facilities and the County Water Utility;

(G) the operation of wellfields located on Pueblo land;

(H) the transfer of any water rights necessary to provide the Pueblo water supply described in section 613(a);

(I) the operation of the Regional Water System with respect to the water supply, including the allocation of the water supply in accordance with section 3.1.8.4.2 of the Settlement Agreement so that, in the event of a shortage of supply to the Regional Water System, the supply to each of the Pueblos' and to the County's distribution system shall be reduced on a pro rata basis, in proportion to each distribution system's most current annual use; and

(J) dispute resolution; and

(3) provisions for operating and maintaining the Regional Water System facilities before and after conveyance under section 611(h), including provisions to—

(A) ensure that—

(i) the operation of, and the diversion and conveyance of water by, the Regional Water System is in accordance with the Settlement Agreement;

(ii) the wells in the Regional Water System are used in conjunction with the surface water supply of the Regional Water System to ensure a reliable firm supply of water to all users of the Regional Water System, consistent with the intent of the Settlement Agreement that surface supplies will be used to the maximum extent feasible;

(iii) the respective obligations regarding delivery, payment, operation, and management are enforceable; and

(iv) the County has the right to serve any new water users located on non-Pueblo land in the Pojoaque Basin; and

(B) allow for any aquifer storage and recovery projects that are approved by the Office of the New Mexico State Engineer.

H. R. 4783—79

(d) EFFECT.—Nothing in this title precludes the Operating Agreement from authorizing phased or interim operations if the Regional Water System is constructed in phases.

## SEC. 613. ACQUISITION OF PUEBLO WATER SUPPLY FOR REGIONAL WATER SYSTEM.

(a) IN GENERAL.—For the purpose of providing a reliable firm supply of water from the Regional Water System for the Pueblos in accordance with the Settlement Agreement, the Secretary, on behalf of the Pueblos, shall—

(1) acquire water rights to—

(A) 302 acre-feet of Nambe reserved water described in section 2.6.2 of the Settlement Agreement; and

(B) 1141 acre-feet from water acquired by the County for water rights commonly referred to as "Top of the World" rights in the Aamodt Case;

(2) enter into a contract with the Pueblos for 1,079 acre-feet in accordance with section 11 of the San Juan-Chama Project Act; and

(3) by application to the State Engineer, seek approval to divert the water acquired and made available under paragraphs (1) and (2) at the points of diversion for the Regional Water System, consistent with the Settlement Agreement and the Cost-Sharing and System Integration Agreement.

(b) FORFEITURE.—The nonuse of the water supply secured by the Secretary for the Pueblos under subsection (a) shall in no event result in forfeiture, abandonment, relinquishment, or other loss thereof.

(c) TRUST.—The Pueblo water rights secured under subsection (a) shall be held by the United States in trust for the Pueblos.

(d) APPLICABLE LAW.—The water supply made available pursuant to subsection (a)(2) shall be subject to the San Juan-Chama Project Act, and no preference shall be provided to the Pueblos as a result of subsection (c) with regard to the delivery or distribution of San Juan-Chama Project water or the management or operation of the San Juan-Chama Project.

(e) CONTRACT FOR SAN JUAN-CHAMA PROJECT WATER SUPPLY.— With respect to the contract for the water supply required by subsection (a)(2), such San Juan-Chama Project contract shall be pursuant to the following terms:

(1) WAIVERS.—Notwithstanding the provisions of the San Juan-Chama Project Act, or any other provision of law—

(A) the Secretary shall waive the entirety of the Pueblos' share of the construction costs for the San Juan-Chama Project, and pursuant to that waiver, the Pueblos' share of all construction costs for the San Juan-Chama Project, inclusive of both principal and interest, due from 1972 to the execution of the contract required by subsection (a)(2), shall be nonreimbursable;

(B) the Secretary's waiver of each Pueblo's share of the construction costs for the San Juan-Chama Project will not result in an increase in the pro rata shares of other San Juan-Chama Project water contractors, but such costs shall be absorbed by the United States Treasury or otherwise appropriated to the Department of the Interior; and

H. R. 4783—80

(C) the construction costs associated with any water made available from the San Juan-Chama Project which were determined nonreimbursable and nonreturnable pursuant to Public Law No. 88–293, 78 Stat. 171 (March 26, 1964), shall remain nonreimbursable and nonreturnable.

(2) TERMINATION.—The contract shall provide that it shall terminate only on—

(A) failure of the United States District Court for the District of New Mexico to enter a final decree for the Aamodt Case by the expiration date described in section 623(b), or within the time period of any extension of that deadline granted by the court; or

(B) entry of an order by the United States District Court for the District of New Mexico voiding the final decree and Settlement Agreement for the Aamodt Case pursuant to section 10.3 of the Settlement Agreement.

(f) LIMITATION.—The Secretary shall use the water supply secured under subsection (a) only for the purposes described in the Settlement Agreement.

(g) FULFILLMENT OF WATER SUPPLY ACQUISITION OBLIGATIONS.—Compliance with subsections (a) through (f) shall satisfy any and all obligations of the Secretary to acquire or secure a water supply for the Pueblos pursuant to the Settlement Agreement.

(h) RIGHTS OF PUEBLOS IN SETTLEMENT AGREEMENT UNAFFECTED.—Notwithstanding the provisions of subsections (a) through (g), the Pueblos, the County or the Regional Water Authority may acquire any additional water rights to ensure all parties to the Settlement Agreement receive the full allocation of water provided by the Settlement Agreement and nothing in this title amends or modifies the quantities of water allocated to the Pueblos thereunder.

**SEC. 614. DELIVERY AND ALLOCATION OF REGIONAL WATER SYSTEM CAPACITY AND WATER.**

(a) ALLOCATION OF REGIONAL WATER SYSTEM CAPACITY.—

(1) IN GENERAL.—The Regional Water System shall have the capacity to divert from the Rio Grande a quantity of water sufficient to provide—

(A) up to 4,000 acre-feet of consumptive use of water; and

(B) the requisite peaking capacity described in—

(i) the Engineering Report; and

(ii) the final project design.

(2) ALLOCATION TO THE PUEBLOS AND COUNTY WATER UTILITY.—Of the capacity described in paragraph (1)—

(A) there shall be allocated to the Pueblos—

(i) sufficient capacity for the conveyance of 2,500 acre-feet consumptive use; and

(ii) the requisite peaking capacity for the quantity of water described in clause (i); and

(B) there shall be allocated to the County Water Utility—

(i) sufficient capacity for the conveyance of up to 1,500 acre-feet consumptive use; and

(ii) the requisite peaking capacity for the quantity of water described in clause (i).

H. R. 4783—81

(3) APPLICABLE LAW.—Water shall be allocated to the Pueblos and the County Water Utility under this subsection in accordance with—

(A) this subtitle;

(B) the Settlement Agreement; and

(C) the Operating Agreement.

