UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


ON THE OCCASION OF THE PORTRAIT PRESENTATION CEREMONY FOR


THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE


DECEMBER 8, 2009

CEREMONIAL COURTROOM
E. BARRETT PRETTYMAN UNITED STATES COURTHOUSE
WASHINGTON, D.C.

# P R O C E E D I N G S

CHIEF JUDGE LAMBERTH:  Good afternoon, ladies and gentlemen.  I'm Royce Lamberth, Chief Judge of the United States District Court for the District of Columbia, and it's my pleasure to welcome all of you here today.  The Court has convened this day for the purpose of receiving the portrait of our colleague, Judge James Robertson.

Before we begin, it's my pleasure to recognize the judges here today from the United States Court of Appeals for the D.C. Circuit, including our chief judge, Judge Tatel, and his colleagues; our colleagues from the D.C. Superior Court and the D.C. Court of Appeals; our special guest, the Attorney General of the United States, Eric Holder.  I also want to welcome those who regularly appear before Judge Robertson: From the U.S. Attorney's Office, Channing Phillips, our acting United States Attorney and his assistants; the Federal Public Defender, A.J. Kramer and his assistants; the CJA Defense Bar; and the D.C. Attorney General's Office.

We welcome Judge Robertson's colleagues from the D.C. bar, the Council For Court Excellence, the Historical Society for the D.C. Circuit, the American College of Trial Lawyers, the Lawyers Committee For Civil Rights and Urban Affairs, the Princeton class of 1959, and especially those here from Judge Robertson's former law firm, Wilmer, Cutler, Pickering, Hale & Dorr.

Also here from two very powerful Washington institutions that fly beneath the radar are a group of women known only as the Farm Ladies, and all the members of the Oberdorfer Historical Salon, also known as the Book Club.  Thank you all for coming.

I'm pleased especially to recognize Judge Robertson's family, who are here today.  Among those present are his wife Berit.  Where is she?  There she is, okay.  Their daughter Catherine, and her husband Adam Thurschwell; their grandchildren, Walter and Sophie Thurschwell; Judge Robertson's sister, Ellen Wallace, and her husband Dr. Donald Wallace; the Wallaces' daughter, Sarah Clark, and her husband Knox; and their son Donald Wallace, with his wife Laura and their brand new baby Josie.  We welcome all of you to the court.

Finally, I would like to recognize in the courtroom the present and former law clerks of Judge Robertson, as well as the members of his staff, including his wonderful judicial assistant Marlene Taylor.  And of course I would like to recognize the artist, Ms. Annette Polan.  Thank you all for coming.

As I mentioned, we're here today to receive the portrait of Judge Robertson and to hear from a few of his friends and colleagues about the kind of man and judge he is. As chief judge, I can tell you I couldn't have hoped for a finer colleague to join me on this bench.  Judge Robertson's reputation for fairness and integrity is well known and well

deserved.  He's also one of the hardest working judges on our court, always willing to help out a colleague or take on a project that he thought would improve the judiciary.

A perfect example is the news that came out just a few hours ago.  It gives me great pleasure to announce that on the very day of his portrait ceremony, Jim has brought the intractable Cobell Indian Trust litigation to settlement.

(Applause.)

Under the terms of the settlement, the government will create a $1.4 billion accounting trust administration fund and a $2 billion trust land consolidation fund.  The settlement also creates a federal Indian education scholarship fund of up to $60 million to improve access to higher education for Indian youth.

The settlement also includes a commitment by the federal government to appoint a commission that will oversee and monitor specific improvements in the Department of Interior's accounting for and management of individual Indian trust assets going forward.  As someone intimately familiar with the case, I can tell you that Jim deserves a world of thanks for his tenacity and hard work in bringing this case to a resolution. This is a great day for America and a great day for all Native Americans.

Jim accomplished what I couldn't accomplish in over 10 years of trying, and that is to preside over a settlement of

one of the most complicated and difficult cases to ever be litigated in this court.  Attorney General Holder and Associate Attorney General Tom Perrelli, who negotiated this settlement, are here.

Also present is Eloise Cobell, the representative of the hundreds of thousands of Indian class members who will benefit from this settlement, along with her attorneys, Dennis Gingold, Thaddeus Holt, Keith Harper, Bill Doris, David Smith, Elliott Levitas, and others from the Kilpatrick Stockton law firm.  We're delighted that all of you could join us here today, and we commend you for all your hard work in making this settlement.

The settlement was a long time coming, and could not have been accomplished without the efforts of Jim Robertson.  It's a settlement that should be approved by Congress, as it has to be.  And I'm sure, after a fairness hearing, it can be approved by Jim as a fair and equitable settlement for Native Americans as well as the American people.  I have to say that I have great admiration for Eloise Cobell and her team of lawyers, who spent year after year to accomplish what was announced today.

I also have to say that this Obama administration and this attorney general and associate attorney general have accomplished something that I dreamt about but was never sure would really happen.  I offer my hardiest congratulations to all

==of you, but especially to Jim Robertson, without whom I doubt
this could have been done.==

At this time I would like to recognize our first
speaker, our colleague, the Honorable Ellen S. Huvelle.

JUDGE HUVELLE:  Good afternoon.  Jim Robertson's
family, friends, his former partners from Wilmer, the
Attorney General of the United States, our colleagues from the
Court of Appeals, judges and members of the District Court
family, I am truly honored to share with you my thoughts about
my friend Jim Robertson.  Of the four judges who will speak this
afternoon, I was chosen to go first because I am the youngest.

(Laughter.)

While Henry, Paul, and David will address Jim's many
accomplishments as a lawyer and as a judge, and his important
contributions these past 16 years to the judiciary and to this
courthouse, I am hoping to paint a portrait of the person who in
my mind is a man for all seasons.

Jim is my next door neighbor on the fourth floor of the
Annex, and over the last 10 years Jeffrey and I have had the
pleasure to spend time with both Jim and Berit on the
Eastern Shore at dinners and bike rides, including occasional
evenings with their gang of Schnapps-drinking Swedes, some of
whom are here today.

When I arrived in the Court in 2000, I was fortunate
enough to be given an office on the sixth floor of this

building, along with Judges Kessler, Friedman, Robertson, and Bryant, an astonishing array of judicial talent. I soon found myself gravitating toward Jim for advice and help, because unlike me, Jim was never hyper, nor was he too busy to talk about a legal problem, since no case was too difficult or too complex for him.

Jim is the only judge I know who is pleased to get a TRO late on a Friday night involving all the major drug manufacturers in this country. And who else among us would have actually volunteered to take the Cobell litigation after more than 10 years of litigation and nine trips to the Court of Appeals?

