

# NOTICE PROGRAM

*Cobell v. Salazar*
No. 1:96 CV 01285

U.S. District Court for the District of Columbia

# Table of Contents

|  | Page |
|---|---|
| **Firm Overview** | 1 |
| **Background on *Cobell v. Salazar*** | |
| Class Definitions | 3 |
| Situation Analysis | 4 |
| **Notice Program Overview** | |
| Development of Program | 7 |
| Program Components | 8 |
| **Direct Notice** | |
| Direct Mail to IIM Account Holders | 11 |
| **Paid Media Methodology** | |
| Native American Media Usage | 13 |
| Approach to Paid Media | 14 |
| **Native American Media** | |
| Publications | 16 |
| Radio | 17 |
| Internet Advertising | 19 |
| **Mainstream Media** | |
| Broadcast Media Methodology | 24 |
| Television | 27 |
| Radio | 29 |
| Newspaper Supplements | 30 |
| Military Newspapers | 32 |
| Rodeo Media | 33 |
| **Paid Media Delivery** | 34 |
| **Third Party Notice Program** | 37 |
| **Earned Media Program** | 41 |

## Notice Design

Methodology                                          44

Long-Form Notice                                     45

Publication Notice                                   46

Radio and/or TV Ad                                   47

DVD                                                  48

Website and Internet Ads                             49

## Toll-Free Telephone Support

52

## Exhibits

Exhibit 1 – Selected KM Cases

Exhibit 2 – Long Form Notice

Exhibit 3 – Publication Notice

Exhibit 4 – Native American Publications (accept advertising)

Exhibit 5 – Native American Publications (do not accept advertising)

Exhibit 6 – Public and Native American Radio Stations

Exhibit 7 – Weekend Newspaper Supplement List

Exhibit 8 – Military Publications

Exhibit 9 – National, State, and Local Organizations Participating in Notice
            Effort

Exhibit 10 – Tribal Entities Participating in Notice Effort

Exhibit 11 – Commercial Enterprises Participating in Notice Effort

Exhibit 12 – Radio Spots

Exhibit 13 – TV Spot

*Cobell v. Salazar*

# Firm Overview

Kinsella Media, LLC ("KM") is a nationally recognized advertising and legal notification firm specializing in the design and implementation of class action and bankruptcy notification programs to reach unidentified putative class members.

KM has developed and directed some of the largest and most complex national notification programs, primarily in antitrust, bankruptcy, consumer fraud, mass tort, and product liability litigation. Specific cases have spanned a broad spectrum of issues, including asbestos, breast implants, home siding and roofing products, infant formula, pharmaceuticals, polybutylene plumbing, tobacco, and Holocaust claims. The firm has developed or consulted on over 600 notification programs and has placed over $230 million in paid media notice. A selection of KM's case experience is attached as Exhibit 1.

The firm is particularly experienced in providing notice to distinct groups that require specialized targeting and outreach efforts. Our experience in complex notice programs with target audiences that have characteristics similar to the instant case includes the following:

> ➤ KM was responsible for providing notice in *In re Holocaust Victim Assets Litigation* Nos. CV-96-4849, CV-96-5161, and CV-97-461 (E.D.NY) to reach Romani Holocaust victims (gypsies). Using in-country organizers and human rights organizations, the firm designed and implemented a "grassroots" campaign to reach the isolated and educationally disadvantaged Roma in 15 countries in Europe and the former Soviet Union.

> ➤ Most recently, *In re W.R. Grace & Co* No. 01-01139 (Bankr. D.Del.), KM included notice to indigenous peoples in Canada in an aboriginal language (Inuktitut) for the Zonolite Attic Insulation notice program using media targeted specifically to these Native peoples.

KM develops advertisements, press materials, websites, and other notice materials that bridge the gap between litigation complexities and the need for a clear and simple explanation of legal rights. The firm employs industry-recognized tools of media measurement to quantify the adequacy of the notice for the court, and ensures all notice materials are in "plain language" and are fully compliant with Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") and comparable state guidelines.

*Cobell v. Salazar*

# Background on Cobell v. Salazar

# Background on Cobell v. Salazar
## Class Definitions

The Settlement includes two Classes, which are largely overlapping and defined as:

Historical Accounting Class.  "Historical Accounting Class" means those individual Indian beneficiaries (exclusive of those who prior to the filing of the Complaint on June 10, 1996 had filed actions on their own behalf stating a claim for a historical accounting) alive on September 30, 2009, and who had an IIM Account open during any period between October 25, 1994 and September 30, 2009, which IIM Account had at least one cash transaction credited to it at any time as long as such credits were not later reversed. Beneficiaries deceased as of September 30, 2009 are included in the Historical Accounting Class only if they had an IIM Account that was open as of September 30, 2009.  The estate of any Historical Accounting Class Member who dies after September 30, 2009 but before the distribution is in the Historical Accounting Class.

Trust Administration Class.  "Trust Administration Class" shall mean those individual Indian beneficiaries (exclusive of persons who filed actions on their own behalf, or a group of individuals who were certified as a class in a class action, stating a Funds Administration Claim or a Land Administration Claim prior to the filing of the Amended Complaint) alive as of September 30, 2009, and who have or had IIM Accounts in the "Electronic Ledger Era" (currently available electronic data in systems of the Department of the Interior dating from approximately 1985 to the present), as well as individual Indians who, as of September 30, 2009, had a recorded or other demonstrable ownership interest in land held in trust or restricted status, regardless of the existence of an IIM Account and regardless of the proceeds, if any, generated from the Land.  The Trust Administration Class does not include beneficiaries deceased as of September 30, 2009, but does include the estate of any deceased beneficiary whose IIM Accounts or other trust assets had been open in probate as of September 30, 2009.  The estate of any Trust Administration Class Member who dies after September 30, 2009, but before the distribution, is included in the Trust Administration Class.

© 2010 Kinsella Media, LLC

# Background on Cobell v. Salazar
## Situation Analysis

➢ The Classes comprise individual Indians who have IIM Accounts and individual Indians who have a recorded or other demonstrable ownership interest in land held in trust or in restricted status by the U.S. Government.

➢ The Classes may include up to 600,000 individuals. The exact number is not known due to the lack of accurate or comprehensive records. Records with current addresses exist for the majority of individual Indians covered by the Settlement, but tens of thousands of addresses are unknown for a variety of reasons, including circumstances where beneficiaries have moved or died.

➢ Class Members, particularly heirs, may or may not be aware of their ownership of an IIM account or interest in trust land. The Notice Program, therefore, must be sufficient to stimulate unaware Class Members to make inquiries about the nature and scope of the Settlement and their legal rights.

➢ The proposed Settlement affects individual Indians across the country, including members of many federally recognized tribes west of the Mississippi River. The chart below allocates IIM Accounts by region.

The objective of the Notice Program is to successfully reach and inform Class Members of the proposed Settlement so they may receive their share of the Settlement funds, object to the Settlement, or – for the Trust Administration Class – opt out of the Settlement. Because Direct Notice in this case will not reach all potential Class Members, a Paid Media Notice Program targeted to unidentified Class Members is necessary. In addition, an extensive outreach program to tribes and third-party organizations that interact with potential Class Members will be undertaken.

*Cobell v. Salazar*

# Notice Program Overview

# Notice Program Overview
## Development of Program

This Notice Program is grounded in information provided by Class Counsel, the Department of Interior ("Interior"), and independent research undertaken by KM including:

➢ Contact information for IIM Account Holders by tribe, region, and state.

➢ Briefings from Class Representative Elouise Cobell and Class Counsel that provided information on tribes, tribal lands, and other pertinent information.

➢ Internet identification of national, state, and local organizations and communities that provide service and assistance to Native Americans.

➢ U.S. Department of the Interior, Bureau of Indian Affairs maps, Veronica E. Velarde Tiller, <u>Tiller's Guide to Indian Country</u> (BowArrow Pub. Co. 2005), and other data that provided geographic locations of allotted acreage ("Allotted Land").

➢ The likely geographic concentration of Class Members based on location of Allotted Lands and identifiable areas such as cities, counties, and states where Native Americans are located.

➢ Research into available mainstream communication vehicles that are likely to reach affected Class Members based on media usage and geographic coverage.

➢ Identification of local and national Native American media vehicles through which Class Members could receive information.

➢ Demographics of Native Americans and their media usage.

*Cobell v. Salazar*

## Notice Program Overview
## Program Components

This Notice Program outlines procedures to provide notice of the Settlement of *Cobell v. Salazar* as a class action, consistent with the requirements set forth in Rule 23 of the Federal Rules of Civil Procedure.

This Notice Program consists of multiple, inter-related, and complementary components to ensure that as many Class Members as practicable are given notice of the Settlement. The key elements of the Program can be broadly categorized as follows:

- ➢ Direct Notice
- ➢ Paid Media Notice
- ➢ Tribal and Third-Party Outreach
- ➢ Earned Media Notice

The existing Informational Website and Toll-Free Support Line will be enhanced and integrated into the Program.

### Direct Notice

Direct Notice consisting of the Long Form Notice ("Notice") (Exhibit 2) and a claim form will be sent via first-class mail to:

- ➢ All Class Members whose names and addresses are readily available and provided by Interior, or whose addresses can be reasonably obtained through advance level research.

- ➢ All individuals who registered on the Informational Website or through the Toll-Free Support Line set up in connection with the announcement of the Settlement.

- ➢ All individuals who contacted and provided contact information to the Toll-Free Support Line, the email address provided on the Informational Website, or the P.O. Box as a result of reading or hearing about the Settlement through the paid media notice, outreach through third-parties, or the earned media program as well as those who otherwise make themselves known to Class Counsel or KM.

The Notice will be available on the Informational Website as a PDF file.

### Paid Media Notice

To reach Class Members who do not receive Direct Notice due to missing records, unknown addresses, or other reasons, the Notice Program will include Native American media as well as mainstream media.

After careful research of the demographics, media habits, and geographical location of Class Members, the Paid Media Program will include:

➢ Publication Notice (Exhibit 3) placed in tribal, local, and national Native American print media.

➢ Internet banner ads on Native American-focused websites.

➢ Local TV and radio spots in key markets that cover the Allotted Lands and key markets with significant concentrations of Native American populations.

➢ Print advertisements in mass newspaper supplements that have broad geographic reach of the U.S. to notify Class Members nationally.

➢ Print advertisements in specialized media including a) military newspapers to reach Native Americans who are serving or who have served in the armed forces, and b) rodeo-oriented magazines and event newsletters, both local and national, with Native American readership.

## TRIBAL AND THIRD-PARTY OUTREACH

KM identified and directly contacted over 2,500 entities affiliated with the most affected tribes to solicit and arrange their participation in the Notice Program. This included national and community-based organizations that provide services and support to Native Americans, tribal colleges, religious institutions, and businesses. Notice materials will be supplied to these third parties containing appropriate, pre-produced materials for use in organizational newsletters and bulletins, as well as posters, DVDs, and flyers to be used by those organizations and agencies that interface directly with potential Class Members.

## EARNED MEDIA

The Direct, Paid Media, and Third-Party Notice efforts will be amplified through a press release sent to national print outlets and tribal newspapers, at the beginning of the Notice Period, as well as distribution of another press release three weeks before the opt-out deadline. Ongoing efforts will be undertaken to stimulate media coverage nationally and in targeted areas. In addition, an audio news release and a video news release, which are pre-produced TV and radio news stories, will be distributed nationally.

Significant earned media resulted from the announcement of the Settlement with over 240 media outlets carrying the information. Similar media coverage has been observed during the legislative approval process. It is anticipated that the same coverage will continue.

*Cobell v. Salazar*

# Direct notice

# Direct Notice
# Direct Mail to IIM Account Holders

Direct Notice will consist of mailing the Long Form Notice and a claim form ("Notice Packet") via first-class mail to inform Class Members of their legal rights and how they may participate in, object to, or opt-out of the Settlement.  The Garden City Group, Inc. ("GCG"), the Claims Administrator, will send the Notice Packet to:

➢ All Class Members whose names and addresses are readily available and provided by Interior or whose addresses can be reasonably obtained through advance level research;

➢ All individuals who registered on the Informational Website or through the toll-free number set up in connection with the announcement of the Settlement;

➢ All individuals who contacted and provided contact information to the Toll-Free Support Line, the email address provided on the Informational Website, or the P.O. Box as a result of reading or hearing about the Settlement through the paid media notice, outreach through third parties, or the earned media program as well as those who otherwise make themselves known to Class Counsel or KM.

## Direct Notice to Identifiable Beneficiaries

GCG has received records of beneficiaries from Interior and will continue to receive updated contact information for beneficiaries from Interior.  Contact information consists of the best and most current records available from Interior that include a beneficiary's name; social security number; date of birth; mailing address; and whether Interior's individual Indian Trust records reflect that beneficiary to be a minor, non-compos mentis, an individual under legal disability, an adult in need of assistance, or an adult whose whereabouts are unknown.    To date, at least one potentially viable mailing address is available for approximately 300,000 beneficiaries.  GCG input this contact information in the database it designed for this Settlement ("Indian Trust Database").

