**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| ) | |
| **ELOUISE PEPION COBELL, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **No. 1:96CV01285(TFH)** |
| ) | |
| **KEN SALAZAR, Secretary of** ) | |
| **the Interior, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

_____ )

**PLAINTIFFS' PETITION FOR CLASS COUNSEL'S FEES,
EXPENSES AND COSTS THROUGH SETTLEMENT**

Pursuant to F.R.Civ. P. 23(h) and 54(d)(2), Plaintiffs petition this Court for Class Counsel's fees, expenses and costs through December 7, 2009.[1]

## INTRODUCTION

For generations, government officials have abused individual Indian trust beneficiaries. As early as 1915, Congress reported that "[t]he Government itself owes many millions of dollars for Indian moneys which it has converted to its own use," and that the Individual Indian Trust ("IIM Trust") is a broken trust, riddled with "fraud, corruption and institutional incompetence almost beyond the possibility of comprehension."[2]

However, the government's fraud and abuse of individual Indians did not stop. In 1989, a Senate Select Committee on Indian Affairs found that "fraud, corruption and mismanagement pervad[e] the institutions that are supposed to serve American Indians."[3] In 1992, a House Committee in the aptly entitled "Misplaced Trust" reported that the government continued to ignore many congressional directives aimed at encouraging Interior to correct IIM Trust management practices.[4] Still, nothing was done; the abuse continued. New reports issued by various government entities and private auditors identified ongoing, severe failures of the trust management and accounting system. "The General Accounting Office, Interior Department Inspector General,

---

[1] This fee petition is submitted by plaintiffs on behalf of Dennis M. Gingold, Thaddeus Holt and the law firm of Kilpatrick Townsend & Stockton, LLP, including William E. Dorris, Keith M. Harper, Elliott H. Levitas, David C. Smith, Adam H. Charnes, G. William Austin and Justin G. Guilder (collectively, "Class Counsel") in accordance with the terms of settlement. Work after December 7, 2009 will be the subject of future applications.

[2] Bureau of Mun. Research, 63rd Cong., *Report to the Joint Commission to Investigate Indian Affairs: Business and Accounting Methods Employed in the Administration of the Office of Indian Affairs* 2 (Comm. Print 1915).

[3] *A Report of the Special Committee on Investigations of the Select Committee on Indian Affairs,* S. Rep. No. 101-216, at 4-5 (1989).

[4] *Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund,* H.R. Rep. No. 102-499, at 2-5 (1992).

and Office of Management and Budget, among others, have all condemned the mismanagement of the IIM trust accounts over the past twenty years." *Cobell v. Norton,* 240 F.3d 1081, 1089 (D.C. Cir. 2001) (*"Cobell VI"*). Again, nothing was done.

Nothing changed until Elouise Cobell engaged Class Counsel to initiate this action by filing a complaint on June 10, 1996, on behalf of more than 500,000 individual Indian trust beneficiaries to enforce trust duties owed by the United States. Class Counsel persevered through more than fifteen years of uniquely hostile litigation and accomplished that which Congress could not do and the Attorney General would not do – enforce the laws of this country and achieve a "stunning victory" for individual Indian Trust beneficiaries. *Cobell v. Babbitt*, 91 F. Supp. 2d 1, 57 (D.D.C. 1999), *("Cobell V"), aff'd, Cobell VI,* 240 F.3d 1081.

Class Counsel, together with Ms. Cobell and the other Class Representatives, caused the government to begin major reform of its broken trust management systems, secured a settlement that provides over $3.4 billion in monetary recovery tax-free to class members, established an educational scholarship fund for Indians, and built a sound foundation for continuing reform. Importantly, they have established precedent that will enable future aggrieved IIM Trust beneficiaries to enforce trust duties they are owed. Individual Indians no longer must accept, suffer, and endure lifetimes of abuse. Most importantly, without Class Counsel, there would have been no case and nothing would have been achieved for individual Indians.

As will be explained, an agreement on Class Counsel fees in this case includes a "clear sailing" provision under which Plaintiffs would not assert a fee greater than $99.9 million for Class Counsel's work through December 7, 2009, and defendants would not appeal any award up to that amount. Parties to the agreement recognized that it did not, and could not bind this Court, which is free to award such fees as it deems appropriate, consistent with controlling law; and that Plaintiffs were free to set forth reasons why controlling law justifies a greater amount. These propositions

were powerfully reinforced in the statute Congress passed approving the settlement and its legislative history where efforts to limit fees were soundly rebuffed.  Congress made crystal clear that Class Counsel fees must be awarded in accordance with controlling law.

With that backdrop, in accordance with the literal provisions of the "clear sailing" clause, Plaintiffs hereby assert a fee of $99.9 million for Class Counsel's work through December 7, 2009. By doing so, however, Plaintiffs do not waive Class Counsel fees that otherwise are appropriate and in accordance controlling law because individual Indians would be adversely affected if controlling law is disregarded.  This petition sets forth relevant factors that this Court should consider under controlling law, and it is then for the Court to apply independently that law to fashion a proper fee award.  Accordingly, Plaintiffs respectfully submit that a fee award of $223 million, plus expenses and costs of $1,276,598, is in accordance with controlling law and within this Court's discretion.

## I.    UNDER CONTROLLING LAW, AS MANDATED BY CONGRESS, CLASS COUNSEL'S FEE IS TO BE SET AS A PERCENTAGE OF THE COMMON FUND.

Congress, in passing the Claims Resolution Act of 2010, Pub. L. No. 111-291, 124 Stat. 3064 (December 8, 2010) (the "Act"),[5] and the parties, in agreeing to Congressional modification of their Settlement Agreement,[6] have confirmed that Class Counsel fees, expenses, and costs must be "in accordance with controlling law"[7] and that they shall be set by this Court.  Following twelve months of debate, Congress modified the settlement legislation proposed by the parties to, among other things, ensure that Class Counsel fee awards are made by the Court in conformity with controlling law.  The Senate ratified that modified version unanimously.  The House approved the same by an overwhelming majority.  Controlling law is the binding standard.

---

[5] A copy of the Act is attached as Exhibit 1.

[6] *See* Settlement Agreement ("Settlement Agreement" or "Agreement") dated December 7, 2009 (Exhibit 2) and modified November 17, 2010 (Exhibit 3).

[7] *See* Act at § 101(g)(1)(A); Settlement Agreement at § J.5.

Controlling law[8] is well established.  Class counsel fees are calculated as a percentage of a common fund[9] plus other tangible benefits conferred on class members as a result of the litigation. *See, e.g., Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993).[10]  A "lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also In re Vitamins Antitrust Litig.*, No. MISC. 99-197(TFH), 2001 WL 34312839, at *8 (D.D.C. July 16, 2001) (explaining that fees are appropriate where "a plaintiff has sued and created a benefit for a class").  This Court has a duty to ensure that fees are reasonable and in accordance with controlling law.  *See Lorazepam II,* 2003 WL 22037741 at *7.

