### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ELOUISE PEPION COBELL, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Case No. 1:96CV01285-JR** |
| **vs.** ) | |
| ) | |
| **KEN SALAZAR, Secretary of the Interior, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

# Class Action Settlement Agreement

## December 7, 2009

## <u>TABLE OF CONTENTS</u>

Page

BACKGROUND .................................................................................................2

TERMS OF AGREEMENT ...............................................................................6

    **A.**    DEFINITIONS ..........................................................................6

    **B.**    AMENDED COMPLAINT AND PRELIMINARY APPROVAL.................15

    **C.**    CLASS NOTICE AND OPT OUT.................................................17

    **D.**    MOTION FOR JUDGMENT, FAIRNESS HEARING, AND FINAL APPROVAL .............................................................................21

    **E.**    ACCOUNTING/TRUST ADMINISTRATION FUND .......................23

    **F.**    TRUST LAND CONSOLIDATION FUND.....................................35

    **G.**    INDIAN EDUCATION SCHOLARSHIPS ....................................38

    **H.**    TAXES AND ELIGIBILITY FOR BENEFITS.................................42

    **I.**    RELEASES..............................................................................43

    **J.**    ATTORNEYS' FEES ................................................................47

    **K.**    CLASS REPRESENTATIVES' INCENTIVE AWARDS ...........................49

    **L.**    NO FURTHER MONETARY OBLIGATION .................................51

    **M.**    ADDITIONAL PROVISIONS .....................................................52

SIGNATURES..................................................................................................55

US2000 11623208.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ELOUISE PEPION COBELL, et al., | ) |
| Plaintiffs, | ) |
| vs. | ) |
| KEN SALAZAR, Secretary of the Interior, et al., | ) |
| Defendants. | ) |

Case No. 1:96CV01285-JR

# CLASS ACTION SETTLEMENT AGREEMENT

This Class Action Settlement Agreement ("Agreement") is entered into by and between Elouise Pepion Cobell, Penny Cleghorn, Thomas Maulson and James Louis Larose (collectively, the "Named Plaintiffs"), on behalf of themselves and members of the Classes of individual Indians defined in this Agreement (collectively, "Plaintiffs"), on the one hand, and Ken Salazar, Secretary of the Interior, Larry Echohawk, Assistant Secretary of the Interior – Indian Affairs, and H. Timothy Geithner, Secretary of the Treasury and their successors in office, all in their official capacities (collectively, "Defendants"). Plaintiffs and Defendants are collectively referenced as the "Parties."

Subject to Court approval as required by Federal Rule of Civil Procedure ("FRCP") 23, the Parties hereby stipulate and agree that, in consideration of the promises and covenants set forth in this Agreement and upon entry by the Court of a Final Order and Judgment and resolution of any appeals from that Final Order and Judgment, this Action shall be settled and compromised in accordance with the terms of this Agreement.

1

The Parties agree that the Settlement is contingent on the enactment of legislation to authorize or confirm specific aspects of the Settlement as set forth below.  If such legislation, which will expressly reference this Agreement, is not enacted on or before the Legislation Enactment Deadline as defined in this Agreement, unless such date is mutually agreed to be extended by the Parties, or is enacted with material changes, the Agreement shall automatically become null and void.

## BACKGROUND

1.      On June 10, 1996, a class action complaint (the "Complaint") was filed in the United States District Court for the District of Columbia (the "Court") entitled <u>Elouise Pepion Cobell, et al. v. Bruce Babbitt, Secretary of Interior, et al.</u>, No. Civ. 96-1285 (RCL) (currently denominated as <u>Elouise Pepion Cobell v. Ken Salazar, Secretary of Interior, et al.</u>, 96-1285 (JR)) (this "Action"), seeking to redress alleged breaches of trust by the United States, and its trustee-delegates the Secretary of Interior, the Assistant Secretary of Interior-Indian Affairs, and the Secretary of the Treasury, regarding the management of Individual Indian Money ("IIM") Accounts held on behalf of individual Indians.

2.      The Complaint sought, among other things, declaratory and injunctive relief construing the trust obligations of the Defendants to members of the Plaintiff class and declaring that Defendants have breached and are in continuing breach of their trust obligations to class members, an order compelling Defendants to perform these legally mandated obligations, and requesting an accounting by Interior Defendants (as hereinafter defined) of individual Indian trust assets.  See <u>Cobell v. Babbitt</u>, 52 F.Supp. 2d 11, 19 (D.D.C. 1999) ("<u>Cobell III</u>").

3.      On February 4, 1997, the Court granted Plaintiffs' Motion for Class Action Certification pursuant to FRCP 23(b)(1)(A) and (b)(2) "on behalf of a plaintiff class consisting of

2

present and former beneficiaries of IIM Accounts (exclusive of those who prior to the filing of the Complaint herein had filed actions on their own behalf alleging claims included in the Complaint)" (the "February 4, 1997 Class Certification Order"), reserving the jurisdiction to modify the February 4, 1997 Class Certification Order as the interests of justice may require, *id.* at 2-3.

4.      On December 21, 1999, the Court held, among other things, that Defendants were then in breach of certain of their respective trust duties, Cobell v. Babbitt, 91 F. Supp. 2d 1, 58 (D.D.C. 1999) ("Cobell V").

5.      On February 23, 2001, the United States Court of Appeals for the District of Columbia Circuit (the "Court of Appeals") upheld the Court's determination that Defendants were in breach of their statutory trust duties, Cobell v. Norton, 240 F.3d 1081 (D.C. Cir. 2001) ("Cobell VI").

6.      Subsequently, the Court made determinations that had the effect of modifying the February 4, 1997 Class Certification Order, determining on January 30, 2008, that the right to an accounting accrued on October 25, 1994, "for all then-living IIM beneficiaries:  those who hold or at any point in their lives held IIM Accounts."  Cobell v. Kempthorne, 532 F. Supp. 2d 37, 98 (D.D.C. 2008) ("Cobell XX").

7.      The Court and the Court of Appeals have further clarified those individual Indians entitled to the relief requested in the Complaint in the following respects:

(a)      Excluding income derived from individual Indian trust land that was received by an individual Indian beneficiary on a direct pay basis, Cobell XX, 532 F. Supp. 2d at 95-96;

(b)      Excluding income derived from individual Indian trust land where such funds were managed by tribes, *id.*;

(c)      Excluding IIM Accounts closed prior to October 25, 1994, date of passage of the American Indian Trust Fund Management Reform Act of 1994, Pub. L. No. 103-

3

412, 108 Stat. 4239 codified as amended at 25 U.S.C. § 162a et. seq. (the "Trust Reform Act"), Cobell v. Salazar, 573 F.3d 808, 815 (D.C. Cir. 2009) (Cobell XXII); and

(d)     Excluding heirs to money from closed accounts that were subject to final probate determinations, *id*.

8.      On July 24, 2009, the Court of Appeals reaffirmed that "[t]he district court sitting in equity must do everything it can to ensure that [Interior Defendants] provide [plaintiffs] an equitable accounting," *Id.* at 813.

9.      This Action has continued for over 13 years, there is no end anticipated in the foreseeable future, and the Parties are mindful of the admonition of the Court of Appeals that they work together "to resolve this case expeditiously and fairly," Cobell v. Kempthorne, 455 F.3d 317, 336 (D.C. Cir. 2006), and desire to do so.

10.     Recognizing that individual Indian trust beneficiaries have potential additional claims arising from Defendants' management of trust funds and trust assets, Defendants have an interest in a broad resolution of past differences in order to establish a productive relationship in the future.

11.     The Parties recognize that an integral part of trust reform includes accelerating correction of the fractionated ownership of trust or restricted land, which makes administration of the individual Indian trust more difficult.

12.     The Parties also recognize that another part of trust reform includes correcting the problems created by the escheatment of certain individual Indians' ownership of trust or restricted land, which has been held to be unconstitutional (*see* Babbitt v. Youpee, 519 U.S. 234 (1997); Hodel v. Irving, 481 U.S. 704 (1987)) and which makes administration of the individual Indian trust difficult.

4

13.     Plaintiffs believe that further actions are necessary to reform the individual Indian trust, but hope that such further reforms are made without the need for additional litigation. Plaintiffs are also hopeful that the Commission which Secretary Salazar is announcing contemporaneously with the execution of this Agreement will result in the further reform which Plaintiffs believe is needed.

14.     The Parties have an interest in as complete a resolution as possible for individual Indian trust-related claims and agree that this necessarily includes establishing a sum certain as a balance for each IIM Account as of a date certain.

15.     Defendants deny and continue to deny any and all liability and damages to any individual Indian trust beneficiary with respect to the claims or causes of action asserted in the Litigation or the facts found by the Court in this Litigation.  Nonetheless, without admitting or conceding any liability or damages whatsoever and without admitting any wrongdoing, and without conceding the appropriateness of class treatment for claims asserted in any future complaint, Defendants have agreed to settle the Litigation (as hereinafter defined) on the terms and conditions set forth in this Agreement, to avoid the burden, expense, and uncertainty of continuing the case.

16.     Class Counsel have conducted appropriate investigations and analyzed and evaluated the merits of the claims made, and judgments rendered, against Defendants in the Litigation, the findings, conclusions and holdings of the Court and Court of Appeals in this Litigation, and the impact of this Settlement on Plaintiffs as well as the impact of no settlement, and based upon their analysis and their evaluation of a number of factors, and recognizing the substantial risks of continued litigation, including the possibility that the Litigation, if not settled now, might not result in any recovery, or might result in a recovery that is less favorable than

that provided for in this Settlement, and that otherwise a fair judgment would not occur for several years, Class Counsel are satisfied that the terms and conditions of this Settlement are fair, reasonable and adequate and that this Settlement is in the best interests of all Class Members.

17.     The Parties desire to settle the Litigation and resolve their differences based on the terms set forth in this Agreement.

## TERMS OF AGREEMENT

NOW, THEREFORE, in consideration of this Background, the mutual covenants and promises set forth in this Agreement, as well as the good and valuable consideration provided for in this Agreement, the Parties agree to a full and complete settlement of the Litigation on the following terms.

### A.     DEFINITIONS

1.     Accounting/Trust Administration Fund.  "Accounting/Trust Administration Fund" shall mean the $1,412,000,000.00 that Defendants shall pay into a Settlement Account held in the trust department of a Qualified Bank (as hereinafter defined) selected by Plaintiffs and approved by the Court, as well as any interest or investment income earned before distribution. The $1,412,000,000.00 payment represents the maximum total amount that Defendants are required to pay to settle Historical Accounting Claims, Funds Administration Claims, and Land Administration Claims.

2.     Amended Complaint.  "Amended Complaint" shall mean the complaint amended by Plaintiffs solely as part of this Agreement, and for the sole purpose of settling this Litigation, to be filed with the Court concurrently with, and attached to, this Agreement.

3.     Amount Payable for Each Valid Claim.  "Amount Payable for Each Valid Claim" shall mean the amount prescribed in section E.3 and E.4 below.

6

4.      Assigned Value.  "Assigned Value" shall have the meaning set forth in subsection E(4)(b)(3) below.

5.      Claims Administrator.  "Claims Administrator" shall mean The Garden City Group, Inc., which shall provide services to the Parties to facilitate administrative matters and distribution of the Amount Payable for Each Valid Claim in accordance with the terms and conditions of this Agreement.

6.      Classes.  "Classes" shall mean the classes established for purposes of this Agreement: the Historical Accounting Class and the Trust Administration Class (both as hereinafter defined).

7.      Class Counsel.  "Class Counsel" shall mean Dennis Gingold, Thaddeus Holt and attorneys from Kilpatrick Stockton LLP, including Elliott H. Levitas, Keith Harper, William Dorris, David Smith, William Austin, Adam Charnes and Justin Guilder.

8.      Class Members.  "Class Members" shall mean members of the Classes.

9.      Contact Information.  "Contact Information" shall mean the best and most current information the Department of the Interior ("Interior") then has available of a beneficiary's name, social security number, date of birth, and mailing address, and whether Interior's individual Indian trust records reflect that beneficiary to be a minor, non-compos mentis, an individual under legal disability, an adult in need of assistance or whereabouts unknown.

10.     Day.  "Day" shall mean a calendar day.

11.     Defendants.  "Defendants" shall mean Ken Salazar, Secretary of the Interior, Larry Echohawk, Assistant Secretary of the Interior – Indian Affairs, and H. Timothy Geithner, Secretary of the Treasury, and their successors in office, all in their official capacities.

7

12.    <u>Fairness Hearing</u>.  "Fairness Hearing" shall mean the hearing on the Joint Motion for Judgment and Final Approval referenced in Paragraph D(4) below.

13.    <u>Final Approval</u>.  "Final Approval" shall mean the occurrence of the following:

a.    Following the Fairness Hearing, the Court has entered Judgment; and

b.    The Judgment has become final.  "Final" means the later of:

(1)    The time for rehearing or reconsideration, appellate review, and review by petition for certiorari has expired, and no motion for rehearing or reconsideration and/or notice of appeal has been filed; or

(2)    If rehearing, reconsideration, or appellate review, or review by petition for certiorari is sought, after any and all avenues of rehearing, reconsideration, appellate review, or review by petition for certiorari have been exhausted, and no further rehearing, reconsideration, appellate review, or review by petition for certiorari is permitted, or the time for seeking such review has expired, and the Judgment has not been modified, amended or reversed in any way.

14.    <u>Funds Administration Claims</u>.  "Funds Administration Claims" shall mean known and unknown claims that have been or could have been asserted through the Record Date for Defendants' alleged breach of trust and mismanagement of individual Indian trust funds, and consist of Defendants' alleged:

a.    Failure to collect or credit funds owed under a lease, sale, easement or other transaction, including without limitation, failure to collect or credit

8

US2000 11623208.1

all money due, failure to audit royalties and failure to collect interest on late payments;

b.  Failure to invest;

c.  Underinvestment;

d.  Imprudent management and investment;

e.  Erroneous or improper distributions or disbursements, including to the wrong person or account;

f.  Excessive or improper administrative fees;

g.  Deposits into wrong accounts;

h.  Misappropriation;

i.  Funds withheld unlawfully and in breach of trust;

j.  Loss of funds held in failed depository institutions, including interest;

k.  Failure as trustee to control or investigate allegations of, and obtain compensation for, theft, embezzlement, misappropriation, fraud, trespass, or other misconduct regarding trust assets;

l.  Failure to pay or credit interest, including interest on Indian monies proceeds of labor (IMPL), special deposit accounts, and IIM Accounts;

m.  Loss of funds or investment securities, and the income or proceeds earned from such funds or securities;

n.  Accounting errors;

o.  Failure to deposit and/or disburse funds in a timely fashion; and

9

p.      Claims of like nature and kind arising out of allegations of Defendants'

breach of trust and/or mismanagement of individual Indian trust funds

through the Record Date, that have been or could have been asserted.

15.      <u>Historical Accounting Claims</u>.  "Historical Accounting Claims" shall mean

common law or statutory claims, including claims arising under the Trust Reform Act, for a

historical accounting through the Record Date of any and all IIM Accounts and any asset held in

trust or restricted status, including but not limited to Land (as defined herein) and funds held in

any account, and which now are, or have been, beneficially owned or held by an individual

Indian trust beneficiary who is a member of the Historical Accounting Class.  These claims

include the historical accounting through the Record Date of all funds collected and held in trust

by Defendants and their financial and fiscal agents in open or closed accounts, as well as interest

earned on such funds, whether such funds are deposited in IIM Accounts, or in tribal, special

deposit, or government administrative or operating accounts.

16.      <u>Historical Accounting Class</u>.  "Historical Accounting Class" means those

individual Indian beneficiaries (exclusive of those who prior to the filing of the Complaint on

June 10, 1996 had filed actions on their own behalf stating a claim for a historical accounting)

alive on the Record Date and who had an IIM Account open during any period between October

25, 1994 and the Record Date, which IIM Account had at least one cash transaction credited to it

at any time as long as such credits were not later reversed.  Beneficiaries deceased as of the

Record Date are included in the Historical Accounting Class only if they had an IIM Account

that was open as of the Record Date.  The estate of any Historical Accounting Class Member

who dies after the Record Date but before distribution is in the Historical Accounting Class.

