IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELOUISE PEPION COBELL, et al.,     )
            )
       Plaintiffs,     )
            )     Civil Action
v.             )     No. I:96 CV 01285 (TFH)
            )
KEN SALAZAR, et al.,     )
            )
       Defendants.     )
            )
            )
_____ )

## AFFIDAVIT OF ELOUISE PEPION COBELL

1. My name is Elouise Cobell. This affidavit is filed in support of plaintiffs' petition for

incentive awards, including expenses and costs. I am a rancher, community developer and a

banking official. I am also the lead plaintiff in this case since it was filed on June 10, 1996.

*History*

2. I've been fighting on behalf of individual Indian trust beneficiaries for decades. I grew up on

my family's allotment in the southern part of the Blackfeet Indian Nation in a modest house

with no running water, telephone or electricity. I was one of eight children living in this

house. My older brother and sisters were shipped to off reservation boarding schools

because we had no school in our area.

3. We had many visitors when I grew up. Every visit recounted an incident with the Indian

Agent or a story that went something like this: "The Indian Agent had their money." As a

young four year old, I didn't understand why the Indian Agent would not give my family friends and relatives their money.

4. My aunt told a story, which had a powerful effect on me.  One winter she needed her lease money very badly because my uncle was very sick.  She caught a ride in a horse driven wagon to Blackfeet Agency to ask for her money.  The snow was chest deep.  Several people had to wait outside of the Indian Agents office in cold chest deep snow, and finally a Government official came out and told them to come back tomorrow.  My aunt had to ask people if she could stay with them overnight.  The next day the Government official said it would be a least two more weeks before their checks were ready.  But, the lease check was not ready until the spring.  My uncle passed away shortly after the check was delivered.  I was very young, but will not forget these stories.

5. I took business and accounting classes in high school and business college and tried to change the way IIM accountholders were treated by the BIA.  I worked in a summer college program at the Blackfeet Agency.  IIM account holders would come to pick up their checks. The Agency had a teller window with bars on it and hard wooden benches with no bathroom facilities.  Accountholders would sometimes wait the entire day – or longer – for their check. I was furious and marched into the Indian Agent's office to tell him he had to help the people get their checks – I found him sleeping on his desk.  I went back to college and the misconduct continued.

6. After a few years of living off the reservation, I decided to move home with my husband and small son.  At 31 years old, I became the Treasurer of the Blackfeet Tribe.  Now IIM accountholders started coming to me asking me to help them get their trust money.  I would

make phone calls and write letters.  There never were answers to these requests.  IIM

accountholders received no statements and my family and I never received statements.  No

information or explanation was provided.  I continued to try to help IIM accountholders.

7.  In the 1980's I began reaching out to Congress to get them to hold the Department of Interior

accountable.  I spoke frequently to Congressman Mike Synar  (D-OK), Chairman of the

Government Operations Committee and the driving force behind the Misplaced Trust report,

Congressman Dale Kildee (D-MI) and Congressman J.D. Hayworth (R-AZ).  Congressmen

Kildee and Hayworth were very supportive.  I met with Congressman Synar on at least five

occasions and he was very interested in reforming the IIM trust. The Government Operations

Committee began holding hearings in the mid-1980's.  And, since the 1980's I have testified

in many Senate and House hearings – far too many to recount.

8.  In 1989 Congressman Yates, Chair of the Appropriations Committee mandated that Interior

reconcile, audit and certify Individual Indian trust accounts.  I was appointed to an Ad Hoc

Committee to oversee the accounting progress.  This was very time consuming.  I recall that

the Arthur Andersen audit contract was for a term of about three years, during which time

they would report periodically to the Ad Hoc Committee.  During this time, I met with

individual members of the committee, or the committee, itself, and committee staff on a

monthly basis. This was a very busy time since GAO and Congress monitored the Arthur

Andersen audit.

9.  After the 1992 report from Congress on Misplaced Trust, the 1994 Trust Fund Reform Act

was enacted into law and I was asked to chair the first Advisory Board of the Special

Trustee.  Our first Advisory Board was terminated by Interior because we recommended to

Congress that the IIM Trust be removed from the Department of Interior.  During this period

of time, I continued to communicate with IIM accountholders about the poor condition of the

Trust, including speaking at conferences.

10. After over 20 years of trying to reform the system as an activist and trust beneficiary, I felt

that I had no choice but file the lawsuit.

11. I have received many awards for my work in Indian Country and this lawsuit, including

Honorary Doctorates from Montana State University and Rollins College. The following list

is not exhaustive.

