IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELOUISE PEPION COBELL, et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>KEN SALAZAR, Secretary of the Interior, et al., )<br>)<br>Defendants. )<br>)<br>) | Civil Action No. 1:96 CV 01285<br>(TFH) |

AFFIDAVIT OF DENNIS M. GINGOLD

1. My name is Dennis M. Gingold. I am a member of the Bar of this Court and lead counsel for the plaintiffs in this action. I have been lead counsel at all times in this litigation, beginning June 10, 1996, the date this action in equity was filed on behalf of the Cobell plaintiffs. I make this affidavit in support of plaintiffs' petition for Class Counsel fees in accordance with the December 7, 2009 settlement agreement by and between the United States and the Cobell plaintiffs and the Claims Resolution Act of 2010.

Professional Information

2. I have been a member of the bar in good standing since 1974, at which time I was admitted by examination to the Bar of the State of New Jersey. Since that time, I have been admitted by examination to the Bar of Colorado (inactive) and by waiver to the Bar of the District of Columbia. I am in good standing in each jurisdiction. I am also admitted to practice before the U.S. District Court for the District of New Jersey, the U.S. District Court for the District of Colorado, and this Court. Further, I am admitted to practice before the U.S. Court of

Appeals for the D.C. Circuit, the 7th Circuit, the 9th Circuit, the 10th Circuit, and the 11th Circuit, as well as the U.S. Supreme Court. Cases that I have developed and led for major clients have been tried and argued on the merits in each of those appellate courts, including the United States Supreme Court.

3. For 27 years, I have been recognized as one of the top 20 banking lawyers in the United States. I am also recognized as one of the top civil litigators in this country. <u>See, e.g.</u>, <u>National Law Journal</u>, December 1983; <u>The American Lawyer</u>, February 2010. In 1995, immediately prior to accepting this engagement, I was selected as one of 9 individuals – and the only lawyer in private practice – who would most influence banking in 1996. <u>American Banker Washington Watch</u>, December 1995. However, I suspended my banking practice and accepted this assignment because of the urgency and compelling nature of the human issues at stake.

4. From 1976 through 1995, first as a Treasury Department lawyer and thereafter in private practice, I specialized in complex, cutting-edge domestic banking and financial matters, including the development of bundled financial products and institutional mechanisms to deliver financial services more effectively in an increasingly competitive market. Following my entry into private practice in 1980, my clients included commercial banks, (<u>e.g.</u>, J.P. Morgan, Bankers Trust, Republic National Bank of New York, Chase, Chemical, Safra Banks); the major bank holding companies in the Rocky Mountain region (<u>e.g.</u>, Sunwest); investment banks, (<u>e.g.</u>, Nomura Securities); merchant banks, (<u>e.g.</u>, Babcock & Brown); leasing companies, (<u>e.g.</u>, Greyhound Financial); and life insurance companies, (<u>e.g.</u>, Great West Life Insurance Company).

5. Further, I designed and implemented the strategy, and led the legal team that

2

neutralized interstate banking barriers, using the "non-bank bank" to avoid geographical constraints, by defeating the Independent Bankers Association of America in the 7th Circuit, and the Board of Governors of the Federal Reserve System in the U.S. Court of Appeals in the 10th Circuit.  This 10th Circuit decision was affirmed 8-0 with 1 abstention by the U.S. Supreme Court in <u>Dimension Financial Corp. v. Board of Governors of the Federal Reserve System</u>.  Interstate constraints promulgated by the Federal Reserve Board in Regulation Y were struck down and interstate banking became what it is today.

      6.  I designed the strategy and led the legal team in a hostile takeover of Baltimore Bancorp, then the publicly held corporate parent of a multi-billion dollar federally insured depository institution, defeating anti-takeover defenses created and defended by Sullivan & Cromwell in the 4th Circuit and completing acquisition of control for novice insurgents within six months.

      7.  At the request of the District Attorney for New York County, I provided counsel in the investigation and prosecution of fraud and corruption in the management and operation of First American Banks through the Bank of Credit and Commerce International ("BCCI") notwithstanding opposition from the Federal Reserve Board and the U.S. Department of Justice, among others.

      8.  I designed and defended the institutional mechanism relied on by the U.S. Comptroller of the Currency to approve bank of deposit powers for general business corporations organized in accordance with D.C. law, which allowed such companies to engage in banking business, the deposits of which are insured by the FDIC, at the same time the companies remained exempt from ownership, product, and geographical restrictions otherwise imposed by

3

the Federal Reserve Board under the Bank Holding Company Act of 1956, as amended), e.g., Treasury Bank.

