**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| ELOUISE PEPION COBELL, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| v. | ) | No. 1:96CV01285(TFH) |
| | ) | |
| KEN SALAZAR, Secretary of | ) | |
| the Interior, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF CLASS REPRESENTATIVES'**
**PETITION FOR INCENTIVE AWARDS AND EXPENSES**

Class Representatives, Elouise Cobell, James Louis LaRose, Thomas Maulson, and

Penny Cleghorn, hereby petition this Court for incentive awards, expenses, and costs incurred in

the litigation of this matter through December 7, 2009.

**Introduction**

The United States created the Individual Indian Money Trust over a hundred years ago

and it has "been mismanaged nearly as long." *Cobell v. Norton (Cobell VI)*, 240 F.3d 1081,

1086 (D.C. Cir. 2001). But individual Indian Trust beneficiaries, abused by the federal

government's repeated and continuing breaches of trust, did not realize any measure of justice

until this year, fifteen years after five Indians "found it in themselves to stand up, draw a line in

the sand, and tell the government: Enough is enough--this far and no further." *Cobell v. Norton*,

229 F.R.D. 5, 23 (D.D.C. 2005), *vacated*, *Cobell v. Kempthorne*, 455 F.3d 317 (D.C. Cir. 2006).

Elouise Cobell, James Louis LaRose, Thomas Maulson, and Mildred Cleghorn,[1] the four

---

[1] Earl Old Person, a named plaintiff in the original complaint, was removed by order entered on
March 5, 2003 [Dkt. No. 1864]. On February 4, 1997, this Court certified a "plaintiff class

remaining Class Representatives, have dedicated substantial time and effort in the prosecution of this highly publicized and crucially important individual Indian Trust case against the federal government, which involves hundreds of billions of dollars of assets that are held in trust by the United States for the benefit of approximately 500,000 of the most vulnerable citizens of this country.

For generations, government officials knew exactly what they were doing to individual Indians.  As early as 1915, Congress reported that "[t]he Government itself owes many millions of dollars for Indian moneys which it has converted to its own use," and that government officials, trustee-delegates of the United States, did "not know what is the present condition of the Indian funds in their keeping."[2]  Congress further reported that the Individual Indian Trust ("IIM Trust") is a broken trust, riddled with "fraud, corruption and institutional incompetence almost beyond the possibility of comprehension."[3]

The abuse never stopped, causing a Senate Select Committee on Indian Affairs to report in 1989 that there still existed "fraud, corruption and mismanagement pervading the institutions that are supposed to serve American Indians"[4] and a House Committee to report in 1992 that defendants continued to ignore many congressional directives aimed at encouraging Interior to

---

consisting of present and former beneficiaries of Individual Indian Money accounts (exclusive of those who prior to the filing of the Complaint herein had filed actions on their own behalf alleging claims included in the Complaint);" approved the Named Plaintiffs as representatives of the class; and approved class counsel.  *See* Order Certifying Class Action [Dkt. No. 27].  Mildred Cleghorn passed away in 1998 and was replaced by her daughter, Penny.

[2] Bureau of Mun. Research, 63rd Cong., *Report to the Joint Commission to Investigate Indian Affairs: Business and Accounting Methods Employed in the Administration of the Office of Indian Affairs* 2 (Comm. Print 1915).

[3] *Id.*

[4] *A Report of the Special Committee on Investigations of the Select Committee on Indian Affairs,* S. Rep. No. 101-216, at 4-5 (1989).

correct IIM Trust management practices.[5]  Still, nothing was done; the abuse continued.  New reports issued by various government entities and private auditors identified ongoing, severe failures of the trust management and accounting system.  "The General Accounting Office, Interior Department Inspector General, and Office of Management and Budget, among others, have all condemned the mismanagement of the IIM trust accounts over the past twenty years." *Cobell VI*, 240 F.3d at 1089.  Again, nothing was done.

Nothing changed until the Class Representatives, led by Ms. Cobell, filed a complaint on June 10, 1996, in the U.S. District Court for the District of Columbia on behalf of themselves and all other individual Indian Trust beneficiaries, alleging that the federal government had breached its fiduciary obligations and asking this Court to enforce trust duties owed by the United States.

