Bert T. Edwards                                                      December 18, 2002
                           Washington, D.C.

                                                                           Page 1

 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF COLUMBIA
 3     - - - - - - - - - - - - - - x
 4     ELOUISE PEPION COBELL,       :
 5       et al.,      :   Case No.
 6              Plaintiffs,    :   1:96CV01285
 7         v.                  :   (Judge Lamberth)
 8     GALE NORTON, Secretary of :
 9       the Interior, et al.,   :
10              Defendants.    :
11     - - - - - - - - - - - - - - x
12                          Washington, D.C.
13                          Wednesday, December 18, 2002
14              Deposition of BERT T. EDWARDS, a witness
15     herein, business address 1801 Pennsylvania Avenue,
16     N.W., Suite 400, Washington, D.C., called for
17     examination by counsel for the Plaintiffs in the
18     above-entitled matter, pursuant to notice, the witness
19     having been first duly sworn by MARK T. EGAN, a Notary
20     Public in and for the District of Columbia, taken at
21     the offices of the Native American Rights Fund, fourth
22     floor conference room, 1712 N Street, N.W.,
23     Washington, D.C., commencing at 9:29 a.m. and the
24     proceedings being taken down by Stenomask by MARK T.
25     EGAN, CVR-CM, and transcribed under his direction.

Washington, D.C.

Page 2

```
 1   APPEARANCES:
 2
 3     Special Master Monitor:
 4       JOSEPH S. KIEFFER, ESQ.
 5       420 7th Street, N.W., #705
 6       Washington, D.C.  20004
 7       202-248-9543
 8
 9     On behalf of Plaintiffs:
10       DENNIS M. GINGOLD, ESQ.
11       MARK BROWN, ESQ.
12       GEOFFREY REMPEL, ESQ.
13       Aukamp & Gingold
14       1275 Pennsylvania Avenue, N.W.
15       Ninth Floor
16       Washington, D.C.  20004
17       202-661-6380
18
19       KEITH HARPER, ESQ.
20       MICHELE MITCHELL, Attorney at Law
21       Native American Rights Fund
22       1712 N Street, N.W.
23       Washington, D.C.
24       202-785-4166
25
```

Page 3

```
 1   APPEARANCES:  (Continued)
 2
 3     On behalf of Defendants:
 4       TERRY PETRIE, ESQ.
 5       Civil Division
 6       United States Department of Justice
 7       1100 L Street, N.W.
 8       Room 10146
 9       Washington, D.C.  20530
10       202-307-0267
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                I N D E X
 2   WITNESS          EXAMINATION FOR COUNSEL FOR
 3                    PLAINTIFFS   DEFENDANTS
 4   BERT T. EDWARDS
 5     By Mr. Gingold       6
 6     By Mr. Petrie
 7     By Mr. Gingold
 8
 9
10                EXHIBITS
11   Edwards No.                    Page
12     1    Interior Dept. Report        22
13     2    Cason 7                 181
14     3    Document                197
15     4    Secretarial Order No. 3231   263
16     5    Preparation             311
17     6    Declaration of Bert Edwards
18          11/26/01                331
19     7    Memorandum to Kenneth Ballen from
20          Colin C. Carriere, Alan Fedman,
21          Jack Kearns - December 27, 1988
22          Update Regarding Natural
23          Resources Investigation     350
24
25
```

Page 5

```
 1            P R O C E E D I N G S
 2         MR. GINGOLD:  On the record.
 3         MR. PETRIE:  I'd like to state two matters
 4   for the record.  One is that we intend to assert our
 5   standing objection, as mentioned at the discovery
 6   conference held on October 18th, that we object to
 7   this deposition because we have contended, and the
 8   Court has not agreed previously about our position
 9   about discovery not being permitted pursuant to the
10   APA.
11         We understand that the Court has previously
12   looked at this differently than us, and at the
13   discovery conference on October 18th this was
14   discussed and we asserted at that time that that would
15   be continue to be a standing objection that we would
16   continue to assert.
17         That's the first matter.  The second matter
18   is that, for two reasons, we will object to questions
19   that inquire of Mr. Edwards' understanding of or what
20   would require him to divulge what the plans will
21   consist of that Interior will submit to the Court on
22   January 6th, to include the deliberations that go into
23   those plans, and forcing Mr. Edwards and Ms. Erwin to
24   be deposed before January the 6th.  And the Court
25   ultimately, as we know, last Friday December 13th
```

Bert T. Edwards                                                                                                   December 18, 2002
Washington, D.C.

