IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELOISE PEPION COBELL, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 96-1285 (TH) |
| | ) |
| KEN SALAZAR, Secretary of the Interior, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## AFFIDAVIT OF JESSICA POLLNER

I, Jessica Pollner, for my affidavit in the above-captioned matter, declare as follows:

1. I am a principal in PricewaterhouseCoopers LLP (PwC) and have been employed by the firm and its predecessor firm, Price Waterhouse LLP (PW), since 1991. I am in the National Economics and Statistics practice, where I provide statistical and analytic consulting services including support for complex disputes and litigation. For the purpose of this affidavit, I will refer to the organization in which I am a principal as "PwC", rather than "PwC and its predecessor firm PW."

2. I am a professional statistician, and received my Ph.D. in statistics from the State University of New York at Buffalo in 1980. My undergraduate training is in mathematics (1973, State University of New York at Buffalo). I received a Master's degree in mathematics (with a specialization in statistics) from Boston University in 1974.

3. In the course of my employment at PwC, I have analyzed large and complex databases; developed sampling plans; extrapolated sample results to the population; and reported on those results. I am familiar with the statistical literature on sample design and evaluation, and have testified on these issues.

4. I provided background on PwC's involvement in this matter in my affidavit dated August 13, 2004; however, for completeness, I will provide that background here as well.

5. Dennis Gingold engaged PwC in this matter on behalf of Plaintiffs in June 1996. My role on this engagement was to oversee the data analysis and anticipated statistical sampling of the Individual Indian Monies (IIM) accountholders. I provided this direction over the entire engagement period. A brief outline of our efforts to obtain the documentation and information necessary to perform an accurate analysis of the Indian accounts, as well as a description of our efforts to work jointly with Defendants' experts follows.

6. From June 1996 through November 1996, PwC's primary tasks were to research and develop a discovery request. This discovery request was ordered on November 27, 1996. As described more thoroughly in Exhibit A, letter to Dennis Gingold dated November 11, 1997, documents and data requested pursuant to this order were not provided in a timely and complete manner.

7. In December 1996, PwC was provided access to the IIM database (covering the period 1985 through 1996) maintained by the Office of Trust Funds Management (OTFM). These data were provided to us on approximately 100 cartridges, and captured information from three files: IITRAN, HISTRAN, and Master. We developed a unified analytic database from these files, which was a critical source of information for this engagement. Defendants indicated that these data were all the data available regarding the IIM accounts. However, as PwC came to find out, these files were missing critical information regarding the IIM accounts. PwC incurred over $450,000 in fees for building and analyzing the OTFM database. As shown on Exhibit AD, these tasks include: Statistical Analysis (Task 005); Database formatting and analysis (Task 006);

Analysis of IIM data by agency (Task 024); OTFM database analysis (Task 029); and Perform summary reporting regional accounts (Task 058).

8. Since the OTFM data were intended to serve as the basis for PwC's statistical sample, PwC would not have proceeded with the extensive analysis of the OTFM database if we had not intended to pursue a statistical sampling approach. Due to the Defendants' inability to provide documents for the five named plaintiffs; the lack of documentation and manuals provided for a number of Bureau of Indian Affairs (BIA)/OTFM systems; the limited data provided during our site visits; and the lack of cooperation from Defendants' experts, we abandoned the statistical sampling approach in July 1998.

9. On February 7, 1997, PwC requested assistance from the Defendants to understand the nuances of the OTFM data (Exhibit B). PwC received a response from Defendants on March 11, 1997 (Exhibit C). The March 11, 1997 response requested examples of certain items. We submitted the requested examples and requested further clarification in a letter dated March 14, 1997 (Exhibit D). The March 14, 1997 letter was re-submitted to Defendants on August 8, 1997 (Exhibit E). No further response on these issues was ever received by PwC.

10. PwC received data and supporting documentation regarding oil and gas transactions for IIM accounts from the Mineral Management Service (MMS). Some of these data were unreadable. As shown in Exhibit F, on February 19, 1997, we requested further documentation regarding the MMS data. As shown in Exhibit G, Defendants' response to this letter in March 1997 suggested a teleconference with MMS to discuss outstanding issues. As shown in Exhibit H, this teleconference took place on March 21, 1997. A further request for MMS documentation was issued on April 1, 1997 (Exhibit I).

