On September 20, 1996, we held a videoconference for your benefit with program staff from the Office of Trust Funds Management (OTFM), the Bureau of Indian Affairs (BIA) and the Minerals Management Service (MMS) to answer this specific question.   On November 12 and 13, 1996, we arranged for you to discuss these matters in depth with OTFM staff in Albuquerque, and on November 14, 1996, field staff of MMS made themselves available for a briefing and questions on this topic at their Denver facility.   We have also provided you with extensive written documentation and have conducted several teleconferences with Price Waterhouse, OTFM and MMS to help you understand the underlying structure of the trust funds system and the data we have provided. At this time, we do not see how we can better explain the relationships for your benefit absent a clearer definition of the question.

We understand that the purpose of the current informal discovery process is to help Price Waterhouse and Arthur Andersen obtain financial data and supporting documentation necessary to produce a statistical analysis which will then form the basis for the functional equivalent of accountings for IIM account holders.   The following questions appear unrelated to the location or interpretation of data or the statistical sampling process in which you are currently engaged. Rather, they address policy issues.   As such, we request that you address these questions through plaintiffs' counsel, and we will respond to them, as appropriate, in that context.

- What information on IIM account balances is accessed and used at BIA/BLM headquarters?

- What summary level IIM information is used at BIA/BLM headquarters?

- What oversight does BIA/BLM headquarters currently have over key reconciliations and Treasury reports by OTFM? What oversight existed before OTFM was removed from BIA?

- What program oversight did BIA/BLM headquarters provided [sic] prior to the reorganization of BIA regarding OTFM's archive and document/data retention;   OTFM's timely processing of data;   OTFM's compliance with stated investment policy;   and OTFM's response to Congressional inquiry?

- What oversight of information systems did BIA/BLM headquarters provide to the reorganization of BIA regarding changes to operating programs, system interfaces, and record layouts by OTFM area and agency offices;   OTFM's "new application" needs assessment; procurement of new applications; and OTFM's compliance with the Joint Financial Management Improvement Program (JPMIP) system requirements?

- Were assessments or other reports prepared by BIA/BLM or other groups regarding OTFM systems?

- What oversight does MMS headquarters have over financial reporting by MMS in the field/bureau/area offices regarding reconciliations to Treasury accounts and periodic Treasury filings?
- What program oversight does MMS headquarters provide regarding archive and document/data retention;  timely processing of data;  and response to Congressional inquiry?

- What oversight of information systems does MMS headquarters provide regarding changes to operating programs by area offices, system interfaces, and record layouts;  "new application" needs assessment; procurement of new applications;  and compliance with the Joint Financial Management Improvement Program (JPMIP) system requirements?

Sincerely,

Willa B. Perlmutter
Attorney - Advisor

-3-

```
fax-LEW WIENER
     DOJ/ENRD - 305-0267

     TRISH ELLENBURG
     ARTHUR ANDERSON
     602-495-8712

     JOE CHRISTIE
     OTFM
     505-248-5741

     DENNIS M. GINGOLD, ESQ.
     637-0497 (662-6975)
```

# MEMORANDUM



To:        File
From:      Jessica Pollner
Date:      March 21, 1997              **Exhibit H**
Re:        Conference call with MMS

On Tuesday March 18, Price Waterhouse (PW) initiated a conference between MMS and PW. Willa Perlmutter was the representative from the Department of Interior. Cecilia Williams from MMS was the MMS point of contact, although there were at least three other MMS representatives. Jessica Pollner, Laura Gooding, and Greg Mason were the PW representatives. The purpose of the call was to address our questions addressed to Willa Perlmutter about the MMS data and documentation provided to us.

MMS apprised us that the missing field from the CRD database is "operator name". It is a 25-character variable, and is found right after the operator number.

In our February 19 letter, we requested additional documentation. They agreed to send us those documents, and we should expect them within the week. Since Willa will be out of town, all documents will be sent to Lew Weiner, who will then send them to us.

MMS personnel indicated that there has been significant restructuring of the AFS and PAAS databases. As such, data elements that appear to be on these databases (delineated in the April 1992 documentation) may no longer be there. They indicated that the majority of data elements that are on these two databases, and not provided to us have no relevance to the individual Indian monies.

MMS answered our specific questions (page 3 of the 2/19 letter). In particular, fund code on CRD and AFS are consistent; a few hard copy of the records from each of the datasets will be provided to us (through Lew) so that we can ascertain that we are reading the data correctly; the agreement number on PAAS does not correspond necessarily to the agreement number on the CRD; the first quality measurement variable from the data element dictionary is provided on AFS; and codes are provided in the payor manual.

MMS indicated that the IIM account number is not included on the RMP. They indicated that the BIA had systems that would tie the MMS lease, financial, and production data to the individual Indians. Finally, they indicated that a small portion of data provided to BIA had not yet been provided to PW -- that would be done in the near term, and most likely provided to Lew Weiner, as Willa was unavailable. In general, they believed that we needed to deal with BIA, as there was not much more they could provide to us.

1301 K Street, N.W. 800W
Washington, DC 20005-3333

Telephone 202 414 1000

*Price Waterhouse* LLP



# Exhibit I

April 1, 1997

Ms. Willa B. Perlmutter, Esq.
Department of the Interior
Office of the Solicitor
Division of Indian Affairs
6456 MS/MIB
Washington, D.C. 20240

Dear Willa:

We appreciate your efforts in arranging the conference call with Minerals Management Service (MMS) that took place on March 19, 1997. We have received hard copy printouts, new versions of the AFS and CRD tapes, and several manuals.

One requested manual has yet to be provided, the PAAS IBM User Reference Manual. In addition, one manual that was not specifically requested by Price Waterhouse, the Lease Desk Manual, was provided by MMS. This manual appears to be useful to our analysis and we appreciate the efforts of MMS for identifying this document.

We understand that MMS is voluntarily providing additional data that they have given to BIA but that has not been requested by Price Waterhouse. We appreciate the efforts of MMS in identifying and preparing these data and we look forward to receiving these data.

We appreciate your assistance in obtaining the missing manual.

Sincerely,

Jessica Pollner

cc:    Mr. Dennis Gingold
       Mr. Bob Peregoy
       Mr. Andy Eschen
       Mr. Lew Weiner

1301 K Street, N.W. 800W
Washington, DC 20005-3333

Telephone 202 414 1000

*Price Waterhouse* LLP



April 17, 1997

**Exhibit K**

Ms. Willa Perlmutter, Esq.
Department of the Interior
Office of the Solicitor
Division of Indian Affairs
6456 MS/MIB
Washington, D.C.  20240

Dear Willa:

Price Waterhouse LLP has been provided with many manuals describing the Integrated
Records Management System (IRMS) as well as the IIM component of this system.
Based on our review of the documentation provided, we believe that it is necessary to
obtain the other components of that system, including but not limited to the People
subsystem, the Lease subsytem, the Ownership subsystem, and the Oil and Gas Royalty
Distribution and Reporting System (RDRS) a subset of the Lease and Ownership
subsystems.

In addition to the data files, we feel it is necessary to obtain the computer programs that
manipulate these data.  For example, the programs that are used to distribute lease
income to the appropriate owners will be useful to our analysis.  A partial list of the
types of programs that we are interested in is attached, however, since this list was
compiled from the manuals provided which span a period of over 15 years, the list may
be outdated and incomplete.

Furthermore, it is our understanding the some of the area offices are not utilizing the
IRMS.  For those area offices, we would like the IRMS-equivalent electronic data that
are used and the programs used to manipulate these data.

In addition, we would like information regarding the Land Records Information System
(LRIS) and how that relates to the lease data contained in the IRMS.

Ms. Willa Perlmutter, Esq.
Page 2
April 17, 1997



We appreciate your assistance in obtaining these data.


Sincerely,

Jessica Pollner


cc:    Mr. Dennis Gingold, Esq.
       Mr. Bob Peregoy, Esq.
       Mr. Lew Wiener, Esq.
       Mr. Andy Eschen, Esq.

Pr... ...ms (2)

| Program Name | System | Document Date | Description |
|---|---|---|---|
| 1081 Reconciliation | Oil and Gas | 9/30/94 | Reconciles data received from MMS with 1081 forms |
| ACREAUMS | Range | 2/1/94 | Counts acres and AUMs for each range unit |
| BA100 | Bid Awards | 7/27/87 | Matches tract numbers with ownership file |
| BA200 | Bid Awards | 7/27/87 | Matches owner file with people file |
| BA300 | Bid Awards | 7/27/87 | Produces bid awards, consent of owners to grant right-of-way, or schedule of landowners |
| CHGAUMS | Range | 2/1/94 | Changes AUMs for billing |
| CHGRATE | Range | 2/1/94 | Changes rates for billing |
| CNVRTLRIS | Oil and Gas | 7/20/85 | Converts LRIS land and owner data to IRMS data |
| EFAA01 | Range | 2/1/94 | IIM/owner match |
| EFAA09 | Range | 2/1/94 | Main range payout program - creates accounts receivable records |
| IIMIIS1 | Range | 7/7/92 | Consolidates multiple payments for an individual |
| IM140 | IIM | 10/31/85 | Batch statement of account list |
| IM145 | IIM | 10/31/85 | Current statements of account |
| IM160 | IIM Interface | 8/1/94 | Edits all batches and computes internal calculations |
|  |  | 10/31/85 | Lease distribution batch edit/interface |
| IM220 | IIM | 10/31/85 | Daily interest calculations |
| IM240 | IIM | 7/20/85 | Daily transaction Register |
| IM242 | IIM | 10/31/85 | Daily finance encoding report |
| IM300 | IIM | 7/20/85 | Check register |
|  |  | 10/31/85 | Daily check register/ISSDA file creation |
| IM320 | IIM | 7/20/85 | Master file check number update |
|  |  | 10/31/85 | IITRANS updated with check numbers |

