IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELOUISE PEPION COBELL, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:96cv01285(TFH) |
| | ) | |
| KEN SALAZAR, Secretary of the Interior, | ) | |
| <u>et</u> <u>al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANTS' RESPONSE AND OBJECTIONS TO PLAINTIFFS' PETITION FOR CLASS COUNSEL FEES, EXPENSES AND COSTS THROUGH SETTLEMENT

Class counsel's petition for $223 million plus expenses is unsupported by and contrary to controlling law, contrary to promises counsel made in the settlement contract, and contrary to representations made to this Court, Congress, and the plaintiff classes. As the Court is aware, class counsel agreed in the class settlement that they would not contend that they were entitled to greater than $99.9 million in fees. They touted that binding commitment repeatedly to Congress and to class members to persuade Congress to enact the legislation and to reassure class members that settlement funds would go to class members, not to excessive compensation of their lawyers. Even if class counsel's demand for fees were not otherwise excessive, it should be rejected out-of-hand for this reason.

But class counsel's fee demand is also excessive and inconsistent with controlling law. Class counsel cannot escape a simple fact: although they enjoyed some early success in this case, they have already been compensated for that success through prior fee petitions. But since their 2001 success in the Court of Appeals, class counsel have lost virtually everything they have tried, being rebuffed in nine consecutive Court of Appeals' decisions. Throughout that period,

rather than advancing this case to conclusion, class counsel embroiled the Court, class members, and the government in a series of wasteful diversions characterized by ad hominem attacks on government officials and a lack of any discernible benefit to the class.  The broader resolution of Individual Indian Money (IIM) management issues and the determination of Congress to bring these issues to a close address claims not pursued by plaintiffs and unconnected to the detours they actually pursued.  Class counsel thus cannot justify the fees that they seek.

Finally, class counsel cannot look to their recently mentioned, but until recently unknown and to this day unseen, contingency fee agreement or to controlling law for support.  As discussed below, neither the fees class counsel seek nor the fees they claim are prescribed by their contingency agreement, are authorized or compelled by controlling law.  Even a fee of $99.9 million – all class counsel are permitted to seek – is grossly excessive.  The award of attorney fees, costs, and expenses to class counsel, as established below, should be limited to $50 million.  Such an award accords with controlling law and the settlement agreement, and is more than fair and reasonable in light of the record in this case.

## BACKGROUND

I.      **The Fee Provision**

To reach a settlement with the government, plaintiffs agreed that their motion for attorney fees incurred through December 7, 2009, "shall not assert that Class Counsel be paid more than $99,900,000.00."  Agreement on Attorneys' Fees, Expenses, and Costs, ¶4.a (Dec. 7, 2009) (Fee Agreement) (Exhibit (Ex.) 1).  It is undisputed that this fee provision was a material term of the settlement.  As the United States has explained in multiple fora, it was critical to ensure that, if this longstanding matter was to be resolved, the funds made available for

settlement should, to the maximum extent possible, be paid to the plaintiff class; the parties' agreement on attorney fees was directed to that end.

Plaintiffs and class counsel have themselves repeatedly reaffirmed the meaning, and importance, of the fee provision. In seeking to persuade Congress to enact the settlement legislation, plaintiffs told a committee of the House of Representatives, regarding their class counsel, "They have agreed to limit their petition for fees to under $100 million." *Proposed Settlement of the Cobell v. Salazar Litig.: Oversight Hearing Before the H. Comm. On Natural Resources* (2010 Oversight Hearing), 111th Cong. 55 (2010) (Statement of Elouise Cobell) (Ex. 4). In seeking this Court's preliminary approval of the settlement, plaintiffs informed the Court that the Fee Agreement provides that they "shall not assert that Class Counsel be paid more than $99,900,000.00," Joint Mot. for Preliminary Approval at 16 (Dec. 10, 2010) [Dkt. 3660] (Ex. 5), and that "Plaintiffs' motion will request that Class Counsel be paid $99.9 million." Plaintiffs' Notice Regarding Attorneys' Fees And Incentive Awards at 3 (Dec. 10, 2010) [Dkt. 3661].

To their class members, plaintiffs sent a formal Rule 23 notice asserting that, although they have contingency fee agreements containing a percentage that could, if applied, result in a higher award, "Plaintiffs' petition will assert that Class Counsel *should be* paid $99.9 million for fees, expenses, and costs through December 7, 2009." Ex. 6 at 14 (Long Form Class Notice) (emphasis added). Despite those representations, counsel now argue that their service to those clients merits a payment of more than twice that amount – further depleting the funds available for payments to class members by more than $120 million. Pet. at 25. Plaintiffs' proposed order directs that the class's custodian of funds "promptly shall pay to Class Counsel $223,000,000.00 [in] fees and $1,276,598 in expenses and costs." [Dkt. 3678-15].

## II.    Litigation

The lengthy history of this litigation looms over the fee petition like a tale of two cases, and class counsel have already been compensated for one of them.  Plaintiffs won early success in the first phase of the case, when they sought injunctions to enforce the accounting requirement of the American Indian Trust Fund Management Reform Act of 1994.  Plaintiffs obtained a favorable ruling at trial, *Cobell v. Babbitt (Cobell V),* 91 F. Supp. 2d 1 (D.D.C. 1999), which was "generally affirm[ed]" on appeal.  *Cobell v. Norton (Cobell VI),* 240 F.3d 1081, 1086 (D.C. Cir. 2001).  They then petitioned under EAJA and obtained an award of over $7 million in fees and expenses for their work, which the government promptly paid.  They also received over $750,000 in additional fees and expenses relating to discovery disputes.  *See* Ex. 7.

