IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELOUISE PEPION COBELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:96cv01285(TFH) |
| | ) | |
| KEN SALAZAR, Secretary of the Interior, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANTS' OBJECTIONS TO CLASS REPRESENTATIVES' PETITION FOR INCENTIVE AWARDS AND EXPENSES

## INTRODUCTION

In addition to class counsel's request for $223 million in attorney fees and $1.2 million in expenses from class members' settlement funds, the class representatives seek personal awards totaling $13,056,274.50. The four class representatives, Elouise Cobell, James Louis LaRose, Thomas Maulson, and Penny Cleghorn, have garnered praise for their efforts on trust reform for Individual Indian Money (IIM) Accounts. But the millions of dollars that they ask to be paid in incentives *and* expenses (which they did not personally incur) is grossly excessive and threatens their fiduciary obligation to the classes. Together they seek $2.5 million as an incentive award, as a bonus for their efforts, which by itself is many times higher than the most generous awards bestowed in any reported case in this Circuit. Incentive awards are supposed to be modest remuneration that do not markedly diminish the moneys available to class members. Their $2.5 million incentive request is neither modest nor fair to the classes. Rather, the four class representatives should not receive more than $1,000,000 total, in addition to their class member

settlement payments, to cover both incentives and personal expenses, to be allocated among the

representatives as the Court deems appropriate.

No basis at all exists for awarding any of the $10.5 million in additional "expenses"

claimed by the class representatives.  The separate expense request is inconsistent with promises

made in the settlement: plaintiffs agreed they would not claim entitlement to more than $99.9

million for all "attorney fees, *expenses,* and costs" incurred in the litigation.[1]  Plaintiffs further

promised that their request for an incentive award would *"includ[e]* expenses and costs that

were not paid for by attorneys,"[2] such as personal travel expenses and the like, but here they

petition for an incentive award *plus* an expense award.  They do not even attempt to justify the

huge sums sought.  Instead, the petition presents a bill for millions of dollars in unsupported

litigation expenses *paid by others,* such as expert witness fees, process servers, and transcript

costs, all of which ought to be covered by the attorney fee award, if recoverable at all.

Moreover, the Court has already reviewed and rejected nearly $2 million of these expenses in

prior fee petitions by class counsel.  Even where the expenses are substantiated, they reflect

spending that is never recoverable in litigation: charges for political and lobbying activities;

millions paid to public relations firms and media consultants; overhead charges for rent,

electricity, insurance, internet, telephone, and administrative salaries.  Even sundry items like

bottled water and cleaning supplies creep into their unwieldy and unjustified tally of expenses.

---

[1]  Agreement on Attorneys' Fees, Expenses, and Costs ¶4.a (Dec. 7, 2009) (Fee Agreement) (Exhibit (Ex.) 1).

[2]  Settlement Agreement § K.2. (Dec. 7, 2009) (SA) (Ex. 2).

These are not personal, out-of-pocket costs of any individual class representative and thus cannot be "reimbursed" out of funds intended for class members.

Defendants did not agree to an award of incentives or other payments to the class representatives beyond the settlement distributions they will receive along with all other class members as part of the settlement.  Defendants fully reserved their rights to object to such additional payments in the Settlement Agreement where it states, "Defendants do not consent in any manner to an award of costs, expenses or incentives, except to the extent supported by and consistent with controlling law."  SA § K.3.  We also reserved the right to respond to any request.  *Id.*  Here, neither the Settlement Agreement nor controlling law supports the extra $10.5 million that the class representatives seek to charge their fellow class members.

Defendants do not dispute that Ms. Cobell has labored extensively on behalf of other class members.  But the amounts sought here cannot be justified under the law, both because they are excessive and because these expenses simply are not a proper basis for recovery through an incentive payment.  The Court should, therefore, limit its consideration to how much of the requested $2.5 million incentive award is sufficient to provide a modest incentive to future class representatives in other cases and still be fair and reasonable to the class members who will be assessed the cost.

**ARGUMENT**

I.    **When Class Representatives Seek a Large Award from the Class Recovery, an Inherent Conflict of Interest Arises and the Court Must Closely Scrutinize the Request**

This Court has recognized that granting an incentive award is about "[t]he propriety of allowing *modest* compensation to class representatives . . . ." *In re Lorazepam & Clorazepate Antitrust Litig.,* No. MDL 1290 (TFH), 2003 WL 22037741, at *10 (D.D.C. June 16, 2003) (emphasis added) (quoting *Bogosian v. Gulf Oil Corp.,* 621 F. Supp. 27, 32 (E.D. Pa.1985)).  But nothing about plaintiffs' petition is modest.  Incentive awards are intended "to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation," *In re Lorazepam,* 205 F.R.D. 369, 400 (D.D.C. 2002) (citations and internal quotation marks omitted), but they are neither universal nor always appropriate.  A study published in 2006 found that "awards were granted in about 28 percent of settled class actions." Theodore Eisenberg & Geoffrey Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study,* 53 UCLA L. Rev. 1303 (2006).  Incentive awards are not to be conferred reflexively, but are considered on the merits and circumstances in each case.  Even when the parties are able to agree on incentive awards (which is not true here), "it is within the Court's discretion [whether] to grant the incentive awards."  *Radosti v. Envision EMI, LLC,* 717 F. Supp. 2d 37, 52 (D.D.C. 2010).  Defendants do not object to a reasonable and modest incentive award for the class representatives, but the $2.5 million sought by this petition is neither.

A court's scrutiny is heightened when the incentive payments are more than nominal and other class members will be made to pay them.  *Varacallo v. Massachusetts Mut. Life Ins. Co.,* 226 F.R.D. 207, 257 (D.N.J. 2005).  As approved representatives for two certified classes, Ms.

Cobell and her named co-plaintiffs must "fairly and adequately protect the interests of the class[es]." Fed. R. Civ. P. 23(a)(4). They "represent not only themselves, but all members of the class, in a fiduciary capacity, and are obligated to do so fairly and adequately, and with due regard for the rights of those class members not present to negotiate for themselves." *Women's Committee for Equal Employment Opportunity v. National Broadcasting Co.,* 76 F.R.D. 173, 180 (S.D.N.Y. 1977); *accord In re Fine Paper Litigation,* 632 F.2d 1081, 1086 (3d Cir.1980).

The fiduciary obligation raises "concerns about whether the payment of any 'awards' can be reconciled with the punctilio of fairness the fiduciary owes to the beneficiary." *In re U.S. Bioscience Securities Litigation,* 155 F.R.D. 116, 120 (E.D. Pa. 1994). When "representative plaintiffs obtain more for themselves by settlement than they do for the class for whom they are obligated to act as fiduciaries, serious questions are raised as to the fairness of the settlement to the class." *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1148 (11th Cir.1983) (quoting *Plummer v. Chemical Bank,* 91 F.R.D. 434, 441-42 (S.D.N.Y.1981), *aff'd,* 668 F.2d 654 (2d Cir.1982)); *see also Warren v. Xerox Corp,* No. 01-CV-2909 (JG), 2008 WL 4371367, at *6 (E.D.N.Y. Sept. 19, 2008). In light of the size of the amount sought here, the Court must carefully "evaluate the award individually." *Hopson v. Hanesbrands Inc.,* No. CV-08-0844 EDL, 2009 WL 928133, at *10 (N.D. Cal. Apr. 3, 2009).

