MARK KESTER BROWN, SBN 89467
mkesterbrown@att.biz
11150 W. Olympic Blvd. Suite 1020
Los Angeles, CA 90064
Telephone:  310-739-3900

Attorney for Plaintiffs

GIRARDI │KEESE
THOMAS V. GIRARDI, SBN 36603
tgirardi@girardikeese.com
STEPHEN G. LARSON, 145225
slarson@girardikeese.com
1126 Wilshire Blvd.
Los Angeles, CA 90017
Telephone:  213-977-0211
Facsimile:  213-481-1554

Attorneys for Movant Mark Kester Brown

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELOUISE PEPION COBELL, el al., | No.  1:96-CV-01285 (TFH) |
| PLAINTIFFS, | **ATTORNEY MARK KESTER BROWN'S MOTION FOR ATTORNEY'S FEES; MARK KESTER BROWN'S OBJECTION TO PLAINTIFFS' PETITION FOR CLASS COUNSEL'S FEES, EXPENSES, AND COSTS THROUGH SETTLEMENT; DECLARATION OF MARK KESTER BROWN; EXHIBITS** |
| v. | |
| KEN SALAZAR, Secretary of Interior, et al.,. | |
| DEFENDANTS. | |

1  **TO THE HONORABLE COURT, PLAINTIFFS, DEFENDANTS AND**

2  **THEIR ATTORNEYS OF RECORD HEREIN:**

3      PLEASE TAKE NOTICE THAT Attorney Mark Kester Brown hereby

4  objects to Plaintiffs' Petition for Class Counsel's Fees, Expenses, and Costs

5  Through Settlement, and also hereby files a Motion to the Court for an order

6  awarding him the sum of $5,517,431.37 in attorneys' fees and for an order

7  subtracting $5,517,431.37 from any judgment entered against the Defendants as

8  part of the parties' December 7, 2009, Settlement.

9      This application will be based on the entire record on file herein, this notice,

10  the attached memorandum of points and authorities, the attached declaration of

11  Mark Kester Brown, the exhibits attached hereto and any and all further argument,

12  evidence or documentation as may be presented at the time of the hearing of this

13  motion.

14

15

16  DATED:

17              By:   /s/ MARK KESTER BROWN

18                   Mark Kester Brown

19
                    Attorney for Plaintiffs
20

21                   and

22
                    Thomas V. Girardi
23                   Stephen G. Larson

24

25                   Attorneys for Movant Mark Kester Brown

26

27

28                              2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This case concerns, and was brought on behalf of, Native Americans who, for too many decades, endured federal government officials' long-standing failure to account for and disburse payments for use of their property granted through a historic Trust formed in the 1880's, thereby depriving them and the generations that followed of the monies they were due, leaving them mired in poverty. This wrong was well-known by the federal government going back to the Trust's earliest years, yet no remedial action was ever taken until this lawsuit was filed in 1996.

In 2000, attorney Mark Kester Brown ("Movant"), struck by the wrongs suffered by Native Americans and the decades of governmental inaction, left behind his practice at a well-respected law firm in Los Angeles, relocated to the Washington, D.C., area, and, at the behest of lead counsel and the named class representatives, devoted almost his entire time for approximately six years to litigating the matter as an attorney of record for the named class representatives. During this time, Movant foreswore receipt of any present salary at an hourly rate for his work for his clients, choosing instead to enter into a contingency fee agreement with the named class representatives.

In December, 2009, these litigation efforts resulted in a Settlement

Agreement between Plaintiffs and the Defendants.  Despite assurances from Mr. Dennis Gingold, lead counsel for the Class, that the time Movant spent in litigating this effort would be sought and included in any Fee Petition submitted to the Court at the conclusion of the litigation, none of Movant's time or work performed was in fact sought, much less mentioned, in Plaintiffs' Petition for Class Counsel's Fees. Upon discovery of this omission, Movant immediately thereafter filed a Notice with the Court of his intent to file Objections to said Fee Petition and to file an Application for his Fees as had been promised would, but which did not occur.

## II.  MOVANT IS ENTITLED TO AN AWARD OF ATTORNEYS FEES

As noted in Plaintiffs' Petition for Class Counsel's Fees, controlling law provides that fees for attorneys representing a class of plaintiffs is calculated as a percentage of a common fund plus other tangible benefits conferred on class members as a result of the litigation.  See Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1271 (D.C. Cir. 1993).  To that end, a "lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980).  This principle applies equally to situations where a "plaintiff has sued and created a benefit for a class."  In re Vitamins Antitrust Litigation, 2001 WL 34312839, at *8 (D.D.C. July 16, 2001).

