# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| **ELOUISE PEPION COBELL, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **No. 1:96CV01285(TFH)** |
| ) | |
| **KEN SALAZAR, Secretary of** ) | |
| **the Interior, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

## <u>PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PETITION FOR CLASS COUNSEL'S FEES</u>

The silence of defendants on the most fundamental point of all is more telling than everything they write in their response.  Defendants do not challenge the fact that without the efforts of Class Counsel, there would have been no reform of the IIM trust's gross mismanagement and no meaningful legal redress for defendants' blatant breaches of trust duties for over a century.  Despite hundreds of congressional and other reports detailing the severe and systemic fraud, corruption and other shenanigans and failings, as well as hearings and even congressional enactments attempting to prod reform, it was only when these Class Counsel and these Class Representatives drew a line in the sand and stood toe-to-toe with the all-powerful and oppressive federal trustee-delegates that anything began to change.  But for their imaginative, prodigious, and persistent efforts, nothing would have changed and individual Indian trust beneficiaries could have spent another century without relief.

The transformative and historic service of these Class Counsel and Class Representatives was the game-changer.  The outcome was much more than a court victory; the future for these Native Americans is now far brighter.  This Court held that the IIM Trust is an enforceable trust and that the trustee-delegates are in breach of that trust.  After waiting decade upon decades, abused and marginalized individual Indian trust beneficiaries heard the Secretary of Interior and the Assistant Secretary for Indian Affairs – two of the three principal trustee-delegates of the United States – admit under oath in this Court that they had failed to fulfill their fiduciary duties to the individual Indian beneficiaries. After a century, these class members will finally receive a measure of justice and, more importantly, have the empowering knowledge that they can stand up and hold their trustee accountable now and in the future. For everything defendants have said to try to belittle the efforts and achievements of Class Counsel, they have not and cannot contest

the fact that without the efforts of these Class Counsel and these Class Representatives, nothing would have changed.

This is the context in which the plaintiffs seek fees for Class Counsel in accordance with the Settlement Agreement and controlling law of this Circuit.  Without trying to respond to defendants' blunderbuss-like approach in their response, this reply focuses on the core issues in this common fund case:  (1) the size of the common fund obtained by Class Counsel for the benefit of the plaintiff classes; (2) the other tangible benefits obtained by Class Counsel; (3) the percentages awarded counsel in other cases; (4) the fact that nothing in the parties' agreements or conduct purports to limit this Court's duty and discretion to determine the appropriate award; and (5) the expenses to which Class Counsel are entitled.

**1.  Class Counsel Have Obtained A Common Fund Of Over $3.412 Billion.**

It is settled law that recovery of a common fund for the benefit of a class entitles counsel to "a reasonable attorney's fee from the fund *as a whole*."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (emphasis added).  The fee is based on "a percentage of the *total* common fund," regardless of whether funds are distributed directly or immediately to class members.  *In re Dep't of Veterans Affairs (VA) Data Theft Litig*., 653 F. Supp. 2d 58, 60 (D.D.C. 2009) (emphasis added), *appeal dismissed*, No. 09-5405, 2009 WL 5179325 (D.C. Cir. Dec. 14, 2009). Additionally, in determining the percentage of the common fund to award, it is critical to take into account the non-monetary tangible benefits received by the class as a result of the litigation. *See, e.g.*, *Bynum v. District of Columbia*, 412 F. Supp. 2d 73, 85 (D.D.C. 2006); 5 James Wm. Moore et al., MOORE'S FED. PRACTICE ¶ 23.124(6)(b)(i) (3d ed. 2010).  Counsel need only show they played a "causal role in achieving the benefits for which they seek fee reimbursement."

2

*Consol. Edison Co. of N.Y., Inc. v. Bodman*, 445 F.3d 438, 451 (D.C. Cir. 2006).  Here, Class Counsel's "causal role" is indisputable.

Indeed, defendants, in their response, do not dispute that this litigation resulted in a settlement establishing a common fund of $3.412 billion, which is enhanced materially above other ostensibly comparable awards because here distributions to class members are tax-free. Nor do they challenge that as a direct result of this litigation, class members have benefited through the over $4.8 billion invested by the government in the IIM trust system, greatly improving its "present and future reliability."  *Cobell v. Kempthorne (Cobell XXI)*, 569 F. Supp. 2d 223, 253 (D.D.C. 2008), *rev'd on other grounds*, 573 F.3d 808 (D.C. Cir. 2009).  Rather, they disregard Supreme Court and Circuit precedent in seeking to limit fees to the amounts set aside for settlement of Historical Accounting claims, less than 11% of the total monetary settlement.

That this case and Class Counsel have played a critical role in realizing the settlement of Trust Administration claims is manifest.  Moreover, defendants' contention that the sole issue in this litigation is the rendering of an historical accounting and that trust mismanagement issues were "never a part of this case," (Defs.' Opp'n at  8), should have been resolved conclusively on December 21, 1999, when this Court stated that it would retain jurisdiction over this matter because of the "long and sorry history of the United States' trusteeship of the IIM trust, the defendants' recalcitrance toward remedying their *mismanagement* despite decades of congressional directives, and the consequences of allowing these enumerated breaches to continue. . . ."[1]

---

[1] *Cobell v. Babbitt (Cobell V)*, 91 F. Supp. 2d 1, 8 (D.D.C. 1999) (emphasis added), *aff'd*, 240 F.3d 1081 (D.C. Cir. 2001); *see also id.* at 43 (finding that "the requirements of architecture and staffing plans are rooted more in Interior's history of IIM trust *mismanagement* and the context of the Trust Fund Management Reform Act's passage than derived from the common law") (emphasis added).

