## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
**ELOUISE PEPION COBELL, et al.,**        )
                                          )
        **Plaintiffs,**                   )
        **v.**                            )          **No. 1:96CV01285(TFH)**
                                          )
**KEN SALAZAR, Secretary of**             )
**the Interior, et al.,**                 )
                                          )
        **Defendants.**                   )
_____)


## PLAINTIFFS' REPLY TO DEFENDANTS' OBJECTIONS TO CLASS REPRESENTATIVES' PETITION FOR INCENTIVE AWARDS AND EXPENSES

### Introduction

Fifteen years ago, Ms. Cobell and other Class Representatives made a decision to "stand up, draw a line in the sand, and tell the government: Enough is enough-this far and no further." *Cobell v. Norton*, 229 F.R.D. 5, 23 (D.D.C. 2005), *rev'd on other grounds*, *Cobell v. Kempthorne*, 455 F. 3d 317 (D.C. Cir. 2006). It took tremendous courage for them to stand up when all others sat idly by. Defendants never dispute that no one else – not Congress, the Executive Branch, tribes nor any other person – rose to defend the 500,000 individual Indians who have suffered grievous breaches of trust at the hands of the government. Nor do defendants dispute that the trust system had been broken for over 100 years. It has been the intrepid efforts of Ms. Cobell and the other Class Representatives that markedly enhanced the trust relationship for every individual Indian trust beneficiary by initiating this case and securing over $9 billion in significant, tangible benefits to the plaintiff classes. Defendants grudgingly acknowledge that those efforts have been and should be lauded: Ms. Cobell and the other Class Representatives

"garnered praise for their efforts,"[1] and Ms. Cobell especially, "has labored extensively on behalf of other class members."[2] They further acknowledge Class Representatives' entitlement to an incentive fee.[3]

However, despite the straightforward congressional mandate to award incentive fees to the Class Representatives "in accordance with controlling law," *see* Claims Resolution Act of 2010, Pub. L. No. 111-291, § 101(g)(1)(A), 124 Stat. 3064, 3068 (2010), defendants largely avoid any mention of controlling law.  They never acknowledge the standard this Court has established for the award of incentive fees.[4]  Nor do they discuss the well-settled rule, confirmed by the Settlement Agreement,[5] that Ms. Cobell's litigation expenses may be recovered from the common fund.[6]

Rather than address controlling law, defendants suggest, contrary to the law of this Circuit and the very cases on which they rely, that incentive payments should approximate the lowest distribution to any class member under the Settlement Agreement.  Further, they trivialize the achievements of the Class Representatives, insisting they can take no credit for 89% of the monetary value of the settlement addressing trust reform and resolving trust administration

---

[1] *Defs' Objections to Class Representatives' Pet. for Incentive Awards & Expenses* [Dkt. No. 3697] at 1 (hereinafter "Defs' Opp'n").

[2] *Id.* at 3.

[3] *Id.* at 1.

[4] *See infra* at 3;  *see also Pls' Mem. in Supp. of Class Representative's Pet.  for Incentive Awards & Expenses* [Dkt. No. 3679] at 4-5 (hereinafter "Pls' Pet.").

[5] *See* Settlement Agreement dated December 7, 2009 ("Settlement Agreement" or "SA") at § K.1 (providing that Class Representatives may petition this Court to be reimbursed for "expenses and costs that were not paid for by attorneys").  The subject expenses have not been paid by attorneys.

[6]  A party litigant who recovers a common fund or funds for the benefit of persons other than herself shall "be reimbursed from that fund for litigation expenses incurred." *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993).  "The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  *See generally* Pls' Pet. at 16-17.

claims.  By doing so they continue to disregard and distort the 15-year history of this litigation in which trust reform and trust mismanagement issues have been squarely addressed and significant improvements have been achieved.[7]  Finally, they again seek to retaliate against Ms. Cobell for her efforts in this case by ignoring controlling law, the facts, and the very terms <u>they</u> insisted on placing in the Settlement Agreement, by arguing that this Court should deny her recovery of the substantial expenses incurred in the prosecution of this litigation.  Controlling law and the facts warrant a total incentive fee to be paid to Class Representatives of $2,500,000 and reimbursement of all expenses incurred.

I.     **In Accordance With Controlling Law, Class Representatives Should Be Awarded Incentive Payments Totaling $2.5 Million.**

   A.     **Defendants Fail to Address Controlling Law Regarding Incentive Awards to Class Representatives.**

   Plaintiffs' Petition explained controlling law for the award of incentive fees to Class Representatives:  "In deciding whether to grant incentive awards and the amount of such awards, courts consider factors such as the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation."  *Wells v. Allstate Ins. Co.*, 557 F. Supp. 2d 1, 8-9 (D.D.C. 2008) (quoting *In re Lorazepam & Clorazepate Antitrust Litig.*, No. MDL 1290(TFH), 2003 WL 22037741, at *10 (D.D.C. June 16, 2003)) (internal quotation marks omitted).  The Petition examined each factor at length, explaining how Ms. Cobell and the other Class Representatives have protected class interests and provided unprecedented, historic tangible benefits to class members as a result of their actions, the time and effort they expended,

---

[7]   *See, e.g., Cobell v. Kempthorne* (*Cobell XXI*), 569 F. Supp. 2d 223, 253 (D.D.C. 2008) ("the benefits of the litigation are manifest," having greatly enhanced "the present and future reliability of the Indian trust system"),  *rev'd on other grounds, Cobell v. Salazar,* 573 F.3d 808 (D.C. Cir. 2009).

and the risks they assumed throughout this litigation.  Pls' Pet. at 4-15.  Yet, defendants'

opposition is silent with respect to each factor that ought to be considered in awarding incentive

fees in accordance controlling law.  Accordingly, in conformity with principles set forth by this

Court in LCvR 7(b), defendants' silence should be construed as a concession of the merits of

plaintiffs' petition.

