*[Handwritten note: "Let this be filed. Hogan, J. 3/[..]/2011"]*

# OBJECTIONS TO THE SETTLEMENT

*Cobell v. Salazar*

1:96cv01285

Edward Charles Valandra

IIM Account Number: 345U022107

1114 Hawthorn St.

Vermillion, SD 57069

605-624-4550

*[Signature: Edward Charles Val—]*
Edward Charles Valandra

28 FEB 2011

Prepared by

Community for the Advancement of Native Studies

February 2011

PREAMBLE: On 8 December 2010 the Americans' leader, President Obama, and the plaintiffs in the *Cobell v. Salazar* lawsuit agreed to an out of court settlement. According to a court authorized notice, Class members can object to the settlement:

> A Class Member who wishes to object to the fairness, reasonableness or adequacy of this Agreement or of the Settlement contemplated hereby must file with the Clerk of the Court and serve on the Parties a statement of the objection setting forth the specific reason(s), if any, for the objection, including any legal support that the Class Member wishes to bring to the Court's attention, any evidence that the Class Member wishes to introduce in support of the objection, any grounds to support his or her status as a Class Member.

As a member of the Historic Accounting Class, I am filing my objections in regards to the following terms of agreement:

Settlement Background Nos. 1,2,4,5,8, 9,10,15,16, and 17;

Terms of Agreement:

A. Definitions Nos. 1,15,16,19, and 20;

B. Amended Complaint and Preliminary Approval No. 1;

C. Class Notice and Opt Out No. 2;

D. Motion for Judgment, Fairness Hearing, and Final Approval Nos. 2 and 3;

E. Accounting/Trust Administration Fund No. 3;

F. Trust Land Consolidation Fund Nos. 1,2,3, and 4;

I. Releases 1,2, and 8;

J. Attorney Fees;

K. Class Representatives' Incentive Awards No. 8;

L. No Further Monetary Obligation 1,2, 3(2), and 9.

These objections to the settlement are not exhaustive, however. They are representative of the unresolved historic claims of the **Oceti Sakowin Oyate** citizens (herein Oyate) against the American people, through their government. These claims remain outstanding with respect to the mismanagement of our trust assets and the breach of Americans' trust responsibilities to Native Peoples. I now come forward to state the reasons for my objections to the settlement.

1. <u>There is no provision in the settlement that permits Opting Out of Agreement.</u> The Agreement prohibits the Historic Accounting Class, unlike the Trust Administration Class, from opting out. This prohibition violates human rights standards, because it denies

trust assets must pay the class counsel, not the allottees or their heirs. In similar liability suits, counsel seeks remuneration not from their clients but from the individuals or organizations that harmed their client(s). It would be disingenuous for a court to award a victim and then give a significant percentage of the award to the victim's counsel. Traditionally, the offender—the person(s) or organization(s) who committed the harm—is required to remunerate the victim's counsel.

4. <u>There is no provision in the settlement protecting the Oyate's future claims</u>. The settlement fails to protect any future claims made by the Oyate against the US regarding treaty lands that were subject to the Allotment Act. This settlement does not contain language that protects or hold harmless any treaty land from the releases. Since treaty lands are held in trust or restricted status, any future claims by the Historic Accounting Class against historic wrongs and past harms by the US are prohibited. Since the allotment act privatized our national lands, the settlement has circumscribed the Oyate's collective interest in what was originally treaty land. Accepting the settlement means individuals—and this would include their descendants—can no longer file any further suits regarding breach of trust. Meanwhile the settlement permits the Americans to avoid any admission of guilt or wrong-doing.

5. <u>There is no provision in the settlement for land reform and restoration program</u>. The $1.9 billion allocated to purchase fractionated Indian trust land cannot meet minimum land reform requirements. It does nothing to address a growing Native population that requires a larger land base for community or sustainable development. For proper land reform, the settlement must identify the colonizers who are willing to sell their ill-gotten lands within our national territories. The US can buy-out these willing sellers and return the purchased land to Native control and management. Purchasing fractionated land with settlement funds is the worst kind of fraud. It forces Native peoples to pay for what is theirs already. The colonizers walk away without any accountability for the conditions they created: poverty, land loss, ill health, substandard facilities, substandard education, and so forth.

