## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ELOUISE PEPION COBELL et al.,

      Plaintiffs,

   vs.

KENNETH L. SALAZAR, Secretary of the
Interior, et al.,

      Defendants.

Civil Action No. 96-1285 (TH)

## Native American Rights Fund's
## Emergency Motion To Intervene

The Native American Rights Fund respectfully moves the Court to permit NARF to intervene in this case, so it may petition the Court for its attorneys' fees and costs.

Unlike the other attorneys who have petitioned the Court for fees in this case, NARF is not seeking a premium, bonus, or fee multiplier. Instead, NARF's request is only for the reasonable value of its attorney time and costs, computed according to the case law. This request is modest in light of the valuable contributions NARF made to Plaintiffs' legal team. Beginning in 1996, NARF devoted more than 31,300 hours to the case and contributed its unmatched expertise in Indian law. NARF's contributions helped to generate the common fund from which the Court may now award attorneys' fees and costs.

NARF's motion is supported by its Memorandum, and the declarations of John E. Echohawk and Kim J. Gottschalk. In compliance with Local Rule 24, NARF has attached its Petition For Attorneys' Fees And Costs as Exhibit A. NARF's Petition is also

supported by the Echohawk and Gottschalk declarations, and by NARF's Appendix Of Documents Supporting Petition For Attorneys' Fees And Costs.

NARF makes this motion on an ***emergency basis***—and requests expedited briefing—for two reasons. First, NARF seeks to provide the Court with sufficient time to consider NARF's Petition in conjunction with the other fee petitions now pending before the Court—including the petition filed on February 28, 2011 by Attorney Mark Kester Brown (Docket No. 3699). The Court recently ordered the parties to brief Mr. Brown's claim, and NARF submits that it would promote judicial efficiency for the Court to authorize the parties to also brief NARF's Petition, if they choose, at or near the same time. Second, NARF seeks leave to intervene on an expedited basis to prevent any delay in the schedule this Court has established for final approval of the Class Action Settlement Agreement.

For these reasons, NARF respectfully requests the Court to order expedited briefing as follows:

- The parties and Mr. Brown may file and serve Oppositions to NARF's Motion, if they choose, within seven calendar days of service of NARF's Motion.

- NARF may file and serve its Reply within four calendar days of service of the Oppositions.

NARF's counsel complied with Local Rule 7(m) by meeting and conferring with counsel for Plaintiffs and Defendants before filing this Motion. Defendants' counsel indicated that Defendants would oppose NARF's motion. Plaintiffs' counsel indicated that Plaintiffs would oppose NARF's motion, and that they already were drafting their opposition papers.

Dated: March 28, 2011

Respectfully submitted,

By: *Charles B. Wayne*

Charles B. Wayne

Richard de Bodo (D.C. Bar No. 993287)
DLA PIPER LLP (US)
1999 Avenue of the Stars , Suite 400
Los Angeles, California 90067
Telephone: (310) 595-3000
Facsimile: (310) 595-3300
richard.debodo@dlapiper.com

Charles B. Wayne (D.C. Bar No. 935858)
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Telephone: (202) 799-4000
Facsimile: (202) 799-5000
charles.wayne@dlapiper.com

*Attorneys for Native American Rights Fund*

Native American Rights Fund
1506 Broadway
Boulder, Colorado 80302
Telephone: (303) 447-8760

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ELOUISE PEPION COBELL et al.,

       Plaintiffs,

  vs.

KENNETH L. SALAZAR, Secretary of the
Interior, et al.,

       Defendants.

Civil Action No. 96-1285 (TH)

# Native American Rights Fund's Memorandum In Support Of Emergency Motion To Intervene

# Table of Contents

I.    Preliminary Statement ................................................................. 1

II.   NARF Deserves Compensation For Its Vital Contributions In Representing The Plaintiff Class ................................................ 6

    A.   NARF Has A Long History Of Protecting And Promoting Native American Rights ...................................... 6

    B.   NARF Always Expected To Receive Compensation For Its Efforts In This Case ................................................... 7

    C.   The Court Recognized NARF Attorneys As Class Counsel ................................................................................. 7

    D.   NARF Was Instrumental To Plaintiffs' Achievement ............ 8

    E.   NARF Reduced Its Role To Help Other Indians In Need ............................................................................... 14

III.  NARF Diligently Pursued Compensation For Its Time And Expenses ................................................................................ 15

IV.  The Court Should Allow NARF To Intervene ............................ 20

    A.   The Court Should Find That NARF Has A Right To Intervene ......................................................................... 20

        1.   NARF's motion is timely in light of all the circumstances ................................................................ 21

        2.   NARF has an interest in disbursements from the common fund—which is now the subject of this action ................................................................. 25

        3.   Disposing of the action without allowing NARF to petition for attorneys' fees would impair or impede NARF's ability to protect its interests ................ 26

        4.   No other parties adequately represent NARF's interests .............................................................. 27

    B.   At Minimum, The Court Should Find That NARF May Permissively Intervene ................................................... 28

        1.   This Court has independent jurisdiction over NARF's fee claim ................................................. 28

        2.   NARF's motion is timely .......................................... 29

        3.   NARF's claim shares common questions of fact and law with the main action .................................. 29

V.   Conclusion ............................................................................. 29

# I.    Preliminary Statement.

The Native American Rights Fund respectfully requests that the Court permit NARF to intervene in this case to assert a claim for attorneys' fees and costs.[1] NARF's intervention will neither prejudice the parties nor affect the amount or timing of any payments to Class Members.

### NARF Contributed To Plaintiffs' "Stunning Victory"

As this Court recognized, Plaintiffs achieved a "stunning victory" in this case.[2] NARF played a central role in that victory. Over a 14-year period, NARF attorneys and law clerks worked more than 31,300 hours to help Plaintiffs obtain a $3.4 billion settlement—one of the largest court settlements in U.S. history.

Since 1970, NARF has provided historically disadvantaged and underrepresented Native Americans with advocates armed with the experience, expertise, and resolve to protect and advance their legal rights. This case is part of that tradition.

In late 1995, Elouise Cobell, a banker from the Blackfeet Tribe of Montana, decided to try to sue the Government to compel reform of the Government's historically inept management of Individual Indian Money (IIM) trust accounts. Ms. Cobell asked NARF, along with other lawyers, to take on the case. NARF knew such a suit would be a massive undertaking. For decades, Congress and numerous administrations had talked about reforming the IIM trust system, but failed to meaningfully act. And with billions of dollars at stake, the Government would vigorously contest any legal action. Yet, despite the difficulties inherent in such a lawsuit, NARF joined the battle because it offered the potential to dramatically improve the condition of hundreds of thousands of Native Americans.

---

[1] As NARF explains in its Motion For Leave To Intervene, NARF respectfully requests expedited consideration of this Motion and of its Fee Petition.

[2] *Cobell v. Babbitt*, 91 F. Supp. 2d 1, 56 (D.D.C. 1999) ("plaintiffs should take great satisfaction in the ***stunning victory*** that they have achieved today on behalf of the 300,000-plus Indian beneficiaries of the IIM trust.") (emphasis added).

NARF made valuable contributions to Plaintiffs' legal team. From 1996 through 1999—before the Court issued its ruling on the Phase I trial, when the outcome was far from certain—NARF accounted for roughly 46% of the total hours on the case. Before filing, NARF attorneys helped identify the claims that Ms. Cobell and a class of plaintiffs should assert, the remedies they should seek, and the court in which they should bring their suit. After filing, NARF attorneys, as Court-appointed Class Counsel, poured tens of thousands of hard hours into the case, using their unmatched expertise in Indian law to help prosecute the action in the district and appellate courts, and to help muster Congressional support for reform. Without doubt, NARF played a key role in generating the fund from which the Court may now award attorneys' fees and costs.

**NARF Always Planned To Seek Its Attorneys' Fees**

NARF always intended to seek recovery of its attorneys' fees in this case, and the Plaintiffs understood this. The Class Action Settlement Agreement provides for a $1.412 billion "Accounting/Trust Administration Fund" (hereafter, the "common fund") from which the Court may award attorneys' fees and costs. The Settlement Agreement—which Plaintiffs negotiated without NARF's participation—also barred Plaintiffs from filing any applications for fees and costs under the Equal Access to Justice Act ("EAJA"). Given this framework, NARF expected to unite with the lawyers with whom it had worked so closely over the years—Dennis Gingold, Thaddeus Holt, and William Dorris, Keith Harper, and others at Kilpatrick Townsend LLP (collectively "GK")—in a single petition for an award out of the common fund. In the early discussions about the fee petition, GK agreed that NARF should receive part of the award, but disagreed about the amount.

**NARF Did Not File A Fee Petition In January Based On Discussions With GK**

When Congress approved the Settlement in November 2010, NARF and GK entered into serious discussions about a fee petition. Gingold and Dorris asserted that NARF should not share with them in any money from the common fund. Instead, they

encouraged NARF to apply for an EAJA award. When NARF raised concerns about EAJA based on the Settlement Agreement, Gingold and Dorris responded that Plaintiffs would file an EAJA application for NARF and persuaded NARF that an EAJA petition would be worth filing.

Gingold also indicated that it would "complicate" matters for GK's fee application if NARF wanted Plaintiffs to file NARF's EAJA application on January 25 (the date GK's fee application was due), and that he preferred that Plaintiffs file the NARF EAJA papers at a later time. For these reasons and because the Court has no jurisdiction over EAJA applications until after final judgment, NARF agreed to postpone filing its EAJA application. However, because of concerns about EAJA and its discussions with GK, NARF retained outside counsel in February to help NARF analyze its attorneys' fees claim. NARF and its counsel worked hard for weeks to analyze the voluminous record, the settlement documents, and the time records in the case. Also, Mark Brown, another attorney for Plaintiffs who GK omitted from its fee petition, applied for a fees award from the common fund, and the Court indicated on March 15 that it wanted to consider Brown's request in the context of the present proceedings, and established a briefing schedule that closes on April 11. Given these developments, NARF decided to petition the Court for an award out of the common fund—but it made one final series of efforts to try to informally resolve the issue with GK.

In compliance with Local Rule 7(m), NARF officers held a series of in-person meetings with Gingold and Dorris. At the end of those talks, despite years of working together to help produce Plaintiffs' "stunning victory" and $3.4 billion settlement, Dorris and Gingold told NARF that GK would oppose NARF's motion to intervene.

### NARF Is Seeking A Fixed, Finite Award Based On The Reasonable Market Value Of NARF's Contribution

By this motion, NARF requests that the Court permit NARF to intervene in this case in order to petition for its attorneys' fees and costs. Unlike the other petitioners,

NARF is not seeking a premium, bonus, or fee multiplier. NARF is only seeking to recover the value of its attorney time and costs, computed according to the Laffey Matrix rates developed by the U.S. Attorney's Office. Using the applicable Laffey Rates, the value of NARF's attorney time and costs is about $8.1 million. NARF is requesting no more than $8.1 million, regardless of the amount the Court awards out of the common fund—*i.e.*, whether it is $50 million, or $99.9 million, or as much as $223 million.

