## IN THE UNITED STATES DISTRICT OF COLUMBIA
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELOUISE PEPION COBELL, et al. on their own behalf of all persons similarly situated, | |
| | Judge Hogan |
| PLAINTIFFS, | |
| vs. | Civil Action No. 96-1285 (TH) |
| KEN SALAZAR, Secretary of the Interior, et al. | |
| DEFENDANTS. | |

**OBJECTION OF THE PUTATIVE CLASS REPRESENTED BY THE HARVEST INSTITUTE FREEDMEN FEDERATION, LLC, LEATRICE TANNER-BROWN AND WILLIAM WARRIOR, ET AL. TO SETTLEMENT AGREEMENT AND NOTICE OF INTENTION TO APPEAR AT FAIRNESS HEARING**

In accordance with the provisions of Paragraph 13 of the December 21, 2010 Order on Joint Motion for Preliminary Approval of Settlement Agreement, Docket No. 3667, the Putative Class of Persons represented by the Harvest Institute Freedmen Federation, LLC, Leatrice Tanner-Brown and William Warrior, et al (hereinafter "Freedmen Objectors") respectfully object to the proposed settlement in this action. Undersigned counsel for the Freedmen Objectors hereby gives notice of his intention to appear on behalf of the Objectors at the June 20, 2011 Fairness Hearing. A memorandum in support of this objection is attached.

s/Percy Squire, Esq.
Percy Squire, Esq. (0022010)
PERCY SQUIRE CO., LLC
514 South High St.
Columbus, Ohio 43215
614-224-6528 Telephone
614-224-6529 Facsimile
psquire@sp-lawfirm.com
Attorney for Putative Class
Of Freedmen Objectors

Exhibit F

**MEMORANDUM**

The putative class of Freedmen Objectors respectfully oppose the Settlement Agreement in this action on grounds that the Agreement as proposed is violative of the Equal Protection Clause of the Fifth Amendment to the United States Constitution and perpetuates past unlawful discrimination on the basis of race.

The Settlement Agreement is unconstitutional by reason of its blatant racially disparate treatment of the descendants of persons who rebelled against the United States during the Civil War and the descendants of persons held in bondage by the aforementioned rebels.[1,2]

During the Civil War, the Five Civilized Tribes, the Seminole, Cherokee, Choctaw, Creek and Chickasaw, entered into treaties with the Confederacy, severing their relations with the United States. As a result of these acts of disloyalty the Five Civilized Tribes forfeited all tribal lands and their status as government wards. In 1866, the United States made treaties with each of the Five Civilized Tribes, setting the terms on which the tribes would continue to exist within the United States, regain their land and trust beneficiary status. All of the treaties with the Five Civilized Tribes eradicated slavery within the tribes and provided that the emancipated "Freedmen" would have certain rights within the tribes. Although these Treaties had a common purpose, the provisions of the various Treaties were not identical. However, under the treaties the Freedmen were emancipated and given civic status equal to Indians whether the Freedmen were adopted into the Tribes or not. The following is a summary of the provisions of the treaties pertinent to this action.

---

[1] See, Exhibit A for definitions of Freedmen from various Administrations.
[2] See, Exhibit B for January 14, 2011 Order of District Court of Cherokee Nation in <u>Raymond Nash, et al. v. Cherokee Nation Registrar</u>, Case No Cv-07-40, et seq. stating 1866 Treaties mandated equal civic status for Cherokees by blood and Freedmen.

2

**The Seminole Treaty**: The United States entered into its first antebellum treaty with the Seminole in 1866. 14 Stat. 755. The treaty provided that the Freedmen members would have rights equal to those of Seminoles by blood:

> And inasmuch as there are among the Seminoles many persons of African descent and blood, who have no interest or property in the soil, and no recognized civil rights, it is stipulated that hereafter these persons and their descendants, and such other of the same race as shall be permitted by said nation to settle there, <u>shall have and enjoy all the rights of native citizens, and the laws of said nation shall be equally binding upon all persons of whatever race or color who may be adopted as citizens or members of said tribe</u>.

