**EDDIE JACOBS**
P.O. Box 2322
Oklahoma City, OK 73101
(405) 524-4215

**RECEIVED**

APR 1 3 2011

CHAMBERS OF
THOMAS F. HOGAN

April 9, 2011

Indian Trust Exclusions
P.O. Box 9419
Dublin, OH 43017-4519

Re:    Request to be declared an Exception to all Cobell classes; or alternatively
       Request to be excluded from *Cobell v. Salazar,* Case number 1:96cv01285;
       Request to speak at Fairness Hearing
       Full Name: Eddie Jacobs and Johnny Jacobs; Telephone number (405) 524-4215;
       Social Security Number XXXXX 1082                                    ;
       IIM account number(s)  XXXXX 0396                                   .

To:    Indian Trust Exclusions

The Indian Trust Settlement Notice received in the mail states, "If you are a member of the
Historical Accounting Class: You **cannot** exclude yourself." However, I believe I am not a
member of the historical accounting class or Trust Administration class because I filed my
administrative claim prior to June 10, 1996. The complaint states, "exclusive of those who prior
to the filing of the Complaint on June 10, 1996 had filed actions on their own behalf stating a
claim for historical accounting." Therefore, pursuant to the original and amended complaint, I
qualify as an exception to both the historical accounting and trust accounting classes. Therefore,
I should be automatically excluded from both classes.

On March 12, 2011, I mailed my Comments and Questions Regarding the Cobell Class Notice
and Settlement, but to date I have not received an answer to my questions.

I do not believe it is necessary to exclude myself or opt out because I am an exception to the
Cobell classes. However, if I am not judged to qualify as an exception to the classes, I request to
be excluded from both classes in the *Cobell v. Salazar,* Case number 1:96cv01285.

In my March 12, 2011 letter, I requested permission to speak at the fairness hearing and I
reassert my request for permission to speak at fairness hearing.

If the court decides that I should not be allowed to speak on my own behalf, I request that I be
allowed to speak on behalf of Indian allottees who I represented in the Oklahoma Indian Land
and Mineral Associated Nations (OILMAN) and Oklahoma Indian Mineral Owners Association
(OIMOA). In 1983, I spoke on behalf of Indian allottees in the *Kauley v. U.S.* litigation, a
federal court action filed on behalf of a class of Oklahoma allottees with interests in oil and gas
leases.

The Indian allottees elected me to speak for them and I feel it is my duty to speak for them at the Cobell fairness hearing. Many of the allottees I represented while chairman of these committees are now deceased, but I still have a duty to their heirs.

I also represented Indian allottees for 12 years when I served on the Secretary of Interior's Royalty Management Advisory Committee, which later became the Royalty Policy Committee. My duty to Indian allottee mineral owners has not ended and I request permission to speak on their behalf, if I am not allowed to speak for myself individually.

I respectfully request that you please advise:

- When my request to speak at the fairness hearing is granted.
- When I have been declared an exception to both classes by the court.
- When my exclusion from both classes has been accepted.

Respectfully submitted,

*Eddie Jacobs*

Eddie Jacobs                                          Date: __4-9-11__

CC:   Hon. Thomas F. Hogan, United States District Judge, District of Columbia
       Clerk's Office, United States District Court, District of Columbia
       Cobell Class Counsel
       Robert E. Kirschman, Jr., Dept of Justice, Civil Div.

P. O. Box 1781
Sapulpa, OK 74067
April 5, 2011

Clerk's Office
United States District Court
For the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

**RECEIVED**

APR 1 3 2011

CHAMBERS OF
THOMAS F. HOGAN

Re: Cobell V. Salazar  1:96cv01285

Dear Clerk:

My objection is with the time period October 25, 1994 and September 30, 2009 used for the Historical Accounting Class and from approximately 1985 to September 30, 2009 for the Trust Administration Class. The Settlement is not fair, reasonable and adequate.

### Why not use the date, when an IIM account begins?

The time period being used (October 25, 1994 and September 30, 2009) does not include the time period, when the IIM account was first opened. Prior to this time large oil and gas royalties were deposited and restricted lands were being sold. They should begin with the date, when the IIM account was opened in the beginning. The IIM account holder has spent their money prior to October 25, 1994 and September 30, 2009. The heirs will not benefit from the lawsuit.

The **period prior to** October 25, 1994 and September 30, 2009 and from approximately 1985 to September 30, 2009 **is the basis for the lawsuit** and **is not included in the calculation** being used to distribute the Indian Settlement.

They want to take an average of the ten highest transactions, during October 25, 1994, and September 30, 2009 for the Historical Accounting Class Members and the Trust Administration Class Members (from approximately 1985 to September 30, 2009), which will end up being a drop in the bucket. The lawyers will end up being millionaires, because of no accountability, since the establishment of the IIM Department, under the Bureau of Indian Affairs.

### Today very few Native Americans own mineral rights.

Native Americans were encouraged to sell half of their mineral rights, when they sold the surface. The Solicitor should have advised the Indian landowner, according to federal law the Indian landowner does not have to sell any mineral rights, when they sell restricted land. The Solicitor was suppose to look out for the best interest of the restricted landowner not the buyer.

APR 1 7 2011

**RECEIVED**

APR 13 2011

CHAMBERS OF
THOMAS F. HOGAN

To : Clerks Office    Corbell v Salazar
NO. 1:96 cv 01285  TFH

George Campbell & Marie Brien were my grandparents they were allotted 80 acres by the President Herbert Hover, in the late 1800 hundreds. It was to be handed down from generation to generation, they were members of the Iowa Tribe. They passed it was handed down to their Children my father included. My brothers signed their Share to me, because I paid for my father funeral with the money he had left me. I was about 16 yrs old when this happened. I sold those shares to my Aunt and Uncle as the wanted to keep it in the Campbell family & my grandfathers decendants. My Aunts have received all Crop money from their 80 acres which has helped raise their families. I was told that you could not sell trust land but the description on the original document.

They now what to sell the land, but there are many generation income including my childrel & grandchildren this land will alway provide a safe place on the reservation for them to come to and to earn a living if some thing should happen. My Aunts are still receiving the crop money which should be. To help take care of them.

**Received**
**Mail Room**

APR - 8 2011

Angela D Caesar, Clerk of Court
S District Court District of Columbia

I have requested them not to sell this land as they requested of me years ago when they wouldn't let me move home to farm it. That's why I sold it back to them to build another home. So I sold my generation out, but there is a next generation left and generation after, along with this becomes all mineral & water rights. There is a cemetary upon this ground the Cambell cemetary where my Great Grandfather Murry Campbell was buried.

Our Tribal Exec Committee has claimed their sovereignty from the United States Goverment we chose to keep are rolls open we have 4012 member as I understand it. In our Casinos we have State gaming compact. I do thank who it responable for this as it helps with a lot of programs.

I am getting older myself. Every time I say I'm Native I feel that I am punished if it by my tribe. I went to the casino, they said the had a complaint on me, but would not tell what is was. So I really dont know if it existed I wanted to cepolize to the Customer. I knew what the compland was about it think. It was because of the Computers being installed. I did not do this.

I stand in protest of computer because they are going to be the ruin of this nation

and the ones that are still living.

I back the union as they help support S.S. for elderly. We do not need machines to take away jobs. We need to creat jobs in this Country. The U.S. Federal Reserve they print the money so they are responsible for whats happening 6 people. There is no reason for a dificit they can pay it off instead of bring it back on the people. The value of the dollar is what you make it and should not be based on gold. as gold is a mineral from the earth.

Maybe thats why I was punished by my own tribe because I said I was native they pressed charges against me and put a criminal trespass against me in tribel court. I am not a criminal. Because Im native does not mean Im federal. And because I protect computor and on line useage and so did some of our customers. But the management has had complaints on them by customers but you don't see a criminal charge against them.

The WWW stands for 666 in Hebrew, to me that is not a good thing. As soon as this happen a ware will be with Isreal and they have 52 nuclear bombs. four computors have also been breaded. There is no beast it is a church Catolic to be exact in my belief.

P.S. Im Confused as you can see. Mary Nauman I don't know who Corbell & Salazon are.

over

I am 56 yr. old and my tribe keeps putting me in jail and I think it because I stand against ticket in ticket out & any thing computerized that has to do with on line or even not on line they are bad for eye sight.

I am community minded and we need to create jobs. We are a nonprofit Organation.

I guess anti socialist is what computers cause also. The federal Gov. would not pay enough our land is not for sale.

Please Contact
Tribal Office At
785.595.3258 To
Confirm Document   Mary Jauman
on Grand Father Land.

TERESA J. PRICE
NOTARY PUBLIC STATE OF KANSAS
My Appt. Exp. 1-30-2013

Signed on this 1st day of april 2011

Teresa Price

RECEIVED

APR 13 2011

CHAMBERS OF
THOMAS F. HOGAN

03/25/2011                                   DOB 10/22/1988

Cobell v. Salazar  1:96 cv 01285 TFH

Toccara Marie Finch-Pittman 22 years old

1526 Big Bend Rd Apt 101

Waukesha, WI 53189  Roll #19046

~~Toccara Lith Finch~~

I feel that I should be included in this settlement.
My view on the settlement is postive. We
as native americans have been waiting for years
for compensation for years of Mismanagement of funds.
I was born tribal. My father Aubrey Finch III was
not present growing up. I am his 1st born child.
As a small child up until now I recently didn't know
him or his sister, or family. I got in contact with
them in the year 2008. That's when things for me changed.
I recieve yearly payments of 1,200 currently but I
never recieved my trust fund as a child (that was set up) which is
17 years of trust fund money. That has set me back so
much. My aunt Cheri finch her son's Julio Watts recieved
his and it was over 16,000. He had a way to buy a car, home,
and invest in his future. In regards to my father he has had
4 or 5 more children. All of these children are or have
trust account funds set up. The question I ask is who will
take care of me? Fiancially things are challenging but with
faith, determination, and willpower things are surely to come together.
Look on Back. Question: Will I recieve anything?

Oneida Nation of Wisconsin
Cheri Finch   Married now (Cheri Dickens)
Auburey Finch III   Married now (unknown alias)

note: Oneidans orginate in Oneida, N.Y.
note - I am giving names and information that I know
to the best of my knowledge. Research will be helpful. There are
many things I still don't know.

Thanks Much

03/25/2011

JOHN D. BARNETT 25/432
MCCI - SMU - D#2
336 REDEMPTION WAY
MCCORMICK, SC   29894

RECEIVED
APR 12 2011
CHAMBERS OF
THOMAS F. HOGAN

CLERK'S OFFICE
U.S. DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
333 CONSTITUTION AVENUE, N.W.
WASHINGTON, DC   20001

TFH

RE: COBELL V. SALAZAR, CASE F(1:96CV01285), INDIAN TRUST SETTLEMENT

DEAR CLERK:
I AM IN RECEIPT OF A "INDIAN TRUST SETTLEMENT CLAIM FORM" (AND NOTICE FROM DIRECTOR OF INFORMATION ABOUT 3.4 BILLION INDIAN TRUST SETTLEMENT) REFLECTING ADDRESS: INDIAN TRUST SETTLEMENT
        P.O. BOX 9577
        DUBLIN, OH
           43017-4377

I AM A ENROLLED MEMBER OF THE SANTEE SIOUX TRIBE OF NEBRASKA, MY QUESTION IS — IS DUBLIN OHIO ADDRESS LEGIT? , IT'S ODD THEY WOULD BE USING A P.O. BOX RATHER THEN COUNSEL ADDRESS;   =/
SURELY YOU CAN UNDERSTAND MY CONCERN DUE TO PERSONAL INFORMATION THE FORM REQUESTED TO BE FILLED IN.
CAN YOU PLEASE CONFIRM/VERIFY THE DUBLIN PO BOX ADDRESS IS LEGIT AND IN CONNECTION WITH THE SETTLEMENT.

ALSO, HAS THE ADDRESS HEARING ALTERED FROM JUNE 20, 2011?

THANK YOU FOR YOUR TIME & CONCERN, YOUR PROMPT REPLY IS REQUESTED AND HIGHLY APPRECIATED.

                                    SINCERELY
                                    John D. Barnett

APR - 7 2011

15 March, 2011

United States District Court

Class action Settlement Agreement

Cobell vs Salazar, Secretary of Interior

Re: Civil Action No. 1:96cv01285 – OBJECTIONS

Objection I   Attorney's Fees

All fees, cost and expenses for Class Counsel, Class Representatives including but not limited to any and all other fees and costs arising from the continued findings and filings in relation to this case should be paid from a fund supplied and paid for by an entity of the Federal Government of the United States and separate from funds allocated to IIM Accounts in this "3.4 Billion Dollar Trust Settlement". The funds break down into a drop in the bucket, a one-time payment of $1,000. per account, in comparison to a century of gross breeches of trust by the United States against the Peoples (Indians) of the Tribes (Nations) with whom treaties were made, and that the 3.4 billion dollars be paid in its entirety to the individual IIM Accounts, as it is a national insult that the already below poverty level Peoples (Indians) should bear the costs for the recovery of the aforementioned breeched trusts.

OBJECTION II   Releases

This one time settlement agreement (3.4 billion dollars resulting in an actual payment of only $1000.00 to each individual IIM account, and 99 million to the attorneys and others) SHOULD NOT "release, waive, and forever discharge the United States, any department, agency or establishment, and any officers, employees or successors of the United States (defendants), as well as any contractor, including any Tribal contractor (collectively the "releases") from obligation to perform a historical accounting and forever be barred and precluded from prosecuting any and all claims and/or causes of action for any and all historical  accounting claims, however characterized whether under common law, at equity or by statute. The above mentioned monies in no way constitute a settlement of this magnitude.

OBJECTION III   Land Consolidation



It would better serve the individual Nations (Tribes), for the enactment of laws and monies provided for Tribally based programs/projects that keep the fractionated lands within the Nation's (Tribe's) possession so as not to further deplete the land bases of each individual Nation (Tribe), whose lands have already been significantly diminished by the original "breach of trust" by the United State as as earlier described within this document.

Signed this __4__ day of __April__ ,2011

Name _Resha Denise Barrier_

Address _11856 Balboa Blvd #349_

_Granada Hills, CA 91344_

IIM Account No __304U023875__

Indian Trust Exclusions

 P.O. Box 9419

Dublin, OH 43017-4519

Re: *Cobell vs Salazar*, Case No 1: 96cv01285

To Whom It May Concern:

I respectfully **request exclusion** from the Trust Administration Class portion of this settlement.

Signed this ____4____ day of ___April___, 2011.

Name _Kesha Denise Barrier_

Phone Number _818-366-3331_

IIM Account No _3C4UC.23875_

SS# _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_

Signature _Kesha Denise Barrier_

**EDDIE JACOBS**
P.O. Box 2322
Oklahoma City, OK 73101
(405) 524-4215

March 12, 2011

Clerk's Office
United States District Court
For the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

Cobell Class Counsel
607 14th Street, NW
Suite 900
Washington, DC 20005-2018

Robert E. Kirschman, Jr.
Dept of Justice, Civil Div.
P.O. Box 875
Ben Franklin Station
Washington, DC 20044

Indian Trust Settlement
P.O. Box 9577
Dublin, OH 43017-4877.

Re:   *Cobell v. Salazar,* Case number 1:96cv01285;
      Name: Eddie Jacobs; Address: P.O. Box 2322, Oklahoma City, OK 73101;
      Telephone number (405) 524-4215;  IIM Account Number(s) xx x x x x 0396

      Eddie Jacobs' Comments and Questions Regarding the Cobell Class Notice and
      Request for Permission to Speak at Fairness Hearing.

To:   The United States District Court, Cobell Class Counsel, and Robert F. Kirschman, Jr.,
      Department of Justice, and Indian Trust Settlement:

Attached are: "Eddie Jacobs' Comments and Questions Regarding the Cobell Class Notice and
Request for Permission to Speak at the Fairness Hearing" and referenced attachments.

Notice question number 9 states, if you are not sure whether you are included in one or both
Classes you may write with questions to Indian Trust Settlement, P.O. Box 9577, Dublin, OH
43017-4877.

I believe I am identified as an exception to the class as defined in the notice's question number 7.

Eddie Jacobs' letter to U.S. District Court, Plaintiffs' Counsel, Robert E. Kirschman, Jr., DOJ,
Indian Trust Settlement - Eddie Jacobs' Comments and Questions Regarding the Cobell Class Notice and Request
for Permission to Speak at Fairness Hearing
Page 1 of 2

I ask that Indian Trust Settlement officials please respond to my questions as soon as possible so I may elect to either exclude myself or if I am an exception, be allowed to continue with my administrative claim **immediately**.   You may contact me at the address listed above.

