**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELOUISE PEPION COBELL et al., | |
| Plaintiffs, | |
| vs. | Civil Action No. 96-1285 (TH) |
| KENNETH L. SALAZAR, Secretary of the Interior, et al., | |
| Defendants. | |

**Native American Rights Fund's
Reply In Support Of Motion To Intervene**

# Table of Contents

I.    Introduction. ..............................................................................................1

II.   GK Tries To Distract The Court With False, Misleading And
      Irrelevant Assertions..................................................................... 4

      A.   Plaintiffs Cannot Contest That NARF Was Instrumental
           In Plaintiffs' Ultimate Victory. ........................................... 4

      B.   NARF Did Not "Abandon" Plaintiffs ........................................ 5

      C.   NARF's Work On The Nez Perce Action Did Not Create A
           Conflict With NARF's Representation In This Case. ........................ 8

      D.   Under NARF's Retention Agreement, NARF May Receive
           An Award From The Common Fund.................................................11

      E.   NARF Has Never Renounced An Award From The
           Common Fund ................................................................................13

      F.   NARF Has Properly Accounted For Grants .................................... 14

III.  As A Matter Of Fairness And Equal Treatment, The Court
      Should Grant NARF Leave To Assert Its Claim .........................................15

IV    Case Law Supports NARF's Request For Leave To Intervene ................................. 16

V.    NARF Has Met The Test For Intervention By Right. ............................................. 18

      A.   NARF's Motion Is Timely ................................................................. 18

      B.   NARF Has A Legal Interest In This Action ...................................... 19

           1.   NARF did not forfeit its claim for attorneys' fees.................................... 19

           2.   The fact that NARF did not have a traditional
                contingency fee agreement with Plaintiffs does not
                disqualify NARF from an award from the common
                fund................................................................................ 22

           3.   NARF does not have unclean hands ....................................... 23

VI.   At A Minimum, NARF Has Met The Test For Permissive
      Intervention ................................................................................. 24

      A.   NARF Has A Viable Claim In This Action.................................... 24

B.   NARF's Petition Presents Issues Relevant To This Action
      In Its Present Posture .......................................................................................... 25

# I.   Preliminary Statement.

NARF was on the pleadings when Plaintiffs filed this case in 1996, and the Court appointed NARF as "Class Counsel" in 1997. NARF seeks to intervene with respect to a major issue now before the Court: the amount attorneys should receive for their contributions to the Class. NARF respectfully submits that it is entitled to share in any fee award the Court issues, given the critical role NARF played in helping Plaintiffs obtain a favorable settlement. NARF also submits that this Court is best qualified to address the charge made by Plaintiffs' current counsel ("GK") that NARF purportedly abandoned the Class and thereby forfeited its claim for fees.

The Court has compelling reasons to grant NARF's motion. The purpose of class action litigation is to resolve similar claims possessed by multiple parties in one suit at one time, instead of through piecemeal actions.[1] Consistent with that overarching policy, the best place to resolve claims by attorneys and others regarding a class action asset— *e.g.*, the fund earmarked for attorneys' fees—is before **this Court** as part of **this action**. This Court is best suited to evaluate NARF's contributions and the circumstances regarding NARF's reduced involvement beginning in late 2006. The Government agrees that the Court should permit NARF to intervene because "it is in the interests of the parties, the classes, and judicial economy to resolve all questions over the division of a fee award at one time."[2] And this Court has signaled its desire to consider all fee claims within this action by accepting without a motion to intervene the fee petition of Mark Brown —an attorney who (like the NARF attorneys) appeared as counsel of record in the case for Plaintiffs.[3]

Further, NARF has shown that it satisfies the tests for both Rule 24(a) intervention as of right and 24(b) permissive intervention. As to Rule 24(a), NARF has shown that:

- NARF's motion is timely under the total circumstances. NARF's intervention will not prejudice the Class (these proceedings will not delay

---

[1] *See, e.g., General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 155 (1982) ("the class action device saves the resources of both the courts and the parties by permitting an issue potentially affecting" many parties "to be litigated in an economical fashion").

[2] Docket No. 3727 at 2.

[3] *See* 4/11/11 Kowsari Declaration at ¶¶ 2-8, Docket No. 3723-3.

payments and NARF's fee request will not affect the size of payments), the Court (the Court has expressed a desire to resolve all fee issues at one time), or the other petitioners (the Court can generously compensate all interested parties within the non-appealable range of $50-99.9 million). Also, NARF moved quickly to assert its claim after settlement talks ultimately failed.

- NARF has a protectable interest in this suit because a *current* subject of this action is allocating the portion of the common fund that is earmarked in the settlement to pay attorneys' fees, and NARF has a valid fee claim based on its significant investment in the case.

- Denying NARF leave to intervene would impair NARF's interests, because NARF likely cannot resort to EAJA, and NARF might not be able to assert a claim against GK. And even if NARF could pursue other means, the most efficient way to resolve NARF's claim is to address it in this action.

- No other parties in this action represent NARF's interests. Indeed, GK froze NARF out of its fee petition, and is vigorously opposing NARF's motion.

This Court has broad discretion to permit NARF to intervene under Rule 24(b). As the Government recognizes, NARF has made the required showing for permissive intervention: its intervention request is timely; the Court has subject-matter jurisdiction over NARF's petition because NARF has a valid claim to a portion of the common fund; and NARF's claim shares common questions with the *current* subject matter of this suit—*e.g.*, how much of the common fund should the Court allocate to attorneys' fees.

NARF's claim also is worthy of the Court's consideration. NARF invested more than 31,300 attorney and law clerk hours in this case. For the Class, these hours were invaluable. NARF played a prominent role during Phase I, when Plaintiffs achieved a "stunning victory." NARF lawyers—especially Keith Harper—continued to make critical contributions during Phase II. Any assertion that NARF did not play a vital role in Plaintiffs' success is selfish, revisionist history. In economic terms, the reasonable value of NARF's invested hours is more than $10.5 million. NARF also advanced more than $1.6 million in costs. Allowing for offsets, NARF's unreimbursed contribution is worth $8.1 million. This is a relatively modest amount, compared with the $223 million request Plaintiffs have made for GK. As the Government noted in its brief, NARF's

request will not slow down these proceedings or require notice.[4]

In its Opposition, GK tried to distract the Court with several false, misleading, and irrelevant assertions:

- GK asserts that NARF played "no role" in Plaintiffs' success by arguing that NARF lawyers did not perform certain "first chair"-type tasks (like making opening arguments), without disputing the *many* contributions NARF detailed in its papers. The law does not hold that only lawyers who do showy tasks get to recover fees. The "behind-the-curtain" lawyers are just as important. Moreover, GK's argument only goes to the amount NARF should recover, not whether the Court should allow NARF to intervene.

- GK claims NARF abandoned the Class. This is nonsense. NARF reduced its role when its primary biller (Harper) left NARF. After that, NARF still stayed involved in the action, but to a lesser degree. Recent comments by Lead Plaintiff Elouise Cobell and Harper undercut GK's contention.

