# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELOUIS PEPION COBELL, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>KEN SALAZAR, Secretary of the Interior, *et al.*,<br><br>Defendants. | Case No: 1:96cv01285 (TFH)<br><br><br>Date: June 20, 2011<br>Time: 10:00 a.m. |

*[handwritten: let this be filed Hogan J. 4/21/11]*

---

## OBJECTION OF KIMBERLY CRAVEN
## TO MOTIONS FOR FINAL APPROVAL,
## ATTORNEYS' FEES, AND INCENTIVE PAYMENTS

---

Theodore H. Frank (DC Bar. No. 450318)
CENTER FOR CLASS ACTION FAIRNESS, LLC
1718 M Street NW, No. 236
Washington, DC 20036
Phone: (703) 203-3848
Email: tedfrank@gmail.com

Attorney for Kimberly Craven

RECEIVED
APR 20 2011
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ I

INTRODUCTION ...................................................................................................................... 1

I.      Objector Kimberly Craven Is A Class Member. ................................................................. 5

II.     The Sprawling Trust Administration Class Is Insufficiently Cohesive And Cannot Be
        Constitutionally Certified. ................................................................................................. 5

III.    The Settlement Is Unfair Because It Fails To Provide A Meaningful Opportunity To
        Knowingly Exercise An Opt-Out Right To The Sprawling Trust Administration Class. 12

IV.     The Parties Have Failed To Demonstrate That The Individualized Claims Of The Dozens
        Of Subclasses In The Sprawling Trust Administration Class Are Being Fairly Valued. . 13

V.      The Remedy For The Sprawling Trust Administration Class Is Unfair Because It Bears
        No Relation To The Underlying Claims; Systematically And Perversely Undervalues The
        Most Injured Class Members While Providing Windfalls To Class Members Who Have
        Suffered No Injury; And Fails To Resolve Intra-Class Conflicts. .................................... 14

VI.     The Settlement's Requirement Of A Mandatory Waiver Of Rights Already Won Is
        Unconstitutional. .............................................................................................................. 16

VII.    The Proposed $13 Million In Class Representative Incentives Creates An Impermissible
        Conflict Requiring Decertification. ................................................................................... 18

VIII.   The Fee Arrangement Breaches the Attorneys' Duty to the Class. .................................... 19

IX.     Any Lodestar Calculation Must Account For Inflated Fees And Hours. ........................... 24

CONCLUSION ......................................................................................................................... 28

PROOF OF SERVICE .............................................................................................................. 29

## INTRODUCTION

This is a case about greed—greed that includes an "outrageous" fee request that has resulted in bipartisan criticism. "Editorial: Attorney fee request out of line," *Lincoln Journal Star* (Apr. 13, 2011) (citing Sen. Byron Dorgan (D-N.D.) and Sen. John Barasso (R-Wyo.)). Class Counsel, more interested in maximizing their personal recovery than the interests of the class, have agreed to a settlement that violates the most basic standards of fairness required for final approval under Fed. R. Civ. Proc. 23(e). There are multiple independent reasons for rejecting the settlement.

*First*, the Rule 23(b)(3) Trust Administration Class unconstitutionally treats wildly disparate "Funds Administration" and "Land Administration" claims identically. These claims— described in *twenty-five* parts (and even more subclasses) in the settlement agreement, and including claims over land administration, water rights, oil rights, mineral rights, grazing rights, timber sales, and several different varieties of misappropriation and mismanagement—are asserted for the first time in an amended complaint on the day of the settlement preliminary review order over a decade after the beginning of this litigation. There is absolutely no precedent for certifying such a sprawling class with such a variety of extraordinarily individualized claims; there is no showing that the class representatives have claims typical of the dozens of subclasses that make up this class; there is not even an attempt to show that there is anything common to this class other than the existence of Individual Indian Money accounts and the defendant. While Congress stated that the Court may disregard the requirements of Rule 23 when making its certification decision in this case, Congress has no authority to abrogate the constitutional guarantees that Rule 23 is designed to protect; this class flunks those constitutional requirements.

*Second,* class members cannot fairly determine whether to opt out: without the accounting that this court has found class members to be legally entitled to, class members cannot calculate the benefits and costs of proceeding individually. But the class members' equitable right to that accounting is entirely extinguished, whether or not a class member wishes to opt out, by the Rule 23(b)(2) Historical Accounting Class settlement.

*Third,* the parties provide no basis for the Court to evaluate these highly individualized claims to determine whether the relief provided is a fair valuation of the claims.

*Fourth,* even if the approximate $1 billion fund for the Trust Administration Class is a fair settlement on a classwide basis, there are insurmountable intra-class conflicts that make the proposed allocation unfair and unreasonable. As part of the trust mismanagement by the federal government, rights for some class members were mistakenly or otherwise improperly assigned to the wrong accounts, often held by other class members. Yet the allocation of the Trust Administration settlement fund is based on the erroneous payment history! This allocation punishes the members of the class who have suffered the most damages while rewarding class members who have already realized a windfall.

*Fifth,* the Historical Accounting Class settlement forces class members to involuntarily waive the hard-won injunctive relief that was the entire basis for this lawsuit to begin with—and to which this Court has already ruled the class was entitled. The procrustean $1000 payment in lieu of this accounting once again punishes the members of the class who have suffered the most damages while rewarding class members who have already realized a windfall.

Each of these five reasons provides independent grounds for the Court to reject the settlement: the Court may neither constitutionally certify the Rule 23(b)(2) class nor the Rule 23(b)(3) class, and cannot approve the settlement as fair under Rule 23(e).

But the problems with this settlement do not stop there. Elouis Cobell's and other class representatives' requests for "incentive payments" of an unprecedented thirteen million dollars from out of the class's pockets divorces her interests from those of the class; because of this conflict of interest, the class representatives are litigating on behalf of themselves, rather than the class, and cannot possibly meet the Rule 23(a)(4) standard. The Seventh Circuit has ruled a settlement "untenable" for much less. This is a sixth independent reason to reject the settlement.

