**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**ELOUISE PEPION COBELL, et al.,**          )
                                                    )
            **Plaintiffs,**                         )
            **v.**                                  )          **No. 1:96CV01285(TFH)**
                                                    )
**KEN SALAZAR, Secretary of**               )
**the Interior, et al.,**                           )
                                                    )
            **Defendants.**                         )
_____)


**PLAINTIFFS' MEMORANDUM IN SUPPORT OF JOINT MOTION
FOR FINAL APPROVAL OF SETTLEMENT AND ENTRY OF FINAL JUDGMENT**


May 16, 2011

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND ................................................................................................... 3

III.   FINAL APPROVAL IS MANDATED BY CONGRESS' RESOLUTION OF THIS LITIGATION THROUGH LEGISLATION ................................................................ 7

IV.   ALTERNATIVELY, THE SETTLEMENT MEETS THE REQUIREMENTS OF RULE 23 AND SHOULD BE GIVEN FINAL APPROVAL ................................... 10

     A.    SUMMARY OF THE KEY TERMS OF THE SETTLEMENT ................... 10

          1.    The Settlement Classes ....................................................... 11

          2.    The Benefits to the Settlement Classes ................................. 12

          3.    The Releases ......................................................................... 13

          4.    Incentive Payments to Class Representatives ...................... 14

          5.    Class Counsel Fees .............................................................. 15

     B.    THE NOTICE PROGRAM IS FULLY IMPLEMENTED ........................... 16

          1.    The law requires that class members be given notice in a "reasonable manner" .......................................................................... 16

          2.    The Notice Program in this case meets the requirements of Rule 23(e)(1)(B) and has been fully implemented ...................................... 17

               a.    Direct Mail Notice Efforts ....................................... 18

               b.    Paid Media Advertisements ...................................... 19

               c.    Third-Party and Tribal Outreach .............................. 19

               d.    Internet Website and Toll-Free Support Number ..................... 20

               e.    Personal Efforts by Class Counsel ........................... 21

     C.    The Settlement warrants final approval under a straight-forward application of Rule 23 ........................................................................................ 22

          1.    The law favors settlement of class action cases ................... 23

2.    The Proposed Settlement in this case Meets the Requirements of Rule 23(e) and Should, Therefore, Receive Final Approval ........................ 24

   a.    The legal standard for final approval of settlements in class action cases ............................................................................. 24

   b.    The proposed Settlement is the product of arm's-length negotiations and is, therefore, presumptively "fair, adequate and reasonable" .......................................................................... 25

   c.    The terms of the proposed Settlement are reasonable in light of the delay and risk of further litigation ...................................... 27

       (1)    The litigation would be interminable ............................ 28

       (2)    There is no guarantee that litigation will produce better results than the Settlement ............................................ 29

   d.    The proposed Settlement in this case was reached at an advanced stage of the litigation and after the strengths and weaknesses of the case were well-known................................. 31

   e.    The Class members' positive reaction supports final approval of the proposed Settlement............................................................. 33

   f.    The recommendations of experienced counsel support approval of the proposed Settlement ...................................................... 34

V.    CONCLUSION ...................................................................................... 34

# TABLE OF CASES AND AUTHORITIES

## Cases

*Ball v. AMC Entm't, Inc.*,
315 F. Supp. 2d 120 (D.D.C. 2004) ................................................................ 1, 24, 27, 33

*Blackman v. Dist. of Columbia*,
454 F. Supp. 2d 1 (D.D.C. 2006) ............................................................................... passim

*Boyd v. Bechtel Corp.*,
485 F. Supp. 610 (N.D. Cal. 1979) ................................................................................. 34

*Bryan v. Pittsburgh Plate Glass Co. (PPG Industries, Inc.)*,
494 F.2d 799 (3d Cir. 1974) ........................................................................................... 33

*Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992) ........................................................................... 23, 27, 33

*Cobell v. Kempthorne*,
455 F.3d 317 (D.C. Cir. 2006) ("*Cobell XIX*") ................................................................ 3

*Cobell v. Kempthorne*,
532 F. Supp. 2d 37 (D.D.C. 2008) ("*Cobell XX*"), *vacated sub nom. Cobell v. Salazar*,
573 F.3d 808 (D.C. Cir. 2009) ("*Cobell XXII*") ................................................................ 5

*Cobell v. Kempthorne*,
569 F. Supp. 2d 223 (D.D.C. 2008) ("*Cobell XXI*"), *vacated sub nom. Cobell XXII*, 573
F.3d 808 ............................................................................................................... 25, 30

*Cobell v. Norton*,
/334 F.3d 1128 (D.C. Cir. 2003) ("*Cobell VIII*") ............................................................. 4

*Cobell v. Norton*,
240 F.3d 1081 (D.C. Cir. 2001) ("*Cobell VI*") .................................................................. 4

*Del. Tribal Bus. Comm. v. Weeks*,
430 U.S. 73 (1977) ...................................................................................................... 8, 9

*Ellis v. Naval Air Rework Facility*,
87 F.R.D. 15 (N.D. Cal. 1980),
*aff'd*, 661 F.2d 939 (9th Cir. 1981) ............................................................................... 34

*Fisher v. Dist. Court*,
424 U.S. 382 (1976) ......................................................................................................... 8

*Gritts v. Fisher,*
   224 U.S. 640 (1912) ................................................................................. 9

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) ................................................................ 24

*In re Baan Co. Sec. Litig.,*
   284 F. Supp. 2d 62 (D.D.C. 2003) ..................................................... 24, 31

*In re First Databank Antitrust Litig.,*
   205 F.R.D. 408 (D.D.C. 2002) ................................................................ 25

*In re Lorazepam & Clorazepate Antitrust Litig.,*
   No. MDL 1290(TFH), 2003 WL 22037741 (D.D.C. June 16, 2003) .................... 14, 27, 34

*In re Prudential Sec. Inc. Ltd. P'ships Litig.,*
   163 F.R.D. 200 (S.D.N.Y. 1995) ........................................................ 23, 31

*In re Vitamins Antitrust Litig.,*
   305 F. Supp. 2d 100 (D.D.C. 2004) ................................................... passim

*In re Vitamins Antitrust Litig.,*
   No. 99-197 TFH, 2000 WL 1737867 (D.D.C. Mar. 31, 2000) .......................... 35

*LeBeau v. United States,*
   474 F.3d 1334 (Fed. Cir. 2007) ....................................................... 8, 9, 10

*Linney v. Cellular Alaska P'ship,*
   No. C-96-3008 DLJ, 1997 WL 450064 (N.D. Cal. July 18, 1997),
   *aff'd*, 151 F.3d 1234 (9th Cir. 1998) ...................................................... 34

*Luevano v. Campbell,*
   93 F.R.D. 68 (D.D.C. 1981) .................................................................... 32

*Marshall v. Holiday Magic, Inc.,*
   550 F.2d 1173 (9th Cir. 1977) ................................................................ 33

*Mayfield v. Barr,*
   985 F.2d 1090 (D.C. Cir. 1993) .............................................................. 23

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd,*
   565 F. Supp. 2d 49 (D.D.C. 2008) ............................................. 23, 24, 25, 27

*Morton v. Mancari,*
   417 U.S. 535 (1974) ......................................................................... 2, 9

*N. Cheyenne Tribe v. Hollowbreast*,
   425 U.S. 649 (1976) ................................................................................. 9

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) ............................................................... 33

*Officers for Justice v. Civil Serv. Comm'n of San Francisco*,
   688 F.2d 615 (9th Cir. 1982) ........................................................... 1, 23, 24

*Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597 (D. Colo. 1974) ...................... 31

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) ................................................................................. 25

*Osher v. SCA Realty I, Inc.*,
   945 F. Supp. 298 (D.D.C. 1996) .............................................................. 27

*Pettway v. Am. Cast Iron Pipe Co.*,
   576 F.2d 1157 (5th Cir. 1978) ................................................................. 34

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ................................................................................. 16

*Pigford v. Glickman*,
   185 F.R.D. 82 (D.D.C. 1999),
   *aff'd*, 206 F.3d 1212 (D.D.C. 2000) ................................................. 23, 30, 31

*Radosti v. Envision EMI, LLC*,
   717 F. Supp. 2d 37 (D.D.C. 2010) ................................................ 14, 24, 25, 34

*Rice v. Cayetano*,
   528 U.S. 495 (2000) ................................................................................... 2

*Santa Clara Pueblo v. Martinez*,
   436 U.S. 49 (1978) ..................................................................................... 8

*Shady Grove Orthopedic Assoc. v. Allstate Ins. Co.*,
   __ U.S. __, 130 S.Ct. 1431 (2010) ........................................................... 22

*Staton v. Boeing*,
   327 F.3d 938 (9th Cir. 2003) .................................................................... 24

*Thomas v. Albright*,
   139 F.3d 227 (1998) ............................................................................ 27, 33

*Timbisha Shoshone Tribe v. Salazar*,
  __ F. Supp. 2d. __, Civ. A. No. 10-968 (GK),
  2011 WL 691366 (D.D.C. Mar. 1, 2011) ................................................................. 2, 10

