# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____ )
ELOUISE PEPION COBELL, et al.,        )
                               )
              Plaintiffs,    )
      v.                    )     No. 1:96CV01285(TFH)
                               )
KEN SALAZAR, Secretary of     )
the Interior, et al.,           )
                               )
             Defendants.   )

## PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT

May 16, 2011

# TABLE OF CONTENTS

I.      Introduction ....................................................................................................... 1

II.     The Settlement Is Constitutional. ...................................................................... 2

        A.      The Trust Administration Class Satisfies Due Process Requirements Identified by the Supreme Court. ............................................................ 2

        B.      The Class Settlement is Not an Unconstitutional Taking of Vested Rights. .... 11

        C.      Class Settlement of the Accounting Claim is Permissible Under Rule 23(b)(1) and Rule 23(b)(2). ..................................................................... 12

        D.      There is No Equal Protection Problem. ............................................. 14

III.    Settlement Amounts and Distribution Methods are Fair and Reasonable. ................ 20

        A.      The Settlement Amount is Fair and Reasonable. ............................... 20

                1.      Standard for Evaluating Settlements ..................................... 20

                2.      Historical Accounting Class Settlement ................................ 22

                3.      Trust Administration Class ................................................... 25

                4.      The Settlement Reflects a Reasonable Percentage of Estimated Losses and Unlawful Benefits Conferred on the Trustee. ............................... 30

        B.      The Distribution to the Trust Administration Class is Fair and Reasonable. ... 32

IV.     Class Members May Not Opt Out Of The Historical Accounting Class. .................. 34

V.      The Land Consolidation Program Is A Significant Benefit To Plaintiff. ................... 37

VI.     Incentive Fee Request Is Reasonable. ............................................................. 39

VII.    No Conflict Exists Between Class Representatives and the Class. ............................ 41

VIII.   Fees Asserted for Class Counsel are Reasonable. ............................................. 46

        A.      The Phantom $7 Billion Offer to Settle *Cobell*. ............................. 47

        B.      Conflicts of Interests. ........................................................................ 52

        C.      Plaintiffs Assert $99.9 Million for Class Counsel. ............................ 53

        D.      Contingent Fee Agreements. ............................................................. 54

E.      Amount of Fee for Class Counsel..................................................................... 55

      1.      Land Consolidation Fund................................................................. 56

      2.      Trust Administration Funds. ............................................................ 56

      3.      Lodestar Check................................................................................. 57

IX.     The Notice Period is Reasonable and Should Not Be Extended............................... 61

X.      The Other Objections Are Without merit................................................................. 62

A.      Future Claims.................................................................................................. 62

B.      Scholarship Program....................................................................................... 62

C.      Settlement Administration Expenses............................................................... 63

D.      Reductions for Opt Outs. ................................................................................ 63

E.      Children Not Included. .................................................................................... 64

F.      Treatment of Direct Pay.................................................................................. 64

G.      Apologies and Other Terms Not Included....................................................... 64

# TABLE OF CASES AND AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995) ............................................................................................ 17

*Allapattah Servs., Inc. v. Exxon Corp.,*
  454 F. Supp. 2d 1185 (S.D. Fla. 2006) ................................................................ 40

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997) .......................................................................................... 8, 9

*Blackman v. District of Columbia,*
  454 F. Supp. 2d 1 (D.D.C. 2006) .................................................................. 21, 30

*Boeing Co. v. Van Gemert,*
  444 U.S. 472 (1980) ............................................................................................ 46

*Braud v. Transp. Serv. Co.,*
  Nos. 05-1898, 05-1977, 05-5557, 060891, 2010 WL 3283398 (E.D. La. Aug. 17, 2010) ......... 2

*Brown v. Board of Education,*
  347 U.S. 483 (1954) ............................................................................................ 13

*Cobell v. Kempthorne,*
  569 F. Supp. 2d 223 (D.D.C. 2008) ("*Cobell XXI*") ............................................. 23

*Cobell v. Norton,*
  240 F.3d 1081 (D.C. Cir. 2001) ("*Cobell VI*") ...................................................... 7

*Cobell v. Norton,*
  283 F. Supp. 2d 66 (D.D.C. 2003) ("*Cobell X*"),
  *rev'd in part,* 392 F.3d 461 (D.C. Cir. 2004) ("*Cobell XIII*") ............................... 26

*Cobell v. Norton,*
  428 F.3d 1070 (D.C. Cir. 2005) ("*Cobell XVI*") .................................................. 33

*Cobell v. Salazar,*
  573 F.3d 808 (D.C. Cir. 2009) ("*Cobell XXII*") ..................................... 11, 23, 24, 33

*Cohen v. Chilcott,*
  522 F. Supp. 2d 105 (D.D.C. 2007) ................................................................ 44, 45

*Council of and for the Blind of Del. Cnty. Valley, Inc. v. Regan,*
  709 F.2d 1521 (D.C. Cir. 1983) ............................................................................ 7

*Covad Commc'ns Co. v. Revonet, Inc.*,
  267 F.R.D. 14 (D.D.C. 2010).............................................................................. 57

*Delaware Tribal Bus. Comm. v. Weeks*,
  430 U.S. 73 (1977).................................................................................... 1, 19

*Democratic Cent. Comm. of Dist. of Columbia v. Wash. Metro. Area Transit Comm'n*,
  3 F.3d 1568 (D.C. Cir. 1993)........................................................................ 52, 53

*DG ex rel. Stricklin v. Devaughn*,
  594 F.3d 1188 (10th Cir. 2010) .......................................................................... 7

*EEOC v. Gen. Tel. Co. of Northwest, Inc*,
  599 F. 2d 322 (9th Cir. 1979),
  *aff'd*, 446 U.S. 318 (1980) ............................................................................ 35

*Equal Rights Ctr. v. Wash. Metro. Area Transit*,
  573 F. Supp. 2d 205 (D.D.C. 2008)...................................................................... 20

*Eubanks v. Billington*,
  110 F.3d 87 (D.C. Cir. 1997)........................................................................ 13, 35

*Feinman v. F.B.I.*,
  269 F.R.D. 44 (D.D.C. 2010)............................................................................ 34

*Fisher v. District Court*,
  424 U.S. 382 (1976)..................................................................................... 17

*Freeport Partners, L.L.C. v. Allbritton*,
  No. Civ.A 04-2030(GK), 2006 WL 627140 (D.D.C. 2006).................................................... 22

*Gavin v. Branstad*,
  122 F.3d 1081 (8th Cir. 1997) .......................................................................... 12

*Grayson v. K Mart Corp.*,
  79 F.3d 1086 (11th Cir. 1996) .......................................................................... 15

*Hallstrom v. Tillamook Cnty.*,
  493 U.S. 20 (1989)..................................................................................... 15

*Hansberry v. Lee*,
  311 U.S. 32 (1940)................................................................................. 4, 7, 8

*Harris v. Koenig*,
  271 F.R.D. 383 (D.D.C. 2010)........................................................................... 13

*In re Baan Co. Sec. Litig.*,
  284 F. Supp. 2d 62 (D.D.C. 2003)....................................................................... 31

*In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*,
  55 F.3d 768 (3d Cir. 1995) ................................................................................. 21

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  205 F.R.D. 369 (D.D.C. 2002) ...................................................................... 31, 44

*In re Newbridge Networks Sec. Litig.*,
  No. Civ. A. 94-1678-LFO, 1998 WL 765724 (D.D.C. Oct. 22, 1998) .................. 31

*In re Rite Aid Corp. Sec. Litig.*,
  396 F.3d 294 (3d Cir. 2005) ................................................................................ 57

*In re Vitamins Antitrust Litig.*,
  209 F.R.D. 251 (D.D.C. 2002) ............................................................................ 42

*In re Vitamins Antitrust Litig.*,
  305 F. Supp. 2d 100 (D.D.C. 2004) ..................................................................... 43

*In re Vitamins Antitrust Litig.*,
  No. 99-197(TFH), 2000 WL 1737867 (D.D.C. March 31, 2000) ......... 37, 42, 43, 46

*In re Western Union Money Transfer Litig.*,
  No. CV-01-0335, 2004 WL 3709932 (E.D.N.Y. Oct. 19, 2004) ........................... 44

*Lightfoot v. District of Columbia*,
  233 F.R.D. 28 (D.D.C. 2006) .............................................................................. 35

*Mars Steel Corp. v. Cont'l Ill. Nat. Bank and Trust Co. of Chicago*,
  834 F.2d 677 (7th Cir. 1987) .............................................................................. 22

*Mayfield v. Barr*,
  985 F.2d 1090 (D.C. Cir. 1993) .......................................................................... 37

*McCullough v. Virginia*,
  172 U.S. 102 (1898) ........................................................................................... 12

*Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.*,
  246 F.R.D. 293 (D.D.C. 2007) ............................................................................ 45

*Menkes v. Stolt-Nielsen S.A.*,
  270 F.R.D. 80 (D. Conn. 2010) ........................................................................... 32

*Mirfasihi v. Fleet Mortgage Corp.*,
  356 F.3d 781 (7th Cir. 2004) ......................................................................... 21, 22

*Morton v. Mancari*,
  417 U.S. 535 (1974) ..................................................................................... passim

*Murray v. GMAC Mortgage Corp.,*
    434 F.3d 948 (7th Cir. 2006) ........................................................................ 45

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999) ...................................................................................... 9

*Parker v. Anderson,*
    667 F.2d 1204 (5th Cir. 1982) ...................................................................... 53

*Pate v. United States,*
    328 F. Supp. 2d 62 (D.D.C. 2004) ................................................................ 35

*Phillips Petroleum v. Shutts,*
    472 U.S. 797 (1985) ......................................................................... 3, 4, 9, 20

*Pigford v. Glickman,*
    185 F.R.D 82 (D.D.C. 1999) ......................................................................... 30

*Plyler v. Moore,*
    100 F.3d 365 (4th Cir. 1996) ........................................................................ 12

*Radosti v. Envision EMI, LLC,*
    717 F. Supp. 2d 37 (D.D.C. 2010) .......................................................... 44, 46

*Reynolds v. Beneficial National Bank,*
    288 F.3d 277 (7th Cir. 2002) ........................................................................ 21

*Rodriguez v. West Publ'g Corp.,*
    563 F.3d 948 (9th Cir. 2009) .................................................................. 31, 32

*Santa Clara Pueblo v. Martinez,*
    436 U.S. 49 (1978) ........................................................................................ 16

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.,*
    __ U.S. __, 130 S.Ct. 1431 (2010) ................................................................ 15

*Shoshone Indian Tribe of the Wind River Reservation v. United States,*
    93 Fed. Cl. 449 (Fed. Cl. 2010) .................................................................... 10

*Swedish Hosp. Corp. v. Shalala,*
    1 F.3d 1261 (D.C. Cir. 1993) .................................................................. 46, 57

*Thomas v. Albright,*
    139 F.3d 227 (D.C. Cir. 1998) ...................................................... 12, 20, 35, 36

*Trist v. First Fed. Sav. & Loan Ass'n of Chester,*
    89 F.R.D. 8 (E.D. Pa. 1980) .......................................................................... 53

*Trombley v. Nat'l City Bank*,
 No. 10-00232 (JDB), 2011 WL 87235 (D.D.C. Jan. 11, 2011)................................ 31

*United States v. Antelope*,
 430 U.S. 641 (1977)................................................................................................ 18

*United States v. Lara*,
 541 U.S. 193 (2004)................................................................................................ 16

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
 350 F.3d 1181 (11th Cir. 2003) ............................................................................. 45

*Velez v. Novartis Pharm. Corp.*,
 No. 04 CIV 09194(CM), 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) ................ 31

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
 429 U.S. 252 (1977)................................................................................................ 14

*Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*,
 246 F.R.D. 349 (D.D.C. 2007)................................................................................ 44

*Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*,
 439 U.S. 463 (1979)................................................................................................ 16

*White v. National Football League*,
 822 F. Supp. 1389 (D. Minn. 1993)....................................................................... 44

*Williams v. Rohm & Haas Pension Plan*,
 No. 4:03-CV-0078, 2010 WL 1490350 (S.D. Ind. 2010)....................................... 22

*Young v. Higbee Co.*,
 324 U.S. 204 (1945)................................................................................................ 45

## Statutes

28 U.S.C.§ 2501 ............................................................................................. 10, 20, 34

8 U.S.C. § 1252(e)(1)(B) .......................................................................................... 15

## Other Authorities

*A Report of the Special Committee on Investigations of the Select Committee on Indian Affairs*,
 S. Rep. No. 101-216 (1989)..................................................................................... 10

Bureau of Mun. Research, 63rd Cong., *Report to the Joint Commission to Investigate Indian Affairs*:
 *Business and Accounting Methods Employed in the Administration of the Office of Indian Affairs* (Comm. Print 1915) .................................................................................. 10

*Manual for Complex Litigation (Third)* § 30.42 (1995) ......................................................... 20, 43

**Rules**

Fed. R. Civ. P. 23(a)(4).......................................................................................................... 42

Fed. R. Civ. P. 23(b)(1)(A)................................................................................................ 34, 41

## I.    <u>Introduction</u>

This historic settlement agreement resolves the claims of approximately 450,000 beneficiaries of the IIM trust.[1]  The agreement has been reviewed and vetted extensively by Congress, which considered comments and suggestions raised by class members and other interested parties.  Legislation authorizing and ratifying this settlement was passed by the Senate <u>unanimously</u>, passed by the House of Representatives overwhelmingly, and signed into law by the President.[2]  In that respect, this class action settlement differs from any other such settlement presented to this or any other court in two important respects.  First, this settlement is the only class action settlement to be "authorized, ratified and confirmed" by Congress.[3]  Accordingly, both the legislative and executive branches have determined the settlement to be reasonable and fair to class members.  Secondly, in ratifying the Settlement, Congress did so as a body having plenary authority to handle Indian affairs.  *See Morton v. Mancari*, 417 U.S. 535, 551-52 (1974).  That authority derives both explicitly and implicitly from the Constitution, *id.*, and entitles Congress to "a large measure of flexibility" and deference in "distributing an award for a century-old wrong."  *Delaware Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 91 (1977) (Blackmun, J., concurring).  It is in the context of this unique relationship that Congress maintains with individual Indians that the present settlement and the legislation ratifying it must be considered.

Upon entry of this Court's order granting preliminary approval of this settlement, the plaintiffs undertook the most comprehensive and complex notice process ever undertaken in class action litigation, which exceeds the requirement of "the best notice that is practicable under

---

[1] Trust data provided by Interior indicates that there are approximately 338,000 members of the Historical Accounting Class and, to date, another 107,000 individuals have filed claims to be included in the Trust Administration Class.

[2]  Claims Resolution Act of 2010, Pub. L. No. 111-291, 124 Stat. 3064 ("Claims Resolution Act").

[3] *Id.* at § 101(c)(1).

the circumstances."[4]  Every beneficiary has had an opportunity to be heard and to voice his or her opinion.  The result has been overwhelming support for the settlement.  99.98% of all beneficiaries agree that this is a fair and adequate settlement.[5]  Of approximately 450,000 class members, only 92 have filed a timely objection to the settlement.  (Exhibit 3)[6]  (Declaration of Jennifer M. Keough ("Keough Decl.") ¶ 28 (attached as Exhibit 4)).

The few objectors cite to no relevant legal authority that supports their views; nor can they.  Their legal arguments are contrary to controlling law and are without merit.

## II.    The Settlement Is Constitutional.

### A.    The Trust Administration Class Satisfies Due Process Requirements Identified by the Supreme Court.

One objector[7] contends that, although the Claims Resolution Act authorizes class certification of the Trust Administration Class without regard to Rule 23, class certification is improper because it violates the U.S. Constitution.[8]  But rather than addressing the applicable constitutional standard, she circles back to Rule 23, citing a host of cases denying class certification under Rule 23's strict requirements.  *Id.*  These cases are irrelevant to the question raised in the objection—whether certifying the Trust Administration Class is *constitutional.*

---

[4] Exhibit 1 (Declaration of Katherine Kinsella ("Kinsella Declaration")) ¶ 2.

