IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELOUISE PEPION COBELL, et al.,      )
                              )
     Plaintiffs,            )
                              )
     v.                    )     Case No. 1:96cv01285(TFH)
                              )
KEN SALAZAR, Secretary of the Interior,  )
     et al.,           )
                              )
     Defendants.        )
_____)

**DEFENDANTS' MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF
SETTLEMENT AND RESPONSE TO OBJECTIONS**

TONY WEST
Assistant Attorney General

MICHAEL F. HERTZ
Deputy Assistant Attorney General

J. CHRISTOPHER KOHN
Director

ROBERT E. KIRSCHMAN, JR.
Deputy Director

JOHN T. STEMPLEWICZ
Special Litigation Counsel

MICHAEL J. QUINN
Trial Attorney
Commercial Litigation Branch
Civil Division
P.O. Box 875, Ben Franklin Station
Washington, D.C. 20044-0875

TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    Congress's Involvement Materially Alters Traditional Settlement Analysis in Several
      Respects. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    Congress Is Settlor of Indian Trusts And Has Power to Dispose of Trust Duties
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      B.    Congress's Legislative Authorization of the Trust Administration Class and
            Settlement of Claims Is a Lawful Exercise of Its Power Over Sovereign
            Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      C.    Congress Had a Rational Basis for Adopting the 2010 Act. . . . . . . . . . . . . . . 10
      D.    Congress Also Has Power to Create Exceptions to Federal Rules of Procedure
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.   The Settlement is Fair, Reasonable, and Adequate for Both Classes. . . . . . . . . . . . . . 15

      A.    The Settlement is a Product of Arms-Length Negotiations. . . . . . . . . . . . . . . . 15
      B.    The Settlement is Fair to Both Classes Based Upon the Classes' Claims. . . . . . 17
            1.    The Historical Accounting Class Terms Are Fair and Reasonable. . . . . 17
            2.    The Trust Administration Class Terms Are Fair and Reasonable. . . . . . 23
                  a.   The Notice Program Satisfied Due Process. . . . . . . . . . . . . . . . 25
                  b.   The Ability of Class Members to Opt Out Satisfies Due Process. . . . 30
                  c.   The Class Representatives Are Adequate for Settlement Purposes. . . 34
                  d.   The Settlement Amount Is Fair and Reasonable. . . . . . . . . . . . . 37
                  e.   The Settlement Distribution Plan Is Sound. . . . . . . . . . . . . . . . . 39

III.  The Court Should Give Great Weight to Objections Opposing Excessive Attorney Fees
      Or Incentive Awards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

IV.   Certain Objectors Lack Standing To Make Their Arguments. . . . . . . . . . . . . . . . . . . . 44

      A.    HIFF Lacks Standing to Object or Participate at the Fairness Hearing. . . . . . . . 44
      B.    Those Who Opted Out of the Trust Administration Class Have Limited
            Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**TABLE OF AUTHORITIES**

**CASES**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). ................................................. 18, 19, 24*

*In re Baan Co. Sec. Litig.*, 288 F. Supp. 2d 14 (D.D.C. 2003). .................................................. 44

*Beers v. Arkansas*, 61 U.S. (20 How.) 527 (1857)................................................................. 7, 8*

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)......................................................................... 37

*Brown v. Board of Education*, 347 U.S. 483 (1954)..................................................................... 20

*Brown v. United States*,195 F.3d 1334 (Fed. Cir. 1999)............................................................... 23

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.1974)................................................. 3, 37

*Clark v. United States*, 228 Ct. Cl. 778 (1981). ......................................................................... 23

*Cobell v. Babbitt*, 91 F. Supp.2d 1 (*Cobell V*) (1999). .................................................................. 4

*Cobell v. Kempthorne (Cobell XX)*, 532 F. Supp. 2d 37 (D.D.C. 2008)................................ 21, 42

*Cobell v. Kempthorne (Cobell XXI)*, 569 F. Supp. 2d 223 (D.D.C. 2008),
   *vacated and remanded*, 573 F.3d 808 (D.C. Cir. 2009)....................................... passim*

*Cobell v. Norton*, 226 F.R.D. 67 (D.D.C. 2005). ......................................................................... 4

*Cobell v. Norton (Cobell VI)*, 240 F.3d 1081 (D.C. Cir. 2001). ............................................. 5, 15

*Cobell v. Norton*, 283 F. Supp. 2d 66 (2003)................................................................................. 4

*Cobell v. Norton (Cobell XIII)*, 392 F.3d 461 (D.C. Cir. 2004)........................................ 6, 21, 41

*Cobell v. Salazar (Cobell XXII)*, 573 F.3d 808 (D.C. Cir. 2009)............................... 2, 6, 32, 40*

*Cohen v. Chilcott*, 522 F. Supp. 2d 105 (D.D.C. 2007). ............................................................. 37

*Delaware Tribal Bus. Comm. v. Weeks*, 430 U.S. 73 (1977)........................................................ 13

*Disability Rights Council v. WMATA*, 239 F.R.D. 9 (D.D.C. 2006)............................................ 34

*Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010) (en banc),
    *cert. granted in part sub nom. Wal-Mart Stores, Inc. v. Dukes,*
    131 S.Ct. 795 (2010) (argued Mar. 29, 2011) ............................................... 23

*EEOC v Trucking Employers, Inc.*, 561 F.2d 313 (D.C. Cir. 1977). ........................................... 39

*Eastern Shawnee Tribe of Oklahoma v. United States*, 82 Fed. Cl. 322 (2008)......................... 33

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)................................................... 25

*In re Four Seasons Securities Laws Litigation*, 502 F.2d 834 (10th Cir. 1974)........................ 36

*General Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318 (1980). .................................... 15

*Getty Oil Co. v. Dep't of Energy, No. Civ. 77-434 MMS,*
    1988 WL 150683 (D.D.C. Dec 28, 1988)........................................................... 3

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2nd Cir. 2000)................................................. 3

*Gritts v. Fisher*, 224 U.S. 640 (1912). ................................................................ 9

*Hansberry v. Lee*, 311 U.S. 32 (1940). ................................................................. 25

*Harvest Institute Freedmen Federation v. United States*, 80 Fed. Cl. 197 (2008),
    *aff'd*, 324 F. App'x 923 (Fed. Cir. 2009), *cert. denied,*
    130 S. Ct. 1147 (2010)................................................................................... 46

*Harvest Institute Freedmen Federation, LLC v. United States,*
    1988 No. 2:10-CV-1131 (S.D. Ohio Jan. 31, 2011). ....................................... 46

*Harvest Institute Freedmen Federation, LLC, et al. v. United States,*
    1988  No. 2:10-CV-449 (S.D. Ohio May 25, 2010). ........................................ 46

*In re Holocaust Victim Assets Litigation,* 105 F. Supp. 2d 139 (E.D.N.Y. 2000). ...................... 42

*Illinois v. Abbott Associates, Inc.*, 460 U.S. 557 (1983). ........................................................... 15

*Iowa Tribe of Kansas and  Nebraska v. Salazar*, 607 F.3d 1225 (10th Cir. 2010).................... 7, 8

*Klamath & Modoc Tribes v. United States*, 174 Ct. Cl. 483 (1966). ....................................... 33

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v.  United States,*
    367 F.3d 650 (7th Cir. 2004). ......................................................................... 13

*LeBeau v. United States,* 474 F.3d 1334 (Fed. Cir. 2007). ................................................ 4, 9, 10*

*Littlewolf v. Hodel*, 681 F. Supp. 929 (D.D.C. 1988). .................................................. 12

*Littlewolf v. Lujan*, 877 F.2d 1058 (D.C. Cir. 1989). .................................................... 11, 12, 30*

*London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246 (11th Cir. 2003).............................................. 35

*In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001). ........................ 35

*In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002). ...................... 42

*In re Lorazepam & Clorazepate Antitrust Litig., No. MDL 1290 (TFH)*,
    2003 WL 22037741 (D.D.C. June 16, 2003). ........................................................... 37, 44

*Lyons v. Georgia-Pacific Corp. Salaried Employees Ret. Plan*,
    221 F.3d 1235 (11th Cir. 2000). ................................................................................. 35

*Mars Steel Corp. v. Continental Illinois National Bank & Trust Co.*,
    34 F.2d 677 (7th Cir. 1987). ..................................................................................... 37, 38

*Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996)...................................................... 34

*Mayfield v. Barr*, 985 F.2d 1090 (D.C. Cir.1993). .......................................................... 2, 45, 46

*McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008). ...................................... 43

*Mirfashi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004). ............................................... 37

*Mitchell v. United States*, 445 U.S. 535 (1980). ....................................................................... 4, 40

*Morton v. Mancari*, 417 U.S. 535 (1974). ............................................................................. 13

*Moulton v. U.S. Steel Corp*, 581 F.3d 344 (6th Cir. 2009). ............................................... 16, 17

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). ...................................... 25

*Narragansett Indian Tribe v. Nat. Indian Gaming Comm'n*, 158 F.3d 1335 (D.C. Cir. 1998). .. 14

*Native American Arts, Inc. v. Mangalick Enter., Inc.*, 633 F. Supp. 2d 591 (N.D. Ill. 2009)...... 14

*Northern Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649 (1976). ............................................. 9

*Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615 (9th Cir.1982)........ 40

*Orner v. Shalala*, 30 F.3d 1307 (10th Cir. 1994).................................................................... 36

*Pelt v. Utah*, 539 F.3d 1271 (10th Cir. 2008). ................................................................ 36

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985). ..................................... 25, 36*

*In re Prudential Ins. Co. of America Sales Practices Litigation*,
   177 F.R.D. 216 (D.N.J. 1997). ..................................................................... 32

*Reynolds v. Beneficial National Bank*, 288 F.3d 277 (7th Cir. 2002). ........................ 37

*Richards v. Delta Air Lines, Inc.*, 453 F.3d 525 (D.C. Cir. 2006). .............................. 18

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009). .......................... 40

*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*,
   130 S. Ct. 1431 (2010). ........................................................................ 14, 15*

*Sheridan Square Partnership v. United States*, 66 F.3d 1105 (10th Cir. 1995). ............. 6, 10, 11*

*Simmons v. United States*, 71 Fed. Cl. 188 (2006). ................................................... 23

*Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993). .............................. 37

*The Authors Guild v. Google, Inc.*, No. 05 Civ 8136,
   2011 WL 986049 (S.D.N.Y. Mar. 11, 2011). .................................................. 20

*Thomas v. Albright*, 139 F.3d 227 (D.C. Cir. 1998). ...................................... 19, 39, 43

*Timbisha Shoshone Tribe v. Salazar*,
   No. 10-968 (GK), 2011 WL 691366 (D.D.C. March 1, 2011). ............................ 9, 14

*Twelve John Does v. District of Columbia*, 117 F.3d 571 (D.C. Cir.1997). .................... 34, 35*

*United States v. Mitchell*, 463 U.S. 206 (1983). ................................................... 4, 33

*United States v. Navajo Nation*, 537 U.S. 488 (2003). .............................................. 40

*United States v. Rowell*, 243 U.S. 464 (1917). ......................................................... 9

*United States v. Sioux Nation*, 448 U.S. 371 (1980). ................................................. 5

*United States v. Tohono O'Odham Nation,* 131 S. Ct. 1723 (2011). ............................. 8

*Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1 (1976) . ......................................... 11

*Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*,
  246 F.R.D. 349 (D.D.C. 2007)............................................................ 2, 43*

*In re Vitamins Antitrust Class Actions*, 215 F.3d 26 (D.C. Cir. 2000). ............................... 45, 46

*In re Vitamins Antitrust Litig. (Vitamins II)*, 305 F. Supp. 2d 100 (D.D.C. 2004). .................. 2, 3

*In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 856290 (D.D.C. July 16, 2001). .............. 44

*Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*,
  679 F. Supp. 2d 1287 (D. Kan. 2010)............................................................. 36

*In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516 (3d Cir. 2004). ............................... 36

*West Virginia. v. Chas. Pfizer & Co.*, 440 F.2d 1079 (2d Cir. 1971). ........................................ 43

*Wolfchild v. United States*,
  559 F.3d 1228 (Fed. Cir. 2009), *cert. denied*, 130 S. Ct. 2090 (2010). .......................... 10

