**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| **ELOUISE PEPION COBELL, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **No. 1:96CV01285(TFH)** |
| ) | |
| **KEN SALAZAR, Secretary of** ) | |
| **the Interior, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

### PLAINTIFFS' OPPOSITION TO NARF'S PETITION
### AND MOTION FOR ATTORNEYS' FEES AND COSTS

Plaintiffs oppose both the petition and motion by the Native American Rights Fund ("NARF") for attorneys' fees and costs. NARF's petition for fees is attached to its motion to intervene. [Dkt. No. 3714.] Prior to the Court granting permissive intervention on May 12, 2011, NARF separately filed an almost identical motion for fees. [Dkt. No. 3752.] Plaintiffs set forth their opposition to both of NARF's pleadings here, the first of which violates local rules.

### INTRODUCTION

The Native American Rights Fund has no right to recover fees from the common fund created for plaintiffs. The terms of its engagement at the commencement of this litigation in 1996 are plain and unequivocal. It would be paid for its work on an hourly basis from funds contributed by foundations and others for purposes of the litigation.[1] In its representations to Congress, the media, and, most importantly, to its clients in this litigation, it disavowed any

_____

[1] *See* Ex. 1, Engagement Letter between Elouise Cobell and NARF dated May 20, 1996 ("Engagement Letter") at 2.

1

intent to seek fees at the conclusion of this case from plaintiffs' recovery.[2]   Accordingly, it never executed a contingent fee agreement as mandated by governing rules.[3]   The failure to execute a written contingent fee agreement is not an inadvertent oversight.  To the contrary, consistent with its Engagement Letter, funds were solicited, which were used to pay for its services during the *Cobell* litigation.[4]

Then, in late 2006, NARF abandoned this litigation, choosing instead to represent tribes in separate actions to enforce trust duties the United States owes to tribes pursuant to treaties, statutory authority, and common law that do not govern the Individual Indian Trust.  There exist serious potential and actual conflicts in representing both tribes and individual Indians in trust litigation.[5]   NARF has never denied those conflicts,[6] nor can it.  When presented with those conflicts, it did nothing to address the issues, elected to represent the tribes, and discontinued its work on this case.  Notably, if, in fact, NARF contemporaneously assessed the various conflicts identified by Class Counsel, it has never provided that assessment to plaintiffs notwithstanding

---

[2] *See* Ex. 2, Aff. of Elouise Pepion Cobell ("Cobell Aff.") ¶¶ 17, 23-25, 27; Ex. 3, Aff. of Robert Peregoy ("Peregoy Aff.") ¶ 19; Ex. 4, Aff. of Dennis M. Gingold dated Apr. 15, 2011 ("Gingold Aff.") ¶¶ 34, 38; *see also* Ex. 5 (Congressional Testimony of John Echohawk, Executive Director, Native American Rights Fund, dated June 18, 1996 ("Echohawk Cong. Test.") at 30; Ex. 6, *The BIA Banker Trust is Hard When Billions Disappear*, Cherokee Observer, Feb. 28, 2003, at 9-10; Ex. 7, NARF 2005 Annual Report at 5 (NARF is not supported by fees from clients).

[3] *See* Cobell Aff. ¶¶ 18, 29-30; Peregoy Aff. ¶ 20; Gingold Aff. ¶¶ 35-38; *see also* D.C. Rules of Prof'l Conduct R. 1.5(c) (2007) (providing in part that a "contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer"); *id.* cmt. 8 (stating that "[t]his writing must explain the method by which the fee is to be computed").

[4] *See* Cobell Aff. ¶¶ 19-21; Peregoy Aff. ¶¶ 16-17; Gingold Aff. ¶¶ 38, 63, 65.

[5] *See infra* pp. 9-12; *see also* Cobell Aff. ¶¶ 33, 36, 40-46, 53, 55; Peregoy Aff. ¶¶ 22-26; Gingold Aff. ¶¶ 42, 44-45.

[6] Beginning in 2007, NARF acknowledged on its website that its representation of tribes in tribal trust litigation required that it cease work on this litigation.  *See infra* pp. 13-14; *see also* Cobell Aff. ¶ 55; Gingold Aff. ¶¶ 42, 45-46.

US2008 2613537.1

that it is advisable to do so under D.C. Bar Rules.[7]   Nor has NARF provided any such assessment to this Court.   Further, NARF never discussed with the Class Representatives its decision to serve as counsel for scores of tribes in trust fund litigation in advance of undertaking those conflicting representations.   Nor did it consult with them prior to stopping work on this case and reallocating its resources to represent tribes.

For the last five years, NARF did not attend hearings, conferences, or other proceedings in this case and has abandoned the case.[8]   Though NARF's own website acknowledged that it was no longer working on the *Cobell* case, NARF now contends that it continued to do so and even made two appearances at status conferences in 2008.[9]   However, the official transcripts from both status conferences show that NARF made no such appearance.[10]   Perhaps Mr. Echohawk observed from the gallery, but that is a far cry from making an appearance by representing the plaintiffs in these proceedings and seeking to further their cause.   Such observations do not constitute an appearance.   Nor could they, given the conflicts of interest that arose out of NARF's tangled representations.

---

[7] *See infra* pp. 22-25; D.C. Rules of Prof'l Conduct R. 1.7(b) & cmts. 7, 27-28.

[8] *See* Cobell Aff. ¶¶ 57-59; Gingold Aff. ¶ 55; *see also* D.D.C. Loc. R. 83.2(i) (2010) (authorizing the court to strike an attorney's appearance for failure, without adequate cause, to attend hearings, conferences and other proceedings).   However, curiously, NARF now contends that it had "continued to work on the Cobell case, although in a reduced capacity, and it continued to serve as Class Counsel at this time."   NARF's Motion for Attorneys' Fees and Costs ("NARF Mot.") dated May 9, 2011 [Dkt. No. 3752] at 5.]   NARF however, is silent with respect to what precisely it did these last five years—its records reflect a paltry 14.3 hours after 2006-2007.   Those hours related to: "DAVID G RE STATUS OF CONFLICTS CHECK W TRIBAL CLIENTS" (10/30/07), "M MCCOY RE PLAN TO MT W DENNIS G RE CONFLICTS" (2/14/08), and, "M MCCOY RE DRAFT CONFLICT LETTER" (2/28/08). [Dkt. No. 3714-8 at 8].

[9] *See* [Dkt No. 3739 at 9] (where NARF contends that it made appearances at status conferences on March 5 and April 28, 2008).

[10] *See* Exhibit 8 at 1 and Exhibit 9 at 1 (March 5, 2008 and April 28, 2008 transcripts reflecting Class Counsel making an appearance).

US2008 2613537.1

NARF played no role in the five months of contentious negotiations that culminated in the December 7, 2009 Settlement Agreement. Nor did it assist in the year-long effort undertaken to obtain Congressional approval of the settlement in the most difficult legislative environment in a generation. Further, because of NARF's conflicts of interest and cessation of work, it is not, and cannot be construed as, Class Counsel[11] as that term is defined in the Settlement Agreement that this Court approved preliminarily on December 21, 2010, following ratification by Congress and approval of the President.[12]

Nonetheless, fifteen years after NARF disclaimed any intent to seek fees from plaintiffs' recovery, five years after it unilaterally created actual conflicts of interest and stopped representing individual Indians in favor of its tribal clients, and over one year after the Settlement Agreement was executed, NARF now seeks contingent fees and expenses to be paid out of plaintiffs' recovery. There is no authority in this Circuit that supports such an award under these circumstances. NARF has no entitlement to an award from plaintiffs' recovery where, as here, it expressly disavowed such an award at the inception of this litigation, has already been compensated, and did not purport to repudiate its no-contingent-fee disavowal until now. Nor is NARF entitled to a fee where, as here, it unilaterally abandoned its representation of its clients without justification and to their prejudice.

Moreover, even assuming NARF had a right at this stage in the litigation to seek fees and expenses, which it does not, it has ignored this Court's orders and, thereby, has disqualified itself from seeking such fees here. First, its request for fees is untimely. This Court mandated that any

---

[11] NARF has not filed a notice of withdrawal, or a motion to withdraw, as co-counsel in this litigation. As a result, NARF attorneys remain on the electronic filing system and have received timely notice of all filings by the parties as well as orders entered by this Court.

[12] *See generally* Claims Resolution Act of 2010, Pub. L. No. 111-291.

