# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELOUISE PEPION COBELL, *et al.*,<br><br>        Plaintiffs,<br><br>vs.<br><br>KEN SALAZAR, Secretary of the Interior,<br>        *et al.*,<br><br>        Defendants. | Case No: 1:96cv01285 (TFH)<br><br><br>Date:  June 20, 2011<br>Time:  10:00 a.m. |

---

## OPPOSITION OF KIMBERLY CRAVEN
## TO MOTION FOR FINAL APPROVAL

---

Theodore H. Frank (DC Bar. No. 450318)
CENTER FOR CLASS ACTION FAIRNESS LLC
1718 M Street NW, No. 236
Washington, DC 20036
Phone: (703) 203-3848
Email: tedfrank@gmail.com

Attorney for Kimberly Craven

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................I

TABLE OF AUTHORITIES........................................................................III

INTRODUCTION...........................................................................................1

I.     Congress Did Not Demand Settlement Approval. ...................................2

II.    Congress Does Not Have *Carte Blanche* Authority To Extinguish Rights. ..............4

III.   The Sprawling Trust Administration Class Is Insufficiently Cohesive And Cannot Be Constitutionally Certified. ...................................................7

IV.    The Notice Failed To Provide A Meaningful Opportunity To The Sprawling Trust Administration Class To Knowingly Exercise An Opt-Out Right Because That Notice Did Not Disclose The Additional Rights Granted To Opt-Outs. ...............15

V.     The Parties Have Failed To Demonstrate That The Individualized Claims Of The Dozens Of Subclasses In The Sprawling Trust Administration Class Are Being Fairly Valued. .........................................18

VI.    The Remedy For The Sprawling Trust Administration Class Is Unfair Because It Bears No Relation To The Underlying Claims; Systematically And Perversely Undervalues The Most Injured Class Members While Providing Windfalls To Class Members Who Have Suffered No Injury; And Fails To Resolve Intra-Class Conflicts.........................................20

VII.   The Settlement's Requirement Of A Mandatory Waiver Of Rights Already Won Is Unconstitutional...............................23

VIII.  The Proposed $13 Million In Class Representative Incentives Creates An Impermissible Conflict Requiring Decertification.................24

IX.    Class Counsel Admits That The $7 Billion Settlement Offer Was Not Phantom. ..27

X.     Courts Should Adopt The American Law Institute Standards For Settlement Approval...........................................28

**CONCLUSION**........................................................................................................**31**

**PROOF OF SERVICE**.........................................................................................**33**

# TABLE OF AUTHORITIES

<u>Cases</u>

\* *Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997) .........................................................7, 8, 10, 12, 14, 18, 22

*American Baptist Churches v. Thornburgh,*
760 F. Supp. 796 (N.D. Cal. 1991) ...........................................................3

*Babbitt v. Oglala Sioux Tribal Pub. Safety Dept.,*
194 F.3d 1374 (Fed. Cir. 1999) ............................................................5–6

*Bonilla v. Las Vegas Cigar Co.,*
61 F. Supp. 2d 1129 (D. Nev. 1999) ...........................................................8

*Boucher v. Syracuse University,*
164 F.3d 113 (2nd Cir. 1999) ...............................................................25

*Cherokee Nation of Oklahoma v. Leavitt,*
543 U.S. 631 (2005) .........................................................................6

*Cisneros v. Alpine Ridge Group,*
508 U.S. 10 (1993) ........................................................................4–5

*Cobell v. Norton,*
392 F.3d 461 (D.C. Cir. 2004) ................................................................4

*Crandon v. United States,*
494 U.S. 152 (1990) .......................................................................2–3

*Cuyahoga Metro. Hous. Auth. v. United States,*
57 Fed. Cl. 751 (2003) .......................................................................5

*East Tex. Motor Freight System, Inc. v. Rodriguez,*
431 U.S. 395 (1977) .........................................................................7

*General Tel. Co. of the Northwest, Inc. v. EEOC,*
446 U.S. 318 (1980) .........................................................................9

*Grove v. Principal Mut. Life Ins. Co.,*
200 F.R.D. 434 (S.D. Iowa 2001) ............................................................29

\* *Hansberry v. Lee,*
    311 U.S. 32 (1940) ....................................................................................... 7–10

*Hardy v. Wise,*
    92 S.W.3d 650 (Tex. App. 2002) ................................................................... 8–9

*Hervey v. City of Little Rock*,
    787 F.2d 1223 (8th Cir.1986) ........................................................................ 25

*Illinois v. Abbott Associates, Inc.,*
    460 U.S. 557 (1983) ......................................................................................... 9

*In re Dennis Greenman Sec. Lit.,*
    829 F.2d 1539 (11th Cir. 1997) ..................................................................... 25

*In re Corrugated Container Antitrust Litig.,*
    643 F.2d 195 (5th Cir. 1981) ......................................................................... 24

*In re Fibreboard Corp.,*
    893 F.2d 706 (5th Cir. 1990) ........................................................................... 8

\* *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995) ................................................................. 8, 29–30

*In re GMC Engine Interchange Litig.,*
    594 F.2d 1106 (7th Cir. 1979) ....................................................................... 30

*In re Integra Realty Resources,*
    354 F.3d 1246 (10th Cir. 2004) ..................................................................... 25

*In re Islamic Republic of Iran Terrorism Litig.,*
    659 F. Supp. 2d 31 (D.D.C. 2009) .................................................................. 4

*In re Joint Eastern and Southern Dist. Asbestos Litigation*,
    982 F.2d 721 (2d Cir. 1992),
    *modified on reh'g sub nom. In re Findley,*
    993 F.2d 7 (1993) ............................................................................... 8, 14, 22

*Kimberly Assocs. v. United States,*
    261 F.3d 864 (9th Cir. 2000) ........................................................................... 5

*LeBeau v. United States,*
474 F. 3d 1334 (Fed. Cir. 2007) ...................................................................6

*Lightfoot v. District of Columbia,*
246 F.R.D. 326 (D.D.C. 2007) ...................................................................25

*Littlewolf v. Lujan,*
877 F.2d 1058 (D.C. Cir. 1989) ...................................................................7

*London v. Wal-Mart Stores, Inc.,*
340 F.3d 1246 (11th Cir. 2003) ...........................................................25–26

*Mirfasihi v. Fleet Mortg. Corp.,*
356 F.3d 781 (7th Cir. 2004) ..............................................................18–19

*Murray v. GMAC Mortg. Corp.,*
434 F.3d 948 (7th Cir. 2006) ...................................................................26

* *Nat'l Ass'n for Mental Health, Inc. v. Califano,*
717 F.2d 1451 (D.C. Cir. 1983) ......................................................7–8, 26

* *Ortiz v. Fibreboard Corp.,*
527 U.S. 815 (1999) ................................................................7, 21, 22

*Petrovic v. Amoco Oil Co.,*
200 F.3d 1140 (8th Cir. 1999) ...................................................................25

*Phillips v. Klassen,*
502 F.2d 362 (D.C. Cir. 1974) ...........................................................8, 26

