# TESTIMONY OF ELOUISE C. COBELL, LEAD PLAINTIFF IN *COBELL V. KEMPTHORNE*

## COMMITTEE ON INDIAN AFFAIRS
## UNITED STATES SENATE

## OVERSIGHT HEARING ON TRUST FUND LITIGATION, *COBELL V. KEMPTHORNE*

## MARCH 29, 2007

## INTRODUCTION

Good morning, Chairman Dorgan, Vice-Chairman Thomas and Members of the Committee.  Thank you for inviting me here today to provide testimony to the Committee on this most critical of issues – bringing justice to 500,000 individual Indians by resolving fairly the Individual Indian Trust Fund lawsuit, *Cobell v. Kempthorne*.

Candidly, Mr. Chairman I come before you today frustrated by this process.  We have waited 120 years to end the abuse and obtain redress from the United States for the malfeasant mismanagement of <u>our property</u>.  We have come to this body year after year asking for relief from this continuing ill-treatment and the pervasive fraud that surrounds the mismanagement of the individual Indian Trust.  We hear year after year pledges of support and promises by Administration after Administration that they will redress what the Congress of the United States itself has admitted is "fraud, corruption, and institutional incompetence almost beyond the possibility of comprehension" in the handling of 10 million acres of resource-rich lands (and the proceeds thereof) belonging to individual Indians, but held in trust and managed by this most unscrupulous of trustees.  Still today, everyday, we continue to endure the broken trust that robs our individual Indians of their birthright.

We have worked with this Committee for many years now to forge a fair settlement.  I do not understand why more progress has not been made.   I feel like every year we are asked to state our position, but our position has not changed. Indeed, my testimony to this Committee on March 9, 2005  is equally relevant to today's proceedings as it was then:

> **There is nothing that I want more than an immediate and fair resolution of the *Cobell* case**.  It is a matter of record that the government has mismanaged this trust for over a century. In November 1989, this Committee explicitly found that fraud and corruption pervades the management and administration of this Trust.

> In the Fall of 1995, Mr. Chairman [Senator McCain], you yourself noted during the confirmation hearing of the first Special Trustee, that the management of this trust has been "criminal." Sadly, nothing has changed. *Cobell v. Norton* has shed further light on the gross mismanagement of this Trust and has raised this serious problem from the deepest and most secluded shadows of government bureaucracies to the light of day, where everyone can see the extraordinary injustice and abuse. A century of deplorable mismanagement is far, far too long.[1] A century with no accounting of trust assets is unconscionable and unprecedented. A century of harm to hundreds of thousands of this nations poorest citizens in inexcusable. And the harm done to the plaintiff class everyday is unquantifiable. This is often a matter of life and death. A resolution is long past due. I, along with other class representatives and our counsel who have aided us in pursuing our rights will work with whomever is capable of achieving a fair resolution.
>
> Moreover, I want to emphasize that this is not a new position. From inception, we have always sought an expeditious resolution of this case. We continue to do so. We have been and continue to be willing to participate in any resolution process conducted in good faith that is reasonably calculated to lead to resolution of this matter in an expeditious and fair manner – whether that be working with Congress for acceptable legislation, mediation, arbitration or continuing litigation. Simply put, plaintiffs have no interest in prolonging these proceedings.
>
> While we will remain steadfast in our commitment to seek a prompt resolution of this case, we have an unconditional ethical obligation to ensure that any settlement is fair. We and our counsel will, of course, vigorously resist "settlement" that allows pennies on the dollar to the beneficiary class or that fails to address in a meaningful way the on-going and profound mismanagement of their trust assets. It is my obligation as lead plaintiff and my lawyers duty as class counsel to work towards immediate settlement, while at the same time forcefully resisting any resolution that would further harm the beneficiary-class.

*Oversight Hearing on Trust Reform Before the S. Comm. on Indian Affairs*, 109th Cong. 2-3 (March 9, 2005) (statement of Elouise P. Cobell) (emphasis original).

