UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ELOISE COBELL, ET AL  . DOCKET NUMBER:  CA 96-125

.

Plaintiffs,  .

.

vs. . Washington, D. C.

. June 20, 2011

KENNETH SALAZAR, ET AL . 10:00 A.M.

.

Defendants.  .

. . . . . . . . . . . . .

TRANSCRIPT OF FAIRNESS HEARING

BEFORE THE HONORABLE THOMAS F. HOGAN

A UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF: DENNIS M. GINGOLD, ESQUIRE

607 14th Street, NW

9th Floor

Washington, D.C.  20005

(202) 824-1448

(202) 318-2372 (fax)

dennismgingold@aol.com

KEITH M. HARPER, ESQUIRE

KILPATRICK, STOCKTON, LLP

607 14th Street NW

Suite 900

Washington, D.C.  0005

(202) 508-5844

(202) 585-0919 - fax

kharper@kilpatricktownsend.com

Page 2

1    ADAM H. CHARNES, ESQUIRE
2    KILPATRICK TOWNSEND & STOCKTON, LLP
3    1001 West Fourth Street
4    Winston-Salem, NC  27101
5    (336) 607-7382
6    (336) 734-2602 (fax)
7    acharnes@kilpatricktownsend.com
8    WILLIAM E. DORRIS, ESQUIRE
9    KILPATRICK TOWNSEND & STOCKTON, LLP
10   1100 Peachtree Street
11   Suite 2800
12   Atlanta, GA  30309-4530
13   (404) 815-6104
14   (404) 541-3183
15   bdorris@kilpatrickstockton.com
16   ELLIOTT H. LEVITAS, ESQUIRE
17   KILPATRICK TOWNSEND & STOCKTON, LLP
18   1100 Peachtree Street
19   Suite 2800
20   Atlanta, GA  303090-4530
21   (404) 815-6500
22   elevitas@kilpatrickstockton.com
23   CRAIG E. BERTSCHI, ESQUIRE
24   KILPATRICK, TOWNSEND & STOCKTON,
25   LLP
26   1100 Peachtree Street, NE
27   Suite 2800
28   Atlanta, GA  30309
29   (404) 815-6493
30   (404) 541-3128
31   cbertschi@kilpatricktownsend.com
32   DAVID C. SMITH, ESQUIRE
33   KILPATRICK STOCKTON, LLP
34   1001 West 4th Street
35   Winston Salem, NC  27101-2400
36   (336) 607-7392
37   (336) 734-2611 (fax)
38   dcsmith@kilpatrickstockton.com

Page 3

1    THADIUS HOLT, ESQUIRE
2    FOR THE DEFENDANTS: ROBERT E. KIRSCHMAN, JR., ESQUIRE
3    U.S. DEPARTMENT OF JUSTICE
4    1100 L Street, NW
5    Suite 10008
6    Washington, D.C.  20005
7    (202) 616-0328
8    robert.kirschman@usdoj.gov
9
10   MICHAEL J. QUINN, ESQUIRE
11   U.S. DEPARTMENT OF JUSTICE
12   Box 875
13   Ben Franklin Station
14   Washington, D.C.  20044
15   (202) 307-0243
16   (202) 514-9613
17   michael.quinn3@usdoj.gov
18   J. CHRISTOPHER KOHN, ESQUIRE
19   U.S. DEPARTMENT OF JUSTICE
20   Commercial Litigation Branch
21   Ben Franklin Station
22   P. O. Box 875
23   Washington, D.C.  20044-0875
24   (202) 514-7450
25   (202) 514-9163 (fax)
26   chris.kohn@usdoj.gov
27   PAUL G. WOLFTEICH, ESQUIRE
28   U.S. DEPARTMENT OF TREASURY
29   799 9th Street, NW
30   Washington, D.C.  20239
31   (202) 504-3705
32   (202) 504-3633
33   paul.wolfteich@bdp.treas.gov

Page 4

1    JOHN T. STEMPLEWICZ, ESQUIRE

2    U.S. DEPARTMENT OF JUSTICE

3    Senior Trial Counsel

4    Commercial Litigation Branch

5    P. O. Box 875

6    Ben Franklin Station

7    Washington, D.C.  20044

8    (202) 307-1104

9    (202) 305-4933

10   john.stemplewicz@usdoj.gov

11   THE COURT REPORTER: SUSAN PAGE TYNER, CVR-CM

12   Official Court Reporter

13   United States District Court

14   333 Constitution Avenue, N.W.

15   Room 6523

16   Washington, D.C.  20001

17   (202) 354-3267 Susan_Tyner@dcd.uscourts.gov

18   Computer aided transcript prepared with the aid of

19   SpeechCAT.

Page 5

1    P R O C E E D I N G S

2    THE COURTROOM DEPUTY:  All rise.  This Honorable

3    Court is now in session.  The Honorable Judge Thomas F.

4    Hogan presiding.  Please be seated and come to order.

5    Civil action 96-1285.  Eloise Cobell, et al,

6    versus Kenneth Salazar, et al.

7    Counsel, please approach the lectern, state your

8    names and who you represent for the record, beginning with

9    plaintiffs' counsel.

10   MR. GINGOLD:  Your Honor, Dennis Gingold for

11   plaintiffs.

12   Would you like me to identify the --

13   THE COURT:  Yes.  For the record, everyone who is

14   here should identify themselves.

15   MR. GINGOLD:  Mr. Harper, Mr. Levitas, Mr.

16   Charnes, Mr. Bertschi, Mr. Smith, Mr. Dorris and Mr. Holt.

17   THE COURT:  Thank you.

18   MR. KIRSCHMAN:  Good morning, Your Honor.  For

19   defendants in this case Robert Kirschman from the Department

20   of Justice, and with me at counsel table, also from the

21   Department of Justice, I have Michael Quinn, John

22   Stemplewicz and Chris Kohn.

23   Also at counsel table with us for the Department

24   of Treasury is Paul Wolfteich.

25   I believe joining us will be -- from the

Page 6

1    Department of Interior -- Hillary Tompkins, the Solicitor,
2    also.
3    THE COURT:  All right, thank you.
4    We are gathered here this morning, and I
5    appreciate --
6    ARENT FOX:  (Unintelligible) from Arent Fox on
7    behalf of Mark Brown.
8    THE COURT:  You filed a motion overnight to
9    intervene.  I am going to hold that for right now.  Thank
10   you.
11   ARENT FOX:  Thank you, Your Honor.
12   THE COURT:  We are here to consider the petitions
13   for the approval of the settlement in this case that were
14   preliminarily approved last year before we proceeded to have
15   the circulation of the settlement, the opportunity for
16   people to object and to appear, and for explanations to be
17   given to those affected.
18   This is an historic case that has a long history,
19   some tragic and now more recently successful, and I have
20   allowed, in my order, the organization for the fairness
21   hearing today to allow those who wish to appear to be heard
22   to be allowed to speak.
23   But first what I'm going to do is have the opening
24   statements by the plaintiffs and the defendants made.  Then
25   I will turn to the objectors, each of which were given a

Page 7

1    reasonable time to hear their objections, and when we
2    conclude that we will have the response to the objections by
3    the plaintiffs and defense counsel, and finally closing
4    remarks and my rulings.
5    I expect this will take some time.  I would
6    appreciate quiet as possible in the courtroom, but you are
7    welcome to leave if you need to leave at some point.  At an
8    appropriate point we will probably take a recess for the
9    parties here to have a short break as well.
10   So with that in mind, we will follow that course,
11   and the first proceedings then for the court will be to
12   recognize the parties' counsel in this case, to basically
13   give an opening statement, a summary of where we are, the
14   factors that I need to consider as to whether or not this is
15   an appropriate settlement, and sort of a preview of where
16   they are going as we go forward before we hear the objectors
17   in this case.
18   I have arranged to have all of the objections
19   filed.  Some were handwritten, many to me.  Every one that
20   has been received in this court has been forwarded to
21   counsel if counsel had not gotten them directly, and filed
22   as a part of the court record.
23   I received one by e-mail this morning that is
24   late, but I have looked at it, plus I received an e-mail
25   from Loren Zeipher, Z-e-i-p-h-e-r, saying that she is unable

Page 8

1    to make the hearing.  She appreciates and thanks the court
2    for its opportunity given to speak, but will not be
3    appearing today.
4    With that background then, I will hear from
5    plaintiffs' counsel first.
6    MR. DORRIS:  Good morning, Your Honor.  If it
7    please the court, I am Bill Dorris, and on behalf of the
8    plaintiffs and class counsel, we would like to thank you for
9    taking on this very difficult, challenging and time-
10   consuming matter, and we appreciate your expeditious
11   handling of it.
12   Plaintiffs respectfully ask this court to bring
13   this epic struggle to a close by the court granting final
14   approval of the settlement agreement which has been
15   ratified, authorized and confirmed by Congress, and signed
16   into law by the President, and to also enter final judgment
17   giving effect the terms of the settlement.
18   Your Honor, it is my privilege today to introduce
19   the class representatives to the court.  We have present in
20   the courtroom with us three of the class representatives,
21   and I would like to introduce them to you, and I would ask,
22   please, that they stand so that you will know who they are
23   as I do.
24   First we have Tom Maulson, who is the tribal
25   chairman of the Lac du Flambeau tribe in Wisconsin.  We have

Page 9

1    Louisa Rose, the former tribal chairman of the Winnebago
2    tribe in Nebraska, and we have Penny Cleghorn who lives in
3    Apache, Oklahoma.  Penny replaced her mother, Mildred, who
4    was one of the original class representatives upon her
5    mother's unfortunate death.
6    Her mother was born in a POW camp with Geronimo,
7    her father having been one of the key lieutenants to
8    Geronimo.  Penny, upon her mother's death, was substituted
9    in and approved by the court as a class representative,
10   but we are sorry that her mother could not be here, as so
11   many of the class members have passed away during this long
12   case.
13   Thank you.
14   Your Honor, we have joining us today by telephone
15   from the Blackfeet Reservation in Browning, Montana, the
16   lead plaintiff, Eloise Cobell.  She has made countless trips
17   for meetings, and mediation, and trials and hearings here in
18   this court, and in Congress and throughout the country over
19   the past 15 years.  But due to health reasons today cannot
20   be present.
21   We would request permission for her to make a
22   brief statement.  We have consulted with the defendants, who
23   have no objection to that, and she is on the line, and I
24   would that she be permitted to do so.
25   THE COURT:  All right.  Rather than have her wait

1  until the later part of the proceeding with her health
2  situation, the court will grant that request.
3  Ms. Cobell, can you hear us?
4  MS. COBELL:  Yes, I can.
5  THE COURT:  All right, Ms. Cobell, you are welcome
6  to make a statement concerning this as the lead plaintiff in
7  the case.
8  MS. COBELL:  Thank you, Your Honor.
9  My name is Eloise Cobell, and I am an enrolled
10  member of the Blackfeet Tribe, and I was born and raised and
11  presently reside on the Blackfeet Indian Reservation.  I am
12  also the lead plaintiff in this litigation.  My great
13  grandfather was Mountain Chief, the last war chief of the
14  Blackfeet Nation.
15  I wish I could be there present in today's
16  fairness hearing so I could introduce myself personally and
17  explain to you how important this settlement is to 500,000
18  individual Indian trust beneficiaries.  However, physically
19  I am unable to do so.  Therefore I sincerely thank you for
20  the opportunity to participate by phone.
21  I want to explain that few, if any, legal cases in
22  modern times have embodied the pain of so many people in
23  Indian Country, and also embodied the hopes of those
24  people.  The possibility of settling this century-old
25  injustice has provided hope for the future and a light for

1  the horizon.
2  For over 100 years individual Indians have been
3  victimized by the government's gross mismanagement of the
4  individual Indian Trust and trust assets, including the
5  income earned on our trust land, and for the last 15 years
6  this court, alone, has held our hope for the individual
7  Indians.
8  Successive administrations stubbornly resisted and
9  bitterly fought our effort with everything it had.  Congress
10  was unable to bring resolution despite great effort to do
11  so.
12  Finally, in 2009, through the extraordinary
13  efforts of this court, and class counsel, and class
14  representatives, for the first time since this case was
15  filed on June 10, 1996, the Executive Branch sat down in
16  good faith and negotiated a fair settlement of this case.
17  Then in December of 2010, after a year of meeting
18  with members of Congress and their staff, we were able to
19  obtain Congressional approval of this settlement.  In this
20  tight budget environment, this was extremely difficult to
21  do, particularly since 100 percent of the Senate needed to
22  pass the ratification of the settlement.
23  What has been accomplished here is historical.  A
24  3.4 billion settlement with 1.5 billion distributed directly
25  to individual Indians, and 1.9 billion to address

1  fractionation, a necessary investment for improving future
2  management, and this is tax free.
3  In addition, 5 billion has been spent by the
4  government on trust reform brought about by the pressure of
5  this case, and it has been brought to bear.  Nothing like
6  this has ever been done for individual Indians.
7  I am confident that this court understands our
8  history of abuse.  Its opinions and decisions speak
9  eloquently and sincerely of the challenges we have had to
10  face.
11  The record is plain to anyone who has spent the
12  time to read and understand it.  It is permanent testimony
13  to the importance of this case and why it has been one of
14  the most difficult challenges I have ever faced.  In terms
15  of settlement, it brings a measure of justice to some of the
16  most vulnerable people in this country.
17  This settlement is not perfect.  I do not think it
18  compensates for all of the losses sustained, but I do think
19  it is fair, and it is reasonable.  That is what matters.  A
20  fair resolution has been achieved.
21  I am convinced that it is the best settlement
22  possible.  I am convinced, also, that if the settlement
23  failed there would be -- there would be many more years of
24  litigation with little possibility of a more favorable
25  resolution.

1  While you will hear from objectors today, the
2  overwhelming majority of class members, over 99.98 percent
3  agreed that the settlement is fair and want this matter
4  resolved now.
5  This support is not surprising to me.  When I have
6  visited innumerable Indian communities over the last year to
7  speak about the settlement, I had heard first-hand the wide
8  support of this settlement.
9  I don't want to get into details of our
10  settlement.  Those issues have been fully briefed and have
11  been debated.  But I know that they will be discussed
12  further in this hearing.
13  However, I want to address an issue that has been
14  addressed by the defendants and a couple of the members of
15  Congress.  That issue is reasonableness of legal fees for
16  our class counsel.
17  Often I have said that if we our attorneys are not
18  treated fairly and in accordance with controlling law, we
19  will never be able to obtain competent lawyers who will be
20  willing to battle the government until justice is served,
21  for however long that it takes.
22  I strongly believe that that is true.  An
23  overwhelming majority of individual Indian class members
24  agree.  So please let the message be that lawyers who
25  represent native people will be treated no worse or

Page 14

1    compensated no less than those who represent people who are
2    not Indians.
3    Until class counsel accepted our case, we had no
4    hope and no remedy for the abuse that we have been forced
5    to endure for decade after decade, generation after
6    generation.
7    Our attorneys have labored tirelessly and at a
8    great sacrifice for many years.  They have never wavered in
9    their commitment to us, and they helped us accomplish
10   something that most people thought would be impossible to
11   achieve.
12   We would not have had the success without our
13   class counsel.  I urge you to treat them fairly in
14   accordance with the law.
15   In closing, 124 years of abuse of our trust is
16   enough.  15 years of intense, difficult litigation is more
17   than enough.  Too many of us have died without justice.  Any
18   more delays will mean that still more will die without
19   justice.  Enough is enough.
20   On behalf of the named Native people, I appreciate
21   beyond words what Judge Lamberth, Judge Robertson and you
22   have done, and how each of you have stepped up and
23   courageously resolved some of the thorniest issues that
24   any judge in this country has ever had to address and
25   resolve.  I am deeply grateful that this court has not

Page 15

1    failed us.
2    I thank this court again for the opportunity to
3    provide my views, and pray and hope that I can see the
4    distribution of our settlement funds later this year.  That
5    is very important to me, my fellow class members and
6    justice.
7    Thank you, Your Honor.
8    THE COURT:  Thank you, Ms. Cobell, for that
9    statement.  We wish you well and hope that you will do
10   better.
11   All right, sir.
12   MR. DORRIS:  Earlier this month this lawsuit
13   entered its sixteenth year.  It has been one of the most
14   complicated and extensively litigated cases ever in this
15   court, or any other court in this land.
16   This proposed settlement begins to provide real
17   justice for the plaintiff classes, in addition to providing
18   for continued trust reform.  It ends a David and Goliath
19   feat of immense proportions, pitting the all-powerful
20   federal government against many of its poorest and most
21   marginalized citizens.
22   The $1,512,000,000 in tax-free dollars for the two
23   classes will be distributed in a carefully balanced way.
24   Each member of the historical accounting class will be paid
25   $1,000 for giving up exactly the same thing, the receipt of

Page 16

1    an equitable accounting which the government has not and
2    cannot provide.
3    The additional payments to the trust
4    administration class will reflect that all have been damaged
5    by poor mismanagement, but that there are individualized
6    differences.
7    The payments to the members of the trust
8    administration class will range from $800 to well over
9    $100,000, and in a number of instances over $1 million,
10   based on the value of their assets in terms of earnings over
11   time as reflected in the best data available.
12   The $1.9 billion land consolidation fund provides
13   funding and a vehicle for addressing one of the most
14   difficult problems facing the administrators of the trust,
15   the presence of highly fractionated ownership interest
16   shares.
17   These funds provide the ability for the government
18   to pay fair market value for the shares, and to be sold on a
19   voluntary basis where it would be difficult to sell those
20   interests if the people chose to do so.
21   In addition, the trust administration -- the land
22   consolidation fund provides for the creation of a $60
23   million scholarship fund for Native Americans.
24   In addition to being tax-free, significantly, none
25   of these payments will diminish the right of any of the

Page 17

1    class members to receive any other federal benefits or
2    welfare.
3    This agreement cannot solve all of the problems
4    with the trust.  Much more work, much more effort will be
5    required.  But the plaintiffs in the settlement agreement
6    insisted on expressly and specifically saying that trust
7    reform was not complete.
8    As a result of this case, as a result of our
9    discussions, and as a result of us now reaching a
10   settlement agreement, Secretary Salazar has issued a
11   Secretarial order calling for the creation of a commission
12   to address further trust reform upon the final approval of
13   this settlement.
14   Following Your Honor granting preliminary approval
15   in December of 2010, the notice program has been
16   successfully completed, and notice in the words of Ms.
17   Kinsella, one of the most experienced notice contractors,
18   was that the notice in this case was extraordinary.
19   The court-approved claims administrator has logged
20   approximately 1,800 exclusions from the trust administration
21   class.  Thus, this shows that the right to opt out was a
22   meaningful right exercised by a number of people.  It also
23   shows that the vast, vast majority of the trust
24   administration class wants to participate in and accept the
25   benefits of this settlement.

Page 18

1   In terms of objections, out of the approximately
2   500,000 members of the classes, we have logged 92
3   objections, some of whom may be here to speak today, with
4   the majority of those objections only going to some
5   particular aspect of the settlement and not the overall
6   settlement itself.
7   However, no comment or objection received during
8   the notice period identifies any reason that this historic
9   settlement agreement should not be provided -- should not be
10  approved.
11  We have responded in writing in detail to the
12  objections, and we will address them later today.
13  A few have said we should have held out for more.
14  We say that in light of the Court of Appeals' decision in
15  Cobell 22, the settlement is fair and reasonable and brings
16  to a close intractable litigation.
17  Even the Court of Appeals in Cobell 22, Your
18  Honor, called the resolution of this case a Gordian knot,
19  and indicated that its prior decisions -- almost apologized
20  that its prior decisions pointed to no clear exit from this
21  legal morass.
22  At least one of the objectors incorrectly contends
23  that there was a $7 billion offer on the table that the
24  plaintiffs rejected in 2005.  That is simply not true.  No
25  such offer was ever made.

Page 20

1   plaintiff classes, can foster the continued trust reform
2   started by the pressure from this case, and can lead to the
3   better relations between the government and Native Americans
4   for the years ahead.
5   Thank you, Your Honor.
6   THE COURT:  Thank you.
7   Let me break in for a minute here.  We have more
8   of a crowd than we expected.
9   (Whereupon, the court conferred with his courtroom
10  deputy.)
11  THE COURT:  I am going to invite those who have to
12  stand -- we are going to be here three or four hours -- it
13  will be difficult -- to come up and sit in the jury box.  I
14  think I have about 12 seats there available.  So those who
15  want to come up and sit down in the jury box -- it will be
16  too long to stand all day.
17  We can also sit a couple over at the extra counsel
18  table over there.
19  (Whereupon, people from the audience took the suggested
20  seats.)
21  THE COURT:  At this point the court recognizes the
22  government counsel to address the court on their opening
23  statement at this time.
24  Mr. Kirschman.
25  MR. KIRSCHMAN:  Thank you, Your Honor.

Page 19

1   A few others, all of whom have stood on the
2   sidelines and out of the fray for these 15 years now say
3   that the class representatives and class counsel should not
4   be paid what is otherwise provided for by precedence and
5   controlling law.
6   We say that until the class representatives and
7   class counsel stood together to hold the government
8   accountable for over 120 years of abuse, a task that almost
9   everyone thought was impossible -- the abuse had continued
10  for over a century with no end in sight.
11  By making it clear that the trustee can be and
12  will be held accountable, the equation between the trustee
13  and the beneficiaries has been rewritten, the lines redrawn,
14  and the relationship between the trustee and the
15  beneficiaries fundamentally changed for all times.
16  In addition to the $3.4 billion in real justice
17  flowing from this settlement, and the $5 billion in trust
18  reforms to date as a result of this case, this case stands
19  as permanent testimony for future generations, historians
20  and scholars as to what our clients have endured and what
21  they have now overcome, and it also stands as a beacon of
22  hope and a wellspring of inspiration for all other oppressed
23  people.
24  In closing, we ask for approval of the proposed
25  settlement so that it can begin to bring real justice to the

Page 21

1   May it please the court, defendants join with
2   plaintiffs in asking that the court approve this historic
3   settlement.  The settlement is one of the largest ever
4   entered into by the United States.  It is fair, reasonable
5   and adequate for both classes.
6   As the court noted in the In re:  Vitamins case,
7   the following factors determine whether this settlement
8   should be approved:
9   One, whether the settlement is a result of arms
10  length negotiations.
11  Two, the terms of the settlement in relation to
12  the strength of the plaintiffs' case.
13  Three, the status of litigation at the time of
14  settlement.
15  Four, the reaction to the class.
16  Five, finally, the opinion of experienced counsel.
17  Here, Your Honor, in this case these factors
18  justify your approval of this settlement.  Defendants'
19  primary concern is that this settlement should be the final
20  resolution of all claims of class members covered by the
21  settlement.  Defendants, like Congress, truly seek to turn a
22  new page through this settlement.
23  Historically, the court subsequently considering
24  whether a settlement was binding has looked to the trial
25  court's articulated reasons for approving it.  For that

Page 22

1   reason, Your Honor, we respectfully request that this
2   court, pursuant to Rule 23(e), provide written findings
3   that this settlement is, indeed, fair, reasonable and
4   adequate.
5   Congress has, of course, authorized, ratified and
6   confirmed this settlement through the Claims Resolution Act
7   of 2010, and the President demonstrated his support for it
8   by promptly signing the legislation into law.
9   The involvement in Congress and the President in
10  the settlement process supports a determination that the
11  settlement comports with the Constitution and is fair and
12  reasonable.
13  THE COURT:  Excuse me one second.
14  If anyone has a cell phone on or a Blackberry on,
15  please turn them off.  We are getting a buzzing in the
16  communications here, and it makes it hard to hear.  Any cell
17  phones, Blackberries, any electronic equipment, you have to
18  turn them off, not just silence them.
19  MR. KIRSCHMAN:  I was keeping time.  I will turn
20  off my Blackberry, Your Honor.
21  THE COURT:  It interferes with our electronics
22  here trying to hear.  Thank you.
23  MR. KIRSCHMAN:  The involvement of Congress, as I
24  said, and the President, Your Honor, supports the
25  determination that the settlement comports with the

Page 23

1   Constitution and is fair and reasonable.
2   Congress subjected this settlement to an enhanced
3   and independent scrutiny on behalf of the class members for
4   a year, which is a strong additional indication that the
5   classes were adequately represented in this process.
6   Congress also did not serve as a mere rubberstamp.
7   As you are aware, it held hearings, and vetted the terms of
8   this settlement, and even caused the original terms of the
9   settlement to be modified to ensure that class members were
10  being treated fairly and reasonably.
11  For example, Your Honor, the 2010 Act required the
12  parties to modify the settlement agreement by reallocating
13  $100 million that had initially been intended for the Land
14  Consolidation Program to augment the minimum settlement
15  payments that would be paid to the trust administration
16  class.
17  Another example, Your Honor, is the fact that
18  Congress has asked this court to consider the special status
19  of class members as beneficiaries when it considers an
20  appropriate amount to award in attorneys' fees and incentive
21  awards.
22  Congress's role in the settlement thus requires
23  this court to conduct an analysis different than in some
24  traditional settlement cases.  As the court is aware,
25  Congress is a settler of Indian trust, and has the plenary

Page 24

1   authority to determine how the United States should carry
2   out its trust obligations.  That is the law of this case,
3   and these principles were recently confirmed in the Supreme
4   Court's case in Hickory Apache.
5   Even outside of the context of Indian litigation,
6   Your Honor, Congress has the authority to change the
7   statutory rights of litigants, and our brief in support of
8   this settlement cites numerous cases that establish that
9   authority.
10  Here Congress has acted well within its authority
11  to resolve a past statutory trust duty, namely, Interior's
12  implied duty to conduct an historical accounting.  The 2010
13  Act is Congress's rational recognition, Your Honor, that
14  this case presents unique challenges to the parties, to this
15  court, and even to Congress, and that the best resolution of
16  the dispute is a comprehensive one that could not be
17  achieved in any other forum.
18  It is also very important, Your Honor, as Mr.
19  Dorris noted, that as part of the 2010 Act, Congress funded
20  $1.9 billion for the Department of the Interior to conduct
21  its Land Consolidation Project, to address the critical
22  issue of fractionation.
23  Turning to the first factors set out in In re:
24  Vitamins, the settlement should be approved as a product of
25  arms-length negotiations.  Contrary to what some have said,

Page 25

1   there is simply no collusion here.  The settlement is the
2   result of nearly 15 years  of intense litigation, and it
3   comes after several attempts at settlement over the course
4   of the litigation, and months of good-faith, intense
5   negotiations between the parties.
6   The settlement is also fair and reasonable when
7   viewed in light of the strength of plaintiffs' cases,
8   another factor in In re:  Vitamins.  This is certainly true
9   in regard to the historical accounting class.
10  In fact -- and again Mr. Dorris noted this, after
11  several trials and more than 14 years of litigation, the
12  scope of the historical accounting still remains unresolved
13  today.  It is, however, now firmly established that
14  Interior's performance of the historical accounting is
15  subject to the willingness of Congress to fund it.
16  In addition, Your Honor, Interior must provide
17  only the best historical accounting possible in light of
18  whatever amount might be funded by Congress.  That is the
19  law of the case.
20  And in 2008, Your Honor, when this court heard
21  evidence regarding restitution claims and afforded every
22  presumption to the plaintiffs, it awarded only $455.6
23  million as restitution for the inability, as the court found
24  at the time, to perform the historical accounting.
25  Of course, the D. C. Circuit in 2009 later vacated

Page 26

1    that money award, now making any monetary payment to this
2    class as a result of any litigation extremely unlikely.
3    The approximately $360 million that will be paid
4    to settle the historical accounting claims is a substitute
5    for the receipt of the information that would have been in
6    the historical statements of account, and it is clearly fair
7    and reasonable.
8    The trust administration class terms are also
9    fair and reasonable, Your Honor, in light of the litigation
10   risks involved in proving such individual claims.  This
11   settlement dedicates a historic amount of approximately $1
12   billion to pay for potential trust administration claims,
13   the merits of which have hardly been tested let alone
14   established.
15   No history of successful litigation of individual
16   Indian trust administration claims exists to undermine the
17   reasonableness of this settlement amount.  Certainly no
18   objectors have pointed to any.
19   There are problems of proof, Your Honor, related
20   to these cases.  The statute of limitations would often be
21   up applicable, and the cost of litigation also poses a very
22   real risk that little, if any, recovery is available under
23   the trust administration claims for most individuals.
24   The facts that have been developed throughout this
25   litigation do not demonstrate a basis for a larger amount,

Page 27

1    and in fact the facts that have been established demonstrate
2    just the opposite.  Those facts led this court to a reject
3    plaintiffs' $47 billion claim when they were seeking
4    restitution.
5    In addition, Your Honor, the billion dollars is to
6    be paid to the trust administration class, and it is a
7    significant percentage of the almost $6 billion of receipts
8    that have flowed through the IIM system into the IIM
9    accounts during the period that is covered by this
10   settlement.
11   This settlement thus strikes a fair and reasonable
12   balance between the government's need for the resolution of
13   its liability on those claims and reasonable compensation
14   that is likely beyond the practical reach of most individual
15   beneficiaries.
16   Despite objections that the trust administration
17   class is improper because it cannot meet the Rule 23
18   requirements -- Rule 23 elements of commonality, Congress
19   properly authorized class certification here without
20   applying those elements.
21   Congress's power to do this was established in
22   Shady Grove Orthopedics Association, and in other cases we
23   have cited in our brief.  As a result, the class
24   certification tests from Rule 23(b)(3) are not relevant
25   here.

Page 28

1    Instead, the only relevant consideration, Your
2    Honor, is whether the settlement, because it is otherwise
3    fair and reasonable, also affords due process to the absent
4    class members.
5    In reviewing the constitutionality of the
6    settlement in that regard, Your Honor, the court should be
7    directed by the protections set out in the Phillips
8    Petroleum v. Shutts Supreme Court case.
9    Those are, Your Honor:
10   One, sufficient notice to the class.
11   Two, a meaningful opportunity for dissatisfied
12   class members to object and be heard.
13   Three, a meaningful chance to opt out of the
14   class.
15   And four, adequate representation of the class by
16   their representatives.
17   As detailed in the parties' briefs and in the
18   declarations from Kinsella Media and the Garden City Group,
19   the notice provided to class members were unprecedented and
20   extraordinarily thorough.
21   The 90-day notice period clearly satisfied due
22   process.  As the court is aware, courts routinely allow only
23   30 to 60 days.
24   It is also very important, Your Honor, that the
25   notice was carried out in a unique way to account for the

Page 29

1    numerous locations of many of the class members, the rural
2    areas in which member many of the class members live, and
3    the several languages that are spoken by many of the class
4    members.
5    After the notice, Your Honor, class members were
6    also given a fair opportunity to be heard, both in writing
7    and today through this fairness hearing.  The class members
8    were also given a meaningful opportunity to opt out as
9    addressed by Mr. Dorris.
10   Although some have objected that they could not
11   make an informed decision because there was no historical
12   accounting, that misperceives the purpose of the historical
13   accounting.
14   That would have led to the provision of
15   transaction histories and account balances, but it did not
16   require, and was never contemplated to require the
17   production of trust records.
18   Class members were also informed of what rights
19   they would forgo and what rights they would retain should
20   they choose to opt out.
21   Finally, Your Honor, looking at the elements under
22   Shutts, the class representatives here are adequate for
23   settlement purposes.
24   In this District case law establishes that there
25   are two criteria for determining the adequacy of the

1  representation and those are:
2  One, that the named representatives must not have
3  antagonistic or conflicting interests with the unnamed
4  plaintiffs.
5  And two, that the representative must be able to
6  vigorously prosecute the interest of the class.
7  No evidence has been presented to show that
8  criteria have not been met here.  The court should give
9  great weight, Your Honor, to the numerous objections to
10  class counsel's request for attorneys' fees and the named
11  plaintiffs request for incentive awards.
12  The objections -- the issue of attorneys' fees
13  elicited the most objections of any other issue raised by
14  the objectors.  As some objectors noted, Your Honor, you
15  should not be swayed by class counsel's request for $224
16  million in fees and expenses into believing that somehow
17  that makes an award of $99.9 million more palatable, because
18  it does not.
19  As we established in our brief that we filed
20  earlier, a $50 million fee is more than reasonable, and that
21  should include all expenses, Your Honor.
22  It is also in accord with the stated position of
23  Congress, as I mentioned earlier, that this court consider
24  the fact that these fees will be coming from class members
25  who are beneficiaries of a Federal trust.

