## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| **ELOUISE PEPION COBELL, by and through TURK R. COBELL, as the personal representative of her estate, _et al._** | ) ) ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 96-cv-1285 (TFH/GMH)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **SALLY JEWELL, Secretary of the Interior** _et al._ | ) ) | |
| | ) | |
| **Defendants.** | ) | |

---

## <u>MEMORANDUM OPINION</u>

Herein the Court will close what may be the final major dispute in two decades of hard-fought litigation.  Plaintiffs, Native Americans whose lands were held in trust by the Department of the Interior, sought to remedy a century of wasteful trust mismanagement.  They obtained a stunning victory which brought about trust reform and a significant recovery for the plaintiff class.  Helping them in their quest was a team of attorneys whose dedication and tenacity deserve high commendation.  One of those attorneys was Mark Brown.  After this case settled in 2009, Plaintiffs' counsel moved for an award of attorney's fees and costs.  Brown was omitted from the motion, as were the hours he spent litigating this matter.  He now petitions this Court for his share of the fee award.

This matter was initially referred to the undersigned for a Report and Recommendation on Brown's petition for attorney's fees [Dkt. 3699].  The parties later consented to the undersigned's making a final determination of Brown's petition [Dkt. 4201].  After reviewing the parties' many

filings and holding a five-day evidentiary hearing on the matter,[1] the Court will grant in part and deny in part Brown's petition.

## BACKGROUND AND PROCEDURAL HISTORY

An abbreviated timeline of this case and the present fee petition will help place the rest of the decision in context. In the late nineteenth and early twentieth centuries, the United States had a policy of dividing Native American lands into smaller parcels, to be held in trust by the Department of the Interior for the benefit of individual Native Americans. *See* Plaintiffs' Amended Complaint [Dkt. 3671] ¶ 17. These parcels of land generated income, which was placed into what are commonly referred to as "Individual Indian Money" accounts. *Id.* ¶ 2. Plaintiffs filed this class action in 1996 against the Secretary of the Interior, alleging that the Department had mismanaged these accounts and the land it held in trust. *Id.* ¶ 3–4. Plaintiffs sought an accounting from the government and an order compelling the government to reform its trust practices. *Id.* ¶ 5.

After a bench trial in 1999, Judge Lamberth found that the government had violated several of its trust duties. *See Cobell v. Babbitt*, 91 F. Supp. 2d 1, 6 (D.D.C. 1999). The Court of Appeals affirmed this finding in 2001. *See Cobell v. Norton*, 240 F.3d 1081, 1086 (D.C. Cir. 2001). The

---

[1] The most relevant docket entries for purposes of this Memorandum Opinion are as follows: (1) Plaintiffs' Proposed Findings and Fact and Conclusions of Law ("Cobell F&C") [Dkt. 4219]; (2) Petitioner's Proposed Findings of Fact and Conclusions of Law ("Brown F&C") [Dkt. 4220]; (3) Plaintiffs' Reply to Petitioner's Proposed Findings of Fact and Conclusions of Law ("Cobell Reply") [Dkt. 4221]; and (4) Petitioner's Reply to Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Brown Reply") [Dkt. 4222]. Brown's fee petition has been pending since 2011. In the years prior to the undersigned's involvement in the matter, the parties filed dozens of briefs concerning the fee petition. The Court will refer to those filings only as the need arises. The parties' post-hearing briefing is comprehensive on the issues presented and the Court sees no need to exhaustively catalog the long history of repetitive arguments on Brown's petition.

Additionally, the Court notes at the outset that it will refer throughout this Opinion to the transcripts of the evidentiary hearing in this matter by date, followed by the usual page-and-line citation. All transcripts on the Court's docket contain both the morning and afternoon sessions in one docket entry, save for April 20, 2016, which has one docket entry for the morning and another for the afternoon. For purposes of clarity, the relevant transcripts are as follows: (1) April 20, 2016 Morning Hearing Transcript ("4/20 A.M. Tr.") [Dkt. 4205]; (2) April 20, 2016 Afternoon Hearing Transcript ("4/20 P.M. Tr.") [Dkt. 4208]; (3) April 21, 2016 Hearing Transcript ("4/21 Tr.") [Dkt. 4206]; (4) April 22, 2016 Hearing Transcript ("4/22 Tr.") [Dkt. 4207]; (5) May 25, 2016 Hearing Transcript ("5/25 Tr.") [Dkt. 4214]; and (6) May 26, 2016 Hearing Transcript ("5/26 Tr.") [Dkt. 4215].

rest of this case's life has been spent overseeing the Department's accounting and the reform of its trust practices.

Following many years of hard fought litigation, the case ultimately settled in 2009. Because of its enormous size – in the billions of dollars – the settlement required congressional approval, which did not come until late 2010. *See* Plaintiffs' Motion for Preliminary Approval of the Settlement [Dkt. 3660] at 1. After Congress signed off on the settlement, the matter came back to this Court for final approval. Within the settlement agreement was a separate agreement on payment of class counsel's fees. *Id.* That agreement provided that Plaintiffs' counsel could apply for fees by motion and, most importantly, that neither party would appeal a fee award that fell within the range of $50–99.9 million. *Id.* at 15–16. Judge Hogan, who had inherited the case earlier in 2010, held a fairness hearing in June 2011 and approved the parties' settlement. *See* Final Order Approving Settlement [Dkt. 3850] at 4. Judge Hogan also awarded Plaintiffs' counsel $99 million in attorney's fees. *Id.* at 9–10. The Court of Appeals affirmed Judge Hogan's approval of the settlement in 2012. *See Cobell v. Salazar*, 679 F.3d 909, 913 (D.C. Cir. 2012).

But according to Brown, something was missing from Plaintiffs' fee application: his hours spent litigating the case. When Plaintiffs' counsel submitted their motion for an award of fees in January 2011, they did not name Brown among class counsel and did not seek compensation for the time he expended in the case. *See* Plaintiffs' Motion for Attorney's Fees and Expenses of Class Counsel [Dkt. 3678]. He intervened in the case a month later and asserted that he ought to be paid out of class counsel's fee award. *See* Petitioner's Response to Plaintiffs' Motion for Attorney's Fees [Dkt. 3699]. In his original petition, Brown sought compensation for approximately 11,500 hours of time, totaling about $5.5 million. *See id.* Judge Hogan tabled the dispute by placing in

escrow the amount Brown claimed and awarding Plaintiffs' counsel the balance of the $99 million fee award.  Final Order Approving Settlement [Dkt. 3850] at 9–10.[2]

After a series of unsuccessful mediations, Judge Hogan referred the matter to the undersigned for resolution of Brown's fee petition.  May 12, 2015 Referral Order [Dkt. 4124].  The undersigned held a hearing, heard testimony from several witnesses, accepted hundreds of exhibits, and heard legal argument from Plaintiffs and Brown.  On this robust record, the Court is now prepared to issue its decision.

## FINDINGS OF FACT

The following findings of fact are based on the record adduced during the Court's five-day evidentiary hearing.  Two introductory notes are in order.  First, Brown filed objections to several affidavits Plaintiffs offered during the hearing.[3]  He also filed two motions *in limine* prior to the hearing – one regarding the affidavit of the late Elouise Cobell, lead class representative, and one regarding the testimony of Bill Dorris, a Kilpatrick Townsend & Stockton ("Kilpatrick Stockton") attorney who entered the case in 2004 and continues to represent Plaintiffs today.[4]  The Court sees

---

[2] A similar dispute arose between Plaintiffs' counsel and attorneys from the Native American Rights Fund ("NARF"), an organization which contributed substantial litigation support to the trial team.  *See* 4/22 Tr. 140:2–25.  Plaintiffs did not seek compensation for NARF's time expended in the case in their January 2011 application, and NARF, like Brown, intervened to request what it believed was its fair share of the fee award.  *See* NARF's Emergency Motion to Intervene [Dkt. 3714].  At the direction of the class representatives, class counsel opposed NARF's fee petition.  5/25 Tr. 131:4–20.  Plaintiffs and NARF were able to settle their dispute in mediation.  *See* Order Authorizing Payment of Certain Pre-Settlement Attorneys' Fees [Dkt. 4122]; 4/22 Tr. 140:2–25.

[3] *See* Brown's Evidentiary Objections to the March 31, 2011 Affidavit of G. William Austin [Dkt. 4198]; Brown's Evidentiary Objections to the March 31, 2011 Affidavit of Keith Harper [Dkt. 4199]; Brown's Evidentiary Objections to the March 31, 2011 Affidavit of Elouise Cobell [Dkt. 4200].  Plaintiffs filed responses to each set of objections.  *See* Plaintiffs' Responses to Brown's Evidentiary Objections to the March 31, 2011 Affidavit of G. William Austin [Dkt. 4202]; Plaintiffs' Responses to Brown's Evidentiary Objections to the March 31, 2011 Affidavit of Elouise Cobell [Dkt. 4203]; Plaintiffs' Responses to Brown's Evidentiary Objections to the March 31, 2011 Affidavit of Keith Harper [Dkt. 4204].

[4] *See* Brown's Motion in Limine to Exclude the Expert Opinions Proffered by William E. Dorris [Dkt. 4193]; Brown's Motion in Limine to Exclude Elouise Cobell's Affidavit [Dkt. 4194].  Plaintiffs responded to these motions as well.  *See* Plaintiffs' Response to Brown's Motion in Limine to Exclude the Expert Opinions Proffered by William E. Dorris [Dkt. 4195]; Plaintiffs' Response to Brown's Motion in Limine to Exclude Elouise Cobell's Affidavit [Dkt. 4196].

little value in addressing each of the voluminous objections in detail here.  Instead, it will overrule

the objections except as stated otherwise in this decision.  Most pertain to the weight, rather than

the admissibility, of the evidence.  And even to the extent some piece of evidence was partially or

potentially objectionable – such as an item of evidence whose relevance was informed by context,

or some statement that would be hearsay if offered for one purpose but not if offered for another

– the Court accepted the evidence for what it was worth, disregarding objectionable portions.  *See*

*Harris v. Rivera*, 454 U.S. 339, 346 (1981) ("In bench trials, judges routinely hear inadmissible

evidence that they are presumed to ignore when making decisions."); *United States v. Microsoft

Corp.*, 253 F.3d 34, 101 (D.C. Cir. 2001) (upholding use of summary witnesses in bench trial

despite danger of hearsay because the judge is presumed to ignore inadmissible evidence); *Flana-

gan v. Islamic Republic of Iran*, Civil Action No.: 10-1643 (RC), 2016 WL 3149560, at *22 n.22

(D.D.C. June 3, 2016) (noting that even if certain record evidence at a bench trial contained hear-

say, there was no danger of the Court's being improperly influenced by it).

Second, almost every witness in this case had the potential to give biased testimony.

Brown, who was his own primary witness, of course stands to win a large sum if he convinces the

Court he is entitled to a fee award.  But the Court also appreciates that, as was made clear at the

hearing, every dollar not awarded to Brown will go from the escrow account to Kilpatrick Stock-

ton, the firm that provides sole representation for Plaintiffs today.  As such, several of Plaintiffs'

witnesses, including Kilpatrick Stockton partners David Smith and Bill Dorris, have a direct fi-

nancial interest in the outcome here.  *See* 4/22 Tr. 139:12–22, 143:5–144:1, 199:11–25, 234:13–

19; 5/25 Tr. 127:14–128:2.  To be sure, some witnesses on each side do not have such an interest,

like Dennis Gingold, who served as lead class counsel from the inception of the *Cobell* case until

2012, whose interest in this case Kilpatrick Stockton bought out when it took over as lead counsel.

*See* 4/21 Tr. 261:5–20.  Nevertheless, the Court took the testimony of each of the potentially biased witnesses for what that testimony was worth, considering the danger of possible bias, the witness's prior consistent or inconsistent statements, corroborating evidence, and the witness's demeanor during the hearing.  *See, e.g., Cruise Connections Charter Mgmt. 1, LP v. Attorney General of Canada*, 55 F. Supp. 3d 156, 177 (D.D.C. 2014) (recognizing that one witness was interested in the outcome but that his testimony should be credited because it was "cogent and unequivocal"); *Faison v. Dist. of Columbia*, 893 F. Supp. 2d 143, 149 n.5 (D.D.C. 2012) (concluding that the plaintiff was an interested witness and only partially credible because of her "tendency to exaggerate when it might help her case").  The Court's findings of fact based on that testimony and the entire record follow.

### A.        Brown's Engagement

Mark Brown has been an attorney since 1979.  4/20 A.M. Tr. 20:12–18.  Prior to working on the instant case, he was employed as a partner in a respected Los Angeles law firm.  *Id.*  He met Dennis Gingold, lead class counsel, in the early nineties.  *Id.* 20:23–21:11.  After Plaintiffs won the first trial before Judge Lamberth in 1999, Gingold recommended to the lead class representative, Elouise Cobell, that she engage Brown to work on the case.  *See id.* 22:11–21; 4/21 Tr. 227:15–18; Brown Ex. 1 at 1; Affidavit of Keith Harper [Dkt. 4204-1] ¶ 2.  She agreed to do so.  Brown Ex. 1 at 1.  Brown accepted her offer to join the *Cobell* team in January 2000, resigned his position in California, and moved to Washington, D.C. to work on the *Cobell* matter full-time.  4/20 A.M. Tr. 21:12–16, 25:3–11, 28:17–29:13.

Their agreement – which is at the heart of the parties' dispute – is memorialized in letters of engagement from several of the class representatives to Brown.  *Id.* 29:14–30:6; *see* Brown Ex. 1 (containing four engagement letters).  The evidence showed that Brown signed two of the

letters – from Cobell herself and from her charitable foundation, the Blackfeet Reservation Devel-opment Fund ("BRDF") – on March 3, 2000. Brown Ex. 1 at 6, 8. The letters provided that Brown would be compensated on a contingency basis. *See id.* at 1. Specifically, Brown was to receive, subject to approval from this Court, two percent of "the total upward adjustment in the aggregate trust funds standing to the credit of the trust beneficiaries as a result of the litigation or its settle-ment." *Id.* The letters also stated that Brown's customary billing rate was $350 per hour. *Id.* Brown testified that his billing rate was included in the letters for future fee applications. 4/20 A.M. Tr. 36:6–10. The letters further provided that Brown would be reimbursed for monthly trips back to California. Brown Ex. 1 at 2; 4/20 A.M. Tr. 26:5–17. In his testimony, Gingold noted that he gave Brown some information to include in the letters, but that Brown drafted the letters himself. 4/21 Tr. 209:7–14.

The March 3, 2000 engagement letters that Brown signed also incorporated the terms of Plaintiffs' engagement letters with Gingold, Thaddeus Holt, and Elliott Levitas, other founding members of the litigation team. Brown Ex. 1 at 1; 4/20 A.M. Tr. 30:16–31:7. Those letters, dated April 14, 1999, provided a contingent fee arrangement for Gingold, Holt, and Levitas and author-ized the attorneys to seek interim fee awards under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 (2016). Brown Ex. 2 at 2. Any interim award under the EAJA would reduce the amount payable to counsel from any later contingent fee award. *Id.*

The April 1999 engagement letters also contained a provision regarding the death, with-drawal, or disability of any *Cobell* attorney. That provision, which has become the focal point of the present dispute, reads in full:

> If any of the counsel dies, withdraws, or becomes disabled prior to the completion of his work under this agreement, he shall be entitled to a portion of the fee (and all expenses to date of the disability, death, or withdrawal) to which he would otherwise have been entitled, also taking into account the services rendered by his sub-retained counsel.  The payment will be made at the same time as other counsel are paid and shall represent the value of his services to the death, disability or withdrawal, taking into account the total fees payable to legal counsel.

*Id.*

### B.      Brown's Early Work on *Cobell*

Because Brown was only to be paid on contingency and as interim EAJA awards might permit, he lived simply after moving to Washington.  He resided in Gingold's basement and the two drove together to and from work each day.  4/20 A.M. Tr. 28:10–20.  As might be expected in a case of this magnitude, workdays were long and tiring.  *See id.* 42:13–22, 63:16–64:14 (observing that the team worked "seven days a week" during the 2000–2003 period).  The team had no secretaries or paralegals and worked in tight office space.  *Id.* 44:16–25, 45:24–46:6, 65:1–12.

Gingold, as lead counsel, was generally in charge of assigning work and coordinating litigation strategy.  *Id.* 42:23–43:16; 4/21 Tr. 226:11–24; 4/22 Tr. 41:2–8.  Brown undertook significant work at Gingold's behest.  This included many tasks typically expected of trial counsel, including drafting and revising filings, researching legal issues, participating in attorney conferences, and taking and defending depositions.  *See, e.g.*, 4/20 A.M. Tr. 69:7–24 (motions practice); *id.* 73:4–12 (took Donna Erwin deposition); 4/20 P.M. Tr. 208:17–21 (prepared and defended Elouise Cobell's deposition); *id.* 211:13–212:15 (discussing time spent in attorney conferences with Elouise Cobell).  Brown also took the lead early-on in negotiating a fee dispute with Price-WaterhouseCoopers, an accounting firm to which Plaintiffs owed a great deal of money.  4/20 A.M. Tr. 45:1–20.  Brown was able to successfully negotiate a payment arrangement that averted the need for a huge one-time outlay to settle the PWC bill.  *Id.*

Following remand from the Court of Appeals in 2001, affirming Judge Lamberth's ruling that the government had breached its trust duties, this Court maintained jurisdiction to oversee the government's efforts to bring itself into compliance with its trust obligations.  During this time, several collateral matters arose and were litigated.  In the proceedings that culminated in what is known as the "Contempt II" trial, the Court held the Secretary and Deputy Secretary of the Interior in civil contempt.  *Cobell v. Norton*, 226 F. Supp. 2d 1, 1 (D.D.C. 2002); 4/20 A.M. Tr. 46:17–47:8.  During the two-month Contempt II trial, Brown sat at counsel's table and assisted Gingold and the other class counsel, including Levitas and Keith Harper.  4/20 A.M. Tr. 47:9–22.  Although he helped prepare some witnesses for the trial, he did not actually examine any witnesses at trial.  *Id.*  The Contempt II ruling was ultimately reversed on appeal.  *Id.* 48:22–49:11; *Cobell v. Norton*, 334 F.3d 1128, 1150 (D.C. Cir. 2003).

At the conclusion of the Contempt II trial, the Court scheduled another trial, later termed the "Phase 1.5" trial, to decide what further injunctive relief should be awarded to ensure that the government was moving expeditiously to reform its trust practices.  *Id.* 51:16–25.  The four-month Phase 1.5 trial occurred in mid-2003.  *Id.* 52:5–6.  Brown participated, along with Gingold, Levitas, and Harper.  *Id.* 53:22–54:4.  In preparation for that trial, Brown aided in relevant discovery practice and defended two of the named class representatives in deposition.  *Id.*  Unlike the previous trial, Brown examined witnesses.  *Id.* 52:9–53:12.  He also assisted the team in preparing proposed findings of fact and conclusions of law.  *Id.* 54:8–13.

As a result of the trial, Judge Lamberth issued a structural injunction against the Department of the Interior mandating several specific actions to bring the Department into compliance with its trust duties.  *Cobell v. Norton*, 283 F. Supp. 2d 66, 287–95 (D.D.C. 2003).  The Court of Appeals reversed the entry of the structural injunction in 2004 based on limiting language in a

9

congressional appropriations act enacted in November 2003, known as the "Midnight Rider." *Cobell v. Norton*, 392 F.3d 461, 478 (D.C. Cir. 2004). When the Midnight Rider expired by its own terms in late 2004, Judge Lamberth reissued his structural injunction without modification or further hearing. *Cobell v. Norton*, 357 F. Supp. 2d 298, 302–07 (D.D.C. 2005). The Court of Appeals again vacated the injunction in late 2005 and began to limit the scope of the accounting the government was required to provide. *Cobell v. Norton*, 428 F.3d 1070, 1078–79 (D.C. Cir. 2005).

C.    **Alleged Problems with Brown and His Work**

Plaintiffs allege that, during the period following the Court of Appeals' 2001 ruling, Brown's performance "began to create problems." Cobell F&C at 8 ¶ 24. Brown disagrees, alleging that he adequately performed all duties assigned to him. The parties presented voluminous testimony and evidence on these alleged problems.

1.    *Brown's Work with the Special Master*

In 1999, with the government's consent, Judge Lamberth appointed a special master to oversee the accounting and trust reform process. 4/21 Tr. 147:14–24. Judge Lamberth's appointee, Alan Balaran, was given considerable authority and responsibility to manage this process. *Id.* 147:25–148:15. Initially, Gingold assigned Brown to represent Plaintiffs before the Special Master. *Id.* 148:16–149:8. He did so because of Brown's proficiency in litigating discovery and evidentiary matters, many of which arose during proceedings before the Special Master. *See* 4/21 Tr. 233:17–21, 258:4–6 (noting that Brown was "very good on evidentiary issues").