(b) DELIVERY OF REGIONAL WATER SYSTEM WATER.—The Authority shall deliver water from the Regional Water System—

(1) to the Pueblos water in a quantity sufficient to allow full consumptive use of up to 2,500 acre-feet per year of water rights by the Pueblos in accordance with—

(A) the Settlement Agreement;

(B) the Operating Agreement; and

(C) this subtitle; and

(2) to the County water in a quantity sufficient to allow full consumptive use of up to 1,500 acre-feet per year of water rights by the County Water Utility in accordance with—

(A) the Settlement Agreement;

(B) the Operating Agreement; and

(C) this subtitle.

(c) ADDITIONAL USE OF ALLOCATION QUANTITY AND UNUSED CAPACITY.—The Regional Water System may be used to—

(1) provide for use of return flow credits to allow for full consumptive use of the water allocated in the Settlement Agreement to each of the Pueblos and to the County; and

(2) convey water allocated to one of the Pueblos or the County Water Utility for the benefit of another Pueblo or the County Water Utility or allow use of unused capacity by each other through the Regional Water System in accordance with an intergovernmental agreement between the Pueblos, or between a Pueblo and County Water Utility, as applicable, if—

(A) such intergovernmental agreements are consistent with the Operating Agreement, the Settlement Agreement, and this title;

(B) capacity is available without reducing water delivery to any Pueblo or the County Water Utility in accordance with the Settlement Agreement, unless the County Water Utility or Pueblo contracts for a reduction in water delivery or Regional Water System capacity;

(C) the Pueblo or County Water Utility contracting for use of the unused capacity or water has the right to use the water under applicable law; and

(D) any agreement for the use of unused capacity or water provides for payment of the operation, maintenance, and replacement costs associated with the use of capacity or water.

(d) INTERIM USE OF COUNTY CAPACITY.—In accordance with section 9.6.4 of the Settlement Agreement, the County may use unused capacity and water rights of the County Water Utility to supply water within the County outside of the Pojoaque Basin—

(1) on approval by the State and the Authority; and

(2) subject to the issuance of a permit by the New Mexico State Engineer.

**SEC. 615. AAMODT SETTLEMENT PUEBLOS' FUND.**

(a) ESTABLISHMENT OF THE AAMODT SETTLEMENT PUEBLOS' FUND.—There is established in the Treasury of the United States a fund, to be known as the "Aamodt Settlement Pueblos' Fund," consisting of—

(1) such amounts as are made available to the Fund under section 617(c) or other authorized sources; and

(2) any interest earned from investment of amounts in the Fund under subsection (b).

(b) MANAGEMENT OF THE FUND.—The Secretary shall manage the Fund, invest amounts in the Fund, and make amounts available from the Fund for distribution to the Pueblos in accordance with—

(1) the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.); and

(2) this title.

(c) INVESTMENT OF THE FUND.—On the date on which the waivers become effective as set forth in section 623(d), the Secretary shall invest amounts in the Fund in accordance with—

(1) the Act of April 1, 1880 (25 U.S.C. 161);

(2) the first section of the Act of June 24, 1938 (25 U.S.C. 162a); and

(3) the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.).

(d) TRIBAL MANAGEMENT PLAN.—

(1) IN GENERAL.—A Pueblo may withdraw all or part of the Pueblo's portion of the Fund on approval by the Secretary of a tribal management plan as described in the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.).

(2) REQUIREMENTS.—In addition to the requirements under the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.), the tribal management plan shall require that a Pueblo spend any amounts withdrawn from the Fund in accordance with the purposes described in section 617(c).

(3) ENFORCEMENT.—The Secretary may take judicial or administrative action to enforce the provisions of any tribal management plan to ensure that any amounts withdrawn from the Fund under an approved tribal management plan are used in accordance with this subtitle.

(4) LIABILITY.—If a Pueblo or the Pueblos exercise the right to withdraw amounts from the Fund, neither the Secretary nor the Secretary of the Treasury shall retain any liability for the expenditure or investment of the amounts withdrawn.

(5) EXPENDITURE PLAN.—

(A) IN GENERAL.—The Pueblos shall submit to the Secretary for approval an expenditure plan for any portion of the amounts in the Fund that the Pueblos do not withdraw under this subsection.

(B) DESCRIPTION.—The expenditure plan shall describe the manner in which, and the purposes for which, amounts remaining in the Fund will be used.

(C) APPROVAL.—On receipt of an expenditure plan under subparagraph (A), the Secretary shall approve the plan if the Secretary determines that the plan is reasonable

H. R. 4783—83

and consistent with this title, the Settlement Agreement, and the Cost-Sharing and System Integration Agreement.

(D) ANNUAL REPORT.—The Pueblos shall submit to the Secretary an annual report that describes all expenditures from the Fund during the year covered by the report.

(6) NO PER CAPITA PAYMENTS.—No part of the principal of the Fund, or the interest or income accruing on the principal shall be distributed to any member of a Pueblo on a per capita basis.

(7) AVAILABILITY OF AMOUNTS FROM THE FUND.—

(A) APPROVAL OF SETTLEMENT AGREEMENT.—

(i) IN GENERAL.—Except as provided in clause (ii), amounts made available under section 617(c)(1), or from other authorized sources, shall be available for expenditure or withdrawal only after the publication of the statement of findings required by section 623(a)(1).

(ii) EXCEPTION.—Notwithstanding clause (i), the amounts described in that clause may be expended before the date of publication of the statement of findings under section 623(a)(1) for any activity that is more cost-effective when implemented in conjunction with the construction of the Regional Water System, as determined by the Secretary.

(B) COMPLETION OF CERTAIN PORTIONS OF REGIONAL WATER SYSTEM.—Amounts made available under section 617(c)(1) or from other authorized sources shall be available for expenditure or withdrawal only after those portions of the Regional Water System described in section 1.5.24 of the Settlement Agreement have been declared substantially complete by the Secretary.

## SEC. 616. ENVIRONMENTAL COMPLIANCE.

(a) IN GENERAL.—In carrying out this subtitle, the Secretary shall comply with each law of the Federal Government relating to the protection of the environment, including—

(1) the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.); and

(2) the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.).

(b) NATIONAL ENVIRONMENTAL POLICY ACT.—Nothing in this title affects the outcome of any analysis conducted by the Secretary or any other Federal official under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

## SEC. 617. FUNDING.

(a) REGIONAL WATER SYSTEM.—

(1) FUNDING.—

(A) MANDATORY APPROPRIATION.—Subject to paragraph (5), out of any funds in the Treasury not otherwise appropriated, the Secretary of the Treasury shall transfer to the Secretary for the planning, design, and construction of the Regional Water System and the conduct of environmental compliance activities under section 616 an amount not to exceed $56,400,000, as adjusted under paragraph (4), for the period of fiscal years 2011 through 2016, to remain available until expended.

H. R. 4783—84

(B) AUTHORIZATION OF APPROPRIATIONS.—In addition to the amount made available under subparagraph (A), there is authorized to be appropriated to the Secretary for the planning, design, and construction of the Regional Water System and the conduct of environmental compliance activities under section 616 $50,000,000, as adjusted under paragraph (4), for the period of fiscal years 2011 through 2024.

(2) RECEIPT AND ACCEPTANCE.—The Secretary shall be entitled to receive, shall accept, and shall use to carry out this title the funds transferred under paragraph (1)(A), without further appropriation, to remain available until expended.