But nothing seems to faze Jim. He does it all effortlessly. My former partner Jack Vardaman told me this has always been the case. When they practiced law together in the '60s at Wilmer, Jack said about Jim, "He always exuded calm and confidence."

Despite his many talents, Jim is a modest man. When he asked me to speak, he wrote me an e-mail and said, "I am frankly uncomfortable casting myself as the center of any ceremony, but tradition must be served, so I am planning. Even if you are not sure yet whether you have anything nice to say about me, do let me know if December 8th is a problem for you."

It is easy to have nice things to say about Jim, and since his portrait is the reason that we are all here today, I

think it would not be inappropriate for me to remark on his good looks.

(Laughter.)

A surprising number of people comment on this, you know.  Even Tom Hogan said, "Jim is a humble person.  He has never sought recognition for all of his work.  And beyond all that, he looks just like a judge should look."

At a bar convention session on women in the legal profession, according to a *Legal Times* article, Delissa Ridgeway who is now a judge in the court of international trade, pondered the image of a stereotypical Washington lawyer as "Someone who's tall, lanky, good-looking, a former Wilmer partner who is now on the bench."

A courtroom observer who was sent to critique Jim on behalf of the Council For Court Excellence said, "Judge Robertson could be a model for a good movie judge."  But this observer was no shrinking violet, because she went on to criticize him for eating as he was stepping away from the podium, and gave him an 8.8 out of a 10 for time management, noting that he had been 20 minutes late coming on the bench.

Now, about five years ago some of the female law clerks in the courthouse went beyond comment to consider nominating Jim for the Super Hottie of the Federal Judiciary.

(Laughter.)

For those who don't know, this is the Article III

analogue to *People* magazine's 50 Most Beautiful People.
Unfortunately, Jim declined the opportunity to participate in a
beauty contest run by the blog "Underneath Their Robes;"
thereby, he permitted the honor to go to Judge Alex Kozinski of
the 9th Circuit.

(Laughter.)

I looked at Jim's latest profile in the *Almanac of the
Federal Judiciary*, which quotes lawyers who have appeared in
front of him.  One says, "He's a bit too liberal for me, but a
good guy who wants to do the right thing."  Another observes,
"He's very conservative, but both sides get a fair shake."  And
the third says, "He is one of the more respected judges, but not
my first choice."

But among his colleagues I can honestly say Jim is
their first choice.  When he was sworn in as a District Court
judge on January 4th, 1995, his old friend and mentor
Judge Lou Oberdorfer, who quoted Judge Krantz, correctly
predicted that "No one would be better equipped than Jim by
profession, skill, experience, and demonstrated courage to
calmly poise the scales of justice in times of commotion."
These have proved to be times of commotion, but Jim has
administered justice, in the words of Judge Krantz, "Undisturbed
by the clamor of the multitude."

Above all, Jim has a deep respect for our legal system
and is eloquent in praising it.  He has written, "We live in a

free country, our liberties are manifold and are the envy of the world.  In the very top tier of those liberties, enshrined in the First Amendment, is the right of the people to petition the government for a redress of grievances.  Many of those petitions are presented to judges, and most will agree that it is important at least to listen to them, especially to the grievances of poor petitioners, disadvantaged petitioners, or those who do not have lawyers, even if the courts are powerless to grant relief."

He believes strongly that the courts should resolve important disputes, that they should be resolved fairly and expeditiously, and that judges should not allow the process to disintegrate into needless discovery, wasteful motions practice, or bickering among lawyers.  As he observed in one order, in response to a motion for sanctions, "The phrase *o tempora o mores* is a lament, not a prescription for behavior.  Straw man, bootstraps, and ad hominem attacks from either direction are out of order in this court."

In another, he ruled that a "Plaintiff's motion for extension of time in which to respond to defendant's sanction motion is stricken.  No sanctions motion has been filed. First-strike capability is a geopolitical concept unknown to the practice of litigation in the federal courts."

(Laughter.)

In another order that was widely reported in the press,

he described a dispute between the lawyers as "A heated exchange that betrays a startling lack of sense of humor or sense of proportion, or both."  And he ordered the parties to, quote, "lighten up."

Just recently Jim took defense counsel to task for abusing the process, stating, "Such a litigation strategy, run it to the sidelines and then kick the can down the road, deserves neither respect nor support from the Court."

Although Jim has great respect for the system of justice, he never takes himself too seriously.  Not long ago he was asked by a lawyer when they could expect an opinion.  Jim indicated that his response should be off the record, but his trusty reporter Rebecca kept on transcribing.

Jim then asked his law clerk if the motion was publicly reportable on the upcoming Civil Justice Reform Act, or CJRA, list of ancient motions.  When the law clerk shook her head, Jim announced that his opinion would be issued after March 30th, explaining to the bewildered lawyer that "Twice a year we have to report all our open motions to Congress.  That's why you'll see everyone burning the midnight oil around here right before March 30th and September 30th.  So my advice to all of you is, if you ever get an opinion on September 30th or March 30th, appeal it."

(Laughter.)

Finally, when talking to defense counsel regarding an

upcoming plea, he explained that he would keep the case, "it's just another judge who will take the plea.  Would you like to do it that way," he asked the lawyer.  She responded, "My concern, I guess, Your Honor, was that the judge who would accept the plea would also be sentencing."  To which Judge Robertson said, "You just want lenient old Robertson.  Isn't that right?"

Now, true to form this year, Jim issued another worthy opinion involving the question of whether President Obama is a natural born citizen, and thus qualified under the Constitution to be president.  In rejecting the claim, Judge Robertson recognized that, quote, "Many people, perhaps as many as a couple of dozen, feel deeply about this issue."

I have every confidence that the portrait we're about to see will capture Jim's good looks.  And I know whenever his colleagues will see it, they will be reminded of Jim's keen intellect, his many witticisms, and the generous friendship that he has shown to all of us over these many years.

(Applause.)

CHIEF JUDGE LAMBERTH:  Thank you very much, Judge Huvelle.

It's my pleasure to introduce our next distinguished speaker, another of our colleagues, the honorable Henry H.  Kennedy, Junior.  While he's coming down, if those standing in the back, Tom and others, want to come up, you can fill up this other jury box.  It's empty, and those who'd like

to have a seat, come on up.

JUDGE KENNEDY:  Friends and family of James Robertson and colleagues, it's not often that a judge has an opportunity to speak publicly of his admiration and respect for a judicial colleague.  When one gets that rare chance, such as when a colleague's portrait is added to the walls of this grand ceremonial courtroom, it is an opportunity to be seized.  I'm very pleased to have this opportunity.