Where Interior has provided a beneficiary's mailing address, prior to the initial mailing, GCG will use the National Change of Address ("NCOA") database to update address changes.  The NCOA database is the official U.S. Postal Service database product, which makes changes of address information available to mailers to help reduce undeliverable mail pieces before mail enters the mail stream.  Mailing addresses obtained from the NCOA database will be updated in the Indian Trust Database.

Where the beneficiary's mailing address is unknown to Interior, prior to the initial mailing, GCG is using other contact information provided by Interior to conduct advance level research in an attempt to obtain current mailing address information to reach the beneficiary or the beneficiary's heirs.  GCG is using several avenues to obtain updated address information.  These services access information from the main credit bureaus, as well as a variety of public record searches including historic property ownership information and next-of-kin information, where appropriate.  When updated mailing addresses are not available in the public domain through advance level research, GCG is

taking steps to locate phone numbers and/or email addresses from which information may be derived to locate and reach beneficiaries.

## Returned Notice

Notice Packets returned with forwarding address information will be updated in the Indian Trust Database and promptly re-mailed.

To reach those beneficiaries whose Notice Packets are returned without forwarding address, GCG will undertake the advance level search steps discussed above and re-mail the Notice when updated address information can reasonably be obtained.

## Direct Notice to Self-Identified Individuals

In addition to Direct Notice sent to beneficiaries with contact information provided by Interior, Direct Notice will be sent to all individuals who registered on the Informational Website or with the Toll-Free Support Line set up in connection with announcement of the Settlement. To date, almost 23,000 individuals have registered to receive Direct Notice.

*Cobell v. Salazar*

# Paid Media Methodology

*Cobell v. Salazar*

# Paid Media Methodology
## Native American Media Usage

Individuals spend varying amounts of time with different media. Certain demographic groups may be heavy consumers, light consumers, or non-users of a particular medium. For example, GfK MRI[1] data shows that individuals who are less educated are likely to be heavy television viewers and light newspaper readers. Conversely, highly educated individuals are more likely to be heavy newspaper readers and light television viewers.

KM develops notice programs that focus on the media types used most often by the target audiences. To examine the media habits of the target audience, KM compares the target audience's media usage to that of the average Adult 18+ as reported by GfK MRI. Using GfK MRI data, KM determined that Native Americans are:

- ➢ Very heavy users of television
- ➢ Heavy users of magazines
- ➢ Above average users of radio
- ➢ Average users of newspapers
- ➢ Below average users of Internet (any online activity will be on sites focused on Native American interests)

These media habits, in conjunction with the geographic location of Allotted Lands, and the availability and penetration of certain media vehicles both on reservations and in metro areas provide direction to the selection of media vehicles.

---

[1] GfK MRI is a nationally accredited media and marketing research firm that provides syndicated data on audience size, composition, and other relevant factors pertaining to major media including broadcast, magazines, newspapers, and outdoor advertising. GfK MRI provides a single source measurement of major media, products, services, and in-depth consumer demographic and lifestyle/psychographic characteristics.

# Paid Media Methodology
## Approach to Paid Media

The goal of the Paid Media Notice Program is to provide comprehensive Notice to Class Members who do not receive Direct Notice.  The media selected for the Paid Media Notice Program relies on Native American media as well as mainstream media targeted to geographic areas where Class Members are likely to reside.  It is multi-faceted and layered— it includes tribal, local, and national Native American media, mainstream media, and diverse media vehicles including print, radio, TV, and Internet.  By using multiple media vehicles, we increase the opportunity for Class Members to see the Notice based on their individual media habits.

In choosing which media would be best for this case, KM first identified and selected tribal, local, and national Native American publications, newsletters, and websites to provide direct reach of Class Members.  Because Native American media cannot provide the breadth of reach needed to assure the Court of adequate notice, KM undertook an examination of the geographic locations in which Class Members are most likely to reside.

Specifically, KM:

- Used <u>Tiller's Guide to Indian Country</u> (BowArrow Pub. Co. 2005) to identify reservations and geographic areas with significant Allotted Lands.

- Undertook a zip code analysis of identifiable IIM Account Holders to ascertain specific areas already containing significant numbers of Account Holders to target media where additional Account Holders would likely be found.

- Used GfK MRI to identify metropolitan areas with high concentrations of Native Americans, given the high percentage of IIM Account Holders who are not identifiable and the dispersal of Native American populations including heirs of IIM Account Holders.

- Undertook additional research to find media likely to be consumed by Native Americans.

Based on the Native American media usage and the physical attributes of many reservations, television and radio are obvious media vehicles for Notice dissemination.  KM therefore reviewed available broadcast options for media markets that cover the Allotted Lands and the key markets with significant concentrations of Native Americans.

*Cobell v. Salazar*

# Native American Media

# Native American Media
## Publications

Advertising the Settlement in tribal, local, and national Native American publications will provide multiple opportunities for the target audience to view the Publication Notice.  The 68 Native American publications in which paid media will be placed for the Notice Program are listed in Exhibit 4.[2]

Given the direct access to potential Class Members by Native American media, print publications will be aggressively used as follows:

➢ Multiple advertisements of the Publication Notice in tribal, local, and national Native American publications that accept paid advertising, to ensure sufficient opportunity to view the Notice.

- One advertisement in all publications that are published monthly or bi-monthly.
- Two advertisements in all publications that are published bi-weekly.
- Three advertisements in all publications that are published daily or weekly.

The Publication Notice will run as follows:

➢ A full-page or page-dominant advertisement in tribal, local, and national Native American magazines and newspapers to initiate the Notice Program.

➢ Additional advertisements to run as a half page (quarter page in oversized magazines and newspapers) in tribal, local, and national Native American publications.

The Publication Notice will run in color, when offered by the publication, to ensure that it stands out and further catches readers' attention.

---

[2] A press release and the Publication Notice will be sent to those publications that do not accept paid advertising or advertising outside of their reservation.  Exhibit 5 lists these publications.

# Native American Media
## Radio

KM recommends that spots be purchased on local stations, including those broadcast from reservations that are specifically geared towards Native Americans. These stations are purchased in the same manner as general mainstream media and are included in the discussion of radio in the Mainstream Media section.

In addition to these general radio formats, KM also recommends purchasing advertising, when available, on Native American radio networks. Programming is focused on topics and music of interest to the Native American community. The programs are distributed to radio stations, both Native American-owned and general market stations, across the U.S.

These networks include:



➢ *Native America Calling* is a live call-in program linking public radio stations, the Internet, and listeners together in a national conversation about issues specific to Native communities. Each program engages noted guests and experts with callers throughout the U.S. and is designed to improve the quality of life for Native Americans. Approximately 500,000 listeners hear Native American Calling each week on 52 stations in the U.S. and Canada.



➢ *Native Voice One (NV1)* educates, advocates, and celebrates Native American life and culture by providing a program service from a Native point of view. NV1 enables Native people, especially those who do not have access to the many reservation and village-based Native-owned and -operated stations, to stay connected. Many Native stations and independent radio producers contribute Native-oriented programs to NV1 for inclusion in the NV1 program service.



➢ *Alaska Public Radio Network (APRN),* based in Anchorage, is a member-based organization of 25 independent public radio stations spread across Alaska. These stations pool their resources to create and share news and public affairs programming of statewide value, boosting service to Alaska's citizens.

*Cobell v. Salazar*



➢ *EarthSongs*, distributed by Native Voice One, gives public radio and Internet listeners the chance to explore the Native influences that help shape and define contemporary American music.



➢ *National Native News* covers the social, economic, and cultural issues that affect every community, and helps radio listeners understand the interconnectedness between Native people and their non-Native neighbors.

*Cobell v. Salazar*

# Native American Media
# Internet Advertising

Internet advertising will be incorporated into the Notice Program to provide Class Members with additional opportunities to see the Notice beyond the broad-reaching broadcast and print program. Internet advertising delivers an immediate message in a targeted environment and allows the viewer of an advertisement to instantly link to a website for further information.

## Internet Ads

KM recommends that ads be placed on a wide range of websites that offer specific Native American content and information, enabling maximum exposure opportunities to reach Native Americans. KM identified a number of websites that cover a broad range of Native American interests, along with several tribal websites that accept banner advertising.

KM will be placing ads on the following websites:



> ➢ This site provides culturally relevant education and information services for North American Indian tribes and organizations.



> ➢ This website serves as the local news source for the Ojibwe Tribe in the Bay Mills Community, replacing the local print publication.

> ➢ As of 2010, NFIC has 14 issues a year with its print and electronic editions, supplying national news, pow wow dates, and information on all of Indian Country. NFIC contains national, cultural, and regional sections along with special interest articles, features, entertainment, letters, and the most up-to-date comprehensive pow wow directory throughout North America.

> ➢ *IndianCountryToday.com* is the news source of record for leaders in Indian Country as well as Native organizations, members of the U.S. Congress, federal government officials, business executives, health professionals, lawyers, educators, students, and local and state politicians.

---

*Cobell v. Salazar*



➢ *IndianVoices.net* is targeted to a diverse readership as a multi-cultural networking tool designed to inform and promote environmental and individual harmony among indigenous peoples.



➢ *Indianz.com* reaches a wide range of viewers:  Native American students in college, Native American young professionals, and people interested in Native American content in general.



➢ *LakotaCountryTimes.com* is the largest Lakota-owned and -operated online and print independent newspaper.



➢ *LCOTimes.com* is the online site of *The Ojibwe Times* – the news source for the Lac Courte Oreilles Chippewa Indians.



➢ *NativeTimes.com* is the official website of the *Native American Times* newspaper published from the capital of the Cherokee Nation, Tahlequah, Oklahoma.



➢ *NativePeoples.com* is the website for the magazine with its focus on the arts, culture, and lifeways of the Native peoples of the Americas.  It also reports on topics related to business, health, education, politics, sports, travel in "Indian Country," the environment, food, language, history, and other subjects associated with Native American life past and present.

© 2010 Kinsella Media, LLC

*Cobell v. Salazar*



➤ *NavajoTimes.com* informs the Navajo people of events, news, and issues of importance to them, within the boundaries of the Navajo Nation and throughout the U.S.



➤ *NhoNews.com* reports on the news and events for the Navajo and Hopi Nations, and Flagstaff, Arizona.



➤ *Pechanga.net* is an important source for Indian and gaming news.  The website and e-mail service disseminates essential stories to decision-makers in Indian Country and the gaming industry.



➤ *Powwows.com*'s network features a unique combination of event information, user forums, and traditional Native American artwork.  The network of sites has all of the important information concerning singing, drumming and dancing.  Visitors can listen to pow wow songs, upload pictures to the Gallery and watch videos of dance styles.



➤ *ShobanNews.com* is the website for the *Sho-Ban News* and is the news source for the Shoshone-Bannock Tribes in Idaho.

*Cobell v. Salazar*



➢ *WhisperingWind.com* is the online companion to the bi-monthly magazine and focuses on Native American crafts, culture, pow wows, and history.



➢ The Google Content Network offers placement of banners on several sites that offer similar editorial interests based on key word phrases linked to Native American culture.

## SPONSORED LINKS

A search engine is a tool designed to look for information on the Internet.  In order to help search engine users locate the informational website about this case – both those specifically looking for it and those looking for related topics – KM will purchase sponsored links to appear when searchers enter certain terms.

KM will contract with Google AdWords and Bing Search Marketing to have sponsored links appear on the results page of keyword/phrase searches that could include:

➢ Cobell v. Salazar

➢ Native American Land Settlement

➢ Indian Land Settlement

The following is a sample ad that may be displayed on a search engine when a visitor enters any of the search terms above:

**Indian Trust Settlement**
Provides benefits to individual
Indian trust landowners and heirs
http://www.IndianTrust.com

© 2010 KINSELLA MEDIA, LLC

*Cobell v. Salazar*

# Mainstream Media

*Cobell v. Salazar*

## Mainstream Media
# Broadcast Media Methodology

Television has the ability to reach a wide audience with an immediate and accessible message.  The combination of audio and visual message delivery increases the message impact.  Viewers can quickly ascertain if the message is important and if so, decide to respond.

Local radio is bought both in metropolitan areas as well as smaller non-metropolitan areas within a larger given market and will be used to increase reach and frequency[3] of the overall Notice Program to Native Americans.  This is especially important in rural reservation communities where radio is a principle means for tribal populations to gather news.

Using the approach outlined on page 14, 59 total media markets (DMAs)[4] were analyzed to determine the level of media to be purchased in each market.  The selected DMAs include the cities listed below, as well as surrounding areas, however, some DMAs are much larger than just the noted city and their immediate surrounding areas.  For example, the Salt Lake City DMA covers the entire state of Utah and the Albuquerque DMA covers most of the state of New Mexico.