In determining the reasonableness of class counsel's fees in common fund cases, this Circuit applies the percentage of recovery method.  *See Swedish Hosp. Corp.*, 1 F.3d at 1271; *In re Vitamins*, 2001 WL 34312839 at *3.[11]  *See also In re Dept. of Veteran's Affairs (VA) Data Theft*

---

[8] "Controlling law" is the law of this Circuit, absent Supreme Court precedent or an applicable statute or treaty.  *See United States v. Torres*, 115 F.3d 1033, 1035-36 (D.C. Cir. 1997) (prior decisions of the D.C. Circuit, even when other Circuits are not in accord, bind this Court unless they are overruled *en banc* or by the Supreme Court).  *See also U.S. v. Stauffer Chem. Co.*, 464 U.S. 165, 181 (1984) (noting that "decisions of [the Sixth and Tenth] circuits are not the 'controlling law' in the Ninth" unless their standards are adopted by the Ninth Circuit).

[9] The common fund doctrine is based on the principle that the payment of class counsel from a common fund equitably spreads the cost of litigation among all class members.  *See Bebchick v. Washington Metro. Area Transit Comm'n*, 805 F.2d 396, 402 (D.C. Cir. 1986).  It "stems from the equitable power of a court to create the obligation for attorney fees against benefits. . . received" by the class members.  *Democratic Cent. Comm. of the Distr. of Columbia v. Washington Metro. Area Transit Comm'n*, 38 F.3d 603, 605 (D.C. Cir. 1994).

[10] *Swedish Hospital* is the seminal case in this Circuit.  Similar to *Cobell*, in *Swedish Hospital,* the Court recognized difficulties and hardships caused by the government's strategies and devices, which prolonged the litigation, and it noted that plaintiffs would have been abused further, but for the efforts of class counsel.  *Swedish Hosp. Corp.,* 1 F.3d at 1270 (finding that "HHS would also have us ignore the lengths to which the Department has gone, through repeated litigation, to avoid its statutory obligations in this matter").

[11] This Circuit has concluded that "every Supreme Court case that has addressed the issue has determined reasonable fees payable from a common fund on a percentage of the fund basis." *Democratic Cent. Comm. of the Dist. of Columbia v. Washington Metro. Area Transit Comm'n,* 3 F.3d 1568, 1573 (D.C. Cir. 1993) (emphasis added), *reh'g denied*, 12 F.3d 269 (D.C. Cir. 1994).

*Litig.* ("*In re Veteran's Affairs*"), 653 F. Supp. 2d 58, 60 (D.D.C.) (describing the common fund doctrine as the "national trend"), *appeal dismissed*, No. 09-5405, 2009 WL 5179325 (D.C. Cir. Dec. 14, 2009).[12]  It applies to litigation involving both private parties and the government.  *See Swedish Hosp. Corp.,* 1 F.3d at 1270; *see also In re Veterans Affairs*, 653 F. Supp. 2d at 61.  Further, it is well settled that such fee awards are within the sound discretion of this Court.  *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

Reasonable fees generally "range from fifteen to forty-five percent" of the settlement value to class members, *In re Vitamins*, 2001 WL 34312839, at \*10, with a fee of 20% to 30% being customary, *see Swedish Hosp. Corp.*, 1 F. 3d at 1272.  In "mega-fund" class actions – those where, as here, the settlement is $100 million or more – an award of 15% of the aggregate of the monetary award and other tangible benefits is customary.  *See Lorazepam II*", 2003 WL 22037741, at \*7.  However, where exceptional benefits are conferred on large classes, this Court has awarded an even greater fee percentage.  *See In re Baan Co. Sec. Litig.*, 288 F. Supp. 2d 14, 17 (D.D.C. 2003).

## II.     THE CLEAR SAILING PROVISION DOES NOT BIND THE COURT AND WOULD HARM INDIVIDUAL AMERICAN INDIANS.

The clear sailing provision in the Agreement on Attorneys' Fees, Expenses and Costs provides, in part, that Plaintiffs' fee petition not "assert that [they] be paid more than $99,900,000.00 above amounts previously paid by Defendants"[13] and that neither party may appeal

---

[12] A corollary to the common fund doctrine is the "common benefit" doctrine, in which contingent fees are awarded if litigation results in "'a common fund, the economic benefit of which is shared by all members of the class.'"  *In re Vitamins,* 2001 WL 34312839 at \*2 n. 20 (quoting *Rosenbaum v. Macallister*, 64 F.3d 1439, 1444 (10th Cir. 1995)).  *See also Polonski v, Trump Taj Mahal Assocs.,* 137 F.3d 139, 145 (3rd Cir. 1998), *cert. denied*, 525 U.S. 823 (1988).  Whether construed as a common fund or a common benefit, the result essentially is the same.

[13] *See* Agreement on Attorneys' Fees, Expenses, and Costs dated December 7, 2009 ("Fee Agrmt.") (Exhibit 4) § 4.a.

an award "equal to or greater than $50,000,000 and equal to or less than $99,900,000." Fee Agrmt. § 4.e. In so doing, Defendants reserved their right to appeal an award in excess of $99.9 million.[14]

This provision is a standard, garden variety "clear sailing clause," which commonly is included in settlement agreements. Such clauses do not resolve the fee question. To the contrary, such clauses invite heightened scrutiny, and certainly such clear sailing clauses do not bind this Court. *See, e.g., Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 522 (1st Cir. 1991); *Malchman v. Davis,* 761 F.2d 893, 908 (2nd Cir. 1985)(Newman, J. concurring), *abrogated on other grounds by Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619-20 (1997); *In re: Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 104-05 (D.R.I. 1999); *In re: Skinner Grp., Inc.*, 206 B.R. 252, 262 n.14 (N.D. Ga. 1997); *Duhaime v. John Hancock Mut. Life Ins. Co*., 989 F. Supp. 375, 376-77 (D. Mass. 1997); *Levit v. Filmways, Inc*., 620 F. Supp. 421, 423-24 (D. Del. 1985). The clear sailing clause "put[s] a court on its guard," and in no way diminishes this Court's inherent authority and duty to conduct an independent assessment of the provision and only award fees that are in accord with controlling law. *Weinberger*, 925 F.2d at 525.

More importantly, Congress has mandated that "the special status of Class Members . . . as beneficiaries of a federally created and administered trust"[15] be considered in the Court's determination of Class Counsel fees. In that regard, an award limited to the clear sailing amount would irreparably harm interests of individual Indians generally, and individual Indian trust beneficiaries specifically, because it will make it far more difficult for these individuals aggrieved in the future to attract competent counsel to enforce trust duties owed by the United States if controlling law is not applied. Fifteen years ago, Ms. Cobell had great difficulty persuading able

---

[14]   That reservation is among the material distinctions between the *Cobell* settlement and the government's settlements in *Keepseagle* and *Pigford* where plaintiffs and the government agreed to a floor and a ceiling on attorneys' fees regardless of controlling law. *See infra* at 24.

[15] Act § 201(g)(1)(B).

counsel to prosecute this case.  In the future, it may well prove impossible to do so if attorneys cannot reasonably expect to be compensated in accordance with controlling law.  Individual Indian trust beneficiaries are as deserving of competent counsel as any other plaintiff class in this country.