10

17.   <u>IIM Account</u>.  "IIM Account" means an IIM account as defined in title 25, Code of Federal Regulations, section 115.002.

18.   <u>Interior Defendants</u>.  "Interior Defendants" shall mean Ken Salazar, Secretary of the Interior, and Larry Echohawk, Assistant Secretary of the Interior – Indian Affairs, and their successors in office, all in their official capacities.

19.   <u>Land</u>.  "Land" shall mean land owned by individual Indians and held in trust or restricted status by Interior Defendants, including all resources on, and corresponding subsurface rights, if any, in the land, and water, unless otherwise indicated.

20.   <u>Land Consolidation Program</u>.  The fractional interest acquisition program authorized in 25 U.S.C. 2201 et seq., including any applicable legislation enacted pursuant to this Agreement.

21.   <u>Land Administration Claims</u>.  "Land Administration Claims" shall mean known and unknown claims that have been or could have been asserted through the Record Date for Interior Defendants' alleged breach of trust and fiduciary mismanagement of land, oil, natural gas, mineral, timber, grazing, water and other resources and rights (the "resources") situated on, in or under Land and consist of Interior Defendants' alleged:

  a. Failure to lease Land, approve leases or otherwise productively use Lands or assets;

  b. Failure to obtain fair market value for leases, easements, rights-of-way or sales;

  c. Failure to prudently negotiate leases, easements, rights-of-way, sales or other transactions;

  d. Failure to impose and collect penalties for late payments;

11

e.     Failure to include or enforce terms requiring that Land be conserved, maintained, or improved;

f.     Permitting loss, dissipation, waste, or ruin, including failure to preserve Land whether involving agriculture (including but not limited to failing to control agricultural pests), grazing, harvesting (including but not limited to permitting overly aggressive harvesting), timber lands (including but not limited to failing to plant and cull timber land for maximum yield), and oil, natural gas, mineral resources or other resources (including but not limited to failing to manage oil, natural gas, or mineral resources to maximize total production);

g.     Misappropriation;

h.     Failure to control, investigate allegations of, or obtain relief in equity and at law for, trespass, theft, misappropriation, fraud or misconduct regarding Land;

i.     Failure to correct boundary errors, survey or title record errors, or failure to properly apportion and track allotments; and

j.     Claims of like nature and kind arising out of allegations of Interior Defendants' breach of trust and/or mismanagement of Land through the Record Date, that have been or could have been asserted.

22.     <u>Legislation Enactment Deadline</u>.  "Legislation Enactment Deadline" shall mean December 31, 2009, 11:59 p.m. Eastern time**.**

23.     <u>Litigation</u>.  "Litigation" shall mean that which is stated in the Amended Complaint attached to this Agreement.

12

24.    Named Plaintiffs; Class Representatives.  "Named Plaintiffs" shall mean and include Elouise Pepion Cobell ("Lead Plaintiff"), Penny Cleghorn, Thomas Maulson, and James Louis Larose.  The Named Plaintiffs are also referred to as the "Class Representatives."

25.    Notice Contractor.  "Notice Contractor" shall mean a mutually agreeable entity that shall provide services to the Parties needed to provide notice to the Classes.

26.    Order Granting Preliminary Approval.  "Order Granting Preliminary Approval" shall mean the Order entered by the Court preliminarily approving the terms set forth in this Agreement, including the manner and timing of providing notice to the Classes, the time period for objections and the date, time and location for a Fairness Hearing.

27.    Parties.  "Parties" shall mean the Named Plaintiffs, members of the Classes, and Defendants.

28.    Preliminary Approval.  "Preliminary Approval" shall mean that the Court has entered an Order Granting Preliminary Approval.

29.    Qualifying Bank; Qualified Bank.  "Qualifying Bank" or "Qualified Bank" shall mean a federally insured depository institution that is "well capitalized," as that term is defined in 12 CFR §325.103, and that is subject to regulation and supervision by the Board of Governors of the Federal Reserve System or the U.S. Comptroller of the Currency under 12 CFR §9.18.

30.    Record Date.  "Record Date" shall mean September 30, 2009, 11:59 p.m. Eastern time.

31.    Settlement Account.  "Settlement Account" shall mean the trust account(s) established by Class Counsel in a Qualified Bank approved by the Court for the purpose of effectuating the Settlement and into which the Accounting/Trust Administration Fund shall be

13

deposited and from which Stage 1 and Stage 2 Distributions, among other things set forth in this Agreement, shall be paid.

32.  <u>Special Master</u>.  "Special Master" shall be the person appointed by the Court as provided in paragraph E.1.a.

33.  <u>Stage 1; Stage 1 Distribution</u>.  "Stage 1" and "Stage 1 Distribution" shall mean the distribution to the Historical Accounting Class as provided in paragraph E(3).

34.  <u>Stage 2; Stage 2 Distribution</u>.  "Stage 2" and "Stage 2 Distribution" shall mean the distribution to the Trust Administration Class as provided in paragraph E(4).

35.  <u>Trust Administration Class</u>.  "Trust Administration Class" shall mean those individual Indian beneficiaries (exclusive of persons who filed actions on their own behalf, or a group of individuals who were certified as a class in a class action, stating a Funds Administration Claim or a Land Administration Claim prior to the filing of the Amended Complaint) alive as of the Record Date and who have or had IIM Accounts in the "Electronic Ledger Era" (currently available electronic data in systems of the Department of the Interior dating from approximately 1985 to the present), as well as individual Indians who, as of the Record Date, had a recorded or other demonstrable ownership interest in land held in trust or restricted status, regardless of the existence of an IIM Account and regardless of the proceeds, if any, generated from the Land.  The Trust Administration Class does not include beneficiaries deceased as of the Record Date, but does include the estate of any deceased beneficiary whose IIM Accounts or other trust assets had been open in probate as of the Record Date.  The estate of any Trust Administration Class Member who dies after the Record Date but before distribution is included in the Trust Administration Class.

14

36.    <u>Trust Land Consolidation Fund</u>.  "Trust Land Consolidation Fund" shall mean the $2,000,000,000.00 allocated to Interior Defendants and held in a separate account in Treasury for the purpose of acquiring fractional interests in trust or restricted land and such other purposes as permitted by this Agreement and applicable law.

**B.    AMENDED COMPLAINT AND PRELIMINARY APPROVAL**

1.    <u>Legislation Required</u>.  The Parties agree that the Agreement is contingent on the enactment of legislation to authorize specific aspects of the Agreement.  The Parties agree that enactment of this legislation is material and essential to this Agreement and that if such legislation is not enacted into law by the Legislation Enactment Deadline, unless such date is mutually agreed by the Parties in writing to be extended, or is enacted with material changes, the Agreement shall automatically become null and void.  In the event this Agreement becomes null and void, nothing in this Agreement may be used against any Party for any purpose.

2.    <u>Effect of Material Modifications</u>.  A copy of the proposed legislation is attached as Exhibit "A".  If legislation is enacted in any manner at any time prior to Final Approval which alters, expands, narrows or modifies the attached proposed legislation in any material way, this Agreement shall be null and void in its entirety.

3.    <u>Amended Complaint</u>.

a.    <u>Amendment of Complaint</u>.  Within two business days of enactment of the legislation, or by January 15, 2010, whichever is later, Plaintiffs will file an Amended Complaint to which Defendants will provide written consent provided that such Amended Complaint conforms with the proposed Amended Complaint attached as Exhibit "B" to this Agreement. Defendants' obligation to answer the Amended Complaint shall be held in abeyance pending Final Approval. Defendants' written consent to the

15

filing constitutes neither an admission of liability regarding any Funds Administration Claims and/or Land Administration Claims, nor a waiver of any defense to such claims in any form.

b. <u>Causes of Action</u>.  The Amended Complaint will include (a) a claim for breach of trust with respect to individual Indians and related request for an historical accounting of the IIM Account, (b) a claim for breach of trust seeking equitable restitution to restate the IIM Accounts in accordance with the historical accounting requested, and (c) one or more claims for breach of trust with respect to Defendants' mismanagement of trust funds and trust assets requesting damages, restitution and other monetary relief.

c. <u>Classes</u>.  The Amended Complaint will set forth the Historical Accounting Class and the Accounting/Trust Administration Class as the two plaintiff classes.

d. <u>Claims</u>.  For purposes of settlement only, and only as a provision of this Agreement, the Amended Complaint will include Funds Administration Claims and Land Administration Claims.

4. <u>Preliminary Approval</u>.

a. <u>Joint Motion</u>.  Concurrent with the filing of the Amended Complaint, the Parties shall file a joint motion for Preliminary Approval of this Agreement by the Court and attach a copy of this Agreement and such other documents which the Parties determine are necessary for the Court's consideration.

b.      <u>Class Certification</u>.  The joint motion referenced in subparagraph a. above shall include a joint request by the Parties that the Court certify the Trust Administration Class pursuant to FRCP 23(b)(3), and also to amend the February 4, 1997 Order Certifying Class Action under FRCP 23(b)(1)(A) and 23(b)(2), in accordance with this Agreement.

5.      <u>Requirement for Notice Acknowledged</u>.  The Parties recognize that the Court is required to provide the Historical Accounting Class and the Trust Administration Class, pursuant to FRCP 23(c)(2)(A) and (B), as applicable, with reasonable and appropriate notice of (i) the Action, (ii) the proposed Agreement, and (iii) the opportunity for members of the Trust Administration Class to opt out of the settlement pursuant to the procedures set forth in paragraph C(2)(c), and, pursuant to FRCP 23(h), with reasonable and appropriate notice of attorney fees and costs to be requested by Class Counsel.

6.      <u>Joint Motion If Settlement Not Completed</u>.  Should (a) either party terminate this Agreement pursuant to the terms hereof, (b) this Agreement become null and void because a condition subsequent does not occur, or (c) this Agreement not finally be approved by the Court, the Parties shall file a joint motion (i) to strike the Amended Complaint, (ii) to vacate any Order of the Court certifying the Amended Complaint as a class action, and (iii) to restore the Parties to the *status quo ante*.

**C.      CLASS NOTICE AND OPT OUT**

1.      <u>Class Notice</u>.

a.      <u>Commencement of Notice</u>.  Upon entry of an Order granting Preliminary Approval, the Notice Contractor, in cooperation with Class Counsel and Interior Defendants, shall notify the Classes of this Agreement.

17

b.      Direct Notice.  The Parties shall use reasonable efforts, and utilize the services of the Notice Contractor and Claims Administrator, as appropriate, to effectuate a Direct Class Notice as soon as practicable following the date of entry of the Order Granting Preliminary Approval.

c.      Published Notice.  The Parties shall also use reasonable efforts and the services of the Notice Contractor to effectuate Published Class Notice through the use of media, including targeted mainstream and Native American media (including translation to native language where appropriate) contemporaneous with the mailing of the Direct Class Notice.

d.      Contents of Notice.  Pursuant to FRCP 23(c)(2), the notice to the Class Members shall include the following general notice information: the definition of the certified class[es]; a general description of the litigation and its claims, issues, and defenses; material terms of this proposed Agreement; procedures for allocating and distributing funds in the Settlement Account; Class Counsel's request for and amount of attorneys' fees, expenses and costs; Class Representatives' incentive awards, including expenses and costs; options available to settlement Class Members, including the manner, time limits, forum and form of an objection to this proposed Agreement; options available to potential Class Members ("claimants") to participate in a Stage 2 distribution, including the manner, time limits and form for such an application; the right of any Class Member to enter an appearance *pro se* or through an attorney to object to the Agreement or any of its terms; the nature and scope of opt

18

out rights; actions that are required to opt out of the Agreement; the effect

of opt outs on the Agreement; the mailing address and toll-free telephone

number of the Claims Administrator for class inquiries and clarifications

regarding the Settlement; the date, time, and location of the Final

Approval Hearing on Agreement; the binding effect on a Class Member's

IIM Account balance as of the Record Date unless the Class Member opts

out of the Trust Administration Class; and the binding effect of the

Agreement on Class Members.

e.       Interior's Second Notice Option.  In addition to the Notice described in

section 1.d, above, Interior Defendants reserve the right to issue a Second

Notice after the Fairness Hearing, with such Second Notice containing

detailed information regarding the Accounting/Trust Administration Fund

and the Land Consolidation Program.  The cost of this Second Notice

would be a separate expense borne by Interior Defendants.

2.       Class Member Opt Out.

a.       No Opt Out for Historical Accounting Class.  In accordance with FRCP

23(b)(2), no opt out will be available to those Class Members in the

Historical Accounting Class.

b.       Deadline for Trust Administration Class Opt Outs.  The deadline for those

Class Members in the Trust Administration Class to opt out will be sixty

(60) days from the first day Notice is sent.  Timeliness will be determined

using the opt out or objection postmark date.

19

c.    Opt Out Requirements.  To opt out, members of the Trust Administration Class must submit to the Claims Administrator a written request for exclusion.  The request for exclusion must include the individual's full name, address, IIM Account number(s), Social Security Number, and a statement of the individual's intention to opt out of the Settlement.

d.    Opt Out List.  The Claims Administrator shall compile a list of valid opt outs for submission to the Court and, if the Parties disagree over the validity of any opt out determination, then any such disagreement may be lodged with the Court for a final and binding decision.  Through the date Class Members must exercise their option to opt out, the Claims Administrator shall be contractually bound to provide written daily status reports in a format agreeable to the Parties that identifies each and every person who has opted out.

e.    Opt Out Fund Adjustment.  When Class Members opt out of the Trust Administration Class, the amount of the Accounting/Trust Administration Fund shall be reduced by the amount such an opting out Class Member would have received in his or her Stage 2 payment, including both the baseline payment and the pro rata amounts.  Such amounts for opt outs shall be determined prior to the Stage 2 distribution and paid to Defendants contemporaneous with the distribution of Stage 2 payments.

f.    Kick-Out Option.  In the event that the Class Members who do not opt out of the Trust Administration Class represent in the aggregate less than eighty five percent (85%) of the aggregate amount of all Assigned Values,

20

then Defendants, at their sole option, may elect to withdraw from and fully

terminate this Agreement in which case the Parties will be restored to their

prior positions as though the Agreement had never been executed, except

as provided in paragraph D.7.  In exercising such an election to terminate,

Defendants must terminate the Agreement in its entirety and may not

terminate only parts of the Agreement.  Defendants must exercise this

election to terminate no later than one day before the Fairness Hearing by

filing a notice with the Court with a schedule under seal of Class Members

who opted out and their respective Assigned Values.  Any disputes

regarding an attempt by Defendants to terminate shall be decided by the

Court.

**D.   MOTION FOR JUDGMENT, FAIRNESS HEARING, AND FINAL APPROVAL**

1.   <u>Motion for Judgment</u>.  Pursuant to this Agreement and in accordance with the

Court's Order Granting Preliminary Approval, the Parties will submit a Joint Motion for Entry of

Judgment and Final Approval for consideration by the Court at the Fairness Hearing.

2.   <u>Objections to Settlement</u>.  A Class Member who wishes to object to the fairness,

reasonableness or adequacy of this Agreement or of the Settlement contemplated hereby must

file with the Clerk of the Court and serve on the Parties a statement of the objection setting forth

the specific reason(s), if any, for the objection, including any legal support that the Class

Member wishes to bring to the Court's attention, any evidence that the Class Member wishes to

introduce in support of the objection, any grounds to support his or her status as a Class Member,

and whether the Class Member intends to appear at the Fairness Hearing.  Class Members may

act either on their own or through counsel employed at their own expense.  Any Class Member

21

may appear at the Fairness Hearing to object to any aspect of the fairness, reasonableness or adequacy of this Agreement or of the Settlement.

3.    <u>Binding Effect</u>.  Any Class Member who neither objects to the Agreement nor opts out of the Class as provided in paragraph C(2), shall waive and forfeit any and all rights the Class Member may have to appear separately and/or to object and to opt out and shall be bound by all the terms of the Agreement and by all proceedings, orders and judgments in the Litigation.