> 1986 – Blackfeet Woman of the Year
> 1997—The John D. and Catherine T MacArthur Foundation Genius Grant
> 2001—Cultural Freedom Award, Lannan Foundation
> 2001—Women Who Make a Difference, International Women Forum
> 2004—Jay Silverheels Achievement Award
> 2005—Pablo Eisenberg Award for Neighborhood Leadership
> 2007—Ten who are changing the World –AARP Impact Award
> 2007—Honored as a warrior at North American Indian Days

_My Contributions to this Case_

12. I am approved as a Class Representative and have been the lead plaintiff in this case since it

was filed on June 10, 1996.  As lead plaintiff, I am, and have been, in constant

communication with Class Counsel – frequently several times a day -- and make the strategic

decisions in this case that do not involve interpretations of law.  However, even when legal

options are debated or discussed, I am involved in those decisions.  As discussed below, I

understand my responsibilities to be broader and more time consuming than almost any other

class action lawsuit ever filed. When I assumed this responsibility, I did not do so to be

compensated.  I did so to help bring justice to Native people.  It was only within the last year,

or so, that I came to understand that I might be able to apply to this Court for an incentive

payment reflecting my contributions to this case (I was aware that if this case was litigated to a successful resolution that I would be able to apply for out of pocket expenses incurred in connection with this case). As such, I did not maintain detailed time records.

13. On an annual basis, I believe that I have spent between 500 and 1,200 hours each year fulfilling my responsibilities as lead plaintiff in this case and logged thousands of miles in outreach, meetings in Washington on the Hill, in court and New York and other destinations to raise money to pay our experts and expenses, since there was scarce funding to pay Class Counsel.

14. I make every major decision in this case with the aid of Class Counsel. This requires that I have a thorough knowledge of the relevant record in this case and an understanding of the applicable law.  I have read the majority of the papers filed in this case and have spent a very large amount of time discussing those papers with Class Counsel.

15. My first major responsibility was to retain the best attorneys and professionals.  I interviewed or spoke to at least 3 major law firms before I retained Dennis Gingold and Thaddeus Holt. It is notable that each attorney I spoke with before retaining Messrs. Gingold and Holt declined the case stating that it was "impossible," "could not be brought," or that it would take too much time and money, or that it would anger Interior Department officials who had authority matters important to existing clients.  I knew that I needed to retain the best people if there was to be a chance of a successful outcome.  I retained and worked closely with the lead attorney, Dennis Gingold, to build and manage a diverse legal team.  My responsibilities relating to the monitoring and retention of members of the legal team have fluctuated, as members of the legal team leave and are replaced.

16. My next significant responsibility was to raise funds to litigate the case. I raised the funds in this case. I quickly learned that complex litigation against the government is very expensive and that highly qualified experts and other professionals are the most significant immediate expense in big cases because Class Counsel agreed to accept this case on a contingent fee. Otherwise, individual Indians could not prosecute this case. And, if the contingent fee isn't fair, no one will ever represent individual Indians again against the government. Perhaps, that is precisely what the government really wants.

17. As a result of not having the funds to pay Class Counsel, I had to engage them on a contingent fee basis. For Dennis Gingold, Thad Holt and the law firm of Kilpatrick Townsend & Stockton LLP, the aggregate contingency fee I agreed to with them is 14.75% of the benefits obtained for the plaintiffs. I was also unable to reimburse them certain expenses over the course of the litigation.

18. Funding the largest class action lawsuit ever filed against the federal government has been a difficult, massive effort and to that end I traveled extensively to raise money and meet with foundations and other supportive organizations. This has been very challenging. The issue of funding is especially critical when suing the U.S. government, which has no practical financial constraints and has spent over $5 billion reforming the trust and defending itself in this case. Fund raising was made more difficult because many otherwise sympathetic foundations were reluctant to support a case that few thought could succeed because Indians never beat the government. Other foundations were reluctant to give us support because they feared retaliation or other problems with the Treasury defendant and its Internal Revenue Service.

19. Indian tribes have never provided financial support to this case and IIM accountholders are largely poor and disenfranchised.  It cannot be understated that the financial condition of many members of the class is a direct result of the governments' mismanagement of their trust assets. It is not possible for these class members to financially support litigation against the U.S. Government. The obstacles to funding this case have been significant and have required that I dedicate large amounts of time to overcome them.

20. I, myself, have contributed significant amounts of money to this case. In 1997, I received The John D. and Catherine T. MacArthur Foundation Genius grant in the amount of $300,000.00. I used almost the entire amount to fund this case. I also covered travel and related costs out of my own pocket when funds were depleted. I estimate that I spent approximately $90,000.00 in addition to the MacArthur Foundation funds.

21. Class communications have been important to ensure that misunderstanding and rumor do not mislead Indian country.  It has been vital to keep class members informed about the status of the case, the meaning of various decisions of this Court and the Court of Appeals, the impact of such decisions on trust assets, and the status and reasons for failure of eight prior settlement negotiations, including one ordered by this Court and one ordered by Congress.  That is why I speak to class members on an almost daily basis about the case.  I have also traveled extensively in Indian Country to speak to members of the class because many class members do not read or do not have access to radio or television.