9. Finally, I created and designed a tax-deferred, annuitized core deposit, which was insured by the FDIC and approved by the U.S. Comptroller of the Currency notwithstanding concerted opposition from the life insurance industry, et al.

Governing Hourly Rate

10. As discussed in Plaintiffs' Class Counsel fee petition, to the extent hourly rates are used to calculate a fair and reasonable contingent fee award in accordance with requirements set forth in The Claims Resolution Act of 2010 and criteria set forth by this Court and the Circuit under the common fund doctrine, controlling law provides that current hourly rates are applied ab initio to compensate class counsel for payment delays that invariably occur in class action contingent fee cases.

10. My current hourly rate is $925.00, which is the minimum rate that I charge and am paid for professional services. See, e.g., Engagement letter dated, April 15, 2010 (redacted to ensure client confidences). That is consistent with rates charged by, and paid currently to, attorneys whose major clients engage them for similarly complex and important banking and financial matters. Available time for such engagements is limited, however, because Ms. Cobell, from the outset, recognized and understood many of the difficulties in this litigation and requested that I undertake no representation if there is any possibility that such representation would interfere with that which must be done to conduct the most effective prosecution of this case. The current rate is not discounted. Nor is it otherwise negotiable (downward). Nor is any portion of the rate deferred or contingent on an event or occurrence. Success bonuses, if any, would be added to the base rate, depending on results achieved in any such engagement.

Common Fund Factors

11. I am paid no salary and receive no draw. At the beginning of this engagement, I agreed to defer a substantial portion of my fees until the ultimate recovery. However, the deferred percentage increased through year-end 1997. Funds were needed to retain and pay engaged experts, accountants, and other litigation support contractors. As a result, since early 1998, no funds have been available to pay my current time in this litigation – not even deeply discounted time -- and I have been engaged by Class Representatives pursuant to a full contingent fee agreement in accordance with the common fund doctrine. From time to time, I have been paid limited expense reimbursements. Funding provided by foundations to prosecute this case principally has been earmarked for consulting and testifying experts as well as other litigation support professionals to pay them currently. From time to time, this Court awarded, and defendants have paid, attorneys' fees to plaintiffs as a result of defendants' litigation misconduct and I have received a portion of such awards and payments, which were limited in time and scope.

12. When we filed the complaint on June 10, 1996, Mr. Holt and I were counsel of record and the only attorneys who entered an appearance on behalf of the Cobell plaintiffs. Over the course of this litigation, attorneys have joined the litigation team and, for various reasons, some have disengaged for periods of time and others have withdrawn entirely from further representation. Given the duration and complexities of this litigation, that is understandable. As lead counsel, to the extent practicable, I have tried to ensure that actively engaged co-counsel participate in the decision-making process and the resolution of legal issues and strategy; however, ultimately that responsibility has rested, and continues to rest, with me. Further, from the outset, I have kept Ms. Cobell informed about every material issue in this

5

litigation to ensure that she, the lead plaintiff, could make informed judgments at each critical juncture in this case.

13. Our clients are among the most vulnerable people in this country. They could not underwrite this litigation effort. At the time Mr. Holt and I filed this action in equity and throughout these proceedings, I assumed the risk that I would never be paid for the time that would be required to prosecute this case. Although I received no income for many years in this case; nonetheless, for the reasons stated herein, if there was any chance that an engagement would interfere with my duties as lead counsel, I declined such representation. In addition, I have declined various invitations to sit on boards of directors and boards of trustees. For the same reasons, I have declined academic appointments.

14. Among other things, in 2010 and 2011 alone, I declined a request to represent an investment firm as lead counsel in a major interpleader action filed in the Southern District of New York that involved several global financial institutions and unique hedge fund issues on matters of economic importance. I have also declined a request to represent a commercial bank in an action against the FDIC, involving financial safety and soundness issues in the 5th Circuit. Further, I declined a seat on the board of directors of a New York firm and a seat on the board of trustees of a respected college. Finally, because of the work that has been required to obtain Congressional approval of the settlement and is required for class out reach and preparation for the June 20, 2011 fairness hearing, I continue to defer academic appointments, including one as a Fellow or Scholar in a well-regarded think tank and have declined an invitation to teach in an Ivy League MBA program this spring. Declining and deferring representations, board seats, and academic appointments are not without financial and professional consequence since no funds

are available to pay attorneys in Cobell and such representations and opportunities are readily accepted by others.