Class Representatives persevered through more than fourteen years of uniquely hostile litigation and accomplished that which Congress could not do and the Attorney General would not do – enforce the laws of this country and achieve a "stunning victory" for individual Indian Trust beneficiaries, who are one of the most discrete and insular minorities in this nation.  *Cobell v. Babbitt* (*Cobell V*), 91 F. Supp. 2d 1, 57 (D.D.C. 1999), *aff'd, Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001).

On December 21, 1999, for the first time in history, this Court held the federal government accountable and liable for gross neglect and mismanagement.  It found the Secretary of Interior and the Secretary of the Treasury in breach of trust duties the United States owes to class members and ordered the Interior and Treasury defendants to account for all items of the IIM Trust.  *Id.* at 58.  But Ms. Cobell and her fellow Class Representatives did not stop.  They

---

[5] *Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund,* H.R. Rep. No. 102-499, at 2-5 (1992).

fought on and would not yield, notwithstanding puzzling reversals of this Court's landmark decisions, the removal of the presiding trial judge, and the vacatur of a restitutionary award of $455.6 million without providing guidance to this Court on the application of governing law.

Finally, the commitment of Ms. Cobell and her fellow Class Representatives bore fruit. They caused the government to begin major reform of its broken trust management systems, secured a settlement that provides over $3.4 billion in monetary recovery to class members, established an educational scholarship fund for Indian children, and built a sound foundation for continuing reform. Most importantly, the Class Representatives have established precedent that will enable future aggrieved IIM Trust beneficiaries to enforce trust duties they are owed. Individual Indians no longer must accept, suffer, and endure lifetimes of unconscionable abuse.

## ARGUMENT

### I.      Each Class Representative is Entitled to and Has Earned an Incentive Award

This Court frequently has approved incentive awards to named plaintiffs in class action litigation, "particularly where a common fund has been created for the benefit of the entire class." *In re Lorazepam & Clorazepate Antitrust Litig.*, No. MDL 1290(TFH), 2003 WL 22037741, at *10 (D.D.C. June 16, 2003). Indeed, "[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002) (citations and internal quotation marks omitted); *see also Wells v. Allstate Ins. Co.*, 557 F. Supp. 2d 1, 8 (D.D.C. 2008); *Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*, 246 F.R.D. 349, 365 (D.D.C. 2007). "In deciding whether to grant incentive awards and the amounts of such awards, courts consider factors such as the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those

actions, and the amount of time and effort the plaintiff expended in pursuing the litigation."
*Wells*, 557 F. Supp. 2d at 8-9 (quoting *Lorazepam*, 2003 WL 22037741, at *10) (internal
quotation marks omitted).   Other federal district courts have looked to the same factors when
assessing the reasonableness of an incentive award, *i.e.,* the services named plaintiffs have
provided and the risks they have assumed in the course of the litigation.  *See, e.g., Allapattah
Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006); *Ingram v. Coca-Cola
Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145
(E.D. Pa. 2000).

Here, each of those factors is satisfied.  In accordance with controlling law, each Class
Representative is entitled to a substantial incentive award because he or she has "protect[ed] the
interests of the class [and] the degree to which the class[es] ha[ve] benefitted" is upwards of $9
billion.  *Wells*, 557 F. Supp. 2d at 8-9.  Plaintiffs' Fee Petition, filed contemporaneously,
describes intangible and tangible benefits that result from this litigation.  There is no doubt that
extraordinary tangible benefits have been conferred on class members as a result of the efforts of
the Class Representatives who prosecuted this suit.  But for this litigation, the government would
continue to disregard its trust duties, there would be no trust reform, there would be no land
consolidation, there would be no multi-billion dollar monetary recovery, and there would be no
scholarship fund.  Simply put, the elderly and infirm as well as Indian children would continue to
suffer the same abuse that generations of individual Indians have suffered for more than a
century.

But the success achieved by Ms. Cobell and other class representatives has come at a
high cost.  It was extremely difficult to overcome "the longstanding inability or unwillingness of
government officials to discharge their fiduciary obligations."  *Cobell VI*, 240 F.3d at 1109.  In