Page 274

1  and it turns out those were health centers and schools
2  and the Indians reconveyed the land back for the life
3  of the asset and improvement on it; land that's
4  unleased. And you add that up and it comes to 11
5  million.
6      I looked at a different report prepared by
7  a different part of Interior and it was the same
8  number down to the tenth of an acre. And when you
9  have two different parts of Interior producing reports
10 for different purposes and they come down to the same
11 number, again those are the official records of the
12 organization and I have accepted those to be
13 reasonably correct.
14     BY MR. GINGOLD:
15 Q.  Are you aware that there was testimony in
16 court during the contempt trial that the official
17 records are not accurate?
18     MR. PETRIE: With regards to the land
19 holdings, the amount?
20     MR. GINGOLD: Yes, with regard to -- as a
21 matter of fact, you raise a very good question.
22     BY MR. GINGOLD:
23 Q.  Are you aware of Dominic Nessi?
24 A.  I've heard the name, yes.
25 Q.  Are you aware that Dominic Nessi said that

Page 275

1  the official system of records is not consistent with
2  the records that are actually used to determine
3  distributions? Are you aware of that?
4  A.  I know he made some statements. I haven't
5  heard that particular one, but I've heard other
6  statements attributable to him.
7  Q.  Do you know what an official system of
8  records is?
9  A.  I've been to the recorder of deeds in the
10 District of Columbia and the land records of
11 Montgomery County.
12 Q.  I'm asking within the Department of the
13 Interior do you know what an official system of
14 records is?
15 A.  Well, I pretty generally understand how the
16 LTRO's work.
17 Q.  Is there a definition of the term, based on
18 your understanding, "official system of records"?
19 A.  I don't know whether it's defined that way,
20 but if you think you own that land at a particular
21 LTRO you can request all the land titled in your name
22 and the next day they give you the report.
23 Q.  You've seen that? They do that? Are you
24 saying this based on your personal knowledge?
25 A.  I've talked to a number of different people

Page 276

1  and they've assured me that they can do that.
2  Q.  Who told you they do that? What are their
3  names?
4  A.  Bob Baracker, who's the Director of the
5  Southwest Region. And I'm trying to think of the LTRO
6  lady there, whose name escapes me just now. But
7  Baracker is B-a-r-a-c-k-e-r, an unusual spelling of
8  that name. And I can't bring the name of the lady up
9  who is number two or number three in the LTRO.
10 Q.  Now, do you know whether or not the two
11 reports that you read relied on the same information
12 or sources of information for their conclusion on 11
13 million acres?
14 A.  I suspect that they eventually had to get
15 it from some type of a common source. But one was MMS
16 and the other one was one of the BIA reports.
17 Q.  Do you know what happened to 34 million
18 acres of land that were held in trust from 1887
19 through prior to your statement of 11 million acres
20 today? Do you know what happened to 43 million acres
21 of land?
22 A.  A lot of land got taken from the Indians
23 one way or the other. There's no question about that.
24
25 Q.  Do you know what happened to it?

Page 277

1  A.  To each of the 43 million acres?
2  Q.  What happened to 40 million acres?
3  A.  I have no idea what happened. It got
4  overrun, I know, in the Black Hills, which was a large
5  piece of that land.
6  Q.  We're talking Individual Trust land, not
7  tribal land. This case is about Individual. There
8  were 54 million acres of land reportedly held in trust
9  in 1887. You're saying there are 11 million acres
10 today, correct?
11 A.  That's my understanding.
12 Q.  What happened to the other land?
13 A.  It was sold, transferred out of Indian
14 ownership.
15 Q.  Do you know this?
16 A.  No, but if it's not there you have to
17 speculate on what could have happened. And I know
18 land gets sold every day.
19 Q.  Isn't that part of an accounting?
20 A.  The proceeds of it certainly would be.
21 Q.  What about accounting for the assets to
22 determine how much land there is held in trust?
23 A.  I've stated at least three or four times
24 earlier, that issue is under discussion right now and
25 has not been resolved.