11. On February 21, 1997, PwC requested lease and ownership data from the Integrated Records Management System (IRMS) as shown in Exhibit J. This letter also requested a meeting with the BIA and/or Bureau of Land Management (BLM) to further understand the relationship among the various agencies involved with the IIM accountholders.

Defendants' response to this letter from March, 1997 (Exhibit G) neglected to address the IRMS data or answer many of the questions regarding the agencies. As shown in Exhibit K, we again requested the IRMS data on April 17, 1997, and requested information regarding the Land Records Information System (LRIS). The April 17, 1997 letter was re-submitted to Defendants on August 8, 1997 (Exhibit E). The status of these requests as of April 1, 1998 is provided in Exhibit L.

12. PwC formally requested the LRIS data and documentation on December 4, 1997 (Exhibit M). The status of these requests as of April 1, 1998 is provided in Exhibit L. Some LRIS data were ultimately provided, however, we were not able to successfully access these data. PwC incurred almost $175,000 in fees for reviewing the IRMS and LRIS data. As shown in Exhibit AD, these tasks include: Examination of TSR data tapes provided by BIA (Task 011); Review data received from BIA (Task 019); Review data received from BIA and create analytical databases (Task 022); and IRMS database analysis (Task 027). Neither the IRMS nor the LRIS data were ultimately useful due to the lack of documentation produced by Defendants, and the inability of Defendants to provide accessible files. PwC would not have incurred this time had we been aware that documentation would not be available and/or that the data would be unreadable.

13. Due to the limited time frame for which OTFM data were available, on March 3, 1997, PwC requested data for the time period 1972 through 1985 for two regions (Exhibit N). This request was submitted to Defendants once again on August 8, 1997 as shown in Exhibit E. No data were ever provided in response to this request.

14. From the inception of this work, PwC had exchanged insights and observations with Arthur Anderson (AA) professionals concerning the analysis of the OTFM database. At no time from June 1996 through July 1998 had there been any agreement that both PwC (engaged by the Plaintiffs) and AA (engaged by the Defendants) would analyze similarly the database. At best, we hoped for some agreement on a sampling approach. As described below and in more detail in Exhibit A, we had numerous difficulties working jointly with AA to design a statistical sampling plan in a timely manner.

15. On August 7, 1997, we indicated to David Lasater of AA and Lewis Wiener of the Department of Justice that the sampling methodology suggested by AA (in a meeting held in the AA offices in New York) was reasonable. Dr. Lasater indicated that his thoughts were preliminary and the design was not yet complete. As shown in Exhibit O, on September 10, 1997, we issued a letter to Dr. Lasater requesting that PwC and AA jointly finalize the statistical sampling plan at a meeting scheduled for September 18, 1997. Dr. Lasater responded to PwC's letter on September 16, 1997, indicating that AA was not "close" to finalizing a sampling plan (Exhibit P). On September 18, 1997, Dr. Lasater, Mr. Wiener, and other AA staff attended a meeting in the Washington, D.C. PwC offices. At that time, Dr. Lasater indicated that he would need an additional six months of time before he could complete the statistical work that would support his sampling design.

16. In late September 1997, PwC proposed a sampling design and drew a random sample of approximately 300 accounts, in a manner consistent with AA's August 1997 proposed approach. We provided Mr. Wiener an explanation of the design, and included ancillary information on the sample in a document dated September 23, 1997 (Exhibit Q).