Pro... .ms (2)

| Program Name | System | Document Date | Description |
|---|---|---|---|
| IM500 | IIM | 10/31/85 | Daily IICHECKS/TRANS file update |
| IM510 | IIM | 7/20/85 | Account reconciliation |
| | IIM | 10/31/85 | Control account reconciliation |
| IM520 | IIM | 7/20/85 | Monthly check register |
| IM540 | IIM | 7/20/85 | Monthly statement of accounts |
| | IIM | 10/31/85 | Monthly tribal and special deposit statements of account |
| IM580 | IIM | 7/20/85 | Overdraft account list |
| | IIM | 10/31/85 | Monthly inactive accounts list |
| | IIM | 10/31/85 | Overdraft/inactive accounts list |
| IM600 | IIM | 3/1/94 | IIM account listing |
| | IIM | 10/31/85 | Alphabetical account list |
| IM600MGT | IIM | 10/31/85 | Balances over $10,000 |
| IM605 | IIM | 10/31/85 | By agency |
| IM620 | IIM | 10/31/85 | Six month statements of account |
| IM620S | IIM | 10/31/85 | Semi-annual statements of account - special deposit |
| IM630 | IIM | 10/31/85 | ISSDA account balance summary |
| | IIM | 9/30/94 | Summary of accounts by location code |
| IM630SS | | 3/1/94 | Missing Social Security numbers |
| IM640 | IIM | 10/31/85 | "J" accounts listing |
| | IIM | 10/31/85 | List of "J" accounts over age 18 |
| IM650 | IIM | 10/31/85 | Inactive account deletion |
| IM680 | IIM | 7/20/85 | Month end account aging |
| IM680FX | IIM | 9/30/94 | Monthly interest summary |
| IM690 | IIM | 7/20/85 | Historical transaction merge |

Page 2

Pro...ns (2)

| Program Name | System | Document Date | Description |
|---|---|---|---|
| IM700 | IIM | 10/31/85 | Creates hold account workfile |
| IM710 | IIM | 10/31/85 | Hold accounts list |
| IM720 | IIM | 10/31/85 | List of changed accounts |
| IM740 | IIM | 10/31/85 | Monthly hold accounts, all locations by management code |
| IM740M | IIM | 3/1/94 | Hold account listing |
| | IIM | 10/31/85 | Monthly list of hold accounts |
| IM745 | IIM | 10/31/85 | Hold account list - one location by account number |
| IM745M | IIM | 3/1/94 | Hold account listing |
| | IIM | 10/31/85 | Hold account list (one location only) |
| IM750 | IIM | 10/31/85 | Inactive (one year) accounts list |
| | IIM | 10/31/85 | List of inactive accounts with less than 5.00 balance |
| IM751 | IIM | 10/31/85 | List of inactive accounts with less than 2.00 balance |
| IM800 | IIM | 7/20/85 | Semi-annual interest calculation - IIM accounts |
| IM800S | IIM | 7/20/85 | Semi-annual interest calculation - special deposit accounts |
| IM810 | IIM Interface | 8/1/94 | Calculates interest for all open accounts with deposits in the previous month |
| IM810S | IIM Interface | 8/1/94 | Calculates interest for specials accounts with deposits in the previous month |
| IM920 | IIM | 10/31/85 | Deletes transactions over five years old from the selected date |
| IM925 | IIM | 10/31/85 | Historical interest transaction retrieval for IRS reporting |
| IM930 | IIM | 10/31/85 | IRS interest income report |
| IM9903 | IIM | 10/31/85 | IIM accounts (oil/gas) over $10,000 |
| IM9920 | Oil and Gas | 7/7/92 | Creates an oil and gas check register |

Programs (2)

| Program Name | System | Document Date | Description |
|---|---|---|---|
| IM9940 | IIM | 10/31/85 | Interest under $2.00 |
| IM9941 | IIM | 10/31/85 | Interest over $2.00 |
| INCOME | Range | 2/1/94 | Lease income report |
| INTFAC | Oil and Gas | 8/4/94 | Enters interest factors into a data file |
| IR340 | | 2/1/81 | Irrigation ledger sheet print |
| LSEOBJ/CHK-90DAY | 90-Day Notice | 7/27/87 | Produces an audit check list for all tracts receiving 90 day notices |
| LSEOBJ/MTCH-90DAY | 90-Day Notice | 7/27/87 | Matches owner data with the selected leases to expire |
| LSEOBJ/SEL-90DAY | 90-Day Notice | 7/27/87 | Selects leases that expire during the selected year |
| LSEOBJ/STATEMENT | Bill for Collection | 7/7/92 | Produces bills for collection for all lease types other than range |
| LSEOBJ/STMTRANGE | Bill for Collection | 7/7/92 | Produces bills for collection for all range leases |
| N133 | Finance | 7/7/92 | Area level SF133 and difference reports; Bureau level report |
| OG050 | Oil and Gas | 7/20/85 | Accepts MMS data and breaks into area files |
| OG060 | Oil and Gas | | Reads the area MMS file and prints a report listing all transactions |
| OG070 | Oil and Gas | | Reads the error recycle file and prints a report listing all transactions |
| OG100 | Oil and Gas | | Reads area MMS file and validates that all records are in the control file |
| OG200 | Oil and Gas | 7/20/85 | Matches MMS transactions with lease master records, lease records with owner records, owner records with IIM record |
| OG250 | Oil and Gas | | Reads the error recycle file and prints a report listing all transactions |
| OG300 | Oil and Gas | 7/20/85 | Calculates disbursement amounts |
| OG350 | Oil and Gas | 7/20/85 | Produces an agency level transaction audit report |
| OG360 | Oil and Gas | | Produces and area level suspense report |

Page 4

Pr... ms (2)

| Program Name | System | Document Date | Description |
|---|---|---|---|
| OG400 | Oil and Gas | 7/20/85 | Prints agency level oil and gas statements |
| OG500 | Oil and Gas | 7/20/85 | Converts agency owner files into one oil and gas ISAM owner file |
| OG550 | Oil and Gas | 7/20/85 | Converts agency lease files into one oil and gas lease file |
| OG900 | Oil and Gas | | Prints listing and edits of selected owners |
| OG910 | Oil and Gas | | Prints listing and edits of all owners |
| PERCAP200 | IIM Interface | 8/1/94 | Produces a report with the total of the Per Capita Interface file |
| PRMITTEE | Range | 2/1/94 | Creates permittee list |
| Range Payout | IIM Interface | 8/1/94 | Creates a report for range payout |
| Range Select | Range | 7/7/92 | Extracts records for all range type leases |
| RANGOPER | Range | 2/1/94 | Lists range units along with the name and address of the operator |
| RANGSEL | Range | 2/1/94 | Extracts records for all range type leases |
| RANGSEL3 | Range | 2/1/94 | Provides for deleting groups of range units |
| RATEUSE | Range | 2/1/94 | Extracts data from selected lease records |
| RIIMSUM | Range | 2/1/94 | Range summary of accounts |
| RNGDUMP | Range | 2/1/94 | Prints records for selected leases |
| RPAYIIM | Range | 2/1/94 | Detail summary of accounts |
| STMTRANG | Range | 2/1/94 | Compute and print range bill statements |
| TRACTRPT | Range | 2/1/94 | Prints out a report for idle lands |
| UPDINTP | Range | 2/1/94 | Provides additional interest or late payment penalty amounts |

Memorandum



# Exhibit L

**To**  File

**From\Location**  Laura Gooding, Washington, D.C.

**Date**  April 1, 1998

**Re**  **Status of Data Request**

On April 17, 1997, Price Waterhouse requested data and programs from the Integrated Records Management System (IRMS).  Also at this time, we requested information regarding the Land Records Information System (LRIS).  On May 9, 1997 and May 14, 1997, we received two tapes presumably containing the IRMS programs.  We were unable to extract the programs from the tapes.  On June 11, 1997, we received a tape containing four of the over hundred requested programs.  Per a telephone conversation with Willa Perlmutter (DOI) on June 16, 1997, the remaining programs were to be provided as soon as possible.

On August 8, 1997, the original request was re-submitted to Lew Wiener (DOJ) and Edith Blackwell (DOI).  On September 4, 1997, Edith Blackwell indicated that the IRMS data and programs would be provided by mid-September 1997.  On September 5, 1997, Price Waterhouse received an inventory of documents regarding the LRIS.  We agreed to review this inventory in order to narrow down our request for the data and programs regarding the LRIS.  After reviewing this inventory, on December 4, 1997, Price Waterhouse issued a request for specific LRIS documents and data.

On February 6, 1998, Price Waterhouse discussed the appropriate format for the data tapes with Edith Blackwell and Mona Infield (DOI).  At that time, the LRIS, TSR (Title Status Report), and IRMS data were requested in the format of flat ASCII files on 3480 cartridges.  As well as the data, we requested file layouts and example printouts for each tape.  Two sample tapes containing TSR data were provided on February 16, 1998.  The file layout for these data was provided on February 20, 1998.  After confirming with Edith Blackwell that we could read the data on these tapes, Edith indicated that the remaining data would be provided as soon as possible.

As of April 1, 1998, Price Waterhouse has received only four of the IRMS programs and two sample tapes of the TSR data.   We have not received any of the IRMS or LRIS data and no LRIS documents.