After that initial phase, class counsel had little success.  The case degenerated into a series of contempt and sanctions motions against 70 people and protracted efforts to shut down the Department of the Interior's computer systems.  The trial court conferred a few temporary victories – a contempt citation against the Secretary of the Interior and an order to disconnect most of Interior's computer systems – but those were short-lived.  After Plaintiffs' 2001 victory on appeal, they suffered nine straight defeats at the appellate level.  *See Cobell v. Kempthorne (Cobell XIX)*, 455 F.3d 317, 320, 330 (D.C. Cir. 2006) (noting that the court had, at that time, heard eight appeals since *Cobell VI,* addressing the historical accounting and collateral matters, such as contempt allegations against senior Interior officials, and had each time set aside a district court order or other action against Interior).[1]

---

[1]  The Court of Appeals expressly rebuffed class counsel's effort to dispute their losing streak: "Plaintiff-beneficiaries' . . .  only example of a break in *the constant stream of reversals* is our dismissal with prejudice of a government appeal. They neglect to mention, however, that the order they cite did not affirm on the merits, but instead responded to the government's motion for voluntary dismissal."  455 F.3d at 334-35 (emphasis added).

In the last appellate decision, the Court of Appeals held that an historical accounting was possible and vacated the Court's restitution award of $455.6 million. *Cobell v. Salazar (Cobell XXII),* 573 F.3d 808 (D.C. Cir. 2009). It noted that "[w]e must not allow the theoretically perfect to render impossible the achievable good," and remanded the case to this Court. *Id.* at 815.

## ARGUMENT

Class counsel's petition asks class members to foot the bill for their years of fruitless digressions from the core issue in the case. Settlement was precipitated not by class counsel's litigation efforts (which, in the years since they were paid for previous work, failed), but by the government's decision to end the litigation on terms that required congressional approval and set a better course for Interior and its relationship with Native Americans. The settlement is a fair one for the parties, but it merits nowhere near one hundred million dollars in attorney fees: the Court of Appeals had just vacated a monetary award to plaintiffs and instructed Interior to provide only "the best accounting possible, in a reasonable time, with the money that Congress is willing to appropriate." *Cobell XXII,* 573 F.3d at 813.

In setting attorney fees, the Court "must 'act as fiduciary for the beneficiaries (who are paying the fee) . . . because few if any, of the action's beneficiaries actually are before the court at the time the fees are set,' and because 'there is no adversary process that can be relied upon in the setting of a reasonable fee.'" *In re Dept. of Veterans Affairs Data Theft Litig.*, 653 F. Supp.2d 58, 60 (D.D.C. 2009) (quoting *Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237, 251 (1985)). As the court in *Warnell v. Ford Motor Co.*, 205 F. Supp. 2d 956 (N.D. Ill. 2002), explained:

> In a common fund case, however, "once the attorneys secure a settlement for the class, they petition the court for compensation from the same fund. Thus 'their

role changes from one of a fiduciary for the clients to that of a claimant against the fund created for the clients' benefit.' The court becomes the fiduciary and must carefully monitor disbursement to the attorneys by scrutinizing the fee applications."

*Id.* at 960 (quoting *Skelton v. General Motors Corp.*, 860 F.2d 250, 253 (7th Cir. 1988)); *see*

*Freeport Partners, L.L.C. v. Allbritton*, Dkt. No. Civ.A. 04-2030(GK), 2006 WL 627140 at *7

(D.D.C. 2006) (recognizing "the Court's duty to protect the class").

Class counsel's work did not hasten resolution of this case, and the plaintiff class should not be made to pay an exorbitant amount for it. An award of attorney fees, costs, and expenses of $50 million would be ample consideration on this record, would comply with controlling law and the settlement agreement, and would be fair and reasonable to class members.

**I.     The Factors That The Court Must Consider In Determining A Fair And Reasonable Award Of Attorney Fees Dictate An Award Limited to $50 Million**

In this Circuit, attorney fees in common fund cases are set using a percentage-of-the-fund method. *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993); Pet. at 4. This Court has articulated several factors that guide its decision under a percentage-of-the-fund method, including: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. *In re Baan Co. Sec. Litig.*, 288 F. Supp. 2d 14, 17 (D.D.C. 2003) *(*citing *In re Lorazepam & Clorazepate Antitrust Litig.* (*Lorazepam II*), Dkt. Nos. MDL 1290 (TFH), 99MS276 (TFH), Civ.99-0790

(TFH), 2003 WL 22037741 (D.D.C. June 16, 2003) at *7); *see In re Vitamins Antitrust Litig*. No.

99-197, MDL No. 1285, 2001 WL 856290 (D.D.C. July 16, 2001) (same).

Class counsel justify their excessive fee petition by inflating both the amount of the fund

for which they are responsible and the percentage to which they are entitled.  The Court should

reject such efforts and find that the controlling factors justify an award limited to $50 million.

A.     **The Size Of The Fund For Which Class Counsel Is Responsible Is Approximately $360 Million**

In *Swedish Hospital*, counsel for the class sought fees equal to twenty percent of a $27.8

million settlement fund.  The district court reasoned that class counsel could claim credit only to

the extent that their efforts enhanced the size of the settlement fund, and awarded fees totaling

twenty percent of only about $10 million of the $27.8 million settlement fund (or $2 million).  1

F.3d at 1264.  The D.C. Circuit affirmed, holding that the district court acted "within its

discretion in *basing its fee calculation only on that part of the fund for which counsel was*

*responsible.*"  *Id.* at 1272 (emphasis added).  When class counsel's litigation efforts were not

responsible for a significant portion of a settlement fund, this Court has followed *Swedish*

*Hospital.  E.g., In re First Databank Anitrust Litig.*, 209 F. Supp.2d 96, 100-101 (D.D.C. 2002)

(awarding attorney fees based upon $8 million of the total $19 million settlement fund).

Of the $3.4 billion involved in this settlement, approximately $1.5 billion will be placed

into a settlement account from which the plaintiff classes will be paid.  Of that $1.5 billion, only

a portion is allocable to the Historical Accounting Claims that class counsel litigated.  Under the

terms of the settlement, approximately 360,000 Historical Accounting Class members will each

receive $1,000 in settlement of those claims.  *See Cobell v. Kempthorne (Cobell XX)*, 532 F.