The relative merits of these particular class representatives' award request must also be weighed in light of Congress' exhortation that the incentive award be determined in a manner "giving due consideration to the special status of Class Members . . . as beneficiaries of a federally created and administered trust." Claims Resolution Act of 2010, Pub. L. No. 111-291, § 101(g)(1), 124 Stat. 3064 (2010) (2010 Act). The Court must, therefore, temper its

consideration in recognition of the fact that class members are trust beneficiaries of the federal government. This important obligation renders evaluation of the incentive award here, and its class impact, markedly different from any precedent that plaintiffs cite from the commercial and antitrust fields.

## II.     The $2,500,000 Requested for Incentive Awards Is Excessive Whether Valued in Absolute or Relative Terms

### A.      In Absolute Terms, $2.5 Million Far Exceeds Awards In Other Cases

The primary purpose of the incentive payment is to encourage the public good that is attained when individuals agree to litigate a meritorious claim not just in their own interest but on behalf of others who may have suffered the same wrong. *See, e.g., Sauby v. City of Fargo,* No. 3:07-cv-10, 2009 WL 2168942, at *2 (D.N.D. July 16, 2009). In the vast majority of cases, the incentive payment tends to fall far short of six figures. The 2006 UCLA study found that in 28 percent of the cases conferring an incentive award, the average award per class representative was about $16,000, with the median payment per class representative being closer to $4,000. 53 UCLA L. Rev. at 1308. Other studies have yielded similar results. *See* Sherrie R. Savett, *et al., Consumer Class Actions: Class Certification Issues, Including Ethical Considerations and Counsel Fees and Incentive Award Payments to Named Plaintiffs,* 936 PLI/Corp. 321, 340 (1996) (listing 52 cases involving incentive award payments where the plaintiffs were awarded between $1,000 and $200,000, with over half of the awards falling between $5,000 and $10,000) (Ex. 3). A study conducted for the Federal Judicial Center in 1996 looked at four federal districts and found:

> The median amounts of all awards to class representatives in the four districts [studied] were $7,500 in two districts, $12,000 in the third, and $17,000 in the

fourth.  In many cases, there was more than one representative.  The median
award per representative in three courts was under $3,000 and in the fourth was
$7,560.  The median percentage of the total settlement that was awarded to class
representatives was less than or equal to eleven thousandths of one percent
(0.011%) in all four districts.

Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in*

*Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* at 26

(1996) (figure citations omitted) (emphasis added).[3]  Based on these multiple empirical studies,

the $2,500,000 sought here is 100 or more times higher than the empirical norm.  Even when

split among the four class representatives, their requested award is an aberration.

This large anomaly is significant because courts often determine reasonableness and

fairness of an incentive payment by comparing them with awards in other cases.  *See, e.g.,*

*Pelletz v. Weyerhaeuser Co.,* 592 F. Supp. 2d 1322, 1330 (W.D. Wash. 2009) (justifying awards

of $7,500 each based on amounts awarded in other cases); *Denney v. Jenkens & Gilchrist,* 230

F.R.D. 317, 355 (S.D.N.Y. 2005) ("$10,000 is comparable to incentive awards granted in other

cases.  An award of $10,000 is also proportionate to the amount absent class members will

recover under the settlement"), *aff'd in part, vacated in part, remanded on other grounds,* 443

F.3d 253 (2d Cir. 2006).  Notably, not one of the incentive award cases from this District that the

class representatives cite comes close to the huge sum sought here.  *See* Pet. at 4.

This Court previously recognized the importance of keeping the incentive award to a

modest number, when it observed that the "propriety of allowing modest compensation to class

representatives seems obvious."  *In re Lorazepam,* at *10.  In *Lorazepam,* which was an antitrust

---

[3]  This study is available on-line at the Federal Judicial Center's web site
(http://www.fjc.gov/public/pdf.nsf/lookup/rule23.pdf/$File/rule23.pdf).

settlement, this Court approved incentive payments to four plaintiffs totaling $80,000, a number that pales in comparison to the $2.5 million sought here. *Id.* at *11.  In *Wells v. Allstate Ins. Co.*, 557 F. Supp. 2d 1, 8 (D.D.C. 2008), the court similarly awarded two class representatives a relatively modest $20,000.  Likewise, in *Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*, 246 F.R.D. 349, 365 (D.D.C. 2007), the Court approved awards of $12,500 each to the two class plaintiffs.  The $2,500,000 incentive requested here would, if granted, be 20 times higher than that awarded in the three mentioned cases *combined.*  The amount sought is anything but modest.

The enormous size of the requested award serves no valid "incentive" purpose and poses a risk that potential plaintiffs in other cases will assert class claims because of the huge profit incentive rather than primarily a desire to do good.  Plaintiffs proffer no support for the implicit contention that such a large sum is necessary in order to encourage plaintiffs in other cases to come forward as class representatives.  None exists.

B.     Even In Relative Terms, $2.5 Million Is Far Too Much

If one overriding consideration comes from the Court's prior decisions in this area, it is that the incentive award should be modest.  *In re Lorazepam* , at *10.  The Court should balance "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment."  *Staton v. Boeing Co.,* 327 F.3d 938 (9th Cir. 2003) (questioning fairness of settlement where named plaintiffs would receive 16 times more money than unnamed class members).  In *Alberto v. GMRI, Inc.,* 252 F.R.D. 652, 669 (E.D. Cal. 2008), for example, the court rejected settlement terms where the named plaintiff would receive "more than $5,000," while ordinary class members would get only $24.17 with

-8-

full class participation.  In *Alberto*, the rejected incentive award was 207 times the average class member recovery ($5,000 ÷ 24.17 = 206.8).

The proposed $2.5 million award threatens a substantially larger imbalance.  Under the terms of the settlement, each member of the Historical Accounting Class will receive $1,000. SA § E.3.a.  The settlement money dedicated to this class reflects the "common fund" relating to the litigation efforts of the class representatives.  *See* Defendants' Response and Objections to Plaintiffs' Petition for Class Counsel Fees, Expenses and Costs Through Settlement at 7-10 (Feb. 24, 2011) [Dkt. 3694] (Defs. Resp. to Fee Pet.).  Using this figure for comparison, the incentive payments to the four class representatives would be 2,500 times greater than the payment to each member of the Historical Accounting Class.[4]  Even if the Court were to consider the Trust Administration Class payments, the imbalance persists.  A majority of participants in both classes are expected to receive about $1,800 each, depending on the final number of class members.  *See generally* Ex. 4 at 8 (Long Form Class Notice) (indicating that the smallest distribution for both classes is expected to be around $1,800).  A $2.5 million award would be 1,389 times greater than the most common expected award to any single class member ($2.5 million ÷ $1,800).  Even though the Trust Administration Fund should not even figure into this award analysis, an incentive payment of $2.5 million would be about 880 times the expected average individual distribution for the two classes *combined* ($2.5 million ÷ $2840).[5]  In short,

---

[4]  Even when the group award of $2.5 million is compared to the settlement distributions to the same number of class members (four), the imbalance is plain ($2.5 million ÷ $4,000 = 625).