1       Accordingly, Movant respectfully submits that he is entitled to the payment

2   of reasonable fees for the work performed on behalf of Plaintiffs in this case.

3

4   **III. THE AMOUNT OF REASONABLE FEES AND COSTS**

5       A.  Reasonable Fees Should Be Awarded Under The Lodestar Computation

6   Utilizing Prevailing Market Value

7

8       Under current law, the United States Supreme Court has sought to make

9   uniform – and equitable – the manner of determining what a "reasonable fee" is

10  under a common fund pursuant to an agreed settlement.  City of Burlington v.

11

12  Dague, 505 U.S. 557, 562 (1992).  As a general proposition, the Court adopted the

13  position that the "lodestar" figure, that is, the multiplication of hours worked by a

14  set hourly rate, is the "guiding light" in determining a reasonable fee.  Id.

15

16      Various cases in this jurisdiction have held that, where as here compensable

17  attorney's fees have been incurred over a period of years, an award of such fees

18  under the lodestar method calculated using current rates for the locality in question

19

20  (using the Laffey matrix as published by the Civil Division of the United States

21  Attorney's Office for the District of Columbia) adequately and appropriately

22  compensates for the delay in receipt of such fees.  See Covad Communs. Co. v.

23

24  Revonet, Inc., 267 F.R.D. 14, 31-32 (D.D.C. 2010); Woodland v. Viacom, Inc., 255

25  F.R.D. 278, 280 (D.D.C. 2008); Miller v. Holzmann, 575 F. Supp. 2d 2 (D.D.C.

26

27

28

2008); <u>Covington v. District of Columbia</u>, 839 F. Supp. 894, 902 (D.D.C. 1993) (court has discretion to award current year fees instead of historic rates to compensate for delay so long as it would not result in a windfall); <u>Hirschey v. FERC</u>, 777 F.2d 1, 5 (D.C. Cir. 1985)(court compensated for delay by awarding fee based on the adjusted EAJA rate at time of decision rather than when services rendered).

Accordingly, Movant calculates his fee application in the attached Schedule utilizing the current Laffey Rate ($475/hour) for his experience level for over 11,600 hours of work.  Movant notes that this rate is substantially less than what he would otherwise seek (as well as what is being sought by other counsel in this case), but believes that it is reasonable given the limited funds available and the public interest nature of this litigation.  Moreover, if this Court for any reason does not award fees under that approach, Movant is prepared to recalculate his hours utilizing whatever schedule or factor the Court wishes to use.

B. <u>Movant's Attorneys' Hours And Hourly Rate Are Reasonable</u>

The hours claimed are all reasonable and directly connected to Plaintiff's prevailing position in the instant litigation.  As reflected in the attached Declaration of Mark Kester Brown, the Movant represented the Plaintiffs in this litigation for approximately six years – virtually full time.  In those years, Movant worked

11,615.645 hours of compensable time.  The reasonableness of this amount of time is apparent when juxtaposed against those being sought by Mr. Rempel (20,399.72 hours at a proposed $450 per hour rate) who joined the <u>Cobell</u> litigation team at roughly the same time as Movant.  Indeed, over the course of nearly six years of litigation, this amounts to an average of approximately 138 hours per month.

Here, Movant's proposed hourly fee of $475/hour is well within the norm for practitioners in the Washington, D.C., legal community – to which Movant relocated from California in order to fully represent the Plaintiff Class – as indicated by the Laffey rate prepared by the United States Attorney for the District of Columbia and the declaration of Mark Kester Brown.  Indeed, Movant regularly charged a reasonable fee of $350 per hour <u>in 2000</u> when he was practicing as a litigation partner at a well-respected law firm.  <u>See</u> Declaration of Brown, ¶6.

Movant therefore prays that the total sum of $5,517,431.37 be deducted from Plaintiffs' Petition for Class Counsel's Fees, Expenses, and Costs Through Settlement and awarded to him for his services he rendered to his clients, the Plaintiffs Class.

## IV.   OBJECTIONS

On the grounds set forth in Movant's declaration, Movant objects to Plaintiffs' Petition for Class Counsel's Fees, Expenses, and Costs Through

1   Settlement for its failure to include or seek fees for the work performed by Movant

2   in this matter on behalf of Plaintiffs.  Such failure clearly abrogates Lead Counsel's

3   contractual and fiduciary obligations to have submitted Movant's hours as he
4

5   expressly promised to do.