Furthermore, defendants' claim has been firmly and repeatedly rejected by the Court of Appeals. In *Cobell VI*, the Court of Appeals expressly recognized that this is an action in equity "to compel performance of trust obligations" the United States owes to individual Indian trust beneficiaries. *Cobell v. Norton (Cobell VI)*, 240 F.3d 1081, 1086, 1092 (D.C. Cir. 2001). In *Cobell XIII,* the Court of Appeals said that it was "puzzled" that defendants had ignored its *Cobell VI* decision and restated their claim that this case is limited to an accounting:

> Interior claims that the district court cannot "expand[] its jurisdiction to include the entire field of trust management" because our decision in *Cobell VI* held "that the only actionable duty was the duty to perform an accounting." We made no such ruling.
>
> First, we are puzzled by the idea that the "fixing" issues represent an expansion of the lawsuit. The complaint's prayer for relief asked for an order "construing the trust obligations of defendants to the members of the class, declaring that defendants have breached, and are in continuing breach of, their trust obligations to such class members, and directing the institution of accounting and other practices in conformity [with the defendants' trust] obligations." It also claimed a wide range of past trust violations independent of accounting failures, e.g., that the government "[f]ailed to exercise prudence and observe the requirements of law with respect to investment and deposit of IIM funds, and to maximize the return on investments within the constraints of law and prudence," and "[e]ngag[ed] in self-dealing and benefiting from the management of the trust funds." And at an early stage the district court responded to the range of attacks by bifurcating the case into the parts now before us – "fixing the system" and "correcting the accounts." . . . .
>
> Interior misconstrues *Cobell VI* in arguing that our holding there limited the issue in this case to the provision of a historical accounting. We held that the duties identified by the district court, such as the duty to create specific written policies and procedures pursuant to the 1994 Act were "subsidiary" to the duty to account *not* that the duty to account was the only fiduciary obligation in this case.

*Cobell v. Norton (Cobell XIII)*, 392 F.3d 461, 470 (D.C. Cir. 2004) (brackets and emphasis in original) (internal citations omitted).[2] In *Cobell XVIII*, the Court of Appeals rejected defendants'

---

[2] *See also Cobell v. Norton (Cobell XII)*, 391 F.3d 251, 256-58 (D.C. Cir. 2004) (concluding that "[i]t is indisputable that the Secretary has current and prospective trust management duties that necessitate maintaining secure IT systems . . . . [and t]he district court . . . retains substantial

4

renewed attempt to narrow the scope of this case as well as applicable law "[b]ecause this case involves the management of a trust." *Cobell v. Kempthorne (Cobell XVIII)*, 455 F.3d 301, 307 (D.C. Cir. 2006). In *Cobell XIX*, the Court of Appeals again rejected defendants' relentless effort to recast the nature and scope of this case, stating that the plaintiffs have been seeking remedies for the government's longstanding, "deplorable" mismanagement of IIM Trust assets. *Cobell v. Kempthorne*, 455 F.3d 317, 333 (D.C. Cir. 2006).

Consequently, notwithstanding that defendants continue to deny that which the Court of Appeals has stated about the scope of this case, mismanagement issues have been an important part of this case and necessarily have been extensively investigated and litigated by Class Counsel. *See* Pls.' Pet. at 9-11. As Associate Attorney General Thomas J. Perrelli candidly explained in sworn testimony before the House Resources Committee:

> [T]he settlement also addresses trust administration or mismanagement claims. Those are claims that allege over the years the government has mismanaged hundreds of thousands of acres of land and millions of dollars, including proceeds from them that it holds in trust for individual Native Americans. Over the last 14 years, these claims have long been linked with this lawsuit.

*Proposed Settlement of the Cobell v. Salazar Litigation: Oversight Hearing Before H. Comm. on Natural Res.*, 111th Cong. 38 (2010) (statement of Thomas J. Perrelli, Associate Att'y Gen.) (hereinafter "H. Comm. Hearing").

That this litigation uncovered massive problems that required redress and applied constant and necessary pressure on Interior to reform is unquestionable. And indeed as recently as last year, Deputy Secretary David Hayes admitted as much: "So it is not as though these years of litigation have been for naught. There has been much more information developed over the

---

latitude, . . . to fashion an equitable remedy because the underlying lawsuit is both an Indian case and a trust case in which the trustees have egregiously breached their fiduciary duties").

5

years.  I think that has been very helpful." *Id.* at 45.  This case revealed breaches and naturally the parties in seeking a global resolution sought to resolve such claims.

Accordingly, defendants' suggestion that trust management claims are incorporated in the agreement solely at their request is disingenuous and refuted conclusively by Mr. Perrelli's congressional testimony as well as the record of these proceedings.  Moreover, the settlement of mismanagement claims has been an important part of each of the eight previous settlement discussions over the course of this litigation.  Defendants themselves admitted in the Settlement Agreement that "Class Counsel have conducted appropriate investigations and analyzed and evaluated the merits of the claims made" in the litigation.[3]

Defendants' insistence that amounts allocated in the Settlement Agreement for the Land Consolidation Fund are "irrelevant," (Defs.' Opp'n at 9-10), is likewise specious.  A key aspect of this litigation has been trust reform – "reforming the management and accounting of the IIM trust so as to meet the federal government's fiduciary responsibilities." *Cobell VI*, 240 F.3d 1081, 1093 (D.C. Cir. 2001).  *See also Cobell XIII*, 392 F. 3d at 470.  Because of limitations of the government's systems and training, trust reform has been hindered by the highly fractionated interests in trust land.  *See generally Cobell v. Kempthorne* (*Cobell XX*), 532 F. Supp. 2d 37, 40 (D.D.C. 2008), *rev'd on other grounds*, 573 F.3d 808 (D.C. Cir. 2009).  Defendants acknowledged in the Settlement Agreement the need to resolve fractionated interests to effectively achieve prudent trust management.[4]  The Land Consolidation Fund has been the subject of extensive negotiations in the months leading up to the Agreement's execution.  The causal link is undeniable.  It is through the efforts of Class Counsel that the Land Consolidation

---

[3] Settlement Agreement at 5, ¶ 16.

[4] *See id*. at 4, ¶ 11 (admitting that "an integral part of trust reform includes accelerating correction of the fractionated ownership of trust or restricted land, which makes administration of the individual Indian trust more difficult").

US2008 2341155.4

Fund has been established and appropriated by Congress, which would have been impossible but for this case and its settlement.