Defendants, while claiming that incentive awards are to be "considered on the merits and

circumstances in each case," Defs' Opp'n at 4, fail to do so.  They never address plaintiffs'

arguments directly.  Instead, they make unsupported conclusory statements that describe the

requested award as "grossly excessive."  *Id.* at 1.  Their baseless assertions, however, do not

trump the powerful record of this case.

It is indisputable that no one else had the courage and fortitude to stand up to the mighty

United States government and put an end to generations of unconscionable abuse. Most

importantly, by doing so, they have obtained almost $9 billion in tangible benefits for the class

members, which is an historic achievement by any standard of measurement.

**B.      Defendants' Argument that Incentive Payments Must be Proportional to Payments to Class Members Is Unsupported by Controlling Law**

To limit Class Representatives' incentive fees, defendants conjure up out of whole cloth

an argument that incentive payments must correspond to the minimum amount to be distributed

to class members under a settlement agreement. *Id.* at 8-11.  But there is no such minimum

payment rule.  Simply put, class distributions paid under a settlement are not factors considered

by this Court in awarding incentive payments.  *See In re Lorazepam*, 2003 WL 22037741, at

*10.  Accordingly, defendants' proportionality argument has no support in controlling law and,

as has been their custom and practice throughout the fifteen years of this litigation, they continue

to distort decisions upon which they rely, including the two cases they cite from the Ninth Circuit.

Defendants wrongly cite *Staton v. Boeing Co.,* 327 F.3d 938 (9th Cir. 2003), for the principle that it is improper for a court to approve an incentive award that is sixteen times greater than the amount distributed to the average class member.  In fact, *Staton* does not address the measurement of incentive awards, other than to direct the district court to consider on remand the factors that guide a court's determination of a proper incentive award.[8]  Instead, *Staton* addresses and rejects the inequitable distribution of damages to a subset of 264 class members, out of 15,000 class members, who were selected by class counsel without regard to merit.  *Id.* at 975-76.  Rejecting the distribution scheme that directed more than half of the common fund to only 264 class members, the *Staton* court explained that class representatives, not subsets, are entitled to incentive awards.  *Id.* at 977-78.  Thus, contrary to defendants' twisted analysis, *Staton* does not support their theory; it confirms controlling law as explained in Plaintiffs' Petition.

Further, defendants mischaracterize *Alberto v. GMRI, Inc.*, 252 F.R.D. 652 (E.D. Cal. 2008), and misrepresent to this Court that the *Alberto* court rejected an incentive award that was 207 times the average class member recovery.  Defs' Opp'n at 9.  To the contrary, the court in *Alberto* approved the incentive award for the class representative, notwithstanding its size in relation to the common fund as a whole (0.71%).  *See Alberto v. GRMI, Inc.*, No. Civ. 07-1895 WBS DAD, 2008 WL 4891201, at *12 (E.D. Cal. Nov. 12, 2008).  Instead of citing the

---

[8] The factors set forth in *Staton* for incentive fees are identical to those discussed in Plaintiffs' Petition:  "The District Court must evaluate [class representative's] awards individually, using 'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, … the amount of time and effort the plaintiff expended in pursuing the litigation … and reasonabl[e] fear[s of] … retaliation.'" 327 F.3d at 977 (quoting *Cook v. Niedert*, 142 F. 3d 1004, 1016 (7th Cir. 1998)).  This sort of obfuscation by the government has been noted and admonished repeatedly by this Court in these proceedings.

dispositive *Alberto* final approval decision, defendants reference only the preliminary approval decision in which the court simply asked the parties to justify the incentive fee by "present[ing] evidence of the named plaintiff's substantial efforts taken as class representative." 252 F.R.D. at 669.   Like *Staton,* the decision in *Alberto* supports the awards requested by the Class Representatives.

Finally, defendants seek to bootstrap their otherwise meritless proportionality argument by challenging the relevancy of *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006), which stands as the only case where the service of the class representatives comes closest to, but still falls well below, the efforts, risks accepted, and historic results achieved by *Cobell* Class Representatives.   Given their "unusual courage and commitment," the *Allapattah* court awarded an incentive payment of $1.76 million to each of nine class representatives, representing 1.5% of the common fund and totaling $15.9 million.   *Id.* at 1220. Defendants' efforts to distinguish *Allapattah* on the basis that class members received their "full compensatory damages," Defs' Opp'n at 11, quoting *Allapattah*,  454 F. Supp. 2d at 1189, fail.[9] That is not controlling law.   Rather, "courts consider factors such as the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Wells,* 557 F. Supp. 2d at 8-9 (quoting *Lorazepam*, 2003 WL 22037741, at *10) (internal quotation marks omitted).