6. <u>There is no provision in the settlement for the return of national land</u>. Prior to the 1887 Allotment Act, the Oyate entered into several treaties with the Americans, namely, the

Fort Laramie Treaty of 1851 and 1868. The 1868 Ft. Laramie Treaty recognized the Oyate's national boundaries. In that treaty, the Americans agreed to our demand that no cession of the Oyate's land is valid without the consent of three-fourths of the adult males. To this date, the Americans have NEVER obtained the necessary supermajority because we have refused to cede our national lands. Not ceding our national lands, the Americans initiated a pogrom against the Oyate in 1876. This planned campaign of racism, persecution, and genocide has been the policy—despite the Americans' protestations to the contrary—ever since. These 1868 treaty-recognized lands eventually were subjected to the 1887 Allotment Act, which privatized much of our national lands as individual trust allotments. The un-allotted lands were unilaterally declared "surplus" and sold to white settlers. Their descendants continue to illegally occupy our homeland. Affirming my nation's position, I say, return all our national lands to us that were stolen through the Allotment Act.

7. <u>There is no provision in the settlement for stopping genocide</u>. White President Grant, along with other white administrators, issued an illegal 1876 order that labeled the Oyate as hostile against Americans. This order was nothing more than a ruse to justify American military action against my nation, the Oyate. The military defeat of the Americans, culminating in our victory at Greasy Grass in June 1876, led white Americans to increase their campaign of slaughtering millions and millions of buffalo. This campaign was a clear act of genocide since the buffalo provided for our nutrition and material well-being. By 1890, only 1,000 to 1,500 free roaming buffalo remained on the Plains. Their numbers have NEVER recovered from the white American policy that nearly drove them to extinction. As a result, the decimation of buffalo left the Oyate without an adequate and healthy food source ever since. Today the Oyate suffer from disproportionate rates of diabetes and other health issues due directly to the forced change from a Native diet to a western one.

The virtual elimination of the buffalo cleared the way for allotment. Forcing a farming lifestyle was one premise of allotment, and forcing dependence was another. Allotment promoted farming in a region that required massive, long-term, federal subsidies (e.g., irrigation, equipment, & maintenance), but Americans did not provide this support willingly. Six years before allotment, Helen Hunt Jackson wrote that American duplicity

had all but destroyed my ancestors' sustainable way of life. Malnutrition and periods of starvation increased as our major food source was systematically destroyed. Not coincidentally, allotment emerged as the panacea for problems that whites caused, but denied having inflicted. Allotment was an unprecedented, social engineering and culture modification program. Because of allotment's scale, it has destabilized my community ever since its imposition. Destabilization has taken many forms in our occupied land: the illegitimate creation of SD in 1889, the 1924 Indian Citizenship Act, the 1934 Indian Reorganization Act, the Indian Claim Commission, PL 83-280, HR 108 and other specific termination acts, Relocation, the 1968 Indian Civil Rights Act, and a number of colonizer court decisions, such as *Kagama*, *Lone Wolf*, and *Oliphant*. Colonization is an especially virulent form of genocide.

8. <u>There is no provision in the settlement for apology for breach of trust</u>. Since the 1887 Allotment Act, the Americans involved with "managing" our "trust" assets have an undeniable record of theft, lying, deceit, and greed, which has directly caused our impoverishment. Despite American protestations to the contrary, the Allotment Act's administration did not improve the well being of the original allottees and their descendants. In 1881, six years before allotment policy became law, Senator Henry Moore Teller from Colorado prophetically proclaimed that any allotment policy was little more than a white land grab clothed in Christian charitable rhetoric.

> If I stand alone in the Senate, I want to put upon the record my prophecy in this matter, that when 30 or 40 years shall have passed and these Indians shall have parted with their title, they will curse the hand that was raised professedly in their defense to secure this kind of legislation, and if the people who are clamoring for it understood Indian character and Indian laws, and Indian morals, and Indian religion, they would not be here clamoring for this at all.