NARF's modest request will not require the Court to pay more than a total of $50 million to $99.9 million in total attorneys' fees to Plaintiffs' counsel, or to pay a lower total recovery to the Class. If the Court chooses to apply Laffey rates to all of Plaintiffs' counsel, the Court could satisfy all claims for less than $81.7 million:

| Petitioner | Total Hours | % Of Total Hours | Award Based On Laffey Rates |
|---|---|---|---|
| GK | 140,710 | 77% | $68,133,250[3] |
| NARF | 31,317 | 17% | $8,098,821 |
| Mark Brown | 11,485 | 6% | $5,455,702[4] |
| **Total:** | | | **$81,687,773** |

This approach would recognize the proportional contribution of each petitioner, and still leave the Court room to award GK a significant bonus or premium if it wants to, and keep the total fees award under $99.9 million, if the Court chooses to do so. GK and the Government have agreed that they will not appeal an award that falls between $50 million and $99.9 million.[5]

---

[3] GK's Fee Petition stated that GK's total hours are 140,710. (1/25/11 Dorris Affidavit at ¶ 13, Docket No. 3678-10.) Multiplying all of these hours at the highest current Laffey rate of $475 per hour yields a total of $66,837,250. Adding in GK's claimed costs of $1,296,000, yields the total of $68,133,250.

[4] Docket No. 3699 at pp. 6-7. Brown calculated his claim by multiplying all of his asserted hours (11,485) by the highest current Laffey rate ($475). *Id.*

[5] 12/7/09 Agreement on Attorneys' Fees, Expenses and Costs at ¶ 4(e), Docket No. 3664-1 ("In the event that the Court awards attorneys' fees, expenses, and costs covered

**NARF Satisfies The Legal Tests For Intervention**

The Court should allow NARF to intervene. This motion is most fundamentally about fairness. NARF's high-quality work helped generate the common fund from which GK now seeks a huge award. The Court should not award any money from that fund without accounting for NARF's significant work for Plaintiffs.

NARF meets the showing required for intervention as of right under Federal Rule 24(a)(2), or for permissive intervention under Rule 24(b):

- **In these circumstances, NARF's motion is timely.** NARF filed this motion within two weeks after its efforts to informally resolve the issue failed. Intervention will not prejudice the Court or the parties, especially in view of the briefing the Court recently ordered regarding Brown's motion for attorneys' fees. The Court can resolve NARF's claim within the current schedule. GK has known about NARF's claim for months, and the Government cannot claim any harm from NARF's intervention. Intervention also will not prejudice any Class Members. NARF's request will not deprive them of expected payments from the common fund, because, as shown above, the Court can award NARF its reasonable claim of $8.1 million and still give the other petitioners a substantial award, resulting in a total non-appealable award of less than $99.9 million. Moreover, the June 20 Fairness Hearing is nearly three months away.

- **NARF has an interest in the action.** A present subject of this suit is attorneys' fees and costs. A small group of NARF staff attorneys worked tirelessly and effectively as counsel for Plaintiffs *in this case*. NARF also paid a significant amount of Plaintiffs' expenses *in this case*. Thus, NARF respectfully submits that the Court should address NARF's relatively modest $8.1 million claim *as part of this case*.

- **Denying intervention will impede NARF's ability to protect its interests.** If NARF cannot assert its claims in this case, NARF faces, at best, uncertain prospects in obtaining its reasonable fees and costs through an EAJA application or through a separate lawsuit.

For all of these reasons, NARF respectfully requests that the Court permit NARF to intervene and that it consider NARF's meritorious and modest claims in this action.

---

by the Paragraph in an amount equal to or greater than $50,000,000.00 and equal to or less than $99,900,000.00, Plaintiffs, Class Counsel and Defendants agree not to file a notice of appeal concerning such award.").

## II. NARF Deserves Compensation For Its Vital Contributions In Representing The Plaintiff Class.

### A. NARF Has A Long History Of Protecting And Promoting Native American Rights.

Since its founding in 1970, NARF has taken on important matters for Native Americans that have resulted in landmark court rulings and legislation. NARF lawyers have won major court victories that have expanded the voting rights of Native Americans,[6] protected Native Americans' rights to fish and pursue their subsistence culture,[7] and protected Native Americans' rights to practice their own religion and traditions.[8] Scholars have recognized some of NARF's court victories as being among the "most-significant decisions in the history of Indian law."[9] At present, NARF's staff attorneys handle approximately 50 cases at a given time.[10]

---

[6] *Buckanaga v. Sisseton Indep. Sch. Dist.*, 804 F.2d 469 (8th Cir. 1986) (challenge to state voting laws that restricted Native Americans from voting in school board elections); *Nick, et al. v. Bethel et al.*, No. 3:07-CV-0098 (TMB) (D. Alaska July 30, 2008) (Document No. 327) (first court-ordered settlement directing local governments to print ballots and other election materials in a Native language); *Black Bull v. Dupree Sch. Dist.*, case no. 86-3012, (D.S.D. May 14, 1986) (settlement reached in challenges to state voting laws). *See also* DANIEL MCCOOL ET AL., NATIVE VOTE: AMERICAN INDIANS, THE VOTING RIGHTS ACT, AND THE RIGHT TO VOTE 43, 54-55 (2007).

[7] *See, e.g., United States v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974) (NARF represented numerous tribes and won the landmark "Boldt decision," which affirmed the rights of most tribes to continue harvesting salmon out of Washington's rivers and streams); *Katie John v. United States*, No. A90-0484-CV (HRH), consolidated with *Alaska v. Babbit*, Nos. A90-0484-CV (HRH), A92-0264-CV (HRH) (D. Alaska March 30, 1994) (NARF lawyers established there is subsistence hunting and fishing priority on federal lands).

[8] *See, e.g.,* Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001 et seq. (NARF lawyers drafted NAGPRA, which requires federal agencies and institutions to return Native American "cultural items"—such as human remains and sacred objects—to their respective peoples and establishes a federal grant program to assist in the repatriation process).

[9] *See* Alex Tizon, *25 Years after the Boldt Decision: The Fish Tale that Changed History*, SEATTLE TIMES, Feb. 7, 1999, *available at* www.kohary.com /env/bill_020799.html ("Without question, the Boldt decision [a victory by NARF in the area of Native fishing rights] is among the one, two or three most-significant decisions in the history of Indian law. It was that profound.") (quoting University of Colorado law professor Charles Wilkinson).

[10] Echohawk Decl. ¶ 3.

John Echohawk, NARF's co-founder and its Executive Director since 1977, has worked tirelessly for more than 40 years as a lawyer and Native American leader to improve the civil rights of Native Americans. He has been called the "Thurgood Marshall of Indian law" and "a Human Rights Hero," because he has fought to ensure "the integrity of long-standing legal obligations" and "helped usher in, and has given substance to, the modern era of 'tribal self-determination.'"[11]

## B.   NARF Always Expected To Receive Compensation For Its Efforts In This Case.

NARF expected the Class to prevail in this case, and then to recover its fees and costs. In early 1996, class plaintiff Elouise Cobell asked NARF to help bring this class action suit. NARF agreed to represent the Class because it believed it could help the Class achieve victory. In its retainer agreement with Ms. Cobell, NARF expressly preserved its ability to seek attorneys' fees and costs from any source, including, presumably, a common settlement fund.[12]

## C.   The Court Recognized NARF Attorneys As Class Counsel.

For almost the entire duration of this suit, the Court has recognized NARF attorneys as Class Counsel. Plaintiffs' June 10, 1996 Complaint listed five NARF attorneys—Echohawk, Richard Dauphinais, Robert M. Peregoy, James K. Kawahara, and Keith Harper—as attorneys representing the Class. In September 1996, Plaintiffs filed a Motion For Class Action Certification.[13] In a February 4, 1997 Order, the Court granted this motion and found that Plaintiffs had "retained counsel qualified to prosecute this lawsuit on behalf of the Class"—including the above-identified NARF

---

[11] *See* Nicholas Targ, *Human Rights Hero: John Echohawk*, HUMAN RIGHTS, Spring 2006, Vol. 33, No. 2, pp. 25-26, *available at* ww.americanbar.org/publications/human_ rights_magazine_home/irr_hr_spring06_echohawk.html.

[12] Echohawk Decl. ¶ 23 & Ex. A ("Nothing will foreclose NARF from seeking reimbursement of fees not paid under this agreement from any other source.").

[13] Plaintiffs' Motion For Class Action Certification at 15-17, Docket No. 5.

attorneys.[14] This Court Order, and its recognition of NARF lawyers as part of the team of Class Counsel, remained in effect through the parties' execution on December 7, 2009 of the Class Action Settlement Agreement and the Fee Agreement.

## D.   NARF Was Instrumental To Plaintiffs' Achievement.

In all, 11 NARF attorneys worked on the Cobell matter.[15] These lawyers brought unique qualities to Plaintiffs' legal team. They provided the Class with expertise in Indian law and the Government's Indian trust responsibilities. They provided extensive experience in dealing with the Department of the Interior and the Bureau of Indian Affairs. And they provided attorneys who had credibility in Indian Country, because the team would have to gather facts from Class Members and communicate effectively with them about the litigation.[16]

At each stage of the case, these attorneys made critical contributions that benefited the class, that ultimately led to the creation of the common fund, and that provide a basis for the Court to award attorneys' fees.[17]

---

[14] 2/4/97 Order, Docket No. 27.

[15] Echohawk Decl. ¶ 7.

[16] Echohawk Decl. ¶ 7 (identifying all the attorneys who worked on the case, and detailing their experience and credentials).

[17] *See Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993) ("[The common fund] doctrine allows a party who creates, preserves, or increases the value of a fund in which others have an ownership interest to be reimbursed from that fund for litigation expenses incurred, including counsel fees. ... The underlying justification for attorney reimbursement from a common fund, as explained by the Supreme Court in three early cases, is that unless the costs of litigation are spread to the beneficiaries of the fund they will be unjustly enriched by the attorney's efforts."); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 2 F. Supp. 2d 175, 176 (D. Mass. 1998) (objector's attorneys who were not "class counsel" awarded fees and expenses from common fund created by settlement, because objections helped improve settlement for benefit of class); *Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261, 1285 (S.D. Ohio 1996) (public advocacy organization which was not "class counsel" entitled to attorneys' fees from common fund because organization had benefited class by objecting to settlement, by objecting to other fee applications before the Court, by participating in settlement negotiations, and by participating in implementation of settlement).