14 Stat. 755, 756. In 1898, the Seminole entered into an agreement with the United States to allot its land held in common to individual members. 30 Stat. 567. The agreement made no distinction between the Freedmen members and the members by blood.

**The Creek Treaty**: The United States' treaty with the Creek is similar to its treaty with the Seminole. It provided that the Creek Freedmen would have all the rights of members by blood, including the right to share equally in land and funds:

> [A]nd inasmuch as there are among the Creeks many persons of African descent, who have no interest in the soil, it is stipulated that hereafter those persons lawfully residing in said Creek country under their laws and usages . . <u>shall have and enjoy all the rights and privileges of native citizens, including an equal interest in the soil and national funds, and the laws of said nation shall be equally binding upon and give equal protection to all such persons</u>, and all others, of whatever race or color, who may be adopted as citizens or members of said tribe

14 Stat. 785, 786. In 1897, the United States and the Creek Nation agreed to terms on which the Creek Nation's common lands would be allotted. 30 Stat 496, 514. The agreement made no distinction between Creeks by blood and the Freedmen. In 1901, the Creek entered a second agreement with the United States. 31 Stat. 861. Like the first, this agreement made no distinction between Creek Indian and Freedmen members.

**The Cherokee Agreement**: The United States entered into a treaty with the Cherokee in 1866. The treaty of 1866, *inter alia* is a basis for Appellants' claims here. A treaty with the Cherokee Tribe and the United States was concluded on July 19, 1866. Article IV of that Treaty provided that "...[a]ll of the Cherokee freed Negros who were formerly slaves to any Cherokee, and all free Negros not having been slaves, who resided in the Cherokee nation prior to June 1, 1861...shall have the right to settle in and occupy the Canadian district ...<u>and will include a quantity of land equal to 160 acres for each person who may so elect to reside in the territory...</u>" Thus, as in the case of the Choctaw and Chickasaw Freedmen, the <u>Cherokee Freedmen were "adopted into the tribe [and] [c]onsequently, they and their descendants were entitled to participate in the allotment of lands equally with members of the tribe by blood.</u>" Ross v. Ickes, 130 F.2d 415 (D.C.C. 1942). It is in the failure of the Cherokee to allot land to the Freedmen represented by Harvest in this action that gave rise to the Harvest Complaint.

**The Choctaw and Chickasaw Treaty**: The United States entered into a treaty with the Choctaw and Chickasaw Tribes on April 28, 1866. 14 Stat. 769. This treaty provided that the tribes had a choice about how to deal with their Freedmen. If the tribes made their Freedmen members within two years, the tribes would receive a portion of a trust fund, and the Freedmen would receive 40-acre allotments once the Choctaw, Chickasaw and Kansas Indians had made their selections. If the tribes did not adopt their Freedmen and the Freedmen voluntarily removed themselves to other land within Indian Territory, the tribes would get nothing and the [Freedmen would receive a portion of the trust fund. *Id*] The Choctaw and Chickasaw resisted adopting the Freedmen, so the Freedmen were not entitled to the 40-acre allotments. In 1883, the Choctaw adopted the Freedmen into the tribe and declared each was entitled to 40 acres. The tribe made no

allotments at that time either. Choctaw Nation of Indians v. United States, 318 U.S. 423, 425 (1943). The Chickasaw never did adopt their Freedmen into the tribe.

In 1897, the United States entered into an agreement with the Choctaw and Chickasaw whereby their lands held in common would be allotted. 30 Stat. 496, 505-506. This agreement provided that the Choctaw Freedmen would receive 40-acre allotments. 30 Stat. 506. Before any allotments were made, the United States entered into another agreement with the tribes. This second agreement also provided that Choctaw and Chickasaw Freedmen would receive 40 acres. 32 Stat. 641.

The United States to failed properly discharge its trust responsibility to the Freedmen held in bondage or residing in Indian Country at the end of the Civil War. In contrast, through the Settlement Agreement the United States is rectifying its breach of fiduciary duty owed to the descendants of the rebellious Five Civilized Tribe slave masters, but denying its breach of fiduciary duty to the slaves of those rebellious tribes. This is blatant and unlawful racial discrimination. The slaves did not rebel against the United States, and were all of African descent. Whereas the rebel Tribes were Native American, rebelled, but now are receiving compensation for the same breaches of fiduciary duty owed to the Freedmen that the United States refuses to acknowledge.