Respectfully,

*Eddie Jacobs*

Eddie Jacobs

Cc:    Hon. Barack Obama, President
       Hon. Joe Biden, Vice President
       Hon. Thomas F. Hogan, United States District Judge
       Hon. Daniel Akaka, Chairman, Senate Committee on Indian Affairs
       Hon. John Barrasso, Vice Chairman, Senate Committee on Indian Affairs
       Hon. Doc Hastings, Chairman, House Committee on Natural Resources
       Hon. Don Young, Chairman, House Indian and Alaska Native Affairs Subcommittee
       Hon. Edward Markey, Ranking Dem. Member, House Committee on Natural Resources
       Hon. Daniel Inouye, Chairman, Committee on Appropriations
       Hon. Thad Cochran, Vice Chairman, Committee on Appropriations
       Hon. John McCain, Senate Committee on Indian Affairs
       Hon. Tom Coburn, Oklahoma, Senate Committee on Finance
       Hon. Dan Boren, Oklahoma, Committee on Natural Resources
       Hon. James M. Inhofe, Oklahoma, Committee on Environment and Public Works
       Ross Swimmer, Former Special Trustee, Office of Special Trustee, DOI
       Donna Erwin, Acting Special Trustee, Office of Special Trustee, DOI
       Chiefs of Oklahoma's Five Civilized Tribes
       Mark Kester Brown, Attorney

Attachments:  "Eddie Jacobs' Comments and Questions Regarding the Cobell Class Notice and Request for Permission to Speak at Fairness Hearing (21 pages) with following attachments:
       October 16, 1996 letter from Edward Cohen (3 pages)
       December 19, 2005 Memorandum Opinion, pages 1, 7-8 (3 pages)
       April 28, 2008 Transcript, Exhibit No. 2, pages 5-9 (5 pages)
       August 30, 2008 letter from Eddie Jacobs to Plaintiffs' Counsel (14 pages)
       September 18, 2008 "Defendants' Petition for Leave to Take Interlocutory Appeal and Response to Plaintiffs' Petition," pages 1, 17 (2 pages)

Eddie Jacobs' letter to U.S. District Court, Plaintiffs' Counsel, Robert E. Kirschman, Jr., DOJ,
Indian Trust Settlement - Eddie Jacobs' Comments and Questions Regarding the Cobell Class Notice and Request for Permission to Speak at Fairness Hearing
Page 2 of 2

## EDDIE JACOBS' COMMENTS AND QUESTIONS
## REGARDING THE COBELL CLASS NOTICE AND
## REQUEST FOR PERMISSION TO SPEAK AT THE FAIRNESS HEARING

I received notice from the United States District Court for the District of Columbia entitled, "Important information about the $3.4 billion Indian Trust Settlement." I offer the following comments and questions regarding the notice.

It is hard to know where to start after so many years of reaching out to the court, trying to be heard and being denied by the court, my government trustee, and plaintiffs' counsel. Finally, the Cobell Settlement Agreement is on a fast track after 15 years of stalling in the court. Congress approved the settlement on November 30, 2010, President Obama signed the Claims Resolution Act of 2010, which included the Cobell settlement on December 8, 2010, and Judge Thomas F. Hogan signed the "Order Granting Preliminary Approval" on December 21, 2010.

It is difficult to separate historical and administrative claim issues, but the notice requires IIM beneficiaries to do so. According to the notice, I could be identified as a member of both the historical accounting class and the trust administration class. However, since I filed my administrative claim prior to the Cobell class action, I believe I am an exception to both classes and have long adhered to this belief.

The notice question 1 asks why did I get this notice? The notice states, "You received this notice because Interior Department records show that: (a) you are now or have been an Individual Indian Money ("IIM") account holder, or (b) you have an individual interest in trust land ..."

While it is true that I am an IIM account holder and have an individual interest in trust land, I was not one of the people who sued in this case. The notice states, "The people who sued—and all the Class Members like them—are called the Plaintiffs." "One court resolves the issues for everyone who remains in the Class."

The notice states individuals cannot exclude themselves from the historical accounting class. I never wanted to be included or believed I was in the Cobell class, but Department of Interior officials arbitrarily made the decision that I was a class member. Their decision that I was a class member has meant I could not pursue my administrative claim first made in 1987 and reaffirmed after the 1994 Trust Reform Act was enacted, before the Cobell class was formed. I have never stopped trying to settle my claim during all the years thereafter without success because no one in the Department of Interior would talk to me about my case. (See enclosed letter from Edward Cohen, dated October 16, 1996, which verifies my statement).

United States Justice Department attorneys, Cobell class counsel, the United States Congress, and even the President of the United States appear to believe the settlement is grand, even noble. The federal government is perhaps the most pleased because the settlement allows the federal government, our trustee, to admit no wrong doing over the past 124 years when their trust duty first began.

RECEIVED
Mail Room

MAR 1 4 2011

Angela D. Caesar, Clerk of Court
US District Court, District of Columbia

Some may view the settlement as a way to compensate all American Indians for all the wrongs ever committed to all Indians. However, this case is not about all Indians or even tribes, but is about only the select few who are beneficiaries of individual Indian money accounts or those who own trust or restricted property. The settlement is a bargain for the federal government and offers only a small fraction of what is actually owed to individual Indian IIM beneficiaries. Some or maybe many of our Indian people agree with the settlement. I do not. I believe it is unfair to the hundreds of thousands of IIM beneficiaries who had no voice in the court.

Paragraph 3 states, "This Settlement does not relate to certain historical claims or any future claims of Class Members." My question is which historical claims does the settlement not relate to? Question 28 in the notice states, "By law, you cannot exclude yourself from the Historical Accounting Class, if you are a member. You can only exclude yourself from the Trust Administration Class." These two statements appear conflicting and need clarifying.

Notice number 4 states, "The federal government denies all these claims. It says it has no legal responsibility for these claims and owes nothing to the Class Members." The government never looked at paper ledger records so they can make this statement. However, they must know they owe many billions to deceased and older IIM beneficiaries. Sadly, with passage of this settlement agreement, they will never have to take responsibility for all these losses.

The federal government, our trustee states, "The Obama administration is continuing to move forward on its agenda to honorably and responsibly address long-standing injustices in Indian Country," said Secretary Salazar. These statements are contradictory because our federal government is our trustee and defendant in this case. How can it act honorably, yet deny all claims and take no legal responsibility?

The United States government has provided better service and countless billions more dollars to foreign countries and the banking and the auto industries than to American Indian IIM account beneficiaries, to whom they actually owe money. The government squandered Indian beneficiaries' money and now have dishonorably agreed to a settlement with plaintiffs counsel, then asked Congress to approve the $3.4 billion dollar settlement.

Congress should not have to pass a law to award us our own money, but since it has all been taken through the years by the federal government, they must now ask taxpayers to pay IIM beneficiaries what they owe us. Some American people do not understand this is not American Indians' fault. Some believe passage of the settlement is a give away to Indian people, while others want to believe they are helping all Indians. Nothing could be farther from the truth. I want to set the record straight. The money Congress agreed to appropriate for payment of the Indian Trust settlement actually belongs to individual Indians. The per capita payments set out for each IIM beneficiary in the settlement will not benefit them more than a few days' groceries. There is no just compensation in the settlement.

Paragraph 5 asks why is there a settlement? The court answers, "The Settlement is an agreement between the Plaintiffs and the federal government." I believe the settlement is between the named plaintiffs, their attorneys and the federal government, but not the class members.

Paragraph 5 further states, "The parties wish to resolve their differences and realize that many Class Members are elderly and dying and need to receive compensation." To me, this means the named plaintiffs and their attorneys want to receive compensation and the government wants to be free from this case without accepting responsibility for its fiduciary duty to IIM beneficiaries. My answer to this statement is class members will never be adequately compensated and they have been elderly and dying years before this litigation began.

"Class Representatives and lawyers representing them believe that the Settlement is reasonable under the circumstances." Undoubtedly they would like to believe that reasonableness is the motivation, but the real motivation appears to be for their gain at the expense of unknowing class members in this case. Judge Robertson stated in the April 8, 2010 transcript, "I have not ruled that it is fair and reasonable to members of the plaintiff class. That is a formal decision, and is yet to be determined."

Paragraph 6 asks who is part of the settlement and defines who will share in the settlement by dividing the classes into historical accounting class and trust administration class. I find it difficult to separate class members from class claims.

For instance, Paragraph 4 defined claims as follows:
"Fund Administration Claims state that the federal government violated its trust duties and mismanaged individual Indian trust funds." "Land Administration Claims state that the federal government violated its trust responsibilities for management of land, oil, natural gas, mineral, timber, grazing, and other resources."

The notice defines "historical Accounting class members" as members who date back to 1985 and continues through September 30, 2009. It is error to allow this country to define our people without mentioning historical IIM account holders prior to 1985.

I disagree with description of allotments in section IV of the settlement agreement which spells out defendants trust obligations to IIM account beneficiaries. Number 17 states, "Such allotments date from the era, lasting until 1934, when it was the policy of the United States to break up Indian tribes and tribal lands." More accurately, the General Allotment Act of 1887 initiated the policy of Indian land allotment by authorizing the President to allocate plots of land on Indian reservations and Indian Territory, to Indian individuals and families. Allotments were held in trust by the government for American Indian recipients. This meant, in part, that the land could not be sold by an individual and was exempt from state property taxation.

IIM accounts were created when the government first became our trustee. When it became apparent there were natural resources on our land, the government decided we were non-competent to handle large monetary amounts. The term non-competent has nothing to do with our degree of mental capacity. The term allowed the government to become our trustee so we could hold land and resources in our name under the trust. They opened IIM accounts in our individual names, took substantial amounts from our accounts, and failed to keep good records. However, they did keep some records and I was fortunate to acquire my father's original records and can prove my claim is accurate. Defendants won't admit to their mistakes without records to prove otherwise. Cobell named plaintiffs had no records.

If an individual is in the historical class and not allowed to exclude themselves, is that person allowed to complain about fund and land administration claims in the fairness hearing?

Paragraph 7 defines exceptions to the classes as follows: "The Historical Accounting Class does not include individuals who filed a separate lawsuit before June 10, 1996, against the federal government making a claim for a complete historical accounting." The December 7, 2009 settlement agreement states, "(exclusive of those who prior to the filing of the Complaint on June 10, 1996 had filed actions on their own behalf stating a claim for a historical accounting). The notice states "lawsuit" and the settlement states "actions."

"The Trust Administration Class does not include individuals who filed a separate lawsuit or who were part of a certified class in a class action lawsuit making a Funds Administration Claim or a Land Administration Claim against the federal government before December 10, 2010."

I filed an administrative claim or action in 1987, reaffirmed it after passage of the 1994 Trust Reform Act, and have continued to pursue it vigorously through these many years of denial by defendants and plaintiffs' counsel as evidenced through many letters and documents I filed in the present case. I wrote numerous letters and made statements (both oral and written) to the Senate Committee on Indian Affairs. I wrote letters to the House Resources Committee, various other members of Congress, and to tribal officials who know of my claim.

My questions regarding notice paragraph 7: Is an administrative claim considered a separate lawsuit? Is my administrative claim or action considered a complete historical accounting? Do I fall under the exception to the settlement? May I pursue my father's and my administrative claim filed in 1987 and reaffirmed after the 1994 Indian Trust Reform Act as originally began? If I am identified to be an exception to the Cobell class, can the DOI Special Trustee begin my reconciliation/accounting immediately?

My father's and my claim is verified by documents dating back to 1912. Department of Interior officials and plaintiffs' counsel were both provided copies of my documents and they are part of DOI records. I attempted to get them entered into the court's records but the court denied them. It would please me to know that Judge Hogan has knowledge of all I have tried to do to get my claim recognized and repaid before this settlement is approved or denied.

There may be many others who have tried to get relief just as I have, but I do not have this knowledge. I know I am at least one exception to this Cobell class action. The court referred to me as one in 500,000 when I filed an objection to plaintiffs' counsels' fees. (See December 19, 2005 Memorandum Opinion, p. 1, 7-8 enclosed).

My next question about number 7 is: If an individual falls into the paragraph 7 exception, is it necessary to opt out? I do not have assets to hire knowledgeable attorneys for which I have to pay out of my pocket. I will not be repaid like the named plaintiffs in this case. I am on my own and would like written assurance and protection from the court for others and myself with administrative cases such as mine, which can be verified pursuant to the 1994 Trust Reform Act. I want assurance that others and I can pursue our administrative claims. I have been struggling

with my claim for 24 years already. I hope this court can somehow assure others and me that our claims will not be denied. Should others or I not fall into the exception defined in notice paragraph 7, what relief remains for our verified historical account claims?

Question 9 attempts to answer, "If I'm not sure I'm included in the settlement." I have always contended that I should never have been included in the Cobell class action because I filed my administrative claim long before Cobell was filed. It was Department of Interior official Edward Cohen who told me the DOJ decided I was a plaintiff in the Cobell lawsuit, not the court. No one in the DOI would talk to me about my case after Cobell was filed. (See enclosed copy of Edward B. Cohen's October 16, 1998 letter).

I have endured my government trustee's silence about my case since 1996, with one exception when Ross Swimmer and Donna Erwin, OST officials said they were ready to reconcile my claim in 2006, but plaintiffs' counsel would not release me from the case. There was nothing fair about that, and now the notice states, historical class individuals cannot exclude themselves from the class, another injustice.

In the April 28, 2008 transcript (partial) attached hereto, Mr. Gingold stated, "There's no beneficiary of which we are aware who has had the advantage of accounting to determine what individual losses may be. We don't believe Mr. Jacobs or anybody else can do that."
If Mr. Gingold and plaintiffs' counsel didn't believe I could verify my claim, why didn't they release me and find out? What was their purpose of holding me in a class, which would only delay my claim?

Notice paragraph 9 states, "If you are not sure whether you are included in one or both Classes or you are unsure if the federal government has your current address, you should call toll-free 1-800-961-6109 with questions or visit www.IndianTrust.com. You may also write with questions to Indian Trust Settlement, P.O. Box 9577, Dublin, OH 43017-4877."

I have lost all trust in speaking with plaintiffs' counsel or government representatives so I will not call the 800 number. Therefore, I am writing this letter with my comments and questions. Will someone provide written answers to my questions?

Question 10 asks what does the settlement provide and gives answers based on which fund you think you might be included.

The $3.4 billion settlement figure is significant, but this amount does not nearly cover losses to historical IIM accounts and only a portion of this amount will go directly to IIM beneficiaries. The December 7, 2009 settlement agreement states, "The $1,412,000,000.00 payment represents the maximum total amount that Defendants are required to pay to settle Historical Accounting Claims, Funds Administration Claims, and Land Administration Claims." Additionally, "Trust Land Consolidation Fund" shall mean the $2,000,000,000.00 allocated to Interior Defendants and held in a separate account in Treasury for the purpose of acquiring fractional interests in trust or restricted land and such other purposes as permitted by this Agreement and applicable law."

So what sounds like a huge settlement for Indian beneficiaries does not include the $2 billion settlement figure allocated to defendants for land consolidation? Unfortunately, most of this sum will likely never be paid to class members but will revert to the treasury after 10 years.

Out of the $1.512 billion to be awarded to class members, add the cost of administering and implementing the settlement, which could include millions or even a billion. Add to this cost, the amount that will be paid to class counsel, who is asking an award of $223,000,000, plus up to $12 million for work past December 7, 2009. This amount for attorneys' fees was not in the original settlement or what congress and President Obama agreed to when they passed legislation for the settlement.

I understand Senator John Barrasso and others were concerned about attorneys' fees for the plaintiffs' lawyers coming directly from the settlement amount, which in all fairness should be paid only to Indian beneficiaries. Plaintiffs' attorneys agreed to payment for litigation, between a range of $50 million to $99.9 million. Why should class counsel be awarded more fees when they already agreed to these terms and Congress agreed to this amount? IIM beneficiaries aren't getting a second chance to come back and argue for more money unless you are one of the named plaintiffs. I understand Senator Dorgan referred to their request for more attorneys' fees, a "profound disappointment."

I objected to attorneys being paid once before IIM beneficiaries got one red cent and I object again. (See December 19, 2005 Memorandum Opinion where the court cites my sole objection on pages 7-8 enclosed). I believe in attorneys being paid for their work at a reasonable rate. My objection was that attorneys were being paid before the IIM beneficiaries, and off the top of any settlement. I recently received a document filed by Attorney, Mark Kester Brown, objecting that Attorney Gingold is refusing to pay him for work done on this case. I believe Mark Kester Brown is entitled to an award of attorney's fees for his services and should be paid from Mr. Gingold's share. Mr. Brown's name was on proof of service documents I filed in the case.

Also included in the $1.512 billion figure, named plaintiffs are requesting $13,056,274.50 for incentive awards and expenses. The named plaintiffs in this case have already been told they were not due any monies. Have the named plaintiffs appeared to testify or present evidence of defendants' wrongdoing? When named plaintiffs were requested for deposition, plaintiffs' counsel requested a protective order to keep them from being deposed. If they were not prepared for answering defendants questions one could infer it was because they did not have any record of loss or proof to show the court. If named plaintiffs had concrete evidence instead of baseless allegations, this case should not have gone on for 15 years. I object to the named plaintiffs' petition for excessive incentive awards and expenses as well as excessive attorneys fees because such fees take funds away from IIM beneficiaries.

Plaintiffs' attorneys have also filed a notice with the Court that they will seek incentive awards and expense reimbursements for the Class Representatives, which is not justified. Elouise Pepion Cobell wants $2,000,000.00; James Louis Larose $ 200,000.00; Thomas Maulson $150,000.00; and Penny Cleghorn $150,000.00. Plaintiffs will also be requesting $10.5 million to reimburse the Class Representatives' expenses. These requested amounts are in addition to payments the Class Representatives will be entitled to as Class Members.

All the named plaintiff representatives have long lists of exemplary leadership credentials, but they should not be paid on their pedigrees. Is it fair that the remainder of the class will get either $500 or $1000 per capita and if they need counsel, they must pay out of their own pockets? Number 32 states; "If you want to be represented by another lawyer, you may hire one to appear in Court for you at your own personal expense." Is that equal justice? DOI solicitors should be standing by our sides to guide us through this litigation, not fighting us. United States solicitors are our legal voice and are required to be present whenever any contract is signed concerning our land and resources. Our position with our trustee may be compared to the fox guarding the hen house.

The notice states, "Class Members and Defendants may object to or comment" on plaintiffs' requests for Class Counsel and Class Representatives and it will consider the objections and comments of Defendants and Class Members.

The $3.4 billion settlement has many strings attached; for one thing $1.9 billion Trust Land Consolidation Fund to purchase "fractionated" individual Indian trust lands can only be received if the individual Indians sell their land and assets if they include resources. Land consolidation was not part of the original litigation and it should not be included in the settlement agreement since only the tribes and the government will benefit.

The program will allow individual Indians to get money for land interests divided among numerous owners. This $1.9 billion should go directly to IIM beneficiaries. Additionally, it is just wrong that Indian trust lands can only be received if the individual Indians sell their land and assets, if they include resources. Will the government take not only our land but also all the resources on the land? Surface and mineral rights are separate interests.