- GK litters its brief with assertions about a purported conflict between NARF's representation of Plaintiffs and its involvement in the Nez Perce Action. GK bases almost all of its legal arguments on the *assumption* that an actual conflict existed. But GK did not present any evidence of an actual conflict. All GK offered is speculation and attorney argument. Furthermore, careful analysis confirms that GK is just wrong that the remote possibility of a potential conflict ever compromised NARF's representation of the Class. And even if one assumed a conflict existed after NARF filed the Nez Perce Action, NARF would still have a claim for the work it did before the purported conflict developed. GK's conflict story just does not hold up.

- GK argues that NARF declared it would never accept a "contingency fee," and therefore is ineligible to recover any fees at all (because they ultimately would derive from the common fund). NARF consistently objected to Plaintiffs' counsel receiving a percentage of the recovery because NARF wanted the Class to reap the maximum benefit of a favorable resolution. But NARF has always insisted that it would petition for its fees and costs.

For all these reasons and the others detailed below, NARF respectfully requests that the Court grant NARF's motion and consider NARF's Fee Petition in this action.

---

[4] If the Court believes the Class should receive specific notice of NARF's claim, NARF suggested means for providing notice in its moving papers: serve all the named class plaintiffs with NARF's papers; publish NARF's fee request on the class action website; and place a notice in major Native Americans magazines. (NARF's Memorandum at 22 n. 69.) GK belittled this suggestion, claiming that NARF had offered nothing "to substantiate" that this notice would be effective. (GK's Opposition at 4, 16.) That is not true. NARF pointed out that these are the same mechanisms this Court found satisfactory in connection with Plaintiffs' Phase I EAJA application. (*See* 12/19/05 Memorandum Opinion at 6-7, Docket No. 3222.)

## II.  GK Tries To Distract The Court With False, Misleading And Irrelevant Assertions.

### A.  Plaintiffs Cannot Contest That NARF Was Instrumental In Plaintiffs' Ultimate Victory.

NARF has detailed the critical contributions it made to Plaintiffs' team. NARF established that it helped develop the case strategy; helped recruit a representative group of class plaintiffs; helped develop an exemplar accounting case; provided thousands of hours of support to the lead trial lawyers during the Phase I trial; helped bring contempt motions against government officials; helped protect Government witnesses from retaliation; helped litigate the Phase 1.5 trial; participated in the 59-day evidentiary hearing on IT matters; did important legislative and lobbying work in Congress; helped raise money to pay Gingold's and Holt's fees; and did invaluable client relations work in Indian Country.[5]

GK—somewhat ungratefully—contends that "NARF played **no role** in this case's ultimate success."[6] To support this startling charge, GK argues that NARF lawyers only argued one of ten appeals, did not "make any opening or closing arguments," and examined witnesses on "17% of total trial days."[7] GK's argument is flawed:

- GK ignores NARF's significant quantitative contribution. NARF attorneys accounted for nearly half of all hours worked through the Phase I trial, and approximately a sixth of all hours billed for the entire case.

- GK ignores the many qualitative contributions NARF itemized in its papers.

- The vast majority of the 90 lawyers whose time GK counts in its fee petition have the same purported experience shortfalls as NARF's lawyers, yet GK maintains their work deserves recognition and compensation. It is insulting to NARF's lawyers—and to most of GK's own legal team—for GK to assert

---

[5] *See* NARF's Memorandum at 8-14.

[6] GK's Opposition at 5 (emphasis added).

[7] GK's Opposition at 6 n.13. The Gingold affidavit also purports to dispute NARF's contribution in general, and the contributions of five particular NARF attorneys (Richard Guest, Kim Gottschalk, Tracy Labin, Michele Mitchell, and Mark Tilden). (4/15/11 Gingold Affidavit at ¶¶ 67-76). Obviously, Gingold's affidavit did not contest at all the contributions of Echohawk, Harper, Babby, Richard Dauphinais, or Robert Peregoy. NARF will not address Gingold's assertions at this time, because they relate more to how much the Court should award NARF, not whether the Court should grant NARF leave to intervene.

that the only contributions that count are such "showy" tasks as opening and closing arguments.

Admissions by GK's own affiants also undercut GK's argument. Ms. Cobell stated in a letter to Mark Brown that she was "pleased with the effort and results obtained by Dennis Gingold, Thaddeus Holt, Elliott Levitas and the Native American Rights Fund in representing me and the certified class."[8] In her affidavit, Ms. Cobell conceded that she retained NARF to "provide advice and counsel on Indian law" and to "aid in the day-to-day litigation tasks." She also stated that she considered NARF attorneys to be "our representatives on the Hill," and "our spokepersons in Indian country."[9]

Peregoy concedes in his affidavit that Plaintiffs viewed NARF "as a valuable resource and addition to the *Cobell* team," and that Gingold discussed "every major issue" with NARF lawyers "before any decision would be made."[10]

Harper accounted for almost 60% of all of NARF's billed time on this case. Gingold indicated in his affidavit that Harper made broad contributions in handling "major litigation duties."[11] Mark Brown, who worked on the case from 2000 to 2005, confirms that Harper, Lorna Babby, as well as other NARF lawyers and staff, made an important contribution to the team.[12]

## B.   NARF Did Not "Abandon" Plaintiffs.

As NARF explained in its opening brief, it reduced its role in this case in late 2006. But NARF never abandoned the Class, as GK asserts throughout its brief.

As of 2006, Keith Harper was the only NARF attorney working significant hours on the case. Echohawk monitored the case and provided input when appropriate, but he was not involved in day-to-day activities. In mid-2006, Harper decided to leave NARF and enter private practice as a partner at the Kilpatrick firm. This departure necessarily

---

[8] 2/24/00 Retention Agreement with Brown, Docket No. 3695-2.

[9] 4/15/11 Cobell Declaration at ¶¶ 14-16.

[10] 4/15/11 Peregoy Declaration at ¶¶ 6, 7, Docket No. 3731-2. *See also id.* at ¶¶ 8, 13 & 14 (NARF lawyers had input on original complaint; NARF worked with Congress; NARF worked with Indian Country).

[11] 4/15/11 Gingold Affidavit at ¶ 32, Docket No. 3731-3.

[12] 4/25/11 Brown Decl. at ¶¶ 2-5.

reduced NARF's overall role in the case. Harper's move, however, had absolutely no impact on the Class: he continued working on the case after he joined Kilpatrick.