The fiduciary breach of Rule 23(a)(4) is further demonstrated by the illegal fee request of Class Counsel. Though the authorizing legislation only permitted Class Counsel to receive up to $99.9 million in fees and expenses, Class Counsel seeks well over double this amount—even independent of the impermissible "incentive payments"—asking for an extra $124 million at the expense of class members who number among the poorest people in the nation. The request, which breaches the settlement agreement and authorizing legislation, is thoroughly inappropriate.

The request for $237 million for the attorneys and class representatives might be excusable if Class Counsel and Cobell had any basis to assert that their litigation was successful. They do not. The last four years of litigation, a product of the greed of Class Counsel, have been disastrous for the class. The papers entirely neglect to mention that Class Counsel played an instrumental role in scuttling a proposed $7 billion legislative settlement shepherded by Senator John McCain in 2006 by claiming that the underlying case was worth over $27 billion. Apparently, Class Counsel's hope for a multi-billion-dollar attorney fee caused them to reject a

settlement that would have provided $7 billion to the class four years ago, perhaps because that legislation capped the fee request at three percent, or $210 million. Having delayed class recovery by four years, and having been forced to take an eighty percent haircut because of their lack of success in the litigation in the last four years, Class Counsel now seeks a windfall that would pay them more than the 2006 settlement would have. This is wrong. If the court approves the settlement, and the Class ends up with eighty percent less than what it would have received under the legislation Class Counsel rejected, Class Counsel should not thereby come out ahead.

If the Court decides to proceed with a lodestar approach, it should be aware of substantial waste and excess in the Class Counsel's fee petition, especially given earlier findings of excessive billing in this case. The Kilpatrick firm has engaged in top-heavy assignments of senior partners; the lack of leverage (compounded by the large workload of co-counsel Gingold) may well mean that expensive senior partners were doing associate-level tasks in anticipation of a lodestar request at a time when the firm was performing poorly and partners may have been short of work. One $925/hour attorney claims a lodestar of $40 million by himself, thus claiming to bill an average of over 9.4 hours a day, 365 days a year without a single day off for fourteen years; a superhuman 28,230 hours in a seven-year stretch; and several days in which he billed more than 24 hours. Class Counsel also attributes $9 million of lodestar to Mr. Rempel, who is not an attorney, and likely was not working for a contingent fee. No private client would stand for such overbilling, and it is especially offensive in this case, where the attorneys are already arguably in breach of their fiduciary duty to the class by putting their interests ahead of the class's, and where the class members are especially vulnerable.

## I.     Objector Kimberly Craven Is A Class Member.

Kimberly Ellen Craven is a member of the Sisseton-Wahpeton Oyate and an Individual Indian Money (IIM) account holder. She has presented testimony to Congress about the abusive attorney-fee request in this settlement. Her address is 3560 Catalpa Way, Boulder, Colorado 80304; her phone number is (303) 494-1974. According to the *Cobell* settlement administrator, Ms. Craven's IIM Account number is 1921671; however, as if to demonstrate the bureaucratic confusion that led to this case, the Department of the Interior has sent Ms. Craven IIM Account statements that say her account number ends in xxxx3088.

Her attorney is Theodore H. Frank of the non-profit project, Center for Class Action Fairness LLC, which represents class members *pro bono* in cases such as this where the class attorneys work against the interests of the class.

## II.    The Sprawling Trust Administration Class Is Insufficiently Cohesive And Cannot Be Constitutionally Certified.

The Trust Administration Class purports to settle "Funds Administration Claims," which according to the Settlement, are "known and unknown claims that have been or could have been asserted through the Record Date for Defendants' alleged breach of trust and mismanagement of individual Indian trust funds, and consist of Defendants' alleged:"

    a.    Failure to collect or credit funds owed under a lease, sale, easement or other transaction, including without limitation, failure to collect or credit all money due, failure to audit royalties and failure to collect interest on late payments;

    b.    Failure to invest;

    c.    Underinvestment;

d.     Imprudent management and investment;

e.     Erroneous or improper distributions or disbursements, including to the
       wrong person or account;

f.     Excessive or improper administrative fees;

g.     Deposits into wrong accounts;

h.     Misappropriation;

i.     Funds withheld unlawfully and in breach of trust;

j.     Loss of funds held in failed depository institutions, including interest;

k.     Failure as trustee to control or investigate allegations of, and obtain
       compensation for, theft, embezzlement, misappropriation, fraud, trespass,
       or other misconduct regarding trust assets;

l.     Failure to pay or credit interest, including interest on Indian monies
       proceeds of labor (IMPL), special deposit accounts, and IIM Accounts;

m.     Loss of funds or investment securities, and the income or proceeds earned
       from such funds or securities;

n.     Accounting errors;

o.     Failure to deposit and/or disburse funds in a timely fashion; and

p.     Claims of like nature and kind arising out of allegations of Defendants'
       breach of trust and/or mismanagement of individual Indian trust funds
       through the Record Date, that have been or could have been asserted.

Settlement ¶ A.14.

The Trust Administration Class also settles "Land Administration Claims," which are

known and unknown claims that have been or could have been asserted through the Record Date

for Interior Defendants' alleged breach of trust and fiduciary mismanagement of land, oil, natural

gas, mineral, timber, grazing, water and other resources and rights (the "resources") situated on,

in or under Land and consist of Interior Defendants' alleged:

a. Failure to lease Land, approve leases or otherwise productively use Lands
   or assets;

b. Failure to obtain fair market value for leases, easements, rights-of-way or
   sales;

c. Failure to prudently negotiate leases, easements, rights-of-way, sales or
   other transactions;

d. Failure to impose and collect penalties for late payments;

e. Failure to include or enforce terms requiring that Land be conserved,
   maintained, or improved;

f. Permitting loss, dissipation, waste, or ruin, including failure to preserve
   Land whether involving agriculture (including but not limited to failing to
   control agricultural pests), grazing, harvesting (including but not limited to
   permitting overly aggressive harvesting), timber lands (including but not
   limited to failing to plant and cull timber land for maximum yield), and
   oil, natural gas, mineral resources or other resources (including but not
   limited to failing to manage oil, natural gas, or mineral resources to
   maximize total production);

g. Misappropriation;

h.    Failure to control, investigate allegations of, or obtain relief in equity and
      at law for, trespass, theft, misappropriation, fraud or misconduct regarding
      Land;

i.    Failure to correct boundary errors, survey or title record errors, or failure
      to properly apportion and track allotments; and

j.    Claims of like nature and kind arising out of allegations of Interior
      Defendants' breach of trust and/or mismanagement of Land through the
      Record Date, that have been or could have been asserted.