*United States v. Antelope*,
  430 U.S. 641 (1977) .......................................................................................................... 8

*United States v. Jim*,
  409 U.S. 80 (1972) ............................................................................................................ 9

*United States v. Lara*,
  541 U.S. 193 (2004) .......................................................................................................... 8

*Util. Reform Project v. Bonneville Power Admin.*,
  869 F.2d 437 (9th Cir. 1989) .......................................................................................... 23

*Vista Healthplan, Inc. v. Bristol-Myers Squibb Co.*,
  287 F. Supp. 2d 65 (D.D.C. 2003) .................................................................................. 27

*Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*,
  246 F.R.D. 349 (D.D.C. 2007) ........................................................................................ 32

*Wal-Mart Stores, Inc. v. VISA U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) .............................................................................................. 16

*Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*,
  439 U.S. 463 (1979) .......................................................................................................... 8

## Other Authorities

4 William Rubenstein, Alba Conte & Herbert B Newberg, *Newberg on Class Actions* § 11.41
  (4th ed. 2002) ............................................................................................................ 24, 25

Claims Resolution Act § 101(c)(1) ........................................................................................ 7

Claims Resolution Act § 101(d)(2)(B) ................................................................................ 22

Claims Resolution Act § 101(g)(1)(A) ................................................................................ 16

Manual for Complex Litigation (Fourth) § 21.312 (2004) .................................................. 17

## Rules

Fed. R. Civ. P. 23(e) ............................................................................................................ 23

Fed. R. Civ. P. 23(e)(1) ....................................................................................................... 16

I.      **INTRODUCTION**

Plaintiffs submit this Memorandum in Support of Joint Motion for Final Approval of Settlement and Entry of Final Judgment.  [Dkt. No. 3761.]  The Settlement Agreement now before the Court is momentous.  It will put an end to more than fifteen years of contentious litigation over the abuses the United States government committed against an often invisible subset of the American citizenry—Native Americans.  It will deliver billions of dollars in tangible benefits to the Classes.  It will continue meaningful reform of the Individual Indian Money (IIM) Trust and enable the trustee to prudently discharge trust duties owed to Class members, duties which gave rise to the claims in this case.  It has been approved and ratified by Congress.  It has been adopted and signed into law by the President.  And, now that all objections and exclusions have been submitted, it is clear that members of the Classes overwhelmingly support the Settlement.  Indeed, 99.98% support this settlement and decided to participate without objection.

Despite these historic achievements, a tiny minority of Class members oppose the Settlement, variously contending that it does not deliver adequate consideration to the Classes or suffers from some procedural defect.  The simple fact is that many of those objections are rooted in a desire "to win" and extract further concessions from Defendants who will not yield.  These objectors "seek … total victory in this litigation.  That is simply not what a settlement [is or] provides.  By definition, a settlement gives each party some of what they are fighting for and gives no party everything they are fighting for."  *Ball v. AMC Entm't, Inc.*, 315 F. Supp. 2d 120, 132 (D.D.C. 2004).  "[A] settlement is compromise, a yielding of absolutes and an abandoning of highest hopes."  *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982) (internal quotation marks omitted).

This Settlement warrants final approval by this Court for two independent reasons.  First, this is no ordinary settlement, an indisputable fact in light of the history of this case.  Given that this litigation only involves Native Americans, and only a subset thereof, Congressional action authorizing this Settlement is deserving of substantial, if not dispositive, weight.  Congress exercises "plenary power" when legislating in the field of Indian affairs—a principle long recognized and repeatedly reaffirmed by the Supreme Court for more than a century.  *See, e.g.*, *Rice v. Cayetano*, 528 U.S. 495, 531-32 (2000); *Morton v. Mancari*, 417 U.S. 535, 554-55 (1974).  Plenary power provides Congress with significant flexibility in legislatively addressing Indian issues.  The Claims Resolution Act of 2010, Pub. L. No. 111-291, 124 Stat. 3064 (to be codified as amended in scattered sections of 19, 25, 26, 31 and 42 U.S.C.) ("Claims Resolution Act") expressly directs that this litigation be resolved via the agreement reached between the Parties on December 7, 2009, as amended.  Where, as here, Congress has clearly spoken on a matter of Indian affairs, congressional will is of paramount consideration.  Its' determination must not be disturbed where it is "tied rationally to the fulfillment of [its] unique obligation toward the Indians."  *Timbisha Shoshone Tribe v. Salazar*, __ F. Supp. 2d. __, Civ. A. No. 10-968(GK), 2011 WL 691366, at *9 (D.D.C. Mar. 1, 2011).  This Court should grant final approval to the Settlement, consistent with the unambiguously expressed intent of Congress, which has adopted and ratified this Settlement Agreement.

Second, this Court should grant final approval of the Settlement under a straight-forward application of Rule 23.  This Settlement meets the requirements of Rule 23, as modified by the Claims Resolution Act § 101(d)(2)(B), thereby providing this Court with an additional independent basis to grant final approval.  It is not necessary for this Court to speculate about how the Settlement could be improved or whether additional concessions might have been forced

from Defendants.    Rather, under Rule 23 this Court must simply determine whether the Settlement is "fair, reasonable and adequate" when compared to the alternative: continued, indefinite litigation with an uncertain result.    Judged against this standard, the Settlement warrants final approval for this reason as well.

## II.    BACKGROUND

This case was filed on June 10, 1996 and has been aggressively litigated since that time. *Cobell* is unique in many respects, not only for the complex legal issues involved, but for the extent, scope, and duration of Class Representatives' and Class Counsel's prosecution of this case.    It can be safely said that there is no case in this Circuit that has been more intensely litigated than *Cobell*.    In a motion for final approval in an ordinary class action, class counsel would describe the number of pages produced, reviewed, depositions taken, and other indicia of an actively litigated case.    Here, a full description of the fact gathering, investigation, and discovery performed in furtherance of Plaintiffs' claims would by itself exceed the page limitations of the motion.    To be clear, the United States courthouse for the District of Columbia has dedicated an entire room to this litigation and the files associated with it.    This is not a case that has sat dormant for a decade or more only to spring to life upon the prospect of settlement. The nearly 3,800 docket entries, amounting to the filing of an entry per business day during the first ten years of the case, dispel any possible characterization that Class Counsel has not zealously represented the Plaintiff Classes through exhaustive investigation of the claims at issue and the unwavering pursuit of justice for individual Indians who are members of the *Cobell* Classes.    In addition, the court of appeals has recognized this case's long history and the cause that calls for Class Counsel's continued efforts to obtain "[r]eal justice for these Indians."    *Cobell v. Kempthorne*, 455 F.3d 317, 329 (D.C. Cir. 2006) ("*Cobell XIX*").

On November 27, 1996, this Court made the First Order regarding the production of trust records. [Dkt. No. 16.] This Order would be the basis for the first of myriad discovery disputes between the Parties. At the direction of this Court, Plaintiffs filed a motion for an order to show cause why Defendants should not be held in contempt for violating the First Order for the Production of Information, and for misrepresenting the status of production. [Dkt. No. 175.] Judge Lamberth granted Plaintiffs' motion and the first contempt trial proceeded shortly thereafter. [Dkt. No. 181.] In 1999, Plaintiffs also filed the first of several motions to compel the production of documents, which had been unreasonably withheld. [Dkt. No. 204.] As a consequence of Defendants' continuing misconduct and their cover-up, this Court held them in contempt. [Dkt. No. 211.]

Subsequent motions to compel were also filed in 2002, 2003, 2004, and 2007. However, the 1999 contempt sanctions did not deter Defendants' litigation misconduct. Defendants were held in contempt a second time by this Court [Dkt. No. 1477]; however, the D.C. Circuit reversed the second contempt decision, in part, because sanctions fashioned by this Court did not compensate Plaintiffs for the harm caused by the government's contemptuous behavior.[1] Both this Court and the D.C. Circuit have recognized the unique difficulties encountered by Plaintiffs in obtaining critical trust documents and protecting them from further destruction and corruption, as well as the degree and intensity of discovery and other litigation disputes between the Parties. *See, e.g.*, *Cobell v. Norton*, 240 F.3d 1081, 1093 (D.C. Cir. 2001) ("*Cobell VI*").

Disputes regarding the production of documents can only be characterized as continuous. However, notwithstanding interminable discovery disputes and the obstruction they have caused, Plaintiffs pressed on with this litigation to enforce trust duties owed by the United States and

---

[1]   *See Cobell v. Norton*, 334 F.3d 1128, 1145-46 (D.C. Cir. 2003) ("*Cobell VIII*").