[5] 114 class members, who had no obligation do to so, have written comments expressing their support for this settlement. (Exhibit 2).

[6] A few objections were transmitted after the April 20, 2011 deadline. Having failed to timely file an objection, those putative objectors are not addressed here.  *See* Order on Joint Motion for Preliminary Approval of Settlement Agreement [Dkt. No. 3667] at ¶ 13.  Similarly, the Quapaw Tribe of Oklahoma's objection and notice of intent to appear [Dkt No. 3737], as well as the objection of the White Earth Reservation Tribal Council, Exhibit 5, are ill considered.  Under Fed. R. Civ. P. 23(e)(5) only class members have standing to object to a settlement.  *See generally Braud v. Transp. Serv. Co.*, Nos. 05-1898, 05-1977, 05-5557, 060891, 2010 WL 3283398, *5 (E.D. La. Aug. 17, 2010).  Neither the Quapaw Tribe nor the White Earth Tribal Council are class members and the counsel for the Quapaw Tribe does not purport to object or file a notice of appearance on behalf of any class member.  *See* Order on Joint Motion for Preliminary Approval at 1.

[7] Objector 52.

[8] *Id.* at 5.

That issue is governed by the due process standard set out in *Phillips Petroleum v. Shutts*, 472 U.S. 797, 811-12 (1985), a case she notably fails to cite or even mention.

In *Shutts*, the Supreme Court identified the "minimal procedural due process protections" necessary to certify a class that, like the Trust Administration Class here, is one that would be covered by Rule 23(b)(3). Those minimal constitutional requirements are (1) "notice plus an opportunity to be heard and participate in the litigation;" (2) "an opportunity to remove [oneself] from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court;" and (3) "that the named plaintiff at all times adequately represent the interests of the absent class members." *Id.* at 812. These three constitutional requirements plainly are satisfied here.

*First*, Plaintiffs have undertaken one of the most comprehensive class notice programs in history. Plaintiffs sent direct mail notice to the known addresses of all class members; advertised the settlement extensively in local, regional, and national media including television, radio, newspapers, and magazines; and contacted businesses, non-profits, educational institutions, and other groups serving Native Americans to provide posters, flyers, DVDs, and other materials providing notice of the settlement.[9] The high-profile nature of this lawsuit and the settlement also garnered significant media coverage, including hundreds of news reports, op-ed pieces, and editorials in local and national media and public statements by high-ranking government officials, including the President of the United States.[10] To say these notice efforts suffice for purposes of minimal due process standards is to commit the ultimate understatement. In addition, Class Counsel has held over 50 information sessions with thousands of individual

---

[9] *See* Joint Motion to Preliminarily Approve Class Settlement ("Joint Mot.") [Dkt. No. 3660] at 19-23.

[10] *Id.* at 23.

Indian trust beneficiaries throughout Indian Country to personally explain the settlement to them and answer their questions.  Further, Class Counsel has provided follow-up information and assistance to hundreds of class members by telephone and email.

*Second*, the Trust Administration Class includes a complete, unfettered opt-out right.  *See Shutts*, 472 U.S. at 812.  In the class notice documents, under the heading "What if I don't want to be in the Settlement?", class members have been provided detailed instructions concerning their opt-out rights and the procedures that they need to follow to opt-out.[11]  Similar opt-out information is contained in posters, print advertisements, and other media used to notify class members of the settlement.[12]  Thus, Plaintiffs satisfied the second of the *Shutts* due process requirements.

*Third*, Elouise Cobell and the other named plaintiffs adequately represent the absent class members as required by *Shutts*.  *Shutts* cited the Supreme Court's earlier decision in *Hansberry v. Lee*, 311 U.S. 32 (1940), as the source for the minimum adequacy requirement necessary to satisfy due process.  *See* 472 U.S. at 812.  In *Hansberry*, the Court held that adequate representation has essentially three requirements: (1) that all class members share some "common issue;" (2) that the named plaintiffs could "insure the full and fair consideration of the common issue;" and, (3) that the named plaintiffs did not have any "conflicting interests" that would frustrate representation of that common issue.  *Id.* at 43-45.  These three factors are satisfied here.

Class members of the Trust Administration Class share substantial common interests.  For example, class members are IIM trust beneficiaries, whose trust duties have been breached and whose trust assets have been mismanaged egregiously by their trustee, the United States

---

[11] *See* Dkt. No. 3660-19 (Class Notice) at 13-14.
[12] *See* Dkt. No. 3660-20 (Poster).

government.  Moreover, the IIM Trust corpus is held in common and income from the corpus is commingled in a common fund managed by the same trustee (the United States), as has been confirmed by record evidence in these proceedings and judicial decisions.

The trust corpus consists of approximately 11 million acres of trust and restricted land, legal title to which is held by the United States as trustee for all class members.  Beneficial title is vested in class members.  Typically, each class member beneficially owns undivided surface rights and subsurface rights in an allotment.  The Interior Secretary, as trustee-delegate of the United States, leases the IIM Trust lands, collects income generated therefrom, pools that income, and deposits the pooled income into the Federal Reserve Bank of New York, which transfers pooled IIM Trust income in the form of credits into the Treasury General Account ("TGA").  Contemporaneously, pooled IIM Trust funds are identified and segregated from other commingled funds in the TGA, including tribal trust funds and funds generated from the lease of government lands, and they are credited to the Treasury 14X6039 account, which holds pooled income of class members.

Collectively, the pooled funds are invested in government securities, *e.g.*, Treasury Bills and Treasury Notes.  Typically, those investments are bearer bonds or bonds in the name of the Interior Secretary as trustee for the class members.  No security is held in the name of an individual Indian.  No security is purchased in the name of an individual Indian.  Upon redemption of the securities, the commingled proceeds are allocated among, and distributed to, class members.  In short, as a matter of practice, IIM Trust funds of class members are collected in common, deposited in common, held in common, invested in common, and managed (and mismanaged) in common.  And indeed the same statutes and regulations govern the management

5

of the allotted interests and other trust assets, including funds generated therefrom, and have been commonly mismanaged pursuant to uniquely poor policies and practices.

Moreover, no account at Treasury holds funds in the name, or for the benefit, of a particular individual Indian trust beneficiary. To determine the proper investment yield for one class member, one must determine the proper investment yield for all class members, collectively. An error in the yield calculation for one class member will cause an error in the yield calculation for every other class member whose funds have been collected, held, and invested in common.

Income from oil, natural gas, coal, hard rock minerals, timber, grazing, and pipeline and utility easements are significant revenue sources for the IIM Trust. But again, here there are common statutes, regulations, policies and practices, which govern the management and administration of these resources. In addition, the source of revenue is irrelevant since it is commingled, held, and managed in common. Communitized or unitized leases cover multiple allotments and are common. The government's trust management and accounting systems, which house IIM Trust data, are common to the class as a whole, as is trust management staff. To the extent that trust records, management and accounting systems, and staff are inadequate, they fail the IIM Trust and all beneficiaries of the trust. Indeed, the breaches of trust and mismanagement, which have been found by this Court and affirmed by the court of appeals, are common to the class as a whole.

Simply put, here, the practical effects of the government's mismanagement and its breaches of trust affect class members as a whole. The effects necessarily are not, and cannot be, confined to individuals. Breaches of trust found by this Court and confirmed by the court of appeals are systemic breaches of trust that the United States owes to class members whether or

not they own undivided interests in any particular natural resource, *e.g.*, failing to provide adequate systems for accounting for and reporting trust fund balances; failing to provide adequate controls over receipts and disbursements; failing to provide periodic, timely reconciliations to assure the accuracy of accounts; failing to create and maintain adequate records; failing to hire and train competent staff; and, failing to appropriately manage the natural resources located within the boundaries of Indian reservations and trust lands.  *See Cobell v. Norton*,  240 F.3d 1081, 1105 (D.C. Cir. 2001) ("*Cobell VI*"); *see also* 25 U.S.C. 4011.  Plainly, the predominant characteristic of this action in equity and the settlement, itself, is sufficient commonality.  Thus, the core issues for all members of the Trust Administration Class are the same.

To be sure, as the objector argues,[13] there are some differences among class members because the government mismanaged the trust assets in many different ways, from imprudent investment strategies and accounting errors to theft and embezzlement.  But the commonality requirement necessary to satisfy due process does not require *every* issue to be common. *Hansberry*, 311 U.S. at 45.  Indeed, in the context of Rule 23's commonality requirement (which is a higher standard than the minimal due process requirement), courts have repeatedly held that commonality does *not* require class members to be "identically situated."  *See Council of and for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1544 n.48 (D.C. Cir. 1983) (Robinson, J., concurring in part and dissenting in part).  Rather, the test is far more lenient:  "A finding of commonality requires only a single question of law or fact common to the entire class."  *See DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010).  As

---

[13] This objection is also raised by Objector No. 67.

explained above, here class members have numerous, indeed pervasive, core common interests and, therefore, the minimum test of commonality is satisfied.

Likewise, the Class Representatives can ensure "full and fair consideration of the common issue" and there are no "conflicting interests" among the named class members and the absent class members. *See Hansberry*, 311 U.S. at 43-44. The objector's only complaint on this point is that claims for the Trust Administration Class were not added until the parties reached their settlement agreement.[14]  As the Court noted at the preliminary hearing, however, Class Counsel "investigated [those claims] thoroughly."[15]  Indeed, during the course of the 15-year litigation for the Historical Accounting Class, the Class Representatives and Class Counsel obtained extensive evidence supporting those trust mismanagement claims and obtained the legal knowledge necessary to litigate those claims.  It is hard to imagine a group of representative plaintiffs or attorneys more capable of fully and fairly litigating the trust mismanagement claims than those who have battled the government for 15 years on related claims for a trust accounting.[16]

The objector also cites the Supreme Court's decisions in *Amchem*, *Ortiz*, and similar cases in the Circuit Courts, which rejected class certification in the context of asbestos litigation. Objector argues, based on those decisions, that "the convenience of aggregating claims . . . cannot trump the constitutional requirements of due process."[17]  But *Amchem* and *Ortiz* are not constitutional cases; both cases turned on whether those classes satisfied the requirements of Rules 23(a) and 23(b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 622-26 (1997); *Ortiz*

---

[14] Objector No. 52 at 10.

[15] December 21, 2010 Preliminary Hrg. Tr. (Exhibit 6) ("Preliminary Hrg. Tr.")at 45.

[16] Importantly, settlement of Trust Mismanagement Claims was included in all prior settlement discussions with the government.

[17] Objector No. 52 at 11.

*v. Fibreboard Corp.*, 527 U.S. 815, 857-58 (1999).  Indeed, in both of those cases, the Supreme Court recognized that "a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure."  *Amchem*, 521 U.S. at 628-29.  But as the Court explained, "Congress, however, has not adopted such a solution" and therefore Rule 23's strict requirements governed class certification in those cases.  This case, by contrast, presents the opposite situation—Congress, in the Claims Resolution Act, has "adopted" the solution that is absent in *Amchem* and *Ortiz*, a "solution" that expressly authorizes this Court to certify the Trust Administration Class, notwithstanding anything that might be contrary in Rule 23.  Thus, the holdings of *Amchem* and *Ortiz* here are inapposite and irrelevant because the applicable standard of review is the "minimal" due process standard set forth in *Shutts*.

Finally, there is an important distinction between the "elephantine mass" of litigation in *Amchem* and *Ortiz* and the class settlement proposed here.  *See Ortiz*, 527 U.S. at 821.  In those asbestos cases, the need for class certification was driven largely by the steadily increasing number of individual lawsuits, the burden placed on the defendants and the courts, and the risk that multiple individual judgments could exhaust the defendants' ability to pay claims.  *Id.* at 821-24.  In other words, individual plaintiffs could—and did—pursue individual claims for relief, and class certification was driven by factors other than the inability of plaintiffs to proceed individually.

Here, by contrast, there is a significant risk that without this settlement class members will be left with no remedy at all.  The United States government publicly has acknowledged for generations that it has mismanaged the IIM trust assets.  For example, as early as 1915, Congress reported that "[t]he Government itself owes many millions of dollars for Indian moneys which it

has converted to its own use," and that government officials, trustee-delegates of the United States, did "not know what is the present condition of the Indian funds in their keeping."[18] Congress further reported that the Individual Indian Trust ("IIM Trust") is a broken trust, riddled with "fraud, corruption and institutional incompetence almost beyond the possibility of comprehension."[19]   The abuse never stopped, causing a Senate Select Committee on Indian Affairs to report in 1989 that there still existed "fraud, corruption and mismanagement pervading the institutions that are supposed to serve American Indians."[20]   But in that seventy-four year time span, no individual Indian trust beneficiaries brought suit against the United States to enforce the IIM Trust and rehabilitate its broken management systems.   As a result, pre-2005 damages claims for resources mismanagement, which are included in this settlement, otherwise may be time barred.[21]

Simply put, the complexity of the legal issues and the enormous cost of pursuing individual actions effectively bar litigation of these common trust mismanagement claims by individual Class Members.   This class settlement is the only realistic means to provide compensation and restitutionary relief to individual Indian trust beneficiaries for the government's breaches of trust and other wrongful conduct associated with its mismanagement of the IIM Trust.

---

[18] Bureau of Mun. Research, 63rd Cong., *Report to the Joint Commission to Investigate Indian Affairs: Business and Accounting Methods Employed in the Administration of the Office of Indian Affairs* at 2 (Comm. Print 1915).

[19] *Id.*

[20] *A Report of the Special Committee on Investigations of the Select Committee on Indian Affairs,* S. Rep. No. 101-216, at 4-5 (1989).

[21] *See, e.g., Shoshone Indian Tribe of the Wind River Reservation v. United States*, 93 Fed. Cl. 449 (Fed. Cl. 2010) (finding breach of trust action barred by six-year statute of limitations of 28 U.S.C. § 2501).

In sum, Congress expressly authorized this Court to certify the Trust Administration Class independent of the requirements of Rule 23. Thus, only minimal due process notice requirements, the opportunity to opt-out, and the adequate representation standard are appropriate. They are satisfied here. Accordingly, the objector's constitutional objections are without merit and should be rejected.

### B.     The Class Settlement is Not an Unconstitutional Taking of Vested Rights.

The same objector next complains that "the settlement's requirement of a mandatory waiver of rights already won is unconstitutional."[22] This fails for several reasons.

First, the objector's argument begins with the faulty premise that Plaintiffs already have "won" the right to a full accounting. That assumption is false. In *Cobell XXII*, the D.C. Circuit held that neither the Department of Interior nor the Department of the Treasury must conduct a full historical accounting. Instead, the Court of Appeals held that the government could simply conduct "the best accounting possible, in a reasonable time, with the money that Congress is willing to appropriate." *Cobell v. Salazar*, 573 F.3d 808, 813 (D.C. Cir. 2009) ("*Cobell XXII*"). As this Court remarked at the preliminary settlement hearing, the "best accounting possible" using the "monies that Congress is willing to appropriate" realistically means "if [Congress] didn't appropriate anything, nothing was going to happen."[23] Thus, the objector's assertion that she has a right to a full accounting of her IIM trust assets is incorrect, particularly where, as here, the *Cobell XXII* court described the government's fiduciary accounting duty as one that is limited to the accounting of "low-hanging fruit." *Cobell XXII*, 573 F.3d at 815.

---

[22] Objector No. 52 at 15.

[23] *See* Preliminary Hrg Tr. at 42. It took twelve months for Congress to ratify this settlement. A principal reason for this delay was the unwillingness of Congress to enact any legislation unless it is fully paid for or offset by cuts to other government programs. Accordingly, $3.4 billion in cuts had to be identified and negotiated before the Claims Settlement Act could be passed. The current Congress is more frugal than the last Congress and appropriations for any accounting, at best, are dubious.