*Woodard v. Andrus*, 272 F.R.D. 185 (W.D. La. 2010). ............................................................ 31

*Wright v. United States*, 32 Fed. Cl. 54 (1994). ........................................................................ 23

## STATUTES & RULES

American Indian Trust Fund Management Reform Act, Pub. L. No. 103-412,
  108 Stat. 4239 (1994)........................................................................................ 5

Claims Resolution Act of 2010, Pub. Law No. 111-291, 124 Stat. 3064 (2010). .............. passim*

Pub. L. 108-108, 117 Stat. 1241 (2003)............................................................................. 6

Fed. R. Civ. P. 23............................................................................................... passim

Fed. R. Civ. P. 23(b) advisory committee notes. ........................................................ 19

# OTHER AUTHORITY

156 Cong. Rec. S8172 (daily ed. Nov. 19, 2010).. ........................................................ 2

H. Rep. No. 102-499 (1992). .................................................................................... 23

*Cobell v. Salazar Settlement Agreement: Hearing before the Committee on Indian Affairs,
United States Senate,* 111th Cong. 2 (Dec. 17, 2009)................................................. 12

*Proposed Settlement of the Cobell v. Salazar Litigation: Full Committee Oversight Hearing
before the Committee on Natural Resources,* 112th Cong. 5-6 (Mar. 10, 2010).. ..................... 13

7A Wright, Miller & Kane, Fed. Prac. & Proc. Civ. § 1765 (3d ed. 2005). ............................. 36

# INTRODUCTION

On December 21, 2010, the Court preliminarily approved the settlement, which provides for one of the largest payments ever agreed to by the United States.[1]  The order initiated a plan for expansive and comprehensive notice to class members, consisting of individual notice mailed to all class members having a known address, combined with a multi-media, multi-language advertising and outreach program that included national print and television; targeted, local print, radio, and television; internet video and website; and posters in retail and government locations. The order further specified that "a Class Member who wishes to object to the fairness, reasonableness, or adequacy of the settlement or the amount of attorneys' fees and incentive payments for Class Representatives, costs, and expenses, shall file his or her objection(s) with the Court and serve such objection upon the parties within 120 days of the date of this Order," a period that ended April 20, 2011.[2]  The Court directed the parties to file a "Joint Motion for Entry of Judgment and Final Approval" by May 16, 2011,[3] and later permitted the parties to submit their responses to class member objections on the same date.[4]

Defendants submit this memorandum in support of the Joint Motion and in response to certain objections raised by a few class members.  From over 500,000 members of the plaintiff

---

[1]  Order on Joint Motion for Preliminary Approval  [Dkt. 3667].

[2]  *Id.* at 3.

[3]  *See id.* at 4.

[4]  *See* Minute Order of May 4, 2011 (granting Plaintiffs' Unopposed Motion for Enlargement of Time to File Responses to Objections [Dkt. 3743]).

classes, the settlement has drawn approximately 90 objections.[5]  As demonstrated below, ample

basis exists to approve this historic settlement as adopted and ratified by Congress.

## ARGUMENT

In July 2009, the D.C. Circuit issued its tenth remand of this case with these words: "we

want to commend the district court for its efforts to cut through this Gordian knot . . .  While we

vacate the district court's orders, . . . we do so with substantial sympathy, recognizing that our

precedents do not clearly point to any exit from this complicated legal morass."[6]  Following

remand, and with encouragement of the Court, the parties pursued good faith, intensive, arms-

length negotiations for several months in order to reach a comprehensive settlement.  The

agreement then underwent nearly a year of scrutiny by Congress which, after hearings and

debates, endorsed the settlement by passing the Claims Resolution Act of 2010,[7] which received

unanimous consent in the Senate and prompt signature by the President.[8]

The courts of this district hold "a long-standing judicial attitude favoring class action

settlements, and the Court's discretion is constrained by the 'principle of preference' favoring

and encouraging settlement in appropriate cases."[9]  This is an appropriate case – the settlement

---

[5]  Some are group objections, such as those asserted by the Lake Traverse landowners [Dkt. 3746 at 252-53] and the Monette Objectors [Dkt. 3746 at 210-221].

[6]  *Cobell v. Salazar* (*Cobell XXII),* 573 F.3d 808, 812 (D.C. Cir. 2009).

[7]  Claims Resolution Act of 2010, Pub. Law No. 111-291, 124 Stat. 3064 (2010) (2010 Act).

[8]  *See* 156 Cong. Rec. S8172, S8202 (daily ed. Nov. 19, 2010).

[9]  *Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.,* 246 F.R.D. 349, 357 (D.D.C. 2007) (quoting *In re Vitamins Antitrust Litig.,* 305 F. Supp. 2d 100, 103 (D.D.C. 2004)) (*Vitamins II*) (internal quotation marks omitted); *see also Mayfield v. Barr,* 985 F.2d 1090, 1092 (D.C. Cir.1993).

is fair, reasonable, adequate, and legally sound – and the Court should approve it.  The objections of class members do not demonstrate otherwise.

As this Court noted in *In re Vitamins Antitrust Litigation,* there exists "no single test in this Circuit" to determine whether a proposed class action settlement should be approved.[10] "Generally, . . . courts consider whether the proposed settlement 'is fair, reasonable, and adequate under the circumstances and whether the interests of the class as a whole are being served if the litigation is resolved by settlement rather than pursued.'"[11]  In making this determination, the Court "examine[s] the following factors: (a) whether the settlement is the result of arm's length negotiations; (b) the terms of the settlement in relation to the strength of plaintiffs' case; (c) the status of the litigation at the time of settlement; (d) the reaction of the class; and, (e) the opinion of experienced counsel."[12]  The Court "need not inquire into the precise legal determination of the dispute nor reach and resolve the merits of the claims or controversy."[13]  Instead, "the evaluation of a proposed settlement requires 'an amalgam of delicate balancing, gross approximations and rough justice.'"[14]

Congress's ratification of this historic settlement is an added factor the Court must consider, for it both justifies and requires a departure from routine analysis observed in other

---

[10]  305 F. Supp. 2d 100, 103 (D.D.C. 2004).

[11]  *Id.* at 103-04 (quoting Manual for Complex Litigation (Third), § 30.42 at 238 (1995)).

[12]  *Id.* at 104 (footnotes omitted).

[13]  *Getty Oil Co. v. Dep't of Energy,* No. Civ. 77-434 MMS, 1988 WL 150683, at *3 (D.D.C. Dec 28, 1988).

[14]  *Id.* (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 468 (2d Cir.1974), *abrogated on other grounds, Goldberger v. Integrated Res., Inc.,* 209 F.3d 43 (2nd Cir. 2000)).

federal class actions.  Recognition of this unique circumstance even further demonstrates that the

settlement comports with the Constitution and is fair and reasonable to the classes.

**I.     Congress's Involvement Materially Alters Traditional Settlement Analysis in Several Respects**

      **A.     <u>Congress Is Settlor of Indian Trusts And Has Power to Dispose of Trust Duties</u>**

As a preliminary matter, the role that Congress has played in reviewing, debating, and

passing Title I of the 2010 Act – which expressly authorizes the settlement – is significant to the

Court's consideration.  First, the 2010 Act allows changes to the Settlement Agreement but only

to the extent they are made to conform the settlement to the provisions of the 2010 Act.[15]  This

limitation necessarily means that the settlement, as approved by Congress in the 2010 Act, is not

amenable to further changes without additional legislation.  Second, Congress is "the settlor of

the IIM trust, which ultimately establishes the contours of the United States' (and its delegates')

fiduciary duties."[16]  Indeed, it is law of the case that "any fiduciary duties the government owes to

the Indian trust beneficiaries, and any corresponding rights that the plaintiffs may enforce

through litigation, flow from federal statutes and not from the common law."[17]

---

[15]  2010 Act, § 101(c)(2) ("Any amendment to the Settlement is authorized, ratified, and confirmed, to the extent that such amendment is executed to make the Settlement consistent with this section.").

[16]  *Cobell v. Babbitt* (*Cobell V*), 91 F. Supp.2d 1, 50 (1999); *see also Cobell v. Norton*, 283 F. Supp. 2d 66, 269 (2003) ("Congress, the settlor of the IIM trust, . . . expressly delegat[ed] the United States's administration of the IIM trust to the Interior and Treasury Departments"); *accord United States v. Mitchell* (*Mitchell II*) , 463 U.S. 206, 234 n.8 (1983) (Congress, as settlor, must manifest intent to make statutory duties trust duties) (Powell, J. dissenting); *Mitchell v. United States (Mitchell I)*, 445 U.S. 535, 547 (1980) (settlor of the Indian trust is the United States) (White, J. dissenting).

[17]  *Cobell v. Norton,* 226 F.R.D. 67 (D.D.C. 2005) (Lamberth, J.); *cf. LeBeau v. United States,* 474 F.3d 1334, 1343 n.6 (Fed. Cir. 2007) ("Although the common law of trusts does not require a beneficiary to have a vested interest in order to bring a breach-of-trust claim, in the special

When Congress enacted the statute that gave rise to the historical accounting claim at issue here –  the American Indian Trust Fund Management Reform Act[18] – it was acting in its capacity as settlor, defining duties of the trustee-delegate, the Secretary of the Interior.[19]  By passing the 2010 Act, Congress likewise manifested its intent as settlor of the IIM trusts – the entity that defined the trusts' terms – to substitute this settlement for the implied historical accounting obligation of the United States to trust beneficiary class members.  Thus, when the settlement provides that the historical accounting duty owed to the class shall be discharged by a stipulation regarding each account's balance and a payment of $1,000 to every class member, that is the beginning and end of that trust responsibility.[20]  Congress's legislative act of adopting this settlement, while authorizing one of the largest class settlement payments in history by the United States, also disposes of the trust duty itself, and supports final approval.

The extensive record in this case validates Congress's exercise of its plenary authority. After several trials and more than ten years of litigation, the scope of the accounting still remains unresolved.  But one critical point is firmly established: the accounting is subject to the willingness of Congress to fund it.  In its latest decision, the Court of Appeals held:

_____

circumstances of the present case, . . . plaintiffs must have had vested rights . . . in order to recover damages").  See discussion, *infra,* at 9-10.

[18]  Pub. L. No. 103-412, 108 Stat. 4239 (1994) (1994 Act).

[19]  The D.C. Circuit construed the 1994 Act to encompass a historical accounting duty; it is not an express term of the statute.  *See Cobell v. Norton* (*Cobell VI*)*,* 240 F.3d 1081, 1102 (D.C. Cir. 2001).

[20]  Even if the "right" to a historical accounting could arguably be claimed as trust property – which it is not –  Congress also remains free to exchange that property.  *United States v. Sioux Nation,* 448 U.S. 371, 408-13 (1980).

-5-

> The proper scope of the accounting ultimately remains a question for the district court, but we will provide as much guidance as we can on appropriate methodology, and principles to guide the analysis of unforeseen circumstances. The overarching aim of the district court should be for Interior to provide the trust beneficiaries the best accounting possible, in a reasonable time, *with the money that Congress is willing to appropriate.*[21]

Thus, where the implied historical accounting at issue has always been subject to delay, modification, or even elimination by Congress[22] – none of which consequences would give rise to a right of compensation – Congress's approval of this historic settlement, and the compensation it will provide to beneficiaries, militates in favor of approval.

      B.     Congress's Legislative Authorization of the Trust Administration Class and Settlement of Claims Is a Lawful Exercise of Its Power Over Sovereign Immunity

When Congress enacts legislation that resolves pending legal actions between plaintiffs and the United States, there should be a "strong presumption of rationality afforded [the] congressional action."[23] "Congress . . . can change the statutory rights of litigants, even where this change may retroactively eliminate an initially meritorious claim, except where the new statute itself is for some reason unconstitutional."[24] In this case, because the affected claims were not and could not have been filed until after its enactment, the 2010 Act has only prospective

---

[21] *Cobell XXII*, 573 F.3d at 813 (emphasis added).