US2008 2613537.1

petition for attorneys' fees and expenses be filed by January 20, 2011.[13]  Ignoring this Court's order, NARF inexplicably delayed over two months in providing notice of its fee request, filing a motion to intervene on March 28, 2011.[14]

Secondly, its delay unfairly prejudices the plaintiff classes.  While citing no authority for its motion, NARF may only claim fees under Fed. R. Civ. P. 23(h), providing that the "court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  However, class members have a right to object to NARF's petition.  *Id.* at 23(h)(2).  On December 21, 2010, this Court ordered that notice of the Settlement be provided to Class Members, which notice informed the Classes of Plaintiffs' request for fees and expenses.[15] As a result, Plaintiffs' Petition for fees and expenses has been subject to extensive scrutiny by Class Members.  NARF's delay in filing its fee request has made it impossible for the Classes to receive proper notice of, and comment on, the more than $8.1 million in fees NARF now seeks, as required by the federal rules.  If NARF intended to intervene, it should have done so no later than the date this Court ordered Preliminary Approval of the Settlement Agreement and put the parties on a path to fulfill the court-ordered notice process, December 21, 2010.[16]

Finally, NARF's Motion is unreasonable, being unfair to both Class Members and Class Counsel who have worked diligently on this case through resolution.  NARF disregards the

---

[13]  *See* Order on Joint Motion for Preliminary Approval of Settlement Agreement dated December 21, 2010 [Dkt. No. 3667] ("Order on Preliminary Approval") ¶ 4.  Pursuant to this Court's Order of January 20, 2011, Plaintiffs were granted an extension of time to January 25, 2011 to file their Petition.

[14]  *See* Motion to Intervene by Native American Rights Fund ("Mot. to Intervene") [Dkt. No. 3714].

[15]  *See* Order on Preliminary Approval ¶ 9; Long Form Notice at p. 14, ¶ 33.

[16]  At this exceptionally late date, the failure to timely file a motion to intervene is fatal to their effort.  Having been an identified recipient on all ECF filings and fully apprised of the schedule of these proceedings at all times, they cannot now claim ignorance of their obligation to intervene if they believe they have an interest in the proceedings.

US2008 2613537.1

specific terms of its own Engagement Letter, including the hourly rates charged and source of payments; seeks recovery of a contingent fee, which it told its clients it would not; seeks to charge its clients at an hourly rate in excess of that which it agreed to charge (while seeking to reduce the compensation Class Counsel should fairly be awarded under controlling law); and ignores the fact that it has been paid for the work it agreed to perform.  Accordingly, NARF's motion should be denied.

## FACTUAL BACKGROUND

### The Hiring of NARF

The landmark settlement in this case was achieved as a result of the persistent efforts of Class Counsel and Class Representatives over 15 years of contentious litigation.  NARF played no role in this case's ultimate results.

The work on behalf of individual Indians in seeking an accounting of the IIM Trust and reform of the trust system began well in advance of the filing of this case.  Elouise Cobell was actively involved in Indian trust issues and worked closely with members of Congress in passing the Trust Reform Act of 1994.[17]   In 1995, after defendants failed to respond to Congress' mandate to reform and rehabilitate their broken trust management systems and provide an accounting of all trust income and assets to individual Indians, Dennis Gingold and Thaddeus Holt, in conjunction with Professor Henry Monaghan, the Harlan Fiske Stone Professor of Constitutional Law at Columbia Law School, developed a strategy for the enforcement of trust duties in the United States District Court and drafted the complaint.[18]   Previously, most litigation for breach of trust on behalf of Indians against the Department of Interior had taken place in the United States Court of Federal Claims.  Mr. Gingold and Mr. Holt envisioned and implemented

---

[17] *See* Cobell Aff.¶ 2; *see also* Gingold Aff. ¶¶ 2-13.
[18] Gingold Aff. ¶¶ 15-19, 22; Cobell Aff. ¶¶ 10, 13; Peregoy Aff. ¶ 8.

US2008 2613537.1

the novel strategy of framing this action as one in equity to be filed in District Court, which strategy ultimately lead to its successful resolution.  NARF reviewed and commented on these pre-litigation efforts.[19]   It would be erroneous to conclude, however, that NARF was instrumental in the pre-litigation efforts.[20]

It was during an initial visit to the Ford Foundation that NARF was first brought to the attention of Ms. Cobell.  Ford suggested adding NARF to the litigation team given its perceived knowledge of Indian law and its prior litigation on behalf of tribes.[21]   There already existed an Indian law specialist on the litigation team.[22]   However, NARF was added to that team to provide additional support for Mr. Gingold and Mr. Holt.[23]   NARF initially limited its role to that of "Of Counsel," principally providing advice on Indian law issues, addressing political matters, and assisting in outreach to Indian Country and the public.[24]   NARF had no experience with complex litigation involving trust or financial matters in federal district court.[25]

On May 20, 1996, NARF entered into an engagement letter with Ms. Cobell.  The terms of its engagement were clear.  It was to be paid for its work at rates ranging from $25 to $150 per

---

[19] Cobell Aff. ¶ 10; Peregoy Aff. ¶ 8.

[20] NARF's contributions have been exaggerated in its papers.  Consider that NARF argued one of the ten interlocutory appeals, did not make any opening or closing arguments for any trial and its participation in the trials and hearings on the merits was substantively insignificant.  During those trials or hearings, NARF took 1 of the 7 witnesses during this Court's November 1998 evidentiary hearing.  During Trial 1.0, NARF took 5 witnesses (over approximately 5 days) over a 30 day trial.  Trial 1.5 occurred during the summer of 2003.  This 44 day trial resulted in the examination of 19 witnesses.  NARF examined 5 witnesses (over approximately 11.5 days) out of the 44 day trial.  And, in the Information Technology Security Trial, NARF examined three witnesses over the course of 6 days in a 59 day trial.  In all, during the time it worked on the case, NARF collectively examined witnesses on no more than 22.5 days out of 133 trial days—17% of total trial days.

[21] Cobell Aff. ¶ 5.

[22] *Id.* ¶ 7; Peregoy Aff. ¶¶ 6-7.

[23] Cobell Aff. ¶¶ 7-8; Peregoy Aff. ¶ 7.

[24] Cobell Aff. ¶¶ 13-16; Peregoy Aff. ¶¶ 10, 12-14.

[25] Cobell Aff. ¶¶ 3, 5, 10-11; Peregoy Aff. ¶ 9.

7

hour, adjusted annually, "from the funds specifically contributed to the [Blackfeet Reservation Development Fund] by foundations and others through grants or program-related investments made exclusively for purposes of the [IIM Trust Correction and Recovery] Project."[26]   Ms. Cobell repeatedly inquired of Mr. Echohawk whether NARF would take this matter on a contingent fee basis.[27]   He refused, stating that he expected NARF to be paid currently out of contributions from foundations and others.[28]   According to Mr. Echohawk, he had been advised by outside counsel that contingent fees would jeopardize NARF's tax-exempt status.[29] Accordingly, no contingent fee agreement was entered into with NARF and Mr. Echohawk publicly disclaimed any intent to seek a contingent fee, including in statements to Congress.[30] He expressly agreed that plaintiffs had no obligation to pay NARF for its time and charges, and no request for payment would be made out of any recovery obtained.[31]

**Fundraising Activity by NARF**

Upon execution of the Engagement Letter, NARF began aggressively fundraising, representing to prospective donors that the money would fund the *Cobell* litigation.   NARF requested that donors make donations to NARF generally, even though donors specifically requested that their funds be used solely for the *Cobell* litigation.[32]   NARF's motion does not explain how donations made solely for the purpose of supporting this litigation were identified and segregated from funds that otherwise had been donated generally to NARF to underwrite its business operations and litigation on behalf of tribes.   Nor could NARF's former lead trial

---

[26] *See supra* note 1.
[27] *See* Cobell Aff. ¶¶ 23-25, 27.
[28] *Id.* ¶¶ 23-24.
[29] *Id.* ¶ 27; Gingold Aff. ¶ 38.
[30] *See* Cobell Aff. ¶¶ 18, 29-30; Peregoy Aff. ¶ 20; Gingold Aff. ¶¶ 34, 36-37; *see also supra* note 2.
[31] Cobell Aff. ¶¶ 23-24; Peregoy Aff. ¶ 17; Gingold Aff. ¶¶ 34-35.
[32] Cobell Aff. ¶¶ 19-21*;* Peregoy Aff. ¶ 18; Gingold Aff. ¶ 63.

US2008 2613537.1

counsel provide an explanation.[33]   So extensive were NARF's fundraising efforts, that Ms. Cobell found it difficult to raise money for the litigation, finding that donors had already contributed funds to NARF to support its work in these proceedings.[34]   Because of NARF's extensive fundraising efforts, Ms. Cobell was unable to pay the lead attorneys (*i.e.*, Gingold, Holt) on a current basis, resulting in their agreement to proceed on a contingent fee basis.[35]

## NARF Creates Conflict of Interest Issues and Ceases Work on *Cobell*

Prior to engaging NARF, Ms. Cobell discussed with Mr. Echohawk potential conflicts of interest with NARF's representation of tribes.  Properly, Mr. Echohawk provided assurance that NARF would avoid additional potential and any actual conflicts.[36]   Consistent with that understanding, NARF initially stated publicly it was not representing the interests of tribes in trust fund litigation.  According to Mr. Echohawk, the Inter-Tribal Monitoring Association ("ITMA") was protecting tribal interests.[37]

However, without discussing potential or actual conflicts with Class Representatives,[38] in 2006 NARF began representing over two hundred tribes in trust fund litigation against the United States, in a class action entitled *Nez Perce Tribe v. Kempthorne*, 1:06-CV-2239-TFH

---

[33] Gingold Aff. ¶¶ 63-64.