*Phillips Petroleum v. Shutts,*
472 U.S. 797 (1985) ............................................................................7, 10

*Prado-Steiman ex rel. Prado v. Bush,*
221 F.3d 1266 (11th Cir. 2000) ...........................................................25–26

*Radosti v. Envision EMI, LLC,*
717 F. Supp. 2d 37 (D.D.C. 2010) ...................................................19, 28

*Reynolds v. Beneficial Nat. Bank,*
288 F.3d 277 (7th Cir. 2002) ..............................................................21–22

*Roeder v. Islamic Republic of Iran,*
    195 F. Supp. 2d 140 (D.D.C. 2002) ...............................................................................4

*Schiavo ex rel. Schindler v. Schiavo,*
    404 F.3d 1270 (11th Cir. 2005) .....................................................................................4

*Seattle Audubon Soc'y v. Robertson,*
    914 F.2d 1311 (9th Cir. 1990) ....................................................................................3–4

*Seminole Nation v. United States,*
    316 U.S. 286 (1942) ......................................................................................................6

*Sheridan Square Partnership v. United States,*
    66 F.3d 1105 (10th Cir. 1995) ....................................................................................4–5

*Shoshone Indian Tribe of the Wind River Reservation, Wyoming v. United States,*
    364 F.3d 1339 (Fed. Cir. 2004) ...................................................................................17

*Sollenbarger v. Mountain States Tel. & Tel. Co.,*
    121 F.R.D. 417 (D.N.M. 1988) ......................................................................................8

*Sw. Bell Tel. Co. v. Mktg. on Hold Inc.,*
    308 S.W.3d 909 (Tex. 2010) ..........................................................................................8

*Synfuel Tech. v. DHL Express (USA),*
    463 F.3d 646 (7th Cir. 2006) .......................................................................................19

*The Authors Guild v. Google, Inc.,*
    No. 05 Civ 8136, 2011 WL 986049 (S.D.N.Y. Mar. 11, 2011) ...................................14

*Timbisha Shoshone Tribe v. Salazar,*
    No. 10-968 (GK), 2011 WL 691366 (D.D.C. Mar. 1, 2011) .........................................6

*Trustees of Dartmouth College v. Woodward,*
    17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819) .................................................................5

*Twigg v. Sears, Roebuck & Co.,*
    153 F.3d 1222 (11th Cir. 1998) ...................................................................................17

*United States v. Klein,*
    80 U.S. 128 (1870) ....................................................................................................3–4

*United States v. Sioux Nation of Indians*,
  448 U.S. 371 (1980) ...................................................................................................24

*\* United States v. Winstar*,
  518 U.S. 839 (1996) ..................................................................................................5–6

*Vista Healthplan, Inc. v. Warner Holdings Co. III., Ltd.*,
  246 F.R.D. 349 (D.D.C. 2007) ....................................................................................30

*Wal-Mart Stores, Inc. v. Dukes*,
  No. 10-277 (U.S. pending 2011) ............................................................................23–24

*Walsh v. Ford Mot. Co.*,
  807 F.2d 1000 (D.C. Cir. 1986) ..................................................................................12

*Wolfchild v. United States*,
  559 F.3d 1228 (Fed. Cir. 2009) ................................................................................6–7

*Young v. Higbee*,
  324 U.S. 204 (1945) ...................................................................................................26

## Rules and Statutes

42 U.S.C. § 1437f(c)(2) .....................................................................................................4

\* Claims Resolution Act of 2010, Pub. Law No. 111-291, 124 Stat. 3064 (2010) ......... *passim*

Claims Resolution Act § 101(c)..........................................................................................2

\* Claims Resolution Act § 101(d)(2)(A) ...........................................................................3

Fed. R. Civ. Proc. 23 ................................................................................................. *passim*

Fed. R. Civ. Proc. 23(a)....................................................................................... 3, 8, 12, 20

Fed. R. Civ. Proc. 23(a)(3) ...............................................................................................8

\* Fed. R. Civ. Proc. 23(a)(4).......................................................2, 8, 12, 17, 24, 25, 26

Fed. R. Civ. Proc. 23(b).......................................................................................... 3, 12

Fed. R. Civ. Proc. 23(b)(2) ................................................................................. 23–24

* Fed. R. Civ. Proc. 23(e) ................................................................................. *passim*

Pub. L. 108-7.......................................................................................................... 17

* U.S. Const. ....................................................................................................... *passim*

U.S. Const., Am. V ................................................................................................... 7

## Other Authorities

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(a)(2) (2010) ........................... 19

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(a)(3) (2010) ........................... 22

* AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(b) (2010) ............................... 22

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010)................................ 30

* AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05, comment *a* (2010) .......... 28–30

* Cobell, Elouise C., Testimony to Senate Committee on Indian Affairs Oversight
    Hearing on Trust Fund Litigation (Mar. 29, 2007) ...........................11–12, 16, 27–28

Coffee, Jr., John C., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty
    in Representative Litigation*, 100 COLUM. L. REV. 370 (2000) ..................................... 19

Leslie, Christopher R., *The Significance of Silence: Collective Action Problems and
    Class Action Settlements*, 59 FLA. L. REV. 71 (2007) .................................................... 29

# INTRODUCTION

The settling parties argue for settlement approval while simultaneously insisting that they do not need to argue for settlement approval. Rather, both parties claim, the Claims Resolution Act[1] constitutes Congressional approval of the settlement, and there is nothing left for the court to resolve. This reflects a fundamental misunderstanding of both the Claims Resolution Act and of the role of Congress in government litigation. The Claims Resolution Act did not write the settlement into law; rather, it merely endorsed and funded an executive branch decision to settle litigation, and left the ultimate resolution to this court. Nor could Congress dictate the rules of decision in this case without violating constitutional separation of powers requirements. Congress has not created an administrative remedy; it has asked the Court to resolve this case through a fairness hearing, and the settlement must still meet the standards of Rule 23(e) and the Constitution for a class-action settlement. The parties are playing a shell game: they tell Congress that the Court will resolve questions of fairness while telling the Court that Congress already resolved any fairness question.

Little wonder we see shell game tactics: the settlement cannot be approved unless the Court abdicates its duty to the unrepresented members of the class. The class cannot be constitutionally certified; the settlement does not meet the fairness requirements for

---

[1] Claims Resolution Act of 2010, Pub. Law No. 111-291, 124 Stat. 3064 (2010).

approval of Rule 23(e); and the class representatives' conflict of interest with class members remains unresolved, making it impossible for the representatives to satisfy the constitutionally-required Rule 23(a)(4) standard. Worse, we now learn that the class notice omitted a material term, and artificially made opting out look like a worse option than it was; it thus prevented class members from making an educated decision about participating or opting out of the settlement. Regrettably, settlement approval must therefore be denied. At a minimum, corrective notice is required to protect the constitutional rights of absent class members to make an informed choice of whether to opt out.