Nothing I say today will depart from my words offered to this Committee two years ago. But what I will add is that now we have further incontrovertible evidence that the Administration is not serious about settling this matter. What we now know with unmistakable clarity is that –

---

[1] *See, e.g., Cobell v. Norton*, 240 F.3d 1081, 1086 (D.C. Cir. 2001) ("The trusts at issue here were created over one hundred years ago through an act of Congress, and have been mismanaged nearly as long.").

unlike you and the rest of Indian Country – the Administration prefers combative litigation where they can indefinitely obfuscate, delay and obstruct. While we would prefer to resolve this matter, we are prepared to give the Administration what they ask for and continue to move forward vigorously in the Courts. With a newly assigned judge, the Honorable James Robertson, we have asked for an accounting trial date. We believe that the directive of the appellate court to move this case to resolution "expeditiously and fairly" will be heeded and a final trial scheduled soon.[2]  But make no mistake – it is the Administration's continuing refusal to discuss a *fair* resolution that makes vigorous and full-blown litigation inevitable.

I am here today, once again, on behalf of myself and one-half million citizens represented in the *Cobell* lawsuit that we filed nearly eleven years ago in the Federal District Court of the District of Columbia. In that lawsuit, we have prevailed time and again on the merits. Precedent-setting decisions have established, among other things, three fundamentally important conclusions: (1) that the United States has substantial trust obligations including an unqualified duty to provide a complete and meaningful accounting of all trust assets belonging to *Cobell* class members; (2) that the United States is in woeful breach of its fiduciary duties and others duties and has "unconscionab[ly]" delayed providing the requisite accounting; and (3) the Federal Courts have the power to provide appropriate redress to the beneficiary-class and take whatever affirmative steps are necessary to ensure the United States is brought into compliance with its legal duties and fiduciary responsibilities. In other words, that the plaintiffs will ultimately prevail is not in question.

The only question is when. The only weapon the government has is to delay the proceedings indefinitely, by abusing its authority. Unfortunately, the Courts have shown

---

[2] *Cobell v. Kempthorne*, 455 F.3d 317, 336 (D.C. Cir. 2006).

reluctance to force them to act within reasonable timeframes and the Administration abuses this leniency. They cannot win, only impede for a time. But everyday they are successful in doing so, is another day that human beings who comprise the beneficiary class suffer. That is why I support a fair resolution through any possible avenue available.

But, candidly, I am disappointed not only in the Administration, but at this body for failing to take the necessary steps to end the trust fund mismanagement debacle. We want action, not mere words. The time for promises and commitments has come and gone. Doing the right thing will require real political courage. We have prevailed in Court and established a record that serves as a sufficient basis for a fair settlement and justifies the redress we seek. The malfeasance and resultant suffering must be ended. Promises to individual Indians about how committed politicians are to attaining redress for this well-documented injustice and righting this wrong is not enough. Mr. Chairman, the time for action and leadership is now.

My testimony will address three issues. First, I will discuss the absurd "offer" for settlement proposed by Secretary Kempthorne and Attorney General Gonzales. Second, I discuss what it will take to move this congressional effort forward. Third, I will inform this Committee about the tragic impact of further delays.

## **ADDING INSULT TO INJURY**

On March 1, Interior Secretary Dirk Kempthorne and Attorney General Alberto Gonzales sent a letter to this Committee proposing that Congress spend $7 billion over 10 years on various Indian programs. This "offer" is an insult, plain and simple. It is not a starting point and it is not worthy of consideration.