1  However, Your Honor, having said that, the mere
2  request for a large amount of fees and incentive awards does
3  not render the representation of the class inadequate.  It
4  is very important that here, Your Honor, that it is up to
5  you to determine what a reasonable attorneys' fee and
6  incentive award is.  Your Honor, you have the authority to
7  scrutinize these requests and determine an appropriate
8  amount.
9  The key then he is here, in the context of this
10  litigation, do the incentives of the class representatives
11  align with the absent class members?  And we believe, Your
12  Honor, that they certainly do.
13  In light of the above, Your Honor, and looking at
14  the status of the litigation, which is another factor under
15  In re:  Vitamin, approval of the settlement is clearly
16  justified.  After the D. C. Circuit remanded this case back
17  to this court in 2009, it was clear that there could be more
18  years of litigation as Mr. Dorris noted.
19  Also, Your Honor, the D. C. Circuit in Little Wolf
20  versus Lujan found that the legislation that it was
21  considering met the rational basis standard where it was,
22  quote:
23  "Rationally related to the
24  government's legitimate interest
25  in protecting thousands of

1  Indian claimants from the need
2  to litigate thousands of
3  expensive, time-consuming,
4  individual actions to recover
5  any compensation for their
6  claims."
7  Congress acted in the same manner here as enacting
8  the 2010 Act, Your Honor, and has made it possible after
9  decades of disputes to have individuals receive compensation
10  without having to pursue costly, time-consuming litigation.
11  And finally, Your Honor, as plaintiffs have noted,
12  it is important to understand that 90 -- only 90 of about
13  450 class members have objected to this settlement.  It is
14  92.
15  THE COURT:  90 out of 450,000?
16  MR. KIRSCHMAN:  Hum?
17  THE COURT:  90 out of 450,000?
18  MR. KIRSCHMAN:  Approximate 450,000.  We don't
19  have final numbers on class members, but it is approximately
20  450,000.
21  That comes out to approximately point zero two
22  percent, Your Honor; and as Mr. Dorris noted, only 1,800
23  individuals opted out of the trust administration class, and
24  of those, 1,100 were Quapaw Tribe members, who are intending
25  to participate in a separate suit in the Court of Federal

1  Claims.
2  Now we do not represent that these numbers mean
3  that everyone in the class favors this settlement.  But what
4  it surely shows, Your Honor, is that there is an overall
5  favorable reaction from class members to this settlement and
6  its terms.
7  In conclusion, Your Honor, there is in this
8  District a long-standing judicial attitude favoring class
9  action settlements in appropriate cases, and this is clearly
10  such a case.  We appreciate Your Honor's careful review of
11  the issues, and respectfully request that pursuant to Rule
12  23(e) that the Court finally approve this settlement as
13  fair, reasonable and adequate.
14  Thank you.
15  THE COURT:  Thank you, Mr. Kirschman.  I
16  appreciate it.
17  We are at the point of having the opening remarks
18  of counsel as to the background and history of this
19  litigation and their request by both parties for the court
20  to approve it as fair, reasonable and adequate.
21  Now to go to the objections at this time, the
22  objectors' statements.  I have given them five or 10 minutes
23  each, that they will stay with the objections that they
24  filed and not go into other non-relevant areas.
25  The simplest way to do it is we tried to outline

1  them in alphabetically order, no matter what their objection
2  was.  So at this time the court is going to proceed with
3  that order.
4  I said alphabetical.  Looking at it it doesn't
5  look alphabetical on the list to me.  I thought it was
6  alphabetical.  I don't think -- oh, it is first name
7  alphabetical.  Thank you.
8  We have copies here of what the objections were.
9  I am going to call on all of on Aldine Farrier first,
10  please, F-a-r-r-i-e-r for the record.
11  All right, we are ready to go.
12  MS. FARRIER:  Thank you, Your Honor.
13  I'm here today to object to the Indian Trust
14  settlement of the $3.4 billion, resulting from the Cobell
15  versus Salazar law suit, and challenge its settlement.
16  First of all, the legal fees are excessive, and
17  they rob the Indian account holders of compensation due to
18  them.
19  This is not a fair settlement for the class.  How
20  many of us 250,000, 300,000 IIM account holders are
21  represented in this lawsuit?  Will we actually benefit from
22  this settlement?  How many IIM account holders will receive
23  sufficient amounts, and how many will benefit beyond their
24  rights and will receive monies who have not incurred
25  injuries?

1  If this settlement is allowed to continue, how in
2  the future will we settle claims that have never been
3  litigated?  This is a dangerous precedent as it allows
4  Congress to create causes of action where none exist.
5  With this settlement the U.S. government can now
6  say that it is closing out 122 years of financial
7  mismanagement.  This accounting only covers the time period
8  between October 25, 1994, and September 30, 2009.  Only
9  those IIM account holders with open accounts during this 15
10  year span will benefit.
11  The government claims to not be able to provide
12  accountings to -- for the accounts to Indian people.  In the
13  meantime, where are all of the persons responsible for this
14  mismanagement of the funds and land-use?  They should be
15  held responsible, be expelled from their jobs, tried in a
16  court of law and sent to prison.
17  The federal government has been charged to protect
18  our lands, and now this settlement is yet another vehicle to
19  take more land away from us.
20  Further, the fractionated ownership interests are
21  not defined in the action.  This settlement encourages IIM
22  account holders who are living in poverty -- living in
23  extremely poverty stricken areas to sell their lands for
24  pennies on the dollar.
25  Who will determine fair market value for those

1  lands?  Will it be taken into account that the value of
2  other minerals, and water, et cetera, which lie beneath the
3  topsoil will be calculated in for future revenues?  Mining,
4  grazing, timber, riverbed rights, et cetera, will those be
5  included in this settlement?
6  I object to this court's acceptance of Congress's
7  waving of the Federal Rules of Civil Procedure in order to
8  enable the trust administration class.  This appears to be
9  another instance where Indian people are treated differently
10  in the federal system than any other class.
11  Excuse me.  Native American people have served
12  this country -- excuse me -- in times of war and peace.
13  They are upstanding citizens.  Shame on this administration
14  for signing this legislation approving this settlement, and
15  shame on the court.
16  Thank you.
17  THE COURT:  Thank you, Ms. Farrier.
18  The court recognizes Ben Carnes, C-a-r-n-e-s, who
19  has filed a written objection with the court and asked to
20  speak.  Mr. Carnes.
21  MR. CARNES:  Let me know if this is too close.  I
22  speak really low.
23  THE COURT:  Yes, please.  Thank you.
24  MR. CARNES:  I will try to stick to my points, but
25  I need to lead up to it.

1  My name is Ben Carnes.  I am a full blood of the
2  Choctaw Nation.  I have never called myself an American
3  Indian, a Native American or an American citizen.  I am a
4  citizen of a sovereign Indian Nation.
5  When the Europeans came to our country, we had a
6  sacred spiritual connection to our lands.  We had a
7  spiritual connection to the way that we live, the waters
8  that we drink, the resources of this land that we used.
9  We were met with a way of life from Europe that
10  construed land as property to be owned.  You cannot walk
11  on this land.  You cannot drink water off of this land.
12  But these people came, and they were hungry.  They
13  were afraid of the way of life that they had in Europe, and
14  so we welcomed them here.  We showed them how to grow food.
15  We showed them how to hunt.  We showed them to find
16  medicines.
17  Then they asked for a little bit of land.  So,
18  okay, we will reserve this part for ourselves, and you can
19  have this, and it continued on.  Eventually somehow we ended
20  up in the custody of the War Department, and through the War
21  Department we now have the Department of Interior and Bureau
22  of Indian affairs.
23  My people were asked to join the alliance against
24  Jackson.  We said no, we will fight.  If it was not for my
25  people there would be no America here today.  About four or

1    five years later, my people were one of the first ones that
2    were sent to what they call Indian Territory on the Trail of
3    Tears.
4    Then Senator Dahl came and looked at the people
5    and said, you know what, there is a problem here.  They are
6    not selfish.  They are not like us, so we have got to break
7    these lands up into allotments.
8    I'm pretty angry about everything that I have
9    read and learned.  I can understand that the attorneys are
10   tired.  I can understand Ms. Cobell is tired.  But I'm
11   tired, too.
12   I mean the Marshall Trilogy, which you understand,
13   Worcester versus Georgia, the Macintosh case -- you know, we
14   were considered wards of the federal government.  How long
15   do we remain wards of the federal government?  Because in
16   this settlement, I don't feel it is fair.
17   I feel that this settlement is nothing more than a
18   cover-up.  You know, pitch a few crumbs -- a few dollars out
19   here, and get them quiet, and now you can never bring up
20   these issues again.  This case is closed.
21   No, it is not closed.  Where did this money go?
22   You know, through their efforts these attorneys, after we
23   found out that the Department of Interior destroyed
24   evidence, they destroyed records, who were they trying to
25   protect?

1    I feel like this case needs to go on.  We need to
2    investigate who stole the money?  When did they steal it?
3    Are they still alive?  Are they still in public office?  Can
4    they be prosecuted?
5    You know, this relationship that we have with the
6    federal government needs to be end -- come to an end.  We
7    can manage our own trust.  We are adults.
8    You know, I challenge the federal government to
9    show us that we are incompetent to manage our own affairs,
10   because if we could become free of the federal government,
11   then maybe we would not have to comply with the Indian
12   Reorganization Act in which the court government tells us
13   how to create tribal councils, how to have chiefs, because
14   this becomes a system of political patronage and a lot of
15   corruption.
16   You know, I just recalled, too, that one of the
17   attorneys in their response to the fairness hearing said,
18   where were we when all of this was going on?  Well, I
19   inherited this from my mother.  She died in 1996, right as
20   this case started.  And two or three years ago someone said,
21   hey, you can get a lot of money.  Go check it out.
22   And so I looked, and I found out that I am a
23   member of this class.  So I tried to research and study it.
24   It is a lot.  I can understand the effort that has gone into
25   this.

1    I also understand, too, that when the other judge
2    was removed from this case, Judge Lamberth, I felt that the
3    people's heart had dropped to the floor, because Judge
4    Lamberth was not being biased.  He was angry.  He was more
5    angry than I am right now.
6    I'm doing my best to control my emotions, but he
7    let it out, because the Department of Interior disobeyed,
8    disobeyed, disobeyed, and disobeyed.  So he lashed out at
9    them.
10   And what frightens me about this change of judges
11   is the same thing that happened to one of our Indian people.
12   His name is Leonard Peltier.  They changed judges on him,
13   and we see what happened to him.
14   So when these attorneys want to know where I was?
15   Well, I was probably out there on a highway hitch-hiking
16   somewhere, advocating for Leonard Peltier.
17   I was probably in front of a Senate Select
18   Committee testifying on religious rights of Native
19   prisoners.
20   I was probably in Hawaii, testifying for a Senate
21   Select Committee who stood up and walked out on me because
22   they did not like what I had to say.
23   Or I was probably sitting in front of the White
24   House after Leonard Peltier was denied parole fasting, a
25   spiritual fast.  I was there because I thought these

1    attorneys would carry this case through.  I thought we were
2    going to see justice.
3    But you know, I think one of the estimates was
4    $166 billion, and now it is 3.4.  I know the numbers have
5    changed, but I did my math.  That is barely 2 percent.  So
6    the Department of Interior takes a knife, they stick it in
7    our back to the hilt, and I have to pull out two percent and
8    it is a victory?  I don't think so.  I cannot agree with
9    that.
10   I cannot agree what I heard Ms. Cobell said
11   earlier, that the majority of the class members support
12   this.  What I feel from my conversation with the Indian
13   people is, we cannot win.  It is the federal government.
14   They are going to do what they are going to do, so I might
15   as well cut the few dollars.  That is a voice out of
16   resignation.  So, you know, I had to come and address these
17   points and these issues.
18   And I'm also concerned, too, about the attorney
19   fees.  As I understand it, a lot of cases, especially under
20   Section 1983 of the Civil Rights Complaint, the losing party
21   usually carries the attorney fees.
22   You know, if the attorneys want to ask for 224
23   million, or asked for a billion, let the federal government
24   pay for it.  They are the ones that created this mess.  We
25   should not have to -- it shouldn't have to come out of our

Page 42

1  settlement to take that.
2  When it comes to land consolidation, that is
3  another mess that Department of Interior, Senator Dahl,
4  created.
5  Do not dare -- do not take any land from our
6  people, no matter how badly fractionated you think it is,
7  because I mentioned Senator Dahl said, we are not selfish.
8  That is because we lived our ways of life in communal
9  living. We didn't have no idea about we owned this much.
10 You know, I have talked to friends on the
11 Roosevelt Reservation. They cannot use their land, even if
12 it is fractionated, because tribal council is getting to
13 well, you can't do this. This is not yours. This is alien
14 to our way of thinking.
15 Maybe there are 500 areas in 100 acres. There is
16 not enough land to build a house on. Well, you know what,
17 that is enough land to grow food on. They can grow food
18 year, after year, after year, and feed a large community of
19 people. That could go a lot further than $1,500.
20 You know, if they want to buy the land at fair
21 market value -- that is something I did not hear in the
22 settlement. We have an inherent right of sovereignty to
23 this land -- our connection to this land.
24 What are they going to pay for sovereignty? I
25 have five acres with 13 family members, and you cannot buy

Page 43

1  my piece for a trillion. You don't have enough money to buy
2  my piece of sovereignty. That belongs to me.
3  You know, if anything else, because of the
4  mismanagement by the Department of Interior and the BIA,
5  they need to start buying surrounding land and bring it in
6  so people could have a place to live, because on the Turner
7  Mountain Reservation, it is not large enough to accommodate
8  housing for all of their people.
9  There are people on the wait list to have an
10 Indian home built on the Reservation. It is not large
11 enough. So do not take from us. We have lost way too much
12 already.
13 You know, if I had had the time I would have
14 brought a map to show the 1700s, 1500s -- all of what they
15 call the United States is all black. But now you look at
16 what is left of the Indian land, we don't have anymore to
17 give.
18 I don't usually read from speeches. You know, I
19 am not an attorney, and I'm not a politician. I speak from
20 right here in my heart. This is not fair. This is not
21 just.
22 I was under the impression that this case was
23 going to go until the end. You know, I can say that because
24 the lawsuit against Long Hair and the Oklahoma State Prison
25 System, I stayed in prison voluntarily for two more years to

Page 44

1  see the case through.
2  So when these attorneys say, where was I? I was
3  doing what I needed to do. And I thought they were here,
4  too. But, you know, we are not ready to settle, and I want
5  to make one more point on behalf of myself, and possibly
6  others, but it is up to them.
7  I did not opt out of this case, because I had
8  hoped to come to this court and present my arguments that
9  the attorneys -- the case would go on. Let's look at
10 eliminating the Bureau of Indian Affairs. Let's look at
11 restoring all of our assets and resources back into our
12 management.
13 Then I want to stay in this case, but if you rule
14 in support of this settlement, then I will see what I can do
15 about appealing, and once I have no more recourse for
16 appealing, then I would wish to opt out.
17 And I would also ask that you allow everyone else
18 who remained a part of this case until it comes to that last
19 step, because all of those people who opted out were afraid
20 of being parsed up, and they didn't want to be a part of.
21 That was too premature.
22 We should wait until the last minute, because
23 maybe something might happen today. Maybe somebody's voice
24 in here may touch your heart. Maybe there are some issues
25 that they bring up it will just become so apparent that you

Page 45

1  may rule that way.
2  So I want to thank you for giving me the time,
3  because I do believe I went over by ten minutes, but I
4  appreciate it.
5  THE COURT: Thank you, Mr. Carnes. I appreciate
6  it.
7  The next objector who wished to address the court
8  was Carol Good Bear and also Darwin Good Bear
9  MS. GOOD BEAR: Good morning, Your Honor.
10 THE COURT: Good morning. Thank you.
11 MS. GOOD BEAR: I am Carol Good Bear of the Mandan
12 Hidatsa and Arikara Tribes of the Fort Berthold Reservation
13 of North Dakota. I am a member of the Mandan and Hidatsa
14 Tribe in particular.
15 I am objecting to the proposed settlement of the
16 historical accounting class, and I challenge the
17 plaintiffs' suitability as a representative of all account
18 holders.
19 The named plaintiffs told us the suit was about an
20 accounting. They each received their accounting and
21 actively prevented the rest of us -- the rest of the class
22 from receiving the account statements that were prepared for
23 us at great expense.
24 The government told the Court of Appeals in oral
25 argument on May 11, 2009 and that the plaintiffs each

1   received transaction-by-transaction reports going back to
2   their predecessors.  These reports, the government said,
3   revealed a single error of $60.94 for one plaintiff, and
4   collectively they had been overpaid 3,000.
5   Now they say their claims are common and typical
6   enough to justify their representation of all account
7   holders.  I think fairness demands that their account
8   statements be put on the records so that a determination can
9   be made.
10   I think I'm entitled to a ruling by the judge who
11   will rule on this settlement if these named plaintiffs
12   really do have -- still have claims that are common and
13   typical of those of us who have had a good deal of money go
14   through our accounts.  In the alternative I think this judge
15   has a duty to examine the account statements prepared for
16   the named plaintiffs and rule on their suitability to
17   represent me.
18   The $1,000 payments some class members will
19   receive is many thousands of times the amount they have
20   received in their accounts.  My $1,000 payment will be less
21   than one percent of the amount that has gone through my
22   account.
23   My account alone has had more money go through it
24   over a 30-year period -- has had more money -- is over
25   100,000 of the class members put together.  It simply is not

1   fair or reasonable that we should all receive the same
2   payment.
3   I do not think the that Constitution's guarantee
4   of due process permits this court to require me to settle
5   the balance in my account by putting into the same amount --
6   by putting into the same amount that it has put into
7   accounts that were opened just days before the settlement
8   period closed.
9   I do not think that this settlement is fair, Your
10   Honor.  My account predates the settlement period.  The
11   class membership is flawed.  Class representatives do not
12   represent me.  My account is not only older than many other
13   IIM accounts, but my account is even older than a lot of the
14   account holders.
15   My account predates the settlement period, and
16   some of the class members have accounts that have been
17   opened just since the settlement was announced.  It is not
18   fair or reasonable to treat equally an account that was
19   opened for pennies the day before the settlement period
20   ended with an account like mine that has been open for
21   decades and had more than $100,000 go through it in a period
22   of 30 years.
23   This settlement would pay out more than 107
24   million to over a hundred thousand individuals who do not
25   even have 15,000 if you put all of their accounts together.

1   My account alone had more than 100,000 go through it during
2   the settlement period, and I don't think I should be
3   required, Your Honor, to accept the same settlement as will
4   be provided to the thousands of account holders who have
5   never even had one dollar in their accounts.
6   I think those of us who are not similarly situated
7   should be required to accept the same settlement.  I do not
8   think due process permits these results.
9   I think that we should be permitted to opt out of
10   the historical accounting.  Not one of the plaintiffs is
11   from my reservation, Your Honor.  Not one of them has an oil
12   lease from the same land, from the same geological
13   formation, from the same reservoir, even the same geological
14   province.
15   There is no plaintiff from the most active and
16   largest oilfield in the nation.  The money in the Fort
17   Berthold accounts, or that should be in the Fort Berthold
18   accounts, has very little in common with what should be in a
19   very small account, for example, in Nebraska and Montana,
20   Oklahoma or Wisconsin.
21   This litigation has revealed that thefts and
22   embezzlements have occurred, and even those accounts will
23   not be made whole.  Instead, every account holder will be
24   treated equally in spite of the known difference, and each
25   will receive $1,000, regardless of the amount actually

1   stolen or embezzled.
2   In any fair settlement there should be some
3   relationship between a settlement payment and the amount of
4   damages, or the risk of loss, or the value of the claim
5   being settled.
6   In this proposed settlement there is no such
7   relationship.  The proposed settlement for the historical
8   accounting class is simply not fair or reasonable.  In fact
9   it perpetuates the very kind of wrongful treatment of IIM
10   account holders the plaintiffs complained of throughout this
11   law suit.
12   The government presumably will no longer have any
13   obligation to audit leases of my land, to determine what
14   should have been paid into my account.  At least it is not
15   clear to me just exactly what is being settled for the
16   historical accounting class.
17   Will this settlement be used as a defense against
18   my claims for an audit of my leases because my account
19   balance has been settled for this period?
20   In their response to objections the plaintiffs are
21   all over the map on this topic as to just what the
22   settlement is.  They state that a common trustee makes all
23   of the claims suitable for treatment as a class for
24   settlement purposes.
25   They state that all trust assets are managed in

1   common. They state that their so-called experts' reports of
2   several years ago justify the amount and the methods of
3   paying the settlement. They claim the IIM trust assets are
4   all managed in common.
5   They state that the government's trust management
6   and accounting systems are common to the class as a whole.
7   In fact, the systems for accounting for my oil and gas
8   income are emphatically not the same as those in accounting
9   for my grazing income. They are not even in the same
10  agency, and they do not even interface electronically.
11  The plaintiffs state many things in their response
12  that are simply and plainly wrong.
13  That points out to a bigger problem in this
14  settlement. There are no longer any adversaries or
15  adversarial positions in this lawsuit. In this lawsuit both
16  the parties owe me a fiduciary duty, and both parties are
17  telling this court that my objections are irrelevant,
18  unsupported and misplaced.
19  This court should consider -- should reconsider
20  whether this lawsuit is even properly before the court. The
21  plaintiffs say that Congress has, quote, unquote, ratified
22  this settlement.
23  That is another way of saying that this court's
24  only remaining duty is to rubberstamp the settlement, and
25  the Constitution does not permit such a demeaning role for

1   the federal courts.
2   The prospect for more, quote, unquote, very
3   expensive litigation that you wanted to avoid, Judge Hogan,
4   when you urged Congress to pass this authorizing legislation
5   cannot be permitted to cloak the wholesale violation of
6   class members' rights to the protection of the federal
7   rules, federal law and the Constitution of the United
8   States.
9   Your Honor, I would urge this court to reject the
10  settlement of claims that have never been presented in this
11  litigation and that are not supported by any evidence or
12  testimony.
13  And, Your Honor, I would ask that you excuse my
14  brother, Darwin. He could not make it here because of
15  financial reasons, and I'm thankful to be here to present
16  today.
17  And also being near Father's Day weekend I want to
18  thank my late father, Lawrence Kingsey Good Bear, who served
19  six years in the Navy, who was present at the bombing of
20  Pearl Harbor, and he fought for my right to get to present
21  here today and to be heard.
22  Thank you, Your Honor.
23  THE COURT: Thank you, Ms. Good Bear. I
24  appreciate you coming in, and will recognize your brother's
25  objections, which are somewhat similar to yours in his

1   written submission that I have reviewed.
2   MS. GOOD BEAR: Yes, Your Honor. Thank you.
3   THE COURT: All right, then we will move down to
4   Celestia Fast Horse Two Eagles.
5   Is Celestia Fast Horse Two Eagles here from
6   Plymouth, Minnesota?
7   (No response.)
8   THE COURT: We have not had a call that she could
9   not come in today. She had filed a request to be heard and
10  had written an objection.
11  A PERSON FROM THE AUDIENCE: Your Honor, my name
12  is Karen (unintelligible). I am from the Blackfeet
13  Reservation in Montana. I wrote to ask to speak at this
14  hearing, and I would like to if somebody -- I don't think I
15  made it on the agenda. I never did hear from --
16  THE COURT: I am sorry, what was your full name
17  again?
18  A PERSON FROM The AUDIENCE: Karen, K-a-r-e-n.
19  THE COURT: I don't have anything here that you
20  had written in to ask for a hearing
21  A PERSON FROM THE AUDIENCE: Yeah. I wrote to
22  both places that it said that little pamphlet that I got,
23  and I would like --
24  THE COURT: In a little but I will let you talk to
25  counsel when we take a break, and see if we can find out who

1   that is. I have made a list of everything that came in
2   here.
3   A PERSON FROM The AUDIENCE: I would like to speak
4   if I may.
5   THE COURT: We will talk with counsel.
6   Ms. Celestia Fast Horse Two Eagles is not here
7   apparently. I would then go down to Charles Colombe, C-o-l-
8   o-m-b-e.
9   He is also not here -- from Mission, South Dakota,
10  MR. CARNES: (Unintelligible.)
11  THE COURT: We cannot hear you. I am sorry, why
12  don't you come to the mic so we can get a record of what you
13  are saying please, sir.
14  Thank you, Mr. Carnes.
15  MR. CARNES: I am not speaking officially for
16  Charles Colombe, but I talked with one of his friends that
17  works for him, and he said that he is not able to come due
18  to doctor's orders. He is receiving treatment in Oklahoma
19  City.
20  And also, Your Honor, I wanted to add, too, that a
21  close friend of mine I spoke with, Jason Nathaniel Corwin,
22  is not going to be here today either. He had a prior
23  commitment, and there was just no way that he could come,
24  and he didn't have time to write a statement and send a
25  power of attorney.

Page 54

1  THE COURT: I don't have anything from him. All
2  right, thank you, sir. We will pass Mr. Colombe. I have
3  his written objections here from the Rosebud Sioux Tribe
4  expressing his concerns.
5  Below him is Darlene Pipeboy. Ms. Darlene Pipeboy
6  is here? She is from the Lake Traverse Reservation.
7  MS. PIPEBOY: Good morning. My name is Darlene
8  Renville Pipeboy.
9  (Whereupon, Ms. Pipeboy spoke in a foreign language
10  that the court reporter was unable to report.)
11  MS. PIPEBOY: The uniqueness of Native American
12  people -- an elderly gentleman, not Indian, said, if the
13  Native people die, we will die, too. And that is very true.
14  We look at the context. Lake Traverse
15  Reservation, 1867. 9 million acres. It included two
16  reservations. One in North Dakota and one in South Dakota.
17  Our current -- let me check here.
18  Our current acreage is 107,000 acres as compared
19  to 9 million. I think the extent of government intervention
20  into the livelihood and (foreign word) -- we say, I am
21  Renville/Pipeboy. All of these allotted lands are held by
22  (foreign word) families.
23  I am a Renville. My grandfather -- if you'll
24  excuse me for a minute -- my grandfather was the head man of
25  the 1867 Allotment Act. He did not sign, but they allowed

Page 55

1  the Allotment Act to pass.
2  His probate was quite extensive. When we look at
3  traditional ways -- excuse me. Okay. He was born in 1824.
4  He died in 1892, two years after the Allotment Act.
5  In our traditional ways, Gabriel Renville, he had
6  three wives. One of the wives was my grandmother. Those
7  are accepted traditional ways at that time, whether or not
8  people objected to them.
9  Sitting Bull, he once said -- the agent came to
10  tell him, you have to get rid of one of your two wives.
11  Sitting Bull said, you tell them which one has to leave.
12  Okay, the same situation.
13  My grandmothers -- I call them all my
14  grandmothers. I love them all. The first wife,
15  Tukanmanikiye Win. She is my grandmother.   Her name is
16  Mary G. Renville. She was an allottee. They had 10
17  children. Six of them died because of, shall we say,
18  economic reasons.
19  The second wife, Tunkantiomani Win. She was Anna
20  T. Renville. She also had 10 children. Seven of them died.
21  Three survived.
22  The third wife, Witeca Win, Sophia Renville. She
23  had six children. One of them died.
24  This is the extent of Gabriel Renville's probate.
25  Paper upon paper. You know, It is unconscionable to me that

Page 56

1  we are looked at in terms of -- however the Bureau of Indian
2  Affairs choose to keep records.
3  They fractionated the land areas on paper. My
4  grandfather holds 320 acres of land. If you fractionate
5  his land, I guess we all own a teaspoon of dirt. But when
6  you go out to Lake Traverse Reservation, his 300 acres are
7  still there. They still need to be utilized by family
8  members.
9  The extent of fractionation, I'm sure you all
10  aware of Michael Larsen. He did a research paper on the
11  extent of fractionation on reservations. He came to Lake
12  Traverse. I was one of the individuals who gave comment.
13  He said Gabriel Renville and Winona Crawford, their probates
14  were the worst because they had so many errors.
15  So when we look at the Allotment Act and the
16  fairness of it and you come to Cobell, Cobell says, money
17  will be given to buy out all of the fractionated lands.
18  If this happens you will decimate Lake Traverse
19  Reservation. When people live in poverty and you offer them
20  money, they're going to accept money. Why? Because they
21  have to eat.
22  You know, this issue of poverty is one of the
23  issues. How dare Cobell use people to find a way to define
24  a determination of what to do with fractionated lands?
25  Those lands are not fractionated. They are fractionated on

Page 57

1  paper. If we do the research we will find this out, and
2  part of it is here.
3  We take deference. We are not intellectuals. You
4  will have to excuse us if we do not talk English -- speak
5  English well.
6  It says if the settlement becomes final you will
7  give up your right to sue the federal government for claims.
8  Lake Traverse is very unique if all of this land is
9  allotted, for all reservations have tribal trust land.
10  And when we look at the allotted lands, it is not
11  part of the court issues. If you lived on allotted lands,
12  you are tax-free. We do not have to pay taxes. And we
13  enjoy that right. So we see the Cobell case as another way
14  for the United States government, and whomever else, to take
15  our land, and we will not allow that to happen.
16  When we look at case law, the United States
17  government created the policy. We did not. There is the
18  Wheeler-Howard Act, the IRA, Indian Reorganization Act,
19  okay. All of the tribes in the thirties were to come to the
20  agency and vote whether or not they wanted to accept. Lake
21  Travers voted against the IRA. We are non-IRA.
22  We do not follow -- excuse me, fall under the
23  policies and the statutes of the United States government.
24  Why? Because we are a traditional government, and we chose
25  to do so. So the acts and policies do not apply to us.

Page 58

1  The vote count, which is also a matter of
2  historical reference, I believe it was 335 to 200.
3  THE COURT: You have about two more minutes,
4  please, Ms. Pipeboy. Thank you
5  MS. PIPEBOY: 335 to 266.
6  These are, again, all of the lands that have
7  already escheated on our reservation. We have lost. So we
8  disagree. We disagree with Cobell. The lack of informed
9  consent. We as historical as an account class cannot opt
10  out. We have the right to exclude ourselves.
11  We say we maintain inalienable rights to our land.
12  I think I read that in the Constitution somewhere.
13  We also object to the Indian education
14  scholarship. We realize education is a good thing, but
15  funds for education should come from treaty entitlement, and
16  should not be part of the class action case. So we object.
17  We object to the Cobell case, and we will continue to do so,
18  whether it is in this court or whether it is at the
19  International Court.
20  Thank you.
21  THE COURT: Thank you, Ms. Pipeboy.
22  I have next on my list, and I was asking my clerk
23  to find the written objection -- I don't seem to have it --
24  of Dorothea Wilson.
25  MR. HARPER: Your Honor?

Page 59

1  THE COURT: Yes.
2  MR. HARPER: Keith Harper for the record.
3  THE COURT: Yes.
4  MR. HARPER: Your Honor, Ms. Wilson and Mr.
5  Solomon Quinn are the next two in order. They filed
6  identical objections to Ms. Pipeboy. In fact it was just a
7  photocopy of the same objection.
8  THE COURT: I see.
9  MR. HARPER: And we would just ask the court that
10  if they are heard that they be limited to speaking on issues
11  that have not already been touched upon.
12  THE COURT: I understand. They both filed
13  identical objections to Ms. Pipeboy?
14  MR. HARPER: That is correct.
15  THE COURT: I just didn't have a Xeroxed copy of
16  it. I just had the original.
17  Is Ms. Wilson here? Or is Mr. Quinn here?
18  (No response.)
19  THE COURT: All right, thank you. We will go to
20  Mr. Eddie Jacobs. Mr. Jacobs has filed objections to the
21  settlement. Good morning, Mr. Jacobs.
22  MR. JACOBS: Thank you, Your Honor. My name is
23  Eddie Jacobs. I am a Muscogee Creek Nation citizen, and I
24  am an account holder, and respectfully request the court's
25  permission to enter my oral response and opposition to the

Page 60

1  settlement agreement and the settling parties motions filed
2  on May 16, 2011.
3  Counsel requested individual --
4  THE COURT: You will have to slow down.
5  MR. JACOBS: My statement is quite lengthy, and
6  that is the reason I was going at such a fast rate.
7  THE COURT: I don't think you will be able to read
8  all twenty some pages of written --
9  MR. JACOBS: I only have 14 pages.
10  THE COURT: Go ahead and read your statement, but
11  you do have to read slowly so the court reporter can get it
12  down so we have it for the record and everybody can read in
13  the future.
14  MR. JACOBS: Okay.
15  THE COURT: Thank you.
16  MR. JACOBS: I am thankful that the court allows
17  up to 10 minutes, which is still a short time to object, to
18  a voice over 124 years of grievance. My individual
19  grievance covers the 99 year period beginning in 1912.
20  I am a supposed member of the historical class,
21  and confine my objections to the historical class issues. I
22  request that this court decide whether or not I'm properly
23  designated as a member of the historical class and offer the
24  following in support of my response and opposition to forced
25  membership in the historical class for the following

Page 61

1  reasons.
2  One, Eddie Jacobs' administrative claim satisfies
3  the definition of an exception to the class because it is
4  action filed on their own behalf prior to the June 10, 1996.
5  The Cobell original complaint and amended
6  complaint define the exception to the Cobell class as
7  historical class consisting of those individual Indians --
8  Indian beneficiaries -- exclusion of those who prior to the
9  filing of the complaint on June 10, 1996, had filed action
10  on their own behalf stating a claim for historical
11  accounting.
12  B, trust administration class consists of those
13  individual Indians exclusive of persons who filed action on
14  their own behalf.
15  I originally asked for a reconciliation of my
16  father's, Johnny Jacobs, IIM account in 1987. Since then I
17  have continuously asked Department of Interior officials to
18  examine my IIM documentation for an accounting and
19  reconciliation.
20  My hopes for success were elevated in 1993 when
21  Mr. Jim Paris, Director of the Office of Trust Fund
22  Management stated in his January 29, 1993 letter to me.
23  This is recognized as a valid task.
24  I believe the Department of Interior officials
25  were considering reconciling my records when Cobell filed

1    this class action in 1996.
2    After filing, the Department of Interior
3    officials would not or could not discuss my claim, because
4    they arbitrarily decided that I was a class member, even
5    though there appears to be some doubt by the Department of
6    Justice.
7    In 1998 a letter from the DOG counsel, Louis S.
8    Weiner, the plaintiffs' counsel, Mr. Weinter stated:
9    "Should our understanding of
10   the scope of the class
11   certification be incorrect,
12   or should you elect to allow
13   us to communicate directly
14   with Mr. Jacobs, please let
15   us know."
16   In 2060 DOG counsel Robert E. Kirschman, Junior's
17   letter requested plaintiffs' counsel contact me regarding my
18   status and stated:
19   "If you have a different
20   understanding, please let us
21   know."
22   Plaintiffs' counsel never contacted me.  The fact
23   is I did not learn the Justice Department wrote Plaintiffs'
24   counsel about my claim until I read this letter attached to
25   defendants' response to plaintiffs' opposition for motion to

1    compel attorneys to sign statements of nonparties or release
2    Eddie Jacobs, as attachment A and C filed September 21st,
3    2006.
4    Your Honor, for your convenience may I present a
5    copy of defendants' response to the court?  Settling parties
6    have access to the documents on DOG's own website.
7    Defendants' reference letters and other -- and my
8    other documents offered prior to my action brought in 1987
9    and reaffirmed in 1994 satisfies the requirement of the
10   exception to the Cobell class.
11   My claim is further supported by my father and my
12   documents dating back to 1912, first brought to the BIA
13   officials and the U.S. Solicitor's Office, and then later to
14   the Office of Special Trustee.
15   Harold Bloom, Assistant Inspector General, stated
16   in his August 15, 1988 letter to me in response to my
17   request for reconsideration of an audit that:
18   "It is our decision not to
19   audit your individual Indian
20   money account."
21   Mr. Bloom's letter confirms that I started my
22   action prior to 1996 and shows that the DOG had my records
23   in their possession.
24   Additionally, he stated:
25   "It is also important to note