Relations between Brown and the Special Master eventually soured. The Special Master reported to Gingold that, during a meeting with the Department of Justice at the Special Master's office, Brown asked whether the Special Master had "early onset Alzheimer's." 4/21 Tr. 151:23–

152:24.[5]  The Special Master reached out to Gingold to express his displeasure with the remark and intimated that Plaintiffs should not expect favorable results if Brown continued to participate in proceedings before him.  *Id.* 152:25–153:3.  The Special Master did not order Brown not to appear before him, but Gingold testified that the Special Master's tone and phrasing stopped just short of such an order.  *Id.* 235:2–23; 4/22 Tr. 82:5–83:3.  Gingold determined that Brown could no longer work with the Special Master and resumed those duties himself.  4/21 Tr. 153:4–10.

In another instance, Brown assisted in drafting a brief in support of a motion for attorney's fees made to the Special Master.  In one of the brief's footnotes, Brown included a picture of a crying fish.  4/21 Tr. 57:24–58:6.  This image was intended to lampoon the government for its complaints that class counsel's fees were excessive.  *See id.* 59:1–60:1.  Gingold told Brown to remove the picture before filing the brief, but Brown insisted that it be included.  *Id.* 153:11–154:9.  Brown counters that Gingold "specifically asked it to be left in."  *Id.* 58:7–8.  The image was left in.  *See* Cobell Ex. 20 at 37.  Gingold testified that the Special Master became quite upset upon seeing the image.  4/21 Tr. 153:11–154:9.  In his decision on the motion for fees, the Special Master noted the presence of a "fish shedding a tear" in Plaintiffs' brief.  Cobell Ex. 20 at 37.  He ultimately deducted 75% of all the time spent preparing the brief.  *Id.*

### 2.   *Findings and Conclusions for the Phase 1.5 Trial*

Gingold testified that Brown's work on the Phase 1.5 trial did not pass muster.  4/21 Tr. 163:16–165:5.  During the trial, Judge Lamberth informed the parties that he would request findings and fact and conclusions of law to aid him in drafting his decision.  Gingold, Brown, and the

---

[5] Brown objected that the Special Master's report of what Brown told him is hearsay.  Brown Reply at 15 ¶ 26.  The Court admitted the statements not for their truth but to show why Gingold removed Brown from working with the Special Master.  4/21 Tr. 151:23–152:9.

rest of the team split up the hard task of combing through the evidence presented at trial to formu-late the proposed findings.  4/20 A.M. Tr. 121:19–122:13.  Gingold asserted that he found Brown's work on the findings to be subpar.  4/21 Tr. 163:16–165:5.  First, Brown decided to use his own formatting style which did not blend easily with that used by the rest of the attorneys.  *Id.*  Specif-ically, Brown cited evidence for each finding of fact in footnotes, rather than in endnotes as the rest of the team had done.  4/20 A.M. Tr. 122:3–123:3.  Second, Gingold felt that Brown did not consistently cite the best support for each proposed finding.  4/21 Tr. 164:10–165:5.  Gingold perceived it as Brown's lack of judgment as to which evidence best supported the proposed find-ings and conclusions.  *Id.*[6]  In his frustration, Gingold sent out what Brown characterized as an "apoplectic" memo criticizing Brown's work.  4/20 A.M. Tr. 123:2–12.  Brown defended his for-matting decisions, arguing that the team's decision to cite evidence in endnotes rather than foot-notes made the task of revising draft versions of the document too difficult.  *Id.* 122:3–123:3.

### 3.   *Brown's Relationships within the Litigation Team*

Gingold also testified as to Brown's inability to get along with other members of the liti-gation team.  He claimed that, while "some people were extremely cooperative and easy to work with, others weren't."  4/21 Tr. 141:13–20.  He called Brown "the extreme outlier" on the unco-operative end of the spectrum and stated that "Mark's conduct was beyond the norm."  *Id.* 142:2–5.  Gingold testified that he became frustrated when Brown would fight with him over even minute changes Gingold requested in Brown's work.  *Id.* 139:23–140:1.  To Gingold, working with Brown was onerous because everything became a debate.  *Id.* 142:6–14.  While he admitted that Brown was not always wrong in these situations, Gingold maintained that, whatever the merits of Brown's

---

[6] In his testimony at the hearing, Brown tried to contradict this assessment, stating that Gingold's complaints related merely to formatting.  4/20 A.M. Tr. 124:2–5.  Brown claimed to have emails to substantiate the limited nature of Gingold's criticisms, but the Court denied their admission because he had not provided them to Plaintiffs before the hearing.  5/26 Tr. 6:25–11:2.  Thus, Gingold's typographical and substantive complaints both stand uncontroverted.

position, Gingold simply did not have time to argue with Brown about every issue.  *Id.* 164:23–165:5.  Instead, it appears that Gingold simply wanted Brown to comply with his orders as lead class counsel.  Gingold added to this entire discussion the caveat that he did not believe it was appropriate to single out Brown's behavior, given the high-stress environment in which all class counsel toiled for many years on end.  *Id.* 136:23–137:9.

Brown defended himself in cross-examination regarding working with Gingold, claiming that, although Gingold was a "creative" lawyer, he had significant weaknesses.  Not the least of these, in Brown's view, was his overly aggressive language in briefing and obsessive focus on obtaining sanctions against the government lawyers.  *See* 4/20 P.M. Tr. 222:18–225:5.  Smith, a Kilpatrick Stockton attorney who entered the case in late 2004 and still represents Plaintiffs today, admitted that Gingold was "a true workaholic" who demanded the same dedication from his fellow lawyers and would not hesitate to point out if he believed that co-counsel was "lapsing in [his] attention to the case."  4/22 Tr. 126:11–22.  Smith further testified that Gingold "could be difficult to work with" at times.  *Id.* 171:5–11.  Dorris, another Kilpatrick Stockton lawyer who joined the team at the same time as Smith, stated that Gingold was "brilliant" and "the hardest-working person I've ever worked with."  5/25 Tr. 32:16–33:10.  Dorris also conceded, like Smith, that he was confident that he had heard a Kilpatrick Stockton lawyer complain about working with Gingold at times, although he could recall no specific instances of such a complaint.  *Id.* 162:1–11.

If Brown's relationship with Gingold was strained, his relationship with Geoffrey Rempel was toxic.  4/20 P.M. Tr. 226:2–16 (Brown describing Rempel's behavior toward him as "hostile and odd").  Rempel, an accountant, worked as a sort of manager on the team.  *See* 4/20 A.M. Tr. 62:19–63:5.  Among other duties, Rempel coordinated all the teams of expert witnesses who assisted Plaintiffs' counsel and helped calculate settlement distributions.  Smith testified that Rempel

could be direct and "intense" in his manner.  4/22 Tr. 126:23–127:14; *see also* 5/25 Tr. 162:12–22

(Dorris testifying that Kilpatrick Stockton attorneys and staff had at times complained about work-

ing with Rempel).  Nevertheless, Smith stated that Rempel was brilliant in his work.  4/22 Tr.

126:23–127:14.  Gingold, in his testimony, claimed that he received no complaints from Kilpatrick

Stockton attorneys about Rempel.  *Id.* 47:2–24.  Brown stated only that he had "issues" with

Rempel, 4/20 A.M. Tr. 59:5–11, but Gingold testified that the two were usually "at war," 4/21 Tr.

140:1–3.  Gingold stated that Rempel claimed that Brown treated him as a mere clerk, asking him

to do menial tasks like mailing Brown's letters.  4/21 Tr. 140:9–20.  Brown complained that

Rempel would not give him his faxes.  4/20 A.M. Tr. 59:5–60:2.  Gingold instructed the two to

put aside their disagreements and work together for the good of their clients, but it is fairly clear

from the record that they never worked well together.  4/21 Tr. 140:1–8.

Brown produced Ruth Hargrow, a legal secretary at NARF during the time in question, and

Neill Freeman, an expert retained by the *Cobell* team, to testify on his behalf about the interper-

sonal difficulties on the team.  Hargrow testified that NARF attorneys found Gingold difficult to

work with and called him a "snake."  4/21 Tr. 104:13–17.  She also stated that Rempel was "con-

descending, rude, and disrespectful," and that he would often yell at Brown and NARF attorneys.

*Id.* 101:3–102:6.  Brown, by contrast, was, in Hargrow's opinion, respectful, pleasant, and profes-

sional.  *Id.* 99:3–100:9.  As an expert, Freeman worked principally with Rempel.  *Id.* 115:6–116:6.

Freeman testified that Rempel was very difficult to work with because he was "arrogant," "de-

manding," "combative," and "insulting."  *Id.* 117:23–119:7.  Freeman described Brown as "re-

spectful" based on their limited interactions.  *Id.* 116:4–7, 119:17–18.

Keith Harper, an attorney for NARF and one of the primary members of Plaintiffs' litiga-

tion team, submitted an affidavit in opposition to Brown's 2011 petition.  In it, Harper averred that

he generally enjoyed a cordial and professional working relationship with Brown. Affidavit of Keith Harper [Dkt. 4204-1] ¶ 3. Harper noted, however, that "Brown would not always comply with the decision made by the litigation team after long deliberations. At times, he would continue an approach inconsistent with the agreed one and the interest of the plaintiff class." *Id.* Harper maintained that, despite these professional differences, he and Brown worked "cooperatively for several years." *Id.*

In or around 2003, when the Brown-Rempel conflict became unmanageable, Gingold asked Harper to work principally with Brown. 4/21 Tr. 154:10–22. Harper agreed to take on that role. Harper averred that "over time, that role became untenable because Mr. Brown and I had differences of opinion and he would too often not follow direction. It became easier for me to just assume tasks he was performing rather than constantly monitoring his work product." Affidavit of Keith Harper [Dkt. 4204-1] ¶ 4. Brown testified that Gingold remained "fickle" even after this reassignment, however, sometimes giving Brown projects when deadlines loomed. 4/20 P.M. Tr. 268:18–25. Brown viewed it as a circular exercise in which he was trying to ameliorate interpersonal difficulties while Gingold would ignore the problem until he forgot about it entirely. *See id.*

In his own testimony, Brown highlighted his good relations with the Kilpatrick Stockton lawyers on the team. He described Mark Levy, a Kilpatrick Stockton appellate lawyer, as "brilliant" and stated that the two had "a very good working relationship." 4/20 A.M. Tr. 94:23–95:2. Similarly, he testified that he liked the other Kilpatrick Stockton attorneys, that he "had no problems with any of them," and that he "[thought] they were gentlemen [and they] viewed [him] the same way." *Id.* 95:3–15; *id.* 230:23–231:2. Dorris corroborated Brown's statements, testifying that while Brown had a "fractured" relationship with others on the team, he and Brown "always had a very pleasant relationship." 5/25 Tr. 34:10–15.

Additionally, Brown pointed to several distinct instances in which a member of the team complimented his work. For instance, in 2005 Levy called one of Brown's research memoranda "excellent." 4/20 A.M. Tr. 91:19–93:3. Another Kilpatrick Stockton partner, David Zachs, deemed one of Brown's draft motions "good work." *Id.* 99:22–100:17.

### D.      Brown's Workload Decrease and 2005 Partial Suspension

Because of the deteriorating relationships between Brown and other members of the *Cobell* team, he began to receive fewer and fewer assignments. This is reflected in his timesheets, which show a precipitous drop in the hours Brown expended on the case in 2003 and 2004. *See* Brown Ex. 3 at 307–452; 4/21 Tr. 25:24–26:11. According to his timesheet tables, Brown logged 1318.929 hours in 2004, 878.023 hours in the first half of 2005, and 122.393 hours in the second half of 2005. Brown Ex. 3 at 400–80. *See also* 4/21 Tr. 26:12-27:12; Brown Ex. 4 (Brown's subtotals by year, listing 1320.75 as the 2004 total, and 590 as the total for all of 2005).

In fall 2003, Gingold's displeasure with Brown became more apparent. On October 6, 2003, Gingold sent an email to the entire team except Brown, instructing that Brown's name be omitted from all signature blocks on all filings unless he "drafted or otherwise contributed to [the filing] materially." Brown Ex. 7. Around the same time, Brown claimed, Gingold began to assign him more "back room" type work. This included drafting research memoranda, motions to compel discovery, and other discovery motions that could be completed without much interaction with other team members. 4/21 Tr. 27:5–12. Gingold perceived Brown to be less involved in the case during this period, testifying that he saw Brown less and less at the office from November 2004 until the start of the IT Security trial in May 2005. *Id.* 155:16–157:11, 245:9–17 (referring to Brown's "prolonged absence" from November 2004 until May 2005). Gingold denied any aware-

ness of work performed by Brown during this period. *Id.* 246:4–17.  Harper echoed this observation.  Affidavit of Keith Harper [Dkt. 4204-1] ¶ 5 ("Brown began to disengage from the case more and more, especially in 2005 . . . [and] I saw very little of him in the office or court proceedings.")

Brown found these denials specious, since it was Gingold who "cut [him] out of the projects."  4/21 Tr. 29:9–20.  Brown maintained that he continued to work a few feet away from Gingold in their office space.  4/21 Tr. 29:9–20.  Brown believed he continued to perform meaningful work during the 2003–2005 period – all at Gingold's or Harper's behest – pointing to various assignments he completed, including the statutory retroactivity research memorandum, the Erwin fee petition, a motion related to the Contempt II trial, a motion requesting the remedy of disgorgement against the government, a draft amended complaint, and other motions and research projects.  4/20 A.M. Tr. 66:12–106:8; 4/21 Tr. 250:2–258:6; 4/22 Tr. 15:20–36:22.  Despite souring relations on the team and a decreasing workload, Brown was still working on projects in the *Cobell* case, including preparation for the IT Security trial, described below.  *See* 4/20 A.M. Tr. 105:2–20.

Toward the end of 2004, at Elouise Cobell's request, the Kilpatrick Stockton firm ramped up its involvement in the case.  *See* 4/20 A.M. Tr. 100:19–102:6; 4/22 Tr. 20:1–11.  Kilpatrick Stockton had previously been involved primarily with appellate matters.  4/20 A.M. Tr. 100:19–102:6.  In late 2004, it added two partners, Smith and Dorris, to work on the trial team in anticipation of an increasing workload.  *Id.*; 4/22 Tr. 104:24–105:8; *id.* 200:1–11.  Kilpatrick Stockton also assigned paralegals and associates to the team.  4/22 Tr. 153:5–14.  Finally, Kilpatrick Stockton moved the entire *Cobell* team to its Washington office.  4/20 A.M. Tr. 65:16–18.

A defining point during this period was the "IT Security" trial.  On April 25, 2005, after the Court of Appeals vacated the structural injunction, Judge Lamberth ordered that a trial would

be held on the security of the Department of the Interior's computer systems and the state of their recordkeeping. *See* Apr. 25, 2005 Order [Dkt. 2946]; 4/22 Tr. 106:2–21. Judge Lamberth ordered that the trial would begin approximately two weeks later, on May 2, 2005. *Id.*

Smith testified that, although Brown attended the early days of the IT Security trial and sat at counsel's table, he made no meaningful contribution to the trial effort and did not examine any witnesses. 4/22 Tr. 112:4–113:1. Brown himself admitted that he played a "supporting role" for the trial, drafting pocket briefs and doing other needed research. 4/20 A.M. Tr. 106:13–107:3. In Smith's view, Brown was unable to participate because he had not reviewed the records needed to examine the witnesses. 4/22 Tr. 112:18–22. Brown attended debriefing sessions after each day in trial, but Smith attested that Brown made no substantive contribution. *Id.* 111:20–112:12. Dorris testified that Brown appeared "disengaged" from the trial and "did not have his heart" in the task. *Id.* 203:12–204:14.

The beginning of the end for Brown's work on *Cobell* took place during the middle of the trial. On May 25, 2005, the government informed Judge Lamberth that it would take months to produce its emails and electronic records, which were held by a third-party vendor, Zantaz. 4/20 A.M. Tr. 110:5–112:1. Plaintiffs responded that they needed those documents immediately to examine witnesses during the trial. *Id.*; 4/21 Tr. 163:5–15; 4/22 Tr. 113:6–18. Gingold testified that the production was "critical" because it would shed light on the government's destruction of records related to the case. 4/21 Tr. 161:17–163:4.

Judge Lamberth instructed Smith to confer with John Siemietowski from the Department of the Interior and representatives from Zantaz to reach a resolution. 4/20 A.M. Tr. 111:23–112:14; 4/22 Tr. 115:1–15. Brown asked to participate in the meeting and Smith initially seemed happy to have his help and the knowledge he had gleaned from his work with the Special Master.

4/20 A.M. Tr. 112:7–14; 4/22 Tr. 116:6–17.  They left the courthouse and met at Kilpatrick Stock-ton's office.  4/20 A.M. Tr. 112:21–113:12; 4/22 Tr. 115:22–116:17.

According to Smith, Brown's participation in the meet-and-confer with the government derailed efforts to resolve the production problem.  4/22 Tr. 116:18–117:14.  Smith observed that Brown focused too much on berating the government for not producing the records sooner, while Smith believed that it was more appropriate to move past that issue and focus on how they could be produced most quickly.  *Id.*  Smith testified that Brown was "caustic" in his manner and that his behavior was inappropriate, particularly in light of Judge Lamberth's order that Smith lead the meeting on Plaintiffs' side.  *Id.*  Smith noted that Brown had not been participating in the prior weeks of negotiations and that Smith did not, as a result, expect Brown to take an active role in the discussion.  *Id.* 118:3–12.  Smith maintained this view on cross-examination, testifying that, although he agreed with Brown's conclusion that the emails should have been produced earlier, he did not think his criticism of Brown's approach constituted "Monday morning quarterbacking." *Id.* 161:9–19.  Rather, Brown's approach "was inappropriate in that context at that time when you had a judge asking me to handle something." *Id.* 161:9–19.  Brown himself testified that the meet-and-confer was "perfectly cordial" and resulted in "some progress" being made.  4/20 A.M. Tr. 113:2–12.

Thereafter, Smith, Brown, and the others returned to the courtroom to report their failure to resolve fully their disputes.  4/22 Tr. 119:7–120:12.  Judge Lamberth then ordered Smith and Siemietowski to again confer with Zantaz to resolve the problem.  4/20 A.M. Tr. 113:9–13.  But Smith was on deck to examine the next witness at the trial, so Judge Lamberth allowed Harper to handle the second meeting.  *Id.*; 4/22 Tr. 120:5–12.  As Harper headed for the door, Brown pulled him aside to ask if he should attend.  4/20 A.M. Tr. 113:19–21.  Harper doubted that Brown would

be of value, but Brown prevailed upon him. *Id.* 113:19–114:1. As Harper, Brown, and Rempel (also present at the second session, at Harper's request) were walking to the conference room, Rempel told Brown that Gingold did not want Brown to participate in the meeting. *Id.* 114:2–9. It does not appear that Brown ever heard this from Gingold directly. *See id.* Brown asked why, and Rempel replied, "because you did such a crappy job on the Zantaz hearing," which had occurred nearly two years prior. *Id.* 114:10–12. Brown termed this characterization "ridiculous" and ignored Rempel's instruction. *Id.* Brown testified that Harper, who overheard this exchange, did no more than shake his head at "another example . . . about how dysfunctional this team is." *Id.* 125:1–9. Harper did not second Rempel's request that Brown not attend the meeting. *Id.* 125:1–17.

Harper did aver later that Brown's participation stymied efforts to reach a resolution because he "was not sufficiently familiar with the record." Affidavit of Keith Harper [Dkt. 4204-1] ¶ 6. At some point, Harper asked Brown not to participate further in the second meeting. *Id.* Brown claimed he said "not a word" at the second meeting. 4/20 A.M. Tr. 125:10–21.

Gingold testified that, approximately twenty-five minutes from the time the lawyers left to confer about the Zantaz issue, Harper returned the courtroom to tell Gingold, "You've got to get Mark out of the room." 4/21 Tr. 137:11–138:11. Harper elaborated, "Mark is ruining the negotiation. He doesn't know what he's talking about. He hasn't been around. And you got to get him out or we're going to have a disaster on our hands." *Id.* 138:12–16. Gingold instructed Brown, standing nearby, not to return to the conference room. *Id.* 138:17–20. Brown insisted that he would return. *Id.* 138:21–139:1. Incensed, Gingold directed Brown to leave the courtroom, which he did. *Id.* 138:25–139:2. Later that afternoon, the parties successfully resolved most of the Zantaz issues. *See* 4/22 Tr. 53:20–54:6, 121:7–122:1.