(3) PRIORITY OF FUNDING.—Of the amounts made available under paragraph (1), the Secretary shall give priority to funding—

(A) the construction of the San Ildefonso portion of the Regional Water System, consisting of—

(i) the surface water diversion, treatment, and transmission facilities at San Ildefonso Pueblo; and

(ii) the San Ildefonso Pueblo portion of the Pueblo Water Facilities; and

(B) that part of the Regional Water System providing 475 acre-feet to Pojoaque Pueblo pursuant to section 2.2 of the Settlement Agreement.

(4) ADJUSTMENT.—The amounts made available under paragraph (1) shall be adjusted annually to account for increases in construction costs since October 1, 2006, as determined using applicable engineering cost indices.

(5) LIMITATIONS.—

(A) IN GENERAL.—No amounts shall be made available under paragraph (1) for the construction of the Regional Water System until the date on which the United States District Court for the District of New Mexico issues an order approving the Settlement Agreement.

(B) RECORD OF DECISION.—No amounts made available under paragraph (1) shall be expended for construction unless the record of decision issued by the Secretary after completion of an environmental impact statement provides for a preferred alternative that is in substantial compliance with the proposed Regional Water System, as defined in the Engineering Report.

(b) ACQUISITION OF WATER RIGHTS.—

(1) IN GENERAL.—Out of any funds in the Treasury not otherwise appropriated, the Secretary of the Treasury shall transfer to the Secretary for the acquisition of the water rights under section 613(a)(1)(B) $5,400,000.

(2) RECEIPT AND ACCEPTANCE.—The Secretary shall be entitled to receive, shall accept, and shall use to carry out this title the funds transferred under paragraph (1), without further appropriation, to remain available until expended.

(c) AAMODT SETTLEMENT PUEBLOS' FUND.—

(1) FUNDING.—

(A) MANDATORY APPROPRIATIONS.—Out of any funds in the Treasury not otherwise appropriated, the Secretary of the Treasury shall transfer to the Secretary the following amounts for the period of fiscal years 2011 through 2015:

H. R. 4783—85

(i) $15,000,000, as adjusted according to the CPI Urban Index beginning on October 1, 2006, which shall be allocated to the Pueblos, in accordance with section 2.7.1 of the Settlement Agreement, for the rehabilitation, improvement, operation, maintenance, and replacement of the agricultural delivery facilities, waste water systems, and other water-related infrastructure of the applicable Pueblo.

(ii) $5,000,000, as adjusted according to the CPI Urban Index beginning on January 1, 2011, and any interest on that amount, which shall be allocated to the Pueblo of Nambe only for the acquisition land, other real property interests, or economic development for the Nambe reserved water rights in accordance with section 613(a)(1)(A).

(B) AUTHORIZATION OF APPROPRIATIONS.—In addition to the amounts made available under clauses (i) and (ii) of subparagraph (A), respectively, there are authorized to be appropriated to the Secretary for the period of fiscal years 2011 through 2024, $37,500,000 to assist the Pueblos in paying the Pueblos' share of the cost of operating, maintaining, and replacing the Pueblo Water Facilities and the Regional Water System.

(2) OPERATION, MAINTENANCE, AND REPLACEMENT COSTS.—

(A) IN GENERAL.—Prior to conveyance of the Regional Water System pursuant to section 611, the Secretary is authorized to and shall pay any operation, maintenance, and replacement costs associated with the Pueblo Water Facilities or the Regional Water System, up to the amount made available under subparagraph (B).

(B) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated to the Secretary to carry out subparagraph (A) $5,000,000.

(C) OBLIGATION OF FEDERAL GOVERNMENT AFTER COMPLETION.—After the date on which construction of the Regional Water System is completed and the amounts required to be deposited in the Aamodt Settlement Pueblos' Fund pursuant to paragraph (1) have been deposited by the Federal Government—

(i) the Federal Government shall have no obligation to pay for the operation, maintenance, and replacement costs associated with the Pueblo Water Facilities or the Regional Water System; and

(ii) the authorization for the Secretary to expend funds for the operation, maintenance, and replacement costs of those systems under subparagraph (A) shall expire.

(3) RECEIPT AND ACCEPTANCE.—The Secretary shall be entitled to receive, shall accept, and shall use to carry out this title the funds transferred under paragraphs (1)(A), without further appropriation, to remain available until expended or until the authorization for the Secretary to expend funds pursuant to paragraph (2) expires.

# Subtitle B—Pojoaque Basin Indian Water Rights Settlement

### SEC. 621. SETTLEMENT AGREEMENT AND CONTRACT APPROVAL.

(a) APPROVAL.—To the extent the Settlement Agreement and the Cost-Sharing and System Integration Agreement do not conflict with this title, the Settlement Agreement and the Cost-Sharing and System Integration Agreement (including any amendments to the Settlement Agreement and the Cost-Sharing and System Integration Agreement that are executed to make the Settlement Agreement or the Cost-Sharing and System Integration Agreement consistent with this title) are authorized, ratified, and confirmed.

(b) EXECUTION.—To the extent the Settlement Agreement and the Cost-Sharing and System Integration Agreement do not conflict with this title, the Secretary shall execute the Settlement Agreement and the Cost-Sharing and System Integration Agreement (including any amendments that are necessary to make the Settlement Agreement or the Cost-Sharing and System Integration Agreement consistent with this title).

(c) AUTHORITIES OF THE PUEBLOS.—

(1) IN GENERAL.—Each of the Pueblos may enter into leases or contracts to exchange water rights or to forebear undertaking new or expanded water uses for water rights recognized in section 2.1 of the Settlement Agreement for use within the Pojoaque Basin, in accordance with the other limitations of section 2.1.5 of the Settlement Agreement, provided that section 2.1.5 is amended accordingly.

(2) APPROVAL BY SECRETARY.—Consistent with the Settlement Agreement, the Secretary shall approve or disapprove a lease or contract entered into under paragraph (1).

(3) PROHIBITION ON PERMANENT ALIENATION.—No lease or contract under paragraph (1) shall be for a term exceeding 99 years, nor shall any such lease or contract provide for permanent alienation of any portion of the water rights made available to the Pueblos under the Settlement Agreement.

(4) APPLICABLE LAW.—Section 2116 of the Revised Statutes (25 U.S.C. 177) shall not apply to any lease or contract entered into under paragraph (1).

(5) LEASING OR MARKETING OF WATER SUPPLY.—The water supply provided on behalf of the Pueblos pursuant to section 613(a)(1) may only be leased or marketed by any of the Pueblos pursuant to the intergovernmental agreements described in section 614(c)(2).

(d) AMENDMENTS TO CONTRACTS.—The Secretary shall amend the contracts relating to the Nambe Falls Dam and Reservoir that are necessary to use water supplied from the Nambe Falls Dam and Reservoir in accordance with the Settlement Agreement.