My friendship with Jim Robertson is rooted in this courthouse.  Before I began my service on this court, I knew Jim only distantly.  I knew that he had made a name for himself in private practice, knew that he had done impressive work as a civil rights lawyer, knew that he was very active in the D.C. bar, eventually becoming its president.  But my first direct contact with Jim dates from the period soon after I joined this court.

In addition to his most cordial words of welcome, I remember well when Jim and Berit opened up their home for a festive event to welcome the two new judges who joined the court in 1997, Judge Kollar-Kotelly and myself.  I recall thinking then that Jim Robertson would be someone for whom collegiality was not just a spoken aspiration, but a truly important goal worthy of time and effort.  Jim did not disappoint.

Over the years, as every judge on the court can attest, Jim has done things big and small to foster a spirit of

collegiality, and has enhanced the gratification that a judge gets from serving on this court.  He does not hesitate to share his views on all manner of subjects and topics of interest, and never hesitates to take on responsibilities that are unique and challenging.

One project that Jim undertook, the On-Line System For Clerkship Application and Review, known in judicial and law school circles as OSCAR, has been a tremendous benefit not only to the judiciary but to the thousands of people involved in the clerkship application process each year.  Jim had a vision of an electronic system for clerkship applications through which applicants could send their judges their applications, law professors and recommenders could submit their recommendations, and judges could sort through the hundreds of applications they receive each year.

People have good ideas every day, but it takes an innovative and committed person like James Robertson to turn a good idea into a reality.  He formed a group of judges to evaluate different options, led an initiative to get a grant from the Administrative Office of the United States Courts, and worked with the group to develop the technology.  As a result of his efforts, in a few short years OSCAR is used by over 65 percent of all federal judges.

I don't think I could overstate how OSCAR has transformed for the better the clerkship application process.

When you consider that OSCAR handled over 400,000 applications in 2009, the amount of time, paper, and postage spared is staggering, as is the number of people who will benefit from Jim Robertson's persistence and hard work on this project in the years to come.

Spearheading OSCAR is only one of the many projects Jim has undertaken to serve the needs of this court and the federal judicial system.  He has served on and led important court committees, and committees on the Judicial Conference of the United States.  His committee memberships include the Judicial Conference Committee on Information and Technology, serving as its chair from 2003 through 2005; the Electronic Case Filing Committee; the Information and Technology Committee; and the Long Range Planning, Space, and Facilities Committee, during which as its chair he did much of the heavy lifting and consulting with the architects and builders of the addition to this courthouse that we know as the annex.  He is almost single-handedly responsible for the beautiful tapestry that hangs in the dining room that commemorates the professional life of Judge William Bryant, our beloved former colleague for whom the annex is named.  And, of course, Jim was a member of the Foreign Intelligence Surveillance Court.

What is so impressive is that Jim pursued these projects, all the while bringing an exemplary professionalism to the difficult craft of judging.  Part of that job, as you know,

entails communicating the rationale for decisions we make.  And as any judge will tell you, often the most trying thing that we do is not arriving at a decision, but rather explaining it.

Jim Robertson is an excellent explainer.  He sets forth the basis of his rulings clearly, candidly, and with nuance and grace.  Behind his smooth writing that is a delight to read, there's a great deal of old-fashioned elbow grease and persistent effort.  Jim, I applaud that effort.  It has not only been conducive to the development of good law, it has been an inspiration to others.  I know that your evident devotion to your craft has been an inspiration to me.

In addition to being a skilled, hardworking, and eloquent jurist, Jim Robertson is also blessed with good judgment and the courage and confidence to exercise that judgment in the face of daunting public scrutiny.  The ruling of Jim's that immediately comes to mind on this score is *Hamdan vs. Rumsfeld*.  The basic issue in that volatile, complex case was whether the defendant, Salim Hamdan, a detainee at Guantanamo Bay, could be tried before a military commission.  Finding that a military commission was not approved by Congress, could not lawfully try him, Judge Robertson issued a writ of habeas corpus to Hamdan.  A unanimous Court of Appeals reversed Judge Robertson, and a divided Supreme Court, however, upheld his decision.

After the Supreme Court remanded the case to

Judge Robertson, he continued to address thorny jurisdictional issues raised by this and subsequent Supreme Court rulings, and by new legislation enacted by Congress.  Each time Judge Robertson revisited the case, his rulings managed to explain the intricate legal landscape and to articulate his holdings in the characteristic elegant and clear style for which he is known.

The import of the *Hamdan* case expands beyond its immediate holding, with repercussions on issues such as separation of powers and checks and balances.  But here is not the place to reprise the complicated welter of contending arguments that arose from that case.  Reasonable people did and do disagree about the outcome of the case.  More important than the debate it raised, however, is that even those that disagree should recognize that the conclusion that Judge Robertson reached and the way he reached it brings honor to him, his office, and, by reflection, to the entire federal judiciary.

When I mention the *Hamdan* case, it is natural that I mention a connection that Jim and I have for which I know we are both proud.  That connection is to our alma mater, Princeton University.  And I know that Jim would want me to mention the connection that we both have as well with our former colleague and friend Oliver Gasch, who also went to Princeton and whose portrait is hanging on the wall in front of me.

Now, you doubtless ask for the connection between

*Hamdan* and Princeton.  Yes, you do.  And I admit that the
connection certainly is not a strong one.  But to me, the motto
of Princeton University, "In the nation's service and in the
service of all nations," was played out perfectly by James in
his handling of the *Hamdan* case and other cases as well.

Speaking of Princeton, I decided that I would do a bit
of research into the archives of the university to learn a
little about what our James Robertson was like as a college
student.  And here I would like to acknowledge the help of one
of Jim's classmates, Jay Siegel.  Now, Jim, don't be nervous up
there.  I won't tell it all.

I can't say that I'm surprised by what I found,
however.  By any reasonable assessment, James Robertson was a
straight arrow.  From the 1959 *Nassau Herald*, Princeton's
yearbook, we learned that James majored in the Woodrow Wilson
school, that the topic of his senior thesis was -- and isn't
this interesting.  The title was "Trial by Newspaper." And that
he served as battalion executive officer of the Navy Reserve
Officer Training Corps.

I also was not at all surprised to read what our
James Robertson wrote in his 25th reunion yearbook, 25 years
ago.  Speaking of his own view of the world and how he fit in to
it, James ended his statement this way:  "25 years have made me
less of a liberal but more of a democrat, small D, than I was as
a student.  I am deeply concerned about the preoccupation of

America's best minds with money, tax shelters, and deals that
create profit from intangibles without producing anything.  The
personal quality I have come to admire and value in others, many
of them my classmates, is day-in, day-out, long-haul,
goal oriented, old-fashioned consistency of effort."