These DMAs were divided into five tiers based on criteria that reflect reservations with Allotted Lands, high incidence of Native Americans in the population, and areas with significant numbers of identifiable IIM Account Holders.  Broadcast media delivery is measured by Gross Rating Points (GRPs).  GRPs represent the percentage of households or persons in the target audience who are exposed to the television and radio commercial messages in the schedule. This is an expressed measurement of the combined reach and frequency achieved by each medium within the market.

KM recommends the following coverage targeted to adults 18 and over:

| Criteria | Media | Markets |
|---|---|---|
| Tier 1 | | |
| • Market includes one or more identified reservation(s). <br> • 1%+ of the market's population is made up of Native Americans based on | • Six weeks of TV (750 GRPs). <br> • Six weeks of metro radio (750 GRPs) when coverage is efficient. <br> • Ads on all non-metro radio stations in key | • Albuquerque, NM <br> • Fargo-Valley City, ND <br> • Great Falls, MT <br> • Los Angeles, CA <br> • Minneapolis-St. Paul, MN <br> • Minot-Bismarck-Dickenson, ND <br> • Oklahoma City, OK |

[3] Media reach and frequency is discussed in further detail in the "Target Audience Selection" of this Plan.

[4] Designated Market Area ("DMA") is generally a group of counties in which the commercial television stations in the Metro/Central area achieve the largest audience share.  This is non-overlapping geography for planning, buying, and evaluating media audiences across various markets.

© 2010 Kinsella Media, LLC

*Cobell v. Salazar*

| Criteria | Media | Markets |
|---|---|---|
| GfK MRI measurement.<br>• There are 7,000+ (2%+ of total) known addresses of Class Members within the market. | counties.<br>• Ads on all available local Native American radio stations that accept advertising. | • Phoenix, AZ<br>• Rapid City, SD<br>• Seattle-Tacoma, WA<br>• Sioux Falls, SD<br>• Spokane, WA<br>• Tulsa, OK<br>• Yakima-Pasco-Richland-Kennewick, WA |
| **Tier 2** | | |
| • Market has one or more identified reservation(s) within its geography.<br>• 1%+ of the market's population is made up of Native Americans based on GfK MRI measurement.<br>• There are 4,000-6,999 (1-2% of total) known addresses of Class Members within the market. | • Six weeks of TV coverage (750 GRPs).<br>• Six weeks of radio coverage (500 GRPs) when coverage is efficient.<br>• Ads on any non-metro radio stations.<br>• Ads on all available local Native American radio stations that accept advertising. | • Anchorage, AK<br>• Bend, OR<br>• Billings, MT<br>• Casper-Riverton, WY<br>• Denver, CO<br>• Eureka, CA<br>• Missoula, MT<br>• Portland, OR<br>• Reno, NV<br>• Salt Lake City, UT |
| **Tier 3**<br>**(Markets meet two of the three criteria)** | | |
| • Market has one or more identified reservation(s) within its geography.<br>• 1%+ of the market's population is made up of Native Americans based on GfK MRI measurement.<br>• There are 2,000-3,999 (.5-1% of total) known addresses of Class Members within the market. | • Four weeks of TV coverage (500 GRPs).<br>• Four weeks of radio coverage (500 GRPs) when coverage is efficient on any non-metro radio stations.<br>• Ads on all available local Native American radio stations that accept advertising. | • Chico-Redding, CA<br>• Detroit, MI<br>• Duluth, MN/Superior, WI<br>• Fairbanks, AK<br>• Flint-Saginaw-Bay City, MI<br>• Ft. Smith-Fayetteville, AR<br>• Green Bay-Appleton, WI<br>• Idaho Falls-Pocatello, ID<br>• Joplin, MO/Pittsburg, KS<br>• Juneau, AK<br>• Kansas City, KS<br>• Madison, WI<br>• Omaha, NE<br>• Sacramento-Stockton, CA<br>• San Diego, CA<br>• San Francisco-Oakland, CA<br>• Sherman, TX/Ada, OK<br>• Sioux City, IA |

*Cobell v. Salazar*

| Criteria | Media | Markets |
|---|---|---|
| | | • Topeka, KS<br>• Tucson, AZ<br>• Wausau-Rhinelander, WI<br>• Wichita Falls, TX/Lawton, OK<br>• Wichita-Hutchinson Plus, KS |
| **Tier 4**<br>**(Meets one of the three criteria)** | | |
| • Market has one or more identified reservation(s) within its geography.<br>• 1%+ of the market's population is made up of Native Americans or 1%+ of the total U.S. Native American population is found in the market based on GfK MRI measurement.<br>• There are 2,000+ (.5%+ of total) known addresses of Class Members within the market. | • Four weeks of TV coverage (500 GRPs).<br>• Ads on all available local Native American radio stations that accept advertising.<br>• | • Buffalo, NY<br>• Chicago, IL<br>• Dallas-Ft. Worth, TX<br>• Fresno-Visalia, CA<br>• Lansing, MI<br>• Las Vegas, NV<br>• La Crosse-Eau-Claire, WI<br>• Washington, DC<br>• Yuma, AZ/El Centro, CA |
| **Tier 5**<br>**(Markets that do not have a strong Native American presence but benefit from media support)** | | |
| • Outlying counties that contain identified reservations but do not encompass a significant portion of the market. | • Four weeks of non-metro radio covering identified counties. | • Asheville, NC<br>• Shreveport, LA<br>• South Bend, IN |

## Mainstream Media

*Cobell v. Salazar*

# Television

For this Notice Program, channels and programs appealing to the broadest audience will be selected.  Our program calls for a Television Spot to be aired throughout the day in different program environments to reach the highest number of viewers.  Because less than half of Native Americans subscribe to cable services, only local network programming will be used, with the exception of Alaska, where cable will be used to reach areas where local broadcasting is not guaranteed.

KM recommends placing a 30-second Television Spot on local independent stations in select markets, cable in Alaska, as well as on the following broadcast networks:









In addition to the more well-known networks noted above, we found that it would be cost effective to use the additional networks below to increase coverage in certain markets. These networks tend to broadcast programming that appeals to young, diverse audiences:





Broadcast advertising is broken into "dayparts," specific timeframes within the broadcast day designated for analytical purposes.  While specific times can vary based on time zones and network programming, these dayparts drive pricing and audience delivery when purchasing advertising.  The media schedule will be dispersed among all dayparts to achieve cost efficient reach and give a diverse group of watchers opportunity to see the message.

The television schedule will be allocated as follows:

*Cobell v. Salazar*

# GRP ALLOCATION



*Cobell v. Salazar*

## Mainstream Media
## Radio

The Radio Spot for this plan will be designed to appeal specifically to Native Americans. Each spot will promote the Toll-Free Support Line and the Informational Website for Class Members to obtain more information.  The Spot will alert Class Members to the nature of the Settlement and stress the importance of the legal information to follow.

- ➢ A 60-second spot will run on all selected commercial radio stations.

- ➢ Either a 15-second spot or a 30-second spot will run on public radio stations.

- ➢ National Public Radio (NPR) stations typically do not accept traditional advertising but instead accept "sponsorships" that must abide with guidelines so that the spot is strictly informational and does not actively ask the listener to take action.  Where available and approved, NPR stations will be used that reach a Native American audience.  The stations and programs on which the spot will air are listed in Exhibit 6.

When placing the Radio Spot on local stations, including those broadcast from reservations, KM recommends placing the Radio Spot on a variety of formats, appealing to a broad range of interests and preferences.  Radio formats are the overall content broadcast on a given radio station and drive the music and content programming for each station.  Formats that will be considered for this campaign which appeal to the broader interests of Native Americans include:   Country Music, News/Talk, Urban, Adult Contemporary Hits, and Oldies.

Similar to television dayparts, radio is divided into timeframes within the broadcast day for analytical purposes.  Advertising prices are driven by these dayparts based on the level of listenership.   "Drivetime" is the time of day during the week when people tend to be commuting to/from work and have the highest audiences and therefore highest advertising costs associated with that timeframe.  KM will purchase advertising time across the most efficient dayparts to reach a diverse group of listeners.

The radio schedule will be allocated as follows:



GRP ALLOCATION

- Weekends Sa-Su (6am-7pm); 16%
- Middays M-F (10am-3pm); 28%
- Drivetimes M-F (5-10am/ 3-8pm); 56%

*Cobell v. Salazar*

## Mainstream Media
## Newspaper Supplements

*Parade*, *USA Weekend,* and *American Profile*, publications known as newspaper supplements, are inserted into weekend or Sunday editions of approximately 2,166 newspapers[5], reaching every major media market in the country.  These magazines, printed on newsprint, contain articles written for broad, general appeal and encourage readership through brevity.  Issues are typically fewer than 30 pages.  For this Notice Program, KM recommends newspaper supplements because of their cost-effective reach capability.  They have coverage in all 50 states and the District of Columbia, which provides wide geographical coverage.  The newspaper supplements would be primarily for those Native Americans who no longer live within or near their home reservation and may not stay current with Native American news, providing opportunities to see the Notice. Newspapers that carry these supplements are listed in Exhibit 7.

KM recommends placing the Publication Notice in the following newspaper supplements:



> ➢ A 2/5-page ad (5.25" x 7") one time in *Parade* with an estimated circulation of 32,200,000.

> ➢ *Parade* is carried in the Sunday edition of 519 daily newspapers and is the highest circulating magazine in the world.  Carrier newspapers serve major urban and suburban markets in the U.S.

> ➢ Approximately 32% of Native Americans read an average issue of a newspaper that carries the *Parade* supplement.



> ➢ A digest-page ad (5" x 9.25") one time in *USA Weekend* with an estimated circulation of 22,600,000.

> ➢ *USA Weekend* is carried in the weekend edition of 661 daily newspapers in major markets complementing U.S. markets served by *Parade*.

---

[5] Thirteen newspapers carry *Parade*, *USA Weekend,* and *American Profile*.  373 newspapers carry at least two of the supplements.

© 2010 Kinsella Media, LLC

*Cobell v. Salazar*

➢ Native Americans are 11% more likely than the average U.S. adult to read an average issue of *USA Weekend*, with an estimated 24.7% of Native Americans reading an average issue.



➢ A 3/5-page ad (5.025" x 9.75") one time in *American Profile* with an estimated circulation of 10,000,000.

➢ *American Profile* is carried in 1,343 weekly and daily newspapers that are published primarily in rural counties nationwide.  Editorial content is designed to appeal to small-town Americans and their interests and activities.

➢ Native Americans are 59% more likely than the average U.S. adult to read an issue of *American Profile*, with an estimated 22.8% of Native Americans reading an average issue.

## Mainstream Media
## Military Newspapers

Research shows that Native Americans have a high propensity to join the Armed Forces — 2.3% of all Native Americans are in the military making them nearly 2.5 times more likely to be in the military than the average U.S. adult.

Newspapers on local military bases serve as a widely read and credible information source for military personnel stationed on or near military bases, both in the U.S. and abroad. Military base newspapers will be used to provide those currently serving in the military and their families with additional opportunities to see the Publication Notice. (See Exhibit 8.)

The Publication Notice will run in military publications as follows:

➢ A quarter-page ad (various dimensions) one time in all U.S. base newspapers for a total of 163 newspapers that are distributed weekly, bi-weekly, or monthly on bases, encompassing all branches of the military. These newspapers provide local and national military news relevant to the daily lives of both enlisted and officer personnel.

➢ A 2/5-page ad (6.083" x 9") one time in *Stars and Stripes*, a military newspaper with a total circulation of 91,115, covering all branches with a heavy distribution to deployed military personnel overseas. *Stars and Stripes* delivers independent news and information to the U.S. military community worldwide. It publishes international, national, and local news daily.

© 2010 Kinsella Media, LLC

*Cobell v. Salazar*

# Mainstream Media
## Rodeo Media

Rodeo events are key entertainment events and part of the lifestyle of many people living in western states.  Through primary research and communication with tribal members, KM found that placement in rodeo publications will offer an additional venue in which to place the Publication Notice in order to reach Native Americans.

KM recommends placing the Publication Notice in the following rodeo publications:



➢ A half-page ad (10" x 6.25") one time in *Humps n' Horns*, with an estimated readership of 60,000.

➢ *Humps n' Horns* is a monthly publication dedicated to news and coverage of bull-riding events and associations.  Their comprehensive bull-riding newspaper is made to inform and educate, as well as entertain.



➢ A half-page ad (8" x 10.5") one time in *ProRodeo Sports News*, with an estimated circulation of 27,300.

➢ *ProRodeo Sports News* is a bi-weekly source for the professional rodeo athlete, avid fan, or anyone who enjoys the western way of life.



➢ A rotating banner (120 x 240 pixels) for one month on *www.ProRodeo.com*, which delivers, on average, an estimated 2,000,000 page views per month.