As demonstrated by the record of these proceedings, government accountability is difficult to ensure.  It is even more difficult where, as here, the government's trustee-delegates resist all enforcement at each stage of the proceedings.  Prior to this litigation, fundamental trust duties had been ignored for more than a century. The nature and scope of the mismanagement has been staggering throughout the life of this trust. The government regarded its duties as unenforceable, dismissing them as irrelevant to the IIM Trust, characterizing it as a "bare" trust – *i.e.,* one in name only.[16]   As a result, class members suffered invidious discrimination, neglect, fraud, waste, and other abuse in violation of trust law and in disregard of Supreme Court precedent requiring the government to manage Indian trust assets in accordance with the "most exacting fiduciary standards."  *See, e.g., Seminole Nation v. United States*, 316 U.S. 286, 297 (1942).

Notably, although Congress from time to time has called to task Republican and Democratic administrations alike for their failure to discharge trust duties owed to the plaintiff classes, nothing changed until Ms. Cobell stepped forward and engaged Class Counsel.  This litigation was framed by Class Counsel to enforce trust duties, including the "fundamental" right to an accounting of all items of the Trust.  *See, e.g., Cobell VI*, 240 F.3d at 1103.  That has been among the most basic rights of trust beneficiaries throughout more than 800 years of trust law, but not individual Indians prior to *Cobell*.  The government turned its back on the *Cobell* plaintiffs and, despite contentious Congressional oversight hearings, *see, id.* at 1090, did nothing.  Not even enactment of the Indian Trust Fund Management Reform Act, Pub. L. No. 103-412, 108 Stat. 4239 (1994), which codified

---

[16] *United States v. Mitchell*, 463 U.S. 206, 224 (1983).  *See generally Cobell v. Babbitt*, 91 F. Supp. 2d 1 (D.D.C. 1999) ("*Cobell V*"), *aff'd Cobell v. Norton*, 240 F.3d 1081, 1103 (D.C. Cir. 2001).

and confirmed the government's preexisting trust duties, compelled the government to change its aberrant behavior.

The D.C. Circuit has called the trust mismanagement in this case "a serious injustice" - one "that has persisted for over a century and that crie[d] out for redress." *Cobell v. Kempthorne*, 455 F.3d 317, 335 (D.C. Cir. 2006) ("*Cobell XIX*"), *cert. denied*, 549 U.S. 1317 (2007).  It took more than one hundred years before someone with the knowledge, understanding, and courage of Ms. Cobell to convince experienced and knowledgeable class counsel to undertake and prosecute this case and address this "serious injustice" at personal risk to Ms. Cobell and professional risk to Class Counsel.  Unlike some tribes, this class of individual Indians does not have the financial resources to pay Class Counsel fees to prosecute a case of this difficulty, complexity, and magnitude.  Tribes did not provide financial support to this litigation.  Yet, ten years after Plaintiffs filed this action, 100 tribes filed complaints against the government to enforce tribal trust claims modeled on those Class Counsel had framed in these proceedings.  Simply put, Class Counsel have leveled the playing field and forced the government to acknowledge principles of trust law in its relationship with Indian trust beneficiaries that heretofore it had refused to accept and, thereby, brought innumerable tangible benefits to the classes.

The importance of this case cannot be overstated.  "Human welfare and livelihood [were] at stake," because class members often depend on trust funds for their basic needs -- food, shelter, and clothing.  *Cobell V*, 91 F. Supp. 2d at 6.  Without Class Counsel's representation in this case, no meaningful progress on improving and reforming the trust would have occurred.  Class members would be receiving nothing for the past abuse.

## III.   THE LITIGATION PRODUCED MONETARY AND OTHER TANGIBLE BENEFITS TO CLASS MEMBERS OF APPROXIMATELY $9 BILLION.

As a result of Class Counsel's efforts, and considering the favorable tax treatment obtained, about $9 billion in monetary and other tangible benefits have been produced for the plaintiffs.

### A.   This settlement has created un-taxable common funds of at least $3.412 billion.

This Court has explained that "the national trend, and the trend in this Circuit, is toward awards that represent a percentage of the *total* common fund," even where, as here, a portion is not distributed directly or immediately to class members.  *In re Veterans Affairs*, 653 F. Supp. 2d at 60 (emphasis added).  As a result of Class Counsel's efforts, common funds of at least $3.412 billion dollars have been established; this amount is dramatically enhanced by, among other things, the value of individual Indians' federal income tax exemption negotiated by Class Counsel.

The settlement consists of two basic monetary components.  First, $1.512 billion will be paid directly to class members to settle historical accounting[17] and trust fund and asset mismanagement claims.[18]  Mismanagement claims are included in the Amended Complaint[19] and have been an underlying issue throughout this litigation.[20]

Specifically, the accounting requested by Plaintiffs and ordered in 1999 "would have documented the management and disposition of allotted assets over the life of the trust," and "allowed individual plaintiffs to determine whether they had viable claims for damages."  *Cobell v. Kempthorne*, 569 F. Supp. 2d 223, 241 (D.D.C. 2008) ("*Cobell XXI*"), *rev'd on other grounds*, 573

---

[17] "Historical Accounting Claims" are defined at § A.16 of the Settlement Agreement.

[18] Trust fund and other asset mismanagement claims are defined as Funds Administration and Land Administration Claims at §§ A.14 and A.21 of the Settlement Agreement, respectively.

[19] *See* Amended Complaint at ¶¶ 48-52; Settlement Agreement at § B.3.a.

[20] Efforts by some in Congress to exclude trust asset mismanagement claims from the calculation of fees failed.  *See* 156 Cong. Rec. H7686-87 (daily ed. November 30, 2010) (Statement of Rep. Doc. Hastings).

F.3d 808 (D.C. Cir. 2009).  In other words, the accounting, among its many benefits, would have enabled beneficiaries to identify their fund and asset mismanagement claims as well as the nature and scope of the government's liability.  Resolution of those claims that had been widely investigated by Class Counsel was a natural and inevitable outgrowth of this litigation.  After all, as this Court noted in 1999, this litigation "stems from the government's . . . *mismanagement* of the Individual Indian Money (IIM) trust accounting system." *Cobell v. Babbitt*, 37 F. Supp. 2d 6, 11 (D.D.C. 1999) ("*Cobell II*") (emphasis added).  Further, in finding the government in breach of trust on December 21, 1999, this Court ordered an historical accounting to "remedy[] [defendants'] *mismanagement.*"  *Cobell V*, 91 F. Supp. 2d 1, 7 (D.D.C. 1999) (emphasis added).  In short, it is undeniable that the monetary award for mismanagement was a benefit derived from this suit and the work of Class Counsel.