4.    <u>Fairness Hearing</u>.  At the Fairness Hearing, the Parties will request that the Court, among other things:

a.    Grant final certification of the Classes;

b.    Enter Judgment in accordance with this Agreement;

c.    Approve the Settlement as final, fair, reasonable, adequate, and binding on all Class Members who have not timely opted out pursuant to paragraph C(2);

d.    Approve the payment of reasonable attorneys' fees, expenses and costs for Class Counsel;

e.    Approve the incentive awards for Class Representatives, including expenses and costs that were not paid for by attorneys;

f.    Order the Claims Administrator to process and pay all Valid Claims from the Settlement Account;

g.    Order the release of all Class Members' claims pursuant to paragraph I(1)–(9); and

h.    Order Defendants to make the final payment into the Accounting/Trust Administration Fund.

22

5.  <u>Final Approval</u>.  The Court's Final Approval shall grant each of those requests.

6.  <u>Effect of Failure to Grant Final Approval</u>.  If Final Approval does not occur, this Agreement shall be null and void.

7.  <u>Return of Remaining Funds in Settlement Account if No Final Approval</u>.  If for any reason Final Approval cannot be achieved, the Notice Contractor and Claims Administrator shall be notified to cease work.  To the extent any funds remain in the Settlement Account, Class Counsel shall promptly seek a Court order to pay the remaining valid invoices of the Notice Contractor and Claims Administrator and, within thirty (30) days thereafter, the Parties shall jointly seek a Court order to return to Defendants all funds, if any, that then remain in the Settlement Account. Defendants shall not be entitled to recoup from Plaintiffs or Class Counsel any funds already spent from the Settlement Account.

**E.  ACCOUNTING/TRUST ADMINISTRATION FUND**

1.  <u>General Provisions</u>

a.  <u>Special Master</u>.  Upon Final Approval, the Parties shall request that the Court appoint a Rule 53 Special Master, who shall have only the duties referenced in this Agreement when so designated by the Court.  The Special Master shall only be involved in taking certain actions or making certain determinations in connection with the distribution of the Accounting/Trust Administration Fund and eligibility of individuals to participate as Class Members.  The Special Master shall have no role regarding the distribution of the Trust Land Consolidation Fund.  The Special Master shall also have no role in resolving any disputes between (i) the Parties or (ii) a Class Member and Defendants.  The Special Master shall be paid out of funds in the Settlement Account, and shall submit

23

invoices for fees and expenses to Class Counsel, at reasonable intervals, who shall file them with the Court, requesting an order to pay the Special Master.  All disputes regarding the Special Master's invoices or compensation shall be decided by the Court.  The Parties agree to cooperate to minimize the costs of the Special Master.

b.   Claims Administrator.  The Parties agree to cooperate as to all aspects of this Agreement to minimize the costs of the Claims Administrator.  All payments to the Claims Administrator must be for reasonable and necessary services in accordance with detailed invoices provided to the Parties and approved by the Court or the Special Master as the Court may designate.  Class Counsel shall be responsible for submitting such invoices to the Court and may include invoices for the Claims Administrator's fees, expenses and costs incurred prior to Preliminary Approval.

c.   Qualifying Bank.  The Accounting/Trust Administration Fund shall be deposited in, and administered by, the trust department(s) of a Qualified Bank or Qualified Banks. To the extent settlement funds are held in deposit accounts in excess of FDIC insurance coverage, the excess amount shall be collateralized with securities that are U.S. Treasury or other securities that are backed by the full faith and credit of the United States.

d.   Duties.  Class Counsel, with the Claims Administrator, shall have responsibility for administering the Accounting/Trust Administration Fund in accordance with this Agreement.  Class Counsel shall provide the

24

necessary account information to Defendants as needed to support deposit
of the Accounting/Trust Administration Fund.

e.    <u>Distributions</u>.  All distributions from the Accounting/Trust Administration
Fund shall be made pursuant to final Order of the Court or the Special
Master as the Court may designate.  The Amount Payable for Each Valid
Claim and the claims process for making such payment shall be in
accordance with the terms set forth below.

f.    <u>Reliance on Defendants' Information</u>.  Class Counsel and the Claims
Administrator shall be entitled to rely on the information provided by the
Interior Defendants in making the distributions provided for in this
Agreement.

g.    <u>Defendants' Limited Role</u>.  Except as specifically provided in this
Agreement, Defendants shall have no role in, nor be held responsible or
liable in any way for, the Accounting/Trust Administration Fund, the
holding or investment of the monies in the Qualifying Bank or the
distribution of such monies.

h.    <u>Payments to minors, non-compos mentis, individuals under legal
disability, or adults in need of assistance</u>.  Class Members who are known
to be minors, non-compos mentis, individuals under legal disability, or
adults in need of assistance and who have an account open as of the
date(s) of distribution shall have their distributions deposited into their
IIM Accounts.  If necessary, an IIM Account will be opened by Interior
Defendants for each of them.  Interior Defendants shall receive these

25

deposits as trust funds for the benefit of the pertinent individual Indian beneficiary.

i.   Payments to "whereabouts unknown".  Class Members who are deemed by Interior Defendants be "whereabouts unknown" and who have an account open as of the date of distribution shall have their distributions deposited into their IIM Accounts.  For any Class Member who is designated as a "whereabouts unknown" and is not a minor, non-compos mentis, an individual under legal disability, or an adult in need of assistance, and does not claim any funds deposited in that beneficiary's IIM Account as a result of this Agreement within five (5) years after the date Defendants first transfer monies for the Accounting/Trust Administration Fund to the Qualifying Bank, the principal amount of the funds deposited pursuant to this Agreement in that beneficiary's IIM Account shall be paid by Interior Defendants to the Indian Education Scholarship Fund set out in Section G of this Agreement.

2.   Payments into the Accounting/Trust Administration Fund

a.   Defendants shall pay $1,412,000,000.00 to the Accounting/Trust Administration Fund in the Settlement Account.  This amount shall be paid in installments from the Judgment Fund, as set forth in subparagraphs b, c and d, below.

b.   Concurrent with the filing of the Amended Complaint, the Parties shall move the Court for an order requiring Defendants to pay $20,000,000.00 to the Accounting/Trust Administration Fund in the Settlement Account,

26

to be used by Plaintiffs to retain the Claims Administrator and Notice

Contractor for necessary work required before Final Approval.

Defendants shall make this payment upon order of the Court.

c.      The Parties may jointly move the Court to order such further payments to

the Accounting/Trust Administration Fund as are necessary to fund the

work of the Claims Administrator and/or Notice Contractor before Final

Approval.  Defendants shall make payments requested in the joint motion

upon order of the Court.

d.      Upon Final Approval, Defendants shall pay $1,412,000,000.00 to the

Accounting/Trust Administration Fund, less any amounts paid under

paragraphs b and  c, above.

3.      <u>Stage 1:  Payment of Historical Accounting Claims</u>

a.      <u>Per-Person Payment</u>.  Each member of the Historical Accounting Class

shall be paid a per capita amount of $1,000.00 after Final Approval.  This

will be a per-person, not a per-account, payment.

b.      <u>Stage 1 Information from Interior Defendants</u>.  Interior Defendants will

provide periodic updates on Contact Information on an ongoing basis.

Within 30 days after Defendants first transfer monies for the

Accounting/Trust Administration Fund to the Qualified Bank, the Claims

Administrator will be able to rely on the Contact Information Interior

Defendants then have for beneficiaries to make a Stage 1 distribution.

c.      <u>Returned Funds; Remainder Account</u>.  For distributions returned from the

Stage 1 distribution, the Qualified Bank, working with the Claims

27

Administrator, shall use its best efforts to ensure that all such funds are deposited into the appropriate individual Indian beneficiary's trust account at Interior, if open, or into a separate interest bearing account at the Qualifying Bank ("Remainder Account") if no such IIM Account exists. The Claims Administrator shall take reasonable steps to locate, and distribute funds to, Class Members whose funds are deposited into the Remainder Account. If a Stage 1 participant whose funds were deposited into the Remainder Account subsequently provides documentation which is sufficient to show that such beneficiary is the Stage 1 participant for whom the returned funds were intended, Class Counsel shall file such documentation with the Court or the Special Master as the Court may designate, requesting an order to pay $1,000.00 to each such beneficiary from the Remainder account.

4.  Stage 2:  Payment of Trust Administration Claims

    a.  Final Determination of Class Prior to Payment. No Stage 2 payments shall be made until all Stage 2 Class Members have been identified in accordance with this Agreement and their respective pro rata interests have been calculated.

    b.  Stage 2 Formula.  Each individual Indian beneficiary determined to be within the Trust Administration Class in accordance with paragraph A.35 shall be paid after Final Approval a pro rata amount based upon the following formula:

28

(1)     <u>Baseline Payment</u>. Each individual Indian beneficiary determined to be within the Trust Administration Class shall be paid a baseline amount of $500.00;

(2)     <u>Amounts Available for Prorating</u>.  In addition, each individual Indian beneficiary in the Trust Administration Class who has or had an IIM Account that generated income that was credited to that IIM Account shall be paid an additional pro rata share of the funds remaining in the Accounting/Trust Administration Fund after deducting (a) amounts attributable to opt outs in accordance with paragraph C.2 of this Agreement, (b) all Stage 1 distributions, (c) an amount sufficient to cover a baseline payment to all Stage 2 Class Members, (d) the amount deemed necessary to fund the Reserve Fund provided for in section E.4.e.6; (e) all payments made, or to be made to, Class Counsel in accordance with an Order of the Court, (f) all payments made to, or to be made to, Class Representatives in accordance with an Order of the Court, (g) all payments to cover the costs of notice, administration and distribution of the Accounting/Trust Administration Fund (including but not limited to payments to the Notice Contractor, Claims Administrator, and Qualified Bank), and (g) an amount estimated by the Class Counsel to pay the remaining and future costs to be paid out of the Accounting/Trust Administration Fund for notice, administration and distribution.

29

(3)  Calculation of Pro Rata Share.  The additional pro rata share referenced in paragraph E.4 above will be calculated based upon an Assigned Value. The Assigned Value will be the average of the ten (10) highest revenue generating years in each individual Indian's IIM Account, from October 1, 1985 until the Record Date (September 30, 2009).  If an account is open fewer than ten (10) years or otherwise reflects fewer than ten (10) years of revenue, the computation of the Assigned Value will utilize a zero dollar amount in each year that no revenue is reflected.  For beneficiaries with more than one account during that period, the Assigned Value is calculated on an account by account basis for that Class Member, with each of the resulting calculations added together. Reversed transactions and inter-account transfers between an individual's accounts will not be considered in the calculation. A Class Member's pro rata percentage in the Stage 2 distribution shall be calculated based upon his or her Assigned Value divided by the sum of all Assigned Values for all Trust Administration Class Members.  This percentage shall then be applied to the funds available for prorating to determine the Class Member's pro rata payment.

c.  Information from Interior Defendants for Stage 2.  Interior Defendants shall provide assistance to the Claims Administrator with respect to the preparation and creation of (i) the Contact Information for Stage 2

30

participants and (ii) the Assigned Value calculations and related Assigned Value percentages described in this Agreement.

d.   Returned Stage 2 Funds.  For distributions returned from the Stage 2 distribution, the Qualifying Bank, with assistance from the Claims Administrator, shall use its best efforts to ensure that all such funds are deposited into the appropriate individual Indian beneficiary's trust account at Interior, if open, or into a Remainder Account if no such IIM Account exists.  The Claims Administrator shall take reasonable steps to locate, and distribute funds to, the Class Member associated with such returned funds. If a Stage 2 participant whose funds were returned subsequently provides documentation which is sufficient to the Claims Administrator to demonstrate that such beneficiary is the Stage 2 participant for whom the returned funds were intended, Class Counsel shall file such documentation with the Court or the Special Master as the Court may designate, requesting an order to pay amounts due to such beneficiary from the Remainder Account.  In the event the documentation is determined insufficient by the Claims Administrator, notice of that determination shall be provided to the person submitting the documentation, who shall then have the right to the reconsideration process set forth in paragraph E(5) below.

e.   Stage 2 Timeline. Stage 2 funds shall be distributed pursuant to the following timeline.  The Court in its discretion may extend any Stage 2 deadline upon a showing of good cause.

31

(1)   <u>Supplementary Notice</u>.  The Parties shall direct the Notice
Contractor to undertake a supplementary notice campaign as soon
as practicable following distribution of the Stage 1 funds. The
purpose of this notice is to target potential claimants and provide
information related to the Stage 2 distribution. Such notice shall be
targeted generally in Native American population centers.

(2)   <u>Standards and Procedures</u>.  The Claims Administrator shall prepare
standards and procedures for the submission, timing and adequacy
of documentation for potential additional Stage 2 participants who
self-identify.  The Parties shall provide assistance to the Claims
Administrator to develop such standards and procedures.  The
Interior Defendants shall designate a liaison to the Claims
Administrator for purposes of verifying documentation or
responding to other queries regarding submitted documentation
that might not be addressed by the agreed-to standards and
procedures.  The Claims Administrator may rely upon the Interior
liaison's response or, after 14 days, the absence of a response, to
the query in evaluating the submitted documentation.  The Claims
Administrator will take reasonable steps to provide assistance to
potential claimants at all phases during the Stage 2 distribution so
that they can comply with the agreed-to standards and procedures
for the submission of documentation. The Claims Administrator
shall maintain adequate records documenting all communications

32

with Class Members and such records shall be available to the Parties upon reasonable request.

(3)    <u>Self-Identification Period</u>. Potential class members who wish to participate in the Stage 2 distributions shall submit any documentation to the Claims Administrator within 45 days of Final Approval or such later date as the Court may order.

(4)    <u>Initial Determination</u>. The Claims Administrator shall make an initial determination with respect to each claimant's inclusion in the Stage 2 class within 90 days of Final Approval or such later date as the Court may order and shall so inform claimants in writing. If a potential claimant is denied participation as part of the initial determination, the Claims Administrator shall state the basis for its denial and the availability of reconsideration with the submission of additional documentation.  Claimants who are denied participation in the Stage 2 distribution may submit additional documentation for reconsideration within 120 days of Final Approval or such later date as the Court may order. A claimant's failure to seek reconsideration will render the Claims Administrator's initial determination final and binding upon the claimant.

(5)    <u>Reconsideration</u>.  The Claims Administrator shall make a determination with respect to all claimants' documents submitted in support of their request to reconsider the initial determination.

33

The Claims Administrator shall make a second determination within 150 days of Final Approval or such later date as the Court may order, and shall so inform each claimant in writing.  If a claimant is again denied participation in the Stage 2 distribution, the Claims Administrator shall state the basis of its denial and the availability of appeal to the Court or the Special Master as the Court may designate.  Any appeal shall be made within 180 days of Final Approval or such later date as may be ordered by the Court.  A claimant's failure to timely appeal will render the Claims Administrator's determination final and binding upon the claimant.

(6)     Creation of Reserve Fund.  Prior to the distribution of Stage 2 funds, the Parties shall discuss the timing and funding of a Reserve Fund out of Stage 2 funds to cover beneficiaries who did not receive notice of Stage 2 distributions and come forward after distribution of Stage 2 funds.  Any disagreements between the Parties related to the creation and eventual termination of a Reserve Fund shall be presented to the Court.

(7)     Distribution.  After Stage 2 Class Members have been substantially identified, Class Counsel may apply to the Court or the Special Master as the Court may designate for permission to commence Stage 2 distribution.  Funds will be set aside for any identified Class Members.  Completion of distribution of Stage 2 funds shall be no later than 14 days after the Court's decision of the last

34

claimant's appeal becoming final. The Court's decision shall be

binding and final, unless timely appealed by the potential claimant.

(8)     Final Disposition of the Accounting/Trust Administration Fund.

Any excess Accounting/Trust Administration Funds remaining

after distribution (*e.g.*, funds not expended on administration), or

funds in the Remainder Account, shall be paid to the organization

selected as the recipient of the Indian Education Scholarship Fund

set out in Section G of this Agreement.