22. It is against my nature to speak to reporters and other media, but it quickly became apparent that media is the most cost-effective way to reach members of this class.  If beneficiaries learned about the case from media – or, at least, learned enough to ask questions or obtain

more information – then they would be more inclined to hold the government responsible as their trustee.  Many class members in Indian country find out information about the case and share that information with their family and friends. As such, I knew that media would be an integral part of our outreach to members of the class.  Speaking to the media has required that I spend a large amount of time briefing reporters who are can be unfamiliar with, or misinformed about, this complicated case.  At the same time, I learned that if I declined to speak to the media, more often than not, a story would not run and an opportunity to reach out to class members would be lost. That is why working with reporters and reaching out to class members through the media has required large amounts of my time.

23. I have traveled frequently to Washington D.C., usually between 8 to 15 times a year, to meet with Class Counsel, attend hearings and trials and meet with members of Congress.  I also attended almost every major settlement negotiation with defendants, including the negotiations that culminated in the December 7, 2009 Settlement Agreement.

24. My responsibilities as lead plaintiff require that I spend time away from my responsibilities as a rancher and my employment as a banker. These are significant sacrifices. My husband and I live on my allotment and we have a cattle ranch. A rancher can't put a "closed" sign in front of their ranch and re-open next week, or month.  Ranching is too challenging for that. This has placed an enormous strain on my husband who has had to pick up my ranching responsibilities when I am on travel or work.  This sacrifice has been extraordinarily difficult on us at times; I gave him a kidney in 2004 to keep my husband alive.  His health issues, which became increasingly alarming due to his diabetes, made it even more difficult to tend to my responsibilities as lead plaintiff.  But, I could not slow down.

25. My "real" job is as a community developer and chairing the Native American Bank. During the course of this litigation, I have held many positions at different banks. Since 1987 I have chaired the Board of Directors of Blackfeet National Bank (1987 – 2001), First Interstate Bank (2001 – on board of directors and audit committee); Native Amreican Bank (2001 – present, chair several committees). My responsibilities as lead plaintiff have also come at significant financial sacrifice inasmuch as I was unable to pursue other employment opportunities, or devote more time to my job as a community developer and banking official.

*My Reputational Interests at Risk were Paramount among all Other Factors*

26. I have significant reputational interests at risk in this case. More than any other contribution or sacrifice to this case, I regard my reputational interests at stake as paramount. Before this case was filed, Dennis Gingold and Thaddeus Holt were candid that nothing like this case had ever been filed before and that many critical arguments that we'd be making were ones of first impression with the courts. I understood from these conversations that success required favorable rulings on all of these arguments, but that the government would substantially prevail in the case-at-large if they could win any one.  Accordingly, despite the importance of my reputation to me in Indian Country and the (perhaps significant) chance that this case may have ended unfavorably, I stayed as the lead plaintiff.

27. The West is a big place, but Indian Country is not. One's reputation in Indian Country is a fickle and fragile thing, frequently made or broken by word of mouth rather than deed or accomplishment. Because I filed this case and took a position as the lead plaintiff, that means that I and my family could suffer reputational harm whether there was a successful resolution or not. Every filing leads with my name and every news report references me personally.

Fairly or unfairly, every victory or setback in this case is personalized to me in a way that has never before occurred for any Indian in Indian Country.

28. The government has sowed misinformation and discord. I hear frequently from class members that government officials are blaming me for other problems in Indian Country. There is ample reason (and history) for Indian Country to be generally distrustful of the U.S. Government, but until now there has never been a single person perceived as being responsible for so much in Indian Country.  This has made it easy for government officials to blame me for their continuing failures.  Many in the government have blamed the general disconnection of their computers from the Internet, trust reform, or another court order for why they fail to fulfill their trust duties and federal functions, pointing at me and the filings in our case as the main excuse. To many class members most concerned about a trust check that has not arrived, I and this Court frequently are responsible in their view because that is what they are told by BIA agents. This Court repeatedly has found that the government has retaliated against individual Indian trust beneficiaries for orders and injunctions entered in this case and I have witnessed this retaliation visited upon my reputation.  I, too, have been a victim of retaliation, including difficulties created by the BIA on leasing issues and IRS audits and the refusal of Interior Department officials to attend meetings on bank and community development issues and programs if I am identified as a speaker.

29. The consequences for success in this case and its effect on my reputation remain uncertain. Time will tell.  However, the consequences for failure in this case would most certainly have made me a pariah in the only community I've ever lived.  Whatever my family felt about the government's mismanagement of their trust assets, none signed onto any of the potentially

adverse consequences of failure. The risk to my reputation and the reputation of my family could well have been generationally and irreparably impaired. Why did I file this case if I am so concerned about my reputation?

30. I filed this case because it was the right thing to do. For over one hundred years the government abused IIM accountholders and breached its trust responsibility and nobody ever fixed the problem. As a child I watched my family and friends suffer great hardships at the hands of abusive BIA agents. As an adult I knew that I had to do something about it. I don't want my son and our grandchildren to suffer. No one should have to suffer what Native people have had to endure under the control of the BIA. Ultimately, the final solution may depend on appointment of a receiver if after this case is settled and BIA no longer needs to be concerned about court oversight, Interior returns to business as usual.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 20, 2010.

Elouise Cobell