    15.   This engagement is regarded by this Court as important to the lives of our clients, including the health and welfare of class members who are children, elderly, and the infirm. The case is the most difficult, time consuming, and risky engagement I have undertaken in my career. From December 20, 1995, through December 7, 2009, I recorded 48,772.3 hours on this case. Notwithstanding that I knew that time would not determine my ultimate compensation where, as here, fees are awarded as a percentage of common funds, I spent whatever time is necessary to ensure that all reasonable issues and options in this case were addressed and considered. What my time reflects is the importance of this case as well as the nature and scope of its difficulty, and my commitment to seeing it through to a favorable conclusion. Evidencing the difficult and complex nature of this case is this Court's own efforts over these past fourteen plus years, including but not limited to, having held approximately 250 days of trial, evidentiary hearings, and oral argument on various motions, including TRO's, preliminary injunctions, and anti-retaliation orders, most of which were granted. Indeed, in order to mitigate the catastrophic risk of continuing trust data and asset loss, plaintiffs successfully restrained defendants' Internet access to BIA and OTFM IIM trust systems for five years and plaintiffs have prevailed on the merits in each trial and hearing before this Court. Further, more than 80 Cobell decisions of this Court and the U.S. Court of Appeals have been published, some of which, including Cobell V and Cobell VI are landmarks in the application of trust law principles to the government's management of the Individual Indian Trust, including fiduciary duties owed by the United States to class members. In addition to trust law, in these proceedings, this Court necessarily has addressed and has had to balance complex questions of law and fact that implicate constitutional

law; restitution; equity; jurisdiction; civil procedure; administrative law; equitable and restitutionary remedies; damages; contempt; information technology security; evidence; spoliation; burdens of proof; witness intimidation; executive and deliberative process privilege; contempt; attorney-client privilege and work product doctrine; evidence, including the nature and scope of evidentiary presumptions and inferences; and irreconcilable tensions or conflicts that exist from time to time among these substantive areas of law.

16.  My responsibilities as lead counsel have been, and continue to be, comprehensive. From the date Ms. Cobell instructed me to prepare this litigation, I worked with Thaddeus Holt to develop the legal strategy and framework and draft the complaint to prosecute equitable claims and enforce trust duties that the United States owes to the Cobell plaintiffs in this Court. The claims, jurisdiction, and venue set forth in the complaint had been, in accordance with conventional wisdom at the time, considered impossible to prosecute and enforce or otherwise unavailable to the plaintiffs. The fact that approximately 100 tribes have filed claims based on what we have accomplished in this litigation confirms a sea change in attitude and reflects what Judge Lamberth described in Cobell V as the "stunning" success of our efforts.

17.  Further, my responsibilities have included, without limitation, the creation, research, development, and implementation of legal strategies and theories, both trial and appellate; the preparation, review, and revision of thousands of draft motions, briefs, and other papers ultimately filed with this Court, the U.S. Court of Appeals, the U.S. Supreme Court, and special masters appointed in this litigation, e.g., more than 3,600 papers have been docketed in this Court alone; oversight and coordination of co-counsel, consultants, specialists, and experts regarding assignments and commitment to their tasks; fund raising to ensure that such experts, consultants, and specialists are paid; the creation and implementation of trial and appellate

litigation strategies, legal theories, and options, including those which are unique; the implementation of decisions made by Ms. Cobell and collective legal and case-management decisions and strategies made by the trial team, including the hiring and firing of personnel; oral argument in the district court and the court of appeals; the preparation and examination of witnesses and the cross-examination of witnesses, including the Secretary of the Interior; the preparation of co-counsel for witness examinations; discovery, including preparation of interrogatories and responses thereto, requests for admission, and affirmative and defense depositions; injunctive relief, including temporary restraining orders; enforcement of court orders, including the prosecution of two Interior Secretaries, two Interior Assistant Secretaries, and one Treasury Secretary for contempt.

18. Moreover, I have defended witnesses and have provided assistance to their personal counsel, including government officials and trust beneficiaries who have suffered retaliation as a consequence of providing testimony to this Court. I have also defended this Court and its special masters when they were attacked or obstructed by defendants and their counsel.

19. Equally important in this case has been the need for effective class communications, particularly where, as here, this Court repeatedly entered Rule 23(d) orders to protect class members from misinformation that Interior had communicated to the Cobell plaintiffs. Throughout this litigation I have communicated with more than one thousand individual Indian beneficiaries and their guardians and personal counsel by telephone and through email exchanges and meetings in Washington, D.C. and on reservations in Oklahoma, Montana, Washington State, Oregon, Idaho, South Dakota, North Dakota, Nebraska, and New Mexico. Intensive strategic class communication efforts have been undertaken, relating to the difficult

implementation of the December 7, 2009 settlement agreement, including legislative efforts that resulted in the Claims Resolution Act of 2010.