part, that explains why this litigation has continued for fifteen years and why there have been more than 3,600 docket entries in this Court, 250 days of hearings and trials, and ten interlocutory appeals.  With respect to the benefits conferred on class members, this Court itself has recognized that the benefits are historic and extend beyond mere financial recovery, *e.g.,* that "the present and future reliability of the Indian trust system [has been] greatly increased."  *Cobell v. Kempthorne* (*Cobell XXI*), 569 F. Supp. 2d 223, 253 (D.D.C. 2008), *vacated*, *Cobell v. Salazar*, 573 F.3d 808 (D.C. Cir. 2009).  Solely as a result of this litigation, the government has invested at least $4.8 billion in trust reform, *see* Ex. 1, Budget Report to Congress at OST-20, which has resulted in "substantial improvements in the administration of the trust."  *Cobell v. Kempthorne (Cobell XX)*, 532 F. Supp. 2d 37, 86 (D.D.C. 2008), *vacated, Cobell v. Salazar*, 573 F.3d 808 (D.C. Cir. 2009).  Defendants themselves have explained that the "investments have allowed Interior to better meet fiduciary trust responsibilities, provide greater accountability at every level, and operate with staff trained in the principles of fiduciary trust management."  Budget Report to Congress at OST-20.  That those investments were made solely as a result of this litigation cannot be questioned—the Trust Reform Act was enacted in 1994, but trust reform investments did not begin until 1996, the year this litigation commenced.[6]

An intangible collateral benefit of the settlement is some comfort that prudent trust management may become a reality, *e.g.,* Secretary Salazar, in accordance with the Settlement Agreement, established a Secretarial Commission to provide guidance in prudent trust management.  Plainly, that which the Class Representatives have accomplished in this landmark litigation serves to "protect the interests of the class."  *Wells*, 557 F. Supp. 2d at 8-9.  The relief obtained for class members has never been exceeded in this Circuit.

---

[6] "From 1996 through 2009, the Department will have invested $4.8 billion in the management, reform, and improvement of Indian trust programs."  Budget Report to Congress at OST-20.

That class members have and will continue to reap the benefits of trust reform cannot be overstated.  The history of the IIM Trust is replete with evidence of loss, dissipation, theft, and wrongful withholding of trust funds and other trust assets.  What was once a Trust corpus consisting of about 54 million acres of individual Indian land, subsurface rights, and other valuable natural resources, today comprises only about 11 million acres of IIM Trust land.  The United States has never provided an explanation for the loss of over 40 million acres, other than to say that "if it's not there you have to speculate …."[7]  Likewise, income from the government's sale and lease of such resources is unaccounted for.

Yet, Congress did nothing until 1994 when it passed the Indian Trust Fund Management Reform Act, which reaffirmed trust duties owed by the United States and commanded Interior to provide an historical accounting to trust beneficiaries, *see* 25 U.S.C. § 4011(a) (2010), and to reform the broken Trust system so the Secretary would "proper[ly] discharge … trust responsibilities to … individual Indians," 25 U.S.C. § 4041(3) (2010).

But, words standing alone, whether framed by Congress or anyone else, continued to mean nothing to defendants, not the Trust Reform Act, not speeches in Congress, not pithy proclamations of trustee-delegates – nothing.  It is this litigation alone that has "greatly increased" the "present and future reliability of the Indian trust system."  *Cobell XXI*, 569 F. Supp. 2d at 253.  Thus, the Class Representatives' collective efforts have introduced trust reform to a bankrupt Trust management system, protected the interests of the class, and secured $9 billion worth of tangible benefits for class members they represent.

In accordance with controlling law, it is proper for this Court to recognize and reward their efforts, as such reward "creates the proper incentives for individuals to come forward and

---

[7] Ex. 2, 12/18/02 Bert Edwards Dep. Tr. at 276-77.

undertake the arduous efforts needed to challenge [pervasive breaches of trust] on a class-wide level." *Ingram*, 200 F.R.D. at 694.

The amount to which each Class Representative is entitled varies, however, because each representative dedicated a different "amount of time and effort … in pursuing the litigation." *Wells*, 557 F. Supp. 2d at 9.  Nonetheless, each amount requested is reasonable given the time and effort expended.  Most importantly, in aggregate, the proposed incentive awards fall well below the percentage that this Court has found to be reasonable.  Specifically, this Court has determined that awards totaling 0.2% and 0.3% of the total fund or funds are reasonable.  *In re Lorazepam*, 2003 WL 22037741, at *11; *see also In re Lorazepam*, 205 F.R.D. at 400 ("The aggregate incentive awards respectively represent approximately 0.3% of each class's recovery.").  Here, the requested aggregate incentive awards total $2.5 million, which represents between 0.07% and 0.08% of the $3.4 billion monetary fund created, an amount that is less than one-fourth of the percentage in *In re Lorazepam*.