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Bert T. Edwards                                                                     December 18, 2002
Washington, D.C.

Page 278

1  Q. Have you hired any professional staff to
2  begin assessing the non-financial assets of the trust?
3  A. If and when we have to do that, we'll bring
4  that expertise on board.
5  Q. Is the answer you haven't done that? You
6  have not hired any?
7  A. I have not hired. First of all, I don't
8  have any money to do it, so even if I wanted to. But
9  if I have to hire an expert, I'll hire an expert.
10 Q. How many experts have you -- what are your
11 human resources needs? Have you assessed your human
12 resources needs in order to assess the non-financial
13 assets of the Individual Indian Trust?
14 A. I have not addressed that problem.
15 Q. Have you been asked to address that
16 problem?
17 A. No.
18 Q. Do you know if anyone is addressing that
19 problem?
20 A. No, I don't.
21 Q. What is your budget today, the Office of
22 Historical Trust Accounting?
23 A. Well, we're on a continuing resolution. We
24 carried about $6 million over. We got $7.5 million
25 last year. So that's what we're spending off. We're

Page 279

1  supposed to get $16.5 million in '03, so it'll be a
2  major bump up. The '04 budget, of course, has not yet
3  been submitted by the President.
4  Q. Have you done a human resources assessment
5  as to what you need to do the full accounting?
6  A. We will have the human resources for the
7  plan that we propose on January 6th. We will have the
8  human resources either in place or contemplated.
9  Q. The human resources in place, actually
10 hired; is that what you mean?
11 A. Well, we have some people hired now. We
12 have a number of consultants. We have five accounting
13 firms. We have two historian firms employed today or
14 tomorrow. By the time I get back, maybe they're
15 hired.
16     We have a geological firm. We have Bank of
17 America. We have a law firm. We have an integration
18 firm, Booz Allen Hamilton. So we do have a wealth of
19 resources available.
20 Q. How many certified public accountants are
21 on your staff today?
22 A. On my staff?
23 Q. Right, other than you, other than you.
24 A. I think there's three: myself -- or two.
25 Myself, Bob Mauri, and I believe Cathy Ramirez is a

Page 280

1  CPA.
2  Q. I believe you testified there's a petroleum
3  expert on staff?
4  A. Not on the staff. It was under contract,
5  Gustafson Associates.
6  Q. How many petroleum experts do you have on
7  staff?
8  A. One, Harold Corley.
9  Q. What is his background, to the best of your
10 recollection?
11 A. He spent most of his entire career -- I'd
12 say Harry's in his late forties -- with MMS, so fairly
13 knowledgeable in minerals. He used to manage all of
14 the offshore leasing at one point.
15 Q. Was he responsible for their systems?
16 A. I doubt if he had systems responsibility.
17 Q. Is he a petroleum engineer?
18 A. What is he?
19 Q. Is he a petroleum engineer?
20 A. I don't know what his undergraduate. I
21 can't recall his undergraduate training. I know he's
22 an Air Force officer and then came into MMS.
23 Q. Does he have experience in trust
24 management, do you know?
25 A. You mean the way Tom Slonaker, Donna Erwin,

Page 281

1  or Paul Homan?
2  Q. No, I mean --
3  A. I suspect not.
4  Q. What type of trust management do you think
5  he has?
6  A. He's the expert on leasing and so forth
7  that I have. He doesn't -- we didn't bring him on
8  board for trust management. When you have just a
9  small number of people, you have people with
10 reasonably defined backgrounds. You can't find a
11 petroleum engineer who's also a CPA or also a vice
12 president of trust operations at a bank. You just
13 don't find those type of people.
14 Q. Is the human resources issue an important
15 issue to you?
16 A. Human resources? If you don't have the
17 horses, you're not going to get the job done.
18 Q. Do you have the horses today?
19 A. I believe I do.
20 Q. Identify exactly who they are and what
21 their backgrounds and experience are for what you're
22 talking about doing?
23 A. Okay. Let me start with myself. I'm a
24 CPA. I spent 34 years in public accounting. My last
25 20 or so years, I was exclusively in the government,