17. In a letter dated October 9, 1997, Mr. Wiener indicated, "we join in the adoption of Price Waterhouse's proposed stratified random sampling plan (the "Plan"). We do, however, have concerns regarding certain elements of the Plan that should be addressed while we are moving forward with its implementation." In December 1997, we received AA's proposed approach to sampling, which was substantially different from both the PwC approach and the proposal tacitly suggested by Dr. Lasater in August 1997. In fact, AA continued to revise their approach over a several day period in December 1997. As detailed in a letters to Dennis Gingold dated December 9, 1997, December 16, 1997, and December 17, 1997, we had numerous conversations with AA regarding the sampling plan. (Exhibits R, S, and T)

18. In December 1997, PwC provided AA with the methodology we utilized in selecting the sample of 300 accounts. (Exhibit U)

19. A detailed summary of PwC's sampling plan is contained in Exhibit V.

20. While PwC staff were analyzing the OTFM data for the purpose of developing an efficient sample design that would be representative of the over 500,000 accountholders, we were contemporaneously reviewing and requesting other relevant documents and data, all of which were expected to provide support for our statistical sampling approach to the Individual Indian accounting. In addition, we participated in site visits to a number of BIA offices; met with Arthur Anderson staff; attended court-mandated status conferences; examined other electronic databases; and performed an in-depth analysis of documents for the five named plaintiffs.

21. On April 16, 1997, we requested a site visit to the Phoenix area office (Exhibit W). At that time, we provided a listing of 50 account holders for whom we wished to review documentation and a detailed list of documentation that we wished to review. PwC agreed to limit the scope of this request to 33 account holders at three agency offices. This site visit took place on May 20 through May 23, 1997. On July 10, 1997, an additional nine boxes of documents for the 33 account holders were provided to PwC. The difficulties we experienced with the site visits are detailed in a letter to Dennis Gingold dated September 15, 1997 (Exhibit X).

22. On May 15, 1997, PwC requested the arrangement of a site visit to the Portland area office (Exhibit Y). At this time, we provided a list of 40 account holders from two agency offices for whom we wished to review documents. As a result of the unproductive nature of the Phoenix site visit, we requested assurances from Defendants that a Portland site visit would be productive (Exhibit Z). This site visit took place on August 26 through August 28, 1997. The difficulties we experienced with the site visits are detailed in a letter to Dennis Gingold dated September 15, 1997 (Exhibit X).

23. PwC incurred over $470,000 in fees for the site visits and the review and analysis of the documents obtained from the site visits. As shown in Exhibit AD, these tasks include: Analysis of Salt River documents (Task 009); Site visits (Denver/Phoenix/Portland) (Task 059) and Analysis of Phoenix/Portland documents (Task 060). PwC would not have conducted extensive site visits if we had been apprised that few documents would be available for review and analysis. Thus, PwC would not have incurred these fees if we had been aware that documents would not be available.

24. Documents responsive to Plaintiffs' First Order of Production regarding the five named plaintiffs were provided sporadically over the time period that PwC was engaged by Plaintiffs. Documents for the five named plaintiffs that were provided to PwC, were unorganized and often duplicative. PwC had to allocate substantial resources to catalog, Bates number, and organize the documents received for the five named plaintiffs. We incurred over $55,000 in fees for producing an inventory and Bates numbering of the documents for the five named plaintiffs (Exhibit AD, task 043). This inventory was ultimately provided to defendants so that they could attempt to come into compliance with paragraph 19.

25. In addition, we incurred about $250,000 in fees for analyzing the incomplete documents produced for the five named plaintiffs (Exhibit AD, Task 008). PwC would not have incurred these fees if we had been apprised that complete documents for the five named plaintiffs would not be provided.

26. In general, documents and information were neither provided to us during our site visits, nor in response to the production orders. Status reports of documents and data requested as of September 17, 1998 and November 20, 1998 are provided in Exhibits AA and AB. Moreover, our effort in analyzing the limited documentation for the site visit and five named plaintiff account holders was substantial, but ultimately was not useful, due to the data limitations, and the incomplete files provided to PwC.

27. In October 1997, PwC began researching and developing an alternative approach to analyze the IIM accounts. PwC incurred over $1 million in fees for researching and developing this alternative approach. As shown in Exhibit AD, these tasks include: Research/compilation of findings (Task 004); Perform analysis in accordance with the "macroeconomic" approach (Task 025); and Research oil, gas, timber and minerals income (Task 032). PwC would not have undertaken the aforementioned tasks if documents had been made available for the statistical sampling approach.