1301 K Street, N.W. 800W          Telephone 202 414 1000
Washington, DC 20005-3333

## *Price Waterhouse* LLP



December 4, 1997

**Exhibit M**

Ms. Edith Blackwell, Esq.
Office of the Solicitor
Department of the Interior
Division of Indian Affairs
6456 MS/MIB
Washington, D.C.  20240

Dear Edith:

We have reviewed the document inventory list regarding the Land Records Information System (LRIS) that was provided to Price Waterhouse in September 1997.  Unfortunately, this list does not offer much clarification as to what electronic data are available.  In addition, after review of the documents, it is unclear whether LRIS or LRIS-II is currently in use.  To that end, we are requesting any electronic data used in the current LRIS (LRIS or LRIS-II) that are related to individual Indian trust beneficiaries.  We believe that these data include but may not be limited to the following databases:  1) Tables Database; 2) Current Status Database; and 3) Historical Database.

As indicated in your letter dated September 5, 1997, the LRIS data contain both tribal and individual land records information and Mr. Jones is proposing to provide only the individual data.  We request that data be provided for any property that was at any time individual, whether or not it is currently tribal.

Attachment A contains a list of LRIS related documents from the document inventory provided to Price Waterhouse that we are requesting.  In addition, the document inventory contains many documents that may not be related to LRIS however, we believe these documents would be helpful in our analysis.  We are requesting these documents as well and they are contained in Attachment B.

In addition to the request regarding LRIS, we expected to receive data and programs regarding the Integrated Records Management System (IRMS) by mid September.  We have not received these materials.

Please advise us when we can expect the LRIS data and documents as well as the IRMS programs and data.  We look forward to hearing from you soon.

Sincerely,

*Jessica Pollner (signature)*

Jessica Pollner

cc:     Mr. Lew Wiener
        Mr. Andy Eschen
        Mr. Dennis Gingold
        Mr. Keith Harper

Attachment A

# LRIS Related Documents

| Control # | Document Title | Document Date |
|---|---|---|
| 7 | Requirement Analysis and Analysis of Alternatives, The Proposed Acquisition of the Land Records Improvement Management Project - LRIS-II Pilot Sites FIP Components | 5/3/91 |
| 12 | Land Records Information System Analysis Package | None |
| 13 | LRIS and LRIS-II Attribute Definition Listing | None |
| 14 | LRIS-II Current Status Entity Definition | None |
| 15 | Report Definitions - Standard Reports | None |
| 18 | LRIS-II General Screen Mechanics Definitions, Owner Verification, Recording Module, and Table Maintenance Samples | None |
| 20 | Land Records Informations System Area/Agency User's Manual | 11/2/89 |
| 21 | Land Records Information System (LRIS) NATURAL -Adabas Data Entry Front-End System User's Manual, 1st edition | 1/31/89 |
| 27 | Current Entity Relational Diagram | None |
| 79 | Introduction | None |
| 82 | User Requirements, Priority Critical w/notes | 4/3/95 |
| 83 | System Requirements | None |
| 84 | Performance Requirements | None |
| 85 | Report Requirements | None |
| 86 | LRIS Report Definitions | None |
| 88 | LRIS-II Data Flow Diagrams | None |
| 89 | LRIS-II Entity Relationship Diagram ("Implemented Model") | None |
| 99 | History Entity Relational Diagram | None |
| 100 | Document Recording Entity Relational Diagram | None |
| 101 | Owner Verification Entity Relational Diagram | None |
| 102 | Tables Entity Relational Diagram | None |
| 103 | Context Diagram | 4/23/91 |
| 105 | Data Flow Diagrams | None |
| 106 | LRIS-II Data Element Listing | None |
| 107 | LRIS-II Data Element Attributes | None |
| 108 | LRIS-II Codes | None |
| 115 | LTRO Computer System-Land Records Information System (LRIS) | None |
| 116 | Sample of Data Entry Sheets and Resulting Document Search Reports | 12/17/92 |
| 117 | Chain of Title Sheet-Sample With Related Tract History Report | None |
| 118 | Sample of Error Suspense Report | 12/16/92 |
| 120 | Agency Training | None |
| 121 | Area/ Agency user's manual for LRIS | 11/2/89 |
| 122 | Tract Definitions | None |
| 123 | Individual Identification Numbers | None |
| 124 | Title/ Non-Title & Encumbrance Documents | None |
| 125 | LRIS Document Recordation Sub-System | None |
| 126 | LRIS-Owner Identification Inquiry Sub-System | None |
| 128 | IRM Document-LRIS | 1/28/92 |
| 130 | Tract Prefix Tables for LRIS-II | None |
| 131 | LRIS User Requirements | 4/3/96 |
| 132 | Land Records Information System (LRIS) Natural-ADABAS Data Entry Front-End System User's Manual | 1/31/89 |
| 133 | LRIS Natural-ADABAS Data Entry Front-End System User's Manual | 1/31/89 |
| 134 | LRIS Natural-ADABAS Data Entry Front-End System User's Manual | 1/31/89 |
| 136 | LRIS Application-Security & Access Control Materials | None |
| 137 | LRIS Area/ Agency Personnel User's Manual | 2/17/90 |
| 139 | LRIS System 2000 Database Sizes ("S2KSIZE") | 1/7/93 |
| 234 | Erwin Entity Relationship Diagrams for LRIS-II | None |
| 235 | Flows Diagrams (LRIS-II) | None |
| 236 | LRIS-II Error Record Layouts | None |
| 237 | LRIS-II Problem/ Solutions | None |
| 241 | Sample Report:  Title Status Report | 4/17/92 |
| 242 | Sample Report:  Tract History Report | 6/26/92 |
| 245 | "Adding Documents to History" | None |
| 246 | "Adding Documents To Current Status" | None |
| 247 | "Tract Information" | |
| 248 | "Items To Check Out and Validate" | None |
| 249 | List of Document Type Codes | None |
| 250 | List of Encumbrance Modifiers | None |
| 251 | List of Encumbrance Codes | None |
| 252 | List of Document Modifiers | None |
| 253 | List of Transfer Interest Types | None |
| 260 | LRIS-II Document History Attribute Definitions | None |
| 261 | LRIS-II Attribute Definitions for Current Ownership | None |
| 265 | User Requirements For LRIS-II | 1/22/91 |
| 285 | Entity Relational Diagram-Title Ownership/ Title Tracking | None |

| Control # | Document Title | Document Date |
|---|---|---|
| 286 | Entity Relational Diagram-Current | None |
| 287 | Entity Relational Diagram-History | None |
| 288 | Flow Charts | None |
| 290 | Entity Relational Diagrams | None |
| 293 | Sample LRIS Input with Programmer Notes | None |
| 298 | Record Descriptions | None |
| 299 | LRIS Ownership File | None |
| 307 | LRIS-II Preliminary Table Definitions | 9/11/96 |
| 310 | Land Record Information System (LRIS) White Paper:  Options For Rehosting/ Reengineering LRIS | 2/12/97 |
| 328 | LRIS II User Requirements | None |
| 332 | Entity Relational Diagrams, Entity Definitions, and Attribute Definitions | 4/22/95 |
| 348 | Sample LRIS Encumbrance List by Modifier | None |
| 351 | LRIS Encumbrance Codes and Document Modifiers | None |
| 352 | LRIS Output/ Report Formats | None |
| 358 | Task Order B641-Land Records Information System (LRIS) | None |
| 444 | Schematic Diagram of the Tables Database Logical Structure | None |
| 445 | Schematic Diagram of Current Status Database Logical Structure | None |
| 446 | Schematic Diagram of Historical Database Logical Structure | None |
| 454 | LRIS User Training Documents | None |
| 483 | LRIS-II Attribute Definitions | None |
| 487 | Meeting Minutes-Conversion of LRIS Data to IRMS | 6/2/91 |
| 501 | LRIS-II Project Data Dictionary | None |
| 530 | List of Document Types, With Definitions | None |
| 535 | Implementation of Land Records Information System (LRIS) Probate Inventory Report | 4/6/90 |
| 536 | LRIS Database Logical Structure | None |
| 570 | LRIS Audit Report-Final | 6/11/97 |
| 571 | LRIS Audit-Raw Results | 5/16/97 |

## Other Documents

| Control # | Document Title | Document Date |
|---|---|---|
| 1 | Organizational Structure - Bureau of Indian Affairs | None |
| 10 | IDEF Drawings:  Manage Trust Assets, Income, and Funds | 8/23/91 |
| 22 | Blue Star Systems Oil and Gas Trust Minerals Mgt Sys (Ofc of Spec Trustee) | 2/26/92 |
| 34 | Anadarko Area Office Branch of Trust Services Real Estate Modules | 4/30/91 |
| 36 | Owner-Life Estate Reference for Maintaining Ownership & Probate Databases | 9/20/90 |
| 37 | Lease Management Rental Income Distribution Workflow Manual | 2/15/90 |
| 47 | Lease Distribution Reference Version 3 in dBase III+ | 7/19/90 |
| 48 | Lease Management Reference for Preparing Mgt & Other Reports | 9/14/90 |
| 49 | Lease Preparation Reference for Creating Lease Documents, Management and Distribution Records | 9/14/90 |
| 92 | Organizational Structure, BIA | None |
| 97 | Model and Process Definitions:  Manage Trust & Federal Assets & Responsibilities | 5/7/91 |
| 112 | List of Agencies and Reservations Served By the Albuquerque Title Plant | 1/28/84 |
| 233 | Oil and Gas Handbook | 6/30/89 |
| 295 | Trust Asset, Income & Title Adjudication Summary Process Flow Diagram | None |
| 350 | Integrated Records Management System (IRMS) Notes | None |
| 463 | Orientation to Real Property Management and Trust Responsibilities | 1/1/84 |
| 478 | Reference Material for Indian Trust Property | 1/1/81 |
| 482 | Lease Administration and Distribution Process (LADP) workgroup notes | None |
| 520 | Tract Number Explanation Sheet and Instructions for Completion of Ownership Tract Prefix and Tract Extra Suffix Reports | 2/25/91 |
| 526 | Land Records and Title Documents Regulations | 10/3/91 |
| 527 | Examination of Title To Indian Lands | 4/7/89 |
| 528 | Program Requirements Land Titles and Records Recordation of Title Documents | None |
| 529 | Program Requirements Land Titles and Records Maintenance of Land Status Maps and Geographic Data | None |
| 559 | How To Figure Life Estates | None |

1301 K Street, N.W. 800W          Telephone 202 414 1000
Washington, DC 20005-3333

*Price Waterhouse* LLP      

**Exhibit N**

March 3, 1997

Ms. Willa B. Perlmutter, Esq.
Department of the Interior
Office of the Solicitor
Division of Indian Affairs
Washington, D.C. 20240

Dear Willa:

Based upon our review of the IIM account data for 1985 through 1996, we feel it is necessary to obtain additional data. In order to gain a better understanding of the implications of the data issues evident in the current database, we feel that additional data should be obtained for two regions. In particular, the issues we are interested in investigating for the period 1972 through 1985 include, but are not limited to:

- IIM accounts opened in the name of corporations;

- IIM account holders with more than one account;

- Juvenile accounts;

- Transactions larger than $1,000,000; and

- Fluctuations in the number and total amount of debits/credits by transaction type over time.