Supp.2d 37, 61 (D.D.C. 2008) (noting Interior's estimate of 364,772 IIM accounts).  As a result, only $360 million of the settlement funds are based on claims that counsel actually litigated.

The remaining funds are the result, not of tens of millions of dollars' worth of work performed by class counsel, but rather the government's desire to resolve the claims of the IIM account holders themselves.  Indeed, plaintiffs amended their complaint to add Funds Administration Claims and Land Administration Claims – claims that were never a part of this case – only after, and in accordance with, the parties' December 7 settlement.  Contrary to their current argument that "the monetary award for mismanagement was a benefit derived from this suit and the work of class counsel," prior to the complaint's December 21, 2010 amendment, plaintiffs repeatedly insisted that they were seeking *neither* money damages *nor* an infusion of money into the IIM trusts.  *Cobell v. Babbitt (Cobell I)*, 30 F. Supp. 2d 24, 39-40 (D.D.C. 1998). The Court previously struck their allegations of funds mismanagement or asset dissipation as "clearly irrelevant."  *Id.* at 40 n.18.  The Court stated, "Given the allegations contained in the Complaint and, importantly, certain representations of the plaintiffs' counsel, the Court holds that the retrospective allegations of the Complaint *seek solely an accounting*.  Thus, the plaintiffs do not seek money damages."  *Id.* at 39-40 (emphasis added).

Until the Court granted leave to amend the complaint, the only claim in this case was for an accounting:

> The plaintiffs' single "live" cause of action seeks a remedy for this legal breach [failure to provide an accounting], and *the remedy that this Court has fashioned is limited to ensuring that the defendants produce the requisite accounting of the Indian trust.*  Nothing in the *Cobell VI* Opinion can be construed to broaden the scope of this case to include issues unrelated to the defendants' obligation to provide an accounting of the trust, *such as matters related to asset mismanagement or other aspects of trust administration* unrelated to the processes by which records and other documentation of transactions involving

trust assets and the actions of the trustee-delegates are created, stored, preserved, and so forth.

The foregoing discussion makes clear that *this case is only about the rendition of an accounting of the Indian trust.*

*Cobell v. Norton*, 226 F.R.D. 67, 77 (D.D.C. 2005) (emphasis added).  Having held the case so limited, the Court invited plaintiffs to "file an amended complaint alleging that the defendants have a statutory duty to use due care in administering trust assets, and stating a statutory claim for breach of that duty."  *Id.* at 81.  It concluded that "[u]ntil such a claim is added, however, the Court's power to act is limited to the single claim over which it retains continuing jurisdiction . . . the plaintiffs' claim concerning the defendant's breach of their accounting duty."  *Id.* at 81-82. Plaintiffs never accepted the Court's invitation and asset mismanagement claims were never litigated.  The Court of Appeals confirmed this limited scope, holding that the IIM accounting is the "ultimate relief sought in this case," and "the ultimate relief sought by the class members." *Cobell v. Kempthorne (Cobell XVIII)*, 455 F.3d 301, 314-15 (D.C. Cir. 2006).

It was *defendants'* proposal to settle potential claims of funds and land mismanagement that led to the Trust Administration Class and to legislation conferring specific authority upon this Court to resolve those claims.  As the settlement agreement plainly states: "Recognizing that individual Indian trust beneficiaries have potential additional claims arising from Defendants' management of trust funds and trust assets, *Defendants* have an interest in a broad resolution of past differences in order to establish a productive relationship in the future."  Settlement Agreement at 4 (Dec. 7, 2009) (emphasis added) (Ex. 2).

The $1.9 billion appropriated for land consolidation is likewise not the product of class counsel's efforts, was not sought in the original or amended complaint, and is simply irrelevant

to the calculation of any common fund.  Under *Swedish Hospital*, no basis exists for imposing

costs associated with that amount on members of the class.  *See* 1 F.3d at 1265.  Interior is to use

the $1.9 billion to further a pre-existing land consolidation program and those funds will be paid

only to individuals who own and are willing to sell fractionated land interests.  To base a fee

award on the $1.9 billion would unfairly assess a tax against the settlement fund to reward class

counsel for a fund which they did not create and which applies to a subset of the classes.

At most, therefore, roughly $360 million might be recognized as representing a common fund

that class counsel arguably procured.

> **B.     Class Counsel Needlessly Generated Much Of The Complexity Of This Case,
> Prolonging The Litigation By Years, Without Benefit To The Class**

Central to the common benefit theory on which class counsel rely is the principle that the

beneficiaries of counsel's labors ought to share in the cost of achieving that benefit.  Here,

however, significant portions of counsel's fees were incurred on efforts that were either

unrelated to, or even affirmatively frustrated, the resolution that plaintiffs sought.  Class counsel

contend that they "have litigated novel issues and navigated a series of ten interlocutory

appellate decisions," Pet. at 18, but after a partial victory in *Cobell VI* (for which they have

already been paid), the work for which they now seek fees resulted in nine straight defeats before

the D.C. Circuit.  *Cobell XIX*, 455 F.3d at 320, 330; *Cobell XXII*, 573 F.3d at 815.

Much of class counsel's efforts over the past decade have been devoted to sideshows

having little to do with achieving the historical accounting that plaintiffs sought.  Class counsel's

skirmishing ran up costs for both sides.  As just one example, the IT security trial ran for 59 trial

days, with plaintiffs holding some witnesses on the stand for a week.  On appeal, the D.C.

Circuit first stayed and then vacated the Court's IT injunction, ruling that plaintiffs presented no

evidence of any risk of harm to the accounting.  *Cobell XVIII*, 455 F.3d at 315 ("Even if

someone did penetrate Interior's systems and alter IITD [individual Indian trust data], we have

been shown no reason to believe that the effects would likely be so extensive as to prevent the

class members from receiving the accounting to which they are entitled.")