[5]  The average payout overall is based on the following estimate.  The total number of class members is estimated to be at least 500,000.  *See* Joint Motion for Preliminary Approval of Settlement at 18 (Dec. 10, 2010) [Dkt. 3660].  Settlement funds of $1.5 billion, less allowances

no matter how the requested amount is compared, it is vastly disproportionate to what most other class members can expect to receive.        Plaintiffs' reliance on *Allapattah Servs., Inc. v. Exxon Corp.,* 454 F. Supp. 2d 1185 (S.D. Fla. 2006), is similarly misguided.  In *Allapattah*, a much smaller class size meant that each claimant, on average, would receive about $66,170, after attorney fees.[6]  The settlement in *Allapattah*, which created a $1.06 billion fund before attorney fees, *id.* at 1191, was to be distributed among 11,000 claimants, *id.* at 1189.  Each of the nine named plaintiffs in *Allapattah* was approved to receive an incentive award around 25 times the average class member award.  *See id.* at 1241-42.  The petition here, in contrast, is far beyond the proportion found reasonable in *Allapattah.*  The other cases cited by plaintiffs are similarly distinguishable.  *See also Ingram v. Coca-Cola Co.,* 200 F.R.D. 685, 688, 694 (N.D. Ga. 2001) (incentive award of $300,000 to each of four class representatives was only eight times average award to the class) ; *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 145, 148 (E.D. Pa. 2000) (approving awards to six class representatives equal to 100 percent refund of their tuition that was about six times more than expected average value of 17 percent of tuition if all 5,300 class members claimed refund).

    *Allapattah* is the only case plaintiffs cite that confers an award of multiple millions, but it is readily distinguishable, even beyond the factors noted above.  *Allapattah* was a commercial lawsuit brought by gas station owners against Exxon for breach of their dealer agreements.  The

---

for expenses of class notice, administration, and all attorney fees, would leave about $1.42 billion for distribution to class members, resulting in an expected average payout of about $2,840.

    [6]  This figure is derived by deducting the attorney fee award of 31⅓ percent from the $1.06 billion common fund and dividing the balance by 11,000 (the number of class members). *See id.* at 1189, 1191.

class members were business owners, not private individuals, many of whom are elderly or impoverished. *Allapattah's* class representatives risked losing their dealerships and going bankrupt, even if they had secured a modest victory.[7] 454 F. Supp. 2d at 1220-21. *Allapattah's* most important distinction from this case is that the result in *Allapattah* was a complete victory for the plaintiff class: "Class Members will receive their *full* compensatory damages and nearly all of their prejudgment interest." *Id.* at 1189 (emphasis added). In contrast, these class representatives do not claim that they have achieved the maximum or full relief for the class, but have indicated that this resolution is a settlement in which all parties compromised.[8] Thus, no precedent exists for the enormous award plaintiffs seek in these circumstances, especially when Congress has directed the Court to be mindful of the class members who will pay for that award.

C.      Other Measures Of Fairness Counsel Against A $2.5 Million Award

Courts striving to derive a fair incentive payment have looked to other computations. Several have considered the time devoted to the case by the plaintiff and sought to base the award on some fair compensation for that time and out-of-pocket expenses. At the lower end, one court analogized to the per diem that district courts pay jurors. After deciding it would be

---

[7] The grave personal risks faced by the *Allapattah* plaintiffs also do not appear to have been softened by public acclaim or honors, as has occurred at times for these plaintiffs. *See, e.g.,* Cobell Aff. ¶ 11 (listing eight awards honoring Ms. Cobell's reform efforts) [Dkt. 3679-3].

[8] In their petition, plaintiffs admit suffering a streak of "puzzling reversals." Pet. at 4. But this Court also rejected plaintiffs' $47 billion lost funds model and concluded that the government's liability was at most $455.6 *million* – not billion – noting that the government's model indicated that the "stated balance [of IIM accounts] could very well be exactly correct." *Cobell v. Kempthorne,* 569 F. Supp. 2d 223 (D.D.C. 2008), *vacated and remanded on other grounds,* 573 F. 3d 808 (D.C. Cir. 2009), *cert. dismissed,* 130 S. Ct. 3497 (2010). Even this smaller award was subsequently vacated on appeal. *See* 573 F. 3d 808.

too difficult to determine an hourly rate of compensation for the named plaintiffs in *In re U.S. Bioscience Securities Litigation,* the court concluded:

> [T]he plaintiffs did incur expenses, and perhaps lost wages, because of their involvement in this litigation. This loss is similar to what jurors suffer. Inasmuch as we believe that the juror per diem represents an objectively reasonable valuation for lay advancement of justice, we shall take Congress's appraisal of that service as our standard. *See* 28 U.S.C. § 1871(b)(1). Since judicial time is better spent on matters other than evaluating vouchers for mileage, parking fees, and other expenses, we shall award round but modest sums calculated to err on the generous side to approximate reimbursement for such costs, in addition to a $40.00 per diem. Those who were deposed doubtless did invest more time and expense than those who merely approved and signed interrogatory answers, and so should be paid more for their presumed per diem fee. We shall therefore award $250.00 and $125.00, respectively.

155 F.R.D. at 122. Other courts have adopted some reasonable hourly rate. *See, e.g., Liberte Capital Group v. Capwill,* No. 5:99 CV 818, 2007 WL 2492461 (N.D. Ohio Aug. 29, 2007) ($80 per hour requested, $60 per hour awarded); *Pozzi v. Smith,* 952 F. Supp. 218 (E.D. Pa. 1997) ($40 per hour approved).

Ms. Cobell avers that she has devoted "between 500 and 1,200 hours each year" to this case over its life span. Cobell Aff. ¶ 13 [Dkt. 3679-3]. Although no records are submitted to show how that time was actually used,[9] Ms. Cobell's claimed time would total somewhere between 7,000 and 16,800 hours over 14 years of litigation. If compensated at $40 per hour, her award based on time would be between $280,000 and $672,000. Ms. Cobell also states that she has spent about $390,000 in out-of-pocket expenses toward prosecution of the case. *Id.* ¶ 20.

---

[9] For purposes of this illustration, we accept Ms. Cobell's time estimate at face value, but her own affidavit suggests that her estimate includes hours spent "in outreach, meetings in Washington on the Hill, in court and New York and other destinations to raise money to pay our experts and expenses." Cobell Aff. ¶ 13 [Dkt. 3679-3]. Time devoted to public relations and political activities should not be considered in setting an incentive award for service as a *plaintiff.*

Even though these expenses are relevant, "an incentive award is not intended to provide a recovery for all litigation expenses." *Liberte Capital,* at *2. But when her stated hours are added to her stated out-of-pocket spending, the number is still far below the $2,000,000 award sought for her personally. In the end, in fairness to the classes, it is "the proportionality which must temper this decision." *Id.*

Proportionality is a particularly important concern, because this case for most of the last 14 years was not structured to produce a common fund at all. Plaintiffs founded their original complaint upon the Administrative Procedure Act and sought only injunctive relief for the Historical Accounting Class. Indeed, all damages allegations were struck from the suit early. *Cobell v. Babbitt (Cobell I)*, 30 F. Supp. 2d 24, 39-40 & n.18 (D.D.C. 1998) (after concluding that plaintiffs were not seeking damages, the Court struck "as clearly irrelevant" all allegations of funds mismanagement and asset dissipation). In 2005, the Court reminded plaintiffs that the only "live" claim in the litigation was their demand that the government render a full historical accounting. *Cobell v. Norton*, 226 F.R.D. 67, 77 (D.D.C. 2005). Thus, regardless of the class representatives' efforts, this litigation was not aimed at securing a common fund. Until settlement was reached, plaintiffs had no hope of anything but injunctive relief for the benefit of the Historical Accounting Class. *See Cobell v. Salazar,* 573 F.3d 808, 813 (D.C. Cir. 2009) (vacating $455.6 million award to plaintiffs, holding that the "district court sitting in equity must do everything it can to ensure that Interior provides them an equitable accounting"). The more than $3 billion dollars relating to the Trust Administration Class settlement funds and to the land consolidation appropriation sprung from the *government's* comprehensive effort to avoid future

litigation and to address chronic problems posed by fractionated ownership interests in Indian trust lands.  *See* Defs. Resp. to Fee Pet. at 9-10.