6       Moreover, the objections to Movant seeking to file this Application and
7
    Objection as listed in Plaintiffs' February 7, 2011, pleading are not well-founded.
8

9   To the extent Mr. Gingold contends that Movant's role in this litigation was

10  "limited," or that there is no documentation of the time spent, the time sheets

11
12  submitted as an exhibit to Movant's declaration refute both points.  Mr. Gingold, as

13  Movant's former partner in this matter, knew very well that such records were

14
    maintained and available.  Furthermore, to the extent Mr. Gingold asserts that this
15

16  Application for Attorney's Fees and Objection to Class Counsel's Petition is

17  untimely, he knowingly fails to mention that he himself expressly represented to

18
    Movant, before the time for filing occurred, that he would include Movant's time in
19

20  any fee request submitted at the conclusion of this litigation, a representation that

21
    was not fulfilled and an abrogation of duty that was not apparent to Movant until
22

23  the Plaintiffs' Petition for Class Counsel was filed on January 25, 2011 – the last

24  day to file said application for fees.

25

26

27

28

# V.  CONCLUSION

Movant provided, with no guarantee of payment, valuable services to his clients, Plaintiffs' Class members, in this matter, vindicating and providing redress for important rights and grievances suffered by Native Americans.  For those valuable services, Movant respectfully request the Court award attorneys fees in the amount of $5,517,431.37 to be deducted against any award made to Plaintiffs' counsel through their Petition for Class Counsel's Fees, Expenses, and Costs Through Settlement.

DATED: February 28, 2011

By /s/ MARK KESTER BROWN
Mark Kester Brown

Attorney for Plaintiffs

and

Thomas V. Girardi
Stephen G. Larson

Attorneys for Movant Mark Kester Brown

## DECLARATION OF MARK KESTER BROWN

I, Mark Kester Brown, declare as follows:

1.   I am an attorney of record for and retained by the named Class Representatives, on behalf of the Class, in this case. I make this Declaration in support of my Objection to the Petition for Class Counsel's Fees, Expenses and Costs Through Settlement and my Motion for Attorney's Fees on the grounds that I was wrongfully omitted in said application that was filed with this Court by Dennis Gingold, et al., on January 25, 2011. This declaration is not a complete record of all facts related to my representation, and I seek to preserve my right to bring such additional relevant facts to the Court's attention as required by the Court to rule equitably on this matter.

2.   I respectfully seek to be paid fairly with the rest of the attorneys of record for Plaintiffs in this matter. Mr. Gingold should have fulfilled his responsibilities as lead counsel, ensuring that all attorneys who, like me, had worked on a contingency-fee-only basis be paid fairly. As Mr. Gingold knows, I took tremendous risks leaving California in support of these under-represented Plaintiffs. Not only did I commit to devote substantially all my billable time to the Indian Trust Litigation – for which it was established from the beginning that I would receive no current compensation (other than the possibility of sanctions-type awards), but only a possibility of deferred compensation years later – but I also was required, as a practical matter, to give up my presence in California, and therefore adversely impact my networking and client-generating connections that I had established over the years. I did the work – important work – for these Plaintiffs, made tremendous sacrifices, gave substantially all of my time for approximately six years, and should be paid accordingly. Moreover, throughout my representation of the Plaintiffs, I believe I brought unique perspectives and talents to the litigation team.

1

3.   I joined the Plaintiffs' litigation team in February, 2000, after having been solicited by Mr. Gingold for many months. Mr. Gingold began recruiting me shortly after attorney Thaddeus Holt served notice that, having conducted the trial of what has become known as Trial 1 (which trial concluded July 23, 1999; judgment issued November 29, 1999) with Mr. Gingold (along with Elliott Levitas and Keith Harper), Mr. Holt would withdraw from active representation of the Plaintiffs.

4.   I graduated from Stanford University in 1976 with distinction and earned my law degree from Boalt Hall, University of California, at Berkeley in 1979, where I was an associate editor of the *California Law Review*. A true and correct copy of my resumé is attached hereto as **Exhibit 1.** I am a member of the Bar of this Court. I am also licensed in the State of California (1979) and the District of Columbia (2001). I was admitted to practice before the United States Supreme Court in 2002 (sponsored by Mr. Gingold), In addition, I am a member of the Bar of the United States Court of Appeal for the Ninth Circuit, as well as all federal district courts in California.

5.   I am a business litigator with over thirty-one years of experience, principally representing parties in complex disputes with numerous issues of first impression in both federal and state courts. I was a full partner practicing with the Los Angeles law firm of Kinsella, Boesch, Fujikawa and Towle from 1985 to 2000 - a practice I left at the request of Mr. Gingold and Plaintiffs in order to devote my full time to the demands of this Litigation.