Defendants principally rely on two cases in their effort to limit the size of the common fund from which fees should be awarded, *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993) and *In re First Databank Antitrust Litigation*, 209 F. Supp. 2d 96 (D.D.C. 2002) (Defs.' Opp'n at 7). Both are readily distinguishable for the purpose cited, standing for the unremarkable proposition that attorneys may not claim entitlement to fees based on whatever portion of the common fund is attributable to the efforts of others <u>before the class action complaint was ever filed</u>. In *Swedish Hospital*, the plaintiffs challenged a policy of the Department of Health and Human Services ("HHS") concerning reimbursement of photocopying expenses incurred by hospitals in satisfying requirements of the Medicare program. 1 F.3d at 1263. In restricting that portion of the common fund from which fees would be awarded, the D.C. Circuit agreed with the district court that plaintiffs' counsel had largely ridden "piggyback" on the work of counsel in a prior case challenging the identical regulation, which decision "represented binding precedent in this Circuit when the plaintiffs in [*Swedish Hospital*] filed their complaint." *Id*. at 1272. As a consequence of that prior litigation and before the class action complaint was ever filed, HHS conceded that reimbursement of photocopy charges was proper and proposed an implementing regulation. *Id*. Accordingly, there, class counsel could not claim entitlement to a fee from that portion of the fund resulting from the work of other counsel in prior litigation.[5] Here, everything that is included in the settlement is attributable in whole or substantial part to the efforts of Class Counsel.

---

[5] The fee awarded was based on the difference between the amount HHS had agreed to pay for photocopy charges before suit was filed, $ .0498 per page, and the amount provided for in the settlement agreement of $ .07 per page. *Swedish Hosp.*, 1 F.3d at 1272.

US2008 2341155.4

Similarly, in *First Databank*, plaintiffs' counsel filed their class action complaint only after the Federal Trade Commission ("FTC") had filed suit and "expended substantial effort to establish the liability of the defendants," and the defendants had committed to pay $16 million in settlement of that action.  209 F. Supp. 2d at 101.  The court held that class counsel could not base their fee on that portion of the common fund that had been negotiated solely through the efforts of the FTC.[6]  That court distinguished this Court's decision in *In re Vitamins Antitrust Litigation*, MDL No. 1285, 2001 WL 856290 (D.D.C. July 16, 2001), wherein the entire settlement had been achieved through the "heavy lifting" of class counsel.  *First Databank*, 209 F. Supp. 2d at 101.

The present litigation bears no resemblance to the facts considered by the courts in either *Swedish Hospital* or *First Databank*.  In initiating this litigation, Class Counsel confronted defendants who had denied and evaded fundamental trust duties that the United States has owed individual Indian trust beneficiaries for more than 120 years.  Reports from governmental entities "condemn[ing] the mismanagement of the IIM trust accounts," *Cobell VI*, 240 F.3d at 1089, had been ignored.  No efforts to resolve claims arising out of that mismanagement were made by defendants in advance of this litigation.

Before this case was filed, no action in equity sought to enforce trust duties the United States owes to individual Indian trust beneficiaries.  No one moved to compel the government to rehabilitate its broken trust management systems. Conventional wisdom said that was impossible.  And the few attorneys who conceded that it might be possible concluded that it was too risky, expensive, and difficult.  Unlike tribes, individual Indians are often among the poorest and most

---

[6] The fee was limited to 30% of $8 million, the amount by which class counsel had enhanced the defendants' settlement offer above the $16 million negotiated by the FTC before the class action complaint was filed.  *First Databank*, 209 F. Supp. 2d at 101.

US2008 2341155.4

vulnerable people in this country.  No money was available to pay Class Counsel.  No assistance was received from governmental entities, tribes, or other litigants.  Rather, Class Counsel did what no one else was willing to do to obtain justice for individual Indians; litigate novel and complex legal issues against trustee-delegates who disclaimed the existence of enforceable trust duties and "flagrantly and repeatedly breached [their] fiduciary obligations."  *Id*. at 333.

In order to remedy this "serious injustice," *Cobell XIX*, 455 F.3d at 335, Class Counsel did not "piggyback" on the efforts of others.  Rather, solely through the persistence, personal and professional sacrifice, and "heavy lifting" of Class Counsel and the Class Representatives[7] through fifteen years of contentious litigation, has this historic settlement been achieved.[8]

### 2.  The Results Achieved By Class Counsel Are Extraordinary.

Defendants argue that Class Counsel spent much of their time on matters outside the scope of, and irrelevant to, this litigation and that Class Counsel's efforts have been unnecessary and futile.[9]  They are wrong and their effort to have this Court diminish the value of Class Counsel's time based on the success or failure of particular motions, claims, and interlocutory

---

[7] When not attempting to diminish the role of Class Counsel and Class Representatives to persuade this Court that fees should be dramatically limited, senior government officials readily admit the important work of Class Counsel that led to the historic recovery for this class.  As Deputy Secretary David Hayes noted before the House Resources Committee:  "Elouise Cobell and her representatives, and their attorneys, have enormous credibility in Indian Country, because [people in Indian country] know how hard they have worked in this matter for the last 13 years."  H. Comm. Hearing at 42 (statement of David J. Hayes, Deputy Sec'y of Interior).

[8] *See In Re Baan Co. Sec. Litig.*, 288 F. Supp. 2d 14, 19 (D.D.C. 2003) (finding the rationale for the limitation on recovery of fees set forth in *Swedish Hospital* inapplicable where "Plaintiffs' Counsel developed and prosecuted the case on their own without assistance from a governmental agency" and "confronted a serious risk of no recovery given the many disputed legal and factual issues that may ultimately have been resolved in Defendants' favor").

[9] As set forth in Plaintiffs' Notice, dated December 14, 2010 [Dkt. No. 3662], defendants may not challenge the reasonableness of Class Counsel's time unless they have produced the time records of all defense counsel, government as well as non-government, on all matters within the scope of this case.  Having produced no such time, defendants' challenges should be barred.

US2008 2341155.4

appeals is contrary to controlling law.[10]  Simply put, there is no authority for their argument because the Supreme Court pointedly has rejected it as a legitimate reason to reduce fee awards and because it would trump established standards that govern this Court's independent determination of fees under the common fund doctrine.

Significantly, defendants mischaracterize the nature and scope of this litigation as well as the extent of plaintiffs' successes.  This is an action in equity to enforce trust duties owed by the United States to individual Indian trust beneficiaries; duties that include the creation, operation, and maintenance of safe, sound, and effective trust accounting and asset management systems, complete and accurate trust records, and competent trust management staff.[11]

In disregard of the Supreme Court's emphatic rejection of "a mathematical approach comparing the total number of issues in the case with those actually prevailed upon," defendants ask this Court nonetheless to accept their calculation of wins and losses to diminish Class Counsel's fees.[12]  Metaphysics aside, defendants selectively fail to take into account, among other things, that they lost every single trial in this case, lost critical foundational issues on accountability and liability, lost their claim that restitutionary relief is damages, and lost numerous motions for injunctive relief.  Under controlling law, the results are what matter.[13] And, results are the basis of this Court's fee determinations.  Here, the results are "stunning." *See, e.g.*, *Cobell V*, 91 F. Supp. 2d at 57.