---

[9] Parenthetically, here, payments to class members under the Settlement Agreement constitute both restitution <u>and</u> damages.  For 700 years, restitutionary relief has been considered by all recognized authorities, including Professor Douglas Laycock, plaintiffs' testifying expert, the mirror image or opposite of damages, which is why this Court has full authority and jurisdiction to award full restitutionary relief free from jurisdictional constraints set forth in the Tucker Act.

Moreover, the *Cobell* settlement is the largest class action settlement the United States has ever executed – and it is tax exempt.  Further, the *Cobell* settlement in aggregate amount is larger than the sum of all settlements between the United States and tribes in the history of this country.  Results achieved in this litigation have been characterized by this Court as "stunning." *Cobell v. Babbitt* (*Cobell V*), 91 F. Supp. 2d 1, 51 (D.D.C. 1999), *aff'd*, *Cobell v. Norton*, 240 F.3rd 1081 (D.C. Cir. 2001).  They have successfully resolved what the Court of Appeals describes as "a serious injustice" committed against Native Americans by our government "that has persisted for over a century and that crie[d] out for redress."  *Cobell v. Kempthorne* (*Cobell XIX*), 455 F.3d 317, 335 (D.C. Cir. 2006).  By any standard, the results achieved in this case are unprecedented and are more, not less impressive, than that which had been achieved in *Allapattah*.

Simply put, there is no support for defendants' claim that incentive payments must be in proportion to payments to individual class members. Defendants' theory is not in accordance with controlling law and it has no support in this Circuit's precedent.  Undistorted and properly applied, the proportionality principle stands for the unremarkable principle that "incentive fees vary[] with the size of the <u>class recovery</u>," Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. REV. 1303, 1348 (2006) (emphasis added), not the size of the recovery of a class member. Moreover, the application advocated by defendants would provide a perverse and illogical incentive in the filing and settling of class action litigation, *i.e.,* class representatives would move to certify the most narrow, lucrative, discrete, and selective class possible to maximize their incentive awards – if such awards no longer are based on the overall tangible benefits to the class as a whole. Misuse of the proportionality principle would penalize, rather than compensate, Ms. Cobell and the other

Class Representatives for the exceptional results they have achieved in this case.  That is not governing law.

      **C.**    **The Work of the Class Representatives Resulted in a Common Fund of Not Less than $3.4 Billion.**

In their crusade to trivialize the achievements of individual Indian Class Representatives, defendants argue that the common fund, for purposes of calculating the incentive fee, is limited to the approximate $360 million allocated for the Historical Accounting Fund; that Class Representatives are entitled to no credit for the balance of the settlement.  Defendants are, once again, in error.

First, the argument that the case was "not structured to produce a common fund," Defs' Opp'n at 13, is incorrect.  From the outset, plaintiffs invoked the equitable authority of this Court to restate IIM account balances to reflect the breaches of trust that would have been revealed by an adequate historical accounting.  This Court determined early in this litigation that plaintiffs were entitled to the equitable remedy of an accounting and declared that the remedy ordinarily is a "restitutionary award," which plainly is within its jurisdiction.  *Cobell V*, 91 F. Supp. 2d at 28 n.20.  This Court so informed defendants on December 21, 1999.  Unfortunately, defendants' instant claim again confirms that they will not recognize, and will continue to re-litigate, holdings of this Court if they are adverse to their strategic position, which is one of the principal reasons Class Representatives and Class Counsel have had to prosecute this case for fifteen years.

Second, it is settled law that where, as here, a common fund is established, fees are awarded "from the fund <u>as a whole</u>," *See, e.g., Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (emphasis added); *see also In re Dep't of Veterans Affairs (VA) Data Theft Litig.*, 653 F. Supp. 2d 58, 60 (D.D.C. 2009), *appeal dismissed*, No. 09-5405, 2009 WL 5179325 (D.C. Cir.

Dec. 14, 2009) (awarding fees on "a percentage of the <u>total</u> common fund) (emphasis added). This litigation has resulted in a settlement that creates a common fund of $3.412 billion, enhanced materially by tax-free distributions to beneficiaries.[10]   Defendants cite no precedent that justifies limiting fees to historical accounting funds, which defendants say are less than 11% of the common fund.

Defendants' assertion is premised on their puzzling assumption that funds allocated to settle Trust Administration claims and to purchase fractionated interests in trust land evolved from the unilateral efforts of the government to resolve future potential claims, wholly independent of this litigation.   Defs' Opp'n at 13-14.   Nothing can be further from the truth. That plaintiffs, through their efforts in fifteen years of this litigation, effectuated the settlement of Trust Administration claims, is clear. Indeed, fund and asset mismanagement have been key trust reform components of this litigation since its inception.

Why defendants continue to argue that the sole issue in this litigation is the rendering of an historical accounting and that trust mismanagement issues were "never part of the case," Defs.' Opp'n at  8, is bizarre. This Court rejected their argument and conclusively resolved the matter on December 21, 1999, when it stated that it was retaining jurisdiction because of the "long and sorry history of the United States' trusteeship of the IIM trust, the defendants' recalcitrance toward <u>remedying their mismanagement</u> despite decades of Congressional directives, and the consequences of allowing these enumerated breaches to continue…." *Cobell V*, 91 F. Supp. 2d at 8  (emphasis added).  *See also id.* at 44 (emphasis added) (finding that "the requirements of architecture and staffing plans are rooted more in Interior's history of IIM trust

---

[10]   In addition, class members have benefited through more than $4.8 billion invested by the government in the reform and rehabilitation of IIM trust systems, greatly improving its "present and future reliability."  *Cobell v. Kempthorne*, 569 F. Supp. 2d 223, 253 (D.D.C. 2008) ("*Cobell XXI*"), *rev'd on other grounds,* 573 F. 3d 808 (D.C. Cir. 2009).