By the time allotting our national lands finally stopped in 1934, Native Peoples' land base had diminished from approximately 140 million to about 50 million acres. Both Jackson and Teller laid bare their compatriots' greed-driven motivation six years before allotment

became law. Their testimonies were well known, proving that Native interests were intentionally disregarded. Teller is right, of course; we do curse the hands that adopted this act and those who administer it.

9. <u>There is no provision in the settlement terminating the Plenary Power Doctrine</u>. The settlement does nothing to end the Americans' doctrine of plenary power. This power was arbitrarily defined by the colonizers' court one year before the Allotment Act. This power is unilaterally invoked whenever Americans cannot defend a breach of their trust responsibilities to Native Peoples. Were it not for the plenary power doctrine, the Allotment Act and other American human-rights-violating laws would not have existed into the 21st century. Therefore, the doctrine reeks with the stench of colonization and its unrestrained abuse of power. The doctrine's continuance makes a complete mockery of any notion of American democracy, including the US Constitution.

10. <u>There is no provision in the settlement recognizing treaty allotments.</u> After June 1876, Americans experienced their first modern "9-11" when news of an American defeat reached the East. Americans reacted in anger toward my people and demanded that we cede the portion of our gold-producing homeland—the infamous sell or starve choice the Americans put to us. My ancestors refused to cede our national lands despite the Americans' threat to starve them. As a result, the Americans illegally annexed our land and nationalized them for the Americans. This act removed a substantial portion of our homelands from a treaty-recognized allotment scheme. Our Black Hills lands were stolen under a mere statute. Treaty allotments are not the same as allotments under the Allotment Act. They were not subject to alienation or US jurisdiction, as were those under the Allotment Act. Treaty allotments are held intact, beyond the reach of US statutes and therefore superior to statutory allotments. They have stronger protections than statutory allotments. Moreover, while the Allotment Act recognized treaty allotments, the administration of the Allotment Act did not adhere to the set acreages of the treaty allotments—160 acres versus 320 acres. The Allotment Act violated other treaty provisions governing allotments. Inferior statutory allotments were used— illegally—to alienate yet more of our national lands. As a result, American colonizers who currently reside in our homeland are, in fact, illegal aliens.

11. <u>There is no provision in the settlement to re-allocate Forced-Fee Patent lands</u>. In 1917, Indian Commissioner Cato Sells arbitrarily formulated a policy in which an allottee, who possessed less than one-half "Indian" blood, was unilaterally given a fee patent. This policy contravened treaty law regarding allotments, which required consent. All forced-fee patents originated from the 1887 Allotment Act. White colonizers obtained thousands of acreages through property tax deeds when our allottee ancestors could not pay taxes on these forced-fee patents. They did not know taxes were owed. Even if they knew, many were poor and could not afford to pay the taxes. The remedy to this colonizer scheme to steal land out from under our ancestors is to re-allocate to Native nations the equivalent in acreages that were lost due to the forced-fee patent policy.

12. <u>There is no provision in the settlement to reimburse royalties that subsidized states</u>. The Allotment Act specifically prohibits encumbering royalties from allotments. Yet, the 1962 *Running Horse et al. v. Udall* lawsuit showed that American officials were routinely—albeit illegally—approving state claims against Individual Indian Money (IIM) accounts for providing old age assistance, aid to the blind, aid to the disabled, and aid to dependent children to allottees or their heirs prior to 1962. Any time allottees and their heirs left the reservation to shop, they paid state sales, and other, taxes, on the goods and services purchased. Hence, they contributed to these state aid programs from the taxes paid. The settlement does not hold states liable for these encumbrances. Together, the states and the US colluded in a scheme to defraud Native people of their rightful royalties. This scheme is also called racketeering.

13. <u>There is no provision in the settlement recognizing Native laws</u>. This provision is further evidence of the Americans' willful intention to breach their trust responsibilities. The Agreement is anti-Native sovereignty. It does not provide that the Agreement shall be interpreted in accordance with the law of any particular Native nation. Native nations' laws and judicial systems are capable of interpreting the provisions of this settlement. Moreover, states are hostile to Native interests and cannot be trusted to impartially carry out the settlement's provisions that involve states. It is utterly inappropriate for the historic perpetrators of harms to name their own laws as the arbiters and executors of justice and to exclude any role for the sovereign laws and judicial and executive powers of those who suffered the harms.