**Prefiling Work**

NARF attorneys played a central role in laying the foundation for the lawsuit. They did critical prefiling research and analysis regarding the operations of the Bureau of Indian Affairs, and possible legal remedies and causes of action. NARF tackled complicated jurisdictional questions and recommended that Plaintiffs should file the lawsuit in U.S. District Court (where the equitable remedy of a trust accounting is available), rather than the U.S. Court of Federal Claims (where money damages are the only available remedy).[18] They helped recruit a diverse group to act as representative class plaintiffs.[19] They helped devise a 3-front strategy requiring: (1) aggressive litigation against the Government; (2) lobbying Congress and the White House to address the issues raised by the litigation; and (3) a campaign to educate Native Americans about the important issues raised by the lawsuit and to encourage grass roots support and involvement. And NARF lawyers helped draft the Complaint, which Plaintiffs filed on June 10, 1996.

In the early years of the suit, NARF lawyers helped fight off motions to dismiss. NARF also worked closely with Price Waterhouse accountants to develop a representative accounting case that could demonstrate how the Government had grossly mismanaged IIM accounts. This would spare the parties and the Court of having to work through hundreds of thousands of individual accounts to establish the Government's malfeasance and liability. NARF attorneys also litigated against the Government to obtain discovery Plaintiffs needed in order to do the representative sample.[20]

---

[18] Echohawk Decl. ¶ 11.

[19] Echohawk Decl. ¶ 10.

[20] Echohawk Decl. ¶ 13.

**Phase I Trial**

NARF attorneys significantly contributed to the Phase I trial the Court held during the summer of 1999. They devoted thousands of hours to trial preparation and trial activities while working along with the lead courtroom lawyers, Gingold and Holt.

The Court favorably commented on the quality of the work that NARF and its legal colleagues provided Plaintiffs during this first part of the case. To recover attorneys' fees and costs incurred during Phase I, Plaintiffs submitted an "interim" application under EAJA.[21] The Government challenged the application "on every conceivable front."[22] In rejecting the Government's objection that Plaintiffs were not a "prevailing party," the Court stated: "Here, plaintiffs achieved more than 'excellent results,' they achieved a *'stunning victory.'"*[23]

In response to Plaintiffs' EAJA application, the Court awarded NARF $1,502,311.84.[24] In so doing, the Court gave NARF attorneys the same recognition and status that it afforded other lawyers working for Plaintiffs, including Gingold and Holt.

**Phase II Activity**

The Court's Phase I ruling required the Government to provide Plaintiffs with an accurate accounting; retrieve and retain all information necessary to render an accurate accounting of all money in the IIM Trust; and establish written policies and procedures for complying with its statutory obligations and for rectifying the breaches identified by the Court.[25] The Government vigorously tried to limit the effect of these rulings. In some cases, the Government even flatly refused to comply. This resulted in intense litigation activity, and NARF continued to provide Plaintiffs' team with valuable work product:

---

[21] *See* 28 U.S.C. § 2412(d)(1)(A).

[22] 12/19/05 Memorandum Opinion at 4, Docket No. 3222.

[23] 12/19/05 Memorandum Opinion at 11, Docket No. 3222 (quoting *Cobell*, 91 F. Supp. 2d at 51 (emphasis added)).

[24] 12/19/05 Memorandum Opinion at 57, Docket No. 3222.

[25] *Cobell v. Babbitt*, 91 F. Supp. 2d 1 (D.D.C. 1999).

- NARF attorneys helped draft motions for contempt sanctions, and oppositions to motions by the Government for protective orders, relating to the Government's compliance with Court orders.[26]

- NARF attorneys helped secure a ruling that required the Government to provide court-approved notice of transfers of property to anyone who had an interest in the property as trust beneficiaries and/or class members.[27]

- NARF attorneys helped draft motions that secured an anti-retaliation order for the benefit of Government employees who had provided information or testimony that the Government deemed helpful to Plaintiffs. NARF attorneys also helped draft motions for contempt sanctions when the Government failed to comply with the anti-retaliation order.[28]

- NARF attorneys helped draft motions that resulted in the Court finding the Secretary of the Interior and the Assistant Secretary of the Interior for Indian Affairs in civil contempt. NARF attorneys also helped draft oppositions to the Government's appeal of the Court's order.[29]

- NARF attorneys helped Plaintiffs try the "Phase 1.5" proceeding that addressed how the Government would perform the accounting and implement the trust management reforms the Court ordered in its Phase I ruling.[30]

- NARF attorneys helped draft preliminary injunction papers that resulted in the Court ordering the Government to protect IIM trust data, and appointing a judicial monitor to advise the Court on the Government's compliance with the injunction order.[31]

- NARF attorneys helped draft papers that resulted in the Court issuing an order requiring the Government to disconnect certain information from the Internet, due to questions about the security of IIM trust data.[32]

- NARF attorneys participated in a 59-day evidentiary hearing on the IT security of the Department of the Interior with respect to systems that house or access IIM trust data.[33]

---

[26] Echohawk Decl. ¶ 19.

[27] Echohawk Decl. ¶ 19.

[28] Echohawk Decl. ¶ 19.

[29] Echohawk Decl. ¶ 19.

[30] Echohawk Decl. ¶ 19.

[31] Echohawk Decl. ¶ 19.

[32] Echohawk Decl. ¶ 19.

[33] Echohawk Decl. ¶ 19.

**Work with Congress**

Plaintiffs secured a $3.4 billion settlement not only by winning victory after victory in the courtroom, but also by creating a favorable environment in Congress. NARF attorneys took a leadership role in working with Congress to advance Plaintiffs' cause. Echohawk and other NARF lawyers testified before Congress and corresponded with members of Congress regarding the litigation. They also prepared Ms. Cobell for her appearances before Congress.[34]

NARF attorneys were heavily involved in a task force devoted to trust reform. In 2005, members of Congress, including Senator John McCain, identified trust reform and settlement of the Cobell Class Action as top legislative priorities. Congress asked for input from Plaintiffs. NARF, working with attorneys representing numerous tribes, solicited input on trust reform in Indian Country, drafted 50 Trust Reform and Cobell Settlement Workgroup Principles, and then sought comments on those Principles in Indian Country. As part of the Settlement Agreement, the Government agreed to establish a commission to study trust reform; that Commission undoubtedly will study the 50 Principles.[35]

NARF lawyers also fought against a "midnight rider" that Congress passed in late 2003. Before the appellate court could affirm a district court order requiring the Government to do an accounting, Congress wanted an opportunity to pass legislation that would gut the trial court's ruling. Thus, Congress attached a last-minute rider to an appropriations bill that purported to stay for one year the appellate court's ability to rule on the pending appeal. NARF lawyers helped bring motions challenging the legality of the rider, and also worked on Capitol Hill against the rider. Congress did not pass anything, and the stay expired.[36]

---

[34] Echohawk Decl. ¶¶ 14-15.

[35] Echohawk Decl. ¶ 19.

[36] Echohawk Decl. ¶ 19.

**Fundraising**

Fundraising was necessary to keep the Cobell litigation progressing in the first few years, before the Court's Phase I ruling established the strength of Plaintiffs' position. NARF helped secure grants from the Ford Foundation that, among other things, helped pay Gingold and Holt for the time they billed between April 1997 and September 1998. NARF also helped Ms. Cobell raise money both by directly soliciting organizations for financial assistance, and by endorsing and supporting her fundraising efforts.[37]

**Total Time**

As shown below, NARF lawyers and support staff worked 31,317 "billable" hours on the Cobell litigation. The reasonable market value of these hours is more than $10.5 million according to Laffey Matrix rates.[38]

### NARF Attorney Time

| NARF Attorney | Years Hours Charged | Recorded Hours | Low/High Laffey Rate | Total Fees |
|---|---|---|---|---|
| Keith Harper | 1996-2006 | 19,671.34 | $230/$420 | $6,551,395.45 |
| Lorna Babby | 1998-2005 | 4,807.21 | $275/$420 | $1,597,191.85 |
| Robert Peregoy | 1996-1999 | 2,297.20 | $420 | $964,824.00 |
| John Echohawk | 1996-2009 | 1,159.20 | $475 | $550,620.00 |
| Richard Guest | 2003-2008 | 1,122.15 | $230/$420 | $408,220.25 |
| Richard Dauphinais | 1996-1997 | 374.95 | $420 | $157,479.00 |
| James Kawahara | 1996-1998 | 253.65 | $275 | $69,753.75 |
| Michelle Mitchell | 2002-2003 | 203.75 | $275 | $56,031.25 |
| Tracy Labin | 2001-2002 | 84.50 | $335 | $28,307.50 |
| Kim Gottschalk | 2003-2004 | 4.80 | $475 | $2,280.00 |

---

[37] Echohawk Decl. ¶ 17.

[38] Gottschalk Decl. ¶ 12.

| NARF Attorney | Years Hours Charged | Recorded Hours | Low/High Lacey Rate | Total Fees |
|---|---|---|---|---|
| Mark Tilden | 2005-2006 | 1.10 | $420 | $462.00 |
| NARF Law Clerks | 1996-2006 | 1,337.15 | $135 | $180,515.25 |
| **Total:** | | **31,317** | | **$10,567,080.30** |

These were efficient, high-quality hours. The case of Keith Harper reinforces this point. As the chart indicates, Harper accounts for roughly 62% of NARF's total time, at a relatively modest average billing rate of $333. In July 2006, Harper left NARF to go into private practice at the Kilpatrick firm. Harper continued working on this case after he joined Kilpatrick, where his current hourly rate is $525.[39] GK obviously believes that Harper does quality work: in GK's Fee Petition, GK is seeking compensation for thousands of Harper's hours. Surely, GK does not believe that Harper's time while he worked for Kilpatrick was worth millions, but was worth $0 while he worked at NARF.[40]

## E.    NARF Reduced Its Role To Help Other Indians In Need.

In the middle of 2006, NARF reduced its involvement in this action so it could commit its limited resources to another matter of great importance to Native Americans. One of NARF's primary missions is to provide underrepresented Native Americans access to legal services when no other options are available. As of 2006, Plaintiffs had won a "stunning victory" in Phase I and had made significant progress toward a favorable resolution in Phase II. Gingold and attorneys from the Kilpatrick firm (including Harper) could fully staff the Cobell Class Action. And at that time, more than 100 unrepresented tribes were confronting a purported deadline to file suit against the

---

[39] Kilpatrick attorneys started working on the Cobell matter in 1999. (1/25/11 Dorris Affidavit at ¶ 3, Docket No. 3678-10.)

[40] Harper's current Kilpatrick hourly rate of $525 is more than 50% greater than his average NARF rate. In its Fee Petition, GK seeks recovery for Harper's hours at an undeterminable contingency fee rate that far exceeds his current Kilpatrick hourly rate.