The settlement reaffirms the existence of a trust relationship between the United States and Native Americans dating back to 1887, the time of enactment of the General Allotment Act of 1887, known as the "Dawes Act." The bulk of trust assets alleged within the Cobell action to have been mismanaged by the United States are proceeds of various transactions in land allotted to individual Indians under the Dawes Act. See, Cobell v. Salazar, July 24, 2009, Opinion of the United States Court of Appeals for the District of Columbia, Case No. 08-5500, p. 2. By reason of racism and misfeasance

members of the putative Freedmen class were excluded from the receipt of proceeds of these land transactions and therefore did not have individual money accounts established, although under the treaties with the defendants establishment of these accounts for Freedmen was mandatory

In point of fact, under 1866 treaties between the United States and the Five Civilized Tribes, Freedmen were accorded equal civic status in relation to the United States as members of the Five Civilized Tribes, whether the Freedman were adopted into the tribes or not.

Cobell establishes that trust obligations are owed and have been owed by the United States to Indians since the close of the Civil War, Freedman having equal civic status under the 1866 treaties to members of the Five Civilized tribes are also owed fiduciary duties by the United States.

Cobell settlement is evidence that the United States has never repudiated its fiduciary duty as trustee to Native American beneficiaries, i.e. the Cobell Plaintiffs.

Contrary to the rulings of the United States Court of Federal Claims in Harvest Institute Freedman Federation, et al. v. United States, Case No 06-907L and its affirmance by the United States Court of Appeals for the Federal Circuit, the six year statute of limitations applicable to claims against the United States under the Tucker Act 28 U.S.C. § 2501, does not, under the repudiation rule[3], begin to run in relation to claims

---

[3] There is a general "repudiation rule" with regards to equitable trusts that says the statute of limitations will not begin to run on claims to enforce a trust against a trustee until repudiation of the trust relationship The underlying rationale is that the trustee's possession of the trust assets is presumed to be possession for the beneficiary (i.e. the cestui que trust), and the time should begin to run on claims against the trustee only when the trustee has taken some acts or communicated in a way that is inconsistent with that presumption, so as to provide notice that the trustee has disavowed the trust relationship or is no longer acting in the interests of the beneficiary. The repudiation rule is applicable in the Harvest action for the reason the Freedmen are seeking recovery of trust property itself, and the Government as evidenced by Cobell has not already repudiated its trust relationship with the Freedmen.

by the Harvest Institute Plaintiffs, et al. until the United States as trustee repudiates its trust responsibility to the Five Civilized Tribes, an event which <u>Cobell</u> establishes has never occurred.

In light of the above it is inequitable and will result in the perpetuation of racial discrimination against the Freedman Objectors to settle claims accruing to the benefit of members of the Five Civilized Tribes, descendants of slaveholders and persons who were disloyal to the United States, while failing to resolve claims against the United States by the Freedmen Objectors.

Objectors such as Leatrice Tanner-Brown are descendants of a person held in bondage by the Cherokee tribe. Ms. Brown's grandfather, George Curls, the son of a Cherokee held slave, was born in 1897. He was allotted land by the Cherokee nation at age thirteen. He was illiterate. He was, despite the promises of the 1866 treaties, denied any assistance by the United States as trustee. As a result, despite federally imposed restrictions against alienation of his allotment his land was in violation of these trust restrictions, swindled from him at age twenty-two.

Copies of the Tanner documents are at Exhibit C. Exhibit C demonstrates that Mr. Curls was listed on the Dawes Rolls and received land from the Cherokee tribe. Ms. Tanner's grandfather despite having received an allotment did not, due to breaches of the fiduciary duties he was owed by the United States, receive an Individual Indian Money account or receive any distributions of royalties that went to other Cherokee tribe

---

The repudiation rule has appeared in cases involving Native American trust claims. For example, in <u>Tunica-Biloxi Tribe v. United States</u>, 1991 U.S. App. LEXIS 10716 (Fed. Cir. may 17, 1991).