Supposedly, "Land sales are voluntary. If you sell your land it will be returned to tribal control." I ask which tribe gets control of land that belongs to tribal members who belong to more than one tribe? Will tribes get equal control? Is it fair that tribes become beneficiaries of the settlement when the case began as an individual IIM case? Is it fair the government itself will become the largest beneficiary?

The notice also states, "The Department of the Interior will consult with tribes to identify fractionated interests that the Department may want to consider purchasing." My question is if the DOI and tribes decide they want to purchase particular lands, will the decision for the fractionated landowners really be voluntary?

Additionally, up to $60 million for an Indian Education Scholarship Fund to help Native Americans attend college or vocational school. This provision also was not part of the original litigation and the settlement should not contemplate using IIM settlement funds for setting up scholarships. This money will come out of the $1.9 billion Trust Land Consolidation Fund and will be based upon the participation of landowners in selling these fractionated land interests.

Who among you would like it if your bank took money from your individual accounts to set up a scholarship fund? While this is a noble gesture, and I believe in scholarships for our Indian

youth, why take individual IIM funds?   Scholarships, like land consolidation, were never at issue in the case. All of the $3.4 billion should go to IIM beneficiaries.

Indian health, education, and welfare should come from the federal government. They are entitlements based on treaty agreements with tribal governments. Tribal government and gaming money funds should be distributed for scholarships regardless of where students live. This may sound harsh and non-charitable on my part but it seems this part of the settlement was added to make the settlement appear to be what a caring, charitable government would do. I see it as another taking.

I am sure most people have heard the term "Indian giver" which is where some entity gives something of value to Indians and then takes it back. Well in this case, the government is not taking everything back, but individual class members will be receiving very little owed to them for their IIM accounts because of government past wrongs. For instance in notice paragraph 20, the U.S. Treasury gets to recover any money remaining in the Land Consolidation Fund after 10 years from the date the settlement is granted final approval to purchase the fractionated trust land. Paragraph 18 states, "The procedures for selling trust land have not been determined at this point." It could take 10 years to determine this procedure and the fund will revert back to the treasury. Our country's deficit is monumental. Is this just another way the treasury will claim our IIM accounts?

I understand two firms began an immediate search for more than one half of the approximate 600,000 unidentified IIM beneficiaries with a $20 million payment from the Indian Trust settlement funds. I object to $20 million coming from the beneficiaries' part of the fund. Defendants should bear the cost of funding the search, not IIM beneficiaries.

When both parties decided to limit coverage of IIM accounts prior to 1985 during the paper era, they cut off recovery of some very large accounts. The 1994 Trust Reform Act mandates recovery of **ALL** IIM account losses are recoverable back to the date when the Indian trust first began, beginning in 1887. There was no statute of limitations on what could be recovered if you could substantiate the claim.

The 1994 Indian Trust Reform Act states claims were retroactive to the date the Secretary began investing individual Indian monies on a regular basis. Specifically, the 1994 Indian Trust Reform Act states in Sec. 4012. "The Secretary shall make payments to an individual Indian in full satisfaction of any claim of such individual for interest on amounts deposited or invested on behalf of such individual before October 25, 1994, retroactive to the date that the Secretary began investing individual Indian monies on a regular basis, to the extent that the claim is identified -(1) by a reconciliation process of individual Indian money accounts, or (2) by the individual and presented to the Secretary with supporting documentation, and is verified by the Secretary pursuant to the Department's policy for addressing accountholder losses."

I can substantiate my father's and my claim with valid records and both sides are aware of my records. I took them to the proper DOI officials, yet to date have been denied relief. Office of Special Trustee (OST), former Special Trustee Ross Swimmer and Deputy Special Trustee, Donna Erwin can verify they were ready to resolve my case in 2006. March 21, 2006, Mr.

Swimmer and Ms. Erwin promised me at an Intertribal Monitoring Association Meeting hosted by the Comanche Nation in Lawton, Oklahoma that they would conduct an accounting/reconciliation based on my father's and my IIM and USGS documents on the condition Cobell attorneys release me from any possible legal representation in Cobell. I requested class counsel release me from the class so the OST would resolve my case, but class counsel refused to answer my pleas to them.

The government does not know or acknowledge that some individuals in the early 1900's had more than one IIM account. However, apparently someone realizes some individuals have more than one account since the notice states in paragraph 12, "This is a per-person, not a per account, payment." What happened to all those accounts?

This court should recognize, for each revenue source, separate IIM accounts were established. My father had two (2) 80 acre tracts with two separate leases. Today the information is incorrect for the revenue sources, which I tried to get corrected but was refused. I want this court to know the revenue sources shown on my monthly reports still carry my deceased father's name, the same as it was prior to 1985.

I can say with certainty that most leases remain in the original allottee's names and are binding even though most of the original allottees are deceased. Therefore, I cannot understand why the government and plaintiffs' counsel agreed to cut out deceased allottees' losses and then not allow class members to exclude themselves or to opt out for IIM class members prior to 1985, the paper era. Judges Lamberth and Robertson allowed for ALL claims just as the 1994 Trust Reform Act provided.

I understand if there are no available records (like all of the named representatives) that providing an accounting for ALL claims would be difficult. This is not the case for me. The appeals court said an accounting was not impossible and we deserve the best accounting possible. I am asking Congress, the President, and this Court to provide those who have documentation with an accounting, without having to file another time consuming and costly lawsuit for those beneficiaries who choose to opt out.

I made this request in my August 30, 2008 letter to plaintiffs' counsel. This letter was filed as Exhibit No. 3 (14 pages) in "Defendants' Petition for Leave to Take Interlocutory Appeal and Response to Plaintiffs' Petition," filed September 18, 2008. You will find reference to Eddie Jacobs letter on page 17 of the petition (enclosed). In the same petition, Eddie Jacobs is also mentioned in the April 28, 2008 Transcript, Exhibit No. 2, pages 5-9 (enclosed). You may view Defendants' September 18, 2008 Petition on the DOJ Cobell case website.

Unfortunately, when the computer era began in 1985, the government failed to look at the losses each account sustained. Thereafter, the process amounted to garbage in, garbage out, and did not show losses where there were no prior records. Plaintiffs' counsel could not show a single loss because the government failed to input the losses into the computerized system. Our government trustee will now forever get to shove them under the rug and never admit they occurred. This is just wrong! They destroyed records, but they could not destroy what I already presented them and I ask this court to order DOI to satisfy others and my claim.

The historical accounting or so it is called, will only cover a period from approximately 1985 thought September 30, 2009. It is known the trust period did not start in 1985, but in fact started in the late 1800's. IIM monies were deposited into banks during the early years and accounts were not commingled. The identities of the IIM accounts were not lost. Banks commingle everyone's funds to invest, to get higher interest rates, but identities are not lost as plaintiffs' counsel argued. The government is only looking at one fifth (1/5) of the actual trust period and the settlement is based only on this small portion of what it owes to trust beneficiaries. Four-fifths (4/5) of the trust period is not be considered for reimbursement, which is where the largest part of income was generated and monies were flowing like milk and honey, supposedly to American Indians.

Unfortunately money was flowing to government officials and those appointed to oversee Indian monies and that is where most of the problems occurred. That is the period prior to the computer era or more commonly called the "paper era." You will not find any wrong doing if you refuse to look at the early years, which is what this settlement does.

Why would Congress vote to pay for IIM funds, which the named plaintiffs could not prove were owed? Why settle a case without merit when our country is suffering such huge deficits? Where will the money for the settlement come from? Why should taxpayers have to bear the burden of paying the $3.4 billion Indian Trust settlement for which losses were never proved?

The settlement is not only unfair to Indian beneficiaries and taxpayers, but creates more undeserved ill-will towards American Indians. The Indian trust settlement is asking taxpayers to pay damages without an accounting. How can a court of equity pay such a sizeable amount when our federal government is suffering from such huge deficits? How can a court of equity pay damages when plaintiffs' counsel said it was not seeking damages?

This settlement cannot heal the wounds inflicted by our government trustee on helpless native individuals. It was not our ancestors' fault that the system set up to protect our land and resources failed to protect it. It is not our fault the government and plaintiffs' lawsuit will take it away by the land consolidation part of this Indian Trust Settlement. You have heard the term justice is blind; well let's hope it is not deaf also.

There is so much that I feel our Indian people do not understand about the settlement and if they did understand, they would not approve. The hundreds of thousands of plaintiffs whose claims will be extinguished for a paltry $500 to $1,000 each from this settlement were never allowed a voice in the settlement. When plaintiffs' lawyers are set to be paid 50,000 to 100,000 times what any plaintiff (except the named plaintiffs) is to receive, Congress, the president, and the court should have asked plaintiffs other than Cobell what they think of the settlement. Only those persons who are not due money from their accounts, but will be able to capitalize on being an original allottee's heir, might possibly be happy with the terms of this mass per capita settlement.

Per capita payments are neither fair nor equitable. Claims should be based on evidence of loss, not per capita, which will provide a windfall to some account beneficiaries while grossly underpaying those who have suffered significant losses through many years. There is no due

process in the Cobell settlement for each IIM account beneficiary. Unless each is paid what is owed, it amounts to a taking under the U.S. Constitution. My losses on 100% of the revenues generated by my father's land over many years cannot reasonably be compared to those of some who inherited a miniscule interest in an already divided account as recently as a few months ago. Some individuals are owed thousands or millions of dollars while other IIM beneficiaries may only be entitled to receive only $5 or $10 monthly. The per capita payment amount cannot provide for a livelihood lost. Where is the fairness here?

Named plaintiffs alleged wrongdoing by the U.S. government. What proof did they show the court since not one of them produced documents from one individual's IIM account to support their allegations? Virtual documents were concocted for them and still they had no proof of loss. These plaintiffs never asked for any legitimate documents and refused to allow mine, which were legitimate to come into the court's records. My records could have demonstrated to the court one individual's non-fractionated IIM account, with one heir, to show where there was actual wrongdoing.

If my father's and my records had been introduced, they would show instances where my father's IIM account lost monies because of poor and questionable record keeping and intentional taking of United States bonds called Liberty Bonds and war stamps. The government took millions of dollars from countless IIM accounts, not just from my father's account.

New York Times article published February 20, 1918 stated, "they (red Men) have subscribed to more than $9,000,000 worth of Liberty bonds." By other accounts, more than $25,000,000 was taken from individual Indian's IIM accounts by the end of the war. Nearly one-half of the investment of purchasing bonds and war stamps came from individual members of the Five Civilized Tribes of Oklahoma individual IIM accounts. Department of Interior officials said, "Indians don't need the money" to justify the taking from their individual IIM trust accounts without their knowledge or authorization.

Individual Indians have always supported this country's war effort even before they were United States citizens, and now this settlement will erase and never repay these debts. Cobell's counsel never even brought this issue before the court. My father's funds were taken when he was a minor when trust reliability was and is so important. Additionally, one IIM account taught was never credited to his account that continued until his death.

These records were never made a part of this case because plaintiffs' class counsel objected and of course, the defendants did not want evidence of wrongdoing to be entered to the court's record. Judges Lamberth and Robertson appeared aware of my efforts, and my name was mentioned in the court's records several times, once to ask "What can we do with Eddie Jacobs? (See April 28, 2008 transcript enclosed). I feel it is my duty to make Judge Hogan aware of my records and attempts to get my case heard before he makes his final order.

Question 11 asks what is fractionated land? While it may be owned by hundreds of individuals, what happens to that one individual or several families who call it home? If all others want to sell, will the ones living on the land be forced to sell also? How will this be decided? I do not have fractionated land or mineral interests, but I care about those who do. Our elders taught us to

love and care for the land. Traditional belief is that no one owns the land; we are charged with being caretakers of our Mother Earth.

Question 13 asks how much a trust administration class member will get. "Individuals with an IIM account open between 1985 and September 30, 2009 may receive more than $800. This payment is separate from, and in addition to, the $1,000 payment to individuals in the Historical Accounting Class." "The payment calculation uses the sum of your 10 highest years of income in your IIM account to determine your share of the Trust Administration Fund."

If IIM beneficiaries cannot show their records (class representatives did not have records to show), will they demonstrate how much income was derived from virtual records?

This paragraph also discusses transfers between an individual's accounts. How will transfers be handled since each source of revenue is separate?

Question 14 deals with Payments to Trust Administration Class Members. It all sounds simple, but the second stage distribution "will be distributed after it is determined that substantially all the Trust Administration Class Members have been identified and the payments have been calculated." What is the time limit for determining when all have been identified? Who decides?

Question 16 states, "The $1.9 billion Trust Land Consolidation Fund will provide individual Indians with an opportunity to get money for the fractionated land. As an additional incentive for owners to sell their land interests, an amount above the fair-market value will be paid into the Indian Education Scholarship Fund." How much over fair-market value? Sounds too ambiguous.

Question 17, "The Department of the Interior will offer fair market value for fractionated trust land." To whom will the offer be made if there are hundreds of individuals involved? Do they all have to agree or will the majority make the decision? Question 10 states, "If you sell your land it will be returned to tribal control." So let me get this straight. The DOI is going to pay for the land and give it back to the tribes, then the U.S. Treasury gets to recover any money remaining in the Land Consolidation Fund after 10 years from the date the settlement is granted final approval if there is still fractionated interests not paid for by the DOI.

Question 18, "The procedures for selling trust land have not been determined at this point. Once those procedures have been determined, the Department of the Interior will attempt to contact individual Indian trust beneficiaries who own fractionated interests that it wishes to purchase."

So is it really not up to the beneficiaries who might want to sell their land at all? Will the purchase be determined by the DOI? Will DOI want to purchase the lands with the most profitable resources? What if there is no mineral or resource lease on the property, will they demand mineral rights be included with the surface rights? Mineral rights are a separate resource from the surface rights.

Question 19 states, "Class Members whose whereabouts are unknown, after diligent efforts have been made by the federal government to locate them, will be assumed to have consented to the transfer of their fractionated interests and their Indian Land Consolidation Funds will be deposited into an IIM account." The federal government will assume Indian landowners' consented to sell fractionated interests after five years of searching and the money they would have received will be deposited into an IIM account. Whose name will be on the account? Does the money in the IIM account go back to the Treasury after 10 years?

Question 20 states, "Any money remaining in the Land Consolidation Fund after that time will be returned to the U.S. Treasury." In other words as long as the DOI is the trustee, will the money never leave the Treasury? What is the true purpose behind the settlement?

Questions 21 and 22 discuss how the scholarship fund will work which sounds complicated. How long will the fund remain? This goes unanswered in question 22. "The trustees will be selected by the Secretary of the Interior, the representative Plaintiffs, as well as the non-profit." The settlement agreements states, "No further contributions from the Trust Land Consolidation Fund to the Indian Education Scholarship Holding Fund shall be made once the sum of such contributions reaches a total of $60,000,000.00."

I object to scholarship funds coming from individual Indian's IIM accounts because this is a taking of private property belonging to individual Indians. I object to any of the funds reverting to the treasury. All funds should go to IIM beneficiaries. Why should the representative plaintiffs help determine who the trustees should be? Does this create a possible bias problem?

Number 23, "The Settlement Agreement allows some funds in the Trust Land Consolidation Fund to be used to pay costs related to the work of a commission on Indian trust administration and reform." Who selects the commission? Won't the DOI still be in control of IIM accounts?

Questions 24 and 25 discuss possible payments. "Payments will be made after the Court grants final approval of the Settlement, and any appeals are resolved." Who can appeal?

Question 27 asks, "What am I giving up as part of the settlement? If the Settlement becomes final, you will give up your right to sue the federal government for the claims being resolved by this Settlement. The specific claims you are giving up against the federal government are described in Section A, paragraphs 14, 15, and 21 of the Settlement Agreement." I feel it is important for every IIM beneficiary to be aware of all they are giving up if they do not exclude themselves from the class, so I am listing them here so IIM beneficiaries will know.

The specific claims you will be giving up listed in Settlement Section A 14 are:

"14. Funds Administration Claims. "Funds Administration Claims" shall mean known and unknown claims that have been or could have been asserted through the Record Date for Defendants' alleged breach of trust and mismanagement of individual Indian trust funds, and consist of Defendants' alleged:
    a. Failure to collect or credit funds owed under a lease, sale, easement or
    other transaction, including without limitation, failure to collect or credit

all money due, failure to audit royalties and failure to collect interest on
late payments;
b. Failure to invest;
c. Underinvestment;
d. Imprudent management and investment;
e. Erroneous or improper distributions or disbursements, including to the
wrong person or account;
f. Excessive or improper administrative fees;
g. Deposits into wrong accounts;
h. Misappropriation;
i. Funds withheld unlawfully and in breach of trust;
j. Loss of funds held in failed depository institutions, including interest;
k. Failure as trustee to control or investigate allegations of, and obtain
compensation for, theft, embezzlement, misappropriation, fraud, trespass,
or other misconduct regarding trust assets;
l. Failure to pay or credit interest, including interest on Indian monies
proceeds of labor (IMPL), special deposit accounts, and IIM Accounts;
m. Loss of funds or investment securities, and the income or proceeds earned
from such funds or securities;
n. Accounting errors;
o. Failure to deposit and/or disburse funds in a timely fashion; and
p. Claims of like nature and kind arising out of allegations of Defendants'
breach of trust and/or mismanagement of individual Indian trust funds
through the Record Date, that have been or could have been asserted."

The specific claims you will be giving up listed in Settlement Section A 15 are:

"15. Historical Accounting Claims. "Historical Accounting Claims" shall mean
common law or statutory claims, including claims arising under the Trust Reform Act, for a
historical accounting through the Record Date of any and all IIM Accounts and any asset held in
trust or restricted status, including but not limited to Land (as defined herein) and funds held in
any account, and which now are, or have been, beneficially owned or held by an individual
Indian trust beneficiary who is a member of the Historical Accounting Class. These claims
include the historical accounting through the Record Date of all funds collected and held in trust
by Defendants and their financial and fiscal agents in open or closed accounts, as well as interest
earned on such funds, whether such funds are deposited in IIM Accounts, or in tribal, special
deposit, or government administrative or operating accounts."