Thereafter, Harper, acting as "Class Counsel," urged NARF to take on the Nez Perce Action. After Harper joined Kilpatrick, he had a series of conversations with Echohawk about tribal trust fund litigation. Many tribes were facing an arguable statute of limitations, but not all could afford to retain private lawyers to assert their claims. Harper told Echohawk that he thought tribal trust fund litigation could further Plaintiffs' interests *in this case* by encouraging the Government to offer a fair settlement. Given the importance of the tribal trust fund issues to the cause of Native American rights, NARF's role as a legal defense fund for Native Americans, and the strategic benefits such litigation could provide to Plaintiffs, Harper encouraged Echohawk to involve NARF in helping the tribes that needed representation. Echohawk decided that NARF should get involved. Echohawk felt no need to discuss the matter further with Gingold or Ms. Cobell, because Harper was "Class Counsel," and Echohawk expected to continue in his modest role on this matter.[13]

GK would have the Court believe that NARF's filing of the Nez Perce Action in December 2006 was a watershed moment—that when NARF lightened its role in this case (with GK's full knowledge and encouragement), NARF was knowingly and willingly writing off almost 31,500 hours of work and more than $1.6 million in costs.[14] That simply is not true. NARF never withdrew from the case, and continued to work on the matter after it filed the Nez Perce Action. For example, Echohawk attended status conferences on March 5, 2008 and April 28, 2008.[15] GK cannot say that Ms. Cobell or any other Plaintiff terminated NARF.[16] To the contrary, *Ms. Cobell has admitted that she did not object to NARF working on both this case and the Nez*

---

[13] Supplemental Echohawk Declaration at ¶¶ 16-17.

[14] GK's Opposition at 8-12 & 18-21.

[15] Supplemental Echohawk Decl. at ¶ 20.

[16] 3/28/11 Echohawk Decl. at ¶¶ 20-22 (NARF did not withdraw and no one terminated NARF).

***Perce Action***.[17] Indeed, she continued to ask NARF attorneys for legal assistance right through 2010, and NARF obliged.[18]

GK did not complain about any abandonment and associated consequences at the time. During the talks Echohawk had with Harper, Gingold and others about the Nez Perce Action, no one claimed that NARF had left the case, or that NARF's involvement could result in NARF ***completely*** forfeiting its claim to attorneys' fees and costs. The first time GK ever made its abandonment/forfeiture assertion was years later—during the recent settlement talks.[19]

Finally, recent statements by Ms. Cobell and Class Counsel devastate GK's abandonment theory.[20] In October 2010, Ms. Cobell attended the celebration of NARF's 40th anniversary in Oklahoma. (The fact that she attended the event is, of itself, evidence that Ms. Cobell never thought that NARF abandoned her.) At the event, Ms. Cobell said she was "pretty happy about" NARF being involved in the case, and that, even though she expected the case to last only a few years, NARF was a "risk taker" that "hung in there" and was "there for the long run."[21] Obviously, statements about NARF "hanging in there" and being "there for the long run" are inconsistent with abandonment.

Harper also attended NARF's anniversary celebration and he joined Ms. Cobell in complimenting NARF's long-term commitment to the case:

> "The Native American Rights Fund was there when [Ms. Cobell] called upon them. It was a difficult case to take. We knew the resources were going to be extraordinary both in lawyer time, but also in experts and things of that nature. And this is a big matter. People knew that going in, but to his credit and to the credit of all those board members and staff of the Native American Rights Fund, there was no hesitation because we knew that this wrong had to be corrected. See it was never about, for NARF, whether or not it was going to be lucrative. It was never about

---

[17] *See* 4/15/11 Cobell Affidavit at ¶¶ 55-56 (Ms. Cobell decided not to ask NARF to withdraw from the Nez Perce Action because she "did not want to interfere with NARF's principal interest in any respect").

[18] 3/28/11 Echohawk Decl. at ¶ 20 (in February 2010, Ms. Cobell asked Echohawk to make calls in Indian Country to help garner support for Settlement Agreement).

[19] Supplemental Echohawk Declaration at ¶ 19.

[20] These statements also undermine GK's assertions about NARF's purported lack of contribution to the case.

[21] Dougherty Decl. at ¶ 8.

whether or not it was not risky. At each and every turn they would make decisions based upon whether or not they thought they could help irrespective of the risks that it involved. That is the kind of courage that it required to develop and lay the foundation, develop Indian law and lay the foundation for a better future for Native people."[22]

GK appears to have a pattern of trying to freeze others out of this case and later complaining that those frozen out abandoned the Class. The briefing on Brown's petition evidences that GK froze Brown out of the case and Plaintiffs' fee petition, and that GK is now asserting that Brown abandoned the Class. And the petition for an incentive award filed by Earl Old Person indicates that GK froze him out as a representative plaintiff.[23] Similarly, GK froze out NARF. Gingold apparently liked to "tweak" NARF with slights. For a time, he was willing to identify NARF as attorneys of record because he felt the case needed an "Indian face."[24] But Gingold quietly (and unilaterally) removed NARF from the papers in 2008 even though Gingold did nothing to remove NARF as court-appointed "Class Counsel." And in 2010 and 2011, he blocked NARF's efforts to join Plaintiffs in their fee petition.[25] Now, despite GK's actions against NARF, GK is arguing that **NARF** abandoned the class.

## C.  NARF's Work On The Nez Perce Action Did Not Create A Conflict With NARF's Representation In This Case.

GK's Opposition reverberates with assertions about a "potential conflict" arising from NARF's dual representation of a class of individual Indians in this case and numerous tribes in the Nez Perce Action. In fact, GK has no evidence of a conflict.

GK's purported conflict was never more than an intellectual hypothetical. Contrary to GK's theory, the interests of the Class and the tribes are aligned:  both complain that the Government mismanaged trust assets. GK's alleged conflict relates to the **possibility** that **some** tribes that are parties to the Nez Perce Action might possess information relevant to the Class's claims in this case. Thus, for an actual conflict to materialize, all of these things must happen:

---

[22] Dougherty Decl. at ¶ 7.
[23] *See* Docket No. 3734.
[24] 4/25/11 Brown Decl. at ¶¶ 6-9.
[25] Supplemental Echohawk Decl. at ¶ 21.

- The Class would need to decide that it wanted the subject information.

- The Class would have to subpoena the Government for the information.

- The Government would have to say that it does not have the information.

- The tribes NARF represents in the Nez Perce Action would actually have to possess the information.

- The Government would have to ask the tribes for the information.

- The tribes would have to refuse to give the information to the Government.

- The Government would have to tell the Class it cannot comply with the subpoena.

- The Class would have to decide to directly ask the tribes for the information.

- The tribes would have to decline the Class's request, and thereby place the tribes in an adversarial position vis-à-vis the Class.

GK's papers are bereft of any evidence that *any* of these events occurred (or were ever even likely to occur). Indeed, NARF understands that the Class never sought such information. GK's papers also are bereft of any evidence or analysis that the mere possibility that a conflict could emerge actually put NARF in a compromised position. GK cites no ethical rule or case law, and offers no expert opinions, regarding its conflict allegations. All GK has given the Court is attorney argument and assumption.

GK tries to convert innocent NARF statements into purported admissions of a conflict. NARF has merely stated that it was looking into the possibility of a conflict:

- NARF's website reported in 2007 that it was "*in the process of assessing* whether there are any issues of conflicts of interest that may arise in the Cobell trial with our tribal clients in the trust funds case."[26]

- In its 2008 Annual Report, NARF merely said that it has not been "active in the case *pending* conflict of interest checks."[27]

- NARF's website reported in 2008 that NARF hoped to continue working on Cobell "following the completion of conflicts checks with our tribal clients."[28]

---

[26] Docket No. 3731-12 at p.1 (emphasis added).
[27] Docket No. 3731-15 at p.2 (emphasis added).
[28] Docket No. 3731-13 at p.1 & Docket No. 3731-14 at p.1.