Settlement ¶ A.21. To state the definition of the class is to demonstrate that it is improper to
certify it as a class. Land Administration Claim (f) by itself—aggregating claims over agriculture,
grazing, harvesting, timber, oil, gas, and mineral resources—is inappropriate for certification. It
is utterly unprecedented to certify a single class with wildly disparate individualized claims for
common relief: the only thing these class members have in common is the defendant and a trust
account. The "questions of law or fact common to the class" that Fed. R. Civ. Proc. 23(a)
requires are absent. "No class action is proper unless all litigants are governed by the same legal
rules. Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R.
Civ. Proc. 23(a), (b)(3)." *In re Bridgestone/Firestone Tire Prods. Liab. Litig.*, 288 F.3d 1012,
1015 (7th Cir. 2002). The Supreme Court has rejected settlement classes far less "sprawling"
than this one. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624-25 (1997) (calling for "caution
when individual stakes are high and disparities among class members great").

        The parties do not even attempt to meet the standards of Rule 23 in asking for settlement
approval. Rather, they rely upon the authorizing legislation, where Section 101(d)(2)(A) of the

---

Claims Resolution Act states "Notwithstanding the requirements of the Federal Rules of Civil Procedure, the court in [this case] may certify the Trust Administration Class." But neither Congress nor this Court may override the constitutional prerequisites for certifying a class. While Congress can create exceptions to the Federal Rules of Civil Procedure, *Shady Grove Orthopedic Assoc's, P.A. v. Allstate Ins. Co.*, ___ U.S.___, 130 S. Ct. 1431, 1438 (2010), it cannot create exceptions to the U.S. Constitution. The only reason Section 101(d)(2)(A) of the Claims Resolution Act is not unconstitutional on its face is because it is only permissive with respect to class certification: the court "may" certify a class notwithstanding Rule 23. The statute does not, and cannot, require a class certification that does not comply with the Constitution.

The requirement that class members be similarly situated and have common claims is of constitutional magnitude. "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. That adjudication-by-representation requirement, reflected in Rule 23(a)(4), is of constitutional import. *Id.* at 626-28; *Ortiz*, 527 U.S. at 845-46 ("serious constitutional concerns" ameliorated only in "limited circumstances"); *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395 (1977); *Hansberry v. Lee*, 311 U.S. 32, 44-45 (1940). *See also, e.g.*, *Nat'l Ass'n for Mental Health, Inc. v. Califano*, 717 F.2d 1451, 1457 (D.C. Cir. 1983) ("At all stages of the litigation the lack of adequate representation denies [absentee class members] due process of law and prevents the court from assuming personal jurisdiction over the absentee members.") (defendant class); *Phillips v. Klassen*, 502 F.2d 362, 364 (D.C. Cir. 1974) (violates due process when plaintiffs are not truly representational); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 796 (3d Cir. 1995) ("The Rule 23(a) class inquiries (numerosity,

commonality, typicality, and adequacy of representation) constitute a multipart attempt to safeguard the due process rights of absentees."); *id.* at 785 (Rule 23(a) commonality requirement, *inter alia,* "represents a measured response to the issues of how the due process rights of absentee interests can be protected and how absentees' represented status can be reconciled with a litigation system premised on traditional bipolar litigation"); *In re Joint Eastern and Southern Dist. Asbestos Litigation,* 982 F. 2d 721, 742-743 (2d Cir. 1992), *modified on reh'g sub nom. In re Findley,* 993 F. 2d 7 (1993); *In re Fibreboard Corp.,* 893 F.2d 706, 710 (5th Cir. 1990) (violates due process clause to certify diverse class of "persons claiming different diseases, different exposure periods, and different occupations" given magnitude of disparities of class); *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.,* 308 S.W.3d 909, 919 (Tex. 2010) (commonality and typicality requirements based in Due Process clause of U.S. Constitution); *Bonilla v. Las Vegas Cigar Co.,* 61 F.Supp.2d 1129, 1136 (D. Nev. 1999) ("In Rule 23 class actions, certification serves due process concerns."); *Sollenbarger v. Mountain States Tel. & Tel. Co.,* 121 F.R.D. 417, 430 (D.N.M. 1988) (Rule 23(a)(3) and (4) encapsulate constitutional requirements of *Hansberry*); *Hardy v. Wise,* 92 S.W.3d 650 (Tex. App. 2002).

Because of the lack of commonality of issues, the class representatives cannot (and make no attempt to) meet the Rule 23(a)(4) adequacy requirement for representing absent class members. Adequacy of the class representative and counsel is not simply a requirement of Rule 23, but of the Constitution. The Claims Resolution Act's permissive authority for class certification is unconstitutional to the extent that it permits this Court to disregard the commonality or adequacy requirements. The class may not be certified.

---

.  .

The problem is multiplied, because the sprawling Trust Administration Class was only added at the last minute, pursuant to the preliminary review of the settlement. There has been no showing that "the released claims [were] adequately represented prior to settlement." *The Authors Guild v. Google Inc.*, No. 05 Civ 8136, *slip op.* at 17 (S.D.N.Y. Mar. 22, 2011) (*citing Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 106-07, 110 (2d Cir. 2005)). *See also Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland (Firefighters)*, 478 U.S. 501, 525 (1986) (consent decree must "com[e] within the general scope of the case made by the pleadings").