-4-

otherwise prosecuted the merits of this case by seeking rehabilitation and reform of broken trust systems in other ways. Among Class Counsel's efforts are: (1) the prosecution of a 59-day trial regarding the Information Technology security of the IIM Trust data, (2) civil contempt proceedings concerning various government employees, (3) efforts to prevent witness intimidation and mitigate retaliatory actions taken by the Interior defendants against employees who testified truthfully before this Court, (4) objections to communication between Defendants and the Plaintiffs, which, among other things, falsely blamed this Court for Defendants' continuing breaches of trust, including their unlawful withholding of trust checks from some of the most vulnerable citizens of this country, and, (5) the defense of this Court and judicial officers from Defendants' attacks on their integrity. *See Cobell v. Kempthorne*, 532 F. Supp. 2d 37, 42 (D.D.C. 2008) ("*Cobell XX*"), *vacated sub nom. Cobell v. Salazar*, 573 F.3d 808 (D.C. Cir. 2009) ("*Cobell XXII*"). Indeed, the Court, itself, took extraordinary steps to preserve the integrity of these proceedings.

Given the critical need to ensure the security of IIM Trust records, trust funds, and other assets, Class Counsel addressed the administration and management of the IIM Trust in all facets, whether it take the form of record-retention or internet security. At each turn, Defendants obstructed the efforts of the Plaintiffs and Class Counsel. Necessarily, Class Counsel engaged experts who worked with them in extensive fact gathering, interviews, investigations, field visits, negotiations with opposing counsel, and the review of millions of pages of documents. A comparable case containing both the degree of complex legal issues, obstruction, witness intimidation, document destruction, and other misconduct, as well as the nature and scope of fact and expert discovery, simply cannot be found within this Circuit.

The parties have had numerous settlement discussions.  Few cases can rival the number of failed attempts at settlement as *Cobell*, which is a testament to the difficulty, complexity and hostile nature of this litigation.  All manner of methods to settle this case have been utilized since the late 1990s.  Settlement talks commenced via formal mediation, Court supervised discussions, as well as Congressional intervention.  Various attempts to settle this litigation began in the end of 1998, only to finally bring about an agreement to resolve this case on December 7, 2009.  Following more than two years of Defendants' stonewalling and misrepresentations to this Court, initial settlement talks began shortly after Judge Lamberth, on December 18, 1998, granted Class Counsel's motion for an order to show cause why Defendants should not be held in contempt.  [Dkt. No. 181.]  That failed effort was the first of many attempts to put an end to this case.  In the late summer of 1999, following Trial I, Judge Lamberth ordered mediation between the parties in a formal attempt to settle the case.  [Dkt. No. 382.]  The following year additional formal settlement discussions occurred with the Special Trustee and other federal officials, all of which failed to result in a settlement.  Unlike most other major litigation, *Cobell* consistently has garnered the attention of Congress.  That interest fostered other efforts at settlement via legislative process.

In 2004, Congress discussed with the Parties a manner to resolve this litigation.  As contemplated, Congress would pass legislation resolving the case and provide remedies for the Plaintiff Classes.  However, Congress' attempt to mediate and create a settlement between the Parties injected politics into an already tense interaction between Plaintiffs and Defendants.  At that point, not only would a settlement agreement have to be agreed to by both the Parties, but Congress must also weigh in and appropriate funds, fashion remedies, and actually pass legislation for such a settlement.  An initial problem arose when Congress would not appropriate

the necessary funds to implement the accounting declared by this Court in 1999.  Again in 2005 Congress, led by Senators McCain and Dorgan, sponsored Senate Bill 1439, entitled "Indian Trust Reform Act of 2005," to, among other things, resolve *Cobell*.  The Bush Administration, however, did not accept the framework of this congressionally-driven settlement approach.  And there was significant opposition in Indian Country as well.  Ultimately, this settlement effort also failed.

The Parties, independent of the Court and Congress, from time to time have talked about an agreement to end this case.  The Special Master and the Court Monitor also encouraged settlement of this dispute.  However, not until the second half of 2009 did substantive settlement negotiations under the supervision of Judge Robertson bear fruit, resulting in the December 7, 2009 Settlement Agreement.  The plaintiffs are aware of no case that has gone through a greater variety and number of methods to reach a settlement of litigation.

## III.   FINAL APPROVAL IS MANDATED BY CONGRESS' RESOLUTION OF THIS LITIGATION THROUGH LEGISLATION

This case is unlike the normal run-of-the-mill class action in two critical respects.  The classes here are comprised of American Indians and Congress has enacted legislation explicitly declaring that this Settlement is "authorized, ratified, and confirmed"—a policy decision made by Congress pursuant to its plenary authority over Indian affairs.  Claims Resolution Act § 101(c)(1).  Congress directed that this litigation be wound up pursuant to the terms of the agreement entered into by the Parties on December 7, 2009.  In light of Congress' ratification, this Court should grant final approval to the Settlement in accordance with its terms.

A bedrock principle of Federal Indian Law provides that Congress possesses power that is "plenary" in nature over Indian affairs, a concept repeatedly confirmed by the Supreme Court. It is well settled that "the Constitution grants Congress broad general powers to legislate in

respect to Indian tribes [and its members], powers that [the Supreme Court] ha[s] consistently described as 'plenary and exclusive.'" *United States v. Lara*, 541 U.S. 193, 200 (2004) (citations omitted); *see also Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978).  "[T]he unique legal status of Indian tribes under federal law permits the Federal Government to enact legislation singling out tribal Indians." *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*, 439 U.S. 463, 500–01 (1979) (internal quotation marks omitted).  Congress, in its exercise of plenary authority, has significant discretion in selecting Indian policies to be carried out through legislation.  *Del. Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 84-85 (1977).  This wide-ranging authority has been affirmed by the Supreme Court in numerous contexts.  *See United States v. Antelope*, 430 U.S. 641 (1977) (holding federal criminal statutes enforced as constitutional because they were not based upon impermissible racial classifications); *Fisher v. Dist. Court*, 424 U.S. 382 (1976) (holding permissible the disparate, unequal treatment of Indians in their access to state court adoption proceedings that is proscribed in the absence of Congressional intent and approval).  Where, as here, Congress has acted, courts may not act to contradict the intent of Congress.  *LeBeau v. United States*, 474 F.3d 1334, 1343 (Fed. Cir. 2007).

Here, Congress has exercised its plenary authority over Indian affairs and passed legislation clearly intending to resolve this litigation.  This litigation ends upon this Court granting final approval to the Settlement, as authorized by the Claims Resolution Act.  Congress' direction to provide redress to class members for breaches of trust that the United States has owed individual Indian Trust beneficiaries for more than a century is unequivocally expressed in the plain language of the legislation.  Although this Settlement is historic, it is not the first

instance where Congress, through passing legislation, has authorized the implementation of a settlement for individual Indians.

In *Delaware Tribal Business Committee v. Weeks*, 430 U.S. 73 (1977), Congress passed legislation, which distributed an award of a judgment fund to certain Delaware Indians, but excluded Delaware Indians who resided in Kansas.  Kansas Delaware Indians challenged the congressionally ratified distribution scheme.  The Supreme Court rejected that challenge and held that Congress is uniquely empowered to determine a distribution scheme.  *Id.* at 90.  Justice Blackmun, concurring, in the judgment, explained that "Congress must have a large measure of flexibility in allocating Indian awards."  *Id.* at 91 (Blackmun, J., concurring).

It is beyond dispute that Congress has unique authority to affect and resolve litigation specifically affecting Indians and that it has exercised that authority in these proceedings.  *See, e.g.*, *N. Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 653-56 (1976) (characterizing Congress' authority as "wide ranging"); *United States v. Jim*, 409 U.S. 80, 82-83 (1972) (same); *Gritts v. Fisher*, 224 U.S. 640, 648 (1912) (describing broad authority of Congress to regulate Indian affairs).  Where, as here, the intent of Congress is clear and its enactment is plainly "tied rationally to the fulfillment of Congress' unique obligation toward the Indians," Congress' "legislative judgments will not be disturbed."  *Mancari*, 417 U.S. at 555.

The authority of Congress in Indian affairs is exemplified by *LeBeau v. United States*, 474 F. 3d 1334, in which the plaintiffs, lineal descendants of members of the Sisseton-Wahpeton Sioux Tribe, brought an action seeking damages against the Secretary of Interior for breach of fiduciary duty in delaying the distribution of Judgment funds.  In 1972, Congress enacted legislation (the "Distribution Act") providing a formula for distribution of Judgment Funds pursuant to which 25% of those funds were to be distributed to plaintiffs.  *Id.* at 1337.  By 1998

the funds had not been delivered by the Secretary. Congress then amended the Distribution Act, which had the effect of reducing those funds available for plaintiffs. *Id.* at 1338. While agreeing that in delaying distribution of the funds the Secretary had breached fiduciary responsibilities as trustee, the court found no damages could result by reason of that breach. *Id.* at 1342. Relying on *Weeks*, the court explained that Congress had wide ranging authority over Indian affairs and could alter its plan of allocation at any time prior to distribution, without consequences under either a breach of trust or takings claims. *Id.* at 1343-44; *see also Timbisha Shoshone Tribe*, 2011 WL 691366, at  *8-9 (holding that by reason of Congress' plenary authority over Indian affairs, it could alter the distribution of funds owed to Indians and the court must defer to that congressional determination as long as the legislation is "tied rationally to the fulfillment of Congress' unique obligation toward the Indians").