In any event, Objector 52 is confused.  Settling the historical accounting claim is not a taking without just compensation.  The modest right to an accounting that the objector claims to have "won" in the D.C. Circuit does not vest for purposes of a constitutional taking until this Court enters a final judgment and all appeals have been exhausted or the time for appeal has passed.  *See McCullough v. Virginia,* 172 U.S. 102, 123 (1898); *Gavin v. Branstad*, 122 F.3d 1081, 1091 (8th Cir. 1997); *Plyler v. Moore*, 100 F.3d 365, 374-75 (4th Cir. 1996).  In other words, at this stage in the litigation, the objector has no vested right in the court-ordered accounting, no matter how narrowly the fiduciary accounting duty is now defined.

Moreover, the purpose of the fairness hearing in class settlements is to ensure that class members receive fair and just compensation for the claims they give up as part of the settlement. *See Thomas v. Albright*, 139 F.3d 227, 231-32 (D.C. Cir. 1998).  Thus, if the Court approves the settlement, it necessarily will determine that the objector and other class members will receive just compensation for the release of their accounting claims.  Accordingly, the objector's claim that the settlement amounts to an unconstitutional taking is devoid of merit.

## C.     Class Settlement of the Accounting Claim is Permissible Under Rule 23(b)(1) and Rule 23(b)(2).

The objector next argues that "the attempt to settle a Rule 23(b)(2) 'injunctive relief' class with a monetary remedy is entirely impermissible."[24]  This argument, too, is misguided and fatally flawed.

First, the Historical Accounting Class is certified under both Rule 23(b)(1) and Rule 23(b)(2).[25]  Thus, even if the objector were correct that settling a Rule 23(b)(2) class for monetary relief is impermissible, the class settlement would still be permissible under 23(b)(1).

---

[24] Objector No. 52 at 16.
[25] *See* Dkt. No. 27; Dkt. No. 3670.

*See Harris v. Koenig*, 271 F.R.D. 383 (D.D.C. 2010) (certifying ERISA claims for monetary relief under Rule 23(b)(1)).

Second, the objector's argument regarding monetary settlements of 23(b)(2) claims is based on the Supreme Court's pending decision in *Wal-Mart Stores, Inc. v. Dukes*, No. 10-277. However, the *Dukes* case addresses a different issue—whether a court may certify a Rule 23(b)(2) class where claims for monetary relief predominate.  Indeed, trust reform and rehabilitation have dominated this action in equity from the outset.  Among other things, the 59-day information technology security trial to examine and mitigate catastrophic and severe risks to the integrity of trust data and other trust assets is powerful evidence of that point as is the injunction that this Court entered, which disconnected the BIA from the Internet for six years. Unless data integrity is assured, no complete and adequate accounting can be rendered.  Further, the objector does not point to any authority prohibiting *settlement* of a properly-certified 23(b)(2) class for a monetary sum, particularly where, as here, Congress has approved the settlement. There is none.  Moreover, the D.C. Circuit has held that monetary relief is available under Rule 23(b)(2) and this Court is required to follow that precedent.  *See Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997).

Finally, objector contends that settlement of a Rule 23(b)(2) class for monetary relief is "unseemly," comparing it to a monetary settlement of the constitutional claims asserted in *Brown v. Board of Education*, 347 U.S. 483 (1954).  This is a false analogy.  In *Brown*, there had been an ongoing constitutional violation—one that monetary payments could not remedy.  Here, by contrast, the monetary payments serve as both equitable restitution to disgorge benefits conferred on the government through its breaches of trust, and damages to compensate class members for the harm caused by the government's breach of its fiduciary duty to account for all items of the

IIM trust.  Thus, the settlement restores Plaintiffs to the position they would have been in but for the government's breach of its fiduciary duties.  Moreover, unlike a settlement of the claims in *Brown*, this settlement does not permit the government to continue its breaches of trust and wrongful conduct and, in fact, provides a stable foundation for prudent trust management henceforth.

Indeed, after final approval the government would maintain its forward-looking fiduciary duty to account for IIM Trust funds held in trust for the benefit of individual Indians as well as its liability if it continues to breach that duty.  The principal purpose of the $1.9 billion land consolidation fund is to enable the government to manage the IIM Trust prudently after final judgment is rendered.[26]

### D.    There is No Equal Protection Problem.

Objectors also contend that "[b]ecause Congress has never surgically modified the FRCP in any other statute, and because the plaintiffs are all Native Americans by race," certifying the Trust Administration Class "would constitute a violation of due process and equal protection."[27] As explained below, the objectors' arguments are uniquely meritless.

*First*, a constitutional violation based on racial discrimination requires "[p]roof of racially discriminatory intent or purpose."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).  Here, objectors do not identify any conceivable discriminatory intent in the Claims Resolution Act.  There is none.  Indeed, the legislation is plainly intended to

---

[26] Throughout the 124-year existence of the trust, heirs of original allottees have inherited undivided beneficial interests in original allotments.  As a result, beneficial ownership interests have become highly fractionated.  The government says that such fractionation has made it difficult, if not impossible, to manage the IIM Trust prudently.  Heretofore, Congress has been unwilling to appropriate sufficient funds for this purpose and it is unlikely that such funds would be appropriated, but for this settlement.  Addressing fractionation sets a stable foundation for prudent management of the trust in the future and is, accordingly, tangibly beneficial to the class.

[27] Objector Nos. 2, 16, 23, 38, 44, 56, and 78 at 3.  This particular section also responds to objections raised by the following objectors: Objector Nos. 14 and 84.

remedy historical breaches of trust and unlawful conduct by the United States government in its mismanagement of the IIM Trust.  Its purpose and intent is to provide a measure of justice to individual Indians.

*Second*, contrary to some objectors' assertions, creating an exemption to the Federal Rules of Civil Procedure does not itself violate any due process or equal protection rights.  Like all statutory law, Congress "has ultimate authority over the Federal Rules of Civil Procedure; it can create exceptions to an individual rule as it sees fit—either by directly amending the rule or by enacting a separate statute overriding it in certain instances."  *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, __ U.S. __, 130 S.Ct. 1431, 1438 (2010).  Thus, the fact that Congress has created an exception to Rule 23 for the Trust Administration Class does not violate the due process or equal protection rights of class members.

*Third*, objectors are grossly uninformed and demonstrably wrong when they say that "Congress never has surgically modified the FRCP in any other statute" or claims to that effect.[28] Repeatedly, Congress has created exceptions to the Rules of Civil Procedure for particular cases and causes of action, including a number of exceptions to Rule 23.  *See, e.g.*, 8 U.S.C. § 1252(e)(1)(B) (Illegal Immigration Reform and Immigrant Responsibility Act) ("[N]o court may … certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized under a subsequent paragraph of this subsection."); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1106 (11th Cir. 1996) ("In creating a collective action procedure for ADEA actions, Congress clearly adopted the opt-in joinder procedures of section 216(b) of the FLSA and thus impliedly rejected the rule 23 class action procedures applicable to Title VII actions"); *cf. Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 26-27 (1989) ("Congress could have

---

[28] Objector Nos. 2, 16, 23, 38, 44, 56, and 78 at 3.

excepted parties from complying with the notice or delay requirement; indeed, it carved out such an exception in its 1984 amendments to RCRA.").

*Fourth*, objectors incorrectly contend that the Claims Resolution Act is subject to heightened constitutional scrutiny because, by creating an exception to the Rules of Civil Procedure, it treats Indian class members differently from other class members in other cases. As explained above, the assumption they make to support their argument is clearly erroneous because Congress repeatedly has created exceptions to the Rules of Civil Procedure for various categories of claimants or causes of actions. In any case, their argument fails to recognize that Congress' legislative power over Indian tribes and their members is plenary and not subject to the same constitutional limitations that the Supreme Court has used in other subject areas.

It is well settled that "the Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that [the Supreme Court] ha[s] consistently described as 'plenary and exclusive.'" *United States v. Lara*, 541 U.S. 193, 200 (2004) (citations omitted));*see also Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59-60 (1978). The Court "has traditionally identified the Indian Commerce Clause and the Treaty Clause as sources of that power." *Lara*, 541 U.S. at 200.

As a result of this broad authority and the "special relationship" between the United States and Indian tribes, as well as their members, it is no affront to the Constitution for Congress to treat members of certain tribes differently from others – if Congress chooses to do so. As the Court made plain in *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*, 439 U.S. 463, 500–01 (1979), "the unique status of Indian tribes under federal law permits the Federal Government to enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive." (internal quotation marks omitted). If it were

otherwise, entire volumes of federal statutes would be constitutionally infirm, as the Court explained in *Mancari*, 417 U.S. at 552:

> Literally every piece of legislation dealing with Indian tribes and reservations . . . single[s] out for special treatment a constituency of tribal Indians living on or near reservations.  If these laws . . . were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased . . . .

Accordingly, unlike the ordinary equal protection context where a federal statute using a racial classification is strictly scrutinized to determine if it "serve[s] a compelling governmental interest" and is "narrowly tailored to further that interest," *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 235 (1995), in Indian affairs a far more lenient rational basis test is used.  *See, e.g., Mancari*, 417 U.S. at 552.[29]  Specifically, "[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward Indians, such legislative judgments will not be disturbed."  *Id.* at 554.

Repeatedly, this rule has been affirmed by the Supreme Court in numerous contexts, even where an individual Indian arguably is disadvantaged relative to non-tribal members.  Thus, in *Fisher v. District Court,* 424 U.S. 382 (1976), members of the Northern Cheyenne Tribe were denied access to Montana state courts in connection with an adoption proceeding arising on their reservation even though a non-Indian in the precise circumstance would have had that judicial access.  The Supreme Court "reject[ed] the argument that denying [the Indian plaintiffs] access to the Montana courts constitutes impermissible racial discrimination. The exclusive jurisdiction of the Tribal Court does not derive from the race of the plaintiff but rather from the quasi-

---

[29] Notably, the objectors fail to describe how Congress treats Indian class members differently from other class members in other cases.  Far from a garden-variety tort claim, this case is a unique trust case.  The government holds no analogous trust duties to any other race or creed.  There is nothing like this case in duration, scope, breadth of fiduciary responsibility, the nature of the action, the claims addressed, or numerosity of the plaintiff class.  Objectors fail to cite any facts supporting their contention and cannot articulate a violation of equal protection standards.

sovereign status of the Northern Cheyenne Tribe under federal law." *Id*. at 390. The Court explained that "even if a jurisdictional holding occasionally results in denying an Indian plaintiff a forum to which a non-Indian has access, such disparate treatment of the Indian is justified because it is intended to benefit the class of which he is a member by furthering the congressional policy of Indian self-government." *Id*. at 390–91 (internal citations omitted).

Furthermore, in *United States v. Antelope*, 430 U.S. 641 (1977), an American Indian criminal defendant challenged his murder conviction under a federal criminal statute on equal protection grounds (as applied to the federal government through the Due Process Clause of the Fifth Amendment) because the applicable legal elements and the prosecutor's burden of proof were less than those applicable to a non-Indian subject to state criminal law. Despite the plainly disparate treatment, applying *Mancari*, the Court held the defendant's conviction constitutional after concluding "that the federal criminal statutes enforced here are based neither in whole nor in part upon impermissible racial classifications." *Id.* at 646-47.

Here, after significant debate, Congress has exercised its plenary authority in Indian affairs to authorize settlement of a 15-year-old, highly contentious lawsuit seeking redress for breaches of trust and trust mismanagement over the last century. Congress agrees that this is the best possible resolution. Even if Congress in the Claims Resolution Act has treated individual Indian class members differently than beneficiaries in other federal trust cases, which, as explained above, is not true, there is no equal protection violation. Simply put, settling this historic class action – one of the largest class settlements in American history – is certainly "tied rationally to the fulfillment of Congress' unique obligation toward the Indians," and, accordingly, does not, and cannot, violate equal protection principles. *Mancari*, 417 U.S. at 554.

Particularly instructive in this regard, is the Supreme Court's decision in *Delaware Tribal*

*Business Committee v. Weeks*, 430 U.S. 73 (1977). *Weeks* involved an equal protection challenge to a federal statute distributing an award of a judgment fund to certain Delaware Indians who were members of certain recognized tribes in Oklahoma but excluded other Delaware Indians residing in Kansas. The Kansas Delawares challenged the congressionally-mandated distribution scheme. Applying the lenient scrutiny of *Mancari*, the Court held that Congress' attempt to "to avoid undue delay" and "administrative difficulty" is sufficient for a court to conclude that the distribution statute is "tied rationally to the fulfillment of Congress' unique obligation toward the Indians." *Id.* at 85, 89. Justice Blackmun concurred in the judgment. His concurring opinion provided a more detailed explanation as to why in Indian affairs, fettering Congress can be impractical. His words are particularly compelling in the disposition of issues raised by the Objectors:

> [W]e must acknowledge that there necessarily is a large measure of arbitrariness in distributing an award for a century-old wrong. One could regard the distribution as a windfall for whichever beneficiaries are now favored. In light of the difficulty in determining appropriate standards for the selection of those who are to receive the benefits, I cannot say that the distribution directed by the Congress is unreasonable and constitutionally impermissible. *Congress must have a large measure of flexibility in allocating Indian awards, and what it has done here is not beyond the constitutional pale.*

*Id.* at 90 (Blackmun, J., concurring) (emphasis added).

In sum, the objectors have not alleged any discriminatory intent, have failed to show that the legislation treats Indian class members differently than other similarly situated class members in other cases, and have failed to provide any reason why the Claims Resolution Act is not tied rationally to Congress' obligations to the Indians. Finally, as explained above, the Trust Administration Class itself satisfies the requisite due process requirements identified by the

Supreme Court in *Shutts*.  Thus, objectors' due process and equal protection arguments are wrong in fact, and as a matter of law, and should be rejected.

**III.**   **Settlement Amounts and Distribution Methods are Fair and Reasonable.**[30]

    **A.**   **The Settlement Amount is Fair and Reasonable.**

The settlement provides funds totaling $1,512,000,000 to resolve certain claims of the Historical Accounting Class and the Trust Administration Class.  Of that amount, $1.412 billion comes from the Accounting/Trust Administration Fund and $100 million from the Trust Administration Adjustment Fund.[31]  Of the $1.512 billion, approximately $338 million is allocated to the Historical Accounting Class and the remainder is allocated to the Trust Administration Class.  The amount recovered for each class member represents a fair and reasonable settlement of the claims being released.

    **1.**   **Standard for Evaluating Settlements**

The standard by which settlements are judged is "whether the proposed settlement is 'fair, reasonable and adequate under the circumstances and whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued.'"  *In re Lorazepam & Clorazepate Antitrust Litig.*, No. MDL 1290(TFH), 99MS276(TFH), Civ. 99-0790(TFH), 2003 WL 22037741, *2 (D.D.C. June 16, 2003) (quoting *Manual for Complex Litigation (Third)* § 30.42 at 238 (1995)).  The Court's primary role is to evaluate the relief provided in the settlement against the relative strength of Plaintiffs' case, including their ability to obtain recovery at trial.  *See Equal Rights Ctr. v. Wash. Metro. Area Transit*, 573 F. Supp. 2d 205, 211 (D.D.C. 2008) (citing *Thomas v. Albright*, 139 F.3d 231, 231 (D.C. Cir. 1988));

---

[30] This section addresses concerns raised by Objector Nos. 8, 14, 15, 21, 24, 28, 31, 35, 39, 41, 42, 51, 60, 61, 66, 67, 70, 71, 73, 74, 76, 77, and 88.

[31] Settlement Agreement ¶ A.1; November 17, 2010 Modification of Class Action Settlement Agreement ¶ 6 and Ex. 1; Claims Resolution Act § 101(j).