[22] Indeed, Congress previously exercised this power in *Cobell* to suspend work on the accounting. In an appropriation measure, Pub. L. 108-108, 117 Stat. 1241 (2003), Congress adopted a moratorium barring Interior from performing historical accounting work from November 10, 2003, until December 31, 2004. The D.C. Circuit interpreted Pub. L. 108-108 as a temporary and partial repeal or modification of the statutory and common law rules that required the historical accounting and found "no constitutional obstacle to enforcement" of the law. *Cobell v. Norton* (*Cobell XIII*), 392 F.3d 461, 467-68 (D.C. Cir. 2004).

[23] *Sheridan Square Partnership v. United States,* 66 F.3d 1105, 1108 (10th Cir. 1995).

[24] *Id.* (quoting *Coleman v. Lyng*, 864 F.2d 604, 611 (8th Cir. 1988)).

effect on the Trust Administration Class.  President Obama signed the 2010 Act into law on

December 8, 2010, which is prior to the December 21, 2010, filing of plaintiffs' Amended

Complaint.[25]  Moreover, the certified class excludes individuals who had previously asserted

such claims before the filing date of the Amended Complaint.[26]

Congress's authority is even greater when the claims at issue are asserted against the

United States as a sovereign.  In that field, Congress is also free to define the boundaries for the

sovereign immunity of the United States, and that is effectively what the 2010 Act achieves with

respect to the Trust Administration Class.  As the Supreme Court recognized more than 150

years ago in *Beers v. Arkansas*,[27] the legislature has the power to modify or revoke a waiver of

sovereign immunity even when litigation is pending.  Despite its age, *Beers* has continuing

vitality and is cited often in various contexts.  For example, in *Iowa Tribe of Kansas and*

*Nebraska v. Salazar*,[28] the Tenth Circuit observed that "[t]he logic of *Beers* has withstood the test

of time,"[29] and although *Beers* involved state law, it "is particularly instructive in the context of

federal sovereign immunity because it relies upon the inherent nature of sovereignty instead of

the text of the Eleventh Amendment."[30]  The *Beers* Court stressed that the courts cannot second-

guess the legislature by "inquir[ing] whether the law operated hardly or unjustly upon the parties

---

[25]  Dkt. No. 3671.

[26]  Dkt. No. 3670.

[27]  61 U.S. (20 How.) 527, 529 (1857).

[28]  607 F.3d 1225 (10th Cir. 2010).

[29]  *Id.* at 1235.

[30]  *Id.* at 1234 n.6.

whose suits were then pending. . . . [The legislature] might have repealed the prior law altogether, and put an end to the jurisdiction of their courts . . . , if they had thought proper to do so . . . ."[31] Just weeks ago, the Supreme Court, in *United States v. Tohono O'Odham Nation,* relied on *Beers* to hold that monetary relief in the Court of Federal Claims is "available by grace and not by right."[32]

The Trust Administration Class's claims for monetary relief also exist because Congress created them. By authorizing recognition and settlement of a Trust Administration Class, the 2010 Act (1) excluded from its effect claims that had already been filed elsewhere before the date of the Amended Complaint containing the Trust Administration Claims; (2) adopted the Settlement Agreement's release provisions, which effectively bar class members (who did not opt out) from asserting mismanagement and other breach of trust claims against the United States that arose before September 30, 2009;[33] and (3) amended the Little Tucker Act's jurisdictional limitation to authorize the district court to enter judgment to that effect. Absent this express waiver of sovereign immunity, no breach of trust claim for damages at all would be cognizable against the government in this case. Congress clearly has authority to revoke or limit the terms of such a waiver, whether it be by amendment or through the legislatively-adopted terms of this proposed settlement. Here, it has approved a $3.4 billion class settlement, one of the largest ever by the United States.

---

[31] *Beers*, 61 U.S. at 530, *quoted in Iowa Tribe*, 607 F.3d at 1234.

[32] 131 S. Ct. 1723, at 1731 (2011).

[33] The Settlement Agreement specifically enumerates and identifies those claims that shall remain exempt from this bar. Settlement Agreement § I. 3.

-8-

The Federal Circuit's decision in *LeBeau v. United States*[34] dispels concern that Congress improperly altered some protected interest.   *LeBeau* involved Little Tucker Act claims by a class composed of lineal descendants of an Indian tribe.   The plaintiffs sought money damages for the government's alleged breach of trust in unreasonably delaying the distribution of a judgment fund.   The court agreed that "the Secretary [of the Interior] breached this trust responsibility by unreasonably delaying" distributions of the judgment funds at issue.[35]   Nevertheless, it denied relief to the class.   It held instead that "plaintiffs are not entitled to a recovery of damages for this breach because Congress, acting within its proper authority before any distribution to the lineal descendants occurred, reallocated the lineal descendants' share of the Judgment Fund."[36]   The court explained that the class members' "right to their per capita share of the Judgment Fund was always subject to modification by Congress until distribution of their share occurred, which would vest the lineal descendants' rights. . . .   Since no action occurred that had the effect of vesting the lineal descendants' share . . . , the lineal descendants are not entitled to recover damages. . . . ."[37]   As in *LeBeau,* the 2010 Act does not alter any vested interest of participating class members.   Every claim that the settlement will extinguish represents, at most, the

---

[34]   474 F.3d 1334 (Fed. Cir. 2007); *see Timbisha Shoshone Tribe v. Salazar,* No. 10-968 (GK), 2011 WL 691366, at *8 (D.D.C. March 1, 2011) (favorably citing *LeBeau*).

[35]   *Id.* at 1342.

[36]   *Id.*

[37]   *Id.* at 1343; *see also Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649 (1976) (Congress could alter mineral rights before tribe's interest vested); *United States v. Rowell,* 243 U.S. 464, 468-71 (1917) ("[S]tatutes of this type are not to be regarded as proposals by the government to enter into executory contracts, but as laws which are amendable and repealable at the will of Congress, save that rights created by carrying them into effect cannot be devested or impaired."); *Gritts v. Fisher,* 224 U.S. 640, 648 (1912).

unliquidated expectancy of a recovery, not a vested right.[38]  Moreover, unlike *LeBeau,* the

plaintiff class members here also had an opportunity to exclude themselves from the settlement if

they chose not to be bound by its terms and thus preserve whatever rights they might have had.

      C.      <u>Congress Had a Rational Basis for Adopting the 2010 Act</u>

By exempting certification of the Trust Administration Class from requirements of the

Federal Rules of Civil Procedure, the 2010 Act stands as a recognition that this case presents

unique challenges to the parties, this Court, and Congress, and that the best resolution is a

comprehensive one that could not be achieved in any other forum.  Given this eminently sound –

and, at minimum, rational –  basis for a statutory exception from the federal rules, the Court is

not required to consider whether the Trust Administration Class satisfies every class settlement

criteria set forth in Rule 23.

The Tenth Circuit's decision in *Sheridan Square Partnership* demonstrates Congress's

power to legislate terms shaping the settlement of a dispute.  That case involved a "long-running

battle" between the government and the owners of Sheridan Square, a low-income housing

development, over the proper method of determining rent subsidies payable by the government to

the project's owners.[39]  Through section 801(a)(1) of the Department of Housing and

Development Reform Act of 1989, Congress "in essence, imposed a congressionally determined

settlement upon the numerous actions brought by project owners against HUD."[40]  It ordered

---

[38]  *Accord Wolfchild v. United States,* 559 F.3d 1228, 1257-58 (Fed. Cir. 2009) (even "a change in the identity of the beneficiaries [of reservation land] does not constitute a taking of property from individuals who had an expectation of benefit but no vested rights in the property."), *cert. denied*, 130 S. Ct. 2090 (2010).

[39]  66 F.3d at 1107.

[40]  *Id.*

HUD "to make retroactive payments to those project owners whose rents had been adversely affected by HUD's prior [method of determining rent]," but that gave the owners only "a partial settlement of the amounts in dispute."[41]  The project owners contended that the statutory settlement was arbitrary and capricious, and thus denied due process, but the Tenth Circuit disagreed.

> Congress eliminated the cost and uncertainties of multiplicious legal battles by imposing a uniform and easily calculated solution.  It may be that certain parties received less than might have been obtained from a successful lawsuit; others, undoubtedly, obtained more.  Under the circumstances, the congressional formula strikes us as eminently reasonable and fair; Sheridan Square points to no evidence that suggests a contrary conclusion.  We therefore hold that § 801(a)(1) does not violate procedural due process.  *See Usery*, 428 U.S. at 19 ("It is enough to say that the Act approaches the problem of cost-spreading rationally; whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension.").[42]

Here, Congress has likewise sought to eliminate costs and uncertainties of further multiple, protracted legal battles by imposing a "uniform and easily calculated solution" though the 2010 Act.  As in *Sheridan Square Partnership,* the few due process objections asserted to this settlement likewise lack merit.

The Court should apply a rational basis standard in reviewing the 2010 Act, and here it is readily satisfied.  In *Littlewolf v. Lujan,* the D.C. Circuit found that the subject legislation met the rational basis standard where it was "rationally related to the government's legitimate interest in protecting thousands of Indian claimants from the need to litigate thousands of expensive, time-

---

[41]  *Id.*

[42]  66 F.3d at 1108-09 (parallel citation and footnote omitted).

consuming individual actions to recover any compensation for their claims."[43]  In similar fashion,

Congress here recognized the need to resolve matters that have been pending for decades,

without individuals needing to pursue costly, time-consuming litigation.

Senator Byron Dorgan, then Chairman of the Indian Affairs Committee, stated at a

hearing held in December 2009, to discuss the settlement:

> [T]he court case lasted a long, long while. . . .[T]he question of how much the
> plaintiffs have been owed or are owed, and how to fix the problem, have
> remained.  And I am really pleased that the settlement agreement compensates the
> individual Indians whose accounts I believe were mismanaged, and takes a
> significant step towards decreasing the amount of land fractionation in Indian
> Country.  I think this will help ensure that there will not be another *Cobell* case in
> the future.[44]

Upon passage of the 2010 Act, Senator Max Baucus expressed pride in the settlement, noting

that this case "has been going on for 14 years, leaving the plaintiffs without resolution of their

claims and diverting attention and resources away from other projects in Indian Country."[45]  He

praised the fact that "a fair agreement has been reached," noting that "we are settling decade-old

injustices and claims against the government.  We are bringing our Nation closer together."[46]  *Id.*

Representative Dale Kildee, acknowledging that legislation was "needed to ensure that [this]

court has jurisdiction over the terms of the Settlement Agreement," stated that "[t]his decision

will help make amends for the past mismanagement of Indian trust funds by the U.S.

---

[43]  877 F.2d 1058, 1064 (D.C. Cir. 1989) (citing *Littlewolf v. Hodel,* 681 F. Supp. 929 (D.D.C. 1988)).

[44]  *Cobell v. Salazar Settlement Agreement: Hearing before the Committee on Indian Affairs, United States Senate,* 111th Cong. 2 (Dec. 17, 2009).

[45]  156 Cong. Rec. S 8294-01 (daily ed. Nov. 30, 2010).

[46]  *Id.*

Government, as well as bring much needed resources to address fractionated Indian lands."[47]

These statements from Congress, and others like them, demonstrate beyond doubt a rational basis for the 2010 Act and the settlement it authorizes.

The above rationale is due even more deference in the context of the IIM trusts.  It is well-settled that courts must give ample room for Congress to articulate how the United States is to carry out its trust obligations.[48]  In the same context, it is appropriate to recognize

> that there necessarily is a large measure of arbitrariness in distributing an award for a century-old wrong. One could regard the distribution as a windfall for whichever beneficiaries are now favored.  In light of the difficulty in determining appropriate standards for the selection of those who are to receive the benefits, [one] cannot say that the distribution directed by the Congress is unreasonable and constitutionally impermissible.  *Congress must have a large measure of flexibility in allocating Indian awards, and what it has done here is not beyond the constitutional pale.*[49]

These principles apply with special force here.  Congress acted rationally in furtherance of its trust obligation to individual Indians.  This settlement dedicates an unprecedented amount of approximately $1 billion to pay for potential Trust Administration claims the merits of which have hardly been tested, let alone established.  Congress, based on the good-faith negotiations of

---

[47] *Proposed Settlement of the Cobell v. Salazar Litigation: Full Committee Oversight Hearing before the Committee on Natural Resources,* 112th Cong. 5-6 (Mar. 10, 2010).