[34] *Id.* ¶ 65; Cobell Aff. ¶¶ 19-20.

[35] Cobell Aff. ¶¶ 20, 22, 26.

[36] *Id.* ¶ 36; Peregoy Aff. ¶ 21.

[37] *See* Ex. 10, NARF website dated Aug. 16, 2000, at 2.

[38] Though NARF claims that Keith Harper encouraged it to file the tribal trust cases, *see* Declaration of John E. Echohawk [Dkt. No. 3714-1] ("Echohawk Decl.") ¶ 21, this is categorically false. NARF's claim is nonsense since such representation of tribes provides no benefit to *Cobell* Class Members. *See* Ex. 11, Aff. of Keith Michael Harper, dated May 26, 2011 ¶ 3. Further, Mr. Harper never suggested that NARF could or should ignore its ethical obligations, *i.e.,* actual conflicts and clear potential conflicts that necessarily would arise. Statements to that effect are patently untrue. *Id.* at ¶ 2. Indeed, only after NARF filed its tribal trust law actions did Mr. Echohawk raise the conflicts issues with Mr. Harper.  However, at that time, not only did Mr. Harper decline to consent, he explicitly advised Mr. Echohawk that he must discuss those issues with Ms. Cobell and Mr. Gingold. *Id.*  Finally, no party may consent to actual conflicts.

9

(D.D.C.).[39]   That NARF's representation of the *Nez Perce* class was in conflict with its representation of individual Indians in the *Cobell* litigation is undeniable.

First, through legislation later held to be unconstitutional, interests in trust land belonging to individual Indians unlawfully had escheated to tribes.  *See generally*, *Hodel v. Irving*, 481 U.S. 704 (1987); *Babbitt v. Youpee*, 519 U.S. 234 (1997).  Despite repeated holdings of the Supreme Court as to the unconstitutionality of such escheatment, by the year 2000 over 775,000 fractionated interests in trust land to which individual Indians were entitled—as well as income generated therefrom—remained unlawfully in the possession and control of tribes.[40]   This unconstitutional taking affected almost every tribe with individual Indian trust lands.  NARF cannot dispute that the taking and continued holding of those individual Indian interests in lands and the revenue generated from those lands does not constitute an actual conflict of interest.

The historical accounting at all times sought in this litigation included those interests and the income generated therefrom.  *Cobell v. Norton*, 283 F. Supp. 2d 66, 183 (D.D.C. 2003) ("*Cobell X*"), *vacated in part on other grounds*, 392 F.3d 461 (D.C. Cir. 2004) ("[T]he Court concludes that Interior must include within its historical accounting project all interests that escheated pursuant to ILCA and that reverted back to IIM beneficiaries during the historical accounting process.").  Further, plaintiffs sought restitution of the land and all proceeds from such lands, whether held or withheld by the government or whether misappropriated by tribes. *Id*. ("Additionally, all interests that escheated pursuant to ILCA and that reverted back to IIM beneficiaries after the historical accounting process is completed must be accounted for in subsequent accounting reports to those beneficiaries.").

---

[39] Cobell Aff. ¶¶ 49-51.
[40] *Id*. ¶ 45.

US2008 2613537.1

Second, over 100 tribes have been delegated responsibility for administering individual Indian trust assets, as agents for the Department of Interior, under contracts, compacts and cooperative agreements.[41]   Notwithstanding that the government's trust duties are not diminished by the contracting and compacting of delegable fiduciary duties, and notwithstanding that contracting and compacting tribes are agents of the trustee-delegates vis-a-vis the IIM Trust, no such trust accounting has ever been produced.[42]   There is no doubt that such records created and maintained by compacting and contracting tribes are IIM Trust assets that are critical to an adequate historical accounting.  *See id.* at 181 ("historical accounting must include an accounting of IIM accounts whose assets are administered or managed by Tribes pursuant to contract, compact, or other form of agreement.").[43]

Third, tribes have custody and control of plaintiffs' accounting records for various reasons.  Following escheatment of IIM trust land, records are transferred to the tribe of the jurisdiction that identifies each of the fractionated individual Indian trust interests and

---

[41] Cobell Aff. ¶ 40; Peregoy Aff. ¶ 22; *see also Cobell X*, 283 F. Supp. 2d at 180 ("The Indian Self-Determination Act and Education Assistance Act of 1975, Pub. L. No. 93-638, 88 Stat. 2203, 25 U.S.C. § 450, as amended, 'creates a mechanism for the transfer to Indian tribes of programs previously carried out by the Bureau of Indian Affairs . . . or by other agencies within the Department of the Interior.'").

[42] As this Court has found, "the fact that a tribe takes over federal duties by entering into one or more contracts or a compacting program *does not extinguish the federal trust responsibility.*" *Cobell X*, 283 F. Supp. 2d. at 180 (emphasis added) (citation omitted).  "Interior's Office of the Solicitor has acknowledged that the 1994 Act unequivocally requires the Secretary to account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian . . . .  Nothing in the [1994] Act suggests that this mandate would be waived if the records relating to that trust responsibility were generated in the context of an Indian self-determination contract or compact program, or if the records were simply being held by a tribe." *Id.* at 182 (footnote and internal quotation marks omitted).

[43] Indeed, the Confederated Salish & Kootenai Tribes (Flathead) are included in *Nez Perce Tribe v. Kempthorne*.   *See* Ex. 12 (also found on NARF's tribal trust fund website at http://www.tribaltrust.com and click on "Tribes").   NARF cannot dispute that its representation of the Confederated Salish & Kootenai Tribes constitutes an actual conflict of interest inasmuch as they are one of three tribes that manage individual Indian trust lands.  *See* Ex. 13, Trial I Tr. 1376:21-1377:6 (Acting Special Trustee, Donna Erwin).

11

corresponding trust income that they have taken unlawfully and in breach of trust.[44]   Another

reason that confidential IIM Trust records are in the possession of tribes relates to the tribal

management of programs that relate to IIM Trust lands.  Individual Indians have not consented to

tribal administration of their trust lands or funds, yet those accounting records, which are IIM

Trust assets, are in the possession and control of the tribes.[45]   Interior has little control over

individual Indian trust records in the tribes' possession.[46]

Fourth, trust income to which individual Indians are entitled properly has been deposited

into tribal accounts, not the IIM account of the individual Indian to whom it belongs.[47]

Accordingly class members in the *Cobell* litigation have claims to funds and vested property

rights in tribal accounts.

Finally, during settlement negotiations prior to 2009, the government invariably sought to

resolve both individual and tribal trust claims, resulting in a direct conflict over the division of

settlement proceeds.[48]

---

[44] Cobell Aff. ¶¶ 43-45; Peregoy Aff. ¶¶ 24-26; Gingold Aff. ¶ 42; Ex. 14, Aff. of Geoffrey Rempel ("Rempel Aff.") ¶¶ 4-5.

[45] Cobell Aff. ¶ 40-41; Peregoy Aff. ¶ 23.

[46] Prior to contracting with the Department of the Interior, the Office of the Special Trustee undertook a review of documentation at the Confederated Salish & Kootenai Tribes (Flathead). Again, Flathead is a member of NARF's tribal trust fund litigation:   *Nez Perce Tribe v. Kempthorne*.  Upon review by the Department of the Interior, there were unfiled documents, documents that were out of date, and documents that were in such disarray that the situation "could no longer be overlooked" by the Interior Department.  *See generally*, Ex. 15, Trial 1 Tr. 1563:22-1566:23 (Erwin).  A follow up review revealed that the "situation is much worse than anyone anticipated.  Filing hasn't been done in 2 years, 16,000 folders in active status, only 4,600 accounts."  *Id*. at 1571:16-20.

[47] Tribes also maintain commingled accounts in the IIM Trust, making it difficult to determine the amount of individual Indian trust funds.  *See Cobell v. Kempthorne*, 532 F. Supp. 2d 37, 84 (D.D.C. 2008) ("*Cobell XX*"), *vacated on other grounds sub nom. Cobell v. Salazar*, 573 F.3d 808 (D.C. Cir. 2009).

[48] On March 29, 2007, Mr. Echohawk testified before the Senate Indian Affairs Committee on behalf of 15 tribal trust clients opposing legislation that would settle both tribal and individual trust claims.  *See* Ex. 16, NARF website dated June 21, 2007.