## I.    Congress Did Not Demand Settlement Approval.

The Settling Parties argue that the existence of the Claims Resolution Act requires deference to Congress in settling the case. Not so. Section 101(c) of the Claims Resolution Act merely authorizes the government to settle the case—a prerequisite to settlement taking place, because Congress must authorize the billions of dollars to be spent. The "ratification" is permission for the executive branch to go forward, rather than an order to the judicial branch to disregard the requirements of Rule 23(e) for settlement approval. Nor could Congress give such an order: the federal government is adverse in litigation to the absent class members, and it would be nonsensical to say that it is owed deference in a decision of whether a settlement is fair, adequate, and reasonable. Congress's litigation decisions receive no deference. *Cf. Crandon v. United*

*States*, 494 U.S. 152 (1990) (no deference to government agency interpretation of ambiguous statute when government acting as litigant). The evaluation of the fairness of this class action settlement deserves no more deference to the government than the evaluation of the fairness of a class action settlement against the government under a different statute. *E.g., American Baptist Churches v. Thornburgh*, 760 F. Supp. 796, 797 (N.D. Cal. 1991) (approving class action settlement against government after "independent determination that the Settlement Agreement is a fair, adequate and reasonable settlement").

Pursuant to the statutory doctrine of *expressio unius est exclusio alterius*, we know that Congress did not intend to sidestep the requirements of Rule 23(e), because it *did* sidestep the requirements of Rule 23(a) and Rule 23(b) for class certification. *See* Section 101(d)(2)(A). But even with respect to those rules, Congress contemplated that this Court might have valid reasons not to certify the class: the section reads "Notwithstanding the requirements of the Federal Rules of Civil Procedure, the court in the Litigation may certify the Trust Administration Class," rather than "***shall*** certify the Trust Administration Class."

The reason for Congress's deference to the judicial determination of class certification and settlement is obvious: Congress could not constitutionally dictate the rule of decision in a pending case without changing the substantive law. *United States v. Klein*, 80 U.S. 128 (1870); *Seattle Audubon Soc'y v. Robertson*, 914 F.2d 1311, 1316 (9th Cir.

1990) (unconstitutional for Congress to direct decision in particular case without general amendment to the law); *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 72 (D.D.C. 2009); *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 164 (D.D.C. 2002); *cf. for comparison Cobell v. Norton*, 392 F.3d 461 (D.C. Cir. 2004) (no *Klein* violation where there is a substantive repeal of underlying statutes). *See also Schiavo ex rel. Schindler v. Schiavo*, 404 F.3d 1270, 1274-75 & n. 4 (11th Cir. 2005) (Birch, J., concurring). Congress avoided this constitutional problem by giving the Court the authority to evaluate the settlement according to the appropriate rules. This Court should not accept the invitation of the Settling Parties to commit legal error by reading the statute to prohibit the constitutionally required scrutiny. The existence of the Claims Resolution Act is no reason to disregard the requirements of Rule 23(e).

## II.     Congress Does Not Have *Carte Blanche* Authority To Extinguish Rights.

The government heavily relies upon dicta in *Sheridan Square Partnership v. United States*, 66 F.3d 1105, 1108 (10th Cir. 1995), for the proposition that "Congress can change the statutory rights of litigants, even where this change may retroactively eliminate an initially meritorious claim." Dkt. No. 3764 at 6–11. *Sheridan Square* cannot be read so broadly; its result is entirely tied up with the specific facts of the particular arcane housing statutes, regulations, and contracts at issue, as well as a binding Supreme Court decision interpreting those contracts. *See generally Cisneros v. Alpine Ridge Group*, 508 U.S. 10 (1993) (amendment of 42 U.S.C. § 1437f(c)(2) not constitutionally problematic

because at-issue "contracts do not prohibit the use of comparability studies to impose an independent cap on the formula-based rent adjustments"). But even if this were not true, the government's reading of *Sheridan Square* would have been superseded by the Supreme Court decision in *United States v. Winstar*, 518 U.S. 839 (1996).

In *Winstar*, the government made contractual obligations with banks that it would provide certain regulatory treatment in exchange for the banks assuming liabilities. Congress passed a law preventing the government from fulfilling its contractual obligations, and the banks sued for breach. The government argued, as it does here, that Congress could abrogate obligations of the government without consequence or liability. Not so, the Court held: Congress cannot resolve contractual disputes by pulling the rug out from under the private contracting party. *Kimberly Assocs. v. United States,* 261 F.3d 864, 870 (9th Cir. 2000); *Cuyahoga Metro. Hous. Auth. v. United States,* 57 Fed. Cl. 751 (2003). What is true in the contractual context is even more so in the fiduciary trust context:

> The critical thread of this country's social fabric is the belief that laws exist to protect our institutions and to enforce obligations undertaken by various agreements. *See e.g., Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819). Our democratic government is based upon the premise that we are a country of laws that are fair, just, and equally applied for the protection of all its citizens. The saliency of any Congressional action derives from the government's duty to fulfill its legal obligations. Americans take great pride in the fact that when our government makes a promise, it keeps that promise or suffers the consequences of its breach. *See*

*United States v. Winstar,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964
(1996).

*Babbitt v. Oglala Sioux Tribal Pub. Safety Dept.,* 194 F.3d 1374, 1382 (Fed. Cir. 1999)

(Garjarsa, J., concurring). "In carrying out its treaty obligations with Indian Tribes the

Government is something more than a mere contracting party. Under a humane and

self-imposed policy which is found expressly in many acts of Congress and numerous

decisions of this Court, it has charged itself with moral obligations of the highest

responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in

dealings with the Indians, should therefore be judged by the most exacting fiduciary

standards." *Id.* at 1383 (quoting *Seminole Nation v. United States,* 316 U.S. 286, 296-97

(1942) (footnotes omitted)).[2]

The government's argument in favor of the settlement requires this Court to

ignore *Winstar* (which the government does not cite), and cannot be accepted.[3]

---

[2] *See also Cherokee Nation of Oklahoma v. Leavitt,* 543 U.S. 631 (2005) (federal Government
legally bound by promise to pay "contract support costs" to two Indian tribes,
notwithstanding Congress's failure to appropriate sufficient funds); *id.* at 646 ("statute
that retroactively repudiates the Government's contractual obligation may violate the
Constitution" (*citing Winstar*)).

[3] Other cases the government relies upon for the proposition of unfettered
Congressional authority are distinguishable. *LeBeau v. United States*, 474 F. 3d 1334
(Fed. Cir. 2007), and *Timbisha Shoshone Tribe v. Salazar*, No. 10-968 (GK), 2011 WL
691366 (D.D.C. March 1, 2011) are Indian Commerce Commission cases, and
Congressional distribution of ICC judgments are subject to rational-basis review. Here,
however, the government is a litigant, and Congress's strategic litigation decisions
merit no deference. *Wolfchild v. United States*, 559 F.3d 1228 (Fed. Cir. 2009), is not

---

### III.   The Sprawling Trust Administration Class Is Insufficiently Cohesive And Cannot Be Constitutionally Certified.

Plaintiffs argue that the only constitutional requirements in a class action certification are those spelled out by *Phillips Petroleum v. Shutts*, 472 U.S. 797, 811-12 (1985). Doc. No. 3763 at 3-4. This is a remarkable misstatement of the law. While compliance with the requirements of notice in *Shutts* is constitutionally **necessary**, it is far from constitutionally **sufficient** for class certification or settlement approval. As discussed in Ms. Craven's objection, the Supreme Court has identified numerous other requirements that are of constitutional significance.