**While $7 billion is certainly not a small amount of money generally-speaking, it does not come close to being sufficient given the extent of mismanagement and the potential liability counted in the hundreds of billions involved here.**

First of all, $7 billion is insufficient to settle the *Cobell* case standing alone. Consider that the Interior Department's own experts, SRA International, have estimated that the government's liability in the *Cobell* case (excluding all other claims) to be at least $10 billion, and that it could exceed $40 billion. We believe that low-balls the true value of the redress we are entitled to, but what it demonstrates conclusively is that when Interior's own consultants review the facts, they agree that $7 billion is insufficient. Moreover, since Interior envisions to pay out this money over 10 years, the time value of money dictates that this is actually not $7 billion, but rather, far less.

But, of course, the proposal is not to settle *Cobell* for $7 billion. Interior would expect to use that same pool to address "all existing and potential individual and tribal claims for trust accounting, cash and land mismanagement, and other related claims, along with the resolution of other related matters . . . that permit recurrence of . . . litigation." The scope of this rights extinguishment is breathtaking.

For a mere $7 billion, they would extinguish *Cobell* and all mismanagement or breach of trust claims whatsoever that an individual Indian could possibly bring against the United States. There has never been any valuation of the non-*Cobell* claims, but reports by the Special Master in *Cobell* indicate that such other claims would in and of themselves be worth tens of billions of dollars.

The proposal would also use part of the $7 billion to address fractionation. By any estimation, to properly address fractionation would cost hundreds of millions, if not billions. It is

a problem of the government's own creation by forcing this broken trust on Indian people so non-Indians could exploit our lands without our consent. Indeed, this issue is not even part of the *Cobell* litigation. Yet, the Administration includes this issue as a part of the "*Cobell*" settlement package. The Indians did not create fractionation problems, the government did. Now, they want us to pay for the resulting mess that they created.

In addition, by its terms, the Administration's proposal would utilize part of this same $7 billion pool to settle all tribal trust claims as well. Ironically, exactly two years ago to the date of the Kempthorne-Gonzales letter of March 1, 2007, Attorney General Gonzales testified before the House Committee on Appropriations regarding the 2006 Budget for the Department of Justice. In discussing the litigation portion of the budget and the impact of tribal trust claims, Attorney General Gonzales pronounced that the "United States' potential exposure in these cases is more than $200 Billion." Yet, somehow he now thinks Indian Country should accept pennies for it.

One additional point about including tribal trust claims in a *Cobell* settlement must be highlighted. Even if the pool was not ridiculously low relative to liability as here, having one pool for Indian Country – tribes vs. individuals to fight over is not a recipe for success. And, unfortunately, given how this Administration plays politics with peoples lives, I suspect it is set up this way purposefully to have individual Indians and tribes battle one another. Simply put, it is yet another government divide-and-conquer technique that, unfortunately, Indian Country is all too familiar with.

Of course, the absurdity of the proposal does not end there. With this same finite $7 billion pool, the government proposes to pay for trust reform and fixing their broken IT security infrastructure – and whatever else government officials might think up in the meantime.

And if that were not enough, the government proposes to end all future liability. That means irrespective of how blatant and how significant future breaches are, the government cannot be held accountable in court for their misdeeds and dereliction. This is in no uncertain terms license to steal provided to an entity – the Interior Department – which is an unscrupulous trustee-delegate with a astonishing record of unconscionable malfeasance.

What this trust needs is more accountability, not less. But the government's proposal would eliminate accountability altogether. Without accountability, as long recognized by courts of equity, there is no trust.[3]

There is still more bad news in this proposal. The "offer" letter, in its plain terms, seeks to terminate the individual Indian Trust. If there are no fiduciary responsibilities, there is no trust. The euphemism used by Secretary Kempthorne and the Attorney General – owner managed trust – is Orwellian indeed. This proposal is not about empowering individual Indians. This is about making the trust, which Interior has broken through its unfitness as trustee and unscrupulousness, become our problem to resolve. If Interior wants to get out of the Indian Trust business, then the appropriate solution is receivership, where the beneficiaries' property can be protected.