1    that these errors were made
2    prior to the automation of
3    the system."
4    Many errors were made prior to the computer system
5    -- computer era.  Yet the settlement leaves all of these
6    errors unaccounted for.
7    The U.S. Solicitor Edward Kohn, October 16, 1998
8    letter -- reference letter provides defendants turn my
9    documents over to plaintiffs' counsel.  Additionally, Kohn's
10   letter shows both settling parties had my records, and
11   neither offered them to the court.
12   Both parties previously stated there was no record
13   with full knowledge I had records until -- I mean dating
14   back to World War II era.
15   How is the denial of my claim for an adequate
16   representation fair?  The fact that defendants and
17   plaintiffs decided there was a historical accounting of
18   class members without obtaining a ruling from this court is
19   not fair.
20   More recently and equally unfair, the Garden City
21   group third-party administrators decided that I'm a member
22   of both Cobell classes without even knowing the relevant
23   facts.
24   In all fairness I ask this court to decide whether
25   or not I am an exception to the historical class.  I

1    respectfully request the court make this decision so I may
2    proceed with my action I began in 1987 and reaffirmed
3    pursuant to the 1994 Trust Reform Act, Section 4012.
4    I fulfilled the requirements of the 1994 statute
5    before this class action was filed, yet both settling
6    parties refuse to recognize my claim and supporting
7    documents, even though the Office of Special Trustee
8    recognized by documents and offered to perform a
9    reconciliation accounting if plaintiffs' counsel would
10   release me from the class.  Plaintiffs would not.
11   Without an accounting and reconciliation, there
12   has been no chance to finish what I started in 1987 and
13   reaffirmed in 1994.  I repeatedly asked plaintiffs' counsel
14   to protect my interests and those of Oklahoma Five Civilized
15   Tribes and individual Indians, but they refused to answer
16   any of my letters.
17   Your Honor, may I present copies of these letters
18   to the court for the record?
19   THE COURT:  Sure.
20   MR. JACOBS:  The settling parties already have
21   them in their files, but I would like to examine them as
22   further proof of my statements here today.
23   Plaintiffs stated in their May 16, 2000 motion
24   that class settlement is the only realistic means to provide
25   compensation and restitution relief to IIM Trust

Page 66

1  beneficiaries for the government's breach of trust and other
2  wrongful conduct associated with its mismanagement of the
3  IIM Trust.
4  I disagree.  If defendants provide an
5  administrative hearing where an unbiased accounting and
6  reconciliation can be accomplished based on supporting
7  documentation, there should be no need of filing a case in a
8  court of law.  Besides, I understand the administrative
9  claims must be exhausted before an action may be brought in
10  a higher court.
11  I respectfully ask this court to examine the
12  reasons why plaintiffs' counsel failed to respond to Eddie
13  Jacobs questions or recognize my request for help with the
14  Oklahoma Five Civilized Indian issues not brought in this
15  case.
16  I understand why the defendants did not want my
17  documents brought, since they would provide evidence of the
18  wrongdoings and the mistakes which they are unwilling to
19  admit.
20  Eddie Jacobs' claim is sufficiently distinct from
21  the class.  All other class members, plaintiffs' counsel,
22  have knowledge of reasons cited and all of Eddie's reference
23  letters to plaintiffs' counsel.
24  The plaintiffs and the defendants should already
25  have my letters in the records, because I mailed them to

Page 67

1  the parties, to Judge Robertson, and select members of
2  Congress.
3  The reason my claim is sufficiently different are
4  -- there are 16 reasons.  I could read those --
5  THE COURT:  You have about two minutes left.
6  MR. JACOBS:  Well, in closing then -- I felt like
7  the time period wasn't adequate to address all of my issues,
8  and I can provide the court with a copy of my documents and
9  the letters which I have.
10  THE COURT:  Do you have them with you, those
11  letters?
12  MR. JACOBS:  I have them right here.
13  THE COURT:  You can give them to my clerk of
14  court, and we will have them filed.
15  MR. JACOBS:  Thank you, Your Honor.
16  THE COURT:   All right, thank you, sir.
17  We are going to take a break.  The court reporter
18  has been going without a break for over an hour and a half,
19  and it is only reasonable to take a short break.  We will
20  take about a 10 minute recess.  We will be back and take up
21  Mr. Yamamoto on behalf of several -- an attorney
22  representing several objectors when we return.
23  All right, a 10 minute recess.
24  (Recess.)
25  THE COURT:  We are going to resume with the

Page 68

1  objector speaking.  I missed one objector.  I was told that
2  Solomon Quinn, whose name I mentioned earlier, was actually
3  here sitting in the jury box, and I missed him.  I apologize
4  for that.  So Mr. Quinn, if you want to come up at this time
5  and address the court you may do so.
6  Your objection was the same as Ms. Pipeboy, so I
7  hope you won't repeat what she said.  It has to be in some
8  area we didn't cover.
9  MR. QUINN:  Thank you, Your Honor.
10  Why I am here?  I inherited my ancestors' land.  I
11  inherited land from my ancestors, and why I opted out,
12  because I believe that in the Cobell case what was awarded -
13  - maybe we should have gotten some lands back so that we
14  could be more self-sufficient.
15  I did not make the statement that everything is
16  coming from my heart.  I apologize for that.  But I hope
17  what all is said from my relatives that are here that it can
18  be honored, and I appreciate that you have us here.
19  And that is all I have to say right now.
20  THE COURT:  Thank you, Mr. Quinn.  I appreciate
21  your coming up.
22  MR. QUINN:  Thank you very much.
23  THE COURT:  We will turn back to Alan H. Yamamoto
24  representing various objectors.
25  Is he here today?

Page 69

1  (No response.)
2  THE COURT:  He filed an appearance and a brief on
3  behalf of the following individuals.  He is from Alexandria,
4  Virginia, an attorney.  It was be on behalf of Feron Thunder
5  Hawk, Laura Begay, Louise and Joe Marie Murphy.
6  Are any of those individuals here who would like
7  to speak since their attorney is not apparently?
8  (No response.)
9  THE COURT:  Then his brief on behalf of their
10  interests has been filed, and I have reviewed it, concerning
11  the issues that he raised regarding both the amounts of the
12  award and the settlement terms on the land purchase, about
13  extending it, as well as the objectives to the attorney
14  fees, expenses and incentive awards.
15  We will pass on then to Jason Nathaniel Corwin
16  from Spencer, New York.
17  Is he here today?
18  (No response.)
19  THE COURT:  Mr. Corwin had filed an objection
20  objecting to it because of a lack of a full accounting.  We
21  will pass on Jason Nathaniel Corwin.
22  Ms. Judith A. Heart Warrior Chosa, C-h-o-s-a.  Is
23  Ms. Chosa here?
24  (No response.)
25  THE COURT:  Ms. Chosa had filed a notice with an

Page 70

1   interest -- intent to appear, bust did not file any
2   objections, per se, just said that she wanted to appear and
3   testify before the court.
4   (No response.)
5   THE COURT:  We will waive Ms. Chosa.
6   The next I have is a counsel, Theodore Frank, on
7   behalf of Kimberly Craven, objection to attorneys' fees,
8   incentive payments and awards, and as to the structure of
9   the settlement class action.
10  We received a lengthy brief from Mr. Frank.  He
11  has also been heard on motions before the court previously.
12  All right, Mr. Frank.
13  MR. FRANK:  May it please the court, Theodore
14  Frank, pro bono, for class member Kimberly Craven.  Ms.
15  Craven could not be here today because of the cost of
16  travel, but she supports this objection, obviously.
17  THE COURT:  Right.
18  MR. FRANK:  And we would like to join Carol Good
19  Bear's objection, and I hope I can be half as eloquent as
20  she was.
21  A District Court judge evaluating a class action
22  settlement has a fiduciary duty to the unrepresented members
23  of the class to vigilantly protect those absent class
24  members' rights.
25  The settling parties asked to have Your Honor

Page 71

1   abdicate that duty and defer to some Congressional plenary
2   power.  This position in their briefs reflects a
3   fundamental misunderstanding of both the Claims Resolution
4   Act --
5   THE COURT:  Slow down a little bit for the
6   reporter, please.   Thank you.
7   MR. FRANK:  And of the role of Congress and the
8   courts in government's litigation.
9   Our briefing presents several independent grounds
10  for rejecting the settlement, but I would like to focus on
11  two issues in response to the parties' briefing today.
12  THE COURT:  All right.
13  MR. FRANK:  First, Congress did not and cannot,
14  for Constitutional reasons, divest this court of its Rule 23
15  review of this class-action proceeding.
16  Second, as a matter of the Rule 23 review, this
17  settlement and class, in general, falls far short of the
18  minimal constitutional Rule 23(e) thresholds.
19  First, the Claims Resolution Act did not make the
20  settlement into law.  Rather, it merely endorsed and funded
21  an Executive Branch decision to settle litigation and left
22  the ultimate resolution to this court.
23  Congress could not constitutionally have done what
24  the settling parties claim they did.  Congress may not
25  dictate the rules of decision in an individual case without

Page 72

1   changing the underlying substantive law.  Nor can Congress
2   pass a statute overriding the individual Constitutional
3   protections of due process currently enshrined in many parts
4   of Rule 23(a) and (b) of the Federal Rules of Civil
5   Procedure.
6   Section 101(c) of the 2010 Act merely authorizes
7   the government to settle the case, a prerequisite to
8   settlement taking place because of the need for
9   Congressional authorization of the billions of dollars to be
10  spent.
11  The ratification is permission for the Executive
12  Branch to go forward rather than an order to the Judicial
13  Branch to disregard the requirements of Rule 23(e).
14  THE COURT:  Slowed down.
15  MR. FRANK:  In advance I gave the court reporter a
16  copy of my remarks to help her.
17  Nor could Congress give such an order.  The
18  federal government is adverse in litigation to the absent
19  class members and would be nonsensical to say that it is
20  owed deference in the decision of whether or not a
21  settlement is fair, adequate and reasonable.  Congress's
22  litigation decisions deserve no deference.
23  In fact Congress contemplated that this court
24  might have valid reasons not to certify the class.  Reading
25  section 101(d)(2)(A) of the Act it says:

Page 73

1   "Notwithstanding the requirements
2   of the FRCP, the court in
3   litigation may certify the trust
4   administration class."
5   May certify, Your Honor, rather than shall certify
6   the trust  administration class.  And the facial
7   constitutionality of the statute is preserved only by the
8   fact that Congress did not mandate the certification of the
9   class.
10  Those valid reasons for withholding certification
11  is contemplated by Congress surely include certifications
12  that would violate the due process rights of the absent
13  class members.
14  Apart from the due process ramifications, the
15  second reason for Congress's deference to the judicial
16  determination of class certification and settlement is
17  obvious.  Congress cannot constitutionally dictate the rule
18  of decision in a pending case without changing the
19  perspective substantive law.
20  That is a simple separation of powers principle
21  from the United States versus Klein, which neither party
22  cites, reaffirms in several opinions in this court, and in
23  fact more recently in this very case in the D. C. Circuit in
24  2004 which held that there was no Klein violation because a
25  particular law repealed the substantive underlying law.

Page 74

1 But that did not happen here. There was no
2 underlying repeal of Rule 23, and as such, the
3 interpretation of the Act that the settling parties urge
4 upon this court would violate Klein.
5 The 11th Circuit addressed exactly this issue in
6 the Terry Schiavo case where the concurrence addresses these
7 issues.
8 Now the government argues in the context of a
9 lawsuit settlement that Congress has sort of carte blanche
10 to extinguish rights, that they can pass a statute and
11 settle the lawsuit that way. For that they rely upon dicta
12 in Sheridan Square and some related cases.
13 I think that that is an incorrect reading of
14 Sheridan Square. That was a fact intensive decision. But
15 even if the government's reading is correct, Sheridan Square
16 was superseded by the Supreme Court in United States versus
17 Winstar, which they also failed to bring to the court's
18 attention.
19 In Winstar, of course, the court held that
20 Congress cannot resolve contractual disputes by pulling the
21 rug out from under the private contracting party.
22 Now what is true in the contractual context is
23 even more so in the fiduciary trust context. The plenary
24 power of Congress, with respect to Indian law, does not
25 change that. We've seen courts apply Winstar to the Indian

Page 75

1 law context on a couple of occasions.
2 Cherokee Nation versus Levitt, 543 U.S. at 646,
3 and I also refer you especially to Judge Gajarsa's
4 concurrence in the Federal Circuit in 1999 in Babbitt versus
5 Oglala Sioux, 194 F. 3rd, 1374. An ex post extinguishment
6 of fiduciary rights is impermissible.
7 Now this is all just to show that the court cannot
8 defer to Congress and must undertake its own Rule 23
9 evaluation. When this court reaches the merits of the Rule
10 23 questions, you will find that the class certification is
11 woefully deficient under Rule 23 and constitutional
12 standards, and that the settlement does not meet the
13 requirements of interclass equity that Rule 23(e) requires.
14 Now our objection details at length several
15 independent reasons to reject the settlement under 23(a)(b)
16 and (e). But I would like to bring the court's attention
17 to the problem of the adequacy of the representation in
18 particular, and Ms. Good Bear touched upon this.
19 The settling parties do not dispute that this is a
20 constitutionally compelled inquiry under Shutts, recently
21 reaffirmed in Concepcion.
22 The lawyers have asked to ask for -- excuse me,
23 the plaintiffs have asked for an unprecedented $13 million
24 windfall for the class representatives. In doing so, they
25 create a conflict of interest between the representatives

Page 76

1 and the class that constitutionally requires
2 decertification.
3 The incentives no longer align, and that is the
4 government's own test. The class can no longer trust that
5 the representatives' interests are their own interests,
6 because with $13 million at stake, the class representatives
7 have as much incentive to sign off on an unfair settlement
8 as a fair settlement, and as much of an incentive to
9 approve an unfair -- sign off on an unfair $223 million
10 windfall for the attorneys as they do for a fair attorney's
11 fee.
12 Now we don't know why Ms. Cobell changed her mind,
13 but we do know that she did change her mind after the
14 possibility of millions of dollars for settlement approval
15 became available to her.
16 Before the Senate Committee on Indian Affairs
17 Oversight on March 29, 2007, Ms. Cobell testified that the
18 trust administration claims were worth billions of dollars,
19 and that's why a $7 billion legislative solution that would
20 not have needed court approval was rejected by the
21 plaintiffs. And that is the same one that the plaintiffs
22 said did not exist, but somehow she testified about it.
23 There has been no admission that she was mistaken
24 or incorrect in her previous testimony. This was not
25 addressed in Cobell 22, which obviously had nothing to do

Page 77

1 with the trust administration claims, which were only bought
2 for the first time with respect to the preliminary approval.
3 And now the class is getting a fraction of what was
4 available to them in 2007.
5 We see Ms. Cobell's brief supporting settlement
6 contradicting what she told Congress in that 2007 testimony.
7 My client, Ms. Craven, argued that settlement was unfair
8 because it failed to take into account the individualized
9 circumstances of class members with widely disparate claims
10 under the trust administration class.
11 MR. HARPER: Your Honor, I would like to object at
12 this time. These issues are a field from what was presented
13 by Mr. Frank in his brief.
14 THE COURT: Sir, are you going into a new area
15 that you did no raise previously?
16 MR. FRANK: No, Your Honor. We are defending an
17 argument that we made in our brief in response to an
18 argument that they made for the first time after we filed
19 our brief.
20 MR. HARPER: Your Honor, he is discussing issues
21 that were raised in what is now a stricken brief, Your
22 Honor.
23 THE COURT: Right.
24 MR. HARPER: And that is impermissible, of course.
25 THE COURT: I think that is a problem.

Page 78

1   MR. FRANK:  Well, they argued that the brief
2   should be stricken because I would have an opportunity to
3   raise it at the fairness hearing, and now they are saying
4   that I can't raise them at the fairness hearing because the
5   brief was stricken.
6   THE COURT:  I will give you a couple of minutes to
7   finish that up.
8   MR. FRANK:  Thank you, Your Honor.
9   Ms. Cobell's brief, and this is what I'm
10  responding to, she claimed that no such people existed, that
11  there was nobody out there who had their sizable claim
12  transfer to another class member.
13  But Ms. Cobell herself testified in 2007 about
14  James Kennerly, an example that demonstrates exactly what we
15  are talking about in our April 20th objection.  She told
16  that Congress that his trust land was pilfered by oil
17  companies over decades without any compensation because of
18  misadministration of her trust claims.
19  She told Congress that he was entitled to
20  millions, and now she would have his claim for misallocated
21  oil royalties be resolved for $500 without an accounting,
22  because all that are available in his trust account are the
23  pennies that he didn't -- because he never received the oil
24  royalties in the first place, and all of those claims are
25  waived in the trust administration class, which groups

Page 79

1   together dozens of widely disparate claims.  I have never
2   seen a class certified that sprawling.  And the parties do
3   not point to any class that spawned that has ever been
4   certified.
5   That $500 is the same as a hypothetical Indian,
6   and it is not hypothetical, because we have just heard
7   about a hundred thousand Indians with an average of $.15
8   each, who are getting the same $500.  But these two entirely
9   unrated claims are in the same impermissibly sprawling
10  class.
11  So why is Ms. Cobell now arguing that Mr.
12  Kennerly's claims don't exist?  Is the possibility of an
13  outsized multimillion payday why?  We don't know.  Mr.
14  Kennerly did not opt out.  We don't know why Ms. Cobell did
15  not tell what she told Congress was her close personal
16  friend that she settled his multimillion dollar claim for
17  $500.
18  Maybe she was wrong in what she told Congress.
19  We don't know, but we do not have any explanation for why
20  that story has changed.  We have no admission that they
21  were incorrect or mistaken in that earlier testimony.  And
22  given incentives that $13 million creates, to change the
23  story and forget about Mr. Kennerly, no explanation would be
24  adequate.
25  The cases the parties cite to the contrary are

Page 80

1   inapposite.  A $2,500 incentive payment to a $7,500
2   incentive  payment, these are not the sort of incentive
3   payments that distort incentives or create conflicts the way
4   $13 million does.  And as Judge Easterbrook said in Murray
5   versus GMAC:
6   "It is inherently impermissible
7   for parties seeking to litigate
8   on behalf of a class to take a
9   widely disproportionate share
10  of the settlement proceeds of
11  litigation."
12  And if Ms. Good Bear is correct, they are taking $13 million
13  for a claim that was worth under 60.
14  Now the Kennerly case and the other issues that we
15  discussed in our April 20 objection demonstrates the
16  constitutional problem of cohesiveness.  It is not enough
17  for there to be a single common issue.  The underlying class
18  has to be sufficiently and predominantly cohesive to be
19  treated identically, and that simply is not possible in the
20  sprawling trust administration class.
21  The parties fail to identify a single example of a
22  class this individualized with this many disparate claims
23  being certified as a single class.
24  When courts refer to rough justice, the standard
25  that the parties ask this court to take, the rough justice

Page 81

1   that the courts are talking about, you know, they are
2   leveling off small claims.
3   You have the consumer fraud case, and somebody
4   with four boxes of cereal gets treated the same way as
5   somebody who bought two boxes of cereal, and given a de
6   minimis claims, it is okay to sort of even that out for the
7   ease of administration.
8   You cannot do that in a case where there are
9   millions of dollars at stake.  And see, for example, the
10  Reynolds versus Beneficial National Bank case -- I believe
11  we cited that -- where it was only the smallness of the
12  claim that permitted that sort of leveling.
13  It does not refer to a scything of the entire
14  class, where those who are entitled to nothing get the same
15  as those who Ms. Cobell earlier claims are entitled to
16  millions.
17  I would like to bring to the court's attention
18  something that contradicts Ms. Cobell's statement that the
19  Indian community supports the attorneys' fee award here.
20  Last week the General Assembly, at the 2011 mid-
21  year session of the National Congress of American Indians in
22  Milwaukee, Wisconsin, they adopted a resolution endorsing
23  the government's request that attorneys' fees and expenses
24  and costs in this case be capped at $50 million.
25  They also supported the fee application of NARF.

Page 82

1   We do not take a position on that.
2   THE COURT:  Did they object to the settlement
3   overall?
4   MR. FRANK:  They did not object to the settlement
5   to my knowledge.
6   You know, the majority of Indians should not
7   object to this settlement.  This settlement is a windfall
8   for the majority of Indians.  The problem is the inter-class
9   equity problems, that there are substantial minorities that
10  the settlement does not treat fairly and cannot treat
11  fairly.
12  We raised several other issues in our objection.
13  I am short on time.  I am happy to answer any questions you
14  might have.
15  THE COURT:  Thank you, Mr. Frank.
16  MR. FRANK:  Thank you, Your Honor.
17  THE COURT:  The next was Ms. Loren Zephier.  She
18  notified the court this morning by e-mail that she is unable
19  to attend.  She thanks the court for the opportunity but
20  will not be able to attend.
21  We will than to go to Margie Eder, E-d-e-r.  Ms.
22  Eder has filed objections to the court continuing this case
23  as well as to the settlement.
24  MS. EDER:  Good morning, Your Honor.
25  THE COURT:  Good morning.

Page 83

1   MS. EDER:  Your Honorable Judge Hogan, I would
2   like to thank you for allowing me to come here and speak
3   concerning this opposition hearing.  I did want to wish
4   Eloise good health, and I am praying for her, and I would ask
5   that you would relay that message to her.
6   However, you attorneys, and I am referring to you
7   at this table, the Lord God rebukes you, because you want to
8   line your pockets by robbing a people of that which is not
9   yours to take.
10  You consider within yourself that you are entitled
11  to more, and you should not be of a greedy heart.  $233
12  million is not right.  Nor should it even be considered by
13  this court.
14  You entered into this lawsuit knowing full well
15  that you could receive nothing or very little.  Now that
16  the settlement is coming to a close, you think within
17  yourselves that you are to receive hundreds of millions of
18  dollars.
19  You claim to be representing us for the good of
20  the Native American people, yet the fees that you are
21  attempting to negotiate, those fees will take more from a
22  poor people, and that is a shame on you.
23  In God's mercy you were given grace to continue on
24  in this lawsuit, but your greed has overcome you, and you
25  have lost your vision for the righteous sake that you once

Page 84

1   held.
2   You wrote in the beginning of this lawsuit, all
3   plaintiffs printing this action on their own behalf and on
4   behalf of all persons similarly situated.  All.  And I don't
5   mean to be yelling, but it sounds like I am.
6   Judge Hogan, I request of the court to set the
7   attorney fees at $50 million and no more.  The attorneys
8   were full knowledge to the risks that are involved in this
9   type of lawsuit.
10  My family has held the IIM accounts since the
11  creation of the IIM and has suffered greater damage, more
12  than most in this court, and certainly more than these
13  attorneys that sit before us and ask for more money, and are
14  willing to take away what little most will receive in this
15  settlement.
16  Every member of my family before me is dead.  My
17  parents, to my grandparents, to make great parents -- great-
18  grandparents, and so on.  Do you understand this?  None of
19  them will receive any compensation for the horrific
20  mismanagement of their lands, their minerals, their oil,
21  their gas leases, all of which was their money and could
22  have helped them to escape the vastness of the poverty in
23  which they lived.
24  Yet I am forced to listen to those that claim that
25  they are representing me and my family for my better

Page 85

1   interests.
2   By the attorneys own tongues, their desire is for
3   more, while I am to settle for less -- $1,500, while they
4   are attempting to walk away with millions upon millions.
5   Yet I am the one who has held my account since 1965.  46
6   years.
7   I do not know of others personally that own in
8   combination 720 acres of their own land.  I own land in
9   Montana, in North Dakota, in South Dakota.  My land has
10  cattle, oil, gas, minerals, pasture, water and even highways
11  on it.
12  I have seen others that are not native raise
13  their family on my land and make a living enough to care for
14  their families very, very well, all the while that I
15  received less than $165 a year from it.  And it is my land.
16  My land.
17  Why should I live as an impoverished woman when I
18  own all of this land?  And if I do not agree to lease my
19  land, then the laws will lease it anyway to another.
20  I hold leases in my possession, and they are right
21  here.  And I would submit this as documentation if you want
22  it, that I am offered and paid one penny -- that is right
23  here.
24  Second one, the undersigned hereby accepts the
25  offer of zero zero.  Nothing.

Page 86

1    Here is another one.  Attached is a notice to
2    lease two point five acres.  This lease is for 50 years.  I
3    think on this one I have to be 104 years old.  I don't think
4    I'm going to live that long, and I think the cost of -- what
5    do they call it?  The cost of inflation or whatever that
6    goes right along with it -- anyway.
7    I watch my land that I share with my sisters
8    diminish.  The same plot of land -- now I have much, much
9    land, was 11 acres.  This is just one area.  It was 11
10   acres.  It is now down to five.  I didn't die.  It did not
11   go to my children.  I am -- I think I am still alive.  I am
12   still here.
13   I will remain silent no longer.  Nor will any
14   steal from my children, and the blessings of God will seal
15   that, and I know this.  Enough is enough.  The attorneys
16   have insulted my family with their proposed settlement and
17   the greedy request that they have.
18   They want millions of dollars, and they readily
19   expect my family to accept peanuts -- I mean none of you
20   would accept it yourself if you had to live it.
21   This whole lawsuit should just go away, or it
22   should be reconfigured fairly to all Native people, not just
23   so the attorneys become multimillionaires at the expense of
24   me, and my family, and the Native American people.
25   I ask that you would remember the names of my

Page 87

1    family that cannot speak from the grave concerning this
2    settlement when you decide which direction to go with it.
3    They were warriors, moms and dads, sons and daughters, and
4    even veterans of war to help this country retain its
5    freedom.  And all of them are deceased.
6    There names were Main Horn, Fixes Up, Bunch of
7    Beads, Fighter, Long Nine, Light on Land, Barrel, and Jack
8    Eater was a Purple Heart recipient more than once, who was
9    my father.  They are all dead, too.  Minnie Two Shoes.  She
10   is my oldest sister, and she was one of the founders of the
11   Native American Journalist Association, and she just passed
12   on last April.
13   My family records date back before the beginning
14   of my reservation, and it is documented on my reservation,
15   which is in Poplar Montana, the Fort Peck Indian
16   Reservation.  And our family was to the government in trust.
17   $1,500 for 46 years in it?  And 233 million to you
18   guys, and you have already received money?
19   THE COURT:  Ms. Eder, you are repeating yourself.
20   MS. EDER:  I know.  I've got go stop that.
21   THE COURT:  Let's finish up.
22   MS. EDER:  I'm repeating myself.
23   Well, that is my opposition, and I do have one
24   other thing.  One of the attorneys said something about that
25   it was fair, but it is not really fair, because what is

Page 88

1    happening here is that it is very obvious -- I have
2    documentation of land abuse, mismanagement, and they are
3    going to base this off -- like I get 162 -- maybe $162 every
4    year.
5    But that $162 is being based off of downright
6    thievery, and yet I have had my land since 1965, sir.  And
7    then there are other people that are going to come in and
8    they may have one transaction, and they're going to walk
9    away with thousands upon thousands of dollars, but based on
10   just -- because I don't have a whole lot of money in my
11   account, and I wonder why?
12   Well, it shows in my documentation.  It is getting
13   stolen, and my land is being removed from me.  I am going to
14   get like $1,500.  And it is wrong, because it is being based
15   on untruth of what really is.
16   It is like you have got a whole piece of pie, and
17   they are only going to base it on the one piece of pie I
18   have left.  What happened to the rest of the pie?  Because I
19   owned that whole pie, and I don't know how else to explain
20   that.
21   I bought my records here.  They are dated back
22   from 1965.  I was told by a Senator -- when I talked to him
23   he said, why doesn't anybody else have documentation?  And
24   then I was also told that whoever held all of these papers
25   destroyed them.

Page 89

1    Well, I did not destroy mine.  I kept mine.  And,
2    sir, if you would like to review them, I would put them in
3    trust for you if I could get a copy -- I don't want them to
4    disappear.
5    THE COURT:  I think you had better keep them for
6    right now.
7    MS. EDER:  Anyway, I'm done.
8    THE COURT:  I don't want you to lose them.
9    MS. EDER:  No.  Thank you.
10   THE COURT:  Thank you, Ms. Eder.  I appreciate it.
11   The court recognizes Ms. Mary Aurelia Johns from
12   Nebraska.
13   Good afternoon, Ms. Johns.
14   MS. JOHNS:  Good afternoon.
15   My name is Mary Aurelia Johns, also known as Mary
16   Lee Johns.  I am an enrolled member of the Cheyenne River
17   Sioux tribe, and I am an IIM account holder.  In fact, I
18   have had my account for 49 years, since 1962 when my mother
19   died.  My lands -- my trust lands are on the Cheyenne River
20   Sioux Reservation in South Dakota.
21   I am objecting to the proposed a settlement in the
22   Cobell versus Caesar -- Salazar case because of -- however,
23   before I begin my discussion of why I am objecting, I would
24   like to take this opportunity tell you why I did not opt
25   out.

Page 90

1  It took a great deal of struggle to make this
2  decision.  I chose not to opt out because if everyone opted
3  out there would be no one to tell you what was wrong with
4  this agreement, and I knew that it would be important for
5  you to know why a person like myself objects to this
6  agreement.
7  My objections are as follows:  I challenge the
8  suitability of the named plaintiffs to maintain this action
9  on behalf of myself.
10  One, according to the federal government, the
11  plaintiffs have received a personal accounting, yet those of
12  us who they purport to represent have not.  Furthermore, the
13  plaintiffs have asked this court to prohibit the government
14  from sending an accounting statement to me.
15  Two, the plaintiffs by asking for an incentive
16  award, no longer have commonality with the other IIM account
17  holders and now represent only themselves.  Trying to
18  collect these awards and asking this court to rule that the
19  agreement is fair and reasonable, and to give a final
20  approval to the settlement, this is an obvious conflict of
21  interest.
22  I also challenge the plaintiffs' assertion that
23  their claims are similar to mine, which has resulted in
24  their being allowed to negotiate this agreement with the
25  federal government that resulted in the trust administration

Page 91

1  class being created.
2  This claim that commonality is based on the fact
3  that IIM account assets are all held in trust by the federal
4  government.  This is not true, and I object to the assertion
5  for the following.
6  One.  Each lease agreement that is approved by the
7  federal government under its responsibility as a trustee has
8  separate regulations and laws that govern the terms,
9  obligations and management of these leases.
10  Two.  The laws that govern these leases, for
11  example, are the American Indian Agricultural Management
12  Reform Act, which governs my lands, are totally different
13  than the Mineral Leasing Act or American Indian Forest and
14  Woodlands Act.
15  Mismanagement claims that individuals have under
16  all of these types of leases do not share a common basis in
17  law, and the facts that would be required to support these
18  claims will be entirely different from the plaintiffs.
19  There is no commonality for this class to be certified.
20  In regard to the certification of the trust
21  administration class, I have questions that need to be
22  answered.
23  One, my questions to this court are this:  Would
24  these claims have enough in common to take the
25  administration class to trial?  If you cannot certify the

Page 92

1  class for trial, how can the court then reasonably certify
2  the trust administration class for settlement?
3  Two.  These administration claims under the trust
4  administration class are the most egregious claims, and yet
5  this class, according to the negotiated agreement is the
6  last to be paid after the attorneys, the plaintiffs and the
7  historical accounting class.
8  This is neither fair nor reasonable.  These
9  payments will bear no relationship to any estimate or actual
10  damages to an individual's assets, but purely on what is
11  left over and how much has gone through the IIM account of
12  those who are in the class.
13  However, my strongest objection is to the
14  following fact:
15  The very idea that individuals, who I never agreed
16  to represent me, should then take it upon themselves to
17  negotiate, on my behalf, with the federal government that
18  has over many, many, many years, mismanaged the lands that I
19  inherited from my great great grandmother, Cleans as She
20  Comes, my great grandfather, Poor Buffalo, my great
21  grandmother, Grows in a Day, my grandmother Sara Poor
22  Buffalo, my grandmother Mabel Dupree, and my mother, Marie
23  Justice.
24  The allotment of Lakota lands began under the law
25  of 1889 that broke up the great Sioux reservation and

Page 93

1  provided for the allotment of the five smaller reservations
2  that were created under this act.
3  The Lakota were then forced to move to these
4  allotments when the federal government began stopping the
5  distribution of rations.  They were then told that they had
6  to grow their own food or starve, thus forcing the Lakota to
7  accept the allotment of the lands.
8  These lands that I inherited were specifically
9  chosen by my great grandfather, who knew which lands he
10  wanted, because they were in the same area that his family
11  had spent many, many winters.  They are truly our
12  traditional lands.
13  He knew that the lands were rich grasslands that
14  would provide for his family.  These lands did provide for
15  several generations of our family by allowing us to have
16  cattle and horses, but now these lands, because of
17  mismanagement by the federal government, have been
18  overgrazed to the point where very few cattle can be
19  nourished for the entire summer.
20  Moreover, the large cottonwood stands are no
21  longer there to protect the river that flows through my
22  family's lands.
23  Not once has the federal government ever
24  determined just how much damage has been caused to these
25  lands by the overgrazing that allowed prairie dogs, evasive

Page 94

1   species of weeds, and other ecological damages to the once
2   productive lands on my reservation.
3   By allowing the certification of the trust
4   administration class, I'm being denied the right to know
5   exactly how much damage has been done and to be represented
6   fairly and adequately as required by due process under the
7   United States Constitution.
8   Because this action purports to settle the trust
9   administration claim, thi8s settlement may forever preclude
10  my claims against the Bureau of Indian Affairs from
11  mismanagement related to the land itself.
12  I ask, can I sue for restoration of these damages
13  after the settlement?
14  As you can see, sir, these lands are precious.
15  They hold the bones of my people.  There are many graves on
16  this land that are directly related to me.
17  For the 14 years of this litigation of this case,
18  I was continually assured that it was only about an
19  accounting and never about our lands.  Then in the last
20  minute the land was brought in, and those of us who are tied
21  to this land now face this new interjection into a case that
22  was not about land.
23  With this in mind, I also would like to say
24  something about what this gentleman on the side and what
25  this gentleman on the side talked about in regards to

Page 95

1   notification.  They stated that this notification regarding
2   these class actions -- this class-action suit was the best
3   that has ever been done.
4   A 16-page document was sent down to the
5   reservations to people who, I guess, were on some kind of a
6   list, and were told, you know -- but you have to understand,
7   culturally our people do not react to documents sent by the
8   federal government.  They throw it on the side, just like
9   probably more people in United States than you can imagine
10  getting a letter from the federal government would probably
11  do.  Throw it on the side.
12  Historically, every time Indians have won an
13  award, from the Alaska Native Lands Claim Settlement Act, to
14  the War Eagle Act, of which my children were both entitled
15  to, you had to participate by filling out a form and saying
16  you wanted to participate.
17  This process went against historical and
18  traditional manners of which Indian people have come to
19  realize that if they wanted to participate they had to fill
20  out a form.
21  My sister, who is one of the most intelligent
22  individuals that I know of, was shocked when I told her --
23  she said, well, I opted out.  And I said, well, did you send
24  in the information?  And she said, no.  I did not fill out
25  the forms, so therefore I'm not participating.