Gingold testified that it was unusual for Harper, who had a "very easygoing personality," to say such things about co-counsel. 4/21 Tr. 139:2–11. Harper had been willing to work with Brown in the past. *Id.* After the trial concluded for the day, Harper approached Gingold at the office and told him, "I will not work with Mark Brown anymore, period." *Id.* 139:12–15; Affidavit of Keith Harper [Dkt. 4204-1] ¶ 6 ("As a result of this incident and the cumulative effect of working with Mr. Brown over time, I expressed disinterest in continuing to monitor his work for this case.").[7]

After leaving court on May 25, 2005, and presumably after the above conversation with Harper, Gingold sent the following email to Brown:

> Once again you have decided to ignore my direct instructions. This is the last time. If you do so again, I will request that Elouise terminate your engagement. Specifically, without my express prior approval, henceforth, you shall not participate in any negotiations or discussions with defendants, their counsel, or their contractors. Your performance this afternoon is inexcusable. Moreover, with respect to the ongoing IT evidentiary hearing, you are not expected to cross-examine witnesses or make oral arguments. Further based upon the concerns that I previously had raised with you concerning your performance in the preparation of the trial 1.5 proposed findings and conclusions, you will not be relied on in that regard in this evidentiary hearing. To the extent you are requested to prepare briefs or memoranda, such work will be done only at the request of Keith – and only if he chooses to do so. Otherwise, your participation in this litigation is suspended. If you have questions or disagree with anything in this regard, you may take them up with Elouise directly. Following the conclusion of this hearing, we will reevaluate the nature and scope of your continued participation, if any, in this litigation.
>
> I expect you to follow these instructions.

Brown Ex. 14 at 1–2. The Court questioned Brown as to what Gingold might have meant by his "[o]nce again" admonition, but Brown testified that he did not know of any instance in which he had previously ignored Gingold's instructions. 4/20 A.M. Tr. 120:17–121:8. He claimed that

---

[7] At some point the same day, Harper – who by this time had moved from NARF to Kilpatrick Stockton – relayed these complaints about Brown to Smith as well. 4/22 Tr. 173:4–14. Smith testified that, prior to Harper's comments on May 25, 2005, he had not heard any Kilpatrick Stockton attorney say anything negative about Brown. *Id.* Dorris echoed this testimony. *Id.* 204:16–205:2; 5/25 Tr. 161:7–25.

"[t]he only blowup we previously had was over the formatting of the findings of fact in Trial 1.5."
*Id.* 120:25–121:2.

As the email itself indicates and as Gingold confirmed at the hearing, Gingold did not speak
with Cobell prior to sending this "suspension" email.  4/22 Tr. 39:17–40:21.  Instead, he stated
that he talked the matter over with Harper and Rempel and decided to suspend Brown pursuant to
his authority as lead class counsel.  *Id.*  In fact, Gingold testified that he "had not raised with
[Cobell] any issues [he] was having with Mr. Brown" prior to May 25, 2005.  *Id.* 41:22–42:14.

Brown responded to Gingold's email that evening, stating

As you may recall, at the lunch break I mentioned to you that I had reviewed the
August 2002 Zantaz transcript and prepared a line of questioning for the Zantaz
witness – to which you responded "Good."  Your response gave me no suggestion
that you did not want me to participate in the Zantaz matter, so I accompanied Da-
vid Smith to Kilpatrick Stockton for that conference call over the lunch hour.

To the best of my knowledge, in participating in the conference with Siemietowski
and Keith, I believed I was following your instructions to take direction from Keith.
As Keith got up from counsel table to go and confer, I asked him if he wanted me
to attend.  He asked if I had been a party to the telephone conference earlier in the
day with the Zantaz California personnel, and I said I had.  He then asked me to
attend.

As, Keith, Geoffrey and I walked to the conference room, Geoffrey in his usual
insulting manner suggested that I stay behind because in his mind I had supposedly
done a "crappy" job asking questions at the Zantaz briefing more than two years
ago.  Naturally, this was the first I had heard of any complaint about my perfor-
mance with respect to such briefing.  Indeed, they did not even recall that I had
attended [sic] Keith heard the entire exchange and, despite the three of us caucusing
for a few minutes before Siemietowski and Carol Wolf came in, I had no indication
from Keith that he did not want me present.  As I have indicated in the past, I will
be happy to work with Keith.  Kilpatrick Stockton asked me several days ago to
work on the appellate brief.  Are you prohibiting me form do [sic] that – or should
I discuss it with Keith?

Brown Ex. 14 at 1.  Brown clarified at the hearing that when he wrote, "[a]s I have indicated in

the past, I will be happy to work with Keith," he was referring to "frictions" between himself and

Rempel in mid-2004 that led Gingold to reassign oversight of Brown to Harper.  4/20 P.M. Tr.

265:23–267:8.  Gingold replied:

> My letter stands.  If KS wants your assistance on appellate matters, its entirely be-
> tween you and KS.  I take no position in that regard.  Nor did I take any position
> on, or discuss your involvement in, *appellate* issues in my email to you of this date.
> My email is solely related to trial court matters [sic] If you wish to discuss the scope
> of your continuing engagement in this litigation, you should have them with Keith,
> KS, and/or Elouise.  I'm sure that you have a better working relationship with them
> because it is clear that ours is no longer tenable.  I have not raised this matter with
> Elouise.  You are certainly free to do so if you wish and you and she are free to
> work out whatever you both think is appropriate.

Brown Ex. 14 at 3.

Later that evening, after the email exchange with Gingold, Brown sent an email to Harper

in which he recounted a voicemail message Siemietowski had left for him that evening regarding

the next steps to take in retrieving the Zantaz records.  Brown Ex. 60.  Brown proffers the email

as evidence that he did not derail the Zantaz meet-and-confer efforts, suggesting that the govern-

ment lawyer chose to call Brown, rather than Rempel or Harper, to tie up loose ends related to

Zantaz.  4/20 P.M. Tr. 131:1–133:15.

### E.     Brown's Post-Suspension Work and Return to California

After the heated exchange on May 25, 2005, Brown nevertheless continued to work on the

case, largely independently of the rest of the *Cobell* team.  *See* 4/20 P.M. Tr. 133:21–134:9.  Nev-

ertheless, Brown testified that it "became harder for [him] to find work" after the May 2005 row

with Gingold.  4/20 A.M. Tr. 120:13–16.  Though Gingold instructed him not to, Brown spent –

and seeks compensation for – substantial time reviewing transcripts of the IT Security trial and

preparing proposed findings and conclusions for the trial before and after May 25, 2005.  *See*

Brown Ex. 3; 4/21 Tr. 9:5–11:9, 165:22–166:25 (Gingold testifying Brown's conduct was contrary

to what he instructed).  He never told anybody that he was preparing the findings and conclusions.

4/20 A.M Tr. 109:10–110:5; 4/21 Tr. 13:23–14:3.  His work was made unnecessary when Judge

Lamberth informed the parties toward the end of the trial that no proposed findings and conclusions would be required.  4/21 Tr. 14:16–20.  When Brown later sent his draft findings and conclusions to Austin, Austin expressed surprise in light of Judge Lamberth's directive.  *Id.* 14:4–15; Affidavit of Bill Austin [Dkt. 4202-2] ¶ 9.  Brown did not know about Judge Lamberth's announcement, since he was not at the trial.  4/21 Tr. 14:4–15; 4/22 Tr. 166:13–167:1.

Brown claims he was only doing his job of keeping abreast of the case.  4/20 A.M. Tr. 109:10–110:9; 4/21 Tr. 11:1–9.  He further asserted that he provided value to the team by uploading the daily transcripts to make them easily accessible to co-counsel.  4/20 A.M. Tr. 109:10–110:9; 4/21 Tr. 15:10–16:2.  But Brown only uploaded the transcripts into his own database, housed on his computer, generally inaccessible to his co-counsel.  4/21 Tr. 16:3–17:8, 21:12–17; 4/22 Tr. 19:14–20.  He claimed he would provide information from his database to Gingold, counsel for NARF, and others at their request, but provided no evidence of any such request – instead, he stated that his co-counsel had done so in the past and that he assumed they would do so again. *See* 4/21 Tr. 16:3–17:8, 21:12–17.  Dorris testified that Kilpatrick Stockton had its own database for transcripts and never knew about or used Brown's database.  4/22 Tr. 19:21–20:18.  Indeed, Brown's computer returned with him permanently to California in January 2006, removing any possibility of its access by other team members.  4/21 Tr. 17:21–18:15, 21:3–11.

In the wake of the trial, Brown's participation in the litigation diminished further.  The parties disagreed sharply as to the cause and extent of diminution.  At the hearing, Brown's counsel tried to elicit testimony from Gingold that his May 25, 2005 emails were calculated to prevent Brown from being able to work on the case.  For instance, Gingold conceded that he directed Brown to seek work from Harper despite knowing that Harper had that day told Gingold that he would not work with Brown any longer.  4/22 Tr. 58:21–59:17.  Nevertheless, Gingold claimed

that he expected Brown to be able to get work from Kilpatrick Stockton given the huge appellate workload facing the team at that time.  *Id.* 64:1–65:3.  Gingold maintained that the suspension was not intended to "deep six" Brown from the *Cobell* team entirely, but to "minimize whatever the personality conflicts were occurring in the trial court."  *Id.* 65:1–3.

Gingold testified that he gave Brown no more work after May 2005.  *See* 4/22 Tr. 65:4–66:1.  Austin averred that he learned from Gingold about the interpersonal clashes during the IT Security trial and he agreed to work with Brown.  Affidavit of Bill Austin [Dkt. 4202-1] ¶¶ 6–8.  Gingold told Austin that he had instructed Brown to contact Austin to request assignments.  *Id.* ¶ 8.  Gingold testified that he heard from Austin that he had work to give but that "Mark never called him."  4/22 Tr. 66:9–25.  Similarly, Dorris testified that Austin contacted him to get his go-ahead to give Brown some appellate work.  *Id.* 211:6–19.  Smith testified that he never saw Brown at the office after May 2005, save one appearance around the time of a September 2005 oral argument in the Court of Appeals.  *Id.* 173:15–24; *see also id.* 205:3–21 (Dorris testifying that he did not see Brown again after his May 2005 partial suspension until the mid-September 2005 oral argument, while admitting that he split that period of time between Washington and Atlanta).  Smith admitted, with noticeable reservation, that Brown's suspension might have lead Brown not to come in to the office.  *Id.* 173:25–174:14.

At the hearing, Brown presented evidence showing that he performed some work following the IT Security trial and his partial suspension.  For instance, on August 25, 2005, he provided comments on an appellate brief drafted by Austin.  4/20 P.M. Tr. 135:2–24; Brown Ex. 16.  He did not draft the brief, nor was he specifically consulted for his commentary.  *See* 4/20 P.M. Tr. 135:9–24.  Instead, he offered his comments *sua sponte* in conformity with the normal practice on the team, which was to circulate drafts to all attorneys for comment and edits.  *Id.*  Brown admitted

that this type of commentary typified most of his work at the time and that he "wasn't receiving actual projects." *Id.* 135:18–21, 141:24–142:8 (Brown testifying that he did not receive assignments from anyone during this period save "an assignment or two from Mr. Levy"); *see also* Brown Ex. 17 (August 30, 2005 email containing comments on draft brief produced by Austin); Brown Ex. 19 (October 11, 2005 email containing comments on draft letter written by Austin); 4/20 P.M. Tr. 257:25–258:9 (Brown testifying that his comments on Austin's work were not "projects" but mere responses to "invitations to all members of the team" to edit and comment); 4/21 Tr. 29:21–30:11 (same).   Nevertheless, at this time, Brown maintained his Washington residence and his office in Kilpatrick Stockton's Washington offices.   4/20 P.M. Tr. 136:8–17.

In mid-September 2005, Brown offered to help Austin prepare for an oral argument before the Court of Appeals.   4/20 P.M. Tr. 137:18–138:10; Brown Ex. 18.   Austin never took him up on the offer, and Austin performed so poorly at the argument that, according to Brown, Gingold "put [him] out to pasture."   4/20 P.M. Tr. 138:11–141:1; *but see* 4/22 Tr. 207:4–208:1 (Dorris testifying that it "wasn't Bill Austin's finest argument" but that "he did admirably under the circumstances"). Brown entreated Austin for work in August 2005, asking him to "keep him in mind" for any substantive projects that might arise.   4/20 P.M. Tr. 142:9–143:7.   But again, no work came, except some small projects from Mark Levy, a Kilpatrick Stockton appellate lawyer.   *Id.*   Brown never followed up with additional requests for work.   4/21 Tr. 30:18–31:10.   Brown stated at the hearing that he didn't receive projects from Austin because, following Austin's argument before the Court of Appeals, Gingold "sent [Austin] to Siberia."   *Id.* 31:6–14; *but see* 4/22 Tr. 208:2–209:1 (Dorris testifying that Austin was not "exiled to Siberia" but continued to work on the case for years). Brown considered that following up with Austin on his request for work would be construed as "nagging."   4/20 P.M. Tr. 31:25–32:10.

Dorris testified that, after November 2005, Plaintiffs faced a "dark" period.  That month, the Court of Appeals vacated the structural injunction for the second time and limited the scope of the accounting the government had to perform.  4/22 Tr. 209:17–25; *Cobell v. Norton*, 428 F.3d 1070, 1077–78 (D.C. Cir. 2005); *see also* 4/21 Tr. 76:4–18 (Brown testifying that the Court of Appeals' November 2005 order "had some positive aspects to it, it had some negative aspects to it").  Also at this time, the Court of Appeals vacated the disconnect order issued following the IT Security trial.  4/22 Tr. 210:21–211:3; *Cobell v. Kempthorne*, 455 F.3d 301, 317 (D.C. Cir. 2006).

After the November 2005 decision from the D.C. Circuit, Brown sought no more assignments from Kilpatrick Stockton, save one assignment he completed for Levy during that month.  4/21 Tr. 32:11–34:19.  According to Dorris, although Kilpatrick Stockton lawyers made no effort in late 2005 or in 2006 to contact Brown or give him appellate work, "[their] perspective was that if Mark wanted work, he would come to us and seek that work out."  4/22 211:20–212:2.  However, Dorris admitted that he was not the "point person" for assigning work to Brown and knew only that no colleagues had reported to him that Brown had sought out work.  *Id.* 212:1–15.  Dorris testified that he gave Brown no work nor instructed any other lawyer at Kilpatrick Stockton to do so.  5/25 Tr. 160:19–161:6.  Brown's position is that he turned down no work assigned to him and that, contrary to the view of Plaintiff, it was the other members of the team who refused to give him work.  According to Brown, he was "frozen out" by the other members of the *Cobell* team after his May 2005 suspension.

The next key juncture in Brown's engagement in *Cobell* came in mid-January 2006.  At that time, he moved back to California.  4/20 P.M. Tr. 9–18.  He did not tell anyone he was leaving.  4/21 Tr. 35:20–39:19, 74:21–75:10; 4/22 Tr. 212:17–213:6 (Dorris testifying that no Kilpatrick Stockton lawyer knew where Brown had gone, only that "he seemed to have just left"); Affidavit

of Bill Austin [Dkt. 4202-2] ¶ 10.   Brown stated that the last time he spoke with Gingold was probably the "funereal" lunch following Austin's argument before the D.C. Circuit in September 2005.  4/20 P.M. Tr. 144:2–145:3.  Brown admitted that he had no final conversation with Gingold before he departed.  *Id.* 145:14–23.

Brown explained his departure as being consistent with his usual practice and suggested that he could be reached for work in California.  *Id.*  Further, in 2001, Gingold had mentioned to Brown that he should move back to California and work from there.  *Id.*  At the time Brown left, the *Cobell* class was still represented by Gingold, Harper, NARF attorneys, and dozens of lawyers from Kilpatrick Stockton.

After his departure, Brown performed almost no additional work on the *Cobell* case, although he repeatedly claimed in his testimony that he remained ready and willing to accept new assignments.  *See* 4/20 P.M. Tr. 150:20–151:1; 4/21 Tr. 35:20–23.  Brown felt he remained "on call" after his return to California.  *Id.*  He stated that, although he was given no new work, he kept up-to-date on the case from California by monitoring the Court's docket.  4/20 P.M. Tr. 145:5–9.  However, he spent no time on the case in 2006, and in 2007 he only expended eighteen hours reviewing an attorney's fee petition that included some of his time.  *See* Brown Ex. 3 at 481.

Brown continued to pay rent to Kilpatrick Stockton for his subleased space in its Washington office until sometime in 2007, when Dorris called him to ask if the firm could use the space.  4/20 P.M. Tr. 185:14–186:3; 4/22 Tr. 213:7–214:12.  During that conversation, Brown asked Dorris whether he would receive any more assignments, and Dorris stated that it was unlikely.  *Id.*  Brown agreed to give up the space.  4/20 P.M. Tr. 185:14–186:3.  At the hearing, he testified that, since his return to California, he had reentered private practice part time.  *Id.* 199:10–20, 234:9–13.

F.      **Brown's Termination**

Gingold testified that he heard nothing from Brown for over fifteen months after his January 2006 departure.  4/21 Tr. 170:16–20; *see also* Brown Ex. 20.  Brown broke the silence late in April 2007.  *See* 4/21 Tr. 75:11–18.  After the Court of Appeals vacated the injunction resulting from the IT Security trial and reversed a class communication order, the case was reassigned to Judge Robertson.  *Cobell v. Kempthorne*, 455 F.3d 301, 317 (D.C. Cir. 2006); *Cobell v. Kempthorne*, 455 F.3d 317, 335–36 (D.C. Cir. 2006).  In April 2007, Judge Robertson granted a petition from Plaintiffs for payment of attorney's fees related to the "GAO" and "Erwin" sanctions.  Apr. 20, 2007 Order [Dkt. 3312].  Judge Robertson then scheduled a trial for October 2007 to determine whether the government continued to be in breach of its accounting obligation.  4/20 P.M. Tr. 147:7–12; Apr. 20, 2007 Order [Dkt. 3312].

Brown emailed Gingold on April 24, 2007:

> Congratulations on obtaining the April 20th order from Robertson.  I am prepared to participate in the October trial and its preparations.  Let me know how I can help.

Brown Ex. 20.  Brown testified that he sent this offer of assistance because Gingold was "somewhat fickle" and, given the passage of time since the May 2005 quarrel, Gingold might be ready to accept him back into the team.  4/20 P.M. Tr. 147:13–20.  Gingold responded by email the next day on April 25, 2007:

> While the government has been ordered to pay certain fees, it may seek reconsideration, so there may be further delay in payment.
>
> With respect to your participation in the October 10 trial, you have not participated in this case for at least two years and, because of the heavy activity, the work done, and issue and evidentiary implications related thereto in your absence, I can't imagine how you can now be of value in a trial on the merits.  Simply too much has occurred in this heavily litigated case in the district court, court of appeals and supreme court in the interregnum.  As I advised you two years ago, given the various issues that I, Geoffrey, and Keith had with you at the time, you should have talked to Bill Austin, or others at KS at your election, to determine the work that you could do with them on this case going forward.  As far as I know, you didn't follow-up

on that advice.  Therefore, your offer to again participate in this litigation is puzzling and surprising.

Under these circumstances, I don't see any reason why your withdrawal from active participation in this case two years ago should not now be memorialized so that we can put that experience behind us.  You're certainly free to discuss this with Keith and Elouise without my participation.  However, I intend to recommend to Elouise that she notify you formally that your withdrawal two years ago vitiates the need for future professional services and that she reject your offer in that regard.

Brown Ex. 21.

Gingold further testified that he contacted Austin before sending the email, who reported that Brown had not reached out to him about work that needed to be done.  *Id.* 175:7–18.  Finally, Gingold explained that he referred in this email to the conclusion of Brown's services on the *Cobell* matter because the addition of the Kilpatrick Stockton lawyers reduced the need for Brown's services, particularly in light of his difficulties in working with Gingold, Rempel, and Harper.  *Id.* 175:19–176:7.

Brown testified at the hearing that he had "never withdrawn in [his] mind" and that Gingold's attempt to characterize his departure as such was inaccurate.  4/20 P.M. Tr. 149:17–150:1. He claimed that, from his return to California onward, he "remained ready to accept any assignment," retained his office space in Washington, and would have returned there if instructed to do so.  *Id.* 150:20–151:1.  He also did not view the long gap in work, from January 2006 until April 2007, as particularly concerning, reiterating that he believed Gingold's fickle nature could result in an attorney's extended exile, only to be welcomed back into the inner circle sometime later.  *See* 4/21 Tr. 44:8–22.  He also had no indication that Gingold ever spoke with Cobell regarding his withdrawal or termination and no one ever told him he had been terminated "for cause."  4/20 P.M. Tr. 152:22–153:7.

On April 30, 2007, Gingold followed up on his prior email, writing:

In thinking about your latest e-mail to me, it is puzzling given my prior e-mail to you concerning your withdrawal from this case. In the event that you didn't receive my [April 25] transmission regarding formal confirmation of the termination of your role as a member of the Cobell litigation team, I am forwarding it to you.

Brown Ex. 22 at 3. Brown attributes the additional follow-up to Gingold "[getting] a little bit

fidgety that I haven't responded." 4/20 P.M. Tr. 159:13–24. On May 1, 2007, Brown replied:

I guess "puzzling" describes a lot of things.