### SEC. 622. ENVIRONMENTAL COMPLIANCE.

(a) EFFECT OF EXECUTION OF SETTLEMENT AGREEMENT.—The execution of the Settlement Agreement under section 611(b) shall not constitute a major Federal action under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(b) COMPLIANCE WITH ENVIRONMENTAL LAWS.—In carrying out this title, the Secretary shall comply with each law of the Federal

H. R. 4783—87

Government relating to the protection of the environment, including—

(1) the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.); and

(2) the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.).

**SEC. 623. CONDITIONS PRECEDENT AND ENFORCEMENT DATE.**

(a) CONDITIONS PRECEDENT.—

(1) IN GENERAL.—Upon the fulfillment of the conditions precedent described in paragraph (2), the Secretary shall publish in the Federal Register by September 15, 2017, a statement of findings that the conditions have been fulfilled.

(2) REQUIREMENTS.—The conditions precedent referred to in paragraph (1) are the conditions that—

(A) to the extent that the Settlement Agreement conflicts with this subtitle, the Settlement Agreement has been revised to conform with this subtitle;

(B) the Settlement Agreement, so revised, including waivers and releases pursuant to section 624, has been executed by the appropriate parties and the Secretary;

(C) Congress has fully appropriated, or the Secretary has provided from other authorized sources, all funds authorized by section 617, with the exception of subsection (a)(1) of that section;

(D) the Secretary has acquired and entered into appropriate contracts for the water rights described in section 613(a);

(E) for purposes of section 613(a), permits have been issued by the New Mexico State Engineer to the Regional Water Authority to change the points of diversion to the mainstem of the Rio Grande for the diversion and consumptive use of at least 2,381 acre-feet by the Pueblos as part of the water supply for the Regional Water System, subject to the conditions that—

(i) the permits shall be free of any condition that materially adversely affects the ability of the Pueblos or the Regional Water Authority to divert or use the Pueblo water supply described in section 613(a), including water rights acquired in addition to those described in section 613(a), in accordance with section 613(g); and

(ii) the Settlement Agreement shall establish the means to address any permit conditions to ensure the ability of the Pueblos to fully divert and consume at least 2,381 acre-feet as part of the water supply for the Regional Water System, including defining the conditions that will not constitute a material adverse affect;

(F) the State has enacted any necessary legislation and provided any funding that may be required under the Settlement Agreement;

(G) a partial final decree that sets forth the water rights and other rights to water to which the Pueblos are entitled under the Settlement Agreement and this subtitle and that substantially conforms to the Settlement

H. R. 4783—88

Agreement has been approved by the United States District Court for the District of New Mexico;

(H) a final decree that sets forth the water rights for all parties to the Aamodt Case and that substantially conforms to the Settlement Agreement has been approved by the United States District Court for the District of New Mexico; and

(I) the waivers and releases described in section 624 have been executed.

(b) EXPIRATION DATE.—If all the conditions precedent described in subsection (a)(2) have not been fulfilled by September 15, 2017—

(1) the Settlement Agreement shall no longer be effective;

(2) the waivers and releases described in the Settlement Agreement and section 624 shall not be effective;

(3) any unexpended Federal funds appropriated or made available to carry out the activities authorized by this title, together with any interest earned on those funds, any water rights or contracts to use water, and title to other property acquired or constructed with Federal funds appropriated or made available to carry out the activities authorized by this title shall be returned to the Federal Government, unless otherwise agreed to by the Pueblos and the United States and approved by Congress; and

(4) except for Federal funds used to acquire or develop property that is returned to the Federal Government under paragraph (3), the United States shall be entitled to set off any Federal funds appropriated or made available to carry out the activities authorized by this title that were expended or withdrawn, together with any interest accrued on those funds, against any claims against the United States—

(A) relating to water rights in the Pojoaque Basin asserted by any Pueblo that benefitted from the use of expended or withdrawn Federal funds; or

(B) in any future settlement of the Aamodt Case.

(c) ENFORCEMENT DATE.—The Settlement Agreement shall become enforceable beginning on the date on which the United States District Court for the District of New Mexico enters a partial final decree pursuant to subsection (a)(2)(G) and an Interim Administrative Order consistent with the Settlement Agreement.

(d) EFFECTIVENESS OF WAIVERS.—The waivers and releases executed pursuant to section 624 shall become effective as of the date that the Secretary publishes the notice required by subsection (a)(1).

(e) REQUIREMENTS FOR DETERMINATION OF SUBSTANTIAL COMPLETION OF THE REGIONAL WATER SYSTEM.—

(1) CRITERIA FOR SUBSTANTIAL COMPLETION OF REGIONAL WATER SYSTEM.—Subject to the provisions in section 611(d) concerning the extent, size, and capacity of the County Distribution System, the Regional Water System shall be determined to be substantially completed if the infrastructure has been constructed capable of—

(A) diverting, treating, transmitting, and distributing a supply of 2,500 acre-feet of water to the Pueblos; and

(B) diverting, treating, and transmitting the quantity of water specified in the Engineering Report to the County Distribution System.

H. R. 4783—89

(2) CONSULTATION.—On or after June 30, 2021, at the request of 1 or more of the Pueblos, the Secretary shall consult with the Pueblos and confer with the County and the State on whether the criteria in paragraph (1) for substantial completion of the Regional Water System have been met or will be met by June 30, 2024.

(3) WRITTEN DETERMINATION BY SECRETARY.—Not earlier than June 30, 2021, at the request of 1 or more of the Pueblos and after the consultation required by paragraph (2), the Secretary shall—

(A) determine whether the Regional Water System has been substantially completed based on the criteria described in paragraph (1); and

(B) submit a written notice of the determination under subparagraph (A) to—

(i) the Pueblos;

(ii) the County; and

(iii) the State.

(4) RIGHT TO REVIEW.—

(A) IN GENERAL.—A determination by the Secretary under paragraph (3)(A) shall be considered to be a final agency action subject to judicial review by the Decree Court under sections 701 through 706 of title 5, United States Code.

(B) FAILURE TO MAKE TIMELY DETERMINATION.—

(i) IN GENERAL.—If a Pueblo requests a written determination under paragraph (3) and the Secretary fails to make such a written determination by the date described in clause (ii), there shall be a rebuttable presumption that the failure constitutes agency action unlawfully withheld or unreasonably delayed under section 706 of title 5, United States Code.

(ii) DATE.—The date referred to in clause (i) is the date that is the later of—

(I) the date that is 180 days after the date of receipt by the Secretary of the request by the Pueblo; and

(II) June 30, 2023.

(C) EFFECT OF TITLE.—Nothing in this title gives any Pueblo or Settlement Party the right to judicial review of a determination of the Secretary regarding whether the Regional Water System has been substantially completed except under subchapter II of chapter 5, and chapter 7, of title 5, United States Code (commonly known as the "Administrative Procedure Act").

(5) RIGHT TO VOID FINAL DECREE.—

(A) IN GENERAL.—Not later than June 30, 2024, on a determination by the Secretary, after consultation with the Pueblos, that the Regional Water System is not substantially complete, 1 or more of the Pueblos, or the United States acting on behalf of a Pueblo, shall have the right to notify the Decree Court of the determination.