Jim, on this day, on the day that your portrait is
unveiled, I believe all who know you, and certainly your
colleagues on this court, admire your many wonderful traits and
values, but none more than your day-in, day-out, long-haul,
goal-oriented, old-fashioned consistency of effort.
Congratulations on all that you have done, and all the best in
the future.

(Applause.)

CHIEF JUDGE LAMBERTH:  Thank you very much,
Judge Kennedy.

The last of our colleagues to speak will be the
Honorable Judge Paul L. Friedman.

JUDGE FRIEDMAN:  Chief Judge Lamberth, my colleagues on
the District Court, Chief Judge Sentelle, judges of the Court of
Appeals, other judges, Mr. Attorney General, Berit and members
of the Robertson family, Marlene, and Judge Robertson's current
and former law clerks, I find myself in the unenviable position
of speaking after Judge Huvelle and Judge Kennedy have already
spoken about Judge Robertson's distinguished judicial career,
and before Judge Tatel speaks about Jim's many contributions to

civil rights and civil liberties.  In fact, I was revising as I listened, sitting up here.

So one wonders, particularly me, what am I doing here? I can't help it, but Admiral Stockdale comes to mind.  It all seemed so logical when -- she didn't say this, but when Judge Huvelle suggested that a fair and objective way to organize today's program was to have the youngest speak first - sorry, David - the oldest speak last, and have each in succession choose the topic for his or her remarks.

Now, the four of us readily agreed, but in retrospect I think I've been had.  It reminds me of the time, and some of you in this courtroom may not be old enough to remember the incident, when Harold Leventhal, Judge Harold Leventhal, decided that the fairest way to assign partners for the tennis tournament at the circuit judicial conference was to do it in alphabetical order.  Harry remembers.  What he well knew at the time, but the rest of us only realized later, that when you did it in alphabetical order, it meant that Judge Leventhal would have Henry Kennedy at his tennis partner.  We all know how that turned out.

(Laughter.)

Still, Judge Huvelle said there would be plenty for me to talk about.  No matter that she and Henry had already talked about the last 15 years of his life; I could talk about Jim's career in the practice of law and as a leader of the bar.  Well,

she was right.  I knew Jim well in those years, and it reminded

me what it was about Jim Robertson that made him one of the

leading litigators and finest lawyers in Washington, and really

one of the most inspirational leaders of our bar.  In fact, as

lawyers, Jim and I had cases with each other and against each

other.

Jim the litigator was a consummate professional, and a

zealous and effective advocate for his clients.  On one

occasion, I'm sorry to report, my side of the litigation pushed

the envelope a little too far.  But Jim, while never losing

sight of his own client's interests, worked hard to smooth over

what could have become a long-lasting rift in important personal

and professional relationships.  I always appreciated that.

Later, when the two of us were vying for a seat on this

court, Jim showed me really what a good and decent person and a

genuine friend he was by the way he conducted himself.  And I'll

always be grateful for the support and compassion he showed me

some years later when I was recuperating at home from a serious

injury.

Now, as D.C. bar president, Jim's lasting contribution

was undoubtedly his initiative to address opportunities for

minorities in the legal profession, and particularly in large

law firms.  Jim enlisted Vernon Jordan to join him in leading a

conference in opportunities for minorities in the legal

profession.  This project made a genuine and permanent

difference in how law firms in our city think about the issues of race, gender, and ethnicity, and it dramatically improved the professional opportunities for minority lawyers, and in turn law firm diversity, in the District of Columbia.

In this and in other efforts Jim ran the bar with his characteristic grace, humor, humility, and purpose. He saw the bar as an agent of change for the good. Through his efforts, both the bar and the profession became more inclusive.

But the year Jim served as bar president was a rough one for the bar. The District of Columbia government had imposed a licensing fee on lawyers which had the effect of the bar losing its funding for pro bono legal services. And the client security fund had to pay out over $200,000 from its limited resources. So when Jim's term ended, members of the board of governors presented him with an artist's caricature, and because of the rough waters and difficult issues that Jim had faced, it showed Robertson crossing the Potomac, reminiscent in his pose of Washington crossing the Delaware.

And foreshadowing things yet to come, the caricature showed Jim, later to become the federal judiciary's resident technophile, holding a laptop as he crossed the Potomac. And in one of Jim's famous sayings, the message on the screen read, "Let's noodle that."

Almost 15 years ago today, at Jim's investiture, one of Jim's great friends and mentors, and a man whom I too greatly

admire, John Pickering, presciently predicted the kind of a judge Jim Robertson would be.  Having practiced with Jim for 30 years, John cataloged the characteristics that he had observed in Jim Robertson the lawyer, and noted that so many of these qualities fit perfectly with the job description of the ideal federal trial judge.

John first said that Jim was a truly outstanding trial lawyer of great ability and dedication who had always shown his commitment to justice and to public service.  But then John got to the heart of the matter.  "Jim Robertson," he said, "was a person of integrity, courage, and compassion, a person with a sense of tolerance and fair play, one who always respected the opinions of others and was open to opposing points of view." Good qualities for a judge.

John spoke too of Jim's extraordinary qualities of heart and mind, and his devotion to the rule of law.  On that same occasion, Jim's close friend Dan Mayers referred to Jim's "curious spirit, his refreshing candor, his generous tolerance for those who differ or don't quite measure up, his complete lack of pretense, and his consistent modesty."

After serving with Judge Robertson on this court for 15 years, I can say without equivocation that John Pickering and Dan Mayers had it exactly right.  As a judge, Jim has demonstrated all of those qualities.  And he has been, as Ellen and Henry have said, a generous and good colleague and friend as

well.

Jim is the leavening voice when things sometimes get a little heated in our monthly judges' meetings, or during the occasional political discussion in the judges' dining room.  And in typical fashion, and it's already been alluded to in reference to the Indian Trust Fund case, which today the Attorney General announced it settled, when that case was remanded by the Court of Appeals with the direction to Chief Judge Hogan to reassign it to a different judge, Jim Robertson volunteered quietly and without fanfare to take on this very time-consuming and difficult assignment.

And when Jim decided that he could no longer in good conscience serve on the Foreign Intelligence Surveillance Court, he told only the presiding judge, Judge Kollar-Kotelly, and her immediate predecessor, Judge Lamberth, of his intention to resign.  He told no one else, but one day he simply sent a one-sentence letter of resignation to the chief justice.  He didn't publicly explain, protest, or complain.  The one-sentence letter was his statement.  This showed the kind of personal integrity and moral compass of which John Pickering and Dan Mayers spoke.