➢ *www.ProRodeo.com* is the online website for the Professional Rodeo Cowboys Association and provides event updates, schedules, and information for the professional rodeo athlete, avid fan, or anyone who enjoys the western way of life.

# Paid Media Delivery

All appropriate Native American media will be used to provide Notice of the Settlement. To select the most effective mainstream media to reach Class Members, KM selected a target audience that encompassed the characteristics of Class Members and chose media vehicles based on their ability to provide effective and cost-efficient penetration of that target audience. KM then measured selected vehicles against the target audience to quantify the reach of the media program and the frequency of exposure to the media vehicles. Reach and frequency estimates are two of the primary measurements used to quantify the media penetration of a target audience.

➢ *Reach* is the estimated percentage of a target audience that is exposed one or more times through a specific media vehicle or combination of media vehicles within a given period.

➢ *Frequency* is the estimated average number of times an audience is exposed to a vehicle carrying the message within a given period of time.

The Notice Program uses both Native American and mainstream media to reach Class Members. Native American media is not measured by GfK MRI or other survey sources. In addition, mainstream media cannot be measured against a target of Native Americans.

Therefore, for media such as TV, radio, and newspapers supplements, reach and frequency estimates are provided for Adults 18 years of age and older as a means of demonstrating the penetration of the media and the frequency of opportunities to see the Notice.

The consumer print portion of the plan provides Class Members with additional opportunities, specifically those who are no longer living on or near their home reservation, to see the Publication Notice and delivers the following estimated reach and frequency measurements to the target audience defined by the *2009 Doublebase Survey* from GfK MRI:

➢ An estimated 59.87% of Native Americans will be reached with an average estimated frequency of 1.3 times, delivering 1,711,000 gross impressions.

The target audience for broadcast media is Adults 18 years of age and older. As previously outlined the type of media used differs by tier as well as by DMA. The weight of the media and size of the DMA will also affect the level of reach achieved.

➢ Tier 1: The reach of Adults 18+ in the DMAs ranges from 72.6% to 97.2%.

➢ Tier 2: The reach of Adults 18+ in the DMAs ranges from 74.8% to 96.5%.

➢ Tier 3: The reach of Adults 18+ in the DMAs ranges from 72.1% to 97.1%.

➢ Tier 4: The reach of Adults 18+ in the DMAs ranges from 68.2% to 92.8%.

*Cobell v. Salazar*

➢ Tier 5:  Non-metro radio is not measurable through accredited sources.

*Cobell v. Salazar*

# Third-Party Notice Program

# Third Party Notice

In addition to Direct Notice and Paid Media Notice, a critical component of the Notice Program is third-party outreach to national and community-based organizations and entities that regularly interface with potential Class Members in order to secure their participation in the Notice effort.  These organizations and entities include: tribal governments, tribal institutions, non-profit organizations that work with Native American populations, associations of Native American landowners, and commercial enterprises that serve potential Class Members or are located near tribal lands.

KM made more than 5,400 phone calls to reach out to these various organizations, requesting their assistance with the Notice effort.  Each organization that agreed to cooperate in the Notice Program will be provided with appropriate pre-produced materials for use in organizational newsletters and bulletins as well as materials to be displayed or distributed such as posters, Long Form Notices, and DVDs.

The Third Party Outreach falls into four categories as follows:

## National, State, and Local Organizations

Conducting thorough online research, KM initially identified more than 500 non-profit organizations that work throughout Indian Country and could assist in notifying Class Members about the Settlement.  Since the announcement of the Settlement, KM has undertaken an extensive effort to speak directly with each organization to ascertain its outreach potential and willingness to assist in providing Notice to Class Members, and to determine what types of Notice materials would be needed.

Through these calls, as well as calls with tribal contacts, KM has also been able to identify other organizations and local government agencies to contact for assistance in getting out word about the Settlement.  Additional contacts include health clinics, eldercare facilities, libraries, educational institutions such as schools and Headstart programs, and church networks, including the Episcopal Church, Roman Catholic Dioceses, the United Methodist Church, and the Presbyterian Church.  To date, more than 900 organizations and government agencies have agreed to participate.  (See Exhibit 9.)

## BIA Affiliated Organizations

Bureau of Indian Affairs ("BIA") is responsible for the administration and management of 55 million surface acres and 57 million acres of subsurface minerals estates held in trust by the U.S. for American Indians, Indian tribes, and Alaska Natives.  In Indian Country, the BIA provides a number of services including, but not limited to, education services, economic development programs, and law enforcement.

To assist in the notice effort, KM contacted the BIA and Indian Health Services ("IHS").  BIA has agreed to post materials in all regional offices and IHS has also agreed to post materials. KM will be working with GCG to send materials including posters and DVDs to the following entities, along with letters from the Director of IHS, and the Deputy Secretary of Interior explaining the importance of posting the materials:

➢ 245 tribal courts
➢ 102 BIA regional offices and agencies
➢ 401 tribal health facilities

## Tribal Outreach

There are 564 federally recognized American Indian tribes and Alaska Native villages in the U.S. Working with the Claims Administrator, KM identified 106 tribes that contain almost 90% of all IIM Account Holders. Extensive outreach was undertaken and will continue to enlist tribal cooperation in dissemination of Notice. To date:

➢ Over 400 tribes have been contacted and over 95% of the top 106 tribes have agreed to receive materials and take a proactive role in the distribution of these materials in their tribal facilities and areas.

➢ Where appropriate and possible, KM contacted individual chapters, districts, and organizations within the tribes and located additional leaders who agreed to post Notices and use DVDs to provide notice of the Settlement.

➢ Almost 600 tribal governments, programs, and offices have agreed to participate in the Notice Program. (See Exhibit 10.)

## Commercial Enterprises

Recognizing the importance of the locally owned businesses on or near tribal lands that tribal members typically shop in or patronize, KM identified and contacted many of them. This includes restaurants, gas stations, casinos, convenience stores, smoke shops, automotive stores and body shops, clothing stores, beauty parlors, barbershops, traditional trading posts, and others. To date, over 600 commercial enterprises have agreed to participate in the Notice Program. (See Exhibit 11.)

In addition, through the Claims Administrator, the following entities have been identified and will be approached to allow the posting of Notice in areas around and contiguous to identified, affected reservations:

➢ U.S. Post Offices
➢ Casinos and other gaming operations
➢ 7-Eleven convenience stores

The Claims Administrator will also support the outreach program by providing "on-the-ground" resources including field personnel. These resources will be deployed to survey a sample of key facilities, such as gas stations and convenience stores, post offices, and other locations, in targeted areas to ensure that materials have been posted.

After distributing the outreach materials, KM will follow up with high-priority outreach targets to encourage them to publicize the Settlement and direct potential Class Members to the Notice.

## Meetings with Class Members

In advance of the start of the notice period, Plaintiffs' litigation team, including Ms. Cobell, traveled extensively throughout Indian Country.  Senior officials from the Department of the Interior and the Department of Justice also met with various Indian and tribal groups. The purpose of the trips was to share information about the status of the case and the terms of the Settlement, and to provide an opportunity for Class Members to ask questions and voice concerns.  The trips have focused on reservations with high concentrations of Class Members and included the following states: Arizona, California, Idaho, Montana, Nebraska, New Mexico, North Dakota, South Dakota, Washington, and Wyoming.

*Cobell v. Salazar*

# Earned Media Program

# Earned Media Program

Earned media provides additional Notice to Class Members, amplifying the Paid Media Notice Program through the use of press releases and targeted follow-up.  Earned media, as opposed to paid media, is not guaranteed to appear.

The earned media outreach for this program will focus primarily on key daily newspapers, Native American media outlets, websites, wire services, national newspaper bureaus, and major television and radio outlets.

## Print and Broadcast Outreach

### Press Release Distribution

A neutral press release will be distributed that highlights the Toll-Free Support Line and Informational Website address so that Class Members can obtain complete information using the following outlets:

> ➢ PR Newswire's US1 national wire, reaching almost 5,000 print and broadcast media outlets, as well as more than 5,000 online media outlets.
> ➢ PR Newswire's Native American distribution list combined with additional Tribal lists, reaching more than 100 media outlets.
> ➢ PR Newswire's Gaming distribution list, reaching 129 publications.
> ➢ 165 military publications across the U.S.
> ➢ Targeted daily and community newspapers with a circulation of more than 20,000 to 30,000, focusing on Tier 1, 2, and 3 markets (see pp. 25-26 for list of markets), reaching a total of 341 publications.

## Targeted follow-up with key media outlets

> ➢ Following distribution of the press release, personalized phone calls/e-mails will be made to key media outlets and contacts including:
>> o Daily and community newspapers in Tier 1, 2, and 3:  341 total contacts.
>> o Media outlets that previously covered the *Cobell* case following the December 2009 settlement announcement:  200+ contacts.
>> o Native American media outlets:  100+ contacts
>> o Targeted military outlets:  approximately 20 contacts

> ➢ Following the initial press release launch, follow-up calls, and emails, all media coverage will be carefully tracked.  Based on coverage results, an additional press release may be distributed three to four weeks prior to the end of the notification period to remind Class Members of their options and the upcoming deadline. The same distribution path outlined above will be utilized.

*Cobell v. Salazar*

> Additional tools such as guest editorials will be developed as needed for placement in tribal, community, and Tier 1, 2, and 3 publications to enhance coverage and message dissemination.

## News Conference (phone/web)

Providing access to interviewees will be an important part of getting the message out to targeted media outlets.  In conjunction with the initial press release launch, phone or web news conferences may be used in order to expand reach and facilitate multiple interviews simultaneously.

## Message Development

All earned media outreach materials will be unbiased, informative stories, designed to provide potential Class Members with a basic overview of the Settlement and how they can obtain further information about their rights.

## News Story Tracking

There will be comprehensive tracking and monitoring of the press release(s) and resulting news coverage.  Print, web, and broadcast will be carefully monitored utilizing national clipping and tracking services.  The monitoring reports will include detailed information by market, media outlet, affiliation, date, time of use, and impressions/circulation when available.

*Cobell v. Salazar*

# Notice Design

# Notice Design
# Methodology

Rule 23(c)(2) of the Federal Rules of Civil Procedure, as well as most state rules of civil procedure, requires class action notices to be written in "plain, easily understood language." KM applies the plain language requirement in drafting notices in federal and state class actions.   The firm maintains a strong commitment to adhering to the plain language requirement, while drawing on its experience and expertise to draft notices that effectively convey the necessary information to Class Members.

## Notice Design
## Long-Form Notice

The Notice will be compliant with Rule 23 and consistent with the Federal Judicial Center's "illustrative" class action notices.  Specifically, the Notice will clearly and concisely state in plain, easily understood language:

- ➢ The nature of the action;

- ➢ The definitions of the classes certified;

- ➢ The class claims, issues, or defenses;

- ➢ That a class member may enter an appearance through an attorney if the member so desires;

- ➢ That the Court will exclude from the class any member who requests exclusion;

- ➢ The time and manner for requesting exclusion; and

- ➢ The binding effect of a class judgment on members under Rule 23 (c)(3).

© 2010 Kinsella Media, LLC

## Notice Design
## Publication Notice

The plain language Publication Notice is an advertisement designed to alert Class Members to the litigation by using a bold headline.  This headline will enable Class Members to quickly determine if they are potentially affected by the litigation. Plain language text provides important information regarding the subject of the litigation, the Class definition, and the legal rights available to Class Members.

The Publication Notice will prominently feature a toll-free number, website, email address, and P.O. Box address for Class Members to obtain the Notice and other information.  The Publication Notice will be translated when appropriate.

## Notice Design
## Radio and TV Ads

The Radio and Television Spots will be designed to appeal to Class Members and attract their attention.

The audio of the Radio Spot and the visuals of the Television Spot will quickly alert viewers and help them determine whether they may be Class Members.   Both spots will prominently feature the website address and toll-free telephone number where Class Members can obtain further information.  The Radio Spot will run for either 15, 30, or 60 seconds, while the Television Spot will run for 30 seconds.  Radio Spots are attached as Exhibit 12.  A Television Spot script is attached as Exhibit 13.

# Notice Design
## DVD

KM will produce a DVD to distribute to tribes, organizations, and other entities for use at meetings, facilities, chapter houses, etc.  The DVD will inform Class Members about their rights and will be especially helpful to those who may not speak English or who read in their native language.  KM recommends the DVD feature an interview with Elouise Cobell discussing key Settlement concepts including:

- ➢ Background and history of the Settlement
- ➢ Who is affected by the Settlement
- ➢ What do IIM Account Holders get
- ➢ Basics of a class action lawsuit, including the process
- ➢ Legal rights of Class Members

The DVD will be dubbed over in the following Native languages:  Apache, Tsalagi (Cherokee), Crow, Dakota, Lakota, Navajo, Ojibwe, Spanish, and Yupik based on requests from third-party groups.  The production will also be uploaded to the Informational Website and YouTube.