Moreover, Class Counsel conducted research and analysis and Plaintiffs retained experts to establish the revenue that should have been collected for the benefit of, and distributed to, class members since the inception of the IIM Trust.  *See, e.g., Cobell v. Norton*, 283 F. Supp. 2d 66, 207-208 (D.D.C. 2003) ("*Cobell X*") (describing the analysis as representing "an impressive use of technology in an attempt to solve a very difficult problem"), *rev'd on other grounds,* 392 F.3d 461 (D.C. Cir. 2004).  In addition, Class Counsel spent thousands of hours discovering, investigating, analyzing, and demonstrating the nature and scope of severe and potentially catastrophic deficiencies in information technology systems that allowed "unauthorized persons to access, alter, or destroy individual Indian trust data."  *Cobell v. Norton*, 274 F. Supp. 2d 111, 129 (D.D.C 2003) ("*Cobell IX*"), *superceded,* 310 F. Supp. 2d 98, *rev'd on other grounds,*391 F.3d 251 (2004) .[21]

---

[21] The attention of Class Counsel to IT security was validated by this Court's statement on April 4, 2000 that it was "alarmed and disturbed by the revelation that BIA had no security plan for the preservation of trust data."  *See Cobell v. Norton,* 310 F. Supp. 2d 77, 80 (D.D.C.) ("*Cobell XI*"), *rev'd on other grounds,* 391 F.3d 251 (D.C. Cir. 2004).  Without accurate and complete trust data,

Additionally, counsel reviewed and catalogued millions of pages of historical records, including GAO and Inspector General Reports and Audits, as well as Congressional findings, which describe the loss and dissipation of trust assets through fraud, waste, and abuse.

Second, the Settlement establishes a fund of $1.9 billion to purchase fractionated interests in trust land.[22] A major component of this litigation has been referred to as "fixing the system" – which involves the rehabilitation and "reform[] [of] the management and accounting of the IIM trusts so as to meet the federal government's fiduciary responsibilities." *Cobell VI*, 240 F.3d at 1093. Defendants often point to fractionation as the major impediment to prudent trust administration. *See, e.g., Cobell v. Kempthorne*, 532 F. Supp. 2d 37, 40 (D.D.C. 2008) ("*Cobell XX*"), *rev'd on other grounds,* 573 F.3d 808 (D.C. Cir. 2009) (identifying its "enormous administrative difficulties"). In short, as Defendants themselves have long contended, addressing fractionation is necessary to successful reform and prudent trust management. Thus, this $1.9 billion tangibly benefits all class members. Moreover, class members, on a voluntary basis, will be provided market value distributions for fractionated interests they wish to sell.

Finally, as part of the Land Consolidation Fund, Class Counsel was also able to negotiate an enduring legacy for the benefit of Plaintiffs and future beneficiaries – the creation of an Indian Education Scholarship Fund of at least $60 million.[23]

### B.     Class members have received additional tangible trust reform benefits in excess of $4.8 billion.

In accordance with controlling law, non-monetary tangible benefits are also important. *See Bynum v. District of Columbia*, 412 F. Supp. 2d 73, 85 (D.D.C. 2006) (explaining that "substantial benefits . . . conferred on the class beyond the monetary recovery" are significant in determining a

---

no complete and accurate accounting can be rendered. That would permit an unscrupulous trustee to avoid liability by destroying its dismal record of performance.

[22] *See* Settlement Agreement §§ A.36 & F.

[23] Settlement Agreement § G.

contingent fee).  *See also Staton v. Boeing Co.,* 327 F.3d 938, 974 (9th Cir. 2003); 5 MOORE'S FED. PRACTICE - CIVIL § 23.124(6)(b)(1) (2010) ("A court should take into account any non-monetary benefits obtained for the class").  The class has benefited, and will continue to benefit, from the reform and rehabilitation of the IIM Trust that has resulted from this litigation.[24]  Put another way, or over 100 years, meaningful reform of this trust was negligible.  It would have continued to be the case except for this lawsuit.

In that regard, the $4.8 billion dollars invested by the government in trust reform between 1996 and 2009, *see, e.g.,* Budget Report to Congress at OST-20,[25] has resulted in "substantial improvements in the administration of the trust."  *Cobell XX*, 532 F. Supp. 2d at 86.  Nonetheless, defendants acknowledge that trust reform is incomplete.  Completion is dependent on effective implementation of the land consolidation program as well as additional reform efforts.  Meaningful trust reform may be significantly enhanced by Secretary Salazar's assent, <u>as part of this settlement</u>, to establish a Secretarial Commission funded by this settlement.[26]  In accordance with controlling law, it is proper and appropriate for these nonmonetary tangible benefits to be considered in setting an appropriate award of Class Counsel fees.

## IV.     PLAINTIFFS' CONTINGENT FEE AGREEMENTS WITH CLASS COUNSEL ARE IN CONFORMITY WITH CONTROLLING LAW.

This Court is bound by controlling law, not plaintiffs' assertions, not defendants' denials, not contingent fee agreements, not any other agreement or provision thereof.  Unlike clear sailing clauses, however, contingent fee agreements provide guidance where, as here, they are consistent

---

[24] This Court previously found that "the benefits of the litigation are manifest" and extend beyond monetary relief, having greatly enhanced "the present and future reliability of the Indian trust system."  *Cobell XXI,* 569 F. Supp. 2d at 253.

[25] Attached as Exhibit 5.

[26] *See* Settlement Agreement at F(2).  *See also Interior Secretarial Order 3292* dated December 8, 2009 attached as Exhibit 6.

with controlling law, are critical to the representation, and have been negotiated at arms length between Class Counsel and representatives approved by the Court.[27]   Moreover, because plaintiffs are paying Class Counsel's fees out of their recovery, defendants have no right to set Class Counsel fees, no right to limit this Court's discretion in that regard, and, given their conduct, which caused and prolonged this litigation, dubious standing to challenge reasonableness under controlling law.[28]

Because no funds were available to pay Class Counsel, Ms. Cobell and other Class Representatives engaged Class Counsel on a contingent fee basis, which now totals in the aggregate 14.75% of the recovery.[29]   Parenthetically, From November 1995 through December 7, 2009, Class Counsel have invested more than $90 million worth of their time in this case.   Calculating the negotiated contingent fee percentage on $1,512,000,000 would result in an award of $223 million. This amount, albeit modest by common fund standards, is consistent with controlling law.   A figure of $223 million is particularly conservative since it is calculated <u>without</u> taking into account the following additional benefits achieved by Class Counsel: (1) The value of the $1.9 billion Land Consolidation Fund; (2) the value to class members of the tax exemption, *i.e.*, that none of the recovery is taxable; (3) the exclusion of settlement funds from inclusion in the determination of a class member's eligibility for social benefits programs, including food stamps, SSI and Medicaid and (4) the $4.8 billion in trust reforms that have been implemented as a result of the declaratory

---

[27] *See, e.g.* 5 J. Moore, et al., <u>Moore's Fed. Practice – Civil</u> § 23.124 (2010) ("When a court determines the size of an attorney's fee award, it is appropriate for it to consider any agreement between class counsel and class representatives about fees and expenses.").

[28] Further, if Defendants contest Class Counsel fees, this Court should strike Defendants' challenges unless they have produced their time and fee records.   *See generally* Pls.' Notice With Respect to Controlling Law as to Challenges to Class Counsel's Fees and Pls.' Incentive Awards (Dec. 14, 2010) [Dkt. No. 3662].

[29] Affidavit of Elouise Pepion Cobell, dated January 20, 2011, ¶ 17, attached as Exhibit 7; Affidavit of Dennis M. Gingold, dated January 21, 2011, ¶¶ 11, 13, attached as Exhibit 8; Affidavit of Thaddeus Holt, dated January 25, 2011, ¶ 5, attached as Exhibit 9; and Affidavit of William E. Dorris, dated January 25, 2011, ¶ ¶ 6-7, attached as Exhibit 10; Affidavit of Dennis M. Gingold Verifying Time and Current Hourly Rate of Rempel, dated January 25, 2011, attached as Exhibit 11.

and injunctive relief obtained by and through the efforts of Class Counsel.  Typically, class counsel fees would be calculated as a percentage of all these tangible benefits in aggregate.  Here, the $223 million is calculated only from a small portion of the total and for that reason is notably modest.