## F.     TRUST LAND CONSOLIDATION FUND

1.     Distribution.  Conditioned on the enactment of the necessary legislation, the

Interior Defendants shall distribute the Trust Land Consolidation Fund in accordance with the

Land Consolidation Program authorized under 25 U.S.C. §§ 2201 *et seq.*, any other applicable

legislation enacted pursuant to this Agreement, and applicable provisions of this Agreement.

2.     Purposes of Trust Land Consolidation Fund.  The Trust Land Consolidation Fund

shall be used solely for the following purposes:  (1) acquiring fractional interests in trust or

restricted lands; (2) implementing the Land Consolidation Program; and (3) paying the costs

related to the work of the Secretarial Commission on Trust Reform, including costs of

consultants to the Commission and audits recommended by the Commission.  An amount up to a

total of no more than fifteen percent (15%) of the Trust Land Consolidation Fund shall be used

for purposes (2) and (3) above.

3.     Fair Market Value.  The Interior Defendants shall offer fair market value in

accordance with 25 U.S.C. § 2214 to owners of such fractionated interests.  Interior Defendants

shall use reasonable efforts to prioritize the consolidation of the most highly fractionated tracts of

land.

35

4.      <u>Length of Fund</u>.  Interior Defendants shall have no more than ten (10) years from the date of Final Approval of this Agreement to expend the Trust Land Consolidation Fund, at which time any amounts remaining in the Trust Land Consolidation Fund shall be returned to the Treasury.

5.      <u>Indian Education Scholarship Holding Fund</u>.  Interior Defendants shall make the transfers to and from the Indian Education Scholarship Holding Fund as provided in paragraphs G.2.c and G.2.d.

6.      <u>Whereabouts Unknown</u>.  For those owners of fractional interests in trust or restricted land whose whereabouts are deemed unknown by Interior Defendants as of the date of Final Approval of this Agreement, Interior Defendants shall undertake the following additional efforts to attempt to locate such owners:

      a.      <u>Additional Service</u>.  In addition to the class notice requirements under this Agreement, the Interior Defendants shall use due diligence to provide all owners whose whereabouts are unknown with actual notice of the opportunity to convey their fractionated interests through the best means available.

      b.      <u>Notice</u>.  The Notice shall contain a general description of the Land Consolidation Program, the fractionated interests that the Interior Defendants wish to acquire, the proposed purchase price for such interests, the mailing address and a toll-free number for inquiries and clarifications regarding the Land Consolidation Program, and the process for responding to the offer to purchase.

US2000 11623208.1

c.    Returned Notice.  In the event the written notice to an owner is returned

undelivered, the Interior Defendants shall attempt to obtain a current

address for such owner by conducting a reasonable search (including a

reasonable search of records maintained by local, State, Federal and tribal

governments and agencies) and by inquiring with the Indian tribe with

jurisdiction over the subject parcel, and, if different from that tribe, the

Indian tribe of which the owner is a member, if applicable, and, if

successful in locating any such owner, send written notice in accordance

with subparagraphs (a) and (b) above.

d.    Notice by Publication. The Interior Defendants shall give notice to all

owners that the Secretary was unable to provide notice pursuant to

subparagraphs (a) thru (c) above, by publication of the opportunity to

convey fractionated interests as follows:

(1)    at least two (2) times in a newspaper of general circulation in the

county or counties where the subject parcel of land is located or, if

there is an Indian tribe with jurisdiction over the parcel of land and

that tribe publishes a tribal newspaper or newsletter at least once

every month, one (1) time in such newspaper of general circulation

and one (1) time in such tribal newspaper or newsletter for a period

of six (6) months;

(2)    posting such notice in a conspicuous place in the tribal

headquarters or administration building (or such other tribal

building determined by the Interior Defendants to be most

37

appropriate for giving public notice) of the Indian tribe with

jurisdiction over the parcel of land, if any; and

(3)    in addition to the foregoing, in the Interior Defendants' discretion,

publishing notice in any other place or means that the Interior

Defendants determine to be appropriate.

7.    <u>Consent for Conveyances</u>.  For those owners of fractional interests in trust or restricted land who are not located after Interior Defendants undertake the measures set forth herein and the passage of five (5) years from the date of Final Approval, the owners shall, to the extent authorized by the legislation contemplated by this Agreement, automatically be deemed to have consented to the conveyance of those fractionated interests that are located on a parcel of highly fractionated Indian land to Interior Defendants.  The term "parcel of highly fractionated Indian land" is defined at 22 U.S.C. § 2201(6).

8.    <u>Deposits in IIM Accounts</u>.  All funds expended from the Trust Land Consolidation Fund for the acquisition of fractional interests from owners whose whereabouts are unknown shall be deposited in an IIM Account for such owners, for the benefit of those owners or their heirs or assigns.

### G.    INDIAN EDUCATION SCHOLARSHIPS

1.    <u>Funds for Indian Education Scholarships</u>.  Funds for Indian Education Scholarships are being established for the principal purposes of providing an additional incentive for individual Indians to participate in the Land Consolidation Program, beneficially utilizing any remainder of any Accounting/Trust Administration Funds, and providing financial assistance to Native American students to defray the cost of attendance at both post-secondary vocational schools and institutions of higher education.

US2000 11623208.1

2.      <u>Source of Funds</u>. There will be three initial sources of funding for Indian Education Scholarships, as follows:

       a.      <u>Accounting/Trust Administration Fund Balance</u>.  In the event that a balance remains in the Accounting/Trust Administration Fund following (1) payment of all settlement distributions to Class Members; (2) payment of all settlement notice and distribution costs, including payments to the Notice Contractor, the Claims Administrator, and the Qualifying Bank; (3) payment of all attorney fees and expenses to Class Counsel as approved by the Court, (4) payment of all Class Representative incentive awards, including expenses and costs that were not paid for by attorneys, as approved by the Court, and (5) payment of any other amounts agreed upon by the Parties or ordered by the Court, such remaining balance shall be transferred by the Qualified Bank in a timely manner upon Order of the Court to the organization selected in paragraph 3 of this section to be governed by the special Board of Trustees (that shall be established pursuant to paragraph 3 of this section).

       b.      <u>Unclaimed Whereabouts Unknown Payments</u>.  Pursuant to Paragraph E.1.i of this Agreement, for any Class Member who is designated a "whereabouts unknown" and is not a minor, non-compos mentis, an adult under legal disability, or an adult in need of assistance, and does not claim any funds deposited in that beneficiary's IIM Account within five (5) years after the date of Final Approval, the principal amount of the funds deposited in that beneficiary's IIM Account from the Accounting/Trust

39

Administration Fund, shall be transferred in a timely manner by Interior

Defendants to the organization selected in paragraph 3 of this section to be

governed by the special Board of Trustees (that shall be established

pursuant to paragraph 3 of this section), and the United States shall be

released from any further obligation to pay that amount to such Class

Member.

c. <u>Consolidation Incentive Payments</u>.  To provide an incentive for individual

Indians to participate in the Land Consolidation Program, a portion of the

Trust Land Consolidation Fund shall be allocated for Indian Education

Scholarships.  For fractionated interests in trust or restricted lands

conveyed by owners pursuant to Section F, contributions not to exceed a

total, aggregated amount of $60,000,000.00 from the Trust Land

Consolidation Fund shall be made to a separate account, established at

Treasury pursuant to legislation, known as the "Indian Education

Scholarship Holding Fund."  No further contributions from the Trust Land

Consolidation Fund to the Indian Education Scholarship Holding Fund

shall be made once the sum of such contributions reaches a total of

$60,000,000.00.  Such contributions shall be made in accordance with the

following formula:

(1)     For an interest that Interior Defendants purchase for less than

$200.00, a contribution of $10.00 shall be made to the Indian

Education Scholarship Holding Fund.

40

(2)     For an interest that Interior Defendants purchase for between $200.00 and $500.00, a contribution of $25.00 shall be made to the Indian Education Scholarship Holding Fund.

(3)     For an interest that Interior Defendants purchase for more than $500.00, a contribution equal to five percent (5%) of the purchase price shall be made to the Indian Education Scholarship Holding Fund.

d.     Transfers From Indian Education Scholarship Holding Fund.  The Interior Defendants shall transfer the amounts in the Indian Education Scholarship Holding Fund to the organization identified in paragraph 3 below on a quarterly basis.  Accompanying the transfer from the Interior Defendants to the organization shall be a report outlining the number of interests conveyed, the purchase price for each conveyance, and the corresponding contribution to the Indian Education Scholarship Holding Fund.  The report shall be available to the public.

3.     Recipient Organization.  Within 60 days after Preliminary Approval of this Agreement by the Court, Plaintiffs shall recommend to the Secretary at least two and no more than three duly established non-profit organizations to administer the funds for Indian Education Scholarships.  Each such organization must have a demonstrated track record and current ability to create and expand academic and vocational educational opportunities for Native Americans.  Further, each such organization shall have a history of financial solvency and health, and a strong institutional governance structure that ensures a prudent and fair administration, investment, and distribution of the funds for Indian Education Scholarships.  The Secretary of

41

Interior shall select from this list one organization to be the recipient of the funds for Indian

Education Scholarships on the conditions that (a) the organization agrees to create a special

Board of Trustees to govern the funds consisting of no more than five (5) members that will

include two (2) representatives selected by the Secretary of Interior or his designee and two (2)

representatives selected by the Lead Plaintiff or her designee, with the fifth representative

selected by the organization; and (b) the organization provides reporting of its activities and

access to its records related to the funds for Indian Education Scholarships which is satisfactory

to the Secretary of Interior and Lead Plaintiff.

4.     Release from Liability.  The Parties shall not be liable, individually or

collectively, for any claims arising out of or relating to the use, management, administration,

distribution or other acts, omissions, or events regarding the funds for Indian Education

Scholarships**.**

5.     Removal Authority.  The two (2) representatives selected by the Secretary of

Interior and two (2) representatives selected by the Lead Plaintiff, as provided in paragraph 3 of

this section, shall be empowered by majority vote to remove the funds for Indian Education

Scholarships at any time from the selected recipient organization for any reason, including but

not limited to, mismanagement of the funds and to select a new administrating entity that meets

the qualifications set forth in paragraph 3 above.

**H.     TAXES AND ELIGIBILITY FOR BENEFITS**

1.     Legislation.  The Parties contemplate that legislation shall address the treatment

for tax purposes and eligibility for benefits of any Settlement Distributions to Class Members.

2.     Source and Nature of Payments from Accounting/Trust Administration Fund.

Notwithstanding the potential enactment of any legislation regarding taxability contemplated by

the preceding paragraph, the Parties agree that the funds distributed pursuant to this Agreement

for the Accounting/Trust Administration Fund include monies derived directly from interests of individual Indians in trust and restricted lands.

3.      <u>Source and Nature of Payments from Trust Land Consolidation Fund</u>.  The Parties agree that all payments for fractionated or escheated shares of individual Indian trust land purchased pursuant to the Trust Land Consolidation Fund are derived directly from interests of individual Indians in trust and restricted lands.

4.      <u>Payments not deemed interest</u>.  No portion of payments to Class Members from either the Accounting/Trust Administration Fund or the Trust Land Consolidation Fund is considered payment of interest.

**I.     RELEASES**

1.      <u>Release by Historical Accounting Class</u>.  Except as provided in this Agreement, upon Final Approval, all members of the Historical Accounting Class and their heirs, administrators, successors, or assigns (collectively, the "Historical Accounting Releasors"), shall be deemed to have released, waived and forever discharged the United States, Defendants, any department, agency, or establishment of the Defendants, and any officers, employees, or successors of Defendants, as well as any contractor, including any tribal contractor, (collectively, the "Releasees") from the obligation to perform a historical accounting of his or her IIM Account or any individual Indian trust asset, including any right to an accounting in aid of the jurisdiction of a court to render a money judgment, except as provided in paragraph I(7).  The Historical Accounting Releasors shall be deemed to be forever barred and precluded from prosecuting any and all claims and/or causes of action for a Historical Accounting Claim that were, or could have been, asserted in the Complaint when it was filed, on behalf of the Historical Accounting Class, by reason of, or with respect to, or in connection with, or which arise out of, any matters stated in the Complaint for a Historical Accounting that the Historical Accounting Releasors, or any of

43

them, have against the Releasees, or any of them.  This release shall include any and all

Historical Accounting Claims, however characterized, whether under the common law, at equity,

or by statute.

2.     <u>Release by Trust Administration Class</u>.  Except as provided in this Agreement,

upon Final Approval, all members of the Trust Administration Class and their heirs,

administrators, successors, or assigns (collectively, the "Mismanagement Releasors"), shall be

deemed to have released, waived and forever discharged the Releasees from, and the

Mismanagement Releasors shall be deemed to be forever barred and precluded from prosecuting,

any and all claims and/or causes of action that were, or should have been, asserted in the

Amended Complaint when it was filed, on behalf of the Trust Administration Class, by reason

of, or with respect to, or in connection with, or which arise out of, matters stated in the Amended

Complaint for Funds Administration Claims or Land Administration Claims that the

Mismanagement Releasors, or any of them, have against the Releasees, or any of them.

3.     <u>Exclusions From Releases</u>.  The releases provided in paragraphs 1 and 2 directly

above neither release nor waive (a) claims for the payment of the account balances within

existing IIM Accounts, (b) claims for the payment of existing amounts in special deposit

accounts, tribal accounts, or judgment fund accounts, (c) claims arising out of or relating to

breaches of trust or alleged wrongs after the Record Date, (d) claims for damage to the

environment other than those claims expressly identified as Land Administration Claims, (e)

claims for trespass or continuing trespass against any or all of the Releasees, where such

Releasee is acting in a capacity other than as a fiduciary for Plaintiffs, (f) claims against tribes,

contractors, or other third parties (provided that this exception does not apply to agents for the

Defendants to the extent such agents had performed Defendants' fiduciary duties to Plaintiffs),

44

(g) equitable, injunctive, or other non-monetary claims for correction of boundary and appraisal

errors, (h) money damages arising out of boundary and appraisal errors, where such errors occur

after the Record Date or where such errors are not corrected within a reasonable time following

written notice to Interior after the Record Date, (i) claims arising out of leases, easements, rights-

of-way, and similar encumbrances existing as of the Record Date against any or all of the

Releasees to the extent such Releasee is acting in a capacity other than as a fiduciary for the

plaintiffs, (j) claims against the Releasees arising out of, or relating to, water or water rights,

whether adjudicated or unadjudicated, involving the adjudication, quantification, determination,

establishment or protection of such rights; provided, however, that this exception does not apply

to breach of trust claims for damages, losses, injuries, or accounting for income arising prior to

and including the Record Date, other than claims that the Releasees failed to timely enforce such

water rights; and (k) health and mortality claims.  Nothing within these stated exclusions is

meant to limit or shall defeat or void valid defenses, if any, based on statute of limitations,

laches, or estoppel.

       4.      <u>Trust Reform</u>.  By accepting this Agreement, Plaintiffs are neither waiving nor

releasing any claims or causes of action for future trust reform.  Defendants waive no defenses to

such claims or causes of action, including res judicata.

       5.      <u>Escheated Interests Not Released Unless Voluntarily Settled Later</u>.  Claims of

beneficiaries or former beneficiaries for any interest that has been escheated to tribes, states,

municipalities, other political subdivisions, the federal government, and companies, where the

escheatment occurred in a manner which is unconstitutional according to decisions of the United

States Supreme Court, are not released by this Agreement, except to the extent specific

US2000 11623208.1

settlement payments are made and accepted by such beneficiaries or former beneficiaries from the Trust Land Consolidation Fund in accordance with paragraphs F(1) – (8).

6.  <u>Osage Headright Owners</u>.  The members of the Historical Accounting Class and the members of Trust Administration Class do not include Osage headright owners, except to the extent individual Osage headright owners have, or have had, (i) IIM Accounts in which their Osage headright payments have been deposited, (ii) IIM Accounts for funds other than Osage Headright monies, or (iii) beneficial ownership interests in trust land.  Nothing in this Agreement releases claims of individual Osage headright owners regarding their headright interests, except to the extent monies from such headright interests beneficially owned by such individual Indian have been deposited into an IIM Account for the benefit of such individual Indian.