### Time Records

20. I maintain time records in annual, hardcopy diaries and electronically in a Microsoft Excel software file. Contemporaneously with each particular identified task, activity, or event, I enter a description of specific matter(s) or task(s) undertaken and performed; time expended to the tenth of an hour; and the identity of individuals or entities relevant to the referenced matter(s) or task(s). Such recordings include confidential information, including that which is protected under attorney-client privilege and the work-product doctrine, as well as, among other things, (a) names of current and former government officials and contractors who, at personal risk, have provided information on matters central to this case; (b) names of foundations that have provided funding for this litigation; and (c) names of Members of Congress and staff. The persons and foundations referenced in 2(a) and (b) herein have requested confidentiality because of concerns that disclosure would expose them to retaliation by government officials, a concern that is confirmed by the record of these proceedings. See, e.g., Anti-Retaliation Orders entered by this Court and Special Master Balaran. See also retaliatory actions taken against Mona Infield; Joe Christie, former special assistant to the Special Trustee; Tom Slonaker, the 2nd Special Trustee for American Indians; and Ronnie Levine, BLM Chief Information Officer, each of whom had been subjected to retaliation for testifying truthfully by written declaration, deposition, and orally before this Court and Congress about matters central to this litigation.

21. Further, discussions with Members of Congress and their respective staffs regarding settlement issues ordinarily are confidential and diary entries also include information that is unrelated to this litigation. That information is also excluded.

22. From the aforementioned diaries, I entered my time electronically into a software file exclusive of confidential information. My time entries are included in Class Counsel's Combined Time Records, which are submitted to this Court in support of plaintiffs' petition for Class Counsel fees. To the extent information is not available or is unreadable to me in the diaries, I did not enter into it in the electronic format and it is not included in plaintiffs' fee application. Similarly, time and charges irrelevant to plaintiffs' fee application are excluded from that which is provided to this Court and defendants.

23. My time and my records reflect actual time. Because time spent in preparation of this action necessarily preceded the filing of the complaint, I included that time, beginning December 20, 1995. It is on that date that Ms. Cobell instructed me to begin preparation of this lawsuit.

24. My records reflect time that I have spent in connection with this litigation, including time incidental to my duties as lead counsel. It also includes substantial time and subject matter excluded from previous, limited-scope submissions to this Court, e.g., inadvertently omitted time; time spent with foundations and others that have provided funding for this litigation; time spent with Members of Congress and staff regarding litigation, policy, and legal issues; time spent in connection with Congressionally directed settlement proceedings and issues related to eight unsuccessful settlement efforts through 15 years of litigation, including time spent pursuant to the 1999 mediation order entered by this Court; time spent on class communications, whether directly or through electronic and print media; time spent on

administrative aspects of case management, including the negotiation, drafting, review, and revision of contracts with foundations for grants, recoverable and otherwise; the review of, and comment on, monthly time statements of co-counsel requested by Ms. Cobell as lead plaintiff (when provided); the negotiation, drafting, review, and revision of, and comment on, engagement letters proposed by consulting and non-consulting experts, contractors, and co-counsel, as well as the review of, and comment on, invoices submitted by consulting and non-consulting experts, and contractors; and from time to time, discussions with co-counsel regarding actual and potential conflicts of interest, similar ethical and internal issues, as well as the resolution of each such issue, <u>e.g.</u>, hiring, firing, independent review, and, where appropriate, replacement of personnel; and travel time related to the prosecution of this case, including site visits with the government and special master, deposition defense and other discovery, fund raising to pay for experts and consultants, and class communications.

25.  I have not modified or otherwise manipulated my time to conform my entries to those of co-counsel, Mr. Rempel, or others.  Differences with respect to individuals identified and time recorded by experts, specialists, consultants, co-counsel, and me during conference calls, in meetings or on various matters may reflect differences in the amount of time each person had participated in such calls, meetings, or matters.  For example, from time to time, participants would join conference calls and meetings in progress and withdraw from conference calls and meetings prior to their conclusion.  Such withdrawals would be announced or unannounced.  Other differences may reflect an inadvertent omission to record time in whole or part due to a particularly heavy work-load at the time, which required immediate attendance in meetings or required an immediate refocus on the preparation, review and revision of multiple trial and

appellate briefs.  Still other differences may reflect the fact that individuals on conference calls did not always identify themselves or otherwise participate in such calls.

I declare under penalty of perjury that the foregoing is true and correct this 21st day of January 2011.

/s/ Dennis M. Gingold<br>
 DENNIS M. GINGOLD