### A.     Elouise Cobell is entitled to an incentive award of $2,000,000

In prosecuting this case for fifteen difficult years, Ms. Cobell expended considerable time and her own money, and she assumed significant reputational risk.  Uniquely, she met each challenge and, as a result, has provided hope to class members who otherwise would have no hope.  In the history of the United States, no single person – no President, no Senator, no tribal leader – has accomplished more for individual Indians than Ms. Cobell, a Blackfeet Indian from Browning, Montana.  In the course of these proceedings, she assumed great responsibilities, burdens, and risks, but the burden and stress of carrying the hopes and dreams of more than 500,000 people can never be quantified.

For "services [she] provided and the risks [she] incurred during the course of th[is] class action litigation," Ms. Cobell is entitled to a substantial incentive award. *In re Lorazepam*, 205 F.R.D. at 400. Indeed, of the over fifty mega-fund cases that federal courts have resolved, only one case – *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) – involved class representatives who played roles nearly as meaningful as the role played by Ms. Cobell. But no class representative has done so much for so many class members against a defendant with unlimited resources. Even Exxon's financial and legal resources pale in comparison to the resources of the United States government.

In *Allapattah*, nine class representatives brought an action, which alleged that Exxon breached contractual obligations to dealers by failing to offset credit charges with wholesale gasoline price reductions. 454 F. Supp. 2d at 1193. That case lasted fourteen years, and involved two trials and one appeal that reached the Supreme Court. *Id.* at 1193-95. It was settled for $1.075 billion. *Id.* at 1197. In justifying an incentive award of $1.76 million to each of the nine class representatives – incentive awards that in aggregate total $15.9 million and are 1.5% of the total common fund – the district court noted that "it is fair to say that nearly all federal class actions end by dismissal, summary judgment, or settlement. Few are resolved by trial. Fewer still are decided by an appellate court." *Id.* at 1193. The court went on to explain that class representatives are entitled to a significant incentive award because they showed "unusual courage and commitment," "made personal contributions to defray [litigation] costs, and promised to help collect money" to cover costs. *Id.* at 1220. Finally, the court agreed with class representatives that "their service sets the standard that may one day be equaled but which can never be bested." *Id.*

Here, it is fair to say that the contributions of Ms. Cobell "best" the *Allapattah* class representatives' service.  For over fifteen years, Ms. Cobell worked closely with Class Counsel to frame the case and prosecute this litigation.  She made every important strategic and political decision and participated in every major legal decision in this case.  At all times, she has provided leadership and steady guidance.  Ex. 3, Cobell Aff. ¶¶ 12, 14.  Further, Ms. Cobell personally contributed almost $390,000.00 to fund the case, *id.* ¶ 20, and she travelled the country raising funds to support the litigation.  *Id.* ¶¶ 18-19.  Indeed, her dedication to this cause never wavered.  Prior to the filing of this action in equity, Ms. Cobell spent over twenty years of her life trying to reform the broken trust system.  *Id.* ¶ 10.

In addition to a financial risk, Ms. Cobell assumed considerable reputational risk by bringing this action in her name.  Universally, this case is referred to as the *Cobell* litigation, meaning that all filings and news reports as well as every success or disappointment refers to Ms. Cobell, herself.  *Id.* ¶¶ 26-27.  That has allowed critics, within and outside the government, publicly to blame Ms. Cobell for many problems in Indian Country that continue to be caused by government failures, including Interior's failure to discharge its trust duties.  *Id.* ¶ 28.  Moreover, Ms. Cobell has been a victim of retaliation from the government for initiating and maintaining this lawsuit.  *Id.*  The reputational risk assumed by Ms. Cobell is magnified by the discrete and insular nature of Indian Country, *id.* ¶ 27, and the potential for long-term irreparable reputation damage.  *Id.* ¶ 29.

Finally, as in *Allapattah*, this is not a case commenced by attorneys who "recruit[ed] plaintiffs to serve as 'figureheads'" for a suit that could be filed and settled quickly.  454 F. Supp. 2d at 1220.  Rather, Ms. Cobell "brought [Interior's] breach to the attention of the lawyers."  *Id.*; Cobell Aff. ¶ 15.  She "select[ed] … trial counsel, communicat[ed] with the Class,

… participat[ed] in decision-making about how to conduct" and settle the case. *Allapattah*, 454 F. Supp. 2d at 1220; Cobell Aff. ¶¶ 12-15. She is the genuine article.