28. Throughout our engagement, PwC provided critical trial related assistance to Plaintiffs' attorneys. These tasks included, but were not limited to: trial and deposition testimony; preparation of an expert report; attendance at depositions for opposing experts; and assistance with pre- and post- trial briefs. PwC incurred over $1.5 million in fees for trial-related assistance. As shown in Exhibit AD, these tasks include, but are not limited to: Prepare for and participate in discussions/meetings with counsel (Task 002); Review of documents received (Task 003); Preparation of memoranda/letters (Task 007); Preparation of deposition questions (Task 012); Prepare for and attend depositions (Task 015); Review depositions (Task 016); Prepare/review Supplemental Interrogatory Responses (Task 020); Prepare sampling affidavit (Task 021); Discovery Request (Task 030); Prepare expert report (Task 033); Preparation for and attendance at hearing (Task 034); Review and prepare affidavit (Task 035); Prepare expert support binder (Task 037); Review Defendants' expert report (Task 040); Review and analysis of Fourth request for production (Task 041); Review/prepare trial exhibits (Task 049); Prepare affidavit re: electronic discovery (Task 051); Trial attendance and preparation (Task 052); Assistance with post-trial briefs (Task 053); and Review of trial transcripts (Task 054).

29. In support of this affidavit, a number of schedules are provided that detail the time spent pursuing the statistical sampling approach; developing an alternative approach to reconcile the trust accounting; and assisting Plaintiffs' attorneys with trial-related tasks. Exhibits AC through AH provide supporting schedules detailing hours, tasks, fees and expenses.

30. PwC's time recording system requires employees to enter time spent on a client engagement into an electronic database. Hours are recorded for each day twice a month; timesheets are submitted to the Finance department bi-monthly.

31. From the onset of this engagement through March 1998, the PwC invoices provided to the client included total hours by task – however, sufficient details were not maintained to allow a description of the specific tasks performed by person by day. Subsequent to March 1998, our invoices detailed the tasks completed by each PwC staff member by day, as well as the total hours for each task.

32. PwC billed Plaintiffs at a flat rate of $180 per hour from June 1996 through May 1997. From June 1997 through March 1998, we billed Plaintiffs at a rate of $180 per hour for professional staff and $75 per hour for paraprofessional staff. From April 1998 through January 1999, we billed Plaintiffs at a rate of $200 per hour for professional staff and $75 per hour for paraprofessional staff. From February 1999 through August 1999, we billed Plaintiffs at a rate of $200 per hour for professional staff and $95 per hour for paraprofessional staff. From September 1999 through January 2000, we billed Plaintiffs at a rate of $225 per hour for professional staff.

33. Exhibit AC contains the hours and expenses per month for those tasks completed by PwC. Exhibit AD contains hours per task. Exhibit AE contains tasks by months for June 1996 through December 1996. (Note that this is the most granular level of detail that is available for this time period.) Exhibit AF contains staff person by task by month for January 1997 through March 1998. (Note that this is the finest level of detail that is available for this time period.) Exhibit AG contains hours by staff person by task and date for April 1998 through January 2000.

34. The hours and fees in Exhibits AC through AG differ slightly from those prepared in my affidavit dated August 13, 2004. I have included additional hours for preparation of fee estimates, budgets, and other analyses that were not previously included in the August 2004 affidavit.

35. PwC issued invoices for expenses related to providing services to Plaintiffs. These expenses include travel to site visits, travel to meetings with AA, photocopying, and other engagement-related expenses. During this time period, it was PwC's practice to bill a flat rate per hour for telephone, reproduction, mail and computer usage. In addition, we incurred expenses related to data conversion and related to our use of a Sun workstation to process and analyze data. A description of expenses by category and month are presented in Exhibit AH.

36. As a result of the schedules provided in Exhibits AC through AH and the information in this affidavit, Plaintiffs are requesting reimbursement for expenses incurred in prosecuting this litigation in the amount of $4,752,034.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 21, 2010.

_____
Jessica Pollner