In order to address these issues, as well as others, we request IIM data for the period 1972 through 1985 for the following two regions: Portland and Phoenix.

In addition to these data, we request data for the Phoenix region for 1970 through 1975. We have been advised that IIM funds were used to pay life insurance premiums for more than 200 juveniles in the Uintah and Ouray Agency within the Phoenix region in 1972 and 1973. We have also been advised that these premiums amounted to over $1.5 million for approximately $2.2 million in life insurance coverage. Among other things, we would like to review copies of the policies themselves, a list of the names of the beneficiaries, names of the insurance companies, policy numbers, and the names of the insurance agents who sold the policies.

Ms. Willa B. Perlmutter, Esq.
Page 2
March 3, 1997



We appreciate your assistance in obtaining these data.  I look forward to hearing from you in the near term.


Sincerely,

Gregory E. Bardnell
Managing Partner, East Region DA&CR


cc:   Dennis Gingold
       Bob Peregoy
       Andy Eschen
       Lew Weiner

1301 K Street, N.W. 800W
Washington, DC 20005-3333          Telephone 202 414 1000

*Price Waterhouse* **LLP**          

## Exhibit O

September 10, 1997

Mr. David Lasater
Arthur Andersen LLP
1345 6th Avenue
Room 1413
New York, New York 10105

Dear David:

As you know, Arthur Andersen and Price Waterhouse have agreed to meet on
September 18, 1997 in Price Waterhouse's Washington, D.C. office.  In light of the
progress we have made in prior meetings, I believe we are very close to reaching an
agreement regarding the methodology for the sampling of the individual Indian trust
monies and transactions.

At our most recent meeting held on August 7, 1997 in New York, Arthur Andersen
submitted a sampling plan with strata defined according to the dollar value of the
credits in the sampled account.  After considering Arthur Andersen's proposed
sampling method closely, Price Waterhouse finds the methodology acceptable (perhaps
with some fine-tuning).  I believe that at our September 18 meeting, both parties
should be prepared to arrive at an agreement and finalize the general methodological
parameters of our sample.  Of course, since the proposed sampling method only
includes the population of accounts on the IIM database from 1985 through November
1996, it is not sufficiently inclusive.  Thus, we believe it will be necessary to also
discuss ways to capture, within our sampling scheme, accounts and/or transactions that
do not appear on the IIM database due to compacting, direct payments, error, etc., and
accounts and transactions that occurred prior to 1985.

Accordingly, we propose the following three agenda items for our September 18
meeting:

I.      Finalize the sampling plan

II.     Discuss how sampled accounts should be selected

III.    Discuss how to make the sampling plan inclusive

Mr. David Lasater
Page 2
September 10, 1997



On September 18, we will be prepared to resolve the remaining issues regarding our sampling approach and firmly believe that additional meetings should not be necessary.  We hope that you are of the same mind.

We look forward to seeing you on September 18.  If you have any questions or concerns, please feel free to call me.


Sincerely,

Jessica Pollner

cc:   Mr. Dennis Gingold, Esq.
      NARF
      Mr. Lewis Wiener, Esq.
      Mr. Andy Eschen, Esq.



**Exhibit P**

By Fax: 202-414-1551

Arthur Andersen LLP

September 16, 1997

1345 Avenue of the Americas
New York NY 10105-0032
Writer's Direct Dial

Jessica Pollner
Price Waterhouse LLP
1301 K Street, N.W. 800W
Washington, D.C. 20005-3333

(212) 708-4753

Dear Jessica:

I am pleased to learn that you believe that you and we are closing in on agreement about the approach to sampling the IIM accounts. I infer from your letter that you would say that each of the meetings between us has resulted in progress toward that goal. I would certainly subscribe to a statement that we have come a good distance toward a joint understanding of the IRMS database, generally, and also the challenges of obtaining historical supporting paper to validate the database. However, I cannot say that I am "close" in any meaningful sense to a final proposal to you regarding the sampling plan.

I believe that my last meeting with you in New York resulted in our mutual recognition that there was at least one approach to the sampling that would result in a smaller sample size. That approach was explicitly described with the caveat that it was not our proposal for sampling. I recall that I and others expressed the caveat. Even moreso today, I am not persuaded that it is necessarily the best approach under the still-evolving circumstances. The circumstances I am concerned about are at least those of (1) definition of the relevant population of accounts, (2) definition of the time-frame of the class period, and (3) impact on the sampling objectives of what each of us has learned from the Phoenix and Portland samples of documents.

It was represented to me that a projection was made by Price Waterhouse during yesterday's status conference that to "evaluate" 250 accounts, Price Waterhouse estimated a 3-year, $5 million effort. I do not have enough information from you to know if such an estimate is accurate. However, even if the estimate is accurate, I am not aware of how the underlying specifics of that projection relate to my understanding of our mutual objectives in this lawsuit.



# ARTHUR ANDERSEN

Jessica Pollner
Page 2
September 16, 1997


I look forward to meeting with you on Thursday, September 18 at 10:00 a.m., to continue our cooperative work.  I expect that our discussion will move us further along toward a mutual understanding on the three points I mentioned above.  Thank you, in advance, for your hospitality in hosting the meeting.

Regards,

David B. Lasater

MCL

1301 K Street, N.W. 800W   Telephone 202 414 1000
Washington, DC 20005-3333

*Price Waterhouse* LLP    

September 23, 1997                    **Exhibit Q**

Mr. Lewis Wiener, Esq.
Department of Justice
General Litigation Section
601 Pennsylvania Avenue, NW
Washington, D.C.   20044

Dear Lew:

This letter documents the sampling plan that Price Waterhouse recommends with
regard to the individual Indian trust beneficiaries contained within the OTFM database
for 1985 through November 1996.[1]  As you are aware, Price Waterhouse and Arthur
Andersen have participated in several meetings in an attempt to arrive at an agreement
concerning a sampling plan for this population of individual Indian trust beneficiaries.
The sampling plan recommended herein by Price Waterhouse is the result of the
discussions at these meetings and is largely based on the sampling plan presented by
Arthur Andersen on August 7, 1997.

Attachment A contains the sampling plan recommended by Price Waterhouse.
Price Waterhouse applied the stratification methodology employed by Arthur
Andersen, i.e., determining stratum breaks by dividing the cumulative sum of credits
into equal groups.  The sampling unit is an account and each stratum is defined by the
sum of credits for an account.

Price Waterhouse obtains slightly different stratum boundaries and a slightly larger
sample size than Arthur Andersen.  We believe that the reason for these slight
differences is that Price Waterhouse has utilized the D/C field of the database to
determine if a transaction is a credit or a debit, while Arthur Andersen has utilized the
transaction code.  We know that there are errors in coding the data into the OTFM
database, and have no reason to believe that either the D/C field or the transaction code
is substantially more correct.  In addition, since there are accounts that appear in more
than one region, but may or may not belong to the same individual, Price Waterhouse
has defined an account by the account number and the region.  For example, an
account that appears in two regions would be eligible for sample selection in both
regions.

---

[1] The OTFM data that has been provided to Price Waterhouse includes all accounts on the IIM system.
These accounts may or may not be opened in the name of an individual.

Mr. Lewis Wiener, Esq.
Page 2
September 23, 1997



Price Waterhouse has added an additional stratum to incorporate the approximately 10,320 accounts that appear only on the Master file. We recommend selecting six of these accounts. Since the Master file only accounts are lacking data regarding the sum of credits, the overall sampling fraction (0.00057) was applied to these Master file only accounts.

The sample size was designed to achieve three percent precision with 95 percent confidence. The overall sample size was allocated to the eleven strata using the Neymen allocation which is optimal for a stratified random sample. In addition, we recommend sub-stratifying based on the type of account (as defined by the fourth character of the account number). Based on conversations with Arthur Andersen on September 18, 1997, Price Waterhouse has grouped the account types into two groups: individuals and administrative. Individual accounts are defined as accounts with the following fourth character of the account number: A, B, C, D, G, H, J, N, P, Q, R, T, U, V, W, and X. The administrative accounts are defined as accounts with the following fourth character of the account number: E, F, I, K, L, M, and S. We have allocated the sample accounts to these sub-strata based on the proportion of credits for the account type group. Attachment B shows how sample accounts are to be allocated within each stratum.

This sampling plan can be applied only to the population of accounts on the OTFM database. Separate methodologies must be developed to address the population of accounts and transactions that do not appear in these data, including those where the individual Indian trust beneficiary is paid directly (thus bypassing the IIM system); those accounts and transactions that may not be in the OTFM data due to compacting and/or contracting; and those accounts and transactions prior to 1985.