      The incivility for which the *Cobell* litigation has become known presents no better

argument for payment and should not be rewarded.[2]  *See Cobell v. Norton (Cobell VIII)*, 334

F.3d 1128, 1146 (D.C. Cir. 2003) (in vacating contempt citations, court agreed that "defendants

reasonably characterize [this Court's] decision as having 'impose[d] opprobrium' upon them.").

Class counsel sought to have the Secretary of the Interior held in contempt and expanded this

vendetta to virtually every lawyer and official at the Departments of Justice, Interior, and

Treasury who had any role in the case, leading to the pendency of contempt or sanctions charges

against 70 individual government employees, *of whom 31 were targeted multiple times*.  The

ploy needlessly interfered with the duties and personal lives of scores of public servants and cost

the government more to defend the case because of the collateral attacks, but it garnered nothing

for plaintiffs' case and provided no benefit to the class.  Eventually, numerous pending contempt

motions were summarily dismissed.  *Cobell v. Kempthorne*, Jan. 16, 2007 Order [Dkt. 3283].

Yet class counsel not only cite these unfounded personal attacks to justify their fee request, but

demand that defendants, as the price of objecting to that request, divulge fees paid to private

attorneys hired to defend individual employees.[3]

---

[2]  Even in their fee petition, class counsel devote considerable space to irrelevant attacks on the BIA.  The reasonableness of the fee award is not a function of rhetoric or BIA history – which counsel distort – but of counsel's record.  Defendants responded to some of plaintiffs' misleading allegations regarding the BIA in response to Plaintiffs' Petition for Incentive Awards and Expenses [Dkt. 3679], which parrots the same *ad hominems*.

[3]  Class counsel's assertions that defendants have "dubious standing" to challenge their fee request and that the Court should strike down the challenges "unless they have produced their

The D.C. Circuit recognized that class counsel's efforts did little to advance their clients' cause. The court called the IT issues "collateral" to the historical accounting. *Cobell XVIII*, 455 F.3d at 315. And in *Cobell XIX*, 455 F.3d at 335, the D.C. Circuit admonished class counsel that "[they] would more ably advance their worthy cause by focusing their energies on legal issues rather than on attacking the government and its lawyers." Aside from the incentives that would be created should class counsel now be rewarded for such a strategy, the plain rulings of the D.C. Circuit demonstrate that class members should not be required to pay for it.

Even worse than the *diversions* from issues in the case is that costs were driven up by tactics that *affirmatively frustrated* the historical accounting that plaintiffs sought. No sooner had Interior begun the historical accounting required by *Cobell V* than class counsel denounced the effort and ultimately repudiated the relief sought in their own complaint. Plaintiffs dismissed Interior's historical accounting plans and argued that no accounting could be performed, even as evidence to the contrary proved them wrong. Their presentation during the 45-day trial known as "Trial 1.5" in May-July 2003, focused on frustrating any provision of an accounting.[4] And

time and fee records," Pet. at 13, n. 28, are frivolous. It is well-settled that the government as a settling defendant may rightly challenge a fee petition. *Swedish Hospital*, 1 F.3d at 1265 n.1. This is especially true here, where defendants serve as fiduciaries of the plaintiff class. Class counsel apparently fail to see the irony in criticizing the government for allegedly not protecting trust funds, on which individual Indians often rely for their basic needs (Pet. at 8), while arguing that the government may not protect those same funds from overreaching by their lawyers. The demand to see the government's fee records is especially disingenuous given that such expenses were largely attributable to wasteful actions initiated by class counsel.

[4] Of particular note, after the Court held defendants in contempt for failing to produce the documents relating to the accounts of the named plaintiffs and agreed-upon predecessors, defendants conducted a search costing upwards of $20 million, and produced over 160,000 documents dating back to 1914. *Cobell XX*, 532 F. Supp.2d at 49-50. Defendants introduced a study of the research results during Trial 1.5, which found only small variances in the over 12,600 transactions reviewed. *Id.* at 50. Plaintiffs vigorously attacked the methodology Interior used to analyze the results of the search, but they presented no proof that any of the more than 160,000 documents in the collection was factually incorrect.

their strategy was so apparent that this Court and, later, the Court of Appeals expressly noted plaintiffs' opposition to the very remedy which they purportedly sought.  *Cobell v. Norton (Cobell X)*, 283 F. Supp.2d 66, 207 (D.D.C. 2003) (noting plaintiffs' position that "the accounting owed by the United States government and ordered by this Court is impossible"); *Cobell v. Norton (Cobell XVII)*, 428 F.3d 1070, 1072 (D.C. Cir. 2005) ("Even the plaintiffs agree that the injunction [requiring a detailed historical accounting] should not stand because they believe it to be impossible to perform.").

The frustration of plaintiffs' own objectives was not limited to the historical accounting. Their actions, especially the temporary success in shutting down Interior's IT systems, significantly impeded and delayed trust reform.  *See, e.g.*, Aug. 1, 2005 Status Report to the Court Number Twenty-Two, Dkt. 3112, at 12-13, 16; Feb. 1, 2007 Status Report to the Court Number Twenty-Eight, Dkt. 3290, at 13, 17, 19, 42, 48-49.  The class members should not be taxed tens of millions of dollars to compensate attorneys for efforts that frustrated the very remedy that they purported to seek.

Finally, the work of class counsel was unduly devoted to what the Court early on deemed an effort to "treat the court as a grievance committee" to effect trust reforms that were within the purview of Congress.  *Cobell V*, 91 F. Supp. 2d at 6-7; *see id.* (reminding plaintiffs that "this is a lawsuit").  Ten years later, the Court of Appeals echoed this unheeded admonition, holding that the trust accounting was, among other things, subject to "the realities of congressional appropriations."  *Cobell XXII*, 573 F.3d at 813.