This history is significant because no incentive award is possible when a common benefit is obtained, as opposed to a common fund.  As the Sixth Circuit explained in *Hadix v. Johnson,* 322 F.3d 895 (6th Cir. 2003), "incentive awards are usually viewed as extensions of the common-fund doctrine, a doctrine that holds that a litigant who recovers a common fund for the benefit of persons other than himself is entitled to recover some of his litigation expenses from the fund as a whole."  *Id.* at 898.  Not surprisingly, the Sixth Circuit was "unable to find any case where a claim for an incentive award that is not authorized in a settlement agreement has been granted in the absence of a common fund."  *Id.; accord Estep v. Blackwell,* No. 1:06CV106, 2006 WL 3469569 (S.D. Ohio Nov. 29, 2006).

Additional requirements of the common benefit doctrine affect consideration of plaintiffs' petition.  When attorney fees are sought in a common benefit case, for example, the beneficiary "class" cannot be made to pay for the benefit conferred unless all the following requirements are satisfied:

1.    The class of beneficiaries must be "small in number."

2.    The class of beneficiaries must be "easily identifiable."

3.    The benefits must be "traced with some accuracy" to the beneficiaries.

4.    There must be "reason for confidence that the costs [can] indeed be shifted with some exactitude to those benefitting."

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 265 n.39 (1975), *superseded by statute on other grounds as recognized in Marquart v. Lodge 837, Intern. Ass'n of Machinists*

*and Aerospace Workers,* 26 F.3d 842 (8th Cir.1994); *Brzonkala v. Morrison,* 272 F.3d 688, 691

(4th Cir. 2001).  "These requirements preclude recovery of attorneys' fees by those who

undertake to enforce statutes embodying important public values, that is, those acting as private

attorneys general."  272 F.3d at 691 (citing *Alyeska,* 421 U.S. at 265 n.39) (internal quotations

and modifications omitted).

Following *Alyeska,* the D.C. Circuit has required "a reasonably close, though not

necessarily perfect, fit between the interests of the litigants and those of the benefitting class."

*American Ass'n of Marriage and Family Counselors, Inc. v. Brown,* 593 F.2d 1365, 1369 (D.C.

Cir. 1979).  The D.C. Circuit has denied fees when "the 'benefit' to the class, while not

inconsequential, is incremental and relatively intangible," compared to the litigant's "direct and

pecuniary benefit."  *Id.*

These common benefit principles weigh against counting any part of the Trust

Administration Claims or the land consolidation fund in deciding on a dollar figure for any

incentive award.  Plaintiffs go beyond even these funds and compile a list of "benefits" totaling

some $9 billion that they claim to have secured for class members.  Pet. 6-7.  Even if their claims

were provable and true,[10] they cannot be relied upon to justify the amount of any incentive

award.  Benefits such as improved trust accounting systems are enjoyed by a wide class of

Indians, not just those who are included or choose to remain in the classes.  These benefits are

---

[10]  Defendants disagree broadly with the degree of credit plaintiffs deserve for various
achievements cited in their petition.  As one example, plaintiffs contend this suit is "solely"
responsible for $4.8 billion in spending on improvements in trust administration. Pet. at 6.  Their
assertion, however, ignores the influence of tribes (both before and after this suit was filed),
legislative oversight and appropriations in Congress, as well as efforts within the Department of
the Interior and elsewhere in the Executive Branch.

enjoyed by Indian country and, indirectly, the public at large, and are not readily traceable. These claimed achievements may justify giving incentive awards, but none of these common benefits can be used to justify the *size* of the awards.

The land consolidation component of the settlement is a case in point.  Land consolidation will benefit Indians and tribes where fractionated lands can be reduced.  The purchase program will be open to individual owners of fractionated trust land who may comprise a subset of the class or may not be current class members at all.  The funds for the program will be held in the Treasury until needed, so that none of this $1.9 billion fund is available to assess for an incentive award.  The same is true for the scholarship funds.  Those benefits will ultimately help individual Indian children generally, conferring an "incremental and relatively intangible" benefit that cannot support an incentive award.  Consequently, plaintiffs' list of achievements does not aid in determining the appropriate amount of an incentive award.

The petition attempts to justify these unprecedented awards with some selective history of the IIM trust accounts.  Repetition of sound bites from the past, however, do not justify a $13.05 million request.  The reasonableness of an award to class representatives is not a function of BIA history – which the petition distorts – but of the outcome obtained for the class members.

The petition, for example, asserts that a 1915 report to Congress indicated that the IIM trust was "riddled with 'fraud, corruption and institutional incompetence almost beyond the possibility of comprehension.'"  Pet. at 2.  The assertion is false.  The report did not find the trust system "riddled" with corruption but actually said that, due to the "increasing value " of the Indians' "remaining estate," the situation posed an "inducement" to fraud or corruption or institutional incompetence.  *Report to the Joint Commission to Investigate Indian Affairs*

*Relative to Business and Accounting Methods Employed in the Administration of the Office of Indian Affairs*, 63d Cong., at 2 (Comm. Print 1915) (Ex. 5 (report excerpt)).  The report's concern was not directed to specific government officials, private individuals, or corporate actors, but identified a general potential problem.  Indeed, the report states that the "critical statements which appear in different parts of the report relate to methods and procedure rather than to officials and employees of the Office of Indian Affairs." *Id.* at 4.  The report further noted that the "incomplete and unsatisfactory accounting system described is largely due to a lack of facilities and lack of personnel for the installation and operation of an up-to-date accounting system rather than to neglect or deficiencies on the part of officials, clerks, and employees in the service." *Id.*  Indeed, the report cautions that it could "not . . . be accepted as a conclusion . . . that those who have been employed in the Indian Service have been below others in ability or integrity when things have gone wrong.  It has been largely due to the conditions under which the service has been required to operate." *Id.* at 2.

This Court concluded after trial in 2008 that "despite a profusion of evidence and opinion about the unreliability of IIM records, there has been essentially no direct evidence of funds in the government's coffers that belonged in plaintiffs' accounts." *Cobell,* 569 F. Supp. 2d at 238.  The class representatives' own IIM accounts confirm the Court's conclusion.  In the course of this case, the accounting firm of Ernst & Young conducted a thorough, $20 million historical investigation of transactions in IIM accounts of the class representatives and their predecessors in interest – dating back to 1914.  The study found "[o]nly small variances." *Cobell v. Kempthorne*, 532 F. Supp. 2d 37, 50 (D.D.C. 2008).  The record in this case, then, runs counter to plaintiffs' narrative.

-17-

This brings the analysis back to fixing a reasonable incentive payment and using a modest percentage of the fund that results directly from plaintiffs' litigation efforts.  Plaintiffs rely on the Court's decision in *Lorazepam*, an antitrust case in which awards totaling between 0.2% and 0.3% of the common fund were deemed reasonable.  Pet. at 8 (citing *In re Lorazepam,* 2003 WL 22037741, at *11; and *In re Lorazepam,* 205 F.R.D. at 400).  Plaintiffs err, though, in their application of *Lorazapam*.  First, they assume that percentages appropriate in commercial litigation are also appropriate in an Indian trust case, where Congress has expressly directed the Court to be mindful of the special status of class members.  2010 Act § 101(g)(1).   No authority justifies the ready transfer of an antitrust case percentage to this case.