6.   At the time I resigned my partnership with the Kinsella firm, my standard billing rate was $350 per hour, which rate was expressly referenced in my retainer agreements in this matter.

7.   In March, 2000, I moved to Washington, D.C., at the request of Mr. Gingold, with the agreement that I would be compensated via a fee application at the end of the Litigation. In addition, Class Representative Ms. Cobell agreed to reimburse me for my airfare and travel expenses between California and Washington, D.C., to allow me to make a reasonable number of trips to my

California residence every quarter. I continued to maintain a residence in California throughout the Litigation, and continued to fulfill my obligations as a partner in a commercial citrus ranch in California. I and my long-time girlfriend, Pat Bowers Thomas, made significant sacrifices being apart, while she stayed behind to perform the day-to-day management of the citrus ranch, as well as other business obligations and investments, allowing me the ability to move to Washington, D.C., and represent the Plaintiffs full-time. We felt that our sacrifice was necessary in order to right the wrongs of decades of Trust mismanagement so that this generation of Native Americans could move forward, receiving just documentation and payment for the fruits of their lands and resources held in trust.

8.   In 2006, I returned to California for the reasons discussed below, but continued to be available to assist Plaintiffs in this case if and when called upon. To that end, I maintained and continued to pay rent for my subleased office at the Kilpatrick Stockton firm in Washington, D.C., through in or about March 2007.

9.   From the beginning, Mr. Gingold asked that I devote "substantially all my time" to the Indian Trust Litigation, to the exclusion of other significant legal work. Unlike the early years (1996-1999) prior to my retention in which he and Mr. Holt billed on an hourly basis before converting to a contingency arrangement, when I joined the team in 2000 Mr. Gingold informed me that there was no longer a source of funds to pay even a portion of the Plaintiffs' attorney time on a current or interim hourly basis. Moreover, he relayed that even though various foundations (primarily the Lannan Foundation) had agreed to fund expert fees in the millions of dollars, they were unwilling to advance any funds to pay attorneys. Because of this, he acknowledged that it would be acceptable if I worked on some legal matters for existing personal clients of mine so long as it did not cause me to take more than a few hours a week away from the Indian Trust Litigation. In addition, it was discussed and agreed that I could return to California a reasonable number of

3

times a quarter to attend to various personal and ongoing business matters there.

10. The agreement Mr. Gingold reached with me that induced me to resign my partnership at Kinsella and move to Washington, D.C. from California was as follows:

    a.    He agreed in to cover my room and board, local transportation, and my office expenses.

    b.    He also obtained Ms. Cobell's agreement that she would reimburse me – either directly or through the Blackfeet Reservation Development Fund, Inc. ("BRDF"), which I understood she controlled – for my travel expenses to and from California a reasonable number of times per quarter.

This Agreement was breached or unfulfilled in a number of material respects which, if deemed relevant by this Court, I will set forth in a supplemental declaration.

11. After reaching agreement with Mr. Gingold and Ms. Cobell with respect to my joining the *Cobell* Litigation team – including my receiving a 2% contingency fee in any recovery -- I, at the suggestion of Mr. Gingold, prepared a retainer agreement that was modeled on the retainer agreements then in place for Mr. Gingold, Mr. Holt and Mr. Levitas. I obtained the approvals of and signatures on such Retainer Agreement of Ms. Cobell, both as an individual Class Representative and on behalf of the Blackfeet Reservation Development Fund, Inc. where she was Project Director of the Individual Indian Trust Correction and Recovery Project, as well as Named Plaintiffs Earl Old Person and Louis LaRose, on or about February 24, 2000. Attached hereto as **Exhibit 2** are true and correct copies of those four executed copies retainer agreements, as well as the two April 14, 1999, retainer agreements of Mr. Gingold, Mr. Levitas, and Mr. Thad Holt expressly referenced therein.

12. Thereafter we obtained court approval of my joining the *Cobell* Litigation team at an early hearing when I was introduced as a new member of the Team and Judge Lamberth welcomed me aboard.

13. Significantly, my Retainer Agreements (as well as the earlier Gingold, Levitas, and Holt retainer

agreements) contain a provision that, in the event of death, withdrawal, or disability, the withdrawing attorney would receive a portion of his share of the contingency fee based on the relative value of his work.

14. After Mr. Holt left, and because Mr. Gingold was by training a banking attorney and not a litigator, I was the attorney on the team with the most litigation experience, particularly in the nuts and bolts of practice and procedure. Mr. Harper, junior to me, was at that time working at Native American Rights Fund ("NARF"), focusing on its interests in this Litigation. Mr. Geoffrey Rempel was hired to serve as the Plaintiffs' accounting expert and quasi-paralegal. We had no secretarial help and therefore had to be self-sufficient. The three of us formed the portion of that trial team then housed in subleased space of the Covington firm, with Mr. Harper working from NARF, and Mr. Levitas from offices at the Kilpatrick firm. This group worked together from these three locations from March, 2000, until approximately early 2003 at which time Mr. Gingold, Mr. Rempel, and I began subleasing offices with the Kilpatrick firm.