---

[10] *See, e.g.*, *Hensley v. Eckerhart,* 461 U.S. 424, 435 (1983) (holding that "the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit . . . . and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee").

[11] *Cobell VI*, 240 F.3d at 1103 ("By this standard, the district court's conclusion that the management of a trust and rendering of an adequate accounting requires the locating and retention of records, operational computer systems, and adequate staffing was, in plaintiffs' words, 'self-evident.'").

[12] *Hensley*, 461 U.S. at 435, n.11.

[13] *See, e.g.*, *id.* at 435.

US2008 2341155.4

In addition to unprecedented monetary benefits that Class Counsel have obtained for class members since Trial 1 in 1999, Class Counsel have protected electronic trust records, trust funds, and other trust assets from further waste and ruin,[14] as well as their catastrophic risk of loss.  This was achieved through injunctive relief, which the government vigorously opposed in this Court and at the Court of Appeals and notwithstanding the irreparable harm continued document destruction and unquantifiable asset loss would cause class members.[15]

Defendants conveniently forget their 1997 admissions about systemic document destruction and its irreparable impact to class members.  They also forget that from the inception of this litigation, plaintiffs have asked this Court to enforce trust duties that the United States owes individual Indians and to fashion equitable remedies to mitigate the consequences of the government's continuing breaches of trust.[16]  That is why trust reform or "fixing the system," has been essential to the successful resolution of this case.  It is revealing that defendants spent less than $70 million in trust reform through the conclusion of FY 1999, but since they lost Trial 1 they have spent nearly $5 billion to reform and rehabilitate this broken trust.

On April 4, 2000, three months after its landmark decision in Trial 1, this Court reviewed post-trial admissions of government officials and contractors and other record evidence proffered

---

[14] *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 475 (2003) (holding that "a fiduciary actually administering trust property may not allow it to fall into ruin,") (citation omitted).

[15] Defendants admitted to this Court on January 21, 1997, that they could not render an adequate accounting because of the loss and systemic destruction of critical trust records.  *See, e.g.*, Defs.' Mem. P. & A. Resp. Pls.' Mot. Class Certification at 17 [Dkt. No. 24].  They repeated that admission in 1998.  Defs.' Mem. Supp. Defs.' Mot. Protective Order & Rule 16 Pre-Trial Conference at 2 [Dkt. No. 66] (confessing that "[a]s a result of missing records, it is not feasible to perform a full accounting").

[16] The Court of Appeals held that "[t]he federal government has 'charged itself with moral obligations of the highest responsibility and trust' . . . and its conduct 'should therefore be judged by the most exacting fiduciary standards.'"  *Cobell VI*, 240 F.3d at 1099 (quoting *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942)).

11

by Class Counsel and a special master and concluded in its bench opinion that defendants had

created a "fiasco":

> This entire fiasco is vivid proof to this Court that Secretary Babbitt and
> Assistant Secretary Gover have still failed to make the kind of efforts that are
> going to be required to make trust reform a reality.  Coming so soon after their
> trial testimony last summer, and all of the personal assurance they gave this
> Court about the priority that they were now placing on trust reform, the facts
> brought to light in this proceeding provide overwhelming proof to the Court
> that the defendants simply continue to provide more empty promises.[17]

A short time later, the former-Chief Information Officer and defendants' chief testifying

witness during Trial 1, notified the Special Trustee on February 23, 2001 that he then believed

"that trust reform is slowly, but surely imploding at this point in time."[18] The entire trial record

was revealed to be "built on wishful thinking and rosy projections." *Id*.  Defendants' improper

and disturbing trial tactics, which had been flushed out during the first contempt trial and

revealed thereafter, and their repeated failure to do that which they had promised this Court in

violation of orders subsequent to that trial, including orders to remedy and purge their contempt,

their conduct during Trial 1 confirmed that nothing had changed.

As a result, careful examination, testing, confirmation, and reconfirmation became

essential to protect the integrity of the judicial process, particularly where, as here, the

government officially encouraged the conduct that this Court had admonished by awarding

substantial cash bonuses to defense counsel as well as the John Marshall Award.[19]

For over six years, this Court disconnected BIA trust management systems from the

Internet because IIM Trust assets had been recklessly exposed to theft, loss, destruction, and

---

[17] Ex. A at 12:4-13 (Transcript of Apr. 4, 2000 Hearing Before the Honorable Royce C. Lamberth).

[18] Ex. B.

[19] The John Marshall Award is one of the highest honors awarded by the Department of Justice. *Human Resources Staff: Awards and Recognition*, U.S. DEP'T OF JUSTICE, http://www.justice.gov/jmd/ps/guiawards.htm (last visited Mar. 6, 2011).

US2008 2341155.4

corruption.[20]   Trust management systems admittedly had been "open" systems that permitted anyone in the world with access to the Internet to hack into the IIM Trust, effect transactions, and destroy, alter, or corrupt trust data without an audit trail.[21]   The Inspector General's experts described the IT security as a failure and the risk to individual Indian trust beneficiaries as potentially catastrophic.[22]   This Court concluded that Interior's IT security is a "disorganized and broken management structure."[23]   But, defendants did nothing until injunctive relief was fashioned by this Court beginning in December 2001.

Defendants represent that new and improved trust management systems have replaced catastrophically risky and failed legacy systems, IT security has improved, systemic document destruction has ceased, extant electronic and paper trust records are preserved, competent contractors are retained and retaliations have abated.   If what they say is true, that was not possible five years ago.   Nor was it possible at any other time prior to the filing of this case.

Until plaintiffs brought this action in this Court, the government behaved as if trust duties the United States has owed to individual Indian trust beneficiaries for more than 120 years are

---

[20] An accurate accounting is impossible unless trust management systems are secure.  *See, e.g.*, *Cobell XII*, 391 F.3d at 256-57 (concluding that "[i]t is indisputable that the Secretary has current and prospective trust management duties that necessitate maintaining secure IT systems in order to render accurate accountings now and in the future").  Defendants have a declared fiduciary duty to protect IIM Trust records, but knowingly breached that duty.  *See, e.g.*, *Cobell VI*, 240 F.3d at 1093 (holding that the trustee-delegates "had a clear obligation to maintain trust records").