<u>mismanagement</u> and the context of the Trust Fund Management Reform Act's passage than derived from common law"). And, the Court of Appeals fully is in accord. *See, e.g., Cobell v. Norton* (*Cobell XIII*), 392 F. 3d 461, 470 (D.C. Cir. 2004) (dismissing "Interior claims that the district court cannot 'expand[] its jurisdiction to include the entire field of trust management' because our decision in *Cobell VI* held 'that the only actionable duty was the duty to perform an accounting.' . . . . <u>We made no such ruling</u>") (emphasis added).

Accordingly, this Court and the Court of Appeals expressly recognized that defendants' mismanagement of the IIM Trust is important part of this case. Necessarily, the issues had to be investigated and litigated. In fact, those matters were intensely debated during the parties' five month contentious negotiations that resulted in the December 7, 2009 Settlement Agreement.[11] They were as important to this settlement as they had been in each of the eight previous failed settlement discussions with the government over the course of these proceedings.

Class Representatives, similarly, are responsible for, and an important cause of, the establishment of the Land Consolidation Fund. There would be no money – none – for land consolidation but for this settlement and that which Ms. Cobell, the other Class Representatives, and Class Counsel have achieved. Notwithstanding defendants' self-serving revisionist history of this case, a key aspect of this litigation always has been trust reform – "reforming the management and accounting of the IIM trust so as to meet the federal government's fiduciary responsibilities." *Cobell VI,* 240 F. 3d at 1093. *See also id.* at 1089 (citing to various reports, including Misplaced Trust: The Bureau of Indian Affairs Mismanagement of the Indian Trust Fund[12] and finding that "[t]ime and again Interior Department officials pledged to address these

---

[11] *See, e.g.,* SA at 8-10 (includes fund mismanagement claims within the Trust Administration class).
[12] H.R. Rep. No. 102-4999, at 2-3 (1992).

concerns. Yet, as Interior Department Officials readily acknowledge, there has been little progress at reforming the management of IIM trust accounts.").[13] Why would this Court and the Court of Appeals discuss trust reform in so much detail in the majority of their 80 published decisions and why would the government invest $5 billion in reform and rehabilitation since this case was filed, if it had not been a critical part of this case?

Often, defendants have tried to excuse their failures and continuing breaches of trust on complexities created by generations of land ownership fractionation.   Government officials complain that the principal impediment to trust reform has been the highly fractionated interests in trust land and this Court has noted their complaints. *See generally Cobell v. Kempthorne* (*Cobell XX*), 532 F. Supp. 2d 37, 40 (D.D.C. 2008), *rev'd on other grounds, Cobell v. Salazar,* 573 F. 3d 808 (D.C. Cir. 2009).   The Settlement Agreement specifically provides that "an integral part of trust reform includes accelerating correction of the fractionated ownership of trust or restricted land, which makes administration of the individual Indian trust more difficult." Settlement Agreement at p. 4 (emphasis added). Those provisions in the Settlement Agreement relating to the Land Consolidation Fund were extensively negotiated in the months leading up to its execution. Accordingly, defendants' argument is meritless.

---

[13] The *Cobell VI* court expressly noted that this Court had bifurcated the case as follows:  "Phase I would address 'fixing the system' or reforming the management and accounting of the IIM trusts so as to meet the federal government's fiduciary responsibilities.  Phase II will address historical accounting of the accounts."  *Id.* at 1093.  It took more than ten years to go to trial on "Phase II" and, even then, the government had to rely on junk science as an alternative to an adequate accounting because it had lost, destroyed, and corrupted too many critical trust documents, historically and throughout this litigation.  Plainly, the record demonstrates that most of this case has been focused on trust reform and defendants' continuing mismanagement.

This Court has held that incentive awards ranging from 0.2% to 0.3% of the common fund are reasonable.[14]  *In re Lorazepam*, 2003 WL 22037741, at *11.  The requested combined $2.5 million is well below that range, constituting only 0.07% to 0.08% of the total common fund[15] (and 0.17% to 0.18% of the combined Historical and Trust Administration Funds). That amount is fully supported by controlling law.

**D.    Defendants' Reliance on Various Studies Further Supports Plaintiffs' Petition for Incentive Awards**

Studies proffered by defendants support Plaintiffs' Petition, not defendants' opposition. Although such studies are not controlling, they are helpful to place the requested incentive awards in context.  Defendants misconstrue the Eisenberg & Miller study[16] for the proposition that the average incentive award is about $16,000.  Defs' Opp'n at 6.  To the contrary, that study found that incentive payments to class representatives average 0.16% of the common fund, or, as applied to this case, $5,440,000 for the Class Representatives.[17]  Eisenberg & Miller, 53 UCLA L. Rev. at 1308.  However, plaintiffs' request for an incentive award of 0.07% is far below of the

---

[14] Defendants cite no authority to support their suggestion that the range for incentive fees that this Court found acceptable in *In re Lorazepam* is limited to antitrust cases.   Defs' Opp'n at 18. The Honorable Royce C. Lamberth, who presided over this litigation for 10 years, characterized it as "one of the most complicated and difficult cases to ever be litigated in this court." *See* Comments of the Honorable Royce C. Lamberth, Chief Judge, United States District Court for the District of Columbia at the December 8, 2009 ceremony honoring the Honorable James Robertson at 5. The complexity of this case compares favorably with antitrust cases litigated in this district.  Indeed, the government ensured that *Cobell* would be much more complex than *In re Lorazepam* as a result of its unprecedented litigation misconduct.