Government for accountings of tribal funds held in trust by the Government.[41] These tribal trusts are four to five times larger than the IIM trusts at issue in this case. Consistent with its organizational philosophy, and at the urging of the Kilpatrick firm, NARF decided to help these unrepresented tribes. In December 2006, NARF filed a suit in the District of Columbia on behalf of the tribes—styled as *The Nez Perce Tribe, et al. v. Salazar, et al.* (hereafter, the "Nez Perce Action").[42] The Nez Perce Action is still pending before this Court. In all, NARF is representing 42 tribes in that proceeding.[43]

Because of its heavy involvement in the Nez Perce Action, and with its biggest biller on the case (Harper) still involved but now working at another firm, NARF scaled back its day-to-day involvement in this suit. NARF, however, did not withdraw from this case, and continued to perform work on the matter. NARF, of course, had no reason to believe that its decision to concentrate its resources on the more needy Nez Perce Action would negatively affect NARF's ability to recover its attorney time and expenses for the Cobell case. NARF expected—as it had throughout the case—that it would submit its claim in conjunction with any claims submitted by the other attorneys who worked for Plaintiffs (*i.e.,* Gingold, Holt and the Kilpatrick firm).[44]

## III. NARF Diligently Pursued Compensation For Its Time And Expenses.

Throughout this case, NARF has strived to preserve its claim for fees and costs.

After Plaintiffs and the Government executed the Settlement Agreement in December 2009, NARF sought to participate in preparing a single petition by all of Plaintiffs' counsel for attorneys' fees and costs. Over the next 15 months, NARF lawyers periodically discussed with GK how best to address NARF's claim. The intensity of these

---

[41] Echohawk Decl. ¶ 21.

[42] Docket No. 1 in Case No. 1:06-cv-02239-CKK.

[43] Echohawk Decl. ¶ 21.

[44] Echohawk Decl. ¶¶ 20-22.

talks depended on the activity on Capitol Hill: when it looked like Congress would approve the Settlement, the parties talked; when it was uncertain whether Congress would approve the Settlement, they saw no need to talk.[45]

Before Congress acted on the Settlement, the parties held preliminary discussions about the attorneys' fees issues. At no time during these early discussions did GK assert that NARF could not obtain a fees award from the common fund:

- **January/February 2010:** In early January, Echohawk sent to Dorris a tentative compilation of NARF's hours for Dorris to review. In early February, Echohawk again asked Dorris to review the records, and told Dorris that NARF would like to begin working with GK to prepare a fee application. In early February, Dorris reviewed the compilation and briefly discussed the matter with Echohawk. He told Echohawk that he felt NARF would be entitled to a percentage of the total fee award.[46]

- **March 2010:** In mid-March, while sitting in on a congressional hearing, Echohawk learned about the existence of an agreement with the Government concerning attorneys' fees. He asked Dorris for a copy, and Dorris provided it.[47]

- **April 2010:** In light of "encouraging reports" that Congress might approve the Settlement in May, Dorris told Echohawk that GK was working on a fee application and suggested they talk about NARF's share of the overall claim. Echohawk told Dorris that he was going to raise the matter with NARF's board.[48]

- **May 2010:** On May 6, Echohawk told Dorris that, after reviewing the attorneys' fees agreement, NARF understood that Plaintiffs would seek an attorneys' fees award on the same basis that Judge Lamberth awarded fees for Phase I—that is, the Court would determine NARF's share by applying Laffey rates to NARF's hours. Using NARF's incomplete hours compilation, Echohawk estimated that, under this formula, NARF should receive an award of about $4.45 million. Dorris responded on May 18 that GK would not, as in the case of EAJA applications, seek an award based on the hours times Laffey rates formula.[49] Rather, Dorris wrote, Plaintiffs would submit a

---

[45] Echohawk Decl. ¶ 25.

[46] Echohawk Decl. ¶¶ 25-28 & Ex. B.

[47] Echohawk Decl. ¶¶ 30-31 & Ex. C.

[48] Echohawk Decl. ¶ 32 & Ex. D.

[49] Echohawk Decl. ¶¶ 33-34 & Ex. E.

petition for fees seeking a percentage of the common fund in accordance with the court's ruling in *Swedish Hospital Corp. v. Shalala*.[50]

- **June 2010:** In light of the advice Echohawk received from Dorris, NARF expected that Plaintiffs' fee petition would include NARF's claim, and that Plaintiffs would compute NARF's share based on NARF's percentage of the total hours worked on the case. On June 8, Echohawk asked Dorris for a compilation of Gingold and Kilpatrick's hours, so NARF could calculate its proportional share. Dorris suggested that Echohawk meet with him in Washington, D.C. to discuss the issue further.[51]

- **September 2010:** Echohawk met with Dorris and Gingold on September 10. They discussed various ways NARF might recover fees—by petitioning for an award out of the common fund, by submitting an EAJA application, or by an informal agreement between NARF, Gingold, and the Kilpatrick firm.[52]

- **November 2010:** Echohawk met with Gingold and Dorris on November 5. They again had a broad discussion about NARF's possible means of recovering fees.[53]

On November 19, the Senate approved the Settlement. At this point, the talks between NARF and Gingold and Dorris began to intensify. On November 29, Echohawk and Kim J. Gottschalk, a member of NARF's Litigation Management Committee, spoke with Gingold. NARF again indicated that it expected to receive a proportional share of an attorneys' fees award, consistent with its percentage of all attorney hours. Gingold countered that NARF might not deserve any award out of the common fund. He argued that NARF was a non-profit organization, and that its attorneys were not, like Gingold and the Kilpatrick lawyers, private practitioners who had purportedly given up other paying opportunities in order to represent the Class. Gingold suggested that NARF had sacrificed any claim to a share of the common fund because NARF purportedly was not "there at the end." The two sides agreed to discuss the matter further.[54]

---

[50] 1 F.3d 1261 (D.C. Cir. 1993).

[51] Echohawk Decl. ¶ 35 & Ex. E.

[52] Echohawk Decl. ¶ 37.

[53] Echohawk Decl. ¶ 37.

[54] Echohawk Decl. ¶ 38.

The House approved the Settlement on November 30. President Obama signed the legislation into law on December 8. On December 17, Echohawk and Gottschalk talked to Gingold and Dorris. Gingold and Dorris asserted that NARF was not entitled to any award from the common fund because NARF was no longer denominated as "Class Counsel." They maintained that NARF had forfeited its right to seek fees out of the common fund by choosing to work on the Nez Perce Action. When NARF asked Gingold and Dorris whether they had any legal support for their assertion, they responded that it would be an "issue of first impression" whether attorneys purportedly conflicted out of a class action could petition for fees from the common fund. But they indicated that Plaintiffs would support an EAJA application by NARF, and they encouraged NARF to submit such an application. Echohawk and Gottschalk disagreed with Dorris and Gingold's assertions, but to avoid a dispute they stated that NARF would draft an EAJA application.[55]

While drafting an EAJA application, NARF learned that it might not be able to rely on EAJA after all. NARF reviewed the Settlement Agreement (drafted by GK and the Government without NARF's involvement), and noted Section J.8, which states: "Plaintiffs shall file no further claim against Defendants for attorneys' fees or expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 or costs pursuant to 28 U.S.C. § 1920." During a January 11, 2011 conference call with Gingold and Dorris, NARF attorneys expressed concern about the effect this provision would have on an EAJA application by NARF.[56] Gingold and Dorris had indicated that if NARF did not prevail in an EAJA proceeding, they would ensure that NARF received some compensation for its work on the case.[57]

---

[55] Echohawk Decl. ¶ 39.

[56] Echohawk Decl. ¶ 40; Gottschalk Decl. ¶ 4.

[57] Echohawk Decl. ¶ 40.

During a January 21, 2011 call, NARF and Gingold revisited Section J.8 of the Settlement Agreement. NARF staff attorney Melody McCoy inquired whether the parties could amend Section J.8 to make it clear that Plaintiffs could file an EAJA application for NARF's benefit. Gingold responded that the Government would not agree to such an amendment. He said the Government had insisted on Section J.8 because it wanted to foreclose the possibility of any EAJA applications.[58]

NARF and Gingold also discussed timing issues during the January 21 call. In working on its draft EAJA application, NARF determined that the Court would not have jurisdiction over an EAJA application until after the Court entered Final Judgment.[59] Thus, in the strict legal sense, NARF believed it could not file an EAJA application until after the Court's January 25 deadline for attorneys' fees petitions. But NARF thought it might be wise to file the EAJA application on January 25, so that the Court and the Class would know about NARF's claim. Gingold did not want Plaintiffs to file NARF's application on the same day that GK filed its own fee petition. Gingold said that a filing on or before January 25 would "complicate" matters for GK's Fee Petition. He also said that Plaintiffs might have to give the Class formal notice of any EAJA filing before Final Judgment, and Plaintiffs would expect NARF to pay for that potentially substantial cost. And Gingold said that he did not think an early filing would improve the prospects for success of an EAJA application.[60]

Given the jurisdictional issue, and Gingold's statements that Plaintiffs would support and file an EAJA application for NARF, NARF decided not to file an application

---

[58] Gottschalk Decl. ¶ 6.

[59] *See* 28 U.S.C. § 2412(d)(1)(A) (fees and expenses under EAJA are awarded to "prevailing party"); *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001) (plaintiff is "prevailing party" under a fee-shifting statute only if the settlement is entered as a consent decree or otherwise formally memorialized by the district court).

[60] Gottschalk Decl. ¶¶ 5-6.

on January 25.[61] GK did file their Fee Petition that day. The document failed to give NARF any credit or acknowledgement for Plaintiffs' success in the Class Action.[62] GK's brief seemingly erased NARF from the history of the case.

After GK filed its petition, NARF decided to seek the advice of outside counsel regarding NARF's claim for attorneys' fees. It took NARF time to retain counsel, and it took counsel some time to become reasonably conversant in a case that spanned 14 years and more than 3,700 docket entries. Armed with analysis from outside counsel, NARF determined it would be extremely risky to rely upon EAJA. Before moving to intervene, NARF decided, based on its long working relationship with GK, to make one final attempt to work out a compromise. Representatives of NARF and GK met in Washington on March 2, March 9, March 14, and March 15. Unfortunately, these face-to-face talks failed to produce an agreement.[63]

## IV.   The Court Should Allow NARF To Intervene.

Rule 24 of the Federal Rules of Civil Procedure articulates the standards for intervention by right and by permission. NARF can make a proper showing for both types of intervention.

### A.   The Court Should Find That NARF Has A Right To Intervene.

The court must allow anyone to intervene who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action" may "impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."[64] The D.C. Circuit has granted motions to intervene under Rule 24(a)(2) if the moving party can show that:

---

[61] Gottschalk Decl. ¶ 6.

[62] *See generally* Docket No. 3678.