> Under the law of trust, a cause of action for breach of a fiduciary obligation owed by a trustee does not accrue until the trust is repudiated or terminated. <u>Manchester Band of Pomo Indians, Inc. v. United States, 363 F. Supp. 1238, 1249 (N.D. Cal 1973)</u> (citing <u>United States v. Taylor, 104 U.S. 216 (1881)</u>

members as required by the 1866 Treaties and subsequent Acts of Congress. It is these breaches that are the focus of this objection and the basis for opposing redress only of breaches against Native Americans.

As a descendant of a recipient of an allotment of Cherokee land, Ms. Brown and her relatives, as members of their putative class, should have inherited an Indian Money Account established for her grandfather. In addition under federal law, the land allotted to her grandfather was inalienable for a minimum period of twenty five years or until approved by the Secretary of Interior. The Curls land was alienated by trickery prior to the expiration of the trust period. The United States, as trustee, did not discharge its fiduciary duties to Mr. Curls, a person of no formal educational training, and no Individual Indian Money account was ever established for Mr. Curls, and his land was unlawfully transferred.

Objector Harvest Institute Freedman Federation is an unincorporated association formed for the specific purpose of seeking redress through the courts to compel the United States to perform obligations owed under various treaties described above to Freedmen. The Institute has conducted research, provided financing and required legal resources, including counsel, to advocate on behalf of Freedmen. The Institute's membership is comprised of persons with African and Native American ancestry, each of whom has standing to sue their own right. The interests which the Institute seeks to protect are germane to its purpose and do not require the participation of individual Freedmen.

Objector William Warrior is also a descendant of such Freedmen and a representative of the entire class of such persons, a class too numerous to list individually

as objectors in this action. Mr. Warrior is a lineal descendant of Chief John Horse's Band of Ethnic Seminole Nation Citizens.

This Court stated in Cobell:

a. It is clear now that this Court has broad equitable authority to deal with a century or more of trustee nonfeasance and to fashion appropriate remedies, see, Cobell v. Norton, 240 F.3d 1081, 1108-10 (D.C. Cir. 2001) (Cobell VI), but it is also clear that the authority is constrained by traditional doctrinal limits on federal courts that apply in suites against the government, including sovereign immunity and separation of powers.

b. Accordingly, methods that might be unacceptable in a typical trust case, such as statistical sampling, are available here, where I am instructed to strike a more forgiving "balance between exactitude and cost."

c. In these unchartered waters, where the trust is of enormous scope, the trustee of unusual character, and the data affected with such great uncertainty, the law of trusts is a sort of magnetic compass; it cannot be expected to point to due north, or to "map directly" onto this context. Id at 1078.

d. One useful is not very precise pointer provided by case law is that a trustee may not hide behind obscurity that he himself has created. See, e.g., Rainbolt v. Johnson, 669 F.2d 767, 769 (D.C. Cir. 1981)

e. "As to a trustee who fails to keep proper records of his trust it is usually stated that, 'all presumptions are against him' on his accounting, or that 'all doubts on the accounting are resolved against him.'"

f. The rules that identify and govern a breach of the accounting duty for a simple, 25-year trust with a single beneficiary cannot be applied, unaltered, to a 121-year old perpetual trust, managed by civil servants, with rapidly multiplying beneficiaries and a variety of ever-changing assets. Equity seeks "to do justice to all parties, Bollinger & Boyd Barge Serv., Inc. v. The Motor Vessel, Captain Claude Bass, 576 F.2d 595, 598 (5th Cir. 1978) (Emphasis added.)

g. --"its orders are adapted to the exigencies of the case," Taylor v. Sterrett, 499 F.2d 367, 368 (5th Cir. 1974), and it seeks to make accurate evaluations of difficult evidence, not to provide "windfalls" for victims or punishment for wrongdoers. See, Bollinger v. Boyd, 576 F.2d at 598.