The specific claims you will be giving up listed in Settlement Section A 21 are:

"21. Land Administration Claims. "Land Administration Claims" shall mean known
and unknown claims that have been or could have been asserted through the Record Date for
Interior Defendants' alleged breach of trust and fiduciary mismanagement of land, oil, natural
gas, mineral, timber, grazing, water and other resources and rights (the "resources") situated on,
in or under Land and consist of Interior Defendants' alleged:
a. Failure to lease Land, approve leases or otherwise productively use Lands

or assets;

b. Failure to obtain fair market value for leases, easements, rights-of-way or sales;

c. Failure to prudently negotiate leases, easements, rights-of-way, sales or other transactions;

d. Failure to impose and collect penalties for late payments;

e. Failure to include or enforce terms requiring that Land be conserved, maintained, or improved;

f. Permitting loss, dissipation, waste, or ruin, including failure to preserve Land whether involving agriculture (including but not limited to failing to control agricultural pests), grazing, harvesting (including but not limited to permitting overly aggressive harvesting), timber lands (including but not limited to failing to plant and cull timber land for maximum yield), and oil, natural gas, mineral resources or other resources (including but not limited to failing to manage oil, natural gas, or mineral resources to maximize total production);

g. Misappropriation;

h. Failure to control, investigate allegations of, or obtain relief in equity and at law for, trespass, theft, misappropriation, fraud or misconduct regarding Land;

i. Failure to correct boundary errors, survey or title record errors, or failure to properly apportion and track allotments; and

j. Claims of like nature and kind arising out of allegations of Interior Defendants' breach of trust and/or mismanagement of Land through the Record Date, that have been or could have been asserted."

Question 27 also states, "If you did not receive an IIM account statement for 2009, you may request your IIM account balance as of September 30, 2009 by calling 888-678-6836. If you request your IIM account balance, you are agreeing to the balance provided by Interior unless you exclude yourself from the Settlement…"

IIM beneficiaries should heed this warning and be aware that you will be agreeing just by calling to verify your balance, unless you exclude yourself. Is it fair that requesting a balance will equal giving consent?

Question 28 states, "By law, you cannot exclude yourself from the Historical Accounting Class, if you are a member." Would it be correct to conclude the only way someone can exclude himself or herself from the Historical Accounting Class would be those who prior to the filing of the Complaint on June 10, 1996 had filed actions on their own behalf stating a claim for a historical accounting?

Number 28 further states, "You cannot object to or comment on this aspect of the Settlement as far as it concerns the Trust Administration Class." If I submit my written comments and questions, does this amount to an objection for purposes of question 28? I want to object and comment to the settlement, and I also want to opt out. Will my comments and objections be

heard without jeopardizing my future claims against defendants even though I consider myself to be an exception to the class?

Question 29 asks, "How do I get out of the Trust Administration Class?"  "To exclude yourself, you must send a letter by mail saying that you want to be excluded from *Cobell v. Salazar…*"  "Please note that the share of money you would have received if you had stayed in the Trust Administration Class will be removed from the $1.512 billion Accounting/Trust Administration Fund and given back to the federal government."

Why not give opt out funds to the IIM beneficiaries?

Question 30 discusses objections, "Any Class Member may comment on or object to the Settlement. However, if you exclude yourself from the Trust Administration Class, you may only object to, or comment on, other parts of the Settlement that you do not like. Also, you may comment on or object to fee and expense requests for Class Counsel and incentive awards and expenses for Class Representatives and other amounts that may be awarded by the Court (*see* Question 33). If you object to any part of the Settlement you must give reasons why."
The reason I make objections is because I believe the Indian Trust Settlement agreement is totally unfair to IIM beneficiaries.

The notice further states, "At your own expense, you may also appear at the Fairness Hearing to comment on or object to any aspect of the fairness, reasonableness, or adequacy of the Settlement."  Obstacles to this provision include the expense of getting to the hearing when the date, time, or place might suddenly change.  Additionally, one must obtain permission to speak at the hearing.  Who grants permission?  How soon will permission be granted so arrangement can be made?  Will the public be allowed into the hearing?

Question 31 states, "You object to the Settlement when you disagree with some part of it but you wish to remain a Class Member. An objection allows the Court to consider your views. On the other hand, exclusion or "opting out" means that you do not want to be part of the Trust Administration Class or share in the benefits of that part of the Settlement. Once excluded, you lose any right to object to any part of the Settlement that relates to the Trust Fund Administration Claims or the Land Administration Claims, because those parts of the case no longer affect you. If you exclude yourself, you are free to bring your own lawsuit for those claims."  Which court has jurisdiction for those claims?

The notice does not mention the kick-out option, but it is defined in the class action settlement agreement as, "f. Kick-Out Option. In the event that the Class Members who do not opt out of the Trust Administration Class represent in the aggregate less than eighty five percent (85%) of the aggregate amount of all Assigned Values, then Defendants, at their sole option, may elect to withdraw from and fully terminate this Agreement in which case the Parties will be restored to their prior positions as though the Agreement had never been executed, except as provided in paragraph D.7. In exercising such an election to terminate, Defendants must terminate the Agreement in its entirety and may not terminate only parts of the Agreement. Defendants must exercise this election to terminate no later than one day before the Fairness Hearing by filing a notice with the Court with a schedule under seal of Class Members who opted out and their

respective Assigned Values. Any disputes regarding an attempt by Defendants to terminate shall be decided by the Court."

Does this mean if less than eighty five percent (85%) do not opt out, it is defendants' sole decision and not the court's decision to withdraw from and fully terminate this Agreement? What does respective assigned values mean? May assigned values be appealed? Why wait until one day before the fairness hearing to decide? Paragraph D.7 discusses return of remaining funds in the settlement account if there is no final approval. Why would defendants at their sole option elect to withdraw from the agreement?

The December 7, 2009 settlement states, "If Final Approval does not occur, this Agreement shall be null and void." My question, if the court does not order final approval of this agreement and it becomes null and void, what happens to the Claims Resolution Act of 2010, which Congress and President Obama signed into law? Is there a separation of powers issue here? If there is a difference in interpretation of what the Act and the settlement states, which controls? Can the court overrule either?

How does one specifically know how to separate objections to the trust fund administration and land administration claims since they overlap? If one objects to the wrong issue will he/she automatically extinguish certain rights just by making an incorrect objection or no objection at all?

Question 32 states, you will not be charged personally for these lawyers (Gingold and Harper). If there have been differences of agreement with these lawyers in the past, how can a person expect to now get unbiased advice?

Question 33 and 34 deal with additional payment requested by plaintiffs' counsel and for named plaintiffs' reimbursement and expenses. If excluded from the case, may I be permitted to complain about these in the fairness hearing if given permission to speak? Why would permission be denied?

Question 34 states, "The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.IndianTrust.com or call 1-800-961-6109."

Is this fair? Many class members would have to travel from distant places and make arrangements for lodging in advance at great expense. Many of us ordinary IIM beneficiaries do not have credit cards to make arrangements for rental cars and hotels. Additionally, traveling such a distance for elderly people creates a hardship that could be insurmountable.

The notice states, "If there are objections, the Court will consider them." Why can't the court consider ALL objections from IIM beneficiaries? None have gotten to be heard in this case.

Question 35, "If you send an objection or comment, you don't have to come to Court to talk about it. As long as you mailed your written objection on time, the Court will consider it." What if I made a written objection and still want to be heard in the Fairness Hearing? Does this statement mean anyone can object and the Court will consider it if it is timely made?

Question 36, "You may ask the Court for permission to speak at the Fairness Hearing. You may appear at the Fairness Hearing to comment on or object to any aspect of the fairness, reasonableness, or adequacy of the Settlement."

I personally have tried to enter the court with my claim so it seems unfair that I may not be allowed permission to speak at the Fairness Hearing if I opt out. I am requesting that I be granted permission to appear and speak at the fairness hearing. Judge Robertson appeared to understand my case was different or he would not have asked, "What do we do with Eddie Jacobs?"

The court, the federal government trustee and plaintiffs' counsel kept me from entering my IIM records into this case. I request that I may be allowed to speak at the fairness hearing.

I have long argued I am an exception to the class. My first argument to this court was July 8, 2003 when I filed "Eddie Jacobs Motion For Leave To File Amicus Curiae Pro Se" and July 28, 2003 when I filed "Brief/Argument In Support Of Motion For Leave To File Amicus Curiae Pro Se" in support of my July 8, 2003 Motion. I do not know if Judge Hogan has knowledge of these documents but I will furnish copies of all documents I filed in the case if needed.   I (EJ) filed. received, or was mentioned in the following relevant documents on the dates indicated on each.

07/08/03-EJ filed "Eddie Jacobs Motion For Leave To File Amicus Curiae Pro Se" and
07/28/03-EJ filed "Brief/Argument In Support Of Motion For Leave To File Amicus Curiae
      Pro Se" in support of his July 8, 2003 Motion believing it was timely.
07/28/03-Received "Defendants' Opposition To Eddie Jacobs' Motion For Leave To
      File Amicus Curiae Pro Se." filed 07/22/2003
08/01/03-Filed "Reply Memorandum To Defendants' Opposition To Eddie Jacobs' Motion
      For Leave To File Amicus Curiae Pro Se."
08/15/03-Defendants filed "Defendants Opposition to Eddie Jacobs Brief/Argument in
      Support of his Motion for Leave to File Amicus Curiae Pro Se."
08/26/03-EJ filed Reply to Defendants' Opposition to Eddie Jacobs' Brief/Argument in
      Support of His Motion for Leave to File Amicus Curiae Pro Se
02/11/05-EJ filed "Motion For Leave To File Under Seal Eddie Jacobs' Individual Indian
      Money Account Documents" since he had no status on July 2003 Amicus Motion
02/24/05-Defendants filed "Opposition to Non-Party Eddie Jacobs' Motion for Leave to File
      Under Seal Eddie Jacobs' Individual Indian Money Account Documents"
02/24/05-Defendants filed "Opposition to Non-Party Eddie Jacobs' Motion for Leave to File
      Under Seal Eddie Jacobs' Individual Indian Money Account Documents"
03/29/05-EJ filed Motion to Clarify and/or Amend Court's Order Dated September 2, 2004.
12/15/05-EJ filed "Objection To Plaintiffs' Petition For An Award Of Attorneys' Fees Pursuant
      To The Equal Access To Justice Act"
12/19/05-Court's Memorandum Opinion - Award of Attorney's Fees, p. 7-8, Court noted,
      "... other than Mr. Jacobs, no trust beneficiary among the 500,000 or more in the
      plaintiff class has objected ..." (See copy p. 1, 7-8 enclosed)

08/00/06-EJ filed "Motion To Compel Attorneys To Sign Statement Of Non-Party Jacobs And Order Reconciliation And Reimbursement"

09/15/06-Plaintiffs file "Plaintiffs' Opposition to Eddie Jacobs' Motion To Compel Attorneys To Sign Statement Of Non-Party Jacobs And Order Reconciliation And Reimbursement"

09/20/06- EJ filed "Eddie Jacobs' Reply Memorandum To Plaintiffs' Opposition To Motion To Compel Attorneys To Sign Statement Of Non-Party Jacobs And Order Reconciliation And Reimbursement"

09/21/06-Defendants filed "Defendants' Response to Plaintiffs' Opposition to Motion To Compel Attorneys To Sign Statement Of Non-Party Jacobs And Order Reconciliation And Reimbursement"

10/02/06-Plaintiffs filed "Plaintiffs' Motion to Strike Defendants' Response to Plaintiffs' Opposition to Motion to Compel Attorneys to Sign Statement of Non-Party or Release Eddie Jacobs and Order Reconciliation and Reimbursement"

10/06/06-Defendants filed "Defendants' Opposition to Plaintiffs' Motion to Strike Defendants' Response to Plaintiffs' Opposition to Motion to Compel Attorneys to Sign Statement of Non-Party or Release Eddie Jacobs and Order Reconciliation and Reimbursement"

10/12/06-EJ filed "Motion for Default Judgment"

11/02/06-Defendants filed "Defendants' Response to Motion for Default Judgment Filed by Nonparty Eddie Jacobs"

11/08/06-Plaintiffs filed "Plaintiffs' Opposition to Eddie Jacobs' Motion for Default Judgment"

11/25/06-EJ filed "Eddie Jacobs' Reply To Defendants' Response To Motion For Default Judgment And Answer To Defendants' Opposition To Plaintiffs' Motion To Strike Defendants' Response To Plaintiffs' Opposition To Motion To Compel Attorney To Sign Statement Of Non-Party Or Release Eddie Jacobs And Order Reconciliation And Reimbursement"

09/18/08 Defendants filed "Defendants' Petition for Leave to Take Interlocutory Appeal and Response to Plaintiffs' Petition." (See enclosed copy of p. 17, Ex. No. 2, p. 5-9, Ex. No. 3, p.1-14.

Many of these documents may be viewed on DOJ's case site. The December 7, 2009 settlement agreement defines parties, "Parties" shall mean the Named Plaintiffs, members of the Classes, and Defendants." Under this definition and because Defendants identified me as a non-party in their pleadings, substantiates my contention that I am not a class member.

Plaintiffs' counsel asked that J.P. Morgan Chase, N.A. be designated as the Qualifying Bank for the deposit of settlement funds. The settlement agreement states, "c. Qualifying Bank. The Accounting/Trust Administration Fund shall be deposited in, and administered by, the trust department(s) of a Qualified Bank or Qualified Banks. To the extent settlement funds are held in deposit accounts in excess of FDIC insurance coverage, the excess amount shall be collateralized with securities that are U.S. Treasury or other securities that are backed by the full faith and credit of the United States."

Liberty bonds should have been backed by full faith and credit of the United States. My father's IIM funds were invested in United States bonds, but were taken and never repaid. Former Assistant Secretary of the Treasury Hammond said, "Treasury is responsible for keeping track of each Treasury security issued by the government." *See, e.g.,* (Pltffs' Ex_h. 2) (testimony of Don

Hammond, Assistant Secretary of the Treasury, Financial Management Service at that time and current Member of the Board of Governors of the Federal Reserve System) at Tr, 57:12,22, May 13, 2003 AM ("Hammond Trial 1.5 Testimony") ("Our responsibility is to keep track of specific Treasury securities issued, the rate of interest they pay, and the payment of those interests credited.")

The 2009 settlement agreement states, "Class Counsel, with the Claims Administrator, shall have responsibility for administering the Accounting/Trust Administration Fund in accordance with this Agreement. Class Counsel shall provide the necessary account information to Defendants as needed to support deposit of the Accounting/Trust Administration Fund."

Does this mean plaintiffs' counsel will not only get attorneys' fees, but will be paid to administer the accounting? Does this present possible conflict of interest and bias in such undertaking? Is this fair?

As previously stated, I find nothing in the settlement fair. I believe Oklahoma's IIM beneficiaries were left out of the litigation by plaintiffs' counsel. There are so many issues they refused to address, which affect Oklahoma IIM beneficiaries. Gross production taxes are levied only on Oklahoma's Five Civilized Tribes individual's IIM accounts in the State of Oklahoma. It was up to our trustee to challenge this discriminatory action, but it remains a problem for Oklahoma Five Civilized Tribes' individual Indian mineral owners and no other individual Indians in the United States.

Taxpayers, Eddie and Marcianna Jacobs, husband and wife, are currently appealing Oklahoma Tax Commission Case No. P-09-115-K to the Oklahoma Supreme Court in Appeal No.108,127, a pending case, which involves gross production taxes on federally, restricted trust property. It is time our trustee challenged this law. Individual Indians are not producers. It is time our trustee provided Oklahoma Five Civilized Tribes' individual mineral owners with an income tax form 1099, which shows this discriminatory state tax imposed on Oklahoma Five Civilized Tribes individual Indians' state taxpayers in the proper box on the form 1099. Presently, this gross production tax is shown not as a tax but as "expenses" in a note on the bottom of the page. The gross production tax must be put in the appropriate box on the form 1099 so Oklahoma Five Civilized Tribes' individual mineral owners can get credit for this tax on their Oklahoma tax returns.

In 1990, I personally contacted the regional United States solicitor and made the request that Oklahoma individual Indian mineral owners be issued a form 1099 for the gross production tax so we could receive credit for it being taken from our IIM accounts. After that date, the Office of Special Trustee began issuing me with a form 1099. I am unsure if others receive a form 1099. It is unfair that Five Civilized Tribes individuals have to pay this tax when no other individual Indians in the United States pay this tax.

Presently there is no Oklahoma representative on the Senate Committee on Indian Affairs to represent Oklahoma's Indians' issues, where a majority of IIM beneficiaries are located. The Daily Oklahoman newspaper says there are at least 50,000 IIM holders in the state. Likely there are many, many thousands more since the settlement includes: "Individual Indian Money

("IIM") account holders (even if the account currently is not active or open), Individual Indian who has or had an ownership interest in land held in trust or in restricted status, and Heir to a deceased IIM account holder or individual landowner."   Almost every individual Indian residing in the State of Oklahoma fits within the notice's description of those considered to be within the Cobell class.

Cobell plaintiffs did not post any informational meetings regarding this settlement in the State of Oklahoma until approximately March 10, 2011.  When I first sought the nearest location to possibly attend, the answer was, "We were unable to locate any meetings within 100 miles of your location."  Is this fair?  Late posting of the dates for Oklahoma sites may create a hardship on Oklahoma's Indians.  In order to get time off from work, ample time is needed.  Not all have access to the Internet and may not get notice until too late..

I have struggled with my claim since 1987 and feel I deserve my day in court to make oral comments and objections, even if I choose to opt out.  I believe the court could benefit by hearing my testimony.  I intend to be present at the fairness hearing and request permission to be allowed to speak and present documents.