GK complains that NARF took on the Nez Perce Action without obtaining Ms. Cobell's consent. NARF did not need such consent. When an attorney desires to represent different clients, whose interests seem to be similar, in separate lawsuits with an overlapping subject matter, Ethics Rule 1.7(b) only requires the attorney to obtain client consent if the representation of one client "will be or is likely to be adversely affected" by the representation of the other client. For NARF to have to obtain consent under this Rule, the Legal Ethics Committee of the D.C. Bar has emphasized that "the conflict must be likely, not merely hypothetical."[29] The "mere possibility that a result in one representation will affect the outcome of another is not enough to trigger a conflict as to which waiver must be sought."[30]

Under these standards, NARF did not have to obtain the Class's consent to represent tribes in the Nez Perce Action.  As explained above, no actual conflict ever emerged between the Class and the tribes. GK's assertions that a conflict could have arisen are speculative and remote at best. Thus, NARF did not need consent to represent tribes in the Nez Perce Action.

Courts also have found that lawyers can adequately represent a class of plaintiffs at the same time they represent other parties in separate actions against the same defendants. For example, in *Anderson v. Bank of the South, N.A.*,[31] the court held that the representative plaintiffs' lawyers could adequately represent the class, even though the lawyers represented competing classes against common defendants in at least four other class actions. The court found that, although there was a potential conflict of interest, the lawyers could adequately represent the class because the conflict was speculative, local counsel were not involved in the other actions, and the court's independent approval of any settlement would safeguard the interests of the class.

---

[29] D.C. Ethics Opinion No. 301, at 2 (2000) (lawyer representing plaintiffs in class action was not precluded from representing class member in separate action involving related subject matter against same defendant, despite alleged facts that created a potential (but unlikely) conflict of interest between the class and individual plaintiff).

[30] D.C. Ethics Opinion No. 265, at 4 (1996) (consent not needed unless "substantial risk" exists that representing one client will adversely affect representing the other).

[31] 118 F.R.D. 136, 149 (M.D. Fla. 1987).

Similarly, in this case, the conflicts GK asserts were merely speculative, Gingold was not involved in the Nez Perce Action, and this Court can ensure that any approved settlement is fair to class members.

## D.    Under NARF's Retention Agreement, NARF May Receive An Award From The Common Fund.

NARF's retention agreement contained two components for reimbursement.[32] The first component provided that NARF would receive direct payments from Ms. Cobell's foundation—the Blackfeet Reservation Development Fund. For billings to the BRDF, NARF agreed to charge its discounted public interest rate. In 1996, that rate was $150 per hour.[33] NARF received $497,286.00 from the BRFD during the case.[34]

The second component was "any other source."[35] One "other source" was grants. As NARF informed the Court, NARF received three grants relating to this case. NARF received $1.5 million from the Ford Foundation, $10,000 from the Bank of America, and another $500,000 from the Ford Foundation.[36]

Another "other source" for NARF has been fee petitions—such as the one NARF now seeks to file. The Court awarded NARF attorneys $72,749 for their work on the retaliation motions. NARF also was a beneficiary of Plaintiff's Phase I EAJA application.[37] This application resulted in a fee award of $4,534,275.97.[38] The Court allocated most of that amount to GK attorneys—$2,007,032 to Gingold, $490,678 to Holt, $2798,061 to Levitas, and $40,278 to Rempel.[39] But the Court also awarded $1.5 million to NARF. In calculating NARF's share, the Court applied hourly Laffey rates

---

[32] Supplemental Echohawk Decl. at ¶¶ 2-4.

[33] 5/20/96 Retention Agreement at 1-2, Ex. A to the 3/28/11 Echohawk Declaration.

[34] *See* NARF's Fee Petition at 8.

[35] 5/20/96 Retention Agreement at 2, Ex. A to the 3/28/11 Echohawk Declaration.

[36] *See* NARF's Fee Petition at 8.

[37] An EAJA application could have been another source for compensation. But GK agreed to a provision in the Settlement Agreement that arguably bars Plaintiffs from filing any EAJA application on NARF's behalf, even though GK knew that EAJA was one means for NARF to recover its fees and costs upon the conclusion of the case. (12/7/09 Class Action Settlement Agreement at § J.8, p. 49, Docket No. 3660-2.)

[38] 12/19/05 Memorandum Opinion at 2, Docket No. 3222

[39] 12/19/05 Memorandum Opinion at 75-80, Docket No. 3222.

ranging from $150 to $350, not NARF's public interest rate.[40]

GK tries to distort the Retention Agreement into a bar on an award from the common fund by asserting that the agreement only allows NARF to receive payment from funds "specifically contributed to the [BRDF] by foundations and others through grants or program-related investments made exclusively for purposes of the Project."[41] GK's twisted reading is false on its face. The quoted language simply indicates that BRDF can "only" pay NARF out of funds earmarked for the Cobell litigation. In other words, the agreement clarifies that BRDF will not pay NARF out of contributions BRDF received for other projects. This is one reason why the agreement freed NARF to seek compensation from "any other source," including from the common fund.[42]

GK also asserts that the Retention Agreement prevents NARF from recovering its fees in *quantum meruit* because Plaintiffs and NARF have a written contract.[43] GK has twisted the facts yet again. NARF is not basing its claim on the non-payment of fees under the Retention Agreement. The cases GK cites are therefore not applicable.[44] NARF is seeking a share of that portion of the common fund that the Court will reserve for attorneys' fees, to compensate NARF for the reasonable value of the services it provided the Class. As the D.C. Circuit has explained, this type of claim exists to prevent the unjust enrichment of beneficiaries of the fund.[45]  NARF's claim for *quantum meruit* compensation is therefore entirely appropriate.[46]

---

[40] 12/19/05 Memorandum Opinion at 75-80, Docket No. 3222.

[41] *See* GK's Opposition at 12-13.

[42] Supplemental Echohawk Decl. at ¶ 5.

[43] *See* GK's Opposition at 23-24.

[44] *E.g., Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 104 (D.D.C. 2006) (*quantum meruit* claim unnecessary where it was based on same facts underlying contract claim); *Dale Denton Real Estate, Inc. v. Fitzgerald*, 635 A.2d 925, 928 (D.C. 1993) (where contract included condition precedent to plaintiff's payment of fees, and condition had not occurred, plaintiff could not recover under *quantum meruit* theory).

[45] *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993) ("The underlying justification for attorney reimbursement from the common fund ... is that unless the costs of the litigation are spread to the beneficiaries of the fund they will be unjustly enriched by the attorney's efforts.").

[46] *See Modern Elec., Inc. v. Ideal Elec. Sec. Co., Inc.*, 81 F.3d 240, 246 (D.C. Cir. 1996) ("unjust enrichment" and "quantum meruit" refer to the same recovery, even though the terms also refer to distinct causes of action).

### E.   NARF Has Never Renounced An Award From The Common Fund.

GK tries to extrapolate NARF statements regarding its lack of support for "contingency fee" agreements into a declaration by NARF that it would never accept an award from a common fund.[47] NARF's statements do not support GK's assertion.