Certainly, one has sympathy for this Court's difficult position. The Court is faced with an enormous injustice and a fifteen-year-old case with over 3600 docket entries, and has been given the opportunity to resolve an "elephantine mass" of litigation with hundreds of thousands of individual claimants ill-served by government trustees. *Cf. Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999). But, as the Supreme Court and other courts have consistently and repeatedly held, the procedural tail cannot wag the substantive dog: even where litigation is so complex and overwhelming that it "defies customary judicial administration," the convenience of aggregating claims in an inappropriate class action certification or settlement cannot trump the constitutional requirements of due process. *Id.*; *see also Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) (rejecting "adventuresome" attempts to "cop[e] with claims too numerous to secure their 'just, speedy, and inexpensive determination' one by one"); *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 219 (2d Cir. 2008) (decertifying class even though "redressing injuries caused by the cigarette industry is one of the most troubling problems facing our Nation today" (internal quotations and ellipses omitted)); *Fibreboard*, 893 F.2d at 712 (issuing *mandamus* to preclude

---

inappropriate class certification, notwithstanding "imaginative and innovative efforts to confront" unmanageable litigation); *Authors Guild*, slip op. at 22 *ff.* (rejecting settlement despite finding "parties are seeking in good faith to use this class action to create an effective and beneficial marketplace for digital books").

Convenience cannot justify discarding individual due process rights and the case-or-controversy requirement. While Congress has the authority to create a claims process and remedial scheme within the executive branch subject to the limitations of the Equal Protection Clause and Takings Clause, it may not use the Article III courts to short-circuit this approach through impermissibly aggregated litigation.

**III.    The Settlement Is Unfair Because It Fails To Provide A Meaningful Opportunity To Knowingly Exercise An Opt-Out Right To The Sprawling Trust Administration Class.**

Perhaps the Settling Parties will argue that the right of opt-out protects the class's due process rights. Unfortunately, this settlement makes that opt-out right illusory; even if the opt-out right could permit a court to disregard the constitutional commonality and adequacy requirements, the unique circumstances in this case mean that the impoverished and uneducated unrepresented class members are faced with a coercive settlement where they cannot make a meaningful choice to exercise their opt-out right.

The class members most victimized by the Department of the Interior who might have the most plausible claims for relief beyond what the settlement provides are doubly injured: not only do they have no access to the records that would demonstrate their victimization and right to collect from the government, but they are precluded by the settlement from ever obtaining that information through an accounting. *Cf. Cobell v. Norton ("Cobell XIII"),* 392 F.3d 461, 468

(D.C. Cir. 2004) (the class needs an accounting to "find[] out the size of their claims"). Even if there were some case in which a class member's right to opt out allowed a court to disregard the constitutional requirements of commonality, typicality, and adequacy, this is not it. At a minimum, the lack of an opt-out option that can be knowingly and meaningfully exercised renders the settlement unfair under Rule 23(e).

IV.     **The Parties Have Failed To Demonstrate That The Individualized Claims Of The Dozens Of Subclasses In The Sprawling Trust Administration Class Are Being Fairly Valued.**

A district judge has a "duty in a class action settlement situation to estimate the litigation value of the claims of the class and determine whether the settlement is a reasonable approximation of that value." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004); *Reynolds v. Beneficial National Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002); *see also Mars Steel Corp. v. Continental Illinois National Bank & Trust Co.*, 834 F.2d 677, 682 (7th Cir. 1987); *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d at 806; *In re Traffic Executive Association-Eastern Railroads*, 627 F.2d 631, 633 (2d Cir. 1980).

Here, the Amended Complaint, filed over a dozen years into this litigation, introduces dozens of disparate "Funds Administration" and "Land Administration" claims, but, other than an *ipse dixit* assertion in their brief, the parties introduce no evidence of the valuation of these claims for each of the dozens of subclasses who will be waiving their claims. (Given the lack of an accounting, it is hard to see how they can.) In 2006, Class Counsel rejected a $7 billion settlement for the class on the grounds that their litigation was worth over $27 billion; they have since settled for about a nickel on the dollar of that assessment. Meanwhile, Class Counsel claims to have obtained evidence that there was "a failure to collect and credit trust funds, a

failure to prudently invest collected funds, charging improper administrative fees, a failure to investigate allegations of theft and fraud, and the incorrect disbursement of trust funds." Docket No. 3660 at 30.   How pervasive were these problems for class members, and which class members were affected? There is no explanation. Do the subclass of class members with viable mineral rights have better or worse claims than the subclass of class members with viable timber rights? Again, no explanation. Given the multitude of subclasses encompassed by the sprawling Trust Administration Class; the lack of representation of many of these subclasses among the class representatives (who give no explanation how or why they are adequate representatives of each of the dozens of potential subclasses in the sprawling Trust Administration Class); and the absence of even a cursory explanation of the valuation of these claims, or how or why all of the subclasses can be grouped together into a single Trust Administration Class with identical relief; the parties have failed to carry their burden of demonstrating that the settlement is fair, reasonable, or adequate as to each of the subclasses encompassed by the sprawling Trust Administration Class.

V.    **The Remedy For The Sprawling Trust Administration Class Is Unfair Because It Bears No Relation To The Underlying Claims; Systematically And Perversely Undervalues The Most Injured Class Members While Providing Windfalls To Class Members Who Have Suffered No Injury; And Fails To Resolve Intra-Class Conflicts.**

Even if the Settling Parties belatedly fulfill their obligation and burden to demonstrate that the settlement size is adequate, the allocation methodology is impermissibly unfair and unreasonable, and cannot be approved under Fed. R. Civ. Proc. 23(e).

Among the many reasons class members have demanded an accounting in this litigation is the problem of misallocation. The government, far too often, deposited or disbursed money to

the wrong accounts, transferring wealth randomly from beneficiary to beneficiary. *Cf.* Testimony of Charles Renfrew and John Bickerman Before a Joint Oversight Hearing of the Senate Committee on Indian Affairs and the House Committee on Resources at 6 (Mar. 1, 2006). Moreover, Class Counsel claims that there was "a failure to collect and credit trust funds, a failure to prudently invest collected funds, charging improper administrative fees, a failure to investigate allegations of theft and fraud, and the incorrect disbursement of trust funds." Docket No. 3660 at 30.