The present legislation fares no differently. It was "authorized, ratified, and confirmed" in accordance with Congress' plenary authority over Indian affairs. It was passed in an effort to fulfill the government's unique trust obligations to Indians. Congress' determination should not be disturbed and the final approval should be granted. *LeBeau*, 474 F.3d at 1343.

## IV.   ALTERNATIVELY, THE SETTLEMENT MEETS THE REQUIREMENTS OF RULE 23 AND SHOULD BE GIVEN FINAL APPROVAL

There are two independent bases upon which this Court may rely in granting final approval to this Settlement. As discussed above, Congress has passed legislation with the intent to end this litigation pursuant to the Settlement Agreement and this Court should award final approval in recognition of the plenary power of Congress. However, this Settlement also meets the requirements of Rule 23, as modified by the Claims Resolution Act solely for purposes of this settlement, thereby warranting this Court's final approval on that ground as well.

### A.   SUMMARY OF THE KEY TERMS OF THE SETTLEMENT

The terms of the Settlement are described in detail in the Joint Motion for Preliminary Approval of Settlement that the Parties filed with the Court on December 10, 2010.  [Dkt. No. 3660.]  Accordingly, the Parties will not repeat that discussion here, but will set forth a summary of the key terms of the Settlement that are necessary for the Court to conduct the Rule 23(e) analysis.

### 1.     The Settlement Classes

The Settlement compromises the claims of two Classes: (1) the "Historical Accounting Class" and (2) the "Trust Administration Class."  The Historical Accounting Class was certified under Rule 23(b)(1) and (2) and consists of:

> [T]hose individual Indian beneficiaries (exclusive of those who prior to the filing of the Complaint on June 10, 1996 had filed actions on their own behalf stating a claim for a historical accounting) alive on the Record Date[2] and who had an IIM Account open during any period between October 25, 1994 and the Record Date, which IIM Account had at least one cash transaction credited to it at any time as long as such credits were not later reversed.  Beneficiaries deceased as of the Record Date are included in the Historical Accounting Class only if they had an IIM Account that was open as of the Record Date.  The estate of any Historical Accounting Class Member who dies after the Record Date but before distribution is in the Historical Accounting Class.[3]

The Trust Administration Class was certified pursuant to Rule 23(b)(3) and consists of:

> [T]hose individual Indian beneficiaries (exclusive of persons who filed actions on their own behalf, or a group of individuals who were certified as a class in a class action, stating a Funds Mismanagement Claim or a Land Mismanagement Claim prior to the filing of the Amended Complaint) alive as of the Record Date and who have or had IIM Accounts in the "Electronic Ledger Era" (currently available electronic data in systems of the Department of the Interior dating from approximately 1985 to the present), as well as individual Indians who, as of the Record Date, had a recorded or other demonstrable ownership interest in land held in trust or restricted status, regardless of the existence of an IIM Account and regardless of the proceeds, if any, generated from the Land.  The Trust Administration Class does not include beneficiaries deceased as of the Record

---

[2]   The "Record Date" is September 30, 2009, 11:59 p.m. Eastern time.

[3]   *See* Order Certifying Trust Administration Class, Appointing Class Counsel, Approving Class Representatives for the Trust Administration Class, and Modifying the February 4, 1997 Class Certification Order [Dkt. No. 3670] at 1-2.

Date, but does include the estate of any deceased beneficiary whose IIM Accounts or other trust assets had been open in probate as of the Record Date. The estate of any Trust Administration Class Member who dies after the Record Date but before distribution is included in the Trust Administration Class.[4]

The Parties believe that there is substantial overlap between the Classes. Nearly, all members of the Historical Accounting Class are members of the Trust Administration Class. And, a majority of the members of the Trust Administration Class are members of the Historical Accounting Class.

## 2.    The Benefits to the Settlement Classes

The Settlement provides substantial monetary relief to members of both Classes. More than $1.5 billion is appropriated for that purpose. Each member of the Historical Accounting Class will receive a payment of $1,000.[5] Each member of the Trust Administration Class who does not opt out of the Settlement will receive a baseline payment of $500,[6] plus an additional pro rata share of the funds remaining in the Accounting/Trust Administration Fund that may be augmented by payments from the Trust Administration Adjustment Fund.[7] At this time, Class Counsel believes that the minimum payment to members of the Trust Administration Class will be in the range of $800. Importantly, these payments are not taxable to members of the Classes and do not affect their eligibility for social benefits programs. Claims Resolution Act § 101(f).

It is widely recognized that this historic litigation has been the catalyst for the $5 billion the government has spent in the reform and rehabilitation of the IIM Trust. Indeed, there would be no trust reform in the absence of this litigation. This settlement preserves and continues that reform and lays the foundation for prudent trust management and administration for the first time in the 124-year history of the IIM Trust. The principal excuse offered by the government for its

---

[4]    *Id.* at 3-4.
[5]    Settlement Agreement at E.3.a.
[6]    *Id.* at E.4.b.1.
[7]    *Id.* at E.4.b.3; Claims Resolution Act § 101(j).

gross breaches of trust is that the continuing fractionation of undivided ownership interests in trust land has impaired its ability to prudently manage the Trust in accordance with trust law. Assuming that representation is true, this Settlement removes that excuse. To wit, the Settlement establishes a $1.9 billion Trust Land Consolidation Fund, to be used by the Interior Defendants to purchase and consolidate fractionated interests in trust and restricted lands over the next ten (10) years and place such lands into tribal beneficial ownership.[8]  The Settlement also establishes procedures for the sale of fractionated interests in Trust or restricted land pursuant to the Land Consolidation Program for individual Indians whose whereabouts are unknown.

Finally, the Settlement provides $60 million for the creation of an Indian Education Scholarship Fund. Scholarships from the Fund will be available to Indian students "to defray the cost of attendance at both post-secondary vocational schools and institutions of higher education."[9]

### 3.    The Releases

In exchange for the consideration described above, members of the Historical Accounting Class are deemed to have released the Department of the Interior from its obligation to perform a historical accounting of IIM Accounts or any individual Indian trust asset, including the right to an accounting in aid of the jurisdiction of a court to render a money judgment.[10]  In addition, all members of the Trust Administration Class will release all claims and causes of action related to fund administration and land administration, as those claims and causes of action are described in the Amended Complaint.[11]  However, class members are neither waiving nor releasing historical environmental or health related claims or causes of action. Nor are they waiving or

---

[8]   Settlement Agreement at F.1-8.
[9]   *Id.* at G.1.
[10]  *Id.* at I.1.
[11]  *Id.* at I.2.

releasing any claims or causes of action for future breaches of trust or further trust reform.[12] And, consistent with Rule 23(c)(2)(B)(v), the rights of Trust Administration Class members who elect to opt out of the settlement are preserved.[13]

### 4.        Incentive Payments to Class Representatives

In class action settlements, it is customary for class representatives to request and receive incentive payments to compensate them for the reputational risk as well as time and effort they devoted to the litigation and settlement that was beneficial to the absent members of the class. *In re Lorazepam & Clorazepate Antitrust Litig.*, No. MDL 1290(TFH), 2003 WL 22037741, at *10 (D.D.C. June 16, 2003) ("*In re Lorazepam*").  This case is no different.  Under the terms of the Settlement, Plaintiffs are entitled to request incentive awards for the Class Representatives in this case.  And, on January 25, 2011, Plaintiffs filed a motion seeking incentive awards as follows: Elouise Cobell: $2,000,000, Louis LaRose: $200,000, Thomas Maulson: $150,000, Penny Cleghorn: $150,000. [Dkt. No. 3679.]

A few objectors to the Settlement have made much of this request, claiming that the proposed incentive payments are exorbitant and compromise the ability of the Class Representatives to represent the Class.  This objection is addressed in detail in Plaintiffs' Response to Objections To Settlement and that response will not be repeated here.  However, Plaintiffs emphasize two observations about this issue that are directly related to the negotiation and terms of the Settlement Agreement.  First, under the Settlement Agreement and controlling law, incentive awards are within the discretion of this Court.  *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 52 (D.D.C. 2010).  Thus, if the Court feels that the awards are exorbitant, it may

---

[12]  *Id.* at I.3-4.
[13]  *Id.* at I.7.

award less than the amount requested.   Second, the incentive awards in this case were not discussed or negotiated until after all material terms of the settlement were agreed upon.   Harper Decl. ¶ 9 – 10, (Exhibit 1).   That is customary in class action settlements because it negates the very argument that Objectors are now making.  In short, the incentive awards could not have impacted the Class Representatives' decisions to support the Settlement because the awards were not proposed until after the Settlement was reached and ratified by Congress.