*Blackman v. District of Columbia*, 454 F. Supp. 2d 1, 8 (D.D.C. 2006) ("[T]he most important factor" in evaluating a proposed settlement is a "comparison of the terms of the proposed settlement with the likely recovery that plaintiffs would realize if they were successful at trial.").

Only one objector has suggested a different standard, citing solely to decisions from other circuits,[32] which stand for the unremarkable proposition that a class action settlement is subject to closer scrutiny where there is evidence of collusion between the parties. Of course, here, there is no allegation, let alone evidence of collusion. Accordingly, the objector's authority is inapposite to the case at bar.

Among the cases on which that objector relies is *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781 (7th Cir. 2004). There, the court addressed a proposed settlement where 1.4 million members of one class were to receive absolutely nothing, despite having "colorable" claims.[33] The Seventh Circuit appropriately held that the "settlement that the district judge approved sold these 1.4 million claimants down the river." *Id.* at 785. Similarly in *Reynolds v. Beneficial National Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002), the court required closer scrutiny of a class action settlement where "suspicious circumstances," including pre-suit negotiations between defendants and class counsel, who at that time represented no class member, were indicative of collusion. Likewise, the court in *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 805-06 (3d Cir. 1995), rejected settlement of a product liability action, which suggested collusion where settlement was achieved at an early stage, did nothing to correct a serious product defect, and provided class members no cash relief but only a coupon for purchase of a new vehicle which few class members would use. *See also Mars Steel Corp. v.*

---

[32] *See* Objector No. 52 at 13.

[33] In fact $243,000 of defendant's unlawful profits attributed to that class were transferred to another class for distribution. *Id.* at 783.

*Cont'l Ill. Nat. Bank and Trust Co. of Chicago*, 834 F.2d 677, 681-82 (7th Cir. 1987) (noting a need for a careful inquiry in reviewing "collusive settlements").[34]

Here, there is no collusion.  Nor can an honest suggestion of collusion be made where, as here, the parties have engaged in 15 years of contentious litigation, 4 months of intense settlement negotiations, and a year of comprehensive Congressional vetting and review prior to ratification.  Further, settlement negotiations were supervised by the Court, itself, a neutral third party responsible for reviewing and approving the settlement.  That scrutiny notwithstanding, Congress ratified and approved this settlement after vetting it for a year.  On this record, it is clear that this settlement has received more scrutiny than any in history.  Moreover, the reasoning of the cases relied upon by the objector is contrary to controlling law.  It has been rejected by this Court where, as here, counsel have maintained "regular communication" with the named plaintiff, "sought their clients advice at every stage of the litigation, and "vigorously represented the interests of the plaintiff and the class." *Freeport Partners, L.L.C. v. Allbritton*, No. Civ.A 04-2030(GK), 2006 WL 627140, at *7 (D.D.C. 2006) (distinguishing *Reynolds*); *see also Williams v. Rohm & Haas Pension Plan*, No. 4:03-CV-0078, 2010 WL 1490350, at *5-6 (S.D. Ind. 2010) (finding *Mirfasihi* inapplicable where no collusion is present, the parties carefully negotiated the settlement and "achieved an equitable result").

### 2.    Historical Accounting Class Settlement

Defendants estimate that the Historical Accounting Class consists of approximately 338,000 individual Indian trust beneficiaries.  Based on the payment of $1,000 to each class member, approximately $338,000,000 will be paid to the Historical Accounting Class.  Those payments are not subject to any federal taxes.  *See* Claims Resolution Act   § 101(f)(1).

---

[34] The court in *Mars Steel*, despite objections from certain class members, approved the settlement, finding that the prospects of success were "dim" and the settlement was "generous and certainly adequate." *Id.* at 682.

Assuming a tax rate of 20%, this equates to a payment of approximately $405.6 million in taxable dollars.

That the Historical Accounting Class settlement is reasonable is evident from this Court's 2008 decision, in which Plaintiffs were awarded a pre-tax sum of $455.6 million. *See Cobell v. Kempthorne*, 569 F. Supp. 2d 223, 226 (D.D.C. 2008) ("*Cobell XXI*"), *rev'd on other grounds by Cobell XXII.* The $455.6 million awarded was based on a statistical model presented by Interior's expert statistician, which was accepted by the Court.

In reversing that award, the Court of Appeals substantially limited both the scope of the required accounting and the class of beneficiaries for whom an accounting must be performed. No longer were Defendants required to account for all funds and other assets of the trust since its inception. Excluded from the accounting were IIM accounts closed prior to October 25, 1994, the date on which the Trust Reform Act was enacted, trust land unlawfully escheated to tribes and the income derived therefrom, and administrative fees charged by the trustee. *Cobell XXII*, 573 F. 2d at 814-15.

Moreover, the court of appeals relieved defendants of their obligation to account for assets that had been subject to probate, meaning that an accounting for any individual living beneficiary would go no earlier than the death of the relative from whom the trust interest was received. *Id.* at 815. In determining the items of the trust for which an accounting must be performed, Interior could consider whether its "limited resources . . . may be better spent elsewhere." *Id.* As the court described, in fulfilling its accounting responsibility Interior need only "concentrate on picking the low-hanging fruit." *Id.* Furthermore, even that limited accounting duty was made dependent upon Congressional appropriations, if any. *Id.* at 813.

A reconciliation of "low-hanging fruit" – the new standard prescribed by the appellate court – would tell beneficiaries little about historical account activity or their assets.  There would be no accounting of all items of the trust, including all deposits, withdrawals, and accruals, which is essential to quantify with precision claims against the trustee.  There would be no accounting of opening balances in the IIM Trust, which is essential to the determination of precise current balances.  Inferences and presumptions that apply to trustees in actions in equity have not been adopted in these proceedings.  As a result, burdens of proof and persuasion have shifted to the beneficiaries.  Moreover, even the reconciliation of low-hanging fruit now requires Congressional appropriations but no such funds have been appropriated for that purpose.  Indeed, no funds may ever be appropriated.  At best, protracted delay is likely, which would cause further irreparable harm to class members.  Simply put, the accounting framed by the *Cobell XXII* court would provide class members little, if any, information about the nature and scope of their claims beyond that which they now know.

The Court of Appeals' decision in *Cobell XXII,* which limits significantly the nature and scope of both the accounting duty and the class of beneficiaries entitled to it, confirms that a settlement amount that approximates the award in *Cobell XXI* is reasonable and fair.  That is especially true since those settlement payments are not subject to federal taxes, will not diminish eligibility for other federal government benefits, and will be paid now rather than many years after some type of accounting of the "low-hanging fruit" is completed, assuming that Congress ever appropriates the money for that purpose.  Considering the tax implications, this settlement for the Historical Accounting Class equates to over 89% of the award in *Cobell XXI* for a substantially smaller class of beneficiaries.[35]

---

[35] $405.6 million ÷ 455.6 million = 89%.

As noted above, the most important factor for this Court to consider when evaluating the fairness of a settlement is a comparison of benefits the class would receive under the settlement versus the likely outcome at trial. In most class action cases, that exercise is hypothetical and speculative in nature. However, in this case, it is not. Claims of members of the Historical Accounting Class have already been tried once, with a result that arguably is no better than the benefits guaranteed by the settlement. If this case were to be retried, there is no guarantee that Plaintiffs would do as well as they did the first time it was tried and there is a substantial risk that the recovery would be smaller. Further, a recovery arising out of a trial is taxable and would be used to calculate a class member's eligibility to social entitlements programs, such as food stamps. In light of these facts and considerations, the conclusion that the settlement is "fair, reasonable and adequate" is inescapable.

### 3.      Trust Administration Class

About $1.1 billion will be available for distribution to members of the Trust Administration Class following distributions to the Historical Accounting Class. The Trust Administration Class includes claims relating to the failure to collect lease and royalty payments and penalties, under-investment, misappropriation, accounting errors, the failure to correct boundary errors, and the failure to prudently negotiate leases. While the scope necessarily is broad, that does not mandate creation of sub-classes where, as here, revenue from the trust corpus – commingled beneficial ownership interests – are held and managed by the trustee in a common trust fund.[36]  Simply put, because all the trust assets are held and invested in common, there are no sub-classes of the Trust Administration Class and the effort of the parties to add specificity to the definition of land and fund mismanagement cannot be construed as creating any.

---

[36] *See supra* at 5 – 6 (all assets are held and invested in common).

In evaluating a fair settlement of the Trust Administration Class, it is necessary to address both: (1) Defendants' failure to collect revenue from the trust assets; and, (2) Defendants' failure to properly manage and administer assets that are held in trust.  Turning first to the failure to collect revenue, Plaintiffs' experts performed extensive analyses estimating total revenues generated from the IIM Trust land.  This effort was first presented to the Court during the Phase 1.5 Trial which was the subject of *Cobell v. Norton*, 283 F. Supp. 2d 66 (D.D.C. 2003) ("*Cobell X*"), *rev'd in part*, 392 F.3d 461 (D.C. Cir. 2004) ("*Cobell XIII*").  The result of this extensive investigation into amounts, which should have been collected by the government from IIM trust lands, was found by this Court to be "an impressive use of technology in an attempt to solve a very difficult problem."  *Id.* at 208.[37]  It resulted in the Court "direct[ing] Interior to analyze the use of such production databases and software as a potential means of gap-filling, and to analyze the potential usefulness of such databases and software as a test or verification of the completeness of its accounting." *Id.* at 211.

As described in *Cobell X*, Plaintiffs' experts used geographic information system (GIS) data overlays.  GIS "permits the use of 'smart maps' linked to a computer database." *Id*. at 207.  As this Court explained, the Plaintiffs' approach:

> included the development of a GIS database of historical boundaries for all reservations that contained Allotted Lands.  Next, other commercially available databases containing information about natural resources (such as oil and gas well locations and production data) derived from all lands were integrated into the GIS database.  The combination of this data in the GIS database allowed for the estimation of natural resources extracted from the reservations containing Allotted Lands.  Historical pricing data, royalty rates and owner charge-back statistics were used to estimate the monies generated from natural resource extraction, and the monies were then allocated to the Allotted Lands.

---

[37] Plaintiffs retained experts in the following fields: geographic information systems, hard rock minerals, financial modeling, timber, and oil and gas.

*Id.* (quoting from Plaintiffs' Accounting Plan). This analysis presented estimates of total revenue from production of oil, gas, and minerals on all IIM trust lands. Since a national database of timber production was not similarly available, Plaintiffs retained an expert on timber production to calculate the total revenue from the production of timber on IIM trust lands. Based on these natural resources – which were the primary sources of revenue in the IIM trust – and using Plaintiffs' experts' estimate of the other revenue,[38] it was determined that $13.3 billion should have been collected from the IIM trust lands from 1887 through 2002. Through 2007, it is estimated that $14.7 billion should have been collected.[39]

During the 2008 trial, the Court ultimately accepted Defendants' analysis, which showed total collections and deposits into the IIM Trust of approximately $14.3 billion from inception through 2007.[40] The government then argued that $1.5 billion had been deposited improperly into the IIM trust [41] – resulting in a government estimate of recorded collections in the amount of $12.8 billion. The shortfall – the amount that should have been posted to IIM accounts – is $1.9 billion.[42]

Another source of information is a study presented by Defendants' experts - a "land-to-dollar" completeness test from the Horton Agency – that provides some insight into deficiencies in Defendants' collection of IIM revenue. *Cobell XX*, 532 F. Supp. 2d at 70. The purpose of the land-to-dollar test had been to determine whether all monies had been collected and properly posted to IIM accounts. Of the 35 expected lease revenues at the Horton Agency selected for

---

[38]  Class Counsel were able to obtain reliable estimates from experts of revenues, which should have been collected and placed into the IIM trust, from the most monetarily productive resources – oil, gas, minerals, and timber. *Cobell XX*, 532 F. Supp. 2d at 86, *rev'd on other grounds by Cobell XXII*.

[39] Plaintiffs took the estimate of $13.3 billion and added estimated collections through 2007.

[40] Exhibit 7 (Defendants' Estimate, DX-371).

[41] *Cobell XXI*, 569 F. Supp. 2d at 235.

[42] $14.7 billion – $12.8 billion = $1.9 billion.

testing, no revenue could be found for two of them.  *Id.*  While no general statistical conclusions should be drawn from that sample alone, *id.*, it, nevertheless, presents evidence that is helpful in informing any decision about an estimated error rate for settlement purposes.  This points toward an error rate of approximately 5.7%.[43]  If applied to the total receipts of $14.3 billion, this would suggest a figure in the range $815 million.

Defendants did not accept Plaintiffs' expert presentations, nor did they concede that the Horton study showed that trust funds, which should have been collected, were not collected. Defendants would be expected to contest vigorously the above damages claims. Therefore, the range of values is estimated to be between $0 and $1.9 billion.

Regarding the management of funds received into the IIM Trust, Plaintiffs estimated an error rate of approximately 30%.  The *Cobell XXI* court found that error rate to be unreasonably high, noting that "[w]hatever problems have existed in the history of this trust, and however serious the misfeasances and malfeasances of the trustees over 120 years, there has never been any evidence of such prodigious pilfering of assets from within the trust system itself." 569 F. Supp. 2d at 231 (footnote omitted).  Defendants, on the other hand, insist that an error rate for the IIM trust is no more than 1%.  *Cobell XX*, 532 F. Supp. 2d at 67.

Given the Court's pointed criticism of Plaintiffs' 30% error rate, a reasonable range for the mishandling of funds is between 1% and 10%.  As applied to collected funds of $14.3 billion, an estimated range of losses and unlawful benefits conferred on the trustee is between $143

---

[43] $2 \div 35 = 5.7\%$.

million to $1.43 billion.[44] Collectively, therefore, a range of values following a successful trial reasonably is estimated to be between $143 million and $3.33 billion.[45]

Furthermore, it is appropriate to consider the substantial litigation risk, which militates strongly in favor of discounting the aforementioned range for purposes of settlement. Absent the Congressional exercise of its plenary power over Indians through the Claims Resolution Act, problems with, and issues implicating, jurisdiction, class certification, and the marshaling of evidence to support damages and restitutionary claims following decades of Defendants' destruction of trust records would present major, if not potentially impossible, challenges. It is especially problematic because this Court made it clear that the usual evidentiary presumptions and inferences that favor beneficiaries in the trust litigation do not apply here. *Cobell XXI*, 569 F. Supp. 2d at 226. Moreover, and most significantly, the bars of the statute of limitations and laches present potentially insurmountable obstacles because pre-2005 claims for resource mismanagement may be time barred, reducing any recovery to a small fraction of the settlement amount.[46]

Accordingly, Class Counsel and Class Representatives concluded that settling these claims for approximately $1.1 billion is reasonable and fair, especially given that settlement payments would be tax free, would not reduce eligibility for other federal benefits, and would be paid now rather than years later after the expenditure of several million dollars in further expenses and costs. In light of the totality of circumstances, including the new accounting standard established by the Court of Appeals and known litigation risks, the settlement amount is demonstrably fair to the class as a whole.

---

[44] $14.3 billion X 1% = $143 million; $14.3 billion X 10% = $1.43 billion.

[45] Estimated uncollected funds plus a derived error rate for collected funds: $0 plus $143 million = $143 million; $1.9 billion plus $1.43 billion = $3.33 billion.

[46] *See, supra* at 11 n.21.

Finally, it is important to recognize that Congress, through the Claims Resolution Act, stated unequivocally that "[t]he Settlement is authorized, ratified, and confirmed."  Claims Resolution Act § 101(c)(1).  In so doing, it made an independent judgment that the $1.5 billion is fair and reasonable.  That judgment is deserving of considerable deference at the very least. When making such a judgment regarding members of federally recognized Indian tribes, as here, Congress' "legislative judgments will not be disturbed" so "long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such." *Mancari*, 417 U.S. at 554.  The settlement here involved resolves claims stemming back a century with dramatic limitations on available documentation and records. Valuation is necessarily difficult.[47]   In such circumstances, congressional judgments are peculiarly appropriate and warrant due consideration.  *See, e.g., Weeks*, 430 U.S. at 90 "[W]e must acknowledge that there necessarily is a large measure of arbitrariness in distributing an award for a century-old wrong. …Congress must have a large measure of flexibility.") (Blackmun, J., concurring).