[48] *Morton v. Mancari*, 417 U.S. 535, 552-53 (1974)*; see Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. United States*, 367 F.3d 650 (7th Cir. 2004) (citing *Delaware Tribal Bus. Comm. v. Weeks,* 430 U.S. 73, 85, 90 (1977)).

[49] *Weeks,* 430 U.S. at 91 (Blackmun, J., joining in part and concurring in result) (emphasis added).

the parties and its own understanding of the issues borne from its own long-time involvement in trust administration, acted well within its broad authority to turn a new page.[50]

D.    Congress Also Has Power to Create Exceptions to Federal Rules of Procedure

Congress took nearly a year to consider and debate the Settlement Agreement, and then decided to "authorize[], ratif[y] and confirm[]" it.[51]  In so doing, Congress expressly provided in section 101(d)(2) of the 2010 Act that "[n]otwithstanding the requirements of the Federal Rules of Civil Procedure, the court in the Litigation may certify the Trust Administration Class."  It further dictates that "[o]n certification under subparagraph (A), the Trust Administration Class shall be treated as a class certified under rule 23(b)(3) . . . for purposes of Settlement."  This provision exempts the formation of the Trust Administration Class and the settlement of its claims from standard Rule 23 analysis.

Congress's authority to create such exceptions in specific cases is well-established.  Last Term, the Supreme Court specifically addressed Rule 23 and Congress's authority to determine what cases can be brought under the Rule.  In *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*,[52] the Court held that Congress wields "ultimate authority over the Federal Rules of Civil Procedure; *it can create exceptions to an individual rule* as it sees fit – either by

---

[50]   These principles subdue both due process and equal protection objections to the settlement. *See Narragansett Indian Tribe v. Nat. Indian Gaming Comm'n,* 158 F.3d 1335 (D.C. Cir. 1998) (denying equal protection claim); *Timbisha Shoshone Tribe,* 10-968 (GK), 2011 WL 691366, *7-11 (D.D.C. Mar. 1, 2011) (rejecting taking and equal protection claims)); *Native American Arts, Inc. v. Mangalick Enter., Inc.,* 633 F. Supp. 2d 591 (N.D. Ill. 2009) (denying equal protection challenge).

[51]   2010 Act §101(c)(1).

[52]   130 S. Ct. 1431 (2010).

-14-

directly amending the rule *or by enacting a separate statute overriding it in certain instances.*"[53]

Congress has, at times, relaxed Rule 23 class action requirements in other circumstances,[54] so the exemption is not unique, as one objector asserted.[55]  Here, Congress adopted just such a legislative exemption for the Trust Administration Class.

## II.     The Settlement is Fair, Reasonable, and Adequate for Both Classes

### A.     The Settlement is a Product of Arms-Length Negotiations

The parties litigated almost five years before getting to an appellate decision that recognized a right to have a historical accounting performed, and since 2001, the parties and the courts continued to struggle over details of what that accounting can or should be.[56]  They engaged in four trials and even more appeals with no final satisfactory, litigated conclusion. In 2008, this Court observed:

> The costs of this litigation have been great: government manpower and funds, careers of financial consultants, judicial resources, and forests of paper have been dedicated to its prosecution and defense. The Cobell case will no doubt stand, in some respects, as a cautionary tale about the limited ability of a court to right

---

[53]  *Id.* at 1438 (emphasis added).

[54]  *See Illinois v. Abbott Associates, Inc.,* 460 U.S. 557, 573 n.29 (1983) (in the Clayton Act, as amended, Congress exempted actions brought by state attorneys general on behalf of consumers from Rule 23); *General Tel. Co. of the Northwest, Inc. v. EEOC,* 446 U.S. 318, 330-31 (1980) (EEOC entitled to bring civil rights class action without meeting Rule 23 requirements, including adequate representation.)

[55]  *See* Monette objection, at 3 [Dkt. 3746 at 212].

[56]  Moreover, although *Cobell VI* construed the 1994 Act to imply a duty for the historical accounting, that construction remains a possible subject of further litigation if the case is not settled.

historical wrongs that could have been – and should have been – settled by the same political branches in recognition of their own failure to preserve the trust.[57]

With no final resolution in sight and more litigation looming, the parties spent four months negotiating an arms-length settlement.[58]

A few objectors presume that the settlement would be impossible without collusion,[59] but that is baseless, misguided conjecture. The Sixth Circuit's decision in *Moulton v. U.S. Steel Corp.*[60] addresses such speculation. In a case far less complex and protracted than *Cobell,* a class of city residents sued a steel company for nuisance. When a settlement was reached after about four years, some objectors alleged the compromise smacked of collusion. The district court overruled the objections and the Sixth Circuit affirmed, providing this explanation:

> The duration and complexity of the litigation, to start, undermines the objectors' suspicions. The parties litigated for almost four years before reaching a settlement agreement. The court fielded numerous contested pretrial motions. Class Counsel pursued multiple avenues to gather evidence – from consulting with Michigan environmental authorities to conducting numerous substantive depositions. And the agreement itself was a product of months of supervised negotiations, two facilitated mediations and a settlement conference with the

---

[57]  *Cobell v. Kempthorne* (*Cobell XXI*), 569 F. Supp. 2d 223, 252 (D.D.C. 2008), *vacated and remanded,* 573 F.3d 808 (D.C. Cir. 2009).

[58]  Defendants disagree with any assertion that their defense in this litigation was unjustified or that plaintiffs' efforts were entirely successful. On the contrary, the class representatives have acknowledged that this resolution is a settlement in which all parties compromised, after plaintiffs suffered what they described as a string of "puzzling reversals" before the Court of Appeals. *See* Class Representatives' Petition for Incentive Awards and Expenses at 4 (Jan. 26, 2011) [Dkt. 3679]. No need exists to recite defendants' view of the litigation history here; that summary appears in Defendants' Response and Objections to Plaintiffs' Petition for Class Counsel Fees, Expenses and Costs Through Settlement at 4-5 (Feb. 24, 2011) [Dkt. 3694], which defendants incorporate by reference.

[59]  *See, e.g.,* Johns objection at 3 [Dkt. 3746 at 152]; Monette objection at 3-4 [Dkt. 3746 at 212-213].

[60]  581 F.3d 344 (6th Cir. 2009).

court.  It is difficult to maintain that Class Counsel took all of these steps merely
to mask its collusion with U.S. Steel, and that the one entity with a bird's eye view
of the proceedings – the district court judge – somehow missed the signs that the
parties were merely engaged in pretense and posturing.[61]

The same negating factors – dispelling any hint of collusion – exist here.  Although the Trust

Administration Claims have not been litigated, their settlement is the product of vigorous

litigation for fourteen years in a case involving many of the same class members.  It has seen five

trials and ten appellate decisions.  The parties engaged in informal arms-length settlement

discussions, formal mediation, and court-supervised negotiations over a decade before coming

close to settlement.  The proposed settlement agreement required nearly four months of

continuous negotiations to achieve.  Moreover, beyond the circumstances addressed in *Moulton,*

members of Congress devoted a year to examining the settlement, holding hearings, and

encouraging the parties to adopt some changes, before passing legislation authorizing and

ratifying the settlement now before the Court.  In the face of such history and scrutiny, it strains

credulity to argue that the settlement is the product of collusion.

     B.     <u>The Settlement is Fair to Both Classes Based Upon the Classes' Claims</u>

Beyond arms-length negotiations, the other relevant factors also favor approval.

Plaintiffs have the burden of proof, but Defendants offer the following considerations as an aid in

determining the fundamental fairness and validity of the settlement as ratified by Congress.

     1.     The Historical Accounting Class Terms Are Fair and Reasonable

The settlement with respect to the Historical Accounting Class is consonant with the

Court's certification of that class pursuant to Federal Rule of Civil Procedure 23(b)(1)(A) and

---

[61]  *Id.* at 351.

(b)(2).  Aside from slight modifications to conform the class definition to intervening decisions of this Court and the D.C. Circuit, this class is largely the same as that certified in February 1997. Few objectors have expressed concerns with the Historical Accounting Class, and those who have focus primarily on the mandatory nature of the class and the dollar value of the settlement payments proposed for this class.[62]  Neither objection has merit.

"Rule 23(b)(1)(A) takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)."[63]  "A court may certify a class pursuant to Rule 23(b)(2) only when 'the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.'"[64]  Throughout this litigation, the parties' focus has been on the government's fulfillment of a uniform, statutory duty: the provision of historical statements of account to members of the class which the D.C. Circuit concluded was a requirement of the 1994 Act.  The Department of the Interior has one such duty that it owes to all class members, and so must act on grounds generally applicable to the class.  No serious contention exists that the historical accounting claims are unsuitable for class treatment under Rule 23(b)(1)(A) and (b)(2).

---

[62]   *See, e.g.,* McGhuey objection [Dkt. 3749 at 40]; Monette objection at 3 [Dkt. 3746 at 212].

[63]   *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614 (1997) (quotation and citations omitted).

[64]   *See Richards v. Delta Air Lines, Inc.,* 453 F.3d 525, 530 (D.C. Cir. 2006) (quoting Fed. R. Civ. P. 23(b)(2)).

In keeping with the bases for certification, the Court should adhere to the established rule that the class is mandatory and opt-outs are not permitted.  Because Interior's accounting obligation to class members is uniform, the settlement terms should apply to the entire class.  The subdivisions of Rule 23 invoked for this class – 23(b)(1)(A) and (b)(2) – are expressly designed for mandatory class membership for this reason.  *See* Fed. R. Civ. P. 23(b) advisory committee notes.  Allowing opt-out from the class would leave the government with uneven obligations to class members for a historical accounting, depriving defendants of a principal purpose of class treatment – one consistent determination of rights and obligations across the whole class.[65] Indeed, in *Thomas v. Albright,*[66] the D.C. Circuit found an abuse of discretion and vacated a Rule 23(b)(2) class certification order when it permitted certain class members to opt-out from a consent decree.  In light of this precedent and Congress's express ratification of the arrangement for this class, all objections seeking opt-out from the Historical Accounting Class should be denied.

The settlement avoids the need to determine what accounting methodology could accomplish the task and remain within the annual budgets provided by Congress.  Instead, class members stipulate to the correctness of the balance stated in their last IIM account statement received during 2009, on or before September 30, 2009.  In exchange, each class member receives a payment of $1,000 as an incidental consideration for that agreement.

---

[65]  *See Amchem Prods.,* 521 U.S. at 614 (describing purposes of (b)(1) and (b)(2) classes).

[66]  139 F.3d 227 (D.C. Cir. 1998).

It is a false analogy to contend, as one objector has,[67] that the proposed settlement would be akin to allowing the plaintiffs in *Brown v. Board of Education*[68] to surrender the class's right to equal protection of the law in return for cash.  This case involves an implied statutory duty – not constitutional ones – and after a decade and a half of litigation, Congress has stepped in to approve and authorize a settlement that effectively disposes of the historical accounting duty for the affected class.  Instead of waiting several more years to receive yet-to-be-completed or approved historical statements of account, Congress has authorized the use of stipulated historical balances and a payment for each class member.  The class issues do not involve a prospective remedy.[69]  Provision of historical statements of account is a one-time duty that – unlike the school segregation at issue in *Brown* – will not recur and has no future impact.  As the D.C. Circuit has noted, the historical accounting "is a purely instrumental right – a way of

---

[67]  Craven objection at 17-18 [Dkt. 3740 at 19-20].

[68]  347 U.S. 483 (1954).

[69]  Congress's approval and the retrospective nature of claims of both settlement classes, substantially distinguish this case from *The Authors Guild v. Google, Inc.,* No. 05 Civ 8136, 2011 WL 986049 (S.D.N.Y. Mar. 11, 2011).  *Google* rejected a proposed settlement of a copyright class action that included future claims for infringements of unclaimed or orphaned books.  The court observed that "questions of who should be entrusted with guardianship over orphan books, under what terms, and with what safeguards are matters more appropriately decided by Congress than through an agreement among private, self-interested parties."  *Id.* at *8. In this case, the 2010 Act reflects Congress's decision.  *Google* also rejected the settlement because "[a]bsent class members who fail to opt out will be deemed to have released their rights even as to future infringing conduct."  *Id.* at *11.  In contrast, the Settlement Agreement here has no application at all to claims that arise after September 30, 2009.  Settlement Agreement § I.3.(c).  Thus, contrary to one objector's contention, Craven objection at 10-11 [Dkt. 3740 at 12-13], *Google* does not support rejection of this settlement.

finding out the size of their claims."[70]  These unique characteristics materially distinguish this case from all other class actions.