US2008 2613537.1

When confronted with NARF's representation of tribes in trust fund litigation, Mr. Echohawk admitted there existed conflicts.[49]  However, he never offered to withdraw from the tribal representation.[50]  Though he committed to address the conflicts, he never did and instead, by the end of 2006, NARF ceased its work on the *Cobell* litigation, provided no assistance with congressional matters, engaged in no outreach to Indian Country, and took no part in the extensive negotiations leading up to this settlement.[51]

Despite NARF's conflicting representation of tribal interests in trust fund litigation, Mr. Echohawk surprisingly insists that NARF "remained involved in the Cobell case as 'Of Counsel.'"[52]  However, his assertion does not square with his own representations and those of NARF, over the past five years.  By 2007, NARF had posted on its website that it was "assessing whether there are any issues of conflicts of interest that may arise in the Cobell trial with our tribal clients in the tribal trust funds case, *Nez Perce Tribe v. Kempthorne*."[53]  In 2008, approximately two years after NARF conflicted itself out of *Cobell,* NARF noted on its website that Mr. Echohawk hoped to resume his role as counsel in *Cobell* "following the completion of conflicts checks with our tribal clients" in *Nez Perce.*[54]  In its 2008 Annual Report, NARF reported that it had "not been active" in *Cobell* "pending conflicts of interest checks with [our] tribal clients" in the tribal trust fund case.[55]  In its 2009 Annual Report, NARF explained that it was "no longer involved" in *Cobell* and that its resources were shifted to its representation of

---

[49] Cobell Aff. ¶ 55.
[50] *Id.*
[51] *Id.* ¶¶ 57-59, 61.
[52] Echohawk Decl. ¶ 22.
[53] *See* Ex. 17, NARF website dated Dec. 14, 2007.  However, no such assessment has been provided to plaintiffs.
[54] *See* Ex. 18, NARF website dated June 30, 2008; *see also* Ex. 19, NARF website dated Nov. 26, 2008.
[55] *See* Ex. 20, NARF 2008 Annual Report at 29.

US2008 2613537.1

tribes in trust fund litigation.[56]   Its current website acknowledges that it had discontinued work

on the *Cobell* litigation in 2006, choosing instead to represent tribes in trust fund litigation.[57]

      Accordingly, there is no question that in 2006 NARF willfully and unilaterally undertook

a representation of tribal interests in trust fund litigation that is in actual and potential conflict

with interests of individual Indian beneficiaries in *Cobell*.  It did so without discussing it with the

Class Representatives, and certainly without their consent.  It then abandoned its representation

of class members in *Cobell* in favor of its tribal trust clients.

## I.     NARF IS NOT ENTITLED TO AN AWARD FROM THE COMMON FUND.

### A.     NARF had an express contract to perform work on an hourly basis.

      In its Motion, NARF invokes the equitable powers of this Court, claiming that principles

of equity justify that it be awarded a fee.[58]   In doing so, it relies on the doctrine of *quantum*

*meruit*, seeking to allegedly recover "compensation for the reasonable value of its services."[59]   A

party asserting a *quantum meruit* claim must demonstrate that the parties' conduct implied the

existence of a contractual relationship by establishing:  "(1) valuable services rendered by the

plaintiff, (2) for the person for whom recovery is sought; (3) which services were accepted and

enjoyed by that person, and (4) under circumstances which reasonably notified the person that

the plaintiff, in performing such services, expected to be paid."  *United States ex rel. Modern*

*Elec., Inc. v. Ideal Elec. Sec. Co.*, 81 F.3d 240, 246 (D.C. Cir.1996) (citation omitted); *see also*

*Plesha v. Ferguson*, 725 F. Supp. 2d 106, 111 (D.D.C. 2010).

---

[56] *See* Ex. 21, NARF 2009 Annual Report at 5-6, 9.
[57] *See* Ex. 22, NARF website dated Mar. 26, 2011.
[58] *See* NARF Mot. at 26 (claiming NARF is "equitably entitled to an award from the common fund").
[59] *Id*. at 3; *see also id.* at 6.

However, claims for *quantum meruit* are unavailable where, as here, there is an actual contract between the parties because there is no need to consider whether the parties' conduct implies a contractual relationship.  *See Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 104 (D.D.C. 2006); *Dale Denton Real Estate, Inc. v. Fitzgerald*, 635 A.2d 925, 928 (D.C. 1993) ("There is no need to resort to a quasi-contract claim based on quantum meruit if a true contract was in existence at the time the services were performed."); *see also Computer Reserves, Inc. v. Computer Network Corp.*, Civ. A. No. 86-1201, 1988 WL 15178, at *6 (D.D.C. Feb. 17, 1988) ("Quantum meruit, or quasi-contract, is available when there is no specific, express contract, either because there was no agreement or because the agreement fails . . . .").

On May 20, 1996, NARF entered into an express written agreement with Ms. Cobell whereby it would be paid for its work at rates ranging from $25 to $150 per hour, adjusted annually, "from the funds specifically contributed to the [Blackfeet Reservation Development Fund] by foundations and others through grants or program-related investments made exclusively for purposes of the [IIM Trust Correction and Recovery] Project."[60]   NARF specifically declined to enter into a contingent fee agreement, asserting that it would take no payment from plaintiffs' recovery but only from donated funds.  It then solicited substantial funds from foundations and others to pay for its attorneys' time and cover its expenses in this case.[61]   Having expressly agreed <u>not</u> to claim a contingent fee 15 years ago, it now may not invoke the equitable authority of this Court to obtain one.

---

[60] *See supra* note 1.

[61] Parenthetically, NARF now claims erroneously that it was the <u>plaintiffs</u> that "assert[] that NARF is not entitled to an award of attorneys' fee because NARF is not a for-profit firm."  [Dkt. No. 3752 at 5]. There is no citation to this argument.  Indeed, plaintiffs have never contended that NARF is not entitled to an award because it is not a for-profit firm.  NARF is confused.  Rather, it is <u>Mr. Echohawk</u>, not plaintiffs, who believed (again, erroneously), that NARF could

However, NARF relies on the following language in the engagement letter with Ms. Cobell to support its belated contingent fee claim: "Nothing will foreclose NARF from seeking reimbursement of fees not paid under this agreement from any other source."[62]   In context, however, that language does not stand for the proposition that NARF is entitled to a contingent fee under any circumstances.

First, NARF ignores the preceding sentence in the Engagement Letter: "[T]he payment of legal fees and related costs and expenses pursuant to this agreement will **only** be from the funds specifically contributed to the Fund by foundations and others through grants or program-related investments made exclusively for purposes of the Project."   *Id.* (emphasis added). Context is important.   The exclusive use of the word "only" makes clear that the source contemplated for payment of NARF's fees and expenses was "from the funds specifically contributed to the Fund by foundations and others through grants or program-related investments made exclusively for purposes of the Project."   *See id.*   The Engagement Letter cannot reasonably be read to justify NARF's collection of a fee both from funds donated for the benefit of the plaintiff classes and from the plaintiffs' themselves, whether through a claim against the Common Fund or otherwise.

Second, to the extent there is any uncertainty over NARF's entitlement to a contingent fee under the express terms of the Engagement Letter, of which there is none, it is settled by NARF's own public statements and representations to Class Counsel and Class Representatives. NARF consistently has opposed any contingent fee award in this case, arguing that Class

---

not take a contingent fee because by doing so it would put at risk NARF's not-for-profit tax status.  Echohawk Decl. at 2.

[62] *See supra* note 1.

Counsel should not request any contingent fee award, even when no funds are available to pay the attorneys.

On June 16, 1996, less than a month after execution of the Engagement Letter with Ms. Cobell, Mr. Echohawk testified that NARF "will not accept contingent fees" in *Cobell*.[63] Likewise, Mr. Echohawk insisted, as recently as 2003, that "neither NARF nor the accounting firm retained by it . . . would collect a contingency fee from this case. 'Fully 100 percent of the recovery in this class-action lawsuit will go to the individual Indians who lost and continue to lose their money daily at the hands of the federal government.'"[64] That NARF does not seek fees from its clients is confirmed by representations in its annual reports: "It is a common misunderstanding, that NARF is supported by fees from clients which is not the case at all. **NARF is a non-profit organization that survives financially on the donations and contributions** of philanthropic groups and on the generosity of Tribes, individuals and limited federal grants."[65] Parenthetically, it is unusual for any organization to claim "a common misunderstanding[] that [it] is supported by fees from clients," *id.*, at the same time it is requesting that this Court award it fees (over the objections of its clients) of almost $8.1 million—a hardly insignificant sum that exceeds collectively its public contributions for 2007, 2008 and 2009.