Yes, *Amchem* and *Ortiz* ultimately turned on the requirements of Rule 23. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). But the Supreme Court noted that those requirements were constitutional in nature. *Amchem*, at 626-28; *Ortiz*, 527 U.S. at 845-46 ("serious constitutional concerns" ameliorated only in "limited circumstances"). *See also, e.g., East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395 (1977); *Hansberry v. Lee*, 311 U.S. 32, 44-45 (1940); *Nat'l Ass'n for Mental Health, Inc. v. Califano*, 717 F.2d 1451, 1457 (D.C. Cir. 1983) ("At all stages of the litigation the lack of adequate representation denies [absentee class

---

relevant because the language of the statute did not create a trust. Nor does *Littlewolf v. Lujan*, 877 F.2d 1058, 1064 (D.C. Cir. 1989), help the government: the court's endorsement of the Tucker Act as a safety net for a constitutional violation was referring to the problem of potential undercompensation under the Fifth Amendment, not the due process violation at issue here.

members] due process of law and prevents the court from assuming personal jurisdiction over the absentee members.") (defendant class); *Phillips v. Klassen,* 502 F.2d 362, 364 (D.C. Cir. 1974) (violates due process when plaintiffs are not truly representational); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 796 (3d Cir. 1995) ("The Rule 23(a) class inquiries (numerosity, commonality, typicality, and adequacy of representation) constitute a multipart attempt to safeguard the due process rights of absentees."); *id.* at 785 (Rule 23(a) commonality requirement, *inter alia,* "represents a measured response to the issues of how the due process rights of absentee interests can be protected and how absentees' represented status can be reconciled with a litigation system premised on traditional bipolar litigation"); *In re Joint Eastern and Southern Dist. Asbestos Litigation,* 982 F.2d 721, 742-743 (2d Cir. 1992), *modified on reh'g sub nom. In re Findley,* 993 F.2d 7 (1993); *In re Fibreboard Corp.,* 893 F.2d 706, 710 (5th Cir. 1990) (violates due process clause to certify diverse class of "persons claiming different diseases, different exposure periods, and different occupations" given magnitude of disparities of class); *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.,* 308 S.W.3d 909, 919 (Tex. 2010) (commonality and typicality requirements based in Due Process clause of U.S. Constitution); *Bonilla v. Las Vegas Cigar Co.,* 61 F. Supp. 2d 1129, 1136 (D. Nev. 1999) ("In Rule 23 class actions, certification serves due process concerns."); *Sollenbarger v. Mountain States Tel. & Tel. Co.,* 121 F.R.D. 417, 430 (D.N.M. 1988) (Rule 23(a)(3) and (4) encapsulate constitutional requirements of *Hansberry*); *Hardy v. Wise,* 92 S.W.3d 650

(Tex. App. 2002). With the exception of *Hansberry*, the Supreme Court has never had to delineate those constitutional requirements because Rule 23 already did so. But, because of the language of the Claims Resolution Act, this Court is placed in the unique-in-the-last-half-century situation of having to decide the constitutionality of a class action settlement without the guidance of Rule 23 jurisprudence.[4]

As *Hansberry* noted,

> It is one thing to say that some members of a class may represent other members in a litigation where the sole and common interest of the class in the litigation, is either to assert a common right or to challenge an asserted obligation. It is quite another to hold that all those who are free alternatively either to assert rights or to challenge them are of a single class, so that any group, merely because it is of the class so constituted, may be deemed adequately to represent any others of the class in litigating their interests in either alternative. Such a selection of representatives for purposes of litigation, whose substantial interests are not necessarily or even probably the same as those whom they are deemed to represent, does not afford that protection to absent parties which due process requires. The doctrine of representation of absent parties in a class suit has not hitherto been thought to go so far. Apart from the opportunities it would afford for the fraudulent and collusive sacrifice of the rights of absent parties, we think that the representation in this case no more satisfies the requirements of due process than a trial by a judicial officer who

---

[4] The cases the government cites, *Illinois v. Abbott Associates, Inc.*, 460 U.S. 557 (1983), and *General Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318 (1980), are inapposite. Both involve the ability of Congress to create *parens patriae* rights of action in federal or state enforcement authority without regard to Fed. R. Civ. Proc. 23. They have nothing to do with the ability of Congress to use the class-action procedure to extinguish absent class members' rights without adhering to constitutional due process requirements. No one has appointed Ms. Cobell as government agent.

---

is in such situation that he may have an interest in the outcome of the litigation in conflict with that of the litigants.

311 U.S. at 44-45 (internal citations omitted). *Shutts* does not help plaintiffs; it also requires "that the named plaintiff at all times adequately represent the interests of the absent class members," 472 U.S. at 812, and that cannot happen when, as here, the Trust Administration class is not sufficiently cohesive for there to be common interests between the class representatives and the class members, not to mention among the class members themselves. *See also* Sec. VIII, *infra*.

The settling parties argue that *Amchem* anticipated the possibility that Congress could have created a class-certification scheme that does not meet the requirements of Rule 23. Dkt. No. 3763 at 9 and Dkt. No. 3764 at 24, *citing Amchem*, 521 U.S. at 629. That is not what *Amchem* said: *Amchem* said Congress could create "a nationwide administrative claims processing regime." And Congress could indeed create an administrative claims processing regime for Indians (as it did in the September 11 Victim Compensation Fund, the National Vaccine Injury Compensation Program, or in the proposed $7 billion settlement that the plaintiffs rejected in this case), but it did not do so in this case. There is no administrative claims processing here, just an attempt at a constitutionally impermissible certification of a sprawling class with a procrustean ministerial distribution of identical sums of cash for unrelated claims of wildly different sizes.

Plaintiffs argue that the class does have common interest, and the mismanagement of one account is the mismanagement of all accounts. Dkt. No. 3763 at 4–7. But that is not so: those with claims of failure to invest trust proceeds properly do not have anything in common with those who have claims that they have not received their fair share of mineral and oil rights, yet they are in the same sprawling class with the same procrustean resolution of their rights. One need only read the Congressional testimony of one Elouise Cobell to see that this is so:

> Accompanying me here today is one such individual Indian trust beneficiary. He is a close personal friend, a Blackfeet Indian from my reservation, James Kennerly, Jr. James is the son of James Otis Kennerly—or as the Interior Department referred to him, "Allottee 1997." James Otis Kennerly was a World War I veteran wounded and disabled in combat fighting for this Nation. He was allotted trust land in 1907 and it included considerable oil and gas resources in the Cut Bank, a resource rich area of the Blackfeet reservation. Today, his son owns this land with his siblings.