In short, this is no offer. Instead, it is a slap in the face of every individual Indian trust beneficiary. Truth be told, however, it is also not a surprise. The nature of the proposals in the Kempthorne-Gonzales letter are perfectly consistent with the abusive attitude long shared by the Departments of Interior and Justice in dealing with Indian people. The *Cobell* case was filed because this proposal is precisely how the government has managed this Trust – without

---

[3]*Bogert, The Law of Trusts & Trustees (rev 2d ed),* § 973, pp 462-464, 467 ("A settlor who attempts to create a trust without any accountability in the trustee is contradicting himself."). *See also, e.g., Wood v. Honeyman*, 178 Or. 484, 566, 169 P.2d 131, 166 (1946) ("We are completely satisfied that no trust instrument can relieve a trustee from his duty to account in a court of

accountability for the rampant fraud, corruption and theft that has defined Interior's reign as trustee. *Cobell* has been and continues to be about infusing accountability after more than a century of documented fraud, incompetence and mismanagement.

## APPROPRIATE NEXT STEPS FOR CONGRESS

We have said for a very long time, in sworn testimony to this body and others that the Administration will *never* come to the table with a fair offer. Never. If this Committee won't act without the tacit or express support of the Administration, then you might as well not waste your time or ours. The Kempthorne-Gonzales Letter of March 1 is simply yet another demonstration of this well established reality.

In dealing with their trust mismanagement, the Interior Department has a long history of foot-dragging topped off with, as here, a watered-down do-nothing proposal. Indeed, as the Vice Chairman will recall, he too has called for immediate congressional action in the face of Interior's continuing recalcitrance and inertia in properly addressing Indian trust matters. On September 26, 1994, then-Congressman Thomas explained to the House Subcommittee on Environment, Energy, and Natural Resources the need to act on this issue of trust reform without further delay:

> We have had two hearings on trust management--or, more properly, mismanagement--in the Native American Affairs Subcommittee this Congress .... Since the Government Operations Committee released its report, "Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund," I have seen precious little change in this sad state of affairs. Instead, I have seen promised deadlines come and go; I have seen promises to reform go unfulfilled. Despite statements made in the early days of the Clinton administration, two years later neither the [Interior] Department nor the BIA has brought us one step closer to resolving the trust fund problem. All we have seen is a continuation of the BIA's one unchallenged specialty: *inertia.*

---

equity.").

> We have seen the pattern repeated over and over. The Department and BIA promise to act, fail to, we are forced to introduce legislation to deal with the issue, and then when passage of the legislation seems imminent they come to us and ask for more time, quote, "because we're working on the problem, really we are," unquote, or they offer their own, watered-down, legislative proposal in the hope of heading ours off....
>
> I am sure that this morning we will hear more of the same excuses and promises, more requests to just give it a little more time, from the Department that we have been hearing for the last six years. But, Mr. Chairman, shame on us, shame on this Congress, if we delay any further.
>
> The Department told us in August, and I am sure will repeat this morning, that they have everything under control. Well, Mr. Chairman, my response to that is an explicative which decorum prevents me from using here but which I will paraphrase: cow manure! .... Mr. Chairman, the Department needs to pull itself out of denial, pull itself out of its fantasy world, and come to grips with [reality]. It is clear that they are incapable of doing it themselves. I sincerely hope that we can do it for them, and will do everything I can to move a bill before Congress adjourns.

140 CONG. REC. 27, 243 (1994).

The unfortunate history is that even after these powerful words, Congress was only able to enact a watered-down version of the 1994 Act that undermined key accountability features of the initial bill. More to the point, this Congress is faced by a similar intractable Administration – refusing to come to the table in good faith to resolve fairly the disaster they and their predecessors created.