Page 96

1   And that is one of the things, if you truly want
2   to know about these two gentleman speaking supposedly on our
3   behalf, actually are stating the truth about only two
4   percent or whatever they said, 99 point something percent of
5   people who did not -- who chose to participate, then you
6   must have to go back and research exactly what took place.
7   That was a very, very legalistic form that they
8   sent out.  A 16-page form that was sent out to individuals
9   who may not even have a sixth-grade education.  And I am not
10  trying to put down my people, but there were very educated,
11  very knowledgeable individuals who were chairmen of certain
12  tribes who, in fact, were against this whole process in the
13  beginning, and did not read that document.
14  I read it, and I was saying, do you realize that
15  you have to do this?  And they said, no.  Let me see that.
16  So I was passing my document around at a National Congress
17  of American Indians meeting so that people, who should have
18  known better, should have read it, and they didn't.
19  And that is why I want you to question these two
20  individuals who stood up and said, this was the best
21  notification service ever done for Indian people.
22  THE COURT:  There was a TV and radio, was also not
23  followed at all?
24  MS. JOHNS:  Well, people don't -- traditionally --
25  traditionally, people don't participate by ignoring

Page 97

1   something.  That is the way it is traditionally.  You have
2   to look back into the history of our people.
3   They did not go to the -- they didn't go to the
4   meetings where they were discussing IRA because they did not
5   agree with the IRA.  They stayed home.  As a result of them
6   staying home, it appeared that they supported it.  But this
7   is -- if you look historically, culturally you can ask any
8   individual who knows something about Native people, then you
9   will find that out.
10  I just also want to say something, and I'm going
11  to say it with the understanding, sir, that I do know that
12  you have an important position, okay.  But I also would like
13  for you to remove yourself, sir, from these rulings of
14  fairness of this proposed settlement.
15  And I ask you, because I have read press reports
16  by reputable journalists where you publicly stated on
17  Friday, 15 October, 2010, that you urged Congress to quickly
18  approve the settlement of the individual Indian trust case
19  known as Cobell versus Salazar, quote, on its own merit,
20  unquote.
21  By stating that the settlement was a fair one
22  and that the, quote, the merits are very clear, unquote,
23  you urged Congress, quote, in the strongest terms, unquote,
24  to approve the settlement, quote, as soon as possible,
25  unquote.

Page 98

1   By these very statements you have gone on record
2   in support of this agreement without waiting to hear from
3   the very people that this settlement impacted the most.  As
4   a result, I fear that my statements, and the statements of
5   others here today, have been given without -- what is the
6   term, just to speak, I guess.  Just to talk -- and will not
7   receive the objective, fair and impartial consideration that
8   I have the right to expect from a federal judge.
9   We have a right to the appearance of fairness and
10  impartiality.  We do believe that your public statements
11  have placed a cloud of doubt over your ability to rule
12  fairly on a matter that your public statements suggest you
13  may have already prejudged.
14  So sir, I ask for justice for myself, my children,
15  my grandchildren, but most of all my great grandchildren.
16  My great granddaughter and my great grandson.
17  You have heard several times several people
18  talking about individuals who have passed away.  My family,
19  there are very few of the older ones left.  That is true.
20  But my family has always considered the grandchildren way
21  more important than themselves.  In fact my grandmother
22  would go without food so that she could feed my sister when
23  we were in very poor circumstances.
24  So I ask for justice great-granddaughter and my
25  great-grandson, who are the eighth generation of my family

Page 99

1   who would inherit the Cleans As She Comes lands.  The
2   question is, what condition will these lands be when they
3   inherit?
4   And that is what this whole concept of this trust
5   administration class is about.  It is about the land.  And
6   we have a statement in Lakota Country, the land and the
7   people are one.  Without our land, without the health of
8   our land, then we are never going to be able to sustain a
9   life.
10  The majority of tribes in my part of the country,
11  which is North Dakota, South Dakota and Nebraska, especially
12  North Dakota, South Dakota and Montana, the majority of
13  Indian people's economics are based on agriculture.  And if
14  our lands are no longer productive, that means that we no
15  longer can support our families on our lands, and this is
16  what has happened over the years.
17  These lands have continually been degraded because
18  of unscrupulous people who, for example -- there are several
19  people that work for the Bureau of Indian Affairs on my
20  reservation who also had -- who were supposed to be the
21  individuals who were supposed to oversee the land.
22  They had -- they also had permits on leases.  So
23  they were overgrazing the lands that they had leased.  So
24  how could they then question the overgrazing of lands -- the
25  lands that my family owns?

Page 100

1   So these are the kinds of things that you have not
2   heard.  You have not heard this from either the federal
3   government's side or the plaintiffs' side.  These are the
4   individuals -- they're going to tell you that everything is
5   so wonderful out in Indian Country, and that $1,500 is the
6   best deal that they could have gotten us.  This is not true
7   at all.
8   I would forgo the $1,500 if the federal government
9   agreed to come in, place certain kinds of programs and redo
10  the lands and bring them back to where they once were before
11  they got a hold of them.
12  So I just -- you know, again, I think that it is
13  really important for you to see the statements that you have
14  made.  I think that for those of us who come before you
15  asking for justice that it is going to be very important for
16  you to think about the fact that this may not be a very good
17  settlement for those of us who own land.
18  I thank you again for allowing me to speak.  Thank
19  you.
20  THE COURT:  Thank you for coming down.  I
21  appreciate it.
22  Is Mr. Richard Monette here?
23  MR. HARPER:  Your Honor, could I be heard for a
24  moment?
25  THE COURT:  About Mr. Monette?  He is just going

Page 101

1   to speak for himself.
2   MR. HARPER:  Pardon me?
3   THE COURT:  He is just going to speak for himself.
4   MR. HARPER:  Yes.  He is speaking for himself, and
5   Your Honor, he has made an objection regarding speaking for
6   -- with respect to the trust administration class.  He is
7   opted out of that class.
8   THE COURT:  All right.  Mr. Monette, good
9   afternoon.  You are going to speak for yourself.  You're not
10  eligible to speak for the others.
11  They said you opted out of the trust class?
12  MR. MONETTE:  Yes.
13  THE COURT:  All right.  I will hear you about what
14  you would like to discuss on the historical class.
15  MR. MONETTE:  I appreciate your holding this
16  hearing and giving everyone the opportunity to present their
17  objections.  I really only have one main objection, and
18  maybe a couple that will go along with it.
19  The main objection I would like to weave into a
20  story, as I have no choice, since my elders asked me to come
21  here and say what I'm about to say, and not necessarily to
22  speak as a lawyer.  So I know you've heard some personal
23  stories here, but if you could humor one more witness, it
24  would be nice.
25  When I was green behind the ears just out of law

1   school, the Native American Rights Fund came to my
2   reservation, and I had just been offered a job with my
3   tribe, and they were talking about bringing this law suit.
4   To cut to the chase, I can say from my
5   understanding at that point that it was my understanding,
6   and I think the chairwoman of my tribe, that all we really
7   wanted was an accounting, and some of us wanted to know what
8   happened to our land.
9   I know you have heard some of the stories, so
10   story is representative of a lot of other people.  I hope I
11   don't bore you and I will hurry.
12   My tribe entered into a treaty of 1863.  My great
13   great great grandfather known as Little Shell walked out of
14   the treaty negotiations because he thought it was unfair.
15   That treaty was being negotiated on the Minnesota/North
16   Dakota border, and he went west, further into North Dakota
17   where one of our homelands was.
18   In 1882 the President unilaterally reduced that
19   reservation, or what we had left from that treaty.  It was
20   about 10 million acres, and they reduced it to 20 townships
21   and gave the tribe $1 million.  It is known in the official
22   annals as the ten cent treaty.
23   Despite that, two years later the President again
24   unilaterally, without Congressional authorization, reduced
25   that reservation to two townships.  Next to nothing compared

1   to what we had.  Some said it was in retaliation for Little
2   Shell's refusal to negotiate.
3   Then along came the Allotment Act which was -- is
4   the font of a lot of what we have in front of us, and our
5   reservation was too small.  There was not enough land for
6   allotments for everybody.  Our people ended up with
7   allotments in Minnesota, South Dakota, Western North Dakota.
8   2,600 allotments in Montana.  Anywhere from 250 to 600 miles
9   away.
10   My grandmother was assigned her allotment in
11   Western North Dakota, 200 miles away.  It was quickly
12   discovered that her allotment would hold coal.  So she was
13   unilaterally removed from that allotment and put on another
14   one, this time further away in Montana.
15   My grandfather and my grandmother both got
16   allotments, but my grandmother's was closer to the
17   reservation, so they stayed there.
18   Over half of that tribe died of starvation over
19   the next three years, and there is an official monument on
20   our reservation indicating that fact.  They almost died of
21   starvation.
22   My mother was born, and they move back to the
23   reservation, away from an allotment that had no roads going
24   through it.  No access to water.  They were supposed to make
25   a living there.  So they left, and they went back to the

1   reservation.
2   When my mother was six she was taken from home and
3   sent to an Indian boarding school for six years.  She was
4   not allowed to come home for six years -- summers or
5   anything.  She left being able to -- being fluent in Cree
6   and Chippewa languages, and she came back afraid to speak
7   either after having been told not to.
8   She met my father later, much later, and they were
9   removed under the relocation program.  So I'm also going
10   through some of the United States' policies for us, the
11   treaty terms, the assimilation of policies, and now the
12   relocation policy where they took a lot of the young Indian
13   men out to do work, hard labor, for America.
14   My dad was with the group that went out to the
15   West Coast where he was a dynamiter for building dams,
16   hanging 300 feet off the ground, laying dynamite into the
17   walls of the mountains so the dam would come down when they
18   blew it up.
19   I was born there in Seattle.  My mother contracted
20   cancer, and we move back to the reservation shortly
21   afterwards, and I grew up on the reservation with my family.
22   Her cancer came back, and she pulled us all
23   together, her children, and she told us about the land in
24   Montana, and what it meant to her, and what it should mean
25   to us, that it was in coal and oil country, and it was

1   strategically located by a lake.  She also told us about our
2   grandfather's allotment as well.
3   The next year she died.  I was eight years old.
4   My dad, he worked hard and he played hard, and within a year
5   I was often spending days alone on my own.  Nicely we had --
6   the Housing and Urban Development had built a housing
7   project on the reservation, and it had sort of a split
8   level, and I found a place to sleep under their often so I
9   wouldn't be too afraid at might, because they built our
10   house between the Tomahawk Bar, the Arrowhead Bar, the
11   Legion Bar, the VFW, and the rest of the housing project.
12   So people often pounded out the doors, or broke windows, or
13   just walked in.  So I slept under the stairwell often.
14   It was an interesting, scary -- I would like to
15   think character building sort of experience.
16   After she died I got sent to the Catholic Mission
17   School where I was sexually assaulted by a priest.  So then
18   they threatened to send me to boarding school, and the two
19   weeks before I was supposed to go I ran away, and they could
20   not find me.  I stayed with my mother -- my mother's mother,
21   my grandmother, for weeks on end.
22   So by the time I was 11 I staying alone for weeks
23   on end, and by the time I was 14 I lived alone in a house
24   for about a year -- until one of my brothers move back and
25   moved in for a short while.

1   That was the life I lived, but always thinking
2   about my heritage, and where I came from, and what my
3   parents left.
4   Thankfully I could play football well.  So when I
5   quit school the coaches would come and get me and make me
6   come back.  I played basketball, the starting five.  I ran
7   track, and was very fast.  I played baseball when we could
8   have it -- when we could afford a baseball.  The whole
9   tribe.
10  I made it through school in those conditions.
11  They were very difficult.  So it bothers me to no end to see
12  what seems to me to be nothing but yet another policy of the
13  federal government being foisted upon my people, a policy
14  that on the one hand almost looks like a reparation, and
15  this should not be deemed a reparation.
16  One of my colleagues on the law school faculty,
17  right after it first started hitting the news that this was
18  settling, said finally you Natives are getting paid for what
19  you have lost, and they view it as a repartition.
20  That scares me, because the last time that the
21  American public viewed an action of the courts and Congress
22  as a repartition it was in 1946 to 1951 when they formed the
23  Indian Claims Commissions and brought all of these cases to
24  finally get rid of this.
25  Well, they thought they'd finally gotten rid of it

1   by 1951, and in 1953 Congress passed the termination act.
2   So the very thought that Americans get in their mind that
3   you finally -- you Indians are getting what you are owed and
4   what you deserve, is a step before them thinking, now let's
5   move on without this, and that would destroy our people back
6   home.
7   So it bothers me to no end that we have young
8   people, Native Americans included, maybe not Native
9   Americans with my experience, but Native Americans at least
10  by skin color, who would help to settle this kind of an
11  action, separating a man now from his heritage much the way
12  U.S. policy separated a boy from his mother, and that is an
13  unfairness.
14  I want to say on the one hand, of course they're
15  going to leverage that equity, and they're going to get rich
16  off of it some of these young lawyers -- and some of the old
17  lawyers.  This is America after all.
18  THE COURT:  Thank you, Mr. Monette.
19  As to any others who have not yet been called who
20  have been listed, did I miss anyone who is listed to
21  testify?  A lady stood up originally.  Who is --
22  A PERSON FROM THE AUDIENCE:  I would like to.
23  THE COURT:  Who is on the list that I didn't call.
24  MR. HARPER:  Counsel is here for Verlita Sugar.
25  She is the last on the list.

1   THE COURT:  Yes.  I am going to call upon her.  I
2   have a note here.
3   And then is there anyone else who is actually on
4   the list that was registered to testified that I have said
5   could therefore that I have not talked with?
6   I have got a power of attorney for Doris Lewis
7   Warner and that's -- Donald Lewis Warner, and that I had --
8   Gerald Warner had filed an objection, and if I missed you on
9   the paper, I didn't see it on the paper, but that is all
10  right, because you did file an objection.
11  Mr. Warner, do you have him on your list to
12  testify -- as objecting today?
13  MR. KIRSCHMAN:  Your Honor, Mr. Warner had been
14  listed as one of the objectors.  Plaintiffs opposed him
15  representing his father I believe.
16  Defendants do not oppose him testifying here
17  today.
18  THE COURT:  I just got in a power of attorney.
19  MR. HARPER:  Yes, Your Honor.  We did initially
20  object, but in light of the power of attorney we would
21  withdraw that objection.
22  THE COURT:  Mr. Warner, why don't you come up,
23  please.  I did just receive the power of attorney, and I
24  will make it part of the record.  I am referring to your
25  elderly father you are now going to represent in this

1   matter.  Thank you, sir.
2   MR. WARNER:  Thank you, Your Honor.  I want to
3   thank you and this court for allowing me to speak on behalf
4   of my father, Donald Lewis George Walking Shield Warner, as
5   he is recovering from a recent surgery, and he would like to
6   be here to speak for himself.
7   My father and I are enrolled members Fond du Lac
8   band of the Minnesota Chippewa tribe.  My name is Gerald
9   Legarde Warner.  I am the great great great grandson of one
10  of this country's greatest leaders that has ever set flesh
11  upon this earth.
12  My grandfather, Abraham Gall was the leader of
13  the Hunkpapa Dakota Sioux of the great Sioux Nation.  This
14  Sioux tribe is the same one this very government has
15  written into their laws making it illegal to up-rise the
16  Sioux Indian.
17  The Sioux tribe was a proud, 1 million strong, and
18  by the time of the Battle of the Little Big Horn and
19  Custer's last stand, there were only 4,000 remaining.
20  My grandfather was one who signed the treaty
21  alongside this government that brought peace to all warriors
22  with the great Sioux Nation.  This treaty was for all Native
23  Americans in this country to live peacefully on these
24  reservations.
25  The trade off was the white man get all of the

1    lands in question east of the Mississippi, and for the lands
2    west of the Mississippi to the Pacific Ocean was Native
3    American reservations.
4    My grandfather also included in the same agreement
5    that he wanted five things:  Food, clothing, housing,
6    schooling and medical for seven generations, and the
7    government agreed.  For those of you who might not know,
8    seven generations to Native people means forever.
9    It was just a short time later this very same
10   government needed more lands, for they, too, did not realize
11   just how many people were still coming to this great land,
12   which has not stopped today.
13   This is where the allotments, blood quantum, and
14   this trust in question comes into the picture and why we are
15   here addressing it today.  This very same government took it
16   upon themselves to decide how much land these people should
17   get, and disguising it as being proud land owners, and to
18   these trusting people, unknowingly, what was about to happen
19   to them again.
20   This government also took upon themselves the
21   duties of the trustee, because this government decided that
22   these people were not smart among enough to handle their own
23   affairs.
24   My great grandfather was a medicine man and a
25   tribal judge for his people, who was looked upon and known

1    as a fair and honorable person.  My father is the oldest
2    living descendent of this great leader today.  My father is
3    also a fair and honorable person, and this is a vision and
4    goal for myself.
5    On my great grandfather's headstone there is an
6    inscription saying:  An honest man should never -- should
7    always be remembered.
8    By the rights as allowed by the laws of this
9    country, and the treaties and our U.S. Constitution, we are
10   natural born American citizens and have all of the rights
11   given by these laws.  The proposed settlement is in clear
12   violation of the U.S. Constitution, Amendment One:
13   "Whereas Congress shall make no
14   law abridging the freedom of
15   speech or the right to petition
16   the government for redress of
17   grievances."
18   And amendment 14, citizenship rights, and all of paragraph
19   1.
20   Using the excuse of time gone by for destruction
21   of lives is wrong.  The 'cannot opt out' portion of the
22   proposed historical class settlement is unconstitutional,
23   starting but not limited to the U.S. Constitution, Amendment
24   One.
25   Who is protecting the interests of the ones of my

1    family that have left this earth, and they have never been
2    probated for 70 years, and they continue today having active
3    IIM accounts?
4    What about my great aunt that this same government
5    cannot find since 1940?  She was placed on the OSD Website,
6    and after my calling she was removed to the BIA Office.  I
7    then asked for a probate, and the two-year investigation and
8    court appearance with probate.  That was thrown out by the
9    judge for not enough research through the Social Security
10   Administration.
11   A year later I called the probate officer, and I
12   was told the Social Security Administration reported this
13   person has a social number and is currently active, and this
14   government still cannot find her.
15   It seems to me that these government offices are
16   not communicating and further proof that the new accounting
17   system is not working.
18   How is my great aunt being protected by this
19   proposed fair settlement if this government cannot find her?
20   What about all of the others on the government's own OSD
21   Website?
22   The monetary part of this proposed settlement, the
23   historical accounting class and trust administration class
24   is far short from what all of the courts that have had this
25   case brought before them, and all have found this government

1    guilty of wrongdoing.
2    The trust administration class part of this
3    settlement was never part of the original lawsuit, but it is
4    attempting to take the majority of the so-called fair class
5    settlement monies from these 300,000 IIM account holders
6    that also make up the historical class, and this should
7    never have been allowed in the settlement.
8    This case was filed in 1996 for 300,000
9    individuals, and these are the ones that have been patient
10   over 120 years, even though many have gone and many are
11   aging, but in the end these individuals -- in the end are
12   the individuals that this case is about, and any final
13   judgment should be the same.
14   Then let the probate laws do their job by
15   distributing what these laws already provide for.  Any
16   settlement should follow historically established probate
17   laws, with the heirs standing in the shoes of the
18   descendants, sharing the descendant's shares, and heirs
19   should not share equally with descendant's siblings.  Then
20   let the probate laws do their job of distributing the
21   original landowner's share of property, including these IIM
22   accounts.
23   The trustee and government officer since 1966 to
24   2011, today, have allowed the undivided interest in my
25   father's and co-owners lands, giving my father a payment of

1    $.76 an acre.  These lands have been growing the wheat for

2    the bread that many of us eat today.  Hasn't there been a

3    slight increase in cost of a loaf of bread since 1966?

4    In 1974, when of my father's frustrating attempts

5    to investigate concerns about his lands, he discovered in

6    the records that he was allowed to see -- he found an equal

7    shareholder and co-owner was not receiving the $.76 an acre,

8    but in fact was getting $35 an acre for the same interest in

9    the land.  This is 46 times higher than what my father

10   received.

11   As of today and since 1949 the maximum yearly

12   total my father has ever received is about $700 a year.

13   This also means in 1974 that same co-owner was getting a

14   minimum of $32,200 a year.

15   Using the proposed trust settlement fund chart, my

16   father would be getting a maximum of $2,500, and his equal

17   partner and co-owner getting $125,000.

18   My father discovered this and confronted the

19   person that was responsible for the lease agreements, and

20   also for getting the government trustee approval.  This

21   person looked directly at my father and told him that he

22   knew too much, and if he did not leave he would not.  The

23   same person worked his way through the government BIA

24   offices and retired.

25   All leases for land in this country have used the

1    railroad lease agreements for the basis of rents.  They have

2    always used one quarter of the crop for a fair price per

3    acre.  Today's average is still one quarter of the crop and

4    $60 an acre.

5    This is 79 times what my father receives today.

6    This clearly shows that this government has not fixed the

7    problem, and this clearly shows a future legal action.

8    We have asked every year since 1949, at the tribe,

9    the BIA office, for copies of all leases.  The tribe totally

10   refuses, and the BIA's exact words were, we have them.

11   After returning several times after time searching, they

12   admitted having no leases on file.

13   A letter I can supply you today shows the last

14   response, April 20, 2006, from the OSD fiduciary trust

15   officer David Shaw.  We have had no response after this

16   letter.

17   THE COURT:  They're concerned what the settlement

18   is because the government will still be involved with

19   setting the value on these leases, et cetera, that it is

20   unfair?

21   I'm trying to focus your objections to the

22   settlement.  I recognize your problem with the Bureau of

23   Indian affairs on the individual leases your father had, and

24   that he has not been equitably paid, but how does that apply

25   to the settlement that we are talking about here?

1    MR. WARNTER:  Well, in the settlement they are

2    offering what was in his account at that time and what

3    could have been in his account if it was today worth 79

4    times what he got, and then his would be different on this

5    chart.

6    THE COURT:  I see.

7    MR. WARNER:  So anyway, today there are no

8    leases, even today, and I have got another letter signed by

9    my father.  He has never received the leases he has asked

10   for.

11   My father was told in 1949 by the Tribal Realty

12   Office that his land and mineral rights were worthless.

13   Hearing this was very disconcerting, so he asked the farmers

14   who were farming his land, and they offered him $250 an acre

15   back in 1973.  Today's offer from the government is $100 an

16   acre in 2011.

17   He also asked the South Dakota Assessor's Office,

18   and the same type of land in the same area is $800 an acre.

19   THE COURT:  Why don't you finish up your

20   objections then, please?

21   MR. WARNER:  And finally in closing, I just want

22   to put a face to this historical class.  This is my father.

23   This case is about a real person that I have been given

24   authority -- and for me, personally, a great honor to speak

25   for.

1    My father is an 83-year-old man sitting at home

2    recovering from surgery.  My dad is a proud member of the

3    Fond du Lac Band of the Minnesota Chippewa tribe, and like

4    his father, and mother, and sisters before him, he has

5    struggled all of his life to survive and make a living for

6    his family.

7    In spite of his daily struggle he has managed to

8    hold on to his Indian trust land, just like his ancestors

9    before him.

10   He has made it known to all of his 11 children and

11   29 plus grand and great grandchildren that in this country

12   and the world that without land you are nothing.  Without

13   your traditional land you lose your connectedness with your

14   ancestors, community and culture.  We can clearly see this

15   happening in this country and as this nation is helping

16   militarily all over the world.

17   My father is proud to be a United States citizen,

18   and proudly to serve his country in the military for the

19   freedoms we all have, and taught his children to respect

20   this country and their Indian heritage.

21   Like his parents, and grandparents, and all of his

22   family who came before him, he trusted in the United States

23   government to perform their fiduciary duty to keep his land

24   safe, productive, and to ensure that it would be there for

25   his children, and their children, and all of their children

Page 118

1    to come.
2    Instead, he now faces losing his land as the
3    government blames fractionization as the reason they failed
4    to perform their self-proclaimed legally responsible
5    fiduciary duty for the Indian Trust land held in trust for
6    himself and his family.
7    Now he is being asked to take fractions of pennies
8    on the dollar for money due him for which the federal
9    government failed to negotiate leases, properly account for,
10   and then deposit into his account.
11   I would ask the court, do not approve this unfair
12   settlement, and to make sure that land owners are given an
13   adequate relief due them for the negligence of the federal
14   government, and that the landowners are not stripped of
15   their Indian Trust land and the rights afforded them under
16   the U.S. Constitution of this country.
17   Thank you, Your Honor.
18   THE COURT: Thank you, Mr. Warner. I appreciate
19   your coming in. Thank you.
20   Is there anybody that is on the list? One lady
21   came up earlier and said -- I don't know if she had filed a
22   written objection or not.
23   Do you just want to come up and tell me your
24   situation, ma'am -- in the pink there.
25   You're not on the list, and I am not going to have

Page 119

1    people just start testifying just out of the audience,
2    because we can't have that.
3    Would you give your name for the record and where
4    you are from, please?
5    MS. KIPP: Karen Kipp.
6    THE COURT: State your name into the microphone
7    here.
8    MS. KIPP: Thank you, Honorable Judge.
9    My name is Karen K. Kipp. I'm from the Blackfeet
10   Reservation in Browning, Montana.
11   THE COURT: Had you written in an objection?
12   MS. KIPP: Well, I do own a lot of land and
13   mineral resources, surface rights, mineral rights, and I
14   have never really received a decent check with royalties for
15   lease, oil rights, anything. It has always had to go
16   through --
17   THE COURTROOM DEPUTY: You don't have to hold the
18   mic so close.
19   MS. KIPP: Oh, okay. It has always gone
20   transcript charity, you know, and other things needed on the
21   reservation. I have had to buy all of the food, all of the
22   clothes --
23   THE COURT: Did you write an objection to us about
24   this settlement?
25   MS. KIPP: No -- yeah. I just asked to speak. I

Page 120

1    just wanted more money, because I have great concerns.
2    I have this philanthropy program called EL,
3    Elongation of Life, and I had money coming from here for the
4    future generations that was supposed to build the mind and
5    body of the people who have suffered and everything.
6    Myself, I am a fourth-generation. My daughter's a
7    fifth generation, and now we have her daughter, who is a
8    sixth generation, and she has -- I have seventh generation
9    children who were given funds, and it was quite obviously
10   lost or stolen in the mail, and that has gone on for a long,
11   long time.
12   I would just like some investigation into a few of
13   the things that have happened on our reservation.
14   Another one is this, that I heard that we were
15   finally getting some money. I was pleased. I felt good and
16   great. It says here in the Great Falls paper of last year:
17   "The trust fund amounts. The
18   Interior Department owes a total
19   of 63 point some million to more
20   than 54,000 people, but federal
21   officials cannot find them."
22   All right I am one. I have walked up to several
23   people and said --
24   THE COURT: Ma'am, this does not really pertain to
25   the immediate objections we are talking about, and you had

Page 121

1    not filed, apparently, a timely and proper objection. So we
2    are not going to continue. If you have concerns you can
3    talk to counsel, or talk to the people from the Interior
4    Department about your foundation or whatever it is.
5    MS. KIPP: All right. I would also like to bring
6    to your attention the importance of building the foundations
7    at these wind farms. I think they are a little out of
8    control. I think the --
9    THE COURT: People have asked me for a lot of
10   things today. This is the first time anyone has talked
11   about wind farms. But that is all right.
12   MS. KIPP: Well, we have wind farms on our
13   reservation.
14   THE COURT: Thank you, ma'am.
15   What the court is going to do is take a luncheon
16   recess. We will return -- it is 1:15. We are going to
17   return at 2:00 o'clock. At 2:00 -- go ahead.
18   MR. HARPER: Your Honor, according to our records,
19   we had one more objector4 that was on your list.
20   THE COURT: We will take care of that then. I am
21   sorry, I thought I covered everybody.
22   Who did I miss, Ms. Sugar?
23   MR. HARPER: Ms. Sugar, represented by counsel.
24   THE COURT: I have a note on that. Didn't we get
25   a note on Sugar? I am sorry, I thought I had gotten a note

Page 122

1  that she had somehow withdrawn, but come in.   That is all
2  right.  I misunderstand.  I had written myself a note about
3  Ms. Sugar, and I thought that something had come in that had
4  changed her mind, but I'm happy to hear from you for
5  representing Ms. Sugar.
6  Would you identify yourself for the record?
7  MS. WORK: May it please the court, my name is
8  Susan Work.  I'm there with local counsel, Joe Membrino, and
9  I am representing Verlita Sugar.
10  THE COURT:  Let me get her objection back up
11  again.  All right, I've got it here.  I do recall this about
12  the five tribes.  Thank you.
13  MS. WORK: Ms. Sugar is a full blooded Cherokee
14  citizen who owns a small, undivided restricted mineral
15  interest in eastern Oklahoma within the boundaries of the
16  Cherokee Nation.
17  The Cherokee Nation is one of the so-called five
18  civilized tribes, which also includes the Muscogee Creek
19  Nation, the Chickasaw Nation, the Choctaw Nation, and the
20  Seminole Nation.
21  These tribes were removed from southeastern United
22  States to Indian territory in the 1930s, and at that time
23  they acquired fee title to their lands, which actually
24  resulted in a unique situation for the tribes when allotment
25  occurred, and it has an impact with respect to the

Page 123

1  identification of trust management class in the Cobell
2  case.
3  At the time of allotment in the early 1900s, the
4  five tribes' allotments, including the Cherokee Nation's
5  allotments, were all in restricted status.  But shortly
6  after that, Congress began to pass a series of special
7  federal laws that apply to only the five tribes, and began
8  to remove the restricted status of those lands based on --
9  primarily based on the blood quantum of the individual
10  owners.
11  This resulted in the practically immediate loss to
12  the restricted land owners of their lands, those that were
13  less than half blood, in the early 1900s.
14  The laws that got passed not only imposed these
15  limitations with regard to blood quantum, but they also gave
16  the state courts authority to act as federal
17  instrumentalities in the probate of the estates of the
18  restricted allotments, and in the approval of sales of the
19  restricted allotments, and in the lease of mineral interests
20  of the restricted allotments.
21  As a result, the records maintenance for these
22  restricted allotments are primarily found in the state court
23  system in the various state county offices.   In the
24  Cherokee Nation alone there are 14 counties.  So that
25  requires -- in order to identify the restricted landowners,

Page 124

1  it is necessary to research the titles for all of these
2  tracks and all of the fractionation that is involved in each
3  county.
4  The most recent of these federal law is the act of
5  August 4, 1947, and that act continues the same limitations
6  with regard to blood quantum, the same state jurisdiction
7  issues.
8  The federal government still maintained a trust
9  responsibility to the five tribes and to the individual
10  allottees.  The federal government managed realty offices
11  for each of the tribes and maintained some form of land
12  title records, but not to the extent that you see elsewhere
13  in the United States.
14  There was also a special office set up in Tulsa.
15  It is a field office of the United States Department of
16  Interior Solicitor's Office, and there are several attorneys
17  in that office that appear in state court proceedings to try
18  to assist in protecting the interests of the individual
19  restrictive landowners.
20  So there is still significant federal fiduciary
21  responsibility with regard to these lands, but there are
22  many problems with land titles involving the lands because
23  of the complicated nature of the federal laws.
24  This leads to the problem with identification of
25  the trust administration class, because it is easy to prove

Page 125

1  persons that have IIM accounts.  They are atomically in the
2  trust administration class.  But there are not that many
3  restricted landowners, or Cherokee landowners at least, that
4  also have IIM accounts.
5  The reason for that is because under the special
6  federal laws the -- well, I would same most of the -- a
7  great deal of the income from restricted lands comes from
8  oil and gas, and the special federal laws concerning oil and
9  gas leases allowed -- or at least were interpreted by the
10  Department of Interior to allow direct pay to individual
11  owners.
12  So of course they are not covered in this
13  particular class as far as any mismanagement of their
14  incomes, but that's part of the problem, because there is
15  now -- there are very are few IIM accounts.
16  It is estimated that there are about 1,800
17  Cherokee IIM accounts.  That places a burden on the
18  individual Cherokee restricted landowners to establish that
19  they have a demonstrable interest -- ownership interest in
20  restricted property.
21  That is difficult to do because of the disarray of
22  all of the records related to the land titles.  The Cherokee
23  Nation has only recently -- well, they were notified in June
24  -- well actually they were notified -- the tribe was
25  notified about a week ago, June 8, that it would receive 2.6

Page 126

1    million from the Department of Interior to fund a project to
2    get individual restricted members' information researched
3    and entered into the TAAMS system.
4    Of course the TAAMS system -- what we understand
5    based on meetings that have been held is that the Department
6    of Interior, which is going to be responsible for providing
7    information to the trust administrator with respect to
8    demonstrable interests in restricted properties, applies to
9    -- probably will be very beneficial to most tribes, but not
10   to the five tribes, because there is no TAAMS system for the
11   restricted five tribes land owners.
12   It is estimated that it will take two to three
13   years, using these funds, to be able to identify the tracks
14   that are subject to restricted status and who the individual
15   restricted landowners are.
16   That does not even take into account the multitude
17   of unprobated estates involving restricted property, and
18   that is a related issue, because -- well, it is not
19   necessarily related to identification of the trust
20   administration class, but it is related to the
21   participation, because if you have a deceased restricted
22   land owner and there has been an IIM account set up for
23   their estate, but there has been no probate filed, the way
24   the settlement agreement reads, the heirs will not receive
25   even -- like if there are six heirs, they will not even

Page 127

1    receive a one sixth share of the estimated $800 that would
2    be given to the trust administration class.
3    The reason that they have not filed probates is
4    because they have to go out and hire an attorney to file a
5    probate.  In the rest of the country, federal administrative
6    law judges are used to probate estates involving trust
7    property.
8    Another issue that is important here, I think
9    also, relates to the notice issue.  If the federal
10   government does not even know who the restricted landowners
11   are, then how can notice be given to the restricted
12   landowners?
13   I've heard about -- people have talked today about
14   individuals receiving lengthy explanations of the proposed
15   settlement.  I have not checked.  I am not aware of whether
16   there has been an attempt to send notices like that out to
17   restricted landowners of the Cherokee Nation or the other
18   four tribes.
19   Also, I would just like to mention that three of
20   the counties in northeastern Oklahoma within the boundaries
21   of the Cherokee Nation are in the most poor, high poverty
22   level counties in Oklahoma.  Those counties also have a
23   significant Indian population and significant restricted
24   lands.
25   Many of these landowners live out in the hills,

Page 128

1    basically, and they do not have Internet access.  Many do
2    not even necessarily have television access, and if they
3    have not received written notice, then there is also an
4    issue of whether there has been fair notice given to these
5    people.
6    Thank you.
7    THE COURT:  Thank you very much.  I appreciate
8    that approach.
9    We will take our lunch recess.  I will extend it
10   now because of that thing for one hour so I can go through
11   these notes about what I have been listening to.  Be back at
12   2:25.  At that point the attorneys for the plaintiffs and
13   the government will have an opportunity to respond to these
14   objections.
15   We have given a lot of time for that.  I will see
16   how much time they will need, and then we will move forward
17   after that with the rest of the hearing.
18   All right, 2:25.
19   (Luncheon recess.)