You began your e-mail response to me of the 25th by raising the issue of sanctions and attorney's fees; it was *not* a topic I had referenced in my earlier e-mail. Apart from that reference, your e-mail was directed – as was my prior e-mail – to the possibility of my working on the upcoming October trial. Moreover, it did not occur to me that offering to work on a sanctions motion in which I was a primary participant, and one which we are now being asked by the Court to respond years later, would be an issue to you.

Please do not attempt to paper this situation as if I chose to "withdraw" some months or years ago. It is not accurate.

To set the record straight, Geoffrey and I began having our differences early on, but rather than intervening in a constructive manner you seemed to enjoy watching the drama. These tensions culminated in Geoffrey's refusing to forward me faxes relevant to the litigation – thereby keeping me in the dark as to key developments and obviously impairing my ability to fully represent my clients. While you at times intervened and intermittently restored the flow of faxes, as you know for much of 2004 and thereafter I had no access to faxes received through Geoffrey's e-fax system – which was the primary conduit through which the non-NARF and non-Kilpatrick portions of the litigation team received faxed communications.

I believe as early as late 2003 you instituted a policy change and had my name removed from almost all pleadings despite my contributing significant portions to many subsequently filed documents. Moreover, starting at least as early as 2004, you began excluding me from conferences and meetings (and most e-mail communications) that were occurring with other team members to discuss strategy and other ongoing topics, leaving me to draft motions, research memoranda and other documents in the background.

Finally, on May 25, 2005 – during the height of the IT Security trial – you e-mailed me that I would have no further role in that trial proceeding and that you were "suspending" my role in the trial portion of the litigation unless either Keith or Kilpatrick asked me to work on something. In a subsequent e-mail you made clear that I could continue to work on appellate matters with Kilpatrick personnel, which I did, staying full time in Washington, D.C. into January 2006. However, given the few assignments I was receiving due to your mandate – assignments that I could

certainly accomplish from California – and the relative calm in the litigation during which there were relatively few filings, I thereafter chose to spend more of my time in California.

Dennis I believe my greatest sin has been that I have not been a "yes-man" to you. I suspect that you were not pleased with many of the research and strategy memoranda that I generated – including the *res judicata* and the statutory retroactivity memoranda, and the strategy memoranda concerning how to handle issues before the Court of Appeal [sic] in the crucial *Cobell XII* and *Cobell XIII* timeframe – because they did not give you your pre-conceived answers. The result was that you would belittle such memoranda and the legal advice I offered, and announce to me and others that "you and I disagree on everything." Of course, as a member of a trial team, it is neither my role to be a yes-man or a no-man, but rather to put the interests of the clients first and provide as accurate advice as possible. I believe I have done this, and provided a very useful perspective in the process – and I believe subsequent events and court opinions have in large part proven my advice extremely sound. There is an extensive written record that I believe amply manifests my competence and sound advice. In short, I stand by all my professional work – all the depositions, examination of witnesses and other trial work that I have performed, and all the motions and memoranda that I have drafted.

You stated in May of 2005 that I was free to consult Elouise if I wished, but I never saw fit to burden her in that way (and to the best of my knowledge you have not done so either). You are the lead counsel and ultimately it is your decision and responsibility tactically to utilize the resources at your disposal in the way you see fit – obviously in accordance with your fiduciary duties, including those owed to the client class. If in your mind that entailed allowing me only a limited or peripheral role and disregarding my advice that is, in the first instance, your decision. However, having made, articulated and enforced that decision, you cannot properly now maintain that I have voluntarily withdrawn from the representation. (Nor do I believe you can obtain your stated goal of formalizing my withdrawal from the litigation team without a court order.)

Obviously if you continue to maintain that I have withdrawn and now wish to involve Eloise [sic] as a representative of the client class in somehow "formalizing" that supposed fact, we will at a minimum need to get Elouise involved. You, however, in your recent e-mail seemed to leave the ball in my court by suggesting that I was free to discuss the matter with Keith or Elouise – puzzlingly "without [your] participation."

If there is some immediate urgency to address and resolve this issue in less than a week's time – or if you have already communicated with Elouise or other class representatives on this matter – please let me know and afford me the courtesy of a copy or synopsis of such communication. I'm not sure whether Elouise or any of us need such a distraction while the litigation is ongoing, but if you think it appropriate to take up these and related issues at this time, so be it.

Brown Ex. 22 at 2–3.  Later that same day, Gingold responded to Brown.  He stated:

> As I indicated in my first email to you on this subject, I would first give you the opportunity to talk to Elouise.  Therefore, I have not yet talked to her about this issue; however, I believe it should be resolved with out [sic] further delay.  We ought to deal with distractions sooner than later so they don't get out of control.  If you have a proposal for an amicable, mutually satisfactory resolution, make it.

Brown Ex. 23.  Gingold testified that he had spoken with Cobell prior to responding and she indicated that she did not dislike Brown and wanted to speak with him.  4/21 Tr. 177:23–178:22.[8] Brown viewed such a conversation as Gingold's attempt to "poison the well" and convince Cobell to be angry at him.  4/20 P.M. Tr. 163:3–13.

After this email exchange, Brown never contacted Cobell to discuss his participation in or departure from the case.  4/20 P.M. Tr. 153:8–10; 4/21 Tr. 176:15–21.  Neither did he make a "proposal" to resolve his feud with Gingold.  4/20 P.M. Tr. 165:6–14; 4/21 Tr. 178:24–179:8.  He justified this by arguing that only two days after the exchange, Gingold contacted him to ask for his help on a sanctions motion.  Id. 153:11–16, 167:13–168:8.  In fact, on May 3, 2007, Gingold contacted Brown at Cobell's direction and asked for him to provide an updated affidavit and time compilation to be included in an application for an interim fee award.  Brown Ex. 24; 4/20 P.M. Tr. 168:20–169:5; 4/22 Tr. 72:10–73:7.  Brown viewed the request as a sign of détente between him and Gingold.  4/20 P.M. Tr. 169:6–14; 4/21 Tr. 81:13–24.  Brown provided the requested affidavit.  4/21 Tr. 179:13–25.  Gingold admitted that he believed Brown should be paid his "legitimate" or "correct" time, as determined by the Court, for the matters at issue in the 2007 fee petition.  Id. 193:15–194:1.

---

[8] There was some disagreement on when this conversation occurred; apparently Gingold testified at his deposition that, consistent with the language of the email, he did not speak with Cobell about the Brown problem until after sending this email.  See 4/22 Tr. 68:21–70:1.  Yet Gingold also testified to speaking with Cobell prior to sending his April 25, 2007 response to Brown's email.  Gingold's recollection as to when he discussed Brown with Cobell seemed confused at the hearing.  In any event, the Court does not read great significance into whether the Gingold-Cobell conversation took place shortly before or after this email or the April 25 email.

On June 6, 2007, Gingold sent an email to class counsel, including Brown, asking for wiring instructions for the fee award resulting from the petition.  Brown Ex. 25; 4/20 P.M. Tr. 170:4–13.  Brown provided his wiring instructions, but was never paid.  In fact, none of the class counsel was ever paid, because Plaintiffs instead determined that they needed the money to defray expert costs.  Thus, no lawyer was compensated for the time submitted in that fee petition.  *See* Brown Ex. 27.  Other than providing the affidavit in support of the fee petition in mid-2007, he never received any more work requests from any member of the *Cobell* team.  4/20 P.M. Tr. 171:4–6; 4/21 Tr. 80:25–81:4.

Two months later, Cobell directed Gingold to terminate Brown, which decision Gingold attributed to Brown's absence and Cobell's inquiries about Brown's role and the need to replace him, given the heavy workload.  4/21 Tr. 169:4–22; 4/22 Tr. 71:9–72:4; *id.* 97:4–15.[9]  Gingold terminated Brown by email on July 10, 2007.  4/21 Tr. 169:4–22; Brown Ex. 26.  That email reads:

> As we are preparing to go to trial in October, we are trying to tie-up various loose ends.  Inasmuch as you have not been participating in the litigation for the last couple of years and we are staffing up to try the next three trials that Judge Robertson indicated we will have, it is time to resolve your professional status.  I had asked you to provide a plan or proposal for resolution of your status a few months ago; however, I received nothing from you in that regard.  I also suggested that you may want to speak to Elouise about your status.  But, you didn't do that either.  Perhaps my suggestions slipped your mind.

> Therefore, in accordance with the provision for termination that is set forth in your engagement letter, please be informed that your engagement is terminated.  If you have any questions, please let me know as soon as possible.  In any event, I wish you the best of luck in the future.

---

[9] Cobell passed away in October 2011.  Because of this, Brown was not able to depose her in anticipation of the evidentiary hearing.  He objects to the admission of her affidavit, which she filed in February 2011 in connection with Plaintiffs' opposition to his fee petition, *see* Cobell Ex. 42, arguing that the affidavit is now hearsay because Cobell is unavailable for cross-examination regarding her statements therein.  Brown is correct:  absent some special indicia of trustworthiness inherent in Cobell's statements, they would be inadmissible hearsay for purposes of this Court's decision.  *See* Fed. R. Evid. 802, 804, 807.  Yet her averments do not affect the ultimate result in this case, so the Court need not and does not decide whether they are admissable.  Cobell's statements are relayed here only to provide context and as including circumstantial evidence of the state of mind and the effect of the statement upon the listener, here Gingold.  *Harris*, 454 U.S. at 346.

Brown Ex. 26.  Brown did not respond.  *See* 4/21 Tr. 182:16–183:4.  Gingold testified that his reference to the "termination provision" of Brown's engagement letter was "an assumption on his part" since he could not locate a copy of the letter prior to sending the email.  4/21 Tr. 181:1–182:5.  Gingold also conceded that his email to Brown, and the follow-up emails to be discussed shortly, never used the term "abandonment" to describe Brown's January 2006 return to California.  4/22 Tr. 72:5–73:17.

Gingold called Brown in September 2007 to ensure that Brown had received the termination email.  4/20 P.M. Tr. 173:2–19.  The two also discussed Plaintiffs' decision to withhold the 2007 interim fee award for paying expert fees.  *Id.*  Gingold thereafter sent Brown an email memorializing their conversation.  *Id.*; Brown Ex. 27.  Gingold summarized the conversation as follows:

> Pursuant to your request, I am confirming the substance of the telephone conversation that you and I had a few minutes ago.  First, you received and read my email to you dated July 10, 2007 terminating your representation of the *Cobell* class.  Secon [sic], funds paid by defendants to plaintiffs that are attributable to your time regarding the GAO and Erwin sanctions are being held in the Native American Bank by the Blackfeet Reservation Development Fund and may be used to pay the fees and expenses of experts.  Third, funds attributable to time spent by other attorneys are also held at the bank for the same purpose.  Fourth, there is nothing that I know of in your engagement letter that requires plaintiffs to pay you interim fees.  Fifth, you did not respond to my July 10, 2007 email because you have no issues to discuss with me regarding your termination.  Sixth you will directly deal with KS regarding your office and furniture.
>
> If, however, you believe you are entitled to the payment of such fees, please explain and I will discuss your position with Elouise.  Otherwise, with your termination, you have no further professional obligation to the *Cobell* plaintiffs – other than to maintain client confidences in accordance with your ethical duties – and the *Cobell* plaintiffs owe no further obligation to you – other than, at final judgment, to request an award for your time at an appropriate hourly rate.
>
> I trust this is consistent with your understanding of the facts.  If your understanding is different than mine, please advise.  Thank you for your efforts and good luck.

Brown Ex. 27.  Brown, not content with Gingold's version of events, responded:

I was surprised in our recent telephone conference to learn for the first time that the Government had paid the attorney's fees that the Court recently awarded – and that such funds were being held in escrow, apparently pending a decision whether to use them to fund experts – and that you had not had the courtesy to have informed me of those events.  Under the circumstances, my request was a limited one:  I asked you to put in writing the details concerning the funds being held and the reasons behind it so that there would be no future misunderstanding.  I thank you for the information you provided.

However, I didn't expect you to send a self-serving letter purporting to confirm portions of our conversation that never occurred.  Let me be clear what I stated in our conversation:  As to item no. 1, I received your July 10th e-mail purporting to terminate me and read the contents thereof; according to my reading of such e-mail, it did not request a response and I have, to date, made none.  In addition, as to item no. 6, I will deal directly with Kilpatrick Stockton regarding my office and furniture.

Things relating to your state-of-mind or that are your representations to me (*i.e.*, items 2, 3 and 4) are what they are.

The balance of your email (item 5 and the last paragraph) is merely a reflection of your hopes and dreams, and not a reflection of reality or anything we discussed – and certainly nothing I agreed to.  As such, your characterization of "facts" in those portions of your e-mail (as well as in any other portions to the extent not directly addressed above) is rejected *in toto*.

MKB

P.S.    In light of your inherent conflicts of interest, I suggest that you not attempt to advise Elouise yourself.  Rather, to use a term that you utilized regularly in the litigation in taking the Government and its counsel to task, if you feel she needs counsel as to any of these matters, she should have "unconflicted" counsel.

Brown Ex. 28.

Brown copied Cobell and Dorris on his response.  Brown Ex. 28.  Brown testified that he copied Cobell because "things had reached the point where we were not going to be able to resolve that in any productive way.  And I thought she needed – I had no confirmation that she was even being kept apprised of things."  4/20 P.M. Tr. 184:18–185:7.  He further stated that he copied her to, in essence, put the ball in Cobell's court about discussing Brown's role in or termination from the team.  4/21 Tr. 84:10–18.  Neither Cobell, Gingold, nor any other member of the litigation

team ever replied to Brown's email.  4/20 P.M. Tr. 185:8–186:3.  Gingold testified that after she was copied on Brown's email, Cobell spoke with Gingold and instructed him to "get [Brown's] time and see what we can do with his time and see . . . whether or not and the extent to which he should be paid."  4/21 Tr. 188:7–19.  Gingold stated that although he later asked Brown to provide his time records, Brown refused to do so.  *Id.* 188:20–24.

The only further communications Brown ever had with any *Cobell* team member were his two conversations with Dorris – one in 2007, a couple of months after these emails, regarding surrendering his subleased office space in the Kilpatrick Stockton Washington office, and a meeting with Dorris in 2010 in California, described further below.  *See id.* 185:14–188:3.

### G.     Brown's Failure to Contact Cobell

Brown did not contact Cobell to discuss his continuing participation in the case after his mid-2005 partial suspension or at the time of his departure in January 2006.  4/20 P.M. Tr. 212:16–213:6.  The first time he communicated with her in any way about these issues was when he copied her on his September 2007 email to Gingold.  4/21 Tr. 88:4–7; *see also* 4/22 Tr. 98:13–100:12.

The reasons why are subject to vigorous dispute.  Plaintiffs claim that Brown should have reached out to her as Gingold recommended.  In their view, Cobell was "very accessible" to all the attorneys on the *Cobell* team, including Brown.  4/22 Tr. 122:25–123:16.  Brown himself admitted that Cobell "reached out to [the team] and tried to meet with us and keep the team going and be friendly and all that."  4/20 P.M. Tr. 208:2–9.  She and Brown had a good professional relationship, and his own time records indicate that they spoke to each other many times.  *Id.* 211:13–212:15; *see* Cobell Ex. 26 (compilation of time from Brown's records reflecting conferences with Cobell).  In other words, Brown "knew how to communicate with her and how to reach her if [he] wanted to."  *Id.* 82:24–83:3.

Brown testified that he assumed other members of the litigation team – either Gingold or Rempel – informed her of the situation concerning his participation on the team. Indeed, according to Brown, it was more common for Gingold, as lead counsel, or Rempel, as "Chief Operating Officer" of the team, to speak with Cobell, as opposed to other members of the team. 4/20 P.M. Tr. 209:12–23, 158:9–159:19. Brown testified that Gingold "pretty much channeled communications with her." *Id.* 213:22–214:5; 4/20 A.M. Tr. 39:18–21 (Gingold channeled all communications with Cobell and "talked to her on a very regular basis"). This was consistent with Brown's prior practice, in which his firm had a "point partner" for each client who was the designated contact person for that client. 4/21 Tr. 90:20–91:2. Gingold himself admitted that he was the "primary contact" on the litigation team for Cobell. *Id.* 228:22–229:10.

Moreover, Brown believed that issues related to the internal workings of the litigation team were not something Cobell should be bothered with, particularly because Gingold was, in Brown's mind, quite unpredictable and apt to change his mind on the suspension. 4/21 Tr. 39:20–40:7, 89:11–21. Further, Brown viewed his problems with Gingold as an interpersonal dispute that was "first and foremost" for Brown and Gingold to resolve. *Id.* 82:6–13. He stated that none of his conversations with Cobell, either before or after his retention – prior to the September 2007 email he copied her on – touched on the matter of his engagement. 4/21 Tr. 87:14–21. Gingold, for his part, claimed that Brown should have talked to Cobell about the matter because he expressly left that option open to Brown.

When asked whether he felt he had a professional obligation to contact Cobell upon his departure to California, Brown responded that he believed he "satisfied any ethical duty [he] might have had" by leaving notification of his departure to Gingold or Rempel. *See* 4/21 Tr. 40:8–44:1. He also believed that he had never withdrawn from the representation and remained ready to do

more work if assigned, thus, in his mind, obviating any need to tell Cobell that he had withdrawn. *Id.*

Plaintiffs place great emphasis on Brown's decision not to contact her directly after his partial suspension during the IT Security trial, before or after his return to California. Gingold testified that Brown's failure to communicate was harmful to the team, although he found it difficult to quantify the impact. 4/22 Tr. 100:14–101:13. In general terms, Gingold felt that Brown should have reached out to Cobell to resolve his issues and get back to work on the trial team, which was in need of assistance. *Id.* He conceded, however, that Brown's 2005 suspension did not harm the trial team but help it, since Gingold perceived that Brown was causing undue friction among the team members. *Id.* 101:14–23.

## H.     Settlement and Attorney's Fees Award

After the October 2007 bench trial, Judge Robertson declared that the government was still in breach of its accounting obligation, but that the required accounting was impossible because Congress would not fund it. 4/22 Tr. 216:10–21. Judge Robertson held another bench trial in June 2008 to determine what remedy should issue instead. *Id.* 217:5–23. In August 2008, he issued a decision awarding $455.6 million in restitution to Plaintiffs. *Id.* 217:24–218:9. The Court of Appeals reversed, directing Judge Robertson to ensure that the government provided the best accounting possible with the resources at its disposal. *Cobell v. Salazar*, 573 F.3d 808, 815 (D.C. Cir. 2009).

Around this time, the parties started to engage in serious settlement negotiations. *Id.* 218:18–219:14. Dorris indicated in his testimony that the change in administration from President Bush to President Obama was a major factor in the government's new-found openness to settle-

ment.  *Id.*  As one might presume, settling a case of this historic importance, vast size, and incred-

ible complexity took some time.  The parties signed a settlement agreement in December 2009.

*Id.* 219:17–24.  The agreement provided for $1.412 billion to pay to the classes of trust beneficiar-

ies and another $2 billion to fund trust reform – in particular, to fund the Department of the Inte-

rior's effort to consolidate heavily fractionated shares of trust land.  Cobell Exhibit 41 at 6; 5/25

Tr. 24:21–25:24.  The agreement required approval from both Congress and the Court.  *See* Cobell

Ex. 41 at 1–2; 5/25 Tr. 23:4–12.  Congress did not approve the settlement until the passage of the

Claims Resolution Act in December 2010, and the Court approved the settlement in June 2011.

The agreement provided for an award of class counsel's pre- and post-settlement fees.  Cobell Ex.

41 at 47.  The pre-settlement fee award would be determined at the Court's discretion "in accord-

ance with controlling law."  *Id.* at 48.  A separate agreement on attorney's fees, executed simulta-

neously with the settlement agreement, stated that neither party would appeal a pre-settlement fee

award falling between $50 million and $99.9 million.  Brown Ex. 29 at 1–3; 4/22 Tr. 223:6–20.

In their fee petition, Plaintiffs sought $99.9 million, but also urged a reading of this Circuit's law

under which a reasonable fee award could be as high as $223 million.  4/22 Tr. 74:2–75:13.  To

evaluate the reasonableness of the fee petition, Judge Robertson ordered Plaintiffs' counsel to file

statements regarding their billing rates and their time records reflecting the hours they spent liti-

gating this matter.  This is called a "lodestar cross-check," and it is common in large class actions

in order to aid the court in its determination of what would be reasonable for class counsel's fee.

*Id.* 75:14–76:11.

    As for post-settlement fees, the separate fee agreement provided for hourly payment at

class counsel's billing rates, subject to Court approval.  *Id.* 133:11–134:3; Brown Ex. 29 at 3.