(B) EFFECT.—The Final Decree shall have no force or effect on a finding by the Decree Court that a Pueblo, or the United States acting on behalf of a Pueblo, has submitted proper notification under subparagraph (A).

H. R. 4783—90

(f) VOIDING OF WAIVERS.—If the Final Decree is void under subsection (e)(5)—

(1) the Settlement Agreement shall no longer be effective;

(2) the waivers and releases executed pursuant to section 624 shall no longer be effective;

(3) any unexpended Federal funds appropriated or made available to carry out the activities authorized by this title, together with any interest earned on those funds, any water rights or contracts to use water, and title to other property acquired or constructed with Federal funds appropriated or made available to carry out the activities authorized by this title shall be returned to the Federal Government, unless otherwise agreed to by the Pueblos and the United States and approved by Congress; and

(4) except for Federal funds used to acquire or develop property that is returned to the Federal Government under paragraph (3), the United States shall be entitled to set off any Federal funds appropriated or made available to carry out the activities authorized by this title that were expended or withdrawn, together with any interest accrued on those funds, against any claims against the United States—

(A) relating to water rights in the Pojoaque Basin asserted by any Pueblo that benefitted from the use of expended or withdrawn Federal funds; or

(B) in any future settlement of the Aamodt Case.

(g) EXTENSION.—The dates in subsections (a)(1) and (b) may be extended if the parties to the Cost-Sharing and System Integration Agreement agree that an extension is reasonably necessary.

SEC. 624. WAIVERS AND RELEASES OF CLAIMS.

(a) CLAIMS BY THE PUEBLOS AND THE UNITED STATES.—In return for recognition of the Pueblos' water rights and other benefits, including waivers and releases by non-Pueblo parties, as set forth in the Settlement Agreement and this title, the Pueblos, on behalf of themselves and their members, and the United States acting in its capacity as trustee for the Pueblos are authorized to execute a waiver and release of—

(1) all claims for water rights in the Pojoaque Basin that the Pueblos, or the United States acting in its capacity as trustee for the Pueblos, asserted, or could have asserted, in any proceeding, including the Aamodt Case, up to and including the waiver effectiveness date identified in section 623(d), except to the extent that such rights are recognized in the Settlement Agreement or this title;

(2) all claims for water rights for lands in the Pojoaque Basin and for rights to use water in the Pojoaque Basin that the Pueblos, or the United States acting in its capacity as trustee for the Pueblos, might be able to otherwise assert in any proceeding not initiated on or before the date of enactment of this Act, except to the extent that such rights are recognized in the Settlement Agreement or this title;

(3) all claims for damages, losses or injuries to water rights or claims of interference with, diversion or taking of water (including claims for injury to land resulting from such damages, losses, injuries, interference with, diversion, or taking) for land within the Pojoaque Basin that accrued at any time

up to and including the waiver effectiveness date identified in section 623(d);

(4) their defenses in the Aamodt Case to the claims previously asserted therein by other parties to the Settlement Agreement;

(5) all pending and future inter se challenges to the quantification and priority of water rights of non-Pueblo wells in the Pojoaque Basin, except as provided by section 2.8 of the Settlement Agreement;

(6) all pending and future inter se challenges against other parties to the Settlement Agreement;

(7) all claims for damages, losses, or injuries to water rights or claims of interference with, diversion or taking of water (including claims for injury to land resulting from such damages, losses, injuries, interference with, diversion, or taking of water) attributable to City of Santa Fe pumping of groundwater that has effects on the ground and surface water supplies of the Pojoaque Basin, provided that this waiver shall not be effective by the Pueblo of Tesuque unless there is a water resources agreement executed between the Pueblo of Tesuque and the City of Santa Fe; and

(8) all claims for damages, losses, or injuries to water rights or claims of interference with, diversion or taking of water (including claims for injury to land resulting from such damages, losses, injuries, interference with, diversion, or taking of water) attributable to County of Santa Fe pumping of groundwater that has effects on the ground and surface water supplies of the Pojoaque Basin.

(b) CLAIMS BY THE PUEBLOS AGAINST THE UNITED STATES.— The Pueblos, on behalf of themselves and their members, are authorized to execute a waiver and release of—

(1) all claims against the United States, its agencies, or employees, relating to claims for water rights in or water of the Pojoaque Basin or for rights to use water in the Pojoaque Basin that the United States acting in its capacity as trustee for the Pueblos asserted, or could have asserted, in any proceeding, including the Aamodt Case;

(2) all claims against the United States, its agencies, or employees relating to damages, losses, or injuries to water, water rights, land, or natural resources due to loss of water or water rights (including damages, losses or injuries to hunting, fishing, gathering or cultural rights due to loss of water or water rights; claims relating to interference with, diversion or taking of water or water rights; or claims relating to failure to protect, acquire, replace, or develop water, water rights or water infrastructure) within the Pojoaque Basin that first accrued at any time up to and including the waiver effectiveness date identified in section 623(d);

(3) all claims against the United States, its agencies, or employees for an accounting of funds appropriated by Acts, including the Act of December 22, 1927 (45 Stat. 2), the Act of March 4, 1929 (45 Stat. 1562), the Act of March 26, 1930 (46 Stat. 90), the Act of February 14, 1931 (46 Stat. 1115), the Act of March 4, 1931 (46 Stat. 1552), the Act of July 1, 1932 (47 Stat. 525), the Act of June 22, 1936 (49 Stat. 1757), the Act of August 9, 1937 (50 Stat. 564), and the Act of May 9, 1938 (52 Stat. 291), as authorized by the Pueblo

H. R. 4783—92

Lands Act of June 7, 1924 (43 Stat. 636), and the Pueblo Lands Act of May 31, 1933 (48 Stat. 108), and for breach of Trust relating to funds for water replacement appropriated by said Acts that first accrued before the date of enactment of this Act;

(4) all claims against the United States, its agencies, or employees relating to the pending litigation of claims relating to the Pueblos' water rights in the Aamodt Case; and

(5) all claims against the United States, its agencies, or employees relating to the negotiation, Execution or the adoption of the Settlement Agreement, exhibits thereto, the Partial Final Decree, the Final Decree, or this title.

(c) RESERVATION OF RIGHTS AND RETENTION OF CLAIMS.—Notwithstanding the waivers and releases authorized in this title, the Pueblos on behalf of themselves and their members and the United States acting in its capacity as trustee for the Pueblos retain.—

(1) all claims for enforcement of the Settlement Agreement, the Cost-Sharing and System Integration Agreement, the Final Decree, including the Partial Final Decree, the San Juan-Chama Project contract between the Pueblos and the United States or this title;

(2) all rights to use and protect water rights acquired after the date of enactment of this Act;

(3) all rights to use and protect water rights acquired pursuant to state law to the extent not inconsistent with the Partial Final Decree, Final Decree, and the Settlement Agreement;

(4) all claims against persons other than Parties to the Settlement Agreement for damages, losses or injuries to water rights or claims of interference with, diversion or taking of water (including claims for injury to lands resulting from such damages, losses, injuries, interference with, diversion, or taking of water) within the Pojoaque Basin arising out of activities occurring outside the Pojoaque Basin;

(5) all claims relating to activities affecting the quality of water including any claims the Pueblos may have under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.) (including claims for damages to natural resources), the Safe Drinking Water Act (42 U.S.C. 300f et seq.), the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.), and the regulations implementing those laws;

(6) all claims against the United States relating to damages, losses, or injuries to land or natural resources not due to loss of water or water rights (including hunting, fishing, gathering or cultural rights);

(7) all claims for water rights from water sources outside the Pojoaque Basin for land outside the Pojoaque Basin owned by a Pueblo or held by the United States for the benefit of any of the Pueblos; and

(8) all rights, remedies, privileges, immunities, powers and claims not specifically waived and released pursuant to this title or the Settlement Agreement.