For the first ten years that Jim and I served together on this court, we had chambers right next door to each other, and we saw each other almost every day.  We were two of the new kids on the block, and we frequently bounced ideas off each

other and sought advice from one another.  Jim was always generous with his time and wise with his counsel.

With Judge Kessler, another one of the new kids on the block on our floor, at the other end of the corridor, she and Jim and I were lucky enough to have as our neighbors two of the greatest mentors a new judge could ever hope for, Judge William Bryant and Judge Joyce Hens Green.  Indeed, we had what Judge Bryant once referred to as the best floor in the entire federal judiciary.  And I say that with apologies to all other floors.

And I know I digress, but I'm sure Jim won't mind.  But you know what Judge Robertson and I thought was the very best thing about the very best floor in the federal judiciary?  The ability we had, any time we wanted, to drop by for a chat with Bill Bryant.  There was no better way to get a reality check, to make yourself feel more optimistic about life, or to give you hope for the future, than spending 30 minutes on a dreary afternoon, or on a day when you felt put upon by the lawyers, to stop by and talk to Bill, the man who Judge Hogan has referred to as the soul of our court.  We always learned something about the court, about it's history and personalities, about the law, and most often about life and living it to the fullest.

I know Jim feels, as I do, that we left those sessions with a better understanding of the true meaning of wisdom, and feeling at least a little bit better about our own prospects and

those of mankind.  This is the legacy that Bill Bryant left to

Jim and to my other colleagues and to me, and for that we will

be forever grateful.

So Jim, John Pickering and Bill Bryant would be very

proud today of the judge you have become, one with a reputation

for courage and integrity, intelligence and decisiveness,

compassion and fair play, a judge who demonstrates those

extraordinary qualities of heart, mind, character, and devotion

to the rule of law of which John Pickering and Dan Mayers spoke,

while at the same time retaining your generosity of spirit, your

genuine humility, and your fundamental decency.

Congratulations on the presentation of your portrait to

the court.  We look forward to seeing you in this courthouse,

both in person and on that wall, for many years to come.

(Applause.)

CHIEF JUDGE LAMBERTH:  Thank you very much,

Judge Friedman.

Our next speaker is United States circuit judge and our

good friend, the Honorable David S. Tatel.

JUDGE TATEL:  Chief Judge Lamberth, Judge Robertson,

Attorney General Holder, colleagues, friends.

More than 30 years ago, on October 1st, 1976, Jim

Robertson, then a partner at Wilmer Cutler & Pickering, stood

before the Mississippi Supreme Court in *National Association For

the Advancement of Colored People vs. Claiborne Hardware,* et al.

The case arose in Port Gibson, Mississippi, a small river town made famous in 1863 when General Ulysses S. Grant, advancing towards Jackson, is said to have ordered the Union Army not to destroy the little town because, the general declared, it was too beautiful to burn.

A century later, with the civil rights movement at a critical stage, the NAACP began boycotting Port Gibson's white merchants because of their adamant refusal to hire blacks to work in their stores.  In response to the boycott, and supported by the White Citizen's Council, the 17 merchants, including a gas station, four grocery stores, a pharmacy, a laundry, two car dealers, and a liquor store, sued the NAACP and 146 of its members in the Chancery Court of the First Judicial District of Hinds County, alleging that the boycott violated the state's antitrust law.

Following eight months of trial, the Chancellor agreed, and entered a $1.25 million judgment in favor of the white merchants.  That verdict, and the even larger bond required to appeal, threatened to bankrupt the nation's oldest civil rights organization.

Before the Mississippi Supreme Court, Jim argued, as did I in a parallel suit we had filed in federal court in Oxford, that the verdict and the required bond violated the First Amendment rights of both the NAACP and its members. During the oral argument, the justices asked Jim not one

question, leading him to suspect that he might lose.  He was right.

Two years later, however, a unanimous Supreme Court of the United States reversed.  Echoing precisely what Jim had argued in the Mississippi court, the Supreme Court declared, "Through speech, assembly, and petition, rather than through riot or revolution, the NAACP and its members sought to change a social order that had consistently treated them as second-class citizens."

I have focused on *Claiborne Hardware* because that important case so well reflects Jim's significant civil rights work prior to his appointment to this court.  That work began over a decade earlier when, at the request of Louis Oberdorfer, then co-chair of the Lawyers' Committee For Civil Rights Under Law, Jim, along with his wife Berit and their three small children, moved to Jackson, Mississippi, where Jim became chief counsel of the Lawyers' Committee's Mississippi office.

Here is how Lou, speaking at Jim's investiture in this very courtroom, described the challenges confronting Jim in Mississippi:

Quote:  "Mississippi was a dangerous place for civil rights lawyers.  The Ku Klux Klan was at large, armed, and murderous.  The presiding judge of the federal court in Jackson was openly antagonistic to federal law that mandated changes in Mississippi's way of life.  The bar was hostile or intimidating.

Jim Robertson's friendly but firm diplomacy built a bridge to that local bar.  His mannerly skill as a litigator won the begrudging respect of unfriendly judges.  Jim's years in Mississippi," Louis concluded, "contributed importantly to the difference between Mississippi then and Mississippi now."

Following his two years in Jackson, Jim returned to Washington, where he became director of the National Lawyers' Committee and later rejoined Wilmer.  Throughout this period, from Mississippi to *Claiborne Hardware* to Wilmer, Cutler & Pickering, where he also served as Lawyers' Committee co-chair and as president of the Southern Africa Legal Services Foundation, Jim - like many lawyers of our generation, including me - was striving to fulfill Lou Oberdorfer's vision of a citizen lawyer, lawyers who understand that practicing law involves far more than billable hours and maximizing income, and that the rule of law requires not just an independent judiciary, but also a legal profession willing and able to make the legal system work for everyone.

Now, Judges Huvelle, Kennedy, and Friedman have nicely captured Jim's judicial career, and there is little that I can add.  But I do enjoy a different perspective.  In fact, it was that different perspective that Jim and I spent quite a bit of time exploring before we were both confirmed in 1994.  How could two such good friends who had worked together for so many years manage this new relationship, where one of us would be reviewing

the other's work?

It turns out to have been no problem at all.  District and appeals court judges have different jobs with different responsibilities.  Jim and I have the advantage of years of friendship and mutual respect, and besides, as this gifted and supremely confident district judge is fond of reminding me, we appeals court judges have much more time and twice as many law clerks.