© 2010 Kinsella Media, LLC

*Cobell v. Salazar*

# Notice Design:
# Website and Internet Ads

An informational, interactive website is a critical component of the Notice Program.  A website is a constant information source instantly accessible to millions.  The site will take advantage of the Internet's ability to serve as a key distribution channel and customer service bureau.  Internet banner ads will help direct Class Members to the website.

The Informational Website, www.IndianTrust.com, has been active since the Settlement was announced in December of 2009.  The site employs the design characteristics laid out below so that Class Members can easily find the information they need about the Settlement, register to receive updates, and update their personal information.

Since launching, the Informational Website has increased the amount of information available to class members, including an "Ask Elouise" column.  People can write in to Elouise Cobell with questions about the Settlement, and her answers are posted on the website.  Also posted on the website is information about the tribal meetings that have been held throughout Indian Country with Ms. Cobell and members of the litigation team to share information about the Settlement.  Class members can also find the following on the website:

- ➢ Press releases
- ➢ Frequently Asked Questions
- ➢ Resolutions supporting the Settlement
- ➢ Key Court Documents

## Website Design

Combining clean site design, consistent site navigation cues and online registration and claim filing, the website provides Class Members with easy access to the details of the litigation.

- ➢ **Clean Design:**  The site is designed for ease of navigation and comprehension, with user-friendly words and icons.  Once the user enters the website from the homepage, a directory, located in a column on the left-hand side of the page, will provide links to the information available on the website.  These include "Key Documents," "Registration," and a section devoted to IIM Account Holders.  The website also features a "Frequently Asked Questions" section to answer commonly asked questions.  It also provides a toll-free number, mailing address, and email address for individuals seeking additional information.

- ➢ **Consistent Navigation Cues:**  Whenever a user goes from the homepage to another part of the site, links to the homepage and subsections remain on the left side of all pages, while the case title and cite remains fixed at the top of each page.

➢ **ONLINE REGISTRATION:**  In an effort to make it even easier for Class Members to receive information and make claims, the website will allow users to request hard copies of materials, update their personal information, and submit proof of Class Membership.

## INTERNET AD DESIGN

KM will design the Internet banner advertisements to alert Class Members to the Proposed Settlement by using a bold headline.  The headline will enable Class Members to quickly determine if they are potentially affected by the proposed Settlement.  When users click on the banner advertisement, they will be connected automatically to the Informational Website.

## WEBSITE AND SAMPLE INTERNET AD

For reference, on the following page is a screen capture from the home page of the current Informational Website and a sample banner ad:

*Cobell v. Salazar*

*Cobell v. Salazar*

# Toll-Free Telephone Support

A Toll-Free Support Line dedicated to this Settlement has been established so that callers can obtain additional information about the case. An Interactive Voice Response (IVR) platform will be accessible 24 hours a day, seven days a week, once the Settlement is granted preliminary approval, and will provide answers to frequently asked questions and the ability to request that the Claims Administrator mail a full Notice to the caller. Should a caller have questions not addressed on the IVR, experienced representatives will be available to provide additional assistance Monday through Saturday.

# EXHIBIT 1



# Kinsella Media, LLC

## Relevant Case Experience

### Antitrust

*Big Valley Milling, Inc. v. Archer Daniels Midland Co.,* No. 65-C2-96-000215 (Minn. Dist. Ct. Renville County) (lysine).

*Carlson v. Abbott Laboratories,* No. 94-CV-002608 (Wis. Cir. Ct. Milwaukee County) (infant formula).

*Comes v. Microsoft Corp.,* No. CL8231 (Iowa Dist. Ct. Polk County

*Connecticut v. Mylan Laboratories, Inc.,* No. 99-276, MDL No. 1290 (D.D.C.) (pharmaceutical).

*Conroy v. 3M Corp.,* No. C-00-2810 CW (N.D. Cal.) (invisible tape).

*Copper Antitrust Litigation,* MDL 1303 (W.D. Wis.) (physical copper).

*Cox v. Microsoft Corp.,* No. 105193/00 (N.Y. Sup. Ct. N.Y. County) (software).

*D.C. 37 Health & Security Plan v. Medi-Span,* No. 07-cv-10988 (D.Mass.); *New England Carpenters Health Benefits Fund v. First DataBank, Inc.,* No. 1:05-CV-11148 (D. Mass.) (pharmaceutical).

*Giral v. Hoffman-LaRoche Ltd.,* C.A. No. 98 CA 7467 (W. Va. Cir. Ct., Kanawha County) (vitamins).

*In re Buspirone Antitrust Litigation,* MDL No. 1413 (S.D.N.Y.) (pharmaceutical).

*In re Cardizem Antitrust Litigation,* 200 F.R.D. 326 (E.D. Mich.) (pharmaceutical).

*In re Compact Disc Minimum Price Antitrust Litigation,* MDL No. 1361 (D. Me.) (compact discs).

*In re Insurance Brokerage Antitrust Litig.,* MDL No. 1663 Civil No. 04-5184 (FSH) (D.N.J.) (insurance).

*In re International Air Transportation Surcharge Antitrust Litigation,* No. M 06-1793, MDL No. 1793 (N.D. Cal.) (airline fuel surcharges).

*In re Monosodium Glutamate Antitrust Litig.,* D-0202-CV-0200306168, D-202-CV-200306168 (N.M. Dist. Ct., Bernalillo County) (MSG).

*In re Motorsports Merchandise Antitrust Litigation,* No. 1:97-CV-2314-TWT (N.D. Ga.) (merchandise).

*In re Nasdaq Market-Makers Antitrust Litigation*, MDL No. 1023 (S.D.N.Y.) (securities).

*In re Pharmaceutical Industry Average Wholesale Price Litigation*, No. CA:01-CV-12257, MDL No. 1456 (D. Mass.) (pharmaceutical).

*In re Toys "R" Us Antitrust Litigation*, No. CV-97-5750, MDL No. 1211, (E.D.N.Y.) (toys and other products).

*In re Western States Wholesale Natural Gas Antitrust Litigation*, No. CV-03-1431, MDL No. 1566, (D. Nev) (natural gas).

*Kelley Supply, Inc. v. Eastman Chemical Co.*, No. 99CV001528 (Wis. Cir. Ct., Dane County) (Sorbates).

*Ohio vs. Bristol-Myers Squibb, Co.*, No. 1:02-cv-01080 (D.D.C.) (pharmaceutical).

*Raz v. Archer Daniels Midland Co., Inc.*, No. 96-CV-009729 (Wis. Cir. Ct. Milwaukee County) (citric acid).

## Consumer and Product Liability

*Azizian v. Federated Department Stores, Inc.,* No. 4:03 CV-03359 (N.D. Cal.) (cosmetics).

*Baird v. Thomson Consumer Elecs.,* No. 00-L-000761 (Ill. Cir. Ct., Madison County) (television).

*Bonilla v. Trebol Motors Corp.,* No. 92-1795 (D.P.R.) (automobiles).

*Burch v. American Home Products Corp.,* No. 97-C-204 (1-11) (W. Va. Cir. Ct., Brooke County) (Fen Phen).

*Cosby v. Masonite Corp., No.* CV-97-3408 (Ala. Cir. Ct. Mobile County) (siding product); *Quin v. Masonite Corp.,* No. CV-97-3313 (Ala. Cir. Ct. Mobile County) (roofing product).

*Cox v. Shell Oil Co.,* No. 18,844 (Tenn. Ch. Ct. Obion County) (polybutylene pipe).

*Daniel v. AON Corp.,* No. 99 CH 11893 (Ill. Cir. Ct. Cook County) (insurance).

*Fettke v. McDonald's Corp.,* No. 044109 (Cal. Super Ct. Marin County) (trans fatty acids).

*Florida v. Nine West Group, Inc.,* No. 00 CIV 1707 (S.D.N.Y.) (shoes).

*Foothill/De Anza Community College Dist. v. Northwest Pipe Co.,* No. 00-20749-JF (N.D. Cal.) (fire sprinklers).



*Galanti v. The Goodyear Tire & Rubber Company,* No. 03-209 (D.N.J.) (radiant heating) (2002).

*Garza v. Sporting Goods Properties, Inc.,* No. SA 93-CA-1082 (W.D. Tex.) (gun ammunition).

*Hoorman v. GlaxoSmithKline,* No. 04-L-715 (Ill. Cir. Ct., Madison Cty.) (Paxil pharmaceutical*).*

*In re Louisiana Pacific Corp. Inner Seal OSB Trade Practices Litigation,* MDL No. 1114 (N.D. Cal.) (oriented strand board).

*In re Tri-State Crematory Litig,* MDL 1467 (N.D. Ga.) (improper burial).

*Lebrilla v. Farmers Group Inc.,* No. 00-CC-07185 (Cal. Super. Ct., Orange County) (auto insurance).

*Lovelis v. Titflex,* No. 04-211 (Ak. Cir. Ct., Clark County) (gas transmission pipe).

*Naef v. Masonite Corp.,* No. CV-94-4033 (Ala. Cir. Ct. Mobile County) (hardboard siding product).

*Peterson v. BASF Corp.,* No. C2-97-295 (D. Minn.) (herbicide).

*Posey v. Dryvit Sys., Inc.* No. 17,715-IV (Tenn. Cir. Ct., Jefferson County) (EIFS stucco).

*Reiff v. Epson America, Inc. and Latham v. Epson Am., Inc.,* J.C.C.P. No. 4347 (Cal. Super. Ct., L.A. County) (ink jet printers).

*Richison v. Weyerhaeuser Company Limited,* No. 05532 (Cal. Super. Ct. San Joaquin County) (roofing product).

*Ruff v. Parex, Inc.,* No. 96-CvS 0059 (N.C. Super. Ct. Hanover County) (synthetic stucco product).

*Shah v. Re-Con Building Products, Inc.,* No. C99-02919 (Cal. Super. Ct. Contra Costa County) (roofing product).

*Shields vs. Bridgestone/Firestone, Inc., Bridgestone Corp.,* No. E-167.637 (D. Tex.) (tires).

*Smith v. Behr Process Corp.,* No. 98-2-00635 (Wash. Super. Ct., Gray Harbor County) (stain product).

*Weiner v. Cal-Shake, Inc., J.*C.C.P. No. 4208 (Cal. Super. Ct., Contra Costa County) (roofing product).

*Wholesale Elec. Antitrust Cases I & II,* J.C.C.P. Nos. 4204 & 4205 (Cal. Super. Ct., San Diego County) (energy).

*Woosley v. State of California,* No. CA 000499 (Cal. Super. Ct., Los Angeles County) (automobiles).



## Mass Tort

*Ahearn v. Fibreboard Corp.,* No. 6:93cv526 (E.D. Tex); *Continental Casualty Co. v. Rudd*, No. 6:94cv458 (E.D. Tex) (asbestos injury).

*Backstrom v. The Methodist Hospital,* No. H.-94-1877 (S.D. Tex.) (TMJ injury).

*Engle v. RJ Reynolds Tobacco Co.,* No. 94-08273 (Fla. Cir. Ct. Dade County) (tobacco injury).

*Georgine v. Amchem, Inc.,* No. 93-CV-0215 (E.D. Pa.) (asbestos injury).

## Bankruptcies

*In re Armstrong World Industries, Inc.,* No. 00-4471 (Bankr. D. Del.).

*In re Dow Corning,* No. 95-20512 (Bankr. E.D. Mich.) (breast implants).

*In re Johns-Manville Corp.,* 68 B.R. 618, 626 (Bankr. S.D.N.Y.) (asbestos).

*In re Kaiser Aluminum Corp.,* No. 02-10429 (JFK) (D. Del).

*In re Owens Corning,* No. 00-03837 (Bankr. D. Del.).

*In re Raytech Corp.,* No. 5-89-00293 (Bankr. D. Conn.) (asbestos).

*In re The Celotex Corp.,* Nos. 90-10016-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.) (asbestos).

*In re U.S. Brass Corp.,* No. 94-40823S (Bankr. E.D. Tex.) (polybutylene).

*In re USG Corp.,* Nos. 01-2094 - 01-2104 (Bankr. D. Del.).

*In re W.R. Grace & Co.,* No. 01-01139 (Bankr. D. Del.).

## Insurance

*McNeil v. American General Life and Accident Insurance Co.,* No. 8-99-1157 (M.D. Tenn.) (insurance).

*Nealy v. Woodmen of the World Life Insurance Co.,* No. 3:93 CV-536 (S.D. Miss.) (insurance).

## Holocaust Victims Reparations



*In re Holocaust Victim Assets Litigation,* Nos. CV 96-4849, CV-5161 and CV 97-461 (E.D.N.Y.) (Holocaust).

The International Commission on Holocaust Era Insurance Claims Outreach

## Pension Benefits

*Collins v. Pension Benefit Guarantee Corp.,* No. 88-3406 (D.D.C.); Page v. Pension Benefit Guarantee Corp., No. 89-2997 (D.D.C.).