As noted above, contingent fees typically range from 15-45%[30] and fee awards of one-third are "customarily awarded."  *Bynum v. Dist. of Columbia*, 412 F. Supp. 2d at 85; *see also In re Vitamins*, 2001 WL 34312839, *10-12 (confirming that one-third is common).[31]  Fees are increased where, as here, class counsel have presented novel claims in "extremely difficult and challenging litigation" against a defendant with "virtually unlimited litigation resources" and achieved an "admirable recovery."  *Wells*, 557 F. Supp. 2d at 7-8 (awarding as a contingent fee 45% of the common fund); *see also In re Vitamins*, 2001 WL 34312839 at *9, 11 (awarding 34% where litigation involved "complex legal and factual matters" and counsel obtained "exceptional benefits" for a large class).[32]  This Court has acknowledged that awards of 15% are common in mega-fund cases. *See Lorazepam II*, 2003 WL 22037741 at *7.  At the same time, this Court has questioned the wisdom of limiting contingent fee awards to 15% in such cases, expressing concern that such arbitrary ceilings "tend[] to penalize attorneys who recover large settlements," and do not "simulate awards that would otherwise prevail in the market."  *In re Vitamins,* 2001 WL 34312839 at *10, 12 (internal citations omitted).

---

[30] *Supra* at 5. The "upper limit" of class action contingent fee awards is 50% of the common fund. *How Do Courts Calculate Attorney Fee Awards?* 39 Fall Brief 52, at 6, American Bar Association (2009).

[31] The median fee award in the D.C. Circuit is 22% and the mean is 21%.  Eisenberg, Theodore & Miller, Geoffrey P. ("Eisenberg & Miller-2010"), Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008 at 13 (Cornell Law Faculty Working Paper No. 64, 2009), 7 J. Empirical L. Stud. 248 (2010), *available at* http://scholarship.law.cornell.edu/cgi/viewcontent.cgi?article= 1066&context=clsops_papers.

[32] *See also Vista Health Plan, Inc. v. Warner Holdings Co. III,  Ltd.,* 246 F.R.D. 349, 364 (D.D.C. 2007) (26%); *Bynum,* 412 F. Supp. 2d at 85 (33%); *In re Baan,* 288 F. Supp. 2d at 18 (28%); *Lorazepam II,* 2003 WL 22037741 at *9 (30%); *In re Newbridge Networks Sec. Litig.,* No. 94-1678, 1998 WL 765724, at *3 (D.D.C. 1998) (30%); *In re Ampicillin Antitrust Litig.*, 526 F. Supp. 494 (D.D.C. 1981) (awarding 40%).

Studies establish that in mega-fund cases, contingent fees of 30% are reasonable.[33]   In an empirical study of 1,100 cases with recoveries ranging from less than $1 million to over $100 million, contingent fees averaged 20.9%.   When focusing on mega-fund cases, the percentage awarded declined to 18.2%.[34]   The average duration of litigation in those cases is 4.5 years, not even one-third the time this case has been litigated.   Thus, the clear sailing amount is so unreasonably low given controlling law and awards in similar cases that it would construed as an anomaly.

In this circuit, there is one mega-fund case our research has identified – *In re Vitamins*. However, since this Court looks to other circuits to ensure fair and reasonable awards of contingent

---

[33] Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 Tul. L. Rev. 1809, 1841 (2000); *see also* Reagan W. Silber & Frank E. Goodrich, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 Rev. Litig. 525, 546-47 (1998) (noting that fee percentages on recoveries in excess of $100 million do not "vary substantially from the percentage awarded in much smaller class actions"); *see, e.g., In re Combustion, Inc*., 968 F. Supp. 1116, 1131-32 (W.D. La. 1997) (awarding 36% of $127.3 million fund); *In re Vitamins*, 2001 WL 34312839, at *10 (awarding 34.06% of $365 million fund); *In re Initial Pub. Offering Sec. Litig*., 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (awarding 33% of $586 million fund); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006) (awarding 31.33% of $1.075 billion fund); *Kurzweil v. Philip Morris Cos.*, Nos. 94 Civ. 2373(MBM), 94 Civ. 2546 (BMB), 1999 WL 1076105, at *1 (S.D.N.Y. Nov. 30, 1999) (awarding 30% of $123 million fund); *In re Linerboard Antitrust Litig.*, No. MDL 1261, 2004 WL 1221350, at *1 (E.D. Pa. June 2, 2004) (awarding 30% of fund of $202,500,000); *In re IKON Office Solutions, Inc. Sec. Litig*., 194 F.R.D. 166, 197 (E.D. Pa. 2000) (awarding 30% of $111 million fund);  *In re Brand Name Prescription Drugs Antitrust Litig*., No. 94 C 897, 2000 WL 204112, at *2 (N.D. Ill. Feb. 10, 2000) (awarding 25.4% of $696,667,000 fund); *In re Rite Aid Corp. Sec. Litig*., 362 F. Supp. 2d 587, 590 (E.D. Pa. 2005) (awarding 25% of $126,800,000 fund); *In re Lease Oil Antitrust Litig*., 186 F.R.D. 403, 448 (S.D. Tex. 1999) (awarding 25% of $190 million fund); Notably, in the class action settlement arising out of the 9/11 tragedy, the district court preliminarily expressed approval of a 25% fee that is calculated on a fund of $712.5 million.  *See* A.G. Sulzberger & Mireya Navarro, *Ground Zero Deal Gives Plaintiffs $712.5 Million*, N.Y. Times (June 10. 2010), http://www.nytimes.com/2010/06/11/nyregion/11zero.html?ref=nyregion.

[34] Stuart J. Logan & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions*, Class Action Reports, Apr. 2003, at 4, 35-36.  In a second study looking at 333 securities class action settlements between 1973 and 1990, the average fee award for cases pending over 7 years and involving a common fund in excess of $75 million is 17.5%.  William J. Lynk, *The Courts And the Plaintiffs' Bar: Awarding the Attorney's Fee in Class-Action Litigation*, 23 J. Legal Stud. 185, 202 (1994).  In a third study, of 600 common fund cases from 1993-2002, where the range of recovery exceeded $190 million, the mean fee percent was 16.4 and the median fee percent 17.6. Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27, 73 (2004).

fees, plaintiffs have identified comparable mega-fund cases in other circuits for this Court's consideration and review.  Of the fifty odd mega-fund cases resolved in federal courts nationwide, fifteen have created a common fund or common funds in excess of $1 billion; six of those have been extensively litigated.  Those six cases plus *In re Vitamins* are referred to herein below as "Comparable Cases."[35]  This Court has confirmed the reasonableness of contingent fee awards by performing a "lodestar check" – *i.e.,* by applying a multiple of the value of class counsel's time, using current hourly rates retroactive to the date class counsel was engaged.  As demonstrated in the Lodestar Check graph below, a $223 million award (or 2.5 lodestar factor) establishes a new floor vis-à-vis Comparable Cases, which average a multiple of 3.6.  The $99.9 clear sailing amount is off the charts – an anomaly that is a meager 1.1, less than one-third of median contingency fee awards.