7.  <u>Preservation of Claims and Rights by Opt Outs</u>.  Notwithstanding the releases stated above (including without limitation the release of Historical Accounting Claims in paragraph I(1), Trust Administration Class Members who properly and timely opt out in accordance with the instructions in paragraph C(2) of this Agreement hereby expressly preserve and do not release, waive or discharge any Funds Administration Claims (including without limitation accounting error claims) and/or Land Administration Claims, whether such claims arise in equity or at law.  Further, any such opting-out Class Member retains and shall be entitled to all methods of proof, applicable evidentiary presumptions and inferences (if any), and means of discovery available in any court of competent jurisdiction pursuant to that court's procedural and evidentiary rules applicable to fiduciaries, including without limitation any right to an accounting in aid of the jurisdiction of a court to render judgment.

8.  <u>Agreed Balances</u>.  Trust Administration Class Members who do not opt out in accordance with paragraph C(2) (c) of this Agreement will be deemed to have waived any right

US2000 11623208.1

to an accounting in aid of judgment in connection with Funds Administration Claims and Land Administration Claims.  Further, except as provided in the preceding paragraph with respect to Class Members who opt out of the Trust Administration Class, each such Trust Administration Class Member and his or her heirs, successors, and assigns will be deemed to have agreed that the stated balance in his or her last IIM Account periodic statement received from Interior in 2009, prior to the date of this Agreement is accurate and that any IIM Account closed before January 1, 2009, shall be deemed to have a zero balance.  Further, if a Trust Administration Class Member did not receive a periodic statement for an open IIM Account in 2009 prior to the date of this Agreement, that Class Member may request written confirmation of his or her IIM Account balance(s) as of the Record Date; such Class Member shall be deemed to have agreed to the balance(s) shown on such written confirmation received from Interior, unless such Class Member opts out of that Class in accordance with this Agreement.

9.      <u>Vacatur of Document Retention Orders</u>.  Upon Final Approval, all existing document retention orders shall be deemed vacated; provided, however, that Plaintiffs do not release Defendants from any ongoing duty to maintain trust records necessary to prudently manage the individual Indian trust.

**J.    ATTORNEYS' FEES**

1.      <u>Notice of Amount to be Requested</u>.  Prior to the hearing on the Motion for Preliminary Approval of this Agreement, Plaintiffs shall file a notice with the Court stating the amount of attorneys' fees, expenses and costs they will be requesting for Class Counsel through the date of this Agreement.  This amount shall be included in the Notice to the class referenced in paragraph C.1.

2.      <u>Petition for Attorneys' Fees</u>.  Within the time set by the Court, Plaintiffs shall file a petition for fair and reasonable attorneys' fees, expenses and costs through the date of this

US2000 11623208.1

Agreement for the Court's approval ("Fee Petition").  Plaintiffs shall post that Fee Petition on their website http://indiantrust.com/.

3.     <u>Objections</u>.  Within the times set by the Court:  (a) Class Members may object to the compensation Plaintiffs have requested for attorneys in the Fee Petition, (b) Defendants may submit a response to the Fee Petition, and (c) Plaintiffs may reply to such objections and responses.

4.     <u>Post-Agreement Attorneys' Fees, Expenses and Costs</u>.  Attorneys' fees, expenses and costs incurred subsequent to the date of this Agreement shall, upon Final Approval, be paid at reasonable intervals as ordered by the Court.  Reasonable time spent after this Agreement in representing the Plaintiffs, including but not limited to preparing fee applications, shall be compensated at the actual hourly billing rates.  Defendants may respond to, and Class Members may object to, any petitions for post-Agreement attorneys' fees, expenses and costs, and Plaintiffs may reply to such response and objections.

5.     <u>Court to Decide</u>.  The amount to which Plaintiffs are entitled for attorneys' fees, expenses and costs are within the discretion of the Court in accordance with controlling law, after receipt and consideration of Class Members' objections, Defendants' responses and Plaintiffs' replies.

6.     <u>Payment</u>.  All payments for attorneys' fees, expenses and costs are to be made following Final Approval from the Settlement Account.

7.     <u>Time of Payments</u>.  Payment for attorneys' fees, expenses and costs through the date of this Agreement shall be made immediately upon the deposit of the funds in the Settlement Account after Final Approval.  Payment of post-Agreement attorneys' fees, expenses and costs are to be made after Final Approval at the times directed by the Court.

48

8.    <u>Release of Attorneys' Fees and Costs</u>.  Upon completion of all payments addressed in this Section J, Named Plaintiffs and Class Counsel, on behalf of the Classes and each individual Class Member, will be deemed to have irrevocably and unconditionally released, acquitted, and forever discharged, any claim that they may have against Defendants for attorneys' fees, expenses or costs associated with their representation of Plaintiffs and the Classes in this Litigation.  Plaintiffs shall file no further claim against Defendants for attorneys' fees or expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 or costs pursuant to 28 U.S.C. § 1920; this paragraph does not apply to claims by Plaintiffs for payments from the Settlement Account, in accordance with this Agreement, for attorneys' fees, expenses and costs, and Plaintiffs' incentive awards, including costs and expenses.

## K.    CLASS REPRESENTATIVES' INCENTIVE AWARDS

1.    <u>Notice of Amounts to be Requested</u>.  Prior to the hearing on the Motion for Preliminary Approval of this Agreement, Plaintiffs shall file a notice with the Court stating the amount of incentive awards which will be requested for each Class Representative, including expenses and costs that were not paid for by attorneys, which expenses and costs are expected to be in the range of $15 million above those paid by Defendants to date.  These amounts shall be included in the Notice to the class referenced in paragraph C(1).

2.    <u>Petition for Expenses and Incentives</u>.  Within the time set by the Court, Plaintiffs shall file a petition for incentive awards, including expenses and costs, of the Class Representatives ("Class Representative Petition").  Plaintiffs shall post that petition on their website http://indiantrust.com/.

3.    <u>Objections</u>.  Within the times set by the Court:  (a) Class Members may object to the amounts Plaintiffs have requested in the Class Representative Petition; (b) Defendants may submit a response to the Class Representative Petition; and (c) Plaintiffs may reply to such

49

objections and responses.   Defendants do not consent in any manner to an award of costs, expenses or incentives, except to the extent supported by and consistent with controlling law.

4.      Post-Agreement Expenses and Costs of Class Representatives.  Class Representatives' expenses and costs incurred subsequent to the date of this Agreement shall, upon Final Approval, be paid at reasonable intervals as ordered by the Court.  Defendants may respond to and Class Members may object to any petitions for post-Agreement expenses and costs of Class Representatives.  Plaintiffs may reply to such responses and objections.

5.      Court to Decide.  The amounts to be granted on the Class Representative Petition and any post-Agreement request for expenses and costs are within the discretion of the Court in accordance with controlling law, after timely receipt and consideration of objections received from Class Members and/or Defendants.

6.      Payment.  All payments of Class Representatives' incentive awards, including expenses and costs, shall be made from the Settlement Account.

7.      Time of Payments.  Payment of incentive awards, including expenses and costs, shall be made immediately upon the deposit of the funds in the Settlement Account after Final Approval.  Payment of post-Agreement expenses and costs are to be made at the times directed by the Court following Final Approval.

8.      Complete Compensation.  Defendants shall have no additional liability for any incentive awards or expenses and costs of Class Representatives.  The payments to Class Representatives under this section K, together with any amounts due them as Class Members under this Agreement, shall be full and complete compensation for the Class Representatives in connection with this Litigation and for any Accounting Claims and Trust Administration Claims the Class Representatives had through the Record Date.

50

L. **NO FURTHER MONETARY OBLIGATION**

1. <u>Complete Monetary Obligation</u>.  The Parties agree and acknowledge that the payments of $1,412,000,000.00 into the Accounting/Trust Administration Fund and the $2,000,000,000.00 deposited into the Trust Land Consolidation Fund represents Defendants' complete financial obligation under this Settlement relating to the settlement and compromise of all Historical Accounting and Trust Administration Claims for Class Members.

2. <u>No Further Monetary Obligations</u>.  Except for the payments of $1,412,000,000.00 into the Accounting/Trust Administration Fund and the $2,000,000,000.00 deposited into the Trust Land Consolidation Fund, the Parties further agree and acknowledge that Defendants shall have no further monetary obligations whatsoever, including but not limited to any monetary obligations with respect to the Class Representatives, the members of the Classes who do not opt out, Class Counsel, Claims Administrator, Notice Contractor, the Qualifying Bank, or the Litigation.  Defendants, however, will retain all monetary obligations that exist as a result of the trust relationship that will continue to exist between Defendants and all individual Indian beneficiaries.  Likewise, the Parties agree that the Classes, Class Representatives, Class Counsel, Claims Administrator, Notice Contractor, and Qualifying Bank shall have no monetary obligation or incur any liability to Defendants or their agents regarding this Agreement or other matters settled and within the scope of this Agreement.

3. <u>Cooperation</u>.  Interior Defendants will in good faith cooperate and make their resources and information available to assist in the distribution of notices and, subsequently, settlement payments.  However, Interior Defendants assume no financial responsibility or liability related to the quality of the information to be provided.

US2000 11623208.1

### M.   ADDITIONAL PROVISIONS

1.   <u>No Assignment</u>.  Class Representatives represent and warrant that they have not assigned or transferred, or purported to assign or transfer, to any person or entity, any claim or any portion thereof or interest therein, including, but not limited to, any interest in the Litigation or any related action.

2.   <u>Non-Admission of Liability</u>.  By entering into this Agreement, Defendants in no way admit any liability to Plaintiffs and the Classes, individually or collectively, all such liability being expressly denied.  Nor do Defendants admit that a class action is an appropriate vehicle to bring Trust Administration Claims.  Rather, Defendants enter into this Agreement to avoid further protracted litigation and resolve and settle all disputes with Plaintiffs and the Classes. The Parties understand and agree that neither this Agreement, nor the negotiations that preceded it, shall be used as evidence with respect to the claims asserted in the Litigation, the propriety of a class action, or in any other proceeding or dispute except to enforce the terms of this Agreement.

3.   <u>Cooperation Between The Parties, Further Acts</u>.  The Parties shall cooperate fully with each other and shall use their best efforts to obtain the Court's approval of this Agreement and all of its terms.

4.   <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and (A) with respect to Plaintiffs and the Class Members, their spouses, children, representatives, heirs, administrators, executors, beneficiaries, conservators, and attorneys, and (B) with respect to Defendants, the Releasees.

5.   <u>No Third-Party Beneficiaries</u>.  This Agreement shall not be construed to create rights in, or to grant remedies to, or delegate any duty, obligation or undertaking established herein to any third party as a beneficiary of this Agreement.

US2000 11623208.1

6.      <u>Arms Length Transaction; Materiality of Terms</u>.  The Parties have negotiated all of the terms and conditions of this Agreement at arms length.  All terms and conditions of this Agreement have been relied upon by the Parties in entering this Agreement.  If any Class Member petitions the Court for a modification of, addition to or alteration of any material terms or condition of this Agreement and if the Court on such request or *sua sponte* does modify, add to or alter any of the material terms or conditions of this Agreement, this Agreement shall become voidable and of no further effect upon the filing with the Court of a Notice of Withdrawal from settlement by Class Counsel or Defendants' Counsel within five (5) business days of receipt of any order or final statement of the Court modifying, adding to or altering any of the material terms or conditions of this Agreement.

7.      <u>Captions</u>.  The captions or headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and shall have no effect upon the construction or interpretation of any part of this Agreement.

8.      <u>Construction</u>.  The determination of the terms and conditions of this Agreement has been by mutual agreement of the Parties.  Each Party participated jointly in the drafting of this Agreement and, therefore, the terms and conditions of this Agreement are not intended to be, and shall not be, construed against any Party by virtue of draftsmanship.

9.      <u>Applicable Law</u>.  This Agreement shall be interpreted in accordance with the laws of the United States without respect to the law of any particular State.

10.     <u>Notices Between the Parties</u>.  For all documents, notices, and submissions filed with the Court, service of a copy on the other Parties shall be deemed complete when uploaded and docketed with the Court's ECF system.

US2000 11623208.1

11.     <u>Agreement to Hold Personal Information Confidential</u>.  The Parties recognize that this Agreement will require the exchange of individual Indian trust data and/or confidential personal information that is or may be subject to the Privacy Act of 1974, as amended, relating to actual and putative class members.  The Parties agree to cooperate in taking all appropriate steps to maintain the confidentiality of all such information.  In order to facilitate the prompt exchange of information to facilitate the best practicable notice to the Class, the Parties further agree to file a stipulated motion with the Court promptly upon public announcement of this Agreement requesting the Court to enter an appropriate order to authorize the disclosure of such information by the Interior Defendants or Plaintiffs to the Notice Contractor and Claims Administrator.

12.     <u>Petition for Writ of Certiorari</u>.  The Parties acknowledge that Plaintiffs' deadline for filing a petition for a writ of certiorari seeking Supreme Court review of <u>Cobell XXII</u> is December 21, 2009, and that the Supreme Court's rules do not permit this deadline to be extended further.  To preserve their right to seek Supreme Court review in the event that this Agreement is terminated, becomes null and void, or otherwise is not finally approved, it is understood that Plaintiffs intend to file a petition for a writ of certiorari on or before the deadline.

(Signatures appear on next page)

US2000 11623208.1

# SIGNATURES

Wherefore, intending to be legally bound in accordance with the terms of this Agreement,

the Parties hereby execute this Agreement:

**FOR PLAINTIFFS:**                              **FOR DEFENDANTS:**


_____          _____
Dennis M. Gingold, Class Counsel            Thomas J. Perrelli
                                            Associate Attorney General


_____
Keith M. Harper, Class Counsel

EXHIBIT "A"


FORM OF LEGISLATION

US2000 11623208.1

THE INDIVIDUAL INDIAN MONEY ACCOUNT
LITIGATION SETTLEMENT ACT OF 2009

SECTION 101.    SHORT TITLE

This part may be cited as the "Individual Indian Money Account Litigation Settlement Act of 2009."

SECTION 102.    PURPOSE

The purpose of this part is to authorize the Settlement.

SECTION 103.    AUTHORIZATION

The Settlement is authorized, ratified, and confirmed.

SECTION 104.    DEFINITIONS

In this part:

(a)    The term "Amended Complaint" means the Amended Complaint attached to the Settlement.

(b)    The term "Land Consolidation Program" means a program, conducted in accordance with the Settlement and 25 U.S.C. §§ 2201 *et seq.*, through which the Secretary may purchase fractionated interests in trust or restricted land.

(c)    The term "Litigation" means the case entitled *Elouise Cobell et al. v. Ken Salazar, et al.*, United States District Court, District of Columbia, Civil Action No. 96-1285 (JR).

(d)    The term "Plaintiff" means a member of any class certified in the Litigation.

(e)    The term "Secretary" means the Secretary of the Interior.

(f)    The term "Settlement" means the Class Action Settlement Agreement dated December 7, 2009, in the Litigation.

(g)    The term "Trust Administration Class" means the class of individual Indian beneficiaries (exclusive of persons who filed actions on their own behalf, or a group of individuals who were certified as a class in a class action, stating a Funds Administration Claim or a Land Administration Claim prior to the filing of the Amended Complaint) alive as of September 30, 2009 and who have or had Individual Indian Money (IIM) accounts in the "Electronic Ledger Era," as that term is defined in the Settlement, as well as individual Indian beneficiaries who, as of September 30, 2009, had a recorded or other demonstrable beneficial ownership interest in land held in trust or restricted status,

regardless of the existence of an IIM account and regardless of the proceeds, if any, generated from the trust land, except that the Trust Administration Class does not include beneficiaries deceased as of September 30, 2009 and does include the estate of any deceased beneficiary whose IIM Accounts or other trust assets had been open in probate as of September 30, 2009.

SECTION 105.    JURISDICTIONAL PROVISIONS

(a)    Notwithstanding the limitation on the jurisdiction of district courts contained in 28 U.S.C. § 1346(a)(2), the United States District Court for the District of Columbia shall have jurisdiction over the claims asserted in the Amended Complaint for purposes of the Settlement.