Ms. Cobell devoted between 500 and 1,200 hours each year as the lead plaintiff and has been the steady driving force behind this action. Cobell Aff. ¶ 13. During the many hearings and trials in this case, she frequently travelled to Washington, D.C. to be in the courtroom and discuss strategy with Class Counsel. *Id.* ¶ 23. Also, she travelled to Washington, D.C. to attend almost every round of settlement negotiations, including the eight failed settlement attempts as well as negotiations that ultimately resulted in the resolution of this case. *Id.* In addition to her frequent travel and the time spent understanding the complex legal and political issues, Ms. Cobell spoke regularly with media and class members, travelling throughout Indian Country to ensure accurate class communications. *Id.* ¶¶ 21-22. At the same time, she maintained her job as a community developer and banker, chairing the Native American Bank, and assisted her husband in running their cattle ranch, extraordinary assistance that included the donation of a kidney in 2004 to keep him alive. *Id.* ¶¶ 24-25. Still, she persisted.

As the *Allapattah* court explained, classes "are better served when they are presented by vigilant, competent and independent class representatives who actively monitor class counsel and the conduct of the litigation." 454 F. Supp. 2d at 1221. Further, failing to reward class representatives for their efforts and the risks they assumed would disincentivize class representatives from actively representing interests of class members and "negat[e] the 'adequate representation' safeguard of Rule 23 and transfer[] all decision-making responsibility to counsel." *Id.* at 1222.

Simply put, there would have been no funding for experts and consultants without Ms. Cobell. Individuals would have obtained no relief without Ms. Cobell. There would be no case

without Ms. Cobell.  Here, Ms. Cobell has "proved [her] fidelity to the Class over more than a decade of fiercely-defended litigation," *id.* at 1221, and she has earned an incentive award of $2,000,000.00.

### B.      Louis LaRose is entitled to an incentive award of $200,000

Louis LaRose, an enrolled member and recognized leader of the Winnebago Tribe and in Indian affairs, has contributed time and effort into the prosecution of this action in equity and, accordingly, is entitled to an incentive award.  Ex. 4, LaRose Aff. ¶¶ 2-3.  During the litigation, Mr. LaRose discussed key litigation issues with Class Counsel and participated in the decision-making process.  *Id.* ¶ 4.  Among other things, Mr. LaRose was deposed by the government and he attended a number of hearings and settlement negotiations in Washington, D.C.  *Id.*  To help facilitate class communications in Indian country, Mr. LaRose worked with Class Counsel to coordinate and arrange regional media programs and attend community meetings.  *Id.* ¶ 5.  Further, since settlement was announced and Congress became the next critical venue, Mr. LaRose maintained regular communications with the Nebraska congressional delegation to garner and maintain support for this settlement in a difficult political climate, support that proved to be crucial because unanimous consent was necessary in the Senate.  *Id.* ¶ 6.

Mr. LaRose also placed his distinguished reputation of leadership on the line by serving as a named plaintiff.  *Id.* ¶¶ 7-10.  At the outset of the litigation, most observers viewed the case as impossible.  Mr. LaRose's position as a tribal leader was nearly compromised by his role as a named plaintiff.  *Id.* ¶¶ 8-9.  His tribe, the Winnebago Tribe, was ordered to produce individual Indian Trust documents that it held under contract with Interior to administer certain IIM Trust functions; however, the Tribe resisted production because the government failed to explain why

such discovery had been ordered by a Washington, D.C. federal court.  The order was viewed as an attack on tribal sovereignty.

    As a result, some in the Tribe questioned Mr. LaRose's motives and loyalty and his role as a named plaintiff.  The general distrust of the government in Indian communities nearly evolved into a personal distrust of Mr. LaRose.  *Id.*  While Mr. LaRose ultimately helped resolve hostilities, the events and related turmoil made it clear that his reputation was at considerable risk as long as he remained a Class Representative.  *Id.* ¶ 9.  Inherent conflicts and tensions that exist between tribes and individual Indians were underscored at Winnebago.  But, Mr. LaRose never wavered.

    New concerns surfaced after settlement was announcement by the President.  Among other things, in April 2010, Mr. LaRose, Ms. Cobell, Class Counsel, Secretary Salazar, and others received certified letters from "Lakota elders," accusing Mr. LaRose and everyone else of "seditious conspiracy" and threatening  "injury [or] damage."  *Id.* ¶ 10.  Lakota elders and others in the Dakotas remain disturbed about the resolution of their Black Hills litigation, which failed to recover their sacred lands.  Unlike Secretary Salazar, other government officials, and Class Counsel, Mr. LaRose lives in Indian Country.  Based on the proximity of the Lakota elders, he took their threat seriously, *id.*, and remains concerned.