We hope that we can come to an agreement with regard to the sampling plan, however, we are prepared to proceed with this sampling plan without further delay if such an agreement cannot be reached.

Sincerely,

Jessica Pollner

cc:    Mr. Dennis Gingold, Esq.
       NARF

## Sample Size Calculation for IIM account holders
## Using Cumulative Sum of Credits to Determine Strata Breaks

| Lower Bound | Upper Bound | Stratum | N | X | $s^2$ | Ns | $Ns^2$ |
|---|---|---|---|---|---|---|---|
| $0.00 | $774.71 | 1 | 260,943 | 56,067,598.33 | 49,201.03 | 57,880,563.21 | 12,838,664,371.29 |
| $774.72 | $7,762.41 | 2 | 184,127 | 504,615,636.04 | 3,173,236.93 | 327,996,135.78 | 584,278,596,210.11 |
| $7,762.42 | $24,141.54 | 3 | 43,077 | 560,676,863.89 | 18,322,165.59 | 184,388,508.83 | 789,263,927,120.43 |
| $24,141.55 | $82,549.09 | 4 | 13,210 | 560,672,582.32 | 239,628,483.85 | 204,489,982.42 | 3,165,492,271,658.50 |
| $82,549.10 | $288,917.04 | 5 | 3,889 | 560,424,527.08 | 2,782,447,155.13 | 205,140,498.05 | 10,820,936,986,300.60 |
| $288,917.05 | $1,040,192.67 | 6 | 1,074 | 560,939,912.45 | 42,764,507,641.51 | 222,098,701.52 | 45,929,081,206,981.70 |
| $1,040,192.68 | $2,691,046.19 | 7 | 350 | 560,643,320.12 | 172,721,987,340.62 | 145,459,422.00 | 60,452,695,569,217.00 |
| $2,691,046.20 | $5,944,411.67 | 8 | 143 | 558,009,813.26 | 854,984,645,016.27 | 132,225,493.03 | 122,262,804,237,327.00 |
| $5,944,411.68 | $12,561,552.92 | 9 | 64 | 557,077,251.35 | 3,299,317,857,875.90 | 116,249,756.76 | 211,156,342,904,058.00 |
| $12,561,552.93 | $23,105,956.08 | 10 | 33 | 557,689,546.05 | 10,093,580,732,087.00 | 104,842,307.38 | 333,088,164,158,871.00 |
| $23,105,956.09 | | 11 | 14 | 570,027,689.66 | 263,107,460,188,380.00 | 227,088,225.58 | 3,683,504,442,637,320.00 |
| Master File Only Accounts | | 12 | 10,320 | | | | |
| | | | 517,244 | 5,606,844,740.55 | | 1,927,859,595 | 4,471,766,341,159,430 |

| | | | Sample Size | Adjusted Sample Size |
|---|---|---|---|---|
| Precision = | 0.03 | Overall = | 314 | 296 |
| Confidence = | 1.96 | Strata 1 | 9 | 9 |
| | | Strata 2 | 53 | 53 |
| | | Strata 3 | 30 | 30 |
| | | Strata 4 | 33 | 33 |
| | | Strata 5 | 33 | 33 |
| | | Strata 6 | 36 | 36 |
| | | Strata 7 | 24 | 24 |
| | | Strata 8 | 22 | 22 |
| | | Strata 9 | 19 | 19 |
| | | Strata 10 | 17 | 17 |
| | | Strata 11 | 37 | 14 |
| | | Strata 12 | 6 | 6 |

Attachment B

## Allocation of Sample

| Stratum | | Account Type | Total Number of Accounts | Percent of Accounts | Sample Allocation | Total Throughput (Credits) | Percent of Total Throughput (Credits) | Sample Allocation |
|---|---|---|---|---|---|---|---|---|
| 1 | <774.72 | a. Administrative | 30,356 | 11.6% | 1 | 6,759,270.36 | 12.1% | 1 |
| | <774.72 | b. Individuals | 230,587 | 88.4% | 8 | 49,308,327.97 | 87.9% | 8 |
| 2 | <7,762.42 | a. Administrative | 22,992 | 12.5% | 7 | 63,605,609.75 | 12.6% | 7 |
| | <7,762.42 | b. Individuals | 161,135 | 87.5% | 46 | 441,010,026.29 | 87.4% | 46 |
| 3 | <24,141.55 | a. Administrative | 6,414 | 14.9% | 4 | 87,104,761.11 | 15.5% | 5 |
| | <24,141.55 | b. Individuals | 36,663 | 85.1% | 26 | 473,572,102.78 | 84.5% | 25 |
| 4 | <82,549.10 | a. Administrative | 3,222 | 24.4% | 8 | 139,137,378.40 | 24.8% | 8 |
| | <82,549.10 | b. Individuals | 9,988 | 75.6% | 25 | 421,535,203.92 | 75.2% | 25 |
| 5 | <288,917.05 | a. Administrative | 1,211 | 31.1% | 10 | 181,920,762.99 | 32.5% | 11 |
| | <288,917.05 | b. Individuals | 2,678 | 68.9% | 23 | 378,503,764.09 | 67.5% | 22 |
| 6 | <1,040,192.68 | a. Administrative | 517 | 48.1% | 17 | 279,371,817.94 | 49.8% | 18 |
| | <1,040,192.68 | b. Individuals | 557 | 51.9% | 19 | 281,568,094.51 | 50.2% | 18 |
| 7 | <2,691,046.20 | a. Administrative | 207 | 59.1% | 14 | 333,554,115.99 | 59.5% | 14 |
| | <2,691,046.20 | b. Individuals | 143 | 40.9% | 10 | 227,089,204.13 | 40.5% | 10 |
| 8 | <5,944,411.68 | a. Administrative | 104 | 72.7% | 16 | 421,972,116.82 | 75.6% | 17 |
| | <5,944,411.68 | b. Individuals | 39 | 27.3% | 6 | 136,037,696.44 | 24.4% | 5 |
| 9 | <12,561,552.93 | a. Administrative | 48 | 75.0% | 14 | 403,009,307.71 | 72.3% | 14 |
| | <12,561,552.93 | b. Individuals | 16 | 25.0% | 5 | 154,067,943.64 | 27.7% | 5 |
| 10 | <23,105,956.09 | a. Administrative | 28 | 84.8% | 14 | 466,876,541.05 | 83.7% | 14 |
| | <23,105,956.09 | b. Individuals | 5 | 15.2% | 3 | 90,813,005.00 | 16.3% | 3 |
| 11 | >23,105,956.08 | a. Administrative | 11 | 78.6% | 11 | 464,833,067.05 | 81.5% | 11 |
| | >23,105,956.08 | b. Individuals | 3 | 21.4% | 3 | 105,194,622.61 | 18.5% | 3 |

1301 K Street, N.W. 800W
Washington, DC 20005-3333

Telephone 202 414 1000

*Price Waterhouse* LLP 

December 9, 1997

**Exhibit R**

Dennis Gingold, Esquire
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20044

Re:  Sample Design

Dear Dennis:

I spoke with David Lasater of Arthur Andersen on Monday, December 8.  The
purpose of my call was to reiterate to David that the Price Waterhouse code for the
sample selection was available.  In addition, I understood that David had expressed
some concerns during the meeting on Friday December 5 about the ability to
augment our random sample without compromising the integrity of the sample.  I
assured David that the mechanism we used to assign random numbers was pristine
and defensible, and we could select additional records for Anderson if they so
elected.

Upon further discussion, David indicated that he has spent a great deal of time
thinking about the sample design.  I did not ask him to specifically elucidate these
points – however, he did indicate that he was now considering for example "live
Indians" and "special deposit accounts with positive balances."  I did express my
surprise and reiterated our understanding of Lew Wiener's October letter which
acknowledged their acceptance of the Price Waterhouse sampling plan, but for the
inclusion of an additional (approximate) 100 special deposit accounts.  Frankly,
David's "research" efforts over the past two months and his proposal for Price
Waterhouse and Andersen to jointly select a new sample baffles me and is without
merit.

I believe that I made my position to David quite clear – we were more than willing
to have Andersen review our code.  If they intended to augment their sample by
adding special deposit accounts, our selection methods could be used, and we
could, if so requested, select the records for them.  We neither believe that sampling
an additional 100 special deposit accounts is necessary, nor that any further
stratification or research is required.

Dennis Gingold, Esquire
Page 2
December 9, 1997



If you have any questions,  please feel free to call me at (202) 414-1505.

Sincerely,

Jessica Pollner

1301 K Street, N.W. 800W
Washington, DC 20005-3333

Telephone 202 414 1000

*Price Waterhouse* LLP



## Exhibit S

December 16, 1997

Mr. Dennis Gingold, Esq.
1201 Pennsylvania Avenue, NW
Suite 645
Washington, D.C.  20004

Dear Dennis:

This letter describes Arthur Andersen's latest sampling proposal which we received on December 12, 1997.  This new proposal differs substantially from the sampling plan that was agreed to on October 9, 1997.  As you know, the sampling plan was proposed by Price Waterhouse on September 23, 1997, was agreed upon on October 9, 1997, and was the result of many months of data analysis and meetings between Price Waterhouse and Arthur Andersen.  In fact, the sampling plan that was ultimately agreed upon was largely based on an Arthur Andersen proposal made in August, 1997.

The sampling plan agreed to on October 9, 1997 was designed to estimate any re-statement of accounts for the population of accounts on the OTFM database with 95 percent confidence and three percent precision.  This sampling plan was stratified by total dollar value of credits and by the type of account (administrative and non-administrative or end-user).  This sampling plan resulted in selecting approximately 300 accounts.