The failure, again, to focus on the legal issues that could be remedied by the court undermined a timely resolution that would benefit the class.  In the end, the Court rejected

plaintiffs' factual allegations, legal theories, and damages model, awarding them only $455.6 million as restitution. *Cobell v. Kempthorne (Cobell XXI),* 569 F. Supp.2d 223, 226, 252 (D.D.C. 2008).[5]  When plaintiffs appealed that award, it was vacated, and Interior was required only to provide "the best accounting possible, in a reasonable time, with the money that Congress is willing to appropriate." *Cobell XXII,* 573 F.3d at 813.  Thus, no monetary relief was forthcoming. *Id.*, at 815.  Any payments from this settlement will be the result of an opportunity to turn the page on the litigation, a congressional policy decision to facilitate resolution of this case and a potential next case, and an opportunity to appropriate funds towards a land consolidation program that would benefit Indian country and Interior for years in the future.  To bestow a hefty award upon counsel would be an inappropriate use of the plaintiff class's settlement funds.

### C.   The Risk Of Nonpayment Was Significantly Mitigated, And No Basis Exists For Applying A Contingency Fee

To the extent the Court must consider the risk of nonpayment, it was significantly mitigated by the Court's 2005 interim award of attorney fees, costs and expenses under the EAJA.  *Cobell v. Norton*, 407 F. Supp.2d 140, 171 (D.D.C. 2005).  By 2007, class counsel had been paid approximately $8.9 million in fees, costs, and expenses.  *See Cobell v. Babbitt (Cobell*

---

[5]  The Court found that, "despite a profusion of evidence and opinion about the unreliability of IIM records, there has been essentially *no direct evidence of funds in the government's coffers that belonged in plaintiffs' accounts*." *Id.*, at 238 (emphasis added).  The Court also found that:

> [Plaintiffs' restitution] model *did not make use of the best available evidence and did not make fair or reasonable comparisons of data.  Plaintiffs injected bias in their model* through use of unfounded adjustments. . . . *The plaintiffs' model stands or falls with their legal theory, and it falls.*

*Id.*, at 251-52 (emphasis added).

*IV)*, 188 F.R.D. 122 (D.D.C. 1999); Ex. 7.  In any event, class counsel must have considered any risk of nonpayment to be well worth taking inasmuch as the Kilpatrick firm alone claims to have employed *200* lawyers and support staff on the case at one time or another.  Dorris Aff., ¶5 [Dkt. 3678-10 at 2 of 14].

Class counsel argue that, due to the risk of nonpayment, "Ms. Cobell and other Class Representatives engaged class counsel on a contingent fee basis, which now totals in the aggregate 14.75% of the recovery."  Pet. at 13.  Class counsel do not provide copies of the agreements, which D.C. Rule of Professional Conduct 1.5 provides "shall be in writing," D.C. R. Prof. Conduct 1.5, or indicate the date(s) on which they were executed, stating only that they were "[p]rior to the Settlement Agreement."  Plaintiffs' Notice at 2. [Dkt. 3661].  The Court has not seen the terms of these purported agreements.  Instead, Ms. Cobell avers generally that she "had to engage them on a contingent fee basis." [Dkt. 3678-7, at 6 of 12].

Assuming that there are, in fact, contingent fee agreements totaling 14.75%, applying that percentage to the proper $360 million common fund results only in a payment of $53.1 million.  But no basis exists for using that claimed 14.75% percentage at all.  First, the Court has neither examined nor approved any written contingency fee agreement.  No agreement has been shown to defendants or, apparently, the class members.  Second, class counsel's reliance on the 14.75% rate expressly contradicts previous representations.  When seeking to certify the original class in 1996, plaintiffs stated that class counsel "are working on an hourly basis; none has been retained on a contingent fee (though some have agreed to withhold a portion of their hourly charge until a favorable termination of the case)." [Dkt. 5].  In March, 1999, plaintiffs reiterated that no class counsel had been retained on a contingent fee and stated that "Messrs. Gingold, Holt, and

Levitas will apply for such fee, if any, as the Court may award to them under the 'common fund' doctrine." [Dkt. 221]. Because the Court has not seen or approved these purported agreements which are at odds with representations at the start of the case and have not been considered by the plaintiff classes, no basis exists for applying a 14.75% contingency figure to any common fund. *See Klamath & Modoc Tribes v. United States*, 1 Cl. Ct. 378, 379 (1983) (in any fee determination matter, it is necessary to examine the provisions of the contract under which the attorney's services were performed for the tribe); Fed. R. Evid. 1002 (the best evidence rule); *cf. Pete v. United Mine Workers of Am. Welfare & Retirement Fund of 1950*, 517 F.2d 1275, 1291 (D.C. Cir. 1975) (en banc) (affirming court's rejection of contingency fee agreement where the court had not approved it, the fee was sought from a class lacking sophistication, and was sought late in the litigation after summary judgment was entered).

### D. Class Counsel's Contentions About The Amount Of Time Devoted To This Case Are Overstated And Not Credible

Class counsel assert that they have amassed fees that exceed $90 million using present-day rates that they have quoted, Pet. at 22, but this figure is not credible. First, their total includes billable hours for which counsel have already been paid – or worse, that counsel have claimed and the Court has already rejected. Class counsel's submitted time log lists hours dating back to the start of the case. Yet, plaintiffs 2004 petition seeking $14 million as an interim award under EAJA resulted in a $7 million award in fees and expenses for work through the first phase of the case, which generally ran from case filing to the partial appeal victory, *Cobell VI*, in 2001. They were also separately paid over $624,000 for time related to the first contempt trial. *Cobell IV*, 188 F.R.D. 122. Those hours are largely claimed again here. Ex. 8 (excerpts of 2010 billing records listing hours worked on Contempt I, Trial I).

-16-

Moreover, the Court already rejected many of these fees and expenses.  In awarding interim EAJA fees in 2005, for example, the Court found lead counsel's reported time spent reviewing and preparing time records for Trial I "grossly excessive" and reduced those hours by 75%, from 455.9 hours to 113.9 hours.  *Cobell*, 407 F. Supp.2d at 163, 190 (Appendix III). Nevertheless, class counsel again cite that "grossly excessive" time in support of their fee request.  Pet. at 21-22; *compare* Ex. 9 (excerpt from 2004 billing records describing time as "review, segregate, prepare relevant time re Trial 1 EAJA fee application"), *with* Ex. 10 (excerpt from 2010 billing records describing time as "work on T-1 time").