Second, plaintiffs use the overall dollar value of this settlement ($3.4 billion) to demonstrate that their requested award is modest.  They state that "$2.5 million . . . represents between 0.07% and 0.08% of the $3.4 billion monetary fund created."  As demonstrated above, however, the appropriate frame of reference is not the $3.4 billion value of all settlement components but, at most, the amount secured for the Historical Accounting Fund, which we estimate to be $360 million.  *See* Defs. Resp. to Fee Pet. at 7-10.  When the *Lorazepam* percentages are applied to $360 million, it produces a range of $720,000 to $1,080,000.  These results would still yield a total award that is 720 to more than 1,000 times larger than any single member of the Historical Accounting Class can expect to receive, which suggests that the *Lorazepam* percentages may be far too generous in these circumstances.  At the very least, these

comparisons strongly militate against granting an incentive award totaling more than $1 million for all four class representatives.[11]

## III.     None of the $10,556,274.59 in Additional Claimed Expenses Should Be Awarded

The class representatives' request for a separate award of more than $10.5 million in alleged expenses relating to the litigation is meritless.  By making a separate expense request, they both disregard their agreement with defendants and tacitly concede that the additional compensation they seek goes far beyond any reasonable figure for an incentive award.  The faults in the request are numerous and fall into the following broad categories:

- ▸     Litigation expenses can only be recouped, if at all, through the attorney fee petition, and a separate request here is inconsistent with the Settlement Agreement;

- ▸     No proffer is made as to the reasonableness of any expenses;

- ▸     No expenses documented in the petition reflect personal, out-of-pocket spending by the class representatives;

- ▸     The Court has already rejected nearly $2 million of these expenses;

- ▸     Many of the submitted records demonstrate that the expenses are neither reasonable nor necessary to the litigation;

- ▸     Expenses for public relations, lobbying, and political activities are not expenses involving the prosecution of the litigation, and are never recoverable; and

- ▸     Other expenses for overhead and general administration (e.g., rent, utilities, insurance, bathroom supplies, etc.) are never recoverable.

---

[11]  The Court, in its discretion, may divide any incentive award among the four class representatives.  Because courts often consider such facts, we note that although each class representative gave one deposition in the case, none was ever a trial witness.  Although Ms. Cobell attended many court hearings, the other class representatives rarely, if ever, attended court.

Each defect is addressed below, along with specific examples from plaintiffs' submission.  None of the extra $10.5 million claimed for expenses should be allowed.

      A.    <u>The Expense Request Violates Terms Of The Settlement Agreement</u>

When the parties negotiated the settlement, they agreed that attorney fees, litigation expenses, and costs would be litigated within a stipulated range.  *See* Fee Agreement ¶ 4 (Ex. 1).  Plaintiffs agreed to ask for no more than $99.9 million, and defendants would not assert that plaintiffs should be paid less than $50 million, in addition to amounts previously paid.  *Id.*  The terms include a briefing schedule and identify what the parties would submit.  The agreement contemplates that the Court may award whatever sum it decides is reasonable and fair for "attorneys' fees, *expenses,* and costs" based on the record before it, and neither side will appeal the decision if the amount awarded for "attorneys' fees, *expenses,* and costs" falls within the parties' stipulated range.  *Id.* ¶ 4 e. (emphasis added).  The Settlement Agreement likewise refers to the filing of "a petition for fair and reasonable attorneys' fees, *expenses* and costs."  SA § J.2. (emphasis added).  Thus, the settlement contemplates that the attorney fee award would also include money for reasonable and allowable expenses of the litigation.  Plaintiffs' separate request for expenses in this petition is inconsistent with these settlement terms.

No basis exists to presume that plaintiffs may split their expenses between the attorney fee petition and the incentive award petition.  After defendants bargained to keep the recovery of attorney fees, expenses, and costs within a negotiated range, it makes no sense to assume that defendants would willingly assent to an unlimited expense recovery request in another form.  Where the Settlement Agreement addresses the incentive award request, the terms provide that

the incentive award shall *include* plaintiffs' personal expenses and not become the subject of an additional, separate award.  *Id.* § K.2.

Plaintiffs read too much into one line from *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993), when they assert that plaintiffs are entitled "to be reimbursed from that fund for litigation expenses incurred."  Pet. at 16.  That decision deals solely with the issue of what attorney fees may be recovered in a common fund case, so the reference to expenses in the quoted phrase is dictum.  It does not address an incentive award, which is the subject of this petition, nor does that language trump the bargain that the parties reached in the Settlement Agreement.  Moreover, as discussed below, notwithstanding the Settlement Agreement, plaintiffs' attempt to recover expenses not incurred by them out-of-pocket cannot be squared with controlling law.

Plaintiffs' prior fee petitions reveal the pretense in their expense request here.  In 2004, plaintiffs submitted a petition for an interim award of fees and expenses in the amount of $14 million under the Equal Access to Justice Act (EAJA).  That petition included $4.5 million in expenses for work performed by an expert accounting firm, PricewaterhouseCoopers (PwC).  In support, plaintiffs submitted a declaration by Jessica Pollner of PwC.  The Court approved $2.5 million of these expenses and denied the rest.  *Cobell v. Norton,* 407 F. Supp. 2d 140, 163-65, 177 (D.D.C. 2005).  Without a word of explanation, the very same expenses – using another, virtually identical affidavit by Jessica Pollner – are recast and presented here as expenses of the class representatives.  *Compare* 2004 Pollner Aff. ¶ 34 (Ex.6) *with* 2011 Pollner Aff. ¶ 34 (Pet.

-21-

Ex. 10) [Dkt. 3679-10].[12]  This history demonstrates that such expenses fall squarely within the ambit of plaintiffs' petition for attorney fees, expenses, and costs – not here.  On this basis alone, plaintiffs are estopped from contending otherwise, and the Court can and should reject the entire $10.5 million request as improper.

Other documents submitted with the current petition support this objection.  John I. Hirshleifer, an officer of Charles River Associates (CRA), for example, states that his sworn statement is made in "support of the Plaintiffs' Application for Fees and Costs pursuant to the Class Action Settlement Agreement *and* the Agreement on Attorneys' Fees, Expenses, and Costs both dated December 7, 2009."  Hirshleifer Aff. ¶ 1 [Dkt. 3679-9] (emphasis added).  He further attests that "CRA was retained on March 6, 2008 by Plaintiffs, *through counsel,* to provide litigation related services."  *Id.* ¶ 2 (emphasis added).

Likewise, all of the $496,393 associated with the Indian Land Tenure Foundation involves payments made *on behalf of class counsel* for witnesses hired *by counsel.*  Rempel Aff. ¶ 5 [Dkt. 3679-8] ("I submitted the invoices attached as Exhibit B to ILTF for payment and I have confirmed with ILTF that they were paid. . . .") (all invoices in the referenced Ex. B are billed to counsel).  Other experts also appear to have been engaged by class counsel, not the

---

[12]  The 2011 Pollner affidavit, for example states:

> The hours and fees in Exhibits AC through AG differ slightly from those prepared in my affidavit dated August 13, 2004. I have included additional hours for preparation of fee estimates, budgets, and other analyses that were not previously included in the August 2004 affidavit.