15. Initially, I spent much of the work day during the first several months at the NARF offices (where the hard-copy files for the case were kept) reading through the entire set of pleading files. Mr. Gingold asked that I do this in order to provide a foundation for my work going forward. I was also the most computer-knowledgeable of the attorneys. Because of the complexity of the case, I identified the need to create and maintain a number of databases that I had utilized in prior complex litigation so that existing and future counsel would have ready access to historic information and would be able to lock, view, and manipulate such data from various perspectives. Therefore, in my attached time entries, particularly in the early time entries, considerable time is logged reviewing documents and updating these databases.

16. One of my first credited accomplishments occurred not long after I arrived in Washington, D.C. PriceWaterhouseCoopers ("PWC") had an outstanding bill to Plaintiffs of approximately $1.5

million from Trial 1; they were pressing for payment, and Mr. Gingold recommended paying it in full. This would have exhausted all of the Plaintiffs' available cash and then some. I argued we should pay them no more than $500,000 and have them carry the balance. I orchestrated the adoption of this payment plan. PWC thereafter agreed to accept only the $500,000 and defer receipt of the balance until the conclusion of the Litigation.

17. I began work with the *Cobell* Litigation Team shortly after the completion of Trial 1; we were gearing up to present the issues of Trial 2 (establishing damages) and what became known as Trial 1.5, regarding possible methods of performing the ordered accounting.

18. To that end, Mr. Gingold gave me various responsibilities, including interfacing with the many resource sub-experts who were essential to modeling the resources that flowed through the Trust (necessary to recreate a rough estimate of revenues, since the Government had destroyed virtually all the records), as well as doing motion and trial work. It also fell to me to do much of the legal research.

19. The first significant research memorandum I generated was on the key issue of the case at that time: Whether the finding of the trial court in Trial 1 - that there had been a breach by the Government of its fiduciary duties (which resulted in an equitable order to account) - was *res judicata* as to a later claim for damages (what was to become Trial 2). The conclusion of my memorandum was that at any time before a truly "final" judgment, a court of equity retains the power to modify an equitable decree because injunctive or quasi-injunctive relief is always subject to modification under appropriate circumstances. This, of course, created significant uncertainty as to the fruits garnered through Trial 1.

20. Later, Mr. Gingold commissioned me to research and prepare a second memorandum on statutory retroactivity (*i.e.*, whether Congress could pass a law that could undercut Plaintiffs' victory in Trial 1) (hereinafter the "Statutory Retroactivity Memorandum"). Such research was necessitated by

what has come to be known as the "Midnight Rider" – the Congressional action that effectively froze the Indian Trust Litigation for eighteen months to allow the federal government time to reorganize from its setbacks in the litigation.

21.   I spent several months crafting the Statutory Retroactivity Memorandum, and concluded that if Congress became hostile to our clients, there was a significant risk that any limiting law that Congress passed would be afforded statutory retroactivity.  Indeed, the appellate court later cited the line of cases I had cited in the Statutory Retroactivity Memorandum.  I delivered these memoranda while there were still ongoing significant mediation efforts aimed at resolving the Litigation.

22.   Mr. Levy, an appellate specialist at the Kilpatrick law firm, complimented me on both of my memoranda highly and encouraged me to turn them into one or more law review articles and seek their publication in whole or in part.  Should the Court desire, I am prepared to submit these approximately 175 pages of legal analysis under seal.

23.   The impact of my written work was exemplified by an encounter I had - after a Congressional subcommittee hearing - with a gentleman who I believe was a mid-level Interior Department official.  I reached to shake his hand and introduced myself and was surprised (and frankly honored) to have him say in a fully friendly manner, "Oh, we know who you are, we can always tell from the writing which is a brief or motion that you wrote."

24.   Following Trial 1.5, we split up the task of preparing the Proposed Findings of Fact among a number of attorneys and Mr. Rempel, with each person being responsible for a portion of the proposed Findings of Fact.  I returned to California for several weeks where I worked on my portion of the Proposed Findings of Fact.