[21] "IITD [is] at imminent risk of corruption or loss" because even the most rudimentary security controls essential for detection of unauthorized manipulation of data are either absent or ineffective.  *Cobell v. Norton (Cobell XVI)*, 394 F. Supp. 2d 164, 273 (D.D.C. 2005), *vacated on other grounds*, 455 F.3d 301 (D.C. Cir. 2006); *see also Cobell v. Norton (Cobell XI)*, 310 F. Supp. 2d 77, 95-96 (D.D.C. 2004) (finding that continued Internet connection "provides an opportunity for undetectable, unauthorized persons to access, alter, or destroy individual Indian trust data via an Internet connection").

[22] *Cobell XVI*, 394 F. Supp. 2d at 276.  Indeed, the Inspector General's national security expert stated that IT security at Interior had been even worse than a failure.  *Id.*

[23] *Id.* at 267.

13

unenforceable because individual Indians had no remedy for the harm and prejudice the government forced them to endure. That is why the Court of Appeals expressly recognized "the magnitude of government malfeasance" in defendants' mismanagement of the Individual Indian Trust and the prejudice their malfeasance has caused. *Cobell VI*, 240 F.3d at 1109.

In suggesting that plaintiffs have been chasing their tails, defendants conveniently omit mention of their own unprecedented litigation misconduct, which is one of the principal reasons that this Court and Class Counsel have had to invest extraordinary time and effort in the management and prosecution of this case. A substantial amount of Class Counsel's time and effort has been focused on defending this Court from defendants' meritless attacks on its integrity and defending and attempting to protect government officials who suffered retaliation for providing truthful testimony to this Court and Congress, *e.g.,* Mona Infield (a former BIA branch chief who was placed on administrative leave for three years for identifying and confirming severe and pervasive IT security vulnerabilities at the Office of Information Resources Management), Joe Christie (removed as special assistant to the Special Trustee for confirming that document production representations had been patently false), Ronnie Levine (threatened while she was on the witness stand with the loss of her position as BLM Chief Information Officer for confirming the vulnerability of trust records), Deborah Lewis (threatened for confirming findings of the special master that trust documents systematically had been destroyed at the BIA Navajo agency and that appraisals routinely were false and misleading), and Tom Slonaker (forced to resign as Special Trustee because he testified truthfully before

Congress in 2002 about the status of trust reform and that widespread document destruction and loss made it impossible to render an adequate accounting).[24]

In this litigation, one Treasury Secretary has been held in contempt,[25] two Interior Secretaries have been held in contempt, and two Assistant Secretaries of the Interior-Indian Affairs have been held in contempt[26] for disobeying this Court's orders and repeatedly misrepresenting matters material to these proceedings.

Further, in these proceedings, this Court sanctioned defendants for repeated violations of document production and preservation orders, witness intimidation, and material misrepresentations to this Court and Class Counsel. Indeed, two anti-retaliation orders were

---

[24] Mr. Slonaker, a Level II Presidential appointee, was warned by White House counsel and Justice Department attorneys not to submit written testimony to Congress, which confirmed that no adequate accounting could be rendered because of the loss and destruction of trust records and raised serious questions about the candor of contemporaneous representations to this Court by defendants and their counsel. Although he heeded their warning and withheld his written testimony, which has been introduced into evidence in these proceedings, his oral testimony confirmed the futility of the historical accounting effort. For that and other truthful testimony about the status of trust reform, Mr. Slonaker was asked to resign as Special Trustee or be fired. He resigned on July 30. 2001. *See, e.g.*, *White House embroiled in trust fund mess*, INDIANZ.COM (Jul. 31, 2002), http://mail.indianz.com/News/show.asp?ID=2002/07/31/slonaker; *see also McCain Statement on Tom Slonaker*, INDIANZ.COM (Jul. 30, 2002), http://64.38.12.138/News/show.asp?ID=2002/07/30/mccain (quoting Senator McCain's reaction to Mr. Slonaker's forced resignation: "The only solution is for Congress to be more aggressive, much like the courts, to pursue changes to enforce more accountability and finally bring resolution to Indian beneficiaries.").

[25] Adding insult to injury, while this Court held a contempt trial for the defendants' violation of orders or production, Treasury officials secretly destroyed documents that were responsive to the production orders and concealed such destruction throughout the trial and for months afterwards. *See, e.g.*, *Cobell VI*, 240 F.3d at 1093 (referencing "the Treasury Department's contemporaneous destruction of documents potentially responsive to the court's production order").

[26] The Court of Appeals reversed the civil contempt decision and vacated orders for one Interior Secretary and one Assistant Secretary, finding, among other things, that sanctions fashioned by this Court were not compensatory and concluding that contemnors are not accountable for contemptuous conduct of predecessors or subordinates even if ordered to show cause in their official capacity. *Cobell v. Norton (Cobell VIII)*, 334 F.3d 1128, 1145-50 (D.C. Cir. 2003). Notably, however, this Court's findings were not set aside and vacatur did not constitute absolution.

entered to protect testifying witnesses and multiple Rule 23(d) orders were entered to protect class members from threats and misrepresentations made by BIA officials.[27]   Additional orders were entered to stop BIA's auction of IIM trust lands,[28] halt the destruction of critical trust documents,[29] and compel production of documents unreasonably withheld.[30] What, if anything, did the Attorney General do to stop this behavior?  Nothing.  What did Congress do?  Nothing. To the extent Class Counsel have departed from core issues in this case, departure was essential to ensure the integrity of these proceedings and counteract defendants' strategy of delay.

Finally, notwithstanding plaintiffs' victories in trial, defendants never entered into settlement negotiations in good faith until the Obama Administration was sworn into office.  In eight previous settlement negotiations, including two that had been mediated, the first of which had been under orders from this Court and the second of which had been pursuant to instructions from Congress, the government never offered one cent in settlement and it refused to admit to a single breach of trust.  Class Counsel had no choice but to prosecute this case for fifteen years.