[15]  Defendants engage in a lengthy discussion of the common benefit doctrine.  Defs' Opp'n at 14-16. However, defendants acknowledge that payment of incentive fees is proper, where there is either "a claim for an incentive award . . . authorized in a settlement agreement," or a common fund.  *Id.* at 14 (quoting *Hadix v. Johnson*, 322 F. 3d 895, 898 (6th Cir. 2003)). Here both criteria are satisfied..

[16] Eisenberg & Miller, 53 UCLA L. Rev. 1303.

[17] $3.4 billion X 0.16% = $5,440,000.

0.16% found by Eisenberg and Miller to be the average award in all studied class action lawsuits.[18]

Apart from a brief, erroneous reference to that study, defendants conveniently disregard other relevant factors that are discussed therein.  For example, when considering incentive awards, Eisenberg & Miller found "[a] strong positive relation between class recovery and aggregate incentive awards.  Because, as shown in our prior work, a strong association exists between class recovery and both attorneys' fees and the expenses of the litigation, incentive awards also display a significant correlation with both the attorneys' fees and the expenses awarded in the settlement." *Id.* at 1308-1309.  Notably, they also found "a consistent, significant association between high risk litigation and the size of incentive awards . . . ." *Id.* at 1309. Defendants remain mute in that regard because their own study supports the requested incentive fees.

### E.   Application of an Hourly Rate in Determining an Incentive Fee is Not Consistent with Controlling Law

Defendants' final contention is that this Court should apply an hourly rate in lieu of a percentage of the common fund in determining a proper incentive fee.  Defs' Opp'n at 12-13. Again, they are wrong.  Defendants found two district courts, each of which is outside of this Circuit, that have ever employed that unorthodox approach.  Moreover, their suggested formula is inconsistent with factors established by this Court in the determination of reasonable incentive fees.  *See In re Lorazepam*, 2003 WL 22037741, at *10.  Therefore, it is not in accordance with controlling law.

---

[18] Plaintiffs' request for an incentive award of $2,500,000 for a $3.4 billion fund amounts to 0.07% [$2,500,000 ÷ $3,400,000,000 = 0.07%].

The approach in *In re US Bioscience Securities Litigation*, 155 F.R.D. 116 (E.D. Pa. 1994), upon which defendants have bet their figurative ranch on this issue, has not been adopted by the Third Circuit and has been rejected by the other district courts sitting in Pennsylvania. *See, e.g., In re Chambers Dev. Sec. Litig.,* 912 F. Supp. 852, 863 (W.D. Pa 1995).  Notably, even the anomalous *US Bioscience* court acknowledged that certain factors justify "particularly high incentive awards," including:

> (a) where a plaintiff subjected himself or his family to abuse at work or in his community for advocating a cause not universally acclaimed; (b) where the plaintiff assumed a disproportionately large financial risk in the context of his potential personal recovery; (c) where the plaintiff's personal privacy was invaded and/or subjected to public attention; and (d) where the plaintiff has had to testify at deposition or trial and/or has had to personally satisfy more than simple discovery obligations."

*In re US Bioscience*, 155 F.R.D. at 121 n.14.  Those factors were found inapplicable in that case because "[n]o evidence of such martyrdom has been proffered."  *Id*.  Such evidence has been proffered here, however, and the record of these proceedings provides powerful evidence that Ms. Cobell and her fellow Class Representatives have met every relevant standard.

The minimal hourly rate conjured up by defendants fails where, as here, an intensely litigated fifteen year case has achieved exceptional benefits for class members.  Moreover, it is a small fraction of the incentive fees awarded by most other courts.  For example, in *Vista Healthplan,* $12,500 incentive awards were requested for each of the class representatives.  *Vista Healthplan, Inc. v. Warner Holdings*, 246 F.R.D. 349, 365 (D.D.C. 2007).  The district court found those requests reasonable where "Class Counsel estimate[d] that each named Plaintiff spent in excess of fifty (50) hours assisting class counsel in prosecuting this action" and where "each named Plaintiff assisted Class Counsel in various essential tasks, including document production, depositions, participating in discussions on damages with the expert, and taking part

in settlement negotiations." *Id.* (internal quotation marks omitted).  That calculation yielded an hourly rate of $250 per hour, a rate that is substantially in excess of that which is requested here.[19]  *See also In re Veeco Instruments, Inc. Sec. Litig.*, No. 05-MDL-01695(CM), 2007 WL 4115808, at*12 (S.D.N.Y. Nov. 7, 2007) (approving incentive award of just under $16,000 for lead plaintiff that spent "over eighty hours" on the litigation, equating to a rate of nearly $200/hr).