[63] Echohawk Decl. ¶ 41; Gottschalk Decl. ¶ 7.

[64] F.R.C.P. 24(a)(2).

❶ Its application to intervene was timely;

❷ It has a legally protected interest in the action;

❸ The action threatens to impair the movant's interest; and

❹ No existing party to the action can adequately represent the movant's interests.[65]

NARF can make this showing.

### 1.   NARF's motion is timely in light of all the circumstances.

NARF, in reliance on its discussions with GK regarding an EAJA application, did not file a petition on the Court's January 25 deadline. But timeliness under the Rule 24 test is not just about compliance with Court deadlines. The case law indicates that NARF's timeliness "is to be judged in consideration of all the circumstances," including the probability of prejudice to those already in the case, the need for intervention to preserve the applicant's rights, and the time elapsed since the inception of the suit.[66] The present circumstances strongly support the timeliness of NARF's intervention.

*No Prejudice*: NARF's intervention will not prejudice anyone.

*First,* it will not prejudice the Class. Class Members are not eligible to receive any payments until the settlement receives "Final Approval." Under the Settlement Agreement, Final Approval does not occur until:

- The Court has entered Judgment after the Fairness Hearing (which is scheduled for June 20); and

- The Judgment becomes "Final" due to the passing of the later of (1) the time for filing a motion for reconsideration or an appeal has passed and no party filed any such papers, or (2) a court has fully adjudicated any appeals or motions for reconsideration filed by any party.[67]

Thus, it will be many months (if not longer) before Class Members will receive disbursements from the fund. Moreover, because NARF is asking the Court for a modest

---

[65] *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008).

[66] *Id.* at 886.

[67] 12/10/10 Class Action Settlement Agreement at 8.

award that would allow the Court to give all petitioners substantial awards and still remain within the non-appealable range of $50-99.9 million, NARF's intervention will not reduce the payments that Class Members are expecting to receive from the common fund.[68] Class Members also will have time to voice any concerns about NARF's petition; the June 20 Fairness Hearing is still months away.[69]

*Second,* it will not prejudice the Court. The parties, through the Fee Petition and the Government's Opposition, already have briefed the legal and factual issues that relate to a fees award decision. NARF's request for an $8.1 million share will not slow down that process. And the Court, in asking the parties to brief Mark Brown's motion, has signaled its desire to resolve all of the fees issues now, instead of on a piecemeal basis. This makes sense—especially in a big class action suit like this one.

*Third,* NARF's claim would not prejudice other petitioners. If the Court decides that a fees award as high as $223 million is justified, allocating to NARF $8.1 million of that award would not seriously prejudice the other petitioners. Indeed, according to GK's own papers, its time valued at its own current billing rates is worth $90 million.[70] And, as shown in Section I above, the Court can give all parties an award consistent with the court-approved Laffey rates for less than $81.7 million.

---

[68] If the Court allows NARF to intervene and awards NARF $8.1 million, the only people adversely affected would be the other lawyers seeking a fees award. These lawyers, however, have been aware of NARF's quality contribution and of its claim for fees and costs for the duration of this case.

[69] Because NARF is not seeking to increase the total amount of fees that GK already has requested, neither NARF nor anyone else would have to provide formal notice to the Class about NARF's petition. And even if the Court finds that the Class should receive notice, the Court can order the parties to use the same notice mechanisms that it endorsed with respect to the Phase I EAJA application—*i.e.,* serving the named class plaintiffs, publishing the request on the class action website, and placing a notice in major magazines directed to Native Americans. (*See* 12/19/05 Memorandum Opinion at 6-7, Docket No. 3222.)

[70] Plaintiffs' Petition For Class Counsel's Fees, Expenses And Costs Through Settlement at 3, Docket No. 3678.

***The Need to Intervene***: NARF faces an uncertain future if the Court does not allow it to intervene. As more fully discussed elsewhere, NARF might not be able to seek compensation via an EAJA application. Also, NARF works closely with Kilpatrick in a set of cases involving tribal trust funds. The Court should not lightly force NARF to sue Kilpatrick in a separate action (if NARF is even able to bring a separate action).[71]

***Elapsed Time***: NARF has acted expeditiously in pursuing its claim. NARF strongly desired to resolve its claim informally with GK, given the many years they have worked together on this action and other Indian rights issues. Thus, NARF officers discussed with Gingold and Dorris whether NARF was entitled to a share of the common fund, the potential viability of an EAJA application, and whether GK would otherwise compensate NARF. When it finally became clear that NARF could not reach an agreement with GK, NARF promptly filed this motion.[72]

In view of the foregoing, all the circumstances weigh strongly in favor of a finding that NARF has acted in a timely manner.

A recent decision applying the Rule 24(a) standard, *Cherokee Nation v. U.S.*,[73] is instructive, because the court in that case addressed facts remarkably similar to this case. In 1989, the Cherokee Nation sued the Government for mismanagement of tribal trust resources along the Arkansas River. Patton Boggs, LLP ("PB") represented the plaintiffs when the Cherokee Nation filed the suit. Six years later, other attorneys replaced PB as Cherokee Nation's counsel. The parties agreed on settlement terms in 2002 through legislation known as the Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act. Upon court approval of a consent decree releasing claims against

---

[71] *See, infra,* pp. 26-27.

[72] *See, supra,* Section III.

[73] 69 Fed. Cl. 148 (Fed. Cl. 2005).

the Government, the Act would have created a fund administered by the Interior Secretary, from which a court could allocate as much as $2 million for attorneys' fees.[74]

In March 2005, plaintiff recommended an attorneys' fee allocation to the Interior Secretary. This recommendation provided for a smaller share for PB than PB claimed the Cherokee Nation owed PB under a prior agreement. PB engaged in months of negotiations with both the Cherokee Nation and the Secretary regarding the allocation. On October 13, 2005, the Secretary announced that he would not revise the allocation and that the plaintiffs would receive in a final payment any unallocated funds remaining in the settlement account. Shortly thereafter, PB filed motions to intervene and for attorneys' fees.[75]

The Federal Claims Court found that PB's motion was timely.[76] The court found that PB had acted "expediently" to protect its interest by notifying the Secretary of its fee claim in 2004 and sending periodic reminders and proposed changes to the allocation over the course of a year.[77] Contrary to the Government's assertion that PB had "slept on its rights," the court found that PB's right to intervene had "only recently developed" when PB learned of the Secretary's final decision about the fee allocation.[78] Moreover, because PB's claims in intervention were "likely to be resolved well-before the parties move to have the consent decree entered," the court found the potential prejudice to the parties from intervention to be "extremely remote."[79]

The parallels between this case and *Cherokee Nation* are striking:

---

[74] *Id.* at 150-51.

[75] *Id.* at 151. PB also moved to temporarily restrain the Secretary from disbursing the balance of fees. PB withdrew its request for a TRO after the Secretary agreed to a voluntary stay. *Id.*

[76] *Id.* at 153-55.

[77] *Id.* at 154.

[78] *Id.*

[79] *Id.*

- In this case, as in *Cherokee Nation*, the settlement of the case resulted in the creation of a common fund.

- In this case, as in *Cherokee Nation*, the parties agreed that the court could use a specified amount of the common fund to pay attorneys. In *Cherokee Nation*, that amount was $2 million; in this case, the parties agreed that if the Court awarded an amount between $50 million and $99.9 million, neither party would file an appeal.

- In this case, as in *Cherokee Nation*, after the settlement set the framework for recovery of attorneys' fees, a firm that worked for the plaintiffs (NARF in this case, PB in *Cherokee Nation*) felt its claim was not receiving due consideration, and tried for many months to negotiate a settlement with co-counsel.

- In this case, as in *Cherokee Nation*, the firm that felt shortchanged moved to intervene within days after settlement talks reached an impasse.

Therefore, just as the court in *Cherokee Nation* found that PB had filed a timely motion to intervene, this Court should find NARF's instant motion timely.

## 2. *NARF has an interest in disbursements from the common fund—which is now the subject of this action.*

In *Cherokee Nation*, the court found that, at the time that PB made its motion to intervene, the subject of the action had evolved from being about the plaintiff's right to recovery from the Government to how the court would distribute money from the fund:

> "The subject of the Cherokee Nation's action *was* its claim that Defendant mismanaged the riverbed property. However, as the Settlement Act ultimately resolves this claim, it follows that this legislation *now represents* the subject of the action at this stage of the case. As PB's claim for attorney's fees is based on the enactment of this legislation, there is no question that these fees relate to the Settlement Act, i.e., the *transaction* between the Defendant and the Cherokee Nation wherein the claim was resolved. Accordingly, the court finds that PB's interest relates to the Settlement Act—the subject of the underlying action."[80]

The same is true here. This case is no longer about Plaintiffs' right to some form of compensation from the Government. The parties have settled that aspect of the suit. The present focus is on how much the Court should award in attorneys' fees, and the merit of

---

[80] 69 Fed. Cl. at 156 (emphasis in original).

any asserted objections to the Settlement Agreement. Thus, NARF's request for an $8.1 million share of any attorneys' fees award is now a fundamental subject of this action.

Moreover, the D.C. Circuit has held that "the 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process."[81] Having contributed early and often to the victories Plaintiffs achieved in this litigation, NARF has a strong legal and equitable interest in receiving compensation for its efforts. NARF is a "concerned person." In the interests of judicial economy, the Court should permit NARF to present its $8.1 million claim.

### 3. Disposing of the action without allowing NARF to petition for attorneys' fees would impair or impede NARF's ability to protect its interests.

In *Cherokee Nation*, the court found that PB's claim for attorneys' fees could be sufficiently impaired if PB could not intervene because, among other things, the Settlement Act created a dedicated fund for attorneys' fees outside of which PB could not recover any compensation, and entry of the consent decree could later preclude any such claim.[82]

NARF faces similar impairments in this case. NARF's analysis suggests it may well not have the right to compensation through EAJA. This is true for three reasons:

❶ A court could read the Settlement Agreement as barring Plaintiffs from pursuing additional fee awards under EAJA. Section J.8 of the Agreement states: "Plaintiffs shall file no further claim against Defendants for attorneys' fees or expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 or costs pursuant to 28 U.S.C. § 1920."[83]

❷ The majority rule indicates that EAJA is not available as a means to recover attorneys' fees in class action suits where the court has ordered

---

[81] *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967).

[82] 69 Fed. Cl. at 156-57.

[83] 12/10/10 Class Action Settlement Agreement at 49.

that attorneys should receive compensation for their time out of the common fund.[84]

❸ Only Plaintiffs have standing to apply for fees under EAJA. NARF does not have standing to submit its own application.[85]

NARF also would face complex issues if the Court's denial of this motion forced NARF to pursue a separate action against GK. For example, NARF works closely with the Kilpatrick firm in other matters relating to Native American rights. These relationships might make it difficult for NARF to sue the Kilpatrick firm for a share of the fees that Kilpatrick receives in this action.