9

    h. The trustee's irremediable breach of its accounting duty has unquestionably harmed individual plaintiffs (if not necessarily the plaintiff class): their putative damages claims have been prejudiced by the impossibility of assembling accurate data about the disposition of their assets

These are but a few of the affirmative statements made by the <u>Cobell</u> Court concerning duties to the <u>Cobell</u> Plaintiffs, including those <u>Cobell</u> Plaintiffs descended from persons disloyal to the United States who forfeited all of their land by reason of their treason This same expansive philosophy however is not being accorded by the United States to the Freedmen. The Freedmen are through this objection seeking to prevent the United States from entering into a settlement that will violate the Constitution by continuing racial discrimination against the Freedmen

    For the above reasons, the Freedmen Objectors oppose the Settlement Agreement and respectfully request an opportunity to appear and formally object on the record at the Fairness Hearing

                                                 <u>s/Percy Squire, Esq.</u>
                                                 Percy Squire, Esq (0022010)
                                                 PERCY SQUIRE CO , LLC
                                                 514 South High St.
                                                 Columbus, Ohio 43215
                                                 614-224-6528 Telephone
                                                 614-224-6529 Facsimile
                                                 <u>psquire@sp-lawfirm.com</u>
                                                 Attorney for Putative Class
                                                 Of Freedmen Objectors

## CERTIFICATE OF SERVICE

Plaintiff certifies that a copy of the foregoing was served upon counsel of record, February 14, 2011, via the Court's EFC system.

<u>*s/Percy Squire, Esq.*</u><br>
Percy Squire, Esq. (0022010)

This document was created with Win2PDF available at http://www.win2pdf.com.
The unregistered version of Win2PDF is for evaluation or non-commercial use only.
This page will not be added after purchasing Win2PDF

## IN THE UNITED STATES DISTRICT OF COLUMBIA
## FOR THE DISTRICT OF COLUMBIA

ELOUISE PEPION COBELL, et al on their
own behalf of all persons similarly
situated,

          Judge Hogan

        PLAINTIFFS,

vs.

          Civil Action No. 96-1285 (TH)

KEN SALAZAR,
Secretary of the Interior, et al.

        DEFENDANTS

## REPLY TO PLAINTIFFS' BRIEF IN OPPOSITION TO MOTION TO INTERVENE FILED BY PROPOSED INTERVENORS THE HARVEST INSTITUTE FREEDMEN FEDERATION, LLC, ET AL.

The Opposition to the Motion of Harvest Institute Freedmen Federation, LLC, et al, (hereinafter, "HIFF" or the "Freedmen"), to Intervene entirely misses the point of the motion. The motion to intervene in this action was filed for the sole purpose of objecting to the settlement. The procedural device of a motion under Fed. R. Civ. P. 24 was utilized for the reason there was no other means known to the undersigned of registering an objection to the settlement without first attaining filer status within the Court's electronic filing system. Now that filer status has been attained, HIFF, et al. are in a position to comply with Paragraph 13 of the Order preliminarily approving the settlement which provides in pertinent part:

> 13. ORDERED that a Class Member who wishes to object to the fairness, reasonableness, or adequacy of the Settlement or the amount of attorneys' fees and incentive payments for Class Representatives, costs, and expenses, shall file his or her objection(s) with the Court and serve such objection upon the parties within 120 days of the date of this Order. Such objection shall set forth specific reason(s), if any, for the objection, including legal authorities that the Class Member wishes to bring to the Court's attention, evidence that the Class Member wishes to introduce in support of the objection, grounds to support his or her status as a Class

Member, and whether the Class Member intends to appear at the Fairness Hearing  Class Members may act and appear pro se or through counsel employed at their personal expense  Class Members may appear at the Fairness Hearing to object to any aspect of the fairness, reasonableness or adequacy of this Agreement or of the Settlement. It is further...

Docket No. 3667, December 21, 2010 Order.