Respectfully submitted,

*Eddie Jacobs*

Date:  *3-12-11*

Eddie Jacobs
P.O. Box 2322
Oklahoma City, OK 73101
Telephone (405) 524-4215



# United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

October 16, 1998

Mr. Eddie Jacobs
P.O. Box 25665
Oklahoma City, OK  73125-0665

Dear Mr. Jacobs:

This letter responds to the issues you raised in your April 16 and July 6, 1998 correspondence to Dianne Shaughnessy, a member of the Indian Minerals Steering Committee.  We appreciate your efforts in raising these issues to the attention of our committee.

**Reconciliation of Individual Indian Money Accounts**

In your April correspondence, you restate your prior request for reconciliation of yours and your deceased father's IIM accounts, and assert that you are not part of the *Cobell* v. *Babbitt* class action lawsuit.  As Ms. Shaughnessy discussed with you in July, the Department of Justice has concluded that you are a plaintiff in this lawsuit, and therefore it would be improper for us to communicate with you regarding the matters addressed in your correspondence relating to the IIM accounts.  In July, the Department of Justice forwarded your letter and its enclosures to the attorneys representing the plaintiff in the IIM lawsuit, Robert Peregoy of the Native American Rights Fund.  The address and telephone number of NARF are 1712 N Street, NW, Washington, DC 20036-2976 (telephone 202-785-4166).

**Taxation Issues**

Since the Oklahoma gross production tax on members of the Five Civilized Tribes is authorized by an Act of Congress, and since the Act has not been successfully challenged, the Department must presume it is lawful.

The Office of Trust Funds Management is taking the necessary steps to issue SF 1099 to members of the Five Civilized Tribes for tax year 1998.

**Tribal Settlement Legislation**

There are two provisions in the tribal settlement legislation that have some tie to individual Indian money accounts.  However, these provisions are not intended to settle or solve potential IIM claims which are currently the subject of a class action lawsuit.

As we explained to Congress, Section 15 of H.R. 3782 is largely aimed at correcting the overall books of the Government, to ensure that the aggregate balances in U.S. Treasury accounts equal the sum of the underlying positive balances in both individual and tribal trust fund accounts. The Department's and the Treasury's books are not in agreement as a result of historic inadequacies in systems, polices, practices, and procedures. Correction of these book differences is an integral part of our trust reform efforts. For the most part, we expect these provisions to result in aggregate account level adjustments. Potentially, implementation of these provisions could result in some adjustments to an underlying account. However, we do not expect such adjustments to be significant. Section 16 provides a mechanism to address routine administrative errors prospectively.

There are two reasons these provisions are included in the tribal settlement legislation. The Special Trustee's Advisory Board recommended that the Tribal Settlement Legislation address these accounting variances, which the Department agreed with in both its 1996 and 1997 reports to Congress. Additionally, we had anticipated that both the tribal settlement legislation and the correction of these accounting discrepancies could potentially have significant "pay-as-you-go" implications under the Budget Enforcement Act, and as such would require offsetting reductions in expenditures or increases in receipts. However, ultimately, the "pay-as-you-go" impact of these provisions was limited.

**Notification of Class Action Suit**

The Court certified the class under the Federal Rules which do not require class notification or an opportunity to opt in or out of the class unless provided by the Court. As noted above, since accountholders are represented by their attorneys, it is improper for the Department to communicate with accountholders regarding the lawsuit.

**Farmington, NM Project [FIMO]**

The Department has a pilot in Farmington to test some new approaches to better serve mineral owners. Once the pilot ends and it is assessed, the Department will determine if some concepts and approaches should be implemented elsewhere.

**Status of the Office of the Special Trustee**

The paramount task of the Special Trustee is to develop a Comprehensive Strategic Plan for all phases of the trust fund cycle. Additionally, in 1996, at the direction of the Congress, the Office of Trust Funds Management was transferred from the Bureau of Indian Affairs to the Office of the Special Trustee. The Special Trustee submitted his strategic plan to the Secretary and the Congress in April 1997.

The Secretary has supported many aspects of the Special Trustee's plan: acquisition of trust systems, records clean-up, and elimination of trust asset processing backlogs. A

comprehensive high-level implementation plan for the 13 subprojects that comprise the Trust Management Improvement Project was completed in July 1998.   Several of the subprojects are well underway.  The Secretary did not support full implementation of the plan.  Most notably, the Secretary opposed the creation of the American Indian Trust and Development Administration (AITDA), a new Government Sponsored Enterprise (GSE) subject to Congressional oversight, with authority, responsibility and funding of all Indian trust activities (BIA, BLM, MMS, OST).  A copy of the plan is enclosed.

**Selection of Mineral Owners to be Paid for BIA Conference**

The Department will fund only one allottee representative per Agency to speak at conferences. The issue was lease competitiveness and each BIA Agency made the recommendation with respect to whose expenses would be paid.

We hope that his letter has been responsive to the issues that you have raised.

Sincerely,

Edward B. Cohen, Chair
Indian Minerals Steering Committee

Enclosure

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **ELOUISE PEPION COBELL, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil Action Number 96-1285 (RCL)** |
| | ) | |
| **GALE A. NORTON, Secretary of the Interior, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Before the Court is plaintiffs' Equal Access to Justice Act Petition for Interim Fees Through the Phase 1.0 Proceeding ("Interim Fee Petition"). Plaintiffs seek fees and expenses in the amount of $14,528,467.21 for their efforts "resolv[ing] issues" central to Phase 1.0 of the case and "set[ting] the stage for future relief." Cobell v. Norton, 319 F.Supp.2d 36, 41 (D.D.C. 2004). Defendants oppose the Interim Fee Petition, citing both plaintiffs' failure to demonstrate a legal entitlement to an award under the Equal Access to Justice Act as well as plaintiffs' submission of poorly documented, excessive, redundant, and otherwise defective time records. Defendants maintain that, to the extent an award is warranted, it should not exceed $4,313,047. Opposition to plaintiffs' Equal Access to Justice Act Petition for Interim Fees Through the Phase 1.0 Proceeding ("Defendants' Opposition"), at 78. Plaintiffs, in response, press the Court to immediately grant an award for all "uncontested" hours at "market rates" and postpone deciding the "contested" hours until a later date. Plaintiffs' Reply, at 67.

The class in this case is comprised of approximately 500,000 current and former IIM Trust beneficiaries. Even Interior has, to date, been unable to identify all of the current beneficiaries of the trust. Notice to every class member, an ideal objective, is far from practicable much less reasonable. Throughout the course of this litigation, class counsel has surmounted this obstacle by utilizing their website as the primary vehicle to communicate with the beneficiaries. Accordingly, on November 8, 2005, the Court held that "it is reasonable to conclude" that notification on plaintiffs' website "is adequate for purposes of Rule 23(h)(1)." See Mem. Op. (November 8, 2005). The Court also ordered plaintiffs to publish the Interim Fee Petition in the *Native American Times*, *Indian Country Today* and *News From Indian Country* – generally considered among the most widely read periodicals in Indian Country. The Native American Times, alone, boasts "a <u>proven</u> readership of over 36,000" and a website that "is now averaging over a million hits monthly." See http://nativetimes.com/.

In accordance with the November 8, 2005 Order, plaintiffs posted and published the Interim Fee Petition allowing the class 30 days to file any comments and objections with the Court. The Court finds plaintiffs' compliance with its November 8 Order sufficient to satisfy the demands of Rule 23(h)(1), and defendants' objections are now moot.

**OBJECTIONS**

Pursuant to the Court's November 8, 2005 Order, plaintiffs received one objection, from Mr. Eddie Jacobs, to "Plaintiffs' Petition for an [Interim] Award of Attorneys' Fees Pursuant to the Equal Access to Justice Act." It is to be noted that other than Mr. Jacobs, no trust beneficiary among the 500,000 or more in the plaintiff class has objected or commented to the interim fee petition by telephone or e-mail. See Plaintiffs' Exhibit 1 (Declaration of Mari Keenan) at ¶¶ 3-4.

Mr. Jacobs objects that the petition is "totally offensive and disrespectful to American Indian beneficiaries" because plaintiffs' attorneys are getting compensation when the beneficiaries "have not received one cent from this class action lawsuit." See Eddie Jacobs Obj. Mr. Jacob's objection has no substantive comment on plaintiffs' interim fee petition. Mr. Jacob's frustration is the same as plaintiffs in that all would like the IIM beneficiaries to receive just compensation in a timely manner and before their attorneys. But this has been, and continues to be, an extremely arduous and complex process. The Court sympathizes with Mr. Jacobs but finds that his lone objection does not take issue with the merits of plaintiffs' application.

II.   ELIGIBILITY TO RECEIVE AN EAJA AWARD PURSUANT TO 28 U.S.C.A. §2412(D)(2)(B)(I)

To receive an award under EAJA, a party must demonstrate "net worth [that] did not exceed $2,000,000 at the time the civil action was filed." 28 U.S.C.A. §2412(d)(2)(B)(I). Defendants maintain that plaintiffs failed to comply with the statute, having merely "alleged" and not "shown" eligibility. Opposition, at 12. Defendants' contention is without merit.

On September 13, 2004, plaintiffs filed their Notice of Filing Named Plaintiff' Affidavits in Support of Plaintiffs' Equal Access to Justice Act Petition for Interim Fees Through the Phase 1.0 Proceeding. Attached to the Notice were affidavits signed by the class representatives, attesting to the fact that their net worth fell within EAJA statutory guidelines at the time the litigation was initiated.  The Court finds these submissions amply satisfy the requirements of the statute for the entire class. See Olenhouse v. Commodity Credit Corp., 922 F.Supp. 489, 493 (D. Kan. 1996) (as "[t]he agency has not shown that the named farmers were unrepresentative of the class or that unnamed members of the class were willing and able to bear the cost of the

# Exhibit No.3

Elouise Pepion Cobell, et al. vs.   CA 96-1285                April 28, 2008
Dirk Kempthorne, et al.

Page 5

1          What I am interested in, I think, are four basic
2     questions.  The first is a question that I raised the last time
3     we were together that I don't think I have yet grasped the
4     answer to, and that is what I call the class certification
5     problem.  Another way of putting that is to ask, if relief is
6     granted under a 23(b)(2) theory or a 23(b)(1) theory, what
7     further relief is precluded for class members who are bound by
8     that judgment?  What is the claim-preclusive effect of a ruling,
9     and what is Eddie Jacobs and others like Eddie Jacobs going to
10    do?
11         The second major question which is raised in the
12    defendants' brief and really not responded to by the plaintiffs
13    is if there is an award with a dollar sign in front of it -- I
14    refuse to call it either damages or restitution or disgorgement.
15    Let's just call it an award with a dollar sign in front of it.
16    If there's an award with a dollar sign in front of it, who does
17    the money go to?  How is it distributed?
18         There is sort of the suggestion in the plaintiffs'
19    brief that it would be just distributed pro rata, which makes
20    very little sense to me.  But the complications of figuring out
21    who would get what share of what amount of money are quite
22    serious problems, it seems to me.
23         The third question relates to the time value of money,
24    which is either prejudgment interest or not.  And if it is, I
25    have no jurisdiction; if it's not, it's something else.  The

United States District Court kingreporter2@verizon.net   Rebecca Stonestreet, CRR
For the District of Columbia   (202) 354-3249            Official Court Reporter

Elouise Pepion Cobell, et al. vs.   CA 96-1285                April 28, 2008
Dirk Kempthorne, et al.

Page 6

1    plaintiffs have unearthed a very interesting decision by

2    Judge Boggs sitting in the 9th Circuit, concluding that the time

3    value of money improperly forfeited or seized in forfeiture is

4    not interest -- I mean -- yeah, is not prejudgment interest.

5          And I haven't come down on one side or another of that

6    issue, but before I even begin to come down on that issue, I

7    need to think about and counsel need to advise me about some of

8    the complexities that Judge Boggs noted in his opinion.  Exactly

9    how is it calculated?  Exactly how is the money booked?  Where

10   was it booked?  As one of my law clerks has pointed out to me,

11   during many of the years in question in this case, the United

12   States didn't have any debt, so what's the debt-servicing idea

13   here for years in which the United States was not borrowing

14   money?  And, of course, the methodology of just allocating some

15   of any reward per year is certainly simple, but I might add the

16   word "istic" after the word simple.

17         So the time value of money problem is a serious problem

18   and one that I would think needs to be addressed in considerable

19   detail.

20         And finally, of course, what numbers follow the dollar

21   sign?  What is the amount of the award?  I used numbers of three

22   million and 3.6 million -- billion, excuse me.  Three billion

23   and 3.6 billion in the January findings, but was frankly quite

24   critical of those numbers.  And the government, of course, is

25   critical of those numbers.  The plaintiff is happy with those

Page 7

1   numbers, or at least accepts those numbers, and wants to move on

2   from there by adding the time value of money to them.

3        But I do not consider that those numbers are -- I don't

4   think we're finished with that question, let's put it that way.

5   I don't think we're finished with that question at all.

6        Now, I have lots of other questions on my mind this

7   morning, but those are the major ones, class certification, how

8   is the money distributed, what about the time value of money,

9   and what is the amount of the award.  And I would like to hear

10  from counsel on any of those four subjects, and if you have to

11  slip over into some other subject, okay, but frankly, I think

12  that's about all we have time to talk about in any serious

13  detail this morning.

14        Who goes first?  Mr. Smith?

15        MR. SMITH:  Good morning, Your Honor.  David Smith

16  representing the plaintiffs.

17        You know, I'll focus on the first two issues that you

18  noted.  Number one, the class certification problem if relief is

19  granted; what about the preclusive effect for any other actions

20  that may be brought, such as Mr. Jacobs.  And number two, to

21  whom does the money go to.

22        Your Honor, addressing that first issue, a lot depends

23  on what the damage claim might be.  There are certain damage

24  claims that certainly this Court, in various opinions, has

25  determined is not covered by this action.  If the damage action

Elouise Pepion Cobell, et al. vs.   CA 96-1285                    April 28, 2008
Dirk Kempthorne, et al.

Page 8

1    is a failure to collect, I believe you said that's not within

2    the scope of this particular proceeding at this time.  Certainly

3    that claim could have been brought in the claims court.  If

4    there are certain mismanagement issues, those claims would not

5    be precluded.

6            The fact of the matter is that any individual

7    beneficiary could at any point have brought a damage action in

8    the court of claims if they felt it was possible.  To our

9    knowledge, that has not happened during the course of this

10   litigation.  The defendants certainly would be more aware of

11   that than we would because they would be the ones being sued.

12           So to our knowledge, certainly Mr. Jacobs hasn't filed

13   such an action, and we're not aware at this point of anybody

14   else who has.

15           The practical matter is, Your Honor, that given the

16   failure of accounting, that would be an impossible task.  If

17   you're sitting here with money that's been placed into a

18   commingled account, nobody knows what the beginning account

19   balances are, there's -- without that accounting, nobody can go

20   and determine what their individual loss may be.

21           So as a practical matter, that remedy is not even

22   available for any plaintiff.  Nobody can go over into the court

23   of claims and say, you know, based on this accounting, I've lost

24   this amount of money.  So that possibility is really not a

25   reality, in our opinion.  Could at some point someone try to do

Elouise Pepion Cobell, et al. vs.   CA 96-1285                April 28, 2008
Dirk Kempthorne, et al.

Page 9

1    it, to go into the court of claims?  Obviously that's a

2    possibility that a judge in that jurisdiction would have to

3    consider.

4            Your Honor, if this Court applied all the assumptions,

5    all the presumptions that a court of equity can in dealing with

6    a trust, giving every benefit of the doubt to the plaintiffs in

7    applying those trust principles, making the government go

8    through its proof of showing every disbursement, certainly I

9    could see the possibility that it would be precluded, any other

10   damage claim would be precluded.  But as I understand from the

11   Court's ruling, that in fact is not what this Court is going to

12   do at this point.

13           Your Honor, the cases are not in agreement as to

14   whether a claim like this, dealing with equitable disgorgement,

15   what effect it may have on a damage claim, even if it was

16   possible.  There are some cases that say you have to make an

17   election of remedies, there are some cases that say you give a

18   credit for anything you obtain in equity.  Some cases you can

19   say you can do both.  The cases certainly are not on agreement

20   on that point.

21           But it's our position that it really makes no

22   difference because it's not even possible.  There's no

23   beneficiary of which we are aware who has had the advantage of

24   accounting to determine what individual losses may be.  We don't

25   believe Mr. Jacobs or anybody else can do that.  If the

**EDDIE JACOBS**
**P.O. Box 2322**
**Oklahoma City, OK 73101**
**(405) 524-4215**

August 30, 2008

**CERTIFIED MAIL**

Dennis M. Gingold, Esq.
607 14th Street N.W.
9th Floor
Washington, DC 20005

Keith Harper, Esq.
Justin Guilder, Esq.
Kilpatrick Stockton LLP
607 14th Street, N.W.
Washington, D.C. 20005

David Coventry Smith, Esq.
Kilpatrick Stockton LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400

Elliott H. Levitas, Esq.
William E. Dorris, Esq.
Kilpatrick Stockton LLP
1100 Peachtree Street
Suite 2800
Atlanta, Georgia 30309

Re:   **Plaintiffs' counsel and Defendants' failure to represent Johnny Jacobs' and Eddie Jacobs' IIM and USGS Accounts**

Plaintiffs' Attorneys:

The Court documented how you failed to prove your case and why it made its August 7, 2008 Decision which favored Defendants' evidence. I am dissatisfied with how you failed me and all other IIM beneficiaries and make this formal complaint against the legal representation you provided for all IIM beneficiaries and especially for me in this class action case.

You had a duty to represent, but failed me and all the other IIM beneficiaries. We have a worse outcome because of your negligent representation. If IIM beneficiaries read the pleadings and the court's August 7, 2008 Memorandum they will discover just how flawed your representation has been and why the judge made his ruling.