GK claims that Echohawk told Congress in 1996, and a newspaper in 2003, that NARF would not accept a "contingency fee."[48] The first flaw with GK's characterization is that these are not two separate statements; the 2003 article just quoted Echohawk's 1996 testimony.[49]

Second, GK is mischaracterizing the substance of Echohawk's remarks. Echohawk did not tell Congress that NARF would never accept a contingency fee. Rather, Echohawk—*speaking for Plaintiffs* and not just NARF—told Congress that:

> "***the lawyers in this case will not accept contingency fees***. Fully 100 percent of the recovery in this class action lawsuit will go to the individual Indians who are losing their money every day at the hands of the Federal Government."[50]

Echohawk said this just eight days after Plaintiffs filed suit. At that time, Plaintiffs expected this case to last only a few years, and they intended to finance the case through private funds and post-resolution fee petitions.[51] Thus, it is not surprising that Echohawk then told Congress that *no lawyers* (including GK) would accept a percentage of the recovery.

In multiple affidavits, GK also asserts that Echohawk told Ms. Cobell and others that NARF objected to contingent fee agreements.[52] When Echohawk discussed this issue with Ms. Cobell and Gingold, Echohawk employed "contingency fee" in the most conventional sense to refer to fee arrangements that paid lawyers a percentage of the recovery without regard to the amount of the recovery or the time the lawyers worked on

---

[47] GK's Opposition at 7, 12, 21-24.

[48] GK's Opposition at 21-22.

[49] Docket No. 3731-8 at p. 1-2.

[50] Docket No. 3731-7 at p. 3.

[51] Supplemental Echohawk Decl. at ¶ 7.

[52] 4/15/11 Cobell Affidavit at ¶¶ 23-30, Docket No. 3731-1; 4/15/11 Peregoy Affidavit at ¶ 20, Docket No. 3731-2; 4/15/11 Gingold Affidavit at ¶¶ 34 & 38, Docket No. 3731-3.

the case. For example, Echohawk did not want lawyers receiving 15% of a $1 billion recovery, whether they contributed 10,000 hours or 100,000 hours. He did not want lawyers receiving huge, premium payments on the backs of class members.[53]

But in stating his objection to such "contingency fee" agreements, Echohawk also made it clear to Ms. Cobell and Gingold that NARF intended to seek compensation from the government for the reasonable value of its work—through an EAJA application, or some other kind of fee petition—if Plaintiffs prevailed.[54]

GK's attempt to use Echohawk's remarks about "contingency fees" against NARF reveals the different attitudes of NARF and GK. On the one hand, NARF refused to take a "contingency fee" out of concerns for the Class, and is now valuing its time according to hourly Laffey rates. On the other hand, GK gladly entered into a "contingency fee" agreement and is now seeking a $223 million award—which is more than double the generous $99.9 million upper limit specified in the Fee Agreement, and more than triple the amount GK would receive using hourly Laffey rates. And to top it off, GK is now trying to use Echohawk's principled and admirable statements about "contingency fees" to convince the Court to deny NARF any fees at all, and thereby increase the pool from which the Court can pay GK. It is apparent that GK has no qualms about trying to maximize its fees at the expense of the Class and its co-lawyers.

## F.    NARF Has Properly Accounted For Grants.

NARF has informed the Court that it received $2.01 million in grants for its work on this case. NARF offset that amount against its fees and costs.[55] GK implies that NARF has not fully accounted for its grants, suggesting that NARF received contributions for the this case but deposited the money in its general fund for use on other activities.[56] GK's supporting affidavit testimony is inadmissible.[57] The witnesses

---

[53] Supplemental Echohawk Decl. at ¶ 6.

[54] Supplemental Echohawk Decl. at ¶ 8.

[55] NARF's Fee Petition at 8.

[56] *See* GK's Opposition at 7-8, 22.

[57] *See* 4/15/11 Cobell Affidavit at ¶¶ 19, 21, Docket No. 3731-1; 4/15/11 Peregoy Affidavit at ¶ 18, Docket No. 3731-2; 4/15/11 Gingold Affidavit at ¶¶ 63-64, Docket No. 3731-3.

did not base their testimony on personal knowledge; the testimony consists of unfounded speculation and hearsay.[58] And the assertion is false.

NARF did not use *a single penny* for general purposes that a donor gave to NARF with the expectation that NARF would apply it to this case. Since 1996, NARF's fundraising has referenced all of NARF's notable projects, including NARF's involvement in this action. Donors can give either "restricted" grants (which NARF must use for a designated matter), or general grants (which NARF can use for all purposes). NARF only received three grants restricted to this case—two from the Ford Foundation totaling $2 million, and a $10,000 grant from the Bank of America. The two Ford Foundation grants NARF received were *in addition to* the sizeable bi-annual *general* grants that NARF has historically received from Ford. All the other grants NARF received during the life of this case were general contributions that NARF properly deposited into its common fund.[59]

NARF has used the "restricted" $2.01 million in grants to benefit Plaintiffs' cause. Among other things, NARF used the first Ford grant to pay Gingold and Holt $561,374 for the time they billed between April 1997 and September 1998.[60]

GK's suggestion that Ms. Cobell could not raise any money because of fundraising competition from NARF is also untrue. The BRDF received numerous grants during the Cobell case, totaling at least $2.675 million—more than NARF raised.[61] Earl Old Person also has told the Court that he helped secure grants from the Kellogg Foundation.[62]

## III.  As A Matter Of Fairness And Equal Treatment, The Court Should Grant NARF Leave To Assert Its Claim.

The Court's treatment of Mark Brown's fee petition provides an additional reason for the Court to grant NARF's motion. Brown filed his petition on February 24, 2011. Thereafter, the Court directed Brown to file a motion to intervene. But when Brown's

---

[58] *See* NARF's Evidentiary Objections to the Cobell, Peregoy and Gingold affidavits.
[59] Supplemental Echohawk Decl. at ¶¶ 9-14 & 22.
[60] Supplemental Echohawk Decl. at ¶ 14.
[61] Dougherty Decl. at ¶¶ 2-4.
[62] *See* Docket No. 3734.

counsel informed the Court Clerk that Brown was still an attorney of record, the Court decided that Brown would not need to seek leave to intervene.[63] As GK admits, NARF has been an attorney of record in this case since its filing, as evidenced by the fact that NARF still receives notices through the ECF system.[64] Thus, for the same reasons that the Court accepted Brown's filing, it should accept NARF's Fee Petition.

## IV.  Case Law Supports NARF's Request For Leave To Intervene.

NARF previously explained how *Cherokee Nation* strongly supports NARF's motion to intervene—whether by right or by permission.[65] GK and the Government both assert that *Cherokee Nation* is distinguishable because, in that case, the only remedy for the attorneys was to recover fees from the fund created by the settlement.[66] That is the same situation here. In the Class Action Settlement Agreement, Plaintiffs appear to have given away the right to file an EAJA application for NARF's benefit.[67] Thus, intervening in this action and requesting attorneys' fees and costs using Laffey rates appears to be the most appropriate way for NARF to obtain just compensation.[68]

Relying on *Laker Airways Ltd. v. Pan American Airways*,[69] GK argues that a party's interest in attorneys' fees is no cause for intervention.[70] The court in *Laker Airways*, however, commented that a court must evaluate each request for intervention according to the unique facts of the case. Given the differences between the facts at issue in *Laker Airways* and in this suit, *Laker Airways* provides no persuasive guidance.