Yet the allocation of settlement proceeds is entirely unrelated to these allegations. Rather, funds will be distributed in two tranches: a $500 payment to every class member, and then a "pro rata" share entirely tied to the size of the "ten highest revenue generating years in each individual Indian's IIM account." Settlement ¶ E.4.b(3).

This distribution is only fair if the errors made by the government in administering trust accounts were evenly distributed amongst class members. But that clearly is not true. This is not a case where the government was systematically skimming from each account, or overcharging each account an impermissible fee; rather, the government made discrete errors that affected individual Indians differently. Worse, the Indians who were most injured by these errors are the ones who receive disproportionately the least amount. A class member whose account was administered appropriately will, *ceteris paribus*, have more revenue than a class member whose account was improperly administered. Yet under the settlement, the first class member, who has suffered no injury, will receive more money than the class member who suffered injury.

Another example makes the problem even clearer. Imagine Indian A has valuable mineral rights. The government, as trustee, leases those rights, but, in its mismanagement of the accounts,

assigns the royalties to the trust account of Indian B. Not only does the settlement systematically undercompensate Indian A for her injuries from this mismanagement, but it systematically overcompensates Indian B, who already realized an unfair windfall, and then gets an increased *pro rata* share of the settlement fund because of the inflated revenue stream from the incorrectly assigned royalties. This upside-down scheme of distribution—unprecedented as best Ms. Craven can tell—where the class members who have suffered the greatest injury are the ones who receive the least money and *vice versa*, compounds the injustice meant to be addressed by this litigation and is the very opposite of "fair" by any reasonable definition of the word. *Ortiz*, 527 U.S. at 857; *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (distinguishing case where stakes are "modest"). The common interests of the class in "achieving a global settlement" does not override this inherent intra-class conflict. *Ortiz*, 527 U.S. at 858; *Amchem*, 521 U.S. at 625-28. "[I]ntraclass equity" is a "requirement." *Ortiz*, 527 U.S. at 863.

Furthermore, a class cannot be certified where it includes those "who claim harm from the very acts from which other class members benefitted." *Pickett v. Iowa Beef Processors,* 209 F.3d 1276, 1280 (11th Cir. 2000).

The allocation methodology bears no rational relationship to the allegations made in the complaint relative to the sprawling Trust Administration Class, and cannot be approved as a matter of law under Fed. R. Civ. Proc. 23(e) or 23(a)(4).

## VI.    The Settlement's Requirement Of A Mandatory Waiver Of Rights Already Won Is Unconstitutional.

This Court held, and the D.C. Circuit affirmed, the right of class members to the "best accounting" possible. *Cobell XXII*, 573 F.3d at 813. Yet the Settlement permanently waives and releases that right for all Historical Accounting Class members, with no opportunity to opt out, in

exchange for $1000. As with the sprawling Trust Administration Class allocation, discussed in the section above, this proposed relief provides a windfall to the class members who have suffered no injury while shortchanging the class members who have suffered the most injury.

There is a strong argument that the attempt to settle a Rule 23(b)(2) "injunctive relief" class with a monetary remedy is entirely impermissible. *Cf. Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 645-50 (9th Cir. 2010) (*en banc*) (Ikuta, J., dissenting), *cert. granted, Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 795 (2010) (argued Mar. 29, 2011). Take a hypothetical lawsuit where a plaintiff brings a Rule 23(b)(2) class action for injunctive relief to desegregate the Topeka school system. Could that plaintiff agree to settle the class action for a $1000 payment to every class member in exchange for a release precluding class members from seeking injunctive relief over segregation? The question answers itself: it is unseemly to have an unrepresented class member, with no opportunity to opt out, being forced to waive her equitable rights in exchange for a cash payment. It would be inappropriate for *Brown v. Board of Education* to settle for cash, and it is inappropriate here as well—especially given that the class has *already won* its right to injunctive relief.

It is unconstitutional to take class members' rights to an accounting without fair compensation. *United States v. Willow River Power Co.*, 324 U.S. 499, 502 (1945) (opinion of Jackson, J.). There is no evidence that $1000 is fair compensation for each individual class member, and, indeed, many class members may well be entitled to well more than $1000 once that accounting is performed. The taking is especially problematic since the motive for the payment appears to be to expedite Class Counsel's fee request (and Class Representatives' $13 million "incentive payment" request) so that they can receive fees now, rather than after

litigation over the meaning of "best accounting" and separate EAJA litigation. Docket No. 3660 at 27 (complaining that "no end is in sight" to the litigation). If so, this creates additional Rule 23(a)(4) intra-class conflict problems.

The Supreme Court will likely decide *Wal-Mart Stores, Inc. v. Dukes*, No. 10-277, before or within two weeks of the June 20 fairness hearing; that case has a strong chance of creating precedent that will dispose of or moot this issue in one direction or the other (though there is also a chance of a narrow fact-bound decision that leaves this question of first impression unresolved). Ms. Craven requests the opportunity for supplemental briefing on the Rule 23(b)(2) issue two weeks after the *Wal-Mart* decision.

## VII.   The Proposed $13 Million In Class Representative Incentives Creates An Impermissible Conflict Requiring Decertification.

Class representatives request $13 million in incentive payments and mischaracterized "expenses"—in contradiction to their representations to the public that they stood "to gain no more than any other trust fund recipient." *See* Todd Wilkinson, "A Blackfeet's crusade to settle accounts with US," *Christian Science Monitor* (Mar. 20, 2002) (Cobell).