### 5.      Class Counsel Fees

The Settlement Agreement also addresses fees that will be requested by Class Counsel for their work on this matter.  On that issue, the Parties have agreed as follows:

1.      With respect to fees, expenses and costs incurred through the date of the Settlement Agreement (*i.e.*, December 7, 2009):  Plaintiffs have agreed not to assert that Class Counsel be paid more than $99,900,000.00 over and above amounts previously paid by Defendants.  In return, Defendants have agreed that they "shall not assert that Class Counsel be paid less than $50,000,000.00 [over and] above the amounts previously paid by Defendants." Significantly, the Parties have also agreed that they will not appeal an award of attorneys' fees "[i]n the event that the Court awards attorneys' fees, expenses, and costs . . . in an amount equal to or greater than $50,000,000.00 and equal to or less than $99,900,000.00."[14]

2.      With respect to fees, expenses, and costs incurred after December 7, 2009:  The Settlement Agreement provides that Class Counsel are to be paid at reasonable intervals following Final Approval at the actual billing rates for the attorneys.[15]  The post-Settlement fees must be approved by the Court, and are limited to $12 million.

---

[14]   *See* [Dkt. 3660, Ex. 14], Agreement on Attorneys' Fees, Expenses, and Costs, December 7, 2009, ¶ 4.
[15]   *Id.* ¶ 5.

This issue has also drawn attention from Objectors, particularly in light of the fee petition that Class Counsel filed on January 25, 2011.   [Dkt. No. 3678.]   While objections to Class Counsel's fee petition are addressed elsewhere, Plaintiffs note that the Settlement Agreement recognizes that the attorneys' fees, expenses, and costs awarded to Class Counsel in this case "are within the discretion of the Court in accordance with controlling law."[16]   They are not capped.   The legislation authorizing the Settlement confirms that standard.[17]   And, given the Parties' agreement not to appeal an award between $50 million and $99.9 million, the Court has full discretion and may award Class Counsel whatever fees it determines are fair to the Classes in accordance with controlling law.[18]

## B.   THE NOTICE PROGRAM IS FULLY IMPLEMENTED

### 1.   The law requires that class members be given notice in a "reasonable manner"

Rule 23(e)(1) requires the Court to "direct notice in a reasonable manner to all class members who would be bound" by the proposed settlement.   Fed. R. Civ. P. 23(e)(1)).   Key to the assessment of the adequacy of the notice process is "reasonableness."   *Wal-Mart Stores, Inc. v. VISA U.S.A., Inc.*, 396 F.3d 96, 113 (2d Cir. 2005).   "There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements."   *Id.* at 114.   Class members must be given "the best practicable" notice.   *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).   In cases that are settled, such as this one, the class notice should:

> define the class and any subclasses; describe clearly the options open to the class members and the deadlines for taking action; describe the essential terms of the

---

[16]   Settlement Agreement at J.5.
[17]   Claims Resolution Act § 101(g)(1)(A).
[18]   Plaintiffs restate their objection to an award of attorneys' fees to Mark Brown and the Native American Rights Fund for the reasons set forth in Plaintiffs' opposition briefs.   [Dkt. No's 3715; 3731].

proposed settlement; disclose any special benefits provided to the class representatives; provide information regarding attorneys' fees . . . ; indicate the time and place of the hearing to consider approval of the settlement; describe the method for objecting to (or, if permitted, for opting out of) the settlement; explain the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, clearly set forth those variations; . . . ; provide information that will enable class members to calculate or at least estimate their individual recoveries . . . ; and prominently display the address and phone number of class counsel and how to make inquiries.

Manual for Complex Litigation (Fourth) § 21.312 (2004).  The notice given in this case does not merely meet, but far exceeds Rule 23's requirements for notice.

> **2.    The Notice Program in this case meets the requirements of Rule 23(e)(1)(B) and has been fully implemented**

The Notice Program approved by this Court on December 21, 2010 is reasonable and satisfies all of the above-described criteria.  Members of the classes certified in this litigation are located throughout the United States, but are concentrated in remote and rural areas.  Contacting American Indians in these regions cannot be effectively accomplished by ordinary, mainstream methods alone.  Compounding the unique nature of these Classes is the variety of Native American languages spoken as first languages.  In light of these circumstances, the Parties retained noted expert Katherine Kinsella to ensure that class members would receive the best notice possible.

Ms. Kinsella is the President of Kinsella Media, LLC ("KM"), a legal notification firm with expertise in the design and implementation of notification programs to reach unidentified supposed class members in various class actions.  Kinsella Decl. ¶ 1.  (Exhibit 2).  She is also a noted expert and author in the area of media communications and class action notice.  Id. ¶¶ 6-7.  KM possesses experience in creating and executing notice in Native American cases.  Most recently, KM was approved as the Notice Administrator in the *Keepseagle v. Vilsack* class action

litigation on behalf of Native American farmers and ranchers.[19]  *See Keepseagle v. Vilsack*, 1:99-cv-03119-EGS.

With Ms. Kinsella's assistance, the Parties designed a 5-part Notice Program, which included:  (1) direct first class mail notice to all Class members whose names and addresses were available; (2) newspaper, radio, television and other paid media advertisements; (3) outreach to various tribes and other organizations that could assist with notice; (4) a national public relations campaign; and (5) electronic notice through an internet website.  Kinsella Decl. ¶ 9.  This notice process, in aggregate, is among the most robust ever provided.  Kinsella Decl. ¶ 72.

### a.    Direct Mail Notice Efforts

The Court's December 21, 2010 Order approved the Notice Program along with the Short Form Notice, Long Form Notice, and Claim Form.  The direct mail component of the Notice Program has been implemented by the Claims Administrator, Garden City Group, Inc. ("GCG") and mailing commenced on January 20, 2011.  Notice packets mailed to Class members provided the Long Form Notice.  Kinsella Decl. ¶ 10.  Direct mail notice was sent to readily identifiable Class members including (1) individuals whose names and addresses were available and provided by the Department of Interior, (2) all individuals who registered on the website or through the Toll-Free Support Line, and (3) all individuals who, as a result of reading or hearing about the Proposed Settlement, provided contact information to any of the following, the Toll-Free Support Line, the email address provided on the website, or the Indian Trust Settlement P.O. Box.  Kinsella Decl. ¶ 11.  The initial mailing included 374,061 packets sent to individuals. Keough Decl. ¶ 8-9.  (Exhibit 3).  An additional 76,521 packets were sent based on advanced

---

[19]   In addition, KM has developed or consulted on over 700 notification programs.  Kinsella Decl. ¶ 4.  Courts have admitted expert testimony from KM regarding its qualitative and quantitative evaluations of notice programs.  *Id.* ¶ 5.  Finally, several courts have favorably commented on the notice programs put into place by KM.  *Id.*

level searches for individuals and addresses.  Keough Decl. ¶ 10.  A total of 73,594 packets were undeliverable with no forwarding information while 34,301 were returned with updated addresses.  Keough Decl. ¶ 9.  An additional 51,748 packets were sent to individuals who requested notice through email, phone, or mail.  Keough Decl. ¶ 10.  Finally, GCG has received 108,328 Claim Forms as of May 11, 2011.  Keough Decl. ¶ 26.

### b.      Paid Media Advertisements

The paid media utilized in providing the best practicable notice to Class members included both Native American media outlets as well as Mainstream media outlets.  Kinsella Decl. ¶¶ 17-18.  Advertisements of the settlement in various Native American media outlets consisted of:  approximately 218 Native American publications (including newspapers and newsletters); roughly 373 radio spots run on stations in and around Indian Country, including 13 stations which broadcast in the region's dominant Native language; and website banner ads placed on 18 prominent Native American websites.  Kinsella Decl. ¶¶ 20, 22-24, 40.  With respect to Mainstream media outlets, notice was made through: a 30-second television spot run for several weeks in approximately 56 markets; 15, 30, and 60 second radio advertisements in metropolitan, non-metropolitan, and local areas; an estimated 163 military newspapers; and publicizing notice in Rodeo media—including publications and websites—and events.  Kinsella Decl. ¶¶ 25, 28-29, 32-33, 43, 45.

### c.      Third-Party and Tribal Outreach

In addition, KM and GCG also worked with additional third parties located throughout Indian Country in order to provide further notice, by posting and distributing materials to Class members.  Kinsella Decl. ¶¶ 56-57; Keough Decl. ¶ 18.  In total, over 1,800 entities agreed to

participate in distributing notice to Class members.  Kinsella Decl. ¶ 59.  Organizations from national, state, local, and tribal levels participated in this effort, including Headstart programs, eldercare facilities, health care facilities, libraries, educational institutions, and church networks, including the Episcopal Church, Roman Catholic Dioceses, the United Methodist Church, and the Presbyterian Church.  Kinsella Decl. ¶¶ 60-62; Keough Decl. ¶ 18.  The United States Postal Service was also utilized in distributing notice via posting 100 posters in local post offices near the most highly concentrated areas of potential class members.  Keough Decl. ¶ 21.  Hundreds of tribes participated in the Notice Program by distributing materials in their tribal facilities and areas.  Kinsella Decl. ¶ 64.  GCG also directly worked with twenty-six tribes, in nine states, involving over 56,500 records in order to locate current address information and provide information about the Settlement to Class Members.  Keough Decl. ¶ 24.  Nearly 250,000 informational packets were distributed to these third parties.  Keough Decl. ¶ 19.  As an important safeguard, GCG directed in-person visits of the highest density areas of Class Member populations near above-referenced third-party contact locations to ensure that materials had been properly posted and distributed.  Keough Decl. ¶ 20.