### 4.    The Settlement Reflects a Reasonable Percentage of Estimated Losses and Unlawful Benefits Conferred on the Trustee.

This Court has not "identified a precise numerical range within which a settlement must fall in order to be deemed reasonable." *In re Newbridge Networks Sec. Litig.,* No. Civ. A. 94-

---

[47] In *Pigford v. Glickman*, the court recognized that the lack of evidence created evidentiary problems that were not easily solved.  "The problem for plaintiffs has been that files simply do not exist for many class members. Providing additional time for discovery would not have solved that problem."  185 F.R.D 82, 99 (D.D.C. 1999).  The lack of evidence would also have raised problems of proof at trial, "[a]bsent any documentation, this would have been an impossible burden for the majority of class members." *Id.* at 104.  In light of these circumstances, this Court in *Pigford* concluded that the risk of litigation outweighed in favor of approving the proposed settlement in that case.  *See also Blackman*, 454 F. Supp. 2d at 13 (approving settlement in action against a school district where further litigation would likely result in "endless rounds of contempt litigation" due to the school district's inability to comply with the Individuals with Disabilities Education Act).

1678-LFO, 1998 WL 765724, at *2 (D.D.C. Oct. 22, 1998).  There is no specific formula for calculating a settlement range and precision in determining a settlement number is necessarily impossible.  *See Rodriguez v. West Publ'g Corp.,* 563 F.3d 948, 965 (9th Cir. 2009).  In reality, a reasonable settlement range is arrived at "by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to present value."  *Id.* Accordingly, it is customary to approve class action settlements as fair even where monetary benefits represent "only a fraction of the potential recovery."  *Velez v. Novartis Pharm. Corp.,* No. 04 CIV 09194(CM), 2010 WL 4877852, at *14 (S.D.N.Y. Nov. 30, 2010).

The fairness, adequacy, and reasonableness of this settlement – over 90% of the award in *Cobell XXI* (for significantly fewer class members) for the Historical Accounting Class and comfortably within the range of damages and restitutionary relief for members of the Trust Administration class if they prevail in Court on every major issue (an assumption that is not free from doubt) – is self-evident when compared to other settlements in this district and nationwide. Settlements involving the recovery of a markedly smaller percentage of potential damages routinely are approved.  *See, e.g., In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369, 394-95 (D.D.C. 2002) (finding recovery of 15-30% of estimated damages reasonable given circumstances of the case, including "significant hurdles to litigating the case to a successful and sustainable verdict"); *In re Baan Co. Sec. Litig.*, 284 F. Supp. 2d 62, 65 (D.D.C. 2003) (holding recovery of 16% of estimated damages in a best case scenario and 32.5-54% of damages as estimated by defendants' expert to be reasonable); *Trombley v. Nat'l City Bank,* No. 10-00232 (JDB), 2011 WL 87235, *5 (D.D.C. Jan. 11, 2011) (determining proposed settlement of 17-24% of potential recovery within range of possible approval); *In re Newbridge Networks Securities*, 1998 WL 765724 at *2 (finding 6-12% of potential trial recovery to be a reasonable

settlement); *see also Rodriguez,* 563 F. 3d at 965 (settlement adequate where represented 10% of the class' estimate of trebled damages and twice the defendants' estimate); *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 102 (D. Conn. 2010) (settlement recovering 8% of potential losses adequate given uncertainty of recovery and costs of further litigation).

**B.      The Distribution to the Trust Administration Class is Fair and Reasonable.**

The distribution formula for the Trust Administration Class consists of three steps:  First, each class member receives $500.  Second, of the amounts then remaining in the $1,412,000,000 Accounting/Trust Administration Fund, each beneficiary will receive a pro rata share based on his or her best ten years of revenue in the trust since 1985 as recorded in Interior's electronic records and as adjusted in accordance with defendants' extensive data verification project. Third, the $100 million in the Trust Administration Adjustment Fund will be used to increase the minimum payments any member would receive to approximately $800.

This balanced approach recognizes that all class members have suffered <u>some</u> damages and that the government unlawfully has obtained some benefit from its failure to distribute all IIM Trust funds, regardless of the extent or value of a class member's trust assets, because the class members are beneficiaries of an egregiously managed trust, the funds and other assets of which are commingled and pooled.  However, it also uses the best available data about the value of their respective assets to reflect fairly that some beneficiaries have considerably more valuable trust assets than others.

That extant trust data relied on in this distribution is incomplete is beyond dispute.  It is, however, the best evidence and, given the work done by Interior over the last 15 years, is sufficiently reliable for settlement purposes.  Moreover, there is no other source – let alone a more reliable source – of information upon which one can establish and present a settlement

amount for class members and distribute the settlement funds.   In fact, after fifteen years of intense litigation and massive discovery, it is fair to say that none exists.

On two separate occasions, the court of appeals has said that the government's electronic IIM Trust data is adequate for the declared historical accounting,[48] holding that "[w]e must not allow the theoretically perfect to render impossible the achievable good."[49]   Plainly, if the information is sufficient for the trustee to discharge its accounting duty, it is adequate to determine a fair and reasonable distribution of a portion of the settlement proceeds.

Thus, fundamental fairness underlies, and is the foundation for, the Trust Administration Class distribution formula.   For example, if $1 million has been paid into the IIM Trust as proceeds of a class member's trust land, that member will receive a greater proportion of the settlement fund than one whose allotment generated only $100 in revenue.   This is logical and fair since the potential loss to the $1 million class member (and corresponding benefit unlawfully obtained by the trustee) is proportionally the same as that of a class member whose trust lands generated $100 in revenue.   Accordingly, fairness is ensured.

One objector[50] postulates a theoretical example where one class member receives a share of another class member's income to argue that there is an intra-class conflict, where none exists.[51]   However, the objector's speculation is not supported by record evidence in these proceedings.   On September 30, 2007, FTI Consulting, an expert retained by the government, presented a Data Completeness Validation Interim Overall Report ("DCV"), which, among other things, represents that "451,875 transactions have been restored to 155,683 accounts in ten

---

[48] *Cobell v. Norton*, 428 F.3d 1070, 1077-78 (D.C. Cir. 2005) ("*Cobell XVI*") and *Cobell XXII*, 573 F.3d at 813-14.
[49] *Cobell XXII*, 573 F.3d at 815.
[50]  Objector 52.
[51] *Id.*  at 15.

regions."[52]   Further, FTI Consulting performed further analysis of transactions to "identify potentially related accounts, and augment the transactional data for reporting purposes."[53]   FTI reported that it successfully had mapped 44,940,081 of the 47,458,943 (or 94.7%) of the transactions identified for mapping consideration in the electronic data."[54]

Notably, this Court found the DCV to be a "massive undertaking . . . . [involving] four and eight employees  . . . between three and four years conducting testing on some 113 million transactions, or 50,000 annual man-hours."[55]   That presentation further supports the fairness of the proposed settlement and the objector does not contend that the analysis is false or that reliance on that information is erroneous.   It is the best available evidence.

## IV.   Class Members May Not Opt Out Of The Historical Accounting Class.[56]

Certain Objectors[57] take issue with their inability to opt out of the Historical Accounting Class. However, the Historical Accounting Class is properly certified under Fed. R. Civ. P. 23(b)(1)(A) and (b)(2).[58]   Unlike classes certified under Rule 23(b)(3), there is no provision in the Federal Rules of Civil Procedure for class members to exclude themselves from classes certified under either 23(b)(1) or (b)(2).   *See Feinman v. F.B.I.*, 269 F.R.D. 44, 48 (D.D.C. 2010).   As this Court has noted in the context of a (b)(2) class, "'absent class members are not required . . . to have the opportunity to opt out of the suit [;] [d]ue process requires only that class members be adequately represented.'"   *Pate v. United States*, 328 F. Supp. 2d 62, 70 (D.D.C.

---

[52] Plaintiffs' Exhibit 8 (September 30, 2007 Data Completeness Validation) at 152-00023.

[53] *Id*. at 152-00032.

[54] *Id*. at 152-00034COR.   FTI reports that it has mapped 99.84% of all transactions identified for consideration through July 2007. *Id*.

[55] *Cobell XX*, 532 F. Supp. 2d at 68.

[56] This section addresses concerns raised by Objector Nos. 1, 4, 6, 9, 12, 14, 22, 25, 28-30, 36, 38, 40, 42, 45, 55, 64, 67-68, 72, 79, 84 and 87.

[57] Objectors 1, 6, 9, 12, 14, 22, 25, 28-30, 40, 42, 45, 55, 64, 67-68, 72, 84 and 87

[58]  *See* February 4, 1997 Class Certification Order [Dkt. No. 27]; December 10, 2010 Order modifying Class Certification Order [Dkt. No. 3670].

2004) (*quoting EEOC v. Gen. Tel. Co. of Northwest, Inc,* 599 F. 2d 322, 334 (9th Cir. 1979), *aff'd*, 446 U.S. 318 (1980)); *see also Lightfoot v. District of Columbia*, 233 F.R.D. 28, 30 (D.D.C. 2006) (explaining that in classes certified under 23(b)(2), "class members are generally not permitted to opt-out of the class and pursue claims independently"). The rule is premised on the understanding that the resources of both the courts and the parties are preserved "by permitting an issue potentially affecting every class member to be litigated in an economical fashion." *Id.* at 30.

This Court may, in its discretion, permit opt outs in a 23(b)(1) or (b)(2) class where "the claims of particular class members are sufficiently distinct from the class as a whole." *Eubanks*, 110 F.3d at 96. The burden is on the class member to establish he or she is uniquely situated relative to the rest of the class. *See Pate*, 328 F. Supp. 2d at 70 n.11. It is not sufficient for a class member to simply claim less is being received under the settlement agreement than if an independent action had been filed. *See Thomas v. Albright*, 139 F.3d 227, 236 (D.C. Cir. 1998). No objector makes any showing that justifies his or her entitlement to opt out here, nor can such a showing be made.

First, no objector claims to have previously filed a lawsuit seeking an independent historical accounting. *See Eubanks*, 110 F.3d at 97 (noting that where an objector filed an administrative action but no lawsuit, his argument that fairness dictates he be allowed to opt out "rings hollow").[59] Second, as explained above, the government's mismanagement of the IIM Trust affects the class as a whole. Trust income is deposited, held, invested and managed in

---

[59] Had any objector taken the initiative to file an action for an accounting prior to the institution of this action, that individual would be outside the scope of the Historical Accounting Class and could pursue his or her claim independently. *See* Settlement Agreement at A.16.

common.[60]  No security is held in the name of an individual Indian.  Nor is there an account at Treasury holding funds in the name of any individual Indian beneficiary.  Thus, no Indian beneficiary can obtain an accounting of his or her individual account, even if such an accounting was possible, without defendants performing an accounting for the class as a whole.  Finally, each beneficiary is identically affected by the inability of the government to properly account for individual Indian trust funds.  Under the circumstances, permitting any objector to opt out would be an abuse of this Court's discretion.  *See generally Thomas,* 139 F.3d at 236 (holding court abused its discretion in permitting class members to opt out of 23(b)(2) class where claims of objectors were typical of class members generally); *see also Lightfoot*, 233 F.R.D. at 30-31 (concluding objectors made no showing claims were unique so as to justify their opting out).

Four objectors[61] complain that payments to members of the Historical Accounting Class are made on a per capita basis as "[a]ll landowners are not similar and do not have similar damages."[62]  However, objectors misunderstand the nature of the claims that are compromised. Claims released by the Historical Accounting Class are limited to claims for a historical accounting through the Record Date.[63]  The $1000 payments to those class members are made in recognition of the fact that defendants are unable to perform the requisite accounting. That is not a damages claim.  Any claim for losses to beneficiaries arising out of trust mismanagement are resolved through settlement of the Trust Administration Claims (from which an opt out is permitted).

---

[60] *See supra* at 5-7.

[61] Objectors 4, 28, 36 and 79.

[62] Objector 4 at 1.  *See also* Objection 28 at 10 (claiming there will be a "windfall to some account beneficiaries while grossly underpaying those who have suffered significant losses through many years").

[63] *See* Settlement Agreement at A.15.

Finally, one objector, citing no authority, contends that beneficiaries should be allowed to object to settlement of Trust Administration Claims despite opting out of the Trust Administration Class.[64]   However, that argument has been firmly rejected by this Court. The rights of all class members who elect to opt out of the Trust Administration Class have been fully preserved under the terms of the Settlement Agreement.[65]   The law is well settled in this Circuit that "those who fully preserve their legal rights cannot challenge an order approving an agreement resolving the legal rights of others."   *Mayfield v. Barr*, 985 F.2d 1090, 1093 (D.C. Cir. 1993).   Accordingly, "class members who opt out of the class and are thus not parties to the settlement lack standing to object to the settlement."   *In re Vitamins Antitrust Litig.*, No. 99-197(TFH), 2000 WL 1737867, *5 (D.D.C. March 31, 2000); *see also Mayfield*, 985 F.2d at 1092.

## V.   <u>The Land Consolidation Program Is A Significant Benefit To Plaintiff.</u>[66]

Certain objectors argue that the Land Consolidation Fund would "eliminat[e] descendants' self-governing and sovereign rights"[67] or that land consolidation funds would "better serve the individual Nations (Tribes), for the enactment of laws and monies provided for Tribally based programs/projects that keep the fractionated lands within the Nation's (Tribe's) possession so as not to further deplete the land bases."[68]   They are wrong because they have a fundamental misapprehension of the Land Consolidation Fund, particularly with respect to what it does and what it does not do.

---

[64] Objector 38 at 2.
[65] *See* Settlement Agreement at I.7.
[66] This section addresses concerns raised by Objector Nos. 1, 13, 15, 28, 39, 43, 50, 53, 59, 61, 74, 77 and 88.
[67] Objector No. 43.
[68] Objector No. 77.

To be clear, the Land Consolidation Fund merely sets aside funds to address what is recognized as a major obstacle to prudent management of the IIM Trust.  Over the last century, generations of landowners have passed their allotment interest – sometimes with wills but more often intestate – to their heirs.  In each succeeding generation, there are more individuals who own increasingly smaller undivided beneficial interest in allotments.  More landowners means more accounts, more undivided interests, and more beneficiaries who must consent to the lease or sale of resources.  As a result, trust management time, cost, complexity, and errors escalate geometrically with the account proliferation and land fractionalization of each succeeding generation.  The practical effect is that with a finite pool of dollars, few competent staff, adequate systems, and necessary records, the government has been woefully inept in managing the IIM Trust.

To be sure, fractionation did not, and does not, cause the government's various and sundry breaches of trust, but it exacerbates them and is an obstacle to complete rehabilitation and trust reform as long as Interior has a central role in IIM Trust management.  As a result, addressing fractionation helps all class members and their heirs because it is essential to continuing reform and prudent trust management for the first time in the history of the Trust – of course, unless and until the IIM Trust is placed into receivership, which this Court twice has declined to do.

What the Land Consolidation Fund does is provide what otherwise are unavailable resources to address fractionation.  With money from that fund, fractionated interests are to be purchased at fair market value from class members who are willing sellers.  Once purchased, the land interests are consolidated and transferred into tribal beneficiary ownership.  It is a rare win-win-win outcome:  (1) Class members win because those wanting to sell land – land that is often

unproductive because of fractionation - can do so, and, further, consolidation improves the foundation for prudent management of their remaining trust property; (2) the Tribes win and, accordingly, are fortunate third party beneficiaries because property, which has been lost through the federal government's failed allotment policy, now can be restored at no cost to the tribes for purposes they decide are appropriate; and (3) the government wins because land consolidation makes it more likely that it will begin to manage the IIM Trust prudently henceforth and, thereby, limit its liability after September 30, 2009.