Finally, the few objectors urging the Court to permit opt-outs from this class express a misguided view that forgoing a statement of historical account will somehow render them unable to pursue claims for trust mismanagement (assuming they also opt out of the Trust Administration Class).  The historical statement of account, however, was never intended to stand as proof of mismanagement.[71]  Those who opt out of the sister class and file a damages action for mismanagement will still have the full panoply of discovery powers at their disposal and will, in any event, be able to request an accounting in aid of judgment.  The Settlement Agreement expressly preserves this right.[72]

A few objectors contend that the $1,000 per capita payment is too small or that it is unfair to pay every class member the same amount.  Neither objection has merit.  The $1,000 per person award is well-supported by the record.  An estimated 360,000 individuals satisfy the class definition, which means that the total compensation to this class is approximately $360 million.[73]  The $1,000 is substitutionary and not intended to be compensatory.  But even if it were, the figure would be fair and reasonable in view of the Court's findings after the 2008 trial.  The Court observed that "absen[t] of some kind of equitable evidentiary presumption in favor of the plaintiffs, one permissible conclusion from the record would be that the government has *not*

---

[70]  *Cobell XIII*, 392 F.3d at 468.

[71]  *See id.*

[72]  *See* Settlement Agreement § I.7.  See also discussion, *infra,* note 128 and accompanying text.

[73]  *Cobell v. Kempthorne* (*Cobell XX*)*, 532 F. Supp. 2d 37, 61 (D.D.C. 2008) (noting Interior's estimate of 364,772 IIM accounts at time of trial).

*withheld any funds from plaintiffs' accounts.*"[74]  The Court further concluded that, "despite a

profusion of evidence and opinion about the unreliability of IIM records, there has been

essentially no direct evidence of funds in the government's coffers that belonged in plaintiffs'

accounts."[75]  The Court, however, applied the statistical evidence in the manner most favorable to

class members and ruled that the United States should pay $455,600,000, after "[c]rediting all the

uncertainty to the plaintiffs."[76]  The Court of Appeals, however, categorically rejected this award,

which makes the proposed settlement generous and patently reasonable.

A few other objections contend that it is not fair that every class member receives the

same amount; those who had multiple IIM accounts, or had IIM accounts with more activity or

greater longevity, they suggest, deserve a larger share.[77]  The contention misapprehends what the

payments represent.  The settlement payment is in lieu of the preparation and distribution to each

class member of a historical statement of account by the Department of the Interior and, instead,

the acceptance of the IIM account balances as stated.  This arrangement is the substitute that

Congress has now approved for the class in lieu of the historical accounting based on the 1994

---

[74]  *Cobell XXI,* 569 F. Supp. 2d at 252 (emphasis added).

[75]  *Id.*

[76]  *Id.* at 238.  The Court acknowledged that the $455.6 million figure was the upper bound of the possible statistical range (at a 99 percent confidence level), and that had it selected the median dollar figure, liability would drop to around $160 million, or about 35 percent of the Court's award.  *Id.*  Moreover, that statistical range also "encompass[ed] a zero difference between the calculated and stated balance of the trust, meaning that the current, stated balance could very well be exactly correct."  *Id.*

[77]  *See, e.g.,* Carol Eve Good Bear objection at 3-4 [Dkt. 3746 at 107-108].

Act.  The equal payment to each class member is also consistent with the underlying purpose of

certified actions under Rules 23(b)(1)(A) and (b)(2), and the Court should approve it.[78]

2.      The Trust Administration Class Terms Are Fair and Reasonable

A class settlement is appropriate due to the litigation risk of proving any individual claim.

For many years, government reports have broadly criticized management of the Indian trusts.[79]

On an individual basis, however, it may not be possible to prove mismanagement, much less

quantify any damages proximately resulting from it.  Beyond problems of proof, the statute of

limitations and the practical concerns of litigation costs pose a risk that little, if any, likelihood of

recovery exists for many mismanagement claims.[80]  The settlement strikes a fair balance between

the government's need for a limited degree of certainty regarding its exposure to liability and

reasonable compensation that is likely beyond the practical reach of individual trust beneficiaries.

---

[78]  One objector (Craven) requests that the Court await the outcome of a pending Supreme Court decision in *Wal-Mart Stores, Inc. v. Dukes,* No. 10-277 (argued Mar. 29, 2011).  [Dkt. 3740 at 20.]  The *Wal-Mart* case, however, is inapposite.  *Wal-Mart* involves issues concerning the cohesiveness of employment class action claims under Rule 23(b)(2) alleging gender discrimination in promotions.  *See Dukes v. Wal-Mart Stores, Inc.,* 603 F.3d 571 (9th Cir. 2010) (en banc) (decision below).  No serious contention exists that the historical accounting duty at issue here lacks the requisite cohesiveness.

[79]  *See generally* H. Rep. No. 102-499 (1992) (titled, "Misplaced Trust: the Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund").

[80]   *See, e.g., Brown v. United States*, 195 F.3d 1334 (Fed. Cir. 1999) (individual Indians' action for Interior's alleged breach of fiduciary duty in administering leases dismissed based on statute of limitations); *Clark v. United States*, 228 Ct. Cl. 778 (1981) (claim by individual allottee for alleged breach of fiduciary duty regarding a sale of land held barred by statute of limitations and dismissed); *Simmons v. United States*, 71 Fed. Cl. 188 (2006) (timber mismanagement case dismissed after court determined that continuing claim doctrine did not toll the statute of limitations and that statutory tolling provision did not apply to asset mismanagement claim); *Wright v. United States*, 32 Fed. Cl. 54, 58 (1994) (in dismissing complaint, court holds that regulations do not "impose a duty on the Secretary [of Interior] to ensure that the Indian land owners get the best lease possible or the most profitable lease arrangement.").

Case 1:96-cv-01285-TFH   Document 3764   Filed 05/16/11   Page 32 of 56

A few objectors criticized the settlement for the Trust Administration Class as improper based upon the commonality, typicality, and similar tests prescribed by Rule 23,[81] but those provisions are inapposite to this class. When, as here, Congress has explicitly authorized class certification without respect to the federal rules, neither the rules nor cases applying them contribute to the analysis. For example, the Supreme Court's leading decision in *Amchem Products* relies heavily on the fact that courts must adhere to the provisions of Rule 23, as approved by Congress, in reviewing class settlements: "The text of a rule thus proposed and reviewed limits judicial inventiveness. Courts are not free to amend a rule outside the process Congress ordered . . . ."[82] "Federal courts . . . lack authority to substitute for Rule 23's certification criteria a standard never adopted – that if a settlement is 'fair,' then certification is proper."[83] The Court acknowledged the proposal in *Amchem Products* had merit, but concluded, "Congress, however, has not adopted such a solution."[84] In contrast, here Congress *has* adopted the very solution presented by the proposed settlement, and has exempted it from the certification requirements of Rule 23 in order to facilitate its implementation. Thus, class certification tests that spring from Rule 23 are not relevant; the only relevant consideration is whether the settlement, if otherwise fair and reasonable, affords due process to absent class members.

Because state courts routinely adjudicate class actions that remain faithful to due process using local procedures that are often not identical to the federal rules, Supreme Court

---

[81] *See* Craven objection at 7-11 [Dkt. 3740 at 9-13]; Monette objection at 3 [Dkt. 3746 at 212]; Johns objection at 2-3 [Dkt. 3746 at 151-152].

[82] 521 U.S. at 621.

[83] *Id.* at 622.

[84] *Id.* at 629.

jurisprudence reviewing such cases is especially instructive.  In *Phillips Petroleum Co. v. Shutts*,[85] the Court outlined the due process protections that must be afforded in state court class actions seeking damages:

> The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel.  The notice must be the best practicable, "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane,* 339 U.S., at 314-315; cf. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 174-175 (1974).  The notice should describe the action and the plaintiffs' rights in it.  Additionally, we hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court.  Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members. *Hansberry,* 311 U.S. at 42-43, 45.[86]

Due process, therefore, is satisfied if three broad criteria are met: (1) sufficient notice to the class about the settlement; (2) a meaningful opportunity for dissatisfied class members to object or to opt out of the class; and (3) adequate representation of the class by their representatives.  The proposed settlement of the Trust Administration Class claims passes this test.

> a.   The Notice Program Satisfied Due Process

Despite some sparse criticism of some aspects of the notice plan,[87] no serious challenge to the class notice exists.  The notice effort was "extraordinary" in its scope, comprehensiveness, and complexity,[88] resulting in notice to the class that stands as the epitome of "best practicable

---

[85]   472 U.S. 797, 811-12 (1985).

[86]   *Id.* at 811-12 (parallel citations omitted).

[87]   *See, e.g.,* Sayers objection at 1 [Dkt. 3746 at 224].

[88]   Declaration of Katherine Kinsella ¶ 74 (May 16, 2011) (submitted with Plaintiffs' Memorandum in Support of Joint Motion for Final Approval of Settlement and Entry of Final Judgment.)

notice." With the court's approval, plaintiffs devoted millions of dollars to provide the best practicable notice. Plaintiffs hired prominent class notice expert Kinsella Media LLC (Kinsella Media) to devise a notice program and a clearly-worded notice that explained the material terms of the settlement and the rights of class members to object or opt out of the Trust Administration Class.[89] The claims administrator, GCG, mailed printed copies of the 16-page notice packet to all potential class members with a known address (over 374,000 pieces mailed initially).[90] The detailed packet was available in English, Spanish, and Navajo.[91] An additional 51,748 notice packets have been requested by telephone, mail, or internet.[92]

GCG also maintains a web site where, beginning on January 20, 2011, the notice could be read and downloaded. But the web presence began over a year before the notice period, commencing shortly after the parties announced the settlement in 2009. That initial web site received more than 145,000 visits *before* the notice period began, and prompted almost 20,000 people to register for information on the settlement.[93] Following preliminary approval of the settlement, GCG updated the web presence to add the notice packet and to provide easily available information on dates, deadlines, answers to commonly-asked questions, and the

---

[89] *See id.* ¶¶ 3, 8-9.

[90] Declaration of Jennifer Keough, ¶ 9 (May 16, 2011) (submitted with Plaintiffs' Memorandum in Support of Joint Motion for Final Approval of Settlement and Entry of Final Judgment.). It re-mailed 34,301 notice packets to forwarding addresses, *id.,* and it has conducted 172,644 advanced searches to locate other potential class members, leading to 76,651 additional mailings, *id.* ¶ 10.

[91] Keough Decl. ¶ 7.

[92] *Id.* ¶ 10.

[93] Keough Decl. ¶ 11.

schedule for live forums on the settlement conducted by plaintiffs and their counsel.[94]   Through

May 11, 2011, the web site has received 206,517 unique visitors, and a total of 302,436 visits.[95]

GCG also established a toll-free number for settlement information in December 2009,

before the notice period.  The recorded information initially allowed people to register to receive

more information.  Beginning with the notice period, GCG added a live call center, manned by

agents with multiple language translation support, to field calls from potential class members,

their relatives, and other individuals with questions about the settlement.[96]  The toll-free number

and web site address have been prominently used on notice packets, posters, and other

advertising for the settlement.  The call center has fielded 182,878 calls, of which 161,122 were

live.  GCG personnel devoted over 1.2 million minutes responding to calls.[97]

Kinsella Media produced a video that was translated into nine additional languages that

summarizes the settlement.[98]  Those videos have been available on-line at the GCG web site, and

to date, GCG has also distributed over 8,000 copies of the video on DVD in ten languages.[99]

---

[94]  *Id.* ¶ 12.

[95]  *Id.* ¶ 13.

[96]  *Id.* ¶ 14.

[97]  *Id.* ¶ 17.

[98]  Kinsella Decl. ¶ 73.