Moreover, NARF expressly represented to Ms. Cobell that no contingent fee would be sought in this case. Shortly after the filing of this litigation, Ms. Cobell ran into difficulties with funding.[66] In substantial part, those difficulties arose from NARF's practice of requesting that

---

[63] Echohawk Cong. Test. at 30
[64] *See* Ex. 6, Cherokee Observer, at 9-10.
[65] *See* Ex. 7, NARF 2005 Annual Report at 5 (emphasis added)*; see also* Ex. 23, NARF website dated Apr. 14, 2011 ("Our work depends solely upon the generosity of donors like you.").
[66] Cobell Aff. ¶¶ 19-21.

donations be made to the organization generally, rather than allocated specifically for the purpose of funding the litigation as many donors had expressly said they wanted.[67]   A general donation to NARF provided it the ability to re-assign those funds, however it saw fit.  In 1997, Ms. Cobell asked Messrs. Gingold and Holt first to discount and then to forego current payment of their fees in lieu of a contingent fee arrangement.[68]   However, Mr. Echohawk opposed repeatedly their contingent fee and noted that NARF would be paid currently out of contributions from foundations and other donors.[69]

In order to resolve this impasse, Ms. Cobell asked Mr. Echohawk and Mr. Peregoy (then-lead attorney for NARF) to meet with Mr. Gingold and her in Washington D.C.[70]   Mr. Echohawk repeated his opposition to any contingent fee arrangement.[71]   It was his belief that accepting a contingent fee would jeopardize NARF's tax-exempt status.[72]   Mr. Echohawk continued to oppose all contingent fees at all times thereafter, that is, until this Settlement was announced.

Finally, to the extent NARF truly intended its Engagement Letter to constitute a potential contingent fee agreement, it is defective and falls far short of the requisite standard in this Circuit for contingent fee agreements.  D.C. Rule of Professional Conduct 1.5(c) ("Fees") provides in part:

> A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial, or appeal, litigation, other expenses to be deducted from the recovery, whether such expenses are to be

---

[67] *Id*.; Peregoy Aff. ¶¶ 18-20 (confirming NARF practice of requesting donations made to the general fund, rather than allocated to *Cobell*).
[68] Cobell Aff. ¶¶ 22-23.
[69] *Id*. ¶¶ 23-24; Peregoy Aff. ¶ 17.
[70] Cobell Aff. ¶ 25.
[71] *Id*. at 25-27; Peregoy Aff. ¶ 19.
[72] Cobell Aff. ¶ 27.

US2008 2613537.1

deducted before or after the contingent fee is calculated, and whether the client will be liable for expenses regardless of the outcome of the matter.

D.C. Rules of Prof'l Conduct R. 1.5(c). NARF's engagement letter satisfies none of those basic requirements. It does not state how the contingent fee is to be calculated, does not state whether expenses are to be deducted before or after the contingent fee is calculated, and does not state whether the client will be liable for expenses regardless of the outcome. Accordingly, it is fundamentally and irrevocably defective as a contingent fee agreement. That is because it was never intended or understood by the parties or the attorneys to be one.

      **B.**     **Principles of equity preclude recovery by NARF from the common fund.**

           **1.**      **<u>NARF lacks clean hands.</u>**

"[T]he maxim 'he who seeks equity must do equity' has long governed entitlement to equitable relief in the federal courts." *Aktieselskabet AF 21. November 2001 v. Fame Jeans, Inc.*, 511 F. Supp. 2d 1, 13 (D.D.C. 2007), *aff'd in part and rev'd in part on other grounds*, 525 F.3d 8 (D.C. Cir. 2008); *see also Aristotle Int'l., Inc v. NGP Software, Inc.*, 714 F. Supp. 2d 1, 15 (D.D.C. 2010) ("It is a long-standing principle that only those who behave with due regard for equity are properly entitled to it.").

Accordingly, "he who comes into equity must come with clean hands." *Monument Realty, LLC v. Wash. Metro. Area Transit Auth.*, 540 F. Supp. 2d 66, 82 (D.D.C. 2008). This doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Precision Instrument Mfg. Co. v. Auto Maint. Mach. Co.*, 324 U.S. 806, 814 (1945); *see, e.g., United Mine Workers of Am. v. Boyle*, No. 3436-69, 1978 WL 1601, at *3 (D.D.C. May 3, 1978) (precluding award of attorneys' fees in favor of party who engaged in breach of fiduciary duty based on clean hands doctrine). Thus, one seeking equitable relief based on *quantum meruit* must establish that it acted in good faith. *See*

US2008 2613537.1

*Ellipso, Inc. v. Mann*, Civ. A. No. 05-1186 (RCL), 2006 WL 1126814, at *2 (D.D.C. Apr. 27, 2006) (dismissing claim seeking recovery of the reasonable value of services based on clean hands doctrine).

NARF does not have "clean hands." It unilaterally accepted conflicting representations and chose to allocate its resources to ensure an adequate representation of tribes in tribal trust litigation. Thereafter, NARF abandoned individual Indians in this litigation in favor of tribes in their trust litigation against the government. There was no notice to the class or the Court or Class Counsel before or after it undertook its tribal representation. Moreover, it now comes into Court after a settlement agreement has been reached seeking recovery of a fee from plaintiffs' recovery, which it consistently and repeatedly has disavowed.

### 2.       **NARF entered into a conflicting representation and abandoned the case.**

Because NARF placed itself in the position of representing clients with conflicting legal interests and abandoned its representation of the Class Representatives and other individual Indian beneficiaries, it is not entitled to recover any fee for its work during the early years of this litigation. This is a non-controversial position. Indeed, a full seven decades ago this Circuit declared it "well settled that, if an attorney without justifiable cause voluntarily abandons or withdraws from a case before his services have been performed, he loses his right to compensation." *Fletcher v. Krise*, 120 F.2d 809, 810 (D.C. Cir. 1941) (holding that the attorney in question was barred from recovery under both his contract with his former client and the doctrine of *quantum meruit*).

The reasoning for this rule is simple: counsel who abandons its clients, demonstrates divided loyalties to its clients, or otherwise acts in a manner contrary to its clients' interests should not be allowed to demand compensation from those clients when other counsel secures a

recovery on the clients' behalf.   Here, NARF's decision to represent scores of tribes with interests adverse to those of the Class Members violates NARF's fiduciary and ethical duty of loyalty to the class members.  *See*, *e.g.*, *Hendry v. Pelland*, 73 F.3d 397, 401-03 (D.C. Cir. 1996) (holding conflict of interest that violated disciplinary rule constituted breach of the duty of loyalty sufficient to permit disgorgement of legal fees).  As a direct result of its breach of its duty of loyalty to pre-existing clients, NARF abandoned those clients midstream.

Having abandoned these plaintiffs, NARF cannot now claim an entitlement to attorneys' fees from the funds recovered through the continued efforts of Class Representatives and Class Counsel who stayed the course and saw the litigation through to settlement.  *See Fletcher*, 120 F.2d at 810; *see also Restatement (Third) of the Law Governing Lawyers* § 37 (2000) ("A lawyer engaging in clear and serious violation of duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter.").

The D.C. Circuit's opinion in *Hendry* is instructive here.  There, defendant Pelland represented several holders of undivided interests in a twenty-acre parcel of land in negotiations to sell and develop the land.  73 F.3d at 399.  When negotiations soured, Pelland's former clients brought suit against him seeking, *inter alia*, disgorgement of legal fees previously paid.  *Id*.  In support of their claim, the former clients alleged that Pelland had breached his fiduciary duty of loyalty by undertaking to represent all of the owners of the property simultaneously despite conflicting interests among the group.  *Id*. at 401.  The district court granted Pelland's motion for summary judgment on the breach of fiduciary duty issue, and the clients appealed.  Applying District of Columbia law, the D.C. Circuit cited expert testimony that Pelland had breached applicable ethics rules because his representation of all five land owners "put him in the 'impossible' position of serving individuals with conflicting interests."  *Id*. at 401.  This evidence

21

was enough to support a jury determination that Pelland had breached an ethical rule and thereby breached his fiduciary duty of loyalty. *Id.*

As the D.C. Circuit recognized, "a breach of the duty of loyalty diminishes the value of the attorney's representation as a matter of law." *Id.* at 402. Under this rule, counsel, like NARF, who have breached a duty of loyalty to clients, is not entitled to compensation, even for services rendered prior to the breach. *See, e.g., Fletcher*, 120 F.2d at 810-11; *Jacobsen v. Oliver*, 555 F. Supp. 2d 72, 87 (D.D.C. 2008) (recognizing that "[c]onduct by an attorney in derogation of the client's interest breaches the attorney's fiduciary duty and . . . may justify the remedy of disgorgement" of counsel fees previously paid (citation omitted))*; see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1156 (8th Cir. 1999) (holding that the district court properly denied any fees to class counsel that was disqualified prior to the conclusion of litigation due to a conflict of interest); *Eriks v. Denver*, 824 P.2d 1207, 1212-14 (Wash. 1992) (*en banc*) (holding that counsel who failed to disclose a potential conflict to clients and obtain their informed consent to the multiple representations breached his fiduciary duties and that the trial court reasonably ordered disgorgement of fees as a form of discipline). This is so even where the former clients were not quantifiably harmed by their counsel's misconduct; the conflicts that arose from such representations suffice to effect a forfeiture of counsel fees. *See Hendry*, 73 F.3d at 402.

While Mr. Echohawk says that he was encouraged to undertake the representation of tribes in trust litigation, in part by Mr. Harper,[73] Mr. Harper did not, and could not, excuse NARF from fulfilling its own ethical responsibilities to its clients. D.C. Rule of Professional Conduct 1.7(b)(3) specifically provides that "a lawyer shall not represent a client with respect to a matter if . . . [r]epresentation of another client will be or is likely to be adversely affected by

---

[73] *See supra* note 34.