> As early as 1930, and most likely much earlier, oil companies pumped thousands of barrels a week off Kennerly's land; this is documented in records by the Interior Department's own experts. Documents establish that payments were made to Interior in connection with the leasing of Kennerly's allotment. Some of the money even went to Kennerly over sixty years ago. However, according to Interior's own historians, after 1946 there are no documents regarding the lease of his land—no statements, no deposits, and no files. And, there was no money deposited into his account. So what happened?

> There is no doubt that the oil wells continue to pump on the land of James Otis Kennerly; you can see it for yourself. His son, James Jr., will take you out there tomorrow if you're interested. Yet after the 1930s, James Sr. did not receive any payments. That continues to be

the situation today with James Jr. ... Interior's historians now speculate that his lease was unlawfully unitized with other lands of the Blackfeet Tribe and that the tribe now receives the income. ...

Now James Kennerly, Jr. and his siblings share their father's land, but they do not receive any money from the oil that still pumps from that land. ... He should be a millionaire, but like his father lives in great poverty.

Testimony of Elouise C. Cobell, Senate Committee on Indian Affairs Oversight Hearing on Trust Fund Litigation 13-14 (Mar. 29, 2007) (attached as Ex. 1). Cobell would now have Kennerly's claim for misallocated oil royalties be resolved for $1500, without an accounting—the same as a hypothetical Indian who owns in trust a fractionated 1/64 of an acre of unproductive land and receives pennies a year—by grouping these two entirely unrelated claims in the same impermissibly sprawling class. It is not enough for there to be a single common issue; the underlying class has to be sufficiently and predominantly cohesive to be treated identically. *E.g.*, *Amchem*, 521 U.S. at 622-25; *Walsh v. Ford Mot. Co.*, 807 F.2d 1000 (D.C. Cir. 1986) (Edwards, J., and R.B. Ginsburg, J.).

Congress may create exceptions to the Federal Rules of Civil Procedure, but it certainly may not require a court to act unconstitutionally. Many of the requirements of Rules 23(a) and 23(b) are constitutionally required in this instance, but, as discussed in the initial objection and below, they are not met.

In her objection, Ms. Craven challenged the Settling Parties to identify a single class certification as sprawling as the Trust Administration Class, with its attempt to

resolve dozens of wildly different theories of liability involving multiple types of property rights in a single class, with proposed relief divorced from the nature of the underlying individualized claim. In 145 pages of combined briefing, they failed to do so: the term "cohesive" is entirely absent from plaintiffs' two briefs, and the government mentions it only in the context of the Historical Accounting class. The settling parties have waived any argument that they can meet the constitutional requirements of cohesiveness for class certification. Rather, they argue against all precedent that, so long as there is a single common issue, a class can be constitutionally certified no matter how divergent individual class members' interests are from each other and the class representative. Dkt. No. 3763 at 4. The only common issue that plaintiffs identify in the Trust Administration class is the common defendant and the fact that the class members have IIM accounts. *Id.* at 4–7. This claim is risible; the government notably does not adopt it.

If one were to take this argument seriously, it would logically follow that it would be constitutionally permissible for a single class representative with a wage-and-hour claim against General Motors to certify a class against that defendant encompassing breach-of-warranty claims, workers' compensation claims, product liability personal injury claims, environmental nuisance claims, and employment discrimination claims, so long as there was a common issue (such as, say, piercing the veil to reach a different corporate entity). That hypothetical class is absurd on its face,

but no more absurd than the Trust Administration Class that these parties ask this Court

to certify: a legal and conceptual monstrosity that entails dozens of similarly divergent

claims over individualized trust accounts and parcels of land. As in *Amchem*, "Although

the named parties alleged a range of complaints, each served generally as representative

for the whole, not for a separate constituency"; thus, the settlement can not be

approved. 521 U.S. at 621.

> [W]here differences among members of a class are such that
> subclasses must be established, we know of no authority that permits
> a court to approve a settlement without creating subclasses on the
> basis of consents by members of a unitary class, some of whom
> happen to be members of the distinct subgroups. The class
> representatives may well have thought that the Settlement serves the
> aggregate interests of the entire class. But the adversity among
> subgroups requires that the members of each subgroup cannot be
> bound to a settlement except by consents given by those who
> understand that their role is to represent solely the members of their
> respective subgroups.

*Id.* (*quoting In re Joint Eastern and Southern Dist. Asbestos Lit.*, 982 F.2d 721, 742-743

(1992), *modified on reh'g sub nom. In re Findley*, 993 F.2d 7 (1993)). The Trust

Administration Class cannot be constitutionally certified.[5]

---

[5] In support of this argument, Ms. Craven's objection cited several cases holding that the
last-minute addition of unlitigated claims to a settlement was problematic. The
government singles out one of those cases, *The Authors Guild v. Google, Inc.*, No. 05 Civ
8136, 2011 WL 986049 (S.D.N.Y. Mar. 11, 2011), and makes an orthogonal argument
about copyright law; regrettably, it fails to address the underlying problem, other than
to state (repeatedly and falsely)  that the Claims Resolution Act was a legislative
enactment of the terms of the settlement, rather than a ratification of an executive
branch litigation decision.

**IV.     The Notice Failed To Provide A Meaningful Opportunity To The Sprawling Trust Administration Class To Knowingly Exercise An Opt-Out Right Because That Notice Did Not Disclose The Additional Rights Granted To Opt-Outs.**

Ms. Craven argued that the settlement could not be approved under Rule 23(e) because the absence of an accounting left class members in the dark about the value of their trust administration claims; the extinguishing of the right to an accounting by the mandatory historical accounting class destroys the power of class members to meaningfully exercise opt-out rights in the Trust Administration class.

Plaintiffs do not address this problem, but the government responds that this is not a problem at all, because Section I.7 of the Settlement Agreement permits Trust Administration Class Members who opt out the right of an accounting. Dkt. No. 3764 at 33. This is an interesting reading of the settlement agreement. This claim was omitted from the notice, rendering it deficient: the notice to the class members and all of the FAQs indicate that one cannot get an accounting. The detailed notice and FAQ refers class members to section A.15 of the Settlement Agreement, and nothing in section A.15 indicates that there is any possibility of obtaining an accounting; rather, it explicitly states that the right to a historical accounting is one of the claims that will be waived. The detailed notice further states:

> If you chose to exclude yourself from the Trust Administration Class,
> - You will not receive any money for your Fund Administration and Land Administration Claims.

- You will not be bound by the Court's ruling and will keep your right to sue the federal government for these Claims.
- You cannot object to or comment on this aspect of the Settlement as far as it concerns the Trust Administration Class.

That list omits the material element "You will have the right to seek a historical accounting," a fact of the utmost importance given that other parts of the notice told class members that they could no longer seek a historical accounting. (The settlement itself incorrectly states that no opt out from the Historical Accounting Class is possible. § C.2.a.) The notice did not give class members a fair opportunity to opt out. Ms. Craven is an attorney who, in fact, the notice misled; how could it have given fair notice to the rest of the class?