There is a way to proceed. You can prepare a bill that puts forward a reasonable settlement of the *Cobell* case. This proposal should not seek to address every issue under the sun – *e.g.,* tribal trust matters, trust reform, IT security, fractionation, and individual claims outside of *Cobell*. Instead, it should address the matter that has brought us to this point, the *Cobell* historical accounting and restatement claims and the underlying malfeasance that *Cobell* seeks to redress. That is simple and doable. Loading a bill up with these other areas will make it impossible to get agreement with all stakeholders, which is precisely why last year the

Administration attached all these provisions to the McCain-Dorgan Bill (S. 1439) in a blatant attempt to kill it. Now, the Kempthorne-Gonzales letter operates in the same fashion.

It is also critical that you not allow yourself to be held hostage by the recalcitrance of this Administration. You must move forward with or without its support. Come forward with what you and the entities who have worked in good faith agree is a fair resolution. Push that forward. If the Administration wants to continue to stand in the way of an equitable resolution to a justice so long denied, then at least force them to do it in the open and on the record.

I understand that it requires courage to take such bold action. But if not on this matter, then on which one? If not now after the Administration has yet again demonstrated their unwillingness to take this process seriously, then when?

## THE COST OF DOING NOTHING

So often in Congress, with respect to this trust mismanagement issue, people talk about the cost of moving forward with a fair resolution. They don't dispute that billions of dollars are owed, but they point out that billions is a lot of money. Last year, this Committee proposed an $8 Billion *Cobell* settlement. Some in Congress thought it was too much; not that they didn't believe we were aggrieved that and more, but that in these days of cost cutting and the Iraq War, it was simply more than the Nation could afford. However, some people seem to forget that what we are seeking the return of *our* own money.

Mr. Chairman, what is curious is how few ask and discuss the costs of failing to resolve the *Cobell* case. There has already been hundreds of millions of dollars wasted on a so-called "accounting," which, because of missing trust records, will never be sufficient to discharge the United States' fiduciary responsibilities. And more than a billion has been wasted on Ross

Swimmer's version of "trust reform" – and still the system is fundamentally broken. There have been many employees of the Department of Interior under attack in retaliation for coming forward to tell the truth with respect to Interior's failed trust reform effort. Additionally, Interior has retaliated against personnel who tell the truth with respect to the insecure information technology systems that put the trust data of individual Indian beneficiaries at grave risk of destruction, manipulation and illicit modification. All of these are costs – extraordinary costs – that will continue to mount every day the case is not fairly and expeditiously resolved.

But these are, by far, not the most important costs resulting from the enduring failure to settle the *Cobell* case fairly and bring justice after a century of abuse. All of these costs pale in comparison to the suffering of individual Indian trust beneficiaries all across this nation. As the Court of Appeals recognized, the consequence of government malfeasance is harm to interests that "are not merely economic interests … but [involve] personal interests in life and health."[4] Since this broken trust robs some of the poorest Americans of the little they have, the human costs outweigh all others.

Here, in Washington D.C., it is a bit easier to overlook the real life consequences of Interior's breaches of trust. But the reality is that every day Indians are dying because they cannot afford adequate medical care and Indian children go hungry because parents lack money to put basic staples on the table. This is not an overstatement and it is not an exaggeration. If you do not take anything else with you today, understand this: Indian beneficiaries are dying and men, women and children are suffering because of the government's abuse and malfeasance.

---

[4] *Cobell v. Norton*, 240 F.3d 1081, 1097 (D.C. Cir. 2001) (internal quotations and citations omitted).

I know the people that suffer this way. They are at every Indian reservation I have visited throughout this country – from Wind River to Fort Berthold to my reservation – the land of the Blackfeet Nation.

Accompanying me here today is one such individual Indian trust beneficiary. He is a close personal friend, a Blackfeet Indian from my reservation, James Kennerly, Jr. James is the son of James Otis Kennerly – or as the Interior Department referred to him, "allottee 1997." James Otis Kennerly was a World War I veteran wounded and disabled in combat fighting for this Nation. He was allotted trust land in 1907 and it included considerable oil and gas resources in the Cut Bank, a resource rich area of the Blackfeet reservation. Today, his son owns this land with his siblings.