Page 129

1    A-F-T-E-R-N-O-O-N  P-R-O-C-E-E-D-I-N-G-S
2    THE COURTROOM DEPUTY:   This Honorable Court is
3    again in session.  Please be seated and come to order.
4    Recalling Civil Action 96-1285, Eloise Cobell, et
5    al, versus Kenneth Salazar, et al.
6    THE COURT:  All right, in the recess two matters.
7    One is there was an original objector, Judith A. Chosa, C-h-
8    o-s-a, who could not be here today, but I was informed that
9    she had asked the court to note that her objection lodged
10   and be made a record of the court.  Let me pull it out just
11   refer to it for a minute.
12   She asked if this could be shared with the parties
13   here.  She gives a history of the Indian peoples, and what
14   she calls people destroying their way of life, and that
15   there is no amount of money to rectify that, and that
16   payment should be, rather, to a monthly income so the land
17   could be made, and homes could be built, and there would be
18   income to live on.
19   She also complained about the parents being from
20   two different tribes, only the one of blood one parent is
21   counted, and that is not fair.
22   That was Ms. Chosa, who had asked to make sure
23   that that was recognized in the record, and her full written
24   objections are in the record.
25   I was informed over lunch that there was an

1    individual, Ms. Short Bill.  Ms. Short Bill had sent a
2    notice in that came in a day late but IO think had been
3    mailed now it looks like in a timely basis, and counsel have
4    no objection to her making a statement, so if Ms. Short Bill
5    would like to come up.
6    Is Ms. Short Bill here, please?
7    MS. SHORT BILL:  Thank you, Your Honor, for
8    letting me speak today.
9    My name is Vanie Short Bill, and I am a member of
10   the Rosebud Sioux Tribe.  I am also a member of both the
11   historical account class and the trust administration
12   class.
13   According to an article from Indian Country today
14   entitled, Warrior Woman, Eloise Cobell said that she decided
15   to settle with the federal government because so many IIM
16   account holders were dying off.
17   My Uncle Red, who lived most of his life homeless
18   and without a job, was one of those members who did not live
19   to see a payment.  He died in 2007.
20   I do agree that this case needs to be settled
21   before more members of the class die off, but let's do so in
22   a manner that is prudent so as to prevent any future or
23   existing gross mismanagement of trust funds.
24   I object to two portions of the settlement
25   agreement.  Both pertain to section F that involves the

1    trust land consolidation fund.
2    My first objection is that no settlement funds be
3    expended on the purchase of fractionated interests until
4    prudent measures are put in place to appropriately account
5    for and manage the trust funds that are used in satisfying
6    the liens.
7    With each interest that is purchased a lien on all
8    revenue is placed against it until the purchase price paid
9    for has been recouped.  According to the Indian Land
10   Consolidation Act and the American Indian Probate Reform
11   Act, once the purchase price is recouped, then the lien is
12   to be removed, and the tribe should hold beneficial title
13   free and clear of any lien.
14   I have reason to believe that there currently is
15   no trust system in place within the Great Plains region of
16   the Bureau of Indian Affairs that currently tracks the
17   amount of revenue -- that accurately tracks the amount of
18   revenue produced by each interest, nor is the purchase price
19   for the interest tracked in any of the trust systems.
20   Without storing or tracking the purchase price
21   paid for the interests, or the revenue it is generated, how
22   would the Secretary ever know when to satisfy the lien so
23   that the respective tribe can decide how the revenue will
24   then be applied?
25   Part four, and I'm quoting, removal -- from

1    Section 2212 to 12:
2    "Removal of liens upon payment
3    into the acquisition fund states
4    that the Secretary shall --"
5    Not may, but shall.
6    "-- remove the lien once the
7    purchase price has been paid
8    to the acquisition fund, except
9    in those cases where the tribe
10   has jurisdiction over the land
11   authorizes the Secretary to
12   continue the lien so that more
13   acquisition funds can be
14   generated."
15   Without a system in place to notify when the
16   purchase price is paid, the Secretary will never be in a
17   position to advise the tribe that the lien can be satisfied,
18   nor get the needed authorization to continue holding the
19   lien.
20   I blatantly disagree with the statement made at
21   page 49 of the response to objections that states -- in
22   quotation marks --
23   "In no way does the land
24   consolidation fund undermine
25   sovereign rights."

1    This current practice undermines the tribe's
2    sovereignty, because the Secretary is not notifying them
3    when the purchase price is recouped and allowing them to
4    decide for themselves whether the lien should continue or
5    not.  The law clearly states in -- states that this is their
6    decision to make, not the Secretary's.
7    The manner in which the revenue is being managed
8    is also an infringement on tribal sovereignty.  It is to be
9    -- in quotation marks, again, from the Indian Land
10   Consolidation Amendments:
11   "To be used to acquire undivided
12   interests on the reservation
13   from which the income was derived."
14   Each month all revenue goes into one acquisition
15   fund.  This is the revenue from those interests that were
16   purchased through the Indian Land Consolidation Program.  It
17   is always used to purchase interests nationally that are
18   located only on those reservations were a tribe has
19   participated in the program.
20   But if there are not current willing sellers of
21   the particular reservation, then the revenue brought in from
22   that reservation can be used for making purchases on another
23   reservation for another tribe -- a blatant violation of the
24   law.
25   There needs to be a mechanism in place that

Page 134

1   earmarks those funds of each tribe participating in the
2   program so that, for example, Rosebud funds are not -- the
3   Rosebud Sioux Tribe's funds are not spent on any other
4   tribe.
5   I am petitioning the court to place an injunction
6   on any purchases of fractionated interests in accordance
7   with 25 U.S.C. 2201 until proper mechanisms are in place
8   that accurately keep track of the purchase price paid for
9   each interest and track all revenue that interest produces
10  so that it can be applied to satisfy the lien.
11  There also needs to be a separate acquisition
12  fund for each tribe so that the revenue paid back into it is
13  only used to purchase interests for that particular
14  reservation.
15  The second objection that I have pertains to
16  section 7 entitled, consent or conveniences.  I do not think
17  that it is right to automatically deem consent for a
18  convenience for people who have been deemed, whereabouts
19  unknown.
20  Based on first-hand experience, and I worked for
21  the Bureau of Indian Affairs for 30 years.  I also own my
22  individual Indian money account since 1976.  Many people's
23  IIM accounts are coded 'whereabouts unknown' simply because
24  they moved and forgot to change their address.
25  I, for one -- my revenue is two cents a year.  So

Page 135

1   when I move do you think I'm going to be worried about my
2   two cents a year?  No, and I don't change my address.
3   The government has paid me hundreds if not
4   thousands of dollars finding people.  I know how critical it
5   is for me to contact the government where I'm at, yet I
6   forget, knowing what I know.  And a lot of other people do
7   this because they just simply forget to change their
8   address.
9   Some of these people are in the military and are
10  in foreign countries fighting for our freedom.  Why would we
11  want to undermine their Constitutional rights to convey
12  their real property as they so choose and not the
13  Secretary?
14  I am petitioning the court to require the parties
15  to seek a legislative remedy that provides for an amendment
16  to the United States Postal Change of Address Form so that
17  it asks if the addressee is Native American and owns an
18  individual Indian money account.
19  It could provide a check box that if checked
20  authorizes the Post Office to notify the Secretary of their
21  change of address.
22  I did a study -- I'm a student at A.S.U.. and I
23  did a study on the ramifications of the Indian probate
24  process, and after interviewing several homeless people that
25  I found in Arizona and South Dakota, A.S.U. professors, and

Page 136

1   a lot of other Native American people, the number one
2   underlying problem with the whereabouts unknown issue is
3   that they simply forget to change their address or notify
4   the government of where they are at when they move.
5   The objections I have can easily be remedied
6   through the authority of this court and with the funds being
7   set aside for trust reform.  According to the United States
8   Census, the average income of Indians living on the
9   reservations is 4,478.
10  As stated in an article from National Relief
11  Charities from Inner-C Programs.org, the standard of life on
12  some Indian reservations is equal to that of Third World
13  countries.
14  Just think what $1,800 would mean to a person
15  living in poverty in Libya?  I wonder what it would have
16  meant to my Uncle Red?
17  I pray that the settlement agreement is approved
18  before more members of the class die, including my 86-year-
19  old mother, but I pray that it is does so in a manner that
20  does not cause further harm and further infringements on the
21  rights of Native American individuals such as my
22  grandchildren, and all of the tribes throughout our
23  country.
24  I thank you for this opportunity to be heard, and
25  I also have left a package that further describes my

Page 137

1   concerns regarding the current mismanagement of funds that
2   is going on with the Indian Land Consolidation Program.
3   Thank you.
4   THE COURT:  Thank you.
5   Yes.  I have gotten and I saw the package and have
6   supplied that to counsel.  Thank you.
7   I just wanted to advise counsel, and over lunch
8   you may have seen this, but the Supreme Court came down with
9   the Wal-Mart class-action decision this morning, and I was
10  worried whether or not that had any effect on our case.
11  That is Wal-Mart Stores versus Duke, et al,
12  decided today, reversing the 9th Circuit's certification of
13  class, commonality issues.
14  One of the other cases that has also recently
15  come down, April 27, is AT&T Mobility versus Vincent
16  Conceptions -- Concepcion, I guess, out of the 9th Circuit
17  as well.  Another one by Justice Scalia, who also wrote the
18  Wal-Mart case.  That came out of the Federal Arbitration Act
19  matter, but they talked about basically what the
20  constitutional requirements may be under notice and opt out
21  rights.
22  If you haven't looked at that you may want to look
23  at that.
24  With that, I will turn back to the response both
25  by the plaintiffs' counsel and by defense counsel to the

1   objections, and they can break them down either individually
2   or in groups as they wish as to the fundamental objections
3   made that I have heard.
4   We have heard some very telling stories and
5   concerns, I think, raised in good faith by people who
6   traveled a very long way here, I'm sure sometimes with great
7   difficulty and expense, to present their issues to the
8   court.
9   The one objection had been made asking the court
10  whether it could be fair or not, basically because I had had
11  status calls with this case as it proceeded on to my
12  calendar after it had been removed Judge Lamberth by the
13  Court of Appeals for the bias, and then Judge Robertson
14  took it over and tried part of the claims.  This case was
15  then reversed by the Circuit, the 450 million or so that
16  he awarded for restitution for the failure to do an
17  accounting.
18  It was reversed by the Circuit and eventually came
19  to me as a senior judge, and I did encourage the parties to
20  settle if at all possible.  That is absolutely accurate.
21  Abraham Lincoln said that the worst thing that could happen
22  to you is a person to be involved in a lawsuit.
23  The potential after what we call Cobell 22 -- you
24  can see how many cases have been up there in the Court of
25  Appeals -- was very dim for the plaintiffs at that point, I

1   think in reality, in certain areas of getting a substantial
2   recovery, at least in the historical accounting class, and
3   because the damages have been reversed and there were only
4   400 and some million awarded by Judge Robertson, not what is
5   considered here to be potentially -- and obviously at that
6   point 14 years or so of litigation, now 15, it is incumbent
7   upon the court to see whether or not a matter could be
8   settled.
9   That does not change my obligation to be fair and
10  consider this case -- we call it de novo, considered new, as
11  to the objections and whether or not this is a fair and
12  adequate and reasonable settlement or not.
13  The fact that I encouraged that there should be a
14  settlement and it would have to go to Congress, because
15  there was so much money involved, and it could not come out
16  of the normal funds available to the government.  So I am
17  not going to recuse myself on that basis.
18  So I will go forward now with first the
19  plaintiffs, and then defense counsel can respond to the
20  objections that have been raised, both legal objections as
21  to the notice of provisions and opt-out provisions as well
22  as the objections that would seem in some way practical
23  objection as to not being able to evaluate the leases
24  properly.
25  They've never been evaluated properly.  They have

1   never been paid fairly.  That it does not reflect the true
2   amounts in the IIM accounts because of either not being
3   fairly paid or because there has not been a lot of money put
4   in lately when there should have been, or whatever the
5   various objections that went to those areas was.
6   Then the bottom line was the objection to the
7   historical accounting should not be settled because there
8   has been no accounting for the individuals, and there will
9   be no accounting, and that is unfair.
10  These are trustees who had the obligation, just
11  like your bank does with your bank account, hopefully, to
12  keep track of the money, and pay it to you when it is due,
13  and they have not done that.
14  It has been established since 1999 by this court
15  that there was mismanagement and not proper accounting of
16  the monies due to the American Indians.  The issue here
17  really is, is this the fair and equitable way to resolve the
18  matter under our laws of the United States as they currently
19  exist?
20  It will never be perfect.  Nothing could resurrect
21  120 years of either intentional or negligent management --
22  mismanagement and harm done, I'm sure.
23  Historically I am not sure that any settlement
24  could cure the mistakes that have been made and harm caused
25  or wrongs done.  The object really today is, is this

1   particular settlement to this set of facts before this
2   court, which doesn't settle every claim that every Native
3   American may have against the government, is it the
4   appropriate way to go about it, and is it fair, reasonable
5   and adequate based upon the factors that the court has to
6   consider under the law.
7   So I will hear from plaintiffs first, and then I
8   will hear from defendants after that.
9   MR. HARPER:  Thank you, Your Honor, good
10  afternoon.
11  THE COURT:  Good afternoon.
12  MR. HARPER:  May it please the court.  Your
13  Honor, we have heard today from 13 objectors, and there have
14  been a total of 92 objectors who have filed papers in the
15  appropriate timeframe.
16  First of all, I would like to thank those -- on
17  behalf of the legal team I would like to thank those folks
18  who have come forward today and provided their views.  It is
19  a critically important part of the process.
20  We do not agree with them, but this is about every
21  class member having the opportunity to be heard.  This is
22  about their day in court.
23  At the same time, Your Honor, we are mindful that
24  by definition when we hear from objectors we hear from the
25  displaced, however few.  But we cannot forget at the same

Page 142

1   time that they are the few.  We cannot forget that for every
2   one of the individuals presenting today, there are literally
3   tens of thousands of beneficiaries out in Indian Country who
4   want this settlement, who have chosen to participate in this
5   settlement, and they are waiting a final resolution to get
6   their due.
7   THE COURT:  What about the argument that notice
8   was not sufficient because of the Indian culture of not
9   reading the mail from the federal government, or not having
10  access to TV or Internet?
11  MR. HARPER:  Your Honor, I too am from Indian
12  Country.  I am a member of the Cherokee Nation.  I can tell
13  you that I heard that objection as well.  There is some kind
14  of notion that there may be some deficiencies in members of
15  the class, and they're not able to understand, or they don't
16  act like others act.
17  I will tell you that that has not been my
18  experience, and I just don't share those kind of
19  paternalistic older notions of what Indian people, and the
20  talents that they bring to the table, and what they
21  understand about the law.
22  We have been out to Indian Country.  We have made
23  visits to 50 different reservations.  I myself have been to
24  about 25 over the past couple of months during the notice
25  process, and what we have found is that there are many

Page 143

1   individuals, thousands of people that we have met with that
2   understand what is going on with this litigation, and they
3   have decided to participate in it.
4   So I don't think that there is any evidence to
5   establish that.  Certainly, Your Honor, Ms. Kinsella, in her
6   affidavit, has set forth in great detail exactly the robust
7   nature of this notice process.
8   There were TV ads.  There were radio ads.  There
9   were DVDs that were created in nine different languages.
10  There were 8,000 of those DVDs that were sent out to members
11  of the class who requested them, and to Indian
12  organizations, and tribal organizations.
13  So there was an outreach effort here -- of course
14  in Ms. Kinsella's terms she is the best of the best as you
15  know with respect to these kinds of matters -- that it was
16  far beyond what is required by law.
17  Again, I just do not see that there is any
18  evidence to the notion that the notice was not sufficient
19  and that the people were not informed of their rights.  And
20  those individuals that were informed of those rights, 99.98
21  percent of them decided to remain in the class.  A handful
22  objected.  92.  Only a few people have presented themselves
23  here today.
24  So what we are dealing with here is that we have a
25  super majority out Indian Country that are looking to

Page 144

1   resolve these claims.
2   During our visits I can tell you that every one of
3   us who went out there -- from Ms. Eloise Cobell, to members
4   of the litigation team, we saw what was near unanimous
5   support for this resolution.
6   People understood, similar to what the court has
7   just articulated, that this does not right every wrong that
8   has occurred over the centuries of mismanagement involved in
9   this case.  But what they do also understand is that this is
10  a groundbreaking, record-breaking settlement, $3.4 billion,
11  that is ultimately fair and which they want to participate
12  in.
13  Your Honor, for those individuals who have been
14  displeased or unhappy with it, they have had the opportunity
15  for the trust administration class to opt out.  Those who
16  have wanted to, and there have been some who have selected
17  to opt out, but that is far different than the idea that the
18  settlement should not be approved, which would deprive the
19  remainder of the class from enjoying the benefits of the
20  settlement that they have chosen to enjoy.
21  Your Honor, at the end of the day, actions speak
22  louder than words.  The actions that class members have
23  taken is to participate.
24  Your Honor, many if the issues that were raised
25  today are similar and the same issues raised in written

Page 145

1   briefs.  We have extensively briefed these issues.  We are
2   not going to outline all of the issues that we have set
3   forth in our papers.  We largely will rest on those
4   responses.
5   Of course if the court has any specific questions,
6   we will address those.  Otherwise, we will just emphasize
7   some of those salient imports.
8   We have divided this on our legal team into two
9   individuals.  Mr. Adam Charnes will step forward initially
10  and address some of the Constitutional issues, including
11  addressing the Supreme Court's decision in Wal-Mart, and
12  then I will address some of the other objections, Your
13  Honor, after that.
14  THE COURT:  Thank you.
15  MR. CHARNES:  May it please the court.  Your
16  Honor, I'm going to address three separate constitutional
17  issues and talk about the Wal-Mart case at the end.
18  THE COURT:  All right.
19  MR. CHARNES:  The first constitutional issue is
20  the argument that we heard this morning that there is a
21  separation of powers problems with respect to the Claims
22  Resolution Act.
23  To be clear, the plaintiffs' position is that
24  Congress, in the statute, does not handcuff this court in
25  anyway.  This court retains discretion to approve or

Page 146

1  disapprove the settlement fully.  Therefore, there is no
2  constitutional or separation of powers violation as has been
3  suggested this morning.
4  To be sure, we think that the court should
5  exercise that discretion in light of the Claims Resolution
6  Act.  In particular, Congress's unprecedential approval of
7  the settlement in this case, and in light of the plenary
8  power doctrine which governs the United States' relationship
9  and Congress's relation with respect to Indians in general,
10  but the court retains discretion to approve or disapprove
11  the settlement as it sees fit, and therefore there is no
12  constitutional issue presented by the statute.
13  Second, with respect to the trust administration
14  class, some objectors have suggested that the class is
15  insufficiently cohesive, or there is insufficient common
16  interest in order for it to be certified and approved -- or
17  for the settlement to be approved.
18  I think it is important to start with first
19  principles.  As the court knows, Congress in the statute
20  said that the trust administration class could be certified,
21  notwithstanding Rule 23.  So the specific requirements of
22  Rule 23, as they have been laid out by the courts --
23  expounded by the courts over many, many years, are not
24  relevant.  What is relevant is what the due process clause
25  requires.

Page 147

1  The due process requirement is set forth in a case
2  that has been mentioned this morning several times, Phillips
3  petroleum versus Shutts.  And Shutts states, as the
4  government explained, four requirements:
5  Notice to class members.
6  Class members have an opportunity to be heard.
7  There would be a right to opt out, at least when
8  monetary relief is involved.
9  And that the named plaintiffs at all times
10  adequately represent the interests of the absent class
11  members.
12  As we explained in our briefing, and as the
13  government has as well, we believe that all four criteria
14  are satisfied here.
15  Mr. Harper has already talked about the notice
16  aspect and why that is sufficient.  Clearly, all class
17  members have had the opportunity to be heard, either in
18  written objections or here this morning if they so choose.
19  There is a fulsome opportunity to opt out with respect to
20  the trust administration class.
21  So the only remaining issue, therefore, is
22  adequacy of representation, and the argument that has been
23  made, really the main argument that has been made is that
24  the class is insufficiently cohesive.
25  As one objectors said, in her view there is a

Page 148

1  constitutional requirement that the class be predominantly
2  cohesive, and our basic point, Your Honor, with respect to
3  that is that that standard appears nowhere in the law.
4  The Supreme Court in Shutts and in the Hansberry
5  versus Lee case on which Shutts relied, does not have a
6  standard of predominant cohesiveness.  In fact, what the
7  courts have held, and this is confirmed by the Wal-Mart
8  case to a certain extent, is that there needs to be one and
9  only one common issue, and that is what due process
10  requires.
11  And one way we know that is by looking at general
12  class action Rule 23 law.  The fact of the matter is that
13  the law has been, for a long time, in (b)(1) and (b)(2)
14  classes, there need be only one common issue.
15  If this objector were correct that the class must
16  be predominantly cohesive, then all of those class actions
17  under (b)(1) and (b)(2) where courts found one common issue,
18  all of those class actions would have been unconstitutional
19  -- or the application of the rule to them would have been
20  unconstitutional.
21  So we believe that all that the due process clause
22  requires is that there be a common interest, a single common
23  interest that applies in every -- to every class member and
24  the claims that that class member is asserting, and that is
25  certainly satisfied here.

Page 149

1  As our paper show, the class members are all
2  trust beneficiaries of the IIM Trust.  The trust corpus is
3  held in common.  Income from the trust is commingled and
4  held in common, and the breaches of trust found by this
5  court and affirmed by the D. C. Circuit are systemically
6  breaches that apply across the board to all beneficiaries of
7  the trust.
8  And that is all that the due process clause
9  requires is that one common issue.  There are many other
10  common issues as well, but that is enough for the due
11  process clause.
12  The third issue -- the third constitutional issue
13  I would like to address is the argument that several
14  objectors have made, including this morning, with respect to
15  an allegation that the settlement violates the equal
16  protection clause, or equal protection principles and the
17  Fifth Amendment's due process clauses I should say because
18  Congress made an exception to the Federal Rules of Civil
19  Procedure in street Claim's resolution act.
20  We believe that that objection is also not well
21  taken.  To begin with, the Supreme Court held many years ago
22  that in order for there to be an equal protection violation,
23  the plaintiff must prove racial discriminatory intent or
24  purpose.  That racially discriminatory effect is not
25  sufficient.  Intent and purpose must be proved.

Page 150

1   That is clearly lacking here.  None of the
2   objectors have pointed to any racial animus.  In fact I
3   think the only fair reading of the events of the settlement
4   and congressional approval of it are that they are meant to
5   benefit American Indians, not to penalize them.
6   Moreover, the settlement does not treat Indians
7   differently based on race.  What it does is it addresses the
8   beneficiaries of the IIM Trust.  The Supreme Court in Morton
9   versus Mancanri case, the principles established there apply
10  here.
11  In that case, as Your Honor may recall, the
12  Bureau of Indian Affairs had a hiring preference for members
13  of a tribe living on reservations, and that was challenged
14  by a non-tribal member saying that that hiring practice
15  violated the equal protection principles, and the Supreme
16  Court rejected it.
17  In the course of doing so it said that the hiring
18  preference was not even based on race.  It was based on
19  politics.  It was meant to benefit Indian members of the
20  tribes living on reservations, and since that was the
21  categorization, it was not a racial classification.
22  Finally, Your Honor, the plenary power doctrine,
23  which I have alluded to, also applies here.  The fact of the
24  matter is that the congressional legislation addressing
25  Indians and Indian tribes is not subject to strict scrutiny

Page 151

1   or any heightened level of review.
2   The Supreme Court has held over and over again, as
3   recently as this term, that Congress has plenary authority
4   to regulate and legislate with respect to Indians and
5   tribes, and that congressional legislation will only be
6   overturned if it lacks a rational basis.
7   And whatever criticisms you could make of the
8   settlement, I think that it is fair to say that there is no
9   rational -- that Congress had a rational basis for approving
10  it.
11  Finally, just a word about Wal-Mart, which we
12  studied over lunch.  We don't believe Wal-Mart presents any
13  difficulties whatsoever with respect to your approval of the
14  settlement.
15  With respect to the historical accounting class,
16  that class was certified under Rule 23(b)(1) as well as
17  23(b)(2).  I don't think there is a problem with Wal-Mart
18  applying even to the 23(b)(2) aspect, but even if there
19  were, the 23(b)(1) certification is sufficient.  Nothing in
20  Wal-Mart addresses Rule 23(b)(1) at all.
21  I will note that I don't think Wal-Mart undermines
22  the 23(b)(2) aspect of the settlement, either, for a couple
23  of reasons.
24  First of all, the Wal-Mart case did not involve a
25  settlement.  What the court said is that a class-action

Page 152

1   cannot be certified under (b)(2) if it seeks monetary relief
2   at least to the extent that the money being sought is not
3   incidental.
4   It says nothing about whether a properly
5   instituted (b)2) class could sometime down the road be
6   settled, and that is, of course, because the Wal-Mart case
7   has not been settled.  It is hotly contested litigation.
8   (b)(2) cases -- even (b)(2) two cases seeking only
9   injunctive relief are frequently settled.  It would be an
10  odd legal regime to say that if a plaintiff class sues for
11  an injunction and the defendant offers a sufficient amount
12  of money to buy itself out of the injunctive belief that is
13  sought that settlement is somehow inappropriate or improper.
14  Wal-Mart has nothing to do with the settlement.
15  And the other aspect is, as we were reading the
16  opinion, at least over the lunch hour, what the Supreme
17  Court said was -- and the reason it disapproved the class
18  in Wal-Mart case in particular, it says under (b)(2) class
19  that you cannot have individualized awards of monetary
20  damages.
21  And that was really the Supreme Court's concern,
22  and that is not the case with respect to the historical
23  accounting class.  Every member of the historical accounting
24  class is getting the same amount of money.  They are being
25  treated exactly the same.  There will be no individualized

Page 153

1   determinations.  So the concerns that animated the Supreme
2   Court's decision in Wal-Mart we do not believe are present
3   here.
4   With respect to the 23(a) aspect of Wal-Mart,
5   again, all that required was one common issue.  The Supreme
6   Court confirmed -- Justice Scalia, that only one common
7   issue is required, and that is satisfied here for the
8   reasons that I explained.
9   THE COURT:  How about the other class?  Instead of
10  the historical class where the damages will be different,
11  the awards would be different?
12  MR. CHARNES:  That is right.
13  Well, congress in that -- in the statute said that
14  the class did not have to satisfy Rule 23, and Wal-Mart is a
15  Rule 23 case.  So we think that disposes of it, even to the
16  extent that Rule 23(a) applies, all the Supreme Court
17  required was one common issue, which is we talked about a
18  minute ago was all that the due process clause requires.  So
19  I think that the analysis is the same.
20  THE COURT:  All right.
21  MR. CHARNES:  And then with respect to the
22  Concepcion case, AT&T versus Concepcion, I am a little
23  puzzled as to what that decision has to do with this.  All
24  it did was reaffirm that adequacy must exist throughout a
25  class action, and we certainly have no dispute about that

Page 154

1    fact.
2    THE COURT: Thank you very much.
3    MR. CHARNES: Thank you, Your Honor.
4    MR. HARPER: Your Honor, I'm going to turn to some
5    of the objections that we heard from a number of different
6    people first, and then there were some narrower specific
7    ones that I will address at the conclusion.
8    First, with respect to the settlement amount,
9    there seems to be a number of objectors who have claimed
10   that, in essence, the settlement amount is not enough. Of
11   course we have a $3.4 billion amount. It is, as far as our
12   research indicates, the largest class action settlement
13   against the United States.
14   Another way to look at it is this, Your Honor. If
15   you look at all of the cases that have been litigated by
16   tribes or individual Indians against the United States, and
17   you added all of them together, their judgments and
18   settlements, you know, for the taking of land under the
19   Indian Claims Commission Act, for trust breaches, all of
20   those claims in the aggregate, this single settlement is
21   larger than all of the others. So that gives you another
22   sense of how significant a resolution this is.
23   Your Honor, class counsel always wishes -- always
24   wishes that they would get more for their class. But that
25   is not the test here. The test here is whether the proposed

Page 155

1    settlement is fair, reasonable and adequate under the
2    circumstances, and whether the interest of the class as a
3    whole are better served in this litigation or resolved by
4    the settlement.
5    The comparative, Your Honor, is between what the
6    claims are worth if fully litigated as compared to what the
7    settlement provides to the class. It is not the theoretical
8    injury that class members may have suffered. It is about
9    what is cognizable in the lawsuit, and what is before the
10   court here is that the settlement clearly is one that is
11   fair under that standard.
12   There is one aspect of this that I would like to
13   spend a moment upon, Your Honor, because there has been an
14   objection made that somehow the asset mismanagement claims
15   were kind of thrown in at the last minute and included
16   without any evaluation.
17   Your Honor, that is simply --
18   THE COURT: Yes, you should ad that, because the
19   original lawsuit did not have that claim. It only asked for
20   an accounting, not damages.
21   MR. HARPER: That is accurate, Your Honor.
22   There have been many fund aspects mismanagement --
23   mismanagement claims regarding funds have been included, and
24   we made requests for disgorgement, requests for equitable
25   restitution that included some of the fund management

Page 156

1    claims. But there are aspects of what has been termed asset
2    or land management that were not a part of the initial
3    lawsuit to a certain degree.
4    Of course, Your Honor, this case was as much about
5    the breaches of trust involved as well as trust reform, and
6    trust reform always included these other aspects of the
7    management of the trust, the asset management as well.
8    Your Honor, one other point on that. We've had
9    eight separate settlement negotiations, and from the very
10   first one in 1998, the government made absolutely crystal
11   clear that they would not resolve this case without what
12   they termed, quote, unquote, total peace.
13   What that meant is that all individual claims
14   needed to be resolved for a settlement. And so from the
15   very inception of the negotiations back more than a decade,
16   we had assessed time and time again the value of those asset
17   mismanagement claims, because we knew that if we were to
18   settle those claims that they would be included.
19   In fact when Senator McCain introduced his bill --
20   Senate Bill 1439 in 2004, 2005 before Congress, he included
21   both asset mismanagement claims and fund mismanagement
22   claims.
23   All of that was included, because again, it was
24   well understood that the administration would not support
25   anything that did not include both kind of claims, and that

Page 157

1    had always been the case.
2    Now in that instance there was no opt out, and
3    that was one of the objections that the people raised at
4    that time. But the notion that the asset mismanagement
5    claims have not been fully investigated and assessed when it
6    was certain that they would need to be included if we were
7    ever to get to a resolution is just not true.
8    And so for many years class counsel have
9    investigated those claims. We have researched those in
10   detail, and so has the federal government, and we have a
11   sense, a good sense of what they are worth.
12   A similar objection, Your Honor, is with respect
13   to the distribution and whether or not it is fair. Your
14   Honor, first we will take the historical accounting class.
15   We think that issue is essentially disposed of with your
16   recent decision regarding the Quapaw tribe, docket 3828.
17   Quote in that decision:
18   "The monies awarded the
19   historical accounting class are
20   not damages. Rather defendants
21   award an identical amount to each
22   historical accounting class
23   member essentially in consideration
24   for being released from the
25   obligation to perform an historical

Page 158

1  accounting."
2  That is exactly how we see it, and that is why a
3  single per capita payment of $1,000, no matter what the
4  value of your trust assets, is the fairest way to make that
5  distribution, because the individuals -- the government owes
6  each individual a duty to account. They are not providing
7  that, and in lieu thereof they are providing the $1,000
8  payment. That is the fairest way to do so.
9  THE COURT: To make clear, there may have been
10 some confusion. The objections, or at least I understood
11 one objection, maybe, that the historical accounting class
12 is $1,000 per person qualified to receive the monies in that
13 class.
14 The second class, the second matter there will be
15 differences of what is awarded on the payments stemming --
16 one said $500 and one said $800, up to -- and they have
17 determined that one of them may be a million dollars,
18 although some people claim that they are going to get a lot
19 less than they should.
20 But the $1,000 per person does not change
21 regardless of the amount of money that you had in your IIM
22 account, et cetera. That is a set fee. I thought there was
23 some confusion with some of the objectors as to that.
24 MR. HARPER: Yes, Your Honor.
25 And turning then to the trust administration class

Page 159

1  as Your Honor just mentioned, there is an $800 minimum
2  payment, and then payments will go up from there depending
3  on what was produced in your property from 1985 to 2009.
4  In essence, Your Honor, this is a balanced
5  approach. On the one hand it recognizes that class members
6  have all suffered some damages and that the government has
7  unlawfully obtained some benefit from its failure to
8  distribute these trust funds.
9  At the same time for those beneficiaries who have
10 more valuable assets, the likelihood of damages is greater.
11 Therefore, their payments are greater.
12 Your Honor, this is fair to the class as a whole.
13 There is no better way to do a distribution of this nature.
14 What we wanted to avoid -- what the parties wanted to avoid
15 was to spend literally tens or hundreds of millions of
16 dollars trying to figure out who gets what rather than
17 getting that money to the beneficiary class.
18 There was no possible way to do that in light of
19 the documents that are extant better than this -- this way
20 of distributing would do so.
21 In addition, Your Honor, for any individuals of
22 the trust administration class that believed they were owed
23 more, they always have the option of opting out, not
24 participating in the settlement, and proceeding in their own
25 subsequent action.