However, the agreement capped the total award for any post-settlement fees and expenses at $10

million.  Brown Ex. 29 at 3.  That amount was increased to $12 million as the congressional approval process lagged on longer than expected and it became apparent that distributing the settlement award would be more time consuming than first anticipated.  4/22 Tr. 133:11–134:3, 223:23–224:4.  Dorris testified that, in order to avoid derailing the hard-fought settlement, class counsel accepted unfavorable pre- and post-settlement attorney's fee provisions.  *Id.* 28:1–31:9.  He claimed that the post-settlement fee provision would not compensate Plaintiffs' counsel for all their time.  Indeed, since he and Smith still represent Plaintiffs today as the distribution period draws to a close, both testified that Kilpatrick Stockton is operating at a loss – at least $4 million – in the case overall because of the required post-settlement work.  4/22 Tr. 224:18–228:2, 136:11–138:10; *see also* Cobell Ex. 47 (calculating Kilpatrick Stockton's payments received and loss calculations totaling nearly $7 million).

In January 2010, Dorris traveled to California to meet with Brown to discuss his fees.  4/20 P.M. Tr. 185:14–188:3; 5/25 Tr. 33:11–34:15.  Dorris testified that his purpose in calling the meeting was to head off an attorney's fees dispute, which he believed likely to irritate the Court while the parties were on the verge of settlement.  5/25 Tr. 34:1–15.  At the meeting, Dorris explained that Cobell was upset with Brown and would not support a fee request from him because he had moved back to California without ever speaking to her.  *Id.* 34:16–36:16.  Brown testified that Dorris stated that "Elouise isn't happy with you, she thinks you've abandoned" the case.  4/20 P.M. Tr. 190:4–21.  Brown responded that it was the first time he had heard anything of the kind, especially since he had copied her on his email following his conversation with Gingold in September 2007.  *Id.*

Dorris tried to strike a deal with Brown to avoid a fee dispute in court.  5/25 Tr. 34:16–36:16.  According to Dorris, Brown stated at the meeting that he would reach out to Cobell, and

Dorris agreed that that was advisable. *Id.* 36:18–37:3. To Dorris' knowledge, Brown never actually contacted Cobell. *Id.* 37:4–8. Brown testified that he asked to speak with Cobell "to set the record straight," but contended that Dorris communicated to him later that Cobell refused to talk to Brown. 4/20 P.M. Tr. 190:4–21.

Also during this meeting, Dorris and Brown discussed Brown's sending Dorris his time records for purposes of including his time in Plaintiffs' forthcoming fee application. *Id.* 185:14–188:3; 5/25 Tr. 37:9–22. Brown testified that he sent Dorris a one-page summary of his time on March 18, 2010. 4/20 P.M. Tr. 185:14–188:3. Dorris testified that he had received Brown's summary, but had expected to receive something more substantial. 5/25 Tr. 37:23–39:3. Brown never heard anything further from Dorris or anyone else after sending the summary. 4/20 P.M. Tr. 189:14–20. Dorris claimed he had tried to reach Brown after receiving the summary, but no one returned his call. 5/25 Tr. 38:8–39:3. Brown testified that the first time he ever knew that Plaintiffs would exclude him from the fee application was when the application was filed in January 2011. 4/20 P.M. Tr. 189:21–190:3.

Plaintiffs submitted their motion for pre-settlement attorney's fees in January 2011, without requesting payment of Brown's fees. In response, Brown intervened and filed his own fee petition in February 2011. Plaintiffs filed an opposition. 4/21 Tr. 135:2–23, 188:25–189:6. Gingold claimed that Cobell directed class counsel to oppose Brown's fee request, arguing that she made "every strategic decision for 17 years" of the case, including this one. 4/21 Tr. 135:2–23; *see also* 5/25 Tr. 39:4–19 (Dorris testifying that Cobell directed class counsel to oppose Brown's fee petition).

Both Gingold and Cobell submitted affidavits in support of Plaintiffs' opposition. Brown Ex. 107 (Gingold's affidavit); Cobell Ex. 42 (Elouise Cobell's affidavit). Gingold testified that

Cobell opposed any award of fees to Brown as early as 2009. 4/21 Tr. 194:22–199:16. Similarly, Gingold testified that, although he had previously supported Brown's participation in the 2007 fee petition, by the time of the 2011 fee application, he opposed an award of fees to Brown because Brown refused to provide Gingold his time records, which hampered settlement efforts and discussions with class members. *Id.* 199:11–200:18. In the 2007 timeframe, Gingold did believe that Brown should be paid for his "legitimate" time as determined by the Court, but, by 2011, not having seen Brown's time or having been able to submit it to the Court or his clients, he could not support any fee award to Brown. *See id.* 200:25–201:6.

In a ruling from the bench during the June 2011 fairness hearing, Judge Hogan awarded Plaintiffs' counsel $99 million in pre-settlement attorney's fees. *See* Order Granting Final Approval to Settlement [Dkt. 3850] at 9–10. He found that, in this Circuit, class counsel are compensated based on a percentage of the common fund they helped to create on behalf of the class. Cobell Ex. 39 at 62. That fund, in Judge Hogan's view, included only the $1.4 billion set aside as restitution for trust beneficiaries, not the $2 billion to be used for trust reform. *Id.*; 4/22 Tr. 27:17–28:23. Nevertheless, Judge Hogan lauded counsel's efforts, finding that they brought about an "exceptional result" which would benefit future generations of Native Americans. Cobell Ex. 39 at 63. Judge Hogan also recognized the extreme length, complexity, and contentious nature of the case in finding that the $99 million award was appropriate. *Id.*

Setting aside the amounts claimed by NARF and Brown, Plaintiffs' counsel were paid a total of approximately $85 million in fees in November 2012. NARF settled its fee dispute with class counsel and received around $6 million, with Kilpatrick Stockton receiving another $2 mil-

lion, which represented the remaining portion of NARF's original fee claim.  The amount remaining in escrow that will go to either Brown or Kilpatrick Stockton is the original amount Brown claimed when he filed his fee petition in 2011 – $5,517,431.37.

## I.     Brown's Fee Petition

The Court now turns to a description of the most salient features of Brown's fee petition and his time records submitted in support of it.  Again, it seeks $5,517,431.37 in fees.  Brown Fee Petition [Dkt. 3699] at 2, 7, 9.  This is based on a claimed 11,615.645 hours of compensable time at the 2011 USAO *Laffey* rate[10] of $475 per hour.  *Id.* at 6–7.  Brown's petition contains two further calculations resulting in sums lower than this total.  In one section of the affidavit Brown submitted with his petition, he stated that his fees at the rate of $475 per hour amounted to $5,455,702.55. *Id.*, Affidavit of Mark Brown ¶ 30.  In that affidavit, he provided no figure for hours.  The time tables that accompany his petition claim $5,455,702.55 on the basis of 11,485.690 hours worked, which would result in a rate of $475.  *See* Brown Fee Petition, Ex. 3 [Dkt. 3699-16], at 515.  In a third part of the petition, Brown calculates his fees for 10,630.1 hours at historical[11] *Laffey* rates, from which he deducts $200,575 he has been paid over the course of litigation in interim fee awards.  Brown Fee Petition, Affidavit of Mark Brown ¶ 30.  That leaves $5,111,513 in unpaid fees.  *Id.*  Thus, Brown's petition asks for three different sums for three different amounts of time, based on two different rate regimes.  He clarifies his position in later briefing, stating that his lower

---

[10] The *Laffey* Matrix is prepared by the Civil Division of the United States Attorney's Office for the District of Columbia.  The USAO *Laffey* Matrix was created to demonstrate the "prevailing rates in the community for lawyers of comparable skill, expertise and reputation in complex federal litigation."  *Laffey v. Nw. Airlines, Inc.*, 572 F. Supp. 354, 371–72 (D.D.C. 1984).

[11] The phrase "historical *Laffey* rates" refers to the practice of seeking compensation for work done at the *Laffey* rate applicable at the time the work was performed.  In other words, work done in years past would be compensated at the then-applicable *Laffey* rate, not at the rate applicable at the time the fee petition was submitted.

figures were mistaken and that he seeks compensation at the highest amount, $5,517,431.37. Brown Fee Petition Reply [Dkt. 3723] at 23–24. This figure does not credit fees previously paid in interim fee awards.[12]

In Brown's briefing submitted prior to the evidentiary hearing, he increases the amount of fees he is seeking. Specifically, he now desires to be paid at his 2016 *Laffey* rate of $568 per hour. *See* Brown Trial Brief [Dkt. 4189] at 3. This gives a new grand total of $6,523,871.92. *Id.* In his pre-hearing briefing, Brown again includes no credit for prior payments. In his post-hearing submissions, however, Brown asks the Court to take this new total and subtract the $200,575 he has received through interim fee awards. Brown F&C at 29 ¶ 59. That brings his grand total down to $6,332,296.92. *Id.* In his post-hearing briefing, Brown also proposes, in the alternative, that the Court apply his 2011 *Laffey* rate of $475 which, after subtracting his interim fee awards, would entitle Brown to $5,225,127.55. *Id.* at 29 ¶ 60.

Brown's time records in support of his petition were filed under seal in 2011 in order to preserve the confidential nature of some of the descriptions of Brown's work and his mental impressions regarding the litigation. *See* Brown Ex. 3; Brown Time Records [Dkt. 3698-1]. Brown testified that his time records are the result of contemporaneous recording of the hours he worked. 4/20 P.M. Tr. 191:7–17. Brown testified that he had a daily calendar in which he recorded his time. 4/20 A.M. Tr. 70:1–8. When he began a task, he would put a start time in the calendar. *Id.* He would enter an end time once the task was finished. *Id.* His time records in this case, *see* Brown Ex. 3, are a printout of those records after they were converted into a WordPerfect table,

---

[12] Brown also clarified at the hearing a discrepancy with regard to the precise number of hours he seeks compensation for. For an unknown – perhaps merely typographical – reason, some of his filings reflect a total of 11,465.69 hours. He testified that the correct number, as reflected in his Exhibit 3, is 11,485.69 hours. *See* 4/20 P.M. Tr. 192:11–193:11.

4/20 A.M. Tr. 70:6–8.  The entries are recorded in twelfth-hour increments.  *See* Brown Fee Petition [Dkt. 3699], Affidavit of Mark Brown ¶ 28.  Each entry includes a description of the work performed, although many entries include multiple and sometimes unrelated tasks, a practice referred to as "block billing."

Brown admitted at the hearing that he did not review the time he submitted for its reasonableness.  4/20 P.M. Tr. 200:8–19.  Moreover, his records include both time paid and time rejected as unreasonable or excessive either by this Court or the Special Master as part of past interim fee awards.  4/20 P.M. Tr. 204:5–23.  Dorris testified extensively on these topics and prepared charts summarizing the hours Plaintiffs believe should not be compensated because they have already been paid or were previously rejected by either this Court or a Special Master as excessive or unreasonable.  *See, e.g.*, 5/25 Tr. 81:23–83:17 (Dorris explaining that his charts summarized the hours billed for a matter, the hours paid, the hours rejected as "out of scope," and the hours rejected as excessive or unnecessary for some reason).[13]

In total, his time records comprise 481 pages and document 11,485.69 hours of time.  Given their volume, the Court's analysis below will break down the records into more manageable categories and describe why each should or should not be fully compensated.

[13] Much of Plaintiffs' evidence regarding Brown's time records came through the testimony of Dorris, who compiled certain categories of time out of the overall records to facilitate the Court's review.  *See* 5/25 Tr. 47:5–48:19.  Brown strenuously objected to Dorris' testimony, claiming that he was attempting to present his allegedly expert opinion on whether the time Brown claims is reasonable.  4/22 Tr. 178:13–184:19.  Brown was willing to accept testimony that involved "just a matter of manipulating the numbers and cutting things out," but not Dorris' making "qualitative assessments" about the reasonableness of the time expenditures.  *Id.* 184:4–19; *see also* Brown's Motion in Limine to Exclude the Expert Opinions Proffered by William E. Dorris [Dkt. 4193].  Plaintiffs contended that Dorris' testimony would focus solely on presenting factual analyses and compilations of Brown's time, not expert assessments thereof.  4/22 Tr. 184:20–187:8.  Plaintiffs noted that their compilations were simply to aid the Court in its calculations should it decide to deduct certain kinds of time entries in accordance with Plaintiffs' legal arguments.  *Id.* 187:5–191:9; *see also* Plaintiffs' Response to Brown's Motion in Limine to Exclude the Expert Opinions Proffered by William E. Dorris [Dkt. 4195].  As the Court indicated at the hearing, it does not view as expert testimony Dorris' compilation of time entries from Brown's records and his proposed calculations based on the assumption that the Court would accept Plaintiffs' legal arguments.  Additionally, having heard Dorris' testimony and seen the exhibits he created, the Court is satisfied that his testimony was not that of an expert.  To the extent Dorris offered any qualitative evaluation of whether the time Brown expended was reasonable, the Court will ignore it.

## LEGAL STANDARDS

### A.      Choice of Law

Both parties agree that District of Columbia law governs their dispute.  *See* Cobell F&C at 44 ¶¶ 4–5; Brown Reply at 75–76 ¶¶ 4–5.  Applying District of Columbia choice of law principles, the Court reaches the same conclusion.

This matter is properly before this Court pursuant to its supplemental jurisdiction as it is a claim "so related to claims in the action . . . that [it] form[s] part of the same case or controversy under Article III."  28 U.S.C. § 1367(a) (2016).  A federal district court sitting in supplemental jurisdiction applies the choice-of-law rules of the state in which it sits, here the District of Columbia.  *Ideal Elec. Sec. Co. v. Int'l Fid. Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997).  As will be discussed further below, the parties' dispute sounds primarily in contract – it is best described as an argument between an attorney and his clients over compensation for legal services rendered pursuant to their engagement agreement.  The District of Columbia applies the Restatement (Second) of Conflict of Laws to determine choice of law in such contract disputes.  *Vaughan v. Nationwide Mut. Ins. Co.*, 702 A.2d 198, 200 (D.C. 1997); *Bennett v. Fun & Fitness of Silver Hill, Inc.*, 434 A.2d 476, 480 (D.C. 1981).  Under the Restatement, contracts for the rendition of services are governed by the law of the place of performance unless another state has a more significant relationship.  Restatement (Second) of Conflict of Laws § 196; *see also id.* cmt. a. (section applies to contracts for services by "persons exercising a public profession, as lawyers").

Here, Brown's contract for legal services was executed and performed in the District of Columbia.  It was the locus of his representation of Plaintiffs and the underlying trust fund litigation.  Further, there is no other state that has more significant relationship than the District of Columbia to parties' fee dispute.  Thus, District of Columbia law governs the resolution of their

dispute.  *See Steven R. Perles, P.C. v. Kagy*, 473 F.3d 1244, 1253 (D.C. Cir. 2007) (applying District of Columbia law to determine "equitable compensation" for attorney handling matter in District Court of the District of Columbia).

### B.   General Standards

Under the laws of the District of Columbia, "compensation paid to attorneys for legal services is largely a question of fundamental fairness." *Connelly v. Swick & Schapiro, P.C.*, 749 A.2d 1264, 1267 (D.C. 2000).  "The goal is to compensate attorneys reasonably for professional services rendered in a manner where the client's obligation is understood in advance, and accepted as an objectively fair undertaking." *Id.*

When an attorney withdraws from representing his client for good cause, he retains a right to compensation for services rendered.  7A C.J.S. Attorney & Client § 329.  The withdrawing attorney bears the burden to show that his withdrawal was justified.  1 Attorneys' Fees § 3:8 n.5 (collecting cases).  But if any attorney withdraws without justification and voluntarily abandons his client before a case's termination, he loses all right to compensation for services rendered. *Fletcher v. Krise*, 120 F.2d 809, 811 (D.C. Cir. 1941); 1 Attorneys' Fees § 3:6 n.4 (collecting cases).

Similarly, if an attorney is discharged for cause by the client, the prevailing rule is that the attorney may not recover any compensation.  *Fletcher,* 120 F.2d at 811; 1 Attorney's Fees § 3:13 n. 1 (collecting cases).  Whether termination was for cause is determined by reference to the facts and circumstances in each case.  *Id.* at § 3:13 n. 3.  A client's mere statement that an attorney was terminated "for cause" is not dispositive, "as the determination requires an objective legal analysis of the attorney's conduct and the client's reasons for terminating the employment." *Wiggins v. Kopko*, 105 A.D.3d 1132, 1134 (N.Y. App. Div. 2013).

48

When, on the other hand, a client discharges an attorney without cause, the lawyer has a "right to recover compensation for the services rendered." *Green v. Louis Fireison & Assoc.*, 618 A.2d 185, 190 (D.C. 1992). Where an attorney has not substantially performed the services he undertook to provide in his engagement letter, however, "he may recover only in *quantum meruit*." In re *Waller*, 524 A.2d 748, 750 (D.C. 1987); *King & King Chartered v. Harbert Int'l, Inc.*, 503 F.3d 153, 156 (D.C. Cir. 2007) (attorney entitled to *quantum meruit* recovery even if he performed only "negligible services[] of little actual benefit to the client"). To recover in *quantum meruit*, the attorney must prove (1) that he provided valuable services; (2) for his client; (3) which services were accepted and enjoyed by the client; and (4) under such circumstances as reasonably notified the client that the attorney, in performing such services, expected to be paid. *New Economy Capital, LLC v. New Markets Capital Grp.*, 881 A.2d 1087, 1095 (D.C. 2005).

In most cases, however, a claim for *quantum meruit* cannot stand where there is an express written agreement between the parties regarding the same subject matter. *Dale Denton Real Estate, Inc. v. Fitzgerald*, 635 A.2d 925, 928 (D.C. 1993); *Standley v. Egbert*, 267 A.2d 365, 368 (D.C. 1970) ("*[Q]uantum meruit*[] is not applicable when compensation of the parties is covered by an express written contract."). *Quantum meruit* refers, after all, to an implied contractual or quasi-contractual duty. *TVL Assocs. v. A&M Constr. Corp.*, 474 A.2d 156, 159 (D.C. 1984). Where the parties have reduced their agreement to an express writing there is ordinarily no need to go beyond its terms. *Dale Denton*, 635 A.2d at 928.

## ANALYSIS AND CONCLUSIONS

Plaintiffs argue that, if Brown withdrew from the litigation, it was unjustified, and if he did not withdraw, he was terminated for cause. Cobell F&C at 46 ¶ 10, 49 ¶ 17. As discussed above, either finding would eliminate Brown's recovery entirely under District of Columbia law. Brown

responds that he did not withdraw, but rather was terminated without cause, and therefore is entitled to recovery of his fees.  Brown Reply at 77 ¶ 7.

The Court ultimately sides with Brown and finds that he is entitled to an award of reasonable fees for his work on this case, although the undersigned does not adopt his reasoning to reach this conclusion.  Despite Brown's belief to the contrary, the Court finds that he withdrew from the *Cobell* litigation in January 2006.  Further, although the terms of Brown's engagement letter with the Plaintiffs do not make a withdrawing attorney's compensation contingent on his or her departure being for good cause, the Court in any event finds that Brown was justified in leaving the *Cobell* team when he did.  His withdrawal also did not result in any prejudice to his clients who were ably represented by a veritable army of attorneys at the time of his departure.  Nor, under the unique facts of this case, did it represent a clear and serious violation of any ethical duty he owed to Plaintiffs.  He is therefore entitled to an award of reasonable fees.

On that score, however, Brown's petition for more than $5 million in fees is lacking.  The billing rate he seeks is in excess of that stipulated in his engagement letters with Plaintiffs.  Further, significant cuts are in order to the hours he presents, given that his time records are larded with many hours that were either previously compensated or deemed unreasonable by a judicial officer, or reflect unnecessary work or clerical tasks not reasonably billed at an attorney's rate.  Most importantly, an overall reduction of his time is in order because he did not exercise billing judgment when he reviewed his records prior to submitting them to the Court.  After all deductions are applied, the Court concludes that Brown should be awarded $2,878,612.52 for his work representing the plaintiff class prior to his withdrawal.  The Court's rationale follows.

A.      **Whether Brown Withdrew from the Litigation in January 2006**

Plaintiffs contend that Brown was fired for cause in July 2007.   Cobell F&C at 18–20

¶¶ 58–65.   For that reason, they argue that Brown should receive neither a contingency fee nor any

other form of compensation.   Cobell F&C at 44 ¶ 5, 45 ¶ 8, 48 ¶ 16.   *See also King & King*, 503

F.3d at 157 (citing *Greenberg v. Sher*, 567 A.2d 882, 882 (D.C. 1989)); *Fletcher*, 120 F.2d at

811.[14]   The Court does not reach the question of the significance of Brown's termination in 2007

because it finds that Brown withdrew from the representation in January 2006.   Stated another

way, this Court need not assess whether Brown was fired for cause in 2007 because, by that point,

he had already effectively quit the representation.   Accordingly, it will analyze Brown's claim for

fees under principles of withdrawal, rather than of termination.