(d) EFFECT.—Nothing in the Settlement Agreement or this title—

H. R. 4783—93

(1) affects the ability of the United States acting in its sovereign capacity to take actions authorized by law, including any laws relating to health, safety, or the environment, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.), the Safe Drinking Water Act (42 U.S.C. 300f et seq.), the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.), the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.), and the regulations implementing those laws;

(2) affects the ability of the United States to take actions acting in its capacity as trustee for any other Indian tribe or allottee; or

(3) confers jurisdiction on any State court to—

(A) interpret Federal law regarding health, safety, or the environment or determine the duties of the United States or other parties pursuant to such Federal law; or

(B) conduct judicial review of Federal agency action;

(e) TOLLING OF CLAIMS.—

(1) IN GENERAL.—Each applicable period of limitation and time-based equitable defense relating to a claim described in this section shall be tolled for the period beginning on the date of enactment of this Act and ending on June 30, 2021.

(2) EFFECT OF SUBSECTION.—Nothing in this subsection revives any claim or tolls any period of limitation or time-based equitable defense that expired before the date of enactment of this Act.

(3) LIMITATION.—Nothing in this section precludes the tolling of any period of limitations or any time-based equitable defense under any other applicable law.

## SEC. 625. EFFECT.

Nothing in this title or the Settlement Agreement affects the land and water rights, claims, or entitlements to water of any Indian tribe, pueblo, or community other than the Pueblos.

## SEC. 626. ANTIDEFICIENCY.

The United States shall not be liable for any failure to carry out any obligation or activity authorized by this title (including any such obligation or activity under the Settlement Agreement) if adequate appropriations are not provided expressly by Congress to carry out the purposes of this title in the Reclamation Water Settlements Fund established under section 10501 of Public Law 111–11 or the "Emergency Fund for Indian Safety and Health" established by section 601(a) of the Tom Lantos and Henry J. Hyde United States Global Leadership Against HIV/AIDS, Tuberculosis, and Malaria Reauthorization Act of 2008 (25 U.S.C. 443c(a)).

# TITLE VII—RECLAMATION WATER SETTLEMENTS FUND

## SEC. 701. MANDATORY APPROPRIATION.

(a) IN GENERAL.—Notwithstanding any other provision of law, out of any funds in the Treasury not otherwise appropriated, for each of fiscal years 2012 through 2014, the Secretary of the Treasury shall transfer to the Secretary of the Interior $60,000,000

for deposit in the Reclamation Water Settlements Fund established in section 10501 of Public Law 111–11.

(b) RECEIPT AND ACCEPTANCE.—Starting in fiscal year 2012, the Secretary of the Interior shall be entitled to receive, shall accept, and shall use to carry out subtitle B of title X of Public Law 111–11 the funds transferred under subsection (a), without further appropriation, to remain available until expended.

# TITLE VIII—GENERAL PROVISIONS

## Subtitle A—Unemployment Compensation Program Integrity

### SEC. 801. COLLECTION OF PAST-DUE, LEGALLY ENFORCEABLE STATE DEBTS.

(a) UNEMPLOYMENT COMPENSATION DEBTS.—Section 6402(f) of the Internal Revenue Code of 1986 is amended—

(1) in the heading, by striking "RESULTING FROM FRAUD";

(2) by striking paragraphs (3) and (8) and redesignating paragraphs (4) through (7) as paragraphs (3) through (6), respectively;

(3) in paragraph (3), as so redesignated—

(A) in subparagraph (A), by striking "by certified mail with return receipt";

(B) in subparagraph (B), by striking "due to fraud" and inserting "is not a covered unemployment compensation debt";

(C) in subparagraph (C), by striking "due to fraud" and inserting " is not a covered unemployment compensation debt"; and

(4) in paragraph (4), as so redesignated—

(A) in subparagraph (A)—

(i) by inserting "or the person's failure to report earnings" after "due to fraud"; and

(ii) by striking "for not more than 10 years"; and

(B) in subparagraph (B)—

(i) by striking "due to fraud"; and

(ii) by striking "for not more than 10 years".

(b) EFFECTIVE DATE.—The amendments made by this section shall apply to refunds payable under section 6402 of the Internal Revenue Code of 1986 on or after the date of the enactment of this Act.

### SEC. 802. REPORTING OF FIRST DAY OF EARNINGS TO DIRECTORY OF NEW HIRES.

(a) ADDITION OF REQUIREMENT.—Section 453A(b)(1)(A) of the Social Security Act (42 U.S.C. 653a(b)(1)(A)) is amended by inserting "the date services for remuneration were first performed by the employee," after "of the employee,".

(b) CONFORMING AMENDMENT REGARDING REPORTING FORMAT AND METHOD.—Section 453A(c) of the Social Security Act (42 U.S.C. 653a(c)) is amended by inserting ", to the extent practicable," after "Each report required by subsection (b) shall".

(c) EFFECTIVE DATE.—

H. R. 4783—95

(1) IN GENERAL.—Subject to paragraph (2), the amendments made by this section shall take effect 6 months after the date of the enactment of this Act.

(2) COMPLIANCE TRANSITION PERIOD.—If the Secretary of Health and Human Services determines that State legislation (other than legislation appropriating funds) is required in order for a State plan under part D of title IV of the Social Security Act to meet the additional requirements imposed by the amendment made by subsection (a), the plan shall not be regarded as failing to meet such requirements before the first day of the second calendar quarter beginning after the close of the first regular session of the State legislature that begins after the effective date of such amendment. If the State has a 2-year legislative session, each year of the session is deemed to be a separate regular session of the State legislature.

## Subtitle B—TANF

### SEC. 811. EXTENSION OF THE TEMPORARY ASSISTANCE FOR NEEDY FAMILIES PROGRAM.

(a) IN GENERAL.—Activities authorized by part A of title IV and section 1108(b) of the Social Security Act (other than the Emergency Contingency Fund for State Temporary Assistance for Needy Families Programs established under subsection (c) of section 403 of such Act) shall continue through September 30, 2011, in the manner authorized for fiscal year 2010, and out of any money in the Treasury of the United States not otherwise appropriated, there are hereby appropriated such sums as may be necessary for such purpose. Grants and payments may be made pursuant to this authority on a quarterly basis through fiscal year 2011 at the level provided for such activities for the corresponding quarter of fiscal year 2010, except that—

(1) in the case of healthy marriage promotion and responsible fatherhood grants under section 403(a)(2) of such Act, such grants and payments shall be made in accordance with the amendments made by subsection (b) of this section;

(2) in the case of supplemental grants under section 403(a)(3) of such Act—

(A) such grants and payments for the period beginning on October 1, 2010, and ending on December 3, 2010, shall not exceed the level provided for such grants and payments under the Continuing Appropriations Act, 2011; and

(B) such grants and payments for the period beginning on December 4, 2010, and ending on June 30, 2011, shall not exceed the amount equal to the difference between $490,000,000 and such sums as are necessary for amounts obligated under section 403(b) of the Social Security Act on or after October 1, 2010, and before the date of enactment of this Act; and

(3) in the case of the Contingency Fund for State Welfare Programs established under section 403(b) of such Act, grants and payments may be made in the manner authorized for fiscal year 2010 through fiscal year 2012, in accordance with the amendments made by subsection (c) of this section.