But most important, and this is why the relationship works so well, I am a huge admirer of His Honor's opinions. They reflect judging at its very best:  Careful fact finding; powerful, principled reasoning; clear, graceful, jargon-free writing; and faithfulness to precedent, to statutory text, and especially to the Constitution.

Marvin Frankel, one of the nation's great federal judges, once summarized qualities we hope for in our district judges.  "The trial judge," he said, "ought to be neutral, detached, kindly, benign, learned in the law, firm but fair, wise, knowledgeable about human behavior, and somewhat superhuman."  What a perfect description of the fine judge we honor today.

Having spoken about Jim Robertson the civil rights lawyer and Jim Robertson the federal judge, I would like to close with a few words about Jim Robertson my friend.  Jim and I met in 1969 at a Lawyers' Committee meeting in

Annapolis, Maryland.  Jim was Chief Counsel in Mississippi; I

was Director of the Lawyers' Committee in Chicago, Lou was

presiding.  In the years that followed, our careers mirrored

each other's.  We each served as Director of the National

Lawyers' Committee, we each then returned to private practice,

exactly where we were during our collaboration in the

*Claiborne Hardware* case, and we each served as co-chairs of the

National and the D.C. Lawyers' Committees.

        And throughout these years, Edie and I have treasured

our friendship with Jim and his lovely wife Berit.  Berit is a

talented painter whose artistic judgment, I'm sure, is reflected

in the portrait we are about to see.  Jim and Berit have three

wonderful children, one of whom, Catherine, is here with her

husband Adam and their two Children, Walter and Sophie - aka

Berit and Jim's grandchildren.

        Jim, 40 years ago at that meeting in Annapolis, who

could have imagined that some day you and I would not only have

the honor of serving together as federal judges in this great

courthouse, but doing so with Louis Oberdorfer, the man whose

values have so profoundly shaped our wonderfully intertwined

careers?

        So, my friend, thank you for everything:  For our

adventures together, for your significant contributions to the

enforcement of the nation's civil rights laws, and especially -

and here I am sure I can speak for all of my colleagues on the

D.C. Circuit - thank you for your years of distinguished service as a United States District Judge.  Thank you.

(Applause.)

CHIEF JUDGE LAMBERTH:  Thank you very much, Judge Tatel.  And you know, that makes me very anxious to hear an appellate judge talk like that about one of my colleagues. Those are wonderful remarks.

It gives me great pleasure at this time to introduce our next speaker, Mr. Eric Citron, who will speak on behalf of all of Judge Robertson's law clerks.

MR. CITRON:  Thank you, Chief Judge.  I'm here to present a gift from the law clerks to Judge Robertson.  As you can tell from the number of speakers, Judge Robertson has a lot of friends and a hard time choosing between them.  In fact, I largely defaulted into this position because of my role organizing the event and Judge's complete refusal to even think about choosing between the many clerks who offered to speak.

Judge Robertson typically bids farewell to his law clerks by saying, "I love all my clerks, and they're all my favorite clerk, so you're my favorite clerk."  But he really means it.  He treats every clerk like his favorite clerk.  In fact, he treats every person like his favorite person.  And in that spirit, it was my intention to replace personal encomiums with a series of e-mail messages from the many clerks who are here, and the some who aren't, containing their fondest thoughts

and memories.

I now realize that time and the overwhelming response are not going to allow me to do that.  But I still want to provide you with some of the highlights from those who know Judge Robertson as being, uncontroversially, really, the greatest boss in the world.

A number of submissions offer a peek behind the veil, or under the robe, as it were.  Harry and Cassie remember how hard it was to keep track of the judge on his way to court.  Quote, "We'd race down the corridor between chambers and the courtroom, struggling to keep up with the judge in every sense as his black robe billowed behind him.  He would stride purposefully into court in his boat shoes, fresh from the Eastern Shore, as we lagged several paces behind."

Another clerk remembers how the judge would mark up drafts and then apologize for making grammatical changes, framing them as, quote, "persisting in my antiquarian tendencies."

Many remember Judge Robertson as an amazing storyteller, including many stories where his own follies are the punch line.  I would repeat them here - most are appropriate for work - but they wouldn't do justice to Judge Robertson the bard.  Jon and Emily recall a certain Friday, not unlike other Fridays, when the judge strolled down the hallway to announce that he was closing chambers early for the day because the

weather was simply too nice for anybody to be stuck indoors.

My co-clerk Anna and I bought the judge a Bocci set for him to bring to the Eastern Shore to use with his grandkids. Bill and Bharat remember using it with him in John Marshall Park on Thursday afternoons.

Other stories similarly reflect the judge's unusual personal style or ever-so-slightly mischievous sense of humor. Judge Robertson once surprised a criminal defendant by wearing an English-style wig on Halloween.  He'll quote Emily Dickinson off the cuff in open court, or throw around what the clerks affectionately call "Robertsonisms."  Those are turns of phrase that often make the point perfectly, but sometimes only he can understand.  My favorite is "kicking in an open door."

Matt Solomon recalls how the judge provided the lawyers in the courtroom with D.C. tap water while he and the jurors got spring water from chambers.  I'll just read his own account of the time he got his own signals crossed.  Quote, "One morning early in my clerkship I was running very late, and panicked.  I filled both the courtroom jugs and the judge's carafe with water from the rusty sink.  The judge took the bench, and I was sitting in the jury box.  The parties entered - some status hearing - and Judge Robertson poured himself a glass of water from the carafe and took a sip.  His face immediately puckered up.  He looked at me squarely in the eye and said, "What are you trying to do, poison me?"

(Laughter.)

These stories all capture an important part of what makes Judge Robertson Judge Robertson:  A vitality, a joie de vivre, an appreciation for life's simple but essential pleasures that make him so human and down to earth, even though he's so tall.  And I received plenty such stories.  But without exception, every single clerk identified the same thing about Judge Robertson that really distinguishes him as a judge and a person:  That is his generosity of spirit, his willingness to listen, his drive to understand and accommodate, and the overwhelming way in which he treated every person in his life with dignity and respect.

Among the greatest beneficiaries were juries. Judge Robertson had a way of delivering jury instructions like they were dinner conversation among old friends, seizing the jurors' attention simply because of the obvious respect and care he had for them and for the defendant.

But others benefitted as well.  Jon and Emily report that their greatest memories, quote, "Are of a criminal defendant, having just received a long sentence under the guidelines, thanking the judge for listening to him and treating him fairly."  Or of hot-headed adversarial parties who finally began listening to each other only once Judge Robertson set the tone of reason and compromise in an everyday status hearing.