*Forbush v. J. C. Penney Co., Inc.,* Nos. 3:90-2719 and 3:92-0109 (N.D. Tex.).

## International

*Ahearn v. Fiberboard Corporation,* No. 6:93cv526 (E.D. Tex) and *Continental Casualty Co. v. Rudd,* No. 6:94cv458 (E.D. Tex.) (asbestos injury) (1993).

*Galanti v. The Goodyear Tire & Rubber Company,* No. 03-209 (D.N.J.) (radiant heating) (2002).

*In re Holocaust Victims Assets Litigation,* No. CV 96-4849 (ERK) (MDG) (Consolidated with CV-5161 and CV 97461) (E.D.N.Y.) (2003).

*In re Owens Corning, Chapter 11,* No. 00-03837 (MFW) (Bankr. D. Del.) (2006).

*In re The Celotex Corporation, Chapter 11,* Nos. 90-10016-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.) (1996).

*In re USG Corporation, Chapter 11,* Nos. 01-2094 (RJN) through 01-2104(RJN) (Bankr. D. Del.) (2006).

*In re Western Union Money Transfer Litigation,* No. 01 0335 (CPS) (VVP) (E.D.N.Y.) (wire transactions) (2004).

*In re W.R. Grace & Co., Chapter 11,* No. 01-01139 (Bankr. D. Del.) (bankruptcy) (2001).

International Committee on Holocaust Era Insurance Claims (1999).

## Product Recall

Central Sprinkler Voluntary Omega Sprinkler Replacement Program

*Hart v. Central Sprinkler Corp.,* No. BC17627 (Cal. Super. Ct. Los Angeles County) & *County of Santa Clara v. Central Sprinkler Corp., No.* CV 17710119 (Cal. Super. Ct. Santa Clara County)



**Telecom**

*Bidner, et al. v. LCI International Telecom Corp d/b/a Qwest Communications.*

*Community Health Association v. Lucent Technologies, Inc.,* No. 99-C-237, (W.Va. Cir. Ct., Kanawha County).

*Cundiff et al. v. Verizon California, Inc.,* No. 237806 (Cal. Super Ct., Los Angeles County).

*Kushner v. AT&T Corporation,* No. GIC 795315 (Cal. Super. Ct., San Diego County).

*Rish Enterprise v. Verizon New Jersey,* No. MID-L-8946-02 (N.J. Super. Ct.).

*Sonnier, et. al. v. Radiofone, Inc.,* No. 44-844, (L.A. Jud. Dist. Ct., Plaqueimes Parish County).

*State of Louisiana v. Sprint Communications Company L.P.,* No. 26,334 (Jud. Dis. Ct., Parish of West Baton Rouge) and *State of Louisiana v. WilTel, Inc.,* No. 26,304 (Jud. Dis. Ct., Parish of West Baton Rouge).



# EXHIBIT 2

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

# Important information about the $3.4 billion Indian Trust Settlement

### For current or former IIM account holders, Owners of land held in trust or restricted status, or their heirs

*A federal court authorized this notice. You are not being sued.*

For Notice in Spanish, Call or Visit Our Website (to be translated into Spanish)

For Notice in Navajo, Call or Visit Our Website (to be translated into Navajo)

- A proposed Settlement has been reached in *Cobell v. Salazar*, a class action lawsuit about individual Indian land, funds and other assets held in trust by the federal government. Courts decided that the federal government has violated its trust duties, including a duty to account for Individual Indian Money trust funds. The Settlement will resolve claims that the government violated its trust duties by (a) mismanaging individual Indian trust funds and other assets, (b) improperly accounting for those funds, and (c) mismanaging trust land and other assets. The individual Indian trust land is called "allotted" land and owners are from time to time referred to as "beneficiaries," "allottees," or "landowners."

- You may be part of this Settlement with certain rights in this Settlement if you are an:
  - Individual Indian Money ("IIM") account holder (even if the account currently is not active or open),
  - Individual Indian who has or had an ownership interest in land held in trust or in restricted status,
  - Heir to a deceased IIM account holder or individual landowner.

- The Settlement establishes funds worth approximately $1.5 billion to pay individual Indian trust beneficiaries for past accounting problems and resolve historical asset mismanagement claims. Settlement and administrative expenses, incentive fees and expenses of the Class Representatives, and legal fees and expenses will be paid out of these settlement funds. Another $1.9 billion will be used primarily to buy up interests in trust lands that are owned by many people ("fractionated interests").

- Congress has passed legislation authorizing the Settlement and provided funding for it. The President has signed the legislation into law.

- The Court in charge of this case still has to decide whether to approve the Settlement. Payments will be made if the Court approves the Settlement and after any appeals are resolved. If the Settlement is approved by the Court, the majority of individual Indian trust beneficiaries will get at least $1,500.

**QUESTIONS? CALL TOLL-FREE 1-800-961-6109 OR VISIT WWW.INDIANTRUST.COM**

<u>UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA</u>

- The Settlement also creates an Indian Education Scholarship Fund worth up to $60 million to improve access to higher education for Indian youth.

**Your legal rights are affected whether you act or do not act, so please read this notice carefully.**

| These rights and options—and the deadlines to exercise them—are explained in this notice. | |
| --- | --- |
| You can object to or comment on the Settlement. | *see* Question 30 |
| You can go to a hearing and ask the Court to speak about the Settlement. | *see* Question 36 |
| You may also have the right to exclude yourself from part of the Settlement. | *see* Question 27 |

- The full details of the Settlement can be found in a document called the Settlement Agreement, and subsequent modifications to it, which can be found on the web at www.IndianTrust.com.

| WHAT THIS NOTICE CONTAINS |
|---|

**BASIC INFORMATION** ………………………………………………………………..**PAGE 5**

    1.      Why did I get this notice?
    2.      What are Individual Indian Money ("IIM") accounts?
    3.      Who is affected by this Settlement?
    4.      What is this lawsuit about?
    5.      Why is there a Settlement?

**WHO IS IN THE SETTLEMENT** ........................................................**PAGE 6**

    6.      Who is part of the Settlement?
    7.      Are there exceptions to being included?
    8.      If I had an IIM account that is now inactive or never existed, does this Settlement affect me?
    9.      I'm not sure if I'm included in the Settlement.

**THE SETTLEMENT BENEFITS—WHAT YOU GET**............................................**PAGE 8**

    10.     What does the Settlement provide?
    11.     What is highly fractionated land?
    12.     How much will my payment be if I'm a Historical Accounting Class Member?
    13.     How much will my payment be if I'm a Trust Administration Class Member?
    14.     How will the Accounting/Trust Administration Fund be distributed?
    15.     What happens to any funds left in the Accounting/Trust Administration Fund?
    16.     What is the Trust Land Consolidation Fund?
    17.     How much money can I get from selling my land?
    18.     How can I sell my land?
    19.     What happens to land when owners cannot be located?
    20.     How long will the Trust Land Consolidation Fund continue?
    21.     How will the Indian Education Scholarship Fund work?
    22.     How will the Indian Education Fund be administered?
    23.     How does this Settlement affect trust reform?

**HOW TO GET A PAYMENT**……………………………………………..............................**PAGE 12**

    24.     How can I get a payment?
    25.     When will I get my payment?

**REMAINING IN THE SETTLEMENT**……………………………..........................**PAGE 12**

    26.     Do I need to do anything to remain in the Settlement?
    27.     What am I giving up as part of the Settlement?

**EXCLUDING YOURSELF FROM THE SETTLEMENT** ....................................................**PAGE 13**

    28.     What if I don't want to be in the Settlement?
    29.     How do I get out of the Trust Administration Class?

**OBJECTING TO OR COMMENTING ON THE SETTLEMENT**......................................**PAGE 14**

    30.     How can I object to or comment on the Settlement?
    31.     What's the difference between objecting to and excluding myself from the Settlement?

**THE LAWYERS REPRESENTING YOU** .............................................................**PAGE 15**

    32.     Do I have a lawyer in the case?
    33.     How will the lawyers be paid?

**THE COURT'S FAIRNESS HEARING**..........................................................................**PAGE 16**

    34.     When and where will the Court decide whether to approve the Settlement?
    35.     Do I have to come to the hearing?
    36.     May I speak at the hearing?

**QUESTIONS? CALL TOLL-FREE 1-800-961-6109 OR VISIT WWW.INDIANTRUST.COM**

**GETTING MORE INFORMATION** ...........................................................................................**PAGE 16**

     37.     How do I get more information?

# BASIC INFORMATION

## 1. Why did I get this notice?

You received this notice because Interior Department records show that: (a) you are now or have been an Individual Indian Money ("IIM") account holder, or (b) you have an individual interest in trust land, or (c) you have requested that this notice be mailed to you. A Court authorized this notice because you have a right to know about a proposed Settlement of this class action lawsuit and about your options, before the Court decides whether the Settlement is fair and to give final approval to the Settlement. This notice explains the lawsuit, the Settlement, and your legal rights.

Judge Thomas F. Hogan, of the United States District Court for the District of Columbia, is currently overseeing this case. The case is known as *Cobell v. Salazar*, No. 1:96cv01285, and is a class action lawsuit.

In a class action lawsuit, one or more people called Class Representatives (in this case, Elouise Cobell and others) sue on behalf of other people who have similar claims. The people together are called a "Class" or "Class Members." The people who sued—and all the Class Members like them—are called the Plaintiffs. The people they sued (in this case, the Secretaries of the Interior and Treasury and the Assistant Secretary-Indian Affairs (together called the "federal government")) are called the Defendants. One court resolves the issues for everyone who remains in the Class.

## 2. What are Individual Indian Money ("IIM") accounts?

IIM accounts primarily contain money collected by the federal government from farming and grazing leases, timber sales, mining, oil and gas production, and other activities on trust land, as well as certain per capita distributions. The funds in IIM accounts are held in trust by the federal government for the benefit of individual Indians.

## 3. Who is affected by this Settlement?

The Settlement will affect all Class Members (*see* Question 6). Class Members include individual Indian trust beneficiaries, which means those individuals who:
- Had an IIM account anytime from approximately 1985 through September 30, 2009, or
- Had an individual interest in land held in trust or restricted status by the U.S. government as of September 30, 2009

The estate of a deceased individual described above whose account was in probate status as of September 30, 2009 is included. Probate means you have asked a court to transfer ownership of the landowner's property after he or she died.

This Settlement does not relate to certain historical claims or any future claims of Class Members. It does not relate to claims tribes might have against the federal government.

## 4. What is this lawsuit about?

The Settlement resolves claims that the federal government violated its trust duties to individual Indian trust beneficiaries. The claims fall into three areas:

- Historical Accounting Claims state that the federal government violated its trust duties by not providing a proper historical accounting relating to IIM accounts and other trust assets.
- Trust Administration claims include:
    - o Fund Administration Claims state that the federal government violated its trust duties and mismanaged individual Indian trust funds.
    - o Land Administration Claims state that the federal government violated its trust responsibilities for management of land, oil, natural gas, mineral, timber, grazing, and other resources.

The federal government denies all these claims.  It says it has no legal responsibility for these claims and owes nothing to the Class Members.

## 5.  Why is there a Settlement?

The Settlement is an agreement between the Plaintiffs and the federal government.  Settlements end lawsuits.  This does not mean the Court has ruled in favor of either side.  The parties wish to resolve their differences and realize that many Class Members are elderly and dying and need to receive compensation. In addition, large numbers of Class Members currently live in poverty.  So, after 14 years of litigation, both sides want to settle the lawsuit so individual Indian trust beneficiaries receive compensation for their claims.  The Settlement will also help the federal government reduce future administration expenses and accounting issues.  Class Representatives and lawyers representing them believe that the Settlement is reasonable under the circumstances.

## WHO IS IN THE SETTLEMENT?

## 6.  Who is part of the Settlement?

The proposed Settlement affects individual Indians across the country, including members of most federally recognized tribes west of the Mississippi River. The Settlement includes two groups or "Classes."  An individual may be a member of one or both Classes.  Most people included in the Settlement are members of both Classes.

Historical Accounting Class

- Anyone alive on September 30, 2009,
- Who had an open IIM account anytime between October 25, 1994 and September 30, 2009, and
- Whose account had at least one cash transaction (that was not later reversed).

**Note to heirs:**
- The estate of an IIM account holder who was deceased as of September 30, 2009is included in the Historical Accounting Class if the IIM account (or its related probate account) was open as of that date.
- The heirs of any Class Member who died after September 30, 2009, but before distribution of any Settlement funds, will receive that Class Member's Settlement payments through probate.

Trust Administration Class

- Anyone alive on September 30, 2009, and who
  - ▪ Had an IIM account recorded in currently available electronic data in federal government systems ("Electronic Ledger Era") anytime from approximately 1985 to September 30, 2009, or
  - ▪ Can demonstrate ownership interest in trust land or land in restricted status as of September 30, 2009.
- The estate of any deceased beneficiary whose IIM account or other trust assets had been open in probate as reflected in the federal government's records as of September 30, 2009.