---

[35] Those seven Comparable Cases are as follows: (1) *In re Vitamins*; (2) *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008); (3) *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 553 F. Supp. 2d 442 (E.D. Pa. 2008); (4) *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005); (5) *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005); (6) *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007); and (7) *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006).

Accordingly, a $223 million award is reasonable and the clear sailing amount is inconsistent with, and cannot be justified under, controlling law.

## V.      THE CLEAR SAILING AMOUNT IS NOT IN ACCORDANCE WITH CONTROLLING LAW.

Unlike other class action settlements negotiated by the United States, the *Cobell* Settlement Agreement provides no cap on Class Counsel fees,[36] and Congress decisively rejected efforts by critics and the Administration to limit this Court's discretion in awarding such fees. Understandably, even defendants conceded that Class Counsel fees are "within the discretion of the Court in accordance with controlling law"[37] and understand that they may exceed the amount asserted. Members of Congress concur.[38] Simply put, the $99.9 million clear sailing clause is entitled to consideration only if it is consistent with controlling law, which it is not.

The $99.9 million would be less than 7% of the trust administration and adjustment funds,[39] less than 3% of the total monetary settlement amount,[40] and approximately 1% of the aggregate tangible benefits conferred on class members as a result of this litigation. The clear sailing amount, thus, is well below and far outside that which is reasonable under controlling law.

---

[36] *See* Settlement Agreement § XV.B, *Keepseagle v. Vilsack*, No. 99-3119 (EGS) (D.D.C. Nov. 1, 2010) ("*Keepseagle* Agreement") (Ex. 12) (providing attorneys' fees and costs "shall . . . not [be] more than 8% of $760,000,000"); Settlement Agreement § IX.B, *In re Black Farmers Discrimination Litig.*, Misc. No. 08-0511 (PLF) (D.D.C. Feb. 18, 2010) ("*Pigford II* Agreement") (Ex. 13) (providing "the Fee Award shall not [be] more than 7.4% of the Fee Base").

[37] *See* Settlement Agreement § J.5.

[38] *See, e.g.,* 156 Cong. Rec. H7652 (daily ed. Nov. 30, 2010) (statement of Rep. Virginia Foxx) ("it [the Settlement Agreement] allows the plaintiff attorneys to be paid in excess of $100 million").

[39] $1,512,000,000 is to be deposited in to the Settlement Account to pay members of the Historical Accounting and Land Administration Classes. Settlement Agreement §§ A.14, A.21; Act, § 101(j)(1).

[40] The direct monetary settlement amount is $3.412 billion. *See* Settlement Agreement §§ A.1, A.36, E.2. $99.9 million dollars represents 2.9% of that amount, without quantifying the tax-free value of such distributions and without considering the $5 billion paid out by the government to rehabilitate its broken trust systems, as a result of declaratory and injunctive relief obtained by Class Counsel. $99.9 million is slightly more than 1% of that amount, which in aggregate is about $9B.

Further, the clear sailing amount is also inexplicably low and unjustifiable given other important non-monetary factors that this Court considers. This Court has looked to factors identified in decisions from sister Circuits. *See, e.g., Lorazepam II*, 2003 WL 22037741, at *8; *In re Vitamins*, 2001 WL 34312839, at *11; *see also Cohen v. Chilcott*, 522 F. Supp. 2d 105, 122 (D.D.C. 2007). The Third Circuit, in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000), identified seven factors in determining a reasonable attorney fee award:

> (1) [T]he size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.[41]

*Id.* at 195 n.1.[42]

Class Counsel have prosecuted this litigation for fifteen years against defendants with unlimited resources. No fewer than four times did the Circuit find that trustee-delegates have "flagrantly and repeatedly breached [their] fiduciary obligations," *Cobell XIX*, 455 F.3d at 333, and engaged in "malfeasance," "recalcitrance," intransigen[ce]," and "unconscionable delay." *Id.*; *Cobell VI*, 240 F.3d at 1096; *Cobell v. Norton* (*Cobell XII*), 391 F.3d 251, 257 (D.C. Cir. 2004); *Cobell v. Norton* (*Cobell XIII*), 392 F.3d 461, 463 (D.C. Cir. 2004).

In prosecuting this case, Class Counsel have litigated novel issues and navigated a series of ten interlocutory appellate decisions that this Circuit admits presented a "complicated legal morass" from which no "exit" had been readily apparent. *Cobell v. Salazar*, 573 F.3d 808, 812 (D.C. Cir.

---

[41] This seventh factor is discussed, *supra*, at pp. 14-16.

[42] The Tenth Circuit considers "the twelve *Johnson* factors," which overlap those of the Third Circuit. *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445 n.3 (10th Cir. 1995) (quoting *Gottlieb v. Barry*, 43 F.3d 474, 482 n.4 (10th Cir. 1994)). An equally compelling factor is the public interest served through prosecution of the litigation. *See Wells*, 557 F. Supp. 2d at 8 (explaining the benefit to the public is a factor "worth serious consideration" in evaluating a contingent fee petition); *Bynum*, 412 F. Supp. 2d at 85 (finding that the litigation is "far ahead of public agencies" in "awaken[ing] to the concerns" identified by plaintiffs' counsel).

2009) *("Cobell XXII")*, *cert. dismissed*, 130 S. Ct. 3497 (2010).  Further, Class Counsel devoted full time to this litigation and routinely declined client engagements and professional opportunities to ensure the most effective prosecution possible.[43]

This settlement has been achieved after eight failed prior settlement efforts and only after Class Counsel spent a year on the Hill to obtain bi-partisan support in the most difficult legislative environment in decades, which was complicated further by unique conditions imposed by the Administration.[44]  Congressional approval was achieved on December 8, 2010 to authorize the largest class action settlement in history against the government and bring to a close a disgraceful chapter in our Nation's history.  As the President explained in signing the legislation authorizing this settlement, "it's finally time to address the way that Native Americans were treated by their government.  It's finally time to make things right."[45]

Considering the difficulty, complexity, and unprecedented nature of the legal and political issues implicated in this case, the exceptional results achieved, the benefits conferred on the plaintiff classes, the duration of the litigation, the risks undertaken by Class Counsel, the public policy served, and the need to ensure that competent counsel will represent individual Indians in complex litigation against the government in the future, the clear sailing amount of $99.9 million plainly is not in accord with controlling law and congressional mandate.  A closer examination of some of the individual factors provides even further support for this conclusion.

---

[43] *See, e.g.,* Gingold Aff., (Ex. 8) ¶¶ 13-14.

[44] The Administration linked the controversial *Pigford II* political settlement to *Cobell* because *Pigford* could not pass the Senate as a stand-alone bill.  During the year, Class Counsel had to address congressional concerns, and negotiated a $100 million increase in the Accounting/Trust Administration fund, thereby increasing that fund to $1.512 billion.

[45] Barack Obama, U.S. President, Remarks by the President at Bill Signing For the Claims Resolution Act (Dec. 8, 2010), *available at* http://www.whitehouse.gov/the-press-office/2010/12/08/remarks-president-bill-signing-claims-resolution-act.