(b)    Notwithstanding the requirements of the Federal Rules of Civil Procedure, the court overseeing the Litigation may certify the Trust Administration Class, which shall then be treated as a class under Federal Rule of Civil Procedure 23(b)(3) for purposes of the Settlement.

SECTION 106.    ACCOUNTING/TRUST ADMINISTRATION FUND

Funds in the amount of $1,412,000,000 shall be disbursed to the Accounting/Trust Administration Fund, as provided in the Settlement, from the moneys appropriated by Congress under 31 U.S.C. § 1304, the conditions of which are deemed to have been met.

SECTION 107.    TRUST LAND CONSOLIDATION

(a)    (i)    Upon the Settlement's final approval, as defined in the Settlement, there shall be established in the Treasury of the United States an account to be known as the "Trust Land Consolidation Fund."

        (ii)    Amounts held in the Trust Land Consolidation Fund shall be available for the Secretary to expend for no more than ten years from the date of the Settlement's final approval, as defined in the Settlement, for purposes of conducting the Land Consolidation Program and for the other costs specified in the Settlement.

        (iii)    Upon the Settlement's final approval, as defined in the Settlement, the United States shall transfer into the Trust Land Consolidation Fund the total sum of $2,000,000,000, from the moneys appropriated by Congress under 31 U.S.C. § 1304, the conditions of which are deemed to have been met.

(b)    (i)    The Secretary may acquire, at the discretion of the Secretary and in accordance with the Land Consolidation Program, any fractional interest in trust or restricted lands.

2

(ii)     In a manner designed to encourage participation in the Land Consolidation Program and at the Secretary's discretion, the Secretary may transfer not more than $60,000,000 from the Trust Land Consolidation Fund to the Indian Education Scholarship Fund.

(c)     (i)     Upon the Settlement's final approval, as defined in the Settlement, there shall be established in the Treasury of the United States an account to be known as the "Indian Education Scholarship Holding Fund."

(ii)     Notwithstanding other law governing competition, public notification, or federal procurement or assistance, amounts held in the Indian Education Scholarship Holding Fund shall be available without further appropriation to the Secretary to contribute to an Indian Education Scholarship Fund, as set forth in the Settlement, to provide scholarships for Native Americans.

(d)     A Plaintiff whose whereabouts are unknown and who, after reasonable efforts by the Secretary, cannot be located within 5 years of the Settlement's final approval, as defined in the Settlement, shall be deemed to accept an offer made pursuant to this section.


SECTION 108.     TAXATION AND OTHER BENEFITS

(a)     For purposes of the Internal Revenue Code of 1986, amounts (whether as lump sums or as periodic payments) received by an individual Indian pursuant to the Settlement (a) shall not be included in gross income, and (b) shall not be taken into account for purposes of applying any provision of such Code which takes into account excludable income in computing adjusted gross income or modified adjusted gross income, including section 86 of such Code (relating to the taxation of Social Security benefits).

(b)     Notwithstanding any other provision of law, amounts (whether as lump sums or as periodic payments) received by an individual Indian pursuant to the Settlement shall not be treated for any household member as income in the month received or as a resource for a period of one year from the date of receipt for purposes of determining initial eligibility, ongoing eligibility, or level of benefits in any Federal or Federally-assisted program.

EXHIBIT "B"


FORM OF AMENDED COMPLAINT

US2000 11623208.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELOUISE PEPION COBELL; PENNY
CLEGHORN;  THOMAS MAULSON; and
JAMES LOUIS LAROSE, all on their own
behalf and on behalf of all persons similarly
situated,

                              Plaintiffs,

       v.

KEN SALAZAR, Secretary of the Interior;
LARRY ECHOHAWK, Assistant Secretary of
the Interior – Indian Affairs; and
H. TIMOTHY GEITHNER, Secretary of the
Treasury,

                            Defendants.

Case No. 1:96 CV 01285 - JR

AMENDED COMPLAINT TO COMPEL THE UNITED STATES TO DISCHARGE
TRUST DUTIES AND TO RECOVER RESTITUTION, DAMAGES, AND OTHER
MONETARY RELIEF FOR DEFENDANTS' BREACHES OF TRUST

Pursuant to Rule 15 of the Federal Rules of Civil Procedure and with the consent of

Defendants, the Plaintiffs amend their Complaint against the Defendants as follows:

GENERAL NATURE OF THE ACTION

      1.     This action is brought to redress gross breaches of trust by the United

States, acting by and through the Defendants, with respect to the money, land and other

natural resource assets of more than 450,000 individual Indians.

      2.     Involved in this action are accounts commonly referred to as Individual

Indian Money ("IIM") accounts. As is more fully set forth herein below, IIM accounts

include money, which is the property of individual Indians, held by the United States as

trustee on their behalf. Such accounts at the time of filing this action  reflected a balance

of more than Four Hundred and Fifty Million Dollars ($450,000,000.00), and more than

Two Hundred and Fifty Million Dollars ($250,000,000.00) passes through them each

year; the true totals would be far greater than those amounts, but for the breaches of trust herein complained of.

3.       Involved as well are funds that were collected or should have been collected by the federal government as trustee for individual Indians (commonly referred to as individual Indian moneys ("IIM")), and the resources, including land, held in trust for individual Indian trust beneficiaries.  Defendants have mismanaged those funds, land, and resources in breach of their trust duties and, thereby, have prevented Plaintiffs from receiving income to which they are entitled.

4.       Defendants, the officers charged with carrying out the trust obligations of the United States, and their predecessors, have grossly mismanaged, and continue grossly to mismanage, such trusts and trust assets in at least the following respects, among others:

(a)       They have failed to keep adequate records and to install an adequate accounting system, including but not limited to their failure to install an adequate accounts receivable system;

(b)       They have destroyed records bearing upon their breaches of trust;

(c)       They have failed to account to the trust beneficiaries with respect to their money;

(d)       They have lost, dissipated, or converted to the United States' own use the money of the trust beneficiaries; and

(e)       They  either have unlawfully obstructed the appointment of a qualified and competent  Special Trustee or  unlawfully have prevented the Special Trustee for American Indians, appointed pursuant to the American Indian Trust Fund Management Reform Act of 1994 ("the 1994 Act"), P.L. 103-412, 108 Stat. 4239, codified to 25 U.S.C. §§ 162a(d) and 4001-4061, from carrying out duties and responsibilities conferred upon him by law to correct their unlawful practices and procedures with respect to IIM accounts.

(f)       They have mismanaged trust funds held or to be held for individual Indians in the following respects:

(1)       They have failed to collect or credit funds owed under leases, sales, easements or other transactions, including without limitation, having failed to collect or credit all money due, to audit royalties and  to collect interest on late payments;

(2)    They have failed to invest trust funds;

(3)    They have underinvested trust funds;

(4)    They imprudently have mismanaged and invested trust funds;

(5)    They have made erroneous or improper distributions or disbursements of trust funds, including to the wrong person or account;

(6)    They have charged excessive or improper administrative fees;

(7)    They have misappropriated, or failed to take steps to prevent the misappropriation of, trust funds;

(8)    They have withheld unlawfully the distribution and disbursement of trust funds;

(9)    They have deposited trust funds above FDIC insurance coverage in accounts in failed depository institutions, resulting in lost principal and interest;

(10)    They have failed to control, or investigate allegations of theft, embezzlement, misappropriation, fraud, trespass, and other misconduct regarding trust assets and have failed to make restitution or seek compensation for same;

(11)    They have failed to pay or credit to IIM Accounts accrued interest, including interest on special deposit accounts;

(12)    They have lost funds and investment securities as well as income or proceeds earned from such funds or securities;

(13)    They have lost funds through accounting errors;

(14)    They have failed to deposit or disburse funds in a timely fashion; and

(15)    They have engaged in conduct of like nature and kind arising out of Defendants' breaches of trust in connection with mismanagement of IIM Trust funds.

(g)    They have mismanaged land and resources, including oil, natural gas, mineral, timber, grazing, and other resources and rights (the "resources"), on, and corresponding subsurface rights, in land held in trust for the benefit of Plaintiffs in the following respects:

(1)    They have failed to lease land, approve leases, or otherwise make trust lands or assets productive;

(2)     They have failed to obtain fair market value for leases, easements, rights-or-way or sales;

(3)     They have failed to prudently negotiate leases, easements, sales or other transactions;

(4)     They have failed to impose and collect penalties for late payments;

(5)     They have failed to include or enforce terms which require that land and other natural resources be conserved, maintained, or restored;

(6)     They have permitted loss, dissipation, waste, or ruin, including failing to preserve trust land whether involving agriculture (including but not limited to failing to control agricultural pests), grazing, harvesting (including but not limited to permitting overly aggressive harvesting); timber lands (including  but not limited to failing to plant and cull timber land for maximum yield), and oil, natural gas, mineral resources or other resources (including but not limited to failing to manage oil, natural gas, or mineral resources for maximum production);

(7)     They have allowed the misappropriation of trust assets;

(8)     They have failed to control, investigate allegations of, or obtain relief in equity and at law for, trespass, theft, misappropriation, fraud or misconduct regarding trust land;

(9)     They have failed to correct boundary errors, survey or title record errors, and have failed to properly apportion and track allotments; and

(10)     They have engaged in conduct of like nature and kind arising out of their breaches of trust in connection with mismanagement of trust lands.

5.     By this action the more than 450,000 individual Indian trust beneficiaries seek, *inter alia*, the aid of this Court to compel Defendants to take action wrongfully withheld and otherwise comply with governing law, to review their acts with respect to the IIM accounts, to direct them to institute prudent trust practices, to direct them to restore trust funds, lands, and other resources wrongfully lost, dissipated, or converted, and to recover in restitution and through damages monies arising out of Defendants' breaches of trust, including their continuing mismanagement of trust assets.

6.     This action is limited to IIM Trust funds and other assets held in trust by the Federal Government and its agents for the benefit of individual Indians.

7.    Plaintiffs have no adequate administrative remedies. Plaintiffs repeatedly have requested Defendants to comply with their fiduciary obligations and redress the breaches of trust herein complained of, without success. Moreover, as is more fully set forth herein below, Plaintiffs supported the passage of legislation directed at redressing some of the wrongs herein complained of, and such legislation has been enacted by Congress; yet Defendants have refused to obey the mandate of Congress through their obstruction of the appointment of a qualified and competent Special Trustee, or by undermining efforts of two qualified and competent Special Trustees hereinafter described to bring Defendants activities into compliance with law. Plaintiffs have exhausted all avenues of redress other than this action. Only this Court may provide to Plaintiffs the relief to which they are entitled.

II.    THE PARTIES

A.    The Plaintiffs

8.    Plaintiff Cobell is an enrolled member of the Blackfeet Indian Tribe and is the beneficiary of funds held in an IIM account or otherwise.  She has experienced losses from the mismanagement of her trust funds and assets.

9.    Plaintiff Cleghorn is an enrolled member of the Mescalaro Apache Tribe and is a beneficiary of funds held in an IIM account or otherwise.  She has experienced losses from the mismanagement of her trust funds and assets.

10.    Plaintiff Maulson is an enrolled member of the Lac du Flambeau Chippewa Tribe (Wisconsin) and was in the past a beneficiary of funds held in an IIM account or otherwise.  Defendants have no record of his IIM account as well as the funds held therein.  He has experienced losses from the mismanagement of his trust funds and assets.

11.    Plaintiff LaRose is an enrolled member of the Winnebago Tribe of Nebraska and is the beneficiary of funds held in an IIM account or otherwise.  He has experienced losses from the mismanagement of his trust funds and assets.

12.    All Plaintiffs bring this action on their own behalf and on behalf of all persons similarly situated, as is more fully set forth under "Class Action Allegations" herein below.

B.    The Defendants

13.     Defendant Salazar is Secretary of the Interior and chief executive officer of the Department of the Interior ("Interior"), and as such is charged by law with carrying out the fiduciary duties and responsibilities of the United States as trustee-delegate for the named Plaintiffs and all other beneficiaries whose assets are held in IIM accounts or otherwise.

14.     Defendant EchoHawk is Assistant Secretary of Interior -- Indian Affairs and head of the Bureau of Indian Affairs within Interior (hereinafter sometimes called "BIA" or "the Bureau"), and as such is the delegate of Defendant Salazar for carrying out certain of his responsibilities with respect to IIM accounts.

15.     Defendant Geithner is Secretary of the Treasury, and as such is a trustee-delegate of the United States and custodian of the moneys held in IIM accounts and elsewhere at Treasury and by its agents, is responsible for maintaining certain records in connection therewith, and has certain investment responsibilities with respect thereto.

III.     JURISDICTION

16.     This Court has jurisdiction over this action under 28 U.S.C. § 1331, in that it is an action arising under the Constitution and laws of the United States, and under 28 U.S.C. § 1361, in that it is an action in the nature of an action of mandamus to compel an officer or employee of the United States to perform fiduciary duties owed to Plaintiffs.

IV.     TRUST OBLIGATIONS OF THE UNITED STATES AND OF DEFENDANTS
        WITH RESPECT TO INDIVIDUAL INDIAN TRUST ACCOUNTS

17.     The bulk of the funds held by the United States in trust for IIM trust beneficiaries is derived ultimately from income from individual land allotments that are controlled and held in trust by the government.  Such allotments date from the era, lasting until 1934, when it was the policy of the United States to break up Indian tribes and tribal lands.  In implementation of such policy, on many reservations the bulk of tribal land was divided into tracts normally of 80 or 160 acres (called "allotments") and the tracts were patented to individual Indians, with legal title thereto held by the United States as trustee

6

for the allottee.  In many instances, such tracts produce income from, <u>e.g.</u>, the lease of tracts for grazing or farming purposes, the sale of timber from tracts, and the grant of oil, gas, or mineral mining rights.  The income so derived forms the core of the IIM accounts here involved.

18.    Further, moneys from one or more of the following additional sources may be contained in, or have passed through, IIM accounts:

(a)    Funds originally held in trust for a tribe which were distributed per capita to tribe members;

(b)    Per capita distributions of funds appropriated to meet judgments of the Indian Claims Commission and courts and in settlement of claims;

(c)    Income from investment of funds;

(d)    Money paid from tribal funds to equalize allotments;

(e)    Proceeds of sales of allotments;

(f)    Compensation for rights-of-way and easements;

(g)    Rent for allotments of aged, infirm, or incompetent allottees;

(h)    Proceeds of sales of allotments of incompetent Indians;

(i)    Money due to incompetent or orphan Indians;

(j)    Money accruing from the Department of Veterans Affairs government agencies to minors or incompetent adults;

(k)    Apportionment or allotment of pro rata shares of tribal or trust funds; and

(l)    Per capita annual payments to members of certain specified tribes.

19.    As trustee of the funds held in such accounts, the United States owes, continuously since it first exercised pervasive control over individual Indian Trust lands at the inception of the IIM Trust, and has owed, certain fundamental fiduciary duties and responsibilities to the account holders as trust beneficiaries, including but not limited to the duty:

(a)    To maintain adequate books and records with respect to such accounts; including, without limitation, records as to leases and other contractual arrangements giving rise to income from allotments, and as to investments of moneys, held in trust;

(b)     To maintain adequate records as to the ownership of such accounts; including, without limitation, records as to the devolution of rights in and to such accounts, by assignment, bequest, devise, intestate succession, or otherwise;

(c)     To maintain adequate systems and controls to guard against error and dishonesty, by, without limitation, maintaining an accurate accounts receivable system and separating the billing and collection functions;

(d)     To invest such funds as permitted by law, and to deposit them in such federally insured depositary institutions as are permitted by law; to exercise prudence in the selection of such investments and depositary institutions as are authorized by law; and, within the constraints of law and prudence, to maximize the return on such investments and deposits;

(e)     To account regularly and accurately to the beneficiaries, to give them upon request accurate information as to the state of their accounts, and to pay to them on demand such amounts as they may be entitled to; and

(f)     To refrain from self-dealing and benefiting from the management of the trust funds.