    Thus, Mr. LaRose has placed his reputation and his family's well-being at risk by remaining a class representative.  But, he has not wavered.  Plainly, because of the extraordinary "services [he] provided and the risks [he] incurred during the course of th[is] class action litigation," he has earned an incentive award of $200,000.  *In re Lorazepam*, 205 F.R.D. at 400. This amount requested is fair and reasonable, considering the benefits conferred on the plaintiff classes as a result of Mr. LaRose's steadfast efforts.

### C.       Thomas Maulson is entitled to an incentive award of $150,000

Thomas Maulson, the past and present leader of the Lac du Flambeau Tribe, contributed time and effort in the prosecution of this action, and, accordingly, is entitled to an incentive award.  Ex. 5, Maulson Aff. ¶¶ 2-4.  During the litigation, Mr. Maulson discussed key litigation issues with Class Counsel, including whether to pursue settlement discussions with the government.  *Id.* ¶ 4.  In addition, he was deposed by the government in Washington, D.C.  *Id.*

Mr. Maulson assumed significant reputational risk by being a class representative.  He greatly values his reputation, which is notable as he is a recognized Indian leader in regional and national affairs, including natural resources protection.  *Id.* ¶¶ 3, 5.  His reputation had been in jeopardy by serving as a Class Representative, and, at various times during the litigation, particularly when it commenced and during various controversial periods, Mr. Maulson was confronted—a risk that he accepted with some trepidation.  For example, Mr. Maulson has received troubling calls from anonymous critics, questioning the value of the litigation and his motivation and loyalty.  Notwithstanding, his support for the case never wavered.  *Id.* ¶ 6.

Accordingly, because of the "services [he] provided and the risks [he] incurred during the course of th[is] class action litigation," Mr. Maulson is entitled to an incentive award of $150,000.  *In re Lorazepam*, 205 F.R.D. at 400 (D.D.C. 2002).  This amount is fair and reasonable given the extraordinary benefits conferred on class members as a result of Mr. Maulson's steadfast efforts.

### D.       Penny Cleghorn is entitled to an incentive award of $150,000

Penny Cleghorn, the daughter of Mildred Cleghorn, an original named plaintiff who was born in a prisoner of war camp, also contributed time and effort in the prosecution of this action, and, accordingly, is entitled to an appropriate incentive award.  Ex. 6, Cleghorn Aff. ¶ 2.

Following her mother's death in April 1997, Penny Cleghorn assumed Mildred's position as Class Representative.  The government deposed Ms. Cleghorn in Washington, D.C., and she attended a district court hearing.  *Id.* ¶ 4.  Moreover, Ms. Cleghorn communicated with Class Counsel to receive updates on the litigation and to stay informed about the status of settlement discussions.  *Id.*  She also participated in strategic decisions.  *Id.*

What is more, Ms. Cleghorn assumed significant professional and reputational risks by being a class representative.  Shortly after she replaced her mother as a Class Representative, Interior retaliated against her for assuming her deceased mother's role.  *Id.* ¶¶ 5-6.  Specifically, Interior informed her that she would lose her job at the Riverside Indian School, a school operated by Interior.  *Id.* ¶ 5.  Class Counsel intervened, and, with the aid of other attorneys, saved Ms. Cleghorn's job.  Nonetheless, her temporary displacement forced her to assess the precarious situation that existed because the Interior Department plays a dominant role in the area of her specialization—Indian education.  Nonetheless, she understood the importance of this case and accepted the risk of further retaliation.  Her support for this case has never wavered.

Finally, Ms. Cleghorn also faced another risk as class representative.  In April 2010, she, too, received a certified letter from Lakota elders, accusing her of "seditious conspiracy" against the government and threatening her with "injury [or] damage."  *Id.* ¶ 7.  Like Messrs. LaRose and Maulson, Ms. Cleghorn took those threats very seriously.  *Id.*  Yet, she remained committed to this case.

Accordingly, because of "services [she] provided and the risks [she] incurred during the course of th[is] class action litigation," Ms. Cleghorn is entitled to an incentive award of $150,000.  *In re Lorazepam*, 205 F.R.D. at 400.  This amount is reasonable given the benefits conferred on class members as a result of her efforts.