Based on conversations with David Lasater and a review of the documentation provided, Arthur Andersen's new proposal is designed to provide a sample to estimate three different definitions of the population of accounts on the OTFM database.  These populations would be stratified by the total dollar value of credits and are defined as follows:

- Population A:  All "alive individuals" and administrative accounts with a non-zero balance;

- Population B:  All "individuals" and administrative accounts with a non-zero balance (i.e., Population A plus individuals with a "date of death"); and

- Population C:  All "individuals" and all administrative accounts (i.e., Population B plus administrative accounts with zero balances).

Andersen's new proposal states that the goal of the sampling plan is to make statements about each of the populations defined above with 95 percent confidence and three percent precision. The agreed upon sampling plan would allow us to make a statement about the population as a whole with 95 percent confidence and three percent precision.

Mr. Dennis Gingold, Esq.
Page 2
December 16, 1997



With regard to these new population definitions, it is unclear if "individuals" refers to all non-administrative accounts on the OTFM database. Lew Wiener's letter of October 9 refers to non-administrative (end-user) accounts and administrative accounts. It is unclear if the term "individuals" is consistent with the Price Waterhouse's definition of non-administrative accounts. Similarly, it is unclear if Andersen's definition of administrative accounts is consistent with Price Waterhouse's. In addition, the differentiation between alive and deceased individual accounts is problematic. We have seen many instances where the date of death provided on the Master file is incorrect. For example, there are many cases in which a juvenile was assigned a date of death at the age of majority. In addition, the date of death is only available for those accounts that have a Master file record. There are approximately 200,000 accounts that do not have a Master file record and thus, no date of death is available.

The sampling plan now suggested by Andersen is similar in some respects to the one agreed to on October 9 in that it is stratified by total dollar amount of credits and sub-stratified by the type of account. The agreed upon plan sub-stratifies accounts into two groups: administrative and non-administrative accounts. Andersen's new plan sub-stratifies into three groups: Population A, Population B, and Population C. Therefore, rather than having 22 strata as defined by the agreed upon plan, Andersen's new plan consists of 33 strata. Andersen's new plan establishes certain strata for attributes that are not particularly meaningful. Strata are defined based on the date of death (which we know to be unreliable) and for non-administrative accounts whether the account currently has a zero balance.

Andersen's new plan forms the dollar value stratum boundaries based on the credit value characteristics of Population A (strata 1 to 11). The sample size required to estimate "total corrected throughput" for Population A is determined and that sample size is then allocated to each of the dollar value strata. The sample sizes required for Populations B (strata 12 to 22) and C (strata 23 to 33) are then calculated and allocated to each of the dollar value strata. This plan results in a sample size of approximately 385 accounts. The sampling plan is intended to select the necessary accounts from Population A, the incremental accounts necessary from Population B, and finally the incremental accounts for Population C. The idea is that the accounts selected for population A can be used along with the accounts selected for Populations B and C. Andersen's description of their sampling plan is attached to this letter.

Assuming that Andersen intends to extrapolate at the "stratum" or "sub-stratum" level, Andersen's plan would be statistically sound if the sample were selected in the appropriate manner. However, given the computer code that was provided to us, the sample is not selected in an appropriate manner (and does not work as Andersen intended it to). In addition, Andersen's plan does not address those accounts that only have a Master file record and no transaction data.

Andersen's sampling plan differs substantially from the plan agreed upon in October. However, this plan is not better than the plan suggested by Price Waterhouse and agreed upon by Andersen. Any number of statistically sound sampling plans could be developed and while

Mr. Dennis Gingold, Esq.
Page 3
December 16, 1997



they may be different, these plans may not be any better than the sampling plan that has been agreed upon. The additional 85 accounts selected by Andersen's plan may provide a slight increase in the precision associated with the sample, however, we do not believe that the increase will be great enough to warrant the examination of an additional 85 accounts.

More importantly, a sampling plan was *agreed* upon on October 9, 1997. We have now lost more than two months of valuable time. We have provided Andersen with our methodology for sample selection and we believe that this methodology is statistically sound. We suggest that we proceed with the sampling plan that was agreed upon and begin document retrieval for the 300 accounts randomly selected by Price Waterhouse.

Sincerely,

Jessica Pollner

cc:     Mr. Keith Harper, Esq.

1301 K Street, N.W. 800W
Washington, DC 20005-3333

Telephone 202 414 1000

*Price Waterhouse* LLP



December 17, 1997

**Exhibit T**

Mr. Dennis Gingold, Esq.
1201 Pennsylvania Avenue, NW
Suite 645
Washington, D.C 20004

Dear Dennis:

Based upon a conversation with David Lasater on December 16, 1997, it appears that
Andersen has changed their sampling proposal. David Lasater stated that based on
conversations with DOJ, they no longer propose to look at alive versus deceased individuals.
Therefore, the proposal we received on December 12, 1997 now includes only two
populations, rather than the three defined previously. These two populations are as follows:

- Population A: All "individuals" and administrative accounts with a non-zero
  balance; and

- Population B: All "individuals" and all administrative accounts.

No other differences in the sampling proposal were mentioned.

David stated that he believes that the definition of "individuals" is consistent with Price
Waterhouse's definition of non-administrative accounts and the definition of non-
administrative accounts is consistent with Price Waterhouse's definition.

Sincerely,

Jessica Pollner

cc:     Mr. Keith Harper, Esq.

1301 K Street, N.W. 800W
Washington, DC 20005-3333

Telephone 202 414 1000

*Price Waterhouse* LLP



# Exhibit U

December 10, 1997

Mr. David Lasater
Arthur Andersen LLP
1345 Sixth Avenue
Room 1413
New York, New York  10105

Dear David:

As discussed during our meeting of September 18, 1997 in Washington, D.C., Price Waterhouse has selected a random sample of accounts from the population of accounts on the OTFM database

Based on Lew Wiener's letter dated October 15, 1997, Federal Defendants' Opposition to Plaintiffs' Application for Order Requiring Furnishing of Information, and comments during the October 21 status conference and the December 5 meeting, there appears to be concern regarding the random selection of accounts. The procedure we used to randomly select the accounts to be sampled is a standard procedure. In essence, each account is assigned a random number generated from the uniform distribution. Accounts are then sorted by stratum and the generated random number. The appropriate number of accounts for each stratum are then selected from the sorted list of accounts. As detailed in our letter of September 23, 1997, we have defined an account by the account number and region and used the D/C field to determine if a particular transaction was a credit or a debit. Attached to this letter is the SAS code that generated the randomly selected sample. Program ANAL4.SAS randomly selects accounts from the accounts that have history file data, and program ANAL9.SAS randomly selects accounts from the accounts that have only Master file data.

If you have further questions regarding the random selection of accounts, please do not hesitate to contact me. I look forward to hearing from you.

Sincerely,

Jessica Pollner

cc:     Mr. Lew Wiener
        Mr. Andy Eschen
        Mr. Dennis Gingold
        Mr. Keith Harper

```
/******************************************************/
/*  Program:  Anal4.sas                               */
/*  Purpose:  Randomly select individuals from each strata */
/******************************************************/

libname dat '/data0/indian/sasdata';

options ls=156 ps=65 n,print;
     footnote1 "PRIVACY ACT MATERIAL.  This document contains material which is subject to a Protective Order entered by the United States District Court for the";
     footnote2 "District of Columbia.  It may be examined or used only pursuant to the terms of that Order.";

data history;
     set dat.histsum3(keep=account region credsum);
     select(substr(account,4,1));
         when('E','F','K','L','M','S','T','Y','Z') acctype = "A";
         otherwise acctype = "I";
     end;
     if credsum le 774.71 then strata = "1";
     else if credsum le 7762.42 then strata = "2";
     else if credsum le 2414.55 then strata = "3";
     else if credsum le 82549.10 then strata = "4";
     else if credsum le 288917.05 then strata = "5";
     else if credsum le 1040192.68 then strata = "6";
     else if credsum le 2691046.20 then strata = "7";
     else if credsum le 5944415.68 then strata = "8";
     else if credsum le 12564511.63 then strata = "9";
     else if credsum le 23105956.09 then strata = "10";
     else strata = "11";
run;

%macro doit(strata,type,sampsize,typedesc);
data hist&strata&type;
     set history;
     where strata = "&strata" and acctype = "&type";
     random = ranuni(22);
run;

proc sort data=hist&strata&type;
     by random;
run;

data hist&strata&type;
     set hist&strata&type;
     if _n_ le &sampsize;
run;

proc print data=hist&strata&type;
     title "Random Selection of &sampsize IIM Account(s) from Strata &strata and &typedesc Account Type";
%mend doit;
/*%strata,type,sampsize,typedesc)*/
%doit(1,A,1,Administrative);
%doit(1,I,8,Individuals);
%doit(2,A,7,Administrative);
%doit(2,I,46,Individuals);
%doit(3,A,5,Administrative);
%doit(3,I,25,Individuals);
%doit(4,A,30,Administrative);
%doit(4,I,18,Individuals);
%doit(5,A,11,Administrative);
%doit(5,I,22,Individuals);
%doit(6,A,18,Administrative);
%doit(6,I,18,Individuals);
%doit(7,A,14,Administrative);
%doit(7,I,10,Individuals);
%doit(8,A,17,Administrative);
```

```
%doit(8,I,5,Individuals);
%doit(9,A,14,Administrative);
%doit(9,I,5,Individuals);
%doit(10,A,14,Administrative);
%doit(10,I,3,Individuals);
%doit(11,A,11,Administrative);
%doit(11,I,3,Individuals);

run;

data dat.samp922(keep=account strata acctype region);
    set hist1A hist1I hist2A hist3I hist4A hist4I hist5A hist5I hist6A hist6I
    hist7A hist7I hist8A hist8I hist9A hist9I hist10A hist10I hist11A hist11I;
run;
```

```
/*******************************************************/
/*  Program:   Anal9.sas                               */
/*  Purpose:   Random sample of accounts taken from master file only*/
/*             records */
/*******************************************************/

libname dat '/data8/indian/sasdata';

options ls=156 ps=65;
footnote1 "PRIVACY ACT MATERIAL. This document contains material which is subject to a Protective Order entered by the United States District Court for the";
footnote2 "District of Columbia.  It may be examined or used only pursuant to the terms of that Order.";

data master;
   set dat.master;
   where ohistry = 'n';
   random = ranuni(2);
run;

proc sort data=master;
   by random;
run;

data master;
   set master;
   if _n_ le 6;
run;

proc print data=master;
   title1 "IIM Account Holders with No History Transactions";
   title2 "Random Selection";
run;
```