More recently, plaintiffs sought $129,642.27 in attorney fees in May 2007, for responding to a motion for reconsideration filed by defendants. [Dkt. 3320].  The Court unequivocally denied that request:

> No, sir.  *That time is not going to be compensated, not out of this Court*. . . .  I think responding to this motion for reconsideration, frankly, counsel, is a kind of a self-inflicted wound.  *You've made some very dramatic over-claims for fees*, and having to respond to that motion for reconsideration, I do not consider compensable.

Tr. at 13-14 (May, 14, 2007) (emphasis added) (Ex. 11).  Without explanation, class counsel now include that same attorney time in their billing totals, *Compare* Ex. 12 *with* Ex. 13.  Counsel should not be paid twice for the same work, or be permitted to rely on hours that the Court rejected.[6]  This Court should exercise its fiduciary obligation to prevent that unwarranted recovery.  *Warnell*, 205 F. Supp.2d at 960.

---

[6]  Class counsel had previously been warned about submitting the same time for payment in different fee petitions, including time that had been previously disallowed by the Court.  At one hearing, for example, the Court told class counsel, "With respect to any time that you have previously asked to be reimbursed and have been rejected, take it out of this bill. I don't care whether you can re-categorize it or not; take it out of this bill." Tr. at 13-14 (May, 14, 2007) (Ex. 11).

Even fees that class counsel now submit for the first time are subject to substantial discounting. The record demonstrates that class counsel's fee claims consistently are grossly exaggerated. On plaintiffs' petition in connection with the first contempt trial, the Court approved about 26% of plaintiffs' request ($624,643.50 out of $2,366,684 sought). *Cobell IV*, 188 F.R.D. at 123. On a sanctions award in 2002, the Court approved just over 30% of plaintiffs' request ($125,484.87 out of $409,038.82 requested). *Cobell v. Norton*, 231 F. Supp.2d 295, 299 (D.D.C. 2002). When plaintiffs presented their interim fee request under EAJA, the Court approved approximately 48% of the amount claimed ($7,066,471.77 out of $14,528,467.21 requested). 407 F. Supp.2d at 144-45. In the last fee petition decided by the Court in 2007, the Court reduced the award by more than one-third from that claimed ($341,728.20 out of $519,565.64 sought). *Compare* Order of Apr. 20, 2007, at 4-5 [Dkt. 3312], *vacated*, Order of Apr. 27, 2007 [Dkt. 3317] *with* Order of June 5, 2007 [Dkt. 3338] (awarding discounted amount after hearing). If just the smallest previous discount were applied here, class counsel's fees would shrink to $59.3 million – even before elimination of any double billing.

Finally, the billing rates used to support the fee request demonstrate that they are not entitled to any amount near $99.9 million. The billing rates are immediately suspect because their fee calculation depends on the use of *current* rates, rather than the rates that the timekeeper in question charged at the time the service was performed – a variation that is significant over thirteen years. Moreover, class counsel assert that they do not have hourly billing arrangements with the named plaintiffs, they only have a contingent fee agreement. Thus, no effective billing rates exist that are actually applicable to this case.

The billing rate claimed by Mr. Gingold also far exceeds the market rate standard this Court has previously authorized, as recently as 2007.  Gingold Aff., at 4 [Dkt. 3678-8].  In 2005 and again in 2007, the Court awarded fees at market rate, employing the *Laffey* Matrix.  *Cobell*, 407 F. Supp.2d at 171; Tr. at 15 (May, 14, 2007) (Ex. 11).  The *Laffey* Matrix currently prescribes an hourly rate of $709 for Mr. Gingold, as opposed to his claimed rate of $925 per hour.  Ex. 14.  Applying this reduced rate to the 48,772.3 hours Mr. Gingold claims alone results in more than a *$10.5 million reduction* in counsel's fee total.

### E.    Awards In Similar Cases Dictate A Percentage Of Well Below Ten Percent

Fee awards in other common fund cases lack sufficient similarity with this unique case to provide a meaningful basis for comparison.  *See In re Cendant Corp. Litig.*, 264 F.3d 201, 284 (3d Cir. 2001).  Nevertheless, a review of other mega-fund cases reveals that nothing near a 14.75% award is appropriate here.  In *In re Sulzer Hip Prosthesis & Knee Prosthesis Liability Litigation*, 268 F. Supp. 2d 907 (N.D. Ohio 2003), the court approved a fee award of *less than 5%* of the common fund based on an agreement between the parties that the attorneys would receive no more than $50 million.  The court did not even award the full $50 million, *id.* at 909, despite finding that "the complexity and novelty of the factual and legal issues presented, and the settlement negotiations necessary to resolve those issues, were exceptional."  *Id.* at 939.  In *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 737 (3d. Cir. 2001), the court's review of mega-fund cases revealed that, in cases where the settlement exceeded $300 million, the percentages ranged between 5%, and 8.275%.  While larger percentages have since been awarded in mega-fund cases, they are commercial cases involving extraordinary success and innovative, efficient

-19-

work. *E.g. In re Diet Drugs Litig.*, 582 F.3d 524 (3d Cir. 2009); *In re Vitamins Antitrust Litig.*,

2001 WL 856290. This case is very different.[7]

Unique to this case, Congress has directed that the Court set the appropriate award by

giving "due consideration to the special status of Class Members . . . as beneficiaries of a

federally created and administered trust." Claims Resolution Act of 2010, Pub. Law No. 111-

291, §101(g)(1)(B), 124 Stat. 3064 (2010) (Ex. 3). Class counsel argue that such consideration

warrants an award at the highest end of the spectrum. The record before Congress when it

enacted this language compels a very different conclusion. 2010 Oversight Hearing, 111th