2011 Pollner Aff. ¶ 34.  Her affidavit also notes that "[a]s a result of the schedules . . . and the information in this affidavit, Plaintiffs are requesting reimbursement for expenses incurred in prosecuting this litigation in the amount of $4,752,034."  *Id.* ¶ 36.

class representatives.  *See, e.g.,* Ex.7 (various expert fees billed to plaintiffs' attorneys).  Thus, to the extent any of these costs are proper litigation expenses at all, they should be paid from whatever amount is awarded on the attorney fee petition.[13]

B.  No Justification Is Offered That These Expenses Were Reasonable And Necessary

As fiduciaries for all class members, the class representatives bear a duty to demonstrate that all expenses they want class members to pay are reasonable and necessary for the litigation. As the First Circuit explained in the parallel circumstance of an expense petition by class counsel, the petitioners "are not necessarily entitled to the quantum of reimbursement to which they aspire.  To the contrary, they must establish the reasonableness of their requests.*"  In re Fidelity/Micron Securities Litigation,* 167 F.3d 735, 738 (1st Cir. 1999).  "In the course of that exercise, the trial court may insist on examining particulars, such as receipts and logs, so that it can determine whether the claimed expenses were reasonable, necessary, and incurred for the benefit of the class.  Unverified expenses may be rejected out of hand." *Id.*  "Parties seeking reimbursement 'must present enough supporting documentation to allow the Court to determine whether specific costs are reasonable and necessary.'"  *Sato & Co., LLC v. S & M Produce, Inc.,* No. 08-CV-7352, 2010 WL 3273927, at *6 (N.D. Ill. Aug. 16, 2010) (quoting *Fischer v.*

_____

[13]  About half of the $10.5 million claim relates to expert witnesses.  The petition identifies four broad expense areas.  *See, e.g.,* Pet. at 17.  About $6.6 million is sought for Blackfeet Reservation Development Fund, and it appears that at least $1.82 million concerns expert fees.  *See* Ex. 8 (summary table of identified experts and invoices to BRDF, with an illustrative sample record for each expert).  As discussed in the main text, PwC is an expert, whose charges are identified at $2.22 million (after deducting the litigation expenses previously approved and paid).  CRA, another expert firm, has fees of $1.03 million, Hirshleifer Aff. ¶ 2, for a total of $5.07 million for experts.  As with PwC fees, all these expenses are ordinarily of the type submitted as litigation expenses with counsel's fee petition.

*Avanade, Inc.,* 2007 WL 3232494, at *1 (N.D. Ill. Oct.31, 2007)).  The petition, however, offers

nothing to prove the more than $10.5 million in expenses are reasonable and necessary.

        C.      <u>The Claimed Expenses Were Not Incurred By The Class Representatives</u>

A first principle of reimbursement is that no one gets paid for expenses borne by others.

The expenses comprising this petition were plainly incurred by other parties and so are not

proper candidates for reimbursement.  The summary table plaintiffs provide on page 17 of their

petition, reproduced below, together with defendants' classification of the charges demonstrates

this.

| Entity | Amount | Summary/Classification |
|---|---|---|
| Blackfeet Reservation Dev. Fund | $6,612,099.02 | Community development corporation |
| Indian Land Tenure Foundation | $496,393.00 | Witness fees and expenses billed to counsel |
| Charles River Associates | $1,037,586.97 | Damages model expert hired by counsel |
| PriceWaterhouseCoopers | $2,220,195.60 | Early accounting experts hired by counsel |
| RSH Consulting | $190,000.00 | Lobbying in Congress and PR |
| TOTAL | $10,556,274.59 | |

Pet. at 17.  No name on the list is a class representative.  No amounts listed are shown to be out-

of-pocket expenses a class representative.  On the contrary, other entities that are not party to

this litigation incurred the expenses.[14]  Thus, no basis exists to award these amounts personally

to the class representatives, because they did not pay them.

The Blackfeet Reservation Development Fund, Inc. (BRDF) is a wholly-owned non-

profit subsidiary of Blackfeet National Bank, which is, in turn, substantially owned by the

---

[14] In fact, records of many travel expenses relating to Ms. Cobell indicate that she was timely reimbursed for them by a nonparty.  *See, e.g.,* Ex. 9 (illustrative travel reimbursements).

Blackfeet Tribe.  Revised Holt Aff. ¶ 21 (Jan. 10, 1997) (Ex. 10).  BRDF is not a party.  Ms.

Cobell is a director of BRDF, but that does not entitle her to be "reimbursed" for BRDF's

expenditures.  On the contrary, the record shows that the class representatives have no obligation

to repay expenses unless they recoup money for expenses.  *See* Ex. 11 at P000479 (Grant

Contract).[15]  Plaintiffs offer no authority for depleting class members' recovery to benefit a

nonparty to the litigation, and we are aware of none.

Similarly, no nexus exists between monies paid by the Indian Land Tenure Foundation

(ILTF) and a class representative.  ILTF itself has filed nothing.  Instead, plaintiffs submit an

affidavit by Geoffrey Rempel, a CPA and a non-attorney member of plaintiffs' litigation team.

He attests that all of the $496,393 paid by ILTF went to experts hired by class counsel or to pay

travel expenses of witnesses at counsel's direction.  Rempel Aff. ¶ 5 [Dkt. 3679-8].  No evidence

indicates that any class representative has paid ILTF for these outlays.

Although the class representatives executed affidavits in support of their petition, not one

document substantiates that any of them actually incurred an out-of-pocket expense.  The

affidavits by Messrs. Maulson and LaRose and by Ms. Cleghorn identify no incurred expenses.

*See* Maulson Aff. [Dkt. 3679-5]; LaRose Aff. [Dkt. 3679-4]; Cleghorn Aff. [Dkt. 3679-6].

Although Ms. Cobell does attest to having "covered travel and related costs out of my own

pocket when funds were depleted," she submitted no documents to verify what or how much

---

[15]  During discovery conducted early in the case, plaintiffs produced documents
evidencing financial support offered by BRDF (and other groups) that appear to obligate
repayment to these contributors only if covered expenses were actually later recouped.  *See, e.g.,*
Ex. 11.

those costs were.  Cobell Aff. ¶ 20 [Dkt. 3679-3].  The lack of records is difficult to square with

the detailed travel expense reimbursements to Ms. Cobell that appear in the submitted documents

of BRDF.  *See, e.g.,* Ex. 9 (sample selection of travel receipts and reimbursement checks for

trips by Ms. Cobell).  Absent a substantiation of personally-incurred expenses, the Court must

disallow them.  As this Court stated in disallowing unverified expenses of PwC earlier in the

case, "[t]his omission is fatal."  407 F. Supp. 2d at 165.  With the records indicating only

payments made by nonparties – and not by class representatives – plaintiffs have not

demonstrated an entitlement to "reimbursement."

      D.      The Court Has Already Rejected Almost $2 Million of the Expenses

As noted above, the Pollner affidavit attests that PwC incurred fees and costs of

$4,752,034, but plaintiffs' petition seeks "reimbursement" for only $2,220,195.60.  *Compare*

Pollner Aff. ¶ 36 [Dkt. 3679-10] *with* Pet. at 17.  The difference is largely explained by the fact

that defendants already paid more than $2.5 million of these expenses as part of the Court's 2005

EAJA award.  The resubmission of the unpaid balance is troubling.  All of PwC's charges should

have been included as expenses incurred by class counsel and addressed as part of the attorney

fee petition presented to the Court in 2004.  Most of the unpaid balance, however, remains

unpaid because the Court previously disapproved them.  The Court rejected $1,363,297.60 of the

PwC expenses as "excessive, unnecessary, or redundant time."  *Cobell*, 407 F. Supp. 2d at 192.

The Court disallowed another $483,839 of PwC expenses as improper.  *Id.*  Plaintiffs' attempt to

resubmit millions in rejected expenses defies this Court's direction not to resubmit fees or

expenses that were previously paid or rejected.  Tr. at 13-14 (May 14, 2007) (Ex. 12).