25.   In addition, I, on my own initiative, produced the Probate Findings of Fact, which had not been allocated among the Members of the Team.  The significant thing about the issues underlying these Probate Findings of Fact was that the Government was arguing that its acts of the Government in

probating deceased trust beneficiaries' estates (via its own administrative law judges)  arguably cut off any obligation to account, as it was a final judgment as to what the decedents owned.  I was singularly responsible for finding the authorities necessary to allow us to destroy the Government's assertion of their defective probate argument – which, had it succeeded, could have cut off more than half of the potential recovery by limiting the recovery to living (i.e., non-probated) beneficiaries.

26. During the height of Trial 1.5, I had taken it upon myself to counter this argument and had asked Kilpatrick Stockton's probate department to do the research.  In doing so, I explained my theory that this was analogous to a real estate boundary dispute in which the death and subsequent probate of the estate of one of the neighbors could not possibly render the boundary dispute (which for purposes of the analogy would have been unknown at the time of the probate) moot.  Neither the head of the Department nor the associate assigned to do the research could find anything directly on point.  Knowing there had to be authority on this topic, during the preparation of the Proposed Findings of Fact, I took it upon myself to do the necessary research and found a key line of cases that were directly on point.  After I had submitted my assigned section of the Proposed Findings of Fact, I supplemented them with these Probate Proposed Findings of Fact.

27. Throughout this litigation, I have recorded my time working on this matter contemporaneously on a timekeeping program contained on my portable computer.  As a matter of course, I contemporaneously enter the date the work was rendered, a description of the work performed, the amount of time spent on such task, and the relevant client and matter identifiers.  The timekeeping program tracks time in 5 minute increments.  Thus, my time is recorded to the nearest 1/12th of an hour.  Most other professionals working for Plaintiffs record their time in tenths of an hour (*i.e.*, in 6 minute increments), but my timekeeping program is unable to record time in other than 5 or 10

minute increments, so I have chosen to utilize the most precise increment (a 5 minute increment) in my timekeeping with respect to this litigation.

28.    The following equivalency table shows the various 5 minute increments in twelfths of an hour, as well as in decimal format, for ease of reference as I use the decimal format in the attached tables:

5 minutes =  1/12  = .083

10 minutes = 2/12  = .166

15 minutes = 3/12  = .25

20 minutes = 4/12  = .333

25 minutes = 5/12  = .416

30 minutes = 6/12  = .5

35 minutes = 7/12  = .583

40 minutes = 8/12  = .666

45 minutes = 9/12  = .75

50 minutes = 10/12 = .833

55 minutes = 11/12 = .916

29.    I have exported each timekeeping entry from my portable computer I used during the litigation to a WordPerfect table for ease of presentation; such tables are attached hereto as set forth more fully below.   I have been precise in recording my time in this case, and I believe that my records state the actual time that I worked on particular matters in this litigation.   A true and correct copy of the table utilizing such time sheets/records itemizing the time I spent and the tasks performed in this case are attached hereto as **Exhibit 3**.

30.    To the extent the fees are not capped, I have approximately $5,455,702.75 in time billed to this Litigation at the rate of $475 per hour, as discussed more fully below.   The attached table includes all time incurred by me in my representation of the Plaintiff Class.   It has always been counsels'

9

discussed intention that the Plaintiff Class would be credited – against any contingency or other

final fee – with all sums received on an interim basis (*e.g.*, through sanctions awards or interim fee

awards), as set forth below:

| | | | Total |
|---|---|---|---|
| 2000 (starting 3/1) | 2064 | $468.00 | $966,037 |
| 2001 | 2256.6 | $487.00 | $1,098,995 |
| 2002 | 2567 | $522.00 | $1,340,061 |
| 2003 | 2251 | $549.00 | $1,236,043 |
| 2004 | 889 | $574.00 | $510,425 |
| 2005 | 590 | $598.00 | $353,062 |
| 2007 | 12.5 | $645.00 | $8,040 |
| SUBTOTAL | | | $5,312,088 |
| LESS MONIES PAID | | | |
| 12/12/02 | | e-mail sanctions | ($38,587) |
| 2/3/03 | | Mona Infield fees | ($82,040) |
| 1/19/06 | | EAJA fees | ($79,948) |
| SUBTOTAL | | | ($200,575) |
| **TOTAL** | | | $5,111,513 |

As discussed below, the most recent interim fees awarded with respect to my efforts relating to the

GAO and Erwin matters (awarded in 2007) has been kept from me.

31.   I was paid no salary, received no draw, and was rarely reimbursed for any expenses.  The only

monies I received came from interim fee awards based largely on sanctions awarded against the

Government.  From the date of my retention as attorney of record for the named Class

Representatives to the present, my compensation was deferred and was contingent upon recovery on

behalf of the Class.