As a result of Class Counsel's persistence and extraordinary effort, individual Indian trust beneficiaries no longer must live in fear of unconscionable abuse and no longer must resign themselves to injury without remedy.  A line has been drawn in the sand.  In this Court, individual Indian trust beneficiaries have comfort in knowing that now they can hold defendants accountable and recover that which the trustee-delegates and their agents unlawfully have taken

---

[27] *See, e.g.*, Anti-Retaliation Order [Dkt. No. 277]; *see also Cobell v. Norton*, 224 F.R.D. 266 (D.D.C. 2004) (restraining defendants' communications with class members regarding the sale of trust lands); *Cobell v. Norton*, 212 F.R.D. 14, 20 (D.D.C. 2002) (preventing the Interior defendants from communicating with class members regarding "this litigation, or the claims that have arisen therein, without the prior authorization of this Court").

[28] *Cobell v. Norton*, 225 F.R.D. 41 (D.D.C. 2004).

[29] Dkt. Nos. 369-70.

[30] *Cobell VI*, 240 F.3d at 1093 (noting the egregious failure of defendants to produce documents, in violation of a court order).

US2008 2341155.4

or withheld from them.  For the first time in history, Class Counsel have leveled the playing field

for the most discrete and insular minority in this country.

### 3. Controlling Law Supports Using A Percentage of 14.75%.

In complaining about Class Counsel's hours and rates, defendants lose sight of the fact

that this is a common fund case and that the time records and rates may be used, if at all, as a

check on the percentage of the fund that is used to calculate the fee.  While plaintiffs disagree

with virtually all that defendants contend regarding Class Counsel's hours and rates,[31] what is

truly significant from that part of the defendants' response is what they do not and cannot

challenge – an award of $223 million would represent a factor lower than other comparable

mega-fund cases and the clear sailing amount of $99.9 million is so low it would be an

anomaly.[32]

Contrary to defendants' contention, a fee award of 14.75% would be in conformity with

other mega-fund class actions.  As this Court itself has expressly recognized, an award of 15% of

the aggregate of the monetary award and other tangible benefits is customary in mega-fund

cases.  *See In re Lorazepam & Clorazepate Antitrust Litigation*, No. MDL 1290(TFH), 2003 WL

22037741, at *7 (D.D.C. June 16, 2003).  In advocating a contrary view, defendants cite two

cases in support of their supposition that similar cases dictate a percentage of well below 10%:

*In re Sulzer Hip Prosthesis & Knee Prosthesis Liability Litigation*, 268 F. Supp. 2d 907 (N.D.

---

[31] For example, defendants criticize plaintiffs' use of current billing rates, but ignore completely the cases from this Circuit that hold that controlling law applies current rates.  Pls.' Pet at 22. Their attack on Mr.Gingold's rate as one that is higher than that which is set forth in the Laffey matrix ignores the fact that the Laffey matrix, which is prepared by U.S. Attorneys, typically, is used in fee shifting cases such as EAJA, not cases controlled by the common fund doctrine. Further, defendants ignore evidence that the stated current rate for Mr. Gingold is that which he is actually paid by other clients.  *See* Gingold Affidavit [Dkt. No. 3678-8] at ¶ 10.  There is no better evidence of an applicable or appropriate rate than that which clients actually pay for an attorney's services.

[32] Pls.' Pet. at 13-25.

Ohio 2003) and *In re Cendant Corp. PRIDES Litigation*, 243 F.3d 722 (3d Cir. 2001).  Both of these cases are demonstrably inapposite.

Neither case is applicable, since neither case involved much litigation.  In *In re Sulzer Hip Prosthesis & Knee Prosthesis Liability Litigation*, the parties entered into a preliminary global settlement agreement only eight months after a number of plaintiffs filed lawsuits in both state and federal courts.  268 F. Supp. 2d at 912-14.  The court granted preliminary approval of the proposed settlement agreement nine months after the first complaints were filed and the federal actions were transferred and consolidated to the Northern District of Ohio.  *Id.* at 914.  What is more, the parties modified the first proposed settlement agreement, amended the complaint to add two classes, and completed the notice process all within a year-and-a-half of the first complaint's filing.  *Id.* at 917-18.  Significantly, the first complaints were filed in December 2000, *id.* at 912, and  the court granted final approval on May 8, 2002.  *Id.* at 917-18. That case is inapposite and it bears no resemblance to the long and hard fought litigation here with more than 80 published decision, more than 3700 docket entries, and 250 trial and hearing days over 15 years.

Similarly, the *In re Cendant Corp. PRIDES Litigation* involved a class action in which the district court granted final approval of the settlement one year after the action was filed.  243 F.3d at 725-26.  That absence of litigation led the Third Circuit to reverse the 5.7% attorneys' fee that was awarded to the law firm that simply filed a motion for class certification in November 1998 and negotiated a settlement in March 1999.[33]  In vacating the award, the circuit held that

---

[33] Moreover, in the *Pigford II* settlement, the government agreed that this Court may award attorneys' fees upwards of about $90 million for a $1.15 billion fully taxable settlement that only involved the negotiation of a settlement agreement.  There was no litigation because *Pigford I* is *res judicata*. *Pigford I* was filed in 1997.  The class was certified in 1998.  Plaintiffs' counsel settled that case in 1999, took their fees, and went home – but for their unsuccessful efforts to

18

"the District Court should have learned from those [other mega-fund] cases that extensive time and effort exerted by the attorneys and the existence of complex legal and factual issues warranted higher fee awards than the fee award that would have been appropriate for Kirby." *Id*. at 738. Further, the court of appeals summarized each of the important factors that were absent in the case before it, but which "recur" in class action litigation that warrants higher attorneys' fees, *i.e.,* "complex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel." *Id.* at 741. The factors discussed by the court of appeals, perfectly describe *Cobell*, not the cases cited by defendants that, together, took two-and-a-half years to resolve.

A comprehensive review of mega-fund cases reveals that the range of attorneys' fees is far greater than defendants suggest for cases where the settlement exceeds $300 million. In *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400 (D. Conn. 2009), a retired federal judge prepared a report in support of the plaintiffs' fee petition, a report that included a chart of the top 26 settlements since enactment of the Private Securities Litigation Reform Act. That chart only details settlements that exceed $300 million. *Id*. at 405. Notably, the average percentage fee award is 13.3% of the total recovery.

A study that is more comprehensive than that which was prepared in the *Carlson* case confirms that an attorneys' fee award of 14.75% is fair and reasonable and in accordance with controlling law. Professors Eisenberg and Miller reviewed over 1000 reported class action cases from 1999-2002 to provide empirical research for guidance on the reasonableness of an attorney fee request. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action*

---

avoid $300,000 in sanctions imposed by this Court. Some of those same attorneys are counsel in *Pigford II* and *Keepseagle,* the $760 million fully taxable Indian farmers settlement for which a $60.8 million fee has been requested by plaintiffs' counsel.

*Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUD. 27 (2004). The study broke down class recoveries into deciles, with the top 10% starting with recoveries that exceed $190 million and average $929.1 million. *Id.* at 73. The average attorneys' fee award for the top 10% of class recoveries ranges from 12% - 16.4%. *Id.* Attorneys' fees of 14.75% fall squarely within that range and are right down the middle of the plate.

Finally, Judge Easterbrook of the Seventh Circuit has explained why defendants' argument – that attorneys' fee awards should be significantly lower in mega-fund cases or for those representing Indians – is meritless and, if accepted, capable of distorting the market for legal services and preventing Indians from obtaining competent counsel in the future.[34] In *In re Synthroid Marketing Litigation*, 264 F.3d 712 (7th Cir. 2001), the Seventh Circuit reversed a district court's decision to cap attorneys' fees at 10% of the recovery for a mega-fund case, explaining that, since the district court defined mega-funds as settlement of $75 million and up, "counsel for the consumer class could have received $22 million in fees had they settled for $74 million but were limited to $8.2 million in fees because they obtained an extra $14 million for their clients (the consumer fund, recall, is $88 million)." *Id.* at 718. The court detailed an even more stark example to show how such a mega-fund rule undermines the attorney-client relationship and stifles zealous advocacy:

> Under the court's ruling, a $40 million settlement would have led to the same aggregate fees as the actual $132 million settlement. Private parties would never contract for such an arrangement, because it would eliminate counsel's incentive to press for more than $74 million from the defendants. Under the district court's

---

[34] Indeed, if the government is successful in its efforts to establish an unreasonably low cap, where none has been negotiated, hereafter, individual Indian plaintiffs will be forced to retain the sort of counsel that this Court knows all too well. No serious litigation would ensue. Instead, boiler-plate complaint would be filed, a class would be certified, a settlement would be negotiated, and counsel would take their fees and go home. Strategically, all the government would need to do is threaten protracted litigation in order to work out a settlement most favorable to it and plaintiff's counsel to the detriment of the class.

20

approach, no sane lawyer would negotiate a settlement of more than $74 million and less than $225 million; even the higher figure would make sense only if it were no more costly to obtain $225 million for the class than to garner $74 million.

*Id.* That the Seventh Circuit has adopted a different method of determining attorneys' fee awards than this Circuit does not diminish the logic of *In re Synthroid Marketing Litigation*. Class Counsel should be rewarded for the exceptional benefits conferred on their clients, which approach $9 billion in monetary and other tangible benefits, in addition to obtaining favorable tax treatment and preserving class members' eligibility for social benefits programs, including food stamps, SSI and Medicaid.

Defendants also suggest that the great risk assumed by Class Counsel had magically disappeared. Class Counsel have toiled for 15 years with an enormous risk they would not be paid for their work. This Court and defendants have known for more than a decade that Class Counsel were not being paid on an hourly basis and were working pursuant to written contingent fee arrangements.[35] The sanctions paid by defendants reflect a small fraction of Class Counsel's

---

[35] *See, e.g.,* Plaintiffs' Memorandum of Supplemental Information, dated March 22, 1999 at 4 [Dkt. No. 221] ("[A]s this Court was orally advised [in early 1998], Messrs. Gingold and Holt waived the hourly fees and expenses which were originally to be paid on a deferred basis; they have now waived all but a portion of the hourly fees which may accrue after March 31, 1999, and Messrs. Gingold, Holt, and Levitas will apply for such fee, if any, as the Court may award to them under the "common fund" doctrine."). Class Counsel have had executed written contingent fee agreements with Class Representatives for upwards of 13 years. *See, e.g.,* Gingold Affidavit [Dkt. No. 3678-8] at ¶ 11 ("As a result, since early 1998, no funds have been available to pay my current time in this litigation – not even deeply discounted time -- and I have been engaged by Class Representatives pursuant to a full contingent fee agreement in accordance with the common fund doctrine.") and Holt Affidavit [Dkt. No. 3678-8] at ¶ 5 ("in 1998 it was agreed to go primarily to a contingent arrangement based on the common fund doctrine."). Further, during the 2001 settlement discussions, contingent fee agreements were discussed in detail and provided to the government. Moreover, defendants jointly proposed the long form notice, which confirms the 14.75% aggregate contingent fee percentage. *See* Joint Motion for Preliminary Approval [Dkt. No. 3660-13] (notice attached to motion for preliminary approval). D.C. Rule of Professional Conduct 1.5 providing for contingent fee agreements to be in writing does not require that they be produced. The contingent fee agreements under which Class Counsel have

21

efforts and do not mitigate the significant risk that Class Counsel had to assume to obtain justice for the plaintiff classes.[36]

### 4.  Determination of the Fee Award Remains for this Court.

Defendants take out of context snippets from statements by plaintiffs' representatives to try to turn the clear sailing provision into something it is not, a cap on what this Court can award. This Court, Congress, and class members have been consistently and correctly informed that the clear sailing provision is not a limit.  For example, the long form notice to class members submitted with the parties' Joint Motion for Preliminary Approval informs plaintiffs of the amounts in the clear sailing provision and what would result from application of the contingency fee percentages, and then states:

> The Court is not bound by any agreed upon or requested amounts, or the contingency fee agreements between Class Representatives and Class Counsel. The Court has discretion to award greater or lesser amounts to Class Counsel in accordance with controlling law, giving due consideration to the special status of Class Members as beneficiaries of a federally created and administered trust.

Long Form Notice § 33, at 15.

As with class members, Congress too has been correctly informed that determination of the appropriate award is within this Court's discretion.  Congress was well aware that the $99.9 million clear sailing amount was not a limit on what this Court could award.  For example, in response to a question from Senator Barrasso regarding testimony before the Senate Indian Affairs Committee, Associate Attorney General Thomas J. Perrelli reconfirmed that there was no cap on the fees:

---

been working are in writing and the record is clear that they total an aggregate percentage of 14.75%.

[36] The $7 million in attorneys' fees defendants say they have paid (Defs.' Opp'n at 16) represent less than 10% of Class Counsel's time at current hourly rates. Also, the clear sailing amount of $99.9 million is in addition to any amounts previously paid by defendants. Settlement Agreement ¶4a.