## II.   Ms. Cobell And Other Class Representatives Are Entitled To Recompense For Expenses Incurred In Connection With This Litigation

### A.   The Parties Expressly and Intentionally Drafted the Settlement Agreement to Include Expenses Attached to the Incentive Award Petition

As if on cue, defendants again mischaracterize the terms of both the Settlement Agreement and the Fee Agreement and misrepresent to this Court that all litigation expenses, including those paid by or on behalf of the Class Representatives, should have been included in the petition for Class Counsel fees, expenses and costs.  Defs' Opp'n at 20.   Neither the Settlement Agreement nor the Fee Agreement provide support or comfort for defendants' meritless position.

The Settlement Agreement makes clear that two separate petitions would be submitted by plaintiffs, one for fees, expenses, and costs of Class Counsel; another for Class Representatives' incentive awards, expenses, and costs.  SA, ¶¶ J & K.  Thus, the Settlement Agreement and the Fee Agreement draw a clear distinction between expenses and costs <u>paid</u> or assumed by Class Counsel – which were required to be included in the petition for Class Counsel's fees, expenses and costs – and expenses <u>not</u> paid or assumed for by Class Counsel.   Those expenses are

---

[19] The proposed hourly rate for an incentive award for Ms. Cobell is $2,000,000 ÷ (average of 850 hours per year for 14 years) = $168 hourly rate.  Defendants "accept Ms. Cobell's time estimate at face value." Defs' Opp'n at 12, n. 9.

required to be included in the petition for Class Representatives.  SA, ¶¶ J.2 and K.1.  Moreover, the Settlement Agreement plainly and unambiguously recognizes that Class Representatives have incurred significant obligations that have not been paid or assumed by Class Counsel and, as such, recovery must be requested as expenses of the Class Representatives, not Class Counsel. The Settlement Agreement provides in pertinent part:

> Prior to the hearing on the Motion for Preliminary Approval of this Agreement, Plaintiffs shall file a notice with the Court stating the amount of incentive awards which will be requested for each Class Representative, <u>including expenses and costs that were not paid for by attorneys</u>, which expenses and costs are expected to be in the range of <u>$15 million</u> above those paid by Defendants to date.

SA, ¶ K.1 (emphasis added).  Likewise, the Settlement Agreement further states:

> Within the time set by the Court, Plaintiffs shall file a petition for incentive awards, including expenses and costs, of the Class Representatives ("Class Representative Petition").

SA, ¶ K.2.  The above fairly and accurately confirms and memorializes the parties' discussions during settlement negotiations.  <u>Nothing</u> suggests that the Class Representatives' expenses should be included in the Petition for Class Counsel's fees and expenses, and nothing suggests that Class Representatives' incentive award is be limited to the expenses they personally had incurred.  In fact, since such expenses have been paid or assumed by Class Representatives, it would be dishonest for plaintiffs to represent otherwise to this Court.

Further, the $99.9 million amount applies only to Class Counsel.  The Fee Agreement states:

> Plaintiffs may submit a motion for Class Counsel's attorneys' fees, expenses and costs incurred through December 7, 2009.  Such motion shall not assert that Class Counsel be paid more than $99,900,000.00 above amounts previously paid by Defendants.

Fee Agreement, ¶ 4.a.  There is no reason plaintiffs should have included in the Petition for Class Counsel any expenses Class Counsel did not pay, especially since the Settlement Agreement

makes clear that "expense and costs that were not paid for by attorneys" shall be included in the petition for the Class Representatives' incentive awards and expenses.  Indeed, that is plaintiffs' contractual and statutory obligation, given the enactment of the Claims Resolution Act of 2010.

By claiming that Ms. Cobell's incentive petition "violates terms of the Settlement Agreement," Defs' Opp'n at 20, defendants misrepresent material terms of the Settlement Agreement.  To be clear, defendants always knew and agreed that the majority of expenses would be included in the petition for incentive awards, not the Class Counsel petition.  That is what has been negotiated, expressly provided in the Settlement Agreement, and presented to this Court.

Yet, oddly, defendants say that section K of the Settlement Agreement, which permits each Class Representative to petition for "expenses and costs that were not paid for by attorneys," only permits recovery of "personal expenses."  Defs' Opp'n at 21.  What demonstrates most clearly the meritless nature of defendants' argument, however, is that the phrase "personal expenses" never appears in the Settlement Agreement, any other agreement, or the Claims Resolution Act.

Ms. Cobell, not Class Counsel, has obtained reimbursable grants, contracted with experts, and arranged for the payment of the vast majority of expenses in this litigation.  Contrary to defendants' speculation, expenses included in the incentive awards petition have not been paid by Class Counsel.  They have been paid by Ms. Cobell and organizations to which Ms. Cobell is indebted, not personally, but solely in her capacity as lead plaintiff in the prosecution of this case.  Such expenses properly are included in the incentive award petition.  The expenses of Class Counsel are included in the Class Counsel fee petition.

**B.      Controlling Law Permits Class Representatives to Recover Expenses Incurred in Creating a Common Fund**

Federal courts and Congress have recognized that class representatives are entitled to be reimbursed for expenses they have incurred.  Defendants, therefore, err in contending that the Class Representatives cannot recover expenses from the common fund created by their effort in prosecuting this class action case to a successful resolution.  To that end, defendants disregard and improperly describe as *dicta* this Circuit's decision in *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993), which instructs that the common fund doctrine "allows a party who creates, preserves, or increases the value of a fund in which others have an ownership interest to be reimbursed from that fund for litigation expenses incurred, including counsel fees." While *Swedish Hospital* is limited to attorneys' fees, various other federal courts expressly hold that the common fund doctrine – which refers to a party's, not a lawyer's, right to reimbursement – permits class representatives to be compensated for expenses: "a class representative . . . is entitled to be compensated for its expenses incurred in conferring a benefit on the other beneficiaries of the Settlement Amount."  *Connectivity Sys. Inc. v. Nat'l City Bank*, No. 2:08-cv-1119, 2011 WL 292008, at *15 (S.D. Ohio Jan. 26, 2011).  And the source for compensation is the common fund.