The most sensible, practical and just solution is for the Court to allow NARF to assert its claim for fees and costs right now as part of this action.

### 4. *No other parties adequately represent NARF's interests.*

NARF tried to persuade Gingold and Dorris to represent NARF's interests in GK's Fee Petition. They declined. They encouraged NARF to wait and seek compensation through EAJA. The Government also will not represent NARF's interest. The court in *Cherokee Nation*, confronted with near-identical circumstances, found the movant had "clearly" met this requirement.[86]

---

[84] *See Briggs v. United States*, No. C 07-05760 WHA, 2010 WL 1759457, *6 (N.D. Cal. Apr. 30, 2010) (when fee-shifting statute provides recovery to prevailing party in class action settlement, "either attorney's fees under the fee-shifting statute are negotiated and presented separately from the merits award, or the fees are subsumed within a single 'lump sum' settlement offer. This is because these two approaches are generally seen as *alternative* means of awarding reasonable and appropriate attorney's fees to class counsel.") (emphasis added).

[85] *Astrue v. Ratcliff*, 130 S. Ct. 2521 (2010) (settling a split of authority and holding that the right to a fee award under EAJA belongs to the client, not the attorney, so only the client has the right seek an EAJA fee award).

[86] 69 Fed. Cl. at 157.

**B.      At Minimum, The Court Should Find That NARF May Permissively Intervene.**

As the foregoing demonstrates, NARF has met the Rule 24(a) standard for intervention by right. Nevertheless, if the Court does not find that NARF has the right to intervene, it still should allow NARF to intervene under Rule 24(b).

Rule 24(b) provides that, on "timely motion, the court may permit anyone to intervene" who has a "claim or defense that shares with the main action a common question of law or fact."[87] Rule 24 states that in exercising its discretion, this Court must "consider whether the intervention will ***unduly delay or prejudice*** the adjudication of the original parties' rights."[88] This requires a "balance between keeping class litigation manageable and allowing affected parties to be adequately heard."[89]

This Court has previously held that movants must show three things to justify a court order allowing permissive intervention:

❶  The court has an independent ground for subject matter jurisdiction;

❷  The movant filed a timely motion; and

❸  The movant has a claim or defense that has a question of law or fact in common with the main action.[90]

NARF can make the necessary showing for permissive intervention.

**1.      *This Court has independent jurisdiction over NARF's fee claim.***

The Court has an independent ground for subject matter jurisdiction over NARF's claim for attorneys' fees. The Court has a legal obligation to allocate a common fund in the underlying action. Furthermore, Section J.8 of the Settlement Agreement requires that this Court determine all attorneys' fees disbursements out of the common fund.

---

[87] F.R.C.P. Rule 24(b).

[88] *Id.* (emphasis added).

[89] *In re Vitamins Antitrust Litig.*, No. MISC. 99-19 7 (TFH), MDL 1285, 2001 WL 34088808, *2 (D.D.C., Mar. 19, 2001).

[90] *Aristotle Int'l, Inc. v. NGP Software, Inc.*, 714 F. Supp. 2d 1, 18 (D.D.C. 2010).

## 2.     *NARF's motion is timely.*

The "all circumstances" test for timeliness articulated above for intervention as of right is the same test courts use in analyzing permissive intervention.[91] As NARF previously discussed in Section IV.A.1, its motion is timely under all the relevant circumstances of this case.

## 3.     *NARF's claim shares common questions of fact and law with the main action.*

The court in *Cherokee Nation* noted that PB had made a sufficient showing for permissive intervention. The court found that "PB's claim has common questions of law and fact with the main action" because "PB's claim involves the payment of attorney's fees as required by the Settlement Act—the subject of this action."[92]

The same holds true here. NARF's claim seeks payment of attorneys' fees out of the common fund created by the Settlement Agreement—which is now the subject of this action. Moreover, NARF is basing its claim for fees on the same law and case-related facts set forth in the Fee Petition.

---

[91] *Id.* at 19 (citing *United States v. AT & T*, 642 F.2d 1285, 1295 (D.C. Cir. 1980), and adopting the same standard as for intervention as of right).

[92] 69 Fed. Cl. at 152 n.3.

## V.    Conclusion.

NARF devoted significant resources to this action—31,317 hours of attorney time and more than $1.6 million in out-of-pocket expenses. NARF respectfully requests that the Court allow NARF to intervene so it may petition the Court for an attorneys' fees/costs award of $8,098,821.11.

Dated:  March 28, 2011

Respectfully submitted,

By:  *Charles B. Wayne*
       Charles B. Wayne

Richard de Bodo (D.C. Bar No. 993287)
DLA PIPER LLP (US)
1999 Avenue of the Stars , Suite 400
Los Angeles, California 90067
Telephone:    (310) 595-3000
Facsimile:    (310) 595-3300
richard.debodo@dlapiper.com

Charles B. Wayne (D.C. Bar No. 935858)
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Telephone:    (202) 799-4000
Facsimile:    (202) 799-5000
charles.wayne@dlapiper.com

*Attorneys for Native American Rights Fund*

**Native American Rights Fund**
1506 Broadway
Boulder, Colorado 80302
(303) 447-8760

Petitioner

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELOUISE PEPION COBELL et al.,<br><br>    Plaintiffs,<br><br>    vs.<br><br>KENNETH L. SALAZAR, Secretary of the<br>Interior, et al.,<br><br>    Defendants. | Civil Action No. 96-1285 (TH) |

# Native American Rights Fund's
# Petition For Attorneys' Fees And Costs

# I.    Preliminary Statement.

The Native American Rights Fund hereby petitions the Court for an attorneys' fees and costs award of **$8,098,821.11**. This amount reflects the reasonable value of NARF's attorney time (hours worked multiplied by Laffey rates), plus NARF's out-of-pocket expenses, minus offsets for monies received. It does not include a bonus, multiplier, or percentage of the Plaintiffs' recovery. NARF respectfully submits that its significant contribution to Plaintiffs' cause justifies such an award. NARF invested 31,317 attorney and law clerk hours in this action, beginning in 1996, and played a crucial role in laying the foundation for the $3.4 billion settlement.

# II.   NARF Is Legally And Equitably Entitled To An Award From The Common Fund.

Under the settlement agreements, attorneys may petition the Court for an award out of the settlement fund. The Class Action Settlement Agreement provides for the establishment of an "Accounting/Trust Administration Fund" (hereafter, the "Common Fund").[1] The Government is required under the Settlement Agreement to deposit $1.412 billion into the Common Fund upon Final Approval of the Settlement Agreement.[2] The parties' "Agreement on Attorneys' Fees, Expenses, and Costs" (hereafter, "Fee Agreement") provides that the Court will decide the amount of "attorneys' fees, expenses and costs" to be awarded to counsel from the Common Fund.[3] In deciding the attorneys' fees and expenses to be awarded, the Court will consider which counsel have "create[d], preserve[d], or increase[d] the value of [the Common F]und."[4]

---

[1] Class Action Settlement Agreement at § E, Docket No. 3660-2.

[2] *Id.* at §§ E.2.a & E.2.d.

[3] Docket No. 3664-1 at ¶ 2.

[4] *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993) ("[The common fund] doctrine allows a party who creates, preserves, or increases the value of a fund in which others have an ownership interest to be reimbursed from that fund for litigation expenses incurred, including counsel fees.")

To date, no attorneys' fee petition has accounted for NARF's significant contribution to the case. Plaintiffs' Petition For Class Counsel Fees, Expenses And Costs Through Settlement (the "Fee Petition") requests that the Court award $223 million in attorneys' fees out of the common fund. But the Fee Petition says nothing about NARF— whose attorneys contributed roughly 17% of all hours on the case (and 46% of all hours from 1996-1999, when the outcome of the case was extremely uncertain). The Fee Petition only seeks an award for Dennis Gingold, Thaddeus Holt, William E. Dorris, Keith Harper, and other attorneys with Kilpatrick Townsend LLP (collectively "GK").

NARF should receive compensation for the reasonable value of its services. GK's omission of NARF from the Fee Petition should not be fatal to NARF's $8.1 million claim. NARF attorneys and law clerks worked more than 31,300 hours on the Cobell matter since lead class plaintiff Elouise Cobell engaged NARF in 1996. NARF has detailed the qualitative contributions of these lawyers in its Memorandum in support of its Motion To Intervene (NARF incorporates that discussion here in full).[5] NARF is entitled to compensation for the reasonable value of its efforts, as determined by the Court.[6] As one court stated, when "there is no agreement concerning how the amount of [an attorney's] fee is to be calculated," the trial court "determines the amount of the fee."[7]

GK has indicated it will fight NARF's petition.[8] NARF expects GK to argue that NARF cannot receive an award from the Common Fund because only "Class Counsel" can tap the fund, and NARF is not currently "Class Counsel." This assertion is both factually and legally wrong:

---

[5] NARF's Memorandum In Support Of Emergency Motion To Intervene at 5-15.

[6] *Stephen R. Perles, P.C. v. Kagy*, 473 F.3d 1244, 1253 (D.C. Cir. 2007) (holding junior attorney was entitled under District of Columbia law to recover equitable compensation for work that she had performed for senior attorney, although parties had no contract).

[7] *Ginberg v. Tauber*, 678 A.2d 543, 551 (D.C. 1996).

[8] Echohawk Decl. ¶ 41.

- **All of NARF's submitted time falls within the period when the Court recognized NARF as "Class Counsel."** The Class Action Settlement Agreement provides that "Plaintiffs shall file a notice with the Court stating the amount of attorneys' fees, expenses and costs they will be requesting for Class Counsel through the date of this Agreement."[9] In September 1996, Plaintiffs filed a Motion For Class Action Certification.[10] In a February 4, 1997 Order, the Court granted this motion and found that Plaintiffs had "retained counsel qualified to prosecute this lawsuit on behalf of the Class"—including NARF attorneys John Echohawk (NARF's Executive Director), Richard Dauphinais, Robert M. Peregoy, James K. Kawahara, and Keith Harper.[11] This Court Order, and its recognition of NARF attorneys as part of the team of Class Counsel, remained in effect through the parties' execution on December 7, 2009 of the Class Action Settlement Agreement and the Fee Agreement.

- **GK itself does not recognize a distinction between "Class Counsel" and other attorneys who worked for the Class.** The Court's December 21, 2010 Order identified the following eight attorneys as "Class Counsel": "Dennis M. Gingold, Thaddeus Holt, and attorneys from Kilpatrick Stockton, LLP—Elliott H. Levitas, Keith Harper, William Dorris, David C. Smith, Adam Charnes, and Justin Guilder." Yet, in the Fee Petition, GK seeks an award based on the work of almost *90 additional attorneys,* and almost 30 other professionals.[12] NARF's staff attorneys were just as much "Class Counsel" as all of these people.