Under Docket No. 3667, Class members who desire to object to the Settlement "may act and appear pro se or through counsel employed at their personal expense." HIFF, et al. represent class members who desire to object to the settlement. Accordingly, reliance on Fed. R. Civ. P. 24 was a mere procedural mechanism to enable these objectors to lodge their objection. Whether they qualify as intervenors under Rule 24 is secondary to the real underlying issue, the fact that approving this settlement will perpetuate past racial discrimination against the Freedmen and the Freedmen should be made members of the settlement class

The Opposition's feigned inability to comprehend the basis for the Freedmen objections is both insulting and ironic given the plight of the Cobell Plaintiffs themselves with unlawful discrimination based on race or ethnicity. There is no mystery surrounding the grounds for the Freedmen claims or their entitlement to be made class members. Simply stated, the Individual Indian Money Accounts that are at issue in this action were, according to the United States Court of Appeals for the District of Columbia, Case No. 08-5500, p 2, "proceeds of various transactions in land allotted to individual Indians under the Dawes Act." (Emphasis added) The Freedmen here contend that by reason of racism and misfeasance by United States governmental officials and in some unfortunate cases, the Tribes themselves, the Freedmen either did not receive allotments or despite having received allotments, the land was taken from them in violation of the trust restrictions applicable to it. In point of fact, Exhibit C to the HIFF/Freedman objection,

2

Exhibit A here, is documentary proof related to George Curls, Sr., the grandfather of HIFF Objector Leatrice Tanner-Brown. These documents established that George Curls, Sr. is listed on the rolls of the Cherokee Freedmen. George Curls, Sr. received an allotment under the Dawes Act. Despite having received an allotment, Mr. Curls, an uneducated former slave, had his land taken in violation of restrictions against alienation and despite being on the Cherokee Freedmen rolls, never received an Individual Indian Money Account as was his right under the 1866 Treaty, given that he was to receive the same treatment as members of the Cherokee Tribe.

This entitlement to civic parity was recently reaffirmed by the District Court of the Cherokee Nation. See, Exhibit B.

The facts concerning Leatrice Tanner-Brown are representative of all individual Freedmen descendants who comprise the HIFF. These individuals object to the settlement here for the reason their ancestors, in many instances slaves, did not receive or were swindled out of allotments resulting in the failure to have Individual Indian Money Accounts established. To the extent that members of the Five Civilized Tribes, persons who took up arms against the United States, received allotments and proceeds from tribal lands which led to the creation of Individual Indian Money Accounts, are now the recipients of governmental efforts to correct historic injustices against them, it is inequitable as well as racially discriminatory to deny equal protection and treatment to the descendants of their slaves who were actually harmed worse than these former Confederate Individual Indian Money Account holders. The Freedmen have been discriminated against by both the Five Civilized Tribes and the United States. The settlement perpetuates this discrimination by only correcting the injustice to the Five Civilized Tribes.

3

The tone of the Opposition in light of this historic reality is quite disappointing. Anyone familiar with history of the Freedmen is aware of the despicable treatment they have received. Approving this settlement in its current form will once again constitute another betrayal by the United States of the interests of loyal Black Americans in order to satisfy the avarice of persons such as the drafters of the Opposition.

The claim that the Freedmen have received their day in court is absurd. Every court that has addressed the plight of the Freedmen has sidestepped the issue on threshold grounds, i.e. statute of limitations. No court has explained how the Five Civilized Tribes are entitled to trust beneficiary status, but not their slaves who were promised civic parity. The objection is nothing but another illogical racially suspect argument.

The HIFF respectfully objects to the Settlement and requests the opportunity to appear in opposition to the settlement at the Fairness Hearing.[1]

*s/Percy Squire, Esq.*
Percy Squire, Esq. (0022010)
PERCY SQUIRE CO., LLC
514 South High St
Columbus, Ohio 43215
614-224-6528 Telephone
614-224-6529 Facsimile
psquire@sp-lawfirm.com
Attorney for Putative Class
Of Freedmen Objectors

---

[1] See, Angie Deboe "And Still Waters Run – Betrayal of the Five Civilized Tribes" (1972) Princeton University Press – also detailing how Freedmen were kept off of the Dawes Rolls and swindled out their right to allotments – "A crushing analysis of the corruption moral depravity and criminal activity that underlay white administration and execution of the allotment policy." The Opposition takes up where the former administration left off.

## CERTIFICATE OF SERVICE

Plaintiff certifies that a copy of the foregoing was served upon counsel of record, February 15, 2011, via the Court's EFC system.

<em>s/Percy Squire, Esq.</em><br>
Percy Squire, Esq. (0022010)