I understand why an accounting may be impossible for all IIM beneficiaries due to costs and/or lost and destroyed records, but an accounting is not impossible for me. You asked for an accounting for all beneficiaries and I asked for an accounting for one person, Eddie Jacobs. Your continued misrepresentation is a substantial factor in the loss of my being able to recover my father's and my property.

The court cited plaintiffs' counsels' multiple flaws, errors, mistakes, uncorroborated evidence, failure to produce credible expert witnesses, failure to produce a witness with personal knowledge who could dispute the government's testimony, failure to produce a single witness who could testify in detail about modern borrowing practices at Treasury, ignoring or refusing to evaluate evidence, overlooking transactions, ignoring or refusing to accept the replacement of figures with updated numbers provided to them by the government, failure to refute Ms. Herman's testimony and figures, failure to produce **any** evidence of stealing of assets from within the trust system in the last 120 years, made baseless, self-serving modifications to the historical data, failure to take time or opportunity to review Scheuren's methodology or data when the court offered, and failure to prove any bias in the government's model.

Plaintiffs' conceded much when they did not have to such as the conceding the government lacked reliable records back to 1887. Plaintiffs' counsel could have found reliable records but failed to seek them. You had my records in your hands, but chose not to present Eddie Jacobs' records dating back to 1912. You had a duty to present Eddie Jacobs' records to the court to help substantiate your case but you did not.

You failed me and all IIM beneficiaries, who have records to show what the government has taken from us. You failed to present any records or American Indian witnesses. I requested more than once to testify to avail plaintiffs of my specific knowledge of the Five Civilized Tribes of Oklahoma and oil and gas issues, which could have benefited plaintiffs, but plaintiffs' counsel chose not to hear my testimony or use my records as evidence to help other plaintiffs.

### PLAINTIFFS' COUNSEL FAILED TO PRODUCE EVIDENCE OF MALFEASANCE OR WRONGS

"Whatever problems have existed in the history of this trust, and however serious the misfeasances and malfeasances of the trustees over 120 years, there has never been any evidence of such prodigious pilfering of assets from within the trust system itself." P. 16

I ask why you failed to produce Johnny Jacobs and Eddie Jacobs' historical documents dating back to 1912, which you and defendants have discussed for a number of years, documents that I have asked you to produce numerous times, but you did not. You said you represented me in this case, but you did not address the contents of my documents, which would have shown serious malfeasances of the trustees during the past 120 years.

The government took money from Johnny Jacobs' Individual Indian Money account when he was a minor and purchased Liberty Bonds and War Savings Stamps. This money was never repaid to his IIM account and there is compound interest due on the full amount.

The BIA failed to terminate oil and gas leases which should have terminated on their own terms, but which they failed to terminate. Beneficiaries cannot terminate these restricted oil and gas leases, which must be terminated by the BIA. These are malfeasances, which you never addressed. You had evidence in my records, which you had a duty to produce, but failed to do so.

The BIA lost an IIM account and all the funds contained it never to be repaid, but you did not show this malfeasance. I am sure if you had interviewed IIM beneficiaries you would have found many more malfeasances for the court to examine, but you failed all American Indian beneficiaries because you refused to view American Indians as individuals. You chose to treat us a class without individual losses.

"Second, plaintiffs presented no evidence that their theoretical benefit to the government was anything other than a theory." P. 41

"Plaintiffs adduced no evidence that the Treasury ever decided to make an actual investment of IIM funds to the government's own benefit and produced no evidence of any decision not to borrow money on account of IIM funds." P. 42

## EDDIE JACOBS' CASE IS UNIQUE AND REQUIRES IMMEDIATE SETTLEMENT

The Cobell court in its Memorandum Opinion dated December 19, 2005, p. 7 stated, "It is to be noted that other than Mr. Jacobs, no trust beneficiary among the 500,000 or more in the plaintiff class has objected or commented to the interim fee petition by telephone or e-mail." Now, I object to plaintiffs' counsels' inadequate representation of all IIM beneficiaries.

The court recognizes that my situation is unique and on March 5, 2008 asked Mr. Gingold, "What do I do with Eddie Jacobs? What are you going to do with Eddie Jacobs? He wants to opt out."[1] Mr. Gingold answered, "Mr. Jacobs, as I read his complaint, Mr. Jacobs is talking for the most part about damages. Mr. Jacobs believes he has an action for damages." Mr. Gingold does not know what I believe. When I went to the United States solicitor I asked for an accounting/reconciliation of my father's and my account, not damages. I presented my father's and my documents for this purpose.

---

[1] Transcript of Status Conference, March 5, 2008, p. 29, ll. 10-11

My case has always been unique and warrants special recognition and immediate settlement because of the documents, which I have presented to defendants pursuant to the 1994 Trust Reform Act, which both plaintiffs and defendants have examined but have failed to present to the court.

My records if produced to the court would have shown that the government benefited from my father's IIM funds for the benefit of the war efforts during World War I and World War II. There was also evidence that showed how the government used funds from IIM accounts for old age pension funds. You chose not to produce any of this evidence to my detriment and to all American Indians' detriment.

My father, Johnny Jacobs and my IIM account is unfractionated and may be settled by defendants without my having to pursue a claim in the Federal Court of Claims, which I understand can take many more years. I should not have to wait. I have been waiting for more than 20 years.

Defendants say they can do my accounting/reconciliation and reimbursement of principal, past and accruing interest at the highest legal rate based on Johnny Jacobs' and Eddie Jacobs' IIM and USGS documents dating back to 1912 beginning on page one. There is money in special deposit accounts for reimbursement to beneficiaries and now there is money to be distributed to individuals in this case.

Ross Swimmer and Donna Erwin from the Office of Special Trustee told me they would conduct an accounting/reconciliation to my IIM account. They said they had all my records and would perform it if Plaintiffs' counsel would release me from this case. I asked Plaintiffs to release me more than once but never received a response to my written requests.

Therefore, I request the Court to recommend or order a remedy for my unique position in this case since Plaintiffs' counsel failed to respond to any of my requests. It should be noted that whenever I asked for a desk review for late posting due to Johnny Jacobs' IIM account, tank bottom payments, and windfall profits tax refunds the BIA proceeded to an audit and paid for these particular items. I was able to get this much done single-handed and yet plaintiffs' counsel failed to prove that the government benefited from any IIM accounts.

"That the government lacks reliable records back to 1887 is hardly surprising, as even the plaintiffs' own witness conceded. Tr. 331:19-332:8 (Cornell). But for the 1994 Act, indeed, an accounting claim raised 121 years into the trust would ordinarily be prejudicially late. See, e.g., BOGERT ET AL. § 962 "Beneficiaries who know of the method employed by a trustee in keeping accounts and do not object over a period of years will not be heard to object later."). The passage of the 1994 Act renewed plaintiffs' entitlement to an accounting, but it did not necessarily create an entitlement to the super-strong adverse inference asserted

here. In importing certain doctrines from background trust
law and excluding others, the Court must seek fairness to
both parties. See, e.g., Providence Rubber Co. v. Goodyear,
76 U.S. 788, 807 (1870) (a court should "exercise its
flexible jurisdiction in equity as to protect all rights
and do justice to all concerned.")." P. 65

I presented my records pursuant to the 1994 Trust Reform Act and received no relief.
My records are the smoking gun that neither defendants nor plaintiffs want to
acknowledge. I, one in 500,000 lodge this additional complaint against plaintiffs'
attorneys and state for the record, you failed me and I hold you responsible for inadequate
representation of my individual case. Therefore, I plead with the court to recommend and
order a remedy for my one in 500,000 case.

The courts' August 7, 2008 Memorandum stated why it made its ruling and showed how
plaintiffs' attorneys failed me and all American Indian beneficiaries in all the different
ways as follows.

### PLAINTIFFS' COUNSEL'S FLAWS

"Plaintiffs' model suffers from numerous methodological
flaws that were illuminated by the government's
presentation and, in many instances, are obvious to anyone
having basic familiarity with the case." P. 15-16

"The most obvious flaw, perhaps, is that the size of
plaintiff's calculated shortfall -- $4 billion, out of
total receipts of about $14 billion, see PX-189-A at Column
B -- is uncorroborated by any other event or data." P. 16

"Methodologically, the two most important flaws in
plaintiffs' model are: (1) that the model includes as
collections certain sums that, by definition, will not be
reflected as disbursements in the CP&R data, including
Osage headright payments; and (2) that the model accepts
historical receipt data and disregards historical
disbursement data from the same documents and systems, or
makes self-serving adjustments to one side of the ledger
and not the other. These flaws will be discussed in turn."
P. 17

### PLAINTIFFS' COUNSEL'S MISTAKES

"This basic mistake in plaintiffs' theory -- ignoring or
overlooking fund transfers -- had the effect of driving up
the amount allegedly "withheld" and driving down the
disbursement rate upon which plaintiffs relied for their

calculations of "withholding" for all the years before
1988." P. 18

The court goes on to say, "Osage headright disbursements
are not to be found in CP&R disbursement data, and both of
plaintiffs' experts agreed that Osage mineral estate
revenues did not belong in IIM system receipt data."   "The
effect of this mistake, once again, is both to add over
$800 million in erroneous receipts and to drive down
plaintiffs' calculated disbursement rate, see Tr. 1596:6-17
(Palmer), causing the inaccuracy to metastasize." P. 21

## PLAINTIFFS' COUNSEL'S SINGLE-MINDED RELIANCE
## ON CP&R DATA

"Transfers from the IIM system are not the only
transactions overlooked by plaintiffs' single-minded
reliance on CP&R data."   P. 18

"The error of plaintiffs' total reliance on CP&R data as
representative of disbursements is especially palpable when
one considers the inclusion in their model of Osage
headright monies as trust receipts. Osage headrights are
the product of the Osage Allotment Act of 1906, Pub. L. No.
59-321, 34 Stat. 539, which allotted Osage tribal lands to
individual members, see id. At § 2, 34 Stat. 540, but
preserved the mineral estate of those lands for common
management under the direction of the tribe."   P. 20

"From the beginning of the June 2008 trial, the
government had the burden of explaining the gap between
receipts and postings revealed by its exhibits from the
October 2007 trial. Plaintiffs added nothing to that burden
by their trial presentation. Their model did not make use
of the best available evidence and did not make fair or
reasonable comparisons of data. Plaintiffs injected bias in
their model through use of unfounded adjustments. By
deeming all receipts admitted and seeking to put the
government to the strictest of proof on all disbursements,
plaintiffs' model not only attempted via the "back door" to
impose a "gold plated" accounting standard the Court of
Appeals had already rejected, but it employed a super-
strong interpretation of the presumption against the
breaching trustee that cannot be equitably applied to the
trusts at issue here. The plaintiffs' model stands or falls
with their legal theory, and it falls." P. 68

## PLAINTIFFS' COUNSEL FAILED
## TO REFUTE DEFENDANTS' FIGURES

"Plaintiffs are skeptical about a reduction in revenue for the years 1986-1997 of "roughly $243 million" between the AR-171 exhibit in the October trial and the revised DX-371 exhibit produced at these proceedings, see Tr. 628:8-17 (Herman); PX-119, but they have in no way refuted Ms. Herman's testimony, and I find it to be credible." P. 19

"Plaintiffs continue to draw their receipts data from government figures produced during the October trial, see PX-189-A n.1; AR-171, ignoring or refusing to accept the replacement of those figures with updated numbers, see DX-371, that have eliminated phantom receipts. They refuse to accept Ms. Herman's reductions in receipt data because she did not "show her work." P. 19

"Plaintiffs' demonstrated willingness to accept data they liked and reject data they disliked did not enhance the credibility of their model. Their initial model would accept government receipt data from a historical document, but reject disbursement data from the same document in favor of their calculated disbursement rate. See Tr. 291:18-292:23 (Cornell)." Their rebuttal model continued to make self-serving modifications to the historical data, some driven by their calculated disbursement rate, see PX-189-A at n.1, and some even more baseless." P. 21-22

### PLAINTIFFS' COUNSEL FAILED TO PRODUCE RELIABLE WITNESSES

"Nonetheless, the plaintiffs' model increases the receipts -- and only the receipts -- by dividing them by 77 percent, the figure that represented the gap between receipts and postings in DX-365. Tr. 1581:7-13 (Palmer). This exhibit from the October 2007 trial was prepared to discuss what percentage of dollars would be covered by the government's accounting procedures, and had nothing to do with the percentage of funds that might have been collected and not paid into the Treasury, a detail about which the plaintiffs' witness (a last-minute surrogate) was evidently unprepared to testify. P. 23-24

"Instead of providing unbiased opinions, plaintiffs' expert witnesses essentially provided plaintiffs with a way to put a dollar value on their argument that all data that favors the plaintiffs may be treated as admitted, and all data

that disfavors them must be proven by the government with discrete, transactional evidence." P. 24

"Plaintiffs' theory assumes that any cash in the government's hands benefits the government regardless of where it is held, but a government witness with knowledge of Treasury borrowing practices testified that cash and investments held outside the Treasury General Account are not considered in Treasury borrowing decisions, Tr. 1245:21-1246:13 (Grippo); plaintiffs believed otherwise, but they did not produce a witness with personal knowledge who could dispute this testimony." P. 41

"Plaintiffs' only witness with knowledge of the borrowing practices of Treasury was Dr. James C. Miller, former director of the Office of Management and Budget. All he could say of plaintiffs' theory regarding saved borrowing costs was that it was sound as a matter of economics and common sense; he said so on the basis of no personal knowledge of the day-to-day mechanics of borrowing decisions at Treasury. Tr. 253:21-254:2 (Miller)." P. 41

"But even plaintiffs' expert agreed that it is only the specific nature of the relief sought here that secures the jurisdiction of this Court to order monetary relief against the government. See Tr. 77:4-21 (Laycock); Blue Fox, 525 U.S. at 262." P. 48

"Plaintiffs did not produce a single witness who could testify in detail about modern borrowing practices at Treasury." P. 52

### PLAINTIFFS' COUNSEL FAILED TO REVIEW DATA

"There can be no complaint that plaintiffs lacked time or opportunity to review Scheuren's methodology or data. The parties were given a standing offer to adjourn the trial in the event that they were confronted with information that they were not immediately able to address. See Hrg. Tr. 83:1-7 (Apr. 28, 2008) (the Court); Tr. Pretrial Conference 13:8-17 (June 2, 2008)(the Court). The offer was not taken up." p. 36, footnote 13.

### PLAINTIFFS' COUNSEL FAILED TO PROVE BIAS

"But whatever criticisms plaintiffs had about the

government's model, they were not able to prove any bias
that would render it fundamentally unsound." P. 38

"First, as explained earlier in this memorandum,
plaintiffs' model contains plain inaccuracies, and the
compound interest factor only compounds them." P. 40

"Second, plaintiffs presented no evidence that their
theoretical benefit to the government was anything other
than a theory." P. 41

## PLAINTIFFS' COUNSEL FAILED TO CONTRADICT
## DEFENDANTS' OFFER OF PROOF

"("All evidence is to be weighed according to the proof
which it was in the power of one side to have produced, and
in the power of the other side to have contradicted.").
Yet there are at least three reasons not to accept
plaintiffs' super-strong assertion of the presumption in
this case. First, and foremost, to do so would breathe new
life into a "gold-plated" form of accounting that the Court
of Appeals has already rejected as unduly burdensome, and
that plaintiffs themselves have disclaimed. See Tr. of
Appellate Oral Argument 40:1-45:25 (Sept. 16, 2005), [Dkt.
3519, Exhibit 1]." P. 63-64

The Court did not find that Plaintiffs were able to contradict defendants offer of proof.
Once again you failed all American Indian beneficiaries.

## REMEDIES

"Restitution and disgorgement are not remedies for the
failure to account, but for the failure to pay.
The only relevance to plaintiffs' restitution claim of my
impossibility finding is that it raises an evidentiary
presumption in favor of the beneficiaries and against the
trustee." P 46-47

"Thus, while equity will influence questions of proof and
calculations regarding funds withheld, it does not allow me
to award any relief -- whether legal or equitable -- other
than the specific return of funds withheld in breach of
trust, because, in this Court, the government has not
waived its immunity to anything other than specific
relief." P. 51

"The foregoing discussion telegraphs the answer to the

next question, which is whether I have jurisdiction in equity to order disgorgement of the "benefit to the government" plaintiffs think was derived from the withholding of trust funds. The answer is simply "No" -- but the plaintiffs have devoted such a significant amount of attention to the claim that a full explanation for its rejection will be attempted here. I have concluded after hearing the evidence that the claim must be denied (1) because there is no proof that the government was actually relieved from the need to borrow money because of IIM funds it had not posted to accounts; (2) because a claim for theoretical savings of borrowing costs is in substance a claim for damages; and (3) because, in general, an accounting for profits is not specific relief within the meaning of Bowen and Blue Fox. P. 51-52

"The financial practices of the Treasury Department in the early years of the trust -- a very important era because, in plaintiffs' submission, early differences compound over the life of the trust -- remain a complete mystery. Even if the record contained information about Treasury's use of identified trust funds now or in the past, such information would not prove anything about the use or management of misidentified or mislaid funds. Plaintiffs' assumption that all funds went into the Treasury General Account and were all taken into account when the government made borrowing decisions is thus only an assumption, entirely unproven as to any specific funds, and specifically refuted as to the modern borrowing practices at Treasury." P. 52

"If profits from the use of the property are sought, the plaintiff has the burden of proof to establish the gross amount of such profits." See Joel Eichengrun, Remedying the Remedy of Accounting, 60 IND. L.J. 463, 469-70 (1985) (citing Pallma v. Fox, 182 F.2d 895 (2d Cir. 1950) (Hand, C.J.)). Plaintiffs essentially concede as much, see Plaintiffs' Proposed Findings of Fact and Conclusions of Law, [Dkt. 3549] at 140 (plaintiffs have burden of proving a reasonable approximation); id. at 141 (citing above article), but they did not sustain their burden." P. 52-53

"Plaintiffs read § 702 and Bowen far too broadly in arguing that any remedy classifiable as restitution or disgorgement is relief "other than money damages." The Supreme Court has already made clear that, where money is at stake, it must be "the very thing to which [the plaintiff] was entitled" to come within the waiver, see

```
Bowen, 487 U.S. at 895 -- or the suit must be brought "to
enforce the statutory mandate itself, which happens to be
one for the payment of money." Blue Fox, 525 U.S. at 262
(citing Bowen, 487 U.S. at 900)." P. 55
```

```
"I have rejected the plaintiffs' claim of entitlement to an
additional sum representing "benefit to the government.""
P. 5
```

I read where your lead plaintiff found the Court's August 7, 2008 decision "disappointing and difficult to understand." Naturally, she and all Individual Indian Money (IIM) Account beneficiaries are disappointed with the $455 million amount cited by the Court.