In *Lakers Airways*, the court noted that courts in this Circuit, in determining

---

[63] *See* 4/11/11 Kowsari Decl. at ¶¶ 2-8, Docket No. 3723-3.

[64] GK's Opposition at 14; Government's Response at 6-7.

[65] NARF's Memorandum at 23-26 & 29.

[66] GK's Opposition at 26-27.

[67] This is certainly the Government's position:  "The hard-fought bargain comprising the Settlement Agreement prohibits any award of fees, expenses, or costs to counsel other than through the petition plaintiffs filed in January." (Docket No. 3727 at 4.)

[68] GK also argues that *Cherokee Nation* is distinguishable because the plaintiff terminated the movant without cause. (GK's Opposition at 26.) This fact did not influence the court's decision.

[69] 109 F.R.D. 541 (1985).

[70] GK's Opposition at 24-26.

whether a party has an interest in the suit that justifies intervention as of right, have "refused to apply a mechanical test." Instead, the courts have "considered the policies underlying the right to intervene in determining whether such intervention is appropriate."[71] The court thus stated that a decision about intervention

> "'involves an accommodation between two potentially conflicting goals: to achieve judicial economies of scale by resolving related issues in a single lawsuit, and to prevent the single lawsuit from becoming fruitlessly complex or unending. Since this task will depend upon the contours of the particular controversy, ***general rules and past decisions cannot provide uniformly dependable guides***.'"[72]

The *Laker Airways* ruling cannot guide this Court for several reasons:

- *Laker Airways* was not a class action, and did not involve a common fund from which the Court would award attorneys' fees. Rather, *Laker Airways* involved a settlement between litigating parties that specified the exact payment of $12.5 million, evenly split, to two specific law firms. In a class action involving a common fund from which the court is to award attorneys' fees, any attorneys who have a claim for fees have an interest in the common fund, and thus have an interest in the subject matter of the suit.[73]

- The *Laker Airways* court found that allowing intervention could "seriously disrupt the future of [the] lawsuit."[74] The movant suggested in his briefs that he might seek "a renegotiation of the entire settlement agreement." No similar concern exists in this case. Neither GK nor the Government has expressed concern that allowing NARF to intervene would threaten the settlement. Indeed, the Government agrees that the Court should let NARF intervene (permissively).

---

[71] 109 F.R.D. at 544.

[72] 109 F.R.D. at 545, quoting *Smuck v. Hobson*, 408 F.2d 175, 179 (D.C. Cir. 1969).

[73] GK's other cited authorities are similarly distinguishable. *See, e.g., Dixon-Covington v. AARP*, Case No. 04-1338, 2005 WL 1271675 (D.D.C. May 5, 2005) (court denied attorney's request to intervene to assert claim for payment of attorneys fees out of settlement plaintiff entered into with defendant, noting that the attorney could pursue a separate contract action against the plaintiff); *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171 (2d Cir. 2001) (not a class action case involving payment of fees out of a common fund); *Newman v. Mut. Life Ins. Co. of N.Y.*, 206 F.R.D. 410 (D. Md. 2002) (court denied motion in non-class action case still pending, noting that the attorney was free to file a separate action to pursue fees); *Budro v. Brown & Root, Inc.*, 109 F.R.D. 619 (E.D. Tex. 1986) (court denied attorney's request for leave to intervene to assert right to collect a contingency fee, because plaintiff might lose the case which would moot the purported claim); *V.I. v. Landsdale*, Case Nos. 2001-157, 1998-243, 1992-79, 2010 WL 2991053, at *3 (D.V.I. July 26, 2010) (court denied motion to intervene as untimely, but noted that intervention would be justified if the intervenor can "show an interest in a specific fund that will be affected by the outcome of the suit").

[74] *Laker Airways*, 109 F.R.D. at 545.

- The attorney who sought leave to intervene in *Laker Airways* already had filed a separate action in the D.C. Superior Court. The court found that this other suit undermined the movant's claim that intervention would "contribute to judicial economy since the underlying questions of law and fact with respect to the partnership dispute will be heard in the Superior Court and those issues are in no way before this Court."[75] NARF has not, and might not be able to, file a separate action to recover fees.

A major issue now before the Court is how much of the common fund it should reserve to cover attorneys' fees. Given its significant work on the case, NARF has an interest in the portion of the fund that the parties and the Court earmark for attorneys' fees. The court in *Cherokee Nation*, confronted with similar circumstances, found that the law firm's interest in the settlement fund justified intervention (both by right, and permissively). This Court should follow *Cherokee Nation* and grant NARF leave to assert its claim for fees.

## V.    NARF Has Met The Test For Intervention By Right.

As discussed above, NARF has satisfied the 4-factor test for intervention by right under Rule 24(a).[76] In its Opposition, GK fails to make a contrary case.

### A.    NARF's Motion Is Timely.

The Government agrees that NARF's motion is timely.[77] GK disputes NARF's timeliness by narrowly focusing on the fact that NARF did not file its petition by January 25, 2011.[78] In making this argument, GK ignores the "total circumstances" standard. And the circumstances in this case dictate a finding that NARF's motion is timely because intervention will not prejudice anyone,[79] and NARF moved quickly to

---

[75] *Id.* at 545.

[76] *See, supra*, Section I. *See also* NARF's Memorandum at 21-27.

[77] Docket No. 3727 at 3 n.1.

[78] GK's Opposition at 15-16.

[79] GK resorts to scare tactics in suggesting that allowing NARF to intervene will cause "undue hardship" to the "most vulnerable people in this country," and prejudice the "elderly, infirm, and indigent." (GK's Opposition at 4.) GK does not explain how NARF asserting its relatively modest $8.1 million claim will harm these people. Moreover, GK's argument is disingenuous, given that GK is asking the Court for a $223 million award, even though the reasonable value of its services is well under $100 million. The Government also rejects GK's argument. Indeed, the Government stated that the Court need not even hear NARF's request on an expedited basis, because plenty

-18-

assert its claim after NARF's salutary efforts to informally resolve the issue failed.[80]

## B.   NARF Has A Legal Interest In This Action.

GK claims that NARF has admitted it has no interest in this case because NARF purportedly argued that its "intervention would have no effect on any of the underlying issues in this case."[81] GK missed NARF's point. NARF informed the Court that its intervention would not impact or concern the issues the Court *already has resolved*. NARF, however, argued persuasively that it has a significant interest in a major issue now before the Court:  payment of attorneys' fees out of the common fund.

GK's other arguments are similarly unavailing.

## 1.   NARF did not forfeit its claim for attorneys' fees.

GK asserts that NARF abandoned Plaintiffs, and that by this abandonment NARF forfeited any claim to an award from the common fund.[82] For authority, GK relies on the D.C. Circuit's ruling in *Fletcher v. Krise*.[83] *Fletcher* is easily distinguishable.