To the extent they do not contradict her own arguments, Ms. Craven adopts and incorporates the Defendants' arguments' against the proposed payment, rather than repeat them. *See* Docket No. 3697. But Defendants do not go far enough. The extraordinary and unprecedented $13 million request creates an "untenable" conflict between the class representatives and the class, and prevents approval of the settlement under Rule 23(a)(4) so long as it is maintained. *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 952 (7th Cir. 2006) (wildly disproportionate incentive award of $3000 proof that "the class device had been used to obtain leverage for one person's benefit"). *Cf. also Young v. Higbee*, 324 U.S. 204 (1945). The size of

the incentive award divorces the class representatives' interests from those of the class, especially because every dollar the class representatives get is a dollar the class will not get. Class representatives' interests are now for the approval of *any* settlement, because of the possibility of a multi-million dollar windfall unavailable to the rest of the class; the size of the request means that the representatives have a strong incentive to avoid any oversight of the proposed settlement or attorney-fee request for fear of losing their chance at the windfall. This makes them an inadequate representative for the class. *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.,* 350 F.3d 1181, 1189-92 (11th Cir. 2003) (class representatives inadequate where their economic interests and objectives conflicted substantially with those of absent class members).

Even the $1 million award proposed by Defendants is enough to divorce the interests of the class representatives from those of the class. By both sides' own accounts, that $1 million proposal includes rewarding class representatives for time spent lobbying.

A $100,000 award for the class representatives would outstrip anything previously awarded in this Circuit. One hopes that the class representatives unilaterally offer to reduce their request to something in this range or lower, because the settlement is otherwise tainted by the lack of an adequate class representative under Rule 23(a)(4). As discussed earlier, this is an issue of constitutional importance, and cannot be waived by legislative action.

**VIII.   The Fee Arrangement Breaches the Attorneys' Duty to the Class.**

The class representatives also demonstrated their indifference to the interests of the rest of the class by permitting their attorneys to materially breach the settlement by requesting more than double the permissible $99.9 million in fees and expenses. In the event that the Court is willing to approve the settlement notwithstanding this breach of fiduciary duty that demonstrates the lack

of adequate representation (not to mention the problems with the settlement identified above), it would be *ultra vires* for the Court to award more than the $99.9 million authorized by Congress.

To the extent they do not contradict her own arguments, Ms. Craven adopts and incorporates the Defendants' arguments' against the proposed fee request, rather than repeat them. *See* Docket No. 3694. As Defendants note, "Class counsel's petition asks class members to foot the bill for their years of fruitless digressions from the core issue in the case," digressions that often worked against Indians' interest in obtaining the accounting to which they were entitled. But Defendants' devastating critique actually understates the counterproductive actions of Class Counsel.

*First,* the $1.9 billion for a land consolidation program is not only not a litigation benefit to the class (Docket No. 3694 at 9-10), but it is not even a net benefit to the class. That money— which the Bureau of Indian Affairs is under no obligation to spend, and which reverts back to the Treasury after ten years—is not just illusory, but it is also not simply *given* to class members. Rather, it is used to purchase valuable land *from* class members at market value. Nothing in the settlement or the fractionated land repurchase program obligates the government to provide an above-market price for land purchased from Indians. Thus, the net benefit is zero: Indians receive $1.9 billion in cash (minus the government's expenses, which would necessarily include a substantial expansion of the bureaucracy) only to the extent that they surrender an equivalent amount of land. Certainly, there are administrative benefits in doing so, but they redound largely to the government in the long run by reducing the expense of administering trust accounts. The fractionated land repurchase program is simply good government, and has nothing to do with this

litigation other than a line item in this settlement to exaggerate its advertised value, so that class counsel may sell it to a deservedly increasingly skeptical class.

*Second*, the parties fail to mention that there was a similar offer to settle this case on the table introduced in Congress in 2005. That proposal, strongly supported by the Senate Committee on Indian Affairs chair, Senator John McCain, provided $7 billion to hold the accounting that Class Counsel waives now; of that $7 billion, at least $5.6 billion was to be used to pay individual Indian claimants. Another $1 billion was allocated for fractionated land repurchases that, unlike this settlement, *would* have included an incentive bonus above fair market value purchase prices. *See* S. 1439, Indian Trust Reform Act of 2005 (109th Congress); S. Hrg. 109-483 (Mar. 28, 2006). The legislation failed because the plaintiffs insisted on demanding $27.5 billion. Testimony of Elouise C. Cobell before the House Committee on Resources Hearing on HR 4322, Indian Trust Reform Act of 2005, December 8, 2005, at 7; Renfrew/Bickerman, *supra*, at 5; Rob Capriccioso, "Cobell's Final Toll," *Indian Country Today* (Jan. 17, 2011). Given that Class Counsel now claims that they had a secret 14.75 percent contingency-fee agreement, however, one suspects that the real stumbling block was that the legislation capped attorneys' fees at three percent, or $210 million.

The greed of Class Counsel in hoping to obtain billions of dollars in attorneys' fees for themselves has been disastrous for the Indian community, those whom class counsel is charged to represent. Having successfully killed legislation that would have ended the lawsuit by providing over $7 billion for the class, including the accounting that was supposedly the goal of this litigation, Class Counsel then proceeded to repeatedly fall short. They won less than two percent of their $27.5 billion settlement demand in this Court, and then lost even that amount at

the D.C. Circuit. Having failed in its litigation, Class Counsel finally went the legislative route, but, with no credible threat at the negotiating table, found only $1.4 billion available for the class—and that over-80-percent haircut was possible only with the waiver of land management claims not previously on the table and by giving up the rights to an accounting that had previously been offered by the Senate.

After turning a $7 billion executive-branch settlement into a four-year-delayed $1.4 billion judicial-branch settlement waiving a much broader set of rights and claims, Class Counsel claims, amazingly, to have achieved "great success" and requests $223 million in fees (with up to $12 million more for post-settlement litigation that would have been made unnecessary by the original legislation)—more than the $210 million that they would have received under the McCain legislation. Ms. Craven's attorney does not know if any of the Indian tribes who are victims of this behavior have a word for such temerity, but his people do: *chutzpah*. *See* Judge Alex Kozinski & Eugene Volokh, "Lawsuit, Shmawsuit," 103 Yale L. J. 463 (1993).