### d.    Internet Website and Toll-Free Support Number

This litigation has long maintained a website (www.IndianTrust.com), which posted relevant documents and updates about the case to inform Class members about the status of the litigation.  For purposes of providing notice, KM and Class Counsel re-organized the website to include all notice materials, a schedule of the upcoming informational meeting sessions with Class Counsel, relevant pleadings from the litigation (including, among others, the actual Settlement Agreement, Motion for Preliminary Approval, and Petition for Attorneys' Fees), a listing of important dates, and the ability to update contact information for putative Class members.  Kinsella Decl. ¶ 54; Keough Decl. ¶ 4, 11-12.  In recognition of the diversity of

languages spoken by Class members, the Long Form Notice was available for download from the website and was translated into English, Spanish, and Navajo. Kinsella Decl. ¶ 12; Keough Decl. ¶ 12. In addition, online content also includes the ability for website visitors to view the informational video explaining the terms of the settlement in the following different Native languages: Apache, Tsalagi (Cherokee), Crow, Dakota, Lakota, Navajo, Ojibwe, Spanish, and Yupik. Kinsella Decl. ¶ 71; Keough Decl. ¶ 12.

Since January 20, 2011, there have been 206,517 unique visits to the website and 6,349 individuals have made inquiries via email seeking information about the settlement. Keough Decl. ¶ 13. In addition to the website, a toll-free number (1-800-961-6109) was created to provide Class members with another method of obtaining information about the settlement and their potential participation. Keough Decl. ¶ 14. The toll-free number was printed on the Short Form Notice, Long Form Notice, and Claim Form. Keough Decl. ¶ 14. The toll-free number is staffed by live people and employs an Interactive Voice Recognition system to assist callers after hours. Keough Decl. ¶ 4. 5. In sum, the call-center received 182,878 phone calls and expended a total of 1.2 million minutes on the phone with putative Class members. Keough Decl. ¶ 16.

### e.    Personal Efforts by Class Counsel

Class Counsel has long recognized the historic nature of this litigation and the importance of these claims to individual Class members. Therefore, beginning in early March of 2010, Class Counsel began holding informational meetings about the terms of the proposed settlement, well before legislation ratifying the settlement was enacted and signed into law by the President. Kinsella Decl. ¶ 70. Class Counsel understood the importance of informing Class members at these informational sessions and spoke with them one-on-one about the proposed settlement and how it might affect their legal rights. *Id.* In the spring of 2010, Class Counsel conducted over 50 meetings across Indian Country with Class members. Kinsella Decl. ¶ 70. After enactment of

the Claims Resolution Act, Class Counsel again returned to Indian Country and held information sessions with thousands of Class members on over 50 Indian reservations and in other communities with a high density of class members, including some of the most geographically remote areas of this country.  Kinsella Decl. ¶ 71; Keough Decl. ¶ 22.  Those direct and personal efforts of Class Counsel to speak with Class members are unheard of in class action settlements.  The scope and reach of the Notice Program implemented in this case is unprecedented and more than satisfies the requirements of Rule 23.

      **C.**    **The Settlement warrants final approval under a straight-forward application of Rule 23**

Consistent with the intent of Congress, as expressed in the Claims Resolution Act, the Parties are proceeding to wind-up this litigation in accordance with the class action requirements of Rule 23.  This Settlement warrants final approval under a traditional application of Rule 23(e).  To ensure compliance with Rule 23, the Act modifies the Federal Rules of Civil Procedure to ensure that this Court may certify the Trust Administration Class.  Claims Resolution Act § 101(d)(2)(B).  Such legislative modification is permissible because Congress "has ultimate authority over the Federal Rules of Civil Procedure; it can create exceptions to an individual rule as it sees fit—either by directly amending the rule or by enacting a separate statute overriding it in certain instances."  *See Shady Grove Orthopedic Assoc. v. Allstate Ins. Co.*, __ U.S. __, 130 S.Ct. 1431, 1438 (2010).

In terms of procedure, Congress' conduct with respect to *Cobell* is not unique.  Congress often enacts changes to the Federal Rules of Civil Procedure, including carving out an exception to the typical Rule 23 requirements.  In the instant case, the resulting analysis to be performed by this Court in the discharge of its duties under Rule 23 is modified by this legislative change.  Specifically, the Act creates an exception to Rule 23 for the Trust Administration Class.  In

assessing the validity of this Settlement under Rule 23, the Court is guided both by the requirements of Rule 23 and the modifications to that analysis as set forth in the Claims Resolution Act.  With the legislative modification of Rule 23, the Settlement meets or exceeds the requirements of Rule 23 and is entitled to final approval under Rule 23(e).

### 1.      The law favors settlement of class action cases

Under Rule 23(e), "[t]he claims … of a certified class may be settled … or compromised only with the [district] court's approval."  Fed. R. Civ. P. 23(e).  The decision to approve a proposed settlement in a class action is committed to this Court's discretion.  *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd*, 565 F. Supp. 2d 49, 54 (D.D.C. 2008) (citing *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 103 (D.D.C. 2004) ("*In re Vitamins*")).  However, such discretion is not unfettered, but "is constrained by the 'principle of preference' favoring and encouraging settlements in appropriate cases."  *In re Vitamins*, 305 F. Supp. 2d at 103 (quoting *Pigford v. Glickman*, 185 F.R.D. 82, 103 (D.D.C. 1999), *aff'd*, 206 F.3d 1212 (D.D.C. 2000)); *see also Mayfield v. Barr*, 985 F.2d 1090, 1092 (D.C. Cir. 1993).

"[V]oluntary conciliation and settlement are the preferred means of dispute resolution," especially in complex class actions.  *Officers for Justice*, 688 F.2d at 625; *see also Util. Reform Project v. Bonneville Power Admin.*, 869 F.2d 437, 443 (9th Cir. 1989).  Class action lawsuits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length, costs, and risks of the litigation.  As a result, courts should exercise their discretion to approve settlements "in recognition of the policy encouraging settlement of disputed claims."  *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995) ("*In re Prudential*"); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) ("[S]trong judicial policy . . . favors settlements, particularly where complex

class action litigation is concerned."); 4 William Rubenstein, Alba Conte & Herbert B Newberg,

*Newberg on Class Actions* ("*Newberg*") § 11.41 (4th ed. 2002).

> **2.     The Proposed Settlement in this case Meets the Requirements of Rule
> 23(e) and Should, Therefore, Receive Final Approval**

>> **a.     The legal standard for final approval of settlements in class
>> action cases**

To approve a proposed class action settlement under Rule 23(e), the Court must find that

the settlement is "fair, adequate and reasonable," recognizing that "'[i]t is the settlement taken as

a whole, rather than the individual component parts, that must be examined for overall fairness.'"

*Staton v. Boeing*, 327 F.3d 938, 960 (9th Cir. 2003) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d

1011, 1026 (9th Cir. 1998)).  As the decision in *Officer's for Justice* reminds:

> [T]he court's intrusion upon what is otherwise a private consensual agreement
> negotiated between the parties to a lawsuit must be limited to the extent necessary
> to reach a reasoned judgment that the agreement is not the product of fraud or
> overreaching by, or collusion between, the negotiating parties, and that the
> settlement, taken as a whole, is fair, reasonable and adequate to all concerned.

688 F.2d at 625.

"In this Circuit, there is 'no obligatory test' that the Court must use to determine whether

a settlement is fair, adequate and reasonable."  *Blackman v. Dist. of Columbia*, 454 F. Supp. 2d

1, 7 (D.D.C. 2006).  However, when determining whether a settlement passes muster under Rule

23(e), the courts in this Circuit have considered the following factors: "(1) whether the

settlement is the result of arm's-length negotiations; (2) the terms of the settlement in relation to

the strength of the plaintiffs' case; (3) the status of the litigation at the time of settlement; (4) the

reaction of the class; and (5) the opinion of experienced counsel."  *Radosti*, 717 F. Supp. 2d at

54; *see also Meijer*, 565 F. Supp. 2d at 54-55; *Ball*, 315 F. Supp. 2d at 125; *In re Vitamins*, 305

F. Supp. 2d at 104; *In re Baan Co. Sec. Litig.*, 284 F. Supp. 2d 62, 64-67 (D.D.C. 2003); *In re*

*First Databank Antitrust Litig.*, 205 F.R.D. 408, 411 (D.D.C. 2002).  As explained below, the proposed Settlement in this case warrants final approval in light of this standard.