In no way does the Land Consolidation Fund undermine sovereign rights, dependent-sovereign rights (given the plenary power of Congress), or treaty rights of tribal communities. Indeed, it reinforces those rights. Consolidation under tribal ownership is a significant boon to tribes and dramatically enhances their ability to become self-sufficient and self-governing within the parameters of the Constitution. Accordingly, objections suggesting that tribal sovereign rights are being infringed are misinformed and misguided.

Similarly misguided is the idea that Individual Indian Trust lands are being stolen. There is, of course, both at law and in the Settlement Agreement, an explicit requirement that willing sellers shall be paid fair market value. Here, there is no forced sale of any interest in individual Indian trust land. Accordingly, the potential theft complained of would be in violation of law and the settlement agreement itself.

## VI.    **Incentive Fee Request Is Reasonable.**[69]

The incentive payments requested by the plaintiffs are reasonable and fair in light of the substantial time and effort that the Class Representatives have invested in the prosecution of this crucial case. Plaintiffs' Memorandum filed in support of Class Representatives' incentive

---

[69] This section addresses concerns raised by Objector Nos. 1, 9, 14, 15, 22, 28, 39, 47, 50, 51, 61, 62, 69, 74 and 77.

payment amply demonstrates the efforts of each Class Representative and the reputation and financial risks incurred by each.[70]   Notably, there are few objections to the requested incentive payments.[71]

Nonetheless, one objector compares *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) to *Cobell*, arguing that "although these Lead Plaintiffs have accomplished a significant result . . . their commitment does not reach the level of commitment and personal risk that the representatives in *Allapattah* undertook."[72] This lone objector disregards the facts and the level of commitment and personal risk undertaken by the Class Representatives in this case, which is understandable inasmuch as the facts refute the objector's claim, *i.e.,* that, here, the commitment of Class Representatives exceeds the time, effort, and risk of the lead plaintiffs in *Allapattah*.

Here, no one has done more for so many people in this country.  No one has sacrificed more to achieve this historic settlement.  For over fifteen years, Ms. Cobell has sacrificed her personal life and worked closely with Class Counsel to frame the case and prosecute this litigation. She has been involved in every important strategic decision, made each political decision, and otherwise has participated in every major legal decision in this case.  At all times, she has provided determined leadership and guidance.[73] Further, Ms. Cobell personally contributed $390,000.00 of her own funds to support this litigation, *id.*, and in disregard of her own health and welfare, tirelessly travelled the country raising funds to support the claims of

---

[70] Plaintiffs respectfully incorporate by reference as if restated in its entirety herein, Plaintiffs' request for incentive payments and their reply.  [Dkt. Nos. 3679 and 3706.]

[71] Plaintiffs have identified 17 objections to the petition for incentive payments. Objector Nos. 1, 9, 14, 15, 22, 28, 39, 47, 50, 51, 54, 58, 61, 62, 69, 74 and 77.

[72] Objector Nos. 37, 54, and 58 at 8. In attempting to distinguish *Allapattah* from *Cobell*, the objector admits that "an incentive award is undoubtedly justified in this case," but declines to suggest a reasonable incentive award. *Id.*

[73] *See* Dkt. No. 3679 at 10.

individual Indians. *Id.* No tribe has provided financial support for this case. Indeed, her dedication to the class members and the personal risk she has assumed in these proceedings is unprecedented. Apart from Ms. Cobell's financial risk, her reputational risk has been substantial, with the outcome always in question. Objectors do not (and cannot) dispute these facts.

Instead, objectors, in fact, provide added support to the requested incentive awards, by admitting that the commitment of the *Allapattah* class representatives is similar to the *Cobell* Class Representatives, *e.g.,* acknowledging the "unusual commitment of time and effort to the litigation." Class representatives were the initiators of the lawsuit, hired the attorneys for the Class, undertook full financial responsibility for all of the costs for the entire litigation . . . made personal investments throughout the litigation to defray costs. . . . [and] faced significant emotional hardship throughout the litigation."[74] Indeed, they concede that "an incentive award is undoubtedly justified in this case,"[75] particularly where, as here, the work done by the Class Representatives has been important to the historical result and the sacrifice made by Ms. Cobell is unprecedented. Simply put, Ms. Cobell dedicated her life to this great cause and, through that dedication, has achieved one of the most extraordinary victories in American jurisprudence.

## VII.   No Conflict Exists Between Class Representatives and the Class.

On February 4, 1997, this Court granted Plaintiffs' Motion for Class Certification pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (b)(2) and approved Ms. Cobell, Mildred Cleghorn, Thomas Maulson and James Louis LaRose as Class Representatives.[76] [*See* Dkt. No. 27.] On December 21, 2010, this Court granted Plaintiffs' motion to certify the Trust Administration

---

[74] Objector Nos. 37, 54, and 58 at 7.

[75] *Id*. at 8.

[76] Earl Old Person, a named plaintiff in the original complaint, was removed by this Court as a Class Representative on March 5, 2003 because he failed to discharge his duties as a class representative. [Dkt. No. 1864.]

Class under Rule 23(b)(3) and also approved Ms. Cobell, Mr. Maulson, Mr. LaRose and Peggy Cleghorn[77] as Class Representatives[78] of that class.   [*See* Dkt. No. 3670.]   In approving their appointment of the Class Representatives, this Court concluded that the requirements of Fed. R. Civ. P. 23(a)(4) are satisfied, that "the representative parties [would] fairly and adequately protect the interests of the class," *In re Vitamins Antitrust Litig.* ("*In re Vitamins*"), 209 F.R.D. 251, 261-62 (D.D.C. 2002), and that there exists no "antagonistic or conflicting interests with unnamed members of the class." *In re Vitamins Antitrust Litig.,* Nos. Misc. 99-197(TFH), MDL 1285, 2001 WL 856292, *3 (D.D.C. July 25, 2001).

At the time of the December 21 order, this Court had before it the Settlement Agreement authorizing Class Representatives to move this Court for an award of incentive fees[79] and Plaintiffs' Notice to this Court stating the incentive fees requested.[80]   This Court ordered that notice of the requested incentive fee be provided to class members[81] and stated that the merits of the petition would be addressed at a later time.[82]   This Court identified no conflict that is created by reason of the requested incentive award.   To be sure, there is none.

---

[77] Mildred Cleghorn passed away in 1998 and her daughter Penny replaced her as a named plaintiff.

[78] *See* Plaintiffs' Unopposed Motion To Certify The Trust Administration Class, Approve Class Counsel, Approve Class Representatives And Modify The February 4, 1997 Class Certification Order dated December 10, 2010.  [Dkt. No. 3659.]

[79] *See* Settlement Agreement a K.2 and K.4 (providing that "[w]ithin the time set by the Court, Plaintiffs shall file a petition for incentive awards, including expenses and costs, of the Class Representatives," and that defendants did not "consent . . . except to the extent supported by and consistent with controlling law").

[80] *See* Plaintiffs' Notice Regarding Attorneys' Fees and Class Representatives' Incentive Awards dated December 10, 2010 [Dkt. No. 3661] at 3.

[81] *See* Order on Joint Motion for Preliminary Approval of Settlement Agreement dated December 21, 2010 [Dkt. No. 3667] ("Preliminary Approval Order") at ¶ 8 (Ordering dissemination of the Long and Short Form Notices to class members); *see also* Long Form Notice at 15 (describing requested incentive fees);

[82] Preliminary Hrg. Tr. at 31 ("There has been a request for an award of moneys to them as Class Representatives that have been filed there that we can treat later").

In an apparent desire to re-litigate this case, a demand has been made that this Court revisit its prior orders appointing Class Representatives and decertify the class on the ground that the request for an incentive fee creates a "conflict between the class representatives and the class."[83] The objection is untenable.[84] Procedurally, the request is improper and there is no support in the law of this Circuit or even the cases outside this Circuit upon which the objectors purport to rely.

This Court's December 21 order granting Preliminary Approval of the settlement provided that class members may "object to the fairness, reasonableness, or adequacy of the Settlement or the amount of attorneys' fees and incentive payments."[85] It gave no opportunity for objectors to request reconsideration of prior orders of this Court, including class certification[86] and appointment of Class Representatives.[87] The sole issue at the fairness hearing is whether the settlement "'is fair, reasonable, and adequate under the circumstances and whether the interests of the class as a whole are being served if the litigation is resolved by settlement rather than pursued.'" *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 103-104 (D.D.C. 2004) (*quoting Manual for Complex Litig. (Third)*, § 30.42 at 238 (1995)).

---

[83]  Objector No. 52 at 18.

[84] This also responds to objections raised by Objector Nos. 15, 28, 39 and 67.

[85]  *See* Preliminary Approval Order [Dkt. No. 3667] at ¶ 13.

[86]  Objector's request that the class be decertified directly contravenes the mandate from Congress that "the Trust Administration Class shall be treated as a class certified under rule 23(b)(3) . . . for purposes of Settlement."  Claims Resolution Act § 101(d)(2)(B).

[87] Even assuming that objectors have standing to request reconsideration of this Court's prior orders, which they do not, they make no effort to satisfy any requirements for doing so. Motions for reconsideration are permitted only in "extraordinary circumstances" where the movant can demonstrate "(1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in law of the first order." *In re Vitamins Antitrust Litig.*, No. 99- 197(TFH), 2000 WL 34230081, *1 (D.D.C. July 28, 2000). The petition for an award of incentive fees – the only reason stated in support of the challenge this Court's prior orders – was considered by this Court in certifying the Trust Administration Class, appointing Class Representatives and granting Preliminary Approval to the settlement.

Moreover, the objectors wholly disregard the law of this Circuit, which holds that a petition for an incentive fee poses no conflict between Class Representatives and the class.  This Court "routinely approve[s] incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."  *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002) (citations and internal quotations omitted). The incentive fee petition gives rise to no conflict as such an award is solely "within the Court's discretion" and Class Representatives have "no assurance of receiving such awards during the pendency of [the] litigation."  *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 115 n.2 (D.D.C. 2007).  *See also Radosti v. Envision EMI, LLC,* 717 F. Supp. 2d 37, 52-53 (D.D.C. 2010) (noting no antagonism existed between Class Representatives and unnamed class members where incentive awards were discretionary and receipt of such an award was never assured during the course of the litigation); *Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd*., 246 F.R.D. 349, 358 n.3 (D.D.C. 2007) (same).   Other jurisdictions are in agreement with decisions of this Court.  *See, e.g., In re Western Union Money Transfer Litig*., No. CV-01-0335, 2004 WL 3709932, at *16 (E.D.N.Y. Oct. 19, 2004) (finding no conflict was created despite request for an incentive fee as "the practice of awarding cash awards to class representatives is well-established in class actions here and in other districts"); *White v. National Football League*, 822 F. Supp. 1389, 1406-07 (D. Minn. 1993) (holding "interests of the named plaintiffs [were] neither antagonistic nor adverse to the interests of absent class members" by reason of incentive awards where the class representatives had been involved in the litigation for years and reached a "comprehensive settlement" which created "substantial benefits for class members").

Those cases relied on by the objector have no application here. In fact, none involve a petition for a traditional incentive fee.  In *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006), the Court questioned a tentative settlement reached prior to class certification, in which, unlike the present settlement, the proceeds would be divided among class counsel and the named plaintiff and the unnamed class members would be "frozen out."  *Id.* at 952.  The court in *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181 (11th Cir. 2003) found an intra-class conflict to be present but only because some class members experienced a net gain by reason of the same alleged anticompetitive conduct that caused others to experience a loss.  *Id.* at 1193-94.[88]  *Young v. Higbee Co.*, 324 U.S. 204 (1945) did not even involve a class action, simply holding that preferred stockholders cannot prosecute an appeal on behalf of all shareholders, settle, and keep the proceeds of that settlement for themselves.  *Id.* at 211-12.

Class Representatives initiated this action on June 10, 1996 after no one else – neither Congress nor the Executive Branch (and certainly not any of the objectors or their opportunistic counsel) – took any affirmative steps to rectify over 100 years of gross mismanagement of the individual Indian trust. Class Representatives have endured 15 years of hostile litigation and, in the case of Ms. Cobell, has put her health at risk and expended substantial personal resources, solely to benefit class members.  At no time during the course of this litigation, the five months of contentious settlement negotiations, or the year of consideration by Congress, were Class Representatives promised a thing.  At all times, they pursued the same objectives of the class as a whole – to establish liability, enforce trust duties, and obtain injunctive and monetary relief for breaches of fiduciary duties owed by the United States to the class members. *See Cohen,* 522 F.

---

[88] The underlying premise of *Valley Drug* – that the court should consider indirect benefits received by class members resulting from anticompetitive conduct in determining the prerequisites for certification under Rule 23 – has been rejected by this Court. *See Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.,* 246 F.R.D. 293, 303 (D.D.C. 2007).

Supp. 2d at 115 (explaining there exists no conflict where named plaintiffs have the same goal of establishing liability of the defendants and recovering monetary relief); *Radosti*, 717 F. Supp. 2d at 52-53 (same).

In accordance with controlling law, including this Court's own precedent, an objector's insistence that a conflict exists merely because this Court may award Class Representatives an incentive fee for their efforts, which substantially have benefitted class members, is baseless and wholly devoid of merit.

## VIII.   Fees Asserted for Class Counsel are Reasonable.[89]

Approximately 20 objectors express some concern about fees for Class Counsel.  None of them, however, contests the fundamental principle that Class Counsel are entitled to compensation out of the common fund and that *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993) is controlling law in this Circuit.  Similarly, none challenges the applicability of *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) (A "lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."), or *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *8 (explaining that fees are appropriate where "a plaintiff has sued and created a benefit for a class"). Furthermore, no objector challenges that reasonable fees generally "range from fifteen to forty-five percent" of the settlement value to class members, *id.* at *10, with a fee of 20% to 30% being customary, *see Swedish Hosp. Corp.*, 1 F.3d at 1272.

Objectors fail, except in the most cursory fashion, to deal with the fact that competent attorneys have not, and will not, undertake to represent plaintiff classes such as these in complex, high risk, expensive financial litigation against the government unless they have a reasonable

---

[89] This section addresses concerns raised by Objector Nos. 8, 10, 13, 15, 24, 28, 30, 39, 48, 50, 51, 53, 61, 62, 65, 69, 74, 77, 85 and 88.

expectation of being compensated in accordance with controlling law.  It is only now with the end nigh upon us that certain objectors scoff that "there is no shortage of competent counsel to take such cases under [these] circumstances."[90]  But where were they in 1996?  Or, 1956?  Or, 1915?  Or, at any other point in the sordid history of the government's mismanagement of the IIM Trust?

No one should forget that attorneys had been interviewed by Ms. Cobell and all indicated that this case was "impossible" and "could not be brought."[91]  Tellingly, these claims have been well known and publicly debated for over 100 years.  Yet, no one filed an action in equity to enforce the IIM Trust until Class Counsel was retained.

Most of the other issues raised in the objections regarding attorneys' fees have already been covered in Plaintiffs' attorneys fee petition and related briefs.[92]  It is nevertheless important to clear up three misconceptions.  First, Plaintiffs did not reject an earlier offer to settle this case for $7 billion – there was no such an offer.  Second, the petition for fees does not create conflicts of interest between the certified classes and Class Counsel.  Third, Plaintiffs, in fact, asserted a fee of $99.9 million for Class Counsel while pointing out pursuant to explicit instructions from Congress that attorneys' fees must be in accordance with controlling law.  Finally, one objector suggests that Class Counsel's contingent fee agreements should have been produced, an issue addressed in Section D below.