[99]  Keough Decl. ¶ 4.  The video is available in (1) English; (2) Spanish; (3) Navajo; (4) Lakota; (5) Apache; (6) Crow; (7) Dakota; (8) Cherokee; (9) Yup'ik; and (10) Ojibwe.  *Id.* ¶ 12.

Kinsella Media designed and implemented an extensive media campaign in print, on-line, on radio, and on television to get the word out even to the most remote parts of the country.[100] Using sound demographic techniques, Kinsella Media used available information on trust lands and class member whereabouts, along with publicly available data on tribes and Native American populations to guide the use of mass media.[101]  Many ads were printed in Native American publications and broadcast on Native American stations, often in Native American languages.[102] The plan also included strategic use of mainstream broadcast and print media.[103]  For example, ads placed in national newspaper supplements, such as *Parade* and *USA Weekend,* added circulations of over 60 million print advertisements to the notice effort.[104]

Kinsella Media designed a third-party notice program to supplement the mass media campaign.  The project identified several thousand locations, frequented by potential class members, such as stores, courts, health clinics, post offices, federal government offices, and tribal offices in key areas of the country where many class members reside.  GCG distributed 245,650 materials relating to the Settlement to over 3,200 contacts as part of this project.[105]  The materials were accompanied by a postage-paid response card, asking recipients to confirm that

---

[100]  The extensive media campaign was also preceded by an entire year of press coverage, beginning with the settlement's announcement in December 2009 and extending through the following year as Congress held hearings and considered legislation to authorize the settlement. *See* Kinsella Decl. ¶ 74.

[101]  Kinsella Decl. ¶¶ 14-19.

[102]  *Id.* ¶¶ 20-24.

[103]  *See generally id.* ¶¶ 27-47 (describing mainstream media placements).

[104]  *Id.* ¶ 43.

[105]  Keough Decl. ¶ 19.

-28-

the announcements had been posted.[106]   Kinsella Media also devised a "poster verification project," in which it asked GCG to inspect 263 sample locations across 11 states to determine whether the posters and/or flyers were, in fact, used.[107]   The sample found an astonishing 89 percent compliance rate.[108]

In reviewing the media plan submitted by Kinsella Media before its approval, the Court praised the plan as "remarkable" and "far reaching," and commented that "I don't know how much more you can do if anything."[109]   One statistic demonstrating the effectiveness of the notice program is that GCG has received 108,328 claim forms through May 11, 2011, from those seeking to establish or confirm class membership.[110]

Beyond formal notice and media outreach, class counsel have conducted scores of town hall meetings to meet with putative class members and answer their questions about the settlement.   During the notice period alone, plaintiffs participated in fifty-five in-person meetings in different towns or cities across seventeen states.[111]   But even before the notice period, class counsel made many trips to reservations with high concentrations of potential class members in the following states: Arizona, California, Idaho, Montana, Nebraska, New Mexico, North

---

[106]   *Id.*

[107]   *Id.* ¶ 20; Kinsella Decl. ¶ 62 .

[108]   *Id.*

[109]   Tr. at 2, 4 (Jan. 14, 2011).

[110]   Keough Decl. ¶ 26. (As noted in the Settlement Agreement, IIM account holders did not need to register if they have been receiving IIM account statements, because they were automatically included as class members.)

[111]   Keough Decl. ¶ 22; Kinsella Decl. ¶ 72.

Dakota, South Dakota, Washington, and Wyoming.[112]  The Secretary of the Interior, the Deputy

Secretary, and the Solicitor for the Department of the Interior have also held informational

sessions with tribal leaders and Native American organizations to publicize the settlement.[113]  On

this record of extensive outreach spanning more than one year, the notice requirement is

manifestly satisfied for due process purposes.

b.  The Ability of Class Members to Opt Out Satisfies Due Process

Those who desired to reserve their rights and pursue claims on their own had a

meaningful opportunity to exclude themselves from this settlement, based on the extensive Class

Notice Program[114] and the simple, ninety-day opt out process it advertised.  In *Littlewolf,* for

example, the D.C. Circuit recognized the Tucker Act as a due process "safety net" that would

ensure an opportunity for full compensation if an individual wished to pursue it.[115]  Similarly,

the opt-out provision in this case served as a "safety net" that allowed any individual to pursue a

claim outside this settlement.

Only passing objections have been made to the right of Trust Administration Class

members to exclude themselves from participation in the settlement, and only about 1,825

putative members – fewer than one-half of one percent – of the class have timely requested

exclusion.[116]  The majority of these opt outs come from the Quapaw Tribe, which is attempting to

---

[112]  *See* Kinsella Decl. ¶ 71.

[113]  *See id.*

[114]  *See id.* ¶¶ 8-9.

[115]  877 F.2d at 1065.

[116]  Declaration of Jennifer Keough (May 5, 2011) (reporting on exclusions) [Dkt. 3748].

pursue a separate Court of Federal Claims case on behalf of the Tribe and its members.[117]  The

complaints involve minor concerns that arise in any class settlement.

Representatives for the Quapaw tribe have requested they be given more time to decide

whether to opt out.[118]  They and others complain that the notice period is too short,[119] but the

Court afforded everyone a ninety-day period already.  In light of the extensive advertising, news

coverage,  and outreach undertaken during that period – and before – to alert class members

about the settlement, ninety days is sufficient.[120]  In every case, some class member will want

more time, but that desire must yield to the class's interest in getting to the approval stage.[121]

Another objector contends that individual Indians lack a fair opportunity to opt out unless

they are first provided a historical accounting, because they "cannot calculate the benefits and

costs of proceeding individually."[122]  The assertion is that "the class members' equitable right to

---

[117]  It appears that those behind the Quapaw Tribe case have been seeking opt out requests from every member of the Tribe, whether or not those individuals are members of either class here.

[118]  Quapaw Tribe letter at 9-11 [Dkt. 3746 at 193-95]

[119]  *Id.*; *see also* Colleen Chippewa objection at 1 [Dkt. 3746 at 248]; Tidwell objection [Dkt. 3746 at 172].

[120]  "Courts addressing opt-out periods in the class settlement context have typically held that between 30 and 60 days from the time of mailing is appropriate."  *Woodard v. Andrus,* 272 F.R.D. 185, 204 (W.D. La. 2010) (citing cases); *see also In re Prudential Ins. Co. of America Sales Practices Litigation,* 177 F.R.D. 216, 240-41 (D.N.J. 1997) ("Courts have routinely approved Class Notice mailings where the deadline to opt out was between thirty and sixty days.").

[121]  The desire for more time must also be balanced against the loss of urgency that can occur if the notice period is too long.  *See* Kinsella Decl. ¶ 74 ("Notice Period provided adequate time to read, understand, and act on the Notice Materials without losing the sense of urgency that comes with a specific deadline.").

[122]  Craven objection at 2 [Dkt. 3740 at 4].

that accounting is entirely extinguished, whether or not a class member wishes to opt out."[123]
The concern is misplaced for several reasons.  First, no settlement is going to provide complete
information about every relevant fact that might become known if the case progressed further.
Imperfect information is part of any compromise, and that is particularly true when experience in
the accounting case alone, over more than 14 years, has shown no easy "exit from this
complicated legal morass."[124]

Second, objectors fail to explain how a historical statement of account is necessary to
"calculate the benefits and costs of proceeding individually."[125]  It is factually incorrect to claim
that class members "have no access to the records that would demonstrate their victimization and
right to collect from the government."[126]  In previous mismanagement claims brought by
individual Native Americans, the plaintiffs were not stymied in bringing those claims because of
the alleged absence of a historical accounting.[127]  Further, the historical statements of account at
issue here would have provided transaction histories and account balances, but would not have
provided specific trust records to individual account holders that would be important for
evaluating particular mismanagement claims.

Finally, a few class members expressed concern that if they opt out, they will not be able
to pursue their own claims because they will not have the benefit of information from an

---

[123]  *Id.*

[124]  *Cobell XXII*, 573 F.3d at 812.

[125]  *E.g.,* Craven objection at 2 [Dkt. 3740 at 4].

[126]  *Id.* at 12 [Dkt. 3740 at 14].

[127]  *See, e.g., Mitchell II,* 463 U.S. 206 (1983).

accounting. They are mistaken. The Settlement Agreement expressly assures opt-outs the right to request an accounting in aid of jurisdiction in a later suit.[128]  Class members who properly excluded themselves from the Trust Administration Class, therefore, retain the ability to seek "an accounting in aid of the jurisdiction of a court to render judgment," for the purpose of calculating any monetary damages if they pursue their own breach of trust claims for funds or land mismanagement.

The United States Court of Federal Claims may require the United States to provide an accounting in aid of the court's jurisdiction to render a money judgment.[129]  If an Indian plaintiff in the Court of Federal Claims establishes the government's liability on a breach of trust claim, he or she can obtain an accounting related to that specific claim.[130]  Thus, it is plainly wrong to

---

[128]  Section I. 7. of the Settlement Agreement provides:

> 7. <u>Preservation of Claims and Rights by Opt Outs.</u>  Notwithstanding the releases stated above (including without limitation the release of Historical Accounting Claims in paragraph I(1), Trust Administration Class Members who properly and timely opt out in accordance with the instructions in paragraph C(2) of this Agreement hereby expressly preserve and do not release, waive or discharge any Funds Administration Claims (including without limitation accounting error claims) and/or Land Administration Claims, whether such claims arise in equity or at law.  Further, any such opting-out Class Member retains and shall be entitled to all methods of proof, applicable evidentiary presumptions and inferences (if any), and means of discovery available in any court of competent jurisdiction pursuant to that court's procedural and evidentiary rules applicable to fiduciaries, *including without limitation any right to an accounting in aid of the jurisdiction of a court to render judgment.*

(Emphasis added.).

[129]  *Klamath & Modoc Tribes v. United States*, 174 Ct. Cl. 483, 490-91 (1966); *Eastern Shawnee Tribe of Oklahoma v. United States*, 82 Fed. Cl. 322 (2008).

[130]  *Klamath*, 174 Ct. Cl. at 493.

contend that individual Indians "are precluded by the settlement from ever obtaining that information through an accounting."[131]

       c.   The Class Representatives Are Adequate for Settlement Purposes

Plaintiffs bear the burden to demonstrate the adequacy of representation.[132]  Defendants defer to the class representatives to confirm that conclusion for settlement of the Trust Administration Class, but note as a general matter, that this Circuit recognizes "[t]wo criteria for determining the adequacy of representation," namely: "(1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and (2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel."[133]  No evidence has been presented to show that the class representatives' interests are antagonistic to those of absentee members of the class, most of whom are also members of the Historical Accounting Class, on whose behalf plaintiffs have diligently litigated for fourteen years before reaching this settlement.[134]

---

[131]  Craven objection at 12 [Dkt. 3740 at 14].

[132]  *See generally Disability Rights Council v. WMATA,* 239 F.R.D. 9, 24-25 (D.D.C. 2006); *cf. Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 395 (1996) ("duty to represent absent class members is a continuing one").

[133]  *Twelve John Does v. District of Columbia,* 117 F.3d 571, 575 (D.C. Cir.1997) (internal quotation omitted).

[134]  If anything, plaintiffs commitment to undertake extraordinary and comprehensive notice program, including travel to many public forums in at least seventeen states, in order to answer questions and inform class members of their right to object and, when available, to opt out, in and of itself stands as a demonstration of adequate representation.

Because Congress exempted certification of the Trust Administration Class from application of Rule 23,[135] the usual prerequisites to eligibility for class treatment under the rule – such as typicality, commonality, and predominance – do not govern here.[136]  In this special circumstance, the question is whether the class's representation affords due process to absent class members – and it does.  The essential consideration is whether the named representatives possess "the forthrightness and vigor . . . to assert and defend the interests of the members of the class,"[137] while avoiding "antagonistic or conflicting interests with the unnamed members of the class."[138]  It is enough that "the 'incentives' of the class representative must 'align with those of absent class members so as to assure that the absentees' interests will be fairly represented.'"[139]  The court must make a "case-specific" inquiry, considering also "the overall context of the litigation" and "communication between class counsel and the class."[140]  With these standards as benchmarks, adequate representation is manifest here.