US2008 2613537.1

such representation."  While the representation may be undertaken where "[e]ach potentially affected client provides informed consent to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation," *id.* at 1.7(c)(1), here, NARF made no effort to do address those issues.  No assessment of identified actual and potential conflicts has been provided to plaintiffs or Class Counsel.  Nor has an assessment of adverse consequences been provided to plaintiffs or Class Counsel.

NARF's position that plaintiffs' consent (to potential conflicts that are legion) can somehow be inferred from casual conversations between Messrs. Echohawk and Harper—during which the issue of potential and actual conflicts admittedly never arose—flies in the face of the requirements of the D.C. Rules of Professional Conduct and logic.  First, those rules define informed consent to potential conflicts as "denote[ing] the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."  D.C. Rules of Prof'l Conduct R. 1.0(e).  Second, the rules make clear that such consent may not to be inferred.  Comment 3 to Rule 1.0 states:  "Obtaining informed consent will usually require an affirmative response by the client or other person.  In general, a lawyer may not assume consent from a client's or other person's silence."  Likewise, the comments to D.C. Rule of Professional Conduct 1.7 make clear that adequate disclosure requires much more than a vague inference:  "such disclosure of the parties and their interests and positions as to enable each potential client to make a fully informed decision as to whether to proceed with the contemplated representation."  D.C. Rules of Prof'l Conduct R. 1.7 Cmt. 27.  Though a written disclosure is not required, it "is ordinarily prudent for the lawyer to provide at least a written

summary of the considerations disclosed and to request and receive a written informed consent."

*Id.* cmt. 28. Such a written consent is advisable, because "the lawyer bears the burden of proof

that informed consent was secured." *Id.* Clearly, NARF's effort to meet its burden of informed

consent falls far short of the legal standard.

Accordingly, like the defendant in *Hendry*, NARF made a voluntary decision to place

itself in an "impossible situation" of serving clients with competing interests, and it did so

without explaining the matter to its clients and obtaining an informed conflict waiver approving

even potentially conflicting representations. Of course, no party may consent to actual conflicts.

After ultimately recognizing and acknowledging the predicament that it had brought upon itself,

NARF abandoned its representation of the individual Indian trust beneficiaries and made no

contribution to the key stretch of litigation and negotiations that ultimately brought about the

resolution of this litigation and produced these historical results. Under these facts, NARF has

no legitimate claim to compensation.

## II.     NARF's FEE REQUEST IS UNTIMELY.

### A.     NARF ignored this Court's deadline for filing its fee petition.

This Court ordered that "**any** Petition for an Award of Attorneys' Fees and Expenses

("Petition") **shall** be filed no later than 30 days after the date of this Order."[74] Thus, all petitions

for attorneys' fees were required to be filed by January 20, 2011, which deadline was extended

for Class Counsel to January 25, 2011.[75] That deadline is mandatory. *See FTC v. Tarriff*, 557 F.

Supp. 2d 92, 95 (D.D.C. 2008) (explaining "shall" means "must"), *aff'd*, 584 F.3d 1088 (D.C.

Cir. 2009). Yet, at no time before the end of that deadline did NARF ask this Court for leave to

---

[74] *See* Order on Preliminary Approval ¶ 4 (emphasis added).

[75] *See supra* note 10. Neither NARF nor any of its attorneys are defined as "Class Counsel"
under the terms of the Settlement Agreement. *See* Settlement Agreement at A.7.

US2008 2613537.1

file a petition for fees after the date set forth by this Court.   Instead, it sat on its claim for two more months.

NARF had actual notice of that deadline as it strategically remained on this Court's ECF service list, despite its abandonment of the *Cobell* plaintiffs.  However, it failed to file its first motion to intervene requesting consideration of its fee petition until March 29, 2011, over two months late.  NARF made the deliberate decision not to file by the January 20, 2011 deadline.[76] Accordingly, its untimely request should be denied.  *See Chemical Mfrs. Ass'n. v. EPA*, No. 99-1236, 99-1515, 2003 WL 21384622, *1 (D.C. Cir. 2003) (per curiam) (denying fee petition where untimely); *In re Pierce*, 214 F. 3d 1364, 1365 (D.C. Cir. 2000) (finding where counsel had notice that fee petition was to be filed "no later than" November 16, 1998, but missed deadline, fee petition would be denied); *Crowley v. L.L. Bean, Inc.*, 361 F. 3d 22, 28 (1st Cir. 2004) (where court ordered fee petition filed within 30 days of disposition of any appeal, petition filed 45 days late was denied as untimely, despite absence of prejudice); *Quick v. People's Bank of Cullman Co.*, 993 F. 2d 793, 798-799 (11th Cir. 1993) (holding untimely petition for fees properly struck even though no party was prejudiced by the delay); *Ballentine v. Dep't of Justice*, No. 87-3407, 1988 WL 10683, *1 (Fed. Cir. 1988) (per curiam) (petition for fees filed less than 30 days after deadline properly denied as untimely); *Morgan Keegan & Co. v. Contois*, No. 6:10-cv-282-Orl-18DAB, 2010 WL 2871104, at *3 (M.D. Fla. July 20, 2010) (denying untimely request for fees); *Allapattah Serv's, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1228 n.39 (S.D. Fla. 2006) (denying fee petition filed 6 months late where no motion made to file out of time).

While an untimely motion may be excused where the movant is misled by an adversary's actions about the running of the filing period, *see Bowden v. United States*, 106 F.3d 433, 438

---

[76] *See* Gingold Aff. ¶¶ 53-62; Ex. 24, Aff. of William E. Dorris ("Dorris Aff.") ¶¶ 3-5.

(D.C. Cir. 1997), NARF makes no such showing here and, thus, that claim cannot be asserted honestly.  In fact, NARF concedes that it was apprised of and, thus, followed the progress of this litigation and the settlement process.[77]  It knew that the parties had agreed to a settlement in December 2009.  The Agreement was in the public record, the subject of great media attention, and specifically did not include NARF among the "Class Counsel" entitled to recover attorneys' fees.  At least as early as March 2010, NARF had a copy of the separate agreement concerning Class Counsel's petition for fees, which once again makes no mention of NARF.[78]  NARF knew as early as May 2010 that Class Counsel would be seeking a fee award under the percentage of the fund theory, rather than using the *Laffey* rate calculation advocated by NARF.[79]  Indeed, Mr. Echohawk has known that for 13 years, *i.e.*, since April 1998, at which time Messrs. Gingold and Holt first executed contingent fee agreements that Mr. Echohawk had opposed.

NARF dispositively admits that in November 2010 and, again, in December 2010, it was informed of Class Counsel's and the Class Representatives' position that NARF is not entitled to fees from the common fund.[80]  Moreover, it was aware of this Court's December 21, 2010 Order setting a January 20, 2011 deadline for the filing of any fee Petition by counsel.[81]  However, NARF made an affirmative, informed decision to forego filing a petition for fees from the common fund and, instead, to make a subsequent request for fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 (2006), despite acknowledging such a request may be problematic.[82]

---

[77] *See* Mot. to Intervene at 15-20.
[78] *Id.* at 16.
[79] *Id.* at 16-17.
[80] *Id.* at 17-18 ("On December 17 . . . Gingold and Dorris asserted that NARF was not entitled to any award from the common fund.").
[81] *Id.* at 19.
[82] *Id.* at 18-20.

US2008 2613537.1

Accordingly, NARF has long been on notice of all the reasons for which it now seeks to excuse its belated filing.  Aside from its knowledge 13 years ago, NARF knew for 17 months prior to its motion to intervene that the parties had agreed to establish the settlement fund from which NARF now seeks to recover, for at least 13 months that the settlement agreement did not include NARF among the Class Counsel, and for at least 5 months that Class Counsel and Class Representatives did not believe NARF is entitled to an award from the common fund. Nonetheless, NARF waited until over two months after the deadline had passed to submit a fee petition, after notice regarding fees to the plaintiffs had been dispatched, and less than three months before the fairness hearing to approve the Settlement Agreement was scheduled to occur.

NARF's suggestion that it did not understand that it needed to file a timely Petition until it hired outside counsel after the January 20, 2011 deadline imposed by this Court is absurd. NARF represents that it is an experienced provider of legal services that, according to it, is capable of handling large-scale, extremely complicated legal matters—including various "landmark" litigation and legislative matters—and has done so for several decades.[83]  Whether or not that is true, most law students and all litigators understand the importance of timely filings as well as the consequences of failure to make timely filings.  NARF certainly had the wherewithal to file a timely fee petition as ordered by this Court.  Had it felt the need to consult with outside counsel regarding its fee application, it had over a year after execution of the Settlement Agreement to do so.  In effect, NARF is throwing itself on the mercy of this Court because it is unable to provide a legitimate justification for its inexcusable delay, certainly no justification that an experienced provider of legal services would assert.  To the extent that this Court is inclined to hear NARF's pleas and excuse its conduct, plaintiffs urge this Court to

---

[83] *Id.* at 6-7.