Given the government's interpretation of the settlement, the notice was constitutionally insufficient. Lay class members should not have to scrutinize an 89-page settlement looking for a loophole; the possibility of a *de facto* opt-out of the Historical Accounting Class that could be achieved by opting out of the Trust Administration Class was only mentioned buried in a March 1, 2010 update. Class members are entitled to "the best notice that is practicable under the circumstances," and there was no reason to omit this highly material fact from an 18-page detailed notice—other than to artificially deflate the number of opt-outs. Corrective notice, and an additional opportunity to opt out, is necessary to let class members know that the government will

provide an accounting to anyone who wishes to opt out and bring trust administration claims.

Moreover, this late description of a critical component of the settlement (again, buried within the legal papers) provides a vivid test of the Rule 23(a)(4) adequacy of the representative plaintiffs. As discussed above, Ms. Cobell testified about the case of James Kennerly and his family, where poor administration of their trust cost them "millions" in misallocated oil royalties. Did Ms. Cobell tell her "close personal friend" that he should forgo his $500 and opt out of the Trust Administration class, sue in federal claims court, and obtain an accounting in aid of judgment? James Kennerly, Jr., did not opt out (Dkt. No. 3748-1), and this court should inquire why: did class counsel and the class representative choose to leave this important fact relatively unpublicized for fear that if it became well known, enough class members might opt out to allow the government to elect to terminate the agreement? Settlement § C.2.f.

The only way to find out is to issue new notice and give class members a fair opportunity to knowingly choose whether to opt out. Because of the notice's omission of a material term of the settlement, class members who should have opted out did not. The existing notice is constitutionally insufficient to bind the class. *See, e.g., Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1226-29 (11th Cir. 1998) (permitting relitigation of class action because of inadequacy of class notice).

**V.    The Parties Have Failed To Demonstrate That The Individualized Claims Of The Dozens Of Subclasses In The Sprawling Trust Administration Class Are Being Fairly Valued.**

A district judge has a "duty in a class action settlement situation to estimate the litigation value of the claims of the class and determine whether the settlement is a reasonable approximation of that value." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004).

The parties do not deny that they failed to do that for each of the dozens of subclasses in this case. Indeed, we now know to a certainty that plaintiffs have undervalued these claims, because they are arguing that the statute of limitations would bar many such claims. Dkt. No. 3763 at 10; *id.* at 29. Not so. Pub. L. 108-7 ("[N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss."); *Shoshone Indian Tribe of the Wind River Reservation, Wyoming v. United States,* 364 F.3d 1339 (Fed. Cir. 2004).

Plaintiffs argue that the duty described in *Mirfasihi* only applies to cases where there is an allegation of collusion. Nothing in Judge Posner's description of the duty depends on collusion; the duty accrues to all district court judges in any evaluation of a

settlement under Rule 23(e).[6] *E.g., Synfuel Tech. v. DHL Express (USA)*, 463 F.3d 646, 653 (7th Cir. 2006). Courts in this Circuit use less vivid language, but the effective standard is no different, requiring a district court judge to examine "the terms of the settlement in relation to the strength of the plaintiffs' case." *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 54 (D.D.C. 2010). *Accord* American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.05(a)(2). But, like *Mirfasihi*, there are dozens of subclasses that a handful of class representatives seek to represent, without any indication of analysis of the numerous claims involved. Ms. Cobell testified under oath that the value of the Kennerly family's claim was millions of dollars, for which they will receive $500—the same as a class member whose claim is indeed worthless. In all of the hundreds of pages of briefing in support of the settlement, there is no explanation of what happened to the Kennerly claim, and those of Indians like them.

Yes, the plaintiffs belatedly provide a specific analysis of some of the subclasses of claims regarding the management of funds received into the Trust; they show that

---

[6] In any event, there is more than one type of collusion. The class representative can collude with the class counsel to produce a settlement that benefits themselves at the expense of fairness to the class members. *Mirfasihi*, 356 F.3d at 785 (citing cases and John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 COLUM. L. REV. 370, 385-93 (2000)). Here, where class counsel is promoting a $13 million award to the class representatives, while the class representatives are standing idly by while class counsel breaches the settlement to request nearly a quarter-billion dollars, there is sufficient evidence of collusion at the expense of the class to require scrutiny even under plaintiffs' stilted view of Rule 23(e).

---

those subclasses of claims can be estimated at between $143 million and $3.3 billion, given prior district court decisions and evidence submitted to date. And if the Trust Administration class waiver just dealt with these claims, then the $1.1 billion allocated to the class could not be challenged. But the sprawling Trust Administration class waiver goes well beyond these issues to encompass dozens of other types of claims where no valuation has been performed—or, at least, disclosed to the class in the filings related to the settlement approval. In sworn testimony, Ms. Cobell stated that these "claims would in and of themselves be worth tens of billions of dollars." Ex. 1 at 6.

The parties have failed to carry their burden, and the Trust Administration class settlement cannot be approved.

**VI.   The Remedy For The Sprawling Trust Administration Class Is Unfair Because It Bears No Relation To The Underlying Claims; Systematically And Perversely Undervalues The Most Injured Class Members While Providing Windfalls To Class Members Who Have Suffered No Injury; And Fails To Resolve Intra-Class Conflicts.**

Ms. Craven objected to the procrustean methodology of allocation of funds in the Settlement Administration class, an allocation whose capriciousness is demonstrated by Ms. Cobell's own testimony about the Kennerly family cited above. The allocation methodology is impermissibly unfair and unreasonable, and cannot be approved under Fed. R. Civ. Proc. 23(e).[7]

---

[7] The parties protest that Ms. Craven does not provide an alternative methodology. There is no requirement for her to do so: the burden is on the proponents of a

Plaintiffs now argue that Ms. Craven's "speculation [about mis-allocated revenues and royalties] is not supported by record evidence in these proceedings." Dkt. No. 3763 at 33. Then why did Ms. Cobell testify under oath otherwise before Congress? Plaintiffs cannot be now heard to claim that their poster child of injured class members never had a claim without a better explanation than has been provided why the Kennerly family's multi-million dollar claims are now worth $500 a family member, the same as class members who have pennies in their trust accounts and no oil derricks on their land. To call that "rough justice," as the government does (Dkt. No. 3764 at 40) is to render the words (and the entire concept of a fairness hearing) devoid of meaning. "[I]ntraclass equity" is a "requirement." *Ortiz*, 527 U.S. at 863, and the parties have not demonstrated its achievement here. Rather, plaintiffs fall back on the fallacy that the "ratification" by Congress of opening the purse-strings for the executive branch to pay class members nullifies the requirement that the judicial branch ensure that the settlement meets the standard of Rule 23(e).

When courts refer to "rough justice," they refer to the sort of leveling off where a class member with three $15 claims is treated identically to one with two. *E.g., Reynolds*

---

settlement to establish that the settlement is fair and reasonable to the absent class members who are to be bound by that settlement, and the court has no power to amend the settlement: all it can do is provide an up or down vote. But the 2007 legislation rejected by plaintiffs provides an example of a fair allocation methodology and administrative procedure that would protect class members' rights.