As early as 1930, and most likely much earlier, oil companies pumped thousands of barrels a week off Kennerly's land; this is documented in records by the Interior Department's own experts. Documents establish that payments were made to Interior in connection with the leasing of Kennerly's allotment. *Some* of the money even went to Kennerly over sixty years ago. However, according to Interior's own historians, after 1946 there are no documents regarding the lease of his land – no statements, no deposits, and no files. And, there was no money deposited into his account. So what happened?

There is no doubt that the oil wells continue to pump on the land of James Otis Kennerly; you can see it for yourself. His son, James Jr., will take you out there tomorrow if you're interested. Yet after the 1930s, James Sr. did not receive any payments. That continues to be the situation today with James Jr. And, every call or visit to Interior (he recounts hundreds of visits) ends the same way – "we can't give you an explanation." Interior's historians now speculate that his lease was unlawfully unitized with other lands of the Blackfeet Tribe and that the tribe now

receives the income. However, despite hundreds of hours looking for his documents, they don't really know. This is all in a report these historians submitted to the Court in *Cobell*.

And what have been the consequences to the Kennerlys of this theft? For James Sr., a disabled vet, unable to work, it meant that he lived in abject poverty the remainder of his life, as he was not provided his VA benefits either. This poverty contributed to declining health and he passed away in the 1940s. Of course, with no money, he could not afford to take care of his kids during his lifetime, so his son, James Jr. - here with us today - was raised in an orphanage. After that he was sent to government boarding schools, with all the incumbent problems of that system with which those of us from Indian Country are all too familiar.

Now James Kennerly, Jr. and his siblings share their father's land, but they do not receive any money from the oil that still pumps from that land. James Jr. has had more than his fair share of hardship. I can personally attest based on our decades-long friendship that he has led an impoverished existence. The government's theft of his trust funds did not on its own bankrupt James Kennerly, Jr., but it certainly significantly contributed and eliminated any options for improving his situation. It robbed him of his health, an education and opportunity and the abuse continues today. He should be a millionaire, but like his father lives in great poverty. In many ways, the broken trust has robbed him of his life. And the pain it causes continues every day.

This is not an isolated tragedy – James Kennerly, Jr. is not alone. Indeed, there are hundreds of James Kennerlys on every Indian reservation. They too have been robbed of health, education and opportunity and the abuse continues today. They too, like Mr. Kennerly, pay the price for government unfitness as a trustee and the failure to resolve this matter.

Understand Senators that this is a life or death issue. It is for these Americans that we must try and forge a resolution. Let us end the malfeasance and the suffering. The time to act is now for all the James Kennerlys across Indian Country.

What is more tragic still is that if the Department of the Interior had its way, none of this would ever be brought to life through the multi-million dollar, so-called "accounting" they say they are performing. In actuality, they are now engaged in a fraud of historic proportions. Under their scheme, no accounting and no restatement of James Kennerly Jr.'s trust account will ever occur. Since no transactions are reflected on his account statement (if they are even able to locate all his account statements), there is no way to sample the missing revenue. This should be contrasted to the nature of the accounting ordered by the U.S. Court of Appeals which requires an accounting of "all funds." Nevertheless, at the conclusion of the accounting process, some Interior official will wave a magic wand at Kennerly and pronounce his statement "accurate," without ever examining the massive theft that continues to occur today.

It is a devious scheme that Interior has set in motion. It should be clear to all that the accounting determinations made by the Secretary have powerful and detrimental consequences to this class of individual beneficiaries.

We, of course, will work to ensure that Interior's truly diabolical scheme fails. And that is why vigorous litigation will continue unless an alternative fair resolution can be reached.

## **CONCLUSION**

I committed long ago to work with this Committee to bring resolution – to bring justice. That is an outcome I intend to obtain by any means necessary. I ask you today to be a partner, not by saying what needs to happen, but by making it happen.

Thank you.