Page 160

1  There have been a couple, Your Honor, objections
2  regarding the land consolidation program. A couple deal
3  with alleged concerns regarding tribal sovereignty and
4  whether or not these undermine individual rights, and just a
5  quick moment on that.
6  There is nothing in this settlement, nothing in
7  that that would in any way negatively affect tribal
8  sovereignty. If anything, tribes are indirect
9  beneficiaries, because they will ultimately get the lands
10 back that are purchased through the consolidation program.
11 With respect to individually Indians, again, all
12 of the sales are voluntary, and so they will then be able to
13 decide.
14 There has also been the notion that there may not
15 be fair market value paid. Well, Your Honor, the settlement
16 itself expressly states that payments will be made for fair
17 market value.
18 In addition, this program will be -- this part of
19 the settlement will be operated under the Indian Land
20 Consolidation Act. There is a provision in the Indian Land
21 Consolidation Act requiring fair market value, requiring an
22 appraisal, and requiring that that appraisal be presented to
23 the beneficiary who is being made an offer under the Indian
24 Land Consolidation Act.
25 So we think that there is the legal coverage that

Page 161

1  some of the class members are seeking, Your Honor.
2  THE COURT: There was some technical objections
3  just raised as to the land consolidation concerning probate
4  and estate records, land records, et cetera.
5  MR. HARPER: Sure. And, Your Honor, we are not in
6  any way saying that there are not continuing issues with the
7  management of the trust. Our understanding is that the
8  Department of Interior is going to have extensive
9  consultations with tribes and individual landowners to
10 figure out and identify some of these problems and seek to
11 address them.
12 But Your Honor, that does not in any way say that
13 the setting forth of the $1.9 billion fund in order to
14 consolidate land is in any way deficient, or not fair, or
15 not adequate.
16 There have been a couple of mentions of the
17 scholarship fund. Quickly on that. I think that there is
18 some misunderstanding there.
19 With respect to the scholarship funds, the
20 payments are going to be made to individuals that are at
21 fair market value. In addition to that, above and beyond
22 that, there will be money set aside for the scholarship
23 fund.
24 The reason that is is because we have heard from
25 many beneficiaries out in Indian Country -- if there is one

Page 162

1   theme that we hear time and time again is the importance of
2   the next generation.
3   We think that it will be a great incentive for
4   folks to participate in the consolidation program if they
5   know about that ad on that will ultimately create a
6   scholarship fund. That was the intent behind it, and it has
7   the additional benefit of creating this scholarship fund.
8   In no way does that set aside any of the existing treaty
9   rights or funds available under the Bureau of Indian
10  Education.
11  The one notion that has been voiced about how the
12  funds will revert back to the federal government after ten
13  years. Of course our position on that is that that is
14  nowhere close to what is called the reverter clause, because
15  reverter clause, the claims are extinguished and then the
16  defendant still keeps the money.
17  Here, if the land is not purchased the individual
18  keeps its land, and those funds do not get paid to him, but
19  then he does not lose his land either. So it is
20  fundamentally different than the traditional reverter
21  clause.
22  A couple of issues related to incentive fee
23  awards. First, Your Honor, of course this court has broad
24  authority to make an incentive fee award that it deems fair
25  and just under the circumstances.

Page 163

1   We have sought incentive fee awards from $150 to
2   $200,000 for three of the named plaintiffs, and $2 million
3   for Ms. Eloise Cobell.
4   All of these named plaintiffs have made important
5   contributions to the success of this case. A handful of
6   individuals have objected to the incentive fee awards, and
7   most have targeted Ms. Cobell's -- the request made for Ms.
8   Cobell.
9   Let's be clear, Your Honor. The request for Ms.
10  Cobell is extraordinary. It is not unprecedented, but it is
11  extraordinary. The Alkatal case awarded, as Your Honor is
12  aware, $1.6 million to each of eight named plaintiffs. So
13  this is not unprecedented.
14  THE COURT: The one in Florida?
15  MR. HARPER: This is the one in Florida, Your
16  Honor.
17  What I would submit to you today, Your Honor, is
18  Ms. Cobell's contributions in this matter have been far
19  greater than the ones made in other matters. She has
20  devoted her life to righting this wrong. She has had day-
21  to-day contact with counsel. She's been involved in every
22  important decision.
23  When this case needed a spokesperson, she was
24  there. When this person -- this case needed somebody to
25  raise funds, she was there. When we needed somebody to

Page 164

1   testify in Congress, she stood up. She took the brunt of
2   the criticism for doing so. When this case needed
3   additional funds, she took $390,000 of her own money that
4   she had won in a McArthur Genius Foundation Award, and she
5   utilized it for experts in this case.
6   Those are extraordinary contributions. Ms. Cobell
7   has answered the call. This case, this settlement is a
8   testament to her strength, courage and perseverance. We
9   think that the request is extraordinary, but we also think
10  that it is well worth it for her contribution.
11  THE COURT: There was some challenge to her by Mr.
12  Frank as to the $7 billion offer that she testified to, et
13  cetera.
14  MR. HARPER: Yes. With respect to the $7 billion
15  offer, again, we presented this in detail in our papers.
16  There has never been a $7 billion offer for settlement of
17  this case. The $7 billion number came from the Bush
18  administration, Your Honor.
19  It included the settlement of all tribal trust
20  cases, the reform of the entirety of the trust, the dealing
21  with IT security issues, with fractionation, with not only
22  individual claims from the past but in the future, and the
23  termination of the trust.
24  That is what the settlement offer was for $7
25  billion. It was considered widely a poison pill. It is not

Page 165

1   being resolved here.
2   You take alone the tribal trust cases, which at
3   one point the Attorney General, Alberto Gonzales, testified
4   in Congress that those were worth potentially up to $200
5   million. I am not attesting one way or the other to it.
6   That was his testimony.
7   And you say -- and that is included in the $7
8   billion offer. Obviously, that is not the resolution of
9   what was we are resolving here. That includes so much more,
10  and when you are talking about including future claims, then
11  there is a grave concern.
12  There is another aspect of that which is that Mr.
13  Frank has posed that this somehow makes Ms. Cobell have some
14  kind of a conflict of interest.
15  Well, Your Honor, the answer to that -- and a
16  similar objection is made regarding attorney fees -- is that
17  you get to decide, Your Honor, exercising discretion,
18  whether or not to make an award for an incentive award, and
19  because of that there is no conflict of interest. Otherwise
20  there would always be a conflict of interest whenever am
21  incentive fee -- an incentive award was asked for and
22  determined by a court.
23  Your Honor, with respect to attorneys' fees. We
24  heard today a number of people -- a couple of objectors talk
25  about attorneys' fees awards. I want to say this, Your

1    Honor, with respect to that.

2    I am very proud to be a member of this litigation

3    team, because I know the work that this litigation team has

4    put into this case for over 15 years, and what I can tell

5    you is that when we do go out to Indian Country, when we

6    have gone to those 50 reservations, we are not hearing

7    extensive complaints about attorneys' fees.

8    What we are hearing is people lining up after our

9    remarks, after we brief them on the settlement, to thank us

10    for the work that we have done.  And it is humbling that

11    folks do that, and we are very grateful to them for stating

12    their appreciation.  That is the reality that we see when we

13    go out to Indian Country.

14    We understand that there are a couple of people

15    who do not see it that way, but the vast majority of the

16    class we feel are comfortable with the request that has been

17    made.

18    And Your Honor, I do want to emphasize the point

19    that Ms. Cobell made earlier today, and that is with respect

20    to attorneys' fees.  The question is that if the attorneys'

21    fees are not fair, what is that going mean the next time an

22    individual Indian seeks representation for a case of this

23    nature, or other kind of case?

24    A couple of other points that were raised by

25    individuals with respect to the five tribes and the concerns

1    there.

2    First, my understanding is that the Interior

3    Department is undertaking an effort to identify the members

4    of the class -- the trust administration class that have

5    what is called restricted fee lands that are recorded in

6    state rather than the federal government systems.

7    That effort I understand it is ongoing.  I would

8    also say that these individuals are allowed under the

9    settlement agreement to self identify if they believe that

10    they are included in the trust administration class.

11    We have also had, as part of our overall effort

12    regarding notice, we have made -- paid a substantial amount

13    of attention to Oklahoma, in part, because of these issues.

14    We made five bases throughout Oklahoma from

15    Anandarko, to Lawton, to Durant, Muscogee and Tulsa.  We

16    met with thousands of individuals during those visits, many

17    from the five tribes.  We have had robust efforts in

18    newspapers, on radio and television, and through that many

19    individuals have self-identified themselves through phone

20    calls.

21    There have been 23,000 flyers that have been sent

22    over to Oklahoma by the notice contractor, and 600 DVDs in

23    languages such as my tribe's language, Cherokee, and others

24    relevant to the beneficiaries in that area.

25    There has been this robust effort.  People know

1    about the settlement.  They know they can self identify, and

2    we have had a reasonable -- it is well past reasonable the

3    efforts that have been made to ensure that these individuals

4    can have the opportunity to include themselves, and those

5    efforts will continue to identify those individuals as I

6    understand it.

7    Your Honor, none of the objections that we have

8    heard today should change the basic fact that this

9    settlement is fair, reasonable and adequate.  Unless the

10    court has any further questions, I would ask that you

11    overrule the objections and that you finally approve the

12    settlement.

13    THE COURT:  Let me go through some of the

14    questions with you, and then you will have a further

15    chance, I think, after the government responds to the

16    objections and to give a summary.  I intended the final

17    chance to talk a little more about attorneys' fees, because

18    I think that that is somewhat separate from the underlying

19    claims.

20    The relief now under the settlement differs

21    somewhat from the original initiation of the case where you

22    asked for an accounting.  Implied with that, I take it, was

23    an accounting plus equitable relief, whatever could be

24    granted beyond that.

25    MR. HARPER:  That is correct.

1    THE COURT:  It wasn't a money damages claim.

2    And then as you said you had trust reform, and

3    then at some point you came into this trust administration

4    class suggestion.

5    Was that created as greatest part of the

6    settlement discussions, this actual class?  Is that how that

7    came about?  How did that come about to be created?

8    MR. HARPER:  Yes.  In essence, Your Honor, the

9    trust administration class, as now articulated in its full

10    form, was part of the resolution of the claims.  It had

11    been, though, part of the discussions for many years, and

12    because of that had been widely investigated.

13    THE COURT:  And this was the vehicle to settle

14    these claims, that is how you came up with this trust

15    administration class?

16    MR. HARPER:  Yes, Your Honor.  They included

17    certain land management claims that were not originally

18    included as damages claims in this action.

19    THE COURT:  In the trust administration claim, if

20    there is an opt out, they preserve their claim for an

21    historical accounting?

22    MR. HARPER:  Well, what they preserve is called an

23    accounting in aid of judgment, Your Honor.  Now the

24    historical accounting that we brought here to District Court

25    is different from what is called an accounting in aid of

Page 170

1    judgment.
2    What they do importantly preserve if they opt out
3    of the trust administration class is all of the evidentiary
4    and discovery abilities that you would normally have in an
5    action.
6    And because the accounting is used in aid of
7    judgment, we felt it necessary to confirm specifically in
8    writing and the settlement agreement that that was -- that
9    kind of an accounting was still available for those seeking
10   damages actions in a subsequent law suit under the Tucker
11   Act, and for that reason --
12   THE COURT:  Would it go to the Court of Claims?
13   MR. HARPER:  Those are generally performed in
14   Court of Claims.
15   Importantly, Your Honor, those are what is called
16   a post liability accounting.  A liability must be
17   established, and to the extent that there is a breach of
18   trust of a money mandating statute, then the United States
19   will perform an accounting in aid of judgment in aid of
20   determination of the damages that should be awarded.
21   THE COURT:  In the information that is going to be
22   relied upon, and maybe Interior wants to answer this
23   question, but the operation of the trust administration
24   class awards you make up a formula, and that information
25   there were some objections raised that that information may

Page 171

1    not be complete or misleading, et cetera.
2    Do you know how that -- where information is
3    coming from, and what is relied upon in order to get this
4    relief formula?  Apparently, some people have already been
5    offered some money they are saying.
6    MR. HARPER:  Your Honor, it is not clear to me.  I
7    heard those objections as well.  It was not clear to me
8    exactly what they meant by that.  I think that the formula
9    is intended to include all funds that were actually
10   deposited and held in trust at the department within an IIM
11   account, which was the focus of the resolution here
12   involved.
13   I think that there are allegations that there may
14   be something incorrect there, but we just have not seen the
15   establishment of those allegations, and certainly the
16   government can respond in more detail.
17   What I will say is that there is an ability for
18   individuals who believe that they should be included but for
19   one reason or another are not on the available systems, to
20   make a claim to be included, and we have received thousands
21   of claims forms from our administrator -- from individuals
22   who want to be included that believe they have not -- have
23   been improperly excluded from the class.
24   So again, that ties into the robust notice
25   process.  But there has been an effort to identify those

Page 172

1    individuals.
2    THE COURT:  Let me -- just a couple of other
3    matters.  As I said, I will wait on attorneys' fees for
4    miniature to question you later.
5    The scholarship fund.  As I understand it that
6    has, I think, three sources to it, the scholarship fund?
7    MR. HARPER:  Yes.
8    THE COURT:  And has it been determined yet -- I
9    think someone has a cell phone on -- has it been determined
10   yet who is eligible to receive the monies from the
11   scholarship fund and regulations set up on it?
12   MR. HARPER:  There hasn't been, Your Honor.  Under
13   the settlement agreement, of course, the plaintiffs by -- I
14   think that it was two months after initial approval that
15   this court granted in December provided to the Department of
16   Interior -- nominated two entities that would be the manager
17   -- the administrators of that.
18   We did take that action, and the government may
19   have a better understanding of where they are in the process
20   of selecting the right organization.
21   There will be a five-member Board of Trustees,
22   uncompensated board, that will then decide the policies with
23   respect to the scholarship.  So the short answer to your
24   question, Your Honor, is that that has not been specifically
25   determined yet.

Page 173

1    THE COURT:  One of the reasons I asked was I did
2    receive a very interesting letter from a Native American
3    asking whether or not this would cover pre-existing
4    educational debt?  Got out of college with a big debt.  That
5    will be up to, I take it, the managers of the fund and the
6    trustees of the fund.
7    If there is a future -- in the event that some
8    members of the class believe there are future IIM trust
9    mismanagement, have they waved that right if there are
10   future mismanagement issues?
11   MR. HARPER:  No, Your Honor.  The settlement
12   agreement clarifies that any breaches of trust that occur
13   after the record date are breaches that can be brought in a
14   subsequent lawsuit.  So this does not affect in any way
15   future claims.
16   Any potential mismanagement that occurs after that
17   record date in 2009 would be a matter that you could --
18   irrespective of whether or not you opted out of the class or
19   didn't opt out, you could bring that action.
20   THE COURT:  And some of the argument that goes to
21   legal fees, and as I said, I am going to reserve that for a
22   minute, but one of the issues I thought about was what is
23   the future of reform in the IIM trust?  You mentioned that
24   one of the purposes of this lawsuit was trust reform.
25   MR. HARPER:  Yes.

Page 174

1  THE COURT:  What have you agreed to in this
2  settlement?  What is enforceable, in other words, to have
3  reform accomplished?
4  MR. HARPER:  Sure, Your Honor.  A couple of things
5  on that point.
6  First, Your Honor, by the government's own
7  admission, they have spent nearly $5 billion on trust reform
8  during the course of this litigation.
9  THE COURT:  5 billion?
10  MR. HARPER:  5 billion, and we would submit a lot
11  due to the efforts of the team here involved.  So that is
12  point number one.
13  Point number two is that we did want to have
14  provisions in the settlement of agreement that addressed
15  trust reform.  One of those provisions is the $1.9 billion
16  for fractionation.  The government has long submitted that
17  fractionation is one of the principal reasons why they have
18  not had sound management of the individual Indian money
19  trusts.
20  In this settlement, $1.9 billion is set aside in
21  order to consolidate land and deal with fractionation in an
22  effective way.  That, too, is about future management.
23  That, too, is about trust reform.
24  Third, Your Honor, the same day that this
25  settlement was announced, Secretary of Interior Ken Salazar

Page 175

1  entered into a secretarial order that establishes a
2  commission that will further study trust reform and what
3  efforts are necessary to sustain additional trust reform.
4  We agree that there are additional problems that
5  need to be resolved, and that that is another aspect of the
6  future looking aspects of this resolution.
7  THE COURT:  And you mentioned the $7 billion
8  figure, that the tribes have their own separate suits, and
9  there are some 20 to 30 as I recall, maybe more than that.
10  MR. HARPER:  About 100.
11  THE COURT:  Following on after this one.  I know I
12  had a few behind me to do -- that have not resolved as a
13  result of this case?
14  MR. HARPER:  That is right.
15  And the point there was that the $7 billion
16  figure, the government made clear that that $7 billion had
17  to pay for the resolution of all of those tribal trust law
18  suits, all of the individual lawsuits, all future claims,
19  trust reforms and other matters.  So it just was not an
20  offer for settling this case, and it was not an offer for
21  settling individual Indian claims.
22  THE COURT:  Let me just -- final-round up question
23  on the overall settlement, then I'll get to the government,
24  and then I'll get back to you on the individual attorneys'
25  fees a little more.

Page 176

1  What is the rough numbers of the American Indians
2  in each class, and how many do you think, in total, will
3  receive monetary benefits from the settlement in both
4  classes?
5  MR. HARPER:  Your Honor, if I could have just a
6  moment?
7  THE COURT:  And the reason I ask is I have seen
8  about 300,000 bandied about in a couple of instances for
9  each class, and then I have seen a total of 450,000, perhaps
10  500,000 total.  It just wasn't clear to me.
11  MR. HARPER:  Sure.
12  Your Honor, our understanding is that there are
13  about 360,000 who are members of the historical accounting
14  class.  360,000, and there are an additional 400 -- or I
15  shouldn't say additional.  Some of those are crossover --
16  most of those are crossover.
17  But there are 450,000 who are members of the trust
18  administration class.  In part that is because that class
19  includes individuals who may have an allotment interest or
20  an interest in restricted fee land but do not have an IIM
21  account, and they will all -- members of both of those
22  classes will receive a minimum benefit depending on whether
23  they are members of the class.
24  THE COURT:  And I just recall.  There was one
25  objection that I forgot to ask you about.  There seems to me

Page 177

1  a person who was knowledgeable -- a person who spoke towards
2  the last concerning the 'whereabouts unknown' and locating
3  people, and that there is a provision, I believe, that
4  parts of land could be sold by default if the parties -- if
5  the 'whereabouts unknown' category remained after five
6  years?
7  MR. HARPER:  Yes.
8  Your Honor, it has been referred to as the deemed
9  consent provision.  Specifically, what that entails is when
10  an individual has not been located for an extensive period
11  of time, and there are provisions for Interior -- the
12  Interior Department having to make efforts to find that
13  person, in the event that they are unable to, then there
14  is a deemed consent provision for the land consolidation.
15  My understanding is that funds are then deposited
16  in an IIM account, and they will still have the funds
17  available.
18  THE COURT:  Thank you for the work.
19  MR. HARPER:  Thank you, Your Honor.
20  THE COURT:  I will hear from the government at
21  this point on the response to the objections, and at the
22  same time the government finishes its response to objections
23  discussion, I will have some questions on the attorneys'
24  fees, and then we will finish with response from the
25  plaintiffs in that area.

Page 178

1  MR. QUINN:  Good afternoon, Your Honor.  Michael
2  Quinn for the defendants.
3  We also spent part of our lunch looking over the
4  Wal-Mart decision.  It was a good accompaniment to a salad.
5  Having looked at it and read through it, we also had an
6  opportunity to kind of search the terminology there to see
7  if it refers to anything in the way of due process or
8  constitutional issues, because our case here, the settlement
9  here as specified by Congress in the Claims Resolution Act
10 of 2010 is that this is not a case to be determined for a
11 class based on Rule 23, at least as to the certification of
12 the trust administration class.
13 Having looked briefly at the Wal-Mart decision as
14 issued as this morning, there are only two references to the
15 due process clause that we could find in the decision, and
16 no references to the constitution at all.
17 It appears to be specifically geared to addressing
18 in the first part of the decision Rule 23(a) and commonality
19 as it particularly applies in the case of a class to be
20 certified under 23 (b)(2) as a mandatory class.  That is not
21 the trust administration class here.  This trust
22 administration class is to be -- was certified as a 23(b)(3)
23 class for purposes of the settlement.
24 But I think it is informative that the court
25 discusses it in two places slip opinion.  Due process is

Page 179

1  mentioned at page 23.  In noting that the court has always
2  required -- and citing Phillips Petroleum versus Shutts that
3  notice and opt out opportunity always be afforded in the
4  instance where money damages are to be awarded.
5  That is nothing new with respect to the structure
6  of the case here.
7  Due process also turns up again at page 26 of the
8  slip opinion, Your Honor.  And there I think it brings to
9  the fore a key distinction between this case and the
10 settlement here before the court today and the litigation
11 going on in the Wal-Mart case, and that is the court says:
12 "Contrary to the 9th Circuit's view --"
13 And I'm quoting the decision, that slip opinion 26:
14 "-- Wal-Mart is entitled to
15 Individualized determination
16 of each employee's eligibility
17 for back pay."
18 That is the -- and other courts have recognized
19 this as well.  The commonality test is not all about
20 protecting the absent class members.  It is often primarily
21 about affording a defendant the right to due process at
22 trial.  That is to face their accuser and to try each claim
23 before a jury at least to the extent it significantly
24 differs.
25 Here in settlement where a defendant comes forward

Page 180

1  to voluntarily waive trial and come to settlement in a
2  voluntary agreement with those parties, we believe that
3  those due process concerns are no longer an issue for the
4  court.
5  In that respect, even to the extent that those due
6  process considerations amount to beyond a rule issue to a
7  constitutional dimension, they don't really apply in the
8  context of the settlement here where the defendant has
9  protected itself by bargaining at the table to come to a
10 settlement.
11 The other aspect of Wal-Mart addresses the Rule
12 23(b)(2) certification in that case.  It focuses primarily
13 on the issue of seeking money damages in a mandatory class
14 action.
15 We agree with the view of plaintiffs as Mr.
16 Charnes articulated then that the Wal-Mart decision is
17 distinguishable from this case and does not apply here as to
18 the 23(b)(2) historical accounting class, but I think for a
19 slightly different reason.
20 It has always been the government's position
21 throughout this litigation that the court's jurisdiction
22 being founded on the Administrative Procedure Act for the
23 failure and the delay of the defendants to provide the
24 implied accounting duty under the 1994 Reform Act was the
25 only thing at issue.

Page 181

1  That is what the plaintiffs could obtain by matter
2  of relief was an accounting statement, not money damages.
3  To that extent, under even the Wal-Mart decision announced
4  today, that holds true.
5  As the court recognized in the order that it
6  issued last week, the thousand dollar settlement payment is
7  not damages.  It does not attempt to resolve, or address, or
8  release anyone's claim that they had funds mismanaged, or
9  that they lost funds in the system.  It is merely a payment
10 in recognition of the stipulation in the settlement that
11 the class is willing to forgo the claim's statutory
12 accounting statement for a stipulated agreement as to what
13 their balance was as of the record date being September 30,
14 2009.
15 So in that respect this case, from the
16 government's perspective, has never been about money
17 damages.  It was to result in a statement issued to the
18 class members, and then those class members would
19 individually determine whether it indicated they were
20 missing money.  And in that case they could bring a Tucker
21 Act claim either in the Court of Federal claims or within
22 the jurisdictional limits of the District Court -- in their
23 local District Court.
24 THE COURT:  So the restitution, or payment, or
25 whatever you call it, was incidental to the equitable

Page 182

1  relief?
2  MR. QUINN:  Absolutely, Your Honor.
3  THE COURT:  All right.
4  MR. QUINN:  And it was part of the claim.  The
5  claim plaintiffs initially included -- if you go back to the
6  original early stages of this case, going back all the way
7  back to 1998, Judge Lamberth struck allegations that even
8  hinted of damages to perfect a pure Administrative
9  Procedures Act claim.
10 So in that respect the 23(b)(2) certification here
11 continues  to be proper even under the Wal-Mart decision,
12 having just had a few hours to digest it.
13 With respect to that, I think it is important to
14 keep in mind that since Congress has exempted the trust
15 administration class from the rigors of Rule 23(a) and
16 23(b)(3) in terms of certification, the court must look back
17 to other authority to determine how to protect absent class
18 members' rights and interests in determining whether the
19 settlement is fair, reasonable and adequate.
20 We have suggested in our briefs, and plaintiffs
21 have as well, that the best benchmark for that is the
22 Philip's Petroleum versus Shutts decision.  That is
23 referenced again in -- it is still good law, and it is
24 referenced again in today's Wal-Mart decision and in another
25 context.

Page 183

1  But that case identifies -- and a subsequent
2  opinion in the Supreme Court and a concurring opinion by
3  Judge Ginsburg in the Matsushita Electric Industries case
4  versus Epstein, 516 U.S. 367 at page 396 decided a few years
5  after Shutts, mentions and describes the Shutts decision as
6  saying that this court, quote:
7  "Listed minimal procedural
8  due process requirements a
9  class action money damage --
10 a class action money
11 judgment must meet."
12 It is to bind absentees, and those requirements
13 include notice, an opportunity to be heard, a right to opt
14 out, and adequate representation.  Those are the
15 requirements.
16 Commonality is not stated among them.  The only
17 place where it comes into play in this context, in this
18 unusual circumstance where Rule 23 does not apply, is to the
19 adequacy of the representation.
20 We have submitted that if you look at the case
21 law on adequacy of representation, the standard requires an
22 actual conflict going to the heart of the representation.
23 In the Hansberry versus Lee, which I believe Ms. Cravens
24 counsel cited, 311 U.S. 32, in 1940, the conflict there
25 among the class was that the earlier lawsuit had a class of

Page 184

1  plaintiffs fighting against members of their own class.
2  Where it was clear that the parties on both sides
3  were members of the same class, you obviously have a
4  conflict among class members.
5  Subsequent decisional authority following
6  Hansberry has been to the effect that it cannot be just mere
7  speculation or conjecture about a conflict.  There has to be
8  some proof of an actual conflict.
9  And nothing that has been presented either in
10 writing, Your Honor, I would submit, or today orally before
11 the court in the objections presents any direct evidence of
12 an actual conflict that prevents the court from finding
13 adequacy of representation.
14 The objectors, at least one this morning,
15 suggested that the plaintiffs cannot be adequate
16 representatives because the named class representatives got
17 an individual accounting.
18 Your Honor, might be wondering how that came
19 about.  There was not an accounting in the sense that the
20 individual named plaintiffs receiving the formal statements
21 that everyone else would do.  It is part of the original
22 work on discovery in the case.
23 Several accounting firms investigated, per an
24 agreement of the parties, the named plaintiffs and their
25 ancestors' records to try to determine if, in fact, an

Page 185

1  accounting could even be done.
2  So there was a thorough accounting work done, but
3  nothing that anyone had ever agreed was tantamount to the
4  receipt of the historical statement of account, which was
5  the ultimate aim of the historical accounting class
6  litigation.
7  And even if by chance -- and we don't agree that
8  it does -- but if such an accounting work for a named
9  plaintiff had, in effect, mooted their claim, which we don't
10 believe that it did, there is -- it is well-established that
11 a class representative, once in a certified class, can
12 continue to represent that class even if their claim winds
13 up being mooted.
14 There is extensive Supreme Court authority in that regard.
15 With respect to the claims that are compromised,
16 Your Honor, there are a couple of things that have come
17 through in the favor of the objections today.  Those that
18 argued that their claims are being undervalued, or that they
19 will be under compensated as a result of the settlement,
20 that is one of the reasons why you have the safeguard for an
21 opt out.
22 Someone giving notice -- receiving notice of the
23 action who disagrees or is concerned for any reason that
24 they might not get their money's worth out of the
25 settlement, was free to submit an opt out.  And several -- a

1   couple of thousand -- close to a couple of thousand people
2   did that.  That is the safeguard.
3   This case has also been in settlement mode for
4   well over a year, even before the actual notice period
5   began.  The settlement was in front of Congress, and the
6   information about the settlement agreement was available on
7   the Internet, and anyone could look at the principle
8   agreement and see what those terms were.
9   The trust administration class, by definition,
10  excludes anyone who filed a claim prior to the complaint in
11  the trust administration class.  So anyone who was
12  concerned that they might be swallowed up in the trust
13  administration class and did not want to deal with it also
14  had the option of, in a sense, jumping ahead in line and
15  filing suit so that they would be outside the definition of
16  class.
17  I think one of the objectors, and I think it was
18  Mr. Carnes this morning, spoke of all of the other issues
19  that lie before people in Indian Country.  He talked about
20  health care, educational concerns and economic development.
21  And that is one of the main reasons why the government and
22  the Secretary of Interior, in particular, had pushed to try
23  to resolve all of these claims so that the government could
24  turn the page and establishing a new relationship between
25  the government and the American Indians.

1   That does not mean that trust reform was done.  It
2   does not mean that claims that people have today -- and
3   there were some objectors here arguing about -- mentioning
4   problems that they have today.
5   This lawsuit settlement, and even the approval by
6   the court of the settlement, does not take away those
7   individuals' rights to redress a current grievance.  The
8   settlement only releases claims going as far current as
9   September 30, 2009.
10  So if a person knows something is being stolen
11  from their account, or knows something -- is certain that
12  someone is doing something improper, those could still be
13  addressed by a lawsuit going forward.
14  The Department of the Interior and the Secretary's
15  announced a Secretarial Commission on Trust Reform will have
16  an evaluation of the Interior's administration with input by
17  trust beneficiaries, and they hope to hold reasonable
18  listening sessions, and examine the trust duties and what
19  further reforms are necessary.
20  One of the benefits out of the approval of this
21  settlement is that the agreement provides -- and the statute
22  provides that the Land Consolidation Fund allows a certain
23  modest amount of money to go to support -- to fund that
24  commission on an ongoing basis as it continues to identify
25  areas of improvement in trust reform on a going forward

1   basis.
2   THE COURT:  I had allowed the government some
3   opportunity to communicate with the class members regarding
4   the settlement, particularly the funds.
5   Do you have any feedback on that?  That was over
6   objection of the plaintiff at the time I did it.
7   MR. QUINN:  I don't know that I have any specifics
8   to relate to Your Honor this morning.  I know that one of
9   the reasons why we requested that relief is that the
10  consultation -- the main for asking for the ability to
11  communicate on a broader basis was because the statute --
12  Congress asked the Department of Interior to consult with
13  Indian tribes on the land consolidation aspects of the
14  settlement going forward, and that means setting up formal
15  conferences with those tribes.
16  I understand that the first ones are scheduled
17  for July 14.  These take time to set up.  But they will be
18  going on, and there will be further conferences and
19  consultations with tribes and other dates and other
20  locations as the schedule can be arranged.  But it has been
21  a more formalized process, and that takes some time to get
22  underway.
23  The other thing about land consolidation,
24  addressing some of the objections that you heard this
25  morning, is that it is voluntary.  No one needs to sell land

1   that they do not want to sell.
2   The land consolidation process is intended to be
3   put forward to identify smaller fractions of land where it
4   is very difficult to administer and may be meaningless to
5   some owners.  If a particular track is meaningful to
6   someone, it is not going to be taken from them.  They might
7   be offered some money for it, but they do not have to take
8   it.
9   The other thing with respect to the 'whereabouts
10  unknown' is -- as I read the settlement agreement, the
11  consent on land consolidation will only apply to those class
12  members who are bound by the settlement agreement.  And in
13  fact by being in the settlement agreement by contract you
14  are agreeing to those terms going forward.
15  But the money will not just disappear.  If after
16  trying for five years to locate the person, identify a tract
17  for sale under that program, the money would then go into a
18  'whereabouts unknown' account and be held for that
19  individual.
20  THE COURT:  Tell me now if you are ready to move
21  forward, or is someone else going to address the attorneys'
22  fees issue.
23  MR. QUINN:  Let me see, Your Honor, if -- oh, if I
24  could just for a moment address Ms. Works comments about the
25  land issue and the notice issue.

1   I think it is important to go back to the very
2   comprehensive notice effort that was undertaken here.  In
3   addition to direct notice that was sent out you had posters
4   like this where people were asked to post them in
5   convenience stores, and clinics, government offices, tribal
6   offices, telling people that if you want to get payment you
7   did not have to do anything if you're a current account
8   holder.
9   Your rights -- you could call for further
10  information.  This was distributed all over reservations in
11  Indian Country where class members were likely to reside.
12  You had radio advertisements.
13  If you go back and look at Ms. Kinsella's
14  declaration, her declaration at exhibit 6 lists several
15  Cherokee publications where full-page ads were taken out.
16  She has got a Cherokee One Feather Weekly, February 3, full-
17  page ad.  Cherokee Feather Weekly, February 17, March 10.
18  Another monthly publication, the Cherokee Phoenix Monthly,
19  two different half page ads in two different issues.
20  So there is outreach, and it doesn't stop there.
21  The settlement agreement provides after approval by this
22  Court of the settlement for further notice efforts to
23  identify people who are in the class who stand to receive
24  payments.
25  I would refer Your Honor to section E of the

1   settlement agreement.  Section E-1 calls for the
2   identification of a special master who would aid in those
3   tasks.  Section E-4 provides in part A that there be no
4   payment -- no payout to the trust administration class until
5   class members are substantially identified.
6   4-E -- section E, 4 little E one, speaks to a
7   supplementary notice program to potential class members
8   encouraging them to register.
9   4-E-2 requires the Garden City group to develop a
10  procedure for verifying class members.
11  4-E-3 sets a self-identification period that Mr.
12  Harper spoke to where people can submit information, say,
13  I'm a member of the class.  I may not have an IIM account,
14  but I have restricted land.
15  And that is just a fact of the historical record
16  here.  There are certain tribes where the records are not
17  with the federal government, and we will probably have to
18  rely to a large extent on self identification from people
19  who can submit information indicating that they are a member
20  of the class.
21  So I would suggest, Your Honor, in closing that
22  the settlement has been thoughtfully approached to be as
23  comprehensive and inclusive as possible and give every class
24  member every opportunity to receive the payments and
25  distributions that they are due under the settlement.