The only party disputing that Brown withdrew from the litigation in January 2006 is Brown

himself.   During the hearing, it was clear that Brown wanted to pitch his battle for his fees at the

point of his termination in 2007, arguing that the decision to terminate him was without cause.   In

Brown's mind, prior to that time, he had not withdrawn from the litigation because he remained

"on call" for assignments from the *Cobell* team.   In his post-hearing submission, however, Brown

alters course and acknowledges that he may have "informally withdrew" from the representation

prior to his termination.   *See* Brown F&C at 22–26 ¶¶ 24–27.

Given the evidence presented at the hearing, Brown could not have reasonably maintained

otherwise.   By January 2006, he had long since ceased to do any work on Plaintiffs' behalf or to

---

[14] Brown notes that "there is no admissible evidence from any Class Representative or Class Member stating that the Plaintiffs support Kilpatrick Stockton's opposition to this motion for fees."   Brown F&C at 14 ¶ 81.   According to Brown, the source of the opposition to his fee petition is not the Plaintiffs but Kilpatrick Stockton which stands to benefit, dollar for dollar, from the petition's defeat.   While Brown is correct that there are no admissible statements in the record from a class representative opposing his fee petition, the opposition was filed by Plaintiffs' counsel on behalf of Plaintiffs.   *See* Plaintiffs' Opposition to Mark Brown's Motion for Attorney's Fees and Expenses [Dkt. 3715].   Seeing no evidence to the contrary, the Court will assume, as it always does, that counsel for Plaintiffs are advancing their clients' position in this fee litigation.

seek any new work from other *Cobell* team members.  4/20 P.M. Tr. 145:5–9; 4/21 Tr. 33:11–34:19.  Having nothing to do, he returned to California.  4/20 P.M. Tr. 145:5–9.  At no time thereafter did he return to the *Cobell* office space in Washington, D.C., nor did he communicate with his clients about the case.  4/21 Tr. 37:20–23; 39:14–19.  Rather, he supported himself by taking on legal work for other clients in California for the first time in five years.  4/20 P.M. Tr. 199:10–20.  Whereas prior to January 2006 he had devoted his full and undivided attention to the *Cobell* case to the exclusion of all other legal work, thereafter he devoted none.  4/21 Tr. 40:18–41:9; 42:25–43:12.

Brown's next substantive exchange with anyone on the *Cobell* team was not until he sent an email to Gingold in April 2007 offering his assistance on an upcoming trial and, notably, seeking information about an interim fee petition award from which he believed he stood to benefit.  During the sixteen months that elapsed between Brown's January 2006 departure and his email, the *Cobell* matter had been heavily litigated by Gingold and the Kilpatrick Stockton attorneys without any help from Brown.  Gingold's reaction to Brown's email is telling:  Gingold characterized Brown's offer of assistance as "puzzling and surprising" given that Brown had "not participated in the case for at least two years."  Brown Ex. 21.  Gingold could not "imagine how [Brown's assistance could] now be of value in a trial on the merits" given "the heavy activity, the work done, and issue and evidentiary implications related thereto" that had occurred in his "absence."  *Id.*

While Brown may have believed in his own mind that he was still "on call" for Plaintiffs after January 2006, such a belief did not reflect reality.  By that point, the Court concludes that he had, for all practicable purposes, withdrawn from the litigation and from service to his clients.

**B.      The Terms of Brown's Engagement Letter**

Having concluded that Brown withdrew from his representation of Plaintiffs in January 2006, the Court must next determine whether and how he should be compensated for the time he spent working on the litigation prior to his departure.   The answers to those questions are bounded by the language of Brown's engagement letter, which was a contract for his legal services.   Indeed, the terms of the agreement expressly provide for paying *Cobell* team attorneys who withdrew from the representation before the litigation's conclusion for the "value of [their] services."   Specifically, it states:

> If any of the counsel dies, withdraws, or becomes disabled prior to the completion of his work under this agreement, he shall be entitled to a portion of the fee (and all expenses to date of the disability, death or withdrawal) to which he would otherwise have been entitled, also taking into account the services rendered by his sub-retained counsel.   The payment will be made at the same time as other counsel are paid and shall represent the value of his services to the death, disability or withdrawal, taking into account the total fees payable to legal counsel.

Brown Ex. 2 at 2.   On the other hand, for those attorneys who remained as class co-counsel until the case's conclusion, the engagement letter provides for the payment of a contingency fee:

> [W]e have agreed to reduce and limit our billings to not more than $150 per hour, collectively, in the aggregate for all the undersigned legal counsel . . . .
>
> Because of the addition of a new counsel, the risks and uncertainties, and our agreement once again to further substantially reduce the amount of our legal fees, instead of the original agreement regarding fees, we agree and you consent to a contingent fee . . . .   Legal counsel and sub-retained counsel have foregone, and are and will be foregoing, substantial current legal fees with a view to compensation from the contingent, court approved fee and any interim fees approved by the Court. . . .

*Id.* at 1, 2.[15]

Thus, the parties' engagement letter foresaw the situation presented here – the withdrawal of an attorney from the litigation – and points to a contractual resolution of the present fee dispute:

---

[15] Brown's portion of the contingency fee was to be two percent of "the total upward adjustment in the aggregate trust funds standing to the credit of the trust beneficiaries as a result of the litigation or its settlement."   Brown Ex. 1 at 1.

a payment to Brown representing the "value of his services" up to his withdrawal, and "taking into account the total fees payable to" all other legal counsel in the matter.[16]  Because it directly addresses the circumstances presented here, that language will guide this Court's resolution of the parties' dispute.

### C.       Whether Brown's Withdrawal was Justified

Placing this matter into its proper context as a contract dispute circumvents a number of issues that have divided the parties from its inception, including whether Brown is entitled to a recovery in *quantum meruit*, and how such a recovery should be calculated using that rubric.  It introduces, however, its own set of questions, principal among them whether payment under the engagement letter's withdrawal provision is contingent upon the departing attorney's (1) only withdrawing for good cause, and/or (2) satisfying his ethical obligations to his client upon his withdrawal.  Each inquiry will be addressed in turn.

As to the first question, the text of the engagement letter imposes no qualitative limitation on the reason for an attorney's withdrawal, and the Court finds no basis for imposing one.  *See Dale Denton,* 635 A.2d at 928 (where the parties have reduced their services agreement to an express writing, there is ordinarily no need to go beyond its terms).  At this case's inception, its duration and outcome were both highly uncertain.  It is little wonder, then, that the parties' engagement letter permitted class co-counsel to withdraw and be compensated "at the same time as other counsel are paid" for the "value of [their] services" through the date of withdrawal.  Doing so provided a necessary measure of practical flexibility to co-counsel who were otherwise devoting all of their time, effort, and earning power to a single matter without any certainty as to when, if ever, they would be paid.

---

[16] The terms of the engagement letter preclude Brown from seeking his portion of a contingency fee award.  He makes no attempt to do so here.

On the other hand, the engagement letter also protected the clients' interests attendant to an attorney's withdrawal.  Under its terms, a withdrawing attorney would forego the right to his portion of any resulting contingency fee, a loss of a potentially huge sum of money in a case where the total contingency fee might have measured in the hundreds of millions of dollars.  That significant withdrawal "penalty" would make it likely that an attorney's decision to withdraw would be well-considered and an infrequent occurrence.  The Court sees no reason to disturb the careful balance concerning attorney compensation that the parties' agreement struck by grafting a "good cause" requirement onto its withdrawal provision.

Even assuming *arguendo* that Brown's engagement letter made his right to compensation contingent upon withdrawal for good cause, the Court finds that his January 2006 withdrawal from the representation satisfied that standard.  Whether a withdrawal is for good or just cause "depends on the facts and circumstances of each case." *Augustson v. Linea Aerea Nacional-Chile S.A.*, 76 F.3d 658, 663 (5th Cir. 1996).  Generally, good cause is present when "continued representation is impossible due to forces beyond the attorney's control," as when withdrawal is necessary because of ethical or financial imperatives. *Id.*; *see also* In re *Agent Orange Prod. Liab. Litig.*, 571 F. Supp. 481, 482 (E.D.N.Y. 1983) (permitting withdrawal where attorneys "will be unable to absorb the enormous expense that continued prosecution of the litigation will inevitably entail").  Withdrawal is also permitted when "a lawyer's 'inability to work with co-counsel indicates that the best interests of the client will be served by withdrawal.'"  Restatement (Third) of the Law Governing Lawyers § 32 (2000), cmt. M (quoting ABA Model Code, DR 2-110(C)(3)); *see also Pritt v. Suzuki Motor Co.,* 513 S.E. 2d 161, 169 (W. Va. 1998) (holding that an attorney may justifiably withdraw where the client requires that the lawyer associate with another lawyer with whom he cannot cordially cooperate).

The Court finds that Brown's withdrawal met this standard.  While the conduct of all parties leading up to Brown's departure in January 2006 is deserving of some reproach, on balance the evidence shows that Brown's withdrawal was not unjustified.  By that time, the relationship between Brown and his co-counsel was irretrievably broken.  Further, following Brown's May 2005 suspension, the record supports Brown's contention that he was "frozen out" of work on the case.  Brown Ex. 14; Brown Reply at 33 ¶ 59.  For the next six months, Brown had little or nothing to do.  4/20 P.M. Tr. 145:5–9; 4/21 Tr. 33:11–34:19.  He sought assignments from those few individuals with whom Gingold allowed him to work, but, after a few projects, that work dried up as well.  4/21 Tr. 31:25–32:19.  Plaintiffs claim that Brown may have received more work had he repeatedly requested it.  4/22 Tr. 211:20–212:2.  It is undisputed, however, that he asked for work, and received little to none.  This is not surprising; it is a fair inference from the record that, following lead class counsel Gingold's suspending him from working with anyone but a few attorneys, Brown was effectively *persona non grata* on the *Cobell* team.  There was clearly much work to be done during that period on behalf of the Plaintiffs, and Brown was willing to do it—indeed, it was never Plaintiffs' complaint that Brown was not hard working on their behalf.  Nevertheless, no assignments were forthcoming.  *See* 4/20/16 P.M. Tr. 167:2–169:14; 5/25/16 Tr. 40:15–41:1; 160:19–161:6; 161:16–19; Brown Ex. 14; *see also* 4/21/2016 Tr. 30:18–34:19.  Based on this record, the Court concludes that Brown was being "unwillingly excluded from the representation of the class."  *B. Dahlenburg Bonar, P.S.C. v. Waite, Schneider, Bayless & Chesley,* 373 S.W. 3d 419, 423 (Ky. 2012).

Moreover, by January 2006, Brown had not received regular compensation for six years.  Brown Decl. [Dkt. 3699] 10–11 ¶¶ 31, 33.  Thus, at the time of his departure, he had had no real work to do for months, he was not being paid, and there was little prospect of either circumstance's

changing in the foreseeable future.  Under these circumstances, Brown's decision to withdrawn from the representation and to return to California to find other work was justified.  If there was cause to terminate him in 2005 – because of his alleged insubordination, bad judgment, prickly personality, the crying fish, or what have you – then he should have been terminated.  Instead, like a bad high-school breakup, Brown was shunned by his former colleagues in the apparent hope that he would leave of his own volition.  He did so.  Counsel for Plaintiffs will not now be heard to claim that Brown should not be paid because he "abandoned" the case.

Certainly, based on the record before it, the Court cannot say that Brown's withdrawal, or his actions leading up to it, were so unjustified as to deprive him of the right to compensation for the six years of loyal and exclusive service to Plaintiffs that preceded it – a result that should surprise no one involved.  Indeed, Plaintiffs acknowledged Brown's right to fair compensation in his September 2007 "termination" email.  Writing at Elouise Cobell's behest, Gingold told Brown then:  "the *Cobell* plaintiffs owe no further obligation to you – other than, at final judgment, to request an award for your time at an appropriate hourly rate."  Brown Ex. 27.  The record presents no reason why this should not be the result now.

### D.     Whether Brown Satisfied His Ethical Obligations upon His Withdrawal

As for the second question, the Court finds that Brown's compensation is contingent on his having not engaged in a clear and serious violation of his ethical obligations to his clients upon his withdrawal from the representation.  While Brown's engagement letter does not expressly address the issue, the Court is nevertheless loathe to permit a lawyer to contract away his ethical obligations to his client unless the rules of professional conduct expressly permit such a waiver and the waiver language of the fee agreement at issue is explicit.  *See* Restatement (Third) of the Law Governing Lawyers §§ 34–37 (2000) (describing restrictions on attorney's fees); *Mawakana v. Bd. of Trs. of*

*Univ. of D.C.*, 113 F. Supp. 3d 340, 354 (D.D.C. 2015) (defining waiver as "the voluntary relin-quishment or abandonment – express or implied – of a legal right or advantage," requiring a show-ing of the waiving party's "knowledge of the existing right and the intention of forgoing it") (cita-tion and internal quotations omitted); In re *Evans*, 902 A.2d 56, 65–66 (D.C. 2006) (requiring the knowing, informed consent of the client to waive attorney conflict of interest). Here, neither is the case; both the engagement letter and the operative ethical rule are silent as to waiver of counsel's ethical obligations to his clients upon his withdrawal from the representation. *See* Brown Ex. 2; D.C. Rule of Professional Conduct 1.16. Absent permissible waiver, the Court believes the better rule is that stated in the Restatement (Third) of the Law Governing Lawyers: "a lawyer engaging in clear and serious violations of duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter." Restatement (Third) of the Law Governing Lawyers § 37; *see also Headfirst Baseball, LLC v. Elwood,* 999 F. Supp. 2d 199, 209 (D.D.C. 2013) (citing to Restatement (Third) of the Law Governing Lawyers for guidance in reviewing the conduct of at-torneys practicing before it). The Restatement concurs with the D.C. Rules of Professional Con-duct in not circumscribing a court's discretion in fashioning an appropriate sanction for ethical violations. Rather, "the Rules presuppose that whether or not discipline should be imposed for a violation, and the severity of the sanction, depend on all circumstances, such as the willfulness and seriousness of the violation, extenuating factors and whether there have been previous viola-tions."[17] D.C. Rules of Professional Conduct, Scope ¶ 3.

---

[17] The undersigned rejects Brown's related suggestion that this Court is powerless to find him in violation of a profes-sional rule absent a charge or finding of violation by Bar Counsel. *See* Brown Reply at 90 ¶ 24. "[A] federal court has the power . . . to discipline attorneys who appear before it." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S. Ct. 2123, 2132, 115 L. Ed. 2d 27 (1991); *Nat'l Ass'n for the Advancement of Multi-jurisdiction Practice v. Roberts*, No. CV 13-01963-NMG, 2015 WL 10459071, at *9 (D.D.C. Dec. 31, 2015) (same); *Palumbo v. Tele-Commc'ns, Inc.*, 157 F.R.D. 129, 131 (D.D.C. 1994) ("The Court has within its inherent supervisory power the discretionary authority to oversee the professional attitudes of lawyers who appear before it.").

Nevertheless, even measuring Brown's withdrawal by the Restatement standard, the Court finds him to have satisfied his ethical obligations sufficient to justify him receiving compensation for his work on this matter. Rule 1.16 of the District of Columbia Rules of Professional Conduct governs an attorney's duty to his client upon termination of the attorney-client relationship. It provides that a lawyer may rightfully withdraw from a representation "if withdrawal can be accomplished without material adverse effect on the interests of the client." D.C. Rule of Prof. Conduct 1.16(b).[18] Further, it instructs that a lawyer "must comply with applicable law requiring notice to or permission of a tribunal when terminating a representation," and "take timely steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client [and] . . . surrendering papers and property to which the client is entitled." *Id.* 1.16(c)–(d).

Brown claims that his withdrawal was permissible under Rule 1.16 because there was no "material adverse effect" on Plaintiffs' interests due to his departure from the representation. Brown's Reply at 80 ¶ 11. The Court agrees. Before he withdrew, Brown completed all of the work he had been assigned. 4/21 Tr. 31:25–32:19. After he withdrew, Plaintiffs were never left without competent counsel. Plaintiffs remained represented by dozens of other attorneys – including many at Kilpatrick Stockton, a prestigious and well-equipped law firm. 4/22 Tr. 152:9–153:14.

---

[18] Additionally, subparagraph (b) of Rule 1.16 permits a lawyer to withdraw regardless of the adverse effect on the client's interests under certain limited circumstances not applicable here. *Id.* 1.16(b)(1)–(b)(5). As this Court has previously held, however, "subparagraph (b) is stated in the disjunctive" and, as a result, a lawyer "may withdraw. . . at any time so long as her doing so does not affect her client's interest in materially adverse way whether or not any of the conditions in subsection (1) through (5) applies." *Coleman-Adebay v. Johnson,* 668 F. Supp. 2d 29, 31 (D.D.C. 2009).

There is no evidence in the record that Brown's absence had any material adverse effect on Plaintiffs or their claims.[19]   Indeed, Brown was a divisive figure on the *Cobell* team.   Far from prejudicial, his departure was viewed as advantageous by Plaintiffs' other counsel, and thus it indirectly benefitted the plaintiff class.   4/21 Tr. 175:19–176:7.   Gingold testified that suspending Brown "eliminated the risk of harm" to the trial team since he was perceived as source of friction on the *Cobell* team.   4/22 Tr. 101:14–23.   Certainly, Brown's co-counsel were not unhappy to see him go.   However long after January 2006 it took them to realize that he was not returning from California, none of them felt inclined to question the change in his status.   The litigation proceeded to its successful conclusion undisturbed by his absence.

These facts distinguish the cases cited by Plaintiffs in which the withdrawing attorneys were found to be in violation of their professional obligations.   In each of those cases, the attorneys knowingly left their clients in the lurch without other representation.   *See* In re *Sumner*, 665 A.2d 986, 988–89 (D.C. 1995) (solo practitioner with little relevant experience abandoned his client's criminal appeal); In re *Steele*, 630 A.2d 196, 197–98 (D.C. 1993) (attorney never filed her client's lawsuit and left the jurisdiction); In re *Lewis*, 689 A.2d 561, 564 (D.C. 1997) (knowing abandonment of client without notice, leaving client without representation).   That was not the case here.   Indeed, none of the cases cited by either party – or that the undersigned could identify – involved facts remotely similar to those presented here:   the advantageous departure of an otherwise marginalized attorney, leaving behind a veritable army of competent counsel to represent the interests of the client.

---

[19] Plaintiffs suggest that Brown's departure harmed the litigation because their counsel no longer had access to note taking and transcript databases that he created.   4/21 Tr. 17:21–21:11.   But testimony at the hearing made clear that denying access to those databases hardly imposed a "material adverse effect" on the litigation.   Plaintiffs' counsel testified that Brown's databases were of no benefit to the litigation team, and that no productive use of them was made even prior to his withdrawal.   4/21 Tr. 16:3–17:8, 21:12–17; 4/22 Tr. 19:14–20.

Granted, Brown should have been more forthright with his clients and the Court in January 2006 about his status, consistent with his duty to dispel doubts as to the nature of the relationship under Local Civil Rule 83.2(h) and D.C. Code of Professional Responsibility 1.16(c) and (d). But under the unique facts of this case, even assuming that Eloise Cobell in fact had no notice of Brown's departure,[20] this lack of notice does not constitute a "clear and serious violation" of Brown's ethical duty causing him to forfeit all compensation in this matter. To begin with, Brown's failure to do so was unintentional. Although this Court has determined that, for all practical purposes, he withdrew from the litigation in January 2006, having heard his testimony, it credits Brown's assertion that he believed he had not. In Brown's view, he remained "on call" in 2006 by the *Cobell* team should the need for his assistance arose. 4/20 P.M. Tr. 150:20–151:1; 4/21 Tr. 40:8–17, 42:8–23. Thus, there was no reason in Brown's mind to put either his clients or this Court on notice of his withdrawal.

In any event, the purpose of the notice provisions of both Local Civil Rule 83.2(h) and D.C. Code of Professional Responsibility Rule 1.16(c) and (d) is to prevent a "withdrawal that would otherwise be improper." D.C. Rule of Professional Responsibility 1.16, cmt. 10; L.Cv.R. 83.6(b) and (c). Here, for all the reasons previously stated, such prevention was unnecessary. Indeed, on this point, the zeal with which Plaintiffs' counsel seeks to expose Brown's purported ethical lapses would be more persuasive if the end result served something other than their own financial gain. Again, under the unique facts of this case, every dollar not awarded to Brown will pass not to Brown's clients but to his former colleagues at Kilpatrick Stockton. Rule 1.16 was

---

[20] Brown testified that he had no responsibility to inform Cobell, since he remained "on call" following his departure. 4/21 Tr. 40:8–17. Gingold, for his part, pointed out that the attorneys were not his employees. *Id.* at 206:3–12. To the extent that was the case, they would have borne the responsibility to communicate with Elouise Cobell directly concerning matters material to their representation of the class. Whether Cobell was in fact notified of Brown's withdrawal, and by whom, is not material to the Court's resolution of this matter.

designed as a shield to protect an unwary client when an attorney withdrawals, not as a sword to financially benefit the client's other counsel.