H. R. 4783—96

(b) HEALTHY MARRIAGE PROMOTION AND RESPONSIBLE FATHERHOOD GRANTS.—Section 403(a)(2) of the Social Security Act (42 U.S.C. 603(a)(2)) is amended—

(1) in subparagraph (A)—

(A) in clause (i), by striking "and (C)" and inserting ", (C), and (E)";

(B) in clause (ii), in the matter preceding subclause (I), by inserting "(or, in the case of an entity seeking funding to carry out healthy marriage promotion activities and activities promoting responsible fatherhood, a combined application that contains assurances that the entity will carry out such activities under separate programs and shall not combine any funds awarded to carry out either such activities)" after "an application"; and

(C) in clause (iii), by striking subclause (III) and inserting the following:

"(III) Marriage education, marriage skills, and relationship skills programs, that may include parenting skills, financial management, conflict resolution, and job and career advancement.";

(2) in subparagraph (C)(i), by striking "$50,000,000" and inserting "$75,000,000";

(3) by striking subparagraph (D) and inserting the following:

"(D) APPROPRIATION.—Out of any money in the Treasury of the United States not otherwise appropriated, there are appropriated for fiscal year 2011 for expenditure in accordance with this paragraph—

"(i) $75,000,000 for awarding funds for the purpose of carrying out healthy marriage promotion activities; and

"(ii) $75,000,000 for awarding funds for the purpose of carrying out activities promoting responsible fatherhood.

If the Secretary makes an award under subparagraph (B)(i) for fiscal year 2011, the funds for such award shall be taken in equal portion from the amounts appropriated under clauses (i) and (ii)."; and

(4) by adding at the end the following:

"(E) PREFERENCE.—In awarding funds under this paragraph for fiscal year 2011, the Secretary shall give preference to entities that were awarded funds under this paragraph for any prior fiscal year and that have demonstrated the ability to successfully carry out the programs funded under this paragraph.".

(c) CONTINGENCY FUND.—Section 403(b)(2) of the Social Security Act (42 U.S.C. 603(b)(2)), as amended by section 131(b)(2)(A) of the Continuing Appropriations Act, 2011, is amended—

(1) by striking "$506,000,000" and inserting "such sums as are necessary for amounts obligated on or after October 1, 2010, and before the date of enactment of the Claims Resolution Act of 2010,"; and

(2) by striking ", reduced" and all that follows up to the period.

(d) CONFORMING AMENDMENTS.—Section 403(a)(3) of the Social Security Act (42 U.S.C. 603(a)(3)), as amended by section 131(b)(1) of the Continuing Appropriations Act, 2011, is amended—

H. R. 4783—97

(1) in subparagraph (F)—
    (A) by inserting "(or portion of a fiscal year)" after "a fiscal year"; and
    (B) by inserting "(or portion of the fiscal year)" after "the fiscal year" each place it appears; and
(2) by striking clause (ii) of subparagraph (H) and inserting the following:
            "(ii) subparagraph (G) shall be applied as if 'fiscal year 2011' were substituted for 'fiscal year 2001';".

### SEC. 812. MODIFICATIONS TO TANF DATA REPORTING.

(a) IN GENERAL.—Section 411 of the Social Security Act (42 U.S.C. 611) is amended by adding at the end the following new subsection:

"(c) PRE-REAUTHORIZATION STATE-BY-STATE REPORTS ON ENGAGEMENT IN ADDITIONAL WORK ACTIVITIES AND EXPENDITURES FOR OTHER BENEFITS AND SERVICES.—

"(1) STATE REPORTING REQUIREMENTS.—

"(A) REPORTING PERIODS AND DEADLINES.—Each eligible State shall submit to the Secretary the following reports:

"(i) MARCH 2011 REPORT.—Not later than May 31, 2011, a report for the period that begins on March 1, 2011, and ends on March 31, 2011, that contains the information specified in subparagraphs (B) and (C).

"(ii) APRIL-JUNE, 2011 REPORT.—Not later than August 31, 2011, a report for the period that begins on April 1, 2011, and ends on June 30, 2011, that contains with respect to the 3 months that occur during that period—

            "(I) the average monthly numbers for the information specified in subparagraph (B); and

            "(II) the information specified in subparagraph (C).

"(B) ENGAGEMENT IN ADDITIONAL WORK ACTIVITIES.—

"(i) With respect to each work-eligible individual in a family receiving assistance during a reporting period specified in subparagraph (A), whether the individual engages in any activities directed toward attaining self-sufficiency during a month occurring in a reporting period, and if so, the specific activities—

"(I) that do not qualify as a work activity under section 407(d) but that are otherwise reasonably calculated to help the family move toward self-sufficiency; or

"(II) that are of a type that would be counted toward the State participation rates under section 407 but for the fact that—

            "(aa) the work-eligible individual did not engage in sufficient hours of the activity;

            "(bb) the work-eligible individual has reached the maximum time limit allowed for having participation in the activity counted toward the State's work participation rate; or

H. R. 4783—98

"(cc) the number of work-eligible individuals engaged in such activity exceeds a limitation under such section.

"(ii) Any other information that the Secretary determines appropriate with respect to the information required under clause (i), including if the individual has no hours of participation, the principal reason or reasons for such non-participation.

"(C) EXPENDITURES ON OTHER BENEFITS AND SERVICES.—

"(i) Detailed, disaggregated information regarding the types of, and amounts of, expenditures made by the State during a reporting period specified in subparagraph (A) using—

"(I) Federal funds provided under section 403 that are (or will be) reported by the State on Form ACF–196 (or any successor form) under the category of other expenditures or the category of benefits or services provided in accordance with the authority provided under section 404(a)(2); or

"(II) State funds expended to meet the requirements of section 409(a)(7) and reported by the State in the category of other expenditures on Form ACF–196 (or any successor form).

"(ii) Any other information that the Secretary determines appropriate with respect to the information required under clause (i).

"(2) PUBLICATION OF SUMMARY AND ANALYSIS OF ENGAGEMENT IN ADDITIONAL ACTIVITIES.—Concurrent with the submission of each report required under paragraph (1)(A), an eligible State shall publish on an Internet website maintained by the State agency responsible for administering the State program funded under this part (or such State-maintained website as the Secretary may approve)—

"(A) a summary of the information submitted in the report;

"(B) an analysis statement regarding the extent to which the information changes measures of total engagement in work activities from what was (or will be) reported by the State in the quarterly report submitted under subsection (a) for the comparable period; and

"(C) a narrative describing the most common activities contained in the report that are not countable toward the State participation rates under section 407.