I really cannot read all the letters that make this

point, because really, every single one does.  But here is how

Cassie and Harry summarize what they learned from the judge:

"In our first week we recognized that our judge was straight out

of central casting, not only in the way he looked but in the way

he treated people, from defendants to courthouse staff to fellow

judges, including his neighbor, Judge Bryant, with whom he would

often visit.  He treated everyone the same, with dignity."

"Both on and off the bench, he was exactly what you

would want in a judge.  He was fair, patient, and respectful.

In our entire year of clerking, we never once heard him raise

his voice on or off the bench.  We learned a lot from

Judge Robertson that year:  How to write concisely, how to

distill complicated ideas to their essence, how to make good

coffee, how a good judge lets a lawyer try his case, and how

wise the judge was to advise opposing counsel, to, quote, 'have

lunch together.'  But by far the greatest lesson Judge Robertson

taught us was what he taught by example, by the way he carried

himself, by the way he lived his life.  He showed us the

importance of hearing every person out and treating every person

decently."

But the greatest beneficiaries of Judge Robertson's

generous spirit were his clerks.  One clerk reports, quote,

"When I completely misread the law, an opinion that actually

went out the door, he was so nice about it, it wasn't until

after my clerkship until I realized how badly I had screwed up."

Many of us have those memories.

     And a touching story here from Mona that she asked me
not to read, but I'll fill in with one from Anna and I.  In our
clerkship we had a controversial criminal case where the
defendant committed suicide after being convicted.  And after
consoling my co-clerk at some length, the judge asked the jury
office to assemble the list of all the jurors who had served,
and their contact information.  And he called every single one
of them to make sure that they were okay, to ensure that they
understood that it wasn't their fault, and to offer them
somebody to talk to if they needed to talk about it.  That was
the kind of caring person that Judge Robertson is.

     I'll close with my own story.  Near the end of my
clerkship with Judge Robertson, my wife and I were on the
Eastern Shore with Berit and the judge for a clerk reunion.  My
wife got into a conversation where she explained to one of the
past clerks that I was working for the judge and I was almost
finished.  The past clerk, I think it was Mona, asked if I was
okay.  My wife was confused.  "Is he okay?  I think so.  I mean,
why wouldn't he be?"

     The past clerk explained that when her clerkship ended,
she was so broken up about it that she cried for weeks.  She was
apparently depressed by the thought that she would never have a
better job or a better boss.  Having finally left the courthouse
after more than two years here, and suffering from Robertson

Withdrawal Syndrome myself, I can't imagine that time has proven her wrong.

So without further ado, Judge, here is a gift from your past clerks.  This is one of the studies that Annette did in preparing her wonderful portrait.  Upon seeing it, one immediately perceives that humanity, that generosity, that spirit of listening and understanding that touched all of us in our time here.  We thought that since the courthouse got to keep this beautiful, fancy picture, you and Berit should have this simpler one that nonetheless so completely captures the essence of the judge and mentor we all remember so fondly.

From all your clerks, thank you Judge Robertson for making us better lawyers and people by your example.  We all hope for wonderful things in our lives, but, being realists, we don't bother hoping for a better year, a better mentor, or a better job.

(Applause.)

CHIEF JUDGE LAMBERTH:  Thank you, Mr. Citron, and all of our speakers for your wonderful remarks today.

Now we will hear from today's honoree, our good friend Judge James Robertson.

JUDGE ROBERTSON:  Well, before I start I want to say something about that beautiful drawing.  I called Annette Polan, or e-mailed Annette Polan, the artist, and said, "That is a beautiful thing.  I would like to give it to Berit for a

present."  She wrote back and quoted a price that was so
astronomical that she knew -- she knew that I was too cheap to
buy that.

        (Laughter.)

        So she's a co-conspirator.  And it's beautiful.  Thank
you very much.

        Some years ago Steve Pollak, who was then and still is
the president of the Historical Society of the D.C. Circuit,
called and told me it was time to have my oral history done.
"Nonsense, Steve," I said.  I'm too young.  "Jim," he said,
"it's time for you to have your oral history."

        Like the oral history, the portrait is an important
tradition of this court.  We all know that we're expected to
commission a portrait and present it to the court; but unlike
the oral history, nobody tells you when or how to do that.
There's an unspoken understanding that the "when" will be
sometime after we take senior status, and hopefully before we
begin to have aesthetic issues that a good artist cannot
overcome.

        (Laughter.)

        But the timing is up to the individual judge.  I feel a
bit presumptuous about jumping ahead of my colleagues Tom Hogan
and Gladys Kessler, both of whom took senior status before I
did.  But I asked, "Mirror, mirror on the wall," and it answered
me in Steve Pollak's voice.  It said, "Jim, it's time to have

your portrait done."

     (Laughter.)

     The "how" is more complicated, because again, unlike the oral history, the portrait process has to be initiated by the judge himself or herself.  One has to select the artist, figure out how to pay for the painting, and decide when and how to proceed with the ceremony that brings us all here today.  For the support of this project I thank my law firm of some 30 years, the firm now known as Wilmer Hale, my former law clerks, the Historical Society of the D.C. Circuit, and the members of the bar of this court.  Yes, a portion of your dues are used for judicial portraits.  And for the all-important first nudge - I didn't say noodge - nudge, and the organizing effort involved, I thank Eric Citron, who just spoke to you.

     It was my wife Berit who led me to the artist whose work will be unveiled shortly.  A number of the subjects of Annette Polan's work have been Swedes, some from the diplomatic community here in Washington, others in Sweden.  Years ago a mutual friend of Berit's and Annette's introduced them to one another, and later a connection occurred when Berit was studying at the Corcoran School of Art, where Annette shared the painting department.  Her impressive credentials are set forth in the program, and you will soon see the results of them on display.

     Annette, not incidentally, is the first woman artist whose work will hang among the 200 years of portraits in this

room.

(Applause.)

An old proverb, maybe Chinese, asks, "What is the current to a fish?"  I think it means that we are all swept along in history's current, and that if we are to understand where we have been and guess where we're going, we need to get out of the river and up on the river bank, which snakeheads can do and no other fish that I know of.  These portraits in a small but important way remind us of how fast the current runs in this particular tributary of the nation's history.  If you look around this courtroom, you will see many faces that remind us not only of the men and women who have served here, but of how quickly their time passed and our own time is passing.

I have been here only 15 years.  15 years is a long time if you call it 180 months, and tell someone in an orange jumpsuit that he will have to serve it.  But for someone in a black robe, it passes in a flash.  It's hard to believe that most of the judges in the left column of the list on the back of your program have passed on during only the last 15 years.