**Note to heirs**:
- The heirs of any Class Member who died after September 30, 2009, but before distribution of any Settlement funds, will receive that Class Member's Settlement payments through probate.

| 7. Are there exceptions to being included? |
| --- |

The Historical Accounting Class does not include individuals who filed a separate lawsuit before June 10, 1996, against the federal government making a claim for a complete historical accounting.

The Trust Administration Class does not include individuals who filed a separate lawsuit or who were part of a certified class in a class action lawsuit making a Funds Administration Claim or a Land Administration Claim against the federal government before **December 10, 2010.**

| 8. If I never had an IIM account or my IIM account is now inactive or closed, does this Settlement affect me? |
| --- |

It could. If you are included in the Historical Accounting Class and/or the Trust Administration Class as defined in Question 6, this Settlement does affect you.

If you **are NOT currently receiving quarterly or annual IIM account statements**, you should fill out a claim form and mail it to the address on the form. You can also submit your claim form online at www.IndianTrust.com. You may be asked to provide additional information to demonstrate your membership in the Historical Accounting Class and/or the Trust Administration Class. Claims must be postmarked or submitted online no later than **Month 00, 0000.**

| 9. I'm not sure if I'm included in the Settlement. |
| --- |

If you are not sure whether you are included in one or both Classes or you are unsure if the federal government has your current address, you should call toll-free 1-800-961-6109 with questions or visit www.IndianTrust.com. You may also write with questions to Indian Trust Settlement, P.O. Box 9577, Dublin, OH 43017-4877. If you believe that you should be considered a member of either Class, but are not receiving quarterly or annual IIM account statements, you must fill out a claim form and mail it to the address on the form, postmarked no later than Month 00, 2011 so the Court can determine whether you are included in the Settlement.

## THE SETTLEMENT BENEFITS—WHAT YOU GET

**10.  What does the Settlement provide?**

The Settlement will provide:
- $1.412 billion Accounting/Trust Administration Fund, plus a $100 million Trust Administration Adjustment Fund, plus any earned interest, to pay for historical accounting and trust administration claims.  This money will also pay for the cost of administering and implementing the Settlement, as well as other expenses (*see* Question 13).
- $1.9 billion Trust Land Consolidation Fund to purchase highly "fractionated" individual Indian trust lands (*see* Question 11).  The program will allow individual Indians to get money for land interests divided among numerous owners.  Land sales are voluntary.   The purchased land will be used for the benefit of the related tribe.
- Up to $60 million for an Indian Education Scholarship Fund to help Native Americans attend college or vocational school.   This money will come out of the $1.9 billion Trust Land Consolidation Fund and will be based upon the participation of landowners in selling these highly fractionated land interests.

More details are in a document called the Settlement Agreement, which is available at www.IndianTrust.com.

**11.  What is fractionated land?**

Fractionated land is a parcel of land that has many owners, often hundreds of owners.  Frequently, owners of highly fractionated land receive very little money from that land.

### ACCOUNTING/TRUST ADMINISTRATION FUND

**12.  How much will my payment be if I'm an Accounting Class Member?**

Each member of the Historical Accounting Class will receive $1,000.  This is a per-person, not a per-account, payment.

**13.  How much will my payment be if I'm a Trust Administration Class Member?**

It depends on how much income you've collected into your IIM account. Each member of the Trust Administration Class will receive a baseline payment of $500.  The $100 million in the Trust Administration Adjustment Fund will be used to increase the minimum payment for Trust Administration Class members.  The current estimate is that will raise the minimum payment to Trust Administration Class members to about $800.  Individuals with an IIM account open between 1985 and September 30, 2009 may receive more than $800.  This payment is separate from, and in addition to, the $1,000 payment to individuals in the Historical Accounting Class.

The calculation uses an average of the 10 highest years of income in your IIM account – this is called your Assigned Value.  That will determine your share of the trust administration fund, which is estimated to be $850 million to $1 billion.  The exact dollar amount you will get cannot be known with certainty at this time because it is based on (a) the recorded income deposited to your IIM account over a period of

time, and (b) the amount of money that will be left in the Accounting/Trust Administration Fund after deducting:

- All of the $1,000 payments to Historical Accounting Class Members, and

- Attorneys' fees, their expenses, including expense reimbursements and possibly incentive fees to Class Representatives (*see* Question 33) and the costs of administering and implementing the Settlement.

Congress has determined that payments to Trust Administration Class members should be increased for individual's whose payment is calculated to be:

- Zero; or
- Greater than zero (but only if you would have received a smaller Stage 2 payment (*see* Question 14) than Trust Administration Class members whose payment is calculated to be zero),

**For example**, if you were supposed to receive a base payment of $500, your payment might be increased to $800.  If your neighbor was supposed to receive a base payment of $600, his payment might be increased to $800.

The following are estimated calculations and are in addition to the $1,000 you will receive as a member of the Historical Accounting Class.  Your final Trust Administration payment could be more or less.

- If your Assigned Value is between $0 and $5,000, you may receive between $800 and $1,250.00.
- If your Assigned Value is between $5,000.01 and $15,000, you may receive between $1,250.01 and $2,500.
- If your Assigned Value is between $15,000.01 and $30,000, you may receive between $2,500.01 and $5,000.
- If your Assigned Value is between $30,000.01 and $75,000, you may receive between $5,000.01 and $15,000.
- If your Assigned Value is between $75,000.01 and $750,000, you may receive between $10,000.01 and $150,000.
- Individuals with an Assigned Value greater than $750,000.01 may receive more than $150,000.

If your account shows fewer than ten years of income, a zero dollar amount will be used in the years for which no income has been recorded.  Reversed transactions and transfers between an individual's accounts will not be included in that calculation.

## 14. How will the Accounting/Trust Administration Fund be distributed?

If the Settlement is approved, there will be two distributions.

Stage 1 – The $1,000 payments to Historical Accounting Class Members will be distributed shortly after the Settlement is approved and the Court's order becomes final.  For those Class Members who cannot be found, their payment will be deposited in a Remainder Account until the Class Member is located and can demonstrate his or her ownership interest.  If a Class Member cannot be located prior to the conclusion of the distribution process, his or her funds will be transferred to the Indian Education Scholarship Fund (*see* Question 21).

Stage 2 – Payments to Trust Administration Class Members will be distributed after it is determined that substantially all the Trust Administration Class Members have been identified and the payments have been calculated (*see* Question 12).

## 15. What happens to any funds left in the Accounting/Trust Administration Fund?

After all payments are made, any money that is left over will be contributed to the Indian Education Scholarship Fund (*see* Question 20).

### TRUST LAND CONSOLIDATION FUND

## 16. What is the Trust Land Consolidation Fund?

Over time, through generations, Indian trust lands owned by individuals have been fractionated into smaller and smaller undivided ("fractionated") ownership interests.   According to government calculations, owners historically have received very little money and the cost to administer the IIM account frequently has been more than what is paid out to individual Indians.

The $1.9 billion Trust Land Consolidation Fund will provide individual Indians with an opportunity to get money for the fractionated land.  As an additional incentive for owners to sell their land interests, an amount above the fair-market value will be paid into the Indian Education Scholarship Fund (*see* Question 21).

The Trust Land Consolidation Fund will be used for four things: (1) to purchase the fractionated land interests, (2) to carry out the Trust Land Consolidation Program, (3) to further Trust Reform efforts (*see* Question 22), and (4) to set aside up to $60 million for Indian scholarships.  At least 85% of the Fund will be used to purchase land. The Department of the Interior will consult with tribes to identify fractional interests that the Department may want to consider purchasing.

## 17. How much money can I get from selling my land?

The Department of the Interior will offer fair market value for fractionated trust land.

## 18. How can I sell my land?

The procedures for selling trust land have not been determined at this point.  Once those procedures have been determined, the Department of the Interior will attempt to contact individual Indian trust beneficiaries who own fractionated interests that it wishes to purchase.

## 19. What happens to land when owners cannot be located?

For fractionated interests that the Department of the Interior wishes to purchase, but whose owners cannot be located, Interior will attempt to find missing Class Members, including through the publication of notice in appropriate newspapers and newsletters for a period of at least six months.  Five years after the Settlement is granted final approval, Class Members whose whereabouts are unknown, after diligent efforts have been made by the federal government to locate them, will be assumed to have consented to

the transfer of their fractionated interests and their Indian Land Consolidation Funds will be deposited into an IIM account.

**20.  How long will the Trust Land Consolidation Fund continue?**

The Department of the Interior will have up to 10 years from the date the Settlement is granted final approval to purchase the fractionated trust land.  Any money remaining in the Land Consolidation Fund after that time will be returned to the U.S. Treasury.

### INDIAN EDUCATION SCHOLARSHIP FUND

**21.  How will the Indian Education Scholarship Fund work?**

The Indian Education Scholarship Fund will provide money for Native American students to attend college and vocational school.  It will be funded in three ways:

- Up to $60 million will come from the Trust Land Consolidation Fund in connection with the purchase of fractionated interests in trust land.  Contributions will be as follows:

| Land Purchase Price | Contribution to Fund |
| --- | --- |
| Less than $200 | $10 |
| Between $200 - $500 | $25 |
| More than $500 | 5% of the purchase price |

The amount paid into the Indian Education Scholarship Fund is in addition to the fair market value amount that will be paid to the individual Indian landowner.

- Any remaining funds in the Accounting/Trust Administration Fund, after all distributions and costs relating to the Settlement are paid, will be transferred to the Indian Education Scholarship Fund.

- Any payments for Class Members that remain unclaimed for five years after Settlement is approved will be transferred to the Indian Education Scholarship Fund.  This transfer will not occur for money being held for minors and adults who are mentally impaired, legally disabled, or otherwise in need of assistance.

**22.  How will the Indian Education Scholarship Fund be administered?**

A non-profit organization chosen by the parties will administer the Indian Education Scholarship Fund. A special board of trustees will oversee the Fund.  The trustees will be selected by the Secretary of the Interior, the representative Plaintiffs, as well as the non-profit. The Secretary will select his trustees only after consulting with tribes and after considering names of possible candidates timely offered by tribes.

**INDIAN TRUST REFORM**

**23.  How does this Settlement affect Indian trust reform?**

Reform of the Indian trust management and accounting system should continue in the future.  The Settlement Agreement allows some funds in the Trust Land Consolidation Fund to be used to pay costs related to the work of a commission on Indian trust administration and reform.   In the future, Class Members will still be able to bring claims against the federal government for trust reform.

**HOW TO GET A PAYMENT**

**24.  How can I get a payment?**

To be eligible for any payments under the Settlement, you must be a member of one or both Classes.  If you are not receiving quarterly or annual IIM account statements and you believe you are a member of either Class, you will need to fill out a claim form.  The claim form describes what you need to provide to prove your claim and receive a payment.  Please read the instructions carefully, fill out the claim form and mail it postmarked by **Month 00, 2011**, to:

> Indian Trust Settlement
> P.O. Box 9577
> Dublin, OH 43017-4877

If you are denied participation, there will be an opportunity to submit additional documentation.

**25.  When will I get my payment?**

Payments will be made after the Court grants final approval of the Settlement, and any appeals are resolved.

**REMAINING IN THE SETTLEMENT**

**26.  Do I need to do anything to remain in the Settlement?**

You do not have to do anything to remain in the Settlement unless you are not receiving quarterly IIM account statements.  In that case, you will need to fill out and return a claim form in order to get a payment.

**27.  What am I giving up as part of the Settlement?**

If the Settlement becomes final, you will give up your right to sue the federal government for the claims being resolved by this Settlement.  The specific claims you are giving up against the federal government are described in Section A, paragraphs 14, 15, and 21 of the Settlement Agreement.  You will be "releasing" the federal government and all related people as described in Section I of the Settlement Agreement.  The Settlement Agreement is available at www.IndianTrust.com.

If you did not receive an IIM account statement for 2009, you may request your IIM account balance as of September 30, 2009 by calling 888-678-6836. If you request your IIM account balance, you are agreeing to the balance provided by Interior unless you exclude yourself from the Settlement (*see* Question 28).

The Settlement Agreement describes the released claims with specific descriptions, so read it carefully. If you have any questions, you can talk to the law firms listed in Question 32 for free or you can talk to your own lawyer at your own expense.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

### 28.  What if I don't want to be in the Settlement?

By law, you cannot exclude yourself from the Historical Accounting Class, if you are a member. You can only exclude yourself from the Trust Administration Class. If you don't want to be in that part of the Settlement, you must take steps to exclude yourself. This is sometimes called "opting out." By excluding yourself, you keep the right to file your own lawsuit. Or you can join any other person who opted out and bring a separate lawsuit against the federal government on any Trust Fund Administration or Land Administration Claims that you may have.