**The size of the fund and number of class members benefited.** This litigation will benefit over 500,000 individual Indian trust beneficiaries. Further, if as a result, Interior begins to manage the IIM Trust prudently, this litigation will benefit hundreds of thousands or millions more beneficiaries because future generations no longer will need to suffer poor trust management and continuing breaches of trust. No case in this Circuit can approach the impact of *Cobell*. *Cf. In re Baan,* 288 F. Supp. 2d at 17 (class encompassed 17,500 claimants); *Wells*, 557 F. Supp. 2d at 7 (1,191 class members); *Freeport Partners, L.L.C. v. Allbritton*, No. Civ.A. 04-2030(GK), 2006 WL 627140, at *12 (D.D.C. Mar. 13, 2006) (15,000 class members); *In re Vitamins*, 2001 WL 34312839, at *11 (nearly 4000 class members); *In re Lorazepam & Clorazepate Antitrust Litig. (Lorazepam I)*, 202 F.R.D. 12, 26 (D.D.C. 2001) (class of approximately 12,000 members); *In re Newbridge Networks Sec. Litig.*, No. CIV. A. 94-1678-LFO, 1998 WL 765724, at *2 (D.D.C. Oct. 22, 1998) (17,400 class members).[46]

Moreover, the $3.4 billion settlement is the largest class action award against the government and it is greater than other class action settlements in this District. *Cf. Freeport Partners*, 2006 WL 627140, at *12 (calling $5.25 million settlement "not insubstantial"); *Bynum*, 412 F. Supp. 2d at 78 ($12 million settlement); *Lorazepam II*, 2003 WL 22037741, at *1 ($35 million settlement); *In re Vitamins*, 2001 WL 34312839, at *1 n.12 (initial settlement fund of $ 1.05 billion but current actual payment to class members of only $242 million). Here, the vast majority of class members will receive at least $1,800 in cash, tax-free. Many will receive much more. *Cf. Wells*, 557 F. Supp. 2d at 7 (stating that payments of $150 to $1200 are of "significant value").

**The skill of Class Counsel.** The quality of representation is properly measured by the "'quality of the result achieved, the difficulties faced, speed and efficiency of the recovery, the standing, experience, and expertise of the counsel, the skill and professionalism with which counsel

---

[46] In each of these cases, the percentage of the common fund awarded in fees far exceeds the clear sailing amount.

prosecuted the case and the performance and quality of opposing counsel.'"  *In re IKON*, 194

F.R.D. at 194 (citation omitted).  This litigation has been prosecuted by experienced and able Class

Counsel[47] who engaged in "zealous and determined advocacy" to vindicate class members' rights.

The case is historically significant and has delivered unprecedented tangible economic benefits to

class members.  *Cobell XXI*, 569 F. Supp. 2d at 252.

> **The complexity and duration of the litigation and hours expended.**  This case, spanning

fifteen years of litigation and more than 3,600 docket entries, is certainly one of the most

complicated and difficult cases to ever be litigated in this court.  *See Cobell XX*, 532 F. Supp. 2d at

103 (describing the "complicated" nature of the litigation).  It has presented many issues of first

impression, including the ability of classes of individual Indian trust beneficiaries to invoke the

jurisdiction of this Court to compel an historical accounting of all items of the trust, restitution, and

reform and rehabilitation of broken trust management systems.  *See, e.g., Wells*, 557 F. Supp. 2d at

7 (stating that novelty is important).

> Through the date of settlement, Class Counsel and those working for them have expended

over 140,000 hours working on behalf of the plaintiff classes.  They appeared in over 250 days of

hearings and trials and briefed and argued ten appeals in the D.C. Circuit.  Scores of witnesses have

been deposed and defended by the parties.  The work of Class Counsel compares favorably with

other class action litigation in this Circuit in which attorneys' fees far exceed the clear sailing

amount.  *See, e.g., Cohen*, 522 F. Supp. 2d at 122-123 (23% fee awarded where counsel litigated

two years, deposed twenty witnesses, and briefed numerous motions); *In re Baan*, 288 F. Supp. 2d

at 17-18 (28% fee award where counsel litigated five years, addressed difficult and novel legal

questions, and reviewed 300,000 pages of documents); *Vista Healthplan, Inc. v. Warner Holdings

Co. III, Ltd.*, 246 F.R.D. 349, 364 (D.D.C. 2007) (26% fee awarded where counsel litigated for one

---

[47] *See generally* Gingold Aff. (Ex. 8); Holt Aff. (Ex. 9); Dorris Aff. (Ex. 10).

and one-half years); *Lorazepam II*, 2003 WL 22037741, at *8 (30% fee awarded where counsel engaged in extensive motion practice and discovery and protracted settlement negotiations over four years).  In comparison, no class counsel in this Circuit have accomplished so much for their class members or endured so long in such intense litigation.

Although the D.C. Circuit in the seminal *Swedish Hospital* case rejected the lodestar approach to calculating Class Counsel fees in favor of the common fund approach,  *see* 1 F.3d at 1266-71, this Court has often applied lodestar to check the reasonableness of a common fund contingent fees.  *See, e.g., Cohen*, 522 F. Supp. 2d at 123 n.4; *Vista Healthplan*, 246 F.R.D. at 364-65; *Lorazepam II*, 2003 WL 22037741, at *9.  The *Lorazepam II* court, after reviewing decisions in this District, concluded that "multiples ranging up to 'four are frequently awarded in common fund cases when the lodestar method is applied.'"  2003 WL 22037741, at *9 (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 341 (3d Cir. 1998)) *Accord Cohen*, 522 F. Supp. 2d at 123 n.4.[48]  The Average multiplier in Comparable Cases is 3.6.  *See* "Lodestar Check" graph, *supra,* at 16 and related discussion.

Class Counsel and those working for them expended 140,710.2 hours on this litigation through December 7, 2009.[49]  In accordance with controlling law, Class Counsel has applied current hourly rates.  *See Covad Commc'ns Co. v. Revonet, Inc.*, 267 F.R.D. 14, 29 (D.D.C. 2010) (holding an attorney's usual hourly rate is presumptively the reasonable rate).  Applying current hourly rates,[50] the total fees incurred are $90.2 million.[51]  The clear sailing amount is a multiple of 1.1,

---

[48] A lodestar "check" does not entail a comprehensive evaluation of time records.  Instead, it is based on a summary of work performed by Class Counsel.  *In re Rite Aid Corp. Sec. Litig*., 396 F. 3d 294, 306 n.16 (3d Cir. 2005).

[49] Dorris Aff. (Ex. 10), ¶ 13; *See also* Class Counsel's Combined Records filed January 25, 2011.

[50] In a lodestar analysis, current rates are applied to ensure that Class Counsel are compensated for the delay in payment.  *See La Shawn A. v. Barry*, Civ. No. 89-1754(TFH), 1998 WL 35243112, at *8 (D.D.C. Feb. 18, 1998).