20.     The proper discharge by Defendants of the trust responsibilities of the United States with respect to IIM accounts was reconfirmed and restated, in part, by § 101 of the 1994 Act, 25 U.S.C. § 162a(d), as including, without limitation:

(a)     Providing adequate systems for accounting for and reporting trust fund balances;

(b)     Providing adequate controls over receipts and disbursements;

(c)     Providing periodic, timely reconciliations to assure the accuracy of accounts;

(d)     Determining adequate cash balances;

(e)     Preparing and supplying account holders with periodic statements of their account performance and with balances of their account which shall be available on a daily basis;

(f)     Establishing consistent, written policies and procedures for trust fund management and accounting; and

(g)     Providing adequate staffing, supervision, and training for trust fund management and accounting.

## V.   TRUST OBLIGATIONS OF THE UNITED STATES AND OF DEFENDANTS WITH RESPECT TO INDIVIDUAL INDIAN TRUST FUNDS

21.     With respect to IIM Trust lands controlled by the government or its agents, the United States, as trustee, and Defendants, as Trustee-Delegates, unconditionally are obligated to collect IIM Trust funds and manage such funds solely for the benefit of the individual Indian beneficiaries.  Such trust obligations include:

(a)     Collecting IIM Trust funds pursuant to a lease, easement, right-of-way,  royalty contract, bonus agreement, and similar contracts and encumbrances relating to the use or sale of individual Indian trust lands and subsurface rights;

(b)     Prudently managing and investing IIM Trust funds;

(c)     Distributing and disbursing IIM Trust funds in a timely manner to each   beneficiary and crediting such funds to the correct IIM account in the correct amount;

(d)     Charging  reasonable and only statutorily authorized administrative fees;

(f)     Preventing and mitigating  misappropriation, unlawful conversion, loss, fraud, waste, abuse, and theft and taking action to remedy such theft, embezzlement, misappropriation, fraud, trespass, and other misconduct;

(g)      Enforcing leases, royalty contracts, bonus agreements, rights-of-way, easements and similar contracts and encumbrances; and seeking recoveries for theft, embezzlement, misappropriation, fraud, trespass, and other misconduct;

(h)     Timely crediting and paying over to beneficiaries all interest accruing on IIM Trust funds held by the government and its agents;

(i)     Safeguarding investment securities and the income earned therefrom; and

(j)     Establishing and implementing prudent accounting procedures to prevent loss and theft.

## VI.   TRUST OBLIGATIONS OF THE UNITED STATES AND OF DEFENDANTS WITH RESPECT TO  TRUST LAND AND NATURAL RESOURCES

22.     With respect to Trust lands controlled by the government and its agents, the United States, as trustee, and Defendants, as Trustee-Delegates, are obligated as fiduciaries to manage land and resources, including oil, natural gas, mineral, timber, grazing and other resources and subsurface rights solely for the benefit of individual Indians.  Such trust obligations include:

(a)     Leasing trust land and otherwise prudently contracting for the use of trust lands and the sale of subsurface rights and natural resources;

(b)     Ensuring fair market value for leases, royalty agreements, easements, rights-of-way, other encumbrances, and sales;

(c)     Imposing and collecting penalties for late payments pursuant to lease, royalty agreement, or encumbrance;.

(d)     Preventing loss, dissipation, waste, or ruin of trust land, subsurface rights, and other natural resources;

(e)     Preventing misappropriation;

(f)     Ejecting trespassers and preventing and mitigating losses from trespass, theft, misappropriation, fraud or other misconduct;

(g)     Correcting boundary, survey, and title record errors; and

(h)     Properly apportioning and prudently tracking allotments.

VII.   <u>BREACHES OF TRUST BY THE UNITED STATES AND OF DEFENDANTS WITH RESPECT TO IIM TRUST ACCOUNTS.</u>

23.     Through September 30, 2009, the United States, acting through the Defendants, consistently and egregiously has failed to comply with these and other responsibilities of a trustee and continues to do so.  Such breaches of trust include, without limitation:

(a)     Failure ever to reconcile IIM Accounts and audit the IIM Trust, so that Defendants are unable to provide accurate account balances or to determine how much money that should have been collected and credited to IIM Accounts was not collected or was diverted to improper ends;

(b)     The loss, destruction, and corruption of records from which amounts that should have been credited to IIM accounts could be determined;

—

(c)     Failure to establish an accounts receivable system, so that Defendants have no way of confirming that the income due from the trust assets, and other funds that should have been credited to IIM accounts, has in fact been collected;

(d)     Failure to separate billing and collection functions or to install other systems necessary to guard against diversion of beneficiaries' funds;

(e)     Failure to maintain accurate ownership records, so that Defendants have no way of determining to whom the income that has been collected belongs;

(f)     Failure to provide regular accurate reports to beneficiaries to tell them the correct amounts and sources of their income;

(g)     Failure to exercise prudence and observe the requirements of law with respect to investment and deposit of IIM Trust funds, and to maximize the return on investments within the constraints of law and prudence; and

(h)     Engaging in self-dealing and benefiting to the detriment of beneficiaries from the mismanagement of the trust funds.

24.     The consequences of these and other acts of mismanagement in breach of trust include, but are not limited to, the following:

(a)     As of the close of fiscal 1995, there were more than 387,000 IIM accounts, among which there were at least 15,599 duplicate accounts with the same number;

(b)     There were many duplicate accounts with the same name;

(c)     Twelve separate databases of accounts were maintained and there was no common database;

(d)     In 1996, at the time of the Complaint's filing, there were more than 54,000 accounts containing over $46,000,000, for individuals with no address or no correct address;

(e)     In 1996, out of more than 48,000 accounts containing more than $159,000,000 supposedly held in trust for minors until they reach the age of 18, over 15,000 accounts, containing more than $24,000,000, were held for persons who in fact were over 18;

(f)     In 1996, more than $122,000,000 was held in nearly 22,000 accounts which were supposedly temporary repositories pending determination of ownership of the

funds; more than 4000 of these accounts, containing over $3,000,000, had no activity for l8 months;

(g)     In 1996, there were more than 21,000 accounts with more than $36,000,000 for persons who had died; at least 2,400 of these were for closed estates, yet more than $600,000 due to heirs under such estates had still not been distributed; and

(h)     In 1996, there were more than 280 overdraft accounts totaling over $325,000.

25.     Plaintiffs have reason to believe that the present situation is significantly worse. Moreover, the foregoing list includes only some examples already admitted by Defendants. On information and belief, there are many other consequences of Defendants' mismanagement in breach of trust which are presently unknown to Plaintiffs and which can only be brought to light and corrected with the aid of this Court.

26.     The representative Plaintiffs, and all other members of the class, thus do not know, and have no way of ascertaining, and unless this Court grants the relief here sought will in the future have no way of knowing or ascertaining, the true state of their accounts; what amounts should have been credited to their accounts and should be so credited in the future; what amounts should have been paid to them and should be paid in the future; or how much of their money has been or will be diverted or converted to other uses.

VIII.   BREACHES OF TRUST BY THE UNITED STATES AND DEFENDANTS WITH RESPECT TO MISMANAGEMENT OF IIM TRUST FUNDS

27.     Through September 30, 2009, the United States, through Defendants, consistently and egregiously has failed to discharge prudently its fiduciary duties as trustee in its management of IIM Trust funds ("Funds Administration Claims").  Such breaches of trust consist of:

(a)     The failure to collect or credit funds owed under leases, sales, easements or other transactions, including without limitation, the failure  to collect or credit all money due, the failure to audit royalty payments,  and failure to collect interest on late payments;

(b)     The failure to invest IIM Trust funds, timely and otherwise; ;

(c)     Under investment;

(d)     Imprudent management and investment;

(e)     Erroneous and otherwise improper distributions or disbursements and deposits; including to the wrong beneficiary and into the wrong account;

(f)     Excessive or improper administrative fees;

(g)     Misappropriation;

(h)      The loss of principal deposited and interest accrued on funds held in failed depository institutions;

(i)     The failure to investigate and prosecute allegations of theft, embezzlement, misappropriation, fraud, trespass or other misconduct as well as the failure to mitigate and obtain compensation or other relief therefore;

(j)     The failure to pay or credit accrued interest, including interest accruing on funds held   in special deposit accounts and IIM accounts;

(k)     The loss of funds and securities purchased with such funds, by accounting error or otherwise as well as income related thereto;

(o)     The failure to deposit and disburse funds in a timely manner; and

(m)     Conduct of like nature and kind arising out of Defendants' breach of trust and mismanagement of IIM trust funds.

IX.     <u>BREACHES OF TRUST BY DEFENDANTS WITH RESPECT TO MANAGEMENT OF TRUST LAND AND OTHER NATURAL RESOURCES</u>

28.     Through September 30, 2009, the United States, through Defendants, consistently and egregiously has failed to discharge prudently its fiduciary duties as trustee in its management and administration of Individual Indian Trust land and other

13

natural resources ("Land Administration Claims").  Such breaches of trust by Defendants consist of:

(a)     The failure to lease trust land  and otherwise prudently contract for the use of trust lands and sale of subsurface rights and other natural resources;

(b)     The failure to obtain fair market value in its lease or sale of IIM Trust lands, subsurface rights, and other natural resources;

(c)     The failure to negotiate prudently leases, royalty and bonus agreements, easements, rights-of-way, similar encumbrances and sales contracts;

(d)     The failure to impose, enforce, and collect penalties for late payments pursuant to the terms of leases, royalty agreements, other contracts, and encumbrances;

(e)     The failure to include in, or enforce the terms of, leases and other contracts that require conservation, maintenance, and restoration;

(f)     The failure to prevent loss, dissipation, waste, or ruin of trust land, subsurface rights, and other natural resources, specifically including the failure   to preserve trust land, whether involving agriculture (including but not limited to failing to control agricultural pests), grazing, harvesting (including but not limited to permitting overly aggressive harvesting); timber lands (including  but not limited to failing to plant and cull timber land for maximum yield), and oil, natural gas, mineral resources or other resources (including but not limited to failing to manage oil, natural gas , or mineral resources for maximum production);

(g)     The failure to prevent and mitigate loss, waste, ruin, and misappropriation, whether through ejectment of trespassers or otherwise to prevent and mitigate such losses from trespass, theft, misappropriation, fraud or other misconduct;

(h)     The failure to correct boundary errors, survey and title record errors, and  properly to apportion and track allotments; and

(i)     Conduct of like nature and kind arising out of Defendants' breach of trust and mismanagement of IIM trust lands, subsurface rights, and other natural resources.

X..  DEFENDANTS' UNDERMINING OF CONGRESSIONALLY MANAGED ACTION TO CORRECT CERTAIN ELEMENTS OF THEIR BREACHES OF TRUST

A.  The American Indian Trust Fund Management Reform Act of 1994

29.  Congress has recognized the gross breaches of trust here complained of, as have the General Accounting Office and the Office of Management and Budget ("OMB").  The OMB has consistently placed the financial management of Indian trust funds as a "high risk liability" to the United States.  In 1992 the House Committee on Government Operations, after several years of investigation and Congressional hearings, issued a report entitled "Misplaced Trust:  The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund."  Ultimately, in 1994 Congress enacted the 1994 Act for the benefit of Plaintiffs and all other beneficiaries of IIM accounts (as well as the beneficiaries of tribal trust funds).

30.  The 1994 Act created the office of Special Trustee for American Indians as a sub-cabinet level officer (Executive Level II or higher pay scale) appointed by the President by and with the advice and consent of the Senate, reporting directly to the Secretary of the Interior.  25 U.S.C. § 4042.  Congress's stated purposes in creating that office were, *inter alia*, "to provide for more effective management of, and accountability for the proper discharge of, the Secretary's trust responsibilities to . . . individual Indians," "to ensure that reform of such practices in the [Interior] Department is carried out in a unified manner," and "to ensure the implementation of all reforms necessary for the proper discharge of the Secretary's trust responsibilities to . . . individual Indians." 25 U.S.C. § 4041.

The statutory responsibilities of the Special Trustee include, *inter alia*:

(a)     To prepare "a comprehensive strategic plan for all phases of the trust management business cycle that will ensure proper and efficient discharge of the Secretary's trust responsibilities to. . . individual Indians," including "identification of all reforms to the policies, procedures, practices and systems . . . of the Bureau" and other relevant Interior Department elements "necessary to ensure the proper and efficient discharge of the Secretary's trust responsibilities. . ."  25 U.S.C. §§ 4043(a)(1) and (2) (A);

(b)     To "oversee all reform efforts within the Bureau" and other relevant Interior Department elements "to ensure the establishment of policies, procedures, systems and practices to allow the Secretary to discharge his trust responsibilities . . . " 25 U.S.C. § 4043(b)(1);

(c)     To "monitor the reconciliation of . . . Individual Indian Money trust accounts to ensure that the Bureau provides the account holders with a fair and accurate accounting of all trust accounts," 25 U.S.C. § 4043(b)(2)(A);

(d)     To "ensure that the Bureau establishes appropriate policies and procedures, and develops necessary systems, that will allow it . . . properly to account for and invest, as well as maximize," subject to requirements of law, "the return on the investment of all trust fund monies," and "to prepare accurate and timely reports to account holders . . . on a periodic basis regarding all collections, disbursements, investments, and return on investments related to their accounts," 25 U.S.C. § 4043(b)(2) (B); and

(e)     To ensure that "the policies, procedures, practices, and systems of the Bureau" and other relevant elements "related to the discharge of the Secretary's trust responsibilities are coordinated, consistent, and integrated, and that the [Interior] Department prepares comprehensive and coordinated written policies and procedures. ," 25 U.S.C. § 4043(c)(1); "that the Bureau imposes standardized trust fund accounting procedures throughout the Bureau . . .," 25 U.S.C. § 4043(c)(2); "that the trust fund investment, general ledger, and subsidiary accounting systems of the Bureau are integrated and that they are adequate to support the trust fund investment needs of the Bureau," 25 U.S.C. § 4043(c)(3); that records, asset management, and accounting systems of the Bureau and other relevant elements of the Interior Department interface

appropriately, and that "the Bureau of Land management and the Bureau provide Indian landholders with accurate and timely reports on a periodic basis that cover all transactions related to leases of Indian resources," 25 U.S.C. § 4043(c)(4).

31.     The powers conferred on the Special Trustee by the 1994 Act to enable him to carry out his responsibilities include development of an annual consolidated trust management program budget proposal "that would enable the Secretary to efficiently and effectively discharge his trust responsibilities and to implement the comprehensive strategic plan." 25 U.S.C. § 4043(c)(5)(A).  The Special Trustee has broad powers with respect to such budget, and funds appropriated for trust management which are included in the Trust Management Program Budget may not be reprogrammed without his consent.  25 U.S.C. § 4043(c)(5).

32.     Moreover, the 1994 Act confers on the Special Trustee "access to all records, reports, audits, reviews, documents, papers, recommendations, files and other material, as well as to any officer and employee, of the [Interior] Department and any office or bureau thereof," as he "deems necessary for the performance of his duties." 25 U.S.C. § 4043(e).

33.     The 1994 Act also provides for a nine-member Advisory Board to the Special Trustee, including five trust fund account holders (including IIM account holders); two members with practical experience in trust fund and financial management; one member with practical experience in fiduciary investment management; and one member from academia with knowledge of general management of large organizations. 25 U.S.C. § 4046.

34.     The 1994 Act requires that the Special Trustee be appointed by the President, with Senate confirmation, "from among individuals who possess demonstrated ability in general management of large governmental or business entities and particular knowledge of trust fund management, management of financial institutions, and the investment of large sums of money." 25 U.S.C. § 4042(b)(1).  Such a person was in fact found and appointed, in the person of Paul Homan, a major figure in banking and trust and fiduciary management, with extensive experience in large-scale turnarounds of troubled banking operations, who has served in such posts as chief executive officer of Riggs National Bank, executive vice-president of Continental Illinois Trust Company,

Senior Deputy Controller of Controller of the Currency. He in turn appointed a qualified Advisory Board, of which Plaintiff Cobell had been elected Chair.