**II.      Class Representatives May Recover Litigation Expenses and Costs**

The Settlement Agreement expressly authorizes Class Representatives to petition for the recovery of expenses and costs related to this litigation, litigation that could not have been filed and prosecuted without such funding.[8]   Generally, in accordance with the "American Rule," each party to litigation must bear its own expenses.  *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993).   However, courts recognize several exceptions to the general rule, one of which is the "common fund" doctrine.  *Id.*  In accordance with controlling law, a party litigant who recovers a common fund or funds for the benefit of persons other than herself is entitled "to be reimbursed from that fund for litigation expenses incurred."  *Id.*  Permitting a litigant to recoup incurred expenses prevents beneficiaries of a common fund from being "unjustly enriched" by the efforts of class representatives.  *Id.*  As the Supreme Court explained, "[t]he doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

Here, Ms. Cobell has incurred significant litigation expenses and costs in prosecuting this action.  The expenses and costs as stated below have been incurred by her in the prosecution of this case.  Key persons and organizations that have provided professional services in support of this litigation have executed affidavits that attest to the validity of their time, expense, and cost. In accordance with controlling law and the terms of settlement, Ms. Cobell is entitled to recover all such expenses.[9]  *See, e.g., Swedish Hosp. Corp.*, 1 F.3d at 1265.  Failing to reimburse Class Representatives for their expenses would unjustly enrich absent class members who have not

---

[8] Settlement Agreement § K.2.

[9] Section K.1 of the Settlement Agreement specifically provides that Class Representatives may petition this Court to be reimbursed for "expenses and costs that were not paid for by attorneys."

contributed to the prosecution of this action, but stand to reap tangible benefits from its successful resolution. *Id.*; *accord Boeing*, 444 U.S. at 478. The litigation expenses and costs for which the Class Representatives seek reimbursement total $10,556,274.59:

| | |
|---|---|
| Blackfeet Development Fund | $6,612,099.02 |
| Indian Land Tenure Foundation | $   496,393.00 |
| CRA | $1,037,586.97 |
| PricewaterhouseCoopers | $2,220,195.60 |
| RSH Consulting | $   190,000.00 |

## A.    Blackfeet Reservation Development Fund expenses

The Blackfeet Reservation Development Fund ("BRDF") is a non-profit organization, of which Ms. Cobell is a director. It has supported this litigation since before it was filed on June 10, 1996. Ex. 7, BRDF Aff. at ¶1. As detailed in the attached affidavit and confirmed by underlying invoices, BRDF has actively supported this litigation by contracting with non-testifying and testifying experts; directing class communication outreach efforts to inform and update the class members; coordinating Ms. Cobell's travel to and from Washington, D.C. for trials, hearings, oral arguments, and meetings with members of Congress, as well as her travel throughout Indian Country to meet with class members; and, critically, by paying litigation costs, including deposition, trial and appellate transcripts, and printing costs. BRDF Aff. ¶¶ 2-4. Further, only BRDF expenses that are relevant to this litigation are submitted for reimbursement. *Id.* ¶¶ 5-6. Invoices for all of BRDF's expenses are submitted with this filing in paper form pursuant to L.Civ.R. 5.4(e)(1).

B.      **Indian Land Tenure Foundation expenses**

Another organization, the Indian Land Tenure Foundation ("ILTF"), has lent financial

support to the prosecution of this case.  ILTF is important to Indian country and it has paid the

fees of certain non-testifying and testifying experts and travel costs to ensure that fact witnesses

were able to provide important testimony to this Court.  Ex. 8, ILTF Aff. ¶ 3.  Costs and

expenses paid by ILTF were incurred principally during the 2007 trial to assess whether and the

extent to which Interior is required to perform an historical accounting.  *Id.* ¶ 4.  All invoices

supporting ILTF's expenses are attached to the ILTF affidavit.