Price Waterhouse LLP        1301 K Street, NW 800W        Telephone 202 414 1000
                            Washington, DC 20005-3333

*Price Waterhouse* 

January 6, 1998                              **Exhibit V**

Mr. Dennis Gingold, Esq.
1201 Pennsylvania Avenue, NW
Suite 645
Washington, D.C.  20004

Dear Dennis:

This letter details the sampling plan with regard to the individual Indian trust beneficiaries
contained within the OTFM database for 1985 through November 1996.[1]  This sampling plan
was recommended by Price Waterhouse on September 23, 1997 and Mr. Lew Weiner has
stated that the defendants consented to this plan on October 9, 1997.  As you are aware, Price
Waterhouse and Arthur Andersen have participated in several meetings in an attempt to arrive
at a common sampling plan for this population of individual Indian trust beneficiaries.  The
sampling plan recommended by Price Waterhouse is the result of the discussions at these
meetings and is largely based on the sampling plan presented by Arthur Andersen on August
7, 1997.

The sampling plan considers the sampling unit (i.e., the items to be randomly selected) to be
an account, defined by the account number.  In addition, since there are accounts that appear
in more than one region, but may or may not belong to the same individual, Price Waterhouse
has defined an account by the account number and the region.  For example, an account that
appears in two regions would be eligible for sample selection in both regions.

Price Waterhouse developed a stratified sampling plan where similar accounts are grouped
together.  The groups, or strata, are defined by the sum of credits for an account as well as the
type of account (administrative or non-administrative).  For example, all non-administrative
accounts with total credits in a specified range (e.g., less than $774.72) are grouped together
into a single stratum. Attachment A contains the sampling plan recommended by Price
Waterhouse.

Price Waterhouse added an additional stratum to incorporate the approximately 10,320
accounts that appear only on the Master file, but have no transactions (either credits or debits).
We selected six of these accounts.  Since the "Master file only accounts" are lacking data
regarding the sum of credits, the overall sampling fraction (0.00057) was applied to these
Master file only accounts to arrive at the sample size of six accounts.

The methodology for determining stratum boundaries was initially suggested by Arthur
Andersen and involves dividing the cumulative sum of credits into equal groups.   This
process results in eleven strata.  The sample size necessary to achieve three percent precision
with 95 percent confidence for the entire sample is approximately 300 accounts.  These 300

---

[1] The OTFM data provided to Price Waterhouse is represented by the government to contain all
accounts on the IIM system.  These accounts may or may not be opened in the name of an individual.

Mr. Dennis Gingold, Esq.
Page 2
January 6, 1998



accounts are allocated to the eleven strata by the Neyman allocation, which is "optimal" for a stratified random sample.

Within each of these dollar value strata, we sub-stratified based on the type of account. We have grouped the accounts into administrative and non-administrative accounts. Administrative accounts are defined as those accounts that have the following fourth character in the account number: E, F, I, K, L, M, and S. Non-administrative accounts are defined as those accounts that have A, B, C, D, G, H, J, N, P, Q, R, T, U, V, W, and X. We have allocated the necessary sample accounts for each stratum to the sub-strata based on the proportion of credits for each account type group. For example, in stratum 1 (sum of credits less than $774.72) the suggested sample size is 9 accounts. In this stratum, approximately 88 percent of the total credits are in non-administrative accounts. Therefore, 88 percent of the 9 accounts (or 8 accounts) will be selected from the sub-stratum of non-administrative accounts. Attachment B shows how sample accounts are to be allocated within each stratum.

Note that even with subsampling of the administrative accounts, we do not intend to report separately the results of the analyses for administrative and non-administrative accounts. Rather, we will report on the OTFM population in the aggregate, but develop an equitable allocation system that allows for the appropriate restatement of all accounts. Since the monies are pooled, there will be no reduction in any account's balance - as such, a constrained allocation methodology will be used.

Price Waterhouse has selected a random sample according to this plan. The accounts were randomly selected by a standard procedure using a random number generator.

This sampling plan can be applied only to the population of accounts on the OTFM database. Separate methodologies must be developed to address the population of accounts and transactions that do not appear in these data, including those where the individual Indian trust beneficiary is paid directly (thus bypassing the IIM system); those accounts and transactions that may not be in the OTFM data due to compacting and/or contracting; and those accounts and transactions prior to 1985.

Sincerely,

Jessica Pollner

cc:   Mr. John Echohawk
      Mr. Keith Harper

1301 K Street, N.W. 800W
Washington, DC 20005-3333        Telephone 202 414 1000

## *Price Waterhouse* LLP



August 4, 1997                          **Exhibit Z**

Mr. Lewis Wiener
Department of Justice
General Litigation Section
P.O. Box 663
Washington, D.C. 20044

RE: Portland Site Visit

Dear Lew:

As we have discussed previously, Price Waterhouse cannot participate in the Portland
site visit unless we have a 100 percent guarantee that the visit will be productive and
fruitful. As you know, there was an enormous amount of confusion that surrounded
the Phoenix visit – the problems that arose in Pima, Salt River, and Uintah and Ouray
were unfortunate, and will not be tolerated again.

As you know, in mid-May 1997 we provided you with a listing of 40 account holders
from the Portland area. You have indicated that the BIA/OTFM staff have been
identifying the relevant documents associated with each of these account holders, and
have pulled the jacket folders for these individuals. To date, we have neither received
the jacket folders, a letter confirming that all of the relevant documentation has been
located and identified, nor a confirmation that the meeting will be held the last week
of August.

I cannot commit to sending staff to Portland if I do not have the assurances that
materials will be identified for us. It is not sufficient to merely have boxes identified
by BIA/OTFM, that may or may not contain the appropriate documents. With our
providing you with the listing of account holders and the documentation that we
believe is sufficient almost 90 days ago, I had hoped that such assurances would be
forthcoming. Furthermore, with the delays, and the lack of confirmation from you
(and Andy – I called him today as well), we have lost the ability to purchase tickets 21
days in advance. As such, our airfare is likely to be significantly higher than what we
anticipated.

In conclusion, unless we receive the information this week confirming that the
materials we requested have been identified, we will not attend a meeting the last

Mr. Lewis Wiener
Page 2
August 4, 1997



week of August.  Rather, we will delay the meeting until the letter arrives and the airfares are reasonable.  If you have any questions, please feel free to contact me at (202) 414-1505.


Sincerely,

Jessica Pollner

# PRICEWATERHOUSECOOPERS 🄯

## Memo

# Exhibit AA

To: / Location:        File

From: / Location:      Laura Gooding

Date:                  September 17, 1998

Subject:               Documents Requested and Received

This memo details the documents and data that we have requested and what documents and data we have not yet received.  It does not address new document or information requests.

**First Order for the Production of Documents, dated November 1996**

All items under the First Order for the Production of Documents, dated November 1996, have been provided with the exception of items 18 and 19.  Item 18 requests, "The current and immediately preceding handbooks, procedures, directives or instructions regarding tribal succession laws as they affect Trust Fund Accounting".  PricewaterhouseCoopers has received no documents regarding tribal succession laws.  Item 19 requests, "All documents, records, or tangible things which embody, refer to, or relate to IIM accounts of the five named plaintiffs or their predecessors in interest".  PricewaterhouseCoopers has received only partial documentation for the five named plaintiffs.

**OTFM Data Questions**

On February 7, 1997, Price Waterhouse submitted a list of questions regarding the OTFM IIM data.  A written response was provided on March 11, 1997.  However, some of the responses requested examples or other additional information.  Therefore, a set of follow-up questions was submitted on March 14, 1997. These questions were re-submitted on August 8, 1997.  PricewaterhouseCoopers has not received any response to these questions.

DRAFT – Confidential Attorney Client Workproduct

1301 K Street, N.W. 800W
Washington, DC 20005-3333

Telephone 202 414 1000

## Price Waterhouse LLP



May 15, 1997

# Exhibit Y

Mr. Lewis S. Wiener, Esq.
Department of Justice
General Litigation Section
P.O. Box 663
Washington, D.C.  20044

Dear Lew:

At this time, we would like to arrange a site visit to an additional area office.  We have selected the Portland area office.   We have selected account holders from two agency offices within the Portland area: the Warm Springs agency located in Warm Springs, Oregon and the Puget Sound agency located in Everett, Washington.

Attached is a list of twenty account holders from each of these agency offices in the Portland area.  We would like the area office to amass the relevant documentation for each of these selected account holders.  We would like to review this documentation during the site visit.

It is our hope that by providing a list of account holders at this time that a site visit can be arranged for mid June.

Sincerely,

*Laura Gooding* for

Jessica Pollner

cc:    Mr. Dennis Gingold, Esq.
        Mr. Bob Peregoy, Esq.
        Ms. Willa Perlmutter, Esq.
        Mr. Andy Eschen, Esq.