Cong. 21 (statement of Hon. Michael O. Finley, Chairman of the Inter-Tribal Monitoring

Association on Indian Trust Funds) ("[P]eople have a problem with that large amount of money

coming out of the settlement itself.") (Ex. 15); 156 Cong. Rec. S4919 (June 15, 2010) (Letter

from President Jefferson Keel, National Congress of American Indians (NCAI), to Chairman

Dorgan and Ranking Member Barrasso) ("These attorneys' fees have generated considerable

discussion. . . . Over the years, the Cobell plaintiffs have frequently estimated the size of the

damages in the hundreds of billions, so disappointment at the size of the award has combined

with views about the size of the attorneys' fees.") (Ex. 16).[8] The suggestion that Congress

---

[7] If any award at all were appropriate for the funds attributed to the Trust Administration claims – and, as explained above, it is not – it would be in the realm of 1% or lower. By comparison, in *In re Cendant Corp. Litig.*, 243 F. Supp.2d 166, 172-73 (D.N.J. 2003), a case resolved "fairly early in the course of litigation," the court approved the lead counsel's negotiated fee request for $55 million, or 1.7% of the $3.2 billion award. Here, where the Trust Administration claims were resolved *without* litigation, and in the course of negotiations in which counsel were already engaged, no additional fee is appropriate.

[8] NCAI subsequently adopted a resolution seeking "[f]airness in attorney fees and incentive payments to ensure that they do not unduly diminish the restitution to individual account holders." NCAI, Resolution #RAP-10-037, *Supporting the Cobell v. Salazar Settlement and Requesting Additional Considerations* (NCAI 2010 Midyear Session) (Ex. 17). Other organizations have made similar calls. *E.g.*, Affiliated Tribes of Northwest Indians, Resolution #10-19, *Supporting Changes to the Proposed Cobell v. Salazar Settlement* (ATNI 2010 Mid-

intended – or that the "special status" of their class requires – that the individual Indian class members be charged more for legal services than controlling law provides is unsupportable.

### F.      Litigation Expenses Should Be Included Within the $50 Million Award

In an apparent effort to circumvent the Fee Agreement's $99.9 million limit, plaintiffs have shifted their efforts to collect over $10.5 million in litigation expenses to the Class Representatives' Petition for Incentive Awards and Expenses.  [Dkt. 3679].  As explained in our objections to that petition, most of those expenses are unjustified and should be disallowed but, to the extent the Court views them favorably, they should be included as part of counsel's award of "fees, expenses and costs."  Fee Agreement, ¶4.a.

## II.      Class Counsel Are Bound By The Terms Of The Fee Agreement

Class counsel mistakenly assert that the Fee Agreement's $50 to $99.9 million range is contrary to controlling law.  Pet. at 17.  The Fee Agreement simply provides for the parties to argue for an award in that range.  That is completely consistent with the law and with the intent of the parties and Congress.

Nothing prohibits counsel from entering into a contract in which they agree to accept fees that may be less than what they could recover under controlling law.  A settlement agreement is unquestionably a contract.  *Bluewater v. Salazar,* 721 F. Supp.2d 7, 19 (D.D.C. 2010) (citing *Makins v. District of Columbia*, 277 F.3d 544, 546-47 (D.C. Cir. 2002)).  The Fee Agreement is a material part of the settlement.  Absent fraud or duress, parties and their attorneys are bound by

---

Year Conference) (calling for attorney fees to be set at $50 million, which "will free up more funds to flow to Indian beneficiaries") (Ex. 18); Great Plains Tribal Chairman's Association, Resolution 29-05-26-10, *To Support Amendments to the Cobell Settlement To Fix and Improve the Proposed Cobell v. Salazar Settlement Agreement and as Included in the Tax Extender Package* (GPTCA) (calling for attorney fees to be set at $50 million, which "will improve the settlement by allowing more funds for the Individual account holders") (Ex. 19).

the settlement contracts they sign, regardless of whether they regret their decisions later.

*Schmidt v. Shah*, 696 F. Supp.2d 44, 62 (D.D.C. 2010).  With two teams of experienced counsel

negotiating its terms, plaintiffs do not, and cannot, demonstrate fraud or duress.  *See In re*

*Vitamins Antitrust Litigation*, 305 F. Supp.2d 100, 104 (2004) (a "presumption of fairness,

adequacy, and reasonableness" applies where experienced, capable counsel negotiate

settlement).

Even if their agreed range of $50 million to $99.9 million is less than what class counsel

now think they deserve, they were free to agree to limit the compensation they would seek as

part of the settlement bargain.  That is exactly what they did.  Keith Harper, one of plaintiffs'

lead counsel, publicly acknowledged their willing compromise shortly after the Fee Agreement

was executed:

> I think all parties understand that the norm award in most class actions would be
> higher than the range. *The parties had discussions about it and agreed to this*
> *range. We think that the interest of the class is served by it,*" said Kilpatrick
> Stockton partner Keith Harper, a lead attorney in the case. . . .  "Obviously there
> is concern about attorneys fees. I think it's fair to say this is well below the norm.
> *But we felt it was important to make sure that nothing held up the deal for the*
> *class.* That's got to be our singular focus. That has always been our focus."

*Attorneys Fees In Cobell Case 'Well Below The Norm' in Class Actions*, The BLT: The Blog of

LegalTimes, (Dec. 18, 2009), http://legaltimes.typepad.com/blt/2009/12/attorneys-fees-in-cobell-

case-well-below-the-norm-in-class-actions.html (emphasis added) (Ex. 20).

The Court should give effect to the common intent of the parties to the settlement.

*Lindell v. Landis Corp. 401(K) Plan*, 640 F. Supp.2d 11, 15 (D.D.C. 2009).  Both parties clearly

intended that they would litigate within a range of $50 million to $99.9 million, even if they may

have otherwise had contrary views on the appropriate boundaries.  Courts attempt to give

meaning to every part of a contract and seek to avoid rendering a portion of it void.  That

principle applies to settlement agreements, *Caglioti v. District Hospital Partners*, 933 A.2d 800,

811 (D.C. 2007), including this one.