Only $149,709 of the amount previously requested on account of PwC could possibly be reimbursable now, for this small fraction was determined to concern matters beyond the scope of the Phase 1 trial, and thus outside the scope of the interim EAJA award. 407 F. Supp. 2d at 192. Without explanation, PwC has now added another $223,350 in expenses for "preparation of fee estimates, budgets, and other analyses," 2011 Pollner Aff. ¶ 34, that were allegedly omitted from the expenses request in the interim EAJA petition. Therefore, the maximum amount of PwC expenses that the Court should even consider is $373,059 ($149,709 + $223,350). Nowhere, however, does plaintiffs' petition demonstrate that these costs were reasonable and necessary to the litigation.[16] Absent this required showing, the class should not be made to bear this expense.

E.    Plaintiffs' Records Prove That Many Expenses Were Unreasonable Or Unnecessary

A cursory review of the expense records reveals that many of these expenses, on their face, cannot be reimbursed because they are not reasonable or necessary to the litigation. Given plaintiffs' failure to justify their submitted expenses, the Court should reject the request outright and not parse through every invoice to divine whether a particular expense was reasonable and necessary. Nevertheless, we tender some examples from the expert witness and travel categories to demonstrate their questionable character. For example, the CRA fees (exceeding $1 million) are for the faulty model that the Court rejected *in toto* at the 2008 trial. As the Court stated, "Plaintiffs' model suffers from numerous methodological flaws that . . . , in many instances, are obvious to anyone having basic familiarity with the case." *Cobell,* 569 F. Supp. 2d at 231. The

---

[16]    For example, a comparison of the fee tables submitted as Exhibit AC to both the 2004 and 2011 Pollner affidavits reveal 216 unexplained new hours for September 1999, resulting in a $48,600 jump in PwC's current bill. *Compare* Ex. 13 (2004 Pollner Aff. Ex. AC *with* 2011 Pollner Aff. Ex. AC at 6 [Dkt. 3679-13] (copy at Ex. 14).

Court concluded, "[i]nstead of providing unbiased opinions, plaintiffs' expert witnesses essentially provided plaintiffs with a way to put a dollar value on their argument," and the Court rejected their entire approach. *Id.* As plaintiffs' spokesman, Bill McAllister, told the *New York Times* after the Court's $455 million award in August 2008, "He [the judge] basically accepted the government's argument that not much money is missing. . . . He rejected our methodology and our theory of the case." Kirk Johnson, *Indians Gain a Slim Victory in Suit Against Government,* nytimes.com (Aug. 7, 2008), http://www.nytimes.com/2008/08/08/us/08indian.html (a version of this story appeared in the N.Y. Times at A16 (Aug. 8, 2008) (local edition)) (Ex. 15.) Absent class members, who had no way to influence the litigation, should not shoulder the burden of a poorly implemented and counterproductive expert model.

Some expert costs now submitted involve questionable overcharges for travel and preparation time. As but one example, expert deposition costs became the subject of briefing by the parties in 2003, following the Phase 1.5 trial. The Court never addressed the issue, but the parties thoroughly briefed whether the expenses were justified. Defendants found numerous excessive and questionable charges and objected to them. *See* Defendants' Opposition to Plaintiffs' Motion for a Protective Order Requiring Defendants to Pay Plaintiffs' Expert Deposition Fees and Expenses (Oct. 24, 2003) [Dkt. 2353]. These same questionable costs appear to be resubmitted now, including: a $1,000 hotel bill for a one-day deposition (Ex. 16); $139 for one evening's dinner (Ex. 17) ; over $100 of charges at a hotel lobby bar (Ex. 18); and time billed for sitting in on depositions of *plaintiffs'* other experts (Ex. 19 at BRDFINC 00963-

64).  These few examples raise sufficient concern about these expenses for the Court to insist that the class representatives do much more than simply present a tally.

Many travel expenses paid by BRDF for trips made by Ms. Cobell and others relate to activities outside of the litigation.  There are travel records that appear to relate to Ms. Cobell's work as a member of the Advisory Board of the Special Trustee for American Indians.  *See, e.g.,* Ex. 20.  There are expense reports for personal appearances by Ms. Cobell as a "guest speaker" at public programs and tribal events.  *See, e.g.,* Ex. 21.  Other trip reports show travel for meetings with tribes.  *E.g,* Ex. 22.  Some travel records show payments made for trips taken by persons who are not even parties in the case.  *See, e.g.,* Ex. 23 (travel reimbursements to Robert Moore, Justin Lee, and Greg Smitman).  On their face, such expenses were not incurred to prosecute the litigation and so cannot be recovered.

F.    Public Relations And Lobbying Expenses Are Not Reimbursable

An incentive award is based upon the prosecution of the litigation.  As this Court put it, courts "approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of *the class action litigation," Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. at 400 (emphasis added).  Plaintiffs' claimed expenses, however, include millions of dollars spent on "public outreach," lobbying, and political activities.  Plaintiffs offer no support for their assumption that lobbying expenses and political activities can be (or should be) compensated by the Court.  We are aware of none.

For sound reasons, the law does not allow attorneys to recover fees for time spent on lobbying the Executive Branch, promoting an agenda in Congress, or engaging more generally in public relations to promote an agenda.  *See, e.g., Kentucky Rest. Concepts, Inc. v. City of*

*Louisville,* 117 Fed. Appx. 415 (6th Cir. 2005); *Rum Creek Coal Sales, Inc. v. Caperton,* 31 F.3d

169 (4th Cir.1994) (time spent attempting to "sway public opinion" are not recoverable); *Leroy*

*v. City of Houston,* 831 F.2d 576 (5th Cir. 1987); *West v. AK Steel Corp. Ret. Accumulation*

*Pension Plan,* 657 Fed. Supp. 2d 914 (S.D. Ohio 2009).  Plaintiffs tender no reason to impose a

different rule for class representatives.  Allowing such a reimbursement would foster improper

incentives by encouraging others to use class litigation as an adjunct to a political strategy in the

hope of recouping lobbying costs at the conclusion of the case.

"Courts that have considered such claims have routinely denied reimbursement for

attorney time related to media relations." *Greenfield Mills, Inc. v. Carter,* 569 F. Supp. 2d 737,

752 (N.D. Ind. 2008).  In *Rum Creek Coal Sales, Inc. v. Caperton,* 31 F. 3d 169, 176 (4th Cir.

1994), the Fourth Circuit rejected a 42 U.S.C. § 1988 claim for fees for public relations efforts

"to sway public opinion and influence State policy-makers."  As the court explained, the

"legitimate goals of litigation are almost always attained in a courtroom, not in the media." *Id.*

The Third Circuit adopted the same reasoning in *Halderman by Halderman v. Pennhurst State*

*School & Hosp.,* 49 F.3d 939, 942 (3d Cir.1995), where it denied a request for "work related to

writing press releases, speaking with reporters and otherwise publicizing the contempt motion,"

holding that "the proper forum for litigation is the courtroom, not the media."  The court warned

that even if counsel "may perform tasks other than legal services for their clients, with their

consent and approval, [that] does not justify foisting off such expenses on an adversary under the

guise of reimbursable legal fees," noting that it was "particularly inappropriate to allow public

relations expenses in the case at hand while it was pending before the district judge . . . ." *Id.*

Another court aptly identified the problem:

Using the media as part of the litigation effort is counterproductive and is not a proper function of litigation. It is the courts who determine the outcome of a case, and the court's decision is based on all the facts, not on what kind of public opinion can be generated through the media. Finally, using the media to publish the alleged "horribles" suffered by the plaintiffs in newspapers all over the world, without proving the truth of any of the allegations, could add an element of coercion and pressure on the defendants to settle due to the bad publicity.