32.   From March, 2000, through May 21, 2007, I recorded 11,485.69 hours on this case.

33.   During this same time, litigation matters I had for clients of mine other than the Plaintiffs in this Litigation had to be referred to other law firms, and were therefore not a source of significant income for me.  Thus, in order to work on this Litigation, I was forced to live off previously-acquired assets.  Despite this I did not allow any opportunities in California to interfere with my duties to the *Cobell* Plaintiffs.

34.   In determining the reasonableness of the $475 per hour rate that I believe is a fair hourly rate for my services under the circumstances, I have utilized the Laffey matrix of hourly rates that the United States Attorney's Office for the District of Columbia has published for attorneys with my experience level for the present day in the local legal services market, which is available at http://www.justice.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_8.html However, to the extent that there is any enhancement to Plaintiffs' counsel's fees over and above a standard hourly rate, I respectfully request that I be considered for an enhancement as well, based on my contributions to this Litigation demonstrated herein and as supported by any future filing that this Court permits.

35.   In or about October, 2003, I noticed that my name had been removed from a pleading that the Kilpatrick firm had prepared entitled Response to Consolidated Petitions for Writs of Mandamus.  When I inquired of Mr. Gingold what was going on, he told me to go speak to Mr. Bill Austin, a partner with the Kilpatrick firm and the primary author of the document.

36.   I went to Mr. Austin's office and said that Mr. Gingold had suggested I talk to him about why my name was not on the latest brief.  Mr. Austin's face grew troubled and he handed me a copy of a recent e-mail from Mr. Gingold in which Mr. Gingold singled me out, and ordered that my name be placed on only those pleadings and court documents that I "drafted or otherwise contributed to materially."  As Mr. Austin handed me the copy of the e-mail, he shook his head and said that the

11

Team didn't need this, and now "**** was going to hit the fan," or words to that effect.  I thanked

him and left his office.  Attached hereto as **Exhibit 4** is a true and correct copy of Mr. Gingold's

October 6, 2003, e-mail ordering other attorneys on the Team to take my name off briefs and court

documents, which email Mr. Austin had given me.

37.   I thereafter confronted Mr. Gingold with the information Mr. Austin had provided me and asked for

the reasons behind this supposedly new policy.  When I pointed out that Mr. Harper's name was

regularly placed on briefs that he did not have a substantial hand in authoring, he said that Mr.

Harper was not subject to the new rule because "he was co-lead counsel."  When I said that title was

news to me, Mr. Gingold said that is just the way it is going to be.

38.   My name appeared on very few court documents after that date despite my direct involvement in

drafting portions of these documents, and I began to be given more and more "backroom" type of

tasks such as preparing research memoranda.

39.   In early 2005, Mr. Gingold was able to persuade Kilpatrick Stockton to add two of their trial

lawyers to the team (Bill Dorris and David Smith from their Atlanta office); previously, Kilpatrick

Stockton had limited its involvement in the litigation to appellate work (most of which was

performed by Mr. Austin and Mr. Levitas).  Once these Kilpatrick trial lawyers appeared, I was

effectively given very few further projects or responsibilities.

40.   In mid-2005, during the IT Security Trial, Mr. Gingold sent me an e-mail wherein he told me I

would have no further role in the IT Security Trial (I had done certain tasks in the background) and

that he would give me no further work (although I could work with Kilpatrick Stockton or NARF if

I wished, and if they chose to utilize me).  I spent the next several months preparing proposed

findings of fact based on trial transcripts that I had to secure.

41.   In January, 2006, shortly after New Year's, I returned to California, making it my central

operating location while leaving my Kilpatrick office space in place.  From there, I monitored

the case and remained prepared to actively participate if given the opportunity.  I also remained in

e-mail and voicemail contact (although Mr. Gingold rarely communicated with me).

42.  On or about April 20, 2007, Judge Robertson issued an order that provided for the determination of

two separate awards of attorney's fees that had been ordered by Judge Lamberth years before but

that had fallen through the cracks (the "Two Fee Applications").  On or about April 24, 2007, I e-

mailed Mr. Gingold offering to work on the upcoming October, 2007, trial.

43.  Attached hereto as **Exhibit 5** is a true and correct copy of the e-mail that I received from Mr.

Gingold in response on or about April 25, 2007.  He declined my offer to participate in the

upcoming October trial, confirmed that he had not been willing to assign me projects or work

during the last months I had been based in Washington, D.C., but purportedly had been willing to

allow me to work with Mr. Austin or one of the other Kilpatrick attorneys.  He erroneously

suggested that I had withdrawn from the Litigation when I returned to California in early 2006.