US2008 2341155.4

Question 5:   You also testified that the Court would not be bound by this agreement when determining the amount of an attorneys' fee award.

   a) Is there a statement to that effect in the agreement?

Response:

   a) The agreement does not expressly so state.  It is implicit in the nature of the agreement and the nature of the court's authority.

*Cobell v. Salazar Settlement Agreement: Hearing Before Sen. Comm. on Indian Affairs*, 111th

Cong. 33 (2009) (statement of Thomas J. Perrelli, Associate Att'y Gen.).  Nor was there any

confusion in the House of Representatives that there was no cap on fees but rather merely a clear

sailing agreement.   Ranking Member Doc Hastings attempted to amend the authorizing

legislation in order to limit fees to $50 million and noted during floor debate that Statement of

Representative Hastings on the floor that the settlement, without his amendment, would include

"possible payment of over $100 million to lawyers" since the Act, as amended by the Senate,

"can be completely disregarded by a federal judge."[37]  There is simply no question that members

of both houses of Congress fully understood that there was no cap and that the court would

decide the fee question consistent with controlling law.[38]

   Plaintiffs have also been clear with this Court that the clear sailing provision was not a

limit on the discretion of this Court.  For example, in Plaintiffs' Notice Regarding Attorneys'

Fees and Class Representatives' Incentive Awards, plaintiffs expressly noted "that the Court has

the discretion to award more or less than the amounts asserted by plaintiffs and agreed to by the

parties so long as the award is consistent with controlling law as reconfirmed by Congress after

---

[37] *Hastings Floor Statement on the Claims Resolution Act of 2010*, H. COMM. ON NATURAL RES. (Nov. 29, 2010), available at:
http://naturalresources.house.gov/News/DocumentSingle.aspx?DocumentID=215938.
[38] *See also, e.g.*, 156 Cong. Rec. H7652 (daily ed. Nov. 30, 2010) (statement of Rep. Virginia Fox) ("it allows the plaintiff attorneys to be paid in excess of $100 million").

US2008 2341155.4

great debate." Dkt. No. 3661 at 3. Accordingly, there is no basis to change the agreements, which leave to this Court the determination in accordance with controlling law of the amount to be paid to Class Counsel.[39]

Defendants suggest that the reference in the Claims Resolution Act of 2010 to the fact that plaintiffs are beneficiaries of a federally created and administered trust should somehow reduce the amount awarded for attorneys' fees. Though they cite nothing from the legislative history to support for this position, it is easy to understand their reason for this position. If the attorneys here are not entitled to fees equal to those for attorneys for other plaintiffs, it will make it all but impossible for such beneficiaries to engage competent counsel in the future, further shielding the trustee-delegates from full accountability. That is not in the best interest of individual Indian trust beneficiaries. Nor is it a position that a fit trustee would assert. For this sound policy reason, defendants' interpretation of the Act should not be accepted.

**5. Class Counsel Are Entitled to Recovery of Their Expenses.**

Defendants do not specifically object to any of the expenses and costs totaling $1,276,598 requested by Class Counsel. Rather, defendants incorrectly argue that expenses and costs paid by or on behalf of the Class Representatives should be deducted from the amount awarded for Class Counsel's fees, expenses and costs. Defs' Opp'n at 21. This argument is based on the faulty premise that all litigation expenses and costs were to be included in the petition for Class Counsel's fees, expenses and costs regardless of whether Class Counsel paid those costs and expenses. However, the Settlement Agreement which provides for the filing of two separate petitions by plaintiffs, one for the fees, expenses and costs of Class Counsel,

---

[39] Given that plaintiffs have consistently informed this Court correctly regarding this Court's continuing discretion to determine the fee award, there is no basis for applying judicial estoppel here, especially since there has been no legal proceeding – separate or otherwise – in which plaintiffs have taken an inconsistent position.

24

another for the Class Representatives' incentive awards, expenses <u>and</u> costs. Settlement Agreement, ¶¶ J & K. Thus, the Settlement Agreement expressly distinguishes expenses and costs that are paid for by Class Counsel from other expenses that have been assumed, paid, and included in the petition regarding Class Representatives. *Id*. at ¶ K.1. Moreover, the Settlement Agreement explicitly recognizes that the Class Representatives had incurred significant expenses and costs, which they would seek to recover in their petition for incentive awards. It states:

> Prior to the hearing on the Motion for Preliminary Approval of this Agreement, Plaintiffs shall file a notice with the Court stating the amount of incentive awards which will be requested for each Class Representative, <u>including expenses and costs that were not paid for by attorneys</u>, which expenses and costs are expected to be in the range of <u>$15 million</u> above those paid by Defendants to date.

*Id*. (emphasis added). Plaintiffs have thoroughly discussed this matter in their *Reply to Defendants' Objections to Class Representatives' Petition for Incentive Awards and Expenses* filed this date.

## CONCLUSION

Class Counsel have achieved a "stunning" landmark victory under extraordinarily difficult circumstances. No lawyers in this Circuit have done so much for so many. They have accomplished what Congress could not, and what a long series of Administrations would not. Accordingly, plaintiffs petition this Court to award fees, expenses, and costs for Class Counsel through December 7, 2009 in accordance with controlling law.

Respectfully submitted,

/s/ Dennis M. Gingold
DENNIS M. GINGOLD
D.C. Bar No. 417748
607 14th Street, N.W., 9th Floor
Washington, D.C. 20005
(202) 824-1448

25

/s/ Keith M. Harper
KEITH M. HARPER
D.C. Bar No. 451956
JUSTIN GUILDER
D.C. Bar No. 979208
KILPATRICK TOWNSEND LLP
607 14th Street, N.W.
Washington, D.C.  20005
(202) 508-5844

DAVID COVENTRY SMITH
N.C. Bar No. 12558
Admitted *Pro Hac Vice*
KILPATRICK TOWNSEND LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
(336) 607-7392

WILLIAM E. DORRIS
Georgia Bar No. 225987
Admitted *Pro Hac Vice*
ELLIOTT LEVITAS
D.C. Bar No. 384758
KILPATRICK TOWNSEND LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309
404-815-6500

Attorneys for Plaintiffs

26

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PETITION FOR CLASS COUNSEL FEES was served on the following via facsimile, pursuant to agreement, on this 7th day of March, 2011.

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
406.338.7530 (fax)


/s/ Shawn Chick_____

US2008 2341155.4