Indeed, the Seventh Circuit specifically concluded that "the usual formulations of the common-fund doctrine describe the plaintiff rather than his lawyer as the person entitled to be compensated for the expenses he has incurred in conferring a benefit on the (other) beneficiaries of the common fund."  *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 571 (7th Cir. 1992).  Further, in passing the Private Securities Litigation Reform Act, Congress recognized that class representatives are entitled to recover expenses and expressly preserved courts' ability to award "reasonable costs and expenses . . . directly relating to the representation of the class to any

representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). Accordingly, contrary to defendants' assertion, controlling law permits Class Representatives to recover from the common fund all expenses incurred in the prosecution of this case.

### C.   Class Representatives' Expenses and Costs are Reasonable, Necessary, Paid, and Obligated

Plaintiffs' incentive award petition and attached affidavits demonstrate that the expenses and costs are "reasonable given the time and effort expended." Pls' Pet. at 8. Nevertheless, defendants argue that the multiple affidavits and four boxes of invoices and receipts submitted in support of the expenses "offer[] nothing to prove the more than $10.5 million in expenses are reasonable and necessary." Defs' Opp'n at 24. Parenthetically, perhaps if they had reviewed the materials carefully, they would have reached a different conclusion. Nonetheless, in support of their misguided argument, defendants cite *In re Fidelity/Micron Securities Litigation*, 167 F.3d 735 (1st Cir. 1999) and *Sato & Co., LLC v. S & M Produce, Inc.*, No. 08-CV-7352, 2010 WL 3273927 (N.D. Ill. Aug. 16, 2010). But, as usual, neither case supports defendants' claim.

*In re Fidelity* stands for the principle that a plaintiff must submit "receipts and logs, so that [the trial court] can determine whether the claimed expenses were reasonable, necessary, and incurred for the benefit of the class," 167 F.3d at 738, and *Sato* explains that "[p]arties seeking reimbursement must present enough supporting documentation to allow the Court to determine whether specific costs are reasonable and necessary," 2010 WL 3273927, at *6 (internal quotations omitted). Plaintiffs did precisely that which is required; they have provided a well-ordered, chronological presentation of expenses, costs and canceled checks, along with reasonable descriptions of the broad categories and how they were compiled. *See generally* Pls' Pet. at 17-20, and Docket No. 3679-7 (1/13/11 Aff. of Elouise Pepion Cobell). Thus, defendants, again, cite and quote from the very cases that vitiate their position. Simply put, the claimed

expenses are reasonable and necessary, and supporting documentation has been submitted to this Court.

Defendants also hope to revise the Settlement Agreement by prohibiting reimbursement of expenses and costs that have been assumed or paid by organizations that have assisted Class Representatives in this litigation, plainly to discourage supporters from assisting litigation against the government. Defs' Opp'n at 24-26.   There is no support whatsoever for this contention.   Nor is it consistent with the Settlement Agreement, which provides that the incentive award petition shall "includ[e] expenses and costs that were not paid for by attorneys." Settlement Agreement at K.1 (emphasis added).

Finally, defendants suggest that Ms. Cobell's work as a member of the Advisory Board of the Special Trustee for American Indians, speaking as a guest speaker in Indian Country, or other reimbursable travel expenses of those who traveled with her, are not compensable. Defs' Opp'n at 29.   Again, defendants are in error.   Each expense or cost related to Ms. Cobell's travel that is referenced by defendants (*id.*) has been incurred to speak about this litigation to class members and potential class members in Indian Country, to discuss the status of this litigation, apprise class members of their rights, and generally inform them on the status of this case.   They are appropriate, necessary and reasonable expenses.

### D.    PricewaterhouseCoopers Expenses are Reimbursable

Defendants make much of the fact that plaintiffs have included in their petition expenses of PricewaterhouseCoopers (PwC) that this Court denied in its 2005 Equal Access to Justice opinion. *Cobell v. Norton*, 407 F. Supp. 2d 140 (D.D.C. 2005).   But those expenses were rejected for a variety of reasons, including falling outside of the scope of EAJA, outside the scope of the limited issues before this Court at that time, or for noncompliance with the specificity required

under the fee shifting statute. *Id.* at 163-65. Here, in a final settlement, however, EAJA is irrelevant. In fact, no fee shifting statute is implicated. Such specificity is not required, principally because all PwC's work was performed solely for the benefit of plaintiffs who are paying the expenses, not defendants. Further, they ignore the fact that this Court expressly invited plaintiffs to re-file for certain expenses at the conclusion of the litigation, which they now have done:

> The Court emphasizes that this interim fee award does not purport to determine the total amount of fees due . . . nor [the] absolute entitlement to attorney's fees. It does not presume to dispositively determine fees due up to this stage of the litigation, nor does it preclude the Court from revising the award at a later time should additional facts come to light

*Id.* at 177 (internal citations and quotations omitted). Plaintiffs have accepted this Court's invitation. Accordingly, PwC's expenses are reimbursable from the common fund.