- **Even if NARF is not now within the definition of "Class Counsel," NARF is still entitled to recover from the Common Fund for the reasonable value of its services.** In *Swedish Hospital,* the court explained that the common fund "doctrine allows a party who creates, preserves, or increases the value of a fund in which others have an ownership interest to be reimbursed from that fund for litigation expenses incurred, including counsel fees."[13] Courts have applied this doctrine to award fees to any attorneys who did work that helped the class. For example, in *Duhaime v. John Hancock Life Ins. Co.,*[14] the court ruled that

---

[9] Class Action Settlement Agreement at § J.1 (p. 47), Docket No. 3660-2.

[10] Plaintiffs' Motion For Class Action Certification at 15-17, Docket No. 5.

[11] 2/4/97 Order, Docket No. 27.

[12] *See* Exs. B & C. to 1/25/11 Dorris Affidavit, Docket No. 3678-10.

[13] *Swedish Hosp. Corp.,* 1 F.3d at 1265.

[14] 2 F. Supp. 2d 175 (D. Mass. 1998). *See also Bowling v. Pfizer, Inc.,* 922 F. Supp. 1261, 1285 (S.D. Ohio 1996) (public advocacy organization which was not "class counsel" was entitled to attorneys' fees from common fund because organization had benefited class by objecting to settlement, by objecting to other fee applications before the Court, by participating in settlement negotiations, and by participating in implementation of settlement).

attorneys representing an objector who were not "class counsel" should share in the attorneys' fee fund created by the settlement, because their objections helped improve the settlement for the benefit of the class. Similarly, in this case, NARF's work for the Class Plaintiffs helped contribute to the Settlement Agreement that will benefit the Class.

GK also cannot maintain that NARF forfeited any claim to a share of the common fund when, in 2006, NARF reduced its involvement in this case. In 2006, NARF's primary attorney working on the Cobell litigation, Keith Harper, left NARF to join the Kilpatrick firm, but he continued to work on the case. There was no need for NARF to hire a new lawyer to replace Harper on the Cobell case, because Harper continued to fill his previous role. NARF continued to work on the Cobell case, although in a reduced capacity, and it continued to serve as Class Counsel at this time. NARF also decided to concentrate its resources on bringing a lawsuit against the Government for accountings of tribal trust funds. That action, styled as *The Nez Perce Tribe, et al. v. Salazar, et al.,* is now pending before this Court, with NARF representing 42 tribes.[15] Since 2006, with Harper's departure, NARF's billings on the Cobell case have been modest. But this should make no difference in NARF's right to recover for the services it performed.

GK also asserts that NARF is not entitled to an award of attorneys' fees because NARF is not a for-profit law firm. This is not the law. Public interest and non-profit law firms are entitled to recover their attorneys' fees, just like for-profit law firms. As this Court stated, an award of attorneys' fees in a civil rights action pursuant to a fee-shifting statute is "calculated according to the prevailing market rates in the relevant community, ***regardless of whether counsel is private or public-interest.***"[16]

Like any non-profit law firm, NARF still needs money to operate, and cannot afford to work on major cases without a reasonable expectation that, if victorious, it will receive some compensation for its time and expenses—either from client payments,

---

[15] *See* Echohawk Decl. ¶¶ 20-22.

[16] *LaShawn v. Barry*, Civ. No. 89-1754, 1998 WL 35243112, *7-8 (D.D.C. Feb. 18, 1998) (J. Hogan) (emphasis added).

contributions, or attorneys' fees awards. With respect to the Cobell matter, NARF knew the case would be a drain on its resources: the Government was certain to vigorously contest a suit brought by a class of hundreds of thousands of Native Americans, with billions of dollars at stake. In the early years of the Class Action, NARF had serious concerns about whether Ms. Cobell and NARF itself could tap sufficient funds to keep the case afloat. NARF also had to consider the effect its work for the Class might have on its overall fundraising efforts. Some in Indian Country opposed the suit. NARF had to confront the possibility that a bad outcome for Plaintiffs could damage its reputation in Indian Country, which could scare off clients and patrons. Yet, NARF chose to accept the risks and pursue the case, instead of turning Ms. Cobell down in favor of safer matters. From 1996 through 1999—before the Court issued its ruling on the Phase I trial and it was far from certain that Plaintiffs would emerge with such a "stunning" result—NARF accounted for roughly 46% of the total hours on the case.

## III. NARF's Fee Request Is Limited To The Reasonable Value of Its Services.

### A.    NARF Is Requesting A Fixed Amount.

NARF's request is for the fixed, finite amount of $8.1 million. NARF is seeking to recover the reasonable value of its services, in accordance with established case law. NARF is not asking the Court to award it a bonus, a multiplier, or a percentage of Plaintiffs' recovery. NARF is not asking for anything that will change the Class Action Settlement Agreement, or that will increase the total amount of the attorneys' fees award. NARF wants no more than $8.1 million, regardless of the total amount the Court awards out of the common fund—whether it is $50 million, or $99.9 million, or even as much as $223 million.

NARF's modest request will not require the Court to pay more than a total of $50 million to $99.9 million in total attorneys' fees to Plaintiffs' counsel, or to pay a lower

total recovery to the Class. If the Court chooses to apply Laffey rates to all of Plaintiffs'

counsel, the Court could satisfy all claims for less than $81.7 million:

| Petitioner | Total Hours | % Of Total Hours | Award Based on Laffey Rates |
|---|---|---|---|
| GK | 140,710 | 77% | $68,133,250[17] |
| NARF | 31,317 | 17% | $8,098,821 |
| Mark Brown | 11,485 | 6% | $5,455,702[18] |
| **Total:** | | | **$81,687,773** |

This approach would recognize the proportional contribution of each petitioner, and still

leave the Court room to award GK a significant bonus or premium if it wants to, and still

keep the total fees award under $99.9 million. GK and the Government have agreed that

they will not appeal an award that falls between $50 million and $99.9 million.[19]

## B.    NARF Has Well-Documented Support For Its Request.

In its request, NARF has attempted to take into account its attorney time relating

to the Cobell case, the applicable Laffey rates according to case law, its costs and

expenses in the case, and offsets for payments it has already received.

NARF determined its total hours by carefully examining the time records of all

attorneys who worked on the Cobell Class Action, and then computed the value of its

hours by using the current Laffey rates set by the U.S. Attorney's Office for the District

---

[17] GK's Fee Petition stated that GK's total hours are 140,710. (1/25/11 Dorris Affidavit at ¶ 13, Docket No. 3678-10.) Multiplying all of these hours at the highest current Laffey rate of $475 per hour yields a total of $66,837,250. Adding in GK's claimed costs of $1,296,000, yields the total of $68,133,250.

[18] Docket No. 3699 at pp. 6-7. Brown calculated his claim by multiplying all of his asserted hours (11,485) by the highest current Laffey rate ($475). *Id.*

[19] 12/7/09 Agreement on Attorneys' Fees, Expenses and Costs at ¶ 4(e), Docket No. 3664-1 ("In the event that the Court awards attorneys' fees, expenses, and costs covered by the Paragraph in an amount equal to or greater than $50,000,000.00 and equal to or less than $99,900,000.00, Plaintiffs, Class Counsel and Defendants agree not to file a notice of appeal concerning such award.").

of Columbia.[20] NARF did not apply a single Laffey rate to each attorney's time. Rather, NARF broke down its attorney time by Laffey year, and multiplied that time by the applicable Laffey rate based on the attorney's level of experience at the time he or she performed the work.[21]

The following table shows the hours and fees for each NARF attorney.

### NARF Attorney Time

| NARF Attorney | Years Hours Charged | Recorded Hours | Low/High Laffey Rate | Total Fees |
|---|---|---|---|---|
| Keith Harper | 1996-2006 | 19,671.34 | $230/$420 | $6,551,395.45 |
| Lorna Babby | 1998-2005 | 4,807.21 | $275/$420 | $1,597,191.85 |
| Robert Peregoy | 1996-1999 | 2,297.20 | $420 | $964,824.00 |
| John Echohawk | 1996-2009 | 1,159.20 | $475 | $550,620.00 |
| Richard Guest | 2003-2008 | 1,122.15 | $230/$420 | $408,220.25 |
| Richard Dauphinais | 1996-1997 | 374.95 | $420 | $157,479.00 |
| Michelle Mitchell | 2002-2003 | 203.75 | $275 | $56,031.25 |
| Tracy Labin | 2001-2002 | 84.50 | $335 | $28,307.50 |
| Kim Gottschalk | 2003-2004 | 4.80 | $475 | $2,280.00 |
| Mark Tilden | 2005-2006 | 1.10 | $420 | $462.00 |
| James Kawahara | 1996-1998 | 253.65 | $275 | $69,753.75 |
| NARF Law Clerks | 1996-2006 | 1,337.15 | $135 | $180,515.25 |
| **Total:** | | **31,317** | | **$10,567,080.30** |

NARF also has paid out $1,614,087.81 in costs and expenses. This accounts for such cost and expense items as transcripts, attorney travel, legal research services, deposition costs, witness expenses, copying services, mailing services, and consultant

---

[20] *See* www.justice.gov/usao/dc/Divisions/Civil_Division/index.html.

[21] Gottschalk Decl. ¶ 11.

fees (which includes more than $500,000 in fees that NARF paid to Gingold and Holt for work they billed in 1997 and 1998).[22] Exhibit C to NARF's Appendix includes documentary support for NARF's unreimbursed expenses.

NARF's claim also accounts for appropriate offsets for payments it has already received. As detailed below, NARF received some compensation for its work on the Cobell litigation from foundations, from a prior application under the Equal Access to Justice Act ("EAJA"), and from sanctions awards issued by the Court.[23]

### NARF OFFSETS TO GROSS CLAIM

| OFFSET TYPE | AMOUNT |
|---|---|
| Blackfeet Reservation Development Fund | $497,286.00 |
| Ford Foundation Grant No. 970-1241 | $1,500,000.00 |
| Bank of America Grant No. 98-421 | $10,000.00 |
| Ford Foundation Grant No. 980-0951-2 | $500,000.00 |
| Retaliation Attorneys' Fees Award | $72,749.00 |
| EAJA Award | $1,502.311.00 |
| **Total Offsets:** | **$4,082,347.00** |

Thus, NARF's net claim is **$8,098,821.11.**[24] NARF has provided an additional summary of its claim in Exhibit A to its Appendix Of Documents Supporting NARF's Fee Petition. Exhibit B to that Appendix contains daily attorney time summaries, and Exhibit C provides supporting documentation for NARF's out-of-pocket expenses.

---

[22] Gottschalk Decl. ¶ 13.

[23] Gottschalk Decl. ¶¶ 14-16.