If American Indians believe all the government's past injustices can be addressed in a class action lawsuit, expectations will never be met. The court must look only at the evidence presented and the laws, which govern the court.

IIM beneficiaries are looking for forgiveness for past sins and wrongs for 120 years, which continue daily. Can any court right these wrongs? Not without reliable witnesses and proof of its theories.

Can any amount of money right these wrongs? Certainly $47 billion would have made Plaintiffs' counsel happier than the $455 million cited by the court. Should IIM claims have been filed in the Federal Court of Claims in the first place? Should there ever have been a class for individuals who are owed individual money damages? Do individual Indians have access to equal justice attorneys?

## EDDIE JACOBS SATISFIED REQUIREMENTS
## OF THE AMERICAN INDIAN TRUST FUND MANAGEMENT REFORM

The court stated how plaintiffs' counsel failed IIM beneficiaries in your representation in this important case. You failed me because I have been denied the constitutional right to my property and procedural due process of law, which requires that proceedings shall be fair. I plead with plaintiffs' counsel, defendants, and the Court to do what is fair and right in hearing my case and reimbursing my father's and my property, including compound interest, due to my father and me and repeat the ways my case is unique.

   (1) Eddie Jacobs began an administrative claim for relief long before there was a
        Cobell class.

   (2) Eddie Jacobs' claim is an unfractionated claim passing from one original allottee,
        Johnny Jacobs' estate to one heir, Eddie Jacobs.

   (3) Historically, Johnny Jacobs, a minor, had two IIM accounts with separate 80-acre
        mineral tracts with two different leases, one for each revenue source.

   (4) Eddie Jacobs' records show the State of Oklahoma levies an Oklahoma Gross

Production Tax and Fees, which separates the Cobell class plaintiffs from all Oklahoma Indian mineral owners similarly affected by the gross production taxes and fees taken from IIM accounts.

(5) February 24, 2005, Defendants' counsel stated Eddie Jacobs is a "non-party."[2]

(6) Eddie Jacobs' case is unique because of the completeness of my father's and my IIM and USGS historical records.

(7) The Court recognized that I was unique when I objected to Plaintiffs' attorneys' fees, "It is to be noted that other than Mr. Jacobs, no trust beneficiary among the 500,000 or more in the plaintiff class has objected or commented to the interim fee petition by telephone or e-mail."[3]

(8) Defendants' officials, Ross Swimmer and Donna Erwin, Office of Special Trustee, told me directly they would reconcile my father's and my accounts if Cobell plaintiffs' counsel would release me from the class.

(9) Department of Justice's counsel asked in a letter to Plaintiffs' counsel, "Should our understanding of the scope of the class certification be incorrect or should you elect to allow us to communicate directly with Mr. Jacobs, please let us know."[4]

Apparently the Justice Department had doubts that I should be a class member. I understand Mr. Swimmer and Ms. Erwin's statements mean DOI trustees will reconcile and repay to Eddie Jacobs all funds due and owing to my father's and my IIM and USGS accounts beginning in 1912, including principal and interest at the highest legal rate, payment for lost IIM accounts, war bonds, and other lost amounts for claims which can be proved in an unbiased review of our records as set out in the 1994 Trust Reform Act.

The 1994 Indian Trust Reform Act guarantees, "The Special Trustee shall monitor the reconciliation of tribal and Individual Indian Money trust accounts to ensure that the Bureau provides the account holders, with a fair and accurate accounting of all trust accounts."[5]

The American Indian Trust Fund Management Reform provides authority for payment of claims for interest owed: "The Secretary **shall make payments to an individual Indian in full satisfaction of any claim** of such individual **for interest on amounts deposited or invested on behalf of such individual before October 25, 1994**, retroactive to the date that the Secretary began investing **individual** Indian monies on a regular basis, to the extent that the claim is identified - (1) by a reconciliation process of individual Indian

---

[2] Defendants' Opposition to Non-Party Eddie Jacobs' Motion for Leave to File Under Seal Eddie Jacobs' Individual Indian Money Account Documents, February 24, 2005
[3] Memorandum Opinion, dated December 19, 2005, p. 7
[4] Letter from Lewis S. Wiener to Robert M. Peregoy, dated July 10, 1998
[5] 25 USC, Title 25, Chapter 42, Sec. 4043, (2) (A)

money accounts, or (2) by the individual and presented to the Secretary with supporting documentation, and is verified by the Secretary pursuant to the Department's policy for addressing accountholder losses."[6] (emphasis added).

Plaintiffs' counsels' failure to produce evidence of Liberty Bond and other type loans to the government and government's use of IIM beneficiaries' funds for old age pension payments constitutes a breach of their duty to me and to all IIM beneficiaries. Plaintiffs' counsels' failure to produce one IIM beneficiary was negligent and disrespectful to all American Indians.

My documents demonstrated evidence of benefit to the government for use of IIM bond investment money and money used to pay old age pension funds, but plaintiffs' counsel chose to ignore these documents. They also chose not to produce any IIM witnesses who could have told their experiences of how they were harmed and how they were unfairly and unjustly mistreated during the past 120 years, but you chose to ignore our people.

You failed to show the United States Treasury guaranteed Liberty bonds and owes my father and IIM beneficiaries' principal, plus compound interest due on these bonds. Secretary of the Treasury Hammond said, "Treasury is responsible for keeping track of each Treasury security issued by the government. *See, e.g.,* (Pltffs' Exh. 2) (testimony of Don Hammond, Assistant Secretary of the Treasury, Financial Management Service at that time and current Member of the Board of Governors of the Federal Reserve System) at Tr. 57:12-22, May 13, 2003 AM ("Hammond Trial 1.5 Testimony") ("Our responsibility is to keep track of specific Treasury securities issued, the rate of interest they pay, and the payment of those interests credited.").[7] Mr. Hammond's statement confirms my argument for interest on all the war bond loans and other investments.

Individual American Indians deserved better legal representation from its counsel. Individual American Indians did not have adequate legal representation. The court said plaintiffs' legal theories fall. 'The plaintiffs' model stands or falls with their legal theory, and it falls." P. 68. Plaintiffs' legal representation of all IIM beneficiaries fell and failed.

---

[6] 25 USC, Title 25, Chapter 42, Sec. 4012
[7] Plaintiffs' Memorandum In Support Of Equitable Restitution And Disgorgement, March 19, 2008, p. 9

I stand by all I have stated to you now and in the past.  My records will bear out the truth of my statements to you and I ask this Court to grant me relief as requested.

Sincerely,   *Eddie Jacobs*

Eddie Jacobs

Cc:    The Hon. James Robertson, United States District Judge, USDC, D.C.
       Jeffrey S. Bucholtz, United States Acting Assistant Attorney General
       Michael F. Hertz, United States Deputy Assistant Attorney General
       J. Christopher Kohn, United States Department of Justice, Director, Civil Division
       John Stemplewicz, Senior Trial Attorney, Commercial Litigation, Civil Division
       Robert E. Kirschman, Jr., United States Department of Justice, Civil Division
       John Warshawsky, United States Department of Justice, Civil Division
       Ross Swimmer, Special Trustee, Office of Special Trustee, DOI
       Donna Erwin, Principal Deputy Trustee, Office of Special Trustee, DOI
       John Echohawk, Esq., Native American Rights Fund
       Hon. Byron L. Dorgan, Chairman, Senate Committee on Indian Affairs
       Hon. Lisa Murkowski, Vice Chairman, Senate Committee on Indian Affairs
       Hon. Tom Coburn, Oklahoma, Senate Committee on Indian Affairs
       Hon. John McCain, Senate Committee on Indian Affairs
       Hon. Nick J. Rahall, II, Chairman, Committee on Natural Resources
       Hon. Don Young, Ranking Republican Member, Committee on Natural Resources
       Hon. Dan Boren, Oklahoma, Committee on Natural Resources

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| ELOUISE PEPION COBELL, et al., | ) | |
|     Plaintiffs, | ) | |
| | ) | No. 08-8011  & |
|     v. | ) | No. 08-___**8013** |
| | ) | |
| DIRK KEMPTHORNE, Secretary of the Interior, | ) | Civ. No. 96-1285 |
| et al., | ) | (D.D.C.) (JR) |
|     Defendants. | ) | |

_____

## DEFENDANTS' PETITION FOR LEAVE TO TAKE INTERLOCUTORY APPEAL AND RESPONSE TO PLAINTIFFS' PETITION

GREGORY G. KATSAS
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

MICHAEL F. HERTZ
Deputy Assistant Attorney General

ROBERT E. KOPP
MARK B. STERN
THOMAS M. BONDY
ALISA B. KLEIN
MARK R. FREEMAN
SAMANTHA CHAIFETZ
 (202) 514-5089
 Attorneys, Appellate Staff
 Civil Division, Room, 7531
 Department of Justice
 950 Pennsylvania Ave., N.W.
 Washington, D.C.  20530

totality of all IIM accounts existing over more than 120 years would not be a proper remedy for an ostensible failure to provide adequate account statements for discrete IIM accounts, which are derived from different sources of revenue, held by discrete individuals, and held for discrete periods of time.  Indeed, for this reason and because the award is not "restitution" in any generally accepted sense, no logical basis exists by which the award could be distributed, as the district court seemed to acknowledge. See 4/28/08 Tr. 13, 15-18, 73 (noting difficulties raised by "per capita" distribution).

For similar reasons, the court had no authority to convert this class action into a suit for money.  The class was certified under Rule 23(b)(1)(A) & (b)(2) because class members had a common interest in compelling the production of historical account statements.  But on the question of whether an account statement can be produced for any particular account, the interests and circumstances of class members diverge, as one class member recently noted.  See Exhibit 3, at 2 (August 30, 2008 letter from Eddie Jacobs, pro se, to class counsel) ("I understand why an accounting may be impossible for all IIM beneficiaries due to costs and/or lost and destroyed records, but an accounting is not impossible for me.").  Nor do class members have a common interest in the monetary award.  Class members hold (or held) discrete interests in monies deposited into individual accounts that were earned from disparate allotted lands and other assets, none of which were held in common for the class.

-17-

25 March, 2011

**RECEIVED**

APR 15 2011

United States District Court

CHAMBERS OF
THOMAS F. HOGAN

Class action Settlement Agreement

Cobell vs Salazar, Secretary of Interior

TFH

Re: Civil Action No. 1:96cv01285 – OBJECTIONS

Objection I

On behalf of all Peoples (Indians/Tribal Members) of all the Nations (the Tribes now of the United States) I object to and oppose the entire document as being unconstitutional in its format, and do vehemently object to the centuries of breeched trusts and non compliance of the rules, regulations and promises included within each of the treaties made between each Nation (Tribe) and the United States, that either have not been dealt with or have been ignored even when presented and filed with the federal court of the United States, therefore, believe this action, Cobell vs Salazar, cannot legally be accepted without first addressing these international issues.

In the event this objection is ignored (as is recounted historically) I then wish that the following objections be heard and taken into account.

Objection II   Attorney's Fees

All fees, costs and expenses for Class Counsel and Class Representatives including but not limited to any and all other fees and costs arising from the continued findings and filings in relation to this case should be paid from a fund supplied and paid into by an entity of the Federal Government of the United States and separated from funds allocated to IIM Accounts in this "3.4 Billion Dollar Trust Settlement". The funds break down into a drop in the bucket, a one-time payment of $1,000. per Historical Class account, in comparison to a century of gross breeches of trust by the United States against the Peoples (Indians) of the Nations (Tribes) with whom treaties were made, and that the 3.4 billion dollars be paid in its entirety to each IIM Account, as it is a national insult that the already below poverty level Peoples (Indians) should bear the costs for the recovery of the aforementioned breeched trusts while, again, the lawyers, council and representatives are paid two hundred twenty-three million dollars, knowing that $1000.00-2500.00 cannot possibly help any family/person who has endured a lifetime of poverty.

OBJECTION III  Releases

This one time settlement agreement (3.4 billion dollars resulting in an actual payment of only $1000.00 to each IIM (Historical Class) account, and up to 223 million dollars to the attorneys and others) SHOULD NOT "release, waive, and forever discharge the United States, any department, agency or establishment, and any officers, employees or successors of the United States (defendants), as well as any contractor, including any Tribal contractor (collectively the "releasees") from obligation to perform a historical accounting and forever be barred and precluded from prosecuting any and all claims and/or causes of action for any and all historical  accounting claims, however characterized whether under common law, at equity or by statute". The above mentioned monies in no way constitute a settlement of this magnitude while the constitutionality of the settlement is questionable and should not be accepted without the United States first acknowledging and enforcing each and every one of the treaties previously made between each of the Nations (Tribes) and itself.


OBJECTION IV  Land Consolidation

"Fractionated Lands" is a Tribal issue and ~~should~~ does not have any context or relevance to this settlement, Cobell vs Salazar.  Tribal lands have been greatly diminished through the aforementioned breeched trusts and the failure of the United States to uphold the current treaties, therefore, should not be included within this document.


Signed this___//___day of_A p R i L____,2011

Name___Margaret Marie LEMKE___

Address___70987 Ave. 345___

___Max , Ne. 69037___

IIM Account No____6489___



April 8, 2011

Judge Thomas Hogan
U.S. District Court for the District of Columbia
333 Constitution Avenue NW
Washington, DC 20001
U.S. District Court, Washington, D.C.
RE: Case Number 1:96CV01285-JR.;
Class Action Settlement Agreement, December 7, 2009

Dear Judge Thomas Hogan,

Years ago, my Grandmother spoke about promises made by the Federal government to repay Native Americans for the lands, oil leases, mineral rights, etc. confiscated by treaties that were not honored by the US government. She referred to these monies as "chi-chi" money. She died October 9th, 1964 and neither she nor her parents received any portion. Throughout the years, it had become a source of laughter at family gatherings about getting money from the Federal government. I read an article twelve years ago in the Minneapolis Star Tribune about the Bureau of Interior's mishandling of three billion dollars in Indian Trust Funds. Enclosed is a copy of that March 4th, 1999 article that discusses how Congress had passed laws two times consolidating individual accounts, Indian lands, and mineral rights that were divided into progressively smaller pieces with each generation. This article also discusses how these laws were struck down by the Supreme Court as unconstitutional. Thank God. Also enclosed are three related articles dating back to the 1980's that discuss fraudulent practices of our government towards Native Americans. But the purpose of this article is not to complain about lost monies. I am writing this article in hopes that you, as a representative of the Federal Government that is our trustee, will consider the points below when signing off on how to distribute these funds to the Indians today.

As you may or may not know, there are currently many non-enrolled Indians in my state (Minnesota) and I would assume in many other states. I discuss three important reasons for this. Firstly, long ago, many Indians failed to sign the rolls simply for lack of knowledge about the rolls. Secondly, many ancestors of the non-enrolled Natives today had no birth certificate proving their identity or existence.

Taking a look at history, Natives were treated as less than human, and census documentation was very sloppy at best. Also remember that Indians were not granted citizenship until the 20th century. Lastly, many reservations today refuse to enroll legitimate and eligible Indians onto reservations. The reasons for these refusals are many, but one important reason is that they may have casinos with per capita payments to community members and additional members translate into less per capita for current members. This is at least true for some reservations in Minnesota. In fact, many reservations changed their tribal by-laws so that only the reservations could choose their members. Here the Federal government, our so-called self-proclaimed trustee, has failed to enforce the laws that it put into place to protect their Indian constituents. There is no end to the amount of arguments I can make and the evidence with regard to the government's failure to protect the rights of the Native Americans both in the past and today.

But I have a question for you. How would these Indian heirs receive any part of the lost funds (if found), i.e. how would they apply for them? There are many full-blood, half-blood, quarter-blood Natives who are not currently enrolled in *any* reservation. In our state, as in many of the states, the Federal monies go to the tribes regardless of the tribe's wealth, and none of the Federal monies ever reach or benefit non-enrolled Indians. Indians who are not enrolled currently have no legal right to any social or monetary benefits provided by the Federal government, and is this just? As a result, non-enrolled Indians are not receiving what was owed and promised to them by the Federal government of the United States of America. In fact, even for enrolled Indians, it is unfortunate that the few tribes that have the means to help them are often hoarding their wealth for their own small communities and leaving the rest to suffer in poverty.

I have no solutions to how you would go about identifying the many non-enrolled Native Americans today, although there should be actions taken by our trustee, the federal government, to force reservations to accept applicants that are deemed eligible by acceptable documentation.

So with regard to the current lawsuit, there are a few Indians in this lawsuit that could potentially receive large amounts of money at the expense of the majority of Indians who receive a relatively miniscule amount of $1000? And why, if these funds are owed to the Indians, would the legal costs need to be deducted from the funds themselves when the Indians are simply asking for what is already theirs by law?

Please educate yourself on the state of the Natives today by listening to a lecture given at a TED talk on *America's Native Prisoners of War*: http://www.ted.com/talks/aaron_huey.html by a photojournalist Aaron Huey who stayed with the Indians of the Pine Ridge Reservation. After five years of work, his haunting photos intertwine with a shocking history lesson in this bold and courageous talk. Please view this short lecture and forward to others to inform them of the state of the Indians today.