*Fletcher* was a unique case of attorney abandonment arising from the attorney's *disbarment*. Fletcher entered into a contingent fee contract with Krise in 1930 to pursue a claim against the U.S. government.[84] In 1931, Fletcher launched two lawsuits. Both suits failed. Also in 1931, the state bar disbarred Fletcher. In 1935, Fletcher drafted a bill for a colleague (Wool) to submit to Congress that would give the Court of Claims jurisdiction over a suit for Krise. Wool later changed the bill, it became law in 1938, and Krise's replacement counsel won a judgment in the Court of Claims. Fletcher sought a portion of that judgment under his fee agreement with Krise. The district court granted a motion for summary judgment in favor of Krise, and Fletcher appealed.[85]

---

of time exists before the Fairness Hearing for any affected parties to assert objections. (*See* Docket No. 3727 at 2.)

[80] NARF's Memorandum at 15-20.

[81] GK's Opposition at 26.

[82] GK's Opposition at 19.

[83] 120 F.2d 809 (D.C. Cir. 1941).

[84] *Fletcher*, 120 F.2d at 809.

[85] *Id.* at 810.

The appellate court affirmed the trial court's ruling. It based its decision on the unique and harsh consequences that necessarily flow from disbarment:

> "'In principle it cannot be doubted that when an attorney makes an agreement to prosecute a case for a fee contingent on success and is disbarred before the fee is earned, he may not collect compensation from his client for the work done. The agreed fee he cannot have, because he has not performed his engagement and the contingency on which the compensation was to rest has not happened. Reasonable compensation in lieu of the fee he cannot have, because his inability to complete his contract has been brought about by his own wrongful conduct.'"[86]

This case bears no resemblance to *Fletcher*. Unlike Fletcher, who got himself disbarred, NARF attorneys did nothing that rendered them incapable of representing the Class. As discussed above, NARF did not "abandon" Plaintiffs. NARF did not withdraw, and continued to do work on the case even into 2010.[87]

GK maintains that its abandonment/total forfeiture contention is "non-controversial."[88] An ALR article relied on by GK demonstrates the falsity of GK's assertion—even if the Court accepts GK's contention that NARF withdrew from the case.[89] The article discusses numerous rulings that have much greater applicability to this case than *Fletcher* and that support, in principal, NARF's request for a fee award. For example, the article notes:

- "[C]ourts have held, in situations where an attorney withdrew from or abandoned a case with the client's consent, that the attorney was entitled to recover compensation."[90] ***In this case***, NARF acted with the knowledge and encouragement of the Class. Harper thought NARF's work on the Nez Perce Action could spur a favorable settlement of this case. Ms. Cobell did not object to NARF working on the Nez Perce Action.

- "If a lawyer withdraws without good cause but follows proper procedures for withdrawal with good cause and there is no resultant prejudice to the client, the attorney should be permitted to show the court the benefits which the

---

[86] *Id.* at 811.

[87] *See, supra*, Section II.B.

[88] GK's Opposition at 19.

[89] *See* Plaintiffs' Opposition To Mark Brown's Motion For Attorney's Fees And Expenses at 12, Docket No. 3715.

[90] G. Blum, "Circumstances under which attorney retains right to compensation notwithstanding voluntary withdrawal from case," 53 A.L.R.5th 287 (1997) at § 2(a).

attorney's work conferred on the client ... ."[91] ***In this case***, NARF's reduced role did not prejudice the Class, because Kilpatrick attorneys provided the necessary staffing, and NARF's most involved lawyer—Harper—continued working on the case with GK's obvious approval at Kilpatrick. Moreover, Class Counsel actually encouraged NARF to work on the Nez Perce Action.

- "The right to compensation for the reasonable value of services continues even if an attorney rightfully withdraws from representation or the client discharges the attorney."[92] ***In this case***, NARF similarly still has a right to the value of its services, even though GK now maintains, years later, that NARF is no longer "class counsel."

- Where "an attorney rendered valuable services to clients in preparing two cases for trial, and he withdrew from the cases with the clients' consent because of the 'removal of the attorney to another place and the number of counsel retained,' but without abandoning his claim to fees for the services actually rendered, the attorney did not lose his right to reasonable compensation for the services rendered."[93] ***In this case***, NARF rendered valuable services to the Class, then took a lessened role when Harper left NARF (and the case was fully staffed) and NARF filed the Nez Perce Action, without ever abandoning its claim for the services it rendered the Class.

GK also asserts that the court in *Hendry v. Pelland*[94] held that counsel that "breach the duty of loyalty to its clients is not entitled to compensation, even for services rendered prior to the breach."[95] The court's opinion is clear that the court held no such thing. The court expressly stated that it did not address "the extent of forfeiture to which the Hendrys might be entitled if, at a new trial, they succeed in proving that Pelland breached his duty of loyalty."[96] Indeed, the court stated that courts "have ruled that lawyers must forfeit all fees earned in such representation ***after*** the breach occurred."[97]

One case cited in *Hendry* is *Jeffry v. Pounds*.[98] There, an attorney employed by the Jeffry firm represented Mr. Pounds in a personal injury case, while another Jeffry

---

[91] *Id.* at § 3(b), citing *May v. Seibert*, 164 W. Va. 673, 681 (1980) (finding that "in certain circumstances of unjustifiable withdrawal" the remedy of complete forfeiture of compensation "is too severe").

[92] *Id.* at § 4 (cumulative supplement), citing *Stageberg v. Stageberg*, 695 N.W.2d 609 (Minn. Ct. App. 2005).

[93] *Id.* at § 5(b), citing *Coopwood v. Wallace*, 12 Ala. 790 (1848).

[94] 73 F.3d 397, 401-03 (D.C. Cir. 1996).

[95] GK's Opposition at 20-21.

[96] *Hendry*, 73 F.3d at 403.

[97] *Id.* at 403 (emphasis in original).

[98] 136 Cal. Rptr. 373 (1977).

lawyer represented his wife in a divorce action against him.[99] Mr. Pounds hired new counsel for his case, won a $4,000 judgment, and gave his new lawyers a $1,000 fee.[100] The Jeffry firm sued Pounds for attorneys' fees, and won $500. On appeal, the court found that the Jeffry attorneys acted wrongly, but ruled that the firm **did not** have to completely forfeit its fees:  "Plaintiffs are entitled to compensation for services supplied ***preceding the breach of professional conduct***."[101]

The Restatement dealing with attorney conduct (relied on by GK) also contradicts GK's contention that NARF forfeited its entire claim when it filed the Nez Perce Action. Section 37 provides that a lawyer engaged in a "serious violation of a duty" may be required to "forfeit ***some*** or all" compensation.[102] Comment b clarifies that forfeiture

> "is not justified in each instance in which a lawyer violates a legal duty, nor is total forfeiture always appropriate. ... Denying the lawyer all compensation would sometimes be an excessive sanction, giving a windfall to a client. The remedy of this Section should hence be applied with discretion."[103]

Comment e is of particular relevance to this case. It teaches that sometimes "forfeiture for the entire matter is inappropriate, ***for example when a lawyer performed valuable services before the misconduct began***."[104]

Thus, according to GK's own cited authorities, NARF ***at least*** has a claim for the work its attorneys performed for the Class before its involvement in the Nez Perce Action (assuming the Nez Perce Action is in conflict with this case—which it clearly is not). Almost all of NARF's submitted time predates the Nez Perce Action.