Given that their clients have taken an 80 percent haircut from what was offered to them in 2005 and 2006, it would be perverse if Class Counsel were to benefit from their own counterproductive behavior. The most just result, and the result that would appropriately incentivize future class attorneys' behavior to accurately value a case and put their unrepresented clients' interests first, would be to give Class Counsel the same 80 percent haircut that their clients received, leaving the lawyers with $42 million. This would constitute an 80 percent discount off the $210 million class counsel would have received if they had supported the McCain legislation in 2005 and 2006.

There is ample precedent in the legal system for the common-sense proposition that attorneys should not be rewarded for overlitigating cases beyond what a reasonable (and larger) settlement offer provided earlier in the case. Some courts have even gone so far as to hold that attorneys waive their rights to fees entirely in the case of an "outrageous" refusal to settle, though Ms. Craven does not take such a hard-line position. *Vocca v. Playboy Hotel of Chicago Inc.*, 686 F.2d 605 (7th Cir. 1982); *Spencer v. General Elec. Co.*, 706 F. Supp 1234, 1243 n.18 (E.D. Va. 1989); *see also Sheppard v. Riverview Nursing Center, Inc.*, 88 F.3d 1332, 1337 (4th Cir. 1996); *cf. Marek v. Chesny,* 473 U.S. 1, 11 (1985) (Fed. R. Civ. Proc. 68). "[I]t is a salutary principle that a prevailing party should not be permitted to inflate a fee award by using unreasonable settlement demands to extend a case." *EEOC v. Nutri/System, Inc.*, 685 F. Supp 568, 577-78 (E.D. Va. 1988).

The D.C. Circuit is, to date, less stringent: it holds that the "district court has discretion to consider settlement negotiations in determining the reasonableness of fees but it is not required to do so." *Thomas v. National Football League Players Ass'n*, 273 F.3d 1124, 1130 n.9 (D.C. Cir. 2001). However, Ms. Craven believes that a class action is different from the typical fee-shifting case. In a typical case, the attorney-client relationship is voluntary and contractual, and the decision not to settle is, at least hypothetically, determined by the client: the client thus has every incentive to be reasonable in settlement negotiations, because the client bears the burden of any unreasonableness. But this is not so in a Rule 23(b)(2) class action, where the unrepresented class members are involuntarily yoked together with a court-assigned attorney and class representative. That attorney and class representative do *not* have the proper incentive to negotiate reasonably, because the unrepresented class members bear most of the burden of any mistaken settlement

decision—unless the Court enforces the attorney's fiduciary obligation to the unrepresented class members by taking settlement behavior that adversely affects the class's interests into account. Ms. Craven thus takes the position that such counterproductive behavior *must* be considered by a court under Fed. R. Civ. Proc. 23(h). That particular flavor of the question appears to be one of first impression, in part because it is unprecedented for a court-assigned class action attorney to fritter away billions of dollars of settlement money.

Given the Congressional authorization, however, Ms. Craven would not object to a $50 million total award of fees, expenses, and class representative incentive payments, appropriately allocated among Class Counsel and class representatives, NARF, and any other attorneys or class representatives inappropriately frozen out by Class Counsel. (Ms. Craven does not take a position on whether the intervening attorneys have any right to the common fund or fees beyond what they have already been awarded under EAJA, other than to object to the extent that their fee requests come at the expense of the class rather than Class Counsel's $50 million.)

## IX.   Any Lodestar Calculation Must Account For Inflated Fees And Hours.

To the extent that the Court adopts Class Counsel's suggestion that it conduct a lodestar inquiry into the fee request, the Court must give greater scrutiny to the fee request than even the Defendants give. Defendants make several valuable arguments that the lodestar request is exaggerated, Docket No. 3694 at 10-19, and, indeed, as this Court has recognized, Class Counsel has a terrible track record of submitting exaggerated requests for fees. *Cobell*, 407 F. Supp. 2d at 144-45, 163, 190 (Appendix III); *Cobell v. Norton*, 231 F. Supp. 2d 295, 299 (D.D.C. 2002); *see also* Tr. 13-14 (May 14, 2007) (Docket No. 3694 Ex. 11); Docket No. 3338.

This fee request is no different. In addition to the Defendants' arguments, Ms. Craven points out the following remarkable aspects of the fee petition.

*First*, Mr. Gingold claims to have billed an astonishing 48,772 hours on this case—which works out to almost 9.5 hours a day, every day without a single day off, between November 4, 1995, and December 7, 2009. This includes a seven-year stretch where Mr. Gingold billed 28,230 hours—an average of eleven hours a day, every day seven days a week without a single day off. As anyone who has had to keep billing records knows, it is rare for ten hours of billing to take only ten hours: there are bathroom breaks, coffee breaks, meal breaks, interruptions, and so forth. There are legendary accounts of tireless attorneys who forgo family and leisure; work on little sleep; and are able to regularly bill 3000 hours a year, but they are few and far between. Perhaps Mr. Gingold is one of these exceptional individuals, so far above average that he can routinely bill 4000 hours a year without loss of productivity or health, but this proposition merits scrutiny.

*Second*, also meriting scrutiny is Mr. Gingold's claim to have billed 28.5 hours on February 14, 2005; 24.5 hours on September 6, 2005; and 24 hours on July 6, 2000. Though Ms. Craven disagrees with the Department of Justice's position in that case, it is worth noting that the government has previously civilly prosecuted far less ambitious billing claims by a Medicaid doctor under the False Claims Act. *United States v. Krizek*, 859 F. Supp 5, 12 (D.D.C. 1994) (government takes position that a nine-hour billing day by Medicaid doctor was presumptive evidence of fraud), *abrogated*, 909 F. Supp. 32 (D.D.C. 1995), *rev'd*, 111 F.3d 934 (D.C. Cir. 1997).

*Third*, Mr. Gingold also claims to have billed 2736 hours in 2009—a calendar year when the case was largely stayed, the settlement was stalled in Congress behind other legislative

priorities, and the plaintiffs only made two perfunctory filings the entire year. This is yet another aspect of Mr. Gingold's billing that would be an understatement to label as questionable.