> **b.      The proposed Settlement is the product of arm's-length negotiations and is, therefore, presumptively "fair, adequate and reasonable"**

This Court frequently has held that "[a] presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."  *Radosti*, 717 F. Supp. 2d at 56 (quoting *In re Vitamins*, 305 F. Supp. 2d at 104); *Meijer*, 565 F. Supp. 2d at 55; *Blackman*, 454 F. Supp. 2d at 8; *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 852 (1999) ("One may take a settlement amount as good evidence of the maximum available if one can assume that parties of equal knowledge and negotiating skill agreed upon the figure through arm's-length bargaining . . . ."); 4 *Newberg* § 11.41.  On these grounds, the proposed Settlement in this case is entitled to a presumption that it is fair, adequate and reasonable.

In 2008, this Court stated that *Cobell* is "hardly [an] ordinary case."  *Cobell v. Kempthorne*, 569 F. Supp. 2d 223, 252 (D.D.C. 2008) ("*Cobell XXI*"), *vacated sub nom. Cobell XXII*, 573 F.3d 808.  Since the inception of this litigation, the Parties have tenaciously represented the interests of their respective clients. The attitude of the Parties towards one another has wavered from contentious to outright hostility over the course of the past fifteen years.  The history of this case, marked by multiple contempt trials and not infrequent motions by either Party seeking the imposition of sanctions under Rules 11, 24, and 37, was the foundation upon which settlement negotiations began anew in August of 2009.  Harper Decl. ¶ 2, 4.  And, this Court has sanctioned Defendants repeatedly for their litigation misconduct.

At inception of the negotiations, Class representatives and Class Counsel were highly skeptical that this case could be resolved.  Harper Decl. ¶ 4 - 5 .  Prior attempts to settle this

litigation ultimately failed.   Nevertheless, under the leadership of the named plaintiff Elouise Cobell, the parties began negotiations in earnest.

Consistent with the litigation, negotiations were often contentious.   Harper Decl. ¶ 8. Over the course of the negotiations, there were numerous times where the Parties reached an impasse and broke off discussions.   Harper Decl. ¶ 8.   During those times of extreme disagreement, Judge Robertson, with consent of the Parties, played an important and constructive role as mediator in resolving points of great dispute.   Harper Decl. ¶ 8. As negotiations continued, meetings between the Parties increased in duration and frequency, sometimes lasting for entire days, multiple times per week.   Harper Decl. ¶ 7  At various points, some of the most senior level cabinet officials from the Department of Interior and Department of Justice participated in negotiations.   Harper Decl. ¶ 5.   Among those officials contributing on a day-to-day basis were Interior Solicitor Hilary Tompkins, Deputy Secretary of the Interior David Hayes, and Associate Attorney General Tom Perrelli.   Harper Decl. ¶ 5.   At critical junctures, the Interior Secretary Ken Salazar participated as well to make clear that both he and the Administration supported resolution of this case.   At all times, the negotiations were at arm's length.   At all times the various involved counsel vigorously advanced the interests of their respective sides.   There can be no serious argument to the contrary.

Furthermore, these negotiations were conducted by competent counsel who had the benefit of more than a decade of litigation and discovery experience in this case.  The degree and extent of fact gathering, investigation, and informal and formal discovery cannot be overstated. The production and review of tens of millions of pages of documents and countless field visits with both IIM account holders and governmental officials evidence the scope of Class Counsel's investigation of the Plaintiff Classes' claims.  As a result of this extensive investigation, Counsel

for the Classes "had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-à-vis the probability of success and range of recovery." *Meijer*, 565 F. Supp. 2d at 57 (quoting *In re Lorazepam*, 2003 WL 22037741, at *4); *see also Osher v. SCA Realty I, Inc.*, 945 F. Supp. 298, 305 (D.D.C. 1996) (finding significant that "counsel had an adequate appreciation of the merits of the case before negotiating," which typically happens after "discovery has been made"). Thus, the Settlement in this case comes at an appropriate point in the litigation process. *See In re Vitamins*, 305 F. Supp. 2d at 105. And, because the Agreement is the result of arm's-length negotiations between experienced counsel, a presumption that the Settlement is fair, adequate, and reasonable applies. *See Ball*, 315 F. Supp. 2d at 131 (finding the settlement "presumptively fair, reasonable, and adequate" in light of the "extensive negotiations in this matter and the total absence of any evidence of collusion between the parties"); *Vista Healthplan, Inc. v. Bristol-Myers Squibb Co.*, 287 F. Supp. 2d 65, 66 (D.D.C. 2003) (approval of settlement warranted because it "was not the product of collusion . . . but rather was the result of *bona fide* and arm's length negotiations conducted in good faith").

        **c.**      **The terms of the proposed Settlement are reasonable in light of the delay and risk of further litigation**

When determining whether to give final approval to a settlement in a class action, "[t]he court's primary task is to evaluate the terms of the settlement in relation to the strength of the plaintiffs' case." *Thomas v. Albright*, 139 F.3d 227, 231 (1998); *see also Blackman*, 454 F. Supp. 2d at 8; *Pigford*, 206 F.3d at 1217. In conducting this analysis, the court "need not reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Class Plaintiffs*, 955 F.2d at 1291 (internal quotation marks omitted). Instead, "the court must examine whether the interests of the

class are better served by the settlement than by further litigation." *Blackman*, 454 F. Supp. 2d at 7.

The Settlement in this case affords significant relief to the Classes.  Members of the Historical Accounting Class each are guaranteed a payment of $1,000, and members of the Trust Administration Class, many of whom are also members of the Historical Accounting Class, will receive a minimum payment estimated to be in the range of $800.  This is a minimum and many beneficiaries will receive greater amounts depending on the income derived from their trust resources and deposited into IIM accounts.  In addition, the Settlement provides a firm foundation for continuing trust reform by creating the Trust Land Consolidation Fund.  This would remove an obstacle to prudent trust management for the first time in the history of the Trust.  That fund also provides *cy pres* relief in the form of the Indian Education Scholarship Fund.  All told, the Settlement represents to the Classes over $3.4 billion in tangible monetary benefits—tax free—in addition to the $5 billion that the government has spent on trust reform solely because of this litigation.  Plainly speaking, this is the largest government settlement in American history.

Some of the Objectors to the Settlement complain that the relief described above is inadequate or insufficient and is, therefore, not in the best interests of the Classes.  While it is tempting to engage in this sort of "what if" analysis, that is not a task for this Court.  This Settlement should not "be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators," *Officers for Justice*, 688 F.2d at 625, but against the certain risks and uncertain rewards of further litigation, which include the following:

### (1)      The litigation would be interminable

There is no question that if the Settlement is not approved, the Parties (and this Court) will be consigned to years of further litigation.  In *Cobell XXII*, the D.C. Circuit held that the

Interior defendants have a duty to render the best historical accounting that it can. "Equity requires the courts to assure that Interior provides the best accounting it can" and do so "in a reasonable time, with the money that Congress is willing to appropriate." *Cobell XXII*, 573 F.3d at 813. Of course, that is easier and sooner said than done. Congress has appropriated money for the Settlement, not for an accounting. There is no assurance that Congress would appropriate such funds. Moreover, Defendants continue to maintain that they do not have sufficient records in their possession to conduct a complete and accurate accounting. And, even if these logistical problems could be solved, which is highly doubtful, the Parties continue to dispute the nature and scope of the accounting.

It is also impossible to reliably estimate how long such an accounting would take. This case was filed as an action in equity to enforce trust duties owed by the United States to Class members, including an accounting, and now, fifteen years later, the accounting duty still has not been discharged. Under the circumstances, it is reasonable to conclude that this case could last another fifteen years. There is no end in sight. Nor is there any assurance that an accounting of "low hanging fruit," the standard currently applied by the Court of Appeals, would provide information that is more complete and accurate than that which is now known.

### (2)    There is no guarantee that litigation will produce better results than the Settlement

Defendants' liability was established long ago. That is not the problem. Because evidentiary presumptions and inferences that ordinarily apply in a trust case have not been applied in these proceedings, burdens of proof and persuasion have been shifted to the beneficiaries. If this case is to continue to be litigated, Plaintiffs must still prove their damages and restitutionary relief, which raise issues similar to that which this Court confronted in the *Pigford* case.

The *Pigford* case involved allegations of decades of discrimination by the USDA against African-American farmers. In a manner analogous to this case, the USDA contended that it did not have documentary evidence regarding many of the class members' claims. The *Pigford* court recognized that the lack of evidence created evidentiary problems that were not easily solved. "The problem for plaintiffs has been that files simply do not exist for many class members. Providing additional time for discovery would not have solved that problem." *Pigford*, 185 F.R.D at 99. The lack of evidence would also have raised problems of proof at trial:

> 80 to 90 percent of the class members lack any documentary evidence of the alleged discriminatory denial of credit or benefits to them. In order to recover damages under ECOA at a trial, a class member would have to be able to establish by a preponderance of the evidence a discriminatory denial of loans or terms of credit, the extent of the injury to him caused by the denial and the amount of damages he suffered. Absent any documentation, this would have been an impossible burden for the majority of class members.