## A.    The Phantom $7 Billion Offer to Settle *Cobell*.

One misguided objector challenges the fees requested for Class Counsel on the ground that plaintiffs allegedly rejected a $7 billion "offer" by the United States Congress to settle the

---

[90]  Objector Nos. 2, 16, 23, 38, 44, 56, and 78 at 7
[91]  Cobell Affidavit at ¶15. Dkt. No. 3678-7
[92]  *See* Dkt Nos. 3678 and 3705. As such, Plaintiffs incorporate by reference as if stated in its entirety herein, their Fee Petition and the related reply.  *Id.*

*Cobell* case in 2005.[93]   The problem with this claim is that it is pure fiction.   No such proposal was made by Congress.   Nor was a bill marked up, let alone introduced, which proposed a payment of $7 billion to settle this matter.   Nor did plaintiffs reject such a phantom "offer" from the Congress.

To the contrary, at all times and repeatedly, plaintiffs made clear that they were prepared to accept a reasonable and fair offer to settle the *Cobell* case.   The objection cites testimony of Ms. Cobell before the House Resources Committee from December 8, 2005.   At that time, both Houses of Congress had introduced an identical settlement bill – S.1439 and HR.4322. However, with respect to the amount to settle the *Cobell* lawsuit and all asset mismanagement claims, neither bill stated a settlement amount, but instead stated "$[___],000,000,000."   *See, e.g.,* H.R. 4322, I., Sec. 103 at 8.   In other words, bills indicated that a settlement would be in the billions, but the settlement amount was left blank.

In fact versus fiction, Ms. Cobell provided testimony to the House Resources Committee, stating that plaintiffs were "encouraged" by certain "aspects of this preliminary bill" and specifically, that plaintiffs were "encouraged that the bill recognizes that the settlement amount must range in the billions of dollars …."   Testimony of Elouise C. Cobell Before the Committee on Resources, U.S. House of Representatives, Oversight Hearing on H.R. 4322, Indian Trust Reform Act of 2005, December 8, 2005 at 3.   (Exhibit 9).

Further, Ms. Cobell urged "Congress to put forward a specific proposed settlement amount," and not leave the amount blank. *Id.*   Accordingly, the assumptions underlying the objection are plainly false – Congress did not put forward a $7 billion "offer" to settle this case and plaintiffs did not reject that offer.   No such offer was introduced by Congress or proposed by

---

[93]   Objector No. 52 at 21.

the Executive Branch and there was no rejection of such an offer by Class Representatives or Class Counsel. No objectors have cited such an offer because no such offer existed.

What makes this objection particularly disturbing is that as of 2005 the government had never, not once, put forward a sum certain to settle the *Cobell* case. And, indeed, Ms. Cobell made note of that in her testimony, stating that "[t]he[] [government] has yet to say specifically what a fair number for resolving the historical accounting is or what they believe is an acceptable amount." *Id.* at 2. Indeed, she implored the Committee to put pressure on the Bush Administration to resolve this case and make a counter-offer to plaintiffs' settlement amount:

> Members of the Committee, if you wish to exert leadership in bringing this terrible injustice to an end, you must call the Government to account. Do not allow their foot-dragging to continue. Call them to task. Demand that they participate in the legislative process. **Demand that they inform you of the specific contours of a settlement they will support.** If there is hope for a legislative settlement, they should no longer be allowed to simply sit back and say "no" to all settlement offers without members of this committee denouncing their recalcitrance. If not, a legislative settlement will never occur. Use your influence to raise the profile of this issue to call their continued intransigence what it is – a continuing slap in the face to Indians that magnifies the underlying wrongdoing.

*Id.* at 2 (emphasis added).

What the record explicitly confirms is that: (1) no settlement amount was made by the House or Senate – let alone Congress; (2) Ms. Cobell supported a continuing congressional role and asked Congress to set a fair settlement amount; (3) defendants up to that point (and until March 2007) refused to state an acceptable settlement amount: and, (4) Ms. Cobell urged Congress to pressure the Bush Administration to settle this case fairly. Those are the facts, not objectors' fiction.

Plaintiffs and others in Indian Country, along with congressional allies, continued to put pressure on the Administration throughout 2006 to delineate acceptable settlement terms. It took

another fifteen months before the Bush Administration finally put a so-called "offer" – such as it was – on the table.  *See Letter from Dirk Kempthorne, Secretary of Interior and Alberto Gonzalez, Attorney General to Byron Dorgan,* March 1, 2007 (Exhibit 10).  But this was not a good faith offer and it certainly was not an offer to settle only the *Cobell* case.

Instead, the Bush Administration, in its own words, said that it would be "willing to invest up to $7 billion, over ten years," if, and only if, settlement legislation would do much more than just settle the *Cobell* case.  Specifically, the Bush Administration insisted that acceptable legislation must "settle all existing and potential individual <u>and tribal</u> claims for trust accounting, cash and land mismanagement, and other related claims, along with the resolution of other matters (e.g., trust reform, IT security, etc.)" including, as the proposal would explain, <u>termination of the IIM Trust and all trust responsibilities, any future liability of</u> the United States, and a forced sale of IIM Trust land through consolidation of all "3.6 million fractionated interests."   *Id.* at 1; Attachment to Kempthorne-Gonzalez Letter Entitled "Key Facets of Acceptable Indian Trust Reform and Settlement Legislation"  (Key Facets).

What the Bush Administration sought to "settle" for $7 billion is breathtaking.  According to the Kempthorne-Gonzalez proposal, acceptable settlement legislation <u>must</u> include <u>all</u> of the following for that $7 billion dollars:

1.     Settle all claims implicated in the *Cobell* lawsuit.  *See* Key Facets at 1 (A settlement must "relieve[] the government of all historical accounting obligations, [sic] and deem[] account balances accurate at the date of enactment of the legislation."  And, it  mandated that settlement legislation must "[p]rovide[] relief from all aspects of the *Cobell* litigation ….").

2.     Settle all other past and present individual Indian claims for breach of trust, including all land and other mismanagement claims for all IIM account holders and all individual Indian trust landowners and bar opt-outs and exclusions from such settlement.  *Id.* ("Settle all cash management claims that have been or should be brought by individuals Indians, [sic] and all land based management claims that have been or could have been brought by individuals Indians (also including

disputes over rights of way, title recording, trespass, or any other related to land.)”).

3. Settle all tribal trust fund and asset mismanagement claims. *Id.* (A settlement must “[e]nd all tribal historical accounting claims, cash management claims, and land management claims in similar fashion as for individual claims.”). The inclusion of tribal claims is particularly noteworthy because Attorney General Alberto Gonzalez had testified two years earlier that the “United States’ potential exposure in these [tribal trust] cases is more than $200 billion.”[94] Yet, the Administration’s position was that an acceptable legislative settlement must include resolution of <u>all</u> <u>tribal</u> trust lawsuits and *Cobell*, collectively, for no more than $7 billion.

4. Appropriate funds to complete trust reform and pay for all improvements necessary to ensure the security of the government’s information technology systems. *See Kempthorne-Gonzalez Letter* at 1 (noting, however that the $7 billion settlement funds must also pay for “resolution of other related matters (e.g., trust reform, IT security, etc.”), which, itself, could cost billions of dollars inasmuch as $5 billion has already been spent on trust reform.[95]

5. Forced sale and consolidation of all fractionated lands and noting that the settlement must “guarantee[] **priority** of all necessary funding (within the overall settlement cap) to consolidate the 3.6 million fractionated interests.” *See* Key Facets at 1 (emphasis added). Notably, the forced sale and consolidation of 3.6 million fractionated interests – especially where, as here, it would be “guaranteed” and the “priority” of the Administration – would account for the lion’s share of the proposed $7 billion fund and otherwise would leave little or nothing for distribution to class members for their waiver of all accounting, restitutionary, and damages claims.

6. Eliminate all future liability for, and provide immunity to, the defendants for any mismanagement of tribal or individual trust funds or assets. *See* Key Facets at 1 (A acceptable settlement must include “[p]recluding the government’s future liability exposure on any land which is left under government title” which “[i]ncludes provisions to prevent future mismanagement liability claims [for individual Indians]… (close loopholes tightly.”) and for tribes. *See id.* (The settlement with tribes must “include provisions to prevent future mismanagement liability claims … (close loopholes tightly.”).

7. Terminate the government’s trust responsibility to individual Indian trust beneficiaries and tribes. *Id.*

---

[94] Gonzalez Testimony 3/1/2005
[95] *See, e.g.*, Docket No. 3678 at 11-12.

It is self-evident that the $7 billion proposal referenced by objectors had been made to settle all individual Indian and tribal claims, terminate both trusts, require the beneficiaries to pay for all trust reform, including without limitation the correction and mitigation of potentially catastrophic IT security vulnerabilities and provide the government complete immunity. It was not to settle *Cobell.* In essence, the government's proposal was a license to steal. What term is more fitting? A provision that eliminates all future liability for breaches of trust, if adopted, would mean that government officials could take any action whatsoever, no matter how adverse and no matter how harmful to class members, and there would be no consequence. Indeed, that settlement offer if accepted would have terminated the IIM Trust as well as the tribal trusts at the same time it would have preserved government control of individual Indian and tribal assets.

It was understood by all to be a poison pill. Plaintiffs, along with the National Congress of American Indians (NCAI) and every tribe that responded to the government's proposal, firmly rejected it. Thus, far from what has been alleged by objectors, the Bush Administration never made a good faith offer and its so-called "investment" necessarily was rejected for all the right reasons. Plaintiffs would reject it again today for those same reasons.

## B.    Conflicts of Interests.

One of the objectors suggests that plaintiffs' petition for Class Counsel fees would create a conflict of interest between the classes and Class Counsel.[96]  Courts have observed that an application for an award of fees out of a common fund creates a natural antagonism between the interests of the class and its counsel. *See, e.g.*, *Democratic Cent. Comm. of Dist. of Columbia v. Wash. Metro. Area Transit Comm'n*, 3 F.3d 1568, 1573 (D.C. Cir. 1993) (noting that "when it comes to the question of fees, the interests of the class members' attorneys may differ from the interests of the class members themselves"); *Trist v. First Fed. Sav. & Loan Ass'n of Chester*, 89

---

[96] Objector No. 52 at 20-21.

F.R.D. 8 (E.D. Pa. 1980) (noting the "antagonistic interests of counsel and their clients" inherent in a common fund fee petition).

Nonetheless, courts consistently hold that that tension is resolved by the trial judge's scrutiny of the fee petition. *See, e.g., Democratic Cent. Comm.*, 3 F.3d at 1573 (In light of the tension, "the court must act to protect the interests of the class members and to insure that the fee awarded is reasonable"); *Trist*, 80 F.R.D. at 10 (in light of the inherent tension, "an uncontested petition calls for heightened scrutiny by the trial judge").

Most importantly, courts conclude that there is no conflict of interest where, as here, the amount of the fee award is left to the discretion of the court. *See Parker v. Anderson*, 667 F.2d 1204, 1213-14 (5th Cir. 1982) (distinguishing cases that found a conflict of interest where there was no such discretion for the court under the proposed settlement agreements in those cases). Further, there is no conflict of interest, where, as here, they have agreed to a clear sailing provision so long as a court retains discretion to determine what is fair and reasonable. *Id.* Moreover, the potential for any conflict is significantly diminished where, as in this Circuit, courts apply the percentage-of-the-fund rather than the lodestar method for awarding fees to class counsel. *Democratic Cent. Comm.*, 3 F.3d at 1573 (holding that "the percentage of the fund approach helps to align more closely the interests of the attorneys with the interests of the parties").

In short, there is no conflict of interest because this is a percentage-of–the-fund Circuit and Congress expressly has confirmed in the Claims Resolution Act that this Court has full discretion to award Class Counsel fees that are fair and in accordance with controlling law.

### C.     Plaintiffs Assert $99.9 Million for Class Counsel.

In conformity with the Agreement on Attorneys' Fees, Expenses and Costs dated December 7, 2009, plaintiffs asserted a fee of $99.9 million for Class Counsel, subject to

controlling law.[97]  Because the clear sailing range of $50 million to $99.9 million is not binding on this Court, because contingent fee agreements similarly are not binding on this Court, because this Court has full discretion and a duty to award Class Counsel fees in accordance with controlling law, and because controlling law tends to provide for fees that are greater than those set forth in the clear sailing range, at least one objector contends that Class Counsel breached the Agreement on Attorneys' Fees.[98]

In response, Plaintiffs re-affirm that they assert a fee for Class Counsel of $99.9 million, subject to controlling law.  Parenthetically, ordinarily, courts are bound by controlling law.  That is especially so where, as here, Congress in the exercise of its plenary authority has restated that principle in its approval of this settlement.  No objector has cited cases or other authorities that state that Plaintiffs' explanation of controlling law is in error or that provide support for a departure from controlling law.  None.  Also, the objector, once again assumes in error, that Congress capped attorneys' fees at $99.9 million.  Congress did not cap Class Counsel fees and, in fact, rejected specific proposals to do just that.  Instead, it mandated in the Claims Resolution Act that Class Counsel's fees award be decided by this Court in accordance with controlling law, taking into account that Plaintiffs are beneficiaries of a federally created and administered trust.  Pub. L. No. 111-291, 124 Stat. 3064 (December 8, 2010) at §101(g)(1).

### D.    Contingent Fee Agreements.

Objector No. 23 chides Class Counsel for not producing their contingent fee agreements.  First, in a common fund case such as this, contingent agreements are not dispositive or binding on this Court, but may be considered by the Court in its sole discretion.  Second, Class Counsel has filed affidavits under penalty of perjury, which state the aggregate percentage of contingent

---

[97]  *See* Dkt No. 3678 at 3.
[98]  Objector No. 52 at 19.

fee arrangements between Class Representatives and Class Counsel. Complaints that Class members have not been informed about the specifics of the arrangements are not true. Third, contingent fee agreements are irrelevant to the clear sailing provision of the settlement agreement. Fourth, neither the settlement agreement nor the authorizing legislation even speaks to, let alone requires production of the agreements. Fifth, two contingent fee arrangements have been filed with this Court by an attorney who once had worked on this case, but they are under seal and may not be discussed.

Nonetheless, because Class Counsel's contingent fee agreements have been given unusual attention, Class Counsel is producing the two remaining agreements – the ones not under seal - which are attached hereto as Exhibits 11 and 12. This includes the agreement between lead plaintiff Elouise Cobell and Kilpatrick Stockton, now known as Kilpatrick Townsend & Stockton LLP (Kilpatrick Agreement) and the agreement between lead plaintiff Elouise Cobell and Keith Harper (Harper Agreement). The Kilpatrick Agreement contains redactions, which are necessary because the redacted language discusses material that is under seal. The KS Agreement combines into a single document its interests through the agreement between Elliott Levitas and the named plaintiffs (which is under seal) and the Harper Agreement, in addition to codifying the percentage for Kilpatrick's agreement to add significant additional resources to the case in 2005 and again in 2007, above and beyond what was envisioned by any of the other agreements.

### E.      Amount of Fee for Class Counsel.

Most other objections relate to the calculation of Class Counsel fees. As we understand the nature and scope of such objections, the principal issues are addressed below.