Beyond negotiation of the settlement by plaintiffs who have pursued trust reform since 1996, Congress also vetted the settlement and specially approved it through legislation.  Class

---

[135]  2010 Act § 101(d)(2)(A) ("Notwithstanding the requirements of the Federal Rules of Civil Procedure, the court in [this case] may certify the Trust Administration Class.").

[136]  See discussion, *supra,* at Part I. D.

[137]  *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003) (quoting *Lyons v. Georgia-Pacific Corp. Salaried Employees Ret. Plan*, 221 F.3d 1235, 1253 (11th Cir. 2000)).

[138]  *Twelve John Does*, 117 F.3d at 575.

[139]  *London,* 340 F.3d at 1253 (quoting *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000)).

[140]  *Twelve John Does*, 117 F.3d at 575; *In re Lorazepam & Clorazepate Antitrust Litigation*, 202 F.R.D. 12, 28 (D.D.C. 2001).  In the settlement context here, class counsel's communication with class members has been robust.

-35-

members received the benefit of the most thorough class notice process in memory, and they had a meaningful opportunity to exclude themselves if they were dissatisfied with the settlement. The Supreme Court recognized in *Shutts* that adequacy of representation is one due process factor, along with sufficient notice and the right to participate or opt out of the class.[141]  The due process concern over representation, however, should not override considerations of the other *Shutts* factors – effective notice and a meaningful opportunity to participate or opt out[142] – in the absence of an actual, proven conflict of interest.[143]   Here, class members have received the best practicable notice and a meaningful opportunity to opt out, and Congress has also subjected the settlement to enhanced and independent scrutiny.

Although defendants oppose the attorney fee and incentive award petitions as excessive – as have many objectors – the mere fact of the requests is not disqualifying.  Almost every class action involves a petition for attorney fees and expenses, and the Supreme Court expressly

---

[141]  472 U.S. at 811-12.

[142]  Although adequacy of representation is one factor under *Shutts*, the degree of adequacy that is required is likely to depend on case-specific circumstances.  Indeed, the Tenth Circuit held in *In re Four Seasons Securities Laws Litigation,* 502 F.2d 834, 843 (10th Cir. 1974), that adequacy of representation is not a consideration if notice and the right to opt out are sufficiently robust.  Although *Four Seasons* was decided before *Shutts,* the Tenth Circuit has continued to cite the case as good law.  *See Pelt v. Utah,* 539 F.3d 1271, 1285-86 (10th Cir.2008); *Orner v. Shalala,* 30 F.3d 1307, 1310 (10th Cir. 1994); *see also Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.,* 679 F. Supp. 2d 1287, 1306 (D. Kan. 2010) ("*Pelt* court's favorable citation [to] *Four Seasons* . . . clearly suggests that the Tenth Circuit considers that decision valid in the wake of *Shutts*"); *accord* Wright, Miller & Kane, 7A Fed. Prac. & Proc. Civ. § 1765 at 319 (3d ed. 2005) ("Indeed, it has been suggested that adequate representation may not be constitutionally required if sufficient notice is provided.").

[143]  The Third Circuit, for example, discounted alleged conflicts of interest among different members of a single settlement class in *In re Warfarin Sodium Antitrust Litigation,* 391 F.3d 516, 533 (3d Cir. 2004), when objectors "ha[d] only asserted, rather than established, an inherent conflict" that would require the use of sub-classes.

approved fee awards as an adjunct of the class action process.[144]   Courts readily recognize the

propriety of modest incentive awards to class representatives in recognition of their work on the

case.[145]   These requests do require the Court's close scrutiny, but their existence alone is not a

basis for disqualification.[146]

> d.   The Settlement Amount Is Fair and Reasonable

The parties engaged in extensive and intense negotiations over an appropriate dollar

amount for the Trust Administration Claims, with the Court's impartial encouragement.  Despite

stated displeasure over the amount, no objector has offered facts or precedent to demonstrate that

it is unfair.  Even if the potential recovery for the class were known, the Second Circuit has noted

that the "fact that a proposed settlement may only amount to a fraction of the potential recovery

does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be

disapproved."[147]

---

[144]   *Boeing Co. v. Van Gemert,* 444 U.S. 472 (1980); *accord Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993).

[145]   *E.g., In re Lorazepam & Clorazepate Antitrust Litig.,* No. MDL 1290 (TFH), 2003 WL 22037741, at *10 (D.D.C. June 16, 2003) (recognizing "[t]he propriety of allowing modest compensation to class representatives . . . ." ) (quoting *Bogosian v. Gulf Oil Corp.,* 621 F. Supp. 27, 32 (E.D. Pa.1985)).

[146]   *See, e.g., Cohen v. Chilcott*, 522 F. Supp.2d 105, 115 n.2 (D.D.C. 2007) (incentive award requests).

[147]   *City of Detroit v. Grinnell Corp.,* 495 F.2d at 455 & n.2 ("In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.").  One objector (Craven, at 13) contends the Court must "estimate the litigation value of the claims of the class and determine whether the settlement is a reasonable approximation of that value."  She relies on *Mirfashi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004); *Reynolds v. Beneficial National Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002); and *Mars Steel Corp. v. Continental Illinois National Bank & Trust Co.*, 834 F.2d 677, 682 (7th Cir. 1987)).  [Dkt. 3740 at 15].  *Mirfashi* and *Reynolds* are inapposite, because they involved, respectively, a class that would take nothing in settlement and suspicions

-37-

No history of successful litigation of individual Indian trust mismanagement claims exists to warrant a higher figure. Although plaintiffs made reference in the past to a potential recovery of many billions of dollars, those claims have been refuted during this litigation.[148] Moreover, the few cases that have been brought for trust mismanagement demonstrate the difficulties in prevailing on such a claim and do not support a higher settlement amount.[149] On the other hand, this settlement would be historic and possibly the largest ever agreed to by the United States. It offers fair payments on potential trust administration claims to hundreds of thousands of individual Indians, without requiring any of them to incur the considerable risks and expense of prosecuting those claims.

The reasonableness of the settlement number is objectively supported by reference to the total dollar value of money that flowed through IIM accounts over time. During the trial in 2008, defendants presented evidence demonstrating the aggregate dollar value of receipts into and payments out of the IIM system, described at trial as system "throughput."[150] Defendants introduced a table of dollar throughput which demonstrates that, between 1985 and 2007, the dollar value of receipts into IIM accounts was approximately $5.975 billion.[151] The Court relied

_____

of collusion, neither of which exist here. *Mars Steel,* on the other hand, supports this settlement, for the case upheld a settlement class.

[148] *Cobell XXI,* 569 F. Supp.2d at 228-34 (rejecting plaintiffs' $47 billion claim).

[149] See discussion, *supra,* note 80.

[150] *Cobell XXI,* 569 F. Supp. 2d at 234-40.

[151] 2008 Trial Exhibit DX-371. The $5.975 billion is derived as follows. Sum the gross total receipts into the IIM system from 1985 through 2007. Next, deduct amounts that do not relate to IIM account deposits, which are primarily Osage headright payments ($358.7 million) and tribal trust funds ($393.32 million) that went through the system over the period. This results in a total IIM accounts throughput of $5.975 billion.

on this same evidence to calculate its restitution amount of $455.6 million.[152]  The Court can

again look to the throughput evidence to evaluate the settlement amount.  The approximately $1

billion that will be paid to the Trust Administration Class represents a significant percentage of

those receipts during the relevant period.

> e.   The Settlement Distribution Plan Is Sound

The proposed distribution methodology also passes muster.  One objector hypothesizes

that the distribution plan overcompensates some class members while underpaying others.[153]  A

similar objection is that "outlier" transactions will result in a windfall for some class members.[154]

Notably, neither objector proposes an alternative methodology for making distributions to the

class.[155]  Unlike an award of litigated damages, a settlement does not require the same precision

for the distribution of proceeds.[156]  As the Ninth Circuit reiterated not long ago, "[u]ltimately, the

district court's [fairness] determination is nothing more than an amalgam of delicate balancing,

---

[152]  *Cobell XXI*, 569 F. Supp. 2d at 252 ("The numbers produced by the application of the uncertainty model are high, but they are plausible in relation to the total throughput [and other factors].").  Plaintiffs relied on this same evidence to derive their own competing but discredited restitution model.  *Id.* at 228-29.

[153]  Craven objection at 13-15 [Dkt. 3740 at 15-17]; *see also* Monette objection at 4 [Dkt. 3746 at 213]; Colombe objection at 3 [Dkt. 3746 at 240].

[154]   Monette objection at 4 [Dkt. 3746 at 213].

[155]  Professor Monette also testified before a House committee about the settlement in March 2010, but proposed no alternatives then, either.  *Proposed Settlement of the Cobell v. Salazar Litigation: Oversight Hearing Before the H. Comm. On Nat'l Res.,* 111 Cong. 17-33 (2010).

[156]  *See, e.g., Thomas,* 139 F.3d at 231 (a "court should not reject a settlement merely because individual class members complain that they would have received more had they prevailed after a trial") (citing *EEOC v Trucking Employers, Inc.,* 561 F.2d 313, 317 (D.C. Cir. 1977)).

gross approximations and rough justice."[157]   The same reasoning applies to an evaluation of how settlement proceeds are to be divided.   The D.C. Circuit pointed out that, in completing the historical accounting, "[w]e must not allow the theoretically perfect to render impossible the achievable good,"[158] and that maxim has equal force in the context of this distribution.

The methodology has a sound rationale.[159]   First, every class member will receive a base amount of approximately $850.[160]   This payment assures that even those who had no funds at all in the IIM system receive some compensation for a potential, land-only claims.[161]   (Similarly, the

---

[157]   *Rodriguez v. West Publishing Corp.,* 563 F.3d 948, (9th Cir. 2009) (quoting *Officers for Justice v. Civil Serv. Comm'n of San Francisco,* 688 F.2d 615, 625 (9th Cir.1982)).

[158]   *Cobell XXII,* 573 F.3d at 518.

[159]   *See* Declaration of Michelle D. Herman ¶¶ 29-39 (May 16, 2011) (attached as Exhibit 1).

[160]   Although Congress deferred to this Court's fairness determination, Congress expressly approved this base distribution, for it appropriated an extra $100 million dollars to augment it and specified the calculation.   *See* 2010 Act § 101(j), (k).

[161]   A land-only individual claim would have relatively less value, because the trust duty of the United States for land is custodial, not managerial.   In *Cobell XIII,* 392 F.3d at 464, the Court of Appeals explained:

> Even apart from the 1994 Act, the IIM funds have quite a different legal status from the allotment land itself. Section 5 of the Dawes Act nominally made the United States trustee of those lands, but did so solely in order to limit alienation by Indians and to assure immunity of the lands from state taxation. *See United States v. Mitchell,* 445 U.S. 535, 540-44 (1980) (*"Mitchell I"*). It gave the Indian beneficiaries the right to possess and manage the lands except insofar as alienation was involved. *Id. at 542-46.   See also United States v. Navajo Nation,* 537 U.S. 488, 504 (2003) (describing *Mitchell I* and applying its principles to certain unallotted lands).   Accordingly, the Supreme Court held in *Mitchell I* that the Dawes Act did not, alone, establish a fiduciary duty on the part of the United States to manage the allotted lands. 445 U.S. at 544, 546. In contrast, the IIM funds are by statute under the full control of the United States, to be invested for the benefit of individual Indians in public debt of the United States or deposited in banks.

-40-

distribution scheme ignores direct payments to Indians by lessees and the like that did not flow

through the IIM system and were thus not susceptible to mishandling or loss at the government's

hand.)  The formula assigns a relative share of proceeds to each class member based on a

fraction.  The numerator is the highest ten years of receipts deposited into a class member's IIM

account(s), from 1985 to 2009, which corresponds to the class membership period.  Accounts

that were not open or did not have activity for at least ten years will have a zero for the periods

when the account was inactive or not open.  The denominator is the sum of these values for all

participating members of the class.  The product of this fraction and the funds available for

distribution results in the enhanced payment amount for each class member.