US2008 2613537.1

consider the profound prejudicial effect upon Class Members who never have had an opportunity to review NARF's Petition, but, nonetheless, would be responsible for paying its fees and expenses should this Court grant the NARF Petition.

**B.      NARF's delay is prejudicial to Class Members.**

NARF ignores the effect its dilatory filing has had on individual Indian trust beneficiaries who it once had represented, much the same way NARF had ignored the effects of its decision to conflict itself out of further representation in this litigation.  NARF had a copy of the Settlement Agreement when it was made public in December 2009.  Accordingly, it knew that the Agreement required plaintiffs to disclose to this Court the amount of fees, costs and expenses they were requesting in advance of the hearing on Preliminary Approval.[84]  Further, NARF knew that the Agreement stated explicitly that the requested fees "**shall** be included" in the Notice provided to Class Members, in order to allow the class to comment on those fees.[85]

Being on the ECF service list, NARF knew that this Court, on December 3, 2010, set a hearing on Preliminary Approval for December 21, 2010.  It further knew that on December 10, 2010, plaintiffs advised this Court of the amount of legal fees and expenses that would be requested, and included a complete description of that request in the proposed Notice to the Class.[86]  That Notice was approved by the Court on December 21, 2010 and disseminated to Class Members in accordance with orders entered by this Court.

During all that time, NARF sat on its purported claim, never advising this Court that it intended to make an $8 million claim for fees against the common fund.  Plaintiffs undertook the most comprehensive Notice process in history to advise Class Members of the Settlement

---

[84] Settlement Agreement at J.1.

[85] *Id.* (emphasis added).

[86] *See* Plaintiffs' Notice Regarding Attorneys' Fees and Class Representatives' Incentive Awards dated December 10, 2010 [Dkt. No. 3661] at 2-3.

US2008 2613537.1

Agreement, including the fees requested for Class Counsel.  Properly, Class Members were provided the opportunity to comment on, and object to, the requested fees, and some did so.[87] However, due to NARF's inaction and delay, Class members were never notified of its fee request.[88]

In order to protect due process rights of class members, Fed. R. Civ. P. 23(h) requires that they be provided notice of requested attorneys' fees and expenses and afforded an opportunity to object.  *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993 (9th Cir. 2010). Accordingly, this Court required that such notice be incorporated into the class notice and that all such fee petitions be filed promptly.[89]  *See generally Riker v. Gibbons,* No. 3:08-cv-00115-LRH-VPC, 2010 WL 4366012, at *7 (D. Nev. 2010) (explaining that notice of requested fees and expenses must be provided to the class, typically through inclusion in notice of proposed settlement).  NARF, through its undue delay, undercut those procedures, which have been fashioned carefully to protect the interests of class members.

Because class members have been provided no notice of NARF's fee request, they have had no opportunity to comment or object.  *See Chemical Mfrs. Ass'n.*, 2003 WL 21384622, at *1 (untimely fee petition properly denied where a party had no opportunity to consider it in conjunction with fee petition properly filed).  And, at this late date, NARF's failure cannot be

---

[87] *See* Plaintiffs' Response to Objections to Settlement dated May 16, 2011 [Dkt. No. 3763] at 46-57.

[88]  In addition, as plaintiffs discuss, *infra*, NARF's Petition reflects a substantial bonus or enhancement to its current rates of $170 per hour that it charges its clients—almost three times *Laffey* rates for some NARF attorneys.  That enhancement, at the same time NARF proposes to discount Class Counsel's actual billing rates to accommodate NARF's request, is material and should have been disclosed to Class Members.  NARF either was neglectful (a proposition that strains credulity) or deliberately evasive in order to obtain an extraordinary enhancement to which it is not entitled.  Whatever the case, such an enhancement is adverse to the plaintiff classes.

[89] *See supra* note 12.

US2008 2613537.1

cured.  Plaintiffs have completed a thorough and expensive notice process as mandated by this Court and the fairness hearing is less than a month away.  Millions of dollars have been spent on the notice process in addition to thousands of hours of time.  Justice in this case has already been unreasonably delayed.  Further delay will deny justice to those who will die before final judgment.  Too many class members have died since this action was filed 15 years ago.  It should not be delayed further to accommodate NARF's untimely and otherwise improper request for fees.

Prejudice is not a requisite for denial of an untimely fee petition.  *See Crowley*, 361 F.3d at 28; *Quick,* 993 F.2d at 798-799.  However, here, the substantial prejudice to class members serves to highlight why denial of NARF's fee request is fair and justified.

## III.    NARF'S FEE REQUEST IS UNREASONABLE.

### A.    NARF's fee request is inconsistent with controlling law.

Congress, in enacting the Claims Resolution Act of 2010, and the parties in their Settlement Agreement, identified the governing standard by which this Court is to award Plaintiffs their attorneys' fees, expenses and costs in this case—that such award is in the discretion of this Court "in accordance with controlling law."[90]  "Controlling law" in this Circuit regarding the award of attorneys' fees in class action litigation resulting in a common fund is well established.  Attorneys' fees are to be based on a percentage of the common fund.  *See Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993).  Fee awards "range from fifteen to forty-five percent" of that fund, *In re Vitamins Antitrust Litig.*, No. MISC. 99-197 (TFH), MDL 1285, 2001 WL 34312839, at  *10 (D.C. Cir. July 16, 2001), with a fee of 20% to 30% being customary.  *Swedish Hosp. Corp.*, 1 F.3d at 1272.  In "mega-fund" cases—defined as

---

[90] *See* Claims Resolution Act § 101(g)(1)(A); Settlement Agreement at J. 5.

US2008 2613537.1

those where the total recovery is in excess of $100 million—a fee of 15% of the common fund is typical.  *See In re Lorazepam and Clorazepate Antitrust Litig.*, No. MDL 1290 (TFH), 2003 WL 22037741, *7 (D.D.C. 2003).

NARF argues that all counsel should be compensated based on what it says are *Laffey* rates.[91]   However, it makes no attempt to reconcile its disregard of both Congress' directive, regarding the compensation of Class Counsel in the Claims Resolution Act, and the controlling law of this Circuit, regarding compensation of counsel in class action litigation.   Moreover, NARF's argument is disingenuous at best, being grossly unfair to class members and Class Counsel who have litigated this matter through settlement.   By requesting a recovery ostensibly under *Laffey*, NARF is seeking to compel class members—its former clients—to pay for services for which it has already been compensated at substantially enhanced hourly rates[92] that are well in excess of its customary hourly rates that it expressly agreed to in its Engagement Letter.   It further seeks to recover those fees from settlement proceeds, despite having represented to its clients it would never do so, while at the same time limiting Class Counsel's compensation for the successful work it performed.[93]   On these grounds, too, NARF's Petition should be denied.

   **B.     NARF seeks to charge the class for its services at rates well in excess of those to which it agreed in its Engagement Letter.**

---

[91] NARF's Mot. at 7.

[92] The enhancement requested by NARF is disguised as *Laffey* when, in fact, it is a variation of Lodestar, which provides for a multiple of customary hourly rates for attorneys' who prevail in class action cases.  However, here, Lodestar is not controlling law.

[93] While attempting to enhance its recovery by charging hourly rates well in excess of that to which it agreed in its Engagement Letter and to recover a second time for services for which it has already been paid, it seeks to discount the recovery of Class Counsel to $22 million dollars less than the value of its services at current hourly rates.  *See* Plaintiffs' Petition For Class Counsel Fees, Expenses and Costs Through Settlement dated January 25, 2011 [Dkt. No. 3678] at 22 (explaining total value of services rendered by Class Counsel at current hourly rates is $90.2 million); NARF Mot. at 7 (allocating $68,133,250 to Class Counsel based on *Laffey* matrix).

31

NARF's Engagement Letter with Ms. Cobell provides that it would bill its time at its standard rate of $150.00 per hour, adjusted annually.  By 2007, that rate had increased to $170.[94] However, in now seeking what is effectively a Lodestar recovery based on what it says is a *Laffey* calculation, it disregards explicit terms of engagement to which it clearly and unambiguously committed in 1996.  And, it utterly ignores the incontestable fact that NARF entered into no agreement with plaintiffs that supersedes or amends the 1996 engagement letter.  Indeed, at no time did NARF ever ask plaintiffs to amend its terms of engagement.  Yet, it now asks this Court to amend its terms of engagement simply because there is money on the table.

In other words, notwithstanding that NARF expressly has disavowed payments from class members and notwithstanding that it had agreed to explicit hourly rates, in violation of the terms of its engagement, it now wants class members to pay its fees and it demands a substantial premium added to agreed-upon hourly rates.  In that regard, NARF's averment that its Petition does "not include a bonus [or] multiplier"[95] is flatly wrong.  The application of Lodestar multiples, which are presented as a *Laffey* calculation, necessarily adds a substantial premium or enhancement to NARF's hourly billing rates.[96]  For many NARF lawyers, a *Laffey* Matrix calculation almost triples the hourly rate that NARF agreed to.