*v. Beneficial Nat. Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (modesty of stakes permits smoothing out minor differences between class members) (rejecting settlement on other grounds). It does not refer to a scything of the entire class, where claims that differ by orders of magnitude are treated identically; it does not allow a court to willy-nilly discard the rights of subclasses and unrepresented class members of a sprawling class to force a square settlement peg into a round class action hole. As Ms. Craven noted in her objection, and as the parties do not deny, when confronted with the choice of disapproving an unfair class action settlement because of constitutional concerns or doing rough justice for the "aggregate interests of the entire class," the Supreme Court and other courts repeatedly reject the idea of rough justice, and deny settlement approval—even if it means forcing the lower courts into lengthy litigation that "defies customary judicial administration" because Congress failed to create an administrative remedy. *Ortiz*, 527 U.S. at 821; *Amchem*, 521 U.S. at 621 ("aggregate interests of the entire class" insufficient reason to approve settlement at expense of constitutional concerns) (*quoting In re Joint Eastern and Southern Dist. Asbestos Lit.*, 982 F.2d 721, 742–743 (1992), *modified on reh'g sub nom. In re Findley*, 993 F.2d 7 (1993)); American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.05(a)(3), (b). *See* Craven Objection at 11–12 (citing other cases).

## VII.   The Settlement's Requirement Of A Mandatory Waiver Of Rights Already Won Is Unconstitutional.

Ms. Craven argued that, as a matter of law, the class representative could not agree to settle claims already won for monetary relief that might be worth less than the underlying right to an accounting in a mandatory 23(b)(2) class. In response, the parties repeat the fallacy that the Claims Resolution Act enacted the settlement into law. Again, if that were true, there wouldn't be a fairness hearing. The only thing Congress ratified was the executive branch's litigation decision. Congress did not, and could not, demand this Court approve the settlement.

Ms. Craven noted that the pending Supreme Court case of *Wal-Mart Stores, Inc. v. Dukes*, No. 10-277, almost certain to be decided by June 30, has a chance of creating precedent relating to the availability of monetary relief under Rule 23(b)(2) in lieu of particularized injunctive entitlement. While *Wal-Mart* is an employment case, the oral argument in that case indicated that the justices were interested in the general question of the appropriate scope of 23(b)(2) classes and relief; that the class in that litigation is bringing employment claims rather than accounting claims does not change its potential relevance to this case. If the settling parties are right and *Wal-Mart* turns out to be irrelevant (and they may well be: Ms. Craven does not pretend to know how broad the Supreme Court's decision will be), then it will be painless for the parties to submit a

one-page brief saying that—much more painless than the converse scenario where this Court issues a decision that might be abrogated by the Supreme Court in under a week.[8]

## VIII.   The Proposed $13 Million In Class Representative Incentives Creates An Impermissible Conflict Requiring Decertification.

Class representatives' request for $13 million in incentive payments and mischaracterized "expenses" is not only exorbitant, but divorces their interests from those of the class, preventing approval of the settlement under Rule 23(a)(4). The class representatives' incentive is now to get *any* settlement approved, no matter its fairness to the class or the request for an extra $173 million windfall for the class counsel. The class representatives are no longer representing the class, and the class must be decertified.

In response, the plaintiffs argue that the 1997 certification decision can not be challenged no matter what the class representatives do during the pendency of the litigation: "the request is improper and there is no support in the law of this Circuit or even the cases outside this Circuit upon which the objectors purport to rely." Dkt. No. 3763 at 43. This is wrong.

---

[8] The government cites *United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980), for the proposition that Congress is free to exchange the right of the historical accounting for cash. But that dicta in *Sioux Nation* imposes the additional requirement that the consideration be adequate, a "mere change in the form of investment." *Id.* at 423-24. It is not a Rule 23(b)(2) distribution, where there is no way of guaranteeing adequate compensation in a mandatory class receiving equal shares. The $1000 is surely adequately compensatory (and even over-compensatory) for many class members, but just as surely not for many others.

> A district court has a duty to assure that a class once certified
> continues to be certifiable under Fed. R. Civ. P. 23(a). *See Hervey v.*
> *City of Little Rock*, 787 F.2d 1223, 1227 (8th Cir.1986). A district court
> must reconsider a ruling certifying a class, for instance, if a
> subsequent development creates a conflict of interest that prevents
> the representative party from fairly and adequately protecting the
> interests of all of the class members. *See Boucher v. Syracuse*
> *University*, 164 F.3d 113, 118-19 (2nd Cir. 1999).

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1145 (8th Cir. 1999). *Accord In re Integra Realty*

*Resources*, 354 F.3d 1246, 1261-62 (10th Cir. 2004) (objection preserves right to challenge

class certification); *In re Dennis Greenman Sec. Lit.*, 829 F.2d 1539, 1542-43 (11th Cir. 1997)

(same); *Lightfoot v. District of Columbia*, 246 F.R.D. 326, 334 (D.D.C. 2007) (citing *Petrovic*

and concluding "that it is appropriate to consider the District's Motion to Decertify at

this point in light of the changed circumstances of this case").[9]

The class representatives have refused to withdraw their $13 million incentive-

payment request. The resulting conflict of interest prevents them from meeting Rule

23(a)(4) adequacy requirements: there is no settlement and no attorney-fee request that

class representatives would refuse, no matter how unfair to unrepresented class

members, if it would endanger an independent multi-million dollar payout. As the

government brief notes, "the 'incentives' of the class representative must 'align with

---

[9] Plaintiffs' similar claim that a preliminary class certification cannot be challenged is
plainly false and exhibits a fundamental misunderstanding of class action law. The
December 21, 2010 preliminary certification does not preclude a full analysis of the
certification question at the fairness hearing; indeed, that analysis is required before the
settlement can be approved.

those of absent class members so as to assure that the absentees' interests will be fairly represented.'" *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003) (*quoting Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000)). Here, the alignment has been disrupted because the class representatives' incentives are to assure settlement approval, rather than the best settlement (or the best result) for the class. As such, the class representatives can no longer be trusted to represent the class's interests, and the parties' argument that there is no evidence of a conflict is risible: the evidence is sitting on the docket in the class representatives' own filing.

The cases the parties cite to the contrary are inapposite: a $2500 or $7500 incentive payment does not distort incentives or create conflicts the way a $13 million incentive payment does. As in *Murray v. GMAC Mortg. Corp.*, "the class device [has] been used to obtain leverage for one person's benefit," preventing settlement approval. 434 F.3d 948, 952 (7th Cir. 2006). And as the Supreme Court held in *Young v. Higbee*, 324 U.S. 204 (1945), it is inherently impermissible for parties seeking to litigate on behalf of a class to take a wildly disproportionate share of the settlement proceeds of litigation.