1   THE COURT:  Thank you.
2   Mr. Kirschman, are you going to address the legal
3   fee issue at this time?
4   MR. KIRSCHMAN:  I am sorry?
5   THE COURT:  Are you going to address the legal
6   fees at this time?
7   MR. KIRSCHMAN:  Yes, Your Honor, and I will be
8   brief.
9   We have fully addressed the issue of legal fees
10  in our brief, and we stand by that filing.  We think that it
11  is important that the court consider what it has heard
12  today, and what it has seen it written objections that have
13  been presented by people who have not appeared today.
14  The government believes that a $50 million award
15  for all attorney fees, including the inclusion of expenses,
16  is a reasonable amount based on the percentage of funds, a
17  method used in this circuit.
18  There has been no reason why the court should feel
19  compelled to find awards, as I mentioned before, of $99.9
20  million somehow appropriate just because plaintiffs, in
21  their filing, or class counsel in their filing, have sought
22  a total of $224 million.  We just caution against any
23  weighing in that manner.
24  The settlement agreement leaves it to the court's
25  sound discretion, and we ask that the court exercise that

1   discretion in determining an appropriate amount.  That
2   discretion should, of course, as I mentioned earlier, be
3   guided by the fact that Congress has asked that you consider
4   that the plaintiff classes here are beneficiaries of a
5   federal trust, and that the purpose of this settlement is to
6   provide funds for these beneficiaries.  So that is an added
7   consideration.
8   It makes it somewhat unique for the court, but it
9   is an important one, and so we again bring that to your
10  attention and ask that you find a total attorneys' fees of
11  $50 million is appropriate here.
12  THE COURT:  I appreciate that.  And I have looked
13  through the materials that have been supplied on attorneys'
14  fees for both sides.  Thank you.
15  Counsel for the plaintiffs want to respond to the
16  attorneys' fees issue at all?
17  MR. HARPER:  Your Honor, Mr. Gingold is going to
18  address the attorneys' fees as part of his closing, if he
19  could do that at this point.
20  THE COURT:  Do you want to summarize anything else
21  first?
22  MR. HARPER:  Unless Your Honor has any further
23  questions of me on any of the other objections, we did not
24  have any specific other objections to address.
25  THE COURT:  I went through my questions that I had

Page 194

1   on this, and I went through all of the objections and most
2   of the generic issues.  I did not ask specific questions on
3   some of the specific objections because they are covered
4   otherwise in the concerns that we have discussed.
5   Thank you.
6   MR. HARPER:  Thank you, Your Honor.
7   THE COURT:  Mr. Gingold, you are going to address
8   attorneys' fees?
9   MR. GINGOLD:  Yes, Your Honor.
10  THE COURT:  All right.
11  MR. GINGOLD:  With respect to the attorneys' fees,
12  plaintiffs asserted in their petition for class counsel fees
13  50 to 99.9 million dollars, expressly in accordance with the
14  terms of settlement.
15  During the year that it took to negotiate with
16  Congress to pass the Claims Resolution Act of 2010, the
17  Senate required additional language be added to what had
18  been the originally proposed legislation in support of the
19  settlement, and that That legislation provided that 50 to
20  99.9 million dollars in accordance with controlling law.
21  Congress and the Senate unanimously passed this
22  and expressly stated that it is this court's determination
23  as to what is appropriate and what isn't in accordance with
24  controlling law.  The 50 to 99.9 million dollar number does
25  not establish a ceiling and does not establish a floor.

Page 195

1   THE COURT:  How do you get around the agreement as
2   part of the class-action settlement agreement -- your fee
3   agreement?  You call that a clear sailing provision, but it
4   seems to me that attorneys may submit a motion for class
5   actions counsel's attorneys' fees, expenses and cost
6   incurred through December 7, 2009.   Such motion shall not
7   assert class counsel be paid more than $99.9 million above
8   the previous amounts paid, and then you filed a motion that
9   included more than that.
10  MR. GINGOLD:  No, Your Honor. I think we
11  explicitly stated -- or plaintiffs explicitly stated that
12  they asserted a fee request of $99.9 million for class
13  counsel subject to controlling law.
14  As I tried to explain, subsequent to the agreement
15  the Senate required an amendment of the proposed
16  legislation, and that amendment was accepted by both the
17  defendants and the plaintiff, adding the additional
18  provision, subject to controlling law, or words to that
19  effect.
20  That was not in the original December 7, 2009
21  agreement.  It was added in the implementing legislation,
22  the Claims Resolution Act, because it was explained to us
23  that they wanted to be sure that whatever this court does is
24  in accordance with controlling law.
25  And Your Honor --

Page 196

1   THE COURT:  If that is not a binding contract --
2   assume for a second that that is not a binding contract that
3   binds the court and I can set a reasonable fee under the
4   law, is there some evidence of what counsel considers to be
5   a reasonable fee in any event?
6   MR. GINGOLD:  Your Honor, there is some evidence
7   of what counsel believed they would be -- this is important.
8   The terms of settlement were negotiated with regard to the
9   plaintiffs prior to any discussion of legal fees during the
10  settlement process, which is required in accordance with the
11  rules of the D.C. Bar, ethical rules, and I think with
12  regard to most judicial decisions.
13  The government indicated that it would not appeal
14  an amount that this court would award if it was $99.9
15  million or less.
16  By that acknowledgment, which is explicit in the
17  December 7, 2009 settlement agreement, the government itself
18  acknowledged that this court had the authority to award an
19  amount more than that and, Your Honor, less than $50 million
20  as well.
21  And Your Honor, unlike the black farmers'
22  settlement, and the Indian farmers' settlement, those were
23  capped fees, and there were floors.
24  In the Indian farmers' settlement, which is a
25  taxable settlement, and I believe the actual net

Page 197

1   distribution is something in the nature of $600 million or
2   less, what was approved by the court was $60.8 million.
3   In the black farmers' settlement the ceiling is, I
4   think, something like $92 million.  There was no litigation
5   surrounding the black farmers' settlement.  The black
6   farmers' settlement was solely a negotiated agreement
7   between the United States and representatives of the black
8   farmers.
9   There had been litigation 10 years before that had
10  been settled which was not perfect, but the settlement that
11  was negotiated with a ceiling of about $92 million, Your
12  Honor, was just solely as a result of the negotiations,
13  whether they were a few months or longer.
14  Your Honor, it was always our understanding when
15  neither we nor the government agreed to a ceiling or a floor
16  that this court had the authority the award what it decided
17  was appropriate and in accordance with the law of this
18  circuit.
19  The only concession made by the government in that
20  regard was that if the ward was in excess of $99.9 million
21  it retained the right to appeal.  If it was below $99.9
22  million or below, it waived its right to appeal.  That is a
23  difference, Your Honor.
24  THE COURT:  The way you all approach the fee
25  request in your pleadings, it is a common funds approach.

1  What is a common fund?  The government has some $300
2  million.  You claim all 3.4 billion, and what the trust
3  reform will cost, or has cost in the past, as fair
4  consideration.
5  Can we consider the land consolidation fund as
6  part of the common fund for the purpose of attorneys' fees?
7  I mean that is a fund that is going to revert back to the
8  government if it is not expended.
9  MR. GINGOLD:  Your Honor, our understanding of the
10  law as we provided in our briefs is that this court
11  ordinarily considers the direct monetary benefits received
12  in a settlement or judgment and the tangible benefits that
13  are in addition to that that the court can assess in
14  deciding what is appropriate.
15  Your Honor, what we pointed out in that regard is
16  direct monetary benefits are in the nature of about $1.5
17  billion.  There are indirect benefits, but there are
18  tangible benefits to the class of $5 billion in trust
19  reform.
20  When you are reviewing the case law in this
21  regard, it is appropriate in this circuit and elsewhere to
22  consider tangible benefits that are not direct monetary
23  benefits to the class members.
24  So we believe they don't necessarily -- or are
25  determined on the basis of 15 percent, or 20 percent, or 25

1  percent, which is often determined in class-action cases,
2  but some value is associated with those benefits.
3  Your Honor, the $1.9 billion -- it is possible
4  that no money out of the $1.9 billion will be paid to an
5  individual Indian, because individual Indians may refuse to
6  sell.  That is possible.  We don't believe it is likely, but
7  it is possible, Your Honor, and therefore all of that money
8  would revert.
9  In addition, Your Honor, of that $1.9 billion, 15
10  percent of that is available for the government to pay its
11  fees and expenses.  That's 15 percent of just the
12  distribution of $1.9 billion, which it apparently believed
13  was reasonable to pay for its contractors, and at the time
14  associated just with the purchase of fractionated interest
15  from individuals who would receive the benefit of the funds
16  once the purchase is consummated.
17  Your Honor, we have been in this litigation for 15
18  years -- well, more than 15 years now.  The litigation has
19  been some of the most difficult and intense litigation in
20  the history of this circuit.
21  We have done whatever needed to be done whether or
22  not we would be paid, and Your Honor, some of us have not
23  been paid since 1998, and we have done it.  And this is
24  important.
25  I would say, Your Honor, that if it was not for

1  Eloise Cobell, we would not have done this, and we did it
2  because she approached us and said -- and, Your Honor, Mr.
3  Harper and Mr. Pearl are Indians.  Mr. Harper as he said is
4  a Cherokee.  Mr. Pearl as a Chickasaw.
5  They are important members of the litigation
6  team.  Everybody on the litigation team is important, Your
7  Honor, but they are very important.  They bring a
8  perspective that those of us who are not Indian would never
9  have understood.
10  But she asked them to do it because she said,
11  nobody will do it.  We have an abuse that has gone on for
12  generations.  She saw her parents and grandparents suffer.
13  She saw children and others suffer.  And she said, if you
14  don't do it, who is going to do it?
15  And she made one request of us when we do this.
16  She said, I don't know if we are going to have any money to
17  pay you, but you have to promise me that if we start this
18  you are going to finish it, because we cannot afford to have
19  you walk out of our litigation.  We have to win because it
20  is so important, symbolically and otherwise, to individual
21  Indians.
22  Those of us who are on the team -- and these are
23  some of the most extraordinary people, Your Honor.  I have
24  been practicing law for 37 years.  I was a partner in major
25  law firms.  These are some of the most extraordinary people

1  I have worked with.
2  It does not make any difference if anyone was
3  being paid.  It would not stop someone from working all
4  night.  It would not stop whatever was necessary to be
5  done.  But, Your Honor, what Judge Lamberth said, and what
6  this court has said, Your Honor, has said himself, in other
7  class action cases, first of all it is the results that
8  counts.
9  Secondly, you look at the effort.
10  Thirdly you look at the difficulty.
11  Fourthly you look at the risk.
12  Fifthly, you look at the sacrifice.
13  And then you look, Your Honor, generally at how
14  the case was litigated and what the obstacles were.  Your
15  Honor, I think it is fair to say there is no case in the
16  history of this circuit that has been more intensely
17  litigated against a more formidable opponent.
18  We do not have to go through what was done, why
19  things were done over the 15 years, but I think it's fair to
20  say that the government vigorously litigated and defended
21  the positions of the United States.
22  Whether we agreed with them on how they did it,
23  they did it vigorously, and Your Honor, at one point in time
24  our litigation team faced the Civil Division of the
25  Department of Justice, the Environment and Natural Resources

1   Division of the Department of Justice, the U.S. Attorney's
2   Office in Washington, the Solicitors Office of the Interior,
3   Treasury General counsel, White House counsel, and 54 law
4   firms.
5   This is what we have done, and we did this
6   knowing fully well we may never get paid. We did this
7   knowing fully well that some of us were not being paid. But
8   we did it.
9   What we want is something that this court
10   determines is fair. We will accept this court's decision.
11   But Ms. Cobell -- everything that Ms. Cobell says is
12   meaningful. This is not lip service. This is not a
13   political speech.
14   It is important to her -- and it is so important
15   to her that whatever she is dealing with right now she is
16   paying attention to this case. She is convinced, and at
17   from those of us who have gone to Indian Country, and I have
18   traveled thousands of miles in Indian Country and met with
19   thousands of individual Indians, including one particular
20   session where more than 1,000 Navajo at one meeting attended
21   the session on this settlement.
22   Your Honor, contrary to what you may have heard
23   today, individual Indians understand how important these
24   issues are to them. They do not throw away what they
25   receive in the mail with regard to Cobell, and they pay

1   attention. They listen. They discuss with us what the
2   issues are.
3   These issues -- and Your Honor, we are talking
4   about millions of dollars. It may seem high in Washington,
5   but it's extraordinary in Indian Country. Whether you go
6   to the Dakotas where people need $20 to fill a propane tank
7   in order to have heat in the winter, or if you go to the
8   Navajo, where most of the people we met with did not speak
9   English and we needed a Navajo translator with us all the
10   time, they understand what millions of dollars mean in legal
11   fees.
12   But I will tell you what they told me, and I will
13   tell you what they told my colleagues. For years people
14   have come from Washington and told them that they were
15   going to do things, and told them don't worry about it, and
16   this is the first time anyone has ever done anything for
17   them.
18   Whatever the fee was, because they could not get
19   lawyers, Your Honor. It is not -- one of the things we
20   pointed out, let's say that it is an $1,800 payment to
21   someone in South Dakota because that person may have an
22   account, but the land doesn't generate income other than a
23   few dollars a year, whether it's 76 or 25. So they would be
24   getting $1,800, which is the expected minimum, not 15, and
25   it is tax-free.

1   Based on those percentages of the 99.9 million,
2   they would have paid us $27 a year. If it was more -- or
3   no, I think it was less than that. It was about $14 a year,
4   and then I think 123 which was the number on 14.75 percent,
5   not 15, it was like $27 year.
6   Your Honor, I can tell you that it covers a
7   couple of car washes a year in the Dakotas. It covers one
8   here in Washington. And Your Honor, there are not a lot of
9   lawyers who would do it for the price of a car wash, but
10   that's what we're talking about here.
11   And let me say one other thing. There is nothing
12   I think you can identify that can properly quantify the
13   importance of the settlement. This is the first time in
14   history where an individual Indian was able to stand up on
15   the same podium as a person of equal stature with the
16   President of the United States, the Attorney General and the
17   Secretary of Interior.
18   Eloise Cabell and other class representatives were
19   not CEOs of major companies. They were not chairman of
20   major tribes. This was important. Individual Indians did
21   this for themselves, and the lawyers who represented the
22   individual Indians did it for them. Not for tribes, not for
23   personal -- any personal benefit, because Your Honor, I will
24   assure you there were no personal benefits that have come
25   out of this representation.

1   So Your Honor, we will abide by whatever this
2   court believes is fair, and we understand why the government
3   is arguing for the minimum, because this government made the
4   same argument, by the way, in Indian farmers, and Judge
5   Sullivan awarded the maximum in Indian farmers. I
6   guarantee you this case has been more intensely litigated
7   than Indian farmers.
8   And Your Honor, I cannot imagine a more difficult
9   assignment than what we have had. People have been away
10   from families. We not only have seen members of our class
11   die and become ill, we have seen our own families going
12   through the same process.
13   But at no time did anybody on the litigation team
14   waiver and say, I cannot do it anymore. The people who are
15   class counsel, I have done something I don't believe this court
16   will ever see done again. I hope it will be, and I hope
17   people are encouraged to do it again. But it's going to be
18   very difficult.
19   I think if the fees are unreasonable and do not
20   represent what has been achieved and the effort has been
21   made, everything that Eloise was trying to do will be lost,
22   because this is the first step in ensuring the relationship
23   between the United States and individuals goes forward on a
24   footing where people are equal, where people are not
25   patronize, where people are viewed as human beings who have

Page 206

1 the same rights as everyone else.
2 And Your Honor, as Mr. Harper says, that is
3 important. He believes that people are entitled to it. Our
4 clients are entitled to it, and Your Honor, that is why we
5 have been in this case.
6 If this court believes that based on whatever has
7 been done in accordance with controlling law, we haven't met
8 it, we can accept that. If this court believes that
9 whatever it awards the fee to be is fair, Your Honor, I
10 guarantee we will accept that.
11 Your Honor, I trust that was responsive.
12 THE COURT: Fully.
13 MR. GINGOLD: Thank you.
14 THE COURT: Mr. Kirschman, do you want to say
15 something? I am going to take a short recess.
16 MR. KIRSCHMAN: Yes, Your Honor.
17 A few points on the attorneys' fees issue. Class
18 counsel seems -- first, I believe Mr. Gingold indicated that
19 in their initial petition for fees that they did not request
20 $224 million. They in fact only requested 99.9. All you
21 have to do is look at the proposed order that accompanied
22 their filing, Your Honor, and you will see that it clearly
23 requested $224 million, as did the last page of their
24 petition. So there should be no question what was going on
25 here.

Page 207

1 Second, class counsel treat the 2010 Act as some
2 kind of intervening event that changed the status of the
3 attorney fee issue subsequent to our good faith
4 negotiations.
5 Your Honor, that just is not true, and I want to
6 point your attention, if I may, to section 101(g)(3) of the
7 2010 Act. Section (g) addresses the incentive awards and
8 the award of attorneys' fees, expenses and costs under the
9 settlement agreement, but (g)(3), subsection (g)(3) state
10 specifically under a heading, affect on agreement, it states
11 specifically:
12 "Nothing in this subsection limits
13 or otherwise affects the
14 enforceability of the agreement
15 on attorneys' fees, expenses and
16 costs."
17 The 2010 Act did not change or modify anything
18 related to the attorney fee agreement the parties have
19 reached, and that subsection makes it clear.
20 Counsel also mention the $5 billion in trust
21 reform action. That action was paid for and taken by the
22 United States. There should be no benefit to class counsel
23 for actions taken as part of the Department of Interior's
24 trust responsibilities and policy actions.
25 Under Swedish Hospital, which is precedent in this

Page 208

1 case, Your Honor, the fee should be limited to that amount
2 that counsel contributed to, that counsel worked towards
3 achieving for the plaintiff.
4 And here, Your Honor, that amount is approximately
5 $360 million. As you heard today and as we discussed in our
6 briefs, there are approximately 360,000 class -- historical
7 accounting class members, each who will receive $1,000. The
8 trust administration claim, as you know, was never
9 litigated, and therefore that should not be a part of the
10 award.
11 Finally, again, Mr. Gingold speaks passionately
12 about the benefits of the settlement for the class, and we
13 certainly join in the request that the settlement be
14 approved as fair, reasonable and adequate.
15 But -- but, there is $50 million or more riding on
16 the issue of attorneys' fees, and that $50 billion would
17 directly affect the amount that these class members receive.
18 So we think that is an important issue tied to this whole
19 discussion today.
20 Again, we only ask that you make note of those
21 objections as you received them.
22 THE COURT: Thank you very much.
23 Robert O'Brian, Esquire, had filed a motion to
24 intervene on behalf of Mark Brown, one of the attorneys who
25 is claiming monies. The plaintiff had opposed the other

Page 209

1 applicant, who had also applied for attorneys' fees to
2 intervene. I allowed that person. I will allow Mr. Brown
3 to intervene with Mr. O'Brian to represent him in this
4 matter.
5 I'm going to do as follows. I am going to take a
6 short recess for about 10 minutes, and then because of the
7 individual plaintiffs, class representatives, the individual
8 objectors who have come from all over the country, who I'm
9 sure it's very difficult to travel for them and an expense,
10 I'm going to make an oral ruling on the matters pending
11 before me that will then be followed by a written ruling on
12 the record.
13 But it is important I think today to have some of
14 these matters resolved for the parties, particularly for all
15 of those who have traveled so far to be here and to hear the
16 ruling of the court and understand what I'm saying and why
17 at this time.
18 So I will take about a ten minute recess and be
19 back to finish the case.
20 (Recess.)
21 THE COURT: The parties today have appeared before
22 me, together with the objectors and interested parties. The
23 record should note that there has been standing room only in
24 the courtroom throughout these proceedings.
25 On this fairness hearing as to whether or not to

1   approve the plaintiffs' and defendants' joint motion for
2   final approval of the settlement and enter of final
3   judgment.
4   I am going to make some remarks, a bench opinion -
5   - that means an oral opinion.  I will do it at this time.
6   As I mentioned earlier, it will be followed by a written
7   opinion for the record.
8   We've heard somewhat about the background of this
9   case and the history which really resulted and lie, I think,
10  in 19th century American politics, and the western movement
11  that resulted in the seizing of the Indian lands, and as the
12  wealth in those lands became apparent, the continued
13  expansion of the government into the Indian lands.
14  The policies are well known which resulted where
15  we are today.  They are very complex, and it would not help
16  to review all of those at this time, but there is no
17  question as to the legitimate concerns that were raised by
18  the American Indians in this litigation.
19  It really stems from the General Allocation Act of
20  1887, or the Dawes Act.  These allotments which were given
21  to Indians to be held in trust by the government.
22  Modification over years as we have heard from some of the
23  people who appeared before me today resulted in less lands,
24  and eventually the government holds millions of acres of
25  Indian lands in trust.

1   The government had promised it would fulfill its
2   obligations as trustee when it took these lands, and what
3   happened was the government mismanaged these resources on a
4   staggering scale.
5   That was established through this litigation
6   perhaps more openly than in the past.  It is not new, these
7   claims of trust mismanagement.  They have been around for
8   100 years.
9   Our Congress has done a study.  There have been
10  hearings starting in the early 1900s until rather recently
11  decrying the state of the Indian Trust affairs, but
12  nothing substantively really happened until this litigation
13  began.
14  Finally, just over 15 years ago on June 10 of
15  1996, the class of Native American beneficiaries of the
16  individual Indian money trust accounts filed this class
17  action here in the federal court in Washington D. C. to
18  address the claims of alleged breaches of fiduciary duties
19  relating to those accounts by the government, really asking
20  for an equitable accounting.  Attached to that was basically
21  claims of trust mismanagement.
22  Judge Lamberth certified the class back in 1997,
23  and in 1999 the court found that they were in breach -- that
24  the government was in breach of its statutory trust duties,
25  and ordered the defendants to provide plaintiffs an accurate

1   accounting of all monies held in the IIM Trust.
2   The Court of Appeals affirmed as to the liability
3   issue.  That was in 1999.  Here we are in 2011.  What
4   followed was major litigation warfare.  There were some 10
5   appeals, seven trials, 250 days of court hearings to reach
6   this stage.  And as was pointed out by one of the counsel
7   today, the Court of Appeals stated in their last opinion,
8   which we call Cobell 22 from the Circuit Court, quote:
9   "Our precedence do not clearly
10  point to any exit from this
11  complicated legal morass."
12  So it looked upon the last remand from Judge
13  Robertson who had the case and found restitution due for the
14  failure to do an accounting of about $455 million.  That was
15  reversed, and we were back here a couple of years ago to
16  start over in the litigation in some ways.
17  The comment about the judge that handled this
18  case, Judge Lamberth took this on and handled it
19  extraordinarily, dedicated to his work, handled the bulk of
20  this litigation for many many years.  And I indicated it was
21  a legal warfare.  That is a fair description of it.
22  It engaged attorneys legally fighting with each
23  other constantly.  It engaged multiple law firms and lawyers
24  at the Justice Department and outside of the Justice
25  Department.  It engaged various subsidiary proceedings

1   involving violation of court orders and discovery issues
2   that subsumed the main litigation for a time.
3   Judge Lamberth's patience over many years of hard
4   work night and day on this case eventually resulted in some
5   very strong opinions decrying the government's actions, and
6   the Circuit Court suggested that he should step aside, that
7   he had lost his objectivity.
8   And so despite his heroic efforts, the case was
9   reassigned.  I was Chief Judge at the time when this was
10  made, and I was assigned the task of finding a judge who
11  had the time and talent to handle this on our court, and
12  Judge Robertson appeared on the scene, and he took the case
13  over.
14  He handled it until his retirement.  He was
15  distressed that he had to retire before he could finish the
16  case.  He also was very interested in seeing this through
17  and seeing that justice be done eventually.
18  Any good deed that you do comes back to haunt you.
19  After I finished being Chief Judge and took senior status I
20  got the case.  So I assumed control of the case.
21  The parties were trying to find out where to go
22  next.  Because of the status of the last reversal from the
23  circuit and the prospects, I think, of years of litigation
24  facing them on both sides, with rather dubious chances of
25  ultimate success, frankly, if you read the law carefully as

Page 214

1  developed by our Circuit.  Rightfully or wrongfully, that is
2  the final word basically.
3  So they entered into negotiations, and the
4  administrations changed, and the parties found a way out of
5  the morass that the Court of Appeals said they saw no easy
6  exit from, and after 15 years of bitter litigation, and that
7  is the only way to say it, the parties entered into a
8  settlement agreement to resolve the issues in this case, and
9  just the issues in this case, not to resolve every single
10  claim that the Native Americans may have against the
11  government.
12  And as a result of that settlement there were some
13  amended orders defining the historical accounting class and
14  creating the trust administration class to facilitate the
15  appropriate remedies for the IIM account holders so they
16  could be resolved as well.
17  Remarkably, I think, Congress, which seems not to
18  be able to get along and do anything these days, remarkably
19  Congress approved and passed a law approving this settlement
20  and approving the trust administration class creation in a
21  way.
22  Under what we call the Claims Resolution Act of
23  2010, it requires the entire Senate's agreement.  They
24  ratified this settlement, and appropriating the funds, which
25  is the most important part of that, to resolve these claims.

Page 215

1  Now a few months later it is hard to realize that that has
2  been accomplished, and that was through the efforts of both
3  sides.
4  I don't think today's world, with the deficit we
5  are facing, and the issues they are debating in Congress,
6  that this would ever pass.  It was very fortuitous, and hard
7  work by the parties, to get this through when they did.
8  I think that the Executive Branch acted extremely
9  well in doing this.  Both the Attorney General and the
10  Associate Attorney General, the Department of Interior,
11  Secretary Salazar, David Hayes, the Deputy Secretary was
12  ultimately involved.
13  All contributed to get this settlement through,
14  and it could not have been accomplished without the
15  approval of the President, who could have denied it at any
16  time he wished, particularly on the grounds of the deficit
17  today.  But he executed the agreement and signed the
18  legislation into order.  Just a remarkable accomplishment by
19  all sides.
20  The Justice Department, who had hard fought this
21  for 15 years, and the legal issues involved -- legitimately
22  fought it legally, and it was not improper that they did so.
23  They represent their client, the United States, and felt
24  that they had defenses to these claims, was willing to
25  resolve the claims, put aside very bitter, unfortunate

Page 216

1  litigation, personal litigation on some levels between the
2  parties, and resolve this matter, and the plaintiffs managed
3  to do the same after having been, they felt, badly treated
4  for 15 years by the government, not only their clients but
5  the lawyers themselves as well.
6  It is, I think, a testament to the better
7  functioning, and I'm glad to see the legal system that these
8  parties could do that -- these counsel could do that.
9  Now what has come about as a result of this
10  settlement is the historical agreement to resolve some of
11  the past mistakes and wrongs that have occurred.  Obviously
12  not all.  It is not meant to solve all problems.
13  We heard today telling, sometimes tragic stories,
14  and deep concerns evidenced by some who are affected by the
15  settlement, have been affected by the mismanagement over the
16  years.
17  One of the concerns the court obviously had was
18  this -- in a way that this litigation could have terminated
19  successfully.  Well, many of the documents simply do not
20  exist in the government records any longer.  They were
21  either destroyed as old and unneeded when they should have
22  been kept perhaps, or allowed to be destroyed because of bad
23  storage practice, or lost over hundreds of years, or simply
24  not created when they should have been.
25  On the plaintiffs' side, many of their

Page 217

1  documentations are lacking as well.  It makes it very
2  difficult for them, and they have expressed some of their
3  concerns here.  So it made it difficult as to determine, I
4  think, for any court that there could ever be an accurate
5  accounting done.
6  Despite Judge Lamberth's many orders, the circuit
7  really, I think, determined that there could never be an
8  accurate historical accounting done.  There might have been
9  some type of generic accounting, but where we would that get
10  you?
11  This settlement at least now provides some measure
12  of certainty for most class members.  The vast majority of
13  class members are entitled to automatic recovery under the
14  historical accounting, and then those under the trust
15  accounting would provide other monies that they can show
16  they are due.
17  It may not be that the results are as fortuitous
18  as some wished and don't provide redress for their wrongs,
19  and I'm sympathetic to the reasons the various class members
20  would have wanted class counsel to have struck a better
21  balance or struck it differently in negotiations, or made
22  sure whether items could be covered, but I'm certainly not
23  persuaded that striking a different balance would have been
24  either achievable in the negotiating process or more
25  favorable to more members of the class.

1    I'm certainly not convinced that a better result
2    would have been achieved by taking this case to trial. Some
3    people said, let's take it all the way. Let's go all the
4    way this case. That is easy to say, but to deal with the
5    substantial issues legal issues after 10 appeals, and nine
6    basically outright reversals of those appeals with lower
7    court victories.
8    It is hard to see how there would be a better
9    result if there had been eventually an accounting ordered
10   that could ever be done and was ever accomplished in the
11   years that that may have taken to do some type of an
12   accounting, then each individual plaintiff would have to
13   sue in the Court of Claims to try to claim the amount that
14   they were due under the accounting if they disagreed with
15   it.
16   We have lost too many members of the class already
17   in waiting the 15 years that this has been going on. Ms.
18   Cobell probably started this 20 years ago trying to get this
19   going, and to prolong this through litigation simply to say
20   we could have won something at the end, whatever it may be,
21   seems to me shortsighted.
22   Obviously, each member of the class wants a
23   settlement to provide the greatest possible compensation to
24   each individual in the class and to them personally. I
25   cannot conclude in the final balance that what has been

1    agreed to by counsel on behalf of the class, after notice to
2    the class, and explanations given, and reviewing the
3    objections is anything but fair.
4    Not having perhaps some draconian enough
5    punishment for this mismanagement and this neglect to fit
6    what they feel the crime is, and based upon them I can
7    understand their are outrage and sense umbrage they have
8    felt over the years.
9    It does not take a person who is familiar with the
10   history of the American Indian to understand their concerns.
11   You can read Chief Joseph's statement and get a pretty good
12   feeling for their concern.
13   But that is not possible to resolve in this case.
14   This case is trying to resolve the accounting issue, and by
15   doing that you will receive a payment of thousand dollars in
16   lieu of having an individual accounting, and secondly to
17   resolve the trust claims.
18   If you wish to stay a member of the class you can
19   do so and resolve it that way, or you can withdraw from that
20   and try to do the accounting and then try to collect what
21   you think you are due for the mismanagement, and perhaps do
22   better.
23   But the process has gone on long enough. The
24   court has the litigation resolved with the Claims Resolution
25   Act and the settlement agreement, and I have to consider

1    whether or not I should approve the final certification of
2    the classes and enter judgment in accordance with the
3    agreement, approve it as fair, reasonable, adequate and
4    binding on the class members who have not timely opted out,
5    and approve what I would award as reasonable, fees, expenses
6    and costs, as well as incentive awards, and to pay the valid
7    claims once we finalize the judgment.
8    What is the settlement about? What are the
9    amounts? We discussed at length here today. This historic
10   -- I think it is truly the historic largest settlement in
11   the history of the United States in any case that has ever
12   been brought against the United States.
13   One counsel indicated that if you add up all of
14   the Indian claims cases in history and the amounts that have
15   been paid, this eclipses them.
16   So it will operate by having a historic accounting
17   class where each member is paid thousand dollars, and
18   release the government's obligation to perform the
19   historical accounting for that -- to their IIM account.
20   If the member opts out of the trust administration
21   class, they are entitled to an accounting, and entitled to
22   the appropriate methods of proof to do that.
23   The other class created was a trust administration
24   class. Once you identify the members and their pro rata
25   share, by their calculations they each receive a base amount

1    that has been estimated at an $800 base amount according to
2    a formula that is outlined in the agreement, and then some
3    Indians who are qualified under that account generate large
4    amounts of revenue and could have funds generated in excess
5    of $1 million. Again, they will be released as to that.
6    And then there is created very cleverly an Indian
7    education scholarship fund. I think that was added late in
8    initiate negotiations. It went through Congress. That's an
9    important factor for the resolution of these claims.
10   Again, as indicated in my questioning of counsel,
11   that will result in a fund that will be created for the
12   education -- for higher education of the Indian populations,
13   and that will be done under independent trustees apart from
14   the Department of Interior, to issue appropriate rules and
15   regulations to awarding of scholarships to the qualified
16   Indian children, which will not affect any other rights they
17   have to other educational funds.
18   Additionally, the settlement and the law that
19   passed, the Claims Resolution Act, formed a $1.9 billion
20   land consolidation program that we discussed at length. It
21   goes on for 10 years.
22   Moneys not spent in that program to purchase
23   fractionalized shares -- trust land from willing sellers --
24   the land would go back to tribal supervision. It does not
25   go back to be controlled by the government directly, and

1     that will go for 10 years, and then the funds will be
2     reverted back to the Treasury.  That, again, is a program
3     that would help in this trust reform effort.  The government
4     has indicated they have already spent $5 billion on
5     attempting to straighten out the situation, separate from
6     this case.
7     Now the Indian educational scholarship fund, as I
8     understand it, is funded by three sources.  The balance of
9     the accounting trust administration fund, once that is
10    completed; certain payments made to class members whose
11    whereabouts are unknown and do not claim payments after five
12    years; and contributions of the land consolidation fund for
13    the purchases made there under as indicated by counsel.
14    That is a sweetener to help sell the land back to
15    consolidate the fractionated shares so it can be a better
16    program run in the future.
17    Now consideration of the factors that the court
18    has been asked to consider have been listed by counsel
19    several times under the Phillips Petroleum case, whether or
20    not I would approve the accuracy and fairness of this
21    settlement.
22    I hope you're not holding your breath.  I will
23    find my cite here in a minute.
24    Looking under the Rule 23 that you have heard
25    discussions about here today, this seems fair, and adequate,

1     and appropriate as to the approval of this settlement, and
2     that is essentially what the basis of the request that is
3     before me today by both counsel with the joint motion that
4     they have filed as I indicated previously.
5     The court is going to order approval of the
6     settlement.  I am going to find that it is fair, reasonable,
7     adequate, and it is appropriately binding on the class
8     members who have not timely opted out of the trust
9     administration class, and I do so for not only the reasons I
10    have articulated, but there is just no question in looking
11    at whether the objectives of the law and the Constitution
12    have been satisfied in these areas.
13    Sufficient notice and an opportunity to appear,
14    and object, and be heard, and to opt out if you wish.
15    Adequate representation has been made, and those factors
16    apply to both classes, the historical accounting class as
17    well as the trust administration class.
18    So I'm going to address the generic provisions
19    first.  I just mentioned under the case law, I don't know
20    whether it is considered essential, before I get to the Rule
21    23 issues as to notice.
22    There has been one claim that the Indian culture
23    that they would not respond and getting a piece of mail from
24    the federal government, but there've been multiple
25    alternative notices sent out.