While the Court does not condone the failure of a withdrawing attorney to put either his client or the Court on proper notice prior to his withdrawal, nevertheless, based on the peculiar facts of this case, the Court finds that any such lapse here is not a sufficient basis to deny Brown the compensation he earned in the six years prior.

### E.    Calculation of Brown's Fee Award

Having found Brown entitled to a fee award, the measure of his award must be determined. The engagement letter states that a withdrawing attorney will receive the "value of his services to [the] withdrawal, taking into account the total fees payable" to co-counsel who did not withdraw. Brown Ex. 2 at 2.  Under District of Columbia law, "[t]he ordinary measure of reasonable value is the market price of the services performed."  *Steven R. Perles, P.C. v. Kagy*, 473 F.3d 1244, 1254 (D.C. Cir. 2007); *Sastry v. Coale*, 585 A.2d 1324, 1329 (D.C. 1991) (the most favored measure of "reasonable value" is "market value.").  In disputes between private parties, District of Columbia courts generally compute the market price of an attorney's services through the lodestar method, i.e., multiplying the total number of hours the attorney reasonably expended on the case by the attorney's reasonable hourly rate. *Id.*; *see also Ginberg v. Tauber*, 678 A.2d 543, 551 (D.C. 1996); Brown Reply at 97 ¶ 30.  That method will guide the Court's calculation of the "value of [Brown's] services" through his January 2006 withdrawal. *See infra* Section 1.  Further, as required by the language of the engagement letter, a comparison will be made between the total amount of fees payable pursuant to the lodestar method and the "total fees payable" to Plaintiffs' counsel who did not withdraw.

*1.   Reasonable Rate*

Here, the effort typically expended in determining a reasonable billing rate under the lode-star method is significantly eased by the parties' contract, which expressly includes a billing rate for Brown of $350.  Brown Ex. 1.  Brown testified that the billing rate was included in the engagement letters in order to aid in the submission of future fee applications.  4/20 AM Tr. 36:6–10.  The rate was Brown's customary hourly billing rate in 2000.  It was never altered through amendments to the engagement letters.  *See* Brown Ex. 1; Cobell F&C at 123.  Rather, Brown used it in multiple fee petitions, including for services he rendered to Plaintiffs between 2000 and 2002.[21]  *See* Cobell Exs. 5 at 84, 19 at 5, 23 at 215.

As this Court held in granting an April 2002 fee petition in this matter, "[t]here is no better indication of what the market will bear than what the lawyer in fact charges for his services and what his clients pay."  *Cobell v. Norton,* 231 F. Supp. 2d 295, 302–03 (D.D.C. 2002).  On that basis, this Court granted the fee request as to Brown "at the rate that he charges for his services to plaintiffs," namely, $350.[22]  *Id.*; *see also Save Our Cumberland Mountains, Inc. v. Hotel,* 651 F. Supp. 1528, 1537 (D.D.C. 1986) ("If an attorney is involved in private practice the hourly rate

---

[21] In four fee petitions submitted in 2002, Brown used an identical paragraph to describe his rate:

> My billing rate for this matter since I commenced my representation of plaintiffs is $350.00 an hour. . . . I believe this rate is conservative in the current market . . . at all times relevant hereto, my billing rate has been at or below the rate set forth in the Laffey Matrix . . . .

*See* Cobell Ex. 5 at 84 (April 29, 2002 Sanctionable Conduct Fee Request); Cobell Ex. 19 at 5 (November 1, 2002 Infield Fee Request); Cobell Ex. 23 at 215 (November 18, 2002 Contempt II Fee Request); Cobell Ex. 24 at 35 (December 30, 2002 Contempt II Reply).  These petitions covered time logged between March 2000 and December 2002.

[22] Brown claimed historical *Laffey* rates in subsequent fee petitions, however.  *See* Cobell Ex. 9 at 54 (June 21, 2004 GAO request, noting that "this Court has already approved $350 as an appropriate hourly rate for my legal services," but requesting $360 per hour for work in 2002 on the GAO Rule 56(g) motion and $380 per hour for work in 2004 in the preparation of the fee petition); Cobell Ex. 1 at 106 (August 17, 2004 EAJA request, at historical *Laffey* rates); Cobell Ex. 10 at 3 (November 15, 2004 Erwin request, at historical *Laffey* rates).  The Court awarded him historical *Laffey* rates, noting that they were "almost indistinguishable from the 'market rates' charged by individual counsel at the time" and offering "no opinion whether these rates should apply to subsequent successful petitions." *Cobell v. Norton*, 407 F. Supp. 2d 140, 170 (D.D.C. 2005).  As explained further below, there is no basis or need here to award Brown fees based on historical *Laffey* rates.

charged for his or her services is presumptively a reasonable rate."). The undersigned sees no reason to deviate from that conclusion now. It will base its award of fees under Brown's engagement letter on the hourly rate for him included in that contract with the Plaintiffs.

Brown contends that his fees be calculated based on higher rates found in the USAO *Laffey* Matrix, whether at his 2011 *Laffey* rate of $475 when his fee petition was filed, or at his present *Laffey* rate of $568 per hour. *See* Brown F&C at 23–24 ¶¶ 30–32. Brown defends the use of *Laffey* rates as a general matter, arguing that it is the "traditional[]" rate used by courts in the District of Columbia to determine a reasonable rate for an attorney engaging in complex litigation in Washington. *Id.* at 23 ¶ 30. But in doing so, he ignores that his contract with his clients makes no reference to the *Laffey* rate. Moreover, the *Laffey* rate is intended to assist in setting reasonable rates in fee-shifting cases brought against the government, not to set rates as between an attorney and a private client, *see Armenian Assembly of Am., Inc. v. Cafesjian*, 758 F.3d 265, 281–82 (D.C. Cir. 2014) (applying District of Columbia law and commenting, "we have never employed the matrix, nor have we explicitly affirmed its use, in a suit exclusively between private parties"), a point which Brown himself acknowledged during the hearing, *see* 4/20 P.M. Tr. 254:19–255:2 (testifying that *Laffey* rates are designed for fee awards against the government, not for awards against an attorney's clients).

Further, like this Court did in resolving the April 2002 fee petition, courts applying District of Columbia law have consistently used as a starting point the attorney's actual historical hourly rate, not *Laffey* rates, when addressing cases requiring the valuation of their services. *See Perles*, 473 F.3d at 1254 (attorney's hourly rate "is a more appropriate starting point for valuation of her services"); *Camenisch v. Martens*, No. CIV. A. 93-0322(AER), 1995 WL 461928, at *5 (D.D.C.

July 7, 1995) (jury award not excessive where roughly equivalent to attorney's billing rate); *Carolina v. Potomac Elec. Power Co.*, No. CIV.A.87-2725SSH/DAR, 1992 WL 321509, at *2 (D.D.C. Oct. 2, 1992) (*quantum meruit* valuation established on the basis of attorney's billing rate).  Brown cites no authority awarding fees based on a *Laffey* rate higher than the actual rate the attorney charged his or her clients.  Nor has he introduced any evidence as to his actual hourly rate at the various times the services here were rendered, except for the $350 rate found in his engagement letter.  *See* Cobell F&C at 40 ¶ 133; Brown Reply at 68–69 ¶ 133; *see also id.* at 111–12 ¶¶ 43–44 (claiming that Holt, "much like Brown, did not have a competitive current rate to submit to the Court").  Brown bears the burden of proof on this issue.  *See Ginberg,* 678 A.2d at 551.  In the absence of persuasive evidence supporting the application of a different rate to his work over the course of the litigation, the Court will calculate the lodestar based on the hourly rate found in his engagement letter.  *See Sweatt v. D.C.*, 82 F. Supp. 3d 454, 460 (D.D.C. 2015) (rate in engagement letter prevailed over higher *Laffey* rate).

Brown also contends that use of his current *Laffey* rate is appropriate to compensate him for the long delay in adjudicating his fee petition.  Brown F&C at 23 ¶ 29; 4/21 Tr. 51:20–52:18.  The cases he cites on that point are unavailing.  *See* Brown Pet. [Dkt. 3699] at 5–6.  In each, the applicant sought to recover fees from the government, which enjoys sovereign immunity from paying interest on accrued fees.  To make up for that deficiency, the courts determined that a fee award based on the then-current *Laffey* rates was appropriate.  *See Covad Commc'ns Co. v. Revonet, Inc.*, 267 F.R.D. 14, 31–32 (D.D.C. 2010); *Woodland v. Viacom, Inc.*, 255 F.R.D. 278, 280 (D.D.C. 2008); *Miller v. Holzmann*, 575 F. Supp. 2d 2, 20 (D.D.C. 2008); *Covington v. D.C.*, 839 F. Supp. 894, 902 (D.D.C. 1993); *Hirschey v. FERC*, 777 F.2d 1, 5 (D.C. Cir. 1985).  Here, because the government has no involvement in this dispute between Brown and his clients, there is no

reason to deviate from the general rule that prejudgment interest is the method to recover the time value of money where appropriate and necessary to make a party whole.  *See Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997).  Brown has not requested prejudgment interest, and neither party has addressed the appropriateness of such an award, a question the Court does not decide here.  If he so chooses, Brown may file a motion seeking prejudgment interest under District of Columbia law dating from when class co-counsel were paid following settlement with the government.  *See* D.C. Code §§ 15-108, 109 (2016); Brown Ex. 2 (engagement letter stipulating that payment to withdrawing attorney will be made at the time payment is made to other class co-counsel).

### 2.    *Reasonable Hours*

Having arrived at a reasonable rate for Brown's work, the number of hours by which that rate should be multiplied must be determined.  Before proceeding to that analysis, a few initial observations are in order.  First, Plaintiffs contend that Brown should be precluded from receiving payment for any services that did not directly lead to the successful resolution of the case or to some significant benefit to Plaintiffs.  *See* Cobell Reply at 18 (arguing that "Brown cannot show that his work on the case benefitted the client or contributed to the final result").  Plaintiffs rely for this argument primarily on cases concerning withdrawing attorneys seeking recovery of some portion of a contingency fee.  *See* Cobell F&C at 54 ¶ 31 (discussing *King & King, Chartered v. Harbert Int'l, Inc.*, 436 F. Supp. 2d 3 (D.D.C. 2006), *aff'd*, 503 F.3d 153 (D.C. Cir. 2007); *Carolina v. Potomac Elec. Power Co.*, No. CIV.A.87-2725SSH/DAR, 1992 WL 321509 (D.D.C. Oct. 2, 1992); *Glick v. Barclays De Zoete Wedd, Inc.*, 692 A.2d 1004 (N.J. App. 1997); *Int'l Materials*

*Corp. v. Sun Corp.*, 824 S.W.2d 890 (Mo. 1992)).  In such cases, it is unsurprising that the with-

drawing attorney would be required to show that his or her efforts contributed to the generation of

the contingency fee in order to claim part of it.

Such considerations are inapposite here.  Brown does not claim a contingency fee but an

award, pursuant to his engagement letter, that approximates the value of the services he rendered

to the Plaintiffs prior to his withdrawal.  In non-contingency fee cases, private clients typically pay

their counsel for their efforts reasonably and necessarily expended regardless of whether the case

was won or lost, and regardless of whether a given expenditure of effort by the attorney directly

led to the case's successful conclusion.  *See Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1175,

185 L. Ed. 2d 242 (2013) (under the "American Rule," each litigant "pays his own attorney's fees,

win or lose, unless a statute or contract provides otherwise").  That principle will guide this Court's

calculation of Brown's hours under the lodestar formula.

In any event, Brown's efforts did generally benefit the Plaintiffs, just like those expended

by Gingold and the attorneys at Kilpatrick Stockton.  Brown, and the other original members of

the *Cobell* team, kept Plaintiffs' claims alive during the initial, often difficult years of the litigation.

His time records demonstrate that he drafted any number of motions and briefs at the direction of

Gingold or another supervisor, including those filed in many of the early skirmishes and all-out

battles in the case.  *See* Brown Reply at 107–08 ¶ 39.  That those efforts sometimes were expended

fighting unsuccessful battles indicates nothing more than the normal ebb and flow of any complex

litigation.  Accordingly, the Court will not exclude hours from Brown's fee petition based solely

on the bald assertion by Plaintiffs' counsel that the effort they represent provided no ultimate ben-

efit to the litigation, a showing more appropriate for a *quantum meruit* claim, not one sounding in

contract.  *See Dale Denton Real Estate, Inc. v. Fitzgerald,* 635 A.2d 925, 928 (D.C.1993) (claim

for *quantum meruit* is not sustainable where there is an express written agreement between the parties regarding the same subject matter); *see also Standley v. Egbert,* 267 A.2d 365, 368 (D.C. 1970) ("[Q]uantum meruit[] is not applicable when compensation of the parties is covered by an express written contract."). Such time includes the hours Brown spent on the Contempt II proceedings and other contempt-related issues, the Phase 1.5 trial, the IT Security trial (other than the time Brown spent drafting findings of fact and conclusions of law further addressed below), miscellaneous time on fee petitions, allegedly unused pleadings and memoranda,[23] and the "law review-style" memoranda.[24] While the undersigned finds that some of the time expended on each of these tasks was excessive, it believes that concern is best addressed as part of an overall deduction for lack of review for billing judgment, discussed further below.

Similarly, Plaintiffs incorrectly seek to import into the calculation of Brown's fee the concept of "prevailing parties," a requirement for awarding attorney's compensation in fee-shifting cases involving the government. *See Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.,* 532 U.S. 598, 602, 121 S. Ct. 1835, 1839, 149 L. Ed. 2d 855 (2001) ("Numerous federal statutes allow courts to award attorney's fees and costs to the 'prevailing party.'"). Such time includes the hours Brown spent on the Contempt II proceeding and the Phase 1.5 trial, in neither of which Plaintiffs prevailed. But Brown is not seeking an award under a fee-shifting

---

[23] Brown includes 155.818 hours of work spent on pleadings or memoranda that were never filed with the Court. Cobell Ex. 31 at 40–42; 5/25 Tr. 76:12–78:7; Cobell F&C at 40 ¶ 132. This time includes, for example, the hours Brown spent preparing a draft amended complaint which Plaintiffs ultimately decided was "potentially too dangerous and risky under the circumstances" to file because a change in the class claims might lead to reconsideration of the propriety of class certification. 4/22 Tr. 93:22–95:3.

[24] In 1999 and 2004, Brown prepared two detailed memoranda discussing several issues bearing on the case. *See* Brown Exs. 5–6. Plaintiffs referred to them as the "law review-style memos." The first memo dealt with *res judicata* issues and to what extent a court could modify its prior rulings. 4/20 A.M. Tr. 50:1–24. Brown drafted it after the first trial in 1999 at Gingold's request. *Id.* The other discussed statutory retroactivity and whether Congress could legislatively alter a court's rulings. *Id.* 68:3–69:6. This one was drafted in late 2004, again at Gingold's request. *Id.* 68:3–15, 70:9–17. Each memo was quite long; the *res judicata* memo was sixty-nine single-spaced pages, Brown Ex. 5, and the statutory retroactivity memo was 101 single-spaced pages, Brown Ex. 6.

statute where the concept of "prevailing party" is operative.  Rather, as the Court conceives his claim, he is seeking compensation from his client for services rendered pursuant to their engagement agreement.  In that context, Plaintiffs must compensate Brown for the number of hours he reasonably and necessarily incurred in the representation, regardless of whether those hours led to victory.

Brown's arguments are also not without their faults.  Throughout these proceedings, he has expended an inordinate amount of effort pointing to prior fee petitions filed by Plaintiffs' other counsel which, he claims, included hours identical to those to which Plaintiffs now object in his fee petition.  *See, e.g.,* 4/20 P.M. Tr. 243:7–21 (contending that Gingold had included time in interim fee petitions to the Special Master without exercising business judgment).  The alleged infirmities, if any, of past fee petitions are not before this Court.  Brown's burden is to demonstrate that the hours for which he now seeks compensation are, in fact, reasonable.  He does not satisfy that burden by pointing the finger at prior fee petitions filed by Plaintiffs' other counsel that might contain the same flaws.  Similarly unavailing is Brown's contention that Plaintiffs never previously questioned his time.  Even if true, this is of little moment.  To award to Brown all requested fees on the basis of a purported prior acquiescence by Plaintiffs – a proposition and characterization the Court finds dubious – would be to shirk the undersigned's duty to determine reasonable compensation for Brown in this matter.

With these caveats in mind, the Court turns to an assessment of Plaintiffs' specific objections to Brown's time records, by category.[25]

---

[25] For every objection lodged by Plaintiffs, their counsel undertook the work of attempting to identify hours falling into the category of the objection, including, for example, hours previously rejected in interim fee awards as being excessive or unreasonable by this Court or the Special Master.  *See* Cobell F&C at 29–36 ¶¶ 96–116, Cobell Exs. 32–35.  Brown's objection to the Court's employing those charts to craft Plaintiffs' fee award is denied.  Brown never challenged the accuracy of the hours in Plaintiffs' resulting charts other than by arguing more generally that they were

a.      Time Previously Compensated

To begin, Plaintiffs rightly contend that Brown improperly included in his original fee pe-

tition time which had previously been compensated through interim fee awards.  Brown belatedly

concedes this point in his post-hearing submission.  *Compare* Brown Pre-trial Brief [Dkt. 4189] at

18 (requesting fees with no deduction for interim fee awards), *with* Brown F&C at 29 ¶ 59 (re-

questing fees minus $200,575 in interim fee awards).  He does not now dispute that he has already

received $200,575 from various interim fee awards for 562.73 hours included in his fee petition.

Brown F&C at 29 ¶¶ 59–60.[26]  Brown should not have included this dollar amount in his fee

petition.  It will be deducted from his fee award here.

b.      Time Previously Excluded as Unnecessary, Unreasonable or
         Unsupported

Brown also improperly includes in his petition time that either this Court or the Special

Master previously refused to award as part of interim fee petitions because the hours were deemed

unnecessary, unreasonable or unsupported.  Brown attempts to justify the inclusion of this time in

his petition by claiming that it "had multiple uses" and could be compensated now even if it was

previously found wanting.  4/21 Tr. 65:22–66:2; *id.* 72:2–16.  Brown provides no further explana-

tion as to what he means.

The Court finds Brown's argument to be vague and unpersuasive.  Like the hours previ-

ously compensated, hours found unnecessary or unreasonable as part of a prior interim fee award

---

created by one of Plaintiffs' counsel, Dorris, a witness "with substantial bias and interest in the outcome of the litiga-
tion."  Brown Reply at 61 ¶ 116; Cobell F&C at 30 ¶ 97.  The Court has compared Plaintiffs' charts to Brown's time
records, and finds them to be an accurate source of information with respect to the categories of information they
purport to contain.

[26] Plaintiffs assert that Brown was awarded $279,164.79 for 771.581 hours of work, but concede that $78,589.52 of
that amount, representing 208.851 hours of work – Brown's share of the GAO/Erwin awarded – was withheld by the
Plaintiffs and never paid to Brown.  Cobell F&C at 36, ¶ 116; Cobell Reply at 21.  Once these 208.851 hours are
subtracted, there remain 562.73 hours of work for which Brown has received compensation.

have no place in Brown's petition now and should have been excised prior to its being filed.  The

passage of time does nothing to make the expenditure of these hours any more satisfactory.  All

such hours will be deducted from Brown's fee award.

As for the hours previously deemed unsupported as part of an interim fee award, this Court

previously held in this case that a fee petitioner's failure to provide timely, detailed documentation

in support of a request for compensation waives any claim of compensation for those hours.  *See*

*Cobell v. Norton*, 231 F. Supp. 2d 295, 307–08 (D.D.C. 2002).  The undersigned sees no reason to

deviate from that ruling now.  Fee petitions are time consuming enough for the parties and for

courts without allowing petitioners multiple bites at the apple.  Petitioners bear the burden of

providing a fully-supported, reasonable petition for all hours for which they seek compensation.

Their failure to do so when they first petition for a fee award is a failure of proof and rightly works

a waiver with respect to the hours deemed unsupported.

The undersigned has reviewed Brown's time records and the prior interim fee awards of

this Court and the Special Master.  For the reasons stated above, it will deduct the following hours

from Brown's fee award, all of which were previously found either unnecessary, unreasonable, or

unsupported:

- 194.399 hours found excessive or otherwise reduced for inadequate documentation and/or block billing as part of the 2004 Phase 1.0 EAJA fee award.  *See Cobell v. Norton*, 407 F. Supp. 2d 140, 194 (D.D.C. 2005).

- 93.15 hours found excessive as part of the 2002 Infield fee award.  *See* Cobell Ex. 20.