"(3) APPLICATION OF AUTHORITY TO USE SAMPLING.— Subparagraph (B) of subsection (a)(1) shall apply to the reports required under paragraph (1) of this subsection in the same manner as subparagraph (B) of subsection (a)(1) applies to reports required under subparagraph (A) of subsection (a)(1).

"(4) SECRETARIAL REPORTS TO CONGRESS.—

"(A) MARCH 2011 REPORT.—Not later than June 30, 2011, the Secretary shall submit to Congress a report on the information submitted by eligible States for the March 2011 reporting period under paragraph (1)(A)(i). The report shall include a State-by-State summary and analysis of such information, identification of any States with missing or incomplete reports, and recommendations for such

administrative or legislative changes as the Secretary determines are necessary to require eligible States to report the information on a recurring basis.

"(B) APRIL–JUNE, 2011 REPORT.—Not later than September 30, 2011, the Secretary shall submit to Congress a report on the information submitted by eligible States for the April-June 2011 reporting period under paragraph (1)(A)(ii). The report shall include a State-by-State summary and analysis of such information, identification of any States with missing or incomplete reports, and recommendations for such administrative or legislative changes as the Secretary determines are necessary to require eligible States to report the information on a recurring basis

"(5) AUTHORITY FOR EXPEDITIOUS IMPLEMENTATION.—The requirements of chapter 5 of title 5, United States Code (commonly referred to as the 'Administrative Procedure Act') or any other law relating to rulemaking or publication in the Federal Register shall not apply to the issuance of guidance or instructions by the Secretary with respect to the implementation of this subsection to the extent the Secretary determines that compliance with any such requirement would impede the expeditious implementation of this subsection.".

(b) APPLICATION OF PENALTY FOR FAILURE TO FILE REPORT.—

(1) IN GENERAL.—Section 409(a)(2) of such Act (42 U.S.C. 609(a)(2)) is amended—

(A) by redesignating subparagraphs (A) and (B) as clauses (i) and (ii), respectively,

(B) by inserting before clause (i) (as redesignated by paragraph (1)), the following:

"(A) QUARTERLY REPORTS.—";

(C) in clause (ii) of subparagraph (A) (as redesignated by paragraphs (1) and (2)), by striking "subparagraph (A)" and inserting "clause (i)"; and

(D) by adding at the end the following:

"(B) REPORT ON ENGAGEMENT IN ADDITIONAL WORK ACTIVITIES AND EXPENDITURES FOR OTHER BENEFITS AND SERVICES.—

"(i) IN GENERAL.—If the Secretary determines that a State has not submitted the report required by section 411(c)(1)(A)(i) by May 31, 2011, or the report required by section 411(c)(1)(A)(ii) by August 31, 2011, the Secretary shall reduce the grant payable to the State under section 403(a)(1) for the immediately succeeding fiscal year by an amount equal to not more than 4 percent of the State family assistance grant.

"(ii) RESCISSION OF PENALTY.—The Secretary shall rescind a penalty imposed on a State under clause (i) with respect to a report required by section 411(c)(1)(A) if the State submits the report not later than—

"(I) in the case of the report required under section 411(c)(1)(A)(i), June 15, 2011; and

"(II) in the case of the report required under section 411(c)(1)(A)(ii), September 15, 2011.

"(iii) PENALTY BASED ON SEVERITY OF FAILURE.— The Secretary shall impose a reduction under clause

(i) with respect to a fiscal year based on the degree of noncompliance.".

(2) APPLICATION OF REASONABLE CAUSE EXCEPTION.—Section 409(b)(2) of such Act (42 U.S.C. 609(b)(2)) is amended by inserting before the period the following: "and, with respect to the penalty under paragraph (2)(B) of subsection (a), shall only apply to the extent the Secretary determines that the reasonable cause for failure to comply with a requirement of that paragraph is as a result of a one-time, unexpected event, such as a widespread data system failure or a natural or man-made disaster".

(3) NONAPPLICATION OF CORRECTIVE COMPLIANCE PLAN PROVISIONS.—Section 409(c)(4) of such Act (42 U.S.C. 609(c)(4)) is amended by inserting "(2)(B)," after "paragraph".

# Subtitle C—Customs User Fees; Continued Dumping and Subsidy Offset

### SEC. 821. CUSTOMS USER FEES.

Section 13031(j)(3) of the Consolidated Omnibus Budget Reconciliation Act of 1985 (19 U.S.C. 58c(j)(3)) is amended—

(1) in subparagraph (A), by striking "December 10, 2018" and inserting "September 30, 2019"; and

(2) in subparagraph (B)(i), by striking "November 30, 2018" and inserting "September 30, 2019".

### SEC. 822. LIMITATION ON DISTRIBUTIONS RELATING TO REPEAL OF CONTINUED DUMPING AND SUBSIDY OFFSET.

Notwithstanding section 1701(b) of the Deficit Reduction Act of 2005 (Public Law 109–171; 120 Stat. 154 (19 U.S.C. 1675c note)) or any other provision of law, no payments shall be distributed under section 754 of the Tariff Act of 1930, as in effect on the day before the date of the enactment of such section 1701, with respect to the entries of any goods that are, on the date of the enactment of this Act—

(1) unliquidated; and

(2)(A) not in litigation; or

(B) not under an order of liquidation from the Department of Commerce.

# Subtitle D—Emergency Fund for Indian Safety and Health

### SEC. 831. EMERGENCY FUND FOR INDIAN SAFETY AND HEALTH.

Section 601 of the Tom Lantos and Henry J. Hyde United States Global Leadership Against HIV/ AIDS, Tuberculosis, and Malaria Reauthorization Act of 2008 (25 U.S.C. 443c) is amended—

(1) in subsection (b)(1), by striking "$2,000,000,000" and inserting "$1,602,619,000"; and

(2) in subsection (f)(2)(B), by striking "50 percent" and inserting "not more than $602,619,000".

# Subtitle E—Rescission of Funds From WIC Program

**SEC. 841. RESCISSION OF FUNDS FROM WIC PROGRAM.**

Notwithstanding any other provision of law, of the amounts made available in appropriations Acts to provide grants to States under the special supplemental nutrition program for women, infants, and children established by section 17 of the Child Nutrition Act of 1966 (42 U.S.C. 1786), $562,000,000 is rescinded.

# Subtitle F—Budgetary Effects

**SEC. 851. BUDGETARY EFFECTS.**

The budgetary effects of this Act, for the purpose of complying with the Statutory Pay-As-You-Go-Act of 2010, shall be determined by reference to the latest statement titled "Budgetary Effects of PAYGO Legislation" for this Act, submitted for printing in the Congressional Record by the Chairman of the Senate Budget Committee, provided that such statement has been submitted prior to the vote on passage.

*Speaker of the House of Representatives.*

*Vice President of the United States and*
*President of the Senate.*