One of my favorites, a fellow Princetonian and GW law graduate who took notice of me and Henry and helped me along the way, was Oliver Gasch.  He was still sitting when I started here, regaling us with his perfect recollection of cases he tried in the 1940s.  But his portrait has already migrated all the way around the walls to the right-hand corner, where he

joins some other judges neither known to or remembered by any living person.

In 15 years we have had three presidents, four chief judges, and no significant pay raises.

(Laughter).

The so-called vanishing trial continues to vanish, with the percentage of filed cases that actually get to trial having fallen by something like 50 percent in 15 years.  We have gone electronic since I arrived here, big time.  When I got here, judges had computers, but except for Chuck Richey, they didn't know how to turn them on.  I came from a firm that was in the vanguard of computer applications, and was immediately appointed to the information technology committee.  Now I spend a ridiculous amount of time reading and answering e-mails, and electronic case filing is ready to move into a second generation.

There have been watershed changes in the law in just 15 years, some of them applicable to our daily work on issues like sentencing and the confrontation clause and how specific a civil pleading has to be.  And I could go on and on from this nice resting place on the river bank, but I need to let you see the portrait and get to the reception.  Before that happens, I need to give thanks.

Thanks first of all to Judges Huvelle, Kennedy, Friedman, and Tatel, and to Eric Citron for their paeans,

encomiums, tributes, and pot shots.  I know it was easy for them
to say yes when I asked them to speak, but that was months ago,
and I know they've been asking themselves in recent days, "Why
do I do this to myself?"  What they said was partially true, and
I love them for what they did not say.

Thanks to all of you for honoring me with your
presence.  You've made a big effort, and on the brink of the
holiday season at that, for what Vernon Jordan calls a drink and
a peanut.

Thanks to the bar of this court.  Last month the
*Washingtonian* magazine named 800 top lawyers in this city, which
is supposed to be the top one percent of the 80,000 lawyers in
this city of 600,000 people.  Many of them are here.  You know
who you are, I'm sure.

But my own top one percent takes a different slice of
the data.  The actual trial bar of this court is a fairly small
group of lawyers, mostly unsung and overlooked by the media,
many working for government salaries or CJA hourly rates, doing
the day-to-day business of the administration of justice, and
doing it with great skill and dedication.  It is a great trial
bar, a privilege to work with.  You are my top one percent, and
I salute you.

Thanks to the people who work in this building.  We all
refer to ourselves here as the court family.  You are too
numerous to name, and I cannot talk fast enough to do it anyway,

as Nancy Mayer-Whittington did in this room a few weeks ago.
The poor Court Reporter.  I'm still -- well, those of you who
were here know what I mean.

But I cannot fail to give special thanks to
Marlene Taylor, who has been with me more years than either of
us remembers, who rightly refuses to be called my judicial
assistant because secretary is a perfectly good and honorable
title; to Joe Burgess, my first courtroom deputy, who took me by
the hand on my first day and taught me the ins and outs of case
management; and to Kirk Bowden, Deputy U.S. Marshal, he of the
stentorian voice who called us all to order today, an icon of
this court, whom I am proud to call friend.

Thanks to my great and indestructible hero and mentor,
Louis Oberdorfer, who showed me the path I have followed for
40 years, and who is, as Tom Hogan says, the conscience of this
court.

Thanks to the astonishingly hardworking and gifted
young men and women who have been my law clerks, making me look
good, keeping me out of trouble, occasionally reversing my
decisions before I could issue them in order to spare the
Court of Appeals the trouble.  They have gone forth and
multiplied.  At last count I have 29 grand-clerks, including two
sets of twins, and three more are on the way.

Thanks to all the judges of this court who have been my
colleagues.  It is traditional at these events to remind

ourselves and you of our importance, and to tout the historic
significance of this court with references to Watergate and AT&T
and Microsoft and Tobacco and Ted Stevens and Guantanamo, and
the host of other cases that make us all justifiably impressed
with ourselves.  But the judges don't need to be thanked for
being important.  That's why they're so highly paid.

        (Laughter.)

        What I do thank them for is their collegiality, their
devotion to the rule of law, and their nonpartisanship.  The
collegiality of this court really is something special.
Paul Friedman spoke of it the other night when he was named
Judge of the Year by the Bar Association.  He rightly singled
out the leadership of Tom Hogan and Royce Lamberth, but the
simple truth is, we like one another and help one another, and
both give and take advice from one another.  It's a happy court.

        As for devotion to the rule of law, this is a serious,
scholarly, and careful court.  I don't care what the Court of
Appeals says.

        (Laughter.)

        And miraculously, given where we live and work, we are
an apolitical court.  Nothing irritates a judge more than a news
story whose second sentence reads, "Robertson, who was appointed
by President Clinton," or "Bates, who was appointed by
President George W. Bush."  We are, all of us, just judges
trying to get it right.

Thanks to my family; our two sons who could not make it today from Ohio and California; our sensational daughter Catherine; our six grandchildren, including the two professional portrait unveilers who are about to do their thing; and most of all, to my lovely Berit, the love of my life and my wife for 50 years.  I could have told Tiger, you don't mess around when your wife is Swedish.

(Laughter.) (Applause.)

(Standing ovation.)

CHIEF JUDGE LAMBERTH:  Just think if you could have lunch with him every day.

Well, we've come to the moment we've all been waiting for.  Unveiling the portrait will be the artist, Annette Polan, and she will be joined by Judge Robertson's grandchildren, Walter and Sophie Thurschwell.

(Painting unveiled.)

(Applause.)

CHIEF JUDGE LAMBERTH:  I would like to congratulate Ms. Polan for creating such a wonderful portrait.  We want to thank Judge Robertson and the artist Ms. Polan for this splendid portrait.  I accept it on behalf of the United States District Court for the District of Columbia.  It will be hung in this room, where it will join the other distinguished jurists who have had the honor of serving on this court.

Ladies and gentlemen, at the conclusion of this

ceremony there will be a reception in the William B. Bryant atrium on the first floor of the annex.  All of you are welcome to join Judge Robertson, his family, and friends on this wonderful occasion.

Before we adjourn, I ask the audience to refrain from entering the well of the court until the judges have an opportunity to greet and congratulate Judge Robertson and his family.  With respect to everyone else, you're asked to adjourn to the reception so Judge Robertson can meet you there.

I do want to thank the Attorney General and the Associate Attorney General for being here today.  You honor us with your presence, and we thank you for joining in the celebration.

Again, all of you who came today, thank you for joining us.  Marshal, you may adjourn the court.

DEPUTY BOWDEN:  This Honorable Court stands adjourned.

### CERTIFICATE OF OFFICIAL COURT REPORTER

I, Rebecca Stonestreet, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____          _____
  REBECCA STONESTREET                       DATE