If you choose to exclude yourself from the Trust Administration Class,

- You will not receive any money for your Fund Administration and Land Administration Claims.
- You will not be bound by the Court's ruling and will keep your right to sue the federal government for these Claims.
- You cannot object to or comment on this aspect of the Settlement as far as it concerns the Trust Administration Class.

If you are a member of the Historical Accounting Class:

- You **cannot** exclude yourself.
- If the Court approves the Settlement, you will not be able to sue the federal government about the Historical Accounting Claims.
- You will receive a $1,000 payment.
- You can object to and/or comment on the terms of the Settlement.

### 29.  How do I get out of the Trust Administration Class?

To exclude yourself, you must send a letter by mail saying that you want to be excluded from *Cobell v. Salazar*. Be sure to include your full name, telephone number, social security number, IIM account number(s) (if any), and your signature. You can't ask to be excluded on the phone or at the website. You must mail your exclusion request so that it is postmarked by **Month 00, 2011** to:

> Indian Trust Exclusions
> PO Box 9419
> Dublin, OH 43017-4519

Please note that the share of money you would have received if you had stayed in the Trust Administration Class will be removed from the $1.512 billion Accounting/Trust Administration Fund and given back to the federal government.

## OBJECTING TO OR COMMENTING ON THE SETTLEMENT

### 30.  How can I object to or comment on the Settlement?

Any Class Member  may comment on or object to the Settlement.  However, if you exclude yourself from the Trust Administration Class, you may only object to, or comment on, other parts of the Settlement that you do not like.  Also, you may comment on or object to fee and expense requests for Class Counsel and incentive awards and expenses for Class Representatives and other amounts that may be awarded by the Court (see Question 33 below).  If you object to any part of the Settlement you must give reasons why. You may also comment favorably on any part of the Settlement.  To object or comment, send a letter stating:

a) The case name (*Cobell v. Salazar*) and case number (1:96cv01285);

b) Your full name, address, telephone number, IIM Account Number(s) and signature;

c) Comments you have about any aspect of the Settlement, including (1) fee and expense requests for Class Counsel, (2) incentive awards and expenses for Class Representatives, or (3) other fees and expenses that may be awarded.  Your comments must state the specific reasons why you are objecting to the Settlement, and

d) Any legal support or factual evidence that you wish to bring to the Court's attention, any grounds to support your status as a Class Member, and whether you intend to appear at the Fairness Hearing.

Mail your comments or objection to these three different places postmarked no later than **Month 00, 2011**:

| COURT | CLASS COUNSEL | DEFENSE COUNSEL |
|---|---|---|
| Clerk's Office<br>United States District Court<br>for the District of Columbia<br>333 Constitution Avenue, N.W.<br>Washington, D.C. 20001 |  | Robert E. Kirschman<br>Dept of Justice, Civil Div.<br>P.O. Box 875<br>Ben Franklin Station<br>Washington, DC 20044 |

At your own expense, you may also appear at the Fairness Hearing to comment on or object to any aspect of the fairness, reasonableness, or adequacy of the Settlement. (See Question 36.)

### 31.  What's the difference between objecting to and excluding myself from the Settlement?

You object to the Settlement when you disagree with some part of it but you wish to remain a Class Member.  An objection allows the Court to consider your views.  On the other hand, exclusion or "opting out" means that you do not want to be part of the Trust Administration Class or share in the benefits of that part of the Settlement.  Once excluded, you lose any right to object to any part of the Settlement that relates to the Trust Fund Administration Claims or the Land Administration Claims, because those parts of the case no longer affect you.  If you exclude yourself, you are free to bring your own lawsuit for those claims.

## THE LAWYERS REPRESENTING YOU

**32.  Do I have a lawyer in the case?**

The Court has appointed these lawyers to represent you and other Class Members as "Class Counsel," including:

| | |
|---|---|
| Dennis Gingold<br>607 14th Street NW, Suite 900<br>Washington, DC  20005-2018 | Keith Harper<br>Kilpatrick Stockton LLP<br>607 14th Street NW, Suite 900<br>Washington, DC  20005-2018 |

You will not be charged personally for these lawyers. If you want to be represented by another lawyer, you may hire one to appear in Court for you at your own personal expense.

**33.  How will the lawyers be paid?  Do the Class Representatives get paid extra?**

The amount of attorneys' fees, expenses and costs to be paid to Class Counsel will be decided by the Court in accordance with controlling law, giving due consideration to the special status of Class Members as beneficiaries of a federally created and administered trust.  The amounts awarded will be paid from the Accounting/Trust Administration Fund.

In accordance with the Settlement Agreement, plaintiffs have filed a Notice with the Court to state the amount of fees, expenses, and costs they will assert through December 7, 2009.  Plaintiffs' Notice states the following:

1.  On December 7, 2009 the parties signed an Agreement on Attorneys' Fees, Expenses and Costs, stating in their motion for attorneys' fees, expenses and costs that plaintiffs may not assert that Class Counsel should be paid more than an additional $99,900,000.00.  In response, defendants may not assert that Class Counsel should be paid less than $50,000,000.00. This Agreement is available at www.IndianTrust.com.

2.  Plaintiffs' petition will assert that Class Counsel should be paid $99.9 million for fees, expenses and costs through December 7, 2009.

3.  Class Counsel are working pursuant to contingency fee agreements, which provide that Class Counsel shall be paid a combined total of 14.75% of the funds that are created for the benefit of the classes.  Applying that percentage to the $1,512,000,000 to be deposited into the Settlement Account would result in an award of $223,020,000.00 for Class Counsel.

4.  The Court is not bound by any agreed upon or requested amounts, or the contingency fee agreements between Class Representatives and Class Counsel.  The Court has discretion to award greater or lesser amounts to Class Counsel in accordance with controlling law, giving due consideration to the special status of Class Members as beneficiaries of a federally created and administered trust.

The Agreement on Attorneys' Fees, Expenses and Costs, as modified, also provides that Class Counsel may be paid up to $12 million for work, expenses and costs after December 7, 2009.  Class Counsel will not be entitled to be paid such amounts unless the Settlement is given final approval by the Court.  All

such requests for fees, expenses, and costs after December 7, 2009 are to be based on Class Counsel's actual billing rates and are subject to approval of the Court, following an opportunity for Class Members to object and defendants to respond.

Plaintiffs will file a petition for payment of attorneys' fees and a memorandum of points and authorities in support of that request no later than **MONTH 00, 2011**.  That petition and memorandum will also be available at www.IndianTrust.com.  As required by the Agreement on Attorneys' Fees, Expenses and Costs, at the same time Plaintiffs file the petition for attorneys' fees, they will also file statements regarding Class Counsel's billing rates, as well as contemporaneous, where available, and complete daily time, expense, and cost records supporting that petition.  Those records will thereafter be available at the Clerk's Office, United States District Court for the District of Columbia, 333 Constitution Ave. NW, Washington, DC 20001.

Plaintiffs have also filed a notice with the Court that they will seek incentive awards and expense reimbursements for the Class Representatives as follows:

| | |
|---|---|
| Elouise Pepion Cobell | $2,000,000.00 |
| James Louis Larose | $   200,000.00 |
| Thomas Maulson | $   150,000.00 |
| Penny Cleghorn | $   150,000.00 |

The requested amounts are in addition to payments the Class Representatives will be entitled to as Class Members.  Any amounts awarded will be paid from the Accounting/Trust Administration Fund.

Plaintiffs will file a petition for payment of those incentive awards and a memorandum of points and authorities in support of that request no later than **MONTH 00, 2011**.  That petition and memorandum will also be available at www.IndianTrust.com.

Class members and Defendants may object to or comment on plaintiffs' requests for Class Counsel and Class Representatives (*see* Question 30 above). After considering the objections and comments of Defendants and Class Members, the Court will determine the amounts of (a) attorneys' fees, expenses and costs and (b) plaintiffs' incentive awards and expense reimbursement in accordance with controlling law giving due consideration to the special status of Class Members as beneficiaries of a federally created and administered trust.

### THE COURT'S FAIRNESS HEARING

**34.  When and where will the Court decide whether to approve the Settlement?**

The Court will hold a Fairness Hearing at (time) on **Month 00, 2011**, at the United States District Court for the District of Columbia, Third Street and Constitution Avenue NW, Washington, DC.  The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.IndianTrust.com or call 1-800-961-6109.

At this hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate.  If there are objections, the Court will consider them. The Court will also consider how much to pay the lawyers representing Class Members and whether to award any additional payment to the Class Representatives. After the hearing, the Court will decide whether to approve the Settlement.  We do not know how long these decisions will take.

**35.  Do I have to come to the hearing?**

No.  Class Counsel will answer any questions the Court may have.  But you are welcome to come at your own expense.  If you send an objection or comment, you don't have to come to Court to talk about it.  As long as you mailed your written objection on time, the Court will consider it.  You may also pay another lawyer to attend on your behalf, but it's not required.

**36.  May I speak at the hearing?**

Yes.  You may ask the Court for permission to speak at the Fairness Hearing.  You may appear at the Fairness Hearing to comment on or object to any aspect of the fairness, reasonableness, or adequacy of the Settlement.

### GETTING MORE INFORMATION

**37.  How do I get more information?**

This notice summarizes the proposed Settlement.  More details are in the Settlement Agreement.  You can get a copy of the Settlement Agreement and the subsequent modifications to it at www.IndianTrust.com.  You may also write with questions to Indian Trust Settlement, P.O. Box 9577, Dublin, OH 43017-4877.  You can also register for updates and get a claim form at the website, or by calling the toll free number, 1-800-961-6109.

# EXHIBIT 3

Legal Notice

# Important information about the
# $3.4 billion Indian Trust Settlement

## For current or former IIM account holders,
## Owners of land held in trust or restricted status, or their heirs

There is a proposed Settlement in *Cobell v. Salazar,* a class action lawsuit about individual Indian land held in trust by the federal government. This notice is just a summary. For details, call the toll-free number or visit the website listed below.

The lawsuit claims that the federal government violated its duties by (a) mismanaging trust funds/assets, (b) improperly accounting for those funds, and (c) mismanaging trust land/assets.  The trust funds include money collected from farming and grazing leases, timber sales, mining, and oil and gas production from land owned by American Indians/Alaska Natives.

If you are included in the Settlement, your rights will be affected.  To object to the settlement, to comment on it, or to exclude yourself, you should get a detailed notice at www.IndianTrust.com or by calling 1-800-961-6109.

### Can I get money?

There are two groups or "Classes" in the Settlement eligible for payment. Each Class includes individual IIM account holders or owners of land held in trust or restricted status who were alive on September 30, 2009.

#### *Historical Accounting Class Members*

- Had an open individual Indian Money account ("IIM") anytime between October 25, 1994 and September 30, 2009, **and**
- The account had at least one cash transaction.
- Includes estates of account holders who died as of September 30, 2009, if the IIM account was still open on that date.

#### *Trust Administration Class Members*

- Had an IIM account recorded in currently available data in federal government systems anytime from approximately 1985 to September 30, 2009 **or**
- Owned trust land or land in restricted status as of September 30, 2009.
- Includes estates of landowners who died as of September 30, 2009 where the trust interests were in probate as of that date.  This means you have asked a court to transfer ownership of the deceased landowner's property.

An individual may be included in one or both Classes.

### What does the settlement provide?

- A $1.5 billion fund to pay those included in the Classes.

- $1.9 billion fund to buy small interests in trust or restricted land owned by many people.

- Up to $60 million to fund scholarships to improve access to higher education for Indian youth.

- A government commitment to reform the Indian trust management and accounting system.

### How much can I get?

- Historical Accounting Class Members will each get $1,000.

- Trust Administration Class Members will get at least $500.

- If you own a small parcel of land with many other people, the federal government may ask you to sell it.  You will be offered fair market value.  If you sell your land it will be returned to tribal control.

If you believe you are a member of either Class and have not received a notice in the mail about the Settlement, you will need to fill out and mail a Claim Form by **Month 00, 2010**.  You can get a Claim Form at the website or by calling the toll-free number.

### What are my other rights?

- If you wish to keep your right to sue the federal government about the claims in this Settlement, you must exclude yourself by **Month 00, 2011**.

- If you stay in the Settlement you can object to or comment on it by **Month 00, 2011**.  The detailed notice explains how to exclude yourself or object/comment.

The U.S. District Court for the District of Columbia will hold a hearing on Month 00, 2011, to consider whether to approve the Settlement.  It will also consider a request for attorneys' fees, costs, and expenses in the amount of $99.9 million.  However, Class Counsel has fee agreements that would pay them 14.75% of the funds created for the Classes, which could result in an award of $223 million. The Court may award more or less than these amounts based on controlling law.  If approved, these payments and related costs will come out of the settlement funds available for payment to class members.

If you wish, you or your own lawyer may ask to appear and speak at the hearing at your own cost.  For more information, call or go to the website shown below or write to Indian Trust Settlement, P.O. Box 9577, Dublin, OH 43017-4877.

For more Information:          1-800-961-6109          www.IndianTrust.com