[51] Dorris Aff. (Ex. 10), ¶ 13.

which is far below controlling law.  An award of 14.75% of $1.512 billion results in a lodestar

multiple of 2.5, which is lower than all Comparable Cases.[52]  Additionally, Class Counsel incurred

expenses and costs of $1,276,598,[53] for which they should be paid.[54]

    **The risk of non-payment.**  Prior to retaining Class Counsel, Ms. Cobell interviewed a

number of attorneys, including those who specialize in the representation of tribes. *See* Cobell Aff.

¶ 15.  Repeatedly, she was turned down because most believed this case would be impossible to

prosecute given jurisdictional hurdles, complexity, remedial options, and cost.  Some declined

because of the time required and the risk involved.  Others declined over concerns that Interior

officials, who have jurisdiction over other client matters, would be angered.  *Id.*

    Attorneys who handle cases on a contingency take "upon themselves the risk that they will

receive no payment at all [and] generally receive far more in winning cases than they would if they

charged an hourly rate."  *Hensley*, 461 U.S. at 448 (Brennan, J., concurring in part and dissenting in

part).  Without a reasonable incentive, lawyers would be "less willing to take on cases that involve

either unsettled legal issues or clients who might otherwise go unrepresented."  *Freeport Partners*,

2006 WL 627140, at *13.  Therefore, "[p]ublic policy is served" by awarding higher fees to lawyers

who assume the risk.  *Id.*

    Here, Class Counsel assumed the risk that they would be paid little or nothing for the more

than $90 million in time they invested in this case.[55]  Nonetheless, they litigated vigorously against

---

[52] In five of seven Comparable Cases discussed *supra* at 16 a lodestar check was done, yielding an average multiple of 3.6 times class counsel's current hourly rates.

[53] Dorris Aff. (Ex. 10), ¶ 14.

[54] Class Counsel are entitled to litigation expenses.  *See In re First Databank Antitrust Litig*, 209 F. Supp. 2d 96, 98 (D.D.C. 2002); *In re Lorazepam & Clorazepate Antitrust Litig.* ("*Lorazepam II*"), No. MDL 1290, 2003 WL 22037741, at *7 (D.D.C. June 16, 2003) (finding that class counsel "were willing to expend their own money, as an investment whose reimbursement was entirely contingent on the success of this litigation, is perhaps the best indicator that the expenditures were reasonable and necessary").

defendants who filed multiple dispositive motions.[56]   A litany of defenses were raised, rejected by

this Court and appellate panels, and re-litigated repeatedly, including issues regarding sovereign

immunity, jurisdiction, separation of powers, statutes of limitation, and laches.   Further, as a matter

of practice, arguments and objections to discovery, which were grounded in deliberative process

privilege, executive privilege, attorney client privilege, and work product doctrine, were asserted

repeatedly to block plaintiffs' discovery.   This Court's decisions on several of plaintiffs' motions

could have resolved this action unfavorably.   Yet, Class Counsel endured and prevailed.

**Public Policy.**   In its historic mismanagement of the IIM Trust, the government engaged in

"fiscal and governmental irresponsibility in its purest form."   *Cobell V*, 91 F. Supp. 2d at 6.   Interior

and Treasury each ignored or disavowed congressional mandates and a century-old fiduciary

obligation to account for assets held in trust for individual Indians.   This lawsuit brought a national

injustice to the attention of the country and forced the United States to begin to right a past wrong.

**Other Settlements.**   Since this settlement was announced, the government settled two other

class type matters.   Given the limited work performed by counsel in those cases, both settlements

provide vastly better treatment for class counsel there than the clear sailing provision would here.

In *Pigford II*, the sole act of class counsel - which include counsel of record in *Pigford I* - is the

negotiation of the settlement agreement.   For this, they will be paid up to $92.5 million.[57]   The

---

[55] *See, e.g.,* Gingold Aff. (Ex. 8), ¶¶ 11, 13.  Where, as here, the risk of non-payment is high, the average fee awarded increases by 3%, from 23.1% to 26.1%.  Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248, 265 (2010).

[56] See, e.g., *Cobell v. Babbitt*, 30 F. Supp. 2d 24, 47 (D.D.C. 1998) *("Cobell I")* (denying defendants' motion for judgment on the pleadings, motion to dismiss, and motion for summary judgment); *Cobell v. Babbitt*, 52 F. Supp. 2d 11, 34 (D.D.C. 1999) *("Cobell III")* (denying summary judgment motion).

[57] *See Pigford II* Agreement § IX.B available at http://benniethompson.house.gov/images/ pigford_2_settlement/pdf.   Further, since *Pigford II* counsel did not negotiate tax and social entitlements provisions, more than $200 million of the $1.15 billion settlement will be withheld by the IRS and farmers may lose their eligibility for social benefits programs, including food stamps.

*Keepseagle* class counsel – who also include class counsel from *Pigford I* – will be paid up to $60.8 million for having approximately $600 million distributed to that plaintiff class after IRS tax withholdings following a case where there were no significant evidentiary hearings or trials.[58]

## CONCLUSION

Class Counsel have achieved a "stunning" landmark victory in this case and through their efforts, approximately $9 billion in tangible benefits have been conferred on the Plaintiff classes. No lawyers have done so much for so many people in this Circuit.  No settlement with the United States has been greater.   Most importantly, in doing so, they have accomplished that which Congress could not do and the Attorney General would not do and have aided a group long abused to stand up against the abuse.   Accordingly, Plaintiffs petition this Court to award fees, expenses, and costs for Class Counsel through December 7, 2009 in accordance with controlling law.   Though Plaintiffs assert $99.9 million in keeping with a "clear sailing" clause, that amount is so far below governing standards that it would be inconsistent with controlling law, which prescribes a fee award of at least $223 million and $1,276,598 in expenses and costs.[59]

Respectfully submitted,

/s/ Dennis M. Gingold
DENNIS M. GINGOLD
D.C. Bar No. 417748
607 14th Street, N.W., 9th Floor
Washington, D.C. 20005
(202) 824-1448

---

[58] *See Keepseagle* Agreement § XV.B available at https://www.indianfarmclass.com/Documents/ SettlementAgreement/pdf.  Akin to *Pigford II*, there is no tax or social benefits clause, meaning that substantial funds will be withheld by the IRS and Indian farmers would lose their eligibility for food stamps.

[59] Supporting documentation is submitted with this filing in paper form pursuant to L.Civ.R. 5.4(e)(1).

/s/ Keith M. Harper
KEITH M. HARPER
D.C. Bar No. 451956
JUSTIN GUILDER
D.C. Bar No. 979208
KILPATRICK TOWNSEND LLP
607 14th Street, N.W.
Washington, D.C.  20005
(202) 508-5844

DAVID COVENTRY SMITH
N.C. Bar No. 12558
Admitted *Pro Hac Vice*
KILPATRICK TOWNSEND LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
(336) 607-7392

WILLIAM E. DORRIS
Georgia Bar No. 225987
Admitted *Pro Hac Vice*
ELLIOTT LEVITAS
D.C. Bar No. 384758
KILPATRICK TOWNSEND LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309
404-815-6500

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing PLAINTIFFS' PETITION FOR CLASS COUNSEL'S FEES, EXPENSES AND COSTS THROUGH SETTLEMENT was served on the following via facsimile, pursuant to agreement, on this day, January 25, 2011.

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
406.338.7530 (fax)


/s/ Shawn Chick