B.    Defendants' Undermining of the Special Trustee's Implementation of the American Indian Trust Fund Management Reform Act of 1994

35.    The then Secretary of Interior, Bruce Babbitt, and Assistant Secretary of Interior Indian Affairs, Ada Deer, vigorously opposed the adoption of the 1994 Act, which created the office of Special Trustee and established his authority and responsibilities.  Since its enactment, among other things, by a unanimous vote in the House of Representatives, and since the first Special Trustee took office in 1995, such Defendants, individually and in combination and conspiracy with employees of the Department of the Interior, have willfully and purposefully obstructed and harassed efforts of the Special trustee to carry out his mandate under the 1994 Act.  Plaintiffs are not presently aware of all the forms, subtle as well as overt, which such obstruction and harassment has taken, but are aware of at least the following forms:

(a)    At the close of Fiscal Year 1995, they had $24,000,000 in uncommitted appropriated funds which could have been reprogrammed with the approval of congressional committees and applied to the work of the Special Trustee; rather than apply such funds, they returned them to the Treasury;

(b)    They refused to request adequate funds for Fiscal Year 1996 for the work of the Special Trustee mandated by the 1994 Act;

(c)    They prevented the Special Trustee from preparing the strategic plan mandated explicitly by the 1994 Act;

(d)    They refused to permit the Special Trustee to conduct the technology and use survey necessary to carry out his duties mandated by the 1994 Act;

(e)    They prevented the Advisory Board from meeting to conduct its functions mandated by the 1994 Act; and

(f)    They refused to permit the Special Trustee to employ adequate staff and expert consultants necessary to carry out his duties mandated by the 1994 Act.

C.    Defendants have obstructed the appointment of a qualified and competent Special Trustee and the position has been vacant for more than one year

(a)     Since this administration took office, the Interior Defendants in breach of trust duties owed by the United States have obstructed or discouraged the appointment of candidates who meet the qualifications set forth in 1994 Act in order to conceal the nature and scope of continuing breaches of trust and serious problems in trust reform, notwithstanding that $5 billion has been spent on trust reform as a result of this litigation.

XI.     CLASS ACTION ALLEGATIONS

36.     This action is brought on behalf of two classes of individual Indians:

(a)     The Historical Accounting Class.  The "Historical Accounting Class" consists of those individual Indian beneficiaries (exclusive of those who prior to the filing of the Complaint on June 10, 1996 had filed actions on their own behalf stating a claim for historical accounting) alive on September 30, 2009 and who had an IIM account open during any period between October 25, 1994 and September 30, 2009, which IIM account had at least once cash transaction credited to it at any time as long as such credits were not later reversed.  Beneficiaries deceased as of September 30, 2009 are included in the Historical Accounting Class only if they had an IIM account that was open as of September 30, 2009.   The estate of any beneficiary in the Historical Accounting Class who dies after September 30, 2009, but before distribution is included in the Historical Accounting Class.

(b)     Trust Administration Class.  The "Trust Administration Class" consists of those individual Indian beneficiaries (exclusive of persons who filed actions on their own  behalf, or a group of individuals who were certified as a class in a class action, stating a Funds Administration Claim or a Land Administration Claim prior to the filing of the Amended Complaint) alive as of September 30, 2009 and who have or had IIM accounts in the "Electronic Ledger Era" (currently available electronic data in systems of the Department of the Interior dating from approximately 1985 to the present), as well as individual Indian beneficiaries who, as of September 30, 2009, had a recorded or other demonstrable beneficial  ownership interest in land held in trust or restricted status, regardless of the existence of an IIM account and regardless of the proceeds, if

any, generated from the trust land.  The Trust Administration Class does not include beneficiaries deceased as of September 30, 2009, but does include the estate of any deceased beneficiary whose IIM trust accounts or IIM trust interest had been open in probate as of September 30, 2009.   The estate of any beneficiary in the Trust Administration Class who dies after September 30, 2009 but before distribution is included in the Trust Administration Class.

37.     <u>Numerosity</u>. Each class is in excess of 300,000 individual Indians.

38.     <u>Common questions</u>. Questions of law and fact common to each class include, but are not limited to:  the legal standards governing the trust obligations of the United States with respect to the funds in IIM accounts; management of IIM and management of trust land and resources; what accounting, recordkeeping, reporting, and other practices are, have been, and will for the future be, necessary to achieve compliance with such standards; the extent to which, if at all, the Defendants have complied with such standards and have implemented or failed to implement such practices; the measures necessary to be taken in order to correct past breaches of trust and bring the activities of Defendants into compliance with the law for the future; and the nature, extent, and lawfulness of the Defendants' interference with the exercise of the statutory responsibilities of the Special Trustee. The commonality of these questions to all members of the class is reinforced by the fact that IIM moneys are pooled for investment purposes.

39.     <u>Typicality</u>. The claims of the representative Plaintiffs and all other members of the classes arise from the same practices and course of conduct of the Defendants and are based on the same legal theory.

40.     <u>Legislative Authorization and Confirmation.</u>   On **[January __, 2010]**, legislation was enacted and signed into law that expressly authorizes and confirms the jurisdiction of the United State District Court to resolve the claims set forth in this Complaint for the Classes stated herein.

41.     <u>Fair and adequate representation</u>.

(a)     All named Plaintiffs are or have been beneficiaries of the trust obligations herein involved, are or have been owners of IIM accounts, and like all owners of IIM accounts are unable to know whether their account balances are what they should have

been in the absence of the breaches of trust herein complained of.  Additionally, each has experienced the mismanagement of their IIM moneys, trust lands and resources and the impact of the breaches of trust set forth above.

(b)     Plaintiff  Elouise Cobell, the lead representative Plaintiff, is a recognized leader in Indian affairs with substantial experience both in financial management and in Indian matters generally, and is project director of the Individual Indian Moneys Trust Correction, Recovery, and Capacity-Building Project of Blackfeet Reservation Development Fund, Inc., a project that is directly supportive of the present effort and is further devoted to development and improvement of Indian capacity to manage funds and achieve self-sufficiency. Ms. Cobell is a recipient of the 1997 "Genius Grant" from the John D. and Catherine T. MacArthur Foundation's Fellowship Program.  In 2005, she received a "Cultural Freedom Fellowship" from the Lannan Foundation, an award that cited her persistence in bringing to light the government's "more than a century of government malfeasance and dishonesty."  In 2007, she was one of ten people given the AARP Impact Award (for making the world a better place).  She is a graduate of Great Falls Business College and attended Montana State University. She has two honorary doctorates, one from Montana State University, Bozeman, Montana, and another from Rollins College, Winter Park, Florida. Her professional background is in accounting. She was one of the lead organizers of Native American Bank, N.A., the only national bank located on a reservation that is owned by Indian tribes. She serves as Chair of the Board of Directors of the bank and is active in its management, and with her husband she manages a ranch producing cattle, wheat, and barley. She served for 13 years as Treasurer of the Blackfeet Indian Tribe, and has served as Controller of the tribe. She has held various positions with the Native American Finance Officer Association. She has served as Chair of the Intertribal Monitoring Association on Indian Trust Funds. She is a member of the board of the Montana Community Foundation; is a member of the executive board of Women and Foundation/Corporate Philanthropy; and is Chair of the National Rural Development and Finance Corporation. She served  the first Chair of the Special Trustee Advisory Board, appointed under the 1994 Act, 25 U.S.C. § 4046.

(c)     Plaintiff Penny Cleghorn is a beneficiary of an IIM account, the owner of interest in lands held in trust by the United States and is an enrolled member of the

Mescalero Apache Tribe.  She resides in Apache, Oklahoma.  Ms. Cleghorn has been in the field of Indian Education since 1991 and currently serves as an Assistant to the Principal at the Riverside Indian School located in Anadarko, Oklahoma.  Ms Cleghorn is a graduate of Cameron University in Lawton, Oklahoma, where she earned a degree in Business Administration, with a minor in Art, in 1986.

(d)     Plaintiff Thomas Maulson is an enrolled member of the Lac du Flambeau Chippewa Tribe (Wisconsin), of which he has served as tribal chairman since October 1992. He is a recognized leader in Indian affairs. He also currently is the president of the Great Lakes Inter-Tribal Council, an association of the Indian tribal governments in Wisconsin. He has been the national spokesman for the Great Lakes Indian Fish and Wildlife Commission, and was elected by nine Indian tribes to serve as chairman of the Voight Task Force, organized to protect Indian hunting, fishing and gathering rights in a three-state area.  From 1960 to 1963 he served in the United States armed forces. After receiving an honorable discharge, he returned to the Lac du Flambeau Reservation and worked as a tribal police officer and later as a tribal fish and game warden. Since then he has been self-employed, operating several successful businesses. From 1983 to 1989 he served two terms as his Tribe's first tribal judge, having attended the National Judicial College at the University of Nevada, Reno. In addition to his extensive tribal government experience, he has served in several state government positions, including his 1992 election as Vilas County supervisor, State Tourism Committee, and Vilas County Mining and Solid Waste Committee.

(e)     Plaintiff James Louis LaRose is an enrolled member of the Winnebago Tribe of Nebraska, of which he has served as tribal councilman and tribal chairman during various periods beginning in 1971. He is a recognized leader in Indian affairs. He is a past board member and chairman of the Nebraska Indian Inter-Tribal Development Corporation, a statewide consortium of Nebraska Indian tribes dedicated to facilitating individual and tribal economic self-sufficiency. He is also the former chairman of the Nebraska Indian Commission, and since 1971 has served as a board member of Americans for Indian Opportunity. In the 1970s he led the organizational effort which culminated in the establishment of Nebraska Indian Community College, of which he served as chief administrator in the formative years. He is a past vice-chairman of the

American Indian Higher Education Consortium, the national association of the twenty-eight tribal colleges in the United States. Since 1992, he has served as the intergovernmental liaison specialist of the Winnebago Tribe of Nebraska, and concurrently is the director of the Winnebago Bison Project, a tribal program to foster and restore a sustainable buffalo herd on the Winnebago Reservation. He holds A.A. and B.S. degrees in education.

(f)     Class Counsel are experienced in the substantive and procedural law involved in the case. They include Dennis M. Gingold, lead counsel, an experienced banking lawyer; Thaddeus Holt, an experienced big-case and class-action litigator; William Dorris, David Smith, Keith Harper, Adam Charnes, and Elliott Levitas, , each Partners or Counsel at Kilpatrick Stockton LLP with extensive litigation experience; and Justin Guilder, an associate in the Washington office of Kilpatrick Stockton LLP.

(g)     In addition, the services of Geoffrey Rempel, a certified public accountant who had been associated with the accounting firm of Price Waterhouse LLP, has been retained full time in this litigation. Mr. Rempel has extensive experience in evidence analysis and expert testimony in banking and fiduciary matters, with expertise in such fields as banking and fiduciary activities; data gathering and evaluation; internal controls, accounting practices, systems, and standards in government; information systems (particularly government), financial systems, and distributed systems; and modeling and statistical analysis.

42.     <u>Risk of inconsistent or varying adjudication</u>.     Substantially all IIM accounts are held for the beneficiaries by the Defendants on essentially the same basis and subject to the same obligations and responsibilities of the United States and the Defendants. Moreover, the funds in such accounts are held by Defendants, and invested, in a common pool.  Defendants' inadequate recordkeeping and other incompetent systems management affect all IIM account holders alike. The duties and obligations of the Defendants need to be ascertained, and adequate systems and controls need to be installed, with respect to all beneficiaries alike, and inconsistent determinations by different courts at the suit of different Plaintiffs with respect to such systems and controls would establish incompatible standards of conduct for the Defendants.

Moreover, Plaintiffs' beneficial land ownership interests generally are fractionated and undivided and suffer from the same mismanagement and breaches of trust, including without limitation inadequate recordkeeping, accounting and management systems, and trust management staff. Further, Defendants' fiduciary duties and trust obligations apply to all beneficiaries alike and are governed by the same composite statutory trust instrument, e.g., relevant legislative enactments that set forth explicit embedded trust duties of the United States. Accordingly, no beneficiary can obtain full restitution or be made whole unless the rights of each member of the class are vindicated. Finally, inconsistent determinations by different courts at the suit of different Plaintiffs with respect to such systems and controls would establish incompatible standards of conduct for the Defendants.

COUNT ONE

43. Plaintiffs reallege the allegations of ¶¶ 1-42 above.

44. The acts of Defendants herein alleged constitute final agency action and the unlawful withholding of action. Plaintiffs and each of them have suffered legal wrong and are aggrieved and adversely affected thereby. Plaintiffs are entitled to review thereof under 5 U.S.C. § 702.

45. Defendants have breached their trust responsibilities by failing to provide an accounting to beneficiaries of IIM Trust funds.

46. Plaintiffs are entitled to relief ordering that Defendants provide a complete and accurate accounting of all IIM Trust assets from the inception of the trust to the present.

COUNT II

47. Plaintiffs reallege the allegations of ¶¶ 1-46 above.

48. Defendants have breached their trust duties in the management of IIM Trust funds.

49. By reason of that breach, Plaintiffs are entitled to restitution, damages, and other appropriate legal and equitable relief.

COUNT III

50. Plaintiffs reallege the allegations of ¶¶ 1-49 above.

24

51.     Defendants have breached their trust responsibilities in the management of individual Indian Trust lands subsurface rights and other natural resources.

52.     By reason of that breach, Plaintiffs are entitled to restitution, damages and other appropriate legal and equitable relief.

WHEREFORE, Plaintiffs respectfully pray the Court as follows:

1.     For an order certifying the named Plaintiffs under Rule 23(b)(1)(A) and (b)(2) of the Federal Rules of Civil Procedure as representatives of the Historical Accounting Class.

2.     For an order certifying the named Plaintiffs under Rule 23(b)(1)(A) and (b)(3) of the Federal Rules of Civil Procedure as representatives of the Trust Administration Class.

3.     For a decree construing the trust obligation of Defendants to members of the class, declaring that Defendants have breached, and are in continuing breach, of their trust obligations to class members, and directing the institution of accounting and other practices in conformity with such obligations.

4.     For a decree ordering a complete and accurate historical accounting and directing the Defendants to make whole, correct, and restate the IIM accounts of class members.

5.     For an award of restitution, damages and other legal and equitable relief arising out of Defendants' breach of their trust responsibilities in the management of IIM, Trust land, subsurface rights, and other natural resources.

6.     For an award of Plaintiffs' costs of suit including, without limitation, attorneys' fees and other costs and expenses incurred, including costs associated with expert assistance, as well as appropriate incentive awards for the named plaintiffs.

7.     And for such other, further, or different relief as plaintiffs may be entitled to in the premises.

Respectfully submitted,


_____
DENNIS M. GINGOLD

D.C. Bar No. 417748
607 14th Street, N.W.
9th Floor
Washington, D.C. 20005
202 824-1448

WILLIAM DORRIS
Georgia Bar No. 225987
Admitted *Pro Hac Vice*
ELLIOTT LEVITAS
D.C. Bar No. 384758
KILPATRICK STOCKTON LLP
1100 Peachtree Street
Suite 2800
Atlanta, GA 30309
404 815-6450

DAVID COVENTRY SMITH
N.C. Bar No. 12558
Admitted *Pro Hac Vice*
ADAM H. CHARNES
KILPATRICK STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
336 607-7300

KEITH M. HARPER
D.C. Bar No. 451956
Justin Guilder
KILPATRICK STOCKTON LLP
Suite 900
607 14th Street, NW
Washington, DC 20005-2018
202 508-5844

Thaddeus Holt
P.O. Box 440
Point Clear, Alabama 36564
251-990-7495

Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I, Geoffrey Rempel  hereby certifies that on the ___ day of January 2010, a copy of this AMENDED COMPLAINT TO COMPEL THE UNITED STATES TO DISCHARGE  TRUST DUTIES AND TO RECOVER RESTITUTION, DAMAGES, AND OTHER MONETARY RELIEF FOR DEFENDANTS' BREACHES OF TRUST in the above-captioned case was served on the following via facsimile, pursuant to agreement, to:

Thomas Perrilli
Associate Attorney General
Michael F. Hertz
Deputy Assistant Attorney General
J. Christopher Kohn
Robert E. Kirschman, Jr.

Attorneys
Commercial Litigation Branch
Civil Division
P,O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875

Attorneys for Defendants

Earl Old Person (Pro se) (served via facsimile)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
Facsimile: (406) 338-7530

I further certify that all parties required to be served have been served.

_____
Geoffrey Rempel

27