C.      **CRA expenses**

Class Representatives also request reimbursement of $1,037,586.97 for professional

services provided by CRA (Charles River Associates) International, Inc. ("CRA").  CRA's time,

fees, and costs are detailed and attested to in the attached affidavit of John I. Hirshleifer, Vice

President of CRA.  Plaintiffs engaged CRA on March 6, 2008, to prepare for and testify in the

2008 "throughput" trial.  CRA helped prepare analyses, models, and documents to estimate the

total benefit conferred on the government when it failed to disburse funds owed to Trust

beneficiaries since the inception of the Trust in 1887.  Ex. 9, Hirshleifer Aff. ¶¶ 6-7.  The model,

which CRA testified to at trial, constituted Plaintiffs' effort to estimate the amount of money

owed as restitution and equitable disgorgement in the absence of an accounting.  *Id.*  CRA also

assisted Class Counsel in responding to defendants' "throughput" models and providing rebuttal

testimony.  *Id.* ¶ 7.

D.      **PricewaterhouseCoopers expenses**

Class Representatives request reimbursement of $2,220,195.60[10] for professional services provided by PricewaterhouseCoopers ("PwC"), which provided statistical and analytical consulting services to support this litigation. The attached affidavit of Jessica Pollner, a PwC Principal, details and attests to PwC's time, fees, and costs.[11] It also provides a detailed history of PwC's contribution to this litigation. Ex. 10, Pollner Aff. ¶¶ 5-28. Briefly, Plaintiffs engaged PwC in June 1996 to perform data analysis on the transactional record of the IIM Trust. *Id.* ¶ 5. Because the government either did not have or did not provide the data necessary to analyze the IIM Trust, PwC also researched and developed an alternative method of analyzing the transactional history of the IIM Trust. *Id.* ¶ 27. All of the work performed by PwC was in furtherance of Plaintiffs' prosecution of this action in equity.

### E.  RSH Consulting expenses

Finally, Class Representatives also request reimbursement of $190,000.00 for professional services provided by RSH Consulting ("RSH"). The attached affidavit of Robert Holmes, the president of RSH, attests to RSH's time, efforts, and fees. RSH provided consulting services to Plaintiffs from August 2003 until October 2006. Ex. 11, Holmes Aff. ¶ 2. During this period of time, RSH worked to inform and educate members of Congress, their staff, various congressional committees, and subcommittees with jurisdiction over the litigation, about the legal principles underlying this action in equity. RSH primarily assisted Plaintiffs in working

---

[10] Expenses incurred by Plaintiffs for the services of PricewaterhouseCoopers total $4,752,034.00. Pollner Aff. ¶ 36. However, Plaintiffs seek reimbursement of only $2,220,195.60 because this Court, on December 19, 2005, awarded plaintiffs $2,531,838.40 for time and charges associated with certain professional services provided by PricewaterhouseCoopers. *Cobell v. Norton*, 407 F. Supp. 2d 140 (D.D.C. 2005).

[11] This Court has previously entered protective orders covering the information contained in the exhibits to the PwC affidavit. Accordingly, Plaintiffs filed a motion to file the PwC exhibits under seal contemporaneously with this filing.

with congressional members, committees, and staff to hold hearings on this litigation relating to settlement discussions.  *Id.* ¶¶ 3-7.

## CONCLUSION

In accordance with controlling law, the terms of settlement, and for the reasons stated above, Plaintiffs respectfully request that this Court grant this petition for Class Representative incentive awards, expenses, and costs in the amount of $13,056,274.59.

Respectfully submitted,

/s/ Dennis M. Gingold
DENNIS M. GINGOLD
D.C. Bar No. 417748
607 14th Street, N.W., 9th Floor
Washington, D.C. 20005
(202) 824-1448

/s/ Keith M. Harper
KEITH M. HARPER
D.C. Bar No. 451956
JUSTIN GUILDER
D.C. Bar No. 979208
KILPATRICK TOWNSEND LLP
607 14th Street, N.W.
Washington, D.C.  20005
(202) 508-5844

DAVID COVENTRY SMITH
N.C. Bar No. 12558
Admitted *Pro Hac Vice*
KILPATRICK TOWNSEND LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
(336) 607-7392

WILLIAM E. DORRIS
Georgia Bar No. 225987
Admitted *Pro Hac Vice*
ELLIOTT LEVITAS
D.C. Bar No. 384758

KILPATRICK TOWNSEND LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309
404-815-6500

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing PLAINTIFFS' PETITION FOR CLASS COUNSEL'S FEES, EXPENSES AND COSTS THROUGH SETTLEMENT was served on the following via facsimile, pursuant to agreement, on this day, January 25, 2011.

>Earl Old Person (*Pro se*)
>Blackfeet Tribe
>P.O. Box 850
>Browning, MT 59417
>406.338.7530 (fax)

>/s/ Shawn Chick