### IRMS Data

On April 17, 1997, we requested IRMS data and the programs used to manipulate these data. At this time, we also requested information regarding the LRIS. Unreadable tapes (intended to provide IRMS programs) were provided to Price Waterhouse on May 9 and May 14, 1997. On June 11, 1997, we received a tape contained four (of the over one thousand) IRMS programs. On August 8, 1997, we resubmitted this request for IRMS data and programs. We have not received any additional programs regarding IRMS. IRMS data were provided to Price Waterhouse on  June 30, 1998 and July 9, 1998.  However, the tapes containing the People component of the IRMS were unreadable.

These data appear to provide only a current snapshot of the lease and ownership data utilized by IRMS.  No historical lease and ownership have been provided.  We believe that such historical IRMS data is necessary for our analysis.

### LRIS Data

We originally requested information regarding the LRIS in April, 1997.  In September, 1997, we were provided with an inventory of LRIS related documents.  On December 4, 1997, we requested the LRIS data and many LRIS-related documents.  On February 16, 1998, two sample tapes containing LRIS data were provided.  On June 30, 1998, data tapes were provided that purported to contain the LRIS data, however, we have been unable to extract these data from the tapes.  We have received no documentation regarding the LRIS data.

We believe that these data are important to our analysis. In particular, it is our understanding that the LRIS data contain a historical component that appears to be absent from the IRMS data.

### Plaintiffs' Second Formal Request for Production of Documents

PricewaterhouseCoopers has received no documents pursuant to the second request for documents.

DRAFT – Confidential Attorney Client Workproduct



**Plaintiffs' Third Formal Request for Production of Documents**

PricewaterhouseCoopers has received no documents pursuant to the third request for documents.

DRAFT – Confidential Attorney Client Workproduct

# PRICEWATERHOUSECOOPERS ⓛ

## Memo

**Exhibit AB**

| | |
|---|---|
| To: / Location: | File |
| From: / Location: | Laura Gooding Schweitzer |
| Date: | November 20, 1998 |
| Subject: | Documents Requested and Received |

This memo details the documents and data that we have requested and the documents and data we have not received.  It does not address new document or information requests.

**First Order for the Production of Documents, dated November 1996**

All items under the First Order for the Production of Documents, dated November 1996, have been provided with the exception of items 18 and 19.  Item 18 requests, "The current and immediately preceding handbooks, procedures, directives or instructions regarding tribal succession laws as they affect Trust Fund Accounting".  PricewaterhouseCoopers has received no documents regarding tribal succession laws.  Item 19 requests, "All documents, records, or tangible things which embody, refer to, or relate to IIM accounts of the five named plaintiffs or their predecessors in interest".  PricewaterhouseCoopers has received only partial documentation for the five named plaintiffs.

**OTFM Data Questions**

On February 7, 1997, Price Waterhouse submitted a list of questions regarding OTFM/IIM data.  A written response was provided on March 11, 1997.  However, some of the responses requested examples or other additional information.  Therefore, a set of follow-up questions was submitted on March 14, 1997. These questions were re-submitted on August 8, 1997.  PricewaterhouseCoopers has not received any response to these questions.

DRAFT – Confidential Attorney Client Workproduct

PriceWaterhouseCoopers 🔲

## Compacting/Contracting

On February 13, 1997, we submitted a letter requesting various information regarding Indian compacting and contracting. We received written responses on April 10, 1997 and April 28, 1997. However, we believe that the information contained within these responses was incorrect. (The responses indicated that there were only three tribes that had compacted or contracted, however, we believe the number of tribes that are compacting or contracting is much higher.) We received a report of all compacting and contracting tribes on June 26, 1997. An additional report was provided on September 18, 1997. PwC was provided with approximately 80 contracts and compacts on February 6, 1998, however, we believe there should be many more.

## BIA Questions

On February 21, 1997, we submitted a letter requesting information regarding the relationship between the BIA, OTFM, BLM and MMS. In addition, we requested that a meeting take place between representatives of Price Waterhouse and the BIA and BLM. We received a written response on March 20, 1997 indicating that many meetings had already taken place and that some of the questions posed related to policy and would not be answered. A meeting took place at the BIA (though with limited attendance from key BIA personnel) in Washington, D.C. on April 15, 1997. We have not received any response to the questions posed in the original letter.

## Earlier Data

On March 3, 1997, Price Waterhouse requested IIM data for two regions (Portland and Phoenix) for the 1972 to 1985 time period. This request was re-submitted on August 8, 1997. We have received no response to this request. In addition, this letter requested data from the Phoenix region from 1970 through 1975.

Any data that can be obtained from earlier time periods would be extremely helpful in our analysis. Similarly, any data that has been produced since the IIM data were provided to us in December 1996 would be helpful.

# PRICEWATERHOUSECOOPERS 🔲

In addition, we requested data regarding the juvenile life insurance premiums paid through IIM funds. In particular, we requested copies of the policies, a list of the names of the beneficiaries, the names of the insurance companies, policy numbers, and the names of the insurance agents who sold the policies. We have received no additional IIM data and no information regarding the Phoenix area insurance policies.

## IRMS Data

On April 17, 1997, we requested IRMS data and the programs used to manipulate these data. At this time, we also requested information regarding the LRIS. Unreadable tapes (intended to provide IRMS programs) were provided to Price Waterhouse on May 9 and May 14, 1997. On June 11, 1997, we received a tape containing four (of the over one thousand) IRMS programs. On August 8, 1997, we resubmitted this request for IRMS data and programs. We have not received any additional programs regarding IRMS. IRMS data were provided to Price Waterhouse on June 30, 1998 and July 9, 1998. However, the tapes containing the People component of the IRMS were unreadable.

These data appear to provide only a current snapshot of the lease and ownership data utilized by IRMS. No historical lease and ownership have been provided.

## LRIS Data

We originally requested information regarding the LRIS in April, 1997. In September, 1997, we were provided with an inventory of LRIS related documents. On December 4, 1997, we requested the LRIS data and many LRIS-related documents. On February 16, 1998, two sample tapes containing LRIS data were provided. On June 30, 1998, data tapes were provided that purported to contain the LRIS data, however, we have been unable to extract these data from the tapes. We have received no documentation regarding the LRIS data.

We believe that these data are important to our analysis. In particular, it is our understanding that the LRIS data contain a historical component regarding land ownership that appears to be absent from the IRMS data.



**Plaintiffs' Second Formal Request for Production of Documents**

To the best of our knowledge, PricewaterhouseCoopers has received complete documentation for items 1-2, 4-5, 8-9, 13, 16-17, and 22.  Most of these requests ask for "all documents".  We have assumed that what has been provided represents all documents, unless there is evidence to the contrary.  PricewaterhouseCoopers has received partial documentation for items 3, 6-7, 19-21, and 24.  We have received no documents for items 10-12, 14-15, 18, 23, and 25.

Items 3 requests all documents related to the transfer of OTFM from BIA to OST, including any documents that relate to problems expressed by IIM clerks, BIA agency superintendents, and BIA area directors.  While some memoranda have been provided related to this transfer, no documentation has been provided regarding problems expressed by IIM clerks, BIA agency superintendents, and BIA area directors.

Item 6 requests an index of IIM trust related documents held by the National Archives.  An index of documents was provided for six of 13 NARA areas.  This index, however, does not list individual documents, but lists documents from a particular agency.  For example, the index for the Pacific Sierra region lists, "records of the following area offices, agencies, and schools:  California agency…"

Item 7 requests an index of IIM trust related documents held by Federal Records Centers.  An index of documents was provided for seven of ??? areas.  This index does not list individual documents, but lists documents by type.  For example, the index for the Central Plains Region lists, "Indian AO FLS".

Item 19 requests the DataComm contract and all weekly reports and reports containing projected time lines and cost estimates.  Only a portion of the DataComm contract has been provided.  Specifically, we are missing exhibits C-1 and C-3; Appendix A; and Appendix D. In addition, we received no weekly reports.

Item 20 requests all lists of errors identified by DataComm and all documentation regarding corrective action taken.  We were provided with detailed description of errors for only nine accounts.

DRAFT – Confidential Attorney Client Workproduct



### Compacting/Contracting

On February 13, 1997, we submitted a letter requesting information regarding Indian compacting and contracting. We received written responses on April 10, 1997 and April 28, 1997. However, we believe that the information contained within these responses was incorrect. We received a report of all compacting and contracting tribes on June 26, 1997. An additional report was provided on September 18, 1997. PwC was provided with some contracts and compacts on February 6, 1998.

### BIA Questions

On February 21, 1997, we submitted a letter requesting information regarding the relationship between the BIA, OTFM, BLM and MMS. In addition, we requested that a meeting take place between representatives of Price Waterhouse and the BIA and BLM. We received a written response on March 20, 1997 indicating that many meetings had already taken place and that some of the questions posed related to policy and would not be answered. A meeting took place at the BIA (though with limited attendance from key BIA personnel) in Washington, D.C. on April 15, 1997. We have not received any response to the questions posed in the original letter.

### Earlier Data

On March 3, 1997, Price Waterhouse requested IIM data for two regions (Portland and Phoenix) for the 1972 to 1985 time period. This request was re-submitted on August 8, 1997. We have received no response to this request. In addition, this letter requested data from the Phoenix region from 1970 through 1975. We requested data regarding the juvenile life insurance premiums paid through IIM funds. In particular, we requested copies of the policies, a list of the names of the beneficiaries, the names of the insurance companies, policy numbers, and the names of the insurance agents who sold the policies. We have received no additional IIM data and no information regarding the Phoenix area insurance policies.

Any data that can be obtained from earlier time periods would be extremely helpful in our analysis. Similarly, any data that has been produced since the IIM data were provided to us in December 1996 would be helpful.

DRAFT – Confidential Attorney Client Workproduct