Class counsel erroneously criticize the Fee Agreement's fee limitation as a "clear sailing

clause."  Pet. at 6.  A "clear sailing" agreement is one in which the party paying the fee agrees

not to contest the amount to be awarded by the court, so long as the award falls beneath a

negotiated ceiling.  *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 520 n.1 (1st

Cir. 1991).  The courts' concern with such clauses is that "the payor is bound by contract not to

contest the application," and that could "exacerbate[ ] the potential conflict of interest between

the plaintiff class and class counsel."  *Id.*, at 524-25.  That is not a problem here.  The Fee

Agreement, ¶4b, provides that "Defendants may submit a memorandum in opposition to

plaintiffs' motion," and defendants are obviously doing so.[9]  Moreover, the concern with "clear

sailing" clauses has never been that *class counsel* would be disadvantaged.  It is just the

opposite: that class counsel – without an adversary to challenge them – will wrest money from

the class to obtain an excessive fee.  *Id.*, at 524-25.  Class counsel turn this concern on its head

for their own gain.

Failing to see the irony of their claim, class counsel seek support in Congress's mandate

that the Court consider "the special status of Class Members . . . as beneficiaries of a federally

created and administered trust."  Pet. at 6.  On the contrary, Congress has mandated that the

Court consider the Indians' status as trust beneficiaries to protect their interests against this sort

---

[9]   In addition, because the Fee Agreement, Ex. 1, ¶2, and the enabling legislation both call for
the Court to exercise its discretion to approve the fee, the core issue raised in *Weinberger* is
notably absent here.  *See id.* at 525 ("[t]o the extent that the court below felt that the parties'
accord relieved it of any obligation to scrutinize the fee arrangement, it was wrong.")

of overreaching.  This view is consistent with Congress' long-standing desire to protect Indians from excessive fees and charges.  *See Quantum Entertainment, Ltd. v. U.S. Dept. of the Interior,* 597 F. Supp.2d 146, 148-49 (D.D.C. 2009) (discussing long history of "legislative protection" through 25 U.S.C. §81, which requires Interior's approval on certain contracts with tribes).

Finally, class counsel's suggestion that the 2010 Act's reference to "controlling law" somehow overrules the Settlement Agreement and frees them to seek any amount they wish is baseless.  The statute makes clear that the parties are bound by the Settlement Agreement's terms, so the agreement itself is part of the controlling law.  Moreover, the notion that Congress went out of its way to authorize or permit class counsel to seek *higher* fees than those that class counsel pointed to when lobbying Congress finds no basis in the text or legislative history of the statute.  *See* 156 Cong. Rec. H4091 (daily ed. May 28, 2010) (statement of Ranking Member Hastings) ("Every dollar paid to the lawyers is a dollar taken out of the pockets of individual Indians.") (Ex. 21); 156 Cong. Rec. S6801 (daily ed. Aug. 5, 2010) (statement of Chairman Dorgan) (lamenting that over a decade, "the case continued in Federal court with more and more money spent on lawyers") (Ex. 22); 156 Cong. Rec. S6803 (daily ed. Aug. 5, 2010) (statement of Ranking Member Barrasso) (calling the difference between the $1,000 Historical Accounting payment and a potential $100 million attorney fees award "an incredible disparity") (Ex. 23); 156 Cong. Rec. S4918 (daily ed. June 15, 2010) (statement of Ranking Member Barrasso) (calling the potential for a $99.9 million fee award a "serious flaw[]" in the settlement, and noting that "Fifty million dollars … is their number, so it must be fair") (Ex. 24).

If nothing else, class counsel are estopped from claiming more than $99.9 million.  Judicial estoppel arises "where a party assumes a certain position in a legal proceeding, . . .

-24-

succeeds in maintaining that position, . . . [and then,] simply because his interests have changed, assume[s] a contrary position." *Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 798 (D.C. Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *Comcast Corp. v. FCC*, 600 F.3d 642, 647 (D.C. Cir. 2010)).  Class counsel's new assertions are clearly contrary to their earlier agreement to seek no more than $99.9 million.  In the Fee Agreement, in their notice to the class, and in the motion for preliminary approval, they represent that they would request to be paid $99.9 million.  Exs. 1, 5, 6.  The Court accepted that representation in granting preliminary approval.  Because class counsel would otherwise derive an unfair windfall, the Court should apply the estoppel doctrine here.  *Moses,* 606 F.3d at 798.

## CONCLUSION

An award limited to $50 million for fees, costs and expenses would take into account that part of the settlement for which class counsel were responsible, would accord with controlling law, and would satisfy Congress' expressed intent that an appropriate award give due consideration to the special status of the class members as beneficiaries of a federal trust.

Dated: February 24, 2011

Respectfully submitted,

TONY WEST
Assistant Attorney General

MICHAEL F. HERTZ
Deputy Assistant Attorney General

J. CHRISTOPHER KOHN
Director

   */s/ Robert E. Kirschman, Jr.*
ROBERT E. KIRSCHMAN, JR.
Deputy Director
(D.C. Bar No. 406635)
JOHN T. STEMPLEWICZ

Special Litigation Counsel
GLENN D. GILLETT
JOHN R. KRESSE
MICHAEL J. QUINN
PHILLIP SELIGMAN
JOHN J. SIEMIETKOWSKI
Trial Attorneys
Commercial Litigation Branch
Civil Division
P.O. Box 875, Ben Franklin Station
Washington, D.C. 20044-0875
Telephone: (202) 616-0328

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 24, 2011, the foregoing *Defendants' Response and Objections to Plaintiffs' Petition for Class Counsel Fees, Expenses and Costs Through Settlement* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile, with exhibits by mail:

> Earl Old Person (*Pro se*)
> Blackfeet Tribe
> P.O. Box 850
> Browning, MT 59417
> Fax (406) 338-7530

/s/ Jay St. John