*Does I v. The Gap, Inc.,* No. CV-01-0031, 2003 WL 22997250, *2 (D. N. Mar. I. Sept. 11, 2003); *accord Hopwood v. Texas,* 236 F.3d 256 (5th Cir. 2000) (affirming denial of fees for media relations and noting "[w]e are chary about granting requests for media fees").

The D.C. Circuit, in *In re Meese,* 907 F.2d 1192 (D.C. Cir. 1990), disallowed recovery for time spent on "[m]edia related activity," because it had "no bearing on the operation of an independent counsel's investigation" and so was "not reasonably related to a defense to such investigation." *Id.* at 1203 (quoting *In re Donovan,* 877 F.2d 982, 994 (D.C. Cir. 1989)). The only media-related activity the Court of Appeals allowed was attorney time incurred in reviewing press accounts, because counsel benefitted *"in this case"* from the "heavy media involvement." *Id.* n.19 (original emphasis). No such assertion is made here.

In the Ninth Circuit, public relations work by counsel may in special cases be compensable when demonstrated to be "directly and intimately related to the successful representation of [the] client," *Davis v. City & County of San Francisco,* 976 F. 2d 1536, 1545 (9th Cir. 1992), *vacated in part on other grounds,* 984 F. 2d 345 (9th Cir. 1993), but that reasoning has not been adopted in this Circuit. Even if it were applicable, "[p]laintiffs have not shown the required direct, intimate relationship between their press activities and success on the merits of the case." *League for Coastal Protection v. Kempthorne,* No. C 05-0991-CW, 2006 WL 3797911, *8 (N.D. Cal. Dec. 22, 2006). More important, such reimbursement has been

denied when, as here, public relations contractors, not counsel, are the source of the expense. *Does I,* at *3 (denying cost recovery when "the plaintiffs hired a national public relations firm to handle this work").  Yet, plaintiffs seek to recoup such spending.  *See* Ex. 24 (table listing identified public relations/lobbying firms and fees, with one sample bill).[17]

Other expenses clearly reflect lobbying, not litigation, activity.  For example, invoices from another public relations firm, RSH Consulting, identify tasks such as "arranged meetings with key Members of Congress on the . . . House Resources Committee and the Senate Committee on Indian Affairs"; "drafted various 'talking points' and briefing papers for a settlement through legislation and other subjects"; "organized a briefing for staffers of the Native American Caucus"; and "drafted 'Dear Colleague' letters from the Native American Caucus co-chairs, Congressman Kildee and Congressman J.D. Hayworth."  Holmes Aff. ¶¶ 3, 5-6 (Jan. 20, 2011) [Dkt. 3679-20].  This and similar work is not labor of the class representatives; it is public relations and lobbying work performed by third parties, and paid for by nonparties.  It is not a proper expense for reimbursement.

G.    Many Other Expenses Are Purely Overhead, Which Is Never Recoverable.

It is axiomatic that basic administrative and operational expenses, often categorized as overhead expenses, are never recoverable as a litigation expense.  *See, e.g., Role Models America, Inc. v. Brownlee,* 353 F.3d 962, 974 (D.C. Cir. 2004) (disallowing librarian time as

---

[17]  In many instances, the nature of the work is not even evident from plaintiffs' documents.  The firm Policy Impact, for example, for which plaintiffs assert a claim totaling $556,209.55 (*see* Ex. 24 at BRDFINC05568), uses only the word "Consulting" followed by the month and year, with the fee, $50,000, in its invoices.  *E.g.,* Ex. 24 at BRDFINC05592.  (Also, although it appears that Policy Impact demanded payment of only one-quarter of their fee, plaintiffs here appear to claim the full amount.  *See id.* )

overhead).  Even when parties are entitled to reasonable attorneys' fees, they "may not recoup

fees for . . . tasks [that] 'ought to be considered part of normal administrative overhead.'" *U.S. ex*

*rel. Miller v. Bill Harbert Intern. Const. Inc.,* 601 F. Supp. 2d 45, 52 (D.D.C. 2009) (quoting

*Michigan v. United States EPA,* 254 F.3d 1087, 1095-96 (D.C. Cir. 2001).   The same result

should obtain for any overhead expenses of the class representatives.

It is important to keep in mind that none of the submitted records establishes the

expenses to have been incurred personally by any class representative, but even if they had been,

general overhead expenses are not recoverable.  As part of their petition, plaintiffs include the

following expenses incurred by BRDF:[18]

| Description | Amount |
|---|---|
| Salaries | $438,231.48 |
| Rent | $28,848.26 |
| Electricity | $5,413.78 |
| Telephone & Internet | $12,756.07 |
| Interest | $150,000.00 |
| Accountant | $23,751.67 |
| Web Site | $47,916.66 |
| Supplies | $141, 044.77 |
| TOTAL | $847,962.69 |

A majority of the salary expense is attributed to Eva Cobell, an administrator for BRDF.

Many of her time records fail even to indicate the hours worked or the tasks performed, *see, e.g.,*

---

[18]  The table below is based upon the table in Ms. Cobell's second affidavit in support of
their petition.  Cobell Aff. ¶ 8 [Dkt. 3679-7].  Sample BRDF records relating to these categories
can be found in Exs. 25-33.

Ex. 25 (pay records for 2000), and in other cases, it appears that BRDF is seeking reimbursement for vacation time, *see, e.g.,* Ex. 26.  Even were such overhead possible to recoup, the records are insufficient.  Similarly, annual audits performed on BRDF are claimed in this petition, without showing how any of that expense was in furtherance of the litigation.

Likewise, the petition seeks recovery of $150,000 in interest paid to the Otto Bremer Foundation, but no records were produced to prove the existence of any loan, much less the terms, or what purpose the financing served.  Thus, as with most elements of the petition, the charges are not only categorically improper, but also so sparsely documented that it is impossible to discern whether they were reasonable and necessary to the litigation.

All these claimed expenses, therefore, are ineligible for reimbursement.

## CONCLUSION

For the foregoing reasons, the petition should be denied in all respects, except for an incentive award no greater than $1,000,000, to be allocated among the class representatives at the Court's discretion.

 Dated: February 24, 2011                           Respectfully submitted,

                                                    TONY WEST
                                                    Assistant Attorney General

                                                    MICHAEL F. HERTZ
                                                    Deputy Assistant Attorney General

                                                    J. CHRISTOPHER KOHN
                                                    Director

                                                    *   /s/ Robert E. Kirschman, Jr.   *
                                                            ROBERT E. KIRSCHMAN, JR.
                                                    Deputy Director
                                                    (D.C. Bar No. 406635)
                                                    JOHN T. STEMPLEWICZ

Special Litigation Counsel
GLENN D. GILLETT
JOHN R. KRESSE
MICHAEL J. QUINN
PHILLIP SELIGMAN
JOHN J. SIEMIETKOWSKI
Trial Attorneys
Commercial Litigation Branch
Civil Division
P.O. Box 875, Ben Franklin Station
Washington, D.C. 20044-0875
Telephone: (202) 616-0328

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 24, 2011 the foregoing *Defendants' Objections to Class Representatives Petition for Incentive Awards and Expenses* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile**,** with exhibits by mail:

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
Fax (406) 338-7530

/s/ *Jay St. John*

_____