44.  I responded to Mr. Gingold's April 25th e-mail by my e-mail of May 1, 2007.  Attached hereto as

**Exhibit 6** is a true and correct copy of my May 1st e-mail.  In this e-mail I disputed Mr. Gingold's

assertion that I had voluntarily withdrawn from representing Plaintiffs, but rather documented Mr.

Gingold's refusal to assign me projects or tasks on behalf of the Plaintiffs.  Moreover, I set forth my

contention that there had been no formal termination by my client, Class Representative Ms. Cobell,

nor of my contingency fee agreement, and that I believed that a court order was required to

terminate my status as a counsel of record representing the Plaintiff Class.

45.  On May 1, 2007, Mr. Gingold responded to my e-mail of the same date and noted that he had not

yet spoken to Ms. Cobell about the subject matter of our recent e-mail exchange, and concluded

with the rather vague statement, "If you have a proposal for an amicable, mutually satisfactory

resolution, make it." Attached hereto as **Exhibit 7** is a true and correct copy of Mr. Gingold's May 1st e-mail.

46. Shortly thereafter, on May 3, 2007, Mr. Gingold invited me to participate in the preparation and filing of papers with respect to the Two Fee Applications. I accepted. Attached hereto as **Exhibit 8** is a true and correct copy of a portion of our interchange of e-mails on the subject. For the next several weeks I worked with Mr. Gingold, Mr. Harper, and Mr. Rempel exchanging and reworking drafts of the Two Fee Applications, including my own affidavit pursuant to Mr. Gingold's directive.

47. Although the Court took exception to certain portions of the Two Fee Applications, it ultimately granted a large part of the fees requested. The Court entered its order on or about June 5, 2007, awarding Plaintiffs $341,728.20 which included interest at the rate of 4.95% for the 30 days within which the Court allowed the Government to pay the money.

48. On or about June 6, 2007, after the Court had awarded fees, the Department of Justice attorney requested wiring instructions for the recipients of the fee award. Mr. Gingold circulated the e-mail among the team members who had worked on the Two Fee Applications, and asked for their wiring instructions so that their respective fees could be wired to them directly. In all prior fee awards, the attorneys (or NARF) had received the portion of the fees attributed to their efforts. Attached hereto as **Exhibit 9** is a true and correct copy of the e-mail Mr. Gingold circulated regarding wiring instructions. That same day, as I was providing him with my wiring instructions, he circulated an e-mail saying he was going to have all fees sent to BRDF "to keep it simple."

49. On or about July 10, 2007, only after the attorney's fees had been received, Mr. Gingold (not Ms. Cobell) sent me an e-mail purporting to terminate me as attorney in this matter. Attached hereto as **Exhibit 10** is a true and correct copy of such "termination" e-mail. In that e-mail Mr. Gingold continued his vague references to my "provid[ing] a plan or proposal for resolution of [my] status...."

50.   On or about September 6, 2007, Mr. Gingold telephoned me.  In that telephone call he raised the recent attorney's fees award and stated that my fees were being held in a separate account but that they weren't being held by him nor had they been paid to him – Ms. Cobell was holding them.  In that conversation, I asked for a written confirmation that my fees were being held and why.

51.   Later that day, Mr. Gingold sent me an e-mail purporting to memorialize our telephone call. Attached hereto as **Exhibit 11** is a true and correct copy of Mr. Gingold's e-mail.  That e-mail confirms that Mr. Gingold and Ms. Cobell had – after inducing me to participate in the preparation of the Two Fee Applications – decided to withhold the attorney's fees awarded from me (and allegedly from other counsel) and pay them to experts.  In this e-mail, Mr. Gingold, as lead counsel for the Class, expressly acknowledged his obligation "to request an award for your time at an appropriate hourly rate" at final judgment.  This he has failed to do.

52.   I took exception to certain statements made in Mr. Gingold's September 6th e-mail and wrote back on September 16, 2007.  Attached hereto as **Exhibit 12** is a true and correct copy of my September 16th e-mail.  In addition, I pointed out to Mr. Gingold that in light of his conflicts of interest he should not be advising Ms. Cobell on these matters.

53.   I have never received any further explanation or accounting of any of these attorney's fees paid on behalf of my efforts which have supposedly been held by Ms. Cobell in a segregated account – nor have I received any of the funds.  The only reply I received to my September 16th e-mail was a terse one-line reply that my position was "noted."

I declare under penalty of perjury under the law of the State of California that the foregoing is true and correct.

15

Executed this twenty-eighth day of February, 2011, in Los Angeles, California.

/s/ MARK KESTER BROWN
Mark Kester Brown

Declarant

16