### E.     Ms. Cobell's Lobbying Expenses are Recoverable

Defendants claim that ordinarily "lobbying" is not within the scope of time and expense charges that may be paid out of the common fund in a class action settlement. However, ordinarily the government is not the defendant. And, ordinarily the defendant does not enlist the assistance and support of Congress to shield it from declaratory and injunctive relief fashioned by this Court to ensure an adequate accounting and meaningful trust reform. Here, defendants aggressively procured extraordinary legislation that would delay and obstruct such remedial efforts notwithstanding Separation of Powers and Due Process implications. *See, e.g., Cobell XIII,* 392 F.3d at 468. The Court of Appeals described the effect of one of defendants' strategic legislative initiatives as "bar[ring] the historical accounting provisions of the injunction." *Id.* The enactment of Pub. L. No. 108-108 accomplished defendants' goal and shielded them from

plaintiffs' enforcement of this Court's accounting orders for one year, ending on December 31, 2004.

Further, as a consequence of defendants' concerted efforts to shield themselves from relief fashioned by this Court, Ms. Cobell and Class Counsel often were summoned to Congress to meet with Members and their staff and address litigation questions and issues raised by defendants' legislative offensives.  Accordingly, it would be improper to deny plaintiffs' expense reimbursement requests because all "lobbying" expenses were caused solely by defendants' unprecedented litigation conduct.  Indeed, this Administration similarly invoked the will of Congress when it required Congressional approval of the December 7, 2009 settlement although final settlements may be paid out of the Judgment Claims Fund of the United States and no special appropriation was required.

**F.    Defendants Seek to Bankrupt Ms. Cobell's Non-Profit in Retaliation for her Work on this Case**

Defendants' argument at bottom is that no expenses are compensable and that the class at large should benefit from the expenses borne by Ms. Cobell to her detriment.  In other words, they are saying "go fly a kite," or words to that effect.  That position, however, has not been adopted in this Circuit or anywhere else.  *See Swedish Hospital*, 1 F.3d at 1265.  Moreover, if defendants' position is adopted, it would have a profound and immediate consequence for Ms. Cobell, effectively bankrupting her non-profit, which courageously has supported the entire class throughout this litigation and is heavily obligated to third party foundations as a result.[20]

Defendants cynically recognize this obligation to repay funds, referencing the funding contracts which required that Ms. Cobell "assign[] to the Fund all rights to any attorneys' fees and/or costs and/or expenses of the Litigation, recovered from the United States, whether

---

[20]  *See*, *e.g.*, Recoverable Grant (Ex. A).

pursuant to judgment or to settlement, that the undersigned recovers as a result of the Litigation,"[21] yet believe that the non-profit she created is entitled to no recovery despite spending upwards of $10.5 million in the prosecution of this case.[22]  This is not the first time defendants have targeted Ms. Cobell for retaliation.  And we assume it will not be the last.  It is no secret that Ms. Cobell is held in disdain by government officials who resent her because she has held them accountable.  Government officials have repeatedly "blame[d her] for their continuing failures" and the "disconnection of their computers from the Internet, trust reform, or another court order for why they fail to fulfill their trust duties and federal functions."  *See* Docket No. 3679-3 at ¶ 28.  It is significant that for some time she has been a target of retaliation, *e.g.,* "including difficulties created by the BIA on leasing issues and IRS audits and the refusal of Interior Department officials to attend meetings on bank and community development issues and programs if I am identified as a speaker."  *Id.*

## Conclusion

Accordingly, plaintiffs' respectfully request that this Court grant incentive awards, expenses, and costs to Class Representatives in the amount of $13,056,274.59.


Respectfully submitted,

/s/ Dennis M. Gingold

DENNIS M. GINGOLD
D.C. Bar No. 417748
607 14th Street, N.W., 9th Floor

---

[21] Defs' Opp'n at 25 (referencing 3697-11 at P000479).
[22] Defendants conclude their opposition by contesting that Ms. Cobell and the other Class Representatives are due no more than $1,000,000 for their efforts; that this is enough "to cover both incentives and personal expenses, to be allocated among the representatives as the Court deems appropriate." Defs' Opp'n at 1-2.  No support exists for such a specious claim and, this too, is a claim made from whole cloth.

Washington, D.C. 20005
(202) 824-1448

/s/ Keith M. Harper
KEITH M. HARPER
D.C. Bar No. 451956
JUSTIN GUILDER
D.C. Bar No. 979208
KILPATRICK TOWNSEND LLP
607 14th Street, N.W.
Washington, D.C.  20005
(202) 508-5844

DAVID COVENTRY SMITH
N.C. Bar No. 12558
Admitted *Pro Hac Vice*
KILPATRICK TOWNSEND LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
(336) 607-7392

WILLIAM E. DORRIS
Georgia Bar No. 225987
Admitted *Pro Hac Vice*
ELLIOTT LEVITAS
D.C. Bar No. 384758
KILPATRICK TOWNSEND LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309
404-815-6500

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing PLAINTIFFS' REPLY TO DEFENDANTS' OBJECTIONS TO CLASS REPRESENTATIVES' PETITION FOR INCENTIVE AWARDS AND EXPENSES was served on the following via facsimile, pursuant to agreement, on this day, _____, 2011.

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
406.338.7530 (fax)


/s/ Shawn Chick _____
Shawn Chick

US2000 12020628.1