[24] This comes from the equation: $10,386,565.06 + $1,614,087.81 - $4,082,347.00.

**C.    NARF's Request Involves Reasonable Hours, Billing Rates, And Staffing.**

NARF performed significant work on the Cobell case and made important contributions to Plaintiffs' success, but it did so in an extremely efficient way by staffing the case with a small number of lawyers with a mix of experience levels. Judging NARF's contribution solely on a total hours basis would penalize NARF for its efficiencies.

**1.    NARF's hours totals are reasonable.**

NARF efficiently staffed the Cobell litigation; it did not constantly stream attorneys in and out of the case. One attorney—Keith Harper—accounted for 63% of NARF's time. Lorna Babby (15%), Robert Peregoy (7%) and Richard Guest (4%) worked significant hours during certain years. John Echohawk (4%), as NARF's most senior attorney on the case, billed a modest amount of hours each year over a 14-year period. And six other attorneys (collectively 3%) billed a small number of hours during concentrated periods at various stages of the case. The fact that the Kilpatrick firm deployed 90 attorneys and 30 other timekeepers to the matter in no way demonstrates that NARF's role and impact was less significant, or that the Court should not fully award NARF the reasonable value of its services.

Similar analysis applies to the number of hours billed by NARF lawyers. Keith Harper billed the most hours of any NARF attorney during a 12-month period—2,625 hours during the 2005-2006 Laffey year.[25] That works out to an average of 7.2 hours per day. During the 5-year period from 2001 to 2006, Harper billed 12,225.36 hours—an average of 6.7 hours per day. In contrast, according to GK's Fee Petition, Gingold personally worked 48,772 hours between November 4, 1995 and December 7, 2009. This translates to an average of 9.48 billed hours per day, or an average of 3,460 billable hours a year for 14+ straight years. The mere fact that Gingold put in more hours a day

---

[25] A Laffey Matrix year runs from June 1 through May 31. (www.justice.gov/ usao/dc/Divisions/Civil_Division/Laffey_Matrix_8.html.)

than Harper does not necessarily mean that Harper's (and NARF's) commitment and value to the case were any less.

## 2.   NARF's billing rates are reasonable.

Strong precedent supports NARF's use of Laffey rates to determine the reasonable value of its attorney time. In adjudicating Plaintiffs' Phase I application under EAJA, this Court applied Laffey rates in awarding NARF more than $1.5 million.[26]

Courts have consistently affirmed the reliability of the Laffey Matrix for determining the prevailing market rates for services provided in complex litigation in the District of Columbia.[27] As this Court stated in *LaShawn v. Barry,* the Laffey "index has been relied upon favorably by the Court of Appeals and by judges on this Court," and the "Court of Appeals has consistently affirmed its reliability, stating that the Laffey index is a 'useful starting point,' which plaintiffs may supplement."[28]

The case law also strongly supports the use of current Laffey rates, as opposed to historic rates. The U.S. Supreme Court has noted that

> "compensation received several years after the services were rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as normally would be the case with private billings."[29]

Thus, "to roughly compensate for delay in payment," the "district court has the authority to award current market rates instead of historic market rates, so long as the use of current instead of historic rates would not overcompensate counsel, 'generating a windfall for the plaintiff's attorneys.'"[30] Here, NARF has waited up to 15 years to receive

---

[26] 12/19/05 Memorandum Opinion at 47, 48 & 52-56, Docket No. 3222.

[27] *See, e.g., Covington v. District of Columbia,* 57 F.3d 1101, 1109 (D.C. Cir. 1995); *Save Our Cumberland Mountains, Inc. v. Hodel,* 857 F.2d 1516, 1525 (D.C. Cir. 1988).

[28] 1998 WL 35243112, at *7-8, *quoting Covington,* 57 F.3d at 1109.

[29] *Missouri v. Jenkins by Agyei,* 491 U.S. 274, 283 (1989).

[30] *Covington v. Dist. of Columbia,* 839 F. Supp. 894, 902 (D.D.C. 1993); *see also Murray v. Weinberger,* 741 F.2d 1423, 1433 (D.C. Cir. 1984).

compensation for its fees and costs in this case. Courts in this district have applied current Laffey rates in cases with much less delay.[31]

The fact that NARF may charge its financially disadvantaged clients a lower rate is no reason for the Court not to use Laffey rates in this case. NARF charges a reduced rate to advance non-economic goals—namely, providing legal services and advocacy to underrepresented Native Americans. In *LaShawn,* this Court recognized that "fees are measured by market value of services rendered, not by the value that was actually charged." In that case, the Court applied Laffey rates to time put in by an attorney and paralegal, even though the attorney did not charge the client for the services rendered.[32]

The Laffey rates applied by NARF in this case are especially "reasonable in light of the rates charged by firms that handle these types of cases."[33] Indeed, this is evident from a comparison of NARF's Laffey rates, and the hourly rates for GK.

NARF's highest Laffey rate is $475 per hour. This rate is for John Echohawk's hours. Echohawk, NARF's co-founder and its Executive Director since 1977, is one of the nation's premier practitioners of Indian law. He has won cases in court; successfully lobbied members of Congress; advised Presidents Clinton and Obama; and educated and taught students throughout the country about important issues relating to civil rights and Indian Law. The *National Law Journal* has recognized him as one of the 100 most influential lawyers in America. Organizations have advanced his name as a potential nominee to the U.S. Supreme Court. Human Rights Magazine called

---

[31] *See, e.g., Pleasants v. Ridge,* 424 F. Supp. 2d 67, 70 (D.D.C. 2006) (using current Laffey rates where award was made six years after litigation began); *Does v. Dist. of Columbia,* 448 F. Supp. 2d 137, 141-42 (D.D.C. 2006) (using current Laffey rates to compensate for 4-year delay in payment); *Muldrow v. Re-Direct, Inc.,* 397 F. Supp. 2d 1, 4 n.4 (D.D.C. 2005) (same).

[32] *LaShawn,* 1998 WL 35243112, at *8. *See also Jordan v. U.S. Dep't of Justice,* 691 F.2d 514, 523-24 (D.C. Cir. 1982) (granting fees for student legal services); *Does,* 448 F. Supp. 2d at 141 (using current Laffey rates to calculate fees for attorneys who charged below-market rates to further non-economic goals).

[33] *See LaShawn,* 1998 WL 35243112, at *8.

Echohawk the "Thurgood Marshall of Indian law," and "a Human Rights Hero."[34] For a person of Echohawk's experience and stature, a $475 hourly rate is *very* reasonable.

In contrast, as shown below, GK is seeking compensation for the work of 36 lawyers with hourly rates that are equal to or greater than Echohawk's Laffey rate. Gingold's hourly rate is almost double Echohawk's proposed Laffey rate. Most of these attorneys have far less experience than Echohawk.

### Attorneys who have $5,000 in time charges to the Cobell Matter[35]

| Attorney | Years of Experience | Proposed Rate |
|---|---|---|
| **Dennis Gingold** | 37 | $925 |
| **Thaddeus Holt** | 52 | $811 |
| David Zacks | 44 | $730 |
| **Elliott Levitas** | 56 | $725 |
| Mark Levy | 35 | $725 |
| Miles Alexander | 56 | $695 |
| **William Dorris** | 32 | $690 |
| Joe Beck | 42 | $675 |
| A. Stephens Clay | 43 | $675 |
| Daniel Taylor, Jr. | 35 | $675 |
| Stanley Gorinson | 38 | $655 |
| Michael Tyler | 29 | $640 |
| Thomas Harney | 39 | $625 |
| **William Austin** | 31 | $625 |
| William Brewster | 24 | $625 |
| Roderick Dennehy, Jr. | 36 | $625 |

---

[34] www.americanbar.org/publications/human_rights_magazine_home/irr_hr_spring06_echohawk.html.

[35] 1/25/11 Dorris Affidavit at ¶ 7 & Exs. A and B. The boldfaced names are identified in the Court's December 21, 2010 Order as "Class Counsel." *See* Docket No. 3670 at 2.

| Attorney | Years of Experience | Proposed Rate |
|---|---|---|
| Lynn Fowler | 25 | $625 |
| Tim Carssow | 41 | $600 |
| Craig Bertschi | 21 | $580 |
| Ron Raider | 25 | $580 |
| Ted Clarkson | 29 | $575 |
| **Adam Charnes** | 18 | $545 |
| Michael Brooks | 17 | $535 |
| **Keith Harper** | 16 | $525 |
| Daniel Marti | 12 | $525 |
| **David Smith** | 27 | $525 |
| Jerry Smith | 25 | $525 |
| Jill Warner | 16 | $525 |
| Julie Lierly | 16 | $520 |
| Kali Beyah | 11 | $515 |
| Wilmer Parker | 37 | $500 |
| Audra Dial | 13 | $475 |
| C. Allen Garrett | 16 | $475 |
| George Marcou | 27 | $475 |
| Robert Marcovitch | 24 | $475 |
| Burleigh Singleton | 15 | $475 |

Moreover, in considering these rates, the Court should keep in mind that, because GK is seeking a $223 million contingency fee, the effective hourly rate for these lawyers is actually more than twice their stated hourly rates.

Harper's case further verifies the reasonableness of NARF's position. For the time that Harper billed while at NARF, NARF is seeking compensation based on an average hourly rate of $333. Harper's hourly billing rate at Kilpatrick is more than 50% greater, at $525 per hour, and GK is seeking a contingency fee for Harper's time that translates

-13-

to more than double his $525 hourly rate. In opposing NARF's motion, GK is essentially arguing that Harper's billing rate while at NARF should be $0.

## IV.  Conclusion.

NARF did efficient, quality work on the Cobell Class Action. Its attorneys helped Plaintiffs achieve a "stunning victory" over the Government. NARF remains uncompensated for 31,317 hours—or $10.38 million worth—of attorney time, and $1.614 million in costs (minus offsets). Thus, NARF respectfully requests that the Court award NARF **$8,098,821.11** from the Common Fund.

Dated:  March 28, 2011                    Respectfully submitted,


                                          By: _Charles B. Wayne_
                                              Charles B. Wayne

                                          Richard de Bodo (D.C. Bar No. 993287)
                                          DLA PIPER LLP (US)
                                          1999 Avenue of the Stars , Suite 400
                                          Los Angeles, California 90067
                                          Telephone:   (310) 595-3000
                                          Facsimile:   (310) 595-3300
                                          richard.debodo@dlapiper.com

                                          Charles B. Wayne (D.C. Bar No. 935858)
                                          DLA PIPER LLP (US)
                                          500 Eighth Street, NW
                                          Washington, DC 20004
                                          Telephone:   (202) 799-4000
                                          Facsimile:   (202) 799-5000
                                          charles.wayne@dlapiper.com

                                          *Attorneys for Native American Rights Fund*

-14-