In a few cases, where legally feasible, some Native American groups in my home state are applying for Federal recognition as a tribe. They have little money or political influence in MN or in Washington D.C. so unfortunately, I do not expect them to succeed.

Throughout the history of our country, Native Americans have been unfairly treated and cheated from their rightful inheritance through the numerous treaties initiated by the US government who made themselves our fiduciary trustee. Today it continues.


Respectfully,

*Yvonne Marie Taylor, Enrolled member of the Santee Sioux Nation of Nebraska*

Yvonne Marie Taylor
2338 Kressin Avenue
Mendota Heights, MN 55120
Phone: 612-452-1172

## INDIAN AFFAIRS

# Indians want $27.5 billion to settle suit against U.S.

**By John Heilprin**
*Associated Press*

WASHINGTON, D.C.— American Indians suing the Interior Department for more than a century's worth of lost royalties said Monday they were willing to settle for $27.5 billion if Congress agreed not to draw the money from other Indian programs.

The class-action suit has lingered in U.S. District Court in Washington for nine years. During that time a federal judge has held both Interior Secretary Gale Norton and her predecessor, Bruce Babbitt, in contempt for failing to come up with an accounting of what the American Indians are owed.

A group of American Indian plaintiffs filed the suit in 1996 on behalf of 300,000, accusing the department of mismanaging oil, gas, grazing, timber and other royalties from American Indian lands dating to 1887.

Elouise Cobell, the lead plaintiff in the case, said American Indian leaders have agreed on 50 "principles" for a settlement, including a calculation that the royalties, plus compounded interest, total $176 billion.

Dan Dubray, an Interior Department spokesman, said the shift in strategy by the plaintiffs was perplexing. He said the department favors a settlement based on facts, not speculation in the absence of an accounting.

"They sued to achieve an accounting and the department has spent $100 million on a historical accounting," he said. "Now they're saying that's not the goal. It's an odd turn of events."



HARDWOOD FLOORING 99¢ A SQ. FT.
BAMBOO 25 YR. WARRANTY FROM $1.99 SQ. FT.
LUMBERLIQUIDATORS.COM
8899 Hastings St. NE • Blaine
763-784-3440



DONATE your CAR
800-407-2600
Or
612-788-3900
www.carshelpingpeople.org
Volunteers of America

2-7-97

3A

# Indian lawsuit over trust funds is ruled class action

## ■ Mismanagement of money claimed

**TRACEY A. REEVES** WASHINGTON BUREAU

**WASHINGTON**

**I**n a major victory for tribes, a judge ruled Thursday that American Indians can sue the federal government collectively for mishandling hundreds of millions of their dollars.

The ruling means that any Indian owed money by the government for past land and natural resource claims automatically is

> **More information on the suit is available from the Native American Rights Fund, 303-447-8760.**

part of a lawsuit already filed at the federal court in Washington.

Attorneys estimate that as many as 300,000 people now are included in the suit, which makes it the largest class action brought by Indians against the government. U.S. District Court Judge Royce Lamberth also ruled that the descendants of Indians who had claims can join the lawsuit.

"This is monumental for us," said Elouise Cobell of the Blackfoot tribe of Montana, the lead plaintiff. "This is good news for every Indian, and all our ancestors who now can be represented."

The lawsuit names Treasury Secretary Rober; Rubin, Interior Secretary Bruce Babbitt and Bureau of Indian Affairs director Ada Deer as defendants.

Stephanie Hanna, an interior Department

spokeswoman, said officials there were not happy with the ruling.

"We oppose this action," said Hanna. "But this is one step in a long series of steps and the judge . . . could choose to revisit it if his decision does not make sense down the road."

Cobell filed her lawsuit last June, saying she was fed up with the way the BIA has handled tribal trust funds — accounts set up decades ago to manage government royalties to Indians for such things as mineral and timber rights and land sales on reservations.

Although the government managed the funds, Indians could make withdrawals at any time. But several studies have shown that the Indians' money has been so poorly managed that officials don't know how

much is there.

Independent auditors have found that the BIA cannot account for $2.4 billion that is supposed to be in Indian trust funds.

"Our people have been cheated out of their money," said Cobell, a board member of the primarily Indian-owned Blackfoot National Bank in northwestern Montana. "I decided to do something about it."

The money isn't necessarily missing. Rather, auditors are having difficulty tracking which tribes and Indians were paid by the government and how much.

Indians and their lawyers liken the problems to a bank's being unable to produce canceled checks or deposit slips to back up its statements.

"If it were anybody else managing someone's money, they would be in jail," said Cobell. "It's a crime."

**12A**          St. Paul Pioneer Press Dispatch          Sunday, February 12, 1989

# Indian hearings questioned
## Approach causes resignations, complaints

**By Reed Karaim**
Washington Bureau

WASHINGTON — Two weeks into special Senate hearings on problems on Indian lands, there have been glimpses of alarming fraud and incompetence among officials running the government's Indian programs.

Those glimpses bolstered the historic claims of Indians that bungling and corrupt federal agencies are partly responsible for the chronic poverty and social ills that burden Indian reservations.

But the well-publicized Senate hearings have primarily targeted one man: Peter MacDonald Sr., the flamboyant leader of the Navajo nation.

Five attorneys on the committee staff resigned over the hearings' focus, calling into question the entire purpose of the yearlong investigation.

"We left on a matter of principle over the direction that the investigation was going," said one attorney, who like the others asked not to be identified.

Three of the attorneys had prepared an internal memo citing 20 areas where they believed the committee had evidence that Indians are being cheated out of millions of dollars in oil and gas royalties. The attorneys wanted to examine those charges during the hearings.

But the committee, which said it has dedicated the largest share of its resources to investigating oil and gas leases, chose to put off hearings on those issues until later this spring. Chairman Dennis DeConcini, D-Ariz., has said the committee needed more time to investigate the matter properly.

Ken Ballen, chief counsel for the committee, refused repeated requests for interviews. He has claimed that the attorneys were fired, but they say that was not the case.

Four of the first eight days of hearings largely dealt with tribal abuses. Three days dealt with allegations concerning MacDonald.

Many Indian leaders say privately that they consider MacDonald a crook. But they echo Sam DeLoria, head of the American In-



**Dennis DeConcini**
Committee chairman



**Peter MacDonald Sr.**
Focus of hearings

dian Law Center in Albuquerque, N.M., who wondered why a Senate committee was spending so much time on a single case of criminal wrongdoing.

"I can't stand Peter MacDonald," he said. "But there's a grand jury investigation of Peter MacDonald, and there are all kinds of people already looking at him. What does he really have to do with solving the serious problems that exist?"

"Is there anybody in the country watching these hearings who believes that all these guys are doing is building a factual basis for legislation?" DeLoria asked. "No, they're out to get Peter MacDonald. Is there anybody who believes they're going after the oil companies with the same zeal? No, it's obvious."

Nobody else appears to have received one-tenth the attention that MacDonald did. The committee wired MacDonald's closest business associate, prepared a special motel room with video equipment to tape him (he avoided it), granted his son limited immunity to testify against his father, taped his phone calls and trailed MacDonald with a surveillance van.

Committee members claim they could not ignore MacDonald, who has been accused of profiting from various kickback schemes, most notably a land deal that netted two of his close friends about $7 million.

"We had an obligation to follow the evidence where it led," said Sen. John McCain, R-Ariz.

The hearings have featured a parade of witnesses, mostly non-Indian businessmen, testifying under grants of immunity about kickbacks and bribes they paid to tribal leaders.

In most cases, the immunized witnesses apparently made more off the deals than the Indians against whom they are testifying.

Allegations that corrupt tribal governments are commonplace has been a refrain. Several tribes were mentioned in passing as building contractors told of handing out envelopes of hundred dollar bills, meals, cars and trips to Las Vegas in order to win Indian business.

Tribal leaders have not received an equal forum to defend themselves.

"It reminds me of the House Un-American Activities hearings into showbiz in the 1950s, where just to have your name mentioned meant you were tainted ... I think it's frightening," said Suzan Shown Harjo, executive director of the National Congress of American Indians.

The Indian congress, the nation's largest Indian organization, has written committee Chairman DeConcini, complaining about the direction of the hearings.

"Corruption cannot be found where it is not sought," the letter notes, "and your investigators should seek out nefarious practices in non-Indian settings as zealously as they have pursued them in tribal settings."

DeConcini noted that "tribal corruption is only about 20 percent of these hearings."

# NATION

TUESDAY, MAY 9, 1989   D  /3A

# Oil thefts from Indians probed

## Investigators saw cheating from behind bushes

Associated Press

WASHINGTON — A special Senate investigative committee was questioning witnesses today to determine if oil companies stole millions of dollars in petroleum and drilling royalties from Indians and the Interior Department.

After six months of interviews, undercover work and study of 700,000 pages of subpoenaed documents, the committee is going after oil companies that may have violated the law.

Sen. Dennis DeConcini, D-Ariz., who chairs the special panel of the Senate Select Committee on Indian Affairs, said the evidence dates back almost 10 years and deals with two basic issues — theft of oil and underpayment of royalties.

Witnesses today included investigators working for the committee, an independent oil and gas expert from Texas, the chief of security from a Denver oil company and Indians from Oklahoma who were victims of oil theft.

In an interview before the hearings began, DeConcini and Sen. John McCain, R-Ariz., said the committee's findings will be turned over to the Justice Department.

> ## " This is a mammoth problem. "
>
> **Dennis DeConcini**
> **Investigative committee**

"This thing is a mammoth problem," said DeConcini. "If we'd had another year, we may have found more evidence."

He said investigators hid behind bushes in the oil fields and saw companies "mismeasure" the amount of oil they took from wells.

Many of the areas are so remote that no one supervises the action, he said.

The senators said none of the top seven oil corporations is involved, though the ones that are involved are multi-million-dollar operations. They are mostly independent, "middle-level" companies, they said.

Earl Ross, spokesman for the American Petroleum Institute, said none of the companies is a member of his organization, which is the largest oil trade association in the country.

But he said the institute supplied the committee with technical information on how to measure oil.

The hearings on oil companies this week and the Indian Health Service next week are the second segment of a series being conducted by the special panel.

In February, the panel investigated contracting fraud, organized crime and child abuse on Indian reservations and among those doing business with them.

The hearings on the health service are expected to reveal "gross mismanagement," said the senators.

"It's a tragedy of all tragedies," said DeConcini, saying the health service provided care at "less than the norm for the nation."

McCain said the goal of the committee is to determine how well the federal government is fulfilling its responsibility to the Indians.

"Our job is to review policies, programs and management so we can recommend changes so problems won't happen again," he said.

DeConcini said he expected to have a report on all the committee's findings by October.

# Babbitt promises to try to fix Indian fund

## Secretary addresses skeptical Senate panel

**Associated Press**

WASHINGTON, D.C. — Interior Secretary Bruce Babbitt, cited for contempt of court over his handling of $3 billion in Indian trust funds, promised lawmakers Wednesday that he would "do my best" to resolve the matter

Key Senate Republicans were skeptical and said they didn't believe the Interior Department could manage the money properly.

"There seems to be an institutional rot that does not go away," said Sen. Ben Nighthorse Campbell, chairman of the Indian Affairs committee.

Babbitt is the latest in a series of interior secretaries to struggle with reconciling the funds, which were mismanaged for years by the Bureau of Indian Affairs.

Last week, a federal judge found Babbitt and Treasury Secretary Robert Rubin in contempt of court over their delay in producing documents sought by Indian account holders suing the government

"I am ready to accept responsibility for what's happened in the past," Babbitt said at a joint hearing of Campbell's committee and the Senate Energy and Natural Resources Committee. Cleaning up the funds will be his "highest priority," he said

There are 300,000 individual accounts worth $500 million and 1,500 tribal accounts worth $2.5 billion. The money includes lease revenue, royalties and court settlements

Thousands of records are missing, others were stored in a warehouse that was allegedly infected for a time with a deadly rodent-borne virus

The department has been unable to document $2.4 billion in transactions involving the tribal accounts over a 20-year period. Taxpayers are likely to be asked to pay for an eventual settlement with the account holders

Babbitt has asked Congress for $100 million next year to work on the funds, a 150 percent increase from this year

The Interior Department has straightened out about two-thirds of the accounts held by individuals, and a new accounting system will be in place by the end of the year, Babbitt said.

But Campbell, R-Colo., said he may introduce legislation to take the funds out of Babbitt's control. Sen. Frank Murkowski, chairman of the Energy and Natural Resources Committee, said he would fight Babbitt's budget request because he no longer trusts the department to manage

........................ Scam,
Wednesday was the first time since
ment Democrats began to en
ge Clinton to enter the race that

---



*March 1999*

*Mpls Star Tribune*

*Minnesota*

skeptical ...

**Associated Press**

WASHINGTON, D.C. — Interior Secretary Bruce Babbitt, cited for contempt of court over his handling of $3 billion in Indian trust funds, promised lawmakers Wednesday that he would "do my best" to resolve the matter.

Key Senate Republicans were skeptical and said they didn't believe the Interior Department could manage the money properly.

"There seems to be an institutional rot that does not go away," said Sen. Ben Nighthorse Campbell, chairman of the Indian Affairs Committee.

Babbitt is the latest in a series of interior secretaries to struggle with reconciling the funds, which were mismanaged for years by the Bureau of Indian Affairs.

Last week, a federal judge found Babbitt and Treasury Secretary Robert Rubin in contempt of court over their delay in producing documents sought by Indian account holders suing the government

"I am ready to accept responsibility for what's happened in the past," Babbitt said at a joint hearing of Campbell's committee and the Senate Energy and Natural Resources Committee. Cleaning up the funds will be his "highest priority," he said

There are 300,000 individual accounts worth $500 million and 1,500 tribal accounts with $2.5 billion. The money includes lease revenue, royalties and court settlements.

Thousands of records are missing; others were stored in a warehouse that was allegedly infected for a time with a deadly rodent-borne virus

The department has been unable to document $2.4 billion in transactions involving the tribal accounts over a 20-year period. Taxpayers are likely to be asked to pay for an eventual settlement with the account holders

Babbitt has asked Congress for $100 million next year to work on the funds, a 150 percent increase from this year

The Interior Department has straightened out about two-thirds of the accounts held by individuals, and a new accounting system will be in place by the end of the year, Babbitt said.

But Campbell, R-Colo., said he may introduce legislation to take the funds out of Babbitt's control. Sen. Frank Murkowski, chairman of the Energy and Natural Resources Committee, said he would fight Babbitt's budget request because he no longer trusts the department to manage the funds

"I wouldn't want to give them 10 cents. You might get seven back," said Murkowski, R-Alaska

Cobell v. Salazar
Case Number 1:96cv01285

Henry J. Altenbernt
13681 Whittaker rd.
Milan,MI 48160
IIM Account #: ******1894

I, Henry Altenbernt wish to comment on the Settlement. My main concern is the division
of the tracts. Originally my mother Esther Tiosh's father; Peter and his two siblings, Tom
and Nancy each had rights to tribal land. Tom had no heirs, which lived to reach
adulthood. While Nancy had several children and Peter had only one child; Esther. In
1993, I closed my mother Esther's, Grandfather Peter's, and Great Uncle Tom's estates.
At that time we had one and a half shares, my Great Grandfather's (Peter) and half of my
Great Uncle Tom's estate. Great Uncle Tom's estate went half to Peter's descendants and
half to Nancy's because he had no other living relatives. After time the shares then turned
into fractions of tracts, which dwindled our share over the years continuously splitting
with no explanation. When I inquire to the tribe about the land they withheld information
of where the tracts are located and are uncooperative upon answering any of my
questions. I would like an explanation of the division of tracts and an explanation of why
our fractions of the tracts are continually reduced.

Sincerely,
Henry J. Altenbernt

734-437-8296

**RECEIVED**

APR 18 2011

CHAMBERS OF
THOMAS F. HOGAN

RECEIVED
APR 14 2011
Angela D. Caesar, Clerk of Court
US District

96 cv 1285

Cobell v. Salazar

april 10, 2010

to whom it may concern;
        this is regarding the cobell vs salazar settlement. i want to opt out, or be excluded from the trust administration class. (land trust part) i will accept the iim mismanagement of indian accounts and have a current and active account. i am a member of the cheyenne river sioux tribe: enrollment #cru 006538, id#10909, ss#503484396. i am rosetta claire traversie.

Rosetta Claire Traversie

RECEIVED
APR 1 8 20..
CHAMBERS OF
THOMAS F. HOGAN

RECEIVED
MAILROOM

APR 1 4 2011

Angela D. Caesar, Clerk of Court
US District

RECEIVED

APR 18 2011

CHAMBERS OF
THOMAS F. HOGAN

Indian Trust Exclusions
P.O. Box 9419
Dublin, OH 43017-4519

To Whom It May Concern:

Pursuant to the notice authorized by the United States District Court For The District Of Columbia, as a member of the Trust Administration Class (TAC), I am submitting this letter to exclude myself from *Cobell v. Salazar*. I find the terms of the settlement a gross injustice for the historical harms committed by the United States on behalf of its citizens. I also understand that excluding myself means I will be removed from the $1.512 billion Accounting/Trust Administration Fund and that my TAC portion, once again, will be stolen by the United States. However, in exchange for not accepting this Faustian settlement, I retain my right to sue the United States for the gross mismanagement of my IIM account and to hold the American people responsible for their breach of trust to me and to my nation and for the crime of genocide and of colonization they have perpetuated and continue to perpetuate against my people, the Oceti Sakowin Oyate. Though the settlement states that the Historic Accounting Class (HAC) is prohibited from opting out, nonetheless, I am—for the record—excluding myself from the HAC portion as well.

Full Name: Edward Charles Valandra
Telephone: 605-624-4550
SSN: 503688607
IIM Account: 345U022107

*Edward Charles Val*                    11 April 2011

Edward Charles Valandra

Cc: Valandra file, Robert E. Kirschman, Jr., Clerks Office US District Court for the District of Columbia