2.    ***The fact that NARF did not have a traditional contingency fee agreement with Plaintiffs does not disqualify NARF from an award from the common fund.***

GK's position that NARF is not due any compensation because NARF does not

---

[99] *Id.* at 374.

[100] *Id.* at 375.

[101] *Id.* at 377.

[102] Restatement (Third) of the Law Governing Lawyers § 37 (2000); emphasis added.

[103] *Id.* at comment b.

[104] *Id.* at comment e; emphasis added.

have a contingency fee agreement is both legally and factually flawed.

In real practice, courts often award attorneys' fees out of a common fund to counsel that had no contingency fee agreement with the class. For example, in *Duhaime v. John Hancock Life Ins. Co.*,[105] Senator Howard Metzenbaum asserted objections to a class action settlement, and requested that the Court pay his attorneys' fees out of a "kind of common fund available for the payment of class attorneys' fees."[106] Metzenbaum did not have a contingent fee agreement. Still, the court awarded Metzenbaum's counsel more than $59,000 from the $16.5 million common fund.[107] The court explained:

> "because his objections improved the settlement for the class, Senator Metzenbaum's attorneys in fact shared with class counsel the work of producing a beneficial settlement. It is appropriate that they also share in the fund awarded to recognize the cost of producing the benefit to the class."[108]

NARF's Fee Petition is also consistent with NARF's retention agreement. The Class expected to pay NARF part of its fees on an hourly basis through the BRDF. But Plaintiffs and NARF knew that the BRDF could not fully pay NARF. Thus, NARF and Plaintiffs agreed that NARF could seek reimbursement "from any other source."[109] Consistent with that agreement, NARF is seeking reimbursement from another "source"—the portion of the common fund earmarked for attorneys' fees.

### 3.   *NARF does not have unclean hands.*

GK's contention that NARF has unclean hands is baseless.[110] From 1996 until the middle of 2006, NARF attorneys worked tens of thousands of hours on the case, doing important work in the courtroom, in Congress, and in Indian Country. By the middle of

---

[105] 2 F. Supp. 2d 175 (D. Mass. 1998).

[106] *Id.* at 176.

[107] *Id.* at 176-77.

[108] *Id.* at 176. Similarly, in *Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261, 1285 (S.D. Ohio 1996),[108] the court awarded Public Citizen more than $105,000 "from the common fund" for its "invaluable" work asserting objections to the class action settlement and fee applications. Public Citizen was not "class counsel" and did not have any type of contingency fee agreement with the class.

[109] Ex. A to the 3/28/11 Echohawk Declaration.

[110] GK's Opposition at 17-18 (arguing NARF has "unclean hands").

2006, Harper was the main NARF attorney on the case. He decided to go into private practice at Kilpatrick—where he could (and did) continue to do the same work he had been doing at NARF for the Class. After Harper left NARF, and while he was working as "Class Counsel," Harper encouraged NARF to divert its attention to the Nez Perce Action as part of a strategy to obtain a settlement **_for this Class_**. Since NARF started working on the Nez Perce action, no actual conflict has emerged between the _de minimis_ work it has been doing for the Class, and the work it has been doing for the tribes.

Overall, NARF is merely seeking appropriate compensation for its work on the case—and on an hourly basis, rather than a percentage-of-the-recovery basis. NARF is not looking to enrich itself by asking for a premium or multiplier (as is GK).

## VI.   At A Minimum, NARF Has Met The Test For Permissive Intervention.

As GK acknowledges, "the court enjoys considerable discretion under Rule 24(b) to permit a party to intervene.[111] The Government agrees that the Court should allow "NARF's intervention on a permissive basis to enable the Court to address all claims for attorney fees, expenses, and costs at one time."[112] Thus, NARF respectfully submits that the Court should exercise its "considerable discretion" and permit NARF to intervene— just as the Court allowed Brown to present his fee request.

NARF also has met the legal standard for permissive intervention.

### A.   NARF Has A Viable Claim In This Action.

GK asserts that NARF does not meet the independent subject-matter jurisdiction element because it has "no colorable claim" for attorneys' fees. This is because, GK maintains, the Settlement Agreement only allows the Court to award fees to "Class Counsel," and NARF is not "Class Counsel."[113] GK's view of the agreement is wrong.

The Settlement Agreement authorizes Plaintiffs to file a notice "stating the amount

---

[111] GK's Opposition at 29.
[112] Docket No. 3727 at 1.
[113] _See, e.g.,_ GK's Opposition at 30.

of attorneys' fees, expenses and costs they will be requesting for Class Counsel."[114] Plaintiffs filed this notice on January 25. But the Court is not limited to awarding the amounts requested in Plaintiffs' Notice, or to issuing an award only to those attorneys and firms identified as "Class Counsel" in Plaintiffs' Notice. The agreement provides that the "amount to which Plaintiffs are entitled for attorneys' fees, expenses and costs are within the discretion of the Court in accordance with controlling law."[115] Thus, the Court has discretion under the agreement to allocate to NARF a portion of the fee award.

GK also fails to address the reasons NARF gave in its Fee Petition as to why GK's "Class Counsel" distinction is off the mark. NARF pointed out that all of NARF's submitted time falls within the period when the Court recognized NARF as "Class Counsel"; GK itself does not recognize a distinction between "Class Counsel" and other attorneys who worked for the Class; and that, even if NARF is not now within the definition of "Class Counsel," NARF is still entitled under the law to recover from the common fund for the reasonable value of its services.[116]

## B.    NARF's Petition Addresses Currently Relevant Issues.

GK asserts that NARF's Fee Petition does not concern any common questions of law or fact because for "more than 15 years the subject of this action has been the enforcement of defendants' trust duties."[117] GK is correct that that *previously* was the subject of this action. But the settlement resolved the trust issues. A primary issue *currently* in dispute is attorneys' fees. Thus, NARF's claim presents common questions of law and fact with the *current* state of this action.


Dated:  April 25, 2011                    Respectfully submitted,


                                          By:   /s/ Charles B. Wayne
                                                Charles B. Wayne

---

[114] 12/7/9 Class Action Settlement Agreement at § J.1, p. 47, Docket No. 3660-2.
[115] *Id.* at § J.5, p. 47.
[116] NARF's Fee Petition at 3-4.
[117] GK's Opposition at 31.

Richard de Bodo (D.C. Bar No. 993287)
DLA PIPER LLP (US)
1999 Avenue of the Stars, Suite 400
Los Angeles, California 90067
Telephone:    (310) 595-3000
Facsimile:     (310) 595-3300
richard.debodo@dlapiper.com

Charles B. Wayne (D.C. Bar No. 935858)
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Telephone:    (202) 799-4000
Facsimile:     (202) 799-5000
charles.wayne@dlapiper.com

*Attorneys for Native American Rights Fund*