*Fourth*, Class Counsel includes Mr. Rempel's work as an accounting expert as "attorneys' fees"—over $9 million of their lodestar is for his litigation support. At least some of those hours were while he was working at PriceWaterhouseCoopers, where he was almost certainly not billed out on a contingent-fee basis. Scrutiny is needed to avoid double-dipping.

*Fifth*, the Kilpatrick firm, which has devoted over 200 different attorneys and other billable employees to this case, seems to have engaged in overlawyering. Ninety-three Kilpatrick attorneys have billed $5,000 or more in this case. Of that number, fifty-three are attorneys with ten or more years experience; twenty-six have more than twenty years' experience, including one $625/hour partner who lists his field as "Tax; tax controversy; business & finance; mergers & acquisitions; private equity." Litigation skills are largely fungible, so Ms. Craven will not complain that attorneys who charge high billing rates for their experience in unrelated complex issues such as intellectual property or antitrust were working on this case. But the sheer number of high-ranking partners devoted to this case merits investigation to see if Kilpatrick was free-riding and inflating its hours at the expense of their clients by throwing underworked senior attorneys into the mix once it became clear that an attorney-fee request was likely. There was almost certainly duplication of effort given the complexity of this litigation and the number of different attorneys working on it, each of whom would have had to put in substantial time to come up to speed. This duplication of effort was almost certainly compounded by Class Counsel's apparent effort to freeze out experienced public-interest attorneys like those at NARF that had already devoted tens of thousands of hours to the case and had extensive human capital

invested in knowing the record. No private client would tolerate the inefficiency and duplication of effort of 93 different attorneys (and dozens of partners) from a single firm each putting in over $5,000 of billing on a case that took under 70,000 hours of attorney work; the impoverished Indians who are Kilpatrick's putative clients should not have to, either.

**CONCLUSION**

Class Counsel, in their greed for a multi-billion-dollar payday for themselves, have devoted their efforts not only to fruitless and counterproductive litigation but also to standing in the way of earlier legislation that would have created an executive-branch accounting and claims process that would have paid their clients more than five times as much. Worse, they agreed to legislation that created a settlement that deprives Indians of their rights and cannot be constitutionally approved by this Court. Tragically, the settlement must be rejected: as the Supreme Court and other courts have held in much larger litigations than this one, the due-process requirements of Article III courts cannot be sacrificed for the convenience of streamlining litigation into a shoehorned class action, much less for the convenience of expediting Class Counsel's fee request.

In the event that this Court does approve the settlement, the fee and expense award for Class Counsel and the intervening attorneys, along with the class representative incentive payments (including "expenses"), should be capped at $50 million total.

Dated: April 20, 2010

Respectfully submitted,

*/s/ Theodore H. Frank*
Theodore H. Frank (DC Bar No. 450318)
CENTER FOR
CLASS ACTION FAIRNESS, LLC
1718 M Street NW, No. 236
Washington, DC 20036
Telephone:  (703) 203-3848
Email:  tedfrank@gmail.com

Attorney for Kimberly Craven

## PROOF OF SERVICE

I declare that:

I am employed in the state of Virginia.  I am over the age of 18 years and not party to the within action; my address is 815 18th St S, Arlington, VA 22202.

On April 20, 2011, I served the attached:

### OBJECTION OF KIMBERLY CRAVEN
### TO MOTIONS FOR FINAL APPROVAL, ATTORNEYS' FEES, AND INCENTIVE PAYMENTS

__X__   By First-Class Mail in that I caused such envelope(s) to be delivered via certified First-Class Mail, return receipt requested to the addressee(s) designated.

| | |
|---|---|
| Clerk's Office<br>United States District Court<br>for the District of Columbia<br>333 Constitution Avenue, N.W.<br>Washington, DC 20001 | Robert E. Kirschman, Jr.<br>Dept of Justice, Civil Div.<br>P.O. Box 875<br>Ben Franklin Station<br>Washington, DC 20044 |
| Cobell Class Counsel<br>607 14th Street, NW<br>Suite 900<br>Washington, DC 20005-2018 | |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 20, 2011.


*/s/ Adam Schulman*
Adam Schulman

Kimberly E. Craven
3560 Catalpa Way
Boulder, CO  80304
303.494.1974

April 20, 2011

Clerk's Office
United States District Court
for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.  2001

Cobell Class Counsel
607 14th Street, NW, Suite 90
Washington, D.C.  2005-2018

Robert E. Kirschman, Jr.
Department of Justice, Civil Division
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044

**RE:    Kimberly Craven's Cover Letter for** *Cobell v. Salazar,* **CV-96-1285 (DCDC), proposed
settlement – brief attached**

To above addressees

I am an enrolled member of the Sisseton Wahpeton Oyate, an Individual Indian Money
(IIM) account holder, and an owner, along with my two sisters, of 55 acres of Indian trust land on
the Lake Traverse Reservation in South Dakota as well as holding fractionated interests in lands in
Montana and North Dakota.   Accordingly, I would be a member of both the supposed plaintiff
classes if the pending *Cobell* settlement is approved.   My IIM Account Number is 1921671.
Currently our land is leased to a NonIndian farmer who has access to all the land but only pays rent
on 47 acres of it. Last year I was told by the BIA Realty Officer in Sisseton that there is no access to
the land for us, its owners. This land was originally allotted to my great grandmothers, Angelique
and Etta Crawford Bird.

I am hereby registering my objection to the settlement announced on December 7, 2009 and
said to have been authorized by Congress on December 8, 2010.   I also announce my intention to
appear or be represented by counsel and be heard at the Fairness Hearing scheduled for June 20,
2011.

Kimberly Ellen Craven's letter cont'd

Please find attached the legal support and factual evidence that I submit and bring to the Court's attention, as well as grounds to support my status as a Class Member and rights as an enrolled member of a federally recognized Indian Tribes that would be negatively impacted if this settlement were approved.

Sincerely,

Kimberly E. Craven

Kimberly Craven
Sisseton Wahpeton Oyate member

cc:  Jennifer Rebecca Craven
     Catherine Mitsu Craven