*Id.* at 104 (citation omitted). In light of these circumstances, this Court in *Pigford* concluded that the risk of litigation weighed in favor of approving the proposed settlement in that case. *See also Blackman*, 454 F. Supp. 2d at 13-14 (approving settlement in action against a school district where further litigation would likely result in "endless rounds of contempt litigation" due to the school district's inability to comply with the Individuals with Disabilities Education Act).

The situation in *Cobell* is analogous. Like the USDA in *Pigford*, Defendants cannot produce complete and accurate individualized accountings for Class members because (1) account level data is missing or corrupted in many instances and (2) data that is available reflects receipt of "monies not intended for IIM accounts" and Defendants have "no way to distinguish IIM transactions from non-individual transactions . . . ." *Cobell XXI*, 569 F. Supp. 2d at 227. Even aggregate level data about the Trust is missing, corrupted, or is inaccurate. *Id.* Unable to

rely on evidentiary presumptions and inferences to establish damages and restitutionary relief, it is this missing evidence that the Class members would need to prove their claims.

As a result, if the Settlement is rejected and Plaintiffs are forced to litigate their claims, they may well find themselves in precisely the same situation as the *Pigford* plaintiffs, with liability conclusively established, but unable to prove their damages and, here, appropriate restitutionary relief.  And, even if Plaintiffs can meet their burdens and prove some level of damages and establish some basis for restitutionary relief, there is no guarantee that they will be able to prove damages or restitutionary relief that is equal to or above that which they will receive if the Settlement is approved.  Finally, proof of damages and restitutionary relief is only one hurdle that Plaintiffs will have to clear in order to bring this case to a successful conclusion.  In light of the risks and burdens of additional, protracted litigation, the wiser course in this case is to approve the Settlement and "take the bird in the hand" rather than litigate for another fifteen years in hopes of securing "the prospective flock in the bush."  *In re Prudential*, 163 F.R.D. at 210 (quoting *Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 624 (D. Colo. 1974).

> **d.**   **The proposed Settlement in this case was reached at an advanced stage of the litigation and after the strengths and weaknesses of the case were well-known**

When determining whether a proposed settlement is fair, adequate, and reasonable, courts in this Circuit consider, among other factors, "the status of the litigation at the time of settlement."  *In re Vitamins*, 305 F. Supp.2d at 104 (citing numerous cases); *In re Baan Co. Sec. Litig.*, 284 F. Supp. 2d at 64-67.  Courts must ensure that the settlement does not "come too early to be suspicious" and that it is at "a desirable point in the litigation to reach an agreement . . . without further delay, expense, and litigation."  *In re Vitamins*, 305 F. Supp. 2d at 105.  "Courts thus consider whether counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-à-vis the probability of success and

range of recovery." *In re Lorazepam*, 2003 WL 22037741, at *4; *Luevano v. Campbell*, 93 F.R.D. 68, 86 (D.D.C. 1981) (reasoning that in conducting the analysis required by Rule 23(e), courts should evaluate "whether the settlement was reached after extensive factual development, so that counsel on both sides would have had information sufficient to make a reasonable assessment of their risks of litigation").

This action in equity was filed on June 10, 1996 and a settlement agreement was executed over thirteen years later. Since the inception of this litigation, Plaintiffs have engaged in extensive investigation, fact-finding, and research on the factual and legal issues pertaining to the legal claims of the Class. After voluminous fact and expert discovery, approximately 250 days of hearings and trials, ten interlocutory appeals, an *en banc* petition to the D.C. Circuit, and two petitions for writs of certiorari to the Supreme Court, the Parties reached agreement to resolve this litigation on December 7, 2009. Over the course of this litigation, Defendants have produced, and Class Counsel has reviewed, millions of pages of documents relating to the IIM Trust. The Parties have retained consulting and testifying experts who have provided testimony to this Court on various aspects of the litigation. The motions practice engaged in by the Parties throughout this litigation is unparalleled and has touched on every procedural and substantive issue in this case. Class Counsel has pursued additional aspects of Plaintiffs' claims through the prosecution of a 59-day trial on information technology security as well as similar proceedings.

This settlement was reached after nearly a decade and a half of discovery and well after the filing of the June 10, 1996 complaint. Even a cursory glance at the more than 3,700 docket entries in this case evidences the fact that the Parties have more than adequately litigated this matter and they "possess[] well-founded views of the merits of their respective positions." *Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*, 246 F.R.D. 349, 362 (D.D.C. 2007). The

advanced stage of this case and the Parties' extensive understanding of the facts and respective legal positions warrant a finding that the proposed settlement agreement is fair, adequate, and reasonable.

> **e.     The Class members' positive reaction supports final approval of the proposed Settlement**

This Court may infer that a class action settlement is fair, adequate, and reasonable when relatively few Class members object to it.  *See, e.g.*, *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977); *Ball*, 315 F. Supp. 2d at 129; *Class Plaintiffs*, 955 F.2d at 1291-96; *see also Bryan v. Pittsburgh Plate Glass Co. (PPG Industries, Inc.)*, 494 F.2d 799, 803 (3d Cir. 1974) ("While the proportion of the class opposed to a settlement is one factor to be considered in assessing its fairness, a settlement is not unfair or unreasonable simply because a large number of class members oppose it.") (citation omitted); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").

In this case, the Classes' reactions to the proposed Settlement have been overwhelmingly positive.  There are approximately 338,000 members of the Historical Accounting Class and perhaps 450,000 members of the Trust Administration Class.   According to the Class Administrator, there were 92 timely objections to the Settlement and 1,826 individuals submitted timely requests to be excluded from the Trust Administration Class.   Keough Decl. ¶ 27, 28.  Thus, 99.98% of the Class members are supportive, fewer than one-tenth of 1% of the Classes filed objections, and a mere .4 % of the Trust Administration Class exercised their right to opt out of the Settlement.  While compelling on their face, these statistics also fit comfortably within the range of approval for settlements in this Circuit.  *See, e.g.*, *Thomas*, 139 F.3d at 232

(approving a settlement where "only 15% of the class members objected"); *see also Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1215-18 (5th Cir. 1978) (denying approval of class action settlement where approximately 70% of the subclass and all class representatives objected).

**f.     The recommendations of experienced counsel support approval of the proposed Settlement**

The opinion of experienced counsel "should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement." *Lorazepam II*, 2003 WL 22037741 at *6; *Radosti*, 717 F. Supp. 2d at 56. "The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979); *see also Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981) ("[T]he fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight."); *Linney v. Cellular Alaska P'ship*, No. C-96-3008 DLJ, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997), *aff'd*, 151 F.3d 1234 (9th Cir. 1998). Here, counsel for both Parties, who are experienced in class action litigation and who have litigated this case from its beginning, endorse the proposed Settlement as fair, reasonable and adequate.

## V.     CONCLUSION

The Parties and their counsel are pleased with the Settlement now before the Court. This Settlement delivers billions of dollars in tangible benefits to members of the Class. It establishes a firm platform for continuing reform of the Trust that gave rise to this case and threatens future litigation. It provides substantial *cy pres* relief for the benefit of Native American students, scholars, and future Native American leaders. It also ends fifteen years of contentious and burdensome litigation for which there was no end in sight. And, it has received praise and

-34-

overwhelming approval from the President and Congress.   Perhaps most importantly, this Settlement provides a measure of justice to Indians who have suffered for far too long.

Is the proposed Settlement in this case perfect?  Of course not.  But, sensibly, that is not what the law requires.  "The test is whether the settlement is adequate and reasonable and not whether a better settlement is conceivable."  *In re Vitamins Antitrust Litig.*, No. 99-197 TFH, 2000 WL 1737867, at *2 (D.D.C. Mar. 31, 2000) (citation omitted).  The Settlement clearly meets this standard and should be approved by the Court.   It is the alternative that is inconceivable and would result in a manifest miscarriage of justice.


Respectfully submitted,

/s/ Dennis M. Gingold

DENNIS M. GINGOLD
D.C. Bar No. 417748
607 14th Street, N.W., 9th Floor
Washington, D.C. 20005
(202) 824-1448

/s/ Keith M. Harper
KEITH M. HARPER
D.C. Bar No. 451956
M. ALEXANDER PEARL
D.C. Bar No. 987974
KILPATRICK TOWNSEND LLP
607 14th Street, N.W.
Washington, D.C.  20005
(202) 508-5844

DAVID COVENTRY SMITH
N.C. Bar No. 12558
Admitted *Pro Hac Vice*
KILPATRICK TOWNSEND LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
(336) 607-7392

WILLIAM E. DORRIS
Georgia Bar No. 225987
Admitted *Pro Hac Vice*
ELLIOTT LEVITAS
D.C. Bar No. 384758
KILPATRICK TOWNSEND LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309
404-815-6500

Attorneys for Plaintiffs


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing PLAINTIFFS' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF SETTLEMENT AND ENTRY OF FINAL JUDGMENT was served on the following via facsimile, pursuant to agreement, on this 16th day of May, 2011.

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
406.338.7530 (fax)


/s/ Shawn Chick

-36-