### 1.      Land Consolidation Fund.

Some objectors suggest that the $1.9 billion Land Consolidation Fund, which is established by the parties in this settlement, should not be considered by the Court in its determination of a fair and reasonable fee.[99]  As addressed in plaintiffs' earlier papers, the creation of the Land Consolidation Fund is a significant tangible benefit to class members that Class Counsel has assisted the Class Representatives achieve for class members and their heirs.[100]  It creates a means for some beneficiaries to sell their interests, which otherwise would be impossible to sell for all practical purposes.  More importantly, however, for class members, who remain in the IIM Trust – which is the vast majority – as well as their heirs, land consolidation will enable the government for the first time in 124 years to begin to discharge prudently its trust duties and responsibilities.  Clearly, in setting fees for Class Counsel, the Court should consider the lasting and meaningful reforms Class Counsel has helped achieve, both in terms of the Land Consolidation Fund and the $5 billion the government has spent on trust reform solely because of the efforts of Class Counsel and the Class Representatives in this case.[101]

### 2.      Trust Administration Funds.

Objectors suggest that Class Counsel had little to do with the creation of the more than $1 billion to settle trust administration claims.[102]  They are fundamentally mistaken.  The suggestion arises out of a misunderstanding of the nature and scope of this case. There is a direct causal relationship between the efforts of Class Counsel and the Trust Administration Fund established in this settlement.  The correction and restatement of IIM Trust accounts and other

---

[99]   *See* Objector No. 52 at 20.
[100]  *See* Dkt. Nos. 3678 at 11 and 3705 at 6.
[101]  *See* Dkt. No. 3678 at 11-12.
[102]  Objector Nos. 2, 16, 23, 38, 44, 56, and 78 at 5-8.

restitutionary relief – matters remedied by the Trust Administration Class provisions, not the Historical Accounting Class – have been central to this litigation, as discussed at length in plaintiffs' previous memoranda.[103]   They have been litigated.   Certainly, but for the efforts of Class Counsel, class members would receive no such funds.  None.

### 3.    Lodestar Check.

Two objectors raise questions about lodestar in connection with this Court's determination of Class Counsel fees.[104]   As noted by plaintiffs in their petition, this Circuit squarely and consistently has rejected Lodestar.  *See, e.g., Swedish Hosp. Corp.*, 1 F.3d at 1266-71.   However, since this Court occasionally has applied lodestar as a cross-check to the reasonableness of a common fund contingent fee, plaintiffs have addressed lodestar in their petition.[105]   Such a cross–check, however, does not entail a comprehensive evaluation of time records and instead is based on a summary of work performed by Class Counsel.  *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 n.16 (3d Cir. 2005).  Failing to understand the nature of such a cross-check, some objectors attack Class Counsel's time records in an effort to detract from the Herculean effort of Class Counsel over the last fifteen years.  The attacks, however, are without merit.

First, a question is raised about the rates Plaintiffs used to calculate the lodestar cross-check.  As provided in *Covad Commc'ns Co. v. Revonet, Inc.*, 267 F.R.D. 14, 29 (D.D.C. 2010), an attorney's usual rate charged is presumptively the reasonable rate.  Nothing in any objection raises anything to rebut the presumption regarding the rates used in the petition, which were supported by appropriate affidavits from Class Counsel.

---

[103]   *See* Dkt. Nos. 3705 at 2-6.
[104]   *See* Objector No. 52 at 24; and Objector Nos. 37, 54 and 58 at 8.
[105]   *See* Dkt. No. 3678 at 22-23.

Second, one objector attacks the hours and rates of Class Counsel.[106]   Regarding Mr. Gingold, the objector claims that his hours are not credible because the objector knows of no one who could have put the amount of time into the prosecution of any case for as long as Mr. Gingold has.   The objector is wrong.   In fact, the time submitted to this Court is a fair representation of the work done by Mr. Gingold in this litigation and it is true and correct.   *See, e.g.,* Exhibit 13, Gingold Affidavit, dated May 16, 2011, ¶¶ 2&3; Exhibit 14, Gingold Affidavit, dated January 25, 2011, ¶¶ 15-19 & 24; *see also* Exhibit Rempel Affidavit, dated May 16, 2011, ¶¶ 7-12; Exhibit 16, Levitas Affidavit, dated May 13,  2011, ¶¶ 2-4.

Further, the objector suggests that the time was manipulated or otherwise enhanced to ensure a maximum lodestar recovery.[107]   The objector overreaches. As discussed above, lodestar is not controlling law and it is largely irrelevant to an award of Class Counsel fees in this circuit. Therefore, there is no incentive to manipulate or enhance time, particularly where, as here, Class Counsel did not expect or plan to submit detailed time records in support of plaintiffs' Class Counsel fee petition.   *See, e.g.,* Exhibit 13, ¶¶ 8-9.  Further, the objector is in error because time records were not manipulated and objector raises nothing other than speculation to suggest otherwise.

Next, the objector alleges that Mr. Gingold has overstated aggregate time on three particular days:  July 6, 2000; September 6, 2005, and February 14, 2005.[108]   The objector is wrong again.  First, with respect to July 6, Mr. Gingold did work 24 hours.  Unfortunately, all-nighters have not been uncommon in this litigation.  On that date, Mr. Gingold participated in a deposition conducted by the special master, drafted a successful brief in opposition to one of

---

[106] Objector 52 at 25
[107] *Id.* at 24.
[108] *Id*. at 25.

Defendants' motions for summary judgment, met with a potential expert for Trial 2, and addressed difficult IT security issues raised by a BIA employee.  *See* Exhibit 13 at ¶ 5.

Second, with respect to September 6, 2005, the objector has miscalculated the recorded time, stating erroneously that 24.5 hours are recorded, when in fact only 15.6 hours are recorded on that date.  *See id.* at ¶ 4.  Plaintiffs assume that the objector's miscalculation is inadvertent.

Third, with respect to February 14, 2005, the objector states that Mr. Gingold recorded 28.5 hours.  The aggregate time is correct; however, inadvertently, Class Counsel's submission combines time for two days, February 14 and February 10.  Specifically, the February 10 time was zeroed-out and added to the February 14 time entries.  As a result, all 16.1 hours of Mr. Gingold's February 10 time are included in Class Counsel's consolidated February 14 time record.  *See id.* at ¶ 6.

That same objector also attacks Mr. Rempel's time charges.[109]  The Objector makes unsubstantiated claims with respect to Mr. Rempel's time, arguing that "[a]t least some of [his] hours were while he was working at PricewaterhouseCoopers . . . . Scrutiny is needed to avoid double dipping."[110]  The Objector is in error and no documentation is cited to support her contention.  Mr. Rempel has at all times been diligent in maintaining his time records and has not "double-dipped".[111]  The last recorded time Mr. Rempel incurred on behalf of PricewaterhouseCoopers ("PwC") was on August 31, 1999.[112] Mr. Rempel left PwC in February

---

[109] *Id.* at 26.
[110] *Id.*
[111] Exhibit 15 (Rempel Affidavit) at ¶ 3.
[112] *Id.* at ¶ 4 (*citing* Motion for Incentive Fees, PwC Affidavit [Dkt. No. 3679-19 at 4]). The last invoice for PwC is dated January 2000. *Id.* at ¶ 5. (*citing* Plaintiffs' Motion for Incentive Fees, PwC Affidavit [Dkt. No. 3679-13 at 6]).  No time is included for PwC following January 2000. *Id.*

2000 and his time reflects his start on the case in March 2000.[113]  It is simply not possible that he has "double dipped" and the record substantiates this fact.

Finally, that objector complains about the number of Kilpatrick timekeepers who worked on the matter and the supposedly senior laden nature of the team.[114]  While Kilpatrick had a large number of people who worked on the matter, that is to be expected in a massive piece of litigation spanning over a decade of work.  However, at any one time, Kilpatrick had a relatively small, focused core of attorneys and paralegals devoted to this case:

- From 1999 through 2004, approximately 90% of Kilpatrick's time was worked by twelve people:  four partners (Bill Austin, Elliott Levitas, Ron Raider and David Zacks), an appellate specialist and partner (Mark Levy), four associates (Leetra Harris, Anitra Goodman, Robin Wharton and Michael Wiggins), and two paralegals (Alexis Applegate and Sarah Perez).

- For the almost five years from 2005 through November 2009, approximately 90% of Kilpatrick's time was worked by seventeen people:  six partners concentrating principally on the district court litigation (Bill Austin, Bill Dorris, Keith Harper, Elliott Levitas, David Smith and Dan Taylor), two partners as appellate specialists (Adam Charnes and Mark Levy), five associates (Blair Andrews, Justin Guilder, Jim Hefferan, Vinay Jolly and Mark Reeves), two paralegals (Alexis Applegate and Lynn Charbonneau), a case assistant (James Teschemaker) and a trial graphics and technology specialist (Antonio Avant).

Thus, Kilpatrick had a dedicated and reasonably staffed team at all times during the case, but retained the ability to call on additional resources and expertise for specialized help and assistance during particularly busy times.  Likewise, there was a reasonable mix of experience among the Kilpatrick team with partners, associates and paralegals performing tasks appropriate for their levels.  Of the total Kilpatrick work, partners worked approximately 55% of the hours and other timekeepers approximately 45%, a reasonable ratio for a case such as this one with such a large number of trial days and such extensive appellate work.

---

[113] *Id.* at ¶ 6 (*citing* Plaintiffs' Petition [Dkt No. 3678-14] at 149 of 1206 (indicating first time entry)).
[114] Objector 52 at 26.

The only Kilpatrick attorney mentioned with any specificity in the objector's discussion is a tax attorney with the implication presumably being that Kilpatrick had someone working outside his or her area of expertise.   However, the attorney is Lynn E. Fowler, head of Kilpatrick's tax practice, who provided 27.3 hours of tax advice during the life of the case.  The bulk of his work – 20.1 hours – was in October and November 2009 when he was helping the negotiating team attempt to maximize the tax benefits for the beneficiaries in the settlement agreement.   During the negotiations, the parties worked on various provisions to eliminate federal tax consequences to the plaintiffs, such as Qualified Settlement Funds.   Mr. Fowler's expertise was necessary and proper and ultimately his advice regarding the uncertainty surrounding the effectiveness of the various proposals assisted the parties in concluding they needed to ask Congress to include a provision in the authorizing legislation expressly providing that the payments would not be taxable, a significant benefit to the plaintiffs.  *See* Exhibit 16 at ¶¶ 5-7.   Thus, the only specific example raised about a Kilpatrick attorney in any of the objections was of an attorney providing timely and efficient advice on an extremely important topic in his area of expertise and which contributed in a material way to the successful outcome of the case.

## IX.    <u>The Notice Period is Reasonable and Should Not Be Extended.</u>[115]

The notice process just completed is among the most extensive and comprehensive notice processes ever designed. Beneficiaries have had 90 days to review and ask any questions about information they have received.  A toll-free number was standing by throughout the process and the website was available at any hour.   It is difficult to understand how any individual could argue in good faith that she or he had insufficient time to digest the information during that

---

[115] This section addresses concerns raised by Objector Nos. 11, 50, 60, 66, 70 and 73.

period of time. No reasons are provided, which purport to justify why a class member has been unable to digest the information during that period of time.

In addition to the robust multi-tiered notice process, Class Counsel held more than 50 information sessions with thousands of class members throughout Indian Country, targeting communities with large class member populations. These sessions were by and large well attended. Class Counsel presented the settlement terms and answered questions from class members.

To the objectors who object to the claims period as too short, it is still ongoing. Claims will be received until otherwise ordered by the Court.

## X.   The Other Objections Are Without merit.

### A.   Future Claims.[116]

Future claims are not precluded by the Settlement Agreement, which, by its terms, only run through the Record Date – September 30, 2009. Any class member is free to file any other claim following the Record Date. To a certain extent, it is true that class members are giving up their right to know what happened to their trust assets before the Record Date, but an accounting of "low-hanging fruit," if ever appropriated and conducted, is unlikely to provide more information than that which class members now know. More importantly, without such a provision barring past claims, there would be no settlement and this litigation would continue into the indefinite future.

### B.   Scholarship Program.[117]

The objection to the scholarship program stems from a misunderstanding of the program. It is not designed to supplant any obligation that the government may have to educate Indian

---

[116] This section addresses concerns raised by Objector Nos. 15, 17, 30, 39 and 64.
[117] This section addresses concerns raised by Objector Nos. 15, 28, 39, 69 and 81.

youth. Rather, it is a program to supplement and create educational opportunities for Indian children. Objectors also claim that it takes money out of the funds that would otherwise be available for distribution to class members. This is not true. The government would not increase the Historical Accounting or Trust Administration funds by one cent. The funds available to the scholarship program are principally taken from land consolidation funds. Settlement Agreement G.2.c.[118]

### C.    Settlement Administration Expenses.[119]

The cost of administering the settlement is substantial, estimated at around $20 million. It is a function of any class action, which requires notice to the plaintiff class – here, over 400,000 long form notices were transmitted and an extensive media campaign was undertaken to notify class members of their rights and obligations under the settlement – and, especially in this case where the Interior Department has lost track of so many class members. These costs, accordingly, are also unavoidable. Although Plaintiffs wanted the government to pay for those costs, it refused to do so. Plaintiffs do not believe that the settlement should have been abandoned because of that one issue. The benefits of settlement to class members are simply too great.

### D.    Reductions for Opt Outs.[120]

This is an ordinary term in class action litigation. To the extent that class members elect to opt-out of this case, defendants may elect to use those funds in other matters – or not use those funds at all. There is no reason suggested why this case should be treated differently.

---

[118] There are nominal amounts that may be contributed from excess funds remaining in the Accounting/Trust Administration Fund following distribution of all settlement proceeds and unclaimed whereabouts unknown payments. *Id*. at G.2.a. and G.2.b.

[119] This section addresses concerns raised by Objector Nos. 28, 42, 46, 64 and 69.

[120] This section addresses concerns raised by Objector Nos. 60, 66, 70 and 73.

### E.   Children Not Included.

The individuals referenced by Objector No. 32 are not members of the class.  That is why they are not included.

### F.   Treatment of Direct Pay.

One Objector[121] complains that direct pay beneficiaries are not included in the settlement. That is a necessary result of judicial rulings in this case.  In *Cobell XXI,* this Court held: "The government may have duties relating to [direct pay] funds, but they do not arise out of the statute, and they are not cognizable in this suit."  *Cobell XXII*, 532 F. Supp. 2d at 97. Similarly, another objector contends that land sales purchased through the Indian Land Consolidation Act should be included within this settlement. To the extent funds are deposited into a beneficiary's IIM account from the sale of that beneficiary's trust allotment, they are included within the terms of this settlement.  Otherwise, that payment is akin to a direct-pay payment, which is not covered by this settlement.

### G.   Apologies and Other Terms Not Included.[122]

In these proceedings, notwithstanding the government's failure to apologize for its gross mismanagement of the IIM Trust, this Court has found the United States government in breach of trust duties it owes to individual Indian trust beneficiaries.  The findings of this Court are a stain on the government that cannot be purged, whether or not it ever has the courage to apologize for its unconscionable behavior and the harm that it has caused.

Respectfully submitted,

/s/ Dennis M. Gingold

DENNIS M. GINGOLD
D.C. Bar No. 417748

---

[121] Objector No. 41
[122] This section addresses concerns raised by Objector Nos. 24, 30 and 64.

607 14th Street, N.W., 9th Floor
Washington, D.C. 20005
(202) 824-1448

/s/ Keith M. Harper
KEITH M. HARPER
D.C. Bar No. 451956
M. ALEXANDER PEARL
D.C. Bar No. 987974
KILPATRICK TOWNSEND LLP
607 14th Street, N.W.
Washington, D.C.  20005
(202) 508-5844

DAVID COVENTRY SMITH
N.C. Bar No. 12558
Admitted *Pro Hac Vice*
KILPATRICK TOWNSEND LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
(336) 607-7392

WILLIAM E. DORRIS
Georgia Bar No. 225987
Admitted *Pro Hac Vice*
ELLIOTT LEVITAS
D.C. Bar No. 384758
KILPATRICK TOWNSEND LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309
404-815-6500

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT was served on the following via facsimile, pursuant to agreement, on this 16th day of May, 2011.

>  Earl Old Person (*Pro se*)
>  Blackfeet Tribe
>  P.O. Box 850
>  Browning, MT 59417
>  406.338.7530 (fax)

>  /s/ Shawn Chick