The agreed-upon use of this formula slightly and reasonably favors those who had large

amounts of money in the IIM system for many years.  The National Conference of American

Indians (NCAI) expresses concern that new account holders will receive relatively smaller

awards, because those who have had accounts for fewer than ten years will have a smaller

relative share due to use of "zero" value years in calculating their numerator.[162]  This distinction

is deliberate, however, in order to assure that those who had money in the IIM system for only a

few years do not receive a windfall compared to those for whom the government has managed

money for ten years or more.  The same logic extends to the distribution methodology overall: it

is reasonable to expect that those who had more money at stake in the IIM system had more at

risk and thus were more likely to suffer larger losses due to any alleged mismanagement.

Conversely, those who historically received only a few dollars a year in their IIM accounts had

---

(Parallel citations and parentheticals omitted.)

[162]  NCAI letter at 1-2 [Dkt 3746 at 267-68].

less at risk.  Even so, the base payment assures that even these class members – despite little or no money in the system – receive a reasonable payment.

Although a few objectors criticize the use of IIM data to determine the distribution amounts, this Court has already recognized IIM throughput as the best available proxy for determining dollar values for restitution purposes.[163]  The data have equal utility in computing a fair settlement distribution.  Moreover, IIM data for this period have been extensively examined and tested for reliability by the Department of the Interior,[164] and have been subjected to thorough cross-examination by plaintiffs and consideration by this Court in two trials.[165]

In settlement, the distribution needs only to be fair and reasonable to class members; it need not correspond exactly to what would result from a damages trial.[166]  Indeed, generalized methods that are often unacceptable for use in proving damages at trial can nevertheless serve as

---

[163]  *Cobell XXI,* 569 F. Supp. 2d at 252.

[164]  Herman Decl. ¶¶ 7-28.

[165]  *Cobell XXI,* 569 F. Supp. 2d at 231-32, 234-36; *Cobell XX*, 532 F. Supp. 2d at 61-69.

[166]  *In re Lorazepam & Clorazepate Antitrust Litigation,* 205 F.R.D. 369, 381 (D.D.C. 2002).  *In re Holocaust Victim Assets Litigation,* 105 F. Supp. 2d 139, 148 (E.D.N.Y. 2000), is also instructive.  Faced with disparate claims and aging class claims, the court approved the settlement, stating:

> I note that the adequacy and reasonableness of the settlement must be measured against the practical alternative to the settlement in the real world.  The alternative to this settlement was prolonged, complex and difficult litigation, in which plaintiffs' chance of success as a class was uncertain. . .  Because of the passage of time, the destruction of records, and the death of most of the percipient witnesses, the potential amount of damages plaintiffs might have recovered, even if they had been able to prevail in litigation, would have been extremely difficult to calculate with precision.

a reasonable settlement device.[167]  As the district court noted in *Vista Health Plan,* "if the

objector believed that it had indeed suffered damages nothing prevented the objector from

opting-out and bringing its own lawsuit against Defendants. . . ."[168]  In this regard, the few

objections to the settlement formula and the low percentage of opt-outs lend support to a

conclusion that the proposed terms are fair and reasonable.[169]

### III.   The Court Should Give Great Weight to Objections Opposing Excessive Attorney Fees Or Incentive Awards

For the reasons set forth in Defendants' Response and Objections to Plaintiffs' Petition

for Class Counsel Fees, Expenses and Costs Through Settlement (Feb. 24, 2011) [Dkt. 3694] and

Defendants' Objections to Class Representatives' Petition For Incentive Awards and Expenses

(Feb. 24, 2011) [Dkt. 3697], which are incorporated by reference, the court should give great

weight to class members' opposition to the amount of attorney fees, costs, expenses, and

incentive awards that plaintiffs seek to extract from the settlement fund.  Defendants have

demonstrated that the attorney fees, costs, and expenses should be $50 million and that the

incentive award should not exceed $1 million, no matter how those funds are divided among the

recipients.  The presence of substantial objections by members of the class to class counsel's fee

---

[167]  For example, although the Second Circuit rejected use of damage models based on a fluid recovery formula as offending the defendant's due process right, *McLaughlin v. American Tobacco Co.,* 522 F.3d 215, 231-32 (2d Cir. 2008), it has long permitted such use in the context of a settlement agreement, *West Virginia. v. Chas. Pfizer & Co.,* 440 F.2d 1079 (2d Cir. 1971).

[168]  *Vista Healthplan,* 246 F.R.D. at 362 (D.D.C. 2007) (quoting the class plaintiffs' brief).

[169]  *See Thomas v. Albright,* 139 F.3d at 232 (approving settlement class despite objections by 15 percent of the class).

request is one factor the Court must consider in determining the appropriate award.[170]  Here, the

most frequent and vigorous objection of class members is to counsel's fee request.

## IV.   Certain Objectors Lack Standing To Make Their Arguments

As demonstrated below, only members of a certified class have standing to object to the

terms of a proposed settlement.  Two categories of objectors lack standing, in whole or in part.

The first includes persons or groups who are not members of either class.  The second consists of

putative class members who have elected to exclude themselves from participation in the Trust

Administration Class but seek to object to matters affecting only that class.  Both categories are

addressed below.

### A.    HIFF Lacks Standing to Object or Participate at the Fairness Hearing[171]

On behalf of several individuals, the Harvest Institute Freedmen Federation, LLC (HIFF)

asserts objections and class membership claims relating to descendants of former slaves of Indian

tribes.  HIFF also filed a motion to intervene,[172] which Defendants have opposed.[173]  For the

reasons stated in defendants' opposition to that motion, which is incorporated by reference, none

---

[170]   *In re Baan Co. Sec. Litig.*, 288 F. Supp. 2d. 14, 17 (D.D.C. 2003) (citing *In re Lorazepam & Clorazepate Antitrust Litig.* (*Lorazepam II*), Dkt. Nos. MDL 1290 (TFH), 99MS276 (TFH), Civ. 99-0790 (TFH), 2003 WL 22037741 (D.D.C. June 16, 2003) at *7); *see In re Vitamins Antitrust Litig.* No. 99-197, MDL No. 1285, 2001 WL 856290 (D.D.C. July 16, 2001) (same).

[171]   The discussion focuses on HIFF due to its request to intervene, but comments submitted by tribes, such as the Quapaw, and well-intentioned public interest organizations, such as the NCAI, face a similar problem.  The NCAI is not itself a class member nor an intervenor, so its letter to the Court is more akin to an amicus brief and does not have the same legal standing as a class member's objection.  *See* NCAI letter [Dkt. 3746 at 184-209, 267-69].

[172]   Dkt. 3684.

[173]   Defendants' Opposition to Harvest Institute Freedmen's Motion to Intervene (Feb. 15, 2011) [Dkt. 3690] (Def'ts' HIFF Br.)

of these individuals is a member of the classes.  HIFF complains that the government deprived its members of allotments of trust land and consequently denied them Individual Indian Money (IIM) accounts.  Because class membership requires ownership of either an IIM account or an interest in allotted trust land, which HIFF concedes is lacking, the very premise of HIFF's grievance demonstrates its members' ineligibility for class participation.  HIFF seeks redress because the government allegedly failed to enforce treaties, whereas the settlement here will resolve accounting claims related to IIM accounts and allegations of asset mismanagement by the Department of the Interior.  Lacking common questions of law and fact, HIFF has no standing to object to the settlement or to participate in the fairness hearing.

Under the D.C. Circuit's holding in *In re Vitamins Antitrust Class Actions*,[174] not only is HIFF not "arguably within the zone of interests to be protected or regulated by the" *Cobell* settlement,[175] but its interests are not even "sufficiently congruent with those of the intended beneficiaries . . . ."[176]  Lacking the basic prerequisite of an IIM account or a demonstrable interest in trust land, HIFF and its members have no commonality whatsoever with *Cobell* class members.  Nor can HIFF demonstrate any prejudice from the *Cobell* settlement.[177]  With no common questions of law or fact, the *Cobell* settlement will not bar HIFF from seeking redress

---

[174]  215 F.3d 26 (D.C. Cir. 2000) (*Vitamins I*).

[175]  *Id.* at 29 (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).

[176]  *Id.* (quoting *Mova Pharmaceutical Corps. v. Shalala,* 140 F.3d 1060, 1075 (D.C. Cir. 1998)).

[177]  *See Mayfield v. Barr*, 985 F.2d at 1093.

elsewhere.  Indeed, HIFF already has sought redress – albeit unsuccessfully – in three other actions.[178]  For all these reasons, HIFF's asserted objections should not be considered.

B.      Those Who Opted Out of the Trust Administration Class Have Limited Standing

Individuals who have opted out of the Trust Administration Class "have no interest in the specifics of the settlement" that concern only the Trust Administration Class and, therefore, lack standing to challenge them.[179]  This rule "rests on the principle that those who fully preserve their legal rights cannot challenge an order approving an agreement resolving the legal rights of others."[180]

Because they lack standing, individuals who opted out of the Trust Administration Class cannot be heard to object, for example, that (1) notice was insufficient;[181] (2) the opt-out fund adjustment is unacceptable;[182] (3) certification of the Trust Administration Class is not possible under Rule 23;[183] or (4) those who opt out should still be able to object to the Trust

---

[178]  *Harvest Institute Freedmen Federation v. United States*, 80 Fed. Cl. 197, 198 (2008), *aff'd*, 324 F. App'x 923 (Fed. Cir. 2009), *cert. denied*, 130 S. Ct. 1147 (2010); *Harvest Institute Freedmen Federation, LLC v. United States*, No. 2:10-CV-1131 (S.D. Ohio Jan. 31, 2011) (notice of appeal filed); *Harvest Institute Freedmen Federation, LLC, et al. v. United States*, No. 2:10-CV-449 (S.D. Ohio May 25, 2010).  Moreover, the doctrines of collateral estoppel and res judicata bar HIFF from obtaining intervention in order to re-litigate issues and claims already rejected by other courts.  *See* Def'ts' HIFF Br. at 4-5.

[179]  *Vitamins I*, 215 F.3d at 29; *Mayfield*, 985 F.2d at 1902.

[180]  *Vitamins I*, 215 F.3d at 29 (quoting *Mayfield*, 985 F.2d at 1093).

[181]  *E.g.*, Roland objection at 2 [Dkt. 3746 at 156]; Sayers objection at 1 [Dkt. 3746 at 224].

[182]  *See, e.g.,* Marlys R. Whiteagle objection at 3 [Dkt. 3746 at 272].

[183]  *See, e.g.*, Carol Eve Good Bear objection at 1-3 [Dkt. 3746 at 105-07].

Administration Class settlement.[184]  Because these objections concern only the Trust

Administration Class but come from individuals who have opted out of that class, the Court

should not entertain them.

**CONCLUSION**

For these reasons, the Court should grant final approval to the settlement of this case and

reject the objections addressed above.


Dated: May 16, 2011                                    Respectfully submitted,

                                                       TONY WEST
                                                       Assistant Attorney General

                                                       MICHAEL F. HERTZ
                                                       Deputy Assistant Attorney General

                                                       J. CHRISTOPHER KOHN
                                                       Director

                                                       _/s/ Robert E. Kirschman, Jr._____
                                                       ROBERT E. KIRSCHMAN, JR.
                                                       Deputy Director
                                                       (D.C. Bar No. 406635)
                                                       JOHN T. STEMPLEWICZ
                                                       Special Litigation Counsel
                                                       MICHAEL J. QUINN
                                                       Trial Attorney
                                                       Commercial Litigation Branch
                                                       Civil Division
                                                       P.O. Box 875, Ben Franklin Station
                                                       Washington, D.C. 20044-0875
                                                       Telephone: (202) 616-0328

---

[184] *See, e.g.,* Monette objection at 2 [Dkt. 3746 at 211] (Although Professor Monette has opted out of the class and thus lacks standing to object on his own behalf, he claims to assert this objection on behalf of relatives who remain in the class. *See* Monette objection at 1).

-47-

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 16, 2011, the foregoing *Defendants' Memorandum in Support of Final Approval of Settlement and Response to Objections* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile:

> Earl Old Person (*Pro se*)
> Blackfeet Tribe
> P.O. Box 850
> Browning, MT 59417
> Fax (406) 338-7530

> */s/ Robert E. Kirschman, Jr.*
> ROBERT E. KIRSCHMAN, JR.

-48-