There is no support, legal or equitable, for NARF's effort to force its clients to pay more than NARF agreed to charge for the services it performed.  NARF cites *LaShawn v. Barry*, Civ. No. 89-1754 (TFH), 1998 WL 35243112, *7-8 (D.D.C. Feb. 18, 1998) (Hogan, J.) in support of its position that it is entitled to an enhancement above "'prevailing market rates in the relevant

---

[94] *See* Ex. 25, Aff. of Keith Harper dated June 19, 2004 at ¶ 9 ("NARF's ordinary billing rate is [] downwardly adjusted to $170 per hour[] for all [] NARF attorneys regardless of experience.") Mr. Harper's hourly rate at the inception of the case was $25 per hour.  Echohawk Decl. at 2.
[95] NARF Mot. at 6.
[96] *Id.* at 8.

community, regardless of whether counsel is private or public-interest.'"[97]   However, *LaShawn* is a fee-shifting case, not a case where, as here, it requests this Court to order former clients to pay its fees out of their recovery.   Moreover, *LaShawn* is not a case where, as here, counsel executed an Engagement Letter setting forth explicitly the rates it charges.   NARF's statement that it is "entitled to recover [its'] attorneys' fees, just like for-profit law firms,"[98] is correct. Had any of the "for-profit" firms in this case agreed to be paid on an hourly basis for their work, and had they set forth in their engagement letter the rates they would charge, this Court would hold them to their commitment to their clients.   They did not do so.   Unlike NARF, they agreed to largely forego or substantially discount current payments to the end of the case and be compensated on a contingent fee basis.   NARF did not do so.   And, like any other firm, it must be held to the commitments—written and oral—it makes to its clients.

Nor may NARF avoid the express terms of its Engagement Letter by arguing it is entitled to a *quantum meruit* recovery.   As set forth above, there is no basis to apply principles of *quantum meruit* where, as here, an express contract exists.[99]   *See Stissi v. Interstate & Ocean Transp. Co. of Philadelphia*, 814 F.2d 848, 852 (2d Cir. 1987) (holding it was error for attorney to obtain a *quantum meruit* recovery where an express contract existed for apportionment of fees).   Moreover, even had NARF been entitled to avoid its commitments to its former clients, *quantum meruit* would not entitle it to recover fees in excess of that which it customarily charged its clients.   Even when basing a fee award on *quantum meruit*, courts use actual rates as opposed to enhanced rates in establishing the appropriate fee.   *See Painewebber R & D Partners II, L.P. v. Centocor, Inc.*, No. C.A. 14405, 2000 WL 130632, *5 n.22 (Del. Ch. Jan. 31, 2000)

---

[97] *Id.* at 5-6.
[98] *Id.* at 5.
[99] *See supra* p. 15.

US2008 2613537.1

(explaining in setting an attorney fee based on *quantum meruit*, the court "utilize[s] counsels' customary hourly rates, not 'multiplied' rates, to arrive at a reasonable fee"); *see also Briggs v. United States*, No. C 07-05760 WHA, 2010 WL 1759457 (N.D. Cal. April 30, 2010) (refusing to apply *Laffey* rates where they far exceeded counsel's customary hourly rates).

Accordingly, while NARF insists that it is has worked 31,317 hours on this litigation and concludes that plaintiffs owed $10,567,080.30 in time and charges based on its *Laffey* Matrix calculation, when actual hourly rates that it agreed to are applied,[100] the aggregate time value of previously engaged NARF lawyers is reduced to $4,572,792.69, before deducting amounts that it has already received.

| Personnel | Hours | Rate | Total |
|---|---|---|---|
| NARF Law Clerks | 1,337.15 | $ 25.00 | $ 33,428.75 |
| Harper Thru 10/31/96 | 426.96 | $ 25.00 | $ 10,674.06 |
| Other Attorneys and Periods | 29,552.89 | $ 170.00 | $ 5,023,990.88 |
| **Subtotal** | **31,317.00** | | **$ 5,068,093.69** |
| Kim Gottschalk | 4.80 | | $ (2,280.00) |
| Richard Guest | 1,122.15 | | $ (408,220.25) |
| Tracy Labin | 84.50 | | $ (28,307.50) |
| Michele Mitchell | 203.75 | | $ (56,031.25) |
| Mark Tilden | 1.10 | | $ (462.00) |
| **Total** | **29,900.70** | | **$ 4,572,792.69** |

## C.   NARF has been paid for its work from donations and grants.

Not only does NARF seek to avoid the hourly rates set forth in its Engagement Letter, it ignores the sources from which it agreed to be paid.  Expressly disavowing any contingent fee, it explicitly committed to be paid from funds received from foundations and grants for purposes of the litigation.[101]  While NARF purports to deduct from its fee request amounts already received

---

[100] Plaintiffs have also adjusted NARF's hours after removing from its claim attorneys, including Gottschalk, Guest, Labin, Mitchell and Tilden, who have made no contribution to the prosecution of this case.  *See* Ex. 4, Aff. of Dennis Gingold at ¶¶ 66-76.

[101] *See supra* p. 18.

US2008 2613537.1

from "foundations, from a prior application under the Equal Access to Justice Act ("EAJA"), and from sanctions awards issued by the Court,"[102] it omits from its calculation significant awards made to it in connection with this litigation.  They are identified in yellow in the following chart.

| | | |
|---|---|---|
| Blackfeet Reservation Development Fund | $ | 497,286.00 |
| Ford Foundation Grant No. 970-1241 | $ | 1,500,000.00 |
| Bank of America Grant No. 98-421 | $ | 10,000.00 |
| Ford Foundation Grant No. 980-0951-2 | $ | 500,000.00 |
| Contempt I, 188 F.R.D. 122 | $ | 252,146.81 |
| Various Sanctions, 211 F.R.D. 7 | $ | 32,270.25 |
| Infield, Special Master Opinion | $ | 40,479.20 |
| EAJA Opinion, 407 F.Supp.2d 140 | $ | 1,502,311.00 |
| GAO/Erwin Opinion, dated June 5, 2007 | $ | 37,701.77 |
| | $ | 4,372,195.03 |

Accordingly, the total amount received for NARF's fees and expenses to date is at a minimum:  $4,372,195.03.  Assuming, *arguendo,* that this Court awards fees and expenses to NARF out of plaintiffs' recovery (and, it should not), that award should be limited to no more than $1,814,685.47.[103]  Importantly, however, it has been NARF's practice to request that donations be made to NARF's general fund, rather than specifically allocated to this case. NARF has provided class members and this Court no accounting of those funds.  The burden is on NARF to properly support its fee petition.  *Case v. Unified School Dist. No. 233, Johnson Cnty., Kan.*, 157 F.3d 1243, 1249 (10th Cir. 1998); *Smith v. District of Columbia*, No. Civ. A. 02-373 (AK), 2005 WL 914773, at *3 (D.D.C. Apr. 18, 2005).

---

[102] NARF Mot. at 9.
[103] $4,572,792.69 (fees in accordance with actual hourly rates) - $4,372,195.03 (funds paid) + $1,614,087.81 (expenses) = $1,814,685.47.

US2008 2613537.1

Accordingly, independent of the conflicts issues, there should be no award of fees whatsoever because NARF has failed to account for amounts it has been paid to date for the services it says that it has performed.

Respectfully submitted this 26th day of May 2011.

/s/ Dennis M. Gingold
DENNIS M. GINGOLD
D.C. Bar No. 417748
607 14th Street, N.W.
9th Floor
Washington, D.C. 20005
(202) 824-1448

/s/ Keith M. Harper
KEITH M. HARPER
D.C. Bar No. 451956
MICHAEL ALEXANDER PEARL
D.C. Bar No. 987974
KILPATRICK TOWNSEND
STOCKTON, LLP
607 14th Street, N.W.
Washington, D.C. 20005
(202) 508-5844

WILLIAM E. DORRIS
Georgia Bar No. 225987
Admitted Pro Hac Vice
ELLIOTT LEVITAS
D.C. Bar No. 384758
KILPATRICK TOWNSEND
STOCKTON
1100 Peachtree Street
Suite 2800
Atlanta, Georgia 30309
404-815-6104

DAVID COVENTRY SMITH
N.C. Bar No. 12558
Admitted *Pro Hac Vice*
KILPATRICK TOWNSEND LLP

US2008 2613537.1

1001 West Fourth Street
Winston-Salem, NC 27101-2400
(336) 607-7392

<u>Attorneys for Plaintiffs</u>

37

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing PLAINTIFFS' OPPOSITION TO NARF'S PETITION AND MOTION FOR ATTORNEYS' FEES AND COSTS was served on the following via facsimile, pursuant to agreement, on this day, May 26, 2011.

Earl Old Person (Pro se)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
406.338.7530 (fax)

<u>/s/ Shawn Chick</u>

38

US2008 2613537.1