The Rule 23(a)(4) requirement of adequate representation is constitutionally mandated. *Nat'l Ass'n for Mental Health, Inc. v. Califano*, 717 F.2d 1451, 1457 (D.C. Cir. 1983); *Phillips v. Klassen*, 502 F.2d 362, 364 (D.C. Cir. 1974). Congress cannot waive it. Ms. Craven does not own a time machine or a crystal ball, and could not possibly point out that a 2010 incentive-payment violates Rule 23(a)(4) when the class was originally

certified in 1997—especially when the class representatives were falsely telling the world that they would not be seeking any special treatment. The changed circumstances, however, do require the court to decertify the class.

## IX.   Class Counsel Admits That The $7 Billion Settlement Offer Was Not Phantom.

Ms. Craven noted that the fee request of $223 million is especially outrageous because the plaintiffs rejected a $7 billion settlement that only offered $210 million in fees. Though class counsel calls that settlement "phantom," they eventually admit that they rejected it, as they must, as Ms. Cobell effectively killed the plan by testifying against it. *See* Ex. 1 (Cobell testimony); Dkt. No. 3763 at 52. But as in Aesop's fable of the sour grapes, plaintiffs claim that they would reject that settlement again today, even though they give no explanation why the additional terms of the settlement (which include an accounting *and* an administrative procedure that prevents the procrustean and unfair results of this settlement, as well as empowering Indians to manage their own affairs) will cost the class more than the $5.6 billion that plaintiffs passed up. Contemporaneously, this was not why they rejected the settlement: plaintiffs rejected the settlement because of a "breathtaking" extinction of claims: "For a mere $7 billion, they would extinguish Cobell and all mismanagement or breach of trust claims whatsoever that an individual Indian could possibly bring against the United States." Ex. 1 at 6. In other words, the same extinction in the Trust Accounting class that

plaintiffs defend today. Having forced the class to wait several extra years and take an 80% haircut, it would be highly inequitable for class counsel to profit from that extra four years of litigation. Class counsel does not challenge Ms. Craven's legal analysis of the effect of unreasonable settlement positions on a fee request; total fees and expenses and incentive payments should not be higher than $50 million. This is especially true here, where class counsel brought litigation they claimed was worth tens or even hundreds of billions of dollars (*e.g.* Ex. 1 at 6–7), but settled for pennies on the dollar: that is a loss, not a win, and class counsel is not entitled to a windfall for their lack of success.

## X.     Courts Should Adopt The American Law Institute Standards For Settlement Approval.

Plaintiffs argue, citing a number of non-binding district-court cases such as *Radosti*, a variety of factors that this Court should consider in evaluating the fairness of the settlement. Dkt. No. 3762 at 24–25. As the American Law Institute's *Principles of the Law of Aggregate Litigation* discusses, however, most of these factors are entirely irrelevant to the fairness of a class action settlement, and can result in courts approving unfair settlements because of trivia common to all class action settlements, fair and unfair. Section 3.05, comment *a*. Ms. Craven asks this court to instead adopt ALI's *Principles* in evaluating the settlement; to the extent this Court feels bound by the district-court cases the plaintiffs cite, Ms. Craven preserves this argument for appeal.

Plaintiffs ask the court to consider "the status of the litigation at the time of settlement." But, a "court, in reviewing a settlement, should not give any predetermined weight either to the fact that the case was pending for a substantial period of time before a settlement was reached or to the fact that a settlement was reached early in the case. ... [T]he mere fact that a settlement occurred many months (or even many years) after the case was originally filed does not itself ensure that the agreement is fair and reasonable." *Id.* § 3.05, comment *a*.

Similarly, the court should not infer anything from the relatively low number of objectors. Silence is simply *not* consent. *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 447 (S.D. Iowa 2001), *citing In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 789 (3d Cir. 1995). "Silence may be a function of ignorance about the settlement terms or may reflect an insufficient amount of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low." Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 73 (2007). Without *pro bono* counsel to look out for the interests of the class, filing an objection is economically irrational for any individual.

"[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a

small number of objectors to a sophisticated settlement." *In re GMC Pick-Up Litig.*, 55 F.3d at 812 (*citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217–18 (5th Cir. 1981)). "Acquiescence to a bad deal is something quite different than affirmative support." *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1137 (7th Cir. 1979) (reversing approval of settlement). The Court similarly cannot put value on the number of opt-outs, especially in such a case as this, in which the notice was impermissibly misleading about the costs and benefits of opting out.

"[T]he opinion of experienced counsel" is obviously irrelevant: "the lawyers who negotiated the settlement will rarely offer anything less than a strong favorable endorsement." *Principles* § 3.05, comment *a*.

Finally, "[i]n reviewing a proposed settlement, a court should not apply any presumption that the settlement is fair and reasonable." *Principles* § 3.05(c). *Accord Vista Healthplan, Inc. v. Warner Holdings Co. III., Ltd.*, 246 F.R.D. 349, 357 (D.D.C. 2007) ("In considering whether to approve a proposed class action settlement, the Court must strike a balance between a rubber stamp approval and the detailed and thorough investigation that it would undertake if it were actually trying the case.") (quotation omitted).

## CONCLUSION

The Court should reject this settlement. The Claims Resolution Act anticipated a full-fledged fairness hearing, and does not require this Court to ignore the requirements of the U.S. Constitution and Rule 23(e) in evaluating this settlement; the settling parties' interpretation of the Act would render it unconstitutional. There are multiple independent reasons to reject the settlement: the sprawling Settlement Administration class cannot be constitutionally certified; the parties have failed to quantify the value of dozens of claims being waived; the allocation of settlement proceeds bears no rational relationship to the alleged damages; the settlement makes many members of the mandatory class worse off than they were situated in the litigation; and the class representatives now have a conflict of interest with the rest of the class that makes them constitutionally inadequate representatives.

Furthermore, the settlement notice was materially misleading, and thus unconstitutional: it artificially discouraged many class members from opting out, though opting out would have been in their best interest. If the Court is inclined to approve the settlement, it must require corrective notice and a new opportunity to opt out.

In the event that this Court does approve the settlement, the fee and expense award for Class Counsel and the intervening attorneys, along with the class representative incentive payments (including "expenses"), should be capped at $50 million total.

Dated:  May 31, 2011

Respectfully submitted,

*/s/ Theodore H. Frank*
Theodore H. Frank (DC Bar No. 450318)
CENTER FOR
CLASS ACTION FAIRNESS LLC
1718 M Street NW, No. 236
Washington, DC 20036
Telephone:  (703) 203-3848
Email:  tedfrank@gmail.com

Attorney for Kimberly Craven

**PROOF OF SERVICE**

I hereby certify that, on May 31, 2011, the foregoing **OPPOSITION OF KIMBERLY CRAVEN TO MOTION FOR FINAL APPROVAL** was served by Electronic Case Filing, and on the following party who is not registered for Electronic Case Filing, by facsimile:

> Earl Old Person (*Pro se*)
> Blackfeet Tribe
> P.O. Box 850
> Browning, MT 59417
> Fax (406) 338-7530

Executed on May 31, 2011.

> */s/ Theodore H. Frank*
> Theodore H. Frank