1     I have never seen, and I handled the largest
2     price-fixing case in the history of the United States, the
3     In re: Vitamins case, notice to the extent sent out in this
4     case, and some have reflected monies and costs, which are
5     millions of dollars, which I was kind of taken aback when
6     counsel approached me to spend that much money.
7     But I became convinced to try to alert the Indian
8     Nation to this settlement that they should know what the
9     terms are and what it is about, and I allowed them to
10    provide notice in every possible way, including personally
11    going out and visiting all of the affected tribal areas.
12    It is just not a letter from Washington.  It is a
13    tremendous effort that was undergone, both by the plaintiffs
14    principally and some by the government, to not only give
15    notice but to explain what happened.
16    And not only are we using modern technology to do
17    that, but such things as posting notice at the local 7-11,
18    putting the town meetings together, and personally going out
19    there to be seen and talked to.  Word-of-mouth.  There is
20    just no question that this was covered in all of the local
21    papers constantly.  It was covered in all of the local
22    advertising outlets.  It was hard to miss.
23    As a side note, I go to Montana two or three times
24    a year, and you could not miss the advertisements if you are
25    out there about this.  So I'm satisfied that there was

1     adequate notice, sufficient notice given, despite some
2     cultural concerns about how the notice would be perceived, I
3     don't know of any other way it could have been done better
4     in this case.
5     There have been opportunities to object and
6     appear.  That was clearly, I hope, communicated -- it seems
7     to me it was from the notices I reviewed, and we did have
8     people who traveled long distances, and I'm sure under some
9     great difficulties.
10    There are some people here today who came before
11    the court and spoke in the finest tradition of our court,
12    to be able to have the court hear them personally and
13    directly.  It is much more meaningful than just reading it
14    on the cold paper, to see these people, look them in the
15    eye, and hear their concerns, and try to understand their
16    concerns, and to make a judgment that is appropriate in this
17    case.
18    I was greatly helpful to the court.  I took all of
19    the comments and kept them in mind as I reviewed this and
20    consider the approval or not.
21    There is an opt-out provision for the class, the
22    trust administration class, under the rule, and that was
23    allowed to be done.  People did exercise themselves of that
24    right and can continue their litigation in that regard if
25    they wish to do so.

1   As to the historical accounting class, and I will
2   discuss that in a minute, that was certified under 23 that
3   allowed us to continue the provision with the opting out
4   and not directly allowed unless there is some historical
5   reason brought to my attention as to why it had to be done.
6   The adequate representation -- after 250 days in
7   court, and literally thousands of court docket entries,
8   after seven trials and 10 appeals, I don't know how anyone
9   can say that there was not adequate representation.
10  This was litigated fully without large
11  compensation.  There was one interim smaller fee award for
12  various issues that had arisen in case and they had to
13  defend, but without any true compensation given to counsel
14  over these years, and they still stayed with it, even though
15  at times it looked bleak as to whether there would ever by
16  any recovery and they would ever have any monies.
17  Their representation was consistent and with no
18  hesitations, doing whatever they felt they had to do to try
19  to push this litigation forward against heavy odds.  No
20  question about that.
21  Now as to the particular classes and approving
22  those or not as being appropriate.  In the historical
23  accounting class it clearly has been -- it was certified by
24  the court back in 1907 by Judge Lamberth, and it satisfies
25  the requirements under what we call the Federal Rules of

1   Civil Procedure, 23.  That is the class-action rule.
2   You heard me ask the lawyers right after lunch
3   about the Wal-Mart case.  That was the largest class-action
4   case ever brought by individuals, and it went to the Supreme
5   Court, one and a half million women suing for back pay,
6   among other issues, suing Wal-Mart, former employees, and
7   the Supreme Court unanimously reversed the certification of
8   the class in that case as not being appropriate under Rule
9   23.
10  So the court has to be satisfied that the rule is
11  met to approve this settlement and historical accounting
12  class as properly put before the court.
13  First there has to be numerosity they call it.
14  The numbers have to be worthwhile.  Here there were over
15  300,000 members of the historical accounting class.  The
16  estimate given to me is at least that or more today.
17  Commonality, the common issue.  Actually the only
18  issue before that class was whether there could be an
19  historical accounting done, and now in lieu of that there
20  would be a restitution type payment.  Not a damage claim,
21  but restitution to make up for not getting the accountant.
22  Typicality.  That is the same actions in this type
23  of claim.  It is identical legal arguments in all cases.
24  It's an identical situation of a pattern of fraud, or abuse,
25  or mismanagement in the trust account.

1   And then again the actual representation referred
2   about.
3   First of all, there is no antagonism between the
4   plaintiffs and the class members, that is the named
5   plaintiffs.  They all wanted an accounting.  That is what
6   they suited for.  One member doesn't succeed and all of the
7   others lose, or some of the others lose because one
8   succeeds.  There is no clash between the representation of
9   the named plaintiffs and the whole class.
10  It was obviously vigorously litigated by them, the
11  named plaintiffs and their counsel, and qualified counsel,
12  obviously, were handling this very complex, difficult
13  litigation.
14  It seems to the court that the named plaintiffs
15  displayed a real commitment to stick with the case for 15
16  years in light of many defeats.  They had a knowledge of
17  the case.  They worked on the case, and they had great
18  interest in the litigation.  They are not simply names put
19  up there.  They were intimately involved in the case and
20  worked hard.
21  If you look at the filings on their behalf and
22  their fees and request for awards, you can realize the work
23  that they were engaged in.
24  There's really no individual damages here that
25  would cause any difficulties in this award under the rules

1   or inconsistent judgments.
2   Here it is clear that the original relief, the
3   predominant relief, was an equitable claim, but the case was
4   then settled, and something that is akin to restitution, and
5   as I discussed with counsel, it seems to be appropriate, and
6   if you can't -- you have to be able to settle a (b)(2) case,
7   and the only way to settle is through money if you don't get
8   the injunction.
9   So here that is appropriate and does not
10  disqualify the case from being properly certified under
11  23(b)(1)(A) and (b)(2), and I'm going to find that the
12  historical accounting class was probably certified as
13  properly engaged as a class and can be salient for the terms
14  suggested in the settlement agreement.
15  The trust administration class is a little more
16  complicated.  The court in this past December requested the
17  parties certify under 23(b)(3) that their questions of law
18  are, in fact, common to the class members, and they
19  predominate over other questions affecting individual
20  members, and the class action is superior to any other
21  available method to fairly and efficiently adjudicating the
22  controversy.
23  That is taken in conjunction with the Claims
24  Resolution Act which held that notwithstanding the
25  requirements to the Federal Rules of Civil Procedure, the

1  court in this litigation may certify the trust
2  administration class, and if that is certified under
3  subsection (a), which I just referred to and did, the trust
4  administration class will be treated as a class certified
5  under 23(b)(3) for the purpose of settlement.
6  So technically I'm freed from the strictures of 23
7  -- Rule 23, and therefore it has to have -- the
8  constitutional standards still have to be made under
9  Phillips Petroleum that had been referred to by counsel.
10  Under Phillips Petroleum, again, I have already
11  reviewed the features.  The best practical notice.  I have
12  already found that there is extensive and extraordinary
13  notice here.  We even had a notice expert retained in how to
14  do it properly.
15  There was an opportunity to opt out under this
16  class -- I am sorry, there is no opt out under this class
17  certified under 23(b)(1), and there is nothing to indicate
18  to the court that any member could make an argument that
19  they should have a discretionary opt out of the historical
20  class.
21  I have issued a ruling just recently in that
22  regard.  As part of the ruling it is necessary to discuss
23  the right to opt out, and that is in the order of June 17,
24  Cobell versus Salazar.
25  That order was as to the Quapaw Tribe of Oklahoma

1  attempting to file materials here, and I indicated that the
2  tribe contends that the awards should be individualized, and
3  they cannot do that, and that the members wish to opt out to
4  seek and complete an accurate damage arising in the
5  government's breach of trust claims related to the IIM
6  account, along with other corresponding monetary relief,
7  because they think that the relief, under the historical
8  accounting class, improperly estimates the amounts, and that
9  it attempts to allocate damages on individual injuries.
10  I indicated that that was not the proper
11  description of the historical accounting class, that they
12  are not damages, but they are considerations for being
13  released from further accounting obligations at this time;
14  that to avoid hundreds of thousands of individual actions --
15  that is what would happen if there was an historical
16  accounting class.
17  Each potentially establishing standards providing
18  an historical accounting, each would could come out
19  differently for the government, where the government acted -
20  - it could be a concern that the assets that are invested in
21  common, and that the claim is that they were improperly
22  handled.
23  It really flows -- the equitable relief of $1,000
24  from the -- the relief of $1,000 from the equitable relief
25  originally requested.  I said it was like restitution, and I

1  thought that was appropriate -- that the tribe had conflated
2  the historical accounting class with the trust
3  administration class, and their objections were not well
4  taken.
5  There is just no compelling reason shown to the
6  court why granting the motion is necessary to have fair and
7  efficient results in this case.  So I denied their request.
8  It simply cannot provide the tribe asking the court to
9  exercise discretion to allow members opt out of the
10  historical accounting class as certified.
11  There is no right, but I could allow in my
12  discretion, I assume, to amend that and try to say, okay,
13  you can opt out if there is some justified rationale that
14  you could show, or if there is some unique and distinct
15  claim, but whether or not permitting the opt out is
16  necessary to have a fair and efficient conduct of the
17  action, it would be impossible to do this action if we had
18  that.  So I did not consider that as appropriate --
19  opportunity.
20  The opt outs were provided for in the trust
21  administration class, and the notice detailed that right.
22  The representation by the named plaintiffs, I have
23  already discussed.
24  Even if you look at the trust administration
25  class, which did have the opt outs, so it qualifies in

1  contrast to the historical accounting class under the
2  Phillips formula, even if I assume for a minute that 23(a)
3  applied to the trust administration class, arguably it seems
4  to me that it could fit there.
5  You have got numerosity.  Some 400,000 plus
6  members.
7  Commonality.  The same question.  The same overall
8  trust mismanagement.
9  Typicality.  The same reasons that I discussed
10  before, the same basic course of events, the same legal
11  theories.
12  There are questions of law that are common to the
13  class members over other questions affecting on the
14  individual members. and certainly this is a class action
15  superior to other available methods to adjudicate the
16  controversy, and to have 400,000 individual claims brought
17  and litigated through the court would not take 15 years, it
18  would take a millennium.
19  So the trust administration class I find is
20  properly certified under the Claims Resolution Act and under
21  Rule 23(B)(3).
22  Now about the settlement.  I went through the
23  factors you considered whether or not -- the bottom line
24  though is, is it fair?  Is it really fair to the parties
25  involved, to all of the Indians, almost half a million

Page 234

```
 1    Indians?
 2    Is it reasonable and adequate?  I have to evaluate
 3    that in relation to the strength of the plaintiffs' case.  I
 4    have to evaluate that in light of some of the individual
 5    class members' complaints.  They would receive more.  I have
 6    to evaluate that -- whether it is an arms length
 7    negotiation, or it's a sweet deal between the parties.
 8    The relationship, as I said, to the plaintiffs'
 9    case, status of the litigation when it is settled, and the
10    reaction of the class, which we heard today from some
11    members and not others, and the opinion of experienced
12    counsel.
13    Arms length negotiation.  I reviewed -- on purpose
14    I gave you the beginning history of this case of 15 years of
15    hostile litigation.  Hostile, not friendly litigation.  A
16    legion of contested motions and issues fought again and
17    again in this court.
18    Numerous trials.  Numerous appeals, most of which
19    the plaintiffs lost, not won, in the Court of Appeals.
20    Congressional examination and hearings on a
21    settlement, which is very unusual, and a review by Congress,
22    and approval by Congress.  The Senate and the United States
23    unanimously approved the settlement after making suggested
24    changes.
25    Approval by the Executive Branch, obviously who
```

Page 235

```
 1    are represented here by the Department of Justice, and at
 2    the highest level by the President signing the legislation.
 3    He could have vetoed it if he did not think it was
 4    appropriate.
 5    Settlement in relation to the strength of the
 6    plaintiffs' case.  It affords substantial benefits.  We have
 7    a total settlement of $3.4 billion -- more than ever before
 8    awarded in an Indian case.  If you put every Indian case in
 9    the past together it is more than that.
10    For its substantial benefits -- two sets of
11    monetary awards, land consolidation to make the trust run
12    better, hopefully.  A scholarship fund to be created for the
13    Indians.
14    I guarantee you that most lawyers who looked at
15    this case five years ago, eight years ago, 10 years ago, 15
16    years ago -- would consider such relief highly improbable
17    and highly doubtful.
18    There has been talk about a $7 billion offer.
19    That was an offer to forgive the government not only on
20    everything in the past that has ever happened, but
21    everything that will happen to the Indians in the future by
22    the federal government.
23    That is not a true offer.  No one settles a case
24    for their client saying, you can do anything you want to my
25    client in the next 50 years and I won't sue you.  So there
```

Page 236

```
 1    was no such offer outstanding.
 2    The success in obtaining Congressional approval.
 3    As I indicated, I'm amazed that it got approved, and that is
 4    to the benefit of the parties that that was done through
 5    terribly hard work by plaintiffs' counsel, and the strong
 6    support of the administration, and an excellent
 7    Congressional work as well, both by Senators and Congressmen
 8    involved in this.
 9    Potential interminable litigation.  As I said,
10    this case would have been another 15 years easily if this
11    settlement fails.  Accurate historic accountings are almost
12    impossible, if not frankly impossible, and I don't know
13    where the case would have gone.
14    There is a famous case in literature by Dickens
15    called the future called Jarndyce versus Jarndyce in the
16    Bleak House.  If you read that where he took on the legal
17    establishment a couple hundred years ago.  We still see the
18    same today unfortunately, where the lawyers fought over an
19    estate for a family for 20 years, and when they finally
20    finished it, not only was there no money left for the
21    heirs, because the lawyers got it all, but all the heirs had
22    died.
23    So we don't want that here.  Here we have lost
24    enough people who are entitled to monies.  This will make an
25    end to the litigation so they can get the monies.
```

Page 237

```
 1    The enormous challenges for those individuals who
 2    wanted to go forward and continue the litigation.  I've
 3    already gone through that.  To try to prove individualized
 4    damages, bringing the complex claim against the government
 5    and try to recover -- I hope some of you who opted out can
 6    do that, but it is going to be difficult.
 7    The status of the litigation.  The litigation had
 8    gone on, obviously, for 15 years.  The strengths and
 9    weaknesses were not.  Discovery had been done.  The case had
10    been tried multiple times, multiple appeals.  It is not the
11    type of litigation you see in class actions where there is
12    no litigation.
13    They come in with the consent decree, and the
14    lawyers are going to get $10 million, and everybody gets a
15    coupon for $5 to buy cereal, or whatever it is about.  This
16    is not like that.  This is a true arm's-length hard-fought
17    battle, hard-fought victory.
18    Even if a significant portion of the class
19    objected, and even if some of the named plaintiffs didn't
20    want to settle I could still approve it if it's appropriate
21    under the law, but we did not have that.  We have 92
22    objectors out of hundreds and hundreds of thousands of
23    members.
24    Even assuming some culturally did not read the
25    papers, we still have hundreds of thousands, I am fairly
```

Page 238

1    convinced, who knew about this settlement and understood
2    what they were getting into and approved it.  Certainly a
3    vast majority, well over 99 percent approved this
4    settlement, not opted out or objected.
5    Both sides have highly skilled and experienced
6    attorneys who have agreed to the settlement as proper, and I
7    guarantee you when they entered into this originally years
8    ago, they got into a fight with each other over they years,
9    and they were not agreeing to anything, including the time
10   of day.  But they agreed that this settlement was fair and
11   proper, and they both are experienced, both sides, as to
12   these cases and what they have worked out.
13   So that is the rationale for approving the
14   settlement as fair, adequate and appropriate.
15   I have been asked to give incentive awards.  That
16   is part of the equitable powers of the court.  They are
17   routinely provided to compensate named plaintiffs for
18   services they provide and the risks they incurred during the
19   course of class-action litigation.
20   That is a quote from a prior class-action case
21   that I had.  I am quoting myself.  But there is no collusion
22   here between the plaintiffs and the defendants.  You know,
23   in some of these class-action cases you get very suspicious.
24   Everybody is selling out for money very quickly and not
25   litigating the case.  That is not true here.

Page 239

1    Here we have serious plaintiffs who have worked
2    hard on the case when you review the files and material
3    submitted.  Plaintiffs admittedly asked for an
4    extraordinary -- not extraordinary, rather a large sum for
5    Eloise Cobell.
6    I was distressed to hear Ms. Cobell attacked today
7    by one of the objectors' representatives.  I felt that was
8    without foundation.  There was no suggestion of any
9    collusion by her part to get a fee, and then she would
10   settle the case.  There is nothing in the record to support
11   that.
12   All I have in the record for Ms. Cobell is
13   starting this case maybe 20 years ago trying to get someone
14   to take it, 15 years ago getting the suit filed, and
15   forever thereafter being intimately involved and paying
16   hundreds of thousands of dollars out of her own pocket to
17   make sure that the case could continue when there was no
18   money.
19   How can it now be claimed that she would then,
20   somehow, compromise easily, I don't understand that
21   accusation.  She has accomplished more for the individual, I
22   think, Native Americans than any other person recently that
23   I can think of in history.
24   This is her case.  She contributed hundreds of
25   thousands of dollars.  She helped fund raise.  She spent

Page 240

1    hundreds and thousands of hours.  She was part of every
2    serious, strategic decision made.  She dedicated up to 1,200
3    hours per year.  She put her reputation on the line, her
4    health, and has unprecedented efforts by a named plaintiff I
5    have not seen before in a class action case.
6    I believe she is fully entitled to the award that
7    she has requested in this matter.  The best analogy is the
8    Allapattah Services -- that is A-l-l-a-p-a-t-t-a-h -- versus
9    Exxon, a Florida case in 2006, where nine plaintiffs each
10   received $1.76 million out of the fund, which is similar to
11   this case and the length of litigation.  Only two trials
12   though, although they did get to the Supreme Court.
13   But again, those plaintiffs showed unusual courage
14   and commitment, participated in the decision-making,
15   communicated with the class, gathered information,
16   discovery, accepted liability of litigation costs, the
17   theory of liability was untested, and there was no certain
18   result with only themselves to receive modes personal
19   damages.  They did not get an extra big damage award, and
20   they incurred retaliation risks from others connected with
21   the case potentially.
22   Those are the factors that the court in that case
23   considered giving those very large rewards.
24   In this case said I have considered those factors.
25   I considered the plaintiffs were not figureheads.  They

Page 241

1    brought it to the lawyers' attention.  They were intimately
2    involved in it.
3    An unprecedented case, untested theory of
4    liability, high uncertainty of success, substantial benefits
5    conferred on the class members $3.4 billion ultimately,
6    achieved Congressional recognition and approval,
7    reputational risks were undertaken in their home
8    territories, and as I said, Ms. Cobell, expended substantial
9    personal sums of her money when she would really not be able
10   to recover that much if she won the case.
11   So I think Ms. Cobell should be congratulated for
12   the work that she has been done on the case and not
13   condemned.  She communicated openly with all class members,
14   discussed the cases -- all the class named plaintiffs did,
15   and I know nothing else can be asked for them to do to earn
16   these awards.
17   Therefore, the court will consider as a fair and
18   reasonable award the award of $2 million to Ms. Cobell and
19   approve that.  However, the expenses she has requested will
20   be deducted from that awarded.  She will not get additional
21   monies for her expenses.  That will incorporate her expenses
22   as well.
23   Louise Larose will receive $200,000.  She was in
24   the deposition.  She coordinated the media efforts.  She
25   engaged political leaders, and as heavily involved in the

Page 242

1   case as the others.  An original plaintiff since the
2   beginning.
3   Thomas Maulson will receive $150,000.  An original
4   plaintiff.  He was deposed by the government; discussed key
5   litigation issues; and helped with the continuation of the
6   case; and again, put his reputation at risk.
7   And Peggy Cleghorn, a $150,000 award.  She took
8   her mother's spot as a plaintiff when her mother died in
9   1997.  Deposed by the government; attended court hearings;
10  participated in the strategic decisions; and came forth to
11  support the case at all times.
12  The sum represents roughly .02 percent of the
13  common fund of $1.4 billion, and I believe is appropriate
14  under the qualifications as I have reviewed them awarding
15  those.
16  There was a request for Mr. Earl Old Person for an
17  award.  Unfortunately, Mr. Earl Old Person, an original
18  plaintiff, was removed in 2003, and the court found at that
19  time he was unable to conclude that Mr. Old Person is
20  satisfying his duties at class representative to adequately
21  protect the interests of the class members; refused to
22  respond regarding his obligations in connection with the
23  case, including his deposition, refused to be taken; and he
24  refused to comply with court discovery orders.  Therefore, I
25  cannot give him an award based on equity to a class

Page 243

1   representative who did not execute his fiduciary duties
2   towards the class as the other named people did, so his
3   motion for an incentive award is denied.
4   Plaintiff asked for 10,500,000 plus, and expenses
5   incurred by third persons connected with this litigation.
6   There is no class representative that occurred those out-of-
7   pocket expenses that I can see that they referred to
8   separate from Ms. Cobell's, so I am not going to -- I don't
9   believe there is authority to award those expenses separate,
10  so the motion for those incentive awards -- that 10,500,000
11  is denied.
12  Ms. Cobell's personal expenses, out-of-pocket
13  ones, was not included in that expense request as I
14  understand it, so those moneys will come out of her sizable
15  incentive award that I have already approved.
16  Now finally what remains to be done is discuss
17  the attorneys' fees, which I will do briefly at this time,
18  and we can address it more in our written opinion.  But I
19  wanted to finish with the parties that are here so they
20  understand what their rights are at this time and the
21  expenses.
22  I am going to decide the aggregate attorneys' fees
23  at this time and expenses for the pre-settlement activities.
24  A portion of the fund that is in dispute between the
25  attorneys I'm going to withhold, pending distribution, until

Page 244

1   I rule upon those disputes which I have before me now.  But
2   I'm not ready to rule upon those.
3   The issue for the court is the calculation I
4   should use.  The Circuit follows a percentage of funds
5   method.  There has been some argument and a lot of written
6   material is already submitted to me, and the real issue came
7   down to me, what is the common fund here?
8   We have of common fund doctrine, and a percentage
9   from the common fund is fair.  That is based upon those
10  benefiting from prosecution or unjustly enriched so they
11  don't share in the costs in proportion to the benefit each
12  one receives.  So what is the common fund here?
13  The plaintiffs' counsel, understandably, say it is
14  $3.4 billion of the class-action settlement.  It could be
15  also consider the $5 billion the government says they are
16  going to spend on the trust reform.
17  I think that is reaching too far frankly.  I think
18  it is clear that the accounting trust administration fund,
19  which will be paid by the defendants now upon final approval
20  of this settlement as defined in this settlement agreement
21  is 1.412 billion dollars, and the plaintiffs have created
22  that fund -- the plaintiffs' counsel, through the
23  litigation.  It did not exist before.
24  They have achieved that result for their clients.
25  That is a fixed monetary amount.  Nothing is subject to

Page 245

1   reversion as some of the other funds are.  It will be
2   distributed to the individual Indians upon their approving
3   the claim against the government.  So it is a true common
4   fund.
5   Any leftovers go to the scholarship fund, because
6   that is appropriate, and it doesn't get deducted for that
7   reason from that.  The scholarship fund is also benefiting
8   their clients.
9   But the land consolidation fund, I am not going to
10  consider them as part of the common fund for the purpose of
11  attorneys' fees, and I'm making this clear so the plaintiffs
12  understand, and they have the right to appeal, the
13  plaintiffs' counsel if they wish, but that is the basis.
14  There is no guarantee that those funds are really
15  going to be used to purchase a fractionated interest if the
16  Indians refuse to do so.  And any remaining funds revert
17  back to the Treasury, not back to the Indians in any
18  capacity.
19  So even though it may be incidental, the
20  plaintiffs' counsel claim, it should be counted -- it is
21  highly uncertain to me what actual amount I could consider
22  as a part of that.  So the scholarship monies really come
23  off from the other funds, so I cannot count them separately
24  and additionally.
25  The monies traceable to the litigation and the

Page 246

1   common fund is really the trust administration fund and not
2   the other funds.
3   So really what the government says -- with that
4   then they only got 330 million, because they think that is
5   the only fair amount that they have got.
6   I disagree with that.  There is no evidence that
7   the government made any of these other concessions in
8   settlement but for this litigation.
9   The plaintiffs are not piggybacking upon the
10  success of earlier cases where someone else has already
11  litigated these issues and they come in secondly to get a
12  fund.  We don't have that here.  It appears to me that
13  plaintiffs are entitled to their counsel -- their fees
14  based upon the one point four plus billion dollars
15  recovered.
16  What percentage should that be then?  One of the
17  factors I look at is, is it must be reasonable in light of
18  the results obtained?  I have to act like a fiduciary for
19  the beneficiaries who are paying the fee, because now the
20  Indians will pay this fee, and there has been somewhat of an
21  adversary process about the fees, but still I have to take a
22  close look at it.
23  I have to consider what is reasonable in the
24  circumstances?  I do that by going over the various
25  factors -- I think we've spent too much time reviewing, but

Page 247

1   again amount involved, the results obtained -- it's an
2   exceptional result, I have already indicated that,
3   substantial trust reform will also come about as a result of
4   this.
5   The awards are tax-free.  The number of persons
6   benefiting, almost half a million perhaps -- at least
7   450,000 roughly.  Future generations are going to benefit
8   from the trust reform that is coming.
9   Class member objections.  I have reviewed the
10  objections about attorney fees, but the majority have lodged
11  no objection -- 99 percent -- and I have considered the
12  objections as what could be fair in taking into account what
13  I will award.
14  Obviously I have counted upon the skill and
15  efficiency of the attorneys involved in this hostile,
16  complex litigation with multiple appeals, the complexity and
17  the duration thereof.
18  The risk of nonpayment?  Mr. Gingold indicated
19  they took a big risk, and they did.  They could go home
20  empty-handed.
21  The amount of time involved?  Enormous.  The time
22  records are impressive.  Even though there are some
23  objections to some of the time records, I think overall the
24  records reflect even a cursory glance a phenomenal number of
25  hours fairly put in.

Page 248

1   The parties' agreements?  I have not gone off and
2   held that the plaintiffs are bound by their agreements.  I
3   am somewhat concerned.  They came in asking for more than
4   there would seem to me an agreement, but I agree that it's
5   up to the court to set a reasonable fee.  They did have an
6   agreement, and it concerns me that they seem to have backed
7   off from that, but they certainly agreed to be bound within
8   that range without an appeal.
9   That is a minimum I think.  I think actually they
10  had an agreement, but beyond that it is up to the court to
11  determine what the size of the attorneys fees should award.
12  I could have felt they did should not get any of that, and
13  that they should get $5 million.  I don't think the
14  agreement bound the court either way.
15  However, it is somewhat persuasive that what they
16  considered to be reasonable when they were attempting to
17  settle this case and sell it to Congress and to their
18  clients.
19  Additionally, it seems to me more reasonable than
20  any contingency fee arrangements they may have had, because
21  this fee agreement postdates any contingency fee agreements.
22  In other words, they seem to have gone off and said, we will
23  accept these fees regardless of whatever we said we would do
24  originally.
25  And similar cases?  There has been a mention of

Page 249

1   looking at large cases, large awards.   This case qualifies
2   as what we call a mega fund case.  That is a gigantic
3   award.  Not just an average couple million dollars
4   settlement case.
5   So how do you do a mega fund?  Because they do not
6   normally get 30 percent of a mega fund case.  That is not
7   awarded by the courts.  That puts too high a premium on the
8   legal fees.
9   I did a survey here with my staff, nine cases,
10  what we call mega fund cases, all in the neighborhood -- all
11  more than 1 billion up to $6 billion in class action funds,
12  and I looked at the legal fees attributed thereto from what
13  was considered then the common fund that was appropriate,
14  and the fees ranged from 4.8 percent to a high of 15
15  percent, depending upon various factors.  Hours went to
16  200,000 or more.  Phenomenal amounts of time spent on some
17  of these cases.
18  And there is a collection of those cases set forth
19  in a report of the 3rd Circuit task force on court awarded
20  attorney fees at 108 Fed. -- the decision is 237, and
21  another case 962 Fed. Supp. at 572 in In re: Prudential
22  Insurance Company case reviewing all of these mega fund
23  settlements, reviewing a percentage range there from 4
24  percent to 17 plus percent.
25  It seems to the court to award the attorneys' fees

Page 250

1  -- in looking at an amount that is sufficient to encourage
2  lawyers to take on similar cases in the future -- that is
3  one of issues that concerns the court.
4  You cannot have cases like the original case that
5  Ms. Cobell wanted to bring where lawyers said, I won't do
6  it.  I can never make money.  It is a loser, and they would
7  never litigate, and a good case -- a good client cannot be
8  put forth before the court.
9  We have to make attorney fees commensurate so that
10 attorneys are encouraged to these cases and to help out the
11 less privileged who need the help, not just Indians, but
12 anyone in this country with similar type of situations where
13 they were deprived of their rights.  You have to make that
14 worthwhile for lawyers to gamble to take these kinds of
15 cases.
16 They sorely need competent representation, and the
17 Indians desperately need these monies to be adequately
18 handled, and now they will receive them from this
19 settlement, and many of them, I know, live in extreme
20 poverty; and they are special beneficiaries of a trust
21 created by the government, and they owe them these monies.
22 I have to look at the agreement between the
23 parties, and they did have an attorneys' fees agreement,
24 informative to the court, not binding upon the court.
25 So the court -- considering those factors that I

Page 251

1  have just reviewed, I'm going to make the following
2  attorneys' fees awards in this matter.  I'm going to make an
3  award of $99 million as reasonable and appropriate for the
4  aggregate attorneys' fees, expense and costs for pre-
5  settlement amounts.
6  That represents 7.1 percent, approximately, of the
7  common fund, the way I found it existed.  That is a common
8  fund of $1.4 billion -- consistent with the parties'
9  agreement, more than the government requested and other
10 people have requested, but at the same time it is within the
11 range of mega settlement attorneys fees.  Maybe a percentage
12 or two below some of the others, but within that same range,
13 as reasonable and adequate for the attorneys for the work
14 they have done on this.
15 It does not denigrate their performance whatsoever
16 that I did not give them $212 million.  I have to make a
17 judgment based upon my review of the case, my consideration
18 of the factors that I have reviewed as to what is fair and
19 reasonable in accordance with the common fund that I found
20 existed that they created in this case.
21 From that will be withheld at this time a maximum
22 amount of $13,616,250.48.  That is if the allocation is not
23 resolved before the final approval of the settlement -- as
24 defined in the settlement agreement.  That amount is going
25 to be withheld from the payment pending determination of

Page 252

1  those claims which I hope to make in the near future.
2  So let me just sum up where we are at this point.
3  One, the historical accounting and class administration
4  class are properly certified as I ruled.
5  Two, I am going to order a judgment on behalf of
6  the plaintiffs in accordance with the terms of the
7  settlement agreement and the joint motion for final approval
8  of the settlement, and the entry of final judgment will be
9  granted.
10 Settlement agreement I have found is fair,
11 reasonable and adequate.  IT is binding on the class members
12 who did not timely opt out.
13 Four, I am approving final payment of reasonable
14 attorneys' fees, expenses and costs for the class counsel in
15 the amount of $99 million, subject to the terms of the
16 settlement agreement, and to the claims against those fees
17 by the two petitioners.  That will be drawn from the common
18 fund established by this settlement.
19 For the incentive amounts approved and the awards
20 requested in the amounts requested as I've already ruled --
21 the claims administrator will now possess and pay all valid
22 claims from the settlement account once the time frames have
23 run that are appropriate.
24 Defendants will be released from the class members
25 claims outlined in the settlement agreement under section 1,

Page 253

1  and the defendants will make their final payments in the
2  accounting trust administration found as is called for in
3  the agreement.
4  So that will be the order of court.
5  I want to congratulate counsel for both sides for
6  getting this result.  It is an incredible result.  I think
7  it does a great service to recognize the harm done to the
8  American Indians in the past by the government who is
9  supposed to be their protector and failed to do so in the
10 categories, at least before this court, as to the trust
11 funds and the land management, and the hope that this does
12 set a new tone for the government and a new course for
13 Interior to deal with the American Indians on a fair and
14 equitable basis as they indicated they will do so from now
15 on.
16 I want to congratulate counsel for the plaintiffs
17 for their work in this case, representing the highest
18 quality of work in the finest traditions of the Bar to
19 undertake a case like this and litigate it for 15 years with
20 no certain result, and getting what may be a disappointing
21 result in the attorneys' fees.  But you all deserve the
22 highest praise for the work that you have done on these
23 cases.
24 With that the court will stand in recess, and if
25 the parties haven't submitted orders in accordance with my

Page 254

1    rulings, you should do so as soon as possible.

2    (Whereupon, the proceedings were adjourned.)

3    - - - - -

4    CERTIFICATE OF COURT REPORTER

5    I certify that the foregoing is a correct transcript of

6    the proceedings in the above-captioned case.

7    _____

8         SUSAN PAGE TYNER, CVR-CM

9         OFFICIAL COURT REPORTER

10