- 40.3 hours found either excessive or unsupported as part of the 2002 sanctions fee award.  *See Cobell v. Norton*, 231 F. Supp. 2d 295, 306, 307–08 (D.D.C. 2002).[27]

---

[27] Plaintiffs seek to exclude 32.75 hours submitted with the 2002 sanctions fee petition, time that was excluded when Brown "failed to provide any . . . detailed time record supporting [his] request," and so was found to have waived his right to compensation for that time.  Cobell F&C at 33 ¶ 108; *Cobell v. Norton*, 231 F. Supp. 2d 295, 307–08 (D.D.C.

c.      IT Security Trial Findings Time

Plaintiffs also seek to deduct from Brown's fee award all of the time he spent drafting

proposed findings of fact and conclusions of law with respect to the IT Security trial – a total of

198.891 hours.  According to Plaintiffs, Gingold expressly told Brown to have no involvement in

drafting the findings of fact and conclusions of law, a fact that Brown does not dispute.  Brown

Ex. 14 at 1–2; Brown Reply at 64 ¶ 123.  Further, Judge Lamberth ordered that no proposed find-

ings or conclusions be submitted by the parties following the trial.  4/21 Tr. 14:4–18; 4/22 Tr.

166:13–167:1.  Brown nevertheless spent nearly five weeks drafting those same documents.  He

now attempts to justify his efforts by arguing that he was under an obligation to keep up with "what

was occurring in [the] trial."  Brown Reply at 64 ¶ 123.  But his argument ignores the obvious

distinction between keeping up with a trial by monitoring filings and transcripts – the need for

which itself was doubtful given his suspension from the trial team in May 2005 – and actually

drafting findings and conclusions, which Gingold specifically instructed him not to do.  Because

his efforts were entirely unnecessary and wasteful, all 198.891 hours he spent doing so will be

excised from his fee award.

---

2002).  In the same decision, however, this Court also reduced Brown's Trade Secrets Motion hours by 20%, excluding
7.55 hours as excessive.  *Cobell*, 231 F. Supp. 2d at 306.  Therefore, a total of 40.3 hours are properly excluded.

Plaintiffs also seek to exclude 197.387 hours submitted as part of the GAO and Erwin fee petition.  This time will not
be disallowed because it is clear from the transcript of the May 14, 2007 hearing that those hours were excluded from
the GAO/Erwin fee award, not because they were unnecessary or unreasonable, but because they were outside the
scope of Judge Lamberth's narrow order authorizing the filing of the petition related to the Erwin deposition.  May
14, 2007 Prehearing Conference [Dkt. 3328] at 4:21–5:22.  Similarly, the Court will not disallow the 27.33 hours of
Mr. Brown's time, the government's objection to which Judge Robertson sustained.  June 5, 2007 Order [Dkt. 3338]
at 2.  The basis of the government's objection was not that the time was unreasonable or unnecessary, but that it was
outside the scope of the original sanctions order.  Defendants' Objections to Plaintiffs' Notice of Filing Restated Fees
and Expenses [Dkt. 3337], at 2.

d.   Database Management and Clerical Work

Plaintiffs also seek to deduct all of Brown's hours related to his performing administrative tasks while on the *Cobell* team.  They have identified 230.92 hours from his records that include time related to his maintenance of document and note taking databases[28] and other clerical work. Cobell F&C at 39 ¶ 127; 4/21 Tr. 15:14–22:4; Brown Ex. 3; Cobell Ex. 30.  Because many of the entries are block billed, containing both administrative and attorney tasks, calculation of the precise number of hours Brown spent on non-attorney tasks is not possible.  5/25 Tr. 62:9–64:22.  To address this problem, Plaintiffs submit that excising 50 percent of the 230.92 hours from his fee award should fairly capture Brown's administrative work.  Cobell F&C at 39 ¶ 127.

Because administrative or clerical tasks cannot be reasonably billed at a rate appropriate to a paralegal, much less an attorney's rate, they are properly excluded from Brown's fee award.  *See Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 973 (D.C. Cir. 2004).  As this Court recently put it, a "Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn."  *Commodity Futures Trading Comm'n v. Trade Exch. Network Ltd.*, 159 F. Supp. 3d 5, 9 (D.D.C. 2015). Brown does not dispute this legal conclusion.  Nor does he make any argument that the tasks Plaintiffs identified in his time records rose to the level of paralegal work, much less that they required an attorney's attention.  And, although he disputes the 50 percent reduction offered by Plaintiffs, he does not suggest any other method to address the problem created by his use of block billing.  *See* Brown Reply at 65.

---

[28] Brown maintained two databases, one for housing documents produced by the government and the other for note taking.  4/20 A.M. Tr. 97:17–98:5; 4/21 Tr. 17:21–19:14.  Others on the team, including Dorris and Smith, testified that they never saw or used the database and that it provided no benefit to the litigation team.  5/25 Tr. 19:14–20. Brown admitted that the note taking database was for his use as a memory aid and was not used by other members of the team.  4/21 Tr. 19:15–20:12.

The Court has reviewed the relevant time entries at issue and reaches the same conclusion as Plaintiffs.  Each contains administrative or clerical work that should be excised from Brown's fee award, but the precise time spent on the administrative task is impossible to determine because of Brown's use of block billing.  Block billing is disfavored in this jurisdiction precisely because it makes review of the reasonableness of an attorney's hours difficult.  *See, e.g., Role Models*, 353 F.3d at 973 (fifty-percent reduction where documentation was inadequate in a number of ways, including block billing); *Williams v. Johnson*, 174 F. Supp. 3d 336, 349 (D.D.C. 2016) (denying compensation entirely for block-billed entries); *Cobell v. Norton*, 407 F. Supp. 2d 140, 166 (D.D.C. 2005) (twenty-percent reduction where documentation was inadequate in a number of ways, including block billing).  Again, it is the fee petitioner's burden to submit time records that demonstrate the reasonability of the hours seeking to be compensated. Brown's failure to do so here with respect to the administrative and clerical tasks identified by Plaintiffs, justifies excising 50 percent of the total time entries at issue – 115.461 hours – from his fee award.

e.      Attorney Conferences

Plaintiffs also seek to deduct from Brown's fee award all time he spent attending attorney conferences during his years on the *Cobell* team.  Plaintiffs have identified entries on his time records totaling 546.97 hours which include, at least in part, time for such conferences.  Cobell F&C at 40 ¶ 131.  Plaintiffs cite to no authority, however, for the proposition that it is unreasonable for a private attorney to bill his client for attorney conferences.  While it may be true that private clients dislike being charged for expensive attorney conferences resulting in no tangible product, "oversight, collaboration and communication among attorneys . . . is necessary in any complex case," especially one as complicated as the *Cobell* litigation.  *Blackman v. Dist. of Columbia*, 56 F. Supp. 3d 19, 29 (D.D.C. 2014).  In many instances, "brainstorming among attorneys is precisely

the sort of work that counsel should do." *Pigford v. Vilsack*, 146 F. Supp. 3d 137, 144–45 (D.D.C. 2015).  Absent a more substantive objection, the Court will not deny Brown payment for attorney conferences in which he participated.

f.       Pre-Engagement Time

Finally, Plaintiffs object to the payment of the 82.208 hours included in Brown's fee petition that predate his March 3, 2000 execution of his engagement letter with Plaintiffs.  Cobell F&C at 39 ¶ 128.   According to Plaintiffs, all work performed before that point cannot properly be compensated.  5/25 Tr. 71:13–72:12

Brown testified that his conversations with Gingold about joining the team "firmed up" in the fourth quarter of 1999, 4/20 A.M. Tr. 25:20–21, before he left his firm in January 2000 to join the litigation team, *id.* 21:12–16; 28:17–29:13.  He accepted Eloise Cobell's offer to join the team in January 2000, resigned his position in California, and moved to Washington, D.C. to work on the *Cobell* matter full-time.  4/20 A.M. Tr. 21:12–16, 25:3–11, 28:17–29:13. He began working on the case ten days before the end of February.  *Id.* 40:3–9.  He understood his engagement to begin at the time he started doing that work even though he had not yet executed the engagement letters.  *Id.* 40:25–41:3.  By the time the agreement was signed, he had already moved to the District of Columbia and had done what he characterizes as "a little work."  *Id.* 38:24–39:1.  The Plaintiffs provided no testimony contradicting these statements.

The Court credits Brown's representation that he was in fact working for Plaintiffs in the weeks prior to the formal execution of his engagement letters.  Accordingly, the Court will not deduct from his fee award the 82 hours of work on the case he performed prior to March 3, 2000.

g.      Lack of Review for Reasonableness or Billing Judgment

Plaintiffs properly fault Brown for failing to exercise any billing judgment to ensure the reasonableness of his time records prior to submitting them in support of his petition.  Cobell F&C at 29 ¶¶ 94–95.  Brown contends that as he was contemporaneously entering his time he would exclude travel time, work performed while traveling, and "short" work-related discussions.  4/20 P.M. Tr. 200:21–201:6.  But when he compiled his hours for submission in support of his fee petition, he failed to review his time entries for duplication, reasonableness, and appropriateness, as was his burden.  *See Blackmun v. District of Columbia,* 397 F. Supp. 2d 12, 14 (D.D.C. 2005) (sound billing judgment requires that legal matters are "appropriately staffed to do the work required efficiently and without duplicative billing").  As a result, he did not remove any hours from his time records but transferred each and every one into his submission, correcting only typographical errors and expanding abbreviations.  4/20 P.M. Tr. 239:3–18, 248:4–15.

Brown calls this method of compiling his time an "intelligent review process."  *Id.* at 239:11.  Whatever you call it, it was neither the exercise of billing judgment nor a review for reasonableness, a process with which Brown is familiar given that he engaged in it prior to submitting multiple interim fee petitions in this case.[29]

Indeed, it would appear that Brown seeks to foist onto the Court the grunt work of reviewing his 481 pages of records and of separating compensable from noncompensable time.  *See, e.g.,* 4/21 Tr. 73:19–24.  But it is not the business of the Court to "comb through endless lists of billing

---

[29] In an affidavit filed in mid-2004 in connection with a petition for an interim fee award, Brown averred that he "exercised business judgment by excising time entries [he] felt were duplicative, unproductive, or not within the scope of the order awarding fees."  Cobell Ex. 9 at 50; *see also* 4/21 Tr. 53:5–17 (Brown testifying that his affidavits in other interim fee applications contained attestations regarding billing judgment similar to that in the mid-2004 affidavit).  No such averment accompanies the fee petition presently before this Court.

entries to gather data" the petitioner has "not seen fit to make clear," or to separate noncompensable time from compensable time. *Am. Immigration Council v. United States Dep't of Homeland Sec.*, 82 F. Supp. 3d 396, 414 (D.D.C. 2015). "[H]ad judges desired to don green eyeshades instead of robes, they would not have gone to law school." *Id.*

Given his failure to engage in the excise of any review for reasonableness of 481 pages of time records, it would be within the discretion of this Court to deny Brown any award at all. *See Environmental Defense Fund, Inc. v. Reilly,* 1 F.3d 1254, 1258 (D.C. Cir. 1993) ("We may deny in its entirety a request for an 'outrageously unreasonable' amount lest claimants feel free to make 'unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place.'") (citation omitted). The Court believes it would be "unduly harsh" to deny an award altogether where, as here, the fee the award would be measured in the millions of dollars for a period of service spanning five years. *See* In re *N.*, 11 F.3d 1075, 1081 (D.C. Cir. 1993).

Nevertheless, in determining a reasonable fee in such a situation, this Court need not do what Brown failed to do and engage in "line-item supervision of billing practices." *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, No. CV 13-260 (JEB), 2016 WL 3919810, at *4 (D.D.C. July 18, 2016). Rather, identifying a pervasive problem with a fee petition, this Court has the discretion to impose a reasonable percentage reduction to the petition as a whole. *See Shaw v. D.C.*, No. 15-CV-927-RCL, 2016 WL 5660222, at *5 (D.D.C. Sept. 28, 2016) (reducing fee award by 10%); *see also Kennecott Corp. v. E.P.A.*, 804 F.2d 763, 767 (D.C. Cir. 1986) (15% reduction); *Williams v. Johnson*, 174 F. Supp. 3d 336, 354 (D.D.C. 2016) (50% reduction); *Craig v. D.C.*, No. 11-CV-1200 (RC), 2016 WL 3926253, at *9 (D.D.C. July 15, 2016) (20% reduction).

Here, as previously noted, Brown's time records include plainly noncompensable time that would have been excised by even the most cursory review for reasonableness.  Given the egregious examples noted above, the Court has no confidence that a significant portion of the remainder of his time entries do not suffer from similar infirmities.  Indeed, the undersigned's review of Brown's time records confirms that, on their face, they suffer from repeated instances of insufficient detail, duplication and excessiveness.  To name only a few such examples, there are numerous entries which lack the detail necessary to assess their reasonableness, including time blocks described only as "review miscellaneous pleadings," "review miscellaneous emails/articles/review webpage," "review documents produced," "office conference with team re: strategy," or "telephone conference with Mr. Harper."  Further, there are entries where the effort expended is plainly excessive, including days and days spent researching issues or drafting briefs.[30]  Finally, there appear to be duplicative time entries as well.[31]

For all of these infirmities, the Plaintiffs propose a 20 percent overall reduction of Brown's time, in addition to the specific deductions addressed above.  *See* 5/26 Tr. 80:18–81:5.  Given the record presented in these proceedings, the undersigned believes that such a reduction is reasonable, if not generous.  It is also consistent with this Court's prior evaluations of what appears to be a subset of the time records at issue.  *See Cobell v. Norton*, 407 F. Supp. 2d 140, 166 (D.D.C. 2005) (applying a 20 percent overall reduction to Plaintiffs' requested hours as part of interim fee award because the time records of Brown and his co-counsel "suffer in the main from insufficient detail and excessiveness").  Accordingly, the Court will not perform an item-by-item accounting of

---

[30] For example, in one span between January 17 and March 26, 2014, 65 entries totaling 143.234 hours are devoted to the issue of a bench subpoena.  *See* Brown Ex. 4 at 402–16.

[31] For example, two entries on September 3, 2002 for 1.416 hours are recorded for working on a "motion to continue contempt opposition," and two entries are recorded on August 29, 2002 for 1.75 hours to "Prepare Res Judicata Motion."

Brown's voluminous time records, but, for the foregoing reasons, will reduce his fee award by 20 percent in addition to the specific reductions noted above.

### 3. *Consideration of Total Fees Payable to Legal Counsel*

As a final step, Brown's engagement letter requires that payment to a withdrawing attorney also "tak[e] into account the total fees payable to legal counsel." Brown Ex. 2 at 2. Having done so, the Court finds no further adjustment of Brown's compensation is justified.

According to Plaintiffs, non-withdrawing counsel have received, *in toto*, $103,234,804.62 in pre- and post-settlement awards. 5/25 Tr. 115:10–122:24. Dorris estimated, however, that when measured by their hours expended on the case, non-withdrawing class counsel had "invested" an effort worth $110,862,463.68 as of May 3, 2016. *Id.* He also estimated that, to complete the representation, the attorneys at Kilpatrick Stockton would incur additional time worth approximately $750,000, resulting in a total investment of $111,612,463.68. *Id.* He characterized the difference between non-withdrawing counsel's total investment in the case and their compensation to date – approximately $8 million – as a "loss." *Id.* Since Kilpatrick Stockton is the only firm still representing Plaintiffs at this point – and thus the only firm that would receive any fees left over in the escrow account after Brown's award is deducted – Dorris performed a similar loss calculation for Kilpatrick Stockton only. *Id.* Based on that calculation, he claims that Kilpatrick Stockton itself stands to lose approximately $7 million in the representation. *Id.*; Cobell Ex. 46–47; Cobell F&C at 41–42 ¶¶ 138–41.

Based on these estimates, Plaintiffs argue that it would be unfair to compensate Brown, who left the representation, prior to compensating fully the Kilpatrick Stockton attorneys, who did not. Of course, fully compensating Kilpatrick Stockton based on Dorris' estimates would result in Brown receiving no compensation at all: however calculated, Brown's fee would not exceed

Kilpatrick Stockton's estimated $7 million deficit. It would be inequitable, however, to provide more compensation to Kilpatrick Stockton while leaving Brown with nothing, especially given Brown's own "investment" in the representation and the very significant payout the attorneys at Kilpatrick Stockton have already received.

Moreover, Dorris' estimate of non-withdrawing class counsel's investment suffers from many of the same infirmities that afflict Brown's fee petition. It is only after correcting for these infirmities that a fair comparison between the compensation of Brown and non-withdrawing class counsel can be made. The Court need only identify one such defect to show the weakness of Plaintiffs' position. Dorris' estimate of non-withdrawing attorneys' investment in the representation is based on time records submitted in support of the lodestar cross-check, a measure used by Judge Hogan to assess the reasonableness of the common fund fee payment made to non-withdrawing counsel in 2011. *See* 5/25 Tr. 132:23–133:11. As Dorris conceded during the hearing, however, those time records, like Brown's, were subject to little or no review for billing judgment. Dorris readily admitted that the cross-check was merely intended to reflect class counsel's total time investment in the case and was not intended to satisfy the requirements for billing that time to a client on an hourly basis. 5/25 Tr. 12:25–13:22 (noting that a lodestar cross-check is "not to be a full-blown line-by-line sort of check," but rather is "for the purpose of giving the Court a sense of the gross effort that the attorneys were making"). Dorris stated that review of the attorneys' pre-settlement time for purposes of the cross-check was limited to a cursory inspection of the time entries to ensure there was an adequate description of the work done and that it was, in some general sense, reasonable to the task. *Id.* 13:23–14:2. It did not include "the further step of 'and would you bill this time on an hourly basis to a client.'" *Id.* 14:3–4; *see also id.* 224:3–225:5 (Dorris opining that Kilpatrick Stockton was not, through the lodestar cross-check, requesting that

the Court pay for every hour included therein).  Gingold, for his part, agreed with this description, noting that his time in the cross-check was submitted without a detailed qualitative judgment about the propriety of billing for particular hours.  4/22 Tr. 78:23–79:6.

Accordingly, a like-for-like comparison of Brown's award to that of non-withdrawing counsel requires adjusting downward the latter's estimates to account for the absence of billing judgment in the underlying time records.  Reducing the non-withdrawing attorney's total invest-ment figure by the same 20 percent by which the Court reduced Brown's petition for lack of billing judgment results in an adjusted total investment by the non-withdrawing attorneys of $89,289,970.40, down from the estimated $111,612,463.68 that Dorris says Kilpatrick Stockton will incur to complete the representation.  Further, because of the Court's deductions from Brown's fee petition, Kilpatrick Stockton will now receive an additional $2,638,817.21 from the amount being held in escrow to cover any fee payment to Brown.[32]  This brings the total fees to be paid to the non-withdrawing attorneys to $105,873,621.83, $16,583,650.43 in excess of their "invest-ment" when adjusted for lack of billing judgment.

These figures are necessarily rough, as were Dorris' original estimates.  Nevertheless, the Court is confident, based on them and the entire record of these proceedings, that by any reasonable measure, the attorneys at Kilpatrick Stockton made out just fine in their representation of Plaintiffs. And so now has Brown.  Accordingly, having considered the total fees payable to non-withdrawing counsel, Brown's compensation will not be further adjusted.

---

[32] An amount of $13,616,250.84 was originally placed in escrow pending resolution of attorney's fees and expenses by NARF and Brown.  Order Granting Final Approval to Settlement at 10 [Dkt. 3850].  Of that amount, $6,000,000 was paid to NARF and $2,098,821.11 was paid to Kilpatrick Stockton.  Order Authorizing Payment of Certain Pre-Settlement Attorneys' Fees [Dkt. 4122].  After these payments, $5,517,429.73 remained in escrow for potential pay-ment to Brown.

**F.**     **Total Fee Award**

| | |
|---|---|
| Total hours claimed | 11485.690 |
| Time previously paid | 562.73 |
| Hours previously excluded as unnecessary, unreasonable or unsupported | |
| 2002 Sanctions fee request | 40.300 |
| 2002 Infield fee request | 93.150 |
| 2004 EAJA fee request | 194.399 |
| GAO/Erwin fee petition | 0.000 |
| Time resulting in limited benefit to the plaintiff class | |
| IT Security trial proposed findings of fact and conclusions of law | 198.891 |
| Database management, administrative and clerical work | 115.461 |
| | |
| Hours remaining after deductions | 10280.759 |
| 20% deduction for lack of billing judgment or review for reasonableness | 2056.1518 |
| Adjustment based on assessment of total fees payable to non-withdrawing counsel | 0 |
| | |
| Compensable hours | 8224.6072 |
| Rate | $350/hour |
| Compensation | $2,878,612.52 |

## CONCLUSION

For the reasons stated above, Mark Brown's petition for attorney's fees [Dkt. 3699] will be **GRANTED IN PART** and **DENIED IN PART**.  The Court will award Brown a total of **$2,878,612.52** to be paid from the portion of the total attorney's fees award in this matter that is currently being held in escrow.  The rest will be paid to class counsel.

An appropriate Order accompanies this Memorandum Opinion.


Date:  January 31, 2017

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE